# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

THE STATE OF ARIZONA,
By and through its Attorney General,
MARK BRNOVICH;

THE STATE OF LOUISIANA,
By and through its Attorney General,
JEFF LANDRY;

THE STATE OF MISSOURI,
By and through its Attorney General,
ERIC S. SCHMITT;

THE STATE OF ALABAMA,
By and through its Attorney General,
STEVE MARSHALL;

THE STATE OF ALASKA,
By and through its Attorney General,
TREG R. TAYLOR;

THE STATE OF ARKANSAS,
By and through its Attorney General,
LESLIE RUTLEDGE;

THE STATE OF FLORIDA,
By and through its Attorney General,
ASHLEY MOODY;

THE STATE OF GEORGIA,
By and through its Attorney General,
CHRISTOPHER M. CARR;

THE STATE OF IDAHO,
By and through its Attorney General,
LAWRENCE G. WASDEN;

THE STATE OF INDIANA,
By and through its Attorney General,
TODD ROKITA;

THE STATE OF KANSAS,
By and through its Attorney General,
DEREK SCHMIDT;

CIVIL ACTION NO. 6:22-cv-01130-DCJ-CBW

1

THE COMMONWEALTH OF KENTUCKY,
By and through its Attorney General,
DANIEL CAMERON;

THE STATE OF MISSISSIPPI,
By and through its Attorney General,
LYNN FITCH;

THE STATE OF MONTANA,
By and through its Attorney General,
AUSTIN KNUDSEN;

THE STATE OF NEBRASKA,
By and through its Attorney General,
DOUGLAS J. PETERSON;

THE STATE OF OKLAHOMA,
By and through its Attorney General,
JOHN M. O'CONNOR;

THE STATE OF SOUTH CAROLINA,
By and through its Attorney General,
ALAN WILSON;

THE STATE OF UTAH,
By and through its Attorney General,
SEAN D. REYES;

THE STATE OF WEST VIRGINIA,
By and through its Attorney General,
PATRICK MORRISEY;

THE STATE OF WYOMING,
By and through its Attorney General,
BRIDGET HILL;

PLAINTIFFS,

v.

MERRICK GARLAND in his official capacity
as Attorney General of the United States of
America;

The UNITED STATES DEPARTMENT OF
JUSTICE;

2

DAVID NEAL in his official capacity as Acting
Director of the Executive Office for Immigra-
tion Review;

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW;

ALEJANDRO MAYORKAS in his official ca-
pacity as Secretary of Homeland Security;

The UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;

CHRIS MAGNUS in his official capacity as Sen-
ior Official Performing the Duties of the Com-
missioner of U.S. Customs and Border Protec-
tion;

U.S CUSTOMS AND BORDER PROTEC-
TION;

TAE JOHNSON in his official capacity as Sen-
ior Official Performing the Duties of Director of
U.S. Immigration and Customs Enforcement;

U.S. IMMIGRATION AND CUSTOMS EN-
FORCEMENT;

UR M. JADDOU in her official capacity as Di-
rector of U.S. Citizenship and Immigration Ser-
vices;

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES;

RAUL ORTIZ in his official capacity as Chief of
the U.S. Border Patrol;

U.S. BORDER PATROL;

The UNITED STATES OF AMERICA;

DEFENDANTS.

**FIRST AMENDED COMPLAINT**

The States of Arizona, Louisiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, Utah, West Virginia, and Wyoming bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.      This is a suit to enforce bedrock requirements of immigration and administrative law.

2.      On March 29, 2022, Defendants published an Interim Final Rule (the "Asylum IFR" or "Rule"), 87 Fed. Reg. 18,163 (Mar. 29, 2002). That Rule eviscerates crucial safeguards to our nation's immigration system and flouts clear statutory commands enacted by Congress. Defendants' Asylum IFR makes it substantially easier for unauthorized economic migrants to enter the United States and obtain asylum through false claims. For example, Immigration Judges ("IJs") within the Department of Justice's ("DOJ") Executive Office of Immigration Review ("EOIR") have adjudicated nearly all asylum claims, whereas Asylum Officers ("AOs") within the Department of Homeland Security ("DHS") have had the authority only to conduct an initial screening of aliens' asylum claims, called a "credible fear" review. 8 U.S.C. § 1225(b)(1)(B). In direct violation of statute, the Asylum IFR empowers asylum officers to conduct final adjudication of asylum claims arising from the border.

3.      Defendants effectuate this change even though, under our current system, less than 15 percent of all asylum claims that pass DHS's notoriously lax initial credible fear review are ultimately approved by IJs. EOIR review—conducted through an adversarial process in which an alien's case is subjected to vigorous scrutiny—thus provides an essential safeguard against granting fraudulent and otherwise unmeritorious asylum claims, which the Asylum abolishes. The entirely predictable result will be a substantial increase in the approval rate of non-meritorious asylum claims. And that increase in approval rates will incentivize even higher rates of illegal immigration into the United States.

4

4.      This is, however, from Defendants' perspective almost certainly a feature and not a bug in the plan. Indeed, these same Defendants have in the past fifteen months taken innumerable actions that have resulted in both increasing unlawful crossings into the United States and the loss of operational control over the southwestern border. The Asylum PFR continues that trend.

5.      The Asylum IFR would thus substantially remove DOJ from the review process. In doing so, the rule would largely transfer authority from immigration judges, who have a level of independence from political officials, to Asylum Officers, who are far more susceptible to political control within the Administration.

6.      Compounding these problems, the Asylum IFR eliminates the adversarial nature of the adjudication of asylum claims arising from the border, continues to guarantee to aliens the right to be represented by counsel during asylum determinations, and eliminates any equivalent representation for the interests of American citizens in preventing the granting of fraudulent and meritless asylum claims.

7.      The net result of all of these changes is to violate numerous statutory requirements that the Asylum Rule purports to "implement," including the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., the Homeland Security Act ("HSA"), Pub. L. No. 107-296 (2002), and the Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat 2638 (2006).

8.      When Congress created DHS by adopting the HSA in 2002, it stated explicitly that DOJ would continue to "have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date." 8 U.S.C. § 1103(g)(1); *see Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (The "Homeland Security Act expressly provides that the Attorney Gen-

eral has authority over certain immigration functions specifically relating to immigration courts"). Before Congress passed the HSA, EOIR adjudicated the asylum claims arising out of the credible fear process that the Asylum IFR purports to re-assign to DHS. Defendants repeal this clear statutory allocation of authority by mere regulation. In doing so, Defendants have usurped Congress's authority by rewriting statutory law in the guise of interpreting it.

9.     The predictable result of the Asylum IFR is more lawlessness at the southern border, leaving the States to shoulder the enormous costs of Defendants' destructive policies and a border beset with ever more horrifying levels of cartel violence and other security threats.

10.     The Asylum Rule's substantive legal violations are equally matched by its procedural infirmities. Defendants' promulgation of that rule violates the Administrative Procedure Act ("APA") many times over.

11.     For example, Defendants violated the APA's notice-and-comment requirements by engaging in a patent bait-and-switch. Defendants published the notice of proposed rulemaking ("NPRM") for the Asylum IFR on August 20, 2021. The Asylum IFR makes an astounding 23 substantive changes to the NPRM, fundamentally altering it. The end result is an interim-final rule that is radically different from what was proposed to the public and on which the public submitted comments.

12.     These changes to the Asylum IFR are not "logical outgrowths" of the NPRM—particularly when considered cumulatively. The Asylum IFR accordingly violates the APA. Indeed, Defendants themselves backhandedly acknowledge as much by issuing the rule as an Interim Final Rule and seeking further comment—which would hardly be necessary if the Asylum IFR bared even passing resemblance to the proposed rule.

13.     As the D.C. Circuit has explained, "'if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal,'"

and the rule thus violates the APA. *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) (citation omitted). And here merely skimming Defendants' *3,100-plus-word summary* of the *23 major changes* they made from the proposed rule is sufficient to conclude that the deviations here wildly exceed that "deviates too sharply" standard.

14. Indeed, Defendants remarkably felt compelled to claim they "are in compliance with the APA's notice-and-comment requirements with respect to these changes *because each change is a logical outgrowth of the proposals set forth in the NPRM*." 87 Fed. Reg. at 18,195 (emphasis added). But that suspiciously specific denial reads more like a confession than a defense of the Rule. Agencies that have properly complied with the APA typically have no need to offer such unintentionally self-aware statements; nor do they gratuitously engage in a second round of purportedly unnecessary notice-and-comment rulemaking.

