# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| THE STATE OF ARIZONA, By and through its Attorney General, Mark Brnovich, et al., <br><br> PLAINTIFFS, <br><br> v. <br><br> MERRICK GARLAND in his official capacity as Attorney General of the United States of America; et al., <br><br> DEFENDANTS. | CIVIL ACTION NO. 6:22-CV-01130 |

**DECLARATION OF ATTORNEY JAMES K. ROGERS**

I, James K. Rogers, declare as follows:

1.  I am over 18 years of age and am fully competent to make this declaration. I am Senior Litigation Counsel in the Solicitor General's Office at the Arizona Attorney General's Office, and I am admitted to practice law in the State of Arizona. My pro hac vice application in this matter is forthcoming. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. I have personal knowledge of the facts stated herein.

2.  Attached hereto are true and correct copies of the following exhibits, which are cited in Plaintiffs' Motion for Preliminary Injunction:

| Exhibit No. | Title |
|---|---|
| 1 | USCIS, "Obtaining Asylum in the United States," https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/obtaining-asylum-in-the-united-states, accessed on May 6, 2022 |
| 2 | DHS, "Fiscal Year 2020 Refugees and Asylees Annual Flow Report," https://www.dhs.gov/sites/default/files/2022-03/22_0308_plcy_refugees_and_asylees_fy2020_1.pdf, accessed on May 6, 2022 |

1

| 3 | *Roll Call Vote 109th Congress - 2nd Session*, United States Senate, https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=109&session=2&vote=00262#top |
|---|---|
| 4 | EOIR, "Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019," https://www.justice.gov/eoir/file/1216991/download, accessed on May 6, 2022 |
| 5 | *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, Regulations.gov, https://www.regulations.gov/docket/USCIS-2021-0012/comments |
| 6 | Comment Submitted by Louisiana and 15 other States, USCIS-2021-0012-4980 (Oct. 19, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-4980. The Plaintiff States that were members of the coalition are Alabama, Arizona, Arkansas, Florida, Georgia, Indiana, Kansas, Missouri, Mississippi, Montana, Oklahoma, South Carolina, and West Virginia |
| 7 | Bill Melugin, *62,000+ illegal immigrants got past Border Patrol agents in March: sources*, Fox News (April 1, 2022), https://fxn.ws/37fqLNq |
| 8 | Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, New York Times, (Mar. 25, 2022), https://nyti.ms/3vOI00F |
| 9 | Priscilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol |
| 10 | Alexander Bolton, *All candidates raise hands on giving health care to undocumented immigrants*, The Hill (Jun. 27, 2019), https://bit.ly/3vJJKbo |
| 11 | Washington Post, *Where Democrats Stand: Do you believe all undocumented immigrants should be covered under a government-run health plan?*, https://wapo.st/36TZKiI |
| 12 | Dave Graham, *Exclusive: 'Migrant president' Biden stirs Mexican angst over boom time for gangs*, Reuters (Mar. 10, 2021), https://reut.rs/3vKlk1x |
| 13 | EOIR, *Executive Office for Immigration Review Adjudication Statistics: Pending I-862 Proceedings Originating With a Credible Fear Claim and All Pending I-862s* (July 2021), https://bit.ly/3OEe1kj |

| 14 | U.S. Citizenship and Immigration Services, *Number of Service-wide Forms Fiscal Year to Date* (Aug. 2021), https://bit.ly/3Mvduzj |
|---|---|
| 15 | Letter from Jon Tester, U.S. Senator for Montana, to Alejandro Mayorkas, Secretary of the U.S. Department of Homeland Security (April 5, 2022) (https://www.tester.senate.gov/files/Letters/2022-4-5%20DHS%20Secretary%20Mayorkas%20Title%2042.pdf) |
| 16 | Off. of Inspector Gen., ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels (April 12, 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-04/OIG-22-37-Apr22.pdf |

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was issued on May 13, 2022 in Phoenix, Arizona.

/s/ *James Rogers*

James K. Rogers
Senior Litigation Counsel
Arizona Attorney General's Office

3

# EXHIBIT 1

 **U.S. Citizenship and Immigration Services**

Home > Humanitarian > Refugees and Asylum > Asylum > Obtaining Asylum in the United States

# Obtaining Asylum in the United States

ℹ️ To continue to keep our workforce and applicants safe during the COVID-19 pandemic while maintaining efficiency and access to the asylum process, USCIS announced another extension to the temporary final rule (TFR) that requires certain asylum applicants to use our contract telephonic interpreters instead of bringing their own interpreters to their affirmative asylum interviews. This rule is in effect through March 16, 2023. For more information, please visit our TFR webpage.

The two ways of obtaining asylum in the United States are through the affirmative process and defensive process.

↗ Close All      ↗ Open All

## Affirmative Asylum Processing with USCIS      ⌃

To obtain asylum through the affirmative asylum process you must be physically present in the United States. You may apply for asylum regardless of how you arrived in the United States or your current immigration status.

You must apply for asylum within one year of the date of your last arrival in the United States, unless you can show:

- Changed circumstances that materially affect your eligibility for asylum or extraordinary circumstances relating to the delay in filing; and
- You filed within a reasonable amount of time given those circumstances.

You may apply for affirmative asylum by submitting Form I-589, Application for Asylum and for Withholding of Removal, to USCIS.

If your case is not approved and you do not have a legal immigration status, we will issue a Form I-862, Notice to Appear (NTA), and refer your case to an immigration judge at the Executive Office for Immigration Review (EOIR). The immigration judge conducts a "de novo" hearing of the case. This means that the judge conducts a new hearing and issues a decision that is independent of the decision made by USCIS. In certain circumstances, if USCIS does not have jurisdiction over your case, the asylum office will issue a Form I-863, Notice of Referral to Immigration Judge, for an asylum-only hearing. See the section "Defensive Asylum Processing With EOIR" below if this situation applies to you.

If you were previously issued an NTA that was not filed and docketed with the EOIR immigration court, or your previously issued NTA was filed and docketed with EOIR either shortly before (within 21 days) or after you filed your Form I-589 with USCIS, USCIS will refile your NTA (if necessary) and send your Form I-589 to the immigration court for adjudication.

To determine where to file your Form I-589, follow the instructions under the "Where to File" section on our Form I-589 page. For more information, please see What Happens After You File Your Form I-589 With USCIS.

You may live in the United States while your Form I-589 is pending before USCIS. If you are found ineligible, you can remain in the United States while your Form I-589 is pending with the immigration judge. Asylum applicants are not authorized to work unless you meet certain requirements. For more information, please see Permission to Work in the United States. Affirmative asylum applicants are rarely detained by U.S. Immigration and Customs Enforcement (ICE).

Please see the Affirmative Asylum Process for step-by-step information on applying for asylum through the affirmative asylum process.

## Defensive Asylum Processing with EOIR 

A defensive application for asylum occurs when you request asylum as a defense against removal from the United States. For asylum processing to be defensive, you must be in removal proceedings in immigration court with the Executive Office for Immigration Review (EOIR).

Individuals are generally placed into defensive asylum processing in one of two ways:

- They are referred to an immigration judge by USCIS after they have been determined to be ineligible for asylum at the end of the affirmative asylum process, or
- They are placed in removal proceedings because they:
  - Were apprehended in the United States or at a U.S. port of entry without proper legal documents or in violation of their immigration status; or
  - Were apprehended by U.S. Customs and Border Protection (CBP) trying to enter the United States without proper documentation, were placed in the expedited removal process, and were found to have a credible fear of persecution or torture by an asylum officer. See Questions & Answers: Credible Fear Screenings for more information on the credible fear process.

Immigration judges hear defensive asylum cases in adversarial (courtroom-like) proceedings. The judge will hear arguments from both of the following parties:

- You (and your attorney, if represented)
- The U.S. government, which is represented by an attorney from U.S. Immigration and Customs Enforcement (ICE)

The immigration judge then decides whether you are eligible for asylum. If the immigration judge finds you eligible, they will grant asylum. If the immigration judge finds you ineligible for asylum, they will determine whether you are eligible for any other forms of relief from removal. If the immigration judge finds you ineligible for other forms of relief, they will order you to be removed from the United States. Either party can appeal the immigration judge's decision.

See the Granted a Green Card by an Immigration Judge or Board of Immigration Appeals page for information about the grant of asylum by an immigration judge.

For information about the Executive Office for Immigration Review, including the Immigration Courts and the Board of Immigration Appeals, see Executive Office for Immigration Review. To determine where to file your Form I-589, follow the instructions under the "Where to File" section on our Form I-589 page.

Key Differences Between "Affirmative" and "Defensive" Asylum Process 

## Key Differences Between "Affirmative" and "Defensive" Asylum Process

| Affirmative | Defensive |
|---|---|
| Individual has not been placed in removal proceedings before an immigration judge. | Individual has been placed in removal proceedings before an immigration judge. |
| Individual affirmatively submits Form I-589 to USCIS. | Individual:<br><br>• Is placed in removal proceedings by an asylum officer;<br>• Is placed in removal proceedings for immigration violations; or<br>• Tried to enter the United States without proper documents and was found to have a credible fear of persecution or torture.<br><br>If the individual was referred by USCIS, the asylum application already filed will carry over to the immigration judge. If the individual did not yet submit an asylum application, they will submit it to the immigration judge. |
| Individual appears before a USCIS asylum officer for a non-adversarial interview | Individual appears before an immigration judge with the Executive Office for Immigration Review for an adversarial, court-like hearing. |
| Individual must provide a qualified interpreter for the asylum interview. | The immigration court provides a qualified interpreter for the asylum hearing and all other court proceedings. |

## Related Links

• [Form I 589, Application for Asylum and for Withholding of Removal](#)

↗ Close All    ↗ Open All

Last Reviewed/Updated:  03/15/2022

# EXHIBIT 2

Fiscal Year 2020 Refugees and Asylees
Annual Flow Report

March 8, 2022

OFFICE OF IMMIGRATION STATISTICS

Ryan Baugh



1

The United States provides protection to certain persons who have been persecuted or have a well-founded fear of persecution through two programs: a refugee program for persons outside the United States and their eligible relatives, and an asylum program for persons physically present or arriving in the United States and their eligible relatives.[1] The *2020 Refugee and Asylees Annual Flow Report*, authored by the Office of Immigration Statistics (OIS) in the Department of Homeland Security (DHS), presents information on persons admitted to the United States as refugees, those who applied for asylum in the United States, and those granted asylum in the United States in Fiscal Year (FY) 2020.[2,3]

## Summary

A total of 11,840 persons were admitted to the United States as refugees during 2020, including 5,142 as principal refugees and 6,698 as derivative refugees.[4] The leading countries of nationality for refugees admitted during this period were the Democratic Republic of the Congo (Congo), Burma, and Ukraine. The United States provided protection to an additional 31,429 individuals who were granted affirmative or defensive asylum during 2020,[5] including 16,864 individuals who were granted asylum affirmatively by DHS,[6] and 14,565 individuals who were granted asylum defensively by the U.S. Department of Justice (DOJ). An additional 1,530 individuals received derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant,[7] and 2,528 individuals who approved for derivative asylum abroad and were issued travel documents that allow their travel to the United States.[8] The leading countries of nationality for persons granted either affirmative or defensive asylum were the People's Republic of China (China), Venezuela, and El Salvador.

---

[1] Additionally, U.S. law bars removing individuals to a country where their "life or freedom would be threatened ... because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A); 8 U.S.C. 1231(b)(3)(A). This is known as statutory withholding of removal. See 8 CFR § 208.16(a)-(b). Pursuant to the Convention Against Torture, the United States is obligated to provide protection to individuals where there are substantial grounds to believe they would be in danger of being subjected to torture. Individuals may seek withholding or deferral of removal under the regulations implementing the Convention Against Torture. See 8 CFR §§ 208.13(c)(1), 208.16, 208.17.

[2] In this report, a year refers to a fiscal year (October 1 to September 30).

[3] The *2020 Yearbook of Immigration Statistics* and other OIS reports contain additional context. Not all numbers reported are contained in this report's tables.

[4] Refugee data in this report may differ slightly from numbers reported by the Department of State (DOS). DOS refugee numbers include Amerasians (children born in Cambodia, Korea, Laos, Thailand, or Vietnam after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen), whereas DHS reports Amerasians as lawful permanent residents.

[5] These asylum grants were based upon a principal asylum applicant's application, which may also include an accompanying spouse and unmarried children under 21 years of age. They do not include individuals who were approved for follow-to-join asylum status while residing in the United States or abroad.

[6] Affirmative asylum data for fiscal year 2020 were retrieved by OIS in December 2020. Data in this report may differ slightly from fiscal year-end 2020 numbers retrieved and reported at different times by DHS's U.S. Citizenship and Immigration Services (USCIS) Asylum Division.

[7] Of these, 1,490 were based on a relative's asylum grant, and 40 were based on a relative's refugee grant.

[8] OIS does not currently collect data on how many of those issued travel documents reach the United States and actually receive asylum.

## 2020 Applications Processing and Admissions Disruptions

President Trump did not sign the Presidential Determination on Refugee Admissions until November 2019, so no refugees at all could be admitted in October 2019, the first month of the new Fiscal Year. Refugee admissions and asylum applications and grants in 2020 were also affected by the Covid-19 pandemic and policy changes related to attempts to limit its spread, including travel restrictions and temporary closures of U.S. Citizenship and Immigration Services (USCIS) offices to in-person services to the public. USCIS field and asylum offices were closed to the public from March 18 through June 3, 2020 and reopened to the public in phases starting June 4, 2020 during which time asylum offices instituted in-office video conferencing interviews. Thus, refugee admissions dropped 98 percent between February and April 2020 and remained at historic lows through July before rebounding to levels similar to those observed in 2019 in the last two months of the fiscal year; and affirmative asylum grants fell 63 percent between February and April 2020 and then remained near historic lows through the end of the fiscal year (Figure 1).

Figure 1.
Refugee Arrivals and Affirmative Asylum Grants by Month:
Fiscal Years 2018 to 2020



Source: OIS analysis of DOS and DOJ data.

## DEFINING "REFUGEE" AND "ASYLUM" STATUS

To be eligible for refugee or asylum status, a principal applicant must meet the definition of a refugee set forth in section 101(a)(42) of the Immigration and Nationality Act (INA), which states in part that a refugee is a person who is unable or unwilling to return to his or her country of nationality because of persecution or a well-founded fear of persecution on account of race,

religion, nationality, membership in a particular social group, or political opinion.[9] Applicants for refugee status are outside the United States, whereas applicants seeking asylum are either within the United States or arriving at a U.S. port of entry (POE).

The INA also generally requires that a person must be outside their country of nationality or country of last habitual residence to qualify as a refugee unless the person has no nationality or is considered "stateless"; but it grants the President authority to designate countries for "in-country processing," allowing people to be processed for refugee status within their own countries. On November 1, 2019, President Trump re-designated eligible persons in Cuba, Eurasia, the Baltics, Iraq, Honduras, Guatemala, and El Salvador for in-country processing. In-country processing is also authorized for extraordinary individual protection cases for which resettlement consideration is requested by a U.S. Ambassador in any location.

## REFUGEES

### History of U.S. Refugee Resettlement

The United States has a long history of refugee resettlement. The Displaced Persons Act of 1948 was passed to address the migration crisis in Europe resulting from World War II, wherein millions of people had been forcibly displaced from their home countries and could not return. By 1952, the United States had admitted over 400,000 displaced people under the Act. The United States extended its commitments to refugee resettlement through legislation including the Refugee Relief Act of 1953 and the Fair Share Refugee Act of 1960. The Attorney General has also exercised parole authority to bring large groups of persons into the country for humanitarian reasons, including over 38,000 Hungarian nationals beginning in 1956 and over a million people from the Indochinese Peninsula beginning in 1975.

Obligations of the United States under the 1967 United Nations Protocol relating to the Status of Refugees (to which the United States acceded in 1968) generally prohibit the United States from returning a refugee to a country where their life or freedom would be threatened on account of a protected ground. The Refugee Act of 1980 amended the INA to bring U.S. law into greater accord with U.S. obligations under the Protocol, which broadened the scope of the 1951 United Nations Convention Relating to the Status of Refugees beyond protection just for refugees arising from events occurring in Europe before January 1, 1951. The Act also established formal refugee and asylum programs.

### Refugee Admissions Ceiling

Under the INA, the President establishes an overall refugee admissions ceiling and has typically set regional allocations before the beginning of each fiscal year following "appropriate

---

[9] Congress expanded this definition in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, providing that persons who have been forced to abort a pregnancy or undergo involuntary sterilization or who have been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program shall be deemed to have been persecuted on account of political opinion.

4

consultation" with Congress.[10] In 2020, the refugee ceiling was set at 18,000—its lowest level since the inception of the program in 1980. Additionally, the President did not sign the Presidential Determination on Refugee Admissions until November 2019, so no refugees could be admitted in the first month of the new Fiscal Year.

Refugee admissions ceilings in 2020 were based on six admission categories rather than world geographic regional allotments as in previous years (Table 1). Admissions were available to those persecuted or with a well-founded fear of persecution on account of religion; certain religious minorities in the former Soviet Union and Iran; certain Iraqis associated with the United States; nationals or residents of El Salvador, Guatemala, or Honduras; those referred by a U.S. embassy; those seeking reunification with family members in the United States admitted as refugees or granted asylum status; and those located in Australia, Nauru, or Papua New Guinea granted admission pursuant to an arrangement between the United States and Australia.

Table 1.
Proposed and Actual Refugee Admissions by Regions: Fiscal Years 2018 to 2020

| Region | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Ceiling | Admissions | Ceiling | Admissions | Ceiling | Admissions |
| Total | 45,000 | 22,405 | 30,000 | 29,916 | 18,000 | 11,840 |
| Africa | 19,000 | 10,459 | 11,000 | 16,366 | X | 4,171 |
| East Asia | 5,000 | 3,582 | 4,000 | 4,946 | X | 2,131 |
| Europe/Central Asia | 2,000 | 3,612 | 3,000 | 4,994 | X | 2,578 |
| Latin America/Caribbean | 1,500 | 955 | 3,000 | 809 | X | 948 |
| Near East/South Asia | 17,500 | 3,797 | 9,000 | 2,801 | X | 2,012 |
| Unallocated Reserve | - | - | - | - | X | - |

- Represents zero.
X Not applicable.
Notes: Ceiling and admission numbers reflect revisions made each fiscal year.  FY 2018 and 2019 data in this table are based on the nationality of the principal applicant. In FY 2020, Refugee Admissions ceilings were based on Admission Category and not by Region/Country of Chargeability. Based on the terms of a settlement in Doe et al. v. Trump et al., No. 17-0178 (W.D. Wash), certain refugee applicants that arrive in FY 2020 and any future fiscal years are counted toward the FY 2018 refugee admissions ceiling. In 2020, the number of such applicants was 26.
Source: OIS analysis of DOS data.

## Refugee Eligibility Requirements

To qualify for refugee status, a principal applicant must: (1) be of special humanitarian concern to the United States; (2) meet the refugee definition as set forth in section 101(a)(42) of the INA; (3) be admissible under the INA (or be granted a waiver of inadmissibility); (4) not be firmly resettled in any foreign country; and (5) merit a favorable exercise of discretion. Derivative refugees need not meet all these eligibility requirements, but they must be admissible to the United States and demonstrate a relationship as the spouse or child of a principal refugee

---

[10] In many cases, an unallocated reserve is also designated which can be used in any region if the need arises and only after notification to Congress.

applicant or an admitted refugee. Any person who has ordered, incited, assisted, or otherwise participated in the persecution of another on account of race, religion, nationality, membership in a particular social group, or political opinion is ineligible for refugee status, including as a derivative refugee.

## Refugee Application Process

The U.S. Refugee Admissions Program (USRAP) establishes processing priorities that identify individuals and groups who are of special humanitarian concern to the United States and who are eligible for refugee resettlement consideration. The priority categories are (P-1)—individuals referred by the United Nations High Commission on Refugees (UNHCR), a U.S. Embassy, or certain non-governmental organizations (NGOs); (P-2)—groups of special humanitarian concern; and (P-3)—family reunification cases. In 2020, unusually, the United States only accepted referrals from UNHCR in the categories listed above. Once principal refugee applicants are referred or granted access to USRAP under any of these priorities, they still must meet all other eligibility criteria, including meriting a favorable exercise of discretion. Upon referral, a Resettlement Support Center, working under a cooperative agreement with Department of State (DOS), conducts pre-screening interviews with the applicants. A USCIS officer then interviews applicants and accompanying derivatives to determine eligibility for resettlement in the United States. Multiple security checks must be completed before an application for refugee classification is approved. Additionally, applicants must also undergo a medical exam.

Individuals who are approved for refugee classification are assigned to a resettlement agency (sponsor) that assists with housing, employment, and other services upon arrival. The International Organization for Migration (IOM) arranges the refugee's travel to the United States. After arrival, refugees are authorized to work and may request documentation to travel outside the United States.

The spouse and unmarried children under the age of 21 of a principal refugee may obtain refugee status as an accompanying or follow-to-join derivative.[11] Accompanying derivatives may enter the United States with the principal refugee or within 4 months after the principal refugee's admission.[12] A spouse or child who joins the principal refugee more than 4 months after admission to the United States is a follow-to-join derivative. Principal refugees may petition for follow-to-join benefits for their qualifying derivatives within 2 years of the refugee's admission to the United States; the principal and the derivative refugee relative's relationship must have existed at the time of the principal's admission into the United States, at the time of filing for accompanying or follow-to-join benefits, and at the time of the relative's subsequent admission.

---

[11] Children may include those age 21 or over who are covered by provisions in the Child Status Protection Act, Pub. L. No. 107-208 (Aug. 6, 2002). A derivative child must be unmarried prior to the refugee's admission to the United States, when the Form I-730 Refugee/Asylee Relative Petition is filed, and at the time of the child's subsequent admission.

[12] In practice, most accompanying derivative refugees enter the United States with the principal refugee.

Principal refugees must file Form I-730, *Refugee/Asylee Relative Petition*,[13] for each qualifying follow-to-join derivative family member, who may be located abroad or in the United States. These beneficiaries are not required to demonstrate an independent refugee claim. Once a principal's I-730 has been approved for an individual located abroad, there are no time constraints placed upon that derivative relative's travel to the United States, provided that (1) the principal's status has not been revoked; (2) the relationship of the derivative to the principal is unchanged; and (3) in the case of a child, the child is unmarried at the time of admission.

DATA

All refugee data presented in this report are from the Worldwide Refugee Admissions Processing System (WRAPS) of the Bureau of Population, Refugees, and Migration of DOS.

TRENDS AND CHARACTERISTICS OF REFUGEES

Since the inception of the program in 1980, the United States has accepted more than 3.7 million refugees and asylees. In 2020, the United States admitted 11,840 refugees, a 60 percent decrease from the 29,916 refugees admitted in the previous year. At a high level, the trend in refugee admissions has gone through three periods since reaching its peak under the current legal framework at 122,066 in 1990 (Figure 2). Admissions generally declined during the 1990s, as the refugee program's focus shifted to more diverse populations across the world. Admissions reached a low point in 2002, due in part to security procedures and changes to admission requirements after September 11, 2001. Refugee admissions reached a post-2001 peak of 84,989 in 2016 under the Obama administration, the highest number in 17 years. More recently, the Trump administration reduced the refugee ceiling during each of its four years and implemented new refugee vetting and screening procedures, contributing to a decrease in admission since 2017.

---

[13] The petition is used to file for relatives of refugees and asylees. The USRAP program handles only *refugee* follow-to-join petitions, which are counted within the annual refugee ceiling. Asylum follow-to-join petitions are processed by USCIS and are not counted in the annual admission ceilings.

Figure 2.
Refugee Admissions and Proposed Ceilings to the United States:
Fiscal Years 1990 to 2020



Source: OIS analysis of DOS data.

## Category of Admission

In 2020, most refugees were admitted under P-1 processing (47 percent)—individuals referred by the UNHCR, a U.S. Embassy, or certain NGOs—and P-2 processing (49 percent)—groups of special humanitarian concern (Table 2). P-3 processing (family reunification cases) constituted 0.7 percent of refugees admitted and follow-to-join refugee beneficiaries made up 2.7 percent of refugees admitted. Principal refugees accounted for 5,142 (43 percent) of the 11,840 refugees admitted to the United States in 2020, while accompanying spouses and dependent children represented 12 and 44 percent, respectively.[14]

---

[14] Numbers in the Principal Applicant category previously included siblings, parents, and other dependents, who are now reported as Dependents. In addition, a small number of follow-to-join children are listed as principal applicants rather than children in WRAPS, and are therefore counted as principal applicants in OIS data.

Table 2.
Refugee Arrivals by Relationship to Principal Applicant and Case Priority:
Fiscal Years 2018 to 2020

| Category of admission and case priority | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **RELATIONSHIP TO PRINCIPAL APPLICANT** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Principal Applicant | 8,863 | 39.6 | 12,291 | 41.1 | 5,142 | 43.4 |
| Dependents | 13,542 | 60.4 | 17,625 | 58.9 | 6,698 | 56.6 |
| Spouse | 2,842 | 12.7 | 3,262 | 10.9 | 1,455 | 12.3 |
| Child | 10,563 | 47.1 | 14,211 | 47.5 | 5,186 | 43.8 |
| Siblings, parents, and other | 137 | 0.6 | 152 | 0.5 | 57 | 0.5 |
| **CASE PRIORITY** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Priority 1 | 12,001 | 53.6 | 16,744 | 56.0 | 5,613 | 47.4 |
| Priority 2 | 9,592 | 42.8 | 12,393 | 41.4 | 5,820 | 49.2 |
| Priority 3 | 95 | 0.4 | 224 | 0.7 | 83 | 0.7 |
| Follow-to-join beneficiaries | 717 | 3.2 | 555 | 1.9 | 324 | 2.7 |

Note: Numbers in the Principal Applicant category previously included siblings, parents, and other dependents, who are now reported as Dependents.
Source: OIS analysis of DOS data.

## Country of Nationality

In 2020, the leading countries of nationality for individuals admitted as refugees were Congo (24 percent), Burma (18 percent), Ukraine (16 percent), Afghanistan (5.1 percent), and Iraq (4.6 percent) (Table 3). These countries made up 68 percent of total refugee admissions in 2020, similar to their share in 2018 but down from 80 percent in 2019.

