**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| STATE OF ARIZONA, *et al.*, | |
| PLAINTIFFS, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*, | CIVIL ACTION NO. 6:22-cv-01130 |
| DEFENDANTS. | |

**CORRECTED MEMORANDUM IN SUPPORT OF MOTION TO POSTPONE THE EFFECTIVE DATE OF ASYLUM IFR OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

    I.    The Comprehensive Immigration Scheme Established by Congress....................2

        A.    Statutory Requirements for Aliens Claiming Asylum ............................2

            1.    Affirmative and Defensive Asylum Claims ...............................2

            2.    Expedited Removal......................................................................3

            3.    Statutory Requirement For Full Removal Proceedings and Detention of Aliens Claiming Asylum ...............................................3

        B.    Through the Homeland Security Act, Congress Divided Responsibility for Asylum Claims Between DHS and DOJ .....................4

        C.    The Secure Fence Act............................................................................5

        D.    EOIR Statistics Show that AOs Have a High Failure Rate for Asylum Determinations ......................................................................6

    II.    The Biden Administration's Asylum IFR. ...........................................................8

    III.   Current Border Conditions .................................................................................10

LEGAL STANDARD ......................................................................................................11

ARGUMENT ...................................................................................................................12

    I.    Plaintiff States Have Standing To Challenge The Asylum IFR. .........................12

    II.    Plaintiff States Are Likely to Succeed on the Merits of their Claims. ................19

        A.    The Asylum IFR Is Beyond the Executive's Statutory Authority....................19

            1.    Adjudication ..............................................................................19

            2.    Parole .........................................................................................23

            3.    Secure Fence Act .......................................................................26

         B.    The Asylum IFR Is Arbitrary and Capricious. .....................................26

             1.    Asylum Procedures ....................................................................27

             2.    Parole .........................................................................................32

        C.    The Asylum IFR Violates the APA's Notice and Comment Requirements. .................34

            1.    The IFR Is Not a Logical Outgrowth of the Proposed Rule ...................34

    III.   The Remaining Requirements For Equitable Relief Are Met Here.....................36

        A.    A. Without Relief from This Court, The States Will Suffer Irreparable Harm..............36

        B.    The Balance Of Harms And Public Interest Favor Relief Here .....................37

        C.    If This Court Enters A Preliminary Injunction, That Injunction Should Apply Nationwide. .............................................................................38

CONCLUSION.................................................................................................................38

# TABLE OF AUTHORITIES

## CASES

*Affinity Healthcare Servs., Inc. v. Sebelius,*
    720 F. Supp. 2d 12 (D.D.C. 2010) ....................................................................11

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) .........................................................................29

*Arizona v. Biden,*
    No. 21-CV-314, ECF No. 4-11 (S.D. Ohio Nov. 23, 2021) ............................33

*Arizona v. United States,*
    567 U.S. 387 (2012) ............................................................................27, 28, 36

*Biden v. Texas,*
    No. 21-954, 2021 WL 6206109 (U.S. 2021) ...................................................13

*Biden v. Texas,*
    No. 21-954, 2022 WL 340629 (U.S. 2022) .....................................................13

*Biden v. Texas,*
    No. 21-954, 2022 WL 815341 (U.S. 2022) .....................................................13

*Chocolate Mfrs. Ass'n v. Block,*
    755 F.2d 1098 (4th Cir. 1985)..........................................................................35

*Christensen v. Harris Cnty.,*
    529 U.S. 576 (2000) .........................................................................................21

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.,*
    981 F.3d 742 (9th Cir. 2020) ...........................................................................36

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) .........................................................................34

*Cruz-Miguel v. Holder,*
    650 F.3d 189 (2d Cir. 2011) .............................................................................23

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019)......................................................................................30

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020)......................................................................................28

*Dillmon v. Nat'l Transp. Safety Bd.,*
    588 F.3d 1085 (D.C. Cir. 2009) .......................................................................30

*East Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ...........................................................................37

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021)......................................................................................26

*HBO v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) .............................................................................34

*International Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005) ........................................................................... 34, 35

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ..................................................................................................21

*Kaufman v. Mukasey*,
    524 F.3d 1334 (D.C. Cir. 2008) ..................................................................................5

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) ....................................................................................3

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ...................................................................................................12

*Nat'l Fed'n of Indep. Bus.*,
    142 S. Ct. 661 (2022) ................................................................................................20

*Northern Mariana Islands v. United States*,
    686 F.Supp.2d 7 (D.D.C. 2009) ...............................................................................37

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ....................................................................................11

*Plyler v. Doe*,
    457 U.S. 202 (1982) ............................................................................................ 12, 16

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ............................................................................. 34, 35

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .....................................................................................27

*Texas v. Biden*,
    142 S. Ct. 1098 (2022) ..............................................................................................13

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) .................................10, 13, 25, 26, 27, 28, 29, 34, 37

*Texas v. Biden*,
    No. 2:21-cv-67, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) ..............................11

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ....................................................................................11

*Texas v. United States*,
    136 S. Ct. 2271 (2016) ..............................................................................................37

*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) .....................................................................38

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .............................................................................. 37, 38

*Tineo v. Ashcroft*,
    350 F.3d 382 (3d Cir. 2003) ...........................................................................4, 23, 24

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) .................................................................... 26, 38

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ..................................................................................... 11

**STATUTES**

5 U.S.C. § 553 ................................................................................................ 34

5 U.S.C. § 706 ................................................................................................ 26

8 U.S.C. § 1103 ........................................................................................... 5, 20

8 U.S.C. § 1158 ................................................................................................ 2

8 U.S.C. § 1182 ........................................................................................... 4, 24

8 U.S.C. § 1225 ....................................................................... 4, 21, 22, 23, 24, 25

8 U.S.C. § 1229a ......................................................................................... 4, 21

H.R. Rep. No. 104-469 (1996) ........................................................................ 23

Homeland Security Act, Pub. L. No. 107-296 (2002) ........................... 4, 5, 8, 20, 22

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L.
    104–208, 110 Stat 3009, Div. C § 302 (1996) ............................... 3, 23, 24, 25, 29

Secure Fence Act of 2006, Pub. L. No. 109–367, 120 Stat 2638 (2006) ............ 5, 6, 26, 29

**OTHER AUTHORITIES**

U.S. Dep't of Justice, Office of Legal Counsel, *Centralizing Border Control Policy Under the
    Supervision of the Attorney General*, 26 Op. OLC 22 (2002) ................................. 20

**REGULATIONS**

42 C.F.R. § 440.255 ........................................................................................ 15

8 C.F.R. § 235.3 ......................................................................................... 9, 33

8 C.F.R. §§ 212.5(b) .................................................................................... 9, 24

86 Fed. Reg. 46,906 (Aug. 20, 2021) ........................................................ 8, 13, 19, 29

87 Fed. Reg. 18,078 (Mar. 29, 2022) ................... 8, 9, 10, 13, 19, 23, 27, 29, 33, 35

## INTRODUCTION

The Departments of Homeland Security and Justice have adopted an Interim Final Rule that turns Congress's asylum-processing machinery into a jumble of surplus parts. In Congress's statutory design, certain components of DOJ have the exclusive power to make final adjudications of the asylum applications of aliens claiming credible fear of persecution. And almost all aliens seeking asylum must be detained while their asylum claims are pending; parole is available rarely, under only exacting statutory standards.

That, for some reason, isn't good enough for President Biden's DHS and DOJ. So, by an Interim Final Rule challenged here, they have purported to reassign the power to make final asylum determinations to certain DHS employees—agency actors with notorious track records of making flawed asylum findings. DHS and DOJ also have inverted Congress's detention rules to make parole of asylum-seeking aliens, not detention, the default norm. This all happened in an IFR that broke in at least 23 ways from the agencies' notice of proposed rulemaking, effectively depriving Plaintiff States and all other members of the public with any pre-effective date chance to comment on the IFR.

This Court should preliminarily enjoin the IFR or delay its effective date (currently set for May 31, 2022). The IFR facially violates no fewer than six statutory commands. It is arbitrary and capricious for more than a dozen reasons. And it violates the Administrative Procedure Act's notice-and-comment requirement in at least two ways. The (no-doubt intended) result of these fatal legal flaws, individually and collectively, will be a ruined and broken federal asylum regime that will unleash a flood of new asylum claims and illegal border-crossers, compounding the current once-in-a-generation crisis at the Country's southern border that already saddles Plaintiff States with untold economic, law-enforcement, criminal-justice-system, social-service, and public-health harms. If the separation of powers and the APA still mean anything, this has to stop—now. The Court should grant the Plaintiff States' motion.

## BACKGROUND

I. THE COMPREHENSIVE IMMIGRATION SCHEME ESTABLISHED BY CONGRESS.

### A. Statutory Requirements for Aliens Claiming Asylum

Unlike refugees, who are screened before coming to the United States and can be denied refugee status before they enter this country, aliens claiming asylum may do so after having entered illegally. *See* 8 U.S.C. § 1158(a)(1) (stating that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such alien's status, may apply for asylum"). There are two ways that an alien may claim asylum.

