```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF LOUISIANA
 2                     LAFAYETTE DIVISION

 3
   STATE OF ARIZONA, ET AL,      ) CIVIL ACTION NO. 6:22-cv-1130
 4                               )
                 Plaintiffs,     )
 5                               )
                 vs.             ) JUDGE JOSEPH
 6                               )
   MERRICK GARLAND IN HIS        )
 7 OFFICIAL CAPACITY AS ACTING   )
   DIRECTOR OF EXECUTIVE OFFICE  )
 8 FOR IMMIGRATION REVIEW, ET AL )
                                 )
 9               Defendants.     ) MAGISTRATE JUDGE WHITEHURST

10
                        MOTION HEARING
11
              Transcript of Proceedings before The Honorable
12    David C. Joseph, United States District Judge,
      Lafayette, Lafayette Parish, Louisiana, commencing
13    on May 18, 2022.

14 Appearances of Counsel:

15      For the Plaintiffs:        JOSEPH SCOTT ST. JOHN
                                   LA Department of Justice
16                                 909 Poydras St., Ste. 1850
                                   New Orleans, LA 70112
17
        For the Defendants:        EREZ R. REUVENI
18                                 U. S. Department of Justice
                                   Civil Division
19                                 450 5th St., N.W.
                                   Washington, DC 20001
20
                                   KAREN KING, AUSA
21                                 U. S. Attorney's Office
                                   800 Lafayette St., Ste. 2200
22                                 Lafayette, LA 70501

23            Cathleen E. Marquardt, RMR, CRR
               Federal Official Court Reporter
24                  Post Office Box 5056
                 Lafayette, Louisiana 70502
25                Phone:  (337) 593-5223
```

1            (Lafayette, Lafayette Parish, Louisiana; May 18, 2022,
2       in open court.)
3            THE CSO:  All rise.  United States District Court for
4       the Western District of Louisiana is now in session, the
5       Honorable Judge David Joseph presiding.  God save the United
6       States and this Honorable Court.
7            THE COURT:  Thank you, please be seated.  Good morning
8       everybody.  We're here this morning in 22-cv-1130, Arizona versus
9       Garland.  Counsel, please make your appearances.
10           MR. ST. JOHN:  Good morning, Your Honor.  Joseph Scott
11      St. John on behalf of the plaintiff states.
12           THE COURT:  Good morning.
13           MR. REUVENI:  Good morning, Your Honor.  Erez Reuveni
14      on behalf of the defendants.
15           MS. KING:  And Your Honor, Karen King, U. S. Attorney's
16      Office, local counsel.
17           THE COURT:  Good morning.
18           MS. KING:  Good morning.
19           THE COURT:  We are here on defendants' motion to
20      transfer for lack of subject matter jurisdiction, Doc. No. 5 on
21      the record.  I guess, Defendant, it's your motion.  Please
22      proceed.
23           I have a number of questions for both counsel.
24      Hopefully, we've come prepared to answer some questions about --
25      well, a lot of different things, but I will either wait till you

1    finish or I will interrupt you if it makes sense to interrupt

2    you.  Okay?

3              MR. REUVENI:  Thank you, Your Honor.  And I will

4    apologize in advance both to the Court and particularly the court

5    reporter if I start speaking too fast, so.

6              THE COURT:  She'll tell you.

7              MR. REUVENI:  I don't doubt it.

8              Good morning, Your Honor.  Erez Reuveni for the

9    defendants.  So from the government's view, this is a fairly

10   straightforward argument, and we've laid out the argument in our

11   briefs.  We've responded to the points that defendants make, but

12   just at a very high level, we have a statute here, a very

13   specialized review provision.  It's not your normal venue

14   provision.  It's a subject matter jurisdictional provision that

15   provides that these sorts of cases -- and I don't think the

16   parties really dispute in their briefs that this is a case that

17   implements the relevant -- or the rule in this case, I should

18   say, is a rule that implements the relevant statutory provision.

19   That's 8 U.S.C. § 1225(b)(1) which governs what's called

20   expedited removal.

21             So the parties don't really disagree about that, and I

22   think if you agree with the government that this is a case about

23   a rule that implements that provision, it's open and shut.  Where

24   the parties disagree is does this apply, this provision apply

25   just to individuals, or does it apply to everybody, and so that's

1   really where the disagreement lies, and I can focus my discussion

2   there.  The plaintiffs make three arguments basically.

3           THE COURT:  Well, I'll tell you right now, I agree with

4   your position.  It says it applies to implementation of 1225(b).

5   Okay.  So that's not the issue.  The issue is whether this IFR is

6   in the scope of 1225 and whether or not the plaintiff agrees with

7   you on that or not, I don't necessarily agree.  So we need to

8   focus our inquiry on that.  Is this regulation within the

9   statutory scope of 1225?  I don't know that it is.

10          MR. REUVENI:  Okay.  Absolutely happy to focus

11   discussion on that, although just to set the table, plaintiffs

12   don't disagree with us on that.  I understand that you need to

13   make your own jurisdictional finding.

14          THE COURT:  I determine jurisdiction, yes.

15          MR. REUVENI:  Absolutely.  Plaintiffs' position is,

16   this doesn't implement that statute.  It fails to implement that

17   statute, which is sort of a circular argument that they find what

18   we're doing unlawful.  That is true about any case.

19          But as to the rule itself, so the statutory provision

20   at issue is 1225(b)(1)(B)(ii).  And just to paraphrase as quoted

21   in the brief, it says essentially, once an individual passes

22   what's called a credible fear screen for whether they are

23   eligible to proceed in the next step in the asylum process, that

24   person is held for further consideration -- that's a quote from

25   the statute -- of their asylum application.

1          It doesn't say how to do that.  It doesn't say what

2     proceeding someone goes into afterwards.  Since 1996 when the

3     statute was first implemented, that was done through what's

4     called a full removal proceeding under 8 U.S.C. 1229(a), but the

5     statute doesn't say it has to be that way.

6          So if the government -- The government in 1996 was

7     implementing the statute by issuing the rule saying do it this

8     way, and now 30 some years later they are saying, we're going to

9     implement it this other way.

10         And so both the regulation in 1998, which is being

11    amended here, and this rule implements Section 1225(b)(1)(B)(ii).

12    We know that because the rule itself -- for two reasons.  First,

13    the rule itself is littered with references to what we're doing

14    in this rule is implementing, quote, Section 235 of the INA which

15    is --

16         THE COURT:  You mean the IFR.  The IFR, yes, makes it

17    very clear that that's what the department purports to be doing,

18    yes.

19         MR. REUVENI:  Yes.  I mean, you have the citations in

20    the brief.  So there's two things this rule does.  It sets up a

21    process for further consideration, and I don't think the parties

22    really dispute that that falls under 1225(b)(1), and then it

23    provides for parole, it amends the parole provision, which is

24    8 CFR 235.3, and I want to point out that that provision is

25    titled Expedited Removal of Inadmissible Aliens.  So that's a

1    provision that has a number of subsections all intended to

2    implement the expedited removal statute.

3           But the parole provision, 235.3(b), up until this rule

4    there were two different provisions in that rule.  One applies to

5    individuals who have passed their credible fear screening and one

6    that apply to those who have not.  And what this rule does is

7    amend that to apply the same rule to everybody, and it demands

8    specifically 8 CFR 235.3(b)(2)(iii), (b)(4)(ii), and (b)(4)(C)

9    and those all fall, again, under 235.3(b).  So, again, it amends

10   8 CFR 235.3, a number of provisions there, all of which are

11   implementing the expedited removal statute.

12          Now plaintiffs don't make this argument, so obviously

13   the Court, again, has to decide what it needs to decide, but the

14   plaintiffs don't make any of these arguments.  They don't argue

15   that the parole part is or is not implementing Section 1225(b)(1)

16   or any other part is.

17          But again, if we look at the choosing that the rule

18   does, it sets up a set of procedures for someone to have "further

19   consideration of" their application for asylum, and that's

20   1225(b)(1)(B)(ii), and then it sets up a procedure for dealing

21   with the detention of those individuals which again implements

22   Section 1225(b)(1)(B)(ii) which says, shall be detained for

23   further consideration of their application for asylum.

24          THE COURT:  Okay.  Just to be clear, have any prior

25   regulations defined further proceedings under 1225(b)(1)(B)(ii),

1   is anything other than referring to another statute, particularly

2   1229(a) or 1158?  Has any prior regulation attempted to make

3   further proceedings something independent of other regulations or

4   statutes, because that never happened before.

5         MR. REUVENI:  Well, yeah.  So let me answer your

6   question two ways, because first, I think, it's undefined, and

7   the agencies have taken that position since 1998 when they first

8   implemented the provisions.  So 8 CFR 235.3 and 8 CFR 208.30,

9   they have essentially existed as they exist now until 2017, the

10   prior administration made some amendments.  Many of those were

11   enjoined, some were not, and now this administration's take on

12   amending those procedures, but in 1998, the agency did two things

13   in the regulations.  It says the statute does not define --

14         THE COURT:  You said 1998.

15         MR. REUVENI:  Yes.

16         THE COURT:  Slow down a little bit.  1998, what

17   happened in 1998?

18         MR. REUVENI:  Well, let me take one step back.  There

19   are provisional regulations in '97 implementing this new system.

20         THE COURT:  Okay.

21         MR. REUVENI:  And then the final regulations went into

22   effect in '98.  So they did notice and comment and they got some

23   comments and they made some tweaks, but they were essentially the

24   same.

25         What happened in '98 was the agency recognizes that

1   this term is ambiguous and were charged with figuring out how to

2   do further proceedings, and they say we're going to do this

3   through 240 proceedings.  That's the 8 U.S.C. 1229(a).

4              THE COURT:  That's 1229(a).

5              MR. REUVENI:  Yes, which is a proceeding that is not

6   identified in the statute as determining whether someone is

7   eligible for asylum, but these are proceedings to determine

8   whether someone is inadmissible and thus removable under the new

9   statute, but there's nothing in the statute that says you must do

10  it that way.

11             In fact, also in 1996, and this encompasses practices

12  from before the amendment to the statute, there are affirmative

13  asylum applications, and those are filed not under -- those are

14  filed not in full removal proceedings.  That's a different thing.

15  That's not what this rule amends.

16             THE COURT:  But those are under 1158 and 1229(a),

17  right?

18             MR. REUVENI:  Well, they are not under 1229(a), Your

19  Honor.  So let me distinguish between those to provisions.

20  1229(a) is a process statute.

21             THE COURT:  Yes.

22             MR. REUVENI:  It sets out how --

23             THE COURT:  How the proceeding is to go.

24             MR. REUVENI:  How that particular proceeding is going

25  to go.

```
1                THE COURT:  Yes.

2                MR. REUVENI:  1158 is a substance statute.

3                THE COURT:  Yes, and that's for affirmative asylum

4     claims.

5                MR. REUVENI:  Well, it's for every asylum claim, it's

6     for every claim.  So if this rule here were to amend the

7     substantive eligibility criteria for asylum, for example, it

8     would define what a refugee is, it would define what a particular

9     social group is, these terms that appear undefined in the

10    statute, it wouldn't be implementing Section 1225.  It would be

11    implementing Section 1158, and if that were the case, we wouldn't

12    be here making that argument because that sort of rule is not

13    channeled through this provision because it's not implementing

14    1225(b)(1) procedures.  It's implementing substantive law that

15    apply to a number of different areas, including affirmative

16    applications, full removal proceedings, and these more expedited

17    proceedings, but that's not what the rule does.

18                So in '98 the agency made the decision to have these

19    process through 1229(a) for further consideration, but they are

20    very clear on the rule.  I don't have the cite on me.  I'm happy

21    to get it to you, so I'm paraphrasing from memory here, but they

22    said, we recognize that the statute doesn't tell us how to do

23    this.  We think since this is a brand new thing, we're going to

24    put it through these processes we are already familiar with, but

25    we reserve the right to change this should we want to change this
```

1    later based on our experiences.  That's in the final rulemaking.

2            A lot has changed since '98 and now.  So in the last

3    10 years asylum applications have skyrocketed.  Migration trends

4    have changed.  Back in '98 it was single Mexican adults

5    primarily.  Now there's a lot of different folks from other

6    places that are seeking asylum.  So the agency made the decision

7    based on that to switch things up, but yeah.

8            So to your original question, in 1998 they made the

9    decision further consideration would go --

10           THE COURT:  My question actually was, has either

11   agency, Department of Justice or Department of Homeland Security

12   or, I guess, its predecessor the INS, have they defined further

13   proceedings independent of referring to another statute or

14   regulation?

15           MR. REUVENI:  No, they haven't.

16           THE COURT:  This hasn't happened before where they are

17   saying, well, further proceedings are, and we're going to create

18   what they are.

19           MR. REUVENI:  Well, yes and no.  I want to be clear

20   here.

21           THE COURT:  No.  They are referred to another process,

22   1229(a), right?

