**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:22-cv-01130 |
| | ) | |
| MERRICK GARLAND, | ) | |
| in his official capacity as Attorney | ) | |
| General of the United States, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

<u>**DEFENDANTS' SUPPLEMENTAL MEMORANDUM**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................ 7

   I. Section 1252(f) strips this Court, and all Courts other than the Supreme Court, of
      jurisdiction to enter injunctive relief or to vacate the IFR under the APA ......................... 7

     A.  Section 1252(f)(1) bars preliminary and permanent injunctive relief ........................... 8

     B.  Section 1252(f) allows properly crafted declaratory relief ........................................ 13

     C.  Section 1252(f) bars a universal vacatur or set aside remedy under the APA .............. 16

     D.  Section 1252(f) is not subject to forfeiture ............................................................. 20

     E. Should the Court reconsider whether to transfer this case to the District of Columbia,
       Section 1252(f) has no bearing on whether section 1252(e)(3) requires transfer............ 22

   II.  The *Ultra Vires* Doctrine Is Not Applicable and Has Not Been Pleaded in Any Event.... 23

   III.  The Legislative History of 8 U.S.C. § 1225(b)(1)(B)(ii) and its Prior Interpretations and
       Applications Demonstrate that Congress Delegated to the Executive Branch Authority to
       Promulgate rules Governing "Further Consideration" of Applications for Asylum and that
       the IFR is a Lawful Exercise of Authority Under Section 1225(b)(1)(B)(ii)................... 28

     A.  The Legislative History of Expedited Removal ........................................................ 29

     B.  "Further Consideration" and Available Evidence of Legislative Intent........................ 35

     C. The Executive Branch Has, Over the Course of Multiple Administrations, Held to the
       View that Section 1225(b)(1)(B)(ii) is Ambiguous ...................................................... 41

CONCLUSION ............................................................................................................ 45

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967) ................................................................................................ 26

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................................................ 27

*Alli v. Decker*,
   650 F.3d 1007 (3d Cir. 2011) .................................................................................. 15

*Am. Airlines, Inc. v. Herman*,
   176 F.3d 283 (5th Cir. 1999) .............................................................................. 2, 28

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006) ............................................................................................ 20, 21

*Arizona v. Biden*,
   31 F.4th 469 (6th Cir. 2022) .................................................................................... 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ................................................................................................ 27

*Barnhart v. Wilson*,
   535 U.S. 212 (2002) ................................................................................................ 38

Barton v. Barr,
   140 S. Ct. 1442 (2020) .............................................................................................. 3

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ............................................................................................ 24, 26

*Bd. of Governors of the Fed. Res. Sys. v. Dimension Fin. Corp.*,
   474 U.S. 361 (1986) ................................................................................................ 40

*Biden v. Texas*,
   2022 WL 1299971 (May 2, 2022) ........................................................................... 11

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................................................ 26

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*,
   51 F.3d 235 (11th Cir. 1995) .................................................................................. 39

*Boechler, P.C. v. Commissioner of Internal Revenue*,
    2022 WL 1177496 (U.S. Apr. 21, 2022) .......................................................................21

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) ...................................................................................................21

*Califano v. Sanders*,
    430 U.S. 99 (1977) .........................................................................................................20

*California v. Grace Brethren Church*,
    457 U.S. 393 (1982) .......................................................................................................15

*Catawba Cnty., N.C. v EPA*,
    571 F.3d 20 (D.C. Cir. 2009) .........................................................................................34

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................................................34

*Coleman v. Court of Appeals of Maryland*,
    566 U.S. 30 (2012) .........................................................................................................22

*Corley v. United States*,
    556 U.S. 303 (2009) .......................................................................................................10

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015) .......................................................................................38

*Ctr. for Biological Diversity v. Regan*,
    2022 WL 971067 (D.D.C. Mar. 30, 2022) .......................................................................6

*Cutrera v. Bd. of Sup'rs of LSU*,
    429 F.3d 108 (5th Cir. 2005) ..........................................................................................28

*Dalton v. Specter*,
    511 U.S. 462 (1994) .......................................................................................................27

*Davis v. United States*,
    495 U.S. 472 (1990) .......................................................................................................41

*Digital Realty Tr., Inc. v. Somers*,
    138 S. Ct. 767 (2018) .....................................................................................................34

*Direct Mktg. Ass'n v. Brohl*,
    575 U.S. 1 (2015) .............................................................................................................9

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) .......................................................................................................16

*Exxon Chemicals Am. v. Chao,*
298 F.3d 464 (5th Cir. 2002)................................................................. 27

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005)................................................................. 35, 39

*Hamama v. Adducci,*
912 F.3d 869 (6th Cir. 2018)................................................................. 10, 15

*Henderson v. Shinseki,*
562 U.S. 428 (2011)................................................................. 21

*Hibbs v. Winn,*
542 U.S. 88 (2004)................................................................. 9

*I.N.S. v. Aguirre-Aguirre,*
526 U.S. 415 (1999)................................................................. 40

*Jama v. Immigration and Customs, Enf't,*
543 U.S. 335 (2005)................................................................. 30

*Jennings v. Rodriguez,*
138 S. Ct. 830 (2018)................................................................. 13

*Kennedy v. Mendoza-Martinez,*
372 U.S. 144 (1963)................................................................. 13, 14

*Kirby Corp. v. Pena,*
109 F.3d 258 (5th Cir. 1997)................................................................. 1, 23, 24, 27

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019)................................................................. 41

*Landon v. Plasencia,*
459 U.S. 21 (1982)................................................................. 30

*Latiolais v. Huntington Ingalls, Inc.,*
951 F.3d 286 (5th Cir. 2020)................................................................. 10

*Leedom v. Kyne,*
358 US 184 (1958)................................................................. 1, 23

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
140 S. Ct. 2367 (2020)................................................................. 17

*Loughrin v. United States,*
573 U.S. 351 (2014)................................................................. 34

iv

*Lundeen v. Mineta,*
   291 F.3d 300 (5th Cir. 2002) .................................................................... 27

*Make the Road N.Y. v. Wolf,*
   962 F.3d 612 (D.C. Cir. 2020) ................................................... 9, 10, 19

*Matter of Sinclair,*
   870 F.2d 1340 (7th Cir. 1989) ................................................................ 40

*MCI Telecomms. Corp. v. AT&T Co.,*
   512 U.S. 218 (1994) ................................................................................ 41

*Milner v. Dep.t of Navy,*
   562 U.S. 562 (2011) ................................................................................ 39

*Minnesota v. United States,*
   305 U.S. 382 (1939) ................................................................................ 22

*Miranda v. Garland,*
   --- F.4th ----, 2022 WL 1493822 (4th Cir. May 12, 2022) .................... 21

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ................................................................................ 19

*National Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) .............................................................. 16

*Nat'l Veterans Affs. Council v. Fed. Serv. Impasses Panel,*
   2021 WL 5936407 (D.D.C. Feb. 10, 2021) ........................................... 25

*Negusie v. Holder,*
   555 U.S. 511 (2009) ......................................................................... 34, 40

*DHS v. New York,*
   140 S. Ct. 599 (2020) .............................................................................. 18

*Nielsen v. Preap,*
   139 S. Ct. 954 (2019) ....................................................................10, 11, 13

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................ 9, 12

*Norwegian Nitrogen Products Co. v. United States,*
   288 U.S. 294 (1933) ................................................................................ 41

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) ............................................................... 28

*Paladin Cmty. Mental Health Ctr. v. Sebelius,*
   684 F.3d 527 (5th Cir. 2012)................................................................27

*Reno American-Arab Anti-Discrimination Comm.,*
   525 U.S. 471 (1999)........................................................................12

*Rivero v. Fid. Invs., Inc.,*
   1 F.4th 340 (5th Cir. 2021)................................................................21

*Rockwell Int'l Corp. v. United States,*
   549 U.S. 457 (2007)........................................................................21

*Safety- Kleen Corp. v. EPA,*
   1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ........................6

*Saucedo-Falls v. Kunkle,*
   299 F. App'x 315 (5th Cir. 2008)........................................................28

*Steffel v. Thompson,*
   415 U.S. 452 (1974)........................................................................14

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)........................................................................17

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021)................................................................17

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021)................................................................11

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994)....................................................................26, 27

*DHS v. Thuraissigiam,*
   140 S. Ct. 1959 (2020)........................................................................12

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018)........................................................................18

*U.S. Dep't of Justice v. FLRA,*
   981 F.2d 1339 (D.C. Cir. 1993)............................................................28

*United States v. Cotton,*
   535 U.S. 625 (2002)........................................................................20

*United States v. U.S. Fidelity & Guaranty Co.,*
   309 U.S. 506 (1940)........................................................................22

*Va. Soc'y for Human Life, Inc. v. FEC,*
   263 F.3d 379 (4th Cir. 2001) ............................................................... 29

**Statutes**

5 U.S.C. § 702(1) ................................................................................... 19, 20

5 U.S.C. § 703 ........................................................................................ 17, 18

5 U.S.C. § 705 ............................................................................................. 10

5 U.S.C. § 706 ..................................................................................... *passim*

5 U.S.C. § 706(2) ................................................................................... 17, 18

5 U.S.C. § 706(2)(A) .................................................................................. 16

8 U.S.C. § 1103(a)(1) ................................................................................. 40

8 U.S.C. § 1103(g)(2) ................................................................................. 40

8 U.S.C. § 1158 ............................................................................................. 3

8 U.S.C. § 1158(b)(1)(A) ........................................................................... 40

8 U.S.C. § 1182 ........................................................................................... 30

8 U.S.C. § 1182(d)(5) ................................................................................... 6

8 U.S.C. §§ 1221-32 ...................................................................... 1, 7, 8, 11

8 U.S.C. § 1225 ......................................................................................... 1, 8

8 U.S.C. § 1225(a)(2) ................................................................................. 34

8 U.S.C. § 1225(b)(1) ............................................................................ 2, 4, 5

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................................. 3, 4, 32

8 U.S.C. § 1227 ........................................................................................... 30

8 U.S.C. § 1229 ........................................................................................... 30

8 U.S.C. § 1229(b)(2)(A) ........................................................................... 34

8 U.S.C. § 1229a .................................................................................. *passim*

8 U.S.C. § 1252 .................................................................................... *passim*

8 U.S.C. § 1252(e)(1)(A) ...................................................................... 13, 22

8 U.S.C. § 1252(e)(3) .................................................................................................. 22

8 U.S.C. § 1252(e)(3)(A) ...................................................................................2, 7, 29, 44

8 U.S.C. § 1252(f)(1) .................................................................................................... 1

8 U.S.C. § 1158(a)(1) .................................................................................................... 3

26 U.S.C. 6330(e)(1) ................................................................................................... 21

28 U.S.C. § 1341 .......................................................................................................... 9

28 U.S.C. § 2201(a) ................................................................................................ 13, 14

28 U.S.C. § 2342 ........................................................................................................ 17

Antiterrorism and Effective Death Penalty Act,
    Pub. L. No. 104-132, 110 Stat. 1214 (1996) ....................................................... 31

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208 ........................................................................................... 12

**Regulations**

8 C.F.R. § 208.2(a) ..................................................................................................... 38

8 C.F.R. § 208.30(b) ..................................................................................................... 3

8 C.F.R. § 208.30(f) ...................................................................................................... 4

8 C.F.R. § 235.3(b)(2)(i) ............................................................................................... 3

8 C.F.R. § 235.3(b)(4) ................................................................................................... 3

8 C.F.R. § 1003.42(d) ................................................................................................... 4

8 C.F.R. § 1208.30(g)(2) ............................................................................................... 4

