**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| STATE OF ARIZONA, *et al.*,<br><br>PLAINTIFFS,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity<br>as Attorney General of the United States, *et al.*,<br><br>DEFENDANTS. | CIVIL ACTION NO. 6:22-cv-01130 |

**PLAINTIFF STATES' SUPPLEMENTAL BRIEFING IN RESPONSE TO THIS
COURT'S MAY 18, ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ...............................................................................................................1

ARGUMENT.......................................................................................................................3

I.   SECTION 1252(F) DOES NOT IMPOSE LIMITATIONS ON THE RELIEF SOUGHT IN THIS CASE.................................................................................................................3

    A.   Section 1252(f) is remedial, not jurisdictional. ..............................................3

    B.   Section 1252(f)(1) Does Not Preclude APA Review .......................................5

        1.   Section 1252(F)(1) Permits Vacatur of Unlawful Administrative Action Under 5 U.S.C. § 706...............................................................................................6

        2.   Section 1252(f)(1) Permits Declaratory Relief ...........................................7

    C.   Section 1252(f)(1) Does Not Apply To The Injunctive Relief Sought Here............................8

        1.   The restriction on injunctive relief is narrow and does not apply to an injunction requiring enforcement. ..............................................................................8

        2.   The Term "Enjoin" in Section 1252(f)(1) Does Not Foreclose All Injunctions..........10

    D.   The narrow scope of Section 1252(f)(1) is confirmed by its context. ....................................11

    E.   Even if Section 1252 Could Be Read As Being Applicable To This Case, It Would Not Apply To All of the States' Claims..........................................................................................12

II.  THIS COURT HAS JURISDICTION TO REVIEW AGENCY ACTIONS ALLEGED TO BE ULTRA VIRES................................................................................................................13

    A.   The Case Falls Within The Supreme Court's *Kyne* Exception ..................................13

III. THE LEGISLATIVE HISTORY, TEXT, AND CONTEXT PRECLUDE DEFENDANTS' INTERPRETATION OF "FURTHER CONSIDERATION".....................................................17

    A.   The Legislative History Shows Congress Intended the Opposite of What the Asylum IFR Does 17

    B.   The Legislative Text And Context Demonstrate The Phrase "Further Consideration Of The Application For Asylum" In 8 U.S.C. § 1225(B)(1)(B)(ii) Does Not Confer Authority For The Asylum IFR..........................................................................................................19

CONCLUSION..................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) ........................................................................................5

*Air Wis. Airlines Corp. v. Hoeper*,
    571 U.S. 237 (2014) ........................................................................................4

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002) ........................................................................................7

*Bloate v. United States*,
    559 U.S. 196 (2010) ......................................................................................10

*Board of Governors of the Fed. Rsrv. Sys. v. MCorp Financial*,
    502 U.S. 32 (1991) ..................................................................................14, 15

*Boechler, P.C. v. Commissioner*,
    142 S. Ct. 1493 (2022) ....................................................................................3

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ....................................................................................3, 6

*Breen v. Selective Serv. Loc. Bd. No. 16, Bridgeport, Conn.*,
    396 U.S. 460 (1970) ..................................................................................13, 16

*Brito v. Garland*,
    22 F.4th 240 (1st Cir. 2021) ...........................................................................9

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ....................................................................................21, 22

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................................10, 11

*Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*,
    993 F.3d 880 (D.C. Cir. 2021) .........................................................................5

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
    944 F.3d 773 (9th Cir. 2019) .........................................................................18

*Clark v. Martinez*,
    543 U.S. 371 (2005) ......................................................................................21

*Corley v. United States*,
    556 U.S. 303 (2009) ......................................................................................19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020) ....................................................................................5

*DHS v. Thuraissigiam*,
    140 S.Ct. 1959 (2020) ................................................................................6, 11

*Direct Mktg. Ass'n v. Brohl,*
  575 U.S. 1 (2015) ................................................................................................8

*Edmond v. United States,*
  520 U.S. 651 (1997) ................................................................................21, 22

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..........................................................................................12

*Freytag v. Commr.,*
  501 U.S. 868 (1991) ..........................................................................................21

*Glidden Co. v. Zdanok,*
  370 U.S. 530 (1962) ............................................................................................4

*Grace v. Barr,*
  965 F.3d 883 (D.C. Cir. 2020) ...........................................................................6

*Graham v. Caston,*
  568 F.2d 1092 (5th Cir. 1978) ...................................................................14, 16

*Hamama v. Adducci,*
  946 F.3d 875 (6th Cir. 2020) ..............................................................................9

*Hatmaker v. Mem'l Med. Ctr.,*
  619 F.3d 741 (7th Cir. 2010) ............................................................................16

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) ..........................................................................................11

*Hibbs v. Winn,*
  542 U.S. 88 (2004) ............................................................................................19

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) ..........................................................................................7

*Johnson v. City of Shelby, Miss.,*
  574 U.S. 10 (2014) ............................................................................................17

*Johnson v. PPI Tech. Servs., L.P.,*
  613 F. App'x 309 (5th Cir. 2015) .....................................................................16

*Kirby Corp. v. Pena,*
  109 F.3d 258 (5th Cir. 1997) .....................................................................15, 16

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ....................................................................................13, 16

*Lightfoot v. Cendant Mortg. Corp.,*
  137 S. Ct. 553 (2017) ..........................................................................................3

*Lucia v. S.E.C,*
  138 S. Ct. 2044 (2018) ................................................................................21, 22

*Mach Mining, LLC v. E.E.O.C.,*
  575 U.S. 480 (2015) ............................................................................................6

*Manges v. Camp,*
    474 F.2d 97 (5th Cir. 1973) ................................................................. 1, 14, 15, 16, 17

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ........................................................................................7

*New Prime, Inc. v. Oliveira,*
    139 S. Ct. 532 (2019) ....................................................................................20

*Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019) ............................................................7

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................8

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne, Wyo.,*
    393 U.S. 233 (1968) ..................................................................................13, 16

*Reed Elsevier, Inc. v. Muchnick,*
    559 U.S. 154 (2010) ........................................................................................3

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ...................................................................................3, 10

*Reno v. Cath. Soc. Servs., Inc.,*
    509 U.S. 43 (1993) .......................................................................................5, 8

*Salinas v. U.S. R.R. Ret. Bd.,*
    141 S. Ct. 691 (2021) ......................................................................................4

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..........................................................................................4

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ........................................................................................7

*Sturgeon v. Frost,*
    577 U.S. 424 (2016) ......................................................................................19

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ...................................................................9, 11, 12

