# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

------------------------------------------------------------- x

THE STATE OF ARIZONA, et al.,                    :

                     Plaintiffs,     :     Civil Action No.  6:22-cv-01130

     vs.                                        :

MERRICK GARLAND, in his official capacity   :
as Attorney General of the United States of
America, et al.,                                      :

                Defendants,     :

------------------------------------------------------------- x

# MEMORANDUM OF LAW IN SUPPORT OF
## THE NONPROFIT ORGANIZATIONS' MOTION TO QUASH

Jessica Myers Vosburgh (*pro hac vice* pending)
Emily Early (*pro hac vice* pending)
Angelo Guisado (*pro hac vice* pending)
**CENTER FOR CONSTITUTIONAL**
   **RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
T:  (212) 614-6492
E:  jvosburgh@ccrjustice.org
    eearly@ccrjustice.org
    aguisado@ccrjustice.org

William P. Quigley (#07769)
**LOYOLA UNIVERSITY SCHOOL OF**
   **LAW**
7214 St. Charles Avenue
New Orleans, LA 70118
T:  (504) 710-3074
F:  (504)861.5440
E:  quigley77@gmail.com

Muhammad U. Faridi (*pro hac vice* forthcoming)
Stephanie Teplin (*pro hac vice* forthcoming)
Julia Haigney Long (*pro hac vice* forthcoming)
David Moosmann (*pro hac vice* forthcoming)
**PATTERSON BELKNAP WEBB &**
   **TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
T:  (212) 336-2000
E:  mfaridi@pbwt.com
   steplin@pbwt.com
   jhaigneylong@pwbt.com
   dmoosmann@pbwt.com

*Attorneys for Home is Here NOLA,*
*Immigration Services and Legal Advocacy,*
*and Louisiana Advocates for Immigrants in*
*Detention*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    I.     The Nonprofit Organizations ...............................................4

    II.    The Subpoenas ................................................................5

ARGUMENT ...................................................................................................6

    I.     The Subpoenas Violate the Rules Governing Non-Party Discovery ......................6

         A.     The Subpoenas Seek Information that Is Not Relevant to the State's Claims ................................................................7

         B.     There Is No "Need" for the Subpoenas as the Information Sought is in the State's and the Federal Government's Possession ......................9

         C.     The Burden of Compliance is Significant.................................11

         D.     The Subpoenas are Overbroad and Vague................................13

    II.    The Subpoenas Seek Sensitive, Confidential Information Concerning the Identities and Immigration Status ........................................14

    III.   The Subpoenas Seek Information Protected by Several Privileges .....................17

         A.     The Information Sought is Protected by the Attorney-Client Privilege ......................................................................18

         B.     The Information Sought is Protected by the Work Product Doctrine........19

    IV.   The Subpoenas Threaten Core Constitutional Freedoms.......................20

         A.     The Subpoenas Impair the Right of Free Association ...............................20

         B.     The Subpoena on La. AID Implicates Protected Religious Exercise ........22

CONCLUSION.....................................................................................................23

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adams v. Mem'l Hermann*,
  973 F.3d 343 (5th Cir. 2020) ................................................................18

*Cazorla v. Koch Foods of Miss., L.L.C.*,
  838 F.3d 540 (5th Cir. 2016) ................................................................15

*Cohen v. City of New York*,
  255 F.R.D. 110 (S.D.N.Y. 2008) .............................................................6

*Convolve, Inc. v. Dell, Inc.*,
  No. C 10–80071 WHA, 2011 WL 1766486 (N.D. Cal. May 9, 2011) ....................6

*David v. Signal Int'l*,
  LLC, 257 F.R.D. 114 (E.D. La. 2009) .....................................................15

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019) ......................................................................17

*E.E.O.C. v. First Wireless Grp., Inc.*,
  225 F.R.D. 404 (E.D.N.Y. 2004) ...........................................................15

*FG Port Holdings, LLC v. Lake Charles Harbor & Terminal Dist.*,
  No. 16-CV-00146, 2018 WL 11388132 (W.D. La. July 9, 2018) .....................16

*Gilmore v. City of Montgomery, Ala.*,
  417 U.S. 556 (1974) .........................................................................20

*In re Grand Jury Subpoena for Att'y Representing Crim. Defendant Reyes-Requena*,
  926 F.2d 1423 (5th Cir. 1991) ..............................................................18

*Guzzino v. Felterman*,
  174 F.R.D. 59 (W.D. La. 1997) .............................................................18

*Hastings v. N. E. Indep. Sch. Dist.*,
  615 F.2d 628 (5th Cir. 1980) ................................................................21

*Hume v. Consol. Grain & Barge, Inc.*,
  No. CV 15-935, 2016 WL 7385699 (E.D. La. Dec. 21, 2016) .........................6

*Jordan v. Comm'r, Mississippi Dep't of Corr.*,
  947 F.3d 1322 (11th Cir. 2020) ............................................................17

*In re Kaiser Aluminum & Chem. Co.*,
  214 F.3d 586 (5th Cir. 2000) ................................................................19

*Leonard v. Martin*,
   38 F.4th 481 (5th Cir. 2022) ...................................................................................7

*In re Mo. Dep't of Corr.*,
   839 F.3d 732 (8th Cir. 2016) ................................................................................17

*Mote v. Walthall*,
   902 F.3d 500 (5th Cir. 2018) ................................................................................20

*Nat'l Ass'n for Advancement of Colored People v. Alabama*,
   357 U.S. 449 ...............................................................................................17, 20

*In re Primus*,
   436 U.S. 412 (1978).............................................................................................20

*Reyes v. Snowcap Creamery, Inc.*,
   898 F. Supp. 2d 1233 (D. Colo. 2012)...................................................................15

*Rivera v. NIBCO, Inc.*,
   364 F.3d 1057 (9th Cir. 2004) ..............................................................................15

*Roberts v. U.S. Jaycees*,
   486 U.S. 609 (1984).............................................................................................22

*Sawyer v. Sandstrom*,
   615 F. 2d 311 (5th Cir. 1980) ...............................................................................20

*S.E.C. v. Brady*,
   238 F.R.D. 429 (N.D. Tex. 2006) ..........................................................................19

*Shelton v. Tucker*,
   364 U.S. 479 (1960).............................................................................................20

*In re Matter of Subpoenas Served on Collins*,
   No. A-14-CV-934 LY, 2014 WL 12586370 (W.D. Tex. Nov. 7, 2014) ..............................23

