UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

---

| | |
|---|---|
| THE STATE OF ARIZONA, et al., | : |
| Plaintiffs, | : Civil Action No. 6:22-cv-01130 |
| vs. | : |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States of America, et al., | : |
| Defendants, | : |

---

### DECLARATION OF HOMERO LÓPEZ, JR. IN SUPPORT OF THE NONPROFIT ORGANIZATIONS' MOTION TO QUASH

I, Homero López, Jr., under penalty of perjury, declare as follows:

1. My name is Homero López, Jr. I am over 18 years of age and have personal knowledge of the facts set forth in this Declaration. I am the Legal Director of Immigration Services and Legal Advocacy ("ISLA"). I make this Declaration based upon my personal knowledge and in support of ISLA's and the other Non-Profit Organizations' Motion to Quash the Subpoenas Ad Testificandum.

2. I have served as ISLA's Legal Director since approximately January 2021. I previously served as the Managing Attorney and Executive Director of ISLA at the time ISLA was founded in 2018.

3. Prior to working at ISLA, I worked at Catholic Charities Baton Rouge for approximately four years and Catholic Charities New Orleans for approximately 3 years.

4. In my over 12 years of experience working in immigration defense, I have observed a high need for immigration detention representation in Louisiana, where individuals are not entitled to attorney.

5. As ISLA's Legal Director, as well as a practicing attorney licensed in the State of Louisiana, I oversee all of the legal work and supervise the entire legal team, which includes setting the vision for case management, balancing our legal staff's overall caseload, helping to decide legal theories in our cases, and reviewing all filings.

6. I also handle approximately half of the executive administrative duties for ISLA, such as fundraising and financial and operations reporting, and I serve as ISLA's registered agent with Louisiana's Secretary of State. Along with ISLA's Executive Director, I also help to coordinate coalition and community organizing work with other Gulf South organizations and advocacy with legislators to address detention and other immigration issues in the region. Additionally, I provide these partner organizations and the community at large Know-Your-Rights presentations.

7. There are seven people on ISLA's staff: the Executive Director, the Legal Director, three legal fellows, who are newly admitted attorneys licensed to practice law; one administrative assistant; and one fully accredited U.S. Department of Justice representative of the Executive Office of Immigration Review. While we sporadically work with volunteers and interns, we do not have a formal intern or volunteer program.

**ISLA's Legal and Advocacy Work**

8. The primary work of ISLA is to defend the rights of our immigrant communities. Our attorneys do this work by visiting with detained immigrants at the nine ICE Processing Centers in Louisiana and Mississippi on a weekly basis to provide pro bono representation under a universal representation model before Immigration Courts. From 2018 to 2020, we served approximately 250 detained immigrant clients per year through direct legal representation to ensure that detained immigrants' due process rights are protected and that our clients do not have

to attend hearings and present their cases on their own.  Since hiring legal fellows in 2021, the number of individuals we represent continues to rise.

9.  We also provide limited representation to thousands of more individuals through a new Immigration Court Help Desk Service, which fields questions from people in removal proceedings at the New Orleans and Annandale Immigration Courts to our attorneys, as well as Know-Your-rights and other legal orientation presentations and immigration trainings to immigrant clients at detention centers and to the broader community.  We also provide Continuing Legal Education trainings and webinars to attorneys.

10.  Through limited Help Desk representation, we provide information and orientation to people in immigration proceedings on their eligibility and prepare them for seeking asylum under the new Asylum Rule process, including the Credible Fear Interview.

11.  None of the ISLA staff have generated any materials on this Asylum Rule, with two exceptions: (1) public comments that we submitted on the proposed Rule during its notice and comment period—a copy of which the federal government has, and (2) emails exchanged among staff on the Rule.  These emails have helped us interpret the Rule and prepare our attorneys with information about the Rule to be able to explain its impact on the asylum process to our clients.

12.  Any other information we have on the Rule has been provided by the federal government and other organizations with which we work.

13.  We do not create or hand out any documents or other written materials for our presentations or trainings.

14.  ISLA also does not inquire into or track the immigration or asylum seeker status of individuals who attend any workshops or participate in any advocacy work we conduct in the community.

15. A smaller amount of ISLA's work is advocacy, which includes coordination with community and coalitions to educate them about immigration issues. We also partner with other organizations to support their work—for example, to identify folks who are habeas-eligible.

16. None of ISLA's work involves the provision of information on public benefits or assisting clients apply for public benefits.

