# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **IN RE: SUBPOENA ISSUED TO NON-PARTY INNOVATION LAW LAB** | **Case No.:** _____ |
| IN THE MATTER OF: | |
| The State of Arizona, By and Through its Attorney General, Mark Brnovich, et al., | |
| Plaintiffs, | United States District Court Western District of Louisiana LaFayette Division Civil Action No.: 6:22-cv-01130-DCJ-CBW |
| v. | |
| Merrick Garland, in his official capacity as Attorney General of the United States, et al., | |
| Defendants. | |

## INNOVATION LAW LAB'S MOTION TO QUASH
## THIRD-PARTY RULE 45 SUBPOENA

**COMES NOW**, pursuant to Rule 45 of the Federal Rules of Civil Procedure, non-party Innovation Law Lab ("Law Lab"), and respectfully moves this Court to quash Plaintiff's Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("Subpoena"). As set out more

thoroughly in the attached Memorandum, the Subpoena requires disclosure of privileged material and production would be unduly burdensome for Law Lab.

This 16th day of March, 2023.

**KILPATRICK TOWNSEND & STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Fax: (404) 815-6555
TCaldas@kilpatricktownsend.com
GReddy@kilpatricktownsend.com
BTRichardson@kilpatricktownsend.com

/s/ Bennett T. Richardson
Gautam Reddy
Georgia Bar No. 757546
Tamara Serwer Caldas
Georgia Bar No. 617053
Bennett T. Richardson
Georgia Bar No. 974586

*Attorneys for Innovation Law Lab*

OF COUNSEL:

Emily Greb
Nancy Cruz
Kaitlin Dryden
**PERKINS COIE LLP**
33 East Main Street, Suite 201
Madison, WI 53703
Phone: (608) 663-7460
Fax: (608) 663-7499
EGreb@perkinscoie.com
NCruz@perkinscoie.com
KDryden@perkinscoie.com

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document filed with the Clerk of Court has been prepared in 14 point Times New Roman font, in accordance with Local Rule 5.1(C).

Dated:          March 16, 2023.

/s/ Bennett T. Richardson
Bennett T. Richardson

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the within and foregoing **INNOVATION LAW LAB'S MOTION TO QUASH THIRD-PARTY RULE 45 SUBPOENA**, with the Clerk of Court using the CM/ECF system, which will automatically send email documentation of such filing to all attorneys of record.

I further certify that on this day, I served a true and correct copy of the within and foregoing upon counsel of record in the underlying action by electronic email and by depositing a true and correct copy of same in the United States Mail, first-class postage prepaid, addressed as follows:

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL
Joseph S. St. John
Deputy Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
STJohnj@ag.louisiana.gov

*Counsel for State of Louisiana*
*A Plaintiff in the Underlying Action*

Brian Ward
U S Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Brian.c.ward@usdoj.gov

Erez R. Reuveni
U S Department of Justice
Civil Division (5th)
450 5th Street NW
Washington, D.C. 20001
Erez.r.reuveni@usdoj.gov

*Counsel for Defendants*
*In the Underlying Action*

Dated: March 16, 2023

**KILPATRICK TOWNSEND &
  STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Fax: (404) 815-6555
TCaldas@kilpatricktownsend.com
GReddy@kilpatricktownsend.com
BTRichardson@kilpatricktownsend.com

/s/ Gautam Reddy
Gautam Reddy
Georgia Bar No. 757546
Tamara Serwer Caldas
Georgia Bar No. 617053
Bennett T. Richardson
Georgia Bar No. 974586

*Attorneys for Innovation Law Lab*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: SUBPOENA ISSUED TO NON-PARTY INNOVATION LAW LAB | Case No.: _____ |
| IN THE MATTER OF: | |
| The State of Arizona, By and Through its Attorney General, Mark Brnovich, et al., | |
| Plaintiffs, v. | United States District Court Western District of Louisiana LaFayette Division Civil Action No. 6:22-cv-01130-DCJ-CBW |
| Merrick Garland, in his official capacity as Attorney General of the United States, et al., | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF INNOVATION LAW LAB'S MOTION TO QUASH THIRD-PARTY RULE 45 SUBPOENA

Pursuant to Federal Rule of Civil Procedure 45(d)(3)(A), non-party Innovation Law Lab ("Law Lab") submits the following Memorandum in Support of its Motion to Quash the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("Subpoena") issued by the

States of Louisiana and Florida (collectively, the "States") to Law Lab on February

17, 2023 and served on February 27, 2023.[1]

## INTRODUCTION

The Subpoena relates to a lawsuit that several states, including Louisiana and

Florida, filed against the United States Attorney General and other Defendants

challenging an interim final rule authorizing U.S. Citizenship and Immigration

Services ("USCIS") to consider the asylum applications of certain individuals

subject to expedited removal who establish a fear of persecution or torture during

their required credible fear screening. (Cruz Decl. at Ex. A; *see also* Procedures for

Credible Fear Screening and Consideration of Asylum, Withholding of Removal,

and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022)

(hereinafter referred to as "March 29, 2022 Interim Final Rule")).

Law Lab is not a party to that lawsuit. Law Lab is a small organization that

leverages law, technology, and advocacy in order to defend the right to asylum,

deploys interventions at immigrant and refugee crisis points to provide and amplify

legal representation for immigrants; facilitates collaboration among direct service

---

[1] (Declaration of Nancy Cruz in Support of Innovation Law Lab's Motion to Quash Third-Party Rule 45 Subpoena, (hereinafter "Cruz Decl") at Exhibit A, Subpoena *Duces Tecum* to Law Lab dated February 17, 2023).

providers, impact litigators, and policy advocates; scales anti-detention work; and defends immigrants in the State of Oregon. (Declaration of Stephen W. Manning in Support of Innovation Law Lab's Motion to Quash Third-Party Rule 45 Subpoena (hereinafter "Manning Decl."), ¶ 2). Despite Law Lab's non-party status, the States have served it with a far-reaching subpoena that this Court should quash.

As detailed below, the Subpoena seeks an enormous amount of privileged and work-product protected information from Law Lab, the disclosure of which would destroy Lab Law's ability to continue its work representing and aiding asylum seekers. (Manning Decl., ¶ 15). It is also unclear what relevant information the States could obtain from Law Lab that could not be obtained from the Defendants in the underlying action. Moreover, Law Lab is a small organization that cannot devote the significant time and resources necessary to determine if every potentially responsive document is privileged or entitled to work-product protection, especially because the requests largely seek privileged documents. (Manning Decl., ¶ 17).

Indeed, this Subpoena, alongside other similar subpoenas served by the States, appears to be a fishing expedition into the files of small, non-profit groups that provide aid to asylum seekers. (Manning Decl., ¶ 16). Notably, the States appear to have specifically targeted small legal service providers in the immigration space with this and other subpoenas. (Manning Decl., ¶ 16). Asking Law Lab and other

small legal services providers to shoulder the burden of gathering information already available to the States is an improper method for the States to seek the discovery they desire. As detailed below, the Federal Rules demand that the Court quash the Subpoena. *Morton v. Lien Filers, Etc. of Heath W. Williams, L.L.C.*, No. 20-cv-3211, 2021 WL 4815899, at *3 (N.D. Ga. Aug. 19, 2021) ("Rule 45 also provides that upon 'timely motion,' the Court 'must' quash or modify a subpoena that . . . subjects a person to undue burden.").

## BACKGROUND

### A. The Underlying Litigation

As noted above, several states filed a lawsuit in the United States District Court for the Western District of Louisiana, challenging the March 29, 2022 Interim Final Rule. (Cruz Decl. at Ex. B at 4). The Plaintiffs include Louisiana and Florida, and the lawsuit names the United States Attorney General and other officials of the United States government and federal governmental agencies as Defendants. Generally, Plaintiffs allege that promulgation of the March 29, 2022 Interim Final Rule violates the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D) for, among other claims, (1) exceeding Defendants' statutory authority under the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1101 et seq. and the Homeland Security Act ("HSA"), Pub. L. No. 107-296 (2002); (2) violating the

APA's notice-and-comment requirements, and (3) arbitrarily and capriciously failing to address reliance interests in the prior system of asylum adjudication, among other requisite considerations. (Cruz Decl. at Ex. B at 47-66).

On December 2, 2022, the parties in the underlying lawsuit filed a Joint Status Report that discussed ongoing discovery issues. (Cruz Decl. at Ex. C). During a Status Conference held on December 16, 2022 ("December 16 Status Conference") addressing the discovery issues presented by the parties, the court directed the Plaintiffs to "apprise the Defendants of the factual bases—including the relevant states and agencies thereof—on which they seek to establish Article III standing" before commencing jurisdictional discovery. (Cruz Decl. at Ex. D).

Subsequently, on January 17, 2023, the court held another Status Conference ("January 17 Status Conference"), during which the parties updated the court about the status of jurisdictional discovery. (Cruz Decl. at Ex. E). During the January 17 Status Conference, the Plaintiffs advised the court that they "intend to establish Article III standing by showing the effect of the [March 29, 2022 Interim Final Rule] on certain discrete programs in the states of Louisiana and Florida, in addition to asserting standing as a matter of law." (*Id.* ). The court ordered the parties to confer and seek agreement on the parameters of jurisdictional discovery and advise the

court of any impasse. The court further ordered the period of jurisdictional discovery to be on or before March 24, 2023, unless extended. (*Id.*).

## B.    The Subpoena

The Subpoena to Law Lab is dated February 17, 2023, and notification of it was sent to the Defendants in the underlying lawsuit on the same date. (Cruz Decl. at Ex. A). However, while the States dated their subpoena February 17th, they did not attempt formal service on Law Lab until February 27th. While the States sent an email to Law Lab on Friday, February 24th, it is unclear why the States waited a full week to send that email and, 10 days to attempt formal service. When it was served, the Subpoena listed a compliance deadline of March 10, 2023. (Cruz Decl. at Ex. A). Likely recognizing that a compliance deadline of less than two weeks from formal service was likely overly burdensome, the States offered an extension until March 17th, and the parties agreed to that date for compliance while preserving all of Law Lab's rights to object to and move to quash the Subpoena. (Cruz Decl. at Ex. F). The place for compliance is listed as the Office of the Attorney General - SG Unit, in Atlanta, Georgia. (Cruz Decl. at Ex. A).

The Subpoena demands production of the following documents:

(1)    Documents sufficient to identify all persons known to Law Lab (including persons in the Law Lab case management system) who are asylum applicants or asylum seekers located, residing, or with a mailing address in Florida or Louisiana;

(2)     All documents used, presented, or distributed by Law Lab at its asylum workshops;

(3)     All documents created for use across Law Lab's initiatives related to asylum applications;

(4)     All non-client specific documents Law Lab provided to clients or prospective clients; and

(5)     All documents related to the August 20, 2021 Notice of Proposed Rulemaking or March 29, 2022 Interim Final Rule regarding asylum procedures.[2]

## C.     Relevant Knowledge Possessed by Law Lab

As explained in detail below, the Subpoena seeks an enormous amount of privileged and work-product protected information from Law Lab. However, Law Lab has some resources for immigrants and people seeking asylum that are readily available on the Internet. For example, Law Lab offers a free training course for asylum. Law Lab's website provides two links where any interested individual—including the lawyers for the states of Louisiana and Florida—can access its training materials, learn about asylum law's complexities, and be referred to other suggested materials to further the lawyers' knowledge. (Manning Decl., ¶ 23).

Additionally, Law Lab filed a public comment on the August 20, 2021 Notice of Proposed Rulemaking which is available to the Plaintiffs from the Defendants and

---

[2] (Cruz Decl. at Ex. A). The requests for documents included in the Subpoena are hereinafter collectively referred to as the "Requests".

can be obtained by the Plaintiffs through a public inspection of the rulemaking proceeding. Law Lab's opinion about the rule's impact on asylum grant rates and asylum applications is outlined in this public comment along with the identification of non-protected source materials. (Manning Decl., ¶ 29). Notably, these resources are all publicly available and accessible to the States.

## **ARGUMENT**

### A.    **Legal Standards**

On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i)     fails to allow a reasonable time to comply;

(ii)    requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii)    requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv)   subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A)(i)-(iv); *see also Schwieterman v. Caterpillar Inc.*, No. 20-CV-2611, 2021 WL 8648760, at *1 (N.D. Ga. Nov. 17, 2021). The burden of proving that compliance with a subpoena presents an undue burden "'lies with the party opposing the subpoena; however, the party seeking to enforce a subpoena bears the burden of demonstrating that the request is relevant.'" *Id*. (quoting *Martin v.*

*DeWafelbakkers LLC*, No. 113CV02529, 2014 WL 12042549, at *1 (N.D. Ga. Jan. 8, 2014)). To determine whether a subpoena imposes an undue burden, "the Court must balance the requesting party's need for the discovery against the burden imposed upon the subpoenaed party." *Id*. Notably, "[c]ourts must also consider the status of a witness as a non-party when determining the degree of burden; the status of the person as a non-party is a factor often weighing against disclosure." *Id*.

**B.    The Subpoena Requires Disclosure of Privileged or Other Protected Matter.**

Under Rule 45(d)(3)(ii), this Court must quash or modify the States' subpoena because it requires disclosure of privileged or other protected matter, and no exception or waiver applies. Fed. R. Civ. P. 45(d)(3)(A)(iii). Here, producing the requested information would violate the attorney-client privilege, reveal client secrets in violation of attorney ethical rules, and cause serious and long-lasting harm to Law Lab's mission and ability to perform its legal work.

First and foremost, the States' Subpoena Requests encompass documents protected by the attorney-client privilege. Like most lawyers, law firms, and legal services organizations, Law Lab uses a case management system to store confidential client information and attorney work product, docket events and tasks, and manage the provision of legal services. (Manning Decl., ¶ 19). The information in Law Lab's case management system relates to current clients, former clients, and

other individuals seeking legal services. (Manning Decl., ¶ 19). The subpoena has far-reaching Requests that collectively implicate the attorney-client privilege. For example, Request Nos. 1 and 3 are of particular concern. Those Requests seek documents (including those in the Law Lab case management system) sufficient to identify all persons known to Law Lab who are either asylum applicants or asylum-seekers and who are located in Florida or Louisiana. However, Law Lab's lawyers interview clients and prospective clients, gather documents from clients, investigate claims, gather data, provide advice and counsel, distribute relevant documents based on our legal judgment to individuals and do what every other lawyer does when working with clients and prospective clients. (Manning Decl., ¶ 18). Such documents are privileged because the responsive documents in Law Lab's possession were collected within the context of the attorney-client relationship. (Manning Decl., ¶ 15).

In addition to violating the attorney-client privilege, production of the documents and information requested by the States would also contravene the applicable rules of attorney conduct. Both the Louisiana and Florida Rules of Professional Conduct prohibit attorneys from revealing information related to representation of a client. *See* La. Rules of Prof'l Conduct R. 1.6; R. Regul. Fl. Bar 4-16; see also *id*. Cmt. ("A fundamental principle in the client-lawyer relationship is

that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation."). Such production of information would also violate the Oregon Rules of Professional Conduct, which apply to all of Law Lab's attorneys. (Manning Decl., ¶ 24; *see also, e.g.*, Oregon Rule of Professional Conduct § 1.6(a) (forbidding the disclosure of "information relating to the representation of a client"); *id*. § 1.8 (prohibiting the disclosure of information gained from prospective clients)). In addition to providing legal services, Law Lab operates a clearinghouse for legal services in Oregon under Oregon law (section 2, chapter 88, Oregon Laws 2022). (Manning Decl., ¶ 20) As part of this operation, all the information Law Lab receives from individuals is protected information under Or. Rev. Stat. § 40.225. (Manning Decl., ¶ 20); *see also* Or. Rev. Stat. 40.225).

Additionally, Law Lab has held numerous so-called "workshops" wherein Law Lab's lawyers, accredited representatives, legal assistants, and others involved in the provision of legal services interview, screen, advise, and counsel individuals who may seek asylum. Law Lab gathers information from individuals and makes legal judgments about facts and law as it relates to their claims and does so in their role as lawyers and accredited representatives. (Manning Decl., ¶ 21). Law Lab provides advice and documents to individuals based on that advice. (Manning Decl., ¶ 21). A so-called "workshop" is a means to provide high-quality legal services at

scale where there is insufficient access to counsel. "Workshops" are a tool Law Lab uses to provide access to counsel. (Manning Decl., ¶ 21). Producing these documents would contravene both the attorney-client privilege and applicable rules of professional conduct.

Not only is Law Lab legally required to protect documents and information subject to the attorney-client privilege and applicable rules of professional conduct, as lawyers and accredited representatives, Law Lab will be permanently damaged in its mission as a legal services organization if required to produce the requested client information. (Manning Decl., ¶ 24). Law Lab could not function as a legal services organization if it were required to produce protected information, including documents from, with, or about its clients. (Manning Decl., ¶ 25). This concern is particularly acute here where representatives associated with the States have made numerous anti-immigrant and inflammatory comments about noncitizens, particularly those seeking asylum under U.S. law. (Manning Decl., ¶ 25).

Beyond these ethical and privilege issues, the information sought by the States is particularly sensitive because it pertains to asylum seekers. The federal government has specific confidentiality rules that pertain to asylum seekers, which "generally prohibit the disclosure to third parties of information contained in or pertaining to asylum applications, credible fear determinations, and reasonable fear

determinations."[3] It is clear based on this policy that the federal government recognizes the sensitive nature of this information and has established these "[confidentiality] regulations [to] safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event the claimant is repatriated. Such disclosure could also endanger the security of the claimant's family members who may still be residing in the country of origin."[4] The simple fact that an individual has applied for asylum is considered a confidentiality breach by USCIS. Consistent with the federal government, Law Lab also recognizes the extremely sensitive nature of this information and is similarly committed to safeguarding this information. Law Lab is further subject to federal regulations requiring representation of clients "in accordance with the law, including applicable rules of professional conduct," which similarly require Law Lab to protect clients' sensitive information as an unbreachable duty.[5]

---

[3] USCIS Policy Manual, Vol. 1 - General Policies and Procedures, Part A - Public Services, Chapter 7 - Privacy and Confidentiality, Section F (https://www.uscis.gov/policy-manual/volume-1-part-a-chapter-7).

[4] *Id*.

[5] USCIS AAO Practice Manual, Chapter 2 - Representation of Parties before the Administrative Appeals Office, Section 2.10 (https://www.uscis.gov/administrative-appeals/aao-practice-manual/chapter-2-

Moreover, any information the States seek that a Court may disagree is attorney-client privileged and/or protected from discovery under applicable rules of professional conduct is protected as attorney work product. Federal law governs the work product doctrine. *See Abusbeih v. Ansari*, No. 18-cv-01061, 2018 WL 11344739, at *4 (N.D. Ga. Dec. 18, 2018). Rule 26 "provides qualified protection to 'documents and tangible things . . . prepared in anticipation of litigation or for trial' by or for a party, or by or for a party's representative." *Freedom Plastics, LLC v. Sparta Polymers, LLC*, No. 11-CV-00334, 2013 WL 12290257, at *6 (N.D. Ga. Apr. 1, 2013) (citing Fed. R. Civ. P. 26(b)(3)). Such work product materials may only be discovered where the party shows "'that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *Abusbeih*, 2018 WL 11344739, at *4 (citing Fed. R. Civ. P. 26(b)(3)(A)(ii)).

Under Rule 26, "even where discovery of fact work product is permitted, the court 'must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'" *Monitronics Int'l, Inc. v. Hall, Booth, Smith, P.C.*, No. 15-CV-3927,

representation-of-parties-before-the-administrative-appeals-office); *see also* 8 C.F.R. § 1003.102.

2016 WL 7030324, at *12 (N.D. Ga. Dec. 2, 2016) (citing Fed. R. Civ. P. 26(b)(3)(B)). These materials comprise opinion work product and "enjoy nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as where they were created to further a crime or fraud." *Id.* (cleaned up). The documents and information sought by the States, especially pertaining to Requests Nos. 1 and 5, fall under this category of work product.

For example, Request No. 5 seeks "[a]ll DOCUMENTS relating to the fINAL RULE or ASYLUM NPRM, including without limitation (a) the impact [sic] (whether anticipated or actual) of the FINAL RULE on asylum grant rates or (b) the impact (whether anticipated or actual) of the FINAL RULE on asylum applications." (Cruz Decl. at Ex. A at 10). Complying with Request No. 5 would require disclosure of Law Lab's mental impressions, conclusions, opinions, or legal theories concerning the March 29, 2022 Interim Final Rule and specifically how this rule may impact current and potential clients and potential legal advice that Law Lab offers, which clearly comprises protected opinion work product.[6]

---

[6] The only material that may be relevant to this request is Law Lab's publicly filed comment on the August 20, 2021 Notice of Proposed Rulemaking which is available to the Plaintiffs from the Defendants and can be obtained by the Plaintiffs through a public inspection of the rulemaking proceeding. Law Lab's opinion about the rule's impact on asylum grant rates and asylum applications is outlined in its public comment along with the identification of non-protected source materials. It is also

In short, this Court should quash the States' subpoena because it seeks documents protected by the attorney-client privilege and/or work product doctrine and/or is protected from discovery by ethics codes. The States should not be allowed to undermine the sanctity of the attorney-client privilege—especially in the case of organizations such as Law Lab whose clients' livelihoods and safety rely on their ethical and zealous representation. This is particularly true for asylum applicants and prospective asylum seekers, as a breach of confidentiality may result in irreparable harm to them or their families in their home country.

## C. The Requested Production Would Be Unduly Burdensome.

In addition, even if some small number of documents are found to be relevant and not protected from discovery for the reasons noted above, production of the requested documents would be unduly burdensome in contravention of the Federal Rules of Civil Procedure. Indeed, the party issuing a subpoena to a non-party "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45 (d)(1); *see also Bailey v. Fair & Walker Unit Owners Ass'n, Inc.*, 22-CV-98, 2023 WL 2119490, at *1 (N.D. Ga. Jan. 17, 2023) (citing *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1329 (11th Cir.

---

available on our website at https://innovationlawlab.org/blog/defending-rights-through-the-rulemaking-process/. (Manning Decl., ¶ 29).

2020)). As noted above, "the court for the district where compliance is required must quash or modify a subpoena that: … subjects a person to undue burden." Fed. R. Civ. P. 45 (d)(3)(A)(iv).. The undue burden analysis requires the court to "'balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it.'" *Jordan*, 947 F.3d at 1337 (quoting 9A Wright & Miller, Federal Practice and Procedure § 2463.1 (3d ed. 2019); *see also Morton*, 2021 WL 4815899, at *3 (N.D. Ga. Aug. 19, 2021).

"Some of the 'factors required to be balanced by the trial court in determining the propriety of a subpoena are the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena.'" *Morton*, 2021 WL 4815899 at *3. Furthermore, "'[c]ourts must also consider the status of a witness as a non-party when determining the degree of burden; the status of the person as a non-party is a factor often weighing against disclosure.'" *Schwieterman*, 2021 WL 8648760 at *1 (quoting *Martin*, 2014 WL 12042549, at *1). As demonstrated below, the undue burden factors heavily weigh in favor of Law Lab.

