UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| STATE OF ARIZONA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MERRICK GARLAND, *et al.*, <br><br> Defendants. | No. 6:22-CV-01130 <br><br> Judge David C. Joseph <br><br> Magistrate Judge Carol B. Whitehurst |

**THE STATE OF LOUISIANA'S CONSOLIDATED
OPPOSITION TO MOTIONS TO QUASH**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................... 2

   I. The Litigation ............................................................................. 2

     A.  The Asylum IFR ............................................................... 2

     B.  Nineteen States Challenge the Asylum IFR on Constitutional and Statutory Grounds. ... 3

     C.  The Court Orders Pre-Answer Jurisdictional Discovery on the States' Standing—at the Federal Defendants' Request and Over the States' Objection. ........................................ 4

     D.  The States Seek Jurisdictional Discovery from the Federal Defendants. ......................... 4

     E.  The States Seek Jurisdictional Discovery from Non-Parties ................................. 5

   II. The Subpoena-Related Litigation. ................................................. 5

     A.  Louisiana Serves Document Subpoenas on Private Parties Who Have Publicly Stated That They Represent Asylum Seekers in Louisiana. ....................................... 5

     B.  Louisiana Emphasizes Its Willingness and Desire to Minimize Any Burden. ................... 7

     C.  The Recipients Move to Quash. ....................................... 7

ARGUMENT ...................................................................................... 7

   I.  THE RECIPIENTS FAILED TO CARRY THEIR BURDEN OF SHOWING THAT THE MODEST, FOUR-TO-FIVE REQUEST DOCUMENT-ONLY SUBPOENAS REQUIRE DISCLOSURE OF PRIVILEGED OR OTHER PROTECTED MATTER. ......................................... 7

     A.  The Recipients' Blanket Privilege and Work-Product Claims Fail as a Matter of  Law. . 8

     B.  The Recipients Failed to Show the Privilege Attaches to Any Document. ....................... 9

       1.  The Recipients Failed to Factually Establish Privilege as to Any Document. ............. 9

       2.  The Recipients Failed to Legally Establish Privilege as to Any Document. ................ 10

     C.  The Recipients Failed to Show that Work-Product Protection Attaches to Any Identifiable Document or Set of Documents. ................................................. 12

       1.  The Recipients Failed to Legally Establish that Work-Product Protection Attaches to Any Document. .......................................................... 12

       2.  The Recipients Failed to Factually Establish that Work-Product Protection Attaches to Any Document. .......................................................... 13

     D.  The Recipients' Remaining Arguments—based on RFRA, the First Amendment, Supposed Confidentiality Interests, and Ethics Rules—are Meritless. .......................... 14

       1.  RFRA Does Not Apply. ........................................... 14

    2.    The Supposed "Sensitivity" of Some Information Supplies No Basis to Quash. ......15

    3.    State Ethics Rules Do Not Apply. ................................................................15

    4.    The Nonprofits Failed to Show An Infringement of Any Associational Rights. .........16

II.   THE RECIPIENTS FAILED TO CARRY THEIR BURDEN OF SHOWING THAT THE MODEST, FOUR-TO-FIVE REQUEST DOCUMENT-ONLY SUBPOENAS UNDULY BURDEN THEM. .........18

   A.  The Requested Documents are Relevant to Standing. ....................................18

     1.    Request No. 1 ....................................................................................18

     2.    Request No. 2 ................................................................................... 20

     3.    Request No. 3 ................................................................................... 20

     4.    Request No. 4 ................................................................................... 20

     5.    Request No. 5 ................................................................................... 21

     6.    The Recipients' Anti-Relevance Argument Fail. .......................................21

   B.  Louisiana Needs the Requested Documents Because of Positions the Federal Defendants Have Taken in This Litigation. .................................................... 22

   C.  The Requests are Tailored to Obtain Information Relevant to Standing. ........................23

   D.  The Time Periods of the Requests are Reasonable. .......................................23

   E.  Any Burden on the Recipients is Not Undue. ............................................. 24

III.  THE COURT SHOULD MODIFY THE SUBPOENAS IF THE COURT FINDS THE SUBPOENAS OBJECTIONABLE IN ANY RESPECT. ..................................................................... 24

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*AHF Cmty. Dev., LLC v. City of Dallas*,
    258 F.R.D. 143 (N.D. Tex. 2009) .......................................................................... 10, 11

*Alden v. Maine*,
    527 U.S. 706 (1999) ...............................................................................................22, 23

*Cazorla v. Koch Foods of Miss., L.L.C.*,
    838 F.3d 540 (5th Cir. 2016) ........................................................................................5

*City of Boerne v. Flores*,
    521 U.S. 507 (1997).....................................................................................................15

*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019)......................................................................................6, 20, 21

*Dole v. Milonas*,
    889 F.2d 885 (9th Cir. 1989) .......................................................................................12

*Dotson v. Edmonson*,
    No. CV 16-15371, 2017 WL 11535244 (E.D. La. Nov. 21, 2017)................................18

*Guzzino v. Felterman*,
    174 F.R.D. 59 (W.D. La. 1997) ...................................................................................14

*Hisaw v. Unisys Corp.*,
    134 F.R.D. 151 (W.D. La. 1991) ..................................................................................14

*Hobbs v. Hawkins*,
    968 F.2d 471 (5th Cir. 1992) .......................................................................................17

*In re Gee*,
    941 F.3d 153 (5th Cir. 2019) ...................................................................................... 22

*In re Grand Jury Subpoena Duces Tecum Issued on April 22, 1991 to Records Custodian*,
    36 F.3d 90, 1994 WL 523913 (5th Cir. Sept. 15, 1994) ...............................................17

*La. Corral Mgmt., LLC v. Axis Surplus Ins. Co.*,
    No. CV 22-2398, 2023 WL 156876 (E.D. La. Jan. 11, 2023) .....................................25

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)......................................................................................................23

*McGovern v. Moore,*
   No. 5:13-CV-1353, 2013 WL 5781315 (W.D. La. Oct. 25, 2013) .................................................16

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ............................................................................................................... 16, 17

*Navigant Consulting, Inc. v. Wilkinson,*
   220 F.R.D. 467 (N.D. Tex. 2004) ...............................................................................................15

*Opulent Life Church v. City of Holly Springs,*
   697 F.3d 279 (5th Cir. 2012) .......................................................................................................15

*Plyler v. Doe,*
   457 U.S. 202 (1982) ....................................................................................................................19

