**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| THE STATE OF ARIZONA, et al., | |
| PLAINTIFFS, | |
| v. | |
| MERRICK GARLAND in his official capacity as Attorney General of the United States of America; et al., | CIVIL ACTION NO. 6:22-cv-01130 |
| DEFENDANTS. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF STATES'**
**<u>FIRST MOTION TO COMPEL</u>**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. iii

INTRODUCTION ........................................................................................................................................ 1

BACKGROUND AND PROCEDURAL POSTURE ......................................................................... 1

    I.    The Asylum IFR ................................................................................................................................ 1

    II.   The Court Orders Pre-Answer Jurisdictional Discovery on the States' Standing—At the Federal Defendants' Request and Over the States' Objection. ................................................. 3

    III.  The States Seek Jurisdictional Discovery from the Federal Defendants. ............................ 4

LEGAL STANDARDS ................................................................................................................................ 5

ARGUMENT ................................................................................................................................................. 6

    I.    Plaintiff States' document requests seek relevant information. ............................................. 6

        A.   Alien counts and identifying information are relevant. .................................................. 6

        B.   Pre-Asylum IFR information is relevant, and Defendants concede as much. ........... 9

        C.   Nationality and parole information relevant, and Defendants concede as much. .... 10

    II.   Defendants' objections are meritless. ....................................................................................... 10

        A.   Defendants maintain the requested information in their databases, and Rule 34 expressly provides for production from such databases. ............................................. 10

        B.   Defendants' selective assertion of confidentiality regulations provides no shield from discovery. ................................................................................................................................ 12

            1.   Under Fifth Circuit law, an agency cannot shield itself from party-discovery via regulatory decree. ............................................................................................................ 12

            2.   In past litigations, Defendants have produced information covered by the regulations on which they now rely, and they routinely do so to non-profit organizations in Louisiana. ......................................................................................................................... 13

CONCLUSION ............................................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado, Inc. v. Mayorkas,*
  2021 WL 1312531 (S.D. Cal. Apr. 8, 2021) ........................................................15

*Bean v. John Wiley & Sons Inc.,*
  2012 WL 129809 (D. Ariz. Jan. 17, 2012)...........................................................12

*Botany Worsted Mills v. United States,*
  278 U.S. 282 (1929) ............................................................................................14

*Chande v. Barr,*
  763 F. App'x 355 (5th Cir. 2019) ........................................................................16

*Dep't of Commerce v. New York,*
  139 S.Ct. 2551 (2019) ...................................................................................... 9, 10

*Dep't of Homeland Sec. v. Thuraissigiam,*
  140 S.Ct. 1959 (2020)............................................................................................3

*Florida v. United States,*
  -- F.Supp.3d --, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023)......................... 7, 9

Halverson v. Slater,
  129 F.3d 180 (D.C. Cir. 1997) ............................................................................14

*Humphrey v. LeBlanc,*
  2021 WL 3560842 (M.D. La. Aug. 21, 2021) .....................................................12

*In re Terra Int'l,*
  134 F.3d 302 (5th Cir. 1998) ...............................................................................16

*Josephs v. Harris Corp.,*
  677 F.2d 985 (3d Cir. 1982) ..................................................................................6

*McGehee v. Wal-Mart La., LLC,*
  2023 WL 186946 (W.D. La. Jan. 13, 2023).........................................................6

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,*
  894 F.2d 1482 (5th Cir. 1990)......................................................................... 6, 16

*Ms. L. v. U.S.C.I.S.,*
  310 F. Supp. 3d 1133 (S.D. Cal. 2018) ..............................................................14

*Ms. L. v. U.S.I.C.E.,*
  403 F. Supp. 3d 853 (S.D. Cal. 2019) ................................................................15

*N.L.R.B. v. Capitol Fish Co.*,
  294 F.2d 868 (5th Cir. 1961) ......................................................................... 13, 14

*Panola Land Buyers Ass'n v. Shuman*,
  762 F.2d 1550 (11th Cir. 1985) ............................................................................6

*Resolution Trust Corp. v. Deloitte & Touche*,
  145 F.R.D. 108 (D. Colo. 1992) ................................................................... 13, 14

*Stout v. Wolff Shoe Co.*,
  2007 WL 1034998 (D.S.C. Mar. 31, 2007) ........................................................12

**Statutes**

8 U.S.C. 1367(a)(2) ........................................................................................................14

