# EXHIBIT 13

**Annual Flow Report**  
SEPTEMBER 2022

# Refugees and Asylees: 2021

**RYAN BAUGH**

The United States provides protection to certain persons who have been persecuted or have a well-founded fear of persecution mainly through two programs: a refugee program for persons outside the United States and their eligible relatives, and an asylum program for persons physically present or arriving in the United States and their eligible relatives.[1] The 2021 *Refugee and Asylees Annual Flow Report*, authored by the Office of Immigration Statistics (OIS) in the Department of Homeland Security (DHS), presents information on persons admitted to the United States as refugees, those who applied for asylum in the United States, and those granted asylum in the United States in Fiscal Year (FY) 2021.[2,3]

## SUMMARY

A total of 11,454 persons were admitted to the United States as refugees during 2021, including 4,557 as principal refugees and 6,897 as derivative refugees.[4] The leading countries of nationality for refugees admitted during this period were the Democratic Republic of the Congo, Syria, and Afghanistan. The United States provided protection to an additional 17,692 individuals who were granted asylum during 2021,[5] including 10,325 individuals who were granted asylum affirmatively by DHS,[6] and 7,367 individuals who were granted asylum defensively by the U.S. Department of Justice (DOJ). An additional 2,169 individuals received derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant,[7] and 2,221 individuals were approved for derivative asylum abroad and were issued travel documents that allow their travel to the United States.[8] The leading countries of nationality for persons granted either affirmative or defensive asylum were Venezuela, the People's Republic of China (China), and El Salvador. Monthly refugee arrivals and asylum grants have fluctuated during the COVID-19 pandemic. In addition, refugee admissions were suspended in October 2019 and 2020 until the President issued the annual Presidential Determination on Refugee Admissions authorizing refugees for admission (Figure 1).

## DEFINING "REFUGEE" AND "ASYLUM" STATUS

To be eligible for refugee or asylum status, a principal applicant must, among other requirements, meet the definition of a refugee set forth in section 101(a)(42) of the Immigration and Nationality Act (INA), which states in part that a refugee is a person who is unable or unwilling to return to their country of nationality (or country of last habitual residence, if stateless) because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.[9]  Applicants for refugee status are outside the United States, whereas applicants seeking asylum are either within the United States or arriving at a U.S. port of entry (POE).

---

[1] In addition to providing protection through refugee and asylum status, U.S. law bars removing individuals to a country where their "life or freedom would be threatened … because of the [noncitizen]'s race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A); 8 U.S.C. 1231(b)(3)(A). This is known as statutory withholding of removal. See 8 CFR § 208.16(a)-(b). And pursuant to regulations implementing the United States' obligations under Article 3 of the Convention Against Torture (CAT) and Other Cruel, Inhuman or Degrading Treatment or Punishment, the United States is obligated not to remove individuals to a country where it is more likely than not that they would be tortured. Individuals may seek withholding or deferral of removal under these regulations. See 8 CFR §§ 208.16(c)-.18, 1208.16(c)-.18. Data on withholding and deferral of removal are not included in this report.

[2] In this report, a year refers to a fiscal year (October 1 to September 30).

[3] The *2021 Yearbook of Immigration Statistics* and other OIS reports contain additional context. Not all numbers reported are contained in this report's tables.

[4] Refugee data in this report may differ slightly from numbers reported by the Department of State (DOS). DOS refugee numbers include Amerasians (children born in Cambodia, Korea, Laos, Thailand, or Vietnam after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen), whereas DHS reports Amerasians as lawful permanent residents.

[5] These asylum grants were based upon a principal asylum applicant's application, which may also include an accompanying spouse and unmarried children under 21 years of age. They do not include individuals who were approved for follow-to-join asylum status while residing in the United States or abroad.

[6] Affirmative asylum data for fiscal year 2021 were retrieved by OIS in November 2021. Data in this report may differ slightly from fiscal year-end 2021 numbers retrieved and reported at different times by DHS's U.S. Citizenship and Immigration Services (USCIS) Asylum Division.

[7] Of these, 2,152 were based on a relative's asylum grant, and 17 were based on a relative's refugee grant.

[8] OIS does not currently collect data on how many of those issued travel documents reach the United States and actually receive asylum.

[9] Congress expanded this definition in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, providing that persons who have been forced to abort a pregnancy or undergo involuntary sterilization or who have been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program shall be deemed to have been persecuted on account of political opinion.



Office of Immigration Statistics  
OFFICE OF STRATEGY, POLICY, AND PLANS

**Figure 1.**

**Refugee Arrivals and Affirmative Asylum Grants by Month: Fiscal Years 2018 to 2021**



Note: Monthly data is not available for defensive asylees.
Source: OIS analysis of DOS and DHS USCIS data.

The INA also generally requires that a person must be outside their country of nationality or country of last habitual residence to qualify as a refugee unless the person has no nationality or is considered "stateless;" but it grants the President authority to designate countries for "in-country processing," allowing people to be processed for refugee status within their own countries.

## REFUGEES

### Refugee Admissions Ceiling[10]

Under the INA, the President establishes an overall refugee admissions ceiling and has typically set regional allocations before the beginning of each fiscal year following "appropriate consultation" with Congress.[11] On October 27, 2020, President Trump issued the Presidential Determination (PD) on Refugee Admissions for Fiscal Year 2021 (PD 2021-02), setting the refugee ceiling at 15,000—its lowest level since the inception of the Refugee Program in 1980. Refugee admissions ceilings in 2020 and initially in 2021 were based on admission categories rather than world geographic regional allotments as in previous years (Table 1).

Pursuant to PD 2021-02, admissions in 2021 were initially available to those persecuted or with a well-founded fear of persecution on account of religion; certain religious minorities in the former Soviet Union and Iran; certain Iraqis associated with the United States; nationals or residents of El Salvador, Guatemala, or Honduras; those referred by a U.S. embassy; those seeking reunification with family members in the United States admitted as refugees or granted asylum status; those located in Australia, Nauru, or Papua New Guinea granted admission pursuant to an arrangement between the United States and Australia; those who are nationals or habitual residents of Hong Kong, Venezuela, or Cuba; and those in the U.S. Refugee Admissions Program (USRAP) who were in "Ready for Departure" status as of September 30, 2019. President Trump also specified in PD 2021-02 that the United States would not admit any refugees from certain areas including Somalia, Syria, and Yemen except in very limited circumstances due to concern of high risk of terrorist presence or control. President Trump also initially limited 2021 in-country processing to certain members of religious minority groups in Eurasia and the Baltics and certain Iraqis associated with the United States, as well as individuals a U.S. ambassador determined to be in need of exceptional treatment, with Department of State and DHS concurrence.

