# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:22-cv-01130 |
| | ) | |
| MERRICK GARLAND, | ) | |
| in his official capacity as Attorney | ) | |
| General of the United States, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL</u>

## Table of Contents

**Introduction**................................................................................................................1

**Background** ..................................................................................................................1

**Procedural History**......................................................................................................4

**ARGUMENT** .................................................................................................................5

    (A) The Court Should Deny Plaintiffs' Motion to Compel Documents or Information
Disclosing the Identities of Asylum Seekers Because This Information is Not Relevant, Is
Confidential, and Could Expose Individuals to Grave Danger ...............................................5

        (i) The identities of asylum seekers is not relevant..............................................5

        (ii) Regulations prevent Defendants from releasing the identities of specific asylum
seekers....................................................................................................................8

    (B) Plaintiffs' motion to compel was premature and is now largely moot ...........................18

    (c) Many of Plaintiffs' requests are overly broad, unduly burdensome and not relevant ......21

**CONCLUSION** ............................................................................................................25

# Table of Authorities

Page(s)

## Cases

*Al Otro Lado v. Wolf*,

497 F. Supp. 3d 914 (S.D. Cal. 2020) ................................................................. 13, 14

*Al Otro Lado, Inc. v. Mayorkas*,

No. 3:187-CV-02366, 2021 WL 1312531 (S.D. Cal. Apr. 8, 2021) ........................................ 14

*Chande v. Barr*,

763 F. App'x 355 (5th Cir. 2019) ........................................................................ 16, 17

*Duncan Roy v. Cnty. of Los Angeles*,

No. CV129012BROFFMX, 2016 WL 11783814 (C.D. Cal. Nov. 18, 2016) .......................... 11

*Florida v. United States*,

No. 3:21-cv-01066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) .......................................... 6, 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs, (TOC), Inc*.,

528 U.S. 167 (2000) ......................................................................................... 7, 22

*In re Terra Int'l*,

134 F.3d 302 (5th Cir. 1998) ............................................................................... 16

*Judicial Watch, Inc. v. Reno*,

No. Civ.A. 00-0723, 2001 WL 1902811 (D.D.C. 2001) ................................................ 11, 14

*L. R. B. v. Capitol Fish Co.*,

294 F.2d 868 (5th Cir. 1961) ............................................................................. 9, 10

*Lin v. U.S. Dept. of Justice*,

459 F.3d 255 (2d Cir. 2006) ......................................................................... 11, 12, 17

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,*

   894 F.2d 1482 (5th Cir. 1990) ................................................................................ 16

*Ms. L. v. U.S Immigr. & Customs,*

   *Enf't,* 310 F. Supp. 3d 1133 (S.D. Cal. 2018) ...................................................... 12

*Ms. L. v. U.S Immigr. & Customs,*

   *Enf't,* 331 F.R.D. 529 (S.D. Cal. 2018), *modified,* 330 F.R.D. 284 (S.D. Cal. 2019) ......... 12, 17

*Ms. L. v. ICE,*

   403 F. Supp. 3d 853 (S.D. Cal. 2019) .................................................................. 13

*Owino v. Holder,*

   771 F.3d 527 (9th Cir. 2014) ................................................................................ 11

*Phillips v. Immigration and Customs Enforcement,*

   385 F. Supp. 2d 296 (S.D. N.Y. 2005) ................................................................. 11

*Tuffly v. U.S. Dep't of Homeland Sec.,*

   870 F.3d 1086 (9th Cir. 2017) .............................................................................. 8

*U.S. Dep't of State v. Ray,*

   502 U.S. 164 (1991) ............................................................................................. 17

*U.S. ex rel. Touhy v. Ragen,*

   340 U.S. 462 (1951) ............................................................................................. 10

**Statutes**

5 U.S.C. § 22 ................................................................................................................. 10

8 U.S.C. § 1367 ............................................................................................................. 18

8 U.S.C. § 1158 ............................................................................................................. 5, 15

8 U.S.C. § 1182(d)(5) .................................................................................................... 22

8 U.S.C. § 1231(b)(3) ................................................................................... 5, 15

8 U.S.C. § 1252 ............................................................................................... 2

8 U.S.C. § 1612 ............................................................................................... 22

**Regulations**

8 C.F.R. § 208.14(a) ....................................................................................... 2

8 C.F.R. § 1240.17 ...................................................................................... 2, 3

8 C.F.R. § 214.11(p) ...................................................................................... 18

8 C.F.R. § 214.14(e) ...................................................................................... 18

8 C.F.R. § 208 ................................................................................................. 1

8 C.F.R. § 208.6 ................................................................................... passim

8 C.F.R. § 1208.17 ...................................................................................... 5, 15

29 C.F.R.§ 102.118 ........................................................................................ 9

86 Fed. Reg. 46906 ..................................................................................... 1, 2

87 Fed. Reg. 18078 (Mar. 29, 2022) ........................................................ 2, 22

**Introduction:**

Plaintiffs' motion to compel should be denied to the extent it seeks to compel the disclosure of the identities of noncitizens seeking asylum, withholding of removal, or protection under the regulations implementing the Convention Against Torture ("CAT"). That information is irrelevant and confidential, and its disclosure potentially dangerous. The remainder of Plaintiffs' motion was premature when it was filed because Defendants repeatedly—at least five times—told Plaintiffs that they were revising their objections, continuing to search for responsive documents, and had not yet determined the extent to which any documents might be withheld based on the objections that Plaintiffs challenge in their motion. And now that Defendants have completed that review, most of Plaintiffs' motion is moot.

**Background:**

On August 20, 2021, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (collectively "the Departments") published a notice of proposed rulemaking ("NPRM") that proposed amending regulations at 8 C.F.R. §§ 208, 235, 1003, 1208, and 1235 in order "to improve the Departments' ability to consider the asylum claims of individuals encountered at or near the border more promptly while assuring fundamental fairness." 86 Fed. Reg. 46906, 46906 (Aug. 20, 2021). The regulations affected by the NPRM govern "the determination of certain protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture." *Id.*

Under the rule as proposed in the NPRM, individuals in expedited removal proceedings could have their claims for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("INA") ("statutory withholding of removal"), or CAT initially adjudicated by an asylum officer within U.S. Citizenship and Immigration Services ("USCIS").

