UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| THE STATE OF ARIZONA, et al.,<br><br>                                     PLAINTIFFS,<br><br>     v.<br><br>MERRICK GARLAND in his official capacity as Attorney General of the United States of America; et al.,<br><br>                                     DEFENDANTS. | CIVIL ACTION NO. 6:22-cv-01130 |

**REPLY IN SUPPORT OF PLAINTIFF STATES'
<u>FIRST MOTION TO COMPEL</u>**

**POST-MOTION EVENTS**

This motion was filed on April 4, 2023. Metadata indicates that Defendants created a PDF on April 21, 2023. Defendants then produced that PDF on April 24, 2023. Exh. 17. On its face, that PDF contains data through April 10, 2023, but it is not segregated by state.

**ARGUMENT**

I. **DEFENDANTS ABANDONED THEIR OBJECTIONS BASED ON DATABASE ACCESS, AND THEY DO NOT SEEK A PROTECTIVE ORDER.**

Defendants' do not dispute that they "bear[] the burden of show[ing] specifically how each [discovery request] is not relevant or how each [request] is overly broad, burdensome, or oppressive." Dkt. 144-1 at 5 (quoting *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)). Defendants do not attempt to defend their objections to producing information from their databases, Dkt. 144-1 at 10-11, and they offer no evidence of burden, etc.

Plaintiff States directed Defendants to the Fifth Circuit's standards for protective orders, Dkt. 144-1 at 15 (citing *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998)), which require "a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements" before such an order can issue. Defendants make no effort to meet those standards, and they affirmatively disclaim seeking such an order, Dkt. 161 at 16 ("[T]he issue here has nothing to do with a protective order."). Indeed, Defendants' opposition is replete with the type of speculative, conclusory claims of harm that are insufficient as a matter of law to establish good cause for protection.

II. **THE IDENTITIES OF ASYLUM APPLICANTS AND ASYLEES ARE RELEVANT AND DISCOVERABLE.**

A. Identifying information is relevant.

With respect to relevance, Defendants urge this Court not to believe its own lying eyes. Dkt. 161 at 6. In the *Florida* case, the same Defendants—represented by the same USDOJ trial team—

argued that Florida failed to prove standing because it could not tie its expenditures to "specific noncitizens released under the challenged policies":

> [Florida] has admitted it ***does not track expenditures or data in a manner that allows it to identify expenditures made on specific noncitizens released under the challenged policies. Therefore, [Florida] cannot determine whether stopping or changing the challenged policies would impact its alleged costs***. Even assuming [Florida's] theory of indirect injury is cognizable, therefore, the evidence it presented fails to carry its burden of demonstrating Article III standing.
>
> \* \* \* \* \*
>
> [I]t is undisputed that DOE "***does not track alien expenditures in a manner that allows it to identify expenditures on specific aliens*** released under the challenged policies." Pretrial Stipulation, ECF 122, at ¶ 27. ***[Florida] has conceded it cannot show traceability*** based on DOE's evidence.

Dkt. 144-1 at 6 (quoting Dkt. 144-7 at 76, 79. There is nothing to "misunderstand" about that argument: Defendants urged that a lack of data "identify[ing] expenditures made on specific noncitizens released under the challenged policies" meant that Florida could not prove standing.

Defendants' contentions in this case are much the same: They urge that Plaintiff States must be able to identify public benefits recipients based on whether they were "granted asylum under the IFR." Dkt. 161 at 7. Assuming *arguendo* Defendants' contention is correct, determining whether recipients of public benefits were "granted asylum [or parole] under the IFR" plainly requires knowledge of which specific aliens have (or have not) benefitted from the IFR. Suffice it to say, Louisiana understands that its Department of Health tracks use of public benefits by alien name and admission status, not by which rule that status was granted under. There's no reason to think any other agency would be different. Indeed, Defendants have told public schools that the schools cannot ask about a child's citizenship, Dkt. 86 at 21 n.5, thereby leaving no basis to analyze education expenditures other than by alien name.[1]

---

[1] Defendants contemplate an accounting exercise. Dkt. 161 at 7. But Plaintiff States challenge the legality of the AMI process set forth in the Asylum Rule as, *inter alia*, violating the statutory process for granting asylum. Plaintiff States also challenge the associated parole provisions as contrary to the statutory "shall be detained" command of 8 U.S.C. § 1225(b), as well as exceeding the statutory limits on parole in 8 U.S.C. § 1182(d). It's therefore enough that Plaintiff States are spending

