**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

THE STATE OF ARIZONA, et al.,

                    Plaintiffs,

    v.

MERRICK GARLAND in his official capacity
as Attorney General of the United States of
America; et al.,

                    Defendants.

Civil Action No. 6:22-cv-01130

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO COMPEL**

i

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND AND PROCEDURAL POSTURE ...................................................... 1

LEGAL STANDARDS ........................................................................................................ 6

ARGUMENT ....................................................................................................................... 7

    I.    PLAINTIFF STATES ASSERT HARM TO THEMSELVES, AND PLAINTIFF
          STATES' ATTORNEYS GENERAL LACK POSSESSION, CUSTODY, OR
          CONTROL OF DOCUMENTS HELD BY NON-PARTY AGENCIES ................. 7

        A.    Plaintiff States alleged harms to themselves, not to State agencies. ......................... 7

        B.    When a sovereign is a named party, Rule 34 production requests only extend to
            the specific agencies that are also named parties. ......................................................... 9

        C.    Defendants actions reveal they do not want the information on which they are
            moving to compel to be part of the record. .............................................................. 12

    II. DEFENDANTS' DISCOVERY COMPLAINTS ARE MERITLESS ......................... 13

        A.    Plaintiff States properly stated the limits of their search. ........................................ 13

        B.    Plaintiff States properly made categorical privilege assertions for documents not
            transmitted outside of their departments of justice, especially after litigation was
            reasonably foreseeable. ............................................................................................ 15

        C.    Defendants specific gripes are meritless. ................................................................. 16

CONCLUSION .................................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Autotech Techs. Ltd. v. Automationdirect.com, Inc.,*
  248 F.R.D. 556 (N.D. Ill. Apr. 2, 2008) ................................................14

*Benson v. Rosenthal,*
  2016 WL 1046126 (E.D. La. Mar. 16, 2016) ...................................... 14, 15

*Bloodworth v. United States,*
  623 F. App'x 976 (11th Cir. 2015) .........................................................9

*City of Trenton v. State of New Jersey,*
  262 U.S. 182 (1923) ...........................................................................11

*Colorado v. Warner Chilcott Holdings Co. III,*
  2007 WL 9813287 (D.D.C. May 8, 2007) ........................................ 10, 12

*D'Onofrio v. SFX Sports Grp.,*
  247 F.R.D. 43 (D.D.C. Jan. 23, 2008) ....................................................14

*Florida v. United States,*
  2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) ...........................................19

*Hall v. Marriott Int'l, Inc.,*
  2022 WL 3718838 (S.D. Cal. Aug. 29, 2022) ..........................................18

*In re Gold King Mine Release,*
  2020 WL 13563527 (D.N.M. Dec. 23, 2020) ...........................................10

*In re Jointly Manages R.S. 2477 Road Cases Litig.,*
  2018 WL 2172934 (D. Utah May 10, 2018) .............................................10

*Johnson v. PI Tech. Servs., L.P.,*
  2013 WL 12231609 (E.D. La. Nov. 22, 2013) ...........................................6

*La. Dep't. of Justice v. Edwards,*
  233 So. 3d 76 (La. App. 1 Cir. 2017), *writ denied,* 239 So. 3d 824 (La. 2018) .....................12

*Lyes v. City of Riviera Beach, Fla.,*
  166 F.3d 1332 (11th Cir. 1999)............................................................11

*McGrath v. United States.,*
  103 Fed. Cl. 658 (Fed. Cl. 2012)...........................................................14

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,*
  894 F.2d 1482 (5th Cir. 1990).............................................................6

*New York ex rel Boardman v. Nat'l R.R. Passenger Corp.*,
　233 F.R.D. 259 (N.D.N.Y. 2006) ........................................................................ 11, 12

*Rekor Sys., Inc. v. Loughlin*,
　2021 WL 5450366 (S.D.N.Y. Nov. 22, 2021) ..............................................................14

*S. Filter Media, LLC v. Halter*,
　2014 WL 4278788 (M.D. La. Aug. 29, 2014) ................................................................6

*State ex rel Guste v. Audubon Park Comm'n*,
　320 So. 2d 291 (La. App. 4 Cir. 1975) ...........................................................................8

*State ex rel Guste v. Simoni, Heck & Assocs.*,
　331 So. 2d 478 (La. 1976) ................................................................................................8

*State ex rel Porterie v. Smith*,
　162 So. 413 (La. 1935) ......................................................................................................8

*Texas v. United States*,
　809 F.3d 134 (5th Cir. 2015) ...............................................................................1, 8, 17

*Thornhill v. Alexandria Mall Co.*,
　2009 WL 10692116 (W.D. La. June 8, 2009) ..........................................................6, 12

*United States v. American Express Co.*,
　2011 WL 13073683 (E.D.N.Y. July 29, 2011) ..........................................................9, 12

*United States v. AT&T*,
　461 F. Supp. 1314 (D.D.C. 1978) ..................................................................................10

*United States v. CITGO Petrol. Corp.*,
　2010 WL 1754167 (W.D. La. Apr. 29, 2010) ...............................................................11

**Statutes**

La. R.S. 42:4 ........................................................................................................................12

**Rules**

Fed. R. Civ. P. 26(b)(1) .......................................................................................................6

Fed. R. Civ. P. 34(b)(1)(C), (b)(2)(E)(iii) .......................................................................14

Fed. R. Civ. P. 34(b)(2)(B), (C) .......................................................................................13

**Constitutional Provisions**

Fla. Const. art. IV §§ 5(b), 6 ..................................................................................12

La. Const. art. IV Sec. 1 ........................................................................................12

La. Const. art. IV Sec. H(1) ...................................................................................12

## INTRODUCTION

Defendants have no defense on the merits, and they are subject to a motion to compel for information relevant to Plaintiff States' standing. So Defendants moved to compel on the premise that the alleged harm is to Plaintiff States' *agencies*, and those agencies are the actual plaintiffs. But the complaint unequivocally alleges alleged harm to Plaintiff States themselves, even if their agencies may suffer harm, too.

