```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF LOUISIANA
 2                         LAFAYETTE DIVISION

 3
      STATE OF ARIZONA, ET AL,      ) CIVIL ACTION NO. 6:22-cv-1130
 4                                  ) AND RELATED CASE 6:23-cv-420
                    Plaintiffs,     )
 5                                  )
                         vs.        ) JUDGE JOSEPH
 6                                  )
      MERRICK GARLAND IN HIS        )
 7    OFFICIAL CAPACITY AS ACTING   )
      DIRECTOR OF EXECUTIVE OFFICE  )
 8    FOR IMMIGRATION REVIEW, ET AL )
                                    )
 9                   Defendants.    ) MAGISTRATE JUDGE WHITEHURST

10

                              MOTIONS HEARING
11
                    Transcript of Proceedings before The Honorable
12          David C. Joseph, United States District Judge,
            Lafayette, Lafayette Parish, Louisiana, commencing
13          on April 4, 2023.

14                         Appearances of Counsel:

15    For the Plaintiffs:          JOSEPH SCOTT ST. JOHN
                                   JORDAN BAILEY REDMON
16                                 LA Department of Justice
                                   909 Poydras St., Ste. 1850
17                                 New Orleans, LA 70112

18    For the Defendants:          No counsel present

19    For the Movant, Rozas &
      Associates Law Firm, LLC:    JOHN S. McLINDON
20                                 Law Office of John S. McLindon
                                   12345 Perkins Rd. Bldg. 2 Ste. 202
21                                 Baton Rouge, LA 70810

22

23                     Cathleen E. Marquardt, RMR, CRR
                        Federal Official Court Reporter
24                           800 Lafayette Street
                           Lafayette, Louisiana 70501
25                         Phone:  (337) 593-5223
```

```
 1                   Appearances of Counsel Continued:

 2   For the Movant, Home
     is Here, et al.:            WILLIAM P. QUIGLEY
 3                               Law Office of William Quigley
                                 7500 Dominican St.
 4                               New Orleans, LA 70118

 5                               JULIA LONG
                                 STEPHANIE TEPLIN
 6                               Patterson Belknap, et al.
                                 1133 Ave. of the Americas
 7                               New York, NY $100,366,710

 8                               JESSICA MYERS VOSBURGH
                                 Center for Constitutional Rights
 9                               666 Broadway 7th Fl.
                                 New York, NY 10012
10
     For the Movant,
11   Innovation Law Lab:         MATTHEW SCOTT VOGEL
                                 National Immigration Project of the
12                               National Lawyers Guild
                                 2201 Wisconsin Ave. N.W. Ste. 200
13                               Washington, DC 20007

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Lafayette, Lafayette Parish, Louisiana; April 4, 2023,

 2   in open court.)

 3                         (Call to order of the court.)

 4           THE COURT:  Please be seated.  Okay.  We're on the

 5   record now in 22-cv-1130, Arizona versus Garland, as well as a

 6   related case, 23-cv-420, which was transferred in a few days ago

 7   from the Northern District of Georgia.  We have several motions

 8   to quash nonparty subpoenas.  Who do we have here today?

 9           Make sure everybody stands by a microphone or else

10   we're all going to get in trouble.

11           MR. QUIGLEY:  Bill Quigley, Your Honor, on behalf of

12   Home is Here, Louisiana Advocates for Immigration and Detention,

13   and Immigration Services and Legal Advocacy.  I'm at Loyola in

14   New Orleans, and we have with us, Julia Long, Stephanie Teplin,

15   and Jessica Vosburgh all part of the pro bono team for these

16   targets of the subpoena.

17           THE COURT:  Okay.  Thank you, Mr. Quigley.

18           And I see Mr. McLindon back there.  You represent the

19   Rozas Law Firm, correct?

20           MR. McLINDON:  Yes, sir.

21           THE COURT:  How are you this morning?

22           MR. McLINDON:  I'm great, Your Honor.

23           THE COURT:  All right.  Who else do we have?

24           MR. VOGEL:  Good morning, Your Honor.  My name is

25   Matthew Vogel.  I'm with the National Immigration Project.  I
```

1  represent Innovation Law Lab which is the movant that was in the

2  case transferred from Georgia, case 420.

3          THE COURT:  I think, Christina, you told me maybe

4  there's an issue with his admission?

5          Have you -- Are you admitted pro hac vice?

6          MR. VOGEL:  No, Your Honor, I'm a member of the bar

7  here, and I entered -- I think what happened was, there was an

8  improper filing.  I think it's been corrected this morning, but I

9  don't think it's been acted on.  There is a motion to substitute

10  counsel.

11          THE COURT:  Okay.  That motion is granted.

12          MR. VOGEL:  Thank you, Your Honor.

13          THE COURT:  You're in.  All right.  Thank you.

14          And is that all we have for the movants today?  All

15  right.

16          And on behalf of the plaintiffs?

17          MR. ST. JOHN:  Good morning, Your Honor, Scott St.

18  John, Deputy Solicitor for the plaintiff states.  I'm joined by

19  my colleagues, Assistant Solicitor Jordan Redmon.

20          THE COURT:  Okay.  Good morning, gentlemen.  Before we

21  get into that, Mr. St. John, do we have anybody on behalf of the

22  defendants?

