```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF LOUISIANA
 2                      LAFAYETTE DIVISION

 3
     STATE OF ARIZONA, ET AL,     ) CIVIL ACTION NO. 6:22-cv-1130
 4                                ) AND RELATED CASE 6:23-cv-420
                    Plaintiffs,   )
 5                                )
                    vs.           ) JUDGE JOSEPH
 6                                )
     MERRICK GARLAND IN HIS       )
 7   OFFICIAL CAPACITY AS ACTING  )
     DIRECTOR OF EXECUTIVE OFFICE )
 8   FOR IMMIGRATION REVIEW, ET AL)
                                  )
 9                  Defendants.   ) MAGISTRATE JUDGE WHITEHURST

10
                        MOTIONS HEARING
11
              Transcript of Proceedings before The Honorable
12       David C. Joseph, United States District Judge,
         Lafayette, Lafayette Parish, Louisiana, commencing
13       on May 24, 2023.

14                   Appearances of Counsel:

15   For the Plaintiffs:        JOSEPH SCOTT ST. JOHN
                                LA Department of Justice
16                              909 Poydras St., Ste. 1850
                                New Orleans, LA 70112
17
     For the Defendants:        ELISSA FUDIM
18                              ERIN RYAN
                                U. S. Department of Justice
19                              P. O. Box 868 Ben Franklin Station
                                Washington, D.C. 20044-0868
20

21

22

23              Cathleen E. Marquardt, RMR, CRR
                Federal Official Court Reporter
24                  800 Lafayette Street
                  Lafayette, Louisiana 70501
25                 Phone:  (337) 593-5223
```

1              (Lafayette, Lafayette Parish, Louisiana; May 24, 2023,

2    in open court.)

3              THE CSO:  All rise.  United States District Court for

4    the Western District of Louisiana is now in session, Honorable

5    Judge David C. Joseph presiding.  God save the United States and

6    this Honorable Court.

7              THE COURT:  Please be seated.  Good morning.  How is

8    everybody today?

9              MS. FUDIM:  Good morning.

10             MS. RYAN:  Good morning, Your Honor.

11             MR. ST. JOHN:  Good morning.

12             THE COURT:  Did y'all have any problems getting in

13   yesterday?

14             MS. FUDIM:  No, smooth sailing all the way.

15             THE COURT:  Okay.  Good.

16             Did you have any problems driving over the bridge?

17             MR. ST. JOHN:  Baton Rouge is always kind of rough in

18   the afternoon.

19             THE COURT:  Yeah.  All right.  Well, good.  Well, we

20   have a number of motions, two motions actually set today.  I

21   notice, Mr. St. John, that you -- your office filed another

22   motion yesterday which I have not yet had time to look at and of

23   course is not ripe for today in any event.  I also got a status

24   report.

25             Have defendants had a chance to review the latest

1   document production from the states?

2          MS. RYAN:  We have not, Your Honor.  It's a sizable

3   production, looks to be three to four thousand pages that came in

4   about 12 hours ago.  So that was something we wanted to raise

5   with Your Honor to give us some time to look at them.

6          THE COURT:  Of course, of course.  So we're not going

7   to -- we don't know.  I mean, Mr. St. John can maybe tell us some

8   of what's in it, but as far as whether or not that complies, you

9   view that as complying, I'm not going to hold you to that today.

10  Okay?

11         MS. RYAN:  Thank you, Your Honor.

12         THE COURT:  So a few things we need to do today.  First

13  of all, just to clarify for the record, the defendants were not

14  present the last time we met.  We had a motion for a protective

15  order filed by some third parties, motion to quash a subpoena,

16  actually, and during that hearing, I did kind of mention to

17  Mr. St. John my view of where we are in this matter.  So I want

18  to repeat that for the record.  Did you get a transcript of that

19  hearing?

20         MS. FUDIM:  We did, Your Honor, and we've read it and

21  are familiar with it.

22         THE COURT:  Okay.  So as you know, the issue kind of

23  central to what we're looking at now is the states' contention

24  that the changes to the Expat Removal Statute, the IFR, will

25  result in more immigrants in their states which impose certain

1   costs on the state agencies.  The defendants contend that change

2   will actually streamline and shorten the process of removing

3   inadmissible aliens who are not entitled to asylum.

4        Because to me at least facially this issue is unclear,

5   I've ordered the parties to engage in jurisdictional discovery to

6   determine if there's any net effect on the burden borne by the

7   plaintiff states because of the change.  In other words, while

8   the change may or may not result in more grants of asylum by the

9   federal government, it may also result in fewer people waiting in

10  the plaintiff states where their asylum claims are to be

11  determined and therefore not have an effect.  I just don't know.

12       As I've made clear repeatedly, all the parties are

13  entitled to engage in discovery on this issue.  As

14  representatives of sovereigns, I expect they will do so in good

15  faith.

16       Document 144 is the plaintiffs' motion to compel.

17  Again, the burden of establishing standing is on the plaintiffs,

18  and so their discovery is aimed at that.  Mr. St. John's

19  discovery is aimed at that.  I do want to hear from the parties,

20  but I'm just going to -- I spent pretty much all day yesterday

21  going through all of these discovery requests and the individual

22  motions you filed, so I kind of know what I'm going to do.  Then

23  we can talk about it more later, but I'm going to go ahead and

24  tell you what I'm going to do.

25       Plaintiffs have to show -- essentially they have

1    informed the Court they intend to show the effect of the asylum

2    IFR on certain discrete programs in both Louisiana and Florida.

3         So with respect to RFP 1 which asks for asylum

4    applicants providing an address in Louisiana or Florida, that

5    motion to compel is granted.

6         RFP 2, asylum applicants living in Florida or

7    Louisiana, that motion is granted.

8         RFP 3, asylum applicants granted parole in Louisiana or

9    Florida, that motion to compel is granted.

10        RFP 4, asylum applicants released from ICE detention in

11   Florida or Louisiana, I'll give you a chance to address this,

12   Mr. St. John, but I don't really see how this is going to lead to

13   admissible evidence.

14        MR. ST. JOHN:  Your Honor, do you prefer I come to the

15   podium or --

16        THE COURT:  You can stand there.

17        MR. ST. JOHN:  Your Honor, part of the federal

18   government's obligation is to detain these applicants unless

19   there are extraordinary circumstances.  If there are additional

20   applicants coming in and they are not being detained, they are

21   going somewhere.  If they are being released in Louisiana, they

22   are hitting the streets of Louisiana.  We know they are being

23   released in Louisiana.  It's been covered repeatedly by the

24   press.  Those folks or those aliens are going to end up being a

25   burden on the state.

1        During the last hearing, you heard from all of the

2   nonprofits that take care of these people.  They are obviously

3   incapable of taking care of themselves.  So this is -- the rule

4   is causing more to come in, and they are being released.

5        Just to head it off at the T, if the federal government

6   is about to say they are releasing people who are not asylum

7   applicants, that's a big deal and we need to have a discussion

8   because we're probably going to have some motion practice in

9   short order because that's just nakedly illegal.

10       So the inference is that anyone being released is an

11  asylum applicant, and they are being released onto the streets of

12  Louisiana.  So we want to know how many are being released

13  because the federal government is not following through with its

14  obligation to "the government shall detain the applicants."  So

15  they are imposing a burden.

16       THE COURT:  From Pine Prairie and Oakdale, you're

17  saying, here in Louisiana?

18       MR. ST. JOHN:  Yes, among other places, Your Honor.

19  Louisiana is the state with the second most detained.

20       THE COURT:  Right now?

21       MR. ST. JOHN:  Historically.

22       THE COURT:  A few years ago it was, but I think most of

23  those release spaces are not being used anymore.

