**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **STATE OF ARIZONA, et al.,**          ) | |
| )  | |
| **Plaintiffs,**          ) | |
| )  | |
| v.          ) | **Case No. 6:22-cv-1130** |
| )  | |
| **MERRICK GARLAND, et al.,**          ) | |
| )  | |
| **Defendants.**          ) | |
| _____) | |

**JOINT DISCOVERY FILING**
**PURSUANT TO THE COURT'S OCTOBER 24, 2023 ORDER**

On October 24, 2023, the Court ordered the parties to confer on outstanding discovery and, "no later than Nov. 3, 2023, file a joint submission with the Court describing the issues actually in dispute, the remaining discovery sought by the Defendants and the specific purpose for each outstanding discovery request, and the legal and factual support for the parties' respective positions." ECF No. 192. The parties met and conferred on October 30, 2023 and still remain in disagreement on the below issues.

## LOUISIANA'S POSITION

### I.     THE COURT SHOULD ENTER A PROTECTIVE ORDER.

Defendants served Louisiana with a **94 topic** notice of deposition pursuant to Rule 30(b)(6). Louisiana timely served its responses and objections on September 18, including a specific reservation of Louisiana's right to seek a protective order *in toto*. Dkt. 191-2. Defendants then sat on Louisiana's objections for nearly a month before taking issue. Dkt. 191-3 at ECF p.3. Defendants have previously conceded they refused to meet and confer regarding Louisiana's objections, Dkt. 186 at ECF p.3, despite the express requirement in Rule 30(b)(6) that they do so. The explanation for that refusal? Defendants unilaterally decreed the required meet-and-confer

wouldn't be "meaningful." *Id.*; *see also* Dkt. 191-2 at ECF p.4. Defendants instead went directly to the Court. Dkt. 186.

This Court ordered the parties to meet and confer, and further ordered Defendants to identify "the specific purpose for each outstanding discovery request." Dkt. 192. The parties engaged in a telephonic meet-and-confer on October 30. Exh. 1. With respect to Topics directed to the Louisiana Department of Public Safety and Corrections, Defendants stated they were merely seeking confirmation of Louisiana's position, then withdrew all DPSC-related topics as well as State Topics 15 and 17-21. Exh. 1 at 4. But when Louisiana sought to discuss the remaining 30(b)(6) topics, Defendants refused. Defendants instead decreed they have a generic "right to explore" and "probe" Louisiana's injuries via a 30(b)(6) deposition, then declared the Court-ordered meet-and-confer "a fruitless endeavor," Exh. 1 at 2 ¶¶ 3, 6, and "declined to go through each individual deposition topic" because "Defendants did not think it would be a good use of the parties' time," *id.* at 3. Defendants have thus  still not complied with Rule 30(b)(6)'s requirement to "before or promptly after the notice or subpoena is served … confer in good faith about the matters for examination." The Court need go no further.

In any event, as of the parties' November 2 exchange of positions, Defendants have also failed to comply with this Court's express order to identify "the specific purpose for each outstanding discovery request." Dkt. 192. And Defendants' ever-varying contentions are wrong at every juncture.

1. Defendants' noticing of **94** topics is facially excessive, overbroad, and unduly burdensome. *See, e.g.*, *Alvarado-Herrera v. Acuity*, 344 F.R.D. 103, 109 (D. Nev. 2023) (granting protective order: 68 30(b)(6) topics "is excessive and improper"); *United States v. HVI Cat Canyon, Inc.*, 2015 WL 11683593, at *2, 8-9 (C.D. Cal. Oct. 16, 2016) (granting protective order

in "undisputably complex case": "[T]he number of topics [61] and the scope of the information

they collectively request make it nearly impossible for Defendant to comply."); *see also* St. John

Decl. & Dkts. 191-5, 191-6, 191-7. Indeed, in light of the significant burden imposed on the noticed

party, courts have recognized a reciprocal obligation by the party seeking the deposition and

"repeatedly emphasized the practical constraints on the scope of a Rule 30(b)(6) deposition in that

it is not feasible for a Rule 30(b)(6) witness to know the details of everything." *Alvarado-Herrera*,

344 F.R.D. at 107. As a prominent magistrate judge explained:

> ***[T]he purpose served by [Rule] 30(b)(6)***—to require an organization to identify
> and designate a witness who is knowledgeable on the noticed topic, particularly
> where the noticing party is unable to itself identify an appropriate witness because
> that knowledge lies within the organization—***does not extend to burdening the
> responding party with production and preparation of a witness on every facet of
> the litigation***. This would render unworkable the obligation of the responding party
> to make a conscientious, good-faith effort to designate knowledgeable persons
> for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer
> questions about the subject matter, as that task becomes less realistic and
> increasingly impossible as the number and breadth of noticed subject areas expand.
> ***To require [the opposing party] to respond to [an excessive] notice would be to
> ignore the directive ... to limit the extent of otherwise relevant discovery where
> the benefit to and need of the propounding party is outdone by the burden,
> expense, and ... impracticable demand imposed on the other side***.

*Id.* at 107 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1511901, at *2 (N.D. Cal. Jan. 27,

2012) (Grewal, M.J., granting protective order)); *see also* Fed. R. Civ. P. 26, 2015 Adv. Comm.

Note ("Rule 26(g) provided that signing a discovery request, response, or objection certified that

the request, response, or objection was 'not unreasonable or unduly burdensome or expensive,

given the needs of the case, the discovery already had in the case … and the importance of the

issues at stake in the litigation.' The parties thus shared the responsibility to honor these limits on

the scope of discovery.")

2. Defendants' seeking 30(b)(6) testimony on **16** topics directed to DPSC—as well as other

crime-related topics directed to the State—exemplifies Defendants' abject failure to comply with

their discovery obligations. By way of background, the Court granted Defendants' request for limited pre-12(b)(1) and pre-answer jurisdictional discovery, and the parties then had multiple status conferences with the Court to further-limit the scope of that "limited" jurisdictional discovery. Plaintiff States accordingly identified "certain discrete programs in the States of Louisiana and Florida, in addition to asserting standing as a matter of law" as the grounds on which they would establish Article III standing. Dkt. 98. Defendants acknowledged those events, but stated they "don't believe [they] have that in writing." Dkt. 191-3 at ECF p.3. Yet Defendants relied on the same limited scope of authorized discovery to object to Plaintiff States' discovery. Dkt. 144-5 at ECF p.6 (Defendants objecting to discovery: "The Court permitted jurisdictional discovery related to …. 'the effect of the IFR on certain discrete programs in the states of Louisiana and Florida.'"). Defendants' using the single most burdensome discovery mechanism—and burdening Louisiana's attorneys with hours of work responding—merely because Defendants "don't believe we have that in writing" was a straight-forward violation of Rules 26(b)(1) and 26(g). That Defendants withdrew their 16 DPSC topics and 6 of their crime-related topics after Louisiana objected and the Court ordered a meet-and-confer does not cure the violation, which was complete when the discovery was signed and served. In any event, yet more crime-related topics have not been withdrawn. *See* Topics C19, C20.

3. Defendants' 72 unwithdrawn topics fare no better. Contrary to their obligation to limit discovery via the burdensome 30(b)(6) mechanism, Defendants seek a deposition on nearly aspect of the case, including statistics that are definitively within Defendants' own control, *see, e.g.*, Topics S1 ("[T]he number of asylees who have established residence within the State."), S2 ("The number of Applicants for Admission paroled by the federal government … who have established residence in the State."), Topic C16 ("The number of unaccompanied minors released under the

Asylum IFR who were resettled in the State of Louisiana…."); *see also* Topics S3, S13, S16; or are likely within the control of other federal agencies, *see, e.g.*, Topic C10 ("The amount and type of funding or financial assistance you receive from the federal government…."), H10 ("The amount of type of funding or financial assistance you receive from the federal government…."), including via agency websites, *see, e.g.*, Response to Topics C3 (linking to federal agency website); C7 (same).

