# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

STATE OF ARIZONA *et al*

PLAINTIFFS,

v.

,

GARLAND *et al*,

DEFENDANTS.

CIVIL ACTION NO. 6:22-cv-1130-Z

**EXPERT REPORT OF
ANDREW "ART" ARTHUR**

## EDUCATION, EXPERIENCE, AND EXPERTISE

1.      I serve as a Resident Fellow in Law and Policy at the Center for Immigration Studies ("CIS"), an independent, non-partisan, non-profit research organization dedicated to providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about immigration into the United States.

2.      Prior to joining CIS in 2017, I served as Staff Director for the U.S. House Committee on Oversight and Government Reform, National Security Subcommittee from 2015-2016.

3.      I served as an Immigration Judge from 2006-2015. During that time, I held hearings and issued decisions in cases involving more than 15,000 aliens charged with removability from the United States; I issued orders in cases where aliens sought release on bond; and I adjudicated applications for immigration benefits.

4.      I served as counsel for the U.S. House of Representatives Judiciary Committee from 2001-2006. My responsibilities focused on immigration laws, immigration policies, and oversight.

5.      I served as an Associate General Counsel for the U.S. Department of Justice from 1999-2001. My responsibilities focused on immigration-related regulations, procedures, legislation, and inter-agency matters. I regularly advised then-Attorney General Janet Reno, speaking with her on a weekly and sometimes daily basis.

6.      I earned a Juris Doctor from the George Washington University Law School in 1992, and a Bachelor of Arts in History from the University of Virginia in 1988.

1

7.     I provide this report in support of Plaintiff States. This report is based on my personal knowledge, my review of cited materials, and my decades of experience in immigration.

8.     A true and accurate copy of my resume is attached as Exhibit A.

9.     I have not given trial or deposition testimony in the past four years.

10.     Within the previous ten years, I have authored the following formal publications: "President Trump's Travel Orders and National Security", Migration und Solidarität/Migration and Solidarity, Soziale Orientierung, Band 28 (2020); and "The Oversized Role of Title 42 in U.S. Southwest Border Security", LIMEN, Journal of the Hungarian Migration Institute, Vol. 5 (2022/1).   I also routinely make blog posts on immigration issues. Those posts are available at https://cis.org/Arthur?type=All

11.     I submitted a comment letter on the Asylum IFR, a copy of which is attached hereto as Exhibit B.[1]

12.     I am being compensated for analysis and testimony in this case for a flat fee of $2,000, plus expenses.

13.     I am recognized as an expert in the area of immigration, generally, and immigration policy, specifically. To that end, I have testified before Congress on 11 different occasions on immigration issues, and I have been quoted on immigration issues by national media such as *The New York Times, Wall Street Journal, Washington Post, Los Angeles Times,* and *National Review*.

## BACKGROUND

### THE IMMIGRATION AND NATIONALITY ACT

14.     The Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163 (1952), as amended ("INA"), generally provides for the removal of non-U.S. citizens or nationals ("aliens," under the INA) without valid entry documents, unless they qualify for asylum or other humanitarian protections. The INA grants the Attorney General and Secretary of Homeland Security authority to grant asylum under specific conditions.

### GENERAL PROCESS FOR ASYLUM

15.     Subject to certain exceptions,

---

[1] https://cis.org/sites/default/files/2021-10/JNPRM_Asylum_Procedures_FINAL_submitted_10-18-2021.pdf

2

ARTHUR REPORT

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. 1225(b)].

INA Section 208, 8 U.S.C. 1158(a)(1).

> The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of [8 U.S.C. 1101(a)(42)(A)].

*Id.* at 1158(b)(1)(A).

16.     The statute provides that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications filed under [8 U.S.C. 1158(a)]." 8 U.S.C. 1158(d)(1). The statute also sets forth limitations on that procedure, however, including that it includes an "initial interview or hearing on the asylum application." 8 U.S.C. 1158(d)(5).

17.     Put succinctly, generally, any foreign national physically present in the United States or arriving at any Port of Entry may seek asylum, regardless of immigration status. Except for unaccompanied alien children, those seeking asylum must apply within 1 year from the date of last arrival or establish that an exception applies based on changed or extraordinary circumstances. Prior to the IFR, principal applicants obtained asylum in one of two ways: affirmatively through a USCIS asylum officer or defensively in removal proceedings before an immigration judge of DOJ's Executive Office for Immigration Review ("EOIR"). An individual applied for asylum by filing Form I-589, *Application for Asylum and for Withholding of Removal*.[2]

18.     The INA also provides for so-called derivative applications for immediate relatives of the primary asylum applicant, *i.e.*, "[a] spouse or child … of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section be granted the same status as the alien …." 8 U.S.C. 1158(b)(3).

---

[2] LADOJ-ASYLUM029 at 041 (https://www.dhs.gov/sites/default/files/2022-03/22_0308_plcy_refugees_and_asylees_fy2020_1.pdf)

3

ARTHUR REPORT

PROCESS FOR ASYLUM IN CONNECTION WITH EXPEDITED REMOVAL

19.     In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. 104-208, 110 Stat. 3009-546 ("IIRIRA").

20.     The House of Representatives Committee on the Judiciary explained that, although immigration can have benefits:

> [I]mmigration has costs as well, many related to the fact that such a preponderance of immigrants (close to 9 million since 1980) are admitted without reference to their level of education or skills. The current cohort of immigrants is far more likely to have less than a high-school education than native-born Americans. This can have the effect of flooding the labor market for unskilled work, as well as creating pockets of impoverished immigrants who will be less likely to assimilate into the broader American society. The rise of immigrant-based organized crime groups suggests that screening of potential immigrants is not as rigorous as it ought to be. These negative impacts are most keenly felt in the handful of States in which a vast majority of immigrants choose to live …. Legal immigration policy must strike a proper balance so that these problems do not overwhelm the opportunities that immigration brings to the nation, and result in job loss and displacement for American workers.
>
> There also are legitimate concerns that the Government's and society's capacity for admitting, assimilating, and naturalizing immigrants have been strained by current levels of legal immigration. Again, these problems are heightened in high-immigration States. Our education system, for example, is burdened by the needs of immigrants who either are not proficient in English or illiterate in their own language or both. In Los Angeles county, education is provided in over 70 languages at a larger ''per student'' cost to the taxpayer.

H.R. 104-469 Pt. 1 (1996) at 133.

21.     Among the concerns underlying IIRIRA was abuse of the asylum process, the corresponding need to ensure removal of aliens denied asylum, misuse of the parole authority by the Attorney General to admit entire categories of aliens who do not qualify for admission, and the burden aliens may impose on public assistance programs. Congress viewed the parole authority as "intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy." Congress accordingly criticized the practice of "admit[ting] entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States" as "contraven[ing] the intent of section 212(d)(5)." Indeed, Congress identified one example of that practice as an "abuse of the parole authority." *See* H.R. 104-469 Pt. 1 (1996) at 139-140, 143-144.

22.     IIRIRA accordingly amended INA Section 235, 8 U.S.C. 1225, to provide for

4

ARTHUR REPORT

inspection and expedited removal of certain categories of aliens.

23.     As amended, the INA now provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States … shall be deemed … an applicant for admission." 8 U.S.C. 1225(a)(1). "All aliens … who are applicants for admission or otherwise seeking admission or readmission to … the United States shall be inspected by immigration officers." 8 U.S.C. 1225(a)(3). "If an immigration officer determines that an alien … who is arriving in the United States … is inadmissible under section 1182(a)(6)(C) [for misrepresentation in the visa or admission process] or section 1182(a)(7) [for not possessing proper documents required for admission] of [8 U.S.C], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." 8 U.S.C. 1158(b)(1). On the other hand, "[i]f an immigration officer determines that an alien … who is arriving in the United States … is inadmissible [for, e.g., lack of a valid visa] and the alien indicates either an intention to apply for asylum under [8 U.S.C 1158] or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer …." *Id*.

24.     "An asylum officer shall conduct interviews of aliens" who indicate either an intention to apply for asylum under 8 U.S.C. 1158 or a fear of persecution. 8 U.S.C. 1225(b)(1)(B)(i). "If the officer determines at the time of the interview that an alien has a credible fear of persecution … the alien shall be detained for further consideration of the application for asylum." 8 U.S.C. 1225(b)(1)(B)(ii).

25.     The accompanying committee report explained:

   The purpose of these provisions is to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers with full professional training in adjudicating asylum claims.

   An alien who states a fear of persecution or an intention to apply for asylum shall be referred for interview by an asylum officer, who is an immigration officer who has had professional training in asylum law, country conditions, and interview techniques comparable to that provided to full-time adjudicators of asylum applications. The officer shall be, for purposes of determinations made under this section, under the supervision of an immigration officer with similar training and substantial experience in adjudicating asylum applications. **If the officer finds that**

5

**the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum under normal non-expedited removal proceedings.** If the alien does not meet this standard and, if the alien requests administrative review, the officer's decision is upheld by an immigration judge, the alien will be ordered removed.

Conference Report, H.R. 104-828 (1996).

26.     Consistent with the committee report, prior to the Asylum IFR, aliens "who receive[d] a positive credible fear determination [by a USCIS asylum officer were] referred to an immigration court for section 240 removal proceedings, during which they have the opportunity to apply for asylum and other forms of relief or protection from removal." 87 Fed. Reg. at 18089.

27.     INA Section 240, 8 U.S.C. 1229a, provides that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. 1229a(a). "Unless otherwise specified in [8 U.S.C. Ch. 12], a proceeding under [8 U.S.C. 1229a] shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. 1229a(a).

**STATUTORY WITHHOLDING OF REMOVAL / CONVENTION AGAINST TORTURE**

28.     There are two significant exceptions to Congress's removal command.

29.     *First*, subject to certain exceptions, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. 1231(b)(3). This exception is generally known as "statutory withholding of removal."

30.     *Second*, the United States signed the United Nations Convention Against Torture ("CAT") in 1988, and ratified the Convention in 1994, subject to certain declarations, reservations, and understandings, including a declaration that CAT Articles 1 through 16 were not self-executing, and therefore required domestic implementing legislation.[3] The CAT was implemented by Section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998. Pub. L. 105-277, 112 STAT. 2681. That section provides, *inter alia*, that

---

[3] https://www.everycrsreport.com/reports/RL32276.html#fn24

6

ARTHUR REPORT

It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

*Id.* at 2681–822 (codified at 8 U.S.C. 1231 note). The statute authorized implementing regulations, and further provided that:

To the maximum extent consistent with the obligations of the United States under the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, the [implementing] regulations … shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)(B)).

*Id.*

## PAROLE

31.    In 1996 Congress "specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" precisely because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011).

32.    As summarized by the Supreme Court:

As relevant here, applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. See § 1225(b)(1)(A)(i) (citing §§ 1182(a)(6)(C), (a)(7)). Section 1225(b)(1) also applies to certain other aliens designated by the Attorney General in his discretion. See § 1225(b)(1)(A)(iii). Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here). See §§ 1225(b)(2)(A), (B).

Both § 1225(b)(1) and § 1225(b)(2) authorize the detention of certain aliens. Aliens covered by § 1225(b)(1) are normally ordered removed "without further hearing or review" pursuant to an expedited removal process.§ 1225(b)(1)(A)(i). But if a § 1225(b)(1) alien "indicates either an intention to apply for asylum ... or a fear of persecution," then that alien is referred for an asylum interview. § 1225(b)(1)(A)(ii). If an immigration officer determines after that interview that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii). Aliens who are instead covered by § 1225(b)(2) are detained pursuant to a different process. Those aliens "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the country.§ 1225(b)(2)(A).

7

1  *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).

2      33.    Parole is permissible only in limited circumstances:

3      The Attorney General may, except as provided in subparagraph (B) or in **section 1184(f)** of [8 U.S.C.], in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled ….

8 U.S.C. 1182(d)(5).

34.    "Most asylum claims … ultimately fail, and some are fraudulent." *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1963 (2020). In enacting IIRIRA, Congress "crafted a system for weeding out patently meritless claims and expeditiously removing the aliens making such claims from the country." *Id.* "It was Congress's judgment that detaining all asylum seekers until the full-blown removal process is completed would place an unacceptable burden on our immigration system and that releasing them would present an undue risk that they would fail to appear for removal proceedings." *Id.*

35.    In short, if an alien lacks a visa and valid passport, the alien should be taken into custody and removed unless the alien requests asylum.[4] Even then, the alien should be detained unless parole is determined to be appropriate on a case-by-case basis.

36.    Notwithstanding its various detention mandates, "[s]ince it began operations in 2003, DHS has never apprehended and removed all removable aliens." *Texas v. United States*, 606 F. Supp. 3d 437, 452 (S.D. Tex. 2022). Historically, however, DHS has re-programmed resources to increase detention capacity when necessary to do so, *i.e.*, its detention capacity is "elastic." *Id.* at 453. But during the Biden Administration, DHS has "persistently underutilized its existing resources" and further sought "a dramatic reduction in detention bed capacity" despite surging numbers of migrants. *Id.* I note that at the same time it was seeking to reduce resources necessary to comply with its statutory mandates, DHS spent funds sponsoring professional rodeos and making grants for "boating safety."[5]

---

[4] *See also* LADOJ-ASYLUM116 at 136, 138 (Ortiz Dep. 81:10-22,  87:7-89:13).
[5] LADOJ-ASYLUM5839; LADOJ-ASYLUM5820 at 5833; LADOJ-ASYLUM5847

8

ARTHUR REPORT

**TRANSFER OF SPECIFIC FUNCTIONS TO THE DEPARTMENT OF HOMELAND SECURITY**

37.     The Homeland Security Act of 2002 ("HSA"), Pub. L. 107-296, 116 Stat. 2135, established the Department of Homeland Security ("DHS") as an executive department of the United States. *See* 6 U.S.C. 111. The HSA established the Bureau of Citizenship and Immigration Services ("USCIS") within DHS. *See* 6 U.S.C. 271. I was a primary drafter of the HSA while serving as a Congressional staff member.

38.     Section 451(b) of the HSA enumerated specific functions that were transferred from INS to USCIS:

> [T]here are transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services the following functions, and all personnel, infrastructure, and funding provided to the Commissioner in support of such functions immediately before the effective date specified in section 455:
> (1) Adjudications of immigrant visa petitions.
> (2) Adjudications of naturalization petitions.
> (3) Adjudications of asylum and refugee applications.
> (4) Adjudications performed at service centers.
> (5) All other adjudications performed by the Immigration and Naturalization Service immediately before the effective date specified in section 455.

6 U.S.C. 271(b).

39.     As relevant here, HSA Section 451(b) authorized USCIS to hear asylum claims (not claims for statutory withholding or CAT protection), but only those asylum claims INS was adjudicating immediately before the effective date of the HSA, *i.e.*, affirmative asylum claims by aliens who were not in expedited removal proceedings.

40.     HSA Section 1101(a) affirmatively recognized the existence of the Executive Office for Immigration Review ("EOIR"), and HSA Section 1102 contemplated shifting EOIR's authorities and functions to the Attorney General on a contingent date that never occurred.

41.     On the effective date of the HSA, EOIR Immigration Judges—not INS Asylum Officers—adjudicated applications for asylum, statutory withholding of removal, and CAT relief by aliens who had been subject to expedited removal proceedings under section 235(b)(1).[6]

---

[6] *See, e.g.*, Asylum Procedures, 65 Fed. Reg. 76,121, 76,130-131 (codified at 8 C.F.R. 208.2), 76,136 (codified at 8 C.F.R. 208.30); Testimony of Joseph Edlow at 52:35 – 53:50 (https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security).

9

ARTHUR REPORT

42.     In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Congress created a narrow exception enabling AOs to adjudicate asylum applications filed by unaccompanied alien children (UACs). 8 U.S.C. § 1225(b)(3)(C). I believe Congress specifically gave jurisdiction over asylum applications filed by UACs to AOs because Congress recognized that those AOs otherwise lacked the power to adjudicate such asylum applications filed by UACs.

### THE IMPACT OF BIDEN ADIMINISTRATION POLICIES ON MIGRATION

#### BIDEN ADMINISTRATION POLICIES

43.     President Biden took office on January 20, 2021. That same day, he issued multiple executive orders related to immigration and border policy, with yet more following in the subsequent month.[7]

44.     On February 2, 2021, Alejandro Mayorkas was sworn in as Secretary of the Department of Homeland Security.

45.     That same day, President Biden issued an Executive Order providing, *inter alia*:

> Nor is the United States safer when resources that should be invested in policies targeting actual threats, such as drug cartels and human traffickers, are squandered on efforts to stymie legitimate asylum seekers.
> * * * * *
> [T]he United States will enhance lawful pathways for migration to this country and will restore and strengthen our own asylum system, which has been badly damaged by policies enacted over the last 4 years that contravened our values and caused needless human suffering.
> * * * * *
> The Secretary of State and the Secretary of Homeland Security shall promptly review mechanisms for better identifying and processing individuals from the Northern Triangle [of Central America, *i.e.*, El Salvador, Guatemala, and Honduras] who are eligible for refugee resettlement to the United States.

EO 14010 (Feb. 2, 2021). That Executive Order further directed federal officials to, *inter alia*, "consider taking all appropriate actions to reverse the 2017 decision rescinding the Central American Minors (CAM) parole policy and terminating the CAM Parole Program, see "Termination of the Central American Minors Parole Program," 82 Fed. Reg. 38,926 (August 16, 2017), and consider initiating appropriate actions to reinstitute and improve upon the

---

[7] https://cmsny.org/biden-immigration-executive-actions/
https://cis.org/Report/Bidens-Executive-Actions-President-Unilaterally-Changes-Immigration-Policy

ARTHUR REPORT

CAM Parole Program;" "promptly begin taking steps to reinstate the safe and orderly reception and processing of arriving asylum seekers, consistent with public health and safety and capacity constraints," *i.e.*, halt Title 42; "review and determine whether to terminate or modify the program known as the Migrant Protection Protocols (MPP)," and "promptly review and consider whether to modify, revoke, or rescind the designation titled "Designating Aliens for Expedited Removal," 84 Fed. Reg. 35,409 (July 23, 2019)." These actions were generally understood to reduce control of the border and ease restrictions on migration.

46.    In June 14, 2023, testimony before the House Committee, Rodney Scott, who served as U.S. Border Patrol Chief from January 24, 2020 to August 14, 2021, testified that he and his staff "engaged and advised the Biden transition teams well before inauguration," but "the Administration's laser focus on expediting processing and increasing opportunities for migrants to enter the U.S. never waivered." Chief Scott elaborated that "[a]dvice from career professionals was ignored," and "policies were implemented that resulted in thousands of aliens being released into the U.S." As a result, "illegal immigration intensified, overwhelmed Border Patrol, and effectively transferred control of our southwest border directly to the Mexican drug cartels."[8]

47.    Chief Scott continued:

> When I worked for [Trump Administration DHS Acting] Secretary Wolf, we had team meetings, we were asked for our input. We were told [sic] over your career, what works and what doesn't work. On January 20, 2021, that all got shut off. DHS, the Secretary even went to the step of shutting down the integrated teams of career professionals that were brought into DHS ops to provide guidance. Our input was no longer solicited, and when my team and I gave it unsolicited, we were basically put in a box. They did not want to know what we had to say. They made it very clear: expedite processing and find new ways to let migrants into the U.S. That was the only agenda.
>
> * * * * *
>
> I personally participated in numerous conference calls. [Secretary Mayorkas] insulated himself a lot, but he had representatives on those calls, and occasionally he was in those calls himself. And, yes, it was very clear. But the Administration made it very clear deterrence was no longer our mission, and we weren't even allowed to talk about it. The minute you talked about trying to slow down the flow, or putting any kind of a deterrent mechanism in place, we were immediately stymied.[9]

---

[8] https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security%20(at%201:34:10%20-%201:35:01,%201:46:55%20-%201:47:40) (at 41:00 – 41:40)

[9] https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security (at 1:34:10 - 1:35:01, 1:46:55 - 1:47:40)

ARTHUR REPORT

48.     With respect to immigration and border-related policies and regulations, the Border Patrol Chief and his staff were generally not consulted by the Biden Administration. Rather, political appointees crafted the policies and regulations without input from the Border Patrol, then merely informed the Border Patrol when the time came to implement those policies and regulations.[10] That failure to consult the Border Patrol is shocking given the importance of involving field information in developing immigration and border-related policy.[11]

49.     The resulting Biden Administration policies — including the Asylum IFR — are perceived around the world as an announcement that the U.S. borders are now open.

**MIGRANT FLOWS ARE RESPONSIVE TO POLICY**

50.     Migrant flows are responsive to policy in generally predictable ways. That follows from the basic economic premise that demand increases when the cost or burden of something — here, the likelihood of detention or removal — is reduced, or the likely gain — here, release into the interior of the United States, with employment authorization following in short order — is increased.[12] Moreover, the response can be rapid based on media or social media reports received by potential migrants.[13]

51.     The linkage between migrant flow and policy is so clear that then-Border Patrol Chief Raul Ortiz testified that in modelling migrant flows, "[t]here is an assumption if migrant populations are told that there's a potential that they may be released, that yes, you can see increases" with more migrants coming to the border, *i.e.*, migrant flow "will increase."[14] Similarly, then-CBP Commissioner Chris Magnus told the *New York Times* that Texas's program to bus migrants to left-leaning cites was "a pull factor" and noted that it is enticing "when migrants hear that there are buses that will take them to locations where they are told they will receive benefits and jobs."[15] On the other side of the equation, former Border Patrol Chief Rodney Scott has testified

---

[10] Personal Communication with Rodney Scott
[11] *See, e.g.*, LADOJ-ASYLUM116 at 122 (Ortiz Dep. at 23:6-19).
[12] *See, e.g.*, LADOJ-ASYLUM116 at 159 (Ortiz Dep. at 92:14-95:3); LADOJ-ASYLUM2345 at 2350 (DHS Working Paper); LADOJ-ASYLUM2482 at 2482 (USCBP Overview of the Southwest Border).
[13] *See, e.g.*, LADOJ-ASYLUM116 at 132-133, 139-140 (Ortiz Dep. 62:21-64:13, 67:11-68:5, 92:14-95:3); LADOJ-ASYLUM6156 at 6159, 161 (*L.A. Times*).
[14] LADOJ-ASYLUM116 at 159 (Ortiz Dep. 172:1-173:12).
[15] LADOJ-ASYLUM6156 at 6159 (*L.A. Times* quoting *N.Y. Times*).

ARTHUR REPORT

that "over years, we've found out that consequences slow down the flow of illegal immigration."[16]

52.     The linkage between migrant flow and policy is reflected in surveys of migrants detained by CBP who, when surveyed on why they were entering the United States, identified "economic opportunities" and "perceptions of favorable U.S. immigration policies" as primary push/pull factors driving migration. As relevant here, migrants also cited "education opportunities" and "desire for family reunification" among the primary push/pull factors driving migration.[17]

53.     The Migrant Protection Protocols ("MPP") are illustrative of the link. MPP was a U.S. Government action whereby citizens and nationals of countries other than Mexico arriving in the United States by land from Mexico could be returned to Mexico pursuant to Section 235(b)(2)(C) of the INA while their U.S. removal proceedings were pending. DHS documents produced in the *MPP* litigation noted that "MPP implementation contributes to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico (including those apprehended between the [Ports of Entry])."[18] Indeed, the Secretary of Homeland Security recognized that Migrant Protection Protocols "likely contributed to reduced migratory flows," and he causally linked that reduction to migrants being forced to remain in Mexico by the MPP.[19]

54.     Similarly, in a February 2023 Notice of Proposed Rulemaking, DHS and DOJ tied a migratory surge to litigation over Title 42 processing:

> [C]hallenges were evident in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in vacatur of the Title 42 public health Order effective December 21, 2022. Leading up to the expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted. According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. In the weeks between the November announcement that the Title 42 public health Order would be lifted and the December 19 stay order that kept the Title 42 public health Order in place, encounter rates jumped from an average of 7,700 per week (early November) to 8,600 per week (mid-December).

---

[16] https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security (at 1:46:00 - 1:46:38)
[17] LADOJ-ASYLUM2482 at 2482-83; *see also* LADOJ-ASYLUM116 at 130 (Ortiz Dep. at 54:1-57:3).
[18] LADOJ-ASYLUM2342 at 2343.
[19] LADOJ-ASYLUM025 at 026 (https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf)

13

ARTHUR REPORT

At the same time, DHS and DOJ tied decreased encounter numbers to policies that disincentivize migration:

> Early data indicate that the recently announced enforcement processes, as applied to Cuban, Haitian, and Nicaraguan nationals, which couple new parole processes with prompt returns of those who cross the SWB without utilizing these processes, are deterring irregular migration from those countries, thus yielding a decrease in encounter numbers.[20]

55.     Earlier this year, the Northern District of Florida summarized the situation and the underlying cause:

> There were undoubtedly geopolitical and other factors that contributed to the surge of aliens at the Southwest Border, but Defendants' position that the crisis at the border is not largely of their own making because of their more lenient detention policies is divorced from reality and belied by the evidence. Indeed, the more persuasive evidence establishes that Defendants effectively incentivized what they call "irregular migration" that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border who were not excluded under the Title 42 Order would not be detained and would instead be quickly released into the country where they would be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course—assuming, of course, that the aliens do not simply abscond before even being placed in removal proceedings, as many thousands have done.
>
> It is particularly noteworthy that USBP Chief Ortiz testified that the current surge differs from prior surges that he seen over his lengthy career in that most of the aliens now being encountered at the Southwest Border are turning themselves in to USBP officers rather than trying to escape the officers. It is reasonable to infer (and just plain common sense) that aliens are doing this because they are aware that they will be expeditiously processed and released into the country. Indeed, on this point, Chief Ortiz credibly opined based on his experience that the aliens are likely "turning themselves in because they think they're going to be released."

*Florida v. United States*, -- F. Supp. 3d --, 2023 WL 2399883, at *7-8 (N.D. Fla. Mar. 8, 2023)

56.     Anecdotal reports are in accord. In August 2023, for example, multiple media outlets reported that U.S. officials welded open 114 gates along the Arizona border, purportedly to allow water to flow freely during the monsoon season and to facilitate antelope migration. The reports indicate smugglers began driving busloads of migrants — whose home countries were around the globe, including India, Egypt, and China — to the Mexican side of the border, where the migrants disembarked and simply walked into the United States through the open gates. Brandon Judd,

---

[20] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705 (Feb. 23, 2023) (NPRM)

14

ARTHUR REPORT

President of the National Border Patrol Council, was quoted as stating:

> Because the cartels are constantly surveilling what we do, the moment something gets left open, it gets exploited. **** In this particular case, it exploded almost immediately, which shows you how adept the criminal cartels are at exploiting any weakness at any time that we show them. **** The cartels know that all you have to do is cross the border illegally, claim asylum. If you're with a family unit, if you're from certain specific countries, if you meet those loopholes that go outside what Secretary Mayorkas has announced, then you're going to get released and that's what we're seeing right now.[21]

57.    The Biden Administration's policies have generally increased migration.[22] Prior to President Biden's inauguration, aliens had an unfavorable view of U.S. immigration policy, which deterred aliens from migrating. Since President Biden was inaugurated, however, aliens have perceived that they will be able to enter and remain in the United States, which acts as a pull-factor for migration.[23] Indeed, in his 2022 deposition, then-Border Patrol Chief Raul Ortiz agreed that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what actually is happening in the United States."[24] I agree.

### STATUS OF THE BORDER

58.    Consistent with — and, in my opinion, based on — the perception that U.S. borders are effectively open, migration has surged.

59.    As of September 15, 2023, CBP reported the following:[25]

|  | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23YTD |
|---|---|---|---|---|---|---|---|
| OFO Total Encounters | 216,370 | 281,881 | 288,523 | 241,786 | 294,352 | 551,930 | 1,016,695 |
| USBP Total Encounters | 310,531 | 404,142 | 859,501 | 405,036 | 1,662,167 | 2,214,652 | 1,843,432 |
| Total Enforcement Actions | 526,091 | 683,178 | 1,148,024 | 646,822 | 1,956,519 | 2,766,582 | 2,860,127 |

60.    Beginning in March FY20, OFO Encounters statistics include both Title 8 Inadmissibles and Title 42 Expulsions. "Inadmissibles" refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws,

---

[21] https://nypost.com/2023/08/21/arizona-borders-open-floodgates-allow-thousands-into-us/
[22] *See, e.g.*, LADOJ-ASYLUM116 at 128 (Ortiz Dep. at 47:11 *et seq.*).
[23] *See, e.g.*, LADOJ-ASYLUM116 at 58:11 *et seq.*)
[24] LADOJ-ASYLUM116 at 133 (Ortiz Dep.67:22 – 68:5)
[25] https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics

15

ARTHUR REPORT

and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

61.     Similarly, beginning in March FY20, USBP Encounters statistics include both Title 8 Apprehensions and Title 42 Expulsions. "Apprehensions" refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

62.     These statistics do not include "gotaways," i.e., persons who are not turned back or apprehended after making an illegal entry.  *See* 6 U.S.C. 223(a)(3) (defining "got away"). Gotaways occur when, e.g., cameras or sensors detect migrants crossing the border, but no one is found, or no agents are available to respond. The DHS OIG reports that in FY 2021, there were 389,155 gotaways, and in FY 2022, more than 600,000 gotaways.[26] In June 2023, the House Committee on Homeland Security published a "fact sheet" stating that there were "more than 1.5 million known gotaways under [the Biden] Administration."[27] And those statistics obviously don't include "unknown gotaways" that were never detected.

63.     In addition to gotaways, large numbers of inadmissibles have been released into the interior. Although CBP and ICE keep track of the number of inadmissible Southwest border applicants for admission whom they release into the interior and can produce those statistics, CBP and ICE generally do not publish those statistics. But we know the numbers are substantial.  In a court-ordered report in June 2022, the federal government stated that 79,652 applicants for admission were released into the United States, paroled or otherwise.[28] And media reports indicate thousands of released aliens have sought appointments with ICE, including 39,216 non-citizens with appointments at ICE's New York City office; 2,686 non-citizens with appointments at ICE's Jacksonville, Florida, office (leaving it "mostly booked" through June 2028); and 24,747 migrants with appointments at ICE's Miramar, Florida office (leaving it "fully booked" through January 2028).[29]

---

[26] https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-24-May23.pdf (DHS OIG 23-24 at 10)
[27] https://homeland.house.gov/2023/06/22/factsheet-post-title-42-border-numbers-confirm-mayorkas-shell-game-unprecedented-national-security-crisis/
[28] https://storage.courtlistener.com/recap/gov.uscourts.txnd.346680/gov.uscourts.txnd.346680.143.0.pdf
[29] https://nypost.com/2023/03/13/nyc-ice-office-fully-booked-for-migrant-appointments-through-late-2032/

16

ARTHUR REPORT

64.    The consensus among experts is that publicly released statistics downplay the level of migration and releases into the interior, with aliens improperly excluded from categories and other categories simply not reported. As Chief Scott testified, "[I]t is a shell game."

65.    In recent Congressional testimony, I estimated the number of aliens released into the interior of the United States during the Biden Administration:

> By my calculations, which are based on published statistics from U.S. Customs and Border Protection (CBP) and court-ordered Department of Homeland Security (DHS) disclosures in the aforementioned *Texas v. Biden*, at least 2.2. million aliens encountered by Border Patrol agents and CBP officers at the Southwest border have been released into the United States under the Biden Administration. That is more people than live in New Mexico, the 36th largest state by population.

My calculation based on data released in September 2023, through the end of August, is 2,390,584 illegal migrants released.[30]

66.    In his June 14 testimony, Chief Scott concluded there is an ongoing "crisis at our border," "the border patrol remains overwhelmed, "[t]he cartels continue to control who and what is entering the United States," and the "chaos at the southwest border [is] a result of actions taken by the Biden Administration."[31] I agree.

67.    The result is that unprecedented numbers of aliens are illegally entering the United States.[32] Those aliens are frequently released into the interior, with substantial impact to States and local communities.[33] And the Biden Administration is seeking to make the situation worse by cutting ICE funding.[34]

## **THE ASYLUM IFR**

68.    On August 20, 2021, EOIR and USCIS published a Notice of Proposed Rulemaking, *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

69.    EOIR and USCIS explained that as the number of asylum claims at the southwest

---

[30] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics
[31] https://www.c-span.org/video/?528717-1/house-hearing-immigration-border-security (38:40 - 39:10)
[32] *See, e.g.*, LADOJ-ASYLUM116 at 126 (Ortiz Dep. at 41:5-19).
[33] *See, e.g.*, LADOJ-ASYLUM116 at 127-128, 176-177 (Ortiz Dep. at 44:1-46:3, 240:21-242:3); LADOJ-ASYLUM2895
[34] https://www.dhs.gov/sites/default/files/2023-03/U.S%20IMMIGRATION%20AND%20CUSTOMS%20ENFORCEMENT_Remediated.pdf

17

ARTHUR REPORT

border "has skyrocketed over the years, the system has proven unable to keep pace, resulting in large backlogs and lengthy adjudication delays." 86 Fed. Reg. at 46,907. The agencies explained that those delays "encourage[] abuse by those who will not qualify for protection and smugglers who exploit the delay for profit." *Id.* According to the agencies, the proposed rule would provide for more expeditious adjudication by, *inter alia*, "transferring the initial responsibility for adjudicating asylum and related protection claims made by noncitizens encountered at or near the border from IJs in EOIR to asylum officers in USCIS," and by "provid[ing] for the prompt filing of asylum applications by such individuals." *Id.*

70.     EOIR and USCIS offered the following legal analysis:

Noncitizens placed into expedited removal and determined to have a credible fear of persecution or torture by an asylum officer or an IJ must be referred for ''further consideration of the application for asylum.'' INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii). The INA is silent as to the procedures by which this ''further consideration'' should occur. Under regulations in place before December 2020,7 such individuals are currently referred to IJs for removal proceedings under section 240 of the INA, 8 U.S.C. 1229a, (''section 240 removal proceedings'') and its implementing regulations, 8 CFR 208.30(f), 235.6(a)(1)(ii)–(iii), 1208.30(g)(2)(iv)(B). In those proceedings, IJs conduct adversarial hearings to determine removability and adjudicate applications for asylum, withholding or deferral of removal, and any other forms of relief or protection.

