# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-00094-Z |
| | ) | |
| ALEJANDRO MAYORKAS, | ) | |
| in his official capacity as | ) | |
| Secretary of Homeland Security, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

<u>**DEFENDANTS' MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT ................................................................................................................. 8

   I.    TEXAS LACKS ARTICLE III STANDING ................................................. 8

      A.   Plaintiff Has No Injury in Fact .............................................................. 9

      B.   Plaintiff Cannot Show Traceability .................................................... 17

      C.   Plaintiff Cannot Show Redressability ................................................ 19

   II.   PLAINTIFF HAS NOT IDENTIFIED A COGNIZABLE ARTICLE III
        INJURY ..................................................................................................... 21

      A.   Asylum ............................................................................................... 23

      B.   Parole ................................................................................................. 29

   III.   SPECIAL SOLICITUDE DOES NOT RELIEVE PLAINTIFF OF ITS
        BURDEN TO SHOW STANDING ........................................................... 30

   IV.   PLAINTIFF'S CLAIMS DO NOT FALL WITHIN THE ZONE OF
        INTEREST ................................................................................................ 33

   V.   THE COURT HAS NO JURISDICTION OVER THIS CASE ..................... 35

   VI.   TEXAS FAILS TO STATE A CLAIM THAT THE IFR VIOLATES THE
        APPOINTMENTS CLAUSE ..................................................................... 38

CONCLUSION ........................................................................................................... 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Biden*,
    31 F.4th 469 (6th Cir. 2022) ........................................................................... 19, 27, 34

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ........................................................................... 21, 32

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................................ 32, 34

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ............................................................................. 19

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014) .................................................................. 10, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 8

*Ayuda, Inc. v. Reno*,
    7 F.3d 246 (D.C. Cir. 1993) ............................................................................... 34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 8

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ............................................................................ 9, 29, 36, 37

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ....................................................................................... 25

*California v. Texas*,
    141 S. Ct. 2104 (2021) .................................................................................... 18, 31

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ........................................................................... 11, 17, 18, 28

*Clarke v. Security Indus. Ass'n*,
    479 U.S. 388 (1987) ........................................................................................... 33

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) .............................................................................. 28

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ........................................................................................... 19

*Davis v. F.E.C.*,
    554 U.S. 724 (2008) ...................................................................................................19

*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................................................31

*Does #1-7 v. Abbott*,
    345 F. Supp. 3d 763 (N.D. Tex. 2018) ...................................................................38

*Does #1-7 v. Abbott*,
    945 F.3d 307 (5th Cir. 2019) ..................................................................................38

*Duarte ex rel. Duarte v. City of Lewisville, Tex.*,
    759 F.3d 514 (5th Cir. 2014) ....................................................................................9

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996).................................................................................34

*Florida v. Mellon*,
    273 U.S. 12 (1927)...................................................................................... 26, 28, 31

*Gen. Land Off. v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ..................................................................................26

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ............................................................................................23

*Heckler v. Chaney*,
    470 U.S. 821 (1985).................................................................................................29

*Hernandez v. Smith*,
    793 F. App'x 261 (5th Cir. 2019) ..........................................................................15

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013).................................................................................................27

*Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*,
    143 F.3d 1006 (5th Cir. 1998) ..................................................................................7

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*,
    946 F.3d 649 (5th Cir. 2019) ..................................................................................20

*Lewis v. Casey*,
    518 U.S. 343 (1996).................................................................................................19

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973).................................................................................................34

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ................................................................................. 39

*Lujan v. Defs. Of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... *passim*

*Make the Road New York v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ..................................................................... 37

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................ 30, 31, 32

*Massachusetts v. Laird*,
    400 U.S. 886 (1970) ................................................................................... 23

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) ..................................................................... 17

*Patel v. Garland*,
    142 S. Ct. 1614 (2022) ........................................................................ 37, 38

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981) ............................................................ *passim*

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ................................................................................... 27

*Railroad Trainmen v. Baltimore & Ohio R.R.*,
    331 U.S. 519 (1947) ................................................................................... 37

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................................... 23

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................................................... 40

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ..................................................................................... 20

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ........................................................................ 8

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ........................................................... 9, 10, 36

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) .................................................... 9, 10, 31, 32

*Texas v. United States*,
   106 F.3d 661 (5th Cir. 1997) ............................................................23, 29

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ........................................................9, 10, 33

*Trump v. New York*,
   141 S. Ct. 530 (2020) ..............................................................................31

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021) ............................................................................40

*United States v. Fausto*,
   484 U.S. 439 (1988) ................................................................................34

*United States* v. *Texas*,
   143 S. Ct. 1964 (2023) .....................................................................*passim*

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..........................................................................25, 28

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ................................................................................38

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ....................................................................8

*Willoughby v. U.S. ex rel. U.S. Dept. of the Army*,
   730 F.3d 476 (5th Cir. 2013) ....................................................................8

*Willy v. Admin. Review Bd.*,
   423 F.3d 483 (5th Cir. 2005) ..................................................................39

## FEDERAL STATUTES

5 U.S.C. § 301 ...............................................................................................39

5 U.S.C. § 706(2)(A) .....................................................................................38

5 U.S.C. § 706(2)(B) .....................................................................................38

6 U.S.C. § 112 ...............................................................................................39

8 U.S.C. § 1103 .............................................................................................28

8 U.S.C. § 1158 .........................................................................................2, 3

8 U.S.C. § 1158(a)(1) .....................................................................................4

8 U.S.C. § 1182 ............................................................................................................. 3

8 U.S.C. § 1225(b) ..................................................................................................... 35

8 U.S.C. § 1225(b)(1) ............................................................................... 2, 3, 4, 5, 33, 35

8 U.S.C. § 1226(e) ..................................................................................................... 34

8 U.S.C. § 1226a(b)(1) ............................................................................................... 34

8 U.S.C. § 1229a ......................................................................................................... 4

8 U.S.C. § 1229c(f) ..................................................................................................... 34

8 U.S.C. § 1231(h) ..................................................................................................... 34

8 U.S.C. § 1252(a)(2)(A) ...................................................................................... 5, 36

8 U.S.C. § 1252(a)(2)(B)(ii) ....................................................................................... 34

8 U.S.C. § 1252(a)(5) ................................................................................................. 34

8 U.S.C. § 1252(a)(2)(C) ............................................................................................ 34

8 U.S.C. § 1252(b)(4)(D) ............................................................................................ 34

8 U.S.C. § 1252(b)(9) ................................................................................................. 34

8 U.S.C. § 1252(d) ..................................................................................................... 34

8 U.S.C. § 1252(e) ............................................................................................. 3, 5, 35

8 U.S.C. § 1252(f) ....................................................................................................... 36

8 U.S.C. § 1252(f)(1) ............................................................................................ 20, 21

8 U.S.C. § 1252(g) ..................................................................................................... 34

42 U.S.C. § 7607(b)(1) .......................................................................................... 32-33

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(1) ................................................................................................. 2

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 2, 3, 8

Fed. R. Civ. P. 36(a)(3) ............................................................................................... 15

## FEDERAL REGULATIONS

8 C.F.R § 208.2(a)................................................................................................14

8 C.F.R § 208.9(a)................................................................................................14

8 C.F.R. § 208.30(d)...............................................................................................4

8 C.F.R. § 208.30(f)................................................................................................4

8 C.F.R. § 235.3(b)................................................................................................4

8 C.F.R. § 1003.42(f).............................................................................................4

86 Fed. Reg. 46906 (Aug. 20, 2021)......................................................................5

87 Fed. Reg. 12111 ...............................................................................................13

87 Fed. Reg. 18078 (Mar. 29, 2022)............................................................*passim*

88 Fed. Reg. 31314 (May 16, 2023) .......................................................................5

## INTRODUCTION

The Court should dismiss this case challenging an interim final rule ("IFR") jointly issued by the Departments of Justice and Homeland Security, entitled *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078 (Mar. 29, 2022). This IFR makes important changes that allows for, among other things, broader application of the expedited removal provisions that allow DHS to remove certain noncitizens with non-meritorious asylum claims more quickly. *Id.* at 18088. By removing certain restrictions on who can be processed for expedited removal due to operational constraints, the IFR avoids the need to process these noncitizens "through the lengthy and backlogged ordinary section 240 removal proceedings" in the immigration courts, allowing "DHS to more efficiently obtain orders of removal." *Id.* at 18108-09. And for noncitizens with potentially meritorious claims, the IFR creates a process that will allow noncitizens to "have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an [immigration judge] in section 240 removal proceedings" in immigration court. *Id.* at 18085. The IFR will thus reduce the overall workload and backlog of cases in the immigration courts, allowing the agency to focus "on other priority work." *Id.* at 18089. And by ensuring that "individuals who are ineligible may more promptly be ordered removed," *id.* at 18088, and "by reducing the amount of time a noncitizen can expect to remain in the United States" while their asylum claims are pending, the rule "reduces a critical incentive for noncitizens not in need of protection to exploit the system." *Id.* at 18192.

Notwithstanding these reasonable goals and the agency's authority to implement them, Texas contends the IFR increases unlawful migration to the United States generally and Texas specifically, and Texas asks this Court to invalidate the IFR. The Court should reject that faulty premise—unsupported by any evidence—and dismiss this case for multiple reasons under Federal

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 11 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 10 of 50   PageID 919
8408

Rule of Civil Procedure 12(b)(1), and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

First, Texas has not identified an injury sufficient to support standing. Rather, Texas alleges only speculative harm from unlawful immigration, which the Court cannot accept as true because Defendants are raising a *factual* attack on standing. The undisputed evidence Defendants submit with this motion shows not a single noncitizen has received an asylum merits interview from USCIS or been granted asylum under the IFR in Texas. The IFR is not applied to noncitizens with destinations in Texas, making any alleged injury speculative at best. Additionally, the total encounters of noncitizens at the border were *lower* in the months after the Rule took effect, undermining Texas' claim that the IFR incentivizes immigration. So even if Texas had identified evidence of the IFR affecting Texas in some way, it still would not matter because the percentage of credible fear findings and the overall asylum grant rate have also not increased under the IFR, undermining Texas' allegations that the IFR will make it easier for noncitizens to obtain asylum.

Second, even if Texas had put forward evidence of its alleged harms, none of the injuries Texas alleges are cognizable injuries for purposes of establishing Article III standing. *See United States v. Texas* ("*Texas Priorities*"), 143 S. Ct. 1964 (2023). Texas can only allege speculative, indirect costs it may incur if this Rule increased the number of noncitizens in Texas. Following the Supreme Court's *Texas Priorities* decision, which rejected a similar standing argument by Texas, it is no longer sufficient grounds to invoke Article III jurisdiction. *Id.* at 1972, n.3. Nor would special solicitude relieve Texas of its burden to show a concrete injury or satisfy the other basic requirements of Article III standing even if Texas was entitled to special solicitude. *Id.*

Third, Texas' claims do not fall within the zone of interests of sections 1225(b)(1), 1229a, and 1158(d)(7)—the statutes relevant to the IFR—because Texas is not the object of a challenged

regulatory action and therefore has no right of review. Fourth, this Court lacks jurisdiction over challenges to rules that implement section 1225(b)(1), because Congress has limited review of regulations implementing § 1225(b)(1) to United States District Court for the District of Columbia, and this Court has previously held the IFR implements § 1225(b)(1). 8 U.S.C. § 1252(e)(3); ECF No. 68.

Finally, Texas' Appointments Clause challenge fails to state a claim upon which relief may be granted. Texas' claim that the IFR violates the Appointments Clause is a facial challenge, which requires the Court to determine the constitutionality of the IFR as written. Nothing in the IFR precludes the Secretary of Homeland Security from appointing asylum officers carrying out their duties under the IFR as if they were officers of the United States or from curing any deficiency in their appointments were they to be deemed officers of the United States. Thus, even if the asylum officers who make asylum decisions under the IFR were determined to be officers of the United States, Texas has not plausibly alleged that there are no circumstances under which the IFR could be constitutionally applied, and the Court should dismiss Texas' claim under Rule 12(b)(6).

## BACKGROUND

Expedited Removal. Congress has authorized the Department of Homeland Security ("DHS") to summarily remove from the United States certain noncitizens who arrive at ports of entry or "certain other [noncitizens]" who recently entered the country as designated by the Secretary. See 8 U.S.C. § 1225(b)(1). Under this summary-removal mechanism—known as expedited removal—a noncitizen "arriving in the United States" who an immigration officer determines lacks valid entry documentation or makes certain kinds of material misrepresentations, shall be "order[ed] ... removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); see id. § 1182(a)(6)(C), (a)(7).

Implementing regulations establish procedures to be used before effectuating an expedited removal order. Immigration officers must "advise the alien of the charges against him or her," provide "an opportunity to respond to those charges in the sworn statement," and provide an interpreter if needed. 8 C.F.R. § 235.3(b)(2)(i). A noncitizen may "present evidence" "that he or she was admitted or paroled into the United States," or was "physically present ... continuously for the 2-year period immediately prior to the date of determination of inadmissibility," and therefore ineligible for expedited removal. *Id.* § 235.3(b)(1)(ii), (b)(6). And "any removal order," the "sworn statement," and any claims concerning a noncitizen's status "must be reviewed and approved by the appropriate supervisor before the order is considered final." *Id.* § 235.3(b)(7).

Under current law, additional procedures apply if a noncitizen asserts an "intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii); *see also* 8 U.S.C. §§ 1158(a)(1), 1225(b)(1)(A)(ii). In that situation, a noncitizen is provided a non-adversarial interview with an asylum officer at which the officer determines whether the noncitizen has a "credible fear of persecution" or torture, and is also provided the rights to request de novo review of that determination by an immigration judge, to consult with a person of the noncitizen's choosing during the credible fear process, and to an interpreter. 8 U.S.C. §§ 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(II), (B)(1)(B)(iv), (v); *see* 8 C.F.R. §§ 208.30(d), (d)(4), (d)(5); 1003.42(d), 1208.30(g)(2). If the asylum officer or immigration judge determines that the noncitizen has a credible fear of persecution or torture, the individual is "detained for further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), unless that individual is eligible for release on parole or bond. Although § 1225(b)(1)(B)(ii) does not specify how that "further consideration" should occur, the prior regulations provided that the noncitizen is placed in removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). If the officer and immigration judge find that

4

the noncitizen lacks such a fear, the noncitizen shall be "removed from the United States without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)(iii)(I), (b)(1)(C); 1252(a)(2)(A)(iii), (e)(2); 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(A).[1]

The IFR. On August 20, 2021, the Departments of Homeland Security and Justice jointly published a notice of proposed rulemaking ("NPRM"). The NPRM proposed amending the regulations governing the procedures implementing "further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), for individuals subject to expedited removal who are found to have a credible fear of persecution or torture under 8 U.S.C. § 1225(b)(1), and governing whether they may be released during the pendency of that application. *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 86 Fed. Reg. 46906 (Aug. 20, 2021); *see also* 87 Fed. Reg. at 18079 (explaining that the NPRM proposed "to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture" under § 1225(b)(1)(B)(i)-(ii)).

On March 29, 2022, after receiving and reviewing public comments submitted in response to the NPRM, the Departments issued the IFR at issue in this case. *See Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078 (Mar. 29, 2022). As the NPRM indicated, the

---

[1] On May 11, 2023, DHS implemented the Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 16, 2023), to incentivize individuals to use lawful, safe, and orderly pathways to enter the United States, or otherwise to seek asylum or other protection in another country through which they travel. The Rule—adopted after notice and opportunity to comment—imposes a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization and without having availed themselves of existing lawful pathways, unless they meet limited exceptions, or they rebut the presumption by demonstrating exceptionally compelling circumstances detailed in the Rule. The Rule took effect on May 11, 2023, the same day the Centers for Disease Control and Prevention (CDC)'s Title 42 public health Order ended.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 15 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 14 of 50   PageID 923
8482

Departments issued the IFR to implement § 1225(b)(1), which the IFR notes "provides that if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution, the noncitizen shall receive 'further consideration of the application for asylum.'" 87 Fed. Reg. at 18080. The "IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and CAT protection, will occur." *Id.* at 18080; *see also id.* at 18085 ("[T]his rule establishes a new process by which such 'further consideration' may occur, wherein a noncitizen will have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an IJ in section 240 removal proceedings.").

The new processes for asylum adjudication in the IFR are only applied to noncitizens who are "single adults who are non-rare language speakers and whose intended destination is one of nine destination cities," which are "Arlington[, Virginia], Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco." U.S. DHS, Asylum Processing Rule Cohorts, Exhibit A. The Rule "does not change the substantive standard for asylum eligibility," 87 Fed. Reg. at 18192, and for June 2022 through June 2023—the period of time since the IFR was put in place—credible fear was found in 39% of cases, compared to a credible fear finding of 68% in 2021, before the IFR was applied. *Id;* U.S. DHS, "Credible Fear Cases Completed and Referrals for Credible Fear Interview."[2] Likewise, asylum was ultimately approved in 22% of the cases processed under the IFR, compared to 26-37% in Fiscal Years 2017 through 2021. U.S. DHS, "Asylum Processing Rule Cohort Report – June 2023."[3]

---

[2] https://www.dhs.gov/immigration-statistics/readingroom/RFA/credible-fear-cases-interview (last visited Sept. 29, 2023).
[3] https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report (last visited Sept. 29, 2023).

      <u>This Case</u>. On April 28, 2022, one month after the IFR was announced, Texas filed a complaint challenging the IFR on five grounds, claiming that the Rule is: contrary to law; exceeds statutory authority; contrary to constitutional power under the Appointments Clause; arbitrary and capricious; and in violation of the APA for lack of notice and comment. Complaint, ECF No. 1. The following day, Defendants moved to dismiss or transfer this case to the District of Columbia, which, under 8 U.S.C. §§ 1252(a)(2)(A)(iv), (e)(3), is the only court with jurisdiction over claims challenging the IFR. ECF No. 7. The Court denied that motion on July 8, 2022, concluding that the IFR does implement section 1225(b)(1), but that section 1252 does not apply to States. ECF No. 68. Defendants moved to reconsider, arguing, among other things, that the Supreme Court had clearly held in *Biden v. Texas* that section 1252 does apply to States. ECF No. 73. The Court denied that motion on September 14, 2022. ECF No. 78.

      While the transfer motion was pending, on May 23, 2022, Texas moved for a preliminary injunction on four of its claims, arguing that the IFR is contrary to law, exceeds statutory authority, contrary to constitutional power, and arbitrary and capricious. ECF No. 20. Texas later withdrew that motion after Defendants sought jurisdictional discovery. ECF Nos. 69, 70, 71. The parties then conducted a period of jurisdictional discovery to determine whether Texas had standing to bring this case. ECF No. 72. Defendants now move to dismiss this case for lack of jurisdiction and failure to state a claim upon which relief can be granted.

## STANDARD OF REVIEW

      "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). "In applying Rule 12(b)(1), the district court has the power to dismiss for lack of subject matter jurisdiction on any one of three

separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Willoughby v. U.S. ex rel. U.S. Dept. of the Army*, 730 F.3d 476, 479 (5th Cir. 2013). In a "factual attack" on jurisdiction "no presumptive truthfulness attaches to plaintiff's allegations," *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981), and the plaintiff has the burden of proving, by a preponderance of the evidence, that the court has subject-matter jurisdiction, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

Courts must dismiss claims under Rule 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion should be granted if "it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief it seeks." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

## ARGUMENT

## I.    TEXAS LACKS ARTICLE III STANDING

To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged government action that a favorable decision would "redress." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–62 (1992). Yet, after a year of conducting jurisdictional discovery, Texas has been unable to produce evidence sufficient to establish any one of these required elements. Instead, the evidence has shown that the IFR is not being applied to noncitizens with destinations in Texas, making any alleged injury speculative at best. Additionally, the data has shown that total encounters with noncitizens at the border were *lower* in the months after the Rule took effect, defeating Texas' claim that the IFR incentivizes immigration. In addition, neither the percentage of cases in which a USCIS officer has found credible fear, nor the

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 18 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 17 of 50   PageID 926
8415

overall asylum grant rate have increased while the IFR has been in effect, undermining Texas'
allegations that the IFR will make it easier for noncitizens to obtain asylum. Texas cannot show it
has been, or will be, injured by the IFR, let alone that any of its alleged injuries are traceable to
the challenged Rule, all of which is fatal to Texas' standing to bring this case.

### A. Plaintiff Has No Injury in Fact

To satisfy the "injury-in-fact" requirement of Article III, Texas must identify an injury that
is "concrete … particularized" and "actual or imminent"—not "conjectural" or "hypothetical."
*Lujan*, 504 U.S. at 560; *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th
Cir. 2014). Texas's alleged injury is neither concrete, particularized, actual nor imminent. Texas
alleges it "spends hundreds of millions of dollars each year" on various State services for "illegal
aliens because of the United States government's failure to enforce federal law." ECF No. 1 at ¶¶
52-60. Yet, notably, Texas does not specify in its Complaint that any of those alleged costs are a
result of this specific IFR. *Id.*

In short, Texas's theory of standing is based on an argument that the IFR was likely to
increase the number of noncitizens obtaining asylum, or being paroled while pending their
application for asylum, which would increase the number of noncitizens in the State and thus
increase the State's costs. And that theory of standing previously made sense in light of the Fifth
Circuit's decisions in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25,
2015) ("DAPA" case); *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021),
*rev'd and remanded*, 142 S. Ct. 2528 (2022) ("MPP" case); and *Texas v. United States*, 50 F.4th
498 (5th Cir. 2022) ("DACA" case).

In the Deferred Action for Parents of Americans and Lawful Permanent Residents
("DAPA") case, the Fifth Circuit found that the plaintiff States had standing to challenge the
program because, if the program went into effect, it would enable at least five-hundred thousand

undocumented immigrants in Texas to become eligible for State-funded benefits. 809 F.3d at 155.

Thus, "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152-153. In the Migrant

Protection Protocols ("MPP") case, the Court found that the plaintiff States had standing to

challenge the termination of MPP based upon the district court's factual finding that "MPP's

termination has increased the number of immigrants paroled into Texas," 20 F.4th at 970, thereby

resulting in increased costs to the State, *id*. at 970-72 (finding standing where the challenged action

"increased the number of parolees in the state" overall). In the Deferred Action for Childhood

Arrivals ("DACA") case, the Court found the plaintiff States had standing to challenge the DACA

program because there was evidence in the record that "if DACA were no longer in effect, at least

some recipients would leave, and their departure would reduce the State's Medicaid, social

services and education costs." 50 F.4th at 520. In other words, in each of those cases, the Fifth

Circuit found standing based on the same rationale—evidence of more noncitizens in the State

who qualify for specific State sponsored programs meant more costs.[4]

The evidence in this case, however, shows a very different story. In those cases, the Court

found there was clear evidence of additional people in Texas who would obtain legal status that

would permit them to use State services; such a clear chain of causation and injury is wholly absent

in this case. Here, Texas *cannot* demonstrate an injury from the IFR increasing noncitizens using

its services *because the asylum adjudication process under the IFR has not been applied to

noncitizens with destinations in Texas*. Currently, the only noncitizens who may be processed for

an asylum interview under the IFR for an ultimate Asylum Merits Interview "include single adults

---

[4] Defendants dispute that standing was properly established in these three cases or that standing can be
based on the presence of more people in a State. *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014),
*aff'd*, 797 F.3d 11 (A state "has not suffered an injury in fact to a legally cognizable interest" when "a
federal government program is anticipated to produce an increase in that state's population and a
concomitant increase in the need for the state's resources.").

who are non-rare language speakers and whose intended destination is one of nine destination cities," which are "Arlington [Virginia], Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco." Exhibit A. If the IFR is not being used to adjudicate asylum applications for noncitizens whose intended destination is in Texas, Texas cannot claim to suffer a direct injury as a result of the IFR.

In fact, there is no evidence in the record that shows a single person who received an asylum interview under the IFR currently resides in Texas and uses State services, because no one who states an intention of migrating to Texas benefits from an asylum adjudication under processes in the Rule. Accordingly, none of the alleged harms to which Texas generally alludes in fact have occurred or are likely to occur. Texas has failed, despite over a year of discovery, to provide any evidence to the contrary, and so has not demonstrated any "actual" or "certainly impending" injury traceable to the IFR.[5] *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) ("[T]he Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.").

Second, despite its burden, Plaintiff has put forward no evidence to support its theory of standing. Instead, to try and demonstrate an injury, Texas layers speculation on speculation, arguing that the IFR will result in an increase in the number of individuals granted asylum, which will incentivize and cause an increase in, illegal immigration, which, in turn, will lead to more noncitizens residing in Texas and costing the state money in terms of education, law enforcement, healthcare, and the provision of other social services to illegal immigrants. *See* ECF No. 1 at ¶ 1.

---

[5] Rather, Texas concedes that the only way it has to connect individuals processed under the Rule to its own expenditures is "using information from the Defendants to demonstrate that paroled applicants have children who attend a public school, have incurred medical costs payable through any of Texas's several public-health programs, have been issued a driver's license, or have been incarcerated." Pl's Resp. to Defs' Discovery Requests, Exhibit B at Interrogatory Nos. 21, 22. However, the evidence produced in discovery does not show any such information that supports Texas's theory of harm.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 21 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 20 of 50   PageID 929
84183

However, Texas has no evidence proving these claims. The only support for this theory Texas

offers is the "truism … that increasing the benefits of a success and reducing the costs of an attempt

strengthen the incentives to attempt a potential action." Exhibit B at Interrogatory No. 14. But a

party may not rely on truisms in a factual attack against its standing. *Paterson v. Weinberger*, 644

F.2d 521, 523 (5th Cir. 1981) ("If a defendant makes a 'factual attack' upon the court's subject

matter jurisdiction over the lawsuit, … a plaintiff is also required to submit facts through some

evidentiary method and has the burden of proving by a preponderance of the evidence that the trial

court does have subject matter jurisdiction.").

While Texas has submitted no evidence whatsoever on this score, *Defendants* have put

forward expert evidence showing that the Rule does not cause an increase in immigration. Michael

A. Clemens—a professor of economics who specializes in the research on the cause and effects of

international migration—specifically analyzed Texas's (and other States in an identical lawsuit in

Louisiana) allegations of harm in this case. Specifically, Texas alleges that the IFR makes it easier

for noncitizens with non-meritorious asylum claims to be released into the United States, it will

induce an increase of immigration to the United States. ECF No. 1 at ¶¶ 51, 58; Expert Report by

Michael A. Clemens, Exhibit C at 2. Prof. Clemens found there was no evidence that the Asylum

Processing IFR, by itself, was sufficient to have an impact on overall CBP encounters at the

Southwest Border. Exhibit C at 3. In fact, Prof. Clemens concluded, the available data shows that

encounters were *lower* in the months after the Rule took effect than before it and the post-Rule

trends in encounters of noncitizens affected by the Rule were "indistinguishable" from trends in

encounters of similar noncitizens who were not affected by the Rule. *Id.* So not only has Texas not

put forward *any* evidence to support their claim that this Rule specifically increases immigration

thus causing injury to Texas, but Defendants have put forward unchallenged expert evidence

showing the exact opposite, shifting the burden to Texas. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) ("If a defendant makes a 'factual attack' upon the court's subject matter jurisdiction over the lawsuit, … a plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.").

Even if Texas had identified evidence of the IFR affecting Texas in some way, it still would not matter because the undisputed record evidence also demonstrates that, where the Rule has in fact been applied, it has not resulted in a higher rate of positive credible fear findings or asylum grants by asylum officers. USCIS maintains comprehensive data regarding outcomes of the Rule's application on its website. Since the Rule was put into place in June 2022 through June 2023, there were a total of 5,877 eligible credible fear outcomes for noncitizens heading to one of the nine destination cities for which the Rule has thus far been implemented. U.S. DHS, "Asylum Processing Rule Cohort Report – June 2023," Asylum Processing Rule Cohorts, *supra* n.3. Of those outcomes, in 2,265 cases, there was a positive credible fear finding—meaning the individual could further pursue asylum through the AMI process. *Id.* There was a negative credible fear finding—meaning the individual would be ordered removed unless that determination was reversed by an immigration judge—in 2,893 cases. *Id.* This equates to asylum officers finding credible fear in 39% of cases under the Rule. *See id.* By comparison, before the Rule was applied, in 2021, the agency completed 43,958 credible fear cases, found credible fear in 29,869 of those and did not find credible fear in 11,711, for an overall credible fear finding rate of 68%. U.S. DHS, "Credible Fear Cases Completed and Referrals for Credible Fear Interview", *supra* n.2. Thus, the application of the Rule has not caused an increase in the number of cases where noncitizens have been permitted to pursue asylum as opposed to facing immediate removal.

The same is true for the asylum grant rate by asylum officers under the Rule. For Fiscal

Years 2017 through 2021, prior to the IFR, overall approval rates for asylum claims adjudicated

by both asylum officers[6] and immigration judges were in the 26–37% range. 87 Fed. Reg. at 18116

n. 57. By comparison, of the 1,824 total asylum merits-interview cases handled by asylum officers

under the Rule through June 2023, asylum was granted in 396 cases, yielding an approval rate of

approximately 22%. U.S. DHS, "Asylum Processing Rule Cohort Report – June 2023," *supra* n.3.

Thus, contrary to Texas's speculation, the undisputed evidence demonstrates that the Rule has not

caused an increase in the grant rate of asylum due to asylum officers handling more of the merits

determinations. Therefore, contrary to Plaintiff's unsubstantiated theory, insufficient to carry

Texas's preponderance burden at this stage even were it true, the Rule has not led to an increase

in the number of noncitizens in the United States either while seeking asylum or after being granted

asylum.

In the alternative, even if Texas could show the number of noncitizens in the United States

has gone up since the IFR took effect, Texas still could not use that to show injury because Texas

has admitted that asylum grant rates fluctuate over time based on numerous factors including

judicial decisions and socio-economic conditions in other countries, all separate and apart from

the IFR. Def. Discovery Requests, Exhibit D at Requests for Admission Nos. 4-7. Defendants

served Requests to Admit on Texas on June 7, 2022, and Texas did not provide written responses

to these requests until July 28, 2022—over a year later. In fact, Defendants had to file a motion to

compel with the Court before Texas would provide a written response to the Requests for

---

[6] Even before the IFR took effect, asylum officers decided asylum claims in some circumstances, such as in affirmative asylum claims. *See* 87 Fed. Reg. 18080 ("USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's affirmative asylum application should be granted."); 87 Fed. Reg. 18111 ("Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect."); *see also* 8 C.F.R §§ 208.2(a), 208.9(a), 208.30.

Production and Interrogatories propounded by Defendants. ECF No. 93.[7] Although Texas may try

to deny portions of the Requests, Requests for Admission are deemed admitted by operation of

law in circumstances like this when the responding party fails to respond within the designated

time. Rule 36(a)(3) provides: "*Time to Respond; Effect of Not Responding.* A matter is admitted

unless, within 30 days after being served, the party to whom the request is directed serves on the

requesting party a written answer or objection addressed to the matter and signed by the party or

its attorney." *See also, e.g.*, *Hernandez v. Smith*, 793 F. App'x 261, 266 (5th Cir. 2019).[8]

It is unsurprising that the Rule has not increased the rates of asylum relief being granted

given what the Rule actually does. First, the IFR clearly states that it "does not change the

substantive standards for qualifying for asylum." 87 Fed. Reg. at 18115. As the IFR explains:

> The Departments do not expect this rule to encourage or cause an increase in the
> number of individuals seeking asylum in the United States. As explained above,
> this rule is not expected to create any significant new incentives that would drive
> increase irregular migration. To the contrary, by reducing the amount of time a
> noncitizen can expect to remain in the United States with a pending asylum claim
> that originated in credible fear screening, the rule dramatically reduces a critical
> incentive for noncitizens not in need of protection to exploit the system. […] This
> rule does not change the substantive standard for asylum eligibility[…].

87 Fed. Reg. at 18192. The IFR further states:

> However, to the extent that the significant delays in the adjudication of asylum
> claims today contribute to rates of irregular migration, the Departments believe that
> the efficiencies introduced by the rule will help to reduce any incentive to exploit
> the system and enhance the Government's efforts to address irregular migration.

---

[7] Defendants did not move to compel responses to the Requests for Admission because, as noted in the
motion, those had already been deemed admitted by operation of law due to Texas' failure to timely
respond. ECF No. 93, at 3 n.1.

[8] Texas also admits that prior to the effective date of the IFR: Texas provided public benefits to individuals
granted asylum by USCIS and immigration judges; the federal government granted parole to individuals
pending adjudication of their asylum applications; asylees who meet Texas state income requirements are
eligible for Medicare, and if they are ineligible for Medicare, they are eligible for Refugees Medical
Assistance for a limited period of time. Exhibit D. It is also deemed admitted that the shorter the time
noncitizens expect to remain in the United States while their asylum claims are pending, the less likely
noncitizens are to file non-meritorious asylum claims, undermining Texas' claim that it is injured by the
IFR when the IFR seeks to shorten the time asylum seekers spend in the United States. *Id.*

> By limiting the amount of time a noncitizen may remain in the United States while
> a claim for relief or protection is pending, the rule stands to dramatically reduce
> potential incentives for noncitizens to make false claims for relief and protection.

87 Fed. Reg. at 18111. Indeed, Texas has conceded that since "increasing the time a person expects to spend in the United States while an asylum claim is pending strengthens the incentive to file non-meritorious claims," therefore "decreasing the time weakens that incentive." Exhibit B at Resp. to Request for Admission No. 10. The Rule thus weakens the incentive for individuals to come to the United States to raise non-meritorious claims for asylum without changing the standard asylum seekers have to meet to be granted relief. The IFR simply focuses on who will hear those claims and the process by which they will be adjudicated.

In addition to its failure to show evidence that the IFR is increasing the number of noncitizens pursuing or ultimately being granted asylum, Texas has also been unable to identify or produce any evidence in support of its other allegations. Defendants served Texas with numerous discovery requests asking that Texas provide all documents that show, *inter alia*, that the number of noncitizens will increase in Texas a result of this Rule, that Texas spends hundreds of millions of dollars on noncitizens subject to the Rule using its services each year, or that noncitizens paroled by the Federal government pending their application under this Rule will establish residence in Texas. Exhibit D at Request for Production Nos. 1, 5, 8. To each of these requests, Texas responded that it does not track this information or data. Exhibit B at Resp. to Request for Production Nos. 1, 5, 8. It is not surprising that Texas cannot show that it spends "hundreds of millions of dollars" attributable to the IFR, given the fact that the asylum adjudication processes under the Rule have not been applied in Texas and has not affected the number of migrants moving to Texas, as explained *supra*.

In short, the undisputed evidence shows that the IFR's asylum adjudication provisions (1) have not been applied to migrants whose destination is Texas, (2) has not led to an increase in encounters, (3) has not resulted in more credible fear findings or asylum grants than before the rule existed, (4) and thus has not injured Texas in any cognizable way. In the face of this overwhelming evidence, Texas's naked speculation that the IFR increases migration to Texas fails to demonstrate, let alone by a preponderance of the evidence, any injury. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Because Texas cannot show actual evidence of increased costs arising from an increase in its population, it cannot establish Article III standing.

### B.  Plaintiff Cannot Show Traceability.

Texas' standing also fails because it cannot show traceability. First, any injury alleged by Texas cannot be traced to the IFR, because as discussed above, total encounters at the border decreased after the IFR took effect, credible fear was being found in fewer cases, and the total amount of actual asylum grants decreased under the IFR. Point I.A, *supra*. Therefore, any increased costs Texas is claiming clearly are not a result of the IFR. Additionally, any increase in asylees in Texas cannot be traced to the IFR because, as Texas admitted, there are numerous factors out of the government's control that impact the number of noncitizens who are granted asylum. *Id.*

Even if Texas could show an actual injury from the costs that Texas claims it will incur as a result of a larger noncitizen population—the costs of education, law enforcement, medical services, and social services—are not fairly traceable to the IFR, but rather would be the consequence of the "unfettered choices made by independent actors." *Lujan*, 504 U.S. at 562. Where causation hinges upon the choices of third parties, a plaintiff must adduce facts to show that those choices "will be made in such a manner that will produce causation and permit redressability of the harm." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562). The Supreme Court has emphasized that

17

standing is "substantially more difficult" to establish in those circumstances. *Lujan*, 504 U.S. at 562; *Texas*, 143 S. Ct. at 1973 ("When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation of someone else, much more is needed' to establish standing."); *see, e.g., California v. Texas,* 141 S. Ct. 2104, 2117 (2021); *Clapper*, 568 U.S. at 414.

 *Texas Priorities* emphasized that in the system of dual federal and state sovereignty created by the Constitution, "federal policies frequently generate indirect effects on state revenues or state spending," and that when a State's bid for standing is based "only those kinds of indirect effects" from federal regulation, "the State's claim for standing can become more attenuated." *Texas Priorities*, 143 S. Ct. at 1972, n.3. The Court rejected such harms as an independently sufficient basis to support standing as well. *See id.* ("In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit."). Indeed, in rejecting such indirect costs as sufficient to show standing, *Texas Priorities* implicitly rejected some of the very same evidence that Plaintiffs rely on here: declarations from state officials addressing the same subject matter for the same time period. Declarations, Bates TX_000282-84, TX_000238-42, Exhibit E; *see also* Exhibit B at Resp. to Request for Production Nos. 3, 4, 19, 30 (citing to Declarations in support of alleged injuries). Texas, in fact, did not even bother changing the header on the declarations—they are the exact same declarations produced in *Texas Priorities* (dated prior to the IFR taking effect) which were rejected by the Court as a sufficient basis for standing. *Id.*

 Plaintiff concedes that it does not track data concerning expenditures on noncitizens in a way that would permit it to trace those expenditures to the IFR. Exhibit B at Resp. to Interrogatories Nos. 1, 2, 6, 7, 3, 4. Given its lack of evidence connecting its alleged expenses to noncitizens processed under the IFR, and the unrefuted evidence that the IFR reduced positive

credible fear determinations and asylum grant rates (and thus the number of noncitizens eligible

to seek asylum and receive parole into the United States while they do so), Plaintiff cannot meet

this burden. Even were there any doubt that Plaintiff had failed to demonstrate the traceability of

its alleged injuries, its claims would fail. The D.C. Circuit rejected a materially identical theory of

standing in *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), where a county sheriff asserted that a

federal immigration policy would result in more noncitizens remaining in his county and that

"some portion of those [noncitizens] will commit crimes," *id.* at 24. The Court observed that even

if the challenged policies increased unlawful immigration, one cannot infer that the policies

increase crime because "crime is notoriously difficult to predict." *Arpaio*, 797 F.3d at 22. "Crime

rates are affected by numerous factors, such as the local economy, population density, access to

jobs, education, and housing, and public policies that directly and indirectly affect the crime rate."

*Id*. Thus, the Court concluded, "it is pure speculation whether an increase in unlawful immigration

would result in an increase" in crime, and "where predictions are so uncertain, we are prohibited

from finding standing." *Id.*; *Whitewater*, 5 F.4d at 1015 ("the attenuation in this chain of reasoning,

unsupported by well-pleaded facts, is worthy of Rube Goldberg"). So too here, where the actual

evidence shows that the overall rate of asylum grants *decreased* after the IFR took effect. *Supra*,

Point I.A.

     Similarly, in *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022), in a unanimous opinion written

by Chief Judge Sutton, in which the Sixth Circuit granted a stay of a nationwide injunction pending

appeal, the Court found that the plaintiff states were not likely to be able to show that their alleged

injuries—including the cost of increased law enforcement and medical costs—were traceable to

the federal government's immigration enforcement priorities, because they depended in large part

upon the choices of third-parties. *Id.* at 8. Not only can Texas not show it was actually injured by

the IFR, it also cannot trace any of its alleged injuries to the IFR, which defeats Texas' standing to bring this case.

### C. Plaintiff Cannot Show Redressability.

Finally, Plaintiff has failed to demonstrate redressability for each type of relief it seeks. "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). *See also Davis v. F.E.C.*, 554 U.S. 724, 733 (2008). "To establish standing, a plaintiff must show an injury in fact caused by the defendant and *redressable by a court order*." *Texas Priorities*, 143 S. Ct. 1964, 1970, *citing Lujan*, 504 U. S., at 560–561 (emphasis added). The Court's judgment must actually "remedy the plaintiff's harms." *Id.* at 1979. "[R]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019).

Even if Texas' claimed injury were likely to occur (and as shown, it is not), the relief Texas seeks would not address it. The evidence has shown that no one subject to the IFR's asylum merits interview process is residing in Texas, so enjoining or vacating the IFR would have no impact on the costs Texas is alleging to suffer as a result of the IFR. Without an actual, traceable injury, there is no targeted relief this Court can provide to address the injuries Texas is alleging. "To establish redressability, a plaintiff must show from the outset of its suit that its injuries are capable of being remedied by a favorable decision." *Texas*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (cleaned up). Even without the IFR, some federal officials, including immigration judges, would retain the authority and discretion to grant asylum to noncitizens, and because Texas has not shown that asylum officers grant asylum at a rate different than immigration judges, removing the IFR would not redress their alleged harm. Likewise, DHS would still retain the authority to parole noncitizens

under section 1182 or release under section 1226(a) of the INA. An injunction of the Rule thus would not restrain the Executive's discretion to process migrants at the border in the most appropriate way. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998) (finding no redressability where specific relief sought would not address the harms suffered). As Justice Gorsuch recognized in his concurrence in *United States v. Texas*, where the relief sought is precluded by statute and there is no other effective judicial remedy, a court cannot redress the claimed injury. *Texas*, 143 S. Ct. at 1978–79 (Gorsuch, J.) (redressability not met where 8 U.S.C. § 1252(f)(1) precludes injunctive relief). Three justices concurred in the judgment but focused on the absence of redressability. They would have held that 8 U.S.C. § 1252(f)(1)'s bar on injunctive relief prevented the court from ordering the government to take those enforcement actions, and lesser relief would not remedy the alleged injury. *Id.* at 1978-79.

Further, enjoining or vacating the IFR would not prevent noncitizens who are seeking asylum from choosing to remain in Texas—and it would allow more of them to do so for longer. Instead, an injunction or vacatur of the IFR would merely remove a tool for quickly removing certain noncitizens who lack a proper basis for seeking asylum, and similarly remove a disincentive for noncitizens to cross into the country without a legitimate asylum claim—placement into expedited removal of noncitizens who could not previously be processed for expedited removal due to operational constraints. Similarly, enjoining or vacating the IFR would not prevent noncitizens paroled under other authority from residing in, or relocating to, Texas. Such an order would more likely contribute to the harms Texas complains of, by taking away the government's carefully calibrated tool to *reduce* the population of noncitizens in the country awaiting removal proceedings, and more quickly removing noncitizens with non-meritorious asylum claims. *See* Point I.A, *supra* (total encounters are lower since the IFR took effect, and rate of credible fear

findings and asylum grants have not increased under the IFR). For all these reasons, Texas lacks standing to bring this case.

## II.      PLAINTIFF HAS NOT IDENTIFIED A COGNIZABLE ARTICLE III INJURY.

Even if Texas could show harm related to the Rule despite being unable to provide proof of those injuries during discovery, Texas' claimed injury is not cognizable. There are "bedrock Article III constraints in all cases, even those brought by States against an executive agency or officer." *Texas*, 143 S. Ct. at 1972, n.3. And "[c]ontingent injuries, especially those arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies." *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). Federal policies routinely have incidental effects on States' expenditures, revenues, and other activities. Yet such effects have historically not been viewed as judicially cognizable injuries, and the Supreme Court recently cautioned against recognition of such "attenuated" claims by States in a very similar context. *Texas Priorities*, 143 S. Ct. at 1972, n.3. The Supreme Court's recent decision in *Texas Priorities* seriously calls into question whether indirect State costs with respect to education, healthcare, law enforcement, or other social services allegedly caused by the Rule can be a basis for Article III standing, even if Plaintiff had been able to provide evidence of such costs.

In *Texas Priorities*, the Supreme Court reaffirmed that courts must examine "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Id.* at 1970. In doing so, courts must consider whether the "asserted injury" is the type that has "traditionally" been "redressable in federal court" and determine the dispute is one that "is traditionally thought capable of resolution through the judicial process." *Texas*, 143 S. Ct. at 1970. Here, the IFR changes the process under which some asylum claims are evaluated, and it expands who is eligible for release while their asylum applications are pending. 87 Fed. Reg. 18078.

### A. Asylum

As to the federal government's authority to grant asylum, there is no historical tradition of anyone, let alone States, challenging grants of asylum to individuals. Texas has not identified any lawsuits challenging such asylum grants, and Defendants are not aware of any such cases. Here, Texas alleges it is injured because, it claims, the IFR will result in increased grants of asylum which will, in turn, affect Texas' population. *See generally*, ECF No. 1. But the Supreme Court has made clear that a State may not satisfy its standing burden by arguing that some change in federal policy may cause a change in population that may in turn cause indirect changes in States expenditures. *Texas Priorities*, 143 S. Ct. at 1972, n.3. To allow such a challenge would open the door to an untold number of lawsuits on the basis that those decisions generally affect the population of a State. For example, where and whether the federal government opens a military base, whether a business should be permitted to open or close one of its locations, or whether an individual enrolls in university in one state over another could all become challengeable by State governments under the theory that it impacts the State population and therefore affects State costs.[9] There is no precedent for such challenges, and under *Texas Priorities* such a lack of historical precedent strongly counsels against allowing Texas to proceed with the challenges made in this case.

The absence during the vast majority of our Nation's history of suits like this one, premised on speculative indirect State costs from regulation of third parties, is powerful evidence that such suits are incompatible with our constitutional structure, which "contemplates a more restricted role

---

[9] *See Massachusetts v. Laird*, 400 U.S. 886 (1970). There, Massachusetts sued the Secretary of Defense to enjoin the Vietnam War. The Court summarily rejected the suit, *id.* at 886, but Justice Douglas argued in dissent that the State had standing, *id.* at 887-891. On Texas' theory, the Court was wrong and Justice Douglas was right. Surely the Vietnam War caused at least one dollar in peripheral harm to Massachusetts - for example, because drafted Bay Staters would earn less taxable income while away or be entitled to state veterans' benefits after returning.

for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (noting limits on State standing to raise claims against the Federal government). "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," and a "State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (A "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws.").

The *Texas Priorities* decision also explained that States will have greater difficulty establishing standing when their theory of harm is based solely on indirect costs that may result from changes in federal policy that could affect a State's population. As the Supreme Court noted, "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Texas Priorities*, 143 S. Ct. at 1972, n.3. In such circumstances, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* Like the guidance at issue in the *Texas Priorities* case, the Rule does not direct States or state agencies to take any particular action with respect to law enforcement or social services costs, making any allegations of costs indirect.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 34 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 33 of 50   PageID 942
8481

Contrast this with, for example, the Supreme Court's discussion of direct injuries just one week later in the student loan forgiveness case, where the Supreme Court explained that the challenged policy would by its terms directly "cut … revenues" of a State entity, which the Court viewed as "necessarily a *direct* injury to Missouri itself." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (emphasis added). The challenged act would have eliminated a sizeable portion of loans serviced by a State entity, costing it approximately "$44 million a year" as a direct result, and eliminating the portion of those revenues that is used to fund education in Missouri. While *Nebraska* provides an example of direct injuries, this case involves an indirect allegation of injury because Texas has no proof of an actual injury, and its theory of harm is fully speculative future injuries based on more people being in the state as a result of this Rule, and—making their claim of harm even more attenuated—those people will then use State services.

Texas' argument is based entirely on these alleged indirect costs from noncitizens processed under the Rule, and those individuals are the only ones who can reasonably be considered the regulated entities for purposes of the Rule. Texas does not allege that States are directly regulated by the Rule. When a "suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be … proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action." *Lujan*, 504 U.S. at 561. "When … a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed." *Id*. The Supreme Court has consistently held that "when the plaintiff is not himself the object of the government action or inaction he challenges"—in other words where the plaintiff is arguing standing based on indirect injuries—plaintiffs face a "substantially more difficult" burden to establish standing. *Id*.; *see also Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) (noting that where

"the harm to petitioners may have resulted indirectly" because they are "a third party" not directly regulated by the challenged policy "the indirectness of the injury" may "make it substantially more difficult to meet the minimum requirement of Art. III"). And as the Supreme Court long ago held, an indirect theory of harm based solely on the assertion that a change in federal policy will affect a State's population and in turn affect State revenue is insufficient to satisfy Article III. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting standing where State argued change in federal policy would "have the result of inducing potential taxpayers to withdraw property from the state," negatively affecting State revenue). Such injuries are "at most, only remote and indirect" and insufficient to show the type of more "direct injury" required for standing. *Id.* at 18; *see also Texas Priorities*, 143 S. Ct. at 1972, n.3 (citing these same cases, *Florida v. Mellon* and *Lujan*, in noting that standing arguments premised on "indirect effects" and "attenuated" harms may not satisfy "bedrock Article III constraints").

Following *Texas Priorities*, it is no longer sufficient for a State simply to argue that some change in federal policy may cause a change in population that may in turn cause indirect changes in the State's expenditures on education, health care, law enforcement, or social services. 143 S. Ct. at 1972, n.3. This is particularly true in cases such as this one, where the change in federal policy neither directly regulates State entities nor affects federal funding to States. While this theory of injury may have previously been plausible, *see Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023), that is no longer the case following the *Texas Priorities* decision. Also, because the government did not raise a factual attack at the pleadings stage in the border wall case, Texas was not required to put forward evidence of its alleged standing like it does here. *See generally, id.* Additionally, the border wall case was decided on June 16, 2023, *see* 71 F.4th 264, and predates the Supreme Court's decision on June 23, 2023, in *Texas Priorities*, 143 S. Ct. 1964

(2023). The Supreme Court's later decision in *Texas Priorities* calls into question the continued viability of the theory of standing discussed in the border wall case. 143 S. Ct. at 1972, n.3.

Because the IFR does not regulate State expenditures or require States to change their approach with respect to State services, any such costs are indirect (to the extent costs exist at all), and Texas has not put forth any evidence showing any actual concrete injury traceable to the IFR. When faced with an identical theory of harm in *Texas Priorities*, the Supreme Court reaffirmed that courts must closely examine such "attenuated" arguments for standing to ensure they can satisfy bedrock Article III constraints. *Id.* And courts generally should not consider these types of indirect costs sufficient to satisfy Article III for another reason—because such costs are self-inflicted and traceable to decisions of State legislatures rather than to changes in federal policy. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures").

Finding standing whenever a change in federal policy might arguably cause some incidental costs to States would allow any State to challenge any change in immigration policy, and improperly draw courts into all sorts of generalized grievances on behalf of States who were unable to obtain their preferred policy outcomes through the political process. But as numerous courts have recognized, "such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (quoting *Lujan*, 504 U.S. at 573-74); *Arizona*, 31 F.4th at 476 (it would be astonishing "to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury.").

27

Here, Plaintiff specifically alleges that it will be injured "[i]f the Defendants are allowed to continue admitting illegal aliens into the United States in violation of federal law" because the increase in immigration will cause the alleged harm to "only grow over time." ECF No. 1 at ¶ 58. However, this general allegation of injury has specifically been foreclosed by the Fifth Circuit as being sufficient to show standing. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (merely alleging that a particular policy increases "illegal immigration", which will require the state to spend money on social benefits does not confer Article III standing). And, that rule makes sense, because Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper*, 568 U.S. at 408, by preserving the "proper—and properly limited—role of the courts in a democratic society," *Warth*, 422 U.S. at 498. The recent explosion of suits brought by states with conflicting policy views seeking nationwide injunctions against national immigration and other policies vividly illustrates the need for Courts to prevent States from litigating generalized grievances. A theory of standing that would allow any State to sue the federal government any time it changed federal immigration policy merely by saying the change might affect its population would vitiate the rule that "[t]he mere fact that a state is the plaintiff is not enough" to establish Article III standing unless the State has suffered a concrete harm of the sort that has traditionally "furnish[ed a] ground for judicial redress." *Mellon*, 273 U.S. at 17.

Finally, the decision to implement the Rule involved a "complicated balancing" of various factors, including "inevitable resource constraints and regularly changing public-safety and public-welfare needs." *Texas Priorities*, 143 S. Ct. at 1972. The Supreme Court held these factors also weigh against finding under Article III or the APA that "federal courts" are "the proper forum for resolving" such disputes. *Id*. Here, DHS was dealing with difficult questions related to how best to use its limited resources and created the IFR in order to reduce "undue delays in the asylum

28

adjudication system" to allow for ineligible noncitizens to be ordered removed more promptly. 87 Fed. Reg. at 18088. Such difficult policy questions are not easily susceptible to judicial resolution because there are no "meaningful standards for assessing those policies," which "explain[s] why federal courts have not traditionally entertained lawsuits of this kind." *Id.* at 1972-1973 (*citing Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985)); *see also Texas*, 106 F.3d at 667 (noting that 8 U.S.C. § 1103 "commits enforcement of the INA to" the Secretary's "discretion" and "is unreviewable under the Administrative Procedure Act because a court has no workable standard against which to judge the agency's exercise of discretion").

**B. Parole**

The Court should also look to the historical precedent of cases by States challenging the use of the parole powers. Despite decades of historical precedent showing the Executive has long used the parole authority, Texas has not identified cases showing a historical tradition of courts reviewing disputes between States and the federal government with respect to parole practices. Nor has Texas shown that this is the type of dispute that has traditionally been redressable in federal court. Just as plaintiffs in *Texas Priorities* failed to cite any precedent for reviewing Executive policies with respect to arrest and prosecution, here Texas has not "cited any precedent, history or tradition of courts" reviewing or ordering the Executive to change its use of its discretionary parole authority. *Texas Priorities*, 143 S. Ct. at 1970.

In fact, cases suggest there is no history or tradition of courts finding indirect costs related to State expenditures for parolees—such as Texas alleges here—are a sufficient basis to challenge the Executive's use of discretionary parole authority. *See Biden v. Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring) (noting that "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment" with respect to the use of parole, particularly when that judgment

29

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 39 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 38 of 50   PageID 947
9486

is based in part on "foreign-policy reasons"). As discussed extensively *supra*, Texas alleges a theory of harm based entirely on indirect costs—on both grants of asylum and grants of parole pending adjudication of applications for asylum. Such an attenuated, speculative theory of harm based on changes in immigration policy is not sufficient to show standing; the Supreme Court's decision in *Texas Priorities* foreclosed these arguments, and no binding Fifth Circuit law requires the Court to reach a different conclusion in this case.

## III.   SPECIAL SOLICITUDE DOES NOT RELIEVE PLAINTIFF OF ITS BURDEN TO SHOW STANDING.

The Supreme Court's decision in *Texas Priorities* questioned the circumstances in which special solicitude might apply and confirmed that the doctrine has no application when a State asserts standing based on the type of indirect costs Texas has asserted here.

In *Texas Priorities*, the majority noted that plaintiffs based "part of their argument for standing" on *Massachusetts v. EPA*. *Texas*, 143 S. Ct. at 1975, n.6. But the Court held that ultimately, "none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit." *Id*. at 1972, n.3. Plaintiffs in *Texas Priorities* based their standing on the same theory of indirect costs that Texas raises in this case— that immigration policy might affect the number of people in the State, which might in turn affect State expenditures with respect to law enforcement or "social services such as healthcare and education." *Id*. at 1968-69. Like the priorities guidance, the IFR does not direct States or state agencies to take any particular action with respect to law enforcement or social services costs, making any allegations of costs indirect. Rejecting the plaintiff States' theory of harm, the Supreme Court emphasized that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the

State's claim for standing can become more attenuated." *Id.* at 1972, n.3. Special solicitude did not save plaintiffs' arguments that they had standing to challenge the agency guidance, a point the concurrence also noted while explaining the limited historical application of the doctrine overall. *Id.* at 1977 (Gorsuch, J., concurring). As Justice Gorsuch explained: "Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence.' … Nor has 'special solicitude' played a meaningful role in this Court's decisions in the years since." *Id.* (citation omitted).[10] As the concurrence noted, "it's hard not to think … that lower courts should just leave that idea on the shelf in future" cases. *Id.*

Ultimately, it is no surprise that special solicitude was no aid to the plaintiff States in *Texas* because even in the rare circumstances where the doctrine has been applied, it does not relieve States of the obligation to meet the basic requirements of Article III by showing a concrete and particularized injury in fact traceable to the challenged agency action. *Massachusetts v. EPA*, 549 U.S. 497, 522 (2007). Even if a State satisfies the additional criteria discussed below that are necessary to invoke special solicitude—such as identifying a particular procedural right Congress provided the plaintiff in the relevant statute[11]—at most all special solicitude would do is lower the threshold for establishing redressability. *See Texas v. United States*, 50 F.4th at 514. But a looser standard for redressability cannot help a plaintiff who has not established a concrete harm to begin with and is thus of no use to plaintiff States that raise the type of indirect, unsubstantiated costs at

---

[10] Indeed, the Supreme Court has never afforded States "special solicitude" in any other case. To the contrary, the Court's decisions since *Massachusetts v. EPA* have consistently analyzed state standing without granting States favorable treatment simply because they are States. *See, e.g.*, *California*, 141 S. Ct. at 2116-20; *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

[11] Texas' notice-and-comment claim is not sufficient to meet this standard. Everyone is entitled the right to comment on a proposed rule; it is not a particular procedural right provided to States by Congress. Contrarily, *Massachusetts v. EPA* dealt with a direct harm to a State and a specific right under the Clean Air Act, as discussed below. *Massachusetts*, 549 U.S. at 521.

issue here that were insufficient to satisfy "bedrock Article III constraints" in the priorities case. *Texas Priorities*, 143 S. Ct. at 1972, n.3; *see Mellon*, 273 U.S. at 17-18 (States may sue the United States only if they have suffered a "direct injury," not where the alleged harm is "only remote and indirect"). Special solicitude thus has no place in a case predicated on indirect costs.

*Massachusetts* in contrast involved a direct harm to a state, namely the threatened loss of territory owned by and subject to the sovereignty of the State. *Massachusetts*, 549 U.S. at 521. The Supreme Court has long treated the loss of territory as a distinct and legally cognizable harm. *See* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 415-16 (1995) (discussing 19th-century cases). Plaintiffs' challenge to the parole processes involves only alleged "indirect fiscal burdens"—a "humdrum feature" of many federal policies, including many policies with respect to immigration. *Arizona*, 40 F.4th at 386 (Sutton, C.J.). "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Id*. at 386-87 (citing *Arizona v. United States*, 567 U.S. 387, 394-97 (2012)). "The States have distinctly less, not more, solicitude in this area." 40 F.4th at 387.

Even if special solicitude still exists in cases involving State challenges to the regulation of third parties and Plaintiff had cleared Article III's basic hurdles to reach the point where it could be invoked in the redressability analysis, it still would not apply here. A State invoking special solicitude must also show, among other things, a procedural right to challenge the action in question. *Texas*, 50 F.4th at 514. *Massachusetts* attached "critical importance" to the State's "procedural right" provided by the Clean Air Act to submit a petition for rulemaking and challenge the denial of such a petition related to emissions standards. *Massachusetts*, 549 U.S. at 516, 518; *see also id*. at 527 (noting case dealt with the denial of a petition "for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file"); 42 U.S.C.

§ 7607(b)(1); *Texas*, 143 S. Ct. at 1975 n.6 (noting that in *Massachusetts*, "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than a challenge to an exercise of the Executive's discretion). The INA creates no similar procedural right for States to challenge use of the discretionary authority in the parole statute. To invoke special solicitude, an agency action must also be "imposing substantial pressure on" the State's "quasi-sovereign" interests." *Texas*, 809 F.3d at 153. In the DAPA case, the Fifth Circuit held that this requirement was satisfied where immigration policy placed substantial pressure on the State to change its laws related to driver's licenses. *Id*.

Because a State seeking to invoke special solicitude "must" among other things "be exercising a procedural right created by Congress" and show that it is under substantial pressure to change State law with respect to some quasi-sovereign interest of the State, the Fifth Circuit has held that the "factors" necessary to invoke special solicitude "will seldom exist." *Texas*, 809 F. 3d at 162. To the extent special solicitude still exists at all, this case is not the rare case where Texas can assert the factors necessary to invoke it.

## IV. PLAINTIFF'S CLAIMS DO NOT FALL WITHIN THE ZONE OF INTEREST.

Plaintiff's claims also do not fall within the zone of interests of sections 1225(b)(1), 1229a, and 1158(d)(7). This inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action—which the State of Texas clearly is not—the plaintiff has no right of review as its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

Nothing in the text, structure, or purpose of the INA generally, or sections 1225(b)(1), 1229a, or 1158(d)(7) specifically, suggests that Congress intended to permit a state to invoke

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 43 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 42 of 50   PageID 951
8460

attenuated downstream financial costs from the enforcement or implementation of immigration policies to bring lawsuits to challenge those policies. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration."). To the contrary, the INA throughout reflects the principle that immigration enforcement is exclusively the province of the federal government and the Executive. And that conclusion is reinforced by the fact that "the key sovereign with authority and 'solicitude' with respect to immigration is the" federal government, "not the States," *Arizona*, 31 F.4th at 476; *see Arizona*, 567 U.S. at 394-97, as well as by the general rule that third parties have no cognizable legal interest in compelling the enforcement of laws against others, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). In light of those principles, it is unsurprising that Congress has provided in the INA that only the noncitizens against whom the immigration laws are being enforced may challenge application of those laws—and only in certain circumstances and only through their removal proceedings. *See, e.g.,* 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g). A detailed review scheme that allows some parties, but not others, to challenge specific executive action is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988); *see Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's right to legalization"). Allowing any state or third party to invoke alleged indirect monetary harms to challenge the Executive's immigration-enforcement decisions through the APA would circumvent Congress's design.

## V.    THE COURT HAS NO JURISDICTION OVER THIS CASE.

Even if the Court were to find that Texas has sufficiently met its burden to establish standing and a cause of action within the INA's zone of interests, it still must dismiss this case because, as previously argued (ECF No. 7, 73), the U.S. District Court for the District of Columbia is the sole federal court with jurisdiction to adjudicate this case.[12]

The IFR, by its own terms, implements "Section 235 of the INA," *i.e.*, 8 U.S.C. § 1225(b)(1), and specifically § 1225(b)(1)(B)(ii), which "provides that if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution, the noncitizen shall receive 'further consideration of the application for asylum.'" INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii)." 87 Fed. Reg. at 18080; ECF No. 68 at 2 ("The IFR relates to Section 235 of the [INA].""). Congress has limited review of regulations implementing § 1225(b)(1) to a single forum. Under 8 U.S.C. § 1252(e)(3), "[j]udicial review of determinations under [8 U.S.C. § 1225(b)] and its implementation is available in an action instituted in the United States District Court for the District of Columbia." This includes review of whether "any regulation issued to implement" § 1225(b) "is constitutional," and of "whether such a regulation … issued by or under the Authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(i)-(ii). "Review relating to section 1225(b)(1)" is strictly limited in this way: "Notwithstanding any other provision of law (statutory or nonstatutory) … no court shall have jurisdiction to review," among other things, any "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title," "*except* as provided in

---

[12] While Defendants acknowledge that the Court previously ruled on these arguments when they were raised in Defendants' motion to transfer this case (ECF Nos. 7, 68), Defendants include them again here in order to preserve their argument that, even if Plaintiff had standing to bring these claims, these claims can only properly be raised in the District Court for the District of Columbia.

subsection [1252](e)." 8 U.S.C. § 1252(a)(2)(A)(iv) (emphasis added). Put differently, section 1252(a)(2)(A) strips *all* federal courts of jurisdiction over the claims advanced in this lawsuit and restores jurisdiction in certain circumstances exclusively in the District of Columbia. 8 U.S.C. § 1252(a)(2)(A), (e).

As this Court had already concluded, ECF No. 68, the IFR that Plaintiff challenges implements § 1225(b)(1). *See* 87 Fed. Reg. at 18080 (explaining that "[t]his IFR addresses how" "further consideration of the application for asylum" under "8 U.S.C. 1225(b)(1)(B)(ii)" "will occur"). As a result, under § 1252 a challenge to the IFR may be brought only in the District of Columbia, in accordance with the provisions of § 1252(e)(3); *see* 8 U.S.C. § 1252(a)(2)(A). This Court concluded, however, that that Section 1252(a)(2)(A) and (e)(3) do not apply in this case because "Section 1252 is titled 'Judicial review of orders of removal,'" and that this title "indicates the section applies to individual aliens (who are subject to orders of removal) rather than programmatic decisions." ECF No. 78 at 5 (quoting *Texas*, 20 F.4th at 977 n.11.); *see also id.* at 6 n.4 (citing Fifth Circuit's statement in *Texas*, 20 F.4th at 97, that the "entirety of the text and structure of Section 1252 indicates that it operates only on denials of relief for individual aliens").

The Supreme Court's decision in the MPP case, however, forecloses this reading of Section 1252. The Court held that "section 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 142 S. Ct. at 2538 (citations omitted). The Supreme Court also held that this Court's injunction in that case "violated that provision" in a case where plaintiffs were States, including the State of Texas. *Id.* at 2538. Section 1252(f) falls under the same section title as Sections 1252(a)(2)(A) and (e)(3). Accordingly, if the title of Section 1252 indicated that "the section applies to individual aliens (who are subject to

orders of removal) rather than programmatic decisions," as this Court held, *see* ECF No. 68 at 5,

then Section 1252(f) could not apply to a challenge by Texas to a programmatic decision. Yet the

Supreme Court held that Section 1252 *did* apply in that case, precluding any argument that Section

1252 or its various sub-provisions must be read based on the title or structure of that section only

to apply in individual cases challenging removal orders. *See Biden*, 142 S. Ct. at 2538.

As Defendants previously argued, the title of Section 1252 cannot override the more

specific text of Section 1252(a)(2)(A) and (e)(3). *See* ECF No. 15 at 5-6. A title, almost by

definition, abridges "the detailed provisions of the text"— to restate every detail of the text in the

title would be "ungainly as well as useless." *Railroad Trainmen v. Baltimore & Ohio R.R.*, 331

U.S. 519, 528 (1947). As many courts have acknowledged, the phrase "review under Subsection

1252(e)(3)" is "not textually confined to claims arising from individual removal actions." *Make*

*the Road New York v. Wolf*, 962 F.3d 612, 627 (D.C. Cir. 2020) (explaining that "Congress

included within Subsection 1252(e)(3) … claims that, by their terms, are not confined to individual

expedited removal proceedings," including "challenges to 'procedures and policies adopted by the

[Secretary] to implement [the statute]' divorced from any individual determination.").

Further, construing section 1252 as limited to "individual aliens" challenging their orders

of removal, ECF No. 68 at 5, 8, would render other provisions of section 1252 nullities,

notwithstanding those provisions' plain text covering claims arising outside of challenges to orders

of removal by individual noncitizens. But the Supreme Court has rejected that view as to section

1252(a)(2)(B)(i), concluding that provision stripped district courts of jurisdiction over all

challenges to factual findings made as part of discretionary judgment, even if those claims cannot

be challenged in any court by any party. *Patel v. Garland*, 142 S. Ct. 1614, 1626 (2022). Congress

has barred judicial review of individual challenges to "decisions denying discretionary relief from

removal" and it also "precludes judicial review of factual findings that underlie a denial of relief." *Id.* at 1618. The Court did not distinguish between who brought the challenge—all are equally barred under the statute. *Id.* Therefore, there is no basis to read *Patel* as barring individual challenges under 1252(e)(3) but permitting challenges by States to proceed outside of the U.S. District Court for the District of Columbia.

Therefore, if the Court were to find that Texas sufficiently showed its alleged injury to establish standing, it should still dismiss this case because the U.S. District Court for the District of Columbia is the sole federal court with jurisdiction to adjudicate this case.

## VI. TEXAS FAILS TO STATE A CLAIM THAT THE IFR VIOLATES THE APPOINTMENTS CLAUSE.

Texas seeks to set aside the IFR under the APA as "contrary to constitutional right, power, privilege, or immunity[,]" 5 U.S.C. § 706(2)(A)-(B), arguing that it facially violates the Appointments Clause. *See* ECF No.1 at 18 & ¶¶ 65-69. Texas raises no "as-applied" challenge to the IFR—it challenges no actual proceeding initiated under the IFR's terms, nor alleges that the IFR has ever been applied in a way contrary to the Appointments Clause—but instead argues that the IFR itself cannot satisfy the Appointments Clause and therefore must be set aside entirely. ECF No. 1 at ¶ 65. Thus, the Court must determine the constitutionality of the IFR "as written." *Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 774 (N.D. Tex. 2018), *aff'd* 945 F.3d 307 (5th Cir. 2019). To prevail, then, Texas must "establish[] that no set of circumstances exists under which the [IFR] would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Texas cannot make that showing, even at the pleading stage.

The Appointments Clause of the U.S. Constitution sets forth the requirements related to the appointment of officers of the United States. *See* U.S. Const. art. II, § 2, cl. 2. Principal officers

must be appointed by the President with the advice and consent of the Senate, but Congress has flexibility to vest the appointment of inferior officers "in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* By contrast, "the Appointments Clause cares not a whit about who name[s]" the "non-officer employees" who make up "the broad swath of lesser functionaries in the Government's workforce." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018) (cleaned up).

Against that constitutional backdrop, Texas has not plausibly alleged that there is no scenario in which the IFR would be valid under the Appointments Clause. As discussed, the IFR amends the procedures governing the consideration of asylum applications submitted by individuals subject to expedited removal who are found to have a credible fear of persecution or torture under 8 U.S.C. § 1225(b)(1). *See supra* at 7. Under the IFR, asylum officers are tasked with conducting non-adversarial asylum merits interviews and are authorized to grant asylum. *See* 87 Fed. Reg. at 18085. Though Texas asserts that these actions can only be taken by "properly appointed officers of the United States," ECF No. 1 at ¶ 69, that assertion does not suffice to support Texas' conclusion that the IFR is facially unconstitutional. Among other reasons, nothing in the IFR precludes the Secretary of Homeland Security from appointing asylum officers, which he is plainly authorized to do under the Department's organic statute. *See* 6 U.S.C. § 112 (vesting Secretary with broad authority over DHS operations as head of Department); 5 U.S.C. § 301 (authorizing head of Department to "prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business"); *Willy v. Admin. Review Bd.*, 423 F.3d 483, 491-92 (5th Cir. 2005) ("broad language employed by Congress in the Reorganization Plan No. 6 of 1950 and in 5 U.S.C. § 301 vests the Secretary [of Labor] with ample authority to" appoint inferior officers). And a Secretarial appointment would ensure that

actions taken by asylum officers under the IFR comply with the Appointments Clause—whether
those asylum officers were deemed inferior officers or employees.

Texas's allegations that "[a]sylum officers . . . are members of the general civil service,"
Complaint, ECF No. 1 at ¶ 37, and that asylum officers occupy "career positions," *id.* at ¶ 66, are
irrelevant.  Although asylum officers are part of the career civil service, *see* 87 Fed. Reg. at 18110,
career status is not incompatible with appointment as an inferior officer. *See, e.g.*, *United States v.
Arthrex*, 141 S. Ct. 1970, 1987 (2021) (administrative patent judges on Patent Trial and Appeal
Board were inferior officers but retain career civil service protections). Thus, even if the asylum
officers who make asylum decisions under the IFR were somehow deemed to be acting as inferior
officers, the challenged provisions of the IFR "can be applied . . . without infringing upon
constitutionally protected rights" under the Appointments Clause, *Rust v. Sullivan*, 500 U.S. 173,
183 (1991).  Because Texas has not plausibly alleged that there are no circumstances under which
the IFR could be constitutionally applied, Texas's Appointments Clause claim should be dismissed
under Rule 12(b)(6) for failure to state a claim on which relief may be granted.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiff's case in its entirety.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 50 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102   Filed 10/02/23   Page 49 of 50   PageID 958
8467

Dated: October 2, 2023                  Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        *Principal Deputy Assistant Attorney General*

                                        WILLIAM C. PEACHEY
                                        *Director*
                                        Office of Immigration Litigation
                                        District Court Section

                                        EREZ REUVENI
                                        *Assistant Director*

                                        BRIAN C. WARD
                                        *Senior Litigation Counsel*

                                        /s/ *Erin T. Ryan*
                                        ERIN T. RYAN
                                        *Trial Attorney*
                                        U.S. Department of Justice
                                        Civil Division
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, DC 20044
                                        Tel.: (202) 532-5802
                                        Erin.t.ryan@usdoj.gov

                                        CHRISTOPHER HALL
                                        *Assistant Branch Director*

                                        /s/ *Elizabeth Tulis*
                                        ELIZABETH TULIS
                                        *Trial Attorney*
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, D.C. 20005
                                        (202) 514-9237
                                        elizabeth.tulis@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 2, 2023, I electronically filed this motion to dismiss with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Erin T. Ryan*
ERIN T. RYAN
U.S. Department of Justice

# EXHIBIT A

9/27/23, 2:43 PM   Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 53 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-8450ed 10/02/23   Page 2 of 2   PageID 961
Asylum Processing Rule Cohort Reports | Homeland Security

🏛️ Homeland
   Security

U.S. Department of Homeland Security

# Asylum Processing Rule Cohort Reports

On May 31, 2022, the Department of Homeland Security (DHS) and Department of Justice (DOJ) began implementing a rule (https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat) to ensure that those subject to expedited removal who are eligible for asylum are granted relief quickly and those who are not are promptly removed. By establishing a process for the efficient and thorough review of asylum claims, the new rule aims to reduce existing immigration court backlogs and to shorten the adjudication process to several months. The rule is being implemented in a phased manner, beginning with a small number of individuals, and continues to grow as USCIS builds operational capacity.

The report on this page describes processing and outcomes under the new rule for noncitizens identified as potentially suitable for placement in the rule, as well as demographic information about the population placed in the rule. Currently, individuals who may be processed under the rule include single adults who are non-rare language speakers and whose intended destination is one of nine destination cities (Arlington, Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco).

Data in this report are organized by cohort based on the month of U.S. Customs and Border Protection (CBP) encounter, rather than by the date of each subsequent event. For example, data in each month describe case outcomes for individuals encountered in that month, regardless of when their fear claims or Asylum Merits Interview (AMI) cases, or Executive Office for Immigration Review (EOIR) cases were adjudicated.

Return to OIS special reports. (/immigration-statistics/special-reports)

Return to OIS home page. (/immigration-statistics)

| Attachment ↕ | Ext. ↕ | Size ↕ | Date ↕ |
|---|---|---|---|
| Asylum Processing Rule Cohort Report - June 2023 (https://www.dhs.gov/sites/default/files/2023-08/2023_0825_plcy_asylum-processing-rule-cohort-report_fy2023_june_v2.xlsx) | XLSX | 60.45 KB | 08/29/2023 |

## Collections

IMMIGRATION DATA AND STATISTICS (/COLLECTIONS/IMMIGRATION-DATA-AND-STATISTICS)

## Keywords

IMMIGRATION STATISTICS (/KEYWORDS/IMMIGRATION-STATISTICS)

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

Last Updated: 08/29/2023

# EXHIBIT B

United States District Court
Northern District of Texas
Amarillo Division

State of Texas,
    *Plaintiff,*

v.

Alejandro Mayorkas, *et al.;*
    *Defendants.*

Case 2:22-cv-00094-Z

## Plaintiff's Responses to Defendant's First Set of Discovery Requests

    The State of Texas objects to and responds to the Defendants' First Set of Requests for Production, Interrogatories, and Requests for Admission Regarding Standing.

Dated July 28, 2023.

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General of Texas
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
(512) 463-1700

/s/ Leif A. Olson
Leif A. Olson
Chief, Special Litigation Division
State Bar No. 24032801
leif.olson@oag.texas.gov

Gene P. Hamilton
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

## CERTIFICATE OF SERVICE

On July 28, 2023, this document was served upon these counsel by email to the indicated addresses.

Erez Reuveni (erez.reuveni@usdoj.gov)
Brian C. Ward (brian.c.ward@usdoj.gov)
Erin Ryan (erin.t.ryan@usdoj.gov)
Elissa Fudim (elissa.p.fudim@usdoj.gov)
Joseph Darrow (joseph.a.darrow@usdoj.gov)
UNITED STATES DEPARTMENT OF JUSTICE
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

/s/ Leif A. Olson

**OBJECTION TO DEFINITION**

Texas objects to Defendants' definition of the term "You" as " any Plaintiff State, including all its agencies, subdivisions, and officers acting in official capacity." Texas's discovery obligations are limited to information or documents in the possession or control of its Attorney General.

"[U]nlike the federal constitution, the Texas Constitution does not vest the executive power solely in one chief executive. Instead, the executive power is spread across several distinct elected offices." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022). The design creates a "decentralize[d] executive authority." *State v. Brabson*, 976 S.W.2d 182, 186 (Tex. Crim. App. 2012) (Womack, J., concurring). Texas's "Executive" is non-unitary to the point where "neither the Governor nor the Attorney General has statutory authority [even] to directly control" the actions of many non-elected departments. *In re Abbott*, 645 S.W.3d at 281.

The Attorney General of Texas, who brought this suit on Texas's behalf, does not have a free-floating Executive power to direct State agencies to take any action. Under Texas law, the Attorney General represents "the state *qua* state and as *parens patriae*." *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997). She is therefore the "party" named as the State of Texas in this suit—the "person who is both named as a party and subject to the court's jurisdiction." *Nagle v. Lee*, 807 F.2d 435, 440 (5th Cir. 1987).

Additionally, the definition is overbroad and creates burdens on Texas that are not warranted by the benefit the Defendants would receive were their definition to govern. Texas has more than 320,000 full-time employees and thousands more part-time employees spread across the general government, health and human services, public education, higher education, the judiciary, public safety and criminal justice, natural resources, business and economic development, regulatory and other state agencies, the legislature, and the Office of the Attorney General. This extends even more broadly to political subdivisions within the State. The undertaking required to inquire after the knowledge and documents of each of those persons would dwarf any benefit the Defendants could receive from it.

Notwithstanding this objection, the Attorney General represents the identified agencies for purposes of responding to these discovery requests, and no responsive materials are being withheld on the basis of this objection.

## Objections and Responses to
## Requests for Production

**Request for Production No. 1:** Provide all documents, including but not limited to writings, data, and correspondence that you contend support your allegation in your motion for a preliminary injunction, ECF No. 21 at pg. 35, that "Should the Interim Final Rule go into effect, the number of illegal aliens in Texas, and thus Texas's spending related to illegal aliens, will continue to climb."

    **Response to Request No. 1:** Texas does not track this information.

**Request for Production No. 2:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that the Asylum IFR will result more in non-meritorious asylum claims being granted.

    **Response to Request No. 2:** These documents are in the Defendants' possession, custody, or control.

**Request for Production No. 3:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation "Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens," as you allege in the Complaint, ECF No. 1, ¶ 54.

    **Response to Request No. 3:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, see documents including TX_000238–000257 and TEXAS_000100–000162, produced by the Texas Health and Human Services Commission.

**Request for Production No. 4:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that "Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens," as you allege in the Complaint, ECF No. 1, ¶ 55.

    **Response to Request No. 4:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, see documents including

TX_000238–000257 and TEXAS_000100–000162, produced by the
Texas Health and Human Services Commission.

**Request for Production No. 5:** Provide all documents, including but not
limited to, writings, data, and correspondence that you contend support
your allegation that "Texas spends hundreds of millions of dollars each year
for uncompensated care provided by state public hospital districts to illegal
aliens," as you allege in the Complaint, ECF No. 1, ¶ 56.

> **Response to Request No. 5:** The Texas Health and Human Services
> Commission has not tracked these costs for the relevant time period.

**Request for Production No. 6:** Provide all documents, including but not
limited to, writings, data, and correspondence that you contend support
your allegation that "Texas spends tens of millions of dollars each year for
increased law enforcement, and its citizens suffer increased crime, unem-
ployment, environmental harm, and social disorder, due to illegal immigra-
tion," as you allege in the Complaint, ECF 1, ¶ 57.

> **Response to Request No. 6:** Texas objects that this request is unduly
> burdensome because the benefit to be gained from producing all such
> documents is disproportionate to the cost that locating and producing
> them would impose. Subject to that objection, see documents including
> TX_000025–125, TX_000252-270, and TEXAS_000163–003238,
> produced by the Texas Department of Criminal Justice and Texas De-
> partment of Public Safety.

**Request for Production No. 7:** Provide all documents, including but not
limited to, writings, data, and correspondence that establish the number of
Asylees who have established residence in Texas.

> **Response to Request No. 7:** Texas does not track this information.
> Documents containing this information are within the Defendants' pos-
> session, custody, and control.

**Request for Production No. 8:** Provide all documents, including but not
limited to, writings, data, and correspondence that establish the number of
Applicants for Admission paroled by the federal government at the South-
west border pending their applications for asylum or their removal proceed-
ings who have established residence in Texas

**Response to Request No. 8:** Texas does not track this information. Documents containing this information are within the Defendants' possession, custody, and control.

**Request for Production No. 9:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants who have established residence in Texas.

**Response to Request No. 9:** Texas does not independently track this data. The Texas Demographic Center analyzes data related to this topic drawn from other sources, such as the Pew Research Center and the U.S. Census Bureau. Examples of the Demographic Center's use of this data can be found at its website, https://demographics.texas.gov. See also documents produced from the Demographic Center at TX_000001–24.

**Request for Production No. 10:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of individuals incarcerated or otherwise detained in prisons and jails operated or overseen by Texas or its agencies.

**Response to Request No. 10:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing "all documents … that establish the number of individuals incarcerated or otherwise detained" in the prisons and jails of Texas and its subdivisions is disproportionate to the cost that locating and producing them would impose. Texas also objects that this request seeks documents that are not relevant to this dispute and will not lead to discovery of relevant information.

Subject to those objections, Texas furnishes at TX_000252–270 documents concerning the number of illegal aliens incarcerated in facilities operated by the Texas Department of Criminal Justice, the cost of incarcerating them, and amounts received to offset those costs.

**Request for Production No. 11:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings incarcerated or otherwise detained in prisons and jails operated or overseen by the Texas or its agencies.

**Response to Request No. 11:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 12:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants incarcerated or otherwise detained in prisons and jails operated or overseen by Texas or its agencies.

**Response to Request No. 12:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing "all documents … that establish the number of Undocumented Immigrants incarcerated or otherwise detained" in the prisons and jails of Texas and its subdivisions is disproportionate to the cost that locating and producing them would impose. Subject to that objection, Texas furnishes at TX_000252–270 documents disclosing the number of illegal aliens incarcerated in facilities operated by the Texas Department of Criminal Justice, the cost of incarcerating them, and amounts received to offset those costs.

**Request for Production No. 13:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of asylees incarcerated or otherwise detained in prisons and jails operated or overseen by Texas or its agencies.

**Response to Request No. 13:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 14:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the amount and type of funding or financial assistance the federal government or local governments contribute to Texas for the purposes of assisting in or supporting prisons and jails in the State.

**Response to Request No. 14:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, Texas furnishes at TX_000252–270 documents disclosing the number of illegal aliens incarcerated in facilities operated by the Texas Department of Criminal

Justice, the cost of incarcerating them, and amounts received to offset those costs.

**Request for Production No. 15:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who have been convicted of crimes in Texas.

> **Response to Request No. 15:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 16:**  Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who have been convicted of crimes in Texas.

> **Response to Request No. 16:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 17:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Asylees paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who have been convicted of crimes in Texas.

> **Response to Request No. 17:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 18:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who seek, receive, and/or require emergency health care services that are funded by Texas.

**Response to Request No. 18:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 19:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants who seek, receive, and/or require emergency health care services that are funded by Texas.

**Response to Request No. 19:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, see documents TX_000126–131, TX_000238–257, and TEXAS_000100–000162, produced by the Texas Health and Human Services Commission.

**Request for Production No. 20:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of asylees who seek, receive, and/or require emergency health care services that are funded by Texas.

**Response to Request No. 20:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 21:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the amount and type of funding or financial assistance you receive from the federal government, local governments, and/or other sources of funding for the purposes of providing health care services to noncitizens.

**Response to Request No. 21:** Texas does not receive funding from any source for the purpose of providing healthcare services to noncitizens. To the extent this request means to seek documents related to amounts received from the federal government to reimburse payments Texas has made for healthcare services furnished to noncitizens, including illegal immigrants, Texas objects that it seeks information that is neither relevant nor calculated to lead to the discovery of relevant information because amounts spent on noncitizens are not at issue in this case. Subject to this objection, the documents produced by the Texas Health and Human Services Commission that discuss Texas's Medicaid spending on

illegal aliens describe the State's share of the spending on the described programs, not the total spending on those programs, which would include both the State and federal shares.

**Request for Production No. 22:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of minor Asylees enrolled in public school in Texas.

**Response to Request No. 22:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 23:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who are enrolled in public schools in Texas.

**Response to Request No. 23:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 24:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrant children enrolled in public schools in Texas.

**Response to Request No. 24:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, see documents TX_000135–237 and TEXAS_03239–3255, produced by the Texas Education Agency.

**Request for Production No. 25:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the average cost per child per year of providing a public education.

**Response to Request No. 25:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, see documents

TX_000135–237 and TEXAS_03239–3255, produced by the Texas Education Agency.

**Request for Production No. 26:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the amount and type of funding or financial assistance you receive from the federal government, local governments, and/or other sources of funding for the purposes of assisting in or supporting public education.

> **Response to Request No. 26:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Texas further objects to this request because it seeks documents that are not relevant to this case and whose discovery will not lead to the discovery of relevant documents. Subject to those objections, Texas directs the Defendants to the Texas Education Agency's 2022 Comprehensive Biennial Report on Texas Public Schools, available at https://tea.texas.gov/reports-and-data/school-performance/accountability-research/comp-annual-biennial-2022.pdf.
> That report shows that approximately $12 billion, or roughly 20%, of that Agency's budget during the 2020–22 biennium was up of federal funds.

**Request for Production No. 27:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the yearly income, sales, and property tax revenue collected by you from Applicants for Admission paroled by the federal government at the Southwest Border pending their applications for asylum or their removal proceedings.

> **Response to Request No. 27:** Texas does not track this data. To the extent this data could be tracked, it would require access to information within the Defendants' possession, custody, and control.

**Request for Production No. 28:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the yearly income, sales, and property tax revenue collected by Texas from Asylees.

> **Response to Request No. 28:** Texas does not track this data. To the extent this data could be tracked, it would require access to information within the Defendants' possession, custody, and control.

**Request for Production No. 29:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the economic impact to Texas and Texas businesses of labor shortages.

**Response to Request No. 29:** Texas does not track this data.

**Request for Production No. 30:** Provide all documents, including but not limited to, writings, data, and correspondence that support your contention that illegal immigrants cause "social disorder" in Texas, as alleged in the Complaint, ECF No. 1, ¶ 57.

**Response to Request No. 30:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Subject to that objection, see TX_000025–131, TX_000238–270,

**Request for Production No. 31:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission who applied for asylum living in Los Angeles, Miami, Newark, Boston, New York, and San Francisco that have moved to Texas, broken down by departure city.

**Response to Request No. 31:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 32:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission applying for asylum in Los Angeles, Miami, Newark, Boston, New York, and San Francisco who are likely to move to Texas in the next year, broken down by departure city.

**Response to Request No. 32:** Texas does not track this data. To the extent relevant documents exist, they are within the Defendants' possession, custody, or control.

**Request for Production No. 33:** Provide all documents, including but not limited to, writings, data, and correspondence that show the number of Applicants for Admission, Asylees, and Undocumented Immigrants who reside in Texas and have moved out of the state, each year.

**Response to Request No. 33:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Texas further objects to this request because it seeks information that is uniquely within the Defendants' possession, custody, and control.

Subject to these objections, Texas does not independently track this data. The Texas Demographic Center analyzes data related to this topic drawn from other sources, such as the Pew Research Center and the U.S. Census Bureau. Examples of the Demographic Center's use of this data can be found at its website, https://demographics.texas.gov. See also documents produced from the Demographic Center at TX_000001–24.

**Request for Production No. 34:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that the Asylum IFR will incentivize non-meritorious asylum claims, as you allege in the Complaint, ECF No. 1, ¶ 73.

**Response to Request No. 34:** Texas objects that this request is unduly burdensome because the benefit to be gained from producing all such documents is disproportionate to the cost that locating and producing them would impose. Texas further objects that this request is unduly burdensome because documents establishing basic propositions of economics are as equally available to the Defendants as they are to Texas.

**Request for Production No. 35:** Provide all documents, including but not limited to, writings, data, and correspondence, consulted or relied upon in responding to Defendants' interrogatories and requests for admission.

**Response to Request No. 35:** These are included in the produced documents.

### Objections and Answers to Interrogatories

**Interrogatory No. 1:** How many noncitizens have been granted asylum and established residence in Texas, by year, for years 2019–2022?

**Answer to Interrogatory No. 1:** Texas does not track this information in general or by year.

**Interrogatory No. 2:** Describe your means of tracking the data requested in Interrogatory No. 1.

> **Answer to Interrogatory No. 2:** As described in answer to that interrogatory, Texas does not track that data.

**Interrogatory No. 3:** State, for the years, 2015–2022, the number of Applicants for Admission who were granted asylum while living in each of the following cities, who subsequently moved to Texas:

> a.   Miami
>
> b.   San Francisco
>
> c.   New York
>
> d.   Los Angeles
>
> e.   Boston
>
> f.   Newark
>
> **Answer to Interrogatory No. 3:** Texas does not track this data.

**Interrogatory No. 4:** Describe your means of tracking the data requested in Interrogatory No. 3.

> **Answer to Interrogatory No. 4:** Texas does not track this data.

**Interrogatory No. 5:** Define "illegal immigration" with respect to your claim that "Texas spends tens of millions of dollars each year for increased law enforcement, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration," as you allege in the Complaint, ECF No. 1, ¶ 57—specifically stating whether illegal immigration includes only Undocumented Immigrants or also includes Applicants for Admission, or Asylees who you contend should not have been granted asylum.

> **Answer to Interrogatory No. 5:** Texas uses the term "illegal immigration" to mean presence in the United States without a lawful immigration status—for example, on a visa or as a lawful permanent resident—and unwarranted presence in the United States based on erroneous grants of asylum to applicants who do not have a good-faith basis to believe they qualify for asylum. It includes both Undocumented Immigrants and Applicants for Admission, as the Defendants define those terms in their requests, and some percentage of Asylees.

**Interrogatory No. 6:** How many Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings have established residence in Texas, by year, for years, 2019–2022?

> **Answer to Interrogatory No. 6:** Texas does not track this data.

**Interrogatory No. 7:** Describe your means of tracking the data requested in Interrogatory No. .6.

> **Answer to Interrogatory No. 7:** Texas does not track that data.

**Interrogatory No. 8:** Do you contend that prior to the effective date of the Asylum IFR noncitizens were incentivized to enter the United States based on their perception that the United States has lax immigration enforcement policies?

> **Answer to Interrogatory No. 8:** Texas contends that the perception that U.S. immigration enforcement is lax and the incentive to attempt to enter the United States are directly correlated. Whether noncitizens perceived pre-Asylum IFR immigration enforcement to be lax is irrelevant to that analysis, which depends on marginal changes rather than absolute values.

**Interrogatory No. 9:** Do you contend the noncitizens perceive USCIS to be more likely to grant asylum than Immigration Judges?

> **Answer to Interrogatory No. 9:** Texas contends that the perception that USCIS is more likely to grant asylum than immigration judges is directly correlated with the incentive to attempt to enter the United States. Texas does not know whether noncitizens currently have that perception, but because asylum officers grant asylum at rates that significantly outstrip those of immigration judges, knowledge of that fact (which is public information available from the Defendants themselves) will grow over time, strengthening the incentive to attempt illegal entry.

**Interrogatory No. 10:** Do you contend that the Asylum IFR will increase the number of non-meritorious asylum claims that are filed or that are granted?

> **Answer to Interrogatory No. 10:** Texas objects that this is multifarious, but answers notwithstanding that objection: Texas contends that, relative to what those numbers would have been absent the rule, the

Asylum IFR will increase both the number of non-meritorious claims filed and the number of non-meritorious claims granted.

**Interrogatory No. 11:** Do you contend that the Asylum IFR will cause the approval rate of non-meritorious asylum claims to increase?

> **Answer to Interrogatory No. 11:** Because the number of non-meritorious asylum claims and the number of erroneous approvals can increase at different rates, Texas contends neither that the approval rate of non-meritorious claims will increase (that asylum officers will grant a greater percentage of increased applications than they grant the baseline number of applications) or decrease (that they will grant those applications at a lower rate than they do the baseline number). Texas contends that increasing the number of non-meritorious applications, even at lower grant rates, will increase the number of persons illegally present in the United States.

**Interrogatory No. 12:** Do you contend that the Asylum IFR will incentivize noncitizens to cross the border between points of entry?

> **Answer to Interrogatory No. 12:** Texas contends that the Asylum IFR will strengthen incentives to attempt to enter the United States by any means, including between ports of entry.

**Interrogatory No. 13:** Identify all of the regulatory changes made through the Asylum IFR that you contend will incentivize immigrants who are not already motivated to come to the United States based on their perception of U.S. immigration policy, to now come to the United States.

> **Answer to Interrogatory No. 13:** Texas objects to the vague language of the interrogatory. A person can be motivated to do something but lack sufficient motivation to actually undertake the task. It interprets this question to ask after persons "who are not already *sufficiently motivated by baseline conditions* to come to the United States[.]" It answers subject to that objection.
>
> The regulatory changes strengthening the incentive to enter the United States are largely described in ¶¶ 45–51 of the Complaint. They are:
>
> a.   Conferring upon asylum officers the authority to grant asylum, the power to reconsider negative credible-fear determinations, and the

power to reconsider their denial or forwarding to an immigration judge of an asylum application;

b. Granting a right to withholding of removal without need for adjudication by an immigration judge;

c. Requiring asylum officers to elicit information regarding eligibility for statutory withholding of removal even if an applicant has not sought it, limiting the speed with which asylum officers can conduct asylum-merits interviews, requiring asylum officers to arrange for interpreters, and entitling applicants to additional delays due to the lack of an interpreter;

d. Requiring DHS to refer asylum applicants whose applications are not granted to immigration judges for further consideration of the application rather than requiring the putative asylee to request further consideration, and considering the referred application and the asylum officer's record of it to constitute a request for review by an immigration judge; and

e. Prohibiting immigration judges from reconsidering a grant by an asylum officer of withholding of removal even if the judge determines the applicant is not entitled to asylum, generally prohibiting DHS from appealing that grant; and requiring the immigration judge to give effect to the grant.

**Interrogatory No. 14:** State all grounds for your response to Interrogatories 8–12 including reference to any evidence supporting your contentions.

**Answer to Interrogatory No. 14:** They are based on the truism, which the Court has previously recognized, that increasing the benefits of a success and reducing the costs of an attempt strengthen the incentives to attempt a potential action

**Interrogatory No. 15:** For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

**Answer to Interrogatory No. 15:** Not applicable.

**Interrogatory No. 16:** Describe your injury with respect to claim for relief A in your complaint.

**Answer to Interrogatory No. 16:** The Homeland Security Act requires that aliens who receive a credible-fear determination be detained while their asylum applications are determined by an immigration judge. The Interim Rule divests the asylum decision from the immigration judge and invests it in the asylum officer, allowing the alien to reap the benefits of presence in the country earlier than would otherwise be possible. These benefits include the expenditures on schooling, healthcare, and government licenses that Texas describes in its complaint. That earlier access also gives aliens the opportunity to commit crime they otherwise could not because they would be subject to required detention, increasing the costs to Texas's citizens of the aliens' presence and increasing the amount Texas must spend on criminal prosecution and incarceration. This is true not only for the aliens who would enter the country under the baseline conditions, but the aliens who enter the country because the Interim Rule has strengthened the incentive for doing so.

**Interrogatory No. 17:** Describe your injury with respect to claim for relief B in your complaint.

**Answer to Interrogatory No. 17:** The Immigration and Nationality Act permits illegal aliens to be paroled from detention only upon a case-by-case showing of urgent humanitarian need or significant public benefit. The Interim Rule permits parole merely because the Defendants determine it to be "impracticable." By doing so, it permits parole of otherwise unparolable aliens, imposing the costs on Texas described in the answer to Interrogatory No. 16.

**Interrogatory No. 18:** Describe your injury with respect to claim for relief C in your complaint.

**Answer to Interrogatory No. 18:** Under the Interim Rule, asylum officers exercise power that marks them as officers of the United States under the Appointments Clause. However, they are not appointed by the President or a head of a federal department, nor are they supervised by or directly accountable to such a person. Because they have not been properly appointed to an office that entitles them to use the granted power, each exercise of that power by an asylum officer that permits an alien to enter the country imposes on Texas the costs described in the answer to Interrogatory No. 16.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 73 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-28   Filed 10/02/23   Page 20 of 23   PageID 981
4770

**Interrogatory No. 19:** Describe your injury with respect to claim for relief
D in your complaint.

> **Answer to Interrogatory No. 19:** The arbitrary and capricious prom-
> ulgation of the Interim Rule results in asylum officers being allowed to
> make determinations that allow aliens earlier and easier access to the
> country than would otherwise be permitted. This imposes on Texas the
> costs described in the answer to Interrogatory No. 16.

**Interrogatory No. 20:** Describe your injury with respect to claim for relief
E in your complaint.

> **Answer to Interrogatory No. 20:** Adopting an interim rule that was
> not a logical outgrowth of the proposed rule has resulted in asylum of-
> ficers being allowed to make determinations that allow aliens earlier and
> easier access to the country than would otherwise be permitted. This
> imposes on Texas the costs described in the answer to Interrogatory No.
> 16.

**Interrogatory No. 21:** Explain how you will determine whether the Asylum
IFR is the but-for cause of any expenditures by Texas for Applicants for Ad-
mission paroled by the federal government at the Southwest border pending
their applications for asylum or their removal proceedings following the ef-
fective date of the Rule.

> **Answer to Interrogatory No. 21:** Texas objects to this interrogatory as
> seeking irrelevant information whose production is not likely to lead to
> admissible information. Expenditures on individual aliens are not rele-
> vant to the standing inquiry when challenging a large-scale program such
> as the one established by the Asylum IFR. *See Texas v. Biden*, 20 F.4th
> 928, 971 (5th Cir. 2021) ("The Government says that's not enough be-
> cause Texas has not shown it has already issued any licenses to immi-
> grants who became eligible because of MPP's termination. … [But] MPP
> is precisely the sort of large-scale policy that's amenable to challenge us-
> ing large-scale statistics and figures, rather than highly specific individ-
> ualized documents. And Texas's standing is robustly supported by just
> such big-picture evidence.").
>
> Subject to that objection, to the extent it chooses to demonstrate that it
> has made such expenditures, Texas may do so by using information from
> the Defendants to demonstrate that paroled applicants have children

who attend a public school, have incurred medical costs payable through any of Texas's several public-health programs, have been issued a driver's license, or have been incarcerated.

**Interrogatory No. 22:** Explain how you will determine whether the Asylum IFR is the but-for cause of any expenditures for Asylees following the effective date for the Rule.

> **Answer to Interrogatory No. 22:** Texas objects to this interrogatory as seeking irrelevant information whose production is not likely to lead to admissible information. Expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale program such as the one established by the Asylum IFR. *See Texas v. Biden*, 20 F.4th at 971.

> Subject to that objection, to the extent it chooses to demonstrate that it has made such expenditures, Texas may do so by using information from the Defendants to demonstrate that persons granted asylum by an asylum officer have children who attend a public school, have incurred medical costs payable through any of Texas's several public-health programs, have been issued a driver's license, or have been incarcerated.

**Interrogatory No. 23:** Do you contend that individuals paroled under the IFR to seek asylum in Los Angeles, Miami, Newark, Boston, New York, or San Francisco will settle in Texas?

> **Answer to Interrogatory No. 23:** Yes.

## OBJECTIONS AND RESPONSES TO
## REQUESTS FOR ADMISSIONS

**Request for Admission No. 1:** Prior to the effective date of the Asylum IFR you provided public benefits to individuals granted asylum by the U.S. Citizenship and Immigration Services.

**Response to Request No. 1:** Admitted.

**Request for Admission No. 2:** Prior to the effective date of the Asylum IFR you provided public benefits to individuals granted asylum by the Immigration Judge.

**Response to Request No. 2:** Admitted.

**Request for Admission No. 3:** Prior to the effective date of the Asylum IFR, the federal government paroled Applicants for Admission at the Southwest border pending their applications for asylum or their removal proceedings.

**Response to Request No. 3:** Admitted.

**Request for Admission No. 4:** Asylum grant rates fluctuate over time based on priorities and guidance issued by the Attorney General.

**Response to Request No. 4:** Texas admits that asylum-grant rates fluctuate over time and that these are factors that may contribute to that fluctuation.

**Request for Admission No. 5:** Asylum grant rates fluctuate over time based on changes in Board of Immigration Appeals precedent.

**Response to Request No. 5:** Texas admits that asylum-grant rates fluctuate over time and that this is one factor that may contribute to that fluctuation.

**Request for Admission No. 6:** Asylum grant rates fluctuate over time based judicial decisions.

**Response to Request No. 6:** Texas admits that asylum-grant rates fluctuate over time and that this is one factor that may contribute to that fluctuation.

**Request for Admission No. 7:** Asylum grant rates fluctuate over time based on socio economic conditions in countries from which immigrants depart.

> **Response to Request No. 7:** Texas does not have information sufficient to admit or deny this request.

**Request for Admission No. 8:** Asylees who meet Texas state income requirements are eligible for Medicare.

> **Response to Request No. 8:** Admitted as to asylees who also meet the other requirements to qualify as eligible for Medicare.

**Request for Admission No. 9:** Asylees that do not qualify for Medicare under the rules of the State of Texas are eligible for Refugee Medical Assistance (RMA) for a period of eight months.

> **Response to Request No. 9:** Admitted as to asylees who also meet the other requirements to qualify as eligible for Refugee Medical Assistance.

**Request for Admission No. 10:** The shorter the time noncitizens expect to remain in the United States while their asylum claims are pending, the less likely noncitizens are to file non-meritorious asylum claims.

> **Response to Request No. 10:** Texas admits that increasing the time a person expects to spend in the United States while an asylum claim is pending strengthens the incentive to file non-meritorious claims and that decreasing the time weakens that incentive.

# EXHIBIT C

BEFORE THE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

In the Matter of

STATE OF TEXAS et al. v. MAYORKAS et al.          Case 2:22-cv-00094-Z

EXPERT REPORT BY MICHAEL A. CLEMENS

ON BEHALF OF THE

U.S. DEPARTMENT OF JUSTICE

August 24, 2023

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 79 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 3 of 35   PageID 987
8477

# Table of Contents

*I. Introduction* ........................................................................................................ *1*

**1.** Qualifications ....................................................................................................... 1

**2.** Scope .................................................................................................................... 2

**3.** Summary of Results ............................................................................................. 3

*II. Analysis* ............................................................................................................... *3*

**1.** Data on border encounters .................................................................................. 3

**2.** Effects of the Asylum Processing IFR on Border Encounters ........................... 5

    a. Comparison to encounters before the rule ............................................................. 5

    b. Comparison to encounters predicted using pre-rule patterns ................................ 6

    c. Comparison to encounters of similar migrants unaffected by the rule .................. 9

*III. Appendices* ....................................................................................................... *14*

**1.** Michael A. Clemens's publications for the past 10 years ................................. 14

**2.** Statement of compensation ............................................................................... 19

**3.** Full CV of Michael A. Clemens (attached below) ........................................... 19

# Table of Figures

Figure 1: Border encounters per month, 2011−2023 ................................................... 4

Figure 2: Validating the model .................................................................................... 7

Figure 3: Econometric test of the effect of the Asylum Processing IFR on border encounters ...... 8

Figure 4: Encounters of accompanied vs. unaccompanied children, Aug. 2021−Mar. 2023 ........... 9

Figure 5: Ratio of accompanied to unaccompanied child encounters, Aug. 2021−Mar. 2023 ....... 10

# I. Introduction

## 1. Qualifications

(1)   My name is Michael A. Clemens. I am a full professor with tenure in the Department of Economics at George Mason University in Fairfax, Virginia, and a Non-resident Senior Fellow at the Peterson Institute of International Economics in Washington, DC. I specialize in research on the causes and effects of international migration. I hold my Ph.D. degree from the Department of Economics and Harvard University.

(2)   Economists study the reasons that immigration flows are different across time and across space. Economists also study the effects of immigration on labor markets, public coffers, crime, assimilation, public attitudes, and other outcomes. I am highly familiar with the academic research literature on the causes and effects of immigration, and the data and methods used to establish empirical facts about immigration.

(3)   The field of economics has also contributed more generally to a body of statistical tools used to transparently assess cause and effect, collectively known as econometrics. Econometrics is the application of statistical methods to real-world data in order to address economic problems and establish causal relationships between quantitative measures of real-world phenomena. The statistical methods and issues in econometrics are common to quantitative analysis in other branches of the social sciences. I have extensive training and experience in the field of econometrics, including regression and other statistical methods.

(4)   I have published 38 articles in peer-reviewed academic journals. As of June 26, 2023, the website Google Scholar counted 12,851 citations of my research by other scholars' papers.[1] My citations by other academic economists place me in the top 2.1 percent of all-time citations among all academic economists, according to the website *Research Papers in Economics (RePEc)* at the Federal Reserve Bank of Saint Louis.[2] For citations of works written in the past 10 years, my rank is in the top 0.4 percent of all academic economists.[3] My research was awarded the Royal Economic Society Prize in 2013, an annual honor to the best research paper published by the world's oldest professional society of economists.

(5)   I hold honorary affiliations with the IZA Institute of Labor Economics in Bonn, Germany, the world's leading network of academic labor economists; the Centre for Research and Analysis of Migration in the Department of Economics at University College London, London, United Kingdom, the world's leading network of academic migration economists; and the Center for Global Development in Washington, DC, a nonpartisan think tank that studies policies to reduce global poverty. I serve occasionally as an Expert Development Economist in the Office of the Administrator at the US Agency for International Development, advising the Administrator on policies to improve and enforce pathways for temporary labor migration in the Western Hemisphere. Before joining George Mason University, I served for 20 years as a fellow of the Center for Global Development, which I joined immediately after my doctorate.

## 2. Scope

(6)   I have been asked by the Department of Justice to assess the effects of federal government policy on the volume of migrants attempting to enter the United States irregularly at the Southwest border.[4]

(7)   I was asked to assess the factual claim that the *Asylum Processing Interim Final Rule* ("Asylum Processing IFR")[5] caused a rise in the total number of migrants encountered by U.S. Customs and Border Protection (CBP) at the Southwest US border. The rule was published on March 29, 2022, became effective since May 31, 2022, and remains in effect as I write this. The relevant passages of the complaints that I was asked to assess read as follows:

> *"Because the Asylum* [Processing] *IFR makes it easier for aliens with non-meritorious asylum claims to be released in the United States, it will induce a significant increase of illegal immigration into the United States. … The Asylum IFR will result in tens or hundreds of thousands of aliens unlawfully entering the United States, who would otherwise not be able to gain entry. … The Asylum IFR will increase illegal immigration into the United States."*

> —Arizona v. Garland, Case 6:22-cv-01130, Para. 61, 106, 110.

> *"If the Defendants are allowed to continue admitting illegal aliens into the United States in violation of federal law, then the harm will only grow over time. As DHS and federal courts have found, incentives matter: reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally."*

> —Texas v. Biden, Case 2:22-cv-00094-Z, Para. 58

(8)     I evaluate the effects of the Asylum Processing IFR in isolation—that is, all else equal. I do *not* examine whether this policy change could, in principle, serve as a necessary element of a bundle of policies that affects migration behavior (a "NESS" cause), including for example physical barriers or parole processes.[6] Rather, I examine whether the Asylum Processing IFR by itself, and without complementary policies, is *sufficient* to affect migration behavior.

### 3. Summary of Results

(9)     I find no evidence that the Asylum Processing IFR, by itself, was sufficient to substantially affect overall CBP encounters at the Southwest Border. Encounters were lower in the months after the Rule took effect than before it. Encounters were also lower after the rule took effect than would have been predicted based on pre-Rule historical patterns in the fluctuations and seasonality of encounters. Finally, post-Rule trends in encounters of migrants affected by the Rule were indistinguishable from trends in encounters of similar migrants who were not affected by the Rule.

(10)    The evidence is *not* inconsistent with the possibility that changes to asylum procedure or processing can be a necessary element of a larger bundle of policies that, together, are sufficient to cause substantial changes in migration behavior. For example, none of the evidence presented here is informative about the effects of a policy bundle that includes both changes in asylum procedure or processing with consequences for illegal entry *and* creates lawful alternative migration pathways. None of the asylum policy changes that I was asked to evaluate here fit that pattern.

## II. Analysis

(11)    The factual claims that I assess rest on a core assumption that the Asylum Processing IFR incentivizes migrants to choose to migrate to the border. I am not aware of prior, direct tests of this effect in the research literature. Due to the absence of direct evidence on the factual questions I am asked to address, I formulate and conduct new tests below.

### 1. Data on border encounters

(12)    My analysis below relies on two main data sources. The first is the monthly data on overall migrant encounters at the Southwest border, FY2019 (October) through FY2023 (March),

published by CBP on its Public Data Portal.[7] The second is the corresponding monthly data on migrant encounters during FY2011 (October) through FY2018 (September), obtained from CBP under the Freedom of Information Act by the Syracuse University Transactional Records Access Clearinghouse (TRAC). Both of these series include encounters by CBP overall (US Border Patrol and the Office of Field Operations), under any title (both Title 8 and Title 42), of migrants of any nationality, age, and family status.

(13)   Figure 1 shows the resulting complete monthly series of border encounters from the calendar month of October 2011 through the calendar month of March 2023, the latest data made public by CBP at the time of this writing. Details of the data sources are presented in the Appendix.

(14)   In this figure and throughout this analysis, the vertical axis measuring levels of encounters is

*Figure 1: Border encounters per month, 2011−2023*



shown on a logarithmic scale, that is, a scale where powers of ten are equally spaced. This has the effect of representing any two equal *percentage changes* in the data as equally-spaced vertical shifts, regardless of the starting *level*. For example, a change from 1,000 to 1,100 is shown in the graph by the same vertical distance as a change from 100,000 to 110,000. This is appropriate when considering the effects of policy interventions that might deter or encourage potential migrants by changing the *probability* that any given person chooses to migrate, by altering their incentives. Intuitively, for example, if a policy change deters 50 percent of

4

potential migrants from migrating, the magnitude of that effect should be assessed independently of the population size considered.

(15) A minor source of data, used only in Section II.4.c (Figure 14), contains monthly enrollments in the Migration Protection Protocols (MPP) from January 2019 through August 2022, also obtained from CBP by TRAC. The portion of that dataset starting in October 2019 is also publicly available from CBP.[8]

## 2. Effects of the Asylum Processing IFR on Border Encounters

(16) Measuring the effect of the Asylum Processing IFR on migrant encounters requires comparing actual encounters to what they would have been in the absence of the policy—that is, "counterfactual" encounters. Because counterfactual encounters cannot be directly observed, a statistical assessment of causation relies on comparing actual encounters to various proxies for the unobserved, counterfactual encounters. Here I test for effects of the Asylum Processing IFR using three independent proxies for counterfactual encounters: encounters before the rule, encounters predicted by pre-rule patterns, and encounters in a similar group of migrants unaffected by the rule.

### a. Comparison to encounters before the rule

(17) A first step in testing for the rule's effect on border encounters is simply to check whether the volume of migrants encountered rose after the rule went into effect on May 31, 2022. The data do not exhibit a substantial rise of this kind in the months around the advent of the rule. Migrant encounters fell after the rule relative to their volume before the rule.

(18) In a time window of one month on either side of the policy change, border encounters fell by 13.8 percent after the rule became effective—from 241,136 (May 2022) to 207,834 (June 2022).

(19) In a time window of four months on either side of the policy change, border encounters fell by 3.0 percent after the rule became effective—from 216,376 per month (average, February–May 2022) to 209,908 per month (average, June–September 2022).

(20) This comparison is transparent but may be too simple. Most importantly, it may not account for underlying trends that could cause the volume of border encounters to rise or fall independent of any policy change. It is hypothetically possible that an irrelevant downward

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 85 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 9 of 35   PageID 993
3482

trend in border encounters could conceal any rise in encounters that might be caused by the rule. For this reason, I proceed to a more sophisticated but somewhat less transparent method.

### b. Comparison to encounters predicted using pre-rule patterns

(21)  The next step is to check whether the advent of the rule was followed by a rise in the volume of border encounters relative to the trend that would have been expected given typical, unrelated trends in border encounters. I do this by building a forecasting model of border encounters of a type known as ARIMA (Autoregressive Integrated Moving Average).

(22)  The ARIMA model is due to Box and Jenkins (1970). ARIMA models are "the most widely used methods for time series forecasting" (Adhikari and Agrawal 2012, p. 43). They are the most well-established statistical method to model patterns over time in the changes of a single variable (e.g. Hamilton 1994, Tsay 2000, Lütkepohl 2004). ARIMA models are very widely used in government, private firms, and academia for quantitative forecasts. They are appropriate for studying time-varying quantities that 1) mostly exhibit smooth changes rather than erratic, unpredictable jumps, 2) exhibit some inertia, so that unexpected changes affect future values, and 3) drift systematically upward or downward over time, rather than always reverting to the same level. In other words, the ARIMA model allows for the time-series being studied to exhibit current values that are systematically correlated with preceding values ("*autoregressive*": AR), whose mean and variance may shift over time ("*non-stationary*" or "*integrated*": I), and whose current values are systematically correlated with prior shocks relative to trend ("*moving average*": MA).

(23)  Due to the clear seasonal variation in border encounters, the ARIMA model used here furthermore allows for autocorrelation between values spaced by 12 months.[9]

(24)  The ARIMA model has been very widely used across a variety of scientific disciplines for the purpose of evaluating the impact of policy interventions, starting with Box and Tiao (1975) and continuing to the present day (e.g. Schaffer et al. 2021). The essence of this method is to compare the actual changes in a quantity of interest, following a policy intervention, to the changes that would have been predicted by an ARIMA forecast based exclusively on information available before the intervention. If the model accurately forecasts how the quantity of interest would have evolved in the absence of the policy intervention, then the

difference between the actual value and the forecast value at any moment in time captures the effect of the policy intervention.

*Figure 2: Validating the model*



(25)  I forecast border encounters with an ARIMA model that allows the current month's volume of encounters to be affected by both levels and shocks in the two preceding months. That timeframe of two months was chosen by the standard method of Hyndman and Khandakar (2008) as the span that best fits the patterns in the full border encounters dataset (October 2011 through March 2023). My ARIMA model allows for nonstationarity (first-order integration) given the obvious time-trend in the mean monthly volume of encounters visible in Figure 1, and for a seasonal ARMA process (with a 12-month lag) given the well-known seasonal variation in migrant arrivals at the border.[10] Irregular migration at the border tends to peak in the spring and early summer, and taper off in the winter. Finally, I add to the model the previous month's US unemployment rate for Hispanic/Latino workers, which affects the volume of border encounters but is not meaningfully affected by border encounters.[11]

(26)  I first validate the model by testing its ability to predict the recent, actual monthly volume of border encounters. Figure 2 shows that the model predicts border encounters with high accuracy. In this validation exercise, I arbitrarily choose a cutoff date of May 31, 2021. I then use the ARIMA model to predict what would have happened to border encounters in each

month after May 31, 2021 using only information available before that date, along with the US
unemployment rate for Hispanic/Latino workers in the preceding month.

(27)   By construction, the model fits the "training data" closely (on or before May 31, 2021). More
importantly, it also fits the "test data" well (after May 31, 2021). Figure 2 shows that the model
closely predicts the overall level of encounters in the following months, the modest fall in
monthly encounters during the rest of 2021, and the marked rise in early 2022. It does all this
using exclusively information available on or before May 31, 2021. In the 22 months from June
2021 through March 2023, actual encounters were 200,295 per month on average, while the
model predicts 203,136—a difference of only 1.4 percent. From this exercise I conclude that the
model contains reliable information about the overall level and likely evolution of future
border encounters in a business-as-usual scenario.

*Figure 3: Econometric test of the effect of the Asylum Processing IFR on border encounters*



(28)   To estimate the effect of the Asylum Processing IFR, then, I use the ARIMA model to forecast
the evolution of border encounters in each month after the policy went into effect, on May 31,
2022. For this forecast I use exclusively information available on or before May 31, 2022, along
with the US unemployment rate of Hispanic/Latino workers (which is not substantially
affected by border encounters). I then compare that predicted evolution of border encounters to
actual border encounters after the rule took effect.

(29)   Figure 3 compares the actual values of monthly border crossings to the predicted values in all
available months since the Asylum Processing IFR took effect at the end of May 2022. Actual
border encounters were lower in June 2022 than would have been expected given the levels
and patterns in border encounters and the US Hispanic/Latino unemployment rate in and
before May 2022. Actual encounters were lower than predicted encounters in all subsequent
months but one, December 2022, when actual and predicted encounters were nearly identical.
In short, migrant encounters at the US Southwest border fell after the Asylum Processing IFR
took effect, relative to the levels that would be typically expected according to a standard
forecasting accounting for past overall trends and seasonal trends in encounters plus the effect
of changes in the US unemployment rate for Hispanic/Latino workers.

*Figure 4: Encounters of accompanied vs. unaccompanied children, Aug. 2021–Mar. 2023*



#### c. Comparison to encounters of similar migrants unaffected by the rule

(30)   The Asylum Processing IFR does not apply to unaccompanied children,[12] that is, alien children
younger than 18 who are not accompanied by adult alien parent(s) or legal guardian(s). The
Asylum Processing IFR does apply to all other children. If migrants' understanding of the
procedural change under the Asylum Processing IFR caused a greater incentive to arrive at the
border and attempt entry, I expect to observe a rise in attempted entry by the group subject to
the rule (accompanied children) relative to the group unaffected by the rule (unaccompanied
children).

(31)   Figure 4 shows total Southwest border encounters of both accompanied children and unaccompanied children in the 10 months between the entry into force of the Asylum Processing IFR and the latest available data at the time of writing (March 2023), as well as the 10 months prior to the effectiveness of the Asylum Processing IFR. There is no apparent rise in encounters with accompanied children relative to unaccompanied children. Between May 2022 and June 2022, monthly encounters with accompanied children fell by 27.7 percent (from 235 to 170), while monthly encounters with unaccompanied children rose by 3.9 percent (from 14,675 to 15,250). Considering the ten-month period since effectiveness of the rule compared to the ten-month period before effectiveness of the rule, the average monthly encounters with accompanied children rose by 12.4 percent after the rule (from 239 to 269) and the average monthly encounters with unaccompanied children rose by 9.6 percent (from 12,178 to 13,346).



*Figure 5: Ratio of accompanied to unaccompanied child encounters, Aug. 2021–Mar. 2023*



(32)   Figure 5 shows the same data expressed as the ratio of accompanied child encounters to unaccompanied child encounters. If migrants' understanding of the procedural change under the Asylum Processing IFR caused a greater incentive to arrive at the border and attempt entry, I expect to observe a rise in this ratio—that is, a rise in the number of accompanied child encounters relative to the number of unaccompanied child encounters.

10

(33)   No such trend is evident in Figure 5. The ratio fell in the first month the rule was effective (0.011 in June 2022) relative to the preceding month (0.016 in May 2022). The average monthly ratio in 2022 after the rule was effective (0.019, June through December 2022) was lower than before the rule (0.021, January through May 2022). The ratio in January 2023 (0.024) was lower than the ratio in January 2022 (0.027).

(34)   In sum, using three independent proxies for how migrant encounters would have evolved in the absence of the Asylum Processing IFR, I find no evidence that encounters after the Asylum Processing IFR took effect have been higher than what they would have been if the rule had not taken effect. If anything, there is suggestive but not conclusive evidence that encounters after the Asylum Processing IFR have been slightly lower than what they would have been in the absence of the rule.

(35)   I am not aware of more informative quantitative tests that could be conducted with the data available to me, but I may supplement, clarify, or revise my opinion if I receive new data during this ongoing matter. ∎



Michael A. Clemens

**References**

Adhikari, R. and R. K. Agrawal (2012), "A novel weighted ensemble technique for time series forecasting", in Tan, Pang-Ning et al., eds., *Advances in Knowledge Discovery and Data Mining*, Heidelberg: Springer-Verlag.

Box, George E. P. and Gwilym M. Jenkins (1970), *Time Series Analysis: Forecasting and Control*, 1st ed., San Francisco: Holden-Day.

Box, G. E. P., & Tiao, G. C. (1975). Intervention Analysis with Applications to Economic and Environmental Problems. *Journal of the American Statistical Association*, 70(349), 70–79. https://doi.org/10.2307/2285379

Buehn, A., Eichler, S. Determinants of Illegal Mexican Immigration into the US Southern Border States. *Eastern Econ J* 39, 464–492 (2013). https://doi.org/10.1057/eej.2012.24

Hamilton, James D. (1994), *Time Series Analysis*, Princeton: Princeton University Press.

Hanson, G.H. and Spilimbergo, A. (1999), "Illegal immigration, border enforcement, and relative wages: Evidence from apprehensions at the US-Mexico border". *American Economic Review*, 89(5), pp.1337-1357.

Helbling, M. and Leblang, D. (2019), Controlling immigration? How regulations affect migration flows. *European Journal of Political Research*, 58: 248-269. https://doi.org/10.1111/1475-6765.12279

Hyndman, R. J. and Y. Khandakar. 2008. "Automatic time series forecasting: the forecast package for R." *Journal of Statistical Software*, 27(1), 1-22.

Lütkepohl, Helmut (2004), "Univariate Time Series Analysis". In Helmut Lütkepohl and Markus Krätzig, eds., *Applied Time Series Econometrics*, New York: Cambridge University Press.

Schaffer, A. L., Dobbins, T. A., & Pearson, S. A. (2021). "Interrupted time series analysis using autoregressive integrated moving average (ARIMA) models: a guide for evaluating large-scale health interventions", *BMC Medical Research Methodology*, 21(1), 1-12.

Tsay, R. S. (2000). "Time series and forecasting: Brief history and future research". *Journal of the American Statistical Association*, 95 (450), 638–643.

Wright, Richard W. "Causation in tort law", *Calif. L. Rev.* 73 (1985): 1735. DOI:10.2307/3480373

---

[1] Michael A. Clemens's research publications with citations compiled by *Google Scholar*: https://scholar.google.com/citations?user=DdtBDnkAAAAJ

[2] 1,362 citations by academic economists, in the top 2.1 percent of 66,166 academic economists rated by RePEc, "Top 5% Authors, Number of Citations, as of March 2023": https://ideas.repec.org/top/top.person.nbcites.html

[3] Number 290 out of 66,407 economists registered, as of April 2023: https://ideas.repec.org/top/top.person.all10.html

[4] An irregular migrant is a person who enters a migrant-destination country without a visa that is normally required. Irregular migrants to the US include people who break the law, such as migrants who enter surreptitiously and without admission by the Dept. of Homeland Security; they also include people who do not break the law, such as migrants who arrive at a US port of entry for the purpose of claiming asylum, a purpose for which no US visa exists.

[5] "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers", 87 FR 18078.

[6] "*The NESS test* [Necessary Element of a Sufficient Set] *states that a particular condition was a cause of a specific consequence if and only if it was a necessary element of a set of antecedent actual conditions that was sufficient for the occurrence of the consequence*" (Wright 1985, 1774).

[7] Overall migrant encounters at the Southwest land border, by month, October 2018 through March 2023 from Customs and Border Protection, "Public Data Portal: Southwest Land Border Encounters", last updated April 3, 2023, accessed April 25, 2023.

[8] The MPP enrollment dataset starting in January 2019 obtained from CBP by TRAC is publicly available at: https://trac.syr.edu/phptools/immigration/mpp4. MPP enrollments starting in October 2019 are publicly available directly from CBP at: https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020, https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy2021, and https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy22

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 92 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 16 of 35   PageID 1000
8489

---

[9] The seasonality of migrant encounters at the US Southwest border is documented by decades of research such as Davila, Alberto (1986), "The seasonality of apprehensions of undocumented Mexican workers." *International Migration Review* 20: 4: 986–991, and many since then. The type of ARIMA model I use, necessary for settings such as the present one where the variable of interest exhibits seasonal patterns and *exogenous* variables are available (those that affect the variable of interest but cannot be caused by it) is known as SARIMAX (<u>S</u>easonal <u>A</u>utoregressive <u>I</u>ntegrated <u>M</u>oving <u>A</u>verage with e<u>X</u>ogenous variables).

[10] Formally, this model is described as *ARIMA* $(2,1,2)$ $(1,0,1)_{12}$.

[11] The US unemployment rate is well known to be an important driver of migrant arrivals at the border (e.g. Hanson and Spilimbergo 1999, Buehn and Eichler 2013; Helbling and Leblang 2019).

[12] 87 FR 18089 https://www.federalregister.gov/d/2022-06148/p-214

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 93 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 17 of 35   PageID 1001
8490

# III. Appendices

## 1. Michael A. Clemens's publications for the past 10 years

*Below is a list of all of Michael Clemens's academic and non-academic publications from 2013 through the time of writing in 2023, in reverse chronological order.*

2023: "Human Capital Investment under Exit Options: Evidence from a Natural Quasi-Experiment", *Journal of Development Economics*, 163: 103112 (with Satish Chand).

2023: "Labour Mobility with Vocational Skill: Australian Demand and Pacific Supply", forthcoming in *Australian Ec. Rev.* (with Satish Chand).

2023: "Why We Won't Reach a 'Climate Migrant' Protection Category—And What We Can Do Instead", Washington, DC: Center for Global Development, Jun. 8 (with Sam Huckstep).

2023: "Climate Change and Migration: An Omnibus Overview for Policymakers and Development Practitioners", CGD Policy Paper 292, Washington, DC: Center for Global Development, May 9 (with Sam Huckstep).

2022: "The economic and fiscal effects on the United States from reduced numbers of refugees and asylum seekers", *Oxford Review of Economic Policy*, 38 (3): 449–486.

2022: "The effect of seasonal work visas on native employment: Evidence from U.S. farm work in the Great Recession", *Review of International Economics*, 30 (5): 1348–1374.

2022: "A Pacific Skills Visa: Improving Opportunities for Skilled Migration Throughout the Pacific Region", *Asia & the Pacific Policy Studies*, 9 (3): 430–446 (with Satish Chand and Helen Dempster).

2022: "The effect of low-skill immigration restrictions on US firms and workers: Evidence from a randomized lottery", NBER Working Paper 30589. Cambridge, MA: National Bureau of Economic Research (with Ethan G. Lewis).

2022: "Do Cash Transfers Deter Migration?", CGD Policy Paper 270, Washington, DC: Center for Global Development, Oct. 19.

2022: "Pathways for Labor Migration from Northern Central America: Five Difficult but Necessary Proposals", North and Central American Task Force on Migration, World Refugee and Migration Council, Jan. 13.

2022: "Doing Refugee Integration Better: Three Lessons from the Latest Research", Washington, DC: Center for Global Development, Oct. 19.

2021: "Violence, development, and migration waves: Evidence from Central American child migrant apprehensions", *Journal of Urban Economics*, 124 (July): 103355.

2021: "The Fiscal Effect of Immigration: Reducing Bias in Influential Estimates", CGD Working Paper, Washington, DC: Center for Global Development.

2021: "Australia needs more Pacific mid-skill migration: Here's how to facilitate it", *DevPolicy*, Oct. 15 (with Satish Chand and Helen Dempster).

2021: "Expanding Legal Migration Pathways from Nigeria to Europe: From Brain Drain to Brain Gain", World Bank-CGD report, Jul. 19 (with Samik Adhikari, Helen Dempster, and Nkechi Linda Ekeator).

2021: "The Real Root Causes of America's Border Crisis: And How Biden Can Address Them", *Foreign Affairs*, Jun. 7.

2021: "Ethical Recruitment of Health Workers: Using Bilateral Cooperation to Fulfill the World Health Organization's Global Code of Practice", CGD Policy Paper 212 (with Helen Dempster), May 27.

2021: "Should the Threat of Pandemics End the Age of Mobility?", *Think Global Health*, Jan. 28 (with Thomas Ginn).

2020: "Global Mobility and the Threat of Pandemics: Evidence from Three Centuries", CGD Working Paper 560, Washington, DC: Center for Global Development (with Thomas Ginn).

2020: "Migration from Developing Countries: Selection, Income Elasticity, and Simpson's Paradox", CGD Working Paper 539, Washington, DC: Center for Global Development (with Mariapia Mendola).

2020: "The Emigration Life Cycle: How Development Shapes Emigration from Poor Countries", CGD Working Paper 540, Washington, DC: Center for Global Development.

2020: "How economic development shapes migration: Facing the emigration life cycle", *Migration Policy Practice*, 10 (4): 31–34 (with Cassandra Zimmer).

2020: "Restricting Mobility Will Not Stop the Next Pandemic", CGD Commentary and Analysis, Dec. 10 (with Thomas Ginn and Reva Resstack).

2020: "Harnessing Northern Triangle Migration for Mutual Benefit", White House and the World Policy Brief, Dec. 3 (with Reva Resstack and Cassandra Zimmer).

2020: "How economic development shapes emigration", *VoxDev* (commissioned), Sep. 21.

2020: "The Future of Legal Migration: Labour Migration Pathways Between Europe and Africa", in Matteo Villa, ed., The Future of Migration to Europe, Milan: ISPI Istituto per gli Studi di Politica Internazionale (with Helen Dempster and Katelyn Gough).

2020: "Migration and household finances: How a different framing can improve thinking about migration", *Development Policy Review*, 38 (1): 3–27 (with Timothy N. Ogden).

2020: "Shared Border, Shared Future: A U.S.-Mexican Bilateral Worker Agreement", in Alex Nowrasteh and David J. Bier, eds., *12 New Immigration Ideas for the 21st Century*, Washington, DC: Cato Institute.

2019: "The Place Premium: Bounding the Price Equivalent of Migration Barriers", *Review of Economics and Statistics*, 101 (2): 201–213 (with Claudio Montenegro and Lant Pritchett).

2019: "The New Economic Case for Migration Restrictions: An Assessment", *Journal of Development Economics*, 138: 153–164 (with Lant Pritchett).

2019: "The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results", *ILR Review*, 72 (4): 818–857 (with Jennifer Hunt).

2019: "Measuring the Spatial Misallocation of Labor: The Returns to India-Gulf Guest Work in a Natural Experiment", CGD Working Paper.

2019: "Promoting New Kinds of Legal Labour Migration Pathways Between Europe and Africa", CGD Policy Brief (with Helen Dempster and Katelyn Gough).

2019: "La migración es lo que hacemos de ella", *Política Exterior*, No. 187. Jan./Feb. (with Cindy Huang, Jimmy Graham, and Kate Gough).

2018: "Immigration Restrictions as Active Labor Market Policy: Evidence from the Mexican Bracero Exclusion", *American Economic Review*, 108 (6): 1468–1487 (with Ethan G. Lewis and Hannah M. Postel).

2018: "Why don't remittances appear to affect growth?", *Economic Journal*, 128 (612): F179–F209 (with David McKenzie).

2018: "Deterring Emigration with Foreign Aid: An Overview of Evidence from Low-Income Countries", *Population and Development Review*, 44 (4): 667–693 (with Hannah M. Postel).

2018: "Testing for repugnance in economic transactions: Evidence from guest work in the Gulf", *Journal of Legal Studies*, 47 (S1): S5–S44.

2018: "A Tool to Implement the Global Compact for Migration: Ten Key Steps for Building Global Skill Partnerships", CGD Brief, Dec. 4.

2018: "Migration as a form of development: New kinds of regulations to create shared benefits", *Migration Policy Practice*, 8 (3): 6–11.

2018: "The Economic and Fiscal Effects of Granting Refugees Formal Labor Market Access", CGD Working Paper 496 (with Cindy Huang and Jimmy Graham).

2018: "Countries should train migrants coming to work—before they arrive", *Apolitical*, June 29 (with Kate Gough).

2018: "Migration Is What You Make It: Seven Policy Decisions that Turned Challenges into Opportunities", CGD Note, May 30 (with Cindy Huang, Jimmy Graham, and Kate Gough).

2018: "Can Development Assistance Deter Emigration?", CGD Policy Brief, Feb. 12 (with Hannah Postel).

2018: "The Best Ideas for Making Migration Work", *Refugees Deeply*, Jan. 25 (with Katelyn Gough).

2017: "Split Decisions: Household Finance When a Policy Discontinuity Allocates Overseas Work", *Review of Economics and Statistics*, 99 (3); 531–543 (with Erwin R. Tiongson).

2017: "The Meaning of Failed Replications: A Review and Proposal", *Journal of Economic Surveys*, 31 (1): 326–342.

2017: "Temporary Work Visas as U.S.-Haiti Development Cooperation: A Preliminary Impact Evaluation", *IZA Journal of Labor & Development*, 6: 4 (with Hannah Postel).

2017: "Migration is a Form of Development: The Need for Innovation to Regulate Migration for Mutual Benefit", Technical Paper No. 2017/8, UN Department of Economic and Social Affairs, Population Division. New York: United Nations.

2017: "Regional Security Means Border Security: New Data on Why Central American Children Flee to the United States", *War on the Rocks*, Texas National Security Network, 30 November.

2017: "Migrants will keep coming. We should give them the skills they need to thrive", *World Economic Forum Agenda*, 15 November.

2017: "The Need for a Bilateral Labor Agreement Between the US and Mexico, and the Responsibility for Leadership", Keynote speech at the conference *¿Qué hacer frente a la crisis migratoria? Nuevas visiones y propuestas de acción*, Universidad Nacional Autónoma de México, Mexico City, jointly sponsored by Colmex and CIDE, 23 October. En español

2017: "The labour market impact of refugee waves", *CentrePiece* 22 (3, October): 26–28. London: Centre for Economic Performance, London School of Economics (with Jennifer Hunt).

2017: "The economic effects of refugees are largely down to decisions made by the countries which take them", *American Politics and Policy blog*, LSE United States Centre, Oct. 20.

2017: "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", CGD Policy Brief, Oct. 11.

2017: "Global Skill Partnerships: A Proposal for Technical Training in Settings of Forced Displacement", CGD Policy Brief, Oct. 11 (with Katelyn Gough).

2017: "Foreign Policy Is Migration Policy: Lessons from the Drivers of Central American Child Migration", CGD Policy Brief, Sep. 13 (with Hannah Postel).

2017: "How Central American Youth Test Outdated U.S. Immigration Laws", Americas Quarterly, Aug. 15. 2017"The Real Economic Cost of Accepting Refugees", *Refugees Deeply*, Aug. 8.

2017: "Trump says banning immigrants helps US workers. A leading economist says he's wrong", Vox.com, Aug. 3.

2017: "The debate over the Mariel boatlift, economics' most famous immigration controversy, explained", Vox.com, Jun. 23.

2017: "Does Kicking Out Mexicans Create Jobs? Here's what happened the last time an American president promised to create jobs by removing Mexican immigrants", *Politico*, Feb. 15.

2017: "Walling the U.S. Off From Mexico Won't Work", *U.S. News & World Report*, Feb. 2.

2016: "The New Role for the World Bank", *Journal of Economic Perspectives*, 30 (1): 53–76 (with Michael Kremer).

2016: "Losing Our Minds? New research directions on skilled migration and development", *International Journal of Manpower*, 37 (7): 1227–1248.

2017: "Don't despair, innovate—Now is the time to try new forms of development cooperation", Devex Global Views, Feb. 23.

2016: Shared Border, Shared Future: A Blueprint to Regulate US-Mexico Labor Mobility, Washington, DC: Center for Global Development (with Ernesto Zedillo and Carlos Gutierrez).

2016: "Development Aid to Deter Migration Will Do Nothing of the Kind", *Refugees Deeply*, Oct. 31.

2016: "World Bank's US dependency has to end: It's time to choose the institution's president based on merit rather than geopolitical considerations", *Politico Europe*, September 13.

2016: "Why today's migration crisis is an issue of global economic inequality", Ford Foundation Equals Change blog, July 29.

2016: "Time for philanthropists to get on board with migration", *Alliance* magazine, March.

2015: "Global Skill Partnerships: A proposal for technical training in a mobile world", IZA *Journal of Labor Policy*, 4:2.

2015: "Does Development Reduce Migration?", in Robert E. B. Lucas, ed., *International Handbook on Migration and Economic Development*, Northampton, Mass.: Edward Elgar Publishing, pp. 152–185.

2015: "Skill Development and Regional Mobility: Lessons from the Australia-Pacific Technical College", *Journal of Development Studies*, 51 (11): 1502–1517 (with Colum Graham and Stephen Howes).

2015: "A Self-Interested Approach to Migration Crises: Push Factors, Pull Factors, and Investing In Refugees", *Foreign Affairs*, Sept. 27 (with Justin Sandefur).

2015: "Gestionar la crisis migratoria desde el interés propio", *Política Exterior*, November-December (with Justin Sandefur).

2015: "Smart policy toward high-skill emigrants", *IZA World of Labor* 203, November.

2015: "Zero Illegal Immigration: A Thought Experiment (with Time Travel)", *Peregrine*, Issue 1502, Hoover Institution, Oct. 23.

2015: "The South Pacific Secret to Breaking the Poverty Cycle", Huffington Post: Impact, Sep. 15.

2015: "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", in Bertelsmann Stiftung, ed., A Fair Deal on Talent: Fostering Just Migration Governance, Gütersloh: Verlag Bertelsmann Stiftung, pp. 297–304.

2015: "In Haiti, U.S. rectifies missed opportunity to help", The Hill Congress Blog, Jan. 12 (with Royce Bernstein Murray).

2014: "A case against taxes and quotas on skilled emigration", *Journal of Globalization and Development*, 5 (1): 1–39.

2014: "Migration and Development Research Is Moving Far Beyond Remittances", *World Development*, 64: 121–124 (with Çağlar Özden and Hillel Rapoport).

2014: "The WHO Global Code of Practice: A Useful Guide for Recruiting Health Care Professionals? Lessons from Germany and Beyond", CGD Essay (with Steffen Angenendt and Meiko Merda).

2014: "Let the People Go: The Problem With Strict Migration Limits", *Foreign Affairs*, 93 (1, Jan./Feb.): 152–159 (with Justin Sandefur).

2014: "Skilled Migration from Mexico: Trends, Concerns, and Outlook", CGD Essay. Washington, DC: Center for Global Development.

2013: "Why Do Programmers Earn More in Houston than Hyderabad? Evidence from Randomized Processing of U.S. Visas", *American Economic Review, Papers & Proceedings*, 103 (3): 198–202.

2013: "Seize the Spotlight: A Case for GCC Engagement in Research on the Effects of Labor Migration". In *Labor Mobility: An Enabler for Sustainable Development*, Abu Dhabi: Emirates Center for Strategic Studies and Research, pp. 103–120.

2013: "Blunt Instruments: Avoiding Common Pitfalls in Identifying the Causes of Economic Growth", *American Economic Journal: Macroeconomics*, 5 (2): 152–186 (with Sami Bazzi).

2013: "More Unskilled Workers, Please: The new immigration bill doesn't do nearly enough to address America's real labor shortage", *Foreign Policy*, July 8.

2013: "What Nativists Don't Want You to Know About Immigrants", *Boston Review*, June 3.

2013: "The New Transparency in Development Economics: Lessons from the Millennium Villages Controversy", *World Economics Journal* 14 (4): 77–97 (with Gabriel Demombynes).

2013: "On the Move: The Highly Skilled (Turning 'Brain Drain' into 'Brain Gain')", World Bank Blog, October.

2013: "What Do We Know About Skilled Migration and Development?", Policy Brief No. 3, September. Washington, DC: Migration Policy Institute.

2013: "The Big Picture on Global Talent: How to better compete for, and grow talent". Paper prepared for the Salzburg Trilogue, August 30. Bertelsmann Stiftung (with Christal Morehouse).

## 2. Statement of compensation

For the research presented in this report I was compensated at the hourly rate of $600.00.

## 3. Full CV of Michael A. Clemens (attached below)

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 99 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 23 of 35   PageID 1007
8486

# Michael A. Clemens

George Mason University            🔗 mclem.org
4400 University Drive, 3G4         @ econtwitter.net/@m_clem
Fairfax, VA 22030 USA             ✉ mcleme@gmu.edu

## Affiliations

| | |
|---|---|
| 2023−present | Dept. of Economics, George Mason University (Fairfax, VA); *Full Professor with tenure* |
| 2023−present | Peterson Institute for International Economics (Washington, DC); *Non-Resident Senior Fellow* |
| 2014−present | IZA–Institute of Labor Economics (Bonn, Germany); *Research Fellow* |
| 2021−present | Centre for Research and Analysis of Migration (CReAM), Department of Economics, University College London; *External Research Fellow* |
| 2023−present | Center for Global Development (Washington, DC); *Distinguished Non-Resident Fellow* |
| 2021−present | Office of the Administrator, USAID; *Expert Development Economist*<br>▷ *Security clearance TS* |
| 2002−2023 | Center for Global Development (Washington, DC)<br>▷ *Director for Migration, Displacement, & Humanitarian Policy, 2019–2023*<br>▷ *Co-Director for Migration, Displacement, & Humanitarian Policy, 2017–2019*<br>▷ *Research Fellow, 2002–2010; Senior Fellow, 2010–2023; Research Manager, 2011–2017* |
| 2022 | Georgetown University (SFS & McCourt School); *Adjunct Professor* |
| 2016−2022 | *Journal of Population Economics* (Springer); *Associate Editor* |
| 2016−2020 | *World Development* (Elsevier); *Associate Editor* |
| 2011 | Dept. of Economics & Wagner School, New York University; *Visiting Scholar* |
| 2003−2010 | McCourt School of Public Policy, Georgetown University; *Affiliated Associate Professor* |
| 2000−2002 | Center for International Development, Harvard University; *Research Fellow* |
| 1998−2000 | World Bank; *Consultant*, environmental economics |
| 1999 | Bain & Company (Istanbul, Turkey); *Associate Consultant* |
| 1996 & 1997 | World Bank; *Summer Assistant*, environmental economics |
| 1994−1995 | Thomas J. Watson Foundation; *Watson Fellow* in Bogotá, Colombia & Cuiabá, Brazil |

## Academic Journal Articles

| | |
|---|---|
| 2023 | "Human Capital Investment under Exit Options: Evidence from a Natural Quasi-Experiment", *Journal of Development Economics*, 163: 103112 (with Satish Chand). ⟨Pre-pub. versions at CGD and IZA⟩<br>▷ Covered by *The Economist*, *The Atlantic* (bis), *Guardian Nigeria* |
| 2023 | "Labour Mobility with Vocational Skill: Australian Demand and Pacific Supply", forthcoming in *Australian Ec. Rev.* (with Satish Chand). ⟨Pre-pub. versions at IZA and CGD⟩ |
| 2022 | "The economic and fiscal effects on the United States from reduced numbers of refugees and asylum seekers", *Oxford Review of Economic Policy*, 38 (3): 449–486. ⟨Pre-pub. versions at IZA and CGD⟩<br>▷ Covered by *Boston Globe*, *Marketwatch*, *Forbes*, *El País*, *NewsNation*, *Dziennik Gazeta* |
| 2022 | "Migration on the Rise, a Paradigm in Decline: The Last Half-Century of Global Mobility", *AEA Papers & Proceedings*, 112: 257–261. ⟨Pre-pub. versions at IZA, CReAM, and CGD⟩ |

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 100 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 24 of 35   PageID 1008
8467

## Academic Journal Articles, *continued*

2022   "The effect of seasonal work visas on native employment: Evidence from U.S. farm work in the Great Recession", *Review of International Economics*, 30 (5): 1348–1374. ⟨*Pre-pub. versions at* IZA *and CGD*⟩

  ▹ Covered by the *Washington Post* (bis), *Fortune*, *News & Observer*
  ▹ Referenced in U.S. Congress debate (video)

2022   "A Pacific Skills Visa: Improving Opportunities for Skilled Migration Throughout the Pacific Region", *Asia & the Pacific Policy Studies*, 9 (3): 430–446 (with Satish Chand and Helen Dempster). ⟨*Pre-pub. version at* CGD *and* IZA⟩

2021   "Violence, development, and migration waves: Evidence from Central American child migrant apprehensions", *Journal of Urban Economics*, 124 (July): 103355. ⟨*Pre-pub. versions at* IZA *and* CGD⟩

  ▹ Covered by *New Yorker*; *Washington Post* (bis); *Wall Street Journal*; *The Atlantic*; *American Prospect*; *Forbes*; *PolitiFact*

2019   "The Place Premium: Bounding the Price Equivalent of Migration Barriers", *Review of Economics and Statistics*, 101 (2): 201–213 (with Claudio Montenegro and Lant Pritchett). ⟨*Pre-pub. versions at* CGD, Harvard University⟩

  ▹ Covered by the *New York Times*; *The Economist* (bis); *The Atlantic*; *Axios*; *El País*; *Quartz*; *Vox*
  ▹ Replication code at DOI:10.7910/DVN/DHZUOT

2019   "The New Economic Case for Migration Restrictions: An Assessment", *Journal of Development Economics*, 138: 153–164 (with Lant Pritchett). ⟨*Pre-pub. versions at* CGD, IZA, *and* Harvard University⟩

  ▹ Covered by the *New York Times* and *The Economist*
  ▹ Replication code and data at DOI:10.7910/DVN/HFTDQZ

2019   "The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results", *ILR Review*, 72 (4): 818–857 (with Jennifer Hunt). ⟨*Pre-pub. version*; *Co-released with* CGD, LSE, IZA, *and* CEPR⟩

  ▹ Summary for VoxEU
  ▹ Covered by *New York Times*; *Bloomberg*; *Wall Street Journal*; *The Economist* (bis); *Washington Post*; *U.S. News*; *Miami New Times*; *Huffington Post*; Bloomberg Surveillance (1:20:15)

2018   "Immigration Restrictions as Active Labor Market Policy: Evidence from the Mexican *Bracero* Exclusion", *American Economic Review*, 108 (6): 1468–1487 (with Ethan G. Lewis and Hannah M. Postel). ⟨*Pre-pub. versions at* NBER, CGD, *and* IZA⟩

  ▹ Summary for VoxEU
  ▹ Covered by *New York Times* (bis); *The Economist* (bis); *WSJ*; AP; *Frankfurter Allgemeine Zeitung*; Vox; *El Diario*; *Newsweek*; *NY Daily News*; Bloomberg; featured by NBER Digest
  ▹ Replication code and data at https://dataverse.harvard.edu/dataverse/bracero

2018   "Why don't remittances appear to affect growth?", *Economic Journal*, 128 (612): F179–F209 (with David McKenzie). ⟨*Pre-pub. version*; *Co-released with* World Bank⟩

  ▹ Covered by *The Economist*

2018   "Deterring Emigration with Foreign Aid: An Overview of Evidence from Low-Income Countries", *Population and Development Review*, 44 (4): 667–693 (with Hannah M. Postel). ⟨*Pre-pub. version*; *Co-released with* GLM-LIC *and* IZA⟩

  ▹ Covered by *Financial Times*; *New York Times*; *The Economist*; *Washington Post*; *The Guardian*; *Mother Jones*; *CS Monitor*; *Die Welt*; *El País*; *De Standaard*; *CQ Researcher*; *Vox*

2018   "Testing for repugnance in economic transactions: Evidence from guest work in the Gulf", *Journal of Legal Studies*, 47 (S1): S5–S44. ⟨*Pre-pub. version*; *Co-released with* IZA⟩

21

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 101 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 25 of 35   PageID 1009
4988

## Academic Journal Articles, *continued*

> Covered by the *Washington Post*

2017 "Split Decisions: Household Finance When a Policy Discontinuity Allocates Overseas Work", *Review of Economics and Statistics*, 99 (3); 531–543 (with Erwin R. Tiongson). ⟨*Pre-pub. version*⟩

> Replication code and data at DOI:10.7910/DVN/2DO8QP

2017 "The Meaning of Failed Replications: A Review and Proposal", *Journal of Economic Surveys*, 31 (1): 326–342. ⟨*Pre-pub. version*⟩

2017 "Temporary Work Visas as U.S.-Haiti Development Cooperation: A Preliminary Impact Evaluation", *IZA Journal of Labor & Development*, 6: 4 (with Hannah Postel). ⟨*Pre-pub. version*⟩

> Replication code and data at DOI:10.7910/DVN/J6P2KT
> Covered by *The Economist* (bis, ter); *Washington Post*; Reuters; NBC; CNN; UPI; *Miami Herald*; *La Opinión*

2016 "The New Role for the World Bank", *Journal of Economic Perspectives*, 30 (1): 53–76 (with Michael Kremer). ⟨*Pre-pub. version*⟩

> Covered by *Vox*

2016 "Losing Our Minds? New research directions on skilled migration and development", *International Journal of Manpower*, 37 (7): 1227–1248. ⟨*Pre-pub. version*⟩

> Covered by the *Financial Times*

2015 "Global Skill Partnerships: A proposal for technical training in a mobile world", *IZA Journal of Labor Policy*, 4:2. ⟨*Pre-pub. version*⟩

> Proposal endorsed by the UN Secretary General and the UN Marrakesh Compact for Migration, Objective 18. Covered by Inter Press Service; *El País*

2015 "Skill Development and Regional Mobility: Lessons from the Australia-Pacific Technical College", *Journal of Development Studies*, 51 (11): 1502–1517 (with Colum Graham and Stephen Howes). ⟨*Pre-pub. version*⟩

2014 "A case against taxes and quotas on skilled emigration", *Journal of Globalization and Development*, 5 (1): 1–39. ⟨*Pre-pub. version*⟩

2014 "Migration and Development Research Is Moving Far Beyond Remittances", *World Development*, 64: 121–124 (with Çağlar Özden and Hillel Rapoport). ⟨*Pre-pub. version*⟩

2013 "Why Do Programmers Earn More in Houston than Hyderabad? Evidence from Randomized Processing of U.S. Visas", *American Economic Review*, Papers & Proceedings, 103 (3): 198–202. ⟨*Pre-pub. version*⟩

> Covered by *Bloomberg* and *Slate*

2013 "Blunt Instruments: Avoiding Common Pitfalls in Identifying the Causes of Economic Growth", *American Economic Journal: Macroeconomics*, 5 (2): 152–186 (with Sami Bazzi). ⟨*Pre-pub. version*⟩

2012 "Counting chickens when they hatch: Timing and the effects of aid on growth", *Economic Journal*, 122 (561), 590–617 (with Steven Radelet, Rikhil Bhavnani, and Sami Bazzi). ⟨*Pre-pub. version*⟩

> *Paper awarded the Royal Economic Society Prize*

2012 "Why were Latin America's tariffs so much higher than Asia's before 1950?", *Journal of Iberian and Latin American Economic History*, 30 (1): 12–39 (with Jeffrey G. Williamson). ⟨*Pre-pub. version*⟩

2011 "Economics and Emigration: Trillion-Dollar Bills on the Sidewalk?", *Journal of Economic Perspectives*, 25 (3): 83–106. ⟨*Pre-pub. version*⟩

## Academic Journal Articles, *continued*

▷ Covered by the *New Yorker*; *New York Times*; *The Economist* (bis); *Fortune*; *Forbes* (bis); *The Atlantic*; *Salon*; NPR

▷ Subject of the American Economic Association's *inaugural* Research Highlight *2015*

2011 "When Does Rigorous Impact Evaluation Make a Difference? The Case of the Millennium Villages", *Journal of Development Effectiveness*, 3 (3): 305–339 (with Gabriel Demombynes). ⟨*Pre-pub. version*⟩

▷ Replication code and data at DOI:10.7910/DVN/28146

▷ Covered by the *Financial Times*; *New York Times* (bis); *The Economist*; *Nature* (bis); *Daily Mail*

2008 "Income Per Natural: Measuring Development for People rather than Places", *Population and Development Review*, 34 (3): 395–434 (with Lant Pritchett). ⟨*Pre-pub. version*⟩

▷ Covered by *The Economist* and *The Atlantic*

2008 "New data on African health professionals abroad", *Human Resources for Health*, 6:1 (with Gunilla Pettersson).

▷ Replication code and data at DOI:10.7910/DVN/28161

2007 "The trouble with the MDGs: Confronting expectations of aid and development success", *World Development*, 35 (5): 735–751 (with Charles Kenny and Todd J. Moss). ⟨*Pre-pub. version*⟩

2007 "The ghost of 0.7%: Origins and relevance of the international aid target", *International Journal of Development Issues*, 6 (1): 3–25 (with Todd J. Moss). ⟨*Pre-pub. version*⟩

2004 "Wealth Bias in the First Global Capital Market Boom, 1870-1913", *Economic Journal*, 114 (495): 304–337 (with Jeffrey G. Williamson). ⟨*Pre-pub. version*⟩

2004 "Why Did the Tariff-Growth Correlation Change after 1950?", *Journal of Economic Growth*, 9 (1): 5–46 (with Jeffrey G. Williamson). ⟨*Pre-pub. version*⟩

1999 "Genuine Savings Rates in Developing Countries", *World Bank Economic Review*, 13 (2): 333–356 (with Kirk Hamilton). ⟨*Pre-pub. version*⟩

1999 "Reserve Design for Species Preservation", *European Journal of Operational Research*, 112 (2): 273–283 (with Charles R. ReVelle and Justin Williams).

1993 "Homologous and illegitimate recombination in developing *Xenopus* oocytes and eggs", *Molecular and Cellular Biology*, 13 (11): 6897–6906 (with Chris W. Lehman, David K. Worthylake, Jonathan K. Trautman, and Dana Carroll).

## Books

2024 *The Walls of Nations*, New York: Columbia University Press, forthcoming.

1991 *Geometry for the Classroom*, New York: Springer-Verlag (with C. Herbert Clemens).

## Papers Under Review

2022 "The effect of low-skill immigration restrictions on US firms and workers: Evidence from a randomized lottery", NBER Working Paper 30589. Cambridge, MA: National Bureau of Economic Research (with Ethan G. Lewis). ⟨*Co-released with IZA, CReAM, CESifo, and CGD*⟩

▷ Summary for VoxEU; Featured in the NBER Digest, December 2022; Referenced by White House Council of Economic Advisers in *Economic Report of the President*, March 2023

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 103 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 27 of 35   PageID 1011
8500

## Papers Under Review, *continued*

> ▷ Covered by *Wall Street Journal* [bis], NPR, NBC, *Bloomberg Law* [bis], *Forbes*, IZA News-room (*Auf Deutsch*)

2021  "The Fiscal Effect of Immigration: Reducing Bias in Influential Estimates", CGD Working Paper, Washington, DC: Center for Global Development. ⟨*Co-released with IZA, CReAM and CESifo*⟩

> ▷ Covered by *Forbes*

2020  "Global Mobility and the Threat of Pandemics: Evidence from Three Centuries", CGD Working Paper 560, Washington, DC: Center for Global Development (with Thomas Ginn). ⟨*Co-released with IZA*⟩

> ▷ Covered by *Bloomberg*

2020  "Migration from Developing Countries: Selection, Income Elasticity, and Simpson's Paradox", CGD Working Paper 539, Washington, DC: Center for Global Development (with Mariapia Mendola). ⟨*Co-released with IZA and Centro Studi Luca d'Agliano*⟩

> ▷ Covered by *The Economist*; *United Nations Dispatch*; *Bistandsaktuelt*; IZA Newsroom

2020  "The Emigration Life Cycle: How Development Shapes Emigration from Poor Countries", CGD Working Paper 540, Washington, DC: Center for Global Development. ⟨*Co-released with IZA*⟩

> ▷ Covered by *The Economist*; IZA Newsroom; *The Correspondent*; *Foreign Policy*; *Washington Examiner*; *Kehitys-Utveckling*

2019  "Measuring the Spatial Misallocation of Labor: The Returns to India-Gulf Guest Work in a Natural Experiment", CGD Working Paper. ⟨*Co-released with IZA*⟩

> ▷ Covered by *India Times*; *Khaleej Times*; *Gulf News*; *The National*

## Expert Reports in Litigation

2020  *Human Rights First v. Chad F. Wolf et al.* (US District Court DC, 1:20-cv-03764)

> ▷ The challenged Rule was enjoined by *Pangea Legal Services v. DHS* (3:20-cv-09253-JD)

## Book Chapters

2015  "Does Development Reduce Migration?", in Robert E. B. Lucas, ed., *International Handbook on Migration and Economic Development*, Northampton, Mass.: Edward Elgar Publishing, pp. 152–185. ⟨*Pre-pub. version*⟩

> ▷ Covered by *The Economist*; *New York Times*; *Foreign Policy*; *Der Spiegel*; *Neue Zürcher Zeitung*

2013  "Seize the Spotlight: A Case for GCC Engagement in Research on the Effects of Labor Migration". In *Labor Mobility: An Enabler for Sustainable Development*, Abu Dhabi: Emirates Center for Strategic Studies and Research, pp. 103–120. ⟨*Pre-pub. version*⟩

2012  "The Collision of Development Goals and Impact Evaluation", in Robert Peccoud, ed., *Evaluation and its Discontents: Do We Learn from Experience in Development?*, Proceedings of the 9th AFD-EUDN Conference, Paris: Agence Française de Développement, pp. 169–197.

2012  "Income per Natural: Measuring Development for People Rather Than Places", in Oliver Bakewell, ed., *Migration and Development*, The International Library of Studies on Migration series, London: Edward Elgar Publishing, Ch. 34 (with Lant Pritchett).

Case 6:22-cv-01130-DCJ-CBW    Document 194-8    Filed 11/03/23    Page 104 of 134 PageID #:
Case 2:22-cv-00094-Z    Document 102-3    Filed 10/02/23    Page 28 of 35    PageID 1012
5503

## Book Chapters, *continued*

2011    "The Labor Mobility Agenda for Development", in Nancy Birdsall and Francis Fukuyama, eds. *New Ideas on Development after the Financial Crisis*, Baltimore: The Johns Hopkins University Press, pp. 260–287.

2011    "The Financial Consequences of High-Skill Emigration: Lessons from African Doctors Abroad", in Sonia Plaza and Dilip Ratha, eds. *Diaspora for Development in Africa*, Washington, DC: World Bank, pp. 165–182.

2011    "Genuine Savings Rates in Developing Countries", in Karl-Gustaf Löfgren and Chuan-Zhong Li, eds. *Green National Accounting And Sustainability*, Northampton, MA: Edward Elgar, pp. 653–676 (with Kirk Hamilton).

2010    "The Biggest Idea in Development That No One Really Tried", in Emily Chamlee-Wright, ed., *The Annual Proceedings of the Wealth and Well-Being of Nations: 2009–2010, Volume II*, Beloit, WI: Beloit College Press, pp. 25–50.

2006    "Aid and Growth: The Current Debate and Some New Evidence", in Peter Isard, Leslie Lipschitz, Alexandros Mourmouras, and Boriana Yontcheva, eds., *The Macroeconomic Management of Foreign Aid: Opportunities and Pitfalls*, Washington, DC: International Monetary Fund, pp 43–60 (with Steven Radelet and Rikhil Bhavnani).

2006    "A first look at the consequences of African health professional emigration", in Treasury of Australia and Reserve Bank of Australia, *G-20 Workshop on Demographic Challenges and Migration: Sydney, 27-28 August 2005*, Canberra: Commonwealth of Australia, pp. 195–231.

2003    "Absorptive capacity: How much is too much?" and "Exit: How long should the MCA commitment last?", in Steven Radelet, *Challenging Foreign Aid: A Policymaker's Guide to the Millennium Challenge Account*, Washington, DC: Center for Global Development (with Steven Radelet).

2001    "Are we saving enough for the future?", in Jonathan M. Harris, Timothy A. Wise, Kevin P. Gallagher, and Neva R. Goodwin, eds., *A Survey of Sustainable Development: Social and Economic Dimensions*, Washington, DC: Island Press, pp. 37–41 (with Kirk Hamilton).

1997    "Are we saving enough for the future?", in World Bank, *Expanding the Measure of Wealth: Indicators of Environmentally Sustainable Development*, Environmentally Sustainable Development Studies and Monographs Series, No. 17, Washington, DC: World Bank (with Kirk Hamilton).

1997    "The Hidrovia Paraguay-Parana: A Review and Analysis of the Feasibility Studies and Environmental Assessment in the Context of Regional Development", in Environmental Defense Fund, *The Hidrovia Paraguay-Parana Navigation Project: Report of an Independent Review*, Washington, DC: Environmental Defense Fund and Fundação Centro Brasileiro de Referência e Apoio Cultural/CEBRAC (with Thayer Scudder).

## Policy Writings

2023    "Why We Won't Reach a 'Climate Migrant' Protection Category—And What We Can Do Instead", Washington, DC: Center for Global Development, Jun. 8 (with Sam Huckstep).

2023    "Climate Change and Migration: An Omnibus Overview for Policymakers and Development Practitioners", CGD Policy Paper 292, Washington, DC: Center for Global Development, May 9 (with Sam Huckstep).

2022    "Do Cash Transfers Deter Migration?", CGD Policy Paper 270, Washington, DC: Center for Global Development, Oct. 19. *(Co-released with IZA)*

2022    "Doing Refugee Integration Better: Three Lessons from the Latest Research", Washington, DC: Center for Global Development, Oct. 19.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 105 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 29 of 35   PageID 1013
5062

## Policy Writings, *continued*

2022    "Pathways for Labor Migration from Northern Central America: Five Difficult but Necessary Proposals", *North and Central American Task Force on Migration*, World Refugee and Migration Council, Jan. 13. ⟨*Co-released with CGD and IZA*⟩

2021    "Australia needs more Pacific mid-skill migration: Here's how to facilitate it", *DevPolicy*, Oct. 15 (with Satish Chand and Helen Dempster).

2021    "Expanding Legal Migration Pathways from Nigeria to Europe: From Brain Drain to Brain Gain", World Bank-CGD report, Jul. 19 (with Samik Adhikari, Helen Dempster, and Nkechi Linda Ekeator). ⟨*Jointly released by World Bank*⟩

     ▷ Policy brief: "Why Europe Should Build Legal Migration Pathways with Nigeria"
     ▷ Covered by *Handelsblatt*, *This Day*

2021    "The Real Root Causes of America's Border Crisis: And How Biden Can Address Them", *Foreign Affairs*, Jun. 7.

2021    "Ethical Recruitment of Health Workers: Using Bilateral Cooperation to Fulfill the World Health Organization's Global Code of Practice", CGD Policy Paper 212 (with Helen Dempster), May 27.

     ▷ Covered by *New York Times*

2021    "The Missing Piece in Biden's Plan for Central America: Bilateral Labor Agreements", CGD blog, Feb. 9.

2021    "Should the Threat of Pandemics End the Age of Mobility?", *Think Global Health*, Jan. 28 (with Thomas Ginn).

2020    "How economic development shapes migration: Facing the emigration life cycle", *Migration Policy Practice*, 10 (4): 31–34 (with Cassandra Zimmer).

2020    "Restricting Mobility Will Not Stop the Next Pandemic", CGD Commentary and Analysis, Dec. 10 (with Thomas Ginn and Reva Resstack).

2020    "Harnessing Northern Triangle Migration for Mutual Benefit", *White House and the World Policy Brief*, Dec. 3 (with Reva Resstack and Cassandra Zimmer).

2020    "How economic development shapes emigration", *VoxDev* (commissioned), Sep. 21.

2020    "Emigration Rises Along with Economic Development. Aid Agencies Should Face This, but Not Fear It", CGD blog, Aug. 18.

2020    "The Future of Legal Migration: Labour Migration Pathways Between Europe and Africa", in Matteo Villa, ed., *The Future of Migration to Europe*, Milan: ISPI Istituto per gli Studi di Politica Internazionale (with Helen Dempster and Katelyn Gough).

2020    "Migration and household finances: How a different framing can improve thinking about migration", *Development Policy Review*, 38 (1): 3–27 (with Timothy N. Ogden). ⟨*Pre-pub. version at CGD*⟩

2020    "Shared Border, Shared Future: A U.S.-Mexican Bilateral Worker Agreement", in Alex Nowrasteh and David J. Bier, eds., *12 New Immigration Ideas for the 21st Century*, Washington, DC: Cato Institute.

2019    "Three Facts You Haven't Heard Much About Are Keys to Better Policy Toward Central America", CGD blog, Nov. 1 (with Jimmy Graham).

     ▷ Covered by *Mother Jones*

2019    "Promoting New Kinds of Legal Labour Migration Pathways Between Europe and Africa", CGD Policy Brief (with Helen Dempster and Katelyn Gough).

2019    "The President Has Mostly Wiped out US Refugee Resettlement. Other Countries Aren't Picking up the Slack", CGD blog, Feb. 6.

2019    "La migración es lo que hacemos de ella", *Política Exterior*, No. 187. Jan./Feb. (with Cindy Huang, Jimmy Graham, and Kate Gough).

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 106 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 30 of 35   PageID 1014
5508

## Policy Writings, *continued*

2018  "A Tool to Implement the Global Compact for Migration: Ten Key Steps for Building Global Skill Partnerships", CGD Brief, Dec. 4.

2018  "Migration as a form of development: New kinds of regulations to create shared benefits", *Migration Policy Practice*, 8 (3): 6–11.

2018  "The Economic and Fiscal Effects of Granting Refugees Formal Labor Market Access", CGD Working Paper 496 (with Cindy Huang and Jimmy Graham).

    ▷ Covered by *Politico*, *Apolitical*

2018  "Countries should train migrants coming to work—before they arrive", *Apolitical*, June 29 (with Kate Gough).

2018  "Migration Is What You Make It: Seven Policy Decisions that Turned Challenges into Opportunities", CGD Note, May 30 (with Cindy Huang, Jimmy Graham, and Kate Gough).

2018  "Can Development Assistance Deter Emigration?", CGD Policy Brief, Feb. 12 (with Hannah Postel).

2018  "The Best Ideas for Making Migration Work", *Refugees Deeply*, Jan. 25 (with Katelyn Gough).

2017  "Migration is a Form of Development: The Need for Innovation to Regulate Migration for Mutual Benefit", Technical Paper No. 2017/8, UN Department of Economic and Social Affairs, Population Division. New York: United Nations.

    ▷ Covered by *El Periódico*

2017  "Regional Security Means Border Security: New Data on Why Central American Children Flee to the United States ", *War on the Rocks*, Texas National Security Network, 30 November.

2017  "Migrants will keep coming. We should give them the skills they need to thrive", World Economic Forum *Agenda*, 15 November.

2017  "The Need for a Bilateral Labor Agreement Between the US and Mexico, and the Responsibility for Leadership", Keynote speech at the conference *¿Qué hacer frente a la crisis migratoria? Nuevas visiones y propuestas de acción*, Universidad Nacional Autónoma de México, Mexico City, jointly sponsored by Colmex and CIDE, 23 October. ⟨*En español*⟩

2017  "The labour market impact of refugee waves", *CentrePiece* 22 (3, October): 26–28. London: Centre for Economic Performance, London School of Economics (with Jennifer Hunt).

2017  "The economic effects of refugees are largely down to decisions made by the countries which take them", *American Politics and Policy* blog, LSE United States Centre, Oct. 20.

2017  "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", CGD Policy Brief, Oct. 11.

2017  "Global Skill Partnerships: A Proposal for Technical Training in Settings of Forced Displacement", CGD Policy Brief, Oct. 11 (with Katelyn Gough).

2017  "Foreign Policy Is Migration Policy: Lessons from the Drivers of Central American Child Migration", CGD Policy Brief, Sep. 13 (with Hannah Postel).

2017  "How Central American Youth Test Outdated U.S. Immigration Laws", *Americas Quarterly*, Aug. 15.

2017  "The Real Economic Cost of Accepting Refugees", *Refugees Deeply*, Aug. 8.

2017  "Trump says banning immigrants helps US workers.  A leading economist says he's wrong", *Vox.com*, Aug. 3.

2017  "The debate over the Mariel boatlift, economics' most famous immigration controversy, explained", *Vox.com*, Jun. 23.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 107 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 31 of 35   PageID 1015
5034

## Policy Writings, *continued*

2017   "Does Kicking Out Mexicans Create Jobs? Here's what happened the last time an American president promised to create jobs by removing Mexican immigrants", *Politico*, Feb. 15.

2017   "Walling the U.S. Off From Mexico Won't Work", *U.S. News & World Report*, Feb. 2.

2017   "Don't despair, innovate—Now is the time to try new forms of development cooperation", *Devex* Global Views, Feb. 23.

2016   *Shared Border, Shared Future: A Blueprint to Regulate US-Mexico Labor Mobility*, Washington, DC: Center for Global Development (with Ernesto Zedillo and Carlos Gutierrez). ⟨*En español*⟩
   ▹ Covered by the *New York Times*; *Washington Post* [*bis*]; National Public Radio; *El Universal*; *La Crónica*

2016   "Development Aid to Deter Migration Will Do Nothing of the Kind", *Refugees Deeply*, Oct. 31.

2016   "World Bank's US dependency has to end: It's time to choose the institution's president based on merit rather than geopolitical considerations", *Politico Europe*, September 13.

2016   "Why today's migration crisis is an issue of global economic inequality", Ford Foundation *Equals Change* blog, July 29.

2016   "Global Skill Partnerships: A proposal for technical training in a mobile world", *OECD Development Centre blog*, April 19.

2016   "Time for philanthropists to get on board with migration", *Alliance* magazine, March.

2015   "A Self-Interested Approach to Migration Crises: Push Factors, Pull Factors, and Investing In Refugees", *Foreign Affairs*, Sept. 27 (with Justin Sandefur).

2015   "Gestionar la crisis migratoria desde el interés propio", *Política Exterior*, November-December (with Justin Sandefur).

2015   "Remittances 101 for Populist Politicians", *Views from the Center* blog, August 24.
   ▹ Covered by *Newsweek* and *ABC News*

2015   "Smart policy toward high-skill emigrants", *IZA World of Labor* 203, November.

2015   "Zero Illegal Immigration: A Thought Experiment (with Time Travel)", *Peregrine*, Issue 1502, Hoover Institution, Oct. 23.

2015   "The South Pacific Secret to Breaking the Poverty Cycle", *Huffington Post: Impact*, Sep. 15.

2015   "Why It's Time to Drop the 'Brain Drain' Refrain", *CGD Blog*, Jun. 30.
   ▹ Covered by *Forbes*

2015   "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", in Bertelsmann Stiftung, ed., *A Fair Deal on Talent: Fostering Just Migration Governance*, Gütersloh: Verlag Bertelsmann Stiftung, pp. 297–304.

2015   "In Haiti, U.S. rectifies missed opportunity to help", *The Hill* Congress Blog, Jan. 12 (with Royce Bernstein Murray).

2014   "The WHO Global Code of Practice: A Useful Guide for Recruiting Health Care Professionals? Lessons from Germany and Beyond", CGD Essay (with Steffen Angenendt and Meiko Merda). ⟨*Auf Deutsch*⟩

2014   "Let the People Go: The Problem With Strict Migration Limits", *Foreign Affairs*, 93 (1, Jan./Feb.): 152–159 (with Justin Sandefur). ⟨*Pre-pub. version*⟩

2014   "Skilled Migration from Mexico: Trends, Concerns, and Outlook", CGD Essay.  Washington, DC: Center for Global Development. ⟨*En español*⟩

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 108 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 32 of 35   PageID 1016
8505

## Policy Writings, *continued*

2013 "Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants", CGD Brief, April.  Washington, DC: Center for Global Development (with Lant Pritchett).

2013 "More Unskilled Workers, Please: The new immigration bill doesn't do nearly enough to address America's real labor shortage", *Foreign Policy*, July 8.

2013 "What Nativists Don't Want You to Know About Immigrants", *Boston Review*, June 3.

2013 "The New Transparency in Development Economics: Lessons from the Millennium Villages Controversy", *World Economics Journal* 14 (4): 77–97 (with Gabriel Demombynes). ⟨*Pre-pub. version*⟩

2013 "On the Move: The Highly Skilled (Turning 'Brain Drain' into 'Brain Gain')", World Bank Blog, October.

2013 "What Do We Know About Skilled Migration and Development?", Policy Brief No. 3, September. Washington, DC: Migration Policy Institute.

2013 "The Big Picture on Global Talent: How to better compete for, and grow talent". Paper prepared for the Salzburg Trilogue, August 30. Bertelsmann Stiftung (with Christal Morehouse).

2012 "L'affrontement entre les objectifs de développement et l'évaluation d'impact", *Revue d'économie du développement*, 26 (4): 175–205.

2012 "Crossing borders to escape natural calamities is no easy option", *The Guardian*, Aug. 23.

2012 "How the Training of Emigrant Professionals Can Be Financed by Destination Countries", Presentation at the Global Economic Symposium, 2012, Rio de Janeiro, October 16–17.

    ▷ *First public discussion of the Global Skill Parnership proposal*

2011 "Putting solutions on trial: Impact Evaluation and the Millennium Villages Experiment in Africa", *Boston Review*, June 16.

2011 "Memo to the WHO: Blocking health worker migration is not the answer", *AidWatch* blog, April 26 (with Amanda Glassman).

2010 "The year when shrinking was good", *Foreign Policy*, Jun. 21.

2010 "Let Haitians come to the U.S.: The best way to help Haiti rebuild is through immigration", *Global Post*, Feb. 26.

2010 "Let them leave: Why migration is the best solution for Haiti's recovery", *Foreign Policy*, Jan. 27.

2010 "To help Haiti's earthquake victims, change U.S. immigration laws", *Washington Post*, Jan. 24, p. B2.

2010 "Heath Worker Migration: Disease or Symptom?", *Global Health*, Winter issue.

2009 "Migrants Count: Report of the Commission on International Migration Data for Development Research and Policy", Washington: Center for Global Development (with Patricia A. Santo Tomas and Lawrence H. Summers). ⟨*Arabic*, *French*, *Russian*, *Spanish*⟩

2009 "Skill Flow: A fundamental reconsideration of skilled-worker migration and development", background paper for the *Human Development Report 2009*, New York: United Nations Development Program.

2009 "Think Again: Brain Drain—The movement of skilled workers from poor countries to rich ones is nothing to fear. In the long run, it will benefit both.", *Foreign Policy*, Oct. 22 (with David McKenzie).

2008 "Immigrants are an Engine of Prosperity", *Atlanta Journal-Constitution*, Nov. 27.

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 109 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 33 of 35   PageID 1017
5506

## Policy Writings, *continued*

2007    "Smart Samaritans: Is There a Third Way in the Development Debate?", *Foreign Affairs*, 86 (5, Sept./Oct.): 132–140.

2006    "Le mythe des 0,7% : origines et pertinence de la cible fixée pour l'aide internationale au développement", *Afrique Contemporaine*, 219: 173-201 (with Todd J. Moss).

2005    "The Millennium Development Goals, Aid Targets, and the Costs of Over-Expectations", *Sustainable Development Law & Policy*, 6 (1): 58–84 (with Charles J. Kenny and Todd J. Moss).

2005    "Costs and Causes of Zimbabwe's Crisis", CGD Note, Washington, DC: Center for Global Development (with Todd J. Moss).

2005    "Aid and Growth: New evidence shows that aid flows aimed at growth have produced results", *Finance and Development*, 42 (3): 16–20 (with Steven Radelet and Rikhil Bhavnani).

2005    "Interpréter les OMD", *Courrier de la Planète.* 76: 18–21 (with Charles Kenny and Todd J. Moss).

## Comments and Reviews

2023    "A Landmark Study Debunks Populist Anti-Immigrant Narratives: Review of *Streets of Gold* by Abramitzky and Boustan", *The UnPopulist*, August 3.

2017    "Review of Patrick Kingsley, *The New Odyssey: The Story of the Twenty-First-Century Refugee Crisis*", *Population and Development Review*, 43 (2).

2015    "Mapping the Worm Wars: What the Public Should Take Away from the Scientific Debate about Mass Deworming", Views from the Center blog, July 30 (with Justin Sandefur).

2013    "Comments on 'Gender Equality and Development' by Esther Duflo", in Justin Yifu Lin and Claudia Paz Sepúlveda, eds., *Development Challenges in a Post-crisis World*, Annual World Bank Conference on Development Economics 2011, Washington, DC: World Bank.

2012    "Concerns about the Millennium Villages project report", *The Lancet*, 379 (9830): 1945 (with Jesse B. Bump, Gabriel Demombynes, and Lawrence Haddad).
       ▸ *This comment resulted in* a retraction *of findings in* the critiqued paper*.*

2012    "Multisector intervention to accelerate reductions in child stunting: an independent critique of scientific method", *American Journal of Clinical Nutrition*, 95 (3): 774–775 (with Gabriel Demombynes).

2009    "Thesis of a rigid revivalist: Review of *Dead Aid* by Dambisa Moyo", *Finance and Development*, 46 (3): 53–54.

2003    "Paul Streeten, *Globalisation: Threat or Opportunity?*", *Economic Development and Cultural Change*, 52 (1): 243–245.

## Other Research Papers

2007    "Do visas kill? Health Effects of African Health Professional Emigration", CGD Working Paper 114, Washington, DC: Center for Global Development.

2004    "The long walk to school: Development goals in historical perspective", CGD Working Paper 37, Washington, DC: Center for Global Development.

2004    "Inequality, Institutions and Long-Term Growth in Colombia", Manuscript (with William Easterly and Carlos Esteban Posada).

## Other Research Papers, *continued*

| | |
|---|---|
| 2003 | "Who Protected and Why? Tariffs the World Around 1870–1938", Harvard Institute of Economic Research Discussion Paper No. 2010, Dept. of Economics, Harvard University (with Christopher Blattman and Jeffrey G. Williamson). |
| 2002 | "World Bank Capital Neither Complements Nor Substitutes for Private Capital", CGD Working Paper 20, Washington, DC: Center for Global Development. |
| 2002 | "Do Rich Countries Invest Less in Poor Countries Than the Poor Countries Themselves?", CGD Working Paper 19, Washington, DC: Center for Global Development. |
| 1998 | "Estimating National Wealth: Methodology and Results", Environmental Economics Series, Paper Number 57, Washington, DC: World Bank (with Arundhati Kunte, Kirk Hamilton, and John Dixon). |

## Influence

| | |
|---|---|
| *Research* | Academic citation statistics at: Google Scholar │ SSRN │ RePEc IDEAS │ ResearchGate |
| | Invited to IOM Migration Research Leaders Syndicate, 2017 |
| | Top 0.4% of academic economists on RePEc IDEAS (221/61709), March 2011–March 2021 |
| | Replication data and code: https://dataverse.harvard.edu/dataverse/mclem |
| | "Six Vital Voices on the Economics of Migration", by *NewsDeeply* |
| *Social media* | "20 most influential think tank experts on Twitter, 2017" by ESGlobal. |
| | *Foreign Policy* magazine "Who's who of the foreign policy Twitterverse" 2012 and 2013. |

## Teaching

| | |
|---|---|
| 2023 | **Economic Problems and Public Policies** (Undergrad.), George Mason University |
| 2022 | **How Migration Policy Shapes Economies, Local and Global** (Master's), Georgetown University McCourt School of Public Policy and Walsh School of Foreign Service |
| 2003–2010 | **Macroeconomics** and **Thesis Advising** (Master's), Georgetown University McCourt School of Public Policy |
| 2005 | **Foreign Aid Effectiveness** (Ph.D.), University of Copenhagen |
| 2002 | Certificate of Distinction in Teaching, Derek Bok Center for Teaching & Learning, Harvard Univ. |
| 2001–2002 | **Economic Development in East Asia** (Undergrad.), Harvard Univ. Dept. of Economics |
| 2001 | **Globalization and History** (Undergrad.), Harvard Univ. Dept. of Economics |

## Education

| | |
|---|---|
| 2002 | **Ph.D., economics**, Harvard University Dept. of Economics, Cambridge, MA |
| | ▷ *NSF Graduate Research Fellowship; Derek Bok certificate of distinction in teaching* |
| 1997 | **M.S., econ. & environmental management**, Johns Hopkins University, Baltimore, MD |

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 111 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-3   Filed 10/02/23   Page 35 of 35   PageID 1019
5508

> *Abel Wolman Merit Scholarship*

1994    **B.S., engineering and applied science**, California Institute of Technology, Pasadena, CA

## Honors

2013    Royal Economic Society Prize for best paper published in the *Economic Journal* in 2012 (with co-authors Steven Radelet, Rikhil Bhavnani, and Sami Bazzi).

2010    Invited for 15th Sir Arthur Lewis Memorial Lecture, Eastern Caribbean Central Bank.

2010    Devex.com "40 young leaders shaping the way international relief and development assistance are being delivered".

1996–2000    National Science Foundation Graduate Research Fellowship.

## Peer Reviews

Referee reports for *American Economic Review, Quarterly Journal of Economics, Review of Economic Studies, Review of Economics and Statistics, Journal of the European Economic Association, Journal of Economic Literature, American Economic Journal: Applied Economics, American Economic Journal: Macroeconomics, Journal of Labor Economics, Journal of Human Resources, ILR Review, Labour Economics, Journal of Development Economics, Science, Science Advances, Journal of Economic Growth, Journal of Economic History, Economic Development and Cultural Change, Journal of International Economics, World Development, Journal of Population Economics, Journal of Health Economics, World Bank Economic Review, Journal of Politics, Scandinavian Journal of Economics, Economic Inquiry, Public Choice, European Economic Review, The Lancet, International Migration Review, Population and Development Review, Journal of Globalization and Development, Regional Science and Urban Economics, Journal of Economic Surveys, European Economic History Review, Journal of Development Effectiveness, Review of World Economics, Journal of Iberian and Latin American History, Journal of International Money and Finance, Economic Notes,* National Science Foundation, World Bank Research Committee, Princeton University Press, Oxford University Press, MIT Press, Stanford University Press, Zed Books, *Journal of Economics and Growth of Developing Areas, Health Affairs, Human Resources for Health, Financial History Review, Social Science & Medicine, Georgetown University Public Policy Review,* several external academic tenure reviews.

## Personal

Languages    English (native); Spanish (advanced)
             Portuguese, French, Turkish (intermediate)

*Updated August 25, 2023*

32

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-94 |
| | ) | |
| ALEJANDRO MAYORKAS, | ) | |
| in his official capacity as Secretary | ) | |
| of Homeland Security, et al. | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION,**
**INTERROGATORIES, AND REQUESTS FOR ADMISSION TO**
**PLAINTIFF TEXAS REGARDING STANDING**

Pursuant to Federal Rule of Civil Procedure 33, 34, 36, Defendants Alejandro Mayorkas, et al., hereby serve the following Requests for Production, Interrogatories, and Requests for Admission upon all Plaintiff the State of Texas. Plaintiff shall respond fully, in writing and under oath, in accordance with the Federal Rules of Civil Procedure.

## **DEFINITIONS**

1. "Applicant for Admission" means a noncitizen who is either an "arriving alien," as defined in 8 C.F.R. § 1.2, or has entered the United States, whether or not through a designated port of entry, and was placed in removal proceedings and claimed a fear of return to their country of origin. 8 U.S.C. § 1225(a)(1).

2. "Undocumented Immigrant" means a noncitizen who is not an Applicant for Admission and is present in the United States without lawful status.

3. "Asylum IFR" refers to the Interim Final Rule, the federal government published on March 29, 2022, at 87 Fed. Reg. 18,163 (Mar. 29, 2022).

4. "Document" means any record of information, including writings, data, correspondence, photographs, video and audio recordings, and images. It specifically includes all communications and electronically stored information, including text messages and emails.

5. "Southwest border" means the international border between the United States and Mexico.

6. "You" means any Plaintiff State, including all its agencies, subdivisions, and officers acting in official capacity.

7. "Noncitizen" means any person who is not a citizen of the United States.

8. "Asylee" means any person who has been granted asylum in the United States.

9. The time period for these demands pertain to the period of January 1, 2019 to the present, unless stated otherwise.

2

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 115 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-4   Filed 10/02/23   Page 4 of 14   PageID 1023
5112

## INSTRUCTIONS

1. Each interrogatory should be answered in full, in writing, and signed by the person answering, and any objections signed by the attorney making them.

2. If you object to any Interrogatory or to a part of an Interrogatory, clearly state the basis for the objection. If you object to only part of any Interrogatory, answer the remainder of the Interrogatory. If an objection is based on a claim of privilege or other protection, clearly state the particular privilege or protection invoked.

3. If you object to any Interrogatory or Request for Production, you must state whether you are withholding documents on the basis of that/those objection(s). FRCP 34(b)(2)(C).

4. For each Request for Production for which you are providing responsive documents, provide the Bates numbers of those documents which are responsive.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation in your motion for a preliminary injunction, ECF No. 21 at pg. 35, that "Should the Interim Final Rule go into effect, the number of illegal aliens in Texas, and thus Texas's spending related to illegal aliens, will continue to climb."

**REQUEST FOR PRODUCTION NO. 2:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that the Asylum IFR will result more in non-meritorious asylum claims being granted.

**REQUEST FOR PRODUCTION NO. 3:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation "Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens,"

3

as you allege in the Complaint, ECF No. 1, ¶ 54.

**REQUEST FOR PRODUCTION NO. 4:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that "Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens," as you allege in the Complaint, ECF No. 1, ¶ 55.

**REQUEST FOR PRODUCTION NO. 5:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that "Texas spends hundreds of millions of dollars each year for uncompensated care provided by state public hospital districts to illegal aliens," as you allege in the Complaint, ECF No. 1, ¶ 56.

**REQUEST FOR PRODUCTION NO. 6:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that "Texas spends tens of millions of dollars each year for increased law enforcement, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration," as you allege in the Complaint, ECF No. 1, ¶ 57.

**REQUEST FOR PRODUCTION NO. 7:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Asylees who have established residence in Texas.

**REQUEST FOR PRODUCTION NO. 8:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who have established residence in Texas.

**REQUEST FOR PRODUCTION NO. 9:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants who

have established residence in Texas.

**REQUEST FOR PRODUCTION NO. 10:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of individuals incarcerated or otherwise detained in prisons and jails operated or overseen by Texas or its agencies.

**REQUEST FOR PRODUCTION NO. 11:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings incarcerated or otherwise detained in prisons and jails operated or overseen by the Texas or its agencies.

**REQUEST FOR PRODUCTION NO. 12:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants incarcerated or otherwise detained in prisons and jails operated or overseen by Texas or its agencies.

**REQUEST FOR PRODUCTION NO. 13:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of asylees incarcerated or otherwise detained in prisons and jails operated or overseen by Texas or its agencies.

**REQUEST FOR PRODUCTION NO. 14:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the amount and type of funding or financial assistance the federal government or local governments contribute to Texas for the purposes of assisting in or supporting prisons and jails in the State.

**REQUEST FOR PRODUCTION NO. 15:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 118 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-4   Filed 10/02/23   Page 7 of 14   PageID 1026
5116

removal proceedings who have been convicted of crimes in Texas.

**REQUEST FOR PRODUCTION NO. 16:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who have been convicted of crimes in Texas.

**REQUEST FOR PRODUCTION NO. 17:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Asylees paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who have been convicted of crimes in Texas.

**REQUEST FOR PRODUCTION NO. 18:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who seek, receive, and/or require emergency health care services that are funded by Texas.

**REQUEST FOR PRODUCTION NO. 19:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrants who seek, receive, and/or require emergency health care services that are funded by Texas.

**REQUEST FOR PRODUCTION NO. 20:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of asylees who seek, receive, and/or require emergency health care services that are funded by Texas.

**REQUEST FOR PRODUCTION NO. 21:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the amount and type of funding or financial assistance you receive from the federal government, local governments, and/or other sources of

funding for the purposes of providing health care services to noncitizens.

**REQUEST FOR PRODUCTION NO. 22:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of minor Asylees enrolled in public school in Texas.

**REQUEST FOR PRODUCTION NO. 23:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings who are enrolled in public schools in Texas.

**REQUEST FOR PRODUCTION NO. 24:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Undocumented Immigrant children enrolled in public schools in Texas.

**REQUEST FOR PRODUCTION NO. 25:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the average cost per child per year of providing a public education.

**REQUEST FOR PRODUCTION NO. 26:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the amount and type of funding or financial assistance you receive from the federal government, local governments, and/or other sources of funding for the purposes of assisting in or supporting public education.

**REQUEST FOR PRODUCTION NO. 27:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the yearly income, sales, and property tax revenue collected by you from Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings.

**REQUEST FOR PRODUCTION NO. 28:** Provide all documents, including but not limited to,

writings, data, and correspondence that establish the yearly income, sales, and property tax revenue collected by Texas from Asylees.

**REQUEST FOR PRODUCTION NO. 29:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the economic impact to Texas and Texas businesses of labor shortages.

**REQUEST FOR PRODUCTION NO. 30:** Provide all documents, including but not limited to, writings, data, and correspondence that support your contention that illegal immigrants cause "social disorder" in Texas, as alleged in the Complaint, ECF No. 1, ¶ 57.

**REQUEST FOR PRODUCTION NO. 31:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission who applied for asylum living in Los Angeles, Miami, Newark, Boston, New York, and San Francisco that have moved to Texas, broken down by departure city and year.

**REQUEST FOR PRODUCTION NO. 32:** Provide all documents, including but not limited to, writings, data, and correspondence that establish the number of Applicants for Admission applying for asylum in Los Angeles, Miami, Newark, Boston, New York, and San Francisco who are likely to move to Texas in the next year, broken down by departure city.

**REQUEST FOR PRODUCTION NO. 33:** Provide all documents, including but not limited to, writings, data, and correspondence that show the number of Applicants for Admission, Aslyees, and Undocumented Immigrants who reside in Texas and have moved out of the state, each year.

**REQUEST FOR PRODUCTION NO. 34:** Provide all documents, including but not limited to, writings, data, and correspondence that you contend support your allegation that the Asylum IFR will incentivize noncitizens to file non-meritorious asylum claims, as you allege in the Complaint, ECF No. 1, ¶ 73.

**REQUEST FOR PRODUCTION 35**:  All documents, including but not limited to, writings, data, and correspondence, consulted or relied upon in responding to Defendants' interrogatories and requests for admission.

<u>**INTERROGATORIES**</u>

**INTERROGATORY NO. 1:** How many noncitizens have been granted asylum and established residence in Texas, by year, for years 2019-2022?

**INTERROGATORY NO. 2:** Describe your means of tracking the data requested in Interrogatory No. 1.

**INTERROGATORY NO. 3:** State, for the years, 2015-2022, the number of Applicants for Admission who were granted asylum while living in each of the following cities, who subsequently moved to Texas:

       a.  Miami

       b.  San Francisco

       c.  New York

       d.  Los Angeles

       e.  Boston

       f.  Newark

**INTERROGATORY NO. 4:** Describe your means of tracking the data requested in Interrogatory No. 3.

**INTERROGATORY NO. 5:**  Define "illegal immigration" with respect to your claim that "Texas spends tens of millions of dollars each year for increased law enforcement, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration," as you allege in the Complaint, ECF No. 1, ¶ 57—specifically stating whether illegal

immigration includes only Undocumented Immigrants or also includes Applicants for Admission, or Asylees who you content should not have been granted asylum.

**INTERROGATORY NO. 6**: How many Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings have established residence in Texas, by year, for years 2019-2022?

**INTERROGATORY NO. 7:** Describe your means of tracking the data requested in Interrogatory No. 6.

**INTERROGATORY NO. 8:** Do you contend that prior to the effective date of the Asylum IFR noncitizens were incentivized to enter the United States based on their perception that the United States has lax immigration enforcement policies?

**INTERROGATORY NO. 9:** Do you contend that noncitizens perceive USCIS to be more likely to grant asylum than Immigration Judges?

**INTERROGATORY NO. 10:** Do you contend that the Asylum IFR will increase the number of non-meritorious asylum claims that are filed or that are granted?

**INTERROGATORY NO. 11:** Do you contend that the Asylum IFR will cause the approval rate of non-meritorious asylum claims to increase?

**INTERROGATORY NO. 12:** Do you content that the Asylum IFR will incentivize noncitizens to cross the border between points of entry?

**INTERROGATORY NO. 13:** Identify all of the regulatory changes made through the Asylum IFR that you contend will incentivize immigrants who are not already motivated to come to the United States based on their perception of U.S. immigration policy, to now come to the United States.

**INTERROGATORY NO. 13:** State all grounds for your response to Interrogatories 8-12

including reference to any evidence supporting your contentions.

**INTERROGATORY NO. 14**: For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

**INTERROGATORY NO. 15:** Describe your injury with respect to claim for relief A in your complaint.

**INTERROGATORY NO. 16:** Describe your injury with respect to claim for relief B in your complaint.

**INTERROGATORY NO. 17:** Describe your injury with respect to claim for relief C in your complaint.

**INTERROGATORY NO. 18:** Describe your injury with respect to claim for relief D in your complaint..

**INTERROGATORY NO. 19:** Describe your injury with respect to claim for relief E in your complaint.

**INTERROGATORY NO. 20**: Explain how you will determine whether the Asylum IFR is the but-for cause of any expenditures by Texas for Applicants for Admission paroled by the federal government at the Southwest border pending their applications for asylum or their removal proceedings following the effective date of the Rule.

**INTERROGATORY N0. 21**: Explain how you will determine whether the Asylum IFR is the but-for cause of any expenditures for Asylees following the effective date of the Rule.

**INTERROGATORY NO. 22**: Do you contend that individuals paroled under the IFR to seek asylum in Los Angeles, Miami, Newark, Boston, New York, or San Francisco will settle in Texas?

Case 6:22-cv-01130-DCJ-CBW   Document 194-8   Filed 11/03/23   Page 124 of 134 PageID #:
Case 2:22-cv-00094-Z   Document 102-4   Filed 10/02/23   Page 13 of 14   PageID 1032
5081

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:** Prior to the effective date of the Asylum IFR you provided public benefits to individuals granted asylum by U.S. Citizenship and Immigration Services.

**REQUEST FOR ADMISSION NO. 2:** Prior to the effective date of the Asylum IFR you provided public benefits to individuals granted asylum by an Immigration Judge.

**REQUEST FOR ADMISSION NO. 3:** Prior to the effective date of the Asylum IFR, the federal government paroled Applicants for Admission at the Southwest border pending their applications for asylum or their removal proceedings.

**REQUEST FOR ADMISSION NO. 4:** Asylum grant rates fluctuate over time based on priorities and guidance issued by the Attorneys General.

**REQUEST FOR ADMISSION NO. 5:** Asylum grant rates fluctuate over time based on changes in Board of Immigration Appeals precedent.

**REQUEST FOR ADMISSION NO. 6:** Asylum grant rates fluctuate over time based judicial decisions.

**REQUEST FOR ADMISSION NO. 7:** Asylum grant rates fluctuate over time based on socio economic conditions in countries from which immigrants depart.

**REQUEST FOR ADMISSION NO. 8:** Asylees who meet Texas state income requirements are eligible for Medicare.

**REQUEST FOR ADMISSION NO. 9:** Asylees that do not qualify for Medicare under the rules of the State of Texas are eligible for Refugee Medical Assistance (RMA) for a period of eight months.

**REQUEST FOR ADMISSION NO. 10:** The shorter the time noncitizens expect to remain in the

United States while their asylum claims are pending, the less likely noncitizens are to file non-meritorious asylum claims.

Date:  June 10, 2022                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        *Principal Deputy Assistant Attorney General*

                                        WILLIAM C. PEACHEY
                                        *Director*
                                        Office of Immigration Litigation
                                        District Court Section

                                        EREZ REUVENI
                                        *Assistant Director*

                                        JOSEPH DARROW
                                        ELISSA FUDIM
                                        ERIN RYAN
                                        *Trial Attorneys*

                                        /s/ *Brian C. Ward*
                                        BRIAN C. WARD
                                        *Senior Litigation Counsel*
                                        U.S. Department of Justice
                                        Civil Division
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, DC 20044
                                        Tel.: (202) 616-9121
                                        Email: brian.c.ward@usdoj.gov

                                        SARAH STEVENS WILSON
                                        *Assistant Director*
                                        Office of Immigration Litigation
                                        Appellate Section

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) | No. 6:21-cv-00016 |
|  | ) |  |
| UNITED STATES OF AMERICA, *et al.* | ) |  |
|  | ) |  |
| Defendants. | ) |  |

### DECLARATION OF REBECCA WALTZ

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.      I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.      The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens with at least one felony or two misdemeanor convictions for

TX_000282

violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.      As a part of my employment with TDCJ, I am responsible for compiling the data to be included in TDCJ's application for federal reimbursement to the State Criminal Alien Assistance Program. These data sets include the number of correctional officers and their salary expenditures ( correctional officer is defined as a person whose primary employment responsibility is to maintain custody of individuals held in custody in a correctional facility) for the reporting period, information regarding maximum bed counts and inmate days, and information about the eligible inmates - (1) whom the agency incarcerated for at least four consecutive days during the reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably and in good faith believes were undocumented criminal aliens.

5.      TDCJ has sought reimbursement from the federal government through SCAAP since 1998.

6.      For the most recently completed SCAAP application (reporting period of July 1, 2018, through June 30, 2019), TDCJ reported data for 8,893 eligible inmates and a total of 2,385,559 days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2020 ($69.27) as reported by the Texas Legislative Budget Board by the number of days.  For example ($69.27 x 2,385,559 days = $165,247,672).

7.      SCAAP awards have not been distributed yet for this application period.

8.      It is my belief that to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.

9.      TDCJ incurs costs of housing, supervising, and providing health care to individuals whose detainers are canceled by federal immigration authorities. When those individuals are on parole or mandatory supervision, TDCJ incurs costs. Keeping detainees in TDCJ custody, or adding them to parole or mandatory supervision, who could have otherwise been detained and/or removed by federal immigration authorities, imposes greater burdens on the system. An estimate of the cost of parole or mandatory supervision for these inmates can be calculated by multiplying the average cost per inmate for active parole supervision for Fiscal Year 2020 ($4.64) as reported by the Texas Legislative Budget Board by the number of days. For example ($4.64 x 2,385,559 days = $11,068,994).

10.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of January 2022.

REBECCA WALTZ

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS, STATE OF LOUISIANA <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.* <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) )     No. 6:21-cv-00016 |

## <u>DECLARATION OF SUSAN BRICKER</u>

1.      My name is Susan Bricker. I am an adult and competent to testify. The information

and opinions contained in this declaration are based upon my personal knowledge, my review of

the relevant documents, and my knowledge, skills, training, and experience.

2.      I am currently the manager (Manager V) of the Health Program Outcomes and

Epidemiology Team ("HPOE") within the Office of Data, Analytics and Performance ("DAP")

(the office formerly known as the Center for Analytics and Decision Support -CADS) at the Texas

Health and Human Services Commission ("HHSC").

3.      A true and correct copy of my current curriculum vitae is attached to this declaration

as Exhibit 1, and it sets out the details of my education, qualifications, and my work experience. I

graduated from Emory University in May of 2001 with a master's degree in the science of

epidemiology.  Except for a brief eight-month period in 2014 when I worked in the private sector,

I've been employed at HHSC since 2007. In that time, I have worked as an Epidemiologist II

(2007-2012), Research Specialist V (2012-Jan. 2014), a Research Specialist V (Sept. 2014-Apr.

2018), a Program Specialist VII (May 2018-May 2021), and Manager V (June 2021-current). The

TX_000238

HPOE Team conducts and/or coordinates legislative and HHS-directed research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs.

4.    In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

5.    HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State.

6.    Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. Attached as Exhibit 2 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 Report. The total estimated cost to the State for the provision of Emergency Medicaid services to

undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62 million in SFY 2009, $71 million in SFY 2011, $90 million in SFY 2013, $73 million in SFY 2015, and $85 million in SFY 2017; the estimate in SFY 2019 was $80 million.

7.  The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. Attached as Exhibit 2 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 Report. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, $1.4 million in SFY 2013, $1.0 million in SFY 2015, and $1.2 million in SFY 2017; the estimate for SFY 2019 is $1.0 million.

8.  Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. Attached as Exhibit 2 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 Report. CHIP Perinatal Coverage expenditures were not included in HHSC's original Rider 59 Report because a full year of program data was not available when the report was prepared. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented

TX_000240

immigrants residing in Texas was $33 million in SFY 2009, $35 million in SFY 2011, and $38 million in SFY 2013, $30 million in SFY 2015, and $30 million in SFY 2017; the estimate for SFY 2019 is $6 million.

9.      In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

10.      Although all of these numbers are estimated costs for the respective programs, it is a certainty that each of these programs has some positive cost to the State of Texas due to utilization by undocumented immigrants.

11.      DAP can produce an updated report on the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. Because of other DAP workload, including ongoing reporting on the impacts of COVID-19 on Texas's vulnerable populations and demands associated with other litigation, and because the necessary data is not considered complete until eight months after the end of the fiscal year, we estimate that the report will be ready in December 2022.

12.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of January 2022.

Susan Bricker

Digitally signed by Susan Bricker
Date: 2022.01.07 14:32:52
-06'00'

_____

SUSAN BRICKER

TX_000242