**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| )<br>The STATE of ARIZONA, et al., )<br>)<br>   *Plaintiffs,* )<br>)<br>   v. )<br>)<br>MERRICK GARLAND, )<br>in his official capacity as )<br>Attorney General of the )<br>United States, *et al.*, )<br>)<br>   *Defendants.* )<br>) | Civil Action No. 6:22-cv-01130 |

**<u>MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................3

STANDARD OF REVIEW ...................................................................................7

ARGUMENT .......................................................................................................8

I.      PLAINTIFFS LACK ARTICLE III STANDING .......................................8

      A.      The States Have Not Established Injury in Fact ......................................9

            1.      Louisiana..................................................................................14

            2.      Florida .....................................................................................20

      B.      The States Cannot Show Traceability.................................................25

      C.      The States Cannot Show Redressability .............................................28

II.     PLAINTIFFS HAVE NOT IDENTIFIED A COGNIZABLE INJURY ..........................29

      A.      Asylum...............................................................................................30

      B.      Parole ................................................................................................33

III.    THE STATES DO NOT BENEFIT FROM SPECIAL SOLICITUDE HERE ................34

IV.     ALL OTHER STATES SHOULD BE DISMISSED FOR LACK OF INJURY .............35

V.      PLAINTIFFS' CLAIMS DO NOT FALL WITHIN THE ZONE OF INTERESTS........35

VI.     THE COURT LACKS JURISDICTION UNDER 8 U.S.C. § 1252(e) ...........................37

VII.    PLAINTIFFS' SECURE FENCE ACT CLAIM SHOULD BE DISMISSED.................38

VII.    THE TAKE CARE CLAUSE CLAIM MUST BE DISMISSED.....................................39

CONCLUSION....................................................................................................40

CERTIFICATE OF SERVICE .............................................................................42

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Arizona v. Biden*,
   31 F.4th 469 (6th Cir. 2022) .......................................................................... 28, 37

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) .......................................................................... 23, 31

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................................ 37

*Arpaio v. Obama*,
   27 F. Supp. 3d 185 (D.D.C. 2014) ................................................................ 23, 25

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ........................................................................ 23, 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................. 7

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) ........................................................................................ 24

*Biden v. Texas*,
   597 U.S. 785 (2022) ............................................................................................ 34

*Biodiversity Assocs. v. Cables*,
   357 F.3d 1152 (10th Cir. 2004) .......................................................................... 16

*California v. Texas*,
   141 S. Ct. 2104 (2021) ........................................................................................ 26

*City of Columbus v. Trump*,
   453 F. Supp. 3d 770 (D. Md. 2020) .................................................................... 39

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) ....................................................................... 19, 25, 26, 38

*Clarke v. Security Indus. Ass'n*,
   479 U.S. 388 (1987) ............................................................................................ 35

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ........................................................................ 27, 33

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .............................................................................................. 8

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) ........................................................................... 18

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ............................................................. 39

*Duarte ex rel. Duarte v. City of Lewisville, Tex.*,
    759 F.3d 514 (5th Cir. 2014) ............................................................... 9

*Egbert v. Boule*,
    142 S. Ct. 1793 (2022) ........................................................................ 40

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ............................................................. 36

*Florida v. Mellon*,
    273 U.S. 12 (1927) ......................................................................... 32, 33

*Florida v. United States*,
    No. CV 21-1066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) .................. 10, 11, 20

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) ........................................................................ 30

*Gen. Land Off. v. Biden*,
    71 F.4th 264 (5th Cir. 2023) .............................................................. 32

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ........................................................................ 32

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................ 34

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) .......................................................................... 40

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ............................................................................ 33

*In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*,
    No. MDL 1712, 2008 WL 2246989 (E.D. Pa. May 30, 2008) .................. 19

*In re Gee*,
    941 F.3d 153 (5th Cir. 2019) ............................................................. 19

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*,
    946 F.3d 649 (5th Cir. 2019) ............................................................. 28

*Las Americas Immigrant Advocacy Center v. Biden*,
   571 F. Supp. 3d 1173 (D. Or. 2021) ........................................ 39

*Lewis v. Casey*,
   518 U.S. 343 (1996) .................................................................. 21

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) .................................................................. 36

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555 (1992) ......................................................... *passim*

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................. 35, 36

*M.M.V. v. Garland*,
   1 F.4th 1100 (D.C. Cir. 2021) ................................................ 35

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ................................................ 40

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................... 39

*Paterson v. Weinberger*,
   644 F.2d 521 (5th Cir. 1981) ......................................... 7, 11, 12

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) .................................................................. 33

*Raines v. Byrd*,
   521 U.S. 811 (1997) .................................................................. 32

*Robbins v. Reagan*,
   616 F. Supp. 1259 (D.D.C.) ..................................................... 40

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) ................................................... 40

*Smith v. GC Servs. Ltd. P'ship*,
   986 F.3d 708 (7th Cir. 2021) ................................................... 19

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ......................................................... 15, 24

*State of Mississippi v. Johnson*,
   71 U.S. 475 (1866) .................................................................... 40

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................................... 29

*Summer v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................................... 23

*Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*,
    778 F.3d 502 (5th Cir. 2015) ........................................................................... 35

*Texas v. Biden* ("*MPP*"),
    20 F.4th 928 (5th Cir. 2021) ............................................................................ 24

*Texas v. United States* ("*DACA*"),
    50 F.4th 498 (5th Cir. 2022) ............................................................................ 24

*Texas v. United States*,
    106 F.3d 661 (5th Cir. 1997) ..................................................................... 32, 34

*Texas v. United States* ("*DAPA*"),
    809 F.3d 134 (5th Cir. 2015) ........................................................................... 24

*Thiebaut v. Colo. Springs Utils.*,
    455 F. App'x 795 (10th Cir. 2011) ................................................................... 35

*United States Trust Co. v. New Jersey*,
    431 U.S. 1 (1977) .............................................................................................. 16

*United States v. Fausto*,
    484 U.S. 439 (1988) ......................................................................................... 38

*United States v. Johnson*,
    319 U.S. 302 (1943) ......................................................................................... 15

*United States v. State of Arizona*,
    No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ........... 40

*United States* v. *Texas* ("*Priorities*"),
    143 S. Ct. 1964 (2023) ............................................................................. *passim*

*We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors*,
    809 F. Supp. 2d 1084 (D. Ariz. 2011) .............................................................. 35

*Webster v. Doe*,
    486 U.S. 592 (1988) ......................................................................................... 39

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021) .............................................................................. 27

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) ............................................................. 7

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ........................................................................... 35

## FEDERAL STATUTES

8 U.S.C. § 1103 ................................................................................ 34

8 U.S.C. § 1158 ............................................................................. 4, 37

8 U.S.C. § 1158(a) ........................................................................... 40

8 U.S.C. § 1158(a)(1) ........................................................................ 4

8 U.S.C. § 1158(d)(7) ...................................................................... 37

8 U.S.C. § 1182(a)(6)(C) ................................................................... 4

8 U.S.C. § 1182(a)(7) ......................................................................... 4

8 U.S.C. § 1182(d)(5) ....................................................................... 17

8 U.S.C. § 1182(d)(5)(A) ............................................................. 29, 40

8 U.S.C. § 1225 ................................................................................ 30

8 U.S.C. § 1225(a)(2)(A)(iii) ............................................................. 5

8 U.S.C. § 1225(b) ........................................................................... 39

8 U.S.C. § 1225(b)(1) ................................................................. *passim*

8 U.S.C. § 1225(b)(1)(A)(i) ............................................................... 4

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................................. 4

8 U.S.C. § 1225(b)(1)(B)(i) ............................................................... 5

8 U.S.C. § 1225(b)(1)(B)(ii) ...................................................... 4, 5, 38

8 U.S.C. § 1225(b)(1)(B)(iii)(I) ......................................................... 5

8 U.S.C. § 1225(b)(1)(B)(iii)(II) ........................................................ 4

8 U.S.C. § 1225(b)(1)(B)(iv) ............................................................. 4

8 U.S.C. § 1225(b)(1)(B)(v) .............................................................. 4

8 U.S.C. § 1225(b)(1)(C) ................................................................................ 5

8 U.S.C. § 1225(b)(2)(A) .............................................................................. 20

8 U.S.C. § 1225(e)(2) ..................................................................................... 5

8 U.S.C. § 1226(a) ................................................................................... 20, 29

8 U.S.C. § 1226(e) ....................................................................................... 38

8 U.S.C. § 1226a(b)(1) ................................................................................. 38

8 U.S.C. § 1229a ................................................................................. 5, 20, 37

8 U.S.C. § 1229c(f) ....................................................................................... 38

8 U.S.C. § 1231(h) ....................................................................................... 38

8 U.S.C. § 1252(a)(2)(A) .......................................................................... 38, 39

8 U.S.C. § 1252(a)(2)(A)(iii) ........................................................................... 5

8 U.S.C. § 1252(a)(2)(A)(iv) .......................................................................... 39

8 U.S.C. § 1252(a)(2)(B)(ii) ........................................................................... 38

8 U.S.C. § 1252(a)(2)(C) ............................................................................... 38

8 U.S.C. § 1252(a)(5) .................................................................................... 38

8 U.S.C. § 1252(b)(4)(D) .............................................................................. 38

8 U.S.C. § 1252(b)(9) .................................................................................... 38

8 U.S.C. § 1252(d) ....................................................................................... 38

8 U.S.C. § 1252(e) ........................................................................................ 38

8 U.S.C. § 1252(e)(2) ...................................................................................... 5

8 U.S.C. § 1252(e)(3) ............................................................................ 3, 38, 39

8 U.S.C. § 1252(f) ........................................................................................ 38

8 U.S.C. § 1252(f)(1) .................................................................................... 30

8 U.S.C. § 1252(g) ....................................................................................... 38

8 U.S.C. § 1701 ........................................................................................... 39

Pub. L. No. 109-367.................................................................................................. 39

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b) ................................................................................................ 2

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 7, 36

Fed. R. Civ. P. 12(b)(6)....................................................................................... 7, 39

## FEDERAL REGULATIONS

8 C.F.R § 208.2(a)................................................................................................... 13

8 C.F.R. § 208.9(a).................................................................................................. 13

8 C.F.R. § 208.30.................................................................................................... 13

8 C.F.R. § 208.30(d) ................................................................................................. 4

8 C.F.R. § 208.30(d)(4)............................................................................................. 4

8 C.F.R. § 208.30(d)(5)............................................................................................. 4

8 C.F.R. § 208.30(f) .................................................................................................. 5

8 C.F.R. § 235.3(b)(1)(ii).......................................................................................... 4

8 C.F.R. § 235.3(b)(2)(i)............................................................................................ 4

8 C.F.R. § 235.3(b)(6)................................................................................................ 4

8 C.F.R. § 235.3(b)(7)................................................................................................ 4

8 C.F.R. § 1003.42(d) ................................................................................................ 4

8 C.F.R. § 1003.42(f) ................................................................................................. 5

8 C.F.R. § 1208.30(g)(2)............................................................................................ 4

8 C.F.R. § 1208.30(g)(2)(iv)(A) ................................................................................ 5

## FEDERAL REGISTER

69 Fed. Reg. 48877 (Aug. 11, 2004) ................................................................................. 3

86 Fed. Reg. 46906 (Aug. 20, 2021) ................................................................................. 5

87 Fed. Reg. 18078 (Mar. 29, 2022) ........................................................................... *passim*

88 Fed. Reg. 11704 (Feb. 23, 2023) ............................................................................... 10

88 Fed. Reg. 31314 (May 16, 2023) ................................................................................. 5

## LEGISLATIVE HISTORY

S. Rep. No. 111-31 .......................................................................................................... 39

## MISCELLANEOUS

EOIR, "Workload and Adjudication Statistics," *Asylum Decision Rates in Cases Originating with a Credible Fear Claim*, https://www.justice.gov/eoir/workload-and-adjudication-statistics (last updated Dec. 8, 2023) ......................................................................................... 7

## INTRODUCTION

The Court should dismiss this case challenging an interim final rule ("IFR") jointly issued by the Departments of Justice and Homeland Security, entitled *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078 (Mar. 29, 2022), because Plaintiffs lack Article III standing and because their claims are not justiciable before this Court.

The IFR makes important changes to the expedited removal process that allow for, among other things, a more efficient application of the expedited removal provisions that facilitate the Department of Homeland Security's ("DHS") removal of certain noncitizens with non-meritorious asylum claims more quickly. *Id.* at 18088. By removing various operational constraints, the IFR avoids the need to process these noncitizens "through the lengthy and backlogged ordinary section 240 [8 U.S.C. § 1229a] removal proceedings" in the immigration courts, allowing "DHS to more efficiently obtain orders of removal." *Id.* at 18108-09. And for noncitizens with meritorious claims, the IFR creates a process that will allow noncitizens to receive protection more promptly without undue delays by having "their asylum claim adjudicated following an Asylum Merits interview before a U.S. Citizenship and Immigration Services ["USCIS"] asylum officer in the first instance, rather than by an [immigration judge] in section 240 removal proceedings" in immigration court. *Id.* at 18085, 18088. The IFR will thus reduce the overall workload and backlog of cases in the immigration courts, allowing those courts to focus "on other priority work." *Id.* at 18089. By ensuring that "individuals who are ineligible [for asylum or other protection] may more promptly be ordered removed," *id.* at 18088, and "by reducing the amount of time a noncitizen can expect to remain in the United States" while their asylum claims are pending, the rule "reduces a critical incentive for noncitizens not in need of protection to exploit the system." *Id.* at 18192.

Notwithstanding these reasonable goals aimed at curtailing irregular migration by expediting adjudication of asylum claims and removal of noncitizens lacking valid ones, 19 states led by Louisiana and Florida ("the States") challenge the IFR, claiming counterfactually that it increases unlawful migration to the United States generally and to their States specifically, and asking this Court to invalidate the IFR. The Court should reject their faulty premise—unsupported by any evidence—and dismiss this case under Federal Rule of Civil Procedure 12(b) for lack of jurisdiction and for failure to state a claim upon which relief can be granted.

First, the States have not shown an injury sufficient to support standing. Indeed, only Louisiana and Florida make any effort to meet the States' evidentiary burden—following discovery—of demonstrating standing by a preponderance of the evidence, and so all other Plaintiffs should be dismissed at the outset. As for Louisiana and Florida, they allege only speculative harm from unlawful immigration, which the Court cannot accept as true because Defendants are raising a *factual* attack on standing. Despite over a year of jurisdictional discovery, neither Louisiana nor Florida has produced any concrete evidence of harm, causation, or redressability. The undisputed evidence and the States' admissions establish that they have no evidence that they have incurred public costs from providing services to the limited cohort of noncitizens processed for asylum under the IFR. Further, total encounters of noncitizens at the border were *lower* in the months after the IFR took effect, as was the asylum grant rate by asylum officers pursuant to the IFR compared to grant rates in immigration court, undermining the States' theory of injury that the IFR incentivizes immigration and makes it easier for noncitizens to obtain asylum and settle in the United States.

Second, even if the States had put forward competent evidence of their alleged harms, none of the injuries they allege are cognizable injuries for purposes of establishing Article III standing.

*See United States v. Texas* ("*Priorities*"), 143 S. Ct. 1964 (2023). The States allege only speculative, indirect costs they might incur if the IFR increased the number of noncitizens residing in Louisiana and Florida. Following the *Priorities* decision, which rejected a similar standing argument by Texas, such allegations of indirect costs are no longer sufficient grounds to invoke Article III jurisdiction. *Id.* at 1972 n.3.

Third, the States' claims do not fall within the zone of interests of 8 U.S.C. § 1225(b)(1)—the statute their witnesses concede the IFR implements—because the States are not the object of the challenged regulatory action and therefore have no right of review. Fourth, this Court lacks jurisdiction over challenges to rules that implement section 1225(b)(1), because Congress has limited review of regulations implementing section 1225(b)(1), as the IFR does, to the United States District Court for the District of Columbia. *See* 8 U.S.C. § 1252(e)(3).

Finally, the States fail to state claims under the Secure Fence Act and Take Care Clause because neither provides an independent ground to challenge discretionary agency action implementing the Immigration and Nationality Act (INA). The Court should dismiss those claims (Counts III and VIII) as a matter of law.

## BACKGROUND

Expedited Removal. Congress authorized DHS to summarily remove from the United States certain noncitizens who arrive at or near ports of entry or "certain other [noncitizens]" who recently entered the country as designated by the Secretary. *See* 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3(b); 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004). Under this summary-removal mechanism—known as expedited removal—a noncitizen "arriving in the United States" who an immigration officer determines lacks valid entry documentation or makes certain kinds of material misrepresentations, shall be "order[ed] ... removed from the United States without further hearing

or review unless the [noncitizen] indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7).

Implementing regulations establish procedures to be used before effectuating an expedited removal order. Immigration officers must "advise the alien of the charges against him or her," provide "an opportunity to respond to those charges in the sworn statement," and provide an interpreter if needed. 8 C.F.R. § 235.3(b)(2)(i). A noncitizen may "present evidence" "that he or she was admitted or paroled into the United States," or was "physically present ... continuously for the 2-year period immediately prior to the date of determination of inadmissibility," and therefore is ineligible for expedited removal. *Id.* § 235.3(b)(1)(ii), (b)(6). And "any removal order," the "sworn statement," and any claims concerning a noncitizen's status "must be reviewed and approved by the appropriate supervisor before the order is considered final." *Id.* § 235.3(b)(7).

Additional procedures apply if a noncitizen asserts an "intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii); *see also id.* §§ 1158(a)(1), 1225(b)(1)(A)(ii). In that situation, a noncitizen is provided a non-adversarial interview with an asylum officer at which the officer determines whether the noncitizen has a "credible fear of persecution" or torture and is provided the right to request *de novo* review of that determination by an immigration judge ("IJ"), to consult with a person of the noncitizen's choosing during the credible fear process, and to an interpreter. 8 U.S.C. §§ 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(II), (b)(1)(B)(iv), (v); *see* 8 C.F.R. §§ 208.30(d), (d)(4), (d)(5); 1003.42(d), 1208.30(g)(2). If the asylum officer or IJ, upon review of an officer's negative credible fear finding, determines the noncitizen has a credible fear of persecution or torture, then the individual is "detained for further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), unless that individual is eligible for release on parole. Although § 1225(b)(1)(B)(ii) does not specify how that "further consideration" should occur, the

prior regulations provided that the noncitizen is placed in removal proceedings before an IJ under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). Alternatively, if both the officer and the IJ find that the noncitizen lacks a credible fear of persecution, the noncitizen shall be "removed from the United States without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)(iii)(I), (b)(1)(C); 1252(a)(2)(A)(iii), (e)(2); 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(A).[1]

 The IFR. On August 20, 2021, the Departments of Homeland Security and Justice jointly published a notice of proposed rulemaking ("NPRM"). The NPRM proposed amending the regulations governing the procedures implementing "further consideration of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii), for individuals subject to expedited removal who are found to have a credible fear of persecution or torture under 8 U.S.C. § 1225(b)(1), and the procedures addressing whether they may be released during the pendency of that application. 86 Fed. Reg. 46906 (proposed Aug. 20, 2021); *see also* 87 Fed. Reg. at 18079 (explaining that the NPRM proposed "to amend the regulations governing the process for further consideration of asylum and related protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture" under 8 U.S.C. § 1225(b)(1)(B)(i)-(ii)).

 On March 29, 2022, after receiving and reviewing public comments submitted in response to the NPRM, the Departments issued the IFR at issue in this case. 87 Fed. Reg. 18078. As the

---

[1] On May 12, 2023, DHS implemented the Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 16, 2023), to incentivize noncitizens to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The Rule—adopted after notice and opportunity to comment—imposes a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization or entry documentation and without having availed themselves of existing lawful pathways, unless they meet limited exceptions, or rebut the presumption by demonstrating exceptionally compelling circumstances detailed in the Rule. The Rule took effect when the Centers for Disease Control and Prevention (CDC)'s Title 42 public health Order ended. The Rule was vacated by a district court, *East Bay Sanct. Covenant v. Biden*, No. 18-06810, 2023 WL 4729278 (N.D. Cal. July 25, 2023), but that order was stayed pending appeal, No. 23-16032 (9th Cir. Aug. 3, 2023).

NPRM indicated, the Departments issued the IFR to implement § 1225(b)(1), which the IFR notes "provides that if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution, the noncitizen shall receive 'further consideration of the application for asylum.'" 87 Fed. Reg. at 18080. The "IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and [Convention Against Torture] protection, will occur." *Id.* at 18080; *see also id.* at 18085 ("[T]his rule establishes a new process by which such 'further consideration' may occur, wherein a noncitizen will have their asylum claim adjudicated following an Asylum Merits interview before a USCIS asylum officer in the first instance, rather than by an IJ in section 240 removal proceedings.").

The new processes for asylum adjudication in the IFR have been applied only to noncitizens in a limited group "whose intended destination is one of nine destination cities," which are "Arlington[, Virginia], Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco." Exhibit A (U.S. DHS, "Asylum Processing Rule Cohort Report – August 2023") at 1; USCIS, "FACT SHEET: Implementation of the Credible Fear and Asylum Processing Interim Final Rule."[2] The IFR "does not change the substantive standard for asylum eligibility." 87 Fed. Reg. at 18192. Indeed, for those noncitizens processed under the IFR, from June 2022 through August 2023—the period since the IFR was put in place through the most recent DHS data report—credible fear was found in 52% of cases, compared to 68% of cases in 2021, before the IFR was applied. Ex. A at "Outcome Summary"; U.S. DHS, "Credible Fear Cases Completed and Referrals for Credible Fear Interview."[3] Likewise, asylum officers granted asylum in only 22.1% of cases processed under the IFR, compared to asylum officer grant rates of 26-37%

---

[2] https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/fact-sheet-implementation-of-the-credible-fear-and-asylum-processing-interim-final-rule (last updated Oct. 17, 2023).

[3] https://www.dhs.gov/immigration-statistics/readingroom/RFA/credible-fear-cases-interview (last visited Dec. 16, 2023).

in Fiscal Years 2017 through 2021. Ex. A at "Outcome Summary"; 87 Fed. Reg. at 18116 n.57.

By further comparison, currently (for FY 2023), in asylum cases originating from credible fear

claims that are not processed under the IFR, IJs granted asylum 55% of the time (7,809 out of

14,173) in cases with merits dispositions (i.e., setting aside cases that were abandoned, closed, or

withdrawn). EOIR, Workload & Adjudication Statistics, "Asylum Decision Rates in Cases

Originating with a Credible Fear Claim."[4]

        This Case. On April 28, 2022, one month after the IFR was announced, the States filed a

complaint challenging it. ECF No. 2. The States filed a motion for a preliminary injunction,

subsequently withdrawn, and twice amended their complaint. ECF Nos. 14, 86. The operative

Second Amended Complaint alleges the IFR's asylum adjudication and parole provisions violate

the APA as arbitrary and capricious, the IFR is in excess of statutory authority, lacked notice and

comment, and violates the Secure Fence Act and the Take Care Clause of U.S. Constitution. ECF

No. 86. The Court permitted jurisdictional discovery to determine whether the States had standing

to bring this case. *See, e.g.*, ECF Nos. 88, 89, 98. Defendants now move to dismiss this case for

lack of jurisdiction and failure to state a claim upon which relief can be granted.

### STANDARD OF REVIEW

        Because this Rule 12(b)(1) motion follows jurisdictional discovery, it is a "factual attack"

on jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations," *Williamson v.*

*Tucker*, 645 F.2d 404, 413 (5th Cir. 1981), and the Plaintiffs have the burden of proving, by a

preponderance of the evidence, that the Court has subject-matter jurisdiction, *Paterson v.*

*Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). The Court must also dismiss claims under Rule

12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to state a

---

[4] https://www.justice.gov/eoir/workload-and-adjudication-statistics (last updated Dec. 8, 2023).

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING.

The States fail to offer evidence sufficient to establish any of the elements of standing, let alone by a preponderance of the evidence. To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" "caused" by the challenged government action that a favorable decision would "redress." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–62 (1992). The States bear the burden to "demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Yet, after over a year of jurisdictional discovery, Plaintiffs have failed to produce evidence establishing any of these requirements. Plaintiffs stated they intend to establish standing based only on alleged injuries to two States, Florida and Louisiana, ECF No. 98, and only those two States offered evidence purporting to show injury. Their injuries rely on the attenuated theory that the IFR increases migration to the United States or increases the number of noncitizens being granted asylum or parole while seeking asylum, that some portion of those noncitizens settle in Louisiana and Florida who otherwise would not have absent the IFR, and that the States may accrue an overall increase in costs they otherwise might not have due to noncitizens' use of public services. *See, e.g.*, ECF No. 86 ¶¶ 80-83, 96-98.

The evidence fails to support this theory at each step. There is no data suggesting the IFR is incentivizing more migration. Quite the opposite is true. The evidence shows that U.S. Customs and Border Protection's ("CBP") total encounters with noncitizens at the border were *lower* in the months after the IFR took effect, defeating Plaintiffs' claim that the IFR incentivizes migration. The IFR is not increasing the number of noncitizens being granted asylum or parole while seeking

asylum after receiving a positive credible fear determination: USCIS officers have not found that a noncitizen has a credible fear or granted asylum more often under the procedures implemented by the IFR. Finally, neither State produced any evidence indicating that state expenditures on services for noncitizens have increased due to the IFR. The States fail to show they have been, or will be, injured by the IFR, which precludes finding they have standing to challenge the IFR.

### A.  The States Have Not Established Injury in Fact.

To satisfy the "injury-in-fact" requirement of Article III, Plaintiffs must identify an injury that is "concrete … particularized" and "actual or imminent"—not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560; *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014). The *Priorities* decision makes clear the States' injuries are not even cognizable. *Infra* § II. But assuming *arguendo* they were cognizable, they still are not concrete, particularized, actual, or imminent and therefore cannot satisfy Article III.

For its injuries, Louisiana alleges that the IFR will incentivize illegal immigration and "cause an influx of aliens at the border" resulting in more migrants being detained and released into Louisiana, and increased expenditures on criminal enforcement, "education, healthcare, public assistance, and general government services." ECF No. 86 at ¶¶ 80-83. Louisiana also relies on self-serving and unsupported assertions of harm from immigration actions set forth in a Memorandum of Understanding (MOU) it drafted with outgoing officials under the previous Administration. *Id.* Florida alleges that it is harmed by the IFR increasing (1) illegal immigration to the United States and (2) the number of noncitizens who will reside in Florida after being granted asylum, with noncitizen residents incurring costs to the State in the form of criminal enforcement, victims' services, healthcare, drivers' licenses, and temporary cash assistance costs. ECF No. 86 at ¶¶ 96-98. When asked to identify the injuries supporting their claims in discovery, Plaintiffs stated that, in addition to these fiscal injuries, they suffer a "sovereign injury" when noncitizens

"enter their territory without proper legal authorization," "when their laws are broken by unauthorized aliens," "when they are forced to permit aliens in their territory," and "when they expend funds on aliens." Exhibit B (Pls.' Supp. Resp. to Defs' Discovery Requests) at Interrogatory No. 18. Plaintiffs also claim they "suffer a procedural injury" for their notice-and-comment claims. *Id.*

As these allegations illustrate, Louisiana and Florida's theory of standing is based on an argument that the IFR is likely to increase the number of noncitizens obtaining asylum, or being paroled while their applications for asylum are pending, which may increase the number of noncitizens in the State and thus increase the State's costs in terms of education, healthcare, and the provision of other social services to noncitizens.[5] *See* ECF No. 86 at ¶¶ 80-83, 96-98. But that is speculation upon speculation; the States have produced no evidence proving these claims.

In an attempt to support their theory that the IFR will result in more unlawfully present noncitizens residing in their territory, the States point only to materials addressing migration impacts allegedly stemming from *other* policies and border issues, *not* the IFR: Exhibit C (*Florida* Deposition of Raul Ortiz); Exhibit D (Migrant Protection Protocols fact sheet); Exhibit E ("Analysis of Smuggling Costs Along Southwest Border"); Exhibit F (news article); Exhibit G (*Florida* Declaration of Matthew Hudak), Exhibit H (Florida Declaration of Raul Ortiz); the *Florida v. United States*, -- F.Supp.3d --, 2023 WL 2399883, at *14-16 (N.D. Fla. Mar. 8, 2023) post-trial opinion and the trial testimony of U.S. Border Patrol Chief Raul Ortiz; and a DHS Notice of Proposed Rulemaking, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704 (Feb. 23, 2023). Ex. B at Request for Production ("RFP") Nos. 28, 32.

---

[5] Neither Louisiana nor Florida sought to prove an alleged injury due to law enforcement costs in discovery.

Similarly, Louisiana's identified evidence purporting to show that the IFR will result in more asylum seekers being paroled into the State than would be the case absent the IFR—an assortment of news articles about detainees and organizational webpages—evinces no connection to the IFR. Ex. B at RFP No. 31 (listing Exhibit I (news article); Exhibit J (immigration bonds ad); Exhibit V (news article); Exhibit K (news article); Exhibit L (Louisiana Advocates for Immigrants in Detention ad)). None of Louisiana's identified materials indicate an increase in migration, asylum rates, credible fear findings, or state service costs *caused by the IFR*.

Florida's only identified basis for its assertions that the IFR will increase its costs are references to a court decision in another jurisdiction in a case which did not involve the IFR, but rather addressed a challenge to parole practices for noncitizens who, unlike those subject to the IFR, were not processed through credible fear screening and expedited removal. Ex. B at RFP Nos. 33, 34 (citing *Florida*, 2023 WL 2399883, at *14-16); *see Florida*, 2023 WL 2399883 at *3-4 (making factual findings regarding the types of immigration processing pathways at issue in *Florida*, which did not include the expedited removal system). As with Louisiana, none of this unrelated material pertaining to other cases and distinct immigration issues indicates an increase in migration, asylum rates, credible fear findings, or state service costs *caused by IFR*, let alone by a preponderance of the evidence. *See Paterson*, 644 F.2d at 523.

While the States submit no evidence demonstrating the IFR is increasing immigration to the United States generally or their territories specifically, Defendants submitted expert evidence showing that the IFR does not cause an increase in immigration. Michael A. Clemens—a professor of economics who specializes in the cause and effects of international migration—specifically analyzed the States' allegations of harm in this case. Exhibit M (Expert Report by Michael A. Clemens). The States' theory is that the IFR "makes it easier for noncitizens with non-meritorious

11

asylum claims to be released into the United States," which will thus "induce an increase of immigration to the United States" and lead to the release of thousands of noncitizens into their States. ECF No. 86 at ¶ 67; Ex. M at 2. However, Prof. Clemens found there was no evidence that the IFR, by itself, was sufficient to have an impact on overall CBP's encounters at the Southwest Border. Ex. M at 3. In fact, Prof. Clemens concluded, the available data shows that encounters were *lower* in the months after the IFR took effect than before it, and the post-IFR trends in encounters of noncitizens affected by the IFR were "indistinguishable" from trends in encounters of similar noncitizens who were not affected by the IFR. *Id.* Thus, not only have the States failed to put forward *any* evidence to support their claim that the IFR specifically increases immigration, resulting in more asylum seekers in their territorys, but Defendants have put forward unrefuted expert evidence showing the exact opposite, shifting the burden to the States to rebut it. *See Paterson*, 644 F.2d at 523.

Even if Louisiana and Florida had identified evidence of the IFR affecting them in some way, it would not matter. The undisputed record evidence also demonstrates that, where the IFR's asylum-adjudication procedures have in fact been applied, it has not resulted in a higher rate of positive credible fear findings or asylum grants by asylum officers. USCIS maintains comprehensive data regarding outcomes of the IFR's application on its website. Since the IFR went into effect, in June 2022 through August 2023 there were a total of 5,884 credible fear outcomes for eligible noncitizens heading to one of the nine destination cities for which the IFR has thus far been implemented. Ex. A at "Outcome Summary." Of those, in 3,037 cases there was a positive credible fear finding—meaning the individual could further pursue asylum through the asylum-officer conducted asylum-merits interview ("AMI") process created by the IFR. *Id.* There was a negative credible fear finding—meaning the individual would be ordered removed unless

that determination was reversed by an IJ—in 2,435 cases. *Id.* This equates to asylum officers finding credible fear in 52% of cases under the IFR. *See id.* By comparison, before the IFR was applied, in 2021, the agency completed 43,958 credible fear cases, found credible fear in 29,869 of those and did not find credible fear in 11,711, for an overall credible fear finding rate of 68%. U.S. DHS, "Credible Fear Cases Completed and Referrals for Credible Fear Interview," *supra* n.3. Thus, the application of the IFR has not caused an increase in the number of cases where noncitizens have been permitted to pursue asylum as opposed to facing immediate removal.

The same is true for the asylum grant rate by asylum officers under the IFR. For Fiscal Years 2017 through 2021, prior to the IFR, overall approval rates for asylum claims adjudicated by both asylum officers[6] and immigration judges were in the 26–37% range. 87 Fed. Reg. at 18116 n.57. By comparison, of the 1,824 total AMI cases handled by asylum officers under the IFR through April 2023, asylum was granted in 404 cases, yielding an approval rate of approximately 22.1%. Ex. A at "Outcome Summary." This rate is significantly lower than the 31–39% IJ approval rate on asylum claims that started as credible fear screenings from FY 2017-2021. 87 Fed. Reg. at 18116 n.57. Thus, contrary to the States' unsupported assertions, the undisputed evidence demonstrates that the IFR has not caused an increase in the grant rate of asylum due to asylum officers handling more merits determinations. Thus, the IFR has not led to an increase in the number of noncitizens in the country either while seeking asylum or after being granted asylum, and indeed those numbers have fallen. Indeed, the States' own witness conceded any immigration impact from the IFR is "de minimis." Ex. R (Expert Deposition of Andrew Arthur) at 140:3-5.

---

[6] Even before the IFR took effect, asylum officers decided asylum claims in some circumstances, such as in affirmative asylum claims. *See* 87 Fed. Reg. at 18080 ("USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's affirmative asylum application should be granted."); 87 Fed. Reg. at 18111 ("Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect."); *see also* 8 C.F.R §§ 208.2(a), 208.9(a), 208.30.

It is unsurprising that the IFR has not increased the asylum grant rates given what it actually does. First, the IFR clearly states that it "does not change the substantive standards for qualifying for asylum." 87 Fed. Reg. at 18115. As the IFR explains, it was designed to *decrease* incentives for unlawful migration by individuals lacking valid asylum claims, and expedite the lawful removal of such individuals who do come to the United States:

> The Departments do not expect this rule to encourage or cause an increase in the number of individuals seeking asylum in the United States. As explained above, this rule is not expected to create any significant new incentives that would drive increased irregular migration. To the contrary, by reducing the amount of time a noncitizen can expect to remain in the United States with a pending asylum claim that originated in credible fear screening, the rule dramatically reduces a critical incentive for noncitizens not in need of protection to exploit the system. [...] This rule does not change the substantive standard for asylum eligibility[...].

87 Fed. Reg. at 18192. The IFR further states:

> [T]o the extent that the significant delays in the adjudication of asylum claims today contribute to rates of irregular migration, the Departments believe that the efficiencies introduced by the rule will help to reduce any incentive to exploit the system and enhance the Government's efforts to address irregular migration. By limiting the amount of time a noncitizen may remain in the United States while a claim for relief or protection is pending, the rule stands to dramatically reduce potential incentives for noncitizens to make false claims for relief and protection.

87 Fed. Reg. at 18111. The IFR thus weakens the incentives for individuals to come to the United States to raise non-meritorious claims for asylum The IFR does not change the standard for granting asylum but simply focuses on the process by which asylum claims will be adjudicated to allow for increased use of expedited removal and reduce the time it takes to resolve claims.

In addition to their meritless contention that the IFR will increase migration or asylum seekers in their territories, Louisiana and Florida allege harms in the form of costs incurred from providing various governmental services. None of these allegations demonstrate an actual injury from the IFR by a preponderance of the evidence, to the extent they relate to the IFR at all.

**1.     Louisiana**

According to the most current available data, in the entire time the IFR has been in operation, only 6 AMIs have been conducted out of the New Orleans field office, and *none* resulted in the grant of asylum. Ex. A at "AMI Cases." This means the IFR has not led to any noncitizens in Louisiana gaining the ability to settle in the United States permanently, which on its own dooms Louisiana's standing bid.  Their additional arguments are also unpersuasive.

Memorandum of Understanding (MOU).  Louisiana nevertheless argues in the Amended Complaint that its injuries are established *ipso facto* by the existence of a MOU drafted by the State and entered into with DHS on January 8, 2021—just twelve days before the conclusion of the last administration—purporting to stipulate that "policies that have the effect of easing, relaxing, or limiting immigration enforcement" or otherwise result in "significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Louisiana]." ECF No. 86 at ¶ 81. Louisiana's reliance on this MOU is misplaced.

Plaintiffs cannot rely on the MOU to confer standing or as an acknowledgment of irreparable harm, because injury is a jurisdictional requirement and must be established as a matter of fact. That is, standing cannot be manufactured via agreement. *See United States v. Johnson*, 319 U.S. 302, 304–05 (1943); *cf. Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Moreover, the MOU, which was void to begin with,[7] was terminated by DHS on February 2, 2021, more than a year before the IFR was published in March 2022 or implemented in May 2022. Exhibit N (DHS

---

[7] The MOU purports to contract away the federal government's power over immigration policy and enforcement pending review and comment by Louisiana's Department of Justice. But an outgoing administration cannot contract away the federal government's plenary power over the enforcement of immigration law. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors...."); *see also United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty"). Further, the statutory authority cited in the MOU does not contemplate DHS entering a contract to grant States the power to delay and review agency policy decisions.

Letter). And, finally, as set forth above, the IFR does not ease, relax, or limit immigration enforcement, nor have Plaintiffs shown that it has caused an increase of noncitizens entering Louisiana. For these reasons, Plaintiffs cannot affect an end-run around showing actual, concrete injury by relying upon a MOU that was terminated before the IFR was even drafted.

        <u>Public assistance and healthcare.</u> Both Louisiana and Florida claim they have suffered costs associated with providing services through the Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF")[8] programs. ECF No. 86 at ¶ 128. The States also claimed that they would incur costs from the IFR with respect to Medicaid and emergency Medicaid. *Id.* at ¶¶ 43, 96-97. But neither State produced any data showing that they have sustained any specific monetary cost associated with SNAP, TANF, Medicaid, or emergency Medicaid on behalf of noncitizens processed under the IFR. Florida stipulated that it does not track the information necessary to determine which, if any, individuals receiving SNAP, TANF, Medicaid, or emergency Medicaid were released pending their application for asylum or granted asylum under the IFR. Exhibit T (Joint Stipulation) at ¶¶ 4, 5. Mr. Andrew Arthur, Louisiana's 30(b)(6) witness, also testified that Louisiana similarly does not have this information. Exhibit O (Arthur 30(b)(6) Transcript) at 77:1-78:7; 80:9-16; 90:19-92:92:4; 108:8-17. Plaintiffs concede that the federal government fully funds both SNAP and TANF. Exhibit P (*Florida* Trial Day 4 Transcript) at 30:17-31:20, 37:6-13; Ex. O at 69:1-9; 87:16-21.[9]

        In fact, few noncitizens paroled under the IFR are even eligible for SNAP, TANF, or Medicaid benefits. Most noncitizens paroled into the country under 8 U.S.C. § 1182(d)(5)—

---

[8] The program in Louisiana is called Financial Independence Temporary Assistance Program (FITAP).

[9] The federal government also covers the States' administrative costs associated with TANF, and thus the States have no net injury. Ex. O at 69:1-9. As to SNAP, the States pay 50% of the administrative costs associated with the program. *Id.*; Ex. O at 68:12-16. Neither Louisiana nor Florida has shown that any of their administrative costs have increased overall as a result of providing benefits to noncitizens processed under the IFR.

whether under the IFR or otherwise—are not eligible for SNAP, TANF, or Medicaid benefits for five years after entering the country.[10] Exhibit S (Florida Noncitizen Guide); https://www.fns.usda.gov/snap/eligibility/citizen/non-citizen-policy; Ex. P at 52:13-18; Ex. O at 94:12-95:2; 96:3-12. The IFR has not yet been in effect for five years. Further, while noncitizens granted asylum under the IFR are eligible for SNAP, TANF and Medicaid benefits, that was true for asylees even before the IFR was implemented, and, as set forth above, Plaintiffs have not shown that asylum grant rates have increased since the IFR was implemented.[11] Neither have Plaintiffs demonstrated that anyone granted asylum under the IFR has received SNAP, TANF, or Medicaid benefits. Ex. P at 55:3-4; Ex. T at ¶¶ 4, 5; Ex. O at 98:12-19; 106:5-107:4. While Cubans and Haitians paroled into the United States under the IFR may also be eligible for SNAP, TANF, and Medicaid benefits, that was likewise true before the IFR. Plaintiffs have not demonstrated that more Cubans and Haitians have been paroled into the country and reside in Florida and Louisiana since the IFR was implemented, or that any such individuals received SNAP, TANF, or Medicaid benefits. *Id.*

The same is true as to emergency Medicaid. While emergency Medicaid is available regardless of immigration status, the States have not shown that they have made emergency Medicaid expenditures for any individuals that are in their States because of the IFR. *See* Ex. T at ¶ 4. Critically, the States have failed to show that any potential expenditures on emergency Medicaid for individuals paroled or granted asylum under the IFR have increased their overall

---

[10] Noncitizens from Colombia, Peru, the Dominican Republic, Ecuador, Brazil, and Nicaragua—who make up the majority of individuals who have received asylum merits interviews under the IFR —are not eligible for SNAP, TANF or Medicaid benefits for five years after being paroled under § 1182(d)(5). *See* https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report.

[11] Plaintiffs also have not shown that any non-meritorious claims were approved. Undisputedly, the fact that any State's costs might rise based on the presence of additional noncitizens who were properly granted asylum would not constitute a cognizable injury. *See, e.g., Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), aff'd, 797 F.3d 11 (D.C. Cir. 2015).

expenses in this area as a result of the IFR. Defendants provided Florida a list of names of noncitizens processed under the IFR and granted asylum and, to the extent Florida is even able to concretely identify benefits expenditures on behalf of those noncitizens, the States have still failed to show net cost increases, which is essential to their ability to demonstrate standing.

On this point, Florida and Louisiana have not shown that their costs associated with SNAP, TANF, Medicaid, or emergency Medicaid are different than what they would have been in the absence of the IFR. Afterall, even before the IFR, noncitizens were processed for asylum, some were paroled and some were granted asylum—and thus some were eligible for SNAP, TANF, Medicaid, or emergency Medicaid benefits. To satisfy Article III, monetary costs must be "concrete … particularized ... actual or imminent." *Lujan*, 504 U.S. at 560. That is, they must be "real." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Louisiana and Florida fail to show their alleged costs from providing SNAP, TANF, Medicaid, or emergency Medicaid benefits for noncitizens are actually and concretely any higher than costs they otherwise would have incurred providing these benefits to eligible asylees absent the IFR. An injury necessarily implies that some situation has gotten worse for the plaintiff relative to the status quo ante. *In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019) ("To the extent the challenged regulations require Plaintiffs to do what they've already been doing [], they do not have standing to challenge them."); *Smith v. GC Servs. Ltd. P'ship*, 986 F.3d 708, 711 (7th Cir. 2021) (finding plaintiff lacked standing where she was no worse off than if the challenged action had not occurred); *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, No. MDL 1712, 2008 WL 2246989, at *5 (E.D. Pa. May 30, 2008) (same). A plaintiff thus cannot show standing where the "present costs and burdens" existed "even before" the challenged policy "was enacted." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416-417 (2013). Here, the States offer nothing but unsupported speculation that the IFR might increase

the number of people eligible for certain programs. They have not shown the IFR is responsible for increasing their costs above the status quo absent the IFR.

Education.  Louisiana alleges sustained financial injuries from the expense of educating children who have come to the State as a result of the IFR. ECF No. 86 at ¶¶ 3, 69, 70. However, only single adults were processed under the first implementation of the IFR, Ex. A, and critically, the documents Louisiana produced demonstrate that the number of children educated in public schools in the State has *decreased* since the IFR was implemented. *See* Exhibit Q.[12] This demonstrable decrease defeats the State's claim that the IFR has caused it to spend more money on education. Furthermore, Louisiana admits it does not track the data necessary to know whether any children educated in Louisiana were either granted asylum or paroled under the IFR. Indeed, Louisiana concedes it does not track the citizenship status of students.  Ex. O at 60:19-24, 61:6-9. Instead, it purports to track students who learn English as a second language, *id*. at 44:15-18, but the State admits that English language learners are not synonymous with immigrants, *id*. at 52:9-12. And even if those terms were synonymous, Louisiana has failed to show that such learners are students present in the State, or that costs to the program increased, as a result of the IFR.

Finally, Louisiana argues that because the IFR speeds up processing times, more individuals may be eligible for benefits resulting from the grant of asylum or parole sooner. Ex. O at 61:6-15, 66:7-11; 67:25-68:8; 106:15-107:10. This argument lacks merit. It ignores both that grants of relief are lower in AMI cases under the IFR and that by decreasing processing times, individuals who are denied asylum may be removed from the country more quickly. *See* Ex. A at 6 (describing Median Processing Times for AMIs).

---

[12] These documents show the following numbers of students were educated before and after the March 2022 IFR: Feb. 2019 – 717,109; Oct. 2019 – 719, 812; Feb. 2020 – 716,416; Oct. 2020 – 699,625; Feb. 2021 – 697,337; Oct. 2021 – 690,092; Feb. 2022 – 686,337; Oct. 2022 – 685,606; Feb 2023 – 683,518. Thus, since the IFR was implemented, Louisiana has seen a decrease of 2,819 students. Ex. Q.

2.      **Florida**

At the threshold, Florida's attempt to demonstrate standing here based on an injury from a different policy in a different case is meritless. In jurisdictional discovery, Florida generally relied upon evidence adduced in the *Florida* case challenging parole practices not at issue here, and the factual findings made by that court to demonstrate injury. Defendants disagree with those findings and have appealed that decision. *Florida v. United States*, No. 23-11528 (11th Cir.). Regardless, any findings or evidence there demonstrating increased State costs does not demonstrate injury from the IFR, which was not challenged in that case. The processing dispositions the Court addressed there were release under 8 U.S.C. §§ 1226(a) of noncitizens placed directly into removal proceedings under 8 U.S.C. § 1229a and parole of noncitizens under 8 U.S.C. § 1182(d)(5)(A) pursuant to Parole Plus Alternatives to Detention (Parole+ATD) while charging documents for full removal proceedings could be prepared, not the asylum process or individuals paroled after being placed in expedited removal proceedings, such as relevant to the IFR. *Florida*, 2023 WL 2399883, at *4 (identifying the "most pertinent dispositions for this case" as "Notice to Appear/Own Recognizance (NTA/OR), Parole+ATD, and Warrant of Arrest/Notice to Appear (Warrant/NTA)"). That a court finds standing to challenge a parole policy addressing different facts and issues does not mean that Florida now has standing to challenge *any* use of parole or immigration policy without showing harm caused by the policy they actually challenge. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The actual-injury requirement would hardly serve [its] purpose … if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.").

Even if the Court could find causation for Florida's claimed injury from the IFR from a different and disparate case, the evidence Florida cites still fails to demonstrate injury here.

Although Florida alleges substantial cost increases across several programmatic areas as a result of the IFR, asylum officers out of the Miami Field Office have granted asylum to *only 56* noncitizens in the *entire time the IFR has been in operation* (for which data is available), and there is no evidence in the record indicating whether any of those noncitizens remained in Florida, used any State services, or committed any incarcerable crimes.[13] Ex. A at "AMI Cases."

Education. Florida concedes it does not track the immigration status of its students. Ex. T at ¶ 2.  Therefore, it further concedes, it does not track the information necessary to determine which, if any, individuals using the services of the Florida Department of Education ("DOE") were released pending their application for asylum or granted asylum under the IFR. *Id.* at ¶ 3. Florida also produced no evidence demonstrating its overall expenses on education have risen as a result of the IFR. These are facts Florida must, but failed to, establish to show education-cost injury in this case.

Economic assistance, healthcare, and victims' services. Florida's evidence purporting to show injury from the IFR in these categories is equally unavailing. The State's failure to demonstrate harm based on SNAP and TANF expenses has already been explained. *Supra* pp. 16-19. Florida concedes it does not track the information necessary to determine which, if any, individuals using the services of Florida's Agency for Healthcare Administration ("AHCA"), including but not limited to Medicaid, and the Florida Department of Children and Families ("DCF"), including but not limited to SNAP and TANF, were released pending their application for asylum or granted asylum under the IFR. Ex. T at ¶¶ 4, 5. While Defendants provided Florida

---

[13] In contrast, the *Florida* Court surmised that the state must be incurring costs because it found that "well over 100,000 aliens released at the Southwest Border under the challenged policies ended up in Florida." 2023 WL 2399883, at *14. Defendants disagree with that finding, but even so this case involves less than 0.25% of the number of noncitizens at issue in *Florida*, and thus that court's inference that Florida must be incurring costs based on the large volume of individuals at issue is wholly inapplicable here.

a list of noncitizens granted asylum under the IFR, even were Florida to attempt to demonstrate that it provided any economic or healthcare benefits to any of those noncitizens, it still would fail to demonstrate an injury in this area because Florida proffered no evidence showing that its overall AHCA or DCF costs have risen as a result of providing benefits to noncitizens processed under the IFR.

Drivers' licenses.  Not only does Florida lack any evidence that paroled asylum seekers have applied for drivers' licenses, *see* Exhibit U (*Florida* Deposition of Robert Kynoch) at 43:16-44:12, 57:14-58:13, but it also cannot claim a cost because the evidence shows Florida actually nets income from issuing licenses. Florida is charged $25 a month to access the SAVE identity-verification system for noncitizens and 50 cents for each verification, *id.* at 58:5-8, but easily recoups these costs and generates millions of dollars more by charging those noncitizens $25 for each identification card, *id.* at 59:12-14, and $48 for each driver's license, *id.* at 43:3-5.

Sovereign and procedural injuries. Both States claim injuries to their sovereignty from the speculated entry of noncitizens into their territory and their potential use of state services, as well as "procedural injury," presumably arising from their notice-and-comment claims. Ex. B at Interrogatory No. 18. Neither provides them standing here.

The presence of noncitizens whom the federal government permitted to enter the country within a State's borders is not an injury to its sovereignty, because the States agreed to cede the authority to determine which noncitizens may enter the country to the federal government when they ratified the Constitution and gave the federal government the power to "establish a uniform Rule of Naturalization." *See* U.S. Const., Art. I, § 8, cl. 4. "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Arizona v. Biden*, 40 F.4th 375, 386–87 (6th Cir. 2022). Thus, a state "has not suffered an injury in fact to a

legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio*, 27 F. Supp. 3d at 202 (D.D.C. 2014).

As for their "procedural injury," the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summer v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id.* Thus, even if the Court finds the IFR violated the notice-and-comment requirement, the States still must show a concrete injury beyond that procedural violation, which they have not done, as explained above. Plaintiffs cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in fact requirement of Article III." *Spokeo*, 578 U.S. at 341.

While the Fifth Circuit has previously found State standing to sue over immigration policies, the reasoning of those cases has been undermined by *Priorities*. *See infra* § II. Regardless, those cases involved substantially different policies and relied on evidence of purported harm not provided by the States here. *See Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("DAPA" case); *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) ("MPP" case); and *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ("DACA" case).

In the DAPA case, the Fifth Circuit found that the plaintiff States had standing to challenge the program because, if the program went into effect, it would enable at least 500,000 undocumented noncitizens in Texas to become eligible for State-funded benefits. 809 F.3d at 155. Thus, "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152-153. In the Migrant Protection Protocols ("MPP") case, the Court found that the plaintiff States had standing to

challenge the termination of MPP based upon the district court's factual finding that "MPP's termination has increased the number of immigrants paroled into Texas," 20 F.4th at 970, thereby resulting in increased costs to the State, *id*. at 970-72 (finding standing where the challenged action "increased the number of parolees in the state" overall). In the DACA case, the Court found the plaintiff States had standing to challenge the DACA program because there was evidence in the record that "if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs." 50 F.4th at 520. In each of those cases, the Fifth Circuit found standing based on the same rationale: clear evidence of more noncitizens in the State who qualify for State sponsored programs, meant more costs.[14]

Such a clear chain of causation and injury is wholly absent in this case. *See Clapper*, 568 U.S. at 409 (noting Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient."). Here, the evidence shows that the IFR's asylum adjudication provisions have not led to an increase in migration to the United States, have not resulted in more asylum grants than before the IFR existed, have not led to more individuals residing in the States and utilizing State services than absent the IFR, and have not injured the States in any cognizable way. As the States previously conceded, "if grant rates are flat or declined," or there is no evidence that "asylum recipients" are residing in Florida or Louisiana, then "the Plaintiff States will have a much more difficult hill to climb" to establish standing. *See* ECF No. 82-1 at 2 (noting Plaintiffs "would seriously consider voluntarily dismissing this suit" in these circumstances). Because the States have failed to show increased grant rates or asylees in these two States by a preponderance of the evidence, the Court should dismiss for lack of standing.

---

[14] Defendants dispute that standing was properly established in these three cases or that standing can be based on the presence of more people in a State. *See Arpaio,* 27 F. Supp. 3d at 202.

**B. The States Cannot Show Traceability.**

The States also lack standing because they cannot show traceability. First, any injury alleged by the States cannot be traced to the IFR, because as discussed above, total encounters at the border decreased after the IFR took effect, and asylum grants did not increase under the IFR. Point I.A. There is also no evidence of the increased costs the States alleged from the IFR.

Even if the States could show increased costs of education, law enforcement, medical services, and social services following the IFR, such costs would not be fairly traceable to the IFR, but rather would be the consequence of the "unfettered choices made by independent actors." *Lujan*, 504 U.S. at 562. Where causation hinges upon the choices of third parties, a plaintiff must adduce facts to show that those choices "will be made in such a manner that will produce causation and permit redressability of the harm." *Lujan*, 504 U.S. at 562. The Supreme Court has emphasized that standing is "substantially more difficult" to establish in those circumstances. *Lujan*, 504 U.S. at 562; *Priorities*, 143 S. Ct. at 1973; *see, e.g., California v. Texas,* 141 S. Ct. 2104, 2117 (2021).

*Priorities* emphasized that in our system of dual federal and state sovereignty created by the Constitution, "federal policies frequently generate indirect effects on state revenues or state spending," and that when a State's bid for standing is based on "only those kinds of indirect effects" from federal regulation, "the State's claim for standing can become more attenuated." 143 S. Ct. at 1972 n.3. The Court rejected such indirect harms as an independently sufficient basis to support standing. *See id.* ("In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.").

The States concede that they do not track data concerning expenditures on noncitizens in a way that would permit them to trace those expenditures to the IFR. Ex. T at ¶¶ 3-5; Ex. O at 44:15-18, 53:9-11 (education costs), 77:15-21 (SNAP and TANF costs), 98:12-100:7, 109:9-11 (Medicaid costs), 109:22-110:5 (admitting Louisiana does not know how many, if any, individuals

processed under the IFR in Louisiana would have remained and settled in the state). Given their lack of evidence connecting alleged expenses to noncitizens processed under the IFR, the States cannot directly trace the IFR to any harm to Florida and Louisiana, and raise only the same type of speculative, attenuated, and indirect harms courts have held are insufficient to meet their burden.

The D.C. Circuit rejected a materially identical theory of standing due to lack of traceability in *Arpaio*, 797 F.3d 11, where a county sheriff asserted that a federal immigration policy would result in more noncitizens remaining in his county and that "some portion of those [noncitizens] will commit crimes," *id.* at 24. The court held that even if the challenged policies increased unlawful immigration, one could not infer that the policies increase crime because "crime is notoriously difficult to predict.," as crime rates "are affected by numerous factors, such as the local economy, population density, access to jobs, education, and housing, and public policies." *Arpaio*, 797 F.3d at 22. Thus, the court concluded, "it is pure speculation whether an increase in unlawful immigration would result in an increase" in crime, and "where predictions are so uncertain, we are prohibited from finding standing." *Id.*; *see Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021) (noting "the attenuation in this chain of reasoning, unsupported by well-pleaded facts, is worthy of Rube Goldberg"). This rationale applies equally to the States' other alleged costs: whether noncitizens seek public benefits or services is also affected by numerous economic, social, and other factors and therefore also "uncertain" and "hard to predict." *See Arpaio*, 797 F.3d at 22. Traceability is all the more lacking in this case because the premise in *Arpaio*—that the governmental conduct had in fact increased immigration and the state's noncitizen population, *see id.*—does not exist here, where unrefuted evidence establishes that the IFR has not increased migration or asylum grant rates. *See Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) ("Mississippi only asserts … that DACA will cost the state money because

26

the state provides social benefits to" noncitizens but "was required to demonstrate that the state will incur costs because of the DACA program" and therefore failed to show standing).

Similarly, in *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022), the Sixth Circuit found that plaintiff states were not likely to be able to show their alleged injuries—including the cost of increased law enforcement and medical costs—were traceable to the federal government's immigration enforcement priorities, because they depended in large part upon the choices of third parties. *Id.* at 8. That is the case here: the States could potentially incur costs only if noncitizens, who would not have been granted asylum or parole but for the IFR, decide to settle in Florida or Louisiana, and then to avail themselves of public services. These are all uncertain, independent choices of third parties, severing any chain of causation to the IFR. Thus, not only can the States not show they were actually injured by the IFR, they also cannot trace any of their alleged injuries to the IFR, precluding standing.

### C.  Plaintiff Cannot Show Redressability.

The States also fail to demonstrate redressability for the relief they seek. "To establish standing, a plaintiff must show an injury in fact caused by the defendant and *redressable by a court order*." *Priorities*, 143 S. Ct. at 1970 (emphasis added) (citing *Lujan*, 504 U.S. at 560–561). The Court's judgment must actually "remedy the plaintiff's harms." *Id.* at 1979. "[R]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019).

Even if the States' claimed injury were likely to occur (and as shown, it is not), the relief they seek would not even partially remedy it. The States have not produced any evidence that more noncitizens have been granted asylum or been paroled under the IFR, moved to their States, and used services, than would have been in the absence of the IFR, or that their costs have increased as a result of the IFR.

Without an actual, traceable injury, there is no targeted relief this Court can provide to redress such an injury. "To establish redressability, a plaintiff must show from the outset of its suit that its injuries are capable of being remedied by a favorable decision." *Texas*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (cleaned up). Here, enjoining or vacating the IFR would not redress the States' alleged injuries from more noncitizens in their territory, but would likely do the opposite, because the IFR has led to a decreased asylum-grant rate, as explained. Even without the IFR, federal officials, including IJs, would retain the authority and discretion to grant asylum to noncitizens, and because the evidence shows that asylum officers grant asylum under the IFR no more frequently than IJs, removing the IFR would not redress their alleged harm. Likewise, regarding the States' challenge to the IFR's parole provision, even absent that authority, DHS would still retain the authority to parole many noncitizens seeking asylum under section 1182(d)(5)(A), which by its terms covers all applicants for admission, or release amenable noncitizens apprehended after crossing the border under 8 U.S.C. § 1226(a). Enjoining the IFR thus would not restrain the Executive's discretion over processing migrants at the border. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998) (finding no redressability where relief sought would not address the harms suffered).

Further, enjoining or vacating the IFR would not prevent noncitizens who are seeking asylum from choosing to remain in Louisiana or Florida (although, as noted, the number of noncitizens gratned asylum under the IFR thus far is minimal in Florida and zero in Louisiana). Instead, an injunction or vacatur of the IFR would merely remove a tool for quickly removing certain noncitizens who lack a lawful basis for remaining in the United States, and similarly remove a disincentive for noncitizens to illegally cross into the country without a legitimate asylum claim—*i.e.*, placement into expedited removal of noncitizens who could not previously be

processed for expedited removal due to operational constraints. 87 Fed. Reg. at 18108-19 (noting IFR will "allow[] DHS to place more eligible noncitizens, particularly noncitizen families, in expedited removal proceedings, rather than processing them through lengthy and backlogged ordinary … removal proceedings"). Similarly, enjoining or vacating the IFR would not prevent noncitizens paroled under other authority from residing in, or relocating to, Plaintiff States. Such an order would likely only *contribute* to the harms Plaintiffs allege, by taking away the government's carefully calibrated tool to *reduce* the number of noncitizens in the country awaiting removal proceedings, and quickly removing those without meritorious asylum claims. *Supra* § I.A.

Finally, redressability is lacking because the Court cannot enjoin or restrain the operation of section 1225(b)(1), which the IFR implements, under 8 U.S.C. § 1252(f)(1). That statute provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter," including 8 U.S.C. § 1225, "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Enjoining the government's chosen means of implementing the credible fear-screening procedures of section 1225(b)(1) would "order" Defendants "to refrain from taking actions to … implement" that section and therefore violate section 1252(f)(1). *See id.* Because this is the relief the States seek, and the Court is prohibited from granting it, Plaintiffs cannot obtain adequate redress and lack standing.

## II.    PLAINTIFFS HAVE NOT IDENTIFIED A COGNIZABLE INJURY.

Even if the States could show harm related to the IFR despite being unable to provide proof of any injuries during discovery, the States' claimed injuries are not of the type that have

traditionally been legally cognizable. The Supreme Court has recently instructed that "courts must remain mindful of bedrock Article III constraints in all cases, even those brought by States against an executive agency or officer." *Priorities*, 143 S. Ct. at 1972 n.3. Federal policies routinely have incidental effects on States' expenditures, revenues, and other activities. Yet such "attenuated" effects have historically not been viewed as judicially cognizable injuries. *Priorities*, 143 S. Ct. at 1972 n.3. The Supreme Court's *Priorities* decision seriously calls into question whether indirect State costs with respect to education, healthcare, or other services can be a basis for standing.[15]

In *Priorities*, the Supreme Court reaffirmed that courts must examine "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Id.* at 1970. In doing so, courts must consider if the "asserted injury" is the type that has "traditionally" been "redressable in federal court" and determine if the dispute is "traditionally thought capable of resolution through the judicial process." *Priorities*, 143 S. Ct. at 1970.

## A. Asylum

There is no historical tradition of States or any other third parties challenging grants of asylum to noncitizens. The States have not identified any lawsuits challenging such asylum grants, and Defendants are not aware of any such cases. The States' theory of injury is that the IFR will result in increased grants of asylum which will, in turn, affect their population. *See generally* ECF No. 86. But the Supreme Court has made clear that a State may not satisfy its standing burden by arguing that some change in federal policy may cause a change in population that may in turn cause indirect changes in States expenditures. *Priorities*, 143 S. Ct. at 1972, n.3. To allow such a challenge would open the door to an untold number of lawsuits on the basis that some government

---

[15] Courts recognize that "[c]ontingent injuries, especially those arising from the impact of regulations on third parties not before the Court," such as here, where the IFR regulates immigrants, not States, "rarely create cognizable cases or controversies." *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022).

action might indirectly affect a State's population. The absence during the vast majority of our Nation's history of suits like this one, premised on speculative indirect State costs from regulation of third parties, is powerful evidence that such suits are incompatible with our constitutional structure, which "contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (noting limits on State standing to raise claims against the Federal government). As the Fifth Circuit explained, a "State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).

The States' argument here is based entirely on alleged indirect costs from regulation, not of the States, but of noncitizens processed under the IFR. That "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else" on its own increases the difficulty, and concomitant evidentiary burden, of showing standing. *See Lujan*, 504 U.S. at 561. And as the Supreme Court long ago held, an indirect theory of harm based solely on the assertion that a change in federal policy will affect a State's population and in turn affect State revenue is insufficient to satisfy Article III. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927). Such injuries are "only remote and indirect" and insufficient to show the type of more "direct injury" required for standing. *Id*. at 18.

Following *Priorities,* it is no longer sufficient for a State simply to argue that some change in federal policy may cause a change in population that may in turn cause indirect changes in the State's expenditures on education, health care, law enforcement, or social services. 143 S. Ct. at 1972, n.3. While this theory of injury may have previously found support in the Fifth Circuit's case law, *see Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023), *Priorities* rejects it as a

basis for standing. Moreover, such costs are self-inflicted and traceable to decisions of State legislatures rather than to changes in federal policy. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). Finding standing whenever a change in federal policy might arguably cause some incidental costs to States would allow any State to challenge any change in immigration policy, and improperly draw courts into all sorts of generalized grievances on behalf of States who were unable to obtain their preferred policy outcomes through the political process. *See Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *see also Crane*, 783 F.3d at 252 (merely alleging that a policy increases "illegal immigration" that will require the state to spend money on social benefits does not confer Article III standing). A theory of standing that would allow any State to sue the federal government any time it changed federal immigration policy merely by saying the change might affect its population would vitiate the rule that "[t]he mere fact that a state is the plaintiff is not enough" to establish standing unless the State has suffered a concrete harm of the sort that traditionally "furnish[ed a] ground for judicial redress." *Mellon*, 273 U.S. at 17.

Finally, like the guidance at issue in the *Priorities* case, the decision to implement the IFR involved a "complicated balancing" of various factors, including "inevitable resource constraints." *Priorities*, 143 S. Ct. at 1972. The Supreme Court held these factors also weigh against finding under Article III or the APA that "federal courts" are "the proper forum for resolving" such disputes. *Id*. Here, DHS and DOJ faced difficult choices about how to allocate their limited resources in managing the Nation's immigration system, including border control, and promulgated the IFR to reduce "undue delays in the asylum adjudication system" and allow noncitizens ineligible for relief to be removed more promptly. 87 Fed. Reg. at 18088. Such difficult policy questions are not susceptible to judicial resolution because there are no "meaningful standards for assessing those policies," which "explain[s] why federal courts have not traditionally

entertained lawsuits of this kind." *Id*. at 1972-1973 (*citing Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985)); *see also Texas*, 106 F.3d at 667 (noting that 8 U.S.C. § 1103 "commits enforcement of the INA to" the Secretary's "discretion" and how the government pursues that enforcement "is unreviewable under the [APA] because a court has no workable standard against which to judge the agency's exercise of discretion").

### B.  Parole

The Court should also look to the historical absence of Supreme Court cases recognizing State challenges to the use of parole. Even though the Executive has long used the parole authority, the States have not identified a historical tradition of courts reviewing disputes between States and the federal government with respect to parole practices. Nor have the States "cited any precedent, history or tradition of courts" reviewing or ordering the Executive to change its use of its discretionary parole authority. *Priorities*, 143 S. Ct. at 1970. Indeed, the opposite is true. *See Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) (noting that "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment" on parole). The States allege harm based entirely on indirect costs from grants of parole pending adjudication of applications for asylum. Such an attenuated, speculative theory of harm based on changes in immigration policy does not present the type of concrete harm that has traditionally been viewed as sufficient to satisfy Article III or raise the type of dispute that is appropriate for resolution in the courts. The Supreme Court's decision in *Priorities* forecloses Plaintiffs' contrary arguments, as explained *supra*, and no binding Fifth Circuit law requires the Court to reach a different conclusion in this case.

### III.    THE STATES DO NOT BENEFIT FROM SPECIAL SOLICITUDE HERE.

In *Massachusetts v. EPA*, the Supreme Court stated that, in certain circumstances, a state litigant asserting a procedural right and quasi-sovereign interests could be entitled to "special

33

solicitude in [the] standing analysis." 549 U.S. 497, 520 (2007). But in *Priorities*, the Supreme Court made clear that the concept of "special solicitude" has no application when a state asserts standing based on the type of indirect costs that the States assert here. The majority in *Priorities* noted that plaintiffs based "part of their argument for standing" in that case on *Massachusetts*. 143 S. Ct. at 1975 n.6, but significantly, the Court failed to accord Texas the special solicitude articulated in *Massachusetts*. *Id*. at 1977 (Gorsuch, J., concurring) (highlighting this omission). Indeed, the Court held that "none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit." *Id*. at 1972 n.3. Because the plaintiffs in *Priorities* based their standing on the same theory of indirect costs that the States invoke in this case, *id.* at 1968-69, if special solicitude did not apply in *Priorities*, it should also not apply here. *See id.* at 1977 (Gorsuch, J., concurring) (explaining "it's hard not to think … that lower courts should just leave that idea [of special solicitude] on the shelf in future" cases).

*Priorities* also made clear that special solicitude does not apply to the basic APA procedural claim advanced in this case. The Supreme Court indicated that the states received special solicitude in Massachusetts because that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking," not just a garden-variety APA notice and comment claim. *See Priorities*, 599 U.S. at 685 n.6. And even if special solicitude applied here, it would not relieve the States of the obligation to meet the basic requirements of Article III by showing a concrete and particularized injury-in-fact traceable to the challenged agency action. *See Massachusetts*, 549 U.S. at 522. "Special solicitude" therefore cannot remedy the fundamental defects in the States' standing theories in this case.

## IV.     ALL OTHER STATES SHOULD BE DISMISSED FOR LACK OF INJURY.

Even where other plaintiffs can establish standing, nothing "*prohibit*[*s*] the court from paring down a case by eliminating plaintiffs who lack standing or otherwise fail to meet the governing

jurisdictional requirements." *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021) (emphasis in original); *see, e.g.*, *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011) (explaining a court is not required to allow "a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing"); *We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091-92 (D. Ariz. 2011).

Of the 19 States bringing this suit, only Louisiana and Florida produced any evidence they asserted could support their allegations of injury from the IFR. Jurisdictional discovery has now closed, and the other States have defaulted on any opportunity to present any such evidence. In the Fifth Circuit, plaintiffs responding to a Rule 12(b)(1) factual challenge to their standing are "obliged to submit facts through some evidentiary method to sustain [their] burden of proof." *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). The 17 absentee plaintiff States have failed to meet their burden, have not demonstrated standing, and should be dismissed for lack of jurisdiction, even if the Court lets Louisiana and Florida proceed. Additionally, because any remedy must be tailored to the actual injury established by each party, the Court could not fashion a remedy to address the other States' claims, which are unsupported by any evidence. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

## V.   PLAINTIFFS' CLAIMS DO NOT FALL WITHIN THE ZONE OF INTERESTS.

The States claims also do not fall within the zone of interests of sections 1225(b)(1), the statute the IFR implements, or the asylum and removal provisions generally. This inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987). A plaintiff has no right of review if its "interests are so marginally related to … the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

Nothing in the text, structure, or purpose of the INA generally, or sections 1225(b)(1), 1229a, or 1158[16] specifically, suggests that Congress intended to permit a state or other entity to invoke attenuated downstream financial costs from the enforcement or implementation of immigration policies to bring lawsuits to challenge those policies. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996). This conclusion is reinforced by the fact that "the key sovereign with authority and 'solicitude' with respect to immigration is the" federal government, "not the States," *Arizona*, 31 F.4th at 476; *see Arizona*, 567 U.S. at 394-97, as well as by the general rule that third parties have no cognizable legal interest in compelling the enforcement of laws against others, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). The disconnect between the IFR and plaintiff States underscores the problem. Plaintiffs are not regulated by the IFR, and they lack a judicially cognizable interest in avoiding incidental effects on state resources that might occur from noncitizens receiving asylum or parole pending their asylum determinations and moving to their state. The States' financial decisions do not give rise to an injury with which the asylum and parole statutes are concerned. "If the law were otherwise, an enterprising plaintiff would be able to secure" the right to challenge a governmental action without any otherwise cognizable injury "simply by making an expenditure" in response to the action. *Clapper*, 568 U.S. at 416.

Consistent with those principles, Congress has provided in the INA that only the noncitizens against whom the immigration laws are being enforced may challenge application of those laws—and only in certain circumstances and, even then, only through their removal proceedings. *See, e.g.,* 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.*

---

[16] Section 1158 expressly provides that "[n]othing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1158(d)(7).

§§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g). A detailed review scheme that allows some parties, but not others, to challenge specific executive action is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

## VI.   THE COURT LACKS JURISDICTION UNDER 8 U.S.C. § 1252(e).

Even if the Court were to find that Plaintiffs have sufficiently met their burden to establish standing and a cause of action within the INA's zone of interests, it still must dismiss this case because the U.S. District Court for the District of Columbia is the sole federal court with jurisdiction to adjudicate this case.

As Defendants previously argued, ECF Nos. 5, 16, the IFR implements the expedited-removal provisions of 8 U.S.C. § 1225(b)(1). Therefore, a challenge to the IFR may be brought only in the District of Columbia, and this Court lacks jurisdiction. 8 U.S.C. § 1252(e)(3). The Court denied Defendants' motion to transfer to D.C. on this basis but said it could revisit transfer later if "legal and factual findings warrant" it. ECF No. 24. The law and the facts do so warrant.

The IFR, by its own terms, implements "Section 235 of the INA," *i.e.*, 8 U.S.C. § 1225(b)(1), and specifically § 1225(b)(1)(B)(ii). 87 Fed. Reg. at 18080. Congress has limited review of regulations implementing § 1225(b)(1) to a single forum. 8 U.S.C. § 1252(a)(2)(A) eliminates federal court jurisdiction over all claims challenging policies and procedures implementing section 1225(b)(1), subject to a limited exception. Under 8 U.S.C. § 1252(e)(3), "[j]udicial review of determinations under [8 U.S.C. § 1225(b)] and its implementation is available in an action instituted in the United States District Court for the District of Columbia." This includes review of whether "any regulation issued to implement" § 1225(b) "is constitutional," and of "whether such a regulation … is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(i)-(ii); *see* 8 U.S.C. §

1252(a)(2)(A)(iv) (barring review of "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)" except in D.C.).

The evidence confirms that the IFR falls within the jurisdictional venue limitation imposed on challenges to implementation of section 1225(b)(1). The States' witness conceded several times that the IFR implements section 1225(b)(1). *See* Ex. R at 96:4-9, 117:11-17, 142:11-21. Accordingly, even if the Court finds standing, the Court should reconsider its prior ruling in light of the subsequent developments in this case and dismiss Plaintiffs' claims on this basis.

## VII.   PLAINTIFFS' SECURE FENCE ACT CLAIM SHOULD BE DISMISSED.

Count III, which alleges that the IFR violates the Secure Fence Act (SFA), ECF No. 86 at ¶¶ 165-170, should be dismissed under Rule 12(b)(6). The "operational control" provision in the Secure Fence Act requires "the Secretary [to] take all actions *the Secretary determines necessary and appropriate* to achieve and maintain operational control." Pub. L. No. 109-367, § 2, 120 Stat. 2638 (2006), 8 U.S.C. § 1701 note (emphasis added). This provision vests discretion over the administration of the SFA in the Secretary. And Congress has elsewhere confirmed that the SFA vests the Secretary with discretion to determine appropriate border control strategies. *See* S. Rep. 111-31, at 38 (2009) ("The Committee *supports the Secretary's continued reconsideration and evaluation* of the proper mix of tactical infrastructure, including physical fencing, and technology .... the Committee *provides the Secretary with the flexibility* to determine the proper mix and location of these border security activities ....") (emphasis added). Because the authority granted by the SFA is purely discretionary, it offers no standard by which the Secretary's exercise of the SFA may be judged. *See, e.g., Webster v. Doe,* 486 U.S. 592, 600 (1988) (rejecting review where statute provided for termination when the CIA Director *"deem[ed]* such termination necessary or

advisable"); *Drake v. FAA,* 291 F.3d 59, 72 (D.C. Cir. 2002) (rejecting review where "the only statutory reference point is the Administrator's own beliefs").

In addition, there is no relief the Court could order with respect to Count III of the Amended Complaint. Courts can order only "discrete" actions, not compliance with a *non-discrete* statutory directive. *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 66 (2004)). In *Norton*, the plaintiffs alleged that because the Wilderness Act contained a "categorical imperative" to preserve certain wilderness lands, the court could "simply enter a general order compelling compliance with that mandate, without suggesting any particular manner of compliance." 542 U.S. at 66. The Supreme Court held that the judiciary lacked authority to enter such a general order, because the requested relief was not a "discrete" action of the sort that could be compelled under the APA. *Id.* Because the States here similarly seek an order compelling compliance with the SFA's general, discretionary "operational control" provision, Count III must be dismissed. *United States v. State of Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (dismissing APA claim based on SFA because "[t]he APA does not empower the Court to enter a general order compelling compliance with the broad statutory objective of "operational control").

## VIII.   THE TAKE CARE CLAUSE CLAIM SHOULD ALSO BE DISMISSED.

The Court should also dismiss Plaintiffs' Take Care Clause claim (Count VIII), ECF No. 86 at ¶¶ 216-20, for failure to state a claim. Despite numerous challenges, no court has yet held that the Take Care Clause provides a private right to sue or cause of action. *See Las Americas Immigrant Advocacy Center v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020) ("No court in this circuit, or any other circuit, has definitively found that the 'Take Care Clause' provides a private cause of action which a Plaintiff may bring against the President of the United States or his

administration."); *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1178 (D. Ariz. 2022) (similar); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.) (similar), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985). This lack of precedent should foreclose finding a private cause of action under the Clause here given the Supreme Court's repeated caution that courts should avoid creating new constitutional causes of action or even extend the application of previously implied causes of action. *See, e.g.*, *Egbert v. Boule,* 142 S. Ct. 1793, 1800 (2022); *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020). If this Court were to be the first to hold that the Clause creates a private right of action, it would be disregarding this Supreme Court admonition to the contrary.

Further, were the Court to recognize such a cause of action, it could only provide relief regarding ministerial duties where "nothing was left to discretion" and there was "no room for the exercise of judgment." *State of Mississippi v. Johnson*, 71 U.S. 475, 498 (1866); *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 608 (D.C. Cir. 1974). However, the asylum and parole authority the IFR implements is explicitly discretionary, *see* 8 U.S.C. §§ 1158(a), 1182(d)(5)(A), and ruling that the IFR's procedures for exercising this discretion are unlawful under the Constitution would constitute impermissible "judicial interference with the exercise of Executive discretion." *Johnson*, 71 U.S. at 499. Thus, the fact that expressly discretionary, and not ministerial, functions are at issue in this challenge to the IFR independently precludes the viability of a Take Care Clause claim.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' case in its entirety.

Dated: December 22, 2023                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            *Principal Deputy Assistant Attorney General*

                                            WILLIAM C. PEACHEY
                                            *Director*
                                            Office of Immigration Litigation
                                            District Court Section

                                            EREZ REUVENI
                                            *Counsel*

                                            SARAH L. VOUNG
                                            *Assistant Director*

                                            BRIAN C. WARD
                                            *Senior Litigation Counsel*

                                            /s/ *Joseph A. Darrow*
                                            JOSEPH A. DARROW
                                            ELISSA P. FUDIM
                                            ERIN T. RYAN
                                            SYDNEY A. JACKSON
                                            EVAN P. SCHULTZ
                                            *Trial Attorneys*
                                            U.S. Department of Justice
                                            Civil Division
                                            Office of Immigration Litigation
                                            District Court Section
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, DC 20044
                                            Tel.: (202) 598-7537
                                            Joseph.a.darrow@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2023, I electronically filed this motion to dismiss with the Clerk of the Court for the United States District Court for the Western District of Louisiana by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice