UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Civil Action No. 3:22-cv-9962 |
| ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity; *et. al* | ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

### DECLARATION OF MATTHEW J. HUDAK

I, Matthew J. Hudak, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, and documents and information made known or available to me as of the time of signature from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am employed with the U.S. Customs and Border Protection (CBP) as the Deputy Chief of the United States Border Patrol (USBP) and have served with USBP since 1997. I have held this position since December 19, 2021. Prior to being the Deputy Chief of USBP, I was the Chief Patrol Agent of the Laredo Sector, which covers approximately 84,000 square miles and 136 river miles along the international boundary with Mexico and managed a workforce of over 1,900 employees spread over one sector complex and nine stations. Prior to that, I was the Chief Patrol Agent of Big Bend Sector. I have also served in various other leadership positions in USBP, including Laredo Sector's Division Chief

1

for Operational Programs, Deputy Chief Patrol Agent of Del Rio Sector, Patrol Agent in Charge of the Laredo South Station, Assistant Patrol Agent in Charge of the Cotulla Station in the Laredo Sector, and as the Acting Patrol Agent in Charge (PAIC) of the Laredo Sector Intelligence Unit. I also established and led the Enforcement and Information Technology Division.

2. In my position as the Deputy Chief of USBP, I am responsible for executing the missions of the U.S. Department of Homeland Security, CBP, and USBP. The USBP is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons and for preventing the illicit trafficking of people and contraband between ports of entry. USBP has a workforce of 19,000 agents who patrol more than 6,000 miles of the United States land borders. As Deputy Chief, I am also responsible for the daily operations of USBP, including the development and implementation of all nationwide policy decisions.

3. I am familiar with the *Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document*, Raul L. Ortiz, (May 10, 2023), as well as the implementing guidance to the field.

4. I am also familiar with the March 8, 2023, U.S. District Court for the Northern District of Florida, Pensacola Division, decision vacating the *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations* (July 18, 2022) memorandum. CBP has not utilized Parole + Alternatives to Detention (ATD) since January 2, 2023, and has disseminated guidance to the field instructing that Parole + ATD not be utilized due to the court's vacatur.

LADOJ-ASYLUM6123

5. I also understand that on May 11, 2023, the U.S. District Court for the Northern District of Florida, Pensacola Division, issued a temporary restraining order enjoining the *Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document* memorandum. That order took effect at 11:59 ET on May 11, 2023.

6. I submit this declaration to inform the court of the operational challenges USBP has faced, the measures CBP has undertaken to increase the speed at which noncitizens depart CBP facilities, including by decreasing processing times during periods of high encounters since March 8, 2023, and the effects of the Court's May 11, 2023 order temporarily enjoining the Parole with Conditions policy.

7. USBP has taken numerous steps to address periods when there are high encounters, and in particular, in anticipation of the termination of the Centers for Disease Control and Prevention's Title 42 public health Order.

    a. CBP has been engaging in A-file digitization, to streamline review and expedite processing for Notice to Appear/Own Recognizance (i.e., the processing of noncitizens for removal proceedings under section 1229a of the Immigration and Nationality Act (INA) and release under section 1226(a) of the INA on a case-by-case basis) that was previously paper-based. This process is live in a number of sectors across the Southwest border, including El Centro, Yuma, San Diego, and Tucson.

    b. CBP is increasing mobile intake, which is an application installed on CBP Mobile devices that replaces the paper field intake forms used by USBP to document biographical data from the non-citizens encountered. The application greatly

LADOJ-ASYLUM6124

    reduces the time needed to perform this function as it transmits the information directly to the CBP database, Enforce 3rd Generation (e3) upon submission.

c. CBP has relied upon DHS employees detailed to the Southwest border through the DHS volunteer force to respond to the border crisis and to stabilize the region. Volunteers are assigned to one of five roles that provide services to migrants and detainees: meal distribution, medical assessment, hospital watch, personal property management, or high-capacity transport. These actions allow a greater number of immigration officers, including Border Patrol Agents, to be available to engage in activities such as processing noncitizens.

d. CBP is engaging in virtual and mobile processing technologies to make processing functions more efficient. This includes the use of laptops and other mobile devices that allow agents to begin the processing and screening of migrants in the field when possible.

e. CBP has been utilizing Border Patrol Processing Coordinators (BPPC), who are not immigration officers but are employed by USBP, to perform administrative tasks related to processing individuals apprehended by Border Patrol agents. This position may also assist in the transportation of individuals and property in USBP custody, as well as assisting with custodial watch of detainees in hospitals. The BPPC position allows Border Patrol agents to more effectively focus on their mission of border security and safeguarding the American public.

f. CBP has also streamlined its Notice to Appear/Own Recognizance process to be able to utilize this processing pathway to the greatest extent possible, ensuring

LADOJ-ASYLUM6125

while all steps required for legally sufficient processing are taken, that the process only includes those steps legally and operationally required.

    g. USBP has received assistance from CBP's Office of Field Operations, the operational component of CBP that normally operates at the Ports of Entry, in multiple Southwest border sectors for transportation, security, and processing noncitizens initially apprehended by USBP.

8. Finally, the Biden Administration has deployed Department of Defense 1,500 military personnel to the Southwest border to assist CBP in non-immigration officer functions, such as ground-based detection, monitoring, data entry and warehouse support duties.

9. Understanding that there have been an increasing number of migrant encounters, and in anticipation of even higher encounter numbers in connection with the with the termination of Title 42, CBP has also taken action to increase its holding capacity.

    a. CBP has increased its soft-side facilities (SSF), to include opening two new SSF in El Paso and San Diego sectors in January 2023. DHS is seeking additional funding for SSF in the FY2024 budget.

    b. Yuma has recently increased their SSF capacity to accommodate a larger number of noncitizens for processing and an expansion is underway in El Paso.

10. I understand that Mexico currently is not accepting any returns under the Migrant Protection Protocols (MPP).

11. While USBP has been putting these additional steps mentioned above in place, encounters remain at a historic high. As of May 9, 2023, USBP was holding more than 27,000 noncitizens in custody. This is overcapacity in eight of nine Southwest border sectors. Currently, the USBP is on pace to surpass the 2.1 million encounters recorded in

LADOJ-ASYLUM6126

Fiscal Year (FY) 2022. During FY23 to date, USBP has encountered approximately 1.33 million noncitizens. The termination of Title 42 is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. Over the last week, the ten day average encounters is 9,087, with May 8, 9, 10 and all surpassing 10,000 apprehensions with a daily in custody average of 23,646. On balance, daily encounters have been outpacing daily bookouts, that is a final release from a CBP holding facility, to include transfer to ICE custody, release, repatriation, or expulsion from the United States, by approximately 950 noncitizens over the last seven days.

12. At the current operational pace, and without any additional measures such as Parole with Conditions, USBP could have over 45,000 individuals in custody by the end of the month. The Parole with Conditions policy is an important tool for USBP because it allows USPB to process and release noncitizens (who are deemed appropriate for release) more quickly than alternative approaches. This allows USBP to reduce the number of noncitizens in detention at times when USBP custody is significantly exceeding capacity posing health and safety concerns.

13. Generally, noncitizens who are not going to be detained pending their removal proceedings are issued a Notice to Appear (NTA) for their removal proceedings and then released on their own recognizance. Parole with Conditions is an alternative to this "NTA/OR" approach, explained in paragraph 7a. Prior to the Court's recent order, Parole with Conditions was used when there was an urgent need to process noncitizens more rapidly than under the NTA/OR approach. The NTA/OR processing pathway generally takes around an hour and a half to two hours currently to complete per person. To

6

LADOJ-ASYLUM6127

complete NTA/OR processing for a family unit takes many hours, depending on the composition of the family unit. There are specific required steps in the NTA/OR process, and those steps, with added volume of people, require a more regimented approach. For example, supervisory review and explanation and service of each document is required for every NTA/OR. In contrast, the Parole with Conditions processing pathway generally takes around only twenty minutes for the head of household of the family unit and approximately five minutes for each additional family member. Thus, the processing for a family unit under Parole with Conditions should only take approximately an hour depending on the family composition. Once the Form I-94, the paperwork that is issued for parole, is signed and stamped, USBP can immediately process the noncitizen for release from custody.

14. On May 10, 2023, Chief Ortiz signed the *Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)* memorandum given the increasing noncitizen encounters, high custody numbers, and USBP's dedicated attempts in the last few months to increase throughput and decrease processing times for each noncitizen.

15. This memorandum has numerous significant differences from the *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations* (July 18, 2022) memorandum.

    a. Parole under this policy "is automatically terminated upon expiration of the period for which parole was authorized." Parole generally terminates in 60 days.

7

LADOJ-ASYLUM6128

 b. This memorandum emphasizes that Parole with Conditions is simply one available pathway and each decision for parole must be made on an individualized case-by-case basis.

 c. This memorandum emphasizes that even where a Sector has been approved to utilize the Parole with Conditions, that it must be used only after a case-by-case individualized determination for each noncitizen. Such approval in no way permits blanket paroles from a Sector.

 d. This memorandum has more stringent factors for a Sector to even be considered for approval to consider Parole with Conditions. Moreover, it requires that when the Sector has fallen below the 95% capacity mark, whether or not the time period for approval has run, the Sector should cease considering individuals for Parole with Conditions.

 e. This memorandum emphasizes that parole decisions must be made based on the circumstances facing an individual, not just overall system efficiency concerns. The policy recognizes that individual noncitizens in USBP's custody are entitled to appropriate and safe detention conditions and focuses on the concerns for a noncitizen, including the urgent humanitarian reasons related to custody conditions, rather than the overall USBP concerns about potential overcrowding.

 f. This memorandum is supported by the analysis of the DHS Office of Health Security with respect to the noncitizen's experience in overcrowded conditions and takes those concerns into consideration.

16. Although there has not been sufficient time to fully review the operationalization of the Parole with Conditions memorandum, initial indications are that these changes to Parole

+ ATD were operationally significant. For instance, not all sectors along the Southwest border have been approved to utilize the Parole with Conditions pathway.

17. The health and safety of individual noncitizens are at risk, posing an urgent humanitarian reason for parole. The DHS Chief Medical Officer has opined that "[b]ased upon the data, current conditions pose an increased risk of adverse health outcomes." *Southwest Border Facilities – Overcrowding Health Concerns,* DHS Acting Chief Medical Officer and Senior Medical Officer (May 9, 2023). Conditions, such as overcrowding and increased movement of noncitizens between facilities, may result in adverse health outcomes of individual noncitizens, including the spread of communicable diseases (e.g., Measles, Varicella, etc.) among noncitizens held in these facilities. Noncitizens held in overcrowded facilities are not only vulnerable to communicable diseases, but this vulnerability is likely to be compounded by some aspects of the noncitizens' journey including poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services while migrating to the Southwest border.

18. CBP is under obligation to provide certain short-term holding conditions in the Tucson Sector, pursuant to a court order in *Unknown Parties v. Nielsen*, 611 F. Supp. 3d 786 (D. Ariz. 2020) (*Doe)*. For instance, individuals must be provided mats, blankets, and the ability to privately wash or clean themselves within twelve hours of arriving at a USBP facility. They must also be provided a raised bed, a cloth blanket showers, adequate food, potable water and a medical assessment within forty-eight hours of arriving at a USBP facility.

19. CBP is also under obligation consistent with *Flores v. Sessions,* 862 F.3d 863 (9th Cir. 2017) , the longstanding *Flores* settlement to ensure that custody conditions for minors

9

are safe and sanitary. Moreover, pursuant to this settlement, DHS must expeditiously release from its custody all minors, including those who enter with their parents.

20. Given all the above information, it is critical that USBP be able to take steps to reduce detention capacity when necessary.

21. The Court's order temporarily enjoining the use of Parole with Conditions has a significant negative impact on USBP's ability to reduce detention capacity when necessary to prevent significant health and safety concerns or to ensure compliance with legal obligations.

22. Indeed, given all of the steps that USBP has already undertaken to streamline the processing of individuals, increase processing capacity, surge resources and increase its capacity to temporarily detain people for processing, while we continue to assess all options as circumstances evolve, at present the alternatives appear limited. With the Parole with Conditions memorandum enjoined, it is possible that USBP will be left with only untenable options such as declining to fully process individuals and potentially not even apprehending them to start. The public safety and national security impacts of such an impact would be extraordinary.

    a. One alternative to using Parole with Conditions would be to process noncitizens via Notice to Report (NTR). This approach would be an exercise of prosecutorial discretion rather than a use of parole. Rather than paroling individuals, USBP would simply exercise discretion not to pursue removal proceedings against them and release them, with merely a notice that they should report to immigration officials. While biometrics and vetting on the noncitizen would still occur with NTRs, there would be no conditions attached to a release as exists with Parole

LADOJ-ASYLUM6131

with Conditions or Parole + ATD. NTRs have no enforcement mechanism associated with processing, and therefore provide less of an incentive for noncitizens to make an appointment with ICE or request service of NTA by mail. Therefore, there is less accountability for NTRs, and transnational criminal organizations may message that CBP is releasing noncitizens without enforcement mechanism which may increase already high encounter numbers. Parole + ATD and Parole with Conditions, by contrast, require noncitizens to comply with their obligation to report.

b. Another alternative for reducing detention numbers in urgent situations would be to actively not apprehend noncitizens. But this alternative would have severe negative consequences and should be avoided if at all possible. USBP needs to minimize unlawful border crossers who are observed making an unlawful entry into the United States, not apprehended, and not turned back. Any potential active decision to not apprehend such individuals contravenes USBP's mission to detect and prevent the illegal entry of individuals in the United States. Moreover, if USBP were to actively decline to detain such individuals, transnational criminal organizations and human smugglers would be able to direct noncitizen traffic to those areas, and there would be a serious life and safety concern for noncitizens. It is critical to understand that when individuals are not apprehended by USBP there is a possibility that those individuals will simply enter the United States. Included within any such group that USBP is unable to apprehend could be those linked with terrorist organizations, those with criminal records, human smugglers, those actively trafficking other members of the same group (which could include

11

LADOJ-ASYLUM6132

children), and vulnerable children not accompanied by their parents, as well as those entering seeking protections like asylum. Without processing individuals, it is impossible to know the demographics, vulnerabilities, and national or public safety risk of any person.

23. Finally, while CBP conducts extensive open-source research and information gathering and closely coordinates with other countries' government partners, it cannot know with certainty the universe of individuals coming to the United States. For example, in 2022, USBP experienced a historic surge of noncitizens, mostly from Haiti, who entered in between the port of entry in Del Rio sector. Within less than a week, this singular surge in Del Rio exceeded 18,000 migrants at one location. Preliminary intelligence did not predict this surge. Our Central American governmental partners also were unable to provide advanced warning on this surge. Despite CBP's best efforts, it cannot ascertain on any given day, exactly how many individuals, or their nationality and specific vulnerabilities, will enter the United States between ports of entry. Given this operational reality, CBP needs a mechanism that allows USBP to thoroughly but quickly process individuals on a case-by-case basis considering the urgent humanitarian reasons and significant public benefit outlined in the Parole with Conditions memorandum.

24. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 12th day of May, 2023.

LADOJ-ASYLUM6133

_[signature: Matthew J. Hudak]_

Matthew J. Hudak
Deputy Chief of the U.S. Border Patrol
U.S. Border Patrol
U.S. Customs and Border Protection
U.S. Department of Homeland Security

13