# UNITED STATES ELEVENTH CIRCUIT COURT OF APPEALS

STATE OF FLORIDA,

  *Plaintiff,*

  v.                                    Civil Action Nos. 23-11528, 23-11644

ALEJANDRO MAYORKAS,
Secretary of Homeland Security,
in his official capacity; *et. al*

  *Defendants.*

## DECLARATION OF RAUL L. ORTIZ

I, Raul L. Ortiz, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me as of the time of signature from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am employed with the U.S. Customs and Border Protection (CBP) as the Chief of the United States Border Patrol (USBP). I have held this position since August 15, 2021. Prior to being the Chief of USBP, I was the Deputy Chief of USBP. Prior to that, I was the Chief Patrol Agent of the Del Rio Sector. I have also served in various other leadership positions in USBP, including Deputy Chief of the Law Enforcement Operational Programs at Headquarters, Deputy Chief Patrol Agent of the Rio Grande Valley Sector, Assistant Chief Patrol Agent at Del Rio Sector, and Assistant Patrol Agent in Charge and Patrol Agent in Charge of the Comstock Station and Del Rio Station. I was also detailed as the Director of the Border Management Task Force, Senior Advisor to the Department of Homeland Security's (DHS) envoy to Afghanistan and Pakistan, and

1

FLORIDA-ASYLUM6168

as the DHS Attaché in Afghanistan, and have over thirty-two years of law enforcement experience.

2. In my position as the Chief of USBP, I am responsible for executing the missions of DHS, CBP, and USBP. USBP is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons and for preventing the illicit trafficking of people and contraband between ports of entry. USBP has a workforce of over 19,000 personnel who patrol more than 6,000 miles of the United States land borders. As Chief, I am also responsible for the daily operations of USBP, including the development and implementation of all nationwide policy decisions.

3. I am familiar with the *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations*, Chris Magnus and Tae Johnson (July 18, 2022) (Parole + ATD).

4. I am also familiar with the March 8, 2023, U.S. District Court for the Northern District of Florida, Pensacola Division, decision vacating the Parole + ATD memorandum. CBP has not utilized Parole + ATD since January 2, 2023, and has disseminated guidance to the field instructing that Parole + ATD not be utilized due to the court's vacatur. I further understand that the District Court denied DHS's request for an emergency stay of the March 8, 2023, Parole + ATD decision.

5. I am familiar with and issued the *Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)*, Raul L. Ortiz (May 10, 2023). I am also familiar with the implementing guidance to the field.

6. I am aware that on May 11, 2023, the U.S. District Court for the Northern District of Florida, Pensacola Division, issued a temporary restraining order (TRO) enjoining the Parole with Conditions memorandum to take effect at 11:59 p.m. Eastern Time (ET) on May 11, 2023. I am aware that there was guidance issued to the field instructing USBP to comply with the TRO.

7. I am aware that on May 15, 2023, the District Court denied DHS's request for an emergency stay of the forthcoming preliminary injunction and the TRO enjoining the Parole with Conditions memorandum, and on May 16, 2023, the District Court granted a preliminary injunction, enjoining the Parole with Conditions memorandum.

8. I submit this declaration to inform the Court of the anticipated imminent harm if emergency relief from the U.S. Courts of Appeal for the Eleventh Circuit is not obtained.

9. USBP processes individuals based on the processing pathways available and in consideration of the facts regarding each individual known to USBP at the time.

    a. As of May 11, 2023, at 11:59 p.m. ET, the Centers for Disease Control and Prevention's Title 42 public health Order (Title 42) expired. Under Title 42, CBP could prevent the entry of and expel certain noncitizens. To process the noncitizens it encounters, CBP must use Title 8, the Immigration and Nationality Act, under which all processing pathways take significantly more time for processing than expulsion under Title 42.

    b. USBP conducts an individualized assessment of each noncitizen's identification and immigration background and reviews any information regarding national security or criminal concerns available to determine which processing pathway is most appropriate for any given noncitizen.

3

c. The processing time for a noncitizen encountered between ports of entry will vary based on the immigration pathway to be applied to the particular noncitizen.

  i. For example, issuing a Notice to Appear to a noncitizen and releasing the noncitizen on their own recognizance (NTA/OR) generally takes around an hour and a half to two hours to complete per individual. There are specific required steps in the NTA/OR process, and those steps, with added volume of individuals, require a regimented approach. These steps may include explanation in a language the noncitizen understands, supervisory review, and service of each document are required for every NTA/OR.

  ii. Completing Parole + ATD generally takes approximately fifteen minutes per single adult. It also takes approximately fifteen minutes for each family member in a family unit. Once the Form I-94, the paperwork that is issued for parole, is signed and stamped, U.S. Immigration and Customs Enforcement (ICE) can then determine which ATD should be utilized for a noncitizen on Parole + ATD.

  iii. Similarly, completing Parole with Conditions generally takes twenty minutes or less to complete for a single adult noncitizen or the head of household for a family unit. Processing the head of household of the family unit takes approximately twenty minutes; each additional family member takes approximately five minutes to process. Once the Form I-94, is signed and stamped, USBP can immediately process the noncitizen for release from custody.

4

    iv. CBP prioritizes other non-parole processes, such as NTA/OR or expedited removal proceedings, to the greatest extent possible. When CBP was using Parole + ATD and Parole with Conditions, the use of this process was limited to specific, narrow circumstances outlined in the memoranda.

10. During the time that noncitizens remain in USBP custody pending release or transfer to ICE custody, USBP's objective is to provide safe and sanitary conditions for all individuals in custody. However, USBP facilities are designed for short-term holding only and have limited capacity. Although USBP provides basic medical care in compliance with all applicable policies, USBP facilities do not provide routine medical care appropriate for long-term detention, or other amenities. Given the nature of its facilities, increased numbers of people in custody and increased times in custody increase the likelihood that USBP facilities will become quickly overcrowded. Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and government personnel. When there are large numbers of noncitizens in custody and average time in custody (TIC) increases, these concerns are magnified.

    a. Additionally, CBP is under an obligation to provide certain short-term holding conditions in the Tucson Sector, pursuant to a court order in *Unknown Parties v. Nielsen*, 611 F. Supp. 3d 786 (D. Ariz. 2020) *(Doe)*. For instance, individuals must be provided mats, blankets, and the ability to privately wash or clean themselves within twelve hours of arriving at a USBP facility. They must also be provided a raised bed, a cloth blanket, showers, adequate food, potable water, and a medical assessment within forty-eight hours of arriving at a USBP facility. As

5

LA-DOJ-ASYLUM 172

the volume of encounters within Tucson Sector increases, there is less space for individuals to lay out mats, provide places for individuals the ability to privately wash or clean themselves, and room for raised beds which challenges the ability for Tucson Sector to provide these amenities, as well as other amenities, required under *Doe*.

b. CBP is also under an obligation consistent with *Flores v. Sessions,* 862 F.3d 863 (9th Cir. 2017), the longstanding *Flores* Settlement Agreement, to ensure that custody conditions for minors are safe and sanitary. Moreover, pursuant to this settlement, DHS must expeditiously release from its custody or transfer to a licensed facility all minors, including those who enter with their parents.

11. Given the short-term holding constraints, if USBP sees a rise in encounters and individuals in custody, then there are many resulting factors that exacerbate the conditions in short-term custody. The following sub-paragraphs are a few examples of how higher noncitizen encounters create compounding problems for finite personnel and resources.

    a. Transnational criminal organizations (TCOs) often abandon noncitizens in remote and dangerous areas, where severe heat, exposure, and miles of desert pose countless threats to noncitizens. USBP commonly conducts search and rescue missions for noncitizens in distress in the field. As encounters increase, there are higher numbers of noncitizens crossing between ports of entry. USBP consequently conducts a greater number of search and rescue missions, diverting resources and personnel from other mission essential functions such as noncitizen processing or border security for these important endeavors.

6

b.  Similarly, USBP accompanies noncitizens who are taken to the hospital for medical care. This duty is called hospital watch. The greater the number of noncitizens who need to go to the hospital, which generally rises as more noncitizens cross in between ports of entry, the greater the number of personnel who are assigned to hospital watch, which then takes personnel away from other portions of the USBP mission, such as border management.

c.  Due to high encounters and numbers in custody, USBP may need to transport noncitizens to other stations or centers that have greater capacity, or to other sectors, which also requires personnel and transportation resources.

d.  USBP conducts many other duties related to short-term holding. Among many others, these duties may include providing noncitizens with fresh clothing and meals, ensuring all necessary equipment for custody is in the right place, and monitoring holding areas to ensure noncitizen safety. The greater number of noncitizens in custody, the greater the need for more personnel to perform these administrative duties. This then takes those personnel away from other duties, such as border security.

e.  After fully processing a noncitizen under Title 8, which means completing and issuing all necessary paperwork, USBP then goes through steps to safely release individuals consistent with policies and procedures. For instance, USBP does not generally release individuals overnight given the safety risks attendant to such releases. Holding noncitizens overnight increases overall TIC.

    f. Because of USBP's broad mission and scope of work, the considerations listed above, and the finite personnel and resources, USBP can only process and release from USBP custody a certain number of noncitizens on any particular day.

12. USBP is not able to predict with certainty when or where noncitizens will enter between ports of entry or how many noncitizens will cross at a particular time. There is no single factor that directly correlates to the number of noncitizens attempting to unlawfully enter the United States between ports of entry on a particular day. Similarly, numerous factors can drive a large increase in the number of noncitizens or a dramatic decrease in encounters, including a temporary decrease in encounters.

    a. For instance, factors that may influence whether a particular noncitizen attempts to cross include: the weather and condition of the area in which they seek to attempt illegal entry; activities of the TCOs which frequently facilitate attempted illegal entry; misinformation spread by smugglers, for example that the border is "open"; holidays, including those in Mexico or the United States; activities by the local or national Mexican authorities or other governmental partners; the health and well-being of a noncitizens and/or others with whom the noncitizen is traveling; as well as information made available to the noncitizen through a variety of channels including journalistic or social media platforms, some of which may not be accurate. Each of these factors may vary daily. Some of these factors may change multiple times even within a single twenty-four-hour period. Each noncitizen may also have a different view on the impact of each of these factors. It is therefore difficult for CBP to predict when numbers may begin to

USCA5 Case: 23-11528   Document: 8-2   Date Filed: 05/19/2023   Page: 8 of 12

LA DOJ-ASYLUM6175

increase again, and CBP seeks to remain operationally flexible and ready to respond with all available tools.

b. TCOs are sophisticated and play a large role in noncitizen movement. The smuggling organizations that have become accustomed to large proceeds from human smuggling will adapt to CBP's messaging and enforcement posture to continue exploiting irregular migration to the United States. TCOs may have noncitizens wait to attempt to cross until they can ensure that a noncitizen would be able to successfully enter between a port of entry.

c. USBP is aware that there are a variety of estimates of noncitizens, ranging from at least tens of thousands, who may be headed towards the southern border of the United States. USBP anticipates that at least some of these noncitizens will attempt to illegally enter the United States. USBP does not know if these noncitizens will attempt to cross in large numbers or if the attempted entries will occur over a prolonged duration of time.

d. Last week, beginning on May 7, 2023, CBP experienced its highest ever ten-day encounter rate, with close to or over 10,000 encounters on multiple days, and the highest number in custody, capping at 28,717 on May 10, 2023.

   i. On balance, daily encounters significantly outpaced daily bookouts. A bookout is a final release from a CBP holding facility, and may include transfer to ICE custody, expulsion from the United States prior to Title 42 expiration, release, or repatriation. This results in thousands of noncitizens cumulatively who USBP cannot bookout, which then results in extremely high numbers of noncitizens in custody.

Case: 23-11528   Document: 8-2   Date Filed: 05/19/2023   Page: 9 of 12

USCA5 LABOR-ASYLUM 676

  ii. While the encounter numbers are experiencing a temporary decrease, there are noncitizens waiting to enter the United States, likely between the ports of entry, at an opportune time. If the numbers of encounters increase again, which could happen because of the number of noncitizens currently estimated to seek to enter the United States illegally, USBP could find itself in the same position it was in last week, beginning on May 7, 2023, and in desperate need for a mechanism like Parole + ATD and Parole with Conditions.

13. In the event of significant increases in migrant encounters, with the Parole + ATD and Parole with Conditions memoranda enjoined, it is possible that USBP will be left with only untenable options such as declining to fully process individuals at all and potentially not even apprehending them to start. The public safety and national security impacts of such an impact could be significant.

  a. Processing via Notice to Report (NTR) would be an exercise of prosecutorial discretion that may be considered, without CBP's ability to utilize Parole + ATD or Parole with Conditions. While biometrics and vetting on the noncitizen would still occur with NTRs, there would be no active monitoring as with Parole + ATD or conditions attached to a release as exists with Parole with Conditions. NTRs have no enforcement mechanism associated with processing, such as parole with the condition to make an appointment with ICE or request service of NTA by mail or an ATD. Therefore, there is less accountability for NTRs, and transnational criminal organizations may message that CBP is releasing noncitizens without enforcement mechanism which may increase already high encounter numbers.

Case 23-11528   Document 8-2   Date Filed: 05/19/2023   Page: 10 of 12
LA-DOJ-ASYLUM 177

b. While another potential outcome to these high encounter numbers without Parole + ATD or Parole with Conditions may be to actively not apprehend noncitizens, CBP also needs to minimize unlawful border crossers who are observed making an unlawful entry into the United States, not apprehended, and not turned back. Any potential active decision to not apprehend such individuals contravenes USBP's mandate to detect and prevent the illegal entry of individuals in the United States. Moreover, if USBP were to actively decline to detain such individuals, TCOs and human smugglers would be able to direct noncitizen traffic to those areas, and there would be a serious life and safety concern for noncitizens and personnel.

c. It is critical to understand that when individuals are not apprehended by USBP there is a possibility that those individuals will simply enter the United States. Without processing individuals, it is impossible to know the demographics, vulnerabilities, and national security or public safety risk of any person.

14. Taking into consideration that USBP only has short-term holding, that high encounter numbers and individuals in custody create strain on finite USBP personnel and resources, and the unpredictability of large number of noncitizen crossings between the ports of entry, USBP needs to have tools at its disposal, such as Parole + ATD or Parole with Conditions, for processing and releasing noncitizens from CBP's custody to ensure the safety of noncitizens in its custody. Given the nature of fluctuations in daily encounters and TIC, as described above, a crisis point could occur with little to no warning. In other words, until USBP can greatly reduce the current number of noncitizens in its care, any

unpredictable increases in encounter numbers may drive the total number in custody or total TIC to an unmanageable level at any time, within days, or even hours.

15. Given this operational reality, CBP still seeks to employ all other Title 8 processing pathways, such as NTA/OR and expedited removal, before utilizing any parole processing pathway. However, CBP needs a mechanism that allows USBP to thoroughly but quickly process noncitizens on an individualized case-by-case basis considering the urgent humanitarian reasons and significant public benefit outlined in the Parole + ATD and Parole with Conditions memoranda, noting that these processes would only be utilized to the extent the triggers outlined in the memoranda are met.

16. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 19th day of May, 2023.

*[signature]*

Raul L. Ortiz
Chief of the U.S. Border Patrol
U.S. Border Patrol
U.S. Customs and Border Protection
U.S. Department of Homeland Security