Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF LOUISIANA
2                      LAFAYETTE DIVISION
3     STATE OF ARIZONA, et al., )
                                )
4          Plaintiffs,          )
                                )
5      v.                       )Civil Action
                                )No. 6:22-cv-01130
6     MERRICK GARLAND, in his   )
      official capacity as      )
7     Attorney General of the   )
      United States, et al.,    )
8                               )
          Defendants.           )
9     _____)
10
11    30(b)(6) VIDEOCONFERENCE DEPOSITION OF ANDREW ARTHUR
                ON BEHALF OF STATE OF LOUISIANA
12
                     (Taken by Defendants)
13
                     Via Videoconference
14
               Thursday, November 30, 2023
15
16
17
18
19
20
21
22
23
24              Reported in Stenotype by
            Diane Pressley, Shorthand Reporter
25     Transcript produced by computer-aided transcription

```
 1                    A P P E A R A N C E S

 2     ON  BEHALF  OF  PLAINTIFFS:

 3         SCOTT  ST.  JOHN,  Esquire
           Louisiana  Department  of  Justice
 4         1885  N.  Third  Street
           Baton  Rouge,  Louisiana  70802
 5         (225)  326-6766
           StjohnJ@ag.louisiana.gov

 6

       ON  BEHALF  OF  DEFENDANTS:
 7

           ERIN  T.  RYAN,  Esquire
 8         U.S.  Department  of  Justice
           Civil  Division
 9         District  Court  Section
           P.O.  Box  868,  Ben  Franklin  Station
10         Washington,  DC  20044
           (202)  532-5802
11         Erin.t.ryan@usdoj.gov

12     ALSO  PRESENT:

13         SYDNEY  JACKSON
           MARIA  LATIMER

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1    30(b)(6) ZOOM VIDEOCONFERENCE DEPOSITION OF ANDREW

2    ARTHUR ON BEHALF OF STATE OF LOUISIANA, a witness called

3    on behalf of Plaintiffs, before Diane Pressley, Notary

4    Public, in and for the State of North Carolina, all

5    parties appearing via videoconference, held on Thursday,

6    November 30, 2023, commencing at 11:01 a.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 44

```
 1        A.  Under Plyler vs. Doe, all school aged students

 2     below the college level have to be provided an

 3     education.  The Department of Education and the

 4     Department of Justice Civil Rights Division they've

 5     actually sent letters to the states informing them that

 6     they don't have the ability to inquire into the

 7     immigration status of individuals or parents of

 8     individuals who are registering for school in the

 9     states.  And that includes asking for a social security

10     number if one is not provided.

11        Q.  So that's a no to my question?

12        A.  I'm sorry, Counsel?

13        Q.  My question was a simple factual question, is

14     there a weighted category for immigrant students?

15        A.  There is no way for the State of Louisiana to ask

16     about the immigration status of school students, so for

17     that reason there is not a weighted average.  There is

18     the English language learner percentage.

19        Q.  Where do you see that?  Because I see five

20     categories:  Economically disadvantaged.  Career and

21     technical education weight.  Students with disability.

22     Gifted and talented.  And economy of scale weight.

23          There is no category for English as a second

24     language, is there?

25               MR. ST. JOHN:  Objection.  This is a
```

Andrew Arthur , 30(b)(6)                                    November 30, 2023

1      Q.  So the Louisiana Department of Education you said

2   uses English language students as a proxy for

3   immigration students?

4      A.  No, they don't.  And let me be clear about that.

5          They agree to the fact that it could be a rough

6   proxy for immigrant students, but I can tell you that in

7   Jefferson Parish schools they do actually have those

8   newcomer programs that are specifically tailored toward

9   immigrants.  As I mentioned before, the State of

10  Louisiana doesn't have the ability to inquire into the

11  immigration status of any of its students.

12     Q.  Isn't French an important language in Louisiana?

13             MR. ST. JOHN:  Objection.  Beyond the scope.

14  BY MS. RYAN:

15     Q.  Mr. Arthur?

16     A.  With respect to French proficiency I believe that

17  there is a small minority of individuals who speak a

18  dialect of French, which is commonly referred to as

19  Cajun, but it is a very limited majority of individuals

20  who speak that as their primary language.  In fact, I

21  don't even know if today there is anyone who speaks

22  Cajun as their sole language.

23          One of the things that I can tell you based upon

24  my experience as an immigration judge is that American

25  culture is pervasive and that English language fluency

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 60

1        Q.   Okay.

2        A.   As I mentioned before it's about 40 percent of

3    the Louisiana state budget.

4        Q.   Has the cost of educational services for the

5    State of Louisiana changed since March of 2022?

6        A.   Could you ask -- I apologize, Counsel, can you

7    ask the question again?

8        Q.   Sure.  The total amount of educational services

9    for the State of Louisiana has that changed in any way

10   since March of 2022?

11       A.   In the new budgetary cycle the most recent budget

12   is actually higher.

13       Q.   And do you know why it is higher?

14            MR. ST. JOHN:  Objection.  Beyond the scope.

15       A.   I'm -- I would conclude that it's because more

16   students and more weighted students are entering the

17   school system.

18   BY MS. RYAN:

19       Q.   Can you articulate any harm to the Minimum

20   Foundation Program that is only attributable to the IFR?

21       A.   Because the State of Louisiana doesn't have the

22   ability to inquire into the citizenship status of the

23   students in the schools, that would be a very difficult

24   calculation to make.

25            However, the Department of Justice and the

Page 61

1    Department of Homeland Security would actually have the

2    ability to make that assessment based upon the number of

3    students that they know are in the school district.

4        Q.  But as you said --

5        A.  The number of school districts in Louisiana.

6        Q.  But as you said, the State of Louisiana doesn't

7    know immigration status so they can't articulate harm

8    directly attributable to the IFR?

9        A.  Right.  So with respect to the IFR there are a

10   couple of different things that would pose or that would

11   impose additional costs.  Because under the IFR asylum

12   can be granted more quickly and because the IFR allows

13   for the parole of individuals pending credible fear

14   reviews, the number of people who show up at the border

15   and be released would increase.

16           In addition, it is my conclusion that the IFR

17   itself would create a magnet that would bring additional

18   individuals, foreign nationals to enter the United

19   States and then become noncitizens in this country.

20   Foreign nationals, by the way, for the record, refers to

21   individuals who are not citizens or nationals of the

22   United States.

23       Q.  The testimony today is not your opinion, we're

24   speaking in the position of the 30(b)(b) for the State

25   of Louisiana.

Page 66

1          With respect to qualified noncitizens there are

2     individuals who are qualified noncitizens without that

3     five year bar, and that includes individuals who have

4     been granted asylum.

5          It also includes Cuban and Haitian entrants who

6     have been paroled into the United States who have

7     pending asylum applications.  So with respect to the

8     quicker adjudication of the asylum applications

9     noncitizens generally who are granted asylum more

10    quickly will be eligible for that SNAP benefit more

11    quickly.

12         To the degree that they are Cuban and Haitian

13    entrants, if they are paroled out of custody under the

14    terms of the IFR, they also would become immediately

15    eligible.

16         Particularly if they are paroled after they have

17    gone through the credible fear determination, because

18    under the IFR, and this is a break from the way that

19    it's always been done in the past, traditionally in

20    order for an individual to apply for asylum the

21    individual had to file what's called a Form-I589

22    application for asylum and for withholding of removal,

23    under the IFR the signed copy of the credible fear

24    determination, positive credible fear determination, is

25    a application for asylum.

Andrew Arthur , 30(b)(6)                                     November 30, 2023

Page 67

1           And, again, that's a break from traditional

2       practice for as long as I know, and I've been doing this

3       for 32 years.

4           Q.  Okay.  So --

5           A.  So by --

6           Q.  Let me ask the question please.

7           A.  I apologize.

8           Q.  So the injury being alleged is that they will be

9       eligible for SNAP benefits faster under the IFR?

10              MR. ST. JOHN:  Objection.  I was going to

11      say incomplete recitation of his testimony, asked and

12      answered.

13              MS. RYAN:  It's not asked and answered,

14      actually, Scott, because he didn't answer the question

15      directly.

16      BY MS. RYAN:

17          Q.  So I'm just trying to summarize -- if I could

18      just get a quick response, what is the injury being

19      alleged?

20              MR. ST. JOHN:  Counsel, he's entitled to

21      answer the question.  I was able to pick out the

22      injuries that he recited.  He gave you the explanation

23      for why there are injuries and he's entitled to give the

24      complete answer.

25          A.  With respect to individuals who were granted

Andrew Arthur , 30(b)(6)                              November 30, 2023

1    asylum more quickly they're going to become eligible for

2    SNAP benefits more quickly.

3            With respect to Cuban and Haitians entrants,

4    those individuals as soon as they pass the credible fear

5    screening and receive a positive credible fear

6    determination will have been deemed to have applied for

7    asylum, and therefore will become eligible.  If they're

8    paroled from custody they're going to be eligible.

9    BY MS. RYAN:

10       Q.  And what about for TANF, what injuries are

11   alleged in regards to that program?

12       A.  With respect to -- with respect to SNAP, the

13   administrative cost of that program are born by the

14   State of Louisia- -- or actually, split between the

15   Federal Government, the United States Department of

16   Agriculture, and the State.  So the more people who are

17   eligible for that, the more that the funding is going to

18   go up, or the more that the cost of the State of

19   Louisiana are going to go up.  It's also going to draw

20   upon the time of employees that the Department of

21   Children and Family Services.  DCFS and Louisiana is

22   unfortunately one of those agencies that has trouble

23   keeping employees, and so they have been -- you know,

24   they are short staffed and that imposes a tangible

25   impact on them.

Page 69

1           With respect to TANF, Temporary Assistance to

2     Needy Families, the program in Louisiana is called

3     FITAP, which is Financial Independence Temporary

4     Assistance Program.  Again, that one is fully funded by

5     the Federal Government including the administrative

6     cost, but with respect to the employee time that is

7     taken, again, those applications are adjudicated by

8     employees of the, of the DCFS, and so it will take their

9     time.

10          The government is actually, the State of

11    Louisiana is reimbursed for the time for those

12    individuals, but it takes them away from other

13    activities.

14          In addition, with respect to the application --

15          Do you want me to go through the application

16    process, because there actually will be cost there

17    associated with that now?

18    Q.  Not at this moment, we'll go through it.

19    A.  Okay.  Please remind me to come back to that

20    because there are costs, because the interview process

21    for individuals who weren't fluent in English is

22    actually longer because they have to verify eligibility.

23    Q.  Okay.  So you said the FITAP program is fully

24    funded by the Federal Government including

25    administrative costs and they do get reimbursed for the

Page 77

1    BY MS. RYAN:

2        Q.  How many noncitizens released under the IFR are

3    enrolled in the SNAP program in Louisiana?

4        A.  As I mentioned before, 8CFR 208.6 actually limits

5    the disclosure of information related to an individual

6    who has applied for asylum or has gone through a

7    credible fear review provision.

8            This is a -- so consequently the only thing that

9    the State of Louisiana is going to know is that an

10   individual has applied for asylum or has been paroled

11   into the United States with respect to the eligibility

12   for those people.  That would be information that would

13   be within the knowledge of the Department of Justice and

14   the Department of Homeland Security.

15       Q.  But they don't know under what program or policy

16   that person was paroled or granted asylum?

17       A.  No, under the policy that is followed by the

18   State of Louisiana they don't inquire into which of

19   those things.  The eligibility is a federal matter

20   rolled into state law and they comply with those

21   requirements.

22       Q.  How many noncitizens released under the IFR are

23   enrolled in the FITAP program in Louisiana?

24       A.  Again, as I mentioned before, 8CFR 208.6 is a

25   confidentiality provision.  There's a separate

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 78

1    confidentiality provision 8CFR 1208.6, they mirror one

2    another, and they bar the disclosure of information

3    relating to asylum applicants, any information that the

4    asylum applicant provides, or with respect to credible

5    fear determinations, so that would be information that

6    would be known to the federal but not for the State of

7    Louisiana.

8        Q.  I'm going to show a document, I believe we're up

9    to Exhibit F.

10               THE COURT REPORTER:  That's correct.

11               (Exhibit F was marked for identification.)

12               MS. RYAN:  If I start jumping around the

13   alphabet, please let me know.

14   BY MS. RYAN:

15       Q.  Do you see this document on your screen?

16       A.  I've got a blank screen.

17       Q.  Okay.  One second.

18       A.  Yes, ma'am, I do.

19       Q.  Okay.  So this is a spreadsheet entitled Asylee

20   Issuance Amount with no Bates number.

21           Have you seen this document before?

22       A.  I believe that I've seen that document before.

23       Q.  And for the record, there's no Bates number but

24   it was produced to defendants on July 27, 2023.

25           What is this document?

Andrew Arthur , 30(b)(6)                                November 30, 2023

1     the same case number repeated, the same individual ID

2     repeated, but with different payment amounts and

3     different payment dates, is that correct?

4         A.   That is correct, Counsel.

5         Q.   Okay.  So these would be different payments to

6     this individual with this ID number?

7         A.   As I understand the document.  I didn't run the,

8     the document itself.

9         Q.   Okay.  And you said these are for asylees

10    generally?

11        A.   This is the asylee issuance amount, yes.

12        Q.   But that is not specific to asylees released

13    under the IFR?

14        A.   There's no way for the State of Louisiana to know

15    which individuals were released under the IFR because it

16    doesn't differentiate with respect to the documents.

17             Louisiana doesn't request specific documents.

18    They request specific documents, but that can include a

19    employment code on a employment authorization document.

20    It can include a stamped version of a judge's order

21    granting asylum, so there's no way for the State of

22    Louisiana to know that.  And they verify that through

23    the SAVE system.

24        Q.   When somebody is eligible for SNAP you've

25    mentioned food assistance or you've mentioned like a

Page 87

1      Q.   Do they request a flat amount or is it per

2   person?

3      A.   Per person, employee, beneficiary.

4      Q.   Let me -- yeah, so let me break that for you.

5           So does the number of people enrolled in the

6   programs affect how much money they request from the

7   Legislature?

8      A.   Based upon the statement that I made before with

9   respect to the administration of the SNAP program, it

10   would be the number of employees that they would need

11   with the amount of money that they received, that they

12   split with the federal with respect to SNAP.

13           With respect to FITAP those administrative costs

14   should be covered.  But again, there's the employee time

15   part.

16      Q.   So you mentioned the FITAP federal funding.  Does

17   the Federal Government provide funding for SNAP

18   benefits?

19      A.   It does.  That is through the United States

20   Department of Agriculture.  The administrative costs are

21   split.

22      Q.   And is that money provided proactively for the

23   upcoming fiscal year or retroactively based on the

24   amount actually spent in the previous fiscal year?

25                MR. ST. JOHN:  Objection.  Beyond the scope.

Page 90

1    upon the limited time of the employees that are

2    currently employed by DCFS.

3        Q.  Let's -- just one moment.

4              (Recess was taken.)

5    BY MS. RYAN:

6        Q.  You mentioned INMAR as the -- that's the type of

7    credit card that the state uses to provide its benefits

8    for SNAP and FITAP, correct?

9        A.  That's the name of the contractor.

10       Q.  Okay.  Does Louisiana pay to license that

11   technology or is it a per user amount that you need to

12   pay for everyone who gets an INMAR card?

13             MR. ST. JOHN:  Objection.  Beyond the scope.

14       A.  To the best of my knowledge, the contract with

15   INMAR is a flat fee.  There is a fee that they pay based

16   upon reconsideration for the term of the contract.

17   BY MS. RYAN:

18       Q.  Okay.  Turning to Medicaid.

19             So in this lawsuit Louisiana is alleging that

20   they suffered injury to their Medicaid program as a

21   result of noncitizens released under the IFR coming to

22   Louisiana, correct?

23       A.  That's correct, Counsel.

24       Q.  Can you summarize what are the injuries that

25   Louisiana is claiming to its Medicaid program as a

Andrew Arthur , 30(b)(6)                                  November 30, 2023

                                                              Page 91

1      result of the IFR?

2          A.   With respect to Medicaid as with SNAP, and TANF,

3      or FITAP, United States citizens and nationals are

4      eligible for Medicaid assuming that they meet the

5      residency and qualification standards.  There is an

6      exception for what's called emergency Medicaid for

7      individuals who need emergency medical care.

8              The -- with respect to noncitizens -- there are

9      qualified noncitizens and there are non --

10             Or there are nonqualified noncitizens and then

11     there are qualified citizens who are subject to a bar,

12     to a five year bar, again, similar to the ones that

13     apply to SNAP and TANF.

14             Individuals who have been -- who are qualified

15     noncitizens who have green cards or fall within other

16     categories have to wait five years before they're

17     eligible for the benefits.

18             With respect to other noncitizens, including

19     asylees and Cuban and Haitian entrants, they are

20     eligible for those benefits as soon as they attain those

21     statuses.  So the more quickly that a applicant, an

22     alien applicant receives the benefit the more quickly

23     they're going to be eligible to draw upon the Medicaid

24     program.

25             Same is true with respect to the release of Cuban

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 92

1    and Haitian entrants either on parole or, which again is

2    impacted by the IFR, or the filing of the asylum

3    application, which again is going to also be impacted by

4    the change by the waiving of the I-589 Rule in the IFR.

5        Q.  What are the different types of Medicaid programs

6    that the State of Louisiana offers?

7        A.  So they offer emergency Medicaid, which I

8    referenced before.  They also reference -- they also

9    offer CHIP, the Children's Health Insurance Program.

10           In fact, they offer expanded CHIP for certain

11   nonqualified, non -- or for certain qualified

12   noncitizens not subject to the bar.

13           Emergency -- there's also CHIP Level 4, which is

14   something that's available to pregnant women.

15       Q.  So there's regular expansion, CHIP, and

16   emergency?

17       A.  Yes.  And then there's also a Affordable Care Act

18   one that is an expanded Medicare program.

19       Q.  And which portions of those -- strike that.

20           Which portions of the Medicaid program is

21   Louisiana claiming injury to as a result of the IFR?

22       A.  With respect to regular Medicaid, with respect to

23   expanded Medicaid, and with respect to the CHIP program.

24           Again, if an individual receives asylum status

25   they are eligible to petition under Section 2A, the INA,

Page 94

1              You can answer.

2         A.   If they are Cuban or Haitian entrants then they

3    immediately become qualified for Medicaid.

4    BY MS. RYAN:

5         Q.   And if they're not?

6         A.   If they're not Cuban and Haitian entrants?

7              All with respect to that, again, there is the --

8    there is an Afghani, Iraqi provision, there is a

9    Ukrainian provision, but with respect to all other

10   individuals they are subject to the five year bar until

11   they're granted asylum.

12        Q.   And once they're granted asylum they are

13   automatically qualified?

14        A.   Once --

15             MR. ST. JOHN:  Objection.  Best Evidence

16   Rule.

17        A.   Once they're granted asylum they're automatically

18   eligible.

19   BY MS. RYAN:

20        Q.   And what about parolees, are they qualified or

21   nonqualified?

22             MR. ST. JOHN:  Objection.  Best Evidence

23   Rule.

24        A.   Parolees are qualified noncitizens provided that

25   they've been paroled for a year or more, subject to the

Andrew Arthur , 30(b)(6)                          November 30, 2023

Page 95

1     five year bar.  And, of course, the Cuban and Haitian

2     parolees, as I mentioned before.

3     BY MS. RYAN:

4         Q.  Right.  But if they're not of a specific

5     nationality that is excluded from the five year bar

6     parolees are eligible after a five year wait if their

7     parole is for one year or longer?

8                   MR. ST. JOHN:  Objection.  Best Evidence

9     Rule.  Calls for testimony about a question of law.

10                  You can answer.

11        A.  The State of Louisiana follows the standards that

12    are set forth in a document issued by the Department of

13    Health.  The I-300, it's I-300, that's it, and they

14    complied with those requirements with respect to

15    qualified and nonqualified noncitizens.

16             Again, with the exception of CHIP, but you

17    haven't asked me about CHIP, we can talk about that.

18        Q.  Yes, we'll get there.

19             The conditions of eligibility for expansion

20    Medicaid, are they the same or different than for

21    regular Medicaid?

22                  MR. ST. JOHN:  Same objection.

23        A.  Yeah, the State of Louisiana follows the ACA with

24    respect to eligibility for expanded Medicaid.  But with

25    respect to eligibility, again, the same eligibility

Page 96

1    standards apply.

2    BY MS. RYAN:

3        Q.  So you said they follow the rules, but my

4    question is, is it the same eligibility for regular

5    Medicaid and expansion Medicaid, or are they different?

6        A.  Well --

7                MR. ST. JOHN:  Same objection.

8                Give me a potato before you start answering,

9    okay?  Just so we can make sure we get the objection in.

10       A.  With respect to the income standards they are

11   lower between expanded Medicaid and regular Medicaid.

12   But again, they're all set forth in federal statute.

13   BY MS. RYAN:

14       Q.  And what are the conditions of eligibility for

15   CHIP?

16               MR. ST. JOHN:  Same objection.

17       A.  With respect to CHIP, CHIP is administered for

18   children under the age of 19, except for CHIP Level 4,

19   which applies to pregnant women.  And again, those are

20   all set forth in the Federal Law with respect to the

21   eligibility for it.

22   BY MS. RYAN:

23       Q.  And does the immigration status impact

24   eligibility for CHIP like it does for regular and

25   expansion Medicaid?

Andrew Arthur , 30(b)(6)                                November 30, 2023

1        A.   That is correct, Counsel.

2        Q.   Is there a specific part of the Department of

3    Health that is responsible for the administration of

4    these programs?

5        A.   So there is a Medicaid director within the

6    Department of Health.

7        Q.   Are all these Medicaid programs administered

8    within that same department or are they separate like

9    SNAP and FITAP were?

10       A.   They're administered within the same department,

11   to the best of my knowledge.

12       Q.   How many noncitizens released under the IFR are

13   enrolled in Medicaid in Louisiana?

14       A.   With respect to that information, again, 8CFR

15   Section 208.6 and 8CFR Section 1208.6, bar the

16   disclosure of information related to asylum applications

17   and with respect to individuals who have applied for

18   credible fear.  The State of Louisiana doesn't have the

19   ability to determine that.

20            However, there is a company called

21   Gainswell(phonetic), which is a financial intermediator

22   that provides information about the individuals who

23   receive Medicare in the State of Louisiana back to the

24   Center for Medicaid and Medicare services, which is not

25   called CMMS, but CMS.  So that is information that is

Andrew Arthur , 30(b)(6)                        November 30, 2023

Page 99

1    available to the Department of Health and Human

2    Services, and available to the Department of Justice,

3    and the Department of Homeland Security.

4         Q.  Can you repeat the name of that company you

5    mentioned?

6         A.  Gainswell.  Gainwell.  Gainwell Technology.

7         Q.  And can you spell that for the record?

8         A.  G-A-I-N-W-E-L-L, I believe.

9         Q.  And you said it reports back to the State of

10   Louisiana about the individuals receiving Medicaid?

11        A.  Other way around.  It reports back to -- they're

12   the financial intermediary between HHS and the State, so

13   they report back to HHS.

14        Q.  And where did you get that information from?

15        A.  I obtained that information through conversations

16   that I've had with employees of the Department of

17   Health.

18        Q.  So my question was whether the state can identify

19   the number of people released under the IFR who are

20   using Medicaid.  Are you implying that this company

21   would somehow know that information?

22        A.   No, they would report back on the individuals who

23   have been granted Medicaid, that information would then

24   go to the Federal Government, and the Federal Government

25   could verify the how those individuals obtained asylum

Andrew Arthur , 30(b)(6)                                   November 30, 2023

Page 100

1    status, the reasons for which they were paroled.

2        Q.  So the --

3        A.  But the State of Louisiana wouldn't have access

4    to the information about the individuals with respect to

5    the IFR because the only thing that they look at is the

6    status of the individual of the noncitizen qualified or

7    not qualified subject to five year bar.

8        Q.  When an individual is eligible for Medicaid, do

9    they receive a payment like the SNAP and FITAP program

10   or is it similar to a health insurance where it would

11   pay out claims if they need to receive medical

12   treatment?

13       A.  Louisiana actually does it both ways, so they

14   have what's called a fee for service or FFS, which is

15   somebody goes to the hospital, they receive the

16   treatment, Louisiana gets billed with that, for that.

17           With respect to other individuals, there are six

18   managed care organizations that the State of Louisiana

19   contracts for that provided medical services and that's

20   on a per member, per month basis.  PMPM is what it's

21   called.

22       Q.  PMPM.  So if they're eligible for Medicaid they

23   are a member of these managed care facilities?

24       A.  They're not facilities, they're organizations.

25   MCOs is what they're called, and basically the MCO

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 106

1    contained, let's see, it would have been in 2021.  It

2    would have been done in 2023, I believe that the amount

3    of money for administrating the Medicaid program has

4    gone up, but it should be in the budget documents.

5        Q.  Are you able to articulate any specific harm to

6    the Medicaid program that's only attributable to the

7    IFR?

8        A.  It would be the amount of money that the State of

9    Louisiana would have to pay as its part of the FMAP with

10   respect to that.  In addition, medical care, of course,

11   is a limited quantity as we all saw during COVID.  So

12   the more people that draw upon the medical system it's

13   going to have a direct impact upon all people who seek

14   medical services.

15       Q.  But couldn't that generally be about immigrants

16   in the state and not specific to the IFR?

17       A.  To the degree that individuals are granted asylum

18   more quickly, to the degree that they are Haitian and

19   Cuban entrants who are released either because they

20   filed asylum applications or under the parole provision

21   in the IFR, that would actually be a real affect.

22       Q.  But if you are unable to know which individuals

23   came in under the IFR because of the CFR cites you have

24   provided, how can the state say these harms are

25   attributable only to the IFR?

Andrew Arthur , 30(b)(6)                           November 30, 2023

Page 107

1        A.   We could project it out based upon the number of

2   people -- we can't project out the number, but we can

3   project out that there would be an affect based upon

4   more people becoming eligible for asylum more quickly.

5             Currently for non-detained cases people wait

6   about four years according to track the transactional

7   record access clearinghouse at Syracuse University.

8             The IFR sets a goal of completion by the asylum

9   officer within 60 days, so, you know, that's a much more

10  quick process.

11            Moreover, as I think as I noted before, under

12  Section 208 of the INA foreign nationals who are granted

13  asylum, or actually noncitizens in this context who are

14  granted asylum, can petition for immediate family

15  members to follow to join.

16       Q.   But you don't know if any individuals under the

17  IFR are even in Louisiana so you don't know if they're

18  using the Medicaid program?

19       A.   Well, I know that Louisiana was actually one of

20  the spots that was specified for the initial rollout of

21  the asylum officer rule, and we know from documents from

22  the Department of Homeland Securities asylum process in

23  rule cohort that six individuals have been subject to

24  the IFR in the State of Louisiana.  We know that four of

25  those individuals were actually referred to an

Page 108

1    immigration judge, the two of the others had their case

2    administratively closed.

3            Honestly, Ms. Ryan, I don't understand the

4    administrative closure part because there's nothing in

5    the IFR that allows for administrative closure.  But we

6    also know that there are asylum applicants within the

7    State of Louisiana.

8    Q.  Just to clarify, you've said multiple times in

9    this deposition that you are unable to know whether

10   these asylum seekers, these asylees, were released or

11   granted asylum under the IFR, correct?  You said that

12   multiple times during this deposition.

13   A.  That's correct, Counsel, because that's not

14   something --

15   Q.  Okay.  So --

16   A.  -- that would be knowable to the State of

17   Louisiana.

18   Q.  Exactly, so it is not knowable whether the person

19   came in or was released under the IFR, so how can you

20   say that you have specific harms to the Medicaid program

21   specific to people coming in under the IFR?

22   A.  With respect to that, we could project out the

23   more quickly people are granted asylum.

24   Q.  I didn't ask about projections, Mr. Arthur.  I

25   asked if you can articulate a specific harm to the

Page 109

1    Medicaid program from the IFR?

2        A.  With respect --

3                THE WITNESS:  You're on mute.

4                MR. ST. JOHN:  Counsel, please speak

5    respectfully to the witness.  It's misleading to suggest

6    it has to be a past harm.  He is testifying about a

7    harm.  Please let the witness answer the question.

8                You can answer, Mr. Arthur.

9        A.  With respect to the quantum of harm to the State

10   of Louisiana, because the State of Louisiana has no way

11   of knowing which of those people have been subject to

12   the IFR, only the Federal Government only in this

13   situation CMS, HHS, DOH, DHS would actually know the

14   number of individuals who have come into Louisiana who

15   would have applied for those benefits within the State

16   of Louisiana.  There's no special code that appears on

17   the employment documents for those individuals.  It's an

18   unknowable fact, but it is one that's in the possession

19   of the Federal Government of the executive branch.

20   BY MS. RYAN:

21       Q.  Switching to general state topics.

22              Are you able to say how many noncitizens released

23   under the IFR have established residence in Louisiana?

24       A.  As I think I mentioned before, with respect to

25   that I can tell you that there are individuals who are

Page 110

1    processed in Louisiana under the IFR.  I know that two

2    of those individuals cases were administratively closed.

3            With respect to other individuals who have

4    relocated within Louisiana after being granted benefits

5    from the IFR, I can't tell you.  But I can tell you that

6    the only individual that would know that, the only

7    entity that would know that, would be the executive

8    branch.

9        Q.  I'm showing you what will be marked as Exhibit F,

10   I believe.  H.  I'll pull it up here.

11               (Exhibit H was marked for identification.)

12       A.  And if I could just to clarify the statement that

13   I made before.  The DHS asylum processing rule cohort is

14   only current to April of 2023.

15   BY MS. RYAN:

16       Q.  I'm sorry, you cut out at the beginning, can you

17   just repeat the beginning of your answer for that?

18       A.  I apologize.  The DHS asylum processing cohort

19   is only current through April of 2023.  It was last

20   issued in October of 2023, but it's not current.

21       Q.  Okay.  Do you see a document on your screen?

22       A.  I do.

23       Q.  Okay.  Scrolling down.

24            One second.  I don't know why it's -- let me try

25   that again.