Page 1

1                IN THE UNITED STATES DISTRICT COURT

               FOR THE WESTERN DISTRICT OF LOUISIANA

2                        LAFAYETTE DIVISION

                  Civil Action No. 6:22-cv-01130

3

4      STATE OF ARIZONA, et al.,

5            Plaintiffs,

6            v.

7      MERRICK GARLAND, in his official

       Capacity as Attorney General of the

8      United States, et al.,

9            Defendants.

       _____/

10

11

12                    DEPOSITION OF ANDREW ARTHUR

13                    Taken Via Video Conference

14                    Thursday, December 14, 2023

15                      Beginning at 10:05 a.m.

16

17

18

19

20

21

22

23

24

25     Job No. CS6327627

Page 2

```
 1                     APPEARANCES OF COUNSEL
 2      On behalf of the Plaintiffs:
 3             SCOTT ST. JOHN, Esq.
               Deputy Solicitor General
 4             Louisiana Department of Justice
               1885 North 3rd Street
 5             Baton Rouge, Louisiana   70802
               225-485-2458
 6             stjohn@ag.louisiana.gov
 7
 8      On behalf of the Defendants:
 9             ERIN T. RYAN, Esq.
               EVAN SCHULTZ, Esq.
10             SARAH VULONG, Esq.
               SYDNEY JACKSON, Esq.
11             U.S. Department of Justice
               Civil Division
12             Office of Immigration Litigation
               District Court Section
13             P.O. Box 868, Ben Franklin Station
               Washington, D.C.  20044
14             202-532-5802
               erin.t.ryan@usdoj.gov
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

INDEX OF EXAMINATION

                                                    Page

By Mr. Schultz                            5,   240

By Mr. St. John                                217

INDEX OF EXHIBITS

Number                    Description            Page

Exhibit 1  Notice of Deposition                 20

Exhibit 2  December 8, 2023 E-mail              20

Exhibit 3  Expert Report                        22

Exhibit 4  Executive Office For Immigration Review

           Adjudication Statistics            192

Exhibit 5  Executive Office For Immigration Review

           Adjudication Statistics            195

Page 4

1                  P R O C E E D I N G S

2                        * * * * *

3                    (Witness Sworn.)

4          MR. SCHULTZ:  So we are on the record.  And

5       again, it's 10:05 a.m.  Andrew Arthur, the

6       witness, has just taken the oath of office.

7       This is Evan Schultz speaking.  Opposing Counsel

8       is Scott.  And Scott, because this deposition is

9       virtual and the court reporter is not in the

10      same room as you, do we agree that the court

11      reporter is an officer who is permitted to

12      administer the oath by video conference?

13         MR. ST. JOHN:  Assuming she's a North

14      Carolina court reporter, yes.

15         MR. SCHULTZ:  Ms. Marsh did tell me before

16      that she's in North Carolina, and I saw her

17      nodding her head.

18         Do you want to confirm that, Ms. Marsh?

19         COURT REPORTER:  Yes, I am in North

20      Carolina.

21         MR. SCHULTZ:  And Scott, Counsel, do you

22      agree not to record this deposition?

23         MR. ST. JOHN:  You know, I will agree to

24      the rules and nothing more, nothing less.  We've

25      had an e-mail correspondence and this came up

Page 5

1          during the last deposition.  The state does not

2          make stipulations that are not agreed to in

3          advance.

4               So if you're asking for anything, it's

5          going to be the rules, nothing more, nothing

6          less.

7               MR. SCHULTZ:  Are you recording this?

8               MR. ST. JOHN:  I'm not the one being

9          deposed.  So the state agrees to the rules,

10         nothing more, nothing less.

11              MR. SCHULTZ:  Okay.  And I'm sorry, are you

12         currently recording this now is all I'm asking.

13              MR. ST. JOHN:  I'm not the witness.  I'm

14         not here to answer questions.

15              MR. SCHULTZ:  Okay.  So you're not going to

16         answer that.  Thank you.

17                        ANDREW ARTHUR,

18           having been duly sworn, testifies as follows:

19                        EXAMINATION

20    BY MR. SCHULTZ:

21         Q.   Judge Arthur, do you agree not to record

22    this deposition?  I saw your head.  I couldn't hear,

23    though.

24         A.   Sorry.  I was opening a thing of nuts.  I

25    do.  I muted myself.  Sorry about that.

Page 6

1          Q.   That's okay.  Thank you.  All you all set?

2     Do you want to take another minute before we start?

3          A.   I'm good to go, Counsel.  Please.

4          Q.   Thank you.  And turning to Judge Arthur, do

5     you agree not to text or call or e-mail or instant

6     message any person during this deposition unless

7     we're on a break and there's no question pending,

8     except for figuring out whether or not there's a

9     privilege?  Is that something you can agree to, sir?

10         A.   Yes, sir.

11         Q.   Okay.  Thanks.  And are you currently in a

12    quiet place where you won't be disturbed, where you

13    won't be overheard?

14         A.   I am, sir.

15         Q.   Thanks.  I'm going to be asking you a

16    series of questions and the reporter is going to

17    write down your answers to that.

18              Do you understand that?

19         A.   I do, sir.

20         Q.   This isn't the first time you've been

21    deposed.  I know you were deposed in this case a week

22    or so ago as a 30(b)(6) witness; is that right?

23         A.   That's correct, sir.

24         Q.   This will sound familiar, but I'll still go

25    through these just to make sure everything is on the

1   record.

2             You do need to give verbal responses.  That

3   means please don't just nod your head.  Please don't

4   just say "uh-huh."  Do you understand that you need

5   to answer questions using words?

6        A.   I do, Counsel.

7        Q.   Thank you.  And when you speak -- and this

8   is always true, but all the more so because we're

9   virtual here or I should say we're on the Microsoft

10  Teams remote system -- please always be sure to use a

11  strong voice and to speak clearly, and that way the

12  court reporter can transcribe the deposition

13  accurately.

14            So do you understand that it's important

15  for you to please speak clearly and loudly?

16       A.   I do, Counsel.

17       Q.   Okay.  Thank you.  And something else to

18  point out -- this is always true again, but all the

19  more so in virtual depositions:  It can be very

20  difficult whenever there's any crosstalk at all

21  because sometimes the words will just cut out and

22  then the court reporter won't hear anything.

23            So let's just everyone be aware of that and

24  try not to talk over each other.  Some of it

25  inevitably happens.  Is that something you can please

Page 8

1    try to avoid?

2         A.   Yes, sir.

3         Q.   Thank you.  Okay.  And along those same

4    lines, when I ask a question, please wait for me to

5    finish the question before you answer.  It makes it

6    easier for the court reporter, but it also makes it

7    easier for you so you know where I'm going.

8              So do you understand to please wait for me

9    to finish asking the questions?

10        A.   I do, Counsel.

11        Q.   Thank you.  And if you don't hear a

12   question, I can repeat it.  And if you don't

13   understand a question, I can repeat it.

14             So is it clear to you that if you don't

15   hear the question or that you don't understand the

16   question, that you should please tell me?

17        A.   Yes, Counsel.

18        Q.   Okay.  Now, unless you tell me otherwise,

19   I'm going to assume that you've understood and heard

20   the entire question.

21             So can you please confirm that

22   understanding that I just told you?

23        A.   Yes, Counsel.  And if I don't understand

24   anything that you say or don't hear part of it, I

25   will ask you to repeat it.

Page 9

```
 1            Q.   Please.  Thank you so much.  That will be
 2       helpful.
 3                 Now, please don't guess.  If you don't know
 4       the answer to a question, please just tell me that
 5       you don't know the answer.
 6                 So do you understand that you shouldn't
 7       guess?
 8            A.   I do, Counsel.
 9            Q.   Okay.  Thank you.
10                 MR. SCHULTZ:  And let me just turn to
11            Ms. Marsh for a second.  Is this pace okay for
12            you?  Are you doing okay taking everything down?
13                 COURT REPORTER:  Yes.  It's perfect.
14       BY MR. SCHULTZ:
15            Q.   Okay.  So turning back to Judge Arthur,
16       this testimony is being given under oath, which is
17       similar to the oath that one takes on a stand at
18       trial.
19                 So do you understand that you just now this
20       morning took an oath to give complete and truthful
21       answers?
22            A.   I did, Counsel.
23            Q.   Okay.  Now, if you realize at some point
24       during the deposition that an earlier answer that you
25       gave was incomplete or not accurate, please just let
```

Andrew Arthur                                    December 14, 2023

Page 10

1    me know and I will give you a chance to follow up on

2    that.  Okay?

3         A.    Thank you, Counsel.  Yes.

4         Q.    Now, we can take breaks during the

5    deposition.  If you need to take one, please let me

6    know.  Same for you, Counsel, and we will do the

7    same.

8              So first of all, do you understand that you

9    can ask for a break?

10        A.    I do, Counsel.

11        Q.    Now, if there's a question pending, I am

12   going to ask you to please answer the question before

13   we take the break.

14             So do you understand that?

15        A.    I do, Counsel.

16        Q.    And please only answer the questions that

17   I've asked.  Again, it just helps move things along

18   in many ways.

19             So do you understand that you should only

20   answer the questions that I ask, please?

21        A.    I do, Mr. Schultz.

22        Q.    Now, after the deposition is over, there

23   will be a transcript that's circulated, and at that

24   point you can review the transcript that's going to

25   be generated by the court reporter from the testimony

Andrew Arthur                                        December 14, 2023

1        today, and you'll have an opportunity to correct any

2        errors or typos that you find.

3                Do you understand that?

4        A.   I do, Counsel.

5        Q.   And if you do make changes to the

6        transcript, then I will be able to comment on those

7        changes at trial.

8                Do you understand that as well?

9        A.   I do, Counsel.

10       Q.   Okay.  So given everything I've just said,

11       do you understand the rules of the deposition that

12       I've just went over with you?

13       A.   I do, Counsel.

14       Q.   Okay.  And are there any physical or mental

15       conditions that could interfere with your testimony

16       today?

17       A.   There are none.

18       Q.   Thank you.  And is there any reason that

19       would prevent you from giving full, accurate, and

20       truthful testimony today?

21       A.   There is none, Counsel.

22       Q.   Okay.  All right.  Well, thank you.  So let

23       me change gears a little bit.  Thank you for going

24       through those rules and initial questions with me.

25                I'm going to turn now to a little bit of

Andrew Arthur                                    December 14, 2023

                                                        Page 12

1     the preparation that you've done for the actual

2     report that you've wrote and also for the litigation

3     generally.

4              So let me ask you this:  When I refer to

5     the lawsuit or this lawsuit, do you understand that

6     I'm talking about the case that we're involved in now

7     that you're giving testimony in that you also gave

8     the testimony for in the 30(b)(6) deposition?

9     A.    That's right, Mr. Schultz.  Arizona versus

10    Garland.

11    Q.    Yes.  Thank you.

12             When did you first become aware of this

13    lawsuit?

14    A.    I'm not entirely sure when I first became

15    aware of the lawsuit.  Part of my job, my normal job,

16    I'm a resident fellow in law and policy at the Center

17    For Immigration Studies.  And in the course of my job

18    at the Center For Immigration Studies, I keep track

19    of lawsuits, litigation over various policies,

20    including administrative procedure of cases.  So I

21    can't really tell you a specific date.

22             It might have been pretty close to the time

23    it was filed.  It might have been thereafter.

24    Q.    And you wrote about this lawsuit in

25    something that you wrote for CIS on October 11, 2022.

Andrew Arthur                                        December 14, 2023

                                                            Page 13

1            Do you remember that?

2       A.   I do not, Counsel.

3       Q.   Okay.  Well, let me just change it this

4   way:  Do you remember learning about this case before

5   you wrote about it -- I should say, do you remember

6   about this -- scratch that.

7            Do you remember hearing about this case

8   before October 11, 2022?

9       A.   2022?  Well, obviously, I'm not entirely

10  sure.  I would have known about it in advance of

11  writing about it.

12      Q.   Okay.  So how did you end up coming into

13  contact with the plaintiffs in this case?

14      A.   I was approached by the State of Louisiana

15  and asked whether I would offer expert testimony in

16  this case.

17      Q.   Okay.  And when you say the state, was

18  there a specific person who approached you?

19      A.   Scott St. John.

20      Q.   Scott St. John.  Thank you.  That's counsel

21  here today for Louisiana, correct?

22      A.   Correct.  Yes.

23      Q.   Do you know what date Mr. St. John

24  approached you?

25      A.   I would not.  I'd have to go back.  I just

Andrew Arthur                                                    December 14, 2023

Page 14

```
 1    don't know.

 2         Q.   Do you know what year it was?

 3         A.   Honestly, I don't know that either.

 4         Q.   Okay.  At some point did you enter into a

 5    contract with Mr. St. John on behalf of Louisiana?

 6         A.   I did.

 7         Q.   Okay.  Do you know the date of that

 8    contract?

 9         A.   I do not.  I don't have it in front of me.

10         Q.   Do you remember the year of the contract?

11         A.   I really don't.

12         Q.   Okay.  Can you tell me what the contract

13    said, please?

14         A.   It asked me to offer my expert opinion in

15    this matter and it set an amount of money that I was

16    going to be paid for offering my expert testimony.

17    And there was discussion with Mr. St. John about the

18    amount that I would be paid.

19         Q.   Okay.  So when you said that you were asked

20    to offer your expert testimony, did it say what areas

21    that your expertise would be used for?

22         A.   I'd have to look at the contractual

23    agreement, Counsel.

24         Q.   Let me ask you this:  Do you remember if he

25    asked you to use your expertise in immigration law?
```

Andrew Arthur                                December 14, 2023

Page 15

1          A.    I believe so, yes.

2          Q.    Is that a yes or you believe so?

3          A.    I believe so.  I'd need to --

4                MR. ST. JOHN:  Objection.

5                THE WITNESS:  -- look at the contract to

6          see the exact terms.

7                MR. ST. JOHN:  I would object.  This is a

8          written document.  Best evidence rule, you

9          can -- the written document is definitive.  The

10         witness has testified that he has vague

11         recollection of it, so we should be looking at

12         the written document.

13               MR. SCHULTZ:  Do you have a copy of that?

14               MR. ST. JOHN:  Not on me, no.

15   BY MR. SCHULTZ:

16         Q.    Judge Arthur, do you have a copy of that?

17         A.    I don't have a copy.

18         Q.    Please send us a copy of that by tomorrow

19   close of business.

20               MR. ST. JOHN:  I'll take that under

21         advisement.  Unfortunately, one of your

22         colleagues indicated that the United States

23         would not take requests on the record for

24         production of expert-related materials, so I

25         hate to be like this, but what's good for the

Andrew Arthur                                    December 14, 2023

Page 16

 1          goose is good for the gander, so we'll take the

 2          request under advisement.

 3                  MR. SCHULTZ:  Okay.  I appreciate that.

 4          Thank you.

 5      BY MR. SCHULTZ:

 6          Q.   Judge Arthur, can you -- if you do

 7      remember, and again, if you don't, please just say

 8      you don't remember, but if you do remember and since

 9      I don't have a copy of that document, did it -- to

10      the best of your recollection, did it ask you to

11      speak about any other area of expertise besides

12      immigration law?

13          A.   I don't remember.  I'd need to look at the

14      contract that I signed with the State of Louisiana.

15          Q.   Okay.  So have you done any preparation for

16      the deposition today?

17          A.   I have spoken to my Counsel in advance of

18      this deposition today -- or Counsel for the State of

19      Louisiana, rather.  I apologize.

20          Q.   Thank you.  That was the next question I

21      was going to ask.  You read my mind.  Thank you.

22                  So that's Mr. St. John, correct?

23          A.   That's correct.

24          Q.   Okay.  Did you speak to anyone else to

25      prepare for this deposition today?

Andrew Arthur                                        December 14, 2023

 1        A.   I did not.  But let me just add the caveat,

 2   Mr. Schultz, that this is what I do for a living.

 3   And so I'm constantly reviewing issues that relate to

 4   immigration law.  I write a daily blog.

 5        Q.   Okay.  Again, that's fine.  I understand

 6   there's overlap in the material.  Again, I'm asking

 7   about what you did to prepare specifically for the

 8   deposition.

 9        A.   I spoke to my counsel and reviewed the

10   submissions in the matter.

11        Q.   And just to make -- just to nail it down

12   since you added that wrinkle a moment ago, aside from

13   Mr. St. John, have you spoken to anyone else to

14   prepare for the deposition today?

15        A.   No, sir.

16        Q.   Okay.  Have you looked at any documents to

17   prepare for the deposition today?

18        A.   The documents that were submitted in the

19   matter.

20        Q.   Okay.  And what do you mean by the

21   documents that were submitted in the matter?  Can you

22   clarify that more, please?

23        A.   The interim Plyler rule that was published

24   on March 29th, 2022, my own statement, and other

25   documents that have been submitted for the record in

Page 18

1    this case.  I can't really remember what they are.  I

2    had a lot.

3         Q.   So by the other documents that were

4    submitted in this case, do you mean documents that

5    were exchanged during the discovery process?

6         A.   I believe that's correct.

7         Q.   Okay.  How many times did you meet with

8    Mr. St. John to talk about this case -- talk about

9    this deposition?

10        A.   Yesterday and today.

11        Q.   Okay.  And how long did you meet with him

12   yesterday?

13        A.   Couple or three hours, if I had to make a

14   guess.

15        Q.   And how long did you meet with him today?

16        A.   About an hour.  About an hour.

17        Q.   Is there -- is there any other time, aside

18   from yesterday and today, that you met with

19   Mr. St. John to prepare for this deposition?

20        A.   Not that I can remember.

21        Q.   Okay.  Did you meet with any other lawyers

22   from his office or any other plaintiffs' office to

23   talk about the deposition while you prepared for it?

24        A.   I did not, sir.

25        Q.   Thank you.  Did you speak to anyone else

1    about this deposition, whether or not it was to

2    prepare for it?  Have you spoken to anyone else about

3    this deposition?

4         A.   I've spoken to people in my office to let

5    them know that I would be having this deposition

6    today.  My boss, Mark Krikorian, who is the executive

7    director for the Center of Immigration Studies and

8    Margaret Telford, who is our press person, about

9    this, just to let them know that I would be having

10   the deposition today and should not be bothered.

11        Q.   Okay.  Did you talk about the substance of

12   the deposition with them?

13        A.   No.

14        Q.   Okay.

15        A.   No.

16        Q.   Now, you had mentioned that you reviewed

17   your statements to prepare for the deposition today.

18   By that, do you mean the expert report that you

19   prepared?

20        A.   That is correct, sir.

21        Q.   Okay.  So I'm going to actually mark a

22   couple of exhibits here.  And this is the

23   technological process, so this is going to take a

24   moment for me to make sure I get this right.  So I'm

25   going to click here.  Is that right?

Andrew Arthur                                    December 14, 2023

1              So my goal here is to basically get a

2       couple of documents to both of you on Teams just to

3       take a quick look at.  If it doesn't work, please let

4       me know and we can see if we can find another way to

5       get them to you.

6              So the first one is going to be the

7       deposition notice.  We'll mark that as Exhibit No. 1.

8                  (EXHIBIT NO. 1 MARKED FOR IDENTIFICATION.)

9              MR. SCHULTZ:  And this is something, Scott,

10          you've already received, just putting it in for

11          purposes of the record.

12              This is going to be Exhibit No. 1, and

13          Exhibit No. 2 is going to be the e-mail you sent

14          the other day, agreeing to this as a virtual

15          deposition.  That's Exhibit No. 2.

16                  (EXHIBIT NO. 2 MARKED FOR IDENTIFICATION.)

17              MR. ST. JOHN:  For the record, these are

18          not being displayed on the screen, so I'm having

19          to rely on your representation of what they are.

20       BY MR. SCHULTZ:

21       Q.   Thank you for saying that.  What we're

22       trying to do is put them in the chat so that you can

23       actually download them from the chat.  Hopefully they

24       will appear in a moment and you can download that

25       yourself.

Andrew Arthur                                    December 14, 2023

Page 21

1          A.   Should I be looking at this in the chat

2     too?

3          Q.   If you could, yes.  If you could let me

4     know if you do see them, then we can figure out our

5     next steps.

6          A.   I can see it, I just can't -- oh, open in

7     browser.  There we go.

8               MR. ST. JOHN:  I'm getting access denied.

9               MR. SCHULTZ:  Access denied.  Interesting.

10          Let's try another technological trick then.

11          Thanks.

12               Thanks for your patience.  I think we're

13          sharing the screen now.  I'm just scrolling up

14          so you can see the Notice of Deposition there.

15               Scott, is that something that you can see?

16               MR. ST. JOHN:  Yes.  I have no -- I don't

17          think I have any control over it, but I can see

18          it appears to be an AOLA-Arthur tab.

19               MR. SCHULTZ:  Yeah.  And can you see it

20          says Defendant's Notice of Deposition?

21               MR. ST. JOHN:  Yes.

22               MR. SCHULTZ:  Okay.  So that's going to be

23          Exhibit No. 1.  I'm sorry, I think you might

24          just be seeing a portion.  So now you should be

25          able to see the full front page there.  That's

Andrew Arthur                                                December 14, 2023

                                                                  Page 22

 1          going to be Exhibit No. 1.

 2               And then Exhibit No. 2 is going to be the

 3          e-mail, Scott, that you sent confirming that

 4          this is a virtual deposition.  I think you

 5          called it a remote deposition.

 6               So can you see that there?

 7               MR. ST. JOHN:  I can.

 8     BY MR. SCHULTZ:

 9          Q.   Okay.  Thanks.  And Judge Arthur, can you

10     see those as well?

11          A.   I can, Counsel.

12          Q.   So then for Exhibit No. 3, we are going to

13     put down your expert report, and obviously it's

14     fairly long.

15               For purposes of this, I'm going to show you

16     the front page there and we can answer any questions

17     if we need to about whether you can see it or not.

18               (EXHIBIT NO. 3 MARKED FOR IDENTIFICATION.)

19     BY MR. ST. JOHN:

20          Q.   Is that something that you can see, Judge

21     Arthur?

22          A.   I can't, sir.

23          Q.   You cannot see it yet.  Okay.  So hopefully

24     now you can see?

25          A.   I can't -- oh, now I can.

Andrew Arthur                                          December 14, 2023

                                                              Page 23

1          Q.   Okay.  And does that look like the title

2    page for your expert report?

3          A.   Yes, sir.

4          Q.   Okay.  Thanks.  And that's what you

5    reviewed when you said you reviewed the statement,

6    right?

7          A.   That's the expert report, yes, sir.

8          Q.   Okay.  And can you confirm that you wrote

9    that?

10         A.   I did, Counsel.

11         Q.   Okay.  Thank you.

12              MR. ST. JOHN:  For the record, the witness

13         is only able to view like the top half of the

14         first page, so we're having to rely on your

15         representation that this is the expert report we

16         provided.

17   BY MR. SCHULTZ:

18         Q.   Thank you.  Once the transcript comes in,

19   you'll be able to see the exhibits, and that will

20   include the entire thing at that point.  If there are

21   any questions at that point, we'll be happy to talk

22   about that.  This is all by the book, I promise.

23              So that's going to be Exhibit No. 3 then,

24   the expert report.

25              So turning back to Judge Arthur, when you

Andrew Arthur                                           December 14, 2023

Page 24

1      created the expert report, did you communicate with

2      anyone while you prepared it, about the preparation?

3           A.   With Mr. St. John.

4           Q.   Okay.  And did you communicate with anyone

5      else, aside from Mr. St. John, to help you prepare

6      the report?

7           A.   Not that I can remember, sir.

8           Q.   And do you remember when you communicated

9      with Mr. St. John about your expert report?

10          A.   Before it was filed and before I signed it.

11          Q.   Do you remember how many times you met with

12     him about the expert report?

13          A.   Honestly, I can't.

14          Q.   Okay.  Do you have some memory even if it's

15     a range of how many hours you met with him?

16          A.   It was all -- honestly, I can't remember.

17     I'd probably say it would be less than ten.

18          Q.   Less than ten hours?

19          A.   It may have been more than that, though.

20          Q.   Okay.  So maybe less than ten hours, maybe

21     more than ten hours; is that what you're saying?

22          A.   That's what I'm saying.  I do apologize,

23     Counsel.  It's been a rough year for me.  My mom

24     died.  I've had a lot of stuff going on this year.

25          Q.   I'm so sorry to hear that, Judge.  If at

Andrew Arthur                                          December 14, 2023

Page 25

1       any point you need to take a break today, by all

2       means, let us know.

3              A.   No.  No.  I apologize, sir.  She died in

4       July.  It's been a very busy year at my household.

5       In fact my sewer went up this weekend, so it's --

6       I've had a lot of stuff going on and work is also

7       very busy.

8              Q.   Well, again, I'm so sorry to hear the news

9       about your mother.  And let's just keep going, but

10      again, if you need to pause --

11             A.   Thank you.  I thank you, Mr. Schultz.

12      Thank you.

13             Q.   How many hours, to the best of your memory,

14      did you spend working on your expert report?

15             A.   Probably pretty close to about ten hours.

16             Q.   Ten hours.  So and that's separate and

17      above and beyond the ten hours, more or less, that

18      you mentioned that you met with Mr. St. John, right?

19             A.   That's correct.  There may be some overlap

20      there.

21             Q.   Okay.  And are you being paid for your work

22      on this case?

23             A.   I am, sir.

24             Q.   So let's try to break that down.  Are you

25      being paid separately for the deposition and for the

Andrew Arthur                                    December 14, 2023

 1    expert report or is it a single amount that you're

 2    being paid for that?

 3         A.   I'm being paid a single amount, a set fee.

 4         Q.   And what is that set fee, please?

 5         A.   $2,000.

 6         Q.   Okay.  And that's being paid by whom?

 7         A.   The State of Louisiana, the Attorney

 8    General's Office, as I understand it.

 9         Q.   Okay.  Have you received a check that

10    you've cashed?

11         A.   I have not.  I just signed as a contractor

12    with the State of Louisiana through a pretty

13    complicated website.  I'm still not even 100 percent

14    sure that I did it correctly, but yeah, I haven't

15    received it.

16         Q.   Okay.  And do you know if any of the other

17    plaintiffs are paying you?

18         A.   Nobody else is paying me.

19         Q.   Okay.

20         A.   Again, I get paid by the Center For

21    Immigration Studies.

22         Q.   But you also mentioned that you have a set

23    fee of $2,000 that's coming to you from the State of

24    Louisiana, right?

25         A.   That's correct.  None of the other

Andrew Arthur                                          December 14, 2023

1    plaintiffs in this case are paying me.

2         Q.   Okay.  So is the Center For Immigration

3    Studies paying you for your work in this case?

4         A.   No.  The State of Louisiana is paying me

5    for my work in this case.  Immigration analysis,

6    educating the public about immigration issues is what

7    I get paid for by the Center For Immigration Studies.

8    I'm the resident fellow in law and policy.

9         Q.   So when you wrote the article that you did

10   back in, I think it was October 22nd of 2022, that

11   was something that was paid -- where the money you

12   received was from CIS, though, right?

13        A.   That's correct.  I'm also a retired

14   government annuitant.

15        Q.   Right.  I'm just asking you about things

16   related to this case.  Thank you for mentioning that.

17             Okay.  Let's turn a little bit to your

18   background then, and let's talk about your education

19   specifically.  And some of this is in your report,

20   but I just want to make sure we get the contours

21   down.

22             So did you go to college?

23        A.   I did, sir.

24        Q.   And where did you go to college?

25        A.   I'm a graduate of the University of

Andrew Arthur                                    December 14, 2023

1    Virginia.  I spent one year at Loyola College in

2    Baltimore, Maryland, my first year of college.

3         Q.   So starting at Loyola for one year, then

4    you moved to the University of Virginia in

5    Charlottesville?

6         A.   That is correct, sir.

7         Q.   Did you graduate from the University of

8    Virginia in Charlottesville?

9         A.   In May of 1988 with a bachelor of arts in

10   history.

11        Q.   Okay.  What sort of history?

12        A.   My thesis was in Russian history.

13        Q.   Russian.

14        A.   It was on Gorbachev's alcohol policies and

15   the impact it would have on Russian society.

16        Q.   Okay.  Did you have any other majors aside

17   from history at the University of Virginia?

18        A.   I had a concentration in economics.

19        Q.   Okay.  So let's start with the majors.  Did

20   you have any other majors?

21        A.   I did not.

22        Q.   Did you have any minors?

23        A.   I did not.

24        Q.   You said --

25        A.   But I did have a concentration in

Andrew Arthur                                    December 14, 2023

1    economics.

2         Q.   Thank you.  And what does that mean, a

3    concentration?

4         A.   So a lot of the work that I did with -- a

5    lot of the studies, the classes that I took had to do

6    with the economic ramifications of historical events,

7    so I've taken microeconomics, macroeconomics,

8    accounting, money and banking.  The only class that I

9    have left to receive my economics degree is

10   statistics.  I'm not sure that Charlottesville will

11   take me back at this juncture.

12        Q.   Okay.  And when you say to receive your

13   degree, do you mean an undergraduate degree?

14        A.   That's correct, sir, to get another BA in

15   economics.

16        Q.   To get another BA in economics.  Okay.  But

17   you don't have that, correct?

18        A.   I do not, sir.

19        Q.   Did you have any other minors or

20   concentrations at University of Virginia?

21        A.   I did not.  Not that I'm aware of.

22   Economics is the only one.

23        Q.   Okay.  You said you graduated from college.

24             Did you have any joint degrees when you

25   graduated from University of Virginia with your BA?

Andrew Arthur                                    December 14, 2023

                                                          Page 30

1          A.   I did not, sir.

2          Q.   Okay.  And then from your resume, I see

3     that you have other education.  So did you go to law

4     school after that?

5          A.   I did.

6          Q.   And then where did you go to law school?

7          A.   I attended George Washington University,

8     The National Law Center in Washington, D.C. in May of

9     1992.

10         Q.   So you graduated in May of '92?

11         A.   Correct, sir.

12         Q.   And was there any sort of a major that you

13    had in law school?

14         A.   No, sir.

15         Q.   Was there any sort of a minor or a

16    concentration that you had in law school?

17         A.   No, sir.

18         Q.   Did you get some sort of specialty

19    certification when you were in law school in any

20    area?

21         A.   I did not.  I did get the highest grade in

22    my constitutional law class, but they didn't give out

23    an award.

24         Q.   Was there any substantive specialty that

25    you took a course of study in while you were in law

Page 31

1    school --

2         A.   No.

3         Q.   -- where you received a certificate?

4         A.   No.

5         Q.   When you -- you said you graduated from law

6    school in 1992, correct?

7         A.   Correct, sir.

8         Q.   And when you graduated, did you receive any

9    joint degrees?

10        A.   I did not, sir.

11        Q.   So it looks like -- so you graduated from

12   college in 1988, graduated from law school in '92.

13   Law school is usually three years.  Was your law

14   school three years?

15        A.   It was, sir.

16        Q.   So it looks like there's a year in the

17   middle there that's not accounted for.  Can you tell

18   me what you did for that time?

19        A.   I worked as an adjuster for the Sovereign

20   Credit Corporation in Charlottesville, Virginia.

21        Q.   What does an adjuster mean?

22        A.   I would write loans, small loans for

23   Sovereign Credit Corporation, which was a branch of

24   Sovereign Bank NA, and I would collect on those loans

25   as well.

Andrew Arthur                                    December 14, 2023

Page 32

1          Q.   And what years or months did you have that

2     job?

3          A.   I took that job, I believe, in July of 1988

4     and I left Sovereign directly before I moved to

5     Washington, D.C. to go to George Washington.   I

6     actually moved to Arlington, Virginia.

7          Q.   And since that was in Charlottesville, did

8     you take any classes at the university during that

9     year?

10         A.   I did not.

11         Q.   Okay.  Aside from the college degree and

12    your law school degree that you just mentioned, have

13    you received any other academic degrees?

14         A.   No academic degrees.

15         Q.   Okay.  Do you have a PhD?

16         A.   I do not, sir.

17         Q.   Okay.  So is there anything else about your

18    education experience that I haven't asked about that

19    would be helpful for me to know about?

20         A.   Not that I'm aware of.

21         Q.   Okay.  So let's talk about your work

22    experience.  I see that at the end of your report you

23    have an Exhibit A.

24              So let me ask you this:  Do you have a copy

25    of your expert report in front of you?

Andrew Arthur                                          December 14, 2023

                                                              Page 33

 1          A.   I can get one.

 2          Q.   If it's -- that would be helpful.  Thank

 3     you.

 4          A.   Very good.

 5               Yeah, Counsel, by the way, it's -- I

 6     apologize, there's highlighter marks on it.  Is that

 7     going to be a problem for you?

 8          Q.   This is just for your own reference.  I'm

 9     not going to even see it.

10          A.   Okay.

11          Q.   Okay.

12          A.   I wasn't concerned about you.  I just want

13     to -- for the deposition.

14          Q.   Okay.  It's not going to be in evidence.

15     This is just to refresh your memory a little bit or

16     to make things easier for you to follow along as I

17     ask you questions.  Okay?

18          A.   That's good, Counsel.

19          Q.   If we had been in the same room, I would be

20     handing you a printed copy of it now.  Since we're

21     virtual, since you have your own copy, that makes it

22     fairly convenient.  So thank you.

23               MR. SCHULTZ:  Scott, I see you're flipping.

24          Are you all set?

25               MR. ST. JOHN:  I am.

Andrew Arthur                                    December 14, 2023

                                                         Page 34

 1    BY MR. SCHULTZ:

 2         Q.    Okay.  Towards the end of your actual

 3    expert report, you have a couple of exhibits, and the

 4    first one is Exhibit A.  Can you flip to there,

 5    please?

 6         A.    I don't actually have the exhibits attached

 7    to my --

 8         Q.    Oh, you don't?  Okay.

 9         A.    Yeah.

10         Q.    Well, the Exhibit A that I have says

11    "Experience" and then it lists your jobs and it goes

12    on for about -- it goes on for two pages.

13              Do you remember writing that up?

14         A.    Is that my CV?  Is that my resum ?

15         Q.    It says "Experience."  It looks like it

16    might have -- it looks like it's fairly similar to a

17    resum .  It has your name and address at the top, the

18    name of your work address at the top, and says

19    "Experience" and it lists about eight or ten items.

20              Do you remember writing that?

21         A.    Actually, I do not, but I assume that I did

22    write it.

23         Q.    Okay.  So let's go then and we're going to

24    call that up and show it to you then.  So this is

25    going to be immediately after page 37 of the expert

Andrew Arthur                                        December 14, 2023

1    report, where it says Exhibit A.

2              I'm going to share that with you.  And

3    we're just going to scroll down that slowly so you

4    can see what we're talking about here.

5         A.   Yeah, that's my CV.

6         Q.   I'm just talking about the two pages here,

7    so that's the first page I just showed you and here

8    is the second page.

9         A.   That is correct, sir.

10        Q.   Okay.  So does that remind you what you

11   wrote up in Exhibit A now?

12        A.   Yes, sir.

13        Q.   Okay.  So I'm just talking about those

14   first two pages here.

15             Have you had a chance to look at that or do

16   you want us to scroll through it again more slowly?

17        A.   I'm familiar with it.  I submit this in

18   connection with congressional testimony and other

19   things.

20        Q.   So Exhibit A was all of your job experience

21   since you graduated from college?

22        A.   It does not include the Sovereign Credit

23   Corporation, and I served briefly as a panelist with

24   the Foreign Impasse Dispute Panel at the Department

25   of Labor.  I was the outside panelist.

1          Q.    And how long was that for?

2          A.    About eight months, I think.  Maybe a year.

3          Q.    And do you remember when that was, please?

4          A.    The Foreign Impasse Disputes Panel is a

5    panel under the Department of Labor.

6          Q.    I'm sorry, I'm just asking what years you

7    worked there.

8          A.    Oh, it was after I had retired from the

9    government.  I believe it was from the fall of 20 --

10              MR. ST. JOHN:  Mr. Arthur, if you don't

11         remember, it's okay.

12              THE WITNESS:  I really don't remember, but

13         it probably would have been from the fall of

14         20 -- I've got to think about this for a second,

15         2017, maybe 2018, and we only ever convened once

16         and that was at the beginning of the panel.

17   BY MR. SCHULTZ:

18         Q.    Okay.  Thank you.  And what was -- now to

19   go back to what you were saying a minute ago, what

20   was that involving?  What was the substance of the

21   work that the panel did?

22         A.    It involved disputes by foreign service

23   officers abroad with respect to employment issues.

24         Q.    Okay.  Thank you.  And aside from that, is

25   there anything else that you have worked on since

Andrew Arthur                                      December 14, 2023

1      graduating from college that's not included in

2      Exhibit A here?

3          A.   I was -- I went from the -- after I

4      graduated college, I worked on the -- I was an honors

5      attorney with the attorney general's honor class and

6      I went to EOIR and then INS, and not that I'm aware

7      of.

8          Q.   You said you went to EOIR and then --

9          A.   The INS.

10         Q.   -- the INS.  Then you said not that you're

11     aware of?

12         A.   Not that I'm aware of.

13         Q.   So just to make sure that we're on the same

14     page, aside from what's listed in those two pages on

15     Exhibit A, and adding to that your time at the

16     Sovereign Credit Union in Charlottesville, and adding

17     to that your time on the panel that you just

18     mentioned, is there any other job experience you have

19     since graduating from college?

20         A.   Not that I can remember.

21         Q.   Thank you.  Let's go back to your education

22     for a moment.  In any of your education at the

23     University of Virginia or at George Washington

24     University, did you study expenditures for education

25     in state and local budgets?

Andrew Arthur                                          December 14, 2023

1          A.    I did not.

2          Q.    Okay.  And for any of your education at the

3    University of Virginia or at George Washington

4    University, did you study Medicaid or children's

5    health insurance programs or emergency medical

6    services in state and local budgets?

7          A.    I did not.  I'm actually married to a

8    surgeon who is currently getting her masters in

9    health administration from the University of North

10   Carolina and she bounces a lot of things off of me in

11   connection with that, in connection with Medicare and

12   things like that.

13         Q.    Okay.  So thank you for adding that, but

14   I'm going to repeat my question because I didn't get

15   a clear answer.

16               In any of your education at the University

17   of Virginia or at George Washington University, did

18   you study Medicaid, did you study children's health

19   insurance programs, or emergency medical services in

20   state and local budgets?

21         A.    I did not.

22         Q.    Thank you.  And in any of your education at

23   the University of Virginia or at George Washington

24   University, did you study expenditures for

25   supplemental nutrition assistance program or the

Andrew Arthur                                    December 14, 2023

1    temporary assistance for needy families in

2    expenditures in state and local budgets?

3         A.   I did not.

4         Q.   Thank you.  I'll turn to your work

5    experience for a moment.  So let me just give you a

6    definition upfront to make sure we're on the same

7    page.  I'm going refer to Exhibit A, plus the credit

8    union and plus the foreign panel that you mentioned.

9    Okay?  I'm going to call that, just for purposes of

10   this question, Exhibit A, plus credit union, plus

11   panel.  Okay?

12        A.   Very good.

13        Q.   Okay.  So in any of the work experiences

14   that you discussed in Exhibit A, plus the credit

15   union, plus the panel, did you work on expenditures

16   for education in state and local budgets?

17        A.   I assume that this includes my work at the

18   Center For Immigration Studies, because of course we

19   do look at the impacts of budgetary issues on states

20   and localities and we also look at welfare programs

21   in the course of that.

22             We often write about means-tested public

23   benefits use in the United States.

24        Q.   Okay.

25        A.   Under the American -- usually based upon

Andrew Arthur                                    December 14, 2023

Page 40

1      information provided by the Census Bureau's American

2      community documents.

3          Q.   Okay.  So then let me rephrase the question

4      a little bit and we'll circle back if we can.

5          A.   Okay.

6          Q.   So in any of the work experiences that you

7      discussed in your expert report and the two pages

8      after Exhibit A, plus the credit union, plus the

9      foreign panel, not including CIS, did you work for

10     expenditures in state and local budgets?

11         A.   I did not.

12         Q.   And in any of the work experiences that you

13     discussed in your expert report and the two pages

14     after Exhibit A, plus the Sovereign Credit Union,

15     plus the foreign panel, but not including CIS, did

16     you work on Medicaid, children on health insurance

17     programs, or emergency medical services in state and

18     local budgets?

19         A.   It may have come up during my time on the

20     House Judiciary Committee.  We certainly looked at

21     issues like that particularly with respect to the

22     implementation of PRWORA.

23         Q.   Implementation of what?

24         A.   Personal Responsibility of Work Opportunity

25     Act of 1996, PRWORA.

Andrew Arthur                                    December 14, 2023

1          Q.   Okay.  Thank you.  And that was in '96,

2     1996, correct?

3          A.   When I was at the judiciary committee?

4          Q.   You just said that the law was passed in

5     1996.

6          A.   Yeah, the law was passed in 1996.

7          Q.   And when would you have worked on those

8     issues then?

9          A.   When I was with the House Judiciary

10    Committee.  I served there from September of 2001

11    until November of 2006.

12         Q.   Now, you were a little bit vague, so let me

13    try and drill it down.

14              You said you may have worked on it.  Are

15    you saying that you may have or do you have a firm

16    memory that you did?

17         A.   We generally addressed a lot of welfare

18    issues with the oversight counsel for immigration for

19    the House Judiciary Committee during the period of

20    time that judiciary had jurisdiction over all

21    immigration-related issues.  And we certainly looked

22    at means-tested public benefits during that time.

23         Q.   Okay.  Thank you.  Sorry.

24              Okay.  So again, let's move forward.

25    Again, using the phrasing that I've been using, in

Andrew Arthur                                    December 14, 2023

1    any of the work experience that you discussed in your

2    expert report and the two pages after Exhibit A, plus

3    the credit union, plus the foreign board, but not

4    including CIS, did you work on expenditures for

5    supplemental nutrition assistance program or

6    temporary assistance to needy family expenditures in

7    state and local budgets?

8           MR. ST. JOHN:  Object to form.

9           THE WITNESS:  Again, we would have looked

10          at that in conjunction with the work that we did

11          looking at means-tested public benefits

12          generally.

13          MR. SCHULTZ:  Thank you.  Just on

14          logistics, I'm getting a bit of feedback or some

15          rustling noises.  I'm not sure where it's coming

16          from.  If folks are rustling, if you can please

17          stop.  It may be interfere a little bit with the

18          audio.  But turning to Ms. Marsh, have you been

19          able to hear and take down everything clear

20          enough?

21          COURT REPORTER:  Yes, I have.  I was

22          hearing the rustling too, but it's fine.

23   BY MR. SCHULTZ:

24          Q.   Okay.  So you wrote in your expert report

25   that you testified in Congress 11 times; is that

Andrew Arthur                                December 14, 2023

Page 43

1    right?

2         A.   That's correct, sir.

3         Q.   Have you ever testified in Congress about

4    the IFR?

5         A.   I'm trying to think if the IFR ever came up

6    during any of the course of my testimony.  I can't

7    say for certain.

8              MR. ST. JOHN:  I would object.  It's public

9         record.  You've had a chance to review his

10        testimony before Congress and it shouldn't be a

11        memory game.

12   BY MR. SCHULTZ:

13        Q.   Okay.  Have you ever testified in Congress

14   about expenditures for education in state and local

15   budgets?

16             MR. ST. JOHN:  Same objection.

17             THE WITNESS:  I believe that expenditures

18        in state and local budgets came up during

19        testimony that I gave in Arizona in August.

20   BY MR. SCHULTZ:

21        Q.   You gave in Arizona in August.  So that was

22   not for Congress, that was for Arizona?

23        A.   No.  No.  That was appeal hearing for the

24   house oversight committee, I believe.

25        Q.   The house oversight committee.  Thank you.

Andrew Arthur                                    December 14, 2023

Page 44

1     What was the date for that one, please?

2          A.   It was in August of this year.  Trying to

3     think.  Was it in August?  My CV should show the

4     date.  I apologize again.  It was a rough summer for

5     me, sir.

6          Q.   Okay.  Thank you.  Just one moment here,

7     please.

8               I think -- Judge Arthur, can you hear me

9     again now?

10         A.   I can.

11         Q.   Okay.  Thank you.  So let me just make sure

12    I got the answer right.  There was some crosstalk

13    that we had from Mr. St. John, so I want to make sure

14    I have a clean answer from you.

15              Have you ever testified in Congress about

16    the IFR?

17              MR. ST. JOHN:  Objection.  His testimony is

18         public record.  This shouldn't be a memory game.

19              You can answer.

20              MR. SCHULTZ:  Mr. St. John, your objection

21         is noted, but I would ask you to please minimize

22         the speaking.  Noting your objection for the

23         record I think should be sufficient.

24    BY MR. SCHULTZ:

25         Q.   Judge Arthur, you can answer that question

Andrew Arthur                                          December 14, 2023

Page 45

1        now, please.  Thank you.

2             A.    It may have come up in the course of

3        questioning.  And for what it's worth, I may have

4        included it in my testimony.  I can't remember

5        whether I did or not.

6             Q.    Okay.  So --

7             A.    By the way, when I say "my testimony," I

8        mean my written testimony.

9             Q.    Does that mean your written testimony to

10       Congress?

11            A.    That's correct, sir.

12            Q.    Okay.  Thank you.  Do you know which set of

13       testimony that is?

14            A.    It would have been something after the IFR.

15       Again, it may have been included in my testimony.  My

16       testimony generally runs a little long, and I try to

17       cover the subject area as much as possible.  I

18       believe that it's my duty to inform the Congress, to

19       the degree that I can, as exhaustively as I can.

20            Q.    Have you ever testified in Congress about

21       Medicaid or children's health insurance programs or

22       emergency medical services expenditures in local or

23       state governments?

24                  MR. ST. JOHN:  Same objection.

25                  THE WITNESS:  I believe that the subject of

Andrew Arthur                                         December 14, 2023

```
 1          the hearing in Arizona was on the cost of

 2          communities and there may have been testimony at

 3          that time.  When you give Congressional

 4          testimony, you're very much in the moment when

 5          you're doing it.

 6     BY MR. SCHULTZ:

 7          Q.   Okay.  Thank you.  And have you ever

 8     testified in Congress about supplemental nutrition

 9     assistance program or temporary assistance for needy

10     family expenditures in state or local budgets?

11               MR. ST. JOHN:  Same objection.

12               THE WITNESS:  Again, if it had come up, it

13          would have been in the course of that testimony

14          in Arizona.

15     BY MR. SCHULTZ:

16          Q.   Okay.  Thank you.  Please tell me the

17     names -- well, have you ever been an expert in any

18     litigation ever before this case?

19          A.   Before this case, no.

20          Q.   Okay.  Have you testified as an expert in

21     this case before now?

22          A.   I was deposed previously.

23          Q.   Were you deposed as an expert in this case

24     previously?

25               MR. ST. JOHN:  Objection.  Question of law.
```

```
 1              THE WITNESS:  I was deposed as a 30(b)(6)
 2         witness the last time, but there were questions
 3         that did relate to issues of law in the course
 4         of that.
 5    BY MR. SCHULTZ:
 6         Q.   Outside the 30(b)(6) deposition in this
 7    case and the current deposition, have you ever been
 8    an expert in court in any litigation ever?
 9         A.   I am an expert witness right now in
10    litigation in a FOIA case.
11         Q.   Can you spell that, please?
12         A.   FOIA?  F-O-I-A, Freedom of Information Act.
13         Q.   Thank you.  And do you know the case number
14    or the location of that, please?
15         A.   I don't even -- I can't even remember the
16    header for that case.
17         Q.   Do you know who hired you for that case?
18         A.   I was hired, I believe, by the Heritage
19    Foundation for that one.
20         Q.   Is that case ongoing?
21         A.   It is.
22         Q.   Okay.  And I'm going to request you please
23    send us at least the caption for that case by close
24    of business tomorrow, please.
25              MR. ST. JOHN:  Again, we'll take that
```

Andrew Arthur                                      December 14, 2023

Page 48

1           request under advisement.

2                   MR. SCHULTZ:  Thank you.  We can follow up

3           in writing.  Thank you, Scott.

4      BY MR. SCHULTZ:

5           Q.   So I'd like to talk to you about a couple

6      of odds and ends here.  So I'm going to just mention

7      something that you talked about as part of your

8      background.

9                   You said in your expert report, you wrote

10     something that was called President Trump's Travel

11     Orders in National Security, and that was in

12     publication called Migration and Solidarity in 2020;

13     is that correct?

14          A.   That's correct.

15          Q.   Was that a foreign publication?

16          A.   It is a publication that is jointly done

17     foreign and in the United States, which I think is

18     why there's a split, and I presented on that at Banz

19     Castle in Bavaria at the time that the paper was

20     presented.

21          Q.   And you mentioned that in paragraph ten,

22     just for the record; is that right, if you remember?

23          A.   As I remember.  I can take a look at that

24     part of my testimony.

25          Q.   If you want to take a moment now, that's

Andrew Arthur                                    December 14, 2023

Page 49

1     fine to look at it.

2          A.    Sure.

3          Q.    There's another publication in that same

4     paragraph that I would like to ask you about.

5          A.    Very good.

6          Q.    It's at paragraph ten.  So let me know when

7     you see that, please.

8          A.    I see it, Counsel.

9          Q.    How did that publication come about, the

10    one that you just mentioned in Migration and

11    Solidarity in 2020?

12         A.    I was invited to present at the panel.  It

13    is an interesting panel.  It is an interesting panel.

14    It is under the aegis of the Catholic church.  And

15    the location itself is owned by the CDU, CSU, which

16    at the time was the political party of Chancellor

17    Angela Merkel.

18         Q.    Okay.  And they reached out to you; is that

19    right?

20         A.    They did.

21         Q.    Okay.  And is that an article or a book?

22         A.    It's an article.

23         Q.    And did you write that in English or in a

24    different language?

25         A.    I wrote it in English.  I wouldn't trust my

Andrew Arthur                                    December 14, 2023

 1    German.

 2         Q.    Do you speak German?

 3         A.    Only a little.

 4         Q.    I see.  Thank you.  In that same paragraph,

 5    there's another publication, and it's called the

 6    Oversize Role of Title 42 in U.S. Southwest Border

 7    Security.  It says it's published in LIMEN,

 8    L-I-M-E-N, and the Journal of Hungarian Migration

 9    Institute, Volume 5, in 2022/1.

10              Do you see that?

11         A.    I do.

12         Q.    How did what -- first of all, was that

13    published in Hungary?

14         A.    It was published in Hungary.  I believe

15    it's available in the United States.

16         Q.    And was that published in English or in

17    Magyar or Hungarian?

18         A.    It was published in English.

19         Q.    Okay.  And how did that come about?

20         A.    I was approached by the Hungarian Migration

21    Institute to present or to offer them a paper on it.

22         Q.    And what was your thesis there?

23         A.    It had to do with the Oversized Role of

24    Title 42 in security, and it explains that during the

25    period of time the Title 42 was in existence, that

Andrew Arthur                                            December 14, 2023

1      basically provided all immigration enforcement that

2      there was in -- at the time it explained how it

3      evolved from the Trump administration, how it was

4      applied in the Biden administration.

5          Q.   Title 42, thank you.  Turning to the

6      previous document that -- turning to the previous

7      publication I just mentioned, the one that was

8      published in -- published in the German publication,

9      Migration and Solidarity.

10             Can you tell me the thesis of that article,

11     please?

12         A.   Yeah, it actually discussed the legislative

13     history of the Trump travel orders from the executive

14     order through the presidential proclamation -- I

15     think it was 9645 -- and through the litigation in

16     Trump versus Hawaii.

17         Q.   Okay.  Turn a little bit now to the

18     substance of your report a little bit more.  So you

19     start off the report on page one with your education,

20     experience, and expertise, and that goes on to page

21     two; is that right?

22         A.   That is correct.

23         Q.   Okay.  And then you go on to your -- on

24     page two you go on to your background, and on page

25     three -- on page two you also begin discussing the

Andrew Arthur                                          December 14, 2023

 1    general process for asylum; is that right?

 2         A.   That's correct, Counsel.

 3         Q.   And on page four -- I'm sorry, page six,

 4    you start going through statutory withholding of

 5    removal and Convention Against Torture.  Do you see

 6    that on page six?

 7         A.   Yes, I do, Counsel.

 8         Q.   And on page seven you discuss parole, and

 9    that goes on for about a page or so until the top of

10    page nine, right?

11         A.   Correct.  Yes.

12         Q.   And then on page nine --

13         A.   Actually goes down to page ten, I think.

14         Q.   Top of page nine says transfer --

15         A.   I'm sorry.  Never mind.  You're right,

16    transfer of a specific -- yes, sir.

17         Q.   Page nine at the top is transfer of

18    specific functions to the Department of Homeland

19    Security, correct?

20         A.   Correct, Counsel.  I apologize.  I wear

21    bifocals, so when I look over, I can't see the text.

22         Q.   That's okay.  If you have trouble seeing

23    the text, please just let me know.  We want to make

24    sure that you have a full chance to look at anything

25    that we're talking about.  Okay?

Andrew Arthur                                     December 14, 2023

Page 53

```
 1          A.   Very good.

 2          Q.   Okay.  Thank you.  So just to be clear,

 3     everything that basically covers pages one through

 4     the -- I'm sorry.

 5               Then page ten has kind of a large font

 6     header that says "The impact of Biden administration

 7     policies on migration."

 8               Do you see that on page ten?

 9          A.   Yeah.  I realize there's a typo on that.

10          Q.   What is the typo?

11          A.   It's in administration.  Yeah, there's an

12     extra I in administration.

13          Q.   Okay.  So this question I have here is on

14     everything on pages one through nine then:  Nothing

15     there deals -- addresses the IFR, does it?

16          A.   No, that's background, Counsel.

17          Q.   Okay.  Okay.  So then let me just ask about

18     something else that I saw in your report in a few

19     places, but this will go back to your experience a

20     little bit.

21               You were an immigration judge for how long,

22     sir?

23          A.   Eight years.  Eight years, a little bit

24     longer.

25          Q.   Okay.  And in your experience, does every
```

Andrew Arthur                                                    December 14, 2023

1       immigration judge grant asylum at the same rate as

2       every other immigration judge?

3            A.    They do not.

4            Q.    So would you say that there's variation

5       between the grant rate of asylum between immigration

6       judges?

7            A.    There are.

8            Q.    Do you have any idea what causes that

9       variation in grant rates?

10            A.    Yeah, actually, in fact, I've written and

11       talked a lot about this.  I've appeared four times

12       before Congress with respect to that, and part of it

13       is the interpretation of the law.  Part of it is the

14       nationalities of the respondents in the case.  Part

15       of it is the claims themselves.

16                  As I often explain, that's why it's good to

17       have the appellate system, because you can smooth out

18       those variations in the grant rate.

19            Q.    You said nationalities.  Why do

20       nationalities matter?

21            A.    Nationalities matter because respondents,

22       applicants from different countries sometimes have

23       more meritorious claims.  I've actually adjudicated

24       asylum claims from the United Kingdom, and I've

25       adjudicated asylum claims from China.  There's a

1    variation amongst asylum grant rates based upon

2    nationality.

3              Things are worse in certain places in the

4    world.  Certain asylum claims are bolstered by

5    activity in foreign countries dependent on the

6    country.

7         Q.   You also said -- can you say those last

8    three words again, please?

9         A.   Dependent on the country.  It was actually

10   four.

11        Q.   Thank you.  And you also said there's

12   variations due to the claims themselves.  What did

13   you mean by that?

14        A.   So not all asylum claims are the same.

15   Certain asylum claims are pretty straightforward

16   based upon race, religion, nationality, and political

17   opinion.

18              In countries in which there is a

19   demonstration of persecution in those countries, it

20   ties directly into the claim.  One of the

21   responsibilities of every immigration judge is to

22   apply the facts in the country to the law and also to

23   look at country conditions reports in those

24   countries.

25        Q.   Okay.  Are there any other areas that you

1      can think of that might change variation?

2            A.    From judge to judge or country to country?

3            Q.    I'm thinking judge to judge.

4            A.    From judge to judge, it all depends on

5      whether you are in a detained court or a nondetained

6      court.

7                  I was in a detained court.  And for that

8      reason, I had jurisdiction over the Federal

9      Correctional Institution at Shannon, Pennsylvania,

10     the Federal Correctional Institution at Allenwood,

11     Pennsylvania, and I also had jurisdiction over the

12     Pennsylvania state prison system.

13                 Many of those individuals have been

14     convicted of crimes that barred them from receiving

15     asylum.  So the asylum rate would be a lot lower.

16                 Many of the people that I heard claims from

17     were barred from asylum but they filed asylum claims

18     in order to seek statutory withholding under section

19     241(b)3 of the INA, withholding under the Convention

20     Against Torture and Convention Against Torture.

21           Q.    Would you say that variation between

22     circuit court rulings could also lead to variations

23     of immigration judge asylum grant rates?

24           A.    It does.  Again, this is a point that I've

25     testified about in the past.  I've been a trial

Andrew Arthur                                      December 14, 2023

Page 57

1    attorney in the 9th circuit and I was a trial

2    attorney in the 4th circuit.  When I was in

3    headquarters, I had to deal with all of the circuits,

4    except, of course, for the DC circuit, which doesn't

5    have any jurisdiction over immigration cases, and the

6    federal circuit because they don't have any either.

7            But yeah, there's variations with respect

8    to the law, the interpretations of section 208 of the

9    INA.

10        Q.   Okay.  Thank you.  So you mentioned that

11   you work at the Center For Immigration Studies,

12   right?

13        A.   I do, sir.

14        Q.   Do you know David North?

15        A.   I do know David North.  I actually -- David

16   has been working remotely.  I can't really say how

17   many times I've seen him or seen him in recent years,

18   but I do know who David North is.

19        Q.   And he writes for the Center For

20   Immigration Study's website.  He writes a blog or

21   various posts there as well, right?

22        A.   Correct, sir.

23        Q.   Have you read his posts?

24        A.   I actually -- most of the posts that he

25   writes involve things that don't really interest me.

1    And I'd like to say that I read all of the stuff on

2    our website, but I don't.  I do get around to reading

3    it from time to time.

4         Q.   Do you know if you read something he wrote

5    on November 10th of this year?

6         A.   Could you tell me what the subject of it

7    was?  He might have written more than one thing on

8    November 10th.

9         Q.   Sure.  It says, "TRAC Offers Explanation on

10   Differing Asylum Approval Ratings."

11        A.   I did actually read that one.

12        Q.   And --

13        A.   David had sent that to me ahead of time to

14   take a look at.

15        Q.   So there's a sentence there that I'll read

16   to you where he wrote about, "A variable stew of

17   factors that led to the actual decisions in

18   individual cases and to the ranges in approval

19   rates."

20             So did you hear what I said there?  I'm

21   happy to repeat it.

22        A.   I did, Counsel.

23        Q.   So do you agree with Mr. North that there's

24   a quote, "Variable stew of factors" that can, quote,

25   "lead to the actual decisions in individual cases and

Andrew Arthur                                           December 14, 2023

1    to the ranges in approval rates"?

2         A.   It's not the language that I would use, but

3    again, I'd have to take a look at the document.  I

4    read a lot.  I write a lot.  That one, I would agree

5    that there are a number of different factors to

6    create a variation of the grant rates.

7         Q.   Give me a moment here.  Please.  Thanks.

8              Let's turn back to your report and go to --

9    actually, it's 11:12.  Everyone doing okay?  We've

10   been on the record about an hour and a quarter.

11             MR. ST. JOHN:  Why don't we take like five

12        minutes?

13             MR. SCHULTZ:  I'll put down 11:13 as the

14        stop time.

15                        (RECESS TAKEN.)

16             MR. SCHULTZ:  I have 11:21.  We are back on

17        the record.

18   BY MR. SCHULTZ:

19        Q.   Just a couple of quick follow-ups, Judge

20   Arthur.  So do you know why Mr. North might have sent

21   you that column since you're not normally writing

22   overlapping areas of work?

23        A.   Yeah, we share columns if it is something

24   that is generally within somebody's area of

25   expertise.

Andrew Arthur                                                    December 14, 2023

Page 60

```
 1          Q.   Okay.  Does that mean that you thought
 2     this -- does that mean you're assuming he thought
 3     this was in your area of expertise?  Is that why you
 4     said that just now?
 5          A.   Well, generally we like to get one
 6     another's opinions about things that we write.
 7          Q.   Did he send this to you before he wrote it
 8     or before he published it or after he published it?
 9          A.   He sent it to me before he published it,
10     before it was sent for review and publication.
11          Q.   Okay.  Did you have any input into that or
12     did you make suggestions that he took?
13          A.   I disagreed with a lot of the statements
14     that he made, but nobody at the center is --
15     everybody at the center is free to write what they
16     want with their own opinions.
17          Q.   What did you disagree with that he wrote?
18          A.   I'd have to take a look at the whole thing.
19     I remember reading it.  There was -- he made
20     conclusions with respect to immigration, differences
21     amongst immigration judge determinations.  If I had a
22     chance to read the whole thing, I'd remember.  Again,
23     we're a busy think tank.  Things have been busy of
24     late.
25          Q.   But you do remember that you disagreed with
```

1    some of the stuff?

2         A.   I did.

3         Q.   Okay.  But not with everything that he

4    wrote?

5         A.   I can't remember what I agreed with and

6    what I didn't agree with.

7         Q.   A moment ago you said that you disagreed

8    with some of the language that he used, but you

9    agreed that there would be multiple factors that go

10   into variation between immigration judges.  That's

11   what you testified to here a few minutes ago.

12        A.   That's correct.  Used the word "stew," but

13   we write colloquially because we write for public

14   consumption.

15        Q.   Okay.  And just to turn back to the German

16   publication for a minute, you said that the

17   publication came about when they reached out to you.

18             Do you know how you might have been on a

19   list of folks that the German publishers, how they

20   knew about you?

21        A.   I have no idea.  I may have been referred

22   by someone with whom I've worked before in the past.

23        Q.   Okay.  Do you remember who?

24        A.   I believe that it was Michael Dougherty.

25        Q.   Michael Dougherty, is that

Andrew Arthur                                            December 14, 2023

Page 62

1      D-o-u-g-h-e-r-t-y?

2           A.    That's correct.  Again, it's been a while.

3      I think that's how they got in touch with me.

4           Q.    Okay.  Thank you.

5                 Let's turn back to your report here, and

6      I'm going to ask you to turn to paragraph 36, which

7      is on page eight, if you can, please.

8                 MR. SCHULTZ:  And Scott, I didn't ask you,

9            but do you have a copy of that expert report

10           from your own expert there in front of you?

11                MR. ST. JOHN:  I do.  And I think, like

12           Mr. Arthur, I don't have all of the attachments.

13           I've got kind of the core report.

14                MR. SCHULTZ:  Okay.  That's fine.  These

15           questions I'm going to have now are of the core

16           report.  I just want to make sure that you have

17           that in front of you.  Right?

18                MR. ST. JOHN:  I do.

19                MR. SCHULTZ:  Thank you so much, Scott.

20     BY MR. SCHULTZ:

21           Q.    Judge Arthur, let's turn to paragraph 36.

22     That's again on page eight.  And you wrote there,

23     quote, "But during the Biden administration, DHS has

24     'persistently underutilized its existing resources'

25     and further sought 'a dramatic reduction in

1    detention, bed capacity' despite surging numbers of

2    migrants."

3            Did I read that correctly?

4        A.   That's correct, Counsel.

5        Q.   So let me ask you a few questions about

6    that then.

7            Does the IFR itself actually call for

8    having the country, quote, "persistently underutilize

9    its existing resources"?

10       A.   With respect to expanding the opportunities

11   for parole for individuals who are subjects to

12   credible fear determinations, before those credible

13   fear determinations, yes, it does, in my opinion.

14       Q.   I don't mean to cut you off.  Are you all

15   set there?

16       A.   Yes, sir.

17       Q.   Okay.  So you see parole as a resource; is

18   that what you're saying?

19       A.   Parole is not a resource.  The case in

20   question was Texas versus United States.  The IFR

21   changes the parole standard for aliens who are

22   subject to credible fear determinations to extended

23   to instances where detention is not in the interest

24   of the United States.

25            That same "detention is not in the interest

1     of the United States" language, it has been used a

2     lot during the Biden administration to release aliens

3     where there is a lack of detention space,

4     notwithstanding the fact there still is detention

5     space.

6              I believe that that statement was included

7     in the Supreme Court's brief in Texas versus Biden.

8     I also believe that the -- that that regulation is

9     ultra vires.

10        Q.   Okay.  Let's stick with the resources.  So

11    it's not the parole that you're saying is a resource

12    so much as you're saying it's unused detention space;

13    is that what you're calling a resource?

14        A.   That's correct.

15        Q.   Okay.  Thank you.  So let's go a little bit

16    further there.  Are you aware of any legal

17    limitations on detaining families in the United

18    States?

19        A.   I am.  The Florida settlement agreement in

20    a case called Flores versus Lynch, there was a court

21    order that was issued in August of 2015 by Judge

22    Dolly Gee, who is district court judge in California,

23    and that was affirmed in part but not in whole by the

24    9th circuit in July of 2016.

25             But I would note that even after that,

Andrew Arthur                                              December 14, 2023

1       there was family detention that was used in Karnes

2       and Dilly.  In fact, when I was an immigration judge,

3       I had jurisdiction over a family immigration court

4       that was prior to Flores -- family detention center.

5              Q.   So you are aware of some limits that the

6       law imposes on detaining families, correct?

7              A.   I am, Counsel.

8                   MR. ST. JOHN:  Objection.  Calls for -- you

9              can answer.

10                  THE WITNESS:  I am, Counsel.

11      BY MR. SCHULTZ:

12             Q.   Thank you.  So even if there are physical

13      unused detention spaces, sometimes the government is

14      not allowed to use that given these limits on

15      detaining families, right?

16                  MR. ST. JOHN:  Objection.  Calls for a

17             legal conclusion.

18                  You can answer.

19                  THE WITNESS:  When I visited, I believe it

20             was either Karnes or Dilly --

21      BY MR. SCHULTZ:

22             Q.   I'm sorry, just -- given the objection,

23      given the speaking objection there, let me ask the

24      question.  And then Scott, your objection is noted,

25      and then let's get a clean record here on this.

Page 66

1    Okay?

2              So even if the United States has detention

3    space that's physical, that's unused, there is still

4    legal limits that can prevent the United States from

5    using that, given the limits on family detention,

6    right?

7              Scott, your objection is noted?

8              MR. ST. JOHN:  Objection.  Calls for a

9         legal conclusion.  Vague and misleading.

10   BY MR. SCHULTZ:

11        Q.   You can answer.

12        A.   I'm sorry?

13        Q.   You can answer the question.

14        A.   I apologize.  I thought you said "good

15   answer," which sort of surprised me.

16              With respect to that, again, the federal

17   government has the opportunity to detain families

18   during that 20-day period when the credible fear

19   determination can be made.

20              And from my personal experience visiting

21   family detention, they were able to utilize that

22   space; however, the Biden administration made the

23   decision not to detain alien families and I believe

24   that that was effective as of December 2021.

25        Q.   I'm not sure that answered my question, so

1     I'm going to try once more.

2            Even if there's unused detention space, if

3     the government -- if the courts say it's not legal

4     for the government to use it, the government can't

5     use it, right?

6            MR. ST. JOHN:  Objection.  Calls for

7        testimony about a question of law.  Vague.

8        Misleading.

9            THE WITNESS:  They can use it up to that

10       20-day period.  But yes, thereafter, they

11       cannot.  With respect to the children, the 9th

12       circuit decision in Flores versus Lynch, I

13       believe it was, said that they could continue to

14       detain the adults in the family unit thereafter.

15    BY MR. SCHULTZ:

16       Q.   So you testified you have a law degree,

17    right, Judge?

18       A.   I do, sir.

19       Q.   And you told me before that you're being

20    paid for your expertise in part -- I'm sorry, you

21    told me before that you're being paid by the State of

22    Louisiana for your expertise in immigration law,

23    right?

24       A.   That's correct.

25            MR. ST. JOHN:  Objection.  Asked and

Andrew Arthur                                    December 14, 2023

Page 68

1          answered.

2     BY MR. SCHULTZ:

3          Q.   There was crosstalk there.

4          A.   That's correct, Counsel.  I didn't hear

5     what you said.  I apologize.

6          Q.   Thank you.  All I said was there was

7     crosstalk, so I waited for you to answer, which you

8     just did.  So thank you.

9               Your report is full of legal conclusions,

10    isn't it?

11         A.   There are applications of facts to law

12    therein.

13         Q.   Okay.  So when I'm asking you to talk about

14    something that's applying to law as something you

15    said, I think that's fair game here.  So thank you.

16              So let's move over to paragraph 42 of your

17    report.  That's going to be on page ten.  And tell me

18    once you have that open, if you can, please.

19         A.   I do, Counsel.

20         Q.   Thank you.  So in paragraph 42, it says, in

21    paragraph 42 you wrote, "I believe Congress

22    specifically gave jurisdiction over asylum

23    applications filed by UACs to AOs because Congress

24    recognized that those AOs otherwise lacked the power

25    to adjudicate such asylum applications filed by

Andrew Arthur                                              December 14, 2023

Page 69

1      UACs."

2                 Did I read those words correctly?

3            A.    That is correct, Counsel.

4            Q.    Okay.  And by UAC, do you mean

5      unaccompanied children or sometimes folks use that to

6      mean unaccompanied alien children?

7            A.    Unaccompanied alien children is the

8      statutory definition.  And AO is the asylum officer.

9            Q.    Thank you.  And the TVPRA you talked about

10     in that same paragraph is the Trafficking Victims

11     Protection Reauthorization Act, correct?

12           A.    Yes, sir.  The William Wilberforce

13     Trafficking Victims Protection Reauthorization Act of

14     2008.

15           Q.    So when you talking in that paragraph about

16     your belief, can you tell me what evidence you have

17     for that belief, please?

18           A.    Yes.  I was one of the drafters of section

19     451(b) of the INA, which specifically delegated as of

20     March 1, 2003, certain responsibilities that had

21     previously been held by the former INS and vis-a-vis

22     the former or the executive office for immigration

23     review.

24                 And my conclusion is the Congress

25     determined, having done legislative drafting in the

1    past, that they had to carve out that exception to

2    exclude children from the credible fear process in

3    Section 235(b)(1) of the INA.  When I say INA, I mean

4    the Immigration and Nationality Act.

5         Q.   Thank you.  Have you ever been elected to

6    Congress, sir?

7         A.   Never.

8         Q.   And were you in Congress when that change

9    that you mentioned in paragraph ten was made?

10        A.   I was not.

11        Q.   And you said you drafted Section 451(b) of

12   the INA; is that right?

13        A.   I assisted as a staffer in the drafting of

14   it.  In Congress, we differentiate between drafting

15   of legislation and the actual presentation of

16   legislation, so I did that for the House Judiciary

17   Committee.

18        Q.   Is section 451(b) of the INA the same as

19   8USC, Section 1225(b)(3)(c)?

20        A.   It is not, Counsel.

21        Q.   So when you said that you had drafted a

22   section of the INA when you were in Congress, that

23   has nothing to do with what you wrote about in

24   paragraph ten here, right?

25        A.   It does, because section 451(b) of the INA

Andrew Arthur                                          December 14, 2023

Page 71

1      designated certain responsibilities over certain

2      cases.  And I concluded that that was a necessary

3      carveout to make clear that those children, rather

4      than going to immigration judges under section

5      235(b)(2)of the INA or 235(b)(1) of the INA, that the

6      primary jurisdiction over the asylum claims should be

7      retained by the asylum officers.

8           Q.   I misspoke a moment ago.  I said page

9      ten -- I said paragraph ten, I should have said page

10     ten.  I'm referring to paragraph 42.

11          Is that your understanding still that I'm

12     talking about paragraph 42?

13          A.   That is correct.  I will note also,

14     Counsel, that when I was with the judiciary

15     committee, I had met with individuals who were in the

16     process of drafting what would become the William

17     Wilberforce Act, though we did not discuss that

18     particular issue.

19          Q.   Did any member of Congress ever tell you

20     that it was their understanding -- that they have the

21     same understanding as what you put in paragraph 42?

22          A.   Not that I'm aware of.

23          Q.   Not that you're aware of or no?

24          A.   I would remember it, but I can't tell you

25     dispositively I've never had that discussion.

1        Q.   Okay.

2        A.   I might have heard reference to it in

3    testimony.  So if the question is, did any member of

4    Congress ever speak to me directly?  The answer would

5    probably be no.

6        Q.   And do you know what testimony that might

7    have been contained in?

8        A.   There was testimony in the Senate, and I

9    believe that it was a panel that included Joseph

10   Edlow, who would have been the prior head of USCIS.

11       Q.   Did you cite to that in paragraph 42 of

12   your expert report?

13       A.   I did not.

14       Q.   Why not?

15       A.   Because, again, I'm -- I just want to

16   answer your question as fully as possible.  I don't

17   have an independent recollection of it.

18            I do know that Ms. Feinstein said in -- the

19   late senator, Dianne Feinstein, of California, had

20   spoken about it and I can't remember whether there

21   was a discussion about it or not.

22       Q.   Okay.  When you said she spoke about it, do

23   you remember what context?

24       A.   I do not.  I remember that she was

25   specifically referencing the TBPRA in that and that

Page 73

1    there had been discussion of that particular act

2    during the hearing.

3         Q.   But you have no citation to that, do you?

4         A.   No, I don't.  I can't even tell you what

5    month or year that was.

6         Q.   Thank you.  So let's go to another

7    paragraph here.  Let's go to paragraph 49.  And this

8    is the entire paragraph.  I'm going to read it out

9    loud.

10            "The resulting Biden administration

11   policies, including the asylum IFR, are perceived

12   around the world as an announcement that the U.S.

13   borders are now open."

14            Did I read that correctly?

15        A.   That is correct, Counsel.

16        Q.   You don't have any citation to that

17   paragraph there, do you?  That's a yes-or-no

18   question.

19            MR. ST. JOHN:  You can answer it in the

20        form you choose, Mr. Arthur.

21            THE WITNESS:  It's generally accepted that

22        the Biden administration policies, amongst

23        experts in immigration, do in fact do that, but

24        I do not have a citation to that specifically.

25   BY MR. SCHULTZ:

Andrew Arthur                                    December 14, 2023

1          Q.   Why didn't -- if it's so generally noted,
2      why didn't you find a citation?
3          A.   Because it's generally noted that -- I
4      would reference in particular the testimony of then
5      Border Patrol Chief Ortiz in Florida versus United
6      States in various statements that have been made by
7      other individuals in the border patrol thereafter.
8          Q.   And we'll turn to the Ortiz point in a
9      moment.
10              You say "perceived around the world."
11     That's a very broad statement, isn't it, "around the
12     world"?
13         A.   It is, but it's one that I believe is
14     correct because we've seen a huge influx in the entry
15     of migrants from countries that we didn't
16     traditionally see them from.
17              As recently as FY 2007, the majority of
18     migrants apprehended by border patrol after entering
19     illegally at the southwest border from Mexico.  We
20     saw that change in FY 2014 to where nationals of the
21     central triangle countries, so El Salvador,
22     Guatemala, and Honduras, actually made up a majority.
23              But we still saw very low levels of
24     immigration from the rest of the world.  Border
25     patrol actually keeps statistics on the nationalities

Andrew Arthur                                        December 14, 2023

```
 1    of the individuals that it apprehends.

 2         Q.   Thank you.

 3         A.   Since the Biden administration has taken

 4    office, we've seen an expansion to individuals from

 5    countries that we did not traditionally see them from

 6    in Africa, Eastern Europe, Asia, and other countries

 7    in South America that were not typically countries

 8    that we saw people from.

 9         Q.   Is there any surveys you know about where

10    people have documented what their views of the Biden

11    administration's policies are that you could have

12    cited but didn't?

13         A.   Well, I know that Chief Ortiz alluded to

14    them in his deposition.  I read a lot of newspaper

15    articles.  This is what I do for a living.

16         Q.   I specifically asked about surveys, not

17    newspaper articles.  Any surveys that you're aware of

18    that show people's perception, since you used the

19    word "perceived"?

20         A.   I based it upon the newspaper articles that

21    I have reviewed, statements that I have seen.

22         Q.   What are those newspaper articles, please?

23         A.   I've seen reference to such things in

24    national newspapers.  Also to -- generally, I read

25    them online.  Part of my job is to read newspaper
```

Andrew Arthur                                    December 14, 2023

Page 76

1      articles every day, read analyses every day.  I can't

2      cite you to a specific one.

3           Q.   So even though you read those newspaper

4      articles every day and even though you read analyses

5      every day and even though you say that these surveys

6      exist, you decided not to put that as a citation to

7      footnote in paragraph 49, correct?

8           A.   It's so generally accepted, I did not

9      believe that it required reference.

10          Q.   Does anyone disagree with that that you've

11     ever read about in all of those newspaper articles or

12     analyses?

13          A.   The Biden administration in particular

14     cites to conditions around the world, geopolitical

15     conditions is the term that Judge T. Kent Wetherell,

16     II used in Florida versus United States.

17               And when I refer to the Biden

18     administration, I'm referring specifically to the

19     White House, where they talk about root causes of

20     immigration.

21               And I do see people that offer contrary

22     views in connection with that.  It is my -- it is my

23     conclusion, based upon the survey that I've read, and

24     it's generally accepted that the Biden administration

25     policies are a pull factor, drawing people to the

Andrew Arthur                                    December 14, 2023

1    United States.

2         Q.   Let's put aside pull factor for a moment.

3    We'll get to that.  But just to make sure I

4    understand what you're saying.

5              What you're saying is that it's generally

6    accepted around the world that the Biden policies are

7    seen as an announcement that the U.S. borders are

8    open and the only -- with all of the reading of

9    newspaper articles and analyses that you read every

10   day, the only descent that you've seen from that is

11   from the Biden administration and more specifically

12   from the White House; is that your testimony here

13   under oath today?

14             MR. ST. JOHN:  Objection.  Asked and

15        answered.

16             THE WITNESS:  Just to clarify the statement

17        that you made, generally accepted within the

18        United States amongst immigration experts that

19        they create a pull factor.  There are differing

20        views, but it is generally accepted that that is

21        a pull factor.

22   BY MR. SCHULTZ:

23        Q.   So now you're modifying what you wrote

24   where you said perceived around the world, to what

25   you said a moment ago where you said it's only within

Andrew Arthur                                        December 14, 2023

Page 78

1      the United States.  Is that what you're now

2      testifying to?

3                MR. ST. JOHN:  Objection.  Misleading.

4                THE WITNESS:  The generally accepted,

5           Counsel, is within the United States that those

6           policies are perceived around the world as a

7           pull factor, as an announcement that the U.S.

8           border is now open.

9      BY MR. SCHULTZ:

10          Q.   You spoke to one source for that as the

11     deposition of Mr. Ortiz; is that right?

12          A.   That is correct.

13          Q.   So when he testified in that deposition, do

14     you know if he did so as an expert or in his own

15     personal capacity?

16               MR. ST. JOHN:  Objection.  Misleading.

17     BY MR. SCHULTZ:

18          Q.   It's a question.  Do you know if he

19     testified as an expert or in his own personal

20     capacity?

21               MR. ST. JOHN:  Objection.  Misleading.

22          Counsel, that is not a binary choice.  You're

23          not even presenting the correct option.

24               MR. SCHULTZ:  That's a speaking objection.

25          Thank you.

Andrew Arthur                                    December 14, 2023

Page 79

1     BY MR. SCHULTZ:

2          Q.   You can answer the question, please.

3          A.   He was testifying in his capacity as the

4     chief of the border patrol.

5          Q.   Okay.

6               MR. ST. JOHN:  Counsel, I will not

7          tolerate -- the state will not tolerate

8          misleading questions like that.  That is not

9          square ball.

10              MR. SCHULTZ:  Counsel, there is no question

11         before the witness right now.  You've made your

12         objection.

13              MR. ST. JOHN:  I've made my objection and

14         I'm informing opposing counsel that trying to

15         mislead the witness is not square ball.  And if

16         it continues, that is absolutely something we'll

17         get the court on the phone for.

18              Do not -- please do not ask a question A or

19         B, when you know that C is the correct answer.

20         And please don't pretend that the people in that

21         room right there did not know the capacity Chief

22         Ortiz was testifying in.

23              MR. SCHULTZ:  Are you giving -- anything

24         else to say here, Scott?

25              MR. ST. JOHN:  I've made my record.

Andrew Arthur                                    December 14, 2023

                                              Page 80

1           MR. SCHULTZ:  Would you like to keep
2      speaking?
3           MR. ST. JOHN:  I will make objections as I
4      need to, and if this continues, we will
5      absolutely get the court on the phone.
6           MR. SCHULTZ:  I'm just asking if you're
7      done?
8           MR. ST. JOHN:  I've made my objection,
9      Counsel.
10          MR. SCHULTZ:  Very good.
11  BY MR. SCHULTZ:
12     Q.   So turning back to paragraph 49, do you
13  conduct any of your own research, any of your own
14  primary research, Judge Arthur, on the perception of
15  the Biden administration policies around the world?
16     A.   I do, in fact, go to the border and I do
17  speak to individuals at the border.
18     Q.   What languages do you speak, sir?
19     A.   I speak English.
20     Q.   Okay.  Do you speak to the people coming
21  across the border in English?
22     A.   I have spoken to individuals in the
23  communities in which those individuals are being
24  released.
25     Q.   What communities are those?

1          A.   I've been all around the border.  I've been

2     to Yuma, Arizona; El Paso, Texas; the Rio Grande

3     Valley, and that's just, I believe, this year.

4          Q.   Okay.  But you didn't cite to any of that

5     research in your expert report, did you?

6          A.    That is correct.  I will note that my

7     colleague, Todd Bensman, does actually go to the

8     other side of the border and he does take a

9     translator with him who is fluent in Spanish and able

10    to speak Spanish, and he regularly writes on those

11    subjects as well.

12         Q.   Can you spell his name, please?

13         A.    B-e-n-s-m-a-n, all one word.  And Todd,

14    T-o-d-d.

15         Q.   Do you cite to his research anywhere in

16    this expert report?

17         A.   I may.  I'd have to look at the whole

18    thing.

19         Q.   Did you cite to it in reference to

20    paragraph 49?

21         A.   I did not, Counsel.

22         Q.   So you could have, but you didn't, right?

23         A.    Again, it's generally accepted that that is

24    the perception around the world.

25         Q.   Okay.  So you talk about Biden policies.

1      Am I saying that right, policies, plural?

2              A.    That is correct, Counsel.

3              Q.    So that means more than one policy, right?

4              A.    That is correct, Counsel.

5              Q.    Please tell me the names or at least the

6      substance of the policies that you have in mind now.

7      Please list them for me.

8              A.    Sure.  The ending of the Migrant Protection

9      Protocols, MPP, which is commonly known as Remain in

10     Mexico, ending the policy of detaining individuals

11     who enter in what are called family units or FMUs,

12     the CBP One application program, which was announced

13     in a White House press release on January 5th.

14              There are other policies that are contained

15     therein, but the general policy of not detaining

16     aliens and following a very different -- parole plus

17     ATD.

18             Q.    I'm sorry, you used and acronym there.

19     Parole plus?

20             A.    That's what it's called, parole plus ATD.

21             Q.    Adam Thomas --

22             A.    Alpha Tango David.

23             Q.    Thank you.

24             A.    And I'm trying to think of some more.

25              Changing the release policies that had been

Page 83

1    followed by previous administrations, including the

2    Trump and Obama administrations.

3        Q.   Are there any other Biden administration

4    policies that have been implemented that made you

5    think that people around the world have a perception

6    that the Biden administration has opened the borders?

7        A.   They all very much tie together with

8    respect to the opportunity for release and the

9    opportunity to work in the United States.

10       Q.   And I appreciate that.

11       A.   There was an EO that was issued February

12   2nd, I think it was, 2021.  I don't have the number,

13   but it talked about how it was going to change the

14   policies of the prior administration.

15       Q.   So you said EO, that means executive order;

16   is that right?

17       A.   That's correct, sir.

18       Q.   And you said February 22nd, it was issued?

19       A.   February 2, 2021.

20       Q.   February 2, 2021.  Changed the policies of

21   former administration; that's what you said?

22       A.   The former administration.  And I would

23   reference also President Biden's election website.  I

24   can't remember what it was called.  They've actually

25   pulled it down.  It's got a picture of President

1    Biden with glowing red eyes now, but it was -- I

2    believe it was the Biden plan for -- I can't

3    remember.

4          Q.   That was an election website, correct?

5          A.   It was an election website, but we saw a

6    huge uptick directly after President Biden took

7    office, you know, in connection with statements he

8    made, including statements he made on that website.

9          Q.   Is there anything else that you can think

10   of that speaks to what you wrote in paragraph 49

11   about resulting -- about Biden administration

12   policies that are perceived around the world as an

13   announcement that the U.S. borders are now opened?

14         A.   Yeah.  Guidelines that were issued by

15   Secretary Alejandro Mayorkas on September 30th, 2021.

16   Sometimes it's referred to as the priorities memo.  I

17   don't want to paraphrase what he said, but he stated

18   that unlawful presence in the United States was not

19   sufficient to take an enforcement action, in and of

20   itself.  Again, I don't want to paraphrase.

21         Q.   That was the guidelines from Secretary of

22   Homeland Security, Mayorkas, from September 31st; is

23   that what you said?

24         A.   September 30th.  I don't think there is a

25   31st.

Andrew Arthur                                          December 14, 2023

Page 85

1          Q.   I apologize.

2          A.   That's quite all right.  I make that

3     mistake all the time.  I have to rewrite checks.

4               I can't remember the exact name of it, but

5     it's known as the guidelines of the priority memo.

6     It's the document that was at issue in Texas versus

7     United States.

8          Q.   Okay.  Is there anything else that you can

9     think of that are Biden administration policies that

10    have led to the perception around the world as an

11    announcement that the U.S. borders are now open?

12         A.   Those are the ones that come to mind.  I'll

13    tell you if I come up with something else.

14         Q.   And if during the rest of this deposition,

15    if anything else comes to mind, please do let me

16    know.

17         A.   Sure.

18         Q.   Okay.  Thank you.

19              Now, you had mentioned pull factors a

20    moment ago, correct?

21         A.   That's correct, Counsel.

22         Q.   And just give me a moment.  I'm going to

23    bring it up in a little bit, but let me see if it

24    makes sense to do it now.  If you don't mind indulge

25    me for a moment, please.

Andrew Arthur                                    December 14, 2023

Page 86

1            How about this:  In paragraph 43, this is

2      kind of related to what we were just saying, I'm

3      going to read you something you wrote there.  This is

4      paragraph 43, page ten.  It looks like it's two

5      sentences.

6            It says, "President Biden took office on

7      January 20, 2021.  That same day he issued multiple

8      executive orders related to immigration and border

9      policy, with yet more following in the subsequent

10     months."

11           Did I read that correctly in paragraph 43?

12     A.    That is correct.

13     Q.    Can you tell me, please, either by name or

14     by substance, what those executive orders were?

15     A.    I would --

16           MR. ST. JOHN:  Objection.  Best evidence

17           rule.

18           MR. SCHULTZ:  My question is what does he

19           think of as those -- that's my question, what's

20           in his head.  I'm going to ask that question

21           again.

22           Are you done with your objection, Scott?

23           MR. ST. JOHN:  Objection.  Best evidence

24           rule.

25           You can answer, Judge Arthur.

1          THE WITNESS:  Yeah, I would need to look at

2     the document again to refresh my recollection

3     with respect to what they were.  There was also

4     a memo that was issued by the acting head of

5     DHS, whose name escapes me at the moment, that

6     actually placed a moratorium on removals from

7     the United States.

8          That was issued almost immediately after

9     President Biden was sworn in.  It's -- let me

10    just see.  Yes, I'd have to take a look at the

11    document to remember what all they were.  He's

12    issued a lot of executive orders.

13  BY MR. SCHULTZ:

14    Q.   Any other way of trying to specify what

15  those might be that you can recall from your own

16  memory right now?

17    A.   I cannot, Counsel.

18    Q.   Okay.  But did you have some of those in

19  mind when you wrote that report, when you wrote

20  paragraph 43 of your report?

21    A.   I did, Counsel.

22    Q.   Okay.  So let's maybe work on the -- let's

23  approach the pull factors this way:  Let's turn to

24  page 12 here.  And there's a subheading there I'm

25  going to read that's between paragraphs 49 and 50.

Andrew Arthur                                    December 14, 2023

Page 88

1    It says, "Migrant flows are responsive to policy."

2             Do you see those words that you wrote?

3        A.   I do, Counsel.

4        Q.   And did I read those correctly?

5        A.   You did, Counsel.

6        Q.   Okay.  So let's look to the next paragraph,

7    paragraph 50.  There's a couple of sentences I'm

8    going to read there.

9             Actually, let's stick with that subheading.

10   You used the phrase migrant flow.  What is migrant

11   flow?

12       A.   Migrant flow is a generally accepted term

13   that refers to an increase, decrease, or steady flow

14   of migrants into the United States illegally or

15   without proper documents at the borders.

16       Q.   Okay.  And you didn't make up that phrase

17   then, did you?

18       A.   No.  That's a common phrase, commonly used

19   phrase.

20       Q.   Okay.  And then you say, are responsive to

21   policy.

22             In that context, can you tell me what you

23   meant by responsive?

24       A.   Sure.

25       Q.   And I'll just note for the record, you seem

Andrew Arthur                                    December 14, 2023

Page 89

1     to be frozen, both of you.  Now you're unfrozen.  The

2     visual doesn't matter, just that it might be a

3     foreshadowing that there might be an audio problem.

4     I didn't actually hear an audio problem, though.

5          A.   It was actually you that was frozen in that

6     particular instance.

7          Q.   I think it was each of us, depending where

8     we sat.

9          A.   It is -- again, I've been in this field for

10    30 years.  And over that 30-year period, I have seen

11    the implementation of policies that have either

12    increased the flow of migrants illegally into the

13    United States or decreased them.

14              The most significant one that I can think

15    of was the election of Donald Trump in January of

16    2017.  We saw a decline when President Trump took

17    office.  That decline didn't last long.  It lasted

18    about four months and we started to see the numbers

19    of individuals entering the United States illegally

20    tick up after that.

21              I've written a lot about this, and I think

22    I've even used the term Trump effect.  I borrowed the

23    term Biden effect with respect to a flow that we saw

24    shortly after President Biden took office, when we

25    saw the number of aliens who entered the United

Andrew Arthur                                          December 14, 2023

Page 90

1      States illegally increase directly thereafter.

2                Another policy that affected the migrant

3      flow was what I referred to before, the migrant

4      protection protocols or MPP.  MPP was implemented in

5      a phase stage, and when it was fully implemented it

6      caused a decline in the migrant flow across the

7      border.  DHS actually did an assessment of that in

8      October 2019.

9           Q.   Okay.  So when folks talk about migrant

10     flows, that seems to get into areas of demography.

11     Are you a demographer?

12          A.   I'm sorry, how does it get into issues of

13     demography?

14          Q.   It seems to me it's about where people are

15     and where they're going.  It's about people being not

16     in one place but instead in another place.

17                My only question is, do you have a degree

18     in demography?

19          A.   No, Counsel.  We've gone over my academic

20     pedigree.  I do not, but I for decades have dealt

21     with the flow of individuals into the United States

22     and the way that they come to the United States.

23          Q.   Okay.  And let me read the first sentence

24     of paragraph 50.  It's right below that subheading.

25     It says, "Migrant flows are responsive to policy in

Andrew Arthur                                    December 14, 2023

1       generally predictable ways."  Next sentence says,

2       "That follows from the basic economic premise that

3       demand increases when the cost or burden of

4       something -- here, the likelihood of detention or

5       removal -- is reduced, or the likely gain -- here,

6       release into the interior of the United States, with

7       employment authorization following in short order --

8       is increased."

9               Did I read that correctly?

10      A.    You did, Counsel.

11      Q.    Okay.  So when you say "predictable ways,"

12      what do you mean by that?

13      A.    Depending on whether the policy makes it

14      more or less likely that the individual will be

15      detained vis-a-vis being released into the United

16      States.  Most of the individuals who come to the

17      United States pay a smuggler to bring them at least

18      part of the way into this country.  And they have to

19      make an economic investment in that smuggler when

20      that happens, and they want to see a return on their

21      investment.

22              Part of the reason why Remain in Mexico was

23      effective was because --

24      Q.    I'm not asking about Remain in Mexico right

25      now.

Andrew Arthur                                          December 14, 2023

                                                            Page 92

 1          A.    I'm sorry, I was just giving you an example

 2     of this.  I wanted to be clear for the record.

 3              But yeah, when the likelihood that an

 4     individual is going to be released into the United

 5     States and be able to live and work here or

 6     potentially gain status here or remain here

 7     indefinitely, the flow increases.

 8          Q.    Okay.  So that first sentence when you talk

 9     about generally predictable ways, there is no

10     footnote, is there?

11          A.    There is not, Counsel.  Again, it's

12     generally accepted that that's how the border works.

13          Q.    When you say it's generally accepted, do

14     you mean there is authority that you could have

15     cited, you just decided not to?

16          A.     No, it's one of those things that's so

17     commonly accepted, it doesn't really require a

18     footnote or citation.

19          Q.    Okay.  So you told me before that you --

20     when you were at the University of Virginia and

21     studied in Charlottesville, you had a concentration

22     in economics and except for statistics, you were one

23     class short for qualifying for a degree in economics,

24     right?

25          A.    That is correct.

Andrew Arthur                                        December 14, 2023

Page 93

1           Q.   Do you remember when you were at the
2     University of Virginia, did you ever study the
3     economics of migration?
4           A.   I did not.
5           Q.   Okay.  Do you have any academic training in
6     the economics of migration?
7           A.   I have 30 years of experience in it.  But
8     with respect to academic degrees, I do not.
9           Q.   Okay.  And not just academic degrees, do
10    you have any academic training at all -- academic
11    training at all in the economics of migrations
12    movement?
13          A.   The economic experience that I have is
14    through the classes that I attended at the university
15    of Virginia and it did not involve migration.
16          Q.   Thank you.  Do you know if there are
17    people, academics who study the economics of
18    migration movement?
19          A.   There are individuals who do have that
20    field of study, yes.
21          Q.   Okay.  But you're not one of them?
22          A.   I am a person who has gained my experience
23    in this through practical experience, not through
24    academic experience.
25          Q.   Okay.  And this is a bit of a paraphrase,

Page 94

1    but tell me if this is a fair paraphrase.  I'm

2    looking at paragraph 50.  Let me see if I can think

3    of a better way to ask this.  One moment, please.

4    Thanks.

5              One of the -- tell me if this is fair or

6    not, and if it's not, then please try to fix it.

7              Is it fair to say in paragraph 50 that

8    you're saying that the likelihood of detention or

9    removal being decreased is something in your opinion

10    that migrant flow responds to?

11             MR. ST. JOHN:  Objection.  The report

12         speaks for itself.

13             You can answer.

14             THE WITNESS:  Yes, I would.

15    BY MR. SCHULTZ:

16         Q.   Okay.  Thank you.

17         A.   And I could give you examples if you'd

18    like, Counsel.

19         Q.   I might ask you for that, but not quite

20    now.  But thank you for that offer.

21         A.   We certainly saw it after Judge Gee issued

22    her order in 2015 --

23         Q.   No question pending, but thank you.

24         A.   I apologize.

25         Q.   So how does that mechanism work?  How, in

Andrew Arthur                                    December 14, 2023

Page 95

1    your experience, does a likelihood of detention

2    somehow affect migrant flow?  Can you walk me

3    through, please, the steps on how that reaches the

4    people whose -- who are part of that migrant flow?

5         A.   Oh, yeah.  It happens in a couple of ways.

6    Part of it is through word of mouth by individuals

7    who have gotten to the United States who have been

8    released into this country where they can live or

9    work.

10             Part of it is the sales pitch that the

11   smugglers themselves offer.  And in fact, I think

12   President Biden alluded to this during statements he

13   made in Guatemala City in June of 2014, with respect

14   to -- when he was vice president, of course -- with

15   respect to smugglers explaining to people how they

16   are able to come to the United States and the

17   likelihood that they're going to be released into

18   this country.  Foreign media sometimes carries

19   information about these things.

20        Q.   Okay.  And does the IFR, in your opinion,

21   lead to a --

22        A.   In fact, Counsel, I do need to -- at one

23   point, I believe that Secretary Mayorkas may have

24   chided individuals, elected representatives who were

25   talking about the border being open, because it would

Andrew Arthur                                                December 14, 2023

Page 96

1    encourage additional individuals to enter the United

2    States, when he asserted that the border was not

3    open.

4         Q.   Okay.  In your view, is the IFR something

5    that decreases the likelihood of detention or

6    removal?

7         A.   It does, by its face, because it lowers the

8    standard for parol for individuals who are pending a

9    credible fear determination.

10             We certainly saw in December of 2009 then

11   ICE director, John Warden, issued a directive to

12   allow individuals who had passed credible fear to be

13   paroled into the United States.

14             And we saw -- up to that point in the years

15   before that, four years before that, we had seen

16   somewhere around 4 to 5 percent of individuals who

17   were subject to credible -- subject to expedited

18   removal make credible fear claims.

19             After Secretary --

20        Q.   Just to be clear, you're talking about

21   Secretary Morton in 2009, correct?

22             MR. ST. JOHN:  Objection.  Counsel, the

23        witness is answering.  He gets to --

24             MR. SCHULTZ:  The question was about the

25        IFR, which was long after 2009.

Andrew Arthur                                          December 14, 2023

Page 97

1          THE WITNESS:  Right, Counsel, but I'm

2      explaining to you how the availability of parol

3      with respect to --

4  BY MR. SCHULTZ:

5      Q.   That wasn't my question.  My question was

6  not about the availability of parol.  My question was

7  specifically about the IFR.

8      A.   Again, we can look back at past experience

9  to see that the opportunity for parole for

10 individuals, the expansion of parol for individuals

11 does increase the number of individuals who will come

12 to the border and make credible fear claims.

13     Q.   Okay.

14     A.   And I apologize, Counselor.  I don't mean

15 to offend you.

16     Q.   There is no offense.  There's just a lot of

17 ground to cover today, and as I'm sure you know,

18 there's a limited amount of time.  I do have some

19 questions about parole, which we might get to later

20 on.  That question was just about the IFR.  So thank

21 you so much.

22     A.   Thank you.  Plus the availability of

23 asylum, because this is the IFR.  If individuals are

24 granted the asylum more quickly through this process,

25 whether they should be granted or not, whether it's

Andrew Arthur                                              December 14, 2023

Page 98

1    easy to get asylum before an asylum officer than it

2    is before an immigration judge, it will in fact

3    encourage other individuals to come to the United

4    States to take advantage of that process.

5         Q.   Now let's get into the phrase you used a

6    moment ago.  You talked about a pull factor.  Did you

7    use that phrase a few minutes ago?

8         A.   I did, Counselor.

9         Q.   You're also familiar with something else

10   that's called a push factor that's related to a pull

11   factor?

12        A.   Yes, Counselor.

13        Q.   Can you tell me as quickly as possible just

14   what those terms, pull factor and push factor, mean?

15   It's a bit of a tongue twister.  I apologize.

16        A.   Sure.  Pull factors are factors that

17   encourage people to come to the United States because

18   of things that are happening in the United States.

19             Push factors are factors that are unique to

20   the countries in which those individuals come that

21   encourage them to come to this country or to leave

22   home or to go anywhere else.  Push factors and pull

23   factors are generally accepted to be fairly common

24   within migration, generally.

25        Q.   And do both pull and push factors lead

Andrew Arthur                                              December 14, 2023

1    people to migrate?

2         A.   Both push factors and pull factors do lead

3    people to migrate.

4         Q.   Okay.  And do pull and push factors lead

5    people to migrate to the United States of America?

6         A.   Yes, in differing degrees depending on the

7    strength of the pull factor and the strength of the

8    push factor.

9         Q.   Okay.  So can you tell me, please, if there

10   are any push factors that you can think about,

11   please -- that you can name, please.

12        A.   Certainly.  Generally accepted push factors

13   are economic conditions in the home country,

14   political conditions in the home country, war in the

15   home country, crime, disorder, violence.  Did I

16   mention corruption before?  Corruption is one that is

17   identified.

18        Q.   Thank you.  You had not.  That was not a

19   repeat.  Corruption was not mentioned before.  Thank

20   you.

21        A.   Those are ones that the Biden

22   administration has specifically cited.

23        Q.   What about you, from your experience?  Any

24   other push factors aside from what the Biden

25   administration has or hasn't said?

Andrew Arthur                                    December 14, 2023

Page 100

1        A.   Again, I've been involved in this for three

2    decades, plus.  With respect to push factors, I can

3    remember times in history, including civil wars in

4    Guatemala and El Salvador, in which we didn't see the

5    same level of individuals coming to this country from

6    those countries as we have of late.

7             I can, you know, think of other conditions

8    of violence in other countries, certainly the rise of

9    Hugo Ch vez in Venezuela.  He's not currently the

10   president.  He's the former president.  That we did

11   not see large numbers of Venezuelans come to the

12   United States.  We would generally see those relocate

13   within other countries.

14       Q.   I don't think you said this before, but now

15   that you mentioned Venezuela, can famine be a push

16   factor?

17       A.   I believe the term that is used is food

18   insecurity.  And with respect to that as a push

19   factor, it can either lead to internal relocation or

20   relocation to a nearby country.

21       Q.   So it can lead to some sort of migrant flow

22   though; is that right?

23       A.   It can lead to a migrant flow.

24       Q.   Okay.  What about COVID?  Obviously that's

25   very recent in human history, but can COVID be a push

Page 101

1    factor?

2          A.   Actually, COVID is sort of a negative push

3    factor because most borders shut down their -- most

4    countries shut down their borders in response to

5    COVID or put restrictions on individuals to transit

6    to the United States or, you know, even to transit to

7    nearby countries.  So with respect to that, it's sort

8    of a mixed bag.

9          Q.   But border closures aren't always a factor

10   that governments might hope they'd be, right?

11         A.   Depends on the government, depends on the

12   border.

13         Q.   I don't think you mentioned educational

14   opportunities.  Is that something else that can be a

15   push factors?

16         A.   Yes.  Educational opportunities in the

17   United States can be a pull factor with respect to

18   the educational opportunities in the country in

19   question.  That's sort of a comparison factor.

20         Q.   Something like education might be both a

21   push and a pull factor; a bad education in their home

22   country might be pushing them and a good education

23   here might be pulling them.  Is that a fair --

24         A.   Yes, but in most countries, the -- again,

25   from my experience, the level of education is static.

1    It's not quite -- it's not quite the factor that food

2    insecurity would be, because again, that's --

3    education is more of a pull factor than a push

4    factor.

5          Q.   Okay.  I mean, I'm not sure much rides on

6    it.  I suppose all I'm thinking is if education were

7    equal in two countries, it wouldn't be a factor.

8               So if it's worse in one country and better

9    in another, it seems that the bad education is doing

10   the pushing and the good education is doing the

11   pulling, right?

12         A.   I would define that as a pull factor,

13   again, because there are educational systems in most

14   countries of differing degrees.  So, you know, the

15   opportunity for better education in the United States

16   would be more of a pull factor.

17         Q.   Okay.  Thanks for clarifying and talking

18   that through.

19              So you said before that both push factors

20   and pull factors can lead to migrant flows, right?

21         A.   That is correct, sir.

22         Q.   Okay.  So what are some of the pull factors

23   then?  You mentioned education.  What are some of the

24   other pull factors?

25         A.   Education, economic opportunities, general

Andrew Arthur                                    December 14, 2023

Page 103

1    security.  Economics is really the biggest one.

2    Comparing the daily rate for unskilled workers.

3              And I did this at one point a couple of

4    years ago.  It's about a ten-to-one differential

5    between Central America and the United States and

6    about an eight-to-one differential between Mexico and

7    the United States.  So, you know, economic

8    opportunities is really the biggest one.

9              Reunification with family is a pull factor.

10   Better education, if I didn't say that already, is a

11   pull factor.

12        Q.   We did talk about the education.  Thank

13   you.

14             Okay.  So in your report, in your expert

15   report, do you talk about any methodology that you or

16   others might have used to kind of differentiate

17   between the force of different pull and push factors?

18        A.   So I look at -- in the past, I've looked

19   at -- in my report, no, but from my experimental --

20   again, these are generally accepted things.

21             I examine the country's conditions in

22   various countries around the world and compare them

23   to previous periods of time when we had large -- when

24   we -- compare them to the migrant flow from those

25   countries in the past.

Page 104

1     Q.   You said you have 30 years of experience

2     looking at migrant flows; is that right?

3     A.   I have 30 years of experience in

4     immigration law.  I certainly had the opportunity to

5     examine migrant flows beginning in September of 1994

6     when I became a trial attorney in San Francisco.

7          San Francisco had an international airport

8     and we had a lot of people who would come through the

9     international airport and a lot of people who would

10    make their way to San Francisco.

11         Certainly when I was in Baltimore, I saw

12    very different flows.  We had an international

13    airport there as well.  When I was in the general

14    counsel's office at the INS, again, these were issues

15    that I had to deal with on a regular basis.

16         I was on both the enforcement and the

17    national security teams serially.  And certainly when

18    I was on the hill as oversight counsel for

19    immigration for house judiciary and as staff director

20    of the national security subcommittee and house

21    oversight and government reform, I certainly saw it

22    come through my corporate.

23    Q.   In all of that experience, have you come

24    across any methodologies for giving different weights

25    to different pull and push factors?

Andrew Arthur                                    December 14, 2023

1          A.    With respect to academic?

2          Q.    Let's start with academic.  Sure.

3          A.    I assume there may be some.  I've never had

4     the opportunity to see them.

5          Q.    Okay.  Did you talk about them in your

6     expert report?

7          A.    I did not, because they may exist; I'm not

8     familiar with them.

9          Q.    So you said, "Do you mean academic?"  I

10    said, "Let's start with that."

11              Aside from academic models, are there any

12    other practical models that you've seen that have a

13    methodology for distinguishing the force of different

14    pull and push factors, even if not from academic,

15    something that is a recognized methodology, though?

16    Anything come to mind?

17         A.    Mine is experiential.

18         Q.    But and is that something that you've

19    reduced in any way to a formula or a flow chart or

20    anything that again shows a method, a methodology?

21         A.    No, Counsel.

22         Q.    And that's not in your report, in your

23    expert report here either, is it?

24         A.    That is correct.  I don't cite any

25    flowcharts or methodologies that I created.

Page 106

1            MR. SCHULTZ:  Okay.  Thank you.  Give me

2       one moment here, please.  Okay?  Thank you.

3            We're going to take a bathroom break for

4       five minutes or so.  We'll come back to this

5       topic when we're done.

6            What I have here is 12:21, so let's take

7       five and see where we are.

8                      (RECESS TAKEN.)

9    BY MR. SCHULTZ:

10       Q.   It's 12:30.  We're back on the record now.

11            So let's turn over actually a little bit

12   back to something on paragraph 43, where you wrote in

13   the second sentence that -- I'm sorry, I have the

14   wrong paragraph here.  One moment.

15       A.   I believe we were on 49 last time.

16       Q.   That's right.  I am moving to something

17   different here, but let me -- my notes are off.  Give

18   me a second to try to find this.  Apologies.

19            Paragraph 46.  There we go.  If you can go

20   there, please.  You're talking there about testimony

21   by Rodney Scott, correct?

22       A.   That's correct, Counsel.

23       Q.   Okay.  And he was also an expert in this

24   case.  Are you aware of that?

25       A.   Was he an expert in this case?

Andrew Arthur                                    December 14, 2023

Page 107

1          Q.   Do you know if he's an expert in this case?

2          A.   I don't know Chief Scott's status in the

3     case.

4          Q.   Okay.

5          A.   I believe he may be an expert, but I'm not

6     100 percent sure.

7          Q.   Okay.  And one of the quotes you have in

8     there talks about a quote -- about, quote, the

9     administration's laser focus on expediting processing

10    and increasing opportunities for migrants to enter

11    the United States.  That's a partial quote.  Is that

12    right?

13         A.   Yes, it ends with "never waivered."

14         Q.   Yeah.  Okay.  Do you know what policies

15    Mr. Scott was talking about there?

16         A.   He doesn't use the words "policies" in that

17    sentence.

18         Q.   Right.

19         A.   I believe that he was -- with respect to

20    what he was saying, I believe that he was referring

21    to the Biden administration's release policies,

22    protocol into the United States.

23         Q.   Can you say that once more?  I didn't quite

24    catch one of those words.

25         A.   The process by which border patrol agents

Page 108

1    would speed the processing of individuals and their

2    release into the United States.  And again, that was

3    reflected in Florida versus United States.

4        Q.   Okay.  And in paragraph 47, also Mr. Scott,

5    he wrote at one point that the Biden, quote,

6    administration has made it very clear deterrence was

7    no longer our mission.

8             Do you remember putting that in paragraph

9    47?

10       A.   Yes, Counsel.

11       Q.   Do you see that there?

12       A.   I do, Counsel.

13       Q.   And do you agree with that?

14       A.   With respect to the degree that Chief Scott

15   made that statement, I agree with it.  I don't work

16   at border patrol, but that's reflected in the actions

17   of the administration.

18       Q.   And it --

19       A.   Certainly in Judge Wetherell's decision.

20       Q.   When you say the acts of the

21   administration, what do you mean?

22       A.   I'm sorry?

23       Q.   You said "reflected in the actions of the

24   administration," and I asked you to please say what

25   you meant.

Andrew Arthur                                    December 14, 2023

1          A.   Sure.  With respect to processing migrants

2     out of custody and releasing them into the United

3     States.

4               In fact, that was actually a key point in,

5     I believe, Florida versus Mayorkas.  Again, Judge

6     Wetherell's decision in that matter.

7          Q.   And besides Mr. Scott's testimony, do you

8     have any support for what he said?

9          A.   Chief Scott actually sent a letter to

10    Senate leadership on September 11, 2021, in which he

11    talked about the dangers with respect to that.  And

12    again, it's reflected in the decisions of Judge

13    Wetherell in both Florida versus United States and

14    Florida versus Mayorkas.

15         Q.   Okay.  So given Mr. Scott's testimony that

16    deterrence was no longer a DHS mission, is that a

17    pull or a push factor?

18         A.   With respect to deterrence not being a

19    factor, that is a pull factor because it makes it

20    more likely that individuals will successfully enter

21    the United States.

22         Q.   Let's go over to paragraph 48 then.  Tell

23    me once you're there, please.

24         A.   I'm here.

25         Q.   So to paraphrase, you said that there were

Page 110

1      policies -- that there was times -- that there were

2      policies implemented and you wrote that the Biden

3      administration did not consult with the border patrol

4      chief, and you wrote in paragraph 48 that that -- the

5      failure to consult was quote, unquote, shocking; is

6      that right?

7            A.   Yes, that is correct.

8            Q.   And do you know what time period we're

9      talking about there?

10           Let me ask it this way:  Is that the time

11     period that's right after the Biden administration

12     took office?

13           A.   Again, that is -- Chief Scott sent his

14     letter to the Senate September 11, 2021, looking back

15     during the time that he was border patrol chief.  He

16     was actually President Biden's first border patrol

17     chief.

18           Q.   Right.  Do you know when that failure to

19     consult took place?

20           A.    Yeah.  He actually discusses it in that

21     letter when he talks about that recommendations

22     from -- I don't have the letter in front of me.  I

23     don't want to paraphrase, but recommendation from

24     career employees were ignored and, you know,

25     political appointees ignored them.

Page 111

1          Q.   Okay.  So thank you for that.  I am going

2     to ask you to please focus on the question that I

3     asked, which is about the time period.

4          Do you know what time period he was saying

5     when that failure to consult took place, please?

6          A.   Yeah, he reflects back.  Again, the reason

7     that I -- I apologize, he talks about the time that

8     he was border patrol chief in that September 2021

9     letter.

10         And you know, the same policies appear to

11    have taken place with respect to internal

12    communications.  I relied on Chief Scott's testimony.

13         Q.   Okay.  So again, do you know when that

14    failure to consult took place?

15         A.   With respect to -- he indicated at the time

16    that that was endemic in the Biden administration

17    while he was chief.

18         Q.   Okay.  So when the Trump administration

19    took over -- so this is back, I guess, January 2017,

20    do you know who the chief of border patrol was back

21    then, starting on inauguration day, let's say?

22         A.   I believe it was Mark Morgan.

23         Q.   And do you know if there was any

24    consultation about policies between the Trump

25    administration and that chief who's name you just

Andrew Arthur                                    December 14, 2023

1    mentioned?

2        A.   I didn't serve in the Trump administration.

3        Q.   So are you saying that you don't know?

4        A.   I have reason to believe that there was a

5    lot of back-and-forth.  I had a lot of access to

6    border patrol agents during that period of time.  And

7    I believe that the border patrol chief's advises were

8    taken seriously by the administration.

9        Q.   So you believe that.  Do you have any

10   source for that?  Any evidence?

11       A.   Again, I spoke to border patrol agents.

12   When I would go to the border to talk about the

13   policies, I would talk to -- I can't remember.  I

14   talked to line agents.  I spoke to chiefs.  I can't

15   give you specific chiefs in places.

16       Q.   Okay.  Why do you say that it's shocking?

17       A.   It's shocking because, again, I served at

18   INS under the Clinton administration, under Attorney

19   General Janet Reno, and input from border patrol was

20   one of those things that not only we at the INS, but

21   all the way up the chain to the attorney general

22   would solicit and listen to.

23       Q.   Okay.  Is the chief of border patrol a

24   political-appointed appointment?

25       A.   The chief of border patrol is a term

Andrew Arthur                                    December 14, 2023

1    appointment or is -- I can't remember whether it's

2    Schedule C or not.

3         Q.   Okay.  Let's go over to paragraph 58.

4    That's 5-8.  And that's going to be on page 15.

5              Are you there?

6         A.   I am, Counsel.

7         Q.   Okay.

8         A.   You hadn't asked a question, so I wasn't

9    sure what you wanted me to say.

10        Q.   I wanted to make sure you are there and had

11   everything there in front of you, that you're

12   comfortable before I start the question.

13             I'm going to read that sentence there.

14   It's a one-sentence paragraph.  "Consistent with and

15   in my opinion based on the perception that U.S.

16   borders are effectively open, migration has surged."

17             Did I read that accurately?

18        A.   Correct.  That's what it says.

19        Q.   Okay.  So when did that surge start, if you

20   know?

21        A.   The surge started -- so there was a

22   surge -- there was a deep valley that started with

23   Title 42 in March of 2020, and I believe it reached

24   its nadir in April of 2021 and we started to see

25   numbers going up.

```
 1              Now, this was during the Trump

 2     administration.  But the surge that I'm referring to

 3     right there was a surge that began in -- primarily in

 4     February of 2021 under the Biden administration.

 5         Q.   And how -- what criteria are you using to

 6     distinguish between that first surge that you said

 7     where the nadir was April 2021 and what you're saying

 8     was somehow separate surge in February of 2021?

 9         A.   Based on the monthly apprehension numbers

10     that border patrol publishes.

11         Q.   Okay.

12         A.   We started to reach monthly levels that we

13     hadn't seen since 2000 -- since before September

14     11th.

15         Q.   Okay.  And I might have just written the

16     date wrong in my notes.  I apologize.  Can you tell

17     me the date again on what you're calling the second

18     surge or separate surge that started later?

19         A.   I believe it began in February and then it

20     ticked up throughout the year with some peaks and

21     valleys in 20 -- I'm sorry, 2021, and then increased

22     with some peaks and valleys thereafter.

23         Q.   Okay.  So the dates seem to have a bit of

24     tension.  Maybe I'm misunderstanding.  You said there

25     was a surge in March of 2020, then you --
```

Andrew Arthur                                    December 14, 2023

Page 115

1          A.   I apologize, Counsel.  What I said was

2     there was a nadir in March of 2020, that it actually

3     reached the nadir in April of 2021 -- 2020.  April

4     2020.

5          Q.   Thank you.  That was my -- that's where we

6     had a disconnect.  I think you said April 2021 when

7     you meant to say April 2020.

8          A.   Thank you.

9          Q.   Just to be fair, the nadir was April 2020;

10    is that right?

11         A.   I believe that might have been one of the

12    lowest months for apprehensions ever.

13         Q.   I understand.  It seemed you had two

14    different dates in 2021.

15         A.   I apologize.

16         Q.   No.  No.  No.  Thank you for clarifying.  I

17    just wanted to make sure that my notes were correct.

18              Okay.  So you mentioned peaks and valleys.

19    So when you're talking about a separate or distinct

20    surge, is that based on those peaks and valleys?

21         A.   Well, I'm talking about a surge that

22    commenced beginning in February of 2021, ended -- has

23    remained fairly steady, again, with peaks and

24    valleys.  Up until December of 2022, there was a

25    slight decline, another decline in May of 2023

Andrew Arthur                                    December 14, 2023

Page 116

1    following the Circumvention of Lawful Pathways Rule.

2    Then we seen them tick up again with small monthly

3    fluctuation thereafter.

4         Q.   Tell me if this is fair to say:  There was

5    a nadir in April 2020, and since then, numbers have

6    gone up; is that right?

7         A.   Right.  So after the April 2020, the

8    numbers still remained low, but they were higher than

9    that April of 2020 number.

10        Q.   Okay.  Thank you.  Let's go over to

11   paragraph 64.

12             You have a sentence there -- tell me once

13   you're there, please.

14        A.   I'm there, Counsel.

15        Q.   Thank you.  It says, "The consensus among

16   experts is that publicly released statistics downplay

17   the level of migration and releases into the

18   interior, with aliens improperly excluded from

19   categories and other categories simply not reported.

20   As Chief Scott testified, it is a shell game."

21             Is that accurate, what I just read?

22        A.   It is correct, Counsel.

23        Q.   Okay.  Do you agree with what Chief Scott

24   said there?

25        A.   I do agree with what Chief Scott said

Andrew Arthur                                    December 14, 2023

Page 117

1    there.

2         Q.   What do you mean then when you're agreeing

3    with him that there's a shell game?

4         A.   I agree that it's a shell game because

5    things like the January 5th, 2023, announcement that

6    migrants would be able to access the CBP One app to

7    make appointments at the ports of entry to be

8    released into the United States, really just had an

9    intention of hiding the flow of migrants across the

10   southwest border.

11            Those individuals are subject to the same

12   inspection protocol in section 235 of the INA.

13   They're equally inadmissible under section 235 of the

14   INA, and they're subject to the same detention

15   standards; however, they've been portrayed as

16   individuals seeking to enter the United States

17   lawfully.

18            An individual seeks to enter the United

19   States lawfully when they come to a port of entry

20   with proper documents to enter the United States.

21   Those individuals don't have proper documents.

22        Q.   Are you saying that the IFR calls for a

23   shell game?

24        A.   With respect to this, with respect to the

25   Biden administration's policies generally.  I would

Andrew Arthur                                    December 14, 2023

Page 118

1    say the same thing about the CHMV parol program that

2    was implemented that brings 30,000 nationals of

3    Cuban, Haiti, Venezuelan, Nicaraguans to the United

4    States.

5         Q.   You started off that paragraph again by

6    saying that the consensus among experts, then you go

7    on with the language I already read.

8              Do you see those words?

9         A.   I do, Counsel.

10        Q.   You don't have a footnote to any of those

11   experts in that paragraph, do you?

12        A.   No, I do not.  I could certainly give

13   examples with respect to that.

14             So CBP publishes what's called Custody of

15   Transfer Statistics.  One of the data points on that

16   custody and transfer statistics is office of field

17   operations issued an NTA, and then the next two are

18   issued in NTA released, issued in NTA detained.

19             It's a binary choice and yet the numbers

20   for CBP there shows zero across the board.

21        Q.   But you haven't named any experts just now,

22   have you?

23        A.   I'm speaking about other experts in my

24   field, other individuals that I consider to have

25   expertise with respect to this.

Andrew Arthur                                        December 14, 2023

Page 119

1          Q.   Okay.  But you didn't put those names into
2     your report, did you?
3          A.   No, I did not.
4          Q.   Okay.  In paragraph 66 you talk about
5     cartels.
6               Do you see that?
7          A.   I do.
8          Q.   Why did you write about cartels here
9     with -- why are you writing about cartels here?
10         A.   Because it's very important.  Again, I've
11    referenced back to Chief Scott's September 2021
12    letter to Congress where he talked about how on the
13    other side of the border, individuals associated with
14    the cartels sent -- control the migrant flow so they
15    can create what are called controllable gaps that
16    they then use to send other migrants who don't want
17    to be caught with drugs and other contraband into the
18    United States.
19              Also, reporting indicates that they charge
20    a PISO or a tax -- Madam Transcriber, P-I-S-O -- with
21    respect to the individuals who come to the United
22    States, if they don't pay that PISO, they're not
23    allowed to cross.
24         Q.   How long have the cartels, in your opinion,
25    been in charge of who can and can't enter the United

Andrew Arthur                                    December 14, 2023

Page 120

1    States?

2         A.   With respect to this particular flow, it is

3    a rather recent phenomenon in my experience.

4         Q.   Okay.

5         A.   The Mexican government has been at war with

6    the cartels for -- again, war is sort of shorthand,

7    but they've been battling the cartels since the

8    presidency of Vicente Fox back in the early 2000s,

9    and the Mexican government has been attempting to

10   tamp down those organizations.

11             There was certainly control -- attempted

12   control of narcotics coming into the United States

13   that provided those individuals with money.  But a

14   border that is viewed as accessible provides them

15   with an opportunity to make more money and create

16   those controllable gaps.

17        Q.   During let's say the years of 2017 through

18   December of 2019, did the cartels have power about

19   who was entering the United States?

20        A.   There was certainly cartel activities on

21   the other side of the border in areas.  There was a

22   certain level of cartel activity at that time with

23   respect to controlling their territory.

24             They would charge fees, basically, to

25   smugglers who would bring those individuals into the

Andrew Arthur                                    December 14, 2023

 1     United States.

 2          Q.   Thank you.

 3          A.   But please understand that with respect to

 4     the smugglers, the cartels, normally they're two

 5     different groups of individuals.  So with respect to

 6     that, again, it's sort of a symbiotic relationship.

 7     Sometimes it can be an ugly symbiotic relationship.

 8          Q.   Thank you.  Go back one notch to paragraph

 9     65, please.  One moment, please.

10               So if you're looking at paragraph, there's

11     a couple -- there's a couple-lines sentence, then a

12     block quote and a line and a half of text that you

13     wrote, so two lines, indent pull quote, then your

14     quote, correct?

15          A.   That's correct, Counsel.

16          Q.   I'm just going to read the stuff that you

17     wrote, not the pull quote.  Okay?

18          A.   Okay.

19          Q.   "In recent congressional testimony, I

20     estimated the number of aliens released into the

21     interior of the United States during the Biden

22     administration" -- then you have the pull quote.

23     Then you say, "My calculation based on data released

24     in September 2023 through the end of August is

25     2,390,584 illegal migrants released."

Andrew Arthur                                    December 14, 2023

                                                    Page 122

1              Did I read your words correctly?

2         A.   You did, Counsel.

3         Q.   And then a 30 and a footnote down to a

4    website, right?

5         A.   That is correct, Counsel.

6         Q.   Where did that number come from, that

7    2,390,584?

8         A.   Yeah, it's interesting because I don't want

9    to say that -- and again, it's sort of, you know,

10   with respect to the work that I do.  And, you know,

11   as I indicated before, I bring the work that I do --

12   you know, it is what I do.  It's my job.

13             There was no full accounting of the number

14   of border patrol -- the number of releases under the

15   Biden administration, so I had to survey documents

16   that had been produced that were required to be

17   produced by Judge Matthew Kaczmaryk in Texas versus

18   Biden when the Supreme Court issued its decision of

19   Biden versus Texas.

20             And then based upon custody and transfer

21   statistics information that was provided by CBP with

22   respect to border patrol, again, I didn't have it

23   with respect to OFO, the Office of Field Operations.

24             And so all of my -- the information that I

25   provided was based on open source reporting, but I

Andrew Arthur                                    December 14, 2023

Page 123

 1    had to pull it from a number of different data

 2    points.

 3         Q.   Okay.  Did you list those many data points

 4    here in your expert report, please?

 5         A.   No, I did not.  Probably if you -- to my

 6    testimony, I explained where the information came

 7    from.

 8              Transparency has been a real problem with

 9    respect to this administration in getting solid

10    numbers on releases.  So I relied upon congressional

11    testimony or congressional releases, open source

12    evidence and things like that.

13         Q.   Okay.  But whether the numbers are easy to

14    get or not, you're telling me now that you have

15    various sources that you used to put that number

16    together, correct?

17         A.   I did, Counsel.

18         Q.   And you don't list those sources here in

19    your expert report, do you?

20         A.   I do not.

21              MR. ST. JOHN:  Asked and answered.

22              MR. SCHULTZ:  Scott, you cut out there.

23         I'm going to let you please say your objection

24         again so it's clear for the record.

25              MR. ST. JOHN:  Asked and answered.

Page 124

1            MR. SCHULTZ:  Thank you, Scott.

2            THE WITNESS:  But that is where I got it

3        from.

4    BY MR. SCHULTZ:

5        Q.   So you said various documents.  Can you

6    tell me now, please, what those documents are, even

7    though they're not in the expert report?

8        A.   Sure.  They are monthly disclosures in

9    Texas versus Biden, from the disclosures by DHS, the

10   CBP custody and transfer statistics.  Those are the

11   main sources that I was able to get them from.

12           More recently, the House Judiciary

13   Committee has released numbers with respect to

14   requests that they've made of Congress for that

15   information.

16           With respect to ICE, individuals who have

17   been transferred from CBP to ICE and CBP OFO, those

18   numbers are available.  So the congressional numbers

19   helped, but I didn't have those congressional numbers

20   at the time that I drafted this.

21       Q.   And your expert report doesn't show how you

22   put those numbers together to reach this number, does

23   it?

24       A.   It does not.

25       Q.   Does your congressional testimony march

Andrew Arthur                                    December 14, 2023

Page 125

1      through the math that you used?

2            A.    No, but things that I've written in the

3      past actually contain a running summary of that.

4            Q.    Okay.  Do those things that you've written

5      in the past go through all of your math number by

6      number to show how you arrived at the conclusion?

7            A.    Generally, yes.

8            Q.    Can you tell me which documents of yours in

9      the past have that math, please?

10           A.    Sure.  Things that I've written from the

11     center with respect to tabulating the disclosures

12     monthly as they've been created.

13                 Again, I write a lot, so I can't tell you

14     the specific documents, but I do go through to

15     calculate them and I do provide the actual number.

16                 Generally when I'm writing for the public,

17     I try to round it off or round it up.  What I was

18     doing then, I actually provided the actual data

19     points.

20           Q.    When you say you were doing that, what does

21     the "that" refer to, please?

22           A.    Monthly calculations to this and it's one

23     of those things that a lot of congressional staff, a

24     lot of people in the press ask me for with respect to

25     that because I really -- until the House Judiciary

Page 126

1      Committee compiled its report, I really was pretty

2      much the basic source for that information, because I

3      did the math.

4              Q.   Okay.  If you can't remember with -- can

5      you remember with any more detail right now what

6      those publications are that you did for CAS that have

7      your math?

8              A.   I really can't, but if you go to the

9      website -- if you go to the disclosures in Texas

10     versus Biden, you can actually compile the numbers as

11     well.

12             Q.   Okay.

13             A.   And there's more documents that were

14     provided by DHS, CBP, and ICE.

15             Q.   Okay.  I want to make sure you finished.

16     Was there anything else?  I think we stumbled over

17     each other there for a second.

18             A.   No, that's it.

19             Q.   Okay.  Thank you.  Thank you for letting us

20     know so we can call up numbers ourselves, but what I

21     am most interested in is the numbers that you put

22     together.  If you don't have that information in your

23     head now, that is fine.  We will send an e-mail to

24     you, though, in writing, calling for you to please

25     give us a list of those publications that you have

Andrew Arthur                                                December 14, 2023

1      done so that we can see what you've done.  So I just

2      want to give you a heads up on that.

3              A.   Okay.  Just to be clear, you want me to

4      give you numbers that were actually provided by DHS?

5              Q.   We're going to ask you to simply refer us

6      to what you just mentioned a minute ago.  You said

7      there's various numbers that you put together for CAS

8      on a monthly basis, and you said that the

9      publications that you give to CAS show your math.  So

10     that's what we're going to call for, the publications

11     that you just mentioned that show your math.

12             A.   Okay.

13             Q.   Thank you.  I need a moment here, please.

14     Thank you.

15             So even if you can't recall those articles

16     right now, can you please walk me through the

17     methodology that you used, if you remember, please.

18             A.   Sure.  I would go to the disclosures in

19     Texas versus Biden and they would break it down into

20     ICE and ICE releases from the border, CBP releases

21     from the border, both border patrol and OFO.

22             Q.   What was that last acronym that you used,

23     please?

24             A.   OFO.  I apologize.  I've referenced that

25     before, Office of Field Operations.

Andrew Arthur                                    December 14, 2023

Page 128

1          Q.   Thank you very much.  Most of these

2     acronyms I know.  There's a few I don't.  Even for

3     the ones I do, it helps to repeat just to make sure

4     we're all on the same page.  Thank you.

5               So something else, I just want to make sure

6     I have the right language here.  Now, if you turn a

7     little bit further down in paragraph 67, at the last

8     sentence there, you say, "And the Biden

9     administration is seeking to make the situation worse

10    by cutting ICE funding."

11              Do you see that?

12         A.   I do, Counsel.

13         Q.   Did I read that last sentence correctly?

14         A.   You did, Counsel.

15         Q.   There's a footnote there, footnote 34,

16    which then goes to a DHS website that you have at the

17    bottom of the page there; is that right?

18         A.   It is correct.

19         Q.   So let me ask you first of all, that

20    footnote -- I'm going to work backwards a bit.  Does

21    that footnote, does the -- does the document that you

22    cited in that footnote, does it say that the Biden

23    administration is seeking to make the situation

24    worse?

25         A.   No, the reference to the footnote is by

Andrew Arthur                                    December 14, 2023

Page 129

1    cutting ICE funding.

2         Q.   By cutting ICE funding.  I see.  Like I

3    said, I'm going to back into this, so I appreciate

4    your patience.

5         So let's just start with the start of the

6    sentence:  "Biden administration is seeking to make

7    the situation worse" is what you wrote.

8         What do you mean by "situation," please?

9         A.   The situation with respect to the crisis at

10   the southwest border with respect to the release of

11   migrants into the United States.

12        Q.   Okay.  And what do you mean by "worse,"

13   please?

14        A.   Exacerbated.  The Biden administration has

15   asked Congress to cut the amount of money that it has

16   for DHS funding both in FY -- in its FY 2023 and FY

17   2024 budgets, from 34,000 down to 25,000.

18        Q.   Okay.  So --

19        A.   So it would actually limit the amount of

20   detention space that it had.

21        Q.   I'm sorry, I thought I just heard a noise.

22   Is everyone okay?

23        A.   Yeah.

24        MR. ST. JOHN:  Let's clarify the record.  I

25        think you're talking about funding for detention

Andrew Arthur                                    December 14, 2023

1      beds; is that correct?

2              THE WITNESS:  That's correct.

3              MR. ST. JOHN:  Okay.

4      BY MR. SCHULTZ:

5         Q.   Okay.  Thank you.  And again, I heard a

6      noise.  Just want to make sure that no one is in

7      trouble.

8              So you also mentioned -- we spoke about

9      detention beds a little bit earlier.  I'm not going

10     to go back into that, but you also say "cutting ICE

11     funding;" is that right, at the end of that sentence?

12        A.   That's correct, Counsel.

13        Q.   And you have the Biden administration

14     cutting ICE funding, right?

15        A.   It's seeking to make that worse.  I

16     apologize, Counsel.  I do have to clarify the record.

17     It's seeking to make that worse by cutting ICE

18     funding.  Appropriations are set by Congress and they

19     send a request to Congress for funding.

20        Q.   And that's kind of what I'm getting at

21     here.  It seems that what you're saying here is that

22     the Biden administration is seeking to make things

23     worse and the way that it's seeking to make things

24     worse is by itself cutting ICE funding; is that

25     accurate or not accurate, what I just said, as to

Page 131

1    what your thoughts are?

2         A.   Regrettably this is one of the imprecisions

3    of the English language.  The "seeking" actually

4    modifies "to make the situation worse."  "By cutting

5    ICE funding" would be through the appropriations

6    process.

7         Q.   So does the Biden administration, meaning

8    the executive branch, do they have the power

9    unilaterally to cut ICE funding in the United States

10   government system?

11        A.   They do have the ability not to utilize ICE

12   detention space.  With respect to ICE funding, it's

13   interesting because it's 8 USC 1368 requires DHS, on

14   a semi-annual basis, to send a report to Congress

15   that talks about the amount of funding that it will

16   need to inform that congressional answer -- that

17   estimate.

18             To the best of my knowledge, they haven't

19   sent that report.  What they do send is the budget

20   for DHS to Congress.

21        Q.   And I think we both know the answer, but

22   just to be clear, it's Congress that sets the budget,

23   correct?

24        A.   At the request of the president, and of

25   course they have their own deliberations.

Andrew Arthur                                    December 14, 2023

1              In the absence of other information, again,

2      the report that's required under 1368, they're

3      relying upon what the administration says is the

4      appropriate amount.  But of course, they do have

5      their own appropriations system with discussion and

6      debate.

7              In fact, I think in the 2023 budget,

8      notwithstanding the fact that the Biden

9      administration asked for a cut, they let detention

10     bed space static.

11         Q.   Does Congress always follow what the

12     executive wants in budgets from year to year?

13         A.   No.  Congress has authority -- is informed

14     by the president, but they have their own independent

15     authority to do that.

16         Q.   This is going back outside the scope of

17     your report:  Didn't the founding fathers say that

18     Congress has the power of the purse; isn't that a

19     phrase you've heard?

20         A.   It's a phrase I've heard.  It's a phrase

21     I've used, correct.

22         Q.   Is that correct?

23         A.   Congress does have the power of the purse,

24     but they rely upon the executive branch with respect

25     to the amount of funding that they need.

Andrew Arthur                                December 14, 2023

Page 133

1          Q.   When you say "rely on," what do you mean by
2     that, please?
3          A.   So if the administration says that it
4     doesn't need more detention beds, that it can handle
5     the situation perfectly fine without it, that is
6     definitely something that is going to inform
7     Congress' discussions.
8          Q.   Okay.  Does Congress sometime put things in
9     the budget that the executive doesn't want?
10         A.   They do.
11         Q.   Okay.
12         A.   As happened in the FY 2023 budget.
13         Q.   Has happened in the FY 2023 budget; is that
14    what you just said?
15         A.   Yeah, with respect to detention beds, as I
16    alluded to before.
17         Q.   Thank you.  Again, just wanted to make sure
18    that I heard the -- I would say words, but heard the
19    letters and numbers correctly.  So thank you.
20         A.   Thank you.  By FY, I mean fiscal year.
21         Q.   One moment, please.  Thank you.
22              I'm sorry, I sometimes am pressing the
23    button here too many times.
24         A.   I saw what happened.
25         Q.   Thank you.

Page 134

1          A.    Thank you, Mr. Schultz.

2          Q.    Just to follow up on what you were saying

3    about the detention beds, weren't there COVID

4    restrictions on that?

5          A.    There were COVID restrictions on the

6    detention beds.  There were lawsuits that placed

7    COVID restrictions on detention.

8          Q.    And can you tell me a bit more about that,

9    please?

10         A.    I can't remember the cases in particular.

11   I know the one had to do with Adelanto, which is a

12   detention facility in California.  And in fact, ICE

13   just announced they're shutting down Adelanto,

14   notwithstanding the fact -- the Biden administration

15   has the ability to go back and ask those restrictions

16   to be lifted.  In the case of Adelanto, it doesn't

17   appear they did.

18         Q.    Okay.

19         A.    Madam Transcriber, A-d-e-l-a-n-t-o.

20         Q.    Capital A usually, right?

21         A.    Capital A, yes.

22         Q.    Thank you.  So still staying with paragraph

23   67, the first part of that sentence, at least what I

24   view as the first part of that sentence, to read it,

25   "And the Biden administration is seeking to make the

Andrew Arthur                                    December 14, 2023

Page 135

1    situation worse."

2            Just referring to that part of the

3    sentence, please, you don't have any citation for

4    that, do you, in your expert report?

5        A.   It's the cutting ICE funding.  It is a

6    natural circumstance that flows with respect to daily

7    detention beds.  There have been tensions not only

8    within this administration, with respect to prior

9    ones, with respect to utilization of detention beds.

10       Q.   I think we've already covered that ground

11   then.  Okay.

12           Let's skip ahead a little bit to paragraph

13   93, which I know is a little bit of a jump forward.

14   I like to make sure I have this right here.

15       A.   You got it.  93 has to do with the latest

16   asylum IFRS.

17       Q.   I just want to make sure that my notes are

18   matching up to what I have here.

19           There we go.  So you talked about -- in the

20   second sentence it talks about information between

21   June and September 2022; is that right?

22       A.   That's correct, Counsel.  June of 2023.

23       Q.   What I have is between June and September

24   2022, column, asylum officers conducted 572 AMIs.

25   That's the second sentence of paragraph 93.

Andrew Arthur                                           December 14, 2023

                                                        Page 136

1              A.    I apologize.  I was looking at 94.

2              Q.    That's okay.

3              A.    Yeah, I'm looking at it.

4              Q.    Okay.  So I'm not so much focussing on the

5        year, which is 2022, but it says months June and

6        September.  Do you see those there?

7              A.    I do, Counsel.

8              Q.    And are you looking at paragraph 93?

9              A.    I am, Counsel.

10             Q.    Thank you.  And that's four months, right,

11       inclusive?

12             A.    That is correct, Counsel.

13             Q.    Okay.  So going back a little bit to push

14       and pull factors, let me ask a foundation question

15       here.

16                   Are you saying that the data that you --

17       that you discuss there is something that contributed

18       to the pull under the IFR that led migrant flows to

19       increase in the United States?

20                   MR. ST. JOHN:  Objection.

21                   THE WITNESS:  That actually doesn't

22             reference that in that paragraph, sir.

23       BY MR. SCHULTZ:

24             Q.    Okay.  Is that what you were getting at or

25       did I kind of misunderstand what you were trying to

Page 137

1    get at there?

2         A.   No, I was explaining the implementation of

3    the IFR there.

4         Q.   So you are speaking about the

5    implementation of the IFR then?

6         A.   That's correct.

7         Q.   Okay.  Is it your opinion -- and I'm not

8    saying that you have this here, I'm just saying is it

9    your opinion now speaking to me, that four months of

10   data would be enough to influence the pull strength

11   that might lead more people to migrate to the United

12   States?

13        A.   The issue with respect to this particular

14   IFR is the expansion of it.  At the time that the

15   administration actually issued the IFR, they

16   announced that it was going to be implemented

17   gradually as it went forward.

18             So the bigger implementation is with

19   respect to the increase in asylum grants based on the

20   IFR vis- -vis the asylum grants by immigration

21   judges.  It would increase the amount.

22             So I believe there were 325,000 asylum

23   claims filed with the DOJ in FY 2023.  Again, the

24   majority of these asylum claims go to the immigration

25   court.  DOJ also keeps statistics on cases arising

Andrew Arthur                                    December 14, 2023

1    from a credible fear claim.

2              So with respect to that, there is a

3    significant differential.  It's actually 11.63

4    percent.

5              The more cases that were transferred over

6    to AOs under the IFR, the more grants there are going

7    to be, the larger it would grow.  It's a very small

8    population at this juncture.

9         Q.   So the fact that it's a small population in

10   your opinion, does that make the pull factor of the

11   IFR less strong?

12        A.   The gradual implementation of it does

13   except for the fact that DHS continues to release

14   individuals to go to immigration court with NTAs to

15   apply for asylum or not.

16        Q.   Okay.  So I suppose what I'm getting at

17   here -- this is funny, you might remember a little

18   bit ago I asked you to walk me through how the

19   communication would work for a pull factor.  Then you

20   gave me an answer.

21             Do you remember that you answered that

22   question?

23        A.   Yeah, I do.

24        Q.   So I'm going to ask a similar question

25   here.  So you just told me that it's a small sample

Andrew Arthur                                    December 14, 2023

Page 139

1    and that it's an implemented -- incremental rollout

2    of how this is being applied; is that fair?

3         A.   That's correct, Counsel.

4         Q.   So you don't have a crystal ball and the

5    migrants don't have a crystal ball, correct?

6         A.   Correct, Counsel.

7         Q.   So walk me through, please, how this is

8    going to be a pull factor then that has any strength.

9              Are you saying that people will hear that

10   there is a new program that is now being executed and

11   that the new program is quite small, though who knows

12   if it gets bigger or not, given the lack of a crystal

13   ball; and given that, are you saying that that's

14   enough force to make a pull factor to get people to

15   migrate to the U.S.?

16             MR. ST. JOHN:  Objection.  Vague and

17        misleading.

18   BY MR. SCHULTZ:

19        Q.   I'm just asking if that's what he said.  He

20   can answer any way he wants.

21        A.   With respect to what I said, when this

22   comes up to scale, which you know is the anticipation

23   of this rule, the number of individuals who are

24   released under the parol provision for individuals

25   facing credible fear and the number of people who are

Andrew Arthur                                          December 14, 2023

Page 140

1    granted asylum will create a very significant pull

2    factor for individuals to come to the United States.

3            Q.   Is the pull factor significant now?

4            A.   It was gradually implemented, so the answer

5    to that is it's de minimis.

6            Q.   So let's look at logistics a little bit.

7    It's 1:18 p.m.  We've been going a little bit over

8    three hours.  Just about three hours once you take

9    the breaks into account.  And it's lunchtime, at

10   least here in the east coast.

11           MR. SCHULTZ:  Scott, apologies, Louisiana

12       is one hour off, correct?  One hour difference.

13       Sorry, I'm using east coast norm there, which I

14       should not do.

15           Louisiana is one hour earlier compared to

16       the east coast where North Carolina and D.C.

17       are, right?

18           MR. ST. JOHN:  This is a fine time for a

19       lunch break, yeah.

20           MR. SCHULTZ:  That's where I'm going.

21           THE WITNESS:  I'm perfectly happy to keep

22       going.

23           MR. SCHULTZ:  I understand that.  We have

24       folks here who I know need to eat.  And if I

25       don't get food into my system before too long, I

Andrew Arthur                                    December 14, 2023

                                                    Page 141

1         might start to feel it also.

2                      (RECESS TAKEN.)

3     BY MR. SCHULTZ:

4         Q.   So let's turn to page 17 of your report,

5     please, Judge.

6         A.   Yes, Counsel.

7         Q.   I couldn't hear you.  I'm so sorry.

8         A.   Yes, Counsel.

9         Q.   Thank you.  Two-thirds of the way down,

10    three-fourths of the way down it says the asylum IFR.

11             Do you see that there?

12        A.   Page 17?

13        Q.   That's right, sir.  It's just a subheading.

14        A.   Yes.  Yes, I do see it.  Yes.

15        Q.   Okay.  So we've been using the term IFR,

16    and I just wanted to -- I think we all know what it

17    means, but let's just make sure.

18             Can you tell me what that acronym stands

19    for, please?

20        A.    It's the Interim Final Rule on the asylum

21    officer rule that creates the IMA system process and

22    it was published on March 29th, 2022.

23        Q.   And just so we're all on the same page,

24    again, Scott, I understand the record will speak for

25    itself.  Just so we're all on the same page, if you

Andrew Arthur                                    December 14, 2023

                                                      Page 142

1        know it, do you know the official citation to that?

2              A.    I could look it up.

3              Q.    That's okay.  But you gave us a date, so

4        that's how we're going to make sure we're all on the

5        same page about what it's referring to.  I wanted to

6        pin that one down.

7              A.    Very good.

8                    MR. SCHULTZ:  Scott, did you have something

9        to say there?

10                   MR. ST. JOHN:  No.

11       BY MR. SCHULTZ:

12             Q.    Okay.  So I have a few questions, not

13       surprisingly, about the IFR then.

14                   First of all, can you tell me your

15       understanding, please, of what it says?

16             A.    The IFR sets up a process for aliens who

17       have received positive credible fear determinations

18       under section 235(b)(1) of the INA, to have their

19       applications maintained and adjudicated by asylum

20       officers, not immigration judges in the course of

21       removal proceedings.

22             Q.    Okay.  Thank you.  If you look at paragraph

23       69, I'm going to read the first part of it, but we

24       can talk about more if you need to.

25                   It says "EOIR and the USCIS explained that

Page 143

 1      as a number of asylum claims at the southwest border

 2      has skyrocketed over the years."  And the sentence

 3      goes on.  Do you see that?

 4              A.   I do, Counsel.

 5              Q.   Okay.  And that's basically -- paragraph

 6      69, bottom of the page 17 over to page 18, right?

 7              A.   Correct, Counsel.

 8              Q.   Do you agree with what I just read from

 9      that paragraph?  I mean, you wrote it.

10              MR. ST. JOHN:  Objection.  Vague.

11              THE WITNESS:  That's a correct citation to

12          the asylum rule.

13      BY MR. SCHULTZ:

14              Q.   Okay.  Do you agree that the number of

15      asylum claims at the southwest border has skyrocketed

16      over the years?

17              A.   Yes, I do.

18              Q.   How many years?

19              A.   Well, it really began to jump toward the

20      end of 2019 and has increased throughout then to

21      2023.

22              Q.   Okay.  So thank you.  Just moving a couple

23      of paragraphs later, paragraph 71, page 18.  That's

24      basically a couple -- a line and a half from you plus

25      a pull quote, plus two pull quotes.

Andrew Arthur                                        December 14, 2023

                                                        Page 144

 1              Do you see that?

 2      A.   I do, Counsel.

 3      Q.   Okay.  And on the second pull quote, this

 4   is -- I'm sorry, let me back up.  The pull quote,

 5   both of them are from 46908, 46909, right?  That's

 6   what you have there at line 26?

 7      A.   Yes, that is correct.  And I can't remember

 8   whether that was from the JNPRM or the IFR.  That's

 9   the Joint Notice of Proposed Rulemaking.

10      Q.   That was my next question.  Thank you so

11   much.

12              And the second pull quote there says,

13   quote, "The ability to stay in the United States for

14   years waiting for an initial decision may motivate

15   unauthorized border crossings by individuals who

16   otherwise might not have sought to enter the United

17   States and who lack a meritorious protection claim."

18              Is that the start of the second pull quote

19   there in paragraph 71?

20      A.   It is, Counsel.

21      Q.   And do you agree with what that sentence

22   says?

23      A.   Yes.

24      Q.   Okay.  And then you say then that the delay

25   is a pull factor?

Page 145

1          A.    The delay facilitates people living and

2     working in the United States so that it creates a

3     pull factor.

4          Q.    Okay.  Thank you.

5                How does it facilitate?  How does that

6     delay facilitate people living and working in the

7     U.S.?  Can you just walk me through your chain of

8     thought there, please?

9          A.    Sure.  In a couple of different ways.

10    First, the delay allows people to live and work into

11    the United States -- I'm sorry, live in and work in

12    the United States, which it allows them to make money

13    here, live their lives here, send their kids to

14    school here, and to make money in this country and

15    build up equities.

16         Q.    And the thing about the delay allows all of

17    that to happen, right?

18         A.    That's correct, Counsel.

19         Q.    Okay.  Thank you.  Okay.  Let's turn over

20    to paragraph 74 then, please.  I'm just going to find

21    my spot here for a moment.  Thanks for your patience.

22         A.    Page 19?

23         Q.    Page 19, yes.  That is paragraph 74 at the

24    bottom there, and it starts off where you wrote "EOIR

25    and USCIS acknowledge that the proposed rule would

Andrew Arthur                                    December 14, 2023

1    alter eligibility for" --

2          A.    It reads "one benefit."

3          Q.    Right.  I'm sorry, I'm reading the wrong

4    part of that paragraph.  I apologize.

5                Let's skip to the next page, same

6    paragraph, middle -- the second sentence there.  It's

7    right after it says table two, top of page 20.

8                First full sentence starts, "EOIR and USCIS

9    nevertheless took the facially implausible position

10   that there would be no impact on state governments,"

11   end quote, though the sentence does continue.

12               Do you see where I wrote that?

13         A.    Yes, Counsel.

14         Q.    I'm sorry, do you see where you wrote that?

15   I'm sorry.

16         A.    I do, Counsel.

17         Q.    Thank you.  Why is that facially

18   implausible?

19         A.    Because by releasing individuals into the

20   United States more quickly it's going to make them

21   eligible for public benefits such as Medicare, SNAP,

22   TANF, and will allow them to then immigrate more

23   immediate relatives to the United States that would

24   again further draw down those means-tested public

25   benefits, and also, if they brought children to the

Andrew Arthur                                    December 14, 2023

1    United States would impose a cost on the schools.

2         Q.   Now, that sentence in the middle does have

3    a citation that says see id. at 46,925, table two.

4    Do you see that?

5         A.   I do, Counsel.

6         Q.   Does that citation say that it's facially

7    implausible?

8         A.   I'd have to take a look at the citation,

9    Counsel.

10        Q.   Do you think you'd remember if there were a

11   federal document that calls it facially implausible

12   in your field?

13        A.   I probably would.  I have a feeling that it

14   doesn't have the facially implausible part on it.

15        Q.   Okay.  So with the facially implausible

16   part, do you have any evidence that it's facially

17   implausible?

18        A.   Well, I have evidence that it's facially

19   implausible for the reasons that I stated before.

20             Individuals who are illegally present in

21   the United States are eligible for Medicare except

22   for emergency Medicare.  They're not eligible for

23   SNAP or TANF.  There's also an increase in

24   incarceration cost that is possible as more people

25   come into the United States.  And again, the

Andrew Arthur                                    December 14, 2023

1    education cost that I referenced before.

2              One other thing that is facially

3    implausible is that the rule itself talks about the

4    effect it's going to have on the wages and working

5    conditions of Americans.  And again, you know, we

6    talked about the benefits to businesses, but it

7    didn't talk about the detriments to workers, who

8    would then have to use those means-tested public

9    benefits.

10        Q.    So at page 20, paragraph 78 --

11        A.    Yes, Counsel.

12        Q.    -- you talk about -- you talk about -- I'll

13   use the word myself, but you don't use this word, but

14   a delay of 21 days after the noncitizen has been

15   served a record for positive credible fear

16   determination.

17             Do you see that in 78?  That's quoting the

18   federal regulation.

19        A.    I do see that, Counsel.

20        Q.    And you didn't use the word "pause" or

21   "delay" there though, right?

22        A.    I did not, Counsel.

23        Q.    Okay.  But that's -- is it fair to say that

24   that's what this calls for, that at a certain point

25   there's a 21-day period where the case cannot go

Andrew Arthur                                December 14, 2023

1    forward for 21 days; is that right?

2         A.   It specifically calls for that and that was

3    a provision that was added between the Joint Notice

4    of Proposed Rulemaking and the Interim Final Rule.

5         Q.   Okay.  So I'm going to ask you a few

6    questions about this.  Let's take a few steps back,

7    first of all.

8              Under federal asylum, you're familiar with

9    federal asylum law from your experience in

10   immigration law, right?

11        A.   Yes, sir, I am.

12        Q.   Under federal asylum law, how long does

13   someone have to file for asylum after they set foot

14   in this country, absent some special circumstances?

15        A.   One year.

16        Q.   One year.  Okay.  And I'll ask a

17   straightforward question:  What's longer, one year or

18   21 days?

19        A.   One year is longer than 21 days, Counsel.

20        Q.   Okay.  Now, in immigration court, there's

21   actually several steps that go into someone's asylum

22   application and consideration, right?

23        A.   There are, Counsel.

24        Q.   Okay.  So the first is or one of the

25   important ones that you just said, someone has to

Andrew Arthur                                    December 14, 2023

Page 150

1     file an asylum application within a year of their

2     getting here, correct?

3          A.    That is correct.

4          Q.    Let's assume for the moment for this

5     question that the case ends up in asylum court.  Can

6     immigration judges give extensions?

7          A.    They can.

8          Q.    Okay.  And you were an immigration judge

9     you said, right?

10         A.    I was in a detained court.  So efficiency

11    was key in those cases, but I would grant brief

12    continuances.

13         Q.    When you say brief, how long would that be?

14         A.    Generally one week, ten days.

15         Q.    One week?

16         A.    Yes.

17         Q.    Seven to ten days?

18         A.    Seven to ten days.  It could be longer.

19         Q.    Okay.  So seven days is a third of that 21

20    days there, right?

21         A.    It is, correct, Counsel.

22         Q.    Ten days is just under half of that 21

23    days, right?

24         A.    That's correct, Counsel.

25         Q.    But you undoubtedly -- maybe you didn't.

Andrew Arthur                                    December 14, 2023

1    Were you -- did you ever have communications with

2    immigration judges who -- actually, you know what?

3    Let me ask you this:  I remember reading one of your

4    columns, I can't remember which one, but I can find

5    it if I have to, when you said how long it took you

6    to decide an immigration case in your detained court.

7            Do you remember writing that in one of your

8    columns or posts?

9        A.   I do.

10       Q.   Do you remember the number you gave there?

11       A.   I believe it was 45 days.

12       Q.   And to ask again an obvious question,

13   what's longer, 45 days or 21 days?

14       A.   45 days is longer than 21 days.

15       Q.   Thank you.  Now, when you were an

16   immigration judge in your detained court, did you

17   ever talk to judges who either were on other sorts of

18   courts or who knew about processes in other sorts of

19   courts?

20       A.   I did.

21       Q.   And I'm being a bit vague here.  I

22   shouldn't be.  When I say other sorts of courts, what

23   I mean is nondetained court.  Have you heard the

24   phrase, nondetained court or nondetained docket?

25       A.   Yes.

Andrew Arthur                                    December 14, 2023

1        Q.   Can you tell me what that means, please?

2        A.   A nondetained docket is one in which the

3   alien is not in NHS custody while the case is

4   proceeding.

5        Q.   And in your experience or your knowledge,

6   do cases of nondetained dockets take longer to

7   resolve than cases on detained dockets?

8        A.   Unless, of course, they fail to appear at

9   the initial master calendar, at which case there was

10  an order for removal issued.

11       Q.   I think I might have missed your last word

12  there or so.

13       A.   I apologize.  You dipped out for a second

14  there.

15       Q.   That's okay.  Let's take a minute and maybe

16  let the technology catch its breath and then you can

17  repeat it.

18       A.   Were you asking me about something that I

19  said?

20       Q.   I missed the last couple words of your last

21  answer, yeah.

22       A.   I apologize.  Unless they failed to appear,

23  in which case they would be ordered removed in

24  absentia.

25       Q.   Okay.  Thank you.  And you probably don't

Page 153

1    get in absentias very much in the detained docket

2    anyway because folks are right there in detention,

3    right?

4         A.   That is correct, Counsel.

5         Q.   But aside from the in absentias, do cases

6    generally take longer in nondetained dockets than

7    detained dockets?

8         A.   They do, Counsel.

9         Q.   Is it fair to say that it takes sometimes

10   years to decide?

11        A.   It can.

12        Q.   On a nondetained docket?

13        A.   It could take years for those to be

14   adjudicated.

15        Q.   And even if it can take years, under --

16   tell me, is it -- tell me if you know this or not, if

17   this is something you're familiar with:  Have you

18   heard about what the goal is for the executive office

19   of immigration review and what their timeline is to

20   resolve cases in on the nondetained docket?  Have you

21   ever heard of a goal for them to do that within a

22   specific time?

23        A.   The statutory goal is 180 days.  Again, I

24   was in a detained court, so anything that had to do

25   with nondetained court is nothing I would have been

Page 154

1    told about.

2         Q.   Is 180 days more than 21 days?

3         A.   180 days is more than 21 days, Counsel.

4         Q.   Okay.  And is one way that the detained

5    docket cases can take longer than 180 days or even

6    longer than a year, is that because immigration

7    judges on nondetained dockets sometimes give

8    extensions that can last for a prolonged period of

9    time?

10        A.   If they're administratively closed, the

11   average period of time that a case was

12   administratively closed was longer.  They can give

13   extensions for longer periods of time based on the

14   docket.

15        Q.   Okay.  So given the various time periods

16   that we just spoke about, which are longer than 21

17   days, is there -- let me actually -- let me focus

18   your attention here just to make it easier.  I think

19   it's paragraph 92.

20             In paragraph 92 you talk about how the

21   21-day delay -- that's where you use the word delay,

22   paragraph 92 -- can lead to coaching and fraud.  Do

23   you remember writing that?

24        A.   I do, Counsel.

25        Q.   So for these other periods of time that we

Andrew Arthur                                      December 14, 2023

Page 155

1    just talked about in immigration court that are

2    longer than 21 days, do those present similar

3    opportunities for fraud and delay or is there a

4    difference?

5        A.   Well, there's a difference because under

6    the Interim Final Rule, the IFR, the Credible Fear

7    Interview is the asylum application.  So for that

8    reason, there is no delay for them to file the asylum

9    application.

10            This is a delay that they don't give any

11   reason for except for to consult with counsel and to

12   supplement the record, to clean up things that they

13   had said that -- and again, I'm not speaking

14   generally.  Fraud is a thing in immigration court.

15   And we know that unscrupulous practitioners have in

16   fact coached and drafted applications for aliens in

17   immigration court.

18            So it is an issue for them with respect to

19   the -- now I've lost my train of thought.  Can you

20   ask the question again?

21       Q.   I think you've answered it.  I was happy to

22   hear your additional thoughts, though.

23       A.   I want to make sure that I've answered it

24   in full.

25            MR. SCHULTZ:  I'll ask the court reporter

1          to read back the question, please.

2                    (Court reporter read back the question:

3          "So for these other periods of time that we just

4          talked about in immigration court that are

5          longer than 21 days, do those present similar

6          opportunities for fraud and delay or is there a

7          difference?")

8                    THE WITNESS:  They offer similar

9          opportunities for fraud and delay except for the

10         fact that as soon as the asylum application is

11         filed in immigration court, again, you have a

12         limited opportunity to consult with counsel and

13         to amend your application, but there will be

14         questions that are raised about those

15         amendments.

16    BY MR. SCHULTZ:

17         Q.   Okay.  When you were an immigration judge

18    and someone had an asylum case in front of you, when

19    the hearing started, the individual merits hearing

20    started, did you ever ask the lawyer or the

21    respondent if they wanted to or needed to amend or

22    supplement their asylum application?

23         A.   Yes.  Actually, I would ask them, if it was

24    their asylum application, if they wanted to amend or

25    to change it in any way, or for ICE counsel to ask

Page 157

1      questions about the amendments in question.

2          Q.   Okay.  Did you do that routinely?

3          A.   Yes.

4          Q.   Did that open the door for fraud and

5      coaching when you did that?

6          A.   It presented -- it did open the door for

7      fraud and coaching, but it also presented a situation

8      where people realized -- where government counsel

9      understood that there had been a change in the record

10     and could ask about that particular change.

11         Q.   Okay.  Let's take a moment here and put

12     things on mute.  Thanks.

13              Thanks.  We were trying to get some of our

14     documents in line so it's less improvised as we're

15     trying to show you the next documents.

16              I apologize again.  I just noticed I have

17     another mistake in my exhibit numbers.  I just need

18     another moment.  Thank you.

19              I think I have my ducks in a row now.

20     Apologize for that delay.  Let's turn over to

21     paragraph 88, please.  I think that's on page 23.

22         A.   Yes, Counsel.

23         Q.   So I'm basing these new questions,

24     addressing what you have there, when you talk about

25     the USCIS director, Ur Jaddou.  And you talked about

Page 158

1        her in that paragraph, correct?

2                A.    It's actually Ur Jaddou.  Madam

3        Transcriber, J-a-d-d-o-u.

4                Q.    Thank you.  Ur Jaddou.  My apologies to you

5        and the director if I mispronounced that.

6                      So here you -- to summarize, please tell me

7        if my summary is fair or not.  Is it fair to say that

8        you criticize her for distinguishing between services

9        and enforcement within USCIS?  Is that fair or would

10       you say it differently?

11                     MR. ST. JOHN:  Objection.  The document

12          speaks for itself.

13                     THE WITNESS:  Yeah, that is fair.

14       BY MR. SCHULTZ:

15               Q.    Thank you.  Again, I apologize if this

16       comes out as an obvious question.  Do you know what

17       USCIS stands for?

18               A.    I do, Counsel.

19               Q.    Can you tell me, please?

20               A.    It's United States Citizenship and

21       Immigration Services.

22               Q.    Is the word "enforcement" in the title?

23               A.    It is not.

24               Q.    Okay.  Does that change your view of what

25       you wrote in that paragraph?

Andrew Arthur                                          December 14, 2023

1          A.   Actually, no, because USCIS is actually

2     part of DHS, which is an agency that was created to

3     protect the Homeland Security.  The entire agency

4     has, to some degree, a law enforcement component.

5               There is actually also a branch within

6     USCIS called the Fraud Detection and National

7     Security Branch that is -- that was created

8     specifically to protect the national security and to

9     prevent fraud.

10         Q.   Thank you.  Aside from what you just told

11    me, do you have any evidence that you can point to

12    for why enforcement should be the mission over

13    services?

14         A.   Again, I participated in the drafting of

15    the Homeland Security Act.  The entire idea behind

16    the Homeland Security Act was actually protecting the

17    homeland from all, you know, possible harms that it

18    may suffer, and that includes harms related to fraud,

19    the possibility that individuals who posed a national

20    security risk to the United States would be able to

21    exploit the system in order to come here.

22              There is a law enforcement component to

23    USCIS.  And in fact, I believe section 235(b)(1) of

24    the INA states that the asylum officer is supposed to

25    order the alien removed if there is no finding of

Page 160

1    welfare, which is a law enforcement activity.

2         Q.   Thank you.  Your words cut out for the last

3    five seconds or so, if you could just repeat that

4    last sentence, please.

5         A.   I'm sorry.  I don't know if that was on my

6    end.  I hope it wasn't.

7              Section 235(b)(1) of the INA directs the

8    asylum officer to order the alien removed if there is

9    no finding of credible fear, and that is a law

10   enforcement activity.

11        Q.   Thank you.  Did Inspector Jaddou say that

12   she was going to stop enforcing section 235(b)(1)?

13        A.   It's actually Director Jaddou.  Did she say

14   that she was going to stop?  What was the question

15   again?  I apologize.

16        Q.   That's okay.  Did she say that she was

17   going to stop enforcing section 235(b)(1)?

18        A.   She did not state that, but I conclude that

19   the way this rule is written, it would definitely

20   change section 235(b)(1) as Congress has written.

21        Q.   So staying in that same paragraph, you

22   wrote that the director, quote, "Has a reputation of

23   hostility to border enforcement."

24              Do you see that?

25        A.   I do, Counsel.  And the next two lines

Andrew Arthur                                     December 14, 2023

Page 161

1      actually are the bases of support for that statement.

2           Q.   Okay.  When you say the next two lines, do

3      you mean --

4           A.   I'm sorry, the next sentence after that.

5           Q.   Okay.  So let me read this in the record.

6      The record -- the sentence that I read says, "Jaddou

7      has a reputation of hostility to border enforcement."

8                The following sentence says, "She spent

9      time as the director of DHS Watch, a pro-amnesty

10     nonprofit."

11               Is that the sentence you're referring to?

12          A.   I'll correct what I said the first time.

13     It's the next two sentences.

14          Q.   Okay.  And the following sentence is,

15     "During that time she went so far as to call for

16     Congress to pause CBP funding and referred to CBP as

17     the 'personal malitia' to then-president Donald

18     Trump."

19          A.   That's correct.

20          Q.   That is the sentence you're referring to?

21          A.   That's correct, Counsel.

22          Q.   So do those sentences show that she has a

23     reputation of hostility or that you view her as being

24     hostile in that way?

25          A.   It would create a reputation of hostility

Andrew Arthur                                    December 14, 2023

Page 162

1    to law enforcement or to enforcement on its face.

2         Q.   On its face.  And what do you mean by "on

3    its face," please?

4         A.   The statement that customs and border

5    protection is a personal malitia in carrying out its

6    law enforcement functions and asking to pause

7    funding.  That evidences hostility to border

8    enforcement on its face.

9         Q.   Okay.  Are there other parts of the

10   government involved in border enforcement besides

11   CBP?

12        A.   With respect to border enforcement --

13        Q.   I misspoke.  I'm so sorry.  Thank you.

14             Are there other parts of the federal

15   government involved in immigration enforcement

16   besides CBP?

17        A.   Yes.  U.S. Immigration and Customs

18   Enforcement.

19        Q.   Okay.  Thank you.

20        A.   Their jurisdiction is over activities in

21   the interior and detention pending removal

22   proceedings and removal.

23        Q.   You don't have anything in paragraph 88

24   indicating that Director Jaddou has ever criticized

25   that part of the government, have you?

Andrew Arthur                                    December 14, 2023

Page 163

1        A.   I do not, counsel.  The reference is to

2   border enforcement in my prior sentence.

3        Q.   Okay.  Let's turn a little bit to -- let's

4   turn to paragraph 89 now and I'd like to talk a

5   little bit about credible fear interviews, please.

6             So please let me know when you flip there,

7   but the questions are going to start off more

8   generally, and not so much about the actual text of

9   the paragraph.

10       A.   I'm ready to go.

11       Q.   So just to be clear, when you say AO, do

12   you mean asylum officer?

13       A.   I do, Counsel.

14       Q.   And at various points either you or I might

15   say CFI, does that mean Credible Fear Interview?

16       A.   Yes.  It's not a term that I generally use.

17   I generally just refer to credible fear, but if you

18   use it as that, I will understand it.

19       Q.   Thank you.  I will try to use the full

20   words.

21       A.   You don't have to.  I'll understand it now.

22       Q.   It's probably easier for everyone to have

23   fewer acronyms, but thank you for indulging if I do

24   slip.

25             So what is -- in your own words, please,

Andrew Arthur                                    December 14, 2023

Page 164

1    what is an asylum officer Credible Fear Interview?

2         A.   A Credible Fear Interview is a screening

3    process that an asylum officer uses in order to

4    determine whether there's a substantial likelihood

5    that an alien who was subject to expedited removal

6    would be eligible for asylum.

7         Q.   Okay.  And does the Credible Fear Interview

8    performed by asylum officers only look to asylum or

9    does it look to any other sort of protection?

10        A.   By statute it does not look to any other

11   form of protection except for withholding of removal,

12   but I believe that the actual title is credible

13   fear -- yeah, it would also look to statutory

14   withholding under section 241(b)(3) of the INA.  By

15   regulation, protection under Article 3 of the

16   Convention Against Torture has been added to that

17   definition.

18        Q.   When you're talking about statutory

19   withholding, withholding of removal, what does that

20   mean, please?

21        A.   It's withholding of removal under section

22   243(b)(1) of the INA.  It is a former protection for

23   individuals usually who aren't eligible for asylum,

24   to prevent them from being removed from the United

25   States.

Andrew Arthur                                    December 14, 2023

Page 165

1            So an order of removal is issued and then

2       withholding is -- removal is withheld from a specific

3       country.  So withholding or removal is

4       country-specific.

5            Q.   Okay.

6            A.   As you know from having been a judge, you

7       order someone removed to a country or countries.

8            Q.   Thank you.  And you also mentioned the

9       Convention Against Torture.  Can you please tell me

10      what you mean by that?

11           A.   The Convention Against Torture is an

12      international agreement that the United States has

13      signed onto to prevent the United States from

14      returning countries -- aliens to countries where

15      they'd be subject to torture by or at the instigation

16      or acquiesces of a government official or other

17      person acting in official capacity.

18               Torture has been defined by case law and by

19      statute -- by regulation, not statute.  There is no

20      statutory provision except for the, FARRA, F-A-R-R-A,

21      with respect to the Convention Against Torture or CAT

22      as it's called.

23           Q.   Okay.  Thank you.  And CAT stands for

24      Convention Against Torture; is that right?

25           A.   That is correct, yes.

Andrew Arthur                                    December 14, 2023

Page 166

1          Q.   Thanks.  And just to make sure that we're

2     rounding out the corners here, we've been speaking of

3     asylum.  Can you just tell me your understanding of

4     the definition of asylum itself, please?

5          A.   Asylum is a form of relief that is granted

6     to an alien who establishes either persecution or

7     well-founded fear of persecution based on race,

8     religion, nationality, membership in a particular

9     social group or political opinion.

10         Q.   Thank you.  Turning back to the text of

11    paragraph 89, you write, "AO credible fear interviews

12    have historically been non-adversarial, in sharp

13    contrast to the adversarial truth-finding in

14    subsequent proceedings before an IJ."

15              Do you see that?

16         A.   I do, Counsel.

17         Q.   Okay.  So what do you mean by

18    non-adversarial?

19         A.   Non-adversarial means that there is no --

20    the process that we're going through right now,

21    Counsel, is an adversarial proceeding.  You are

22    asking me questions on the record to probe the

23    statements I've made and to impeach statements that

24    I've made in the past.  That's an adversarial

25    proceeding.  Courts are adversarial proceedings.

Andrew Arthur                                    December 14, 2023

1          A non-adversarial asylum interview means

2     that there is no government attorney, in this case

3     from ICE, present at that to offer contrary evidence,

4     to offer contrary evidence, to cross-examine the

5     alien and to impeach the alien.

6          Q.   Okay.  Thank you.

7               And is a CFI non-adversarial?

8          A.   It is, Counsel.

9          Q.   Thank you.  At a CFI interview, at a

10    Credible Fear Interview, that is, can the asylum

11    officer ask questions?

12         A.   Yes.

13         Q.   Can credible fear interviews get

14    confrontational or tense?

15         A.   It's never been my experience that that

16    happens.  Sometimes if there's internal

17    inconsistencies, asylum officers will ask about them

18    and I've reviewed a lot of transcripts from asylum

19    officer, CFIs, as you refer to them.

20         Q.   Okay.  Now, we spoke a moment about what

21    asylum means and what withholding -- statutory

22    withholding of removal means and what the Convention

23    Against Torture means.

24              Does the Credible Fear Interview apply the

25    same standard as any of those three types of relief

Andrew Arthur                              December 14, 2023

 1      for protection?

 2           A.   It actually applies a lower standard with

 3      respect to statutory of withholding under section

 4      241(b)(3) of the INA with respect to the Convention

 5      Against Torture.

 6           Q.   Does it apply the same standard as is

 7      necessary for a final determination on asylum?

 8           A.   It does not.  That's why Congress included

 9      the "substantial likelihood" language.

10           Q.   Now, is the credible -- is the standard for

11      credible fear interviews -- let me back up again.

12      There's one other acronym that comes up, AMI, that's

13      in your report, I believe.  Can you tell me what AMI

14      means, please?

15           A.   Asylum Merits Interview under the Interim

16      Final Rule.

17           Q.   Okay.  Thank you.  And does an AMI have the

18      same standard -- I'm sorry, I apologize.  I'll skip

19      the acronyms.

20                Does an Asylum Merits Interview use the

21      same standard as a Credible Fear Interview?

22           A.   It is supposed to use the statutory

23      standard with respect to asylum statutory withholding

24      under section 241(b)(3) as well as the regulatory

25      standard for a torture convention claim.

Andrew Arthur                                    December 14, 2023

1          Q.   Thank you.  I'm not sure I completely

2     understood that.  Let me --

3          A.   I apologize.  I can clarify.  But go ahead

4     and ask me.  I'll explain.

5          Q.   Let me break it down.  So at a CFI -- I'm

6     sorry, at a Credible Fear Interview, the ultimate

7     standard for asylum relief is not applied, correct?

8          A.   It is not.

9          Q.   Okay.  Is the ultimate standard for asylum

10    relief applied at an Asylum Merits Interview?

11         A.   It is supposed to be by statute and

12    regulation.

13         Q.   So does the statute and regulations state

14    that the final asylum standard will be applied for

15    Asylum Merits Interviews?

16         A.   It does state that.

17         Q.   Okay.  Thank you.  So is it fair to say

18    that the standard that's applied in the Credible Fear

19    Interview is different from the standard that's

20    applied at the Asylum Merits Interview?

21         A.   That is correct, Counsel.

22         Q.   Okay.  Thank you.  So let's turn back in

23    time a little bit to before the IFR, before the

24    Interim Final Regulation was put into effect.  Okay?

25    So we're talking --

Andrew Arthur                                   December 14, 2023

Page 170

1          A.    It's actually Interim Final Rule.

2          Q.    I apologize.  Interim Final Rule.  Thank

3    you.  Let's turn back to time before that.

4               So before the IFR was ever implemented or

5    even written, did asylum officers ever -- did asylum

6    officers ever grant asylum in any context?

7          A.    They did, through the affirmative asylum

8    process.

9          Q.    Okay.  And what do you mean by the

10   affirmative asylum process?

11         A.    The affirmative asylum process is an asylum

12   application filed in an asylum office by an alien,

13   not citizen -- I apologize, I used a statutory term.

14   Please forgive me -- who is present in the United

15   States but is not in removal proceeding.  That's

16   called affirmative asylum.

17         Q.    Is there another sort of asylum?

18         A.    Defensive asylum.

19         Q.    Okay.  And when you say asylum, do you mean

20   defensive asylum application; is that fair?

21         A.    That is correct.  It's a -- prior to the

22   IFR, it was all on the I589, which is captioned

23   Application For Asylum and Withholding of Removal.

24         Q.    And is the actual asylum standard different

25   in defensive asylum applications versus affirmative

Andrew Arthur                                    December 14, 2023

Page 171

1    asylum applications?

2          A.   It's the same statutory standard that's set

3    forth in section 208 of the INA.

4          Q.   Okay.  And would that also be true for what

5    we call statutory withholding of removal and

6    convention -- I'm sorry, let me start over.

7               When asylum officers in the past have

8    considered positive applications for asylum, could

9    they also consider positive applications for

10   statutory withholding?

11         A.   No, they do not.

12         Q.   Okay.  What about the Convention Against

13   Torture?

14         A.   They do not.  A condition precedent to

15   granting either statutory withholding under section

16   241(b)(3) or withholding under the Convention Against

17   Torture or deferral under the Convention Against

18   Torture require a final order of removal.  And for

19   that reason, they don't have jurisdiction to

20   adjudicate them.

21         Q.   So when we're talking about positive

22   application for asylum, we're talking just asylum?

23         A.   We're talking about just asylum.  That's

24   correct.

25         Q.   Okay.  Thank you.  Given that, is the

Andrew Arthur                                    December 14, 2023

Page 172

1    asylum standard that asylum officers apply -- I'm

2    sorry.  Let me start over.

3            Is the asylum standard for positive asylum

4    applications the same as those for defensive asylum

5    applications?

6        A.   The asylum standard is the same except by

7    statute.

8        Q.   Thank you.  And how many years, if you

9    know, have asylum officers in CIS been making the

10   final decisions on asylum in positive asylum

11   applications?

12       A.   In USCIS?

13       Q.   Let's limit it to that, yes.

14       A.   Since March 1st, 2003.

15       Q.   Thank you.  Is that when the Department of

16   Homeland Security was created?

17       A.   That's correct, Counsel.

18       Q.   About 20 years then, right?

19       A.   About 20 years, yes, Counsel.

20       Q.   Okay.  Is there any reason to believe that

21   asylum officers over 20 years or so have been making

22   asylum determinations in affirmative asylum

23   applications would have any reason to act in a

24   different way when they're reviewing defensive asylum

25   applications?

Page 173

1          A.   I know that the standards for review

2     affirmative asylum applications are not as robust as

3     they are with the BIA system, Board of Immigration

4     Appeals system, on review of immigration judge

5     decision.

6               Asylum officer decision are not publicly

7     available documents.  So I don't have any reason to

8     believe that they are, but based upon the review

9     standards, there's a distinct possibility that

10    they're not.

11         Q.   And thank you for answering that.  I had a

12    little bit of trouble following that because of the

13    pronouns.  Let me try to break that down a little bit

14    more then.

15              Let's put aside immigration judges.  Okay?

16    If possible.

17         A.   Okay.

18         Q.   But my question is not on immigration

19    judges, so my question is just on asylum judges.  If

20    you need to bring it in, by all means, please do.

21              But what I'm trying to get at here is, if

22    asylum officers have been making decisions on asylum

23    for 20 years in the context of affirmative

24    applications, what is to make you doubt they'll do

25    any worse a job on defensive applications?

Andrew Arthur                                    December 14, 2023

Page 174

1          A.    There is no visibility in the system and

2    all of the review that takes place with respect to

3    those asylum officer decisions, it's entirely

4    internal.

5          You're not going to find a circuit court

6    case that discusses that affirmative asylum

7    application process because there is no judicial

8    review of a grant.

9          Q.    So maybe I should ask a different question.

10         Do you have any criticisms of the system

11   that allows asylum officers to make determinations

12   about asylum for affirmative applications of asylum?

13         A.    I do have concerns about the validity of

14   that system, generally.

15         Q.    I think we stumbled on your last two words.

16   Repeat those last two or three words, please.

17         A.    Generally was the last one.

18         Q.    Thank you.  Are the concerns that you have

19   the same for asylum officers making decisions in the

20   positive or affirmative application context versus

21   the defensive context?

22         A.    The defensive context is a proceeding in

23   which it's an adversarial proceeding, as we stated

24   before.  And there is an opportunity for

25   cross-examination and an opportunity for ICE to

Andrew Arthur                                    December 14, 2023

Page 175

1       review those or to appeal those decisions.

2              There is no opportunity for that -- those

3       procedural safeguards aren't present in the

4       affirmative asylum process.

5       Q.    Okay.  So when you talked about the

6       adversarial, though, that's in the immigration court

7       context, right?

8       A.    That's correct, Counsel.

9       Q.    And the positive -- the positive -- sorry,

10      the decisions that asylum officers make to positive

11      applications or affirmative applications for asylum,

12      those are non-adversarial, correct?

13      A.    The affirmative asylum process is not

14      adversarial.

15      Q.    Just like the process under the IFR is

16      non-adversarial, correct?

17      A.    That is correct, Counsel.

18      Q.    So in that sense, they're parallel,

19      correct?

20      A.    The process under the IFR is parallel to

21      the affirmative asylum process.  It is not

22      adversarial.  In fact, it specifically calls it a

23      non-adversarial interview in the IFR.

24      Q.    Do you fear that there will be worse

25      results under the IF R before asylum officers versus

Andrew Arthur                                    December 14, 2023

Page 176

1      positive applications for asylum before asylum

2      officers?

3          A.   By positive, do you mean affirmative asylum

4      applications?

5          Q.   I do.  Thank you for that clarification.

6          A.   Yeah, I think that it will probably be

7      similar.  I'm concerned that the applications as

8      adjudicated by the -- under the IFR is going to be

9      worse because many of the individuals who have -- who

10     apply for affirmative asylum have actually been

11     lawfully admitted to the United States.

12             They've been screened by a counselor or

13     officer before they enter the United States or they

14     came under the Visa Waiver Program.  Counselor

15     screening is one of those things that happens abroad.

16             For those individuals who enter illegally

17     and apply for the affirmative asylum process, they

18     actually have a footprint in the United States,

19     something that we can look to to determine whether

20     bars to asylum, as we've referred to them, may be

21     present in a specific case.

22             We're not going to have that same level of

23     trust in this process because, by definition, these

24     individuals haven't been in the United States before

25     or have only very briefly been in the United States.

Andrew Arthur                                    December 14, 2023

1          Q.   Let's talk about that counselor screening

2     process for a minute.

3               When someone tries to come to the United

4     States through a counselor screening process of

5     getting a visa; is that what you're referring to?

6          A.   I am, by the Department of State abroad.

7          Q.   Does that screening take place for people

8     who are coming on, for instance, tourist visas?

9          A.   If they're not from a visa waiver country,

10    it does include people who are coming here on tourist

11    visas.  People who are coming here from a visa waiver

12    country perform an online application before they can

13    come here.

14         Q.   For the people who are not on the Visa

15    Waiver Program, when they go to the state department

16    consulate abroad, are they screened for asylum

17    criteria?

18         A.   They're not screened for asylum criteria.

19    Section 212(a) of the INA contains a number of

20    grounds of inadmissibility for aliens who are seeking

21    to enter the United States.  Amongst those grounds

22    for inadmissibility are a national security risk and

23    to determine whether they have a criminal history.

24              Because they are seeking a visa to come to

25    the United States, the counselor or officer abroad

Andrew Arthur                                          December 14, 2023

                                                                    Page 178

1      can check with the security system in that country

2      and can require the applicant to provide a police

3      report before adjudicating that.

4              Because the IFR considers the Credible Fear

5      Interview to be the asylum application under section

6      208.6, we can't make those counselor checks abroad

7      based upon information that the applicant is included

8      in the asylum application.

9          Q.   Let's talk about what you said a few

10     minutes ago about the concerns you have about the

11     lack of an asylum application, which is also called

12     an I589.  Is that right that an asylum application is

13     called an I589?

14         A.   Yes, it is, Counselor.

15         Q.   So why -- you mentioned that you have

16     concerns to the fact that there's no asylum

17     application under the IFR; is that right?

18         A.   I do have concerns.  I don't remember

19     whether I specifically stated that.

20         Q.   Right.  My understanding is that you did

21     have concerns.  If I misspoke, I apologize.

22              What are those concerns and why do you have

23     them?

24         A.   The concerns are many.  One, the I589 is a

25     document that is signed under oath in which the

Andrew Arthur                                        December 14, 2023

Page 179

 1    applicant averse to the duress in the statements that
 2    are made therein.
 3             It also lays out the questions that are
 4    pertinent to the asylum withholding and CAT process
 5    with respect to that application.  So you check boxes
 6    that say, I'm seeking asylum based upon particular
 7    social group or something like that.
 8             That is a document that can then be used to
 9    challenge statements that are made in the course of
10    the proceedings.  In fact, it's very common for
11    credibility determinations to be made based upon
12    inconsistencies between the asylum application and
13    the testimony of the respondent or applicant.
14        Q.   And you talk about some of this in
15    paragraph 95, right?
16        A.   I'll take a look.  Yes, I allude to this,
17    but I talk about the difference of -- 95 actually has
18    to deal with a slightly different issue.
19        Q.   It says in the second line "Eliminating the
20    requirement for applicants to file an asylum
21    application will almost inherently increase the
22    asylum grant rate."
23        A.   Yeah, it will do so in a number of
24    different ways; one of which is what I just described
25    before with respect to the asylum grant rate, but it

Andrew Arthur                                    December 14, 2023

1       also goes on to say that a number of individuals who

2       end up in immigration court -- immigration court with

3       respect to following a credible fear determination

4       don't actually file applications for asylum, and

5       therefore they don't get asylum.

6            Q.   You said almost inherently in paragraph 95.

7       Why did you say almost?  Why not just say inherently?

8            A.   I don't want to speculate too far in the

9       future.  Plainly, it would change the grant rate.

10           Q.   So does that mean that you do want to

11      speculate a little bit into the future?

12           A.   It all depends upon whether they stick to

13      the procedure in this rule or whether they go back to

14      the I589 rule.

15                Congress drafted section 208 or amended

16      section 208 of the INA prefaced upon the fact that

17      there would be an I589.  They refer to the

18      application and the I589 was a preexisting

19      application at the time that they made that

20      statement, which was in September 1996.

21           Q.   Is paragraph 95 speculation?

22           A.   No, it's not at all because, again, as I

23      referenced before, there are a number of individuals,

24      38 out of 100, who do not file I589s and, for that

25      reason, don't get granted asylum.

Page 181

1        Q.   In paragraph 95 there's no citation or

2   footnote, is there?

3        A.   I believe that I've referred back to that

4   document.  That's a DOJ document that is on the EOIR

5   website, but I believe that I referred to it

6   elsewhere in the applications marked in the evidence

7   in this case.

8        Q.   Does paragraph 95 refer to that?

9        A.   It does not, Counsel.

10       Q.   Okay.  So do you have any evidence to show

11   that it's inherently going to increase the asylum

12   grant rate?

13            MR. ST. JOHN:  Objection.  Asked and

14        answered.

15            THE WITNESS:  The statements that I just

16        made before are the reasons why it will increase

17        the grant rate.  There is no document upon which

18        the veracity of the alien -- as you know,

19        Congress has made clear in section 208 of the

20        INA, in the Real Idea Act, that that is a

21        credibility assessment because Congress was

22        concerned about credibility.

23            If you take away that application, that is

24        one more thing that is not available to the --

25        to any adjudicator to question the respondent

1          with respect to.

2     BY MR. SCHULTZ:

3          Q.   Okay.  And again --

4          A.   Also, 38 out of 100 of them never file

5     589s.

6          Q.   So --

7          A.   And it's a period FY 2018 to the fourth

8     quarter of FY 2019.

9          Q.   Let's go to the next paragraph, please.

10          It's one sentence.  I'll read it here.  It

11    says, "Regardless, even if the grant rate did not

12    increase, the asylum IFR would necessarily impact

13    states by speeding grants of asylum and thereby

14    increasing eligibility for certain public benefits."

15          Did I read that accurately?

16          A.   You did, Counsel.

17          Q.   Okay.  Thank you.  And do you have any

18    footnotes or citations in paragraph 96?

19          A.   No, but I believe that that is cumulative

20    of other statements that I make in the application --

21    or in the expert report.

22          Q.   But you don't refer to those in paragraph

23    96, do you?

24          A.   I do not, Counsel.

25          Q.   Let me ask you a bit about the substance

Page 183

1    there.  If the grant -- you're saying, even if the

2    grant rate did not increase, you're saying that

3    speeding grants of asylum would have an effect,

4    right?

5         A.    That's correct, Counsel.

6         Q.    And you're saying it's speeding because of

7    the IFR, right?  That's what you put in line one

8    there?

9         A.    That's correct, Counsel.

10        Q.    Does the speediness, to use a slightly

11   different word, of the IFR that you're concerned

12   about here, even if it leads to more grants, wouldn't

13   it also by its speediness lead to an increased number

14   of denials -- an increased rate of denials?

15        A.    No.  Actually, because for -- denial isn't

16   the right term.  I believe that they -- yeah, denial

17   would be correct in this context because the case

18   would then go to the immigration court for further

19   adjudication, and then to the board of immigration,

20   appeals, potentially to the Court of Appeals under

21   section 2.2.

22             So there are more avenues for denial than

23   there are for a grant.

24        Q.    Okay.  Do all of the cases go to the

25   immigration court that have been denied by the AO

Andrew Arthur                                    December 14, 2023

Page 184

1    under the IFR?

2         A.   Under the IFR, the applicant actually has

3    the ability to miss one application or one interview

4    at least and then be interviewed again, and then the

5    IFR sets up a process by which those cases in which

6    asylum is not granted are referred over to the

7    immigration court.

8         Q.   Is it your understanding that some people

9    after the initial denial say, okay?

10        A.   It's not -- it's not set forth in the IFR.

11   Given the fact that the IFR permits them to be

12   released, they would probably say there is nothing in

13   the IFR that requires them to be detained.

14        Q.   Okay.  Thank you.

15             Are there statistics that you know about

16   that talk about the current speed of rates of

17   granting, let's say the current efficiency of

18   granting under the IFR?

19        A.   With respect to time?

20        Q.   That's right.

21        A.   Not that I'm aware of.

22        Q.   Still talking about the IFR.  I'm going to

23   change angles a little bit here.  How are we on

24   timing?  I'm sorry?  Do you need a break, sir?  It's

25   3 o'clock now.

Andrew Arthur                    December 14, 2023

Page 185

1        A.    No.  We can keep going.

2        Q.    We can keep going?  Okay.  Great.  Thanks.

3   And folks here are okay?  Ms. Marsh?

4            COURT REPORTER:  I'm fine.

5   BY MR. SCHULTZ:

6        Q.    Very good.  So again, still on the IFR but

7   a slightly different angle I'm going to be talking

8   about here.

9            First let's go to paragraph 93, back a

10  couple of ticks, please, and one of the numbers there

11  on the second sentence, you say, "Between June and

12  September of 2022, asylum" -- I'm sorry, I'm sorry.

13  I asked for the first half of that.

14            Let me ask about the second half of that

15  sentence there where you have the number about 572

16  AMIs, right?

17       A.    That's correct, Counsel.

18       Q.    Where did you get that number from, please?

19       A.    That's from the asylum cohort report that

20  was issued by DHS.

21       Q.    Okay.  And is that a number that you lifted

22  directly from it or did you perform calculations on

23  that data to get that number?

24       A.    I had to calculate the numbers.

25       Q.    Okay.  Do you walk through that calculation

Andrew Arthur                                December 14, 2023

Page 186

1      here in paragraph 93?

2          A.   Sure.  So if you take 57 -- by the way,

3      Counsel, I will tell you, math is sometimes a -- not

4      my strong point, but if you take 110 referrals and

5      you add 49 grants, you get to 159 and then if you

6      deny the or divide the 49 by the 159, you get to the

7      number.

8          Q.   Okay.

9               MR. ST. JOHN:  For the record --

10     BY MR. SCHULTZ:

11         Q.   There's some crosstalk there.  Judge

12     Arthur, if you could finish please and then Scott.

13         A.   That was it.

14              MR. ST. JOHN:  Judge, you made a couple of

15              statements.  We're on a transcript.  It doesn't

16              reflect intonation.

17              I assume you were joking about your math

18              ability, that you have the ability to do basic

19              arithmetic?

20              MR. SCHULTZ:  Scott, are you testifying

21              here?

22              MR. ST. JOHN:  Counsel, you know, you made

23              a big statement about not wanting to record it.

24              I tell you what we're going to do.  I'm going to

25              start recording this.  I think you noticed the

Andrew Arthur                                    December 14, 2023

Page 187

1          deposition as being recordable.

2                If we're going to -- if you're going to

3          play games with the witness -- a witness making

4          an obvious joke, I want to protect the record

5          from that.

6                If you're going to play games, I'll turn on

7          the recording and then we can play the recording

8          when you try to do this in court.

9                MR. SCHULTZ:  Scott, first of all, I'm not

10         playing games.  All I said is that you can't

11         testify.

12               MR. ST. JOHN:  I will protect my record.  I

13         will protect the record.  I'm not testifying.  I

14         want a clean record for Mr. Arthur.

15               And Counsel, do you disagree that -- let's

16         chat.  Do you disagree that Mr. Arthur was

17         joking based on his intonation?

18               MR. SCHULTZ:  Counsel, this isn't the time

19         or place for this sort of exchange.  All I said

20         is, please don't testify.

21               MR. ST. JOHN:  Counsel, for the record, we

22         are going to start recording this.

23               MR. SCHULTZ:  Okay.  I am going to object

24         to the recording there please, Counsel.

25               MR. ST. JOHN:  Did you notice the

Andrew Arthur                                    December 14, 2023

                                              Page 188

1           deposition saying it could be video or audio

2           recorded?

3                MR. SCHULTZ:  That was by us, is I think

4           the common way to read that, sir.

5                MR. ST. JOHN:  Well, any party can do it,

6           so we're going to do it, given your conduct just

7           now and given your prior conduct.

8                MR. SCHULTZ:  Well, there is no prior

9           conduct to object about.  This there is no

10          current conduct by me to object about.

11               I simply asked you as counsel not to

12          testify, please.  That was my request, sir.

13               So let's do this.  It is 3:08.  And we're

14          going to go off the record for a little bit.

15          Let's say five minutes, please.  Thank you.

16               We're off the record at 3:08.

17                    (RECESS TAKEN.)

18    BY MR. SCHULTZ:

19          Q.   It's 3:18.  We're back on the record.  Are

20    you set?

21          A.   Yes, I am.

22          Q.   So just a couple quick notes.  First of

23    all, we just want to make a couple objections, first

24    to the speaking objection and also -- I'm sorry, we

25    are objecting to your speaking objection.  And in

1    addition, I am objecting to any coaching or

2    correction of testimony.  And third, I'm objecting to

3    any partial recording of the deposition that's been

4    going on for hours already.  Those are my objections.

5    Going on to the next question.

6              MR. ST. JOHN:  May I for the record, for

7         the record, I think it's important that the

8         court has made clear to the United States, to

9         Ms. Ryan, who I understand is sitting in the

10        room, not to play games.

11             The witness made an obvious joke.  Although

12        the United States noticed a recorded deposition,

13        they chose not to record.  And when I made a

14        statement for the record that the witness had

15        just made an obvious joke based on his

16        intonation, I was chewed out by Mr. Schultz.

17             That reflects that Mr. Schultz intends to

18        play games with the transcript.  So we have been

19        forced to record in order to prevent the United

20        States from playing games.

21             It's unfortunate.  This has been the second

22        instance in this deposition where Mr. Schultz

23        used sharp practices.  The first time was an

24        attempt to mislead the witness by make

25        statements and offering alternatives that the

 1              people sitting next to Mr. Schultz know are

 2              false.

 3                   The plaintiff and state will not tolerate

 4              such sharp practices.  If we need to reach out

 5              to the court, we will.  It's unfortunate that

 6              we've been put in this deposition position, but

 7              let's proceed with the deposition.

 8                   MR. SCHULTZ:  Let's proceed with the

 9              deposition.  I do disagree with some of the

10              statements that you made, but let's go forward.

11      BY MR. SCHULTZ:

12              Q.   So let's turn to paragraph 93, please,

13      Judge, and that's where we were before, but it's a

14      different part of it.

15                   So at the end there, there's a sentence,

16      very last sentence in paragraph 93, it says, "I

17      concluded that AOs have granted asylum in nearly 31

18      percent of the border cases that they heard to

19      completion, i.e., almost twice as often as IJs

20      historically had."

21                   And then there's a footnote that leads to

22      something that you wrote for CIS; is that accurate

23      what I just said?

24              A.   That's correct, Counsel.

25              Q.   Okay.  So when you write about the -- in

Andrew Arthur                                    December 14, 2023

1    that last phrase, almost twice as often as IJs

2    historically had, is it fair to say that you're

3    talking about the rates that IJs, immigration judges,

4    have historically granted asylum?  Is that what

5    you're referring to in that phrase?

6          A.    Yes, Counsel.  It should be reflected in

7    my -- in the blog post that is referenced.

8          Q.    You're talking about the rate.  That's what

9    I want to use as my starting point there.  Right?

10         A.    Correct, Counsel.

11         Q.    Thank you.  So when you say historically,

12   what frame of years are you looking at there, please?

13         A.    I'd have to go back to the blog post itself

14   to actually give you an exact answer.

15         Q.    But you don't know that right now?

16         A.    I don't know it off the top of my head.

17         Q.    Okay.  Do you have any source for that

18   statement aside from your own blog post?

19         A.    For the statement it would be based upon

20   Department of Justice Executive Office For

21   Immigration Review statistics that are available on

22   their website.

23         Q.    But their website wouldn't say how long

24   you're looking at when you say historically, would

25   it?

Andrew Arthur                                    December 14, 2023

                                                    Page 192

1        A.   It would not, Counsel.

2        Q.   That's your phrasing, right, historically?

3        A.   That's correct, Counsel.

4        Q.   Okay.  I'm just trying to figure out how

5    you came to the conclusion of what that number might

6    be.  Okay.

7             So let's look at footnote 47 there on page

8    25 if you can, please.  Okay?

9        A.   Yes, Counsel.

10       Q.   And we have a copy of that here that I'm

11   going to put in as Exhibit No. 4, please.  And we are

12   going to show that to you in just a moment.  Thank

13   you for your patience while we do that.

14            (EXHIBIT NO. 4 MARKED FOR IDENTIFICATION.)

15   BY MR. SCHULTZ:

16       Q.   There we go.  Can you see that on your

17   screen, Judge Arthur?

18       A.   Mine is blank, Counsel.  There it is.

19       Q.   Okay.  Great.

20            MR. SCHULTZ:  And Scott, can you see that

21       as well?

22            MR. ST. JOHN:  I can.

23   BY MR. SCHULTZ:

24       Q.   Okay.  Great.  And that's a one-page

25   document, if you scroll down to show that, please.

Andrew Arthur                                    December 14, 2023

1      It's just the one page there, okay?

2           A.   Correct.  Counsel.

3           Q.   Okay.  So I'm going to ask a question, then

4      I'm going to suggest where you might find the answer.

5      That's just for your own help.  You don't need to

6      follow my suggestion.

7                Does the data indicate in that chart, does

8      that show data for all initial asylum decisions by

9      immigration judges?  And if you look at footnote one,

10     that might help with your answer, if you scroll down

11     to footnote one.

12          A.   I believe that that is all adjudication.

13               MR. ST. JOHN:  Objection.  The document

14          speaks for itself.

15     BY MR. SCHULTZ:

16          Q.   Okay.  Now, I have a question before we go

17     forward.

18               For Asylum Merits Interviews, under the

19     Interim Final Rule, do those always take place after

20     there's been a Credible Fear Interview?

21          A.   They do, Counsel.  It's a condition

22     precedent.

23          Q.   Okay.  Thank you.  But that document here

24     that you cited in footnote 47, that isn't limited to

25     cases in immigration court where there's been a

Page 194

1    Credible Fear Interview, is there?

2          A.   It does not, Counsel.

3          Q.   Okay.  So --

4          A.   I apologize, there is another document that

5    actually talks about adjudications after Credible

6    Fear Interviews.

7          Q.   And no need to apologize at all.  I think

8    we're both heading into the same direction.

9               So is it fair to say then that that --

10   looking at this document here as an indication of

11   what immigration judges do with asylum cases, is it

12   fair to say it's not really an apples to apples

13   comparison because this includes cases where there

14   hasn't been a Credible Fear Interview?

15         A.   Well, it does indicate that from 2022 to

16   the third quarter of 2023, it's 14.79 percent, but

17   it's not an apples to apples, but it is -- it does

18   reflect immigration decisions or asylum decisions by

19   the judges at large.

20         Q.   Okay.  Thank you.

21              So you mentioned there was another

22   document, and we're going to pull up what I think you

23   might be thinking of, but you can tell me.  And we're

24   going to call that Exhibit No. 5 and we're going to

25   put that on in just a moment, please.  So thank you

Andrew Arthur                                    December 14, 2023

1       for your patience.

2                And Judge, no need to apologize at all, but

3       what you're saying is always helpful.  Thank you so

4       much.

5            A.   I can see the document.

6                (EXHIBIT NO. 5 MARKED FOR IDENTIFICATION.)

7       BY MR. SCHULTZ:

8            Q.   Okay.

9            A.   I apologize, that's the document that I'm

10      referencing.

11           Q.   Okay.  Good.  So this is Exhibit No. 5.

12      This is a public document, by the way.  It is a very

13      long and cumbersome web page, which even reading into

14      the record is cumbersome.

15               Do you know how to get this document, Judge

16      Arthur?

17           A.   I do, Counsel.

18           Q.   Okay.  So let's then look at this document.

19      And just my eyesight is not as good as I wish it

20      were.  I'm standing up and getting closer.

21               At the top of the document, in light blue,

22      does it say, "Asylum decision and filing rates in

23      cases originating with a credible fear claim"?  Do

24      you see that in light blue?

25           A.   It does, Counsel.

Page 196

1          Q.   Okay.  Thank you.  And is that a more

2     limited set of data -- I'm sorry, is the chart

3     reflected here, does that come from a more limited

4     set of data than what we saw in the first chart a

5     moment ago?

6               MR. ST. JOHN:  Objection.  The document

7          speaks for itself.

8               THE WITNESS:  It does, Counsel.

9     BY MR. SCHULTZ:

10         Q.   Thank you, Judge.  And is this the document

11    that you said you had in mind?

12         A.   That is the one, Counsel.

13         Q.   Okay.  Thank you.  And would using this

14    document give an apples to apples comparison to

15    asylum officer decisions made in Asylum Merits

16    Interviews under the -- under the Interim Final Rule?

17         A.   It would, Counsel.

18         Q.   Okay.  Thank you.  Why didn't you use this

19    document or some version or some earlier version of

20    this document in your expert report?

21         A.   Because my knowledge of this is expanding

22    with respect to the document in question that I cited

23    directly to a blog post that I had written.

24         Q.   When you say your knowledge of this is

25    expanding, can you clarify what you mean by that,

Andrew Arthur                                           December 14, 2023

1    please?  I don't know that I followed.

2         A.   I apologize.  This is what I do for a

3    living, Mr. Schultz.  I'm constantly finding data

4    points to explain immigration issues to the public,

5    and to other individuals.

6         Q.   I see.  So is it fair to say you didn't

7    know about this document -- you didn't know about

8    this chart when you wrote your expert report?

9         A.   It wasn't the one that I relied upon when I

10   wrote the -- I can't remember whether I knew about it

11   or not.  EOIR's website is a little cumbersome, as

12   you mentioned, with respect to the documents that are

13   available.

14        Q.   I'm not sure I mentioned that, but thank

15   you.

16        A.   I apologize, I thought you actually used

17   the term cumbersome.  But yeah, there were a number

18   of documents on there and sometimes new documents are

19   added.  Sometimes they come off.  I believe this

20   document actually has been there.

21        Q.   I think I understand now where you came

22   from.  I said that the web address was cumbersome,

23   not that the navigation on the website was

24   cumbersome.  I just mean there's a lot of dashes and

25   such on the web address on that chart.  Thank you for

Andrew Arthur                                      December 14, 2023

Page 198

1    clarifying that.  Thank you.

2              And you didn't use this anywhere in your

3    report, did you, this second chart?

4         A.   To the best of my knowledge, I did not.

5         Q.   Okay.  Thank you so much.

6              Let's move on a little bit to paragraph

7    100.  That's on page --

8         A.   Sorry.

9         Q.   I'm sorry, everyone okay?  We can take down

10   the chart now, yes.  Judge, are you still there?

11        A.   I'm still here.

12        Q.   I thought I heard a noise.

13        A.   Yeah, I dropped my binder.

14        Q.   I see.  Are you all set now?

15        A.   I am.  Yes.  Go ahead.

16        Q.   So paragraph 100, let me make sure I have

17   the right words here for a moment.

18              In the first sentence you write, "The

19   presence of asylum applicants in Louisiana and

20   Florida is implicitly confirmed by pronouncements

21   regarding the asylum IFR itself."

22              Did I read that right?

23        A.   You did Counsel.

24        Q.   Okay.  What do you mean by implicitly

25   confirmed?

Andrew Arthur                                        December 14, 2023

1          A.    Because they talk about the fact that, in

2     this instance Miami would be an office, as would

3     later on New Orleans.  And the way that the IFR

4     assigns the cases, at least initially, is to places

5     near where AMIs are being performed.

6          Q.    Is there any distinction between implicitly

7     confirmed versus just confirmed?

8          A.    I guess, honestly, in that particular

9     instance, no.  Tacitly confirmed probably would have

10    been a more artful way of saying it.

11         Q.    Now, you mentioned that that was because of

12    the information, I guess, that's later in that same

13    paragraph, that would include New Orleans and Miami,

14    right?

15         A.    That is correct, Counsel.

16         Q.    Has that begun yet in New Orleans yet, to

17    your knowledge?

18         A.    There have been six interviews that I'm

19    aware of.

20         Q.    Six interviews in New Orleans?

21         A.    Six that eventually -- four were denials

22    and two were administratively closed.

23         Q.    And those are Asylum Merits Interviews

24    under the Interim Final Rule; is that correct?

25         A.    That is correct, Counsel.

Andrew Arthur                                    December 14, 2023

1          Q.   To your knowledge, have there been any

2     Asylum Merits Interviews under the Interim Final Rule

3     in Miami so far?

4          A.   I would need to take a look at the Interim

5     Final Rule, to the asylum cohort with respect to

6     Miami, but to the best of my knowledge there are.

7          Q.   There are?

8          A.   There have been, yes.

9          Q.   There have been.  Okay.  But do you have

10    some sense of how many?  And if you don't, that's

11    fine.

12              MR. ST. JOHN:  Objection.  Best evidence

13         rule.

14              THE WITNESS:  I don't.

15    BY MR. SCHULTZ:

16         Q.   Okay.  I was asking what he knew, not what

17    was in the document.  Thank you so much, Judge.

18              If you go to the end of that paragraph now,

19    please, so instead of the first sentence, the last

20    sentence, it reads, quote, "In a June 2023 cohort,

21    report indicates the asylum IFR has been applied to

22    cases in Miami and New Orleans."

23              Do you see that?

24         A.   I do, Counsel.

25         Q.   Did I read that accurately?

Page 201

1          A.   You did, Counsel.

2          Q.   Similar question:  What do you mean by

3     apply to cases, be applied to cases?  Can you expand

4     on that, please?

5          A.   Yeah.  They have performed IFR interviews

6     in those places.

7          Q.   You just mean that the rule has gone into

8     effect there?

9          A.   Correct, Counsel.

10         Q.   Okay.  Now, does that report that you

11    talked about talk about any expenditures of money by

12    the state of Louisiana?

13         A.   It does not, Counsel.

14         Q.   And what about for Florida?

15         A.   It does not.  It is simply a document that

16    reflects how many interviews have been completed, how

17    many were referred, how many were closed, and how

18    many were denied or how many were granted, how many

19    were referred and how many were administratively

20    closed.

21         Q.   All right.  Let's go on a little bit to a

22    couple of paragraphs down, to paragraph 105.  You

23    wrote, "I am informed that Louisiana's obligated by

24    its state constitution to fund education."  Then it

25    goes on.

Andrew Arthur                                    December 14, 2023

                                                      Page 202

1              Do you see that phrase where it says, "I am

2       informed"?

3              A.    That is correct, Counsel.

4              Q.    So let me take a couple of steps back.  I

5       just wanted to give you that to orient you to where

6       my questions are going to be heading right now.  I

7       just realized one thing I need to check here.

8              Okay.  You were a 30(b)(6) witness in this

9       case.  We talked about that earlier, right?

10             A.    That's correct, Counsel.

11             Q.    So let me just ask you generally first and

12      then we can kind of go from there.  In what context

13      were you informed about Louisiana, as you wrote in

14      paragraph 105?

15             A.    I was informed by the attorney general's

16      office at that time.

17             Q.    And when you say "at that time," what do

18      you mean, please?

19             A.    I've subsequently spoken to the Department

20      of Education in Louisiana.

21             Q.    Okay.  I still don't understand what you

22      meant when you said "at that time."  Was there a

23      specific time frame that you were referring to?

24             A.    Yes, at the time that I issued this report.

25             Q.    I see.  Okay.

Page 203

1              I need to pause for a second here, please.

2       Thank you.

3              Let's go to the last sentence there.  It

4       says, "I am further informed that additional state

5       funding is allocated based on certain student

6       characteristics, one of which is the English Language

7       Learner."

8              Do you see that?

9         A.   I do, Counsel.

10        Q.   Was that information that you were given or

11      a conclusion that you were given?

12        A.   That was information that I was provided.

13        Q.   Okay.  And what information exactly were

14      you provided?

15        A.   That the funding per student is $4,015,

16      under the FMAP, and then there are variations in

17      that.

18        Q.   Okay.  And what was the source of that

19      information, please?  You had mentioned both

20      information and the state attorney general's office.

21      Can you tell me which was the source, please?

22        A.   The state attorney general's office.

23        Q.   Okay.  Thank you.  And for paragraph 106,

24      there's a similar phrasing about Florida.  It says,

25      "I am informed that Florida is similarly obligated,"

Page 204

1    and then it goes on with what you wrote in 106.

2                When you said -- when you wrote "I am

3    informed," who informed you, please?

4         A.   The attorney general's office of the state

5    of Louisiana.

6         Q.   And --

7         A.   And I've since confirmed both of those

8    facts with the Department of Education.

9         Q.   Of Louisiana?

10        A.   Of Louisiana.

11        Q.   So you confirmed with the Department of

12   Education of Louisiana what the Florida constitution

13   does?

14               MR. ST. JOHN:  Objection.  Vague.

15   BY MR. SCHULTZ:

16        Q.   You can answer, please.

17        A.   With respect to the -- with the Florida

18   constitution, that one, I have been informed by the

19   attorney general's office of Louisiana.

20        Q.   Again, I'm just trying to get at, so for

21   all of this it wasn't Florida that gave it to you, it

22   was Louisiana that gave it to you, right?

23        A.   Yes, it was, Counsel.

24        Q.   Okay.  And there's various other places in

25   your report where you have that phrasing, "I am

Andrew Arthur                                              December 14, 2023

1       informed."  For all of those, was it from the

2       attorney general of Louisiana?

3              A.    It was, Counsel.

4              Q.    Thank you.  If you look at paragraph -- I'm

5       sorry, if you look at footnotes 58 to 63, those are

6       the ones at the bottom of page 28.  There's just a

7       list of them there running from 58 to 63.

8                    Do you see those?

9              A.    Correct, Counsel.

10             Q.    Okay.  Do those sources mention the number

11      of people whose presence in Louisiana can be

12      attributed to the IFR?

13             A.    They do not.  That information is not

14      available to the state of Louisiana or to me, because

15      under 8 CFR 208.6, information that's contained

16      inside Credible Fear Interviews and Asylum Interviews

17      is not for public disclosure, and that includes

18      through the state.

19             Q.    Do you know if Louisiana has the ability to

20      track who is or isn't a parolee in those numbers?

21             A.    With respect to education?

22             Q.    Correct.

23             A.    Under Plyler versus Doe, which is a Supreme

24      Court case, the state is required to provide

25      education to every resident of the state who request

Andrew Arthur                                    December 14, 2023

Page 206

1      it.  And DOJ -- the civil division of DOJ and the

2      Department of Education have sent letters to state

3      officials warning them not to inquire into the

4      immigration status of individuals, whether they have

5      legal status or whether they don't.

6           Q.   And is it your understanding that Louisiana

7      follows that -- follows the -- follows what was

8      offered in that letter?

9           A.   Yes, they do.

10          Q.   Thank you.  Let's turn to paragraph 110,

11     please, the next one up -- the next page up, I should

12     say, on page 29.

13               And it starts off in the first sentence

14     talking about a natural experiment involving

15     enrollment of defined group -- I'm sorry, enrollment

16     of a defined group of migrant children, also provides

17     some insight.  And the next two words say that it

18     took place in 2014.

19               Do you see that?

20          A.   Do I -- I see where it says 2014 to begin

21     with.

22          Q.   Okay.  So if you look at paragraph 110, on

23     the second line down there, which is line four of the

24     page, the second sentence there begins in 2014.

25          A.   Correct, Counsel.  I thought you said that

Andrew Arthur                                    December 14, 2023

1      2014 had been referenced twice.

2           Q.   If I did, I apologize.  But thank you.

3               I was trying to pull it onto your awareness

4      that this is a time frame in 2014 that you're talking

5      about in paragraph 110; is that accurate?

6           A.   That is accurate, that was a rather

7      well-publicized request that Senator Vitter had made.

8           Q.   Okay.  And I just was hoping you could

9      please explain to me why you're talking about a 2014

10     phenomena when the IFR didn't come into existence for

11     years after that?

12          A.   It establishes the fact that unaccompanied

13     alien children have imposed cost on the state of

14     Louisiana with respect to their enrollment in school,

15     indicative of the fact that students without status

16     have in fact enrolled in Louisiana schools.

17          Q.   Okay.  But this all took place years before

18     the IFR was even proposed, right?

19          A.   Correct, Counsel.

20          Q.   Okay.  And going to the next paragraph, it

21     starts off with the words "There can be little doubt

22     that alien children impose education cost on Florida

23     and Louisiana even if those costs are difficult to

24     quantify precisely."

25               Do you see where those words are?

Page 208

```
 1        A.   I do, Counsel.

 2        Q.   And did I read those correctly?

 3        A.   You did, Counsel.

 4        Q.   Okay.  Thanks.

 5             So a couple of questions about that.  First

 6   of all, I'm sorry, following that -- immediately

 7   following that sentence there is no footnote, is

 8   there?

 9        A.   The remainder of that paragraph explains

10   that.

11        Q.   Okay.  But Mr. Arthur, there is no footnote

12   immediately following that sentence, right?

13             MR. ST. JOHN:  Objection.  Asked and

14        answered.

15             THE WITNESS:  There is no footnote,

16        Counsel.

17   BY MR. SCHULTZ:

18        Q.   I'm sorry, I think that the connection just

19   stuttered there for a moment.  If you could just

20   repeat what you said.  I couldn't hear.

21        A.   There is no footnote accompanying it.

22        Q.   Okay.  Thank you.

23        A.   The rest of the paragraph explains it.

24        Q.   Okay.  Thank you.  And there's one footnote

25   in that paragraph and it's one of your -- it's to a
```

Andrew Arthur                                    December 14, 2023

1      CIS report, right, number 66?

2          A.   That is correct, Counsel.

3          Q.   Okay.  Now, you say at the end of that

4      paragraph, "As former acting Secretary of Homeland

5      Security, Chad Wolf, testified earlier this year."

6               Chad Wolf wasn't acting Secretary of

7      Homeland Security in 2023, was he?

8          A.   It is modified by the word "former."

9          Q.   Oh, I see.  He testified as the former,

10     not -- okay.  Thank you for clarifying.

11              And where was -- where or when did that

12     testimony take place?  I don't see a footnote for

13     that either.

14         A.   I've got to think about that.  At the

15     moment, I can't remember when that testimony took

16     place.

17         Q.   Okay.  When you write at the top of that

18     paragraph "There can be little doubt," does that mean

19     that there can be some doubt?

20         A.   The language is probably imprecise.  There

21     can be no doubt.

22         Q.   That's not what you wrote here, is it?

23         A.   No, it's not, Counsel.

24         Q.   Okay.  And the second part of that opening

25     sentence, you say that "Those costs are difficult to

Andrew Arthur                                    December 14, 2023

1      quantify precisely."

2                Do you see that?

3            A.   I do, Counsel.

4            Q.   Okay.  How could there be little doubt when

5       it's so hard to quantify?

6            A.   Because of the structure of the law,

7       because of the presence of aliens and alien children

8       in the state of Louisiana, and because of the fact it

9       can't be quantified because under Plyler versus Doe

10      and the DOJ civil division -- actually, I think it

11      was civil rights division and DOE, Department of

12      Education letter, they're not allowed to ask about

13      the immigration status of the students of their

14      schools.

15           Q.   Thank you.  And I do understand that you're

16      saying it's difficult to quantify.  What I'm getting

17      at, which I'm not sure you quite addressed, was given

18      that it's so difficult to quantify, how can you have

19      little to no doubt?

20           A.   Because there are immigrant students who

21      are present in Louisiana, based upon it's cumulative

22      of Senator Vitters' request, because of Plyler versus

23      Doe, because they can't ask about the immigration

24      status of the children in the schools.

25           Q.   Okay.  Let's go forward a little bit.

Page 211

1      Let's make sure.  Paragraphs 117 through 128, if you

2      can just look at those, please, and let me know once

3      you've familiarized yourself with them.

4           A.   Yes, Counsel.

5           Q.   Okay.  I didn't see any mention of the IFL

6      in those paragraphs.  Did I miss that?

7           A.    It is not in there, Counsel.

8           Q.   Okay.  Why not?

9           A.    The theory of my report, the basis of my

10     report is that by increasing the number of aliens who

11     will be released in the United States, it will

12     increase the -- and by expediting the process by

13     which those individuals would be granted asylum, that

14     it would impose additional costs on the state of

15     Louisiana.

16          Q.   And moving forward a little bit to

17     paragraph 129, let's skip that.  Let's skip that.

18          A.    That's the paragraph that actually

19     summarizes the point I just made.

20          Q.   Okay.  Very good.  Thank you.

21               So at the end of your report, or so your

22     report -- I think this is what you have in front of

23     you -- ends at page 37; is that right?

24          A.    That is correct, Counsel.

25          Q.   And it has a signature line that says

Andrew Arthur                                    December 14, 2023

                                                            Page 212

1        Andrew Arthur and what looks like a signature.

2        That's your signature, right?

3             A.   It is, correct, Counsel.

4             Q.   And then that's where your current copy in

5        front of you ends; is that right?

6             A.   That is the one that I signed.  That is the

7        current one that I signed based upon my knowledge at

8        the time that I signed everything.

9             Q.   Okay.  And that's where yours ends too,

10       right, at page 37, I think?

11            A.   It is.

12            Q.   You said the core report, right?

13            MR. ST. JOHN:  The report is the report.  I

14            mean, you know, he -- I mean, the total report

15            is I wanted to say 100-something pages.

16            MR. SCHULTZ:  I thought that was your

17            phrase from before.  I thought I heard you say

18            core report before.

19            MR. ST. JOHN:  Thankfully I'm not the

20            witness.

21            MR. SCHULTZ:  Really all I'm getting at is

22            yours ends at page 37, right?

23            MR. ST. JOHN:  That's where the document I

24            have in front of me ends.

25            MR. SCHULTZ:  That's all I'm asking.

Andrew Arthur                                    December 14, 2023

                                                        Page 213

1    BY MR. SCHULTZ:

2         Q.   So the document that I have in front of me

3    goes on.  It has Exhibit A, which we talked about

4    before, which we showed you.  That was the -- what

5    you called your CV.

6              Do you remember talking about that?

7         A.   I do, Counsel.

8         Q.   There's also an Exhibit B that I have here.

9    Do you remember that there was an Exhibit B?

10        A.   I believe the Exhibit B is my comment in

11   response to the JNPRN.

12        Q.   Okay.  So do you have a copy of that in

13   front of you?

14        A.   I do not.

15        Q.   Okay.  So I have it dated October 28, 2021.

16   Does that sound right?

17        A.   That does sound correct, Counsel.

18        Q.   Was that written before you signed your

19   contract with the state of Louisiana to be an expert

20   in this case?

21        A.   That was in response to the JNPRN.  Yes, it

22   should have been.

23        Q.   It should have been?

24        A.   It should have been because the JNPRN

25   predated the IFR and the IFR is what I was hired to

1    offer expert testimony on.

2         Q.   Okay.  And I'm not sure that I followed the

3    answer there, and I apologize if I wasn't clear.

4         A.   JNPRM is Joint Notice of Proposed

5    Rulemaking.

6         Q.   I appreciate that.  Thank you.  My question

7    is just about the dates.  My question is, did you

8    sign your contract with Louisiana before or after

9    October 18, 2021?

10        A.   It would have been after.

11        Q.   Okay.  Thank you.  Thank you.

12             And were you paid to write this Exhibit B

13   by anyone?

14        A.   It is part of my responsibilities at the

15   Center For Immigration Studies.

16        Q.   Okay.  Did the state of Louisiana pay you

17   to write that letter?

18        A.   They did not.

19        Q.   Did the state of Florida pay you to write

20   it?

21        A.   They did not, Counsel.

22        Q.   Did any plaintiff in the case pay you to

23   write it?

24        A.   No.

25        Q.   Do you know who Robert Law is?

Andrew Arthur                                    December 14, 2023

1        A.    Robert Law is a former colleague of mine at

2     the Center For Immigration Studies.

3        Q.    Did Robert Law help you write the letter

4     dated October 18, 2021?

5        A.    He did not.

6              I'm sorry, what was the date on that one?

7        Q.    October 18, 2021.

8        A.    Yes.

9        Q.    So just for a clear record, I'll ask the

10    question again.

11             Did Robert Law help you write the letter

12    dated October 18, 2021?

13       A.    Yes, he did, Counsel.

14       Q.    Okay.

15       A.    By the way, it's not a letter.  It's a

16    comment.  It's in the form of a letter, but under

17    filing it's technically a comment.

18       Q.    Thank you.  It's framed as a letter, so

19    that's why I was referring to it that way, but I'm

20    happy to call it a comment.  That's just fine.  Thank

21    you for clarifying.

22             And do you know who Julie Axelrod is?

23       A.    I do.

24       Q.    Did Julie Axelrod write this comment with

25    you as well?

Andrew Arthur                                December 14, 2023

1          A.    She did.

2          Q.    Is Robert Law an expert who's been hired by

3     the plaintiffs in this case?

4          A.    He is not.

5          Q.    Okay.  And is Julie Axelrod an expert who's

6     been hired by the plaintiffs in this case?

7          A.    It is not.

8          Q.    Do you mean she is not?

9          A.    I apologize.  She is not.  Sorry.

10         Q.    Thank you so much.

11               How did you come to write this letter, the

12    October 18th comments, I should say?

13         A.    Well, the comment was written in response

14    to the interim, the Joint Notice of Proposed

15    Rulemaking.  Part of the Center's job -- part of what

16    we do, part of the reason that we exist is to inform

17    the public with respect to immigration issues.

18    Consistent with that is informing -- is responding to

19    proposed rulemaking.

20         Q.    Okay.  Thank you.  Was it your idea to

21    write the letter or do you remember exactly how the

22    mechanics worked out on who thought to do it first?

23         A.    Honestly, I don't remember.  It was the --

24    I can remember the mechanics of it very well.  Rob

25    Law produced more or less the structure of it.  Julie

Andrew Arthur                                    December 14, 2023

Page 217

1      Axelrod produced a portion at the end, but the vast

2      majority of work in that comment are mine.

3              Q.   Okay.

4              A.   We generally respond to notices of proposed

5      rulemaking that are submitted or that are issued by

6      the administration, both this administration and the

7      prior one.

8              Q.   Okay.  Thank you.  I'm going to take a

9      moment here and go on mute.  Thank you.

10             A.   Thanks, Counsel.

11                        (OFF THE RECORD.)

12             MR. SCHULTZ:  It's 4:02, so we're back on

13         the record now.  So those are the questions that

14         I have.  Scott, if you are planning to ask

15         questions, then of course that's fine.  But

16         let's take five minutes before we do that, if

17         that's what you want to do.

18             MR. ST. JOHN:  Okay.  Off the record.

19             MR. SCHULTZ:  You're going to do the

20         questions then, yes?

21             MR. ST. JOHN:  Yes.  It is 4:02.  Back in

22         five minutes.  Thank you all.

23                        (RECESS TAKEN.)

24                        EXAMINATION

25      BY MR. ST. JOHN:

Andrew Arthur                                    December 14, 2023

1          Q.    Welcome back, Judge Arthur.

2          A.    Thank you, sir.

3          Q.    Mr. Schultz at times talked about push and

4     pull factors, analysis, modeling.  Do you know if

5     there is a group within the Department of Homeland

6     Security that does any type of analysis or modeling

7     of migrant flows?

8          A.    There is -- identifying the migrant flow in

9     advance is critical to the mission of CBP and border

10    patrol in particular.  And in fact, in the

11    Circumvention of Lawful Pathways Rule, the interim

12    version that was issued in February, they

13    specifically referenced the fact that they do track

14    that information or that there is an organization

15    within the department that tracks that information.

16         Q.    To your knowledge, is the concept of push

17    and pull factors generally accepted among immigration

18    experts?

19         A.    It is, Counsel.

20         Q.    The your knowledge, does the Department of

21    Homeland Security rely on push and pull factors in

22    making the analysis you just testified about?

23         A.    There is -- again, there is a robust --

24    there is a robust team within DHS that performs those

25    analyses, but I didn't see reference to any of those

Page 219

 1    analyses in this particular IFR.

 2         Q.   And presumably, the results of that team

 3    are sufficiently reliable that the United States

 4    Government relies upon them, correct?

 5         A.   They are.

 6              MR. SCHULTZ:  Objection.

 7              THE WITNESS:  They are sufficiently

 8         reliable.  This is an effort that's been going

 9         on for years.  Familiar with it when I was at

10         the INS and also familiar with it when I was on

11         the hill.

12    BY MR. ST. JOHN:

13         Q.   So you talked about statistics a little

14    bit.  Presumably, they collect -- well, not

15    presumably, you know, there's actually a statutory

16    requirement that the federal government collects

17    certain statistics about the border, correct?

18         A.   That is correct.  I can't cite to the

19    specific statute, but they do collect it.  And in

20    fact, it goes into modeling that was required or it

21    goes into analyses that were required under the NDA,

22    National Defense Authorization Act of 2017, which I

23    think is now at 6 U.S. Code 223.  And they produce an

24    annual report that's provided under the government

25    accountability office.

Andrew Arthur                                    December 14, 2023

Page 220

1          Q.   And forgive me if I'm wrong, my

2     recollection is that the statistics include border

3     encounters, correct?

4          A.   That is correct, Counsel.

5          Q.   Gotaways, which is a statutorily defined

6     term, correct?

7          A.   It's statutorily defined in 6 USC 223.

8          Q.   And estimates of what I would call unknown

9     gotaways?

10         A.   There is generally a factor that is

11    commonly accepted.  In fact, in testimony before, I

12    believe it was the house oversight committee in

13    March, then-chief -- Border Patrol Chief Ortiz

14    actually talked about a 10 percent or 20 percent --

15    10 percent to 20 percent assumption that there are

16    unknown gotaways.

17         Q.   And so to really model or understand the

18    border flow, you have -- migrant flow across the

19    United States border, you would have to look at all

20    of those, correct?

21              MR. SCHULTZ:  Objection.

22              THE WITNESS:  To model those, yes.  In

23         fact, they're kept in realtime and accessible to

24         the department in realtime on a daily basis.

25              When I say in realtime, I mean on a daily

Andrew Arthur                                    December 14, 2023

Page 221

1          basis.

2     BY MR. ST. JOHN:

3          Q.   Are you familiar -- there was -- well,

4     strike that.

5               At some point either you testified or

6     Mr. Schultz asked about TRAC, T-R-A-C.  What is TRAC?

7          A.   It's the Transactional Records Access

8     Center in Syracuse University.

9          Q.   Where does TRAC get its data?

10         A.   From FOIA, Freedom of Information Act,

11    requests that they make of the federal government.

12         Q.   So TRAC's data is purely derivative of data

13    that the federal government has in its possession?

14         A.   It is.  That's where the FOIA disclosures

15    come from.

16         Q.   Do you know if TRAC data is generally

17    accurate or not?

18         A.   Could you define "generally accurate"?

19         Q.   Well, are you aware of any significant

20    errors in TRAC data?

21         A.   With respect to they keep track of -- track

22    with a K in this instance -- of asylum or immigration

23    judge asylum grant rates.  And I believe that they do

24    actually underestimate -- they did actually

25    underestimate the number of asylum cases that I

Page 222

1    handled.  That's the -- that is one that is specific

2    to me.

3          Q.   What did TRAC show as far as the number of

4    immigration cases you handled, Judge?

5          A.   It's been a while since I looked at that

6    data.  It's been a long time since I looked at that

7    data, but I thought that the TRAC data showed that I

8    had performed a couple hundred asylum cases, wherein

9    I know just from my recollection that it was much

10   higher than that number.

11         Q.   Much higher?  A thousand?  Two thousand?

12              MR. SCHULTZ:  Objection.

13              THE WITNESS:  I didn't keep track of the

14         number of asylum cases that I did, but I would

15         generally do a number of asylum cases every week

16         and I served as an immigration judge for eight

17         years and a couple of months.

18   BY MR. ST. JOHN:

19         Q.   Do you have an estimate, even a ballpark, a

20   range of how many immigration cases you think you

21   did?

22         A.   Yeah, I didn't keep a running tally of the

23   number of asylum cases -- immigration or asylum

24   cases.

25              With respect to asylum cases, I didn't keep

Page 223

1     a running tally, but it was probably upwards of --

2     again, it's going to be a really rough ballpark.  It

3     was probably upwards of -- I want to say maybe five

4     hundred to a couple thousand.

5              And again, I apologize, when you adjudicate

6     those cases, as Mr. Schultz will tell you, you do

7     them in real time and you move on to the next one.

8          Q.   If I wanted the real data, I would need to

9     look to the federal government, not to TRAC, though,

10    correct?

11             MR. SCHULTZ:  Objection.

12             THE WITNESS:  That is correct.  The federal

13        government actually maintains a list of all of

14        the cases that I handled.  There were codes.  05

15        is the code for asylum, and you could obtain

16        that information with respect to me.

17    BY MR. ST. JOHN:

18         Q.   And that's true more generally -- is that

19    true more generally of data TRAC maintained; you

20    would look to the federal government for the

21    definitive answer?

22             MR. SCHULTZ:  Objection.

23             THE WITNESS:  Yes.  The federal government

24        keeps very accurate records on that data.

25        Again, we talked before about the chart that

Andrew Arthur                                    December 14, 2023

                                                   Page 224

1          Mr. Schultz had referenced.  That is accurate

2          data because they do capture that 05.

3              In fact, I came across that chart in

4          response to some inquiries I had from

5          congressional staffers.

6    BY MR. ST. JOHN:

7          Q.   I'm going to shift gears.  A few times

8    today Mr. Schultz said you were an expert in

9    immigration law.

10             Do you recall that?

11             MR. SCHULTZ:  Objection.

12             THE WITNESS:  Yes, I do.

13   BY MR. ST. JOHN:

14         Q.   You're an immigration judge.  I assume it's

15   fair that you are in fact an expert in immigration

16   law?

17             MR. SCHULTZ:  Objection.

18   BY MR. ST. JOHN:

19         Q.   Is that fair?

20         A.   Not simply because I was an immigration

21   judge, but also because of my experience as a trial

22   attorney as oversight counsel for immigration, and

23   because of my role as staff director at the house

24   committee on oversight and government reform,

25   national security subcommittee in which role I had

Page 225

1    jurisdiction over immigration for a chairman and a

2    subcommittee chairman that were very interested in

3    immigration.

4         Q.   But in this case, you're not just an expert

5    on immigration law, I'd refer you to paragraph 13 of

6    your expert report.

7              MR. SCHULTZ:  Objection.

8    BY MR. ST. JOHN:

9         Q.   If you can read the first sentence of

10   paragraph 13.

11        A.   "I am a recognized expert in the field of

12   immigration, generally."  Yes.

13        Q.   In immigration policies, specifically?

14             MR. SCHULTZ:  Objection.

15   BY MR. ST. JOHN:

16        Q.   You can answer, Judge Arthur.

17        A.   Yes.  With respect to immigration national

18   security and specifically immigration policy.

19        Q.   And within that, you have experience, I

20   believe you testified earlier today, with respect to

21   the impact of policies?

22             MR. SCHULTZ:  Objection.

23   BY MR. ST. JOHN:

24        Q.   Is that correct?

25        A.   That is correct.  Both because of my work

Andrew Arthur                                    December 14, 2023

Page 226

1      at the Center For Immigration Studies and because of

2      my role as oversight counsel for immigration on the

3      House Judiciary Committee.

4              One of the big things that we looked at was

5      impacts upon societies, particularly with respect to

6      public benefits with respect to the wages and working

7      conditions of Americans.

8              And just to clarify, by American, that term

9      is defined as United States citizens and lawfully --

10     lawful immigrants who are eligible to work.

11     Q.   And to make the analysis that you're

12     talking about, looking at the impact of policy, you

13     don't need to be -- necessarily be an expert in every

14     program that an immigration policy would impact; is

15     that correct?

16             MR. SCHULTZ:  Objection.

17             THE WITNESS:  That is correct, because one

18         of things that immigration experts -- one of the

19         things that I do, I don't want to speak for

20         immigration experts generally -- is to look at

21         the monetary cost of immigration in the United

22         States, particularly with respect to localities.

23         This has become a key issue in response to

24         complaints that have been raised by Mayor Eric

25         Adams of New York City and other public

Andrew Arthur                    December 14, 2023

Page 227

1              officials about the cost that they are bearing

2              with respect to the -- with respect to migrants

3              who have resettled in their areas.  And my work

4              in that has been cited by Congress, by

5              congressional committees.

6      BY MR. ST. JOHN:

7              Q.   There has been an awful lot of talk about

8      footnotes today, Judge Arthur.

9              A.   I apologize.

10             Q.   Judge Arthur, has there been a lot of

11     discussion about footnotes today?

12             A.   I thought that was a prefatory statement.

13     There has been, Counsel.

14             Q.   If I told you there were 50 states in the

15     union, would you need a footnote to accept that

16     statement as true?

17             A.   No, I would not.

18             MR. SCHULTZ:  Objection.

19             THE WITNESS:  I apologize, Counsel.  I can

20             answer the question?

21     BY MR. ST. JOHN:

22             Q.   Yes, you may answer.

23             A.   It is well-known and generally accepted

24     that there are 50 states in the union.

25             Q.   If I told you Pearl Harbor was bombed by

Andrew Arthur                                    December 14, 2023

1    the Japanese on December 7, 1941, would you need a

2    footnote and a source to believe that?

3              MR. SCHULTZ:  Objection.

4              THE WITNESS:  No, I would not need a

5         footnote or a source to make that statement.

6    BY MR. ST. JOHN:

7         Q.   Let's go to something a little softer.  Are

8    you familiar with a publication called Penthouse,

9    Penthouse magazine?

10        A.   I am familiar that it exists.

11        Q.   If I told you that Penthouse was a

12   pornographic magazine, would you need me to supply a

13   footnote and a citation for the fact that Penthouse

14   is a pornographic magazine?

15             MR. SCHULTZ:  Objection.

16             THE WITNESS:  I would not need such a

17        footnote.  It's generally accepted that that's

18        true.

19   BY MR. ST. JOHN:

20        Q.   To your knowledge, did a justice named

21   Potter Stewart say something about that?

22             MR. SCHULTZ:  Objection.

23             THE WITNESS:  I apologize.  I believe that

24        Potter Stewart's quote may have preexisted the

25        creation of Penthouse magazine, but Potter

Andrew Arthur                                                December 14, 2023

Page 229

1                Stewart did make a rather famous statement, "I

2                know pornography when I see it."

3        BY MR. ST. JOHN:

4                Q.    It's something that's obvious and you don't

5        need a citation, correct?

6                A.    That's correct.

7                      MR. SCHULTZ:  Objection.

8                      THE WITNESS:  I apologize.

9                      Sorry, Counsel.  Correct.

10       BY MR. ST. JOHN:

11               Q.    When you're having a conversation, you

12       don't source every sentence, do you?

13                     MR. SCHULTZ:  Objection.

14                     THE WITNESS:  I do not.

15       BY MR. ST. JOHN:

16               Q.    I remember a while back you and I were

17       chatting about the economics of World War II, and I

18       remember you were talking about a book by -- I think

19       it was by John Kenneth Galbraith.

20                     Do you remember that conversation?

21               A.    I do, Counsel.  It was actually an analysis

22       by John Kenneth Galbraith of the effects of bombing

23       on German industry during World War II.

24               Q.    That's Right.  I recall.

25                     We talked for several minutes about that,

Andrew Arthur                                        December 14, 2023

Page 230

1    correct?

2              MR. SCHULTZ:  Objection.

3              THE WITNESS:  Sorry.  We actually did.  I

4         can be a bit pedantic sometimes.

5    BY MR. ST. JOHN:

6         Q.   And did you preface every sentence with

7    "John Kenneth Galbraith said"?

8              MR. SCHULTZ:  Objection.

9              THE WITNESS:  I did not, Counsel.

10   BY MR. ST. JOHN:

11        Q.   Because you and I both understood from the

12   conversation exactly what you were talking about,

13   correct?

14             MR. SCHULTZ:  Objection.

15             THE WITNESS:  That's correct, Counsel.

16   BY MR. ST. JOHN:

17        Q.   At one point today, my recollection is that

18   you testified that an alien's ability to remain in

19   the United States may be a pull factor.

20             Let me ask you, do you agree with that

21   statement?

22        A.   I do, without a doubt.  By remain, to

23   clarify if I wasn't clear, to remain undetained in

24   this country, yes.

25        Q.   That was the question I was going to ask.

Andrew Arthur                                                December 14, 2023

                                                            Page 231

1          Thank you, Judge.

2                    Mr. Schultz asked you about paragraph 78 of

3          your expert report, and it dealt with the 21-day

4          resolution requirement or the 21-day calendar

5          requirement under the asylum IFR.

6                    Do you recall that line of questioning?

7          A.    I do recall that, Counsel.

8          Q.    Does that 21-day period in the asylum IFR

9          interact with the Flores settlement agreement?

10                   MR. SCHULTZ:  Objection.

11                   THE WITNESS:  Yes.  Actually, the IFR is

12              applicable to family units as well as to single

13              adults.

14                   And just to re-clarify the record, under

15              the district court order in August of 2015, in

16              Flores versus Lynch, Judge Dolly Gee -- Madam

17              Transcriber, that's D-o-l-l-y G-e-e -- mandated

18              the release of adult migrants and children who

19              entered in family units within 20 days.

20                   That was clarified by the -- or that was on

21              appeal by DOJ.  The circuit court, the 9th

22              circuit stated that the adults in those family

23              units could be detained.  The children would be

24              released.  But generally, in order to avoid

25              family separation, everyone is released.

```
 1              And in fact, there was a recent decision

 2         that was issued.  It was the agreement of the

 3         immigration judge -- I'm sorry, Judge Dana

 4         Sabraw, S-a-b-r-a-w, extended that with respect

 5         to the detention of criminal aliens.

 6              It was an agreement that said criminal

 7         aliens or aliens subject to criminal -- by

 8         criminal aliens, I mean aliens subject to

 9         criminal penalties from proper entry and proper

10         reentry could not enter or could not be

11         detained, with exceptions.

12              And the 21-day rule would actually push all

13         FMUs then outside of the window for that AMI,

14         Asylum Merits Interview.

15    BY MR. ST. JOHN:

16         Q.   Let me try to narrow that down.  Does that

17    mean that a family -- an FMU could not be detained

18    until their AMI?

19         A.   That's correct.

20         Q.   Mr. Schultz in discussing paragraph 89 of

21    your expert report, he asked you a good number of

22    questions about the standard for credible fear, and

23    that it's different within the standard for asylum.

24              Do you recall that line of questioning?

25         A.   That is correct.
```

Page 233

1          Q.   How close are the two standards?

2          A.   For credible fear and asylum?

3          Q.   Yes.

4               MR. SCHULTZ:  Objection.

5               THE WITNESS:  Counsel, I can't see you, so

6          I apologize.

7               Can I answer the question?  I actually

8          didn't hear what Mr. Schultz said.

9               MR. ST. JOHN:  He objected.

10              Madam Court Reporter, can you read back the

11         question?

12              (Court reporter read back the question:

13         "How close are the two standards?")

14              THE WITNESS:  So the asylum standard is a

15         well-founded fear of persecution on account of

16         the five factors I listed before.  Persecution

17         or well-founded fear of persecution, based upon

18         race, religion, nationality, membership in a

19         particular social group and political opinion.

20              The credible fear standard is a substantial

21         likelihood -- it's been a long day.  I

22         apologize -- that an alien could make such a

23         showing.

24    BY MR. ST. JOHN:

25         Q.   How close are those two standards in

Page 234

1    practice?

2        A.   In practice, they are pretty close.  The

3    asylum standard is not terribly high.  The

4    substantial likelihood is akin to -- tracks it, it

5    plainly narrows it, but it doesn't narrow it

6    significantly with respect to -- it's not simply that

7    they make a claim, it's that there's a substantial

8    likelihood that they'll be granted asylum.

9        Q.   Judge, have you ever thrown a baseball with

10   your son?

11       A.   I've thrown a baseball, a football, and a

12   lacrosse ball with my son.

13       Q.   The mechanics of it, you know how to throw

14   a baseball and you expect that when you throw the

15   baseball, you know about where it's going to go,

16   right?

17            MR. SCHULTZ:  Objection.

18            THE WITNESS:  That is correct.

19            I apologize, Counsel.  That is correct.

20   BY MR. ST. JOHN:

21       Q.   Because you've done it hundreds of

22   thousands of times and it's predictable?

23       A.   That is correct, Counsel.

24       Q.   But one of the core ideas of science is

25   that we observe something, we observe it, we observe

Page 235

1      it, see the same thing again and again and again.  We

2      expect that same result to follow predictably.

3                Does that agree with your basic

4      understanding of the world?

5                MR. SCHULTZ:  Objection.

6                THE WITNESS:  That is human nature, yes,

7           the way that we have evolved.

8      BY MR. ST. JOHN:

9           Q.   I suppose the good Lord could shut off

10     gravity and suddenly your baseball is not going to go

11     to your son, but that would be an astounding

12     surprise, right?

13          A.   That is correct.

14          Q.   And so your analysis here today is that,

15     okay, I think the asylum IFR may not be fully rolled

16     out yet or may even only be rolled out a little, but

17     its ultimate result is predictable.

18                MR. SCHULTZ:  Objection.

19     BY MR. ST. JOHN:

20          Q.   Correct?

21          A.   Based upon the statistics that I've seen

22     and based upon the differential with respect to

23     asylum officer grants and immigration grants, I

24     believe that it is predictable.

25                And with respect to the 21-day rule, the

Andrew Arthur                                     December 14, 2023

Page 236

1    completion of that, it would be performed more

2    quickly.  I'll note that detain cases are generally

3    contained for about 41 days.

4              As I told Mr. Schultz before, nondetained

5    cases can go on for an extended period of time, for

6    years before reaching a rule.

7         Q.   I think Mr. Schultz asked you a little bit

8    about fraud, and I think you testified that there was

9    a fraud unit in USCIS.

10             Am I recalling things correctly?

11        A.   There is in that -- there is a fraud unit

12   in FDNS that is charged with detecting fraud

13   particularly in applications and with respect to

14   safeguarding the national security of the United

15   States.

16        Q.   Will the 21-day period, under the asylum

17   IFR, impact the ability of that USCIS unit to detect

18   and resolve fraud?

19             MR. SCHULTZ:  Objection.

20             THE WITNESS:  It will have two significant

21        impacts.  Because the -- because of the short

22        period of time, there will be no opportunity

23        for -- there will be little opportunity in most

24        cases, in almost any case, for FDNS to actually

25        assess the claim for fraud.

Page 237

```
 1              The other way that it would virtually
 2         affect it is one of the things that FDNS does is
 3         they compare asylum applications, I589s, across
 4         different applications, look for similarities,
 5         similar language and things like that in sussing
 6         out fraud because it waives the I589
 7         requirement.
 8              I have no idea how in the world FDNS is
 9         going to be able to assess fraud in that
10         process, and I'm concerned about the effect it
11         would have on national security as well.
12    BY MR. ST. JOHN:
13         Q.   Hate to have to walk you through this line
14    of questioning, Judge, but given what transpired
15    today, I feel I need to.
16              Judge, you made a statement about your math
17    skills.  Do you recall that statement?
18         A.   I do, Counsel.
19         Q.   And based on your demeanor, quite frankly,
20    I understood that was a joke.  Was it a joke, Your
21    Honor?
22              MR. SCHULTZ:  Objection.
23              THE WITNESS:  It was a joke, Counsel.  I
24         generally check my math more than once to make
25         sure that I didn't make an error.
```

Page 238

1    BY MR. ST. JOHN:

2        Q.   And you're generally familiar with

3    statistics in the ordinary course of the work you do

4    for CIS; is that correct?

5            MR. SCHULTZ:  Objection.

6            THE WITNESS:  I am familiar with

7        statistics.  There's a lot of statistics out

8        there, so I'm constantly, as I mentioned before,

9        discovering new sorts -- new data sets that I

10       can use to refine my analysis.

11   BY MR. ST. JOHN:

12       Q.   Judge, it would be misleading, wouldn't it,

13   to take your joke and treat it as anything other than

14   a joke; do you agree with that, Judge?

15           MR. SCHULTZ:  Objection.

16           THE WITNESS:  I do, Counsel.  I was -- I

17       was being -- I was joking.  Not that I don't

18       have respect for what we're doing today.

19   BY MR. ST. JOHN:

20       Q.   Judge Arthur, you work with a lot of folks

21   at the Center For Immigration Studies, or at least

22   several folks; is that correct?

23       A.   Yeah.  We're a pretty small staff, but I

24   believe there are about 20 employees at the Center

25   For Immigration Studies.

Page 239

```
 1          Q.   You don't agree with all of them; is that a
 2     fair statement?
 3          A.   We pride ourselves on being nonpartisan.
 4     And I don't agree with many of the assessments that
 5     are made by my colleagues, including the one in
 6     question from Mr. North.  But we have a policy of if
 7     you write it and it's relevant, it gets published.
 8          Q.   Judge, we talked about your experience as
 9     an immigration judge.
10               What did you -- did you have Fridays off --
11     some Fridays off as an immigration judge?
12          A.   I had an alternative work schedule, and so
13     I would get every other Friday off.
14          Q.   Judge, what did you do on those Fridays
15     off?
16          A.   I would often go to -- I apologize,
17     Counsel, if you want to object.
18               I would often go to the U.S. CIS office in
19     Baltimore so that I could participate in swearing in
20     new citizens when I was there.  A couple of times
21     they were really special things.  I'm sure
22     Mr. Schultz is familiar, but, you know, special
23     events particularly at the Roundhouse, the Baltimore
24     Railroad Roundhouse in Baltimore.  But often it would
25     be at the U.S. CIS office, and I was honored to do
```

Andrew Arthur                                    December 14, 2023

Page 240

```
 1    that.
 2            MR. ST. JOHN:  On that note, unless
 3       Mr. Schultz has anything else, I hope we're done
 4       for today.
 5            MR. SCHULTZ:  Thank you.  It's 4:45.  I
 6       just have two or three questions.  So I think it
 7       will just take a moment.  I'm happy to keep
 8       going, but if you need to take a break, of
 9       course we can do that.  Judge Arthur, I don't
10       think it will be more than two or three minutes,
11       but I'm happy to take a break if you'd like.
12            THE WITNESS:  No, I'm more concerned about
13       the court reporter.  I'm happy to defer to her,
14       but I'm fine otherwise.
15            MR. SCHULTZ:  That was my next question.
16       Ms. Marsh, how are you?
17            COURT REPORTER:  I'm fine.
18                      FURTHER EXAMINATION
19    BY MR. SCHULTZ:
20       Q.   Okay.  So just a couple of questions.
21    Judge Arthur.  Did you hear me object to that last
22    question?  I was wondering if you heard me object to
23    that?
24       A.   I apologize, Counsel.  I would have stopped
25    if I heard you object.
```

Andrew Arthur                                    December 14, 2023

Page 241

1          Q.   No, I don't want to testify.  I did not

2     object is what I'm trying to say, but I didn't want

3     to leave the implication that I had.  I thought you

4     could answer that.  I don't want to testify though.

5               So two more substantive questions:  You

6     said at the University of Virginia that you did not

7     take statistics, correct?

8          A.   I did not take statistics at the University

9     of Virginia.

10         Q.   Thank you.  Also, is a casual conversation

11    the same thing as an expert report in a case in

12    federal court?

13         A.   No, Counsel, it's not.

14         Q.   Okay.  And would you expect that someone

15    writing an expert report would feel -- I'm sorry, let

16    me start that over.

17              Is it your understanding that someone who

18    writes a federal report should show their work more

19    than someone having a casual conversation with

20    someone?

21         A.   With respect to that, it would be different

22    from filing a legal brief.  And certainly as a judge,

23    certainly when I wrote legal briefs, I would cite

24    everything that I said or add a citation for it.  But

25    if in doing an expert report, I thought it naturally

Andrew Arthur                                    December 14, 2023

                                                      Page 242

1     flowed from what I had written, I would not include a

2     citation.

3              But yes, an expert report requires more

4     citation generally than a casual conversation.

5              MR. SCHULTZ:  Okay.  Those are the only

6        questions that I have.  So Scott, did you want

7        to follow up with anything?

8              MR. ST. JOHN:  I do not.

9              MR. SCHULTZ:  So I have 4:48 p.m., which I

10       think is well within the seven hours, and I

11       wanted to thank everyone.  Judge Arthur,

12       Ms. Marsh, and Scott, it's been a lot of

13       questions today, but I want to thank everyone

14       for all of your assistance today.

15             MR. ST. JOHN:  The witness will read and

16       sign.

17             COURT REPORTER:  Okay.  And do you both

18       want to order a copy of the transcript?

19             MR. SCHULTZ:  Yes, please.

20             MR. ST. JOHN:  Yes.

21                      (SIGNATURE RESERVED.)

22                 (DEPOSITION CONCLUDED AT 4:48 P.M.)

23

24

25

Andrew Arthur                                    December 14, 2023

WITNESS CERTIFICATION

1

2          I, ANDREW ARTHUR, do hereby certify that I have

3     read and examined the contents of the foregoing testimony as

4     given by me on December 14, 2023, and that to the best of my

5     knowledge and belief the foregoing pages are a complete and

6     accurate record of the testimony given by me, except as

7     noted on the Errata Sheet attached hereto.

8          I have _____ have not _____ made changes/corrections.

9

10                              _____

                                    ANDREW ARTHUR

11

12          I, _____, Notary Public for

13     the County of _____, State of

14     _____, hereby certify that the herein

15     above-named appeared before me this the _____ day of

16     _____, 20___; and that I personally

17     witnessed the execution of this document for the intents and

18     purposes as herein-above described.

19

20          (Official Seal)

21                              _____

                                    Notary Public

22

       My commission expires: _____

23

24

25     Job No. CS6327627

Andrew Arthur                                December 14, 2023

Page 244

1                        ERRATA SHEET

2      DEPOSITION OF:  ANDREW ARTHUR

       DATE TAKEN:  DECEMBER 14, 2023

3

          Please read this transcript with care.  If you find

4      any corrections or changes you wish made, list them by page

       and line number below.  DO NOT WRITE IN THE TRANSCRIPT

5      ITSELF.  Return the Errata Sheet and Witness Certification

       to this office.  We appreciate your prompt attention to this

6      matter.

7          To assist you in making any corrections, please use

       the form below.  If supplemental or additional pages are

8      needed, please furnish same and attach thereto.

9      Page      Line      Correction or Change/Reason for Change

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23

24                                  _____

25     AHM                          ANDREW ARTHUR

       Job No. CS6327627

Andrew Arthur                                                 December 14, 2023

Page 245

1    STATE OF NORTH CAROLINA

2    COUNTY OF DAVIDSON

3

4                     CERTIFICATE OF REPORTER

5

6         I, APRIL H. MARSH, Notary Public, do hereby certify

7    that the witness whose testimony appears in the foregoing

8    transcript was duly sworn or affirmed by me prior to the

9    taking of the foregoing proceeding; that said proceeding was

10   taken by me to the best of my ability and transcribed under

11   my supervision and direction; that the parties were present

12   as stated; and that I am not of counsel for, related to, in

13   the employment of any of the parties to this action, nor am

14   I financially or otherwise interested in the outcome of this

15   action.

16        I do further certify that the foregoing pages

17   constitute a true and accurate transcript of the

18   proceedings.

19

20        This the 17th day of December 2023.

21

22

23        *April Marsh*

          April H. Marsh

24        Notary Public Number 201119500253

25

Andrew Arthur                                    December 14, 2023

Page 246

1    Scott St. John, Esq.

2    stjohn@ag.louisiana.gov

3                        December 18, 2023

4    RE:    State Of Arizona Et Al v. Garland, Merrick Et Al

5         12/14/2023, Andrew Arthur (#6327627)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Andrew Arthur                                                     December 14, 2023

[01130 - 2023]                                                          Page 1

| 0 |
| --- |

**01130**   1:2
**05**   223:14
224:2

| 1 |
| --- |

**1**   3:7 20:7,8,12
21:23 22:1
69:20 70:3
71:5 142:18
159:23 160:7
160:12,17,20
164:22
**10**   220:14,15
**100**   26:13
107:6 180:24
182:4 198:7,16
212:15
**105**   201:22
202:14
**106**   203:23
204:1
**10:05**   1:15 4:5
**10th**   58:5,8
**11**   12:25 13:8
42:25 109:10
110:14
**11.63**   138:3
**110**   186:4
206:10,22
207:5
**117**   211:1
**11:12**   59:9
**11:13**   59:13
**11:21**   59:16
**11th**   114:14
**12**   87:24

**12/14/2023**
246:5
**1225**   70:19
**128**   211:1
**129**   211:17
**12:21**   106:6
**12:30**   106:10
**13**   225:5,10
**1368**   131:13
132:2
**14**   1:14 243:4
244:2
**14.79**   194:16
**15**   113:4
**159**   186:5,6
**17**   141:4,12
143:6
**17th**   245:20
**18**   143:6,23
214:9 215:4,7
215:12 246:3
**180**   153:23
154:2,3,5
**1885**   2:4
**18th**   216:12
**19**   145:22,23
**192**   3:11
**1941**   228:1
**195**   3:13
**1988**   28:9
31:12 32:3
**1992**   30:9 31:6
**1994**   104:5
**1996**   40:25
41:2,5,6
180:20
**1:18**   140:7

**1st**   172:14

| 2 |
| --- |

**2**   3:8 20:13,15
20:16 22:2
71:5 83:19,20
**2,000**   26:5,23
**2,390,584**
121:25 122:7
**2.2.**   183:21
**20**   3:7,8 36:9
36:14 66:18
67:10 86:7
114:21 146:7
148:10 172:18
172:19,21
173:23 220:14
220:15 231:19
238:24 243:16
**2000**   114:13
**2000s**   120:8
**2001**   41:10
**2003**   69:20
172:14
**20044**   2:13
**2006**   41:11
**2007**   74:17
**2008**   69:14
**2009**   96:10,21
96:25
**201119500253**
245:24
**2014**   74:20
95:13 206:18
206:20,24
207:1,4,9
**2015**   64:21
94:22 231:15

**2016**   64:24
**2017**   36:15
89:16 111:19
120:17 219:22
**2018**   36:15
182:7
**2019**   90:8
120:18 143:20
182:8
**202-532-5802**
2:14
**2020**   48:12
49:11 113:23
114:25 115:2,3
115:4,7,9
116:5,7,9
**2021**   66:24
83:12,19,20
84:15 86:7
109:10 110:14
111:8 113:24
114:4,7,8,21
115:3,6,14,22
119:11 213:15
214:9 215:4,7
215:12
**2022**   12:25
13:8,9 17:24
27:10 115:24
135:21,24
136:5 141:22
185:12 194:15
**2022/1**   50:9
**2023**   1:14 3:8
115:25 117:5
121:24 129:16
132:7 133:12
133:13 135:22

Andrew Arthur                                                                                       December 14, 2023

**[2023 - 74]**                                                                                              Page 2

137:23 143:21
194:16 200:20
209:7 243:4
244:2 245:20
246:3
**2024**  129:17
**208**  57:8 171:3
180:15,16
181:19
**208.6**  178:6
205:15
**21**  148:14,25
149:1,18,19
150:19,22
151:13,14
154:2,3,16,21
155:2 156:5
231:3,4,8
232:12 235:25
236:16
**21137**  245:23
**212**  177:19
**217**  3:4
**22**  3:9
**223**  219:23
220:7
**225-485-2458**
2:5
**22nd**  27:10
83:18
**23**  157:21
**235**  70:3 71:5,5
117:12,13
142:18 159:23
160:7,12,17,20
**240**  3:3
**241**  56:19
164:14 168:4

168:24 171:16
**243**  164:22
**25**  192:8
**25,000**  129:17
**26**  144:6
**28**  205:6
213:15
**29**  206:12
**29th**  17:24
141:22
**2nd**  83:12

--- **3** ---

**3**  3:9 22:12,18
23:23 56:19
70:19 164:14
164:15 168:4
168:24 171:16
184:25
**30**  6:22 12:8
47:1,6 89:10
89:10 93:7
104:1,3 122:3
202:8 246:17
**30,000**  118:2
**30th**  84:15,24
**31**  190:17
**31st**  84:22,25
**325,000**  137:22
**34**  128:15
**34,000**  129:17
**36**  62:6,21
**37**  34:25
211:23 212:10
212:22
**38**  180:24
182:4

**3:08**  188:13,16
**3:18**  188:19
**3rd**  2:4

--- **4** ---

**4**  3:10 96:16
192:11,14
**4,015**  203:15
**41**  236:3
**42**  50:6,24,25
51:5 68:16,20
68:21 71:10,12
71:21 72:11
113:23
**43**  86:1,4,11
87:20 106:12
**45**  151:11,13
151:14
**451**  69:19
70:11,18,25
**46**  106:19
**46,925**  147:3
**46908**  144:5
**46909**  144:5
**47**  108:4,9
192:7 193:24
**48**  109:22
110:4
**49**  73:7 76:7
80:12 81:20
84:10 87:25
106:15 186:5,6
**4:02**  217:12,21
**4:45**  240:5
**4:48**  242:9,22
**4th**  57:2

--- **5** ---

**5**  3:3,12 50:9
96:16 194:24
195:6,11
**5-8**  113:4
**50**  87:25 88:7
90:24 94:2,7
227:14,24
**57**  186:2
**572**  135:24
185:15
**58**  113:3 205:5
205:7
**589s**  182:5
**5th**  82:13 117:5

--- **6** ---

**6**  6:22 12:8
47:1,6 202:8
219:23 220:7
**63**  205:5,7
**6327627**  246:5
**64**  116:11
**65**  121:9
**66**  119:4 209:1
**67**  128:7
134:23
**69**  142:23
143:6
**6:22**  1:2

--- **7** ---

**7**  228:1
**70802**  2:5
**71**  143:23
144:19
**74**  145:20,23

| | | | |
|---|---|---|---|
| **78** 148:10,17 231:2 | **able** 11:6 21:25 23:13,19 42:19 66:21 81:9 92:5 95:16 117:6 124:11 159:20 237:9 | **access** 21:8,9 112:5 117:6 221:7 | **act** 40:25 47:12 69:11,13 70:4 71:17 73:1 159:15,16 172:23 181:20 219:22 221:10 |
| **8** | | **accessible** 120:14 220:23 | **acting** 87:4 165:17 209:4,6 |
| **8** 3:8 131:13 205:15 | **above** 25:17 243:15,18 246:6 | **accompanying** 208:21 | **action** 1:2 84:19 245:13 245:15 |
| **868** 2:13 | **abroad** 36:23 176:15 177:6 177:16,25 178:6 | **account** 140:9 233:15 | **actions** 108:16 108:23 |
| **88** 157:21 162:23 | | **accountability** 219:25 | **activities** 120:20 162:20 |
| **89** 163:4 166:11 232:20 | **absence** 132:1 | **accounted** 31:17 | **activity** 55:5 120:22 160:1 160:10 |
| **8usc** 70:19 | **absent** 149:14 | **accounting** 29:8 122:13 | **acts** 108:20 |
| **9** | **absentia** 152:24 | **accuracy** 246:9 | **actual** 12:1 34:2 58:17,25 70:15 125:15 125:18 163:8 164:12 170:24 |
| **92** 30:10 31:12 154:19,20,22 | **absentias** 153:1 153:5 | **accurate** 9:25 11:19 116:21 130:25,25 190:22 207:5,6 221:17,18 223:24 224:1 243:6 245:17 | |
| **93** 135:13,15 135:25 136:8 185:9 186:1 190:12,16 | **absolutely** 79:16 80:5 | | |
| | **academic** 32:13,14 90:19 93:5,8,9,10,10 93:24 105:1,2 105:9,11,14 | | |
| **94** 136:1 | | **accurately** 7:13 113:17 182:15 200:25 | **actually** 19:21 20:23 32:6 34:6,21 38:7 51:12 52:13 54:10,23 55:9 57:15,24 58:11 59:9 63:7 74:22,25 81:7 83:24 87:6 88:9 89:4,5 90:7 101:2 106:11 109:4,9 110:16,20 115:2 125:3,18 |
| **95** 179:15,17 180:6,21 181:1 181:8 | | | |
| **96** 41:1 182:18 182:23 | **academics** 93:17 | **acknowledge** 145:25 | |
| **9645** 51:15 | **accept** 227:15 | **acknowledg...** 246:12 | |
| **9th** 57:1 64:24 67:11 231:21 | **accepted** 73:21 76:8,24 77:6 77:17,20 78:4 81:23 88:12 92:12,13,17 98:23 99:12 103:20 218:17 220:11 227:23 228:17 | **acquiesces** 165:16 | |
| **a** | | **acronym** 82:18 127:22 141:18 168:12 | |
| **a.m.** 1:15 4:5 | | | |
| **ability** 131:11 134:15 144:13 184:3 186:18 186:18 205:19 230:18 236:17 245:10 | | **acronyms** 128:2 163:23 168:19 | |

Andrew Arthur                                                December 14, 2023

126:10 127:4
129:19 131:3
136:21 137:15
138:3 149:21
151:2 154:17
156:23 158:2
159:1,1,5,16
160:13 161:1
168:2 170:1
176:10,18
179:17 180:4
183:15 184:2
191:14 194:5
197:16,20
210:10 211:18
219:15 220:14
221:24,24
223:13 229:21
230:3 231:11
232:12 233:7
236:24
**adam** 82:21
**adams** 226:25
**add** 17:1 186:5
241:24
**added** 17:12
149:3 164:16
197:19
**adding** 37:15
37:16 38:13
**addition** 189:1
**additional** 96:1
155:22 203:4
211:14 244:7
**address** 34:17
34:18 197:22
197:25

**addressed**
41:17 210:17
**addresses**
53:15
**addressing**
157:24
**adelanto**
134:11,13,16
**adjudicate**
68:25 171:20
223:5
**adjudicated**
54:23,25
142:19 153:14
176:8
**adjudicating**
178:3
**adjudication**
3:11,13 183:19
193:12
**adjudications**
194:5
**adjudicator**
181:25
**adjuster** 31:19
31:21
**administer**
4:12
**administration**
38:9 51:3,4
53:6,11,12
62:23 64:2
66:22 73:10,22
75:3 76:13,18
76:24 77:11
80:15 83:3,6
83:14,21,22
84:11 85:9

99:22,25 108:6
108:17,21,24
110:3,11
111:16,18,25
112:2,8,18
114:2,4 121:22
122:15 123:9
128:9,23 129:6
129:14 130:13
130:22 131:7
132:3,9 133:3
134:14,25
135:8 137:15
217:6,6
**administratio...**
75:11 107:9,21
117:25
**administratio...**
83:1,2
**administrative**
12:20
**administrativ...**
154:10,12
199:22 201:19
**admitted**
176:11
**adult** 231:18
**adults** 67:14
231:13,22
**advance** 5:3
13:10 16:17
218:9
**advantage** 98:4
**adversarial**
166:12,13,18
166:19,21,24
166:25 167:1,7
174:23 175:6

175:12,14,16
175:22,23
**advisement**
15:21 16:2
48:1
**advises** 112:7
**aegis** 49:14
**affect** 95:2
237:2
**affected** 90:2
**affirmative**
170:7,10,11,16
170:25 172:22
173:2,23 174:6
174:12,20
175:4,11,13,21
176:3,10,17
**affirmed** 64:23
245:8
**africa** 75:6
**ag.louisiana....**
2:6 246:2
**agency** 159:2,3
**agents** 107:25
112:6,11,14
**ago** 6:22 17:12
36:19 61:7,11
71:8 77:25
85:20 98:6,7
103:4 127:6
138:18 178:10
196:5
**agree** 4:10,22
4:23 5:21 6:5,9
58:23 59:4
61:6 108:13,15
116:23,25
117:4 143:8,14

144:21 230:20
235:3 238:14
239:1,4
**agreed** 5:2 61:5
61:9
**agreeing** 20:14
117:2
**agreement**
14:23 64:19
165:12 231:9
232:2,6
**agrees** 5:9
**ahead** 58:13
135:12 169:3
198:15
**ahm** 244:25
**airport** 104:7,9
104:13
**akin** 234:4
**al** 1:4,8 246:4,4
**alcohol** 28:14
**alejandro**
84:15
**alien** 66:23
69:6,7 152:3
159:25 160:8
164:5 166:6
167:5,5 170:12
181:18 207:13
207:22 210:7
233:22
**alien's** 230:18
**aliens** 63:21
64:2 82:16
89:25 116:18
121:20 142:16
155:16 165:14
177:20 210:7

211:10 232:5,7
232:7,8,8
**allenwood**
56:10
**allocated** 203:5
**allotted** 246:20
**allow** 96:12
146:22
**allowed** 65:14
119:23 210:12
**allows** 145:10
145:12,16
174:11
**allude** 179:16
**alluded** 75:13
95:12 133:16
**alpha** 82:22
**alter** 146:1
**alternative**
239:12
**alternatives**
189:25
**amend** 156:13
156:21,24
**amended**
180:15
**amendments**
156:15 157:1
**america** 75:7
99:5 103:5
**american**
39:25 40:1
226:8
**americans**
148:5 226:7
**ami** 168:12,13
168:17 232:13
232:18

**amis** 135:24
185:16 199:5
**amnesty** 161:9
**amount** 14:15
14:18 26:1,3
97:18 129:15
129:19 131:15
132:4,25
137:21
**analyses** 76:1,4
76:12 77:9
218:25 219:1
219:21
**analysis** 27:5
218:4,6,22
226:11 229:21
235:14 238:10
**andrew** 1:12
4:5 5:17 212:1
243:2,10 244:2
244:25 246:5
**angela** 49:17
**angle** 185:7
**angles** 184:23
**announced**
82:12 134:13
137:16
**announcement**
73:12 77:7
78:7 84:13
85:11 117:5
**annual** 131:14
219:24
**annuitant**
27:14
**another's** 60:6
**answer** 5:14,16
7:5 8:5 9:4,5

9:24 10:12,16
10:20 22:16
38:15 44:12,14
44:19,25 65:9
65:18 66:11,13
66:15 68:7
72:4,16 73:19
79:2,19 86:25
94:13 131:16
131:21 138:20
139:20 140:4
152:21 191:14
193:4,10
204:16 214:3
223:21 225:16
227:20,22
233:7 241:4
**answered**
66:25 68:1
77:15 123:21
123:25 138:21
155:21,23
181:14 208:14
**answering**
96:23 173:11
**answers** 6:17
9:21
**anticipation**
139:22
**anyway** 153:2
**ao** 69:8 163:11
166:11 183:25
**aola** 21:18
**aos** 68:23,24
138:6 190:17
**apologies**
106:18 140:11
158:4

| apologize | appellate 54:17 | applied 51:4 | appropriations |
|---|---|---|---|
| 16:19 24:22 | apples 194:12 | 139:2 169:7,10 | 130:18 131:5 |
| 25:3 33:6 44:4 | 194:12,17,17 | 169:14,18,20 | 132:5 |
| 52:20 66:14 | 196:14,14 | 200:21 201:3 | approval 58:10 |
| 68:5 85:1 | applicable | applies 168:2 | 58:18 59:1 |
| 94:24 97:14 | 231:12 246:8 | apply 55:22 | april 113:24 |
| 98:15 111:7 | applicant | 138:15 167:24 | 114:7 115:3,3 |
| 114:16 115:1 | 178:2,7 179:1 | 168:6 172:1 | 115:6,7,9 |
| 115:15 127:24 | 179:13 184:2 | 176:10,17 | 116:5,7,9 |
| 130:16 136:1 | applicants | 201:3 | 245:6,23 |
| 146:4 152:13 | 54:22 179:20 | applying 68:14 | area 16:11 |
| 152:22 157:16 | 198:19 | appointed | 30:20 45:17 |
| 157:20 158:15 | application | 112:24 | 59:24 60:3 |
| 160:15 168:18 | 82:12 149:22 | appointees | areas 14:20 |
| 169:3 170:2,13 | 150:1 155:7,9 | 110:25 | 55:25 59:22 |
| 178:21 194:4,7 | 156:10,13,22 | appointment | 90:10 120:21 |
| 195:2,9 197:2 | 156:24 170:12 | 112:24 113:1 | 227:3 |
| 197:16 207:2 | 170:20,23 | appointments | arising 137:25 |
| 214:3 216:9 | 171:22 174:7 | 117:7 | arithmetic |
| 223:5 227:9,19 | 174:20 177:12 | appreciate | 186:19 |
| 228:23 229:8 | 178:5,8,11,12 | 16:3 83:10 | arizona 1:4 |
| 233:6,22 | 178:17 179:5 | 129:3 214:6 | 12:9 43:19,21 |
| 234:19 239:16 | 179:12,21 | 244:5 | 43:22 46:1,14 |
| 240:24 | 180:18,19 | apprehended | 81:2 246:4 |
| app 117:6 | 181:23 182:20 | 74:18 | arlington 32:6 |
| appeal 43:23 | 184:3 | apprehends | arrived 125:6 |
| 175:1 231:21 | applications | 75:1 | artful 199:10 |
| appeals 173:4 | 68:11,23,25 | apprehension | arthur 1:12 4:5 |
| 183:20,20 | 142:19 155:16 | 114:9 | 5:17,21 6:4 |
| appear 20:24 | 170:25 171:1,8 | apprehensions | 9:15 15:16 |
| 111:10 134:17 | 171:9 172:4,5 | 115:12 | 16:6 21:18 |
| 152:8,22 | 172:11,23,25 | approach | 22:9,21 23:25 |
| appearances | 173:2,24,25 | 87:23 | 36:10 44:8,25 |
| 2:1 | 174:12 175:11 | approached | 59:20 62:12,21 |
| appeared | 175:11 176:1,4 | 13:14,18,24 | 73:20 80:14 |
| 54:11 243:15 | 176:7 180:4 | 50:20 | 86:25 186:12 |
| appears 21:18 | 181:6 236:13 | appropriate | 187:14,16 |
| 245:7 | 237:3,4 | 132:4 | 192:17 195:16 |

208:11 212:1
218:1 225:16
227:8,10
238:20 240:9
240:21 242:11
243:2,10 244:2
244:25 246:5
**article** 27:9
49:21,22 51:10
164:15
**articles** 75:15
75:17,20,22
76:1,4,11 77:9
127:15
**arts** 28:9
**asia** 75:6
**aside** 17:12
18:17 24:5
28:16 32:11
36:24 37:14
77:2 99:24
105:11 153:5
159:10 173:15
191:18
**asked** 10:17
13:15 14:14,19
14:25 32:18
67:25 75:16
77:14 108:24
111:3 113:8
123:21,25
129:15 132:9
138:18 181:13
185:13 188:11
208:13 221:6
231:2 232:21
236:7

**asking** 5:4,12
6:15 8:9 17:6
27:15 36:6
68:13 80:6
91:24 139:19
152:18 162:6
166:22 200:16
212:25
**asserted** 96:2
**assess** 236:25
237:9
**assessment**
90:7 181:21
**assessments**
239:4
**assigns** 199:4
**assist** 244:7
**assistance**
38:25 39:1
42:5,6 46:9,9
242:14
**assisted** 70:13
**associated**
119:13
**assume** 8:19
34:21 39:17
105:3 150:4
186:17 224:14
**assuming** 4:13
60:2
**assumption**
220:15
**astounding**
235:11
**asylum** 52:1
54:1,5,24,25
55:1,4,14,15
56:15,15,17,17

56:23 58:10
68:22,25 69:8
71:6,7 73:11
97:23,24 98:1
98:1 135:16,24
137:19,20,22
137:24 138:15
140:1 141:10
141:20 142:19
143:1,12,15
149:8,9,12,13
149:21 150:1,5
155:7,8 156:10
156:18,22,24
159:24 160:8
163:12 164:1,3
164:6,8,8,23
166:3,4,5
167:1,10,17,18
167:21 168:7
168:15,20,23
169:7,9,10,14
169:15,20
170:5,5,6,7,10
170:11,11,12
170:16,17,18
170:19,20,23
170:24,25
171:1,7,8,22
171:22,23
172:1,1,3,3,4,6
172:9,10,10,21
172:22,22,24
173:2,6,19,22
173:22 174:3,6
174:11,12,12
174:19 175:4
175:10,11,13

175:21,25
176:1,1,3,10
176:17,20
177:16,18
178:5,8,11,12
178:16 179:4,6
179:12,20,22
179:25 180:4,5
180:25 181:11
182:12,13
183:3 184:6
185:12,19
190:17 191:4
193:8,18
194:11,18
195:22 196:15
196:15 198:19
198:21 199:23
200:2,5,21
205:16 211:13
221:22,23,25
222:8,14,15,23
222:23,25
223:15 231:5,8
232:14,23
233:2,14 234:3
234:8 235:15
235:23 236:16
237:3
**atd** 82:17,20
**attach** 244:8
**attached** 34:6
243:7 246:11
**attachments**
62:12
**attempt** 189:24
**attempted**
120:11

**attempting**
120:9
**attended** 30:7
93:14
**attention**
154:18 244:5
**attorney** 1:7
26:7 37:5,5
57:1,2 104:6
112:18,21
167:2 202:15
203:20,22
204:4,19 205:2
224:22 246:13
**attributed**
205:12
**audio** 42:18
89:3,4 188:1
**august** 43:19
43:21 44:2,3
64:21 121:24
231:15
**authority**
92:14 132:13
132:15
**authorization**
91:7 219:22
**availability**
97:2,6,22
**available** 50:15
124:18 173:7
181:24 191:21
197:13 205:14
246:6
**avenues** 183:22
**average** 154:11
**averse** 179:1

**avoid** 8:1
231:24
**award** 30:23
**aware** 7:23
12:12,15 29:21
32:20 37:6,11
37:12 64:16
65:5 71:22,23
75:17 106:24
184:21 199:19
221:19
**awareness**
207:3
**awful** 227:7
**axelrod** 215:22
215:24 216:5
217:1

**b**

**b** 6:22 12:8
47:1,6 56:19
69:19 70:3,11
70:18,19,25
71:5,5 79:19
81:13 142:18
159:23 160:7
160:12,17,20
164:14,22
168:4,24
171:16 202:8
213:8,9,10
214:12 232:4
**ba** 29:14,16,25
**bachelor** 28:9
**back** 9:15
13:25 23:25
27:10 29:11
36:19 37:21

40:4 53:19
59:8,16 61:15
62:5 80:12
97:8 106:4,10
106:12 110:14
111:6,19,20
112:5 119:11
120:8 121:8
129:3 130:10
132:16 134:15
136:13 144:4
149:6 156:1,2
166:10 168:11
169:22 170:3
180:13 181:3
185:9 188:19
191:13 202:4
217:12,21
218:1 229:16
233:10,12
**background**
27:18 48:8
51:24 53:16
**backwards**
128:20
**bad** 101:21
102:9
**bag** 101:8
**ball** 79:9,15
139:4,5,13
234:12
**ballpark**
222:19 223:2
**baltimore** 28:2
104:11 239:19
239:23,24
**bank** 31:24

**banking** 29:8
**banz** 48:18
**barred** 56:14
56:17
**bars** 176:20
**baseball** 234:9
234:11,14,15
235:10
**based** 39:25
55:1,16 75:20
76:23 113:15
114:9 115:20
121:23 122:20
122:25 137:19
154:13 166:7
173:8 178:7
179:6,11
187:17 189:15
191:19 203:5
210:21 212:7
233:17 235:21
235:22 237:19
**bases** 161:1
**basic** 91:2
126:2 186:18
235:3
**basically** 20:1
51:1 53:3
120:24 143:5
143:24
**basing** 157:23
**basis** 104:15
127:8 131:14
211:9 220:24
221:1
**bathroom**
106:3

Andrew Arthur                                                    December 14, 2023

**baton** 2:5
**battling** 120:7
**bavaria** 48:19
**bearing** 227:1
**bed** 63:1
  132:10
**beds** 130:1,9
  133:4,15 134:3
  134:6 135:7,9
**began** 114:3,19
  143:19
**beginning** 1:15
  36:16 104:5
  115:22
**begins** 206:24
**begun** 199:16
**behalf** 2:2,8
  14:5
**belief** 69:16,17
  243:5
**believe** 15:1,2,3
  18:6 32:3 36:9
  43:17,24 45:18
  45:25 47:18
  50:14 61:24
  64:6,8 65:19
  66:23 67:13
  68:21 72:9
  81:3 84:2
  95:23 100:17
  106:15 107:5
  107:19,20
  109:5 111:22
  112:4,7,9
  113:23 114:19
  115:11 137:22
  151:11 159:23

164:12 168:13
172:20 173:8
181:3,5 182:19
183:16 193:12
197:19 213:10
220:12 221:23
225:20 228:2
228:23 235:24
238:24
**ben** 2:13
**benefit** 146:2
**benefits** 39:23
  41:22 42:11
  146:21,25
  148:6,9 182:14
  226:6
**bensman** 81:7
**best** 15:8 16:10
  25:13 86:16,23
  131:18 198:4
  200:6,12 243:4
  245:10
**better** 94:3
  102:8,15
  103:10
**beyond** 25:17
**bia** 173:3
**biden** 51:4 53:6
  62:23 64:2,7
  66:22 73:10,22
  75:3,10 76:13
  76:17,24 77:6
  77:11 80:15
  81:25 83:3,6
  84:1,2,6,11
  85:9 86:6 87:9
  89:23,24 95:12
  99:21,24

107:21 108:5
110:2,11
111:16 114:4
117:25 121:21
122:15,18,19
124:9 126:10
127:19 128:8
128:22 129:6
129:14 130:13
130:22 131:7
132:8 134:14
134:25
**biden's** 83:23
  110:16
**bifocals** 52:21
**big** 186:23
  226:4
**bigger** 137:18
  139:12
**biggest** 103:1,8
**binary** 78:22
  118:19
**binder** 198:13
**bit** 11:23,25
  27:17 33:15
  40:4 41:12
  42:14,17 51:17
  51:18 53:20,23
  64:15 85:23
  93:25 98:15
  106:11 114:23
  128:7,20 130:9
  134:8 135:12
  135:13 136:13
  138:18 140:6,7
  151:21 163:3,5
  169:23 173:12
  173:13 180:11

182:25 184:23
188:14 198:6
201:21 210:25
211:16 219:14
230:4 236:7
**blank** 192:18
**block** 121:12
**blog** 17:4 57:20
  191:7,13,18
  196:23
**blue** 195:21,24
**board** 42:3
  118:20 173:3
  183:19
**bolstered** 55:4
**bombed** 227:25
**bombing**
  229:22
**book** 23:22
  49:21 229:18
**border** 50:6
  74:5,7,18,19
  74:24 78:8
  79:4 80:16,17
  80:21 81:1,8
  86:8 90:7
  92:12 95:25
  96:2 97:12
  101:9,12
  107:25 108:16
  110:3,15,16
  111:8,20 112:6
  112:7,11,12,19
  112:23,25
  114:10 117:10
  119:13 120:14
  120:21 122:14
  122:22 127:20

Andrew Arthur                                          December 14, 2023

[border - case]                                                    Page 10

127:21,21
129:10 143:1
143:15 144:15
160:23 161:7
162:4,7,10,12
163:2 190:18
218:9 219:17
220:2,13,18,19
**borders** 73:13
77:7 83:6
84:13 85:11
88:15 101:3,4
113:16
**borrowed**
89:22
**boss** 19:6
**bothered** 19:10
**bottom** 128:17
143:6 145:24
205:6
**bounces** 38:10
**box** 2:13
**boxes** 179:5
**branch** 31:23
131:8 132:24
159:5,7
**break** 6:7 10:9
10:13 25:1,24
106:3 127:19
140:19 169:5
173:13 184:24
240:8,11
**breaks** 10:4
140:9
**breath** 152:16
**brief** 64:7
150:11,13
241:22

**briefly** 35:23
176:25
**briefs** 241:23
**bring** 85:23
91:17 120:25
122:11 173:20
**brings** 118:2
**broad** 74:11
**brought** 146:25
**browser** 21:7
**budget** 131:19
131:22 132:7
133:9,12,13
**budgetary**
39:19
**budgets** 37:25
38:6,20 39:2
39:16 40:10,18
42:7 43:15,18
46:10 129:17
132:12
**build** 145:15
**burden** 91:3
**bureau's** 40:1
**business** 15:19
47:24
**businesses**
148:6
**busy** 25:4,7
60:23,23
**button** 133:23

**c**

**c** 4:1 70:19
79:19 113:2
221:6
**calculate**
125:15 185:24

**calculation**
121:23 185:25
**calculations**
125:22 185:22
**calendar** 152:9
231:4
**california**
64:22 72:19
134:12
**call** 6:5 34:24
39:9 63:7
126:20 127:10
161:15 171:5
194:24 215:20
220:8
**called** 22:5
48:10,12 50:5
64:20 82:11,20
83:24 98:10
118:14 119:15
159:6 165:22
170:16 178:11
178:13 213:5
228:8
**calling** 64:13
114:17 126:24
**calls** 65:8,16
66:8 67:6
117:22 147:11
148:24 149:2
175:22
**capacity** 1:7
63:1 78:15,20
79:3,21 165:17
**capital** 134:20
134:21
**caption** 47:23

**captioned**
170:22
**capture** 224:2
**care** 244:3
**career** 110:24
**carolina** 4:14
4:16,20 38:10
140:16 245:1
**carries** 95:18
**carrying** 162:5
**cartel** 120:20
120:22
**cartels** 119:5,8
119:9,14,24
120:6,7,18
121:4
**carve** 70:1
**carveout** 71:3
**cas** 126:6 127:7
127:9
**case** 6:21 12:6
13:4,7,13,16
18:1,4,8 25:22
27:1,3,5,16
46:18,19,21,23
47:7,10,13,16
47:17,20,23
54:14 63:19
64:20 106:24
106:25 107:1,3
134:16 148:25
150:5 151:6
152:3,9,23
154:11 156:18
165:18 167:2
174:6 176:21
181:7 183:17
202:9 205:24

213:20 214:22
216:3,6 225:4
236:24 241:11
**cases** 12:20
57:5 58:18,25
71:2 134:10
137:25 138:5
150:11 152:6,7
153:5,20 154:5
183:24 184:5
190:18 193:25
194:11,13
195:23 199:4
200:22 201:3,3
221:25 222:4,8
222:14,15,20
222:23,24,25
223:6,14 236:2
236:5,24
**cashed** 26:10
**castle** 48:19
**casual** 241:10
241:19 242:4
**cat** 165:21,23
179:4
**catch** 107:24
152:16
**categories**
116:19,19
**catholic** 49:14
**caught** 119:17
**caused** 90:6
**causes** 54:8
76:19
**caveat** 17:1
**cbp** 82:12
117:6 118:14
118:20 122:21

124:10,17,17
126:14 127:20
161:16,16
162:11,16
218:9
**cdu** 49:15
**census** 40:1
**center** 12:16,18
19:7 26:20
27:2,7 30:8
39:18 57:11,19
60:14,15 65:4
125:11 214:15
215:2 221:8
226:1 238:21
238:24
**center's** 216:15
**central** 74:21
103:5
**certain** 43:7
55:3,4,15
69:20 71:1,1
120:22 148:24
182:14 203:5
219:17
**certainly** 40:20
41:21 94:21
96:10 99:12
100:8 104:4,11
104:17,21
108:19 118:12
120:11,20
241:22,23
**certificate** 31:3
245:4
**certification**
30:19 243:1
244:5

**certify** 243:2
243:14 245:6
245:16
**cfi** 163:15
167:7,9 169:5
**cfis** 167:19
**cfr** 205:15
**ch** 100:9
**chad** 209:5,6
**chain** 112:21
145:7
**chairman**
225:1,2
**challenge**
179:9
**chance** 10:1
35:15 43:9
52:24 60:22
**chancellor**
49:16
**change** 11:23
13:3 56:1 70:8
74:20 83:13
156:25 157:9
157:10 158:24
160:20 180:9
184:23 244:9,9
**changed** 83:20
**changes** 11:5,7
63:21 243:8
244:4 246:10
**changing** 82:25
**characteristics**
203:6
**charge** 119:19
119:25 120:24
**charged** 236:12

**charlottesville**
28:5,8 29:10
31:20 32:7
37:16 92:21
**chart** 105:19
193:7 196:2,4
197:8,25 198:3
198:10 223:25
224:3
**chat** 20:22,23
21:1 187:16
**chatting**
229:17
**check** 26:9
178:1 179:5
202:7 237:24
**checks** 85:3
178:6
**chewed** 189:16
**chided** 95:24
**chief** 74:5
75:13 79:4,21
107:2 108:14
109:9 110:4,13
110:15,17
111:8,12,17,20
111:25 112:23
112:25 116:20
116:23,25
119:11 220:13
220:13
**chief's** 112:7
**chiefs** 112:14
112:15
**children** 40:16
67:11 69:5,6,7
70:2 71:3
146:25 206:16

207:13,22
210:7,24
231:18,23
**children's** 38:4
38:18 45:21
**china** 54:25
**chmv** 118:1
**choice** 78:22
118:19
**choose** 73:20
**chose** 189:13
**church** 49:14
**circle** 40:4
**circuit** 56:22
57:1,2,4,6
64:24 67:12
174:5 231:21
231:22
**circuits** 57:3
**circulated**
10:23
**circumstance**
135:6
**circumstances**
149:14
**circumvention**
116:1 218:11
**cis** 12:25 27:12
40:9,15 42:4
172:9 190:22
209:1 238:4
239:18,25
**citation** 73:3
73:16,24 74:2
76:6 92:18
135:3 142:1
143:11 147:3,6
147:8 181:1

228:13 229:5
241:24 242:2,4
**citations**
182:18
**cite** 72:11 76:2
81:4,15,19
105:24 219:18
241:23
**cited** 75:12
92:15 99:22
128:22 193:24
196:22 227:4
**cites** 76:14
**citizen** 170:13
**citizens** 226:9
239:20
**citizenship**
158:20
**city** 95:13
226:25
**civil** 1:2 2:11
100:3 206:1
210:10,11
**claim** 55:20
138:1 144:17
168:25 195:23
234:7 236:25
**claims** 54:15,23
54:24,25 55:4
55:12,14,15
56:16,17 71:6
96:18 97:12
137:23,24
143:1,15
**clarification**
176:5
**clarified**
231:20

**clarify** 17:22
77:16 129:24
130:16 169:3
196:25 226:8
230:23 231:14
**clarifying**
102:17 115:16
198:1 209:10
215:21
**class** 29:8
30:22 37:5
92:23
**classes** 29:5
32:8 93:14
**clean** 44:14
65:25 155:12
187:14
**clear** 8:14
38:15 42:19
53:2 71:3 92:2
96:20 108:6
123:24 127:3
131:22 163:11
181:19 189:8
214:3 215:9
230:23
**clearly** 7:11,15
**click** 19:25
**clinton** 112:18
**close** 12:22
15:19 25:15
47:23 233:1,13
233:25 234:2
**closed** 154:10
154:12 199:22
201:17,20
**closer** 195:20

**closures** 101:9
**coached** 155:16
**coaching**
154:22 157:5,7
189:1
**coast** 140:10,13
140:16
**code** 219:23
223:15
**codes** 223:14
**cohort** 185:19
200:5,20
**colleague** 81:7
215:1
**colleagues**
15:22 239:5
**collect** 31:24
219:14,19
**collects** 219:16
**college** 27:22
27:24 28:1,2
29:23 31:12
32:11 35:21
37:1,4,19
**colloquially**
61:13
**column** 59:21
135:24
**columns** 59:23
151:4,8
**come** 40:19
45:2 46:12
49:9 50:19
85:12,13 90:22
91:16 95:16
97:11 98:3,17
98:20,21
100:11 104:8

104:22,23
105:16 106:4
117:19 119:21
122:6 140:2
147:25 159:21
177:3,13,24
196:3 197:19
207:10 216:11
221:15
**comes**  23:18
85:15 139:22
158:16 168:12
**comfortable**
113:12
**coming**  13:12
26:23 42:15
80:20 100:5
120:12 177:8
177:10,11
**commenced**
115:22
**comment**  11:6
213:10 215:16
215:17,20,24
216:13 217:2
**comments**
216:12
**commission**
243:22
**committee**
40:20 41:3,10
41:19 43:24,25
70:17 71:15
124:13 126:1
220:12 224:24
226:3
**committees**
227:5

**common**  88:18
98:23 179:10
188:4
**commonly**  82:9
88:18 92:17
220:11
**communicate**
24:1,4
**communicated**
24:8
**communicati...**
138:19
**communicati...**
111:12 151:1
**communities**
46:2 80:23,25
**community**
40:2
**compare**
103:22,24
237:3
**compared**
140:15
**comparing**
103:2
**comparison**
101:19 194:13
196:14
**compile**  126:10
**compiled**  126:1
**complaints**
226:24
**complete**  9:20
243:5
**completed**
201:16 246:17
**completely**
169:1

**completion**
190:19 236:1
**complicated**
26:13
**component**
159:4,22
**concentration**
28:18,25 29:3
30:16 92:21
**concentrations**
29:20
**concept**  218:16
**concerned**
33:12 176:7
181:22 183:11
237:10 240:12
**concerns**
174:13,18
178:10,16,18
178:21,22,24
**conclude**
160:18
**concluded**  71:2
190:17 242:22
**conclusion**
65:17 66:9
69:24 76:23
125:6 192:5
203:11
**conclusions**
60:20 68:9
**condition**
171:14 193:21
**conditions**
11:15 55:23
76:14,15 99:13
99:14 100:7
103:21 148:5

226:7
**conduct**  80:13
188:6,7,9,10
**conducted**
135:24
**conference**
1:13 4:12
**confirm**  4:18
8:21 23:8
**confirmed**
198:20,25
199:7,7,9
204:7,11
**confirming**
22:3
**confrontational**
167:14
**congress**  42:25
43:3,10,13,22
44:15 45:10,18
45:20 46:8
54:12 68:21,23
69:24 70:6,8
70:14,22 71:19
72:4 119:12
124:14 129:15
130:18,19
131:14,20,22
132:11,13,18
132:23 133:7,8
160:20 161:16
168:8 180:15
181:19,21
227:4
**congressional**
35:18 46:3
121:19 123:10
123:11 124:18

| | | | |
|---|---|---|---|
| 124:19,25 | **consumption** | **contributed** | **corporate** |
| 125:23 131:16 | 61:14 | 136:17 | 104:22 |
| 224:5 227:5 | **contact** 13:13 | **control** 21:17 | **corporation** |
| **conjunction** | **contain** 125:3 | 119:14 120:11 | 31:20,23 35:23 |
| 42:10 | **contained** 72:7 | 120:12 | **correct** 6:23 |
| **connection** | 82:14 205:15 | **controllable** | 11:1 13:21,22 |
| 35:18 38:11,11 | 236:3 | 119:15 120:16 | 16:22,23 18:6 |
| 76:22 84:7 | **contains** | **controlling** | 19:20 25:19 |
| 208:18 | 177:19 | 120:23 | 26:25 27:13 |
| **consensus** | **contents** 243:3 | **convened** | 28:6 29:14,17 |
| 116:15 118:6 | **context** 72:23 | 36:15 | 30:11 31:6,7 |
| **consider** | 88:22 170:6 | **convenient** | 35:9 41:2 43:2 |
| 118:24 171:9 | 173:23 174:20 | 33:22 | 45:11 48:13,14 |
| **consideration** | 174:21,22 | **convention** | 51:22 52:2,11 |
| 149:22 | 175:7 183:17 | 52:5 56:19,20 | 52:19,20 57:22 |
| **considered** | 202:12 | 164:16 165:9 | 61:12 62:2 |
| 171:8 | **continuances** | 165:11,21,24 | 63:4 64:14 |
| **considers** | 150:12 | 167:22 168:4 | 65:6 67:24 |
| 178:4 | **continue** 67:13 | 168:25 171:6 | 68:4 69:3,11 |
| **consistent** | 146:11 | 171:12,16,17 | 71:13 73:15 |
| 113:14 216:18 | **continues** | **conversation** | 74:14 76:7 |
| **constantly** 17:3 | 79:16 80:4 | 229:11,20 | 78:12,23 79:19 |
| 197:3 238:8 | 138:13 | 230:12 241:10 | 81:6 82:2,4 |
| **constitute** | **contours** 27:20 | 241:19 242:4 | 83:17 84:4 |
| 245:17 | **contraband** | **convicted** | 85:20,21 86:12 |
| **constitution** | 119:17 | 56:14 | 92:25 96:21 |
| 201:24 204:12 | **contract** 14:5,8 | **copies** 246:14 | 102:21 105:24 |
| 204:18 | 14:10,12 15:5 | **copy** 15:13,16 | 106:21,22 |
| **constitutional** | 16:14 213:19 | 15:17,18 16:9 | 110:7 113:18 |
| 30:22 | 214:8 | 32:24 33:20,21 | 115:17 116:22 |
| **consulate** | **contractor** | 62:9 192:10 | 121:14,15 |
| 177:16 | 26:11 | 212:4 213:12 | 122:5 123:16 |
| **consult** 110:3,5 | **contractual** | 242:18 | 128:18 130:1,2 |
| 110:19 111:5 | 14:22 | **core** 62:13,15 | 130:12 131:23 |
| 111:14 155:11 | **contrary** 76:21 | 212:12,18 | 132:21,22 |
| 156:12 | 167:3,4 | 234:24 | 135:22 136:12 |
| **consultation** | **contrast** | **corners** 166:2 | 137:6 139:3,5 |
| 111:24 | 166:13 | | 139:6 140:12 |

143:7,11 144:7
145:18 150:2,3
150:21,24
153:4 158:1
161:12,19,21
165:25 169:7
169:21 170:21
171:24 172:17
175:8,12,16,17
175:19 183:5,9
183:17 185:17
190:24 191:10
192:3 193:2
199:15,24,25
201:9 202:3,10
205:9,22
206:25 207:19
209:2 211:24
212:3 213:17
219:4,17,18
220:3,4,6,20
223:10,12
225:24,25
226:15,17
229:5,6,9
230:1,13,15
232:19,25
234:18,19,23
235:13,20
238:4,22 241:7
**correction**
189:2 244:9
**correctional**
56:9,10
**corrections**
243:8 244:4,7
**correctly** 26:14
63:3 69:2

73:14 86:11
88:4 91:9
122:1 128:13
133:19 208:2
236:10
**corresponden...**
4:25
**corruption**
99:16,16,19
**cost** 46:1 91:3
147:1,24 148:1
207:13,22
226:21 227:1
**costs** 207:23
209:25 211:14
**counsel** 2:1 4:7
4:21 6:3 7:6,16
8:10,17,23 9:8
9:22 10:3,6,10
10:15 11:4,9
11:13,21 13:2
13:20 14:23
16:17,18 17:9
22:11 23:10
24:23 33:5,18
41:18 49:8
52:2,7,20
53:16 58:22
63:4 65:7,10
68:4,19 69:3
70:20 71:14
73:15 78:5,22
79:6,10,14
80:9 81:21
82:2,4 85:21
87:17,21 88:3
88:5 90:19
91:10 92:11

94:18 95:22
96:22 97:1
104:18 105:21
106:22 108:10
108:12 113:6
115:1 116:14
116:22 118:9
121:15 122:2,5
123:17 128:12
128:14 130:12
130:16 135:22
136:7,9,12
139:3,6 141:6
141:8 143:4,7
144:2,20
145:18 146:13
146:16 147:5,9
148:11,19,22
149:19,23
150:21,24
153:4,8 154:3
154:24 155:11
156:12,25
157:8,22
158:18 160:25
161:21 163:1
163:13 166:16
166:21 167:8
169:21 172:17
172:19 175:8
175:17 181:9
182:16,24
183:5,9 185:17
186:3,22
187:15,18,21
187:24 188:11
190:24 191:6
191:10 192:1,3

192:9,18 193:2
193:21 194:2
195:17,25
196:8,12,17
198:23 199:15
199:25 200:24
201:1,9,13
202:3,10 203:9
204:23 205:3,9
206:25 207:19
208:1,3,16
209:2,23 210:3
211:4,7,24
212:3 213:7,17
214:21 215:13
217:10 218:19
220:4 224:22
226:2 227:13
227:19 229:9
229:21 230:9
230:15 231:7
233:5 234:19
234:23 237:18
237:23 238:16
239:17 240:24
241:13 245:12
246:14
**counsel's**
104:14
**counselor**
97:14 98:8,12
176:12,14
177:1,4,25
178:6,14
**countries** 54:22
55:5,18,19,24
74:15,21 75:5
75:6,7 98:20

100:6,8,13
101:4,7,24
102:7,14
103:22,25
165:7,14,14
**country** 55:6,9
55:22,23 56:2
56:2 63:8
91:18 95:8,18
98:21 99:13,14
99:15 100:5,20
101:18,22
102:8 145:14
149:14 165:3,4
165:7 177:9,12
178:1 230:24
**country's**
103:21
**county** 243:13
245:2
**couple** 18:13
19:22 20:2
34:3 48:5
59:19 88:7
95:5 103:3
121:11,11
143:22,24
145:9 152:20
185:10 186:14
188:22,23
201:22 202:4
208:5 222:8,17
223:4 239:20
240:20
**course** 12:17
30:25 39:18,21
43:6 45:2
46:13 47:3

57:4 95:14
131:25 132:4
142:20 152:8
179:9 217:15
238:3 240:9
**court** 1:1 2:12
4:9,10,14,19
7:12,22 8:6
9:13 10:25
42:21 47:8
56:5,6,7,22
64:20,22 65:3
79:17 80:5
122:18 137:25
138:14 149:20
150:5,10 151:6
151:16,23,24
153:24,25
155:1,14,17,25
156:2,4,11
174:5 175:6
180:2,2 183:18
183:20,25
184:7 185:4
187:8 189:8
190:5 193:25
205:24 231:15
231:21 233:10
233:12 240:13
240:17 241:12
242:17
**court's** 64:7
**courts** 67:3
151:18,19,22
166:25
**cover** 45:17
97:17

**covered** 135:10
**covers** 53:3
**covid** 100:24
100:25 101:2,5
134:3,5,7
**create** 59:6
77:19 119:15
120:15 140:1
161:25
**created** 24:1
105:25 125:12
159:2,7 172:16
**creates** 141:21
145:2
**creation**
228:25
**credibility**
179:11 181:21
181:22
**credible** 63:12
63:12,22 66:18
70:2 96:9,12
96:17,18 97:12
138:1 139:25
142:17 148:15
155:6 160:9
163:5,15,17
164:1,2,7,12
166:11 167:10
167:13,24
168:10,11,21
169:6,18 178:4
180:3 193:20
194:1,5,14
195:23 205:16
232:22 233:2
233:20

**credit** 31:20,23
35:22 37:16
39:7,10,14
40:8,14 42:3
**crime** 99:15
**crimes** 56:14
**criminal**
177:23 232:5,6
232:7,8,9
**crisis** 129:9
**criteria** 114:5
177:17,18
**critical** 218:9
**criticisms**
174:10
**criticize** 158:8
**criticized**
162:24
**cross** 119:23
167:4 174:25
**crossings**
144:15
**crosstalk** 7:20
44:12 68:3,7
186:11
**crystal** 139:4,5
139:12
**cs** 246:15
**cs6327627** 1:25
243:25 244:25
**csu** 49:15
**cuban** 118:3
**cumbersome**
195:13,14
197:11,17,22
197:24
**cumulative**
182:19 210:21

**current** 47:7
  184:16,17
  188:10 212:4,7
**currently** 5:12
  6:11 38:8
  100:9
**custody** 109:2
  118:14,16
  122:20 124:10
  152:3
**customs** 162:4
  162:17
**cut** 7:21 63:14
  123:22 129:15
  131:9 132:9
  160:2
**cutting** 128:10
  129:1,2 130:10
  130:14,17,24
  131:4 135:5
**cv** 1:2 34:14
  35:5 44:3
  213:5

**d**

**d** 4:1 62:1
  81:14,14
  134:19 158:3,3
  231:17
**d.c.** 2:13 30:8
  32:5 140:16
**daily** 17:4
  103:2 135:6
  220:24,25
**dana** 232:3
**dangers** 109:11
**dashes** 197:24

**data** 118:15
  121:23 123:1,3
  125:18 136:16
  137:10 185:23
  193:7,8 196:2
  196:4 197:3
  221:9,12,12,16
  221:20 222:6,7
  222:7 223:8,19
  223:24 224:2
  238:9
**date** 12:21
  13:23 14:7
  44:1,4 114:16
  114:17 142:3
  215:6 244:2
**dated** 213:15
  215:4,12
**dates** 114:23
  115:14 214:7
**david** 57:14,15
  57:15,18 58:13
  82:22
**davidson** 245:2
**day** 20:14
  66:18 67:10
  76:1,1,4,5
  77:10 86:7
  111:21 148:25
  154:21 231:3,4
  231:8 232:12
  233:21 235:25
  236:16 243:15
  245:20
**days** 148:14
  149:1,18,19
  150:14,17,18
  150:19,20,22

150:23 151:11
  151:13,13,14
  151:14 153:23
  154:2,2,3,3,5
  154:17 155:2
  156:5 231:19
  236:3 246:17
**dc** 57:4
**de** 140:5
**deal** 57:3
  104:15 179:18
**deals** 53:15
**dealt** 90:20
  231:3
**debate** 132:6
**decades** 90:20
  100:2
**december** 1:14
  3:8 66:24
  96:10 115:24
  120:18 228:1
  243:4 244:2
  245:20 246:3
**decide** 151:6
  153:10
**decided** 76:6
  92:15
**decision** 66:23
  67:12 108:19
  109:6 122:18
  144:14 173:5,6
  195:22 232:1
**decisions** 58:17
  58:25 109:12
  172:10 173:22
  174:3,19 175:1
  175:10 193:8
  194:18,18

196:15
**decline** 89:16
  89:17 90:6
  115:25,25
**decrease** 88:13
**decreased**
  89:13 94:9
**decreases** 96:5
**deep** 113:22
**defendant's**
  21:20
**defendants** 1:9
  2:8
**defense** 219:22
**defensive**
  170:18,20,25
  172:4,24
  173:25 174:21
  174:22
**defer** 240:13
**deferral** 171:17
**define** 102:12
  221:18
**defined** 165:18
  206:15,16
  220:5,7 226:9
**definitely**
  133:6 160:19
**definition** 39:6
  69:8 164:17
  166:4 176:23
**definitive** 15:9
  223:21
**degree** 29:9,13
  29:13 32:11,12
  45:19 67:16
  90:17 92:23
  108:14 159:4

**degrees** 29:24
31:9 32:13,14
93:8,9 99:6
102:14
**delay** 144:24
145:1,6,10,16
148:14,21
154:21,21
155:3,8,10
156:6,9 157:20
**delegated**
69:19
**deliberations**
131:25
**demand** 91:3
**demeanor**
237:19
**demographer**
90:11
**demography**
90:10,13,18
**demonstration**
55:19
**denial** 183:15
183:16,22
184:9
**denials** 183:14
183:14 199:21
**denied** 21:8,9
183:25 201:18
**deny** 186:6
**department**
2:4,11 35:24
36:5 52:18
172:15 177:6
177:15 191:20
202:19 204:8
204:11 206:2

210:11 218:5
218:15,20
220:24
**dependent** 55:5
55:9
**depending** 89:7
91:13 99:6
**depends** 56:4
101:11,11
180:12
**deponent**
246:13
**deposed** 5:9
6:21,21 46:22
46:23 47:1
**deposing**
246:13
**deposition** 1:12
3:7 4:8,22 5:1
5:22 6:6 7:12
9:24 10:5,22
11:11 12:8
16:16,18,25
17:8,14,17
18:9,19,23
19:1,3,5,10,12
19:17 20:7,15
21:14,20 22:4
22:5 25:25
33:13 47:6,7
75:14 78:11,13
85:14 187:1
188:1 189:3,12
189:22 190:6,7
190:9 242:22
244:2
**depositions**
7:19

**deputy** 2:3
**derivative**
221:12
**descent** 77:10
**described**
179:24 243:18
**description** 3:6
**designated**
71:1
**despite** 63:1
**detail** 126:5
**detain** 66:17,23
67:14 236:2
**detained** 56:5,7
91:15 118:18
150:10 151:6
151:16 152:7
153:1,7,24
154:4 184:13
231:23 232:11
232:17
**detaining**
64:17 65:6,15
82:10,15
**detect** 236:17
**detecting**
236:12
**detection** 159:6
**detention** 63:1
63:23,25 64:3
64:4,12 65:1,4
65:13 66:2,5
66:21 67:2
91:4 94:8 95:1
96:5 117:14
129:20,25
130:9 131:12
132:9 133:4,15

134:3,6,7,12
135:7,9 153:2
162:21 232:5
**determination**
66:19 96:9
148:16 168:7
180:3
**determinations**
60:21 63:12,13
63:22 142:17
172:22 174:11
179:11
**determine**
164:4 176:19
177:23
**determined**
69:25
**deterrence**
108:6 109:16
109:18
**detriments**
148:7
**dhs** 62:23 87:5
90:7 109:16
124:9 126:14
127:4 128:16
129:16 131:13
131:20 138:13
159:2 161:9
185:20 218:24
**dianne** 72:19
**died** 24:24 25:3
**difference**
140:12 155:4,5
156:7 179:17
**differences**
60:20

**different** 49:24
54:22 59:5
82:16 103:17
104:12,24,25
105:13 106:17
115:14 121:5
123:1 145:9
169:19 170:24
172:24 174:9
179:18,24
183:11 185:7
190:14 232:23
237:4 241:21
**differential**
103:4,6 138:3
235:22
**differentiate**
70:14 103:16
**differently**
158:10
**differing** 58:10
77:19 99:6
102:14
**difficult** 7:20
207:23 209:25
210:16,18
**dilly** 65:2,20
**dipped** 152:13
**direction** 194:8
245:11
**directive** 96:11
**directly** 32:4
55:20 72:4
84:6 90:1
185:22 196:23
**director** 19:7
96:11 104:19
157:25 158:5

160:13,22
161:9 162:24
224:23
**directs** 160:7
**disagree** 60:17
76:10 187:15
187:16 190:9
**disagreed**
60:13,25 61:7
**disclosure**
205:17
**disclosures**
124:8,9 125:11
126:9 127:18
221:14
**disconnect**
115:6
**discovering**
238:9
**discovery** 18:5
**discuss** 52:8
71:17 136:17
**discussed**
39:14 40:7,13
42:1 51:12
**discusses**
110:20 174:6
**discussing**
51:25 232:20
**discussion**
14:17 71:25
72:21 73:1
132:5 227:11
**discussions**
133:7
**disorder** 99:15
**displayed**
20:18

**dispositively**
71:25
**dispute** 35:24
**disputes** 36:4
36:22
**distinct** 115:19
173:9
**distinction**
199:6
**distinguish**
114:6
**distinguishing**
105:13 158:8
**district** 1:1,1
2:12 64:22
231:15
**disturbed** 6:12
**divide** 186:6
**division** 1:2
2:11 206:1
210:10,11
**docket** 151:24
152:2 153:1,12
153:20 154:5
154:14
**dockets** 152:6,7
153:6,7 154:7
**document** 15:8
15:9,12 16:9
51:6 59:3 85:6
87:2,11 128:21
147:11 158:11
178:25 179:8
181:4,4,17
192:25 193:13
193:23 194:4
194:10,22
195:5,9,12,15

195:18,21
196:6,10,14,19
196:20,22
197:7,20
200:17 201:15
212:23 213:2
243:17
**documented**
75:10
**documents**
17:16,18,21,25
18:3,4 20:2
40:2 88:15
117:20,21
122:15 124:5,6
125:8,14
126:13 157:14
157:15 173:7
197:12,18,18
**doe** 205:23
210:9,11,23
**doing** 9:12 46:5
59:9 102:9,10
125:18,20
238:18 241:25
**doj** 137:23,25
181:4 206:1,1
210:10 231:21
**dolly** 64:22
231:16
**donald** 89:15
161:17
**door** 157:4,6
**doubt** 173:24
207:21 209:18
209:19,21
210:4,19
230:22

**dougherty**
61:24,25
**download**
20:23,24
**downplay**
116:16
**drafted** 70:11
70:21 124:20
155:16 180:15
**drafters** 69:18
**drafting** 69:25
70:13,14 71:16
159:14
**dramatic** 62:25
**draw** 146:24
**drawing** 76:25
**drill** 41:13
**dropped**
198:13
**drugs** 119:17
**ducks** 157:19
**due** 55:12
**duly** 5:18 245:8
**duress** 179:1
**duty** 45:18

**e**

**e** 3:8 4:1,1,25
6:5 20:13 22:3
50:8 62:1
81:13 126:23
134:19 231:17
231:17
**earlier** 9:24
130:9 140:15
196:19 202:9
209:5 225:20

**early** 120:8
**easier** 8:6,7
33:16 154:18
163:22
**east** 140:10,13
140:16
**eastern** 75:6
**easy** 98:1
123:13
**eat** 140:24
**economic** 29:6
91:2,19 93:13
99:13 102:25
103:7
**economics**
28:18 29:1,9
29:15,16,22
92:22,23 93:3
93:6,11,17
103:1 229:17
**edlow** 72:10
**educating** 27:6
**education**
27:18 30:3
32:18 37:21,22
37:24 38:2,16
38:22 39:16
43:14 51:19
101:20,21,22
101:25 102:3,6
102:9,10,15,23
102:25 103:10
103:12 148:1
201:24 202:20
204:8,12
205:21,25
206:2 207:22
210:12

**educational**
101:13,16,18
102:13
**effect** 89:22,23
148:4 169:24
183:3 201:8
237:10
**effective** 66:24
91:23
**effectively**
113:16
**effects** 229:22
**efficiency**
150:10 184:17
**effort** 219:8
**eight** 34:19
36:2 53:23,23
62:7,22 103:6
222:16
**either** 14:3
57:6 65:20
86:13 89:11
100:19 105:23
151:17 163:14
166:6 171:15
209:13 221:5
**el** 74:21 81:2
100:4
**elected** 70:5
95:24
**election** 83:23
84:4,5 89:15
**eligibility**
146:1 182:14
**eligible** 146:21
147:21,22
164:6,23
226:10

**eliminating**
179:19
**emergency**
38:5,19 40:17
45:22 147:22
**employees**
110:24 238:24
**employment**
36:23 91:7
245:13
**encounters**
220:3
**encourage** 96:1
98:3,17,21
**ended** 115:22
**endemic**
111:16
**ends** 48:6
107:13 150:5
211:23 212:5,9
212:22,24
**enforcement**
51:1 84:19
104:16 158:9
158:22 159:4
159:12,22
160:1,10,23
161:7 162:1,1
162:6,8,10,12
162:15,18
163:2
**enforcing**
160:12,17
**english** 49:23
49:25 50:16,18
80:19,21 131:3
203:6

enrolled 207:16
enrollment 206:15,15 207:14
enter 14:4 82:11 96:1 107:10 109:20 117:16,18,20 119:25 144:16 176:13,16 177:21 232:10
entered 89:25 231:19
entering 74:18 89:19 120:19
entire 8:20 23:20 73:8 159:3,15
entirely 12:14 13:9 174:3
entry 74:14 117:7,19 232:9
eo 83:11,15
eoir 37:6,8 142:25 145:24 146:8 181:4
eoir's 197:11
equal 102:7
equally 117:13
equities 145:15
eric 226:24
erin 2:9
erin.t.ryan 2:14
errata 243:7 244:1,5 246:11 246:13,17

erratas 246:15
error 237:25
errors 11:2 221:20
escapes 87:5
esq 2:3,9,9,10 2:10 246:1
establishes 166:6 207:12
estimate 131:17 222:19
estimated 121:20
estimates 220:8
et 1:4,8 246:4,4
europe 75:6
evan 2:9 4:7
events 29:6 239:23
eventually 199:21
everybody 60:15
evidence 15:8 33:14 69:16 86:16,23 112:10 123:12 147:16,18 159:11 167:3,4 181:6,10 200:12
evidences 162:7
evolved 51:3 235:7
exacerbated 129:14

exact 15:6 85:4 191:14
exactly 203:13 216:21 230:12
examination 3:1 5:19 174:25 217:24 240:18
examine 103:21 104:5 167:4
examined 243:3
example 92:1
examples 94:17 118:13
except 6:8 57:4 92:22 138:13 147:21 155:11 156:9 164:11 165:20 172:6 243:6
exception 70:1
exceptions 232:11
exchange 187:19
exchanged 18:5
exclude 70:2
excluded 116:18
executed 139:10
execution 243:17
executive 3:10 3:12 19:6

51:13 69:22 83:15 86:8,14 87:12 131:8 132:12,24 133:9 153:18 191:20
exhaustively 45:19
exhibit 3:7,8,9 3:10,12 20:7,8 20:12,13,15,16 21:23 22:1,2 22:12,18 23:23 32:23 34:4,10 35:1,11,20 37:2,15 39:7 39:10,14 40:8 40:14 42:2 157:17 192:11 192:14 194:24 195:6,11 213:3 213:8,9,10 214:12
exhibits 3:5 19:22 23:19 34:3,6
exist 76:6 105:7 216:16
existence 50:25 207:10
existing 62:24 63:9
exists 228:10
expand 201:3
expanding 63:10 196:21 196:25

| | | | |
|---|---|---|---|
| **expansion** 75:4 | 14:20 15:24 | **explain** 54:16 | 73:23 80:16 |
| 97:10 137:14 | 19:18 22:13 | 169:4 197:4 | 95:11,22 98:2 |
| **expect** 234:14 | 23:2,7,15,24 | 207:9 | 109:4 132:7,8 |
| 235:2 241:14 | 24:1,9,12 | **explained** 51:2 | 134:12,14 |
| **expedited** | 25:14 26:1 | 123:6 142:25 | 138:9,13 |
| 96:17 164:5 | 32:25 34:3,25 | **explaining** | 155:16 156:10 |
| **expediting** | 40:7,13 42:2 | 95:15 97:2 | 159:23 175:22 |
| 107:9 211:12 | 42:24 46:17,20 | 137:2 | 178:16 179:10 |
| **expenditures** | 46:23 47:8,9 | **explains** 50:24 | 180:16 184:11 |
| 37:24 38:24 | 48:9 62:9,10 | 208:9,23 | 199:1 207:12 |
| 39:2,15 40:10 | 72:12 78:14,19 | **explanation** | 207:15,16 |
| 42:4,6 43:14 | 81:5,16 103:14 | 58:9 | 210:8 218:10 |
| 43:17 45:22 | 105:6,23 | **exploit** 159:21 | 218:13 219:20 |
| 46:10 201:11 | 106:23,25 | **extended** 63:22 | 220:11,23 |
| **experience** | 107:1,5 123:4 | 232:4 236:5 | 224:3,15 |
| 32:18,22 34:11 | 123:19 124:7 | **extensions** | 228:13 232:1 |
| 34:15,19 35:20 | 124:21 135:4 | 150:6 154:8,13 | **factor** 76:25 |
| 37:18 39:5 | 182:21 196:20 | **extra** 53:12 | 77:2,19,21 |
| 42:1 51:20 | 197:8 213:19 | **eyes** 84:1 | 78:7 98:6,10 |
| 53:19,25 66:20 | 214:1 216:2,5 | **eyesight** 195:19 | 98:11,14,14 |
| 93:7,13,22,23 | 224:8,15 225:4 | | 99:7,8 100:16 |
| 93:24 95:1 | 225:6,11 | **f** | 100:19 101:1,3 |
| 97:8 99:23 | 226:13 231:3 | **f** 47:12 165:20 | 101:9,17,19,21 |
| 101:25 104:1,3 | 232:21 241:11 | **face** 96:7 162:1 | 102:1,3,4,7,12 |
| 104:23 120:3 | 241:15,25 | 162:2,3,8 | 102:16 103:9 |
| 149:9 152:5 | 242:3 | **facially** 146:9 | 103:11 109:17 |
| 167:15 224:21 | **expertise** 14:21 | 146:17 147:6 | 109:19,19 |
| 225:19 239:8 | 14:25 16:11 | 147:11,14,15 | 138:10,19 |
| **experiences** | 51:20 59:25 | 147:16,18 | 139:8,14 140:2 |
| 39:13 40:6,12 | 60:3 67:20,22 | 148:2 | 140:3 144:25 |
| **experiential** | 118:25 | **facilitate** 145:5 | 145:3 220:10 |
| 105:17 | **experts** 73:23 | 145:6 | 230:19 |
| **experiment** | 77:18 116:16 | **facilitates** | **factors** 58:17 |
| 206:14 | 118:6,11,21,23 | 145:1 | 58:24 59:5 |
| **experimental** | 218:18 226:18 | **facility** 134:12 | 61:9 85:19 |
| 103:19 | 226:20 | **facing** 139:25 | 87:23 98:16,16 |
| **expert** 3:9 | **expires** 243:22 | **fact** 25:5 54:10 | 98:19,19,22,23 |
| 13:15 14:14,16 | | 64:4 65:2 | 98:25 99:2,2,4 |

Andrew Arthur                                    December 14, 2023

99:10,12,24
100:2 101:15
102:19,20,22
102:24 103:17
104:25 105:14
136:14 218:4
218:17,21
233:16
**facts** 55:22
68:11 204:8
**fail** 152:8
**failed** 152:22
**fails** 246:19
**failure** 110:5
110:18 111:5
111:14
**fair** 68:15 94:1
94:5,7 101:23
115:9 116:4
139:2 148:23
153:9 158:7,7
158:9,13
169:17 170:20
191:2 194:9,12
197:6 224:15
224:19 239:2
**fairly** 22:14
33:22 34:16
98:23 115:23
**fall** 36:9,13
**false** 190:2
**familiar** 6:24
35:17 98:9
105:8 149:8
153:17 219:9
219:10 221:3
228:8,10 238:2
238:6 239:22

**familiarized**
211:3
**families** 39:1
64:17 65:6,15
66:17,23
**family** 42:6
46:10 65:1,3,4
66:5,21 67:14
82:11 103:9
231:12,19,22
231:25 232:17
**famine** 100:15
**famous** 229:1
**far** 161:15
180:8 200:3
222:3
**farra** 165:20
**fathers** 132:17
**fdns** 236:12,24
237:2,8
**fear** 63:12,13
63:22 66:18
70:2 96:9,12
96:18 97:12
138:1 139:25
142:17 148:15
155:6 160:9
163:5,15,17
164:1,2,7,13
166:7,11
167:10,13,24
168:11,21
169:6,18
175:24 178:4
180:3 193:20
194:1,6,14
195:23 205:16
232:22 233:2

233:15,17,20
**february** 83:11
83:18,19,20
114:4,8,19
115:22 218:12
**federal** 56:8,10
57:6 66:16
147:11 148:18
149:8,9,12
162:14 219:16
221:11,13
223:9,12,20,23
241:12,18
**fee** 26:3,4,23
**feedback** 42:14
**feel** 141:1
237:15 241:15
**feeling** 147:13
**fees** 120:24
**feinstein** 72:18
72:19
**fellow** 12:16
27:8
**fewer** 163:23
**field** 89:9 93:20
118:16,24
122:23 127:25
147:12 225:11
**figure** 21:4
192:4
**figuring** 6:8
**file** 149:13
150:1 155:8
179:20 180:4
180:24 182:4
**filed** 12:23
24:10 56:17
68:23,25

137:23 156:11
170:12
**filing** 195:22
215:17 241:22
**final** 141:20
149:4 155:6
168:7,16
169:14,24
170:1,2 171:18
172:10 193:19
196:16 199:24
200:2,5
**financially**
245:14
**find** 11:2 20:4
74:2 106:18
145:20 151:4
174:5 193:4
244:3
**finding** 159:25
160:9 166:13
197:3
**fine** 17:5 42:22
49:1 62:14
126:23 133:5
140:18 185:4
200:11 215:20
217:15 240:14
240:17
**finish** 8:5,9
186:12
**finished** 126:15
**firm** 41:15
**first** 6:20 10:8
12:12,14 20:6
23:14 28:2
34:4 35:7,14
50:12 90:23

92:8 110:16
114:6 128:19
134:23,24
142:14,23
145:10 146:8
149:7,24
161:12 185:9
185:13 187:9
188:22,23
189:23 196:4
198:18 200:19
202:11 206:13
208:5 216:22
225:9
**fiscal** 133:20
**five** 59:11
106:4,7 160:3
188:15 217:16
217:22 223:3
233:16
**fix** 94:6
**flip** 34:4 163:6
**flipping** 33:23
**flores** 64:20
65:4 67:12
231:9,16
**florida** 64:19
74:5 76:16
108:3 109:5,13
109:14 198:20
201:14 203:24
203:25 204:12
204:17,21
207:22 214:19
**flow** 88:10,11
88:12,13 89:12
89:23 90:3,6
90:21 92:7

94:10 95:2,4
100:21,23
103:24 105:19
117:9 119:14
120:2 218:8
220:18,18
**flowcharts**
105:25
**flowed** 242:1
**flows** 88:1
90:10,25
102:20 104:2,5
104:12 135:6
136:18 218:7
**fluctuation**
116:3
**fluent** 81:9
**fmap** 203:16
**fmu** 232:17
**fmus** 82:11
232:13
**focus** 107:9
111:2 154:17
**focussing** 136:4
**foia** 47:10,12
221:10,14
**folks** 42:16
61:19 69:5
90:9 140:24
153:2 185:3
238:20,22
**follow** 10:1
33:16 48:2
59:19 132:11
134:2 193:6
235:2 242:7
**followed** 83:1
197:1 214:2

**following**
82:16 86:9
91:7 116:1
161:8,14
173:12 180:3
208:6,7,12
**follows** 5:18
91:2 206:7,7,7
**font** 53:5
**food** 100:17
102:1 140:25
**foot** 149:13
**football** 234:11
**footnote** 76:7
92:10,18
118:10 122:3
128:15,15,20
128:21,22,25
181:2 190:21
192:7 193:9,11
193:24 208:7
208:11,15,21
208:24 209:12
227:15 228:2,5
228:13,17
**footnotes**
182:18 205:5
227:8,11
**footprint**
176:18
**force** 103:17
105:13 139:14
**forced** 189:19
**foregoing**
243:3,5 245:7
245:9,16
**foreign** 35:24
36:4,22 39:8

40:9,15 42:3
48:15,17 55:5
95:18
**foreshadowing**
89:3
**forgive** 170:14
220:1
**form** 42:8
73:20 164:11
166:5 215:16
244:7
**former** 69:21
69:22 83:21,22
100:10 164:22
209:4,8,9
215:1
**formula** 105:19
**forth** 112:5
171:3 184:10
**forward** 41:24
135:13 137:17
149:1 190:10
193:17 210:25
211:16
**foundation**
47:19 136:14
**founded** 166:7
233:15,17
**founding**
132:17
**four** 52:3 54:11
55:10 89:18
96:15 136:10
137:9 199:21
206:23
**fourth** 182:7
**fourths** 141:10

fox 120:8
frame 191:12
  202:23 207:4
framed 215:18
francisco 104:6
  104:7,10
franklin 2:13
frankly 237:19
fraud 154:22
  155:3,14 156:6
  156:9 157:4,7
  159:6,9,18
  236:8,9,11,12
  236:18,25
  237:6,9
free 60:15
freedom 47:12
  221:10
friday 239:13
fridays 239:10
  239:11,14
front 14:9
  21:25 22:16
  32:25 62:10,17
  110:22 113:11
  156:18 211:22
  212:5,24 213:2
  213:13
frozen 89:1,5
full 11:19
  21:25 52:24
  68:9 122:13
  146:8 155:24
  163:19
fully 72:16
  90:5 235:15
functions 52:18
  162:6

fund 201:24
funding 128:10
  129:1,2,16,25
  130:11,14,18
  130:19,24
  131:5,9,12,15
  132:25 135:5
  161:16 162:7
  203:5,15
funny 138:17
furnish 244:8
further 62:25
  64:16 128:7
  146:24 183:18
  203:4 240:18
  245:16
future 180:9,11
fy 74:17,20
  129:16,16,16
  133:12,13,20
  137:23 182:7,8

**g**

g 4:1 62:1
  231:17
gain 91:5 92:6
gained 93:22
galbraith
  229:19,22
  230:7
game 43:11
  44:18 68:15
  116:20 117:3,4
  117:23
games 187:3,6
  187:10 189:10
  189:18,20

gander 16:1
gaps 119:15
  120:16
garland 1:7
  12:10 246:4
gears 11:23
  224:7
gee 64:22 94:21
  231:16
general 1:7 2:3
  52:1 82:15
  102:25 104:13
  112:19,21
  205:2
general's 26:8
  37:5 202:15
  203:20,22
  204:4,19
generally 12:3
  41:17 42:12
  45:16 59:24
  60:5 73:21
  74:1,3 75:24
  76:8,24 77:5
  77:17,20 78:4
  81:23 88:12
  91:1 92:9,12
  92:13 98:23,24
  99:12 100:12
  103:20 117:25
  125:7,16
  150:14 153:6
  155:14 163:8
  163:16,17
  174:14,17
  202:11 217:4
  218:17 220:10
  221:16,18

222:15 223:18
  223:19 225:12
  226:20 227:23
  228:17 231:24
  236:2 237:24
  238:2 242:4
generated
  10:25
geopolitical
  76:14
george 30:7
  32:5 37:23
  38:3,17,23
german 50:1,2
  51:8 61:15,19
  229:23
getting 21:8
  38:8 42:14
  123:9 130:20
  136:24 138:16
  150:2 177:5
  195:20 210:16
  212:21
give 7:2 9:20
  10:1 30:22
  39:5 46:3 59:7
  85:22 94:17
  106:1,17
  112:15 118:12
  126:25 127:2,4
  127:9 150:6
  154:7,12
  155:10 191:14
  196:14 202:5
given 9:16
  11:10 65:14,22
  65:23 66:5
  109:15 139:12

139:13 154:15
171:25 184:11
188:6,7 203:10
203:11 210:17
237:14 243:4,6
**giving** 11:19
12:7 79:23
92:1 104:24
**glowing** 84:1
**go** 6:3,24 13:25
21:7 27:22,24
30:3,6 32:5
34:23 36:19
37:21 51:23,24
53:19 59:8
61:9 64:15
73:6,7 80:16
81:7 98:22
106:19,19
109:22 112:12
113:3 116:10
118:6 121:8
125:5,14 126:8
126:9 127:18
130:10 134:15
135:19 137:24
138:14 148:25
149:21 163:10
169:3 177:15
180:13 182:9
183:18,24
185:9 188:14
190:10 191:13
192:16 193:16
198:15 200:18
201:21 202:12
203:3 210:25
217:9 228:7

234:15 235:10
236:5 239:16
239:18
**goal** 20:1
153:18,21,23
**goes** 34:11,12
51:20 52:9,13
128:16 143:3
180:1 201:25
204:1 213:3
219:20,21
**going** 5:5,15
6:15,16 8:7,19
10:12,24 11:23
11:25 14:16
16:21 19:21,23
19:25 20:6,12
20:13 21:22
22:1,2,12,15
23:23 24:24
25:6,9 33:7,9
33:14 34:23,25
35:2,3 38:14
39:7,9 47:22
48:6 52:4 62:6
62:15 67:1
68:17 71:4
73:8 83:13
85:22 86:3,20
87:25 88:8
90:15 92:4
95:17 106:3
111:1 113:4,13
113:25 121:16
123:23 127:5
127:10 128:20
129:3 130:9
132:16 133:6

136:13 137:16
138:6,24 139:8
140:7,20,22
142:4,23
145:20 146:20
148:4 149:5
160:12,14,17
163:7 166:20
174:5 176:8,22
181:11 184:22
185:1,2,7
186:24,24
187:2,2,6,22
187:23 188:6
188:14 189:4,5
192:11,12
193:3,4 194:22
194:24,24
202:6 207:20
217:8,19 219:8
223:2 224:7
230:25 234:15
235:10 237:9
240:8
**good** 6:3 15:25
16:1 33:4,18
39:12 49:5
53:1 54:16
66:14 80:10
101:22 102:10
142:7 185:6
195:11,19
211:20 232:21
235:9
**goose** 16:1
**gorbachev's**
28:14

**gotaways**
220:5,9,16
**gotten** 95:7
**government**
27:14 36:9
65:13 66:17
67:3,4,4
101:11 104:21
120:5,9 131:10
157:8 162:10
162:15,25
165:16 167:2
219:4,16,24
221:11,13
223:9,13,20,23
224:24
**governments**
45:23 101:10
146:10
**grade** 30:21
**gradual** 138:12
**gradually**
137:17 140:4
**graduate** 27:25
28:7
**graduated**
29:23,25 30:10
31:5,8,11,12
35:21 37:4
**graduating**
37:1,19
**grande** 81:2
**grant** 54:1,5,9
54:18 55:1
56:23 59:6
150:11 170:6
174:8 179:22
179:25 180:9

**h**

181:12,17
182:11 183:1,2
183:23 221:23
**granted** 97:24
97:25 140:1
166:5 180:25
184:6 190:17
191:4 201:18
211:13 234:8
**granting**
171:15 184:17
184:18
**grants** 137:19
137:20 138:6
182:13 183:3
183:12 186:5
235:23,23
**gravity** 235:10
**great** 185:2
192:19,24
**ground** 97:17
135:10
**grounds**
177:20,21
**group** 166:9
179:7 206:15
206:16 218:5
233:19
**groups** 121:5
**grow** 138:7
**guatemala**
74:22 95:13
100:4
**guess** 9:3,7
18:14 111:19
199:8,12
**guidelines**
84:14,21 85:5

**h**

**h** 62:1 245:6,23
**haiti** 118:3
**half** 23:13
121:12 143:24
150:22 185:13
185:14
**handing** 33:20
**handle** 133:4
**handled** 222:1
222:4 223:14
**happen** 145:17
**happened**
133:12,13,24
**happening**
98:18
**happens** 7:25
91:20 95:5
167:16 176:15
**happy** 23:21
58:21 140:21
155:21 215:20
240:7,11,13
**harbor** 227:25
**hard** 210:5
**harms** 159:17
159:18
**hate** 15:25
237:13
**hawaii** 51:16
**head** 4:17 5:22
7:3 72:10
86:20 87:4
126:23 191:16
**header** 47:16
53:6

**heading** 194:8
202:6
**headquarters**
57:3
**heads** 127:2
**health** 38:5,9
38:18 40:16
45:21
**hear** 5:22 7:22
8:11,15,24
24:25 25:8
42:19 44:8
58:20 68:4
89:4 139:9
141:7 155:22
208:20 233:8
240:21
**heard** 8:19
56:16 72:2
129:21 130:5
132:19,20
133:18,18
151:23 153:18
153:21 190:18
198:12 212:17
240:22,25
**hearing** 13:7
42:22 43:23
46:1 73:2
156:19,19
**held** 69:21
**help** 24:5 193:5
193:10 215:3
215:11
**helped** 124:19
**helpful** 9:2
32:19 33:2
195:3

**helps** 10:17
128:3
**hereto** 243:7
**heritage** 47:18
**hiding** 117:9
**high** 234:3
**higher** 116:8
222:10,11
**highest** 30:21
**highlighter**
33:6
**hill** 104:18
219:11
**hired** 47:17,18
213:25 216:2,6
**historical** 29:6
**historically**
166:12 190:20
191:2,4,11,24
192:2
**history** 28:10
28:11,12,17
51:13 100:3,25
177:23
**home** 98:22
99:13,14,15
101:21
**homeland**
52:18 84:22
159:3,15,16,17
172:16 209:4,7
218:5,21
**honduras**
74:22
**honestly** 14:3
24:13,16 199:8
216:23

honor 37:5
237:21
honored
239:25
honors 37:4
hope 101:10
160:6 240:3
hopefully
20:23 22:23
hoping 207:8
hostile 161:24
hostility 160:23
161:7,23,25
162:7
hour 18:16,16
59:10 140:12
140:12,15
hours 18:13
24:15,18,20,21
25:13,15,16,17
140:8,8 189:4
242:10
house 40:20
41:9,19 43:24
43:25 70:16
76:19 77:12
82:13 104:19
104:20 124:12
125:25 220:12
224:23 226:3
household 25:4
huge 74:14
84:6
hugo 100:9
huh 7:4
human 100:25
235:6

hundred 222:8
223:4
hundreds
234:21
hungarian 50:8
50:17,20
hungary 50:13
50:14

**i**

i.e. 190:19
i589 170:22
178:12,13,24
180:14,17,18
237:6
i589s 180:24
237:3
ice 96:11
124:16,17
126:14 127:20
127:20 128:10
129:1,2 130:10
130:14,17,24
131:5,9,11,12
134:12 135:5
156:25 167:3
174:25
idea 54:8 61:21
159:15 181:20
216:20 237:8
ideas 234:24
identification
20:8,16 22:18
192:14 195:6
identified
99:17
identifying
218:8

ifl 211:5
ifr 43:4,5 44:16
45:14 53:15
63:7,20 73:11
95:20 96:4,25
97:7,20,23
117:22 136:18
137:3,5,14,15
137:20 138:6
138:11 141:10
141:15 142:13
142:16 144:8
155:6 169:23
170:4,22
175:15,20,23
176:8 178:4,17
182:12 183:7
183:11 184:1,2
184:5,10,11,13
184:18,22
185:6 198:21
199:3 200:21
201:5 205:12
207:10,18
213:25,25
219:1 231:5,8
231:11 235:15
236:17
ifrs 135:16
ignored 110:24
110:25
ii 76:16 229:17
229:23
ij 166:14
ijs 190:19
191:1,3
illegal 121:25

illegally 74:19
88:14 89:12,19
90:1 147:20
176:16
ima 141:21
immediate
146:23
immediately
34:25 87:8
208:6,12
immigrant
210:20
immigrants
226:10
immigrate
146:22
immigration
2:12 3:10,12
12:17,18 14:25
16:12 17:4
19:7 26:21
27:2,5,6,7
39:18 41:18,21
51:1 53:21
54:1,2,5 55:21
56:23 57:5,11
57:20 60:20,21
61:10 65:2,3
67:22 69:22
70:4 71:4
73:23 74:24
76:20 77:18
86:8 98:2
104:4,19
137:20,24
138:14 142:20
149:10,20
150:6,8 151:2

Case 6:22-cv-01130-DCJ-CBW   Document 214-19   Filed 12/22/23   Page 275 of 315 PageID #: 9342
Andrew Arthur                                                December 14, 2023
[immigration - individual]                                              Page 29

151:6,16
153:19 154:6
155:1,14,17
156:4,11,17
158:21 162:15
162:17 173:3,4
173:15,18
175:6 180:2,2
183:18,19,25
184:7 191:3,21
193:9,25
194:11,18
197:4 206:4
210:13,23
214:15 215:2
216:17 218:17
221:22 222:4
222:16,20,23
224:9,14,15,20
224:22 225:1,3
225:5,12,13,17
225:18 226:1,2
226:14,18,20
226:21 232:3
235:23 238:21
238:25 239:9
239:11
**impact**  28:15
53:6 146:10
182:12 225:21
226:12,14
236:17
**impacts**  39:19
226:5 236:21
**impasse**  35:24
36:4
**impeach**
166:23 167:5

**implausible**
146:9,18 147:7
147:11,14,15
147:17,19
148:3
**implementati...**
40:22,23 89:11
137:2,5,18
138:12
**implemented**
83:4 90:4,5
110:2 118:2
137:16 139:1
140:4 170:4
**implication**
241:3
**implicitly**
198:20,24
199:6
**important**  7:14
119:10 149:25
189:7
**impose**  147:1
207:22 211:14
**imposed**
207:13
**imposes**  65:6
**imprecise**
209:20
**imprecisions**
131:2
**improperly**
116:18
**improvised**
157:14
**ina**  56:19 57:9
69:19 70:3,3
70:12,18,22,25

71:5,5 117:12
117:14 142:18
159:24 160:7
164:14,22
168:4 171:3
177:19 180:16
181:20
**inadmissibility**
177:20,22
**inadmissible**
117:13
**inauguration**
111:21
**incarceration**
147:24
**include**  23:20
35:22 177:10
199:13 220:2
242:1
**included**  37:1
45:4,15 64:6
72:9 168:8
178:7
**includes**  39:17
159:18 194:13
205:17
**including**
12:20 40:9,15
42:4 73:11
83:1 84:8
100:3 239:5
**inclusive**
136:11
**incomplete**
9:25
**inconsistencies**
167:17 179:12

**increase**  88:13
90:1 97:11
136:19 137:19
137:21 147:23
179:21 181:11
181:16 182:12
183:2 211:12
**increased**
89:12 91:8
114:21 143:20
183:13,14
**increases**  91:3
92:7
**increasing**
107:10 182:14
211:10
**incremental**
139:1
**indefinitely**
92:7
**indent**  121:13
**independent**
72:17 132:14
**index**  3:1,5
**indicate**  193:7
194:15
**indicated**  15:22
111:15 122:11
**indicates**
119:19 200:21
**indicating**
162:24
**indication**
194:10
**indicative**
207:15
**individual**
58:18,25 91:14

92:4 117:18
156:19
**individuals**
56:13 63:11
71:15 74:7
75:1,4 80:17
80:22,23 82:10
89:19 90:21
91:16 93:19
95:6,24 96:1,8
96:12,16 97:10
97:10,11,23
98:3,20 100:5
101:5 108:1
109:20 117:11
117:16,21
118:24 119:13
119:21 120:13
120:25 121:5
124:16 138:14
139:23,24
140:2 144:15
146:19 147:20
159:19 164:23
176:9,16,24
180:1,23 197:5
206:4 211:13
**indulge** 85:24
**indulging**
163:23
**industry**
229:23
**inevitably** 7:25
**influence**
137:10
**influx** 74:14
**inform** 45:18
131:16 133:6

216:16
**information**
40:1 47:12
95:19 122:21
122:24 123:6
124:15 126:2
126:22 132:1
135:20 178:7
199:12 203:10
203:12,13,19
203:20 205:13
205:15 218:14
218:15 221:10
223:16
**informed**
132:13 201:23
202:2,13,15
203:4,25 204:3
204:3,18 205:1
**informing**
79:14 216:18
**inherently**
179:21 180:6,7
181:11
**initial** 11:24
144:14 152:9
184:9 193:8
**initially** 199:4
**input** 60:11
112:19
**inquire** 206:3
**inquiries** 224:4
**ins** 37:6,9,10
69:21 104:14
112:18,20
219:10
**insecurity**
100:18 102:2

**inside** 205:16
**insight** 206:17
**inspection**
117:12
**inspector**
160:11
**instance** 89:6
177:8 189:22
199:2,9 221:22
**instances** 63:23
**instant** 6:5
**instigation**
165:15
**institute** 50:9
50:21
**institution** 56:9
56:10
**insurance** 38:5
38:19 40:16
45:21
**intends** 189:17
**intention** 117:9
**intents** 243:17
**interact** 231:9
**interest** 57:25
63:23,25
**interested**
126:21 225:2
245:14
**interesting**
21:9 49:13,13
122:8 131:13
**interfere** 11:15
42:17
**interim** 17:23
141:20 149:4
155:6 168:15
169:24 170:1,2

193:19 196:16
199:24 200:2,4
216:14 218:11
**interior** 91:6
116:18 121:21
162:21
**internal** 100:19
111:11 167:16
174:4
**international**
104:7,9,12
165:12
**interpretation**
54:13
**interpretations**
57:8
**interview**
155:7 163:15
164:1,2,7
167:1,9,10,24
168:15,20,21
169:6,10,19,20
175:23 178:5
184:3 193:20
194:1,14
232:14
**interviewed**
184:4
**interviews**
163:5 166:11
167:13 168:11
169:15 193:18
194:6 196:16
199:18,20,23
200:2 201:5,16
205:16,16
**intonation**
186:16 187:17

189:16
**investment**
91:19,21
**invited** 49:12
**involve** 57:25
93:15
**involved** 12:6
36:22 100:1
162:10,15
**involving** 36:20
206:14
**issue** 71:18
85:6 137:13
155:18 179:18
226:23
**issued** 64:21
83:11,18 84:14
86:7 87:4,8,12
94:21 96:11
118:17,18,18
122:18 137:15
152:10 165:1
185:20 202:24
217:5 218:12
232:2
**issues** 17:3
27:6 36:23
39:19 40:21
41:8,18,21
47:3 90:12
104:14 197:4
216:17
**items** 34:19

**j**

**j** 158:3
**jackson** 2:10

**jaddou** 157:25
158:2,4 160:11
160:13 161:6
162:24
**janet** 112:19
**january** 82:13
86:7 89:15
111:19 117:5
**japanese** 228:1
**jnprm** 144:8
214:4
**jnprn** 213:11
213:21,24
**job** 1:25 12:15
12:15,17 32:2
32:3 35:20
37:18 75:25
122:12 173:25
216:15 243:25
244:25
**jobs** 34:11
**john** 2:3 3:4
4:13,23 5:8,13
13:19,20,23
14:5,17 15:4,7
15:14,20 16:22
17:13 18:8,19
20:17 21:8,16
21:21 22:7,19
23:12 24:3,5,9
25:18 33:25
36:10 42:8
43:8,16 44:13
44:17,20 45:24
46:11,25 47:25
59:11 62:11,18
65:8,16 66:8
67:6,25 73:19

77:14 78:3,16
78:21 79:6,13
79:25 80:3,8
86:16,23 94:11
96:11,22
123:21,25
129:24 130:3
136:20 139:16
140:18 142:10
143:10 158:11
181:13 186:9
186:14,22
187:12,21,25
188:5 189:6
192:22 193:13
196:6 200:12
204:14 208:13
212:13,19,23
217:18,21,25
219:12 221:2
222:18 223:17
224:6,13,18
225:8,15,23
227:6,21 228:6
228:19 229:3
229:10,15,19
229:22 230:5,7
230:10,16
232:15 233:9
233:24 234:20
235:8,19
237:12 238:1
238:11,19
240:2 242:8,15
242:20 246:1
**joint** 29:24
31:9 144:9
149:3 214:4

216:14
**jointly** 48:16
**joke** 187:4
189:11,15
237:20,20,23
238:13,14
**joking** 186:17
187:17 238:17
**joseph** 72:9
**journal** 50:8
**judge** 5:21 6:4
9:15 15:16
16:6 22:9,20
23:25 24:25
44:8,25 53:21
54:1,2 55:21
56:2,2,3,3,4,4
56:23 59:19
60:21 62:21
64:21,22 65:2
67:17 76:15
80:14 86:25
94:21 98:2
108:19 109:5
109:12 122:17
141:5 150:8
151:16 156:17
165:6 173:4
186:11,14
190:13 192:17
195:2,15
196:10 198:10
200:17 218:1
221:23 222:4
222:16 224:14
224:21 225:16
227:8,10 231:1
231:16 232:3,3

234:9 237:14
237:16 238:12
238:14,20
239:8,9,11,14
240:9,21
241:22 242:11
**judges** 54:6
61:10 71:4
137:21 142:20
150:6 151:2,17
154:7 173:15
173:19,19
191:3 193:9
194:11,19
**judicial** 174:7
**judiciary** 40:20
41:3,9,19,20
70:16 71:14
104:19 124:12
125:25 226:3
**julie** 215:22,24
216:5,25
**july** 25:4 32:3
64:24
**jump** 135:13
143:19
**juncture** 29:11
138:8
**june** 95:13
135:21,22,23
136:5 185:11
200:20
**jurisdiction**
41:20 56:8,11
57:5 65:3
68:22 71:6
162:20 171:19
225:1

**justice** 2:4,11
191:20 228:20

**k**

**k** 221:22
**kaczmaryk**
122:17
**karnes** 65:1,20
**keep** 12:18
25:9 80:1
140:21 185:1,2
221:21 222:13
222:22,25
240:7
**keeps** 74:25
137:25 223:24
**kenneth** 229:19
229:22 230:7
**kent** 76:15
**kept** 220:23
**key** 109:4
150:11 226:23
**kids** 145:13
**kind** 53:5
62:13 86:2
103:16 130:20
136:25 202:12
**kingdom** 54:24
**knew** 61:20
151:18 197:10
200:16
**know** 4:23 6:21
8:7 9:3,5 10:1
10:6 13:23
14:1,2,3,7 19:5
19:9 20:4 21:4
25:2 26:16
32:19 45:12

47:13,17 49:6
52:23 57:14,15
57:18 58:4
59:20 61:18
72:6,18 75:9
75:13 78:14,18
79:19,21 84:7
85:16 93:16
97:17 100:7
101:6 102:14
103:7 107:1,2
107:14 110:8
110:18,24
111:4,10,13,20
111:23 112:3
113:20 122:9
122:10,12
126:20 128:2
131:21 134:11
135:13 139:22
140:24 141:16
142:1,1 148:5
151:2 153:16
155:15 158:16
159:17 160:5
163:6 165:6
172:9 173:1
181:18 184:15
186:22 190:1
191:15,16
195:15 197:1,7
197:7 205:19
211:2 212:14
214:25 215:22
218:4 219:15
221:16 222:9
229:2 234:13
234:15 239:22

**knowledge**
131:18 152:5
196:21,24
198:4 199:17
200:1,6 212:7
218:16,20
228:20 243:5
**known** 13:10
82:9 85:5
227:23
**knows** 139:11
**krikorian** 19:6

**l**

**l** 50:8 134:19
231:17,17
**labor** 35:25
36:5
**lack** 64:3
139:12 144:17
178:11
**lacked** 68:24
**lacrosse** 234:12
**lafayette** 1:2
**language** 49:24
59:2 61:8 64:1
118:7 128:6
131:3 168:9
203:6 209:20
237:5
**languages**
80:18
**large** 53:5
100:11 103:23
194:19
**larger** 138:7
**laser** 107:9

**lasted** 89:17
**late** 60:24
  72:19 100:6
**latest** 135:15
**law** 12:16
  14:25 16:12
  17:4 27:8 30:3
  30:6,8,13,16
  30:19,22,25
  31:5,12,13,13
  32:12 41:4,6
  46:25 47:3
  54:13 55:22
  57:8 65:6 67:7
  67:16,22 68:11
  68:14 104:4
  149:9,10,12
  159:4,22 160:1
  160:9 162:1,6
  165:18 210:6
  214:25 215:1,3
  215:11 216:2
  216:25 224:9
  224:16 225:5
**lawful** 116:1
  218:11 226:10
**lawfully**
  117:17,19
  176:11 226:9
**lawsuit** 12:5,5
  12:13,15,24
**lawsuits** 12:19
  134:6
**lawyer** 156:20
**lawyers** 18:21
**lays** 179:3
**lead** 56:22
  58:25 95:21

98:25 99:2,4
  100:19,21,23
  102:20 137:11
  154:22 183:13
**leadership**
  109:10
**leads** 183:12
  190:21
**learner** 203:7
**learning** 13:4
**leave** 98:21
  241:3
**led** 58:17 85:10
  136:18
**left** 29:9 32:4
**legal** 64:16
  65:17 66:4,9
  67:3 68:9
  206:5 241:22
  241:23 246:23
**legislation**
  70:15,16
**legislative**
  51:12 69:25
**letter** 109:9
  110:14,21,22
  111:9 119:12
  206:8 210:12
  214:17 215:3
  215:11,15,16
  215:18 216:11
  216:21
**letters** 133:19
  206:2
**letting** 126:19
**level** 100:5
  101:25 116:17
  120:22 176:22

**levels** 74:23
  114:12
**lifted** 134:16
  185:21
**light** 195:21,24
**likelihood** 91:4
  92:3 94:8 95:1
  95:17 96:5
  164:4 168:9
  233:21 234:4,8
**likely** 91:5,14
  109:20
**limen** 50:7
**limit** 129:19
  172:13
**limitations**
  64:17
**limited** 97:18
  156:12 193:24
  196:2,3
**limits** 65:5,14
  66:4,5
**line** 112:14
  121:12 143:24
  144:6 157:14
  179:19 183:7
  206:23,23
  211:25 231:6
  232:24 237:13
  244:4,9
**lines** 8:4
  121:11,13
  160:25 161:2
**list** 61:19 82:7
  123:3,18
  126:25 205:7
  223:13 244:4

**listed** 37:14
  233:16
**listen** 112:22
**lists** 34:11,19
**litigation** 2:12
  12:2,19 46:18
  47:8,10 51:15
**little** 11:23,25
  27:17 33:15
  40:4 41:12
  42:17 45:16
  50:3 51:17,18
  53:20,23 64:15
  85:23 106:11
  128:7 130:9
  135:12,13
  136:13 138:17
  140:6,7 163:3
  163:5 169:23
  173:12,13
  180:11 184:23
  188:14 197:11
  198:6 201:21
  207:21 209:18
  210:4,19,25
  211:16 219:13
  228:7 235:16
  236:7,23
**live** 92:5 95:8
  145:10,11,13
**lives** 145:13
**living** 17:2
  75:15 145:1,6
  197:3
**loans** 31:22,22
  31:24
**local** 37:25
  38:6,20 39:2

39:16 40:10,18
42:7 43:14,18
45:22 46:10
**localities**  39:20
226:22
**location**  47:14
49:15
**logistics**  42:14
140:6
**long**  18:11,15
22:14 36:1
45:16 53:21
89:17 96:25
119:24 140:25
149:12 150:13
151:5 191:23
195:13 222:6
233:21
**longer**  53:24
108:7 109:16
149:17,19
150:18 151:13
151:14 152:6
153:6 154:5,6
154:12,13,16
155:2 156:5
**look**  14:22 15:5
16:13 20:3
23:1 35:15
39:19,20 48:23
49:1 52:21,24
55:23 58:14
59:3 60:18
81:17 87:1,10
88:6 97:8
103:18 140:6
142:2,22 147:8
164:8,9,10,13

176:19 179:16
192:7 193:9
195:18 200:4
205:4,5 206:22
211:2 220:19
223:9,20
226:20 237:4
**looked**  17:16
40:20 41:21
42:9 103:18
222:5,6 226:4
**looking**  15:11
21:1 42:11
94:2 104:2
110:14 121:10
136:1,3,8
191:12,24
194:10 226:12
**looks**  31:11,16
34:15,16 86:4
212:1
**lord**  235:9
**lost**  155:19
**lot**  18:2 24:24
25:6 29:4,5
38:10 41:17
54:11 56:15
59:4,4 60:13
64:2 75:14
87:12 89:21
97:16 104:8,9
112:5,5 125:13
125:23,24
167:18 197:24
227:7,10 238:7
238:20 242:12
**loud**  73:9

**loudly**  7:15
**louisiana**  1:1
2:4,5 13:14,21
14:5 16:14,19
26:7,12,24
27:4 67:22
140:11,15
198:19 201:12
202:13,20
204:5,9,10,12
204:19,22
205:2,11,14,19
206:6 207:14
207:16,23
210:8,21
211:15 213:19
214:8,16
**louisiana's**
201:23
**low**  74:23
116:8
**lower**  56:15
168:2
**lowers**  96:7
**lowest**  115:12
**loyola**  28:1,3
**lunch**  140:19
**lunchtime**
140:9
**lynch**  64:20
67:12 231:16

| m |
|---|

**m**  50:8 81:13
**macroecono...**
29:7
**madam**  119:20
134:19 158:2

231:16 233:10
**made**  60:14,19
66:19,22 70:9
74:6,22 77:17
79:11,13,25
80:8 83:4 84:8
84:8 95:13
108:6,15
124:14 166:23
166:24 179:2,9
179:11 180:19
181:16,19
186:14,22
189:8,11,13,15
190:10 196:15
207:7 211:19
237:16 239:5
243:8 244:4
**magazine**
228:9,12,14,25
**magyar**  50:17
**mail**  3:8 4:25
6:5 20:13 22:3
126:23
**main**  124:11
**maintained**
142:19 223:19
**maintains**
223:13
**major**  30:12
**majority**  74:17
74:22 137:24
217:2
**majors**  28:16
28:19,20
**make**  5:2 6:25
11:5 17:11
18:13 19:24

| | | | |
|---|---|---|---|
| 27:20 33:16 | **malitia** 161:17 | 54:20,21 89:2 | 152:1 166:19 |
| 37:13 39:6 | 162:5 | 109:6 244:6 | 167:1,21,22,23 |
| 44:11,13 52:23 | **mandated** | **matthew** | 168:14 173:20 |
| 60:12 62:16 | 231:17 | 122:17 | **meant** 88:23 |
| 71:3 77:3 80:3 | **march** 17:24 | **mayor** 226:24 | 108:25 115:7 |
| 85:2 88:16 | 69:20 113:23 | **mayorkas** | 202:22 |
| 91:19 96:18 | 114:25 115:2 | 84:15,22 95:23 | **mechanics** |
| 97:12 104:10 | 124:25 141:22 | 109:5,14 | 216:22,24 |
| 113:10 115:17 | 172:14 220:13 | **mean** 17:20 | 234:13 |
| 117:7 120:15 | **margaret** 19:8 | 18:4 19:18 | **mechanism** |
| 126:15 128:3,5 | **mark** 19:6,21 | 29:2,13 31:21 | 94:25 |
| 128:9,23 129:6 | 20:7 111:22 | 45:8,9 55:13 | **media** 95:18 |
| 130:6,15,17,22 | **marked** 20:8 | 60:1,2 63:14 | **medicaid** 38:4 |
| 130:23 131:4 | 20:16 22:18 | 69:4,6 70:3 | 38:18 40:16 |
| 133:17 134:25 | 181:6 192:14 | 91:12 92:14 | 45:21 |
| 135:14,17 | 195:6 | 97:14 98:14 | **medical** 38:5 |
| 138:10 139:14 | **marks** 33:6 | 102:5 105:9 | 38:19 40:17 |
| 141:17 142:4 | **married** 38:7 | 108:21 117:2 | 45:22 |
| 145:12,14 | **marsh** 4:15,18 | 129:8,12 133:1 | **medicare** 38:11 |
| 146:20 154:18 | 9:11 42:18 | 133:20 143:9 | 146:21 147:21 |
| 155:23 166:1 | 185:3 240:16 | 151:23 161:3 | 147:22 |
| 173:24 174:11 | 242:12 245:6 | 162:2 163:12 | **meet** 18:7,11 |
| 175:10 178:6 | 245:23 | 163:15 164:20 | 18:15,21 |
| 182:20 188:23 | **maryland** 28:2 | 165:10 166:17 | **member** 71:19 |
| 189:24 198:16 | **master** 152:9 | 170:9,19 176:3 | 72:3 |
| 211:1 221:11 | **masters** 38:8 | 180:10 196:25 | **membership** |
| 226:11 228:5 | **matching** | 197:24 198:24 | 166:8 233:18 |
| 229:1 233:22 | 135:18 | 201:2,7 202:18 | **memo** 84:16 |
| 234:7 237:24 | **material** 17:6 | 209:18 212:14 | 85:5 87:4 |
| 237:25 | **materials** | 212:14 216:8 | **memory** 24:14 |
| **makes** 8:5,6 | 15:24 | 220:25 232:8 | 25:13 33:15 |
| 33:21 85:24 | **math** 125:1,5,9 | 232:17 | 41:16 43:11 |
| 91:13 109:19 | 126:3,7 127:9 | **meaning** 131:7 | 44:18 87:16 |
| **making** 172:9 | 127:11 186:3 | **means** 7:3 25:2 | **mental** 11:14 |
| 172:21 173:22 | 186:17 237:16 | 39:22 41:22 | **mention** 48:6 |
| 174:19 187:3 | 237:24 | 42:11 82:3 | 99:16 205:10 |
| 218:22 244:7 | **matter** 14:15 | 83:15 141:17 | 211:5 |
| | 17:10,19,21 | 146:24 148:8 | |

**mentioned**
19:16 25:18
26:22 32:12
37:18 39:8
48:21 49:10
51:7 57:10
70:9 85:19
99:19 100:15
101:13 102:23
112:1 115:18
127:6,11 130:8
165:8 178:15
194:21 197:12
197:14 199:11
203:19 238:8
**mentioning**
27:16
**meritorious**
54:23 144:17
**merits** 156:19
168:15,20
169:10,15,20
193:18 196:15
199:23 200:2
232:14
**merkel** 49:17
**merrick** 1:7
246:4
**message** 6:6
**met** 18:18
24:11,15 25:18
71:15
**method** 105:20
**methodologies**
104:24 105:25
**methodology**
103:15 105:13
105:15,20

127:17
**mexican** 120:5
120:9
**mexico** 74:19
82:10 91:22,24
103:6
**miami** 199:2,13
200:3,6,22
**michael** 61:24
61:25
**microecono...**
29:7
**microsoft** 7:9
**middle** 31:17
146:6 147:2
**migrant** 82:8
88:1,10,10,12
90:2,3,6,9,25
94:10 95:2,4
100:21,23
102:20 103:24
104:2,5 119:14
136:18 206:16
218:7,8 220:18
**migrants** 63:2
74:15,18 88:14
89:12 107:10
109:1 117:6,9
119:16 121:25
129:11 139:5
227:2 231:18
**migrate** 99:1,3
99:5 137:11
139:15
**migration**
48:12 49:10
50:8,20 51:9
53:7 93:3,6,15

93:18 98:24
113:16 116:17
**migrations**
93:11
**mind** 16:21
52:15 82:6
85:12,15,24
87:19 105:16
196:11
**mine** 105:17
192:18 215:1
217:2
**minimis** 140:5
**minimize** 44:21
**minor** 30:15
**minors** 28:22
29:19
**minute** 6:2
36:19 61:16
127:6 152:15
177:2
**minutes** 59:12
61:11 98:7
106:4 178:10
188:15 217:16
217:22 229:25
240:10
**mislead** 79:15
189:24
**misleading**
66:9 67:8 78:3
78:16,21 79:8
139:17 238:12
**mispronounc...**
158:5
**missed** 152:11
152:20

**mission** 108:7
109:16 159:12
218:9
**misspoke** 71:8
162:13 178:21
**mistake** 85:3
157:17
**misunderstand**
136:25
**misunderstan...**
114:24
**mixed** 101:8
**model** 220:17
220:22
**modeling** 218:4
218:6 219:20
**models** 105:11
105:12
**modified** 209:8
**modifies** 131:4
**modifying**
77:23
**mom** 24:23
**moment** 17:12
19:24 20:24
37:22 39:5
44:6 46:4
48:25 59:7
61:7 71:8 74:9
77:2,25 85:20
85:22,25 87:5
94:3 98:6
106:2,14 121:9
127:13 133:21
145:21 150:4
157:11,18
167:20 192:12
194:25 196:5

Andrew Arthur                                                                          December 14, 2023

[moment - non]                                                                              Page 37

198:17 208:19
209:15 217:9
240:7
**monetary**
226:21
**money** 14:15
27:11 29:8
120:13,15
129:15 145:12
145:14 201:11
**month** 73:5
**monthly** 114:9
114:12 116:2
124:8 125:12
125:22 127:8
**months** 32:1
36:2 86:10
89:18 115:12
136:5,10 137:9
222:17
**moratorium**
87:6
**morgan** 111:22
**morning** 9:20
**morton** 96:21
**mother** 25:9
**motivate**
144:14
**mouth** 95:6
**move** 10:17
41:24 68:16
198:6 223:7
**moved** 28:4
32:4,6
**movement**
93:12,18
**moving** 106:16
143:22 211:16

**mpp** 82:9 90:4
90:4
**multiple** 61:9
86:7
**mute** 157:12
217:9
**muted** 5:25

## n

**n** 4:1 50:8
81:13,13
134:19
**nadir** 113:24
114:7 115:2,3
115:9 116:5
**nail** 17:11
**name** 34:17,18
81:12 85:4
86:13 87:5
99:11 111:25
**named** 118:21
228:20 243:15
**names** 46:17
82:5 119:1
**narcotics**
120:12
**narrow** 232:16
234:5
**narrows** 234:5
**national** 30:8
48:11 75:24
104:17,20
159:6,8,19
177:22 219:22
224:25 225:17
236:14 237:11
**nationalities**
54:14,19,20,21

74:25
**nationality**
55:2,16 70:4
166:8 233:18
**nationals** 74:20
118:2
**natural** 135:6
206:14
**naturally**
241:25
**nature** 235:6
**navigation**
197:23
**nda** 219:21
**near** 199:5
**nearby** 100:20
101:7
**nearly** 190:17
**necessarily**
182:12 226:13
**necessary** 71:2
168:7
**need** 7:2,4 10:5
15:3 16:13
22:17 25:1,10
80:4 87:1
95:22 127:13
131:16 132:25
133:4 140:24
142:24 157:17
173:20 184:24
190:4 193:5
194:7 195:2
200:4 202:7
203:1 223:8
226:13 227:15
228:1,4,12,16
229:5 237:15

240:8
**needed** 156:21
244:8
**needy** 39:1
42:6 46:9
**negative** 101:2
**never** 52:15
70:7 71:25
105:3 107:13
167:15 182:4
**nevertheless**
146:9
**new** 139:10,11
157:23 197:18
199:3,13,16,20
200:22 226:25
238:9,9 239:20
**news** 25:8
**newspaper**
75:14,17,20,22
75:25 76:3,11
77:9
**newspapers**
75:24
**nhs** 152:3
**nicaraguans**
118:3
**nine** 52:10,12
52:14,17 53:14
**nod** 7:3
**nodding** 4:17
**noise** 129:21
130:6 198:12
**noises** 42:15
**non** 166:12,18
166:19 167:1,7
175:12,16,23

noncitizen
  148:14
nondetained
  56:5 151:23,24
  151:24 152:2,6
  153:6,12,20,25
  154:7 236:4
nonpartisan
  239:3
nonprofit
  161:10
norm  140:13
normal  12:15
normally  59:21
  121:4
north  2:4 4:13
  4:16,19 38:9
  57:14,15,18
  58:23 59:20
  140:16 239:6
  245:1
notary  243:12
  243:21 245:6
  245:24
notch  121:8
note  64:25
  71:13 81:6
  88:25 236:2
  240:2 246:10
noted  44:21
  65:24 66:7
  74:1,3 243:7
notes  106:17
  114:16 115:17
  135:17 188:22
notice  3:7 20:7
  21:14,20 144:9
  149:3 187:25

214:4 216:14
noticed  157:16
  186:25 189:12
notices  217:4
noting  44:22
notwithstand...
  64:4 132:8
  134:14
november
  41:11 58:5,8
nta  118:17,18
  118:18
ntas  138:14
number  3:6
  47:13 59:5
  83:12 89:25
  97:11 116:9
  121:20 122:6
  122:13,14
  123:1,15
  124:22 125:5,6
  125:15 139:23
  139:25 143:1
  143:14 151:10
  177:19 179:23
  180:1,23
  183:13 185:15
  185:18,21,23
  186:7 192:5
  197:17 205:10
  209:1 211:10
  221:25 222:3
  222:10,14,15
  222:23 232:21
  244:4 245:24
numbers  63:1
  89:18 100:11
  113:25 114:9

116:5,8 118:19
  123:10,13
  124:13,18,18
  124:19,22
  126:10,20,21
  127:4,7 133:19
  157:17 185:10
  185:24 205:20
nutrition  38:25
  42:5 46:8
nuts  5:24

## o

o  4:1 47:12
  62:1 81:14
  119:20 134:19
  158:3 231:17
o'clock  184:25
oath  4:6,12
  9:16,17,20
  77:13 178:25
obama  83:2
object  15:7
  42:8 43:8
  187:23 188:9
  188:10 239:17
  240:21,22,25
  241:2
objected  233:9
objecting
  188:25 189:1,2
objection  15:4
  43:16 44:17,20
  44:22 45:24
  46:11,25 65:8
  65:16,22,23,24
  66:7,8 67:6,25
  77:14 78:3,16

78:21,24 79:12
  79:13 80:8
  86:16,22,23
  94:11 96:22
  123:23 136:20
  139:16 143:10
  158:11 181:13
  188:24,25
  193:13 196:6
  200:12 204:14
  208:13 219:6
  220:21 222:12
  223:11,22
  224:11,17
  225:7,14,22
  226:16 227:18
  228:3,15,22
  229:7,13 230:2
  230:8,14
  231:10 233:4
  234:17 235:5
  235:18 236:19
  237:22 238:5
  238:15
objections  80:3
  188:23 189:4
obligated
  201:23 203:25
observe  234:25
  234:25,25
obtain  223:15
obvious  151:12
  158:16 187:4
  189:11,15
  229:4
obviously  13:9
  22:13 100:24

Case 6:22-cv-01130-DCJ-CBW Document 214-19 Filed 12/22/23 Page 285 of 315 PageID #: 9352

**october** 12:25 13:8 27:10 90:8 213:15 214:9 215:4,7 215:12 216:12
**odds** 48:6
**offend** 97:15
**offense** 97:16
**offer** 13:15 14:14,20 50:21 76:21 94:20 95:11 156:8 167:3,4 214:1
**offered** 206:8
**offering** 14:16 189:25
**offers** 58:9
**office** 2:12 3:10 3:12 4:6 18:22 18:22 19:4 26:8 69:22 75:4 84:7 86:6 89:17,24 104:14 110:12 118:16 122:23 127:25 153:18 170:12 191:20 199:2 202:16 203:20,22 204:4,19 219:25 239:18 239:25 244:5
**officer** 4:11 69:8 98:1 141:21 159:24 160:8 163:12 164:1,3 167:11 167:19 173:6 174:3 176:13 177:25 196:15 235:23
**officers** 36:23 71:7 135:24 142:20 164:8 167:17 170:5,6 171:7 172:1,9 172:21 173:22 174:11,19 175:10,25 176:2
**official** 1:7 142:1 165:16 165:17 243:20
**officials** 206:3 227:1
**ofo** 122:23 124:17 127:21 127:24
**oh** 21:6 22:25 34:8 36:8 95:5 209:9
**okay** 5:11,15 6:1,11 7:17 8:3 8:18 9:9,11,12 9:15,23 10:2 11:10,14,22 13:3,12,17 14:4,7,12,19 16:3,15,24 17:5,16,20 18:7,11,21 19:11,14,21 21:22 22:9,23 23:1,4,8,11 24:4,14,20 25:21 26:6,9 26:16,19 27:2 27:17 28:11,16 28:19 29:12,16 29:23 30:2 32:11,15,17,21 33:10,11,14,17 34:2,8,23 35:10,13 36:11 36:18,24 38:2 38:13 39:9,11 39:13,24 40:3 40:5 41:1,23 41:24 42:24 43:13 44:6,11 45:6,12 46:7 46:16,20 47:22 49:18,21 50:19 51:17,23 52:22 52:25 53:2,13 53:17,17,25 55:25 57:10 59:9 60:1,11 61:3,15,23 62:4,14 63:17 64:10,15 66:1 68:13 69:4 72:1,22 79:5 80:20 81:4,25 85:8,18 87:18 87:22 88:6,16 88:20 90:9,23 91:11 92:8,19 93:5,9,21,25 94:16 95:20 96:4 97:13 99:4,9 100:24 102:5,17,22 103:14 105:5 106:1,2,23 107:4,7,14 108:4 109:15 111:1,13,18 112:16,23 113:3,7,19 114:11,15,23 115:18 116:10 116:23 119:1,4 120:4 121:17 121:18 123:3 123:13 125:4 126:4,12,15,19 127:3,12 129:12,18,22 130:3,5 133:8 133:11 134:18 135:11 136:2,4 136:13,24 137:7 138:16 141:15 142:3 142:12,22 143:5,14,22 144:3,24 145:4 145:19,19 147:15 148:23 149:5,16,20,24 150:8,19 152:15,25 154:4,15 156:17 157:2 157:11 158:24 160:16 161:2,5 161:14 162:9 162:19 163:3 164:7 165:5,23 166:17 167:6 167:20 168:17

[okay - page]                                                               Page 40

169:9,17,22,24
170:9,19 171:4
171:12,25
172:20 173:15
173:17 175:5
181:10 182:3
182:17 183:24
184:9,14 185:2
185:3,21,25
186:8 187:23
190:25 191:17
192:4,6,8,19
192:24 193:1,3
193:16,23
194:3,20 195:8
195:11,18
196:1,13,18
198:5,9,24
200:9,16
201:10 202:8
202:21,25
203:13,18,23
204:24 205:10
206:22 207:8
207:17,20
208:4,11,22,24
209:3,10,17,24
210:4,25 211:5
211:8,20 212:9
213:12,15
214:2,11,16
215:14 216:5
216:20 217:3,8
217:18 235:15
240:20 241:14
242:5,17
**once**  23:18
36:15 67:1

68:18 107:23
109:23 116:12
140:8 211:2
237:24
**ones**  85:12
99:21 128:3
135:9 149:25
205:6
**ongoing**  47:20
**online**  75:25
177:12
**open**  21:6
68:18 73:13
77:8 78:8
85:11 95:25
96:3 113:16
122:25 123:11
157:4,6
**opened**  83:6
84:13
**opening**  5:24
209:24
**operations**
118:17 122:23
127:25
**opinion**  14:14
55:17 63:13
94:9 95:20
113:15 119:24
137:7,9 138:10
166:9 233:19
**opinions**  60:6
60:16
**opportunities**
63:10 101:14
101:16,18
102:25 103:8
107:10 155:3

156:6,9
**opportunity**
11:1 40:24
66:17 83:8,9
97:9 102:15
104:4 105:4
120:15 156:12
174:24,25
175:2 236:22
236:23
**opposing**  4:7
79:14
**option**  78:23
**order**  51:14
56:18 64:21
83:15 91:7
94:22 152:10
159:21,25
160:8 164:3
165:1,7 171:18
189:19 231:15
231:24 242:18
**ordered**  152:23
**orders**  48:11
51:13 86:8,14
87:12
**ordinary**  238:3
**organization**
218:14
**organizations**
120:10
**orient**  202:5
**originating**
195:23
**orleans**  199:3
199:13,16,20
200:22

**ortiz**  74:5,8
75:13 78:11
79:22 220:13
**outcome**
245:14
**outside**  35:25
47:6 132:16
232:13
**overheard**  6:13
**overlap**  17:6
25:19
**overlapping**
59:22
**oversight**  41:18
43:24,25
104:18,21
220:12 224:22
224:24 226:2
**oversize**  50:6
**oversized**
50:23
**own**  17:24 33:8
33:21 60:16
62:10 78:14,19
80:13,13 87:15
131:25 132:5
132:14 163:25
191:18 193:5
**owned**  49:15

| p |
|---|

**p**  4:1 119:20
**p.m.**  140:7
242:9,22
**p.o.**  2:13
**pace**  9:11
**page**  3:2,6
21:25 22:16

Andrew Arthur                                                    December 14, 2023

| | | | |
|---|---|---|---|
| 23:2,14 34:25 | **panelist** 35:23 | 186:1 190:12 | 142:23 146:4 |
| 35:7,8 37:14 | 35:25 | 190:16 198:6 | 147:14,16 |
| 39:7 51:19,20 | **paper** 48:19 | 198:16 199:13 | 159:2 162:25 |
| 51:24,24,25 | 50:21 | 200:18 201:22 | 190:14 209:24 |
| 52:3,3,6,8,9,10 | **paragraph** | 202:14 203:23 | 214:14 216:15 |
| 52:12,13,14,17 | 48:21 49:4,6 | 205:4 206:10 | 216:15,16 |
| 53:5,8 62:7,22 | 50:4 62:6,21 | 206:22 207:5 | **partial** 107:11 |
| 68:17 71:8,9 | 68:16,20,21 | 207:20 208:9 | 189:3 |
| 86:4 87:24 | 69:10,15 70:9 | 208:23,25 | **participate** |
| 113:4 128:4,17 | 70:24 71:9,10 | 209:4,18 | 239:19 |
| 141:4,12,23,25 | 71:12,21 72:11 | 211:17,18 | **participated** |
| 142:5 143:6,6 | 73:7,7,8,17 | 225:5,10 231:2 | 159:14 |
| 143:23 145:22 | 76:7 80:12 | 232:20 | **particular** |
| 145:23 146:5,7 | 81:20 84:10 | **paragraphs** | 71:18 73:1 |
| 148:10 157:21 | 86:1,4,11 | 87:25 143:23 | 74:4 76:13 |
| 192:7,24 193:1 | 87:20 88:6,7 | 201:22 211:1,6 | 89:6 120:2 |
| 195:13 198:7 | 90:24 94:2,7 | **parallel** 175:18 | 134:10 137:13 |
| 205:6 206:11 | 106:12,14,19 | 175:20 | 157:10 166:8 |
| 206:12,24 | 108:4,8 109:22 | **paraphrase** | 179:6 199:8 |
| 211:23 212:10 | 110:4 113:3,14 | 84:17,20 93:25 | 218:10 219:1 |
| 212:22 244:4,9 | 116:11 118:5 | 94:1 109:25 | 233:19 |
| **pages** 34:12 | 118:11 119:4 | 110:23 | **particularly** |
| 35:6,14 37:14 | 121:8,10 128:7 | **parol** 96:8 97:2 | 40:21 226:5,22 |
| 40:7,13 42:2 | 134:22 135:12 | 97:6,10 118:1 | 236:13 239:23 |
| 53:3,14 212:15 | 135:25 136:8 | 139:24 | **parties** 245:11 |
| 243:5 244:7 | 136:22 142:22 | **parole** 52:8 | 245:13 |
| 245:16 | 143:5,9,23 | 63:11,17,19,21 | **parts** 162:9,14 |
| **paid** 14:16,18 | 144:19 145:20 | 64:11 82:16,19 | **party** 49:16 |
| 25:21,25 26:2 | 145:23 146:4,6 | 82:20 97:9,19 | 188:5 |
| 26:3,6,20 27:7 | 148:10 154:19 | **paroled** 96:13 | **paso** 81:2 |
| 27:11 67:20,21 | 154:20,22 | **parolee** 205:20 | **passed** 41:4,6 |
| 214:12 | 157:21 158:1 | **part** 8:24 12:15 | 96:12 |
| **panel** 35:24 | 158:25 160:21 | 48:7,24 54:12 | **past** 56:25 |
| 36:4,5,16,21 | 162:23 163:4,9 | 54:13,14 64:23 | 61:22 70:1 |
| 37:17 39:8,11 | 166:11 179:15 | 67:20 75:25 | 97:8 103:18,25 |
| 39:15 40:9,15 | 180:6,21 181:1 | 91:18,22 95:4 | 125:3,5,9 |
| 49:12,13,13 | 181:8 182:9,18 | 95:6,10 134:23 | 166:24 171:7 |
| 72:9 | 182:22 185:9 | 134:24 135:2 | |

Andrew Arthur                                                    December 14, 2023

**pathways**
116:1 218:11
**patience** 21:12
129:4 145:21
192:13 195:1
**patrol** 74:5,7
74:18,25 79:4
107:25 108:16
110:3,15,16
111:8,20 112:6
112:7,11,19,23
112:25 114:10
122:14,22
127:21 218:10
220:13
**pause** 25:10
148:20 161:16
162:6 203:1
**pay** 91:17
119:22 214:16
214:19,22
**paying** 26:17
26:18 27:1,3,4
**peaks** 114:20
114:22 115:18
115:20,23
**pearl** 227:25
**pedantic** 230:4
**pedigree** 90:20
**penalties** 232:9
**pending** 6:7
10:11 94:23
96:8 162:21
**pennsylvania**
56:9,11,12
**penthouse**
228:8,9,11,13
228:25

**people** 19:4
56:16 75:8,10
76:21,25 79:20
80:20 83:5
90:14,15 93:17
95:4,15 98:17
99:1,3,5 104:8
104:9 125:24
137:11 139:9
139:14,25
145:1,6,10
147:24 157:8
177:7,10,11,14
184:8 190:1
205:11
**people's** 75:18
**perceived**
73:11 74:10
75:19 77:24
78:6 84:12
**percent** 26:13
96:16 107:6
138:4 190:18
194:16 220:14
220:14,15,15
**perception**
75:18 80:14
81:24 83:5
85:10 113:15
**perfect** 9:13
**perfectly** 133:5
140:21
**perform**
177:12 185:22
**performed**
164:8 199:5
201:5 222:8
236:1

**performs**
218:24
**period** 41:19
50:25 66:18
67:10 89:10
110:8,11 111:3
111:4 112:6
148:25 154:8
154:11 182:7
231:8 236:5,16
236:22
**periods** 103:23
154:13,15,25
156:3
**permits** 184:11
**permitted** 4:11
**persecution**
55:19 166:6,7
233:15,16,17
**persistently**
62:24 63:8
**person** 6:6
13:18 19:8
93:22 165:17
**personal** 40:24
66:20 78:15,19
161:17 162:5
**personally**
243:16
**pertinent** 179:4
**phase** 90:5
**phd** 32:15
**phenomena**
207:10
**phenomenon**
120:3
**phone** 79:17
80:5

**phrase** 88:10
88:16,18,19
98:5,7 132:19
132:20,20
151:24 191:1,5
202:1 212:17
**phrasing** 41:25
192:2 203:24
204:25
**physical** 11:14
65:12 66:3
**picture** 83:25
**pin** 142:6
**piso** 119:20,22
**pitch** 95:10
**place** 6:12
90:16,16
110:19 111:5
111:11,14
174:2 177:7
187:19 193:19
206:18 207:17
209:12,16
**placed** 87:6
134:6
**places** 53:19
55:3 112:15
199:4 201:6
204:24
**plainly** 180:9
234:5
**plaintiff** 190:3
214:22
**plaintiffs** 1:5
2:2 13:13
18:22 26:17
27:1 216:3,6

**plan** 84:2
**planning**
    217:14
**play** 187:3,6,7
    189:10,18
**playing** 187:10
    189:20
**please** 6:3 7:3,3
    7:10,15,25 8:4
    8:8,16,21 9:1,3
    9:4,25 10:5,12
    10:16,20 14:13
    15:18 16:7
    17:22 20:3
    26:4 34:5 36:3
    42:16 44:1,7
    44:21 45:1
    46:16 47:11,14
    47:22,24 49:7
    51:11 52:23
    55:8 59:7 62:7
    68:18 69:17
    75:22 79:2,18
    79:20 81:12
    82:5,7 85:15
    85:25 86:13
    94:3,6 95:3
    99:9,11,11
    106:2,20
    108:24 109:23
    111:2,5 116:13
    121:3,9,9
    123:4,23 124:6
    125:9,21
    126:24 127:13
    127:16,17,23
    129:8,13 133:2
    133:21 134:9

135:3 139:7
141:5,19
142:15 145:8
145:20 152:1
156:1 157:21
158:6,19 160:4
162:3 163:5,6
163:25 164:20
165:9 166:4
168:14 170:14
173:20 174:16
182:9 185:10
185:18 186:12
187:20,24
188:12,15
190:12 191:12
192:8,11,25
194:25 197:1
200:19 201:4
202:18 203:1
203:19,21
204:3,16
206:11 207:9
211:2 242:19
244:3,7,8
**plural** 82:1
**plus** 39:7,8,10
    39:10,14,15
    40:8,8,14,15
    42:2,3 82:16
    82:19,20 97:22
    100:2 143:24
    143:25
**plyler** 17:23
    205:23 210:9
    210:22
**point** 7:18 9:23
    10:24 14:4

23:20,21 25:1
56:24 74:8
95:23 96:14
103:3 108:5
109:4 148:24
159:11 186:4
191:9 211:19
221:5 230:17
**points** 118:15
    123:2,3 125:19
    163:14 197:4
**police** 178:2
**policies** 12:19
    28:14 53:7
    73:11,22 75:11
    76:25 77:6
    78:6 80:15
    81:25 82:1,6
    82:14,25 83:4
    83:14,20 84:12
    85:9 89:11
    107:14,16,21
    110:1,2 111:10
    111:24 112:13
    117:25 225:13
    225:21
**policy** 12:16
    27:8 82:3,10
    82:15 86:9
    88:1,21 90:2
    90:25 91:13
    225:18 226:12
    226:14 239:6
**political** 49:16
    55:16 99:14
    110:25 112:24
    166:9 233:19

**population**
    138:8,9
**pornographic**
    228:12,14
**pornography**
    229:2
**port** 117:19
**portion** 21:24
    217:1
**portrayed**
    117:15
**ports** 117:7
**posed** 159:19
**position** 146:9
    190:6
**positive** 142:17
    148:15 171:8,9
    171:21 172:3
    172:10 174:20
    175:9,9,10
    176:1,3
**possession**
    221:13
**possibility**
    159:19 173:9
**possible** 45:17
    72:16 98:13
    147:24 159:17
    173:16
**post** 191:7,13
    191:18 196:23
**posts** 57:21,23
    57:24 151:8
**potentially**
    92:6 183:20
**potter** 228:21
    228:24,25

Andrew Arthur                                    December 14, 2023

**power** 68:24 120:18 131:8 132:18,23

**practical** 93:23 105:12

**practice** 234:1 234:2

**practices** 189:23 190:4

**practitioners** 155:15

**precedent** 171:14 193:22

**precisely** 207:24 210:1

**predated** 213:25

**predictable** 91:1,11 92:9 234:22 235:17 235:24

**predictably** 235:2

**preexisted** 228:24

**preexisting** 180:18

**preface** 230:6

**prefaced** 180:16

**prefatory** 227:12

**premise** 91:2

**preparation** 12:1 16:15 24:2

**prepare** 16:25 17:7,14,17

18:19 19:2,17 24:5

**prepared** 18:23 19:19 24:2

**presence** 84:18 198:19 205:11 210:7

**present** 49:12 50:21 147:20 155:2 156:5 167:3 170:14 175:3 176:21 210:21 245:11

**presentation** 70:15

**presented** 48:18,20 157:6 157:7

**presenting** 78:23

**presidency** 120:8

**president** 48:10 83:23,25 84:6 86:6 87:9 89:16,24 95:12 95:14 100:10 100:10 110:16 131:24 132:14 161:17

**presidential** 51:14

**press** 19:8 82:13 125:24

**pressing** 133:22

**presumably** 219:2,14,15

**pretend** 79:20

**pretty** 12:22 25:15 26:12 55:15 126:1 234:2 238:23

**prevent** 11:19 66:4 159:9 164:24 165:13 189:19

**previous** 51:6,6 83:1 103:23

**previously** 46:22,24 69:21

**pride** 239:3

**primarily** 114:3

**primary** 71:6 80:14

**printed** 33:20

**prior** 65:4 72:10 83:14 135:8 163:2 170:21 188:7,8 217:7 245:8

**priorities** 84:16

**priority** 85:5

**prison** 56:12

**privilege** 6:9

**pro** 161:9

**probably** 24:17 25:15 36:13 72:5 123:5 147:13 152:25 163:22 176:6 184:12 199:9 209:20 223:1,3

**probe** 166:22

**problem** 33:7 89:3,4 123:8

**procedural** 175:3

**procedure** 12:20 180:13

**proceed** 190:7 190:8

**proceeding** 152:4 166:21 166:25 170:15 174:22,23 245:9,9

**proceedings** 142:21 162:22 166:14,25 179:10 245:18

**process** 18:5 19:23 52:1 70:2 71:16 97:24 98:4 107:25 131:6 141:21 142:16 164:3 166:20 170:8,10,11 174:7 175:4,13 175:15,20,21 176:17,23 177:2,4 179:4 184:5 211:12 237:10

**processes** 151:18

**processing** 107:9 108:1 109:1

**proclamation** 51:14

**produce**
219:23
**produced**
122:16,17
216:25 217:1
**production**
15:24
**program** 38:25
42:5 46:9
82:12 118:1
139:10,11
176:14 177:15
226:14
**programs** 38:5
38:19 39:20
40:17 45:21
**prolonged**
154:8
**promise** 23:22
**prompt** 244:5
**pronouncem...**
198:20
**pronouns**
173:13
**proper** 88:15
117:20,21
232:9,9
**proposed** 144:9
145:25 149:4
207:18 214:4
216:14,19
217:4
**protect** 159:3,8
187:4,12,13
**protecting**
159:16
**protection**
69:11,13 82:8

90:4 144:17
162:5 164:9,11
164:15,22
168:1
**protocol**
107:22 117:12
**protocols** 82:9
90:4
**provide** 125:15
178:2 205:24
**provided** 23:16
40:1 51:1
120:13 122:21
122:25 125:18
126:14 127:4
203:12,14
219:24
**provides**
120:14 206:16
**provision**
139:24 149:3
165:20
**prwora** 40:22
40:25
**public** 27:6
39:22 41:22
42:11 43:8
44:18 61:13
125:16 146:21
146:24 148:8
182:14 195:12
197:4 205:17
216:17 226:6
226:25 243:12
243:21 245:6
245:24
**publication**
48:12,15,16

49:3,9 50:5
51:7,8 60:10
61:16,17 228:8
**publications**
126:6,25 127:9
127:10
**publicized**
207:7
**publicly** 116:16
173:6
**published**
17:23 50:7,13
50:14,16,18
51:8,8 60:8,8,9
141:22 239:7
**publishers**
61:19
**publishes**
114:10 118:14
**pull** 76:25 77:2
77:19,21 78:7
85:19 87:23
98:6,10,14,16
98:22,25 99:2
99:4,7 101:17
101:21 102:3
102:12,16,20
102:22,24
103:9,11,17
104:25 105:14
109:17,19
121:13,17,22
123:1 136:14
136:18 137:10
138:10,19
139:8,14 140:1
140:3 143:25
143:25 144:3,4

144:12,18,25
145:3 194:22
207:3 218:4,17
218:21 230:19
**pulled** 83:25
**pulling** 101:23
102:11
**purely** 221:12
**purposes** 20:11
22:15 39:9
243:18
**purse** 132:18
132:23
**push** 98:10,14
98:19,22,25
99:2,4,8,10,12
99:24 100:2,15
100:18,25
101:2,15,21
102:3,19
103:17 104:25
105:14 109:17
136:13 218:3
218:16,21
232:12
**pushing** 101:22
102:10
**put** 20:22
22:13 59:13
71:21 76:6
77:2 101:5
119:1 123:15
124:22 126:21
127:7 133:8
157:11 169:24
173:15 183:7
190:6 192:11
194:25

Andrew Arthur                                                    December 14, 2023

[putting - read]                                                        Page 46

| | | | |
|---|---|---|---|
| **putting** 20:10 108:8 | 189:5 193:3,16 196:22 201:2 | **quote** 58:24,24 62:23 63:8 | **rates** 54:9 55:1 56:23 58:19 |

**q**

**qualifying** 92:23

**quantified** 210:9

**quantify** 207:24 210:1,5 210:16,18

**quarter** 59:10 182:8 194:16

**question** 6:7 8:4,5,12,13,15 8:16,20 9:4 10:11,12 16:20 38:14 39:10 40:3 44:25 46:25 53:13 63:20 65:24 66:13,25 67:7 72:3,16 73:18 78:18 79:2,10 79:18 86:18,19 86:20 90:17 94:23 96:24 97:5,5,6,20 101:19 111:2 113:8,12 136:14 138:22 138:24 144:10 149:17 150:5 151:12 155:20 156:1,2 157:1 158:16 160:14 173:18,19 174:9 181:25

214:6,7 215:10 227:20 230:25 233:7,11,12 239:6 240:15 240:22

**questioning** 45:3 231:6 232:24 237:14

**questions** 5:14 6:16 7:5 8:9 10:16,20 11:24 22:16 23:21 33:17 47:2 62:15 63:5 79:8 97:19 142:12 149:6 156:14 157:1 157:23 163:7 166:22 167:11 179:3 202:6 208:5 217:13 217:15,20 232:22 240:6 240:20 241:5 242:6,13

**quick** 20:3 59:19 188:22

**quickly** 97:24 98:13 146:20 236:2

**quiet** 6:12

**quite** 85:2 94:19 102:1,1 107:23 139:11 210:17 237:19

107:8,8,11 108:5 110:5 121:12,13,14 121:17,22 143:25 144:3,4 144:12,13,18 146:11 160:22 200:20 228:24

**quotes** 107:7 143:25

**quoting** 148:17

**r**

**r** 4:1 62:1 165:20,20 175:25 221:6 232:4

**race** 55:16 166:7 233:18

**railroad** 239:24

**raised** 156:14 226:24

**ramifications** 29:6

**range** 24:15 222:20

**ranges** 58:18 59:1

**rate** 54:1,5,18 56:15 103:2 179:22,25 180:9 181:12 181:17 182:11 183:2,14 191:8

59:1,6 184:16 191:3 195:22 221:23

**rather** 16:19 71:3 120:3 207:6 229:1

**ratings** 58:10

**reach** 114:12 124:22 190:4

**reached** 49:18 61:17 113:23 115:3

**reaches** 95:3

**reaching** 236:6

**read** 16:21 57:23 58:1,4 58:11,15 59:4 60:22 63:3 69:2 73:8,14 75:14,24,25 76:1,3,4,11,23 77:9 86:3,11 87:25 88:4,8 90:23 91:9 113:13,17 116:21 118:7 121:16 122:1 128:13 134:24 142:23 143:8 156:1,2 161:5 161:6 182:10 182:15 188:4 198:22 200:25 208:2 225:9 233:10,12 242:15 243:3

Andrew Arthur                                          December 14, 2023

[read - reflected]                                                Page 47

244:3 246:9

**reading** 58:2
60:19 77:8
146:3 151:3
195:13

**reads** 146:2
200:20

**ready** 163:10

**real** 123:8
181:20 223:7,8

**realize** 9:23
53:9

**realized** 157:8
202:7

**really** 12:21
14:11 18:1
36:12 57:16,25
92:17 103:1,8
117:8 125:25
126:1,8 143:19
194:12 212:21
220:17 223:2
239:21

**realtime**
220:23,24,25

**reason** 11:18
56:8 91:22
111:6 112:4
155:8,11
171:19 172:20
172:23 173:7
180:25 216:16
244:9 246:11

**reasons** 147:19
181:16

**reauthorization**
69:11,13

**recall** 87:15
127:15 224:10
229:24 231:6,7
232:24 237:17

**recalling**
236:10

**receipt** 246:18

**receive** 29:9,12
31:8

**received** 20:10
26:9,15 27:12
31:3 32:13
142:17

**receiving** 56:14

**recent** 57:17
100:25 120:3
121:19 232:1

**recently** 74:17
124:12

**recess** 59:15
106:8 141:2
188:17 217:23

**recognized**
68:24 105:15
225:11

**recollection**
15:11 16:10
72:17 87:2
220:2 222:9
230:17

**recommenda...**
110:23

**recommenda...**
110:21

**record** 4:4,22
5:21 7:1 15:23
17:25 20:11,17
23:12 43:9

44:18,23 48:22
59:10,17 65:25
79:25 88:25
92:2 106:10
123:24 129:24
130:16 141:24
148:15 155:12
157:9 161:5,6
166:22 186:9
186:23 187:4
187:12,13,14
187:21 188:14
188:16,19
189:6,7,13,14
189:19 195:14
215:9 217:11
217:13,18
231:14 243:6

**recordable**
187:1

**recorded** 188:2
189:12

**recording** 5:7
5:12 186:25
187:7,7,22,24
189:3

**records** 221:7
223:24

**red** 84:1

**reduced** 91:5
105:19

**reduction**
62:25

**reentry** 232:10

**refer** 12:4 39:7
76:17 125:21
127:5 163:17
167:19 180:17

181:8 182:22
225:5

**reference** 33:8
72:2 74:4
75:23 76:9
81:19 83:23
128:25 136:22
163:1 218:25

**referenced**
119:11 127:24
148:1 180:23
191:7 207:1
218:13 224:1
246:6

**referencing**
72:25 195:10

**referrals** 186:4

**referred** 61:21
84:16 90:3
161:16 176:20
181:3,5 184:6
201:17,19

**referring** 71:10
76:18 107:20
114:2 135:2
142:5 161:11
161:20 177:5
191:5 202:23
215:19

**refers** 88:13

**refine** 238:10

**reflect** 186:16
194:18

**reflected** 108:3
108:16,23
109:12 191:6
196:3

Andrew Arthur

| | | | |
|---|---|---|---|
| **reflects** 111:6 189:17 201:16 | 95:8,17 116:16 117:8 118:18 | 14:24 16:7,8,8 16:13 18:1,20 | **removals** 87:6 **removed** |
| **reform** 104:21 224:24 | 121:20,23,25 124:13 139:24 | 24:7,8,11,16 34:13,20 36:3 | 152:23 159:25 160:8 164:24 |
| **refresh** 33:15 87:2 | 184:12 211:11 231:24,25 | 36:11,12 37:20 45:4 47:15 | 165:7 **reno** 112:19 |
| **regarding** 198:21 | **releases** 116:17 122:14 123:10 | 48:22,23 60:19 60:22,25 61:5 | **repeat** 8:12,13 8:25 38:14 |
| **regardless** 182:11 | 123:11 127:20 127:20 | 61:23 71:24 72:20,23,24 | 58:21 99:19 128:3 152:17 |
| **regrettably** 131:2 | **releasing** 109:2 146:19 | 83:24 84:3 85:4 87:11 | 160:3 174:16 208:20 |
| **regular** 104:15 | **relevant** 239:7 | 93:1 100:3 | **rephrase** 40:3 |
| **regularly** 81:10 | **reliable** 219:3,8 | 108:8 112:13 | **report** 3:9 12:2 |
| **regulation** 64:8 148:18 164:15 | **relied** 111:12 123:10 197:9 | 113:1 126:4,5 127:17 134:10 | 19:18 22:13 23:2,7,15,24 |
| 165:19 169:12 169:24 | **relief** 166:5 167:25 169:7 | 138:17,21 144:7 147:10 | 24:1,6,9,12 25:14 26:1 |
| **regulations** 169:13 | 169:10 | 151:3,4,7,10 154:23 178:18 | 27:19 32:22,25 34:3 35:1 40:7 |
| **regulatory** 168:24 | **relies** 219:4 **religion** 55:16 | 197:10 209:15 213:6,9 216:21 | 40:13 42:2,24 48:9 51:18,19 |
| **relate** 17:3 47:3 | 166:8 233:18 | 216:23,24 229:16,18,20 | 53:18 59:8 62:5,9,13,16 |
| **related** 15:24 27:16 41:21 | **relocate** 100:12 **relocation** | **remind** 35:10 **remote** 7:10 | 68:9,17 72:12 81:5,16 87:19 |
| 86:2,8 98:10 159:18 245:12 | 100:19,20 **rely** 20:19 | 22:5 **remotely** 57:16 | 87:20 94:11 103:14,15,19 |
| **relationship** 121:6,7 | 23:14 132:24 133:1 218:21 | **removal** 52:5 91:5 94:9 96:6 | 105:6,22,23 119:2 123:4,19 |
| **relatives** 146:23 | **relying** 132:3 **remain** 82:9 | 96:18 142:21 152:10 162:21 | 124:7,21 126:1 131:14,19 |
| **release** 64:2 82:13,25 83:8 | 91:22,24 92:6 230:18,22,23 | 162:22 164:5 164:11,19,21 | 132:2,17 135:4 141:4 168:13 |
| 91:6 107:21 108:2 129:10 | **remainder** 208:9 | 165:1,2,3 167:22 170:15 | 178:3 182:21 185:19 196:20 |
| 138:13 231:18 | **remained** 115:23 116:8 | 170:23 171:5 171:18 | 197:8 198:3 200:21 201:10 |
| **released** 80:24 91:15 92:4 | **remember** 13:1 13:4,5,7 14:10 | | |

202:24 204:25
209:1 211:9,10
211:21,22
212:12,13,13
212:14,18
219:24 225:6
231:3 232:21
241:11,15,18
241:25 242:3
**reported**
116:19
**reporter**  4:9,11
4:14,19 6:16
7:12,22 8:6
9:13 10:25
42:21 155:25
156:2 185:4
233:10,12
240:13,17
242:17 245:4
**reporting**
119:19 122:25
**reports**  55:23
**representation**
20:19 23:15
**representatives**
95:24
**reputation**
160:22 161:7
161:23,25
**request**  16:2
47:22 48:1
130:19 131:24
188:12 205:25
207:7 210:22
**requests**  15:23
124:14 221:11

**require**  92:17
171:18 178:2
**required**  76:9
122:16 132:2
205:24 219:20
219:21
**requirement**
179:20 219:16
231:4,5 237:7
**requires**
131:13 184:13
242:3
**research**  80:13
80:14 81:5,15
**reserved**
242:21
**resettled**  227:3
**resident**  12:16
27:8 205:25
**resolution**
231:4
**resolve**  152:7
153:20 236:18
**resource**  63:17
63:19 64:11,13
**resources**
62:24 63:9
64:10
**respect**  36:23
40:21 54:12
57:7 60:20
63:10 66:16
67:11 83:8
87:3 89:23
93:8 95:13,15
97:3 100:2,18
101:7,17 105:1
107:19 108:14

109:1,11,18
111:11,15
117:24,24
118:13,25
119:21 120:2
120:23 121:3,5
122:10,22,23
123:9 124:13
124:16 125:11
125:24 129:9
129:10 131:12
132:24 133:15
135:6,8,9
137:13,19
138:2 139:21
155:18 162:12
165:21 168:3,4
168:23 174:2
179:5,25 180:3
182:1 184:19
196:22 197:12
200:5 204:17
205:21 207:14
216:17 221:21
222:25 223:16
225:17,20
226:5,6,22
227:2,2 232:4
234:6 235:22
235:25 236:13
238:18 241:21
**respond**  217:4
**respondent**
156:21 179:13
181:25
**respondents**
54:14,21

**responding**
216:18
**responds**  94:10
**response**  101:4
213:11,21
216:13 224:4
226:23
**responses**  7:2
**responsibilities**
55:21 69:20
71:1 214:14
**responsibility**
40:24
**responsive**
88:1,20,23
90:25
**rest**  74:24
85:14 208:23
**restrictions**
101:5 134:4,5
134:7,15
**result**  235:2,17
**resulting**  73:10
84:11
**results**  175:25
219:2
**resum**  30:2
34:14,17
**retained**  71:7
**retired**  27:13
36:8
**return**  91:20
244:5 246:13
246:17
**returning**
165:14
**reunification**
103:9

Andrew Arthur                                                        December 14, 2023

**[review - saw]**                                                        Page 50

| | | | |
|---|---|---|---|
| **review** 3:10,12 | 116:6,7 122:4 | **robust** 173:2 | **rulemaking** |
| 10:24 43:9 | 126:5 127:16 | 218:23,24 | 144:9 149:4 |
| 60:10 69:23 | 128:6,17 | **rodney** 106:21 | 214:5 216:15 |
| 153:19 173:1,4 | 130:11,14 | **role** 50:6,23 | 216:19 217:5 |
| 173:8 174:2,8 | 134:20 135:14 | 224:23,25 | **rules** 4:24 5:5,9 |
| 175:1 191:21 | 135:21 136:10 | 226:2 | 11:11,24 |
| 246:7 | 140:17 141:13 | **rolled** 235:15 | **rulings** 56:22 |
| **reviewed** 17:9 | 143:6 144:5 | 235:16 | **running** 125:3 |
| 19:16 23:5,5 | 145:17 146:3,7 | **rollout** 139:1 | 205:7 222:22 |
| 75:21 167:18 | 148:21 149:1 | **room** 4:10 | 223:1 |
| **reviewing** 17:3 | 149:10,22 | 33:19 79:21 | **runs** 45:16 |
| 172:24 | 150:9,20,23 | 189:10 | **russian** 28:12 |
| **rewrite** 85:3 | 153:2,3 165:24 | **root** 76:19 | 28:13,15 |
| **rides** 102:5 | 166:20 172:18 | **rouge** 2:5 | **rustling** 42:15 |
| **right** 6:22 | 175:7 178:12 | **rough** 24:23 | 42:16,22 |
| 11:22 12:9 | 178:17,20 | 44:4 223:2 | **ryan** 2:9 189:9 |
| 19:24,25 23:6 | 179:15 183:4,7 | **round** 125:17 | |
| 25:18 26:24 | 183:16 184:20 | 125:17 | **s** |
| 27:12,15 43:1 | 185:16 191:9 | **roundhouse** | |
| 44:12 47:9 | 191:15 192:2 | 239:23,24 | **s** 4:1 81:13 |
| 48:22 49:19 | 198:17,22 | **rounding** 166:2 | 119:20 232:4 |
| 51:21 52:1,10 | 199:14 201:21 | **routinely** 157:2 | **sabraw** 232:4 |
| 52:15 57:12,21 | 202:6,9 204:22 | **row** 157:19 | **safeguarding** |
| 62:17 65:15 | 207:18 208:12 | **rule** 15:8 17:23 | 236:14 |
| 66:6 67:5,17 | 209:1 211:23 | 86:17,24 116:1 | **safeguards** |
| 67:23 70:12,24 | 212:2,5,10,12 | 139:23 141:20 | 175:3 |
| 78:11 79:11,21 | 212:22 213:16 | 141:21 143:12 | **sales** 95:10 |
| 81:22 82:1,3 | 229:24 234:16 | 145:25 148:3 | **salvador** 74:21 |
| 83:16 85:2 | 235:12 | 149:4 155:6 | 100:4 |
| 87:16 90:24 | **rights** 210:11 | 160:19 168:16 | **sample** 138:25 |
| 91:24 92:24 | **rio** 81:2 | 170:1,2 180:13 | **san** 104:6,7,10 |
| 97:1 100:22 | **rise** 100:8 | 180:14 193:19 | **sarah** 2:10 |
| 101:10 102:11 | **risk** 159:20 | 196:16 199:24 | **sat** 89:8 |
| 102:20 104:2 | 177:22 | 200:2,5,13 | **saw** 4:16 5:22 |
| 106:16 107:12 | **rob** 216:24 | 201:7 218:11 | 53:18 74:20,23 |
| 107:18 110:6 | **robert** 214:25 | 232:12 235:25 | 75:8 84:5 |
| 110:11,18 | 215:1,3,11 | 236:6 | 89:16,23,25 |
| 114:3 115:10 | 216:2 | | 94:21 96:10,14 |
| | | | 104:11,21 |

| | | | |
|---|---|---|---|
| 133:24 196:4 | 31:1,6,12,13 | 182:2 185:5 | 65:24 66:7 |
| **saying**   20:21 | 31:14 32:12 | 186:10,20 | 79:24 86:22 |
| 24:21,22 36:19 | 145:14 207:14 | 187:9,18,23 | 106:21 107:15 |
| 41:15 63:18 | **schools**   147:1 | 188:3,8,18 | 108:4,14 109:9 |
| 64:11,12 77:4 | 207:16 210:14 | 189:16,17,22 | 110:13 116:20 |
| 77:5 82:1 86:2 | 210:24 | 190:1,8,11 | 116:23,25 |
| 94:8 107:20 | **schultz**   2:9 3:3 | 192:15,20,23 | 123:22 124:1 |
| 111:4 112:3 | 4:4,7,15,21 5:7 | 193:15 195:7 | 140:11 141:24 |
| 114:7 117:22 | 5:11,15,20 | 196:9 197:3 | 142:8 186:12 |
| 118:6 130:21 | 9:10,14 10:21 | 200:15 204:15 | 186:20 187:9 |
| 134:2 136:16 | 12:9 15:13,15 | 208:17 212:16 | 192:20 217:14 |
| 137:8,8 139:9 | 16:3,5 17:2 | 212:21,25 | 242:6,12 246:1 |
| 139:13 183:1,2 | 20:9,20 21:9 | 213:1 217:12 | **scott's**   107:2 |
| 183:6 188:1 | 21:19,22 22:8 | 217:19 218:3 | 109:7,15 |
| 195:3 199:10 | 23:17 25:11 | 219:6 220:21 | 111:12 119:11 |
| 210:16 | 33:23 34:1 | 221:6 222:12 | **scratch**   13:6 |
| **says**   21:20 | 36:17 42:13,23 | 223:6,11,22 | **screen**   20:18 |
| 34:10,15,18 | 43:12,20 44:20 | 224:1,8,11,17 | 21:13 192:17 |
| 35:1 50:7 | 44:24 46:6,15 | 225:7,14,22 | **screened** |
| 52:14 53:6 | 47:5 48:2,4 | 226:16 227:18 | 176:12 177:16 |
| 58:9 68:20 | 59:13,16,18 | 228:3,15,22 | 177:18 |
| 86:6 88:1 | 62:8,14,19,20 | 229:7,13 230:2 | **screening** |
| 90:25 91:1 | 65:11,21 66:10 | 230:8,14 231:2 | 164:2 176:15 |
| 113:18 116:15 | 67:15 68:2 | 231:10 232:20 | 177:1,4,7 |
| 132:3 133:3 | 73:25 77:22 | 233:4,8 234:17 | **scroll**   35:3,16 |
| 136:5 141:10 | 78:9,17,24 | 235:5,18 236:4 | 192:25 193:10 |
| 142:15,25 | 79:1,10,23 | 236:7,19 | **scrolling**   21:13 |
| 144:12,22 | 80:1,6,10,11 | 237:22 238:5 | **seal**   243:20 |
| 146:7 147:3 | 86:18 87:13 | 238:15 239:22 | **second**   9:11 |
| 161:6,8 179:19 | 94:15 96:24 | 240:3,5,15,19 | 35:8 36:14 |
| 182:11 190:16 | 97:4 106:1,9 | 242:5,9,19 | 106:13,18 |
| 202:1 203:4,24 | 123:22 124:1,4 | **science**   234:24 | 114:17 126:17 |
| 206:20 211:25 | 130:4 134:1 | **scope**   132:16 | 135:20,25 |
| **scale**   139:22 | 136:23 139:18 | **scott**   2:3 4:8,8 | 144:3,12,18 |
| **schedule**   113:2 | 140:11,20,23 | 4:21 13:19,20 | 146:6 152:13 |
| 239:12 | 141:3 142:8,11 | 20:9 21:15 | 179:19 185:11 |
| **school**   30:4,6 | 143:13 155:25 | 22:3 33:23 | 185:14 189:21 |
| 30:13,16,19 | 156:16 158:14 | 48:3 62:8,19 | 198:3 203:1 |

Andrew Arthur                                                December 14, 2023

[second - seriously]                                                Page 52

| | | | |
|---|---|---|---|
| 206:23,24 | 49:7,8 50:4,10 | **seeks** 117:18 | 134:24 135:3 |
| 209:24 | 52:5,21 53:8 | **seem** 88:25 | 135:20,25 |
| **seconds** 160:3 | 63:17 74:16 | 114:23 | 143:2 144:21 |
| **secretary** 84:15 | 75:5 76:21 | **seemed** 115:13 | 146:6,8,11 |
| 84:21 95:23 | 85:23 87:10 | **seems** 90:10,14 | 147:2 160:4 |
| 96:19,21 209:4 | 88:2 89:18 | 102:9 130:21 | 161:4,6,8,11 |
| 209:6 | 91:20 94:2 | **seen** 57:17,17 | 161:14,20 |
| **section** 2:12 | 97:9 100:4,11 | 74:14 75:4,21 | 163:2 182:10 |
| 56:18 57:8 | 100:12 105:4 | 75:23 77:7,10 | 185:11,15 |
| 69:18 70:3,11 | 106:7 108:11 | 89:10 96:15 | 190:15,16 |
| 70:18,19,22,25 | 113:24 118:8 | 105:12 114:13 | 198:18 200:19 |
| 71:4 117:12,13 | 119:6 127:1 | 116:2 235:21 | 200:20 203:3 |
| 142:18 159:23 | 128:11 129:2 | **semi** 131:14 | 206:13,24 |
| 160:7,12,17,20 | 136:6 141:11 | **senate** 72:8 | 208:7,12 |
| 164:14,21 | 141:14 143:3 | 109:10 110:14 | 209:25 225:9 |
| 168:3,24 171:3 | 144:1 146:12 | **senator** 72:19 | 229:12 230:6 |
| 171:15 177:19 | 146:14 147:3,4 | 207:7 210:22 | **sentences** 86:5 |
| 178:5 180:15 | 148:17,19 | **send** 15:18 | 88:7 161:13,22 |
| 180:16 181:19 | 160:24 166:15 | 47:23 60:7 | **separate** 25:16 |
| 183:21 | 192:16,20 | 119:16 126:23 | 114:8,18 |
| **security** 48:11 | 195:5,24 197:6 | 130:19 131:14 | 115:19 |
| 50:7,24 52:19 | 198:14 200:23 | 131:19 145:13 | **separately** |
| 84:22 103:1 | 202:1,25 203:8 | **sense** 85:24 | 25:25 |
| 104:17,20 | 205:8 206:19 | 175:18 200:10 | **separation** |
| 159:3,7,8,15 | 206:20 207:25 | **sent** 20:13 22:3 | 231:25 |
| 159:16,20 | 209:9,12 210:2 | 58:13 59:20 | **september** |
| 172:16 177:22 | 211:5 218:25 | 60:9,10 109:9 | 41:10 84:15,22 |
| 178:1 209:5,7 | 229:2 233:5 | 110:13 119:14 | 84:24 104:5 |
| 218:6,21 | 235:1 | 131:19 206:2 | 109:10 110:14 |
| 224:25 225:18 | **seeing** 21:24 | 246:14 | 111:8 114:13 |
| 236:14 237:11 | 52:22 | **sentence** 58:15 | 119:11 121:24 |
| **see** 15:6 20:4 | **seek** 56:18 | 90:23 91:1 | 135:21,23 |
| 21:4,6,14,15 | **seeking** 117:16 | 92:8 106:13 | 136:6 180:20 |
| 21:17,19,25 | 128:9,23 129:6 | 107:17 113:13 | 185:12 |
| 22:6,10,17,20 | 130:15,17,22 | 113:14 116:12 | **serially** 104:17 |
| 22:23,24 23:19 | 130:23 131:3 | 121:11 128:8 | **series** 6:16 |
| 30:2 32:22 | 134:25 177:20 | 128:13 129:6 | **seriously** 112:8 |
| 33:9,23 35:4 | 177:24 179:6 | 130:11 134:23 | |

| | | | |
|---|---|---|---|
| **serve** 112:2 | **shift** 224:7 | **significant** | 141:13 149:11 |
| **served** 35:23 | **shocking** 110:5 | 89:14 138:3 | 184:24 188:4 |
| 41:10 112:17 | 112:16,17 | 140:1,3 221:19 | 188:12 218:2 |
| 148:15 222:16 | **short** 91:7 | 236:20 | **sitting** 189:9 |
| **service** 36:22 | 92:23 236:21 | **significantly** | 190:1 |
| **services** 38:6 | **shorthand** | 234:6 | **situation** 128:9 |
| 38:19 40:17 | 120:6 | **similar** 9:17 | 128:23 129:7,8 |
| 45:22 158:8,21 | **shortly** 89:24 | 34:16 138:24 | 129:9 131:4 |
| 159:13 | **show** 22:15 | 155:2 156:5,8 | 133:5 135:1 |
| **set** 6:1 14:15 | 34:24 44:3 | 176:7 201:2 | 157:7 |
| 26:3,4,22 | 75:18 124:21 | 203:24 237:5 | **six** 52:3,6 |
| 33:24 45:12 | 125:6 127:9,11 | **similarities** | 199:18,20,21 |
| 63:15 130:18 | 157:15 161:22 | 237:4 | **skills** 237:17 |
| 149:13 171:2 | 181:10 192:12 | **similarly** | **skip** 135:12 |
| 184:10 188:20 | 192:25 193:8 | 203:25 | 146:5 168:18 |
| 196:2,4 198:14 | 222:3 241:18 | **simply** 116:19 | 211:17,17 |
| **sets** 131:22 | **showed** 35:7 | 127:5 188:11 | **skyrocketed** |
| 142:16 184:5 | 213:4 222:7 | 201:15 224:20 | 143:2,15 |
| 238:9 | **showing** | 234:6 | **slight** 115:25 |
| **settlement** | 233:23 | **single** 26:1,3 | **slightly** 179:18 |
| 64:19 231:9 | **shows** 105:20 | 231:12 | 183:10 185:7 |
| **seven** 52:8 | 118:20 | **sir** 6:9,10,14,19 | **slip** 163:24 |
| 150:17,18,19 | **shut** 101:3,4 | 6:23 8:2 17:15 | **slowly** 35:3,16 |
| 242:10 | 235:9 | 18:24 19:20 | **small** 31:22 |
| **several** 149:21 | **shutting** | 22:22 23:3,7 | 116:2 138:7,9 |
| 229:25 238:22 | 134:13 | 24:7 25:3,23 | 138:25 139:11 |
| **sewer** 25:5 | **side** 81:8 | 27:23 28:6 | 238:23 |
| **shannon** 56:9 | 119:13 120:21 | 29:14,18 30:1 | **smooth** 54:17 |
| **share** 35:2 | **sign** 214:8 | 30:11,14,17 | **smuggler** 91:17 |
| 59:23 | 242:16 246:12 | 31:7,10,15 | 91:19 |
| **sharing** 21:13 | **signature** | 32:16 35:9,12 | **smugglers** |
| **sharp** 166:12 | 211:25 212:1,2 | 43:2 44:5 | 95:11,15 |
| 189:23 190:4 | 242:21 245:23 | 45:11 52:16 | 120:25 121:4 |
| **sheet** 243:7 | **signed** 16:14 | 53:22 57:13,22 | **snap** 146:21 |
| 244:1,5 246:11 | 24:10 26:11 | 63:16 67:18 | 147:23 |
| **shell** 116:20 | 165:13 178:25 | 69:12 70:6 | **social** 166:9 |
| 117:3,4,23 | 212:6,7,8 | 80:18 83:17 | 179:7 233:19 |
| | 213:18 246:20 | 102:21 136:22 | |

| | | | |
|---|---|---|---|
| **societies** 226:5 | 196:2 198:8,9 | **space** 64:3,5,12 | 77:11 97:7 |
| **society** 28:15 | 205:5 206:15 | 66:3,22 67:2 | 99:22 149:2 |
| **softer** 228:7 | 208:6,18 215:6 | 129:20 131:12 | 159:8 175:22 |
| **solicit** 112:22 | 216:9 229:9 | 132:10 | 178:19 218:13 |
| **solicitor** 2:3 | 230:3 232:3 | **spaces** 65:13 | 225:13,18 |
| **solid** 123:9 | 241:15 | **spanish** 81:9 | **specify** 87:14 |
| **solidarity** | **sort** 28:11 | 81:10 | **speculate** 180:8 |
| 48:12 49:11 | 30:12,15,18 | **speak** 7:7,11,15 | 180:11 |
| 51:9 | 66:15 100:21 | 16:11,24 18:25 | **speculation** |
| **solutions** | 101:2,7,19 | 50:2 72:4 | 180:21 |
| 246:23 | 120:6 121:6 | 80:17,18,19,20 | **speed** 108:1 |
| **somebody's** | 122:9 164:9 | 81:10 141:24 | 184:16 |
| 59:24 | 170:17 187:19 | 226:19 | **speediness** |
| **someone's** | **sorts** 151:17,18 | **speaking** 4:7 | 183:10,13 |
| 149:21 | 151:22 238:9 | 44:22 65:23 | **speeding** |
| **son** 234:10,12 | **sought** 62:25 | 78:24 80:2 | 182:13 183:3,6 |
| 235:11 | 144:16 | 118:23 137:4,9 | **spell** 47:11 |
| **soon** 156:10 | **sound** 6:24 | 155:13 166:2 | 81:12 |
| **sorry** 5:11,24 | 213:16,17 | 188:24,25 | **spend** 25:14 |
| 5:25 21:23 | **source** 78:10 | **speaks** 84:10 | **spent** 28:1 |
| 24:25 25:8 | 112:10 122:25 | 94:12 158:12 | 161:8 |
| 36:6 41:23 | 123:11 126:2 | 193:14 196:7 | **split** 48:18 |
| 52:3,15 53:4 | 191:17 203:18 | **special** 149:14 | **spoke** 17:9 |
| 65:22 66:12 | 203:21 228:2,5 | 239:21,22 | 72:22 78:10 |
| 67:20 82:18 | 229:12 | **specialty** 30:18 | 112:11,14 |
| 90:12 92:1 | **sources** 123:15 | 30:24 | 130:8 154:16 |
| 106:13 108:22 | 123:18 124:11 | **specific** 12:21 | 167:20 |
| 114:21 129:21 | 205:10 | 13:18 52:16,18 | **spoken** 16:17 |
| 133:22 140:13 | **south** 75:7 | 76:2 112:15 | 17:13 19:2,4 |
| 141:7 144:4 | **southwest** 50:6 | 125:14 153:22 | 72:20 80:22 |
| 145:11 146:3 | 74:19 117:10 | 165:2,4 176:21 | 202:19 |
| 146:14,15 | 129:10 143:1 | 202:23 219:19 | **spot** 145:21 |
| 160:5 161:4 | 143:15 | 222:1 | **square** 79:9,15 |
| 162:13 168:18 | **sovereign** | **specifically** | **st** 2:3 3:4 4:13 |
| 169:6 171:6 | 31:19,23,24 | 17:7 27:19 | 4:23 5:8,13 |
| 172:2 175:9 | 32:4 35:22 | 68:22 69:19 | 13:19,20,23 |
| 184:24 185:12 | 37:16 40:14 | 72:25 73:24 | 14:5,17 15:4,7 |
| 185:12 188:24 | | 75:16 76:18 | 15:14,20 16:22 |

17:13 18:8,19
20:17 21:8,16
21:21 22:7,19
23:12 24:3,5,9
25:18 33:25
36:10 42:8
43:8,16 44:13
44:17,20 45:24
46:11,25 47:25
59:11 62:11,18
65:8,16 66:8
67:6,25 73:19
77:14 78:3,16
78:21 79:6,13
79:25 80:3,8
86:16,23 94:11
96:22 123:21
123:25 129:24
130:3 136:20
139:16 140:18
142:10 143:10
158:11 181:13
186:9,14,22
187:12,21,25
188:5 189:6
192:22 193:13
196:6 200:12
204:14 208:13
212:13,19,23
217:18,21,25
219:12 221:2
222:18 223:17
224:6,13,18
225:8,15,23
227:6,21 228:6
228:19 229:3
229:10,15
230:5,10,16

232:15 233:9
233:24 234:20
235:8,19
237:12 238:1
238:11,19
240:2 242:8,15
242:20 246:1
**staff** 104:19
125:23 224:23
238:23
**staffer** 70:13
**staffers** 224:5
**stage** 90:5
**stand** 9:17
**standard** 63:21
96:8 167:25
168:2,6,10,18
168:21,23,25
169:7,9,14,18
169:19 170:24
171:2 172:1,3
172:6 232:22
232:23 233:14
233:20 234:3
**standards**
117:15 173:1,9
233:1,13,25
**standing**
195:20
**stands** 141:18
158:17 165:23
**start** 6:2 28:19
51:19 52:4
105:2,10
113:12,19
129:5,5 141:1
144:18 163:7
171:6 172:2

186:25 187:22
241:16
**started** 89:18
113:21,22,24
114:12,18
118:5 156:19
156:20
**starting** 28:3
111:21 191:9
**starts** 145:24
146:8 206:13
207:21
**state** 1:4 5:1,9
13:14,17 16:14
16:18 26:7,12
26:23 27:4
37:25 38:6,20
39:2,16 40:10
40:17 42:7
43:14,18 45:23
46:10 56:12
67:21 79:7
146:10 160:18
169:13,16
177:6,15 190:3
201:12,24
203:4,20,22
204:4 205:14
205:18,24,25
206:2 207:13
210:8 211:14
213:19 214:16
214:19 243:13
245:1 246:4
**stated** 84:17
147:19 174:23
178:19 231:22
245:12

**statement**
17:24 23:5
64:6 74:11
77:16 108:15
161:1 162:4
180:20 186:23
189:14 191:18
191:19 227:12
227:16 228:5
229:1 230:21
237:16,17
239:2
**statements**
19:17 60:13
74:6 75:21
84:7,8 95:12
166:23,23
179:1,9 181:15
182:20 186:15
189:25 190:10
**states** 1:1,8
15:22 39:19,23
48:17 50:15
63:20,24 64:1
64:18 66:2,4
74:6 76:16
77:1,18 78:1,5
83:9 84:18
85:7 87:7
88:14 89:13,19
90:1,21,22
91:6,16,17
92:5 95:7,16
96:2,13 98:4
98:17,18 99:5
100:12 101:6
101:17 102:15
103:5,7 107:11

Andrew Arthur                                                December 14, 2023

[states - substantive]                                                Page 56

| | | | |
|---|---|---|---|
| 107:22 108:2,3 | 219:13,17 | **stipulations**  5:2 | **stumbled** |
| 109:3,13,21 | 220:2 235:21 | **stjohn**  2:6 | 126:16 174:15 |
| 117:8,16,19,20 | 238:3,7,7 | 246:2 | **stuttered** |
| 118:4 119:18 | 241:7,8 | **stop**  42:17 | 208:19 |
| 119:22 120:1 | **status**  92:6 | 59:14 160:12 | **subcommittee** |
| 120:12,19 | 107:2 206:4,5 | 160:14,17 | 104:20 224:25 |
| 121:1,21 | 207:15 210:13 | **stopped**  240:24 | 225:2 |
| 129:11 131:9 | 210:24 | **straightforwa...** | **subheading** |
| 136:19 137:12 | **statute**  164:10 | 55:15 149:17 | 87:24 88:9 |
| 140:2 144:13 | 165:19,19 | **street**  2:4 | 90:24 141:13 |
| 144:17 145:2 | 169:11,13 | **strength**  99:7,7 | **subject**  45:17 |
| 145:11,12 | 172:7 219:19 | 137:10 139:8 | 45:25 58:6 |
| 146:20,23 | **statutorily** | **strike**  221:4 | 63:22 96:17,17 |
| 147:1,21,25 | 220:5,7 | **strong**  7:11 | 117:11,14 |
| 158:20 159:20 | **statutory**  52:4 | 138:11 186:4 | 164:5 165:15 |
| 159:24 164:25 | 56:18 69:8 | **structure**  210:6 | 232:7,8 |
| 165:12,13 | 153:23 164:13 | 216:25 | **subjects**  63:11 |
| 170:15 176:11 | 164:18 165:20 | **student**  203:5 | 81:11 |
| 176:13,18,24 | 167:21 168:3 | 203:15 | **submissions** |
| 176:25 177:4 | 168:22,23 | **students** | 17:10 |
| 177:21,25 | 170:13 171:2,5 | 207:15 210:13 | **submit**  35:17 |
| 182:13 189:8 | 171:10,15 | 210:20 | **submitted** |
| 189:12,20 | 219:15 | **studied**  92:21 | 17:18,21,25 |
| 211:11 219:3 | **stay**  144:13 | **studies**  12:17 | 18:4 217:5 |
| 220:19 226:9 | **staying**  134:22 | 12:18 19:7 | **subsequent** |
| 226:22 227:14 | 160:21 | 26:21 27:3,7 | 86:9 166:14 |
| 227:24 230:19 | **steady**  88:13 | 29:5 39:18 | **subsequently** |
| 236:15 | 115:23 | 57:11 214:15 | 202:19 |
| **static**  101:25 | **steps**  21:5 95:3 | 215:2 226:1 | **substance** |
| 132:10 | 149:6,21 202:4 | 238:21,25 | 19:11 36:20 |
| **station**  2:13 | **stew**  58:16,24 | **study**  30:25 | 51:18 82:6 |
| **statistics**  3:11 | 61:12 | 37:24 38:4,18 | 86:14 182:25 |
| 3:13 29:10 | **stewart**  228:21 | 38:18,24 93:2 | **substantial** |
| 74:25 92:22 | 229:1 | 93:17,20 | 164:4 168:9 |
| 116:16 118:15 | **stewart's** | **study's**  57:20 | 233:20 234:4,7 |
| 118:16 122:21 | 228:24 | **stuff**  24:24 | **substantive** |
| 124:10 137:25 | **stick**  64:10 | 25:6 58:1 61:1 | 30:24 241:5 |
| 184:15 191:21 | 88:9 180:12 | 121:16 | |

successfully
109:20
suddenly
235:10
suffer 159:18
sufficient 44:23
84:19
sufficiently
219:3,7
suggest 193:4
suggestion
193:6
suggestions
60:12
summarize
158:6
summarizes
211:19
summary
125:3 158:7
summer 44:4
supervision
245:11
supplement
155:12 156:22
supplemental
38:25 42:5
46:8 244:7
supply 228:12
support 109:8
161:1
suppose 102:6
138:16 235:9
supposed
159:24 168:22
169:11
supreme 64:7
122:18 205:23

sure 6:25 7:10
12:14 13:10
19:24 26:14
27:20 29:10
37:13 39:6
42:15 44:11,13
49:2 52:24
58:9 62:16
66:25 77:3
82:8 85:17
88:24 97:17
98:16 102:5
105:2 107:6
109:1 113:9,10
115:17 124:8
125:10 126:15
127:18 128:3,5
130:6 133:17
135:14,17
141:17 142:4
145:9 155:23
166:1 169:1
186:2 197:14
198:16 210:17
211:1 214:2
237:25 239:21
surge 113:19
113:21,22
114:2,3,6,8,18
114:18,25
115:20,21
surged 113:16
surgeon 38:8
surging 63:1
surprise
235:12
surprised
66:15

surprisingly
142:13
survey 76:23
122:15
surveys 75:9
75:16,17 76:5
sussing 237:5
swearing
239:19
sworn 4:3 5:18
87:9 245:8
sydney 2:10
symbiotic
121:6,7
syracuse 221:8
system 7:10
54:17 56:12
131:10 132:5
140:25 141:21
159:21 173:3,4
174:1,10,14
178:1
systems 102:13

**t**

t 2:9 62:1 76:15
81:14 134:19
221:6
tab 21:18
table 146:7
147:3
tabulating
125:11
tacitly 199:9
take 6:2 10:4,5
10:13 15:20,23
16:1 19:23
20:3 25:1

29:11 32:8
42:19 47:25
48:23,25 58:14
59:3,11 60:18
81:8 84:19
87:10 98:4
106:3,6 140:8
147:8 149:6
152:6,15 153:6
153:13,15
154:5 157:11
177:7 179:16
181:23 186:2,4
193:19 198:9
200:4 202:4
209:12 217:8
217:16 238:13
240:7,8,11
241:7,8
taken 1:13 4:6
29:7 59:15
75:3 106:8
111:11 112:8
141:2 188:17
217:23 244:2
245:10
takes 9:17
153:9 174:2
talk 7:24 18:8,8
18:23 19:11
23:21 27:18
32:21 48:5
68:13 76:19
81:25 90:9
92:8 103:12,15
105:5 112:12
112:13 119:4
142:24 148:7

148:12,12
151:17 154:20
157:24 163:4
177:1 178:9
179:14,17
184:16 199:1
201:11 227:7
**talked** 48:7
54:11 69:9
83:13 98:6
109:11 112:14
119:12 135:19
148:6 155:1
156:4 157:25
175:5 201:11
202:9 213:3
218:3 219:13
220:14 223:25
229:25 239:8
**talking** 12:6
35:4,6,13
52:25 69:15
71:12 95:25
96:20 102:17
106:20 107:15
110:9 115:19
115:21 129:25
164:18 169:25
171:21,22,23
184:22 185:7
191:3,8 206:14
207:4,9 213:6
226:12 229:18
230:12
**talks** 107:8
110:21 111:7
131:15 135:20
148:3 194:5

**tally** 222:22
223:1
**tamp** 120:10
**tanf** 146:22
147:23
**tango** 82:22
**tank** 60:23
**tax** 119:20
**tbpra** 72:25
**team** 218:24
219:2
**teams** 7:10
20:2 104:17
**technically**
215:17
**technological**
19:23 21:10
**technology**
152:16
**telford** 19:8
**tell** 4:15 8:16
8:18 9:4 12:21
14:12 31:17
46:16 51:10
58:6 68:17
69:16 71:19,24
73:4 82:5
85:13 86:13
88:22 94:1,5
98:13 99:9
109:22 114:16
116:4,12 124:6
125:8,13 134:8
141:18 142:14
152:1 153:16
153:16 158:6
158:19 165:9
166:3 168:13

186:3,24
194:23 203:21
223:6
**telling** 123:14
**temporary**
39:1 42:6 46:9
**ten** 24:17,18,20
24:21 25:15,16
25:17 34:19
48:21 49:6
52:13 53:5,8
68:17 70:9,24
71:9,9,10 86:4
103:4 150:14
150:17,18,22
**tense** 167:14
**tension** 114:24
**tensions** 135:7
**term** 76:15
88:12 89:22,23
100:17 112:25
141:15 163:16
170:13 183:16
197:17 220:6
226:8
**terms** 15:6
98:14
**terribly** 234:3
**territory**
120:23
**tested** 39:22
41:22 42:11
146:24 148:8
**testified** 15:10
42:25 43:3,13
44:15 45:20
46:8,20 56:25
61:11 67:16

78:13,19
116:20 209:5,9
218:22 221:5
225:20 230:18
236:8
**testifies** 5:18
**testify** 187:11
187:20 188:12
241:1,4
**testifying** 78:2
79:3,22 186:20
187:13
**testimony** 9:16
10:25 11:15,20
12:7,8 13:15
14:16,20 35:18
43:6,10,19
44:17 45:4,7,8
45:9,13,15,16
46:2,4,13
48:24 67:7
72:3,6,8 74:4
77:12 106:20
109:7,15
111:12 121:19
123:6,11
124:25 179:13
189:2 209:12
209:15 214:1
220:11 243:3,6
245:7 246:9,18
**texas** 63:20
64:7 81:2 85:6
122:17,19
124:9 126:9
127:19
**text** 6:5 52:21
52:23 121:12

Andrew Arthur                                              December 14, 2023

[text - thought]                                                    Page 59

| | | | |
|---|---|---|---|
| 163:8 166:10 | 134:1,22 | **thankfully** | 27:10 36:2,14 |
| **thank** 5:16 6:1 | 136:10 141:9 | 212:19 | 43:5 44:3,8,23 |
| 6:4 7:7,17 8:3 | 142:22 143:22 | **thanks** 6:11,15 | 48:17 51:15 |
| 8:11 9:1,9 10:3 | 144:10 145:4 | 21:11,12 22:9 | 52:13 56:1 |
| 11:18,22,23 | 145:19 146:17 | 23:4 59:7 94:4 | 60:23 62:3,11 |
| 12:11 13:20 | 151:15 152:25 | 102:17 145:21 | 68:15 82:24 |
| 16:4,20,21 | 157:18 158:4 | 157:12,13 | 83:5,12 84:9 |
| 18:25 20:21 | 158:15 159:10 | 166:1 185:2 | 84:24 85:9 |
| 23:11,18 25:11 | 160:2,11 | 208:4 217:10 | 86:19 89:7,14 |
| 25:11,12 27:16 | 162:13,19 | **theory** 211:9 | 89:21 94:2 |
| 29:2 33:2,22 | 163:19,23 | **thereto** 244:8 | 95:11 99:10 |
| 36:18,24 37:21 | 165:8,23 | **thesis** 28:12 | 100:7,14 |
| 38:13,22 39:4 | 166:10 167:6,9 | 50:22 51:10 | 101:13 115:6 |
| 41:1,23 42:13 | 168:17 169:1 | **thing** 5:24 | 126:16 129:25 |
| 43:25 44:6,11 | 169:17,22 | 23:20 58:7 | 131:21 132:7 |
| 45:1,12 46:7 | 170:2 171:25 | 60:18,22 81:18 | 135:10 141:16 |
| 46:16 47:13 | 172:8,15 | 118:1 145:16 | 147:10 152:11 |
| 48:2,3 50:4 | 173:11 174:18 | 148:2 155:14 | 154:18 155:21 |
| 51:5 53:2 | 176:5 182:17 | 181:24 202:7 | 157:19,21 |
| 55:11 57:10 | 184:14 188:15 | 235:1 241:11 | 174:15 176:6 |
| 62:4,19 64:15 | 191:11 192:12 | **things** 10:17 | 186:25 188:3 |
| 65:12 68:6,8 | 193:23 194:20 | 27:15 33:16 | 189:7 194:7,22 |
| 68:15,20 69:9 | 194:25 195:3 | 35:19 38:10,12 | 197:21 208:18 |
| 70:5 73:6 75:2 | 196:1,10,13,18 | 55:3 57:25 | 209:14 210:10 |
| 78:25 82:23 | 197:14,25 | 60:6,23 75:23 | 211:22 212:10 |
| 85:18 93:16 | 198:1,5 200:17 | 92:16 95:19 | 219:23 222:20 |
| 94:16,20,23 | 203:2,23 205:4 | 98:18 103:20 | 229:18 235:15 |
| 97:20,22 99:18 | 206:10 207:2 | 112:20 117:5 | 236:7,8 240:6 |
| 99:19 103:12 | 208:22,24 | 123:12 125:2,4 | 240:10 242:10 |
| 106:1,2 111:1 | 209:10 210:15 | 125:10,23 | **thinking** 56:3 |
| 115:5,8,16 | 211:20 214:6 | 130:22,23 | 102:6 194:23 |
| 116:10,15 | 214:11,11 | 133:8 155:12 | **third** 150:19 |
| 121:2,8 124:1 | 215:18,20 | 157:12 176:15 | 189:2 194:16 |
| 126:19,19 | 216:10,20 | 226:4,18,19 | **thirds** 141:9 |
| 127:13,14 | 217:8,9,22 | 236:10 237:2,5 | **thomas** 82:21 |
| 128:1,4 130:5 | 218:2 231:1 | 239:21 | **thought** 60:1,2 |
| 133:17,19,20 | 240:5 241:10 | **think** 21:12,17 | 66:14 129:21 |
| 133:21,25 | 242:11,13 | 21:23 22:4 | 145:8 155:19 |

197:16 198:12
206:25 212:16
212:17 216:22
222:7 227:12
241:3,25
**thoughts** 131:1
155:22
**thousand**
222:11,11
223:4
**thousands**
234:22
**three** 18:13
31:13,14 51:25
55:8 100:1
140:8,8 141:10
167:25 174:16
240:6,10
**throw** 234:13
234:14
**thrown** 234:9
234:11
**thursday** 1:14
**tick** 89:20
116:2
**ticked** 114:20
**ticks** 185:10
**tie** 83:7
**ties** 55:20
**time** 6:20 12:22
18:17 31:18
37:15,17 40:19
41:20,22 46:3
47:2 48:19
49:16 50:25
51:2 58:3,3,13
59:14 85:3
97:18 103:23

106:15 110:8
110:10,15
111:3,4,7,15
112:6 120:22
124:20 137:14
140:18 153:22
154:9,11,13,15
154:25 156:3
161:9,12,15
169:23 170:3
180:19 184:19
187:18 189:23
202:16,17,22
202:23,24
207:4 212:8
222:6 223:7
236:5,22
246:19
**timeframe**
246:8
**timeline** 153:19
**times** 18:7
24:11 42:25
54:11 57:17
100:3 110:1
133:23 218:3
224:7 234:22
239:20
**timing** 184:24
**title** 23:1 50:6
50:24,25 51:5
113:23 158:22
164:12
**today** 11:1,16
11:20 13:21
16:16,18,25
17:14,17 18:10
18:15,18 19:6

19:10,17 25:1
77:13 97:17
224:8 225:20
227:8,11
230:17 235:14
237:15 238:18
240:4 242:13
242:14
**todd** 81:7,13
**together** 83:7
123:16 124:22
126:22 127:7
**told** 8:22 67:19
67:21 92:19
138:25 154:1
159:10 227:14
227:25 228:11
236:4
**tolerate** 79:7,7
190:3
**tomorrow**
15:18 47:24
**tongue** 98:15
**took** 9:20 29:5
30:25 32:3
60:12 84:6
86:6 89:16,24
110:12,19
111:5,14,19
146:9 151:5
206:18 207:17
209:15
**top** 23:13 34:17
34:18 52:9,14
52:17 146:7
191:16 195:21
209:17

**topic** 106:5
**torture** 52:5
56:20,20
164:16 165:9
165:11,15,18
165:21,24
167:23 168:5
168:25 171:13
171:17,18
**total** 212:14
**touch** 62:3
**tourist** 177:8
177:10
**toward** 143:19
**towards** 34:2
**trac** 58:9 221:6
221:6,9,16,20
222:3,7 223:9
223:19
**trac's** 221:12
**track** 12:18
205:20 218:13
221:21,21
222:13
**tracks** 218:15
234:4
**traditionally**
74:16 75:5
**trafficking**
69:10,13
**train** 155:19
**training** 93:5
93:10,11
**transactional**
221:7
**transcribe** 7:12
**transcribed**
245:10

| | | | |
|---|---|---|---|
| **transcriber** | 228:18 245:17 | 190:12 206:10 | 162:17 219:23 |
| 119:20 134:19 | **trump** 51:3,13 | **turning** 6:4 | 239:18,25 |
| 158:3 231:17 | 51:16 83:2 | 9:15 23:25 | **uac** 69:4 |
| **transcript** | 89:15,16,22 | 42:18 51:5,6 | **uacs** 68:23 69:1 |
| 10:23,24 11:6 | 111:18,24 | 80:12 166:10 | **ugly** 121:7 |
| 23:18 186:15 | 112:2 114:1 | **tvpra** 69:9 | **uh** 7:4 |
| 189:18 242:18 | 161:18 | **twice** 190:19 | **ultimate** 169:6 |
| 244:3,4 245:8 | **trump's** 48:10 | 191:1 207:1 | 169:9 235:17 |
| 245:17 246:6 | **trust** 49:25 | **twister** 98:15 | **ultra** 64:9 |
| 246:20 | 176:23 | **two** 34:12 35:6 | **unaccompani...** |
| **transcripts** | **truth** 166:13 | 35:14 37:14 | 69:5,6,7 |
| 167:18 | **truthful** 9:20 | 40:7,13 42:2 | 207:12 |
| **transfer** 52:14 | 11:20 | 51:21,24,25 | **unauthorized** |
| 52:16,17 | **try** 7:24 8:1 | 86:4 102:7 | 144:15 |
| 118:15,16 | 21:10 25:24 | 115:13 118:17 | **under** 9:16 |
| 122:20 124:10 | 41:13 45:16 | 121:4,13 141:9 | 15:20 16:2 |
| **transferred** | 67:1 94:6 | 143:25 146:7 | 36:5 39:25 |
| 124:17 138:5 | 106:18 125:17 | 147:3 160:25 | 48:1 49:14 |
| **transit** 101:5,6 | 163:19 173:13 | 161:2,13 | 56:18,19 71:4 |
| **translator** 81:9 | 187:8 232:16 | 174:15,16 | 77:13 112:18 |
| **transparency** | **trying** 20:22 | 199:22 206:17 | 112:18 114:4 |
| 123:8 | 43:5 44:2 | 222:11 233:1 | 117:13 122:14 |
| **transpired** | 79:14 82:24 | 233:13,25 | 132:2 136:18 |
| 237:14 | 87:14 136:25 | 236:20 240:6 | 138:6 139:24 |
| **travel** 48:10 | 157:13,15 | 240:10 241:5 | 142:18 149:8 |
| 51:13 | 173:21 192:4 | **type** 218:6 | 149:12 150:22 |
| **treat** 238:13 | 204:20 207:3 | **types** 167:25 | 153:15 155:5 |
| **trial** 9:18 11:7 | 241:2 | **typically** 75:7 | 164:14,15,21 |
| 56:25 57:1 | **turn** 9:10 11:25 | **typo** 53:9,10 | 168:3,15,24 |
| 104:6 224:21 | 27:17 39:4 | **typos** 11:2 | 171:15,16,17 |
| **triangle** 74:21 | 51:17 59:8 | | 175:15,20,25 |
| **trick** 21:10 | 61:15 62:5,6 | **u** | 176:8,14 178:5 |
| **tries** 177:3 | 62:21 74:8 | | 178:17,25 |
| **trouble** 52:22 | 87:23 106:11 | **u** 62:1 158:3 | 183:20 184:1,2 |
| 130:7 173:12 | 128:6 141:4 | **u.s.** 2:11 50:6 | 184:18 193:18 |
| **true** 7:8,18 | 145:19 157:20 | 73:12 77:7 | 196:16,16 |
| 171:4 223:18 | 163:3,4 169:22 | 78:7 84:13 | 199:24 200:2 |
| 223:19 227:16 | 170:3 187:6 | 85:11 113:15 | 203:16 205:15 |
| | | 139:15 145:7 | |

205:23 210:9
215:16 219:21
219:24 231:5
231:14 236:16
245:10
**underestimate**
221:24,25
**undergraduate**
29:13
**understand**
6:18 7:4,14 8:8
8:13,15,23 9:6
9:19 10:8,14
10:19 11:3,8
11:11 12:5
17:5 26:8 77:4
115:13 121:3
140:23 141:24
163:18,21
189:9 197:21
202:21 210:15
220:17
**understanding**
8:22 71:11,20
71:21 142:15
166:3 178:20
184:8 206:6
235:4 241:17
**understood**
8:19 157:9
169:2 230:11
237:20
**underutilize**
63:8
**underutilized**
62:24
**undetained**
230:23

**undoubtedly**
150:25
**unfortunate**
189:21 190:5
**unfortunately**
15:21
**unfrozen** 89:1
**unilaterally**
131:9
**union** 37:16
39:8,10,15
40:8,14 42:3
227:15,24
**unique** 98:19
**unit** 67:14
236:9,11,17
**united** 1:1,8
15:22 39:23
48:17 50:15
54:24 63:20,24
64:1,17 66:2,4
74:5 76:16
77:1,18 78:1,5
83:9 84:18
85:7 87:7
88:14 89:13,19
89:25 90:21,22
91:6,15,17
92:4 95:7,16
96:1,13 98:3
98:17,18 99:5
100:12 101:6
101:17 102:15
103:5,7 107:11
107:22 108:2,3
109:2,13,21
117:8,16,18,20
118:3 119:18

119:21,25
120:12,19
121:1,21
129:11 131:9
136:19 137:11
140:2 144:13
144:16 145:2
145:11,12
146:20,23
147:1,21,25
158:20 159:20
164:24 165:12
165:13 170:14
176:11,13,18
176:24,25
177:3,21,25
189:8,12,19
211:11 219:3
220:19 226:9
226:21 230:19
236:14
**units** 82:11
231:12,19,23
**university**
27:25 28:4,7
28:17 29:20,25
30:7 32:8
37:23,24 38:3
38:4,9,16,17
38:23,24 92:20
93:2,14 221:8
241:6,8
**unknown**
220:8,16
**unlawful** 84:18
**unquote** 110:5
**unscrupulous**
155:15

**unskilled** 103:2
**unused** 64:12
65:13 66:3
67:2
**upfront** 39:6
**ups** 59:19
**uptick** 84:6
**upwards** 223:1
223:3
**ur** 157:25
158:2,4
**usc** 131:13
220:7
**uscis** 72:10
142:25 145:25
146:8 157:25
158:9,17 159:1
159:6,23
172:12 236:9
236:17
**usdoj.gov** 2:14
**use** 7:10 14:25
39:23 59:2
65:14 67:4,5,9
69:5 98:7
107:16 119:16
148:8,13,13,20
154:21 163:16
163:18,19
168:20,22
183:10 191:9
196:18 198:2
238:10 244:7
**used** 14:21
61:8,12 64:1
65:1 75:18
76:16 82:18
88:10,18 89:22

[used - want]                                                          Page 63

98:5 100:17
103:16 123:15
125:1 127:17
127:22 132:21
170:13 179:8
189:23 197:16
246:20
**uses**  164:3
**using**  7:5 41:25
41:25 66:5
114:5 140:13
141:15 196:13
**usually**  31:13
39:25 134:20
164:23
**utilization**
135:9
**utilize**  66:21
131:11

**v**

**v**  1:6 246:4
**vague**  15:10
41:12 66:9
67:7 139:16
143:10 151:21
204:14
**validity**  174:13
**valley**  81:3
113:22
**valleys**  114:21
114:22 115:18
115:20,24
**variable**  58:16
58:24
**variation**  54:4
54:9 55:1 56:1
56:21 59:6

61:10
**variations**
54:18 55:12
56:22 57:7
203:16
**various**  12:19
57:21 74:6
103:22 123:15
124:5 127:7
154:15 163:14
204:24
**vast**  217:1
**venezuela**
100:9,15
**venezuelan**
118:3
**venezuelans**
100:11
**veracity**  181:18
**verbal**  7:2
**verify**  246:9
**veritext**  246:14
246:23
**veritext.com**
246:15
**version**  196:19
196:19 218:12
**versus**  12:9
51:16 63:20
64:7,20 67:12
74:5 76:16
85:6 108:3
109:5,13,14
122:17,19
124:9 126:10
127:19 170:25
174:20 175:25
199:7 205:23

210:9,22
231:16
**vez**  100:9
**vice**  95:14
**vicente**  120:8
**victims**  69:10
69:13
**video**  1:13 4:12
188:1
**view**  23:13
96:4 134:24
158:24 161:23
**viewed**  120:14
**views**  75:10
76:22 77:20
**violence**  99:15
100:8
**vires**  64:9
**virginia**  28:1,4
28:8,17 29:20
29:25 31:20
32:6 37:23
38:3,17,23
92:20 93:2,15
241:6,9
**virtual**  4:9 7:9
7:19 20:14
22:4 33:21
**virtually**  237:1
**vis**  69:21,21
91:15,15
137:20,20
**visa**  176:14
177:5,9,11,14
177:24
**visas**  177:8,11
**visibility**  174:1

**visited**  65:19
**visiting**  66:20
**visual**  89:2
**vitter**  207:7
**vitters**  210:22
**voice**  7:11
**volume**  50:9
**vulong**  2:10

**w**

**w**  232:4
**wages**  148:4
226:6
**wait**  8:4,8
**waited**  68:7
**waiting**  144:14
**waiver**  176:14
177:9,11,15
**waivered**
107:13
**waives**  237:6
**walk**  95:2
127:16 138:18
139:7 145:7
185:25 237:13
**want**  4:18 6:2
27:20 33:12
35:16 44:13
48:25 52:23
60:16 62:16
72:15 84:17,20
91:20 110:23
119:16 122:8
126:15 127:2,3
128:5 130:6
133:9 135:17
155:23 180:8
180:10 187:4

187:14 188:23
191:9 217:17
223:3 226:19
239:17 241:1,2
241:4 242:6,13
242:18
**wanted** 92:2
113:9,10
115:17 133:17
141:16 142:5
156:21,24
202:5 212:15
223:8 242:11
**wanting**
186:23
**wants** 132:12
139:20
**war** 99:14
120:5,6 229:17
229:23
**warden** 96:11
**warning** 206:3
**wars** 100:3
**washington**
2:13 30:7,8
32:5,5 37:23
38:3,17,23
**watch** 161:9
**way** 7:11 13:4
20:4 33:5 45:7
87:14,23 90:22
91:18 94:3
104:10 105:19
110:10 112:21
130:23 139:20
141:9,10 154:4
156:25 160:19
161:24 172:24

186:2 188:4
195:12 199:3
199:10 215:15
215:19 235:7
237:1
**ways** 10:18
91:1,11 92:9
95:5 145:9
179:24
**we've** 4:24 59:9
74:14 75:4
90:19 135:10
140:7 141:15
166:2 176:20
190:6
**wear** 52:20
**web** 195:13
197:22,25
**website** 26:13
57:20 58:2
83:23 84:4,5,8
122:4 126:9
128:16 181:5
191:22,23
197:11,23
**week** 6:21
150:14,15
222:15
**weekend** 25:5
**weights** 104:24
**welcome** 218:1
**welfare** 39:20
41:17 160:1
**went** 11:12
25:5 37:3,6,8
137:17 161:15
**western** 1:1

**wetherell** 76:15
109:13
**wetherell's**
108:19 109:6
**white** 76:19
77:12 82:13
**wilberforce**
69:12 71:17
**william** 69:12
71:16
**window** 232:13
**wish** 195:19
244:4
**withheld** 165:2
**withholding**
52:4 56:18,19
164:11,14,19
164:19,21
165:2,3 167:21
167:22 168:3
168:23 170:23
171:5,10,15,16
179:4
**witness** 4:3,6
5:13 6:22 15:5
15:10 23:12
36:12 42:9
43:17 45:25
46:12 47:1,2,9
65:10,19 67:9
73:21 77:16
78:4 79:11,15
87:1 94:14
96:23 97:1
124:2 130:2
136:21 140:21
143:11 156:8
158:13 181:15

187:3,3 189:11
189:14,24
196:8 200:14
202:8 208:15
212:20 219:7
220:22 222:13
223:12,23
224:12 226:17
227:19 228:4
228:16,23
229:8,14 230:3
230:9,15
231:11 233:5
233:14 234:18
235:6 236:20
237:23 238:6
238:16 240:12
242:15 243:1
244:5 245:7
246:8,10,12,19
**witnessed**
243:17
**wolf** 209:5,6
**wondering**
240:22
**word** 61:12
75:19 81:13
95:6 148:13,13
148:20 152:11
154:21 158:22
183:11 209:8
**words** 7:5,21
55:8 69:2 88:2
107:16,24
118:8 122:1
133:18 152:20
160:2 163:20
163:25 174:15

174:16 198:17
206:17 207:21
207:25
**work**   20:3 25:6
25:21 27:3,5
29:4 32:21
34:18 36:21
39:4,13,15,17
40:6,9,12,16
40:24 42:1,4
42:10 57:11
59:22 83:9
87:22 92:5
94:25 95:9
108:15 122:10
122:11 128:20
138:19 145:10
145:11 217:2
225:25 226:10
227:3 238:3,20
239:12 241:18
**worked**   31:19
36:7,25 37:4
41:7,14 61:22
216:22
**workers**   103:2
148:7
**working**   25:14
57:16 145:2,6
148:4 226:6
**works**   92:12
**world**   55:4
73:12 74:10,12
74:24 76:14
77:6,24 78:6
80:15 81:24
83:5 84:12
85:10 103:22

229:17,23
235:4 237:8
**worse**   55:3
102:8 128:9,24
129:7,12
130:15,17,23
130:24 131:4
135:1 173:25
175:24 176:9
**worth**   45:3
**wrinkle**   17:12
**write**   6:17 17:4
31:22 34:22
39:22 49:23
59:4 60:6,15
61:13,13 119:8
125:13 166:11
190:25 198:18
209:17 214:12
214:17,19,23
215:3,11,24
216:11,21
239:7 244:4
**writes**   57:19,20
57:25 81:10
241:18
**writing**   13:11
34:13,20 48:3
59:21 119:9
125:16 126:24
151:7 154:23
241:15
**written**   15:8,9
15:12 45:8,9
54:10 58:7
89:21 114:15
125:2,4,10
160:19,20

170:5 196:23
213:18 216:13
242:1
**wrong**   106:14
114:16 146:3
220:1
**wrote**   12:2,24
12:25 13:5
23:8 27:9
35:11 42:24
48:9 49:25
58:4,16 60:7
60:17 61:4
62:22 68:21
70:23 77:23
84:10 86:3
87:19,19 88:2
106:12 108:5
110:2,4 121:13
121:17 129:7
143:9 145:24
146:12,14
158:25 160:22
190:22 197:8
197:10 201:23
202:13 204:1,2
209:22 241:23

**y**

**y**   62:1 231:17
**yeah**   21:19
26:14 33:5
34:9 35:5 41:6
51:12 53:9,11
54:10 57:7
59:23 84:14
87:1 92:3 95:5
107:14 110:20

111:6 122:8
129:23 133:15
136:3 138:23
140:19 152:21
158:13 164:13
176:6 179:23
183:16 197:17
198:13 201:5
222:22 238:23
**year**   14:2,10
24:23,24 25:4
28:1,2,3 31:16
32:9 36:2 44:2
58:5 73:5 81:3
89:10 114:20
132:12,12
133:20 136:5
149:15,16,17
149:19 150:1
154:6 209:5
**years**   31:13,14
32:1 36:6
53:23,23 57:17
89:10 93:7
96:14,15 103:4
104:1,3 120:17
143:2,16,18
144:14 153:10
153:13,15
172:8,18,19,21
173:23 191:12
207:11,17
219:9 222:17
236:6
**yesterday**
18:10,12,18
**york**   226:25

Andrew Arthur                                        December 14, 2023

| | |
|---|---|
| **yuma** | 81:2 |
| **z** | |
| **zero** | 118:20 |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.