15. If Defendants' actions and perfunctory defenses seem extraordinary, that's because they are. Defendants understandably cannot quite hide their unease with the sheer volume of changes they have made in the Asylum IFR. APA violations rarely come so patent, and Defendants' illuminating inability to maintain their poker faces is amply apparent even from the face of the Rule itself.

16. The Asylum IFR also violates the APA because it is arbitrary and capricious. Among other violations, the Rule fails to—indeed explicitly *refuses to*—address reliance interests in the prior system, fails to consider costs it will impose on the States, fails to consider obvious alternatives, and fails to explain adequately departures from past practices.

17. The Asylum IFR also fails to consider the interaction between it and the announced termination of the Title 42 Orders, which even the Administration admits will cause a *massive* increase in unlawful border crossings and asylum claims.

18. With benefit of a month of hindsight, it is now obvious that it is no coincidence that the Title 42 Orders are set to be rescinded on May 23, 2022, and the Asylum IFR will become effective

eight days later. There are obvious interactions between the two enormously important rules that have not been considered by Defendants in the slightest—at least formally in the Rule itself. But that hardly means that Defendants have not considered the interactions furtively. For example. the Administration itself predicts that the number of illegal border crossings will nearly triple because of aliens taking advantage of the cancellation of Title 42. There is strong reason to suspect that the Administration will attempt to handle the predicted explosion in unlawful crossings by employing the unlawfully lenient standard of the Asylum IFR, thus mass-dispensing asylum.

19.    At a bare minimum, Defendants were required by the APA to consider how these two concurrent, *enormous* changes in immigration policy might interact with each other, but have not expended a *single word* in doing so.

20.    Arizona, as a border state, will be directly affected by Defendants' decision to ignore the law. The Asylum IFR will exacerbate the serious drug trafficking problems associated with illegal immigration that have afflicted communities across the State. Drug trafficking and the resulting drug-related crime and drug use threaten public safety and put a strain on Arizona's limited law enforcement resources. Moreover, the Asylum IFR will create a flood of migrants into the State asserting non-meritorious asylum claims that will nonetheless be granted, which will further stress hospitals, schools, jails, and other social services at the local and county level.

21.    All Plaintiff states will also be directly affected by Defendants' decision to abdicate their legal obligations. The Asylum IFR is part of a wider pattern of Defendants' refusal to enforce immigration laws either faithfully or adequately. These practices have incentivized, and the Asylum IFR will incentivize even further, an unprecedented level of illegal border activity, including a record influx of fentanyl at the southern border, which is trafficked into communities nationwide. Plaintiffs' law enforcement officers must confront rising crime as from the aliens the Asylum IFR will bring into

the country, and the States' social services will face stresses beyond those they are already facing be-cause of the COVID-19 pandemic.

22.     Furthermore, the Asylum IFR purports to reserve residual regulatory authority to adopt additional regulations outside of the APA's notice-and-comment requirements by promulgating so-called future "guidance" that would purport to empower DHS to parole aliens into the United States in violation of the INA's commands, essentially setting out a welcome mat for unauthorized aliens crossing the border, rather than detaining them as Congress has commanded. *See* 8 U.S.C. § 1225(b) (requiring detention of aliens awaiting adjudication of their asylum claim and aliens who are "not clearly and beyond a doubt entitled to be admitted," unless narrow exceptions apply).

## PARTIES

23.     Plaintiff State of Arizona is a sovereign state of the United States of America. Arizona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in pro-tecting its citizens. Arizona brings this suit through its Attorney General, Mark Brnovich. He is the chief legal officer of the State of Arizona and has the authority to represent the State in federal court. His offices are located at 2005 North Central Avenue, Phoenix, Arizona 85004.

24.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Loui-siana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Louisiana brings this suit through its Attorney General, Jeff Landry. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

25.     Plaintiff State of Missouri is a sovereign State of the United States of America. Mis-souri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Missouri brings this suit through its Attorney General, Eric S. Schmitt. He is

authorized by Missouri law to sue on the State's behalf. His address is P.O. Box 899, Jefferson City, Missouri 65102.

26.     Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Alabama brings this suit through its Attorney General, Steve Marshall. He is authorized by Alabama law to sue on the State's behalf. His address is 501 Washington Avenue, P.O. Box 300152, Montgomery, Alabama 36130-0152.

27.     Plaintiff State of Alaska is a sovereign State of the United States of America. Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Alaska brings this suit through its Attorney General, Treg R. Taylor. He is authorized by Alaska law to sue on the State's behalf. His address is 1031 West 4th Avenue, Suite 200, Anchorage, Alaska 99501-1994.

28.     Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Arkansas brings this suit through its Attorney General, Leslie Rutledge. She is authorized by Arkansas law to sue on the State's behalf. Her address is 323 Center Street, Suite 200, Little Rock, Arkansas 72201.

29.     Plaintiff State of Florida is a sovereign State of the United States of America. Florida sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Florida brings this suit through its Attorney General Ashley Moody. She is authorized by Florida law to sue on the State's behalf. Her address is The Capitol, Pl-01, Tallahassee, Florida 32399-1050.

30.     Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Georgia brings this suit through its Attorney General, Christopher M. Carr. He is authorized by Georgia law to sue on the State's behalf. His address is 40 Capitol Square, S.W., Atlanta, Georgia 30334.

31.     Plaintiff State of Idaho is a sovereign State of the United States of America. Idaho sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Idaho brings this suit through its Attorney General, Lawrence G. Wasden. He is authorized to sue on the State's behalf. His address is P.O. Box 83720, Boise, Idaho 83720-0010.

32.     Plaintiff State of Indiana is a sovereign State of the United States of America. Indiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Indiana brings this suit through its Attorney General, Todd Rokita. He is authorized by Indiana law to sue on the State's behalf. His address is 302 W. Washington Street, I.G.C.S – 5th Floor, Indianapolis, IN 46204.

33.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Kansas brings this suit through its Attorney General, Derek Schmidt. He is authorized by Kansas law to sue on the State's behalf. His address is 120 SW Tenth Avenue, 3rd Floor, Topeka, Kansas 66612-1597.

34.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Kentucky brings this suit through its Attorney General, Daniel Cameron. He is authorized by Kentucky law to sue on the State's behalf. His address is 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601.

35.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Mississippi sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Mississippi brings this suit through its Attorney General, Lynn Fitch. She is authorized by Mississippi law to sue on the State's behalf. Her address is 550 High Street, Suite 1200, Jackson, Mississippi 39201.

36.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Montana brings this suit through its Attorney General, Austin Knudsen. He is authorized to sue on the State's behalf. His address is 215 N Sanders St., Helena, Montana 59601.

37.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Nebraska brings this suit through its Attorney General, Douglas J. Peterson. He is authorized to sue on the State's behalf. His address is 2115 State Capitol, Lincoln, Nebraska 68509.

38.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Oklahoma brings this suit through its Attorney General, John M. O'Connor. He is authorized by Oklahoma law to sue on the State's behalf. His address is 313 NE 21st Street, Oklahoma City, Oklahoma 73105.

39.     Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. South Carolina brings this suit through its Attorney General, Alan Wilson. He is authorized by South Carolina law to sue on the State's behalf. His address is P.O. Box 11549, Columbia, South Carolina 29211.

40.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Utah brings this suit through its Attorney General, Sean D. Reyes. He is authorized by Utah law to sue on the State's behalf. His address is 350 North State Street, Suite 230, Salt Lake City, Utah 84114.

41.     Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. West Virginia brings this suit through its Attorney General, Patrick Morrisey. He is authorized by West Virginia law to sue on the State's behalf. His address is State Capitol, Bldg 1, Room E-26, Charleston, WV 25305.

42.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Wyoming brings this suit through its Attorney General, Bridget Hill. She is authorized by Wyoming law to sue on the State's behalf. Her address is 109 State Capitol, Cheyenne, Wyoming 82002.

43.     Plaintiffs States are required to spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c). Plaintiffs are also required to spend state monies on detaining unauthorized aliens. On information and belief, the Asylum IFR will require Plaintiff States to spend at least some money on healthcare, detention, and other services that would otherwise not have to be spent.

44.     Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing the Asylum IFR.

45.     Defendant Merrick Garland is Attorney General of the United States of America. He is sued in his official capacity.

46.     Defendant Department of Justice ("DOJ") is a federal cabinet department.

47.     Defendant David Neal is the Acting Director of the Executive Office for Immigration Review. He is sued in his official capacity.

48.     Defendant Executive Office for Immigration Review ("EOIR") is an agency within DOJ.

49.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

50.     Defendant United States Department of Homeland Security ("DHS") is a federal cabinet department.

51.     Defendant Chris Magnus serves as Commissioner of U.S. Customs and Border Protection. He is sued in his official capacity.

52.     Defendant U.S. Customs and Border Protection ("USBP") is an agency within DHS that is headquartered in Washington, D.C.

53.     Defendant Tae Johnson serves as Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

54.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an agency within DHS that is headquartered in Washington, D.C.

55.     Defendant Ur Jaddou serves as the Director for U.S. Citizenship and Immigration Services. She is sued in her official capacity.

56.     Defendant U.S. Citizenship and Immigration Services is an agency within DHS that is headquartered in Camp Springs, Maryland.

57.     Defendant Raul Ortiz serves as the Chief of the U.S. Border Patrol. He is sued in his official capacity.

58.    Defendant U.S. Border Patrol ("BP") is an agency within DHS that is headquartered in Washington, D.C.

59.    Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346 and includes the departments and agencies thereof.

## JURISDICTION AND VENUE

60.    This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06.

61.    An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, 28 U.S.C. § 1361, and its inherent equitable powers.

62.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

## FACTUAL AND LEGAL BACKGROUND

63.    States "bear[] many of the consequences of unlawful immigration.*" Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. The States thus rely significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

64.    Record numbers of aliens have entered the United States unlawfully since January 20, 2021.

65.     DHS's own statistics show the dramatic increases in the number of crossings into the United States. Indeed, current levels of illegal crossings are at their highest levels in at least two decades, and perhaps ever. The following is DHS's own chart graphically showing these enormous increases in crossings:

Table 1: DHS Southwest Border Encounters By Month



Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

66.     Furthermore, DHS sources have indicated that "there have been more than 300,000 known 'gotaways'—migrants who were not apprehended or turned themselves in and who got past agents—since fiscal year 2022 began on October 1st" through April 1.[1] If that rate merely continues, the total number of gotaways for the fiscal year will be more than 600,000. For comparison, "former Border Patrol Chief Rodney Scott said there had been approximately 400,000 gotaways in the entirety of FY 2021."[2]

67.     Because the Asylum IFR makes it easier for aliens with non-meritorious asylum claims to be released in the United States, it will induce a significant increase of illegal immigration into the United States. Tens of thousands of these aliens will be released into the Plaintiff States in violation of federal statutes.

68.     Another district court in this Circuit has found that reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas v. Biden*, 554 F. Supp. 3d 818, 834, 847-48 (N.D. Tex. 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting) ("An alien ... has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.")

69.     Since 1982, the Supreme Court has mandated that States provide public education to school-age aliens not lawfully in the United States. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). As a direct result of the influx of migrants that the Asylum IFR will cause, some of whom will be minors, the Plaintiff States will be compelled to spend additional moneys on education for these additional aliens. The Asylum IFR is thus a direct, but-for cause of these imminent injuries.

---

[1]  Bill Melugin, *62,000+ illegal immigrants got past Border Patrol agents in March: sources*, FOX NEWS (April 1, 2022), https://fxn.ws/37fqLNq.

[2]  *Id.*

70.     The presence of these aliens in each State violates each State's quasi-sovereign interest in its territory and the welfare of its citizens.

71.     The Asylum IFR will also cost the States millions, as explained in further detail below.

**Arizona**

72.     As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration.

73.     Defendant DHS has previously recognized that Arizona "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Arizona's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona." Exhibit A, Memorandum of Understanding Between DHS and the State of Arizona at 2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Arizona], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona 's current residents for, among other things, employment, housing, goods and services." *Id.* at 3.

74.     Arizona is required to expend its scarce resources when DHS acts unlawfully to induce increased illegal immigration. This includes resources expended by Arizona's law enforcement community.

75.     Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts to tens of millions of dollars each year, as reflected by Arizona's State Criminal Alien Assistance Program (SCAAP) requests, the great majority of which are not reimbursed by the federal government.

76.     Arizona has approximately 275,000 to 365,000 immigrants living in the State who are not lawfully in the United States. About 54% of them do not have health insurance, about 32% of them have incomes below the poverty level, and they cost Arizona taxpayers more than $1.7 billion a year.[3] More illegal aliens entering the State will increase the costs of the State's healthcare system.

77.     Drug cartels use human trafficking routes to also traffic illegal drugs into the United States. Increased illegal immigration means increased quantities of illegal drugs. For example, drug cartels coordinate surges of unauthorized immigrants who cross the border in large groups and then make non-meritorious asylum claims. This serves as a distraction to Border Patrol personnel. While all available Border Patrol personnel are busy processing these aliens' asylum claims, they are unable to patrol the border, which allows drug mules to enter the United States unimpeded. Individuals believed to be cartel drug smugglers are regularly caught on camera crossing the border, dressed in camouflage and carrying weapons to protect their drug loads.[4] Cartel scouts appear to even brazenly "occupy strategically-selected hilltops for dozens of miles inside Arizona," establishing a presence on American territory to track Border Patrol movements and coordinate surges of aliens entering the United States.[5] Even the drugs themselves are becoming more dangerous, as smugglers are trading

---

[3]   The number of unauthorized aliens is notoriously difficult to calculate. Several studies, however, estimate the number of unauthorized aliens in Arizona to be in this approximate range. *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AZ (273,000, 54% uninsured); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (275,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (365,000, $1.7 billion annual cost).

[4]   Brian Brennan, *'People don't need to die': Border rancher deals with constant flow of migrants, drug packers*, KGUN 9 (May 20, 2019), https://www.kgun9.com/border-watch/people-dont-need-to-die-border-rancher-deals-with-constant-flow-of-migrants-drug-packers

[5]   U.S. House of Representatives, Committee on Homeland Security, *Testimony of Jim Chilton on "Examining the Effect of Border Wall on Private and Tribal Landowners"*, (February 27, 2020), https://homeland.house.gov/imo/media/doc/Testimony%20-%20Chilton1.pdf

large bags of marijuana for smaller packs of more potent "cocaine, fentanyl, heroin, [and] meth."[6] In December 2021, police in Scottsdale, Arizona seized 1.7 million fentanyl pills that were worth $9 million; they also seized ten kilograms of powdered fentanyl and one pound of methamphetamine.[7] The seized drugs were from the Sinaloa Cartel.[8] According to the DEA, "[t]he Sinaloa Cartel primarily uses trafficking routes that go through Arizona,"[9] and the Phoenix area is a major cartel drug trans-shipment hub.[10]

### Louisiana

78.     Plaintiff Louisiana will also be injured gravely by the Asylum IFR. Louisiana will be required to stretch its resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Louisiana's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services.

79.     Defendant DHS has previously recognized that Louisiana "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting

---

[6]  Natasha Yee, *As marijuana profits fade, cartels increasingly smuggle fentanyl across the border*, (October 18, 2021),        https://gilaherald.com/as-marijuana-profits-fade-cartels-increasingly-smuggle-fentanyl-across-the-border/

[7]  Steven Hernandez, *Scottsdale police, DEA seize record 1.7 million fentanyl pills in Arizona*, Arizona Republic,        (Dec.        16,        2021),        https://www.azcentral.com/story/news/local/phoenix-breaking/2021/12/16/authorities-arizona-seize-9-million-fentanyl-pills-narcotics/8929613002/

[8]  *Id.*

[9]  *Id.*

[10]  Alex Gallagher, *Record fentanyl seizure by Scottsdale cops, DEA*, Scottsdale Progress, (Dec. 19, 2021), https://www.scottsdale.org/news/record-fentanyl-seizure-by-scottsdale-cops-dea/article_fbf7c02e-6074-11ec-91ab-b35932ed58da.html

immigration enforcement. Such changes can negatively impact [Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona." Exhibit B, Memorandum of Understanding Between DHS and the Louisiana Department of Justice at 2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Louisiana's current residents for, among other things, employment, housing, goods and services." *Id.* at 3.

80.     Louisiana has approximately 70,000 to 78,000 aliens living in the State who are not lawfully in the United States. More than 70% of them do not have health insurance, about 34% of them have incomes below the poverty level, and they cost Louisiana taxpayers more than $362 million a year.[11] More illegal aliens entering the State will increase the costs of the State's healthcare system.

81.     DHS operates multiple alien detention facilities in the Western District of Louisiana, including the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana, and others in Oberlin, Plain Dealing, Jonesboro, Jena, Natchitoches, Monroe, Ferriday, Basile, and Winnfield, Louisiana. DHS releases illegal aliens from those detention facilities to Louisiana cities throughout the Western District, including Lafayette, Monroe, and Shreveport. Releases in Lafayette are so common that a California business advertises "immigration bail bonds in Lafayette" and urges illegal immigrants and

---

[11]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/LA (70,000, 73% uninsured, 34% poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (70,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (78,820, $362 million annual cost).

their families to "contact our Lafayette bail bondsmen" "if you have a family member who finds him or herself in custody of [DHS]." Upon information and belief, DHS "paroles" many illegal immigrants into Louisiana cities without even the minimal security of a bond. The Asylum IFR will increase the use of DHS detention facilities and lead to the increased release of aliens into the Western District and throughout the State.

### Missouri

82.     Missouri is directly and adversely affected by increases in illegal immigration at the southern border, including increased admissions of asylum applicants. Based on recent statistics, approximately 56 out of every 1,000 unlawful aliens who enter the United States end up residing in Missouri. These unlawful aliens impose pocketbook injuries on Missouri in the form of education, healthcare, and criminal-justice costs. These pocketbook injuries are irreparable because Missouri has no plausible recourse to recoup them.

83.     "Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license." *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at *10 (N.D. Tex. Aug. 13, 2021).

84.     The total costs to … Missouri … of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases." *Id.*

85.     "Some aliens who … are being released or paroled into the United States and will use state-funded healthcare services or benefits in … Missouri." *Id.* "The total costs to the State will increase as the number of aliens within the state increases." *Id.*

86.     Missouri is also a destination state and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. Such crimes disproportionately afflict illegal aliens, and these crimes (and other crimes committed by illegal aliens) impose irreparable law-enforcement and criminal-justice costs on Missouri. As another district court

recently found, "[s]ome aliens who … are being released or paroled into the United States and will commit crimes in … Missouri," and "Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally." *Id.* Both crimes committed by unlawful aliens, and human-trafficking crimes committed by and against unlawful aliens, inflict irreparable costs on Missouri, both in law-enforcement costs and providing resources for victims. "Human trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri." *Id.*

87.     An increased influx of illegal aliens, including an increased influx of asylum applicants, also affects the labor market and reduces job opportunities for U.S. citizens and lawfully present aliens in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri is a State with large agricultural sector. The presence of large numbers of unlawful aliens distorts Missouri's job markets and inflicts irreparable injury on both the State and its citizens.

## Alabama

88.     Plaintiff Alabama is also injured by the Asylum IFR. Alabama will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Alabama's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Alabama to expend limited resources on education, healthcare, public assistance, and general government services.

89.     Alabama has approximately 55,000 to 73,000 illegal aliens living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and they cost

Alabama taxpayers more than $324.9 million a year.[12] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Alaska

90.     Plaintiff Alaska is also injured by the Asylum IFR. Alaska will be required to stretch its scarce resources under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Alaska's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Alaska to expend limited resources on education, healthcare, public assistance, and general government services.

91.     Alaska has approximately 5,000 to 11,260 illegal aliens living in the State; they cost Alaska taxpayers more than $72 million a year.[13] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[12]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AL (62,000, 68% uninsured, 34% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (55,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (73,190, $324.9 million annual cost).

[13]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles (10,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (11,260; $72 million annual cost).

**Arkansas**

92.     Plaintiff Arkansas is also injured by the Asylum IFR. Arkansas will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Arkansas's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Arkansas to expend limited resources on education, healthcare, public assistance, and general government services.

93.     Arkansas has approximately 58,000 to 79,000 illegal aliens living in the State; about 63% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Arkansas taxpayers more than $339.5 million a year.[14] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

**Florida**

94.     Plaintiff State of Florida is injured by the Asylum IFR. The increase in unlawful migration caused by the IFR will result in more illegal drugs flowing into Florida and more unvetted migrants—many of whom commit crimes—in Florida's communities. These effects cost Florida millions in law enforcement resources, incarceration costs, and victim's services. For example, Florida spends over $100 million per year incarcerating aliens who commit crimes within its borders. On top

---

[14] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AR (58,000, 63% uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (55,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (78,820, $339.5 million annual cost).

of that, Florida provides a variety of public benefits regardless of immigration status. E.g., 42 U.S.C. § 1395dd (requiring that participating Medicaid facilities provide emergency services to immigrants regardless of status); § 443.101(7), Fla. Stat. (providing unemployment benefits for certain aliens).

95.     Illegal migration aside, individuals who are granted asylum are eligible for certain benefits under Florida law, and an increase in asylum grants will increase those costs. *E.g.*, § 322.051, Fla. Stat. (driver's licenses), *id.* § 414.095 (temporary cash assistance); *id.* (Medicaid benefits).

96.     According to some estimates, Florida currently has approximately 772,000 to 957,000 illegal aliens living in the State, costing Florida taxpayers more than $4.7 billion a year.[15][fn]. The IFR will make these costs worse.

## Georgia

97.     Plaintiff State of Georgia is directly and adversely affected by any changes to federal immigration policy. When illegal immigration increases, Georgia must redirect its scarce resources. The Asylum IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. Illegal aliens in Georgia receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related costs, among others. Ending the Title 42 policy would injure Georgia by increasing the number of illegal aliens receiving these services at its expense.

---

[15] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/FL (estimating 772,000 in Florida); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorizedimmigrants-by-state/ (estimating 775,000 in Florida); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (estimating 957,100 in Florida, with a $4.7 billion annual cost).

98.     For instance, Georgia has approximately 339,000 to 422,000 aliens living unlawfully in the State; about 70% of them are uninsured; about 36% of them have incomes below the poverty level; and they cost Georgia taxpayers more than $1.8 billion a year.[16] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

99.     The Asylum IFR will also increase crime and criminal justice expenses in Georgia. In fiscal year 2020, which ended September 2020, ICE's Atlanta Office removed 9,137 aliens, of which 5,889 were convicted criminals and 1,111 had pending criminal charges.[17] If additional illegal aliens migrate to Georgia, some will commit crimes. That will impose irreparable law-enforcement and criminal-justice costs on Georgia.

**Idaho**

100.    Plaintiff Idaho is also injured by the Asylum IFR. Idaho will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Idaho's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Idaho to expend limited resources on education, healthcare, public assistance, and general government services.

---

[16]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/GA (339,000, 70% uninsured, 36% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (400,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (422,250, $1.8 billion annual cost).

[17]  Local Statistics, ERO FY 2020 Report, U.S. Immigration & Customs Enforcement (Oct. 2021), https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf

101.    Idaho has approximately 29,000 to 51,000 illegal aliens living in the State; about 60% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost Idaho taxpayers more than $225.4 million a year.[18] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Indiana

102.    Plaintiff Indiana is also injured by the Asylum IFR. Indiana will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendant to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Indiana's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Indiana to expend limited resources on education, healthcare, public assistance and general government services.

103.    Indiana has approximately 100,000 to 124,000 illegal aliens living in the state, about 53% are uninsured; about 17% of them have incomes below the poverty line; and they cost Indiana taxpayers more than $549 million a year.[19] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[18]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/ID (29,000, 60% uninsured, 27% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (35,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (50,670, $225.4 million annual cost).

[19]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/IN (102,000, 53% uninsured); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (100,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform

## Kansas

104.     Plaintiff Kansas is also injured by the Asylum IFR. Kansas will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Kansas communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Kansas to expend limited resources on education, healthcare, public assistance, and general government services.

105.     Kansas has approximately 69,000 to 85,000 illegal aliens living in the State; about 64% of them are uninsured; about 25% of them have incomes below the poverty line; and they cost Kansas taxpayers more than $377 million a year.[20] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Kentucky

106.     Plaintiff Kentucky is also injured by the Asylum IFR. Kentucky will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially.

---

(2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (123,860, $549 million annual cost).

[20] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/KS (69,000, 64% uninsured, 25% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (75,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (84,450, $377 million annual cost).

The Asylum IFR will create increased crime and drug trafficking in Kentucky's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Kentucky to expend limited resources on education, healthcare, public assistance, and general government services.

107.    Kentucky has approximately 35,000 to 56,000 illegal aliens living in the State; about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and they cost Kentucky taxpayers more than $261 million a year.[21] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Mississippi

108.    Plaintiff Mississippi is also injured by the Asylum IFR. Mississippi will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Mississippi's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Mississippi to expend limited resources on education, healthcare, public assistance, and general government services.

109.    Mississippi has approximately 20,000 to 28,150 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost

---

[21]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/KY (46,000, 60% uninsured, 37% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (35,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (56,300, $261 million annual cost).

Mississippi taxpayers more than $117 million a year.[22] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Montana

110.     Plaintiff Montana is also injured by the Asylum IFR. Montana will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Montana communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Montana to expend limited resources on education, healthcare, public assistance, and general government services.

111.     Montana has approximately 3,000 to 6,000 illegal aliens living in the State, and they cost Montana taxpayers more than $27 million a year.[23] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[22] *See, e.g.,* Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MS (25,000, 75% uninsured, 49% below poverty level); U.S. Unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (20,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (28,150, $117 million annual cost).

[23] *See, e.g.,* Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MT (3,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (<5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $27 million annual cost).

**Nebraska**

112.    Plaintiff Nebraska is also injured by the Asylum IFR. Nebraska will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Nebraska communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Nebraska to expend limited resources on education, healthcare, public assistance, and general government services.

113.    Nebraska has approximately 42,000 to 60,000 illegal aliens living in the State; about 56% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Nebraska taxpayers more than $233.1 million a year.[24] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

**Oklahoma**

114.    Plaintiff Oklahoma is also injured by the Asylum IFR. Oklahoma will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially.

---

[24] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NE (42,000, 56% uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (60,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (50,670, $233.1 million annual cost).

The Asylum IFR will create increased crime and drug trafficking in Oklahoma's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Oklahoma to expend limited resources on education, healthcare, public assistance, and general government services.

115.    Oklahoma has approximately 90,000 to 107,000 illegal aliens living in the State; about 68% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost Oklahoma taxpayers more than $467 million a year.[25] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### South Carolina

116.    Plaintiff South Carolina is also injured by the Asylum IFR. South Carolina will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in South Carolina's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force South Carolina to expend limited resources on education, healthcare, public assistance, and general government services.

117.    South Carolina has approximately 88,000 to 98,000 illegal aliens living in the State; about 69% of them are uninsured; about 33% of them have incomes below the poverty line; and they

---

[25] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/OK (90,000, 68% uninsured, 27% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (85,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (106,970, $467 million annual cost).

cost South Carolina taxpayers more than $471 million a year.[26] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Utah

118.    Plaintiff Utah is also injured by the Asylum IFR. Utah will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Utah's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Utah to expend limited resources on education, healthcare, public assistance, and general government services.

119.    Utah has approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year.[27] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[26] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/SC (88,000, 69% uninsured, 33% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (85,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (95,710, $471 million annual cost).

[27] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/UT (89,000, 61% uninsured, 23% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (95,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (112,600, $521 million annual cost).

## West Virginia

120.     Plaintiff West Virginia is also injured by the Asylum IFR. West Virginia will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in West Virginia's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force West Virginia to expend limited resources on education, healthcare, public assistance, and general government services.

121.     West Virginia has approximately 4,000 to 6,000 illegal aliens living in the State, and they cost West Virginia taxpayers more than $26.3 million a year.[28] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Wyoming

122.     Plaintiff Wyoming is also injured by the Asylum IFR. Wyoming will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Wyoming's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration,

---

[28] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WV (4,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (<5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $26.3 million annual cost).

the Asylum IFR will force Wyoming to expend limited resources on education, healthcare, public assistance, and general government services.

123.     Wyoming has approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year.[29] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### All Plaintiffs

124.     The Asylum IFR will result in tens or hundreds of thousands of aliens unlawfully entering the United States, who would otherwise not be able to gain entry. This, in turn, will cause Plaintiff States to spend money on healthcare, detention, education, and other services for aliens that would otherwise not have to be spent.

125.     For example, the States are required to spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c). Plaintiff States' emergency medical providers deliver millions of dollars in medical services to illegal aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves. While these costs are significant in typical years, the COVID-19 pandemic makes the potential for harm to Plaintiff States through additional emergency healthcare costs to unauthorized aliens exceptionally high. The Asylum IFR necessarily increases the number of aliens in the States who are subject to receiving such medical care at the expense of Plaintiff States' healthcare institutions.

---

[29] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WY (7,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $26.1 million annual cost).

126.     By ignoring the requirements of the INA, HSA, and Secure Fence Act of 2006, and thus facilitating the entry of unauthorized aliens into the United States, the Asylum IFR encourages a greater influx of unauthorized aliens into Plaintiff States. This further increases law enforcement costs in Plaintiff States, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

127.     The Asylum IFR will allow a far greater number of aliens with meritless asylum claims to enter the United States. Such aliens rarely leave the United States of their own accord, and Defendants rarely remove such aliens, even after their asylum claims have been denied. The Asylum IFR will therefore increase Plaintiff States' costs of providing emergency medical care to these individuals who would otherwise never have been allowed into the United States. Additionally, the Asylum IFR encourages a greater influx of unauthorized aliens into Plaintiff States, further increasing the population of unauthorized aliens for whom Plaintiff States must bear the cost of emergency medical care, education, and other social services.

128.     The Asylum IFR will increase illegal immigration into the United States. Some of the additional illegal aliens will migrate into each of the Plaintiff States, and some of those aliens will commit crimes in each of the Plaintiff States. The increased number of illegal aliens in the Plaintiff States will thus also increase crime and criminal justice expenses in Plaintiff States, thus injuring the States through increased law enforcement, incarceration, and crime-prevention costs. The increased crime will also injure the citizens of Plaintiff States.

129.     In addition, Defendants will be unable to adequately screen, mitigate, and treat for communicable diseases—of all types—when illegal border crossings (including crossings of "covered aliens") reach the elevated levels induced by the Asylum IFR. This presents a serious threat to the public health of Plaintiff States.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Rule in Excess of Defendants' Statutory Authority
### (Asylum Adjudication)

130.    Plaintiff States repeat and incorporate by reference all the Complaint's allegations stated above.

131.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

132.    The Asylum IFR is in excess of Defendants' statutory authority because the INA and HSA do not authorize asylum officers to adjudicate the asylum claims at issue.

133.    Congress codified into law this regulatory separation of authority when it passed the HSA. Specifically, Section 451(b) of the HSA enumerated specific functions that were transferred from INS to USCIS, empowering USCIS only to perform those "adjudications performed by the INS immediately before those authorities were transferred from DOJ to DHS." Thus, the HSA conferred on AOs within USCIS only the authority to adjudicate those types of asylum claims that they adjudicated on the effective date of the HSA, which was March 1, 2003.

134.    Furthermore, the HSA amended the INA to expressly state that the EOIR would continue to have the same authority that it did before adoption of the HSA. *See supra* ¶8. When Congress passed the HSA, EOIR adjudicated applications for asylum, statutory withholding, and CAT by aliens who had been subject to expedited removal proceedings under section 235(b)(1). Thus Congress, through the HSA, plainly assigned those specific functions to the EOIR. If it had not, or if Congress had simply wanted to leave it up to DHS and DOJ to divvy up those functions at some point in the future—as the Asylum IFR attempts to do more than 19 years after the fact—it would not have specified the exact dates that those functions were supposed to be assigned to vest (or continue to

vest in the case of EOIR). Having set an end date for the assignment of those functions in the HSA, those functions are settled, and appropriately assigned to USCIS and EOIR and could be changed only through a legislative—not administrative—reassignment.

135.    Congress has allowed for only one exception to the HSA's assignment of asylum adjudication to the EOIR. In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Congress created a narrow exception so that AOs would adjudicate asylum applications filed by unaccompanied alien children (UACs). 8 U.S.C. § 1225(b)(3)(C). Congress specifically gave jurisdiction over asylum applications filed by UACs to AOs because Congress recognized that those AOs otherwise lacked the power to adjudicate such asylum applications filed by UACs.

136.    Under the *expressio unius* canon, "[t]he expression of one thing implies the exclusion of others." *Jennings v. Rodriguez*, 138 S.Ct. 830, 844 (2018). Thus, "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen v. Harris Cty.*, 529 U.S. 576, 583 (2000) (cleaned up)); *accord Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc). Congress determined that UACs should receive a specific AO carve-out, but it did not apply that exception to any other type of alien, let alone to all aliens in expedited removal proceedings under section 8 U.S.C. § 1225(b)(1). Under *expressio unius*, the enumeration of only a single exception to the HSA's assignment of asylum adjudication to the EOIR means that only one such exception exists. The legislative history confirms this interpretation, as Congress explained in amending Section 1225 that "further consideration of the application for asylum" meant "further consideration of the application for asylum **under normal non-expedited removal proceedings**." H. Rep. No. 104–828 at 209 (1996) (emphasis added).

137.    Furthermore, the INA itself prohibits the Asylum IFR, as it requires that "[u]nless otherwise specified in this chapter," a removal "proceeding under [8 U.S.C. § 1229a] **shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United**

40

States." 8 U.S.C. § 1229a(a)(3) (emphasis added). Congress explicitly established the procedure to be used for making asylum determinations. Defendants do not have the power to conjure out of thin air new procedures more to their liking.

138.    The Asylum IFR therefore grossly exceeds Defendants' statutory authority related to asylum and is therefore unlawful.

## COUNT II
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Rule in Excess of Defendants' Statutory Authority
### (Parole)

139.    Plaintiff States repeat and incorporate by reference all the Complaint's allegations stated above.

140.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

141.    The Asylum IFR exceeds Defendants' statutory authority because the INA strictly limits Defendants' exercise of the parole power. For example, the Asylum IFR incorrectly claims that Defendants have the statutory authority to parole aliens "where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular [alien] would limit the agency's ability to detain other noncitizens whose release may pose a greater risk of flight or danger to the community." 87 Fed. Reg. at 18,108.

142.    However, Congress has commanded the opposite: that such aliens "shall" be detained. Aliens who convince an asylum officer that the alien has a credible fear of persecution "**shall be detained** for further consideration of the application for asylum." 8 U.S.C.A. § 1225(b)(1)(B)(ii) (emphasis added). Aliens who have failed to convince an asylum officer of their credible fear who seek review before an immigration judge "**shall be detained** pending a final determination." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added). And for aliens who are "not clearly and beyond a doubt

entitled to be admitted, the alien[s] **shall be detained**," subject only to limited exceptions not applicable here (for crewmen and stowaways). 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Against this backdrop of mandatory detention, Congress created a limited exception in 8 U.S.C. § 1182(d)(5)(A). That provision gives DHS the power to parole aliens into the United States, rather than detain them, but "only on a case-by-case basis for urgent *humanitarian reasons or significant public benefit.*" *Id.* (emphasis added).

143.    In 1996 Congress "specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" precisely because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Congress made crystal clear its intent that its 1996 amendment to the parole statute was a limit on the use of parole: the section heading in IIRIRA that makes this amendment is titled "LIMITATION ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602 (1996) (emphasis added); *see also Ram v. I.N.S.*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret its meaning").

144.    When Congress amended Section 1225(b) in 1996, it created a "de facto mandatory detention regime." *Tineo v. Ashcroft*, 350 F.3d 382, 398 (3d Cir. 2003). The Third Circuit provided the following summary of the combined effect of Section 1225(b)'s mandatory detention rules and 1182(d)(5)'s limits on parole: "§ [1225](b)(2) requires the INS to detain aliens 'not clearly and beyond a doubt entitled to be admitted' and because of **the limited grounds for parole** in § [1182](d)(5)(A), in practice, these provisions often result in ... mandatory detention." *Id.* at 387 (emphasis added).

145.    The Asylum IFR's determination that parole is justified when detention space is unavailable constitutes an unlawful programmatic decision to parole aliens en masse into the United States. The Fifth Circuit has already held that such a practice is an unlawful violation of the INA's

requirement that grants of parole be granted on a strictly limited, case-by-case basis: "[d]eciding to parole aliens *en masse* is the opposite of [the] *case-by-case* decisionmaking" required by Section 1182(d)(5)(A). *Texas v. Biden*, 20 F.4th 928, 942 (5th Cir. 2021) (emphasis in original).

146.    Indeed, the Asylum IFR is part of a wider pattern from Defendants of unlawfully mass-granting parole on an unprecedented scale. For example, in President Trump's last full month in office, the Border Patrol paroled 17 aliens caught at the border into the interior of the United States. The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was still only 76.[30] One year later, in December 2021, President Biden's Border Patrol paroled over 51,000[31]—a mindboggling 300,882% increase. Since President Biden took office, the total number has grown to more than 366,000 aliens.[32]

147.    Furthermore, § 1225(b)(2)(C) already provides an alternative to detention to the federal government: to "return … aliens" who "arriv[e] on land … from a foreign territory contiguous to the United States … to that territory pending" immigration proceedings. In other words, when migrants arrive at the southern border and claim asylum, the federal government may—instead of detaining them—require them to wait in Mexico while their claims are adjudicated. Congress did not confer on Defendants the discretion to refuse to detain aliens and instead parole them en masse into the United States. Rather, Congress provided the alternative of returning those aliens to Mexico. And

---

[30]    *See* Custody and Transfer Statistics FY2020, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (U.S. Border Patrol – Dispositions and Transfers tab). In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

[31]    Defendant Customs and Border Protection reports these numbers on its website. Numbers for FY2022 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, and numbers for FY2021 are available at https://www.cbp.gov/newsroom/stats/ custody-and-transfer-statistics-fy2021. The numbers were calculated using the "U.S. Border Patrol – Dispositions and Transfers" tab and combining the "Notice to Appear/Order of Recognizance" and "Parole + ATD" rows. (The "Parole + ATD" row is only used in FY2022.)

[32]    *Id.*

the policy to do just that, the Migrant Protection Protocols, worked extraordinarily well—the Trump Administration needed to grant parole to only 17 aliens in December 2021. That Defendants refuse to use the only available statutory alternative to detention does not absolve them of their obligation to detain. *Texas*, 20 F.4th at 996 (Defendants simply "don't want to do [the] one thing Congress allowed" as an alternative to detention).

148.    Additionally, the Asylum IFR amends 8 C.F.R. § 212.5(b) to greatly expand the aliens to whom its parole criteria apply, from applying only to aliens in full removal proceedings under INA § 240 to applying also to aliens subject to expedited removal. This vast expansion of the 8 C.F.R. § 212.5(b) constitutes an unlawful programmatic parole policy.

149.    Finally, the NPRM contained a broad expansion of the parole power. After significant pushback from comments pointing out that such an expansion would be blatantly illegal, the Asylum IFR ostensibly gave up on that vast expansion, at least through regulation. Instead, Defendants telegraphed their intent to effect the same vast expansion outside of the requirements of the APA. The Asylum IFR states that "DHS intends to use further directives and guidance to apply the parole standard to [aliens] in expedited removal pending a credible fear interview." 87 Fed. Reg. at 18,109. Issuing such "guidance" without notice-and-comment rulemaking is a violation of the APA, and the Asylum IFR's reliance on such ambiguous future "guidance" makes it unlawful.

150.    The Asylum IFR therefore grossly exceeds Defendants' statutory authority as it relates to the parole authority and is therefore unlawful.

**COUNT III**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Rule in Excess of Defendants' Statutory Authority**
**(Secure Fence Act)**

151.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

44

152.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

153.    The Asylum IFR exceeds Defendants' statutory authority because it violates the Secure Fence Act.

154.    In 2006, Congress passed the Secure Fence Act, which requires the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act of 2006, Pub. L. No. 109–367, 120 Stat 2638 (2006) (codified as 8 U.S.C. § 1701 note). The bill specifically defines "operational control" to mean "the prevention of *all unlawful entries* into the United States, including entries by terrorists, *other unlawful aliens*, instruments of terrorism, narcotics, and other contraband." *Id.* (emphasis added).

155.    The Secure Fence Act remains in force. It enjoyed bipartisan support in both houses of Congress, and passed in the Senate by a vote of 80 to 19. Indeed, among those voting for the bill was then-Senator Biden.[33]

156.    The Asylum IFR violates the Secure Fence Act because, as discussed above, rather than preventing unlawful entries into the United States, it incentivizes them.

**COUNT IV**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Arbitrary and Capricious Agency Action**
**(Asylum Procedures)**

157.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

---

[33]https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=109&session=2&vote=00262#top

158.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

159.     "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

160.     For starters, an agency cannot "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Am. Wild Horse*, 873 F.3d at 931 ("the Service's Finding of No Significant Impact not only failed to take a 'hard look' at the consequences of the boundary change, it averted its eyes altogether"); *Gresham v. Azar*, 363 F. Supp. 3d 165, 177 (D.D.C. 2019) ("The bottom line: the Secretary did no more than acknowledge—in a conclusory manner, no less—that commenters forecast a loss in Medicaid coverage").

161.     Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered ... is not a substitute for considering it.'" *State v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

162.     The Asylum IFR is arbitrary and capricious for several independently sufficient reasons.

163.     *First*, Defendants failed to estimate or account for the costs to the States of the Asylum IFR, such as the increased health care costs for aliens infected with COVID-19 and the cost of increased illegal immigration caused by the Asylum IFR, and the presence of much greater numbers

of paroled aliens with non-meritorious asylum claims who were induced to enter the United States because of the Asylum IFR.

164. *Second*, Defendants failed to consider or arbitrarily rejected obvious alternatives to the Asylum IFR, such as by hiring more Immigration Judges ("IJs") and ICE attorneys, or by implementing in good faith the Migrant Protection Protocols ("MPP") (and thus sending most aliens from third countries back to Mexico to await asylum decisions). *See* 87 Fed. Reg. at 18,115 (acknowledging comments proposing the hiring of IJs and more effective implementation of MPP, but cursorily rejecting them without analysis). They alternatively could implement measures to weed out and deter meritless claims, which would reduce the backlog.

165. *Third*, the Asylum IFR is arbitrary and capricious because the Defendants did not consider Plaintiffs States' reliance interests in the continuation of the current asylum system. The government is obligated to "turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). When an agency changes course, as DHS and DOJ have done here, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

166. The Asylum IFR claims that the Defendants "perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions." 87 Fed. Reg. 18,109. But "'Stating that a factor was considered ... is not a substitute for considering it.'" *State*, 10 F.4th at 556. And Defendants' cursory dismissal of the existence of any reliance interests misses the mark. Their analysis fails to account for the actual real-world effects of the current asylum system and how States might have legitimately relied on it.

167.    Plaintiff States have overwhelming reliance interests in federal enforcement of immigration law. Specifically, the most of the Plaintiffs submitted a comment explaining that the Asylum IFR will incentivize additional illegal immigration and thus "affect[] State finances and resources, public safety, and public health during the midst of the COVID-19 global pandemic." Comment Submitted by Louisiana and 15 other States, USCIS-2021-0012-4980 at 14 (Oct. 19, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-4980. Plaintiffs' State budgets and resource allocations are determined in reliance on Defendants' continued enforcement of immigration law. Defendants did not consider whether the States relied on continuation of the asylum system when Plaintiff States determined how they would marshal and distribute their resources to deal with the number of unauthorized aliens entering their states. The Asylum IFR is arbitrary and capricious because it utterly ignores these reliance interests. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913-14.

168.    *Fourth*, Defendants ignored statutory factors, and relied upon factors Congress did not direct it to consider, by completely failing to address the immigration consequences of the Asylum IFR. IIRIRA and the Secure Fence Act are designed to reduce crossings. Yet the IFR utterly ignores this aspect of the problem.

169.    *Fifth*, Defendants failed to justify their deviation from prior practice. The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923-27; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (APA requirements ensure that an agency's "prior policies and standards are being deliberately changed, not casually ignored"). Yet Defendants fail to grapple with their prior actions and act as if their prior positions don't exist.

170.    *Sixth*, the Asylum IFR is arbitrary and capricious because its rationales are obviously pretextual. The actions of the President, Secretary Mayorkas, and other Administration officials have

made clear that the intent of the Administration's immigration policies is to incentivize illegal immigration. Indeed, that the Administration's immigration policies incentivize high amounts of illegal immigration is widely recognized internationally. For example, the President of Mexico called President Biden the "migrant president" and observed that the Biden Administration's policies and rhetoric greatly incentivize illegal immigration.[34] Human traffickers have recognized this as well. Internal Mexican government assessments "state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.'"[35] The presence of such blatant pretext is enough to render the Asylum IFR arbitrary and capricious. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Accepting Defendants' description of the Asylum IFR requires this Court to "'exhibit a naiveté from which ordinary citizens are free.'" *Id.*

171.    *Seventh*, the Asylum IFR fails to account for the significant planning and additional funding required to implement it, and fails to justify these costs versus maintaining the status quo. For example, the Asylum IFR will require Defendants to redraft all training materials, retrain existing officers, and ultimately hire hundreds (if not thousands) of new AOs. This failure is particularly egregious because DHS only just recently narrowly escaped financial ruin in the midst of the COVID-19 pandemic.

172.    *Eighth*, the Asylum IFR fails fully to consider the effects of eliminating the adversarial nature of asylum proceedings and the salutary nature of adversarial proceedings for determining the true facts of a situation. This failure is particularly egregious because the Asylum IFR would place asylum adjudications solely in the hands of AOs who have an established and documented track record of granting credible fear determinations to unmeritorious claims, which has led to their record of

---

[34] Dave Graham, "Exclusive: 'Migrant president' Biden stirs Mexican angst over boom time for gangs," Reuters, Mar. 10, 2021 https://reut.rs/3vKlk1x.
[35] *Id.*

having a greater-than-85% failure rate in approving non-meritorious asylum claims at the credible fear stage.

173.    *Ninth*, the Asylum IFR's claimed justification of a backlogged immigration court system is pretextual, as only 17% of EOIR's pending caseload is credible fear referrals. And because more than one-third of all aliens referred to EOIR for a credible fear determination never actually bother to file an application, the proportion of "real" asylum cases before EOIR is even smaller.[36]

174.    *Tenth*, the Asylum IFR fails to account for the reality that the vast majority of asylum claims have no merit and that AOs have a terrible track record of correctly adjudicating aliens' credible fear claims. Between FY2008 and the third quarter of 2021, the grant rate for asylum matters originating from credible fear referrals made by AOs was only 12.69%. Furthermore, *in absentia* removal order rates for such cases are very high. This means that most aliens being placed into immigration court proceedings following a positive credible fear determination by AOs are being ordered removed. The current system is rife with fraud and frivolous claims. Rather than make the system stricter to solve these problems, the Asylum IFR inexplicably relaxes requirements even further, thus making it even easier for aliens with meritless claims improperly to gain entry into the United States.

175.    *Eleventh*, the Asylum IFR eliminates the requirement that aliens arriving at the border complete a full complete asylum application on paper. Instead, the Asylum IFR treats an alien's oral asylum claim as a complete asylum application. In contrast, aliens already inside the United States who file an asylum application would still be required to submit a full asylum application on paper. This improperly provides more favorable treatment to aliens who cross the border illegally, and will also create significant administrative problems, as judicial review of such oral asylum applications will be nearly impossible in the absence of a clear record of the alien's asylum claims.

---

[36] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Pending I-862 Proceedings Originating With a Credible Fear Claim and All Pending I-862s* (July 2021), https://bit.ly/3OEe1kj.

176.    *Twelfth*, the Asylum IFR makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and it fails to consider the effect that this change will have on illegal immigration rates, unemployment rates for citizens and authorized aliens, and the effect on wages. The Asylum IFR treats a positive credible-fear finding, which has little relation to whether an individual will ultimately qualify for asylum, as a properly filed asylum application that starts the clock for eligibility to file for work authorization. Because a large percentage of aliens who meet the credible fear bar never even apply for asylum, this change makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and to get it sooner. This change will greatly incentivize aliens who lack meritorious asylum claims to enter the United States and falsely claim asylum.

177.    For each of these independently sufficient reasons, the Asylum IFR is arbitrary and capricious.

**COUNT V**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action**
**(Parole)**

178.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

179.    The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As explained *supra* ¶¶ 156-58, agency action is arbitrary and capricious, and thus unlawful, if the agency failed to analyze and consider relevant factors and important aspects of the problem.

180.    The Asylum IFR's parole provisions are arbitrary and capricious for multiple independently sufficient reasons, including the following.

181.    *First*, Defendants have failed to analyze and consider how their own failure to maintain detention capacity affects the purported need to parole aliens into the United States. For example, at

the same time Defendants claim that their detention facilities are at overcapacity, Defendants submitted a budget request to Congress that would *decrease* DHS's alien detention capacity by 25%.[37] Moreover, Defendants affirmatively have degraded their own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities.[38]

182.     In addition, even where DHS has capacity, it has often failed to utilize it. For example, an April 12, 2022 DHS Inspector General Report explains how DHS acquired detention capacity from hotels from no-bid contracts and then inexplicably failed to use it: indeed, DHS "spent approximately $17 million for hotel space and services at six hotels that went largely unused between April and June 2021" and "did not adequately justify the need for the sole source contract to house migrant families." The Asylum IFR is arbitrary and capricious as it fails to account for Defendants' failure to employ the detention capacity they have spent millions of dollars to obtain, but apparently prefer to keep utilized so that they can grant parole *en masse* on the basis of putative lack of detention space. This arrangement—premised on no-bid contracts to politically favored entities—is as corrupt as it is violative of the APA.

183.     Defendants' failure to address the Inspector General's report (of which they had knowledge at the time the Rule was promulgated) further renders the Rule arbitrary and capricious.

184.     *Second*, Defendants have failed to explain their deviation from prior practice. Specifically, current regulations strictly limit when aliens pending a credible fear interview or in expedited removal may be paroled, so that it is permitted only when "parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii) and (b)(4)(ii). This limitation is consonant with Congress's intent to strictly limit Defendants' use of the

---

[37] Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, NEW YORK TIMES, (Mar. 25, 2022), https://nyti.ms/3vOI00F.

[38] *Id*.; Priscilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol.

parole power. Defendants claim that elimination of these constraints on the parole authority will allow them to process more families through expedited removal proceedings and "facilitat[e] their expeditious removal." 87 Fed. Reg. at 18,109. However, this justification is obviously pretextual, as Defendants have issued guidance strictly limiting removal of such aliens, and the number of removals under the Biden Administration has dropped precipitously. *See, e.g.*, September 30, 2021 DHS Permanent Guidance Memo; *Arizona v. Biden*, No. 21-CV-314, ECF No. 4-11 at 12 (S.D. Ohio Nov. 23, 2021) (deposition testimony of Acting Phoenix ICE Director Albert Carter noting a "big dropoff in removals" beginning in February 2021).

## COUNT VI
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D)
### Lack of Notice and Comment – Logical Outgrowth

185.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

186.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

187.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c). Thus, the Asylum IFR can be issued, if at all, only via notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

188.    Such requirements "are not mere formalities" but rather "are basic to our system of administrative law." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018). "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984); *see also NRDC*, 894 F.3d at 115 (notice and comment

53

serves "the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking"); *Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review").

189.     The Asylum IFR is not an interpretive rule, general statement of policy, or a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.

190.     The Asylum IFR was issued as an interim final rule, thus becoming effective without additional notice or comment.

191.     The Asylum IFR makes twenty-three major changes from the initial NPRM. *See* 87 Fed. Reg 18,081-18,084 (summarizing the twenty-three major changes). "[A]gencies may not 'pull a surprise switcheroo'" between a proposed and final rule. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014). When a final rule has major changes from the proposed rule, the "logical outgrowth" test governs whether an agency must submit the rule again for notice-and-comment before it may take effect. "As the Supreme Court recently explained [in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007)], the object of the logical outgrowth test is one of fair notice." *Owner-Operator Indep. Drivers Ass'n, Inc., v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 209 (D.C. Cir. 2007) (citations omitted).

192.     Defendants claim that the Asylum IFR is a logical outgrowth of the NPRM merely because the changes in the IFR "were adopted in response to comments received." 87 Fed. Reg. at 18,195. However, the twenty-three changes to the Asylum IFR are not a "logical outgrowth" of the NPRM because a "reasonable commenter" would not "have anticipated that such ... requirement[s] would be promulgated," and the NPRM did not provide notice "sufficient to advise interested parties that comments directed to the controverted aspect of the final rule should have been made." *First Am.*

*Discount Corp. v. Commodity Trading Futures Ass'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (cleaned up). The Asylum IFR therefore may not take effect until commenters are provided "their first occasion to offer new and different criticisms which the agency might find convincing." *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058-59 (D.C. Cir. 2000) (citation omitted).

193.    Indeed, Defendants themselves recognize that the changes in the Asylum IFR are major changes requiring further comment from the public, "acknowledge[ing] that [DOJ and DHS] would benefit from the public's input on the provisions in this IFR as well as the IFR's implementation." 87 Fed. Reg. at 18,195.

194.    Because the logical outgrowth test requires that the Asylum IFR be subject to an additional round of notice-and-comment before taking effect, the Asylum IFR must be "held unlawful and set aside" as it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

195.    Furthermore, considering the magnitude of the Asylum IFR's impact on State authorities, it was incumbent on Defendants to consult with the States on both the wisdom and implementation of such a far-reaching endeavor, and failure to do so was not harmless error. *See Johnson*, 632 F.3d at 931 ("An overreaching harmless error doctrine would allow the agency to inappropriately 'avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, [the agency] would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.'"); 2 U.S.C. § 1534(a) ("[e]ach agency *shall* . . . develop an effective process to permit elected officers of State, local, and tribal governments . . . to provide *meaningful and timely* input in the development of regulatory proposals containing significant Federal intergovernmental mandates." (emphasis added)).

196.    Under these circumstances, Defendants' failure to comply with the APA's notice and comment provisions is fatal to the Asylum IFR. *Johnson*, 632 F.3d at 928-29 ("Without good cause, we must enforce Congress's choice in favor of the traditional, deliberative rulemaking process.").

**COUNT VII**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Notice and Comment**
**(Failure to Address Comments)**

197.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

198.    The Asylum IFR is a rule that can be issued, if at all, only by notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

199.    The Asylum IFR failed to take account of the States' comments, either summarily rejecting them without substantive explanation, or outright ignoring them. For example, a coalition of 16 states that includes most of the Plaintiffs submitted an 18-page comment that raised general concerns, as well as 10 specific comments about serious deficiencies in the proposed rule. *See* Comment Submitted by Louisiana and 15 other States, USCIS-2021-0012-4980 (Oct. 19, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-4980. Defendants ignored much of the States' comment and, for the aspects of the comment that they purported to address, they summarily disposed of the States' comment in a cursory, dismissive fashion that refused to offer any substantive legal or factual basis for dismissing the States' comment. *E.g.*, 87 Fed. Reg. at 18,193-18,194 (cursorily rejecting States' NEPA and federalism concerns without offering substantive legal or factual justification for rejection).

200.    Furthermore, the Asylum IFR similarly fails to take account of other important comments from immigration subject-matter experts that point out a number of unlawful and misguided aspects to the proposed rule, and which remain unchanged in the IFR. *See*, *e.g.*, Comment Submitted

by America First Legal Foundation, USCIS-2021-0012-5140 (Oct. 19, 2021), https://www.regula-tions.gov/comment/USCIS-2021-0012-5140; Comment Submitted by Center for Immigration Stud-ies, USCIS-2021-0012-2333 (Oct. 19. 2021), https://www.regulations.gov/comment/USCIS-2021-0012-2333.

201.     Thus, the Asylum IFR must be "held unlawful and set aside" as it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VIII
### Administrative Procedure Act, the INA, 5 U.S.C. §§ 702, 706(2)(B), U.S. Constitution Take Care Clause Violation

202.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

203.     The APA aside, the federal government cannot ignore federal statutes, and the Con-stitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count VII. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

204.     The U.S. Constitution requires that the President "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

205.     The Asylum IFR represents an abdication of multiple duties placed upon DHS to en-force U.S. immigration law, including clear statutory mandates.

206.     Defendants' issuance and implementation of the Asylum IFR thus violates the Presi-dent's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

### PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

1.     Declaring, under 28 U.S.C. § 2201, that the Asylum IFR is arbitrary and capricious and unlawful under the APA;

2.      Declaring, under 28 U.S.C. § 2201, that the Asylum IFR is contrary to law and in excess of statutory authority under the APA;

3.      Declaring, under 28 U.S.C. § 2201, that the Asylum IFR violates the APA because it was promulgated without notice and comment;

4.      Declaring, under 28 U.S.C. § 2201, that the Asylum IFR violates the INA, HSA, and the Secure Fence Act;

5.      Declaring that the Asylum IFR was issued in violation of the Constitution, including the Take Care Clause, art. II, § 3;

6.      Postponing the effective date of the Asylum IFR pursuant to 5 U.S.C. § 705;

7.      Holding unlawful and vacating the Asylum IFR under 5 U.S.C. § 706;

8.      Preliminarily and permanently enjoining, without bond, Defendants from applying the Asylum IFR;

9.      Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

10.      Granting any and all other such relief as the Court finds appropriate.

Dated:   May 5, 2022

Respectfully submitted,

By: */s/ Elizabeth B. Murrill*

MARK BRNOVICH
  Attorney General
BRUNN ("BEAU") W. ROYSDEN III *
  Solicitor General
DREW C. ENSIGN *
  Deputy Solicitor General
JAMES K. ROGERS *
  Senior Litigation Counsel
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

STEVE MARSHALL
  Alabama Attorney General
EDMUND G. LACOUR JR.*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

TREG R. TAYLOR
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Indiana Attorney General
BETSY M. DENARDI*
  Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
  Attorney General,
BRIAN KANE*
  Chief Deputy Attorney General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
OFFICE OF THE KANSAS ATTORNEY
GENERAL
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

Sean D. Reyes
  *Utah Attorney General*
Melissa Holyoak
  *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

PATRICK MORRISEY
  Attorney General
LINDSAY SEE*
  Solicitor General
OFFICE OF THE WEST VIRGINIA AT-
TORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

\* Pro hac vice application forthcoming