Since the inception of the refugee program, the nationalities of refugees admitted to the United States have changed as U.S. policies evolved and new conflicts around the world arose. Over the last ten years, the United States has admitted just over half a million refugees from around the world. Twenty-one percent have been from Burma, 17 percent from Iraq, 13 percent from the Congo, and 12 percent from Bhutan (Figure 3).

Table 3.
Refugee Arrivals by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country of nationality | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Congo, Democratic Republic | 7,841 | 35.0 | 12,875 | 43.0 | 2,863 | 24.2 |
| Burma | 3,525 | 15.7 | 4,928 | 16.5 | 2,112 | 17.8 |
| Ukraine | 2,637 | 11.8 | 4,432 | 14.8 | 1,935 | 16.3 |
| Afghanistan | 802 | 3.6 | 1,197 | 4.0 | 603 | 5.1 |
| Iraq | 140 | 0.6 | 462 | 1.5 | 541 | 4.6 |
| Syria | 62 | 0.3 | 560 | 1.9 | 486 | 4.1 |
| Eritrea | 1,260 | 5.6 | 1,750 | 5.8 | 475 | 4.0 |
| El Salvador | 724 | 3.2 | 311 | 1.0 | 362 | 3.1 |
| Moldova | 197 | 0.9 | 116 | 0.4 | 352 | 3.0 |
| Sudan | 74 | 0.3 | 376 | 1.3 | 258 | 2.2 |
| All other countries, including unknown | 5,143 | 23.0 | 2,909 | 9.7 | 1,853 | 15.7 |

Source: OIS analysis of DOS data.

Figure 3.
Refugee Arrivals by Top Country of Nationality: Fiscal Years 2011 to 2020



Source: OIS analysis of DOS data.

## Age, Sex, and Marital Status

Three-quarters of refugees admitted to the United States in 2020 were under 35 years of age, and two out of five were children under 18 years old (Table 4). Refugees tend to be relatively younger than the native-born population, with a median age of 23 years for those arriving in

10

2020, compared to a median age of 36 years for the native-born population.[15] Refugee median age varies widely by region and country of birth: refugees from Africa had the lowest median age of 20 years, while those from the Near East/South Asia and Europe had the highest median age of 26. Slightly more male than female refugees were admitted in 2020, and 50 percent of adults were married at arrival, compared to 47 percent in 2019.

Table 4.
Refugee Arrivals by Age, Sex, and Marital Status: Fiscal Years 2018 to 2020

| Characteristic | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| 0 to 17 years | 9,901 | 44.2 | 13,107 | 43.8 | 4,808 | 40.6 |
| 18 to 24 years | 3,418 | 15.3 | 4,286 | 14.3 | 1,584 | 13.4 |
| 25 to 34 years | 3,816 | 17.0 | 5,795 | 19.4 | 2,504 | 21.1 |
| 35 to 44 years | 2,447 | 10.9 | 3,212 | 10.7 | 1,426 | 12.0 |
| 45 to 54 years | 1,480 | 6.6 | 1,669 | 5.6 | 756 | 6.4 |
| 55 to 64 years | 767 | 3.4 | 1,139 | 3.8 | 484 | 4.1 |
| 65 years and over | 576 | 2.6 | 708 | 2.4 | 278 | 2.3 |
| **SEX** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Female | 11,099 | 49.5 | 14,651 | 49.0 | 5,700 | 48.1 |
| Male | 11,306 | 50.5 | 15,265 | 51.0 | 6,140 | 51.9 |
| **MARITAL STATUS** | | | | | | |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| Married | 6,891 | 30.8 | 7,770 | 26.0 | 3,493 | 29.5 |
| Single[1] | 14,405 | 64.3 | 20,828 | 69.6 | 7,873 | 66.5 |
| Other[2] | 1,109 | 4.9 | 1,318 | 4.4 | 474 | 4.0 |

[1] Includes persons who were engaged and not yet married.
[2] Includes persons who were divorced, separated, widowed, or of unknown marital status.
Source: OIS analysis of DOS data.

## State of Initial Resettlement

In 2020, more than half of admitted refugees (56 percent) were resettled in the top ten resettling states (Table 5). California, Washington, and Texas resettled the most refugees (10, 9.4, and 7.6 percent of admitted refugees, respectively), and Washington, Idaho, and Kentucky resettled the most refugees per capita, each resettling between 10 and 15 refugees per 100,000 population (Figure 4). Majorities of refugees resettling in Kentucky and Idaho were from Congo (68 and 52 percent, respectively), while the majority of those settling in Washington were from Ukraine (64 percent).

---

[15] Calculated from the 2020 March Current Population Survey as downloaded from *IPUMS-CPS, University of Minnesota, www.ipums.org.*

11

Table 5.
Refugee Arrivals by State of Residence: Fiscal Years 2018 to 2020
(Ranked by 2020 state of residence)

| State of residence | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 22,405 | 100.0 | 29,916 | 100.0 | 11,840 | 100.0 |
| California | 1,362 | 6.1 | 1,841 | 6.2 | 1,192 | 10.1 |
| Washington | 1,537 | 6.9 | 1,945 | 6.5 | 1,116 | 9.4 |
| Texas | 1,669 | 7.4 | 2,433 | 8.1 | 905 | 7.6 |
| New York | 1,281 | 5.7 | 1,845 | 6.2 | 626 | 5.3 |
| Michigan | 651 | 2.9 | 1,146 | 3.8 | 493 | 4.2 |
| Kentucky | 896 | 4.0 | 1,421 | 4.7 | 476 | 4.0 |
| North Carolina | 934 | 4.2 | 1,255 | 4.2 | 469 | 4.0 |
| Pennsylvania | 906 | 4.0 | 1,088 | 3.6 | 448 | 3.8 |
| Arizona | 998 | 4.5 | 1,216 | 4.1 | 444 | 3.8 |
| Ohio | 1,408 | 6.3 | 1,426 | 4.8 | 427 | 3.6 |
| Other | 10,763 | 48.0 | 14,300 | 47.8 | 5,244 | 44.3 |

Source: OIS analysis of DOS data.

Figure 4.
Per Capita Refugee Resettlement by State of Residence: Fiscal Year 2020



Source: OIS analysis of DOS and Census Bureau data.

Lawful Permanent Residence and Naturalization of Refugees

One year after being admitted to the United States, refugees are statutorily required to apply for lawful permanent resident (LPR) status. Of those arriving as refugees between 2000 and 2018, 97 percent gained LPR status by the end of 2020.[16] Refugees granted LPR status may apply for naturalization 5 years after their admission as refugees. Refugees have some of the highest naturalization rates of all immigrants: of the approximately 640,000 adults who obtained LPR status from 2000 to 2014 based on prior admission as a refugee, 49 percent naturalized within 5 years and 58 percent did so within 6 years.[17, 18]

## ASYLEES

### Filing of Claims

Generally, any foreign national physically present in the United States or arriving at a POE may seek asylum regardless of immigration status. Those seeking asylum must apply within 1 year from the date of last arrival or establish that an exception applies based on changed or extraordinary circumstances.[19] Principal applicants obtain asylum in one of two ways: affirmatively through a USCIS asylum officer or defensively in removal proceedings before an immigration judge of DOJ's Executive Office for Immigration Review (EOIR). An individual applies for asylum by filing Form I-589, *Application for Asylum and for Withholding of Removal*.

Spouses and unmarried children under the age of 21 who are not included in the principal's grant of asylum may obtain derivative asylum status.[20] A principal asylee may petition for follow-to-join benefits for qualifying derivatives within 2 years after they were granted asylum, as long as the relationship between the principal and their spouse and/or child existed on the date the principal was granted asylum. In practice, the vast majority of derivative asylum status beneficiaries receive follow-to-join benefits.

The principal asylee must file an I-730 for each qualifying family member, who may be located abroad or in the United States. Once an I-730 is approved for an individual located abroad, there are no time constraints placed upon the derivative relative's travel to the United States, as long as (1) the principal's status has not been revoked; (2) the relationship of the derivative to the

---

[16] Although the majority of refugees apply for LPR status 1 year after admission, due to operational and other factors, processing time can vary widely for those who apply.

[17] In comparison, the 11.6 million non-refugee adult immigrants who obtained LPR status from 2000 to 2014 had 5- and 6-year naturalization rates of 12 and 28 percent, respectively. The data were restricted to immigrants who were 18 years of age and older when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.

[18] For more discussion of refugee naturalization see Mossaad N., Ferwerda J., Lawrence D., Weinstein J. M., Hainmueller J., Determinants of refugee naturalization in the United States. Proceedings of the National Academy of Sciences U.S.A. 115, 9175–9180 (2018).

[19] Unaccompanied noncitizen children are not subject to the 1-year fling requirement. INA § 208(a) (2)(E); 8 U.S.C. 1158(a)(2)(E).

[20] See reference to Child Status Protection Act, n. 9, *supra*.

principal is unchanged; and (3) in the case of a child, the child is unmarried at the time of admission.

## Adjudication of Claims

The USCIS Asylum Division adjudicates claims and may grant asylum directly through the affirmative asylum process. Asylum officers conduct interviews to determine asylum eligibility using an applicant's testimony, information on Form I-589, any accompanying evidence provided by the applicant, and material provided by DOS, other USCIS offices, or other credible sources. The asylum applicant must meet the definition of a refugee, be credible considering the totality of the circumstances and all relevant factors, and not be barred from obtaining asylum. If the officer finds that the applicant satisfies the eligibility requirements, then the officer determines whether the application warrants a grant of asylum as a matter of discretion. Individuals may be barred for previously committing certain crimes, posing a national security threat, engaging in the persecution of others, or firmly resettling in another country before coming to the United States.

If applicants with a valid immigration status (e.g., a foreign student) fail to establish eligibility for asylum, USCIS denies the application, and the applicant remains in his or her valid status. If applicants are not in a valid status and are found ineligible for asylum, USCIS places these applicants in removal proceedings before an EOIR immigration judge, where the application is considered anew.[21]

Individuals who have not previously filed for asylum may apply defensively after being placed in removal proceedings by immigration enforcement officials because they are unlawfully present, are in violation of their status, or were apprehended while attempting to enter the United States. Defensive applicants apply for asylum directly with EOIR. During the proceedings, an immigration judge may grant asylum or deny the asylum application and issue a removal order if the noncitizen does not qualify for any other forms of relief. Defensive and affirmative applicants may appeal an EOIR denial to the Board of Immigration Appeals and, if unsuccessful there, may seek further review by a U.S. Court of Appeals, and finally the U.S. Supreme Court.

Follow-to-join asylum beneficiaries are not required to demonstrate a persecution claim because their status is derived from the principal asylee. Beneficiaries in the United States at the time of application are granted derivative asylum immediately upon the approval of their I-730 petitions. Beneficiaries abroad at the time of application are granted derivative asylum when admitted into the United States at a POE.

## Lawful Permanent Residence and Citizenship

One year after being granted asylum, asylees are eligible to apply for LPR status, as are their qualifying family members who meet the eligibility criteria. If LPR status is approved, the

---

[21] OIS tallies all asylum grants from an immigration judge as defensive grants, regardless of whether they first applied affirmatively.

asylee's "resident since" date is rolled back to one year prior to the LPR approval date. Asylees who have become LPRs may apply for naturalization 5 years after their "residence since" date.[22]

## DATA

The affirmative asylee data presented in this report were obtained from Global, a cloud-based platform of USCIS that has replaced the Refugees, Asylum, and Parole System (RAPS) mainframe system for storing affirmative asylee data.[23]

Defensive asylee data were obtained from EOIR. Follow-to-join asylum derivative data for people residing outside the United States at the time of their admission were obtained from the Case and Activity Management for International Operations (CAMINO) system of USCIS and the Consular Consolidated Database (CCD) of DOS. These data reflect travel documents issued, not admissions. Follow-to-join data for people residing within the United States at the time of the approval of their I-730 petition were obtained from the USCIS Computer-Linked Application Information Management System (CLAIMS).

## TRENDS AND CHARACTERISTICS OF ASYLEES

### Asylum Filings

Affirmative asylum filings with USCIS decreased by 4.1 percent from 97,192 applications in 2019 to 93,224 in 2020.[24] Venezuelan applications made up 24 percent of total applications in 2020, despite dropping 10 percent from 2019, and Chinese applications made up 10 percent of total applications in 2020. The next-highest numbers of affirmative applications in 2020 came from Guatemalan (9.0 percent), Honduran (6.4 percent), and El Salvadoran (5.8 percent) nationals (Table 6a). Unaccompanied children from Central America's Northern Triangle countries (El Salvador, Guatemala, and Honduras) accounted for 91 percent of all unaccompanied child asylum applications in 2020 and made up the 37 percent of affirmative asylum applications from these three countries.[25]

The total number of defensive asylum applications filed with EOIR decreased for the first time in several years, dropping 11 percent from a peak of 213,307 in 2019 to 189,838 in 2020.[26] Similar to the last couple of years, the largest numbers of applications lodged with the courts were from

---

[22] In other words, asylees may count a maximum of 1 year of their time in asylum status toward the required 5 years of permanent residence for naturalization eligibility purposes.
[23] The migration from RAPS to Global caused slight changes in historical numbers.
[24] These include principal applicants only. There were an additional 48,523 dependents.
[25] Unaccompanied children, unlike other populations, can apply affirmatively before a USCIS asylum officer after being placed into removal proceedings. See INA § 208(b)(3)(C); 8 U.S.C. 1158(b)(3)(C)..
[26] EOIR has recently changed its methodology in reporting affirmative asylum cases referred from USCIS. Instead of using the court application date as they do for defensive asylum cases, EOIR now reports on affirmative cases based on the date of the initial asylum application filing with USCIS. This change may result in a slight difference in historical numbers, and OIS has updated the data reported here and in the Yearbook of Immigration Statistics for 2015 – 2020.

16

citizens of the Northern Triangle countries (99,112) and Mexico (20,713) (Table 6b). These four countries made up 63 percent of defensive asylum applications filed with EOIR.

Table 6a.
Affirmative Asylum Cases Filed (USCIS) by Country of Nationality:
Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 106,193 | 100.0 | 97,192 | 100.0 | 93,224 | 100.0 |
| Venezuela | 28,429 | 26.8 | 25,224 | 26.0 | 22,586 | 24.2 |
| China, People's Republic | 8,196 | 7.7 | 9,663 | 9.9 | 9,656 | 10.4 |
| Guatemala | 10,196 | 9.6 | 9,717 | 10.0 | 8,361 | 9.0 |
| Honduras | 6,143 | 5.8 | 5,622 | 5.8 | 6,008 | 6.4 |
| El Salvador | 9,145 | 8.6 | 5,970 | 6.1 | 5,404 | 5.8 |
| Haiti | 2,959 | 2.8 | 3,281 | 3.4 | 5,008 | 5.4 |
| Mexico | 6,620 | 6.2 | 4,600 | 4.7 | 4,005 | 4.3 |
| Colombia | 2,574 | 2.4 | 2,897 | 3.0 | 3,676 | 3.9 |
| India | 2,912 | 2.7 | 2,965 | 3.1 | 3,117 | 3.3 |
| Nigeria | 3,323 | 3.1 | 2,769 | 2.8 | 2,302 | 2.5 |
| All Other Nations | 25,696 | 24.2 | 24,484 | 25.2 | 23,101 | 24.8 |

Source: OIS analysis of DHS data.

Table 6b.
Defensive Asylum Cases Received (EOIR) by Country of Nationality:
Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| TOTAL | 164,062 | 100.0 | 213,307 | 100.0 | 189,838 | 100.0 |
| Guatemala | 27,139 | 16.5 | 42,035 | 19.7 | 40,508 | 21.3 |
| Honduras | 22,168 | 13.5 | 32,198 | 15.1 | 33,398 | 17.6 |
| El Salvador | 32,426 | 19.8 | 30,229 | 14.2 | 25,206 | 13.3 |
| Mexico | 24,826 | 15.1 | 30,598 | 14.3 | 20,713 | 10.9 |
| Cuba | 1,160 | 0.7 | 5,523 | 2.6 | 11,427 | 6.0 |
| Venezuela | 5,279 | 3.2 | 11,695 | 5.5 | 11,213 | 5.9 |
| India | 7,856 | 4.8 | 11,091 | 5.2 | 5,449 | 2.9 |
| China, People's Republic | 8,103 | 4.9 | 6,904 | 3.2 | 4,683 | 2.5 |
| Ecuador | 4,051 | 2.5 | 4,477 | 2.1 | 4,319 | 2.3 |
| Nicaragua | 735 | 0.4 | 3,908 | 1.8 | 4,178 | 2.2 |
| unknown | 30,319 | 18.5 | 34,649 | 16.2 | 28,744 | 15.1 |

Note: Case receipts include affirmative claims that arrive at EOIR after being placed in proceedings.
Source: Source: OIS analysis of DOJ data.

## Asylum Grants

17

The total number of persons granted asylum in the United States decreased 32 percent from 46,130 in 2019 to 31,429 in 2020. USCIS granted asylum affirmatively to 16,864 people in 2020, a decrease of 38 percent from 2019; and EOIR immigration judges granted defensive asylum to 14,565 people in 2020, a decrease of 23 percent from 2019 but an increase of 10 percent from 2018 (Figure 5).

Figure 5.
Annual Grants of Affirmative and Defensive Asylum: 1990 to 2020



Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS and DOJ data.

## Country of Nationality

The three leading countries of nationality of persons granted affirmative or defensive asylum in 2018, 2019, and 2020 were China (15 percent in 2020), Venezuela (13 percent), and El Salvador (6.4 percent) (Table 7). Nationals of these three countries accounted for 35 percent of all persons granted asylum, down from 38 percent in 2019 and 41 percent in 2018. Of the top ten countries of nationality, only Cuba increased between 2019 and 2020, rising 72 percent, while India experienced the greatest proportional decrease (41 percent), followed by El Salvador and Venezuela (37 percent each). Among the top ten countries of nationality, asylum grants for nationals of Central America's Northern Triangle countries (El Salvador, Guatemala, and Honduras) and India have increasingly come from defensive cases rather than affirmative cases in the last few years, while Venezuelan asylum grants have remained mostly affirmative, and grants to Chinese nationals have remained fairly evenly split between defensive and affirmative.

The leading countries of nationality for persons granted affirmative asylum were Venezuela (20 percent), China (17 percent), Turkey (9.3 percent), and Egypt (7.9 percent) (Table 8). Fifty-four percent of those granted asylum affirmatively in 2020 were nationals of these countries.

18

The leading countries of nationality for persons granted defensive asylum were China (13 percent), El Salvador (12 percent), Guatemala (10 percent), and Cuba (8.4 percent) (Table 9). Forty-three percent of those granted asylum defensively in 2020 were nationals of these countries.

The leading countries of nationality for follow-to-join asylees authorized for travel to the United States in 2020 were India (14 percent), China (13 percent), Eritrea (11 percent), and Turkey (6.8 percent) (Table 10). Nationals of these four countries accounted for 44 percent of all follow-to-join derivative relatives issued travel documents allowing their travel to the United States. Additionally, 1,530 individuals were approved for derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant.[27]

Table 7.
Individuals Granted Asylum Affirmatively or Defensively by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 37,511 | 100.0 | 46,130 | 100.0 | 31,429 | 100.0 |
| China, People's Republic | 6,798 | 18.1 | 7,448 | 16.1 | 4,804 | 15.3 |
| Venezuela | 5,824 | 15.5 | 6,701 | 14.5 | 4,239 | 13.5 |
| El Salvador | 2,914 | 7.8 | 3,195 | 6.9 | 2,012 | 6.4 |
| Guatemala | 2,319 | 6.2 | 2,585 | 5.6 | 1,876 | 6.0 |
| Turkey | 501 | 1.3 | 1,774 | 3.8 | 1,622 | 5.2 |
| Egypt | 1,565 | 4.2 | 2,271 | 4.9 | 1,444 | 4.6 |
| India | 1,302 | 3.5 | 2,256 | 4.9 | 1,337 | 4.3 |
| Honduras | 1,996 | 5.3 | 1,815 | 3.9 | 1,269 | 4.0 |
| Cuba | 163 | 0.4 | 721 | 1.6 | 1,242 | 4.0 |
| Mexico | 1,346 | 3.6 | 1,585 | 3.4 | 1,207 | 3.8 |
| All other countries, including unknown | 12,783 | 34.1 | 15,779 | 34.2 | 10,377 | 33.0 |

Note: Data exclude follow-to-join asylees.
Source: Source: OIS analysis of DHS and DOJ data.

---

[27] 1,490 derivative asylum grants were based on an asylee relative petition and 40 were based on a refugee family petition.

Table 8.

Individuals Granted Asylum Affirmatively by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| Venezuela | 5,701 | 23.4 | 6,200 | 22.8 | 3,349 | 19.9 |
| China, People's Republic | 3,750 | 15.4 | 3,989 | 14.7 | 2,855 | 16.9 |
| Turkey | 475 | 2.0 | 1,714 | 6.3 | 1,568 | 9.3 |
| Egypt | 1,401 | 5.8 | 2,125 | 7.8 | 1,336 | 7.9 |
| Russia | 756 | 3.1 | 1,097 | 4.0 | 741 | 4.4 |
| Mexico | 715 | 2.9 | 783 | 2.9 | 490 | 2.9 |
| Guatemala | 1,303 | 5.4 | 1,041 | 3.8 | 441 | 2.6 |
| Nigeria | 452 | 1.9 | 764 | 2.8 | 411 | 2.4 |
| El Salvador | 1,141 | 4.7 | 875 | 3.2 | 291 | 1.7 |
| Syria | 545 | 2.2 | 501 | 1.8 | 286 | 1.7 |
| All other countries, including unknown | 8,078 | 33.2 | 8,137 | 29.9 | 5,096 | 30.2 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS data.

Table 9.

Individuals Granted Asylum Defensively by Country of Nationality: Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 13,194 | 100.0 | 18,904 | 100.0 | 14,565 | 100.0 |
| China, People's Republic | 3,048 | 23.1 | 3,459 | 18.3 | 1,949 | 13.4 |
| El Salvador | 1,773 | 13.4 | 2,320 | 12.3 | 1,721 | 11.8 |
| Guatemala | 1,016 | 7.7 | 1,544 | 8.2 | 1,435 | 9.9 |
| Cuba | 161 | 1.2 | 711 | 3.8 | 1,226 | 8.4 |
| India | 951 | 7.2 | 1,927 | 10.2 | 1,179 | 8.1 |
| Honduras | 1,181 | 9.0 | 1,291 | 6.8 | 1,013 | 7.0 |
| Venezuela | 123 | 0.9 | 501 | 2.7 | 890 | 6.1 |
| Mexico | 631 | 4.8 | 802 | 4.2 | 717 | 4.9 |
| Cameroon | 312 | 2.4 | 659 | 3.5 | 591 | 4.1 |
| Nicaragua | 35 | 0.3 | 357 | 1.9 | 364 | 2.5 |
| All other countries, including unknown | 3,963 | 30.0 | 5,333 | 28.2 | 3,480 | 23.9 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DOJ data.

20

Table 10.
Follow-to-join Asylee Travel Documents Issued by Country of Nationality:
Fiscal Years 2018 to 2020
(Ranked by 2020 country of nationality)

| Country | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 6,107 | 100.0 | 6,253 | 100.0 | 2,528 | 100.0 |
| India | 526 | 8.6 | 610 | 9.8 | 342 | 13.5 |
| China, People's Republic | 1,625 | 26.6 | 1,478 | 23.6 | 327 | 12.9 |
| Eritrea | 199 | 3.3 | 503 | 8.0 | 266 | 10.5 |
| Turkey | 15 | 0.2 | 126 | 2.0 | 171 | 6.8 |
| Guatemala | 371 | 6.1 | 334 | 5.3 | 127 | 5.0 |
| Egypt | 132 | 2.2 | 226 | 3.6 | 113 | 4.5 |
| Ethiopia | 287 | 4.7 | 190 | 3.0 | 98 | 3.9 |
| El Salvador | 335 | 5.5 | 169 | 2.7 | 84 | 3.3 |
| Nepal | 466 | 7.6 | 277 | 4.4 | 76 | 3.0 |
| Syria | 87 | 1.4 | 140 | 2.2 | 60 | 2.4 |
| All other countries, including unknown | 2,064 | 33.8 | 2,200 | 35.2 | 864 | 34.2 |

Source: OIS analysis of DHS and DOS data.

Age, Sex, and Marital Status

In 2020, 61 percent of persons granted affirmative asylum were between the ages of 18 and 44
(Table 11). The median age of asylees has increased in recent years from a low of 24 years old in
2017 to 32 years in 2020, closer to the median age of the native-born population (36 years).
Fifty-one percent were male, and 58 percent of adults were married. Just over half (52 percent)
of follow-to-join beneficiaries were under the age of 18. The median age of follow-to-join
beneficiaries was 17 years (Table 12). Data on marital status are not available for this group.

State of Residence

In 2020, the leading states of residence for individuals granted asylum affirmatively were
California (34 percent), New Jersey (9.5 percent), and Florida (9.3 percent) (Table 13). More
than half (52 percent) of individuals granted affirmative asylum in 2020 resided in these three
states. Per capita, the leading areas include New Jersey and California, with approximately 17
and 14 recipients per 100,000 residents, respectively.

State of residence data are not available for defensive or follow-to-join asylees.

21

Table 11.
Individuals Granted Asylum Affirmatively by Age, Sex, and Marital Status:
Fiscal Years 2018 to 2020

| Characteristic | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| 0 to 17 years | 5,677 | 23.3 | 6,019 | 22.1 | 3,515 | 20.8 |
| 18 to 24 years | 3,883 | 16.0 | 3,768 | 13.8 | 1,982 | 11.8 |
| 25 to 34 years | 6,333 | 26.0 | 6,977 | 25.6 | 4,235 | 25.1 |
| 35 to 44 years | 5,172 | 21.3 | 6,284 | 23.1 | 4,102 | 24.3 |
| 45 to 54 years | 2,286 | 9.4 | 2,878 | 10.6 | 2,072 | 12.3 |
| 55 to 64 years | 700 | 2.9 | 1,001 | 3.7 | 733 | 4.3 |
| 65 and over | 266 | 1.1 | 299 | 1.1 | 225 | 1.3 |
| **Sex** | | | | | | |
| Total | 24,317 | 100.0 | 27,226* | 100.0 | 16,864 | 100.0 |
| Female | 11,925 | 49.0 | 13,340 | 49.0 | 8,241 | 48.9 |
| Male | 12,392 | 51.0 | 13,884 | 51.0 | 8,623 | 51.1 |
| **MARITAL STATUS** | | | | | | |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| Married | 9,684 | 39.8 | 11,617 | 42.7 | 7,738 | 45.9 |
| Single | 13,541 | 55.7 | 14,232 | 52.3 | 8,218 | 48.7 |
| Other** | 1,092 | 4.5 | 1,377 | 5.1 | 908 | 5.4 |

- Represents zero or rounds to zero.
* Includes 2 persons of unknown sex.
** Includes persons who were divorced, separated, widowed, or of unknown marital status.
Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS data.

Table 12.
Follow-to-join Asylee Travel Documents Issued by Age and Sex:
Fiscal Years 2018 to 2020

| Characteristic | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total | 6,107 | 100.0 | 6,253 | 100.0 | 2,528 | 100.0 |
| 0 to 17 years | 3,174 | 52.0 | 3,056 | 48.9 | 1,307 | 51.7 |
| 18 to 24 years | 1,135 | 18.6 | 1,199 | 19.2 | 448 | 17.7 |
| 25 to 34 years | 645 | 10.6 | 646 | 10.3 | 274 | 10.8 |
| 35 to 44 years | 610 | 10.0 | 677 | 10.8 | 288 | 11.4 |
| 45 to 54 years | 396 | 6.5 | 471 | 7.5 | 155 | 6.1 |
| 55 to 64 years | 132 | 2.2 | 172 | 2.8 | 43 | 1.7 |
| 65 and over | 15 | 0.2 | 32 | 0.5 | 13 | 0.5 |
| **SEX** | | | | | | |
| Total | 6,107 | 100.0 | 6,253 | 100.0 | 2,528 | 100.0 |
| Female | 3,364 | 55.1 | 3,311 | 53.0 | 1,363 | 53.9 |
| Male | 2,737 | 44.8 | 2,910 | 46.5 | 1,135 | 44.9 |
| Unknown | 6 | 0.1 | 32 | 0.5 | 30 | 1.2 |

Source: OIS analysis of DHS and DOS data.

Table 13.
Individuals Granted Asylum Affirmatively by State of Residence: Fiscal Years 2018 to 2020
(Ranked by 2020 state of residence)

| State of residence | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 24,317 | 100.0 | 27,226 | 100.0 | 16,864 | 100.0 |
| California | 8,092 | 33.3 | 9,205 | 33.8 | 5,656 | 33.5 |
| New Jersey | 1,340 | 5.5 | 2,544 | 9.3 | 1,609 | 9.5 |
| Florida | 3,069 | 12.6 | 2,469 | 9.1 | 1,563 | 9.3 |
| Texas | 1,583 | 6.5 | 1,798 | 6.6 | 916 | 5.4 |
| Illinois | 890 | 3.7 | 1,454 | 5.3 | 868 | 5.1 |
| New York | 2,021 | 8.3 | 2,125 | 7.8 | 841 | 5.0 |
| Pennsylvania | 567 | 2.3 | 773 | 2.8 | 451 | 2.7 |
| Ohio | 245 | 1.0 | 643 | 2.4 | 441 | 2.6 |
| Indiana | 287 | 1.2 | 650 | 2.4 | 418 | 2.5 |
| Washington | 394 | 1.6 | 484 | 1.8 | 334 | 2.0 |
| Other | 5,829 | 24.0 | 5,081 | 18.7 | 3,767 | 22.3 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS data.

## Naturalization of Asylees

Eighty-three percent of those granted affirmative asylum from 2009 to 2018 gained LPR status
by the end of 2020. Similar to refugees, asylees have some of the highest naturalization rates of

all immigrants. Of the almost 525,000 adults who obtained LPR status from 2000 to 2014 based on the prior grant of asylum (affirmative or defensive), 56 percent naturalized within 6 years.[28]

FOR MORE INFORMATION Visit the Office of Immigration Statistics web page at http://www.dhs.gov/immigration-statistics.

Breakout text box:

DHS and DOJ published an interim final rule on July 16, 2019 to add a new bar to eligibility for asylum for a noncitizen who enters or attempts to enter the United States across the Southern Border, but who transited through a third country *en route* to the United States and did not apply for protection there. A court ordered the Departments to cease implementation of the interim final rule in June 2020. A total of 6,911 noncitizens were subject to the bar in Fiscal Year 2019,[29] and 18,247 were subject to the bar in Fiscal Year 2020. Of the 18,247 individuals subject to the bar in 2020, 344 were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of May 6, 2021, another 6,672 individuals subject to the asylum bar in 2020 had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture.

In addition, the United States signed Asylum Cooperative Agreements (ACAs) in 2019 with Guatemala, Honduras, and El Salvador. In general, these ACAs allowed DHS to transfer asylum claimants to one of these three countries (other than the country of the noncitizen's nationality) to seek protection there. The agreement with Guatemala was operational between November 21, 2019 and March 16, 2020 and resulted in 61 removal flights with a total of 948 individual removals to Guatemala. Agreements with El Salvador and Honduras were never implemented as a result of the COVID-19 pandemic.

Consistent with Executive Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," issued on February 2, 2021, on February 6, 2021, the Secretary of State announced the suspension of all three ACAs. DOS terminated the U.S.-Guatemala ACA in early May 2021 and terminated the other two ACAs in early August 2021.

---

[28] The data were restricted to individuals who were at least 18 years old when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.

[29] This updates previously published information. In 2019, 77 were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of January 29, 2021, another 4,049 individuals subject to the asylum bar in 2019 had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture.

# EXHIBIT 3

# Roll Call Vote 109th Congress - 2nd Session

## Vote Summary

XML

**Question:** On Passage of the Bill (H.R. 6061 )

**Vote Number:** 262     **Vote Date:** September 29, 2006, 09:30 PM

**Required For Majority:** 1/2     **Vote Result:** Bill Passed

**Measure Number:** H.R. 6061 (Secure Fence Act of 2006 )

**Measure Title:** A bill to establish operational control over the international land and maritime borders of the United States.

**Vote Counts:**   YEAs   80
                     NAYs   19
                     Not Voting   1

*Information compiled through Senate LIS by the Senate bill clerk under the direction of the secretary of the Senate

Vote Summary      By Senator Name      By Vote Position      By Home State

### Alphabetical by Senator Name

Akaka (D-HI), **Nay**
Alexander (R-TN), **Yea**
Allard (R-CO), **Yea**
Allen (R-VA), **Yea**
Baucus (D-MT), **Yea**
Bayh (D-IN), **Yea**
Bennett (R-UT), **Yea**
Biden (D-DE), **Yea**
Bingaman (D-NM), **Nay**
Bond (R-MO), **Yea**
Boxer (D-CA), **Yea**
Brownback (R-KS), **Yea**
Bunning (R-KY), **Yea**
Burns (R-MT), **Yea**
Burr (R-NC), **Yea**
Byrd (D-WV), **Yea**
Cantwell (D-WA), **Nay**
Carper (D-DE), **Yea**
Chafee (R-RI), **Nay**
Chambliss (R-GA), **Yea**
Clinton (D-NY), **Yea**
Coburn (R-OK), **Yea**
Cochran (R-MS), **Yea**
Coleman (R-MN), **Yea**
Collins (R-ME), **Yea**
Conrad (D-ND), **Yea**
Cornyn (R-TX), **Yea**
Craig (R-ID), **Yea**
Crapo (R-ID), **Yea**

Dayton (D-MN), **Yea**
DeMint (R-SC), **Yea**
DeWine (R-OH), **Yea**
Dodd (D-CT), **Yea**
Dole (R-NC), **Yea**
Domenici (R-NM), **Yea**
Dorgan (D-ND), **Yea**
Durbin (D-IL), **Nay**
Ensign (R-NV), **Yea**
Enzi (R-WY), **Yea**
Feingold (D-WI), **Nay**
Feinstein (D-CA), **Yea**
Frist (R-TN), **Yea**
Graham (R-SC), **Yea**
Grassley (R-IA), **Yea**
Gregg (R-NH), **Yea**
Hagel (R-NE), **Yea**
Harkin (D-IA), **Yea**
Hatch (R-UT), **Yea**
Hutchison (R-TX), **Yea**
Inhofe (R-OK), **Yea**
Inouye (D-HI), **Nay**
Isakson (R-GA), **Yea**
Jeffords (I-VT), **Nay**
Johnson (D-SD), **Yea**
Kennedy (D-MA), **Not Voting**
Kerry (D-MA), **Nay**
Kohl (D-WI), **Yea**
Kyl (R-AZ), **Yea**

Landrieu (D-LA), **Yea**
Lautenberg (D-NJ), **Nay**
Leahy (D-VT), **Nay**
Levin (D-MI), **Nay**
Lieberman (D-CT), **Nay**
Lincoln (D-AR), **Yea**
Lott (R-MS), **Yea**
Lugar (R-IN), **Yea**
Martinez (R-FL), **Yea**
McCain (R-AZ), **Yea**
McConnell (R-KY), **Yea**
Menendez (D-NJ), **Nay**
Mikulski (D-MD), **Yea**
Murkowski (R-AK), **Yea**
Murray (D-WA), **Nay**
Nelson (D-FL), **Yea**
Nelson (D-NE), **Yea**
Obama (D-IL), **Yea**
Pryor (D-AR), **Yea**
Reed (D-RI), **Nay**
Reid (D-NV), **Nay**
Roberts (R-KS), **Yea**
Rockefeller (D-WV), **Yea**
Salazar (D-CO), **Nay**
Santorum (R-PA), **Yea**
Sarbanes (D-MD), **Nay**
Schumer (D-NY), **Yea**
Sessions (R-AL), **Yea**
Shelby (R-AL), **Yea**

Smith (R-OR), **Yea**      Sununu (R-NH), **Yea**      Voinovich (R-OH), **Yea**
Snowe (R-ME), **Yea**      Talent (R-MO), **Yea**      Warner (R-VA), **Yea**
Specter (R-PA), **Yea**      Thomas (R-WY), **Yea**      Wyden (D-OR), **Yea**
Stabenow (D-MI), **Yea**      Thune (R-SD), **Yea**
Stevens (R-AK), **Yea**      Vitter (R-LA), **Yea**

| Vote Summary | By Senator Name | By Vote Position | By Home State |
|---|---|---|---|

## Grouped By Vote Position

### YEAs ---80

| | | |
|---|---|---|
| Alexander (R-TN) | DeWine (R-OH) | McConnell (R-KY) |
| Allard (R-CO) | Dodd (D-CT) | Mikulski (D-MD) |
| Allen (R-VA) | Dole (R-NC) | Murkowski (R-AK) |
| Baucus (D-MT) | Domenici (R-NM) | Nelson (D-FL) |
| Bayh (D-IN) | Dorgan (D-ND) | Nelson (D-NE) |
| Bennett (R-UT) | Ensign (R-NV) | Obama (D-IL) |
| Biden (D-DE) | Enzi (R-WY) | Pryor (D-AR) |
| Bond (R-MO) | Feinstein (D-CA) | Roberts (R-KS) |
| Boxer (D-CA) | Frist (R-TN) | Rockefeller (D-WV) |
| Brownback (R-KS) | Graham (R-SC) | Santorum (R-PA) |
| Bunning (R-KY) | Grassley (R-IA) | Schumer (D-NY) |
| Burns (R-MT) | Gregg (R-NH) | Sessions (R-AL) |
| Burr (R-NC) | Hagel (R-NE) | Shelby (R-AL) |
| Byrd (D-WV) | Harkin (D-IA) | Smith (R-OR) |
| Carper (D-DE) | Hatch (R-UT) | Snowe (R-ME) |
| Chambliss (R-GA) | Hutchison (R-TX) | Specter (R-PA) |
| Clinton (D-NY) | Inhofe (R-OK) | Stabenow (D-MI) |
| Coburn (R-OK) | Isakson (R-GA) | Stevens (R-AK) |
| Cochran (R-MS) | Johnson (D-SD) | Sununu (R-NH) |
| Coleman (R-MN) | Kohl (D-WI) | Talent (R-MO) |
| Collins (R-ME) | Kyl (R-AZ) | Thomas (R-WY) |
| Conrad (D-ND) | Landrieu (D-LA) | Thune (R-SD) |
| Cornyn (R-TX) | Lincoln (D-AR) | Vitter (R-LA) |
| Craig (R-ID) | Lott (R-MS) | Voinovich (R-OH) |
| Crapo (R-ID) | Lugar (R-IN) | Warner (R-VA) |
| Dayton (D-MN) | Martinez (R-FL) | Wyden (D-OR) |
| DeMint (R-SC) | McCain (R-AZ) | |

### NAYs ---19

| | | |
|---|---|---|
| Akaka (D-HI) | Jeffords (I-VT) | Murray (D-WA) |
| Bingaman (D-NM) | Kerry (D-MA) | Reed (D-RI) |
| Cantwell (D-WA) | Lautenberg (D-NJ) | Reid (D-NV) |
| Chafee (R-RI) | Leahy (D-VT) | Salazar (D-CO) |
| Durbin (D-IL) | Levin (D-MI) | Sarbanes (D-MD) |
| Feingold (D-WI) | Lieberman (D-CT) | |
| Inouye (D-HI) | Menendez (D-NJ) | |

### Not Voting - 1

Kennedy (D-MA)

| Vote Summary | By Senator Name | By Vote Position | By Home State |
|---|---|---|---|

## Grouped by Home State

**Alabama:**
Sessions (R-AL), **Yea**      Shelby (R-AL), **Yea**

**Alaska:**

Murkowski (R-AK), **Yea**          Stevens (R-AK), **Yea**

**Arizona:**

Kyl (R-AZ), **Yea**                McCain (R-AZ), **Yea**

**Arkansas:**

Lincoln (D-AR), **Yea**            Pryor (D-AR), **Yea**

**California:**

Boxer (D-CA), **Yea**              Feinstein (D-CA), **Yea**

**Colorado:**

Allard (R-CO), **Yea**             Salazar (D-CO), **Nay**

**Connecticut:**

Dodd (D-CT), **Yea**               Lieberman (D-CT), **Nay**

**Delaware:**

Biden (D-DE), **Yea**              Carper (D-DE), **Yea**

**Florida:**

Martinez (R-FL), **Yea**           Nelson (D-FL), **Yea**

**Georgia:**

Chambliss (R-GA), **Yea**          Isakson (R-GA), **Yea**

**Hawaii:**

Akaka (D-HI), **Nay**              Inouye (D-HI), **Nay**

**Idaho:**

Craig (R-ID), **Yea**              Crapo (R-ID), **Yea**

**Illinois:**

Durbin (D-IL), **Nay**             Obama (D-IL), **Yea**

**Indiana:**

Bayh (D-IN), **Yea**               Lugar (R-IN), **Yea**

**Iowa:**

Grassley (R-IA), **Yea**           Harkin (D-IA), **Yea**

**Kansas:**

Brownback (R-KS), **Yea**          Roberts (R-KS), **Yea**

**Kentucky:**

Bunning (R-KY), **Yea**            McConnell (R-KY), **Yea**

**Louisiana:**

Landrieu (D-LA), **Yea**           Vitter (R-LA), **Yea**

**Maine:**

Collins (R-ME), **Yea**            Snowe (R-ME), **Yea**

**Maryland:**

Mikulski (D-MD), **Yea**           Sarbanes (D-MD), **Nay**

**Massachusetts:**

Kennedy (D-MA), **Not Voting**     Kerry (D-MA), **Nay**

**Michigan:**

Levin (D-MI), **Nay**              Stabenow (D-MI), **Yea**

**Minnesota:**

Coleman (R-MN), **Yea**            Dayton (D-MN), **Yea**

**Mississippi:**

Cochran (R-MS), **Yea**            Lott (R-MS), **Yea**

**Missouri:**

Bond (R-MO), **Yea**               Talent (R-MO), **Yea**

**Montana:**

Baucus (D-MT), **Yea**             Burns (R-MT), **Yea**

**Nebraska:**

Hagel (R-NE), **Yea**                      Nelson (D-NE), **Yea**

**Nevada:**

Ensign (R-NV), **Yea**                      Reid (D-NV), **Nay**

**New Hampshire:**

Gregg (R-NH), **Yea**                       Sununu (R-NH), **Yea**

**New Jersey:**

Lautenberg (D-NJ), **Nay**                  Menendez (D-NJ), **Nay**

**New Mexico:**

Bingaman (D-NM), **Nay**                    Domenici (R-NM), **Yea**

**New York:**

Clinton (D-NY), **Yea**                     Schumer (D-NY), **Yea**

**North Carolina:**

Burr (R-NC), **Yea**                        Dole (R-NC), **Yea**

**North Dakota:**

Conrad (D-ND), **Yea**                      Dorgan (D-ND), **Yea**

**Ohio:**

DeWine (R-OH), **Yea**                      Voinovich (R-OH), **Yea**

**Oklahoma:**

Coburn (R-OK), **Yea**                      Inhofe (R-OK), **Yea**

**Oregon:**

Smith (R-OR), **Yea**                       Wyden (D-OR), **Yea**

**Pennsylvania:**

Santorum (R-PA), **Yea**                    Specter (R-PA), **Yea**

**Rhode Island:**

Chafee (R-RI), **Nay**                      Reed (D-RI), **Nay**

**South Carolina:**

DeMint (R-SC), **Yea**                      Graham (R-SC), **Yea**

**South Dakota:**

Johnson (D-SD), **Yea**                     Thune (R-SD), **Yea**

**Tennessee:**

Alexander (R-TN), **Yea**                   Frist (R-TN), **Yea**

**Texas:**

Cornyn (R-TX), **Yea**                      Hutchison (R-TX), **Yea**

**Utah:**

Bennett (R-UT), **Yea**                     Hatch (R-UT), **Yea**

**Vermont:**

Jeffords (I-VT), **Nay**                    Leahy (D-VT), **Nay**

**Virginia:**

Allen (R-VA), **Yea**                       Warner (R-VA), **Yea**

**Washington:**

Cantwell (D-WA), **Nay**                    Murray (D-WA), **Nay**

**West Virginia:**

Byrd (D-WV), **Yea**                        Rockefeller (D-WV), **Yea**

**Wisconsin:**

Feingold (D-WI), **Nay**                    Kohl (D-WI), **Yea**

**Wyoming:**

Enzi (R-WY), **Yea**                        Thomas (R-WY), **Yea**

| Vote Summary | By Senator Name | By Vote Position | By Home State |
|---|---|---|---|

# EXHIBIT 4

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

**Credible Fear and Asylum Process:**
**Fiscal Year (FY) 2008 – FY 2019**

**Out of 100 aliens who were to claim a credible fear...[1]**

**CREDIBLE FEAR INTERVIEW**
United States Citizenship and Immigration Services (USCIS) would **refer 81 credible fear claimants to EOIR**
*(81% of claims referred to EOIR)[2]*

**OPTION FOR EOIR TO REVIEW A NEGATIVE FEAR FINDING**

**7 cases are closed[3]**

**3 credible fear claimants would not request review by an immigration judge (IJ)** - - - - - - → *Alien Is Removed*

**9 credible fear claimants would request review** by an IJ

**CREDIBLE FEAR REVIEW (CFR)[4]**
IJs would **find credible fear for 2 credible fear claimants**
*(IJs find credible fear in 22% of CFRs)*

**REMOVAL PROCEEDINGS**
EOIR would **receive and complete 83 I-862 cases[5] originating from credible fear claims**

**ASYLUM APPLICATION**
**45 credible fear claimants would file for asylum**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, 54 percent of aliens filed for asylum)*

**ASYLUM DECISION**
IJs would grant asylum to only 14 credible fear claimants and would not grant asylum to 31 credible fear claimants
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, IJs grant asylum 17 percent of the time)*

**... only 14 out of 100 would be granted asylum.**



*Never Referred to EOIR*

*Referred, but Never Filed Asylum (23 ordered removed in absentia)*

*Referred & Filed, but Not Granted (4 ordered removed in absentia)*

*Referred, Filed, & Granted Asylum*

EOIR Data Generated: October 23, 2019,
[1] Percentages used in assessing this population may change as more cases are completed over time and because some cases may be reopened.
[2] Based on USCIS data (generated October 15, 2019). Includes claims referred to EOIR in which USCIS did not make a credible fear finding because it could not obtain an interpreter.
[3] Closed cases include those in which a claim is dissolved or withdrawn or an alien is found to be ineligible for the credible fear process.
[4] If USCIS finds that an alien has not established a credible fear, the alien may request review of that finding by an IJ. If the IJ finds that an alien has established a credible fear, then the alien (unless the alien is a stowaway) is placed in removal proceedings.
[5] Includes completed removal, exclusion, and deportation case types.

EXHIBIT 5

An official website of the United States Government. 🇺🇸

You can now subscribe to email notifications of changes to dockets of interest. See the FAQs (https://www.regulations.gov/faq?anchor=subscriptions) and recent blog (https://www.gsa.gov/blog/2022/01/19/new-improvements-to-regulationsgov-boost-transparency-and-engagement).

✕

**RULEMAKING DOCKET**

# Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers

Created by the **U.S. Citizenship and Immigration Services**

Share ▾        Subscribe

Docket Details (/docket/USCIS-2021-0012)

Unified Agenda (/docket/USCIS-2021-0012/unified-agenda)

Browse Documents  9  (/docket/USCIS-2021-0012/document)

Browse All Comments  5.26K  (/docket/USCIS-2021-0012/comments)

Refine Results

COMMENTS

Search

SORT BY  Best Match ▾

**PUBLIC SUBMISSION**

## Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0032)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0024)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Katherine Worden (/comment/USCIS-2021-0012-0033)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0029)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Robert Belrose (/comment/USCIS-2021-0012-0022)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Eric Harris (/comment/USCIS-2021-0012-0025)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Joyce Mansur (/comment/USCIS-2021-0012-0031)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Andrea Brennan (/comment/USCIS-2021-0012-0056)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Jon Stephenson (/comment/USCIS-2021-0012-0053)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0065)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Bradley Letts (/comment/USCIS-2021-0012-0048)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Cheryl Devereux (/comment/USCIS-2021-0012-0046)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0047)

PUBLIC SUBMISSION

## Comment Submitted by Donald Olmstead (/comment/USCIS-2021-0012-0045)

View Details ▾

PUBLIC SUBMISSION

## Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0050)

View Details ▾

PUBLIC SUBMISSION

## Comment Submitted by Anonymous (/comment/USCIS-2021-0012-0042)

View Details ▾

PUBLIC SUBMISSION

## Comment Submitted by Jesuit Conference Office of Justice and Ecology and the Kino Border Initiative (/comment/USCIS-2021-0012-1425)

View Details ▾

PUBLIC SUBMISSION

## Comment Submitted by Anonymous (/comment/USCIS-2021-0012-1424)

View Details ▾

PUBLIC SUBMISSION

Comment Submitted by Richard Hobbs (/comment/USCIS-2021-0012-1408)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Anonymous (/comment/USCIS-2021-0012-1406)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by David Swingle (/comment/USCIS-2021-0012-1405)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Human Rights First (/comment/USCIS-2021-0012-1452)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Philip Schrag (/comment/USCIS-2021-0012-1454)

View Details ▾

---

PUBLIC SUBMISSION

Comment Submitted by Catholic Legal Immigration Network, Inc. (/comment/USCIS-2021-0012-2240)

View Details ▾

PUBLIC SUBMISSION

## Comment Submitted by Amy Reisbig (/comment/USCIS-2021-0012-2480)

View Details ▾

Displaying 1 - 25 of 5,265 results

# EXHIBIT 6



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

October 19, 2021

Attorney General Merrick B. Garland
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Secretary Alejandro Mayorkas
Department of Homeland Security
Washington, D.C. 20528

*Via regulations.gov.*

**RE: DHS Docket No. USCIS-2021-0012 – Proposed Rule by the Department of Homeland Security and Executive Office for Immigration Review – Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers**

Dear Attorney General Garland and Secretary Mayorkas:

The undersigned Attorneys General, as the chief legal officers of our States, write to express concern about and opposition to the Department of Homeland Security's ("DHS") and the Department of Justice's (collectively, "the Departments") August 20, 2021, proposal to amend regulations governing the determination of certain protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture ("the Proposed Rule").

GENERAL COMMENT:

The Proposed Rule advances troubling revisions to asylum procedures, generally, and the credible fear determination process, specifically, that exacerbate loopholes in the expedited removal process. Indeed, the Proposed Rule prioritizes administrative efficiency and expediency over national security, health risks, the impact to the States, and basic common-sense solutions and effective border security policies.[1]

Congress enjoys formidable power in setting the nation's immigration policy. "The power of Congress over the admission of aliens and their right to remain [in the United States] is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and national security."[2] While the effective legislation and faithful execution of our nation's immigration laws necessarily requires coordination between the Executive and Legislative Branches,

---

[1] *See* 86 Fed. Reg. 46,906 (Aug. 20, 2021).
[2] *Galvan v. Press*, 347 U.S. 522, 530 (1954).

Page 2

the Executive Branch may not "disregard legislative direction in the statutory scheme it administers."[3] Nor may the Executive Branch "ignore statutory mandates or prohibitions merely because of policy disagreements with Congress."[4] That is so because "[n]o matter how successful Congress might be in crafting a set of immigration laws that would – in theory – lead to the most long-term benefits to the American people, such benefits will not actually occur if those laws cannot be enforced."[5]

The United States faces an unprecedented immigration crisis at the Southwest Border. July 2021 proved the busiest month for illegal border crossings at the Southwest Border in over 21 years, with 212,672 encounters between migrants and U.S. Customs and Border Protection ("CBP") agents.[6] August 2021 again exceeded the 200,000 encounter threshold, with 208,887 migrant encounters at the Southwest Border.[7] Indeed, the Departments' Proposed Rule itself recognizes the significant challenges presented by such a sharp increase in non-citizens attempting to cross (and in many cases successfully crossing) the nation's Southwest Border.[8]

The Departments point to an "overwhelmed" and back-logged asylum system that "delays justice and certainty for those who need protection" and, as presently constructed, "encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[9] However, much of this crisis was created by the new Administration's own policies and "priorities." The changes suggested by the Department's Proposed Rule, at best, miss the mark, and at worst, shift significant burdens to the States and local communities.

**SPECIFIC COMMENT 1: The Departments should clarify how the statutory changes advocated by the Proposed Rule comply or conflict with the Departments' existing legal obligations under the Migrant Protection Protocols.**

The undersigned Attorneys General have serious concerns as to whether the statutory revisions suggested by the Proposed Rule are consistent with the legal obligations imposed by the Migrant Protection Protocols ("MPP"), informally known as the "Remain in Mexico" program.

On December 20, 2018, then-Secretary of Homeland Security Kirstjen M. Nielsen announced MPP,[10] under which DHS planned to initiate the process of removing non-citizens from the United

---

[3] *Heckler v. Chaney*, 470 U.S. 821, 833 (1985).

[4] *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013).

[5] S. Rep. No. 104-249, at 3 (1996).

[6] U.S. Customs and Border Protection, *CBP Releases July 2021 Operational Update*, (Aug. 12, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2021-operational-update; Nick Miroff, *July was busiest month for illegal border crossings in 21 years, CBP data shows*, WASHINGTON POST (Aug. 12, 2021, 9:43 p.m.), https://www.washingtonpost.com/national/record-numbers-illegal-border-crossings/2021/08/12/e3d305e2-facd-11eb-b8dd-0e376fba55f2_story.html.

[7] U.S. Customs and Border Protection, *CBP Releases August 2021 Operational Update*, (Sep. 15, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-august-2021-operational-update.

[8] *See* 86 Fed. Reg. at 46,907 ("As the number of [asylum and related protection] claims [have] skyrocketed over the years, the system has proven unable to keep pace, resulting in large backlogs and lengthy adjudication delays.").

[9] *Id.*

[10] Department of Homeland Security, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration*, (Dec. 20, 2018), *available at* https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

Page 3

States pursuant to 8 U.S.C. § 1225(b)(2)(C)[11] for the duration of the non-citizen's removal proceedings under 8 U.S.C. § 1229a.[12] One stated goal of MPP is to ensure that

> [c]ertain aliens attempting to enter the U.S. illegally or without documentation, *including those who claim asylum*, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim.[13]

Specifically as it pertains to the Southwest Border, MPP authorizes "DHS to return to Mexico certain third-country nationals— *i.e.*, aliens who are not nationals or citizens of Mexico – arriving in the United States from Mexico for the duration of their removal proceedings under 8 U.S.C. § 1229a."[14]

Predictably, MPP faced legal challenges in federal district court[15] and in the United States Court of Appeals for the Ninth Circuit.[16] A California federal district court enjoined the implementation of MPP and the Ninth Circuit affirmed the injunction on the merits.[17] The United States Supreme Court thereafter stayed the district court's injunction in March 2020[18] and dismissed the legal challenges against MPP as moot in June 2021.[19] Thus, MPP remained in effect before and at the time when President Biden took office on January 20, 2021.

Notwithstanding the clear, recognized success achieved through MPP's implementation,[20] DHS unilaterally suspended new enrollment in the program on January 20, 2021, Inauguration Day, subject to a department-wide review of the program.[21] On June 1, 2021, Secretary Mayorkas issued a document titled "Termination of the Migrant Protection Protocols Program" that terminated MPP in its entirety.[22] This action precipitated yet another round of legal challenges concerning MPP.

In April 2021, Texas and Missouri challenged DHS's suspension of MPP—and later DHS's wholesale termination of MPP (which mooted the initial suspension challenge)—in the United States

---

[11] 8 U.S.C. § 1225(b)(2)(c) provides that: "In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title."

[12] *See* 8 U.S.C. § 1229a (providing for removal proceedings).

[13] *See supra* note 11 (emphasis added).

[14] *State v. Biden*, --- F. Supp. 3d ---, 2021 WL 3603341, at *5 (N.D. Tex. Aug. 13, 2021).

[15] *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110 (N.D. Cal. 2019).

[16] *See Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020).

[17] *Id.* at 1095 (holding that "[b]ecause the MPP is invalid in its entirety due to its inconsistency with [8 U.S.C.] § 1225(b), it should be enjoined in its entirety.").

[18] *Wolf v. Innovation Law Lab*, --- U.S. ---, 140 S. Ct. 1564, 206 L.Ed.2d 389 (2020) (mem.).

[19] *Mayorkas v. Innovation Law Lab*, ---U.S. ---, 141 S. Ct. 2842, --- L.Ed.2d --- (2021) (mem.).

[20] Department of Homeland Security, *Assessment of the Migrant Protection Protocols (MPP)*, (Oct. 28, 2019), *available at* https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp.

[21] Department of Homeland Security, *DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program*, (Jan. 20, 2021), https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

[22] Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, on Termination of the Migrant Protection Protocols Program (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

Page 4

District Court for the Northern District of Texas.[23] On August 13, 2021, the District Court entered a nationwide permanent injunction that ordered DHS to, among other things:

> enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1225 without releasing any aliens *because of* a lack of detention resources.[24]

DHS sought an emergency stay of the injunction. The United States Court of Appeals for the Fifth Circuit denied DHS's motion for stay pending appeal on August 19, 2021.[25] The Proposed Rule was announced the next day, August 20, 2021. Four days later, the Supreme Court refused to consider DHS's application for a stay of the District Court's permanent injunction.[26] Thus, the District Court's nationwide injunction compelling DHS to implement MPP remains in *full legal effect* pending appeal and resolution on the merits in the Fifth Circuit and ultimately the Supreme Court.

The undersigned Attorneys General remain concerned with DHS's sluggishness in implementing MPP in a manner consistent with the District Court's permanent injunction.[27] Indeed, DHS's unilateral cancellation of the program and sluggish restarting of it have contributed significantly to the crisis at the Southwest Border. In short, DHS *created* and is *perpetuating* the very crisis it purports to address with this Proposed Rule. The Departments should at the very least clarify how and to what extent the Proposed Rule complies—or conflicts—with the existing legal obligations imposed by MPP and why implementing MPP would not adequately reduce the demand on the system in processing individuals who appear at the Border.

In addition, the undersigned Attorneys General request that a non-citizen's eligibility for MPP be part of a threshold screening process, similar to the process that applies to non-citizens barred from seeking asylum pursuant to the safe-third country agreement with Canada.[28] In making an early, initial determination that a non-citizen is eligible for MPP, the Departments would preserve detention space for vulnerable non-citizens, enhance security at the border, and promote humanitarian interests.

**SPECIFIC COMMENT 2: Permitting asylum officers to fully adjudicate asylum claims could encourage a substantial increase in non-meritorious credible fear claims.**

In the context of immigration policies and procedures, the ends to achieve goals of expediency and administrative efficiency do not justify the means. The Departments do not analyze or discuss the likelihood that the Proposed Rule's revisions to the asylum process would encourage *more* non-citizens to seek asylum. For example, the Departments consider the administrative efficiencies expected to be gained from the Proposed Rule and the expected benefits conferred upon non-citizens availing themselves of the asylum process through quicker adjudication timelines. But the Departments fail to analyze (much less discuss) whether these changes to the asylum process will in fact make the Border

---

[23] *See supra* note 14.

[24] *State*, 2021 WL 3603341, at *27 (emphases in original).

[25] *State v. Biden*, 10 F.4th 538 (5th Cir. 2021) (per curiam).

[26] *Biden v. Texas*, --- U.S. ---, --- S.Ct. ---, --- L.Ed.2d ---, 2021 WL 3732667, at *1 (Aug. 24, 2021) (mem.).

[27] Grace Dixon, *States Say Feds Are Slow-Walking 'Remain in Mexico' Reboot*, LAW360 (Sep. 24, 2021, 5:45 p.m.), https://www.law360.com/immigration/articles/1425004/states-say-feds-are-slow-walking-remain-in-mexico-reboot.

[28] *See* 86 Fed. Reg. at 46,945; *see also* 8 U.S.C. § 208.30(6) (providing for threshold screening to determine asylum eligibility prior to credible fear determination).

Page 5

crisis worse by encouraging non-citizens living abroad to make their way to the United States. And an increase in non-citizens seeking to enter the United States (illegally or to claim asylum) will further drive up enforcement actions at the Southwest Border and increase the statistical likelihood of non-meritorious asylum claims and illegal entry overall.

Many non-citizens already attempt to seek asylum in the United States based on nothing other than their inability to find work in their home countries. But this is not a basis for asylum. As reported in *The Texas Tribune*, a migrant from South America readily admitted to the press that he and his family were encamped under a bridge in Del Rio, Texas, and planned on seeking asylum in the United States on the basis that he "couldn't find work to support his family."[29] This "economic asylum" is a far cry from the statutory requirements for asylum, such as a credible fear of persecution or torture.[30]

MPP, for example, achieved concrete results in managing asylum seekers attempting to cross the Southwest Border, but it is unclear whether the Proposed Rule would achieve even remotely the same results because the Departments failed to analyze this issue.

At a minimum, the Departments should address with specificity whether the Proposed Rule is expected to stem or grow the number of non-citizens attempting to travel to the United States in order to seek asylum and explain the basis for its conclusions. It is likely that this policy will exacerbate the existing Border crisis because the Departments' Proposed Rule creates a super-highway for asylum applications with little to no oversight. The Proposed Rule does not address this problem.

**SPECIFIC COMMENT 3: The Proposed Rule affords little or no opportunity for meaningful, independent review of positive credible fear determinations made by an asylum officer.**

Enforcement of immigration policies and procedures demands both intra- and inter-agency cooperation. Nowhere is this inter-agency cooperation more vital (or more visible) than in the cooperation between USCIS asylum officers and EOIR immigration judges ("IJs"). This Proposed Rule seems to unravel that inter-agency coordination.

Through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress established the process for expedited removal, which is codified in the Immigration Nationality Act ("INA") § 235.3(b), 8 U.S.C. § 1225(b)(1)(A)(i). The expedited removal process authorizes DHS to remove non-citizens arriving if they (1) lack valid entry documents, or (2) tried to procure their admission into the United States through fraud or misrepresentation.[31] Non-citizens attempting to enter the United States at a port of entry and those apprehended within 100 miles of the U.S. border within 14 days of entering the United States are both subject to the expedited removal process.[32] These non-citizens are to be "removed from the United States without further hearing or review" unless

---

[29] Uriel J. García and Jolie McCullough, *Thousands of Haitian migrants fleeing disaster and unrest seek asylum at Del Rio bridge*, THE TEXAS TRIBUNE (Sep. 17, 2021 7:00 p.m.), https://www.texastribune.org/2021/09/17/texas-border-del-rio-migrants/.

[30] Alicia A. Caldwell, *Middle-Class Migrants Fly to Mexico and Then Cross U.S. Border Illegally*, THE WALL STREET JOURNAL (Oct. 13, 2021 5:30 a.m.), https://www.wsj.com/articles/middle-class-migrants-fly-to-mexico-and-then-cross-u-s-border-illegally-11634117401.

[31] HILLEL R. SMITH, CONG. RESEARCH SERV., IF11357, EXPEDITED REMOVAL OF ALIENS: AN INTRODUCTION 1 (2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11357.

[32] *Id.*

Page 6

they meet one of the few exceptions to expedited removal, *i.e.*, they indicate "an intention to apply for asylum" or "a fear of persecution."[33]

A non-citizen expressing an intention to apply for asylum or a fear of persecution is referred to a USCIS asylum officer for an asylum interview to determine whether the non-citizen has a "credible fear" of persecution or torture. "Credible fear of persecution" is statutorily defined as a "significant possibility" that the noncitizen could establish eligibility for asylum.[34] As noted by the Congressional Research Service,

> [a] credible fear determination is a screening process that evaluates whether an alien might qualify for one of three forms of relief from removal: asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Asylum is the only form of relief that gives the alien a permanent legal foothold in the United States.[35]

A non-citizen may apply for asylum in the United States through one of two methods: affirmative asylum processing or defensive asylum processing.[36] Affirmative asylum processing permits a non-citizen physically present in the United States to apply for asylum within one year of the date of their last arrival, regardless of the non-citizen's immigration status.[37] Defensive asylum processing is an application for asylum that occurs when a non-citizen is placed in removal proceedings before an immigration court with EOIR and the non-citizen requests asylum as "a defense against removal from the United States."[38]

Under the current regulatory scheme, a non-citizen found to have a positive credible fear is placed into full removal proceedings before an IJ. The asylum applicant bears the burden of proving that they qualify for asylum; *the IJ*—not the asylum officer—serves as the adjudicator as to whether a non-citizen is eligible for asylum in the United States.[39] However, the Department's Proposed Rule offers a puzzling solution insofar as it would effectively permit the *asylum officer* to have the final say on whether a non-citizen may receive asylum once a positive credible fear determine has been made.

If implemented, the Proposed Rule would permit asylum officers, upon making a positive credible fear determination, to adjudicate in the first instance—through a non-adversarial hearing— the protection claims of non-citizens otherwise subject to expedited removal.[40] Thus, the Proposed Rule entirely *strips* IJs (and thus the EOIR) from meaningful participation in the asylum determination process once an asylum officer has determined that a credible fear exists. This Proposed Rule starkly departs from the present statutory regime as envisioned by Congress.

Administrative judges are a vital component to the asylum system, because the ultimate question is whether the non-citizen meets a legal standard. Asylum officers, employed by USCIS, do not weigh evidence or test claims as part of their intake process.  In Fiscal Year ("FY") 2019, asylum

---

[33] INA § 235.3(b)(4); 8 U.S.C. § 1225(b)(1)(A)(i).
[34] 8 U.S.C. § 1225(b)(1)(B)(v).
[35] SMITH, *supra* note 31, at 1.
[36] U.S. Citizenship and Immigration Services, *Obtaining Asylum in the United States*,
https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/obtaining-asylum-in-the-united-states  (last  updated
Sept. 16, 2021).
[37] *Id.*
[38] *Id.*
[39] *See generally* 8 C.F.R. § 1240.1 (providing for the immigration judge's authority).
[40] The Proposed Rule would significantly alter 8 C.F.R. §§ 208.2, 208.3, and 208.9 to achieve these goals.

Page 7

officers found that 73.6 percent of non-citizens claiming credible fear passed that bar.[41] However, only 15.1 percent of non-citizens were ultimately granted asylum by an IJ.[42]  While some of that delta relates to non-citizens never filing a claim for asylum, the vast difference in grant rates illustrates that the two entities have different, if not incompatible, missions. While asylum officers review claims for whether, if true, the claims *might* support a finding of refugee status, immigration judges determine whether the non-citizen has actually carried his or her burden. This requires evidence, an evaluation of the standard of proof, and other features of our legal system that make asylum officers improper decision-makers.

As justification, the Departments contend that permitting asylum officers to adjudicate asylum claims in the first instance will relieve "strain" on the asylum system and address the significant backlog of cases.  While many observers may readily agree that the current immigration system is strained, and that certain asylum procedures are untenable in the long-term, the undersigned Attorneys General sharply dispute that a viable solution to a situation significantly exacerbated by the Administration's unlawful refusal to implement proven policies, like MPP and removal of violent criminals, involves wholesale removal of IJs and the EOIR from the asylum determination process. Making the matter worse, the Departments do not address at all the vast difference in training, qualifications, and adjudicatory conditions between the two different officers.

The Proposed Rule does not state whether the Departments sought or evaluated any alternative means of reducing caseloads and stemming rapid growth of EOIR caseloads outside of removing the EOIR from the asylum adjudication process entirely. One thing is clear, however: the Proposed Rule offers *no meaningful administrative review* by an IJ once an asylum officer makes a positive credible fear determination and proceeds to consider the wide array of benefits able to award the non-citizen.

<u>SPECIFIC COMMENT 4</u>: **The Proposed Rule dramatically alters the burden of proof that more appropriately rests with the non-citizen applying for asylum protections, rather than USCIS.**

Whether a non-citizen affirmatively or defensively applies for asylum, it is incumbent on *the non-citizen* to take the necessary steps in filing an application for asylum. If referred to an IJ for full removal proceedings, the burden rests with the applicant to demonstrate eligibility for asylum.[43] The Department's Proposed Rule turns this burden on its head and demands that USCIS assume the burden in what should be the non-citizen's role in the asylum application process.

The Proposed Rule provides that

[a]s part of this new procedure for "further consideration," and to eliminate delays between a positive credible fear determination and the filing of an application for asylum, the

---

[41] *See* USCIS, Credible Fear Workload Report Summary, FY2019 Total Caseload, *available at* https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf.

[42] DEPARTMENT OF HOMELAND SECURITY, OFFICE OF IMMIGRATION STATISTICS, 2019 REFUGEE AND ASYLEES ANNUAL FLOW REPORT 6-7 (SEP. 2020), *available at* https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2019/refugee_and_asylee_2019.pdf.

[43] *See* 8 C.F.R. § 208.2(c)(3)(i) (applying the same procedures as removal proceedings held under 8 C.F.R. § 240, subpart A); 8 C.F.R. § 1240.8(d) ("The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief [from removal] may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

Page 8

Departments propose that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, would be treated as an "application for asylum," with the date of service on the individual considered the date of filing. 8 CFR 208.3(a)(2) (proposed). Every individual who receives a positive credible fear determination would be considered to have filed an application for asylum at the time the determination is served on him or her.[44]

By the Departments' own admission, credible fear *claims* made at the border (one of the few exceptions to placement in expedited removal proceedings) now appear to be the norm.[45] In a February 2020 report to Congress, the Government Accountability Office ("GAO") found that 73 to 80 percent of all credible fear assessments resulted in positive credible fear determinations between FY 2014 through the first two quarters of FY 2019.[46] The Departments assert that the asylum system is overwhelmed, yet the Proposed Rule would treat every positive credible fear determination as an application for asylum. The overwhelming majority of non-citizens seeking asylum in the United States will not receive it. During FY 2019, USCIS received 96,952 applications for affirmative asylum and EOIR received 210,752 applications for defensive asylum as a defense to removal from the United States.[47] Of these, 46,508 non-citizens received asylum, with 27,643 individuals receiving it through the affirmative asylum process and 18,865 individuals receiving it through the defensive asylum process.[48] So, to put these numbers into perspective, only 46,508 non-citizens received asylum in FY 2019 out of the 307,704 applications received by USCIS and EOIR—a mere 15.1 percent. It is clear that the problem is *not* that too many non-citizens are granted asylum. In fact, quite the opposite. It is the unmanageable amount of non-meritorious asylum applications about which the Departments complain.

Curiously, the Proposed Rule appears to promote the filing of asylum applications, an action that seems counterproductive to the purported goals set out by the Departments. While the Proposed Rule may in fact reduce administrative delay between the time a non-citizen is placed into full removal proceedings before an IJ (after a positive credible fear determination is made), it does so at the expense of the secondary review Congress expected to evaluate that initial decision. This appears to be the actual purpose of the Proposed Rule – to avoid the secondary review, which would dramatically increase the number of non-citizens released at a border entry point into the United States. The undersigned Attorneys General have serious concerns about the Proposed Rule's impact on the amount of non-citizens that may attempt to unlawfully enter the United States in the hope of obtaining asylum and the burden that places on our States. This problem may be further exacerbated were USCIS permitted to virtually prepare the application for asylum on behalf of the non-citizen. The Departments should strongly reconsider these proposed changes.

---

[44] 86 Fed. Reg. at 46,916.

[45] *Id.* at 46,909 ("These steps are meant to ensure greater efficiency in the system, which was initially designed for protection claims to be the exception, not the rule, among those encountered at or near the border").

[46] U.S. Gov't Accountability Off., GAO-20-250, Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings 15 (2020), *available at* https://www.gao.gov/assets/gao-20-250.pdf.

[47] Department of Homeland Security, *supra* note 42, 6-7.

[48] *Id.* at 8.

Page 9

**SPECIFIC COMMENT 5: The Proposed Rule includes revisions to parole considerations that undercut and substitute the mandatory detention standard as envisioned by Congress in favor of subjective, ambiguous standards for parole created by administrative rule.**

The Departments' Proposed Rule envisions significant changes to parole considerations made prior to a positive credible fear determination. Currently, 8 C.F.R. § 235.3 requires mandatory detention pending a credible fear determination, providing that:

> [a]n alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section *shall be detained* pending determination and removal, except that parole of such alien . . . may be permitted only when the Attorney General determines, in the exercise of discretion, *that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.*[49]

The Departments revise this mandatory statutory language by permitting DHS to consider whether parole is required "because detention is unavailable or impracticable."[50] The proposed changes to parole considerations, presently submitted, are problematic because they are overly broad and subjective. The issue of space for detention is squarely within the control of DHS, specifically ICE. For example, in a January 2021 report to the Chairman of the Committee on Homeland Security in the House of Representatives, GAO found that ICE, among other things, "agreed to pay detention facility operators for a fixed number of detention beds regardless of whether it use[d] them" and "spent millions of dollars a month on unused detention space" between FY 2017 through May 2020.[51] Thus, DHS can unilaterally restrict available space and create its own discretionary safe-harbor that evades the clear intent of Congress regarding mandatory detention. DHS has not imposed upon itself or disclosed any meaningful limits on its power to *make* detention "unavailable." And the Proposed Rule plainly envisions no change to detention facility capacity.[52] In addition, DHS does not address what condition or set of conditions would be sufficient for the DHS to consider detention "impracticable."

Recent press coverage highlights a disturbing trend: DHS is following its own standards instead of the statutory standards envisioned by Congress when it comes to releasing and paroling out non-citizens from detention centers.[53] According to this reporting, the Biden Administration has released at least 160,000 illegal immigrants into the United States since March and has made liberal use of statutory parole standards.[54] Former Border Patrol Chief Rodney Scott put it simply:

---

[49] 8 C.F.R. § 235.3(b)(2)(iii) (emphases added). *See also* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . in his discretion parole into the United States temporarily" any noncitizen apply for admission "under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit . . . .").

[50] 86 Fed. Reg. at 46,913.

[51] U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-149, ACTIONS NEEDED TO IMPROVE PLANNING, DOCUMENTATION, AND OVERSIGHT OF DETENTION FACILITY CONTRACTS 24 (2021), *available at* https://www.gao.gov/assets/gao-21-149.pdf.

[52] *See* 86 Fed. Reg. at 46,939 ("The proposed rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence . . . .").

[53] Bill Melugin & Adam Shaw, *Leaked Border Patrol docs show mass release of illegal immigrants into US by Biden administration*, FOX NEWS (Oct. 13, 2021), https://www.foxnews.com/politics/leaked-border-patrol-docs-release-immigrants-us-biden-administration.

[54] *Id.*

Page 10

'By law and regulation a parole shall only be granted on a case by case basis and only for significant humanitarian reasons or significant public benefit. Neither of these appear to apply to the current situation,' he said, adding that the number of paroles brings into question the review and approval process.[55]

DHS must remain within the statutory bounds envisioned by Congress. The vague standards offered by the Proposed Rule appear to be intended to evade the clear limits on such unbounded discretion that Congress intended to apply. The Proposed Rule is unclear and inconsistent with the statute. The Departments should utilize more definite language if they insist on revising the mandatory detention provisions contained in 8 C.F.R. § 235.3.

SPECIFIC COMMENT 6: **The Proposed Rule fails to acknowledge and in fact disclaims any impact on States, which incur much of the social and economic costs related to positive asylum determinations with little recourse available.**

America has benefited much from lawful immigration and the contributions made by immigrants lawfully present within the United States. The unfortunate challenge facing the Nation presently, however, is one of a grim reality: States and local communities disproportionately bear the social and economic costs of illegal immigration.

First, the social cost. The unfortunate truth is that many non-citizens seeking asylum in the United States—regardless of whether their circumstances *actually* merit the ultimate legal status of asylee—arrive with little or no resources – usually only what they can carry. Recent press reports detail ICE officers dropping off non-citizens at shelters, bus stations, and airports without resources, language skills, or assistance. Some non-governmental organizations ("NGOs") have decried this treatment and complained about ICE failing to give any notice.[56] Immigration advocacy groups have similarly complained of the "chaotic way" in which ICE has elected to release non-citizens at various urban and rural locations.[57] Additionally, state and local officials have accused ICE of providing "little to no warning" prior to the release of non-citizens,[58] and members of Congress have sought information on ICE's conduct.[59] Regrettably, over the past few months, ICE has employed such

---

[55] *Id.*

[56] Dan Lieberman, *U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources*, PBS: NEWS HOUR (Jun. 4, 2021 6:48 p.m.), https://www.pbs.org/newshour/show/u-s-border-patrol-is-increasingly-dropping-off-migrants-in-rural-areas-lacking-resources.

[57] Destinee Patterson, *Some asylum seekers dropped off in Shreveport reportedly were not allowed to call their families*, KSLA NEWS 12 (Jul. 19, 2021 at 4:48 p.m.), https://www.ksla.com/2021/07/19/some-asylum-seekers-dropped-off-shreveport-reportedly-were-not-allowed-call-their-families/.

[58] Bill Lunn, *ICE releases immigrants in Shreveport with little warning to local officials*, KTBS 3 (Jul. 16, 2021), https://www.ktbs.com/news/3investigates/ice-releases-immigrants-in-shreveport-with-little-warning-to-local-officials/article_f764e9a4-e678-11eb-a69f-13f40e85871f.html; Matt Sledge, *Disorganized immigration releases draw concern from advocates, U.S. Sen. Bill Cassidy*, NOLA.COM (Jul. 20, 2021), https://www.nola.com/news/politics/article_f7e6d19e-e8d5-11eb-b64b-8b51fd85a303.html.

[59] *See* Press Release, Bill Cassidy, U.S. Senator, Cassidy Statement on ICE Immigrant Dropoff in Shreveport (Jul. 18, 2021), https://www.cassidy.senate.gov/newsroom/press-releases/cassidy-statement-on-ice-immigrant-dropoff-in-shreveport.

Page 11

tactics not only in Louisiana, but in Arizona,[60] Georgia,[61] and Mississippi,[62] to name a few examples. This troubling practice adversely impacts States and local communities, who have little choice other than to bear these consequences without assistance from the Federal government.

As the Supreme Court has noted, "deportable criminal aliens who remain[ ] in the United States often commit[ ] more crimes before being removed."[63] Many non-citizens arrested by ICE have previously been convicted of *at least* one crime or had criminal charges pending against them at the time of their arrest. According to ICE's Fiscal Year 2020 Enforcement and Removal Operations Report, ICE conducted 103,603 administrative arrests in FY 2020.[64] Ninety percent of the non-citizens arrested had either criminal convictions or criminal charges pending.[65] ICE effectuated even more administrative arrests of non-citizens with criminal histories in FY 2019, totaling 143,099.[66] Additionally, ICE effectuated 4,360 criminal arrests in FY 2020 and assisted prosecutorial agencies in securing 5,397 convictions.[67] According to ICE's own statistical reporting, many of the non-citizens arrested in FY 2019, 2020, and 2021 have criminal histories that include crimes of violence, sex offenses, property crimes, weapon and drug offenses, trafficking, kidnapping, and fraud.[68] To be sure, States and local communities are the ones that overwhelmingly bear the tangible and intangible costs of crimes committed by non-citizens.

In a September 30, 2021, memorandum, Secretary Mayorkas instructed ICE to prioritize the apprehension and removal of non-citizens based on three enumerated factors: 1) threat to national security; 2) threat to public safety; and 3) threat to border security.[69] This memorandum demands ICE officials examine the "totality of the circumstances" and consider "mitigating factors that militate in favor of declining enforcement action."[70] Even more concerning, DHS imposes these final guidelines

---

[60] Aila Slisco, *ICE Resumes Dropping Migrants Off at Greyhound Terminal Instead of Welcome Center*, NEWSWEEK (May 7, 2021 9:45 p.m.), https://www.newsweek.com/ice-resumes-dropping-migrants-off-greyhound-terminal-instead-welcome-center-1589765; Kirk Siegler, *Why The U.S. Government Is Dropping Off Migrants In Rural Arizona Towns*, NPR (Apr. 15, 2021 6:57 p.m.), https://www.npr.org/2021/04/15/987618530/why-the-u-s-government-is-dropping-off-migrants-in-rural-arizona-towns.

[61] Lautaro Grinspan, *When ICE detainees are dropped off at Atlanta airport, this group helps*, THE ATLANTA JOURNAL-CONSTITUTION (Sep. 24, 2021), https://www.ajc.com/news/when-ice-detainees-are-dropped-off-at-atlanta-airport-this-group-helps/2RNBQ25RTRBB7H7DMUQLSMDN4E/.

[62] Jan Griffey, *Update: ICE drops more than 90 immigrants at Natchez bus station*, THE NATCHEZ DEMOCRAT, (Jul. 16, 2021 7:41 p.m.), https://www.natchezdemocrat.com/2021/07/16/ice-drops-more-than-90-immigrants-at-natchez-bus-station/.

[63] *Demore v. Kim*, 538 U.S. 510, 518 (2003) (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)).

[64] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FISCAL YEAR 2020 ENFORCEMENT AND REMOVAL OPERATIONS REPORT 13 (2020), *available at* https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf.

[65] *Id.*

[66] *Id.* at 14.

[67] *Id.* at 16.

[68] U.S. Customs and Border Protection, Criminal Noncitizen Statistics Fiscal Year 2021, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last updated Sep. 15, 2021).

[69] Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, on Guidelines for the Enforcement of Civil Immigration Law 3-4 (Sep. 30, 2021), *available at* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

[70] These mitigating factors include considerations such as: (1) advanced or tender age; (2) lengthy presence in the United States; (3) a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment; (4) status as a victim of crime or victim, witness, or party in legal proceedings; (5) the impact of removal on family in the United States, such as loss of provider or caregiver; (6) whether the noncitizen may be eligible for

Page 12

even though the interim guidelines on this issue hampered ICE's ability to make arrests—reportedly only averaging one arrest every two months.[71]

This Proposed Rule, which relaxes parole considerations and encourages more asylum seekers to travel to the United States, will only make matters worse for an already overwhelmed Southwest Border. The Proposed Rule blatantly disregards the social costs to States and local communities.

Second, this extraordinary shift in immigration policy will have a deleterious effect on the States' public fisc.[72] Non-citizens granted the legal status of asylee are entitled to certain public benefits such as Social Security Income, Medicaid, welfare and food stamps, employment authorization, a driver's license, and more.[73] Critically though, as explained in more detail below, many non-citizens (and their minor children) are entitled to many of these benefits while they remain in the United States as undocumented immigrants, while they await removal proceedings outside of a detention facility, or while they have their removal from the United States withheld, even if they are not ultimately granted asylum. The Proposed Rule will have financial impacts on States ranging from costs of border security to education to medical care and other public services. Notably, the Supreme Court and the Fifth Circuit have recognized injuries to a local or state government's financial interest based on the actions of the federal government, specifically in the context of immigration.[74]

In a 2017 report titled *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, the Federation for American Immigration Reform ("FAIR") examined "the fiscal impact of illegal aliens as reflected in both federal and state budgets." [75] FAIR analyzed state expenditures associated with border security and policing, actions which require substantial expenditure of state monies. In 2017, Texas allocated $800 million to operations to secure the Texas-Mexico border, with the federal government "ignoring reimbursement requests for Texas funds spent on border security."[76] Similarly, and over the same period, New Mexico and Arizona spent approximately $49.1 million and $29.6 million, respectively, on border security.[77]

---

humanitarian protection or other immigration relief; (7) military or other public service of the noncitizen or their immediate family; (8) time since an offense and evidence of rehabilitation; or (9) whether a criminal conviction was vacated or expunged. *See id.*

[71] Nolan Rappaport, *Biden isn't doing as well as Trump at removing aliens who pose a threat to public safety,* THE HILL (Oct. 7, 2021), https://thehill.com/opinion/immigration/575710-biden-isnt-doing-as-well-as-trump-at-removing-aliens-who-pose-a-threat-to?rl=1.

[72] *See Texas v. United States*, 524 F. Supp. 3d 598, 619-628 (S.D. Tex. 2021) (discussing DHS's 100-day pause on removal of non-citizens, analyzing the impact of this decision on the State of Texas's public fisc, and enjoining the implementation of the 100-day pause on removal of non-citizens).

[73] U.S. Citizen and Immigration Services, Benefits and Responsibilities of Asylees, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/benefits-and-responsibilities-of-asylees (last updated Mar. 8, 2018).

[74] *See Clinton v. City of New York*, 524 U.S. 417, 430-31 (1998) (finding a local government to have standing when challenging immigration policies for purposes of the local government's claim to suffering injury to its "borrowing power, financial strength, and fiscal planning."); *see also Texas v. United States*, 809 F.3d 134, 152-53 (5th Cir. 2015) (finding sufficient for standing purposes several States' claims to suffering injury to their public fiscs).

[75] Matthew O'Brien, Spencer Raley, and Jack Martin, *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, FEDERATION FOR AMERICAN IMMIGRATION REFORM 1 (2017), *available at* https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf.

[76] *Id.* at 44.

[77] *Id.*

Page 13

But the States' financial obligations do not begin and end with securing their borders. Many non-citizens unlawfully entering the country often arrive with children, whom States are required to protect and educate and provide health care.[78] States are required to provide free public education to the children of unlawfully present non-citizens pursuant to the Supreme Court decision in *Plyler v. Doe*, which presents the States with an unfunded mandate.[79] According to FAIR's analysis, much of the public school expenditures involve limited English proficiency ("LEP") programs which require specialize training in English language skills for children possessing limited abilities to speak, read, and write in English.[80] In a 2016 report titled *The Elephant in the Classroom Mass Immigration's Impact on Education*, FAIR noted that the federal government provides a mere 8 percent of public school funding, with the lion's share funded by state and local government, and only 1 percent of cost associated with LEP programs.[81] As public education budgets have witnessed cuts over the past decade in tandem with an overall increase in the number of non-citizen children enrolled in public schools and relying on LEP, it is not difficult to understand that many municipalities' LEP programs are growing at a rate faster than the municipalities' ability to operate or fund them effectively.[82] Additionally, FAIR examined various aid and subsidy programs—the benefits of which are sometimes obtained by fraud—and found that the states overwhelming make up the federal shortfall in these programs, with approximately $2.6 billion in state and local funds being drawn on by ineligible illegal aliens nationwide.[83]

States also provide public services such as emergency medical care to non-citizens who lack other medical resources.[84] Many millions of undocumented non-citizens seeking medical care lack health insurance, and often an emergency room visit is their only source of health care.[85] And to make matters worse, we are still coping with the global COVID-19 pandemic, with hospitals in many of our states advising they have limited capacity. Some are even rationing care. The Departments' denial of any impact to states is flatly contradicted by the daily news and on-the-ground reports in our States from a wide scope of state officials and NGOs.[86] Given the current crisis at our borders, these numbers are no doubt exponentially larger. Health care and other costs arising from the pandemic also must be added to the current costs.

**Specific Comment 7**: **The Proposed Rule fails to properly consider and analyze substantial Federalism concerns.**

The Proposed Rule wholly fails to provide a federalism summary impact statement, as required by, *inter alia*, the Unfunded Mandates Reform Act ("UMRA"), which requires that "[e]ach agency shall

---

[78] *Id.* at 36, 40.

[79] *Id.* at 37 (citing *Plyler v. Doe*, 457 U.S. 202 (1982)).

[80] *Id.*

[81] Marc Ferris and Spencer Raley, *The Elephant in the Classroom Mass Immigration's Impact on Education*, FEDERATION FOR AMERICAN IMMIGRATION REFORM 6 (September 2016), *available at* https://www.fairus.org/sites/default/files/2017-08/FAIR-Education-Report-2016.pdf.

[82] *Id.* 6-7.

[83] O'Brien, *supra* note 75, at 46-48.

[84] *Id.* at 40-42.

[85] *See* Whitney L. Duncan & Sarah B. Horton, *Serious Challenges And Potential Solutions for Immigrant Health During COVID-19*, HEALTH AFFAIRS BLOG (April 18, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200416.887086/full/.

[86] Julia Harte & Sharon Berstein, *Some U.S. Hospitals forced to ration care amid staffing shortages, COVID-19 surge*, Reuters (Sep. 17, 2021 7:39 p.m.), https://www.reuters.com/world/us/some-us-hospitals-forced-ration-care-amid-staffing-shortages-covid-19-surge-2021-09-17/.

Page 14

. . . assess the effects of Federal regulatory actions on State, local, and tribal governments, and the private sector."[87] Astonishingly, the Departments contend that the Proposed Rule insubstantially impacts States and presents *no substantial Federalism concerns*. The Departments state that

> [t]his proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.[88]

This position is as astonishing as it is false. Federalism concerns abound. "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."[89] Admittedly, under our constitutional design, States have ceded to the federal government the authority to establish a "uniform Rule of Naturalization"[90] as well as the authority to regulate and enforce immigration policies.[91] Nevertheless, the fundamental premise that States "bear[ ] many of the consequences of unlawful immigration" cannot be seriously disputed.[92] Indeed, the Supreme Court and Fifth Circuit have recognized that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States."[93] To be sure, "[t]he problems posed to the State[s] by illegal immigration must not be underestimated."[94] This Proposed Rule nakedly underestimates these concerns.

The impact of the Proposed Rule on the States is wide-ranging, affecting State finances and resources, public safety, and public health during the midst of the COVID-19 global pandemic, to say the least. Whether the Departments choose to recognize these concerns has *no* bearing on the fact that they exist. Nor does it change the fact that the States will be left to navigate the consequences of ill-conceived immigration policies. Despite these serious concerns, however, the undersigned Attorneys General are unable to provide meaningful comment on this issue because the Proposed Rule contains no Federalism analysis or impact statement.

At a minimum, the Departments should reassess the Federalism implications of this Proposed Rule and republish the Proposed Rule with an appropriate Federalism summary impact statement.

**<u>Specific Comment 8</u>: The Proposed Rule fails to adequately analyze whether an unfunded mandate is imposed on the States through this Proposed Rule.**

The Proposed Rule states that "the Departments do not believe this proposed rule would impose any unfunded Federal mandates on State, local, and Tribal governments, in the aggregate, or on the private sectors" because, in the Departments' view, "[t]he impacts are likely to apply to

---

[87] 2 U.S.C. §1531.
[88] 86 Fed. Reg. at 46,939.
[89] *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)).
[90] U.S. Const. art. 1, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization").
[91] *Texas*, 524 F. Supp. 3d at 617.
[92] *Arizona*, 567 U.S. at 397.
[93] *Id.*; *see also Texas*, 809 F.3d at 163.
[94] *Arizona*, 567 U.S. at 398.

Page 15

individuals, potentially in the form of beneficial distributional effects and cost savings."[95] The undersigned Attorneys General sharply dispute this contention.

UMRA considers a mandate unfunded unless the legislation authorizing the mandate fully meets its estimated direct costs by either (1) providing new budget authority (direct spending authority or entitlement authority) or (2) authorizing appropriations. If appropriations are authorized, the mandate is still considered unfunded unless the legislation ensures that in any fiscal year, either (1) the actual costs of the mandate are estimated not to exceed the appropriations actually provided; (2) the terms of the mandate will be revised so that it can be carried out with the funds appropriated; (3) the mandate will be abolished; or (4) Congress will enact new legislation to continue the mandate as an unfunded mandate.[96] The Departments address the requirements of the Act by *denying* any impact. But the undersigned Attorneys General have already raised concerns and provided examples of how States are forced to incur costs as a result of immigration.

The Departments cannot avoid their obligations under UMRA by blinding themselves to reality, nor may they adopt conclusory statements of Adminspeak. Whatever "beneficial distributional effects and cost savings" means, it is at best unsupported and conclusory. The undersigned Attorneys General submit that it is also flatly contradicted by the findings of several federal courts as well as economic studies and our experiences. "Although the State has no interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service."[97] At bottom, the Departments must assess the financial costs associated with the Proposed Rule, which clearly constitute an unfunded Federal mandate. Because the Departments did not perform a thorough analysis of this issue, it is difficult for the undersigned Attorneys General to provide a meaningful comment on the specific impact of the unfunded mandates imposed by the Proposed Rule.

UMRA also requires that "[e]ach agency shall . . . develop an effective process to permit elected officers of State, local, and tribal governments . . . to provide *meaningful and timely* input in the development of regulatory proposals containing significant Federal intergovernmental mandates."[98] The Departments never allowed elected leaders in State, local, and tribal governments to provide *any* input into the development of the new Proposed Rule. The Departments must therefore allow State, local, and tribal governments to provide meaningful and timely input before republishing the Proposed Rule.

**Specific Comment 9: Environmental costs related to immigration and population growth were not considered by the Departments, in contravention of applicable regulations and statutory directives.**

The Proposed Rule, as presently submitted, contains only a cursory environmental analysis under the National Environmental Policy Act ("NEPA").[99] NEPA includes two statutory directives: it places an obligation on federal agencies to "consider every significant aspect of the environmental

---

[95] 86 Fed. Reg. at 46,939.

[96] *See* 2 U.S.C. § 658d(a)(2); § 425 of the Congressional Budget and Impoundment Control Act of 1974, as amended, P.L. 93-344, 88 Stat. 297, 2 U.S.C. § 658, *et seq.*

[97] *Plyler*, 457 U.S. at 228 n.23.

[98] 2 U.S.C. §1534(a) (emphasis added)

[99] *See* 86 Fed. Reg. 46,939-940.

impact of a proposed action," and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[100] To put it lightly, the Proposed Rule's NEPA analysis leaves much to be desired.

The Proposed Rule acknowledges the obligations imposed by NEPA; however, the Departments contend that no NEPA analysis is required because the Proposed Rule "clearly fits within categorical exclusion A3(d) [and] A3(a)" in the Instruction Manual.[101] Specifically, the Departments state that "NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impact would be largely, if not completely, speculative."[102] Moreover, the Departments aver that

> [t]he proposed rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence and to attempt to calculate how many noncitizens would be paroled—a highly discretionary benefit—and how many would proceed to the detention centers would be near impossible to determine. The Departments have no reason to believe that these amendments would change the environmental effect, if any, of the existing regulations.[103]

Thus, the Departments rely on categorical exclusions to avoid a more fulsome NEPA analysis. The undersigned Attorneys General sharply dispute the Departments' assertions that the potential environmental impacts of the Proposed Rule are "largely, if not completely, speculative" and that statutory amendments proffered by the Proposed Rule would not change the environmental effect of the existing regulations.

While it may be an inconvenient truth for some, concerns about the environmental costs of immigration and population growth are not new. Title I, Section 101 of NEPA contains a "Congressional Declaration of National Environmental Policy" which, among other things, recognizes "the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth[.]"[104] A recent report from the U.S. Census Bureau indicates that "[d]ifferent levels of immigration between now and 2060 could change the projection of the population in that year by as much as 127 million people, with estimates ranging any-where from 320 to 447 million U.S. residents."[105] Environmental challenges posed by mass immigration include loss of biodiversity, water shortages, increased urban sprawl, overcrowding cities, and an increase in carbon emissions.[106] Some studies suggest that non-citizens, particularly those migrating from lower-polluting countries, produce more $CO_2$ annually than these

[100] *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).
[101] 86 Fed. Reg. 46,940 (citing Department of Homeland Security, *Implementing the National Environmental Policy Act* (Directive 023-01, issued Oct. 31, 2014, and Instruction Manual, issued Nov. 6, 2014), *available at* https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex).
[102] *Id.* at 46,939.
[103] *Id.* at 46,939-40
[104] *See* NEPA, Pub. L. 91-190, 42 U.S.C. § 4321, *et seq.*, Jan. 1, 1970, 93 Stat. 852.
[105] U.S. CENSUS BUREAU, P25-1146, A CHANGING NATION: POPULATION PROJECTIONS UNDER ALTERNATIVE IMMIGRATION SCENARIOS 1 (FEBRUARY 2020), *available at* https://www.census.gov/content/dam/Census/library/publications/2020/demo/p25-1146.pdf.
[106] Matthew Sussis, *Five Ways Immigration-Driven Population Growth Impacts Our Environment*, CENTER FOR IMMIGRATION STUDIES (Nov. 19, 2018), https://cis.org/Sussis/Five-Ways-ImmigrationDriven-Population-Growth-Impacts-Our-Environment.

Page 17

non-citizens would have produced had they remained in their home countries.[107] The same is undoubtedly true of other greenhouse gasses and other pollutants. In declining to perform a NEPA analysis, the Departments ignored the potential increase in environmental harm that the Proposed Rule is likely to directly and indirectly cause.

Moreover, the Proposed Rule makes no mention of the guidance provided by President Biden's January 20, 2021, Executive Order on *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*.[108] This Executive Order instructs an Interagency Working Group ("IWG") to analyze the social cost of carbon, social cost of nitrous oxide, and social cost of methane, which "are estimates of monetized damages associated with incremental increases in greenhouse gas emissions."[109] The Executive Order then instructs agencies to rely on an interim social cost analysis "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions" until a final social cost analysis is published no later than January 2022.[110] Given the Proposed Rule's cursory NEPA analysis, it is readily apparent that the Departments did not refer to or rely on President Biden's Executive Order concerning the social cost of carbon. Louisiana and other States are challenging the legality and use of the IWG values for the social cost of carbon and other greenhouse gasses.[111] But to the extent the federal government is permitted to implement them, it is clearly arbitrary and capricious to use them only when the Biden Administration dislikes a policy.

**<u>Specific Comment 10</u>: Automatically starting the work-authorization time clock increases the illegal immigration pull-factor and harms U.S. workers.**

The Proposed Rule treats a positive credible-fear finding, which has little relation to whether an individual will ultimately qualify for asylum, as a properly filed asylum application that starts the clock for eligibility to file for work authorization. Because only 56 percent of non-citizens who meet the credible fear bar currently apply for asylum, this change will drastically increase the number of work-eligible non-citizens in the United States.[112]

This change will exacerbate the asylum system as a backdoor immigration system for economic non-citizens. By speeding up the process by which a non-citizen can gain work authorization, the Departments are creating yet another pull factor that will exacerbate the crisis at the Southwest Border. At no point does the Proposed Rule address this concern or determine ways to mitigate it. Moreover, the impact on U.S. workers could be severe. The U.S. economy generated only 194,000 jobs in September.[113] Meanwhile, border agents are encountering more than 200,000 inadmissible non-citizens monthly.[114] Without sufficient job-growth, and with hundreds of thousands of working age non-citizens gaining work authorization, U.S. workers may experience wage depression. While this shift may benefit some business owners, that benefit represents a transfer of wealth *away* from low-wage U.S. workers. The Proposed Rule acknowledges a potential "distributional economic impact"

---

[107] *Id.*
[108] Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021).
[109] *Id.* at § 5(a), 86 Fed. Reg. at 7,040.
[110] *Id.* at § 5(b)(ii)(A), 86 Fed. Reg. at 7.040.
[111] *Louisiana, et al., v. Biden, et al.*, No. 2:21-01074 (W.D. La.)
[112] U.S. Gov't Accountability Off., *supra* note 46, at 20.
[113] U.S. Bureau of Labor Statistics, USDL-21-1799, Employment Situation Summary (Oct. 8, 2021), *available at* https://www.bls.gov/news.release/empsit.nr0.htm.
[114] *See supra* notes 6 & 7.

Page 18

from U.S. workers to asylum seekers, but fails to quantify it or otherwise acknowledge the serious
economic issues that could arise if U.S. workers see their wages decrease in a time of drastic inflation.[115]

\*      \*      \*      \*

The Proposed Rule represents a fundamental shift in immigration policy in the United States
and raises several grounds for concern about the Departments' methodology and analysis. It is unclear
how the Proposed Rule complies or conflicts with other existing legal obligations. Also unclear is the
intersection between this Proposed Rule and an increase in asylum seekers seeking safe haven in the
United States. Importantly, the Proposed Rule ignored entirely any Federalism analysis, any
explanation of how States and local communities will be impacted by such a momentous change in
immigration policy, meaningful and timely input from State governments, and an environmental
assessment. The Departments should withdraw the Proposed Rule, or must substantially revise it,
consistent with the contours of the Administrative Procedure Act and UMRA.

Sincerely,

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Steve Marshall
Alabama Attorney General

Eric Schmitt
Missouri Attorney General

Mark Brnovich
Arizona Attorney General

Austin Knudsen
Montana Attorney General

---

[115] Gwynn Guilford, *Accelerating Inflation Spreads Through the Economy*, THE WALL STREET JOURNAL (Oct. 13, 2021 3:30
p.m.), https://www.wsj.com/articles/us-inflation-consumer-price-index-september-2021-11634074529.

Page 19

Leslie Rutledge
Arkansas Attorney General

Dave Yost
Ohio Attorney General

Ashley Moody
Florida Attorney General

John O'Connor
Oklahoma Attorney General

Christopher Carr
Georgia Attorney General

Alan Wilson
South Carolina Attorney General

Todd Rokita
Indiana Attorney General

Ken Paxton
Texas Attorney General

Derek Schmidt
Kansas Attorney General

Patrick Morrisey
West Virginia Attorney General

# EXHIBIT 7

**FOX NEWS.com**

# 62,000+ illegal immigrants got past Border Patrol agents in March: sources

By Bill Melugin, Adam Shaw

Published April 01, 2022

Fox News

More than 62,000 illegal immigrants evaded Border Patrol agents in March, averaging about 2,000 a day, according to multiple Customs and Border Protection (CBP) sources – showing the extent to which Border Patrol agents are already being overwhelmed by the massive number of migrants trying to get into the United States.

Per those same sources there have been more than 300,000 known "gotaways" -- migrants who were not apprehended or turned themselves in and who got past agents -- since fiscal year 2022 began on October 1st. For comparison, former Border Patrol Chief Rodney Scott said there had been approximately 400,000 gotaways in the entirety of FY 2021.

**BORDER PATROL AGENTS BRACING FOR NEW MIGRANT WAVE IF TITLE 42 LIFTS: 'WE ARE EXPECTING TO GET WRECKED'**



Dec. 7, 2021: Immigrant men from many countries are taken into custody by U.S. Border Patrol agents at the U.S.-Mexico border in Yuma, Arizona. (Photo by John Moore/Getty Images)

Known gotaways are migrants that are seen on cameras, sensors and other means but there is no manpower to get to. Agents will also used a method called "cutting sign" in which they use a chain link fence to smooth out the surface of a dirt road – coming back later to observe foot prints.

The sources point out that the true number of getaways is likely much higher, because these numbers only account for the ones they know about. The sources told Fox that Del Rio Sector has the most gotaways with about 700 a day, followed by Tucson Sector with over 500 a day.

The massive numbers are the latest indicator of a surging migrant crisis on track to eclipse last year, as the Biden administration reportedly moves to end the controversial Title 42 public health order. It was only this week that Border Patrol agents said that Title 42 was used to expel more than half of the more than 164,000 migrants encountered in February. The 164,973 encounters was up dramatically from 101,099 in Feb. 2021 – and the number is expected to rise in the months ahead.

Border Patrol Chief Raul Ortiz on Tuesday said that the U.S. is currently on track to hit one million migrant encounters so far in Fiscal Year 2022, compared to 1.7 million in all of FY 2021. Ortiz described a situation on the ground in which Border Patrol is short on staff, is facing additional challenges due to the ongoing COVID-19 pandemic and where "every sector is busier than they were back in '21." He also said that agents have encountered migrants from 157 different countries.

## DEM SENATORS SOUND ALARM OVER REPORTS BIDEN ADMINISTRATION WILL END TITLE 42 BORDER POLICY

The Biden administration is reported to be planning to end Title 42 in May, which has led to fears within the administration and among lawmakers and Border Patrol agents that it will encourage even more migrants to try to get into the U.S.



Multiple Border Patrol officials have told Fox News that ending Title 42 would lead to what one agent described as a "surge on top of a surge" as word spreads among migrants that they will not be deported. There are also believed to be a considerable number of migrants waiting in Mexican cities waiting for Title 42 to drop.

"We are expecting to get wrecked," one Border Patrol agent told Fox News Digital.

Brandon Judd, head of the National Border Patrol Council, told Fox News Digital this week that busy parts of the border like Del Rio and Yuma Sectors are already seeing overcrowding to four times their capacity.

## CLICK HERE TO GET THE FOX NEWS APP

The Border Patrol Union president warned that agents will have less than 50% of their resources in the field as agents will have to shift into administrative duties like processing and dealing with transports.

"This administration has created the most dangerous situation we have ever seen on the border," he said.

*Fox News' Peter Hasson contributed to this report.*

Bill Melugin currently serves as a national correspondent for FOX News Channel based out of the Los Angeles bureau.

Print        Close

---

**URL**
https://www.foxnews.com/politics/62000-illegal-immigrants-border-patrol-agents-march

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

# EXHIBIT 8

**The New York Times**	https://www.nytimes.com/2022/03/25/us/politics/biden-immigration-detention-beds.html

## Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds

The administration plans to seek funding for 25,000 beds, down from the 34,000 beds that are currently funded. It also severed a contract with a detention facility in Alabama.

 **By Eileen Sullivan**

March 25, 2022

**Sign Up for On Politics, for Times subscribers only.** A Times reader's guide to the political news in Washington and across the nation. Get it with a Times subscription.

WASHINGTON — The Biden administration is looking to cut more than 25 percent of the bed capacity at immigration detention facilities in its budget request for the next fiscal year, the latest indication that the government is shifting from incarcerating undocumented immigrants to using ankle-monitoring devices and other alternatives.

On Friday, the administration announced that Immigration and Customs Enforcement was ending a contract with a facility that holds immigrants and reducing its use of three others. All four detention facilities have been criticized for having poor living conditions.

An official familiar with a draft of the budget plan described details of the funding request on the condition of anonymity ahead of President Biden's release of the plan on Monday. According to the draft, the request would be for a total of 25,000 immigration detention beds. Congress funded 34,000 beds for the current fiscal year, which runs through September, a number consistent with spending during the Trump administration.

The Biden administration quietly ended the practice of detaining immigrant families this year, continuing the practice only for single adults.

Reducing the number of detention beds as a matter of policy, and making good on promises to hold detention facilities to higher standards of care, could be seen as a peace offering to immigration advocates who have been critical of the progress Mr. Biden has made in fulfilling his campaign promises on immigration.

In recent weeks, members of Mr. Biden's own party, including Senator Chuck Schumer of New York, the majority leader, have condemned the administration's continued use of a public health rule that has limited immigration during the coronavirus pandemic.

"That's a great step forward," Kerri Talbot, the deputy director for the Immigration Hub, an advocacy group, said of the upcoming request for 9,000 fewer detention beds. She said the plan to sever ties with one local jail and reduce the government's reliance on three others was good news as well.

The administration said it would stop using beds at the Etowah County Jail in Gadsden, Ala. It will also reduce the number of beds it pays for at the Alamance County Detention Center in Graham, N.C.; the Glades County Detention Center in Moore Haven, Fla.; and the Winn Correctional Center in Winnfield, La. Problems with the facilities, which also hold nonimmigrant inmates, include poor medical treatment, lack of access to outdoor areas, bug infestations and other inhumane conditions.

Last year, the Biden administration cut ties with two other facilities, the C. Carlos Carreiro Immigration Detention Center in Dartmouth, Mass., and the Irwin County Detention Center in Ocilla, Ga.

Because of the pandemic, Immigration and Customs Enforcement has used only a fraction of its available beds for immigration detention. There have been public health concerns about spreading the coronavirus in congregate settings, and currently only about 60 percent of the beds the agency is paying for are in use.

The number of undocumented migrants crossing the southwest border has increased sharply during Mr. Biden's presidency, and his administration has increasingly turned to alternatives to detention, including ankle monitors, a smartphone application with facial recognition technology and phones that undocumented immigrants awaiting court proceedings can use to check in with immigration authorities.

As of Friday, more than 200,000 immigrants were equipped with one of these monitoring devices, according to internal data. That is more than double the number of such devices that Immigration and Customs Enforcement was using a year ago. Congress recently gave the agency more than $440 million for alternatives to detention for the current fiscal year, and the agency is testing a home confinement program that is expected to go nationwide this summer.

Republicans have hammered the Biden administration for releasing so many migrants into the country to await deportation proceedings, a practice referred to derogatorily as "catch and release." The concern has long been that such immigrants will not appear in court and will instead disappear into the country like millions of other undocumented immigrants.

The situation on the southwest border, where about 13,000 undocumented migrants have been apprehended each day in recent weeks, has proved fertile for Republican attacks on the administration. Many Republicans were outraged by the drop in arrests and deportations by Immigration and Customs Enforcement in 2021 compared with the prior year, the details of which were disclosed in a recent report from the agency.

Deportations declined last year partly because officials have been expelling migrants under the public health rule during the pandemic, and those expulsions do not get counted as deportations. But other enforcement actions inside the country declined as well because of revised priorities under Mr. Biden and staffing shortages.

"In a year where there have been record highs of illegal border crossings, we shouldn't have a record low in arrests and deportations," Senator Shelley Moore Capito, Republican of West Virginia, wrote on Twitter after the report was released.

Alternatives to detention are not widely embraced by either Republicans or immigration advocates. For Republicans, detained immigrants are much easier to deport than those who are not in detention, regardless of whether they are wearing ankle monitors.

And many liberals see the proliferation of these devices as an enormous surveillance operation.

"We cannot swap physical cages for virtual ones and expect different results from a system that criminalizes immigrants at every turn," Carl Hamad-Lipscombe, the executive director of Envision Freedom Fund, a Brooklyn-based nonprofit and bail fund. "Immigrants need to be free to be reunited with their families and access the resources they need to live their lives while their immigration cases continue."

Eileen Sullivan is a Washington correspondent covering the Department of Homeland Security. Previously, she worked at the Associated Press where she won a Pulitzer Prize for investigative reporting. @esullivannyt

A version of this article appears in print on , Section A, Page 17 of the New York edition with the headline: Biden to Reduce Immigration Detention Bed Capacity

# EXHIBIT 9

🔗 https://www.cnn.com/2021/05/20/politics/ice-detention-center/index.html

✏️ Priscilla Alvarez, CNN

🕐 5 min read

# Biden administration to close two immigration detention centers that came under scrutiny

*Washington (CNN)*The Biden administration announced Thursday that it will stop detaining immigrants at two detention centers that came under investigation over allegations of inadequate medical care and poor conditions.

It's the latest move by the administration to address immigration detention following President Joe Biden's executive order that called for a review of Immigration and Customs Enforcement's policies. Advocates have pressed the administration on immigration detention, sending a letter to Homeland Security Secretary Alejandro Mayorkas late last month calling for the closure of 39 ICE detention facilities.

As of May 14, there were more than 20,400 immigrants in ICE detention, according to the agency.

Immigration and Customs Enforcement will discontinue the use of two centers, the Irwin County Detention Center in Georgia, which is operated by a private contractor, and the C. Carlos Carreiro Immigration Detention Center in Bristol County, Massachusetts. The agency will also terminate an agreement with the Bristol County Sheriff's Office wherein the federal government and state and local police officers collaborate to enforce federal immigration law.



"We have an obligation to make lasting improvements to our civil immigration detention system," Mayorkas said in a statement. "This marks an important first step to realizing that goal. DHS detention facilities and the treatment of individuals in those facilities will be held to our health and safety standards. Where we discover they fall short, we will continue to take action as we are doing today."

Last fall, a whistleblower who previously worked at Irwin detailed a high rate of hysterectomies and alleged medical neglect in a complaint filed to the Department of Homeland Security inspector general. The inspector general has since launched a review into the allegations.

Bristol was the subject of litigation over poor treatment of immigrants. In December, the Massachusetts attorney general released its report on an incident that took place in May 2020 between detainees and the Bristol County Sheriff's Office, finding that authorities violated the civil rights of detainees.

"Indeed, our central conclusion is that a series of institutional failures and poor decisions by BCSO leadership throughout the late afternoon and evening of May 1 culminated in a calculated -- that is, planned and deliberate -- use of force against the ICE B detainees that was disproportionate to the security needs at that time and that unnecessarily caused, or risked causing, harm to all involved," the report says.

"Allow me to state one foundational principle: we will not tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention," Mayorkas said in a memo to acting ICE Director Tae Johnson, which was obtained by CNN.

The memo, which was first reported by The Washington Post, also requests that ICE prepare a list of new detention contracts and agreements, as well extensions and modifications, executed between January 1, 2020, and January 20, 2021.

It's unclear how many detainees remain at the Irwin and Bristol detention centers. Those who
remain will be transferred out of the facilities.

"These are two facilities with terrible records of harm and abuse that have been widely reported
in recent years, and this is hopefully a positive sign of things to come," said Jorge Loweree,
director of policy at the American Immigration Council. "It's become increasingly clear in recent
years that the only solution to address the harms created by this parallel system of mass
incarceration is to begin closing facilities, starting with those that have the worst track record of
abuse."

Mayorkas suggested on a call with immigrant advocates earlier this year that the administration
planned to take a different approach to detention, a source familiar with the call told CNN, and
discussed reviewing all forms of detention, including alternatives such as ankle monitors, and
reconsidering family detention altogether.

Since the start of the coronavirus pandemic, ICE released more than 900 individuals who were
considered vulnerable to the virus after "evaluating their immigration history, criminal record,
potential threat to public safety, flight risk and national security concerns," according to the
agency, and reduced the intake of new detainees.

The number of people arrested and deported for being in the US illegally has dropped under
Biden after his administration narrowed its enforcement focus to those who may pose a threat
or have criminal backgrounds.

Just as arrests have dropped, so has the detention population. The detention of immigrants
arrested by ICE decreased by more than two-thirds in the first 100 days of the Biden
administration, according to an analysis by the Migration Policy Institute.

# EXHIBIT 10

🔗 https://thehill.com/homenews/campaign/450797-all-candidates-raise-hands-on-giving-health-car…

✏️ Alexander Bolton

🕐 3 min read

# The Hill



Getty

All 10 Democratic presidential candidates on the debate stage raised their hands when asked whether their health plans will provide coverage for undocumented immigrants, a controversial idea that could dramatically expand the pool of people needing government subsidies.

South Bend, Ind., Mayor Pete Buttigieg was the first to defend the concept, arguing that a federal program providing health coverage to undocumented migrants would not significantly add to the deficit.{mosads}

"Our country is healthier when everybody is healthier. And remember we're talking about something people are given a chance to buy into. In the same way that there are undocumented immigrants in my community who pay — they pay sales taxes, they pay property taxes, directly

or indirectly — this is not about a hand out. This is an insurance program and we do no favors by having 11 million undocumented people in our country be unable to access health care," he said.

NBC moderator Savannah Guthrie pressed former Vice President Joe Biden on the subject after failing to see that he raised his hand with the other candidates.

When asked by Guthrie if he would provide federally supported health coverage to undocumented immigrants, Biden quickly corrected her.

"You cannot let people who are sick, no matter where they come from, no matter what their status, go uncovered. You can't do that. It's just going to be taken care of. Period. You have to. It's the humane thing to do," he insisted.

Biden also argued that bringing illegal residents into a national health care program they could help defray costs by adding wage earners to the pool of covered people.

"Number one, they in fact contribute to the wellbeing of the country but they also, for example, they increase the lifespan of Social Security," he said, alluding to concerns that Social Security will run out of money because of baby boomers dropping out of the work force.

"They would do the same thing in terms of reducing the overall cost of health care by them being able to be treated and not wait until they're in extremis," Biden said.

Tags Joe Biden Pete Buttigieg

EXHIBIT 11

The Washington Post

ts stand    **Health care**    Immigration    Voting    Climate    Education    Foreign policy    Economy    Guns

HEALTH CARE                                    **Expand answers**    **Collapse**

## Do you believe all undocumented immigrants should be covered under a government-run health plan?



YES

Biden    Bennet    Booker    Castro    de Blasio

Gillibrand    Harris    Moulton    Sanders    Steyer

Swalwell    Warren    Williamson

YES, WITH CAVEAT

Bloomberg    Buttigieg    Yang

NO

Bullock    Delaney    Ryan    Sestak

UNCLEAR/NO RESPONSE

Gabbard    Hickenlooper    Inslee    Klobuchar    O'Rourke

Patrick

👆 Hover for more information

**BACKGROUND** Some government health-care plans call for the federal government to fund the health insurance of the approximately 11 million undocumented people

living in the United States.

The Post is sending detailed questionnaires to every Democratic candidate asking for their stances on various issues. See all the issues we've asked about so far.

See our other questions on health care:

- Do you support Medicare-for-all?

- What should happen to private insurance?

- Do you support creating a public option to expand health care, such as allowing people to buy into a state Medicaid program regardless of income?

- Should there be restrictions on abortion at any point during a healthy pregnancy?

- Do you support having the federal government produce and sell generic drugs to lower drug prices?

- Do you support importing drugs from other countries?

- Do you support giving the federal government the ability to negotiate drug prices for Medicare?

- Do you support partially expanding Medicare by allowing people ages 50 to 64 to buy into Medicare?

- Would you seek to repeal the Hyde Amendment, which prohibits the use of federal funds for abortion?

- Should federal law require all private insurance plans cover abortion?

- Would you reverse the Mexico City policy, which prohibits U.S. funding for foreign organizations that "perform or actively promote" abortion?

**How we compiled candidate positions**

The Washington Post sent a detailed questionnaire to every Democratic campaign asking whether they support various health-care policies. We organized candidates with similar stances into groups using a combination of those answers, legislative records, action taken in an executive role and other public comments, such as policy discussion on campaign websites, social media posts, interviews, town halls and other news reports. See something that we missed? Let us know.

This page will update as we learn more about the candidates' plans. We also will note if candidates change their position on an issue. At initial publication, this page included major candidates who had announced a run for president. If a candidate dropped out after a question was published here, their stance is included under the "Show former candidates" option. If they dropped out before a question was first published, the Post did not reach out to get their stance.

Candidate illustrations by Ben Kirchner.

EXHIBIT 12

🔗 https://www.reuters.com/article/us-usa-immigration-mexico-exclusive-idUSKBN2B21D8

✒️ Dave Graham

🕐 5 min read

# Exclusive: 'Migrant president' Biden stirs Mexican angst over boom time for gangs

MEXICO CITY (Reuters) - Mexico's government is worried the new U.S. administration's asylum policies are stoking illegal immigration and creating business for organized crime, according to officials and internal assessments seen by Reuters.

Migrants are pictured after a protest at the Mexico-U.S. San Ysidro port of entry to ask U.S. President Joe Biden to allow them to apply for asylum, in Tijuana, Mexico March 2, 2021. Picture taken March 2, 2021. REUTERS/Jorge Duenes

Ever since President Joe Biden won the White House vowing to undo the hardline approach of his predecessor Donald Trump, Mexico has both looked forward to an end to migration burdens imposed by Trump, and braced for a new influx of people.

Detentions on the U.S border have surged since Biden took office on Jan. 20. Mexico has urged Washington to help stem the flow by providing development aid to Central America, from where most migrants come, driven by a humanitarian crisis.

"They see him as the migrant president, and so many feel they're going to reach the United States," Mexican President Andres Manuel Lopez Obrador said of Biden the morning after a virtual meeting with his U.S. counterpart on March 1.

"We need to work together to regulate the flow, because this business can't be tackled from one day to the next."

Previously unreported details in the internal assessments, based on testimonies and intelligence gathering, state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will "incentivize migration."

Apprehensions on the U.S.-Mexico border in February hit levels unseen since mid-2019, and were the highest for that month in 15 years, data reported by Reuters showed.

Among U.S. steps Mexico worries are encouraging migration are improved support for victims of gangs and violence, streamlining of the legalization process, and suspension of Trump-era accords that deported people to Central America.

Recent Mexican policies are also encouraging migration, according to one assessment. It saw potential fillips in measures such as offering COVID-19 vaccines to migrants, as well as better protections for undocumented children.

One Mexican official familiar with migration developments, who spoke on condition of anonymity, said organized crime began changing its modus operandi "from the day Biden took office" and now exhibited "unprecedented" levels of sophistication.

That includes briefing clients on the latest immigration rules, using technology to outfox authorities, and disguising smuggling operations as travel agencies, assessments showed.

"Migrants have become a commodity," the official said, arguing they were now as valuable as drugs for the gangs. "But if a packet of drugs is lost in the sea, it's gone. If migrants are lost, it's human beings we're talking about."

Mexico's security ministry, foreign ministry and national migration institute did not reply to requests for comment for this story. The White House and the Department of Homeland Security did not immediately respond to requests for comment.

Higher concentrations of migrants in border areas have encouraged gangs to recruit some as drug mules, and kidnap others for money, said Cesar Peniche, attorney general of Chihuahua, the state with the longest stretch of U.S. frontier.

Both Mexican and U.S. policy should be more clear-cut so as not to spur illegal immigration, he told Reuters.

Mexico has praised Biden for offering a pathway to citizenship to millions of U.S. residents of Mexican origin, and for rolling back Trump-era policies that sent U.S. asylum seekers back into Mexico to await their court hearings.

To avoid detection, migrants now often travel in small groups instead of caravans, and increasingly follow more dangerous, less well-trodden routes, the Mexican official said.

Communicating via social media such as Facebook, WhatsApp, Instagram and YouTube, smugglers update migrants on impending checkpoints, when freight trains they can jump on pass, where to stay and how to navigate immigration laws, the official added.

To ease their passage, smugglers advise Central American clients to register complaints with authorities saying they have been victims of extortion or, for young men, that they have faced death threats from street gangs, the assessments show.

And, as in previous years, migrants are being told to bring along children to make it easier to apply for asylum.

Mexican intelligence shows smugglers' transit costs vary widely. One assessment said an unaccompanied Central American minor could secure passage to the U.S. border for about $3,250. By contrast, for African travelers, the rate was $20,000. Asians must also pay more.

One evaluation set out concerns there could be a significant influx in migrants from outside the region - the Caribbean, Asia, Africa and the Middle East - as coronavirus-led border restrictions begin easing.

Even as Mexicans hail Biden's cancellation of work on Trump's border wall, some officials say it is time Mexico returns to an idea the government raised in 2019: improving the infrastructure along its own southern border with Guatemala.

"Mexico spends more on every new wave of migrants than that would cost," said another official. "We have to do it."

Reporting by Dave Graham; Additional reporting by Sofia Menchu in Guatemala City and Alexandra Alper in Washington; Editing by Rosalba O'Brien

EXHIBIT 13

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### Pending I-862 Proceedings Originating With a Credible Fear Claim and All Pending I-862s[1]



| Pending I-862 Proceedings Originating with a Credible Fear Claim | All Pending I-862 Proceedings |
|---|---|
| 238,042 | 1,496,335 |

Data Generated: January 19, 2022
[1] Pending I-862 proceedings as of September 30, 2021. I-862 proceedings include removal, exclusion, and deportation proceedings.

# EXHIBIT 14

Number of Service-wide Forms
By Quarter, Form Status, and Processing Time
Fiscal Year 2021, Quarter 3

**U.S. Citizenship and Immigration Services**

| Category and Form Number | Description | 3rd Quarter | | | | | | Fiscal Year - To Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Forms Received | Completed | | | Pending | Processing Time | Forms Received | Completed | | | Pending |
| | | | Approved | Denied | Total[15] | | | | Approved | Denied | Total[15] | |
| **TOTAL - ALL FORMS** | | 2,575,092 | 1,488,902 | 203,870 | 1,708,182 | 7,791,959 | N/A | 6,489,930 | 4,233,212 | 556,675 | 4,834,504 | 7,791,959 |
| **Family Based** | | | | | | | | | | | | |
| I-129F | Petition for Alien Fiancé(e) | 12,637 | 5,629 | 1,761 | 7,390 | 27,437 | 8.0 | 26,776 | 18,161 | 4,374 | 22,535 | 27,437 |
| I-130 | Petition for Alien Relative | 243,753 | 161,925 | 21,344 | 183,269 | 1,465,631 | 12.4 | 540,965 | 520,772 | 64,724 | 585,496 | 1,465,631 |
| I-600[1] | Petition to Classify Orphan as an Immediate Relative | 321 | 296 | 59 | 355 | 531 | N/A | 822 | 913 | 154 | 1,067 | 531 |
| I-601A | Application for Provisional Unlawful Presence Waiver | 11,966 | 5,040 | 498 | 5,538 | 84,032 | 17.9 | 34,468 | 15,556 | 1,373 | 16,929 | 84,032 |
| I-751 | Petition to Remove Conditions on Residence | 56,919 | 41,866 | 1,907 | 43,773 | 221,056 | 15.2 | 131,391 | 122,498 | 4,975 | 127,473 | 221,056 |
| I-800[2] | Petition to Classify Convention Adoptee as an Immediate Relative | 653 | 843 | 14 | 857 | 430 | N/A | 1,713 | 2,392 | 57 | 2,449 | 430 |
| **Employment Based** | | | | | | | | | | | | |
| I-129 | Petition for a Nonimmigrant Worker | 186,822 | 149,201 | 17,509 | 166,710 | 100,997 | 1.2 | 388,488 | 379,480 | 54,102 | 433,582 | 100,997 |
| I-140 | Immigrant Petition for Alien Workers | 40,225 | 34,893 | 1,964 | 36,857 | 89,454 | 8.3 | 130,823 | 88,059 | 7,293 | 95,392 | 89,454 |
| I-526 | Immigrant Petition by Alien Investor | 169 | 592 | 135 | 727 | 12,798 | 31.6 | 358 | 2,348 | 384 | 2,732 | 12,798 |
| I-765[3] | Application for Employment Authorization | 752,399 | 367,091 | 42,430 | 409,521 | 1,364,128 | 2.8 | 1,916,227 | 1,075,940 | 116,380 | 1,192,320 | 1,364,128 |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | 1,249 | 402 | 46 | 448 | 11,160 | 36.0 | 2,507 | 1,609 | 124 | 1,733 | 11,160 |
| I-924[4] | Application For Regional Center Designation Under the Immigrant Investor Program | D | 18 | D | 19 | 133 | 17.7 | 11 | 43 | 17 | 60 | 133 |
| I-924A | Annual Certification of Regional Center | D | - | - | - | 1,577 | N/A | 430 | - | - | - | 1,577 |
| **Humanitarian** | | | | | | | | | | | | |
| I-589[5] | Application for Asylum and for Withholding of Removal | 13,371 | 2,063 | 4,603 | 9,580 | 403,957 | N/A | 42,888 | 5,175 | 13,211 | 28,158 | 403,957 |
| Legalization[6] | Legalization/ SAW | 19 | D | 60 | 62 | 583 | N/A | 35 | 10 | 330 | 340 | 583 |
| I-730 | Refugee/Asylee Relative Petition | 2,159 | 1,642 | 189 | 1,831 | 25,942 | 21.7 | 6,884 | 4,280 | 544 | 4,824 | 25,942 |
| I-817 | Application for Family Unity Benefits | 125 | 146 | 69 | 215 | 400 | 4.0 | 267 | 502 | 277 | 779 | 400 |
| I-821 | Application for Temporary Protected Status | 133,019 | 4,086 | 176 | 4,262 | 125,049 | 3.0 | 137,504 | 6,194 | 463 | 6,657 | 125,049 |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | 134,286 | 65,903 | 1,171 | 67,074 | 167,034 | 1.2 | 338,763 | 223,405 | 2,905 | 226,310 | 167,034 |
| I-870[7] | Record of Determination/Credible Fear Worksheet | 24,160 | 9,574 | 3,740 | 13,886 | 9,209 | N/A | 35,570 | 14,475 | 5,835 | 21,766 | 9,209 |
| I-881[8] | App. for Susp. of Deport. or Spec. Rule Cancel. of Remov. (Sect. 203 of Public Law 105-100 | 45 | 55 | D | 59 | 575 | N/A | 151 | 90 | D | 99 | 575 |
| I-899[9] | Record of Determination/Reasonable Fear Worksheet | 1,197 | 261 | 529 | 980 | 179 | N/A | 3,757 | 718 | 1,731 | 3,278 | 179 |
| I-914[10] | Application for T Nonimmigrant Status | 832 | 375 | 276 | 651 | 3,717 | 19.4 | 1,969 | 1,010 | 702 | 1,712 | 3,717 |
| I-918[11] | Petition for U Nonimmigrant Status | 9,123 | 2,463 | 1,787 | 4,250 | 276,899 | 60.6 | 26,753 | 16,541 | 4,931 | 21,472 | 276,899 |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | 255 | 163 | 51 | 214 | 1,275 | 15.4 | 773 | 495 | 122 | 617 | 1,275 |
| **Lawful Permanent Residence** | | | | | | | | | | | | |
| I-485 | Application to Register Permanent Residence or Adjust Status (Family) | 91,036 | 70,044 | 11,599 | 81,643 | 339,070 | 13.0 | 203,725 | 198,427 | 32,779 | 231,206 | 339,070 |
| I-485 | Application to Register Permanent Residence or Adjust Status (Employment) | 41,332 | 29,353 | 1,988 | 31,341 | 288,677 | 8.7 | 246,183 | 74,734 | 4,930 | 79,664 | 288,677 |
| I-485 | Application to Register Permanent Residence or Adjust Status (Asylum) | 13,679 | 7,066 | 269 | 7,335 | 84,835 | 12.8 | 36,817 | 16,367 | 812 | 17,179 | 84,835 |
| I-485 | Application to Register Permanent Residence or Adjust Status (Refugee) | 6,699 | 2,690 | 367 | 3,057 | 22,315 | 9.3 | 19,379 | 12,507 | 1,257 | 13,764 | 22,315 |
| I-485 | Application to Register Permanent Residence or Adjust Status (Cuban) | 4,776 | 5,644 | 544 | 6,188 | 20,750 | 9.1 | 14,921 | 14,918 | 1,563 | 16,481 | 20,750 |
| I-485 | Application to Register Permanent Residence or Adjust Status (Other) | 12,103 | 5,891 | 967 | 6,858 | 49,293 | 12.7 | 34,826 | 17,488 | 3,796 | 21,284 | 49,293 |
| **Citizenship and Nationality** | | | | | | | | | | | | |
| N-300 | Application to File Declaration of Intention | - | - | - | - | - | N/A | - | - | - | - | - |
| N-336 | Req. for a Hearing on a Decision in Natz. Proceedings (Under Sect. 336 of the INA) | 1,441 | 987 | 577 | 1,564 | 3,977 | N/A | 3,155 | 2,378 | 1,410 | 3,788 | 3,977 |
| N-400 | Application for Naturalization (Military) | 1,861 | 2,129 | 120 | 2,249 | 6,471 | 10.9 | 4,387 | 5,268 | 280 | 5,548 | 6,471 |
| N-400 | Application for Naturalization | 203,591 | 229,608 | 24,831 | 254,439 | 900,953 | | 591,610 | 563,150 | 59,344 | 622,494 | 900,953 |
| N-470 | Application to Preserve Residence for Naturalization Purposes | - | - | - | - | D | N/A | - | - | - | - | D |
| N-565 | Application for Replacement Naturalization/Citizenship Document | 9,231 | 3,596 | 463 | 4,059 | 22,888 | 6.8 | 21,816 | 11,402 | 1,569 | 12,971 | 22,888 |
| N-600[12] | Application for Certificate of Citizenship | 18,177 | 10,895 | 1,077 | 11,972 | 47,231 | 6.0 | 42,442 | 31,519 | 3,117 | 34,636 | 47,231 |
| N-644 | Application for Posthumous Citizenship | - | - | - | - | - | N/A | - | - | - | - | - |
| N-648 | Medical Certification for Disability Exceptions | 11,667 | N/A | N/A | 11,732 | 2,305 | N/A | 32,634 | N/A | N/A | 32,557 | 2,305 |
| **Other** | | | | | | | | | | | | |

Number of Service wide Forms
By Quarter, Form Status, and Processing Time
Fiscal Year 2021, Quarter 3

U.S. Citizenship and Immigration Services

| Category and Form Number | Description | 3rd Quarter | | | | | | Fiscal Year - To Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Forms Received | Completed | | | Pending | Processing Time | Forms Received | Completed | | | Pending |
| | | | Approved | Denied | Total[15] | | | | Approved | Denied | Total[15] | |
| I-90 | Application to Replace Permanent Resident Card | 245,301 | 125,008 | 4,718 | 129,726 | 557,451 | 6.6 | 616,679 | 378,125 | 31,008 | 409,133 | 557,451 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 1,507 | 621 | 119 | 740 | 3,421 | 2.5 | 3,084 | 1,780 | 500 | 2,280 | 3,421 |
| I-131 | Application for Travel Document | 24,119 | 10,967 | 841 | 11,808 | 48,310 | 7.2 | 52,956 | 30,078 | 1,890 | 31,968 | 48,310 |
| I-131 | Application for Travel Document (Advance Parole) | 131,800 | 53,721 | 15,192 | 68,913 | 365,705 | 7.3 | 455,835 | 164,258 | 35,513 | 199,771 | 365,705 |
| I-131 | Application for Travel Document (Parole-in-Place) | 4,524 | 1,648 | 427 | 2,075 | 3,200 | 4.7 | 10,246 | 4,770 | 1,050 | 5,820 | 3,200 |
| I-193 | Application for Waiver of Passport and/or Visa | D | D | D | 13 | 454 | 64.8 | 28 | 47 | 31 | 78 | 454 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | 16,456 | 7,683 | 1,223 | 8,906 | 53,335 | 4.9 | 40,147 | 23,070 | 4,181 | 27,251 | 53,335 |
| I-539 | Application To Extend/Change Nonimmigrant Status | 82,247 | 54,882 | 31,669 | 86,551 | 327,485 | 11.4 | 215,894 | 139,882 | 67,112 | 206,994 | 327,485 |
| I-824 | Application for Action on an Approved Application or Petition | 3,547 | 2,059 | 312 | 2,371 | 8,126 | 3.5 | 8,575 | 5,432 | 1,088 | 6,520 | 8,126 |
| Waivers[13] | Waivers | 15,705 | 6,908 | 2,833 | 9,741 | 224,224 | 7.7 | 44,737 | 28,140 | 9,848 | 37,988 | 224,224 |
| I-290B | Notice of Appeal or Motion | 8,575 | 2,966 | 3,407 | 6,373 | 17,296 | 5.5 | 19,561 | 8,766 | 8,584 | 17,350 | 17,296 |
| Supplemental Processing | | | | | | | | | | | | |
| DS-230 (IV)[14] | Immigrant Visas | 55,227 | 52,051 | | 52,051 | 30,272 | N/A | 112,688 | 110,445 | | 110,445 | 30,272 |
| EOIR Adjustment[14] | EOIR Adjustment | 7,567 | 4,962 | 2,605 | 7,567 | 9,143 | N/A | 24,001 | 15,739 | 8,262 | 24,001 | 9,143 |



**Number of Service wide Forms**
By Quarter, Form Status, and Processing Time
Fiscal Year 2021, Quarter 3

**U.S. Citizenship and Immigration Services**

**Table Key:**

D  Data withheld to protect applicants' privacy. Does not apply to Form N-644, Posthumous Naturalization.

N/A  Not captured/calculated.

- Represents zero.

**References:**

[1] Includes I-600A, Application for Advance Processing of an Orphan Petition.

[2] Includes I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country.

[3] I-765 Includes DACA Employment Authorization Documents.

[4] I-924 approvals include regional center reaffirmations and I-924 denials include regional center terminations.

[5] Data are for affirmatively filed I-589 asylum applications and do not include defensive asylum claims before a DOJ EOIR immigration court. For affirmative I-589s, the "denial" column includes cases where USCIS found the applicant not eligible on the merits of the claim and referred the applicant to an immigration judge. Previous reports did not include referrals in the denied counts. Administratively closed cases are not included in approvals or denials but are included in the total number of completions.

[6] Includes the following applications for persons applying for benefits under the Immigration Reform and Control Act of 1986:  Forms I-687, I-700. I-698, I-690, I-694, and I-695.

[7] Credible fear cases approved indicate fear established. Credible fear cases denied indicate fear not established.  Administratively closed cases are not included in approvals or denials, but are included in total number of completions.

[8] NACARA cases approved indicate a grant of suspension of deportation or special rule cancellation of removal and adjustment of status. Denied indicates USCIS found the applicant not eligible on the merits of the claim and referred the applicant to an immigration judge. Administratively closed and dismissed cases are not included in approvals or denials, but are included in total number of completions.

[9] Reasonable fear cases approved indicate fear established. Reasonable fear cases denied indicate fear not established. Administratively closed cases are not included in approvals or denials, but are included in total number of completions.

[10] Includes I-914A, Application for Family Member of T-1 Recipient.

[11] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient. Processing times shown are from receipt to date of waitlist.

[12] Includes N-600K, Application for Citizenship and Issuance of Certificate Under Section 322.

[13] Includes the following applications filed to waive exclusionary grounds:  Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[14] Immigrant Visa and EOIR Adjustment are not included in the "Total - All Forms" line.

[15] Total Completions on the 'Total - All Forms' line are approvals plus denials with two exceptions. The N-648 line does not break down Approvals and Denials, only Completions. The I-589 line includes administratively closed cases in Completions, which are not reported under the Approvals or Denials.

**Note(s):**

1) Some applications or petitions approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the database is queried.

3) Forms received, completed (approved and denied), and pending counts may differ from counts reported in previously published reports due to processing delays and the time at which the data are queried, system updates, and post-adjudicative outcomes.

4) Forms Received are the number of new applications or petitions received and entered into a case-tracking system during the reporting period.

5) Approved are the number of applications or petitions approved during the reporting period.

6) Denied are the number of applications or petitions that were denied, terminated, withdrawn, or revoked during the reporting period. Outcomes included in this count will vary by benefit type as not all benefit types have all of these outcomes in every reporting period.

7) Completed are the number of applications or petitions approved or denied. Some benefit types include other outcomes, such as administrative closures, in the total number of completed cases. As such, approvals and denials will not sum to the total number of completions for all benefit types.

8) Pending is the number of applications or petitions awaiting a decision as of the end of the reporting period.

9) Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. The number of months presented is the median which is the time it took to complete 50% of all the cases processed in the quarter.

10) Forms where a processing time is unavailable are shown with an N/A. Processing times may be unavailable for a variety of reasons such as forms pending a processing times calculation or forms where times cannot be calculated.

11) Credible and Reasonable Fear screenings (and their respective forms I-870 and I-899) do not confer an immigration benefit, rather they are intended to identify individuals with viable protection claims, which are then referred to the Immigration Courts for adjudication. Asylum Officers do not adjudicate the actual asylum applications during the screening process.

12) The federal fiscal year is from October 1st through September 30th.

13) Summing the six I-485 types results in the I-485 overall total for the reporting period.

**Source(s):**

All data except I-589, I-870, I-899 and I-881 - Department of Homeland Security, U.S. Citizenship and Immigration Services, Performance Reporting Tool (PRT), USCIS Electronic Immigration System (ELIS) and C3 Consolidated, August 2021, TRK 7768.

I-589, I-870, I-899 and I-881 data were provided by the Directorate of Refugee, Asylum and International Operations (RAIO).

# EXHIBIT 15

JON TESTER
MONTANA

COMMITTEES
APPROPRIATIONS
BANKING
COMMERCE
INDIAN AFFAIRS
VETERANS' AFFAIRS

SENATE HART BUILDING
SUITE 311
WASHINGTON, DC 20510
202-224-2644

tester.senate.gov/contact

## United States Senate

April 5, 2022

The Honorable Alejandro Mayorkas
Secretary
U.S. Department of Homeland Security
3801 Nebraska Ave. N.E.
Washington, D.C. 20016

Secretary Mayorkas:

I write to raise concerns about the Department of Homeland Security's preparedness for ending Title 42. The White House recently announced it would terminate the program on May 23, 2022. Ending this policy without sufficient preparation risks undermining our national security. I urge the Department to provide Congress with a comprehensive plan on how it will address the increased strain on our immigration system and increased security needs before Title 42 is now set to expire next month.

Ending Title 42 is expected to cause a significant increase of migration to the United States and put more pressure on an already broken system. These problems do not only affect the southern border, but put more strain on those working to secure the northern border as well.

Reports indicate that the Department is developing contingency plans, but it has not provided sufficient information to Congress. The Department must provide additional information on how it is working with other federal, state, and local agencies to ensure that additional staffing, processing, humanitarian, and security resources are in place, and how it is prepared to address the increased numbers of encounters and asylum claims that are expected to follow.

Customs and Border Patrol's (CBP) own staffing models show a current shortage of more than 1,000 officers, and I continue to hear from officers that frequent reassignments to the southern border are negatively impacting security at the northern border, officer morale, and staffing levels. I also urge the Department to provide additional information about how it is working to address this staffing shortage, and improve recruitment and retention of CBP officers. The Department must also ensure that CBP officers from the northern border ports of entry will not be subject to frequent reassignments to the southern border and that the northern border will remain secure.

Title 42 is an emergency order and should not stay in effect indefinitely, especially as we continue to make headway in combatting the COVID-19 pandemic. But we should not end this policy without ample preparation. I appreciate your work to ensure the Department provides Congress with a comprehensive plan that will safely ease immigration restrictions.

I stand ready to work with you on this matter.

Sincerely,

Jon Tester

# EXHIBIT 16

# OFFICE OF INSPECTOR GENERAL

# ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels


Homeland Security

**April 12, 2022**

OIG-22-37



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

April 12, 2022

MEMORANDUM FOR:   Tae D. Johnson
                  Acting Director
                  U.S. Immigration and Customs Enforcement

FROM:             Joseph V. Cuffari, Ph.D.
                  Inspector General

JOSEPH V
CUFFARI

Digitally signed by
JOSEPH V CUFFARI
Date: 2022.04.12
17:39:57 -04'00'

SUBJECT:          *ICE Spent Funds on Unused Beds, Missed COVID 19*
                  *Protocols, and Detention Standards While Housing*
                  *Migrant Families in Hotels*

Attached for your action is our final report, *ICE Spent Funds on Unused Beds, Missed COVID 19 Protocols, and Detention Standards While Housing Migrant Families in Hotels*. We incorporated the formal comments provided by your office.

The report contains four recommendations aimed at improving ICE's contracting and oversight of hotel facility management and operations. Your office concurred with one recommendation and did not concur with three recommendations. Based on information provided in your response to the draft report, we consider recommendation 2 resolved and closed and recommendations 1, 3, and 4 administratively closed.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait, Deputy Inspector General for Inspections and Evaluations at (202) 981-6000.

Attachment

# DHS OIG HIGHLIGHTS

## ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels

**April 12, 2022**

## Why We Did This Inspection

We evaluated U.S. Immigration and Customs Enforcement's (ICE) plans to house migrant families in hotels and how ICE selected a contractor to implement these plans. From April 2021 to September 2021, we conducted remote inspections of the ICE hotel facilities to assess compliance by the contractor, Endeavors, with ICE detention standards and COVID-19 requirements.

## What We Recommend

We made four recommendations to improve ICE's contracting and oversight of hotel facility management and operations.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

ICE did not adequately justify the need for the sole source contract to house migrant families and spent approximately $17 million for hotel space and services at six hotels that went largely unused between April and June 2021. ICE's sole source contract with Endeavors resulted in millions of dollars being spent on unused hotel space. In addition, Endeavors did not meet new healthcare protocols or ensure proper COVID-19 testing for families. For example, families were not tested by ICE for COVID-19 prior to being transported to hotels and were not always tested by Endeavors staff upon arrival at or departure from hotels, putting migrant families and the outside population at risk of contracting COVID-19. Further, Endeavors did not follow required ICE standards to ensure the proper care for housing migrant families while such families were residing in its facilities.

## ICE Response

ICE concurred with one recommendation and did not concur with three recommendations. One recommendation was resolved and closed, and three recommendations were administratively closed. See Appendix B for ICE's full response.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Table of Contents

Introduction ................................................................................................ 2

Background ................................................................................................ 2

Results of Inspection ................................................................................. 5

    ICE Did Not Adequately Justify Its Use of Sole Source Contracting in Selecting Endeavors .................................................................................. 5

    ICE Did Not Determine Space Necessary to House a Migrant Family Surge, Leaving Contracted Space Underutilized .................................................. 6

    Endeavors Did Not Comply with New Healthcare Protocols, Including Protocols for COVID-19 .............................................................................. 7

    Endeavors Did Not Comply with Several Modified Family Residential Standards ................................................................................................... 10

Recommendations ...................................................................................... 11

## Appendixes

    Appendix A:  Objective, Scope, and Methodology ...................................... 19
    Appendix B:  ICE Comments to the Draft Report ...................................... 21
    Appendix C:  Office of Inspections and Evaluations Major Contributors to this Report .................................................................. 26
    Appendix D:  Report Distribution ............................................................. 27

## Abbreviations

| | |
|---|---|
| COVID-19 | coronavirus disease 2019 |
| FAR | Federal Acquisition Regulation |
| FRC | Family Residential Center |
| FRS | *Family Residential Standards* |
| ICE | U.S. Immigration and Customs Enforcement |
| U.S.C. | United States Code |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Introduction

U.S. Immigration and Customs Enforcement (ICE) is responsible for housing migrant families in detention.  ICE has historically used Family Residential Centers (FRC)[1] to accommodate family units in ICE custody.  However, in early 2021, ICE anticipated increased apprehensions of migrant families along the southern U.S. border and entered into a contract to house migrant families in hotels while ICE completed its intake processing.  Our objective was to evaluate ICE's plans to house migrant families in hotels and how ICE selected a contractor to implement these plans.

During the review, we also examined the contractor's compliance with the standards that apply to housing migrant families in hotel facilities.  From April 2021 to September 2021, we conducted remote inspections and fieldwork of ICE hotels housing migrant families and identified concerns regarding the contract and detainee care.  We referred the actions surrounding the use of a sole source contract to our Office of Investigations.

# Background

ICE first began housing detained family units in FRCs in 2001 at Berks Family Residential Center (Berks) in Leesport, Pennsylvania.  In 2014, following an increase in the number of families apprehended on the southern U.S. border, ICE opened two additional FRCs — the South Texas Family Residential Center (Dilley) in Dilley, Texas, and the Karnes County Residential Center (Karnes) in Karnes, Texas.  The three FRCs have a total capacity of 3,326: 96 at Berks, 2,400 at Dilley, and 830 at Karnes.  In 2007, ICE developed *Family Residential Standards* (FRS) to govern all aspects of family detention, including medical care, nutrition, legal access, educational services, and grievances.

In early 2021, ICE anticipated another surge in migrant families crossing the southern border into the United States and believed the existing housing infrastructure of the FRCs would be insufficient to handle the anticipated influx.  To increase its housing capacity for detained families, ICE entered into an $86.9 million sole source contract with Endeavors[2] for approximately 6 months (March to September 2021) to provide 1,239 beds and other

---

[1]FRCs maintain family unity as families go through immigration proceedings or await return to their home countries.  To be eligible to stay at an FRC, the family members cannot have a criminal history and must include a non-U.S. citizen child or children under the age of 18 accompanied by their non-U.S. citizen parent(s) or legal guardian(s).  ICE also refers to FRCs as Family Staging Centers.

[2] Endeavors is a non-profit faith-based organization founded in 1969 to provide social welfare services to the community.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

necessary services in hotels. Sole source contracts are used when an agency can demonstrate that the contract meets specific and justified criteria, such as:

> the executive agency's need for the property or services is of such an unusual and compelling urgency that the Federal Government would be seriously injured unless the executive agency is permitted to limit the number of sources from which it solicits bids or proposals.[3]

If contracts do not meet one of the criteria, they must be awarded through an open competitive process. The contract with Endeavors included the use of six hotels,[4] which were repurposed as Emergency Family Reception Sites (see Figure 1),[5] set up to accommodate migrants for stays typically lasting less than 3 days[6] while ICE considered conditions of release based on specific circumstances, including alternatives to detention.[7]

**Figure 1. Hotels Endeavors opened as part of its contract with ICE to house migrant families.**



*Source:* DHS OIG analysis of ICE data

---

[3] 41 United States Code (U.S.C.) § 3304(a)(2).
[4] After our fieldwork was completed, two additional hotels were opened for a total of eight.
[5] The contract defined these sites as "Temporary residential shelter care and other related services to families in its [ICE's] custody."
[6] Families with members testing positive for coronavirus disease 2019 (COVID-19) may stay at hotels up to 10 days.
[7] ICE's Alternatives to Detention program uses technology and other tools to manage undocumented individuals' compliance with release conditions while they are on the non-detained docket. It is not a substitute for detention but allows ICE to exercise increased supervision over a portion of those who are not detained.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

In March 2021, ICE modified its FRS[8] to establish guidelines for housing and caring for migrant families held in ICE custody at hotel locations operated by Endeavors, as pictured in Figure 2. The standards were customized for hotel locations to reflect that hotels are not intended to provide long-term residential care. The modified FRS kept some of the required standards intact but modified or removed several key standards that were not useful or appropriate for short-term stays.[9]



**Figure 2. Migrants waiting to be processed at an ICE hotel in Phoenix, Arizona, in May 2021.**

*Source:* Video surveillance footage provided by Endeavors hotel staff

The Office of Inspector General initiated this inspection to evaluate ICE's plans to house migrant families in hotels and how ICE selected a contractor to implement these plans. We also examined Endeavors' compliance with ICE detention standards and coronavirus disease 2019 (COVID-19) requirements. We conducted remote inspections of four of the six ICE hotels operated by Endeavors: Casa de Estrella and Casa Consuelo in El Paso, Texas; Casa de Paz in Pearsall, Texas; and Casa de la Luz in Phoenix, Arizona.

---

[8] ICE modified the FRS in March 2021 except for the behavior standard, which provided Endeavors' approach to emergency crisis situations and resident searches at the hotels and was not modified until July 2021.

[9] The modified FRS removed the visitation, educational policy, marriage requests, voluntary work program, resident transfers, and media tours standards. Further, ICE customized standards for admissions and release, staff-resident communication, recreation, and the resident handbook. ICE also replaced the standard for healthcare of migrant families with a new standard outlining how basic healthcare would be provided in a hotel setting.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Results of Inspection

ICE did not adequately justify the need for the sole source contract to house migrant families and spent approximately $17 million for hotel space and services at six hotels that went largely unused between April and June 2021. ICE's sole source contract with Endeavors resulted in millions of dollars spent on unused hotel space. In addition, Endeavors did not meet new healthcare protocols or ensure proper COVID-19 testing for families. For example, families were not tested by ICE for COVID-19 prior to being transported to hotels and were not always tested by Endeavors staff upon arrival at or departure from hotels, putting migrant families and the outside population at risk of contracting COVID-19. Further, Endeavors did not follow required ICE standards to ensure the proper care for housing migrant families while in its facilities.

## ICE Did Not Adequately Justify Its Use of Sole Source Contracting in Selecting Endeavors

Government contracts must be awarded through an open competitive process, as outlined in the Federal Acquisition Regulation (FAR). The FAR establishes limited situations in which contracting officers may award contracts on a sole source basis. The agency must provide a justification[10] for a sole source award that cites the rationale for selecting a contractor without allowing other contractors to submit proposals. According to the FAR,[11] ICE is responsible for "providing and certifying as accurate and complete necessary data to support [its] recommendation for other than full and open competition."

Rather than using the competitive procurement process, ICE awarded a sole source contract to Endeavors, which had provided an unsolicited proposal[12] for housing migrant families in hotels. A Government agency typically receives proposals from contractors after it has put out a request for proposal. However, Endeavors provided a proposal without such a request from ICE. In this instance, ICE cited "unusual and compelling urgency" as the basis for an exception to the competitive contracting process. ICE's justification noted that Endeavors was the only known source capable of meeting the requirements to provide 1,239 hotel beds and all-inclusive emergency family residential services to support the surge of asylum seekers.

---

[10] 41 U.S.C. § 3304.
[11] FAR 6.303-1(c), *Requirements.*
[12] Endeavors sent ICE a proposal for housing migrant families without ICE requesting such a proposal.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Based on our analysis of ICE's justification for sole sourcing the contract to Endeavors, we determined ICE did not have supporting documentation to establish that Endeavors was the only contractor that could provide the services needed. ICE records showed that Endeavors had no experience providing the services covered by the sole source contract, including hotel beds or all-inclusive emergency family residential services. Rather, the contractor only had experience providing staffing for other migrant services. Further, there was no documentation to show that Endeavors had the capability to provide such services, other than the statements made in its proposal.

ICE documentation we reviewed showed that ICE used a different contractor in 2021 to provide hotel services to house individuals as they awaited transfer to FRCs, but neither that contractor nor any other contractor was given the opportunity to submit a proposal. Without documentation to support the justification used for sole sourcing this contract, ICE could not provide evidence it procured a qualified contractor at the most cost-effective price.

## ICE Did Not Determine Space Necessary to House a Migrant Family Surge, Leaving Contracted Space Underutilized

Prior to its contract award to Endeavors, ICE did not accurately determine the number of beds necessary to address the anticipated surge or determine whether the surge would require additional capacity beyond the existing FRCs that house migrant families. ICE's contract with Endeavors ultimately required that ICE pay for up to 1,239 beds regardless of how many beds were used. We reviewed costs and usage rates at hotels operated by Endeavors to house migrant families between the dates the hotels opened and June 2021 and found none of the facilities used more than half of the number of beds ICE paid for under its contract. For example, usage ranged from an average of 21 percent at one hotel in El Paso to an average of 45 percent at one hotel in Phoenix. As a result, ICE spent $16.98 million[13] for unused beds at the hotels between April and June 2021 (see Figure 3).

---

[13] Occupancy rates were calculated based on ICE's reported usage at each hotel compared to the contracted capacity at each hotel from when each hotel opened to June 30, 2021. The number of unoccupied beds was multiplied by the contracted daily rate to determine the overall cost for unused beds.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Figure 3. Funds ICE spent for beds that were not used at each hotel operated by Endeavors from the date each hotel opened to June 30, 2021.**



*Source:* DHS OIG analysis of ICE data

In addition, we also found that the three FRCs that house migrant families were underutilized both prior to and during the hotels contract[14] with Endeavors.  From January 1 to June 30, 2021, Karnes used an average of 18 percent of its contractual capacity,[15] and Dilley used an average of 23 percent of its contractual capacity.[16]  Berks was only occupied in January and February 2021 and used an average of 6 percent of its contractual capacity.[17] ICE reported that after February 2021, it left Berks empty until its contract ended in June 2021.  ICE reported that some of the reduced capacity was in response to COVID-19.  In March 2020, ICE issued guidance stipulating that facilities holding detainees should reduce usage to 75 percent of capacity limits to allow for increased social distancing.

## Endeavors Did Not Comply with New Healthcare Protocols, Including Protocols for COVID-19

In March 2021, ICE issued new healthcare protocols and modified its FRS to accommodate housing migrant families at its new Emergency Family Reception Sites.  The modifications included protocols for basic healthcare and for COVID-19.

---

[14] Contract period was between March and September of 2021.
[15] Karnes held an average of 150 family members and had a capacity of holding 830.
[16] Dilley held an average of 540 family members and had a capacity of holding 2,400.
[17] Berks held an average of 6 family members and had a capacity of holding 96.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The new COVID-19 protocols required Endeavors to:
- screen incoming migrant families for COVID-19 upon arrival at each hotel, as pictured in Figure 4;
- develop policies and procedures to quarantine migrants who test positive for the virus;
- follow Centers for Disease Control and Prevention guidelines on COVID-19;
- test staff members who are not vaccinated; and
- test migrant families again at departure if they are showing signs and symptoms of the illness.



**Figure 4. Migrants arriving at an ICE hotel in El Paso, Texas, in May 2021.**
*Source:* Video surveillance footage provided by ICE hotels staff

We determined that Endeavors took some steps to mitigate the spread of COVID-19 according to the new healthcare protocols, but several testing practices were deficient. According to ICE, there were 1,713 cases of COVID-19 in the six Emergency Family Reception Sites operated by Endeavors between April 9, 2021, and November 18, 2021.

We found Endeavors properly tested staff members and generally cared for quarantined migrant families. Endeavors conducted weekly testing of staff members who were not yet vaccinated. All facilities we reviewed were also properly quarantining migrant families who tested positive for COVID-19, and staff at three out of the four hotels checked on the quarantined families at least three times per day.

Nonetheless, we found that both Endeavors and ICE did not always complete testing to reduce the COVID-19 exposure of migrants who had contracted the



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

virus on their passage into the United States.  First, we found ICE did not ensure migrant families, even those with symptoms, were tested prior to being transported to hotels.  For example, ICE did not have a process for rapid onsite[18] testing for COVID-19, which would allow ICE to identify and separate families that are COVID-19 positive from those that are negative.  Without rapid testing, migrant families that tested positive once they reached the hotel had already spent up to 4 hours on a bus, exposing others to the virus.  Second, two of the four hotels did not consistently perform or document COVID-19 tests of migrant families at intake, and none of the facilities consistently documented or completed testing for migrant families exhibiting COVID-19 symptoms upon release.  Without properly performing and documenting COVID-19 tests of migrant families at various stages of custody and release, ICE cannot effectively limit the spread of COVID-19 in the detained and general civilian populations.

In addition to the COVID-19 protocols, ICE's new healthcare protocols also required Endeavors to provide basic healthcare to migrants at the facilities, including treatment of basic medical conditions, referrals for offsite treatment, medical staffing, and requirements for medical records.

We determined the facilities did not follow the new healthcare protocols and modified FRS in several areas.  In particular, the Endeavors medical staff did not properly document healthcare encounters as required by the medical protocols, including inconsistently documenting sick call encounters and insufficiently documenting release assessments.  In two of the four facilities we reviewed, medical staff did not collect informed consent forms from patients.  Informed consent forms explain medical treatments before patients agree to them.  In addition, two of the four facilities did not have sufficient medical staffing according to the standards[19] and did not ensure medical staff were aware of their respective facility's required medical quality management programs.

Overall, the lapse in compliance with the new healthcare protocols demonstrates that migrant families at Endeavors' facilities may not have received timely COVID-19 testing to prevent the spread of COVID-19, and medical staff may not have provided the level of medical care intended by the protocols.

---

[18] Specifically, testing at the location where families are picked up from U.S. Customs and Border Protection custody to be transported to hotels.

[19] The contract defined modifications to the Family Residential Standards in Attachment 2B – *Health Care – Emergency Family Reception Sites,* which required two 12-hour shifts, with 4 medical professionals per shift.  Two of the facilities were unable to cover the night shift for a couple nights a week.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Endeavors Did Not Comply with Several Modified Family Residential Standards

The modified FRS kept some of the required standards intact but modified or removed several key standards.  Specifically, the modified FRS required the amendment of the FRS Behavior Management standard, which describes Endeavors' approach to emergency crisis situations and resident searches at the hotels,[20] but ICE did not finalize this modified standard until July 2021, effectively leaving no approved behavior standard in place at the hotels for up to 3 months of their operations.

In addition, the four facilities we reviewed did not adhere to several standards that remained unchanged from the 2020 revised FRS.  Specifically:

- ICE did not modify the funds and personal property standard.[21] However, facility staff did not provide a secure locker or separate property storage areas as required, leaving the safeguarding of property up to migrant families.

- ICE did not change the portion of the admission and release standard[22] that requires facility staff to maintain control over important documents such as passports.  However, facilities allowed migrant families to keep important documents such as passports and birth certificates in their hotel rooms instead of staff safeguarding these items as required.

- ICE did not alter the food service standard,[23] which requires snacks to be available via self-service to migrant families.  However, we found that facilities required migrant families to request snacks from Endeavors staff and wait for items to be brought to their rooms.

- ICE did not alter the use of physical control measures[24] and emergency plans standards,[25] which require video recording capabilities in facilities. We found that none of the facilities had required handheld video cameras to record use-of-force incidents (cases where facility staff must physically

---

[20] *Family Residential Standards*, Section 3.1, *Behavior Management* (Revised 2020).
[21] *Family Residential Standards*, Section 2.3, *Funds and Personal Property* (Revised 2020).  ICE reported that it modified this standard in September of 2021.
[22] *Family Residential Standards*, Section 2.1, *Admission and Release* (Revised 2020).  ICE reported that it modified this standard in September of 2021.
[23] *Family Residential Standards*, Section 4.1, *Food Service* (Revised 2020).
[24] *Family Residential Standards*, Section 2.10, *Use of Physical Control Measures and Restraints* (Revised 2020).
[25] *Family Residential Standards*, Section 1.1, *Emergency Plans* (Revised 2020).



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

gain compliance of migrant family members) inside the hotel rooms if they occurred. Additionally, facilities were not properly ensuring video recordings of facility interiors, including one facility which had not connected half of its cameras to its recording system and three of the four facilities which had blind spots in their camera coverage.

- ICE did not alter the grievance system standard,[26] which requires facilities to have a handbook outlining the grievance process, including how to obtain grievance forms, submit grievances, and appeal grievance decisions. We reviewed Endeavors' resident handbook and found that it did not include information on how to submit medical grievances, emergency grievances, and grievance appeals, nor did it contain information on the policy prohibiting staff from harassing residents for filing grievances.

Overall, these broad lapses in compliance with the modified FRS demonstrate that migrant families at Endeavors' facilities may not have received the level of care intended by the standards.

## Recommendations

We recommend the Executive Associate Director of Enforcement and Removal Operations direct the Director of ICE Enforcement and Removal to:

**Recommendation 1:** ICE should ensure appropriate contract processes and policies are followed, including the use of sole source contracting for hotel space.

**Recommendation 2:** Conduct a full assessment of ICE's migrant family housing needs, including its existing agreements at Family Residential Centers, before entering into a similar or follow-on contract for additional bed space.

**Recommendation 3:** Implement testing protocols for the remainder of the COVID-19 response to ensure that migrant families are tested.

**Recommendation 4:** Ensure Endeavors complies with the new healthcare protocols and modified FRS at facilities covered by those standards.

---

[26] *Family Residential Standards*, Section 6.2, *Grievance System* (Revised 2020).



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Management Comments and OIG Analysis

ICE concurred with one recommendation and did not concur with three recommendations.  Appendix B contains ICE management comments in their entirety.  We also received technical comments on the draft report and made revisions as appropriate.  One recommendation was resolved and closed, and three recommendations were administratively closed. However, we reserve the option to reopen the administratively closed recommendations should ICE reinstate a contract to house detainee families in hotels.

A summary of ICE's responses to our recommendations and our analysis follows.

**Recommendation 1:**  ICE should ensure appropriate contract processes and policies are followed, including the use of sole source contracting for hotel space.

**ICE Response to Recommendation 1:**  Non-concur.  The ICE Office of Acquisition Management (OAQ) used a valid exception to competition given the urgency of the migrant crisis on the Southwest border.  Based on market research, ICE determined that using FAR exception 6.302-2 was appropriate to meet the agency's urgent housing needs on the Southwest border for the migrant crisis in early 2021.  The DHS Office of Chief Procurement Officer concurred with ICE's strategy in February 2021 and reviewed and approved the justification and approval (J&A) on March 29, 2021.  ICE OAQ proceeded with issuing the J&A for a sole source award and posted the J&A after award as permitted by FAR 6.305(b), "Availability of the justification."

ICE OAQ subsequently awarded a contract to Endeavors, as the only known qualified source that was able to meet the immediate needs of the Southwest border crisis regarding bedding and other required ancillary support for the migrant population.  Further, the total period of performance did not exceed 1 year and met the requirements of FAR 6.302-2.  It is also important to note that ICE ERO and OAQ continued to monitor the marketplace for any potential follow-on support for hoteling spaces based on the Southwest border migrant crisis and later issued a request for quotation against all DHS strategic sourcing vehicle contract vendors.  However, ICE decided against awarding a task order for the additional hotel beds based on its current Southwest border requirements.

With these actions, ICE demonstratively shows it followed appropriate contract processes and policies and obtained approval from all required levels of leadership regarding the Endeavors contract.  ICE is committed to continuing



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

to follow all Federal, departmental and agency statutes, regulations, and policies for contract competition and awards.

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**OIG Analysis:**  Although ICE states that it used a valid exception to competition given the urgency of the migrant crisis, we determined ICE did not have supporting documentation to establish that Endeavors was the only contractor that could provide the services needed.  ICE records showed that Endeavors had no experience providing the services covered by the sole source contract, including hotel beds or all-inclusive emergency family residential services.  Rather, the contractor only had experience providing staffing for other migrant services.  Further, there was no documentation to show that Endeavors had the capability to provide such services, other than the statements made in its proposal.  ICE documentation we reviewed showed that ICE used a different contractor in 2021 to provide hotel services to house individuals awaiting transfer to FRCs, but neither that contractor nor any other contractor was given the opportunity to submit a proposal for the contract awarded to Endeavors.  Without documentation to support the justification used for sole sourcing this contract, ICE could not provide evidence it procured a qualified contractor at the most cost-effective price.

Nonetheless, Officials reported in their management response that ICE closed six of the eight hotels.  Subsequently, ICE closed the remaining two hotels on March 31, 2022 and did not extend the hotels contract past March 31, 2022, because it is transitioning all forms of family staging to alternatives to detention programs.  Therefore, we consider the recommendation administratively closed.

**Recommendation 2:**  Conduct a full assessment of ICE's migrant family housing needs, including its existing agreements at Family Residential Centers, before entering into a similar or follow-on contract for additional bed space.

**ICE Response to Recommendation 2:**  Concur.  When OIG conducted its inspection, ICE was overseeing three FRCs: (1) Berks in Leesport, Pennsylvania; (2) Karnes County in San Antonio, Texas; and (3) South Texas Family Residential Center (STFRC) in Dilley, Texas.  Due to mission requirements, ICE stopped housing families at the Berks FRC on February 26, 2021, and the Karnes County FRC on November 5, 2021.  ICE stopped housing families at STFRC on December 10, 2021.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The contract with Endeavors was specifically for the provision of emergency temporary shelter at eight hotels, and for processing families placed in ICE custody. Pursuant to the terms of the contract, six of the eight hotels were demobilized and are no longer in use as of December 2021. The remaining two hotels will continue to remain open until the end of March 2022. At this time, ICE officials do not plan to execute a contract extension, because ICE has begun to transition all forms of family staging to alternatives to detention programs.

Should ICE's requirement for housing migrant families change in the future, then ICE will conduct an assessment to appropriately determine the housing needs of families before entering into a similar or new contract.

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**OIG Analysis:**  We consider these actions responsive to the recommendation, which is resolved and closed. ICE's management response documented that it closed six of eight hotels. Subsequently, ICE closed the remaining two hotels on March 31, 2022 and did not extend the hotels contract past March 31, 2022, because it is transitioning all forms of family staging to alternatives to detention programs.

**Recommendation 3:** Implement testing protocols for the remainder of the COVID-19 response to ensure that migrant families are tested.

**ICE Response to Recommendation 3:**  Non-concur.  ICE believes that the current testing protocols for COVID-19, which are documented in ICE's Pandemic Response Requirements (PRR) (version 7.0, dated October 19, 2021), are sufficient. The PRR sets forth requirements and expectations so that detention facility operators can sustain detention operations while mitigating potential risk to the safety and wellbeing of detainees, staff, contractors, visitors, and stakeholders. These testing protocols are in alignment with the Centers for Disease Control and Prevention's (CDC) *Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities* (available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html) and are mandatory requirements to be adopted and implemented by all detention facilities.

Accordingly, ICE ERO procedures already require that all migrants are tested upon intake to an ICE facility, regardless of vaccine status, and address further testing to be performed based on exposure to COVID-19 or following CDC requirements. Further, ICE will continue to follow the CDC's guidance, and will adapt testing protocols, as appropriate.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**OIG Analysis:**  In its response, ICE officials state that testing protocols were sufficient and in line with CDC and ICE guidance.  Officials indicate that ICE will follow CDC guidance and adapt COVID-19 testing protocols as appropriate.  However, during our fieldwork, we found that both Endeavors and ICE did not always complete testing to reduce the COVID-19 exposure of migrants who had contracted the virus on their passage into the United States.  First, we found ICE did not ensure migrant families, even those with symptoms, were tested prior to being transported to hotels.  For example, ICE did not have a process for rapid onsite testing for COVID-19, which would allow ICE to identify and separate families that are COVID-19 positive from those that are negative.  Without rapid testing, migrant families that tested positive once they reached the hotel had already spent up to 4 hours on a bus, exposing others to the virus.  Second, two of the four hotels did not consistently perform or document COVID-19 tests of migrant families at intake, and none of the facilities consistently documented or completed testing for migrant families exhibiting COVID-19 symptoms upon release.  Without properly performing and documenting COVID-19 tests of migrant families at various stages of custody and release, ICE cannot effectively limit the spread of COVID-19 in the detained and general civilian populations.

Nonetheless, Officials reported in their management response that ICE closed six of the eight hotels.  Subsequently, ICE closed the remaining two hotels on March 31, 2022 and did not extend the hotels contract past March 31, 2022, because it is transitioning all forms of family staging to alternatives to detention programs.  Therefore, we consider the recommendation administratively closed.

**Recommendation 4:**  Ensure Endeavors complies with the new healthcare protocols and modified FRS at facilities covered by those standards.

**ICE Response to Recommendation 4:**  Non-concur.  The ICE Health Service Corps Field Medical Coordinators (FMC), from the Medical Case Management Unit (MCMU), conducted a number of site visits to facilities in Texas from May 2021 to February 2022 to ensure compliance and adherence to healthcare protocols and standards.  Additionally, FMCs are in daily contact with the sites to ensure strict adherence to current healthcare protocols and any new protocols as they arise.  For example, FMCs provide guidance and oversight on the screening and testing of incoming migrant families for COVID-19 upon arrival, to include informed consent and informed consent documentation, as



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

well as ensuring that migrant individuals who test positive remain isolated and exposed families are quarantined, in accordance with CDC guidance.

Further, FMCs provide oversight to ensure that all migrant families receive timely access to care, including daily sick calls, which are documented appropriately.  Families are screened and tested for COVID-19 upon arrival and departure, which is included in medical discharge and discharge documentation.  Since the date of opening, onsite testing has been performed using the Abbott ID NOW analyzers and rapid PCR cartridges, and MCMU will continue to provide close monitoring to ensure compliance at these sites.

Overall, ICE ERO ensured that Endeavors was in compliance with FRS at the Emergency Family Staging Centers.  Although these centers are not traditional detention settings, ICE ERO worked closely with Endeavors to develop an operationally sound and feasible plan to meet the standards, which ICE believes to be sufficient.  Further, it is important to note that OIG's statement in the draft report that ICE did not modify or alter standards surrounding funds, personal property, and admission and release is inaccurate.  In actuality, ICE ERO tailored certain FRS standards, as appropriate, and other standards (i.e., food services and grievances) were not waived or modified, because families had 24-hour access to items that would normally have limitations in a detention facility.  For example, family residents have 24-hour access to snacks, drinks, and food, as these items are located within their room.  If food needs to be restocked, then family residents simply contact Endeavors staff and the snacks, drinks, and food are restocked in a timely manner within their room.  Therefore, there is no limitation to the amount or access to food for families.

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**OIG Analysis:**  In its response, ICE contends that it provides sufficient guidance and oversight of these facilities with its FMCs and site visits conducted by MCMU.  However, as stated previously, we found that both Endeavors and ICE did not always complete testing to reduce the COVID-19 exposure of migrants who had contracted the virus on their passage into the United States.

Next, ICE contends Endeavors complied with FRS at the Emergency Family Staging Centers, deeming the plan that it developed with Endeavors to meet these standards to be sufficient.  However, when ICE initially issued its contract with Endeavors, it had not updated the standards for Behavior Management, personal property, and admission and release.  It was not until July 2021 that ICE updated those



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

standards.  Specifically, ICE did not amend the FRS Behavior Management standard until 3 months after the contract was issued and did not properly ensure video recordings of facility interiors complied with the standards for use of physical control measures and emergency plans.

ICE also contends that it was inaccurate to state the standards for Funds and Personal Property, and Admission and Release were not modified or altered and that the standards for food services and grievances did not need to be modified because families had 24-hour access to snacks. However, ICE did not modify these standards until September 2021, which was 6 months after the contract was issued and after our fieldwork had been completed.  Number 2.3 in the below excerpt from the March 2021 contract between ICE and Endeavors outlined modifications to FRS plainly shows there was "no change" to the FRS Funds and Personal Property standard.

**Modifications to the Family Residential Standards –Under 72 Hours**

| # | Title | Status |
|---|-------|--------|
| 1.0 | FRS: Program Philosophy, Goals, and Expected Outcomes | TBD |
| 1.1 | Emergency Plans | No change |
| 1.2 | Environmental Health and Safety | No change |
| 1.3 | Transportation (by Land) | No change |
| 1.4 | Housekeeping | No change |
| 2.1 | Admissions and Release | Modify |
| 2.2 | Contraband | No change |
| 2.3 | Funds and Personal Property | No change |

In addition, ICE did not update the Admissions and Release standard until September 2021.  Under the March 2021 standards, facility staff were required to maintain control over important documents such as passports, and therefore, facilities should not have allowed migrant families to keep important documents in their hotel rooms.  ICE also contends the FRS Grievances standard did not need to be modified but does not address Endeavors' failure to outline the grievance process in the handbook as required.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Finally, during our fieldwork in May 2021 we did not observe snacks to be available in migrants' hotel rooms but confirmed ICE's assertion that snacks had to be restocked by calling Endeavors staff. The standard specifies "24-hour availability of snacks, fruits, juice, and milk via self-service within each living area." It is not "self-service" if migrants must wait for Endeavors staff to bring them snacks, because migrants are unable to leave their rooms without an escort to retrieve snacks themselves.

Nonetheless, Officials reported in their management response that ICE closed six of the eight hotels. Subsequently, ICE closed the remaining two hotels on March 31, 2022 and did not extend the hotels contract past March 31, 2022, because it is transitioning all forms of family staging to alternatives to detention programs. Therefore, we consider the recommendation administratively closed.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*.

Our objective was to evaluate ICE's plans to house migrant families in hotels and how ICE selected a contractor to implement these plans.

We conducted the inspection remotely, given the inherent risks associated with onsite inspections during the COVID-19 pandemic.  Prior to our inspection, we reviewed relevant background information, including:

- ICE 2020 *Family Residential Standards*;
- ICE *Modified Family Residential Standards*;
- ICE Office of Detention Immigration Oversight reports; and
- information from nongovernmental organizations.

We conducted our remote inspection of four of the six ICE hotels operated by Endeavors from April 19, 2021, to September 1, 2021.  During the inspection we:

- Directed the locations within the facilities we would observe during live video walkthroughs in May 2021.  We viewed areas used by migrant families, including intake processing areas; medical facilities; residential areas, including sleeping, showering, and toilet facilities; and recreational facilities.
- Reviewed select video surveillance footage of ICE hotels from April, May, and June 2021.
- Reviewed facilities' compliance with the modified FRS, including the standard on medical care.
- Reviewed the facilities' response to COVID-19.
- Interviewed ICE and facility staff members, including key ICE operational and facility oversight staff.
- Interviewed migrants held at the ICE hotels to evaluate compliance with the modified FRS.
- Reviewed documentary evidence, including medical files, internal emails, and contract formation documents.

We contracted with a team of medical professionals to conduct a comprehensive evaluation of migrant families' medical care at the ICE hotels.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

We incorporated information provided by the medical contractors into our findings.

We conducted this review under the authority of the *Inspector General Act of 1978*, *as amended*, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## ICE Comments to the Draft Report



*Office of the Chief Financial Officer*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

March 15, 2022

MEMORANDUM FOR:    Joseph V. Cuffari, Ph.D.
                                       Inspector General

FROM:                          Stephen A. Roncone        STEPHEN A   Digitally signed by
                                       Chief Financial Officer and    RONCONE   STEPHEN A RONCONE
                                                                                      Date: 2022.03.16
                                       Senior Component Accountable Official         17:00:56 -04'00'

SUBJECT:                       Management Response to Draft Report: "ICE Spent Funds on
                                       Unused Beds, Missed COVID-19 Protocols and Detention
                                       Standards While Housing Migrant Families in Hotels"
                                       (Project No. 21-031-SRE-ICE)

Thank you for the opportunity to comment on this draft report. U.S. Immigration and
Customs Enforcement (ICE) appreciates the work of the Office of Inspector General
(OIG) in planning and conducting its review and issuing this report.

ICE leadership, however, does not agree with the OIG's assertion that ICE did not
adequately justify the need for using a sole source contract to house migrant families in
hotel space. Following January 2021, the Department of Homeland Security (DHS or the
Department) encountered an increase in irregular migrant flows to the Southwest Border
(SWB) of the United States, including greater numbers of family units (FAMUs) that
created an urgent need for appropriate housing due to the limited available housing
capacity for FAMUs.

Accordingly, ICE signed a short-term contract with the non-profit division of Endeavors
to provide temporary shelter and processing services for noncitizen families, and utilized
an expedited contracting authority established in the Federal Acquisition Regulations
(FAR) exception 6.302-2, "Unusual and compelling urgency." ICE used this exception to
competition based on an urgent need to obtain Emergency Family Staging Centers and
meet its critical mission of housing, feeding, transporting, and providing medical attention
to thousands of noncitizen families.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE is committed to ensuring that noncitizens in its custody reside in safe, secure, and humane environments, and under appropriate conditions of confinements. As such, ICE has implemented, executed, and ensured healthcare protocols and testing procedures for the COVID-19 were in alignment with the Center for Disease Control and Prevention (CDC) Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities. This is described more fully in the detailed response to OIG's recommendations (see attached).

The draft report contained four recommendations. ICE concurs with Recommendation 2 and non-concurs with Recommendations 1, 3, and 4. Attached find our detailed response to each recommendation. ICE previously submitted technical comments addressing several accuracy, contextual, and other issues under a separate cover for OIG's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions.

Attachment



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Attachment: Management Response to Recommendations
Contained in 21-031-SRE-ICE**

OIG recommended that the Executive Associate Director of Enforcement and Removal Operations (ERO) direct the Director of ICE Enforcement and Removal:

**Recommendation 1**: Ensure appropriate contract processes and policies are followed, including the use of sole source contracting for hotel space.

**Response:** Non-concur. The ICE Office of Acquisition Management (OAQ) utilized a valid exception to competition given the urgency of the migrant crisis on the SWB. Based on market research, ICE determined that utilizing FAR exception 6.302-2, was appropriate to meet the urgent housing needs of the agency on the SWB for the migrant crisis in early 2021. The DHS Office of Chief Procurement Officer concurred with ICE's strategy in February 2021 and reviewed and approved the justification and approval (J&A) on March 29, 2021. ICE OAQ proceeded with issuing the J&A for a sole source award and posted the J&A after award as permitted by FAR 6.305(b), "Availability of the justification."

ICE OAQ subsequently awarded a contract to Endeavors, as they were the only known qualified source that was able to meet the immediate needs of the SWB crisis for bedding and other required ancillary support for the migrant population. Further, the total period of performance did not exceed one year and met the requirements of 6.302-2. It is also important to note that ICE ERO and OAQ continued to monitor the marketplace for any potential follow-on support for hoteling spaces based on the SWB migrant crisis, and later issued a request for quotation against all DHS strategic sourcing vehicle contract vendors. However, ICE decided against awarding a task order for the additional hotel beds based on the agency current SWB requirements.

With these actions, ICE demonstratively shows it followed appropriate contract processes and policies and obtained approval from all required levels of leadership regarding the Endeavors contract. ICE is committed to continuing to follow, all federal, departmental and agency statutes, regulations and polices and for contract competition and awards.

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 2**: Conduct a full assessment of ICE's migrant family housing needs, including its existing agreements at Family Residential Centers, before entering into a similar or follow-on contract for additional bed space.

**Response:** Concur. When the OIG conducted its inspection, ICE was overseeing three family residential centers (FRC): (1) Berks in Leesport, Pennsylvania; (2) Karnes County in San Antonio, Texas; and (3) South Texas Family Residential Center (STFRC) in



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Dilley, Texas. Due to mission requirements, ICE stopped housing families at the Berks Family Residential Center on February 26, 2021, and the Karnes County Family Residential Center on November 5, 2021. ICE stopped housing families at STFRC on December 10, 2021.

The contract with Endeavors was specifically for the provision of emergency temporary shelter at eight hotels, and for processing of families placed in ICE custody. Pursuant to the terms of the contract, six of the eight hotels were demobilized and are no longer in use as of December 2021. The remaining two hotels will continue to remain open until the end of March 2022. At this time, ICE does not plan to execute a contract extension, since ICE has begun to transition all forms of family staging to alternatives to detention programs.

Should ICE's requirement for housing migrant families change in the future, then ICE will conduct an assessment to appropriately determine the housing needs of families before entering into a similar or new contract.

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 3:** Implement testing protocols for the remainder of the COVID-19 response to ensure that migrant families are tested.

**Response:** Non-concur. ICE believes that the current testing protocols for COVID-19, which are documented within ICE's Pandemic Response Requirements (PRR) (current version 7.0, dated October 19, 2021) are sufficient. The PRR sets forth requirements and expectations so that detention facility operators sustain detention operations while mitigating potential risk to the safety and wellbeing of detainees, staff, contractors, visitors, and stakeholders. These testing protocols are in alignment with the CDC's Guidance on Management of COVID-19 in Correctional and Detention Facilities, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, and are mandatory requirements to be adopted and implemented by all detention facilities.

Accordingly, ICE ERO procedures already require that all new admissions are tested upon intake to an ICE facility, regardless of vaccine status, and address further testing to be performed based on exposure to COVID-19 or following CDC requirements. Further, ICE will continue to follow the CDC's guidance, and will adapt testing protocols, as appropriate.

ICE requests OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 4:** Ensure Endeavors complies with the new healthcare protocols and



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

modified FRS [Family Residential Standards] at facilities covered by those standards.

**Response:** Non-concur. The ICE Health Service Corps Field Medical Coordinators (FMCs), from the Medical Case Management Unit (MCMU), conducted a number of site visits to facilities in Texas from May 2021 to February 2022 to ensure compliance and adherence to healthcare protocols and standards. Additionally, FMCs are in daily contact with the sites to ensure strict adherence to current healthcare protocols, and any new protocols as they arise. For example, FMCs provide guidance and oversite on the screening and testing of incoming migrant families for COVID-19 upon arrival, to include informed consent and informed consent documentation, as well as ensuring that migrant individuals who test positive remain isolated and exposed families are quarantined, in accordance with CDC guidance.

Further, FMCs provide oversight to ensure that all migrant families receive timely access to care, including daily sick calls which are documented appropriately. Families are screened and tested for COVID-19 upon arrival and departure, which is included in medical discharge and discharge documentation. Since the date of opening, onsite testing has been performed using the Abbott ID NOW analyzers and rapid PCR cartridges, and MCMU will continue to provide close monitoring to ensure compliance at these sites.

Overall, ICE ERO ensured that Endeavors was in compliance with Family Residential Standards (FRS) at the Emergency Family Staging Centers. Although these centers are not traditional detention settings, ICE ERO worked closely with Endeavors to develop an operationally sound and feasible plan to meet these standards, which ICE believes to be sufficient. Further, it is important to note that the OIG's statement in the draft report that ICE did not modify or alter standards surrounding funds, personal property, admission, and release is inaccurate. In actuality, ICE ERO tailored certain FRS standards, as appropriate, and other standards (i.e., food services, and grievances) were not waived or modified since families had 24-hour access to items that would normally have limitations in a detention facility. For example, family residents have 24-hour access to snacks, drinks, and food, as these items are located within their room. If food needs to be restocked, then family residents simply contact an Endeavors staff and their snacks, drinks, and food is timely restocked within their room. Therefore, there is no limitation to the amount or access to food for families.

ICE requests OIG consider this recommendation resolved and closed, as implemented.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix C**
**Office of Special Reviews and Evaluations Major Contributors to This Report**

John D. Shiffer, Chief Inspector
Stephanie Christian, Lead Inspector
Ian Stumpf, Senior Inspector
Ryan Nelson, Senior Inspector
Brett Cheney, Inspector
Lisa Knight, Communications Analyst
Brendan Bacon, Independent Referencer



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix D
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary for Office of Strategy, Policy and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305