#### 1. Affirmative and Defensive Asylum Claims

The first is an "affirmative asylum" claim. This is available only to an alien already present in the United States and who has not been placed in removal proceedings. Ex. A, Declaration of James K. Rogers John ("Attorney Decl."), Ex. 1. Aliens making such asylum applications appear "before a USCIS asylum officer ["AO"] for a non-adversarial interview." *Id.*

The second way to apply for asylum is a "defensive asylum" claim. This is made after the alien has been placed in removal proceedings, usually because the alien was (1) "apprehended in the United States or at a U.S. port of entry without proper legal documents or in violation of … immigration status," or (2) "apprehended by U.S. Customs and Border Protection (CBP) trying to enter the United States without proper documentation, [was] placed in the expedited removal process, and [was] found to have a credible fear of persecution or torture by an asylum officer." *Id.* "Immigration judges hear defensive asylum cases in adversarial … proceedings" where both the alien and the U.S. government are allowed to be represented by an attorney. *Id.*

In Fiscal Year 2020, aliens filed 93,224 affirmative asylum applications and 189,838 defensive applications. Attorney Decl. Ex. 2. But as explained *infra* at Section II.D, only about half of all aliens

who pass DHS's credible fear asylum screening (and are thus allowed to entered the United States)

actually end up filing an asylum claim. Thus, a substantial majority of aliens who are processed by the

asylum system encounter the system only with the possibility of a defensive application.

### 2.   Expedited Removal

Aliens arriving at the border who make defensive asylum applications typically do so as part

of the expedited removal process, which Congress created in 1996 when it adopted the Illegal

Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Pub. L. 104–208, 110

Stat 3009, Div. C § 302 (1996). As the DC Circuit explained, IIRIRA:

> sets forth expedited procedures to remove certain inadmissible aliens arriving at the
> border. 8 U.S.C. § 1225(b)(1). Aliens subject to expedited removal may either claim a
> fear of persecution or seek to apply for asylum. *Id.* § 1225(b)(1)(A)(i). If an alien does
> either, an asylum officer must interview the alien and determine whether he has a
> "credible fear of persecution." *Id.* § 1225(b)(1)(A)(ii), (B)(ii). If the asylum officer finds
> such a credible fear, the alien must receive a full removal proceeding before an
> immigration judge, subject to further review in the Board of Immigration Appeals and
> a court of appeals. *Id.* §§ 1225(b)(1)(B)(ii), 1229a; *Grace v. Barr*, 965 F.3d 883, 887–88
> (D.C. Cir. 2020). If the asylum officer finds no credible fear of persecution, the alien
> may seek review before an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). If the
> judge then disagrees with the asylum officer, the alien is placed in full removal
> proceedings. *See id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 1208.30(g)(2)(iv)(B), (C). If the judge
> agrees with the asylum officer, the alien may be removed without further review. *See* 8
> U.S.C. § 1225(b)(1)(B)(iii)(I); 8 C.F.R. § 1208.30(g)(2)(iv)(A).

*M.M.V. v. Garland*, 1 F.4th 1100, 1104–05 (D.C. Cir. 2021). For an alien placed in full removal

proceedings to qualify for an actual grant of asylum, the alien must establish that he or she has a "well-

founded fear of persecution on account of race, religion, nationality, membership in a particular social

group, or political opinion." 8 U.S.C. § 1101(a)(42); *see also* 8 U.S.C. § 1158(b)(1)(A) (stating that asylum

may be granted only if alien "is a refugee within the meaning of section 1101(a)(42)(A)").

### 3.   Statutory Requirement For Full Removal Proceedings and Detention of Aliens Claiming Asylum

The INA provides that "[u]nless otherwise specified in this chapter," a removal "proceeding

under [8 U.S.C. § 1229a] shall be the sole and exclusive procedure for determining whether an alien

may be admitted to the United States." 8 U.S.C. § 1229a(a)(3). Section 1229 sets forth the system for full removal proceedings of aliens. Thus, aliens who have been found to have a credible fear of persecution under expedited removal are required by statute to proceed to full removal proceedings for full adjudication of their asylum claims.

In all cases, Congress has required that such aliens "shall" be detained. Aliens who convince an asylum officer that the alien has a credible fear of persecution "shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). Aliens who have failed to convince an asylum officer of their credible fear who seek review before an immigration judge "shall be detained pending a final determination." *Id.* § 1225(b)(1)(B)(iii)(IV). And for aliens who are "not clearly and beyond a doubt entitled to be admitted, the alien[s] shall be detained," subject only to limited exceptions not applicable here (for crewmen and stowaways). *Id.* § 1225(b)(2)(A).

Against this backdrop of mandatory detention, Congress created a limited exception in 8 U.S.C. § 1182(d)(5)(A). That provision gives DHS the power to parole aliens into the United States, rather than detain them, but "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* When Congress amended Section 1225(b) in 1996, it created a "de facto mandatory detention regime." *Tineo v. Ashcroft*, 350 F.3d 382, 398 (3d Cir. 2003). The combined effect of § 1225(b)'s mandatory detention rules and § 1182(d)(5)'s limits on parole is straightforward: "§ [1225](b)(2) requires the INS to detain aliens 'not clearly and beyond a doubt entitled to be admitted' and because of the limited grounds for parole in § [1182](d)(5)(A), in practice, these provisions often result in ... mandatory detention." *Id.* at 387.

### B. Through the Homeland Security Act, Congress Divided Responsibility for Asylum Claims Between DHS and DOJ

Before Congress passed the Homeland Security Act ("HSA"), Pub. L. No. 107-296 (2002), AOs' main role in the asylum process was only to conduct the credible fear review of aliens' asylum claims. 8 U.S.C. § 1225(b)(1)(B). Any aliens found to have a "credible fear" were placed into full

removal proceedings. Thus, before the HSA, Immigration Judges ("IJs") within the Executive Office for Immigration Review ("EOIR") adjudicated most asylum claims, including asylum claims arising out of the credible fear process.

When Congress created DHS by adopting the HSA, it stated explicitly that DOJ would continue to "have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date." 8 U.S.C. § 1103(g)(1); *see Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (The "Homeland Security Act expressly provides that the Attorney General has authority over certain immigration functions specifically relating to immigration courts").

In 451(b) of the HSA enumerated specific functions that were transferred from INS to USCIS, empowering USCIS only to perform those "adjudications performed by the INS immediately before those authorities were transferred from DOJ to DHS." Thus, the HSA conferred on AOs within USCIS only the authority to adjudicate those types of asylum claims that they adjudicated on the HSA's effective date, March 1, 2003 and preserved EOIR's authority over all other adjudications.

C.     **The Secure Fence Act**

In 2006, Congress passed the Secure Fence Act, which requires the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act of 2006, Pub. L. No. 109–367, 120 Stat 2638 (2006) (codified as 8 U.S.C. § 1701 note). The bill specifically defines "operational control" to mean "the prevention of *all unlawful entries* into the United States, including entries by terrorists, *other unlawful aliens*, instruments of terrorism, narcotics, and other contraband." *Id.* (emphasis added).

5

The Secure Fence Act remains in force. It enjoyed bipartisan support in both houses of Congress, and passed in the Senate by a vote of 80 to 19 with then-Senator Biden voting "aye." Attorney Decl. Ex. 3.

**D.** **EOIR Statistics Show that AOs Have a High Failure Rate for Asylum Determinations**

According to EOIR's statistics aggregated for Fiscal Years 2008 through 2019, out of 100 aliens who claim credible fear, DHS made positive determinations for 81 of them, thereby allowing those 81 to enter the United States. Of those 81, however, only 45 actually ended up filing an asylum claim before an IJ. And of those 45, only 14 were granted asylum by an IJ.Attorney Decl. Ex. 4. Thus, DHS AOs' initial credible fear determinations were confirmed by IJs as satisfying the applicable requirement for obtaining asylum only 17.3% of the time. IJs are also called upon to make credible fear determinations, when aliens request such a review after a credible fear denial by an AO. IJs make positive credible fear determinations at a much lower rate than AOs, approving only 22% of the credible fear claims that they adjudicate. The following chart, which was created by EOIR, illustrates the practical operation of the existing system.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019

**Out of 100 aliens who were to claim a credible fear...[1]**

**CREDIBLE FEAR INTERVIEW**
United States Citizenship and Immigration Services (USCIS) would **refer 81 credible fear claimants to EOIR**
*(81% of claims referred to EOIR)[2]*

**OPTION FOR EOIR TO REVIEW A NEGATIVE FEAR FINDING**

**7 cases are closed[3]**

**3 credible fear claimants would not request review by an immigration judge (IJ)**                    *Alien Is Removed*

**9 credible fear claimants would request review** by an IJ

**CREDIBLE FEAR REVIEW (CFR)[4]**
IJs would **find credible fear for 2 credible fear claimants**
*(IJs find credible fear in 22% of CFRs)*

**REMOVAL PROCEEDINGS**
EOIR would **receive and complete 83 I-862 cases[5]** originating from credible fear claims

**ASYLUM APPLICATION**
**45 credible fear claimants would file for asylum**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, 54 percent of aliens filed for asylum)*

**ASYLUM DECISION**
IJs would **grant asylum to only 14 credible fear claimants** and **would not grant asylum to 31 credible fear claimants**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, IJs grant asylum 17 percent of the time)*

**... only 14 out of 100 would be granted asylum.**



*Never Referred to EOIR*

*Referred, but Never Filed Asylum (23 ordered removed in absentia)*

*Referred & Filed, but Not Granted (4 ordered removed in absentia)*

*Referred, Filed, & Granted Asylum*

EOIR Data Generated: October 23, 2019.
[1] Percentages used in assessing this population may change as more cases are completed over time and because some cases may be reopened.
[2] Based on USCIS data (generated October 15, 2019). Includes claims referred to EOIR in which USCIS did not make a credible fear finding because it could not obtain an interpreter.
[3] Closed cases include those in which a claim is dissolved or withdrawn or an alien is found to be ineligible for the credible fear process.
[4] If USCIS finds that an alien has not established a credible fear, the alien may request review of that finding by an IJ. If the IJ finds that an alien has established a credible fear, then the alien (unless the alien is a stowaway) is placed in removal proceedings.
[5] Includes completed removal, exclusion, and deportation case types.

## II.     THE BIDEN ADMINISTRATION'S ASYLUM IFR.

On August 20, 2021, Defendants published a notice of proposed rulemaking ("NPRM") for new regulations that would radically transform and weaken Congress's procedures for adjudicating asylum claims of aliens. Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021). The NPRM generated substantial controversy, garnering 5,265 comments. *See* Attorney Decl. Ex. 5. Among those comments was one submitted by Louisiana Attorney General Jeff Landry and a coalition of 15 other states that includes most of the Plaintiffs to this action. Attorney Decl. Ex. 6.

On March 29, 2022, Defendants published an Interim Final Rule (the "Asylum IFR" or "Rule"), 87 Fed. Reg. 18,078 (Mar. 29, 2022), that purports to implement the NPRM and become effective without the submission of additional comments even though the Asylum IFR makes 23 substantive changes to the NPRM, fundamentally altering it.

The Asylum IFR would eliminate safeguards to our nation's immigration system and contravene Congress's statutory commands. The Asylum IFR would make it substantially easier for unauthorized economic migrants to enter the United States and obtain asylum through false claims. Most importantly, the Asylum IFR would directly violate the HSA by purporting to confer on AOs within DHS the authority to conduct final adjudication of asylum claims arising from the border—authority that Congress statutorily made exclusive to IJs within DOJ. 87 Fed. Reg. at 18,096. The Asylum IFR would also eliminate the adversarial nature of the adjudication of asylum claims arising from the border—it would continue to guarantee to aliens the right to be represented by counsel during asylum determinations, but would eliminate any equivalent representation for the interests of American citizens in preventing the granting of fraudulent and meritless asylum claims. *Id.*

8

Additionally, the Asylum IFR would eliminate the requirement that aliens arriving at the border complete a full asylum application on paper. *Id.* at 18,085, 18,097, and 18,139. Instead, the Asylum IFR would treat an alien's oral asylum claim as a complete asylum application. *Id.* In contrast, immigrants already inside the United States requesting asylum would still be required to submit a full asylum application on paper. *Id.* at 18,146.

The Asylum IFR would also make it significantly easier for aliens with non-meritorious asylum claims to get work authorization. Specifically, the rule would for the first time treat a positive credible-fear finding as a properly filed asylum application that starts the clock for eligibility to apply for work authorization. *Id.* at 18,085, 18,090, 18,095, and 18,138-18,139. Because a large percentage of aliens who meet the credible fear bar never even apply for asylum, this change would make it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and to obtain it sooner.

Additionally, the Asylum IFR would amend 8 C.F.R. §§ 212.5(b) and 235.3(b) to expand significantly the parole of aliens into the U.S., by expanding eligibility from only those aliens in full removal proceedings under INA § 240 to those aliens subject to expedited removal. 87 Fed. Reg. at 18,082 and 18,088. The Asylum IFR incorrectly claims that Defendants have the statutory authority to parole aliens "where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular [alien] would limit the agency's ability to detain other noncitizens whose release may pose a greater risk of flight or danger to the community." 87 Fed. Reg. at 18,108.

Current regulations strictly limit when aliens pending a credible fear interview or in expedited removal may be paroled, so that parole is permitted only when it "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii) and (b)(4)(ii). This limitation is consonant with Congress's intent to strictly limit Defendants' use of the parole power. The Asylum IFR claims that elimination of these constraints on the parole authority

will allow DHS to process more families through expedited removal proceedings and "facilitat[e] their expeditious removal." 87 Fed. Reg. at 18,109.

The Fifth Circuit has already held that programmatic decision to parole aliens en masse into the United States is an unlawful violation of the INA's requirement that grants of parole be granted on a strictly limited, case-by-case basis: "[d]eciding to parole aliens *en masse* is the opposite of [the] *case-by-case* decisionmaking" required by Section 1182(d)(5)(A). *Texas v. Biden*, 20 F.4th 928, 942 (5th Cir. 2021) (emphasis in original).

## III.   CURRENT BORDER CONDITIONS

As explained in greater detail in the First Amended Complaint ("FAC") (Doc. 14) (at ¶¶ 63-67), the Administration has lost operational control of the border and is facing historically unprecedented levels of illegal crossings. *See also* Appendix Table 1 (DHS Encounters).

Record numbers of aliens have entered the United States unlawfully since January 20, 2021. DHS's own statistics show the dramatic increases in the number of crossings into the United States. Indeed, current levels of illegal crossings are at their highest levels in at least two decades, and perhaps ever. Furthermore, DHS sources have indicated that "there have been more than 300,000 known 'gotaways'—migrants who were not apprehended or turned themselves in and who got past agents—since fiscal year 2022 began on October 1st" through April 1. Attorney Decl. Ex. 7. If that rate merely continues, the total number of gotaways for the fiscal year will be more than 600,000. For comparison, "former Border Patrol Chief Rodney Scott said there had been approximately 400,000 gotaways in the entirety of FY 2021." *Id.* Because the Asylum IFR makes it easier for aliens with non-meritorious asylum claims to be released in the United States, it will induce a significant increase of illegal immigration into the United States. Tens of thousands of these aliens will be released into the Plaintiff States in violation of federal statutes.

Furthermore, Defendants have reduced their capacity to detain unauthorized aliens, even though the INA requires their detention. For example, at the same time Defendants claim that their detention facilities are at overcapacity, Defendants submitted a budget request to Congress that would *decrease* DHS's alien detention capacity by 25%. Attorney Decl. Ex. 8. And Defendants have cancelled contracts with private detention facilities and have closed detention facilities. *Id.*; Attorney Decl. Ex. 9.

Courts have recognized that reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *See, e.g.*, *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at *6, *18–19 (N.D. Tex. Aug. 13, 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting). ("An alien ... has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.") The Asylum IFR will thus predictably lead to greater numbers of attempted (and successful) crossings.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiff States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Each factor weighs in Plaintiffs' favor.

And "[m]otions to stay agency action … are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010); *accord Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

## ARGUMENT

## I.   PLAINTIFF STATES HAVE STANDING TO CHALLENGE THE ASYLUM IFR.

States are "entitled to special solicitude in" the "standing analysis" when they are suing to protect their "procedural right[s] and ... [their] quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). And even if Plaintiffs were not entitled to special solicitude, here their harms are obvious. The Asylum IFR makes it easier for aliens lacking legitimate claims to asylum to gain entry into the United States, to get work authorization, and to improperly receive grants of asylum. FAC ¶¶ 2, 126-128, 172-176.

Even worse, the Asylum IFR contravenes Congress's express statutory commands and transfers the authority to grant asylum to AOs (who have an infamously lax track record). According to the federal government's own statistics about approval rates during the credible fear stage, the historical grant rate for AOs is 81%, while the grant rate for IJs making reasonable fear evaluations is much lower—only 22% *See supra.* Section I.D

No one can seriously question that the Asylum IFR will result in increased immigration into the United States. It has been recognized for decades that "lax enforcement of the laws barring entry into this country ... results in the creation of a substantial 'shadow population' of illegal migrants— numbering in the millions—within our borders." *Plyler v. Doe*, 457 U.S. 202, 218 (1982). Additionally, the influx of unauthorized aliens crossing the border illegally to make asylum claims will stretch DHS resources and reduce the number of officers actually patrolling the border. This will make it easier for aliens not making asylum claims to cross illegally and to do so undetected. The number of so-called "gotaway" aliens who manage to cross the border and evade capture and detention is already at record levels. Attorney Decl. Ex. 7. The Asylum IFR will increase these levels even further.

Such large increases in illegal immigration will cause the Plaintiff States harm, principally in the form of increased health care, education, law enforcement, and imprisonment costs. *See, e.g., Texas*

*v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) *cert. granted* 142 S. Ct. 1098 (2022) (recognizing that "*if* the total number of in-State aliens increases, the States will spend more on healthcare").

Indeed, the Fifth Circuit confirmed that these sorts of large-scale immigration policies are "precisely the sort of large-scale polic[ies] that [are] amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And [the States'] standing is robustly supported by just such big-picture evidence." *Id.* at 971. Even more tellingly, while DHS sought Supreme Court review of that decision, it made *zero attempt* to challenge that standing holding, either in its petition for certiorari or its merits brief. *See* Petition for Certiorari, *Biden v. Texas*, No. 21-954, 2021 WL 6206109 (U.S. 2021); Brief for Petitioners, *Biden v. Texas*, No. 21-954, 2022 WL 815341 (U.S. 2022); Reply Brief for the Petitioners, *Biden v. Texas*, No. 21-954, 2022 WL 340629 (U.S. 2022).

As in *Texas v. Biden*, the government's only conceivable standing defense here is that the Asylum IFR won't "cause[] either an increase in entries or an increase in parolees." *Texas*, 20 F.4th at 969. But that would contradict the Administration's own projections. The NPRM states that "the lowest number of credible fear cases received within the last five years was 79,842 in FY 2017, while the highest was 102,204 in FY 2019." 86 Fed. Reg. at 46,933. Yet, the Asylum IFR's projections implicitly acknowledge the likelihood that it will greatly increase the number of aliens claiming asylum—its projections assume three possible scenarios: annual asylum claims of 75,000, 150,000, or 300,000. 87 Fed. Reg. at 18,207. Thus, the federal government itself anticipates that the Asylum IFR may lead to a *tripling* of annual asylum applicants. That conceded potential influx precludes any colorable standing defense.

In addition, the States have submitted evidence showing that changes in federal immigration policy cause increased illegal immigration into their States and that illegal immigration causes increased costs to the States for law enforcement and social services. *See* Exhibits B-F.

There is widespread agreement that the Asylum IFR will induce additional illegal immigration. Arizona's recent experience helps to quantify just how staggering the impact of this will be. Cochise County, Arizona, operates "a sophisticated camera system that views remote areas of the border region across a large section of southern Arizona." Ex. B, Declaration of Anthony R. Napolitano ("Napolitano Decl."), Ex. 1 ¶ 4. That camera system shows that "only 27.6%" of "undocumented persons" crossing the southern border were apprehended by the Border Patrol from July 2020 to January 2021. *Id.* Thus, the percentage of gotaway aliens who are not apprehended by Border Patrol is 72.4%. Put differently, for every three migrants that the Border Patrol apprehends, another seven successfully enter the United States without being stopped.

Defendants' own estimates concede that the Asylum IFR could cause annual asylum claims to triple, 86 Fed. Reg. at 46,933; 87 Fed. Reg. at 18,207, and that increase will predictably lead to a similar, or even greater, increase in gotaways. Because the Border Patrol already has a staffing shortage of "more than 1,000 officers," Attorney Decl. Ex. 15, it cannot triple its capacity in response to the Asylum IFR. Indeed, Defendants seem intent on ensuring that staffing does *not* increase to meet the increased demand that the Asylum IFR will create. The Asylum IFR's budget and hiring projections assume without explanation that the actual number of annual asylum requests will decrease to 75,000 from the recent historical range of about 80,000 to 100,000. *E.g.*, 87 Fed. Reg. at 18,114 ("USCIS has estimated that it will need to hire approximately 800 new employees and spend approximately $180 million to fully implement the proposed Asylum Merits interview and adjudication process to handle approximately 75,000 cases annually.") And, even worse, the Asylum IFR would provide only for the hiring of additional Asylum Officers, but not for the hiring of additional Border Patrol officers to address the higher number of gotaways who will be induced to cross.

Similarly, the Border Patrol reported 25 notable apprehensions of dangerous criminal aliens at the Arizona border in December 2021. Napolitano Decl. ¶¶ 10-11. The Cochise County data of an

14

approximate three-to-one ratio of gotaways to apprehensions thus suggests that 75 criminal aliens whose apprehension would have been publicly worth noting managed to enter Arizona undetected in December 2021. Once again applying the federal government's estimate that the number of illegal entries may triple, and the assumption that Border Patrol capacity will stay static (or increase only modestly), then the number of dangerous criminal aliens crossing the border into Arizona undetected could increase to 275 per month.

Criminal aliens impose significant law enforcement costs on the State of Arizona and other Plaintiff States. A tripling of illegal crossings will lead to an even greater increase in gotaways, and will significantly increase law enforcement costs as a result of the Asylum IFR. *See* Napolitano Decl. ¶¶ 2-4. These costs include environmental damage due to those crossing illegally, as well as an increase in the law enforcement costs incident to combatting the illegal drug trade. *See* Napolitano Decl. ¶ 4. Additionally, some of those who cross illegally will commit crimes and impose incarceration and supervised release costs on Arizona. *See* Napolitano Decl. ¶¶ 6-7.

Furthermore, decreased enforcement at the border leads also to increased drug trafficking. Law enforcement officials in Louisiana have "confiscated drugs suspected to have been moved from the border into Louisiana, including but not limited to marijuana, fentanyl, methamphetamine, and heroin. This criminal activity requires substantial law enforcement resources to apprehend, detain, prosecute, and incarcerate the individuals involved." Ex. C, Declaration of Tommy Romero, "Romero Dec.," ¶ 4. Law enforcement in Louisiana "is adversely affected by having to devote resources to respond to this criminal activity. Those resources are necessarily diverted from other public safety activities." *Id.*

Illegal immigration imposes significant costs on healthcare providers and on social services. Under federal law, the Plaintiff States are required to spend state monies on Emergency Medicaid for aliens not lawfully in the United States. *See* 42 C.F.R. § 440.255(c). The increased illegal immigration

induced by the Asylum IFR will impose real and significant harm on Plaintiffs. For example, Yuma Regional Medical Center ("YRMC") in Arizona was forced to provide $546,050 in unreimbursed medical care for unauthorized aliens during, for example, the first six months of 2019, when border crossings were lower than even their current level. Napolitano Dec. ¶ 4. Applying the Cochise County data about gotaways and Defendants' prediction about a potential tripling suggests that YRMC's unreimbursed medical care for unauthorized aliens would increase dramatically. Similarly, "Missouri expended $361,702 in emergency medical care costs for treatment of ineligible aliens during Fiscal Year 2020," and Missouri had to spend $30,114.11 just on database inquiries to "verify unlawful individuals' lawful immigration status." Ex. D, Declaration of Maddie Green "Green Dec.", ¶¶ 11-12. If the Asylum IFR causes an influx of three times the prior number of illegal aliens into Missouri, then these expenditures for Missouri could increase by approximately $1.2 million a year.

Since 1982, the Supreme Court has mandated that States provide public education to school-age aliens not lawfully in the United States. *Plyler*, 457 U.S. at 230. A tripling of the number of illegal alien minors in Plaintiff States will significantly increase education costs the States must spend. For example, "Missouri spent an average of $10,654 per student in school year 2019-2020," and in 2018 "an estimated 3,000 illegal alien school-aged children were enrolled in Missouri schools." Green Dec., ¶¶ 8-9. This works out to approximately $32 million spent to educate illegal aliens in Missouri during the 2019-2020 school year. If the Asylum IFR causes an influx of three times the prior number of illegal alien children into Missouri, then the cost to Missouri could increase by an additional $96 million a year.

Every Plaintiff State has a population of illegal immigrants residing therein, and will experience similar increases to healthcare and social service costs. *Id.*, Ex. C (chart showing illegal alien population estimates for each state; *see also* FAC ¶¶ 72-129 (allegations about illegal alien populations in each

Plaintiffs State and the related costs to each state). Compounded across all medical and social services in every Plaintiff State, the resulting costs of the Asylum IFR will be enormous.

Furthermore, because the Asylum IFR amplifies Defendants' lax border enforcement policies, it will also incentivize human trafficking for sexual exploitation. "Destination countries with weak border security and lax immigration policies in effect create an open door for traffickers to enter and do business. It creates more opportunity for them to make money and in turn motivates traffickers to recruit more victims from origin countries. Put simply, traffickers would not invest the time and resources to groom, recruit and transport large numbers of potential victims to the U.S. border if they had reason to believe a crossing would not be possible. There's no money in that.… Russian mafia, Asian organized crime, and Mexican cartels smuggle people into the United States for the purpose of human trafficking. Much of this occurs across the U.S.-Mexico border…. Unaccompanied and undocumented minors who enter the United States via smugglers are extremely vulnerable to traffickers and other abusers. There is no one to file a missing child report, or issue an Amber Alert. There is no record that the child is even here in this country. No one even knows to look. In the eyes of a trafficker, children in these circumstances make ideal victims." Ex. E, Declaration of Alison Philips, ¶¶ 7-8, 13. Such exploitation occurs in every Plaintiff State. *See id.* at 6 and ¶ 20.

Cross-border human trafficking imposes significant costs on the States and their citizens in three ways. First, there are direct costs on the "states for things like law enforcement; and other criminal justice system resources, social service costs, [and] the public health system." *Id.* ¶ 17. Second, human trafficking of aliens to provide unskilled labor "results in lost wages and tax revenue and puts downward pressure on wages in general, especially in unskilled labor pools. This further exacerbates the economic challenges for individuals working in those areas of the economy which often impacts increased demand for assistance with housing and food." *Id.* ¶¶ 17, 33-37 And third, "[t]he money made through human trafficking by international organized criminal organizations operating in the

17

United States further empowers these entities and contributes to an increase in crime in general." *Id.* ¶ 17.

Cross-border human trafficking affects not only border states such as Plaintiff Arizona, but all Plaintiff States. For example, "[f]or the three years 2017 through 2019, between 9% and 12% of calls made to the National Human Trafficking Hotline for the state of Missouri involved foreign nationals." *Id.* ¶ 19. Cases of trafficked aliens are likely underreported because "[m]ost of these victims are very isolated and marginalized by physical, geographical, cultural and linguistic factors. They, like many human trafficking victims, do not self-identify as victims, do not know their rights, and do not know who or how to ask for help." *Id.* These victims usually were able to "gain entry into the United States due to weaknesses in immigration policy." *Id.* Human trafficking, including of minors for sexual purposes, has become so pervasive that local law enforcement agencies in Plaintiff States often lack the necessary resources to investigate cases that present horrifying circumstances. *See, e.g., id.* ¶¶ 23-33 (detailing cases of lack of law enforcement resources to investigate (1) unaccompanied three year girl from Ecuador, possibly for sexual purposes; (2) pregnant 12-year-old girl from Honduras; (3) 11-year-old Central American illegal alien rape victim who had been photographed "wearing lingerie and had sent thousands of nude photos of herself to adult men on her phone"; (4) "50 Hispanic children between the ages of 10 and 16" being trafficking in the back of a "tractor trailer for over 20 hours," where they "had been malnourished and beaten" and were abandoned when the semi-truck pulling the trailer broke down).

And beyond the costs to the States and their citizens, the trafficking which will be facilitated by the Asylum IFR will do untold harm to the lives of the victims of such trafficking.

Defendant DHS itself has acknowledged the immense harm caused by (intentionally) weak border enforcement. It specifically has acknowledged that both Arizona and Louisiana are "directly and concretely affected by changes ... that have the effect of easing, relaxing, or limiting immigration

enforcement. Such changes can negatively impact [Arizona's and Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests." Napolitano Dec., Ex. 7, Memorandum of Understanding Between DHS and the Arizona Attorney General ("DHS-Arizona MOU") at 2; Ex. F, Declaration of Wilbur "Bill" Stiles ("Stiles Dec."), Ex. A, Memorandum of Understanding Between DHS and the Louisiana Department of Justice ("DHS-Louisiana MOU") at 2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Arizona and Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona 's current residents for, among other things, employment, housing, goods and services." DHS-Arizona MOU at 3; DHS-Louisiana MOU at 2-3.

Given the multitude and magnitude of the harms that the Asylum IFR will have upon the Plaintiff States, those States readily satisfy the requirements for Article III standing.

## II.   PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   The Asylum IFR Is Beyond the Executive's Statutory Authority.

#### 1.   Adjudication

The Asylum IFR upends the careful statutory regime Congress established to adjudicate asylum claims. The IFR purports to empower asylum officers to issue *final* asylum decisions on the merits for aliens subject to expedited removal. 87 Fed. Reg. at 18,096. Before the IFR, HHS asylum officers had authority to issue only an initial positive credible-fear determination; once that happened, the alien would be detained for further consideration of his asylum application on the merits, § 1225(b)(1)(B)(i)-(ii), something that since 1997 has occurred through an adversarial removal proceeding before a DOJ EOIR immigration judge, *see* 87 Fed. Reg. at 18,090; 86 Fed. Reg. at 46,908.

19

The IFR, however, cuts out the DOJ—it empowers the HHS asylum officer to issue a *final* asylum determination, which entitles the alien to asylum. The IFR thus transfers final authority to grant asylum from DOJ EOIR immigration judges to DHS asylum officers.

This transfer of authority by regulation violates the Homeland Security Act of 2002's plain text. The HSA states that DOJ retains the "authorities and functions ... relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002." 8 U.S.C. § 1103(g)(1). In other words, authority that EOIR exercised when the HSA entered in force (on March 1, 2003) remains with EOIR. Back then, EOIR had final authority to make the asylum determination. Therefore, the authority to make final asylum determinations remains with EOIR. And a regulation cannot change how Congress allocated authority in a statute. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. (NFIB)*, 142 S. Ct. 661, 665 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."); *see also* U.S. Dep't of Justice, Office of Legal Counsel, *Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch....").

This regulatory transfer of authority also violates the HSA's specific enumeration of USCIS's authorities. The HSA empowers USCIS to perform only those "adjudications performed by the [INS] immediately before" those authorities were transferred from DOJ to DHS. 6 U.S.C. § 271(b). This provision reinforces the separation of authority set out in § 1103(g)(1)—DHS does not have authority over adjudications that EOIR performed on the HSA's effective date. On that date, EOIR performed final asylum adjudications. Accordingly, by force of the HSA, Congress vested this power in EOIR alone, and it cannot be transferred except by another statute. *See Christensen v. Harris Cnty.*, 529 U.S.

576, 583 (2000) ("When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.") (cleaned up).

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) further confirms Congress's intentional separation of these authorities. In the TVPRA, Congress created a narrow exception allowing AOs to issue final decisions in asylum applications filed by unaccompanied alien children. 8 U.S.C. § 1225(b)(3)(C). This confirms two relevant facts: (1) Congress knows how to vest final authority for asylum adjudications in DHS when it wants to, and (2) Congress recognized that DHS does not have this authority over asylum claims generally, and thus Congress needed to act affirmatively to confer any such authority. DHS's efforts to accomplish the same result for expedited removal through regulation contradicts Congress's choice that only unaccompanied minors should receive a specific carve out from the EOIR process. Because "[t]he expression of one thing implies the exclusion of others," *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018), Congress's vesting of limited final DHS asylum-officer authority over one class of alien is further evidence that it withheld such authority from DHS over aliens generally, and thus particularly over aliens subject to expedited removal.

Finally, if any doubt remained that EOIR must have the final say over whether an alien who receives a credible fear determination is to be granted asylum, the INA itself dispels it. The INA requires that a "proceeding under [8 U.S.C. § 1229a] shall be the *sole and exclusive procedure* for determining whether an alien may be admitted to the United States." 8 U.S.C. § 1229a(a)(3) (emphasis added). Only an immigration judge may conduct a proceeding under § 1229a. *See* 8 U.S.C. § 1229a(a)(1) ("[a]n immigration judge shall conduct proceedings" under § 1229a)). Defendants cannot ignore the INA's plain text and create a system for making final asylum determinations that facially conflicts with at least four statutory provisions.

That makes this a straightforward case: Congress said that DOJ's EOIR retains the immigration functions it performed when the HSA was enacted. EOIR, not DHS, exercised the final authority on credible-fear determinations. Thus, EOIR—not DHS—must continue to perform that function until Congress says otherwise.

What is DHS's response? Crickets. Instead of grappling with the HSA head-on, DHS locates its purported authority in the INA's provision stating that an alien "shall be detained for further consideration of the application for asylum" upon a credible-fear determination. § 1225(b)(1)(B)(ii). From the term "further consideration," DHS purports to derive unlimited authority to restructure the entire asylum process. And then, knowing the sandy foundation upon which this interpretation rests, it begs for *Chevron* deference.

Defendants' analysis of the term "further consideration" would sunder it from the statutory framework and authorize them to override the remainder of the INA—including § 1229a, which mandates that immigration judges must make admissibility determinations; and the HSA, which mandates that EOIR must have final authority over whether to admit an alien who has received a positive credible-fear determination. When read together, the statutory regime is coherent and unambiguous: DHS asylum officers may make initial positive credible fear determinations, but an immigration judge of EOIR must conduct the "further consideration"—as they did when the HSA was enacted.

The question is thus not the meaning of the term "further consideration," but instead whether such "further consideration" was an "authorit[y]" or "function[]" "exercised by" EOIR when the HSA was enacted. Defendants do not dispute that EOIR exercised final review over positive credible-fear determinations when HSA was enacted. Accordingly, there is no ambiguity here—EOIR retains the final authority over whether to admit aliens who have received a positive credible-fear determination. Because the text is unambiguous, Defendants' resort to *Chevron* cannot change the outcome.

22

### 2. Parole

The IFR's parole provisions also contradict Congress's comprehensive immigration and border-security laws. The IFR allows for parole upon the Executive's determination that detention is "impracticable." 87 Fed. Reg. at 18,108. Specifically, the IFR claims statutory authority to parole aliens "where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular [alien] would limit the agency's ability to detain other [aliens] whose release may pose a greater risk of flight or danger to the community." *Id.* This contravenes the text, structure, and purpose of the immigration laws.

The INA, as amended by IIRIRA, sets forth in exacting detail exactly what is to be done with aliens pending review. And it is not parole. Because of its "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy," Congress enacted IIRIRA, which "specifically narrowed the executive's discretion ... to grant 'parole into the United States.'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). In fact, to counter executive overreach, Congress created a "de facto mandatory detention regime." *Tineo*, 350 F.3d at 382.[1]

Specifically, Congress limited executive abuses of parole by commanding that aliens who receive a positive credible-fear determination "*shall* be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added). And aliens who receive a

---

[1] To the extent relevant, the legislative history is clear that the parole provisions of IIRIRA were enacted to respond to (and prevent) *exactly* what Defendants are trying here:

The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary. H.R. Rep. No. 104-469, at 140 (1996).

23

negative credible-fear determination "*shall* be detained pending a final determination." *Id.* § 1225(b)(1)(B)(iii)(IV) (emphasis added). Similarly, aliens who are "not clearly and beyond a doubt entitled to be admitted ... *shall* be detained." *Id.* § 1225(b)(2)(A) (emphasis added). Congress left only one narrow exception to this mandatory detention regime—DHS may parole aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* § 1182(d)(5)(A). If more clues were needed, Congress entitled the IIRIRA amendment to the parole provisions, "LIMITATION ON USE OF PAROLE." Pub. L. No. 104-208, 110 Stat. 3009, § 602. Taken together, these previsions "require[] the INS to detain aliens 'not clearly and beyond a doubt entitled to be admitted' and because of the limited grounds for parole in § [1182](d)(5)(A), in practice, these provisions often result in ... mandatory detention." *Tineo*, 350 F.3d at 387.

The IFR's determination that parole is justified based on resource limitations runs headlong into the INA's mandatory-detention regime and Fifth Circuit precedent. Although Defendants use the label "case by case," in practice the parole provision is an en masse programmatic parole rule. The parole provision sets out a new rule of decision for the entire agency that allows them to parole aliens into the United States based on resource limitations. Unlike the individualized statutory factors, resource limitations are inherently general—if Alien A must be paroled due to resource limitations, so too must Alien B. And resource limitations focus on the agency's general circumstances whereas the individualized statutory factors—"urgent humanitarian reasons" for the alien's parole or "significant public benefit" resulting from the alien's parole—focus on the individual circumstances of the aliens to be paroled. Further confirming its programmatic reach, the IFR amends 8 C.F.R. § 212.5(b) to greatly expand the aliens to whom its parole criteria apply; where it used to apply only to aliens in full removal proceedings under INA § 240, it now applies also to aliens subject to expedited removal. This vast expansion of 8 C.F.R. § 212.5(b) also constitutes an unlawful programmatic parole policy.

24

Accordingly, the IFR's parole provision also runs headlong into the Fifth Circuit's holding that a programmatic parole provision violates § 1182(d)(5)(A): "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *Texas,* 20 F.4th at 942.[2] Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse.*" *Id.* at 997. Yet the new nonstatutory resource-limitation provision of the IFR allows precisely the type of programmatic parole that the INA expressly prohibits.

Not only does the parole provision contravene the INA's case-by-case requirement, it also lets nonstatutory regulatory considerations receive equal consideration as statutory factors. Rather than examining each case to determine if the alien should be admitted for "urgent humanitarian reasons or significant public benefit," DHS can now parole based on the non-statutory factor of general "available detention resources." Such resource-limitation concerns are not statutory grounds for parole. As the Fifth Circuit has held, the "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Texas*, 20 F.4th at 947. Making resource limitations a decisional factor differs in kind from looking at the statutory factors.  The Asylum IFR thus does not "implement" section 1225, but rather contravenes it by converting all of its mandatory commands into readily (and frequently-to-be) ignored suggestions.

Finally, Congress has specifically provided for an outlet for aliens who cannot be detained due to resource limitations—"the Attorney General may return the alien" to his country of origin pending his proceeding. 8 U.S.C. § 1225(b)(2)(C). Defendants cannot ignore Congress's solution to the very problem DHS identified because they disagree with Congress's policy choice. Congress has left DHS

---

[2] The data eliminate any doubt about Defendants' attempt to create en masse parole: there has been a 300,000% increase in paroles in the Biden Administration. *See* Doc. 14 ¶ 146.

with one—and only one—tool to respond to resource limitations at the southern border: return aliens to Mexico. Because "[p]arole does not provide a way out of the box created by DHS's can'ts-and-don't-wants," *Texas*, 20 F.4th at 996, Defendants' resort to parole to cure resource limitations is contrary to law, *cf. id.* (Defendants simply "don't want to do [the] one thing Congress allowed" as an alternative to detention).

### 3. Secure Fence Act

The Asylum IFR also independently violates the Secure Fence Act. The Act requires DHS to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Pub. L. No. 109–367, 120 Stat 2638 (2006) (codified as 8 U.S.C. § 1701 note). Congress defined "operational control" to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." *Id.* The Asylum IFR violates both the text and the spirit of the Secure Fence Act. It does the opposite of preventing unlawful entries—it incentivizes them.

### B. The Asylum IFR Is Arbitrary and Capricious.

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). In the Fifth Circuit, "[t]his review 'is not toothless.'" *Texas*, 20 F.4th at 989. Quite the contrary: "after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). The Asylum IFR's asylum-review procedures and parole provision are each arbitrary and capricious.

1.      **Asylum Procedures**

The asylum procedure provisions are arbitrary and capricious for several independently sufficient reasons.

*First*, Defendants utterly fail to consider State reliance interests. Indeed, Defendants rely explicitly on the same legal premise that the Fifth Circuit expressly rejected in *Texas v. Biden*—the notion that State reliance interests are nonexistent in the asylum context. Defendants declare that they "perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions." 87 Fed. Reg. at 18,109. And Defendants simply declare—without any support—that "[e]ven if such reliance interests exist, the Departments would nevertheless promulgate this regulation for the reasons stated in this rule." *Id.*

The Fifth Circuit rebuffed this precise reasoning as "astonishing[]" in the MPP asylum case. As the court there observed, States have overwhelming reliance interests in how the federal government executes its immigration laws: "Given the Supreme Court's explanation that border states 'bear[ ] many of the consequences of unlawful immigration,' one would expect a 'reasonable and reasonably explained' memo to mention the issue at least once." *Texas*, 20 F.4th at 989 (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)). That is precisely the case here—Defendants fail to consider even once the States' interests in preventing unlawful immigration. And their cursory one-sentence dismissal (without reasoning) comes nowhere close to meeting their obligation to reasonably explain why they think State interests are not relevant. *See Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) ("'Stating that a factor was considered ... is not a substitute for considering it.'"). Defendants' analysis fails to account for the actual real-world effects of the current asylum system and how States might have legitimately relied on it.

Even putting aside Defendants' defiance of the Fifth Circuit's holding, Plaintiff States have overwhelming reliance interests in federal enforcement of immigration law. *See Arizona*, 567 U.S. at

398 ("The problems posed to the State by illegal immigration must not be underestimated."). Specifically, Plaintiff States submitted a comment explaining that the Asylum IFR will incentivize additional illegal immigration and thus "affect[] State finances and resources, public safety, and public health during the midst of the COVID-19 global pandemic." Attorney Decl. Ex. 6. Plaintiff States' budgets and resource allocations are determined in reliance on Defendants' continued enforcement of immigration law. Defendants did not consider whether the States relied on the current asylum system continuing when Plaintiff States determined how they would marshal and distribute their resources to deal with the number of unauthorized aliens entering their states. The Asylum IFR utterly ignores these reliance interests. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

Making matters worse, as in *Texas v. Biden*, Defendants fail to account for the reliance interests recognized by the January 2021 Agreements between DHS and Louisiana and Arizona. Docs. 2-1, 2-2. In those agreements, "DHS recognize[d] that" certain "actions result in direct and concrete injuries to" Arizona and Louisiana including the "relaxation of the standards for granting relief from return or removal, such as asylum." DHS-Louisiana MOU at 1-2; DHS-Arizona MOU at 1-2. These Agreements "underscore[] the reliance interests at play—and DHS's awareness of them." 20 F.4th at 989. On this point, the Fifth Circuit's holding in *Texas v. Biden* is again controlling. In analyzing these same agreements, the court held that they "both demonstrate[] DHS's prior knowledge of the States' reliance interests *and* affirmatively created reliance interests all [their] own." *Texas*, 20 F.4th at 989-90. Accordingly, "DHS's failure to consider those interests [is] arbitrary and capricious." *Id.*

*Second*, Defendants failed to estimate or account for the costs to Plaintiff States of the Asylum IFR, such as increased healthcare costs for aliens infected with COVID-19, the cost of increased illegal immigration that the Asylum IFR will prompt, and the presence of many more paroled aliens with non-meritorious asylum claims who were induced to enter the United States because of the Asylum IFR. This failure to estimate cost is particularly egregious because of the IFR's infinitesimal claimed

28

benefits. By DHS's own calculations, the IFR will reduce the number of cases referred to the Executive Office of Immigration Review by only 11,250 to 45,000 cases a year, yet he pending EOIR caseload is approximately 1.3 million cases, which works out to a reduction of only between .8% and 3.5%.

*Third*, Defendants failed to consider or arbitrarily rejected obvious alternatives to the Asylum IFR, such as hiring more Immigration Judges ("IJs") or by implementing in good faith the Migrant Protection Protocols ("MPP") (and thus sending most aliens from third countries back to Mexico to await asylum decisions). *See* 87 Fed. Reg. at 18,115 (acknowledging comments proposing the hiring of IJs and more effective implementation of MPP, but cursorily rejecting them without analysis). Agencies are required "to consider the alternatives that are within the ambit of the existing policy." *Texas*, 20 F.4th at 992. Defendants' "fail[ure] to consider any alternative within the ambit of the" current regime … 'alone renders [DHS's] decision arbitrary and capricious.'" *Id.*

*Fourth*, Defendants failed to consider important statutory factors and relied upon factors that Congress did not direct them to consider. IIRIRA and the Secure Fence Act elevate reducing border crossings above all other factors. *See supra* at Section II.A.2 and II.A.3. Yet the IFR utterly ignores these statutory goals.

*Fifth*, Defendants failed to justify their deviation from prior practice. The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923-27 (D.C. Cir. 2017). For decades, Defendants have recognized that EOIR properly has final decisional authority over asylum requests. *See, e.g.*, 86 Fed. Reg. at 46,908 . Yet in switching that authority from EOIR's immigration judges to mere asylum officers, Defendants fail to grapple with their prior actions and act as if their prior positions don't exist. Because the APA requires that an agency's "prior policies and standards are being deliberately changed" rather than "causally ignored," Defendants' failure to

grapple with their longstanding polices is arbitrary and capricious. *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009).

*Sixth*, the Asylum IFR is arbitrary and capricious because its rationales are flagrantly pretextual. The actions of the President, Secretary Mayorkas, and other Administration officials have made clear that the intent of the Administration's immigration policies is to incentivize illegal immigration. In 2019, then-candidate Biden committed to free government-provided health care to illegal aliens in the United States. Attorney Decl. Ex. 10; Attorney Decl. Ex. 11.E**rror! Hyperlink reference not valid.** Indeed, that the Administration's immigration policies incentivize high amounts of illegal immigration is widely recognized internationally. For example, the President of Mexico called President Biden the "migrant president" and observed that the Biden Administration's policies and rhetoric greatly incentivize illegal immigration.  Attorney Decl. Ex. 12. Human traffickers have recognized this as well. Internal Mexican government assessments "state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.'" *Id.* And there is evidence of a "significant mismatch" between the decision made and the rulemaking record. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019). Defendants ground their rationale for the IFR as promoting efficiency and reducing caseload, but the record demonstrates that the IFR would reduce EOIR's caseload by as little as only 11,250 (leaving over a million backlogged cases still pending). Thus, the true rationale is clear: increasing illegal immigration. The presence of such blatant pretext suffices to render the Asylum IFR arbitrary and capricious. *New York*, 139 S. Ct. at 2575-76. Because accepting Defendants' description of the Asylum IFR requires this Court to "'exhibit a naiveté from which ordinary citizens are free,'" *id.*, it should reject Defendants' fabricated reasoning.

*Seventh*, the Asylum IFR fails to account for the significant planning and additional funding required to implement it, and fails to justify these costs versus maintaining the status quo. For example, the Asylum IFR will require Defendants to redraft all training materials, retrain existing officers, and

ultimately hire hundreds (if not thousands) of new AOs. This failure is particularly egregious because DHS only just recently narrowly escaped financial ruin in the midst of the COVID-19 pandemic.

*Eighth*, the Asylum IFR fails fully to consider the effects of eliminating the adversarial nature of asylum proceedings and the salutary nature of adversarial proceedings for determining the true facts of a situation. This failure warrants special mention because the Asylum IFR would place asylum adjudications solely in the hands of AOs who have an established and documented track record of naïve credulity in the face of spurious asylum claims, which has led to their abysmal record at the credible-fear stage: asylum on that basis is rejected for more than 85% of the aliens they find to make the initial positive showing.

*Ninth*, the Asylum IFR's claimed justification of a backlogged immigration court system is pretextual, as only 17% of EOIR's pending caseload is credible-fear referrals. And because about 45% of all aliens referred to EOIR for a credible-fear determination never actually bother to file an application, the proportion of "real" asylum cases before EOIR is even smaller. Attorney Decl. Ex. 13. Furthermore, the Asylum IFR's claimed justification makes little sense, as the USCIS case backlog within DHS is significantly worse than EOIR's. *See* Attorney Decl. Ex. 14.

*Tenth*, the Asylum IFR fails to account for the reality that the vast majority of asylum claims have no merit and that AOs have a terrible track record of correctly adjudicating aliens' credible fear claims. Between FY2008 and the third quarter of 2021, the grant rate for asylum matters originating from credible fear referrals made by AOs was only 12.69%. Furthermore, *in absentia* removal-order rates for such cases are very high. This means that most aliens being placed into immigration court proceedings following a positive credible-fear determination by AOs are being ordered removed. The current system is rife with fraud and frivolous claims. Rather than hone the system to solve these problems, the Asylum IFR inexplicably relaxes requirements even further, thus making it even easier for aliens with meritless claims to gain improper entry into the United States.

*Eleventh*, the Asylum IFR eliminates the requirement that aliens arriving at the border complete a full complete asylum application on paper. Instead, the Asylum IFR treats an alien's oral asylum claim as a complete asylum application. In contrast, aliens already inside the United States who file an asylum application would still be required to submit a full asylum application on paper. This improperly provides more favorable treatment to aliens who cross the border illegally, and will also create significant administrative problems, as judicial review of such oral asylum applications will be nearly impossible in the absence of a clear record of the alien's asylum claims.

*Twelfth*, the Asylum IFR makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and it fails to consider this change's effect on illegal immigration rates, unemployment rates for citizens and authorized aliens, and wages. The Asylum IFR treats a positive credible-fear finding—which has little relation to whether an individual will ultimately qualify for asylum—as a properly filed asylum application that starts the clock for eligibility to file for work authorization. Because a large percentage of aliens who meet the credible-fear bar never even apply for asylum, this change makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and to get it sooner. This change will greatly incentivize aliens who lack meritorious asylum claims to enter the United States and falsely claim asylum.

### 2.    Parole

The Asylum IFR's parole provisions are also arbitrary and capricious for several independently sufficient reasons.

*First*, as noted, Defendants utterly neglect to consider State reliance interests on the previous regime and the harm to States in the *en masse* parole of aliens. The DHS MOUs with Arizona and Louisiana expressly recognize such reliance interests, but Defendants ignored them in the Asylum IFR.

*Second*, Defendants have failed to analyze and consider how their own failure to maintain detention capacity affects the purported need to parole aliens into the United States. For example, at the same time Defendants claim that their detention facilities are over capacity, Defendants submitted a budget request to Congress that would *decrease* DHS's alien detention capacity by 25%. Attorney Decl. Ex. 8. Defendants have degraded their own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities. *Id.*; *see also* Attorney Decl. Ex. 9. Moreover, Defendants have refused to employ the capacity they do have. The DHS Inspector General, for example, has concluded in an April 12, 2022 report that DHS abused its authority in securing hotel space as detention capacity through no-bid contracts, and then allowed that dubiously obtained capacity to remain fallow. Attorney Decl. Ex. 16.

*Third*, Defendants have failed to explain their deviation from prior practice. Specifically, current regulations strictly limit when the executive branch can parole aliens pending a credible-fear interview or in expedited removal, such that parole is permitted only when it "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii) and (b)(4)(ii). This limitation is consonant with Congress's intent to strictly limit Defendants' use of the parole power. *See supra* at Section **II.A.2**. Defendants claim that eliminating these constraints on the parole authority will allow them to process more families through expedited removal proceedings and "facilitat[e] their expeditious removal." 87 Fed. Reg. at 18,109. But this justification is obviously pretextual, as Defendants have issued guidance strictly limiting removal of such aliens, and the number of removals under the Biden Administration has dropped precipitously. *See, e.g.*, September 30, 2021 DHS Permanent Guidance Memo; *Arizona v. Biden*, No. 21-CV-314, ECF No. 4-11 at 12 (S.D. Ohio Nov. 23, 2021) (deposition testimony of Acting Phoenix ICE Director Albert Carter noting a "big dropoff in removals" beginning in February 2021). Because Defendants

have once more "failed to reasonably consider [their] own factual findings regarding the benefits," the Asylum IFR, like the MPP repeal, is arbitrary and capricious. *See Texas*, 20 F.4th at 990.

### C.      The Asylum IFR Violates the APA's Notice and Comment Requirements.

#### 1.      The IFR Is Not a Logical Outgrowth of the Proposed Rule

With certain exceptions that Defendants do not try to invoke here, the APA requires rulemaking to be conducted through notice-and-comment procedures. *See* 5 U.S.C. § 553(b)-(c). A notice of proposed rulemaking thus must include "the terms or substance of the proposed rule or a description of the subjects and issues involved. *Id.* § 553(b). And the public must be given a chance to comment on the proposed rule, *id.*, § 553(c), which the agency then must respond to, *see, e.g.*, *HBO v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

To evaluate whether the notice provided is sufficient, federal courts use the "logical outgrowth" test. Under that test, "[f]inal rules under APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule. The objective is fair notice." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021) (citation omitted). "If interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule." *Id.* at 381-82 (citation omitted).

A "final rule" that is "'surprisingly distant' from the proposed rule" fails the logical outgrowth test. *International Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) (citation omitted)). "'[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal,'" and the rule thus violates the APA. *City of Waukesha*, 320 F.3d at 245.

34

Here, the Asylum IFR is "surprisingly distant" from the proposed rule and "deviates too sharply from the proposal" under any reasonable understanding of those terms. The Asylum IFR makes an astounding 23 substantive changes to the NPRM, fundamentally altering it. Merely skimming Defendants' *3,100-plus-word summary* of the *23 major changes* they made from the proposed rule is sufficient to conclude that the deviations here wildly exceed the "deviates too sharply" standard. The end result is an IFR that is radically different from what was proposed to the public and on which the public submitted comments. This does not comport with 5 U.S.C. § 553.

Highlighting the point, Defendants felt compelled to claim they "are in compliance with the APA's notice-and-comment requirements with respect to these changes *because each change is a logical outgrowth of the proposals set forth in the NPRM*." 87 Fed. Reg. at 18,195 (emphasis added). That suspiciously specific denial reads more like a confession than a defense of the Rule. Agencies that have properly complied with the APA typically have no need to offer such unintentionally self-aware statements; nor do they engage in a second round of purportedly unnecessary notice-and-comment rulemaking. In any event, even if all 23 major changes were individually logical outgrowths, the *cumulative effect* of all the changes renders the interim-final rule "surprisingly distant" and "deviat[ing] too sharply" from the proposal, thereby violating the APA.

Any other outcome would undermine the logical outgrowth test's purpose of ensuring "fair notice." *Texas Ass'n of Mfrs.*, 989 F.3d at 381. Again, the "'essential inquiry' … 'is whether the commentators have had a fair opportunity to present their views on the contents of the final plan.'" *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) (citation omitted). No such "fair opportunity" was present here. The final rule deviates so profoundly from the proposed rule that no one could fairly have commented on anything that remotely looked like the former without having to "divine [DHS's and DOJ's] unspoken thoughts." *International Union*, 407 F.3d at 1260. The APA prevents agencies from engaging in those kinds of tactics.

*2. The IFR Fails to Adequately Address Comments*

The Asylum IFR failed to take account of the States' comment to the NPRM, either summarily rejecting them without substantive explanation, or outright ignoring them. For example, a coalition of 16 states that includes most of the Plaintiffs submitted an 18-page comment that raised general concerns, as well as 10 specific comments about serious deficiencies in the proposed rule. *See* Attorney Decl. Ex. 6. Defendants ignored much of the States' comment and, for the aspects of the comment that they purported to address, they summarily disposed of the States' comment in a cursory, dismissive fashion that refused to offer any substantive legal or factual basis for dismissing the States' comment. For example, Defendants cursorily rejected the States' NEPA and federalism concerns and failed to offer any substantive legal or factual justification for that rejection. 87 Fed. Reg. at 18,193-18,194. Instead Defendants merely claimed, without justification, that the Asylum IFR will not increase the asylum grant rate. Defendants' failure to address the States' comment is arbitrary and capricious.

## III.   THE REMAINING REQUIREMENTS FOR EQUITABLE RELIEF ARE MET HERE.

### A.   A.   Without Relief from This Court, The States Will Suffer Irreparable Harm.

Plaintiff States will suffer irreparable harm without a delay in the effective date of the IFR or if they are denied injunctive relief. As discussed, the Asylum IFR will impose costs on the States in the form of increased law enforcement, education, and health care spending. *See supra* Section I. Indeed, States bear the "heavy financial costs" of supporting an increased number of immigrants "on state and local programs" as a consequence of a federal agency rulemaking. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020). The Supreme Court has similarly recognized that States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

Due to sovereign immunity, the States cannot recover damages from the federal government. Their unrecoverable injuries thus constitute irreparable harm. *See, e.g., Texas,* 20 F.4th at 1001; *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). That's why, the Fifth Circuit has squarely recognized economic harms resulting from unlawful federal immigration policy to constitute irreparable harm. *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

Plaintiffs have also suffered irreparable procedural harm tied to their unrecoverable monetary damages, having been deprived of the opportunity to participate in notice-and-comment rulemaking on the Asylum IFR before it takes effect. *East Bay,* 993 F.3d at 677 ("Intangible injuries may also qualify as irreparable harm, because such injuries 'generally lack an adequate legal remedy.'" (citation omitted)). The States suffer actionable harm when "depriv[ed] of a procedural protection to which [they] are entitled" under the APA, including the chance to shape the rules through notice and comment. *Northern Mariana Islands v. United States*, 686 F.Supp.2d 7, 17, 18 (D.D.C. 2009).

### B.      The Balance Of Harms And Public Interest Favor Relief Here

The remaining *Winter* factors also support the States' motion. As to the balance of harms, this case is unusual and the States' arguments are uniquely strong. A delay in the IFR's effective date, or alternatively, a preliminary injunction, will not only avoid harm to the States, but also prevent the Executive Branch from perpetrating the harm of violating laws that assign specific immigration authorities to specific Executive departments. Those harms to the *federal government*—as well as the harms to the States—can be *completely averted* by delaying the effective date or entering a preliminary injunction. This case is truly rare in that a delay in the effective date, or a preliminary injunction, will *avoid* harms to all sides. Here there is no balancing to be had, because all the harms are on one side of the scale.

The public interest also favors the states: "The 'public interest is in having governmental agencies abide by the federal laws that govern their existence and operations.' And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Wages & White Lion Invs.*, 16 F.4th at 1143 (cleaned up). Because the Asylum IFR's promulgation violates the APA multiple times over, the public interest favors enjoining it.

### C. If This Court Enters A Preliminary Injunction, That Injunction Should Apply Nationwide.

This Court should enjoin implementation of the Asylum IFR nationwide, and not just in Plaintiff States. On this issue, "the Fifth Circuit's precedent in this area is applicable and controlling." *Texas v. United States*, 524 F. Supp. 3d 598, 667 (S.D. Tex. 2021). In the circumstances here, "a geographically-limited injunction would be ineffective" since once migrants crossed U.S. borders in other States they "would be free to move among states." *Texas v. United States*, 809 F.3d at 188. This flouts the bedrock notion that "immigration policy" is supposed to be "a comprehensive and *unified* system." *Id.* And because Plaintiffs include 20 states, an injunction limited to those states could create an unworkable patchwork.

Given the magnitude of harms that will occur if the Asylum IFR is permitted to go into effect somewhere, it should not be permitted to go into effect anywhere.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' Motion for a Preliminary Injunction.

Dated:  May 13, 2022
Corrected: May 17, 2022

MARK BRNOVICH
  Attorney General
Brunn ("Beau") W. Roysden III *
  Solicitor General
Drew C. Ensign **
  Deputy Solicitor General
James K. Rogers *
  Senior Litigation Counsel
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

Steve Marshall
  Alabama Attorney General
Edmund G. LaCour Jr.*
  Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

Respectfully submitted,
By:/s/ *Joseph S. St. John*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

Treg R. Taylor
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
Christopher A. Robison*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Indiana Attorney General
Betsy M. DeNardi*
  Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

Lawrence G. Wasden
  Attorney General,
Brian Kane*
  Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

Derek Schmidt
  Attorney General
Dwight R. Carswell*
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

DANIEL CAMERON
  Attorney General of Kentucky
Marc Manley*
  Associate Attorney General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

ALAN WILSON
  South Carolina Attorney General
Thomas T. Hydrick*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA  ATTORNEY  GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

Sean D. Reyes
  *Utah Attorney General*
Melissa Holyoak
  *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

Patrick Morrisey
  Attorney General
Lindsay See*
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL
    Attorney General of Wyoming
RYAN SCHELHAAS*
    Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*


* Pro hac vice application forthcoming
** Pro hac vice application granted