23           MR. REUVENI:  Well, what they have done before is we

24   are going to put this in this bucket, 1229(a).  They're not going

25   to say, the statute here doesn't define it, we're going to put it

1    in a different bucket.  They haven't done it exactly in that way,

2    but they are implementing that language.

3            THE COURT:  I would like to see at the initial, at the

4    outset in 1998 when there is some discussion that you've

5    referenced or some administrative record about the agency's

6    interpretation of further proceedings in this context.  What was

7    said about it then?

8            MR. REUVENI:  I'm happy to get that to you after the

9    argument.

10           THE COURT:  I think there's a congressional -- I think

11   there's some legislative history on this about what congress

12   meant by that.  I think we've pulled some of that in our

13   research.  It may not exactly jibe with that.  They may have

14   intended for it to go through the 1229(a) process.

15           MR. REUVENI:  Two responses to that.  So yes, there is

16   legislative history, but legislative history is really only

17   relevant if the statute isn't clear.  Here we're talking about

18   judicial review.  You and I right now are talking about the

19   merits.

20           THE COURT:  Yeah, but it bleeds into the merits.

21           MR. REUVENI:  I don't think it does.  I know plaintiffs

22   take that position, but I don't think it does.

23           THE COURT:  Well, I'm going to decide that.

24           MR. REUVENI:  Certainly, Your Honor.  I was telling you

25   what our position is on that.  The legislative history provision

1    that you referred to does say that that individual congress

2    person believed it should go through a 240 proceeding, but if you

3    look at the statutory text, I mean, it doesn't define it.

4           THE COURT:  My problem is this, and I know where you're

5    coming from.  My problem is this.  It doesn't say, for further

6    proceedings which shall be determined by the department.  It

7    doesn't say that.  It doesn't say anything other than "further

8    proceedings."  It doesn't give -- The statute does not authorize

9    the agencies to make up what the process is.  It just says "for

10   further proceedings."  It does not give the statutory authority

11   to do that.  That's my problem with it.

12          And so back, you know, you are wondering why we're

13   talking about that in the context of a motion to transfer.  I

14   need to be convinced in order for the venue provision to apply

15   that the regulation is in fact within the scope of the statutory

16   authorization, and that's why I'm asking you these questions.

17   Okay?

18          MR. REUVENI:  Yep, I understand that, but if you were

19   to jump ahead to the end.  If you were to decide on the merits if

20   you were to keep the case, I don't think that this provision

21   authorizes what the government has done.  You're interpreting

22   Section 1225(b)(1)(B)(ii).  You are doing precisely what,

23   precisely what the statute says should be decided by a single

24   court.  That's the district court.

25          THE COURT:  We'll get to that.  We'll get to that.

1          MR. REUVENI:  I want to point out in the statute cause
2     you say -- you say this provision doesn't authorize the agency to
3     do anything.
4          THE COURT:  I'm not saying that.
5          MR. REUVENI:  Not authorizing to decide how further
6     consideration is supposed to occur.
7          THE COURT:  Well, I think it's certainly ambiguous if
8     not --
9          MR. REUVENI:  Well, that's exactly it.  It's ambiguous.
10    Also in the statute when congress wants to say you can pick one
11    and only one step provision, only one way to do a thing, it says
12    so.  And there are a couple of examples of that in 1225.
13         So for the record, 1225(a)(2) with respect to
14    stowaways, it says, anyone who is a stowaway cannot categorically
15    be put in a 1229(a) proceeding.  They can only be put in an
16    expedited removal proceeding.  They are clear on that.
17         Later in the section we are talking about now,
18    1225(b)(2), so 1225(b)(2)(B)(ii), it says, Three types of people
19    who are not entitled to a 240 proceeding, including stowaways,
20    alien crewmen, and individuals that go through expedited removal.
21         So when congress says you must do one type of procedure
22    or another type of procedure to determine -- and to be clear
23    here -- it says to determine inadmissibility.  It's not saying to
24    determine asylum in those provisions.
25         THE COURT:  Right.

1          MR. REUVENI:  It says so.  Here it didn't say so.

2     Here, if I may speak on behalf of congress in 1996, they are

3     setting up this brand new complicated, comprehensive immigration

4     reform.  Hundreds and hundreds of pages, many, many new

5     provisions and subprovisions.

6          So congress doesn't always when it sets up a new system

7     speak in specifics.  Here they left it open for the agency, the

8     INS at the time, and now DHS and the attorney general to figure

9     out, this out as they go along.  So what they have said is the

10    substantive law for asylum, that's 1150(a), which this rule

11    doesn't touch.  If you are going to change that in certain ways,

12    well, we've litigated this a lot in the last four or five years.

13    If you are going to change the timing or the standards, congress

14    hasn't told you you can do those things, although some of the

15    courts have told us.  But here --

16          THE COURT:  Okay.  Let's go there real quick because I

17    am interested in that.  What I don't see in either the briefing

18    of either party or in the IFR which, you know, we have spent some

19    time looking at, how does this, how does the Department of

20    Homeland Security intend that this process work.  Okay.

21          So an asylum officer -- well, an immigration officer

22    refers someone to an asylum officer for a credible fear

23    determination.  A positive credible fear determination is made by

24    the asylum officer.  What happens next under the new process?

25          MR. REUVENI:  Respectfully, I just want to quibble with

1    the premise a bit.  I do think the rules spell this out, and I

2    know the parties didn't really get into it, and if you want more

3    briefing on that we're happy to give it to you.

4            THE COURT:  I have other cases.  I don't only have this

5    one.

6            MR. REUVENI:  Okay, Your Honor.  If someone passes

7    credible fear, the rule sets up a structure where that person is

8    then referred to an initial, what's called an asylum -- an asylum

9    process with an asylum officer, and that's a term that's defined

10   in the statute, 1225 as well, someone who has specific types of

11   training in asylum law and refugee law.  And that person has --

12           THE COURT:  But they are not lawyers, right?

13           MR. REUVENI:  They are not lawyers.

14           THE COURT:  They don't have to be lawyers.

15           MR. REUVENI:  They don't have to be lawyers under the

16   statute; but, no, they are not lawyers.  When congress wants

17   someone to be a lawyer, they say so, so immigration judges.

18           THE COURT:  Well, congress didn't give them authority

19   to decide asylum claims.  They only gave them the authority to

20   initially decide whether or not there's a credible fear.

21           MR. REUVENI:  So we're on the merits again, but we

22   disagree with that, and we haven't filed our opposition to the

23   motion for preliminary injunction yet.  That will provide our

24   view on it.  But again, high level here.  This provision is

25   ambiguous, process-wise, whether further consideration is

1    supposed to happen.

2            Now I know plaintiffs' position is that asylum officers

3    don't have authority and that it didn't transfer when the

4    Homeland Security Act set up the new Department of Homeland

5    Security.  We disagree with that too.

6            Asylum officers have always had authority to decide

7    asylum claims.  There's no rule that says only immigration judges

8    can decide asylum claims.  We know that because there's always

9    been affirmative asylum process entirely outside the removal

10   process.

11           We also know that because congress in amending the INA

12   under the Homeland Security Act in setting up the Homeland

13   Security Act, added the Secretary of Homeland Security to all

14   these different provisions governing asylum.

15           So for example, 1158 says "as determined by the

16   Secretary of Homeland Security or the Attorney General."  Where

17   congress wants to say "only the Attorney General," and here that

18   would include immigration judges who fall under the Attorney

19   General or asylum officers fall under the Secretary, it says that

20   and it does that.

21           They went out of their way to amend it to say the

22   Secretary.  So even if that authority didn't exist in the past

23   before the INA was amended in '96, it exists now because congress

24   has gone out of its way and said the Secretary can do this too.

25           So you have a statute that says nothing other than

1    further consideration of the application.  Unlike those other

2    statutes I just was discussing with you, it doesn't say "it must

3    be this proceeding or that proceeding."  You mentioned

4    legislative history.  That's clear statutory tech in ambiguity,

5    and legislative history doesn't really come into play when you

6    don't have a provision saying, like we do here, do it this way or

7    do it that way.  Here you have one that says you decide.

8              THE COURT:  Yeah, it's real clear, right?

9              MR. REUVENI:  You figure it out.

10             THE COURT:  It's all very clear.

11             MR. REUVENI:  Well, that is the argument here if we get

12   to the merits, totally understand.  But anyway, back to your

13   question "how does this work."  Goes to an asylum officer.  They

14   take evidence, they do the things that they do similar, but not

15   identical to an affirmative asylum application, and they either

16   grant --

17             THE COURT:  Look, I'm not -- I certainly haven't formed

18   an opinion on that.  I'm simply asking questions.  Okay.  So

19   don't -- you don't have to try to convince me of that point.

20   Again, I haven't received the government's response to the

21   states' preliminary injunction, and that's certainly not

22   something we need to figure out today, but I am trying to figure

23   out what the process is, so let's go back to that.

24             The asylum officer makes a credible fear determination.

25             MR. REUVENI:  Yes.

```
1              THE COURT:  There's no -- no longer are they referred
2         to the 1229(a) process.  So what happens next?
3              MR. REUVENI:  There's a new intermediate step.  So they
4         are referred to the asylum office at USCIS.  That's a
5         subcomponent of the department, and these asylum officers then,
6         like I said, take evidence and interview the individual.  They
7         allow for an opportunity to have counsel or not should they
8         choose, but it's designed to move quickly unlike the current
9         process when it goes to a 240 proceeding, it takes years.
10             THE COURT:  So an asylum officer makes a credible fear
11        determination.  Is there another asylum officer that then
12        receives the case to make the asylum determination?
13             MR. REUVENI:  That's correct.
14             THE COURT:  A different asylum officer.
15             MR. REUVENI:  I believe so.  I believe so.
16             THE COURT:  Because I think the IFR says that the
17        credible fear determination by the first, number one, the first
18        asylum officer, that fear determination is considered to be an
19        asylum application, correct?
20             MR. REUVENI:  That's correct.  That's correct.
21             THE COURT:  So there's no longer a need to fill out any
22        additional paperwork or make any additional showing by the
23        asylee.
24             MR. REUVENI:  If I may just quibble with that for a
25        second just to be clear.  There is a need to make an affirmative
```

1    showing.  That counts as the application.  So right now under the

2    current system, they have to file an affirmative application,

3    make out their case, the credible fear determination plus

4    whatever information is put before the credible fear interviewer.

5    That counts as the application, but that doesn't bind the asylum

6    officer who reviews it next.  They can put in new evidence, and I

7    would certainly recommend that they do.  It's not etched in stone

8    to be clear.  What the first person does is not the end.

9             THE COURT:  I'm getting to that.  I'm trying to figure

10   out -- I'm trying to figure out the process because, you know,

11   you may live in this stuff, but I don't.

12            MR. REUVENI:  I wish I didn't.

13            THE COURT:  Well, you know, maybe you'll do something

14   different, but I'm learning a lot about it.  So the credible fear

15   determination is made.  That constitutes the application of

16   asylum.  So it takes out kind of this group of people that, for

17   some reason, don't end up completing their asylum application.

18   It says there's been a credible fear determination.  We're going

19   to move it to the next stage.  There's another asylum officer,

20   right?

21            MR. REUVENI:  Correct.

22            THE COURT:  Who then does what?  What additional things

23   need to be done beyond the credible fear determination to decide

24   the merits of the asylum application?

25            MR. REUVENI:  Well, what the second person does is,

1    quote, further consideration of the application for asylum.

2             THE COURT:  Does that go under 1158 then?

3             MR. REUVENI:  No, that continues under

4    1225(b)(1)(B)(ii).  Again, 1158 is substance, the substantive law

5    that is applied.  These are procedures.

6             THE COURT:  I'm asking about the substantive law now.

7    What does the asylum officer use to make the final determination

8    of asylum?

9             MR. REUVENI:  That would be 1158 because 1158 defines

10   or by reference to another statute, 1101(42) -- (a)(42), which is

11   what a refugee is, and there's about five subcategories.

12            THE COURT:  So you are saying essentially they use the

13   same standards, the same substantive law as the immigration

14   judges do now.

15            MR. REUVENI:  And as the individuals who do the initial

16   credible fear determination.  And if I can take a step to the

17   side for a minute, a credible fear screen happens quickly.  It's

18   just a screening mechanism.  It's supposed to be done very

19   quickly.

20            The statute provides that -- it doesn't speak to the

21   asylum officer, but it provides an IJ who reviews a negative

22   determination.  It's supposed to do it within 24 hours.  That

23   doesn't normally happen, but it says up to seven days.  That's a

24   very fast process.  So obviously you want to have further review

25   to screen for error, both positive and negative.

1          But the current system, an IJ does that initially.

2     This system, an asylum officer does that initially.  Takes new

3     evidence.  Questions the individual about the alleged basis for

4     refugee status, particular social group, political opinion, that

5     sort of thing.  Takes more documents, makes an assessment if the

6     person is telling the truth or not, and if they grant, that's not

7     really the end because there can be further review within the

8     agency, but in the normal course, let's just for the sake of

9     discussion say if they grant -- after the multi-week process

10    occurs, that person is granted asylum, and if they deny the

11    person can then appeal to the immigration judge or get referred

12    to the removal proceeding.

13         THE COURT:  If they grant asylum, then what further

14    review is there in the agency?  That's another question I have.

15    Is there any -- I mean, there's not adversarial process anymore.

16    So who would know to appeal?  Who would think there's a bad

17    decision?  What do you do if there's an asylum officer that

18    grants, you know, an inordinately high number of applications?

19    What recourse, you know, does, quote, unquote, the government

20    have?

21         I mean, you know, the role of the Department of

22    Homeland Security now is to act as essentially the prosecutor and

23    to try to make sure these claims are merit through the

24    adversarial process?  What appeal right does the government have?

25    I mean, there's no longer adversarial process, right?

1           MR. REUVENI:  Two responses.  First by comparison,

2      there's also now a review process from the affirmative asylum

3      application that was granted.  That doesn't exist either.  But

4      specifically to this rule, it's a little bit different.  The rule

5      in a number of places contemplates internal supervisory review,

6      and this is a brand new work in progress, obviously.  So you

7      know, as the rule states, we're going to figure things out a bit

8      as we go along.  We're going to not roll this out all at once.

9      We're going to take a few months to really just focus and try

10     this out in a more focused manner.

11          But what the rule contemplates, as I understand, is

12     that there's internal supervisory review.  The Secretary or his

13     designee actually retains the authority to review any single

14     asylum grant, and that's not just here but also in the

15     affirmative asylum context.  And so I'm not suggesting that this

16     is --

17          THE COURT:  You are saying the Secretary can then

18     delegate that down to a level where they can review the asylum

19     grants on a more -- on a quicker basis?

20          MR. REUVENI:  Yes, exactly.  I'm not suggesting that

21     the rule explicitly says, should any interested party disagree

22     with the grant of asylum, they can do X, Y, Z.  That's not in

23     there to be clear, but what's in there is the supervisory review

24     of every single asylum grant.

25          So the department does it in a number of other areas.

1    If it comes to their attention that asylum officer X is granting

2    a hundred percent and asylum officer Y, she is granting

3    20 percent, that's a problem obviously.  That doesn't really make

4    a lot of sense, and there's mechanisms in the rule to figure that

5    out.

6            And I could see a future where a policy is implemented

7    saying, well, we're going to have to do more focused review on

8    this office or this type of claim because we see what's happening

9    here.  But explicitly in the rule, no, it's not in there.  But

10   again, also, that's true about affirmative asylum grants.  That's

11   true about any immigration benefit that is granted outside the

12   removal process.  There is no adversarial process when someone

13   gets work authorization, when someone is granted parole, when

14   someone gets something like H-1B visa or a B1 tourist visa.

15   That's millions and millions of applications that don't have

16   review through the adversarial process.  So I just want to push

17   back a bit on the notion that there's something inherently

18   suspect about a rule that doesn't have the IJ immediately --

19           THE COURT:  Well, I guess one difference in this

20   example that you are citing, do you know off the top of your

21   head, you know, what percent of asylum grants are withdrawn at

22   some point?

23           MR. REUVENI:  I do not know that.

24           THE COURT:  I mean, they turn -- would you agree most

25   of them turn into green card status.  They are here most of them.

1          MR. REUVENI:  I would not agree with that.

2          THE COURT:  Oh, you are saying some are withdrawn a

3    lot.

4          MR. REUVENI:  A large majority of asylum applications

5    are denied.

6          THE COURT:  No, no, the ones that are granted, are they

7    then withdrawn later?  That's what I'm asking.

8          MR. REUVENI:  I mean, that sort of defeats the purpose

9    of asylum, Your Honor.

10         THE COURT:  So it's different than the visas you are

11   talking about for people that are here for a limited period of

12   time?

13         MR. REUVENI:  Well, it depends if it's an immigrant or

14   nonimmigrant visa.  I'm happy to get into that, but there are

15   millions of immigrant visas granted every year to family members

16   or people --

17         THE COURT:  You are saying there's not an adversarial

18   system for the grant of those.

19         MR. REUVENI:  Correct, Your Honor.  No one can go to

20   court and say I disagree with the agency's grant of this

21   decision.

22         THE COURT:  Yeah.  I'm not talking about going to

23   court.  I'm talking about --

24         MR. REUVENI:  Or even the IJ, Your Honor.

25         THE COURT:  -- the processes for deciding these

1    situations.

2          MR. REUVENI:  Right.  So even -- all those, if they are

3    granted by USCIS, and these are hundreds of thousands of

4    applications every year, many of them as you identify result in

5    ultimately a green card or work authorization and the right to

6    stay here indefinitely if you don't commit crimes or do other

7    things that would get you removed.  None of that is reviewed by

8    an immigration judge, none of it.  It's all done by USCIS through

9    so affirmative application.

10         So there's nothing unusual about that.  The suggestion

11   should it exist in the papers if there is, that this is some new

12   nefarious different scheme outside the statute is not true

13   because, again, hundreds of thousands of these things are granted

14   every year by USCIS officers.  And that's what the rule

15   contemplates within DHS.  There is supervisory review of every

16   single case, and if something irregular is occurring, that gets

17   to the supervisor's attention, and I have to believe that the

18   government does its best to fix that.  I mean, there's no

19   evidence to the contrary yet.  The rule hasn't even gone into

20   effect obviously.

21         But to bring it all back, all of that, what we're

22   talking about, Your Honor, is again how does the government

23   implement, quote, further consideration of the application?  Is

24   there going to be an adversarial process at step one or no?  Are

25   we going to go straight to an adversarial process at step one or

1    not?

2          THE COURT:  I would agree that's all further

3    consideration, but, you know, again, back to why I'm asking these

4    questions is, does the statute authorize the agencies to

5    wholesale make the further consideration process up.  That's the

6    question I have, and that refers directly to your motion that

7    we're talking about.

8          MR. REUVENI:  Your Honor, just to respond to that.  So

9    let's say you rule against us on everything, right.  Let's just

10   jump ahead to the merits here, and you say a snippet of

11   legislative history balanced against all these other things that

12   the government argues about, that's it.  That's the case cracker.

13   We're done here.  You can't do this.  It's illegal.

14         You've still interpreted what the meaning of "shall be

15   detained for further consideration" is.  You've said, the statute

16   doesn't authorize that, even though you think it was ambiguous

17   and it does.  So at the end of the day, you tell us we're wrong

18   on the merits and we have many other arguments we haven't gotten

19   into here, but I want to be clear, you are telling us what this

20   provision which appears under 1225(b)(1) means, and congress was

21   very clear on this.  It wants one court to develop expertise on

22   that.  Doesn't want inconsistent judgments.  All the usual rules

23   you have for an exclusive venue provision like in the patent

24   system and the Court of Federal Claims, many other examples.

25         We already have in the D. C. Circuit, you have four

1    precedent decisions on this, you have multiple unpublished

2    decisions, you have dozens of district court decisions, and to be

3    clear, I haven't got enough time to visit Lafayette.  I'd be very

4    happy to come back.  My flights were late yesterday.  I couldn't

5    see anything.  So we have no issue with proceeding in this court

6    versus that court.  The arguments are the arguments.  We have

7    full faith in any judge who will decide the case fairly to us,

8    but that's not the issue here.  The issue is, congress wants one

9    court to do that.  Once we accept that this --

10           THE COURT:  Aren't there similar venue provisions for

11   1229(a)?

12           MR. REUVENI:  Not like this.  1229(a), if you go

13   through a proceeding, there are venue provisions that say you

14   must go to a specific Court of Appeals.  So if your proceeding

15   arose in Texas, you're going to the Fifth Circuit.  If it arose

16   in California, you're going to the Ninth Circuit.  There are

17   other exclusive venue provisions --

18           THE COURT:  What about 1158?  Does 1158 have an

19   exclusive venue provision?

20           MR. REUVENI:  No, it does not.

21           THE COURT:  I'm curious why.  To me it doesn't make

22   much sense, given the wide latitude the department has, very wide

23   latitude to administer the asylum process, why the department

24   chose this very tenuous toehold in 1225(b) to implement this

25   regulation.  It goes way beyond that.  It's the expedited removal

1    statute.  It's not the asylum statute.

2              MR. REUVENI:  Respectfully, Your Honor, the expedited

3    removal statute does explicitly contemplate asylum applications.

4    It refers to asylum applications.

5              THE COURT:  Wouldn't you agree it contemplates how to

6    initiate asylum applications.  It does not talk at all about how

7    to determine asylum applications.  Would you agree with that?

8              MR. REUVENI:  I would agree that the statute doesn't

9    define how further consideration is supposed to occur.

10             THE COURT:  Okay.  I'm curious why these regulations

11   weren't, weren't invoked under the authority of 1229(a) or of

12   1158.

13             MR. REUVENI:  Because these proceedings don't arise

14   under 1229(a).

15             THE COURT:  Well, they could easily -- they are already

16   referred to 1229(a).

17             MR. REUVENI:  That's exactly it, Your Honor, they

18   could.  They don't have to.  They could.

19             THE COURT:  1229 could be changed to where that process

20   is -- contemplates a different process for everybody.

21             MR. REUVENI:  I think a statutory amendment to 1229

22   because there's no asylum officer involvement in 1229(a).  That's

23   an immigration judge, the statute says an immigration judge.  The

24   Attorney General --

25             THE COURT:  You are telling me that the reason that it

1   was under 1225(b) is so the department could use asylum officers

2   instead of immigration judges.

3            MR. REUVENI:  Not exactly, Your Honor.  The rule

4   explains why they are using asylum officers.  The immigration

5   courts are overwhelmed.  No one disputes that.  There's a backlog

6   of one-and-a-half million cases.

7            THE COURT:  Okay.  Good, I'm glad you brought that up.

8   Let's talk about the process again.  So we are to the asylum

9   officer granting asylum.  There could be supervisory review.

10  Probably will be, and I don't doubt that at all.  I'm sure there

11  will be.

12           For the asylum applications that are denied, which you

13  say are the vast majority of them now, and probably will be under

14  the new process, then the asylum applicants have the chance to

15  appeal that to immigration judges.

16           MR. REUVENI:  I think you got caught on the

17  nomenclature.  The asylum officer denies.  The asylum officer

18  affirmatively has to refer them to that proceeding.  So there's

19  no getting out of that proceeding.  The asylum officer initiates

20  the proceeding, so to speak, issues a notice to appear, and they

21  are put in this -- back in front of the world of the adject.

22  It's very different because this is much more streamlined.

23  That's the whole purpose --

24           THE COURT:  Yeah, that's my question.  How is it

25  streamlined if they still have to go before the immigration

1    judges for the denial of asylum.

2              MR. REUVENI:  So normal process, if you are not

3    detained under current procedures and regulations, it takes years

4    and years and years, and an individual who is in that position,

5    usually gets let out of detention, gets work authorization, and

6    those proceedings are then put on the back burner.  That's why we

7    have this problem.

8              What this does if it's denied, you have a very specific

9    amount of time.  The rule speaks of certain deadlines, 45 days,

10   100 days, 180 days.  None of those apply to people who are coming

11   into -- not coming into removal proceedings through this process.

12   So the rule is setup, should asylum be denied, or release be

13   denied at the asylum officer stage, to essentially set up a

14   rocket docket and make these cases go much faster.

15             THE COURT:  So you're saying an immigration judge has a

16   particular amount of time to decide the appeal?

17             MR. REUVENI:  Correct.

18             THE COURT:  Okay.  And during that time period, the

19   immigrant is -- they are detained?

20             MR. REUVENI:  Well, the statute, because again we're

21   talking about this very specific statute.

22             THE COURT:  Shall be detained.

23             MR. REUVENI:  They can be released on parole on a

24   case-by-case basis even under the current rule.

25             THE COURT:  Right, but normally it's a short period of

1    time, so they are probably going to be detained for that period

2    of time.

3              MR. REUVENI:  Well, that's all going to depend on, as

4    you know, there are a number of cases involving these issues

5    percolating right now.

6              THE COURT:  I'm not interested in that.  That's not

7    before us.  I'm just trying to figure out how to streamline the

8    process.

9              MR. REUVENI:  So like I said, currently many years are

10   going to pass before someone gets a final order of removal if

11   they are coming under the normal system.  Unless they are

12   criminally detained or a dangerous person, they are not going to

13   get a rocket docket decision.

14             This rule is they need to fix this admittedly glaring

15   problem.  We have, again, a backlog of hundreds of thousands of

16   cases.  These cases drag on for years.  That doesn't help

17   anybody.  It doesn't help the government, doesn't help the

18   community, and it doesn't help the individual who is or is not

19   applying for asylum and some other form of relief.

20             I mean, to jump ahead to sort of what this case is

21   ultimately about, it's surprising to me that the plaintiffs would

22   prefer a system where many millions of people will be here much

23   longer.

24             THE COURT:  And that's the understanding which we're

25   going to talk about with him in a minute.  I have a lot of

1    questions on that, but I do need -- I am trying to get, you know,

2    that IFR, you may have looked at this a lot.  We read it.  Emily

3    over here read it a bunch; but, you know, I mean, it refers to a

4    lot of different things.

5            MR. REUVENI:  It's a long rule, Your Honor.

6            THE COURT:  Yeah.

7            MR. REUVENI:  It's a long rule.  If we get to

8    housekeeping matters, I know the parties filed a notice about

9    scheduling, and that sort of thing, I can save that for the end.

10           THE COURT:  We're going to talk about that.  Assuming I

11   don't send this to Washington, D. C., or dismiss it, we'll talk

12   about that after this hearing, okay.

13           MR. REUVENI:  Just to wrap up the sort of process how

14   it works.  So the rule sets up what I think is fair to call a

15   rocket docket compared to current practices for people that, if

16   the asylum application, at step one of, quote, further

17   consideration is denied, they go to the rocket docket with an

18   immigration judge, and those cases are designed to finish in a

19   matter of months.  Firm cutoffs.  Under current system you can

20   get endless continuances to find counsel and make your case.

21   That's one of the big problems with the current system.  This

22   says, one continuance and you are done.

23           THE COURT:  So the asylum application is denied by the

24   AO.  Okay.  So there's positive fear determination, that's the

25   prerequisite.  Goes to the asylum officer who determines the

1    merits.  Asylum officer says asylum should not be granted in this

2    case.  Automatically sent to the immigration judge.  45 days you

3    said, something like that?

4              MR. REUVENI:  Well, initial cutoff, 45 days, 120 days,

5    180 days.  But the thing is supposed to be done at day 180.

6              THE COURT:  180 days final, and what happens if the

7    immigration judge agrees with the asylum officer that asylum

8    should not be granted?

9              MR. REUVENI:  They can appeal to the Board of

10   Immigration Appeals.

11             THE COURT:  And how long do they have to do that?

12             MR. REUVENI:  I don't know off the top of my head.

13             THE COURT:  They are not deported at that point either.

14             MR. REUVENI:  It's not done at that point, but under

15   the current system you can do that without any expedition of the

16   things that occur in front of the immigration judge.  And under

17   the appeal system after that, you are entitled to appeal to the

18   Court of Appeals.  That's in the statute.  There's nothing anyone

19   can do about that until congress changes its mind about that.

20             So what the agency is doing is what it actually has

21   control over.  It can move things along quicker.  It can say less

22   continuances.  It can say we're going to put a bucket of

23   individuals in front of asylum officers so that the immigration

24   judges aren't so backlogged and they can focus on other more

25   pressing matters.  Move the immigration cases along so they can

1    get more removals and more final decisions.  What the agency

2    can't do is say, oh, also, we're going to bar you from going to

3    the Board of Immigration Appeals in a normal removal proceeding

4    because that's in the statute.

5              THE COURT:  That's statutory.

6              MR. REUVENI:  Yeah.  A petition for review to the

7    relevant Court of Appeals is in the statute.  It's statutory.

8              THE COURT:  Right.

9              MR. REUVENI:  Reasonable people can disagree on whether

10   that's a wise system.  It takes a long time.  Like I said, years

11   and years in some cases, but there's nothing anyone could do

12   about it if it's statutory.  If the statute says explicitly --

13             THE COURT:  Well, congress can do something about it.

14   Congress can do something about all of this, right, but they

15   don't seem to be able to do it.

16             MR. REUVENI:  I think we can all agree on that, Your

17   Honor.

18             THE COURT:  All right.  Let me see if -- I'll let you

19   continue.  Let me just see if I have any other questions on that

20   point.  So 1158 we reviewed that.  That does seem to have some --

21   you refer to it as a substantive provision which generally it is,

22   but it does seem to have some procedural aspects to it as well,

23   doesn't it?

24             Do you have a copy of that, Emily?  Can you run and go

25   get it real quick?  Thanks.

1          MR. REUVENI:  Recalling off the top of my head, again,

2     I don't -- It seems like the merits.  I'm happy to respond.

3          THE COURT:  I found a provision in there which kind of

4     in one context gave authority for further regulation of the

5     process.

6          MR. REUVENI:  That strikes me as another example of why

7     plaintiffs merits argument doesn't really hold water.  You have

8     provision 1158.  I think I know the one you're referring to.

9          THE COURT:  That's the point here.  You have 1225(b)

10    and the government issued the regulation under that statute.

11    There's all kind of authority granted to the Attorney General and

12    the Department of Homeland Security to govern asylum.  So why

13    that statute?  That's my question, and that goes directly to the

14    motion we're talking about here today, and that's what I'm

15    confused about.

16         MR. REUVENI:  Let me give you one clear example I know

17    from the top of my head because we litigated this.

18         THE COURT:  He wants to give one clear example, but

19    he's going to speak fast on that.

20         MR. REUVENI:  Let me give you a fast example that isn't

21    clear.  Give you an example that I'm aware of because we

22    litigated this a lot during the last administration.  As a

23    provision of 1158, that allows the Attorney General to issue new

24    substantive rules governing eligibility for asylum.  I don't know

25    it off the top of my head.  It's 1158(b)(2)(C) maybe.

```
1                    THE COURT:  Yeah, let's see.  (b)(2), yeah.

2                    MR. REUVENI:  I might be making that up.

3                    THE COURT:  No, I think you are right.

4                    MR. REUVENI:  But it's the one that says, such further

5       requirements that the Attorney General may establish.

6                    THE COURT:  Yeah, okay, here it is.  You're right.  So

7       it's (d), (d)(1) Asylum procedure, 1158(d)(1).  Says "The

8       Attorney General shall establish a procedure for consideration of

9       asylum applications filed under subsection (a)" which is the --

10                   MR. REUVENI:  So let me answer that.

11                   THE COURT:  But it also refers to asylum in accordance

12      with 1225(b).

13                   MR. REUVENI:  That's not the Attorney General anymore.

14      That reference to Attorney General means the Secretary, so

15      there's this provision --

16                   THE COURT:  I know, but my point is that's in 1158.

17                   MR. REUVENI:  Right, but that's talking about

18      affirmative asylum applications.

19                   THE COURT:  Well, it's talking about both because (a)

20      also talks about 1225(b).

21                   MR. REUVENI:  Again, I think that helps us, not the

22      other way.  There are two provisions, there's 1158 and also

23      there's 1225, and what we're talking about is 1225.  What we're

24      talking about is further consideration under 1225.

25                   THE COURT:  What you have here is a statute giving
```

1    specific authorization for the then Attorney General, now the

2    Secretary of Homeland Security to, quote, establish a procedure

3    for the consideration of asylum applications, which is not in

4    1225.  That's not in there.  It just says further consideration.

5              MR. REUVENI:  I mean, true to a point, but take another

6    provision even broader than that one, 8 U.S.C. § 1103(a) and (g)

7    which say the Secretary and the Attorney General have all the

8    authority to do whatever they need to do to implement any

9    provision under this statute.  That's the authority invoked in

10   the rule.

11             Just cause the Attorney General or the Secretary is

12   invoking their general delegation of authority from congress to

13   do their jobs doesn't mean they're not implementing a specific

14   subprovision.  They are exercising broad categorical delegation

15   of authority that's found in 1103 to implement specific

16   subprovisions, and when they exercise that authority to implement

17   specific subprovisions, we wouldn't say colloquially they are

18   implementing Section 1103, and no one in this case does say that.

19   We say they are implementing specifically the provision that they

20   say they are implementing, and the authority comes from another

21   statute, the authority to do something, the delegation from

22   congress, but that's 1103.

23             So when I take your point as to 1158(d) to set up

24   further procedures, but my suggestion here is there are different

25   types of procedures.  If this rule is saying, here's what we're

1    going to do for affirmative asylum applications, or here is what

2    we're going to do for an asylum process that has nothing to do

3    with expedited removal, they would be implementing some other

4    provision in 1225(b)(1)(B)(ii), but they are very clearly here

5    focused on one thing and one thing only, individuals who have

6    gone through credible fear and are in expedited removal -- and I

7    know I'm being annoying at this point -- who are detained for

8    further consideration of the application.

9         At the end of the day, I didn't see anything in

10   plaintiffs' briefs quibbling with that.  What I do hear them

11   saying is it's an illegal implementation, but that again is

12   circular and brings us back to the whole idea that, if everything

13   is illegal, then nothing is covered by 1225(e) -- I'm sorry --

14   1252(e).

15        THE COURT:  I guess -- okay.  I think I understand your

16   position.

17        MR. REUVENI:  But there was one another provision that

18   I wanted to refer the Court to.  Sorry, I didn't mean to

19   interrupt if you had a question.

20        THE COURT:  Go ahead.

21        MR. REUVENI:  To give you an example, it would be the

22   substance versus procedure.  The provision 1158, it might be

23   (b)(2)(C), it says the Attorney General or the Secretary can set

24   up additional substantive requirements.  And so there is a good

25   example of something that has nothing to do with 1225(b)(1)

1    procedures.   That's going to be substantive law.

2            In the last administration, we had a number of rules

3    that said, to try to tighten up the requirements substantively

4    for asylum, and in case after case, I mean, I was there.   I had

5    the misfortune of signing those briefs.   So plaintiffs refer to a

6    case, for example, East Bay out of the Ninth Circuit, and that

7    case involved just such a rule.   A rule that changed, one, the

8    eligibility requirements were found, implementing 1158, and also

9    had a rule saying we are going to apply mandatory bars to asylum,

10   which is something the provision allows for, in expedited removal

11   procedures.

12           And the case in question there said, I don't think the

13   first thing is covered by this claim channeling provision because

14   it doesn't implement 1225.   It implements substantive law under

15   1158, but I do think the second thing is covered, because those

16   procedures apply explicitly only to some subprovision of

17   1225(b)(1).   And the Court said pretty clearly, I lack authority

18   to enjoin or issue any relief as to that, and I' not going to

19   touch that.

20           What I do have authority to do is enjoin something

21   implementing 1158.   We think if you are going to look at cases

22   like East Bay, our situation falls squarely within that carve-out

23   that the Court recognized as to implementation of procedures

24   implementing 1225(b)(1).   And again -- I'm sorry.   Did you have a

25   question, Your Honor?

1          THE COURT:  Oh, no.  I understand what you're saying.

2          MR. REUVENI:  I have just a practical consideration.

3          THE COURT:  Yeah, I like that.

4          MR. REUVENI:  Okay.  To be fair to plaintiffs, and this

5     is the only thing I will agree with them on in this particular

6     issue.  It is true that there is no case out there involving a

7     state party challenging something to do with expedited removal

8     that I'm aware of.

9          That's not a real argument for a pretty clear statutory

10    provision on venue, and exclusive jurisdiction doesn't apply.

11    They have their arguments.  We have ours.  They say individual.

12    We say it doesn't apply to individual, but as I said when I

13    started, if you think this does implement Section 1225(b)(1), it

14    would be pretty -- you'd be the first court, you'd be the first

15    judge to say, Well, nevertheless, it doesn't go to DC.  There's

16    no case out there.

17         What we do have is individuals and we do have

18    organizations.  A lot of cases with organizations.  Some of them

19    do in fact challenge 1225(b)(1) procedures, some of them don't.

20    And court after court has said this has to go in front of D.C.

21         THE COURT:  And those cases were probably having to do

22    with expedited removal, not creating a new asylum process under

23    1225.

24         MR. REUVENI:  Well, yes and no.  Again the East Bay

25    example doesn't.

```
1              THE COURT:  The expedited removal statute, congress
2    wanted it to be reviewed in one place because they didn't want
3    courts all over the country getting involved in the government
4    trying to expedite removal of aliens.  That's the reason it's
5    there.
6              MR. REUVENI:  That's exact, but also the rules and
7    policies that go --
8              THE COURT:  Wants to create a whole new asylum process
9    by some little phrase within a statute.
10             MR. REUVENI:  Your Honor, I think we're again
11   conflating merits and --
12             THE COURT:  No, it's not.  It's actually not.  Is this
13   IFR within the scope of 1225?  That's what I'm trying to figure
14   out.  That governs my decision on whether to transfer this.
15             MR. REUVENI:  We agree with that.  And again, you are
16   asking me a lot of questions.
17             THE COURT:  I don't agree that they say that it is.
18   What if the government -- example.  What if the government
19   decided that they would issue a regulation under, purportedly
20   under 1225(b), you know, regulating the export of crawfish from
21   Louisiana.  I'm just saying, and then would that have to be
22   brought in DC because, oh, it's under -- we're saying it's under
23   1225(b).  So you have to bring it under in D.C.  We're saying it
24   is.  We're saying it's under 1225(b).  Therefore the scope of
25   that statute has to be reviewed in one place.
```

```
1              MR. REUVENI:  We're not saying what matters is what we
2    say.  You obviously have to look behind --
3              THE COURT:  Well, I think it's clear there are other
4    statutes that are much more relevant to the asylum process than
5    1225(b), and I don't know why the regulation was issued under
6    that statute.  That's my problem.
7              MR. REUVENI:  There's no other statute that governs,
8    that the plaintiffs have identified or that we discussed today.
9              THE COURT:  I think the plaintiffs haven't identified.
10   They also say that the Texas v. Biden case governs this inquiry.
11             MR. REUVENI:  I'm happy to give you Texas --
12             THE COURT:  It's not even close, but anyway.
13             MR. REUVENI:  Okay.  So you don't want me to talk about
14   Texas?
15             THE COURT:  No, I don't.
16             MR. REUVENI:  Because I do agree with you that it's not
17   even close.  But to go back to the beginning here, I hear
18   everything you are saying.  Your Honor, there are these other
19   provisions that -- well, at least in our view, articulate
20   substantive criteria for asylum applications across the board,
21   and if --
22             THE COURT:  I mean, the phrase is "shall be detained
23   pending further consideration."
24             MR. REUVENI:  Right.
25             THE COURT:  Congress's intent in that phrase was that
```

1   they be detained pending their asylum claim adjudication, not

2   that the statute authorizes the agency to create a new asylum

3   process.  I mean, to me it's not even ambiguous.  It's not --

4   there's no -- The statute does not give the authority for the

5   agencies to make this process up.  That's my problem.  That goes

6   to the venue issue to me because I don't see that it's rationally

7   related to that statute to have a new asylum process, and I know

8   maybe the states don't argue that.

9           MR. REUVENI:  Well, your Honor, I just have to

10  respectfully --

11          THE COURT:  They filed it here and I gotta figure out

12  whether to keep it or not.

13          MR. REUVENI:  Understood.  I just have to respectfully

14  disagree, and I know I've said this a few times, so I'll just try

15  it one more time and we can just move on, and I won't take up

16  more of your time on the same point.

17          But there's no other provision, no other statute

18  anywhere in the INA.  We would have told you if there was.

19  Plaintiffs haven't identified it, which says, do something more

20  if this initial things happens, but doesn't tell you how to do

21  it.  That's exactly what the statute is.  Now, if you have

22  someone, if you put out a rule saying --

23          THE COURT:  Well, maybe the only answer is to refer it

24  to 1229(a) then.  Maybe that's the only answer because that's all

25  that congress has authorized.  There's no other further

1    consideration available.  Maybe that's it.  Maybe that's the

2    answer, but it still doesn't necessarily authorize a statute to

3    create a new asylum process that congress hasn't authorized or

4    congress doesn't say you can do, so anyway.

5         MR. REUVENI:  Again, the way you are framing it, Your

6    Honor, you are saying, well, I don't think it actually is

7    authorized, if we could jump to the end, and actually the only

8    thing they can do is 1229(a).  That's a merits conclusion.

9    That's not a jurisdiction conclusion.

10        And I know plaintiffs say, well, it sort of touches on

11   it, it's intertwined, and you and I have talked about that, but

12   there's nothing that the determination of whether this implements

13   an expedited removal procedure, nothing about that that turns on

14   whether the government is right or wrong on the merits.

15        And I think there's an instructive case on this that we

16   cite in our briefs and actually every case that arises under this

17   context has a species of this argument.  Just recently last year

18   the D. C. Circuit had a case called MMB.  Plaintiffs argued all

19   sorts of things, including due process and the First Amendment,

20   challenged a bunch of procedures implementing expedited removal,

21   and have the same argument that what they are doing is illegal.

22        So this is what I refer to as plaintiffs' circular

23   argument.  It's not actually authorized.  This is the only thing

24   that's authorized.  Then that still challenged the expedited

25   removal procedure, and the government's chosen means of

1    implementing it.

2            And I take the point that that's a case that arose by

3    choice in the D. C. Circuit, so it doesn't necessarily tell you

4    whether your case has to go to the D. C. Circuit, but if that

5    case arose anywhere else, I'd be very surprised to -- if the

6    conclusion was that case doesn't have to go to the D. C. Circuit.

7            I mean, it's the same -- it's on all fours with this

8    case but for one thing.  There's state plaintiffs here,

9    individuals there.  And one of the cases we were discussing

10   unauthorized here, other than it was organizations instead of

11   states, and there are multiple cases involving organizations that

12   arrive in the District Court for the District of Columbia, and

13   there are cases that have been transferred to the District Court

14   of the District of Columbia, and we do have --

15           Let me just retreat to the end on the assumption you

16   may not be buying anything I'm selling.  If you think any part of

17   this case is implemented by section -- does implement Section

18   1225 because there are a number -- like you said, there are a

19   number of different parts of the rule, and if you think the

20   parole thing doesn't fairly implement 1225, although we've

21   explained pretty clearly why.  We've cited cases.

22           THE COURT:  Yeah.  Then this part should be dismissed,

23   probably, right?

24           MR. REUVENI:  Yes, those parts would be dismissed.

25           THE COURT:  Yeah, I've thought about that.

1          MR. REUVENI:  We cite a case out of D.C. that did this,

2     severed and transferred and dismissed that arose in the context

3     of some family separation cases in the last administration, but

4     they were challenging other things, family separation, and they

5     were challenging expedited removal procedures.  And the Court

6     split it in two.  We think you should transfer and dismiss the

7     whole thing.  On that I want to be clear.  We're not trying to

8     avoid judicial review.

9          THE COURT:  I know.  I would have filed the same brief

10    if I was in your position.

11         MR. REUVENI:  We just want it to go to D. C. because

12    that's where -- Speaking practically.  Let's say we stay here,

13    and again, I would Love to come back in some other context, of

14    course, to see the city, but we go through all this.  We litigate

15    the case.  You decide the case one way or the other.  Somebody

16    wins, somebody looses.  Guaranteed to be an appeal.  Go up to

17    Court of Appeals.  We have this jurisdictional thing hanging over

18    us.  Maybe the Fifth Circuit disagrees, maybe the Fifth Circuit

19    agrees.  Now we have to start back at square one.  How does that

20    help anybody?

21         And if we don't stop there, then we go to the Supreme

22    Court.  We could have a situation two years from now where some

23    sword of Damocles in the jurisdictional statute is hanging over

24    the case.  Transferring it to D. C., apart from the fact that we

25    think that's the only court with jurisdiction, takes that off the

1    table, that's gone, and plaintiffs can get, and the government,

2    because we'd like clarity too, can get a decision quickly, and

3    there's no jurisdictional -- no jurisdictional morass hanging

4    over this at all.

5           And again, the statute itself, 1252, it says, move

6    fast.  It says, decide this case quickly.  It says, you must take

7    an appeal within 30 days, instead of the usual 60.  It says, the

8    Court of Appeals has to decide the appeal as quickly as possible.

9    It's all in the statute.  Congress wants this decided quickly by

10   that court.

11          We proceed here or any other of the 92 district courts

12   outside of D. C., excluding this one, none of those provisions

13   would necessarily apply.  I mean, we would argue they would, if

14   we are going to event a new extra statutory expedited removal

15   proceeding outside of D. C., the same rules should apply, and the

16   plaintiffs would disagree with that, that there's limitations on

17   injunctions, there's limitations on declaratory relief, there's

18   limitations on what can be reviewed, written versus unwritten,

19   that sort of thing, but at the end of the day, we're going to go

20   through this whole process, and years from now we may get a

21   reversal on jurisdiction.  That helps nobody, because then we're

22   back at square one and have another manufactured emergency we

23   have to deal with.

24          So even aside from the clear jurisdictional, it's a

25   good reason to transfer, just to take that off the table so the

1    government doesn't argue that or a higher court on its own says,

2    actually, I don't think anyone had jurisdiction here.

3                THE COURT:  Yeah.  A few more questions for you.

4    What's the government's projection on the impact on the number of

5    individuals receiving asylum under the new IFR once fully

6    implemented?

7                MR. REUVENI:  I don't know that off the top of my head.

8                THE COURT:  Is that in the record?  Is that in the

9    administrative record, do you think?

10               MR. REUVENI:  I don't know if that's in the IFR text

11   itself.  I'm not sure.  I can go back and check, but if anything,

12   if it's not in there, it's going to be expanded upon in an

13   administrative way.

14               THE COURT:  That would be something the government

15   would look at in issuing this probably.  They would have to.

16               MR. REUVENI:  Yeah, I think they will clearly make

17   projections on what the savings to the government are balanced

18   against the resources needed to set up this new system.  I think

19   it says 15 percent of cases that would go to the IJ, the

20   immigration courts, will potentially be taken off their docket.

21               I don't know if it specifically says they expect to

22   grant or deny a certain number.  I mean, that would be odd for

23   them to say that ahead of time without knowing what the claims

24   are.

25               THE COURT:  Right, but, you know, in any kind of, you

1    know, ask the insurance business.  In any kind of large enough

2    number, they can assume that a particular action will have an

3    impact on the number of positive asylum claims that are

4    eventually granted.

5              MR. REUVENI:  That I don't know.  I think it's

6    plaintiffs' argument.  They seem to cast aspersions on asylum

7    officers as being more inclined to grant asylum.  I don't know

8    that to be true or not.

9              THE COURT:  I don't think that's what I'm asking.

10             MR. REUVENI:  I know that the rule articulates costs

11   and benefits pretty extensively.  If you'd like us to go back and

12   give you --

13             THE COURT:  No, it's something I'm interested, but

14   that's for later.  What's the percentage of the asylum officers'

15   credible fear determinations that are ultimately granted asylum

16   under the current process, the 1229(a) process?  Do you know?

17             MR. REUVENI:  Not off the top of my head.  I do know

18   that under -- there were a number of rules that were issued

19   during the last administration.  They are also discussed in this

20   one.  Did some assessments of that, but I think it's very low,

21   low.  So most people fail the credible fear stage, and those that

22   don't, most of those people don't get asylum.

23             Ultimately at the end of the day, and I want to caveat

24   because I'm just sort of paraphrasing statistics here.

25             THE COURT:  Yeah, I'm not going to hold you.

1          MR. REUVENI:  We're not doing more than 1 out of 10, I

2    think.  I mean, I can come back and get you the number.

3          THE COURT:  All right.  Of the credible fear, there's

4    about 10 percent of people who have been determined to have a

5    credible fear, about 10 percent ultimately get asylum or

6    something like that.  All right.

7          MR. REUVENI:  And I will ensure if I learn that not to

8    be the case, I'll let the Court know.

9          THE COURT:  Thank you, appreciate it.

10         MR. REUVENI:  I can say one other thing that's not --

11   it's not in the record, but I raised this with my clients because

12   I wanted to have it ready to discuss if we are going to get to

13   scheduling and housekeeping at the hearing, and I identified it

14   in the -- our portion of the joint notice that the parties filed

15   identified it.  As I mentioned earlier, the rule does say it's

16   going to be rolled out pretty slowly and deliberately.  This

17   isn't going to drop like a hammer all at once.

18         They are going to target our focus.  We have to train

19   our asylum officers.  They have to get the resources up and

20   running.  They are going to do it in specific locations.  There's

21   a lot of things -- We have months to go before this thing is

22   rolled out full steam nationwide.

23         THE COURT:  Yeah, I understand that.  I understand

24   generally how the government works.

25         MR. REUVENI:  I want to say the departments anticipate

1    in the short term, we're talking a few hundred applications a

2    month at most.  I know that doesn't quite answer your statistical

3    question.

4            THE COURT:  What do you mean by "short term"?  What are

5    you authorized to mean by "short term"?

6            MR. REUVENI:  Beginning May 31, I mean, I can give you

7    a direct quote.  Beginning May 31st, they anticipate putting no

8    more than a few hundred people in these proceedings because

9    that's the capacity they have, that's the resources they have.

10   They don't have this up and running.

11           THE COURT:  For how long?

12           MR. REUVENI:  That I don't know.  I mean, I'm sure it

13   will increase.

14           THE COURT:  Till June 3rd they are going to do a few

15   hundred, and then starting June 3rd, it's full bore?

16           MR. REUVENI:  Look I'm not swearing this under perjury,

17   under the threat of perjury.

18           THE COURT:  We'll talk about this later, but I'm, you

19   know, I understand that we have to -- we're not -- I'm not going

20   to do anything until I'm convinced it's the right thing to do,

21   so, you know, timelines are great.  The government has its

22   prerogative.  The executive has its prerogative.  If the

23   executive branch takes an action, then it's under review, then

24   I'll decide that when I'm able to decide it, but we'll talk about

25   that later.

```
 1              MR. REUVENI:  Yeah, I was just raising that primarily

 2   for the scheduling issues since plaintiffs view there's some sort

 3   of immediate emergency.  I don't know if you have any other

 4   questions.

 5              THE COURT:  No, that's pretty much it.  I appreciate

 6   your illuminating some of these issues for me.  It certainly

 7   helps.

 8              MR. REUVENI:  I didn't ask at the outset, but with the

 9   Court's permission, I just request a brief opportunity for

10   rebuttal if anything comes up.

11              THE COURT:  You want to speak to me again, you are

12   saying?

13              MR. REUVENI:  Yes.

14              THE COURT:  All right.  You can.

15              MR. REUVENI:  After the states tell you what they have.

16              THE COURT:  We'll let Karen speak next.  How about

17   that?

18              MS. KING:  I object.

19              MR. REUVENI:  I don't think she wants to, Your Honor.

20              THE COURT:  Mr. St. John, would you like to respond?

21              MR. ST. JOHN:  I would, Your Honor.  We've been going

22   about an hour.  Would the Court indulge a five-minute comfort

23   break?

24              THE COURT:  Yes.

25              MR. ST. JOHN:  I appreciate it, Your Honor.
```

1          THE COURT:  All right.  Court will be in recess until

2     10:10.

3          THE CSO:  All rise.

4                     (Recess taken.)

5          MR. ST. JOHN:  Good morning, Your Honor.

6          THE COURT:  Are you representing all the states?

7          MR. ST. JOHN:  I am, Your Honor.

8          THE COURT:  Do you have different kind of socks on with

9     different flags?

10          MR. ST. JOHN:  Pretty much, Your Honor.

11          THE COURT:  Okay.

12          MR. ST. JOHN:  I think we're generally centered in the

13     SEC, so.

14          THE COURT:  All right.  Your SEC socks on.

15          MR. ST. JOHN:  Yes, Your Honor.  Having listened to

16     Your Honor's questions, I'm not going to belabor the Texas v.

17     Biden point.

18          THE COURT:  It wasn't interpreting 1225(b).  In the

19     implementation, it didn't say the implementation of 1225(b), we

20     have explicit words saying that there's a venue provision dealing

21     with 1225(b) and its implementation, and Texas v. Biden does not

22     address that.

23          MR. ST. JOHN:  It does do one important thing, Your

24     Honor.  My colleague from the federal government made an

25     important concession, quote, you obviously have to look behind

1    the screen, end quote, and that was the point, I think, Your

2    Honor made with the, you know, what if it were a regulation

3    nominally tied to the immigration code.

4            THE COURT:  Yes, I was just actually talking with my

5    law clerks about this.  You know, 1225 is the expedited removal

6    statute, and the venue provision mandates determinations, which

7    if you look at the statutory text, it's the determinations by the

8    immigration official and the asylum officer.  The challenges to

9    that can be brought at D. C. in the implementation of the

10   statute.

11           But again, it's the implementation of the expedited

12   removal statute.  It's how the executive branch is removing

13   people from the country.  That's what congress meant by including

14   that provision in there.  And it may apply broader than that

15   which is why we're talking about it, but the question is, does it

16   reach to a new asylum process that is -- has a little toehold in

17   this further consideration language.

18           MR. ST. JOHN:  Your Honor, I think there are a couple

19   ways to look at it.  One I think Your Honor has kind of previewed

20   the elephants and mouseholes canon given the coverage of powers

21   throughout the immigration statute, this is fitting, not one

22   elephant but a whole heard of elephants in a very tiny little

23   mousehole that seems a very odd place for that herd of elephants.

24           There's got to be a, a look, at least a superficial

25   look at whether the claim, the government's claim is colorable,

1    and this is not unique.  Kind of a peek at the merits, and even

2    in an immigration context, the Supreme Court in a case called

3    Kucana, 558 U.S. 233, rejected the idea that the executive gets a

4    free hand to determine the Court's power by just declaring.  And

5    that was the point I was trying to make about Texas v. Biden.  It

6    did the same thing.  It's a peek behind the curtain.  It's bound

7    up in the merits.

8             East Bay, that is a little more squarely on point.

9    Same thing, a peek behind the curtain.  The government obviously

10   claimed the statute applied, and the Ninth Circuit took a look at

11   that, squinted and said, no.

12            THE COURT:  That's that Northern District of California

13   case?

14            MR. ST. JOHN:  I believe it came out of the Southern

15   District.

16            THE COURT:  Yeah, there's a Northern District and a

17   Southern District one, I think.

18            MR. ST. JOHN:  Right, and the Ninth Circuit was

19   993 F.3d 640.  Just like the Fifth Circuit, the Ninth Circuit

20   emphasized that the purpose in the claim channeling looked at the

21   overall picture of the statute, and you look -- you then apply

22   the elephants and mouseholes canon, and it's just not a colorful

23   claim what the federal government is trying to do here.

24            THE COURT:  And you're relying on venue -- you're

25   relying on the APA's venue provisions, correct?

1           MR. ST. JOHN:  APA and I believe it would also be just

2    the general, the general venue provision.  There is a take

3    care --

4           THE COURT:  Suits against the United States, correct?

5    Suits against the United States, federal question and the APA.

6           MR. ST. JOHN:  Yes, Your Honor.

7           THE COURT:  And suits against government officials,

8    correct?

9           MR. ST. JOHN:  Yes, Your Honor.  A federal court has

10   jurisdiction.

11          THE COURT:  All right.  Do you want to add anything

12   else to that?

13          MR. ST. JOHN:  What I was getting at with the taking a

14   peek, there's a lot of support for that in a lot of areas of the

15   law.  You see it in the transfer, right, and the futility

16   provision of transfer.

17          THE COURT:  Get to the substance of what is really

18   going on in the case, what the operative facts involved are, and

19   then make the venue, and then make the jurisdictional

20   determination?

21          MR. ST. JOHN:  Yes, Your Honor.

22          THE COURT:  Is that what you mean by "take a peek"?

23          MR. ST. JOHN:  Yeah, you have to take a peek.  The

24   Court has to take a peek at the merits to make sure that the

25   claim is colorable.  Otherwise you are giving the executive

1    unlimited discretion just to say, oh, it's --

2                    THE COURT:  Set-aside.

3                    MR. ST. JOHN:  Provide a fig leaf cover.  That's what

4    they seem to be doing in East Bay.  You take a look at the

5    regulation that was at issue there.  It's got all kinds of

6    citations to 1225(b), and the Ninth Circuit said, no, nice

7    squint, but that's not within the scope of 1252(e)(3).  I think

8    the states' position is pretty straightforward.  This just isn't

9    covered.  It's -- the Court has to take -- we think, you know,

10   I've got to say for the record --

11                   THE COURT:  You agree that the statute says the

12   implementation of 1225(b), claims, you know, involving the

13   implementation of 1225(b) can be brought in the District of

14   Columbia, but your contention is it's not properly brought under

15   1225(b).  The regulation is not properly issued under 1225(b).

16                   MR. ST. JOHN:  Correct, Your Honor.  The standard that

17   you see in the, kind of the take a squint -- or take-a-peek

18   cases, there's an older Fifth Circuit case, just as an example,

19   United States v. Feaster, 410 F.2d 1354, where the error on the

20   merits is obvious on the face of the papers.  That's a violation

21   of specific statutory language, or the government's action is

22   plainly beyond the bounds of the statute or clearly in defiance

23   of it, and that's Count 1 and Count 2 of our complaint.  There is

24   on point statutory language that is controlling and this elephant

25   is contrary, plainly contrary to that statutory language.  So

1    apply the "take a peek."

2          THE COURT:  Okay.  Couple of questions for you.  And

3    we'll talk about this more later, but how does the state contend

4    that this change -- You heard government counsel talk about, you

5    know, the reasons for the change in the asylum process and, you

6    know, moving it to the Department of Homeland Security to promote

7    efficiency and to promote a faster resolution for denied, for

8    both granted and denied asylum claims.  How does this change the

9    illegal immigration picture?

10         MR. ST. JOHN:  Let's look through the efficiency

11   argument, Your Honor.  This is an administration applying its

12   policy.  There's been a change in administration.  That's fine.

13   This administration is politically disposed to high levels of

14   immigration.  Expediting the asylum process is going to increase

15   levels of immigration, and not only is it going to increase the

16   number of asylees, it's going to act as a magnet to pull in more.

17         THE COURT:  It looks like -- and I haven't spent enough

18   time with it to get a full grasp of the picture, but I did look

19   at the standing portion of the preliminary injunction motion you

20   filed, and seems like the states are basing their standing on an

21   expected increase in illegal immigration.  I'll tell you it's not

22   at all clear how that happens under this regulation to me.

23         You know, start out saying it may result in a higher

24   number of asylees, which the government may have information.

25   You're going to have a chance to look at that, but then it leaps

1   real quick to illegal immigration, which to me is a non sequitur

2   and not at all sufficient to establish standing to bring this.

3         That's a gateway matter for me, that there has to be a

4   plausible likelihood of establishing standard to proceed with the

5   preliminary injunction, and we'll talk about that in a minute,

6   but I guess I just want to ask you, how does that supposedly

7   work?  I mean, there's more people pushed into the asylum claim.

8   Wouldn't that make more people likely to want to encounter an

9   agent if they thought the process would move quicker?  Wouldn't

10  that push people away from illegal immigration to actually try to

11  go through the defense of the asylum process.

12        MR. ST. JOHN:  The issue is there are a very large

13  number of claims of asylum that are nonmeritorious, and Your

14  Honor hit on it asking about the statistics.  And my recollection

15  is similar.  I don't have it in front of me, but the asylum

16  officers have a very high error rate, we'll put it like that.

17        THE COURT:  You're talking about the error rate being

18  between the credible fear determination and the ultimate

19  disposition by the immigration judge, it's a low percentage

20  you're saying.

21        MR. ST. JOHN:  Yes.  There's a very -- there are a very

22  high number of credible fear determinations and a very low number

23  or small percentage that are --

24        THE COURT:  Your assumption is that these credible fear

25  determinations would go on to be a grant of asylum, and that's

1    what I was asking about the process.  I don't know the answer to

2    that.  Government's counsel seems to think there's yet another

3    asylum officer that's going to review that, under the same

4    standards the immigration judges are now, and it's not going to

5    be same thing as credible fear determination.

6             MR. ST. JOHN:  That's not how we read the rule.  The

7    rule seems to indicate there will be some determinations that are

8    binding or preclusive subsequently as a review.  There's also an

9    issue with the nominal review being provided under the new rule,

10   being by, we'll say, more politically accountable officials, or

11   to put it more directly, they are much more easily swayed by an

12   administration versus the immigration judges that have at least

13   some measure of independence.

14            THE COURT:  What are the terms for immigration judges?

15   They have a 7- or 8-year term or something like that?

16            MR. ST. JOHN:  Your Honor, I don't know off the top of

17   my head.  There's a measure of insulation.  It's not Article III,

18   but it's there.

19            THE COURT:  Do you think it might be like a small town

20   police officer that's encouraged to increase his quota of traffic

21   tickets or something like that?

22            MR. ST. JOHN:  Right, they may or may not be able to

23   issue a written order saying "I want more traffic tickets."

24   Sure, there are those.

25            THE COURT:  There's more opportunity for influence that

1    may change from administration to administration you're saying.

2         MR. ST. JOHN:  Absolutely, Your Honor.  Setting aside

3    that, any increase in immigration is necessarily going to impact

4    the plaintiff states.  Well, you've got Plyler v. Doe.  We have

5    to educate the kids.

6         THE COURT:  Yeah.  And I think the states may be able

7    to prove that, but I mean, I haven't seen it.  All that's been

8    talked about in the affidavit, looks like it may have been from a

9    different case, but it talks about increase in illegal

10   immigration.  Here we're talking about a possible, although not

11   certain, a possible effect on the number of asylum, granted

12   asylum applications.  That's what we're talking about.

13        MR. ST. JOHN:  Well --

14        THE COURT:  And there may be, you know, there may be

15   some link to illegal immigration, but I think that's pretty

16   farfetched, and I guess I'm the one that decides standing, so.

17        MR. ST. JOHN:  That's fair, Your Honor.  I would say

18   that that is not the issue that's before the Court today, and I

19   will confess I was not fully prepared to discuss standing.

20        THE COURT:  No, we'll talk about that in a minute.

21   We're going to have some more on that, but I just have some

22   questions I wanted to ask.  Let's see.  All right.  What else do

23   you want to say to respond to the government's argument and the

24   motion to transfer?

25        MR. ST. JOHN:  Your Honor, I agree with my colleague,

1    it's briefed, it's well briefed.  If Your Honor has questions,

2    I'm happy to answer them to the best of my ability.  The

3    plaintiff states see Texas v. Biden as controlling.  I understand

4    Your Honor disagrees.  Difference of opinion.  You are in the

5    chair, Your Honor.  That's your decision, but even beneath that,

6    you've got to kind of "take a peek" which is what Texas v. Biden

7    and East Bay did.  My colleague disagrees that you can take a

8    peek.  I think you have to.  Otherwise you run into the problem

9    with the Supreme Court who condemned in Kucana of the executive

10   having free hand to decide whether or not something would be --

11          THE COURT:  Well, it's not just having to do with the

12   court.  It's really having to do with congress.  I mean,

13   congress, it's kind of, just kind of ipse dixit.  They say a

14   regulation is issued under a particular statute, and it kind of

15   overrides congress and the judiciary by doing that if it's not in

16   fact related by the statute.  That's my concern.  I think I made

17   that clear to everybody.

18          Would the government like to respond?

19          Is that all you've got, Mr. St. John?

20          MR. ST. JOHN:  I believe so, Your Honor.  I think there

21   are some extraneous factors that the Court should consider.  We

22   are not normal plaintiffs, the states are not normal plaintiffs.

23   A large number of states in the union came to this Court and

24   waived their sovereign immunity to come in front of Your Honor.

25   That's a big deal, and the choice of venue I don't think should

1    be disregarded lightly.  Certainly not unless the statute

2    unquestionably commands it, that a subsequent reviewing court may

3    ultimately disagree on the jurisdiction.  That is not the ground

4    to be considered in the Court's transfer decision, Your Honor.

5    That's a decision for Your Honor to make without

6    considering what --

7              THE COURT:  You're saying the other factors, judicial

8    efficiency, those are not proper considerations you're saying?

9              MR. ST. JOHN:  Correct, this isn't a typical transfer

10   motion where it's transfer for the convenience or something like

11   that.  This is a -- The transfer motion was brought under a

12   specific statutory provision.  If the statutory provision is met,

13   okay, transfer.  If it's not met, then you've got a pile of

14   sovereign states that came to this Court, and that decision

15   should be respected.

16             On the Transfer versus dismissal, if the Court were

17   inclined to transfer, we would ask that only the claims that the

18   Court concludes have to be transferred be transferred.  Again, a

19   large number of sovereign states have come to this Court, and

20   that decision should be respected.

21             So if on a count-by-count basis, counts don't need to

22   be transferred or fall outside of the statute, and certainly I

23   would think Count 1, County 2, and Count 8 fall outside of the

24   statute, then those counts should stay here.  I would ask the

25   Court not to dismiss.  There is a clock on the ability.

1          THE COURT:  So the states would prefer a transfer to

2    dismissal?

3          MR. ST. JOHN:  Yes, Your Honor.  I do want to hit on

4    the stakes.  This goes to the calendaring.  The states' theory is

5    essentially that asylum decisions are being placed in the hands

6    of officers who have no authority, and they would be void

7    ab initio.  So you can say it's a few hundred a month, escalating

8    to thousands a month.  You talk about a efficiency disaster

9    problem for the Courts and for the asylum system if six months

10   from now a court agrees that, hey, these are void.

11         So you've got hundreds or thousands of asylees that are

12   in limbo and are now to be reprocessed.  So I would ask the Court

13   to consider that, as we shift to calendaring and discuss

14   calendaring.

15         THE COURT:  Knowing that there's judicial review of

16   this provision, I think there's another court that has a similar

17   case.  Isn't that the executive's problem if they choose to go

18   forward with it, knowing it's under judicial review?  I mean,

19   it's their problem if they tell some of these individuals they

20   have asylum and then later have to tell them that they didn't

21   have authority to do that.

22         MR. ST. JOHN:  Absolutely, Your Honor.

23         THE COURT:  So I don't know how that's states' problem

24   or the Court's problem.  It's the executive's problem.

25         MR. ST. JOHN:  It is the executive's problem, I think.

1    There is a rule that has been in place for a couple decades now
2    very successfully.  We've asked the plaintiffs -- or we've asked
3    the defendants to delay to permit orderly resolution.  They've
4    declined.
5            So, yes.  I mean, there is a -- I just wanted to alert
6    the Court to the possibility of what are the downstream
7    consequences if the rule, the I bar goes into effect, and there
8    isn't judicial guidance on.
9            Does Your Honor have any other questions?
10           THE COURT:  No, I think that's all I had.  Anything you
11   think we need to beat the horse more on?
12           MR. REUVENI:  I don't want to beat the horse, Your
13   Honor, but I do have one or two things, and I did promise to give
14   you something before.  I just want to update you on that.
15           THE COURT:  Okay, yeah, great.
16           MR. ST. JOHN:  Your Honor, one housekeeping matter,
17   just to alert, another thing to alert the Court.  There's an
18   identical motion pending before Judge Kacsmaryk in the Southern
19   District of Texas, in Texas with Myorkas, that's 2:22-cv-94.
20   Texas brought it's own independent case.
21           THE COURT:  Yeah, that's the one I was referring to.
22   I'm aware of that somewhat, although I don't know anything about
23   what stage they are at.
24           Yeah, looks like 12.6 percent of credible fear
25   determinations were ultimately granted asylum.  You're right,

1    you're about right, 12.6 percent.  You said 10 percent.

2              MR. REUVENI:  Lucky guess.  That sounds about right.  I

3    remember saying it.  Thank you, Your Honor.  Just before anything

4    else, if the Court is going to go take up the rest of the

5    morning, I just ask that you give me an opportunity to change my

6    flight.

7              THE COURT:  What time is your flight?

8              MR. REUVENI:  12:21, so that may have been a bit

9    ambitious on my part.

10             THE COURT:  No, no, we're going to be done in an hour.

11             MR. REUVENI:  Okay.  I mean, I can change it then if I

12   need to.  If we go until 12, I lose the opportunity.

13             THE COURT:  Do you check luggage?

14             MR. REUVENI:  No, I don't need to check luggage.

15             THE COURT:  Then you'll be fine.  You'll be able to

16   make your flight.

17             MR. REUVENI:  Can I tell them the Court promised me

18   that?

19             THE COURT:  Yeah.

20             MR. REUVENI:  I wanted to make just two or three quick

21   points in response, and then I think the plaintiff is right, we

22   should talk scheduling.

23             So a lot on this East Bay case.  Again, just the

24   general distinction, and that case does it too, and I know what

25   the government argued there because I signed that brief.  That

1    was me.  So I'm not saying I'm the authority on what East Bay

2    decided as a court, but I know what the government argued, and

3    it's not what the Court of Appeals decided.  Those are two

4    different things, but in the district court where the argument

5    actually came up, the government argued that there's two

6    provisions, one that implements 8 U.S.C. § 1158 and one that then

7    implements something specific to 1225.  The first is not subject

8    to this claim channeling provision.  The second is, and the Court

9    agreed.  So that issue wasn't up on appeal.  That wasn't an

10   argument the court made on appeal.

11          The Ninth Circuit, I'm not really sure what they did,

12   but they rewrote the statute to say, the Court has jurisdiction.

13   The government didn't argue the Court of Appeals didn't have

14   jurisdiction.  That wasn't an argument we made.  We argued that

15   an organization is not within the zone of interest of the INA,

16   and so doesn't have cause of action.

17          THE COURT:  So standing argument.

18          MR. REUVENI:  Yeah, on threshold, just disability

19   argument.  My friend on the other side here made a point just now

20   that the asylum standard sort of all gelled together, and you

21   need to look behind the screen, look behind the Wizard of Oz, if

22   you will.  I want to be clear, 1225(b)(1) has a standard,

23   significant possibility, and then the merits determination is

24   something entirely higher, it's a much higher threshold.  So

25   significant possibility is, one court said that's like a

1    10 percent chance of passing your asylum case which actually

2    matches up with the numbers pretty closely, so.

3              THE COURT:  Say that again.

4              MR. REUVENI:  So significant possibility that they will

5    be granted asylum.

6              THE COURT:  Where does that language come from?

7              MR. REUVENI:  1225(b)(1)(B)(v).  So that's the standard

8    that is being applied in credible fear.

9              THE COURT:  Okay.

10             MR. REUVENI:  And so plaintiffs' counsel said, well,

11   then, they go to the asylum officer and it's basically

12   preordained, but that's wrong.

13             THE COURT:  That's a different standard.

14             MR. REUVENI:  Well, it's a much higher standard.

15             THE COURT:  What's that standard?

16             MR. REUVENI:  Show by a preponderance of the evidence

17   that they are eligible, that they are in fact a refugee.  But so

18   this, the Court has said 10 percent of that.  So you're going to

19   get a lot more of these claims going through.

20             THE COURT:  IFR changes that too.  It goes back, I

21   think, to a prior iteration of what a refugee is.  It defines it

22   according to some international organization standard, correct?

23             MR. REUVENI:  Actually, no, not an international

24   organization standard.  I'm glad you brought that up, Your Honor.

25             THE COURT:  Treaty.

1          MR. REUVENI:  The significant possibility has been the
2    same thing until 2019, and then -- actually until 2020.  A rule
3    called the Global Asylum Rule changed it.  It wasn't joined
4    immediately on some ground or other, and that never went into
5    effect.  But until 2020 significant possibility meant one thing
6    and then the new rule tried to ratchet that up a bit.
7          THE COURT:  Practice nothing.
8          MR. REUVENI:  Nothing changes and sends it back to
9    that.  But the point really --
10          THE COURT:  That's not going to affect asylum numbers
11    because it hasn't ever changed.
12          MR. REUVENI:  Right.  And I do want to just defend my
13    client a little bit.  I want to quibble with the suggestion that
14    asylum officers are suspect and are somehow not doing their job
15    in carefully assessing whether someone is eligible for asylum.
16          I mean, that's plaintiffs' position.  That's not in the
17    record at this point at all.  There's no evidence to that effect.
18    Really they were only just opening the floodgates, so to speak.
19    Just to bring it back to the jurisdictional point, at the end of
20    the day, I mean, I agree, I think we all agree on this.  Don't
21    just take the government's word for it.
22          Like if I say that you're crawfish law is implementing
23    expedited removal, you'd obviously look at me suspiciously
24    because that's crazy.  But we're so far removed from that.  We
25    have a provision that says, if you pass credible fear, do these

1    other things.  We have no statute or regulation that articulates

2    what those other things are other than by reference to 240

3    proceedings.  And so I asked a colleague of mine to send me that

4    document, by the way.  I have not yet received it.

5           THE COURT:  That's the 1998 document?

6           MR. REUVENI:  Yeah.  If the Court thinks it's relevant,

7    if you really haven't made up your mind, I can get that to you

8    today.

9           THE COURT:  I would like it, but you don't have to send

10   it to me today, just whenever you get a chance.

11          MR. REUVENI:  Well, I'd like to get it to you quickly

12   cause we do want these issues decided quickly.  So I will commit

13   to getting it to you as quickly as I can, and I will identify the

14   specific language for you.  If you want me to file it that in the

15   docket or send it to chambers.

16          THE COURT:  Just send it to chambers if you have the

17   email.

18          MR. REUVENI:  I'll do that and then I'll cc plaintiff.

19   That's all I really have on those issues, Your Honor.  I think if

20   Your Honor wants to talk housekeeping.

21          THE COURT:  Okay.  All right.  Thank you, sir.  I

22   appreciate it.

23          So I don't have any other questions for either side.

24          Okay.  I'm going to rule on the motion right now, but

25   that doesn't mean the issue -- this does not mean the issue goes

1   away.  Okay.  It means that I'm not going to stay or transfer the

2   case right now.

3          The Court finds the defendants' motion to transfer for

4   lack of subject matter jurisdiction and motion to stay, Doc. 5,

5   stem from and are contingent upon the same operative facts and

6   issues of law that governs the Court's resolution of the merits

7   of this case, namely, whether the Executive Branch properly and

8   in accordance with its statutory authority issued the subject

9   interim final rule which among other things purports to create an

10  entirely new process for adjudicating asylum claims by, one,

11  dispensing with the adversarial process and adjudicating asylum

12  claims, and two, vesting authority to adjudicate asylum claims in

13  asylum officers rather than immigration judges for those asylum

14  applications initiated under the Expedited Removal Statute which

15  is 8 U.S.C. 1225.

16          Specifically, the Court must decide in its merits

17  ruling, number one, whether the Executive Branch properly issued

18  the IFR under that statute, the Expedited Removal Statute 1225,

19  and two, whether the IFR was issued in contravention of other

20  statutes governing the asylum process, including any bearing upon

21  the federal agency process and/or personnel authorized to

22  adjudicate asylum applications.

23          The defendants' contend that the IFR issues are under

24  the authority -- the IFR issued under the authority of 825 --

25  8 U.S.C. § 1225 without reference to any other statute.  However,

1   the link between the challenged portions of the IFR and 8 U.S.C.

2   1225 are tangential at best.  Congress did not clearly intend

3   8 U.S.C. § 1225 to govern how asylum applications should be

4   adjudicated, nor is it evidence that the statutory provision in

5   1225(b)(1)(B)(ii) mandating the aliens determined to have a

6   credible fear of persecution shall be, quote, detained for

7   further consideration of the application for asylum; that this

8   phrase authorizes the Executive Branch to create a system for

9   adjudicating asylum applications apart from the frameworks

10  Congress set forth in 8 U.S.C. § 1158 and 1129(a).

11          Because this Court has not yet been called upon to

12  decide whether the IFR was issued in excess of its statutory

13  authority granted by 8 U.S.C. § 1225 and, in fact, the disputed

14  portions of it clearly bear more directly upon other statutes

15  neither of which -- well, particularly 1158 and 1229(a), neither

16  of which have analogous venue provisions mandating judicial

17  review in a specific forum, the Court denies the defendants'

18  motion at this time.

19          This notwithstanding, the Court shall remain cognizant

20  of the jurisdictional limit set forth in 1252 and will dismiss or

21  transfer this matter should the Court's legal and factual

22  findings warrant.  Okay.

23          Now I'm going to follow up on the motion I received

24  yesterday which is -- well, it's the parties joint submission

25  regarding the briefing schedule.  Okay.  Do you have that

1    Document 23?  I've reviewed that, and this matter is not close to

2    being in a posture where we can have a preliminary injunction

3    hearing from my perspective.  Okay?  I'm concerned about the

4    states' standing to bring this suit.

5              As I mentioned to states counsel, they have asserted

6    their standing is based essentially on the likelihood that this

7    change in the process of adjudicating asylum claims will lead to

8    an increase in illegal immigration.  The Court needs more before

9    it proceeds with a preliminary injunction.

10             Given that the states contend, number one, that the

11   challenges to the asylum process will lead to more immigrants

12   being granted asylum, and two, that these changes are contrary to

13   law, the Court orders the parties to engage in a 30-day period of

14   limited discovery as to the likely effect this change will have

15   on the number of immigrants granted asylum, residing in the

16   plaintiff states, and two, the costs or other measurable effect

17   these additional persons, which again the states contend have

18   been illegally granted asylum, will have on the plaintiff states.

19             At the end of this period, the states must clearly show

20   that they are -- and the standard at the PI stage is likely to

21   obtain each element of standing for the Court to proceed with a

22   preliminary injunction hearing.  Okay?

23             So while this is ongoing, concurrently with this, and

24   no later than June 3rd, the government will produce to plaintiffs

25   the administrative record in this case, and I'll put this in

1    minutes.  Okay.  So you may not be able to write as fast as I'm

2    speaking.

3              The government will produce to plaintiffs -- and I

4    think that's under way, correct?

5              MR. REUVENI:  (Nodding head.)

6              THE COURT:  Okay.  The government will produce to the

7    plaintiffs the administrative record no later than June 3rd.  The

8    parties will brief whether 8 U.S.C. § 1252(f)(1) imposes any

9    jurisdiction -- jurisdictional or remedial limitations on the

10   entry of injunctive relief, declaratory relief, or relief under

11   5 U.S.C. 706 which the Supreme Court wanted to know about in that

12   Texas v. Biden case we talked about, and whether these

13   limitations are subject to forfeiture.

14             Three, the applicability, if any, of the ultra vires

15   doctrine set forth in Leedom versus Kyne and Kirby versus Pená

16   which is a Fifth Circuit case, to the defendants' issuance of the

17   IFR under 8 U.S.C. 1225, including whether this doctrine has been

18   properly pleaded by the plaintiffs.

19             The legislative history of 8 U.S.C. 1225(b)(1), and we

20   talked about this some, and you're going to email me that

21   document, but the legislative history and other relevant history

22   of 1225(b)(1)(B)(ii), particularly, the legislative intent behind

23   the phrase "shall be detained for further consideration of the

24   application for asylum," and prior interpretations and

25   applications of this phrase in other regulations since the

1    statute's enactment.

2            Okay.  So I want that briefing by June 3rd, and the

3    discovery period should be over by then as well.  I'm sorry, the

4    discovery period won't be over by then.

5            And the Court will hold a status conference on

6    June 27th at 2:00 p.m., and we can do that on the telephone or

7    Zoom.  We'll figure that out.  I'm not going to have you come

8    back down here until we have the PI hearing if, in fact, we do

9    have one.  Okay?

10           MR. REUVENI:  Thank you, Your Honor.

11           THE COURT:  Plaintiffs will file briefing and evidence

12   on or before June 15, 2022, regarding the states' standing to

13   bring this action.  This will be after the 30-day period -- hmmm,

14   June 15th.  It should say June 20th, I think, June 20th.  That

15   would be a week before the status conference.

16           What date is that, Emily, June 20th?

17               (Conferring with law clerk.)

18           THE COURT:  And the 27th is the following Monday, I

19   guess.  Okay.  Let's give the states more time than that because

20   the discovery period will have just completed on that.  The 24th

21   is a Friday before the status conference.  June 24th states will

22   be required to file briefing on or before June 24th regarding

23   their standing to bring this action.

24           We'll discuss at the status conference whether

25   defendants want to respond to that or not.  They probably will,

```
1    in which case I'll provide a time period at the status conference
2    for that response.  Okay?
3            At the June 27th status conference, the parties will be
4    prepared to discuss the need for discovery, if any, beyond the
5    administrative record, and again, there has to be a strong
6    showing for need of that.
7            And also, if the Court -- I anticipate being able to
8    set at that time a hearing date for the preliminary injunction at
9    our June 27th status conference.  Any questions?
10           MR. REUVENI:  I just have two, Your Honor.  Should I
11   approach or stay?
12           THE COURT:  Oh, yeah, that's fine where you are.
13           MR. REUVENI:  That all sounds good to us.  Just one
14   clarification and then one request.  So since all this other
15   stuff is going to be occurring in the short term, are we
16   responding -- is the government expected to respond to the motion
17   for preliminary injunction or is that tolled for now until we get
18   all this --
19           THE COURT:  Yeah, good question.  I don't -- we don't
20   need that right now.
21           MR. REUVENI:  Okay.  So I guess I just request --
22           THE COURT:  I think it's likely after they engage in
23   the standing steps that I've outlined, that their PI motion will
24   be amended.  So don't respond to it until after the 27th status
25   conference at which time I'll provide a briefing schedule.
```

1          MR. REUVENI:  That makes sense.  If you could just

2    include a note on that in the order, that the government is

3    relieved of its obligation to respond to the PI pending --

4          THE COURT:  Yeah.

5          MR. REUVENI:  -- all these other things.

6          THE COURT:  Yeah.

7          MR. REUVENI:  And then the second thing related to

8    that, Your Honor, since that's going to take us pretty close up

9    to the answer deadline in this case, which I'm not sure what it

10   is, but it's a little bit after June 27th, I think.  It might be

11   July 5th, based on when we were served, and that's true both in

12   this case and the case in Texas.  Should we -- we'd request that

13   you sort of either stay or extend the answer deadline so that

14   we're not also simultaneously moving to dismiss or dealing with

15   any of that, and we're just focused on the preliminary

16   injunction.  If you'd like us to file a motion to dismiss, it's

17   going to be fairly repetitive of the preliminary injunction.

18         THE COURT:  No, I know.  I will say that the

19   government -- the defendants' deadline to respond to the

20   preliminary injunction and to file an answer or motion under Rule

21   12 is stayed pending the June 27th status conference.  It will be

22   reestablished at the June 27th status conference.

23         MR. REUVENI:  Thank you, Your Honor.

24         THE COURT:  And Mr. St. John?

25         MR. ST. JOHN:  Your Honor, you indicated this would be

1    a period of limited discovery.  I assume you are referring to

2    jurisdictional discovery.

3            THE COURT:  Yes.

4            MR. ST. JOHN:  That would be outside of the AR.  I

5    assume that the government, or I would hope that the government

6    would have projections and whatnot, whether or not they are in

7    the AR about the impact of the regulation.  Given the 30-day

8    clock on normal discovery tolls, can the Court order like a

9    14-day clock for discovery responses?

10           THE COURT:  Yeah.  I think you'll find the defendants

11   will work with you on that, if you can come up with something.

12   If there's a dispute let me know, and I'll try to work it out.

13           MR. REUVENI:  That raises one further point for me that

14   I should just be clear on.  I understood the Court's order to

15   allow for reciprocal discovery, not just plaintiffs asking us

16   questions, but we can ask them questions too.

17           THE COURT:  Yeah.

18           MR. REUVENI:  All plaintiffs' dates about their

19   injuries and so on?

20           THE COURT:  Yeah.

21           MR. REUVENI:  Okay.

22           THE COURT:  This has to do with the impact of -- well,

23   number one, what if any change there will be to the number of

24   asylum -- asylees in the plaintiff states, and number two, what

25   the impact of those might be.  And again, we're looking -- the

1    standard is whether the states are like -- have shown that they

2    are likely to be able to establish standing as to each of the

3    elements of standing here with regard, you know, here with the

4    special solicitude type standing inquiry that Texas v Biden kind

5    of laid out.

6         MR. REUVENI:  Thank you, Your Honor.  That raises one

7    additional point, and I say this out of an abundance of caution,

8    just knowing what I would do if I heard this later in the case if

9    I was on the other side.  I am aware of draft guidance documents

10   that will be made public that articulate -- not yet, so it's in

11   deliberative stage, but I want to flag this now so it doesn't

12   sound like the government has done this to move the goalpost

13   later.

14        But as of right now, there are documents that will

15   articulate, as I discussed earlier with you, limitations on where

16   this is going to be deployed, what geographic areas and other

17   sort of requirements that are not in the rule itself, and those

18   are still being worked on and reviewed internally at the agency

19   and will be made public in due course, I think certainly well

20   ahead of June 27th and before discovery closes, but that is

21   certainly going to affect some of these arguments, and we'll, of

22   course, disclose that as soon as we have it to the Court and

23   plaintiffs.  But I just phrase that now because I'm concerned

24   what would happen if I were on the other side.  I would say, Oh,

25   they issued that after your Court's order to moot out the case.

```
 1    So I'm just letting you know now that is happening.  There are

 2    specific limited jurisdictions where this is going to be

 3    deployed, initially at least, and that will all be made public,

 4    that we won't be hiding the ball on that.  We'll just let

 5    everyone know that when we have it, but the guidance is not final

 6    yet.

 7              THE COURT:  So you bring that up for what point?

 8              MR. REUVENI:  Well, I would expect plaintiffs to

 9    potentially argue --

10              THE COURT:  So you are saying that it might impact

11    their standing if the areas where the government is going to

12    first implement this is not in Arizona?

13              MR. REUVENI:  For example, correct.  So if it's only

14    going to be implemented in -- I'm just making things up here, but

15    one or two specific states.

16              THE COURT:  Yeah.

17              MR. REUVENI:  And none of those states are the

18    plaintiffs.

19              THE COURT:  Yeah.

20              MR. REUVENI:  I mean.

21              THE COURT:  California and Montana, huh?  Canadians are

22    worried.

23              MR. REUVENI:  I think I can predict with confidence

24    that it won't be Montana.  It might be California for obvious

25    reasons.
```

1              THE COURT:  Yeah, okay.

2              MR. REUVENI:  That's the only reason I bring it up.

3              THE COURT:  Okay.  I appreciate that, and that -- when

4    you have that, I know you'll produce it.  I also know you offer

5    it in good faith.  I hold the Department of Justice in high

6    regard, and I know that you will operate in good faith to try to

7    not intentionally drag your feet on this providing information to

8    their requests.  Again, I think a lot of the work that the states

9    need to do may be internal --

10             MR. ST. JOHN:  Understood, Your Honor.

11             THE COURT:  -- with state agencies to figure out what

12   the costs are of people who have been granted asylum residing in

13   their states, and then of course the external component is going

14   to be what the projection -- I mean, from what I can see.  I'm

15   not -- I'm trying to maybe how this goes, but what the effect is

16   on the numbers that the states are contending is illegal.  Any

17   increase would be illegal under this program, according to the

18   states' position, and therefore that would give them standing if

19   there is a cost associated with having asylums in the states.

20             So, I mean, to me that seems like the clearest kind

21   of -- really, you know, this has to do with -- Largely the

22   complaint and the preliminary injunction has to do with the

23   change to the asylum process that may or may not result in

24   additional asylees which then may or may not result in more

25   asylees living in the states, and so I think beyond that, saying

1  it's going to influence people in Mexico and Central America or

2  other places to then try to evade law enforcement and increase

3  illegal immigration, I think -- I mean, if the states want to try

4  to use that -- if that's the argument the states use, I'm not

5  going to tell them they can't use it, but I don't -- I'm jut

6  saying, I don't really see that as a viable standing argument.

7  All right?

8            MR. ST. JOHN:  Understood, Your Honor, thank you.

9            MR. REUVENI:  Thank you, Your Honor.

10           THE COURT:  You going to make your flight?

11           MR. REUVENI:  I hope so.

12           THE COURT:  Court's in recess.

13                     (Hearing concluded.)

14                     * * * * * *

15           **C E R T I F I C A T E**

16     I, Cathleen E. Marquardt, RMR, CRR, Federal Official Court

17  Reporter, do hereby certify this 22nd day of May, 2022, that the

18  foregoing pages 1-82 constitute a true transcript, to the best of

19  my ability, of proceedings had in the above-entitled matter.

20                     ___*/s/ Cathleen E. Marquardt*___
                       Federal Official Court Reporter

21

22

23

24

25