8 C.F.R. § 208.30(d) ..................................................................................................... 4

69 Fed. Reg. 69,480 (Nov. 29, 2004) ......................................................................... 42

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of
    Removal Proceedings; Asylum Procedures,*
    62 Fed. Reg. 444 (Jan 3, 1997) ..................................................................... 5, 41

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of
    Removal Proceedings; Asylum Procedures,*
    62 Fed. Reg. 10,312 (Mar. 6, 1997) ............................................... 5, 8, 41, 42, 44

*Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,*
85 Fed. Reg. 36,264 (June 15, 2020)............................................................33, 43, 44

*Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum* Officers,
86 Fed. Reg. 46906 (Aug. 20, 2021) ...................................................................4

*Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers,*
87 Fed. Reg. 18,078 (Mar. 29, 2022)................................................................ 5, 11

**Other Authorities**

Immigration Reform and Control Act of 1983,
H.R. 1510, 98th Cong., 1st Sess. ..........................................................................29

142 Cong. Rec. S. 11491 (Sept. 27, 1996).................................................................37

S. Con. Res. 55(i),104th Cong., 2d Sess. (April 24, 1996)............................................32

*Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies,* 37 Yale J. on Reg. Bull. 37 (2020) (Harrison)............................17

*The Immigration Reform and Control Act: Immigration Policy and the National Interest,*
17 U. Mich. J. L. Reform 147 (1984) .....................................................................31

## INTRODUCTION

Defendants submit this brief in response to the Court's May 18 order directing the parties to brief (1) "[w]hether 8 U.S.C. § 1252(f)(1) imposes any jurisdictional or remedial limitations on the entry of injunctive relief, declaratory relief, or relief under 5 U.S.C. § 706 and whether such limitations are subject to forfeiture," (2) "[t]he applicability of the *ultra vires* doctrine set forth in *Leedom v. Kyne*, 358 US 184 (1958) and *Kirby Corp. v. Pena*, 109 F.3d. 258 (5th Cir. 1997) to the Government's issuance of the [interim final rule (IFR)] under 8 U.S.C. § 1225, including whether this doctrine has been properly pleaded by Plaintiffs," and (3) "[t]he legislative history of 8 U.S.C. § 1225(b)(1)(B)(ii) – particularly the legislative intent behind 'further consideration of the application for asylum;' and prior interpretations and applications of this phrase in other regulations since the statute's enactment."

First, Section 1252(f)(1) provides that, with one exception not relevant here, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of the provisions of the Immigration and Nationality Act (INA) at 8 U.S.C. §§ 1221-32. By its plain terms, Section 1252(f)(1) bars injunctive relief, like that sought by Plaintiffs here, that enjoins or restrains the government's chosen means of implementing the covered statutory provisions. Moreover, while Section 1252(f) does not bar properly crafted declaratory relief, it bars any universal set-aside or vacatur relief under 5 U.S.C. § 706. Furthermore, although any question of forfeiture is premature, as Defendants have not yet responded to Plaintiffs' motion for preliminary injunction, Section 1252(f)(1) is a jurisdictional limit not subject to forfeiture.

Second, Plaintiffs cannot invoke the *ultra vires* doctrine discussed in *Leedom v. Kyne* and applied in *Kirby Corp. v. Pena*. *Kyne* applies only in extraordinary circumstances where an agency violates a clear "right which Congress has given" a plaintiff by statute, and the plaintiff would

otherwise have "no other means … to protect and enforce that right." *Kyne*, 358 U.S. at 190. Plaintiffs fail on both requirements. They argue the IFR is inconsistent with what they view as the proper interpretation of certain statutory provisions, but in doing so Plaintiffs simply raise "a dispute over whether an agency charged with a statute's implementation has interpreted it correctly, which is not the sort of 'egregious' error envisioned by the Supreme Court in *Kyne*." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999). Plaintiffs also do not, and cannot, argue that they have no other means to enforce their alleged rights under the statute. Defendants do not dispute that the IFR may be challenged in a suit for declaratory judgment under the Administrative Procedure Act (APA) in the District of Columbia. *See* 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(3). Even if the *ultra vires* doctrine could apply here, Plaintiffs do not raise it or cite Kyne or Kirby in their complaint, and have failed to plead any such claim.

Finally, the legislative history of 8 U.S.C. § 1225(b)(1)(B)(ii) and its prior interpretations and applications demonstrate that Congress delegated to the Executive Branch the authority to promulgate rules governing "further consideration" of applications of asylum and that the IFR is a lawful exercise of that delegated authority under section 1225(b)(1)(B)(ii). Moreover, section 1225(b)(1)(B)(ii)'s text and history further demonstrate that the IFR is a "procedure[]" or "polic[y]" "implement[ing] the provisions of section 1225(b)(1)," 8 U.S.C. § 1252(a)(2)(A)(iv), such that judicial review of any challenge to the IFR may be brought only in the District of Columbia. *See* 8 U.S.C. § 1252(e)(3)(A); Dkts. 5, 16.

## BACKGROUND

Expedited Removal. Congress has authorized the Department of Homeland Security ("DHS") to summarily remove from the United States certain noncitizens who arrive at ports of entry or "certain other noncitizens" who recently entered the country as designated by the

Secretary.[1] *See* 8 U.S.C. § 1225(b)(1). Under this summary-removal mechanism—known as expedited removal—a noncitizen "arriving in the United States" who an immigration officer determines lacks valid entry documentation or makes certain kinds of material misrepresentations, shall be "order[ed] ... removed from the United States without further hearing or review unless the noncitizen indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7); 8 C.F.R. §§ 208.30(b), 235.3(b)(4).

Implementing regulations establish procedures to be used before effectuating an expedited removal order. Immigration officers must "advise the alien of the charges against him or her," provide "an opportunity to respond to those charges in the sworn statement," and provide an interpreter if needed. 8 C.F.R. § 235.3(b)(2)(i). A noncitizen may "present evidence" "that he or she was admitted or paroled into the United States," or was "physically present ... continuously for the 2-year period immediately prior to the date of determination of inadmissibility," and therefore ineligible for expedited removal. *Id.* § 235.3(b)(1)(ii), (b)(6). And "any removal order," the "sworn statement," and any claims concerning a noncitizen's status "must be reviewed and approved by the appropriate supervisor before the order is considered final." *Id.* § 235.3(b)(7).

Under current law, additional procedures apply if a noncitizen asserts an "intention to apply for asylum ... or a fear of persecution," 8 U.S.C. § 1225(b)(1)(A)(ii); *see also* 8 U.S.C. §§ 1158(a)(1), 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4) (indicating that these procedures apply if the noncitizen expresses a fear of persecution or torture). In that situation, a noncitizen is provided a non-adversarial interview with an asylum officer at which the officer determines whether the

---

[1] This brief uses "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

noncitizen has a "credible fear" of persecution or torture, and is also provided the rights to request de novo review of that determination by an immigration judge, to consult with a person of the noncitizen's choosing during the credible fear process, and to an interpreter. 8 U.S.C. §§ 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(II), (B)(1)(B)(iv), (v); *see* 8 C.F.R. §§ 208.30(d), 1003.42(d), 1208.30(g)(2). If the asylum officer or immigration judge determines that the noncitizen has a credible fear of persecution, the individual is "detained for further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), unless that individual is eligible for release on parole.[2] Although § 1225(b)(1)(B)(ii) does not specify how that "further consideration" should occur, until May 31, 2022, regulations provide that the noncitizen is placed in full removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). If the asylum officer and immigration judge find that the noncitizen has not established such a fear, the noncitizen shall be "removed from the United States without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)(iii)(I), (b)(1)(C); 1252(a)(2)(A)(iii), (e)(2); 8 C.F.R. §§ 208.30(g)(1)(ii), 1003.42(f), 1208.30(g)(2)(iv)(A).

The Interim Final Rule. On August 20, 2021, the Departments of Homeland Security and Justice jointly published a notice of proposed rulemaking ("NPRM"). The NPRM proposed amending the regulations governing the procedures for determining "further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), for individuals subject to expedited removal who are found to have a credible fear under 8 U.S.C. § 1225(b)(1), and governing whether they may be released during the pendency of that application. *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 86 Fed. Reg. 46906 (Aug. 20, 2021); *see also Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by*

---

[2] Certain covered noncitizens may also be eligible for bond due to court orders in other cases.

*Asylum Officers*, 87 Fed. Reg. 18,078, 18,079 (Mar. 29, 2022) (explaining that the NPRM proposed "to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture" under § 1225(b)(1)(B)(i)-(ii)).[3]

On March 29, 2022, after receiving and reviewing public comments submitted in response to the NPRM, the Departments issued an IFR. See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078 (Mar. 29, 2022). As the NPRM anticipated, the Departments issued the IFR to implement § 1225(b)(1), which "provides that if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution, the noncitizen shall receive 'further consideration of the application for asylum.'" 87 Fed. Reg. at 18,080. The "IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and CAT protection, will occur." *Id.* at 18,080; *see also id.* at 18,085 ("this rule establishes a new process by which such 'further consideration' may occur, wherein a noncitizen will have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an [immigration judge (IJ)] in section

---

[3] The Executive Branch has long taken the view that "the statute is silent as to the procedures for those who … demonstrate a credible fear of persecution," and "does not specify how or by whom this further consideration should be conducted." 87 Fed. Reg. at 18,907; *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312, 10,320 (March 6, 1997) ("section 235(b) of the Act is very specific as to what procedures should be followed if an alien does not establish a credible fear. However, the statute is silent as to the procedures for those who do demonstrate a credible fear of persecution."); *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 444, 447 (Jan 3, 1997) ("Section 235(b)(1)(B)(ii) of the Act provides that aliens who are determined by an asylum officer to have a credible fear of persecution will be detained for further consideration of the asylum claim. … [T]he statute does not specify how or by whom this further consideration should be conducted."). *See infra* 28-44.

240 removal proceedings.").

<u>This Case</u>. Plaintiffs initiated this suit on April 28, 2022. Compl. (Dkt. 2). Plaintiffs challenge the IFR under the APA on various grounds, alleging that: the IFR (1) is contrary to law under the Homeland Security Act, (2) exceeds the government's parole authority under 8 U.S.C. § 1182(d)(5), (3) violates the Secure Fence Act, (4) is arbitrary and capricious, (5) does not comply with notice and comment requirements, and (6) violates the Take Care Clause. *See* Compl. ¶¶ 112-88. As relief, Plaintiffs ask this Court to declare the IFR unlawful, postpone the effective date of the IFR under 5 U.S.C. § 705,[4] vacate the IFR under 5 U.S.C. § 706, and to both preliminarily and permanently enjoin implementation of the IFR. *Id*., Prayer for Relief.

The day after Plaintiffs initiated suit, Defendants moved to dismiss or transfer this case to the District of Columbia, the only court with jurisdiction over this lawsuit. Dkt. 5. Plaintiffs then moved for a preliminary injunction against the IFR on May 13, 2022. Dkt. 19. The Court held a hearing on the Defendants' motion on May 18, 2022, and denied the motion without prejudice to granting the motion "should the Court's legal and factual findings warrant." Dkt 24 at 1; *see* Tr. at 70:24-71:2 ("I'm not going to stay or transfer the case right now"). The Court also stayed all pending deadlines, ordered the parties to engage in expedited discovery, and directed the parties to file supplemental briefing. Dkt. 24 at 1-2.

---

[4] This request for relief is now moot, as the IFR went into effect on May 31, 2022. *See, e.g., Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (stating that § 705 is intended to "postpone the effective date *of a not yet effective rule*, pending judicial review") (emphasis added); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022) (same, collecting cases). This brief therefore does not address whether section 1252(f)(1) precludes relief under 5 U.S.C. § 705. The government has briefed that issue elsewhere and can file a supplemental brief if the Court desires further briefing on this issue. Defs.' Supp. Memorandum at 18-23, Dkt. 17, *Texas v. Mayorkas*, 22-cv-94 (N.D. Tex.).

**ARGUMENT**

As explained below, 8 U.S.C. § 1252(f)(1) bars injunctive relief, like that sought by Plaintiffs here, that enjoins or restrains the government's chosen means of implementing the covered statutory provisions, as well as any universal set-aside or vacatur relief under 5 U.S.C. § 706. Moreover, although any question of forfeiture is premature, as Defendants have not yet responded to Plaintiffs' motion for preliminary injunction, Section 1252(f)(1) is a jurisdictional limit not subject to forfeiture. Further, the *ultra vires* doctrine is irrelevant in this case because Plaintiffs cannot raise a claim under the doctrine where they have an alternative avenue for seeking review, here a suit for declaratory relief which Congress authorized in the District Court for the District of Columbia, and Plaintiffs have not pleaded any such claim in any event. Finally, the legislative history of 8 U.S.C. § 1225(b)(1)(B)(ii) and its prior interpretations and applications demonstrate that Congress delegated to the Executive Branch authority to promulgate rules governing "further consideration" of applications for asylum and that the IFR is a lawful exercise of that delegated authority under section 1225(b)(1)(B)(ii). Moreover, section 1225(b)(1)(B)(ii)'s text and history further demonstrate that the IFR is a "procedure[]" or "polic[y]" "implement[ing] the provisions of section 1225(b)(1)," 8 U.S.C. § 1252(a)(2)(A)(iv), such that judicial review of any challenge to the IFR may be brought only in the District of Columbia. *See* 8 U.S.C. § 1252(e)(3)(A); Dkts. 5, 16.

**I.     Section 1252(f) strips this Court, and all Courts other than the Supreme Court, of jurisdiction to enter injunctive relief or to vacate the IFR under the APA**

Section 1252(f)(1) provides that, except in a case brought by "an individual [noncitizen]" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the [plaintiff], no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-32]." 8 U.S.C. § 1252(f)(1). That

remedial restriction applies in this case by its plain terms: Plaintiffs are not individual noncitizens in removal proceedings, and their suit seeks to enjoin or restrain the operation of 8 U.S.C. § 1225 by prohibiting Defendants from implementing section 1225(b)(1)(B)(ii)'s provision that noncitizens who have established a credible fear "shall be detained for further consideration of the application for asylum" through the IFR. All courts other than the Supreme Court thus lack jurisdiction to grant injunctive relief against the IFR. Section 1252(f)(1) would not, however, bar properly crafted declaratory relief on final judgment, so long as it does not have the prohibited effect of compelling the government to alter its operation of the covered sections, 8 U.S.C. §§ 1221-32. But Section 1252(f)(1) does preclude district courts from vacating the IFR under the APA—a universal remedy foreclosed by Section 1252(f)(1). Moreover, although any question of whether Section 1252(f) is subject to forfeiture is premature, Section 1252(f)(1) is a jurisdictional limit not subject to forfeiture.

A. Section 1252(f)(1) bars preliminary and permanent injunctive relief

Section 1252(f)(1) bars this Court, or any other lower court, from granting any of the injunctive relief, preliminary or final, that Plaintiffs seek. Section 1252(f)(1) provides that lower courts lack jurisdiction to "enjoin or restrain" the "operation of" the covered INA provisions "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action." 8 U.S.C. § 1252(f)(1). That language indicates that the jurisdictional bar encompasses injunctions prohibiting the Executive Branch's implementation of the covered provisions, including those injunctions premised on a conclusion that the agency action violates the covered provisions.

To start, the term "enjoin" carries not only a negative meaning, but also a positive one: it means "[t]o require; command; positively direct." Black's Law Dictionary 529 (6th ed. 1990). An

"[i]njunction" is "[a] court order prohibiting someone from doing some specified act *or* commanding someone to undo some wrong or injury." *Id.* at 784 (emphasis added). Thus, by depriving lower courts of authority to "enjoin," Section 1252(f)(1) bars not only injunctions that block the operation of the covered INA provisions on constitutional or other grounds, but also injunctions that direct the Executive Branch to adhere to the court's reading of those provisions instead of the Executive Branch's own interpretation and implementation of them.

To the same effect, the Supreme Court has explained that the term "enjoin" includes both affirmative and negative commands. In interpreting the adjoining paragraph, which restricts judicial authority to "enjoin the removal of any alien," 8 U.S.C. § 1252(f)(2), the Court described an injunction as "a means by which a court tells someone what to do or not to do," *Nken v. Holder*, 556 U.S. 418, 428 (2009). The Court further observed that, "[i]n a general sense, every order of a court which commands or forbids is an injunction." *Id.* (citation omitted; brackets in original). Similarly, in the context of the Tax Injunction Act, 28 U.S.C. § 1341, which provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law," the Court has suggested that the term "enjoin" may include injunctions requiring rather than forbidding the specified acts. *See Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12-13 (2015); *see also Hibbs v. Winn*, 542 U.S. 88, 118 (2004) (Kennedy, J., dissenting).

Even if Section 1252(f)(1) were limited to negative commands, the relief Plaintiffs request would still be barred. Section 1252(f)(1) prohibits orders that restrain "the operation of" the covered provisions. 8 U.S.C. § 1252(f)(1). The term "operation," in this context, means execution, enforcement, or implementation. Webster's Third New International Dictionary of the English Language 1581 (1993) ("method or manner of functioning"); s*ee Make the Road N.Y. v. Wolf*, 962 F.3d 612, 647 (D.C. Cir. 2020) (Rao, J., dissenting) ("injunctions run against an officer, not

statutory text"). Section 1252(f)(1) therefore prohibits injunctions that restrain the Executive Branch's implementation of the immigration laws, whether the basis for the suit is that the agency has misinterpreted the relevant provisions or violated the APA or the Constitution. *See Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018), cert. denied, 141 S. Ct. 188 (2020) ("The district court ... created out of thin air a requirement ... that does not exist in the statute; and adopted standards that the government must meet. … If these limitations on what the government can and cannot do under the ... provision are not 'restraints,' it is not at all clear what would qualify as a restraint" under Section 1252(f).); *Make the Road*, 962 F.3d at 647 (Rao, J., dissenting) ("Of course the [challenged rule] is not part of the statute; however, [the rule is] the mechanism by which the Secretary carries his expedited removal authority into 'operation.' By enjoining the Secretary from [implementing] the [challenged rule], the district court 'enjoin[ed] or restrain[ed] the operation of' the [covered] provision in violation of the INA.").

Furthermore, any distinction between claims that "seek to prevent" the government from enforcing a covered provision and those that "require[]" it to "apply" a covered provision, is incompatible with Section 1252(f)(1)'s instruction that the jurisdictional bar applies "*[r]egardless of the nature of the action or claim*," 8 U.S.C. § 1252(f)(1) (emphasis added); *see Nielsen v. Preap*, 139 S. Ct. 954, 975 (2019) (Thomas, J., joined by Gorsuch, J., concurring in part and concurring in the judgment). Any interpretation of Section 1252(f) which makes the inquiry turn on the nature of the claim at issue effectively deletes the "regardless" clause. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that under the anti-surplusage canon courts are to give effect to "all of a

statute's provisions, so that no part will be inoperative or superfluous, void or insignificant.").[5]

Finally, any suggestion that an injunction in this case would not impermissibly enjoin the operation of the relevant statute but rather enjoin a policy not authorized by the statute is also "circular" because it presumes that Plaintiffs are correct on the merits. Preap, 139 S. Ct. at 975 (Thomas, J.). Justice Thomas's concurring opinion in Preap is instructive. Like Plaintiffs here, the plaintiffs in Preap "dispute[d] the extent of the statutory authority that the Government claim[ed]," and sought an injunction compelling the government to conform its operations to the plaintiffs' understanding of the statute. 139 S. Ct. at 962 (plurality opinion); *see id.* at 961 (majority opinion). The only apparent difference between a hypothetical injunction in this case and the one that Justice Thomas found impermissible in Preap is that the Plaintiffs here contend they are correct about the meaning of the INA, whereas the Preap plaintiffs were not. But if Section 1252(f)(1)'s bar on injunctive relief applied only when the plaintiff failed on the merits—and therefore had no entitlement to any relief—then that bar would be a nullity.

Justice Thomas's interpretation of Section 1252(f)(1) finds additional support in the history

---

[5] Defendants acknowledge *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), which held that Section 1252(f) bars injunctions "seeking to prevent" enforcement of sections 1221-32, but not those seeking to "require[]" the government to "apply" a covered provision. 20 F.4th at 1004. As the Court knows, that interpretation is presently under review in the Supreme Court. *See Biden v. Texas*, 21-954, 2022 WL 1299971 (May 2, 2022) (ordering briefing on this question, among others). But even were *Texas*'s interpretation precedential following any decision in Biden v. Texas, it would not apply here. *Texas* involved DHS's alleged prohibition of its officers from applying section 1225(b)(2)(C) as the Court construed it. Here, however, Defendants are in no way "forb[idding] its own officers from invoking the 'operation' of" section 1225(b)(1)(B)(ii). *Texas*, 20 F.4th at 1003-04. Rather, Defendants have articulated how its officers should implement that provision, a point Plaintiffs did not contest in their opposition to the motion to transfer and dismiss. Dkts. 5, 16; *see* 87 Fed. Reg. at 18,080 (explaining that "[t]his IFR addresses how" "further consideration of the application for asylum" under "8 U.S.C. § 1225(b)(1)(B)(ii)" "will occur"). Moreover, Texas explained that Section 1252(f) governs when "DHS was applying the provision in question, and the injunction interfered with the way it did so." *Texas*, 20 F.4th at 1004. But in this case—the IFR "appl[ies] the provision in question," yet Plaintiffs seek an injunction interfering with that. *Id.* Texas thus has no bearing on Section 1252(f)'s application here.

11

and purpose of that provision and related judicial-review provisions of the INA. Congress adopted Section 1252(f)(1) as part of an overhaul of judicial review of immigration proceedings in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, sec. 306(a)(2), § 242(f), 110 Stat. 3009-611. As the Supreme Court has observed, IIRIRA "substantially limited the availability of judicial review." *Nken*, 556 U.S. at 424. And "many provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts— indeed, that can fairly be said to be the theme of the legislation." *Reno American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999) (emphasis omitted); *see DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1966 (2020) (same).

Adopting a narrow interpretation of Section 1252(f)(1) would undermine IIRIRA's carefully designed system for limiting and channeling judicial review and authorize judicial micromanagement of immigration enforcement. Under that interpretation, Section 1252(f)(1) would not prevent States, advocacy organizations, or classes of individuals from bringing programmatic challenges to the Executive Branch's implementation of the relevant provisions of the INA and obtaining injunctions requiring the government to comply with a single district court's misinterpretation of the law. But Congress considered and rejected such a state of affairs:

> Section 306 [Section 1252(f)] also limits the authority of Federal courts other than the Supreme Court to enjoin the operation of the new removal procedures established in this legislation. These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending. In addition, courts may issue injunctive relief pertaining to the case of an individual alien, and thus protect against any immediate violation of rights. However, single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S.

H.R. Rep. No. 104-469, pt 1, at 161 (House Judiciary Committee Report).[6]

---

[6] Many of the same Plaintiffs in an amicus brief before the Supreme Court in *Biden v. Texas* addressing section 1252(f)(1) did not contend that section 1252(f)(1) applies only to individual

B.  Section 1252(f) allows properly crafted declaratory relief

Section 1252(f)(1) generally does not preclude declaratory relief that adheres to the proper scope for such relief and does not circumvent Section 1252(f)(1)'s limitations: A declaratory judgment "declare[s] the rights and other legal relations" of the parties, 28 U.S.C. § 2201(a), but does not coerce compliance or "interdict[] the operation" of the challenged statute or administrative action, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963).

The plurality opinion in *Preap* stated that Section 1252(f)(1) had not deprived the district court in that case of "jurisdiction to entertain the plaintiffs' request for declaratory relief." 139 S. Ct. at 962 (Alito, J.). Three Justices in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), similarly concluded that "a court could order declaratory relief" notwithstanding Section 1252(f)(1). *Id.* at 875 (Breyer, J., dissenting). And the statutory text and structure indicate that a properly crafted declaratory judgment would not be precluded by Section 1252(f)(1).

Section 1252(f) is titled "[l]imit on injunctive relief," and it withdraws authority "to enjoin or restrain" the operation of the covered INA provisions. 8 U.S.C. § 1252(f)(1). By contrast, the neighboring remedial restriction in Section 1252(e)(1)(A)—enacted by IIRIRA at the same time— is more broadly titled "[l]imitations on relief," and it provides that "no court may … enter *declaratory*, injunctive, or other equitable relief in any action pertaining to" the INA's expedited removal provision (8 U.S.C. § 1225(b)(1)), 8 U.S.C. § 1252(e)(1)(A) (emphasis added).[7]

---

noncitizens challenging their removal orders. Should they advance that argument here, it is meritless for the reasons explained in the government's reply in support of the motion to transfer. Dkt. 16 at 3-10. Furthermore, a contrary reading would render the phrase "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action," which encompasses plaintiffs like the States and individuals alike, a nullity.

[7] As the government explained in its motion to transfer or dismiss, Dkt. 7, under Section 1252(e)(3), the District of Columbia has exclusive jurisdiction over this lawsuit. The limitation on declaratory, injunctive, or other equitable relief codified at Section 1252(e)(1) would govern this

Moreover, a typical declaratory judgment pronouncing an agency action unlawful does not, by its nature, "enjoin or restrain" the operation of the statute that authorized the agency action. 8 U.S.C. § 1252(f)(1). Both of those terms indicate that a court may not compel the government to operate the covered provisions in a particular way. *See Black's Law Dictionary* 529 ("[e]njoin" means to "require," "command," or "positively direct"); *id.* at 1314 ("[r]estrain" means to "limit" or "put compulsion upon"). But a declaratory judgment does not do that; the remedy is "totally noncoercive," *Kennedy*, 372 U.S. at 155, and merely "declare[s]" the parties' "rights and other legal relations," 28 U.S.C. § 2201(a). *See Steffel v. Thompson*, 415 U.S. 452, 471 (1974) ("Though [a declaratory judgment] may be persuasive, it is not ultimately coercive.") (citation omitted). That difference between declaratory judgments and injunctions is why the two remedies require "different considerations" and why a declaratory judgment may be appropriate even if an injunction is not. *Id.* at 469.

Interpreting Section 1252(f)(1) to preclude injunctions, but not properly crafted declaratory judgments, also accords with the statutory purpose of limiting systemic disruptions until this Court can definitely resolve a legal challenge. When a lower court enters a declaratory judgment but not a preliminary or permanent injunction, "the Government [remains] free to continue to apply" the challenged statute or administrative action pending further district-court proceedings and appellate review. *Kennedy*, 372 U.S. at 155. That was precisely Congress's plan for Section 1252(f)(1), which was enacted not to entirely "preclude challenges" to covered immigration procedures, but to ensure that "the procedures will remain in force while such lawsuits are pending." H.R. Rep.

---

suit once transferred. But were this Court to nevertheless retain jurisdiction notwithstanding Section 1252(e)(3), then it would be improper to issue declaratory or other equitable relief, in addition to injunctive relief. To do otherwise would render Section 1252(e)(1) a nullity.

No. 469, 104th Cong., 2d Sess. Pt. 1, at 161 (1996).[8]

That said, although Section 1252(f)(1) does not categorically withdraw lower courts' jurisdiction to enter declaratory judgments, those judgments may, in certain circumstances, effectively function to "enjoin or restrain" the operation of the covered provisions.

8 U.S.C. § 1252(f)(1). In those circumstances, Section 1252(f)(1) would bar a district court from issuing declaratory relief. *Cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982). For instance, the government has repeatedly invoked Section 1252(f)(1) when noncitizens sought class-wide declaratory relief. *See, e.g., Alli v. Decker*, 650 F.3d 1007, 1011-1016 (3d Cir. 2011) (approving class-wide declaratory relief over the government's opposition); Pet. App. at 84a, *Garland v. Aleman Gonzalez*, (No. 20 322) (district court decision rejecting government's argument against class-wide declaratory relief); *see also* Oral Arg. Tr. at 14 16, Aleman Gonzalez. If such relief were permissible, "every single member of the class" could, and potentially would, "immediately seek an injunction grounded on the authority of the declaratory judgment"—even before appellate proceedings had concluded. *Alli*, 650 F.3d at 1020 n.2 (Fuentes, J., dissenting). And Section 1252(f)(1) would not itself preclude follow-on injunctions sought by "an individual alien" in removal "proceedings." 8 U.S.C. § 1252(f)(1). Thus, permitting class-wide declaratory relief would contravene Section 1252(f)(1) by allowing the lower courts to grant what would in "practical effect" be "a class-wide injunction." *Hamama*, 912 F.3d at 880 n.8.

No similar concern is presented here, however, at least based on what Plaintiffs allege in

---

[8] If a district court treated a nominal declaratory judgment like an injunction by threatening the government with contempt for non-acquiescence, that judgment would impermissibly "enjoin or restrain" the operation of the INA and would be barred under Section 1252(f)(1). *Cf. Calderon Jimenez v. McAleenan*, No. 18 cv-10225, Dkt. 295, at 1 (D. Mass. June 28, 2019) (stating that "any violation of" the court's construction of the law "could constitute civil and/or criminal contempt").

their complaint:[9] Plaintiffs are not noncitizens in removal proceedings, and Section 1252(f)(1) would thus bar Plaintiffs from converting a declaratory judgment into coercive relief in the lower courts. A properly crafted declaratory judgment on final judgment would not require the government to alter its implementation of the INA pending further review and accordingly would not "enjoin or restrain" the operation of the relevant statutory provisions. 8 U.S.C. § 1252(f)(1). Of course, "prior to final judgment, there is no established declaratory remedy comparable to a preliminary injunction." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). But Plaintiffs do not ask this Court for such a remedy, so the Court need not address the issue.

C.   Section 1252(f) bars a universal vacatur or set aside remedy under the APA

The universal vacatur or set aside relief Plaintiffs seek on final judgment is not authorized by Section 706 of the APA in the first place and, because such a vacatur would "enjoin or restrain" the operation of covered provisions of the INA, it would violate of 8 U.S.C. § 1252(f)(1).

Before addressing how Section 1252(f)(1) applies to relief available under the APA, the Court should begin by addressing the proper scope of that relief. Section 706 provides that "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Some lower courts have read that provision to authorize district courts to vacate a challenged rule and render it void, preventing the government from implementing its chosen means of applying the relevant statutory provision anywhere in the Nation. *See, e.g., National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1410 (D.C. Cir. 1998).[10] But

---

[9] The government's position on this issue may change should Plaintiffs further elaborate on what sort of declaratory relief they seek in a subsequent pleading.

[10] Although lower court decisions in this Circuit have relied on *National Mining* to vacate a rule universally, no precedential decision of the Fifth Circuit explicitly holds that result is required in every APA case. The Fifth Circuit has held, however, that in APA cases "[r]emand, not vacatur,

as the government has long argued, that interpretation is wrong: "Nothing in the language" of Section 706 authorizes courts "to exercise such far-reaching power" by "setting aside" a regulation "for the entire country." *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).[11]

First, Section 706(2) does not define the relief available in an APA action, much less authorize courts to nullify an agency action nationwide. The nature and scope of remedies available in an APA action are determined "not in section 706, but in section 703." John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Reg. Bull. 37, 37 (2020) (Harrison). Under 5 U.S.C. § 703, some cases are governed by a "special statutory review proceeding" that authorizes the reviewing court to act directly upon the challenged agency action in the way an appellate court acts upon a lower court's judgment. An example is the Hobbs Act, which authorizes courts of appeals to directly review certain agency actions, and which does authorize reviewing courts to "suspend (in whole or in part)" the action under review. 28 U.S.C. § 2342; *see* Harrison, *supra*, at 39-40.

Where no special review proceeding applies, however, Section 703 provides that "[t]he form of proceeding" under the APA is not direct appellate-type review of the agency's action, but

---

is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," and "[o]nly in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).

[11] *See, e.g.,* Memorandum from Attorney General Jefferson B. Sessions, *Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions* 7-8 (Sept. 13, 2018), https://go.usa.gov/xuwNn ("universal vacatur is not contemplated by the APA") (capitalization altered; emphasis omitted); Gov't Br. at 49-50, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) (No. 19-431); Gov't Br. at 40-47, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (No. 07-463).

instead a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Section 703 also provides that agency action is "subject to judicial review in civil or criminal proceedings for judicial enforcement." *Id*. Those forms of review do not authorize universal vacatur or set aside of agency action. It would make no sense for a court to purport to vacate an agency regulation in a civil or criminal enforcement proceeding or a habeas action. Harrison, *supra*, at 45-46. And as justices of the Supreme Court have recognized, universal injunctions extending beyond what is necessary to redress the injuries to the parties before the court are "inconsistent with longstanding limits on equitable relief and the power of Article III courts." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay).

Accordingly, the "set aside" language in 5 U.S.C. § 706(2) speaks to the court's decisional process, not the appropriate relief. It directs the court to disregard—that is, set to the side— unlawful "agency action, findings, and conclusions" in resolving the case before it, whether that case is an enforcement action, habeas petition, or request for declaratory or injunctive relief. That understanding accords with contemporaneous usage, which recognized that a court may "set[ ] aside" an unconstitutional statute in deciding a case even though no one would suggest that a court can vacate a statute. *E.g.*, Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 752-753; *see* Harrison, *supra*, at 43-44 (discussing other examples).

Second, even if Section 706(2)'s "set aside" language did describe a remedy, it would not suggest that courts should "set aside" an unlawful agency action universally, as opposed to as applied to the specific parties before the court. 5 U.S.C. § 706(2). As Chief Judge Sutton recently observed, Section 706 did not "upset the bedrock practice of case-by-case judgments with respect

to the parties in each case or create a new and far-reaching power" allowing every district judge to nullify agency action nationwide. *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). The APA incorporates traditional limitations on equitable relief, including the principle that relief must not extend "beyond the parties to the case," *Hawaii*, 138 S. Ct. at 2427 (Thomas, J., concurring), by providing that the APA's authorization of judicial review does not affect "the power or duty of the court to … deny relief on any other appropriate legal or equitable ground," 5 U.S.C. § 702(1). A contrary conclusion would be inconsistent with principles of equity and Article III, and would replicate all of the now-familiar problems of nationwide injunctions, including forum-shopping, conflicting court orders, and "rushed, high-stakes, low-information decisions." *New York*, 140 S. Ct. at 60-601 (Gorsuch, J.).

In any event, whatever the scope of the relief available under Section 706 in other contexts, Section 1252(f)(1) deprives district courts of jurisdiction to vacate regulations implementing covered provisions of the INA. For the reasons explained above, where a court purports to issue a veto-like vacatur that formally revokes an agency action to implement a covered INA provision, the court plainly "enjoin[s] or restrain[s]" the "operation" of that provision, 8 U.S.C. § 1252(f)(1). *See also*, *supra* 8-9 (dictionary definitions of "enjoin" and "restrain"); *Make the Road*, 962 F.3d at 644 (Rao, J., dissenting) ("[S]ection 1252(f) further confirms that courts cannot engage in preenforcement review of the legal validity of" an agency action implementing a covered provision.). That vacatur is sometimes "a less drastic remedy" than an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010), does not change the fact that a court "enjoin[s] or restrain[s] the operation of" the covered INA provisions, 8 U.S.C. § 1252(f)(1), by vacating entirely an agency decision implementing those provisions. Regardless, Section 1252(f)(1) bars not just lower-court orders that enjoin, but also those that "restrain" the

government's operation of the covered INA provisions. A court order vacating nationwide an agency's chosen means of implementing a covered provision does just that.

The INA and the APA both make clear that the APA's remedial authorities give way to the specific remedial limitations in Section 1252(f)(1). The INA makes those limitations applicable "[r]egardless of the nature of the action or claim or of the identity of the [plaintiff]," and it expressly withdraws "jurisdiction" to enter the prohibited remedies. 8 U.S.C. § 1252(f)(1). The APA is not "an independent grant of subject-matter jurisdiction." *Califano v. Sanders*, 430 U.S. 99, 105 (1977). And the APA itself reinforces remedial limitations like those in Section 1252(f)(1) by expressly providing that "[n]othing" in the APA right of review "affects other limitations on judicial review," the "duty of the court to … deny relief on any other appropriate legal or equitable ground," or "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702(1), (2).

D.  Section 1252(f) is not subject to forfeiture

It is premature to address whether Section 1252(f) is subject to forfeiture, as Defendants have not yet responded to any pending substantive motion or pleading in which the argument might be raised. For that reason, regardless of whether section 1252(f)(1) is jurisdictional or not, the government has not forfeited the argument.

Nevertheless, Section 1252(f)(1) is not subject to forfeiture. Section 1252(f)(1) explicitly limits the "jurisdiction or authority" of the lower courts. 8 U.S.C. § 1252(f)(1). Because jurisdictional limitations speak to "a court's *power*," a jurisdictional defect "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002) (emphasis added). Federal courts "have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006);

*see also Rivero v. Fid. Invs., Inc.*, 1 F.4th 340, 343 (5th Cir. 2021), *cert. denied*, No. 21-978, 2022 WL 1131384 (U.S. Apr. 18, 2022).

The fact that Section 1252(f)(1) strips courts of jurisdiction to grant a particular form of relief, rather than to hear a particular type of case, does not alter that analysis. *See Miranda v. Garland*, No. 20-1828, --- F.4th ----, 2022 WL 1493822, at *8 (4th Cir. May 12, 2022) ("conclud[ing] that § 1252(f)(1) is a jurisdiction-stripping statute" and rejecting argument that section 1252(f)(1) merely "limits the courts' remedial powers," and so is not jurisdictional). Although limits on relief ordinarily are not jurisdictional, Congress "is free to attach the conditions that go with the jurisdictional label"—including exemption from forfeiture—to whatever requirements it chooses. *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Congress unambiguously did so in Section 1252(f)(1), which expressly states that no court "shall have jurisdiction or authority" to grant the specified relief.[12] That limitation "is jurisdictional … because explicit statutory language makes it so." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1318 (2017); *see, e.g., Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468 (2007); Gov't Reply Br. at 1-2, *Aleman Gonzalez*, (No. 20 322) (explaining that Section 1252(f)(1) is not subject to forfeiture and that the Supreme Court has authority to decide

---

[12] Plaintiffs, as the Respondent in *Biden v. Texas* did before the Supreme Court, might suggest that Section 1252(f)(1) is a non-jurisdictional remedial limitation and that the Court treats provisions as jurisdiction only if Congress clearly indicates. Resp. Supp. Br. 8-9. But Section 1252(f)(1) does clearly indicate that the remedial limitation it imposes is "jurisdiction[al]." 8 U.S.C. § 1252(f)(1). To nevertheless treat that limitation as non-jurisdictional would impair the "readily administrable bright line" that the Court has adopted for identifying jurisdictional rules. *Arbaugh*, 546 U.S. at 516. Plaintiffs to date have not identified any statute similar to Section 1252(f) found to be non-jurisdictional. Indeed, the Supreme Court recently described another provision analogous to Section 1252(f)(1)—providing that "[t]he Tax Court shall have no jurisdiction . . . to enjoin any action or proceeding unless a timely appeal has been filed," 26 U.S.C. § 6330(e)(1)—as the sort of "clear statement" that "plainly conditions the [court's] jurisdiction." *Boechler, P.C. v. Commissioner of Internal Revenue*, No. 20 1472, 2022 WL 1177496, at *5 (U.S. Apr. 21, 2022).

the Section 1252(f)(1) question it added in *Aleman Gonzalez* even though the government had not

raised Section 1252(f)(1) in the petition for a writ of certiorari).[13]

E.  Should the Court reconsider whether to transfer this case to the District of Columbia, Section 1252(f) has no bearing on whether section 1252(e)(3) requires transfer

Section 1252(f) is not relevant to the question of whether this Court has subject matter

jurisdiction over the underlying claims in this suit. Section 1252(f)(1) is an unusual jurisdictional

provision that does not deprive the lower courts of all jurisdiction over a case, but instead denies

jurisdiction to enter particular forms of *relief*. Here, *all* lower courts lack jurisdiction to grant

injunctive relief or universal vacatur, but that does not mean no court has jurisdiction to reach the

merits of Plaintiffs' claims or the request for declaratory relief. As the government explained, the

District of Columbia has jurisdiction to reach the merits of Plaintiffs' claims or to grant any relief

in this case. Dkts. 5, 17. That result is mandated by 8 U.S.C. § 1252(a)(2)(A)(iv) and (e)(3), which

strip all courts other than the District of Columbia, of jurisdiction to review the *merits* of Plaintiffs'

claims or to grant any relief. *See id.*; *see also* 8 U.S.C. § 1252(e)(1)(A) (barring "declaratory,

injunctive, or other equitable relief" in suit arising under section 1252(e) unless "specifically

authorized in a subsequent paragraph of this subsection"). Accordingly, although Section 1252(f)

would not preclude properly crafted declaratory relief on a final judgment in a court with subject

---

[13] Before the Supreme Court, Respondent there also argued that, "[e]ven if" Section 1252(f)(1) is "jurisdictional," it is "subject to forfeiture because it is best understood as a limitation on the United States' waiver of sovereign immunity," and "sovereign-immunity defenses can be waived." Resp. Supp. Br. 12. That argument is meritless. The United States' sovereign immunity can be waived only expressly, and only where "authorized by some act of Congress." *Minnesota v. United States*, 305 U.S. 382, 387 (1939). That immunity cannot be forfeited by litigation conduct. *See, e.g., id.* at 388-389 ("Where jurisdiction has not been conferred by Congress, no officer of the United States has power to give any court jurisdiction of a suit against the United States."). Plaintiffs may cite *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012), but that case involved state sovereign immunity, which States can waive "at [their] pleasure." *Id.* at 43 (plurality opinion) (citation omitted). The United States' sovereign immunity "cannot be waived by officials." *United States v. U.S. Fidelity & Guaranty Co.*, 309 U.S. 506, 513 (1940).

22

matter jurisdiction, *supra* 13-16, consistent with Section 1252(e), it does not establish this Court's Article III power to hear this case, which is governed by Section 1252(e).[14]

## II.    The Ultra Vires Doctrine Is Not Applicable and Has Not Been Pleaded in Any Event

Plaintiffs cannot invoke the *ultra vires* doctrine discussed in *Leedom v. Kyne* and applied in *Kirby Corp. v. Pena*. *Kyne* applies only in extraordinary circumstances where an agency violates a clear statutory "right which Congress has given" a plaintiff and the plaintiff would otherwise have "no other means … to protect and enforce that right." *Kyne*, 358 U.S. at 190. And even were an argument under Kyne available, Plaintiffs have waived such a claim by failing to plead it in the operative complaint.

In *Kyne*, a union of professional employees challenged a National Labor Relations Board decision to include them in a collective bargaining unit with non-professional employees where the statute barred the agency from including "both professional employees and employees who are not professional employees" without their consent. *Id*. at 185. While there was no dispute that the agency had violated a "clear and mandatory" prohibition and that the agency had thus exercised a "power that had been specifically withheld," the review provisions of the statute provided no avenue for the union to challenge the agency's decision. *Id*. at 188-89. Here, in contrast, while Plaintiffs dispute Defendants' interpretation of the relevant statutory provisions as allowing Defendants to implement the statutory scheme in the manner contemplated by the IFR, a mere dispute over statutory interpretation is nothing like the clear statutory right the Supreme Court

---

[14]  Should the Court conclude section 1252(e)(3) does not preclude suit in this Court, that conclusion would have no impact on whether 1252(f) separately bars injunctive relief.

considered in *Kyne*.[15]  As the Fifth Circuit has made clear, "the exception allowing review of facial violations must remain narrow, and agency action allegedly in excess of authority must not simply involve a dispute over statutory interpretation." *Kirby*, 109 F.3d at 269. Moreover, even if Plaintiffs could identify the type of "lawless ... clear departure … from [a] statutory mandate" necessary to even raise the *ultra vires* doctrine, *id.*, the doctrine still would not apply here where Plaintiffs have another means they can pursue to enforce their alleged rights under the statute—a suit for declaratory judgment under the APA "is available in … the District of Columbia." *See* 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(3). And Plaintiffs have also forfeited any claim based on the *ultra vires* doctrine by failing to raise it in their complaint.

The Supreme Court has addressed *Kyne* only twice in the last 30 years, and the reasoning of both decisions fully forecloses its application here. First, in *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991), the Supreme Court reviewed a decision that had "interpreted … *Kyne* as authorizing judicial review of any agency action … alleged to have exceeded the agency's statutory authority." The Supreme Court reversed and emphasized that "central to our decision in *Kyne* was the fact that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights." *Id*. The Court explained that the lower courts had erred by invoking the doctrine in a case that was "entirely different from *Kyne* because FISA"—the statute at issue in that case—"expressly provides … a meaningful and adequate opportunity for judicial review of the validity of the source of [the] regulation." *Id*. The Supreme Court held plaintiffs had a meaningful and adequate opportunity to challenge the regulation even though that review was channeled to particular courts—the D.C.

---

[15] As explained in the following section, the relevant statutory provisions are silent as to the specific procedures that should be adopted to implement Section 1252(b)(1)(B)(ii), leaving it to the agencies' expertise to develop those procedures over time.

Circuit or certain other courts of appeals, *id.* at 38 n.8—and required plaintiffs to wait until the completion of administrative proceedings before they could challenge the regulation, *id.* The same is true here. Plaintiffs challenge the IFR under the APA as inconsistent with the statutory scheme, and Congress has provided that such suits challenging whether "a regulation" issued to implement Section 1225(b)(1) is "consistent with" the agency's statutory authority "or is otherwise in violation of law" "is available in an action instituted in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(3). Plaintiffs dispute whether they should have to bring their claim in the District of Columbia, as opposed to proceeding under the APA in this district, but they do not argue that either circumstance deprives them of an avenue to seek judicial review of the IFR. Nor could they. *See, e.g., Nat'l Veterans Affs. Council v. Fed. Serv. Impasses Panel*, 552 F. Supp. 3d 21, 34 (D.D.C. 2021) (explaining that alternative avenue for judicial review need not be identical or the plaintiff's "preferred path" to foreclose relief under *Kyne*).[16]

In *Bd. of Governors* the Supreme Court also explained that, where a statutory provision clearly forecloses judicial review, as opposed to where such a bar on review is only vaguely "implied," Kyne does not apply. 502 U.S. at 44. Where "Congress has spoken clearly and directly" and, for example, stated that "*[N]o court shall have jurisdiction to affect by injunction or otherwise*" a particular agency action, "the clarity of the congressional preclusion" on review must be respected. *Id.* (emphasis and alteration in the original). Again, Section 1252 merely channels Plaintiffs' claims to a specific court, rather than forecloses review, and Plaintiffs have never raised any issue with the adequacy of this avenue of review Congress provided, making *Kyne* wholly

---

[16] Because Section 1252(e)(3) authorizes suit in the District of Columbia, Plaintiffs cannot show the absence of an avenue for judicial review necessary to invoke Kyne. If the Court ultimately decides that Section 1252(e)(3) does not apply to limit review to the District of Columbia, and that the Court has jurisdiction to hear Plaintiffs' APA challenges to the IFR in this district, that avenue of review also makes jurisdiction under Kyne both inapplicable and unnecessary.

inapplicable in this case. But even if Plaintiffs had raised some argument for the necessity of review in this district under *Kyne*, Section 1252(a)(2)(A)'s equally clear language would foreclose review by providing that "[n]otwithstanding any other provision of law (statutory or nonstatutory) … no court shall have jurisdiction to review" "except as provided in subsection (e),"—i.e., except in the District of Columbia—"procedures and policies adopted … to implement the provisions of section 1225(b)(1)." 8 U.S.C § 1252(a)(2)(A)(iv). "*Kyne* stands for the familiar proposition that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.'" *Bd. of Governors*, 502 U.S. at 44 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967)). Statutory language providing that "[n]o court shall have jurisdiction" to review certain claims or hear claims in certain forums "provides [that] clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the [ ] administrative" action. Bd. of Governors, 502 U.S. at 44.

The only more-recent Supreme Court decision to mention *Kyne* came to the same conclusion. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 213 (1994). In *Thunder Basin*, the Court explained that a statute that establishes a "comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a 'fairly discernible' intent to preclude district court review" in any other manner. *Id.* (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). Permitting review under *Kyne* and "uphold[ing] the District Court's jurisdiction in these circumstances would be inimical to the structure and the purposes of the [statute]." 510 U.S. at 216. Here, as in *Thunder Basin*, "[n]othing in the language and structure of the Act or its legislative history suggests that Congress intended to allow [plaintiffs] to evade the statutory-review process" Congress created "by enjoining the Secretary" through a challenge in this district outside of that process. *Thunder*

*Basin*, 510 U.S. at 213. Allowing a claim under the *ultra vires* doctrine in these circumstances would eviscerate Congress's carefully constructed mechanisms in Section 1252 for streamlining and channeling judicial review related to the INA, as well as the APA's other limits on judicial review. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The power of federal courts … to enjoin unlawful executive action is subject to express and implied statutory limitations"); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Dalton v. Specter*, 511 U.S. 462, 477 (1994) ("The judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute.").

In *Kirby*, 109 F.3d at 268-69, the Fifth Circuit noted that review under Kyne is thus "rarely exercised," and declined to allow such review in that case, explaining that "the Kyne standard is to be used for extraordinary situations." The Fifth Circuit has repeatedly and consistently read Kyne narrowly in this way since *Kirby. See, e.g., Paladin Cmty. Mental Health Ctr. v. Sebelius*, 684 F.3d 527, 533 (5th Cir. 2012) (noting that "[e]ven if" the Secretary's "interpretation" of statutory provision "was incorrect, the Secretary's decision can hardly be said to be 'so contrary to the terms of the relevant statute that it necessitates judicial review independent of'" statutory provisions governing review); *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 469 (5th Cir. 2002) (noting that "even if the [agency] exceeded its delegated authority … we still lack jurisdiction to review … under *Kyne* because Exxon can obtain meaningful judicial review" in another manner); *Lundeen v. Mineta*, 291 F.3d 300, 312 (5th Cir. 2002) ("to permit review, a *Kyne* error must not simply involve a dispute over statutory interpretation" (quotation marks omitted)); *Am. Airlines,*

27

*Inc.*, 176 F.3d at 293 ("a dispute over whether an agency charged with a statute's implementation has interpreted it correctly, [ ] is not the sort of 'egregious' error envisioned by the Supreme Court in *Kyne*"). Other circuits have reached the same conclusion. *See, e.g., Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (characterizing Kyne exception as a "Hail Mary pass" and noting "in court as in football, the attempt rarely succeeds"); *U.S. Dep't of Justice v. FLRA*, 981 F.2d 1339, 1342-43 (D.C. Cir. 1993) (*Kyne* standard demands a "nearly insurmountable" showing of "exceptional circumstances").

Finally, even if *Kyne* could provide jurisdiction over Plaintiffs' statutory challenges, they have not pleaded such a claim. The operative complaint does not mention either *Kyne* or *Kirby*. *See generally* ECF No. 14. Nor does it argue for relief based on the *ultra vires* doctrine. *Id.* To the extent Plaintiffs argue the IFR is in excess of statutory authority, they raise that claim under the APA, not the *ultra vires* doctrine, and nowhere do they argue that the APA is inadequate to the review they seek. Am. Compl. ¶¶ 131-56; *see also* Prayer for Relief (requesting the Court declare "the Asylum IFR is contrary to law and in excess of statutory authority *under the APA*" (emphasis added)). Plaintiff's thus have waived any such claim in this case. *See Cutrera v. Bd. of Sup'rs of LSU*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint . . . is not properly before the court."); *accord Saucedo-Falls v. Kunkle*, 299 F. App'x 315, 318 n.3 (5th Cir. 2008) (claim not raised in complaint; and first raised a brief, is waived).

**III.    The Legislative History of 8 U.S.C. § 1225(b)(1)(B)(ii) and its Prior Interpretations and Applications Demonstrate that Congress Delegated to the Executive Branch Authority to Promulgate rules Governing "Further Consideration" of Applications for Asylum and that the IFR is a Lawful Exercise of Authority Under Section 1225(b)(1)(B)(ii)**

The IFR is supported by the legislative history of the expedited removal provision, while nothing in the legislative history of IIRIRA can be read to forbid adoption of the procedure

28

advanced by the IFR. Additionally, the government's interpretation of the statute is consistent with Executive Branch interpretations going back to 1997 and the initial regulations promulgated in the wake of IIRIRA, as well as the prior administration's own claims about the statute's ambiguity and the government's authority to adopt non-1229a proceedings to resolve asylum claims arising from credible fear proceedings. Finally, section 1225(b)(1)(B)(ii)'s text and history further demonstrate that the IFR is a "procedure[]" or "polic[y]" "implement[ing] the provisions of section 1225(b)(1)," 8 U.S.C. § 1252(a)(2)(A)(iv), such that judicial review of any challenge to the IFR may be brought only in the District of Columbia. *See* 8 U.S.C. § 1252(e)(3)(A); Dkts. 5, 16.

A.   The Legislative History of Expedited Removal

Congress's enactment of the expedited removal provisions through IIRIRA, including Section 1225(b)(1)(B)(ii), was the culmination of more than a decade of congressional consideration of a more streamlined procedure for removing certain inadmissible noncitizens from the United States. Despite the disparity of provisions considered and enacted, however, there are at least two key takeaways from this history: (1) Congress consistently sought to forestall recourse to a full removal proceeding for noncitizens who established the threshold credible fear of persecution; and (2) Congress was aware of how to mandate a specific procedure for consideration of a noncitizen's asylum claim in expedited proceedings, and did so in various precursors to Section 1225(b)(1)(B)(ii).

In 1983, both houses of Congress took up versions of what was known as the Immigration Reform and Control Act of 1983. *See* H.R. 1510, 98th Cong., 1st Sess. (1983); S. 529, 98th Cong., 1st Sess. (1983). These bills provided for the streamlined exclusion of noncitizens seeking entry who did "not present the documentation required ... to obtain entry to the United States" and who

did "not have any reasonable basis for legal entry into the United States."[17] H.R. 1510, § 121. Noncitizens otherwise subject to the streamlined exclusion process could avoid expedited exclusion by indicating "an intent to apply for asylum." *See id.* Noncitizens who did make a threshold showing of eligibility for asylum were referred for exclusion proceedings, but those proceedings were "limited to the issues raised in connection with the alien's application for asylum." *Id.*; *accord* S. 529, at § 121(b). In other words, the 1983 bills barred a full exclusion hearing for noncitizens who could establish a threshold showing of eligibility for asylum, and set up an early version of the current "asylum-only" proceeding.

Congress justified this narrow procedure by reference to the posture of such cases: "If an alien's only claim for entry is a request for asylum, the exclusion for that alien would be limited to the asylum issue." H.R. Rept. 98-115, pt. 1, 98th Cong., 1st Sess. 76 (May 13, 1983); *accord* S. Rept. 98-62, 98th Cong., 1s Sess. 35. The streamlined asylum proceeding was also "designed to prevent aliens from delaying their expulsion by raising issues never before put in controversy," H.R. Rept. 98-115, at 52, which was a specific aspect of Congress's more general intention of increasing the adjudicative efficiency of the asylum process. As Senator Alan Simpson, one of the co-sponsors of the Senate version of the bill, wrote, "[t]he bill operates under the assumption that

---

[17] The immigration laws "historically distinguished between aliens who have 'entered' the United States and aliens still seeking to enter (whether or not they are physically present on American soil." *Jama v. Immigration and Customs Enf't*, 543 U.S. 335, 349 (2005) (citation omitted). Immigration proceedings traditionally tracked this distinction: "[t]he deportation hearing is the usual means of proceeding against an alien already physically present in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission." *Landon v. Plasencia*, 459 U.S. 21, 25 (1982). With IIRIRA, Congress eliminated the distinction between "exclusion" proceedings and "deportation" proceedings, and replaced them with a single unified proceeding termed a "removal proceeding." IIRIRA § 304(a)(3), codified at 8 U.S.C. §§ 1229, 1229a; *see Jama*, 543 U.S. at 349. Despite the new unified proceeding, the INA does retain the distinction between admissibility and deportability, and the separate grounds of removal applicable to each class of noncitizen. *See* 8 U.S.C. § 1182 (grounds of inadmissibility); 8 U.S.C. § 1227 (grounds of deportability).

valid asylum claims should be approved as soon as possible, and invalid claims should not be encouraged by a system allowing extensive delays and endless opportunities for appeal." Senator Alan K. Simpson, *The Immigration Reform and Control Act: Immigration Policy and the National Interest*, 17 U. Mich. J. L. Reform 147, 161 (1984); *see id.* ("The reforms in the area of asylum adjudication attempt to accelerate the decision process and streamline the review mechanism, while retaining fundamental fairness and objectivity.").

The 1983 bills failed to become law, and it was not until 1996 that Congress enacted an expedited removal provision as part of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996). That Act provided that "[t]he examining immigration officer shall refer for an interview by an asylum officer any [qualifying excludable] alien who ... has indicated an intention to apply for asylum under section 208 or a fear of persecution." AEDPA § 422(b)(1)(B). As with the earlier bills, AEDPA did not mandate a full removal proceeding upon a finding of a credible fear, but neither did it contemplate an "asylum-only" proceeding before an immigration judge. Instead, AEDPA provided that "[i]f the officer determines at the time of the interview that an alien has a credible fear of persecution ..., the alien shall be detained for an asylum hearing before an asylum officer under section 208." AEDPA § 422(b)(1)(C)(ii). The Conference Report described this process as detention "for *further consideration of the application for asylum.*" H.R. Conf. Rept. 104-518, 104th Cong., 2d Sess. 117 (Apr. 15, 1996) (emphasis added).

Although AEDPA was enacted, this provision never took effect. The day AEDPA was signed by President Clinton, Congress, by concurrent resolution, provided that the effective date for the expedited removal provision would be set for 180 days after enactment, rather than the 90 days provided for in the bill itself. *See* S. Con. Res. 55(i), 104th Cong., 2d Sess. (Apr. 24, 1996).

A mere 159 days after passage of AEDPA, however, Congress enacted IIRIRA. As part of IIRIRA, Congress repealed the recently enacted expedited exclusion provision before it could take effect. *See* IIRIRA § 308(d)(5) ("Effective as of the date of the enactment of the [AEDPA], section 422 of such Act is repealed and the [INA] shall be applied as if such section had not been enacted.").

With IIRIRA, Congress enacted a new expedited-removal provision. It retained the fundamental features of the 1983 bills and AEDPA, by requiring an immigration officer to refer a noncitizen arriving in the United States to an asylum officer where the noncitizen "indicates either an intention to apply for asylum under section 208 or a fear of persecution." IIRIRA § 302(a), *codified* at 8 U.S.C. § 1225(b)(1)(A)(ii). But unlike either the 1983 bills or AEDPA, it declined to enact a set procedure for what happened upon a determination that a noncitizen possessed a credible fear of persecution; it adopted neither the asylum-only scheme of the 1983 bills nor the asylum-officer review of AEDPA. Instead, Congress enacted language lifted from AEDPA's Conference Report describing how the prior provision would have worked: "If the officer determines at the time of the interview that an alien has a credible fear of persecution ... the alien shall be detained for *further consideration of the application for asylum.*" *Compare* IIRIRA § 302(a), codified at 8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added) (enacting this language), *with* H.R. Conf. Rept. 104-518, at 117 (using identical language to describe the process under AEDPA § 422(b)(1)(C)(ii)).

This history holds two lessons applicable to consideration of the IFR. First, Congress consistently sought to provide further consideration of a positive credible fear determination in a streamlined proceeding outside the scope of a full removal proceeding. In the 1983 bills that never became law, that took the shape of an asylum-only proceeding; an exclusion hearing where the

only issues raised would pertain to the application for asylum.[18] In 1996, with AEDPA, the form Congress selected aligns with what the IFR proposes—an initial hearing before an asylum officer—and in IIRIRA, Congress enacted the governing statutory text that mirrors the AEDPA Conference Report's description of that law's procedure. The reasoning for this preference constitutes a through-line extending from at least the 1983 bills through the IFR: with the only issue being eligibility for asylum, it makes sense to place the noncitizen in something less than a full removal proceeding.

Second, where Congress had a preference for the mechanism the Executive Branch would be required to implement in conducting the further consideration of asylum eligibility, it used express language to that effect. In 1983, the bills proposed by Congress would have left little interpretive leeway to the Executive Branch: the Department of Justice would be required to conduct an exclusion hearing for noncitizens who expressed a credible fear of persecution, but that hearing would be limited, by the terms of the statute, to consideration of the asylum application only. Similarly, with AEDPA, the Department would have been required to provide an asylum officer hearing upon the line-officer's determination that the noncitizen had a credible fear of persecution, with no discretion to establish a different mechanism or procedure. Unlike either the proposed bills or AEDPA, Congress did not mandate any particular procedure in the text of IIRIRA.

This history thus leads to one of two conclusions, both favorable to the government's interpretation in the IFR.

First, Congress left the statute deliberately ambiguous to permit the Executive Branch to

---

[18] As discussed below, the prior administration sought to implement this sort of procedure through a rule, *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36264, 36266 (June 15, 2020).

implement the procedure it thought best fulfilled the purpose of the expedited removal statute. In contrast, where Congress wanted to mandate a particular procedure, it did so explicitly; when it wanted an immigration judge to review a determination arising from the expedited removal proceeding, it clearly stated that intent, *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (requiring immigration judge review of a negative credible fear determination when requested by the noncitizen); 8 U.S.C. § 1225(b)(2)(A) (requiring removal proceedings under section 1229a for certain inadmissible applicants for admission), just as when it wanted to foreclose a full 1229a proceeding for a class of noncitizens, *see* 8 U.S.C. § 1225(a)(2) (barring stowaways from Section 1229a proceedings), or deny an entitlement to such proceedings to a class or classes of noncitizens, *see* 8 U.S.C. § 1225(b)(2)(B)(i)-(iii) (certain classes of inadmissible applicants for admission not entitled to a Section 1229a proceeding), it did so explicitly. "'[W]hen Congress includes particular language in one section of a statute but omits it in another[,]'" courts "'presume[] that Congress intended a difference in meaning.'" *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (first and second alterations in the original) (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)). More specifically, "a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion." *Catawba Cty., N.C. v EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009). This statutory structure and history support the conclusion that the current statute at least constitutes an implicit delegation of authority to the Executive Branch to determine the best procedure, and the question solely becomes whether the procedure selected by the government constitutes a permissible option. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843-44 (1984); *see also Negusie v. Holder*, 555 U.S. 511, 516–17 (2009) (discussing the INA, and holding that "[i]t is well settled that principles of Chevron deference are applicable to this

statutory scheme"). Or, second, by deliberately enacting in IIRIRA the language Congress had previously used to describe asylum-officer review under AEDPA, Congress sought to direct the Executive Branch towards that resolution. Under the first conclusion, the Departments' IFR is a permissible interpretation entitled to deference, while under the second, it is the exact fulfillment of Congressional intent as gleaned from the legislative development of Section 1225(b)(1)(B)(ii). Plaintiffs' contrary interpretation of Section 1225(b)(1)(B)(ii), as requiring a Section 1229a proceeding to resolve the asylum claim, *see, e.g.*, Mot. 21 (arguing that Section 1229a(a)(3) requires an immigration judge to adjudicate such claims in Section 1229a proceedings), simply is not colorable under any plausible interpretation of the statute's historical development.

B.  "Further Consideration" and Available Evidence of Legislative Intent

Although using legislative history to render clear an otherwise ambiguous statutory provision is a fraught enterprise, to the extent it is appropriate to refer to legislative history in construing section 1225(b)(1)(B)(ii), that history supports the view that Congress delegated to the Executive Branch authority to promulgate rules governing "further consideration" of applications for asylum and that the IFR is a lawful exercise of that authority.

As the Supreme Court has noted, "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). "[L]egislative history is itself often murky, ambiguous, and contradictory," *id.*, and "judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text," *id*. Here, the available evidence of legislative intent is, at best,

ambiguous regarding the question raised by this case: did Congress require a specific procedure to follow a positive credible fear determination. The legislative history includes both evidence that Congress desired flexibility and evidence that it expected a full removal proceeding to follow a credible fear finding, as well as other opaque statements that fail to offer a clear answer to the pivotal question of whether a particular procedure was intended. Moreover, the evidence against the IFR is contained in various reports that represent a minority of the Congress as a whole, as well as a minority of the actual committees that produced the reports. They cannot be said to embody in any meaningful sense the will of the legislature.

First, legislative history points in both directions. On February 11, 1997, the House Judiciary Committee held a hearing to address implementation concerns arising from IIRIRA, as well as the recently proposed Department of Justice (DOJ) regulations implementing the new statute. *See Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, 105th Cong. (1997) (IIRIRA Hearing). Included in the materials for that hearing was a letter from the Subcommittee Chairman, Representative Lamar Smith, who had also been a driver of IIRIRA while on the House Judiciary Committee the prior year, and a member of the team of House managers when the competing House and Senate bills went to conference, *see* H.R. Conf. Rept. 104-828, at 251 (Conference Report). Congressman Smith took issue with DOJ's proposal to provide a full removal hearing following a credible fear referral, noting that:

> Section 235(b)(1)(B)(ii) [was] drafted deliberately to leave flexibility regarding how the asylum adjudication would take place. However, the point of the referral is to provide for adjudication of the asylum claim, not an adjudication of the alien's right to be admitted to the United States on other grounds. Hence, we are concerned with the decision to provide such aliens with a full right to a hearing under section 240.[19]

---

[19] Congressman Smith proposed that the regulation be amended "to provide that such aliens shall receive an 'asylum-only' hearing before an immigration judge, with right of appeal to the Board of Immigration Appeals." *See* Smith Letter, *in IIRIRA Hearing*, *supra* 21-22.

Letter from Lamar Smith, Chairman, Subcommittee on Immigration and Claims, to Richard A. Sloan, Director, Policy Directives and Instructions Branch, INS, Re: INS 1788-96, RIN 1115-AE47 (Feb. 3, 1997) (Smith Letter), in IIRIRA Hearing, *supra* 21. Congressman Bill McCollum was also part of the House managers for the IIRIRA conference, as well as a member of the House Judiciary Committee, and similarly expressed a view that the statute was open-ended as against the more specific procedure Congress put into place to address negative credible fear determinations, which triggered review by an immigration judge. *See* IIRIRA Hearing, *supra* 43-44 (statement of Rep. Bill McCollum) ("If the asylum officer determines that the alien has a credible fear of persecution, the alien shall be detained for further consideration. If the asylum officer determines that the alien does not have a credible fear of persecution, the alien may request a review of this decision by an immigration judge.").

Against these statements is a range of potentially contrary evidence of varying specificity. For instance, the House Judiciary Committee Report stated that "[t]he credible fear standard is designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed *to the regular asylum process*. If the alien meets this threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim, the same as any other alien in the U.S." H.R. Rept. 104-469, pt. 1, at 158 (emphasis added). Echoing this point, Senator Orrin Hatch, who served on the conference committee on behalf of the Senate, opined that those who establish a credible fear of persecution "will be referred to the usual asylum process." 142 Cong. Rec. S. 11491 (Sept. 27, 1996) (Statement of Sen. Hatch); *see id.* (the credible fear standard was "intended to be a low screening standard for admission *into the usual full asylum process*") (emphasis added). The Conference Report stated that "[i]f the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application

for asylum under normal non-expedited removal proceedings." H.R. Conf. Rept. 104-828, at 209.

Although ostensibly in tension with the text of the statute, as well as the views of Congressmen Smith and McCollum, these points are themselves ambiguous. The statements in the House Judiciary Committee Report and by Senator Hatch are vague, referring ultimately only to full consideration of the asylum claim without a description as to what form of proceeding that consideration could take. Full consideration could encompass asylum-only proceedings, such as those contemplated by Congressman Smith, *see supra* 36-37 & n.19, or a process commencing with consideration of the application by an asylum officer outside of any removal proceeding, which would be available to noncitizens present in the United States, *see* 8 C.F.R. § 208.2(a), or a formal removal proceeding under Section 1229a. None of these potential options is in derogation of the language used in the Report or by Senator Hatch. Even the Conference Report statement regarding full non-expedited proceedings expresses only an expectation for such proceedings, in contrast to the direction that noncitizens be detained *during* those proceedings unless released on parole. *See, e.g., Council for Urological Interests v. Burwell*, 790 F.3d 212, 221 (D.C. Cir. 2015) (although expressing a congressional "inten[t]," "[t]he language [in the conference report] is not obligatory," and thus insufficient to render statute unambiguous).

The statutory language that Congress actually enacted does not "unambiguously forbid," *Barnhart v. Wilson*, 535 U.S. 212, 218 (2002), the procedure adopted by the IFR. Although the Supreme Court has noted that "clear evidence of congressional intent may illuminate ambiguous text," it has also cautioned against "allowing ambiguous legislative history to muddy clear statutory language." *Milner v. Dep.t of Navy*, 562 U.S. 562, 572 (2011). The available evidence of legislative intent is ambiguous, and at best points in multiple directions. In such circumstances, it is of little or no use in illuminating the text Congress enacted, and certainly not sufficiently

compelling to render unambiguous a provision that otherwise clearly provides flexibility to the Executive Branch. *Cf. Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 238 (11th Cir. 1995) ("we may decline to follow the plain meaning of a statute because *overwhelming extrinsic evidence demonstrates a legislative intent contrary to the text's plain meaning*") (emphasis added).

Second, this case also highlights the other danger noted by the Supreme Court in *Exxon Mobil*, *i.e.*, for whom do these legislative materials speak? The Conference Report was the product of seven Senators and eleven Representatives, not the Congress as a whole. *See* H.R. Conf. Rept. 251-52 (listing Managers). This calculus is complicated further by the fact that two of the House managers, Representatives Smith and McCollum, clearly took a different view from that ostensibly embodied in the Conference Report. Likewise, even the House Judiciary Committee Report reflects substantial disagreement about amendments offered during the process, *see* H.R. Rept. 104-469, pt. 1, at 187-205, and specific aspects of the bill, which ultimately embodied a range of views and opinions on virtually every aspect of the legislation, *see, e.g., id.* at 512-14 (additional views of Rep. Elton Gallegly); *id.* at 515-16 (additional views of Rep. Ed Bryant, et al.); *id.* at 517-18 (additional views of Rep. Jack Reed); *id.* at 519-25 (additional views of Rep. John Conyers, et al.); *id.* at 526-45 (dissenting views of Rep. John Conyers, et al.). Using legislative history in this context "would demean the constitutionally prescribed method of legislating to suppose that its elaborate apparatus for deliberation on, amending, and approving a text is just a way to create some evidence about the law, while the real source of legal rules is the mental processes of legislators." *Matter of Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989) (Easterbrook, J.).

The final flexibility and ambiguity embodied in the text of the statute thus likely reflects a compromise between differing views in Congress about what procedures could be implemented.

As the Supreme Court has noted, "Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises." *Bd. of Governors of the Fed. Res. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986). Such delegations of authority are especially common in the immigration laws, where Congress has authorized the Secretary to "establish such regulations ... as he deems necessary for carrying out his authority," 8 U.S.C. § 1103(a)(1); mandated that the "Attorney General shall establish such regulations, ... issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as [he] determines to be necessary for carrying out" the law, 8 U.S.C. § 1103(g)(2); directed that the Secretary and Attorney General shall establish "the requirement [] and procedures" governing applications for and consideration of asylum, 8 U.S.C. § 1158(b)(1)(A); and otherwise filled the INA with various delegations large and small to be resolved by the Executive Branch. *See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) ("It is clear that principles of *Chevron* deference are applicable to [the INA]."); *Negusie*, 555 U.S. at 516-17 ("[j]udicial deference in the immigration context is of special importance"). Here, Congress unquestionably wanted to establish an expedited removal system in IIRIRA, and additionally wanted to safeguard consideration of valid asylum claims once a credible fear was established. It did so by delegating to the Executive Branch the authority to establish the procedures best designed to meet these goals, and this Court is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994).

C.   The Executive Branch Has, Over the Course of Multiple Administrations, Held to the View that Section 1225(b)(1)(B)(ii) is Ambiguous

The Executive Branch has never, since the enactment of Section 1225(b)(1)(B)(ii), taken

the view that this provision unambiguously requires immigration judge review, in a full removal proceeding, of asylum claims of individuals determined to have a credible fear determination. Instead, it has consistently professed the ambiguity of this provision, while implementing or proposing a range of permissible procedures best suited to meet the policy goals of current immigration enforcement. That longstanding interpretation is significant, as courts "give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States*, 495 U.S. 472, 484 (1990) (citing *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 (1933)); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) ("the government's early, longstanding, and consistent interpretation of a statute, regulation, or other legal instrument could count as powerful evidence of its original public meaning" (emphasis omitted)).

Beginning in January 1997, in proposed regulations to implement the many changes wrought by IIRIRA, DOJ noted that "Section 1225(b)(1)(B)(ii) of the Act provides that aliens who are determined by an asylum officer to have a credible fear of persecution will be detained for further consideration of the asylum claim.... [But] the statute *does not specify how or by whom this further consideration should be conducted*[.]" 62 Fed. Reg. 444, 447 (Jan. 3, 1997) (emphasis added). In response to the proposed rule on IJ review of asylum claims of noncitizens determined to have a credible fear, at least one "commenter maintain[ed] that IIRIRA contemplates that [aliens who establish a credible fear of persecution] will be limited to an 'asylum only' hearing with an appeal to the Board." *See* 62 Fed. Reg. 10312, 10320 (Mar. 6, 1997). But the DOJ again disagreed that the statute mandated any particular procedure, noting both the specificity of other provisions of Section 235 and the ambiguity of Section 1225(b)(1)(B)(ii) specifically: "The remainder of

section 235(b) of the Act is very specific as to what procedures should be followed if an alien does not establish a credible fear. However, the statute is silent as to the procedures for those who do demonstrate a credible fear of persecution." *Id.*

Ultimately, DOJ opted to adopt IJ review of a positive credible fear determinations via referral for a full proceeding under Section 1229a. DOJ justified this mechanism as a reasonable interpretation of the statute and its purposes. The intent of the expedited removal provision was to "screen out arriving aliens with fraudulent documents or no documents and with no significant possibility of establishing a claim to asylum." 62 Fed. Reg. at 10320.  Once a noncitizen arriving in the United States established a credible fear of persecution, this intent was satisfied, and it was permissible to shift the noncitizen from the expedited procedures to full removal proceedings under Section 1229a. *See id*.

No substantive changes were made to this interpretation of Section 1225(b)(1)(B)(ii) during the subsequent two administrations. But neither did those administrations state that the regulatory mechanism established in 1997 was in fact statutorily required. Instead, through rule-making that addressed other asylum and expedited-removal issues, these administrations quoted only the broad language of the statute requiring "further consideration" of asylum applications, without hinting at any limitations on the scope of their authority to establish what constituted permissible "further consideration." *See, e.g.*, 69 Fed. Reg. 69480, 69481 (Nov. 29, 2004) (implementing the U.S. – Canada Safe Third Country Agreement, and noting the open-ended delegation regarding "further consideration" once a credible fear is established).

It was not until the previous administration that a substantive change to the regulatory framework for credible fear determinations was proposed. Harkening back to the 1983 bills, in 2020 the DOJ and DHS proposed a joint rule "to amend [the regulations] ... so that aliens who

42

establish a credible fear of persecution, a reasonable possibility of persecution, or a reasonable possibility of torture and accordingly receive a positive fear determination will appear before an immigration judge for 'asylum-and-withholding-only' proceedings." 85 Fed. Reg. 36264, 36266 (June 15, 2020). The Departments justified this interpretation on grounds of ambiguity in the statutory text, statutory context, and purpose. First, "[t]he INA ... instructs only that an alien who is found to have a credible fear 'shall be detained for further consideration of the application for asylum,' and neither mandates that an alien who demonstrates a credible fear be placed in removal proceedings in general nor in section 240 proceedings specifically." *Id*. Second, this ambiguity was bolstered by statutory context; interpretive flexibility was supported by the different language Congress used in Section 1225(b)(2), which mandated a proceeding under Section 1229a, as well as the general exclusion of noncitizens subject to expedited removal proceedings from the statutory entitlement to Section 1229a proceedings. *See id.* Finally, a purposivist interpretation pointed away from full Section 1229a proceedings. A full removal proceeding was designed to deal with questions of removability and whether a noncitizen is eligible for immigration benefits, which were not present in referred-credible fear proceedings, whereas a referral for full proceedings effectively negated DHS's initial charging determination to process the noncitizen through expedited proceedings rather than Section 1229a proceedings. *Id*.

In the final 2020 regulation, promulgated six months later, the Departments maintained their view of ambiguity in the face of commenters who opined "that the INA requires aliens who are found to have a credible fear to be placed in full removal proceedings pursuant to section 240 of the Act[.]" 85 Fed. Reg. 80274, 80288 (Dec. 11, 2020). Like the previous rejection of an interpretation of the statute as mandating asylum-only proceedings, *see* 62 Fed. Reg. at 447; *id.* at 10320, the 2020 regulation rejected the contention that a full removal proceeding before an

immigration judge was statutorily mandated or the only mechanism available for addressing asylum claims after a positive credible fear determination: "The expedited removal statute states only that 'the alien shall be detained for further consideration of the application of asylum,' but is silent on the type of proceeding," 85 Fed. Reg. at 80,288.[20]

The IFR is consistent with these regulatory forebears from previous administrations, based as it is on the exact same statutory ambiguity. No administration has taken a different view from the one professed in the IFR, and the Departments' current interpretation of the statute as permitting a range of possible mechanisms to effectuate the goal of "further consideration" is indistinguishable from the interpretations in previous rulemakings.

Finally, Section 1225(b)(1)(B)(ii)'s text and history further support Defendants' motion to transfer or dismiss, Dkts. 5, 16, which the Court denied without prejudice to granting the motion "should the Court's legal and factual findings warrant." Dkt 24 at 1; *see* Tr. at 70:24-71:2 ("I'm not going to stay or transfer the case right now"). As the foregoing demonstrates, the IFR is a "procedure[]" or "polic[y]" "implement[ing] the provisions of section 1225(b)(1)," 8 U.S.C. § 1252(a)(2)(A)(iv). Specifically, the IFR implements Section 1225(b)(1)(B)(ii), through which Congress delegated the authority to the Executive Branch to determine what form of "further" proceeding an asylum application would take after a noncitizen passed a credible fear screening. *Supra* 28-43. Judicial review of any challenge to the IFR therefore may be brought only in the District of Columbia, *see* 8 U.S.C. § 1252(e)(3)(A); Dkts. 5, 16, and the Court should transfer the case there.

---

[20] Curiously, Plaintiffs did not challenge this rulemaking, either through comment or a legal challenge, let alone on any ground similar to that they advance here. Both the prior rule and the IFR similarly attempt to establish streamlined asylum proceedings, i.e., something other than a full removal proceeding under section 1229a before an immigration judge, to resolve asylum claims referred from a positive credible-fear determination.

## CONCLUSION

For these reasons, Section 1252(f)(1) bars injunctive relief in this case, as well as universal set-aside or vacatur relief under 5 U.S.C. § 706; Section 1252(f)(1) is a jurisdictional limit not subject to forfeiture; the *ultra vires* doctrine has no bearing on this case; and the legislative history of section 1225(b)(1)(B)(ii) supports the government.

Dated: June 3, 2022                         Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            WILLIAM C. PEACHEY
                                            Director
                                            Office of Immigration Litigation
                                            District Court Section

                                            /s/ *Erez Reuveni*
                                            EREZ REUVENI
                                            Assistant Director
                                            U.S. Department of Justice
                                            Civil Division, Office of Immigration Litigation
                                            450 5th St NW
                                            Washington, DC 20530
                                            Tel: (202) 307-4293
                                            Email: erez.r.reuveni@usdoj.gov

                                            PATRICK GLEN
                                            BRIAN C. WARD
                                            Senior Litigation Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2022, I electronically filed this motion with the Clerk of the Court for the United States District Court for the Western District of Louisiana by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Erez Reuveni
EREZ REUVENI
U.S. Department of Justice