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex.) ........................................................................14

*United States v. Arthrex,*
    141 S. Ct. 1970 (2021) ...................................................................................22

**STATUTES**

12 U.S.C. § 1818 ...............................................................................................15

5 U.S.C. § 559 ....................................................................................................5

5 U.S.C. § 703 ....................................................................................................7

5 U.S.C. § 706 ....................................................................................................5

8 C.F.R. § 208.1 ...............................................................................................21

8 C.F.R. § 208.14 .............................................................................................21

8 C.F.R. § 208.9 ....................................................................................................................................21

8 U.S.C. § 1103 .......................................................................................................................................1

8 U.S.C. § 1158 ............................................................................................................................... 19, 20

8 U.S.C. § 1182 .....................................................................................................................................12

8 U.S.C. § 1225 ...................................................................................................................2, 19, 21, 22

8 U.S.C. § 1229a ............................................................................................................................... 1, 19

8 U.S.C. § 1252 .......................................................................................................................................7

H.R. Conf. Rep. 104-828 (1996) .......................................................................................................18

H.R. Rep. No. 104-828 (1996) (Conf. Rep.) ............................................................................. 2, 17

H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, Mar. 4, 1996 ..................................................11

Omnibus Consolidated Appropriations Act, 1997, PL 104–208, September 30, 1996, 110 Stat 3009 .................................................................................................................................................18

Pub. L. 104–208, 110 Stat. 3009–546 (1996) .................................................................................11

Pub. L. 104–208, 110 Stat. 3009–546 § 302 (1996) .....................................................................17

Pub. L. No. 107-296 § 451(b) (2002) .................................................................................................1

S.Rep. No. 752, 79th Cong., 1st Sess. (1945) .................................................................................6

## OTHER AUTHORITIES

32 Weekly Comp. Pres. Doc. 1935, 1996 U.S.C.C.A.N. 3388, 3391 (Sep. 30, 1996)...........17

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195-98 (2012)...... 5, 10

Bryan A. Garner, *A Dictionary of Modern Legal Usage* 317 (3d ed. 2009)...................................10

*New Oxford American Dictionary* 1229 (2010) ..................................................................................8

*Webster's Third New International Dictionary of the English Language* 754 (2002) ...........................8

## REGULATIONS

87 Fed. Reg. 18,078 (May 31, 2022) ......................................................................................... 21, 22

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2 ........................................................................................................................5

## INTRODUCTION

**I.**     Section 1252(f)(1) does not prevent this Court from ordering the relief that Plaintiff States seek. That relief does not prevent the operation of federal immigration laws. To the contrary, it would require Defendants to abide by the requirements of those laws, including (1) the Immigration and Nationality Act ("INA"), which requires that aliens be subject to removal proceedings before an Immigration Judge "[u]nless otherwise specified in this chapter," 8 U.S.C. § 1229a(a)(3); (2) the Homeland Security Act (HSA), which requires that asylum claims be adjudicated by Immigration Judges (IJs), Pub. L. No. 107-296 § 451(b) (2002) and 8 U.S.C. § 1103(g)(1); and (3) the Secure Fence Act, which requires that Defendants achieve operational control of the border.

Section 1252(f)(1), which forbids lower courts "to enjoin or restrain the operation" of certain provisions of the INA, poses no obstacle to such an injunction, which would actually prevent Defendants from violating those provisions of the INA. And in any event, section 1252(f)(1) does not affect a district court's authority to vacate unlawful action or to enter declaratory relief.

**II.**     The exception enunciated by the Supreme Court in *Leedom v. Kyne,* 358 U.S. 184, 188-90 (1958) holds that a jurisdiction-stripping statute will not deprive federal courts of jurisdiction to review claims that agency action is *ultra vires* when a party otherwise "would wholly [be] deprive[d] … of a meaningful and adequate means of vindicating its rights." *MCorp Fin., Inc.*, 502 U.S. at 43. Thus, when an administrative action is clearly unlawful, federal courts have jurisdiction to review that action, even if a jurisdictional statute might otherwise apply. "[A] clear departure from designated authority *demands* judicial review." *Manges v. Camp*, 474 F.2d 97, 99 (5th Cir. 1973) (emphasis added). And the States' Complaint specifically alleges that the Asylum IFR is *ultra vires*, and thus falls within the *Kyne* exception.

In addition, because the *Kyne* exception functions as a defense to dismissal, then Plaintiffs were not required to plead it in their complaint. But even if they were, Plaintiffs have asserted numerous

allegations in their complaint contending that the Asylum IFR is *ultra vires*, which would thus trigger the *Kyne* exception. *See* Doc. 14 at ¶¶ 1-9, 130-156.

**III.**     The legislative history, text, and statutory context establish that "further consideration of the application for asylum" under 8 U.S.C. § 1225(b)(1)(B)(ii) is contrary to the Asylum IFR. Congress added the phrase "further consideration of the application for asylum" to the INA when it adopted in 1996 the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104–208, 110 Stat. 3009–546 (1996). IIRIRA's purpose was "to improve deterrence of illegal immigration to the United States by ... reforming exclusion and deportation law and procedures." H.R. Rep. No. 104-828, at 1 and 199 (1996) (Conf. Rep.).

Congress did not intend that the mere seven words "further consideration of the application for asylum" would confer on the federal government breathtaking authority to invent wholly new asylum procedures that *facilitate and encourage* illegal immigration. The House Conference Report for IIRIRA confirms that Congress understood "further consideration of the application for asylum" to mean normal removal proceedings in an adversarial process before an IJ, and that such aliens would be detained and not paroled. Furthermore, the context of IIRIRA makes clear that Congress did not intend to confer unbounded discretion on the federal government to create a new asylum system through regulation—when Congress wanted to confer discretion on the Executive Branch in IIRIRA, it did so clearly and expressly. And the legislative text and context of 8 U.S.C. § 1225(B)(1)(B)(ii) also demonstrate that the phrase "further consideration of the application for asylum" does not confer authority on DHS for the Asylum IFR.

**ARGUMENT**

I.   **SECTION 1252(F) DOES NOT IMPOSE LIMITATIONS ON THE RELIEF SOUGHT IN THIS CASE.**

A.   **Section 1252(f) is remedial, not jurisdictional.**

Unlike other provisions in Section 1252 that might entirely prohibit judicial review, Section 1252(f)(1) stands out as merely limiting available remedies. On its face, Section 1252(f)(1) only limits jurisdiction to "enjoin or restrain the operation of" specific statutory provisions. Section 1252(f)(2) similarly sets an evidentiary standard via a prohibition on "enjoin[ing] the removal of any alien pursuant to a final order under this section" unless that standard is met. Accordingly, neither Section 1252(f)(1) nor Section 1252(f)(2) implicates the declaratory relief and APA remedy sought by Plaintiff States. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("*AADC*") ("By its plain terms, and even by its title, [Section 1252(f)] is nothing more or less than a limit on injunctive relief.").

Because section 1252(f)(1) "plainly serves as a limit on injunctive relief," *AADC*, 525 U.S. at 487, it is a remedial limit and not a jurisdictional one. Section 1252(f)(1) therefore would not limit this Court's jurisdiction to hear Plaintiffs' claims—only the available remedies for those claims. In short, this is not a limit on lower courts' "power to hear cases." *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560 (2017); *see also, e.g., Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–61 (2010) ("'Jurisdiction' refers to a court's adjudicatory authority. Accordingly, the term 'jurisdictional' properly applies only to prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) implicating that authority." (cleaned up)).

Congress must speak unambiguously to give a statutory limitation jurisdictional consequences. *E.g., Boechler, P.C. v. Commissioner*, 142 S. Ct. 1493, 1497-98 (2022). An especially clear statement is necessary here because courts "begin with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).

3

Section 1252(f)(1)'s use of the term "jurisdiction" does not command a different result. The term "'jurisdiction ... is a word of many, too many, meanings,'" and "it is commonplace for the term to be used as" a reference to something other than subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (providing examples). "The word 'jurisdiction'" often "says nothing about whether a federal court has subject-matter jurisdiction to adjudicate claims." *Muchnick*, 559 U.S. at 163-64. Indeed, for decades, the Supreme Court has recognized it is "unreasonable" to read any reference to "jurisdiction" as "jurisdictional, rather than as merely specifying the remedial powers of the court." *Steel Co.*, 523 U.S. at 90 (emphasis omitted).

When Congress intends to remove the lower courts' subject-matter jurisdiction, it does so unambiguously, consistent with the Supreme Court's guidance. For example, section 1252(a)(2) is entitled "[m]atters not subject to judicial review" and states that "no court shall have jurisdiction to review" specified claims and decisions. By contrast, section 1252(f) is labeled a "[l]imit on injunctive relief," and section 1252(f)(1) expressly addresses types of relief—orders that "enjoin or restrain the operation" of part of the INA.

Section 1252(f)(1) does not unambiguously speak in jurisdictional terms. "[I]t is a cardinal rule of statutory construction that when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached" to that term. *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014). Congress's use of the term "jurisdiction" here tracks twentieth-century usages of the term as concerning when a court may grant relief—not when it has the power to adjudicate a case. *E.g., Steel Co.*, 523 U.S. at 90-93; *Glidden Co. v. Zdanok*, 370 U.S. 530, 557 (1962).

Finally, other well-established principles support the interpretation of section 1252(f)(1) as a remedial limitation. There is a "strong presumption favoring judicial review of administrative action," and "Congress is presumed to legislate with it in mind." *Salinas v. U.S. R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021). If section 1252(f)(1) is a jurisdictional rule, it would require litigants to raise certain

4

challenges in the Supreme Court in the first instance. But such claims must be brought against the United States or one of its officers, which would fall within the Supreme Court's appellate jurisdiction and generally not within its original jurisdiction. U.S. CONST. art. III, § 2, cl. 2. Such an expansion of the Supreme Court's original jurisdiction would violate Article III. *Ortiz v. United States*, 138 S. Ct. 2165, 2173 (2018). Because interpreting section 1252(f)(1) as a remedial limitation both preserves judicial review and "avoids placing its constitutionality in doubt," that is the interpretation required by well-established canons of construction. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195-98 (2012).

### B.      Section 1252(f)(1) Does Not Preclude APA Review

Just as Section 1252(f) does not affect this Court's jurisdiction, it similarly does not preclude review under the APA. Section 1252(f)(1) does not include a clear statement foreclosing APA relief, so the command that a court "shall" "set aside" unlawful agency action remains intact. 5 U.S.C. § 706. Indeed, the APA provides that a "[s]ubsequent statute may not be held to supersede or modify ... chapter 7 ... except to the extent that it does so expressly." 5 U.S.C. § 559; *see also, e.g., Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880, 889 (D.C. Cir. 2021) ("[Federal Election Campaign Act] cannot alter the APA's limitation on judicial review unless it does so expressly.").

Consistent with 5 U.S.C. § 559, judicial review is presumptively available under the APA except to the extent that statutes explicitly preclude it. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967). "[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993) (citations omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020).

"It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its

policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board." S.Rep. No. 752, 79ᵗʰ Cong., 1st Sess., 26 (1945) *cited in Bowen,* 476 U.S. at 671. Accordingly, the government bears a "heavy burden" to show Congress precluded the States' APA claims. *See Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015).

Subsection 1252(f)(1) does not contain "clear and convincing" evidence that Congress intended to deny the States APA review of executive branch action. The only language in the subsection that could possibly suggest APA review is unavailable is the phrase: "Regardless of the action or claim." This makes clear that one cannot evade the rest of the statute's provisions by creative framing. But this clause does not stand on its own. The action or claim which (f)(1) addresses is simply to "enjoin or restrain the operation of" 8 U.S.C. §§ 1221–1231. An APA challenge brought against regulatory action cannot restrain the operation of a statute. Subsection 1252(f)(1) must be read to fit within § 1252's context, and the Congressional intent to protect the removal system from procedural obstruction by aliens seeking to prevent removal. *DHS v. Thuraissigiam*, 140 S.Ct. 1959, 1963 (2020).

Accordingly, lower courts have recognized, both explicitly and implicitly, that APA remedies remain available notwithstanding Section 1252(f). In *Grace v. Barr*, for example, the court expressly held that Section 1252(f)(1) "places no restriction on the district court's authority to enjoin agency action found to be unlawful." 965 F.3d 883, 907 (D.C. Cir. 2020). Thus, Section 1252(f)(1) does not limit this Courts' ability to grant relief under the APA

### 1.    Section 1252(f)(1) Permits Vacatur of Unlawful Administrative Action Under 5 U.S.C. § 706

Section 1252(f)(1) does not affect the district court's authority under 5 U.S.C. § 706 to vacate the Asylum IFR. That remedy is distinct from injunctive relief. A district court's authority to set aside or vacate administrative action under 5 U.S.C. § 706 differs from its power to enjoin unlawful action. In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court distinguished vacatur as a "less drastic

remedy" than an injunction. 561 U.S. 139, 165-66 (2010). An order vacating administrative action does not "enjoin or restrain" the INA's operation because vacatur alone does not enjoin anything at all.

### 2.    Section 1252(f)(1) Permits Declaratory Relief

Like vacatur, declaratory relief is distinct from injunctive relief and is not even conceivably precluded by § 1252(f). Though a declaratory judgment binds the parties, "Congress plainly intended declaratory relief to act as an alternative" to injunctive relief, *Steffel v. Thompson*, 415 U.S. 452, 466 (1974), because declaratory relief does not directly coerce any party or enjoin any action.

Section 1252(f)(1)'s silence regarding declaratory relief stands in contrast to the preceding subsection, which explicitly enumerates "declaratory, injunctive, or other equitable relief." 8 U.S.C. § 1252(e)(1)(A). The APA similarly distinguishes between "declaratory judgments" and "writs of prohibitory or mandatory injunction." 5 U.S.C. § 703. Yet § 1252(f)(1) refers to injunctive relief alone. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (cleaned up).

Consistent with section 1252's text, the Supreme Court has suggested that section 1252(f)(1) does not bar declaratory relief. *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018) ("[I]f the Court of Appeals concludes that it may issue only declaratory relief [under § 1252(f)(1)], then the Court of Appeals should decide whether that remedy can sustain the class on its own."). The *Jennings* dissent explicitly embraced that view. *Id.* at 875 (Breyer, J.). And the *Preap* plurality similarly indicated that section 1252(f)(1) did not deprive courts of jurisdiction to entertain a "request for declaratory relief." *Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019). Even where section 1252(f)(1) prohibits a given injunction, it does not limit district courts' power to issue declaratory relief.

### C.    Section 1252(f)(1) Does Not Apply To The Injunctive Relief Sought Here.

#### 1.    The restriction on injunctive relief is narrow and does not apply to an injunction requiring enforcement.

The Supreme Court has interpreted Section 1252 narrowly and strictly. *See AADC*, 525 U.S. at 482. And none of the relief sought in this case would "enjoin or restrain" the "operation" of section 1225. Section 1252(f)(1) is thus no obstacle to relief. Section 1252(f)(1) does not affect this Court's power to vacate and enjoin Defendants' attempt to adopt an Asylum IFR that violates the INA, the HSA, the Secure Fence Act, and the APA. That provision prevents an order that "enjoin[s] or restrain[s]" the operation of part IV of the INA; it does not prevent an order requiring the enforcement of part IV (and the HSA, and the Secure Fence Act, and the APA). And because section 1252(f)(1)'s text limits only injunctive relief, it does not affect this Court's authority to vacate unlawful administrative action or to issue declaratory relief.

In textual terms, section 1252(f)(1) prevents the lower courts from prohibiting the enforcement of covered provisions, but it does not prevent them from *requiring* such enforcement. *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009). To "enjoin" is to "forbid" or "prohibit," *Webster's Third New International Dictionary of the English Language* 754 (2002), and to "restrain" is to "prevent from doing something," id. at 1936. The word "enjoin" is a "term[] of art in equity" that "refer[s] to" an "equitable remed[y] that restrict[s] or stop[s] official action." *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015). Here, the official action to be enjoined or restrained is the "operation" of the specified provisions— a term that means "the condition of functioning or being active." *New Oxford American Dictionary* 1229 (2010); *see also Webster's Third* at 1581. Taken together, these terms mean that a district court cannot prohibit or prevent the functioning of part IV of the INA.

But section 1252(f)(1) does not prohibit injunctions requiring the Executive to continue the functioning of the INA. An injunction against a violation of a statute does not "forbid" or "prevent"

that statute's "functioning." It instead aids—or even restores—its operation. Indeed, it would be nonsensical for Congress to pass a statute in response to lax immigration enforcement, but then prevent the courts from requiring the executive to actually enforce that new statute. But that is precisely the nonsensical interpretation the federal government advances here. Thus, section 1252(f)(1) permits injunctions requiring continued enforcement of covered provisions while forbidding lower courts from prohibiting executive enforcement of those provisions.

The injunction that the States seek here would not enjoin or restrain the operation of covered statutory provisions. It would enjoin implementation of unlawful agency action that would lead to systemic violations of the INA, the HSA, and the Secure Fence Act. No aspect of the relief sought here would restrict, stop, or restrain the exercise of section 1225 authority—the asylum system would continue to function as it has for decades. Indeed, it is the Asylum IFR that restrains the operation of the INA, and not the relief sought in this case. Far from restraining the operation of the INA, an injunction would restore it. Nothing in the injunction requested by the States would enjoin or restrain Defendants' exercise of statutory authority or would compel any result as to any particular alien. Such an injunction falls outside section 1252(f)(1)'s limitation.

This is precisely why the Fifth Circuit has already rejected the 1252(f) argument, *Texas v. Biden*, 20 F.4th 928, 1003-04 (5th Cir. 2021), and other courts have read the statutory text (and Supreme Court precedent) the same way. *See, e.g., Brito v. Garland*, 22 F.4th 240, 249 (1st Cir. 2021) (reading *Jennings* to mean "an injunction against conduct not authorized by a statute does not enjoin the operation of the statute, while an injunction against conduct authorized by a statute but independently barred by the Constitution does enjoin operation of the statute"). *Cf. Hamama v. Adducci*, 946 F.3d 875, 878 (6th Cir. 2020) (rejecting argument that district court's injunction simply "implemented" immigration law because the court "ordered detainees released, created new time limits on detention, and adopted new standards that the government had to meet to continue detention," which exceeded

statute's terms).

### 2.       The Term "Enjoin" in Section 1252(f)(1) Does Not Foreclose All Injunctions

Consistent with the narrow textual interpretation given Section 1252, *AADC*, 525 U.S. at 482, the term "enjoin" as used in section 1252(f)(1) does not foreclose all injunctions.

*First*, though the term "enjoin" can at times mean to "order that something be done," Bryan A. Garner, *A Dictionary of Modern Legal Usage* 317 (3d ed. 2009), adopting such a reading here would ignore linguistic context. The direct object of "enjoin" is "operation," and to "enjoin the operation" of something ordinarily means to prevent it from operating, not to require it to operate. *See* WEBSTER'S THIRD at 754. Further, the term appears in conjunction with the term "restrain," which suggests the two terms "should be given related meanings." Scalia & Garner at 247. Ordinarily, the term "restrain" refers to preventing an actor from acting—not to require an actor to act. *Webster's Third* at 1936.

That principle applies with greater force here because giving the terms "enjoin" and "restrain" diametrically opposite meanings would make the word "operation" in section 1252(f)(1) superfluous. But "[a] statute ought, upon the whole, to be so construed that, if it can be prevented, no . . . word shall be superfluous, void, or insignificant." *Bloate v. United States*, 559 U.S. 196, 209 (2010). A different phrasing—such as "compel" or "require" the "continued operation"—would have been a far more natural way to convey the opposite meaning here.

*Second*, given that "enjoin" may be fairly read as reaching either only prohibitory orders or both prohibitory and mandatory orders, the Supreme Court's longstanding precedent counsels the narrower meaning. "Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). Because Congress did not clearly seek to prevent lower courts from reviewing alleged executive dereliction, this Court should "resolve [any] ambiguities" as allowing it to

act "in accordance with their traditional practices." *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944).

*Third*, the contrary view would read section 1252(f)(1) as amended by IIRIRA ahistorically. IIRIRA was passed in response to persistent executive refusal to enforce Congress's immigration mandates. Section 1252(f)(1)'s legislative history confirms that Congress did not contemplate that provision would prevent injunctive relief against administrative policies seeking to nullify congressional commands and relax enforcement of immigration laws. As a report of the House Judiciary Committee noted, section 1252(f)(1) was designed to ensure that "the new removal procedures established in this legislation ... will remain in force while ... lawsuits are pending." H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, Mar. 4, 1996, at 161. This history confirms that section 1252(f)(1) lacks the "clearest command" the Supreme Court requires to extinguish equitable authority. *Califano*, 442 U.S. at 705.

### D.    The narrow scope of Section 1252(f)(1) is confirmed by its context.

The narrow scope of Section 1252(f)(1) is confirmed by the context in which it was enacted. After years of persistent executive refusal to enforce immigration laws accompanied by gridlock as aliens sought judicial review, Congress enacted Section 1252(f)(1) as part of IIRIRA, Pub. L. 104–208, 110 Stat. 3009–546 (1996). That act set forth a comprehensive scheme for weeding out meritless asylum claims and expeditiously removing the aliens making them. *Thuraissigiam*, 140 S. Ct. at 1963. As part of that scheme, Section 1252 sharply circumscribed judicial review for aliens seeking to challenge expedited removal. Section 1252(f)(1) must be read in this context. It applies to aliens' challenges to removal orders—not to States' efforts to make the executive branch enforce the law. Indeed, as the Fifth Circuit noted, the "entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *Texas v. Biden*, 20 F.4th at 977.

Indeed, reviewing the surrounding statutory provisions, Section 1252 makes sense as a "harmonious whole" only within the broader context of challenges by aliens to orders of removal.

*Compare FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133–34 (2000). The States are not suing on behalf of aliens challenging actual or impending orders of removal, and therefore, § 1252 does not apply. As the Fifth Circuit explained, the "entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *Texas v. Biden*, 20 F.4th at 977.

    **E.**    **Even if Section 1252 Could Be Read As Being Applicable To This Case, It Would Not Apply To All of the States' Claims**

Section 1252(f)(1) applies only to relief concerning "the provisions of part IV of this subchapter," *i.e.*, Sections 1221 to 1232. But a critical component of the States' claims concerns a different part—Part II—in which is found Section 1182(d)(5)(A), which confers limited authority on DHS to parole aliens into the United States and which Defendants cite in the Asylum IFR as justification for its purported authority to parole en masse aliens who are not clearly admissible. *See* Doc. 14 ¶¶ 139-150 and 178-184 (Counts II and V of First Amended Complaint detailing APA claims against Asylum IFR because it violates § 1182(d)(5)(A)).

Section 1182(d)(5)(A) allows the Secretary of DHS to "parole" aliens "into the United States temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). But the Asylum IFR would allow the United States to parole asylum applicants not on a case-by-case basis for permissible reasons but en masse under the theory that its own insufficient detention capacity and resources somehow qualify as an "urgent humanitarian reason" or "significant public benefit" justifying parole.

Section 1252(f)(1) unambiguously has no applicability to this Court's authority to enjoin all aspects of the Asylum IFR that are related to parole. And because the Asylum IFR's parole provisions are an inextricable part of the Rule, an injunction of the Rule's parole provisions would likely require that the entire Rule be enjoined.

## II.   THIS COURT HAS JURISDICTION TO REVIEW AGENCY ACTIONS ALLEGED TO BE ULTRA VIRES

### A.   The Case Falls Within The Supreme Court's *Kyne* Exception

Even where a statute would otherwise bar review, the Supreme Court has long recognized an exception for plaintiffs alleging *ultra vires* action. *See Leedom v. Kyne,* 358 U.S. 184, 188-90 (1958). The *Kyne* exception permits courts to review claims seeking "to strike down [administrative action] made in excess of [an agency's] delegated powers and contrary to ... specific" statutory language, even if a statute purports to "foreclose[] review ... in a District Court." *Id.* at 188; *see also Breen v. Selective Serv. Loc. Bd. No. 16, Bridgeport, Conn.,* 396 U.S. 460, 467–68 (1970) (holding that draft board had clearly departed from its statutory mandate and acted in a lawless manner and thus *utra vires* exception applied); *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne, Wyo.,* 393 U.S. 233, 238–39 (1968) (same).

In *Kyne*, the NLRB claimed that the National Labor Relations Act, 9 U.S.C. § 159(d), precluded district court jurisdiction to review NLRB actions except under specific circumstances not present in that case. 358 U.S. at 188. The Supreme Court rejected this argument, holding that district courts retain authority to review agency action: "If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." *Id.* at 190. Federal courts therefore had jurisdiction in *Kyne* because the action in question was "an attempted exercise of power that had been specifically withheld [by Congress]" and, as such, the NLRB was acting "in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 184. The Supreme Court later explained that the *Kyne* doctrine does not apply when the plaintiff or petitioner would have a subsequent chance for review of the allegedly *ultra vires* action,

such as subsequent enforcement of an order. *Board of Governors of the Fed. Rsrv. Sys. v. MCorp Financial,* 502 U.S. 32, 43-44 (1991).

This case fits squarely within the *Kyne* exception. Here, the States allege that Defendants have acted beyond the limits of their statutory authority under the INA, the HSA, and the Secure Fence Act in an attempt to improperly expand DHS's control over asylum determinations beyond the plain language of the statutes and beyond Congress's clear intent. *See* Doc. 14 at ¶¶ 1-9, 130-156; Doc. 22-1 at 4-5, 8, 20-22. DHS's actions are thus patently *ultra vires.*

But if Defendants' reading of §1252(f) were correct, the States would have no other subsequent opportunity to seek review of the Asylum IFR. In that circumstance, the *Kyne* exception permits this Court to hear the States' challenge, as it squarely alleges *ultra vires* action.

"[A] clear departure from designated authority *demands* judicial review." *Manges v. Camp*, 474 F.2d 97, 99 (5th Cir. 1973) (emphasis added). It is settled law in the Fifth Circuit that federal district courts may exercise Article III jurisdiction under *Kyne* to enjoin administrative enforcement actions where agency action is *ultra vires. See, e.g., Graham v. Caston*, 568 F.2d 1092, 1097 (5th Cir. 1978) ("If an administrative official clearly departs from statutory authority, the administrative action is subject to judicial review even though a jurisdictional withdrawal statute is otherwise applicable." (citations omitted)). Therefore, if an agency "was not acting within ... authority granted by Congress, then [a jurisdiction-stripping statute] could not withdraw jurisdiction.... This exception comes into play when there has been a clear departure from statutory authority, and thereby exposes the offending agency to review of administrative action otherwise made unreviewable by statute." *Manges*, 474 F.2d at 99. "Thus even 'unreviewable' administrative actions may be subject to judicial review ... such as when there has been a clear departure from the agency's statutory authority." *Texas v. United States*, 86 F. Supp. 3d 591, 643 (S.D. Tex.), aff'd, 809 F.3d 134 (5th Cir. 2015) (citing *Manges*, 474 F.2d at 99). Just

such a clear departure has occurred here: DOJ has for decades *always* exercised *sole* authority to grant asylum—until the Asylum IFR abruptly departed from that settled practice.

In *Kyne*, the statute at issue limited jurisdiction only by implication, because it specified only one particular type of review permitted in district court. The Fifth Circuit has held *Kyne* to apply more broadly to statutes that specifically preclude district courts from exercising jurisdiction. For example, in *Manges*, the jurisdictional statute at issue stated that "[j]udicial review of any such order shall be exclusively as provided in this subsection," 12 U.S.C. § 1818(h)(1) (1966); that such review would be "by the filing in the court of appeals of the United States for the circuit in which the ... bank is located," *Id.* at 1818(h)(2) (1966); and that district courts only had jurisdiction is certain specific circumstances (which were not applicable in that case), and that otherwise "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order." *Id.* at 1818(i) (1966).

None of that was enough to eliminate district court jurisdiction. The Fifth Circuit recognized federal court jurisdiction because "the [agency] was not acting within the scope of [its] proper authority under [the statute at issue], thus, exposing [itself] to judicial review under the doctrine of *Oesterich* and *Breen*. This case also involves a clear departure from statutory authority.... There can be no doubt after considering the intent and purpose Congress had in promulgating this legislation that this court should and does have jurisdiction in this specific situation." *Manges*, 474 F.2d at 101.

*Kyne* created an "exception that permits judicial intervention—even when the relevant statutory language precludes jurisdiction—when an agency exceeds the scope of its delegated authority or violates a clear statutory mandate." *Kirby Corp. v. Pena*, 109 F.3d 258, 268 (5th Cir. 1997) (citation omitted). *Kyne* applies when a party otherwise "would wholly [be] deprive[d] ... of a meaningful and adequate means of vindicating its rights." *MCorp Fin., Inc.*, 502 U.S. at 43.

15

If this Court finds that Section 1252(f)(1) applies here, then the Asylum IFR would still be reviewable as *ultra vires* action under the *Kyne* exception since the States would otherwise be deprived of "meaningful and adequate means of vindicating [their] rights." *Id.*

### A.   The States Do Not Need to Separately Plead the *Kyne* Doctrine.

The *ultra vires* doctrine set forth in *Kyne* does not create a separate cause of action that needs to be pled. Rather, the *Kyne* doctrine is jurisdictional in nature, and thus operates to prevent dismissal for lack of jurisdiction, such as in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(1). In all three of the most important Supreme Court cases on point—*Kyne*, *Oesterich* and *Breen*—the doctrine was brought to bear after a defendant had moved for dismissal. *Breen*, 396 U.S. at 462–63 ("[t]he respondent local board moved to dismiss the suit for want of jurisdiction"); *Oestereich*, 393 U.S. at 235 ("[t]he District Court dismissed the complaint"); *Kyne*, 358 U.S. at 186 ("[t]he defendants, members of the Board, moved to dismiss for want of jurisdiction"). The same is true of the relevant Fifth Circuit cases. *Kirby*, 109 F.3d at 261 (the district court "dismissed the suit for lack of subject matter jurisdiction"); *Graham*, 568 F.2d at 1094-1095 (district court dismissal because of jurisdiction withdrawal statute); *Manges*, 474 F.2d at 98 ("[t]he district court dismissed the suit for want of jurisdiction due to ... a withdrawal statute").

Because the *ultra vires* doctrine is a defense against dismissal, there was no need for Plaintiffs to plead it affirmatively. "[P]laintiffs in federal courts are not required to plead legal theories." *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). "[P]leading standards are liberal as a general matter, and precise statements of legal theories are not required." *Johnson v. PPI Tech. Servs., L.P.*, 613 F. App'x 309, 313 (5th Cir. 2015). But even if that were not the case, Plaintiffs' allegations are more than sufficient for the *ultra vires* doctrine to apply here. That doctrine applies when a plaintiff has alleged that the federal government has made a "clear departure from designated authority,"

*Manges*, 474 F.2d at 99. Plaintiffs' allegations here about Defendants' departure from designated authority are more than sufficient. *See, e.g.*, Doc. 14 at ¶¶ 1-9, 130-156.

 "Federal pleading rules ... do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). But if this Court believes pleading the *Kyne* exception is required, Plaintiffs would be happy to amend their Complaint.

## III.   THE LEGISLATIVE HISTORY, TEXT, AND CONTEXT PRECLUDE DEFENDANTS' INTERPRETATION OF "FURTHER CONSIDERATION"

### A.   The Legislative History Shows Congress Intended the Opposite of What the Asylum IFR Does

Congress added the phrase "further consideration of the application for asylum" to the INA when it adopted IIRIRA in 1996. Pub. L. 104–208, 110 Stat. 3009–546 § 302 (1996). The legislative history and cases examining IIRIRA confirm the intent already evident from IIRIRA's text. The House Conference Report on IIRIRA made plain that the bill's purpose was "to improve deterrence of illegal immigration to the United States by ... reforming exclusion and deportation law and procedures." H.R. Rep. No. 104-828, at 1 and 199 (1996) (Conf. Rep.). President Clinton's signing statement likewise described IIRIRA as "landmark immigration reform legislation that ... strengthens the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system." 32 Weekly Comp. Pres. Doc. 1935, 1996 U.S.C.C.A.N. 3388, 3391 (Sep. 30, 1996). It could never have been Congress's intent that the mere seven words "further consideration of the application for asylum" would confer on the federal government breathtaking authority to invent wholly new asylum procedures that *facilitate and encourage* illegal immigration.

The context of IIRIRA makes clear that Congress did not intend to confer unbounded discretion on the federal government to create a new asylum system through regulation. In IIRIRA,

Congress conferred discretion on the Executive Branch more than a dozen times,[1] but each time with clear language such as "in the Attorney General's discretion" or by explaining that a determination was "within the discretion of the Attorney General." *E.g.* Omnibus Consolidated Appropriations Act, 1997, PL 104–208, September 30, 1996, 110 Stat 3009, §§ 301, 302, 303, 304, 306, 341, 343, 345, 349, 354, 384, 403, 604, 623, 634, and 647. When it wanted to confer discretion in IIRIRA, Congress made clear that it was doing so. If Congress had meant to confer the discretion that Defendants claim in the IFR, it would have used clear words to do so. It did not, and Defendants' broad interpretation of "further consideration of the application for asylum" thus fails.

The House Conference Report for IIRIRA confirms that Congress understood "further consideration of the application for asylum" to mean normal removal proceedings in an adversarial process before an IJ, and that such aliens would be detained and not paroled: "An alien who states a fear of persecution or an intention to apply for asylum shall be referred for interview by an asylum officer…. If the officer finds that the alien has a credible fear of persecution, **the alien shall be detained for further consideration of the application for asylum under normal non-expedited removal proceedings**. If the alien does not meet this standard and, if the alien requests administrative review, the officer's decision is **upheld by an immigration judge**, the alien will be ordered removed. To the maximum extent practicable, **review by the immigration judge** shall be completed within 24 hours, but in no case shall such review take longer than 7 days. Throughout this process of administrative review, the alien shall be detained by the INS." H.R. Conf. Rep. 104-828, 209-10 (1996).

---

[1] At the time, most of these grants of discretion were to the Attorney General. Following passage of the Homeland Security Act, the Attorney General's authority over immigration matters was largely transferred to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103(g); *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 781 n.2 (9th Cir. 2019) (explaining that "[t]he Homeland Security Act of 2002 transferred much of the Attorney General's immigration authority to the newly created office of the Secretary of Homeland Security").

**B.     The Legislative Text And Context Demonstrate The Phrase "Further Consideration Of The Application For Asylum" In 8 U.S.C. § 1225(B)(1)(B)(ii) Does Not Confer Authority For The Asylum IFR**

The INA commits the initial screening of affirmative asylum applications to asylum officers, after which an applicant found to have a "credible fear of persecution" is referred for "further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). The Asylum IFR claims that this phrase—which does not define who conducts that "further consideration" or how it is conducted—permits the federal government to invest the power to grant asylum in frontline employees. But this is flawed for at least four reasons.

*First*, the phrase is not ambiguous. Statutory language is read "in context," not in isolation, "with a view to [its] place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016). Here, that context is IIRIRA, which spells out how an asylum application is "further consider[ed]": "Unless otherwise specified in this chapter," a removal proceeding conducted by an immigration judge is "the sole and exclusive procedure for determining whether an alien may be admitted to the United States[.]" 8 U.S.C. § 1229a(a)(3). "[T]his chapter" refers to Chapter 12 of Title 8 of the U.S. Code—that is, the Immigration and Nationality Act, as amended

Nothing in that chapter of Title 8 specifies any other procedure (*i.e.*, nothing specifies otherwise). Certainly, the Defendants can point to nothing that does so.

*Second*, the reading Defendants necessarily urge would render much of the statutory language regarding asylum applications surplusage. *See Corley v. United States*, 556 U.S. 303, 314–15 (2009) (statute must be construed to give effect to all its provisions) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). To that end, the Asylum IFR would erase from the law language indicating a judicial or quasi-judicial proceeding:

- "The burden of proof is on the applicant to establish" entitlement to asylum. 8 U.S.C. § 1158(b)(1)(B)(i).

- To qualify for asylum, an applicant's "testimony" must satisfy "the trier of fact" that it is credible, persuasive, and specific. *Id.* § 1158(b)(1)(B)(ii).
- In making that determination, "the trier of fact" may weigh "the credible testimony along with other evidence of record." *Id.*
- If "the trier of fact" determines that corroborating "evidence" is necessary, "such evidence must be provided" unless the applicant "does not have" and "cannot reasonably obtain the evidence." *Id.*
- The "trier of fact may base a credibility determination" on a number of facts gleaned from a "witness:" demeanor, candor, responsiveness, plausibility, internal and external consistency, and accuracy. *Id.* § 1158(b)(1)(B)(iii).

Non-adversarial interviews do not have "triers of fact," "testimony," or "evidence of record." And while an interviewer may talk with a witness and gather evidence, "most people" reading those terms "would have understood" them to indicate a formal proceeding at least resembling a trial. *See New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019).

What to make, then, of the investiture of the asylum power in the DHS Secretary? *See* 8 U.S.C. § 1158(b)(1)(A). The statute answers that question, too: the Secretary may rule on certain applications from an asylee's spouse or children. A removal proceeding is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States," *id.* § 1229a(a)(3)—but an asylee's spouse and children "may . . . be granted the same status as the alien if accompanying, or following to join, such alien." *Id.* § 1158(b)(3)(A). A following spouse and children are not physically present in or arriving in the United States, *id.* § 1158(a)(1). Instead, they are seeking, from elsewhere, to share in the status that has already been granted by an immigration judge in a proceeding that was required to be heard by that immigration judge. By deciding the applicant's asylum claim, the immigration judge has already decided that the family members may be admitted; the Secretary may then verify the family members' identities and grant them asylee status.

*Third*, even assuming that the phrase is ambiguous, the constitutional-avoidance doctrine would forbid the interpretation necessary to support the Asylum IFR. By permitting the Defendants to vest significant sovereign power in non-officers, the Defendants' interpretation would create the

significant possibility of a conflict with the Appointments Clause. Yet when presented with a choice between "competing plausible interpretations of a statutory text," courts make "the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

Officers have duties that are "continuing and permanent," have positions that are "continuing," and exercise "significant authority pursuant to the laws of the United States." *Lucia v. S.E.C*, 138 S. Ct. 2044, 2051 (2018); *see Edmond v. United States*, 520 U.S. 651, 662–63 (1997). Conversely, employees are lesser functionaries subordinate to officers of the United States that have duties that are only "occasional or temporary." *Buckley v. Valeo*, 424 U.S. 1, 125–26 & n.162 (1976).

Under the Interim Rule, asylum officers would be—as their name indicates—officers, not employees. Under existing statutes and regulations—outside of the credible-fear and expedited-removal context—they have the authority to grant asylum, which provides a pathway to obtaining lawful permanent resident status, and eventually, citizenship. *See e.g.*, 8 C.F.R. § 208.14(b) ("an asylum officer may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee. . . ."). The IFR purports to delegate even more authority to asylum officers. 87 Fed. Reg. 18,078, 18,086 (May 31, 2022). When deciding whether to grant asylum, asylum officers, inter alia, administer oaths, verify the identity of asylum applicants, present and receive evidence, question applicants and any witnesses, make credibility determinations, issue written decisions, and determine whether an applicant has met their burden of proof. *See, e.g.*, 8 C.F.R. § 208.9(b)–(c). These are the same type of quasi-judicial functions that the Supreme Court has found requires appointment as an officer. *See Lucia*, 138 S. Ct. at 2053-54; *Freytag v. Commr.*, 501 U.S. 868, 881 (1991).

Moreover, asylum officers "hold a continuing office established by law." *Lucia*, 138 S. Ct. at 2053. They do not have "episodic" or temporary appointments. Their positions are career positions created and defined by statute. 8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R. § 208.1(b). Additionally, their

21

actions are not subject to oversight by a properly appointed officer; rather, they are supervised by other asylum officers with "substantial experience adjudicating asylum applications. 8 U.S.C. § 1225(b)(1)(E). *Cf. United States v. Arthrex*, 141 S. Ct. 1970, 1976 (2021).

But officers they are not. They are not principal officers, that is, persons appointed by the President following the Senate's advice and consent. Nor are they inferior officers, that is, officers appointed by principal officers whose work is directed and supervised by a principal officer. *See Lucia*, 138 S. Ct. at 2051; *Edmond*, 520 U.S. at 663. As the Interim Rule concedes, they are not—they are "career Government employees," 87 Fed. Reg. 18,110, who are "only empowered to grant asylum[] as an exercise of the Secretary's authority,' *Id.* at 18,113, whose decisions are "subject to supervisory review," *Id.* at 18,112, by other employees, reviewed by an actual officer of the United States only upon certification by the USCIS Director herself, *Id.* And because they are not properly appointed, they have no power to exercise the federal government's sovereign authority—whether for affirmative filings or, as proposed in the IFR, to adjudicate claims after a positive credible fear finding.

The IFR, however, delegates significant duties and discretion to these employees, expanding their authority and granting them substantial discretion to actually grant aliens asylum after receiving a positive credible fear finding. *Id.* at 18,086. Because asylum officers are not properly appointed under the Appointments Clause, and yet the IFR purports to vest them with "significant authority pursuant to the laws of the United States," it follows that the IFR is unlawful and exceeds the scope of authority granted by the phrase "further consideration of the application for asylum." *Lucia*, 138 S. Ct. at 2055; *Buckley*, 424 U.S. at 126.

*Fourth*, the HSA presupposed the same reading the States are putting forward here. If "further consideration of the application for asylum" was meant to confer authority on the federal government to make up its own new form of asylum removal proceedings outside of EOIR, then Congress would not have included in the HSA specific language commanding that EOIR continue to exercise the same

functions that it had been exercising before the HSA. *See* Doc. 22-1 at 4-5, 8, 20-22.

The IFR purports to strip authority from the officers in whom it is vested by statute because the Defendants believe that they have hit upon a better solution. The Defendants' opinion of their regulation does not override Congress's command.

## CONCLUSION

Section 1252(f)(1) does not restrict jurisdiction here, nor does it preclude APA review, nor an injunction. Even if it did preclude review or an injunction, it did would not prevent declaratory relief or vacatur. Furthermore, this case squarely falls within the *Kyne* exception, since the agency action here is *ultra vires*. And the legislative history, text, and context support the conclusion that the Asylum IFR is unlawful.

There is thus no jurisdictional or statutory bar to the relief Plaintiffs seek here, and because the Asylum IFR is clearly unlawful, it should be enjoined.

Dated:   June 6, 2022

MARK BRNOVICH
   Attorney General
Brunn ("Beau") W. Roysden III *
   Solicitor General
Drew C. Ensign **
   Deputy Solicitor General
James K. Rogers *
   Senior Litigation Counsel
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

Steve Marshall
   Alabama Attorney General
Edmund G. LaCour Jr.*
   Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

Respectfully submitted,
By:*/s/ Joseph S. St. John*

ELIZABETH B. MURRILL (La #20685)
   Solicitor General
J. SCOTT ST. JOHN (La #36682)
   Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
   Attorney General
D. JOHN SAUER *
   Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

Treg R. Taylor
   Attorney General of Alaska
CORI M. MILLS*
   Deputy Attorney General of Alaska
Christopher A. Robison*
   Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Indiana Attorney General
Betsy M. DeNardi*
  Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

Lawrence G. Wasden
  Attorney General,
Brian Kane*
  Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

Derek Schmidt
  Attorney General
Dwight R. Carswell*
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

DANIEL CAMERON
   Attorney General of Kentucky
Marc Manley*
   Associate Attorney General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
   Attorney General of Mississippi
JUSTIN L. MATHENY*
   Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DOUGLAS J. PETERSON
   Attorney General
JAMES A. CAMPBELL*
   Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

ALAN WILSON
   South Carolina Attorney General
Thomas T. Hydrick*
   Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

AUSTIN KNUDSEN
   Attorney General
DAVID M.S. DEWHIRST*
   Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

JOHN M. O'CONNOR
   Attorney General of Oklahoma
BRYAN CLEVELAND*
   Deputy Solicitor General
OKLAHOMA   ATTORNEY   GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

Sean D. Reyes
   *Utah Attorney General*
Melissa Holyoak
   *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

Patrick Morrisey
   Attorney General
Lindsay See*
   Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

26

*Counsel for the State of South Carolina*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

* Pro hac vice application forthcoming
** Pro hac vice application granted