*Suntrust Mortgage, Inc. v. Busby*,
   No. 2:09-cv-3, 2009 WL 5511215 (W.D.N.C. Dec. 18, 2009)..................................10

*Sykes v. Bayer Corp.*,
   No. 08–mc–13–JM, 2008 WL 2559419 (D.N.H. June 23, 2008)...............................14

*Taylor Lohmeyer L. Firm P.L.L.C. v. United States*,
   957 F.3d 505 (5th Cir. 2020) ................................................................................18

*United States v. Garde*,
   673 F. Supp. 604 (D.D.C. 1987)............................................................................21

*United States v. Homes*,
    614 F. 2d 985 (5th Cir. 1980) ............................................................................23

*U.S. Navy Seals 1-26 v. Biden*,
    27 F.4th 336 (5th Cir. 2022) ............................................................................22

*Warnock Eng'g, LLC v. Canton Mun. Utilities*,
    No. 3:17-CV-160-HSO-JCG, 2018 WL 11418435 (S.D. Miss. Apr. 20, 2018)....................10

*Whole Woman's Health v. Smith*,
    896 F.3d 362 (5th Cir. 2018), *as revised* (July 17, 2018)................................22, 23

*Wilemon Found., Inc. v. Wilemon*,
    No. 1:19-CV-136-GHD-DAS, 2021 WL 1649507 (N.D. Miss. Apr. 27, 2021) ....................10

*Wiwa v. Royal Dutch Petroleum Co.*,
    392 F.3d 812 (5th Cir. 2004) ............................................................................6

## **Constitutional Provisions, Statutes, and Rules**

Fed. R. Civ. P. 26............................................................................14

Fed. R. Civ. P. 45............................................................................10, 14, 23

La. Rules of Prof'l Conduct R. 1.6 ............................................................19

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*................................22

## **Other Authorities**

IRS, *Lobbying*, https://www.irs.gov/charities-non-profits/lobbying#:~:text=In%20general%2C%20no%20organization%20may....................21

La. Department of Justice, *Biden Moves To Insure [Sic] Welfare Benefits For Immigration Applicants, Louisiana Petitions Court To Intervene* (Mar. 12, 2021), ag.state.la.us/Article/10873 ............................................................16

Dede Willis, *Louisiana Attorney General Landry supports Trump's immigration executive order* (Jan. 25, 2017) https://www.knoe.com/content/news/Louisiana-Attorney-General--411814945.html ............................................................16

Non-parties Home is Here NOLA, Immigration Services and Legal Advocacy ("ISLA"), and Louisiana Advocates for Immigrants in Detention ("La. AID") (collectively, the "Nonprofit Organizations") respectfully submit this brief in support of their motion to quash document subpoenas (the "Subpoenas") issued by the State of Louisiana (the "State").

## PRELIMINARY STATEMENT

The Nonprofit Organizations are small, nonprofit groups dedicated to serving the immigrant community and advocating for the rights and interests of immigrants in the United States.  The State of Louisiana, in an effort to shore up its challenge to the United States' immigration policies, seeks information from the Nonprofit Organizations concerning the presence of asylum seekers within the State's borders.  Such information, the State contends, will establish its standing to sue the federal government on the ground that the presence of immigrants injures the State.  But the Subpoenas are overbroad, seek information that is both irrelevant and duplicative of party discovery and otherwise impose an undue burden on the non-party Nonprofit Organizations; the Subpoenas also undermine the guarantees enshrined in the First Amendment.  They must be quashed.

*First*, the Subpoenas seek information that has little or no relevance to the claims and defenses at issue in this litigation.  At the same time, they impose an undue burden on the Nonprofit Organizations.  Importantly, ***all*** of the information sought by the Subpoenas is in the possession of the parties to the litigation—the State and/or the United States.  Indeed, the State concedes as much in its pleadings, acknowledging that "DHS keeps detailed statistics about grants of asylum, about the aliens it allows into the United States, about their intended destinations, about their residential addresses, and about their immigration status."[1]  Yet the State

---

[1] Dkt. No. 86 ¶ 143.

seeks to burden these nonparties rather than look into its own sources or seek the information

from the actual defendant in the lawsuit.  There is no reason why the burden of identifying who

attends **Louisiana** schools or who receives **Louisiana** benefits should fall on the Nonprofit

Organizations rather than the State of **Louisiana** or U.S. Government agencies that readily have

access to that data.

And that burden is significant.  The Nonprofit Organizations are small, leanly staffed and

financially resourced, and rely on a network of volunteers to support their missions.  The State

nevertheless demands that the Nonprofit Organizations conduct a search for five years of

documents, including documents identifying every single person to whom the Nonprofit

Organizations have provided "support" during that period.  That effort alone would bring the

Nonprofit Organizations' work to a grinding halt, undermine their missions, and threaten their

ability to carry out future work.  Given the available alternatives to obtain this information, the

State imposes that burden out of convenience, not necessity.

*Second*, the Subpoenas seek highly sensitive personal information, the disclosure of

which would harm the Nonprofit Organizations and the communities they serve.  Because of the

national and personal significance of immigration, courts recognize the sensitivity of information

concerning a person's immigration status.  Accordingly, when a party seeks such information, it

bears the affirmative and particular burden of demonstrating its need for it.  The State has no

need for the information it seeks from the Nonprofit Organizations, let alone a need sufficiently

compelling to override client and constituents' interest in protecting their personal information

from disclosure.  The burden imposed by disclosure is particularly dramatic in light of the

Louisiana Attorney General's open hostility to the presence of immigrants within the State's

borders.  Faced with the prospect of their information being disclosed to an Attorney General

actively opposed to their presence, immigrant communities will understandably decline to associate with the Nonprofit Organizations.  In other words, compliance with the Subpoenas will harm immigrant communities by instilling fear and deterring them from seeking assistance from the Nonprofit Organizations, which, in turn, poses an existential threat to the Nonprofit Organizations themselves.

*Third*, as to ISLA, the Subpoena seeks information that is protected by the attorney-client privilege and the work product doctrine.  ISLA provides, among other things, legal services to its clients in connection with immigration matters.  Thus, the overwhelming number of documents in its possession are covered by the attorney-client privilege and the work product doctrine.  Yet the State has made it clear that it wants those documents.  There is no basis in law for that request.

*Lastly*, the Subpoenas threaten core First Amendment interests.  Under the First Amendment, civic organizations enjoy the freedom of association.  The Subpoenas offend that principle because any person who associates with the Nonprofit Organizations risks disclosure of their information to the State, thereby permitting the State to harass and retaliate against them. Similarly, the Subpoena served on La. AID runs afoul of the organization's rights under the Free Exercise Clause.  That is so because La. AID's work is inextricably intertwined with that of the various churches and religious institutions with whom it collaborates.  And those organizations provide refuge for immigrants because it is their belief that immigrants, too, are created in the image of God.[2]  By forcing La. AID to share sensitive information about immigrants with the

---

[2] *See Genesis* 1:26 (King James) ("And God said, Let us make man in our image, after our likeness . . . ."); *see also Leviticus* (King James) 19:33-34 ("And if a stranger sojourn with thee in your land, ye shall not vex him.  *But* the stranger that dwelleth with you shall be unto you as one born among you, and thou shalt love him as thyself; for ye were strangers in the land of Egypt:  I *am* the LORD your God." (emphasis in original)).

State and thereby strike fear into the hearts of immigrants, the Subpoena compromises the ability of La. AID and the religious organizations with which they associate to perform their religious obligations.

Accordingly, the Nonprofit Organizations respectfully request that the Subpoenas be quashed.

## STATEMENT OF FACTS

### I.     The Nonprofit Organizations

The Nonprofit Organizations' mission is to serve the immigrant community.  While their goal is the same, each Organizations' contributions are unique.

Home is Here NOLA, consisting of two full-time and one part-time staff members, focuses on providing "community resettlement[,] housing[,] and legal aid."  Ward Decl. ¶ 6.  In conjunction with its partner organizations, Home is Here NOLA facilitates connections between immigrants and community groups capable of assisting them.  For example, Home is Here connects prospective tenants with landlords and clients with attorneys.  *Id.*  In addition to matching immigrants with service providers, Home is Here conducts trainings for the benefit of immigrants and partner organizations alike.  *Id.* ¶ 7.

ISLA is a legal aid organization.  Run by a team of seven employees, ISLA provides legal representation and assistance to immigrants.  Lopez Decl. ¶ 7.  Each year, ISLA takes on approximately 250 clients.  *Id.* ¶ 8.  Additionally, ISLA provides educational support to immigrants through the Immigration Court Help Desk, a program in which ISLA attorneys fields questions from immigrants subject to removal proceedings.  *Id.* ¶ 9.  ISLA also provides Continuing Legal Education services to the local legal community.  *Id.*

La. AID, run by one AmeriCorps VISTA and two part-time employees, advocates and supports immigrants who are, or have recently been, detained by the United States.  Kelley Decl.

¶¶ 3-4.  For those in detention, La. AID provides support by way of detention center visits, letter writing, petitioning the government for their humane treatment, monitoring conditions, and acting as an intermediary between immigrants and their families.  *Id.* ¶ 5.  For those released from detention, La. AID, under the auspices and on the premises of the Church for the Highlands, operates a shelter.  *Id.* ¶¶ 10-14.

## II.     The Subpoenas

The Subpoenas, which are identical, are overbroad and demand documents falling into five categories:

- Request No. 1 seeks "DOCUMENTS sufficient to IDENTIFY all ASYLUM APPLICANTS and 'asylum seekers' to whom YOU provided support.  For the avoidance of doubt, this request asks YOU to IDENTIFY anyone who is an ASYLUM APPLICANT or asylum seeker to whom YOU provided legal representation."

- Request No. 2 seeks "ALL DOCUMENTS YOU provide(d) to aliens, including ASYLUM APPLICANTS or asylum seekers, regarding public education Temporary Assistance for Needy Families ('TANF'), Supplemental Nutrition Assistance Program ('SNAP'), Medicaid, or other public benefits."

- Request No. 3 seeks "ALL DOCUMENTS regarding the ASYLUM NPRM ["notice of proposed rulemaking"] or FINAL RULE."

- Request No. 4 seeks "ALL DOCUMENTS used or presented by YOU in any workshop or presentation regarding asylum from August 20, 2021 through the present."

- Request No. 5 poses seeks "Any contract between YOU and any agency of the United States government.  For the avoidance of doubt, this request includes subcontracts for which any agency of the United States government is the ultimate contracting party."

With the exception of Request No. 4, the relevant period for the requests is January 1, 2018 through the present—a total of 5+ years.

On March 14, 2023, the Nonprofit Organizations' counsel sent an objections letter to the State, outlining concerns regarding breadth of the Subpoenas, the burden in producing

documents responsive to the requests, as well as the Nonprofit Organizations' concerns that the Subpoenas infringed on First Amendment protections.  *See* Quigley Declaration, Ex. A.  That afternoon, the Nonprofit Organizations' counsel met and conferred with the State about the Subpoenas.  During that call, the State maintained that the Subpoenas were proper because, *inter alia*, the State requires specific information—rather than statistical data—to prove its theory of standing.

Shortly thereafter, also on March 14, 2023, the State sent the Nonprofit Organizations' counsel a letter summarizing the State's understanding of the call and offering to narrow certain requests.  *See* Quigley Declaration, Ex. B (the "State's Letter").  However, the narrowed requests did nothing to address the fundamental problems in the Subpoenas.

On March 15, 2023, the State agreed to extend the Nonprofit Organizations' deadline for compliance to March 20, 2023.  This motion ensued.

## ARGUMENT

### I.     The Subpoenas Violate the Rules Governing Non-Party Discovery

"[N]on-parties have greater protections from discovery" than parties.  *Hume v. Consol. Grain & Barge, Inc.*, No. CV 15-935, 2016 WL 7385699, at *3 (E.D. La. Dec. 21, 2016) (internal quotation marks omitted); *see also Convolve, Inc. v. Dell, Inc.*, No. C 10–80071 WHA, 2011 WL 1766486, at *2 (N.D. Cal. May 9, 2011) ("[N]on-parties should not be burdened in discovery to the same extent as the litigants themselves."); *Cohen v. City of New York*, 255 F.R.D. 110, 117 (S.D.N.Y. 2008) (concluding "[c]ourts should be particularly sensitive to weighing the probative value" of information demanded from a non-party).  "Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation."  *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004).

The Fifth Circuit considers six factors in assessing whether a non-party subpoena should be quashed: "(1) the relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." *Leonard v. Martin*, 38 F.4th 481, 489 (5th Cir. 2022). Each of these factors weigh in favor of quashing the Subpoenas.

A.    <u>The Subpoenas Seek Information that Is Not Relevant to the State's Claims</u>

The Subpoenas demand materials that are wholly irrelevant to the State's theory of standing as well as to the merits. The State's theory of standing is premised on the notion that, if immigration increases, the State will incur increased costs.[3] To carry this burden, the State does not need to identify the magnitude of the costs arising from the alleged increase in immigrants arriving to the country. Rather, because it is undisputed that certain costs accompany immigration, the State's standing inquiry boils down to whether the challenged rule increases immigration to the State.

The Subpoenas are not targeted to elicit information concerning this theory of harm. That is unsurprising, for unlike the actual governmental parties to the dispute, no private organization—let alone the Nonprofit Organizations—possesses information evidencing aggregate levels of immigration. Instead, the Subpoenas seek granular information about the

---

[3] According to the transcript of the May 18, 2022 conference, "the states contend, number ***one, that the [changes] to the asylum process will lead to more immigrants being granted asylum***, and ***two, that these changes are contrary to law***." Dkt. No. 25 at 73 (emphasis added). Nowhere does the State raise a question about whether increased immigration will result in increased *costs* to the State. Rather, the Court's inquiry appears to focus on whether the asylum rule would result in an increase of asylum grants. None of the information sought in the Subpoenas answers that inquiry.

Nonprofit Organizations' operations that bear no relation to the either the State's theory of standing or the merits of its underlying claims.  For example:

- Request No. 1 seeks the identities of the Nonprofit Organizations' clients, constituents, and other persons who have come into contact with the Organization.  It is unclear what role, if any, the names of asylum seekers could play in supporting the State's theory of standing—particularly when, as described below, those identities are so sensitive that their disclosure would threaten the Nonprofit Organizations' missions.  Nor is there any possible relevance to identifying which of those asylum seekers sought assistance from these particular Nonprofit Organizations—particularly when none of the Nonprofit Organizations' missions actually encompass providing access to state benefits or services.

- Request No. 2 fares no better, seeking documents "provide(d) to aliens, ASYLUM APPLICANTS or asylum seeks, regarding" certain public benefits, including public education, TANF, SNAP, and Medicaid.  To the extent such documents exist,[4] they do not provide information concerning the State's theory of harm—namely, the documents do not confirm the number of asylum seekers who actually enrolled in public benefits.  That information rests in the State and the federal government's control.  In particular, it strains credulity to suggest that the State does not have data concerning public school enrollment.  To the extent that the State seeks to connect its data with immigration status, that data rests in the federal government's control.

- Request Nos. 3 is similarly untethered to the State's theory of injury.  Under Request No. 3, the Nonprofit Organizations would be forced to produce copies of the NPRM or comments publicly submitted by other groups concerning the NPRM.  But the production of such documents would provide no new or relevant information to the State.

- Request No. 4, which seeks "workshop" materials, is perhaps the most unmoored from the issues in dispute.  The State cannot plausibly connect the mere existence and content of, for example, organizational PowerPoints regarding immigrants' rights, leading to an actual, let alone quantifiable, increase in distribution of public benefits.

- Request No. 5, which seeks contracts between the Nonprofit Organizations and the federal government, also does not advance the State's standing theory.

---

[4] Subject to and without waiving any objections, the Organizations have disclosed to the State that they do not have documents responsive to Request No. 2.

Because the information requested by the Subpoenas does not provide any reliable information on the issues giving rise to the State's standing, the Subpoenas should be quashed.

B.     There Is No "Need" for the Subpoenas as the Information Sought is in the State's and the Federal Government's Possession

There is no "need" for the information sought by the Subpoenas because, to the extent it exists, the information is duplicative of information in the care, custody, or control of actual parties to the litigation.  To establish standing, the State would need information sufficient to demonstrate that increased immigration would incur increased costs—for example, the number of persons seeking various benefits from the State and the amount of benefits paid thereto—lies in the State's (or the federal government's) custody, care, and control.  The State concedes as much by representations it has made in the operative complaint in this action.  *See, e.g.*, *Arizona v. Garland*, No. 6:22-cv-1330, Dkt. No. 86 ¶ 70 (alleging that information concerning the "extent of harm" to the States is "in the possession of Defendants"); ¶ 82 (alleging the number of persons unlawfully present in Louisiana and information concerning their health insurance status, their incomes, and the amounts allegedly expended by Louisiana because of their presence); ¶ 129 (alleging "the exact magnitude of those harms will become clear in discovery, when the federal government produces statistics about changes in the asylum grant rate, processing times under the new procedures, and the number of aliens settling in each Plaintiff State").

Indeed, as this Court recognized at the May 18, 2022 conference permitting jurisdictional discovery, "a lot of the work that the states need to do may be ***internal . . . with state agencies*** to figure out what the costs are of people who have been granted asylum residing in their states." Dkt. No. 25 at 81 (emphasis added).  Thus, there is no "need" for the State to burden the Nonprofit Organizations—immigrant rights organizations who focus on services to detained and post-detention immigrants—with collecting, analyzing, and ultimately producing information

that could be obtained from a party to the underlying action.  *See Wilemon Found., Inc. v. Wilemon*, No. 1:19-CV-136-GHD-DAS, 2021 WL 1649507, at *5 (N.D. Miss. Apr. 27, 2021) (concluding that, if documents are available from a party, "it has been thought preferable to have them obtained pursuant to Rule 34 rather than subpoenaing them" pursuant to Rule 45); *Warnock Eng'g, LLC v. Canton Mun. Utilities*, No. 3:17-CV-160-HSO-JCG, 2018 WL 11418435, at *2 (S.D. Miss. Apr. 20, 2018) ("[I]f documents are available from a party, it has been thought preferable to have them obtained pursuant to Rule 34 rather than subpoenaing them from a non-party witness [pursuant to Rule 45]." (alterations in original)); *see also Suntrust Mortg., Inc. v. Busby*, No. 2:09-cv-3, 2009 WL 5511215, at *2 (W.D.N.C. Dec. 18, 2009) (holding that, "where the sought-after documents are within the possession, custody, or control of a party, it is not appropriate to employ Rule 45 to secure such documents from a non party . . . who may also be in possession of the documents or copies").

If the State's aim is to identify how many people made use of services it or the United States Government provided, it need not seek a list of people to whom the Nonprofit Organizations provided "support."  Rather, the State need only look to its own databases or those maintained by the federal government—either of which likely have the requested information in a more complete and reliable form.  This is consistent with the allegations in the operative complaint that the federal government maintains relevant data:  "DHS keeps detailed statistics about grants of asylum, about the aliens it allows into the United States, about their intended destinations, about their residential addresses, and about their immigration status."  Dkt. No. 86 ¶ 143.  When information is so readily obtainable from a party—including potentially the party issuing the subpoena—it is unnecessary to compel non-party nonprofits to bear the burdens of discovery.

Nor does the State's failure to collect this information from the federal government impact the relevant analysis. In its March 14, 2023, letter, the State admitted that Defendants have been asked to produce nearly identical information and that "the federal defendants have **informally stated** they will not produce that information based on yet-to-be-identified regulatory restrictions." Quigley Declaration, Ex. B at 1 (emphasis added). Nowhere does the State mention any efforts to meet and confer further with Defendants; nor has the State pursued motion practice against Defendants to seek information known to be within Defendants' care, custody, or control. The State's Letter also does not address whether State agencies outside of "LADOJ" may have access to the relevant underlying data. *See id.* The United States' "informal" statement that it will not produce this information does not permit the State to shift discovery obligation to a non-party, and certainly not without even trying to enforce those document requests against parties to the pending litigation.

Moreover, it strains credulity that the State itself does not have information concerning, for example, public school enrollment and individuals who receive other State-managed public benefits within its care, custody, or control. Accordingly, as non-parties to the action, it is inappropriate to burden the Nonprofit Organizations with the collections of, at most, tangentially relevant and duplicative data.

C.     The Burden of Compliance is Significant

The Nonprofit Organizations—like many nonprofit and community groups—lack the resources enjoyed by the State and other large, well-funded parties. The Nonprofit Organizations depend substantially on the efforts of volunteers committed to their respective missions. Nonetheless, Request Nos. 1, 2, 3, and 5 seek half a decade of documents, including documents concerning each and every person to whom the Nonprofit Organizations provided "support," a term nowhere defined in the Subpoenas.

11

Each of the Nonprofit Organizations has submitted a declaration detailing the significant burden imposed by the Subpoenas.  *See* Kelley Decl. ¶¶ 17-21; Lopez Decl. ¶¶ 30-37; Ward Decl. ¶¶ 8-12.  As small nonprofits, the Nonprofit Organizations lack the personnel and resources necessary to conduct such a far-ranging search.  *See* Kelley Decl. ¶¶ 17-19; Lopez Decl. ¶¶ 30-35; Ward Decl. ¶¶ 4, 9-10.  For example, none of the Nonprofit Organizations have a dedicated IT department—let alone an IT manager who could assist with the document collection process.  *See* Kelley Decl. ¶ 17; Lopez Decl. ¶ 30; Ward Decl. ¶ 10.  Indeed, each of the Nonprofits is extraordinarily leanly staffed, with between three and seven staff members (inclusive of part-time employees and contractors).  *See* Kelley Decl. ¶ 3; Lopez Decl. ¶ 7; Ward Decl. ¶¶ 4, 10.  Put concretely, compliance with the Subpoenas would bring the Nonprofit Organizations' mission and critical work to a grinding halt.  *See* Kelley Decl. ¶¶ 18-21; Lopez Decl. ¶¶ 32-36; Ward Decl. ¶¶ 9-11.

As further detailed in the Nonprofit Organizations' declarations, to obtain the information requested by the Subpoenas (as originally issued by the State), the Nonprofit Organizations would be required to manually review their files.  *See* Kelley Decl. ¶ 18; Lopez Decl. ¶¶ 31-34; Ward Decl. ¶¶ 9-10.  For example, Home is Here does not have an advanced data collection or storage system and would need to manually search tens of thousands of emails to identify potentially responsive documents—in addition to potential hard-copy documents and other communications.  *See* Ward Decl. ¶¶ 9-10.  La. AID is in a similar position and would to need to contact all of its volunteers to individually review their personal emails, text messages, and hard copy documents as part of a responsiveness review.  *See* Kelley Decl. ¶ 18.  Although ISLA does have a data management system for its client files, the vast majority of that data is protected by the attorney-client privilege, *see* Section III, which would require the additional time and

expense of a document-by-document privilege review.  *See* Lopez Decl. ¶ 34.  The Nonprofit

Organizations estimate that this review could take extraordinary amount of time—easily a month

or more of their time.  *See* Kelley Decl. ¶ 18; Lopez Decl. ¶ 32; Ward Decl. ¶ 10.  This amounts

to a significant burden, and one unlikely to generate information relevant to the State's theory of

harm.

      D.     <u>The Subpoenas are Overbroad and Vague</u>

The plain text of the requests in the Subpoenas underscores their overbreadth and lack of

particularity.  For instance, Request No. 1 would require the Nonprofit Organizations to identify

asylum seekers who may have no connection to the State.  Further, Request No. 1 fails to specify

the type of "support" that the Nonprofit Organizations must have provided to the asylum

seeker—surely, not every type of "support" provided by the Nonprofit Organizations is relevant

to the issue of standing.  On their face, Request Nos. 2, 3, and 4 seek "ALL" documents bearing

on various issues irrespective of their relevance to the issue of standing.  And Request No. 5

seeks all contracts between the Nonprofit Organizations and federal government—again,

irrespective of their relevance to the issue of standing.

The State's Letter proposed a "narrowing" of Request No. 1 to either:

- "cover[ing] only ASYLUM APPLICANTS or asylum seekers (a) not detained but located in Florida or Louisiana, (b) who provided a residence address in in Florida or Louisiana, or (c) who provided a mailing address in Florida or Louisiana"; or

- the "identi[ty] of 5-10 pending asylum applicants/seekers and 5-10 asylum grantees who have non-citizen children enrolled in public school, who are on SNAP or TANF, or who are on Medicaid as fully satisfying Request No. 1" provided that the identified individuals are "in Louisiana or Florida, and they cannot be all Cuban or Haitian."

Quigley Declaration, Ex. B at 2.  But these "narrowed" versions of Request No. 1 remain

overbroad, irrelevant, and objectionable.  Neither proposal addresses, for example, the relevance

of the ***identities*** of asylum seekers to the State's standing theory.  In addition, it is particularly

concerning that the State attempts to use the "narrowing" to emphasize documents that are related to *Florida's* standing. Certainly, whether *Florida* expends additional resources to non-citizen public school attendees would have no bearing on whether *Louisiana* has been harmed by additional expenditures within its borders. Moreover, the first of the two proposals remain overly broad and unduly burdensome—particularly as it still would require the Nonprofit Organizations to sift through five years of documents to determine which documents may be responsive.

The second approach—which essentially asks the Nonprofit Organizations to target five to ten individuals who have "non-citizen children enrolled in public school, who are on SNAP or TANF, or who are on Medicaid"—is unacceptable because, if anything, it heightens concerns about the sensitive, confidential information sought by the Subpoenas. It is unreasonable to ask the Nonprofit Organizations to single certain immigrant families out and present their private information, to the extent it exists, to the State. *See* Section II.

## II. The Subpoenas Seek Sensitive, Confidential Information Concerning the Identities and Immigration Status

Rule 26 prohibits discovery on any topic "for any improper purpose, such as to harass . . . or needlessly increase the cost of litigation." Fed. R. Civ. P. 26(g)(1)(B)(ii); *see Sykes v. Bayer Corp.*, No. 08–mc–13–JM, 2008 WL 2559419, at *2 (D.N.H. June 23, 2008) (holding that a party "ha[d] no right [under Rule 45] to serve a grossly overly broad subpoena intended to harass" that amounted to no more than a "fishing trip"). Immigration is among the mostly hotly contested political issues in the nation and implicates far-reaching concerns—economic, cultural, legal, and otherwise. The personal dimension of immigration is no less substantial. One's immigration status—or lack thereof—affects one's livelihood and standing in the community. Accordingly, courts—including the Fifth Circuit—have consistently held that immigration status

14

is sensitive such that disclosure risks impermissibly chilling an individual's access to and

participation in legal process.  *See, e.g.*, *Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540,

563-64 (5th Cir. 2016) (recognizing that a person's immigration status is "sensitive information,"

the disclosure of which "may have a chilling effect extending well beyond this case, imperiling

important public purposes"); *David v. Signal Int'l*, LLC, 257 F.R.D. 114, 126 (E.D. La. 2009)

("[I]nquiry into plaintiffs' current immigration status . . . will most assuredly strike paralyzing

fear in the plaintiffs . . . ."); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1065 (9th Cir. 2004)

(recognizing that disclosure of information concerning immigration status has a chilling effect

that "unacceptably burdens the public interest").

When a subpoena seeks such information, courts conduct a balancing inquiry and weigh

whether the issuing party's need for the information outweighs the burden of disclosure.

Balancing the interests, courts have consistently prohibited discovery related to an individual's

immigration status, even when the information sought is both relevant and requested from a

party to the litigation.  *See, e.g.*, *David*, 257 F.R.D. at 125 (holding that the chilling effect of

inquiry into the plaintiffs' immigration status outweighed the defendants' need for the

information sought); *E.E.O.C. v. First Wireless Grp., Inc.*, 225 F.R.D. 404, 406 (E.D.N.Y. 2004)

(barring discovery into claimant employees' immigration status because "discovery of . . .

immigration status would cause [the claimant employees] embarrassment and[,] if their status is

found to be illegal[,] would subject them to criminal charges and, possibly, deportation"); *Reyes*

*v. Snowcap Creamery, Inc.*, 898 F. Supp. 2d 1233, 1235 (D. Colo. 2012) ("Courts have also

denied discovery requests related to a plaintiff's immigration status because of the *in terrorem*

effect that discovery into such issues would have on litigants.").  Where a party seeks sensitive

information concerning a person's immigration status, only the most compelling showing of

15

need will suffice.  That principle applies *a fortiori* where, as here, the information is sought from a non-party.  *See FG Port Holdings, LLC v. Lake Charles Harbor & Terminal Dist.*, No. 16-CV-00146, 2018 WL 11388132, at *2 (W.D. La. July 9, 2018) (recognizing that the Federal Rules "afford[] non-parties a higher protection in terms of the burden that can be imposed upon them" (internal quotation marks omitted)).

Here, disclosure of the information sought by the Subpoenas will have an in terrorem effect on immigrants and their families by exposing them to harassment and retaliation.  That effect is far from theoretical.  The State's ultimately unfounded suppositions in the operative complaint—that the presence of immigrants can lead only to more crime, more public expenditures, and fewer resources—contribute to this hostility.  *See* Dkt. No. 86 ¶¶ 80-83.  That Louisiana objects to immigrants' presence is bolstered by statements of Mr. Landry, the State's Attorney General, whose office issued the Subpoenas.  *See, e.g.*, La. Department of Justice, *Biden Moves To Insure [Sic] Welfare Benefits For Immigration Applicants, Louisiana Petitions Court To Intervene* (Mar. 12, 2021), ag.state.la.us/Article/10873 (stating that immigrants should not receive social welfare programs); Dede Willis, *Louisiana Attorney General Landry supports Trump's immigration executive order* (Jan. 25, 2017), https://www.knoe.com/content/news/Louisiana-Attorney-General--411814945.html (quoting Mr. Landry's inflammatory, false statement that "illegal immigrants have more rights than American citizens").  Immigrants have good reason to fear the consequences of their personal information falling into Mr. Landry's hands.

Immigrants' well-founded fears of retaliation and harassment by the State will inevitably affect the Nonprofit Organizations' ability to perform their work.  The law has long recognized that, where association with an organization is penalized, that organization suffers a cognizable

injury.  *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. Alabama*, 357 U.S. 449, 462-63 (1958) ("[C]ompelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.").  That principle applies outside of the membership-organization context.  For example, several Circuits have held that the disclosure of the identity of manufacturers of lethal injection drugs poses an undue burden on States because manufacturers will refuse to associate with the States without the protection of anonymity.  *See, e.g.*, *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1340 (11th Cir. 2020); *In re Mo. Dep't of Corr.*, 839 F.3d 732, 736 (8th Cir. 2016).

Unless the Subpoenas are quashed, an analogous problem will arise.  Immigrants in Louisiana will have to decide whether to associate with the Nonprofit Organizations and risk the disclosure of highly sensitive information to the State (or others) or to deprive themselves of the valuable services the Nonprofit Organizations will provide.  The natural and probable consequence of that dilemma is that the Nonprofit Organizations' ability to serve the immigrant community will suffer.  *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (recognizing that disclosure of citizenship status would depress participation in census by immigrants because of reasonable, creditable fear of retaliation).

### III.    The Subpoenas Seek Information Protected by Several Privileges

The sensitivity of the information sought by the Subpoenas has an additional dimension for one of the Nonprofit Organizations.  ISLA, in addition to engaging in advocacy and community service like the other Nonprofit Organizations, primarily provides legal representation and advice to immigrant community members.  Thus, the information in its

17

possession is protected by the attorney-client privilege, the duty of confidentiality that bounds lawyers, and the work product doctrine.

      A.     <u>The Information Sought is Protected by the Attorney-Client Privilege</u>

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law" and "protects both the giving of professional advice to those who can act on it and the giving of information to the lawyer to enable him to give sound and informed advice." *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020); *Guzzino v. Felterman*, 174 F.R.D. 59, 60-61 (W.D. La. 1997). Request Nos. 1 through 3 encompass documents protected by the privilege, including communications with ISLA's clients concerning their immigration status and communications received from those clients. These documents are protected by the attorney-client privilege because they involve communications made in confidence between clients and their lawyers for the purpose of providing or obtaining legal advice. *See* Lopez Decl. ¶¶ 17-25, 37-38.

The State's Letter asserts that "the existence of an attorney-client relationship and the identity of a client are *per se* not privileged." *See* Quigley Declaration, Ex. B at 2. This argument fails to acknowledge the body of law protecting client identity where disclosure of the client's identity would amount to a disclosure of the advice sought—here, legal advice concerning immigration status. *See Taylor Lohmeyer L. Firm P.L.L.C. v. United States*, 957 F.3d 505, 510 (5th Cir. 2020); *In re Grand Jury Subpoena for Att'y Representing Crim. Defendant Reyes-Requena*, 926 F.2d 1423, 1431 (5th Cir. 1991). The State's focus on the identities of "asylum seekers" would require ISLA to disclose not only an individual's name but also the specific and sensitive type of legal representation being provided.

The sensitivity of the information sought is reinforced by the ethical rules governing the conduct of lawyers. Irrespective of the existence of privilege, a lawyer is generally forbidden to

disclose confidential information, including the identity of her clients, except with consent or where necessary to effectively conduct the representation. *See* La. Rules of Prof'l Conduct R. 1.6 (enumerating narrow circumstances in which a lawyer may "reveal information relating to the representation of a client"). Here, disclosure of clients' identities would reveal the contents of their communications concerning their immigration status. In other words, information concerning ISLA's client's identities is inextricably intertwined with privileged communications. Therefore, the identities are privileged in their own right.

     B.    <u>The Information Sought is Protected by the Work Product Doctrine</u>

The work product privilege applies to documents "prepared in anticipation of litigation." *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000). Litigation need not be imminent, however. So "long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation," the doctrine applies. *Id.* (internal quotation marks omitted). Work product may be disclosed only upon a showing of "substantial need" by the party seeking the materials and the inability of that party to acquire the materials elsewhere without undue hardship. *S.E.C. v. Brady*, 238 F.R.D. 429, 442 (N.D. Tex. 2006). "However, even when the requisite showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.* (internal quotation marks omitted).

Requests Nos. 1, 2, and 3 seek documents that are protected by the work-product doctrine. In the course of its work with immigrants, ISLA provides, *inter alia*, assistance with asylum applications and immigration court proceedings. In the course of and/or in preparation for those proceedings, ISLA prepares documents designed to facilitate eventual litigation, including analysis of how the asylum rule may impact its clients. *See* Lopez Decl. ¶ 11. Those documents reflect the mental impressions of ISLA's counsel, including their assessment of the

19

importance of various facts.  Thus, the materials are protected work product and, consequently, cannot be disclosed except upon a showing of substantial need by the State.  Because the State has failed to exhaust other avenues of acquiring the tangentially relevant information in the control of the Nonprofit Organizations, it cannot demonstrate a substantial need for these materials.

## IV.     The Subpoenas Threaten Core Constitutional Freedoms

### A.      The Subpoenas Impair the Right of Free Association

"[T]he First Amendment protects the right of all persons to associate together in groups to further their lawful interests."  *Mote v. Walthall*, 902 F.3d 500, 507 (5th Cir. 2018) (internal quotation marks omitted).  That right "lies at the foundation of a free society."  *Shelton v. Tucker*, 364 U.S. 479, 486 (1960).  It is what empowers political activists and community groups alike to advance their causes, thereby "produc[ing] the diversity of opinion that oils the machinery of democratic government and insures peaceful, orderly change."  *Gilmore v. City of Montgomery, Ala.*, 417 U.S. 556, 575 (1974).  Associated organizations need not be "'political in the customary sense' but includes those which 'pertain to the social, legal, and economic benefit of the members.'"  *Sawyer v. Sandstrom*, 615 F.2d 311, 316 (5th Cir. 1980).  The Constitution limits the ability of government to penalize people for associating with organizations it disfavors.  Consistent with that principle, the Supreme Court has struck down efforts by State governments to demand information identifying members of civic organizations.  *See NAACP*, 357 U.S. at 462-63 (finding that compelled disclosure of membership lists violated the First Amendment because such disclosure would cause members to "withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.");  *In re Primus*, 436 U.S. 412, 431 (1978) (holding that a client's solicitation of a client was protected by the First Amendment, and thus

20

could not be penalized, where that solicitation was made to advance her organization's political and social advocacy goals). "Where, as here, constitutionally protected rights are infringed by [discovery], the party seeking discovery must demonstrate an interest in obtaining the disclosures which is sufficient to justify the deterrent effect which these disclosures may well have." *Hastings v. N. E. Indep. Sch. Dist.*, 615 F.2d 628, 632 (5th Cir. 1980) (internal quotation marks and alterations omitted); *United States v. Garde*, 673 F. Supp. 604, 606 (D.D.C. 1987) (court upheld associational defense to subpoena where nonprofit advocacy organization alleged client list would chill First Amendment rights).

Each of the Nonprofit Organizations exists to advance important social and political values, including the equal dignity and humanity of immigrants.[5] The Nonprofit Organizations advance those values both by providing assistance to immigrant communities and by working hand-in-hand with those communities to advance their interests in various fora. That core First Amendment activity cannot take place in a world where their immigrant clients' and constituents' private information risks being involuntarily disclosed to the State. Because immigrant communities are frequently subject to discrimination and worse, trust between those communities and the Nonprofit Organization would erode without assurance that community members can call upon the Nonprofit Organizations without exposing themselves to harassment

---

[5] In the parties' March 14, 2023, meet and confer and the State's Letter, the State argued that "a claim of confidential association for political advocacy would be in significant tension with [the Nonprofit Organizations'] claims to be 501(c)(3) tax-exempt organizations." Quigley Declaration, Ex. B at 2. This is, quite simply, false. First, non-legislative advocacy (lobbying) is in no way restricted by 501(c)(3)—issue advocacy is the very point of that tax exempt status. In addition, it is clear that "[a] 501(c)(3) organization may engage in some lobbying." IRS, *Lobbying*, https://www.irs.gov/charities-non-profits/lobbying#:~:text=In%20general%2C%20no %20organization%20may,loss%20of%20tax%2Dexempt%20status. Only "too much lobbying activity risks loss of tax-exempt status." *Id.* Needless to say, the Nonprofit Organizations comply with applicable tax law.

or retaliation by the State (or others).  It would more than frustrate the Nonprofit Organizations'

mission; it would make their work impossible.  The ultimate consequence of the Subpoenas, if

enforced, would be to permanently break those bonds of trusts.  No immigrant could ever discuss

sensitive matters with the Nonprofit Organizations lest their personal information be

appropriated by the State.  When the price of compliance is the eradication of the Nonprofit

Organizations, the State's meager interest in the information sought cannot justify its intrusion

into the core associational freedoms guaranteed by the First Amendment. *See Roberts v. U.S.

Jaycees*, 468 U.S. 609, 623 (1984) (even an "indirect infringement on associational rights" is

impermissible and subject to the closest scrutiny).  The law does not require non-party

organizations to give up their missions because of the State's refusal to seek discovery from

other sources.

  B. <u>The Subpoena on La. AID Implicates Protected Religious Exercise</u>

  The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*, which is

designed to provide robust enforcement embodied in the Free Exercise Clause of the First

Amendment, requires the application of strict scrutiny whenever government action substantially

burdens religious belief.  *Whole Woman's Health v. Smith*, 896 F.3d 362, 371 (5th Cir. 2018), *as

revised* (July 17, 2018); *see also U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 350 (5th Cir. 2022)

("[A] government action or regulation creates a 'substantial burden' on a religious exercise if it

truly pressures the adherent to significantly modify his religious behavior and significantly

violates his religious beliefs." (internal quotation marks omitted)).  As the Fifth Circuit recently

ruled, RFRA applies in the context of third-party subpoenas.  *See Whole Woman's Health*, 896

F.3d at 373 (ruling that third-party subpoenas that seek to reveal religious groups' internal

communications "interfere[] with [religious groups'] decision-making processes on a matter of

intense doctrinal concern but also exposes those processes to an opponent and will induce similar ongoing intrusions against religious bodies' self-government").

Here, the Subpoena served on La. AID impairs the organization's rights under RFRA. La. AID depends on a volunteer network of churches and other religious organizations and operates a shelter that is part of a church ministry whose religious principles compel advocacy for immigrant communities. *See* Kelley Decl. ¶¶ 6-14. In other words, La. AID's work is inextricably intertwined with that of the religious institutions with whom it collaborates. Indeed, La. AID's shelter—the focal point of its work—operates under the auspices of a church. *See* Kelley Decl. ¶¶ 8, 10-14. By forcing La. AID to share sensitive information about immigrants with the State, the Subpoena creates friction between the church and those it wants to serve, thereby the undermining the church's right to practice its faith.[6] *See Whole Women's Health,* 896 F.3d at 373 (disclosure of sensitive information "potentially empower[s] certain interest groups to harass, impose[s] disastrous costs on, and uniquely burden religious organizations").

## CONCLUSION

The Subpoenas should be quashed because they violate the Federal Rules of Civil Procedure, infringe core constitutional liberties, and threaten to destroy the Nonprofit Organizations' ability to serve immigrant communities. While the State may disagree with the

---

[6] In the alternative, as in *Whole Women's Health*, 896 F.3d at 370, this Court can apply the principle of constitutional avoidance and decline to rule on the weighty First Amendment questions raised by the subpoenas on the grounds of constitutional avoidance. *United States v. Holmes*, 614 F.2d 985, 989 (5th Cir. 1980) ("Ordinarily we should refrain from constitutional adjudication where statutory interpretation or application will suffice."). Federal Rule of Civil Procedure 45—as well as the applicable privileges—already provide ample justification to quash a subpoena that severely burdens the third parties in this case. *Cf. See In re Matter of Subpoenas Served on Collins*, No. A-14-CV-934 LY, 2014 WL 12586370, at *2 (W.D. Tex. Nov. 7, 2014) (noting "special weight [given] to the burden on non-parties of producing documents to parties involved in litigation.").

Nonprofit Organizations' views concerning immigration, the principles on which their objections rest are applicable to all organizations who seek to advance their values through advocacy and community engagement.  Churches, community organizations, and advocacy groups alike should be free to pursue their missions without the burden of unreasonable discovery in cases to which they are not party.

Dated:  March 20, 2023

Respectfully submitted,

*/s/ Jessica Myers Vosburgh*
Jessica Myers Vosburgh (*pro hac vice* pending)
Emily Early (*pro hac vice* pending)
Angelo Guisado (*pro hac vice* pending)
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
T:  (212) 614-6492
E:  jvosburgh@ccrjustice.org
     eearly@ccrjustice.org
     aguisado@ccrjustice.org

*/s/ William P. Quigley*
William P. Quigley (#07769)
**LOYOLA UNIVERSITY SCHOOL OF LAW**
7214 St. Charles Avenue
New Orleans, LA 70118
T:  (504) 710-3074
F:  (504)861.5440
E:  quigley77@gmail.com

*/s/ Muhammad U. Faridi*
Muhammad U. Faridi (*pro hac vice* forthcoming)
Stephanie Teplin (*pro hac vice* forthcoming)
Julia Haigney Long (*pro hac vice* forthcoming)
David Moosmann (*pro hac vice* forthcoming)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
T:  (212) 336-2000
E:  mfaridi@pbwt.com
     steplin@pbwt.com
     jhaigneylong@pwbt.com
     dmoosmann@pbwt.com

*Attorneys for Home is Here NOLA, Immigration Services and Legal Advocacy, and Louisiana Advocates for Immigrants in Detention*

24