**ISLA's Efforts to Maintain Trust and Confidentiality with and for our Clients and the Larger Community**

17. To aid in our representation of our clients, our clients give me and the ISLA legal fellows very private information.

18. Our clients are in very vulnerable, often desperate, life-threatening situations. Our asylum clients in particular have left their home countries due to persecution, violence, death threats, and sexual assault. They are often not comfortable speaking about this private information with most people.

19. So when they share this information with us, we orally explain to clients that this information is kept confidential and that it does not leave our office unless necessary for us to carry out our legal representation for them.

20. When ISLA staff communicate with non-staff persons about our clients, such as co-counsel or other organizational partners, we do not use clients' names because we want to protect their identity due to the sensitivity of immigration cases. Instead, we use their first name, initials, or other information to describe the client.

21. We also always get clients' consent to use their name in any media about a case.

22. Staff also are not permitted to take any client or related files outside of the office, except when necessary for representation in court. We also shred documents we no longer need, and all hard-copy files are locked.

23. We have our interns and administrative assistant sign confidentiality agreements that they will not disclose client and case information and make every reasonable effort to keep that information private, except when necessary for court representation. Interns also only have limited access to clients' files on the Drive.

24. We recently started to require our Help Desk clients to enter into limited representation agreement that confirms our limited representation, which includes the provision of information on the Asylum Rule.

25. Our Help Desk clients also must sign a confidentiality agreement that confirms we will keep their information private and confidential. The confidentiality agreement contains just the name and the client's type of immigration case.

**Document Management**

26. ISLA uses Microsoft drive for organizational file management and Clio for legal case management. All staff have access to both systems, and interns are given limited access to the Drive only for the duration of their internship.

27. For each new client representation, we create a file in Microsoft Drive that contains retainer agreements, intake forms, and any other documents relevant to a client's case. We also create for each new client a client profile in Clio with fields for the client's name, address of family, location of where the client is detained, the type of immigration case, and what relief the client seeks. For staff to access both Clio and the Drive, they must have approved log-in credentials, which they must use each time they log in.

28. Each client profile also contains a notes section, where we enter all information obtained from the intake form completed with clients during the intake process at a detention, including name, case details, any criminal background, date of U.S. entry, previous deportations,

dates of hearings, names of family members, and level of education, income, property ownership, and health conditions, among other information.

29. In the notes, we also track all communications with clients, including anything an attorney has done for them.

**Detriment that compliance with the subpoena will cause to ISLA**

30. We do not have an IT department or any IT staff. To comply with this subpoena, I would be responsible for locating and reviewing potentially responsive documents, which would mean I would not be able to do my job.

31. I would have to sift through thousands of files and emails from within the last 5 years. It would take a month of dedicated time to even just to identify and find the files and even more to review them to confirm whether they would be responsive.

32. This one-month estimate is based on the number of clients ISLA has had over the last 5 years and that we only kept hard-copy records of our clients' files and did not use Clio until late 2019. As a result, I would have to dig through a year-and-half worth of physical client files and review hand-written notes to identify any asylum cases we took during that period.

33. For the more recent cases maintained in Clio, I would have to pull a report in Clio for all of our cases entered as "asylum" cases and then would have to review through the notes section in each client entry to identify what information we gave a client. I then would have to review their file in the Drive to see what responsive documents we may have.

34. As a final step, I would have to review the documents to identify any attorney-client communications, work product material, or other privileged information. This privilege review would take even more time.

35. If I had to take the above steps, I would not be able to take any new cases or continue representation of my current clients—much less, provide required supervision for the three legal fellows (all of whom have fewer than 2 years' experience) under my direction, such as review of any of their draft filings. Even the dedication of time I have had to give to help prepare objections to this subpoena and the motion to quash has taken up hours of time from my daily job.

36. Even if other ISLA staff tried to help me respond to the subpoena, I would still have to stop my job because I would have to review any potentially responsive documents they bring to me. In short, we all would have to stop doing our legal work to collect and review this documentation.

37. Compliance with this subpoena would also break the necessary trust that we build with clients and would shut down our work. If we give the state government and Attorney General Landry specifically—who have shown negative attitudes towards immigrants—the information and documents requested in the subpoena, clients would feel that that their trust in us is lost and they are not going to come to us, and we will not be able to do our work. In fact, there will be no work to do at all and our legitimacy will be lost.

38. Clients' families and the larger community of organizers that ISLA works with would also no longer place their trust in ISLA and would not want or invite us as a part of their coalitions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at <u>New Orleans, Louisiana</u> on March <u>20</u> , 2023.

                                                          Homero López