First, it is unclear how any of the Requests are relevant to the underlying lawsuit.[7] As explained *supra*, the claims in the underlying lawsuit were brought against officials of the United States government and federal governmental agencies responsible for promulgating or implementing the March 29, 2022 Interim Final Rule. (Cruz Decl. at Ex. B, ¶ 44). Further, the claims in the underlying lawsuit relate to alleged violations of the Administrative Procedure Act by the Defendants for exceeding statutory authority in promulgating and implementing an interim final rule that took effect in May 2022.[8] (Cruz Decl. at Ex. B). The requested information, which includes documents about Law Lab's programs and clients,[9] is immaterial to the underlying claims, especially as it pertains to Law Lab's asylum workshops and Centers of Excellence pro bono programs. The existence and operation of these programs has no bearing on the Defendants' actions in the underlying lawsuit.

---

[7] The only potential exception is Law Lab's publicly filed comment on the August 20, 2021 Notice of Proposed Rulemaking. *See supra* fn. 6.

[8] See FACT SHEET: Implementation of the Credible Fear and Asylum Processing Interim Final Rule | USCIS; *see also Piccard v. Deedy*, No. 21-cv-558, 2022 WL 832425, at *2 (N.D. Ga. Mar. 21, 2022) (citing Fed. R. Evid. 201(b)) ("a court [may] take judicial notice of a fact without formal proof when the fact is not subject to reasonable dispute because it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.")

[9] See, e.g., Requests 1 and 3. (Cruz Decl. at Ex. A).

Additionally, the relevant time period for the requested documents in all five Requests date back long before the March 29, 2022 Interim Final Rule that is at issue in the underlying case. (Manning Decl., ¶ 31). For example, Request No. 2 seeks "all documents" created for use across several of Law Lab's programs. (Cruz Decl. at Ex. A at 9). Of the named programs in the Subpoena, neither Law Lab's Centers of Excellence nor its EPIC program (the El Paso Immigration Collaborative) operate in the states of Louisiana or Florida. (Manning Decl., ¶ 31). Law Lab's BorderX detention project ceased operating under that name in 2021, before the promulgation of the Asylum IFR that is at issue in the underlying case. (*Id.*) Moreover, Law Lab has not conducted any workshops in Florida or Louisiana of any kind at any time. (Manning Decl., ¶ 32).

Indeed, the burden imposed on Law Lab clearly outweighs the need of the States to obtain the requested documentation. Identifying and producing the requested documents is unduly burdensome to Law Lab for several reasons. First, setting aside any ethical considerations and obligations, the immense time and effort required to search, locate, provide notice to Law Lab clients of the Subpoena, screen for privilege, and review for production would significantly burden Law Lab's small staff—which consists of only 30 employees. (Manning Decl., ¶ 26). As a non-party to the underlying lawsuit, Law Lab's lawyers would be forced to pause their mission-

related work to respond to the requested production—which, given the nature of Law Lab's mission, would cause harm to Law Lab's clients and work. (Manning Decl., ¶ 26). Moreover, as a small non-profit, Law Lab has not and is unable to budget any of its already limited funds for this production. (*Id.*).

Furthermore, the States can obtain the information about asylum applicants and asylum seekers (as sought in Request No. 1) from the Defendants in the underlying action. The Defendants process the asylum applications of all people seeking asylum throughout the country, including in Florida and Louisiana. (Manning Decl., ¶ 28). Additionally, applicants must promptly provide their updated addresses and regularly report to the Defendants. (*Id.*). It is clear that the States have other avenues to obtain the requested information that do not unduly burden a small non-profit and that do not risk the disclosure of attorney-client information as addressed in Section B above.

Similarly, producing the documents requested in Requests Nos. 1, 2, 3, and 4, including, for example, documents related to asylum or asylum applications dated back to 2018, would also be expensive and unduly burdensome. Since 2014, when Law Lab supported the launch of an extensive, collaborative representation project at a large-scale family detention center in Artesia, New Mexico, Law Lab has launched or supported many representation efforts, both short- and long-term, that

serve asylum seekers at sites throughout the country. These efforts have included (but are not limited to) coordinating the representation of some of the first asylum seekers subjected to the Migrant Protection Protocols; representing over one hundred immigrant men detained at the federal prison; and coordinating Oregon's first universal representation program. (Manning Decl., ¶ 30). Gathering and producing the documents "created for use" across these, and other, programs implemented over the past decade would be extremely burdensome, and, as noted above, not relevant to the claims in the underlying suit. (*Id.*) Doing so would also require coordination with various other groups, as almost all of Law Lab's representation projects operate in partnership with other advocacy organizations. (*Id.*).

## CONCLUSION

For the reasons stated above, Law Lab respectfully urges this Court to quash the States' Subpoena because it violates Rule 45 by requiring the disclosure of privileged or other protected matter and by subjecting Law Lab to undue burden.

This 16th day of March, 2023.

**KILPATRICK TOWNSEND &**
    **STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Fax: (404) 815-6555
TCaldas@kilpatricktownsend.com
GReddy@kilpatricktownsend.com
BTRichardson@kilpatricktownsend.com

/s/ Bennett T. Richardson
Gautam Reddy
Georgia Bar No. 757546
Tamara Serwer Caldas
Georgia Bar No. 617053
Bennett T. Richardson
Georgia Bar No. 974586

*Attorneys for Innovation Law Lab*

OF COUNSEL:

Emily Greb
Nancy Cruz
Kaitlin Dryden
**PERKINS COIE LLP**
33 East Main Street, Suite 201
Madison, WI 53703
Phone: (608) 663-7460
Fax: (608) 663-7499
EGreb@perkinscoie.com
NCruz@perkinscoie.com
KDryden@perkinscoie.com

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document filed with the Clerk of Court has been prepared in 14 point Times New Roman font, in accordance with Local Rule 5.1(C).

Dated:     March 16, 2023.

/s/ Bennett T. Richardson
Bennett T. Richardson

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the within and foregoing **MEMORANDUM IN SUPPORT OF INNOVATION LAW LAB'S MOTION TO QUASH THIRD-PARTY RULE 45 SUBPOENA**, with the Clerk of Court using the CM/ECF system, which will automatically send email documentation of such filing to all attorneys of record.

I further certify that on this day, I served a true and correct copy of the within and foregoing upon counsel of record in the underlying action by electronic email and by depositing a true and correct copy of same in the United States Mail, first-class postage prepaid, addressed as follows:

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL
Joseph S. St. John
Deputy Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
STJohnj@ag.louisiana.gov

*Counsel for State of Louisiana*
*A Plaintiff in the Underlying Action*

Brian Ward
U S Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Brian.c.ward@usdoj.gov

Erez R. Reuveni
U S Department of Justice
Civil Division (5th)
450 5th Street NW
Washington, D.C. 20001
Erez.r.reuveni@usdoj.gov

*Counsel for Defendants*
*In the Underlying Action*

Dated:  March 16, 2023

**KILPATRICK TOWNSEND &**
    **STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Fax:  (404) 815-6555
TCaldas@kilpatricktownsend.com
GReddy@kilpatricktownsend.com
BTRichardson@kilpatricktownsend.com

/s/ Bennett T. Richardson
Gautam Reddy
Georgia Bar No. 757546
Tamara Serwer Caldas
Georgia Bar No. 617053
Bennett T. Richardson
Georgia Bar No. 974586

*Attorneys for Innovation Law Lab*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **IN RE: SUBPOENA ISSUED TO NON-PARTY INNOVATION LAW LAB** | **Case No.:** _____ |
| IN THE MATTER OF: | |
| The State of Arizona,<br>By and Through its Attorney General,<br>Mark Brnovich, et al., | |
| Plaintiffs,<br>v. | United States District Court<br>Western District of Louisiana<br>LaFayette Division<br>Civil Action No. 6:22-cv-01130-DCJ-CBW |
| Merrick Garland, in his official capacity as Attorney General of the United States, et al., | |
| Defendants. | |

## DECLARATION OF STEPHEN MANNING
## IN SUPPORT OF INNOVATION LAW LAB'S
## MOTION TO QUASH THIRD-PARTY RULE 45 SUBPOENA

## DECLARATION OF STEPHEN MANNING

I, Stephen W. Manning, declare as follows:

1.       I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.  I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein and, if called to testify, I could and would do so competently.

2.       I am the Executive Director of Innovation Law Lab ("Law Lab"), a small nonprofit organization based in Oregon that I founded to defend and improve the legal rights of immigrants and refugees. Law Lab's mission is to leverage law, technology, and organizing to fight for immigrant and refugee justice. As part of that mission, Law Lab aims to increase access to legal representation and legal resources for asylum-seeking individuals from around the world, the majority of whom arrive in the United States at the southern border. Law Lab defends the rights of asylum seekers, intervenes at immigrant and refugee crisis points to provide direct representations for immigrants, works to find long-term  representation for asylum

applicants, litigates in federal and state courts on behalf of its clients, and advocates for policy changes in federal and state forums. Our work is national, but we have a particular emphasis on immigrant rights in the State of Oregon.

3.     Law Lab employs lawyers, accredited representatives, legal assistants, and similar professionals in its provision of legal services. Accredited representatives are individuals who are authorized under federal law to provide immigration legal services. *See* 8 C.F.R. § 1292.1(a)(4).

4.     I am aware that Louisiana and Florida, among other plaintiffs, filed a lawsuit against the U.S. Attorney General, and other defendants, challenging an interim final rule on asylum. Law Lab is not a party to the lawsuit.

5.     I am aware that state officials of Louisiana and Florida have made disparaging, degrading, and highly controversial remarks related to immigrants.

6.     I have reviewed the document titled "Subpoena to produce documents, information, or objects or to permit inspection of premises in a civil action" (hereinafter referred to as the "Subpoena") issued in the civil action, *Arizona v. Garland*, a copy of which was emailed to Law Lab's registered agent.

7.     The document commands that we appear at the Office of the Attorney General for the State of Georgia in Atlanta, Georgia on March 10, 2023 at 10 a.m. and produce at such time:

8.    "DOCUMENTS sufficient to IDENTIFY all persons known to Law Lab (including persons in the Law Lab case management system) who are ASYLUM APPLICANTS or asylum seekers (a) located in Florida or Louisiana, (b) who provided a residence address in in [sic] Florida or Louisiana, or (c) who provided a mailing address in Florida or Louisiana."

9.    "All DOCUMENTS used, presented, or distributed by Law Lab in its asylum workshops."

10.    "All DOCUMENTS created for use across Law Lab's Centers of Excellence pro bono programs, BorderX detention project, EPIC program, and other initiatives related to asylum or asylum applications, including without limitation printed guides, worksheets, training videos, and self-help videos."

11.    "All non-client specific DOCUMENTS YOU provide(d) to aliens, including ASYLUM APPLICANTS or asylum seekers, regarding public education, Temporary Assistance for Needy Families ('TANF'), Supplemental Nutrition Assistance Program ('SNAP'), Medicaid, or other public benefits."

12.    "All DOCUMENTS relating to the FINAL RULE or ASYLUM NPRM, including without limitation (a) the impact the impact [sic] (whether anticipated or actual) or the FINAL RULE on asylum grant rates or (b) the impact (whether anticipated or actual) of the FINAL RULE on asylum applications."

13.     The document defines certain words including DOCUMENTS, YOU, ASYLUM APPLICANTS, FINAL RULE, and ASYLUM NPRM among other words.

14.     I am aware that Louisiana and Florida have served similar subpoenas on other similar legal service organizations, a private attorney, and other similar migrant beneficial aid organizations.

15.     Even though Law Lab is not a party to the lawsuit, the Subpoena seeks an enormous amount of information from Law Lab and its lawyers that is privileged and work-product protected. Our clients and prospective clients provide us information and we provide advice and counsel to them. The Subpoena demands that we provide our client secrets, our confidential advice, the identities of our clients, and materials we provided our clients and prospective clients. This is information is collected within and protected by Law Lab in the context of the attorney-client relationship. Plainly stated, the forced disclosure of this information would permanently destroy Lab Law's ability to continue its work aiding asylum seekers and furthering its policy work.

16.     This Subpoena, like the other similar subpoenas served by Louisiana and Florida, appears to be a fishing expedition by Louisiana and Florida into the files of small non-profit groups that provide aid to asylum seekers and perhaps in

retaliation for providing legal services to people their governors and attorneys general dislike.

17.    Producing the requested information would violate the attorney-client privilege, reveal client secrets in violation of attorney ethical rules, and cause irreversible damage to Law Lab's mission and ability to perform its legal work.

18.    Like most lawyers, law firms, and legal services organizations, Law Lab's lawyers interview clients and prospective clients, gather documents from clients, investigate claims, gather data, provide advice and counsel, distribute relevant documents based on our legal judgment to individuals and do what every other lawyer does when working with clients and prospective clients.

19.    Like most lawyers, law firms, and legal services organizations, Law Lab uses a case management system to docket events and tasks; store client secrets, confidential client information and attorney work product; and manage the provision of legal services. The information in our case management system relates to current clients, former clients, and prospective clients seeking legal services. That is, we use the case management system to manage our cases. There is no information in our case management system that does not relate to a current client, former client, or prospective client.

20.     In addition to providing legal services, Law Lab operates a clearinghouse for immigration legal services in Oregon under Oregon law. *See* section 2, chapter 88, Oregon Laws 2022. All the information we receive from individuals is, by law, protected information. *See* ORS 40.225.

21.     Over the years, Law Lab has held numerous so-called "workshops" wherein our lawyers, accredited representatives, legal assistants, and others involved in the provision of legal services interview, screen, advise, and counsel individuals who may seek asylum. We gather information from individuals and make legal judgments about facts and law as it relates to their claims and we do so in our role as lawyers and accredited representatives. We provide advice and documents to individuals based on that advice. A so-called "workshop" is a means to provide high-quality legal services at scale where there is insufficient access to counsel. "Workshops" are a tool we use to provide access to counsel.

22.     Law Lab provides training to other lawyers and in many cases provides technical assistance to pro bono lawyers on aspects of asylum law. Asylum law is very complex. Many people seeking asylum are unrepresented or, because of systemic barriers, are unable to access counsel. Because access to counsel is difficult for asylum-seekers, Law Lab relies on pro bono attorneys from big law firms, small law firms, and private practice to represent individuals in their legal matters,

including asylum. Law Lab creates materials specific to these lawyers to train them and provides advice to these lawyers within a confidential arrangement about their particular cases.

23.    For non-privileged information, Law Lab has   some resources for immigrants and people seeking asylum that are readily available on the Internet.  For example, we have a free training course for asylum. There are two links available on our website where any interested individual—including the lawyers for the states of Louisiana and Florida—can access our training materials, learn about asylum law's complexities, and be referred to other suggested materials to further the lawyers' knowledge. The first link is: https://innovationlawlab.org/immigrant-u/ and the second link is: https://innovationlawlab.org/center-of-excellence-training/. These links appear in the footer of our website under "Immigrant U" and "Center of Excellence Training."

24.    As lawyers and accredited representatives, Law Lab would be permanently damaged in its mission as a legal services organization if it were required to produce client information. *See, e.g.,* Oregon Rule of Professional Conduct 1.6(a) (forbidding the disclosure of "information relating to the representation of a client"); *id.* § 1.8 (prohibiting the disclosure of information gained from prospective clients).

7

25.     We would be unable to function as a legal services organization if we were required to produce protected information, including documents from, with, or about our clients. This concern is particularly acute here where representatives associated with the States have made numerous anti-immigrant and inflammatory comments about noncitizens, particularly those seeking asylum under U.S. law.

26.     Even if the requested information were not privileged or protected, the identification and production of the requested information is unduly burdensome to Law Lab, who is not a party to this case.  If it were even possible to produce the information consistent with our ethical obligations and Oregon statutory obligations—which we doubt— the time to search, locate, provide notice to our clients of the request, collate, and review for production, would burden our small staff and imperil our representation of others. As a non-party, Law Lab does not have the capacity to devote the significant time and resources needed to determine whether it could produce documents that are non-privileged. Law Lab is an organization consisting of approximately 30 employees and has no lawyers on staff who are designated to represent us in this matter. In fact, our lawyers are engaged in other mission-related work. We would be forced to pause our mission-related work, work with impending deadlines before courts and administrative tribunals, in order to respond to the production request. This would harm our clients, our mission, and

work. As a small nonprofit and a nonparty, Law Lab has not budgeted any funds to support the production of information for Louisiana and Florida in their case.

27.     The requested information about the number of asylum-seeking individuals in Florida and Louisiana is certainly available to the Plaintiffs from the Defendants and would likely be available from the Plaintiffs' own records.

28.     The Defendants process the asylum applications of *all* people seeking asylum throughout the country, including in Florida and Louisiana; applicants must provide their updated address to the Defendants promptly.  *See* 8 C.F.R. § 265.1.

29.     With regard to the demand to produce information about "the impact the impact [sic] (whether anticipated or actual) of the FINAL RULE on asylum grant rates" or "the impact (whether anticipated or actual) of the FINAL RULE on asylum applications" Law Lab filed a public comment on the August 20, 2021 Notice of Proposed Rulemaking which is available to the Plaintiffs from the Defendants and can be obtained by the Plaintiffs through a public inspection of the rulemaking proceeding. Our opinion about the rule's impact on asylum grant rates and asylum applications is outlined in our public comment along with the identification of non-protected source materials.    It is also available on our website at https://innovationlawlab.org/blog/defending-rights-through-the-rulemaking-process/.

30.     With regard to the demand for producing the other information, it would be very expensive and unduly burdensome for Law Lab, who is not a party to this lawsuit.  For example, searching for, locating, and producing documents related to asylum or asylum applications dating back to 2014 would be expensive and unduly burdensome, even if it were not privileged and protected. In 2014, Law Lab launched an extensive array of representation projects including at a large-scale family detention center in Artesia, New Mexico. The Artesia Pro Bono Project provided representation to more than 700 women and children who were detained at the Artesia Family Residential Center in Artesia, New Mexico, including representation during their credible and reasonable fear screenings, applications for release, and merits adjudication on immigration relief. The Artesia Pro Bono Project lasted six months and ended when the detention center in Artesia was closed in December 2014. Since then, Law Lab has launched or supported many representation efforts, both short- and long-term, that serve people seeking asylum at sites throughout the country, including (but not limited to) the representation of some of the first asylum seekers subjected to the Migrant Protection Protocols; representing over one hundred immigrant men detained at the federal prison in Sheridan, Oregon, in 2018; running our Centers of Excellence pro bono programs in several cities with in immigration courts with nearly 100% asylum denial rates; and

managing Oregon's first universal representation program (which provides legal representation to noncitizens in Oregon). Gathering and producing the documents "created for use" across these, and other, programs implemented over the past decade would be extremely burdensome. It would also require coordination with various other groups, as almost all our representation projects operate in partnership with other legal service organizations who may also have claims of attorney work product, common interest, or privilege.

31.     It is not clear how or why production of these additional documents relates to Plaintiffs' claims or standing in this case. As noted above, the requested documents date back long before the May 2022 publication date of the Asylum IFR that is at issue in this case. Of the named programs, neither Law Lab's Centers of Excellence nor our EPIC program (the El Paso Immigration Collaborative) operate in the states of Louisiana or Florida. Our BorderX detention project ceased operating in 2021, before the promulgation of the Asylum IFR that is at issue in this case.

32.     Law Lab has not conducted any workshops of any kind in Florida or Louisiana at any time.

33.     Appearing in Atlanta would be expensive and burdensome. Law Lab is headquartered in Portland, Oregon. Our organization is a small, Oregon-based nonprofit and the cost of arranging for production of such a multitude of sensitive

and important documents across the country from our headquarters would be significant. Our two staff members, both of whom are accredited representatives (meaning they are permitted to provide legal service on immigration matters but are not licensed to practice any other area of law) who work from the Atlanta area, would be burdened in their capacity to deliver legal services.

34. I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 16th day of March, 2023.

_____
Stephen W. Manning, OSB #013373

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the within and foregoing **DECLARATION OF STEPHEN W. MANNING IN SUPPORT OF INNOVATION LAW LAB'S MOTION TO QUASH THIRD PARTY RULE 45 SUBPOENA**, with the Clerk of Court using the CM/ECF system, which will automatically send email documentation of such filing to all attorneys of record.

I further certify that on this day, I served a true and correct copy of the within and foregoing upon counsel of record in the underlying action by electronic email and by depositing a true and correct copy of same in the United States Mail, first-class postage prepaid, addressed as follows:

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL
Joseph S. St. John
Deputy Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
STJohnj@ag.louisiana.gov

*Counsel for State of Louisiana*
*A Plaintiff in the Underlying Action*

Brian Ward
U S Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Brian.c.ward@usdoj.gov

Erez R. Reuveni
U S Department of Justice
Civil Division (5th)
450 5th Street NW
Washington, D.C. 20001
Erez.r.reuveni@usdoj.gov

*Counsel for Defendants*
*In the Underlying Action*

Dated: March 16, 2023

**KILPATRICK TOWNSEND &
    STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Fax: (404) 815-6555
TCaldas@kilpatricktownsend.com
GReddy@kilpatricktownsend.com
BTRichardson@kilpatricktownsend.com

/s/ Bennett T. Richardson
Gautam Reddy
Georgia Bar No. 757546
Tamara Serwer Caldas
Georgia Bar No. 617053
Bennett T. Richardson
Georgia Bar No. 974586

*Attorneys for Innovation Law Lab*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **IN RE: SUBPOENA ISSUED TO NON-PARTY INNOVATION LAW LAB** | **Case No.:** _____ |
| IN THE MATTER OF: | |
| The State of Arizona,<br>By and Through its Attorney General,<br>Mark Brnovich, et al., | |
| Plaintiffs, | United States District Court<br>Western District of Louisiana<br>LaFayette Division<br>Civil Action No. 6:22-cv-01130-DCJ-CBW |
| v. | |
| Merrick Garland, in his official capacity as Attorney General of the United States, et al., | |
| Defendants. | |

## DECLARATION OF NANCY CRUZ IN SUPPORT OF INNOVATION LAW LAB'S MOTION TO QUASH THIRD-PARTY <u>RULE 45 SUBPOENA</u>

I, Nancy Cruz, declare as follows:

1.     I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto. I state that the following is true and correct to the best of my knowledge and belief.

161455562.1

2.     I am employed as an attorney with Perkins Coie LLP. I represent Innovation Law Lab ("Law Lab") in the above-captioned action.

3.     Attached hereto as Exhibit A is a true and correct copy of the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, dated February 17, 2023 ("Subpoena").

4.     Attached hereto as Exhibit B is a true and correct copy of the Second Amended Complaint filed on November 10, 2022, with the United States District Court for the Western District of Louisiana Lafayette Division, in Civil Action No. 6:22-cv-01130-DCJ-CBW.

5.     Attached hereto as Exhibit C is a true and correct copy of the Status Report submitted on December 2, 2022, by the parties to the United States District Court for the Western District of Louisiana Lafayette Division, in Civil Action No. 6:22-cv-01130-DCJ-CBW.

6.     Attached hereto as Exhibit D is a true and correct copy of the Minutes of Court for a Status Conference held on December 16, 2022, by the United States District Court for the Western District of Louisiana Lafayette Division, in Civil Action No. 6:22-cv-01130-DCJ-CBW.

7.     Attached hereto as Exhibit E is a true and correct copy of the Minutes of Court for a Status Conference held on January 17, 2023, by the United States

District Court for the Western District of Louisiana Lafayette Division, in Civil Action No. 6:22-cv-01130-DCJ-CBW.

      8.    Attached hereto as Exhibit F is a true and correct copy of e-mail correspondence between Perkins Coie LLP partner, Emily Greb, and Deputy Solicitor General, Joseph Scott St. John, or the State of Louisiana's Office of Attorney General, by which attorneys conferred regarding service of and compliance with the Subpoena attached as Exhibit A to this declaration.

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.


Executed on March 16, 2023

By: /s/ Nancy Cruz
Nancy Cruz

- 3 -

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the within and foregoing **DECLARATION OF NANCY CRUZ IN SUPPORT OF INNOVATION LAW LAB'S MOTION TO QUASH THIRD-PARTY RULE 45 SUBPOENA**, with the Clerk of Court using the CM/ECF system, which will automatically send email documentation of such filing to all attorneys of record.

I further certify that on this day, I served a true and correct copy of the within and foregoing upon counsel of record in the underlying action by electronic email and by depositing a true and correct copy of same in the United States Mail, first-class postage prepaid, addressed as follows:

JEFF LANDRY
LOUISIANA ATTORNEY GENERAL
Joseph S. St. John
Deputy Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
STJohnj@ag.louisiana.gov

*Counsel for State of Louisiana*
*A Plaintiff in the Underlying Action*

Brian Ward
U S Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Brian.c.ward@usdoj.gov

Erez R. Reuveni
U S Department of Justice
Civil Division (5th)
450 5th Street NW
Washington, D.C. 20001
Erez.r.reuveni@usdoj.gov

*Counsel for Defendants*
*In the Underlying Action*

161455562.1

Dated: March 16, 2023

**KILPATRICK TOWNSEND &**
    **STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Fax: (404) 815-6555
TCaldas@kilpatricktownsend.com
GReddy@kilpatricktownsend.com
BTRichardson@kilpatricktownsend.com

/s/ Bennett T. Richardson
Gautam Reddy
Georgia Bar No. 757546
Tamara Serwer Caldas
Georgia Bar No. 617053
Bennett T. Richardson
Georgia Bar No. 974586

*Attorneys for Innovation Law Lab*

# Exhibit A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

THE STATE OF ARIZONA,
By and through its Attorney General, Mark
Brnovich, et al.,

                         PLAINTIFFS,

v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States, *et al.,*

                        DEFENDANTS.

No. 6:22-cv-1130

## LOUISIANA AND FLORIDA'S NOTICE OF SUBPOENA TO INNOVATION LAW LAB

TO:    Defendants Merrick Garland *et al*, by and through their attorney of record, Brian Ward, U.S. Department of Justice (868), P.O. Box 868 Ben Franklin Station, Washington, DC, 20044-0868, tel. 202-616-9121, email brian.c.ward@usdoj.gov.

       Pursuant to Federal Rule of Civil Procedure 45(a)(4), Plaintiffs hereby provide notice that they will serve a subpoena to produce documents on to produce for inspection and copying all documents referred to in Attachment A of the subpoena. The requested documents may be used as evidence in this case. A copy of the subpoena is attached hereto.

Respectfully submitted,

JEFF LANDRY
 LOUISIANA ATTORNEY GENERAL

  /s/ Joseph S. St. John
Joseph S. St. John
 Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 485-2458
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I served the foregoing document and its attachments via email upon counsel for Defendants:

This the 17th day of February 2023.

 /s/  Joseph S. St. John _____

Joseph S. St. John
 Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 225-485-2458
stjohnj@ag.louisiana.gov

*Counsel for Louisiana*

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Western District of Louisiana ☐▾

|  |  |
|---|---|
| THE STATE OF ARIZONA et al | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 6:22-cv-1130 |
| MERRICK GARLAND et al | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: INNOVATION LAW LAB, by its President AHMER INAM 4012 SE Main Street, Portland, OR 97212, or its registered agent, ANNE KOCH

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: Office of the Attorney General - SG Unit 40 Capitol Square SW, Atlanta, GA 30334 Attn: Stephen Petrany | Date and Time: March 10, 2023 at 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 2/17/23

|  | |  |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
State of Louisiana _____ , who issues or requests this subpoena, are:
Joseph St. John, 909 Poydras St. Ste. 1850, New Orleans, LA 70112, stjohnj@ag.louisiana.gov, 225-485-2458

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 6:22-cv-1130

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

THE STATE OF ARIZONA,
By and through its Attorney General, Mark
Brnovich, et al.,

PLAINTIFFS,

v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States, *et al.*,

DEFENDANTS.

No. 6:22-cv-1130

## ATTACHMENT A

Pursuant to the attached Subpoena and in accordance with the following Definitions and Instructions, you are required to produce the documents described below.

## DEFINITIONS

1.     **ALL," "ANY," "EACH,"** and **"EVERY"** shall be construed inclusively to include the collective as well as the singular meaning so as to include the broadest possible amount of information.

2.     **"ASYLUM APPLICANT"** means any person who has indicated either an intention to apply for asylum under 8 U.S.C. 1158 or a fear of persecution, including, without limitation, any person who has submitted (or on whose behalf was submitted) an Form I-589 or has received written record of the credible fear determination. ASYLUM APPLICANT includes without limitation any person who has submitted (or on whose behalf was submitted) or a refugee/asylee relative petition (Form I-730).

3.     **"ASYLUM CLAIM" or "ASYLUM APPLICATION"** means any asylum application made by an alien pursuant to 8 U.S.C. § 1158 or through the procedures described in 8 U.S.C. § 1225(b), and includes an application for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3), or relief under the Convention Against Torture pursuant to 8 C.F.R. §§ 1208.17 and 1208.18.

4.     **"ASYLUM NPRM"** refers to the August 20, 2021, Notice of Proposed Rulemaking, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021), including its precursors, drafts, or pre-publication versions.

5.     **"ASYLUM IFR" or "FINAL RULE"** refers to the March 29, 2022 Interim Final Rule, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078-01 (Mar. 29, 2022), including its precursors, drafts, or pre-publication versions.

6.  **"COMMUNICATION"** means any message, document, email, fax, letter, voicemail, or other expressed idea (collectively "message") that has been recorded in writing, electronically, or by audio or video means and transmitted to one or more individuals, including the creator of the message, either simultaneously with the creation of the message or after its creation.

7.  **"DOCUMENT"** is consistent with the full scope of Federal Rule of Civil Procedure 34, and includes any document or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form. "Document" includes communications, as defined above, and all drafts and copies of a document or electronically stored information.

8.  **"IDENTIFY,"** with respect to a person, means the person's full name, alien registration number (A-number), country of citizenship or nationality, residence in the United States, mailing address in the United States, telephone number, and date of birth.

9.  **"USCIS"** means Defendant U.S. Citizenship & Immigration Services.

10.  **"CBP"** means Defendant U.S. Customs & Border Protection.

11.  **"DHS"** means Defendant U.S. Department of Homeland Security.

12.  **"DOJ"** means Defendant U.S. Department of Justice.

13.  **"EOIR"** means Defendant Executive Office for Immigration Review.

14.  **"ICE"** means Defendant U.S. Immigrations & Customs Enforcement.

15.  **"YOU"** and **"YOUR"** refers to INNOVATION LAW LAB, and any persons or agencies acting on your behalf. For the avoidance of doubt, YOU includes any predecessor in

interest whose DOCUMENTS are in your possession, custody, or control.

16.    The singular shall be construed to include the plural, and the plural shall be construed to include the singular, as necessary to bring within the scope of each Request all documents that might otherwise be construed as nonresponsive to the Request.

17.    The connectives "and" and "or" and the phrase "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of each Request all documents that might otherwise be construed as nonresponsive to the Request. The word "and" shall be construed to mean both "and" and "or," and vice versa, as necessary to bring within the scope of each Request all documents that might otherwise be construed as nonresponsive to the Request.

## **INSTRUCTIONS**

1.     In responding to these requests, you are required to furnish all responsive documents in your possession, custody, or control, or in the possession, custody, or control of your attorneys, agents, employees, independent contractors, and all other persons acting on your behalf.

2.     Each document request shall be responded to separately and fully, unless it is in good faith objected to, in which event the reasons for the objection shall be stated with specificity. If an objection pertains to only a portion of the request, or to a word, phrase, or clause contained therein, you shall state the objection to that portion only and respond to the remainder of the request.

3.     If, in responding to these document requests, you claim any ambiguity in a document request, or in a definition or instruction applicable thereto, you shall not rely upon the ambiguity as a basis for refusing to respond, but shall set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to the document request.

4.     An original or one copy of each responsive document shall be produced. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation, highlighting, underlining, or other marks, or a draft or successive iteration thereof and all modifications thereto, shall constitute a separate document and must be produced, whether or not the original of such document is within your possession, custody, or control. If the same document exists in both electronic and non-electronic format, the electronically maintained document must be produced; provided, if the non-electronically maintained document varies in any way from the electronically maintained document as described above, both the electronically maintained and non-electronically maintained documents shall be produced.

5.    Documents shall be produced as they are kept in the ordinary course of business. Each document requested is to be produced in its original file folder, file jacket, or cover (or you may, in the alternative, designate in writing the titles of such folder, jacket, or cover with respect to each document).  The individual or department from whose files the document is being produced is to be indicated.

6.    If there are no documents responsive to any particular request, you shall so state in writing.

7.    A request for documents shall be deemed to include a request for all transmittal sheets, cover letters, exhibits, enclosures, and attachments to the documents, in addition to the document itself, without abbreviation or expurgations.  Documents attached to other documents or materials shall not be separated unless information is provided sufficient to permit reconstruction of the grouping or context in which the document is maintained in the ordinary course of business.

8.    If the documents requested differ or vary from one office, division, or location to another, the Requests require production of documents for each office, division, or location.

9.    Each document requested shall be produced in its entirety and without redactions, deletions, or excisions, regardless of whether you consider the entire document to be relevant or responsive to these Requests.

10.    If you refuse to produce any requested document, or part of any requested document, under a claim of attorney-client privilege, work product, or any other privilege, you shall submit, for each document or part of a document withheld, a written statement that:

a)  specifies the privilege or other asserted basis for withholding the document;

b)  describes the nature and general topic of the document;

c)  identifies the persons who prepared the document and any persons to whom the document was sent or disclosed;

6

d)  identifies any persons who have seen or had possession of the document; and

e)  specifies the dates on which the document was prepared, transmitted, and received.

11.     These document requests are continuing in nature.  Any document obtained, created, identified, or located after service of any response to these requests that would have been included in the responses had the document been available or had its existence been known at that time should be produced immediately.

12.     If any document which you would have produced in response to any request was, but is no longer, in your present possession or subject to your control or is no longer in existence, please identify with respect to each document:

a)  the date of the document;

b)  the title of the document;

c)  the type of document;

d)  description of the subject matter of the document;

e)  the name of each person who prepared, received, viewed, or had possession, custody, or control of the document;

f)  the date on which the document was destroyed, discarded, or lost;

g)  the name of each person who directed that the document be destroyed, who directed that the document be discarded, or who lost the document; and

h)  a statement of the reasons for and circumstances under which the document was destroyed, discarded, or lost.

13.     Documents not maintained electronically shall be scanned and electronically produced as Adobe .pdf files.  Each page of each document shall be individually Bates-numbered.

14.     Should you opt to produce a loadfile, You shall produce electronically stored documents and files as follows:

a)  Optical Character Recognition ("OCR") text files and a load file indicating the beginning and ending Bates numbers of each document shall be provided

b)  Documents shall be produced as searchable Bates-numbered .pdf files in a print setting of 300 d.p.i., accompanied by:

c)  corresponding database load files, containing at a minimum DOCID and path to the image;

d)  corresponding searchable text files in .TXT format;

e)  where applicable, corresponding metadata files, to include at a minimum the following fields: (1) beginning/ending document number; (2) beginning/ending attachment range; (3) document type; (4) sent date/time; (5) received date/time; (6) created date/time; (7) author(s) and/or FROM; (8) recipient(s) and/or TO; (9) CC; (10) BCC; (11) subject/title/header; (12) custodian; (13) attachment count; (14) file name; and (15) last modified date/time.

f)  Spreadsheet documents (Microsoft Excel and similar) shall be produced in their native formats and named after their corresponding beginning Bates number.

g)  To the extent that responsive electronically stored information is contained in database files, the parties should promptly identify and discuss the appropriate form of production.

h)  If it is infeasible to convert any file (*e.g.*, audio/visual files) to the format described in subsection a, above, you shall produce (i) a "placeholder" image containing the file name of the attachment; (ii) the document in native format; and (iii) information sufficient to link the native-format document with its "placeholder" image.

i)  Documents that present imaging or formatting problems (*e.g.*, Microsoft Access or other user databases that cannot feasibly be produced as individual files) shall be promptly identified, and the parties shall meet and confer to attempt to resolve the problems.

j)  You shall produce electronically stored documents on DVD, CD, or portable hard drives.

15.  Load files shall be in one of the following formats suitable for Summation software: DII or eDII; TXT; CSV; or DAT. DAT files shall have a corresponding LFP (IPRO viewer) or OPT (Opticon viewer) image import file.

16.  Defendants reserve the right, as to any document produced, to request:

8

a) that an image be produced in color;

b) that a document be produced in native format;

c) that reasonable technical assistance be provided to enable Defendants and their attorneys, staff, consultants, and experts to use the electronically stored information; and

d) that additional metadata be provided.

17.     These requests seek only documents and other items within your possession, custody, or control.

18.     The parties issuing the Subpoena further reserve the right to amend the Instructions after they have viewed your production.

19.     The relevant time period for these Requests is January 1, 2018, through present, unless otherwise stated, and should include documents in force, created, or modified since that date.

## **REQUESTS**

Pursuant to the attached subpoena, you are required to produce the following:

1.     DOCUMENTS sufficient to IDENTIFY all persons known to LawLab (including persons in the LawLab case management system) who are ASYLUM APPLICANTS or asylum seekers (a) located in Florida or Louisiana, (b) who provided a residence address in in Florida or Louisiana, or (c) who provided a mailing address in Florida or Louisiana.

2.     All DOCUMENTS used, presented, or distributed by Law Lab it its asylum workshops.

3.      All DOCUMENTS created for use across Law Lab's Centers of Excellence pro bono programs, BorderX detention project, EPIC program, and other initiatives related to asylum or asylum applications, including without limitation printed guides, worksheets, training videos, and self-help videos.

4.      All non-client-specific DOCUMENTS YOU provide(d) to aliens, including ASYLUM APPLICANTS or asylum seekers, regarding public education, Temporary Assistance for Needy Families ("TANF"), Supplemental Nutrition Assistance Program ("SNAP"), Medicaid, or other public benefits.

5.      All DOCUMENTS relating to the FINAL RULE or ASYLUM NPRM, including without limitation (a) the impact the impact (whether anticipated or actual) of the FINAL RULE on asylum grant rates or (b) the impact (whether anticipated or actual) of the FINAL RULE on asylum applications.

# Exhibit B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

THE STATE OF ARIZONA, By and through
its Attorney General,
MARK BRNOVICH;

THE STATE OF LOUISIANA,
By and through its Attorney General,
JEFF LANDRY;

THE STATE OF MISSOURI,
By and through its Attorney General,
ERIC S. SCHMITT;

THE STATE OF ALABAMA,
By and through its Attorney General,
STEVE MARSHALL;

THE STATE OF ALASKA,
By and through its Attorney General,
TREG R. TAYLOR;

THE STATE OF ARKANSAS,
By and through its Attorney General,
LESLIE RUTLEDGE;

THE STATE OF FLORIDA,
By and through its Attorney General,
ASHLEY MOODY;

THE STATE OF GEORGIA,
By and through its Attorney General,
CHRISTOPHER M. CARR;

THE STATE OF IDAHO,
By and through its Attorney General,
LAWRENCE G. WASDEN;

THE STATE OF INDIANA,
By and through its Attorney General,
TODD ROKITA;

THE STATE OF KANSAS,
By and through its Attorney General,

CIVIL ACTION NO. 6:22-cv-01130-DCJ-CBW

1

DEREK SCHMIDT;

THE COMMONWEALTH OF KENTUCKY,
By and through its Attorney General,
DANIEL CAMERON;

THE STATE OF MISSISSIPPI,
By and through its Attorney General,
LYNN FITCH;

THE STATE OF MONTANA,
By and through its Attorney General,
AUSTIN KNUDSEN;

THE STATE OF NEBRASKA,
By and through its Attorney General,
DOUGLAS J. PETERSON;

THE STATE OF OKLAHOMA,
By and through its Attorney General,
JOHN M. O'CONNOR;

THE STATE OF SOUTH CAROLINA,
By and through its Attorney General,
ALAN WILSON;

THE STATE OF UTAH,
By and through its Attorney General,
SEAN D. REYES;

THE STATE OF WEST VIRGINIA,
By and through its Attorney General,
PATRICK MORRISEY;

THE STATE OF WYOMING,
By and through its Attorney General,
BRIDGET HILL;

PLAINTIFFS,

v.

MERRICK GARLAND in his official capacity
as Attorney General of the United States of
America;

2

The UNITED STATES DEPARTMENT OF JUSTICE;

DAVID NEAL in his official capacity as Acting Director of the Executive Office for Immigration Review;

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW;

ALEJANDRO MAYORKAS in his official capacity as Secretary of Homeland Security;

The UNITED STATES DEPARTMENT OF HOMELAND SECURITY;

CHRIS MAGNUS in his official capacity as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection;

U.S CUSTOMS AND BORDER PROTECTION;

TAE JOHNSON in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;

UR M. JADDOU in her official capacity as Director of U.S. Citizenship and Immigration Services;

U.S. CITIZENSHIP AND IMMIGRATION SERVICES;

RAUL ORTIZ in his official capacity as Chief of the U.S. Border Patrol;

U.S. BORDER PATROL;

The UNITED STATES OF AMERICA;

DEFENDANTS.

3

## SECOND AMENDED COMPLAINT

The States of Arizona, Louisiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, Utah, West Virginia, and Wyoming bring this civil action against the above-listed Defendants for declaratory relief and vacatur, and allege as follows:

## INTRODUCTION

1.     This is a suit to enforce bedrock requirements of immigration and administrative law.

2.     On March 29, 2022, Defendants published an Interim Final Rule (the "Asylum IFR" or "Rule"), 87 Fed. Reg. 18,163 (Mar. 29, 2002). That Rule eviscerates crucial safeguards to our nation's immigration system and flouts clear statutory commands enacted by Congress. Defendants' Asylum IFR makes it substantially easier for unauthorized economic migrants to enter the United States and obtain asylum through false claims. For example, Immigration Judges ("IJs") within the Department of Justice's ("DOJ") Executive Office of Immigration Review ("EOIR") have adjudicated nearly all asylum claims, whereas Asylum Officers ("AOs") within the Department of Homeland Security ("DHS") have had the authority only to conduct an initial screening of aliens' asylum claims, called a "credible fear" review. 8 U.S.C. § 1225(b)(1)(B). In direct violation of statute, the Asylum IFR empowers asylum officers to conduct final adjudication of asylum claims arising from the border.

3.     Defendants effectuate this change even though, under our current system, less than 15 percent of all asylum claims that pass DHS's notoriously lax initial credible fear review are ultimately approved by IJs. EOIR review—conducted through an adversarial process in which an alien's case is subjected to vigorous scrutiny—thus provides an essential safeguard

against granting fraudulent and otherwise unmeritorious asylum claims, which the Asylum IFR abolishes. The entirely predictable result will be a substantial increase in the approval rate of non-meritorious asylum claims. This will cause harm to the Plaintiff States because migrants who are improperly granted asylum will settle in the Plaintiff States; this, in turn, will cause the States to spend additional amounts on education, healthcare, and law enforcement (in part due to federal mandates). Furthermore, the increase in asylum approval rates will incentivize even higher rates of illegal immigration into the United States, and into the Plaintiff States. Citizens of other countries perceive (correctly) that the Asylum IFR, as well as overall administration policy, is much laxer and more likely either to grant legal status and/or refuse to enforce immigration laws against those unlawfully in the United States. And whenever aliens perceive that U.S. immigration policies have changed in a manner more likely to permit them to enter and remain in the United States, they cross into the United States unlawfully in greater numbers.

4.      This is, however, from Defendants' perspective almost certainly a feature and not a bug in the plan. Indeed, these same Defendants have in the past fifteen months taken innumerable actions that have resulted in both increasing unlawful crossings into the United States and the loss of operational control over the southwestern border. The Asylum IFR continues that trend.

5.      The Asylum IFR would thus substantially remove DOJ from the review process. In doing so, the rule would largely transfer authority from immigration judges, who have a level of independence from political officials, to Asylum Officers, who are far more susceptible to political control within the Administration.

6.      Compounding these problems, the Asylum IFR eliminates the adversarial nature of the adjudication of asylum claims arising from the border, continues to guarantee to aliens the

right to be represented by counsel during asylum determinations, and eliminates any equivalent representation for the interests of American citizens in preventing the granting of fraudulent and meritless asylum claims.

7.     The net result of all of these changes is to violate numerous statutory requirements that the Asylum Rule purports to "implement," including the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., the Homeland Security Act ("HSA"), Pub. L. No. 107-296 (2002), and the Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat 2638 (2006).

8.     When Congress created DHS by adopting the HSA in 2002, it stated explicitly that DOJ would continue to "have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date." 8 U.S.C. § 1103(g)(1); *see Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (The "Homeland Security Act expressly provides that the Attorney General has authority over certain immigration functions specifically relating to immigration courts"). Before Congress passed the HSA, EOIR adjudicated the asylum claims arising out of the credible fear process that the Asylum IFR purports to re-assign to DHS. Defendants repeal this clear statutory allocation of authority by mere regulation. In doing so, Defendants have usurped Congress's authority by rewriting statutory law in the guise of interpreting it.

9.     The predictable result of the Asylum IFR is more lawlessness at the southern border, leaving the States to shoulder the enormous costs of Defendants' destructive policies and a border beset with ever more horrifying levels of cartel violence and other security threats.

10.     The Asylum Rule's substantive legal violations are equally matched by its procedural infirmities. Defendants' promulgation of that rule violates the Administrative Procedure Act ("APA") many times over.

11.     For example, Defendants violated the APA's notice-and-comment requirements by engaging in a patent bait-and-switch. Defendants published the notice of proposed rulemaking (''NPRM'') for the Asylum IFR on August 20, 2021. The Asylum IFR makes an astounding 23 substantive changes to the NPRM, fundamentally altering it. The end result is an interim-final rule that is radically different from what was proposed to the public and on which the public submitted comments.

12.     These changes to the Asylum IFR are not "logical outgrowths" of the NPRM—particularly when considered cumulatively. The Asylum IFR accordingly violates the APA. Indeed, Defendants themselves backhandedly acknowledge as much by issuing the rule as an Interim Final Rule and seeking further comment—which would hardly be necessary if the Asylum IFR bared even passing resemblance to the proposed rule.

13.     As the D.C. Circuit has explained, "'if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal,'" and the rule thus violates the APA. *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) (citation omitted). And here merely skimming Defendants' *3,100-plus-word summary* of the *23 major changes* they made from the proposed rule is sufficient to conclude that the deviations here wildly exceed that "deviates too sharply" standard.

14.     Indeed, Defendants remarkably felt compelled to claim they "are in compliance with the APA's notice-and-comment requirements with respect to these changes *because each change is a logical outgrowth of the proposals set forth in the NPRM*." 87 Fed. Reg. at 18,195

(emphasis added). But that suspiciously specific denial reads more like a confession than a defense of the Rule. Agencies that have properly complied with the APA typically have no need to offer such unintentionally self-aware statements; nor do they gratuitously engage in a second round of purportedly unnecessary notice-and-comment rulemaking.

15.     If Defendants' actions and perfunctory defenses seem extraordinary, that's because they are. Defendants understandably cannot quite hide their unease with the sheer volume of changes they have made in the Asylum IFR. APA violations rarely come so patent, and Defendants' illuminating inability to maintain their poker faces is amply apparent even from the face of the Rule itself.

16.     The Asylum IFR also violates the APA because it is arbitrary and capricious. Among other violations, the Rule fails to—indeed explicitly *refuses to*—address reliance interests in the prior system, fails to consider costs it will impose on the States, fails to consider obvious alternatives, and fails to explain adequately departures from past practices.

17.     The Asylum IFR also fails to consider the interaction between it and the announced termination of the Title 42 Orders, which even the Administration admits will cause a *massive* increase in unlawful border crossings and asylum claims.

18.     With benefit of a month of hindsight, it is now obvious that it is no coincidence that the Title 42 Orders are set to be rescinded on May 23, 2022, and the Asylum IFR will become effective eight days later. There are obvious interactions between the two enormously important rules that have not been considered by Defendants in the slightest—at least formally in the Rule itself. But that hardly means that Defendants have not considered the interactions furtively. For example. the Administration itself predicts that the number of illegal border crossings will nearly triple because of aliens taking advantage of the cancellation of Title 42. There is

strong reason to suspect that the Administration will attempt to handle the predicted explosion in unlawful crossings by employing the unlawfully lenient standard of the Asylum IFR, thus mass-dispensing asylum.

19.    At a bare minimum, Defendants were required by the APA to consider how these two concurrent, *enormous* changes in immigration policy might interact with each other, but have not expended a *single word* in doing so.

20.    Arizona, as a border state, will be directly affected by Defendants' decision to ignore the law. By creating a system that is materially more likely to grant asylum claims, the Asylum IFR will incentivize higher rates of illegal border crossing. Greater flows of people across the border facilitate increased flows of illegal drugs as well, because drug cartels use their human trafficking activity to distract and overwhelm Border Patrol from being able to focus resources on interdicting illegal drugs being trafficked into the United States. The Asylum IFR will exacerbate the serious drug trafficking problems associated with illegal immigration that have afflicted communities across the State. Drug trafficking and the resulting drug-related crime and drug use threaten public safety and put a strain on Arizona's limited law enforcement resources. Moreover, the Asylum IFR will create a flood of migrants into the State asserting non-meritorious asylum claims that will nonetheless be granted, which will further stress hospitals, schools, jails, and other social services at the local and county level.

21.    All Plaintiff states will also be directly affected by Defendants' decision to abdicate their legal obligations. The Asylum IFR is part of a wider pattern of Defendants' refusal to enforce immigration laws either faithfully or adequately. These practices have incentivized, and the Asylum IFR will incentivize even further, an unprecedented level of illegal border activity, including a record influx of fentanyl at the southern border, which is trafficked into communities

nationwide. Plaintiffs' law enforcement officers must confront rising crime as from the aliens the Asylum IFR will bring into the country, and the States' social services will face stresses beyond those they are already facing because of the COVID-19 pandemic.

22.     Furthermore, the Asylum IFR purports to reserve residual regulatory authority to adopt additional regulations outside of the APA's notice-and-comment requirements by promul-gating so-called future "guidance" that would purport to empower DHS to parole aliens into the United States in violation of the INA's commands, essentially setting out a welcome mat for un-authorized aliens crossing the border, rather than detaining them as Congress has commanded. *See* 8 U.S.C. § 1225(b) (requiring detention of aliens awaiting adjudication of their asylum claim and aliens who are "not clearly and beyond a doubt entitled to be admitted," unless narrow ex-ceptions apply).

## PARTIES

23.     Plaintiff State of Arizona is a sovereign state of the United States of America. Ar-izona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its in-terests in protecting its citizens. Arizona brings this suit through its Attorney General, Mark Brnovich. He is the chief legal officer of the State of Arizona and has the authority to represent the State in federal court. His offices are located at 2005 North Central Avenue, Phoenix, Arizo-na 85004.

24.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Louisiana brings this suit through its Attorney General, Jeff Landry. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

25.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Missouri brings this suit through its Attorney General, Eric S. Schmitt. He is authorized by Missouri law to sue on the State's behalf. His address is P.O. Box 899, Jefferson City, Missouri 65102.

26.     Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Alabama brings this suit through its Attorney General, Steve Marshall. He is authorized by Alabama law to sue on the State's behalf. His address is 501 Washington Avenue, P.O. Box 300152, Montgomery, Alabama 36130-0152.

27.     Plaintiff State of Alaska is a sovereign State of the United States of America. Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Alaska brings this suit through its Attorney General, Treg R. Taylor. He is authorized by Alaska law to sue on the State's behalf. His address is 1031 West 4th Avenue, Suite 200, Anchorage, Alaska 99501-1994.

28.     Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Arkansas brings this suit through its Attorney General, Leslie Rutledge. She is authorized by Arkansas law to sue on the State's behalf. Her address is 323 Center Street, Suite 200, Little Rock, Arkansas 72201.

29.     Plaintiff State of Florida is a sovereign State of the United States of America. Florida sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Florida brings this suit through its Attorney General Ashley

Moody. She is authorized by Florida law to sue on the State's behalf. Her address is The Capitol, Pl-01, Tallahassee, Florida 32399-1050.

30.     Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Georgia brings this suit through its Attorney General, Christopher M. Carr. He is authorized by Georgia law to sue on the State's behalf. His address is 40 Capitol Square, S.W., Atlanta, Georgia 30334.

31.     Plaintiff State of Idaho is a sovereign State of the United States of America. Idaho sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Idaho brings this suit through its Attorney General, Lawrence G. Wasden. He is authorized to sue on the State's behalf. His address is P.O. Box 83720, Boise, Idaho 83720-0010.

32.     Plaintiff State of Indiana is a sovereign State of the United States of America. Indiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Indiana brings this suit through its Attorney General, Todd Rokita. He is authorized by Indiana law to sue on the State's behalf. His address is 302 W. Washington Street, I.G.C.S – 5th Floor, Indianapolis, IN 46204.

33.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Kansas brings this suit through its Attorney General, Derek Schmidt. He is authorized by Kansas law to sue on the State's behalf. His address is 120 SW Tenth Avenue, 3rd Floor, Topeka, Kansas 66612-1597.

34.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Kentucky brings this suit through its Attorney General, Daniel Cameron. He is authorized by Kentucky law to sue on the State's behalf. His address is 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601.

35.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Mississippi sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Mississippi brings this suit through its Attorney General, Lynn Fitch. She is authorized by Mississippi law to sue on the State's behalf. Her address is 550 High Street, Suite 1200, Jackson, Mississippi 39201.

36.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Montana brings this suit through its Attorney General, Austin Knudsen. He is authorized to sue on the State's behalf. His address is 215 N Sanders St., Helena, Montana 59601.

37.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Nebraska brings this suit through its Attorney General, Douglas J. Peterson. He is authorized to sue on the State's behalf. His address is 2115 State Capitol, Lincoln, Nebraska 68509.

38.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Oklahoma brings this suit through its Attorney General, John

M. O'Connor. He is authorized by Oklahoma law to sue on the State's behalf. His address is 313 NE 21st Street, Oklahoma City, Oklahoma 73105.

39.     Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. South Carolina brings this suit through its Attorney General, Alan Wilson. He is authorized by South Carolina law to sue on the State's behalf. His address is P.O. Box 11549, Columbia, South Carolina 29211.

40.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Utah brings this suit through its Attorney General, Sean D. Reyes. He is authorized by Utah law to sue on the State's behalf. His address is 350 North State Street, Suite 230, Salt Lake City, Utah 84114.

41.     Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. West Virginia brings this suit through its Attorney General, Patrick Morrisey. He is authorized by West Virginia law to sue on the State's behalf. His address is State Capitol, Bldg 1, Room E-26, Charleston, WV 25305.

42.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Wyoming brings this suit through its Attorney General, Bridget Hill. She is authorized by Wyoming law to sue on the State's behalf. Her address is 109 State Capitol, Cheyenne, Wyoming 82002.

43.     Plaintiffs States are required to spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c). Plaintiffs are also required to spend state monies on detaining unauthorized aliens. On information and belief, the Asylum IFR will require Plaintiff States to spend at least some money on healthcare, detention, and other services that would otherwise not have to be spent.

44.     Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing the Asylum IFR.

45.     Defendant Merrick Garland is Attorney General of the United States of America. He is sued in his official capacity.

46.     Defendant Department of Justice ("DOJ") is a federal cabinet department.

47.     Defendant David Neal is the Acting Director of the Executive Office for Immigration Review. He is sued in his official capacity.

48.     Defendant Executive Office for Immigration Review ("EOIR") is an agency within DOJ.

49.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

50.     Defendant United States Department of Homeland Security ("DHS") is a federal cabinet department.

51.     Defendant Chris Magnus serves as Commissioner of U.S. Customs and Border Protection. He is sued in his official capacity.

52.     Defendant U.S. Customs and Border Protection ("USBP") is an agency within DHS that is headquartered in Washington, D.C.

53.     Defendant Tae Johnson serves as Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

54.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an agency within DHS that is headquartered in Washington, D.C.

55.     Defendant Ur Jaddou serves as the Director for U.S. Citizenship and Immigration Services. She is sued in her official capacity.

56.     Defendant U.S. Citizenship and Immigration Services is an agency within DHS that is headquartered in Camp Springs, Maryland.

57.     Defendant Raul Ortiz serves as the Chief of the U.S. Border Patrol. He is sued in his official capacity.

58.     Defendant U.S. Border Patrol ("BP") is an agency within DHS that is headquartered in Washington, D.C.

59.     Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346 and includes the departments and agencies thereof.

## JURISDICTION AND VENUE

60.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06.

61.     An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201(a), and this Court may grant declaratory relief, vactur, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, 28 U.S.C. § 1361, and its inherent equitable powers.

62.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial

16

part of the events or omissions giving rise to the Complaint occur within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

## FACTUAL AND LEGAL BACKGROUND

63.     States "bear[] many of the consequences of unlawful immigration*." Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. The States thus rely significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

64.     Record numbers of aliens have entered the United States unlawfully since January 20, 2021.

65.     DHS's own statistics show the dramatic increases in the number of crossings into the United States. Indeed, current levels of illegal crossings are at their highest levels in at least two decades, and perhaps ever. The following is DHS's own chart graphically showing these enormous increases in crossings:

## Table 1: DHS Southwest Border Encounters By Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 164,837 | 174,845 | 179,253 | 154,874 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | 2,378,944 |
| 2021 | 71,929 | 72,113 | 73,994 | 78,414 | 101,099 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | 1,734,686 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |

Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

66.     Furthermore, DHS sources have indicated that "there have been more than 300,000 known 'gotaways'—migrants who were not apprehended or turned themselves in and who got past agents—since fiscal year 2022 began on October 1st" through April 1.[1] If that rate merely continues, the total number of gotaways for the fiscal year will be more than 600,000. For comparison, "former Border Patrol Chief Rodney Scott said there had been approximately 400,000 gotaways in the entirety of FY 2021."[2] These DHS numbers are likely significant underestimates. For example, comprehensive monitoring by Arizona law enforcement using an advanced camera system observing a large section of the border showed that "for the period from July 2020 to January 2021, only 27.6% of undocumented persons crossing the southern border were apprehended by DHS personnel." *Louisiana v. Centers for Disease Control & Prevention*, --- F.Supp.3d ----, 2022 WL 1604901, at *6 (W.D. La. May 20, 2022). These observations took place when the border was not facing a once-in-a-century crisis of overwhelming numbers of illegal crossings. The proportion of gotaways may very well be higher now.

67.     Defendant Raul Ortiz, who is Chief of the Border Patrol, has admitted under oath that when citizens of other countries perceive that immigration policy has become more favorable to them, they are more likely to cross U.S. borders illegally. *Florida. v. United States*, No. 21-CV-1066, ECF No. 78-3 at 59:12-60:5, 67:22-68:5, 171:13-172:9, 173:7-12 (N.D. Fla. 2021). Because the Asylum IFR makes it easier for aliens with non-meritorious asylum claims to be released in the United States, it will induce a significant increase of illegal immigration into the United States. Tens of thousands of these aliens will be released into the Plaintiff States in violation of federal statutes.

---

[1]  Bill Melugin, *62,000+ illegal immigrants got past Border Patrol agents in March: sources*, Fox News (April 1, 2022), https://fxn.ws/37fqLNq.

[2]  *Id.*

19

68.     Another district court in this Circuit has found that reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas v. Biden*, 554 F. Supp. 3d 818, 834, 847-48 (N.D. Tex. 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting) ("An alien ... has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.")

69.     Since 1982, the Supreme Court has mandated that States provide public education to school-age aliens not lawfully in the United States. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). As a direct result of the influx of migrants that the Asylum IFR will cause, some of whom will be minors, the Plaintiff States will be compelled to spend additional moneys on education for these additional aliens. The Asylum IFR is thus a direct, but-for cause of these imminent injuries.

70.     The population of potential asylum applicants includes a large number of school-age children.[3] After these school-age children enter the United States, they disperse across the United States and force local schools to incur significant additional costs to educate them.[4] On information and belief, school-age asylum applicants processed under the Asylum IFR have moved to every Plaintiff State. It is the position of the DOJ and Department of Education ("ED")

---

[3] CBS News, *Despite COVID-19 Pandemic, Texas Border Pop-Up School For Young Asylum Seekers Thrives*, CBS NEWS, (Dec. 1, 2020), https://www.cbsnews.com/dfw/news/covid-19-texas-pop-up-school-asylum-seekers-thrives/.

[4] Polo Sandoval, Kimberly Berryman and Ray Sanchez, *'It's all behind us now.' 1,700 migrant children see hope in nation's largest school system*, CNN, (Sep. 20, 2022), https://www.cnn.com/2022/09/19/us/migrants-new-york-school-year; Czarinna Andres, *Adams Administration Preparing to Enroll 1,000 Migrant Children in City Schools Who Were Bused From Texas*, JACKSON HEIGHTS POST, (Aug. 19, 2022), https://jacksonheightspost.com/adams-administration-preparing-to-enroll-1000-migrant-children-in-city-schools-who-were-bused-from-texas; Reema Amin, *New York City grapples with influx of new asylum-seeking students*, CHALKBEAT NEW YORK, (Oct. 18, 2022), https://ny.chalkbeat.org/2022/10/18/23411736/nyc-asylum-seekers-students-budget-bilingual-teachers.

that schools cannot inquire into the immigration status of students,[5] and the Plaintiff States there-

fore do not have data on the exact number of such school-age children who have settled in each

State. However, on information and belief, DHS tracks detailed information about the age, loca-

tion, and immigration status of school-age asylum applicants. Information about the extent of

harm that the Plaintiff States are suffering from additional education expenses is therefore in the

possession of Defendants and will come to light during discovery in this case.

71.     Asylum applicants often do not remain in the State in which they first crossed into

the United States. In 2019, Stephen Manning of the immigration activist organization Innovation

Law Lab provided a sworn declaration stating:

> [T]he clients served by Law Lab's programs do not [*sic*] complete their immigra-
> tion case in a single jurisdiction. It is possible that a client would move seamlessly
> between our program sites—and thus between different judicial circuits—as their
> case progresses. A person fleeing persecution might receive a legal orientation
> and services at a workshop supported by Law Lab in Tijuana, Mexico; obtain re-
> lease on bond or parole from a detention center in Texas with assistance from our
> BorderX project; and complete their asylum application at a Law Lab-run legal
> workshop in Atlanta, Georgia. Many persons served by Law Lab programs move
> between jurisdictions throughout the lifetime of their asylum case as well. In my
> experience, such movement between jurisdictions is common for asylum seekers.

Manning further declared that "asylum seekers that Law Lab has provided guidance to in Tijuana

[Mexico] … end up in detention centers in Louisiana and Mississippi, despite the fact that they

entered the US to request asylum in the Ninth Circuit." Accordingly, Law Lab maintains offices

throughout the United States, including in Portland, Oregon; Atlanta, Georgia; San Diego, Cali-

fornia; Kansas City, Missouri and San Antonio and El Paso, Texas.

72.     The presence of these aliens in each State violates each State's quasi-sovereign in-

terest in its territory and the welfare of its citizens.

---

[5] Dear Colleague Letter from Catherine E. Lhamon, Assistant Secretary, ED, Philip H. Rosenfel,
Deputy General Counsel, ED, and Jocelyn Samuels, Acting Assistant Attorney General, DOJ
(May 8, 2014), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201405.pdf.

73. The Asylum IFR will also cost the States millions, as explained in further detail below.

**Arizona**

74. As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration.

75. Defendant DHS has previously recognized that Arizona "is directly and concrete-ly affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limit-ing immigration enforcement. Such changes can negatively impact [Arizona's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona." Exhibit A, Memorandum of Understanding Between DHS and the State of Arizona at 2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Arizona], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona 's current residents for, among other things, employment, housing, goods and services." *Id.* at 3.

76. Arizona is required to expend its scarce resources when DHS acts unlawfully to induce increased illegal immigration. This includes resources expended by Arizona's law en-forcement community.

77. Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts to tens of millions of dollars each year, as reflected by Arizona's State Criminal Alien Assistance Program (SCAAP) requests, the great majority of which are not reimbursed by the federal government.

78. Arizona has approximately 275,000 to 365,000 immigrants living in the State who are not lawfully in the United States. About 54% of them do not have health insurance, about 32% of them have incomes below the poverty level, and they cost Arizona taxpayers more than $1.7 billion a year.[6] More illegal aliens entering the State will increase the costs of the State's healthcare system.

79. Drug cartels use human trafficking routes to also traffic illegal drugs into the United States. Increased illegal immigration means increased quantities of illegal drugs. For example, drug cartels coordinate surges of unauthorized immigrants who cross the border in large groups and then make non-meritorious asylum claims. This serves as a distraction to Border Patrol personnel. While all available Border Patrol personnel are busy processing these aliens' asylum claims, they are unable to patrol the border, which allows drug mules to enter the United States unimpeded. Individuals believed to be cartel drug smugglers are regularly caught on camera crossing the border, dressed in camouflage and carrying weapons to protect their drug loads.[7] Cartel scouts appear to even brazenly "occupy strategically-selected hilltops for dozens of miles inside Arizona," establishing a presence on American territory to track Border Patrol movements and coordinate surges of aliens entering the United States.[8] Even the drugs themselves are be-

---

[6] The number of unauthorized aliens is notoriously difficult to calculate. Several studies, however, estimate the number of unauthorized aliens in Arizona to be in this approximate range. *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AZ (273,000, 54% uninsured); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (275,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (365,000, $1.7 billion annual cost).

[7] Brian Brennan, *'People don't need to die': Border rancher deals with constant flow of migrants, drug packers*, KGUN 9 (May 20, 2019), https://www.kgun9.com/border-watch/people-dont-need-to-die-border-rancher-deals-with-constant-flow-of-migrants-drug-packers

[8] U.S. House of Representatives, Committee on Homeland Security, *Testimony of Jim Chilton*

coming more dangerous, as smugglers are trading large bags of marijuana for smaller packs of more potent "cocaine, fentanyl, heroin, [and] meth."[9] In December 2021, police in Scottsdale, Arizona seized 1.7 million fentanyl pills that were worth $9 million; they also seized ten kilograms of powdered fentanyl and one pound of methamphetamine.[10] The seized drugs were from the Sinaloa Cartel.[11] According to the DEA, "[t]he Sinaloa Cartel primarily uses trafficking routes that go through Arizona,"[12] and the Phoenix area is a major cartel drug trans-shipment hub.[13]

### Louisiana

80.     Plaintiff Louisiana will also be injured gravely by the Asylum IFR. Louisiana will be required to stretch its resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Louisiana's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services.

---

on *"Examining the Effect of Border Wall on Private and Tribal Landowners"*, (February 27, 2020), https://homeland.house.gov/imo/media/doc/Testimony%20-%20Chilton1.pdf

[9] Natasha Yee, *As marijuana profits fade, cartels increasingly smuggle fentanyl across the border*, (October 18, 2021), https://gilaherald.com/as-marijuana-profits-fade-cartels-increasingly-smuggle-fentanyl-across-the-border/

[10] Steven Hernandez, *Scottsdale police, DEA seize record 1.7 million fentanyl pills in Arizona*, Arizona Republic, (Dec. 16, 2021), https://www.azcentral.com/story/news/local/phoenix-breaking/2021/12/16/authorities-arizona-seize-9-million-fentanyl-pills-narcotics/8929613002/

[11] *Id.*

[12] *Id.*

[13] Alex Gallagher, *Record fentanyl seizure by Scottsdale cops, DEA*, Scottsdale Progress, (Dec. 19, 2021), https://www.scottsdale.org/news/record-fentanyl-seizure-by-scottsdale-cops-dea/article_fbf7c02e-6074-11ec-91ab-b35932ed58da.html

81.    Defendant DHS has previously recognized that Louisiana "is directly and con-

cretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or

limiting immigration enforcement. Such changes can negatively impact [Louisiana's] law en-

forcement needs and budgets, as well as its other important health, safety, and pecuniary interests

of the State of Arizona." Exhibit B, Memorandum of Understanding Between DHS and the Loui-

siana Department of Justice at 2. DHS has also recognized that "rules, policies, procedures, and

decisions that could result in significant increases to the number of people residing in a commu-

nity" will "result in direct and concrete injuries to [Louisiana], including increasing the rate of

crime, consumption of public benefits and services, strain upon the healthcare system, and harm

to the environment, as well as increased economic competition with the State of Louisiana's cur-

rent residents for, among other things, employment, housing, goods and services." *Id.* at 3.

82.    Louisiana has approximately 70,000 to 78,000 aliens living in the State who are

not lawfully in the United States. More than 70% of them do not have health insurance, about

34% of them have incomes below the poverty level, and they cost Louisiana taxpayers more than

$362 million a year.[14] More illegal aliens entering the State will increase the costs of the State's

healthcare system.

83.    DHS operates multiple alien detention facilities in the Western District of Louisi-

ana, including the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana, and others in

Oberlin, Plain Dealing, Jonesboro, Jena, Natchitoches, Monroe, Ferriday, Basile, and Winnfield,

---

[14]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/LA (70,000, 73% uninsured, 34% poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (70,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (78,820, $362 million annual cost).

Louisiana. DHS releases illegal aliens from those detention facilities to Louisiana cities through-

out the Western District, including Lafayette, Monroe, and Shreveport. Releases in Lafayette are

so common that a California business advertises "immigration bail bonds in Lafayette" and urges

illegal immigrants and their families to "contact our Lafayette bail bondsmen" "if you have a

family member who finds him or herself in custody of [DHS]." Upon information and belief,

DHS "paroles" many illegal immigrants into Louisiana cities without even the minimal security

of a bond. The Asylum IFR will increase the use of DHS detention facilities and lead to the in-

creased release of aliens into the Western District and throughout the State.

**Missouri**

84.     Missouri is directly and adversely affected by increases in illegal immigration at

the southern border, including increased admissions of asylum applicants. Based on recent statis-

tics, approximately 56 out of every 1,000 unlawful aliens who enter the United States end up re-

siding in Missouri. These unlawful aliens impose pocketbook injuries on Missouri in the form of

education, healthcare, and criminal-justice costs. These pocketbook injuries are irreparable be-

cause Missouri has no plausible recourse to recoup them.

85.     "Missouri likewise faces a cost of verifying lawful immigration status for each

additional customer seeking a Missouri driver's license." *Texas v. Biden*, No. 2:21-cv-67, 2021

WL 3603341, at *10 (N.D. Tex. Aug. 13, 2021).

86.     The total costs to … Missouri … of providing public education for illegal alien

children will rise in the future as the number of illegal alien children present in the State increas-

es." *Id.*

87.     "Some aliens who … are being released or paroled into the United States and will use state-funded healthcare services or benefits in … Missouri." *Id.* "The total costs to the State will increase as the number of aliens within the state increases." *Id.*

88.     Missouri is also a destination state and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. Such crimes disproportionately afflict illegal aliens, and these crimes (and other crimes committed by illegal aliens) impose irreparable law-enforcement and criminal-justice costs on Missouri. As another district court recently found, "[s]ome aliens who … are being released or paroled into the United States and will commit crimes in … Missouri," and "Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally." *Id.* Both crimes committed by unlawful aliens, and human-trafficking crimes committed by and against unlawful aliens, inflict irreparable costs on Missouri, both in law-enforcement costs and providing resources for victims. "Human trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri." *Id.*

89.     An increased influx of illegal aliens, including an increased influx of asylum applicants, also affects the labor market and reduces job opportunities for U.S. citizens and lawfully present aliens in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri is a State with large agricultural sector. The presence of large numbers of unlawful aliens distorts Missouri's job markets and inflicts irreparable injury on both the State and its citizens.

### Alabama

90.     Plaintiff Alabama is also injured by the Asylum IFR. Alabama will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Alabama's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Alabama to expend limited resources on education, healthcare, public assistance, and general government services.

91.     Alabama has approximately 55,000 to 73,000 illegal aliens living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and they cost Alabama taxpayers more than $324.9 million a year.[15] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Alaska

92.     Plaintiff Alaska is also injured by the Asylum IFR. Alaska will be required to stretch its scarce resources under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Alaska's communi-

---

[15]     *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AL  (62,000, 68% uninsured, 34% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (55,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (73,190, $324.9 million annual cost).

ties, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Alaska to expend limited resources on education, healthcare, public assistance, and general government services.

93.     Alaska has approximately 5,000 to 11,260 illegal aliens living in the State; they cost Alaska taxpayers more than $72 million a year.[16] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

**Arkansas**

94.     Plaintiff Arkansas is also injured by the Asylum IFR. Arkansas will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Arkansas's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Arkansas to expend limited resources on education, healthcare, public assistance, and general government services.

95.     Arkansas has approximately 58,000 to 79,000 illegal aliens living in the State; about 63% of them are uninsured; about 30% of them have incomes below the poverty line; and

---

[16]     *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles (10,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (11,260; $72 million annual cost).

they cost Arkansas taxpayers more than $339.5 million a year.[17] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Florida

96.     Plaintiff State of Florida is injured by the Asylum IFR. The increase in unlawful migration caused by the IFR will result in more illegal drugs flowing into Florida and more un-vetted migrants—many of whom commit crimes—in Florida's communities. These effects cost Florida millions in law enforcement resources, incarceration costs, and victim's services. For example, Florida spends over $100 million per year incarcerating aliens who commit crimes within its borders. On top of that, Florida provides a variety of public benefits regardless of immigration status. E.g., 42 U.S.C. § 1395dd (requiring that participating Medicaid facilities provide emergency services to immigrants regardless of status); § 443.101(7), Fla. Stat. (providing unemployment benefits for certain aliens).

97.     Illegal migration aside, individuals who are granted asylum are eligible for certain benefits under Florida law, and an increase in asylum grants will increase those costs. E.g., § 322.051, Fla. Stat. (driver's licenses), id. § 414.095 (temporary cash assistance); id. (Medicaid benefits).

98.     According to some estimates, Florida currently has approximately 772,000 to 957,000 illegal aliens living in the State, costing Florida taxpayers more than $4.7 billion a year.[18][fn]. The IFR will make these costs worse.

---

[17]     See, e.g., Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AR (58,000, 63% uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (55,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (78,820, $339.5 million annual cost).

**Georgia**

99.     Plaintiff State of Georgia is directly and adversely affected by any changes to federal immigration policy. When illegal immigration increases, Georgia must redirect its scarce resources. The Asylum IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. Illegal aliens in Georgia receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related costs, among others. Ending the Title 42 policy would injure Georgia by increasing the number of illegal aliens receiving these services at its expense.

100.     For instance, Georgia has approximately 339,000 to 422,000 aliens living unlawfully in the State; about 70% of them are uninsured; about 36% of them have incomes below the poverty level; and they cost Georgia taxpayers more than $1.8 billion a year.[19] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

101.     The Asylum IFR will also increase crime and criminal justice expenses in Georgia. In fiscal year 2020, which ended September 2020, ICE's Atlanta Office removed 9,137 al-

---

[18]     *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/FL (estimating 772,000 in Florida); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorizedimmigrants-by-state/ (estimating 775,000 in Florida); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (estimating 957,100 in Florida, with a $4.7 billion annual cost).

[19]     *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/GA (339,000, 70% uninsured, 36% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (400,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (422,250, $1.8 billion annual cost).

iens, of which 5,889 were convicted criminals and 1,111 had pending criminal charges.[20] If additional illegal aliens migrate to Georgia, some will commit crimes. That will impose irreparable law-enforcement and criminal-justice costs on Georgia.

## Idaho

102.    Plaintiff Idaho is also injured by the Asylum IFR. Idaho will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Idaho's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Idaho to expend limited resources on education, healthcare, public assistance, and general government services.

103.    Idaho has approximately 29,000 to 51,000 illegal aliens living in the State; about 60% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost Idaho taxpayers more than $225.4 million a year.[21] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[20]    Local Statistics, ERO FY 2020 Report, U.S. Immigration & Customs Enforcement (Oct. 2021), https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf

[21]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/ID (29,000, 60% uninsured, 27% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (35,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (50,670, $225.4 million annual cost).

## Indiana

104.     Plaintiff Indiana is also injured by the Asylum IFR. Indiana will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendant to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Indiana's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Indiana to expend limited resources on education, healthcare, public assistance and general government services.

105.     Indiana has approximately 100,000 to 124,000 illegal aliens living in the state, about 53% are uninsured; about 17% of them have incomes below the poverty line; and they cost Indiana taxpayers more than $549 million a year.[22] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Kansas

106.     Plaintiff Kansas is also injured by the Asylum IFR. Kansas will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Kansas

---

[22]     *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/IN (102,000, 53% uninsured); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (100,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (123,860, $549 million annual cost).

communities, requiring additional expenditure by law enforcement. In addition, by incentivizing

further illegal immigration, the Asylum IFR will force Kansas to expend limited resources on

education, healthcare, public assistance, and general government services.

107.    Kansas has approximately 69,000 to 85,000 illegal aliens living in the State; about

64% of them are uninsured; about 25% of them have incomes below the poverty line; and they

cost Kansas taxpayers more than $377 million a year.[23] If more illegal aliens enter the State, that

will increase the costs of the State's healthcare system.

### Kentucky

108.    Plaintiff Kentucky is also injured by the Asylum IFR. Kentucky will be required

to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an

influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into

the United States monthly and similarly increasing the number of aliens Defendants fail to ap-

prehend initially. The Asylum IFR will create increased crime and drug trafficking in Kentucky's

communities, requiring additional expenditure by law enforcement. In addition, by incentivizing

further illegal immigration, the Asylum IFR will force Kentucky to expend limited resources on

education, healthcare, public assistance, and general government services.

109.    Kentucky has approximately 35,000 to 56,000 illegal aliens living in the State;

about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and

---

[23]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/KS (69,000, 64% uninsured, 25% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (75,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (84,450, $377 million annual cost).

they cost Kentucky taxpayers more than $261 million a year.[24] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Mississippi

110.    Plaintiff Mississippi is also injured by the Asylum IFR. Mississippi will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Mississippi's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Mississippi to expend limited resources on education, healthcare, public assistance, and general government services.

111.    Mississippi has approximately 20,000 to 28,150 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost Mississippi taxpayers more than $117 million a year.[25] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[24]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/KY (46,000, 60% uninsured, 37% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (35,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (56,300, $261 million annual cost).

[25]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.mi-grationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MS (25,000, 75% uninsured, 49% below poverty level); U.S. Unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewre-search.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (20,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration

## Montana

112.    Plaintiff Montana is also injured by the Asylum IFR. Montana will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Montana communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Montana to expend limited resources on education, healthcare, public assistance, and general government services.

113.    Montana has approximately 3,000 to 6,000 illegal aliens living in the State, and they cost Montana taxpayers more than $27 million a year.[26] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Nebraska

114.    Plaintiff Nebraska is also injured by the Asylum IFR. Nebraska will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Nebraska

---

Reform    (2017),    https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (28,150, $117 million annual cost).

[26]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MT (3,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (<5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $27 million annual cost).

36

communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Nebraska to expend limited resources on education, healthcare, public assistance, and general government services.

115.    Nebraska has approximately 42,000 to 60,000 illegal aliens living in the State; about 56% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Nebraska taxpayers more than $233.1 million a year.[27] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Oklahoma

116.    Plaintiff Oklahoma is also injured by the Asylum IFR. Oklahoma will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Oklahoma's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Oklahoma to expend limited resources on education, healthcare, public assistance, and general government services.

117.    Oklahoma has approximately 90,000 to 107,000 illegal aliens living in the State; about 68% of them are uninsured; about 27% of them have incomes below the poverty line; and

---

[27]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NE (42,000, 56% uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (60,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (50,670, $233.1 million annual cost).

they cost Oklahoma taxpayers more than $467 million a year.[28] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### South Carolina

118.    Plaintiff South Carolina is also injured by the Asylum IFR. South Carolina will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in South Carolina's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force South Carolina to expend limited resources on education, healthcare, public assistance, and general government services.

119.    South Carolina has approximately 88,000 to 98,000 illegal aliens living in the State; about 69% of them are uninsured; about 33% of them have incomes below the poverty line; and they cost South Carolina taxpayers more than $471 million a year.[29] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[28]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/OK (90,000, 68% uninsured, 27% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (85,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (106,970, $467 million annual cost).

[29]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/SC (88,000, 69% uninsured, 33% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (85,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (95,710, $471 million annual cost).

**Utah**

120.    Plaintiff Utah is also injured by the Asylum IFR. Utah will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Utah's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Utah to expend limited resources on education, healthcare, public assistance, and general government services.

121.    Utah has approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year.[30] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

**West Virginia**

122.    Plaintiff West Virginia is also injured by the Asylum IFR. West Virginia will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in

---

[30]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/UT (89,000, 61% uninsured, 23% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (95,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (112,600, $521 million annual cost).

West Virginia's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force West Virginia to expend limited resources on education, healthcare, public assistance, and general government services.

123.    West Virginia has approximately 4,000 to 6,000 illegal aliens living in the State, and they cost West Virginia taxpayers more than $26.3 million a year.[31] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Wyoming

124.    Plaintiff Wyoming is also injured by the Asylum IFR. Wyoming will be required to stretch its scarce resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Asylum IFR will create increased crime and drug trafficking in Wyoming's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Asylum IFR will force Wyoming to expend limited resources on education, healthcare, public assistance, and general government services.

125.    Wyoming has approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year.[32] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[31]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WV (4,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (<5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $26.3 million annual cost).

[32]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WY (7,000);

**All Plaintiffs**

126.    The Asylum IFR will result in tens or hundreds of thousands of aliens unlawfully entering the United States, who would otherwise not be able to gain entry. This, in turn, will cause Plaintiff States to spend money on healthcare, detention, education, and other services for aliens that would otherwise not have to be spent.

127.    For example, the States are required to spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c). Plaintiff States' emergency medical providers deliver millions of dollars in medical services to illegal aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves. While these costs are significant in typical years, the COVID-19 pandemic makes the potential for harm to Plaintiff States through additional emergency healthcare costs to unauthorized aliens exceptionally high. The Asylum IFR necessarily increases the number of aliens in the States who are subject to receiving such medical care at the expense of Plaintiff States' healthcare institutions.

128.    Furthermore, under federal law, aliens granted asylum become eligible for a variety of benefits after five years in the United States.[33] These benefits include Medicaid[34]; SNAP

---

U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $26.1 million annual cost).

[33] *See* 8 U.S.C.A. § 1641(b)(2) (defining a "qualified alien" as "an alien who is granted asylum"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States").

[34] *See, e.g.*, Arizona Health Care Cost Containment System (Arizona's Medicaid system), Medical Assistance Eligibility Policy Manual §§ 524A and 524B (defining "qualified noncitizen" to include "[a]sylee[s]" and making such asylees eligible for benefits after the alien "[h]as been a qualified noncitizen for at least five years")

41

(commonly referred to as "food stamps")[35]; and TANF (commonly referred to as "welfare" payments).[36] Because these benefits are paid by State agencies and are partially financed from State budgets, the Asylum IFR will increase the States' costs because higher asylum grant rates will cause a higher number of individuals granted asylum claiming benefits.

129.    The Asylum IFR will result in a higher Asylum grant rate, thus increasing the number of asylees in each of the Plaintiff States. And even if the Asylum IFR did not result in a higher grant rate, because it will significantly speed up asylum processing, it will allow asylum recipients to become eligible for benefits faster, and thus increase the costs on the States as a result of the expanded eligibility windows. Some proportion of asylees will claim benefits sooner than they otherwise would have been able to and will receive benefits for longer periods of time than they otherwise would have been able to. This will cause quantifiable financial harm to the States, and the exact magnitude of those harms will become clear in discovery, when the federal government produces statistics about changes in the asylum grant rate, processing times under the new procedures, and the number of aliens settling in each Plaintiff State. For present purposes, however, even "a dollar or two" of injury satisfies Article III. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008).

---

https://azahcccs.gov/Resources/guidesmanualspolicies/eligibilitypolicy/eligibilitypolicymanual/#t=Policy%2FChapter_500_Non-Financial_Conditions_of_Eligibility%2F524_NonCitizen_Status%2FA_Overview.htm and https://azahcccs.gov/Resources/guidesmanualspolicies/eligibilitypolicy/eligibilitypolicymanual/#t=Policy%2FChapter_500_Non-Financial_Conditions_of_Eligibility%2F524_NonCitizen_Status%2F524B.htm.
[35] *See, e.g.*,Ariz. Dep't of Econ. Sec., Cash and Nutrition Assistance Policy Manual, § FAA3.D(06)(B), https://dbmefaapolicy.azdes.gov/#page/FAA3/Qualified_Noncitizens.html (manual for Arizona's SNAP and TANF program explaining that "[a] noncitizen granted asylee status is potentially eligible for [SNAP] and [TANF]").
[36] *See, e.g.*,, Ariz. Admin. Code § R6-12-305 (making eligible for Cash Assistance (TANF) "a noncitizen legal alien who satisfies the requirements of [8 U.S.C. § 1641]").

42

130.    By ignoring the requirements of the INA, HSA, and Secure Fence Act of 2006, and thus facilitating the entry of unauthorized aliens into the United States, the Asylum IFR encourages a greater influx of unauthorized aliens into Plaintiff States.

131.    The Biden Administration continues to publicly tout its lax border policies. As Defendant Secretary Mayorkas recently boasted, "[u]nlawful presence in the United States will alone not be a basis for an immigration enforcement action."[37]

132.    Defendant Border Patrol Chief Raul Ortiz admitted under oath that, since President Biden's election, the number of aliens trying illegally to enter the United States has increased, and that internal Customs and Border Patrol documents state that "since President Biden was elected ... aliens illegally entering the United States perceive that they will be able to enter and remain in the United States." *Id.* at 59:12-60:5. Chief Ortiz agreed that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what actually is happening in the United States." *Id.* at 67:22-68:5.

133.    The Asylum IFR contributes to the perception that the border is open and that immigration policy has become more favorable to noncitizens illegally crossing the southern border. The Asylum IFR thus incentivizes increased immigration into the Plaintiff States. Increased illegal immigration imposes on the States through increased law enforcement, education, medical, and other costs, as explained *supra* ¶¶ 69-130. All of this constitutes injury to the States and to their sovereign, quasi-sovereign, and proprietary interests.

134.    Chief Ortiz also admitted under oath that "the southern border is currently in crisis" and that "the crisis that is currently ongoing at the southern border [is] making the border

---

[37] *Secretary Mayorkas Delivers Remarks at the U.S. Conference of Mayors, U.S. Dep't of Homeland Security* (Jan. 20, 2022), https://www.dhs.gov/news/2022/01/20/secretary-mayorkas- delivers-remarks-us-conference-mayors, but it has since been removed.

less safe for Americans and aliens alike." Ortiz Depo. at 40:18-21, 53:9-13. Specifically, Chief

Ortiz admitted that criminal trafficking organizations incentivized by the border crisis created by

the Biden Administration "are putting ... border communities in danger," such as by locating

"stash houses in neighborhoods" and causing "damage to property [of] ranchers and farmers,"

including damage to "fences" and "livestock that are lost when these smugglers drive through

their property," and that they "have little regard for the safety of the community out there." *Id.* at

241:6-242:3.

135.    Chief Ortiz further admitted that criminal trafficking organizations "continue to

flood the border area with ... narcotics… We've had more agents assaulted this year than we ever

have, and we continue to see increase in firearm seizures." *Id.*at 243:7-9, 15-17. Chief Ortiz dis-

closed that these policies disproportionately harm Arizona specifically, expressly stating that the

Tucson Border Patrol Sector in Arizona is one of the two sectors "where we see the criminal or-

ganizations, smuggling organizations operating at a higher level." Ortiz Depo. at 83:10-13.

136.    The Asylum IFR contributes to this increase in lawlessness and criminal activity

in border regions, and including within the State of Arizona. This causes sovereign harm to

Plaintiff Arizona, because "[t]he States have a legally protected sovereign interest in 'the exer-

cise of sovereign power over individuals and entities within the relevant jurisdiction[, which] in-

volves the power to create and enforce a legal code.'" *Wyoming ex rel. Crank v. United States*,

539 F.3d 1236, 1242 (10th Cir. 2008); *see also Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir.

2017), *vacated on other grounds*, 138 S. Ct. 377 (2017) (similar); *Virginia ex rel. Cuccinelli v.

Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (collecting cases where state was found to possess

sovereign standing on this basis). Indeed, the "defining characteristic of sovereignty" is "the

power to exclude from the sovereign's territory people who have no right to be there." *Arizona*, 567 U.S. at 417 (Scalia, J., concurring in part and dissenting in part).

137. The increased lawlessness in the border region, and thus in Arizona, also injures the State's proprietary interests because it increases the State's law enforcement and incarceration costs.

138. Because illegal aliens settle in all Plaintiff States, encouraging a greater influx of unauthorized aliens further increases law enforcement costs in all Plaintiff States, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

139. The Asylum IFR will allow a far greater number of aliens with meritless asylum claims to enter the United States. Such aliens rarely leave the United States of their own accord, and Defendants rarely remove such aliens, even after their asylum claims have been denied. The Asylum IFR will therefore increase Plaintiff States' costs of providing emergency medical care to these individuals who would otherwise never have been allowed into the United States. Additionally, the Asylum IFR encourages a greater influx of unauthorized aliens into Plaintiff States, further increasing the number of unauthorized aliens for whom Plaintiff States must bear the cost of emergency medical care, education, and other social services.

140. The Asylum IFR will increase illegal immigration into the United States. Some of the additional illegal aliens will migrate into each of the Plaintiff States, and some of those aliens will commit crimes in each of the Plaintiff States. The increased number of illegal aliens in the Plaintiff States will thus also increase crime and criminal justice expenses in Plaintiff States, thus injuring the States through increased law enforcement, incarceration, and crime-prevention costs. The increased crime will also injure the citizens of Plaintiff States.

141.    In addition, Defendants will be unable to adequately screen, mitigate, and treat for communicable diseases—of all types—when illegal border crossings (including crossings of "covered aliens") reach the elevated levels induced by the Asylum IFR. This presents a serious threat to the public health of Plaintiff States.

142.    In *Florida. v. United States*, No. 21-CV-1066 (N.D. Fla. 2021), which asserts claims related to the Administration's failure to follow immigration law, discovery produced by the federal government showed that from November 1, 2021 to July 4, 2022 the number of aliens that DHS released into the United States who had listed Florida addresses as their place of final destination and who had failed to report back to DHS for further immigration proceedings was 47,984 individuals. On information and belief, the vast majority of these aliens were released into the United States after making asylum claims. During Florida's deposition of Defendant Ortiz, he admitted that this was "a large number" that was "concerning." Id. at 148:11-14.

143.    DHS keeps detailed statistics about grants of asylum, about the aliens it allows in-to the United States, about their intended destinations, about their residential addresses, and about their immigration status. Additionally, DHS (or a DHS contractor) monitors a subset of asylum applicants using global positioning system tracking devices, telephonic reporting, or a smartphone application called SmartLink.[38] On information and belief, aliens granted asylum under the Asylum IFR have settled, and continue to settle, in every single Plaintiff State. Fur-thermore, on information and belief, the number of aliens settling in each state is higher because of the Asylum Rule, and aliens who would have been approved under the old asylum system will be eligible for benefits sooner than they otherwise would have been. Discovery in this case will confirm it.

---

[38] https://www.ice.gov/detain/detention-management

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Rule in Excess of Defendants' Statutory Authority
### (Asylum Adjudication)

144.     Plaintiff States repeat and incorporate by reference all the Complaint's allegations stated above.

145.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

146.     The Asylum IFR is in excess of Defendants' statutory authority because the INA and HSA do not authorize asylum officers to adjudicate the asylum claims at issue.

147.     Congress codified into law this regulatory separation of authority when it passed the HSA. Specifically, Section 451(b) of the HSA enumerated specific functions that were transferred from INS to USCIS, empowering USCIS only to perform those "adjudications performed by the INS immediately before those authorities were transferred from DOJ to DHS." Thus, the HSA conferred on AOs within USCIS only the authority to adjudicate those types of asylum claims that they adjudicated on the effective date of the HSA, which was March 1, 2003.

148.     Furthermore, the HSA amended the INA to expressly state that the EOIR would continue to have the same authority that it did before adoption of the HSA. *See supra* ¶8. When Congress passed the HSA, EOIR adjudicated applications for asylum, statutory withholding, and CAT by aliens who had been subject to expedited removal proceedings under section 235(b)(1). Thus Congress, through the HSA, plainly assigned those specific functions to the EOIR. If it had not, or if Congress had simply wanted to leave it up to DHS and DOJ to divvy up those functions at some point in the future—as the Asylum IFR attempts to do more than 19 years after the

fact—it would not have specified the exact dates that those functions were supposed to be as-signed to vest (or continue to vest in the case of EOIR). Having set an end date for the assign-ment of those functions in the HSA, those functions are settled, and appropriately assigned to USCIS and EOIR and could be changed only through a legislative—not administrative—reassignment.

149.    Congress has allowed for only one exception to the HSA's assignment of asylum adjudication to the EOIR. In the William Wilberforce Trafficking Victims Protection Reauthori-zation Act of 2008 (TVPRA), Congress created a narrow exception so that AOs would adjudi-cate asylum applications filed by unaccompanied alien children (UACs). 8 U.S.C. § 1225(b)(3)(C). Congress specifically gave jurisdiction over asylum applications filed by UACs to AOs because Congress recognized that those AOs otherwise lacked the power to adjudicate such asylum applications filed by UACs.

150.    Under the *expressio unius* canon, "[t]he expression of one thing implies the exclu-sion of others." *Jennings v. Rodriguez*, 138 S.Ct. 830, 844 (2018). Thus, "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen v. Harris Cty.*, 529 U.S. 576, 583 (2000) (cleaned up)); *accord Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc). Congress determined that UACs should receive a specific AO carve-out, but it did not apply that exception to any other type of alien, let alone to all aliens in expedited removal proceedings under section 8 U.S.C. § 1225(b)(1). Under *expres-sio unius*, the enumeration of only a single exception to the HSA's assignment of asylum adjudi-cation to the EOIR means that only one such exception exists. The legislative history confirms this interpretation, as Congress explained in amending Section 1225 that "further consideration of the application for asylum" meant "further consideration of the application for asylum **under**

**normal non-expedited removal proceedings**." H. Rep. No. 104–828 at 209 (1996) (emphasis added).

151.    Furthermore, the INA itself prohibits the Asylum IFR, as it requires that "[u]nless otherwise specified in this chapter," a removal "proceeding under [8 U.S.C. § 1229a] **shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States**." 8 U.S.C. § 1229a(a)(3) (emphasis added). Congress explicitly established the procedure to be used for making asylum determinations. Defendants do not have the power to conjure out of thin air new procedures more to their liking.

152.    The Asylum IFR therefore grossly exceeds Defendants' statutory authority related to asylum and is therefore unlawful.

### COUNT II
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Rule in Excess of Defendants' Statutory Authority
### (Parole)

153.    Plaintiff States repeat and incorporate by reference all the Complaint's allegations stated above.

154.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

155.    The Asylum IFR exceeds Defendants' statutory authority because the INA strictly limits Defendants' exercise of the parole power. For example, the Asylum IFR incorrectly claims that Defendants have the statutory authority to parole aliens "where, in light of available detention resources, and considered on a case-by-case basis, detention of any particular [alien] would limit the agency's ability to detain other noncitizens whose release may pose a greater risk of flight or danger to the community." 87 Fed. Reg. at 18,108.

156.     However, Congress has commanded the opposite: that such aliens "shall" be detained. Aliens who convince an asylum officer that the alien has a credible fear of persecution "**shall be detained** for further consideration of the application for asylum." 8 U.S.C.A. § 1225(b)(1)(B)(ii) (emphasis added). Aliens who have failed to convince an asylum officer of their credible fear who seek review before an immigration judge "**shall be detained** pending a final determination." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added). And for aliens who are "not clearly and beyond a doubt entitled to be admitted, the alien[s] **shall be detained**," subject only to limited exceptions not applicable here (for crewmen and stowaways). 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Against this backdrop of mandatory detention, Congress created a limited exception in 8 U.S.C. § 1182(d)(5)(A). That provision gives DHS the power to parole aliens into the United States, rather than detain them, but "only on a case-by-case basis for urgent *humanitarian reasons or significant public benefit*." *Id.* (emphasis added).

157.     In 1996 Congress "specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" precisely because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Congress made crystal clear its intent that its 1996 amendment to the parole statute was a limit on the use of parole: the section heading in IIRIRA that makes this amendment is titled "LIMITATION ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602 (1996) (emphasis added); *see also Ram v. I.N.S.*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret its meaning").

158.     When Congress amended Section 1225(b) in 1996, it created a "de facto mandatory detention regime." *Tineo v. Ashcroft*, 350 F.3d 382, 398 (3d Cir. 2003). The Third Circuit

provided the following summary of the combined effect of Section 1225(b)'s mandatory deten-

tion rules and 1182(d)(5)'s limits on parole: "§ [1225](b)(2) requires the INS to detain aliens 'not

clearly and beyond a doubt entitled to be admitted' and because of **the limited grounds for pa-**

**role** in § [1182](d)(5)(A), in practice, these provisions often result in ... mandatory detention."

*Id*. at 387 (emphasis added).

159.    The Asylum IFR's determination that parole is justified when detention space is

unavailable constitutes an unlawful programmatic decision to parole aliens en masse into the

United States. The Fifth Circuit has already held that such a practice is an unlawful violation of

the INA's requirement that grants of parole be granted on a strictly limited, case-by-case basis:

"[d]eciding to parole aliens *en masse* is the opposite of [the] *case-by-case* decisionmaking" re-

quired by Section 1182(d)(5)(A). *Texas v. Biden*, 20 F.4th 928, 942 (5th Cir. 2021) (emphasis in

original).

160.    Indeed, the Asylum IFR is part of a wider pattern from Defendants of unlawfully

mass-granting parole on an unprecedented scale. For example, in President Trump's last full

month in office, the Border Patrol paroled 17 aliens caught at the border into the interior of the

United States. The low number in December 2020 was not caused by COVID-19, as the number

in January 2020 was still only 76.[39] One year later, in December 2021, President Biden's Border

Patrol paroled over 51,000[40]—a mindboggling 300,882% increase. Since President Biden took

office, the total number has grown to more than 366,000 aliens.[41]

---

[39]    *See* Custody and Transfer Statistics FY2020, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (U.S. Border Patrol – Dispositions and Transfers tab). In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

[40]    Defendant Customs and Border Protection reports these numbers on its website. Numbers for FY2022 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, and numbers for FY2021 are available at https://www.cbp.gov/newsroom/stats/ custody-and-transfer-

161.     Furthermore, § 1225(b)(2)(C) already provides an alternative to detention to the federal government: to "return ... aliens" who "arriv[e] on land ... from a foreign territory contiguous to the United States ... to that territory pending" immigration proceedings. In other words, when migrants arrive at the southern border and claim asylum, the federal government may—instead of detaining them—require them to wait in Mexico while their claims are adjudicated. Congress did not confer on Defendants the discretion to refuse to detain aliens and instead parole them en masse into the United States. Rather, Congress provided the alternative of returning those aliens to Mexico. And the policy to do just that, the Migrant Protection Protocols, worked extraordinarily well—the Trump Administration needed to grant parole to only 17 aliens in December 2021. That Defendants refuse to use the only available statutory alternative to detention does not absolve them of their obligation to detain. *Texas*, 20 F.4th at 996 (Defendants simply "don't want to do [the] one thing Congress allowed" as an alternative to detention).

162.     Additionally, the Asylum IFR amends 8 C.F.R. § 212.5(b) to greatly expand the aliens to whom its parole criteria apply, from applying only to aliens in full removal proceedings under INA § 240 to applying also to aliens subject to expedited removal. This vast expansion of the 8 C.F.R. § 212.5(b) constitutes an unlawful programmatic parole policy.

163.     Finally, the NPRM contained a broad expansion of the parole power. After significant pushback from comments pointing out that such an expansion would be blatantly illegal, the Asylum IFR ostensibly gave up on that vast expansion, at least through regulation. Instead, Defendants telegraphed their intent to effect the same vast expansion outside of the requirements of the APA. The Asylum IFR states that "DHS intends to use further directives and guidance to

---

statistics-fy2021. The numbers were calculated using the "U.S. Border Patrol – Dispositions and Transfers" tab and combining the "Notice to Appear/Order of Recognizance" and "Parole + ATD" rows. (The "Parole + ATD" row is only used in FY2022.)

[41] *Id.*

apply the parole standard to [aliens] in expedited removal pending a credible fear interview." 87 Fed. Reg. at 18,109. Issuing such "guidance" without notice-and-comment rulemaking is a violation of the APA, and the Asylum IFR's reliance on such ambiguous future "guidance" makes it unlawful.

164.    The Asylum IFR therefore grossly exceeds Defendants' statutory authority as it relates to the parole authority and is therefore unlawful.

## COUNT III
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Rule in Excess of Defendants' Statutory Authority
### (Secure Fence Act)

165.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

166.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

167.    The Asylum IFR exceeds Defendants' statutory authority because it violates the Secure Fence Act.

168.    In 2006, Congress passed the Secure Fence Act, which requires the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act of 2006, Pub. L. No. 109–367, 120 Stat 2638 (2006) (codified as 8 U.S.C. § 1701 note). The bill specifically defines "operational control" to mean "the prevention of *all unlawful entries* into the United States, including entries by terrorists, *other unlawful aliens*, instruments of terrorism, narcotics, and other contraband." *Id.* (emphasis added).

169.    The Secure Fence Act remains in force. It enjoyed bipartisan support in both houses of Congress, and passed in the Senate by a vote of 80 to 19. Indeed, among those voting for the bill was then-Senator Biden.[42]

170.    The Asylum IFR violates the Secure Fence Act because, as discussed above, rather than preventing unlawful entries into the United States, it incentivizes them.

## COUNT IV
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Arbitrary and Capricious Agency Action
### (Asylum Procedures)

171.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

172.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

173.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

174.    For starters, an agency cannot "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *see also Am. Wild Horse*, 873 F.3d at 931 ("the Service's Finding of No Significant Impact not only failed to take a 'hard look' at the consequences of the boundary change, it averted its eyes altogether"); *Gresham v. Azar*, 363 F. Supp. 3d 165, 177 (D.D.C. 2019) ("The bottom

---

[42]https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=109&session=2&vote=00262#top

line: the Secretary did no more than acknowledge—in a conclusory manner, no less—that com-

menters forecast a loss in Medicaid coverage").

175.    Further, agencies must actually analyze the relevant factors. "'Stating that a factor

was considered ... is not a substitute for considering it.'" *State v. Biden*, 10 F.4th 538, 556 (5th

Cir. 2021). The agency must instead provide more than "conclusory statements" to prove it con-

sidered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127

(2016).

176.    The Asylum IFR is arbitrary and capricious for several independently sufficient

reasons.

177.    *First*, Defendants failed to estimate or account for the costs to the States of the

Asylum IFR, such as the increased health care costs for aliens infected with COVID-19 and the

cost of increased illegal immigration caused by the Asylum IFR, and the presence of much great-

er numbers of paroled aliens with non-meritorious asylum claims who were induced to enter the

United States because of the Asylum IFR.

178.    *Second*, Defendants failed to consider or arbitrarily rejected obvious alternatives

to the Asylum IFR, such as by hiring more Immigration Judges ("IJs") and ICE attorneys, or by

implementing in good faith the Migrant Protection Protocols ("MPP") (and thus sending most

aliens from third countries back to Mexico to await asylum decisions). *See* 87 Fed. Reg. at

18,115 (acknowledging comments proposing the hiring of IJs and more effective implementation

of MPP, but cursorily rejecting them without analysis). They alternatively could implement

measures to weed out and deter meritless claims, which would reduce the backlog.

179.    *Third*, the Asylum IFR is arbitrary and capricious because the Defendants did not

consider Plaintiffs States' reliance interests in the continuation of the current asylum system. The

government is obligated to "turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). When an agency changes course, as DHS and DOJ have done here, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

180.    The Asylum IFR claims that the Defendants "perceive no serious reliance interests on the part of any State, county, or local governmental entity in the currently existing provisions." 87 Fed. Reg. 18,109. But "'Stating that a factor was considered ... is not a substitute for considering it.'" *State*, 10 F.4th at 556. And Defendants' cursory dismissal of the existence of any reliance interests misses the mark. Their analysis fails to account for the actual real-world effects of the current asylum system and how States might have legitimately relied on it.

181.    Plaintiff States have overwhelming reliance interests in federal enforcement of immigration law. Specifically, the most of the Plaintiffs submitted a comment explaining that the Asylum IFR will incentivize additional illegal immigration and thus "affect[] State finances and resources, public safety, and public health during the midst of the COVID-19 global pandemic." Comment Submitted by Louisiana and 15 other States, USCIS-2021-0012-4980 at 14 (Oct. 19, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-4980. Plaintiffs' State budgets and resource allocations are determined in reliance on Defendants' continued enforcement of immigration law. Defendants did not consider whether the States relied on continuation of the asylum system when Plaintiff States determined how they would marshal and distribute their resources to deal with the number of unauthorized aliens entering their states. The Asylum IFR is

56

arbitrary and capricious because it utterly ignores these reliance interests. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913-14.

182.     *Fourth*, Defendants ignored statutory factors, and relied upon factors Congress did not direct it to consider, by completely failing to address the immigration consequences of the Asylum IFR. IIRIRA and the Secure Fence Act are designed to reduce crossings. Yet the IFR utterly ignores this aspect of the problem.

183.     *Fifth*, Defendants failed to justify their deviation from prior practice. The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923-27; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (APA requirements ensure that an agency's "prior policies and standards are being deliberately changed, not casually ignored"). Yet Defendants fail to grapple with their prior actions and act as if their prior positions don't exist.

184.     *Sixth*, the Asylum IFR is arbitrary and capricious because its rationales are obviously pretextual. The actions of the President, Secretary Mayorkas, and other Administration officials have made clear that the intent of the Administration's immigration policies is to incentivize illegal immigration. Indeed, that the Administration's immigration policies incentivize high amounts of illegal immigration is widely recognized internationally. For example, the President of Mexico called President Biden the "migrant president" and observed that the Biden Administration's policies and rhetoric greatly incentivize illegal immigration.[43] Human traffickers have recognized this as well. Internal Mexican government assessments "state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize

_____

[43] Dave Graham, "Exclusive: 'Migrant president' Biden stirs Mexican angst over boom time for gangs," Reuters, Mar. 10, 2021 https://reut.rs/3vKlk1x.

migration.'"[44] The presence of such blatant pretext is enough to render the Asylum IFR arbitrary and capricious. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Accepting Defendants' description of the Asylum IFR requires this Court to "'exhibit a naiveté from which ordinary citizens are free.'" *Id.*

185.    *Seventh*, the Asylum IFR fails to account for the significant planning and additional funding required to implement it, and fails to justify these costs versus maintaining the status quo. For example, the Asylum IFR will require Defendants to redraft all training materials, retrain existing officers, and ultimately hire hundreds (if not thousands) of new AOs. This failure is particularly egregious because DHS only just recently narrowly escaped financial ruin in the midst of the COVID-19 pandemic.

186.    *Eighth*, the Asylum IFR fails fully to consider the effects of eliminating the adversarial nature of asylum proceedings and the salutary nature of adversarial proceedings for determining the true facts of a situation. This failure is particularly egregious because the Asylum IFR would place asylum adjudications solely in the hands of AOs who have an established and documented track record of granting credible fear determinations to unmeritorious claims, which has led to their record of having a greater-than-85% failure rate in approving non-meritorious asylum claims at the credible fear stage.

187.    *Ninth*, the Asylum IFR's claimed justification of a backlogged immigration court system is pretextual, as only 17% of EOIR's pending caseload is credible fear referrals. And because more than one-third of all aliens referred to EOIR for a credible fear determination never

---

[44] *Id.*

58

actually bother to file an application, the proportion of "real" asylum cases before EOIR is even smaller.[45]

188.     *Tenth*, the Asylum IFR fails to account for the reality that the vast majority of asylum claims have no merit and that AOs have a terrible track record of correctly adjudicating aliens' credible fear claims. Between FY2008 and the third quarter of 2021, the grant rate for asylum matters originating from credible fear referrals made by AOs was only 12.69%. Furthermore, *in absentia* removal order rates for such cases are very high. This means that most aliens being placed into immigration court proceedings following a positive credible fear determination by AOs are being ordered removed. The current system is rife with fraud and frivolous claims. Rather than make the system stricter to solve these problems, the Asylum IFR inexplicably relaxes requirements even further, thus making it even easier for aliens with meritless claims improperly to gain entry into the United States.

189.     *Eleventh*, the Asylum IFR eliminates the requirement that aliens arriving at the border complete a full complete asylum application on paper. Instead, the Asylum IFR treats an alien's oral asylum claim as a complete asylum application. In contrast, aliens already inside the United States who file an asylum application would still be required to submit a full asylum application on paper. This improperly provides more favorable treatment to aliens who cross the border illegally, and will also create significant administrative problems, as judicial review of such oral asylum applications will be nearly impossible in the absence of a clear record of the alien's asylum claims.

---

[45] EOIR, *Executive Office for Immigration Review Adjudication Statistics: Pending I-862 Proceedings Originating With a Credible Fear Claim and All Pending I-862s* (July 2021), https://bit.ly/3OEe1kj.

190.  *Twelfth*, the Asylum IFR makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and it fails to consider the effect that this change will have on illegal immigration rates, unemployment rates for citizens and authorized aliens, and the effect on wages. The Asylum IFR treats a positive credible-fear finding, which has little relation to whether an individual will ultimately qualify for asylum, as a properly filed asylum application that starts the clock for eligibility to file for work authorization. Because a large percentage of aliens who meet the credible fear bar never even apply for asylum, this change makes it significantly easier for aliens with non-meritorious asylum claims to get work authorization, and to get it sooner. This change will greatly incentivize aliens who lack meritorious asylum claims to enter the United States and falsely claim asylum.

191.  For each of these independently sufficient reasons, the Asylum IFR is arbitrary and capricious.

## COUNT V
## Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action
### (Parole)

192.  Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

193.  The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As explained *supra* ¶¶ 156-58, agency action is arbitrary and capricious, and thus unlawful, if the agency failed to analyze and consider relevant factors and important aspects of the problem.

194.  The Asylum IFR's parole provisions are arbitrary and capricious for multiple independently sufficient reasons, including the following.

195.   *First*, Defendants have failed to analyze and consider how their own failure to maintain detention capacity affects the purported need to parole aliens into the United States. For example, at the same time Defendants claim that their detention facilities are at overcapacity, Defendants submitted a budget request to Congress that would *decrease* DHS's alien detention capacity by 25%.[46] Moreover, Defendants affirmatively have degraded their own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities.[47]

196.   In addition, even where DHS has capacity, it has often failed to utilize it. For example, an April 12, 2022 DHS Inspector General Report explains how DHS acquired detention capacity from hotels from no-bid contracts and then inexplicably failed to use it: indeed, DHS "spent approximately $17 million for hotel space and services at six hotels that went largely unused between April and June 2021" and "did not adequately justify the need for the sole source contract to house migrant families." The Asylum IFR is arbitrary and capricious as it fails to account for Defendants' failure to employ the detention capacity they have spent millions of dollars to obtain, but apparently prefer to keep utilized so that they can grant parole *en masse* on the basis of putative lack of detention space. This arrangement—premised on no-bid contracts to politically favored entities—is as corrupt as it is violative of the APA.

197.   Defendants' failure to address the Inspector General's report (of which they had knowledge at the time the Rule was promulgated) further renders the Rule arbitrary and capricious.

198.   *Second*, Defendants have failed to explain their deviation from prior practice. Specifically, current regulations strictly limit when aliens pending a credible fear interview or in

---

[46] Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, NEW YORK TIMES, (Mar. 25, 2022), https://nyti.ms/3vOI00F.

[47] *Id*.; Priscilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol.

expedited removal may be paroled, so that it is permitted only when "parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii) and (b)(4)(ii). This limitation is consonant with Congress's intent to strictly limit Defendants' use of the parole power. Defendants claim that elimination of these constraints on the parole authority will allow them to process more families through expedited removal proceedings and "facilitat[e] their expeditious removal." 87 Fed. Reg. at 18,109. However, this justification is obviously pretextual, as Defendants have issued guidance strictly limiting removal of such aliens, and the number of removals under the Biden Administration has dropped precipitously. *See, e.g.*, September 30, 2021 DHS Permanent Guidance Memo; *Arizona v. Biden*, No. 21-CV-314, ECF No. 4-11 at 12 (S.D. Ohio Nov. 23, 2021) (deposition testimony of Acting Phoenix ICE Director Albert Carter noting a "big dropoff in removals" beginning in February 2021).

## COUNT VI
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D)
### Lack of Notice and Comment – Logical Outgrowth

199.   Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

200.   The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

201.   The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c). Thus, the Asylum IFR can be issued, if at all, only via notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

202.    Such requirements "are not mere formalities" but rather "are basic to our system of administrative law." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018). "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984); *see also NRDC*, 894 F.3d at 115 (notice and comment serves "the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking"); *Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review").

203.    The Asylum IFR is not an interpretive rule, general statement of policy, or a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.

204.    The Asylum IFR was issued as an interim final rule, thus becoming effective without additional notice or comment.

205.    The Asylum IFR makes twenty-three major changes from the initial NPRM. *See* 87 Fed. Reg 18,081-18,084 (summarizing the twenty-three major changes). "[A]gencies may not 'pull a surprise switcheroo'" between a proposed and final rule. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014). When a final rule has major changes from the proposed rule, the "logical outgrowth" test governs whether an agency must submit the rule again for notice-and-comment before it may take effect. "As the Supreme Court recently explained [in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007)], the object of the logical outgrowth test

is one of fair notice." *Owner-Operator Indep. Drivers Ass'n, Inc., v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 209 (D.C. Cir. 2007) (citations omitted).

206.    Defendants claim that the Asylum IFR is a logical outgrowth of the NPRM merely because the changes in the IFR "were adopted in response to comments received." 87 Fed. Reg. at 18,195. However, the twenty-three changes to the Asylum IFR are not a "logical outgrowth" of the NPRM because a "reasonable commenter" would not "have anticipated that such ... requirement[s] would be promulgated," and the NPRM did not provide notice "sufficient to advise interested parties that comments directed to the controverted aspect of the final rule should have been made." *First Am. Discount Corp. v. Commodity Trading Futures Ass'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (cleaned up). The Asylum IFR therefore may not take effect until commenters are provided "their first occasion to offer new and different criticisms which the agency might find convincing." *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058-59 (D.C. Cir. 2000) (citation omitted).

207.    Indeed, Defendants themselves recognize that the changes in the Asylum IFR are major changes requiring further comment from the public, "acknowledge[ing] that [DOJ and DHS] would benefit from the public's input on the provisions in this IFR as well as the IFR's implementation." 87 Fed. Reg. at 18,195.

208.    Because the logical outgrowth test requires that the Asylum IFR be subject to an additional round of notice-and-comment before taking effect, the Asylum IFR must be "held unlawful and set aside" as it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

209.    Furthermore, considering the magnitude of the Asylum IFR's impact on State authorities, it was incumbent on Defendants to consult with the States on both the wisdom and im-

64

plementation of such a far-reaching endeavor, and failure to do so was not harmless error. *See Johnson*, 632 F.3d at 931 ("An overreaching harmless error doctrine would allow the agency to inappropriately 'avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, [the agency] would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.'"); 2 U.S.C. § 1534(a) ("[e]ach agency *shall* . . . develop an effective process to permit elected officers of State, local, and tribal governments . . . to provide *meaningful and timely* input in the development of regulatory proposals containing significant Federal intergovernmental mandates." (emphasis added)).

210.    Under these circumstances, Defendants' failure to comply with the APA's notice and comment provisions is fatal to the Asylum IFR. *Johnson*, 632 F.3d at 928-29 ("Without good cause, we must enforce Congress's choice in favor of the traditional, deliberative rulemaking process.").

**COUNT VII**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Notice and Comment**
**(Failure to Address Comments)**

211.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

212.    The Asylum IFR is a rule that can be issued, if at all, only by notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

213.    The Asylum IFR failed to take account of the States' comments, either summarily rejecting them without substantive explanation, or outright ignoring them. For example, a coalition of 16 states that includes most of the Plaintiffs submitted an 18-page comment that raised general concerns, as well as 10 specific comments about serious deficiencies in the proposed

rule. *See* Comment Submitted by Louisiana and 15 other States, USCIS-2021-0012-4980 (Oct. 19, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-4980. Defendants ignored much of the States' comment and, for the aspects of the comment that they purported to address, they summarily disposed of the States' comment in a cursory, dismissive fashion that refused to offer any substantive legal or factual basis for dismissing the States' comment. *E.g.*, 87 Fed. Reg. at 18,193-18,194 (cursorily rejecting States' NEPA and federalism concerns without offering substantive legal or factual justification for rejection).

214.    Furthermore, the Asylum IFR similarly fails to take account of other important comments from immigration subject-matter experts that point out a number of unlawful and mis-guided aspects to the proposed rule, and which remain unchanged in the IFR. *See*, *e.g*., Comment Submitted by America First Legal Foundation, USCIS-2021-0012-5140 (Oct. 19, 2021), https://www.regulations.gov/comment/USCIS-2021-0012-5140; Comment Submitted by Center for Immigration Studies, USCIS-2021-0012-2333 (Oct. 19. 2021), https://www.regulations.gov/comment/USCIS-2021-0012-2333.

215.    Thus, the Asylum IFR must be "held unlawful and set aside" as it was promulgat-ed "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VIII
### Administrative Procedure Act, the INA, 5 U.S.C. §§ 702, 706(2)(B), U.S. Constitution
### Take Care Clause Violation

216.    Plaintiff States repeat and incorporate by reference each of the Complaint's alle-gations stated above.

217.    The APA aside, the federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count VII. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

218.    The U.S. Constitution requires that the President "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

219.    The Asylum IFR represents an abdication of multiple duties placed upon DHS to enforce U.S. immigration law, including clear statutory mandates.

220.    Defendants' issuance and implementation of the Asylum IFR thus violates the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

1.    Declaring, under 28 U.S.C. § 2201, that the Asylum IFR is arbitrary and capricious and unlawful under the APA;

2.    Declaring, under 28 U.S.C. § 2201, that the Asylum IFR is contrary to law and in excess of statutory authority under the APA;

3.    Declaring, under 28 U.S.C. § 2201, that the Asylum IFR violates the APA because it was promulgated without notice and comment;

4.    Declaring, under 28 U.S.C. § 2201, that the Asylum IFR violates the INA, HSA, and the Secure Fence Act;

5.    Declaring that the Asylum IFR was issued in violation of the Constitution, including the Take Care Clause, art. II, § 3;

6.    Postponing the effective date of the Asylum IFR pursuant to 5 U.S.C. § 705;

7.    Holding unlawful and vacating the Asylum IFR under 5 U.S.C. § 706;

8.    Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

9. Granting any and all other such relief as the Court finds appropriate.

Respectfully submitted,

Dated: November 10, 2022

By:/s/ Elizabeth B. Murrill

MARK BRNOVICH
  Attorney General
DREW C. ENSIGN *
  Deputy Solicitor General
JAMES K. ROGERS *
  Senior Litigation Counsel
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

STEVE MARSHALL
  Alabama Attorney General
EDMUND G. LACOUR JR.*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Indiana Attorney General
BETSY M. DENARDI*
  Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

TREG R. TAYLOR
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
  Attorney General,
BRIAN KANE*
  Chief Deputy Attorney General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

69

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
OFFICE OF THE KANSAS ATTORNEY
GENERAL
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

ALAN WILSON
   South Carolina Attorney General
THOMAS T. HYDRICK*
   Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*
BRIDGET HILL
   Attorney General of Wyoming
RYAN SCHELHAAS*
   Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

Sean D. Reyes
   *Utah Attorney General*
Melissa Holyoak
   *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

PATRICK MORRISEY
   Attorney General
LINDSAY SEE*
   Solicitor General
OFFICE OF THE WEST VIRGINIA AT-
TORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

* Pro hac vice application filed or forthcoming

Exhibit A

## AGREEMENT BETWEEN THE DEPARTMENT OF HOMELAND SECURITY AND THE ARIZONA ATTORNEY GENERAL'S OFFICE AND THE ARIZONA DEPARTMENT OF LAW

The parties to this Sanctuary for Americans First Enactment (SAFE) Agreement (Agreement) are on the one hand:

    (1)    The Department of Homeland Security,
    (2)    U.S. Customs and Border Protection (CBP),
    (3)    U.S. Immigration and Customs Enforcement (ICE), and
    (4)    U.S. Citizenship and Immigration Services (USCIS);[1]

and on the other hand:

    (5)    the Arizona Attorney General's Office and the Arizona Department of Law (Agency).

## I.    AUTHORITY

The authorities governing this Agreement include, but are not limited to:

    (1)    Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
    (2)    Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.
    (3)    Privacy Act, 5 U.S.C. Section 552a, as amended.
    (4)    The Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended.
    (5)    Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended.
    (6)    Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II.    PURPOSE AND COMMITMENT

DHS recognizes that Agency, like other state agencies and municipalities, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact Agency's law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona. The harm to Agency is particularly acute where Agency's

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter into this Agreement individually and collectively, such that termination or removal of one or more of those parties (whether by law or contract) (including the Department of Homeland Security) does not terminate this Agreement as to any other parties.

budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in direct and concrete injuries to Agency, including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona's current residents for, among other things, employment, housing, goods and services:

(1)     a decrease of any immigration enforcement priorities;

(2)     a voluntary reduction in the number of DHS agents performing immigration enforcement functions;

(3)     a decrease or pause on returns or removals of removable or inadmissible aliens;

(4)     a decrease or pause on apprehensions or administrative arrests;

(5)     relaxation of the standards for granting relief from return or removal, such as asylum;

(6)     an increase in releases from detention;

(7)     a relaxation of the standards for granting release from detention;

(8)     changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

(9)     rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Agency recognizes that DHS relies on cooperation with Agency and information shared by Agency to carry out DHS's functions, including but not limited to combating financial crimes, internet crimes against children, and human trafficking, as well as immigration enforcement. Any decrease in a State's or municipality's cooperation or information sharing with DHS can result in a decrease in these law enforcement priorities.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Agency, in which Agency will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult Agency and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)     reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)     decrease the number of ICE agents performing immigration enforcement duties;

(3)     pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)     increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)     increase or decline to decrease the number of releases from detention;

(6)     relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Agency.

In case of doubt, DHS will err on the side of consulting with Agency.

## III.   RESPONSIBILITIES

### A.   DHS agrees to:

(1)     Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

   a.   enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

   b.   enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

   c.   enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

   d.   eliminating incentives and so-called "pull factors" for illegal immigration;

   e.   limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

   f.   refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2)     Consult with Agency before taking any action or making any decision that could reduce immigration enforcement, increase the number of illegal aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens. This includes policies, practices, or procedures which have as their purpose or effect:

   a.   reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

   b.   decreasing the number of ICE agents within Agency's territorial jurisdiction performing immigration enforcement duties;

   c.   pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

   d.   decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

   e.   decreasing or pausing apprehensions or administrative arrests;

      f.      increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

      g.     increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

      h.     otherwise negatively impacting Agency.

(3)     Provide Agency with 180 days' written notice (in the manner provided for in Sections IV of this Agreement) of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action listed above.

(4)     Consider Agency's input and provide a detailed written explanation of the reasoning behind any decision to reject Agency's input before taking any action listed in Section III.A.2.

(5)     Err on the side of consulting with Agency in case of doubt as to whether DHS's action is implicated by this provision.

**B.**     **Agency agrees to:**

(1)     Provide the support, cooperation, assistance, and information that is reasonably necessary for DHS to perform its missions.

(2)     To the extent permitted by Agency's budget and resources in the good-faith determination of the Arizona Attorney General, continue participating in law enforcement task forces, including working with Homeland Security Investigations as part of the Financial Crimes Task Force, Internet Crimes Against Children (ICAC) Task Force, and any applicable anti-human trafficking task force(s), as well as any future task forces on these subjects. DHS and Agency understand and agree that the specifics of cooperation for any particular task force may be governed by a separate agreement regarding the particular task force.

(3)     Honor and assist DHS, to the extent consistent with applicable state and federal law and when covered under Agency's jurisdiction, with (1) ICE or CBP "detainer requests" or "requests to hold" issued to Agency and (2) DHS requests for records or information from Agency.

## IV.   NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below,

or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

> Department of Homeland Security
> Secretary of Homeland Security
> Washington, DC 20528

> U.S. Customs and Border Protection
> Office of the Commissioner
> 1300 Pennsylvania Ave. NW
> Washington, D.C. 20229

> U.S. Immigration and Customs Enforcement
> Office of the Director
> 500 12th Street SW
> Washington, D.C. 20536

> U.S. Citizenship and Immigration Services
> Office of the Director
> 5900 Capital Gateway Drive
> Suitland, MD 20746

> Arizona Attorney General's Office
> Attn: Chief Deputy Attorney General
> 2005 N. Central Avenue
> Phoenix, AZ 85004

## V.    PENALTIES

Agency acknowledges the information it receives from DHS pursuant to this Agreement is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement, or otherwise permitted by another agreement with DHS or applicable law, may be subject to civil or criminal penalties.

## VI.    INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled to injunctive relief (in addition to any other remedy to which it may be entitled in law or in equity), including specific performance, to enforce such obligations. If any action should be brought in

equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII.   THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII.   DISPUTE RESOLUTION

DHS and Agency will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the heads of all parties for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated by invoking the judicial or alternative dispute resolution process.

## IX.   CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Agency. Any inconsistency or conflict between or among the provisions of this Agreement will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement.

## X.   SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.  ASSIGNMENT

Agency may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Agency without restriction.

## XII.  WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.  EFFECTIVE DATE

This Agreement shall be effective immediately when both the DHS authorized officials and the Agency authorized official have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.  MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

## XV.  TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate the Agreement as to the remaining parties.

## XVI.  STATUS

The foregoing constitutes the full agreement on this subject between DHS and Agency.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or other entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.  KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.  FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Agency, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Agency, respectively.

[Signatures on the following pages]

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____        1/8/2021
Kenneth T. Cuccinelli II                          Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively. Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

**Signature for the Arizona Attorney General's Office and the Arizona Department of Law**

THE ARIZONA ATTORNEY GENERAL'S OFFICE AND THE ARIZONA DEPARTMENT OF LAW

29Dec20

_____          _____
Mark Brnovich                                     Date
Attorney General

# Exhibit B

# AGREEMENT BETWEEN THE DEPARTMENT OF HOMELAND SECURITY AND THE LOUISIANA DEPARTMENT OF JUSTICE

The parties to this Sanctuary for Americans First Enactment (SAFE) Agreement (Agreement) are on the one hand:

 (1) The Department of Homeland Security,
 (2) U.S. Customs and Border Protection (CBP),
 (3) U.S. Immigration and Customs Enforcement (ICE), and
 (4) U.S. Citizenship and Immigration Services (USCIS);[1]

and on the other hand:

 (5) Louisiana Department of Justice (Agency).

## I. AUTHORITY

The authorities governing this Agreement include, but are not limited to:

 (1) Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
 (2) Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.
 (3) Privacy Act, 5 U.S.C. Section 552a, as amended.
 (4) The Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended.
 (5) Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended.
 (6) Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II. PURPOSE AND COMMITMENT

DHS recognizes that Agency, like other States and municipalities, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact Agency's law enforcement, housing, medical, education, employment, commerce, and healthcare needs and budgets, as well as its other important health, safety, and pecuniary interests. The harm to Agency is particularly acute where Agency's budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in direct and concrete injuries to Agency, including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter into this Agreement individually and collectively, such that termination or removal of one or more of those parties (whether by law or contract) (including the Department of Homeland Security) does not terminate this Agreement as to any other parties.

environment, as well as increased economic competition with Agency's current residents for, among other things, employment, housing, goods and services:

    (1)    a decrease of any immigration enforcement priorities;

    (2)    a voluntary reduction in the number of DHS agents performing immigration enforcement functions;

    (3)    a decrease or pause on returns or removals of removable or inadmissible aliens;

    (4)    a decrease or pause on apprehensions or administrative arrests;

    (5)    relaxation of the standards for granting relief from return or removal, such as asylum;

    (6)    an increase in releases from detention;

    (7)    a relaxation of the standards for granting release from detention;

    (8)    changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

    (9)    rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Agency recognizes that DHS relies on cooperation with Agency and information shared by Agency to carry out DHS's immigration enforcement functions. Any decrease in a State's or municipality's cooperation or information sharing with DHS can result in a decrease in immigration enforcement.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Agency, in which Agency will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Agency and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

    (1)    reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

    (2)    decrease the number of ICE agents performing immigration enforcement duties;

    (3)    pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

    (4)    increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

    (5)    increase or decline to decrease the number of releases from detention;

    (6)    relax the standards for granting relief from return or removal, such as asylum;

    (7)    relax the standards for granting release from detention;

    (8)    relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

    (9)    increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

    (10)    otherwise negatively impact Agency.

In case of doubt, DHS will err on the side of consulting with Agency.

III. **RESPONSIBILITIES**

A. **DHS agrees to:**

(1) Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

    a. enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

    b. enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

    c. enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

    d. eliminating incentives and so-called "pull factors" for illegal immigration;

    e. limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

    f. refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2) Consult with Agency before taking any action or making any decision that could reduce immigration enforcement, increase the number of illegal aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens. This includes policies, practices, or procedures which have as their purpose or effect:

    a. reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

    b. decreasing the number of ICE agents within Agency's territorial jurisdiction performing immigration enforcement duties;

    c. pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

    d. decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

    e. decreasing or pausing apprehensions or administrative arrests;

    f. increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

    g. increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

    h. otherwise negatively impacting Agency.

(3)      Provide Agency with 180 days' written notice (in the manner provided for in Sections IV of this Agreement) of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action listed above.

(4)      Consider Agency's input and provide a detailed written explanation of the reasoning behind any decision to reject Agency's input before taking any action listed in Section III.A.2.

(5)      Err on the side of consulting with Agency in case of doubt as to whether DHS's action is implicated by this provision.

**B.**      **Agency agrees to:**

(1)      Provide the support, cooperation, assistance, and information that is reasonably necessary for DHS to perform its missions.

(2)      Honor, to the extent consistent with law, (1) ICE or CBP "detainer requests" or "requests to hold" issued to Agency and (2) DHS requests for records or information from Agency's Department of Motor Vehicles.

## IV.    NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below, or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

     Department of Homeland Security
     Secretary of Homeland Security
     Washington, DC 20528

     U.S. Customs and Border Protection
     Office of the Commissioner
     1300 Pennsylvania Ave. NW
     Washington, D.C. 20229

     U.S. Immigration and Customs Enforcement
     Office of the Director
     500 12th Street SW
     Washington, D.C. 20536

     U.S. Citizenship and Immigration Services
     Office of the Director
     5900 Capital Gateway Drive
     Suitland, MD 20746

Louisiana Department of Justice
Deputy Director of the Louisiana Bureau of Investigation
1885 N. 3rd. Street
Baton Rouge, Louisiana 70802

## V.    PENALTIES

Agency acknowledges the information it receives from DHS is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement may be subject to civil or criminal penalties.

## VI.    INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled to injunctive relief (in addition to any other remedy to which it may be entitled in law or in equity), including specific performance, to enforce such obligations. If any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII.    THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII.    DISPUTE RESOLUTION

DHS and Agency will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the heads of all parties for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated by invoking the judicial or alternative dispute resolution process.

## IX. CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Agency. Any inconsistency or conflict between or among the provisions of this Agreement, will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement.

## X. SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI. ASSIGNMENT

Agency may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Agency without restriction.

## XII. WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII. EFFECTIVE DATE

This Agreement shall be effective immediately when both the DHS authorized officials and the Agency authorized official have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV. MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification

or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate the Agreement as to the remaining parties.

## XVI.   STATUS

The foregoing constitutes the full agreement on this subject between DHS and Agency.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or other entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.  KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.   FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Agency, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Agency, respectively.

[Signatures on the following pages]

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____     1/8/2021
Kenneth T. Cuccinelli II                              Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively. Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

**Signature for the Louisiana Department of Justice**

LOUISIANA DEPARTMENT OF JUSTICE

_____        12-15-20
Jeff Landry                                              Date
Attorney General

# Exhibit C

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

THE STATE OF ARIZONA, By and through
its Attorney General,
MARK BRNOVICH; et al.,

PLAINTIFFS,

v.

CIVIL ACTION NO. 6:22-cv-01130

MERRICK GARLAND in his official capacity
as Attorney General of the United States of
America; et al.,

DEFENDANTS.

## STATUS REPORT

Pursuant to the Court's November 21, 2022, Order (Dkt. 88), the parties submit this status report. The parties met-and-conferred telephonically on November 30, 2022, but were unable to reach an agreement regarding the need for and scope of jurisdictional discovery.

### STATES' POSITION

At a May 18, 2022, hearing regarding Defendants' Motion to Transfer, the Court expressed concern with the States' standing to seek a preliminary injunction. Dkt. 25 at 73:1-4. The Court explained:

> As I mentioned to states counsel, they have asserted their standing is based essentially on the likelihood that this change in the process of adjudicating asylum claims will lead to an increase in illegal immigration. The Court needs more before it proceeds with a preliminary injunction.
>
> Given that the states contend, number one, that the challenges to the asylum process will lead to more immigrants being granted asylum, and two, that these changes are contrary to law, the Court orders the parties to engage in a 30-day period of limited discovery as to [1] the likely effect this change will have on the number of immigrants granted asylum, residing in the plaintiff states, and [2] the costs or other

1

measurable effect these additional persons, which again the states contend have been illegally granted asylum, will have on the plaintiff states.

Dkt. 25 at 73:5-18. The Court accordingly ordered limited jurisdictional discovery. Dkt. 24. The States subsequently withdrew their request for injunctive relief, and both parties withdrew all outstanding discovery requests. Dkt. 76.

Since the May hearing, the posture of this case has changed in three significant ways: (1) As noted above, Plaintiffs are no longer seeking a preliminary injunction, Dkt. 76, and thus there is no need for discovery in conjunction with issues raised by their motion for a preliminary injunction, (2) Defendants now possess actual implementation data from their rollout of the Asylum Rule "in specific locations" involving only "a few hundred applications a month," Dkt. 25 at 50:10 – 51:10, which could conclusively resolve the Article III standing inquiry, and indeed may render a 12(b)(1) motion by Defendants beyond the bounds of Rule 11 after they conduct a reasonable investigation of their own data, and (3) Fifth Circuit precedents regarding Article III standing for States in the immigration context has become even more favorable, *see Texas v. United States*, 40 F.4th 205 (5th Cir. July 6 2022).

In view of the changed posture, the States oppose any jurisdictional discovery before Federal Defendants have filed their Rule 12(b) motion or answer. Before Defendants file such a Rule 12(b) motion, they would be required to make a reasonable investigation of the data that they possess and what arguments that they can tenably advance in light of that investigation. Defendants should not be permitted to take discovery into topics that, after a reasonable investigation of their own data, they know that they will be unable to advance a standing argument related to it. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (requiring protection if discovery "can be obtained from some other source that is more convenient, less burdensome, or less expensive").

As DOJ argues in innumerable other APA cases, discovery in APA cases is rare. More generally, pre-Rule 12(b)-motion discovery is nearly unprecedented. The Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But Defendants are seeking something even more aberrational: being able to take discovery without even needing to advance bare conclusions in a Rule 12(b) motion.

At the November 30 meet-and-confer, it became apparent that counsel for Defendants have not yet investigated what data that DHS and DOJ possess regarding the location of asylees, including whether Defendants have GPS data for where those asylees are residing from ankle monitors required by Defendants themselves. Defendants' insistence upon proceeding with jurisdictional discovery without first investigating whether discovery is warranted in light of data in its own possession suggests Defendants are merely seeking to impose burdens upon Plaintiff States through intrusive discovery into questions for which Defendants already possess answers.

The States therefore propose that Defendants should proceed with filing an answer or Rule 12(b) motion, and the parties can then evaluate whether jurisdictional discovery is warranted based on that filing, and meet-and-confer as appropriate. But the proposition that Defendants require discovery before they can even file a Rule 12(b) motion is essentially a contradiction in terms. Rule 12(b) motions are typically resolved *before* discovery begins, rather than discovery being conducted and concluded before a responsive pleading is ever filed.

### DEFENDANTS' POSITION

Defendants respectfully request an opportunity to complete discovery related to Plaintiffs' standing to bring this suit before responding to the Second Amended Complaint. As explained further below, there is good cause for this request because (1) the Court already granted Defendants

such discovery, (2) that discovery was not yet completed only because Plaintiffs asked Defendants to withdraw their pending discovery requests to allow Plaintiffs to amend their complaint a second time, which Defendants agreed to only on the condition that the withdrawal was without prejudice to re-serving the requests before responding to the second amended complaint, (3) Defendants already responded to jurisdictional discovery from Plaintiffs, who had the benefit of that discovery in drafting their second amended complaint, and Defendants should have a similar opportunity before responding to the complaint, and (4) discovery into Plaintiffs' allegations of harm and standing will be necessary at some point in this case, and proceeding with that discovery now is the most efficient way for this case to proceed because the merits of APA claims are reviewed based on an administrative record rather than some later period of discovery.

On May 18, 2022, the Court ordered a period of limited reciprocal discovery as to Plaintiffs' Article III standing. ECF No. 24 at 1. The Court had noted that "a lot of the work that the states need to do may be internal with state agencies to figure out what the costs are of people who have been granted asylum residing in their states." May 18 Hr'g Tr. at 81; *see also id* at 78.

The Parties subsequently served discovery requests on each other. On May 27, 2022, Plaintiffs served Interrogatories, Requests for Production, and Requests for Admission on Defendants. On June 17, 2022, Defendants responded to those requests and produced responsive documents. In addition to responding to 29 interrogatories[1] and 15 requests for admission, Defendants produced several thousand pages of documents in response to requests for production. And this document production was in addition to the 14,952-page Administrative Record Defendants compiled and provided to Plaintiffs.

---

[1] Plaintiffs numbered their interrogatories 1 through 10, but one of their interrogatories included 20 discrete subparts. *See* Fed. R. Civ. P. 33(a)(1) (noting "discrete subparts" of interrogatories are counted separately towards the 25 limit).

During the same time period, on June 6 and 7, 2022, Defendants served Interrogatories, Requests for Production, Requests for Admission, and deposition notices on Plaintiffs. Plaintiffs requested additional time to respond to those requests, and ultimately never responded because they informed Defendants that they intended to file a Second Amended Complaint and asked that the outstanding discovery be postponed until that filing. Based on the Parties' discussions, Defendants understood that Plaintiffs would clarify and narrow their allegations with respect to injury and standing in their Second Amended Complaint. Accordingly, on July 20, 2022, the Parties filed a Joint Status Report noting that Plaintiffs intended to file a Second Amended Complaint and that "all outstanding discovery requests are withdrawn without prejudice to propounding such requests in the future." ECF No. 76 at 1. As a result, although the Court ordered reciprocal discovery with respect to standing, Plaintiffs have had an opportunity to obtain discovery while Defendants have not. Defendants noted in the Joint Status Report that they anticipated that they would "need to complete jurisdictional discovery related to potential motions under Rule 12(b)(1) before responding to the Second Amended Complaint." *Id.*; *see also* ECF No. 79 (approving the Parties' proposal).

Plaintiffs subsequently requested several extensions before filing their Second Amended Complaint on November 10, 2022. *See* ECF Nos. 80, 85, 86. Despite the expectation that Plaintiffs would narrow and clarify their allegations of harm in the amended complaint, the second amended complaint largely tracks their earlier filings. *Compare* ECF Nos. 1, 14, 86.

Defendants respectfully request that the Court allow Defendants to serve updated discovery requests with respect to Plaintiffs' standing to bring this suit and complete that discovery before responding to the Second Amended Complaint. Such discovery is appropriate where, as here, Defendants anticipate raising a factual attack on the allegations of standing in the complaint. *See, e.g.*,

*Rick v. Women's & Children's Hosp.*, No. CIV.A.08-2013, 2010 WL 2360703, at *2 (W.D. La. May 10, 2010) (considering "plaintiffs' discovery responses" in evaluating "factual attack" on jurisdiction). And it is particularly appropriate because Plaintiffs already had an opportunity to request and receive discovery from Defendants, but Defendants have not yet had such an opportunity. Defendants would not have agreed to Plaintiffs' request to withdraw the earlier discovery requests so they could amend their complaint if Plaintiffs had not agreed that the withdrawal "was without prejudice to propounding such requests in the future." ECF No. 76 at 1.

Plaintiffs' contrary arguments lack merit. They argue that discovery before a response to the complaint is improper. But Plaintiffs already obtained extensive discovery from Defendants before the currently operative complaint was even filed. Plaintiffs also moved for even more discovery from Defendants after they withdrew their motion for preliminary injunction but before they filed their amended complaint. *See* ECF No. 82. Allowing jurisdictional discovery prior to responding to the complaint would also put this case on a similar track to the one other case challenging the same rule. *See* Order, *Texas v. Mayorkas*, No. 2:22-cv-94 (Nov. 7, 2022) (granting Defendants until January 2023 to complete jurisdictional discovery before responding to plaintiff's complaint).

Plaintiffs also argue that discovery should be denied because this is an APA case. While Defendants agree that the merits of an APA case must be resolved based on an administrative record, Plaintiffs still must separately put forward evidence of some harm sufficient to invoke the Court's jurisdiction. *See, e.g.*, *Louisiana Crawfish Producers Ass'n v. Mallard Basin, Inc.*, No. 6:10-CV-1085, 2019 WL 171693, at *3 (W.D. La. Jan. 10, 2019) ("Extra-record evidence may also be allowed to determine whether plaintiffs can satisfy a jurisdictional prerequisite, such as standing."). Plaintiffs attempt to flip the burden onto Defendants to figure out whether there is

6

support for any of their allegations of standing, but under Fifth Circuit precedent the burden continues to remain on "[t]he States" who "must establish by a preponderance of the evidence an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Texas v. United States*, 40 F.4th 205, 216 (5th Cir. 2022) (quotation marks and citation omitted).[2] Plaintiffs took a kitchen-sink approach to standing, throwing everything against the wall in hopes that something would stick. The amended complaint lists various State agencies in 20 separate States and raises wholly speculative harms on behalf of each, *see* ECF No. 86 at ¶¶ 74-129, while Plaintiffs all but concede that they currently have no idea whether any of these allegations are true or sufficient to invoke the Court's jurisdiction, *see* ECF No. 82 at 1 (arguing Plaintiffs need discovery from the government in order to "shed light on the States' injuries"); ECF No 82-1 at 2 (noting that Plaintiffs "would seriously consider dismissing this suit" if Defendants cannot provide them evidence that they have been harmed). Defendants should have an opportunity to examine whether Plaintiffs have the required "good faith basis" for their allegations of harm and what that basis is before asking the Court to resolve the question of the States' standing. *Advanced Data Access LLC v. Nanya Tech. Corp*., No. 6:11-cv-473, 2012 WL 10873894, at *3 (E.D. Tex. Apr. 24, 2012), *report and recommendation adopted*, 2012 WL 10889455 (E.D. Tex. June 11, 2012); *see also Turner v. ILG Techs., LLC*, No. 2:21-cv-04192, 2022 WL 4543209, at *14 (W.D. Mo. Sept. 28, 2022) (explaining that party filing complaint must first conduct a reasonable inquiry and be able to certify that the factual contentions have evidentiary support).

---

[2] To the extent Plaintiffs cite *Texas v. United States* as supporting a more permissive view of standing, Defendants note that the Supreme Court granted certiorari in that case and specifically directed the parties to brief "[w]hether the state plaintiffs have Article III standing" to raise APA challenges to Department of Homeland Security actions. *United States v. Texas*, No. 22A17 (22-58), 2022 WL 2841804, at *1 (U.S. July 21, 2022).

Plaintiffs argue that responding to discovery will be burdensome. This assertion is in tension with their arguments that Defendants, rather than Plaintiffs, have the only relevant evidence. If Defendants request the evidence Plaintiffs have that supports their allegations of harm and Plaintiffs' response is that they have no evidence beyond what might be in the Federal Government's possession, that answer will be useful in defining the universe of evidence on which Plaintiffs' standing should be assessed, and Plaintiffs have never explained how doing so would be burdensome. Moreover, to the extent there is any burden, Defendants have repeatedly offered to confer and for Plaintiffs to limit their standing assertions to four or less representative States to ease the burden on the Parties and the Court in resolving this question. Plaintiffs have refused to do so, including in the Parties' conferrals this past week.

Before this case can be resolved on the merits, Plaintiffs will have to clarify what precisely their harm is, and meet their burden of proof to show an actual, concrete injury they can trace to the challenged rule. Because this is an APA case, and "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," review of the merits of the claims will otherwise be based solely on the administrative record. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Since the merits of APA claims will be assessed on the administrative record alone rather than following some later period of discovery, in an APA case where standing is in dispute it makes sense to resolve the standing question and any discovery necessary to resolution of that question before the case proceeds any further.

Dated:  December 2, 2022

Respectfully submitted,

By:/s/ Joseph S. St. John

MARK BRNOVICH
  Attorney General
Brunn ("Beau") W. Roysden III **
  Solicitor General
Drew C. Ensign **
  Deputy Solicitor General
James K. Rogers **
  Senior Litigation Counsel
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

Steve Marshall
  Alabama Attorney General
Edmund G. LaCour Jr.**
  Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

Treg R. Taylor
  Attorney General of Alaska
CORI M. MILLS**
  Deputy Attorney General of Alaska
Christopher A. Robison**
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY**
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Indiana Attorney General
Betsy M. DeNardi**
  Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL**
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

Lawrence G. Wasden
  Attorney General
Brian Kane**
  Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

Derek Schmidt
  Attorney General
Dwight R. Carswell**
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

DANIEL CAMERON
   Attorney General of Kentucky
Marc Manley**
   Associate Attorney General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
   Attorney General of Mississippi
JUSTIN L. MATHENY**
   Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DOUGLAS J. PETERSON
   Attorney General
JAMES A. CAMPBELL**
   Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

AUSTIN KNUDSEN
   Attorney General
DAVID M.S. DEWHIRST*
   Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

JOHN M. O'CONNOR
   Attorney General of Oklahoma
BRYAN CLEVELAND**
   Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

Sean D. Reyes
   *Utah Attorney General*
Melissa Holyoak**
   *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

ALAN WILSON
  South Carolina Attorney General
Thomas T. Hydrick**
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS**
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

* Pro hac vice application forthcoming
** Pro hac vice application granted

Patrick Morrisey
  Attorney General
Lindsay See**
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

Dated: December 2, 2022        Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Brian C. Ward*
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-9121
brian.c.ward@usdoj.gov

*Counsel for Defendants*

# Exhibit D

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**STATE OF ARIZONA ET AL**            **CASE NO. 6:22-CV-01130**

**VERSUS**                             **JUDGE DAVID C. JOSEPH**

**MERRICK GARLAND ET AL**              **MAGISTRATE JUDGE CAROL B. WHITEHURST**

## MINUTES OF COURT:
### Status Conference

| | | | |
|---|---|---|---|
| Date: | 12/16/2022 | Presiding: Judge David C. Joseph | |
| Court Opened: | 10:00 AM | Courtroom Deputy: | Lysandra Williams |
| Court Adjourned: | 10:27 AM | Courtroom: | Zoom Video Conference |
| Statistical Time: | 27 Minutes | | |

## APPEARANCES

| | | |
|---|---|---|
| Joseph Scott St John | For | State of Louisiana, Plaintiff |
| Drew C Ensign | For | State of Arizona, Plaintiff |
| Brian Ward | For | U S Dept of Justice, Defendant |

## PROCEEDINGS

A Status Conference was held December 16, 2022, via Zoom Video Conference.

The parties discussed ongoing discovery issues outlined in [89] JOINT STATUS REPORT filed December 2, 2022.

After discussion and careful consideration of the issues presented, the Court discussed its intent for the parties to engage in a period of jurisdictional discovery. Prior to commencing the period of jurisdictional discovery and on or before January 3, 2023, Plaintiffs are directed to apprise the Defendants of the factual bases – including the relevant states and agencies thereof – on which they seek to establish Article III standing.

The Court set a Status Conference for **January 5, 2023, at 10:00 a.m. via Zoom Video Conference**

# Exhibit E

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**STATE OF ARIZONA ET AL**                **CASE NO.  6:22-CV-01130**

**VERSUS**                                **JUDGE DAVID C. JOSEPH**

**MERRICK GARLAND ET AL**                 **MAGISTRATE JUDGE CAROL B. WHITEHURST**

## MINUTES OF COURT:
### Status Conference

| | | | |
|---|---|---|---|
| Date: | January 17, 2023 | Presiding: Judge David C. Joseph | |
| Court Opened: | 9:00 AM | Courtroom Deputy: | Sandy Williams |
| Court Adjourned: | 9:11 AM | Courtroom: | Zoom Video Conference |
| Statistical Time: | 11 Minutes | | |

## APPEARANCES

| | | |
|---|---|---|
| Joseph Scott St. John | For | State of Louisiana, Plaintiff |
| Brian Ward | For | U S Dept of Justice, Defendant |

## PROCEEDINGS

A Status Conference was held January 17, 2023, via Zoom Video Conference.

The parties updated the Court regarding status of jurisdictional discovery.

The Plaintiff States advised the Court that they intend to establish Article III standing by showing the effect of the IFR on certain discrete programs in the states of Louisiana and Florida, in addition to asserting standing as a matter of law.

The parties will confer and seek agreement on the parameters of jurisdictional discovery and advise the Court of any impasse.  The Court ordered the period of jurisdictional discovery to be completed on or before March 24, 2023, unless extended.

The Court is available upon request for any additional status conferences needed to complete discovery.

| From: | St. John, Joseph |
|---|---|
| To: | Greb, Emily J. (MSN); Dryden, Kaitlin (MSN); Cruz, Nancy (MSN) |
| Cc: | James Percival |
| Subject: | RE: Arizona v. Garland, No. 6:22-cv-1130 (W.D. La.) |
| Date: | Wednesday, March 8, 2023 11:13:49 AM |
| Attachments: | image001.png |

Emily:

We agree vis-à-vis service on February 27, and that the date for compliance will be March 17. If you have other issues that can be resolved informally, please let me know as soon as possible.

Best regards,
Scott

---

**From:** Greb, Emily J. (MSN) <EGreb@perkinscoie.com>
**Sent:** Wednesday, March 8, 2023 11:04 AM
**To:** St. John, Joseph <StJohnJ@ag.louisiana.gov>; Dryden, Kaitlin (MSN) <KDryden@perkinscoie.com>; Cruz, Nancy (MSN) <NancyCruz@perkinscoie.com>
**Cc:** James Percival <James.Percival@myfloridalegal.com>
**Subject:** RE: Arizona v. Garland, No. 6:22-cv-1130 (W.D. La.)

***CAUTION:*** *This email originated outside of Louisiana Department of Justice. Do not click links or open attachments unless you recognize the sender and know the content is safe.*

Scott,

I am writing to follow up on my below email. We would appreciate your prompt confirmation that we have reached the agreement outlined below. If not, I think we should touch base with a phone call this afternoon. Please provide the confirmation requested below, or times you are available to discuss later today.

Best Regards,
Emily

**Emily Greb | Perkins Coie LLP**
PARTNER
D. +1.608.663.7494
F. +1.608.283.4494
E. EGreb@perkinscoie.com

---

**From:** Greb, Emily J. (MSN)
**Sent:** Tuesday, March 7, 2023 3:00 PM
**To:** St. John, Joseph <StJohnJ@ag.louisiana.gov>; Dryden, Kaitlin (MSN) <KDryden@perkinscoie.com>; Cruz, Nancy (MSN) <NancyCruz@perkinscoie.com>
**Cc:** James Percival <James.Percival@myfloridalegal.com>
**Subject:** RE: Arizona v. Garland, No. 6:22-cv-1130 (W.D. La.)

Scott,

Thanks for the response. While we do not agree with your analysis of service of the subpoena, in order to reach a resolution on the operative deadlines, we are willing to agree in this case that we have accepted service as of February 27th on the understanding that the date for compliance will be March 17th, and that, as in my initial email, we have reserved all our rights to object and/or move to quash, as provided by the Federal Rules of Civil Procedure and any relevant Local Rules.

Please confirm we are in agreement.

Regards,
Emily

**Emily Greb** | **Perkins Coie LLP**
PARTNER
D. +1.608.663.7494
F. +1.608.283.4494
E. EGreb@perkinscoie.com

**From:** St. John, Joseph <StJohnJ@ag.louisiana.gov>
**Sent:** Monday, March 6, 2023 1:50 PM
**To:** Greb, Emily J. (MSN) <EGreb@perkinscoie.com>; Dryden, Kaitlin (MSN) <KDryden@perkinscoie.com>; Cruz, Nancy (MSN) <NancyCruz@perkinscoie.com>
**Cc:** James Percival <James.Percival@myfloridalegal.com>
**Subject:** RE: Arizona v. Garland, No. 6:22-cv-1130 (W.D. La.)

Emily:

Your email needlessly puts us off on a rocky start.

Innovation Law Lab ("ILL") – through its executive director and its registered agent – has had actual notice of our subpoena since at least February 24 via an email to Ms. Koch and Mr. Manning that attached the subpoena, as well as an attempt to serve ILL's President that same day. With respect to service, I am informed that Ms. Koch, as registered agent, failed to present for service at ILL's registered address on February 27; the office manager could not provide a time or date when Ms. Koch would be in; and the office manager would not say if Ms. Koch had a set schedule. The office manager did, however, confirm the location was an address for ILL and that she could accept service. Accordingly, personal service was effected on ILL as of February 27. *See, e.g.*, Or. R. Civ. P. 7(D)(3)(b)(i). As a courtesy, I then sent confirmatory emails attaching the subpoena to Ms. Koch and Mr. Manning on February 28. Our request for confirmation was to avoid any needless dispute before a federal district court. We renew that request now.

With respect to timing, we believe the subpoena provides a reasonable time for compliance. As a courtesy, we will extend the deadline to March 17, 2023, at 10:00 a.m. If you believe the place of compliance is inconvenient, we are willing to work with ILL, and we are happy to accept production electronically. We are also willing to work with you to minimize any burden. Again, we would like to avoid troubling a federal court with procedural disputes that can be resolved informally.

Best regards,
Scott



**Joseph Scott St. John**

Deputy Solicitor General
Office of Attorney General Jeff Landry
Tel: (225) 485-2458
stjohnj@ag.louisiana.gov
www.AGJeffLandry.com

**From:** Greb, Emily J. (MSN) <EGreb@perkinscoie.com>
**Sent:** Saturday, March 4, 2023 1:46 PM
**To:** St. John, Joseph <StJohnJ@ag.louisiana.gov>; Dryden, Kaitlin (MSN) <KDryden@perkinscoie.com>; Cruz, Nancy (MSN) <NancyCruz@perkinscoie.com>
**Cc:** James Percival <James.Percival@myfloridalegal.com>
**Subject:** RE: Arizona v. Garland, No. 6:22-cv-1130 (W.D. La.)

*CAUTION:  This email originated outside of Louisiana Department of Justice.  Do not click links or open attachments unless you recognize the sender and know the content is safe.*

Scott,

Thanks for the email.   We are willing to accept service of a subpoena with an updated date for compliance, while preserving all our rights to object and/or move to quash.  As you suggest in your email regarding burden, the current date for compliance is unreasonable.   If you agree to email a modified subpoena with an April 10th date for compliance, and drop the subpoena attached to your below email, we will accept service of the modified subpoena on behalf of Innovation Law Lab. However, in agreeing to accept email service of the modified subpoena we reserve all our rights to object and/or move to quash, as provided by the Federal Rules of Civil Procedure and any relevant Local Rules.  Please let me know if you agree.

Best,

Emily

**Emily Greb | Perkins Coie LLP**
PARTNER
D. +1.608.663.7494
F. +1.608.283.4494
E. EGreb@perkinscoie.com

**From:** St. John, Joseph <StJohnJ@ag.louisiana.gov>
**Sent:** Friday, March 3, 2023 10:54 AM
**To:** Dryden, Kaitlin (MSN) <KDryden@perkinscoie.com>; Greb, Emily J. (MSN) <EGreb@perkinscoie.com>; Cruz, Nancy (MSN) <NancyCruz@perkinscoie.com>

**Cc:** James Percival <James.Percival@myfloridalegal.com>
**Subject:** Arizona v. Garland, No. 6:22-cv-1130 (W.D. La.)

Counsel:

We look forward to working with you on Innovation Law Lab's subpoena response. In particular, we are happy to discuss the timing of Innovation Law Lab's response and work with you to minimize any burden.

Given the circumstances of service and consistent with Innovation Law Lab's duty to minimize costs, please confirm that Innovation Law Lab has been served or, alternatively, that you will accept service on Innovation Law Lab's behalf.

Best regards,
Scott



**Joseph Scott St. John**

Deputy Solicitor General
Office of Attorney General Jeff Landry
Tel: (225) 485-2458
stjohnj@ag.louisiana.gov
www.AGJeffLandry.com

---

**From:** Stephen Manning <stephen@innovationlawlab.org>
**Sent:** Friday, March 3, 2023 10:25 AM
**To:** St. John, Joseph <StJohnJ@ag.louisiana.gov>
**Cc:** Dryden, Kaitlin (MSN) <KDryden@perkinscoie.com>; Greb, Emily J. (MSN) <EGreb@perkinscoie.com>; Cruz, Nancy (MSN) <NancyCruz@perkinscoie.com>
**Subject:**

*CAUTION:* *This email originated outside of Louisiana Department of Justice. Do not click links or open attachments unless you recognize the sender and know the content is safe.*

Greetings,

In relation to "Subpoena to produce documents, information, or objects or to permit inspection of premises in a civil action" in the matter of *Arizona v. Garland*, 6:22-cv-1130, please direct all communications to our counsel, Emily Greb, Nancy Cruz, and Kaitlin Dryden, cc'd here.
--

***Stephen W Manning*** | **Executive Director**

**p:** 503-241-0035
**a:** PO Box 8382, Portland, OR 97207
**w:** https://innovationlawlab.org
pronouns: he/him

*stephen@innovationlawlab.org*

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. To reply to our e-mail administrator directly, please send an e-mail to postmaster@ag.state.la.us.

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. To reply to our e-mail administrator directly, please send an e-mail to postmaster@ag.state.la.us.

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. To reply to our e-mail administrator directly, please send an e-mail to postmaster@ag.state.la.us.