*SEC v. Brady,*
   238 F.R.D. 429 (N.D. Tex. 2006) ...............................................................................................10

*SEC v. Microtune,*
   258 F.R.D. 310 (N.D. Tex. 2009) ................................................................................... 11, 13, 14

*Taylor Lohmeyer Law Firm P.L.L.C. v. United States,*
   957 F.3d 505 (5th Cir. 2020) ................................................................................................ 10, 11

*Total RX Care, LLC v. Great Northern Ins. Co.,*
   318 F.R.D. 587 (N.D. Tex. 2017) ...............................................................................................14

*United States v. El Paso Co.,*
   682 F.2d 530 (5th Cir. 1982) ............................................................................................ 9, 12, 13

*United States v. Legal Servs. for New York City,*
   100 F. Supp. 2d 42 (D.D. C. 2000), *aff'd & remanded,* 249 F.3d 1077 (D.C. Cir. 2001) ...........12

*United States v. Rivera,*
   837 F. Supp. 565 (S.D.N.Y. 1993) ..............................................................................................12

*Univ. of Penn. v. EEOC,*
   493 U.S. 182 (1990) ............................................................................................................... 17, 18

*Whole Women's Health v. Smith,*
   896 F.3d 362 (5th Cir. 2018) .......................................................................................................15

*Wiwa v. Royal Dutch Petroleum Co.,*
   392 F.3d 812 (5th Cir. 2004) ................................................................................................18, 24

**Statutes**

5 U.S.C. § 706 ................................................................................................................ 4

**Other Authorities**

9A Fed. Prac. & Proc. Civ. § 2459 (3d ed.) .................................................................... 24

*Circumvention of Lawful Pathways*, 88 Fed. Reg 11,704 (Feb. 23, 2023) ....................... 19

Dane S. Ciolino, Louisiana Legal Ethics: Standards & Commentary 166–67 (2022) ................... 16

Executive Office for Immigration Review, *Adjudication Statistics, Credible Fear and Asylum Process: Fiscal Year (FY) 2019 Quarter 2*, https://www.justice.gov/eoir/page/file/1148911/download ..................................... 3

Executive Office for Immigration Review, *Adjudication Statistics, Pending Cases, New Cases, and Total Completions* (July 15, 2022), https://www.justice.gov/eoir/page/file/1242491/download3

The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) ....................................................... 22

La. R. Prof'l Cond. § 1.6(b)(6) ....................................................................................... 16

Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb ............................... 15

United States Department of Homeland Security & United States Department of Justice, *Notice of Proposed Rulemaking, Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705, 11,716 (Feb. 23, 2023) ........................................................................................................... 3

United States Government Accountability Office, GAO-20-250, *Immigration: Actions Needed To Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings* (Feb. 2020) ........................................................................................................................... 2

**Rules**

Fed. R. Civ. P. 26(b)(3) ................................................................................................. 13

Fed. R. Civ. P. 45(d)(3)(A)(iii) ....................................................................................... 8

Fed. R. Civ. P. 45(d)(3)(A)(iv) ..................................................................................... 18

Local Civil Rule 7.5 ......................................................................................................... 8

**Regulations**

87 Fed. Reg. 18,078 (Mar. 29, 2022) ................................................................. passim

C.F.R. § 208.30(f) (2018) .................................................................................................... 2

**Constitutional Provisions**

U.S. Const. art II, § 3 ........................................................................................................ 4

**INTRODUCTION**

A successful immigration law firm and three immigration-services groups move to quash modest, four-to-five request document subpoenas the State of Louisiana issued to them to obtain Court-ordered jurisdictional discovery that the U.S. Department of Justice refused to provide.

But a reader of the motions could be forgiven for forgetting all that—for the motions read more like press releases than legal briefs.

The motions misunderstand privilege. Fighting forty years of Fifth Circuit precedent, the subpoena recipients first contend that the identities of their clients are privileged. But they are not, and they never have been. The recipients next gesture towards unspecified documents collected in the course of a supposed attorney-client relationship, which they simply declare are privileged. But those sorts of blanket assertions are not sufficient, and never have been.

The motions also misinterpret lawyer-client confidentiality rules. They contend, for example, that a lawyer cannot produce in discovery nonprivileged, responsive material just because the client shared that material with him. That can't be right, and it isn't. Modern civil discovery depends on the exchange of client-related information from lawyer to lawyer. The motions' view of state ethics rules would bring an end to civil litigation.

The motions then invoke a variety of arguments: claiming undue burden, impingement of associational freedoms, and even violations of the Religious Freedom Restoration Act. But each is meritless. Not one of the recipients has shown that responding to four-to-five document requests is unduly burdensome. Not one of the recipient's associational freedoms is burdened. And the Religious Freedom Restoration Act has no application here. The motions should be denied.

# BACKGROUND

## I. The Litigation

### A.  The Asylum IFR

This is a 19-State challenge to the lawfulness of an interim final rule that changes the way asylum claims are adjudicated. 87 Fed. Reg. 18,078 (Mar. 29, 2022) ("Asylum IFR"). Before the Asylum IFR, aliens "who receive[d] a positive credible fear determination [by an asylum officer were] referred to an immigration court for [INA] section 240 removal proceedings, during which they have the opportunity to apply for asylum and other forms of relief or protection from removal." *Id.* at 18,089. The asylum officer's credible-fear determination was quick and non-adversarial.  *See* 8 C.F.R. § 208.30(f) (2018). The immigration-court proceedings that followed, by contrast, were thorough and adversarial, and they included cross-examination of the applicant. *Id.*

Asylum-officer screening is notoriously lax. According to the United States Government Accountability Office (GAO), "asylum officers made positive determinations in about 71 percent of all credible- and reasonable-fear screenings between fiscal year 2014 and the first two quarters of fiscal year 2019."[1] "The remaining credible and reasonable fear screenings were almost evenly divided between negative determinations and administrative closures ([about] 14 percent each)."[2]

Most credible-fear claims fail upon further inspection. And many applicants found to have a credible fear by an asylum officer do not even file for asylum. For example, United States Department of Justice (DOJ) statistics indicate that in the second quarter of 2019, of every 100 aliens claiming a credible fear, 83 would be referred to the Executive Office of Immigration Review

---

[1] United States Government Accountability Office, GAO-20-250, *Immigration: Actions Needed To Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings* (Feb. 2020) at 13, and fig. 2.

[2] *Id.*

(EOIR) for adjudication by an immigration judge, but only 48 would even file for asylum.[3] Of those 48, only 13 would get asylum.[4] EOIR statistics over the last 10 years concur.[5] And in a recent notice of proposed rulemaking, DOJ and the DHS reached a similar conclusion by way of a similar analysis: they admitted that "most migrants who are initially deemed eligible to pursue their claims ultimately are not granted asylum in the subsequent EOIR removal proceedings."[6]

Under the Asylum IFR, however, asylum officers "conduct final adjudication of asylum claims arising from the border," a truncated process that Plaintiff States allege is unlawful. ECF No. 86 at ¶ 2. The Asylum IFR accordingly "makes it substantially easier for unauthorized economic migrants to enter the United States and obtain asylum through false claims." *Id.* And it "harm[s] . . . the Plaintiff States because migrants who are improperly granted asylum will settle in the Plaintiff States," causing sovereign, quasi-sovereign, and fiscal injuries. *Id.* at ¶ 3.

### B. Nineteen States Challenge the Asylum IFR.

About a year ago, fourteen States brought constitutional and statutory challenges to the Asylum IFR. *See* ECF No. 1. That coalition expanded to include 19 States. *See* ECF No. 86. The Plaintiff States bring claims against the Attorney General of the United States and 15 federal agencies or officials involved in promulgating or implementing the Asylum IFR. *Id.* at ¶¶ 144–220; ¶¶ 44–59.

---

[3] Executive Office for Immigration Review, *Adjudication Statistics, Credible Fear and Asylum Process: Fiscal Year (FY) 2019 Quarter 2*, https://www.justice.gov/eoir/page/file/1148911/download.

[4] *Id.*

[5] Executive Office for Immigration Review, *Adjudication Statistics, Pending Cases, New Cases, and Total Completions* (July 15, 2022), https://www.justice.gov/eoir/page/file/1242491/download.

[6] United States Department of Homeland Security & United States Department of Justice, *Notice of Proposed Rulemaking, Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705, 11,716 (Feb. 23, 2023)

### C. The Court Orders Pre-Answer Jurisdictional Discovery on the States' Standing—At the Federal Defendants' Request and Over the States' Objection.

After some preliminaries, the federal defendants challenged the States' standing and asked for pre-answer jurisdictional discovery. ECF No. 89 at 3–8. The States opposed because Rule 11(b) would've required the federal defendants to investigate their own data before moving to dismiss, and the States believed (and continue to believe) that the federal defendants' reasonable investigation would make a standing-based Rule 12(b)(1) motion beyond the bounds of Rule 11. *See id.* at 2.

But the federal defendants got the jurisdictional discovery they asked for. The Court directed discovery on "the likely effect the [Asylum IFR] will have on the number of immigrants granted asylum and/or otherwise residing in Plaintiff [S]tates." ECF No. 24. And the Court directed discovery on "the cost or other measurable effect these additional persons (which the Plaintiff States contend will have been illegally granted asylum) will have on Plaintiff [S]tates." *Id.*

To make jurisdictional discovery more manageable, the parties agreed to take representative discovery from Louisiana and Florida. And the Plaintiff States advised the Court that "they intend to establish Article III standing by showing the effect of the Asylum IFR on certain discrete programs in the state of Louisiana and Florida, in addition to asserting standing as a matter of law." ECF No. 98. Indeed, the Plaintiff States orally advised the Court at status conferences that they would seek the identities of asylum applicants and asylees, and then look to State agencies to ascertain the expenditures attributable to those individuals.

### D.  The States Seek Jurisdictional Discovery from the Federal Defendants.

Consistent with the Court's directive, the Plaintiff States sought jurisdictional discovery from the federal defendants. The Plaintiff States sought, in particular, information about asylum applicants residing in Louisiana or in Florida so that the States could establish: (1) that asylum applicants

4

and asylees predictably reside in those States; and (2) "the cost or other measurable effect" of the Asylum IFR. *See* St John Decl. at ¶ 1. As Plaintiff States expected, however, the federal defendants overread their own regulations and refused to provide that information. *See id.* at ¶ 3.

### E. The States Seek Jurisdictional Discovery from Non-Parties.

The States correctly anticipated the federal defendants' refusal to turn over the requested information. *See* St. John Decl. at ¶ 3.  So the States sought modest jurisdictional discovery from private parties that have publicly stated that they help individuals seek asylum in Louisiana, Florida, or nationwide:  Rozas & Associates Law Firm, L.L.C.; Home is Here NOLA; Immigration Services and Legal Advocacy (ISLA); and Louisiana Advocates for Immigrants in Detention (LA Aid). *See* ECF No. 114-2 at 1–16 (Rozas); ECF No.122-2 at 18–33 (Home is Here); *id.* at 35–50 (ISLA); *id.* at 52–67 (LA Aid). The States did so cognizant of Fifth Circuit law holding that the confidentiality regulations on which the federal defendants relied here do not apply to private parties. *See Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 552 (5th Cir. 2016) (explaining that such regulations "clearly do *not* preclude discovery from" private parties) (emphasis original).

## II. The Subpoena-Related Litigation.

### A. Louisiana Serves Document Subpoenas on Private Parties Who Have Publicly Stated That They Represent Asylum Seekers in Louisiana.

Each subpoenas is targeted to obtain information as to the States' standing in accord with the pre-answer jurisdictional discovery the federal defendants obtained over the States' objection. The requests seek information about asylum applicants and asylees residing in Louisiana or Florida, and information about the effect of the Asylum IFR on asylum applications and asylum grant rates. They also seek documents bearing on the States' standing theory under *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019): if asylum applicants or asylees receive information about the

availability of public benefits and how to apply for them, they "will likely react in predictable ways," *i.e.*, by seeking (and obtaining) public benefits in the State where they settle. *Id.* at 2566.

From the Rozas Firm, the requests seek—

1. Documents sufficient to identify all asylum applicants and "asylum seekers" to whom [the Rozas Firm] provided support.

2. All documents the Rozas firm provided to aliens, including asylum applicants or asylum seekers, regarding public education, Temporary Assistance for Needy Families (TANF), Supplemental Nutrition Assistance Program (SNAP), Medicaid, or other public benefits.

3. All documents regarding the Asylum IFR.

4. All documents used or presented by the Rozas Firm in any workshop or presentation regarding asylum from August 20, 2021 through the present.[7]

From each of the "nonprofit organizations," the requests seek—

1. Documents sufficient to identify all asylum applicants and asylum seekers to whom each nonprofit provided support.

2. Documents each nonprofit provided to aliens, including asylum applicants or asylum seekers, regarding public education, TANF, SNAP, Medicaid, or other public benefits.

3. Documents regarding the Asylum IFR.

4. Documents each nonprofit used or presented in any workshop or presentation regarding asylum from August 20, 2021 to now.

5. Any contract between any nonprofit and the federal government.[8]

It is undisputed that (i) each subpoena was properly served on each recipient; (ii) each subpoena allowed each recipient a reasonable time to comply; and (iii) each subpoena included an appropriate place for compliance. *See generally* ECF Nos. 114-1 (Rozas Firm) (not disputing any of those service-related facts) & 122-1 ("nonprofit organizations") (same).

---

[7] ECF No. 114-2 at 16.

[8] ECF No.122-2 at 18–33 (Home is Here); *id.* at 35–50 (ISLA); *id.* at 52–67 (LA Aid).

**B.  Louisiana Emphasizes Its Willingness and Desire to Minimize Any Burden.**

Before and after service, Louisiana strove to minimize any burden. As for the Rozas Firm, Louisiana's counsel spoke with the firm's owner about narrowing the scope of any request the firm thought to be burdensome. Louisiana granted the firm a week-long extension, and asked the firm to "reach out if there is anything we need to discuss." Ex. A to St. John Decl. As for the "nonprofit organizations," Louisiana's counsel spoke to the registered agent for ISLA, proposed a narrowing of certain requests, and stated that Louisiana was "more-than-willing to discuss ways to minimize any burden." Ex B to St. John Decl. Louisiana later spoke to counsel for all of the nonprofits, discussed objections, and proposed a further narrowing of certain requests. Ex. C to St. John Decl.

**C.  The Recipients Move to Quash.**

On their respective compliance deadlines, each recipient filed (or joined in) a motion to quash. *See* ECF Nos. 114 (Rozas Firm) & 122 (nonprofits). The Court *sua sponte* set the motions for an April 4 hearing and expedited Louisiana's response deadline to today. *Cf.* Local Civil Rule 7.5.

## ARGUMENT

### I.  The Recipients Failed to Show that Any Subpoena Requires Disclosure of Privileged or Other Protected Matter.

The recipients failed to show that any of the subpoena's modest document requests requires any recipient to disclose any privileged or other protected matter. True enough, the Court must quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii). But the recipients' motions flunk that test four times over. *First*, the recipients' blanket claims of attorney-client privilege and work-product protection fail as a matter of law. *Second*, the recipients failed to (a) factually or (b) legally establish that any privilege of any sort attaches to any requested document. *Third*, the recipients

failed to (a) factually or (b) legally establish that any document or set of documents enjoys work-product protection of any kind. *Fourth*, the recipients' remaining arguments—under the Religious Freedom Restoration Act, the First Amendment, and state ethics rules—lack even arguable merit.

### A.  The Recipients' Blanket Privilege and Work-Product Claims Fail as a Matter of Law.

The recipients make only blanket claims of privilege and work-product protection that are inadequate as a matter of binding Fifth Circuit law. Forty years ago, that court "made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents." *United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982). "The privilege must be specifically asserted with respect to particular documents." *Id.* So a privilege claim fails as a matter of law if the proponent does not "particularize its assertion of the privilege and prove its case with respect to any specific document." *Id.* at 541. None of the recipients did that here.

Not a single recipient raised a single privilege or work-product claim tied to a single particular document or set of documents. Start with the Rozas Firm. It invokes privilege *en masse*—without regard to any particular document or any particular request. ECF No. 114-1 at 2–4. And it simply (and wrongly) concludes that since it believes that responding to an unspecified request would require disclosing client identities, "this information is privileged and protected." ECF No. 114-1 at 3. The invocations of the others are not much better. The self-styled "nonprofit organizations," for instance, claim two requests "encompass documents protected by the attorney-client privilege" "because they involve communications made in confidence between clients and their lawyers for the purpose of providing or obtaining legal advice." ECF No. 122-1 at 18. But that is a legal conclusion—a recitation of the dictionary definition of the privilege. It tells the State of Louisiana nothing about the particular documents to which the organizations claim a privilege attaches.

At bottom, the recipients' profligate invocations of privilege and work-product protection contain nowhere near enough specificity to allow Louisiana—or the Court—to evaluate any of them. The Court can and should reject each such claim on this basis alone. If the Court declines to reject each of those claims here and now, the State of Louisiana specifically requests that the Court order the recipients to produce a log (or index) sufficient to allow Louisiana to assess on a document-by-document basis each invocation of privilege and work-product protection.

**B.  The Recipients Failed to Show the Privilege Attaches to Any Document.**

The recipients' privilege arguments fail for the independent reason that none of the recipients met its burden of establishing—factually or legally—that the federal attorney-client privilege attaches to any identifiable document or set of documents the subpoena implicates.

**1.  The Recipients Failed to Factually Establish Privilege as to Any Document.**

Federal privilege law applies in this federal-question case. *See Taylor Lohmeyer Law Firm P.L.L.C. v. United States*, 957 F.3d 505, 509 (5th Cir. 2020). "Determining the applicability of the privilege is a highly fact-specific inquiry, and the party asserting the privilege bears the burden of proof." *Id.* That burden is also document-specific: "The burden is on the party asserting the privilege to demonstrate how e*ach document* satisfies *all the elements* of privilege." *SEC v. Brady*, 238 F.R.D. 429, 439 (N.D. Tex. 2006) (emphasis added). So to meet its burden here, each subpoena recipient must factually "establish as to each document" each of the following elements:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is (the) member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*AHF Cmty. Dev., LLC v. City of Dallas*, 258 F.R.D. 143, 146 (N.D. Tex. 2009) (quotation omitted).

None of the recipients factually established any element as to any of the unspecified documents over which they have claimed privilege. *See* ECF Nos. 114-1 at 2–3 (Rozas) & 122-1 at 23–24 (others). They instead offer (at best) "a general allegation of privilege," which "is insufficient to meet [their] burden." *SEC v. Microtune*, 258 F.R.D. 310, 315 (N.D. Tex. 2009). So none of the recipients met their burden of factually establishing that the privilege attaches to any documents the subpoenas call for. The privilege analysis can begin—and end—here.

### 2. The Recipients Failed to Legally Establish Privilege as to Any Document.

Besides failing to *factually* establish privilege, the recipients also failed to *legally* establish it. None of them have shown that the attorney-client privilege—properly understood—attaches to any alleged document or alleged set of documents. "Because the attorney-client privilege has the effect of withholding relevant information from the fact-finder, it is interpreted narrowly so as to apply only where necessary to achieve its purpose." *Taylor Lohmeyer*, 957 F.3d at 509 (quotation omitted). "[A]mbiguities as to whether the elements of a privilege claim have been met are construed against the proponent." *Id.* (quotation omitted). Of course, "the mere existence of an attorney-client relationship or the mere exchange of information with an attorney does not give rise to a presumptive claim of privilege." *AHF Com. Dev.*, 258 F.R.D. at 146 (quotation omitted).

Here, the recipients claim privilege only as to the identity of their clients. *See* ECF Nos.  114-1 at 2-3 (Rozas) & 122-1 at 23–24 (others). But they are wrong about that. As a general rule, "client identities . . . are not protected as privileged." *Taylor Lohmeyer*, 957 F.3d at 510. To be sure, there's "a narrow exception" for "when revealing the identity of the client . . . would itself reveal a confidential communication." *Id.* But that exception is a "limited and rarely available sanctuary" that

"does not expand the scope of the privilege; it does not apply independent of the privileged communication between an attorney and his client." *Id.*  And it does not apply here either.

For their part, the recipients contend (in two sentences) that the attorney-client privilege ought to cover their clients' identities because disclosing them would also disclose "the specific and sensitive type of legal representation being provided." ECF No. 122-1 at 23. Not so. The purpose of a lawyer's representation of a client is not a confidential communication covered by the attorney-client privilege. *See United States v. Legal Servs. for New York City*, 100 F. Supp. 2d 42, 45–46 (D.D.C. 2000), *aff'd & remanded*, 249 F.3d 1077 (D.C. Cir. 2001).

And the supposedly "sensitive" context doesn't change that. In immigration cases too, client identities are not privileged. *See, e.g.*, *Dole v. Milonas*, 889 F.2d 885, 899 (9th Cir. 1989) (exception to general client-identity rule did not apply even though the proponent of the privilege claimed disclosure of his clients' identities might lead to negative immigration consequences). That is doubly true where the purportedly "privileged" information has been shared with a third-party—here, the federal government. "[A]ny information given to any attorney with the expectation that it would be turned over to a third party would not be protected by the privilege." *United States v. Rivera*, 837 F. Supp. 565, 569 (S.D.N.Y. 1993). Even the client files of amnesty applicants have been held non-privileged because the amnesty applicants gave those files to their lawyer with the expectation that they'd be turned over to the government. *See id.* The same thing necessarily happened here, and it dooms the recipients' attempts to invoke the client-identity exception.[9]

---

[9] The Rozas Firm contends, however, that the privilege ought to be extended because "it is important that the client feel comfortable and assured." ECF No. 114-1 at 3. That might well prove desirable as a matter of policy, but it is not the law. *See, e.g.*, *El Paso Co.*, 682 F.2d at 544.

### C. The Recipients Failed to Show that Work-Product Protection Attaches to Any Identifiable Document or Set of Documents.

The recipients also failed to show that work-product protection attaches to any identifiable document or set of documents. ECF No. 122-1 at 24–29. They contend briefly (and wrongly) that the subpoenas somehow call for unidentified work-product-protected materials. *Id.* But they do not, as a matter of law. And even if they did, the nonprofits have failed to factually establish the entitlement of any identifiable document (or set of documents) to work-product protection.

#### 1. The Recipients Failed to Legally Establish that Work-Product Protection Attaches to Any Document.

"The work product doctrine is not an umbrella that shades all materials prepared by a lawyer." *El Paso Co.*, 682 F.2d at 542. It "focuses only on materials assembled and brought into being in anticipation for litigation." *Id.* Even documents that "involve[] weighing legal arguments" are not work-product-protected if they are merely "a means to a business end." *Id.* at 543. "Like all privileges, the work product doctrine must be strictly construed." *SEC v. Microtune, Inc.*, 258 F.R.D. 310, 318 (N.D. Tex. 2009). It "provides for the qualified protection of documents and tangible things prepared for a party or that party's representative 'in anticipation of litigation or for trial.'" *Id.* (quoting Fed. R. Civ. P. 26(b)(3)). "[T]he primary motivating purpose behind the creation of the document must be to aid in possible future litigation." *Id.* (quotation omitted).

Here, the recipients failed to carry their burden of demonstrating, as a legal matter, that the work-product doctrine even applies. ECF No. 122-1 at 24–25. Unburdened by citation to authority, the recipients declare that "documents designed to facilitate eventual litigation" that supposedly "reflect the mental impressions of . . . counsel" are "protected work product." *Id.*  But a general "analysis of how the asylum rule may impact" clients is obviously not protected. *See El Paso Co.*,

682 F.2d at 543–44 (concluding that "analyses" of "theories about the results of possible litiga-tion" were not work-product-protected because they were "not designed to prepare a specific case for trial or negotiation"). Nor have the recipients explained how a general, non-client-specific anal-ysis about the Asylum IFR's impact is anything but material created "in the ordinary course of business" "without regard to whether litigation was expected to ensue." *Microtune*, 258 F.R.D. at 318. The burden of explaining all of that was on the recipients, and they failed to carry it.

### 2. The Recipients Failed to Factually Establish that Work-Product Protection At-taches to Any Document.

The recipients have also failed to factually establish any claim to work-product protection. The proponent "must provide a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure." *Total RX Care, LLC v. Great North-ern Ins. Co.*, 318 F.R.D. 587, 596 (N.D. Tex. 2017). "The mere allegation that a document or group of documents constitutes work-product is insufficient." *Hisaw v. Unisys Corp.*, 134 F.R.D. 151, 153 (W.D. La. 1991). The proponent must present evidence "that the primary motivating purpose be-hind" the "creation of the withheld documents was to aid in possible future litigation." *Guzzino v. Felterman*, 174 F.R.D. 59, 63 (W.D. La. 1997); *see Microtune*, 258 F.R.D. at 319 (no work-product protection because the proponent "has not establishing that the primary motivating purpose be-hind the creation of any of the documents was to aid in possible future litigation").

The nonprofits have not come forward with evidence showing that the "primary motivating purpose" for the creation of any withheld document was "to aid in possible future litigation." *Guzzino*, 174 F.R.D. at 63; *Microtune*, 258 F.R.D. at 319. In fact, they have failed to shoulder their evidentiary burden with respect to *any* identifiable document. ECF No. 122-1 at 23–24. Their only

attempt to carry their evidentiary burden comes by way of a declaration that (1) parrots the elements of opinion work product, and then (2) tries to sweep every withheld (but unidentified) document under that umbrella. *Id.* (citing Lopez Decl. ¶ 11). That is not how work-product works. It was the nonprofits' burden to specify each document and "establish that the primary purpose behind the creation of the document was to aid in possible future litigation." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D. Tex. 2004). They failed to do so.

### D.  The Recipients' Remaining Arguments—based on RFRA, the First Amendment, Supposed Confidentiality Interests, and Ethics Rules—are Meritless.

The recipients next ask the Court to quash the subpoenas because they supposedly implicate the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, infringe First Amendment freedoms, and raise lawyer-client confidentiality issues. They do none of that.

#### 1.  RFRA Does Not Apply.

The recipients say the subpoena to La. AID, in particular, "implicates protected religious exercise" under RFRA. ECF No. 122-1 at 27.  But there is an obvious problem with that—RFRA applies only to the federal government; it does not apply to states like Louisiana. *See City of Boerne v. Flores*, 521 U.S. 507, 511 (1997); *accord, e.g.*, *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 289 (5th Cir. 2012) ("Four years after RFRA's enactment, the Supreme Court invalidated [RFRA] as applied to the states and their subdivisions."). So the argument is meritless.[10]

---

[10] The recipients cite *Whole Women's Health v. Smith*, as purported support for their argument. *See* 896 F.3d 362 (5th Cir. 2018).  But it is unclear what relevance the nonprofits believe *Smith* has; for this case and that one are worlds apart. There, a divided panel rejected the efforts of a coalition of abortion providers to obtain intrusive discovery into the internal communications of the Texas Conference of Catholic Bishops concerning the bishops' views on the treatment of human fetal remains. *Id.* at 371–71. The communications the abortion providers sought may have "reveal[ed] internal deliberations about the implications of TCCB's position under canon law and catholic doctrine." *Id.* at 371. To describe *Smith* is to distinguish it.

### 2.  The Supposed "Sensitivity" of Some Information Supplies No Basis to Quash.

The recipients next say that since some of the requested information is "sensitive," the sub-poenas should be quashed. ECF No. 122-1 at 15. But the only precedential authority they cite, *Cazorla*, 838 F.3d at 563–64, supports the States. The panel there directed a district court to "rede-fine" the "contours" of an order that allowed U-visa discovery—that is, discovery of the details of applications submitted by aliens claiming abuse—for purposes of *mere impeachment*. 838 F.3d at 561–64. On remand, the district court *allowed* limited U-visa discovery. *Cazorla v. Koch Foods of Miss., LLC*, No. 3:10-CV-135, 2018 WL 1405297, at *1 (S.D. Miss. Mar. 20, 2018). The infor-mation sought here is far more important (it goes to Court-ordered jurisdictional discovery as to State standing) and far less intrusive (it seeks nothing about the details of any alleged abuse).

This "sensitivity" point is also surprising. The public-interest firm representing the recipients recently *objected* to a protective order that would've barred further disclosure of identifying asylum information under 8 C.F.R. §§ 208.6 and 1208.6. Opposition to Motion for Protective Order Con-cerning Asylum Information, *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-CV-2366 (S.D. Cal. Jan. 5, 2021), ECF No. 656; Ex. F to St. John Decl. The information was not too "sensitive" when the firm needed it to get a injunction. But it becomes too "sensitive," apparently, when it is responsive to court-ordered discovery, or provides them fodder for a press release.[11]  Ex. E to St. John Decl.

### 3.  State Ethics Rules Do Not Apply.

The recipients next contend that Louisiana lawyer-confidentiality rules bar disclosure of the documents sought. ECF Nos. 114-1 at 2 (Rozas) & 122-1 at 23–24 (others). But there is nothing to

---

[11] Any concerns the recipients have could be addressed via a protective order. Louisiana notes, however, that the generic concerns on the current record probably does not justify one. *See, e.g., Chande v. Barr*, 763 F. App'x 355, 356 (5th Cir. 2019); *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998)

this argument. Louisiana's ethics rules permit disclosure of "information relating to the representation of a client . . . to comply with other law or a court order." LA. R. PROF'L COND. § 1.6(b)(6). Along those lines, "a lawyer may disclose otherwise confidential information that is responsive to lawful discovery requests and subpoenas." DANE S. CIOLINO, LOUISIANA LEGAL ETHICS: STANDARDS & COMMENTARY 166–67 (2022). So a lawyer cannot withhold otherwise discoverable, nonprivileged material merely by invoking lawyer-confidentiality rules. *Cf. McGovern v. Moore*, No. 5:13-CV-1353, 2013 WL 5781315, at *2 (W.D. La. Oct. 25, 2013). If she could, discovery could not exist—everything a lawyer produces she has obtained from her client in the course of the representation. This argument is as meritless as the one that preceded it.

### 4. The Recipients Failed to Show An Infringement of Any Associational Rights.

The nonprofits next ask the Court to quash the subpoenas because they supposedly "impair" their "right of free association" under *NAACP v. Alabama*, 357 U.S. 449 (1958), and the cases that follow it. ECF No. 122-1 at 25–27. The subpoenas do no such thing. And *NAACP v. Alabama* itself proves it. There, the Supreme Court held that Alabama couldn't compel the NAACP to reveal its membership lists to the Alabama Attorney General. 357 U.S. at 462–53. That holding rested on the NAACP's "uncontroverted showing that on past occasions revelation of the identity of its rank and file members has exposed those members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462. "The freedom of association was burdened by retaliation against the group's members *because of* their membership in the group." *Hobbs v. Hawkins*, 968 F.2d 471, 483 (5th Cir. 1992) (italics original).

This case and that one are worlds apart. *First*, no one here is seeking any membership lists of any of the nonprofits. *See* 357 U.S. at 462–63. Louisiana seeks limited information about asylum

16

applicants and asylees known to the nonprofits—not names of any of the nonprofits' members, officers, or employees. *Second*, the information is here sought for a limited and indisputably proper purpose: so that Louisiana can prove its Article III standing following a period of pre-answer jurisdictional discovery that (i) the Court ordered, (ii) the government asked for, and (iii) the States did not want or think necessary. *Third*, there has been no showing "that on past occasions revelation of" the identities of the nonprofits' clients "has exposed [the recipients] to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462. In the end, all the recipients offer is "speculation about a chilling effect," which is "not sufficient to defeat a validly issued subpoena" like the ones here. *In re Grand Jury Subpoena Duces Tecum Issued on April 22, 1991 to Records Custodian*, 36 F.3d 90, 1994 WL 523913, at *2 (5th Cir. Sept. 15, 1994) (citing *Univ. of Penn. v. EEOC*, 493 U.S. 182 (1990)).

*Fourth*, none of the *nonprofits'* associational rights are even burdened. There is not even an allegation of "retaliation against" the nonprofits' members "because of their membership" in the nonprofit organizations.  *Hobbs*, 968 F.2d at 583. The only allegations, instead, relate to the nonprofits' baseless speculation that states may retaliate against third-party asylum applicants and asylees if the identities of those third parties are known. In other words, the nonprofits claim an associational burden based on the supposed "chilling effect" the subpoena will have on third parties to whom their organization provides services. That stretches the First Amendment beyond recognition. Because the recipients failed to show any request burdens any of their First Amendment rights, Louisiana "need not demonstrate any special justification to support its subpoena." *Univ. of Penn*, 493 U.S. at 201.

## II. The Recipients Failed to Show that the Modest, Four-to-Five Request Document-Only Subpoenas Unduly Burden Them.

The recipients failed to show that any request unduly burdens any of them. To be sure, the Court "must" quash or modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). But the recipients had "the burden of proof to demonstrate that compliance with the subpoena would be unreasonable and oppressive." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817–18 (5th Cir. 2004). And they didn't meet it. To decide if any subpoena imposes an undue burden, the Court considers "(1) the relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document requests; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." *Id.* The recipients have not shown that *any factor* favors modifying (let alone quashing) any request in any subpoena. And they have not even come close to carrying their burden of showing that the factors, on balance, require quashing the subpoenas.

### A. The Requested Documents are Relevant to Standing.

Each of Louisiana's request is relevant to standing. "Relevance should be construed broadly to encompass any matter that bears on, or that reasonably could lead to, other matters that could bear on any party's claim or defense." *Dotson v. Edmonson*, No. CV 16-15371, 2017 WL 11535244, at *2 (E.D. La. Nov. 21, 2017). Each request falls comfortably within relevance's broad scope.

#### 1. Request No. 1

The first request seeks documents sufficient to identify known asylum applicants in Louisiana and Florida. It goes to standing. As the Court knows from Louisiana's statements at one or more status conferences, one way Louisiana intends to establish its standing is by seeking the identities

of asylum applicants and asylees, and then looking to State agencies to ascertain the expenditures attributable to those individuals. Stepping back, the stated purpose of the Asylum IFR is to speed asylum determinations, *see* 87 Fed. Reg. 18,089, which in turn will directly increase the number of aliens eligible for state benefits programs. And shortly after asking the Court for pre-Rule 12 jurisdictional discovery, the federal defendants conceded that migrant flows are responsive to border policy, i.e., weaker border controls and easier asylum policies act as a so-called immigration magnet. *See Circumvention of Lawful Pathways*, 88 Fed. Reg 11,704 (Feb. 23, 2023); Ex. D to St. John Decl. at 171–72 (testimony of U.S. Border Patrol Chief Raul Ortiz: "There is an assumption if migrant populations are told that there's a potential that they may be released, that yes, you can see an increase."). If the Asylum IFR predictably increases the number of asylum applicants and the number of asylees in Louisiana or Florida, it will presumably cause the relevant State to incur added social-services costs, which would in turn give the State standing.

It is almost certain, for instance, that asylees with children make use of public schools. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202 (1982). Proof that asylum applicants and asylees do, in fact, impose social-services costs is relevant to the States' standing, particularly in view of federal government's admission about policies acting as immigration magnets. That proof can be obtained by matching the identities of asylum applicants and asylees located in Louisiana and Florida with records of recipients of public benefits. And it bears repeating that Louisiana is seeking this information only because (1) the federal defendants have refused to provide it, citing confidentiality regulations applicable to them (but not to third-party organizations like the recipients); and (2) the federal defendants asked for and obtained pre-answer jurisdictional discovery over Louisiana's objection.

19

### 2.   Request No. 2

The second request seeks documents the recipients have provided to asylum applicants about public benefits. These requests are relevant to the States' standing theory under *Department of Commerce v. New York*—i.e., once an asylum applicant learns that public benefits are available to them, the asylum applicant will likely apply for those benefits in the State in which the applicant settles. And such documents are themselves indirect evidence that asylum applicants seek public benefits. Presumably, the recipients do not provide asylum applicants and asylees with copies of *War & Peace*; they give them information they expect asylum applicants and asylees to use.

### 3.   Request No. 3

The third request seeks documents relating to the Asylum IFR. Again, this request goes to the States' standing. If the Asylum IFR results in an increase in asylum applications or in asylum grant rates, then the State will be able to establish, as a statistical matter, that at least one asylum additional applicant (i) will settle in Florida or Louisiana and (ii) obtain public benefits which he or she otherwise would not have, which would in turn give the State standing. The recipients hold themselves out as an expert in these matters, so one would expect them to have done some analysis of how the Asylum IFR affects their business/mission—for example, if any recipient will experience an increased demand for its services. Documents reflecting that analysis are relevant.

### 4.   Request No. 4

The fourth request seeks documents the recipients used, presented, or distributed at workshops. Like the other requests, this one is relevant to the States' standing under *Department of Commerce v. New York*. First, if the requested documents inform workshop attendees that the Asylum IFR makes asylum easier to get, that State benefits are available to them, and/or instructs the

attendees how to go about obtaining those benefits, then the recipients "will likely react in predict-able ways," *i.e.*, by applying for public benefits in the State in which they settle. *Id.* at 2566. And if a *single* applicant or asylee who settles in Louisiana or Florida obtains public benefits from Louisi-ana or Florida, then the respective State has standing. Second, if the documents coach migrants on what to say to an asylum officer to establish credible fear, such documents would evidence the impact of the lack of an adversarial hearing to test that claim under the Asylum IFR via increased grants of asylum, which would yield standing for much the same reason.

### 5.  Request No. 5

The fifth request seeks contracts with the federal government. It is relevant to standing for an obvious reason: any contracts between these Louisiana-based, asylum-focused organizations and the federal government shows that asylees and asylum applicants settle in Louisiana. And evidence that asylees and asylum applicants settle in Louisiana is evidence of Louisiana's standing to chal-lenge the Asylum IFR.

### 6.  The Recipients' Anti-Relevance Argument Fail.

The nonprofits spend a few pages trying to show why each of Louisiana's requests is irrelevant in their view. ECF No. 122-1 at 12–13. They fail. For starters, the nonprofits ignore Louisiana's actual standing theories. They say, for example, the "standing inquiry boils down to whether the challenged rule increases immigration to the State." ECF No. 122-1 at 12. That is certainly one way Louisiana and Florida can establish standing. But it is far from the only way. And it is assuredly not what the "inquiry boils down to." Louisiana and Florida can establish their standing in a mul-titude of ways—for example, by identifying $ 1 of social services costs spent on a single identifiable asylee or asylum applicant in the State, by identifying a single asylee or asylum applicant with a

single child who attends public school in the State, or by asserting standing as a matter of law based on their rights as sovereigns to exclude aliens from their borders and to know the identities of those within their borders.

**B.   Louisiana Needs the Requested Documents Because of Positions the Federal Defendants Have Taken in This Litigation.**

The requested documents are by definition important because they go to the Article III standing of two sovereign States. And the information from the requests should overcome any standing objection, allowing this litigation to proceed apace. Because the information sought would defeat the federal defendants' standing objection, moreover, the discovery may make unnecessary forthcoming motion practice tied to those defendants' failure to comply with their own discovery obligations—which is what led Louisiana to seek this non-party discovery in the first place.

As a matter of federalism, the information is important. Louisiana retained "residuary and inviolable sovereignty" when it entered the Union. THE FEDERALIST NO. 39, p. 245 (C. Rossiter ed. 1961). And the "'[t]he Supreme Court has long recognized that States are not normal litigants.'" *In re Gee,* 941 F.3d 153, 167 (5th Cir. 2019) (per curiam) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)). They are instead "residuary sovereigns and joint participants in the governance of the Nation" with "special rights to seek relief in federal court." *Id.* The requested information goes to the ability of 19 States to have the merits of their claims heard. It is important.

The recipients complain, however, that Louisiana does not really "need" the information because it should be able to get it from the federal defendants. ECF No. 122-1 at 9–10. But the premise is wrong. Louisiana agrees that it *should* be able to obtain from the federal defendants some information about the identities of specific asylum applicants and asylees settling in Louisiana or

Florida, just as Louisiana believes that the federal defendants likely have in their possession, custody, or control evidence that affirmatively proves Louisiana's standing. ECF No. 89 at 2. But the federal defendants have refused to provide that information, citing confidentiality regulations that do not apply to third parties. St. John Decl. at ¶ 3. So Louisiana had no choice.

The nonprofits' final argument fares no better. They say it "strains credulity" that Louisiana does not know the names of asylees or applicants who get State benefits. ECF No. 122-1 at 11. The argument does not follow. The Louisiana Department of Justice does not have any of that information in its custody or control, and the nonprofits—armed with eight lawyers arrayed across the nation—want to keep it that way. That is precisely the point of their 29-page motion.

**C.   The Requests are Tailored to Obtain Information Relevant to Standing.**

Each request is no broader than necessary. The recipients nonetheless complain that the subpoenas are overbroad and vague. But they have not shown how. As for request 1, the recipients complain that it requires the identification of "asylum seekers who may have no connection to the State." It does nothing of the sort. Each of the recipients is based in the State of Louisiana, so each asylum seeker it supports is necessarily tied to Louisiana in some way. As for requests 2–5, the recipients only complaint seems to be that Louisiana did not use the word "standing" in its requests, and so the information sought can't be relevant. But Louisiana showed the relevance of each of those requests to Louisiana's standing in Section II(A) above.

**D.  The Time Periods of the Requests are Reasonable.**

No recipient seriously disputes durational reasonableness. A couple recipients do lodge a drive-by complaint that four requests cover a five-year period. ECF No. 122-1 at 16–17. But they offer

nothing to support it. *Id.* Nor does the Rozas Firm. ECF No. 114-1 at 4. The time periods are rea-

sonable in any event. To establish a pre-COVID baseline of (i) asylum applications and (ii) asylum

grant rates, Louisiana had to seek information from 2018. Nothing about that is "unreasonable."

**E.  Any Burden on the Recipients is Not Undue.**

No recipient has shown that complying with any request imposes an *undue* burden. A subpoena

is not unduly burdensome simply "because the documents themselves are voluminous and cum-

bersome and significant difficulty and expense will be involved in producing them." 9A FED.

PRAC. & PROC. CIV. § 2459 (3d ed.). And that is the only real complaint any recipient has made.

**III.  THE COURT SHOULD MODIFY THE SUBPOENAS IF THE COURT FINDS THE SUBPOENAS OBJECTIONABLE IN ANY RESPECT.**

"Generally, modification of a subpoena is preferable to quashing it outright." *Wiwa*, 392 F.3d

at 818. And courts routinely modify subpoenas to "exclude documents covered by privilege or

work product," for example. *La. Corral Mgmt., LLC v. Axis Surplus Ins. Co.*, No. CV 22-2398, 2023

WL 156876, at *8 (E.D. La. Jan. 11, 2023). If the Court concludes that any aspect of any subpoena

is objectionable in any respect, the Court should modify the subpoena accordingly.

## CONCLUSION

The Court should deny the motions and direct compliance with the subpoenas. Each privi-

lege and work-product claim is inadequate—factually and legally. The Court can and should reject

each one here and now. If the Court wants to further entertain any of them, however, the Court

should require the recipients to produce a log (or index) that allows the State of Louisiana to assess

each claim on a document-by-document basis. And no request imposes any *undue* burden. But if

the Court disagrees, the Court should modify the particular request accordingly.

Dated: March 31, 2023

Respectfully submitted,

/s/ Jordan Bailey Redmon
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
J. Scott St. John (La #36682)
  *Deputy Solicitor General*
Jordan Bailey Redmon (La #37272)
  *Assistant Solicitor General*
Louisiana Department of Justice
909 Poydras Street, Suite 1850
New Orleans, Louisiana 70112
Tel: (504) 556-9918
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff the State of Louisiana*

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document with the Clerk of Court on March 31, 2023

using the CM/ECF system, which will automatically send the document to all counsel of record.

/s/ Jordan Bailey Redmon
Jordan Bailey Redmon
  *Assistant Solicitor General*

25