**Other Authorities**

8 C.F.R. § 208.6 ........................................................................................5, 13, 14, 15

8 C.F.R. § 208.30(f) ........................................................................................................2

8 C.F.R. § 1208.6 ...........................................................................................5, 13, 15

87 Fed. Reg. 18,078 (Mar. 29, 2022) ...................................................................passim

Aliens & Nationality, 55 Fed. Reg. 30,674, 30,677, 30,681 (July 27, 1990) ............14

Aliens and Nationality, 45 Fed. Reg. 37,392 (June 2, 1980) .....................................14

Aliens and Nationality, 52 Fed. Reg. 32,552, 32,553, 32,555 (Aug. 28, 1987) .........14

Aliens and Nationality, 53 Fed. Reg. 11,300, 11304 (Apr. 6, 1988) ..........................14

*Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704 (Feb. 23, 2023) ..................8

Executive Office for Immigration Review, *Adjudication Statistics, Credible Fear and Asylum Process: Fiscal Year (FY) 2019 Quarter 2*, https://www.justice.gov/eoir/page/file/1148911/download ................3

Executive Office for Immigration Review, *Adjudication Statistics, Pending Cases, New Cases, and Total Completions* (July 15, 2022), https://www.justice.gov/eoir/page/file/1242491/download ...............3

United States Department of Homeland Security & United States Department of Justice, *Notice of Proposed Rulemaking, Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705, 11,716 (Feb. 23, 2023) ..................................................................................................................................3

United States Government Accountability Office, GAO-20-250, *Immigration: Actions Needed To Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings* (Feb. 2020) ......2

iv

**Rules**

Fed. R. Civ. P. 26(b)(1)................................................................................................................6

**INTRODUCTION**

Defendants sought jurisdictional discovery without bothering to file a Rule 12(b)(1) motion. A subsequent proposed rulemaking explains that elision: Defendants could not have filed such a motion in light of their own data and views of how aliens predictably respond to immigration policy. So Defendants try a new tack: they refuse to provide the discovery sought by Plaintiff States.

Defendants have taken the position that proof of injury tied to individual aliens is necessary for standing. For their part, Plaintiff States told the Court during status conferences that they intended seek discovery of alien counts and identities, but Defendants never spoke a word in opposition. Nevertheless, in early March, Defendants informally informed Plaintiff States that they wouldn't produce identifying information. And when Defendants finally provided formal discovery responses on March 24 – having had Plaintiff States discovery in hand for six weeks – Defendants confirmed their refusal in writing, accompanied by a single internet link to a document from last December. But Defendants' excuses are inconsistent with the plain text of Rule 34, the regulations on which they rely, and their practice in prior litigation. This Court should accordingly compel Defendants to produce the information sought by Plaintiff States. Alternatively, this Court should bar Defendants from contesting Plaintiffs' evidence of standing.

**BACKGROUND AND PROCEDURAL POSTURE**

**I.  The Asylum IFR**

This is 19-State challenge to the lawfulness of an interim final rule that changes the way asylum claims are adjudicated. 87 Fed. Reg. 18,078 (Mar. 29, 2022) ("Asylum IFR"). Before the Asylum IFR, aliens "who receive[d] a positive credible fear determination [by an asylum officer were] referred to an immigration court for [INA] section 240 removal proceedings, during which they have the opportunity to apply for asylum and other forms of relief or protection from removal." *Id.* at 18,089. The asylum officer's credible-fear determination was quick and non-adversarial. *See* 8 C.F.R.

1

§ 208.30(f) (2018). The immigration-court proceedings that followed, by contrast, were thorough and adversarial, and they included cross-examination of the asylum seeker. *Id.*

Asylum-officer screening is notoriously lax. According to the United States Government Accountability Office (GAO), "asylum officers made positive determinations in about 71 percent of all credible- and reasonable-fear screenings between fiscal year 2014 and the first two quarters of fiscal year 2019."[1] "The remaining credible and reasonable fear screenings were almost evenly divided between negative determinations and administrative closures ([about] 14 percent each)."[2]

Most credible-fear claims fail upon further inspection. Indeed, many applicants found to have a credible fear by an asylum officer do not even file for asylum. For example, United States Department of Justice (DOJ) statistics indicate that in the second quarter of 2019, of every 100 aliens claiming a credible fear, 83 would be referred to the Executive Office of Immigration Review (EOIR) for adjudication by an immigration judge, but only 48 would even file for asylum.[3] Of those 48, only 13 would get asylum.[4] EOIR statistics over the last 10 years concur.[5] And in a recent notice of proposed rulemaking, DOJ and the DHS reached a similar conclusion by way of a similar analysis: they admitted that "most migrants who are initially deemed eligible to pursue their claims ultimately are not granted asylum in the subsequent EOIR removal proceedings."[6] Topping it all off, there is evidence that even the pre-Asylum IFR adversarial process resulted in significant numbers

---

[1] United States Government Accountability Office, GAO-20-250, *Immigration: Actions Needed To Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings* (Feb. 2020) at 13, and fig. 2.

[2] *Id.*

[3] Executive Office for Immigration Review, *Adjudication Statistics, Credible Fear and Asylum Process: Fiscal Year (FY) 2019 Quarter 2*, https://www.justice.gov/eoir/page/file/1148911/download.

[4] *Id.*

[5] Executive Office for Immigration Review, *Adjudication Statistics, Pending Cases, New Cases, and Total Completions* (July 15, 2022), https://www.justice.gov/eoir/page/file/1242491/download.

[6] United States Department of Homeland Security & United States Department of Justice, *Notice of Proposed Rulemaking, Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705, 11,716 (Feb. 23, 2023)

of fraudulent asylum claims being granted. *See Dep't of Homeland Sec. v. Thuraissigiam*, 140 S.Ct. 1959, 1967 & nn. 9-10 (2020).

Under the Asylum IFR, however, asylum officers "conduct final adjudication of asylum claims arising from the border" a truncated process that Plaintiff States allege is unlawful. ECF No. 86 at ¶ 2. That adjudication takes the form of a "nonadversarial interview." 87 Fed. Reg. at 18,079. The Asylum IFR even goes so far as to eliminate the need for claimants to actually file an application for asylum, instead treating the credible fear determination is "a complete asylum application" and thus side-stepping a simple procedural requirement that terminated 35% of credible fear claims. 87 Fed. Reg. at 18,085. The Asylum IFR accordingly "makes it substantially easier for unauthorized economic migrants to enter the United States and obtain asylum through false claims." ECF No. 86 at ¶ 2. And it "harm[s] … the Plaintiff States because migrants who are improperly granted asylum will settle in the Plaintiff States," causing sovereign, quasi-sovereign, and fiscal harms. *Id.* at ¶ 3. The Asylum IFR then compounds the harm by unlawfully expanding the availability of parole. 87 Fed. Reg. at 18,125.

About a year ago, fourteen States brought constitutional and statutory challenges to the Asylum IFR. *See* Dkt. 1. That coalition expanded to include 19 States. *See* Dkt. 86. The Plaintiff States bring claims against the Attorney General of the United States, the Secretary of the Department of Homeland Security, and various federal agencies and officials involved in promulgating or implementing the Asylum IFR. *Id.* at ¶¶ 144–220; ¶¶ 44–59.

## II. The Court Orders Pre-Answer Jurisdictional Discovery on the States' Standing—At the Federal Defendants' Request and Over the States' Objection.

After some preliminaries, the Defendants challenged the States' standing and asked for pre-answer jurisdictional discovery. Dkt. 89 at 3–8. The States opposed because Rule 11(b) would've required the federal defendants to investigate their own data before moving to dismiss, and the States believed (and continue to believe) that the federal defendants' reasonable investigation would

make a standing-based Rule 12(b)(1) motion beyond the bounds of Rule 11. *See id.* at 2.

But the Defendants got the jurisdictional discovery they asked for. The Court directed discovery on "the likely effect the [Asylum IFR] will have on the number of immigrants granted asylum and/or otherwise residing in Plaintiff [S]tates." Dkt. 24. And the Court directed discovery on "the cost or other measurable effect these additional persons (which the Plaintiff States contend will have been illegally granted asylum) will have on Plaintiff [S]tates." *Id.*

To make jurisdictional discovery more manageable, the parties agreed to take representative discovery from Louisiana and Florida. And the Plaintiff States advised the Court that "they intend to establish Article III standing by showing the effect of the Asylum IFR on certain discrete programs in the state of Louisiana and Florida, in addition to asserting standing as a matter of law." Dkt. 98. Indeed, the Plaintiff States orally advised Court at one or more status conferences that they would seek the identities of asylum applicants and asylees, and then look to State agencies to ascertain the expenditures attributable to those individuals.

### III.   The States Seek Jurisdictional Discovery from the Federal Defendants.

Consistent with the Court's directive, the Plaintiff States issued document requests to the Defendants. St. John Decl. Exh. 1. In particular, the Plaintiff States sought information about asylum applicants residing in Louisiana or in Florida so that the States could establish: (1) that asylum applicants and asylees predictably reside in those States; and (2) the cost or other measurable effect of the Asylum IFR. Louisiana repeatedly offered to discuss any issues after Defendants received their discovery requests, then twice agreed to Defendants' requests to extend the response deadline, as well as to permit rolling document production. St. John Decl. Exh. 2. In early March, Defendants informally informed Louisiana that they would not produce information identifying asylum applicants or asylees. Louisiana accordingly asked the Defendants to provide their objections so as to tee-up any legal issues. *See id.*

Defendants finally provided their discovery responses on March 24. St. John Decl. Exh. 3. As Defendants had stated, they objected to producing identifying information based on 8 C.F.R. § 208.6 and 8 C.F.R. § 1208.6. Moreover, Defendants' entire document production consisted of a link to a single, publicly available document from last December. Counsel for the Plaintiff States met-and-conferred with counsel for the federal defendants on March 28, but the Defendants refused to withdraw their objections. St. John Decl. Exh. 4. This motion follows.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 26 provides that, unless otherwise limited by court order, the scope of discovery is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). In the Fifth Circuit, the party resisting discovery bears the burden of show[ing] specifically how each [discovery request] is not relevant or how each [request] is overly broad, burdensome, or oppressive." *McLeod, Alexander, Powel & Apfel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (quoting *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982)); *see also, e.g.*, *McGehee v. Wal-Mart La., LLC*, 2023 WL 186946 (W.D. La. Jan. 13, 2023) (citing *McLeod* and granting motion to compel: "The party resisting discovery must show how the request is not relevant."). Moreover, conclusory, non-specific recitations of expense, burden, irrelevance, and the like are insufficient to state an objection. *McLeod*, 894 F.2d at 1485 (discussing *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985)).

## ARGUMENT

I.   **PLAINTIFF STATES' DOCUMENT REQUESTS SEEK RELEVANT INFORMATION.**

### A.  Alien counts and identifying information are relevant.

As they appear to be doing in this case, the Defendants recently took the position that standing requires proof of injury tied to individual aliens:

> [Florida] has admitted it does not track expenditures or data in a manner that allows it to identify expenditures made on specific noncitizens released under the challenged policies. Therefore, [Florida] cannot determine whether stopping or changing the challenged policies would impact its alleged costs. Even assuming [Florida's] theory of indirect injury is cognizable, therefore, the evidence it presented fails to carry its burden of demonstrating Article III standing.
>
> * * * * *
>
> [I]t is undisputed that DOE "does not track alien expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies." Pretrial Stipulation, ECF 122, at ¶ 27. [Florida] has conceded it cannot show traceability based on DOE's evidence.

St. John Decl. Exh. 5 at 76, 79. Consistent with Defendants' position, the court in that case strongly criticized Florida for not providing such granular information. *See id* at 75.

The court nevertheless found that Florida had standing, and its findings are equally applicable here. "[O]ver a million aliens have been released rather than detained at the Southwest Border since January 2021" as the federal Defendants are required to do by statue. *Florida v. United States*, -- F.Supp.3d --, 2023 WL 2399883, at *13 (N.D. Fla. Mar. 8, 2023). That figure does not include "get aways" or releases by CBP's Office of Field Operations. Defendant DHS provided data during that litigation "estimating that about 160,000 of the aliens released into the country between January 2021 and July 2022 provided a Florida address or are on the Miami ERO docket, which covers Florida, Puerto Rico, and the Virgin Islands." *Id.* at *14. That number does not account for aliens released after July 2022, which is notable because DHS's monthly releases have increased since then. *Id.* at *14. The court explained that "[t]his evidence does not establish with absolute certainty the precise number of aliens who have been released into Florida under the challenged policies," but it

"ha[d] no trouble finding from this evidence that well over 100,000 aliens released at the Southwest Border [since January 2021] ended up in Florida. *Id*.[7]

With respect to standing, the *Florida* court explained "[t]he fact that Florida cannot tie a specific public expenditure to a specific alien impacted the weight the Court gave to the evidence from Florida's agency witnesses, but the court did not discount that evidence in its entirety." *Id.* at *15. The court focused, however, on "reasonable inferences" from large scale statistics about Florida's education expenditures to conclude the challenged policies had caused Florida fiscal harm. *Id.* at *16-18.

The *Florida* court alluded to the so-called magnet effect, explaining the Biden Administration's "actions were akin to posting a flashing 'Come In, We're Open' sign on the southern border." *Id.* at *6. In support, the court pointed to U.S. Border Patrol Chief Ortiz's testimony that, based on his experience, there have been increases in migration "when there are no consequences" and migrant populations believe they will be released into the country. *Id.* After that testimony was entered in the record, Defendants publicly conceded that migration patterns respond to changes in border policy. Indeed, that was the very basis for a proposed rulemaking in February 2023. *See generally Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704 (Feb. 23, 2023); *see also* Dkt. 143-5 at 171–72 (testimony of U.S. Border Patrol Chief Raul Ortiz: "There is an assumption if migrant populations are told that there's a potential that they may be released, that yes, you can see an increase.").

---

[7] Media reports are in accord, and indicate that Defendants have largely ceased detaining asylum seekers or even starting the asylum process. Rather, via a variety of ever-changing policies, Defendants have released aliens without even issuing Notices to Appear — instead asking aliens to self-report to an ICE office up to ten years in the future. St. John Decl. Exh. 6. The Miramar, Florida, ICE office, for example, is "fully booked" through January 2028 with 24,747 apparent asylum seekers in line. The Jacksonville, Florida ICE office is likewise "mostly booked" for appointments with 2,686 apparent asylum seekers in line through June 2028. *Id.* at 6-7. Contrary to statute, those asylum seekers are simply released into the interior, raising serious doubt as to how those aliens are being accounted for and tracked. *See* St. John Decl. Exh. 7.

Here, like in the *Florida* case, Plaintiff States believe standing can be inferred from the text of the Asylum IFR and large-scale statistics alone, including the fact that asylum applicants and asylees reside in Plaintiff States, consume public benefits, and additional aliens granted asylum status more quickly and easily under the Asylum IFR (or aliens drawn by that possibility) will predictably do so, too. *See Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2566 (2019). But the Defendants declined to specify how, exactly they believe the Plaintiff States lack standing via a Rule 12(b)(1) motion. And Defendants' own discovery requests and statements during the parties' meet-and-confer suggest a continued fixation on needing to prove standing via injury by individual aliens. So the Plaintiff States are attempting to fill the gaps identified by the Northern District of Florida by (a) identifying additional aliens residing in Plaintiff States subject to the Asylum IFR and additional aliens eligible for public benefits, as well as (b) identifying specific aliens and specific expenditures attributable to those aliens.

As relevant to this motion, Request Nos. 1, 2, 3, and 4 are directly relevant to both points – the numbers and identities of asylum applicants who provided addresses, were located in, who were paroled into, or who were released into Louisiana and Florida. *See* St. John Decl. Exh. 1. Request No. 5 is likewise relevant to both points – the number and identities of asylum recipients in Louisiana and Florida. Request Nos. 6 and 7 address the same issue with respect to aliens granted withholding of removal or Convention Against Torture relief, the standards for which were altered by the Asylum Rule. *See* 87 Fed. Reg. at 18,130-31. And even if the standards had not been altered by the Asylum Rule, Request Nos. 6 and 7 would be a necessary check given Defendants' practice of stuffing aliens into new or inappropriate categories, such that recent statistics may not be consistent with Defendants' historical counting practices. Request No. 11 seeks summary data breaking out information about asylum grants, withholding from removal, or CAT relief grants, *i.e.*, data that can hardly be objectionable given that the Asylum Rule affects them all.. In view of what was disclosed

in the *Florida* litigation and recent media reports about Defendants' releasing aliens seeking asylum without even a Notice to Appear, Plaintiff States' discovery requests are likely under inclusive, particularly if those aliens are *sub silentio* not considered by Defendants to be asylum applicants.

### B.  Pre-Asylum IFR information is relevant, and Defendants concede as much.

Defendants' objections make clear that Plaintiff States' concern with definitional games is warranted. Defendants complain, for example, that the discovery requests "do not distinguish between asylum applications under the rule and applications submitted through processes that were in place before the rule and were not changed by it." St. John Decl. Exh. 3 at 3. Defendants then attempt to limit discovery to aliens "who are affected by the IFR" and the relevant time period "to when the IFR has been in place." *Id.* at 5. Yet establishing that asylum applicants have resided in Louisiana and Florida, have used public benefits, and will predictably continue to do so are all relevant. Indeed, the Supreme Court expressly endorsed using past information and "showing that third parties will likely react in predictable ways" to establish standing to challenge an agency action. *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2566 (2019). Defendants' relevance objection boils down to – at best – an insistence that Plaintiff States must wait as harm mounts rather than challenge imminently impending harm, all while ignoring harm from the magnet effect of an easier process for obtaining asylum. That is not the law.

Defendants cannot limit discovery to the manners of proving standing they might prefer. In any event, Defendants have themselves sought discovery of the number of asylees and parolees residing in Louisiana and Florida dating back to 2019, *i.e.*, well-before the Asylum IFR. St. John Decl. Exh. 8 at 10 (Rog 1) and 11 (Rog 8). Indeed, Defendant seek discovery of some information dating back to 2015. *Id.* at 10 (Rog 3). In doing so, they concede the relevance of pre-Asylum IFR information. Sauce for the goose is sauce for the gander.

### C.  Nationality and parole information relevant, and Defendants concede as much.

Defendants also urge that summary data on nationality, processing times, and the like is not relevant. St. John Decl. Exh. 3 at 17-19. Yet eligibility for certain of public benefits at issue is dependent on the nationality of the asylum applicant and the time for which the applicant has been paroled. St. John Decl. Exh. 9 at LADOJ-ASYLUM2300. Moreover, Defendants have themselves requested discovery about the nationality of public benefit recipients, Exh. 8 at 5 (RFP No. 9), and the number of parolees in Plaintiff States, Exh. 8 at 5 (Rog No. 8), thereby conceding the relevance of that information, too.

## II.   DEFENDANTS' OBJECTIONS ARE MERITLESS.

### A.  Defendants maintain the requested information in their databases, and Rule 34 expressly provides for production from such databases.

Defendants undoubtedly have the information sought by Plaintiff States. Indeed, in a prior case, Defendants provided declarations detailing how they identified by name "a broad swath of asylum applicants who entered along the Southern land border" for sharing with the plaintiffs in that case. St. John Decl. Exh. 10 at 7. "To create this list, CBP pulled data from its electronic system of records for 'all non-Mexican aliens encountered along the southwest border by both USBP and OFO, with an encounter date of 7/16/19 through 6/30/20, who were processed for expedited removal, expedited removal/credible fear, or a notice to appear (NTA).'" *Id.* (citing St. John Decl. Ex. 11 ¶ 5). The Defendants then "cross-referenc[ed] the alien registration numbers (A Numbers) of the individuals on this master list with data from [Defendants] USCIS and EOIR to narrow the list to individuals who sought asylum or similar forms of protection from removal (as well as to exclude those that have already been finally granted asylum …." *Id.* (citing St. John Decl. Exh. 12 Shinners Decl. ¶ 28).

Moreover, Defendants publish statistics identifying the specific number of asylum grants each year on a state-by-state basis. If Defendants can ascertain, for example, that 454 individuals

were granted affirmative asylum in Louisiana in 2021, and 613 individuals were granted affirmative asylum in Florida in 2021, St. John Decl. Exh. 13 at 13, Defendants are presumably looking at a database that allows them to sum specified characteristics of individual records. Providing the underlying records to Plaintiff States can hardly be more of a burden than generating statistics summarizing those records.

Defendants thus fall back on the truism that "Rule 34 does not require a party responding to discovery to create responsive materials" and erroneously contend that excuses them from producing "information that does not already exist in producible form." St. John Decl. Exh. 3 at 3. On the contrary, Rule 34 provides for production of "electronically stored information—including … data or data compilations—stored in any medium from which information can be obtained either directly or, *if necessary, after translation by the responding party into a reasonably usable form.*" Fed. R. Civ. P. 34(a).

"Case law makes clear that simply searching a database and providing the results therefrom does not require creation of a new document beyond the scope of Rule 34." *Humphrey v. LeBlanc*, 2021 WL 3560842, at *3 (M.D. La. Aug. 21, 2021) (Johnson, M.J., compiling cases). Moreover, Rule 34 "explicitly places the burden of translating the data on the responding party," "spreadsheets are generally a useable form," and meaningfully labeling the spreadsheets or providing explanatory keys falls within the scope of Rule 34's requirement to translate the data into a usable form. *Bean v. John Wiley & Sons Inc.*, 2012 WL 129809, at *1 (D. Ariz. Jan. 17, 2012); *see also, e.g., Stout v. Wolff Shoe Co.*, 2007 WL 1034998, at *2-3 (D.S.C. Mar. 31, 2007) (rejecting undue burden argument: "A party that selects its own information recording system and expects to be able to access information for business purposes will be obligated to produce that same information in discovery."). Defendants' database objection is contrary to the plain text of Rule 34; it should be overruled.

11

**B. Defendants' selective assertion of confidentiality regulations provides no shield from discovery.**

**1. Under Fifth Circuit law, an agency cannot shield itself from party-discovery via regulatory decree.**

Defendants next point to 8 C.F.R. § 208.6 and 8 C.F.R. § 1208.6, which provide that

Information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the [Immigration and Nationality] Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary [or Attorney General].

Defendants' claim that these regulations shield them from discovery is both legally wrong and inconsistent with their past practice.[8]

"The issue is … whether the Rules of Civil Procedure governing discovery in federal courts can be abrogated by agency regulations." *Resolution Trust Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 111 (D. Colo. 1992). "Those courts which have considered this issue have uniformly answered the query in the negative." *Id.* (compiling cases). The Fifth Circuit, for example, explained that although agencies may use their regulatory authority to centralize "the determinations of when to assert and when not to assert a privilege," they cannot by regulatory decree *create* a privilege. *N.L.R.B. v. Capitol Fish Co.*, 294 F.2d 868, 875 (5th Cir. 1961). An agency "cannot hide behind a self-erected [regulatory] wall evidence adverse to its interests as a litigant." *Id.* But that is precisely what Defendants attempt to do here: rely on their regulations as creating a substantive privilege, not merely an allocation of authority.

Defendants are wrong. Consistent with the centralizing function laid out in *Capitol Fish*, 8 C.F.R. 208.6 and 8 C.F.R. 1208.6 contemplate release of identifying information at the discretion of

---

[8] The cited regulations facially apply only to Defendants; Plaintiff States are accordingly seeking discovery from private parties. *See Cazorla v. Koch Foods of Miss.*, 838 F.3d 540, 552 (5th Cir. 2016).

the Secretary of Homeland Security and the Attorney General, respectively. During the parties meet and confer, however, counsel for Defendants made clear they have not even asked for the named Defendants to exercise that discretion, and counsel would not do so.[9]

### 2. In past litigations, Defendants have produced information covered by the regulations on which they now rely, and they routinely do so to non-profit organizations in Louisiana.

Defendants' past litigation practices are consistent with *Resolution Trust Corp.* and *Capitol Fish*, not with the regulations providing a substantive privilege against discovery. In *Ms. L. v. U.S.C.I.S.*, No. 3:18-cv-428 (S.D. Cal.), for example, an essentially identical group of Defendants — including the Attorney General, the Secretary of Homeland Security, E.O.I.R., C.B.P., I.C.E., and U.S.C.I.S. — were sued over an immigration policy that was allegedly contrary to statute and a violation of the Administrative Procedure Act. The court certified a class that included asylum seekers and persons claiming a credible fear of persecution. *See Ms. L. v. U.S.C.I.S.*, 310 F. Supp. 3d 1133, 1144, 1146 (S.D. Cal. 2018). Without mentioning the regulations on which they now rely, the Defendants simply stipulated to a protective order covering, *inter alia*, "information that would be covered by the Privacy Act if the subject of the information had been a U.S. citizen or a persona lawfully admitted for permanent residence," St. John Decl. Exh. 14, then went about identifying class members and dis-

---

[9] If viewed as a substantive barrier to disclosure, the validity of these regulations would be in grave doubt. The original implementing regulations for the Refugee Act of 1980 did not include a confidentiality provision. *See generally* Aliens and Nationality, 45 Fed. Reg. 37,392 (June 2, 1980). Rather, the confidentiality provision was first proposed in 1987 without substantive explanation. Aliens and Nationality, 52 Fed. Reg. 32,552, 32,553, 32,555 (Aug. 28, 1987) (proposed rule). Following a revision to the proposed rule, Aliens and Nationality, 53 Fed. Reg. 11,300, 11304 (Apr. 6, 1988), it was adopted, but still without substantive explanation, Aliens & Nationality, 55 Fed. Reg. 30,674, 30,677, 30,681 (July 27, 1990) (codified at 8 C.F.R. 208.6). That unexplained additional regulation of disclosure is dubious. What's even more damning is that the INA restricts federal agencies from disclosing information about specific, narrow categories of visas for human trafficking victims, crime victim-witnesses, and VAWA self-petitioners. 8 U.S.C. 1367(a)(2). Even that restriction applies only for a limited period of time. *See id.* Defendants cannot use their general regulatory authorities to expand such an unambiguous, carefully-tailored statutory restriction on disclosure. *Expressio unius est exclusio alterius. See Halverson v. Slater*, 129 F.3d 180, 181 (D.C. Cir. 1997); *see also, e.g., Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.").

closing their identities to plaintiffs' counsel, *see Ms. L. v. U.S.I.C.E.*, 403 F. Supp. 3d 853, 856 nn.1-3, 861 n.9 (S.D. Cal. 2019). The stipulated protective order notably included broad authorization to disclose class member information to "any individuals or persons who Class Counsel designates … including (but not limited to) nonprofit organizations, lawyers, faith-based groups, shelters, or any other organization or individuals who may be able to assist in the reunification process." St. John Decl. Exh. 14 at 5-6. In short, that order offered protection of asylum-related information in name only.

*Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-2366-BAS-KSC (S.D. Cal.), is also instructive. That case was a class action APA challenge, with a provisional sub-class defined as "non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE [port of entry] before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process." St. John Decl. Exh. 15. The federal Defendants – including the Attorney General, the Secretary of Homeland Security, I.C.E., C.B.P., and U.S.C.I.S. – proposed a protective order to facilitate information sharing about class members with Plaintiffs, but the federal Defendants sought to limit further disclosure of that information on the basis of 8 C.F.R. 208.6 and 8 C.F.R. 1208.6. St. John Decl. Exh. 15 at 1, 4-5. Two of the public interest law firms involved in this case — Center for Constitutional Rights and Al Otro Lado — objected to "any limitation on their disclosure of this information, beyond the requirement that it be used to facilitate compliance with the [preliminary injunction]," and they cogently explained that the cited regulations only apply to government officials. St. John Decl. Exh. 16 at 13, 15-17. They then prayed for denial of the protective order *in toto. Id.* at 17.

The *Al Otro Lado* court disagreed with the federal Defendants' analysis of the regulations, but it nevertheless entered a limited protective order "to govern the production of asylum information" based on generic sensitivity concerns. *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 1312531

14

(S.D. Cal. Apr. 8, 2021). Of course, such generic concerns are insufficient to support a protective order in the Fifth Circuit. *See, e.g.*, *Chande v. Barr*, 763 F. App'x 355, 356 (5th Cir. 2019); *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998); *McCleod*, 894 F.2d at 1485.

The Court need not, however, look to those litigation records to ascertain that Defendants release asylum-related information when it's convenient for them to do so. One of the subpoena recipients in this litigation testified that "ICE provides [her] with an electronic manifest of these individuals names approximately 24 hours before release." Kelly Decl. (Dkt. 122-3) ¶ 15, 19. The recipient then "assist[s] released [aliens] with travel." *Id.* ¶ 16.

## CONCLUSION

It cannot be the rule that asylum-related information can be freely released to activist plaintiffs seeking open borders—or organizations that convey asylum-seekers into the interior—but the same information can be denied to sovereign States seeking to compel the federal executive to comply with federal law.

The discovery sought by Plaintiff States is relevant, and Defendants have established no basis for lawfully withholding it. Defendants accordingly should be compelled to comply with Plaintiff States' discovery requests in full. Alternatively, Defendants should be precluded from contending that proof of standing requires proof of injury by individual aliens, and further barred from contesting Plaintiff States' evidence of standing.

Dated:   April 3, 2023

Respectfully submitted,

**JEFF LANDRY**
 **ATTORNEY GENERAL OF LOUISIANA**

By:*/s/ Joseph Scott St. John*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
JOSEPH S. ST. JOHN (La #36682)
  Deputy Solicitor General
JORDAN B. REDMON (La #37272)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*