On February 4, 2021, President Biden issued Executive Order 14013, "Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration," which directed a broad set of actions to rebuild, expand, and

---

[10] Note that previous versions of this report included a brief history of U.S. refugee resettlement that has been deleted from this report due to space limitations; see the FY 2020 Refugee and Asylum report for that history.
[11] In many cases, an unallocated reserve is also designated, which can be used in any region if the need arises and only after notification to Congress.

improve the USRAP.[12] On April 16, 2021, President Biden issued the Emergency Presidential Determination on Refugee Admissions for Fiscal Year 2021 (PD 2021-05), which superseded PD 2021-02 and was intended to respond to unforeseen emergency refugee situations around the globe. PD 2021-02 resumed the previous practice of establishing refugee limits based on Region/Country of Chargeability and re-designated eligible persons in Cuba, Eurasia, the Baltics, Iraq, Honduras, Guatemala, and El Salvador for in-country processing, as well as in special circumstances persons identified by a United States Embassy in any location or initially referred to the Federal Government by a designated non-governmental organization. On May 3, 2021, President Biden issued another Emergency Presidential Determination on Refugee Admissions for Fiscal Year 2021 (PD 2021-06), which raised the overall limit to 62,500.

**Table 1.**

**Proposed and Actual Refugee Admissions by Regions: Fiscal Years 2019 to 2021**

| Region | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Ceiling | Admissions | Ceiling | Admissions | Ceiling | Admissions |
| Total | 30,000 | 29,916 | 18,000 | 11,840 | 62,500 | 11,454 |
| Africa | 11,000 | 16,366 | X | 4,171 | 22,000 | 6,250 |
| East Asia | 4,000 | 4,946 | X | 2,131 | 6,000 | 776 |
| Europe/Central Asia | 3,000 | 4,994 | X | 2,578 | 4,000 | 983 |
| Latin America/Caribbean | 3,000 | 809 | X | 948 | 5,000 | 400 |
| Near East/South Asia | 9,000 | 2,801 | X | 2,012 | 13,000 | 3,045 |
| Unallocated Reserve | - | - | X | - | 12,500 | - |

\- Represents zero.
X Not applicable.
Notes: Ceiling and admission numbers reflect revisions made each fiscal year. FY 2019 data in this table are based on the nationality of the principal applicant. In 2020 and initially in 2021, refugee admissions ceilings were based on Admission Category and not by Region/Country of Chargeability. An April 16, 2021 Presidential Memorandum revised the 2021 limits based on Region/Country of Chargeability, and a subsequent May 3, 2021 Emergency Presidential Determination on Refugee Admissions for Fiscal Year 2021 revised the overall allocation to 62,500. Based on the terms of a settlement in Doe et a. v. Trump et al., No. 17-0178 (W.D. Wash), certain refugee applicants that arrive in 2020 and any future fiscal years are counted toward the 2018 refugee admissions ceiling. In 2020, the number of such applicants was 26, and in 2021, the number was 43.
Source: OIS analysis of DOS data.

### Refugee Eligibility Requirements

To qualify for refugee status, a principal applicant must: (1) be of special humanitarian concern to the United States; (2) meet the refugee definition as set forth in section 101(a)(42) of the INA; (3) be admissible under the INA (or be granted a waiver of inadmissibility); (4) not be firmly resettled in any foreign country; and (5) merit a favorable exercise of discretion. Derivative refugees need not meet all these eligibility requirements, but they must be admissible to the United States and demonstrate a bona fide relationship as the spouse or child of a principal refugee applicant or an admitted refugee. Any person who has ordered, incited, assisted, or otherwise participated in the persecution of another on account of race, religion, nationality, membership in a particular social group, or political opinion is ineligible for refugee status, including as a derivative refugee.

### Refugee Application Process

The USRAP establishes processing priorities that identify individuals and groups who are of special humanitarian concern to the United States and who are eligible for refugee resettlement consideration. The Priority One (P-1) category includes individuals referred by the Office of the United Nations High Commissioner for Refugees (UNHCR), a U.S. Embassy, or certain non-governmental organizations (NGOs); Priority Two (P-2) includes groups of special humanitarian concern; and Priority Three (P-3) includes family reunification cases. The years 2020 and start of 2021 were unusual in that the United States only accepted referrals from UNHCR in the categories listed above. Once principal refugee applicants are referred or granted access to the USRAP under any of these priorities, they still must meet all other eligibility criteria, including meriting a favorable exercise of discretion. Upon referral, a Resettlement Support Center, working under a cooperative agreement with DOS, conducts pre-screening interviews with the applicants. A USCIS officer then interviews applicants and accompanying derivatives to determine eligibility for resettlement in the United States. Multiple security checks must be completed before an application for refugee classification is approved. Additionally, applicants must also undergo a medical exam.

Individuals who are approved for refugee classification are assigned to a resettlement agency (sponsor) that assists with housing, employment, and other services upon arrival. The International Organization for Migration arranges the refugee's travel to the United States. After arrival, refugees are authorized to work and may request documentation to travel outside the United States.

The spouse and unmarried children under the age of 21 of a principal refugee may obtain refugee status as accompanying or follow-to-join derivatives.[13] Accompanying derivatives may enter the United States with the principal refugee or within 4 months after the principal refugee's admission.[14] A spouse or child who joins the principal refugee more than 4 months after admission to the United States is a follow-to-join derivative. Principal refugees may petition for follow-to-join benefits for their qualifying derivatives within 2 years of the refugee's admission to the United States; the principal and the derivative refugee relative's relationship must have existed at the time of the principal's admission into the United States, at the time of filing for accompanying or follow-to-join benefits, and at the time of the relative's subsequent admission. Principal refugees must file Form I-730, *Refugee/Asylee Relative Petition*,[15]

---

[12] Executive Order 14013 also revoked the October 24, 2017 Executive Order 13815, "Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities," and the September 26, 2019 Executive Order 13888, "Enhancing State and Local Involvement in Refugee Resettlement."

[13] Children may include those age 21 or over who are covered by provisions in the Child Status Protection Act, Pub. L. No. 107-208 (Aug. 6, 2002). A derivative child must be unmarried prior to the refugee's admission to the United States, when the Form I-730 Refugee/Asylee Relative Petition is filed, and at the time of the child's subsequent admission.

[14] In practice, most accompanying derivative refugees enter the United States with the principal refugee.

[15] The petition is used to file for relatives of refugees and asylees. The USRAP handles only refugee follow-to-join petitions, which are counted within the annual refugee ceiling. Asylum follow-to-join petitions are processed by USCIS and are not counted in the annual admission ceilings.

for each qualifying follow-to-join derivative family member, who may be located abroad or in the United States. These beneficiaries are not required to demonstrate an independent refugee claim. Once a principal's Form I-730 has been approved for an individual located abroad, there are no time constraints placed upon that derivative relative's travel to the United States, provided that (1) the principal's status has not been revoked; (2) the relationship of the derivative to the principal is unchanged; and (3) in the case of a child, the child is unmarried at the time of admission.

### DATA

All refugee data presented in this report are from the Worldwide Refugee Admissions Processing System (WRAPS) of the Bureau of Population, Refugees, and Migration of DOS.

### TRENDS AND CHARACTERISTICS OF REFUGEES

In 2021, the United States admitted 11,454 refugees, slightly fewer than the 11,840 refugees admitted in 2020 and a 62 percent decrease from the 29,916 refugees admitted in 2019.

Since the inception of the Refugee Program in 1980, the United States has accepted more than 3 million refugees. At a high level, the trend in refugee admissions has gone through three periods since reaching its peak under the current legal framework at 122,066 in 1990 (Figure 2). Admissions generally declined during the 1990s, as the refugee program's focus shifted to more diverse populations across the world. Admissions reached a low point in 2002, due in part to security procedures and changes to admission requirements after September 11, 2001. Refugee admissions reached a post-2001 peak of 84,989 in 2016 under the Obama administration, the highest number in 17 years. More recently, the Trump administration reduced the refugee ceiling during each of its 4 years and implemented new refugee vetting and screening procedures, contributing to a decrease in admissions since 2017.

**Figure 2.**

**Refugee Admissions and Proposed Ceilings to the United States: Fiscal Years 1990 to 2021**



Source: OIS analysis of DOS data.

### Category of Admission

In 2021, most refugees were admitted under P-1 processing (62 percent)—individuals referred by the UNHCR, a U.S. Embassy, or certain NGOs—and P-2 processing (34 percent)—groups of special humanitarian concern (Table 2). P-3 processing (family reunification cases) constituted 0.5 percent of refugees admitted and follow-to-join refugee beneficiaries made up 3.5 percent of refugees admitted. Principal refugees accounted for 4,557 (40 percent) of the 11,454 refugees admitted to the United States in 2021, while accompanying spouses and dependent children represented 12 and 48 percent, respectively.[16]

**Table 2.**

**Refugee Arrivals by Relationship to Principal Applicant and Case Priority: Fiscal Years 2019 to 2021**

| Category of admission and case priority | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **RELATIONSHIP TO PRINCIPAL APPLICANT** | | | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . . | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| Principal applicant . . . . . . . . . . . . . | 12,291 | 41.1 | 5,142 | 43.4 | 4,557 | 39.8 |
| Dependents. . . . . . . . . . . . . . . . . . . | 17,625 | 58.9 | 6,698 | 56.6 | 6,897 | 60.2 |
| Spouse . . . . . . . . . . . . . . . . | 3,262 | 10.9 | 1,455 | 12.3 | 1,364 | 11.9 |
| Child. . . . . . . . . . . . . . . . . . . . . . | 14,211 | 47.5 | 5,186 | 43.8 | 5,493 | 48.0 |
| Siblings, parents, and other . . . . . . | 152 | 0.5 | 57 | 0.5 | 40 | 0.3 |
| **CASE PRIORITY** | | | | | | |
| Total . . . . . . . . . . . . . . . . . . . . . . | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| Priority 1. . . . . . . . . . . . . . . . . . . . | 16,744 | 56.0 | 5,613 | 47.4 | 7,059 | 61.6 |
| Priority 2. . . . . . . . . . . . . . . . . . . . | 12,393 | 41.4 | 5,820 | 49.2 | 3,934 | 34.3 |
| Priority 3. . . . . . . . . . . . . . . . . . . . | 224 | 0.7 | 83 | 0.7 | 58 | 0.5 |
| Follow-to-join beneficiaries. . . . . . . | 555 | 1.9 | 324 | 2.7 | 403 | 3.5 |

Note: Numbers in the principal applicant category previously included siblings, parents, and other dependents, who are now reported as dependents.
Source: OIS analysis of DOS data.

---

[16] Numbers in the principal applicant category previously included siblings, parents, and other dependents, who are now reported as dependents. In addition, a small number of follow-to-join children are listed as principal applicants rather than children in WRAPS and are therefore counted as principal applicants in OIS data.

## Country of Nationality

In 2021, the leading countries of nationality for individuals admitted as refugees were Democratic Republic of the Congo (43 percent), Syria (11 percent), Afghanistan (7.6 percent), Ukraine (7.0 percent), and Burma (6.7 percent) (Table 3). These countries made up 75 percent of total refugee admissions in 2021.

Since the inception of the refugee program, the nationalities of refugees admitted to the United States have changed as U.S. policies evolved and new conflicts around the world arose. Over the last 10 years, the United States has admitted just under half a million refugees (482,278 people) from around the world. Of these, 19 percent have been from Burma, 17 percent from Iraq, 15 percent from Democratic Republic of the Congo, and 10 percent each from Bhutan and Somalia (Figure 3).

Table 3.

### Refugee Arrivals by Country of Nationality: Fiscal Years 2019 to 2021
(Ranked by 2021 country of nationality)

| Country of nationality | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| Congo, Democratic Republic | 12,875 | 43.0 | 2,863 | 24.2 | 4,876 | 42.6 |
| Syria | 560 | 1.9 | 486 | 4.1 | 1,255 | 11.0 |
| Afghanistan | 1,197 | 4.0 | 603 | 5.1 | 874 | 7.6 |
| Ukraine | 4,432 | 14.8 | 1,935 | 16.3 | 802 | 7.0 |
| Burma | 4,928 | 16.5 | 2,112 | 17.8 | 769 | 6.7 |
| Sudan | 376 | 1.3 | 258 | 2.2 | 510 | 4.5 |
| Iraq | 462 | 1.5 | 541 | 4.6 | 500 | 4.4 |
| El Salvador | 311 | 1.0 | 362 | 3.1 | 200 | 1.7 |
| Somalia | 230 | 0.8 | 149 | 1.3 | 196 | 1.7 |
| Eritrea | 1,750 | 5.8 | 475 | 4.0 | 185 | 1.6 |
| All other countries, including unknown | 2,795 | 9.3 | 2,056 | 17.4 | 1,287 | 11.2 |

Source: OIS analysis of DOS data.

Figure 3.

### Refugee Arrivals by Top Country of Nationality: Sum of Fiscal Years 2012 to 2021



Source: OIS analysis of DOS data.

## Age, Sex, and Marital Status

Seventy-three percent of total refugees admitted to the United States in 2021 were under 35 years of age, and 40 percent of the total were children under 18 years of age (Table 4). Refugees tend to be relatively younger than the native-born population, with a median age of 22 years for those arriving in 2021, compared to 38 for the whole U.S. population.[17] Refugee median age varies widely by region and country of birth: Refugees from Africa had the lowest median age of 21 years, while those from East Asia and Europe had the highest median age of 26. Slightly more male than female refugees were admitted in 2021, and 48 percent of adults were married at arrival, compared to 50 percent in 2020.

---

[17] U.S. population defined as only those within the 50 states and District of Columbia. U.S. Census Bureau/MDAT. 2022. Current Population Survey, Annual Social and Economic Supplement, March 2021. Web. 25 February 2022.

Table 4.

### Refugee Arrivals by Age, Sex, and Marital Status: Fiscal Years 2019 to 2021

| Characteristic | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| **AGE** | | | | | | |
| Total | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| 0 to 17 years | 13,107 | 43.8 | 4,808 | 40.6 | 4,526 | 39.5 |
| 18 to 24 years | 4,286 | 14.3 | 1,584 | 13.4 | 1,644 | 14.4 |
| 25 to 34 years | 5,795 | 19.4 | 2,504 | 21.1 | 2,188 | 19.1 |
| 35 to 44 years | 3,212 | 10.7 | 1,426 | 12.0 | 1,466 | 12.8 |
| 45 to 54 years | 1,669 | 5.6 | 756 | 6.4 | 833 | 7.3 |
| 55 to 64 years | 1,139 | 3.8 | 484 | 4.1 | 493 | 4.3 |
| 65 years and over | 708 | 2.4 | 278 | 2.3 | 304 | 2.7 |
| **SEX** | | | | | | |
| Total | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| Female | 14,651 | 49.0 | 5,700 | 48.1 | 5,486 | 47.9 |
| Male | 15,265 | 51.0 | 6,140 | 51.9 | 5,968 | 52.1 |
| **MARITAL STATUS** | | | | | | |
| Total | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| Married[1] | 7,819 | 26.1 | 3,505 | 29.6 | 3,322 | 29.0 |
| Single[2] | 20,828 | 69.6 | 7,873 | 66.5 | 7,666 | 66.9 |
| Other[3] | 1,269 | 4.2 | 462 | 3.9 | 466 | 4.1 |

[1] Includes persons in common law marriage and persons who are separated.
[2] Includes persons who were engaged and not yet married.
[3] Includes persons who were divorced, widowed, or of unknown marital status.
Source: OIS analysis of DOS data.

### State of Initial Resettlement

In 2021, more than half of admitted refugees (53 percent) were resettled in the top ten resettling states (Table 5). California, Texas, and New York resettled the most refugees (8.6, 8.1, and 6.2 percent of admitted refugees, respectively), and Kentucky and Idaho resettled the most refugees per capita, each resettling between 14 and 15 refugees per 100,000 population (Figure 4).[18] The majority of refugees resettling in Kentucky and Idaho were from Democratic Republic of the Congo (84 and 70 percent, respectively).

Table 5.

### Refugee Arrivals by State of Residence: Fiscal Years 2019 to 2021
(Ranked by 2021 country of nationality)

| State of residence | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 29,916 | 100.0 | 11,840 | 100.0 | 11,454 | 100.0 |
| California | 1,841 | 6.2 | 1,192 | 10.1 | 986 | 8.6 |
| Texas | 2,433 | 8.1 | 905 | 7.6 | 929 | 8.1 |
| New York | 1,845 | 6.2 | 626 | 5.3 | 710 | 6.2 |
| Kentucky | 1,421 | 4.7 | 476 | 4.0 | 669 | 5.8 |
| Michigan | 1,146 | 3.8 | 493 | 4.2 | 534 | 4.7 |
| North Carolina | 1,255 | 4.2 | 469 | 4.0 | 502 | 4.4 |
| Washington | 1,945 | 6.5 | 1,116 | 9.4 | 480 | 4.2 |
| Ohio | 1,426 | 4.8 | 427 | 3.6 | 453 | 4.0 |
| Arizona | 1,216 | 4.1 | 444 | 3.8 | 422 | 3.7 |
| Pennsylvania | 1,088 | 3.6 | 448 | 3.8 | 402 | 3.5 |
| Other | 14,300 | 47.8 | 5,244 | 44.3 | 5,367 | 46.9 |

Source: OIS analysis of DOS data.

[18] State population estimates for per capita calculations from U.S. Census Bureau's Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2021 (NST-EST2021-POP).

**Figure 4.**

Per Capita Refugee Resettlement by State of Residence: Fiscal Year 2021



Source: OIS analysis of DOS and Census Bureau data.

### Lawful Permanent Residence and Naturalization of Refugees

One year after being admitted to the United States, refugees are statutorily required to apply for lawful permanent resident (LPR) status. Of the 1.1 million people arriving as refugees between 2000 and 2019, 96 percent gained LPR status by the end of 2021. These rates were similar across sex (96 percent for female refugees and 95 percent for male) and age group but varied by world region (for those entering from 2016 to 2019, 95 percent for refugees from the Near East/South Asia and 89 percent or less for those from each other region).[19,20]

Refugees granted LPR status may apply for naturalization 5 years after their admission as refugees. Refugees have some of the highest naturalization rates of all immigrants: of the approximately 690,000 adults who obtained LPR status from 2000 to 2015 based on prior admission as a refugee, 49 percent naturalized within 5 years and 58 percent did so within 6 years.[21,22] These rates varied slightly across sex (6-year naturalization rate of 60 percent for female refugees who obtained LPR status and 56 percent for males) but varied considerably by age group (6-year naturalization rate of 56 percent for those refugees who gained LPR status between 18 and 54 years of age, and 70 percent for those who became LPRs at 55 years of age or older).

### ASYLEES

### Filing of Claims

Generally, any foreign national physically present in the United States or arriving at a POE may seek asylum regardless of immigration status. Those seeking asylum must apply within 1 year from the date of last arrival or establish that an exception applies based on changed or extraordinary circumstances.[23] Principal applicants obtain asylum in one of two ways: affirmatively through a USCIS asylum officer or defensively in removal proceedings before an immigration judge of DOJ's Executive Office for Immigration Review (EOIR). An individual applies for asylum by filing Form I-589, *Application for Asylum and for Withholding of Removal*.

---

[19] This rate by world region is not available for those arriving prior to 2016.
[20] Although the majority of refugees apply for LPR status 1 year after admission, due to operational and other factors, processing time can vary widely for those who apply.
[21] In comparison, the 12.4 million non-refugee adult immigrants who obtained LPR status from 2000 to 2015 had 5- and 6-year naturalization rates of 12 and 28 percent, respectively. The data were restricted to immigrants who were 18 years of age and older when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.
[22] For more discussion of refugee naturalization see Mossaad N., Ferwerda J., Lawrence D., Weinstein J. M., Hainmueller J., Determinants of refugee naturalization in the United States. Proceedings of the National Academy of Sciences U.S.A. 115, 9175–9180 (2018).

[23] Unaccompanied noncitizen children are not subject to the 1-year filing deadline. INA § 208(a)(2)(E); 8 U.S.C. 1158(a)(2)(E).

Spouses and unmarried children under the age of 21 who are not included in the principal's grant of asylum may obtain derivative asylum status.[24] A principal asylee may petition for follow-to-join benefits for qualifying derivatives within 2 years after they were granted asylum, as long as the relationship between the principal and their spouse and/or child existed on the date the principal was granted asylum. In practice, the vast majority of derivative asylum status beneficiaries who are approved receive follow-to-join benefits. The principal asylee must file a Form I-730 for each qualifying family member, who may be located abroad or in the United States. Once a Form I-730 is approved for an individual located abroad, there are no time constraints placed upon the derivative relative's travel to the United States, as long as (1) the principal's status has not been revoked; (2) the relationship of the derivative to the principal is unchanged; and (3) in the case of a child, the child is unmarried at the time of admission.

### Adjudication of Claims

The USCIS Asylum Division adjudicates claims and may grant asylum directly through the affirmative asylum process. Asylum officers conduct interviews to determine asylum eligibility using an applicant's testimony, information on Form I-589, any accompanying evidence provided by the applicant, and material provided by DOS, other USCIS offices, or other credible sources. The asylum applicant must meet the definition of a refugee, be credible considering the totality of the circumstances and all relevant factors, and not be barred from obtaining asylum. If the officer finds that the applicant satisfies the eligibility requirements, then the officer determines whether the application warrants a grant of asylum as a matter of discretion. Individuals may be barred for previously committing certain crimes, posing a national security threat, engaging in the persecution of others, or firmly resettling in another country before coming to the United States.

If applicants with a valid immigration status (e.g., a foreign student) or parole fail to establish eligibility for asylum, USCIS denies the application and the applicant remains in their valid status or parole. If applicants are not in a valid status or parole and are found ineligible for asylum, USCIS places these applicants in removal proceedings before an EOIR immigration judge, where the application is considered anew.[25]

Individuals may apply for asylum defensively after being placed in removal proceedings by immigration enforcement officials because they are unlawfully present, are in violation of their status, or were apprehended while attempting to enter the United States. Defensive applicants apply for asylum directly with EOIR.[26] During the proceedings, an immigration judge may grant asylum or deny the asylum application and issue a removal order if the noncitizen does not qualify for any other forms of relief or protection (including withholding or deferral of removal under the statute or CAT). Asylum applicants may appeal an EOIR denial to the Board of Immigration Appeals and, if unsuccessful there, may seek further review by a U.S. Court of Appeals, and finally the U.S. Supreme Court.

Follow-to-join asylum beneficiaries are not required to demonstrate a persecution claim because their status is derived from the principal asylee. Beneficiaries in the United States at the time of application are granted derivative asylum immediately upon the approval of their Form I-730 petitions. Beneficiaries abroad at the time of application are granted derivative asylum when admitted into the United States at a POE.

### Lawful Permanent Residence and Citizenship

One year after being granted asylum, asylees are eligible to apply for LPR status, as are their qualifying family members who meet the eligibility criteria. If LPR status is approved, the asylee's "resident since" date is rolled back to 1 year prior to the LPR approval date. Asylees who have become LPRs may apply for naturalization 5 years after their "resident since" date.[27]

## DATA

The affirmative asylee data presented in this report were obtained from Global, a cloud-based platform of USCIS that has replaced the Refugees, Asylum, and Parole System (RAPS) mainframe system for storing asylum-related data.[28]

Defensive asylee data were obtained from EOIR. Follow-to-join asylum derivative data for people residing outside the United States at the time of their admission were obtained from the Case and Activity Management for International Operations (CAMINO) system of USCIS and the Consular Consolidated Database (CCD) of DOS. These data reflect travel documents issued, not admissions. Follow-to-join data for people residing within the United States at the time of the approval of their Form I-730 petition were obtained from the USCIS Computer-Linked Application Information Management System (CLAIMS).

## TRENDS AND CHARACTERISTICS OF ASYLEES

### Asylum Filings

Affirmative asylum filings with USCIS decreased by 33 percent from 93,518 applications in 2020 to 62,795 in 2021.[29] Venezuelan applications made up the highest proportion (14 percent) of total applications in 2021, despite dropping 60 percent from 2020, and Guatemalan applications made up 10 percent of total applications in 2021. The next highest numbers of affirmative applications in 2021 came from Haitian (8.0 percent), Honduran (7.0 percent), and Colombian (6.5 percent) nationals (Table 6a). Unaccompanied children from Northern Central America (El Salvador, Guatemala, and Honduras) accounted for

---

[24] See reference to Child Status Protection Act, n. 12, supra.

[25] OIS tallies all asylum grants from an immigration judge as defensive grants, regardless of whether they first applied affirmatively.

[26] In March 2022 DHS and the Department of Justice published an interim final rule (IFR) titled "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers." Under the rule, beginning in May 2022 USCIS asylum officers may consider the asylum applications of certain individuals subject to expedited removal who establish a fear of persecution or torture during their required credible fear screening. The rule and its implementation both post-date the period covered by this report.

[27] In other words, an asylee is generally considered an LPR 1 year before the date USCIS approves the adjustment application for naturalization eligibility purposes.

[28] The migration from RAPS to Global caused slight changes in historical numbers.

[29] These 62,795 affirmative asylum applications each included one principal applicant and together included an additional 27,174 dependents.

91 percent of the over 5,600 unaccompanied child asylum applications in 2021 and made up 35 percent of affirmative asylum applications from these three countries.[30]

The total number of defensive asylum applications filed with EOIR decreased 56 percent from 194,266 in 2020 to 85,537 in 2021.[31] Similar to the last couple of years, the largest numbers of applications lodged with the courts in 2021 were from citizens of the Northern Central American countries (37,502) and Mexico (10,292) (Table 6b). These four countries made up 56 percent of defensive asylum applications filed with EOIR.

Table 6a.

**Affirmative Asylum Cases Filed (USCIS) by Country of Nationality: Fiscal Years 2019 to 2021**

(Ranked by 2021 country of nationality)

| State of residence | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 97,270 | 100.0 | 93,518 | 100.0 | 62,795 | 100.0 |
| Venezuela | 25,374 | 26.1 | 22,713 | 24.3 | 9,082 | 14.5 |
| Guatemala | 9,724 | 10.0 | 8,396 | 9.0 | 6,558 | 10.4 |
| Haiti | 3,282 | 3.4 | 5,020 | 5.4 | 5,044 | 8.0 |
| Honduras | 5,631 | 5.8 | 6,036 | 6.5 | 4,390 | 7.0 |
| Colombia | 2,850 | 2.9 | 3,648 | 3.9 | 4,081 | 6.5 |
| Mexico | 4,600 | 4.7 | 4,022 | 4.3 | 4,069 | 6.5 |
| El Salvador | 5,977 | 6.1 | 5,432 | 5.8 | 3,788 | 6.0 |
| China, People's Republic | 9,667 | 9.9 | 9,678 | 10.3 | 3,496 | 5.6 |
| Cuba | 269 | 0.3 | 1,406 | 1.5 | 2,752 | 4.4 |
| India | 2,968 | 3.1 | 3,130 | 3.3 | 2,097 | 3.3 |
| All other countries, including unknown | 26,928 | 27.7 | 24,037 | 25.7 | 17,438 | 27.8 |

Source: OIS analysis of DHS USCIS data (received 11/15/2021).

Table 6b.

**Defensive Asylum Cases Received (EOIR) by Country of Nationality: Fiscal Years 2019 to 2021**

(Ranked by 2021 country of nationality)

| Country | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 214,490 | 100.0 | 194,266 | 100.0 | 85,537 | 100.0 |
| Guatemala | 42,373 | 19.8 | 41,594 | 21.4 | 14,721 | 17.2 |
| Honduras | 32,442 | 15.1 | 34,209 | 17.6 | 12,975 | 15.2 |
| Mexico | 30,721 | 14.3 | 21,017 | 10.8 | 10,292 | 12.0 |
| El Salvador | 30,456 | 14.2 | 25,812 | 13.3 | 9,806 | 11.5 |
| Venezuela | 11,726 | 5.5 | 11,550 | 5.9 | 5,213 | 6.1 |
| Cuba | 5,538 | 2.6 | 11,704 | 6.0 | 3,564 | 4.2 |
| Brazil | 2,627 | 1.2 | 3,939 | 2.0 | 3,092 | 3.6 |
| Ecuador | 4,496 | 2.1 | 4,400 | 2.3 | 2,996 | 3.5 |
| China, People's Republic | 6,908 | 3.2 | 4,752 | 2.4 | 2,591 | 3.0 |
| Haiti | 1,812 | 0.8 | 2,504 | 1.3 | 2,205 | 2.6 |
| All other countries, including unknown | 45,391 | 21.2 | 32,785 | 16.9 | 18,082 | 21.1 |

Note: Case receipts include affirmative claims that arrive at EOIR after being placed in proceedings.
Source: OIS analysis of DOJ data (received 3/14/2022).

---

[30] Unaccompanied children, unlike other populations, can apply affirmatively before a USCIS asylum officer after being placed into removal proceedings. See INA § 208(b)(3)(C); 8 U.S.C. 1158(b)(3)(C).
[31] EOIR has recently changed its methodology in reporting affirmative asylum cases referred from USCIS. Instead of using the court application date as they do for defensive asylum cases, EOIR now reports on affirmative cases based on the date of the initial asylum application filing with USCIS. This change may result in a slight difference in historical numbers, and OIS has updated the data reported here and in the Yearbooks of Immigration Statistics for 2015 to 2021.

## Asylum Grants

The total number of persons granted asylum in the United States decreased 43 percent from 30,964 in 2020 to 17,692 in 2021. USCIS granted asylum affirmatively to 10,325 people in 2021, a decrease of 37 percent from 2020 and of 62 percent from 2019; and EOIR immigration judges granted defensive asylum to 7,367 people in 2021, a decrease of 50 percent from 2020 and of 61 percent from 2019 (Figure 5).

**Figure 5.**

**Annual Grants of Affirmative and Defensive Asylum: 1990 to 2021**



Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS USCIS and DOJ data (received 11/15/2021 and 3/14/2022, respectively).

## Country of Nationality

The three leading countries of nationality of persons granted asylum (affirmatively or defensively) in each of 2019, 2020, and 2021 were Venezuela (12 percent in 2021), China (11 percent), and El Salvador (8.2 percent) (Table 7). Nationals of these three countries accounted for 31 percent of all persons granted asylum in 2021, down from 35 percent in 2020. While the number of people granted asylum from each of the top ten countries of nationality decreased between 2020 and 2021, China experienced the greatest proportional decrease (58 percent), followed by Venezuela and Egypt (49 percent each).

The leading countries of nationality for persons granted affirmative asylum in 2021 were Venezuela (15 percent), China (12 percent), and Turkey (10 percent) (Table 8). Thirty-seven percent of those granted asylum affirmatively in 2021 were nationals of these countries, down from 46 percent in 2020.

The leading countries of nationality for persons granted defensive asylum in 2021 were El Salvador (16 percent), Guatemala (12 percent), and China (11 percent) (Table 9). Thirty-eight percent of those granted asylum defensively in 2021 were nationals of these countries.

The leading countries of nationality for follow-to-join asylees authorized for travel to the United States in 2021 were China (14 percent), Cameroon (13 percent), and Turkey (9.1 percent) (Table 10). Nationals of these countries accounted for 36 percent of all follow-to-join derivative relatives issued travel documents allowing their travel to the United States, up from 21 percent in 2020. Additionally, 2,169 individuals were approved for derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant.[32]

---

[32] 2,152 derivative asylum grants were based on an asylee relative petition and 17 were based on a refugee family petition.

**Table 7.**

**Total Individuals Granted Asylum (Affirmatively or Defensively) by Country of Nationality: Fiscal Years 2019 to 2021**
(Ranked by 2021 country of nationality)

| Country | 2019 | | 2020 | | 2021 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 45,888 | 100.0 | 30,964 | 100.0 | 17,692 | 100.0 |
| Venezuela | 6,612 | 14.4 | 4,077 | 13.2 | 2,068 | 11.7 |
| China, People's Republic | 7,416 | 16.2 | 4,758 | 15.4 | 1,975 | 11.2 |
| El Salvador | 3,182 | 6.9 | 1,993 | 6.4 | 1,459 | 8.2 |
| Guatemala | 2,579 | 5.6 | 1,853 | 6.0 | 1,336 | 7.6 |
| Turkey | 1,754 | 3.8 | 1,579 | 5.1 | 1,082 | 6.1 |
| Honduras | 1,805 | 3.9 | 1,264 | 4.1 | 1,022 | 5.8 |
| Egypt | 2,250 | 4.9 | 1,414 | 4.6 | 724 | 4.1 |
| India | 2,261 | 4.9 | 1,337 | 4.3 | 715 | 4.0 |
| Mexico | 1,591 | 3.5 | 1,210 | 3.9 | 670 | 3.8 |
| Russia | 1,394 | 3.0 | 972 | 3.1 | 574 | 3.2 |
| All other countries, including unknown | 15,044 | 32.8 | 10,507 | 33.9 | 6,067 | 34.3 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS USCIS and DOJ data (received 11/15/2021 and 3/14/2022, respectively).

Table 8.

**Individuals Granted Asylum Affirmatively by Country of Nationality: Fiscal Years 2019 to 2021**

(Ranked by 2021 country of nationality)

| Country | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 26,979 | 100.0 | 16,363 | 100.0 | 10,325 | 100.0 |
| Venezuela | 6,111 | 22.7 | 3,187 | 19.5 | 1,596 | 15.5 |
| China, People's Republic | 3,957 | 14.7 | 2,808 | 17.2 | 1,195 | 11.6 |
| El Salvador | 1,694 | 6.3 | 1,525 | 9.3 | 1,030 | 10.0 |
| Guatemala | 2,104 | 7.8 | 1,303 | 8.0 | 654 | 6.3 |
| Turkey | 1,034 | 3.8 | 416 | 2.5 | 456 | 4.4 |
| Honduras | 514 | 1.9 | 248 | 1.5 | 419 | 4.1 |
| Egypt | 1,095 | 4.1 | 727 | 4.4 | 418 | 4.0 |
| India | 861 | 3.2 | 262 | 1.6 | 310 | 3.0 |
| Mexico | 749 | 2.8 | 400 | 2.4 | 306 | 3.0 |
| Russia | 789 | 2.9 | 491 | 3.0 | 303 | 2.9 |
| All other countries, including unknown | 8,071 | 29.9 | 4,996 | 30.5 | 3,638 | 35.2 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS USCIS data (received 11/15/2021).

Table 9.

**Individuals Granted Asylum Defensively by Country of Nationality: Fiscal Years 2019 to 2021**

(Ranked by 2021 country of nationality)

| Country | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 18,909 | 100.0 | 14,601 | 100.0 | 7,367 | 100.0 |
| El Salvador | 2,321 | 12.3 | 1,731 | 11.9 | 1,149 | 15.6 |
| Guatemala | 1,545 | 8.2 | 1,437 | 9.8 | 880 | 11.9 |
| China, People's Republic | 3,459 | 18.3 | 1,950 | 13.4 | 780 | 10.6 |
| India | 1,929 | 10.2 | 1,179 | 8.1 | 629 | 8.5 |
| Honduras | 1,291 | 6.8 | 1,016 | 7.0 | 603 | 8.2 |
| Venezuela | 501 | 2.6 | 890 | 6.1 | 472 | 6.4 |
| Mexico | 802 | 4.2 | 719 | 4.9 | 367 | 5.0 |
| Nicaragua | 357 | 1.9 | 364 | 2.5 | 163 | 2.2 |
| Russia | 299 | 1.6 | 245 | 1.7 | 156 | 2.1 |
| Nepal | 606 | 3.2 | 308 | 2.1 | 143 | 1.9 |
| All other countries, including unknown | 5,799 | 30.7 | 4,762 | 32.6 | 2,025 | 27.5 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DOJ data.

Table 10.

**Follow-to-join Asylee Travel Documents Issued by Country of Nationality: Fiscal Years 2019 to 2021**

(Ranked by 2021 country of nationality)

| Country | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 6,389 | 100.0 | 2,560 | 100.0 | 2,221 | 100.0 |
| China, People's Republic | 1,482 | 23.2 | 323 | 12.6 | 311 | 14.0 |
| Cameroon | 134 | 2.1 | 46 | 1.8 | 287 | 12.9 |
| Turkey | 130 | 2.0 | 176 | 6.9 | 202 | 9.1 |
| Egypt | 226 | 3.5 | 115 | 4.5 | 138 | 6.2 |
| Pakistan | 143 | 2.2 | 53 | 2.1 | 135 | 6.1 |
| Eritrea | 557 | 8.7 | 279 | 10.9 | 75 | 3.4 |
| Congo, Democratic Republic | 78 | 1.2 | 42 | 1.6 | 57 | 2.6 |
| Bangladesh | 65 | 1.0 | 20 | 0.8 | 55 | 2.5 |
| Ethiopia | 191 | 3.0 | 96 | 3.8 | 53 | 2.4 |
| El Salvador | 177 | 2.8 | 86 | 3.4 | 50 | 2.3 |
| All other countries, including unknown | 3,206 | 50.2 | 1,324 | 51.7 | 858 | 38.6 |

Source: OIS analysis of DHS USCIS and DOS data.

## Age, Sex, and Marital Status

In 2021, 61 percent of persons granted affirmative asylum were between the ages of 18 and 44 (Table 11), the same as in 2019 and 2020, and the median age of affirmative asylees was 29. Fifty-two percent were male and 58 percent of adults were married. Half (50 percent) of follow-to-join beneficiaries were under the age of 18. The median age of follow-to-join beneficiaries was 17 years (Table 12). Data on marital status are not available for this group.

**Table 11.**

**Individuals Granted Asylum Affirmatively by Age, Sex, and Marital Status: Fiscal Years 2019 to 2021**

| Characteristic | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| **AGE** | | | | | | |
| Total | 26,979 | 100.0 | 16,363 | 100.0 | 10,325 | 100.0 |
| 0 to 17 years | 5,972 | 22.1 | 3,423 | 20.9 | 2,041 | 19.8 |
| 18 to 24 years | 3,736 | 13.8 | 1,905 | 11.6 | 1,521 | 14.7 |
| 25 to 34 years | 6,908 | 25.6 | 4,139 | 25.3 | 2,387 | 23.1 |
| 35 to 44 years | 6,221 | 23.1 | 3,966 | 24.2 | 2,521 | 24.4 |
| 45 to 54 years | 2,858 | 10.6 | 2,016 | 12.3 | 1,266 | 12.3 |
| 55 to 64 years | 990 | 3.7 | 702 | 4.3 | 413 | 4.0 |
| 65 and over | 294 | 1.1 | 212 | 1.3 | 176 | 1.7 |
| **SEX** | | | | | | |
| Total | 26,979* | 100.0 | 16,363 | 100.0 | 10,325 | 100.0 |
| Female | 13,218 | 49.0 | 8,005 | 48.9 | 4,961 | 48.0 |
| Male | 13,759 | 51.0 | 8,358 | 51.1 | 5,364 | 52.0 |
| **MARITAL STATUS** | | | | | | |
| Total | 26,979 | 100.0 | 16,363 | 100.0 | 10,325 | 100.0 |
| Married | 11,503 | 42.6 | 7,507 | 45.9 | 4,403 | 42.6 |
| Single | 14,110 | 52.3 | 7,965 | 48.7 | 5,406 | 52.4 |
| Other** | 1,366 | 5.1 | 891 | 5.4 | 516 | 5.0 |

- Represents zero or rounds to zero.
* Includes two persons of unknown sex.
** Includes persons who were divorced, separated, widowed, or of unknown marital status.
Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS USCIS data.

**Table 12.**

**Follow-to-join Asylee Travel Documents Issued by Age and Sex: Fiscal Years 2019 to 2021**

| Characteristic | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| **AGE** | | | | | | |
| Total | 6,389 | 100.0 | 2,560 | 100.0 | 2,221 | 100.0 |
| 0 to 17 years | 3,129 | 49.0 | 1,319 | 51.5 | 1,121 | 50.5 |
| 18 to 24 years | 1,243 | 19.5 | 456 | 17.8 | 416 | 18.7 |
| 25 to 34 years | 658 | 10.3 | 278 | 10.9 | 243 | 10.9 |
| 35 to 44 years | 682 | 10.7 | 294 | 11.5 | 244 | 11.0 |
| 45 to 54 years | 472 | 7.4 | 156 | 6.1 | 134 | 6.0 |
| 55 to 64 years | 174 | 2.7 | 44 | 1.7 | 52 | 2.3 |
| 65 and over | 31 | 0.5 | 13 | 0.5 | 11 | 0.5 |
| **SEX** | | | | | | |
| Total | 6,389 | 100.0 | 2,560 | 100.0 | 2,221 | 100.0 |
| Female | 3,386 | 53.0 | 1,385 | 54.1 | 1,211 | 54.5 |
| Male | 2,972 | 46.5 | 1,145 | 44.7 | 1,009 | 45.4 |
| Unknown | 31 | 0.5 | 30 | 1.2 | 1 | 0.0 |

Source: OIS analysis of DHS USCIS and DOS data.

### State of Residence

In 2021, the leading states of residence for individuals granted asylum affirmatively were California (28 percent), Illinois (8.1 percent), and New York (7.7 percent) (Table 13). Forty-four percent of individuals granted affirmative asylum in 2021 resided in these three states, the same as in 2020. Per capita, the leading areas include the District of Columbia and Louisiana, with approximately 11 and 10 recipients per 100,000 residents, respectively.

**Table 13.**

**Individuals Granted Asylum Affirmatively by State of Residence: Fiscal Years 2019 to 2021**

(Ranked by 2021 state of residence)

| State of residence | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 26,979 | 100.0 | 16,363 | 100.0 | 10,325 | 100.0 |
| California | 9,167 | 34.0 | 5,591 | 34.2 | 2,872 | 27.8 |
| Illinois | 1,443 | 5.3 | 848 | 5.2 | 838 | 8.1 |
| New York | 2,105 | 7.8 | 814 | 5.0 | 793 | 7.7 |
| Texas | 1,775 | 6.6 | 885 | 5.4 | 631 | 6.1 |
| Florida | 2,458 | 9.1 | 1,551 | 9.5 | 613 | 5.9 |
| Virginia | 240 | 0.9 | 264 | 1.6 | 527 | 5.1 |
| Louisiana | 253 | 0.9 | 147 | 0.9 | 454 | 4.4 |
| New Jersey | 2,542 | 9.4 | 1,568 | 9.6 | 450 | 4.4 |
| Maryland | 139 | 0.5 | 190 | 1.2 | 447 | 4.3 |
| Ohio | 633 | 2.3 | 435 | 2.7 | 305 | 3.0 |
| Other, including unknown | 6,224 | 23.1 | 4,070 | 24.9 | 2,395 | 23.2 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DHS USCIS data.

In 2021, the leading states of residence for individuals granted asylum defensively were California (32 percent), New York (16 percent), and Maryland (9.8 percent) (Table 14). Fifty-seven percent of individuals granted defensive asylum in 2021 resided in these three states, the same as in 2020. Per capita, the leading areas include Maryland and the District of Columbia, with approximately 12 and 8 recipients per 100,000 residents, respectively.

State of residence data are not available for follow-to-join asylees.

**Table 14.**

**Individuals Granted Asylum Defensively by State of Residence: Fiscal Years 2019 to 2021**

(Ranked by 2021 state of residence)

| State of residence | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent |
|---|---|---|---|---|---|---|
| Total | 18,909 | 100.0 | 14,601 | 100.0 | 7,367 | 100.0 |
| California | 5,139 | 27.2 | 3,912 | 26.8 | 2,325 | 31.6 |
| New York | 5,832 | 30.8 | 3,637 | 24.9 | 1,161 | 15.8 |
| Maryland | 959 | 5.1 | 740 | 5.1 | 724 | 9.8 |
| Massachusetts | 372 | 2.0 | 434 | 3.0 | 314 | 4.3 |
| Virginia | 965 | 5.1 | 558 | 3.8 | 250 | 3.4 |
| Washington | 371 | 2.0 | 199 | 1.4 | 247 | 3.4 |
| Florida | 617 | 3.3 | 597 | 4.1 | 239 | 3.2 |
| Pennsylvania | 361 | 1.9 | 227 | 1.6 | 231 | 3.1 |
| New Jersey | 294 | 1.6 | 268 | 1.8 | 211 | 2.9 |
| Utah | 81 | 0.4 | 147 | 1.0 | 200 | 2.7 |
| Other, including unknown | 3,918 | 20.7 | 3,882 | 26.6 | 1,465 | 19.9 |

Note: Data exclude follow-to-join asylees.
Source: OIS analysis of DOJ data.

**Naturalization of Asylees**

Of the almost 143,000 people granted affirmative asylum from 2012 to 2019, 73 percent gained LPR status by the end of 2021. These rates were similar across sex (74 percent for female affirmative asylees and 73 percent for male) but varied by age group (59 percent for those granted affirmative asylum status under 18 years of age, 73 percent for those between 18 and 24 years, and 78 percent for those 25 years and older). Rates of attaining LPR status are not available for defensive asylees.

Similar to refugees, asylees have some of the highest naturalization rates of all immigrants. Of the almost 552,000 adults who obtained LPR status from 2000 to 2015 based on a prior grant of asylum (affirmative or defensive), 43 percent naturalized within 5 years and 56 percent naturalized within 6 years.[33] These rates varied slightly across sex (6-year naturalization rate of 57 percent for female asylees who obtained LPR status and 55 percent for males). Rates varied more considerably by age group (6-year naturalization rate of 63 percent for those asylees who gained LPR status between 18 and 34 years of age, 49 percent for those between 35 and 54 years of age, and 54 percent for those who became LPRs at 55 years of age or older). Rates also varied considerably by world region (96 percent for affirmative asylees from Oceania, 85 percent for affirmative asylees from Asia, and 66 percent for those from other regions).

**FOR MORE INFORMATION**

Visit the Office of Immigration Statistics web page at http://www.dhs.gov/immigration-statistics.

> The United States signed Asylum Cooperative Agreements (ACAs) in 2019 with Guatemala, Honduras, and El Salvador, which in general allowed DHS to remove asylum claimants to one of these three countries (other than the country of the noncitizen's nationality) to seek protection there. See INA § 208(a)(2)(A), 8 U.S.C. § 1158(a)(2)(A). The agreement with Guatemala was operational between November 21, 2019, and March 16, 2020, and agreements with El Salvador and Honduras were never implemented as a result of the COVID-19 pandemic.
>
> Consistent with Executive Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," issued on February 2, 2021, the Secretary of State on February 6, 2021, announced the suspension of all three ACAs. DOS terminated the U.S.-Guatemala ACA in early May 2021 and terminated the other two ACAs in early August 2021.

---

[33] The data were restricted to individuals who were at least 18 years old when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.