1

*Id.* Individuals who are granted asylum or protection by the asylum officer would be entitled to asylum, statutory withholding of removal, or protection under CAT, as appropriate. *Id.* Individuals who are denied protection would be able to seek prompt, de novo review by an immigration judge ("IJ") in the DOJ Executive Office for Immigration Review ("EOIR"), with appeal available to the Board of Immigration Appeals ("BIA"). *Id.* Review would also be available in the federal courts in accordance with the provisions of 8 U.S.C. § 1252. 86 Fed. Reg. at 46921 & n.50.

Organizations and individuals submitted over 5,200 comments for consideration regarding the NPRM during a 60-day comment period that closed on October 19, 2021. *See* USCIS 2021-0012-0001, October 19, 2021 (https://www.regulations.gov/document/USCIS-2021-0012-0001). Following a review of the comments received, on March 29, 2022, the Departments issued an interim final rule ("IFR"). 87 Fed. Reg. 18078 (Mar. 29, 2022). The March 29, 2022 IFR responded to the comments received in response to the NPRM and adopted the NPRM with 23 changes. 87 Fed. Reg. at 18078, 18081. Like the NPRM, the IFR provides that asylum officers may conduct asylum merits interviews and grant asylum to individuals who qualify. However, the IFR departs from the NPRM by amending "8 C.F.R. §§ 208.14(a) and 208.16(a) and (c) to provide that if an asylum officer conducting an Asylum Merits interview . . . does not grant asylum to an applicant, the asylum officer" will not issue an order of removal as proposed in the NPRM, but "will refer the application – together with the appropriate charging document and written findings of, and the determination on, eligibility for statutory withholding of removal or CAT protection – to an [immigration judge] for streamlined [INA] section 240 proceedings." 87 Fed. Reg. at 18086. In turn, the IFR adds a new provision to the DOJ regulations at 8 C.F.R. § 1240.17 to impose streamlining measures that enable immigration judges to complete such proceedings originating from an Asylum Merits interview "more expeditiously than ordinary section 240 proceedings". 87

Fed. Reg. at 18087. These changes are intended to ensure that proceedings under the IFR quickly resolve meritorious claims, while also ensuring that individuals without meritorious claims are removed as quickly as reasonably possible. *Id*.

By issuing an IFR, the Departments provided "the public with an additional opportunity to comment" beyond what was legally required "given the new procedures and scheduling deadlines applicable to the IFR's streamlined EOIR process, the limited time between issuance of this IFR and when the first cases will be calendared for hearings, and the changes made to facilitate a shift from the proceedings proposed in the NPRM to the IFR's streamlined 240 proceedings." 87 Fed. Reg. at 18081. Thus far, the IFR has been applied only to "single adults . . . whose intended destination is one of seven destination cities (Boston, New York, Newark, Miami, Chicago, Los Angeles, and San Francisco)," with fewer than 1,000 cases being referred for an asylum merits interview as of January 2023 and only 130 cases being handled by an asylum office located in any one of the twenty-three Plaintiff States. https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report[1].

On April 4, 2022, Plaintiffs, a group of twenty-three States led by Louisiana, filed a complaint challenging the IFR under the Administrative Procedure Act, INA and Constitution. On May 6, 2022, Plaintiffs amended their complaint, ECF No. 14, and on November 20, 2022, filed a second amended complaint, ECF No. 86. At bottom, they allege that the "IFR makes it substantially easier for unauthorized economic migrants to enter the United States and obtain asylum through false claims." *Id.* at ¶ 2. And they claim that more noncitizens admitted through the rule will result in more noncitizens in their States consuming resources and costing the States money for medical care, education and law enforcement, among other costs. *Id*. at ¶¶ 73-143.

---

[1] Data available through January 2023.

3

Although Plaintiffs had initially filed a motion for preliminary injunction, ECF No. 22, they later withdrew that motion, ECF No. 79. The Court then issued an ordering permitting the parties to engage in jurisdictional discovery and stayed Defendants' time to answer or otherwise respond to the second amended complaint until the completion of jurisdictional discovery. *Id*. The Court has extended the deadline by which jurisdictional discovery is to be completed, and the current deadline is May 23, 2023. ECF No. 129.

**<u>Procedural History</u>**:

The parties began discovery in 2022; Defendants produced a 14,952-page Administrative Record on June 3, 2022, and on June 17, 2022, Defendants produced an additional 2,477 pages of discovery in response to Plaintiffs' first set of discovery requests. On February 9, 2023, Plaintiffs served Defendants with a second set of discovery requests. On March 21, 2023, the Parties jointly moved to extend the discovery cut-off by sixty days. ECF No. 128. At that time, the Parties advised the Court that although "[t]he Parties anticipate[d] providing responses and objections to the discovery requests" shortly after filing the joint extension motion, the Parties also "anticipate[d] that it will take at least another 30 days to identify, collect, review, and produce responsive documents." ECF No. 128, at 1. Finding good cause, the Court extended the discovery cut-off to May 23, 2023. ECF No. 129.

On March 24, 2023, Defendants served Plaintiffs with their initial responses to Plaintiffs' second set of discovery requests. *See* Exhibit A, Defendants' Responses to Plaintiffs' Second Set of Discovery Demands. Defendants noted in the responses that they were continuing to search for documents and would provide revised responses and likely additional documents when that search was concluded. *Id*. Shortly thereafter, at Plaintiffs' request, the parties conferred on those responses, and Defendants advised Plaintiffs that the issues they raised were premature because

they would mostly be resolved when Defendants completed their production and served revised responses in the following weeks. On April 4, 2023, rather than wait for Defendants' production to be completed, Plaintiffs filed a motion compel. ECF No. 144. On April 24, 2023, Defendants served Plaintiffs with their revised responses to Plaintiffs' second set of discovery demands, *see* Exhibit B—as they had always planned to do—along with an additional 3,408 pages of documents.

## **ARGUMENT**

A. **The Court Should Deny Plaintiffs' Motion to Compel Documents or Information Disclosing the Identities of Asylum Seekers Because This Information is Not Relevant, Is Confidential, and Could Expose Individuals to Grave Danger.**

   i. **The identities of asylum seekers is not relevant.**

In many of their demands, Plaintiffs seek not only data regarding the number of asylum seekers released into the United States—both pursuant to the processes announced in the IFR and pursuant to preexisting processes—but also seek their identities. For example, in Request for Production ("RFP") number 5, Plaintiffs request "DOCUMENTS sufficient to IDENTIFY by year and month, all persons granted asylum by USCIS pursuant to 8 U.S.C. § 1158, withholding of removal pursuant to 8 U.S.C. § 1231(b)(3), or relief under the Convention Against Torture pursuant to 8 C.F.R. §§ 1208.17 and 1208.18." *See* Exhibit A at RFP 5. Plaintiffs define the term "IDENTIFY," with respect to a person, to mean "the person's full name, alien registration number (A-number), country of citizenship or nationality, residence in the United States, mailing address in the United States, telephone number, and date of birth." As set forth below in Section A(ii), this information is confidential, and pursuant to regulation cannot be disclosed. It is also not relevant. Plaintiffs' standing argument depends upon whether they have spent more money on providing services to noncitizens living in their States who were processed via the procedures set forth in the IFR than they had previously spent on noncitizens living in their States who were processed under

processes that pre-date the IFR. Thus, the critical factors are how many noncitizens processed under the IFR have gone to live in the Plaintiff States,[2] how that number compares to data predating the IFR, if there are more asylees getting State benefits than before the IFR, and whether Plaintiffs can show the States have incurred additional costs post-dating the IFR compared to the period predating the IFR, which they can trace to the IFR. The identities of those individuals are irrelevant to that assessment.

Plaintiffs argue, however, that the identities of asylum seekers are relevant because if they had the names of these individuals, they could go to their State agencies, particularly their Department of Education, and ask if those named individuals have used their services. *See* ECF No. 156, Tr. of April 18, 2023 hearing, at 22:28-20.[3] Plaintiffs argue they need to do it this way because in litigation in Florida, regarding programs different than those challenged here, Defendants argued that Florida's inability to tie costs to specific noncitizens defeated standing. Pl. Mot. at 11-12, referring to *Florida v. United States*, No. 3:21-cv-01066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023). But, Plaintiffs' argument fails for several reasons. First, Plaintiffs misunderstand the arguments made in *Florida*. Defendants did not argue, nor did the Court find, that the State had to tie its alleged costs to specifically named noncitizens. Rather, Defendants argued that the State had to tie its costs to the policies and alleged policies it was challenging. *Id.,*

---

[2] The Asylum IFR has been implemented only as to applicants for admission who state an intention to settle in seven cities— Boston, New York, Newark, Miami, Chicago, Los Angeles, and San Francisco —only one of which is in any of the twenty-three Plaintiff States.
[3] Notably, as discussed further below, Plaintiffs have also argued that even if they had these identities, they could not get information from their own State agencies about these individuals without issuing third-party subpoenas to those agencies. This explanation was never provided to Defendants directly, nor does it appear in Plaintiffs' motion to compel, but instead was explained at the hearing on certain non-parties' motions to quash subpoenas. In any case, if, as Plaintiffs maintain, they do not even have the information for which they argue identities are relevant, that further undermines the relevance of identifying information.

6

ECF No. 156, at 67-82. In other words, because Florida challenged the government's parole policies (and alleged policies) at the Southwest border since January 2021, Defendants argued that the State needed to show that its injury (financial costs) was traceable to parole, at the Southwest border, since January 2021—as opposed to, for example, an influx of people into Florida from other States based on the fact that Florida remained open during the Pandemic. *Id*. This was not a novel argument. Traceability is an element of standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs, (TOC), Inc*., 528 U.S. 167 (2000) (Article III standing requires Plaintiffs show a "concrete and particularized" injury that is "fairly traceable" to the challenged government action.)

Second, even if Plaintiffs could show that a specifically identified noncitizen granted asylum under the IFR used State services resulting in a cost to the State, that alone does not establish standing. If the total cost to the State is not higher than it was before the IFR was implemented, then there is not even a basis for Plaintiffs to argue for standing. Thus, it is not the individual noncitizens' use of State funded services that is relevant to standing, but the aggregate of such figures.

Third, this case differs from *Florida* in a critical way. One of the intended purposes of the IFR is to speed up the process of asylum adjudication such that noncitizens denied asylum will be removed more quickly. Therefore, even if Plaintiffs could show that the IFR caused the asylum grant rate to go up—which the data shows is not the case—and that those noncitizens granted asylum under the IFR are using State resources at a cost to the State in excess of the cost previously imposed by noncitizens granted asylum, overall, the costs to the State may still be lower because noncitizens with non-meritorious claims are being removed more quickly and spending less time in the United States as a result.

Furthermore, the government has already produced documents that show the aggregate number of noncitizens processed under the IRF, where those individuals have been processed, and the outcome of their claims. That data shows that, rather than increasing as Plaintiffs speculated, the grant rate for asylum claims under the IFR, and the overall number of asylum grants to individuals in Louisiana or Florida (including those not processed under the IFR) are in line with historical trends. Plaintiffs have not shown how the data that Defendants produced is inadequate. Moreover, as to Louisiana, the IFR does not even apply at present. Accordingly, their request for the identifying information of particular asylum seekers is not relevant. *See Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086, 1095 (9th Cir. 2017) (government not required to disclose identities of noncitizens released from detention in FOIA litigation because their identities were not relevant to understanding government's actions).

Finally, it bears mentioning, that at the April 18, 2023 hearing, counsel for Louisiana told the Court that even if it were to receive the identifying information it seeks, in order to get responsive information from their State agencies, they would have to issue subpoenas to those agencies, because Louisiana's attorney general's office has no control over those agencies.[4] ECF No. 156, Tr. at 38:15-21. Assuming that is true, whether, how, or to what extent those agencies may comply with those subpoenas is unknown.

### ii. Regulations prevent Defendants from releasing the identities of specific asylum seekers.

In addition to being irrelevant, the identities of those seeking asylum, withholding of removal and protections under the CAT is confidential because such information may jeopardize

---

[4] In fact, counsel for Louisiana has claimed that he does not represent those agencies and those agencies are not part of this case. If that is true, then the State cannot premise Article III standing upon harms allegedly sustained by those agencies. *See* Defendants' Motion to Compel, ECF No. 157, at 6-11.

the safety and security of noncitizens and their families. In support of this confidentiality, Defendants have invoked 8 C.F.R. §§ 208.6 and 1208.6 in response to certain of Plaintiffs' discovery demands seeking the release of this information. *See e.g.* Ex. A, RFP Nos. 2, 5.

Those regulations provide:

> Information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the [Immigration and Nationality] Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reason-able fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary [or Attorney General].

Plaintiffs argue that Defendants cannot, by regulation, create a privilege that contravenes the Federal Rules of Civil Procedure, and that even if they could, the privilege is discretionary, and Defendants have selectively disclosed such information in the past. Pl. Mot. at 12-14. Plaintiffs are wrong.

Plaintiffs rely upon *N. L. R. B. v. Capitol Fish Co.*, 294 F.2d 868, 874 (5th Cir. 1961) for the proposition that Defendants cannot create a substantive privilege by regulation. But Defendants do not seek to create a privilege, and Plaintiffs' reliance on *Capital Fish* is misplaced. *Capital Fish* concerned a determination by the National Labor Relations Board that the Capital Fish seafood company discriminatorily discharged an employee because of his union activities. Capital Fish argued that it was denied due process in the administrative trial and appeal because it was precluded from soliciting the testimony of the Board's investigator, and had it been able to do so, it would have shown that he had personal bias in his investigation and convinced other witnesses to lie. *Id.*, 294 F.2d at 869. The Board prevented Capital Fish from speaking to or soliciting testimony from its investigator by relying upon a N.L.R.B. Regulation, 29 C.F.R. § 102.118, which

prohibited Board employees from producing files or records or testifying in regard thereto without permission of the Board or General Counsel. *Id*. at 870. That regulation was, in turn, issued under 5 U.S.C. § 22, authorizing the head of each department to prescribe regulations for the "custody, use, and preservation of the records, papers and property" of his department. *Id*. The Court found that while Section 22 has been upheld, including by the Supreme Court, *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), it was intended to centralize determinations of when to assert and when not to assert a privilege. *Id*. at 872. It did not authorize agencies to create new privileges that do not otherwise exist. *Id*. The Court in *Capital Fish* found "[t]here is no suggestion in the record that the testimony sought to be elicited [] is privileged." *Id*. at 875. It also found there were no issues of confidentiality. "The testimony does not involve matters vital to national security [] or information which should be kept secret for other reasons." *Id*. On the contrary, the investigator was a fact witness, and significant evidence corroborated Capital Fish's claim that the investigator was biased and convinced other witnesses to lie. *Id*. at 871. "Fundamental fairness" required that Capitol Fish "be allowed to introduce testimony that may impeach the evidence offered against it." *Id*. at 875. The Court concluded that while "government papers may be privileged because of their confidential nature," *id*. at 874, there was nothing confidential or privileged about the testimony of the Board's investigator, and the agency could not create a privilege out of thin air.

Here, Defendants have not objected to providing identifying information of asylum applicants because such information is *privileged*. *See* Exhibit A, B. Defendants have objected because the information is *confidential* under 8 C.F.R. §§ 208.6, 1208.6. *Id*. And the reason for that confidentiality, and the promulgation of sections 208.6 and 1208.6, is grounded in common sense: "Mindful . . .  that the public disclosure of [information pertaining to an asylum application] could subject an applicant to retaliatory measures in his country of origin and endanger his relatives

still residing abroad, the Attorney General has issued regulations providing that federal officials must, with limited exceptions, maintain in confidence information relating to applicants' asylum applications." *Owino v. Holder*, 771 F.3d 527, 533 (9th Cir. 2014). Other courts have similarly held that the need to keep confidential the identity of asylum seekers outweighs the public interest of disclosure. *See, e.g.*, *Duncan Roy v. Cnty. of Los Angeles*, No. CV129012BROFFMX, 2016 WL 11783814, at *3 (C.D. Cal. Nov. 18, 2016) (denying motion to compel responsive documents pertaining to, or containing information contained in, any asylum application, credible fear determination, or reasonable fear determination because the language in Section 208.6 is "unambiguous," and "[n]one of the enumerated exceptions allows for DHS's production of such documents in civil discovery."); *Phillips v. Immigration and Customs Enforcement*, 385 F. Supp. 2d 296 (S.D. N.Y. 2005) (denying FOIA request for production of documents attached to asylum application on ground that promise of confidentiality in Section 208.6 created "justifiable expectation of privacy" that was not outweighed by limited public interest in documents); *Judicial Watch, Inc. v. Reno*, No. Civ.A. 00-0723, 2001 WL 1902811 (D.D.C. 2001) (unpublished opinion) (holding that the public interest in disclosure of asylum matters in a request under the FOIA was outweighed by the recognized need for confidentiality in asylum matters). And at least one Court of Appeals has found that the government's violation of Section 208.6 can create a new risk of persecution independent of the original claim for asylum. *See Lin v. U.S. Dept. of Justice*, 459 F.3d 255 (2d Cir. 2006). In *Lin*, the court held that the U.S. consulate violated the regulation when it asked the Chinese government to verify certain documents which contained the applicant's name, sex, age, prisoner number, and former residency in China. *Id*. at 258. The court held that, on an application for asylum, information need not be "sensitive" to be considered confidential under the statute prohibiting disclosure of confidential information. *Id*. at 262. Disclosure is prohibited

if the information provided to the third party enables that party to infer that the subject of the information has applied for asylum in the United States. *Id.* at 266.

Plaintiffs argue that even if Defendants properly invoke the confidentiality protections of 8 C.F.R. §§ 208.6, 1208.6, Defendants have waived those protections in the past, and should be compelled to do so here. Pl. Mot. at 15. Plaintiffs point to *Ms. L. v. U.S.C.I.S.*, No. 18-cv-0428, 1144 (S.D. Cal.) and *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-2366 (S.D. Cal.) as two cases where Defendants allegedly agreed to disclose the identities of asylum seekers, thereby waiving the protections of the regulations. Pl. Mot. at 13-14. But those cases present markedly different circumstances than this case and, most critically, the courts in those cases ordered disclosure of noncitizens' identifying information to their own class counsel representing them in federal court litigation, not to an unrelated third-party like Plaintiff States.

*Ms. L.* is a class action filed by migrant parents alleging that agencies of the U.S. government violated their due process rights, the APA and INA when those agencies separated them from their children while they were being held in immigration detention without showing that they were unfit or presented a danger to the child. On June 26, 2018, the Court granted class certification, *Ms. L. v. U.S Immigr. & Customs Enf't*, 331 F.R.D. 529 (S.D. Cal. 2018); *modified,* 330 F.R.D. 284 (S.D. Cal. 2019), along with a preliminary injunction requiring reunification of *Ms. L.* class member parents with their children. *Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). To fulfill the preliminary injunction, the government identified parents who were separated from their children at the United States-Mexico border and who therefore were likely class members. The Court, in a series of oral and written orders, then directed Defendants to provide class counsel with several lists of class members who had been separated from their children at the Southwest border. *See, e.g., Ms. L. v. U.S Immigr. & Customs*

12

*Enf't*,, Case No. 18-cv-428  (S.D. Cal.), 7/6/18 Tr. at 43:8-47:3 (discussing the need for a court order and protective order allowing for production of a list of class members to Plaintiffs and the Court); ECF Nos. 108, 158, 162 (ordering Defendants to provide various lists of class members). Defendants produced these lists of class members only because they were ordered by the Court to do so under a protective order. At no point were any of these disclosures intended to provide the asylum status of any individual, nor was information about any individual's asylum status included in those productions.[5] Indeed, the certified class was not defined by whether one was an asylum seeker, nor was it related to asylum status in any way. Further, the lists of class members were provided to the noncitizens' own attorneys representing them in litigation pursuant to Court orders for the purpose of complying with the injunction and reunifying class member parents with their minor children. Here, in contrast, Plaintiffs are seeking information on asylum seekers who are in no way involved in or a party to this case.

In the *Al Otro Lado* case, the district court ordered information-sharing about members of a certified class with class counsel for purposes of implementing the benefits provided to that class by the court's preliminary injunction.  *Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 932-34 (S.D. Cal. 2020). Specifically, the court clarified its preliminary injunction against application of an asylum eligibility rule to a certified class of asylum-seekers who had tried to enter before the rule's effective date, holding, among other things, that its injunction required the government to make

---

[5] Defendants also, under a later Court order, produced information to Plaintiffs about a smaller set of class members who were seeking to return to the United States. *See Ms. L. v. ICE*, 403 F.Supp.3d 853, 861 (S.D. Cal. 2019) ("[T]he Court requested supplemental briefing from the parties and ordered Defendants to produce the parents' immigration records to fully develop the facts of each parent's case. (*See* ECF No. 437.)"). These disclosures may in some instances have included information about asylum claims, but they were for the limited purpose of providing the Court a full record on which to decide Plaintiffs' motion and, as with the lists, pertained only to class members.

additional efforts to identify class members and notify them of the injunction, and that class counsel's access to the contact details for class members would allow them to "facilitate the notification process for those who were removed and remain outside the United States." *Id.* The government later moved for a protective order to limit further disclosure by class counsel of the information. The Magistrate Judge held that Section 208.6 cannot be used to impose restrictions on how Plaintiffs' class counsel treat the information, although the court agreed "that much of the information contained in an asylum seeker's file is likely to be sensitive, and that some protection against unfettered disclosure of that information is warranted." *Al Otro Lado, Inc. v. Mayorkas*, No. 3:187-CV-02366, 2021 WL 1312531, at *5 (S.D. Cal. Apr. 8, 2021). Notably, the Magistrate Judge's decision to deny (in part) the government's motion was partially based on the fact that information was already safeguarded because class counsel "owe a fiduciary duty to the class – including putative class members." *Id.* at *5 (S.D. Cal. Apr. 8, 2021).

Thus, in both cases, the Courts ordered disclosure of certain information concerning asylum-seeking migrants *to their counsel.* Here, by contrast, Plaintiffs are not counsel for the noncitizens whose asylum status and related documents they seek. Neither do they have any other type of fiduciary relationship with those noncitizens. On the contrary, their interests are generally adverse to the noncitizens whose asylum status and documents they seek. Indeed, by their counsel's own admission, if they had this information, their intention is to disseminate it further, including to agencies over whom they have no control. ECF No. 156, Tr. at 22:18-20.[6] There is no parallel between this case and the court ordered disclosures made in *Ms. L* and *Al Otro Lado*.

---

[6] As confidential information is disseminated to more entities and more people have access to it, the risk of even inadvertent disclosure increases.

Plaintiffs argue, however, that even disregarding *Ms. L.* and *Al Otro Lado*, the Court can surmise that "Defendants release asylum-related information when it's convenient for them to do so" by looking at the declaration of Frances Elizabeth Kelly, filed by a third party in this case. Pl. Mot. at 15, citing ECF No. 122-3. Ms. Kelly is an employee of Louisiana Advocates for Immigrants in Detention (LAID), one of the non-governmental organizations (NGO) to whom Plaintiffs issued subpoenas. She states in her declaration that "ICE provides us with an electronic manifest of these individuals' names approximately 24 hours before release." ECF No. 122-3, at ¶ 15. Plaintiffs argue that because ICE provides information concerning the release date from detention of certain noncitizens to LAID, there is no basis for deeming asylee's information confidential in this case. Pl. Mot. at 15. This argument is flawed. First, ICE does not disclose to its NGO partners, including LAID, the asylum status of any noncitizen nor provide them with documents contained in those noncitizens' A-files. Nor does Ms. Kelly say otherwise. What she says, and what ICE sometimes does, is disclose to certain NGO partners the identities of individuals *being released from ICE detention* so that the NGOs can assist those individuals with obtaining housing, legal services, and other support. ICE does not disclose their nationalities, their dates of birth, when they came to the United States, how they came to the United States, where they entered the United States, their addresses, whether they claimed asylum, or the status of that request. Here, by contrast, Plaintiffs seek for example, "DOCUMENTS sufficient to IDENTIFY by year and month, all persons granted asylum by USCIS pursuant to 8 U.S.C. § 1158, withholding of removal pursuant to 8 U.S.C. § 1231(b)(3), or relief under the Convention Against Torture pursuant to 8 C.F.R. §§ 1208.17 and 1208.18." *See* Exhibit A at RFP 5.

In sum, Plaintiffs have not shown that Defendants have selectively waived the protections of 8 C.F.R. §§ 208.6 and 1208.6 such that they should no longer be permitted to rely upon the

regulations to protect the confidential information of third-party asylum seekers. Nor is it clear that Defendants can waive confidentiality provisions created for the benefit of third parties not before the Court. Defendants have invoked 8 C.F.R. §§ 208.6, 1208.16 for the very serious and real purpose of safeguarding the life and safety of asylum applicants and their families.

Plaintiffs trivialize that concern. They cite to *Chande v. Barr*, 763 F. App'x 355, 356 (5th Cir. 2019), *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998) and *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) for the proposition that such "generic concerns" are insufficient to support the issuance of a protective order. Pl. Mot. at 15. But the issue here has nothing to do with a protective order. And the cases to which Plaintiffs point are irrelevant. *In Re Terra* and *McLeod* have nothing to do with immigration. *In Re Terra* was a products liability case and the issue pertained to the sequestration of witnesses prior to deposition. *In re Terra Int'l*, 134 F.3d 302. *McLeod* was a lawsuit by a law firm against a former client for unpaid legal fees and the issue was boilerplate objections to discovery. *McLeod,* 894 F.2d 1482.

*Chande* is irrelevant for other reasons. *Chande* went to the Court of Appeals on a petition for review by a Tanzanian national challenging the BIA's decision affirming the IJ's denial of his motion to reopen his immigration proceedings. That court references Section 208.6 only in passing when it notes that even if the petitioner could establish that a deportation officer disclosed information in violation of 8 C.F.R. § 208.6, he had not shown that Tanzania persecutes asylum seekers upon their return, thus requiring the BIA to order the immigration judge to reopen the petitioner's removal proceedings. *Chande*, 763 F.App'x at 356. Plaintiffs have not explained how *Chande* has any relevance here. Nor can they. On the contrary, *Chande* implicitly acknowledges

that in certain circumstances the government's violation of Section 208.6 may create a new basis for a noncitizen to seek asylum. Indeed, that was the holding in *Lin*, supra.[7]

And while Plaintiffs minimize the danger to the noncitizens whose identities they seek as mere "generic concerns," the Supreme Court held in the context of a FOIA matter that the disclosure of information identifying by name individuals who have sought political asylum is not "*de minimis*," but rather is "significant." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 (1991). There, the Supreme Court overturned a decision by the Eleventh Circuit Court of Appeals affirming a district court order which permitted the disclosure of the names and addresses of Haitian noncitizens who applied for political asylum in the United States. *Id*. In reaching its conclusion, the Court determined that "the Court of Appeals gave insufficient weight to the fact that the [asylum] interviews had been conducted pursuant to an assurance of confidentiality." *Id*. at 549. And it noted that although the actual risk of danger was "impossible to measure," "the privacy interest in protecting these individuals" "must be given great weight." *Id*. at 548.

And yet, here, Plaintiffs seek the identities of individuals seeking asylum, withholding of removal, and protections under the CAT since 2019—those processed under the procedures in the IFR and those processed before its issuance. As set forth above, not only are the identities of such

---

[7] And in *Asylum Seekers Trying To Assure Their Safety v. Johnson et al.*, case number 23-cv-163, currently pending in the U.S. District Court for the District of Columbia, a group of asylum seekers whose personal information was inadvertently exposed have sued the federal government seeking an order compelling the government to presume the breach endangers them in weighing their asylum claims. *Id*. ECF No. 6 at ¶ 9. The plaintiffs claim "they will have to look over their shoulders for the rest of their lives," *id.* at ¶ 124, and that they face persecution or death if sent home to governments that may know or find out they sought asylum in the United States. *Id*. at ¶ 120. The personal information, which was exposed in late November, included the asylum seekers' names, countries of origin, birthdays, detention locations in the U.S. and alien registration numbers. *Id*. at ¶ 4.

noncitizens irrelevant to standing, such disclosure would violate 8 C.F.R. §§ 208.6, 1208.16,[8] potentially expose many noncitizens and their families to danger, and potentially open up an additional basis upon which they may ground their claims of asylum. These weighty confidentiality concerns outweigh whatever benefit, if any, there might be from disclosure as part of this case, particularly where Plaintiffs cannot show this information is relevant and necessary.

To the extent Plaintiffs' requests seek the identities of specific noncitizens, their motion should be denied.

**B.  Plaintiffs' motion to compel was premature and is now largely moot.**

Plaintiffs complain that Defendants "refuse to provide the discovery sought by Plaintiff States," Pl. Mot. at 1, "Defendants' entire document production consist[s] of a link to a single, publicly available document from last December," Pl. Mot. at 5, and that at a meet-and-confer, "Defendants refused to withdraw their objections" to Plaintiffs' second set of discovery demands. *Id.* Plaintiffs mischaracterize Defendants' position, the scope of Defendants' document production, and the substance of the meet-and-confer. Furthermore, many of Plaintiffs' arguments are now moot.

As the Court is aware, on March 21, 2023, the Parties jointly moved to extend the discovery cut-off by sixty days. ECF No. 128. At that time, the Parties advised the Court that although "[t]he Parties anticipate[d] providing responses and objections to the discovery requests" shortly after filing the joint extension motion, the Parties also "anticipate[d] that it will take at least another 30

---

[8] Some of the noncitizens for whom Plaintiffs seek information may also be subject to additional statutory protections for those seeking U-visas, T-visas, or qualify for additional protections under the Violence Against Women Act. 8 U.S.C. § 1367; *see also* 8 C.F.R. § 214.14(e), 8 C.F.R. § 214.11(p). Determining whether a noncitizen qualifies for those additional protections might require a review of individual files.

days to identify, collect, review, and produce responsive documents." ECF No. 128, at 1. Finding

good cause, the Court extended the discovery cut-off to May 23, 2023. ECF No. 129.

Thus, even before Defendants served Plaintiffs with their initial responses to Plaintiffs'

second set of requests for production, Plaintiffs were on notice that Defendants were still in the

process of searching for responsive documents. When Defendants served Plaintiffs with their

initial responses, Defendants again advised Plaintiffs that they were still searching for documents

and anticipated serving revised responses and objections once the search was complete. The initial

responses made that clear:

> Defendants are still in the process of searching for potentially
> responsive information which will affect what Defendants
> ultimately produce, and may affect what objections and privilege
> assertions Defendants raise. Defendants anticipate serving revised
> responses and objections once the search for responsive information
> is complete and reserve the right to supplement, clarify, revise, or
> correct any or all of their responses to Plaintiffs' Requests for
> Production.

*See* Ex. A, at RFP 1.

Most of Defendants' individual objections also came with a caveat: "Subject to and without

waiving these objections, Defendants are continuing to search for responsive non-privileged

documents that can be produced and will provide such documents on a rolling basis to the extent

possible." *See e.g.* Ex. A, at ¶ 1.

Defendants reiterated this message by email on March 24, 2023, when the responses were

served:

> Attached are an initial set of responses and objections to your second
> set of discovery requests. As discussed, and as noted in these
> responses, we anticipate filing revised responses and objections
> after we complete the search for responsive documents.

*See* Ex. C, Transmittal email.

19

Defendants repeated this message yet again during the parties' meet-and-confer. And if there were still any doubt that Defendants intended to provide updated responses, amended objections, and almost certainly additional documents, Defendants repeated this message again in an email to Plaintiffs' counsel on March 30, 2023.

> I think all of this is premature while we're still searching for documents. As we previously discussed, agreed, and told the Court, we need approximately another 30 days to search for responsive documents, and we plan to serve updated responses and objections once we have completed that search and production. I don't know that any of this is ripe for discussion until we determine what we're producing and whether we ultimately withhold documents based on our objections or revise those objections.

*See* Ex. D, follow-up email.

In short, Defendants informed Plaintiffs' counsel at least five times that Defendants were still searching for responsive documents to Plaintiffs' second set of discovery demands, planned to serve updated responses and objections once Defendants had completed their search, and had not yet determined whether they would withhold documents on the basis of their prior objections. Accordingly, Plaintiffs' motion to compel was premature at the time it was filed. Indeed, Rule 37(a)(1) provides that a party shall not move to compel without certifying that "the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." The Local Rules for the Western District of Louisiana contain the same requirement. L.Civ.R. 37.1. Plaintiffs did not attach the required certification, nor disclose in their motion that Defendants were still looking for documents and intended to revise their responses. Indeed, they knew that they might obtain much of the discovery they sought "without court action" if they simply waited for Defendants to conclude their search for responsive material—which was expressly contemplated by the Parties when they jointly requested, and this Court granted, a sixty-day enlargement of time to complete discovery. And, in

fact, they have now received Defendants' revised discovery responses and 3,408 pages of additional documents—in addition to the 14,952 pages of the administrative record and the 2,477 pages that were produced in response to Plaintiff's first set of document demands.

**C. Many of Plaintiffs' requests are overly broad, unduly burdensome and not relevant.**

The Court authorized "jurisdictional discovery" related to Plaintiffs' alleged Article III standing based on "the effect of the IFR on certain discrete programs in the states of Louisiana and Florida." ECF No. 98. Yet Plaintiffs seek discovery beyond the scope authorized by the Court and interpose requests that are irrelevant to standing and/or are overly broad or unduly burdensome. For example, Plaintiffs have not explained the relevance of their requests seeking information about nationality, processing times, and parole.

Plaintiffs argue that "eligibility for certain public benefits at issue is dependent on the nationality of the asylum applicant and the time for which the applicant has been paroled." Pl. Mot. 10 (citing Pl. Mot. Exh. 9, at LADOJ-ASYLUM2300). But Plaintiffs have provided no further explanation for why this information is relevant to Plaintiffs' standing, and they did not raise this issue when the Parties' conferred on Defendants' initial responses to Plaintiffs' discovery requests or provide any clarity on the relevance of the information they seek. Their motion does not identify what public benefits are relevant or dependent on nationality or processing times. The only document they cite in support of this proposition is Exhibit 9 to their motion, which they describe as a "copy of a printout from healthcare.gov." *See* ECF No. 144-2 at 2, 144-11. And the specific page of the document they cite, LADOJ-ASYLUM2300, addresses federal health benefits that are predominantly paid by the federal government rather than the States. Moreover, this document says nothing about the nationality of asylum seekers, and the only time limit it mentions—a 5-year waiting period for certain categories of immigrants to obtain Medicaid and CHIP coverage—does

not apply to asylees. ECF NO. 144-11 at 2. In any event, the IFR was put in place in May of 2022. 87 Fed. Reg. 18,078. Since that rule has been in place for less than a year, if Plaintiffs are seeking information on the number of asylum seekers processed under the rule who have been in the United States for five years, no discovery is necessary to determine that the answer is zero.

Plaintiffs certainly have not explained how information about nationality or processing times for asylum seekers processed under the rule could show an increase in State expenditures with respect to asylum seekers.[9] Plaintiffs have disputed that they are required to show that the particular rule they challenge in this case has caused increased State expenditures, but a basic requirement of standing is establishing a concrete injury that is traceable to the specific thing a plaintiff challenges, and thus may be redressable by a favorable decision. *Friends of the Earth, Inc.*, 528 U.S. at 180-81. Moreover, the government has pointed Plaintiffs to data the government has made publicly available on the use of the rule. While Plaintiffs complain about Defendants providing "a single internet link" in their initial responses to the discovery requests, Pl. Mot. at 1, that link includes various spreadsheets containing extensive information about how the rule has been implemented thus far.[10] The data provided includes information about the number of claims

---

[9] On nationality, Plaintiffs simply note that Defendants sought information in their requests for discovery pertaining to the nationality of certain noncitizens the States claim are receiving certain benefits at a cost to their States. *See* Pl. Mot. at 10 (referring to Defendants' request for production number 9, Pl. Ex. 8 at RFP 9). That request for data on nationality is relevant because with limited exceptions for Haitian, Cuban, Afghani and Ukrainian nationals, noncitizens paroled into the United States, pursuant to 8 U.S.C. § 1182(d)(5), are ineligible for many benefits, such as Medicaid, SNAP, TANF, until they have been in the United States for five years. 8 U.S.C. § 1612 and § 1613. Thus, information about the nationality of noncitizens receiving these benefits in the States will not show an increase in States expenditures, but may show that many of these individuals are not even eligible for benefits.

[10] Plaintiffs' claim was also inaccurate even when they made their motion. Defendants had already provided thousands of pages of documents in response to Plaintiffs' earlier discovery requests, some of which are also responsive to Plaintiffs' second round of discovery requests. And this production was in addition to the many thousand-page administrative record Defendants provided for the rule. Plus, as noted in the Parties' conferral, the Parties' joint motion to extend discovery,

22

processed, where those claims were processed and when, and information on the nationality of the top groups processed through the rule. *See* https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report. This data also shows that no claims have been processed in Louisiana, and that no claims were granted under the rule by an asylum office in Florida in the last three months that have been reported. *Id.*[11]

Moreover, the requests Plaintiffs reference seek a host of information in addition to processing times and nationality, and seek this information for proceedings and circumstances that have no connection to the IFR or the claims Plaintiffs raise challenging it. *See, e.g.*, ECF No. 144-5 (Requests for production numbers 11f, 11g, 11h, 11i seeking information on nationality in addition to a range of other information unrelated to this case). Plaintiffs do not identify with specificity the requests they are seeking to compel with respect to "data on . . . processing times," Mot. at 10, nor did they raise or clarify this issue at the meet and confer. Presumably Plaintiffs refer to request for production number 12 (ECF No. 144-5 at 21) but that request does not seek information related to "the time for which the applicant has been paroled," the purported justification Plaintiffs' now advance for this discovery. Pl. Mot. at 10. Rather, it seeks information on the length of time between when a noncitizen is first encountered and the date of any charging document, statistics that are irrelevant to the rule at issue and the claims in this case.

As to parole, Plaintiffs have similarly failed to identify how broad information on parole unrelated to the IFR is relevant to standing. In response to an interrogatory requesting Plaintiffs identify their alleged injury with respect to each count in their complaint, Plaintiffs' response did

---

and in Defendants' initial responses to Plaintiffs' requests, and above, Defendants had not completed their search for potentially responsive information or completed their production when Plaintiffs filed their motion.

[11] The data further shows that the process under the rule has not led to any meaningful change in the asylum grant rate, undermining Plaintiffs' theory of standing.

not specifically cite parole as the basis for their claimed harm. *See* ECF No. 157-9, Plaintiffs' Response to Defendants' Discovery at Interrogatory No. 18. Parole is governed by other statutes and regulations that Plaintiffs do not challenge here, and this discovery seems aimed at other challenges to other polices the States have not yet brought (or perhaps pending litigation in Florida challenging DHS parole practices). *See, e.g.*, Pl. Mot. Ex. 7 (citing news articles on parole practices unrelated to the rule in this case); Pl. Ex. 5 (attaching Florida's proposed findings of fact from *Florida v. United States*, No. 3:21-1066 (N.D. Fl. Feb. 16, 2023)). In any event, Defendants noted that they were continuing to search for responsive documents and trying to determine whether there is data or information the government can provide with respect to parole. Defendants have now produced additional responsive documents. This production includes information on cases related to the IRF and contains information on cases unrelated to the IFR. Defendants also produced a spreadsheet containing parole data for both asylum applicants not covered by the Rule and for noncitizens processed under the Rule who provided Louisiana and Florida addresses. That data shows that only one person processed under the Rule with an address in either Florida or Louisiana has been paroled in the year this Rule has been in place. Plaintiffs' arguments about parole are accordingly now moot.

Finally, Plaintiffs' requests cover January 1, 2018, to the present—a period of five years, four of which predate the implementation of the IFR. Defendants never disputed that some data pre-dating the IFR is relevant and would be produced. But Defendants needed time, as it represented to Plaintiffs and the Court, to determine how information is stored and how burdensome production may be, in order to determine what range of documents Defendants would be able to produce given the discovery cut-off. As a result, Defendants advised Plaintiffs numerous times, they were continuing to search for documents and determine what information is accessible.

Although Defendants continue to maintain that some of the information Plaintiffs requested is of questionable relevance, Defendants have now produced thousands more pages of documents, including information dating back to January 1, 2018. *See* Ex. B. Accordingly, Plaintiffs' arguments with respect to the time-period covered by this request are also moot.

## **CONCLUSION**

For the reasons stated above, Plaintiffs' motion should be denied.


Date:  April 28, 2023                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         *Principal Deputy Assistant Attorney General*

                                         WILLIAM C. PEACHEY
                                         *Director*
                                         Office of Immigration Litigation
                                         District Court Section

                                         EREZ REUVENI
                                         *Assistant Director*

                                         BRIAN WARD
                                         *Senior Litigation Counsel*

                                         /s/_____
                                         ELISSA FUDIM

                                         U.S. Department of Justice
                                         Civil Division
                                         Office of Immigration Litigation
                                         District Court Section
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, DC 20044
                                         Tel.: (202) 598-6073
                                         Email: Elissa.P.Fudim@usdoj.gov