Falling back, Defendants seek to constrain the scope of any discovery they are ordered to provide by claiming that "as to Louisiana, the IFR does not even apply at present." Dkt. 161 at 8. Defendants thus urge that information about Louisiana is not relevant. But Defendant U.S.C.I.S.'s website states that during phased implementation, Asylum Merits Interviews are available to individuals who are "release[d]" and "indicate an intent to reside in or near one of the destination cities where AMIs will take place." Exh. 18. U.S.C.I.S. specified that those destination cities include New Orleans, Louisiana, as well as Miami, Florida. *Id.* In short, Defendants' claim that the Asylum Rule isn't being applied in Louisiana is flatly contradicted by what Defendant U.S.C.I.S. is telling the public. And Defendants' failed to produce information allowing state-specific identification as Plaintiff States requested, Dkt. 144-3 at "Identify" definition, so Defendants' curated-to-be-of-limited-use document doesn't show anything one way or the other. Exh. 17 at USA13145-157. In any event, it's enough for Louisiana to demonstrate that it has expended funds on asylees and parolees in the past, and will predictably do so in the future, *see Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2565-66 (2020), albeit on individuals made eligible via an unlawful asylum process and parolees whose release was illegal under statutory law.

### B. Defendants can't rely on regulations to exempt information from discovery.

Defendants point to no authority contradicting the "uniform[]" authority that "the Rules of Civil Procedure governing discovery in federal courts [cannot] be abrogated by agency regulations." Dkt. 144-1 at 13 (quoting *Resolution Trust Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 111 (D. Colo. 1992)). Defendants try to distinguish on-point Fifth Circuit authority by urging that they "do not seek to create a privilege," as the agency tried to do in that case. Dkt. 161 at 9 (discussing *N.L.R.B. v.*

---

(or predictably will spend) *any* money on individuals that are eligible for benefits only because of a nakedly unlawful grant of asylum. *See* Dkt. 64 at 25:3-10 ("The [S]tates' theory is essentially that asylum decisions are being placed in the hands of officers who have no authority, and they would be void ab initio."). It's likewise enough that Plaintiff States are spending *any* money on aliens who should be detained by the federal government. Defendants also ignore harm from the magnet effect, which Defendants do not contest exists.

*Capitol Fish Co.*, 294 F.2d 868 (5th Cir. 1961). But the Fifth Circuit's holding in *Capitol Fish* is not so limited, and it aligns with the uniform authority of other courts: An agency "cannot hide behind a self-erected [regulatory] wall evidence adverse to its interests as a litigant." 294 F.2d at 875. That is precisely what Defendants seek to do by claiming that the requested discovery is "confidential under 8 C.F.R. §§ 208.6, 1208.6," and it therefore cannot be produced in response to discovery. Dkt. 161 at 10. Whether those regulations are characterized as a "privilege" or "confidentiality" is of no moment: Defendant agencies cannot by regulation render information non-discoverable.

Defendants seek to buttress their self-created shield by pointing to *U.S. Department of State v. Ray*, 502 U.S. 164 (1991). Dkt. 161 at 17. In *Ray*, the question presented was whether deletion of names from certain documents was authorized by a *statutory* exception "which provides that FOIA disclosure requirements do not apply to 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'" *Id.* at 166 (quoting 5 U.S.C. § 552(b)(6)). The Court accordingly applied the balancing test required by the statute.

Far from supporting Defendants, *Ray* illuminates the absence of authority supporting Defendants' position. For starters, "the Federal Rules of Civil Procedure pertaining to discovery and the FOIA 'provide two independent schemes for obtaining information through the judicial process[.]'" *Vinzant v. United States*, 2010 WL 2674609, at *8 (E.D. La. June 30, 2010) (Drell, J.) (*quoting United States v. Murdock*, 548 F.2d 599, 602 (5th Cir. 1977)). The FOIA—the statute at issue in *Ray*—may act as a "floor" for discovery, but "information unavailable under the FOIA is not necessarily unavailable through discovery." *Id.* at *9.

*Vinzant* illustrates how the outcome *Ray* was therefore tied to a specific statutory exemption to the FOIA. *Vinzant* also makes clear that such exemptions have no applicability to discovery. Indeed, Defendants do not dispute that—in sharp contrast to *Ray*—no statute provides an exemption here. *See* Dkt. 144-1 at 13 n.9. Quite the opposite: Congress restricted disclosure of identifying in-

5

formation related to certain categories of aliens, but Congress did not do so for asylees or asylum applicants. *See id.* (citing 8 U.S.C. 1367(a)(2)). Defendants offer no response to the argument that their confidentiality regulations fall in light of the straight-forward application of the *expressio unius* canon. Defendants certainly offer no response to cases applying that canon and holding that agencies cannot add categories by regulation to those Congress provided by statute. But that is precisely what Defendants claim their regulations do.

Turning to reliance, in contrast to *Ray*, there is no evidence the identities sought here were provided in response to any assurance of confidentiality. On the contrary, the Department of Justice and the Department of Homeland Security adopted confidentiality regulations without any apparent statutory authority to do so, *see* 5 U.S.C. 706(2)(A), and those regulations facially provide for disclosure at the respective agency head's unfettered discretion. If reliance is relevant at all, it cannot be justified where the agency claims unfettered discretion to disclose or not disclose.

Defendants thus turn to out-of-circuit cases applying the confidentiality provisions. *Phillips v. ICE*, 385 F. Supp. 2d 296 (S.D.N.Y. 2005), and *Judicial Watchin, Inc. v. Reno*, 2001 WL 1902811 (D.D.C. 2001), are both FOIA cases, and thus irrelevant to the question of discovery. *See Vinzant*, infra. Defendants find more support in *Owino v. Holder*, 771 F.3d 527 (9th Cir. 2014), and *Line v. U.S.D.O.J.*, 459 F.3d 255 (2d Cir. 2006), both of which hold that disclosure of an asylum application to a foreign country may, independent of the applicant's original claim, render the asylum eligible for asylum and/or withholding of removal based on persecution of asylum applicants. But Defendants' tellingly don't cite Fifth Circuit law on this issue, which makes clear that release of asylum-related information is not *per se* harmful. Rather, individualized proof is required. *See Dayo v. Holder*, 687 F.3d 653, 657-59 (5th Cir. 2012) (denying petition for review despite disclosure to asylum applicant's government); *Chande v. Barr*, 763 F. App'x 355, 356 (5th Cir. 2019) (denying petition for review despite assuming "a deportation officer disclosed information in violation of 8 C.F.R. § 208.6 and that the

Tanzanian government knew [petitioner] was a failed asylum seeker"). In short, Defendants—at best—make a case for restricting Plaintiff States from disseminating identities obtained in discovery, not for denying discovery of those identities. That's precisely what Defendants concede happened in *Al Otro Lado* and *Ms. L.*

## III. DEFENDANTS' REMAINING RELEVANCE ARGUMENTS ARE MERITLESS

Defendants' remaining arguments about spotlight their strategy in this case. Defendants profess ignorance of the relevance of nationality, processing times, and length of parole. Dkt. 161 at 21-22. But surely USDOJ's Office of Immigration Law knows that certain nationalities (such as Cubans and Haitians) are immediately eligible for Medicaid; other nationalities must either be paroled for at certain period of time or receive asylum to be eligible for Medicaid. Defendants nevertheless claim they don't understand the federal document—Dkt 144-11—laying out those eligibility criteria. But in a footnote on the very same page in which they profess ignorance, Defendants attempt to slice-and-dice expenditures on the basis of the eligibility criteria laid out in the federal document the claim not to understand. Dkt. 161 at 22 n.9. If Plaintiff States aren't given granular information in discovery, fairness requires that Defendants be barred from slicing-and-dicing Plaintiff States' proof on the basis of nationality, processing time in the United States, length of parole, etc.

Defendants next claim that "the length of time between when a noncitizen is first encountered and the date of any charge document" is irrelevant. But Plaintiffs don't dispute that they are cooking the books on parole by simply releasing thousands of putative asylum seekers into the interior in Plaintiff States, thereby increasing, e.g., education expenditures, without necessarily registering the alien as being paroled. *See* Dkt. 144-1 at 7 n.7. Given that at least Counts II, III, V, VIII attack Defendants' failure to adhere to (or consider) the statutory conditions for parole, statistics about Defendants unauthorized parole and—worse—naked release of aliens are plainly relevant. Defendants fail to show otherwise.

**IV.     PLAINTIFF STATES' MOTION IS RIPE AND NOT MOOT.**

Defendants attempt to dodge their refusal to provide discovery by pointing to repetitive statements that they were still searching for responsive documents. Yet Defendants don't deny they informed Plaintiff States they would not produce the identifying information sought, and Defendants maintain that refusal in their opposition. The issue is fully ripe for judicial resolution.

## CONCLUSION

Defendants are here of their own choosing. Defendants declined to proceed through the usual, orderly process of a 12(b)(1) motion followed by discovery targeting any factual issues on which Defendants could submit evidence to contradict the allegations in the Complaint. Defendants instead demanded wholesale pre-motion discovery on standing issues. They can hardly be heard to complain about confidentiality issues or burden as Plaintiff States seek to prove standing.

Dated: April 3, 2023            Respectfully submitted,

**JEFF LANDRY**
  **ATTORNEY GENERAL OF LOUISIANA**

By: */s/ Joseph Scott St. John*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
JOSEPH S. ST. JOHN (La #36682)
  Deputy Solicitor General
JORDAN B. REDMON (La #37272)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*