Defendants' actions are telling: Rather than simply issue subpoenas to non-party agencies that possess relevant documents – an action Plaintiff States support and encouraged during the parties' meet and confer – Defendants moved to compel the Louisiana Department of Justice and Florida Department of Legal Affairs, which have no control over documents in the possession of other agencies. Defendants do so in the apparent hope of obtaining some type of proof preclusion. Defendants offer no fact or law to support their theory, which multiple courts have rejected. In any event, Defendants' theory is foreclosed by the holding in *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("*Texas DAPA*"), that Texas had standing "by demonstrating that it would incur significant costs in issuing drivers licenses" through the Texas Department of Public Safety, even though the Texas DPS was not a party.

The remainder of Defendants' motion is a shotgun blast of gripes that are inconsistent with law that has been called to Defendants' attention; inconsistent with this Court's orders authorizing "limited jurisdictional discovery;" Dkt. 24, based on the specific discrete programs identified by Plaintiff States, Dkt. 91, 98; inconsistent with the standing analysis in *Texas DAPA*, and inconsistent with Defendants' own discovery responses..

## BACKGROUND AND PROCEDURAL POSTURE

### THE COMPLAINT AND RELEVANT ALLEGATIONS OF HARM

This is 19-State challenge to the lawfulness of an interim final rule that changes the way asy-

lum claims are adjudicated. 87 Fed. Reg. 18,078 (Mar. 29, 2022) ("Asylum IFR"). Plaintiff States al-lege, *inter alia*, "[t]he Asylum IFR will result in tens or hundreds of thousands of aliens unlawfully entering the United States, who would otherwise not be able to gain entry." Dkt. 86 ¶ 126. "This, in turn, will cause Plaintiff States to spend money on healthcare, detention, education, and other ser-vices for aliens that would otherwise not have to be spent." *Id.* Further, "[u]nder federal law, aliens granted asylum become eligible for a variety of benefits after five years in the United States." *Id.* ¶ 128. "These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments)." *Id.* "Because these benefits are paid by State agen-cies and are partially financed from State budgets, the Asylum IFR will increase the States' costs be-cause higher asylum grant rates will cause a higher number of individuals granted asylum claiming benefits." *Id.* "And even if the Asylum IFR did not result in a higher grant rate, because it will signif-icantly speed up asylum processing, it will allow asylum recipients to become eligible for benefits faster, and thus increase the costs on the States," *i.e.*, "[s]ome proportion of asylees will claim bene-fits sooner than they otherwise would have been able to and will receive benefits for longer periods of time than they otherwise would have been able to." *Id.* ¶ 129. "This will cause quantifiable finan-cial harm to the States." *Id.*

JURISDICTIONAL DISCOVERY

On May 18, 2022, the Court ordered "that the parties engage in a … period of limited dis-covery." Doc. 24 at 1. Although the parties served discovery requests, the parties later "agreed that all outstanding discovery requests [were] withdrawn without prejudice to propounding such requests in the future." Dkt. 76 at 1. The Court entered an order adopting that agreement. Dkt. 79.

After Plaintiff States filed their Second Amended Complaint, Dkt. 86, Defendants sought pre-answer jurisdictional discovery, Dkt. 89. The Court granted Defendants' request. Dkt. 91. Pur-suant to the Court's order and to minimize the scope of discovery, "Plaintiff States advised the

2

Court that they intend to establish Article III standing by showing the effect of the IFR on certain discrete programs in the states of Louisiana and Florida," *i.e.*, education, SNAP, TANF, and Medicaid, "in addition to asserting standing as a matter of law." Dkt. 98. The parties thereafter exchanged discovery, with Plaintiff States serving their requests on February 9, Dkt. 144-3, and Defendants serving their requests on February 16, Dkt. 144-10.

Defendants repeatedly requested more time to respond to Plaintiffs' requests, which Plaintiff States granted. Dkt. 144-4. In March, Defendants informally informed Plaintiff States that they would not produce information identifying aliens. *See* Dkt. 143-1 ¶¶ 2-3. Defendants then served their discovery responses, including formal objections to producing identifying information for aliens in Louisiana and Florida, which included a "general statement" setting forth various objections, no date-certain for document production, specific objections without any statement as to whether documents are being withheld on the basis of those objections, and statements that Defendants "are continuing to search for responsive non-privileged documents that can be produced and will provide such documents on a rolling basis." Dkt. 144-5. Following a telephonic meet-and-confer, Louisiana and Florida moved to compel on April 4 to address certain narrow legal issues. Dkt. 144.

THE PRESENT DISPUTE

Pursuant to the parties agreement, Plaintiff States served their responses and objections on April 3. Plaintiff States were transparent about how they were proceeding. For example, Plaintiff States disclosed what sources of documents would not be searched based on undue burden. Dkt. 157-2 at 4. And in view of the document requests being served on the Louisiana Department of Justice and the Florida Department of Legal Affairs — the States' captive law firms with no relevant operational activities — Plaintiff States identified the criteria they would use for creating a privilege log. Dkt. 157-2 at 2. Again, given that the requests were served on Plaintiff States' law firms, Plaintiff States categorically asserted the attorney-client privilege, work product doctrine, and deliberative

3

process privilege for documents not transmitted outside of the Louisiana Department of Justice and the Florida Department of Legal Affairs, as well as documents created after the Asylum IFR was published. *Id.* Plaintiff States elaborated that "requiring Plaintiff States to search for, review, and prepare a log of such documents is not proportional to the needs of the case because those agencies were acting as counsel for Plaintiff States." *Id.* Accordingly, "Plaintiff States will neither search for nor prepare a log of such internal documents." *Id.*

Plaintiff States then made their first production of documents on April 6. That same day, Defendants began griping that Louisiana had not tied specific documents to specific requests; Louisiana responded that—consistent with the Defendants' statement that they would update their responses and objections after completion of a rolling production—Plaintiff States would similarly do so after its production was substantially complete. Dkt. 157-4.

On April 12, with Plaintiff States' motion to compel pending, Defendants dramatically expanded their list of gripes. Dkt. 157-5. Defendants insisted the Louisiana Department of Justice and the Florida Department of Law should search their email, provide a privilege log, and produce documents with metadata. Indeed, notwithstanding the parties' agreement to conduct a rolling document production, and Defendants' not producing a privilege log with their initial (non)production, Defendants faulted Plaintiff States for not doing so.

The parties met-and-conferred on April 18. Dkt. 157-7. As relevant here, the parties discussed the commentary accompanying the 2015 Amendments to Rule 34, which makes clear that a statement regarding the scope of a search inherently has the specificity required by the rule itself. *Id.* Louisiana explained that the Louisiana Department of Justice lacks possession, custody, or control of documents held by other agencies. *Id.* Louisiana made clear that it had discussed discovery with various agencies, and Defendants were welcome to subpoena Louisiana agencies for relevant information, albeit subject to the Court's April 4 instruction – in a discussion of this very issue -- that the

Court be consulted before additional subpoenas are issued. *Id.* With respect to documents actually in the control of the Louisiana Department of Justice and Florida Department of Legal Affairs, Defendants declined to proffer any document internal to LADOJ or FL-DLA that would not be privileged. *Id.* Defendants pressed Plaintiff States on when they anticipated completing their document production, but Defendants steadfastly refused to provide a date when they would do so. *Id.* Throughout that call, Plaintiff States expressed concern with Defendants' inconsistent positions in discovery, and explained that reciprocity – what is sauce for the goose is sauce for the gander – is a core component of discovery and is enforced via Rule 26(g). *Id.*

Plaintiff States served revised responses and objections on April 22. Dkt. 157-9, accompanied by an email noting sharp inconsistencies between Defendants' statements during the meet-and-confer and Defendants' discovery responses. Defendants nevertheless filed the instant motion to compel on April 25, attacking, *inter alia*, the scope of LADOJ's control over other agencies, that Plaintiff States transparently described the scope of their search, and Plaintiff States' engaging in a rolling document production pursuant to the parties' agreement. Dkt. 157-1.

On May 2, Plaintiff States followed-up with an additional email, noting that Defendants had not responded to Plaintiff States' April 22 query regarding Defendants inconsistent positions. St. John Decl. Exh. 1. Plaintiff States further explained that "although [they] disagree with Defendants' position [in their motion to compel] regarding agency control, that position has significant implications for Defendants' discovery obligations." *Id.* "[T]he named Defendants include 'the United States of America … and includes the departments and agencies thereof.'" *Id.* (quoting Dkt. 86 ¶ 59). Plaintiff States then asked that "[i]n view of Defendants' position regarding agency control," that Defendants "confirm that [their] searches have included – at a minimum – all federal instrumentalities involved in border control issues and/or issuing the Asylum Rule, specifically the White House / Executive Office of the President and the Department of Defense." *Id.* Plaintiff States

asked for a response by the following day or, alternatively that Defendants state their availability to meet-and-confer. *Id.*

Defendants responded that they were "looking into this," but offered no substantive response. *Id.* Plaintiff States emailed again on May 9, noting that two weeks had passed without a substantive response addressing Defendants inconsistent positions, that Plaintiff States' week-old query regarding the scope of Defendants' search "is purely factual, and should be known by Defendants' counsel," and requesting that Defendants provide their availability to meet-and-confer on May 9, 10, or 11. *Id.* Defendants finally responded on the afternoon of May 10 with a litany of questions, stated *ipse dixit* that they "conducted a reasonable search for relevant documents" without disclosing the agencies actually searched, and failing to provide their twice-requested availability to meet-and-confer. *Id.*

## LEGAL STANDARDS

Federal Rule of Civil Procedure 26 provides that, unless otherwise limited by court order, the scope of discovery is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Courts in the Fifth Circuit repeatedly hold "[t]he party seeking discovery has the burden to show that the responding party has control of the material or information sought." *Thornhill v. Alexandria Mall Co.*, 2009 WL 10692116, at *3 (W.D. La. June 8, 2009) (Hayes, M.J., denying motion to compel); *see also, e.g.*, *S. Filter Media, LLC v. Halter*, 2014 WL 4278788, at *5 (M.D. La. Aug. 29, 2014) (Bourgeois, M.J.); *Johnson v. PI Tech. Servs., L.P.*, 2013 WL 12231609, at *3 (E.D. La. Nov. 22, 2013) (Knowles, M.J.). In contrast, "the party resisting discovery bears the burden of

show[ing] specifically how each [discovery request] is not relevant or how each [request] is overly broad, burdensome, or oppressive." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990).

## ARGUMENT

I. **PLAINTIFF STATES ASSERT HARM TO THEMSELVES, AND PLAINTIFF STATES' ATTORNEYS GENERAL LACK POSSESSION, CUSTODY, OR CONTROL OF DOCUMENTS HELD BY NON-PARTY AGENCIES.**

### A. Plaintiff States alleged harms to themselves, not to State agencies.

Defendants' primary premise is that "Plaintiffs refuse to produce documents from State agencies upon whose alleged harm they base standing." Dkt. 157-1 at 6. That premise is false. The Complaint speaks exclusively in terms of harms to the "State" or "States." "***States*** bear many of the consequences of unlawful immigration." Dkt. 86 ¶ 63. The Asylum IFR "will cause ***Plaintiff States*** to spend money on healthcare, detention, education, and other services for aliens that would otherwise not have to be spent." Dkt. 86 ¶ 126. For example, "[u]nder federal law, aliens granted asylum become eligible for a variety of benefits after five years in the United States. These benefits include Medicaid; SNAP (commonly referred to as 'food stamps'); and TANF (commonly referred to as 'welfare' payments)." Dkt. 86 ¶ 128. "Because the benefits are paid by State agencies and are partially financed from State budgets, the Asylum IFR will increase ***the States' costs***." *Id.* The States then elaborated on the mechanisms of harm:

> The Asylum IFR will result in a higher Asylum grant rate, thus increasing the number of asylees in each of the Plaintiff States. And even if the Asylum IFR did not result in a higher grant rate, because it will significantly speed up asylum processing, it will allow asylum recipients to become eligible for benefits faster, and thus increase the costs on the States as a result of the expanded eligibility windows. Some proportion of asylees will claim benefits sooner than they otherwise would have been able to and will receive benefits for longer periods of time than they otherwise would have been able to. This will cause quantifiable financial ***harm to the States*** ...."

Dkt. 86 ¶ 129.

Consistent with the allegations of harm to the States themselves, Plaintiff States bring this suit, not their operational agencies. Louisiana, for example, "brings this suit through its Attorney General, Jeff Landry," who "is authorized by Louisiana law to sue on the State's behalf." Dkt. 86 ¶ 24.[1] And Louisiana's state-specific allegations of harm speak in terms of harm to the *State* itself:

> Plaintiff **Louisiana** will also be injured gravely by the Asylum IFR. **Louisiana** will be required to stretch its resources even further under the Asylum IFR, because the IFR will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. * * * * In addition, by incentivizing further illegal immigration, the Asylum IFR will force **Louisiana** to expend limited resources on education, healthcare, public assistance, and general government services.

Dkt. 86 ¶ 80.

To be sure, State agencies may be harmed too, and they may have evidence that supports the States' claims. That does not mean that the States themselves aren't harmed. After all, it is the States – not their agencies – that have the power to tax and appropriate, and it is States that bear the fiscal burden of increased demand for government benefits. *See Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (holding that Texas had standing "by demonstrating that it would incur significant costs in issuing drivers licenses" through the Texas Department of Public Safety as a result of the challenged immigration action).[2] Put differently, agencies are merely a channel for implementing programs created and funded by the States.

---

[1] The Louisiana constitution provides that "[a]s necessary for the protection or of any right or interest of the state, the attorney general shall have authority … to institute … any civil action or proceeding." La. Const. art. IV Section 8. That grant of authority is expansive. For example, it authorizes the Attorney General to seek injunctive relief on behalf of the State where he believes the State is injured or a government actor is acting ultra vires. *See State ex rel Guste v. Audubon Park Comm'n*, 320 So. 2d 291, 295 (La. App. 4 Cir. 1975); *see also State ex rel Porterie v. Smith*, 162 So. 413, 418-19 (La. 1935) ("Since the state has an interest in this suit, the Attorney General has a right to assert it."). Even in cases where a state agency has a cause of action, the Attorney General may bring claims where the State ultimately suffers harm, too. *State ex rel Guste v. Simoni, Heck & Assocs.*, 331 So. 2d 478, 482 (La. 1976).

[2] The State of Texas the Plaintiff. The Texas Department of Public Safety was not. *See* Am. Compl. (Dkt. 14), *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex.).

**B. When a sovereign is a named party, Rule 34 production requests only extend to the specific agencies that are also named parties.**

On its face, Rule 34 only requires production of documents "in the responding party's possession, custody or control." Fed. R. Civ. P. 34(a)(1). It's thus axiomatic that "[a] party does not have authority to compel the production of documents outside the possession, control, or custody of [another] party to the case through a motion to compel under Rule 37." *Bloodworth v. United States*, 623 F. App'x 976, 979 (11th Cir. 2015). Recognizing how governmental power is divided, courts limit Rule 34 production to the agencies that are named parties, even if the sovereign is also a named party. In *Bloodworth*, for example, the Eleventh Circuit held the district court "correctly concluded that [the plaintiff] could not compel the Government to produce an FBI report because the report was not in the Government's possession and was held by an agency who was not a party to the case." *Id.* That was true even though the United States itself was the named defendant.

The same is true when the sovereign party is a State, even more so. In *United States v. American Express Co.*, 2011 WL 13073683 (E.D.N.Y. July 29, 2011), for example, the court explained that "[i]n almost every case, the State Attorneys General are independent, elected officials pursuant to the States' constitutions." *Id.* at *2. "[T]he dual structure of the States' executive branches was purposeful; the State Attorneys General are to operate independently of … State Governors." *Id.* Accordingly, "for purposes of … discovery … state agencies … are not parties" to a suit brought by a State Attorney General. *Id.* The court had "no doubt that informally the State Attorneys General could probably make … requests of each agency and garner voluntary participation." *Id.* at *3. But State Attorneys General lack control over documents held by "state agencies [that] operate outside of the State Attorneys General's authority." *Id.* "Legally, the State Attorneys General have no more way of compelling production than [the defendant] does if an agency refuse to cooperate." *Id.* And a federal court "cannot order a party to produce that which it does not have, and that to which it does not have any right or recourse to acquire." *Id.*

*Colorado v. Warner Chilcott Holdings Co. III*, 2007 WL 9813287 (D.D.C. May 8, 2007), is directly on point. In that case, Louisiana, Florida, and numerous other states alleged a violation of the Sherman Act by two companies conspiring to prevent the marketing of a cheaper generic drug. *Id.* at *1. The defendant companies moved to compel production of Medicaid data they viewed as relevant to whether there was economic harm *vel non*. *Id.* at *2. Like the Defendants do here, the *Warner Chilcott* defendants "argue[d] that, because the State Attorneys General purport to bring this action on behalf of their respective States, [d]efendants should be able to obtain the Medicaid data at issue through discovery requests made through the offices of the State Attorneys General." *Id.* at *3. The court rejected that argument, holding that "the State Medicaid agencies are not to be treated as parties … for the purposes of discovery." *Id.* at *4. It explained that "[a]lthough the Medicaid agencies may be subject to control by their Governors, the State Attorneys General are not subject to discipline or removal by their Governors and bring suit under their own authority." *Id.* "More fundamentally," the court refused to "aggregate separate state governmental agencies without a strong showing to the contrary by [d]efendants." *Id.* The court then concluded the *Warner Chilcott* defendants failed to establish "the State Attorneys Generals have a legal right to obtain documents from their respective State Medicaid agencies upon request." *Id.* at *5. That non-party state agencies may have provided some data voluntarily did not demonstrate the State Attorneys General could obtain that discovery from those agencies. *Id.* at *6.[3]

---

[3] Other cases are in accord. *See In re Gold King Mine Release*, 2020 WL 13563527, at *2 (D.N.M. Dec. 23, 2020) ("Neither the State of New Mexico through the New Mexico Attorney General nor the New Mexico Environment Department have the authority or ability to produce Rule 30(b)(6) witnesses from the named agencies … without the voluntary cooperation from these other state entities."); *In re Jointly Manages R.S. 2477 Road Cases Litig.*, 2018 WL 2172934 (D. Utah May 10, 2018) (finding third-party subpoena appropriate way to seek discovery from state agency: "[W]hile the State represents that PLPCO is an active part of the development of this litigation, it states no basis for concluding PLPCO is subordinate to the Attorney General such that the Attorney General could require its compliance in discovery); Such cases frequently distinguish a handful of cases holding that the unitary executive of the United States is subject to discovery. *See, e.g., United States v. AT&T*, 461 F. Supp. 1314, 1333-34 (D.D.C. 1978).

Magistrate Judge Hanna reached a similar conclusion in *United States v. CITGO Petrol. Corp.*, 2010 WL 1754167 (W.D. La. Apr. 29, 2010). In that case, the Louisiana Department of Environmental Quality – putatively as the State of Louisiana – filed claims related to oil pollution. *Id.* at *1. CITGO moved to compel Louisiana to produce "all correspondence with, or other documents in the possession of, the state's agencies" regarding a Natural Resources Damage Assessment. *Id.* Magistrate Judge Hanna held "that LDEQ cannot compel the production of documents by other state agencies" and accordingly denied the motion to compel "to the extent that CITGO seeks to compel the production of documents by state agencies other than LDEQ." *Id.*

Defendants offer no facts or authority supporting their contrary position. Dkt. 157-1 at 6-11. They instead attempt to reverse the burden of demonstrating control, then distinguish an exemplary case as involving an agency "on whose behalf the State [of New York] had not alleged any harm." *Id.* at 10 (discussing *New York ex rel Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259 (N.D.N.Y. 2006)). But that's equally true here. Once again, Plaintiff States are asserting harm to *themselves*, not their agencies, even though their agencies were also harmed by the Asylum IFR. Moreover, the agency control rule is not limited in the way Defendants belief. The discovery in *Colorado*, for example, involved the question of harm to the Plaintiff States *vel non*. It's hardly unusual that a litigant needs third-party discovery or expert testimony to establish and quantify the harm that he suffered. That's a work-a-day medical malpractice, eminent domain, or antitrust case.

Continuing their attempt to reverse the applicable burden, Defendants fault Plaintiff States for not exhaustively expounding on state law during the parties' meet and confer. Lest their be any

---

These cases apply the proposition that "[w]hen it comes to creating subordinate public bodies and defining their relationship to one another and to itself, 'the state is Supreme and its legislative body, confirming its action to the state Constitution, may do as it will.'" *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1343 (11th Cir. 1999) (quoting *City of Trenton v. State of New Jersey*, 262 U.S. 182, 186-87 (1923)). "Defining the nature and relationship of such bodies, no less than determining their level of funding, is uniquely an exercise of state sovereignty." *Id.* at 1344. Federal courts accordingly "owe such determinations by the state legislature not only deference, but great deference." *Id.*

doubt: Unlike the federal government, Louisiana does not have a unitary executive. *See* La. Const. art. IV Sec. 1. The Louisiana constitution provides for an elected governor who appoints "the head of each department in the executive branch whose election or appointment is not provided by [the Louisiana] constitution." La. Const. art. IV Sec. H(1). The heads of departments who are appointed by the governor serve at his pleasure. La. R.S. 42:4. But the Louisiana constitution provides for a separately elected attorney general, and further provides that the attorney general is the head of the Louisiana Department of Justice. La. Const. art. IV Section 8. Neither the governor nor the Attorney General exercise control over departments reporting to the other. *See La. Dep't. of Justice v. Edwards*, 233 So. 3d 76 (La. App. 1 Cir. 2017), *writ denied*, 239 So. 3d 824 (La. 2018). Likewise Florida. Fla. Const. art. IV §§ 5(b), 6. That Plaintiff States' Attorneys General worked to obtain voluntary productions of documents from non-party state agencies does not establish control over those agencies. *See American Express Co.*, 2011 WL 13073683, at *3.

As the parties moving to compel, Defendants bore the burden of demonstrating that the Louisiana and Florida Attorneys General have possession, custody, or control of documents held by non-party state agencies. *Thornhill*, 2009 WL 10692116, at *3; *New York*, 233 F.R.D. at 268. Defendants failed to do so. Applying the straight-forward rationale of *American Express*, *Warner Chilcott*, and *CITGO*, Defendants motion to compel documents in the possession, custody, or control of non-party agencies should be denied.

### C. Defendants actions reveal they do not want the information on which they are moving to compel to be part of the record.

At first, Defendants' motion to compel seems bizarre. Defendants correctly note that Plaintiff States bear the burden of demonstrating standing, and Plaintiff States will eventually need to make that showing with evidence, at least with respect to fact-based standing issues. But Defendants plainly don't believe a full presentation of evidence will shows Plaintiff States lack of standing. If Defendants believed that, they would have issued subpoenas to the state agencies that have that evi-

dence months ago. Plaintiff States agree that subpoenas to those agencies are appropriate, but Plaintiff States are adhering to the Court's instruction to await court approval for further subpoenas, as well as data possessed by Defendants necessary to make those subpoenas meaningful. The explanation is that Defendants are attempting to use a discovery motion to address a legal issue on the merits of Plaintiff States' standing.

## II. DEFENDANTS' DISCOVERY COMPLAINTS ARE MERITLESS.

### A.  Plaintiff States properly stated the limits of their search.

Defendants next turn to Plaintiff States' General Statement, gripe in bulk that the statement is "boilerplate," then point to broad statements in cases condemning boilerplate. Dkt. 157-1 at 11-12. But Defendants never grapple with the text of Rule 34, the accompanying commentary, Plaintiff States' actual responses, or cases addressing the substance of those responses.

What Rule 34 requires is specificity: "[T]he response must … state with specificity the grounds for objecting to the request, including the reasons," and "state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2)(B), (C). As Plaintiff States pointed out during the meet-and-confer and again via email, the Advisory Committee Notes to the 2015 Amendments gives as example of a proper objection "a statement that the responding party will limit the search to documents or electronically stored information created within a given period of time prior to the events in suit, or to specified sources." The Advisory Committee Notes then explain that "[a]n objection that states the limits that have controlled the search for responsive and relevant materials qualifies as a statement that the materials have been 'withheld.'" That is precisely what Plaintiff States did.

Plaintiff States transparently identified the scope of their search: Plaintiff States would not search for documents "not transmitted outside" their departments of justice or documents "transmitted between the Attorney Generals' offices of Plaintiff States after August 20, 2021 (when the

NPRM was published),'' explaining that such documents are categorically privileged under the attorney-client privilege, common interest doctrine, work product doctrine, and/or the deliberative process privilege, and ''requiring Plaintiff States to search for, review, and prepare a log of such documents is unduly burdensome and not proportional to the needs of the case.'' Dkt. 157-9 at 2-3. Plaintiff States cited authorities in support of their position. *Id.* (citing *Rekor Sys., Inc. v. Loughlin*, 2021 WL 5450366 (S.D.N.Y. Nov. 22, 2021) and *Benson v. Rosenthal*, 2016 WL 1046126, at *10-11 (E.D. La. Mar. 16, 2016)). Plaintiff States also stated that they would not search for documents transmitted between their offices and any retained expert because those documents are categorically privileged under the work product doctrine and/or Rule 26(b)(4). *Id.* at 3 Plaintiff States further objected to searching ''email, backup media, voicemails, PDAs, or mobile phones'' and ''metadata'' on the basis of proportionality, and Plaintiff States cited cases supporting that proposition. *Id.* at 4 (citing *McGrath v. United States.*, 103 Fed. Cl. 658, 658-59 (Fed. Cl. 2012); *D'Onofrio v. SFX Sports Grp.*, 247 F.R.D. 43, 48 (D.D.C. Jan. 23, 2008)). The Advisory Committee Notes to Rule 34 makes clear that such transparent identification of the scope of a search is sufficiently specific and inherently qualifies as a statement that materials outside the stated scope are being withheld. The requirements of Rule 34 were satisfied, and Defendants notably do not challenge the stated scope of Plaintiff States' search.[4]

---

[4] Defendants make no proffer of relevance as to ESI and internal communications in their motion, and they repeatedly responded ''we don't know'' during the meet-and-confer when asked to proffer the relevance of searching email given the narrow scope of discovery. Dkt. 157-7 at 4. Out of an abundance of caution, Plaintiff States provide the attached declaration describing the burden of searching their email, other ESI, and internal communications. *See* St. John Decl. With respect to metadata, Defendants' discovery requests never asked for it, and Defendants are only entitled to production of ESI in a single form. Fed. R. Civ. P. 34(b)(1)(C), (b)(2)(E)(iii). Setting aside that Defendants never explained why they believe this case warrants the extraordinary burden of producing metadata, Dkt. 157-7 at 4, Courts routinely deny motions to compel metadata that wasn't requested on the basis of Rule 34(b)(2)(E)(iii) alone. *See Autotech Techs. Ltd. v. Automationdirect.com, Inc.*, 248 F.R.D. 556 (N.D. Ill. Apr. 2, 2008) (''Ordinarily, courts will not compel the production of metadata when a party did not make that a part of its request.'').

**B. Plaintiff States properly made categorical privilege assertions for documents not transmitted outside of their departments of justice, especially after litigation was reasonably foreseeable.**

Rule 26(b)(5) requires that a party must "expressly make [a] claim" of privilege and "describe the nature of the documents, communications, or tangible things not produced … in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." The accompanying commentary explains that "[d]etails concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories." Adv. Comm. Notes to 1993 Amend.

Discovery targeting a law firms—especially discovery seeking documents produced after litigation was foreseeable—is the quintessential case for such categorical privilege assertions. *See Benson v. Rosenthal*, 2016 WL 1046126, at *10-11 (E.D. La. Mar. 16, 2016) (Wilkinson, M.J.). That's because "[a] detailed privilege log may be of no material benefit to the discovering party when … affidavits or other information before the court reveal little, if any, reason to believe that very many of the withheld documents would be other than protected by the attorney-client privilege or work product." *Id.* at *11. That's the case here, where Defendants were unable to proffer any document internal to LADOJ or FL-DLA that would not be privileged. Dkt. 157-7 at 3. In terms of relevance, nothing Plaintiff States' counsel has written or said can make Plaintiff States' standing more or less likely: standing is largely a question of law and data. In terms of proportionality, it's difficult to imagine anything more disproportionate than having a law firm spend time and money merely generating a list of documents when there is no colorable dispute that withholding them is proper. The exercise would be the kind of costly litigating-just-to-litigate that led to the adoption of the Rule 26 require-

ment for proportionality. And, like with the scope of Plaintiff States' search, Defendants notably

don't challenge Plaintiff States' assertions of privilege themselves.[5]

### C. Defendants specific gripes are meritless.

### 1. Defendants are acting in accordance with the parties agreement to a rolling search and document production.

Defendants first gripe that Plaintiff States only agree to produce documents after doing a

reasonable search, but do not provide a date-certain by when they will update their responses. Dkt.

157-1 at 18. That's part of a rolling search and production, to which the parties agreed. *See* Dkt. 157-

5 at 4. Consistent with that agreement, Defendants similarly did not provide an anticipated comple-

tion date in their document responses, and similarly stated that they "will provide [responsive] doc-

uments on a rolling basis." Dkt. 144-5. When Plaintiff States noted the inconsistency, Defendants

repeatedly refused to identify a specific date when Defendants' document production would be

complete, and refused to discuss the issue. Dkt. 157-7 at 4. Defendants now point to the parties

statement that it would take "at least another 30 days to … produce responsive documents" as evi-

dencing the timeline for Defendants' production, but that statement was made by both parties. De-

fendants try to sidestep the inconsistency with a blithe claim that "any perceived deficiency in De-

fendants discovery responses does not excuse the same deficiency by Plaintiffs." Dkt. 157-1 at 18

n.13 (quoting Dkt. 128). That's not correct. If the requirement for a date-certain is for document

production is as clear, strict, and non-negotiable as Defendants urge in their motion to compel, De-

fendants' discovery responses—which also identified no date certain—were not properly certified

---

[5] Defendants profess uncertainty as to whether Plaintiff States are withholding documents on the basis of their categorical privilege assertions, an issue never raised during the meet-and-confer. *See* Dkt. 157-8. The answer is obviously "yes" – Plaintiff States have internal communications related to this litigation, communications between their respective departments of justice, communications with their expert, and documents generated after this litigation was reasonably foreseeable that they are withholding. In terms of the Federal Rules, Plaintiff States' exclusion of those documents from the scope of their search "qualifies as a statement that the materials have been 'withheld.'" Adv. Comm. Notes to 2015 Amend. to Rule 34.

under Rule 26(g)(1). Alternatively, Plaintiff States are operating consistent with the parties' agree-
ment and the timeline the parties presented to the Court, and Defendants motion to compel is not
justified. The inconsistency in Defendants' positions is rampant, and the same USDOJ trial team
was criticized for it in *Florida v. United States*, 2023 WL 2399883, at *14 n.20 (N.D. Fla. Mar. 8, 2023)
(noting "the long pause and blank look on counsel's face" when the court raised Defendants' incon-
sistent positions").[6]

## 2. Defendants seek discovery of documents irrelevant to standing under controlling Fifth Circuit law.

Defendants next move to compel discovery of tax revenue from aliens and asylees, as well as
the generic economic impact of labor shortages, Dkt. 157-9 at 18-19 (RFP 21-23), the number of
aliens who resided in Plaintiff States but have moved out of each State, *id.* at 21 (RFP 27), and doc-
uments that "establish the basis" for an admission by Defendants in a MOU, *id.* at 22-23 (RFP 29).
With respect to RFPs 21-23, the Fifth Circuit long-ago rejected the same arguments Defendants
make here. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("*Texas DAPA*"). In that
case, "the United States claim[ed] that the costs [of DAPA] would be offset by other benefits to the
state." *Id.* at 155. The United States theorized that DAPA would "generat[e] income for the State"
related to vehicles and auto insurance, as well as "lead to increased tax revenue and decreased reli-
ance on social services." *Id.* at 155. The Fifth Circuit rejected that argument because courts "consid-
er only those offsetting benefits that are of the same type and arise from the same transaction as the
costs" in analyzing standing. *Id.* & n.59. The Fifth Circuit specifically rejected "increased tax reve-
nue" as relevant to the standing analysis, even though tax revenue was funding the drivers licenses

---

[6] Defendants' claim to be "baffled" by the time required to search for documents outside of
Plaintiff States' ordinary possession, custody, or control is not well-taken. Dkt. 157-1 at 19. Defend-
ants have refused to produce the most definitive data on aliens present in Plaintiff States, data which
could be combined with data held by non-party agencies to definitively resolve most standing ques-
tions. So Plaintiff States are forced to engage in a time-intensive effort to collect less-definitive but
publicly available data that supports standing.

that underlay standing, explaining "standing analysis is not an accounting exercise." *Id.* at 156. Yet the Defendants rehash their arguments, and once again seek discovery of tax revenue from aliens in RFPs 21-22. The generic economic impacts from "labor shortages," as sought by RFP 23, are even further afield. The relevance of the flow of aliens *out* of Louisiana isn't facially apparent, RFP 27, but it's information almost uniquely in Defendants' possession, and Defendants have refused to produce information from which that statistic could be obtained. *See* Dkt. 144. Likewise the "basis" for Defendants' admission in an MOU, as sought by RFP 29.

Most troublingly, Defendants point to allegations of harm beyond those discrete programs identified by Plaintiff States as the bases on which they would rely for standing. Dkt. 157-1 at 20-21. The Court ordered limited jurisdictional discovery on those bases, which are a subset of bases identified in the Complaint. As Plaintiff States objected, discovery requests beyond that that subset is not within the scope of permissible discovery. Defendants should not be permitted to point to broad statements about relevance and admissibility, then demand discovery on, e.g., affects on the labor market, that are beyond the bases identified at the Court's request.

### 3. Defendants are not entitled to Rule 11 discovery, and Defendants are actually receiving more than they asked for.

Defendants finally move to compel on RFPs 28, 31-31, Dkt. 157-1 at 21-23, which seek documents "that establish the basis for" specific allegations in Plaintiff States' complaint, Dkt. 157-9 at 22, 24-26. Plaintiff States objected that in seeking discovery of "the basis for" those allegations, Defendants are seeking Rule 11 discovery, which implicates work product and cannot be had without filing a Rule 11 motion. Indeed, "[t]he advisory comments to Rule 11 caution that courts are discouraged from using Rule 11 as a basis for discovery," and such "discovery should be conducted only by leave of the court, and then only in extraordinary circumstances" *Hall v. Marriott Int'l, Inc.*, 2022 WL 3718838, at *3 (S.D. Cal. Aug. 29, 2022) (discussing and quoting 1983 Adv. Comm. Notes). Rather than withhold documents, Plaintiff States produced documents "that support the

allegations" identified by Defendants. Plaintiff States made clear during the meet-and-confer "that set is broader than documents underlying the complaint." Dkt. 157-7 at 5. In short, Defendants are getting everything they asked for, and more. The only basis for Defendants moving to compel is if Defendants are engaging in a fishing expedition for narrower Rule 11 discovery, for which they have not sought leave.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Compel should be denied.

Dated:   May 11, 2023

Respectfully submitted,

JEFF LANDRY
  ATTORNEY GENERAL OF LOUISIANA

By: */s/ Joseph Scott St. John*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
JOSEPH S. ST. JOHN (La #36682)
  Deputy Solicitor General
JORDAN B. REDMON (La #37272)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*