23          MR. ST. JOHN:  Your Honor, when I spoke with Mr. Ward,

24  I spoke with him last week, he indicated the federal defendants

25  were not sending anyone to this hearing.

```
 1              THE COURT:  Okay.  All right.  I received this morning,
 2    Mr. St. John, a motion to compel.  Do you have a position whether
 3    or not the Court's ruling on that motion to compel may affect
 4    what we're doing here today?
 5              MR. ST. JOHN:  It may, Your Honor.  The issue is that
 6    ultimately the federal defendants have made clear in the Florida
 7    case and in this case that they expect granular proof of
 8    standing.  We disagree that's the standard, but that's the
 9    position the federal defendants have taken.
10              In all fairness, the Court has to give us the discovery
11    from either the federal defendants or the nonparties.  So, you
12    know, you can resolve it one way or the other; but in fairness,
13    if we're going to be expected to -- if the federal defendants'
14    position is that we need to prove standing at that level, we're
15    entitled to discovery from someone.
16              The Fifth Circuit has made clear that, if we can't get
17    it from the feds, we can look to private parties.  So really in
18    some sense the dispute is between the federal defendants and the
19    third parties as to who should produce the discovery.
20              THE COURT:  Right, and Mr. St. John, you say several
21    times in your response to the motions to quash that essentially
22    you don't believe jurisdictional discovery is necessary to move
23    forward, and I don't want to discuss that too much because it
24    obviously involves the defendants, and they may have a position
25    on that, but I do want to discuss with you and with the
```

```
1    defendants whether -- I mean, ultimately the plaintiffs have the
2    burden to prove standing.
3              MR. ST. JOHN:  I agree with that, Your Honor.
4              THE COURT:  It may not be much, but ultimately
5    someone's got the burden of proof, and it's your client.  So if,
6    you know, if the plaintiff states don't believe any more
7    discovery is necessary, they believe standing, can be shown in
8    other ways, then we can just end this and we can just brief it
9    and I'll decide, because I'm the one that's going to decide --
10   this was initiated because I want to move forward with standing
11   before we move forward with the merits of the case.  That's my
12   decision, and the courts have constant obligation to look at
13   whether they have jurisdiction, and I decided at the outset of
14   this case, that's something I'm going to do.  So we can discuss
15   that with -- maybe I'll -- I'll set up a status conference with
16   the defendants so we can discuss that in detail whether we want
17   to do that.
18             MR. ST. JOHN:  Yes, Your Honor.
19             THE COURT:  But I do want to discuss that because I
20   think it's important.  Especially I had a chance this morning to
21   look at -- I haven't finished your motion to compel, but I had a
22   chance to start looking at some of it, and I'm aware of some of
23   the issues.
24             So given that motion to compel, would your clients have
25   any objection to defer any ruling today on these motions to quash
```

1    until I rule on that?

2              MR. ST. JOHN:  I think that's probably the correct

3    answer at least for request number one on the motion to quash.

4    Some of the smaller requests may be correctly ripe.  They are

5    secondary indicia of the presence of asylum applicants who would

6    be a burden on the state.  Those are probably ripe.

7              If the nonprofits are handing out, here's how you get

8    benefits, okay, that's a pretty good indicia that some of these

9    folks are indeed partaking of state benefits.  So that part is

10   ripe.  The part that's really being fought over is request number

11   one which is --

12             THE COURT:  Identity of the clients and the individuals

13   they are servicing.

14             MR. ST. JOHN:  Correct, Your Honor, and that's the one

15   where the federal defendants and the nonprofits and Mr. Rozas are

16   at kind of cross points as to who is obligated to produce that.

17             THE COURT:  Okay.  I think, John, I think you filed

18   your motion first.  Do you want to start, and we can, I think,

19   tailor it to just that issue.  I guess with respect to your

20   client it would have to do with claims of some kind of work

21   product or something like that, right?

22             MR. McLINDON:  I'm sorry, with what?

23             THE COURT:  Work product.

24             MR. McLINDON:  Sure.  It's more attorney-client

25   privilege, but I would like to start off by saying I think Your

 1   Honor is right, that I think a motion to compel should be decided

 2   first, because I don't think they even disagree with us that the

 3   case law is, if you can get it from somewhere else, go get it.

 4   Don't come to --

 5          THE COURT:  Yeah, we're not getting into that.  I think

 6   the only, the only remaining issue is some of these, I think how

 7   Mr. St. John characterized it was tangential requests for

 8   documents advising asylum applicants or maybe other illegal

 9   immigrants who have not applied yet for asylum how to operate.

10   Okay?  So what's your position with respect to that?

11          MR. McLINDON:  Well, if I could, I'd like to talk about

12   the burden that it puts on the Rozas firm, if that's where you're

13   going with this.  So, again, what makes us different from

14   everyone else is we're a -- David Rozas is here, Your Honor, is a

15   private law firm, and he does a lot of immigration work, and he's

16   actually missing a sentencing in front of Brian Jackson right now

17   to be here.  He's paying me to be here.  And if this subpoena is

18   granted, it's going to cost him thousands and thousands of

19   dollars to try and find this information.  He's going to have to

20   take his staff off of what they are doing and get onto this, and

21   that's not fair.

22          THE COURT:  And there's, for third-party discovery,

23   there's -- you can push that onto the people asking for the

24   information, right?

25          MR. McLINDON:  Yeah, for costs.

1          THE COURT:  For cost.

2          MR. McLINDON:  That's something we would like to

3   explore.

4          THE COURT:  Yeah.

5          MR. McLINDON:  But burden is not only financial burden.

6   It's other burdens, and this is a big one to somebody who is in

7   private practice, and I will tell you, Judge, word is already on

8   the street in Baton Rouge that David Rozas has got a subpoena.  I

9   don't know how it got out there, but the other immigration

10  lawyers in Baton Rouge are saying, hey, what's going on with

11  Rozas.  I heard he got subpoenaed.

12         If he is ordered to turn these names over, it's going

13  to spread like wildfire among the other immigration lawyers, and

14  you can imagine the scenario, Judge.  I'm looking for --

15         THE COURT:  We're not turning the names over today.

16  We're not doing that today.  I'm deferring any client list from

17  any of these organizations.  We're not doing that.

18         Now down the road, if it's absolutely necessary and

19  they can't be obtained from party discovery, we will start anew

20  on that, and you'll have a chance to argue this point, but we're

21  not doing that today.

22         MR. McLINDON:  Is there any other issue you wanted me

23  to address then?

24         THE COURT:  Just the ancillary documents, as

25  Mr. St. John calls them, about --

1          MR. McLINDON:  Public benefits and things like that?

2          THE COURT:  Yeah, maybe flyers or --

3          MR. McLINDON:  The answer is we don't do that.  Rozas

4    doesn't do that.  He doesn't give those documents out.  He

5    doesn't give them -- he has no idea -- Any client that he

6    represents in an asylum case, whether they are going to get

7    public benefits or not, he has nothing to do with that.  So they

8    are nonexistent.  So really don't even need the motion to quash

9    on that.  The answer is, no, we don't have them and never have

10   had them.

11         THE COURT:  So the big issue for you is the names of

12   the clients serviced by Rozas Law Firm?

13         MR. McLINDON:  Yes.  It's not that easy to find those

14   names.  I mean, it's not like -- Like if someone would ask me,

15   John, give me the names of your clients that did -- convicted

16   felon in possession of a firearm.  I don't have it like that.

17   I'd have to go through every file.  I don't put that like that.

18         THE COURT:  How many of those cases do you do, John?

19   Do you do a lot of 922's?

20         MR. McLINDON:  I do, Your Honor.  I do quite a lot.

21         THE COURT:  All right.

22         MR. McLINDON:  Most of my practice is federal criminal

23   defense, so.

24         THE COURT:  I didn't know if you did any gun cases

25   though.

1            MR. McLINDON:  In other words, it would take a lot of

2       work.  And Mr. Rozas' firm is a lot bigger than mine.  The burden

3       would be unbelievable.

4            THE COURT:  Well, we will certainly have a chance to

5       address that if we get there; but, again, I think we have --

6            MR. McLINDON:  But the documents, never have, have no

7       idea about that.  Whether they go get public benefits or not,

8       that's beyond the scope of our representation.

9            THE COURT:  Okay.  All right, thank you, Mr. St. John.

10           Okay.  So --

11           MR. QUIGLEY:  Your Honor, Ms. Long is going to address

12       the Court.

13           THE COURT:  Okay, Ms. Long please proceed.

14           MS. LONG:  Good morning, Your Honor.  Julia Long from

15       Patterson, Belknap, Webb & Tyler, pro bono counsel for our

16       clients, the nonprofit organizations.  Your Honor, I know you've

17       already said you don't want to address Request Number 1, but if I

18       could just make one point that I think is clear, particularly,

19       from the State's motion to compel, the State of Louisiana is

20       effectively asking our clients, three very small nonprofit

21       organizations, to carry the burden of jurisdictional discovery in

22       this case.  That's inappropriate.  It's inconsistent with the

23       Federal Rules of Civil Procedure, and as Ms. Vosburgh will argue,

24       it's also inconsistent with core constitutional principles.

25            Diving into the remaining requests, certainly we have

1    objections to Request 1.  I think that's clear on the record.

2    There is no need for this information, but there is also no

3    relevance.  We have said on Request Number 2, which is the

4    information on how to seek public benefits, we said in our

5    initial meet-and-confer and our objections letter that our

6    clients simply don't have this information.  The state has made

7    that a big point.

8            THE COURT:  You don't need me to do anything.  You can

9    just respond to the state subpoena saying "no responsive

10   documents."

11           MS. LONG:  We have, Your Honor.  We put that in our

12   objection letter.

13           THE COURT:  So I don't need to quash anything.

14           MS. LONG:  So setting that aside, I think that leaves

15   us with Requests 3, 4, and 5.  Request Number 3 is particularly

16   burdensome.  If I could just make a point on that.  It seeks all

17   information about the Notice of Proposed Rulemaking.  That goes

18   back five years in time.

19           If I could just give the Court some insight into our

20   clients.  Home is Here New Orleans is a three-person

21   organization.  They don't have an IT manager.  They don't have

22   the staff to deal with this, and they've estimated that this

23   would take an incredible amount of time to compile, and it's not

24   clear from the subpoena itself whether this would include

25   publicly available documents.  That request is simply overbroad

1   as written, and frankly, we don't see the relevance to the

2   state's standing inquiry.

3           For our other clients, La. AID, again, a three-person

4   organization.  They don't have a centralized document management

5   system.  La. AID has specifically has an incredible network of

6   volunteers.  They would have to go back and ask their volunteer

7   network to turn over hard copy, text message communication, all

8   responsive documents that they have.  This is an incredible

9   burden.

10          ISLA is in a slightly different boat.  As a legal

11  services provider, they do have a client management system of

12  some kind, but as my colleague will argue, they have significant

13  privilege concerns, and as you've already heard today, that would

14  be an additional burden.  The state doesn't address this burden

15  in its brief, and we think it would be an alternate basis to

16  conclude that the subpoena should be quashed.

17          Your Honor, I would also just point out, I know that

18  the Court has indicated that on Request Number 1 specifically

19  that the Court may defer that ruling, and I think our clients

20  would be open to that.  But the record is also sufficient to rule

21  now.  We don't see the relevance to this information.

22          The state has advanced a couple of theories of

23  standing.  One is an aggregate data model.  Certainly our clients

24  don't have information about aggregate immigration data.  On the

25  states extra theory -- extra dollar of spend theory, there's

1    nothing in the request that tailor any of this information,

2    certainly on the identities of clients to the Notice of Proposed

3    Rulemaking, the final rule.

4            So even if there's an extra dollar of spend, the state

5    has done nothing to try and tailor that to show attribution again

6    to that rule.

7            And third, if standing is proven as a matter of law,

8    certainly our clients don't need to be burdened either on Request

9    1 or the remaining requests.

10           THE COURT:  Thank you, Ms. Long.

11           MS. VOSBURGH:  Good morning, Judge.  Jessica Vosburgh

12   also for the nonprofit organizations.  If I can just address

13   briefly the privilege and constitutional issues, which also come

14   into the Court's consideration of the burden.  I wanted to touch

15   on these issues briefly, but also know as the Fifth Circuit

16   recently held in Whole Woman's Health, these sort of weighty

17   constitutional and privilege issues, the Court doesn't ultimately

18   need to rule on those grounds, but should take careful

19   consideration of them in assessing the severe burden on our

20   clients.

21           So these subpoenas, and I think centrally Request

22   Number 1, but the subpoenas in their entirety and also Request

23   Numbers 2 through 5 burden our clients core associational rights.

24   As the codirector of Home is Here explained in her declaration,

25   their work is centered on sustaining relationships, building new

1   ones, and establishing trust across partner organizations in

2   Louisiana.  Complying with these subpoenas, handing over this

3   sensitive internal information to the state would lead to

4   devastating relational consequences, causing their network of

5   partners to collapse and severely weakening their ability to

6   advocate and would have ripple effects that would put their

7   partners --

8           THE COURT:  You got to slow down a little bit.

9           MS. VOSBURGH:  The ripple effects, and this is quoting

10  the director of Home is Here, (reading:) would put our partners

11  in fear of retribution, harassment, and abuse from both

12  government actors and from private vigilantes.

13          The same goes for Louisiana Advocates for Immigrants in

14  Detention who depend on an extensive network of largely

15  faith-based volunteers and the trust of the individuals to whom

16  they provide temporary shelter.

17          And also to ISLA where the associational interests are

18  primarily with their current, former, and prospective clients,

19  something that the Supreme Court has long recognized since NAACP

20  v Button and In re Primus in the '60s and '70s is a protected

21  associational right, as well as their relationships with their

22  broader community, client families, and partner organizations.

23  Complying with these subpoenas would threaten those core

24  associational rights.

25          In addition as Mr. McLindon has raised with respect to

1    the Rozas Law Firm, attorney-client privilege applies with

2    respect to immigration services and legal advocates.  Much of the

3    information sought -- and not just with respect to number one,

4    although we agree that's by far the most concerning, implicates

5    both the privilege and work-product doctrine, as well as the

6    general duty of confidentiality under the state's ethics rules.

7    Turning over this information is going to violate those

8    privileges, and I would note that Rule 45(d)(3) sweeps broader

9    than just the strict application of attorney-client privilege,

10   but also applies to other protected matters.

11           And so taking all those into account and also, again,

12   assessing the immense burden, both in terms of time, resources,

13   and threat to these organizations' mission and their reputation,

14   that this Court quash the subpoenas in their entirety.

15           THE COURT:  Thank you, Ms. Vosburgh.

16           All right.  And then we have Mr. Vogel.

17           MR. VOGEL:  Yes, Your Honor.

18           THE COURT:  Did they leave anything on the table for

19   you?

20           MR. VOGEL:  Well, I have a couple of issues.

21           THE COURT:  Get up here.

22           MR. VOGEL:  Thank you, Judge.  And thank you for

23   allowing us -- allowing me to speak today.  You know, I didn't

24   have a whole lot of notice, but I am here.

25           THE COURT:  Yeah, the judge in Georgia gave you notice

1    that we were transferring it for the purpose of this hearing, so

2    you did have some notice.

3              MR. VOGEL:  I think I would add to what the other

4    counsel said.  I certainly echo what counsel said about the

5    privilege issues, the work-product issues, the ethical

6    considerations.  Law Lab is a legal services organization.  It

7    provides -- as is outlined in our submissions, it provides legal

8    services to people.  Excuse me.  And so I think that, you know,

9    those are all very weighty issues.  And like counsel said, these

10   also apply to the other requests, as well, not just the first

11   one.

12             Law Lab's subpoena is a little bit different, but still

13   the first request seeks identities, and we too agree that that is

14   the most significant one with respect to the questions of

15   privilege and work product, but also the other requests, you

16   know, Request 2 seeks documents used in asylum workshops.

17   Request 3 seeks other materials and documents used across Law

18   Lab's other programs.  And you know, Law Lab has produced in our

19   declaration, in Steve Manning's declaration, did produce a number

20   of 21 -- It pointed counsel for the states to 21 videos, to three

21   guides to asylum.

22             THE COURT:  Right, and that's hopefully available, and

23   that would be a good way for people in the organizations trying

24   to help to view that without your organization having to actually

25   hand them something.  They could just view it on the public

1  website.

2          MR. VOGEL:  Precisely.

3          THE COURT:  That would be the primary way that your

4  client communicates with people that might want services,

5  correct?

6          MR. VOGEL:  In a nonconfidential, nonprivileged --

7          THE COURT:  Not an attorney-client relationship.

8          MR. VOGEL:  Exactly.

9          THE COURT:  Okay.  I read that as well.

10          MR. VOGEL:  And we also pointed counsel as far as

11  Request 5 deals with documents relating to Law Lab's assessment

12  of the final rule, the Asylum Rule, and Law Lab files a lengthy,

13  a seven-page, single-spaced public comment, outlining its

14  perspective on the rule, what the rule would do and what the

15  impact of the rule would have on the asylum system.

16          But Law Lab maintains that apart from those things,

17  we're talking about materials that are covered by privilege, that

18  are covered by work product, and that are also covered by

19  counsel's ethical obligations.

20          And putting all of that stuff to one side, there is

21  also the burden question.  And I think, you know, the burden for

22  Law Lab, you know, we're talking about a small, 30-person

23  nonprofit, and Law Lab operates across the country, and in order

24  for a small, 30-person nonprofit to do that, it frequently, just

25  about always has to collaborate with other organizations.  So not

1    only are we talking about the need to identify and locate clients

2    who may be needed to be notified, we also have to deal with

3    addressing the questions of privilege and cocounsel relationships

4    with Law Lab's partners across the country, and we're talking

5    about a wide variety of programs.

6            These requests are seeking information going back to

7    2018, for the past five years, and just some of the things we

8    highlight in our briefing, Law Lab coordinated representation of

9    some of the first asylum seekers that were involved in the

10   Migrant Protection Protocols.  It represented over a hundred

11   immigrant men detained in federal prison, and it runs -- it has

12   been running and runs Oregon's first universal immigration

13   representation program.  So there's a wide variety of different

14   kinds of programs that these requests would implicate and that

15   would require a great amount of time and expense and constitute a

16   great burden.

17           The -- I mentioned the time, right.  These are going

18   back to 2018, the requests.  The rule is from 2022.  The Notice

19   of Rulemaking was from 2021.  And we're talking about an

20   incredible amount of time across a wide variety of programs, some

21   of which never operated here in Louisiana.

22           The Request Number 2 mentions by name Law Lab's Centers

23   of Excellence and its EPIC program.  The EP in EPIC is for

24   El Paso.  That operated just in El Paso.  And the BorderX

25   detention project ceased operating under that name before the

 1   rule was -- the proposed -- was even proposed.  There was a

 2   proposed rulemaking.  And Law Lab has never conducted any

 3   workshops in Florida or Louisiana either.  So there are also

 4   these questions of relevance that we bring up in our briefing.

 5          And finally, I just wanted to highlight what I think

 6   we've heard from everyone so far is that these requests go to the

 7   very possibility of Law Lab's existence.  Requiring Law Lab to

 8   turn over information that is confidential, that is

 9   attorney-client privileged, that is protected by work product, is

10   a threat to Law Lab's very existence because it means that people

11   will not be able to trust that Law Lab will be able to keep them

12   safe, and if people aren't going to be able to trust Law Lab,

13   they are not come to Law Lab and Law Lab will have to cease

14   operations.

15          THE COURT:  Mr. Vogel, attorney-client work product

16   documents are not discoverable.

17          MR. VOGEL:  That's right.

18          THE COURT:  The only point, and I think you may be

19   overstating it a bit, but the only point that's relevant here is

20   essentially the identities in the context of immigration clients

21   are entitled to additional protection under attorney-client

22   privilege because of the lack of legal status of some of these

23   people, and that is an issue.  But again, I'm deferring ruling on

24   any of the production of identities of your clients until later.

25          MR. VOGEL:  I understand, and I appreciate that, but

1    I'm arguing like I think counsel is as well, that many of the

2    other documents that are requested under the other requests are

3    themselves protected by privilege, as we outlined in our briefing

4    or themselves protected by work product.  We have produced --

5            THE COURT:  If you are ordered eventually to produce

6    those, then you would put them on a privilege log.

7            MR. VOGEL:  We have produced what we have that is not

8    already, and -- but like I said, there is this incredible burden.

9            THE COURT:  All right.  Thank you, Mr. Vogel.

10           MS. VOSBURGH:  Your Honor, if I could address one

11   additional point.

12           THE COURT:  Okay.

13           MS. VOSBURGH:  Would you prefer me to do it from the

14   podium?

15           THE COURT:  You can just stand up.

16           MS. VOSBURGH:  Okay.

17           THE COURT:  There's just one point.

18           MS. VOSBURGH:  Of course.  Yeah.  And this is covered

19   in our briefing, but just to address something in the state's

20   response.  With respect to Louisiana Advocates for Immigrants in

21   Detention, we are also raising First Amendment, really just

22   freedom in both federal and state statutory protections.  La. AID

23   operates a temporary shelter which is core work out of a church

24   basement.  It is intertwined inextricably with the work of the

25   Church for the Highlands.  Both their leaders and volunteers are

1    called to do the work that they do, based on their sincerely held

2    religious beliefs.  And so although La. AID has already stated to

3    the state -- and you know, I know we're not talking about Request

4    Number 1 right now, but certainly that's deeply concerning from a

5    religious freedom perspective.

6            They have already stated that on Request Number 2, 3,

7    4.  They don't have anything other than what's publicly

8    available.  That would be incredibly burdensome, but certainly

9    with respect to the subpoena as a whole, that this would also

10   infringe upon their religious freedoms, and that applies with

11   full force, both the federal RFRA to an order from this Court,

12   part of the federal judiciary branch and also under Louisiana

13   State RFRA, the Preservation of Religious Freedom Act.  Thank

14   you, Your Honor.

15           THE COURT:  Mr. St. John.

16           MR. ST. JOHN:  Good morning, Your Honor, Scott St. John

17   for the plaintiff states.  Let me start with the relevance.  As

18   we told the Court in status conferences, we get the identity of

19   these folks, we can go to the state agencies, particularly,

20   public schools, is this child enrolled in your public school?

21   The answer is yes.  That is an expense.  That's an injury to the

22   state.

23           Why are we in this position?  I don't know what tack

24   the federal government is going to take on standing.  I have a

25   pretty good indicia based on their discovery requests and based

1   on the position they took in the Florida v. United States case,

2   but there's no 12(b)(1) motion for me to say, okay, the issue is

3   X and to focus discovery on that.

4          Discovery is my chance to pack my bag for trial.

5   That's where I pack my beans, my bullets, my butter.  I don't get

6   to go to trial and say, oh, they actually care about this.  I

7   have to do it all right now because I don't know.  So we sought

8   information from the plaintiffs and from some private parties.

9          What do we know from those private parties?  Mr. Rosaz

10  estimates his office represents, quote, around 600 applicants a

11  year, end quote, over the past five years in Louisiana.  ISLA,

12  quote, served approximately 250 detained immigrant clients per

13  year from 2018 to 2020, and quote, the number of immigrant

14  clients is climbing.  That's Docket 122-4, paragraph 8.

15         And ISLA serves thousands more through orientation

16  presentations and trainings.  ISLA admits that it provides its

17  clients, quote, with information on the asylum rule, end quote.

18  Docket 122-4, paragraph 24.

19         Ms. Kelly of La. AID states that ice releases, quote, a

20  large volume of immigrants, end quote, into Louisiana, and that

21  nonprofits maintain programs to help them.  And Ms. Kelly averred

22  that ICE discloses at least the names of at least some of those

23  immigrants to her in the form of electronic manifests.  So they

24  have responsive information.

25         We also know that immigrants released in Louisiana are

1    unable to care for themselves and are directed to, quote, housing

2    programs and an immigrant shelter in Shreveport.  Docket 122-3,

3    paragraph 14.

4            So what are the objections?  I think the leading one

5    across all the subpoena responses is attorney-client privilege.

6    The existence of an attorney-client relationship is per se not

7    privileged.  There's a narrow exception for the last-link

8    doctrine.  That's not here.  If you think about what someone has

9    to put on a privilege log, they have to prove the existence of

10   the attorney-client relationship.

11           THE COURT:  What about the cases cited by the movants

12   with respect to immigration law in particular, that the

13   identities of clients, immigration firms are entitled to

14   additional protection?  Have you had a chance to look at those

15   cases?

16           MR. ST. JOHN:  I've looked at some of them, Your Honor.

17   I think the overall answer is that congress has provided a very

18   narrow statutory protection for T visa, U visa, and Violence

19   Against Women Act self-petitioners.  Statutory is very narrow.

20   T and U are human trafficking, severe human trafficking victims

21   and victims/witnesses of crimes.

22           So congress has a told us where the sensitivity is.

23   And historically there was no protection for this.  There is now

24   a regulation that we discussed this in the motion to compel the

25   federal government is really and only being viewed as a

1    processing regulation that puts the decisional authority of

2    whether to produce in the hands of the Attorney General or the

3    Secretary of Homeland Security, but it's not a substantive

4    privilege.  So there is no --

5              THE COURT:  On producing information on asylums?

6              MR. ST. JOHN:  Yes.

7              THE COURT:  Asylees?

8              MR. ST. JOHN:  Yes.  So there is no protection outside

9    of the narrow category that congress has specified, and it would

10   be a very odd reading to say that congress has said, okay, we're

11   going to protect --

12             THE COURT:  That applies to what the government can do

13   with the information, not a third party.  They have

14   understandable concerns about releasing the identities

15   specifically with respect to the attorneys, the movant attorneys

16   with respect to their clients.  The clients come to them for a

17   reason.

18             MR. ST. JOHN:  Their clients come to them for a reason,

19   but there's an inconsistency in their briefing.  It's, on the one

20   hand, the state already has this, and on the other hand, the

21   world will end if the state gets this information.  Which is it?

22   The reality is the state is the sovereign.  The State of

23   Louisiana and State of Florida are the sovereigns over their

24   territory.  For thousands of years, the sovereign is entitled to

25   know who is present in its territory.  That's why Jesus was born

1    in Nazareth.

2         THE COURT:  Yeah, but these organizations don't -- what

3    they don't have is any kind of -- they don't have a complete list

4    of that.  They have very, very small pieces.  I'm not even sure

5    how you chose to subpoena these particular organizations.  That's

6    another question that I have, but they don't have anything that

7    would give -- shed any light onto the situation in Louisiana or

8    Florida as a whole.  The government has that.  The government

9    does have that.

10        MR. ST. JOHN:  Absolutely, Your Honor.  The federal

11   government should have a complete list of that.  Okay.  If I

12   can't get the complete list, this is that cross-purposes.

13        THE COURT:  Yeah, let's move on.  What do you want from

14   these organizations besides the identities of the individuals

15   they service?

16        MR. ST. JOHN:  So working through the request, the

17   example, Request Document 122-2 page 50.  Documents provided to

18   aliens regarding public benefits.  Okay.  If they don't have it,

19   there's no need for a motion to quash.  They respond to the

20   subpoena.  We performed an adequate search, and we don't have it.

21   That's the easy one.

22        Flip side, if they are handing this stuff out, the

23   analogy my colleague used in his brief, they are probably not

24   giving out War and Peace.  If they are giving their client

25   something, they are giving it to them for a reason, and the Court

1  can infer that those aliens are using whatever benefits are being

2  advertised.

3          THE COURT:  I don't want to get too much into this

4  without the defendants here, but is there a difference in the

5  benefits that asylum applicants would be entitled to versus those

6  who have been granted asylum?

7          MR. ST. JOHN:  There is, and it's actually more

8  complicated than that, and it depends on the nationality of an

9  individual.  For some benefits there's like a five-year waiting

10  rule.  For some they're eligible upon asylum grant.  For some, if

11  they're an applicant, I think it's from Haiti and Cuba, they are

12  instantly eligible, and there are a couple of other countries

13  like that.  It's somewhat complicated.  I know the Court doesn't

14  like this, but it depends is the actual answer.

15          Public school, if it's a child, Plyler v. Doe, we're

16  required to educate the child.  So that's going to be universally

17  applicable.  If I can identify children who are going to public

18  schools in Louisiana, it only takes one.

19          THE COURT:  Well, the asylum, those waiting for asylum

20  determination would go to public schools as well.

21          MR. ST. JOHN:  Yes, yes.

22          THE COURT:  As those who have been granted asylum.

23          MR. ST. JOHN:  Yes, sir.

24          THE COURT:  And I'm talking about a specific case

25  because the reality is and the reason I have big question marks

1    about the standing in this case, it's different from the other

2    cases you cited, the one in Florida, Northern District of

3    Florida, for example, is different because here what we have is

4    the government asserting that one of the primary reasons for

5    this, for the IFR, was to expedite the removal statute, the

6    expedited removal statute, streamlined the removal of those who

7    are not granted asylum.  That's one of the purposes.  So what we

8    have -- and then, of course, another purpose is to go to the

9    adversarial proceeding, right, so that may affect the grant rate,

10   but we have two sides of the equation.  We have one side being

11   that the government is asserting that actually the process is

12   streamlined under the expedited removal statute so that people

13   are not waiting in the system as long, and on the other hand, it

14   may affect the grant rate.  It may be higher as a result of

15   several factors, among others, maybe the lack of an adversarial

16   system for certain asylum applicants, but that's why the standing

17   issue is complicated.

18            MR. ST. JOHN:  Yes.

19            THE COURT:  Because the net effect on the states to me

20   is not clear, not clear.  And I'm not clear at all that, in fact,

21   there are more asylees getting state benefits than before the

22   IFR.  I'm not clear about that.  That's why I'm asking these --

23   That's why we're having this jurisdictional discovery.

24            What I don't think and what I don't think we're going

25   to get from any of the nonprofits or the Rozas Law Firm is any

1    kind of whole cloth answer to that question.  I think the motion

2    to compel, we'll have to look at that, and I'm going to look at

3    that, but I don't -- I guess I don't -- I understand what you are

4    trying to do by getting names and running them through state

5    databases to figure out what benefits they are receiving, but

6    that still doesn't give us the big picture.  That doesn't give us

7    the big picture of what the net effect to Louisiana and Florida

8    is.

9          MR. ST. JOHN:  So Your Honor, one, by speeding the

10   process, you are increasing the eligibility.  You're eliminating

11   that period of ineligibility because for some benefits, the

12   grantee is eligible, the applicant is not.

13         The rule does other things though.  It increases

14   parole.  Okay.  That's going to put more of these folks on the

15   streets of Louisiana and Florida, and there's not really, I don't

16   think, any doubt about that.

17         THE COURT:  Well, the government is not -- they are not

18   really detaining anybody unless there's a reason for it right now

19   anyway is my understanding.

20         MR. ST. JOHN:  I think it's very opaque what they are

21   doing, and nobody knows other than the administration doesn't

22   want to detain people.  How far they are pressing that, I don't

23   know.

24         A bigger picture item is the magnet theory, and the

25   government conceded that in February, and that's the reason for

1   the theory, the government's entire theory behind the February

2   Notice of Proposed Rulemaking about how to deal with the

3   expiration of Title 42 is that, when we change border policy, it

4   can act as a magnet and it's going to draw people here.

5          So if you have a process that is substantially easier,

6   substantially quicker, nonadversarial, that's going to draw

7   people.  The government's effectively conceded that, and then you

8   have the testimony from Florida v. United States of the border

9   patrol chief, yeah, that's what everybody understands.

10         So what is one way we can prove standing?  Okay.

11  Asylum applicants and grantees consume public benefits.  Okay.

12  One dollar example of that.  And then you zoom back out and say,

13  okay, is the asylum rule going to predictably increase that

14  consumption?  And if it's acting as a magnet effect, as an

15  immigration magnet, the answer is pretty clearly, yes, it will

16  predictively increase the consumption based on big picture

17  statistics.  That's New York v. Department of Commerce.  You

18  know, the Court asked why did we select these folks.

19         THE COURT:  So the big picture statistics would be the

20  number of illegal crossings?

21         MR. ST. JOHN:  The predictable effect on the number of

22  illegal crossings, the predictable effect of an increased grant

23  rate.

24         THE COURT:  Well, that's all information that should be

25  publicly available, right?

1          MR. ST. JOHN:  What is not publicly available is the

2    very granular piece of information.  Is there an asylee or an

3    asylum applicant -- and I don't mean to sound trite, but this is

4    the argument that the federal government has advanced, can I

5    prove that one of them, that one applicant or one asylee has

6    consumed public benefits.  That's what was advanced in Florida v

7    The United States.  The Court ultimately rejected that.  That's

8    the federal government's position.

9          And I don't know the Court's views.  I don't know this

10   Court's views.  I've got to pack my bag now.  This is discovery,

11   this is my chance to prove that up.  So, yes, do I want to

12   identify at least one applicant, school child, and one grantee,

13   asylum grantee using public benefits, yes, because that proves

14   the underlying point that these folks do consume public benefits

15   and increase the cost on the state or impose a cost on the state,

16   and if the number increases, that cost is going to increase.

17         You asked why these folks, these particular subpoena

18   recipients.  All have made public statements about the size of

19   their programs.  Innovation Law Lab --

20         THE COURT:  What do their views on what the IFR may or

21   may not do have to do with anything?

22         MR. ST. JOHN:  They will presumably have used, whether

23   it makes it easy or not, how it's going to impact their business.

24   If they are expecting an increased number of clients, that's, you

25   know, the expert in the area is saying, Hey, this rule is

1   predicting, going to increase the number of my clients, that's

2   relevant to the impact of the rule.

3        THE COURT:  Okay.

4        MR. ST. JOHN:  We also know that at least some of these

5   folks, some of the recipients, Innovation Law Lab in particular

6   conducts workshops.  They have a nationwide and international

7   presence, and in fact, Mr. Manning filed a declaration in East

8   Bay demanding a nationwide injunction on the specific theory that

9   their clients don't remain in one jurisdiction.  So it's not just

10  what they are doing in Louisiana.  We know they have presence in

11  Florida, but why do they have offices in Missouri and Georgia?

12  That was the East Bay declaration, because their clients moved

13  throughout the United States.

14       So whatever is happening on the border, whatever these

15  folks are being told on the border in these workshops impacts

16  Louisiana and Florida.  So that's the answer for documents

17  regarding the rule, that's Request Number 3.  Same request number

18  4.  And what are you telling -- what are the applicants, are the

19  aliens being told?  Are they being told how to access public

20  benefits?  Are they being told what they need to say to establish

21  credible fear.

22       THE COURT:  Law Lab, for one, I think pointed you to

23  some videos on their website, correct?

24       MR. ST. JOHN:  I've looked at the videos on their

25  website.  I also know that they have filed a very public

1    declaration saying they give workshops in Mexico and throughout

2    the southwest United States, but what's being said in those

3    workshops.  And if the list of videos is complete, then there's

4    not a -- there's no privilege issue, there's nothing like that.

5    If it's not complete --

6            THE COURT:  What's the relevance of that?  You're going

7    to again say that what they are telling potential asylum

8    applicants will result in a predictable response?

9            MR. ST. JOHN:  Yes.  It also goes to the impact of the

10   rule.  If you are eliminating -- The rule impact eliminates the

11   adversarial stage of the process, and based on the statistics,

12   and we've pointed you to DOJ statistics, the adversarial part of

13   it was a huge part of the filter.  The nonadversarial was not

14   much of a filter at all.

15           The other part that the -- other thing that the rule

16   does is it eliminates the need for a separate application for

17   asylum.  Okay.  That was something on the order of a 40 percent

18   filter on credible fear to asylum grant.  Folks would get the

19   credible fear determination -- aliens would get the credible fear

20   determination by the asylum officer, and then something like

21   40 percent of them never bothered to apply.  They just wanted to

22   get in, get on parole, and be released into the interior of the

23   United States.  That 40 percent filter is eliminated.

24           The last item is contracts with the federal government.

25   There can be no privilege on that.  I mean, we don't have perfect

1    visibility into the contracts.  I looked on spending.gov.  Didn't

2    see any of their names.  At the same time I was told by counsel

3    at the meet-and-confer that at least one of them receives federal

4    money.

5            If there are subcontracts, we may not have visibility

6    in that, but if they have contracts related to asylees or asylum

7    applicants in Louisiana and Florida, that's pretty good indicia

8    that these folks are here and causing a burden.

9            On the objections, there's a mechanical objection from

10   some of these, from I think Mr. McLindon and the Rozas firm.

11   That doesn't apply to ISLA or Law Lab.  Law Lab's whole claim to

12   fame or part of its claim to fame is that it maintains a client

13   database, so it should be pretty trivial to search that.

14           ISLA tells us that it maintains a database.  It's

15   searchable by, quote, type of immigration case, end quote, Docket

16   122-4, paragraph 27.

17           On the religion and association claims, I think those

18   are only raised by La. AID.  The declaration, Ms. Kelly's

19   declaration is pretty interesting.  It talks a lot about

20   volunteers.  Talks a lot about Church of the Highlands, but it

21   doesn't talk a lot about La. AID, and if La. AID is indeed a

22   religious organization conducting religious activities, if it is

23   indeed conducting lobbying activities, that's a real problem if

24   it is being run by a VISTA program participant.  It's probably a

25   violation of the Hatch Act.  So the very carefully worded

1    declaration and the problem that it would pose suggests that it's

2    not actually a religious organization.

3           As far as the associational claims, nobody is asking

4    about their membership.  We're asking about what do they give

5    nonmembers.  It's no different than Rotary Club.  Actually a

6    Rotary Club is a pretty good analogy for La. AID.  Often

7    associated or sponsored by a church.  Members tend to be fairly

8    religious, tend to be upright members of the community.  Each

9    Rotary Club tends to have a couple of charities that it focuses

10   on and it sponsors.  In my hometown, they take care of the city

11   park, but that does not transform that taking care of the city

12   park into a religious exercise.

13          Zooming back out to the big picture on the

14   confidentiality, I think we've touched on it in the brief.  I

15   think we need to pull the curtains back and say, what's going on?

16   The puppet master here, or puppet masters, are Al Otro Lado suing

17   for constitutional rights.  Same exact lawyers -- not same

18   individuals, same law firms that were in the Al Otro Lado case in

19   California a couple of years ago.

20          It cannot be the rule that when public interest law

21   firm is wanting open borders and advocating that, it gets access

22   to this confidential information and argues there shouldn't even

23   be a protective order on it.

24          But when a sovereign state comes into court for an

25   order compelling the federal executive to follow federal law,

1    whoa, that information is too sensitive.  That cannot be the

2    rule.  It's either sensitive or it's not.  And the same public

3    interest law firms have argued successfully in the Southern

4    District of California that it's nonsensitive.

5              I hope I've answered your questions, Your Honor.  Do

6    you have anything?

7              THE COURT:  Yes, that's fine.  What I'm concerned with

8    is the matter pending before me.  I'm not concerned with what may

9    have happened between this public interest law firm in other

10   cases.  And I'm not concerned with adjudicating any more than I

11   need to adjudicate to decide this issue before me.  Okay.

12             MR. ST. JOHN:  Understood.

13             THE COURT:  Maybe others do things differently than I

14   do, but this is how I operate court.

15             MR. ST. JOHN:  Understood, Your Honor.

16             THE COURT:  All right.  What we have here, and I think

17   my view is that, by filing a motion to compel, either yesterday

18   or this morning -- I got it this morning.  The plaintiff states

19   acknowledge as much, and Mr. St. John acknowledged as much, but

20   what we do not have here is a demonstrated need at this point for

21   these third-party subpoenas.

22             Based on my understanding of Article III standing, at

23   this point I believe that sufficient documents are likely in the

24   possession of the plaintiff states and the federal defendants to

25   show Article III standing.  Again, this is just my current

1    understanding.  It could change based on argument or submissions

2    of the parties, but the plaintiffs must exhaust these discovery

3    tools between and among the parties before engaging in this type

4    of third-party discovery.

5          If party discovery is complete, particularly, with

6    respect to the motion to compel filed yesterday by the

7    plaintiffs, and the states show a need for the subpoena and

8    information and these subpoenas issued to these nonprofit

9    organizations and the Rozas Law Firm, the states can file a brief

10   listing the steps they have taken to obtain the needed

11   information from the parties to the lawsuit.  I will then

12   determine if third-party discovery is necessary in this case, and

13   if I decide that it is, I will refer to the magistrate judge in

14   this case the subpoenas and the motions to quash, and she will

15   schedule a time to go through each of the discovery requests and

16   determine the discoverability of each category of documents.  My

17   impression is that some of the documents are discoverable, but

18   the states have not shown a need for that information yet.

19         Therefore, it's the ruling of the Court that I defer

20   ruling on the motions to quash which are Documents 114 and 122,

21   as well as Document 1 in the related case, 23-cv-420.  The Court

22   orders that compliance with the subpoenas issued by the plaintiff

23   states that are subject to the motions to quash are stayed

24   pending further order of the Court.

25         If within 60 days the plaintiff states file a motion to

1    reopen the motions to quash and enforce the subpoenas, they

2    should list specific documents which they feel they must obtain

3    from these nonparties and the necessity of that information for

4    standing so that we will have this -- these matters in a posture

5    where we can -- where Judge Whitehurst can go through each

6    category with the parties and make rulings on the

7    discoverability.  Okay?

8            MR. ST. JOHN:  Your Honor, if I may, a housekeeping

9    matter.

10           THE COURT:  Yes.

11           MR. ST. JOHN:  Given Your Honor's --

12           THE COURT:  I'm going to schedule a status conference

13   with the defendants because we need to discuss what I just

14   talked -- what I talked about previously.

15           MR. ST. JOHN:  Understood, Your Honor, and what I

16   wanted to alert the Court of is once we receive names, the state

17   agencies that we've talked to have said they would want a

18   subpoena for information.  So just so the Court is aware of the

19   sequence of events.  I know the Court is expressing concern about

20   third-party discovery.  I just want to alert the Court to the

21   sequence of events the state would expect.

22           THE COURT:  So your office would have to subpoena other

23   state agencies?

24           MR. ST. JOHN:  Right.  Mr. Landry is a separately

25   elected state official.  He doesn't control agencies under the

1   control of Governor Edwards.  We have worked together, but they

2   have indicated that they would want a subpoena for any

3   information in their possession.

4           THE COURT:  Okay.  Let's address that before we go down

5   that road.  All right?  Thank you, Mr. St. John.

6           Anything further?  Court's in recess.

7                   (Hearing concluded.)

8                   * * * * * *

9           **C E R T I F I C A T E**

10      I, Cathleen E. Marquardt, RMR, CRR, Federal Official Court

11   Reporter, do hereby certify this 19th day of April, 2023, that

12   the foregoing pages 1-39 constitute a true transcript of

13   proceedings had in the above-entitled matter.

14                           */s/ Cathleen E. Marquardt*
                            Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25