24       MR. ST. JOHN:  That is -- we don't have great

25  visibility into that, Your Honor.  I do know that, from the

1   filings in the Florida case, it looks like the bed count has gone

2   down, the bed count that the federal government is maintaining.

3   Where that decreased count has come from, I don't have visibility

4   into that, Your Honor.

5           THE COURT:  So your position is that, if they are

6   released in Louisiana or Florida, then they stay for some period

7   of time in Louisiana or Florida, so there's a bit of a -- I guess

8   a bit of a presumption there.

9           MR. ST. JOHN:  There is a bit of a presumption there,

10  Your Honor.  Some of them may leave.  I don't know that either.

11          THE COURT:  Okay.  What's the defendants' position on

12  that?

13          MS. FUDIM:  Well, first, Your Honor, I would state that

14  we've already produced data to the plaintiff on every stage of

15  the rule in terms of individuals who indicate a Louisiana or a

16  Florida address.

17          So just to specify what I mean by that, first you've

18  got individuals who are filing affirmative applications for

19  asylum, and we have disclosed the number of those individuals who

20  have affirmative applications for asylum under the rule and who

21  have indicated a Florida or Louisiana address.

22          Then those individuals go to credible fear and to those

23  interviews, and we have indicated for each of those the outcome

24  with respect to credible fear for individuals with a Florida or a

25  Louisiana address, the numbers.

1          Then we go to the actual asylum merits interview, and

2     we have again disclosed the numbers for the number of individuals

3     in Florida and Louisiana.  And then you go to the EOIR cases.  So

4     if the asylum merits interview results in a negative

5     determination, the individual can then move to EOIR, and again,

6     we have indicated the numbers for Louisiana and Florida.  And

7     those numbers are exceptionally small.  I think they are

8     somewhere around a hundred total at the highest levels.  Most of

9     those would be in Florida.  I believe the highest number we've

10    got so far for Louisiana, I believe, is eight.

11         In terms of individuals who have been paroled, we have

12    also provided data regarding numbers of paroled under the

13    program, so individuals who are between two stages of the process

14    and are paroled into Louisiana or Florida, we have disclosed

15    those numbers as well.

16         In terms of individuals who are not part of or not

17    processed under the rule, we have produced, also produced data in

18    terms of number of grant rates, number of typical applications,

19    historically going back to 2018.

20         We do oppose, and I guess this is a clarifying question

21    in terms of the rulings that the Court has already stated,

22    whether in issuing those grants with respect to the first several

23    requests for production, if you are ordering disclosure of the

24    names because we have not produced names.

25         THE COURT:  We're going to get to that.

1          MS. FUDIM:  But we have produced already all of that

2    data, and that data is also broken down by country of origin in

3    many of the instances.  So I just want it to be clear what the

4    starting point is.

5          THE COURT:  Yeah.  And you know, it's very difficult

6    from our position to, to get into those details with you.  You

7    know, I understand there's a time range issue.  I understand

8    there's different programs that were in effect at different

9    times, different utilization of different programs by the

10   Executive Branch at different times.

11         So, again, I expect both sides to act in good faith in

12   determining what request for production has actually been met and

13   what's still outstanding.  I'm just telling you how I view the

14   discovery request at issue.

15         MS. FUDIM:  Yes.

16         THE COURT:  If there's particular documents later that

17   we have to then get into, I may look at, you know, in camera what

18   documents we're talking about, then we'll have to do that.  I

19   have other things to do, but I will do that if we need to, but

20   right now I'm giving you my overall view of the case.

21         MS. FUDIM:  Yes.  And so to answer the specific

22   question that you started with, and I apologize for backing up

23   there, but I just wanted to make sure we were all operating from

24   the same starting point.  Our position with regard to numbers of

25   individuals who provided Louisiana or Florida addresses outside

1    of the IFR that's being challenged, our position is that does not

2    go to standing and that that data is not required to be produced.

3             Having said that, I think a lot of this data with

4    regard to parole, generally, is perhaps not at the granular level

5    that plaintiffs are looking for, have been produced in terms of

6    total number of parole, total number of people who seek asylum on

7    a yearly basis.  What percentages have been granted, what numbers

8    of people, for the most part that data --

9             THE COURT:  Has been produced.

10            MS. FUDIM:  Or is public.  A lot of this information --

11   some of it.  I shouldn't say a lot, but some of this information

12   is public on VHF and various web-point shares.

13            THE COURT:  What about the people being released from

14   ICE custody in Florida and Louisiana?  That was the question.

15            MS. FUDIM:  Yeah.  I don't know that we have disclosed

16   that in particular, the people who have been released by ICE, but

17   our position is that that's not relevant to standing under this

18   rule.  Individuals could have been in ICE custody for any number

19   of reasons for any length of time and have nothing to do with

20   this rule.

21            An individual may have been -- may have entered the

22   country prior to, for example, the introduction of the IFR, may

23   have been detained for some reason, and then there may have been

24   a subsequent decision to release.  And so there is not a

25   premise --

1          THE COURT:  The IFR -- does the IFR address in any way

2     the procedure for if and when to release, parole someone out of

3     ICE custody?

4          MS. FUDIM:  No, not more generally.  I mean, an

5     individual could be in ICE custody for --

6          THE COURT:  Right.  My understanding would be whether

7     or not they go through the normal immigration proceedings or

8     through the Expat Removal Statute.  I guess Mr. St. John's point

9     is that the rule says, of course, shall be detained pending

10    determination of the asylum claim, right?

11         MS. FUDIM:  Yeah, I mean, that's the same --

12         THE COURT:  It's a rule that's been in place forever.

13         MS. FUDIM:  That's the same rule that's been in place

14    forever.  That's 1225.  The only change to parole that the rule

15    made is not on the substance in terms of when parole can be used,

16    and that's being litigated in other courts across the country,

17    and it's been the same rule that's been in place forever.  The

18    only change is that the rule allowed people to be paroled prior

19    to the credible fear determination.  So it's not a substantive

20    change in criteria for parole.  It's rather a timing change.

21         Having said that, we -- we have produced parole data

22    for individuals who have been paroled under the rule.  So

23    whenever they are paroled, we've produced what those numbers are.

24    So from the point of view of the plaintiff states, I think the

25    relevant piece is what are the number of people who are being

```
 1    paroled under the rule as opposed to when is that parole
 2    happening, because the rule did not substantively change the
 3    statute.
 4              THE COURT:  Yeah, right.  But I do think -- Obviously,
 5    it's plaintiffs' burden here.  I do think those individuals who
 6    are being paroled under the rule in Louisiana and Florida, as
 7    opposed to just generally in the country, is relevant.  They
 8    could use that for standing, so I'm going to grant that.
 9              MS. FUDIM:  We agree, and that's been produced.
10              MR. ST. JOHN:  Thank you, Your Honor.  I do want to
11    clarify.
12              THE COURT:  Okay.
13              MR. ST. JOHN:  There seems to be a little bit of
14    quibbling about dates here.  Under Department of Commerce, we can
15    show historic trends and that this rule is supposed to ultimately
16    be universally applicable.  Let me put an asterisk right there.
17              So if there are asylum applicants, grantees in
18    Louisiana, and there were over the last three years, the data,
19    the Medicaid data shows we're spending a ton of money on these
20    folks.  That was attached in the status report.  If we can show
21    that they were here historically and they will be here under the
22    rule, that's -- it's a foreseeable consequence.  This is supposed
23    to be the rule for asylum.
24              So if they are being made eligible for benefits to
25    avoid process, and that's one of the allegations in the
```

1    complaint, then it doesn't matter if the count changes.  It's

2    just the fact that they are here and they're loose.  I also

3    heard -- as I think Your Honor picked up, there is a concession

4    that there was a change in the way parole was handled.  The

5    asterisk --

6            THE COURT:  They can be paroled before the credible

7    fear determination.

8            MR. ST. JOHN:  Correct, Your Honor.

9            THE COURT:  Let's stay focused here.  We could talk and

10   just have a free flowing conversation for hours about all this,

11   but I'm really trying to stick with what's at issue here.

12           MR. ST. JOHN:  Understood, Your Honor.

13           THE COURT:  So Mr. St. John, beyond those asylum

14   applicants who have been paroled in Louisiana and Florida, who

15   else that's being released from ICE custody do you need?  What's

16   the relevance of anybody else?

17           MR. ST. JOHN:  Your Honor, quite honestly, we don't

18   know what's going on.  We know that the federal government is

19   releasing people not even on parole.  They are being given a

20   "come to ICE up to 10 years in the future and check in and then

21   we'll make a determination about that."  As far as I can tell

22   from the public reports, these folks are just being cut loose on

23   the streets.  And my concern --

24           THE COURT:  Not in Louisiana or Florida.

25           MR. ST. JOHN:  In Florida, Your Honor, in Florida, in

1    Florida.  The backlog at one of the -- the ICE facilities for a,

2    hey, come check in with ICE to get your notice to appear, was

3    like 27,000 people, and they were issuing dates to come in to get

4    your notice to appear.  So come in to get your summons for, like,

5    six, eight years in the future.

6           So I don't know what the federal government is calling

7    that, that being cut loose before even getting a notice to

8    appear.  That's one of my concerns here, Your Honor, is there's a

9    definitional problem.

10          THE COURT:  Okay.  So RFP 4, what do you want them to

11   produce that they haven't already produced?

12          MR. ST. JOHN:  The identities of anyone who --

13          THE COURT:  Yeah, we're going to get to identities.

14   What categories?

15          MR. ST. JOHN:  Anyone who is being released, however we

16   want to call that, whatever we want to call that.  Historically

17   parole, but whatever it is, whatever the federal government is

18   calling it now into Louisiana or Florida or that have an address

19   in Louisiana or Florida.

20          MS. FUDIM:  May I respond, Your Honor?

21          THE COURT:  Yes.

22          MS. FUDIM:  So the program that I believe counsel is

23   referring to is the parole with conditions program which was

24   launched on May 11th after the conclusion of Title 42.  That

25   program has been challenged by the State of Florida.

1          THE COURT:  It's enjoined right now, isn't it?

2          MS. FUDIM:  It's enjoined right now.  Yes, it is, and

3    it's up at the Eleventh Circuit right now in Florida.

4          Simultaneously, 13 states, including the State of

5    Louisiana, filed a motion in a pending case that's going on in

6    Texas right now to supplement their claims in that case, which

7    has nothing to do with that program.  It challenges the Cuban

8    Haitian, Nicaragua, Venezuela parole processes.

9          They have filed a motion to supplement their complaint,

10   even though that case is going to trial in three weeks, to add in

11   challenges to the parole with conditions policy.  My point is a

12   simple one which is that, whatever those claims are, they are not

13   part of this case.  This is a case challenging the asylum officer

14   role.  That's the case that we have engaged in jurisdictional

15   discovery with respect to, and that's the case that we're

16   preparing to litigate here.

17         And I think it is inappropriate at this juncture for

18   them to be seeking discovery with respect to claims that are not

19   part of this lawsuit and that are, in addition, potentially part

20   of claims in another lawsuit in which they are plaintiffs which

21   is pending in Texas right now.

22         THE COURT:  Okay.  So if there's not a pending

23   application, asylum application, for those individuals being

24   released from Pine Prairie or Jenner or whatever or in Florida,

25   if there's not a pending asylum application for those

1    individuals, what's the relevance to the IFR in this case?

2              MR. ST. JOHN:  If there's not a pending asylum

3    application, then we're just negligently cutting loose illegals

4    into the street.

5              THE COURT:  Well, what's the relevance here to the IFR?

6              MR. ST. JOHN:  My assumption was that the federal

7    government was at least -- at least in the breach trying to honor

8    the statute.  If we're just negligently cutting loose large

9    numbers of illegals, if that's what counsel is representing,

10   let's have that representation that these people are not asylum

11   applicants.  I just want that to be clear, and we'll deal with

12   that as it is.  I haven't heard that they are.

13             THE COURT:  I think she's saying -- I tell you what.

14   If there are individuals being released in Florida and Louisiana

15   from ICE detention, paroled, when there's not a pending asylum

16   application, produce that information too.

17             MS. FUDIM:  Yes, that's fine.

18             THE COURT:  I think it's going to be the same number,

19   but --

20             MS. FUDIM:  Also just to make the record clear, I don't

21   recall saying, and I certainly didn't, but I want to make sure

22   the record is clear.  I did not say that the government is

23   releasing people without asylum applications at random onto the

24   streets.  I did not say that.

25             THE COURT:  All right.  We have a record, so we can

1   look at that.

2           MS. FUDIM:  Thank you.

3           THE COURT:  All right.  So anybody -- any -- anybody in

4   ICE detention is being released in Florida or Louisiana, again,

5   this is plaintiffs' burden.  If they think that helps make their

6   burden to show standing, then they are entitled to that

7   information.

8           All right. RFP 5 and 6 are asylum grantees pursuant to

9   1158.  This is from January 20, 2021, to present, having an

10  address in Louisiana or Florida, and that's from USCIS and UIIR.

11  Has that information been produced already?

12          MS. FUDIM:  Sorry, you are looking at --

13          THE COURT:  Request for Production 5 and 6.

14          MS. FUDIM:  Yes, Your Honor.

15          THE COURT:  Anything further you need on 5 and 6?

16          MR. ST. JOHN:  Your Honor, I want to be clear.  It

17  needs to be segregated by state.  As the current status is --

18          THE COURT:  Oh, I see.  Your issue is you can't tell

19  what states.

20          MR. ST. JOHN:  No.  If the federal government has told

21  us, well, this is Florida and Louisiana.  Well, okay, are you

22  conceding that it doesn't matter.  That was the question during

23  the meet-and-confer.  Are you going to try to say, well, this

24  doesn't prove they are in Louisiana, and if the federal

25  government said, yeah, they would potentially take that position.

1    So I asked for identity or identifying information that's going

2    to have an address.  And they say, well, these aliens are in

3    Louisiana, these aliens are in Florida.  The government's

4    production was, here's the mass, here's the total number.

5            THE COURT:  Okay.  So other than identifying

6    information, they have produced that.

7            MR. ST. JOHN:  And it needs to be state specific, Your

8    Honor, not an amalgamated --

9            THE COURT:  All right.  And then training materials,

10   RFP 7.

11           MS. FUDIM:  We produced training materials, Your Honor,

12   about a year ago.  There is a body of them.  I know that there is

13   still a dispute with respect to the parties which we met and

14   conferred on the other day with respect to training materials.

15   Our position is that training materials are not relevant to

16   standing.

17           Whatever the effects of the IFR are, they are.  The

18   data will speak for itself, and the training material goes to the

19   merits, and that's an ECA case.  That will be decided based upon

20   an administrative record, so it's not within the scope of the

21   jurisdictional discovery that was granted.

22           Having said that, we did produce training materials

23   about a year ago in response to an initial set of demands, but we

24   have not produced further training materials now, and our

25   position is that it's not called for with jurisdictional

```
 1   discovery.
 2            THE COURT:  Okay.  Well, there is case law where -- to
 3   establish standing.  You know, the Court can rely on if it's
 4   convinced that certain actions are likely to result in increase,
 5   in this case, increase or decrease in immigration, then that
 6   might be sufficient.  So I'm going to grant -- supplement those
 7   training materials in your production.  Okay?
 8            RFP 11 is a breakdown in immigration practices.  It
 9   doesn't come to mind what that -- Is there still an issue on
10   RFP 11?
11            MR. ST. JOHN:  Your Honor, this was information that
12   our expert had requested, and my understanding --
13            THE COURT:  Oh, this is all the subcategories.
14            MR. ST. JOHN:  Yeah.  Go ahead, Your Honor.
15            THE COURT:  Okay.  So I think some of the stuff in
16   RFP 11 is discoverable.  Some of it, I think, is pretty
17   tangential and probably beyond the scope of discovery.  I'm not
18   going to get into that right now.  If you can break down what the
19   actual real disputes are with respect to what categories of
20   documents for me, we'll do it later, but it's very broad.
21            MR. ST. JOHN:  Yes, Your Honor.
22            MS. FUDIM:  Can we rewind for one second because I want
23   to make sure I'm clear on something.  With regard to 5 and
24   6 where counsel is requesting data broken down between Florida
25   and Louisiana by state, has the Court ordered that?
```

1          THE COURT:  I've kind of circled that.  We're going to

2     come back to it because what they want is state specific stuff

3     and identifying information.  Okay?

4          MS. FUDIM:  Yes.  Can I make a comment with regard to

5     state specific identifying information.

6          THE COURT:  Yeah.

7          MS. FUDIM:  For the majority of individuals for the

8     majority of the time period for which the data was produced, it's

9     almost exclusively Florida because the numbers for Louisiana were

10    basically zero because the rollout for Louisiana occurred very

11    recently, and I wanted to address that point because there was a

12    comment made by plaintiffs' counsel in the reply to the motion to

13    compel which alluded to, perhaps, that there was some sort of

14    dishonesty on the part of the defendants in stating in our

15    opposition to the motion to compel that the IFR had not yet been

16    rolled out in Louisiana and that information on a CIS website

17    that mentioned New Orleans.  So I did want to clarify that point.

18         THE COURT:  Please do.  I don't, I didn't -- I don't

19    think you're being dishonest.

20         MS. FUDIM:  Okay.  Well, I appreciate that because I

21    wasn't.  As the Court might imagine, sometimes website data goes

22    up or announcements go up before policies actually roll out.  At

23    the time that the opposition was written, the Office of

24    Immigration Statistics, which we colloquially refer to as OIS,

25    still had zeros for the State of Louisiana for each column,

```
1   credible fear interview, asylum merits, and EOIR, they were all
2   zeros at that time.  My understanding is that, since I filed the
3   opposition, there have been the commencement of the IFR in the
4   State of Louisiana.
5               THE COURT:  Supplement your discovery production.
6               MS. FUDIM:  The data I think went up yesterday,
7   actually the March data or the April data went up yesterday, I
8   think, and the total numbers are eight, but we will -- There have
9   been eight interviews for the State of Louisiana.
10              THE COURT:  So this is happening where in Louisiana?
11              MS. FUDIM:  New Orleans.
12              THE COURT:  New Orleans.
13              MS. FUDIM:  New Orleans, yeah.  But I just wanted to be
14  clear about that because I didn't want there to be a suggestion
15  on the record that defendants were trying to hide something or
16  obscure something.  At the time the opposition was written, the
17  Office of Immigration Statistics had zero.
18              THE COURT:  I saw it for what it was, and we've known
19  for a long time that this was going to be rolled out, and that
20  when you made your production there wasn't anything to report,
21  but it looks like they may be planning on doing that now.  I'm
22  satisfied.  I assume was the truth.
23              MS. FUDIM:  Thank you.
24              THE COURT:  All right.  Now to the issue of identifying
25  information, what the defendants have are agency regulations
```

1    which are, I think, appropriately designed to try to protect the

2    identity of certain applicants for asylum in the United States to

3    protect them from any potential retribution in their home

4    countries, to their families, et cetera.

5           These agency regulations, however, cannot be used by

6    the Executive Branch to effectively shield that same agency from

7    meaningful judicial review under the APA.  Let me say this.

8    Plaintiffs are sovereign states represented by people that

9    elected them.  They are presumed to be acting in the public

10   interest as they perceive it on behalf of the people they serve

11   and to act responsibly with respect to the asylum information

12   they receive.

13          Defendants are also appointed officers and employees of

14   the Executive Branch of the United States.  They are entitled to

15   the same presumption.  They are acting ethically and on behalf of

16   the public interest as they perceive it.  That's my view.  It's

17   going to take evidence to convince me otherwise.

18          The idea that the states aren't capable of safeguarding

19   this information to me is not, is not right, but just to make

20   sure we're all on the same page, I am going to enter a protective

21   order with respect to the use of personally identifiable

22   information and how the states can use it.

23          I want to -- this order to both limit the use of this

24   information and the dissemination of this information.  This is

25   the PII of asylum applicants, parolees, and other individuals in

1     immigration proceedings.  Okay?  Any questions?  So how long do

2     y'all need to come up with something?

3          MR. ST. JOHN:  That was going to be my question.  I've

4     had this issue before, Your Honor, with frankly an abortion

5     litigation where there's a protective order on names.  How do I

6     go to the medical board and say, hey, can you give me the file on

7     person X, and we don't have to say why.  We would need a subpoena

8     to get a response, like going to the state Medicaid office.

9          I need to be able to say, tell me whether you have

10    these people you are spending money on.  Same with a local school

11    system.  Are you spending money on these people?  I just want to

12    highlight that issue for the Court and how we should go about

13    dealing with that.

14         THE COURT:  Okay.

15         MR. ST. JOHN:  I mean, for a school system, it's

16    biographical information which is my understanding not covered by

17    FERPA.  I can say, do you have these students.  I've already been

18    informed by the state Medicaid agency that they are not going to

19    give me names without a subpoena or not going to match things up

20    without a subpoena.

21         THE COURT:  Okay.  Well, you know, and I'm going to get

22    into this letter.  You have to look at that in the state court.

23    That is not -- I see it as the State of Louisiana.  If you are

24    going to base standing on an agency, such as the State Medicaid

25    Office, then that's your client, and you have to deal with your

1    client.  I mean, that's not for a third-party subpoena.  We'll go

2    back to that, but that's my view.  Go ahead.

3           MS. FUDIM:  Yeah.  I wanted to say two things.  I first

4    wanted to make clear that there's no insinuation by the

5    government that the states have any ill intent.

6           THE COURT:  I don't take it as that.  I'm just making

7    clear, that's my perspective, and I don't think they have any

8    interest in acting irresponsible with this information.

9           MS. FUDIM:  I don't think they do either.  I think our

10   concern is one based on the size of dissemination, just based on,

11   you know, frankly, logic; that the more people you let in on a

12   secret, the more likely that there could be an inadvertent

13   disclosure, and so here where we've got many states, many

14   agencies within those states, and counsel has represented to us

15   that the information needs to be disseminated -- I mean, we

16   disagree with that, but disseminated in a way that these

17   agencies, as third parties, so to speak.  That's what raises the

18   concern for us in terms of would there be some sort of

19   inadvertent disclosure now that this is on, you know, more

20   people's computers, more people's pads, sitting on more people's

21   desks, across many agencies, across many states.  So if we're

22   going, you know, down that road, that's really why in the

23   protective order --

24          THE COURT:  Yeah, I think the protective order has to

25   address those issues.  I don't think now is the time to discuss

1    that.  I will give it a lot of thought, but I first want to give

2    the parties a chance to try to do a protective order that will

3    work and minimize those concerns.

4         MS. FUDIM:  I also have a question.  With regard to the

5    individuals with whom we have to provide that data, that would be

6    solely individuals released under the IFR into the states of

7    Louisiana and that Florida; is that correct, Your Honor?

8         THE COURT:  Yes.

9         MR. ST. JOHN:  Your Honor, that's contrary to

10   Department of Commerce.  If we can show spending on asylees,

11   asylum applicants, the standard for standing is actual or, in the

12   disjunctive, imminent harm.  And when it's a state, the imminence

13   requirement is significantly attenuated.

14        So that's why the Supreme Court said in Department of

15   Commerce, I can look at historical information, and you can --

16   the Court doesn't have to blind itself that, hey, if school

17   system X, if Jefferson Parish schools are spending a ton of

18   money, state money on asylum applicant kids, you can project that

19   they will continue to do so for new asylum applicants under the

20   rule.  The temporal limitation here, the asylum IFR limitation

21   would be --

22        THE COURT:  Okay.  That's fair enough, Mr. St. John,

23   but the rule, you know, I'm going to be looking at, and I expect

24   we're going to get a new ruling from the U. S. Supreme Court on

25   the relevance of standing in the next few weeks, so I may revise

1    this opinion, but for now my view is the IFR has to materially

2    change.  There has to be a change that's detrimental to the

3    states.  So historical information is relevant to that change,

4    but in and of itself doesn't provide enough for standing.  So I

5    think -- so what else do you want?

6             MR. ST. JOHN:  I would want the historical information

7    on alien school children for the last few years so that I can go

8    to a local school board and with their addresses, I can say,

9    okay -- I used Jefferson Parish because it's got thousands of

10   alien children.  There's a huge state spend there.  Okay, you

11   know, please confirm this child is enrolled in your school.  I

12   know he's an asylum applicant, you know, do that times a hundred,

13   all right, the Court can reasonably foresee or I can have an

14   expert come in and say, yes, this is what's been happening in the

15   past.  It will forseeably continue to do so under the change

16   rule.  And that is on fours with the Department of Commerce, what

17   the Supreme Court said was an okay way to prove standing in the

18   Department of Commerce.

19            MS. FUDIM:  Your Honor, may I interject one thing?

20            THE COURT:  Okay.

21            MS. FUDIM:  And I'm not going to respond to his whole

22   point.  I will if the Court wants me to, but just one sliver of a

23   comment I'd like to introduce is that the IFR has only been

24   rolled out with respect to single adults.

25            THE COURT:  Right.

1          MR. ST. JOHN:  This goes back to the imminence point,

2    Your Honor.  We don't have to wait for the harm to hit.  If that

3    were the standard for standing, there would be no such thing as a

4    TRO, you know, it's actual or imminent.  I know the federal

5    government has, quote, paused the implementation of the asylum

6    IFR without explanation, okay, but the presumption is they

7    published a rule and are rolling it out nationwide.

8          So, yes, there may be one person in Louisiana now or

9    10 people in Louisiana now.  Two years from now or a year from

10   now, there's going to be thousands of people in Louisiana, and

11   that challenge is ripe now.

12         THE COURT:  About how many, how many asylum grantees,

13   asylees, you said there are a handful in Louisiana.  How many are

14   in Florida?

15         MS. FUDIM:  Give me a second.

16         THE COURT:  Approximately.  You don't have to give me

17   an exact number.

18         MS. FUDIM:  I believe the total number of individuals

19   who were granted -- I think we're somewhere in the hundred to 150

20   total in terms of individuals paroled into -- under the IFR in

21   the states, whether it was parole or grant, that I think we're

22   looking at like a hundred -- I have the numbers here, but there's

23   a bunch of spreadsheets.

24         THE COURT:  To me, you know, the individuals that are

25   granted asylum or whether they are granted asylum or not, whose

1    asylum status is determined under the rule under the new

2    procedure, under the IFR, those people are not then being --

3    having their asylum claim adjudicated under the old rule or under

4    the regular order, so to speak, and so -- but regardless of

5    whether they are, you know, waiting for an immigration judge to

6    rule on their asylum claim, or they have been granted asylum, I

7    don't know that the daily life for them changes that much.  They

8    are still going to, you know, getting sick.  They are still

9    sending their kids to school, and they are still living in

10   Louisiana or Florida, right?  So why wouldn't we kind of need all

11   that information?  I mean, I think from the defendant's

12   perspective I think just producing the information about those

13   granted asylum under the rule doesn't give the full picture of

14   what the actual costs are to a state if any.

15           MS. FUDIM:  I think that is a two-step process, Your

16   Honor, and there may be a world where we revisit this, and we

17   come back here and have a conversation.  But I think when you are

18   talking about information that is being guarded for legitimate

19   reasons, grounded in the safety of human beings, that we should

20   be looking at the step one question first, which is this.  And I

21   would bring the Court back to docket entry, I think it was around

22   82, when the state first sought discovery, jurisdictional

23   discovery in this case, and they said if grant rates are flat or

24   declined or asylum recipients are exclusively settling elsewhere,

25   the plaintiff states will have a much more difficult hill to

 1   climb, and depending on the clarity of the data, would seriously

 2   consider voluntarily dismissing the suit.

 3          So I think the question one is how do we see numbers go

 4   up?  And in terms of the data that we've produced, it shows that

 5   the grant rates are in line with historical trends.  And so if

 6   you get to a point where you say, you know what, more people are

 7   being released, whether it's on parole while they are waiting for

 8   that adjudication, or whether it's those who have been granted

 9   parole under the processes.

10          If the answer is since the IFR has been in place we

11   have more of these people and more costs in the state than we did

12   before, then I think you get to the question of like, Okay, well,

13   who are these people and are they using resources, because then

14   it becomes a point where you have to, perhaps, know that.

15          But when the initial data shows that there hasn't been

16   an increase, that the grant rates are in line with historical

17   trends, and only a handful of people have come into these states

18   under this new process, that the names of those individuals

19   become far less, and I would argue not at all, relevant to

20   standing.

21          And so I would suggest that plaintiffs have to first

22   show the Court that there has been some augmentation in those

23   figures before we start releasing names, date of birth, home

24   address, country of origin.  I mean, the way that they defined

25   the word "identify" was quite broad, so it's not just names, just

1   so we're clear on the record.

2           Before we start providing information for every single

3   person who has been paroled or sought asylum since 2018 who has

4   provided a Louisiana or Florida address, that is a vast amount of

5   information.  It is far broader than the Court's limited grant of

6   jurisdictional discovery, and it does impose real concern upon

7   real people, and it imposes those concerns separate and apart

8   from whatever the good faith intentions of counsel and the states

9   may be.

10          THE COURT:  Yeah.  Well, look, I've been working for

11  the federal government for a while, and I've gotten lots of

12  notifications of data breaches from the federal government, so

13  I'm not at all certain the state government is less trustworthy.

14  Okay.

15          All right.  I'm going to -- at this time I am going to

16  limit the information to those who have been granted asylum under

17  the rule.  Okay?  And I think we can limit it to name -- what do

18  you need?  Name, date of birth?

19          MR. ST. JOHN:  Name, date of birth, address.

20          THE COURT:  Address.

21          MR. ST. JOHN:  I would probably go with A-number

22  because I think that's how it's -- how they are identified to

23  certain state agencies.  Just like you have a Social Security

24  number, aliens are given an A-number.

25          THE COURT:  Okay.  We'll limit it to those four things.

1    And we will circle this and come back to it if we need to, but

2    right now I think that's -- at least it will give the states an

3    idea, if any of the folks that have been granted asylum under the

4    new rule, under the new system, are in fact imposing any costs on

5    the states.  And we're going to put this stuff in the minutes,

6    Ms. Brown here is supposed to be taking notes.  Are you taking

7    notes?

8              MS. FUDIM:  We'll also order the transcript.

9              THE COURT:  Okay.  We have a record.  We have a

10   transcript, too.

11             MS. FUDIM:  Thank you.

12             THE COURT:  All right.  So how long do y'all need to

13   work out a protective order for the use and the dissemination of

14   this information?

15             MS. FUDIM:  Two weeks maybe?

16             MR. ST. JOHN:  That sounds reasonable, Your Honor.

17             THE COURT:  Two weeks?  Okay, perfect.  Let it be done.

18             All right.  Anything else on plaintiffs' motion to

19   compel?

20             Okay.  The next document is Doc. 157, that's

21   defendants' motion to compel.  I have reviewed, of course, the

22   status report filed yesterday by the states that's document 169

23   where the states have made subsequent production.  The defendants

24   have not yet had a chance to review that subsequent production,

25   so we're going to just proceed today.  On the motion as it stands

1    in Doc. 157 and the response, I -- of course, if, you know,

2    certain of my rulings have already been accomplished, then that's

3    great, but if not, then parties will act in conformity with the

4    ruling.

5            All right.  And I know, Mr. St. John, you're going to

6    want to address further kind of the practical issues with respect

7    to how you might get information from various state agencies, and

8    I'll give you a chance to do that, but let me just kind of give

9    you my view after some thought and research on the state's

10   position with respect to its relationship with state agencies.

11   Okay.

12           Certainly in some context, for example, if the Attorney

13   General of Louisiana is suing on behalf of the State Department

14   of Health to try to recover overpaid Medicaid payments or

15   something of that nature, certainly the defendant in that case

16   couldn't try to get party discovery from the Department of

17   Transportation normally, but here this isn't that situation.

18   What we have is we have the State of Louisiana suing in proper

19   form, and it's alleging standing based on harm or effect that

20   this asylum IFR is causing to these state agencies.  So these

21   are, in my view, the clients of the AG's office.  These agencies

22   are the clients.

23           MR. ST. JOHN:  Your Honor, I have got to be incredibly

24   clear.  We do not represent state agencies in this.  I represent

25   the Attorney General who speaks for the State of Louisiana.

1          THE COURT:  But the Attorney General is an Attorney

2    General, and there is a client.  The client is the State of

3    Louisiana who acts through its agencies.  Okay?  Standing is that

4    your client is being harmed.  That's what standing is.

5          MR. ST. JOHN:  And that the state is being harmed.

6          THE COURT:  And you have a chance to show that, but the

7    way you are going to show that is through its agencies.  So

8    that's --

9          MR. ST. JOHN:  Your Honor, I can look at HB1, the State

10   Appropriations Bill, and there's a line item for Medicaid.

11   There's a line item under the Department of Education for the

12   Minimum Foundation Program.  The agencies are mere channels for

13   that.  The legislature could direct the governor, Governor

14   Edwards, you contract with someone to handle Medicaid.  You,

15   Governor Edwards, directly.  There's not going to be an agency.

16   You contract with someone directly.  That would be a fine way to

17   organize it.

18          Government affairs are organized in a variety of ways.

19   There doesn't have to be an agency.  The agency is no different

20   than this case and that contractor.  It's just a channel for the

21   program.  The legislature is writing the check and giving it to

22   the agency.  The damage filters back up, just like in an indirect

23   purchaser antitrust case.  The damage filter -- the harm can

24   filter through layers.

25          MS. RYAN:  Your Honor, could I speak to that briefly?

1              THE COURT:  Sure.

2              MS. RYAN:  Two things on this.  First, in our

3     interrogatory to the plaintiffs where we asked them to describe

4     their harm, they didn't mention date appropriation, they didn't

5     mention the legislature, they didn't mention budget, they

6     mentioned agencies, health care, Medicaid.

7              THE COURT:  I'm aware.

8              MS. RYAN:  And also, even under that theory, when we

9     asked them to produce documents showing their harm, we weren't

10    given appropriation bills.  We weren't given budgets, things from

11    the governor's office or the legislature.  So we have no hard

12    data under either theory to show harm to the state or to the

13    state agency.

14             MR. ST. JOHN:  State appropriations bill is subject to

15    judicial notice, and I'll go ahead and clue my opponent in or my

16    colleague in that it's in yesterday's production, HB1.  If you

17    want to look, it's every odd-numbered year, it's almost always

18    HB1.  Florida doesn't have a consistent numbering system, but I

19    don't think I have to --

20             THE COURT:  The allocation of state money to the

21    agencies you're saying is HB1.

22             MR. ST. JOHN:  Yes, Your Honor.

23             THE COURT:  All right.  Well, again, let me just tell

24    you my broad view.  My broad view is that Attorney Generals of

25    the plaintiff states, specifically, with respect to standing, if

1   they allege the states are being harmed, then those parts of the

2   state government, which the agencies are parts of the state

3   government that are alleged are harmed are subject to party

4   discovery, not third-party discovery.  Hard stop.  Okay.

5          So you've made a production, voluntary, great.  If, you

6   know, additional documents are needed beyond that, then, you

7   know, that may be something you have to litigate in state court.

8          MR. ST. JOHN:  Your Honor, can I ask the Court to make

9   a clear finding of how the Attorney General controls the agencies

10  and a factual basis for that --

11         THE COURT:  Look I see one thing.  I see the State of

12  Louisiana.  Agencies are part of the State of Louisiana, period.

13  That's all I see.  What authority does the state agency have to

14  get documents from its agencies, that's not for me to decide.

15  That's for the state courts to decide if they need to.  Okay?  I

16  see the State of Louisiana.  And if the states are trying to

17  prove standing based on harm to state agencies, then they need to

18  get those documents from its agencies to prove it, and I don't

19  know how it's done because that's not my job, but that might be

20  your job to figure it out and to get a state court judge to rule

21  on that.  That's not something we can use third-party discovery

22  for.  You can't say you are harmed and then issue third-party

23  subpoenas to the part of your state that you say is harmed.

24  Doesn't make any sense.

25         MR. ST. JOHN:  Your Honor, if there's no harm, will the

1    Court allow me to issue subpoenas?  If it's -- taking the Court's

2    position -- I respectfully disagree, Your Honor -- if it's the

3    state issuing a subpoena to the state, what's the problem with

4    allowing the issuance of subpoenas?

5              THE COURT:  Say that again.

6              MR. ST. JOHN:  I respectfully disagree with your

7    position and your holding, Your Honor, but accepting that as it

8    is, if it's the state getting discovery from the state, what's

9    the harm in allowing me, allowing the Attorney General to issue a

10   subpoena to someone that's, by the Court's holding, under the

11   same roof?  It's a piece of paper as far as the Court is

12   concerned.

13             THE COURT:  It's this Court, you're using the authority

14   of this Court.

15             MR. ST. JOHN:  Yes, Your Honor.

16             THE COURT:  To do something that I think that, you

17   know, the Attorney General should be able to do because it

18   represents the state, and this is a litigation.  In order to

19   fulfill the mission of the Attorney General, there has to be

20   cooperation of agencies within the state to do that, and that's

21   something that maybe needs to be resolved by the Louisiana

22   Supreme Court.  I don't know.  But it's not something for which

23   we issue third-party subpoenas.  To me that just does not make a

24   bit of sense.  It's not what third-party discovery is for because

25   anybody would tell you that the State Department of Health is

```
1    part of the State of Louisiana.  It is.

2          MR. ST. JOHN:  Your Honor, respectfully, the State

3    Supreme Court, which again respectfully this Court is bound on as

4    a matter of state law, has said two things.  One, if the state

5    has a claim, the Attorney General has the authority to bring it.

6    And two, the Attorney General doesn't control agencies that

7    report to the government.  We cited -- Judge, I think it's common

8    knowledge in this district that General Landry and Governor

9    Edwards --

10          THE COURT:  I understand there may be practical issues.

11   I'm just telling you how I view it.  And, again, you've produced

12   documents.  Maybe that's sufficient for purposes of what's going

13   on here, but states act through their agencies.  If the states

14   are making assertion of standing based on harm to those agencies,

15   then certainly those parties are considered to be within the

16   context of party discovery, not third-party discovery.

17          MR. ST. JOHN:  Your Honor, can I ask to make my clean

18   record?  Can I ask the Court to make a finding of which paragraph

19   in the complaint harm is asserted based on an agency?

20          THE COURT:  That's what you've told me.  So I'm

21   asserting to you what you've told me you anticipate.  Now when

22   you show standing, we'll make that determination.  You've told me

23   that.  So I'm taking you at your word that you intend to show

24   standing based on harm to agencies within Florida and Louisiana.

25          MR. ST. JOHN:  We've pled harm to the states
```

1    themselves.  The word "agency" appears in the complaint one time.

2         THE COURT:  What is a state without an agency?  How

3    does a state do anything without an agency?

4         MR. ST. JOHN:  At a fundamental level, the state -- the

5    legislature -- Well, the legislature can organize the state

6    however it wants to.  It could have a state without agencies.  It

7    can direct the governor to do everything.  It can direct the

8    Attorney General to do everything and give the Attorney General

9    no staff, and that's an issue of state law, and a federal court,

10   very respectfully, Your Honor, is required to defer to state law

11   on that issue.

12        THE COURT:  Give me a ruling and we'll see.  Give me a

13   ruling from a state judge saying, you know, saying that the state

14   agency are third parties, and basically the Attorney General of

15   Louisiana is a free-wheeling litigation machine who can just sue

16   whoever without having a real client.  Give me that order.  We'll

17   go forward, but that's not how it's supposed to work.

18        MR. ST. JOHN:  Your Honor, will state trial court order

19   be acceptable or will you wait for a state are Supreme Court

20   order?

21        THE COURT:  Let's see how this will work.  If you were

22   to try to issue a state subpoena from your office to a state

23   agency and they would move to quash it, that would go to court.

24        MR. ST. JOHN:  I'm not even sure we could issue a

25   subpoena under those circumstances.  I'd have to look at the

1  statutory authority.  So we'd probably have to bring a

2  declaratory judgment action in the 19th JDC.  I'm speaking off

3  the cuff, but that would be my guess.

4           MS. FUDIM:  Can I respond, Your Honor?

5           THE COURT:  Respond to the declaratory judgment action?

6           MS. FUDIM:  Respond to the colloquy that just --

7           THE COURT:  All right.  Briefly.  I'm still trying to

8  consider Mr. St. John's request.

9           MS. FUDIM:  As am I, Your Honor, and our position would

10  be that, if plaintiffs intend to take this to the state court,

11  that number one this action should be stayed pending that

12  determination.  Two, our position would be that it should go up

13  to the Louisiana Supreme Court, and three, that regardless of the

14  determination made by the Louisiana state court, authority is

15  still vested in this court to determine whether or not standing

16  can be based upon agencies that are third parties.

17           I mean, I think the question that would get certified

18  to the state would be our agency, such as the Department of

19  Health within the State of Louisiana, third-party entity separate

20  from the state, and that's the question they could answer, but

21  once that question is answered --

22           THE COURT:  You are talking about semantics.  You're

23  talking about semantics, and we're not getting into that.  What

24  I'm saying you know, and both sides have to argue both different

25  perspectives depending on what they are talking about.  You have

1    to say, well, the AG's office, if they really are third parties,

2    then they can't base standing on that, but if they are part of

3    the state, they need to produce documents.

4            MS. FUDIM:  Well, yes, but I think I'm saying something

5    slightly different, if I may.

6            THE COURT:  Plaintiffs' problem is a practicable

7    problem, how they get state agencies to cooperate without a

8    subpoena.  I understand that.  I'm sympathetic with

9    Mr. St. John's position, I really am, but I don't know how I can

10   order a subpoena issued from this Court to an agency that's

11   represented -- you know, anytime an agency is in court, and here,

12   it's based on a harm that's the standing for this lawsuit, the

13   Attorney General's Office represents that agency in that state,

14   and the agency is part of the state.

15           MR. ST. JOHN:  Your Honor, will the goose-gander rule

16   apply?  We should be getting discovery from the entirety of the

17   federal government then.

18           THE COURT:  Yeah, and we'll get to that in a minute.

19   But again, as to that, Mr. St. John, I need to know exactly what

20   you want from them.  I mean, I generally agree, I generally

21   agree, yeah.  The federal government is the Executive Branch.  I

22   believe in the Unitary Executive Branch, what the Constitution

23   says.

24           MR. ST. JOHN:  Understood, Your Honor.

25           THE COURT:  So if there are certain documents you want

1    from the Unitary Executive Branch of government that are relevant

2    to your issue of standing, then you better let me know.  But the

3    goose and the gander.  The AG's office represents the State of

4    Louisiana, and the agencies are part of the State of Louisiana.

5    Because this is limited to jurisdictional discovery on what

6    states base their standing, then, you know, not initially every

7    agency has to produce documents.

8           But those upon which the state intends to assert

9    standing do need to produce documents and not through third-party

10   discovery because they are the ones the state is saying, yes, our

11   agencies were harmed.  I am representing our agencies.  I'm

12   representing the state as the Attorney General.  Therefore, here

13   are the documents that support our basis of standing.  That's --

14   I think that's the clear view.

15          And those cases you cited, you know, dealt with

16   situations more like the first situation where, you know, the

17   AG's office representing an agency in federal court, and the

18   other side is trying to get something from a different agency or

19   different part of the government.

20          Here we're talking about the basis of standing, and

21   which agencies have actual harm.  That's not a third party.

22   That's the basis for your lawsuit.  That's why you have a

23   lawsuit.  Standing is, I've been harmed; therefore I'm suing.  It

24   can't be a third party.  It has to be you.

25          So, you know, the defendants' arguing semantics

1    somewhat, but it has a grain of truth which is that, you know,

2    standing is there because you have to have a harm so that the

3    courts don't become the legislature.  So that's why it's party

4    discovery.

5        All right.  So as to your point, for my purposes,

6    Mr. St. John, if it comes down to needing documents from another

7    agency and they are not cooperating, if the 19th JDC judge, you

8    know, has the view, based on state law, that the AG's office

9    can't get documents without, you know -- what would you say in

10   your declaratory judgment action, what would you say?  What would

11   you ask them to decide?

12       MR. ST. JOHN:  Your Honor, I hesitate, given the --

13   again, respectfully, dramatic departure from state law that the

14   court has --

15       THE COURT:  It's not a dramatic departure from state

16   law.  You're in federal court.  The Attorney General's Office has

17   to represent somebody.  The attorney generals are not just a

18   freestanding, free floating litigation machine.  That's not what

19   they are.  They have a client.  Their client is the State of

20   Louisiana.  Their client is the State of Florida.  That's the

21   client, and if there's a suit filed, that means the harm has to

22   happen to that client, and you have to be able to show that.

23   Okay.  That's not hard to understand, so do it.

24       MR. ST. JOHN:  Understood, Your Honor.

25       THE COURT:  Number two.  I've made clear on multiple

```
 1   occasions discovery obligations are reciprocal.  Any discoverable
 2   documents in the possession of the states relevant to their
 3   claimed basis of standing, their bases of standing must be
 4   produced.  Okay?  If that's not accomplished, this case won't
 5   proceed.
 6          I've reviewed the defendants' discovery requests.  Many
 7   of those documents requested from the states deal with categories
 8   of documents that should be in the possession of the United
 9   States, not the states.  A lot of them are just purely an
10   exercise to create headache for the states, I assume.  The
11   federal government has the sole responsibility to administer
12   immigration in the United States.  Therefore those documents,
13   most of those documents requested are in the possession of the
14   federal government, not the states.  Okay?
15          As to the specific issues raised in your motion to
16   compel, RFPs 8 and 9, responsive documents must be produced by
17   the states after asylum information is produced by the
18   defendants.  Before that happens I don't see the states have any
19   way of figuring out what that information is.
20          MS. RYAN:  I'm sorry, Your Honor, RFP 8 and 9, you
21   said?
22          THE COURT:  8 and 9.
23          MS. RYAN:  Okay.  Thank you.
24          THE COURT:  RFPs 13 through 15, again, responsive
25   documents must be produced by the states after asylum information
```

1    is produced by defendants.

2            RFP-18, states must produce any responsive

3    nonprivileged documents if they have any.

4            RFP 20, I find that it's not relevant.  That motion to

5    compel is denied.

6            RFPs 25 and 26, the states must produce any responsive

7    nonprivileged documents.

8            RFP's 34 and 35, the states must produce any responsive

9    nonprivileged documents.

10           RFP 36, states must produce any responsive

11   nonprivileged documents.

12           RFPs 21 and 22, the states must produce any responsive

13   nonprivileged documents.

14           RFP 23, not relevant, denied.

15           RFP27, produce any responsive nonprivileged documents.

16           RFP 29, I agree with the objections that this request

17   is overbroad, the states' objection it's an overbroad request.

18   However, I'm ordering production of any responsive nonprivileged

19   documents from agencies the plaintiff intends to use to show

20   standing.

21           RFP 28, produce any responsive nonprivileged documents.

22           RFP 31 through 33, produce any responsive nonprivileged

23   documents.

24           Okay.  So let me sum it up.  This is simple.

25   Plaintiffs must produce relevant documents pertaining to the

1    effect of the IFR on state agencies on which they intend to base

2    standing.  Plaintiffs must produce relevant documents pertaining

3    to the effect of the IFR on the state agencies on which they

4    intend to base their asserting of standing.

5            So do we need to extend the discovery deadline, given

6    the Court's rulings?

7            MS. RYAN:  Yes, we do, Your Honor.  And I believe both

8    parties now have experts, and the experts may need some of this

9    discovery to finalize their reports or declaration.  So perhaps

10   we need to set an internal deadline within that discovery period

11   for the production and then for the expert reports.

12           THE COURT:  Have you discussed that with Mr. St. John?

13           MS. RYAN:  We have not.  Their expert was disclosed to

14   us at midnight last night, and Ms. Fudim and I were both in

15   transit yesterday.  We haven't had a chance to discuss timing and

16   possible deadlines, but it seems like some of this may need to be

17   sequenced, if we need a protective order, and then defendants

18   have to produce things before plaintiffs can produce things, we

19   may need some interim deadlines that we have to work out.

20           THE COURT:  Okay.  Let's go to chambers after this and

21   we're going to talk about that.

22           Next, a briefing schedule.  We'll talk about that in

23   chambers too.

24           Mr. St. John, given the Court's grant of your motion to

25   compel, will the states withdraw their request to those agencies,

1    immigration?

2              MR. ST. JOHN:  Say that again, Your Honor.

3              THE COURT:  Will the states -- I have these pending

4    motions to quash your third-party subpoenas.  Given the

5    defendants have to produce identifying information, will you

6    withdraw those?

7              MR. ST. JOHN:  Yes, Your Honor.  We're talking about

8    the third-party subpoenas to the nonprofits?

9              THE COURT:  Yeah, I've deferred ruling on that pending

10   this.  So if you withdraw those, I will deny the motions to

11   quash, 144 and 122 as moot at this point.  Okay?

12             MR. ST. JOHN:  Okay.

13             THE COURT:  Let's go back to chambers and get situated.

14             MS. FUDIM:  We have one more issue, I think, Your

15   Honor, if we could right here.

16             THE COURT:  All right.

17             MS. FUDIM:  In terms of the responses that we received

18   from plaintiff in response to our document demands, the revised

19   responses, when documents have been produced, they have used a

20   CEG and then given an example, responsive document.  Our position

21   has been that, to the extent there are any documents that are

22   responsive to a particular demand, all the documents need to be

23   noted so that when we're looking through a production we know

24   what documents they view as responsive to which demand.

25             I'll also note that we've very roughly -- I mean, I

 1   would not suggest more than that, but we did do a cursory

 2   flip-through of the new three to four thousand pages that were

 3   produced last night, and it seems that there are documents that

 4   were produced that are not referenced in response to any demands

 5   which then raises the question, are these documents which are

 6   being disclosed under Rule 26A absent a Rule 26A statement.

 7            So we would ask for a ruling from the Court that, as

 8   plaintiffs provide documents, that they let us know not by, for

 9   example, but broadly speaking which documents are responsive to

10   which request so that we have an understanding of that, Your

11   Honor.

12            MR. ST. JOHN:  Your Honor, if I may.  This is an old

13   part of the rule that dates back to when everybody Xeroxed paper.

14   Okay.  The corollary to this was you only had to produce a

15   document one time.  So if it was produced in response to RFP 1,

16   you put it in the folder for RFP 1, and maybe it was responsive

17   to 10, 12, 15 and 17.

18            THE COURT:  Yeah, I mean, I've done this.  Practice

19   unfortunately is not to categorize documents by what RFP they

20   respond to.  They say they are kept in the ordinary course of

21   business, and that obviates the rule, right?

22            MS. FUDIM:  Well, I think there are some documents that

23   are not -- have been produced, but are not kept in the ordinary

24   course of business.  I think that applies to documents, as the

25   Court said, that are kept by the client in the ordinary course of

1    business, but when we have documents that have been produced

2    which appear to be, for example, printouts from websites.

3    There's many documents that if you Google, immigration in the

4    State of Louisiana and you took the first 15 things that popped

5    up in Google and printed them, we've got a lot of documents that

6    look like that.  And so we need to be able to know what is this.

7    Like are we missing something?  What is this responsive to.

8              There's also documents, Your Honor, which are not

9    indicated in response to any RFP which then raises the question

10   to us, is this a 26A document, and that is something we are

11   entitled to know under Rule 26A, and so we would ask for a 26A

12   disclosure if those documents are being produced affirmatively as

13   opposed to in response to demand, and the way that they have

14   labeled documents, there's no way for us to tell.

15             THE COURT:  Are any of your productions, are they being

16   made as part of your initial disclosures or evidence you intend

17   to present?

18             MR. ST. JOHN:  Yes, Your Honor.  Quite frankly, the

19   Attorney General -- in the ordinary course of the Attorney

20   General's operations, I take your ruling.  Marching on, Your

21   Honor.  In the ordinary course of the Attorney General's

22   operations, we don't have operational documents about these kind

23   of things.

24             Absent the federal government producing identifying

25   information, what we did was start to compile publicly available

1    information and then produce it.  A lot of documents we produced,

2    hey, we went to the government website, printed the statistics.

3    Some of them are responsive to RFPs.  We noted when they were.  A

4    lot of them are just, I have to have data to prove standing.  So,

5    you know, that's the position we're in.

6              THE COURT:  I'm not going to impose more burden on --

7    I'm trying to impose as little burden, extra work on both sides,

8    but I'll tell you this, you know, both sides need to try in good

9    faith to try to let the other side know what they are producing,

10   okay, whether it's by RFP or just generally what the category of

11   the documents you are producing.  You need to include a cover

12   letter or something letting them know.  It's just kind of

13   professionalism to me.  All right?  All right.  Let's go back to

14   chambers.

15                        (Hearing concluded.)

16                        *  *  *  *  *  *

17                  **C E R T I F I C A T E**

18      I, Cathleen E. Marquardt, RMR, CRR, Federal Official Court

19   Reporter, do hereby certify this 13th day of June, 2023, that the

20   foregoing pages 1-49 constitute a true transcript of proceedings

21   had in the above-entitled matter.

22                        **/s/ Cathleen E. Marquardt**
                         Federal Official Court Reporter

23

24

25