During the parties' meet and confer, Defendants made clear they had not consulted their own data or the data of other federal agencies before seeking burdensome testimony from Louisiana, with their counsel stating "why would I do that?" Exh. 1 at 2. That Defendants did not look at their own definitive data first, *i.e.*, a plainly "more convenient, less burdensome, [and] less expensive" source than a 30(b)(6) deposition – mandates a protective order pursuant to Rule 26(b)(2)(C). *See Lebron v. Ensco Offshore Co.*, 2013 WL 12184555, at *1 (W.D. La. May 28, 2013) (explaining that Rule 26(b)(2)(C) limits the Court's discretion and acting to limit depositions), *aff'd*, 2013 WL 3967165 (W.D. La. July 31, 2013). That Defendants have made no inquiry of their own data regarding basic information like the number of asylees in Louisiana, the number of applicants for admission in Louisiana, and "[t]he number of unaccompanied minors released under the Asylum IFR who were resettled in Louisiana," raises serious doubt that Defendants ever had a good faith basis for seeking jurisdictional discovery. *Cf.* Dkt. 89 at 2 (suggesting a 12(b)(1) motion may be "beyond the bounds of Rule 11 after [Defendants] conduct a reasonable investigation of their own data.").

4. Confirming that Defendants' failed to make any inquiry before issuing their burdensome, 94 topic notice, Topic C7 seeks testimony regarding "The number of Undocumented Immigrants who seek, receive, and/or require services by the Department of Children and Family Services."

But turning to the "discrete programs" for which discovery was actually authorized, federal agency websites state that, in contrast to asylees, "SNAP eligibility has never been extended to undocumented noncitizens,"[1] and "[n]onimmigrants and unauthorized aliens are ineligible for SNAP, SSI, and TANF."[2] Louisiana linked to those federal websites in its response. Dkt. 191-2 at 12 n.3. Perhaps Defendants have some explanation. But Louisiana has no way to know because Defendants refused to meet-and-confer on specific topics.

5. Many of Defendants' Topics are directly inconsistent with Defendants' objections to producing data extending beyond the Asylum IFR. *Compare, e.g.*, Topic S1 ("The number of Asylees who have established residence in the State.") *with* Dkt. 144-5 at, e.g. Response to Request No. 5 (objecting to discovery about "all persons granted asylum … from January 20, 2021 through the present, who do or did have a (a) residence address in Florida or Louisiana, or (b) a mailing address in Florida or Louisiana" as "overbroad" and "not relevant to this lawsuit" because the request "is not limited to asylum applicants who were granted asylum under processes pursuant to the IFR"). Indeed, Defendants pervasively objecting to producing information about aliens other than those processed through the Asylum IFR. *See generally* Dkt. 144-5. Such inconsistent positions are yet another ground mandating a protective order pursuant to Rule 26(b)(2)(C), and the naked inconsistency raises the question of whether Defendants' discovery objections or their 30(b)(6) Topics violate Rule 26(g). Put succinctly, Defendants plainly can't object to a request for information as irrelevant and outside the scope of discovery, then turn around and issue discovery for that same information.

---

[1] https://www.fns.usda.gov/snap/recipient/eligibility (at "Are Non-Citizens Eligible for SNAP?") (last accessed November 3, 2023)
[2] https://crsreports.congress.gov/product/pdf/RL/RL33809 (last accessed Nov. 3, 2023)

6. Many of the remaining Topics are cumulative of existing fact discovery, *compare, e.g.,* Topic C5 ("Whether and to what extent your department has policies or practices pertaining to provision of services specifically to noncitizen residents of Louisiana.") *and* Topic C12 ("If and how you determine whether individuals and/or families receiving assistance from your department are citizens or noncitizens, and for the latter group, their immigration status.") *with* Exhs. 2, 3; *see also* Topics C15, E8, H3, H4, H5, H6, H7,H8, H9, H12, H14, H15. Others topics are cumulative of — and more properly addressed by -- expert discovery, *see* Exh. 5, and/or seek testimony regarding matters of law or regulation, *e.g.*, Topic C3 ("For each of those services, the eligibility requirements."); *see also* Topics C10, C11, E9. Louisiana spent hours identifying documents that address those topics and specifically identified those documents on a topic-by-topic basis, making plain that the topics are cumulative of existing discovery. Yet all Defendants proffer as the necessity for a burdensome 30(b)(6) deposition are generic references to "prob[ing]" and "explor[ing]" Louisiana's document production at large.

7. On the other hand, some topics seek testimony on information the federal government has affirmatively barred the State from collecting— as the State has repeatedly made clear — and for which the Defendants have refused to provide the underlying information that would be necessary to meaningfully respond. *See* Topics E2 ("The number of Applicants for Admission paroled by the federal government … enrolled in public schools…"); E5 ("The number of Asylees enrolled in public schools in the State of Louisiana."); E11 (If and how you determine whether individuals receiving Louisiana public education citizens or non-citizens…."); E12 ("[H]ow the immigration status of students is maintained and in what format…."). And many more Topics are beyond the "discrete programs" that are the subject of the Court's "limited" discovery authorization, are irrelevant under controlling law, or of such tangential relevance that discovery

via the 30(b)(6) mechanism is improper. *See* Topics S8, S9, S11, S14, S15, S22, S23, C2, C3, C4, C17, C18, C19, C20, C21, C22, E1, E2,  E7, C1, C2, C3, C4, H1, H2, H16, H17.

8. Where, as here, "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)," issuance of a protective order is non-discretionary. *Lebron*, 2013 WL 12184555, at *1.

## II.  LOUISIANA CORRECTLY APPRISED DEFENDANTS OF THE SCOPE OF ANY DEPOSITION UNDER RULE 30(b)(6).

What remains is Defendants' gripe about the Attorney General's objection that Rule 30(b)6) testimony would be "limited to information known or reasonably available to the Office of Attorney General Jeff Landry and the Louisiana Department of Justice." Defendants maintain that gripe notwithstanding that the Attorney General has sought and obtained the voluntary cooperation of other state agencies, and he informed Defendants of that fact before they ran to the Court with their hypothetical dispute. Dkt. 191-9 at ECF p.6 (discussing the Attorney General's 30(b)(6) objection: "In this case, unlike in *Missouri* [*sic, Nebraska*], relevant agencies are cooperating with the Louisiana Attorney General and the Louisiana Department of Justice."). Regardless, the Attorney General's objection is a straight-forward application of Rule 30 in view of Fifth Circuit law.

### A.  Rule 30(b)(6) Deposition Notices Do Not Reach Subsidiaries or Sister Agencies

Defendants' primary contention is that they "noticed … depositions of the State of Louisiana and its Department of Children and Family Services, Department of Education, and Department of Health," "Defendants are entitled to question Plaintiffs," and "discovery should be extended to allow the depositions to take place." Defendants are wrong on every point.

1. Defendants sent Rule 30 deposition notices directed to the State, LDH, LDCFS, LDOE, and LDPSC. Exh. 7.[3] Defendants accompanied those notices with an email explaining that "as there has been some confusion and disagreement in the past about the relationship between the state and its agencies, we included the same topics from the agency notices in the notice of the state of Louisiana. If the standalone notices for the agency are preferred, we can amend the notice to the state to remove those duplicate topics. We just included them in this format to cover both bases, but are open to discussing which way will be best for you to reach out to the agencies regarding witnesses." *Id*.

2. Of course, a Rule 30 deposition notice can only compel the attendance of a party. *See Utopia Entm't, Inc. v. Claiborne Parish,* 2007 WL 4560362, at *1 (W.D. La. Dec. 21, 2007); *see also Campos v. Webb Cnty., Tex.*, 2013 WL 12387156, at *1 (S.D. Tex. Apr. 18, 2013) (compiling cases). The relevant plaintiff in this case is "The State of Louisiana, by and through its Attorney General, Jeff Landry," Dkt. 2 at Caption, not any of the agencies Defendants identify. As a matter of Louisiana and Fifth Circuit law, a Louisiana state agency "is a separate legal entity from the State." *Louisiana Highway Comm'n v. Farnsworth*, 74 F.2d 910, 912 (5th Cir. 1935) (quoting *Saint v. Allen*, 134 So. 246, 248-49 (La. 1931). Although "[i]t is the duty of the Attorney General … to prosecute and defend all suits or other legal proceedings to which the state is a party, and to have charge of all legal matters in which the state, as a distinct legal entity, apart from other entities or corporate agencies it may create, has an interest," that is "no reason … why the Attorney General and his assistants should be deemed to be the attorneys for" a state agency, at least in the absence

---

[3] Those notices did not specify deposition dates or locations, such that they were invalid. Fed. R. Civ. P. 30(b)(1); *see also, e.g.*, *Senegal v. Anderson*, 2021 WL 4444722, at *2 (M.D. La. Sept. 28, 2021) (denying motion to compel: "The unsigned and undated draft Rule 30(b)(6) deposition notice … noes not meet the basic requirements of Rule 30(b)(1) … by stating the 'time and place of the deposition.'").

of a specific retention. *Id*. If Defendants wanted to depose particular agencies, they were obligated to proceed via Rule 45 and serve subpoenas on those agencies. Defendants did neither.

3. Regardless of whether one views the State itself or the Attorney General as the Plaintiff, a notice served on that Plaintiff cannot require testimony about information known to other agencies, at least absent evidence of involvement in the "discrete programs" that are the subject of discovery. That's because Rule 30(b)(6) limits the required testimony to "information known or reasonably available to the organization," *i.e.*, a narrower obligation than the "control" set forth for document discovery under Rule 34. Accordingly, Courts applying the plain text of Rule 30 hold that parties are not required to provide testimony about information known to subsidiaries or affiliates. As one court explained, "[i]t is one thing to require a corporate parent to produce documents in the possession of its foreign subsidiary, when, as a practical matter, it is able to secure those documents." *In re Ski Train Fire*, 2006 WL 1328259, at *9 (S.D.N.Y. May 16, 2006). "It is simply not comparable to require a corporate parent to acquire all of the knowledge of the subsidiary on matters in which the parent was not involved, and to testify to those matters in a manner which binds the parent, a separate legal entity." *Id.*; *see also, e.g.*, *Townsend v. AutoZone Stores, LLC*, 2017 WL 2790553, at *4 (W.D. Ark. June 27, 2017) ("AutoZone Stores is not required to produce 30(b)(6) witnesses of its sister corporation" because "no evidence has been presented to establish that AutoZone Stores was involved in many of the transactions related to the topics noticed"); *Honda Lease Trust v. Middlesex Mut. Assurance Co.*, 2008 WL 3285242, at *3 (D. Conn. Aug. 7, 2008) ("[T]he plaintiff need not produce as 30(b)(6) witnesses the employees of any related companies[.]"). Applied here, Defendants present no evidence from which the Court could find the Attorney General or the State is involved in any of the programs at issue.

4. The Attorney General accordingly objected based on the limitations of Rule 30, and he properly sought to educate his witness by soliciting the cooperation of other state agencies. *See* Dkt. 191-5, 6, 7. Defendants have no basis for contending that witness would have been inadequately prepared; Defendants' gripe is merely hypothetical. If Defendants were interested in discovery rather than delay and disputes that needlessly trigger serious federalism concerns, Defendants could simply have issued subpoenas to State agencies: Whether a subpoena recipient is a party or non-party is nearly irrelevant under Rule 45. Defendants tellingly did not go down that path.

**B.  *Nebraska*, especially when read in context of *Cameron*, *Molina*, and *Louisiana Highway Commission*, makes clear the Attorney General is not required to control operational agencies to have standing to assert the State's claims.**

Notwithstanding the textual difference between Rule 30 (governing depositions) and Rule 34 (governing document production), Defendants fall back on this Court's resolution of document discovery issues in May and urge the Court to blindly reach the same result now. But in the post-hearing status conference in May, the Court noted that two pending Supreme Court cases — *United States v. Texas* and *Biden v. Nebraska* — would likely impact its view of this case. Both have now issued, and *Nebraska* is effectively controlling, especially when read in the context of *Cameron v. EMW Women's Surgical Center*, 595 U.S. 267 (2022), *State ex rel. Caldwell v. Molina Healthcare, Inc.*, 283 So. 3d 472 (La. 2019), and *Louisiana Highway Commission*, *supra*.

1. In *Nebraska*, the Supreme Court held a State — proceeding through its attorney general — had standing to assert injury to a state instrumentality. 143 S. Ct. 2355, 2365-68 & n.3, 2385-2391 (2023); *see also Nebraksa v. Biden*, 636 F. Supp. 3d 991, 998-1000 (E.D. Mo. 2022); Dkt. 191-8 (complaint). The Court reached that conclusion despite the instrumentality having "a legal personality separate from the state," despite the instrumentality being ultimately controlled by the

State's governor rather than the State's attorney general, and despite the instrumentality's affirmative refusal to cooperate with the attorney general's lawsuit. 143 S.Ct. at 2366-2367, 2391. The Supreme Court explained that the instrumentality performed an "essential public function" such that a harm to the instrumentality "is necessarily a direct injury to [the State] itself," notwithstanding the instrumentality's independence. *Id.* at 2366. The Court notably distinguished cases holding that a similar instrumentality was not part of the state, explaining that "a public corporation can count as part of the State for some but not other purposes." *Id.* at 2368 n.3.

2. Louisiana and Fifth Circuit law are in accord. *See State ex rel. Caldwell v. Molina Healthcare, Inc.*, 283 So. 3d 472, 487 (La. 2019) (holding the Attorney General has authority to assert claims on behalf of the State related to Medicaid due to Medicaid contractor's "involvement with government functions" notwithstanding LDH's lack of participation in the suit); *Louisiana Highway Comm'n v. Farnsworth*, 74 F.2d 910, 912-13 (5th Cir. 1935) (citing *Saint v. Allen*, 134 So. 246 (La. 1931), and holding a Louisiana state agency is distinct from the state itself); *see also Hudson v. City of New Orleans*, 174 F.3d 677, 680-691 (5th Cir. 1999) (focusing on "political realities" and holding that Louisiana district attorneys are not subject to Eleventh Amendment sovereign immunity, despite the State constitution classifying them as state officials, their litigating on behalf of the state, and their being subject to some control by the Attorney General); *Cates v. LTV Aerospace Corp.*, 480 F.2d 620, 622 (5th Cir. 1973) (holding that for purposes of a subpoena, documents were in control of agency head).

3. Defendants try to side-step the import of *Nebraska* by pointing to its procedural posture. That's irrelevant. The Supreme Court concluded the State had standing, notwithstanding the independence of its instrumentality, the lack of financial risk to the State, and the instrumentality's affirmative refusal to cooperate with the suit. Moreover, the outcome in *Nebraska* is unremarkable.

12

In *Cameron v. EMW Women's Surgical Center*, 595 U.S. 267 (2022), the Supreme Court addressed a dispute between a state agency head and the State's attorney general over whether to continue litigation *vel non*. *Id.* at 278-79. The Court made clear that both state officers had authority to litigate because "[r]espect for state sovereignty must also take into account the authority of a State to structure its executive branch in a way that empowers multiple officials to defend its sovereign interests in federal court." *Id.* at 277. That "respect" necessarily included a determination that the attorney general had Article III standing, otherwise the litigation would have ceased. And *Nebraska* necessarily rejects any supposed rule that an attorney general authorized to bring suit on behalf of the State must also have control over operational agencies to pursue the State's claim.[4]

4. Defendants again try to sidestep *Nebraska* by arguing that they are making a "factual" attack on jurisdiction rather than a "facial" attack. But Defendants have yet to make *any* jurisdictional attack, such that the allegations in the complaint must be accepted as true. In any event, the question here is the interaction between Article III standing and control over agencies. *Nebraska* makes clear the State, through its attorney general, has Article III standing to assert injuries to the State itself. Whether the Attorney General has control over agencies that may also be injured or may have relevant discovery is a separate question. But Defendants make no argument regarding control.

---

[4] Like many states – but unlike the United States -- Louisiana does not have a unitary executive. *See* La. Const. art. IV Sec. 1. The State has an elected governor who appoints "the head of each department in the executive branch whose election or appointment is not provided by [the Louisiana] constitution." La. Const. art. IV Sec. H(1). The Attorney General, in contrast, is separately elected and the head of only the Louisiana Department of Justice. La. Const. art. IV Section 8. As relevant here, the heads of the Departments of Education, Health, and Children & Family Services report to the Governor. Each of those agencies is a body corporate with the power to sue and be sued. R.S. 36:251(A) (LDH); R.S. 36:471(A) (LDCFS); R.S. 36:642(A) (LDOE). *Louisiana Highway Commission* and *Saint* make clear that those agencies are distinct from the State itself. And *Molina* makes clear that the Attorney General has authority to assert the claims he asserts in this case, regardless of whether those agencies are involved in the litigation.

5. *Nebraska's* acceptance of a divergence between standing to sue and operational control of an instrumentality aligns with federal law regarding relators. Louisiana courts treat the Attorney General as a type of relator when he brings suit on behalf of the State. *See, e.g.*, *State ex rel Guste v. Simoni, Heck & Assocs.*, 331 So. 2d 478, 486 (La. 1976) (Summers, J., dissenting) ("The State of Louisiana on the relation of the Attorney General applied for certiorari…."); *id.* at 482 (recognizing the State through the Attorney General and a state agency can both have a cause of action arising from the same transaction, then holding the State's action continued notwithstanding agency's declining to appeal); *State ex rel Porterie v. Smith*, 162 So. 413, 419-420 (La. 1935) (on "application by the State, on relation of" the attorney general, recognizing that both the governor and the attorney general have causes of action: "Since the state has an interest in this suit, the Attorney General has a right to assert it."). In analogous circumstances, federal courts hold that a federal *qui tam* relator has Article III standing, but the government and its agencies are not parties, and are accordingly subject only to non-party discovery. *See, e.g.*, *Vermont Agency of Nat'l Res. v. United States ex rel Stevens*, 529 U.S. 765, 787 (2000) (holding that a private *qui tam* relator has Article III standing to assert an injury to the United States); *United States ex rel Eisentein v. City of New York*, 556 U.S. 928, 932-33 (2009) (holding that the United States is a not a "party" to a qui tam action unless it has exercised its right to intervene); *United States v. Academy Mortgage Corp.*, 968 F.3d 996, 1006 (9th Cir. 2020) (explaining that in a *qui tam* case "as a third party, the Government and its agencies are subject to the same discovery obligations as other non-parties under Federal Rule of Civil Procedure 45").

14

III.    **EXPERT DEPOSITIONS**

**A. Defendants declined to depose Louisiana's experts when offered.**

The parties jointly moved to extend the deadline for expert reports September 25, and to extend the deadline for depositions to October 25, to "allow the parties time to complete depositions in this matter.: Dkt. 184. On its face, the motion contemplated only one month for expert depositions. The Court granted that motion.

Consistent with the agreed schedule, on September 25, Louisiana served an expert report by former Immigration Judge Art Arthur, as well as a disclosure of former Border Patrol Chief Rodney Scott as a non-retained expert pursuant to Rule 26(a)(2)(C). Exhs. 4, 5, 6. On Tuesday, October 10, Defendants noted the "upcoming [discovery] deadline" and asked Louisiana to provide "names and potential dates for your deponents" by that Friday, all without identifying any scheduling conflicts. Dkt. 191-4. Louisiana responded on Thursday, October 12, that Chief Scott "preliminarily responded that he is available on October 23," but both Chief Scott's and Judge Arthur's availability depended on the form of deposition due to travel commitments. Dkt. 191-3 at 2. Having received no response, on Friday, October 13, Louisiana confirmed Chief Scott's availability for October 23, and Judge Arthur's availability on October 24 or 25. Dkt. 191-3 at 1. The following Monday, Defendants reversed course and refused to take the depositions they had requested, claiming "none of the dates … provided … work for us due to previously scheduled commitments." Dkt. 191-9 at 3.

Defendants now fault Louisiana for not starting to respond with dates until Thursday, October 12, *i.e.*, a day ***earlier*** than the deadline Defendants set. Defendants then gripe that although the discovery deadline was approaching and Louisiana provided dates as requested, all of the four attorneys who have appeared for Defendants had filled their calendars with unspecified

"commitments that could not be moved." Defendants then double back, complaining that Louisiana's providing deposition dates by the deadline Defendants themselves set—and offering witnesses as far to the end of the discovery period as possible—didn't provide Defendants with adequate time to prepare for those depositions. The collection of dates that were "just right" for Defendants is apparently a null set. Defendants' arguments suggest they never really intended to depose Louisiana's experts during the discovery period, and Defendants were caught off foot when Louisiana actually provided dates. That's no ground for another bite at the apple.

### B. Defendants declined to make their expert available.

Although Defendants expected Louisiana to make its experts available on short notice as the close of discovery approached—a not uncommon occurrence in litigation—Defendants insist that what's sauce for the goose is **not** sauce for the gander. Tellingly, Defendants declared their expert unavailable despite apparently having never contacted him, then stated they would seek his availability "in the next few months." Dkt. 191-9 at 1. Having failed to make their expert available for deposition during the discovery period, Defendants should be precluded from offering his testimony.

## IV.    DISCOVERY SHOULD NOT BE EXTENDED.

Enough is enough. This case has been pending for 18 months, and Defendants have had 10 months to take discovery. Defendants have evaded answering or moving to dismiss. Having put off discovery until the last minute and sat on Louisiana's 30(b)(6) objections for nearly a month, Defendants now seek yet more time to take discovery of facts that are largely within their own control, on which Louisiana has already produced evidence, and that Defendants have elsewhere urged are not relevant. Tellingly, when asked about the need for that discovery, Defendants' refused to engage and instead pointed only to a general interest in interest in "explor[ing] and

"prob[ing]" Louisiana's injuries. Exh. 1 at 2 ¶¶ 3, 6. But the Federal Rules authorizing discovery have "never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Crosby v. La. Health Serv. And Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011). Defendants' failure to consult their own data makes clear that's exactly what this is: a ten-month fishing expedition that Defendants want to extend for months more. That point is confirmed by their motion to dismiss the parallel challenge in Texas, which asserts nothing more than a failure of proof accompanied by a superficial expert report, notwithstanding an equally-lengthy period of jurisdictional discovery. Exh. 8.

Far from being good cause to extend the schedule, Defendants' dilatory conduct mandates a protective order. *See* Fed. R. Civ. P. 26(b)(2)(C) ("On motion or on its own, the court **must** limit the frequency or extent of discovery otherwise allowed … if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; [or] (ii) the party seeking discovery has had ample opportunity to obtain the information").

In terms of the scheduling provisions of the Federal Rules, "a schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause under Rule 16(b) requires a party to show that the deadlines cannot reasonably be met despite the diligence of the party [seeking] the extension." *Bennett v. Consolidated Gravity Drainiage Dist. No. 1*, 648 Fed. App'x 425, 248 (5th Cir. 2016); *see also, e.g.*, *Puig v. Citibank, N.A.*, 514 Fed. App'x 483, 488 (5th Cir. 2013) ("[W]e look to the Puigs' diligence in conducting discovery within the scheduling order's timeline."). But Defendants offer no excuse for their delay in bringing their hypothetical dispute to the Court or for declining to take depositions offered within the existing schedule. And when the parties met-an-conferred pursuant to the Court's order, Defendants

17

abjectly refused to engage about their actual *need* for the additional discovery they seek. Plaintiff States, in contrast, will be prejudiced by further delay, including by increased migration, increased grants of asylum, and increased benefits expenditures on indigent aliens, including as a result of void actions by asylum officers acting in excess of their statutory authority. [5] Defendants' request for yet another discovery extension should be denied. To the extent it is granted, however, the extension should be reciprocal.

---

[5] On the same day Defendants' lodged their request, some of the harm from the Asylum IFR reared its head when it became public that U.S.C.I.S. had hired the Palestine Liberation Organization's former spokeswoman as an asylum officer. Dkt. 191-11. The Palestine Liberation Organization is, of course, condemned by statute as a terrorist organization, 22 U.S.C. § 5201(b), and the asylum officer's public statements are more-than-consistent with that statutory finding. *See* Dkt. 191-11, 191-12. Suffice it to say such a person would have difficulty passing the character and fitness portion requirements for bar admission, as is required to be an immigration judge.

<u>DEFENDANTS' POSITION</u>

I.   **Whether Defendants Should be Permitted to Take Depositions of State Agencies on Which Plaintiffs Base Their Standing**

Defendants noticed, and still seek, depositions of the State of Louisiana and its Department of Children and Family Services, Department of Education, and Department of Health.

Following the last status conference, the Court set a deadline of July 28, 2023 for Defendants to produce any outstanding documents, and directed the parties to exchange expert reports by August 11, 2023. ECF No. 178. The Court granted Defendants' motion to extend these deadlines to August 11 and August 25, respectively, on July 31, 2023. ECF No. 182. The last document productions were made by August 11, and then Defendants served deposition notices on Plaintiffs on August 18. ECF No. 186-4. The parties jointly requested an extension of the deadline to produce expert reports and to conduct depositions. ECF No. 184. The Court granted this motion, setting a deadline of September 25 for expert reports, and October 25 for the parties to conduct depositions. ECF No. 185.

Defendants served deposition notices on August 18 and asked Plaintiffs to identify witnesses so the parties could discuss dates that worked for all parties for scheduling these depositions to avoid scheduling them at the last minute, and to provide time for the parties to confer on the depositions as necessary and for Defendants to make necessary preparations for the depositions in advance. ECF No. 186-4. Plaintiffs responded on August 23 saying they would "be in touch about dates." Ex. A. Plaintiffs then stopped responding, so Defendants repeated their request on September 11. Ex. B. Plaintiffs responded on September 12, informing Defendants, for the first time, that they would be objecting to the notices "in due course" and objected to any depositions being done before the September 25 deadline to produce expert reports. *Id.* Defendants responded on September 15, agreeing to not hold any depositions until after September 25, but

19

asking for the third time that the parties discuss possible dates and put them on the calendar to ensure the parties were able to complete the depositions before the October 25 deadline on dates that worked for all parties and witnesses. *Id.*

Plaintiffs sent their objections on September 18. ECF No. 186-4. In these objections, for the first time, Plaintiffs informed Defendants that they would not be producing witnesses from the state agencies, and that any deponents will only speak to information known to the AG's office. *Id.* The parties then exchanged expert reports on September 25. *Id.* On October 10, Defendants again asked, for the fourth time, that Plaintiffs provide the identity and availability of their witnesses while the parties worked through the objections. Ex. C. Defendants got no response, so on October 12, Defendants followed up again about Plaintiffs' objections, and the subsequent emails led into the disputes currently before the Court. ECF Nos. 186, 191.

Defendants are permitted to take depositions and discovery should be extended to allow the depositions to take place. As an initial matter, Defendants have withdrawn their notice to the Department of Public Safety and Corrections ("DPSC") based on counsel's representation during the October 30, 2023 meet and confer that Plaintiffs will not seek to establish standing based on injuries related to that agency.[6] The parties previously asked for time to be set aside for depositions

---

[6] On this representation, Defendants have also withdrawn State topics 15, 17, 18, 19, 20, and 21. Defendants anticipate serving updated deposition notices, if necessary, following the Court's rulings at the November 6, 2023 status conference regarding the scope of depositions. As Defendants always represented to Plaintiffs, there is nothing in the record, either through email, stipulation, or Court transcript, confirming Plaintiffs' withdrawal of those injuries, and Plaintiffs never amended their complaint to remove those allegations. Therefore, in an abundance of caution, Defendants served a deposition notice to DPSC but noted in the email serving the notice that if Plaintiffs would confirm in writing that they were not relying on those injuries, the notice would be withdrawn. ECF 186-3 at 2 ("We also include a notice for Louisiana's Department of Public Safety and Corrections to the extent those are injuries you are still planning to rely on to show standing. From some of your previous emails, you seemed to indicate that standing would be based on the Departments of Health, Education, and Children and Families, but the second amended complaint still contains a number of allegations related to public safety and corrections. If

in the discovery schedule, which the Court granted, ECF Nos. 184, 185, so Louisiana cannot now feign surprise that Defendants seek depositions. Defendants were diligent in seeking these depositions and in attempting to confer with Plaintiffs on the identify and availability of their witnesses to ensure the depositions could be completed in a reasonable manner before the close of discovery. As discussed above, many of Defendants' communications to Plaintiffs about the agency depositions went unanswered. Additionally, at no point did Louisiana communicate to Defendants that the state agencies were "cooperating" with discovery, as Louisiana later told the Court in its October 23 filing, and which appears to be contrary to Plaintiffs' objections. ECF No. 191 at 2; ECF No. 191-2. Defendants only learned of this at the same time as the Court. *Id.*

Prior to that it was unclear whether Plaintiffs were going to make any effort to comply with their obligation to respond to Defendants' deposition notices with witnesses from State agencies, and as discussed below, because it remains unclear what Plaintiffs mean by "cooperating," it also remains unclear the extent to which Plaintiffs will provide witnesses who can speak for the agencies. Defendants also note that all the communications with the agencies that Louisiana puts forward to show the agencies are cooperating are partial email chains between counsel that appear to originate on October 12 and 13, precisely when these disputes between the parties were solidifying and Defendants advised they were going to seek a status conference with the Court. ECF No. 191-5; 191-6; 191-7. Louisiana accuses Defendants of delay based on its belief that Defendants "sat on Louisiana's 30(b)(6) objections for nearly a month," ECF No. 191 at 4, but in

---

Louisiana is withdrawing their reliance on standing based on those injuries, we can withdraw the deposition notice."). Plaintiffs did not confirm this understanding until the October 30, 2023 meet and confer, and once that representation was made, Defendants verbally, and then in email, withdrew the notice. Plaintiffs, therefore, cannot now claim harm and expenses in objecting to these deposition notices when a simple email in August would have prevented all the time they claim was spent copying and pasting form objections to these topics.

reality, Louisiana received Defendants' deposition topics on August 18, informed Defendants they would "be in touch about dates" on August 23, and then apparently did not reach out to the agencies to begin discussions until October 12 or 13. *Id.*; ECF No. 186-4.

Louisiana also objects to the agencies being noticed for depositions and noted that to the extent a witness is produced, "that witness's testimony is limited to information known or reasonably available to the Office of Attorney General Jeff Landry and the Louisiana Department of Justice." ECF No. 191-1 at 2.[7] Louisiana reiterated that position in the parties October 30 meet and confer, stating that while the agencies will put forward witnesses, those witnesses will be testifying "on behalf of" the Attorney General's Office. First, to the extent Plaintiffs are basing their standing argument on purported injuries to state agencies, Defendants should have a right to challenge those allegations through discovery and should not be limited in doing so to information that is already known to the AG's Office when there is no way to know whether the AG's Office obtained all the relevant information, rather than just the information Plaintiffs believe supports their standing arguments. Second, not only does it not make sense to have witnesses from state agencies testify on behalf of the AG's Office if there is no legal relationship between the agencies and the AG's Office, as Louisiana claims, it also flies in the face of rulings this Court has already made directing Louisiana to produce discovery from the state agencies.

The parties have already briefed and argued at length about the relationship between the State of Louisiana and the State agencies identified in their complaint regarding alleged injuries and standing. ECF Nos. 157, 166, 167. The Court ruled in favor of Defendants, holding that the

---

[7] In their portion of this filing, Plaintiffs purport to seek a protective order from the Court through this filing, despite this not being a motion or the proper vehicle for such a request. *Supra*. At no point during the meet and confer did Plaintiffs inform Defendants they would affirmatively seek to obtain a protective order. Defendants object to that request to the extent the Court entertains it.

State agencies are part of the State, and if the State is going to base its harm and standing on State agencies, then those agencies must take part in discovery. *See* Transcript from May 24, 2023 Conference at 34:24-35:4 ("My broad view is that Attorney Generals of the plaintiff states, specifically, with respect to standing, if they allege the states are being harmed, then those parts of the state government, which the agencies are parts of the state government that are alleged are harmed are subject to party discovery, not third-party discovery. Hard stop."); 35:12 ("Agencies are part of the State of Louisiana, period.").

The State of Louisiana now unilaterally tries to avoid complying with this Court's ruling on the basis of the Supreme Court's decision in *Biden v. Nebraska*. 143 S.Ct. 2355 (2023). First, if Louisiana believed that this case was relevant to the Court's May 24, 2023 ruling, it could—and should—have brought that to the Court's attention upon the issuance of the Supreme Court's decision on June 30, and moved for reconsideration of the Court's prior ruling, or at least conferred with Defendants. It did not. Nor did Louisiana raise the *Nebraska* decision when the parties were negotiating the scope of their discovery requests, as ordered by the Court, or when the parties were still producing documents to each other throughout July and August. Nor did Plaintiffs' counsel raise it after Defendants served these deposition notices on Plaintiffs on August 18. The first time Louisiana raised *Nebraska* as a bar on discovery was in its September 18, 2023 objections to the deposition topics, and even there it was only in passing. ECF No. 191-2 at 2-3 ("[Louisiana] objects to the definition of 'You' and 'your' to the extent it refers to any entity outside control of the Office of the Attorney General or the Louisiana Department of Justice. *See Biden v. Nebraska*, 143 S.Ct. 2355, 2365-68 2386-88 (2023) (holding that State had standing to assert injury to instrumentality notwithstanding instrumentality's refusal to cooperate with litigation).”). The first time Louisiana actually raised its position about the relevance of *Nebraska* on discovery in this case was in its

October 12 email to Defendants, and the first time it was raised to the Court was in Louisiana's October 23 filing—two days before discovery was scheduled to close. ECF No. 191-3; 191.

Louisiana alone decided that a Supreme Court decision materially changed a ruling this Court made and relieved Louisiana from having to participate in discovery, failed to bring that to the Court's attention until two days before the close of discovery, and now claims that discovery should not be extended claiming that *Defendants* are delaying this matter. *Id.* Not only should this not be allowed, but Louisiana is also incorrect that *Nebraska* relieves Louisiana of its burden to participate in discovery in this case.

Louisiana claims that *Nebraska* held that "a State — proceeding through its attorney general — had standing to assert injury accruing through a state instrumentality." ECF No. 191 at 2-3. But *Nebraska* is distinguishable several key respects and says nothing about a State Plaintiffs' burden where Defendants serve discovery requests as part of a factual attack on standing. First, the district court in *Nebraska* dismissed the case based on briefing on a preliminary injunction motion alone and the case never reached discovery. The states in *Nebraska* sought a preliminary injunction, and the district court denied and dismissed the case because the court found that the states did not have standing. *Nebraska*, 143 S. Ct. at 2365 *Nebraska v. Biden*, 636 F. Supp. 3d 991, 1002 (E.D. Mo.), *cert. granted before judgment,* 143 S. Ct. 477 (2022), and *rev'd and remanded,* 143 S. Ct. 2355 (2023). That is a very different posture than this case, where the Defendants have indicated they intend to raise a factual attack on Plaintiffs' standing, and the Court has repeatedly stated that it wants to resolve whether Plaintiffs' have an injury that can support standing before moving forward with the case.

Second, in *Nebraska* there was no question of a financial injury to MOHELA; the central issue was the legal question of whether Missouri had a sufficient connection to MOHELA, a state-

created corporation, such that MOHELA's financial injury could support state standing. Here, Defendants dispute that there is a financial injury to the state agencies at all, and that such injury is caused by the challenged programs. Defendants are making a factual attack on Louisiana's standing, which did not occur in *Nebraska*. *Nebraska* says nothing about a State's burden to respond to discovery requests addressing a plaintiff's allegations of harm, and it does not relieve Louisiana of its burden to show an actual injury traceable to the IFR. Defendants do not dispute that, if there is an actual, traceable injury to Louisiana's state agencies that are part of this case that this could be sufficient to show standing. Defendants dispute that there is any actual, injury to state agencies traceable to the IFR at all. As discussed during the last status conference, the Asylum IFR has barely been applied in Louisiana, and the Asylum IFR does not change the asylum standard, so there is a good basis to doubt that the IFR has had an impact on Louisiana, or that Louisiana can show any harm resulting from the IFR. Transcript from May 24, 2023 conference at 8:1-10.

Nor do any of the other cases Plaintiffs cite support their position either. *Molina Healthcare* and *Louisiana Highway Commission* both deal with disputes directly between a state agency or corporation and the opposing party. In *Molina Healthcare*, the defendant was a company contracted to run computer systems for the Department of Health, and when there was a dispute, the Department of Health delegated the litigation to the Attorney General's Office. *State ex rel. Caldwell v. Molina Healthcare, Inc.*, 283 So. 3d 472 (La. 2019). Likewise in *Louisiana Highway Commission*, a case from 1935, a citizen brought a lawsuit against the Louisiana Highway Commission, a corporation created by the state, similar to MOHELA. *Louisiana Highway Comm'n v. Farnsworth*, 74 F.2d 910 (5th Cir. 1935). Neither case dealt with the issue in dispute here

25

regarding the Attorney General's obligation to participate in discovery when alleging injuries to state agencies to establish standing.[8]

*Cates*, cited by Plaintiffs, actually supports *Defendants'* position that Defendants should be able to obtain 30(b)(6) depositions from state agencies, even if they are "non-parties," as Plaintiffs claim. *Cates* was a lawsuit brought by a widow and son of a Navy pilot, killed in the Okinawa plane crash, brought against three private companies which manufactured the plane and its parts. *Cates v. LTV Aerospace Corp.*, 480 F.2d 620, 621 (5th Cir. 1973). The Navy—the government agency at issue in the case—was not a party. *Id.* Plaintiffs attempted to obtain documents from the Navy under a Rule 30(b)(6) notice "to which was attached a list of documents to be produced" at the deposition. *Id.* The Navy refused to designate a deponent or produce the documents, and argued that plaintiffs could not obtain documents through a Rule 30(b)(6) notice. *Id.* at 621-22. The district court, and the Fifth Circuit, both held that the Navy improperly refused to designate a 30(b)(6) deponent despite its role as a non-party. *Id.* at 624. ("The district court ordered production of the documents and that a person be designated to testify should it become necessary. Rule 30(b)(6) required the designation and this part of the order of the court was correct.").

So even assuming Louisiana's position that the state agencies are non-parties, Defendants are still entitled to seek their 30(b)(6) deposition under Fifth Circuit law. When Defendants served deposition notices on Louisiana, Defendants asked what Plaintiffs' preference was regarding format and service of the deposition notices, and Plaintiffs maintained that the depositions of the state agencies could not be noticed at all since they were non-parties. ECF 191-3 ("LDOE, LDH,

---

[8] Plaintiffs also cite *Hudson*, which deals with a District Attorney's Office ability to be sued in federal court. *Hudson v. City of New Orleans*, 174 F.3d 677 (5th Cir. 1999). The inapplicability of that scenario to the issues currently before the Court hardly needs to be explained.

LDCFS, and LDPSC are distinct agencies, are not parties to this case, and are not represented by the Louisiana Department of Justice in connection with this matter. Accordingly, their depositions cannot be noticed."). As Defendants have maintained throughout this case, that is incorrect. Whether Louisiana would prefer to facilitate the depositions, or whether Defendants serve their notices directly to the agencies, the end result is the same: the state agencies must put forward deponents who will speak on behalf of those agencies, and thus will testify regarding the documents the agency produced during discovery and knowledge known to the agency—rather than knowledge know to the AG's Office—if the State wants to rely on those agencies to assert standing.

Louisiana produced documents it claims show injury to state agencies and argue that should be enough for the parties to move to motion practice. Defendants believe that they should have an opportunity to question agency officials about the produced documents, and that questioning will reveal that these documents do not show an injury that can be traced to the IFR, and in many cases do not actually track information relevant to the allegations of harm at all.

## II.    Scope of Depositions

In any case, Defendants are entitled to question Plaintiffs. When a plaintiff puts forward documents purportedly showing their alleged injury, the defendant is entitled to question the plaintiff on those documents and have the plaintiff explain, under oath, what they believe the documents show, confront the plaintiff with other documents or information, determine how the information in the documents is obtained (which impacts its reliability), and generally probe the plaintiff's alleged injuries and remedies sought. This case is no different. "It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *see*

*also Campos v. Webb Cnty. Tex.*, 288 F.R.D. 134, 138 (S.D. Tex. 2012) (collecting cases and holding there is a "higher burden imposed on a party who is seeking a protective order, as opposed to a witness seeking one, [which] stems from the non-movant's legitimate interest in trial preparation and the discernable importance of the witness whose deposition is at issue."). Louisiana produced numerous documents it claims shows an injury to its state agencies. Defendants disagree, and also disagree that the documents show the required traceability to the challenged IFR, so they issued deposition notices to the state agencies.

Although Plaintiffs repeatedly complain about the "94 deposition topics" this figure is misleading and does not represent the number of topics served on each agency, which Plaintiffs eventually concede in their portion, *supra*. Because of prior difficulties obtaining discovery from the Louisiana agencies identified in the complaint, Defendants served notices directed to each individual agency. ECF No. 186-4. Those notices include around 16 topics per agency, and some of the topics overlap in different notices to get similar information from different agencies. *Id.* As noted above, Defendants have also withdrawn all topics served on the Department of Public Safety and Corrections, and also State Topics 15 and 17-21. Plaintiffs maintain that this is still "facially excessive, overbroad, and unduly burdensome." Yet Defendants did not serve 72 deposition topics on one deponent. Defendants served approximately 16 topics on each agency that is alleging harm. ECF 191-2. Plaintiffs cite *Alvarado-Herrera* and *HVI Cat Canyon* in support of their argument, but in both of those cases the courts found the requests were unreasonable and burdensome because they included 60+ deposition topics, some with multiple subparts, served on a single corporate entity. *Alvarado-Herrera v. Acuity*, 344 F.R.D. 103, 108 (D. Nev. 2023); *United States v. HVI Cat Canyon, Inc.*, No. CV 11-5097 FMO (SSX), 2016 WL 11683593, at *1 (C.D. Cal. Oct. 26, 2016). But such is not the case here, where less than 20 topics are at issue for each state agency.

Defendants served each of their topics in good faith and in order to obtain relevant information. The deposition topics may overlap with documents produced by the agencies, because as discussed below, Defendants are entitled to question witnesses about the content of those documents. In any event, once the scope of discovery is clarified, Defendants are of course willing to confer with Plaintiffs as necessary to resolve any issues with the remaining topics.[9] But as Defendants have repeatedly explained to Plaintiffs, such a meet and confer would be a waste of the parties' time if they cannot even agree on whether the deponents will speak on behalf of their agencies or not.

Plaintiffs have now offered deponents from the state agencies, claiming the agencies are "cooperating," but Plaintiffs confirmed during the meet and confer that the witnesses will only speak on behalf of the Attorney General's Office and not the knowledge known to the agencies, and will otherwise only authenticate the documents produced. First, it is not clear what Louisiana means by "cooperation" and what impact that will have on the testimony given by these witnesses. Claiming the agencies are "cooperating" for the purposes of depositions is not the same as agreeing to put forward agency witnesses. Such a position seems to ensure that the testimony provided by the witnesses will be wholly self-serving to Plaintiffs, rather than the unbiased 30(b)(6) testimony to which Defendants are entitled. Such a difference in opinion on the basic scope of the depositions is why Defendants have not engaged in topic-by-topic conferral with Louisiana. Defendants served

---

[9] Defendants do object to a meet and confer on deposition topics for which Louisiana already agreed to produce a witness, as Louisiana demanded during the parties' meet and confer. For example, Louisiana demanded that Defendants justify State Topic 1 and detail what steps Defendants had taken to obtain the information from non-parties before "burdening" Louisiana with this deposition topic, despite the fact that Louisiana already agreed to produce a witness for this topic. ECF No. 191-2 at 4. Defendants will not waste the parties' time negotiating topics over which there is no dispute. Defendants also note that the "least costly" source for the basic standing information this topic seeks is not a non-party government agency—it is the *Plaintiff* who brought this case and has the burden to establish standing, not Defendants.

topics assuming the witnesses would testify on behalf of the agencies; Plaintiffs objected assuming the witnesses would testify only on behalf of the Attorney General's Office. Until that core dispute is resolved, conferral on which topics are relevant cannot happen. Once the Court issues its ruling, and Louisiana agrees to follow it, Defendants will meet and confer on, and revise as necessary, the deposition topics they served. Defendants informed Louisiana of same during the parties' meet and confer on October 30.

Defendants are permitted to better understand and challenge the information contained in the documents from the agencies themselves. For example, Louisiana may use different categorizations or definitions for noncitizens who seek public services such as Medicaid or SNAP/TANF benefits. The documents produced, on their face, do not provide the necessary context and background knowledge for Defendants to understand what definitions and statuses Louisiana is using or tracking, versus what its co-lead Plaintiff Florida uses. Louisiana also claims that "the Asylum IFR will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services." ECF No. 86 at 24. None of the documents produced, however, clearly explain what those specific "services" are, what they cost, or how those costs may have changed as a result of the IFR, which are all necessary elements of traceability. Instead, Plaintiffs produced thousands of pages of agency handbooks, large spreadsheets, or documents that do not, on their face, make clear their relevance or why Plaintiffs believe they show injury. Depositions are needed to probe and better understand these documents. The deposition topics Defendants served go to these central questions.

Defendants took depositions of co-Plaintiff Florida's state agencies last year in *Florida v. United States, et al.*, 3:21-cv-1006 (N.D. Fla) and are currently working with Florida on stipulations to incorporate that testimony into this case to alleviate much of the need for depositions

of Florida agencies. Notably, the topics served on Louisiana mirror those topics, for which Florida,

co-lead Plaintiff here, had very little objections. In that previous lawsuit, also challenging a federal

immigration policy, the State of Florida determined the necessary witnesses and their availability,

the parties blocked those dates out on the calendars immediately, and then the parties engaged in

some negotiation about the wording and scope of the topics. An agreement was reached and the

depositions were taken. Defendants seek nothing different here.

## III.    Plaintiffs' Experts

The parties exchanged their expert reports on September 25, 2023, pursuant to the schedule

set by the Court. Ex. D. Plaintiffs identified Andrew Arthur as a retained expert, and attached an

expert report from Mr. Arthur; and Rodney Scott as an unretained expert, and did not provide a

report for Mr. Scott. *Id*.; Ex. E. On October 6, 2023, Defendants emailed Plaintiffs advising that

they intended to notice the deposition of both experts, and asking for some potential dates to take

the depositions and the location of each expert so Defendants could determine if the depositions

should be done in person or virtually. Ex. F. Plaintiffs did not respond to these requests until 11pm

on Thursday, October 12. ECF No. 186-4. In that response, Plaintiffs advised that Mr. Scott was a

"non-party" but as a "courtesy" counsel reached out[10], and Mr. Scott was only available on October

23, five business days from Plaintiffs' email and only two days before discovery closed. *Id*. In the

evening of Friday, October 13, Plaintiffs advised that Mr. Arthur was available on October 24 or

---

[10] Plaintiffs identified Mr. Scott as an "expert not retained" pursuant to Rule 26(a)(2)(C), and therefore did not provide an expert report. Ex. E. However, when Defendants sought Mr. Scott's availability, Plaintiffs referred to Mr. Scott as a "non-party" who they reached out to as a "courtesy", implying that Plaintiffs have no obligation to communicate or coordinate with Mr. Scott. Yet no contact information was provided to Defendants for Mr. Scott, as would typically be expected if Mr. Scott was a true non-party witness. If Plaintiffs can clarify the information they intend to use from Mr. Scott and his role in this litigation, that may impact whether Defendants need to take Mr. Scott's deposition or not.

25. *Id.* No location was provided for either witness. *Id.* Defendants informed Plaintiffs on Monday, October 16 that defense counsel were not available to take depositions on those dates. *Id.* By the time Plaintiffs provided those dates, Defendants' calendars had already been taken by other commitments that could not be moved. *Id.*[11] This was the precise reason Defendants had been trying to discuss potential deposition dates with Plaintiffs back in August, in order to work out a reasonable schedule that accommodated the other obligations of the witnesses and attorneys on both sides.

It is Plaintiffs' position that they "made their witnesses available" for depositions during the discovery period, Defendants declined to take those depositions, and therefore Defendants should be precluded from deposing Plaintiffs' experts. Defendants disagree that Plaintiffs truly made their witnesses available to be deposed. Providing only one date for Mr. Scott, and two dates for Mr. Arthur, all to take place in the last three days of discovery, with only five business days' notice is not sufficient. Even if defense counsel had been available on the dates Plaintiffs provided—which they were not—Defendants would still require time to not only prepare to take the depositions themselves, but make arrangements for a court reporter and, in the event of a virtual deposition as Plaintiffs requested, set up the video conference, ensure the witness, the court reporter and all counsel have locations to attend the deposition with the proper technology, and then ensure the witnesses and counsel have all possible documents that could be referenced during the deposition. This is on top of the extra complexity of deposing an expert in general, and the complications posed in this case by the fact that Plaintiffs did not provide an expert report for Mr.

---

[11] Defendants have also asked that Plaintiffs obtain the full availability for their experts for the months of November and December so the dates could be put on the calendar as soon as possible following the Court conference. ECF No. 186-4. Defendants have not heard back from Plaintiffs on this request.

Scott, and instead just referred Defendants to 8 hours of previous statements and Congressional testimony Mr. Scott has given as the basis for his expertise. Ex. E. Doing that, and then demanding that the deposition take place with only five business days' notice on the last few days of the discovery period smacks of gamesmanship and the Court should not allow it stand.

Plaintiffs did not meaningfully make their witnesses available during discovery, ignored Defendants' emails seeking availability until the eve of discovery closing, and refused to join a request for a reasonable extension to discovery when reasonable, mutually agreeable dates were not available during the remaining week of the discovery period. There is no good faith basis to preclude Defendants from taking their depositions.

## IV.   Defendants' Expert

As noted *infra*, Defendants identified Professor Michael Clemens and provided Plaintiffs with his expert report on September 25. Plaintiffs never expressed any intention to depose Prof. Clemens following that disclosure. Then, only after Defendants informed Plaintiffs that we had concerns with Louisiana's position regarding agency depositions and thought Court intervention may be needed, did Plaintiffs ask for Prof. Clemens' availability. ECF No. 186-4. Plaintiffs sent this email, mentioning Prof. Clemens' deposition for the first time, at 11 pm EST on Thursday, October 12, and demanded that Prof. Clemens' availability be provided by Monday, October 16. *Id.* Defendants informed Plaintiffs that we would obtain Prof. Clemens' availability for the full months of November and December, but could not produce him for a deposition with such little notice and so close to the end of discovery. ECF No. 186-4. Plaintiffs then advised that they would seek to preclude Defendants from using Prof. Clemens as a witness in this case. ECF No. 186-4.

First, it is patently unreasonable for Plaintiffs to seek the deposition of Defendants' expert, *for the first time*, less than two weeks before the close of discovery, and then demand he sit for a

deposition within a week, at the same time Defendants were trying to schedule depositions they had been asking Plaintiffs to help schedule for months. By email at 10:48 P.M. on Monday, October 16, Plaintiffs suggested the following dates for Prof. Clemens' deposition: Thursday October 19, Friday October 20, Saturday October 21, or either Tuesday October 24 or Wednesday October 25, "whichever day Mr. Arthur is not being deposed." ECF No. 186-4. This is not reasonable notice for a deposition, especially one as extensive and detailed as that of an expert. "Although Rule 45 does not specify what amount of time is 'reasonable,' courts have ruled that a week or less is not sufficient notice pursuant to the rules." *Gulf Prod. Co. v. Hoover Oilfield Supply, Inc.*, No. CIV.A. 08-5016, 2011 WL 891027, at *3 (E.D. La. Mar. 11, 2011), *citing Memorial Hospice, Inc. v. Norris,* 2008 WL 4844758 (N.D.Miss. Nov. 5, 2008) (finding that three days' notice of deposition was clearly unreasonable).

Second, while Plaintiffs claim it unreasonable that Defendants would refuse to provide Prof. Clemens for a deposition without even checking on his schedule first, counsel had to remind Plaintiffs during the parties' meet and confer that Prof. Clemens could not be deposed without counsel and defense counsel was not available on such short notice. Defendants have been asking for witness availability for months to prevent this exact situation, and to ensure as little burden on the witnesses' and counsels' calendars. Many of Defendants' communications to Plaintiffs have been ignored or the responses have been delayed until the last minute. Plaintiffs should not be permitted to fail to notice a deposition of Defendants' expert until the last minute, demand he be produced for a deposition within a few days, and when they do not get their way, preclude the witness from this case entirely.

Defendants have the full availability for Prof. Clemens for the months of November and December, which they offered to discuss with Plaintiffs during the meet and confer if they would

similarly provide schedules for Plaintiffs' experts. Plaintiffs merely reiterated their position that

Defendants' expert should be precluded. But Defendants remain willing to compare schedules with

Plaintiffs and put the depositions on the calendar, just as they have for the last two months.

Date:  November 3, 2023

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

BRIAN C. WARD
*Senior Litigation Counsel*

ELISSA P. FUDIM
*Trial Attorney*

*/s/ Erin T. Ryan*
ERIN T. RYAN
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 532-5802
Erin.t.ryan@usdoj.gov

*Counsel for Defendants*

**JEFF LANDRY**
 **ATTORNEY GENERAL OF LOUISIANA**

By: */s/ Joseph S. St. John*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General

JOSEPH S. ST. JOHN (La #36682)
  Deputy Solicitor General
JORDAN B. REDMON (La #37272)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 3, 2023 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

By: */s/ Erin T. Ryan*
ERIN T. RYAN
Trial Attorney
United States Department of Justice
Civil Division