86 Fed. Reg. at 46,908.

71.     EOIR and USCIS then faulted the existing system, and speculated that it "may" act as a pull factor increasing immigration:

The process put into place in 1997, under which noncitizens who establish credible fear generally must have their asylum claims decided through an adversarial removal proceeding before an IJ, is no longer fit for its intended purpose. It does not adequately address the need to adjudicate in a timely manner the rapidly increasing number of asylum claims raised by individuals arriving in the United States.

* * * * *

The ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim. This delay creates additional stress for those ultimately determined to merit asylum and other forms of humanitarian protection, as they are left in limbo as to whether they might still be removed and unable to petition for qualified family members….

86 Fed. Reg. at 46,908, 46,909.

72.     EOIR and USCIS explained how the proposed rule would address these issues:

To respond to this problem, this rule proposes at 8 CFR 208.2(a)(1)(ii) and 208.9 to

18

1   provide USCIS asylum officers the authority to adjudicate in the first instance the
protection claims of individuals who receive a positive credible fear determination,
2   and that they do so in a nonadversarial hearing. The rule also proposes at 8 CFR
208.3(a)(2) that the record of a credible fear interview may serve as an asylum
3   application for those noncitizens whose cases are retained by or referred to USCIS
for adjudication after a positive credible fear determination, thereby helping to
4   ensure that asylum seekers meet the statutory requirement to apply for asylum within
one year of arrival. These steps are meant to ensure greater efficiency in the
5   system....

                                        * * * * *

6   To ensure effective implementation of the expedited removal system, this rule also
proposes to revise the parole considerations prior to a positive credible fear
7   determination in 8 CFR 235.3.

8   86 Fed. Reg. at 46,909, 46,910. They also explained that the proposed rule went further, and

9   expanded parole:

10
11   Since expedited removal's implementation regulations were first promulgated,
parole consideration has been limited to a narrow category of circumstances for
individuals awaiting a credible fear determination—when necessary ''to meet a
12   medical emergency or . . . for a legitimate law enforcement objective.'' See 8 CFR
235.3(b)(2)(iii), (b)(4)(ii) (current). This proposed rule change would add to those
13   grounds, allowing parole when ''detention is unavailable or impracticable
(including situations in which continued detention would unduly impact the health
14   or safety of individuals with special vulnerabilities).'' 8 CFR 235.3(b)(2)(iii),
(b)(4)(ii) (proposed).

15   *Id.* at 46,913.

16   73.    EOIR and USCIS noted that they would need to increase staffing to effectuate the

17   proposed rule, such that there would be delay in full implementation:

18
19   USCIS has estimated that it will need to hire approximately 800 new employees and
spend approximately $180 million to fully implement the proposed asylum officer
hearing and adjudication process to handle approximately 75,000 cases annually. If
20   the number of noncitizens placed into expedited removal and making successful fear
claims increases significantly above that estimate, the cost to implement this
21   proposed rule with staffing levels sufficient to handle the additional cases in a timely
fashion would be substantially higher.
22                                      * * * * *
The Departments therefore propose that the new process be implemented in phases,
23   as the necessary staffing and resources are put into place.

24   86 Fed. Reg. at 46,921, 46,922.

25   74.    EOIR and USCIS acknowledged that the proposed rule would alter eligibility for at

26   least one benefit: "[m]ore expeditious grants of asylum" would result in quicker "authorizing work

27   incident to status." 86 Fed. Reg. at 46,923 Table 1. Indeed, "some asylum-seeking individuals

28   [would] move through the asylum process more expeditiously than through the current process,

                                            19

1    with timelines potentially decreasing significantly." *Id.* at 46,924 Table 2. EOIR and USCIS

2    nevertheless took the facially implausible position that there would be no impact on state

3    governments, *see id.* at 46,925 Table 2, which grant certain benefits based on asylum status. At the

4    same time, EOIR and USCIS acknowledged that "[p]arole may result in more individuals failing

5    to appear for hearings," *i.e.*, an increase in illegal aliens absconding to the interior of the United

6    States. *Id.* at 46,924 Table 1.

7         75.    On March 29, 2022, EOIR and USCIS published an interim final rule, *Procedures*

8    *for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT*

9    *Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022), effective May 31,

10   2022.

11        76.    The Asylum IFR finalized the key aspects of the proposed rule, albeit subject to 23

12   identified changes.

13        77.    Particularly relevant here, the Asylum IFR permits aliens to "amend" or

14   "supplement" their credible fear claims, and further requires "that, in the case of a noncitizen whose

15   case is retained by USCIS for an Asylum Merits interview, an asylum officer will also elicit all

16   relevant and useful information bearing on the applicant's eligibility for statutory withholding of

17   removal and CAT protection," and further requires that "[i]f the asylum application includes a

18   dependent (that is, a spouse or child who is in the United States and is included on the principal

19   applicant's application as a dependent, cf. 8 CFR 208.30(a), 208.14(f)) who has not filed a separate

20   application and the principal applicant is determined to not to be eligible for asylum, the asylum

21   officer will elicit sufficient information to determine whether there is a significant possibility that

22   the dependent has experienced or fears harm that would be an independent basis for protection prior

23   to referring the family to the IJ for a hearing." 87 Fed. Reg. at 18,081.

24        78.    Despite the rule's purported focus on efficiency, the Asylum IFR added a provision

25   that "USCIS shall not schedule an Asylum Merits interview for further consideration of an asylum

26   application following a positive credible fear determination fewer than 21 days after the noncitizen

27   has been served a record of the positive credible fear determination." 87 Fed. Reg. at 18,082.

28        79.    The Asylum IFR also eliminated consequences for failure to appear: it deleted a

20

ARTHUR REPORT

1  provision providing that "failure of a noncitizen to appear for an Asylum Merits interview might

2  result in the issuance of an order of removal." 87 Fed. Reg. at 18,082. Rather, "[f]ailure to appear

3  *may* result in referral of the noncitizen to section 240 removal proceedings before an IJ as well as

4  dismissal of the asylum application." *Id.*

5        80.    The Asylum IFR rejected the proposed rule's restriction on duplicative evidence.

6  *See* 87 Fed. Reg. at 18,082.

7        81.    Consistent with EOIR and USCIS's statement that the Asylum IFR would be

8  implemented in phases, DHS announced that referrals for Asylum Merits Interviews under the new

9  rule would be "limited to those individuals who indicate to USCIS and [ICE] an intention of

10  residing in … Boston, Los Angeles, <u>Miami</u>, New York, Newark, or San Francisco."[35]

11        82.    Implementation of the Asylum IFR was halted c. April 2023, and its current status

12  is uncertain.[36] The most recent cohort report is from June 2023, *i.e.*, it is several months old.[37] The

13  halt does not appear to have been subject to formal rulemaking, and the Asylum IFR remains the

14  applicable regulatory regime.

15        83.    Available evidence indicates DHS and DOJ have attempted to quantify migration

16  projections, including policy impacts. Indeed, in connection with the *Circumvention of Lawful*

17  *Pathways* rulemaking, DHS and DOJ referenced "an interagency SWB Encounter Projections

18  Working Group that generates encounter projections every 2-4 weeks, using the best data and

19  modeling available" that "generate[s] 68 percent and 95 percent confidence intervals for each of 33

20  separate demographic groupings."[38] I am not, however, aware of any disclosure of such modelling

21  in connection with the Asylum IFR.

22  **IMPACT OF THE IFR**

23  **GRANT RATES**

24        84.    As far back as 1996, Congress noted that the asylum system "has been subject to

---

25  [35] LADOJ-ASYLUM2176 (https://www.dhs.gov/news/2022/05/26/fact-sheet-implementation-credible-fear-and-asylum-processing-interim-final-rule).

26  [36] https://www.dhs.gov/sites/default/files/2023-07/2023%20Annual%20Report%20to%20Congress_0.pdf (at 7 & n.33).

27  [37] https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report

28  [38] 88 Fed. Reg. at 11,705 n.11.

ARTHUR REPORT

abuse by tens of thousands … who filed non-legitimate claims simply in order to extend their stay in the U.S. and to receive work authorization."[39] Indeed, the commentary accompanying the proposed rule acknowledged that problem. *See* 86 Fed. Reg. at 46,907, 908, 909, *discussed supra*.

85.     Just three years ago, the Supreme Court noted that "[f]raudulent asylum claims can … be difficult to detect, especially in a screening process that is designed to be expedited…." *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020). The Court cited with approval a study "in which 58% of randomly selected asylum applications exhibited indicators of possible fraud and 12% were determined to be fraudulent." *Id.* And a 2015 GAO Report—also cited with approval in *Thuraissigiam*—concluded that even under the pre-Asylum IFR adversarial system, there were insufficient protections against fraudulent asylum claims. It noted, as examples, two criminal investigations:

> Operation Fiction Writer[] resulted in charges against 30 defendants, including 8 attorneys, for their alleged participation in immigration fraud schemes in New York City. According to discussions with USCIS officials and a FBI press release, allegations regarding these defendants generally involved the preparation of fraudulent asylum applications that often followed one of three fact patterns: (1) forced abortions performed pursuant to China's family planning policy; (2) persecution based on the applicant's belief in Christianity; or (3) political or ideological persecution, typically for membership in China's Democratic Party or followers of Falun Gong. Attorneys and preparers charged in Operation Fiction Writer filed 5,773 affirmative asylum applications with USCIS, and USCIS granted asylum to 829 of those affirmative asylum applicants.63 According to EOIR data, 3,709 individuals who were connected to attorneys and preparers convicted in Operation Fiction Writer were granted asylum in immigration court; this includes both affirmative asylum claims referred from USCIS as well as defensive asylum claims.

> An asylum fraud investigation prompted in 2009 and led by the Los Angeles asylum office resulted in the indictment and subsequent conviction of two immigration consultants. The indictment alleged that the two consultants charged approximately $6,500 to prepare and file applications on behalf of Chinese nationals seeking asylum in the United States. These applications falsely claimed that the applicants had fled China because of persecution for their Christian beliefs. HSI investigators have linked the consultants to more than 800 asylum applications filed since 2000.[40]

86.     Despite the risk of fraud, the non-adversarial credible fear review by AOs has historically been used to filter out only the most patently meritless claims, and it has generally been viewed as lax.

---

[39] At 1517.
[40] https://www.gao.gov/assets/gao-16-50.pdf (GAO 16-50 at 33).

ARTHUR REPORT

87.     Consistent with the coarse and lax nature of credible fear interviews by AOs, according to EOIR Adjudication Statistics, between FY2008 and FY2019, out of every 100 aliens who claim credible fear, USCIS would directly refer 81 to EOIR, and two more claimants would successfully challenge a negative credible fear finding before an Immigration Judge, resulting in 83 cases referred to EOIR. Of those, only 45 credible fear claimants would actually file for asylum, of whom only 14 would be granted asylum.[41]

88.     That lax review follows from USCIS's view of itself, both at the political level and among the rank-and-file AOs. For example, after leaving her role as chief counsel for USCIS but before being appointed USCIS Director, Ur Jaddou characterized the agency's mission as "services," which she distinguished from "enforcement" of immigration law.[42] Jaddou has a reputation of hostility to border enforcement. She spent time as the director of DHS Watch, a pro-amnesty nonprofit. And during that time, she went so far as to call for Congress to pause CBP's funding, and referred to CBP as the "personal militia" to then-President Donald Trump.[43] Nor is the "services" not "enforcement" view limited to USCIS's senior leadership. The National Citizenship and Immigration Services Counsel 119, which represents approximately 1,000 AOs and refugee officers, has repeatedly filed comments and amicus briefs in opposition to restrictive immigration policies.[44]

89.     AO credible fear interviews have historically been non-adversarial, in sharp contrast to the adversarial truth-finding in subsequent proceedings before an IJ. Indeed, AOs were instructed to elicit all information relevant to a credible or reasonable fear claim. To that end, AOs were instructed to ask applicants separate questions about each protected ground, even if the applicant had not previously expressed they were harmed because of, e.g., political beliefs or race. Even inconsistent statements were handled non-adversarially.[45]

90.     The Asylum IFR extends that non-adversarial approach to Asylum Merits

---

[41] LADOJ-ASYLUM6118 (EOIR Adjudication Statistics).
[42] LADOJ-ASYLUM3157 at 160.
[43] LADOJ-ASYLUM6139 (media report)
[44] LADOJ-ASYLUM3164 (comment opposing Circumvention of Lawful Pathways Rule); LADOJ-ASYLUM3190 (SCOTUS amicus brief opposing MPP); LADOJ-ASYLUM5968 (DDC amicus brief opposing the ACA Rule)
[45] *See, e.g.*, LADOJ-ASYLUM2178 at 2208-09 (GAO-20-250 (Feb. 2020)).

23

ARTHUR REPORT

Interviews and eliminates adversarial proceedings (including cross-examination) from the asylum process. There is good reason cross-examination has been called "the greatest engine ever invented for the discovery of truth" and made a Constitutional right of criminal defendants. *California v. Green*, 399 U.S. 149, 158 (1970) (quoting John Henry Wigmore, 5 *Evidence* § 1367). In my experience and opinion, the adversarial nature of IJ proceedings—including cross-examination—were critical to rooting out meritless or fraudulent asylum claims. Even then, IJs were not always successful in doing so. The absence of adversarial proceedings will necessarily increase the rate of grants of asylum to aliens with claims that are meritless or fraudulent.

91.     Even if adversarial proceedings were retained, unlike IJs, AOs are not required to have a legal background, such that they are far less equipped to apply evidentiary rules.

92.     Those problems are compounded by the Asylum IFR's requiring a 21-day delay between a credible fear interview and an asylum merits interview, as well as permitting applicants to "supplement" or correct their credible fear claims. Striking similarities between asylum claims, as well as inconsistent statements between credible fear claims and subsequently developed testimony, have historically helped IJs root out meritless and fraudulent asylum claims. Numerous examples appear in caselaw. *See, e.g.*, *Singh v. Garland*, 20 F.4th 1049 (5th Cir. 2021) (reviewing case law and denying petition for review challenging IJ's adverse credibility finding based on "eerie similarities" with a wave of applications together with inconsistent statements). The delay and supplementation provisions invite coaching and fraud, with attendant increases in meritless and fraudulent grants of asylum.

93.     In October 2022, I evaluated Asylum IFR statistics. Between June and September 2022, asylum officers conducted 572 AMIs following a credible fear determination. In 49 of those cases, AOs granted asylum, while 110 others were referred to IJs (essentially a first-stage denial), 49 were administratively closed (which the report admits appears to be a data error) and 364 are pending completion. I concluded that AOs have granted asylum in nearly 31 percent of the border cases that they heard to completion, *i.e.*, almost twice as often as IJs historically had.[46]

94.     The latest Asylum IFR estimates are current to June 2023.  Between June 2022 and

---

[46] https://cis.org/Arthur/Asylum-Officers-Granting-Asylum-Cases-Almost-Twice-Rate-Judges

ARTHUR REPORT

June 2023, asylum officers conducted 1,824 AMIs following a credible fear determination.  In 396 of those cases, AOs granted asylum, while 747 others were referred to IJs (again, essentially a first-stage denial), 583 were administratively closed, and 98 are pending completion.  That latest report attributed the administrative closures to "interview no-show, ineligible APR/AMI processing, outside of Jurisdiction, and other [undefined] reasons".  I conclude based upon these statistics that, in the 1,143 AMIs in which AOs issued decisions, they granted asylum in 34.6 percent of them, compared to an IJ asylum grant rate of between 14.18 percent in FY 2022 and 14.79 percent in the first three quarters of FY 2023, or more than twice as often as IJs have since October 2021.[47]

95.    Separate and apart from the impact of the non-adversarial AO-AMI process, eliminating the requirement for applicants to file an asylum application will almost inherently increase the asylum grant rate. Recall that, historically, of the 83/100 asylum claimants referred to EOIR, only 45 credible fear claimants would actually file for asylum. It's almost inconceivable that some portion of the 38/100 who would not have even filed for asylum will not now be granted asylum, thereby increasing the grant rate.

96.    Regardless, even if the grant rate did not increase, the Asylum IFR would necessarily impact States by speeding grants of asylum, and thereby increasing eligibility for certain public benefits.

**PROCESSING**

97.    According to the USCIS Ombudsmen, implementation of the Asylum IFR negatively impacted processing of asylum applications:

> First, the depletion of resources to the Southern border (primarily asylum officers to conduct credible fear interviews) continued to impact the affirmative asylum caseload and the agency's ability to chip away at it. DHS and the Department of Justice's (DOJ's) Executive Office for Immigration Review (EOIR) published the joint Credible Fear and Asylum Processing interim final rule, which allows for the transfer of jurisdiction over some applications for asylum for individuals subject to expedited removal from EOIR to USCIS. The rule placed not only credible fear determinations but also "asylum merits interviews" in the hands of asylum officers, moving the consideration of asylum applications of those who established a credible fear from DOJ's immigration courts to USCIS asylum officers. The rule, promulgated in March 2022, became effective on May 31, 2022.30 The agencies assured the public that it would implement the rule gradually in a "phased manner," placing only a few hundred applicants each month in this new process and building

---

[47] https://www.justice.gov/eoir/page/file/1248491/download.

25

ARTHUR REPORT

up capacity over time. That has turned out to be very much the case; as of the end of February 2023, almost a year after implementation, only 4,760 individuals had been referred for processing under the new rule, with 1,850 establishing credible fear and 233 being granted asylum. With implementation paused during the lifting of Title 42, the rule remains in limbo until resumption. The same asylum officers, however, continue to be needed for credible fear interviews at the border, and so remain diverted from adjudicating affirmative asylum cases.

Not only did this divert resources from existing asylum office workloads, but it also created new ones; by definition, the asylum merits process falls entirely to USCIS under this new process.[48]

### PRESENCE OF ASYLUM APPLICANTS AND ASYLEES IN FLORIDA AND LOUISIANA

98.    After crossing the border and being released into the interior, asylum applicants move throughout the country.

99.    Asylum applicants and asylees have historically been present in Louisiana and Florida.[49] Consistent with that, multiple media reports recite the release of asylum seekers into Louisiana.[50] And a Louisiana law firms advertise services assisting asylees with naturalization.[51]

100.    The presence of asylum applicants in Louisiana and Florida is implicitly confirmed by pronouncements regarding the Asylum IFR itself. In a May 26, 2022, Fact Sheet, DHS announced that referrals for Asylum Merits Interviews under the new rule would be "limited to those individuals who indicate to USCIS and [ICE] an intention of residing in … Boston, Los Angeles, Miami, New York, Newark, or San Francisco."[52] A December 2, 2022, Fact Sheet includes New Orleans in the list of destination cities for which Asylum Merits Interviews would be conducted.[53] And a June 2023 cohort report indicates the Asylum IFR has been applied to cases in Miami and New Orleans.[54]

101.    Defendants' documents also make clear that tens of thousands of asylum applicants who claim addresses in Florida have been released but failed to check in. In short, vast numbers of

---

[48] https://www.dhs.gov/sites/default/files/2023-07/2023%20Annual%20Report%20to%20Congress_0.pdf (at 7)
[49] See, e.g., LADOJ-ASYLUM053 at 065 (DHS 2021 Annual.Flow Report).
[50] See, e.g., LADOJ-ASYLUM2327.
[51] LADOJ-ASYLUM1360 (https://www.shelbylawfirm.com/blog/2017/11/asylum-often-stepping-stone-to-citizenship-in-louisiana/)
[52] LADOJ-ASYLUM2176 (https://www.dhs.gov/news/2022/05/26/fact-sheet-implementation-credible-fear-and-asylum-processing-interim-final-rule).
[53] https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/fact-sheet-implementation-of-the-credible-fear-and-asylum-processing-interim-final-rule
[54] https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report

ARTHUR REPORT

putative asylum applicants have absconded to the interior and are without supervision.[55]

### EDUCATION

102.    Alien children are generally entitled to the same free public education that is provided to children who are citizens of the United States, regardless of immigration status. *See Plyler v. Doe*, 457 U.S. 202 (1982).

103.    Historically, education has been one of the largest single expenditures in state and local budgets.[56]

104.    The federal government pressures States to provide specialized instruction to students whose native language is not English. *See Lau v. Nichols*, 414 U.S. 563 (1974) (holding school system that accepted federal funds violated Title VI of the Civil Rights Act of 1964 by failing to provide non-English language instruction to Chinese students who did not speak English).

105.    I am informed that Louisiana is obligated by its State Constitution to fund education pursuant to a formula adopted by a State agency, La. Const. art. VIII, Section 13, the mechanism for which is known as the Minimum Foundation Program ("MFP"). I am informed that the MFP formula provides for a base amount of State funding per student, supplemented by additional funding. I am informed that the current base funding is $4,015 per student.[57] I am further informed that additional state funding is allocated based on certain student characteristics, one of which is English Language Learner ("ELL").

106.    I am informed that Florida is similarly obligated by its State Constitution to fund education, Fla. Const. art. IX, Section 1, the mechanism for which is known as the Florida Education Finance Program ("FEFP"). I am informed that FEFP funds are primarily generated by multiplying the number of full-time equivalent (FTE) students in each of the funded education programs by cost factors to obtain weighted FTE students, and weighted FTE students are then multiplied by a base student allocation (BSA) and by a district cost differential (DCD) to determine

---

[55] LADOJ-ASYLUM2895 (ERO LESA Strategy and Operational Analysis Unit Data)
[56] LADOJ-ASYLUM001 at 015 (https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf)
[57] https://www.louisianabelieves.com/docs/default-source/minimum-foundation-program/a-fy2023-24-mfp-budget-letter-guidance-memo---circular-no-1167.pdf?sfvrsn=dde46018_2

ARTHUR REPORT

the base funding from state and local FEFP funds.[58] I am informed that the Florida Legislature has established English for Speakers of Other Languages ("ESOL") as a cost factor incorporated in weighted FTE students, with a cost factor of 1.206 in 2022-2023.[59] I am informed that the base student allocation for 2022-2023 was $4,587,[60] and for 2023-2024 is $5,139.[61]

107.    The federal government has effectively precluded States from obtaining detailed information on the impact of immigration on education expenditures. In 2014, the United States Department of Justice and Department of Education issued a "Dear Colleague" letter stating that they had "become aware of student enrollment practices that may chill or discourage the participation, or lead to the exclusion, of students based on their or their parents' or guardians' actual or perceived citizenship or immigration status," and further indicated that those practices were illegal under federal law.[62] An accompanying "Questions and Answers" sheet included the following:

> Q - 1. Should a district inquire into the immigration or citizenship status of a student or parent3 as a means of establishing the student's residency in the district?

> A - 1. No. Immigration or citizenship status is not relevant to establishing residency in the district, and inquiring about it in the context of establishing residency is unnecessary and may have a chilling or a discouraging effect on student enrollment.[63]

108.    Accordingly, at least partially as a result of the 2014 "Dear Colleague" letter, precise information about public school enrollment based on immigration status is limited.

109.    Large scale data can provide insights. A recent study based on Census Bureau data indicates that there were 11 million public school students in 2021 from immigrant-headed households and, of those, 17 percent were not born in the United States. The impact from migration tends to be concentrated. In the Northeast Date County, North Central Hialeah City, Florida, Public Use Microdata Area ("PUMA"), for example, 87% of the public school students are from immigrant households. In the wider Miami-Fort Lauderdale-West Palm Beach metropolitan area,

---

[58] https://www.fldoe.org/core/fileparse.php/7507/urlt/Fefpdist.pdf
[59] *Id.* at PDF p.17.
[60] https://www.fldoe.org/core/fileparse.php/7507/urlt/22-23FEFPFourthCalc.pdf
[61] https://www.fldoe.org/core/fileparse.php/7507/urlt/2324FEFP2ndCalc.pdf
[62] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201405.pdf
[63] https://www2.ed.gov/about/offices/list/ocr/docs/qa-201405.pdf

ARTHUR REPORT

56% of public school students are from immigrant households. In Florida as a whole, 31% of Florida public school students are from immigrant households, as compared to 6% in Louisiana.[64]

110.     A natural experiment involving enrollment of a defined group of migrant children also provides some insight. In 2014, then-Senator David Vitter requested information on the cost to Louisiana of educating almost 1,400 unaccompanied alien children. According to a media reports, school systems throughout the State said they would need to hire new teachers (including ESL teachers) to deal with the specifically identified influx, with Louisiana public schools spending at least $6.9 million that year to educate the approximately 1,400 alien children.[65]

111.     There can be little doubt that alien children impose education costs on Florida and Louisiana, even if those costs are difficult to quantify precisely. In both Florida and Louisiana, students in immigrant-headed households are more likely to live in poverty as compared to native-headed households.[66] The poverty of migrants combined with mandatory education laws forces migrant children into public schools. As former Acting Secretary of Homeland Security Chad Wolf testified earlier this year: nearly "[a]ll of the [migrant] children that we've talked about go into public education systems, [and] English is usually not their first language. That's going to strain public education systems and every community that they go into, certainly the ones that they go into in a large amount."

112.     The Northern District of Florida recently analyzed available data in connection with a challenge to the Biden Administration's Alternatives to Detention policy and reached essentially the same conclusion. The Court explained:

> [The Florida Department of Education] does not maintain data about where and when alien students entered the country (or their immigration status) that would allow the Court to determine with absolute certainty that children of aliens released under the challenged polices enrolled in Florida schools. However, DOE does keep data on the number of "immigrant children and youth" enrolled in Florida's public schools and that data provides sufficient information from which the Court can draw reasonable inferences about the number of alien children released under the challenged polices that are enrolled in Florida public schools.

---

[64] https://cis.org/Report/Mapping-Impact-Immigration-Public-Schools
[65] LADOJ-ASYLUM1354 (https://www.nola.com/news/education/central-american-immigrant-children-will-cost-louisianas-schools-at-least-6-9-million/article_dca455cb-c5dc-51b6-9aa4-288ab10a9690.html)
[66] https://cis.org/Report/Mapping-Impact-Immigration-Public-Schools

ARTHUR REPORT

In the 2020-21 school year there were just over 95,000 immigrant children and youth in Florida's public schools. That number increased by more than 17,000 in the 2021-22 school year, and although there is no direct evidence establishing exactly how many of these children were released into the country under the challenged policies, it can be reasonably inferred from the testimony of the DOE witness (who personally visited schools and met with families) that a good number of these children were released into Florida under the challenged policies.

Florida spends roughly $8,000 per public school student per year, and an increase in the number of students in Florida's schools requires the state to spend more money over time.

Thus, even considering the other factors that might have contributed to an increase in immigrant children and youth in Florida's public schools (e.g., the fact that Florida and its schools were more "open" than other states during the COVID-19 pandemic), the Court has no trouble finding that at least some of the aliens released under the challenged policies have enrolled their children in Florida's public schools and caused the state financial harm.

*Florida v. United States*, -- F. Supp. 3d --, 2023 WL 2399883, at *15-16 (N.D. Fla. Mar. 8, 2023), *stay denied*, 2023 WL 3813774 (11th Cir. June 5, 2023).

113.    I agree with Secretary Wolf's and the Northern District of Florida's analysis. And the same analysis is applicable to the Asylum IFR. By acting as an immigration magnet (and to the extent the Asylum IFR provides more-expansive parole provisions), the Asylum IFR will directly increase the number of school-aged children in Florida and Louisiana, and the attendant public education cost. Even if that were not true and the number of aliens seeking asylum otherwise held steady, by increasing the asylum grant rate and decreasing delays in reviewing asylum applications, the rule will predictably increase the number of children who are eligible to "follow to join" the principal asylum grantee to the United States in derivative asylum status, further increasing attendant public education cost.

114.    Consistent with increasing numbers of alien children in Louisiana, I am informed that the Louisiana Department of Education provided the following data on English Language Learners:

30

ARTHUR REPORT

| YEAR | October Count | February Count |
|------|---------------|----------------|
| 2022-23 | 31,938 | 33,148 |
| 2021-22 | 28,945 | 30,643 |
| 2020-21 | 26,882 | 27,187 |
| 2019-20 | 26,768 | 27,262 |

115.   I am informed that at least Florida maintains data on the number of "immigrant children and youth" enrolled in public schools. *See* 20 U.S.C. 7011(5).

116.   Consistent with increasing numbers of alien children in Florida, I am informed that the Florida Department of Education provided the data in FLDOE-ASYLUM-847, showing increasing enrollment of immigrant students since 2020, with 116,174 immigrant students enrolled in 2022-23.

**MEDICAID / CHIP / EMERGENCY MEDICAL SERVICES**

117.   According to the CBO, "immigrants in the United States, both authorized and unauthorized, are less likely than their native-born counterparts to have health insurance. As a result, they are more likely to rely on emergency rooms or public clinics for health care."[67]

118.   As summarized by the Congressional Research Service, Medicaid is a means-tested entitlement program that finances the delivery of, *inter alia*, medical services. The federal government and the states jointly finance Medicaid, with the federal government reimbursing states for a portion of each state's Medicaid program costs.[68] The reimbursable amount is known as the Federal Medical Assistance Percentage (FMAP). For the period October 1, 2022, through September 30, 2023, the FMAP for Florida is 60.05%, and the FMAP for Louisiana is 67.28%. Dept. HHS, *Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares, for Medicaid, the Children's Health Insurance Program*, 86 Fed. Reg. 67,479, 67,481 Table 1 (Nov. 26, 2021).

---

[67] https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf

[68] https://crsreports.congress.gov/product/pdf/R/R43357#:~:text=Medicaid%20is%20an%20entitlement%20for,to%20federal%20Medicaid%20matching%20funds.

ARTHUR REPORT

119.    CHIP, authorized in SSA Title XXI, provides health insurance coverage to low-income, uninsured children in families with incomes above applicable Medicaid income standards, as well as to certain pregnant women. Similar to Medicaid, CHIP is jointly financed by the federal government and the states, and the states are responsible for administering CHIP.[69] The reimbursable amount is known as the Enhanced Federal Medical Assistance Percentage (EFMAP). For the period October 1, 2022, through September 30, 2023, the EFMAP for Florida is 72.04%, and the EFMAP for Louisiana is 77.10%. 86 Fed. Reg. at 67,481 Table 1.

120.    Aliens' eligibility for Medicaid and CHIP largely depends on (1) an applicant's immigration status; (2) whether they arrived in the United States (or were enrolled in Medicaid) before August 22, 1996 (the date PRWORA was enacted); and (3) how long they have lived and worked in the United States.[70]

121.    With respect to an applicant's immigration status, generally, noncitizen eligibility for most federal public benefits—including Medicaid and CHIP—is governed by the term qualified alien (8 U.S.C. §1641), which was created in PRWORA, as amended. Qualified aliens include lawful permanent residents (LPRs), refugees, aliens paroled into the United States for at least one year, aliens granted asylum or related relief, certain abused spouses and children, and Cuban-Haitian entrants. Many qualified aliens are nevertheless prohibited from receiving Medicaid for the first five years after entry/grant of status (often referred to as the five-year bar).[71]

122.    Nonimmigrants, those with Temporary Protected Status (TPS), short-term (less than one year) parolees, asylum applicants, those granted Deferred Action for Childhood Arrivals (DACA), unauthorized immigrants, and various other classes of noncitizens granted temporary permission to remain in the United States are nonqualified aliens. These statuses and are generally barred from Medicaid and CHIP (8 U.S.C. §1611), with certain exceptions.[72]

123.    Under emergency Medicaid (§1903(v)(3) [42 U.S.C. §1396b(v)(3) and 8 U.S.C. §1611(b)(1)(A)], states are required to provide limited Medicaid services for the treatment of an

---

[69] https://crsreports.congress.gov/product/pdf/R/R43949
[70] https://crsreports.congress.gov/product/pdf/IF/IF11912
[71] https://crsreports.congress.gov/product/pdf/IF/IF11912
[72] https://crsreports.congress.gov/product/pdf/IF/IF11912

ARTHUR REPORT

emergency medical condition to otherwise eligible aliens, regardless of immigration status or lack of immigration status. [73] Indeed, Louisiana and Florida are required by federal law to include aliens in their Emergency Medicaid Program. 42 C.F.R. 440.255(c). I am informed that Emergency Medical provides far more limited services that Medicaid or CHIP.

124.    Consistent with the Congressional Research Service's summary, and as relevant here, the Louisiana Medicaid Manual indicates the following categories of noncitizens are qualified non-citizens eligible for Medicaid and CHIP coverage, but subject to a five-year bar:

- Non-citizens granted parole for at least one (1) year, as pursuant to section 212(d)(5) of the INA[74]

125.    Consistent with the Congressional Research Service's summary, and as relevant here, the Louisiana Medicaid Manual indicates the following categories of noncitizens are eligible for Medicaid and CHIP coverage, but not subject to a five year bar:

- Asylees

- Non-citizens whose deportation is being withheld[75]

126.    Consistent with the Congressional Research Service's summary, and as relevant here, the Louisiana Medicaid Manual states that "Non-citizens who do not meet qualified non-citizen status are considered non-qualified non-citizens," and "[n]on-qualified non-citizens include illegal/undocumented non-citizens." "These individuals may be eligible for emergency services only (or, if pregnant, for LaCHIP Phase IV only)."[76]

127.    Data produced by the Louisiana Department of Health (LDH) indicates it provides benefits to over 1,200 asylees every month, a number that has roughly doubled since 2019, in line with the explosion of unlawful migration. LDH data also indicates it provides benefits to over 10,000 undocumented aliens every month, a number that has more than doubled since 2019. [77]

128.    The cost of those benefits is substantial. Through May 2023, LDH paid for tens of

---

[73] https://crsreports.congress.gov/product/pdf/IF/IF11912
[74] https://ldh.la.gov/assets/medicaid/MedicaidEligibilityPolicy/I-300.PDF
[75] https://ldh.la.gov/assets/medicaid/MedicaidEligibilityPolicy/I-300.PDF
[76] https://ldh.la.gov/assets/medicaid/MedicaidEligibilityPolicy/I-300.PDF
[77] LDH-2.

33

ARTHUR REPORT

millions of dollars in Medicaid, CHIP, and Emergency Medical Services for aliens, of which $84,913,178 appears to have come from Louisiana's General fund.[78]

129.    To the extent the Asylum IFR operates as EOIR and USCIS expect, "some asylum-seeking individuals [would] move through the asylum process more expeditiously than through the current process, with timelines potentially decreasing significantly." 86 Fed. Reg. at 46,924 Table 2. The effect would be to remove the five-year bar on Medicaid eligibility for those aliens, thereby making them immediately qualified for Medicaid and increasing State expenditures on Medicaid. The effect will be compounded to the extent the Asylum IFR acts as an immigration magnet, including by increasing the number of aliens eligible for Emergency Services, or increases parole (and thereby increases the number of aliens eligible for Medicaid or CHIP, albeit subject to the 5 year bar).

### SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM

130.    The Supplemental Nutrition Assistance Program (SNAP), formerly called the Food Stamp Program, provides food-purchase assistance to low-income households. SNAP benefits are 100% federally funded, but States cover certain administrative costs, including for certifying household eligibility and issuing benefits.[79]

131.    The Biden Administration has taken the position that migrants on SNAP are not "public charge[s]" that could impact their immigration status. The Biden USCIS has even issued guidance that certain migrants are eligible for SNAP, and encouraged States to "share the message that participating in SNAP does not make someone a public charge and will not be considered in a public charge determination."[80]

132.    As relevant here and according to the U.S. Department of Agriculture, the following categories of noncitizens are eligible for federally funded SNAP without a five-year bar:[81]

- Noncitizen children under 18 with a qualified immigration status, as defined by the 1996 *Personal Responsibility and Work Opportunity Reconciliation Act*

---

[78] LDH-4
[79] https://crsreports.congress.gov/product/pdf/R/R42505
[80] https://www.fns.usda.gov/snap/joint-letter-public-charge#1
[81] LADOJ-ASYLUM5858 at 5859; *see also* FLDCF-ASYLUM586 at 586; FLDCF-ASYLUM459

34

ARTHUR REPORT

1          • Asylees and holders of derivative visas

2          133.   As relevant here and according to the U.S. Department of Agriculture, the following

3    categories of noncitizens are eligible for federally funded SNAP but subject to a five-year bar:[82]

4          • Lawful permanent residents, except those who are eligible without a five-year bar

5          • Parolees if paroled into the United States for one year or more, other than certain

6             Afghans and Ukrainians who are eligible without a five-year bar

7          • Certain domestic violence survivors

8          134.   As relevant here, the following categories of noncitizens are ineligible for federally

9    funded SNAP:

10         • Unauthorized immigrants

11         • Temporary Protected Status (TPS) beneficiaries, unless they also hold a qualifying

12            status

13         • Deferred Action for Childhood Arrivals (DACA) beneficiaries

14         • People with pending asylum claims

15         • Lawfully present noncitizens without a qualified status

16         135.   To the extent the Asylum IFR acts as intended and speeds asylum grants, it will

17    make those asylees immediately eligible for SNAP, rather than ineligible or eligible only after a

18    five-year bar as parolees. That expanded number of eligible aliens will be compounded to the extent

19    the Asylum IFR acts as an immigration magnet and/or results in additional parolees.

20         136.   The numbers are not small. According to the Migration Policy Institute, in 2019,

21    millions of immigrants were in households below the federal poverty level, and therefore eligible

22    for SNAP.

23    30.8 million individuals lived in poor all-U.S.-born households in 2019 and 13.0
      million individuals lived in poor immigrant households (where at least one member
24    was foreign born). Of those in immigrant households, a little more than half (6.6
      million) were in households where all members were eligible for SNAP, meaning
25    all noncitizens held an eligible immigration status.[83]

26         137.   The same analysis estimated the eligibility for SNAP on a state-by-state basis. It

27

28    _____
      [82] LADOJ-ASYLUM5858 at 5859-60; *see also* FLDCF-ASYLUM at 466
      [83] https://www.migrationpolicy.org/sites/default/files/publications/mpi_snap-brief-2023-final.pdf

ARTHUR REPORT

found that in Louisiana, 73,000 people were in poor immigrant households. Of those poor immigrant households, all members were eligible for SNAP in 42% of households; some members were eligible for SNAP in 42% of households, and all members were ineligible for SNAP in 16% of households. With respect to participation, 36% of households where all members were eligible for SNAP in-fact participated in SNAP, and 31% of immigrant households where some members were eligible for SNAP in-fact participated in SNAP. [84]

138.    It found that in Florida, 1,136,000 people were in poor immigrant households. Of those poor immigrant households, all members were eligible for SNAP in 60% of households; some members were eligible for SNAP in 30% of households; and all members were ineligible for SNAP in 11% of households. With respect to participation, 53% of households where all members were eligible for SNAP in-fact participated in SNAP, and 49% of immigrant households where some members were eligible for SNAP in-fact participated in SNAP.[85]

139.    In short, the impact of the Asylum IFR as it is extended to all claims for asylum will not be small – many thousands of migrants in Louisiana and Florida will be eligible or more quickly eligible for SNAP. Although the federal government will bear the burden of the SNAP benefits themselves, the States will bear the administrative costs of reviewing increased applications for SNAP benefits. The States will also bear the increased administrative costs of providing SNAP benefits to more aliens. Publicly available information indicates that doing so will be measurable. Chase Bank, for example, charges $0.15 per ACH transaction for high-volume business accounts.[86] Multiplied on a monthly basis by thousands of additional eligible aliens will result in measurable financial outlay.

140.    At least Louisiana appears to have ruled on and initiated SNAP payments to thousands of asylees in the last three years.[87] Increasing the asylee population – whether through a rule acting as an immigration magnet, increasing the asylum grant rate, or decreasing the pendency time for applications – will predictably increase the number of asylees seeking SNAP benefits, and

---

[84] https://www.migrationpolicy.org/sites/default/files/publications/mpi_snap-brief-2023-final.pdf
[85] https://www.migrationpolicy.org/sites/default/files/publications/mpi_snap-brief-2023-final.pdf
[86] https://www.chase.com/business/banking/services/pay-and-transfer
[87] Asylee Issuance Amount spreadsheet

ARTHUR REPORT

1   providing benefits.

2   ### NO NET BENEFIT

3   141.   A 2007 Congressional Budget Office report concluded that (1) "State and local
4   governments incur costs for providing services to unauthorized immigrants and have limited
5   options for avoiding or minimizing those costs," (2) "[t]he tax revenues that unauthorized
6   immigrants generate for state and local governments do not offset the total costs for services
7   provided to those immigrants," and (3) "[f]ederal aid programs offer resources to state and local
8   governments that provide services to unauthorized immigrants, but those funds do not fully cover
9   the costs incurred by those governments."[88]

10   142.   Strictly speaking, asylees and asylum applicants are not unauthorized immigrants as
11   defined by the CBO, but I do not believe the analysis would be substantially different.

12   143.   I reserve the right to supplement my opinions if additional data becomes available,
13   in response to witness testimony, or in response to the reports of other experts.

14

15

16   **ANDREW ARTHUR**

17

18

19

20

21

22

23

24

25

26

27

28   [88] LADOJ-ASYLUM001 at 011 (https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf)

37

ARTHUR REPORT

# EXHIBIT A

**Andrew R. "Art" Arthur**
**Center for Immigration Studies**
**1629 K Street, Suite 600**
**Washington, DC 20006**
**(202) 466-8185**

<u>**EXPERIENCE**</u>:

**Resident Fellow in Law and Policy, Center for Immigration Studies, Washington, D.C.  April 2017 to Present.**
Review, analyze, and evaluate issues related to immigration litigation, policy, and enforcement for an independent, non-profit, research organization.  Provide interviews to media outlets on immigration law and its implementation.  Prepare reports evaluating national security vulnerabilities relating to immigration, and propose corrective solutions.

**Staff Director, United States House of Representatives, Committee on Oversight and Government Reform, National Security Subcommittee. Washington, D.C.  January 2015 to September 2016.**
Advised the Chairman of the House Committee on Oversight and Government Reform on matters related to the national security of the United States.  Directed staff oversight of issues relating to the Departments of Homeland Security, State, Justice, and Defense, and national intelligence.  Performed investigations of border security issues and State Department security.

**Immigration Judge, United States Department of Justice, Executive Office for Immigration Review, Immigration Court.  York, Pennsylvania.  November 2006 to January 2015.**
Held hearings and issued decisions in cases involving more than 13,000 aliens charged with removability from the United States.  Adjudicated applications for immigration benefits.  Administered oath of naturalization to new citizens.

**Counsel, United States House of Representatives, Committee on the Judiciary. Washington, D.C.  July 2001 to November 2006.**
Advised the Chairman of the House Committee on the Judiciary and the Chairman of the Subcommittee on Immigration, Border Security, and Claims on matters relating to the enforcement of the immigration laws and on immigration policy. Performed oversight of the operations of the Immigration and Naturalization Service, Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, Customs and Border Protection, the Department of State, and the Executive Office for Immigration Review.  Prepared hearings on immigration legislation and oversight.  Drafted, advised on, and negotiated proposed legislation.

**Acting Chief, United States Department of Justice, Immigration and Naturalization Service (INS), General Counsel's Office, National Security Law Division. Washington, D.C. May 2001 to July 2001.**
Supervised staff of three attorneys who supervised and coordinated immigration cases involving aliens alleged to have engaged in persecution, torture, espionage, and terrorism.

**Associate General Counsel, United States Department of Justice, INS General Counsel's Office. Washington, D.C. January 1999 to April 2001.** Advised the Attorney General, the Deputy Attorney General, the INS Commissioner and staff, and the Chief of the INS National Security Law Division on legal matters. Served as a liaison between the INS and the State Department, and between the INS and intelligence and law-enforcement agencies. Supervised litigation of national security cases by INS District Counsel's Offices, and coordinated, assisted in, and advised on litigation of those cases. At the direction of the Attorney General, drafted proposed revisions of Justice Department procedures on the use of national security information in immigration cases. Drafted and reviewed proposed legislation, and drafted and reviewed comments and testimony on pending legislation. Drafted and reviewed proposed regulations. Represented the INS before the Attorney General in immigration proceedings on certification.

**Assistant District Counsel, United States Department of Justice, INS San Francisco District Counsel's Office and Baltimore District Counsel's Office. San Francisco, California. September 1994 to February 1998. Baltimore, Maryland, February 1998 to December 1998.**
Represented the INS in removal, deportation, exclusion, rescission, and bond proceedings before the Immigration Court and Board of Immigration Appeals (Board); in visa appeal proceedings before the Board; in employer sanctions cases; and in civil document-fraud proceedings before the Office of the Chief Administrative Hearing Officer. In San Francisco District Counsel's Office, served as a liaison to the respective United States Attorney's Offices on immigration matters before the United States District Courts for the Northern and Eastern Districts of California, and represented the INS in responding to subpoenas and requests for testimony and for INS records.

**Attorney Advisor, United States Department of Justice, Executive Office for Immigration Review, Office of the Chief Administrative Hearing Officer (OCAHO). Falls Church, Virginia. June 1992 to August 1994.**
Served as law clerk to the Honorable Joseph E. McGuire, Administrative Law Judge, within OCAHO. Drafted opinions and orders in employer sanctions, civil document fraud, and unfair immigration-related employment practices cases. Advised the Administrative Law Judge on issues arising before the tribunal.

**__PROFESSIONAL__:**

Testified before the House Committee on the Judiciary, Subcommittee on Immigration and Border Security, on "Restoring Enforcement of our Nation's Immigration Laws," March 28, 2017.

Testified before the House Committee on Natural Resources, Subcommittee on Oversight and Investigations, on "The Costs of Denying Border Patrol Access: Our Environment and Security," February 15, 2018.

Testified before the House Committee on Oversight and Government Reform, Subcommittee on National Security, on "A Caravan of Illegal Immigrants: A Test of U.S. Borders," April 12, 2018.

Testified before the Senate Committee on the Judiciary, Subcommittee on Border and Immigration, on "Strengthening and Reforming America's Immigration Court System," April 18, 2018.

Testified before the House Committee on Appropriations, Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, on "Reviewing the Administration's Unaccompanied Children Program," February 27, 2019.

Testified before the House Committee on the Judiciary, on "Protecting Dreamers and TPS Recipients," March 6, 2019.

Testified before the House Committee on the Judiciary, Subcommittee on Immigration and Citizenship and the House Committee on Foreign Affairs, Subcommittee on Oversight and Investigations, on "Oversight of the Trump Administration's Travel Ban," September 24, 2019.

Testified before the House Committee on the Judiciary, Subcommittee on Immigration and Citizenship, on "Courts in Crisis: The State of Judicial Independence and Due Process in U.S. Immigration Courts," January 29, 2020.

Testified before the House Committee on the Judiciary, Subcommittee on Immigration and Citizenship, on "For the Rule of Law, An Independent Immigration Court," January 20, 2022.

Testified before the House Committee on Homeland Security, Subcommittee on Oversight, Investigations, and Accountability, on "Biden's Growing Border Crisis: Death, Drugs, and Disorder on the Northern Border", March 28, 2023.

Testified before the House Committee on Oversight and Accountability, Subcommittee on National Security, the Border, and Foreign Affairs and the House Committee on the Judiciary, Subcommittee on Crime and Federal Government Surveillance on "Biden's Border Crisis and its Effect on American Communities," August 8, 2023.

Attorney General's Honors Program, June 1992 and September 1994.

Admitted to practice law before the Maryland Court of Appeals and the United States Court of Federal Claims.

Appeared before the National Commission on Terrorism, 1999.

**<u>EDUCATION</u>:**

**George Washington University Law School, Washington, D.C.**
Juris Doctor May 1992

**The University of Virginia, Charlottesville, Virginia**
Bachelor of Arts in History May 1988.  Concentration in Economics.

# EXHIBIT B

# CENTER FOR IMMIGRATION STUDIES

October 18, 2021

Andria Strano
Acting Chief, Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
5900 Capital Gateway Drive
Camp Springs, MD 20746

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike
Falls Church, VA 22041

VIA ELECTRONIC FILING

**Re: Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protections by Asylum Officers**

Dear Ms. Strano and Ms. Alder Reid,

The Center for Immigration Studies (CIS) submits the following public comment to the U.S. Department of Justice (DOJ) and U.S. Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) in response to the departments' request for comments on the Joint Notice of Proposed Rulemaking (JNPRM) titled *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protections by Asylum Officers*, as published in the Federal Register on August 20, 2021.[1]

CIS is an independent, non-partisan, non-profit, research organization. Founded in 1985, CIS has pursued a single mission – providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about the social, economic, environmental, security, and fiscal consequences of legal and illegal immigration into the United States. CIS is the nation's only think tank devoted exclusively to the research of U.S. immigration policy informing policymakers and the public about immigration's far-reaching impact.

---

[1] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

1

# CENTER FOR IMMIGRATION STUDIES

## I.   INTRODUCTION

Through this JNPRM, DOJ and DHS are proposing to amend various immigration regulations relating to the determination of certain protection claims made by aliens[2] subject to expedited removal.

Specifically, the rule[3] would allow asylum officers (AOs) within USCIS to adjudicate, as an initial matter, applications for asylum under section 208 of the Immigration and Nationality Act (INA)[4], for statutory withholding of removal (statutory withholding) under section 241(b)(3) of the INA[5], and for withholding and deferral of removal pursuant to the Convention Against Torture (CAT)[6] brought by aliens who are subject to expedited removal proceedings under section 235(b)(1) of the INA[7] and who were determined by AOs to have a "credible fear"[8] of persecution and/or torture.

---

[2] *See* section 101(a)(3) of the INA (2021) ("definitions" section; "The term 'alien' means any person not a citizen or national of the United States."), available at: https://www.uscis.gov/ilink/docView/SLB/HTML/SLB/0-0-0-1/0-0-0-29/0-0-0-101.html; *see also* Section 101(a)(22) of the INA (2021) ("The term 'national of the United States' means: (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."), available at: https://www.uscis.gov/ilink/docView/SLB/HTML/SLB/0-0-0-1/0-0-0-29/0-0-0-101.html; *Miller v. Albright*, 523 US 420, 467 n. 2 (1998) (Ginsberg, J., dissenting) ("Nationality and citizenship are not entirely synonymous; one can be a national of the United States and yet not a citizen."), available at: https://scholar.google.com/scholar_case?case=16706312627647904855&hl=en&as_sdt=6&as_vis=1&oi=scholarr#[31]; Andrew Arthur, *Defining Immigrants, Noncitizens, Aliens, Nonimmigrants, and Nationals, Who's Who in Immigration Law?*, CENTER FOR IMMIGRATION STUDIES (Jun. 26, 2017) ("So, citizens are nationals of the United States, but not all nationals are citizens. Therefore, the term "noncitizen" includes aliens and nationals who are not citizens. But, nationals are not subject to removal proceedings under section 240 of the INA, only aliens are; therefore, any case that discusses whether or an individual is to be removed, unless it is a case involving contested citizenship, relates to an 'an alien' not a 'noncitizen'."), available at: https://cis.org/Arthur/Defining-Immigrants-Noncitizens-Aliens-Nonimmigrants-and-Nationals.

[3] *Id.* at 46909 (Aug. 20, 2021) ("[T]his rule proposes at 8 CFR 208.2(a)(1)(ii) and 208.9 to provide USCIS asylum officers the authority to adjudicate in the first instance the protection claims of individuals who receive a positive credible fear determination, and that they do so in a nonadversarial hearing."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[4] Section 208 of the INA (2020), available at: https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf.

[5] Section 241(b)(3) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1231&num=0&edition=prelim.

[6] *See Fact Sheet: Asylum and Withholding of Removal Relief, Convention Against Torture Protections*, U.S. DEP'T OF JUSTICE (Jan. 15, 2009) ("CAT protections relate to the obligations of the United States under Article 3 of the United Nations Convention Against Torture. This is an international treaty provision designed to protect aliens from being returned to countries where they would more likely than not face torture. Torture is defined, in part, as severe pain or suffering (physical or mental) that is intentionally inflicted by or at the instigation of or with the consent or acquiescence of a public official, or other person acting in an official capacity.  Under this treaty provision, the United States agrees not to "expel, return, or extradite" aliens to another country where they would be tortured."), available at: https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/23/AsylumWithholdingCATProtections.pdf.

[7] Section 235(b)(1) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[8] *Id.* at cl. (B)(v).

 CENTER FOR IMMIGRATION STUDIES

This proposal reflects a significant procedural change from current administrative practices.

Under current regulations[9], aliens apprehended entering the United States illegally or without proper documents are subject to expedited removal[10], allowing DHS to quickly remove them without placing them before an immigration judge (IJ) in removal proceedings under section 240 of the INA[11].

There is a notable exception to this quick-removal process if the alien requests asylum or claims a fear of harm if returned.[12]  In that scenario, the alien is interviewed by an AO to determine whether the alien has a "credible fear"[13].  The credible fear interview serves as a screening process to determine whether the alien *may be* eligible for asylum.[14]

Under the current regulations, if an alien receives a "positive credible fear determination" from an AO, the alien is placed into removal proceedings before an IJ to apply for asylum, statutory withholding, or CAT.[15]  If the alien receives a "negative credible fear assessment"[16], the alien can seek a review of that decision from an IJ.[17]  If the IJ agrees with the assessment of the AO[18], the alien is to be removed.  If the IJ reverses the AO and finds that the alien has satisfied the credible fear standard, the alien is placed into removal proceedings, again to apply for protection.[19]

While this proposed rule does not change the underlying eligibility for asylum, statutory withholding, or withholding or deferral under CAT, an explanation of each kind of relief and of the expedited removal process (set forth in section II, below) is necessary to explain why the JNPRM's proposed procedural change is *ultra vires* and would expose the Departments to significant litigation risk should they finalize this regulation as drafted.

---

[9] *See* 8 CFR § 235.3(b)(8) (2021), available at: https://www.law.cornell.edu/cfr/text/8/235.3.

[10] Section 235(b)(1) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[11] Section 240 of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim.

[12] *See* section 235(b)(1)(A)(ii) of the INA (2020) ("Claims for asylum.  If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under [section 212(a)(6)(C) or 212(a)(7) of the INA] and the alien indicates either an intention to apply for asylum under [section 208 of the INA] or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)."); available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelimid; id. at subpara. (B) ("Asylum interviews").

[13] 8 CFR § 235.3(b)(4) (2021), available at: https://www.law.cornell.edu/cfr/text/8/235.3

[14] *See* Andrew Arthur, *DHS/DOJ Propose Changes to Asylum Process at the Border, Boosting grants, slowing removals, facilitating releases of illegal migrants, and encouraging fraud*, CENTER FOR IMMIGRATION STUDIES (Aug. 18, 2021, available at: https://cis.org/Arthur/DHSDOJ-Propose-Changes-Asylum-Process-Border.

[15] 8 CFR § 208.30(f) (2021), available at: https://www.law.cornell.edu/cfr/text/8/208.30.

[16] *Id*. at subsec. (g).

[17] *Id*.  at para. (g)(1).

[18] 8 CFR § 1208.30(g)(2)(iv)(A) (2021), available at: https://www.law.cornell.edu/cfr/text/8/1208.30.

[19] *Id*. at cls. (iv)(B) and (C).

 CENTER FOR IMMIGRATION STUDIES

The proposed rule[20] would also amend the regulations implementing the parole authority in section 212(d)(5)(A) of the INA[21] for aliens in expedited removal proceedings prior to a credible fear screening.

Congress mandated that aliens in expedited removal proceedings be detained: detained when apprehended[22]; detained pending an interview on a credible fear claim[23]; and detained pending a determination on any subsequent asylum claim[24].

Despite these congressional detention mandates for aliens in expedited removal proceedings, the current regulations provide for the release of aliens subject to expedited removal in extremely limited situations.  Specifically, 8 CFR § 235.3(b)(2)(iii)[25] states:

> *Detention and parole of alien in expedited removal. An alien whose inability is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act,* **may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective**.  *(Emphasis added.)*

Similarly, 8 CFR § 235.3(b)(4)(ii)[26] provides:

> *Detention pending credible fear interview. Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act* **may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet**

---

[20] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 49610 (Aug. 20, 2021) ("To ensure effective implementation of the expedited removal system, this rule also proposes to revise the parole considerations prior to a positive credible fear determination in 8 CFR 235.3. The current rule limits parole consideration before the credible fear determination to situations in which parole "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). Under this proposed rule, DHS also would be able to consider whether parole is required "because detention is unavailable or impracticable."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[21] Section 212(d)(5)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

[22] Section 235(b)(1)(B)(iii)(IV) of the INA (2021) ("Mandatory Detention. Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[23] *Id.*

[24] Section 235(b)(1)(B)(ii) of the INA (2021) ("Referral of certain aliens.  If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[25] 8 CFR § 235.3(b)(2)(iii) (2021), available at: https://www.law.cornell.edu/cfr/text/8/235.3.

[26] *Id.* at subpara.(4)(ii).

CENTER FOR IMMIGRATION STUDIES

*a medical emergency or is necessary for a legitimate law enforcement objective.* *(Emphasis added).*

The JNPRM would amend these provisions[27] to allow DHS to parole any alien subject to expedited removal at any point during the expedited removal process in any situation where, in the department's discretion, "detention is unavailable or impracticable."

That amendment would also be *ultra vires*, and in excess of the authority granted to DHS and DOJ under section 212(a)(5) of the INA, as explained in section V, below.

## II.   ASYLUM, STATUTORY WITHHOLDING, AND CAT, AND THE EXPEDITED REMOVAL PROCESS

As noted in section I, a background explanation of asylum, statutory withholding, and CAT, as well as of the expedited removal process, is necessary to understand the implications of the proposed changes in the JNPRM.

### A.  Background on Asylum

Congress, through the INA, has established various levels of permanent and temporary legal immigration per fiscal year, while exempting certain categories from numerical limitation.  In general, the INA establishes three avenues for an alien to become a lawful permanent resident (LPR), putting them on a path to U.S. citizenship[28]: family-based petitions, employment-based petitions, and the "diversity visa lottery".[29]

Combined, the United States awards approximately one million green cards to new LPRs each fiscal year.[30]  In addition to permanent immigration, there are a variety of nonimmigrant visas that allow foreign nationals to be admitted temporarily for business or pleasure[31], as students[32], or as guest workers[33], to name just a few nonimmigrant visa categories.

Despite a plethora of legal immigration options available, many aliens seek to enter the United States without a visa or other permission to live and work in this country.  Many of these inadmissible aliens claim, legitimately or otherwise, to be asylum seekers to remain in the

---

[27] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46946 (Aug. 20, 2021) (amending   8 CFR §§ 235.3(b)(2)(iii) and (4)(ii)), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[28] *See* section 316(a) of the INA (2021) ("Requirements of naturalization"), available at: https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1427&num=0&edition=prelim.

[29] *See* section 201 of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1151&num=0&edition=prelim; and section 203 of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1153&num=0&edition=prelim.

[30] Julia Gelatt, *Explainer: How the U.S. Legal Immigration System Works*, MIGRATION POLICY INSTITUTE (April 2019), available at: https://www.migrationpolicy.org/content/explainer-how-us-legal-immigration-system-works.

[31] Section 101(a)(15)(B) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1101%20edition:prelim).

[32] *Id*. at subparas. (F) and (M).

[33] *Id*. at subpara. (H).

 CENTER FOR IMMIGRATION STUDIES

country, and it is beyond cavil that many aliens without a legitimate claim to asylum game the credible fear process to gain indefinite entry into the United States. [34]

An applicant for asylum has the burden to demonstrate that he or she is eligible for that protection.[35]  To satisfy that burden, the applicant must prove that he or she is a refugee.[36]

A "refugee" is a person outside of his or her country of nationality or habitual residence who is "unable or unwilling" to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[37]  The statutory requirement that the fear of harm be based on one of the five enumerated grounds is sometimes referred to as the "nexus requirement."[38]

The burden that an alien must carry to establish a "well-founded fear" is not a heavy one.  The regulation governing asylum eligibility explains:

> *An applicant has a well-founded fear of persecution if:*
>
> *(A) The applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion;*
>
> *(B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and*
>
> *(C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.[39]*

---

[34] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46909 (Aug. 20, 2021) ("The ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

[35] 8 C.F.R. § 1208.13(a), available at: https://www.law.cornell.edu/cfr/text/8/208.13.

[36] *See* section 208(b) of the INA (2020), available at: https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf.

[37] Section 101(a)(42) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1101&num=0&edition=prelim.

[38] *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. at 36281 (proposed Jun. 15, 2020) (to be codified at 8 C.F.R. §§ 208, 235, 1003, 1208, and 1236), *available at*: https://www.federalregister.gov/documents/2020/06/15/2020-12575/procedures-for-asylum-and-withholding-of-removal-credible-fear-and-reasonable-fear-review.

[38] *See Matter of A-C-A-A-*, 28 I&N Dec. 84 (AG 2020) ("In this case, the Board neither analyzed in any depth whether the evidence presented by the respondent established the nexus requirement, nor reviewed the immigration judge's ultimate determination that the respondent was eligible for humanitarian asylum."), available at: https://www.justice.gov/eoir/page/file/1319866/download, *vacated on other grounds Matter of A-C-A-A-*, 28 I&N Dec. 351 (AG 2021), available at: https://www.justice.gov/eoir/page/file/1415401/download.

[39] 8 C.F.R. § 208.13(b)(2)(i) (2020), available at: https://www.law.cornell.edu/cfr/text/8/208.13.

 CENTER FOR IMMIGRATION STUDIES

The first and third factors above are subjective, that is, individual to the applicant. The second is objective, meaning that the adjudicator must conclude that such persecution would occur, not just that the applicant thinks it would.

In *INS v. Cardoza-Fonseca*[40], the Supreme Court fleshed out the parameters of this standard: "One can certainly have a well[-]founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."  In fact, the Court suggested that a 10-percent likelihood of persecution may be sufficient.

There are generally two different processes by which an alien may apply for asylum:  The affirmative asylum process (affirmative asylum) and the defensive asylum process (defensive asylum).[41]

To obtain asylum through the affirmative asylum process, an alien must be physically present in the United States and may apply for asylum regardless of how the alien arrived in this country or the alien's current immigration status.[42]  Affirmative asylum applications are filed with USCIS, followed by a non-adversarial interview[43], which is to say without confrontation or cross-examination by a government attorney, conducted by an AO.

If the application is denied, the alien can renew the application in removal proceedings before an IJ[44].  An IJ is "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review" (EOIR)[45].  A defensive application for asylum is one filed by an alien as a defense against removal from the United States.[46]

For asylum processing to be defensive, the alien must be in removal proceedings in immigration court before an IJ.[47]  Before an alien can file such an application, the IJ must have found that the alien is removable because the alien entered without inspection or on some other ground of removability.[48]  Those proceedings are adversarial, with the United States represented by an attorney from U.S. Immigration and Customs Enforcement (ICE).[49]

---

[40] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1980), available at: https://supreme.justia.com/cases/federal/us/480/421/.

[41] *See Obtaining Asylum in the United States*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES. (last updated Oct. 19, 2015), *available at*: https://www.uscis.gov/humanitarian/refugees-asylum/asylum/obtaining-asylum-united-states

[42] *Id.*

[43] *See Training Module, INTERVIEWING – INTRODUCTION TO THE NON-ADVERSARIAL INTERVIEW*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES.(revised Dec. 20, 2019), available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf.

[44] See *Obtaining Asylum in the United States*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, (last updated Oct. 19, 2015), available at: https://www.uscis.gov/humanitarian/refugees-asylum/asylum/obtaining-asylum-united-states.

[45] Section 101(b)(4) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1101&num=0&edition=prelim.

[46] *See Obtaining Asylum in the United States*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES. (last updated Oct. 19, 2015), *available at*: https://www.uscis.gov/humanitarian/refugees-asylum/asylum/obtaining-asylum-united-states

[47] *Id.*

[48] *Id.*

[49] *Id.*

CENTER FOR IMMIGRATION STUDIES

### B. Background on Statutory Withholding of Removal

Statutory withholding of removal[50] is like asylum, but the standards for that protection are higher, and the benefits available to an alien granted statutory withholding are fewer.

Specifically, under the statutory withholding provision in section 241(b)(3)(A) of the INA[51], an alien may not be removed "to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."

This provision has been interpreted to require the alien to "establish that it is more likely than not" such persecution would occur upon removal to the country in question to be granted statutory withholding of removal[52], a significantly higher burden than showing a "well-founded fear."

An alien can only be granted statutory withholding after the alien has been ordered removed.[53] Aliens granted statutory withholding can be removed to a "third country" — just not any country to which removal has been withheld (and if such withholding has not been rescinded).[54]

Aside from withholding the removal of the alien to such country or countries, aliens granted statutory withholding are eligible for employment authorization[55], but not much else.  They are not placed on a path to lawful permanent residence, and therefore cannot, unless otherwise eligible, be naturalized.[56]

Due to the limited benefits available to aliens who are granted statutory withholding, alien respondents generally only apply for that protection in lieu of asylum for one of three reasons: (1) They have failed to establish that they are eligible for asylum in the exercise of discretion (asylum is discretionary relief[57], whereas a grant of statutory withholding is mandatory for any alien who establishes eligibility); (2) they are barred from applying for asylum because they

---

[50] Section 241(b)(3) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1231&num=0&edition=prelim.
[51] *Id.*
[52] *Fact Sheet: Asylum and Withholding of Removal Relief, Convention Against Torture Protections*, U.S. DEP'T OF JUSTICE (Jan. 15, 2009), available at: https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/23/AsylumWithholdingCATProtections.pdf.
[53] *See Matter of I-S- and C-S-*, 24 I&N Dec. 432 (BIA 2008), available at: https://www.justice.gov/sites/default/files/eoir/legacy/2014/07/25/3595.pdf ("When an Immigration Judge issues a decision granting an alien's application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act . . . without a grant of asylum, the decision must include an explicit order of removal.; Andrew Arthur, *SCOTUS: Courts Can Review Factual Challenges to CAT Denials for Criminal Aliens, Moving the goal posts to find jurisdiction*, CENTER FOR IMMIGRATION STUDIES (Jun. 3, 2020), available at: https://cis.org/Arthur/SCOTUS-Courts-Can-Review-Factual-Challenges-CAT-Denials-Criminal-Aliens.
[54] 8 CFR § 1208.16(f) (2021), available at: https://www.law.cornell.edu/cfr/text/8/1208.16.
[55] *See* 8 C.F.R. 274A.12(a)(10) (2020), available at: https://www.law.cornell.edu/cfr/text/8/274a.12.
[56] *See* section 316(a) of the INA (2021) ("Requirements of naturalization"), available at: https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1427&num=0&edition=prelim.
[57] *Matter of Salim*, 18 I&N Dec. 311 (BIA 1982), available at: https://www.justice.gov/sites/default/files/eoir/legacy/2012/08/14/2922.pdf.

 CENTER FOR IMMIGRATION STUDIES

failed to file for that protection within one year of entry[58] (the "one-year bar"); or (3) they are subject to one of the criminal bars to asylum that are not otherwise applicable to statutory withholding[59].

### C. Background on CAT

The United States is a signatory to CAT[60], which it ratified on October 21, 1994.[61] That ratification was not "self-executing"[62] and therefore required congressional legislation to implement it under U.S. law.

The legislation implementing CAT is section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA)[63]. Pursuant to that section, it is the policy of the United States "not to expel, extradite, or otherwise effect the involuntary removal of any person to a country where there are substantial grounds for believing that the person would be in danger of being subjected to torture."[64]

FARRA did not dictate how that policy was to be implemented, instead leaving it up to the "appropriate" executive branch agencies to promulgate regulations to enforce those CAT protections.[65]

---

[58] *See* section 208(a)(2)(B) of the INA (2020), available at:
https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf.
[59] *Compare* section 208(b)(2) of the INA (2020), available at:
https://www.dhs.gov/xlibrary/assets/training/xus/crcl/asylumseekers/crcl_asylum/pdfs/Immigration%20and%20Nationality%20Act%20208.pdf *with* section 241(b)(3)(B) of the INA (2020), available at:
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1231&num=0&edition=prelim.
[60] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, , G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc. A/39/51 (1984), *available at*:
https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-9&chapter=4&clang=_en.
[61] *Id*.
[62] Michael John Garcia, *The U.N. Convention Against Torture, Overview of U.S. Implementation Policy Concerning the Removal of Aliens*, CONGRESSIONAL RESEARCH SERVICE (Jan. 21, 2009) at 3 ("The United States signed CAT on April 18, 1988, and ratified the Convention on October 21, 1994, subject to certain declarations, reservations, and understandings, including a declaration that CAT Articles 1 through 16 were not self-executing, and therefore required domestic implementing legislation.") available at: https://fas.org/sgp/crs/intel/RL32276.pdf.
[63] *See* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. 105-277, Div. G, Tit. XII, chap. 3, subchap. B, section 2242 (1998), available at:  https://www.govinfo.gov/content/pkg/PLAW-105publ277/pdf/PLAW-105publ277.pdf.
[64] *Id*. at section 2242(a).
[65] *Id*. at section 2242(b).

 CENTER FOR IMMIGRATION STUDIES

Because of that, and aside from the somewhat vague directions in FARRA, CAT protection is largely regulatory. The regulations implementing CAT are found at 8 C.F.R. §§ 208.16(c), (d), and (f)[66]; 208.17[67]; 208.18[68]; 1208.16(c), (d), and (f)[69]; 1208.17[70]; and 1208.18[71]. Like statutory withholding, protection under CAT is only available to aliens who have been ordered removed from the United States.[72]

There are two forms of CAT protection that are available to aliens: Withholding of removal[73] and deferral of removal[74].

The latter is a more restrictive protection that remains available to applicants for protection who are not eligible for CAT withholding because they fall within one or more of a series of categories barring statutory withholding in section 241(b)(3)(B) of the INA[75] (including the fact that the alien is a persecutor, has been convicted of a particularly serious crime, or poses a danger to the national security of the United States).

The bars to statutory withholding are incorporated into the bars for CAT withholding via regulation.[76] This reflects the fact that, in FARRA[77], Congress directed:

> To the maximum extent consistent with the obligations of the United States under the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, the regulations described in subsection (b) shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the [INA].

---

[66] 8 C.F.R. § 208.16(c), (d), and (f) (DHS, withholding of removal under CAT) (2020), available at: https://www.law.cornell.edu/cfr/text/8/208.16.

[67] 8 C.F.R. § 208.17 (2020) (DHS, deferral of removal under CAT), available at: https://www.law.cornell.edu/cfr/text/8/208.17.

[68] 8 C.F.R. § 208.18 (2020) (DHS), available at: https://www.law.cornell.edu/cfr/text/8/208.18.

[69] 8 C.F.R. § 1208.16(c), (d), and (f) (2020) (EOIR, CAT withholding), available at: https://www.law.cornell.edu/cfr/text/8/1208.16.

[70] 8 C.F.R. § 1208.17 (2020) (EOIR, CAT deferral), available at: https://www.law.cornell.edu/cfr/text/8/1208.17.

[71] 8 C.F.R. § 1208.18 (2020) (EOIR, CAT standards), available at: https://www.law.cornell.edu/cfr/text/8/1208.18.

[72] See Andrew Arthur, *SCOTUS: Courts Can Review Factual Challenges to CAT Denials for Criminal Aliens Moving the goal posts to find jurisdiction*, CENTER FOR IMMIGRATION STUDIES (Jun. 3, 2020), available at: https://cis.org/Arthur/SCOTUS-Courts-Can-Review-Factual-Challenges-CAT-Denials-Criminal-Aliens.

[73] See 8 C.F.R. § 208.16(c), (d), and (f) (2020), available at: https://www.law.cornell.edu/cfr/text/8/208.16; 8 C.F.R. § 1208.16(c), (d), and (f) (2020), available at: https://www.law.cornell.edu/cfr/text/8/1208.16.

[74] See 8 C.F.R. § 208.17 (2020), available at: https://www.law.cornell.edu/cfr/text/8/208.17; 8 C.F.R. § 1208.17 (2020), available at: https://www.law.cornell.edu/cfr/text/8/1208.17.

[75] See section 241(b)(3)(B) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1231&num=0&edition=prelim.

[76] See 8 C.F.R. § 208.16(d)(2) (2020), available at: https://www.law.cornell.edu/cfr/text/8/208.16; 8 C.F.R. § 1208.16(d)(2) (2020), available at: https://www.law.cornell.edu/cfr/text/8/1208.16.

[77] Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. 105-277, Div. G, Tit. XII, chap. 3, subchap. B, section 2242(c) (1998), available at: https://www.govinfo.gov/content/pkg/PLAW-105publ277/pdf/PLAW-105publ277.pdf.

 CENTER FOR IMMIGRATION STUDIES

The drafters of those regulations in the former INS, concluding that they could not bar "aliens described in" the referenced section from protection under CAT, opted instead to create a "less extensive" form of protection, deferral.[78]

### D.  Background on Expedited Removal

When aliens seeking entry without authorizing documents arrive at the United States border, they may take one, or both, of two separate actions: Entering the United States illegally across the border or presenting themselves for admission at a port of entry.

If they present themselves at a port of entry without proper documents, they will be deemed inadmissible to the United States under section 212(a)(7)(A)(i)(I) of the INA.[79]

If they enter the United States illegally and are apprehended by the Border Patrol, on the other hand, DHS could charge them under one or both of two grounds of inadmissibility: Either section 212(a)(7)(A)(i)(I) of the INA[80] or section 212(a)(6)(A)(i) of the INA.[81]

Aliens who have entered illegally and are charged with inadmissibility under section 212(a)(6)(A)(i) of the INA are to be placed into removal proceedings under section 240 of the INA[82], pursuant to section 235(b)(2)(A) of the INA[83].

---

[78] See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8481 ("Although aliens who are barred from withholding of removal under § 241(b)(3)(B) of the Act are not eligible for withholding under 208.16(c), the Article 3 implementing statute directs that any exclusion of these aliens from the protection of these regulations must be consistent with United States obligations under the Convention, subject to United States reservations, understandings, declarations, and provisos conditioning ratification. Section 2242(c) of the Foreign Affairs Reform and Restructuring Act of 1998. Article 3 prohibits returning any person to a country where he or she would be tortured, and contains no exceptions to this mandate. Nor do any of the United States reservations, understandings, declarations, or provisos contained in the Senate's resolution of ratification provide that the United States may exclude any person from Article 3's prohibition on return because of criminal or other activity or for any other reason. Indeed, the ratification history of the Convention Against Torture clearly indicates that the Executive Branch presented Article 3 to the Senate with the understanding that it 'does not permit any discretion or provide for any exceptions.'"), available at: https://www.govinfo.gov/content/pkg/FR-1999-02-19/pdf/99-4140.pdf#page=13.

[79] Section 212(a)(7)(A)(i)(I) of the INA (2021) ("Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission- (I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or (II) whose visa has been issued without compliance with the provisions of section 1153 of this title,  is inadmissible."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim

[80] See id.

[81] Section 212(a)(6)(A)(i) of the INA (2021) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

[82] Section 240 of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim.

[83] See section 235(b)(2)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

On the other hand, those aliens charged with inadmissibility under section 212(a)(7)(A)(i)(I) of the INA, regardless of whether they entered illegally or presented themselves without proper documents at the ports of entry, are amenable to expedited removal under section 235(b)(1)(A)(i) of the INA.[84]  That provision directs in such cases that "the [immigration] officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [of the INA] or a fear of persecution."[85] The process by which aliens make such persecution or asylum claims is known as "credible fear".[86]

Then-Attorney General Jeff Sessions explained that process in a speech he delivered on October 12, 2017 before EOIR:

> *[DHS] is tasked in the first instance with evaluating whether an apprehended alien's claim of fear is credible. If DHS finds that it may be, the applicant is placed in removal proceedings and allowed to present an asylum claim to an immigration judge.*
>
> *If, however, DHS finds that the alien does not have a credible fear, the alien can still get an immigration judge to review that determination. In effect, those who would otherwise be subject to expedited removal get two chances to establish that their fear is credible.[87]*

Under section 235(b)(1)(B)(v) of the INA[88], "the term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under" section 208 of the INA.

A "significant possibility . . . that the alien could establish eligibility for asylum" is lower than the standard required for asylum itself, which requires proof of either "past persecution" or "well-founded fear of persecution."[89]

---

[84] *See* section 235(b)(1)(A)(i) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.  Note that the expedited removal provisions do not apply to unaccompanied alien children.  *See* 8 U.S. Code § 1232 (2021), available at: https://www.law.cornell.edu/uscode/text/8/1232.

[85] *Id.*

[86] *See Questions and Answers: Credible Fear Screening*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (updated Jul. 15, 2015), available at: https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-credible-fear-screening.

[87] *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review*, U.S. DEP'T OF JUSTICE, OFC. OF PUBLIC AFFAIRS (Oct. 12. 2017), available at: https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.

[88] Section 235(b)(1)(B)(v) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[89] *See* section 208(b)(1) of the INA (2021) ("The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A)."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-

 CENTER FOR IMMIGRATION STUDIES

In that October 2017, speech, Attorney General Sessions identified several key problems with the "credible-fear" system:

> [I]n 2009, the previous Administration began to allow most aliens who passed an initial credible fear review to be released from custody into the United States pending a full hearing. These changes — and case law that has expanded the concept of asylum well beyond Congressional intent—created even more incentives for illegal aliens to come here and claim a fear of return.
>
> The consequences are just what you'd expect. Claims of fear to return have skyrocketed, and the percentage of claims that are genuinely meritorious are down.
>
> The system is being abused to the detriment of the rule of law, sound public policy, public safety, and of just claims. This, of course, undermines the system and frustrates officers who work to make dangerous arrests in remote areas. **Saying a few simple words is now transforming a straightforward arrest and immediate return into a probable release and a hearing — if the alien shows for the hearing.**
>
> Here are the shocking statistics: in 2009, DHS conducted more than 5,000 credible fear reviews. By 2016, that number had increased to 94,000. The number of these aliens placed in removal proceedings went from fewer than 4,000 in 2009 to more than 73,000 by 2016 — nearly a 19-fold increase — overwhelming the system and leaving those with just claims buried.
>
> The increase has been especially pronounced and abused at the border. From 2009 to 2016, the credible fear claims at the border went from approximately 3,000 cases to more than 69,000.
>
> All told [EOIR] has over 600,000 cases pending — tripled from 2009.
>
> And the adjudication process is broken as well. DHS found a credible fear in 88 percent of claims adjudicated. That means an alien entering the United States illegally has an 88 percent chance to avoid expedited removal simply by claiming a fear of return.
>
> But even more telling, half of those that pass that screening — the very people who say they came here seeking asylum — never even file an asylum application once they are in the United States. This suggests they knew their asylum claims

section1158&num=0&edition=prelim; section 101(a)(42)(A) of the INA ("The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ."), available at:
https://uscode.house.gov/view.xhtml?req=(title:8%20section:1101%20edition:prelim).

 CENTER FOR IMMIGRATION STUDIES

*lacked merit and that their claim of fear was simply a ruse to enter the country illegally.*[90]

(Emphasis added).  The total number of aliens who have claimed credible fear, alluded to by Attorney General Sessions, have only increased in the interim (with notable exceptions[91]).

According to DHS, prior to 2013, only about one percent of arriving aliens claimed credible fear.[92]

By contrast, CBP[93] reports that "nearly 72,000 migrants" have been placed in expedited removal proceedings in FY 2021 through the end of August.  USCIS statistics[94], however, show that the agency received more than 52,000 credible fear cases during the same period: A more than 70 percent credible-fear claim rate in the last fiscal year, through the end of August.

It makes sense for an arriving alien to make such a claim, because the odds of being found to have credible fear are high.  Between FY 2008 and the third quarter of FY 2019[95], 81 percent of aliens who asserted a fear of harm received a positive credible fear determination from AOs, and an additional two percent received such a determination from IJs.

That said, just less than 17 percent of those aliens who received a positive credible fear determination were granted asylum (14 percent of total credible fear claimants).  By contrast, more than 32.5 percent of aliens who received a positive credible fear determination were ordered removed *in absentia* when they failed to appear for removal proceedings.[96]

---

[90] *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review*, U.S. DEP'T OF JUSTICE, OFC. OF PUBLIC AFFAIRS, Oct. 12. 2017, *available at*: https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.

[91] *See, e.g.* Andrew Arthur, *Border Patrol Apprehensions Drop for the Eighth Straight Month in January, Administration initiatives are paying off*, CENTER FOR IMMIGRATION STUDIES (Feb. 18, 2020), available at: https://cis.org/Arthur/Border-Patrol-Apprehensions-Drop-Eighth-Straight-Month-January.

[92] To *Secure the Border and Make America Safe Again, We Need to Deploy the National Guard*, U.S. DEP'T OF HOMELAND SECURITY, Apr. 4, 2018, *available at*: https://www.dhs.gov/news/2018/04/04/secure-border-and-make-america-safe-again-we-need-deploy-national-guard.

[93] *CBP Releases August 2021 Operational Update*, U.S. CUSTOMS AND BORDER PROTECTION (Sept. 15, 2021), available at: https://www.cbp.gov/newsroom/national-media-release/cbp-releases-august-2021-operational-update.

[94] *Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions*, U.S. Citizenship and Immigration Services (updated Sept. 20, 2021), available at: https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.  Note that USCIS received  an additional 2,598 credible fear cases in the two weeks between September 1st and 15th, as well.

[95] *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019*, U.S. DEP'T OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (data generated Oct. 23, 2019), available at: https://www.justice.gov/eoir/file/1216991/download.

[96] *Id*.

 CENTER FOR IMMIGRATION STUDIES

### III.   ASYLUM OFFICERS LACK AUTHORITY TO ADJUDICATE ASYLUM, STATUTORY WITHHOLDING, AND CAT CLAIMS BY ALIENS WHO HAVE RECEIVED POSITIVE CREDIBLE FEAR DETERMINATIONS

As the 9/11 Commission determined, the September 11, 2001 terrorist attacks reflected significant failures by our national security and immigration agencies.[97]  In response to those attacks, Congress created DHS through the Homeland Security Act of 2002 (HSA).[98]

### A.   DHS's Authorizing Legislation Limits the Authority of Asylum Officers

In the process of implementing the HSA, the immigration jurisdiction that had been held by the former Immigration and Naturalization Service (INS) within DOJ was transferred to three components within DHS, known today as U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).

Section 451(b) of the HSA enumerated five functions that were transferred from the then-INS commissioner to the "Director of the Bureau of Citizenship and Immigration Services": (1) adjudications of immigrant visa petitions; (2) adjudications of naturalization petitions; (3) adjudications of asylum and refugee applications; (4) adjudications performed at service centers; and (5) all other adjudications performed by the INS immediately before those authorities were transferred from DOJ to DHS.[99]

The precise wording of the delegation in the HSA irrefutably demonstrates that Congress intentionally gave AOs within USCIS only authority to hear asylum claims (not claims for statutory withholding or CAT protection), and even then, only those (affirmative) asylum claims

---

[97] *See The 9/11 Commission Report*, NAT'L COMM. ON TERRORIST ATTACKS UPON THE UNITED STATES (Aug. 20, 1994), at 186 ("The third point on which the principals had agreed on March 10 was the need for attention to America's porous borders and the weak enforcement of immigration laws."); *id*. at 81-83 (discussing the role of the former Immigration and Naturalization Service in national security), available at: https://www.9-11commission.gov/report/911Report.pdf; H. REP. NO. 107-609, at 66 (2002) ("Terrorists seeking to bring destructive technologies into the United States have many potential entry points. The United States is a large nation, historically protected from adversaries by two large bodies of water and friendly neighbors to the north and south. It is a nation with relatively open borders that are open to trade and the free flow of people and ideas. Such openness also brings about vulnerabilities. Every day $8.8 billion of goods, 1.3 million people, 58,000 shipments, and 340,000 vehicles enter the United States. The Customs Service is only able to inspect 1 to 2

percent of them. . . . Once here, they have an excellent chance of remaining anonymous and using the freedom America affords to plan and execute their violent deeds. The Immigration and Naturalization Service (INS) was unable to track more than 3 million foreigners with expired visas and, according to press reports, had no record of six of the 19 hijackers who entered the United States legally (Washington Post, Page A16, October 7, 2001). A report by the Government Accounting Office (GAO) offered, ``In several border areas, INS has multiple anti-smuggling enforcement units--they overlap in jurisdictions, operate autonomously, establish their own priorities and report to different INS offices," (GAO Report, ``Alien smuggling: Management and Operational Improvements Needed to Address Growing Problem" (GAO/GGD-00-103 p.3))."), available at: https://www.congress.gov/107/crpt/hrpt609/CRPT-107hrpt609.pdf.
[98] Homeland Security Act of 2002, Pub. L. 107-296 (Nov. 25, 2002), available at: https://www.congress.gov/107/plaws/publ296/PLAW-107publ296.pdf.
[99] *Id.* at section 451, 116 Stat. 2195-2197.

 CENTER FOR IMMIGRATION STUDIES

they had the authority to adjudicate on the effective date of the HSA, for purposes of section 451 therein, March 1, 2003.[100]

   *B. DHS's Authorizing Legislation Retained the Authority of Immigration Judges*

To understand this point, it is crucial to understand what specifically HSA did and did not do.

The HSA in no way affected the jurisdiction or authority of EOIR.  Rather, it explicitly preserved the jurisdiction, authorities, and functions of that component and the IJs therein as they existed on the effective date of that bill.

Congress did this in two ways.  First, Title XI, subtitle A, section 1101(a) of the HSA (notably captioned "Executive Office for Immigration Review") reiterated by statute the existence of EOIR within DOJ.[101]

Second, and more importantly for purposes of this analysis, section 1102 of the HSA[102] amended section 103(g) of the INA[103], to read as follows, in pertinent part:

   *Attorney General*

   *(1) In general*

   *The Attorney General **shall have such authorities and functions under this chapter** and **all other laws** relating to the immigration and naturalization of aliens **as were exercised by the Executive Office for Immigration Review**, or by the Attorney General with respect to the Executive Office for Immigration Review, **on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002** . . . .[104] (Emphasis added.)*

The Immigration Reform, Accountability and Security Enhancement Act of 2002, S. 2444[105], referenced in section 1102 of the HSA, was introduced in the Senate on May 2, 2002.[106]  No votes were subsequently taken on that bill, and it died at the end of the 107th Congress.[107]  It was,

---

[100] *Overview of INS History*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (undated), at 11 ("The Homeland Security Act of 2002 disbanded INS on March 1, 2003."; note, however, that section 471 of the HSA, 116 Stat. 2205, made clear that the INS was "abolished", not "disbanded"), available at: https://www.uscis.gov/sites/default/files/document/fact-sheets/INSHistory.pdf.

[101] *See* Homeland Security Act of 2002, Pub. L. 107-296, section 1101(1), 116 Stat. 2273 (Nov. 25, 2002) ("EXISTENCE OF EOIR.—There is in the Department of Justice the Executive Office for Immigration Review, which shall be subject to the direction and regulation of the Attorney General under section 103(g) of the Immigration and Nationality Act, as added by section 1102."), available at: https://www.congress.gov/107/plaws/publ296/PLAW-107publ296.pdf

[102] *Id*. at 1102.

[103] Section 103(g) of the INA (2020), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1103&num=0&edition=prelim.

[104] *Id*.

[105] Immigration, Reform, Accountability, and Security Enhancement Act of 2002, S. 2444, 107th Cong. (2002), available at: https://www.congress.gov/bill/107th-congress/senate-bill/2444/text.

[106] *Id*., available at: https://www.congress.gov/bill/107th-congress/senate-bill/2444/actions/

[107] *Id*.

 Center for Immigration Studies

however, pending without action other than referral to the Senate Judiciary Committee at the time the HSA was enacted.

Consequently, a plain reading of the HSA makes clear that EOIR continued to have the same functions and authorities under the INA, regulations, and all other laws *after* the enactment of the HSA that it had *prior to* that enactment date, and prior to the HSA's later effective date, as well. That provision remains, unamended, in the INA to this day.

### C. The Authority of Asylum Officers in USCIS vis-à-vis Immigration Judges in EOIR

Section 1102 of the HSA is mirrored by section 451(b) therein[108], which as noted, moved specific functions-- including "[a]djudications of asylum and refugee applications" -- from INS to the new USCIS.

Section 451(b) of the HSA specifically transferred those "functions, and all personnel, infrastructure, and funding provided to the Commissioner [of the INS] in support of such functions immediately before the effective date" to the new USCIS as of the effective date of that provision (again, March 1, 2003).[109]

Congress, through the HSA, plainly intended to assign specific functions to the new USCIS and the existing EOIR.  If it hadn't, or if Congress had simply wanted to leave it up to DHS and DOJ to divvy up those functions at some point in the future (as the JNPRM attempts to do[110], almost 19 years after the fact), it would not have specified the exact dates that those functions were supposed to be assigned in order to vest (or continue to vest in the case of EOIR) with each.

Having set an end date for the assignment of those functions in both sections 451(b) and 1102 of the HSA, those functions are settled, and appropriately assigned to USCIS and EOIR, individually, pending a future *legislative* – not administrative -- reassignment.

Such legislative reassignment of functions between USCIS and EOIR has not occurred in the intervening years, with one minor exception, in the directly relevant and instructive William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)[111], discussed further below.

---

[108] Section 451(b) of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2196 (Nov. 25, 2002), available at: https://www.congress.gov/107/plaws/publ296/PLAW-107publ296.pdf.

[109] *Id*.

[110] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46909 (Aug. 20, 2021) ("To respond to this problem, this rule proposes at 8 CFR 208.2(a)(1)(ii) and 208.9 to provide USCIS asylum officers the authority to adjudicate in the first instance the protection claims of individuals who receive a positive credible fear determination, and that they do so in a nonadversarial hearing."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[111] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5081 (2008), available at: https://www.congress.gov/110/plaws/publ457/PLAW-110publ457.pdf.

 CENTER FOR IMMIGRATION STUDIES

That is true even though the INA has been amended numerous times since 2002, and even though the specific asylum provisions in section 208 of the INA received significant amendment in the REAL ID Act of 2005.[112]

Simply put, the jurisdiction of AOs in USCIS and IJs in EOIR over specific applications for immigration benefits and relief remains vested where it was when INS was abolished on March 1, 2003 (again, with one specific exception in the TVPRA).

>    D.  *Any Attempt to Reassign Jurisdiction Over Protection Claims made by Aliens who Have Received a Positive Credible Fear Determination from Immigration Judges to Asylum Officers Would Be* Ultra Vires

Any attempt to reassign those functions administratively—as again the instant JNPRM attempts to do[113]-- even with the joint consent of DHS and DOJ is therefore *ultra vires*, and adoption of this proposal would expose the departments to significant litigation risk.[114] Reference to the regulations as they existed at the time of enactment of the HSA, and on the effective date of that law for purposes of the jurisdiction of USCIS, underscores this point.

Among the functions and authorities that were exclusively "exercised by" IJs within EOIR under section 103(g)(1) of the INA as of that effective date (and continuing to the present day) was their jurisdiction to adjudicate applications for asylum, statutory withholding, and protection under CAT filed by alien respondents who were subject to expedited removal and who had received a positive credible fear determination, assigned to them under 8 CFR § 208.30(f) (2001).

The last iteration of that regulation prior to the effective date for sections 451(b) and 1002 of the HSA was promulgated via a final rule[115] published by DOJ on December 6, 2000, and effective on January 5, 2001.

It clearly gave *exclusive* jurisdiction over the adjudication of asylum, statutory withholding, and CAT claims by aliens who had received positive credible fear determinations in expedited removal proceedings to IJs in EOIR, given the fact that it read as follows:

---

[112] *See* REAL ID Act of 2005, div. B, tit. 1, section 101 of Pub. L. 109-13, 119 Stat. 302-306 (May 11, 2005), available at: https://www.govinfo.gov/content/pkg/PLAW-109publ13/pdf/PLAW-109publ13.pdf.
[113] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46909 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[114] *See* 5 U.S. Code § 706(2)(A) (2021) ("Scope of review" for the Administrative Procedure Act; "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— (2) hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), available at: https://www.law.cornell.edu/uscode/text/5/706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971) ("The court is first required to decide whether the Secretary acted within the scope of his authority."), available at: https://supreme.justia.com/cases/federal/us/401/402/.
[115] Asylum Procedures, 65 Fed. Reg. 76121 (Dec. 6, 2000) (to be codified at 8 CFR § 208.30(f)), available at: https://www.federalregister.gov/documents/2000/12/06/00-30601/asylum-procedures.

 CENTER FOR IMMIGRATION STUDIES

*Procedures for a positive credible fear finding. If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, **the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act.** If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I-863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). . . .[116] (Emphasis added).*

Section 240 of the INA[117], referenced in that regulatory subsection, is the INA provision that governs removal proceedings before IJs, as paragraph (a)(1) therein makes clear: "In general. An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien." Congress provided no authority to the former INS or to the current DHS generally or to USCIS in particular to conduct removal proceedings anywhere in section 240 of the INA.

Thus, 8 CFR § 208.30(f) (2001) -- a "law[] relating to the immigration and naturalization of aliens" for purposes of section 103(g)(1) of the INA-- gave sole jurisdiction over the adjudication of applications for asylum, statutory withholding, and CAT by aliens who had been subject to expedited removal proceedings under section 235(b)(1) of the INA to IJs as of the effective date of the HSA.

This fact is made even clearer by reference to 8 CFR § 208.2 (2001), which was also revised and amended by that December 2000 final rule.[118] It contained a strict demarcation between the jurisdiction of AOs within the former INS's Office of International Affairs (OIA), on the one hand, and that of IJs within EOIR, on the other.[119]

DOJ explained in the final rule that it had reorganized and revised that regulation specifically "[t]o clarify jurisdiction over asylum applications".[120] Pertinently, it divided jurisdiction over those applications between AOs and IJs. It explained that an amendment to 8 CFR § 208.2(a) was necessary "to establish" that OIA "has initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31".

That jurisdictional regulation, at 8 CFR § 208.2(b)[121], retained IJs' "exclusive jurisdiction over asylum applications filed by" aliens once a charging document (including a Notice to Appear — "NTA") had been filed, consistent with the regulatory scheme under which aliens who had received positive credible fear determinations were issued NTAs and placed into removal proceedings to seek benefits or protection.

---

[116] *Id.* at 76137.
[117] Section 240 of the INA, available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim.
[118] Asylum Procedures, 65 Fed. Reg. 76121, at 76130-31 (Dec. 6, 2000) (to be codified at 8 CFR § 208.30(f)), available at: https://www.federalregister.gov/documents/2000/12/06/00-30601/asylum-procedures.
[119] *See id.*
[120] *Id.* at 76122.
[121] *Id.* at 76130.

 CENTER FOR IMMIGRATION STUDIES

Again, that regulation is a "law[] relating to the immigration and naturalization of aliens"[122] which had given sole and exclusive jurisdiction over the consideration of asylum, statutory withholding, and CAT claims by aliens who had been subject to expedited removal proceedings under section 235(b)(1) of the INA to IJs, as of the effective date of the HSA.

The JNPRM asserts[123] repeatedly that Congress in section 235(b)(1)(B)(ii) of the INA[124] was silent as to how the "further consideration of the application for asylum" made by an alien who had received a positive credible fear determination should occur.  Even accepting that point for argument's sake (the Center otherwise disputes it, as explained below), Congress was not required to be clearer to assign that responsibility exclusively to IJs.

The Supreme Court[125] has held, for purposes of statutory interpretation that Congress is assumed to be "aware of existing law when it passes legislation."  Congress knew when it enacted section 235(b)(1)(B)(ii) of the INA that IJs—not AOs—adjudicated asylum applications for aliens *after* they had been apprehended by INS and placed into proceedings, regardless of the proceedings.

The expedited removal provisions in section 235(b)(1) of the INA were added to that act by section 302(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).[126]  IIRIRA was signed on September 30, 1996.[127]

As the Immigration Policy Center[128] has explained:

> *The Asylum Corps was created in 1990 when the federal government issued final regulations implementing the Refugee Act in its entirety. These regulations took responsibility for asylum cases away from the District Offices of the Immigration and Naturalization Service (INS) and placed it in the hands of the INS Asylum Corps, which on March 1, 2003, became part of the Department of Homeland Security (DHS).*

At no point since the Asylum Corps was created in 1990 up to and following enactment of the HSA and continuing to the present day have AOs ever had jurisdiction over asylum claims made by aliens after they were apprehended by either the former INS or by its successor agencies

---

[122] *See* section 103(g)(1) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1103&num=0&edition=prelim.

[123] *See, e.g.*, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46908 (Aug. 20, 2021) ("The INA is silent as to the procedures by which this 'further consideration' should occur."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[124] Section 235(b)(1)(B)(ii) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[125] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990), available at: https://supreme.justia.com/cases/federal/us/498/19/.

[126] Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-579 to 584 (1996), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.

[127] *Id.*

[128] Walter A. Ewing, Ph.D. and Benjamin Johnson, *Asylum Essentials: The U.S. Asylum Program Needs More Resources, Not Restrictions*, IMMIGRATION POLICY CENTER (Feb. 2005), available at: https://www.americanimmigrationcouncil.org/sites/default/files/research/Asylum%20Essentials%202-05.pdf.

 CENTER FOR IMMIGRATION STUDIES

tasked with enforcing the INA (ICE or CBP) and placed into proceedings, with one narrow and very enlightening exception.

That narrow exception applies to asylum applications filed by unaccompanied alien children[129] (UACs), and is set forth in section 208(b)(3)(C) of the INA[130], as follows:

> *An asylum officer (as defined in section [235(b)(1)(E) of the INA]) shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child (as defined in section 279(g) of title 6), regardless of whether filed in accordance with this section or section [235(b) of the INA].*

That exception was added to the INA by section 235(d)(7)(B) of the TVPRA[131], and it was added expressly to ensure that UACs – and only UACs—had access to asylum adjudications by AOs after they had been apprehended by DHS and placed into proceedings.

The specific language that is used in section 235(d)(7)(B) of the TVPRA is crucial to understanding why the proposal in the instant JNPRM to allow AOs to adjudicate applications for asylum, statutory withholding, and protection under CAT by aliens in expedited removal proceedings who received a positive credible fear determination is *ultra vires*.

Congress, in the TVPRA, specifically *gave jurisdiction* over asylum applications filed by UACs to AOs because it recognized that those AOs otherwise *lacked* jurisdiction over asylum applications filed by UACs who had been apprehended entering illegally or without proper documents and placed into proceedings, a clear recognition of the fact that AOs had no such jurisdiction under the HSA or any other law prior to passage of the TVPRA.

Congress determined that UACs should receive that AO carve-out, but it didn't apply it to *any other alien*, let alone any other alien in expedited removal proceedings under section 235(b)(1) of the INA.  Yet, that is what the instant JNPRM attempts to do.

As the Supreme Court[132] has held: "A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."  That is as true of the language in the INA as it is in any other federal statute and controls the question of AO jurisdiction for purposes of this JNPRM.

Again, with that singular exception, AOs have only ever had jurisdiction over affirmative asylum applications filed by aliens before they were apprehended and placed into proceedings by federal

---

[129] *See* 6 U.S.C. § 279(g)(2) (2021) (defining "unaccompanied alien child"), available at: https://uscode.house.gov/view.xhtml?req=(title:6%20section:279%20edition:prelim)%20OR%20(granuleid:USC-prelim-title6-section279)&f=treesort&num=0&edition=prelim.

[130] Section 208(b)(3)(C) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[131] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5081 (2008), available at: https://www.congress.gov/110/plaws/publ457/PLAW-110publ457.pdf.

[132] *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006), available at: https://crsreports.congress.gov/product/pdf/R/R45153.

 Center for Immigration Studies

immigration authorities-- be they INS, CBP, or ICE—not to those apprehended and placed into proceedings (expedited removal, removal, exclusion, or deportation proceedings).

That explains why the regulations implementing the expedited removal provisions in IIRIRA are so terse in their explanation and dispositive in their effect when assigning jurisdiction over applications for asylum, statutory withholding, and CAT by aliens who had received a positive credible fear determination to IJs, in accordance with section 235(b)(1)(B)(ii) of the INA.

The regulations implementing the statutory provisions in IIRIRA were initially promulgated as an interim rule[133] published jointly by INS and EOIR on March 6, 1997. The explanation of why IJs would adjudicate asylum applications for aliens who had received positive credible fear determinations in removal proceedings was so truncated that it did not even receive its own header in the interim rule, but rather appeared under the caption "Review of Credible Fear Determinations".[134]

The only question that the agencies referenced concerning the "further consideration" of asylum applications by aliens who had received a positive credible fear determination for purposes of section 235(b)(1)(B)(ii) of the INA was whether that consideration should be in "asylum only" proceedings before IJs or in full removal proceedings before IJs under section 240 of the INA.[135]

Here was how the interim rule explained its resolution of that question:

> *This portion of the regulation will not be changed in the interim rule. Section 235(b)(1)(B)(ii) of the Act provides that if an asylum officer determines that an alien has a credible fear of persecution, the alien "shall be detained for further consideration of the application for asylum." The remainder of section 235(b) of the Act is very specific as to what procedures should be followed if an alien does not establish a credible fear. However, the statute is silent as to the procedures for those who do demonstrate a credible fear of persecution.* ***Once an alien establishes a credible fear of persecution, the purpose behind the expedited removal provisions of section 235 of the Act to screen out arriving aliens with fraudulent documents or no documents and with no significant possibility of establishing a claim to asylum has been satisfied. Therefore, the further consideration of the application for asylum by an alien who has established a credible fear of persecution will be provided for in the context of removal proceedings under section 240 of the Act.*** *(Emphasis added.)*

Again, there was not even an issue that it would be IJs who would adjudicate those asylum applications; the only issue was whether the subsequent proceedings would be "asylum only"

---

[133] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997), available at: https://www.govinfo.gov/content/pkg/FR-1997-03-06/pdf/97-5250.pdf.

[134] *Id*. at 10320.

[135] *See id*. ("One commenter asserted that the proposed regulation that provides for an alien who demonstrates a credible fear of persecution to be placed in removal proceedings under section 240 of the Act is incorrect. The commenter maintains that IIRIRA contemplates that such aliens will be limited to an ''asylum only'' hearing with an appeal to the Board.").

 Center for Immigration Studies

proceedings or full removal proceedings under section 240 of the INA-- and INS and EOIR explained fully why they chose the latter.

With due respect, asking whether it should be the IJ or the AO who would adjudicate such asylum applications—or reviewing IIRIRA almost 19 years after the fact and asking that question, as the JNPRM does—is akin to asking whether it would be INS/DHS who would be performing the detention that section 235(b)(1)(B)(ii) of the INA also calls for, or whether it would be DOJ.[136]

The Bureau of Prisons in DOJ detains tens of thousands of individuals daily[137], so the department plainly has the ability and the capacity to detain aliens subject to expedited removal.  Of course, such detention would have been performed by INS for DOJ prior to the effective date of the HSA and ICE for DHS after, but the statute is as silent on that question as it is on who would be considering asylum applications for aliens who received positive credible fear determinations.

It would be risible to think that DOJ would have retained the authority to detain those aliens following the effective date of the HSA, just as it's clear that Congress intended IJs to adjudicate applications for asylum, statutory withholding, and CAT filed by aliens who were subject to expedited removal.  Simply put, Congress did not expressly state who would adjudicate those asylum applications because it did not need to.  Only IJs had ever adjudicated such applications for aliens in immigration proceedings—any immigration proceedings.

Lest there be any lingering doubts about the question that only IJs can adjudicate applications for asylum, statutory withholding, or CAT filed by aliens who received a positive credible fear determination in expedited removal proceedings under section 235(b)(1)(B)(ii) of the INA, however, the legislative history of IIRIRA provides the answer: IJs, in removal proceedings.

As noted, the expedited removal provisions were added to the INA by section 302 of IIRIRA.[138] IIRIRA was enacted as Division C of Public Law 104-208 (Sept. 30, 1996), the Omnibus Consolidated Appropriations Act for 1997 (1997 Omnibus).[139]

---

[136] *See* Section 235(b)(1)(B)(ii) of the INA (2021) ("If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), **the alien shall be detained** for further consideration of the application for asylum.") (Emphasis added), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[137] *See Restricted Housing*, U.S. DEP'T OF JUSTICE, BUREAU OF PRISONS (accessed Oct. 10, 2021) (there were 131,647 inmates in DOJ's Bureau of Prisons custody on October 7, 2021), available at: https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp#:~:text=The%20data%20is%20updated%20on,%25) %20are%20housed%20in%20SHU.

[138] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, section 302, Pub. L. 104-208, 110 Stat. 3009-579 to 584 (1996), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.

[139] *Id*. at 110 Stat. 3009-546 to 110 Stat. 3009-724.

 CENTER FOR IMMIGRATION STUDIES

Prior to passage, the 1997 Omnibus was designated as H.R. 3601.[140]  IIRIRA did not appear in any version of that bill prior to the final conference on it.[141]  Rather, it was added to H.R. 3601 at the time of the final conference on the bill, as the conference committee report shows.[142]

A review of that conference report reveals no explanatory statement for IIRIRA.  That is because IIRIRA had begun as a stand-alone bill, H.R. 2202, originally captioned the "Immigration Control and Financial Responsibility Act of 1996".[143]  That bill passed both the House[144] and the Senate[145] by wide bipartisan margins and went to conference to resolve differences between the versions in each.

H.R. 2202 was passed out of the conference committee (*sub nom*., the "Illegal Immigration Reform and Immigrant Responsibility Act") on September 24, 1996, as the conference report for the bill shows.[146]  That conference report was approved in the House[147] (again, on a bipartisan basis) the next day, but was not brought up for a vote in the Senate before it was added to the conference report for the 1997 Omnibus, which was approved on September 28, 1996[148] -- four days after the conference committee for IIRIRA cleared on its report.

Section 302(a) of IIRIRA as included in the 1997 Omnibus is identical to the same subsection in IIRIRA (H.R. 2202), and identical to the current version of section 235 of the INA.[149]  Given all of this, the conference report for IIRIRA, as H.R. 2202, is the primary and best source of legislative history for the expedited removal provisions in section 235(b)(1) of the INA as enacted.

In the explanatory subsection of the conference report for H.R. 2202 as pertained to what would become section 235(b)(1) of the INA[150], the conferees stated: "If the [asylum] officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of

---

[140] H.R. 3601, 104th Cong. (1996) (enacted), available at: https://www.congress.gov/bill/104th-congress/house-bill/3610.
[141] *See, e.g.*, *id*. as an engrossed amendment in the Senate (Jul. 18, 1996), available at: https://www.congress.gov/bill/104th-congress/house-bill/3610/text/eas.
[142] *See* H. Rep. No. 104-863, at div. C, pp. 561-741 (1996), available at: https://www.congress.gov/104/crpt/hrpt863/CRPT-104hrpt863.pdf.
[143] H.R. 2202, 104th Cong. (1996), available at: https://www.congress.gov/bill/104th-congress/house-bill/2202.
[144] H. Rep. Roll Call 89 (Mar. 21, 1996), available at: https://clerk.house.gov/Votes/199689.
[145] Roll Call Vote 104th Congress - 2nd Session, On Passage of the Bill (h.r.2202 as amended) (May 2, 1996), available at: https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=104&session=2&vote=00108.
[146] H. Rep. No. 104–828 (1996), available at: https://www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf.
[147] H. Rep. Roll Call 432 (Sep. 25, 1996), available at: https://clerk.house.gov/Votes/1996432.
[148] *See* H. Rep. No. 104-863, at div. C, pp. 561-741 (1996), available at: https://www.congress.gov/104/crpt/hrpt863/CRPT-104hrpt863.pdf.
[149] *Compare id*. at 110 Stat. 3009–3009–584 *with* H. Rep. No. 104–828 (1996) at 33-38, available at: https://www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf *with* section 235 of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[150] H. Rep. No. 104–828 (1996) at 209, available at: https://www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf

 CENTER FOR IMMIGRATION STUDIES

the application for asylum **under normal non-expedited removal proceedings**." (Emphasis added.)

That is as clear statement as one could ask to show that Congress, in creating the expedited removal provision in section 235(b)(1) of the INA, intended for aliens who had received a positive credible fear determination from an AO to be placed into removal proceedings under section 240 before an IJ "for further consideration of" their applications for asylum.

Finally, however, the JNPRM's assertion[151] that "[t]he INA is silent as to the procedures by which"[152] further consideration of applications for asylum, statutory withholding, and CAT should occur is in error. To understand this, a brief reiteration of the authorities in the expedited removal provision is in order.

Under section 235(b)(1)(A)(i) of the INA[153], an "immigration officer" must order an alien removed if the alien is inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, unless the alien asserts a fear of persecution or requests asylum. In that case, an AO must interview the alien to determine whether the alien has "a credible fear of persecution" or torture.[154] If the alien "does not have a credible fear of persecution" or torture, it is the AO who must order removal.[155] If the AO finds that the alien does have "a credible fear of persecution", then the alien is detained for the "further consideration of the application for asylum"[156] that the JNPRM references.

At that point, the only issue is whether the alien is eligible for asylum, statutory withholding, or CAT on the one hand, or should be removed on the other. Given the fact that there are no remaining authorities for ordering removal in section 235(b)(1) of the INA, authority for that latter determination must be found elsewhere in the INA.

That "elsewhere" is in section 240 of the INA.[157] Specifically, section 240(a)(3) of the INA[158] provides:

> *Unless otherwise specified in this chapter, a proceeding under this section **shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States** or, if the alien has been so admitted, removed from*

---

[151] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46908 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat
[152] *See* section 235(b)(1)(B)(ii) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[153] Section 235(b)(1)(A)(i) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[154] Section 235(b)(1)(I) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[155] Section 235(b)(1)(B)(iii) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[156] Section 235(b)(1)(B)(ii) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[157] Section 240 of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim.
[158] *Id* at para. (a)(3).

 CENTER FOR IMMIGRATION STUDIES

*the United States. Nothing in this section shall affect proceedings conducted pursuant to section [238 of the INA, pertaining to the expedited removal of aliens convicted of committing aggravated felonies].*

Again, the only question that remains after the AO has determined that the alien has a credible fear is whether the alien should be granted asylum, statutory withholding, or CAT (and thus be admitted, notwithstanding the grounds of inadmissibility) or be denied one or more of those forms of protection and be deemed inadmissible (and thus ordered removed[159]).

Section 235(b)(1) is also in chapter 4 of the INA, but there is no "specification" therein for an order of removal for an alien found to have a credible fear.  The exception in that section for removal thus ends when that determination is made.

As section 240(a)(3) of the INA shows, therefore, applications for asylum, statutory withholding, and CAT made by aliens who were subject to expedited removal proceedings and determined to have a credible fear *must be* made by IJs in removal proceedings under section 240 of the INA.

In summary:

- A review of IIRIRA and sections 235(b)(1) and 240 of the INA demonstrates that Congress never intended AOs to adjudicate claims for asylum, statutory withholding, or CAT made by aliens who had received a positive credible fear determination in expedited removal proceedings.

- The HSA provided AOs in USCIS only with the authority that they had on the effective date of that bill for purposes of the creation of that agency, March 1, 2003.  That authority did not extend to adjudications of claims for asylum, statutory withholding, or CAT made by aliens who had received a positive credible fear determination in expedited removal proceedings, which instead was vested with IJs in EOIR.

- The TVPRA provided a specific carveout for UACs, granting AOs primary jurisdiction over their applications for asylum, statutory withholding and CAT, even if they were subject to section 235(b) of the INA.  This demonstrates that Congress intended that jurisdiction over such applications filed by all other aliens—including aliens in expedited removal proceedings under section 235(b)(1) of the INA-- was and should be vested with IJs in expedited removal proceedings.

Accordingly, the proposal in the JNPRM to grant authority to AOs to adjudicate claims for asylum, statutory withholding, and CAT made by aliens in expedited removal proceedings is

---

[159] *See* section 240(c)(1)(A) of the INA (2021) ("In general. At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

*ultra vires*, would expose the departments to significant litigation risk[160], and therefore should not be regulatorily assigned to those AOs in any final rule.

### IV.   USCIS LACKS AUTHORITY TO MAKE STATUTORY WITHHOLDING AND CAT DETERMINATIONS

Additionally, and contrary to the proposals in the JNPRM, AOs lack the authority to make statutory withholding or CAT determinations generally.

As discussed in Section II.B, under the statutory withholding provision in section 241(b)(3)(A) of the INA[161], an alien may not be removed "to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."

Critically, an alien can only be granted statutory withholding *after* the alien has been ordered removed, as the Board of Immigration Appeals (BIA) has held.[162]  This is reflected in the statutory structure of section 241 of the INA generally, and paragraph (b)(3) therein specifically.

Section 241 of the INA is captioned "Detention and removal of aliens ordered removed", and the provisions therein, and in particular the protection provisions under paragraph (b)(3) therein, relate solely to aliens under final orders of removal.

To understand how statutory withholding of removal operates, it is important to review sections 241(b)(1) and (b)(2) of the INA[163], which directly precede the statutory removal provision in section 241(b)(3) of the INA.  In those sections, Congress either directs the countries to which an alien may be removed, or in the case of section 241(b)(2)(A) of the INA[164], allows the alien to designate the country of removal.  There are limitations on such designations[165], and that provision allows DHS and DOJ to ignore aliens' designations[166] and permits DHS to deport aliens to a non-designated country in specified circumstances.

---

[160] *See* 5 U.S. Code § 706(2)(A) (2021) ("Scope of review" for the Administrative Procedure Act; "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— (2) hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), available at: https://www.law.cornell.edu/uscode/text/5/706; *Citizens to Preserve Overton Park*, 401 U.S. at 415 (1971) ("The court is first required to decide whether the Secretary acted within the scope of his authority."), available at: https://supreme.justia.com/cases/federal/us/401/402/.

[161] Section 241(b)(3) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1231%20edition:prelim).
[162] *See Matter of I-S- and C-S-*, 24 I&N Dec. 432 (BIA 2008), available at: https://www.justice.gov/sites/default/files/eoir/legacy/2014/07/25/3595.pdf.
[163] Sections 241(b)(1) and (2) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1231%20edition:prelim).
[164] *Id*. at subpara. (b)(2)(A).
[165] *Id*. at subpara. (b)(2)(B).
[166] *Id*. at subpara. (b)(2)(C).

 CENTER FOR IMMIGRATION STUDIES

Perhaps more importantly, an alien granted statutory withholding can be removed to a "third country" — just not any country to which that protection has been extended (and not rescinded). After a country or countries of removal are designated, alien respondents in removal proceedings apply for statutory withholding, generally (but not exclusively) in conjunction with asylum. If the IJ determines that the alien respondent is eligible for statutory withholding, the IJ must first order the respondent removed, and then withhold that removal to the designated countries.

The same is true of CAT. It is not "relief" from removal, per se, but rather a bar to the removal of an alien respondent under an order of removal to a designated country or countries. The unique nature of statutory withholding and CAT is reflected in the regulations governing those forms of protection.

Specifically, 8 CFR § 1208.16(f)[167] (which governs statutory withholding and withholding under CAT) states: "Removal to third country. Nothing in this section or § 1208.17 [which governs CAT deferral] shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred."

If statutory withholding and CAT removal did not necessarily follow an order of removal than at the point at which that protection was granted, an alien could not be removed to *any country*, because the alien would not be under an order of removal.[168]

The JNPRM does not propose to amend this provision[169], nor should it, as it correctly reflects both the structure of the law and the mechanism by which the INA and FARRA direct statutory withholding and CAT be administered.

Similarly, 8 CFR § 1208.17[170], which governs CAT deferral, begins:

> *Grant of deferral of removal. An alien who:* **has been ordered removed**; *has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured. (Emphasis added.)*

---

[167] 8 CFR § 1208.16(f) (2020), available at: https://www.law.cornell.edu/cfr/text/8/1208.16.
[168] *See* section 240(a)(3) of the INA (2021) ("Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section" 238 of the INA), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim. Note that statutory withholding determinations are not "proceedings under" section 208 of the INA.
[169] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46908, 46948-49 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[170] 8 CFR § 1208.17 (2020), available at: https://www.law.cornell.edu/cfr/text/8/1208.17.

 CENTER FOR IMMIGRATION STUDIES

The highlighted provision directly reflects the fact that deferral under CAT, like statutory withholding and CAT withholding, can only be granted to an alien who is under an order of removal.

The Center notes that the current regulations[171] permit AOs to make statutory withholding determinations in one very limited class of cases—those involving aliens who would otherwise have been eligible for asylum based on persecution for resistance to coercive population control methods[172], except for an annual cap on grants of that protection under former section 207(a)(5) of the INA (2005).

That authority is vestigial in the regulations, as section 207(a)(5) of the INA was stricken by section 101(g)(2) of the REAL ID Act[173] more than 16 years ago.  Even if it were not, however, it would create a legal impossibility, as it would allow AOs to grant statutory withholding to aliens who were not actually under final orders of removal.[174]

In any event, there was no discussion of this authority either in the original, March 1997 interim rule[175] promulgating this provision or in the January 1997 proposed rule[176].

The only statutory authority that AOs have that allows them to order aliens removed, as noted above, however, is in the expedited removal provisions themselves, at section 235(b)(1)(B)(iii)(I) of the INA[177], and it shows that the proposal in the JNPRM to grant AO's jurisdiction over applications for asylum, statutory withholding, and CAT is *ultra vires*.

It states: "In general. Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer **shall order the alien removed** from the United States without further hearing or review."  (Emphasis added.).

---

[171] 8 CFR § 208.16(a) (2020), available at: https://www.law.cornell.edu/cfr/text/8/208.16; 8 CFR § 1208.16(a) (2020), available at: https://www.law.cornell.edu/cfr/text/8/1208.16.

[172] *See* section 101(a)(42) of the INA (2021) (definition of "refugee": "For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well[-]founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well[-]founded fear of persecution on account of political opinion."), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1101%20edition:prelim).

[173] *See* REAL ID Act of 2005, section 101(g)(2), Pub. L. 109-13, 119 Stat. 305 (1995), available at: https://www.govinfo.gov/content/pkg/PLAW-109publ13/pdf/PLAW-109publ13.pdf.

[174] *See Matter of I-S- and C-S-*, 24 I&N Dec. 432 (BIA 2008), available at: https://www.justice.gov/sites/default/files/eoir/legacy/2014/07/25/3595.pdf.

[175] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997), available at: https://www.govinfo.gov/content/pkg/FR-1997-03-06/pdf/97-5250.pdf#page=26.

[176] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444 (Jan. 3, 1997), available at: https://www.govinfo.gov/content/pkg/FR-1997-01-03/pdf/FR-1997-01-03.pdf.

[177] Section 235(b)(1)(B)(iii)(I) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

Thus, the *only* authority that the INA provides to AOs to issue orders of removal forestalls applications for asylum, withholding, or CAT for aliens in expedited removal proceedings.  In other words, the very jurisdiction that the departments would propose to convey to AOs—again, to adjudicate claims for asylum, statutory withholding, and CAT – is unavailable to aliens subject to the sole order of removal AOs can issue.

The JNPRM nonetheless offers an extensive analysis to demonstrate that AOs possess authority to issue an order of removal after denying an alien's asylum claim.[178]  Specifically, the departments cite to section 101(a)(47)(A) of the INA[179], which defines the term "order of deportation" as "the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation."

The Center notes that this itself is a vestigial provision in the INA, as "orders of deportation" have subsequently been replaced by orders of removal pursuant to IIRIRA, and that in creating orders of removal in IIRIRA, Congress did not include a conforming amendment to section 101(a)(47)(A) of the INA.  This definition was no longer needed in the INA following the enactment of IIRIRA, as Congress therein[180] created a statutory scheme delineating the effects of various administrative removal orders.[181]

By its terms, as noted, the expedited removal provision grants authority to AOs to issue orders of removal in just one discrete instance, at section 235(b)(1)(B)(iii)(I) of the INA[182], which states: "Subject to subclause (III) [IJ review of credible fear denial], if the officer determines that an alien does not have a credible fear of persecution, the officer **shall order the alien removed from the United States without further hearing or review**."  (Emphasis added.)

The Center notes, as explained above, that this provision supports the fact that providing AOs with jurisdiction over asylum claims for aliens who had been subject to expedited removal is *ultra vires*.  To consider an asylum application necessarily includes the possibility of denying it.  The denial of an asylum application filed by an alien who has no other avenue of relief or protection requires the authority to order the alien removed-- authority that Congress did not

---

[178] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46908, 46919 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[179] Section 101(a)(47)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1101%20edition:prelim).
[180] *See* section 241 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-597 to 607 (Sep. 30, 1996) (adding current section 241 to the INA), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.
[181] *See*, *e.g.*, section 241 of the INA (2021) ("Detention and removal of aliens ordered removed"), and *id*. at subpara. (a)(1)(B) ("Beginning of period. The removal period begins on the latest of the following: (i) The date the order of removal becomes administratively final. (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order. (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement."), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1231%20edition:prelim).
[182] Section 235(b)(1)(B)(iii)(I) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

grant to AOs that authority in section 235(b)(1) of the INA, except in the section 235(b)(1)(B)(iii)(I) context.

In that context (where the alien receives a negative credible fear determination), however, the alien is not allowed to apply for asylum *at all*. That provision closes the loop on AO authority, demonstrating Congress's intention that AOs are not to consider asylum applications by aliens who had been subject to expedited removal and who had received positive credible fear determinations.

The departments also cite[183] to *Mitondo v. Mukasey[184]*, 523 F.3d 784 (7th Cir. 2008) to support this proposition. That case is apposite. *Mitondo* involved circuit court review of an asylum application by an alien denied admission under the Visa Waiver Program (VWP)[185]. Courts of appeals are only allowed under the INA to consider final orders of removal[186], but VWP aliens are not amenable to removal proceedings under section 240 of the INA, only "asylum only" proceedings to determine whether they are eligible for asylum, withholding, and CAT[187]. That is because VWP applicants must waive their right to contest removability as a condition of seeking admission under VWP[188].

The Seventh Circuit concluded that it nonetheless had jurisdiction over the case because "an order that is proper only if the alien is removable implies an order of removal"[189], the quote that the departments rely on in the JNPRM.[190] That decision is not applicable in the expedited removal context, because unlike section 235(b)(1) of the INA, which explicitly provides removal authority to immigration officers in the case of aliens who do not claim a fear of persecution or request asylum[191], and limited authority to AOs to order removal for aliens who receive a

---

[183] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46908, 46919 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[184] *Mitondo v. Mukasey*, 523 F.3d 784 (7th Cir. 2008), available at: https://www.courtlistener.com/opinion/1444180/mitondo-v-mukasey/.

[185] *See* section 217 of the INA (2021) ("Visa waiver program for certain visitors"), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1187&num=0&edition=prelim.

[186] *See* section 242(a)(1) of the INA (2021) ("General orders of removal. Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to [section 235(b)(1) of the INA] is governed only by chapter 158 of title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1252&num=0&edition=prelim.

[187] *See* section 217(b)(2) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1187&num=0&edition=prelim

[188] *Id*.

[189] *Mitondo*, 523 F.3d at 787, available at: https://www.courtlistener.com/opinion/1444180/mitondo-v-mukasey/.

[190] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46908, 46919 (Aug. 20, 2021) (quoting *Mitondo*), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

[191] Section 235(b)(1)(A)(i) (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

 Center for Immigration Studies

negative credible fear determination[192], the VWP provisions are vague (at best) on the issuance of orders of removal.[193]

That said, taking the argument of the JNPRM's application of that decision to its logical conclusion, circuit courts would have jurisdiction over *any decision* issued at *any level* that an alien is removable and that denies available relief.

That, however, is not what the judicial review provision in section 241(a)(1) of the INA[194] allows—it only allows for judicial review of "final order[s] of removal", which demonstrates that *Mitondo* is limited to its facts and apposite.

In summary, because AOs cannot otherwise order an alien's removal, they are unable to otherwise grant requests for statutory withholding and CAT, as the issuance of an order of removal is a condition precedent to either of those forms of protection.  Accordingly, any regulation that would give AOs authority to grant aliens statutory withholding or CAT would be *ultra vires*, would expose the departments to significant litigation risk if it were adopted[195], and thus should not be included in the final rule.

## V.   THE PAROLE PROVISION IN THE JNPRM IS *ULTRA VIRES*

As noted in section II above, the proposed rule[196] would also amend the regulations governing the parole, under section 212(d)(5)(A) of the INA[197], of aliens in expedited removal proceedings prior to a credible fear screening.

---

[192] Section 235(b)(1)(B)(iii)(I) of the INA (2021), available at:

[193] *See generally* section 217 of the INA (2021), available at:
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1187&num=0&edition=prelim

[194] *See* section 241(a)(1) of the INA (2021)

[195] *See* 5 U.S. Code § 706(2)(A) (2021) ("Scope of review" for the Administrative Procedure Act; "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— (2) hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), available at:
https://www.law.cornell.edu/uscode/text/5/706; *Citizens to Preserve Overton Park*, 401 U.S. 402, 415 (1971) ("The court is first required to decide whether the Secretary acted within the scope of his authority."), available at:
https://supreme.justia.com/cases/federal/us/401/402/.

[196] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 49610 (Aug. 20, 2021) ("To ensure effective implementation of the expedited removal system, this rule also proposes to revise the parole considerations prior to a positive credible fear determination in 8 CFR 235.3. The current rule limits parole consideration before the credible fear determination to situations in which parole "is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). Under this proposed rule, DHS also would be able to consider whether parole is required "because detention is unavailable or impracticable."), available at:
https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[197] Section 212(d)(5)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

The current regulation itself contradicts Congress's clear directive in section 235(b)(1) of the INA that aliens in expedited removal proceedings are to be detained throughout the entire process, from apprehension[198] to a determination on any subsequent asylum claim[199].

Notwithstanding these congressional detention mandates for aliens in expedited removal proceedings, the current regulations provide for the release of aliens subject to expedited removal but only in an extremely limited set of circumstances.

Specifically, 8 CFR § 235.3(b)(2)(iii)[200] states:

> *Detention and parole of alien in expedited removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal,* ***except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective***.

Similarly, 8 CFR § 235.3(b)(4)(ii)[201] provides:

> *Detention pending credible fear interview. Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act* ***may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective***.

The JNPRM would amend these provisions[202] to allow DHS to parole any alien subject to expedited removal at any point during the expedited removal process in any situation where, in the department's discretion, "detention is unavailable or impracticable."

The word "unavailable" merits its own comment (provided below), but the Center will first focus on the "impracticability" of detention, a concept of little fixed meaning in this context. For

---

[198] Section 235(b)(1)(B)(iii)(IV) of the INA (2021) ("Mandatory Detention. Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[199] Section 235(b)(1)(B)(ii) of the INA (2021) ("Referral of certain aliens.  If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[200] 8 CFR § 235.3(b)(2)(iii) (2021), available at: https://www.law.cornell.edu/cfr/text/8/235.3.
[201] *Id*. at subpara.(4)(ii).
[202] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46946 (Aug. 20, 2021) (amending   8 CFR §§ 235.3(b)(2)(iii) and (4)(ii)), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

 CENTER FOR IMMIGRATION STUDIES

purposes of the law, Merriam-Webster[203] defines "impracticable" as "excessively difficult to perform especially by reason of an unforeseen contingency". One can assume that "unforeseen contingencies" would arise in the detention context, but the ability of DHS to respond to any contingency is a function of resources, which again goes to unavailability.

The proposed regulation itself, however, appears to link impracticability (at least as an initial matter) to the need to provide medical care or special accommodations to certain aliens. Specifically, proposed 8 CFR § 235.3(b)(2)(iii)[204] would state:

> *An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal. Parole of such alien, in accordance with section 212(d)(5) of the Act & § 212.5 of this chapter, may be permitted only when DHS determines, in the exercise of discretion, that parole is required to meet a medical emergency, for a legitimate law enforcement objective, or because detention is unavailable or impracticable (including situations in which continued detention would unduly impact the health or safety of individuals with special vulnerabilities).* (Emphasis added.)

To the degree that this would simply allow for the parole of aliens to seek medical treatment that is not available in the normal immigration setting, it is just slightly more violative of the statutory scheme than the current regulations. Plainly, however, the proposed regulation would exceed even the current regulations.

"Special vulnerabilities" is not otherwise defined and could cover any number of scenarios. It is, quite simply, an exception that would swallow the rule. As a purely subjective phrase, it could be applied in many contexts that would violate the statutory detention scheme, and therefore would be *ultra vires ab initio*.

Note that Congress knew what it was doing when it enacted section 302 of IIRIRA[205], including the detention mandates therein, because it knew how the law was being enforced. Although most aliens apprehended entering the United States illegally in 1996 were single adult males (the vast majority of whom were Mexican nationals)[206], Border Patrol at the Southwest border had as of that time apprehended aliens of almost every nationality, and of every demographic: Young,

---

[203] *Definition of "impracticable"*, MERRIAM-WEBSTER (undated), available at: https://www.merriam-webster.com/dictionary/impracticable.

[204] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46946 (Aug. 20, 2021) (amending 8 CFR §§ 235.3(b)(2)(iii) and (4)(ii)), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[205] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, section 302, Pub. L. 104-208, 110 Stat. 3009-579 to 584 (1996), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.

[206] *See To Secure the Border and Make America Safe Again, We Need to Deploy the National Guard*, U.S. DEP'T OF HOMELAND SECURITY (Apr. 4, 2018) ("Before 2011, over 90% of arriving aliens were single adult males. . .. Before 2009, 90% of arriving aliens were Mexican nationals."). available at: https://www.dhs.gov/news/2018/04/04/secure-border-and-make-america-safe-again-we-need-deploy-national-guard.

 CENTER FOR IMMIGRATION STUDIES

working age, elderly, males, females, and travelling in so-called "family units" (made up of adults and accompanying children), as well as UACs.

Congress, however, did not include any exceptions to the detention mandates in section 235(b)(1) of the INA. Rather, in section 235(b)(1)(B)(iii)(IV) of the INA[207], Congress stated that: "Any alien subject to the procedures under this clause **shall be detained** pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." (Emphasis added.) Section 235(b)(1)(B)(ii) of the INA[208] states: "If the officer determines at the time of the interview that an alien has a credible fear of persecution . . . the alien **shall be detained** for further consideration of the application for asylum." (Emphasis added.)

The Supreme Court[209] has held: "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." It plainly does connote a requirement in these instances, but lest there be any doubt, as the IIRIRA conference report[210] makes clear:

> *An alien who states a fear of persecution or an intention to apply for asylum shall be referred for interview by an asylum officer, who is an immigration officer who has had professional training in asylum law, country conditions, and interview techniques comparable to that provided to full-time adjudicators of asylum applications. The officer shall be, for purposes of determinations made under this section, under the supervision of an immigration officer with similar training and substantial experience in adjudicating asylum applications. **If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum under normal non-expedited removal proceedings.** If the alien does not meet this standard and, if the alien requests administrative review, the officer's decision is upheld by an immigration judge, the alien will be ordered removed. To the maximum extent practicable, review by the immigration judge shall be completed within 24 hours, but in no case shall such review take longer than 7 days. **Throughout this process of administrative review, the alien shall be detained by the INS**.*

Despite this, the theory that has been followed by the executive branch since the first IIRIRA regulations were implemented in 1997 has ostensibly been that the detention mandates in section

---

[207] Section 235(b)(1)(B)(iii)(IV) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.
[208] *Id*. at cl. ii.
[209] *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016), available at: https://casetext.com/case/kingdomware-techs-inc-v-united-states-2.
[210] H. Rep. No. 104–828, at 209 (1996), available at: https://www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf; *see also* section III.D, above.

 CENTER FOR IMMIGRATION STUDIES

235(b)(1) of the INA[211] do not supersede the general parole authority in section 212(d)(5)(A) of the INA[212].

Note, however, that Congress also amended the parole provision in section 212(d)(5)(A) of the INA in section 602 of IIRIRA[213].  As the Supreme Court[214] has held: "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."

Here, Congress addressed *both* the general parole authority and the "narrow, precise, and specific subject" of detention of aliens in expedited removal proceedings *in the same statute*.  Had Congress wanted to allow the Attorney General or DHS to parole aliens subject to detention under section 235(b)(1) of the INA, it would have done so.  It didn't, but in any event, the specific language it used in section 235(b)(1) of the INA should be read to preclude *any* parole of such aliens.

Even if, however, this canon of statutory interpretation was abandoned in the expedited removal context, the parole authority that is proposed in the JNPRM far exceeds the parole authority DHS was given in section 212(d)(5)(A) of the INA[215], which reads as follows:

> *The Attorney General [or DHS] may, except as provided in subparagraph (B) or in [section 214(f) of the INA], in his discretion parole into the United States temporarily under such conditions as he may prescribe* **only on a case-by-case basis for urgent humanitarian reasons or significant public benefit** *any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States. (Emphasis added.)*

That statutory provision makes no reference at all to the unavailability or impracticability of detention of aliens, and no reasonable interpretation of section 212(d)(5)(A) of the INA would allow such an accommodation.  Simply put, there is no legal way to term the release of aliens on parole because of the unavailability or impracticability of detention as a "parole for urgent

[211] *See* section 235(b)(1) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[212] Section 212(d)(5)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

[213] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, section 602, Pub. L. 104-208, 110 Stat. 3009-689 to 690 (1996), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf

[214] *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976), available at: https://supreme.justia.com/cases/federal/us/426/148/.

[215] Section 212(d)(5)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

humanitarian reasons or significant public benefit." Congress cabined the parole authority of DHS and DOJ, but now the departments in the JNPRM[216] propose to ignore Congress's express limitations on that authority.

The parole proposal is the definition of *ultra vires*[217], and adopting the proposed regulation would expose the departments to significant litigation risk.[218]

Not that it is necessary, but a review of the statutory history of that provision makes this even more clear. As noted, section 212(d)(5)(A) of the INA was amended by section 602 of IIRIRA[219], and the highlighted section in the excerpt immediately above was added to that provision.

Prior to that amendment, the Attorney General had authority under section 212(d)(5)(A) of the INA to parole aliens "for emergent reasons or for reasons deemed strictly in the public interest". As INS explained in promulgating regulations to implement that subsequently amended (and narrowed) provision[220], even the more earlier expansive parole statute was meant to be applied extremely narrowly:

> *The legislative history of the parole provision shows a Congressional intent that parole be used in a restrictive manner. The drafters of the Immigration and Nationality Act of 1952 gave as examples situations where parole was warranted in cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution. . .. In 1965, a Congressional committee stated that the parole provisions "were designed to allow the Attorney General to act only in emergent, individual, and isolated situations, such as in the*

---

[216] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46946 (Aug. 20, 2021) (amending 8 CFR §§ 235.3(b)(2)(iii) and (4)(ii)), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[217] *See* Ultra vires, CORNELL LAW SCHOOL, LEGAL INFORMATION INSTITUTE (undated) ("Definition. Latin, meaning "beyond the powers." Describes actions taken by government bodies or corporations that exceed the scope of power given to them by laws or corporate charters. When referring to the acts of government bodies (e.g., legislatures), a constitution is most often the measuring stick of the proper scope of power."), available at: https://www.law.cornell.edu/wex/ultra_vires.

[218] *See* 5 U.S. Code § 706(2)(A) (2021) ("Scope of review" for the Administrative Procedure Act; "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— (2) hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), available at: https://www.law.cornell.edu/uscode/text/5/706; *Citizens to Preserve Overton Park*, 401 U.S. at 415 ("The court is first required to decide whether the Secretary acted within the scope of his authority."), available at: https://supreme.justia.com/cases/federal/us/401/402/.

[219] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, section 602, Pub. L. 104-208, 110 Stat. 3009-689 to 690 (1996), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.

[220] *Detention and Parole of Inadmissible Aliens; Interim Rule with Request for Comments*, 47 Fed. Reg. 30044 (Jul. 9, 1982), available at: https://www.govinfo.gov/content/pkg/FR-1982-07-09/pdf/FR-1982-07-09.pdf#page=1.



CENTER FOR IMMIGRATION STUDIES

> *case of an alien who requires immediate medical attention, and not for the*
> *immigration of classes or groups outside the limit of the law."*

Section 602(a) of IIRIRA struck that prior parole language in section 212(d)(5)(A) of the INA[221], and substituted the current, even more restrictive phrase, again allowing for parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit''.

In *Cruz-Miguel v. Holder*[222], the Second Circuit explained why that change was made:

> *IIRIRA struck from section 212(d)(5)(A) of the INA] the phrase "for emergent*
> *reasons or for reasons deemed strictly in the public interest" as grounds for*
> *granting parole into the United States and inserted "only on a case-by-case basis*
> *for urgent humanitarian reasons or significant public benefit." See Pub.L. No.*
> *104-208, Div. C, § 602(a), 110 Stat, at 3009-689. The legislative history indicates*
> *that this change **was animated by concern that parole under [section***
> ***212(d)(5)(A) of the INA] was being used by the executive to circumvent***
> ***congressionally established immigration policy**. See H.R. Rep. No. 104-169, pt.*
> *1, at 140-41 (1996).  (Emphasis added.)*

That appears to be what the JNPRM is attempting to accomplish.

More recently, in issuing a permanent injunction of DHS's attempted termination[223] of the Migrant Protection Protocols program[224] (MPP) in *Texas v. Biden*[225], Judge Matthew Kacsmaryk of the U.S. District Court for the Northern District of Texas found: "Any class-wide parole scheme that paroled aliens into the United States simply because DHS does not have the detention capacity would be a violation of the narrowly prescribed parole scheme in" section 212(d)(5)(A) of the INA.

---

[221] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, section 602, Pub. L. 104-208, 110 Stat. 3009-689 to 690 (1996), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.
[222] *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n. 15 (2d Cir. 2011), *available at*: https://casetext.com/case/cruz-miguel-v-holder.
[223] *See Memorandum, "Termination of the Migrant Protection Protocols Program"*, ALEJANDRO N. MAYORKAS, SECRETARY OF HOMELAND SECURITY (Jun. 1, 2021), available at: https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.
[224] *See Migrant Protection Protocols (Trump Administration Archive)*, U.S. DEP'T OF HOMELAND SECURITY (last published Apr. 14, 2020), available at: https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.
[225] *Texas v. Biden*, No. 2:21-CV-067-Z (N.D. Tex. Aug. 13, 2021), available at: https://www.scribd.com/document/520115982/Federal-judge-s-ruling-on-Remain-in-Mexico, *stay pending appeal den. Texas v. Biden*, No. 21-10806 (5th Cir. Aug. 19, 2021) (per curiam), available at: https://www.ca5.uscourts.gov/opinions/pub/21/21-10806-CV0.pdf, *stay pending appeal denied Biden v. Texas*, 594 U.S. ___ (Aug. 24, 2021) (order in pending case), available at: https://www.supremecourt.gov/orders/courtorders/082421zr_2d9g.pdf.

 CENTER FOR IMMIGRATION STUDIES

In denying the government's request for a stay of Judge Kacsmaryk's injunction, the Fifth Circuit, in a *per curiam* decision[226], went even further, holding:

> *What the Government cannot do, the district court held, is simply release every alien described in [section 235 of the INA] en masse into the United States. The Government has not pointed to a single word anywhere in the INA that suggests it can do that. And the Government cannot claim an irreparable injury from being enjoined against an action that it has no statutory authorization to take.*

And yet, that is precisely what the departments are attempting to do through their regulatory amendment to the parole regulation for aliens in expedited removal in the JNPRM[227].

We do not question the intentions of the departments in proposing this regulatory change, but such an amendment to the regulations to confer on DHS the authority to parole entire classes of migrants who have entered the United States simply because their detention is impracticable or unavailable would fly in the face of these clear congressional restrictions and invite significant litigation risk, not least of which in the ongoing proceedings in *Texas v. Biden*.

That said, however, as noted above, the unavailability and impracticality of the detention for aliens in expedited removal proceedings is, at its core, a resource issue over which the executive branch has a significant amount of authority. Stated plainly, the administration can request resources to detain aliens to meet the congressional detention mandates in section 235(b)(1) of the INA, but it has failed to do so and does not propose doing so.

In the press release for its August 2021 Operational Update[228], CBP reports: "A total of 1,002,722 unique individuals have been encountered year-to-date during Fiscal Year 2021", more than 150,000 than the agency did "during the same time period in Fiscal Year 2019". FY 2019, referenced in that press release, was not a good year at the Southwest border. In fact, on March 29, 2019, then-DHS Secretary Kirstjen Nielsen stated[229]:

> *Today I report to the American people that we face a cascading crisis at our southern border. The system is in freefall. DHS is doing everything possible to*

---

[226] *Texas v. Biden*, No. 21-10806, at 29 (5th Cir. Aug. 19, 2021) (per curiam), available at: https://www.ca5.uscourts.gov/opinions/pub/21/21-10806-CV0.pdf, *stay pending appeal denied Biden v. Texas*, 594 U.S. ___ (Aug. 24, 2021) (order in pending case), available at: https://www.supremecourt.gov/orders/courtorders/082421zr_2d9g.pdf.

[227] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46946 (Aug. 20, 2021) (amending 8 CFR §§ 235.3(b)(2)(iii) and (4)(ii)), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

[228] *CBP Releases August 2021 Operational Update*, U.S. CUSTOMS AND BORDER PROTECTION (Sep. 15, 2021), available at: https://www.cbp.gov/newsroom/national-media-release/cbp-releases-august-2021-operational-update.

[229] *Secretary Kirstjen Nielsen Statement on Border Emergency*, KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY (Mar. 29, 2019), available at: https://www.dhs.gov/news/2019/03/29/secretary-kirstjen-nielsen-statement-border-emergency.

CENTER FOR IMMIGRATION STUDIES

> *respond to a growing humanitarian catastrophe while also securing our borders, but we have reached peak capacity and are now forced to pull from other missions to respond to the emergency.*

The vast majority of those "unique encounters" in FY 2021 have been Border Patrol apprehensions of aliens who have entered the United States illegally over the Southwest border. In fact, agents there have apprehended more than 1.47 million aliens who entered the United States illegally in FY 2021 through the end of August[230].  Each of those aliens is amenable to expedited removal.

Despite this fact, ICE detained just 22,129 aliens total as of October 1[231], and of those, just 17,133 were aliens who had been apprehended by CBP.  Rather than requesting additional detention capacity for ICE, the administration is actually requesting *fewer* detention beds (measured as "average daily population" or ADP) in its FY 2022 budget.[232]

A massive and *ultra vires* regulatory change is not necessary to deal with the increased influx of aliens entering the United States illegally[233].  Nor is it required "to ensure effective implementation of the expedited removal system", as the JNPRM claims[234].  Increased detention resources to comply with the detention mandates in section 235(b)(1) of the INA are, at least until immigration policies that actually limit illegal immigration can be implemented.

Instead, the proposed regulations would simply encourage more illegal immigration at the Southwest border, as history has shown.  Whenever a policy is implemented that directs or facilitates the release of illegal aliens into the United States (despite the detention mandates in section 235(b)(1) of the INA), the number of aliens who thereafter enter the United States illegally increases.  That is why the departments are facing the crisis that the JNPRM purports to address.

---

[230] *Southwest Land Border Encounters*, U.S. Customs and Border Protections (modified Sep. 15, 2021), available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[231] *ICE Detainees*, TRAC Immigration (undated), available at: https://trac.syr.edu/immigration/detentionstats/pop_agen_table.html.
[232] *FY 2022 Budget in Brief*, U.S. DEP'T OF HOMELAND SECURITY (undated), at 35 ("FY 2022 Major Decreases"; "The FY 2022 President's Budget supports an ADP level of 32,500 (30,000 adult and 2,500 family). This is a decrease of 1,500 adult beds from the FY 2021 Enactment."), available at: https://www.dhs.gov/sites/default/files/publications/dhs_bib_-_web_version_-_final_508.pdf.
[233] *Southwest Land Border Encounters*, U.S. Customs and Border Protections (modified Sep. 15, 2021), available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[233] *ICE Detainees*, TRAC Immigration (undated), available at: https://trac.syr.edu/immigration/detentionstats/pop_agen_table.html.
[234] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46910 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

 CENTER FOR IMMIGRATION STUDIES

DHS had complied with the detention mandate for aliens in expedited removal until December 2009, when then-ICE Director John Morton issued an agency directive[235] stating that aliens who had received a positive credible fear determination should generally be released from DHS custody on parole under section 212(d)(5)(A) of the INA.  AOs completed 5,173 credible fear cases in FY 2009[236], before the Morton parole directive went into effect. The number of credible fear claims grew to 8,926 in FY 2010[237], 11,716 in FY 2011[238], and 13,607 in FY 2012[239], before increasing by almost 280 percent, to 36,454, in FY 2013[240].

By FY 2019[241], AOs were adjudicating more than 102,000 credible fear claims (they received 105,000-plus that year but were unable to keep up) as smugglers discovered and exploited the "credible fear" loophole that allowed illegal aliens to live and work in the United States indefinitely.[242]

Plainly, the Morton directive drove more illegal aliens to claim credible fear in order to be released in the United States, as then-Attorney General Sessions explained.

The Trump administration never rescinded the 2009 Morton directive, even though it directly contravenes the law. Instead, it implemented MPP[243], which effectively satisfied the expedited-removal detention mandate by denying illegal aliens free movement in the United States and returning then back across the border to await their removal proceedings, in accordance with section 235(b)(2)(C) of the INA[244].  Some 68,000 aliens[245] who had claimed credible fear were returned to Mexico under MPP and paroled into the United States to make asylum claims. Under

---

[235] *ICE Directive No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (Dec. 8, 2009), available at: https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

[236] *Credible Fear Workload Report, Summary*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Jan. 24, 2012), available at: https://www.uscis.gov/sites/default/files/document/data/PED_CredibleFearWorkloadReport.pdf.

[237] *Id*.

[238] *Id*.

[239] *Id*.

[240] *Id*.

[241] *Credible Fear Workload Report Summary, FY2019 Total Caseload*, U.S. Citizenship and Immigration Services (undated), available at: https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf.

[242] *See* Andrew Arthur, *How the Border Became the Disaster It Is, and How Biden Wants to Make It Worse Understanding the decade-long series of specific decisions that led to chaos*, CENTER FOR IMMIGRATION STUDIES (Sep. 20, 2021), available at: https://cis.org/Report/How-Border-Became-Disaster-It-and-How-Biden-Wants-Make-It-Worse.

[243] *Migrant Protection Protocols (Trump Administration Archive)*, U.S. DEP'T OF HOMELAND SECURITY (last published Apr. 14, 2020), available at: https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[244] *See* section 235(b)(2)(C) of the INA (2021) ("Treatment of aliens arriving from contiguous territory. In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under" section 240 of the INA), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[245] Camila DeChalus, *Biden's immigration problem: How to end 'Remain in Mexico', The program is one of many Trump policies that the president-elect has promised to unravel*, ROLL CALL (Dec. 11, 2020), available at: https://www.rollcall.com/2020/12/11/bidens-immigration-problem-how-to-end-remain-in-mexico/.

 CENTER FOR IMMIGRATION STUDIES

MPP, between July and September 2019[246], the number of credible fear claims USCIS received dropped 59 percent.

As DHS determined in its October 2019 assessment of MPP[247], however, the program speeded the adjudication of legitimate asylum claims while deterring bad ones. Consequently, "aliens without meritorious claims — which no longer constitute[d] a free ticket into the United States — [were] beginning to voluntarily return home."

A similar case example has to do with legislation surrounding the *Flores* settlement agreement[248] (FSA), which is discussed at greater length, below.  Prior to FY 2013, most aliens who entered the United States did so alone, without bringing children with them[249].  Beginning that fiscal year, however, Border Patrol began apprehending more alien adults entering illegally with children, in so-called "family units" or FMUs.[250]  In FY 2013[251], Border Patrol agents at the Southwest border apprehended 14,855 aliens in FMUs.  That number increased more than 360 percent, to more than 68,000 by the next fiscal year.[252]

The Obama administration responded by detaining most aliens in FMUs who had entered illegally, allegedly to dissuade others.[253]  Consequently, the number of aliens in family units who were apprehended at the Southwest border in FY 2015 fell to just less than 40,000.[254]  The

---

[246] *Credible Fear Workload Report Summary, FY2019 Total Caseload*, U.S. Citizenship and Immigration Services (undated), available at: https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf.

[247] *Assessment of the Migrant Protection Protocols (MPP)*, U.S. DEP'T OF HOMELAND SECURITY (October 28, 2019), at 3, available at: https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf

[248] *See Flores v. Reno*, No. CV 85-4544-RJK(Px), Stipulated Settlement Agreement (C.D. Cal. 1997), available at: https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf.

[249] *See* Andrew Arthur, *How the Border Became the Disaster It Is, and How Biden Wants to Make It Worse Understanding the decade-long series of specific decisions that led to chaos*, CENTER FOR IMMIGRATION STUDIES (Sep. 20, 2021), available at: https://cis.org/Report/How-Border-Became-Disaster-It-and-How-Biden-Wants-Make-It-Worse.

[250] *Id*.

[251] *Total Family Unit Apprehensions By Month - FY 2013*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

[252] *Total Family Unit Apprehensions By Month - FY 2014*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

[253] *See* Andrew Arthur, *How the Border Became the Disaster It Is, and How Biden Wants to Make It Worse Understanding the decade-long series of specific decisions that led to chaos*, CENTER FOR IMMIGRATION STUDIES (Sep. 20, 2021), available at: https://cis.org/Report/How-Border-Became-Disaster-It-and-How-Biden-Wants-Make-It-Worse.

[254] *Total Family Unit Apprehensions By Month - FY 2015*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

 CENTER FOR IMMIGRATION STUDIES

FSA[255] required that alien children be detained in licensed facilities, a requirement that the Obama administration was not complying with as related to the children in FMUs[256], but it had its reasons.  There is no federal licensing requirement, and there are no state licensing standards because states don't detain children with parents incarcerated for criminal convictions.  Plus, the FSA had never been applied to children who were accompanied by their parents, only to those travelling alone.[257]

In February 2015[258], the *Flores* plaintiffs filed a motion with U.S. District Court Judge Dolly Gee (who oversees *Flores*) to enforce the FSA with respect to the children in the FMUs that the Obama administration was detaining.  The result was an August 2015 order[259] (affirmed in July 2016[260]) directing that alien children in FMUs be released from custody within 20 days of their detention by DHS.  To avoid family separation, the parents are usually released, as well.[261]

As a direct consequence, the number of aliens in FMUs apprehended by Border Patrol at the Southwest border soared, increasing from 39,838 in FY 2015[262] to 77,674 in FY 2016[263], before tapering off at 75,622 in FY 2017[264], at the beginning of the Trump administration.  The vast majority of the FMUs apprehended in FY 2017 (71 percent or 54,142) were caught in or before January of that year, that is prior to the start of the Trump administration.  Apparently deterred

---

[255] *See Flores v. Reno*, No. CV 85-4544-RJK(Px), Stipulated Settlement Agreement (C.D. Cal. 1997), available at: https://www.aclu.org/sites/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf

[256] *See* Andrew Arthur, *How the Border Became the Disaster It Is, and How Biden Wants to Make It Worse Understanding the decade-long series of specific decisions that led to chaos*, CENTER FOR IMMIGRATION STUDIES (Sep. 20, 2021), available at: https://cis.org/Report/How-Border-Became-Disaster-It-and-How-Biden-Wants-Make-It-Worse.

[257] *See Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 2 ("The crisis is further exacerbated by a 2017 federal court order in *Flores v. DHS* expanding to FMUs a 20-day release requirement contained in a 1997 consent decree, originally applicable only to unaccompanied children (UAC)."), available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[258] *See* Andrew Arthur, *Ninth Circuit Flores Decision Puts Biden in a Fix, The more that come, the more that will come*, CENTER FOR IMMIGRATION STUDIES (Jan. 11, 2021), available at: https://cis.org/Arthur/Ninth-Circuit-Flores-Decision-Puts-Biden-Fix.

[259] *Flores v. Lynch*, 212 F. Supp. 3d 907 (2015), available at: https://cite.case.law/f-supp-3d/212/907/.

[260] *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016), available at: https://casetext.com/case/flores-v-lynch-4.

[261] *Id*.

[262] *Total Family Unit Apprehensions By Month - FY 2015*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

[263] *Total Family Unit Apprehensions By Month - FY 2016*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

[264] *Total Family Unit Apprehensions By Month - FY 2017*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

 CENTER FOR IMMIGRATION STUDIES

from entering by then-candidate Trump's pro-immigration enforcement stances on the campaign trail, illegal entrants in FMUs slowed to a trickle (1,118) by April 2019.

As it became apparent, however, that the Trump administration was unable to restrict the release policies in the FSA litigation, FMU numbers soared again, to 107,212 in FY 2018[265], before peaking in FY 2019[266] at 473,682— a 1,089 percent increase over FY 2015, the year that Judge Gee issued her order.

A bipartisan federal panel convened to address the FMU crisis at the Southwest border determined in April 2019[267] that:

> By far, the major "pull factor" [driving the increase in FMU migration] is the current practice of releasing with a NTA most illegal migrants who bring a child with them. The crisis is further exacerbated by a 2017 federal court order in Flores v. DHS expanding to FMUs a 20-day release requirement contained in a 1997 consent decree, originally applicable only to unaccompanied children (UAC).

Reading that panel's report, it is apparent that the biggest reason why those aliens in FMUs were being released with just NTAs was because DHS had not invested in detention space for the FMUs it could not detain under Flores.[268]  Only the full implementation of MPP slowed the number of illegal aliens in FMUs, as DHS's assessment of that program made clear.[269]

The lesson to be learned from the Morton directive and the FSA litigation is that as soon as a policy is enacted that makes it more likely that illegal aliens will be released from DHS custody,

---

[265] *Total Family Unit Apprehensions By Month - FY 2018*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

[266] *Total Family Unit Apprehensions By Month - FY 2019*, U.S. BORDER PATROL (undated), available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_1.pdf.

[267] *See Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 1-2, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[268] *See generally id.*; *see also Final Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Nov. 14, 2019), at 27 ("A primary reason that ICE ERO did not and could not expand its capacity was lack of funding and the judicial enforcement of the *Flores* consent decree in July 2017 that had been expanded to include children accompanied by a parent."), available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[269] *Assessment of the Migrant Protection Protocols (MPP)*, U.S. DEP'T OF HOMELAND SECURITY (October 28, 2019), at 2 ("Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%."), available at: https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf

 CENTER FOR IMMIGRATION STUDIES

notwithstanding the detention mandates in section 235(b)(1) of the INA, the number of illegal aliens who enter to exploit that policy balloons.

The parole provision in the JNPRM accelerates these problematic policies by expediting the release of aliens in expedited removal proceedings.  By essentially allowing the release of aliens in expedited removal who simply claim credible fear, the number of illegal aliens who do so will soar, increasing the total number of illegal aliens and the scope of the disaster at the Southwest border.

Finally, and relatedly, these proposed regulatory changes to the parole regulations for aliens in expedited removal proceedings are in contravention of section 2(a) of the Secure Fence Act (SFA)[270].  That section of the SFA requires the secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States", within 18 months of date of enactment of that act (October 26, 2006)[271].

"Operational control" for purposes of that provision is defined as "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband."[272]  DHS is currently failing to comply with this provision, which, because it lacks a "sunset" clause, remains in effect.

Again, Border Patrol agents at the Southwest border apprehended more than 1.47 million aliens who entered at the Southwest border illegally in FY 2021, through August 31.[273]  Of those illegal aliens, more than 535,000 were processed under the INA (as opposed to being expelled under Title 42 orders issued in response to the pandemic[274]).

As the detention numbers above demonstrate, almost all those 535,000-plus aliens who were apprehended entering illegally and processed under the INA were released into the United States, in contravention of the SFA.  The proposed regulatory changes to the parole standard for aliens in expedited removal would make this worse, abrogating DHS's clear statutory duty to gain operational control of the Southwest border.

---

[270] Secure Fence Act of 2006, Pub. L. 109-367, 120 Stat. 2638 (Oct. 26, 2006), at section 2(a), available at: https://www.congress.gov/109/plaws/publ367/PLAW-109publ367.pdf.
[271] *Id*.
[272] *Id*. at section 2(b).
[273] *Southwest Land Border Encounters*, U.S. CUSTOMS AND BORDER PROTECTION (modified Sep. 15, 2021), available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[274] *See* Andrew Arthur, *Covid, Title 42, and the Biden Administration's Border Policies, Stop the name calling, and let's get some facts*, CENTER FOR IMMIGRATION STUDIES (Aug. 14, 2021), available at: https://cis.org/Arthur/Covid-Title-42-and-Biden-Administrations-Border-Policies.

 CENTER FOR IMMIGRATION STUDIES

Again, the JNPRM's proposed noncompliance with the SFA renders the proposal *ultra vires*, and thus exposes the departments to significant litigation risk if it were adopted[275], and should therefore be rejected.

The entire parole provision in the JNPRM appears to be premised on the fact that, unless DHS can parole aliens who would otherwise be subject to expedited removal under section 235(b)(1) of the INA, it must process illegal entrants apprehended at the border under section 235(b)(2) of the INA.

As noted, an alien who enters the United States illegally is inadmissible under both section 212(a)(6)(A)(i) of the INA[276] (alien present without admission or parole) and section 212(a)(7)(A)(i)(I) of the INA[277] (alien seeking admission without proper documents).  Aliens charged under the former section of the INA are not amenable to expedited removal under section 235(b)(1) of the INA, while those charged under the latter ground of inadmissibility are.[278]

The implication in the JNPRM is that DHS can otherwise release aliens who are charged with being present without admission or parole who are thus processed under section 235(b)(2) of the INA[279] pursuant to section 236(a)(1) of the INA[280], which it plainly cannot do with respect to aliens subject to the congressional detention mandates in section 235(b)(1) of the INA.[281]

---

[275] *See* 5 U.S. Code § 706(2)(A) (2021) ("Scope of review" for the Administrative Procedure Act; "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— (2) hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), available at: https://www.law.cornell.edu/uscode/text/5/706; *Citizens to Preserve Overton Park*, 401 U.S. at 415 ("The court is first required to decide whether the Secretary acted within the scope of his authority."), available at: https://supreme.justia.com/cases/federal/us/401/402/.

[276] Section 212(a)(6)(A)(i) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

[277] Section 212(a)(7)(A)(i)(I) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

[278] *See* section 235(b)(1)(A)(i) of the INA (2021) ("If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under [section 212(a)(6)(C) of the INA] or [section 212(a)(7) of the INA}, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [section 208 of the INA] or a fear of persecution."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[279] *See* section 235(b)(2) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[280] Section 236(a)(1) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1226&num=0&edition=prelim.

[281] Aliens who are processed under section 235(b)(2) of the INA are to be placed into removal proceedings under section 240 of the INA.  *See* section 235(b)(2) of the INA (2021) ("Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding

 CENTER FOR IMMIGRATION STUDIES

If that is a correct assessment, then DHS is in error in concluding that it can release illegal aliens apprehended at the border after entering illegally under section 236(a)(1) of the INA.  That provision permits detention or release of aliens on bond or conditional parole, but only in the case of aliens who are arrested on warrant.[282]   Most illegal aliens who are apprehended by Border Patrol are not apprehended on warrant, but rather are subject to warrantless arrest under section 287(a)(2) of the INA[283].  Thus, DHS does not have the authority to release them under section 236(a)(1) of the INA, which again by its terms only provides for the release of aliens arrested on warrants.

Further, Congress has mandated the detention of illegal aliens who are subject to section 240 removal proceedings under section 235(b)(2) of the INA, just as it has for aliens who are subject to expedited removal under section 235(b)(1) of the INA.

Specifically, section 235(a)(1) of the INA[284] states:

> *An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)* ***shall be deemed for purposes of this chapter an applicant for admission****.  (Emphasis added.)*

In turn, section 235(b)(2) of the INA[285] provides:

> *Subject to subparagraphs (B) and (C), in the case of an alien* ***who is an applicant for admission****, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the*

---

under" section 240 of the INA), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[282] *See* section 236(a)(1) of the INA (2021) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1226&num=0&edition=prelim.

[283] *See* section 287(a)(2) of the INA (2021) ("Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant- (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States . . . "), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1357&num=0&edition=prelim.

[284] Section 235(a)(1) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[285] Section 235(b)(2) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

CENTER FOR IMMIGRATION STUDIES

*alien shall be detained* for a proceeding under [section 240 of the INA].
(*Emphasis added.*)

It is clear from these provisions that Congress intended that *all* aliens apprehended at the border after entering the United States illegally are to be detained and not released.

Even if the departments conclude, however, that aliens processed under section 235(b)(2) of the INA are amenable to detention, DHS can only release those aliens in accordance with the terms of the parole provision in section 212(d)(5)(A) of the INA[286]-- again, "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit"—not because detention is unavailable or impracticable, as the JNPRM proposes.[287]  Any contrary action would be *ultra vires*.

## VI.   RATHER THAN ADOPTING *ULTRA VIRES* REGULATORY CHANGES, DHS AND DOJ SHOULD PROMULGATE REGULATIONS TO DETAIN ALIENS IN "FAMILY UNITS"

Instead of adopting the *ultra vires* regulatory changes in the JNPRM, DHS and DOJ should promulgate regulations to address the *Flores* settlement agreement (again, "FSA"), to allow DHS to detain alien adults and children entering illegally in "family units" (FMUs), to comply with the detention mandates in section 235(b)(1) of the INA.

The departments admit that the FSA is a problem but contend that the real issue is the statutory parole standard in section 212(d)(5)(A) of the INA: "The current narrower parole standards effectively prevent DHS from placing into expedited removal many noncitizens who would otherwise be eligible for this process, especially families, given the requirements of" the FSA.[288]

Footnote 27 in the JNPRM[289] accurately describes the history of the FSA, and the Center incorporates that history in this comment as if contained herein.[290]  Briefly, however, in 2016, the Ninth Circuit issued an opinion interpreting the FSA in *Flores v. Lynch*[291] (*Flores I*). The

---

[286] Section 212(d)(5)(A) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.
[287] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46910 (Aug. 20, 2021) ("Under this proposed rule, DHS also would be able to consider whether parole is required "because detention is unavailable or impracticable."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[288] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46910 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[289] *Id*. at n. 27.
[290] *But see* Andrew Arthur, *Ninth Circuit Flores Decision Puts Biden in a Fix, The more that come, the more that will come*, CENTER FOR IMMIGRATION STUDIES (Jan. 11, 2021) (more complete history of the *Flores* litigation), available at: https://cis.org/Arthur/Ninth-Circuit-Flores-Decision-Puts-Biden-Fix.
[291] *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016), available at: https://scholar.google.com/scholar_case?case=12780774456837741811.

48



Center for Immigration Studies

circuit court in *Flores I* sustained an August 2015 order[292] by Judge Gee of the U.S. District Court for the Central District of California mandating the release of children in FMUs in 20 days.

The practical effect of the circuit court's order (as noted) was to require DHS to release all minors it apprehended within that 20-day period, regardless of whether they were UACs or instead entered illegally accompanied by adults in FMUs. To avoid "family separation", accompanying adults in FMUs have been released as well (in most cases) since 2015. Consequently, the promise of a quick release from DHS custody has encouraged an untold number of foreign national adults to bring children with them when entering the United States illegally, in order to gain quick release.

In its bipartisan April 2019 Final Emergency Interim Report[293], the Homeland Security Advisory Council's CBP Families and Children Care Panel explained:

> *There is a real crisis at our border. An unprecedented surge in family unit (FMU) migration from Central America is overwhelming our border agencies and our immigration system. This crisis is endangering children.* ***In too many cases, children are being used as pawns by adult migrants and criminal smuggling organizations solely to gain entry into the United States*** *(U.S.). Because 40% of the U.S. Customs and Border Protection (CBP), U.S. Border Patrol's (USBP) resources are currently absorbed in dealing with this crisis,* ***the USBP is not able to effectively manage its other border security missions -- apprehending migrants illegally seeking to evade detection, including criminal aliens and those who pose a public safety or national security threat, uncovering instances of trafficking, fraudulent family relationships and other criminal activity among this population, and monitoring the border for drug smuggling and other contraband****. To cover this gap, CBP will need to re-assign an increasing number of CBP officers stationed at ports of entry to assist the USBP in handling the surge in FMU migration.*
>
> *The surge in FMU migration will continue to soar, endangering more and more children making the treacherous 2,000 mile trek to our border and crossing illegally into the U.S. at dangerous and remote areas between ports of entry (POE),* ***until the dynamics causing this trend are changed*** *. . ..*

* * * *

---

[292] *Flores v. Lynch*, 212 F.Supp.3d 907 (C.D. Cal. 2015), available at: https://www.leagle.com/decision/inadvfdco170904000560.
[293] *Final Emergency Interim Report*, Homeland Security Advisory Council, CBP Families and Children Care Panel (Apr. 16, 2019), at 1, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

 CENTER FOR IMMIGRATION STUDIES

> *As the findings in our report reflect, the large-scale influx of FMUs is new, having increased dramatically in the last year by 600%. Over 53,000 FMU were apprehended last month alone by the Border Patrol, and at the current trajectory, that number of FMU apprehensions is likely to exceed 500,000 in Fiscal Year (FY) 2019.  (Emphasis added.)*

The panel was not too far off the mark in that interim report: In FY 2019[294], Border Patrol apprehended 473,682 illegal migrants in FMUs.  The number would have been much worse, except for the implementation of MPP[295] that fiscal year.

As DHS explained in its October 2019 assessment of the MPP program[296]:

> *In the past nine months—following a phased implementation, and in close coordination with [the government of Mexico] —DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system. . . .*

> *Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.*

Interestingly, the JNPRM[297] references the CBP Families and Children Care Panel's April 2019 final emergency interim report and relies in part[298] on the panel's November April 2019 final report[299] to support its proposal to shift authority for adjudicating asylum claims by aliens in expedited removal proceedings from IJs to AOs, but fails to examine those proposals further, to place them into context, or to discuss the other significant findings and recommendations therein.

---

[294] *Southwest Border Migration FY 2019*, U.S. CUSTOMS AND BORDER PROTECTION (modified Nov. 14, 2019), available at: https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.
[295] *Migrant Protection Protocols (Trump Administration Archive)*, U.S. DEP'T OF HOMELAND SECURITY (last published Apr. 14, 2020), available at: https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.
[296] *Assessment of the Migrant Protection Protocols (MPP)*, U.S. DEP'T OF HOMELAND SECURITY (Oct. 28, 2019), available at: https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf.
[297] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906 n. 1 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[298] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46918 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[299] *Final Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Nov. 14, 2019), at 24, available at: https://www.dhs.gov/sites/default/files/publications/fccp_final_report_1.pdf.

CENTER FOR IMMIGRATION STUDIES

In its final emergency interim report, that panel concluded:

> By far, the major "pull factor" [encouraging migrants to enter illegally] is the current practice of releasing with a NTA most illegal migrants who bring a child with them. **The crisis is further exacerbated by a 2017 federal court order in Flores v. DHS** *expanding to FMUs a 20-day release requirement contained in a 1997 consent decree, originally applicable only to unaccompanied children (UAC). After being given NTAs, we estimate that 15% or less of FMU will likely be granted asylum. The current time to process an asylum claim for anyone who is not detained is over two years, not counting appeals*. (Emphasis added.)[300]

Similarly, in its final report[301], the panel explained:

> Panel members traveled to Guatemala and Honduras and received extensive briefings on both "push" and "pull" factors. **We assess that pull factors, especially the prompt release of migrants who bring a child, account for much of the huge increase in FMU migration over the past year**. *Put differently there were no significant increases in level of crime, gang activity or poverty in the past year that account for the phenomenal rise in FMU migration from Guatemala and Honduras.* (Emphasis added.)

The final emergency interim report detailed how the current incentives encouraging aliens to enter illegally harmed not only CBP's ability to perform its other vital national-security and law-enforcement duties, but endangered the aliens themselves, and traumatized the children used as "pawns"[302] in those FMUs to gain entry:

> Migrant children are traumatized during their journey to and into the U.S. The journey from Central America through Mexico to remote regions of the U.S. border is a dangerous one for the children involved, as well as for their parent. There are credible reports that female parents of minor children have been raped, that many migrants are robbed, and that they and their child are held hostage and extorted for money.

\* \* \* \*

---

[300] *Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 1, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[301] *Final Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Nov. 14, 2019), at 2-3, available at: https://www.dhs.gov/sites/default/files/publications/fccp_final_report_1.pdf.

[302] *Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 1, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

 CENTER FOR IMMIGRATION STUDIES

> *Criminal migrant smuggling organizations are preying upon these desperate populations, encouraging their migration to the border despite the dangers, especially in remote places designed to overwhelm existing USBP infrastructure, and extorting migrants along the way, thereby reaping millions of dollars for themselves and the drug cartels who also charge money to cross the border.*
>
> \* \* \* \*
>
> *A substantial number of families and children are entering our country in remote areas of the border versus the POEs, enduring dangerous and terrifying crossings in remote desert areas, across rivers, over fences, and through razor wire. These children increasingly require significant personal and medical care that exceeds the ability and capacity of CBP even with their current patchwork of contracted assistance. . ..*
>
> \* \* \* \*
>
> *FMUs illegally crossing our border consist of adults who are bringing a child with them, and most are being released into the U.S. with a NTA due to a shortage of detention capacity for FMUs.[303]*

Nothing in the JNPRM addresses any of these issues.

Instead, by speeding the release of aliens apprehended after entering the United States illegally and ensuring them the ability to remain in this country indefinitely while pursuing the additional avenues of review for their protection claims therein, the JNPRM is creating an "attractive nuisance"[304] that will ensure more aliens pay smugglers to travel to the United States in violation of the INA.

That will mean that more aliens will be raped, robbed, and extorted, more will die, and Border Patrol resources will be further strained. But it was in this context that the reports of the CBP Families and Children Panel—again referenced by the JNPRM as support for its proposals—were issued, and to avoid those horrors that the panel issued its recommendations.

It is true, as the JNPRM states[305], that the panel recommended allowing AOs to process asylum applications from aliens "found to have credible fear", because their "cases could be adjudicated

---

[303] *Id.* at 6-7.

[304] *Attractive Nuisance Doctrine*, Cornell Law School, Legal Information Institute (undated) ("A doctrine in tort law under which a landowner may be liable for injuries to children who trespass on land if the injury results from a hazardous object or condition on the land that is likely to attract children who are unable to appreciate the risk posed by the object or condition."), available at: https://www.law.cornell.edu/wex/attractive_nuisance_doctrine.

[305] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46918 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

 CENTER FOR IMMIGRATION STUDIES

much more quickly, especially for clearly approvable cases"[306].  The panel offered no analysis of the legality of this proposal, however, and failed to mention in connection with this recommendation that most such asylum applications are denied.

It was clear, however, from that final report that easily remedied flaws in U.S. immigration laws and policies were the driving force behind that FMU surge.  The panel explained therein:

> *One question the Panel asked was to what degree were "push" factors responsible for the 400 percent increase in FMU migration in FY 2019? There is chronic poverty in both Guatemala and Honduras. 64 percent of Hondurans live in poverty. And a high, but lesser number of Guatemalans at 46.6 percent. Poverty is especially severe in the rural areas of these countries. There is, compared to the U.S. and western Europe, relatively high crime levels and relatively weak law enforcement institutions, in both countries, and gang activity exists in some areas of these countries, primarily in urbanized areas. Indeed, the level of gang control of some neighborhoods of San Pedro Sula, Honduras and its environs is troubling.*
>
> *That said, the homicides rates in both Guatemala and Honduras have been declining fairly sharply in the past several years. There has been no discernible increase in poverty or the crime rate that explains the huge increase in FMU migration.* ***That increase is primarily attributable to pull factors created by the U.S. government, to include lack of humane detention space for FMUs, an asylum system that is far too slow, the judicial decision expanding Flores, and Congressional inaction****[307]   (Emphasis added.)*

The proposals in the JNPRM would simply create stronger "pull factors" encouraging foreign national adults to bring children with them when travelling to the United States illegally, to take advantage of quick release on parole and with the expectation that they would be able to live and work here indefinitely while seeking asylum through an even more extended process than now exists.

Which brings the discussion back to the FSA.  In its final emergency interim report, the panel noted that ICE had detention space for just 2,500 aliens in FMUs.[308]  In its final report, the panel explained why there were so few beds for FMUs: "A primary reason that ICE ERO did not and could not expand its capacity was lack of funding and the judicial enforcement of the *Flores* consent decree in July 2017 that had been expanded to include children accompanied by a parent."[309]

---

[306] *Final Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Nov. 14, 2019), at 2-3, available at: https://www.dhs.gov/sites/default/files/publications/fccp_final_report_1.pdf.
[307] *Id*. at 28.
[308] *Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 7, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.
[309] *Final Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Nov. 14, 2019), at 27, available at: https://www.dhs.gov/sites/default/files/publications/fccp_final_report_1.pdf.

 Center for Immigration Studies

Consistent with the recommendations in its final emergency interim report, the panel stated[310]: "CBP used Supplemental Funding to rapidly set up, staff and equip six Centralized Processing Centers (CPC), of which four were for FMUs, operated by the Border Patrol."  That gave Border Patrol space for an additional 2,000 migrants in FMUs.[311]

Despite the clear need for additional FMU detention space (and the panel's recommendation that those aliens in FMUs be detained-- not indefinitely, but long enough for their asylum claims to be considered[312]), the administration's FY 2022 budget request asks for, again, just 2,500 FMU detention beds.[313]  The panel was clear that a "*Flores* fix"[314] is necessary to address the issue of illegal immigration by FMUs at the border in order to avoid the consequences to them and to our immigration system.[315]  The JNPRM, while recognizing that the FSA is a problem[316], does nothing to address it.  That is in error.

The panel called on Congress to fix *Flores* to allow for the detention of FMUs who were encountered by CBP, stating: "We believe that a legislative fix of *Flores*, is preferable to a regulation, in order to remove any uncertainty and make clear that the Flores restriction on the number of days an FMU may be detained has been lifted."[317]

That said, however, the JNPRM admits that the FSA can be fixed administratively, and that the FSA is intended to be replaced by regulations, not legislation.  The JNPRM expressly noted: "The FSA was to terminate 5 years after the date of final court approval; however, the termination provisions were modified in 2001, such that the FSA does not terminate until 45 days **after publication of regulations** implementing the agreement."[318]  (Emphasis added.)

---

[310] *Id*. at 8.

[311] *See id*. at 27.

[312] *See id*. at 19 n. 11 ("As noted, the Panel does not support and is not advocating for indefinite detention, but only sufficient time to rapidly process asylum claims").

[313] *See* n. 189.

[314] *Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 6, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[315] *See Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 5 ("Notably, until our asylum system is reformed and the restrictions of *Flores* relating to family detention, which led to the widespread catch and release of FMUs, are removed, the pull factor of bringing a child will remain."), available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[316] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46910 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[317] *Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 12, available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[318] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46910 n. 27 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

 CENTER FOR IMMIGRATION STUDIES

As the panel explained repeatedly: (1) the FSA is one of the main drivers of illegal FMU migration because it all but guarantees release into the United States for any foreign national who seeks to enter illegally with a child; and (2) illegal FMU migration was at the heart of the 2019 migration crisis.[319]  It remains at the heart of the current crisis at the Southwest border.[320]

DHS and DOJ *must* address the FSA before taking any steps to expand the availability of parole for illegal migrants subject to the detention mandates in section 235(b)(1) of the INA and before implementing any regulation that would expand the amount of time that illegal migrants are able to remain in the United States while pursuing what are usually meritless asylum claims.

The JNPRM fails, however, to address the FSA, or *Flores*, in any manner.  Consequently, and as additional reasoning, the departments should not implement the regulatory changes in the JNPRM.

VII.  **THE PROPOSED PROCEDURAL CHANGES WOULD SLOW THE REMOVAL OF INADMISSIBLE ALIENS, UNDERMINING THE STATED PURPOSE FOR THE RULE**

A.  *Adding Layers of Appeal to Illegal Aliens is the Antithesis of a "Streamlined" Approach*

The JNPRM states, "A system that takes years to reach a result is simply not a functional one."[321]  According to the departments therein: "The aim of this rule is to begin replacing the current system, within the confines of the law, with a better and more efficient one that will adjudicate protection claims fairly and expeditiously."[322]

As explained in sections III, IV, and V above, the JNPRM is not "within the confines of the law", but an equally significant problem is that the proposed changes are neither "better", "more efficient", "fair[]", nor "expeditious[]".

---

[319] *See Final Emergency Interim Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Apr. 16, 2019), at 23 ("As we made clear in our interim report, the *Flores* decision was perhaps the single greatest
factor in creating the current crisis, and in encouraging unauthorized migrants to expose young children to the dangers of illegal border crossings. Once it became clear that migrants with minor children would have to be released after 20 days of detention, or often even less, and could stay lawfully in the U.S. for years, the rush of FMUs overwhelmed CBP Border Patrol's capacity. For as long as Flores remains unaddressed, the risk of a large-scale family migration remains."), available at: https://www.dhs.gov/sites/default/files/publications/19_0416_hsac-emergency-interim-report.pdf.

[320] Of the more than 1.47 million aliens apprehended at the Southwest border in FY 2021 through August, 388,354 were migrants in FMUs, including 279,938 who were processed under the INA and, likely, released.  *See Southwest Land Border Encounters*, U.S. DEP'T OF HOMELAND SECURITY (modified Sep. 15, 2021), available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[321] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46907 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

[322] *Id.*

 CENTER FOR IMMIGRATION STUDIES

As the Center has explained at length above, there are several key differences between the current regulatory scheme and the regulations proposed in the JNPRM. Those differences give more rights to aliens with few if any ties to the United States who have violated the INA and accord fewer protections to the American people (both citizens and lawful immigrants).

Rather than limiting the rights of aliens who had been subject to expedited removal to appeal adverse decisions (the definition of "streamlining[323]"), the proposed rule would expand them, meaning arriving aliens without status would be able to remain in the United States indefinitely while pursuing additional avenues of review.

Given that the current procedures comply with due process, additional avenues for review of protection denials are unnecessary to comply with constitutional requirement; moreover, they defeat the statutory "expedited" removal scheme[324].

Both under current regulations and under the proposed rules, the AO "credible fear interview process" is non-adversarial, meaning that an ICE attorney is not present to cross-examine the alien or to offer evidence contradicting aliens' claims.[325]

Currently, confrontation of an applicant's claims following a positive credible fear determination is reserved for the subsequent removal hearing before the IJ under section 240 of the INA[326], when the alien actually applies for asylum, statutory withholding, and CAT. Those proceedings are "adversarial", allowing ICE attorneys to cross-examine aliens who were subject to expedited removal and offer evidence that contradicts those aliens' protection claims.[327]

Under the proposed rule, if an alien in expedited removal received a positive credible fear determination (as 83 percent of all aliens who claimed credible fear between FY 2008 and the third quarter FY 2019 did),[328] however, the subsequent proceeding before the AO at which the

---

[323] *See id.* at 46910 ("This proposed rule offers another approach. It would establish a streamlined and simplified adjudication process for individuals encountered at or near the border, placed into expedited removal, and determined to have a credible fear of persecution or torture, with the aim of deciding protection claims in a more timely fashion while ensuring procedural protections against erroneous denials of relief.").

[324] *See* section 235 of the INA (2021) ("Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[325] *See, e.g.*, 8 CFR § 208.30(d) (2020) ("Interview. The asylum officer will conduct the interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the alien can establish a credible fear of persecution, reasonable possibility of persecution, or reasonable possibility of torture."), available at:

[326] Section 240 of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1229a&num=0&edition=prelim.

[327] *See generally id.*; *see also* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46908 (Aug. 20, 2021) ("In those [removal] proceedings, IJs conduct adversarial hearings to determine removability and adjudicate applications for asylum, withholding or deferral of removal, and any other forms of relief or protection."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[328] *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019*, U.S. DEP'T OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (data generated Oct. 23, 2019), available at: https://www.justice.gov/eoir/file/1216991/download

 CENTER FOR IMMIGRATION STUDIES

alien could apply for asylum, statutory withholding, and CAT would again be non-adversarial — *except* that only the alien would have a right to counsel.[329]

That means that the alien applicant would have a right to an attorney at a proceeding that could afford the alien work authorization and place the alien on an expedited path to citizenship, but the American people would not have a right to be represented by an ICE attorney to challenge the alien applicant's claims.  That would be problematic by itself if, under the proposed rule, an AO's denial of asylum, statutory withholding, and CAT were final.

Even in that scenario, asylum grant rates would increase because the alien applicant's claims to protection would go uncontested.  That increase, however, would not necessarily reflect the fact that more aliens who had been subject to expedited removal were being granted asylum because they were eligible for or merited asylum as a matter of law and discretion.

In fact, more applicants with fraudulent or non-meritorious claims would be granted asylum, statutory withholding, or CAT because there would be no ICE attorney to challenge the alien applicant's claims by offering contradictory and impeachment evidence, or to appeal an erroneous decision.

No citation is needed for this proposition because it is simple common sense.  ICE attorneys add value to the removal hearing process because they are present to offer evidence contradicting the alien respondent's claims, to impeach the alien through cross-examination, and to appeal erroneous decisions to the BIA.  When those ICE attorney duties are not performed, the likelihood of adjudicators—any adjudicators, be they IJs or AOs— granting asylum, statutory withholding, or CAT in error rises significantly.

The JNPRM fails to give any weight whatsoever to the value ICE attorneys add to those proceedings.  Respectfully, that is an offense to the ICE attorney corps.

The proposed rule is worse than even that "problematic scenario", however, because a denial of protection by the AO *would not be* final.  The asylum processing system proposed in the JNPRM[330] would then give the alien the right to seek a de novo review of the AO's denial of asylum, statutory withholding, or CAT.  That means that the whole process would *start all over*

---

[329] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46909 (Aug. 20, 2021) ("To respond to this problem, this rule proposes at 8 CFR 208.2(a)(1)(ii) and 208.9 to provide USCIS asylum officers the authority to adjudicate in the first instance the protection claims of individuals who receive a positive credible fear determination, and that they do so in a nonadversarial hearing."); *id*. at 46919 ("Third, as in section 240 removal proceedings, the Departments propose that the noncitizen would be entitled to be represented, at no expense to the Government, by counsel of the noncitizen's choosing who is authorized to practice in such proceedings."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[330] *See id*. at 46911 ("In cases in which a noncitizen seeks review of an asylum officer's adverse decision, the Departments propose that the IJ would make an independent de novo determination based on the record of the hearing before the Asylum Office plus any additional, non-duplicative evidence presented to the court that is necessary to reach a reasoned decision."); *id*. at 46915 ("This opportunity will allow such individuals to present any additional evidence or arguments they may wish to make to the IJ, who will consider them in making a de novo determination about whether the individual has a credible fear of persecution or torture.").

 CENTER FOR IMMIGRATION STUDIES

*again* — and the alien would receive from the IJ what amounts to an appeal from the AO's denial, a metaphorical "second bite at the apple".

The JNPRM contends that this proposed regulatory process:

> *Reflect[s] an intention to return to the statutory scheme of INA 235(b)(1)(B) . . . under which it is the IJ review of the credible fear determination that serves as the check to ensure that individuals who have a credible fear are not returned based on an erroneous screening determination by USCIS.*

That is in error, because the only IJ review would be of a credible fear denial, not an erroneous grant.

As explained above, Congress's intent in adding expedited removal to the INA in IIRIRA was to have IJs make adjudicatory determinations before an alien in proceedings was granted asylum (again, placing the respondent on a path to work authorization and citizenship).

That protects not only the alien respondent's rights, but the interests of the American people in having the immigration laws enforced properly, and the rights of U.S. workers (both citizens and lawful aliens) in the workplace[331].

The safeguard on the alien's specific rights is contained in section 235(b)(1)(B)(iii) of the INA[332], pursuant to which the alien in expedited removal proceedings who receives a negative *credible fear determination* from an AO can seek IJ review.

Nor would the alien's appeal rights end there. Under the JNPRM[333], the alien could then appeal the IJ's denial to the BIA, consistent with the current statutory scheme. BIA appeals area available now, but only as a first layer of review, not a second because AOs can't grant asylum, statutory withholding, or CAT to aliens apprehended at the border under current law.

---

[331] *See* section 212(a)(5)(A)(i) (2021) ("Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that-(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (II) **the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed**.") (emphasis added.), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

[332] *See* section 235(b)(1)(B)(iii) of the INA (2021) ("Review of determination. The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution. Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[333] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906 (Aug. 20, 2021) ("Such individuals who are denied protection would be able to seek prompt, de novo review with an immigration judge ('IJ') in the DOJ Executive Office for Immigration Review ("EOIR"), with appeal available to the Board of Immigration Appeals ('BIA')."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

 Center for Immigration Studies

Thereafter, under the proposals in the JNPRM, aliens who were denied protection could seek judicial review from the courts of appeals by filing a petition for review under section 242 of the INA.[334]  There are no restrictions in the JNPRM on the timing of the proposed AO adjudications of applications for asylum, statutory withholding, and CAT for aliens who, while subject to expedited removal under section 235(b) of the INA, received positive credible fear determinations.

That fact, coupled with the additional layer of administrative review (at the IJ level) therein, means that aliens with meritless asylum claims will be able to remain in the United States illegally, if not forever.  That is the antithesis of "streamlining".

> B.  *The Proposed Regulations Would Improperly Provide Greater Due Process Protections to Arriving Aliens than to Other Aliens*

The proposed regulations also would improperly provide greater due process protections to arriving aliens than are accorded to other aliens, including LPRs, who are, by law, guaranteed comparably greater due process rights.

The JNPRM asserts that: "The Departments believe that the proposed changes in this rule are necessary to establish a more streamlined and timely adjudication process for individuals who establish a credible fear of persecution or torture, while simultaneously ensuring fundamental fairness."[335]  "Fundamental fairness" is not a term that is defined in the INA, nor in the regulations, nor in the JNPRM itself.  Logically, however, the purpose of due process is to achieve a determination that is fundamentally fair, but that means "fundamentally fair" to all parties within the law's zone of interests—which includes the American people in general and American workers in particular.

The regulatory scheme for AO adjudications in the JNPRM offers no "fairness" to the American people—again, citizens and lawful immigrants.  It may expedite certain decisions in specific cases, but it does nothing to ensure that our laws will be enforced; rather, as explained above, it would do just the opposite.  All of that said, however, the preceding description of the various layers of review that are available to aliens who are in expedited removal proceedings simply further supports the Center's conclusion that this regulatory AO adjudication scheme is *ultra vires*.

Under section 235(a)(1) of the INA[336]:

> *An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an*

---

[334] Section 242 of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1252&num=0&edition=prelim.

[335] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46921 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[336] Section 235(a)(1) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

 Center for Immigration Studies

> *alien who is brought to the United States after having been interdicted in*
> *international or United States waters) shall be deemed for purposes of this*
> *chapter an applicant for admission.*

The expedited removal provision in section 235(b)(1) of the INA also deems aliens who are apprehended at the border after entering illegally or at the ports without proper documents as "arriving" aliens.[337]

Traditionally, such aliens who are seeking admission to the United States as an initial matter (as opposed to LPRs) have been deemed to have fewer due process rights that U.S. citizens and lawfully admitted aliens.[338]  The Supreme Court directly addressed this constitutional balance in the expedited removal process just last year in *DHS v. Thuraissigiam*[339].

The Court there[340] held that statutory limitations on judicial review in cases involving aliens in expedited removal proceedings did not violate the constitution as applied.  Justice Alito explained:

> *While aliens who have established connections in this country have due process*
> *rights in deportation proceedings, the Court long ago held that Congress is*
> *entitled to set the conditions for an alien's lawful entry into this country and that,*
> *as a result, **an alien at the threshold of initial entry** cannot claim any greater*
> *rights under the Due Process Clause. . .. Respondent attempted to enter the*
> *country illegally and was apprehended just 25 yards from the border. **He***
> ***therefore has no entitlement to procedural rights other than those afforded by***
> ***statute**.*[341] *(Emphasis added.)*

The statutory scheme in section 235(b)(1) of the INA reflects Congress's intentions to limit the rights of aliens who are apprehended entering the United States illegally or seeking admission at the ports of entry without proper documents, consistent with their limited due process rights.

---

[337] *See* section 235(b)(1) of the INA (2021) ("Inspection of aliens **arriving in the United States** and certain other aliens who have not been admitted or paroled") (emphasis added; the "certain other aliens who have not been admitted or paroled" refers to aliens apprehended in the interior, to whom expedited removal may be extended at the discretion of the Attorney General or DHS under section 235(b)(1)(A)(iii) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[338] *See Shaughnessy v. Mezei*, 345 U.S. 206, 212 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. . .. But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" (quoting *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); other internal citations omitted), available at: https://supreme.justia.com/cases/federal/us/345/206/.

[339] *DHS v. Thuraissigiam*, __ U.S. ___ (2020), available at: https://www.supremecourt.gov/opinions/19pdf/19-161_g314.pdf.

[340] *Id.*, slip op. at 2.

[341] *Id.* (internal citations omitted).  Note that many, if not most, aliens who are subject to expedited removal under section 235(b)(1) are in the exact same position as the respondent in that matter, as most are apprehended shortly after entering the United States illegally.  All such aliens would benefit from the changes in the JNPRM.

 CENTER FOR IMMIGRATION STUDIES

Generally, those aliens are to be quickly removed. If they seek asylum or claim fear of return, though, they are to be quickly interviewed by an AO to determine whether they have a credible fear. If they receive a negative credible fear determination, they can request an expedited IJ determination of that decision. Where, however, they receive a positive credible fear determination, they may seek asylum in removal proceedings.

That "expedited removal" process reflects limits the process rights due to those "arriving aliens" as compared to "aliens who have established connections in this country"; the latter are entitled to full due process rights under the constitution, the former are not.

The regulatory scheme in the JNPRM, however, turns these due process concepts—which are more than a century old in the immigration context[342]—on their collective head.

If the regulations proposed therein were to be adopted, aliens in expedited removal proceedings would have *greater* due process rights than other aliens—including LPRs facing removal from the United States.

The "expedited removal alien class" would receive one more layer of review (IJ/BIA/court of appeals on a petition for review) than an LPR in removal proceedings who files a defensive application for asylum, statutory withholding, or CAT (BIA/court of appeals).

And, speaking of an "application", the JNPRM[343] would eliminate (not even waive) the requirement that an alien who had received a positive credible fear determination file a formal asylum application (Form I-589[344]) before applying for asylum, statutory withholding or CAT.

Instead:

> Under this proposed rule, an individual who passes the initial credible fear screening would have his claim reviewed by an asylum officer in USCIS in the first instance, rather than by an IJ in a removal hearing under section 240 of the INA. As part of this new procedure for "further consideration," and to eliminate delays between a positive credible fear determination and the filing of an application for asylum, the Departments propose that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, would be treated as an "application for asylum," with the

---

[342] *See generally id.*

[343] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46916 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[344] *See I-589, Application for Asylum and for Withholding of Removal*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (updated Aug. 19, 2021) (Use this form to apply for asylum in the United States and for withholding of removal (formerly called "withholding of deportation"). You may file for asylum if you are physically in the United States and you are not a U.S. citizen." NOTE: If you fail to file Form I-589 within one year of your arrival in the United States, you may not be eligible to apply for asylum under section 208(a)(2)(B) of the Immigration and Nationality Act (INA)."), available at: https://www.uscis.gov/i-589.

 CENTER FOR IMMIGRATION STUDIES

> *date of service on the individual considered the date of filing.  8 CFR 208.3(a)(2) (proposed).[345]*

Deeming credible fear notes as an "asylum application" violates the USCIS regulatory requirement that applications and petitions be properly filed.  That requirement is spelled out at 8 CFR § 103.2(a)(1)[346], and provides in pertinent part:

> *Preparation and submission.* ***Every form, benefit request, or other document must be submitted to DHS and executed in accordance with the form instructions regardless of a provision of 8 CFR chapter I to the contrary****.* ***The form's instructions are hereby incorporated into the regulations requiring its submission****.  Each form, benefit request, or other document must be filed with the fee(s) required by regulation. . ..  (Emphasis added.)*

Whether an alien is seeking asylum through the affirmative asylum process or trying to stop a removal order by claiming asylum as a defense, the alien *must* complete the Form I-589.[347]  As that form, which the JNPRM does not propose to amend, states:

> ***Instructions****.  What is the Purpose of this Form?*  ***This form is used to apply for asylum and for withholding of removal*** *(formerly called 'withholding of deportation').  This application may also be used to apply for protection under the Convention Against Torture." (Emphasis added.)*

Similarly, the instructions for the I-589 continue, in pertinent part:

> ***Part I. Filing Instructions. Section V. Obtaining and Completing the Form.***
>
> *You must type or print all of your answers in black ink on Form I-589. Your answers must be completed in English. Forms completed in a language other than English will be returned to you.* ***You must provide the specific information requested about you and your family and answer all the questions asked****. If any question does not apply to you or you do not know the information requested, answer "none," "not applicable," or "unknown."* ***You must provide detailed information and answer the questions as completely as possible****. If you file your application with missing information, we may return it to you as incomplete.[348]  (Emphasis added.)*

The Form I-589 instructions unambiguously show that it is the alien, and not the government, who is responsible for filing an asylum application.

---

[345] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46916 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[346] 8 CFR § 103.2 (2021), available at: https://www.law.cornell.edu/cfr/text/8/103.2.
[347] *See I-589, Application for Asylum and for Withholding of Removal* (Aug. 25, 2020), available at: https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf.
[348] *Id*.

 CENTER FOR IMMIGRATION STUDIES

Moreover, it is apparent from the text of the I-589 that for an alien to apply for asylum, statutory withholding, or CAT, the alien *must* complete the I-589. As the controlling regulation, 8 CFR § 103.2(a)(1)[349], explains, that is true "regardless of a provision of 8 CFR chapter I"—which would include[350] 8 CFR § 208.3(a)(2) as proposed in the JNPRM[351]— "to the contrary", because the I-589 itself has the force of regulation.

## VIII.  THE AMENDMENTS IN THE JPNRM IMPROPERLY UNDERMINE CONGRESSIONAL INTENT, AND FAIL TO CONSIDER THE INTERESTS OF AMERICANS, INCLUDING LAWFULLY ADMITTED ALIENS

The proposed asylum filing amendments in the JNPRM improperly undermine congressional intent and fail to give proper weight to the interests of Americans, both citizens and lawfully admitted aliens.

As noted, pursuant to the regulatory amendments proposed in the JNPRM[352], aliens subject to expedited removal proceedings under section 235(b)(1) of the INA who had received a positive credible fear determination would be exempted from the current regulatory requirement that they file Forms I-589 to be considered for asylum, statutory withholding, and CAT protection, as explained above.

Those I-589 filing requirements would, however, still apply to aliens seeking affirmative asylum from AOs, and seeking defensive asylum from IJs.

Why does the JNPRM carve out this special exception for aliens who had been subject to expedited removal? By its terms[353], expressly to avoid allow those aliens to avoid the statutory bar to consideration of an asylum application filed more than one year after the alien's entry at

---

[349] 8 CFR § 103.2 (2021), available at: https://www.law.cornell.edu/cfr/text/8/103.2.

[350] *See* 8 CFR Chapter I, "Department of Homeland Security" (2021), available at: https://www.law.cornell.edu/cfr/text/8/chapter-I.

[351] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46941 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat#citation-60-p46921.

[352] *Id*. at 46909, 46941

[353] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46909 (Aug. 20, 2021) ("Every individual who receives a positive credible fear determination would be considered to have filed an application for asylum at the time the determination is served on him or her. The application would be considered filed or received as of the service date for purposes of the 1-year filing deadline for asylum, see INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), and for starting the clock for eligibility to file for work authorization on the basis of a pending asylum application, 8 CFR 208.3(c)(3) (current).")., available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat#citation-60-p46921.

 CENTER FOR IMMIGRATION STUDIES

section 208(a)(2)(B) of the INA[354] if they were otherwise required to file a Form I-589, and to ensure that those aliens can apply for employment authorization as quickly as possible[355].

Note that those are not rights or courtesies that are extended under the INA to aliens who have entered lawfully as nonimmigrants and seek protection in the United States, even though, as explained in the Supreme Court decisions refenced above, those aliens are entitled to *greater due process protections* than aliens subject to expedited removal as arriving aliens.

That said, this scheme is the exact *opposite* of Congress's intent when it added both the one-year bar to asylum[356] and the requirement that an asylum applicant must wait at least 180 days after filing an asylum application to apply for work authorization[357] to the INA in section 604 of IIRIRA[358].

As the House Judiciary Committee explained in its committee report[359] for what would become IIRIRA (H.R. 2202, *sub nom*., the "Immigration in the National Interest Act"):

> *Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative. Removal of aliens who enter the United States illegally, even those who are ordered deported after a full due process hearing, is an all-too-rare event. The asylum system has been abused by those who seek to use it as a means of "backdoor" immigration.[360]*

---

[354] *See* section 208(a)(2)(B) of the INA (2021) (exceptions to the right to apply for asylum in section 208(a)(1); "Time limit. Subject to subparagraph (D) [changed circumstances], paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States"), available at:
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[355] *See* section 208(d)(2) of the INA (2021) ("Employment. An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum."), available at:
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim; 8 CFR § 208.3(c)(3)(2021) ("An asylum application must be properly filed in accordance with 8 CFR part 103 and the filing instructions. Receipt of a properly filed asylum application will commence the 365-day period after which the applicant may file an application for employment authorization in accordance with § 208.7 and 8 CFR 274a.12 and 274a.13."), available at: https://www.law.cornell.edu/cfr/text/8/208.3.

[356] Section 208(a)(2)(B) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[357] *Id*. at para. (d)(2).

[358] *See* Section 604 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-690 to 694 (1996) ("ASYLUM REFORM"), available at: https://www.congress.gov/104/plaws/publ208/PLAW-104publ208.pdf.

[359] H. Rep. No. 104-469 (1996) at 107, available at: https://www.congress.gov/104/crpt/hrpt469/CRPT-104hrpt469-pt1.pdf?__cf_chl_jschl_tk__=pmd_iWTm.KkB_IdFyTs7HsFLgckD7nCkiLG8lUO4ZWI70t0-1634044319-0-gqNtZGzNAmWjcnBszQrR; *see also Cruz-Miguel*, 650 F.3d at 199, n. 15 (referencing H. Rep. No. 104-469 to interpret the parole amendments in IIRIRA), available at: https://scholar.google.com/scholar_case?case=3685118480561118183&hl=en&as_sdt=6&as_vis=1&oi=scholarr.

[360] H. Rep. No. 104-469, at 107  (1996), available at: https://www.congress.gov/104/crpt/hrpt469/CRPT-104hrpt469-pt1.pdf?__cf_chl_jschl_tk__=pmd_iWTm.KkB_IdFyTs7HsFLgckD7nCkiLG8lUO4ZWI70t0-1634044319-0-gqNtZGzNAmWjcnBszQrR.



CENTER FOR IMMIGRATION STUDIES

The committee report continues:

> The number of asylum applications has increased more dramatically, from
> approximately 30,000 in the early 1980s to 150,000 per year by the early 1990s.
> **Most of these were meritless applications filed by illegal aliens in order to
> prolong their stay in the U.S. and to receive work authorization**. Thus, abuse of
> the asylum system has had a profound effect on illegal immigration.[361]  (Emphasis
> added.)

Similarly, it found:

> The asylum system established in the 1980 Refugee Act has provided protection to
> thousands of legitimate claimants, **but has been subject to abuse by tens of
> thousands more who filed non-legitimate claims simply in order to extend their
> stay in the U.S. and to receive work authorization**.[362]  (Emphasis added.)

That committee report explains that by tightening the employment authorization requirements for
aliens filing asylum applications, the then-Clinton administration had been able to deter aliens
with meritless claims from applying for asylum simply to extend their unlawful presence in the
United States and to work.[363]

Those regulatory changes, the Judiciary Committee concluded, were insufficient, however, and
thus deemed it necessary to implement the one-year bar[364] and later the 180-day filing
requirement for employment authorization.  The purpose of those provisions was to discourage
all aliens except for legitimate asylum seekers from applying for protection by setting firm
deadlines for submission of a Form I-589 and by requiring aliens to wait at least 180 days after
applying for asylum to receive employment authorization.

---

[361] *Id.* at 131.

[362] *Id.* at 139.

[363] *See id.* at 131 ("The asylum reform regulations effective in January 1995 were intended to discourage the filing
of nonmeritorious asylum applications by illegal immigrants and to expedite the removal of applicants who are
denied. The number of asylum applications has significantly declined since these regulations went into effect."); *id.*
at 139 ("The Administration has taken significant steps to resolve these problems, principally through regulations
effective in January 1995. Under these new rules, asylum applicants no longer will be eligible for work authorization
unless they are granted asylum or there are unusual delays in completing adjudication of their claims. Asylum
claims are scheduled for interview within 45 days of the application. The asylum officer will either grant the claim,
or refer the case without decision to an immigration judge. (The vast majority of asylum applicants are not lawfully
present in the U.S., and under the administrative reforms, the final decision on referred
cases will be made by the immigration judge in the context of a deportation proceeding.) The entire system is
streamlined, with the objective of completing proceedings before the immigration judge within 180 days of the
original application.").

[364] *See id.* at 175 ("Section 531 reforms the asylum process, requiring that applications be filed within 30 days of
arrival in the U.S., unless circumstances in the alien's home country or in the alien's personal circumstances that
relate to the alien's eligibility for asylum have fundamentally changed. . ...   This report has previously discussed the
need for such measures to supplement the administrative reforms of the asylum process that were effective in
January 1995. This section is intended to build upon the success of such provisions in streamlining the asylum
process, while ensuring that no alien will be returned to persecution.").

 CENTER FOR IMMIGRATION STUDIES

An asylum application is not supposed to be a "backdoor" to employment authorization or long-term presence for aliens simply seeking to exploit the availability of that protection to live and work here indefinitely.  The proposed regulations in the JNPRM deliberately undermine those temporal asylum filing and employment authorization requirements by streamlining the process pursuant to which aliens can enter the United States illegally, claim credible fear, quickly obtain employment authorization, and remain for years pending the resolution of their asylum claims, regardless of the merit or strength of those claims.[365]

The lessons of the past—as well as the reasons for the one-year bar and work authorization requirements in section 208 of the INA-- have either been forgotten or ignored.  Which brings the Center to the interests of Americans in general and American workers specifically.

The JNPRM[366]notes, in discussing the economic aspects of the proposed rule:

> *The impact accruing to labor earnings developed above has the potential to include both distributional effects (which are transfers) and indirect benefits to employers.  The distributional impacts would accrue to asylum applicants who enter the U.S. labor force earlier than under current regulations, in the form of increased compensation (wages and benefits). A portion of this compensation gain might be transferred to asylum applicants from others that are currently in the U.S. labor force or eligible to work lawfully.*

In a footnote[367], the JNRPM explains exactly what that means: "Transfer payments are monetary payments from one group to another that do not affect total resources available to society."

In the "Summary of the Proposed Impact of This Proposed Rule" in the JNPRM[368], the departments include: "Potential early labor earnings to asylum applicants who obtain an employment authorization document ("EAD") of $225.44 per person per workday; **this impact could potentially constitute a transfer from workers in the U.S. labor force to certain asylum applicants**." (Emphasis added.)

Essentially, the JNPRM recognizes that by expediting the employment authorization process, aliens who had been subject to expedited removal will now be able to work in the United States more quickly, and some will undermine the wages of American workers (although these points are explained in the conditional in the JNPRM).

---

[365] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46916 (Aug. 20, 2021) ("The application would be considered filed or received as of the service date for purposes of the 1-year filing deadline for asylum, see INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), and for starting the clock for eligibility to file for work authorization on the basis of a pending asylum application, 8 CFR 208.3(c)(3) (current)."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat; *see also id.* ("The Departments propose that this application for asylum would not be subject to the completeness requirement of 8 CFR 208.3(c) and 208.9(a) in order to qualify for hearing and adjudication . . ..").
[366] *Id.* at 46931.
[367] *Id.* at n. 88.
[368] *Id.* at 46923.

 CENTER FOR IMMIGRATION STUDIES

Logically, most—if not the vast majority—of aliens who would be apprehended entering the United States illegally would have limited education and work skills.[369]  When they enter the labor force, they would be placed into direct competition with similarly situated American workers (citizens and lawful immigrants) for low-skilled and entry-level jobs.

In a report from the George W. Bush Institute captioned "Benefits of Immigration Outweigh the Costs"[370], economist Pia Orrenius explained which Americans were most affected by immigration:

> *Immigration changes factor prices — it lowers the wages of competing workers, while raising the return to capital and the wages of complementary workers.* ***In other words, the immigration surplus does not accrue equally to everyone.*** *It goes primarily to the owners of capital, which includes business and land-owners and investors.*
>
> * * * *
>
> ***Research also suggests any negative wage effects are concentrated among low-skilled and not high-skilled workers.*** *Perhaps that is because high-skilled U.S.-born workers are complementary to immigrants to a greater extent than native low-skilled workers, who hold jobs that require less education and fewer language skills.  (Emphasis added.)*

Thus, the "transfers" that will occur should these proposed rules be enacted will be in the form of increased wages to aliens who have entered illegally, at the expense primarily of the wages of the most vulnerable, low-skilled working Americans.

As Barbara Jordan[371], former congresswoman (D-Tex.) and then-chairman of President Clinton's Commission on Immigration Reform stated in June 1995 congressional testimony[372]: "Immigrants with relatively low education and skills may compete for jobs and public services with the most vulnerable of Americans, particularly those who are unemployed or underemployed."  Thus, she explained[373]: "Immigration policy must protect U.S. workers against

---

[369] *But see* Alicia A. Caldwell, *Middle-Class Migrants Fly to Mexico and Then Cross U.S. Border Illegally*, WALL STREET JOURNAL (Oct. 13, 2021) ("More migrants illegally entering the U.S. to apply for asylum are members of South America's middle class who fly to the border by plane, according to authorities and aid workers."), available at: https://www.wsj.com/articles/middle-class-migrants-fly-to-mexico-and-then-cross-u-s-border-illegally-11634117401?mod=hp_lead_pos5.

[370] Pia Orrenius, *Benefits of Immigration Outweigh the Costs*, GEORGE W. BUSH INSTITUTE (Spring 2016), available at: https://www.bushcenter.org/catalyst/north-american-century/benefits-of-immigration-outweigh-costs.html.

[371] Jerry Kammer, Remembering Barbara Jordan and Her Immigration Legacy, Center for Immigration Studies (Jan. 17, 2016), available at: https://cis.org/Report/Remembering-Barbara-Jordan-and-Her-Immigration-Legacy.

[372] *Testimony of Barbara Jordan, Chair, U.S. Commission on Immigration Reform Before a Joint U.S. House of Representatives Committee on the Judiciary Subcommittee on Immigration and Claims and U.S. Senate Committee on the Judiciary Subcommittee on Immigration* (Jun. 28, 1995), available at: https://www.numbersusa.com/sites/default/files/public/Testimony%20of%20Barbara%20Jordan_1995_June%2028. pdf.

[373] *Id.*

 CENTER FOR IMMIGRATION STUDIES

unfair competition from foreign workers, with an appropriately higher level of protection to the most vulnerable in our society. . ..."

Chairman Jordan referenced those "most vulnerable in our society" in earlier testimony[374], noting that: "The Commission is particularly concerned about the impact of immigration on the most disadvantaged within our already resident society--inner city youth, racial and ethnic minorities, and recent immigrants who have not yet adjusted to life in the U.S."

The JNPRM does nothing to advance the interests of those American workers, who would pay the highest price—in the form of reduced wages—were the proposals therein to expedite employment authorization for aliens determined to have credible fear in expedited removal proceedings adopted.  In fact, it barely mentions those adverse wage effects in passing, and then only elliptically.

That is in error, because those workers are squarely in the "zone of interests" of these regulatory changes.  Section 212(a)(5)(A)(i) of the INA[375] renders:

> *Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor [] inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that-*
>
> *(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and*
>
> *(II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.*

Given the tacit recognition in the JNPRM that many of the aliens who will benefit from the expedited asylum filing rules therein will seek to work in the United States as quickly as they are able, and thus adversely affect the wages of similarly situated American workers, DHS and DOJ are required under section 212(a)(5)(A)(i) of the INA to seek an assessment from the secretary of Labor before proceeding with this proposal.

The conditional hypotheses in the JNPRM are not sufficient to meet this statutory requirement.

---

[374] *Testimony of Barbara Jordan, Chair, U.S. Commission on Immigration Reform Before the U.S. Senate Committee on the Judiciary Subcommittee on Immigration and Refugee Affairs* (August 3, 1994), available at: https://www.numbersusa.com/sites/default/files/public/Testimony%20of%20Barbara%20Jordan_1994_Aug.%203_0.pdf.
[375] Section 212(a)(5)(A)(i) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1182&num=0&edition=prelim.

 CENTER FOR IMMIGRATION STUDIES

Even absent that, however, the departments must consider the effect that the JNPRM *in toto* will have on the American people—citizens and lawful aliens alike—before proceeding. No such consideration whatsoever is contained in the proposed rulemaking.

Notably, however, the JNPRM explains:

> *In many cases, the application [for asylum filed by aliens who had been subject to expedited removal] may be filed many months after removal proceedings are initiated, thus potentially delaying adjudication. In many other cases, an application is never filed. EOIR has reported that, for individuals who were referred to USCIS for the credible fear screening process and then placed into proceedings before EOIR between FY 2008 and the third quarter of FY 2020, only 62 percent have filed an asylum application with EOIR as of July 2020.*[376]

It is unclear whether that is a justification for its proposed waiver of the Form I-589 for aliens who had been subject to expedited removal or a simple statement of fact. It is, however, the strongest argument *against* adopting the proposed changes in the JNPRM, as it demonstrates why tightening the application restrictions in the credible fear process—not loosening them as the JNPRM proposes—is the appropriate course of action.

The entire rationale behind credible fear is that the United States must extend protection to all eligible aliens who seek it, even if they violate our laws by entering the United States illegally. That imposes on the aliens who claim credible fear the duty to *apply for asylum*—by filing an I-589 as quickly as possible.

The longer an alien waits to apply for asylum, the more reasonable it is to conclude that the alien's true intentions in entering illegally and claiming credible fear were to simply gain entry to the United States and work here—not to escape persecution on account of any of the five factors for asylum protection or torture. That is especially true when aliens who had been subject to expedited removal fail to apply for asylum at all, or worse, fail to appear in subsequent removal proceedings wherein their claims for protection would be adjudicated.

And yet, the percentage of aliens who failed to appear for removal proceedings after receiving a positive credible fear determination (32.5 percent) or who failed to file a Form I-589 (greater than 45 percent) in those proceedings between FY 2008 and the third quarter of FY 2019[377] *far exceeded* the percentage (17 percent) of that cohort who were granted asylum in that almost 12-year period.[378]

---

[376] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46916 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[377] *Credible Fear and Asylum Process: Fiscal Year (FY) 2008 – FY 2019*, U.S. DEP'T OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (data generated Oct. 23, 2019), available at: https://www.justice.gov/eoir/file/1216991/download.

[378] *Id*.

 CENTER FOR IMMIGRATION STUDIES

There is no disputing that the American people have a paramount interest in ensuring that the immigration laws, including those against illegal entry, are enforced.  This is especially true given the threats posed to the United States in the border context, the very scenario in which the majority of aliens in expedited removal proceedings are encountered.

For example, in a September 11, 2021 letter[379] to Senate leadership, former Border Patrol Chief Rodney Scott warned about serious law-enforcement and national-security vulnerabilities at the Southwest border that were being exacerbated by illegal immigration.

He explained[380]:

> *Contrary to the current rhetoric, this is not simply another illegal immigration surge.  This is a national security threat.*
>
> * * * *
>
> *In my professional assessment, the U.S. Border Patrol is rapidly losing the situational awareness required to know who and what is entering our Homeland. The ability of USBP to detect and interdict those that want to evade apprehension is being degraded daily.  Low level, unsophisticated and uneducated smugglers are illegally crossing the border and increasingly evading apprehension daily. To think that well-resourced terrorist networks, criminal organization[s], and hostile nations are not doing the same is na[i]ve. The current situation is unsustainable and must be mitigated.*

Scott described how criminal organizations script the movement of illegal aliens across the border to create "gaps in border security" that they then exploit "to easily smuggle contraband, criminals, or even potential terrorists into the U.S. at will."[381]  As he stated, "these mass incursions are not simply an immigration issue".[382]

As explained above in section V, policy changes that have made it easier for aliens who have entered illegally to enter and remain in the United States have prompted those ongoing surges of illegal migrants over the Southwest border.

Those surges will be magnified, likely exponentially, if the proposals in the JNPRM to (1) expand DHS's ability to release aliens on parole and (2) expedite employment authorization for aliens who had been subject to expedited removal and who had received a positive credible fear determination are adopted.

As Chief Scott explained, criminal organizations use such alien surges to smuggle deadly and illegal narcotics and criminals into this country, and possibly terrorists as well.  That would

---

[379] Letter from Rodney S. Scott, Chief, U.S. Border Patrol (ret.) to Sens. Charles Schumer, Mitch McConnell, Gary Peters, and Rob Portman (Sep. 11, 2021), available at: https://justthenews.com/sites/default/files/2021-09/Honorable%20Rob%20Portman%20%20US%20Senate%20Secuirty%20Concerns%20-%20Rodney%20Scott.pdf.
[380] *Id*. at 1-2.
[381] *Id*. at 2.
[382] *Id*.

 CENTER FOR IMMIGRATION STUDIES

result in more drug overdoses, leave Americans even more vulnerable to criminal predation, and potentially expose the United States to hostile attack.

The JNPRM, however, fails to take the interests of the American people in avoiding such dangers into account in proposing the regulatory amendments therein. That is in error and renders the proposals in the JNPRM "arbitrary and capricious" in violation of the Administrative Procedure Act.[383]

## IX.    PROCEDURAL CHANGES IN THE JNPRM WILL UNDULY BURDEN USCIS, PROMOTE FRAUD, AND NOT SIGNIFICANTLY AMELIORATE IMMIGRATION JUDGE PROCESSING

The departments cite to the swollen dockets of the immigration courts and increasing backlog of cases before IJs as justification for transferring jurisdiction over asylum applications for aliens who had been subject to expedited removal to USCIS AOs. In the preamble, they write:

> *EOIR now faces a pending caseload of approximately 1.3 million cases, with approximately 610,000 pending asylum applications. While the corps of IJs has more than doubled since 2014, going from 249 at the end of FY 2014 to 539 as of April 2021, the number of pending cases has more than tripled in that same period, growing by nearly 500,000 cases" since the end of [FY 2018].[384]*

Noting that the current average case completion time in immigration court is approximately 3.75 years[385], DHS and DOJ claim that, "Absent changes to the current system, the continuing arrival of large numbers of [inadmissible aliens] at the southwest border with protection claims is likely to lengthen adjudication times further."[386]

While reform of this system is plainly necessary (by adopting *Flores* regulations for example, to allow for the detention of family units), the *ultra vires* procedural changes in the JNPRM will unduly burden USCIS, a fact the departments skim over in the preamble.

According to the JNPRM, USCIS will need to hire and train approximately 800 new AOs and spend approximately $180 million to "fully implement the proposed asylum officer hearing and

---

[383] *See* 5 U.S. Code section 706(2)(A) (2020) (Administrative Procedure Act "Scope of review"), available at: https://www.law.cornell.edu/uscode/text/5/706; *see also Motor Vehicle Manufacturers Assoc. of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (citations omitted), available at: https://casetext.com/case/motor-vehicle-manufacturers-association-of-united-states-inc-v-state-farm-mutual-automobile-insurance-company-consumer-alert-v-state-farm-mutual-automobile-insurance-company-united-states-department-of-transportation-v-state-farm-mutual-automobile-ins#p43.
[384] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46908 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat
[385] *Id.* at 46909.
[386] *Id.*

 CENTER FOR IMMIGRATION STUDIES

adjudication process to handle approximately 75,000 cases annually."[387]  The JNPRM glosses over, however, the critical fact that the existing AO corps will also require training on these new work streams called for therein[388] and omits the fact that USCIS continues to hemorrhage money due to the agency's failure to properly charge fees that fully recover the costs of adjudication.[389]

Additionally, as the JNPRM explains in a footnote, USCIS "presently has over 400,000 pending affirmative asylum applications awaiting interview or adjudication."[390]  So while this procedural change in the JNPRM may limit the growth of the IJ docket, it simply pushes those cases as an initial matter onto USCIS AOs, who are themselves already overwhelmed with affirmative asylum cases.

That said, it is doubtful that these proposals will offer any relief to IJs or their dockets.

As explained repeatedly herein, historically, fewer than 20 percent of all aliens who had been in expedited removal and received positive credible fear determinations were granted asylum in removal proceedings.  By having AOs adjudicate claims for asylum, statutory withholding, and CAT protection in non-adversarial proceedings, the number of erroneous protection grants would increase, as there would be no ICE attorney present to represent the interests of the American people by confronting those aliens' claims, or to appeal erroneous decisions.

That will leave fewer subsequent protection denials for IJs to review on de facto appeal under proposed 8 CFR § 1003.48[391], but those cases will be more complicated, due to the proposal in the JNPRM to eliminate the requirement that those aliens file Forms I-589.  Under that proposal, the IJ will be required to examine the AO's decision and the transcript prior to review proceedings to assess what, exactly, the alien's claim is.  Because there will be no Form I-589, the IJ will be required to piece together the alien's "application" from the documents submitted

---

[387] *Id*. at 46921.

[388] *See, e.g., id*. at 46933 ("In developing the quantified costs of this proposed rule, there are likely to be initial costs associated with the hiring and training of staff, and those payroll and other costs associated with the additional personnel would continue in future years.").

[389] *See* Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43, ___ Stat.___, section 132 ("In addition to amounts otherwise provided by section 101, an amount is provided to the Department of Homeland Security for "**U.S. Citizenship and Immigration Services—Operations and Support" for application processing, the reduction of backlogs within asylum, field, and service center offices, and support of the refugee program at a rate for operations of $250,000,000**: Provided, That such amounts shall be in addition to any other funds made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)): Provided further, That prior to the obligation of such resources, U.S. Citizenship and Immigration Services shall provide to the Committees on Appropriations of the Senate and the House of Representatives an expenditure plan that identifies backlog reduction metrics and quarterly reports on the execution of such plan.") (Emphasis added.), available at: https://www.congress.gov/bill/117th-congress/house-bill/5305/text.

[390] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46921 n.20 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[391] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46946 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

 CENTER FOR IMMIGRATION STUDIES

by the AO.[392]  After the IJ examines those documents, the alien will still be allowed to offer additional testimony and evidence.

The only restriction on that additional testimony and evidence is that it not be "duplicative of testimony or documentation already presented to the" AO, "and that the testimony or documentation is necessary to ensure a sufficient factual record upon which to base a reasoned decision on the application or application"—not that it was unavailable at the AO interview.

That will burden the immigration court and enable the alien respondent to supplement any deficiencies in his or her claim *after* being informed what those deficiencies are.  That is an invitation to fraud.

Almost every "review" case before an IJ will still require a merits hearing to allow the IJ to reach a decision, and those decisions will be as lengthy—if not lengthier—as under the current regulations, because the IJ will have to recount the findings of the AO.

The only decision that the IJ would no longer have to make under this proposal is whether the alien is removable.  Given the fact that most—if not all—aliens who are currently referred to removal proceedings after receiving a positive credible fear determination concede removability at the Master calendar hearing, the positive effects of that change would be *de minimis*.

On this issue of removability, however, and even though few such aliens now claim other forms of relief aside from asylum, statutory withholding, and CAT in removal proceedings after receiving a positive credible fear determination, the proposed regulation would nonetheless allow the alien to file a "motion to vacate"[393] the AO's removal order to seek other forms of immigration relief.

If the IJ grants that motion: "DHS may, in the exercise of its discretion, place the applicant in removal proceedings, by issuing a Notice to Appear and filing it with the immigration court."[394] There is no "streamlining" in that proposal.

As a practical matter, the proposed IJ review proceedings in 8 CFR § 1003.48 will be as lengthy as current removal proceedings for aliens who received positive credible fear determinations, but on a much more jumbled record.  The I-589 requires applicants to state their claims precisely and with specificity, providing the court with a clear record on which to proceed.  It is doubtful, at best, that the record submitted by the AO will provide such benefits.

Further, the Center assumes that the departments will take administrative notice of the fact that IJs receive one-half day of case preparation time to review their dockets for the following two-week period.  Given the presumed state and nature of the records that AOs will be submitting, including transcripts[395], that preparation time will be grossly insufficient.

---

[392] *See Id.*
[393] *Id.* at 46947.
[394] *Id.*
[395] *Id.* at 46942.

 CENTER FOR IMMIGRATION STUDIES

Finally, the Center notes that while AOs are required to issue written decisions when they deny protection, no similar requirement can be found for cases in which AOs grant asylum, statutory withholding, and CAT.

That is problematic for two reasons.

First, if the alien is granted protection, and subsequently becomes amenable to removal, there will be little or no record of the alien's original claim. That would be directly relevant to any subsequent claims for relief or protection that the alien may make to avoid removal.

Second, and casting no aspersions on the AO corps or any individual AO, it is readily conceivable that overburdened AO could simply grant protection as a time-saving device. That is not an option for IJs, whose decisions can be appealed either by the respondent or the government.

The proposed regulatory changes to the process by which AOs and IJs consider applications for asylum, statutory withholding, and CAT claims from aliens who have received positive credible fear determinations will further strain AO and IJ resources, invite fraud, result in more erroneous protection grants, and undermine justice, as explained herein. For these reasons, the departments should reject those proposals.

## X. THE DEPARTMENTS MUST DELAY THIS RULEMAKING AT LEAST ONE YEAR BECAUSE THEY ARE IN THE PROCESS OF AMENDING THE DEFINITION OF "PARTICULAR SOCIAL GROUP" FOR ASYLUM AND STATUTORY WITHHOLDING PROTECTION

If the departments continue to pursue the rulemaking in the JNPRM in its entirety, notwithstanding the points herein including that most of the proposal is *ultra vires*, it must delay further consideration for at least 365 calendar days.

As stated in the preamble, "The principal purpose of this proposed rule is to simultaneously increase both the efficiency and the procedural fairness of the expedited removal process for noncitizens who have been found to have a credible fear of persecution or torture."[396]

Thus, the entire justification for the proposed changes in the JNPRM relies on an analysis of the status quo for claims to asylum, statutory withholding, and CAT protection.

In Executive Order 14,010, "Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border"[397], issued

---

[396] *Id.* at 46909.
[397] Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 5, 2021), available at: https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

 CENTER FOR IMMIGRATION STUDIES

on February 2, 2021, the president pledged to "strengthen our own asylum system", including by rolling back asylum eligibility rules that had been imposed by the previous administration.

That EO also directed DHS and DOJ to promulgate new regulations "addressing the circumstances in which a person should be considered a member of a 'particular social group'" by October 30, 2021.[398]  Notably, that is 11 days after the comment period ends for the proposed regulation allowing AOs to grant asylum in expedited removal proceedings.[399]

The preamble and economic analysis in the JNPRM are silent on this matter[400], making the foundation of the impacts of the rule speculative at best, and in error at worst.

The potential expansion of the phrase "particular social group" for purposes of asylum[401] and statutory withholding[402] could have a significant impact on the economy and the immigration system, the full effect of which would be unknown until such a proposal is issued.

Therefore, the instant JNPRM is putting the proverbial cart before the horse as the potential substantive changes must necessarily be considered before the departments are in any position to understand how the subsequent procedural changes will impact DOJ and DHS.

Given the uncertainty surrounding a potential rulemaking expanding the definition of "particular social group" for asylum and statutory withholding protection, it is premature to pursue this separate rulemaking.

A minimum one-year extension in the comment period for the instant JNPRM is necessary to allow the public to review the substance and costs of the proposed asylum and statutory withholding changes the administration will propose, in order to comment meaningfully on the interconnection between those proposed substantive changes and the procedural changes in the instant JNPRM.

---

[398] *Id*. at section 4(c).

[399] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[400] *See generally Id*. and at 46923 to 46933.

[401] *See* section 208(b)(1)(B)(i) of the INA (2021) ("The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of [section 101(a)(42)(A) of the INA]. To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[402] *See* section 241(b)(3)(A) of the INA (2021) ("Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."), available at: https://uscode.house.gov/view.xhtml?req=(title:8%20section:1231%20edition:prelim).

 CENTER FOR IMMIGRATION STUDIES

**XI.** **FAILURE TO CONDUCT AN ENVIRONMENTAL IMPACT STATEMENT, OR, AT THE VERY LEAST, AN ENVIRONMENTAL ASSESSMENT OF THE PROPOSED POLICY CHANGES BEFORE PUBLISHING A FINAL RULE WOULD VIOLATE THE NATIONAL ENVIRONMENTAL POLICY ACT.**

The departments make several unsustainable and mutually exclusive claims in the JNPRM to disavow their legal obligations to conduct environmental analysis under the National Environmental Policy Act (NEPA)[403].

First, the departments assert that they are entitled to an exemption under NEPA for any action intended to change an aspect of an immigration program, stating: "Generally, the Departments believe NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impacts would be largely, if not completely, speculative."[404]

To imply from the mere fact that the potential environmental impacts are not wholly apparent from the face of the proposed rule creates a legal exemption from NEPA for immigration programs in general is contrary to both NEPA and NEPA precedent. The entire purpose of the NEPA process is to perform such analysis. Soon after NEPA was passed, agencies attempted to avoid applying it by claiming that conducting NEPA analysis would be too speculative, but such mere assertions proved unavailing:

> *The agency need not foresee the unforeseeable, but by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting. And one of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry."[405]*

Further, the departments made no attempt whatsoever to ground this extremely broad claim of exemption that covers actions that change an immigration program with any sort of support when they promulgated their NEPA procedures.

---

[403] National Environmental Policy Act, 42 U.S. Code §§ 4321 through 4347 (2021), available at: https://www.energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/Req-NEPA.pdf.
[404] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46939 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.
[405] *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973), available at: https://law.justia.com/cases/federal/appellate-courts/F2/481/1079/292744/.

 Center for Immigration Studies

DOJ promulgated NEPA regulations in January 1981.[406]  In those NEPA regulations, DOJ provided a NEPA framework for analyzing the environmental effects of detention centers but provided no evidence that immigration itself—and not just the number, size, and location of detention centers-- has no environmental effects.

After many of DOJ's immigration functions were transferred to DHS upon its creation, that department also promulgated NEPA procedures, specifically DHS Directive 023-01[407] and its Instruction Manual[408], which it updated most recently in 2015.

The departments reference these procedures in the JNPRM, stating that they establish "the policies and procedures that DHS and its components use to comply with NEPA."[409]

The substance of these procedures is contained in the DHS Instruction Manual.  That manual, like DOJ's 1981 NEPA procedures, provides no basis for the departments' conclusion that changes to aspects of immigration programs are exempt from NEPA.

On the contrary, the Instruction Manual states:

> *The NEPA process helps DHS decision-makers systematically identify and evaluate the potential environmental effects of proposed actions and make informed decisions. Therefore, the NEPA process must be completed before DHS makes a final decision on a proposed action.*
>
> ***NEPA applies to the majority of DHS actions****. If there is any doubt as to the applicability of NEPA, the Component, working with or through its respective EPPM, consults OGC to determine whether NEPA applies to a proposed action. **Examples of situations in which NEPA is not triggered are very few** and include cases of statutory exemption, executive branch waiver of compliance when such waiver authority has been granted by Congress and properly exercised, or when the action does not constitute a major Federal action significantly affecting the quality of the human environment as that term has been interpreted in regulations and court decisions.* [410] *(Emphasis added.)*

---

[406] 46 Fed. Reg. 7,953 (Jan. 26, 1981), 28 CFR § 61 (2021), available at: https://www.law.cornell.edu/cfr/text/28/appendix-C_to_part_61.

[407] *Directive Number: 023-01*, U.S. DEP'T OF HOMELAND SECURITY, DHS DIRECTIVES SYSTEM (issued Oct. 31, 2014), available at: https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.

[408] *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, U.S. DEP'T OF HOMELAND SECURITY, OFC. OF THE CHIEF READINESS SUPPORT OFFICER (effective Mar. 26, 2015), available at: https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.

[409]Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46939 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[410] *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, U.S. DEP'T OF HOMELAND SECURITY, OFC. OF THE CHIEF READINESS SUPPORT OFFICER (effective Mar. 26, 2015), at V-1,  available at:

 CENTER FOR IMMIGRATION STUDIES

Immigration policy and procedure does not meet any of the named categories of exemption from NEPA, which also does not list the kind of exemption claimed here—an exemption for an action that requires speculation to determine its environmental effects.[411]  Immigration is one of DHS' primary mandates, and yet the Instruction Manual is silent on any exemption for it provided by Congress, interpretations of regulations, or judicial decisions.[412]

In actuality, the policy changes proposed in the JNPRM have the potential to significantly impact the environment.

As explained in previous sections, the regulatory changes in the proposed rule have the potential to increase population growth in the United States and to exacerbate the crisis on the Southwest border. Impeding the removal of inadmissible aliens, which the foregoing demonstrates is an effect of the JNPRM, would allow them to remain in the United States indefinitely.

Notably, the Supreme Court has held[413]: "[I]n a deportation proceeding . . . as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States."

Further, enabling illegal aliens to exploit loopholes in the asylum system will lead to larger numbers of aliens augmenting the national population through this pathway, and further expand the already existing environmental crisis at the border.[414]

The federal government has unambiguously acknowledged the environmental significance of population growth, both at the time it passed NEPA and afterwards.

NEPA itself was explicitly concerned with population growth; in fact, population growth is the *first* concern mentioned in NEPA's "Congressional declaration of national environmental policy":

> *The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, **particularly the***

---

https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf

[411] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46939 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

[412] *See generally* Instruction *Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, U.S. DEP'T OF HOMELAND SECURITY, OFC. OF THE CHIEF READINESS SUPPORT OFFICER (effective Mar. 26, 2015), at V-1,  available at: https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf

[413] *INS v. Doherty*, 502 U.S. 314, 323 (1992), available at: https://scholar.google.com/scholar_case?case=8707621299668215514&hl=en&as_sdt=6&as_vis=1&oi=scholarr.

[414] *See The Costs of Denying Border Patrol Access: Our Environment and Security Before the H. Comm. on Natural Resources*, 115th Cong. (2018) (statement of Andrew Arthur, Resident Fellow in Law and Policy, Center for Immigration Studies) ("The large number of cross-border traffickers who have attempted to enter the United States illegally have caused harm to our most vulnerable, and culturally and environmentally valuable, federal lands."), available at: https://cis.org/Testimony/Costs-Denying-Border-Patrol-Access-Our-Environment-and-Security.

 CENTER FOR IMMIGRATION STUDIES

> ***profound influences of population growth,*** *high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.  (Emphasis added.)*[415]

Given that population growth itself was mentioned in the statutory language of NEPA as the first of the important environmental considerations making the passage of NEPA necessary, immigration policies-- which essentially *are* federal population growth programs— are the most obvious area for the application of NEPA to any of the federal government's activities.

Moreover, NEPA also authorized a study of the effects of population growth, which became known as the Rockefeller Commission.[416]

NEPA's original proponents would have never considered that federal policies directly accelerating population growth should be exempt from the law. Instead, NEPA was designed to promote informed decision making, and informed decision making about the causes and environmental effects of population growth goes to the very purpose of that act.

In the years since, it has become obvious that environmentally informed decision making about population growth is inextricably intertwined with decisions about immigration.

The departments claim[417] that the JNPRM fits into either categorical exclusion (CATEX) A3(a)[418] which applies to rules of a "strictly administrative or procedural nature"[419] or CATEX

---

[415] 42 USC § 4331(a)(2021), available at: https://www.law.cornell.edu/uscode/text/42/4331.

[416] *Population and the American Future, The Report of The Commission on Population Growth and the American Future (The Rockefeller Commission Report)* (Jul. 18, 1969), available at: https://population-security.org/rockefeller/001_population_growth_and_the_american_future.htm#The%20Commission.

[417] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46940 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat

[418] Instruction *Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, U.S. Dep't of Homeland Security, Ofc. of the Chief Readiness Support Officer (effective Mar. 26, 2015), at A-1,  available at: https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf

[419] *Id*. at A-2.

 CENTER FOR IMMIGRATION STUDIES

A3(d), applicable to the "[p]romulgation of rules . . . that amend an existing regulation without changing its environmental effect."[420]

CATEX A3(a) fails to define what "strictly administrative or procedural" rules *are*, and thus on its face it is impermissibly broad, and citation to it would be arguably arbitrary and capricious.

If reasonably limited, however, CATEX A3(a) could not apply to a proposed rule like the instant JPNRM, and the administrative record for this categorical exception is devoid of evidence that it can. This rule, by the departments' own admission, includes changes to the asylum program that will affect how aliens qualify and apply for asylum, and obtain employment authorization, as well.[421]

There is no conceivable scenario in which the changes to the parole regulations at 8 CFR § 235.3(b)(2)(iii)[422] will not result in greater numbers of illegal aliens being released from detention (that is the purpose of the proposed procedural change[423]), which will inevitably encourage massive additional numbers of others to follow.[424]

Terming those changes as "procedural" or "administrative" does not change the fact that, as the foregoing explains, they have the potential to substantially increase the population of the United States, and substantially increase the number of illegal migrants crossing the border, which en masse, have significant environmental effects.

Take, for example, just the number of illegal entrants who were apprehended by Border Patrol at the Southwest border last fiscal year (through August) and processed under the INA: 535,027.[425] As the ICE detention numbers above indicate, most of those aliens were released into the United States.

Conservatively assuming that 80 percent were released, that would be 428,021 new residents of the United States, more people than reside in Tampa, Florida (404,636)[426] or Tulsa, Oklahoma

---

[420] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46940 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[421] *Id*. at 46916.

[422] *Id*. at 46946.

[423] *See id*. at 46910 ("The proposed parole provision would allow more noncitizens arriving at the U.S. border without proper documents for entry into the country to be placed into expedited removal and allow for them to have their fear claims heard and considered **outside the detention setting when space is unavailable or impracticable to use**.") (Emphasis added.).

[424] *See, e.g., Final Report*, HOMELAND SECURITY ADVISORY COUNCIL, CBP FAMILIES AND CHILDREN CARE PANEL (Nov. 14, 2019), at 2 ("We assess that pull factors, **especially the prompt release of migrants who bring a child**, account for much of the huge increase in FMU migration over the past year.") (Emphasis added.), available at: https://www.dhs.gov/sites/default/files/publications/fccp_final_report_1.pdf.

[425] *Southwest Land Border Encounters*, U.S. CUSTOMS AND BORDER PROTECTION (modified Sep. 15, 2021), available at: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[426] *The 200 Largest Cities in the United States by Population 2021*, WORLD POPULATION REVIEW (undated), available at: https://worldpopulationreview.com/us-cities.

CENTER FOR IMMIGRATION STUDIES

(402,742)[427].  In fact, if they were a city, they would be America's 46th largest, and fast approaching Minneapolis (439,012)[428].

Doubling the numbers of illegal aliens who are released into the United States, which the JNPRM could-- and likely would-- do would mean that a population larger than Seattle (776,555) would be added to the nation annually.  That would have significant environmental impacts, which would need to be addressed before these rules are finalized, not after.

Likewise, the departments cannot use CATEX A3(d) without some analysis showing that the proposed change would result in no change to the environmental footprint of the current asylum program.  DHS and DOJ would be unable to do so with respect to the instant JNPRM because the changes therein would greatly increase the population growth that already results from the U.S. asylum program.

Respectfully, the department's assertion "even if NEPA applied to this action, this proposed rule clearly fits within categorical exclusion A3(d)"[429] is factually wrong. The very purpose of the proposal to give AOs authority to adjudicate protection applications for aliens who have received positive credible fear assessments is grant protection more quickly:

> *As explained above, it may take years before the individual's protection claim is first adjudicated by an IJ. . .. This delay creates additional stress for those ultimately determined to merit asylum and other forms of humanitarian protection, as they are left in limbo as to whether they might still be removed and unable to petition for qualified family members, some of whom may still be at risk of harm.*[430]

Not only will the proposals result in more asylum grants (many in error, as explained above), but as this excerpt shows, those aliens who are granted asylum become immediately eligible to petition for their family members to come to this country[431], which will also have an upward population effect.

Even if the Departments' assertion were not wrong as a matter of practical fact, there is no rational basis for it, given that DHS and DOJ have never done any analysis of the current asylum program, or any previous one, either, and claim in the instant JNPRM that "any attempt to analyze its potential impacts would be largely, if not completely, speculative."[432]

---

[427] *Id*.

[428] *Id*.

[429] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46940 (Aug. 20, 2021), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

[430] *Id*. at 46909.

[431] *See* section 208(b)(3) of the INA (2021), available at: https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[432] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46939 (Aug. 20, 2021), available at:

 CENTER FOR IMMIGRATION STUDIES

Simply put, by their own admissions in this the departments admit that they would not be able to judge whether CATEX A3(d) applies, and it is therefore arbitrary and capricious for them to claim the categorical exclusion. A claim that a proposed policy change will not change the environmental footprint of the policy assumes that the environmental footprint of the policy is calculable, which the departments have claimed it is not.

The departments must, at the very least, provide a response that includes a specific definition of CATEX A3(a) and an explanation of how they are able to judge whether CATEX A3(d) can apply to programs whose current environmental footprint is unknown.  Not to do so would be to rely on a mere tautology.

Given the legal insufficiency of the department's claims of exemption or categorical exclusion, before promulgating any final rule, they must conduct, at the very least, an environmental assessment, if not an environmental impact statement.

Additionally, the departments also have the legal obligation to consult with the U.S. Fish and Wildlife Service before adopting a final rule, as either part of the NEPA process or separately. Specifically, under Section 7 of the Endangered Species Act, federal agencies must consult with the U.S. Fish and Wildlife Service (Service) when any action the agency carries out, funds, or authorizes (such as through a permit) may affect a listed endangered or threatened species or designated critical habitat.  Both the potential of population growth and the potential of increasing the numbers of people crossing the border as a result of these policies have the potential to jeopardize species that are federally protected, or to destroy or modify the critical habitats of federally protected species.  The JNPRM fails to include any such analysis as required by Section 7 and the departments would be exposed to litigation risk on this issue if they attempt to finalize the regulation without conducting an examination of the possible impact this rule could have on endangered or threatened species.

## XII.    CONCLUSION

For the reasons set forth herein, the departments should not adopt the proposals in the instant JNPRM, which are, in large part, *ultra vires* and in contravention of congressional intent and directives.  The JNPRM fails to give due consideration to several key relevant facts and concerns; which do little if anything to streamline or expedite the process by which the protection claims of aliens in expedited removal proceedings who have received positive credible fear determinations are considered.  If finalized, the JNPRM will promote fraud and encourage increased numbers of foreign nationals to enter the United States illegally to live and work in this country, indefinitely.

---

https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.



CENTER FOR IMMIGRATION STUDIES

The JNPRM[433] admits: "The ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim."

That is true, and the regulatory amendments in the JNPRM will simply make that problem exponentially worse.

In lieu of finalizing the proposed regulations in the JNPRM, the departments should instead promulgate regulations in response to the *Flores* settlement agreement that would allow DHS to detain aliens who have entered the United States illegally in family units, in accordance with the congressional detention mandates in sections 235(b)(1) and (b)(2) of the INA.

Should they nonetheless decide to proceed on the regulatory amendments in the instant JNPRM, DHS and DOJ should extend the comment period for this proposed rule for one year, pending the promulgation and publication of proposed rules amending the definition of "particular social group" for purposes of asylum and statutory withholding, which are to be issued in accordance with Executive Order 14,010. Additionally, the Departments are required to conduct an environmental analysis under NEPA for immigration regulations or offer a detailed analysis for why an exception applies, as well as analysis under Section 7 of the Endangered Species Act.

Sincerely,

Andrew Arthur
Resident Fellow in Law and Policy

Robert Law
Director of Regulatory Affairs and Policy

Julie Axelrod
Director of Litigation

Center for Immigration Studies

---

[433] *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906, 46909 (Aug. 20, 2021) ("The ability to stay in the United States for years waiting for an initial decision may motivate unauthorized border crossings by individuals who otherwise would not have sought to enter the United States and who lack a meritorious protection claim."), available at: https://www.federalregister.gov/documents/2021/08/20/2021-17779/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat