# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| THE STATE OF ARIZONA, et al.,<br><br>        PLAINTIFFS,<br><br>v.<br><br>MERRICK GARLAND in his official capacity as Attorney General of the United States of America; et al.,<br><br>        DEFENDANTS. | CIVIL ACTION NO. 6:22-cv-01130 |

## PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..............................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................iii

INTRODUCTION .......................................................................................................................1

BACKGROUND ........................................................................................................................2

LEGAL STANDARDS.............................................................................................................12

ARGUMENT.............................................................................................................................13

I.    DEFENDANTS FAIL TO IDENTIFY AND APPLY THE CORRECT LEGAL
       STANDARDS FOR A "FACTUAL" MOTION TO DISMISS.................................13

   A.   In ruling on a "factual" motion to dismiss, the Court must accept as true all allegations not
         specifically disputed. ....................................................................................................13

   B.   The Court cannot consider post-complaint events in analyzing standing............................14

II.   THE FACTS ESTABLISH PLAINTIFF STATES HAVE STANDING. .............................14

   A.   Defendants executed a MOU acknowledging the impact to Louisiana and other States of
         changes to immigration policy, and the undisputed testimony of former Border Patrol
         Chief Rodney Scott is that those acknowledgements are correct. ..........................................15

   B.   The undisputed evidence is that the Biden Administration is committed to a non-
         enforcement policy, including expediting the flow of aliens into the United States............16

   C.   The undisputed evidence is that the impact of immigration policies on migration is
         predictable, that predictability is the agency's position, and a senior Border Patrol official
         advised the Biden Administration that the Asylum IFR "would increase cross-border
         flow." ......................................................................................................................................17

   D.   The undisputed evidence is that the Asylum IFR will increase fraudulent claims...............19

   E.   Plaintiff States spend substantial sums providing public benefits to aliens, and increases in
         alien population or more rapid grants of asylum will increase that spending.......................20

      1.   Aliens are eligible for some public benefits regardless of status, such that State
            expenditures for those benefits increase directly with the population of aliens. ..............20

      2.   Asylees are eligible for additional benefits, such that speeding grants of asylum will
            increase expenditures on those benefits. ...............................................................................22

F.  Defendants limited evidence at most confirms that implementation of the Asylum IFR has been limited. ........................................................................................................24

  1.  Professor Clemens's expert report cannot be considered. In any event, it merely confirms that implementation of the Asylum IFR has been limited. .................................24

  2.  The Asylum IFR has increased the asylum grant rate. ........................................27

G.  The Court should draw an adverse inference from Defendants' silence. .............................29

III.   PLAINTIFF STATES HAVE STANDING. ...........................................................29

A.  Plaintiff States suffer financial injuries from the Asylum IFR. ....................................29

B.  Plaintiff States' sovereign or quasi-sovereign interests are harmed. ...............................32

C.  Plaintiff States suffer procedural harm. ............................................................32

D.  Plaintiff States' injuries satisfy the imminence and traceability requirements. ...................34

E.  Plaintiffs States' injuries are redressable. .........................................................36

F.  Plaintiff States pass the lenient zone-of-interests test. ............................................37

G.  Each Plaintiff State need not prove standing. ......................................................37

H.  Venue is not limited by 8 U.S.C. 1252(e)(3). ....................................................38

IV.   NONE OF PLAINTIFF STATES' CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM. ...............................................................39

A.  Plaintiff States state a claim that the Asylum Rule is arbitrary and capricious because it violates the Secure Fence Act. ...................................................................39

B.  Plaintiff States state a Take Care Clause claim. ....................................................40

CONCLUSION ................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alliance for Hippocratic Med. v. FDA*,
   78 F. 4th 210 (5th Cir. 2023), *cert. granted* 2023 WL 8605744 (Dec. 13, 2023) ................................... 35

*Arizona v. United States*,
   567 U.S. 387 (2012) ................................................................................................................. 20

*Barrera-Montenegro v. United States*,
   74 F.3d 657 (5th Cir. 1996) ...................................................................................................... 13

*Bosse v. Oklahoma*,
   580 U.S. 1 (2016) ...................................................................................................................... 34

*California v. Green*,
   399 U.S. 149 (1970) .................................................................................................................. 20

*Carr v. Alta Verde Indus., Inc.*,
   931 F.2d 1055 (5th Cir. 1991) ................................................................................................... 14

*Clark v. United States*,
   95 U.S. 539 (1877) ................................................................................................................... 16

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ..................................................................................................... 31

*Cruz-Miguel v. Holder*,
   650 F.3d 189 (2d Cir. 2011) ........................................................................................................ 4

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017) ................................................................................................................ 35

*Davis v. FEC*,
   554 U.S. 724 (2008) .................................................................................................................. 14

*DeCanas v. Bica*,
   424 U.S. 351 (1976) .................................................................................................................. 24

*Defense Distributed v. Platkin*,
   55 F. 4th 486 (5th Cir. 2022) .................................................................................................... 39

*Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .............................................................................................................. 35

*Department of Homeland Security v. Regents of the University of California*,
   140 S.Ct. 1891 (2020) ......................................................................................................... 30, 31

*DHS v. Thuraissigiam,*
   140 S. Ct. 1959 (2020) ................................................................................... 19, 29

*Durbois v. Deutsche Bank Nat'l Trust Co.,*
   37 F.4th 1053 (5th Cir. 2022) ............................................................................... 16

*East Bay Sanctuary Covenant v. Biden,*
   2023 WL 4729278 (N.D. Cal. July 25, 2023) .......................................................... 32

*East Bay Sanctuary Covenant v. Garland,*
   994 F.3d 962 (9th Cir. 2020) ................................................................................ 31

*Flores v. Barr,*
   2020 WL 3488040 (C.D. Cal. June 26, 2020) ......................................................... 8

*Florida v. United States,*
   660 F. Supp. 3d 1239 (N.D. Fla. 2023) ..........................................................passim

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ............................................................................................ 37

*GLO v. Biden,*
   74 F. 4th 264 (5th Cir. 2023) .......................................................................... 14, 24

*Guillory v. Dotmar Indus.,*
   95 F.3d 1320 (5th Cir. 1996) ............................................................................... 26

*Interstate Circuit v. United States,*
   306 U.S. 208 (1939) .......................................................................................... 1, 29

*Jackson v. U.S. Dep't of Housing & Urban Dev.,*
   116 F.3d 477, 1997 WL 256046 (5th Cir. Apr. 17, 1997) ........................................ 24

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) ............................................................................................ 38

*Kaboh v. Barr,*
   826 Fed. App'x 381 (5th Cir. 2020) ..................................................................... 31

*Kansas v. Garcia,*
   140 S. Ct. 791 (2020) .......................................................................................... 24

*Linda R.S. v. Richard D.,*
   410 U.S. 614 (1973) ...................................................................................... 30, 31

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................... 12, 14

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ................................................................................12, 34, 37

*Meridian Sec. Ins. Co. v. Sadowski,*
   441 F.3d 536 (7th Cir. 2006) ......................................................................16

*Montana v. United States,*
   440 U.S. 147 (1979) ...................................................................................17

*Moore v. Ashland Chem., Inc.,*
   151 F.3d 269 (5th Cir. 1998) ......................................................................27

*Motor Vehicle Ass'n v. State Farm,*
   463 U.S. 29 (1983) .....................................................................................13

*New York v. U.S. Dep't of Homeland Sec.,*
   969 F.3d 42 (2d Cir. 2000) ...........................................................................4

*Ojeda-Terrazas v. Ashcroft,*
   290 F.3d 292, 296 n.11 (5th Cir. 2002) .......................................................3

*Paz v. Brush Eng'd Materials, Inc.,*
   555 F.3d 383 (5th Cir. 2009) ......................................................................26

*Pickett v. Tex. Tech Univ.,*
   37 F.4th 1013 (5th Cir. 2022) .....................................................................13

*Plyler v. Doe,*
   457 U.S. 202 (1982) ...................................................................................21

*Reinagel v. Deutsche Bank Nat'l Trust Co.,*
   735 F.3d 220 (5th Cir. 2013) ......................................................................32

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) .....................................................................................37

*Ry. Co. v. Ramsey,*
   89 U.S. 322 (1874) .....................................................................................16

*Smith v. Palafox,*
   728 F. App'x 270 (5th Cir. 2018) ...............................................................24

*Spokeo, Inc. v. Robbins,*
   578 U.S. 330 (2016) ...................................................................................33

*State Farm Fire & Cas. v. Flowers,*
   854 F.3d 842 (5th Cir. 2017) ......................................................................13

*State v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ................................................................................37

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ..........................................................................................33

*Tampa Times Co. v. NLRB,*
    193 F.2d 582 (5th Cir. 1952) ............................................................................26

*Texas v. Biden,*
    20 F. 4th 928 (5th Cir. 2021), *rev'd* 597 U.S. 785 (2022)............................17, 38

*Texas v. Biden,*
    554 F. Supp. 3d 818 (N.D. Tex. 2021), *aff'd* 20 F. 4th 928 (5th Cir. 2022), *rev'd on other grounds*, 597
    U.S. 785 (2022)..................................................................................................17

*Texas v. Biden,*
    646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................................17

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ..............................................................12, 32, 33

*Texas v. United States,*
    40 F. 4th 205 (5th Cir. 2022) ..............................................................................9

*Texas v. United States,*
    50 F. 4th 498 (5th Cir. 2022) ....................................................................passim

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ............................................................................30

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ....................................................................passim

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................................40

*Town of Lantana v. Hopper,*
    102 F.2d 118 (5th Cir. 1939) ......................................................................13, 14

*United States ex rel Bernard Lumber Co. v. Lanier-Gervais Corp.,*
    896 F.2d 162 (5th Cir. 1990) ............................................................................13

*United States v. Johnson,*
    288 F.2d 40 (5th Cir. 1961) ..............................................................................29

*United States v. Texas,*
    599 U.S. 670 (2023) ..............................................................................1, 30, 31

*Valdiviviez-Hernandez v. Holder,*
   739 F.3d 184 (5th Cir. 2013) .................................................................3

*Wages & White Lion Invs., LLC v. FDA,*
   -- F.4th --, 2024 WL 30287 (5th Cir. Jan. 3, 2024)............................ 18, 39

*Webster v. Doe,*
   486 U.S. 592 (1988) ...........................................................................39

*Welsh v. Am. Sur. Co. of N.Y.,*
   186 F.2d 16 (5th Cir. 1951) ................................................................13

*Wetmore v. Rymer,*
   169 U.S. 115 (1898) ...........................................................................29

*Weyerhauser Co. v. U.S.F.W.S.,*
   139 S. Ct. 361 (2018) .........................................................................39

*Williamson v. Tucker,*
   645 F.2d 404 (5th Cir. 1981) ..............................................................13

*Winstead v. Georgia Gulf Corp.,*
   77 F. App'x 267 (5th Cir. 2003) ..........................................................24

*Young Conserv. of Tex. Found'n v. Smatresk,*
   73 F. 4th 304 (5th Cir. 2023) ..............................................................12

**Statutes**

5 U.S.C. § 701 ........................................................................................39

5 U.S.C. § 706 ........................................................................................13

6 U.S.C. § 223 ...............................................................................5, 24, 25

8 U.S.C. § 1182 ........................................................................................4

8 U.S.C. § 1252 ......................................................................................38

8 U.S.C. § 1601 ........................................................................................4

8 U.S.C. §§ 1611-1613 .............................................................................4

8 U.S.C. § 1622 ........................................................................................4

8 U.S.C. §1641 ......................................................................................22

8 U.S.C. § 1158 ........................................................................................3

8 U.S.C. § 1225 ............................................................................................................................3

18 U.S.C. § 1182 ..........................................................................................................................4

18 U.S.C. § 1183 ..........................................................................................................................4

**Other Authorities**

42 C.F.R. 440.255(c) ..................................................................................................................21

86 Fed. Reg. 67,479 (Nov. 26, 2021)..........................................................................................22

86 Fed. Reg. 7,005 (Jan. 25, 2021) .............................................................................................16

86 Fed. Reg. 7,225 (Jan. 27, 2021) .............................................................................................16

*Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705-06 (Feb. 23, 2023) ...................18

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. 104-208, 110 Stat. 3009-546............................................................................................................passim

*Inspection and Expedited Removal of Aliens*, 44 Fed. Reg. 10,313, 10,320 (Mar. 6, 1997) .....................4, 39

John Henry Wigmore 5 *Evidence* § 1367...................................................................................20

National Defense Authorization Act of 2017 ("NDAA 2017") § 1092, Pub. L. 114-328, 130 Stat. 2000, 2429-36 (Dec. 23, 2016) .................................................................................................5

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105..................................................................................................................3, 8, 22, 37

*Procedures for Credible Fear Screening*, 86 Fed. Reg. 46,906 (Aug. 20, 2021) ............................7, 8

*Procedures for Credible Fear Screening*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) ............................7, 8

Pub. L. 82-414, 66 Stat. 163 (1952) .............................................................................................2

Secure Fence Act of 2006 § 2, Pub. L. 109-367, 120 Stat. 2638 .........................................5, 37

**Rules**

Fed. R. Civ. P. 7, 11....................................................................................................................13

Fed. R. Evid. 702 ........................................................................................................................24

**Regulations**

8 CFR 208.2(a)(1)(ii), 208.9 ...................................................................................7

8 C.F.R. 1003.10(b) .............................................................................................28

**Constitutional Provisions**

Fla. Const. art. IX, § 1 .......................................................................................20

La. Const. art. VIII, § 13 ....................................................................................20

U.S. Const. art. II, § 3.........................................................................................40

## INTRODUCTION

In 1996, Congress grew concerned with aliens using meritless asylum claims to enter the United States, the Executive's concomitant abuse of its parole authority to release those aliens into the interior, and the resulting harm to the States. Congress accordingly amended the Immigration and Nationality Act to address those problems. Four Presidents later, the Executive is at it again, this time with a rule is contrary to the 1996 amendments. That rule—the Asylum IFR—was pushed by political appointees who bluntly told Border Patrol Chief Rodney Scott "they weren't looking for [the Border Patrol's] input and opinions." Scott Dep. 80:16-19. A senior Border Patrol official nevertheless advised in "no uncertain terms that [the proposed rule] would increase cross border flow unless they factored in detention or remain outside the country." *Id.* 83:1-20. That advice was ignored, and Defendants published the new rule.

Twenty states filed suit. Defendants now move to dismiss, principally asserting the Plaintiff States can't prove standing. That reverses the burden in a factual attack. Worse, contrary to controlling Supreme Court and Fifth Circuit precedent, Defendants rely on post-complaint events to support their attack. The undisputed evidence—including testimony by Chief Scott—shows the Asylum IFR will increase migrant flow when it is fully implemented, thereby increasing Plaintiff States' expenditures on public benefits. And even if the Asylum IFR didn't increase migration flow, it will speed up alien eligibility for public benefits, which will also increase Plaintiff States' expenditures. The scintilla of expert evidence Defendants put forward makes clear the evidence they possess and the witnesses they control wouldn't support their position. That mandates an adverse inference. *See Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939). Defendants thus fall back on assertions that *United States v. Texas*, 599 U.S. 670 (2023) ("*Priorities*"), the Supreme Court overruled controlling precedent finding standing based on public benefits expenditures. *Priorities* actually distinguished those precedents and emphasized its limited holding. Defendants' motion should be denied.

## BACKGROUND

E<span style="font-variant:small-caps">XPEDITED</span> R<span style="font-variant:small-caps">EMOVAL</span>, A<span style="font-variant:small-caps">SYLUM</span>, <span style="font-variant:small-caps">AND</span> P<span style="font-variant:small-caps">AROLE</span>

The Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163 (1952), as amended, generally requires that aliens without valid entry documents be removed from the United States unless they qualify for asylum or other humanitarian protections. In 1995, Congress concluded "the asylum system … ha[d] been subject to abuse by tens of thousands … who filed non-legitimate claims simply in order to extend their stay in the U.S. and to receive work authorization." RJN Exh. 211 (H.R. Rep. 104-469 Pt. 1) at 139. Making that problem worse, the Executive had been abusing its limited parole authority "to admit entire categories of aliens who do not qualify for admission," despite the INA being "clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs." *Id.* at 140.

The resulting influx of aliens was a significant burden on the States. A House Committee Report explained:

> The current cohort of immigrants is far more likely to have less than a high-school education than native-born Americans. This can have the effect of flooding the labor market for unskilled work, as well as creating pockets of impoverished immigrants…. The rise of immigrant-based organized crime groups suggests that screening of potential immigrants is not as rigorous as it ought to be. These negative impacts are most keenly felt in the handful of States in which a vast majority of immigrants choose to live….
>
> * * * * *
>
> Again, these problems are heightened in high-immigration States. Our education system, for example, is burdened by the needs of immigrants who either are not proficient in English or illiterate in their own language or both. In Los Angeles county, education is provided in over 70 languages at a larger "per student" cost to the taxpayer.

*Id.* at 133. The Committee Report went on to explain that "aliens [were] applying for and receiving public benefits from Federal, State and local governments at increasing rates." *Id.* at 144.

Congress accordingly enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. 104-208, 110 Stat. 3009-546 ("IIRIRA"), and Title IV of the

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 ("PRWORA").[1]

*First*, Congress created an expedited removal process coupled with mandatory detention during that process. The INA now provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States … shall be deemed … an applicant for admission." 8 U.S.C. 1225(a)(1). "All aliens … who are applicants for admission or otherwise seeking admission or readmission to … the United States shall be inspected by immigration officers." 8 U.S.C. 1225(a)(3). "If an immigration officer determines that an alien … who is arriving in the United States … is inadmissible under section 1182(a)(6)(C) [for misrepresentation in the visa or admission process] or section 1182(a)(7) [for not possessing proper documents required for admission] of [8 U.S.C], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." 8 U.S.C. 1158(b)(1). But "[i]f an immigration officer determines that an alien … who is arriving in the United States … is inadmissible [for, e.g., lack of a valid visa] and the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer…." *Id.*

"An asylum officer shall conduct interviews of aliens" who indicate either an intention to apply for asylum under 8 U.S.C. 1158 or a fear of persecution. 8 U.S.C. 1225(b)(1)(B)(i). "If the officer determines at the time of the interview that an alien has a credible fear of persecution … the alien shall be detained for further consideration of the application for asylum." *Id.* at 1225(b)(1)(B)(ii). The accompanying committee report elaborates: "**If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for**

---

[1] H.R. Rep. 104-169 is considered part of the legislative history and justification for IIRIRA. *See, e.g., Valdiviviez-Hernandez v. Holder*, 739 F.3d 184, 191 (5th Cir. 2013); *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 296 n.11 (5th Cir. 2002).

**asylum under normal nonexpedited removal proceedings."** But "[i]f the alien does not meet this standard and, if the alien requests administrative review, the officer's decision is upheld by an immigration judge, the alien will be ordered removed." *Id.* Defendants' long-standing construction is in accord. *See Inspection and Expedited Removal of Aliens*, 44 Fed. Reg. 10,313, 10,320 (Mar. 6, 1997).

*Second*, Congress narrowed the executive's discretion to grant "parole into the United States'" to "a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011) (recognizing that narrowing of parole authority was because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy.").

*Third*, Congress amended the long-standing bar on admitting "[a]ny alien who … is likely at any time to become a public charge" to, *inter alia*, mandate consideration of "age," "health," "family status," "assets, resources, and financial status;" and "education and skills," 18 U.S.C. § 1182(a)(4), and to require certain aliens to obtain affidavits of support that are "legally enforceable against the sponsor by … any State," 18 U.S.C. § 1183a; *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 53 (2d Cir. 2000) (summarizing provisions).

*Fourth*, Congress limited alien eligibility for any "federal public benefit" to "qualified aliens," with even those qualified aliens subject to a five-year bar on receiving benefits. 8 U.S.C. §§ 1611-1613. But Congress created exceptions to the five year bar on benefits for "alien[s] granted asylum under section 208 of [the INA]" and "alien[s] whose deportation [are] being withheld under section 243(h) of [the INA]." 8 U.S.C. § 1622; *see also* RJN Exh. 216 (WMCP 104-15) at 34-40.

*Fifth*, Congress made supporting findings that, *inter alia*, "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates," and "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601.

THE SECURE FENCE ACT OF 2006 AND THE NDAA OF 2017

In subsequent years, Congress enacted additional provisions to stem the flow of aliens.

Particularly relevant here, Congress directed the Secretary of Homeland Security to

> take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States, to include the following—
> (1) systematic surveillance of the international land and maritime borders of the United States through more effective use of personnel and technology, such as unmanned aerial vehicles, ground-based sensors, satellites, radar coverage, and cameras; and
> (2) physical infrastructure enhancements to prevent unlawful entry by aliens into the United States ….

Secure Fence Act of 2006 § 2, Pub. L. 109-367, 120 Stat. 2638. Congress made its intent clear in the definition of "operational control": "the prevention of **all** unlawful entries into the United States, including entries by terrorists, other unlawful aliens … and other contraband." *Id.*

Faced with a recalcitrant executive, Congress sought to monitor compliance with its commands. It directed the Secretary of Homeland Security to collect and report data on, *inter alia*, "[t]he rate of apprehension of attempted unlawful border crossers," "[t]he number of detected unlawful entries," "[t]he number of estimated undetected unlawful entries," "[t]urn backs," "[g]ot aways," and "a probability of detection rate." National Defense Authorization Act of 2017 ("NDAA 2017") § 1092, Pub. L. 114-328, 130 Stat. 2000, 2429-36 (Dec. 23, 2016) (codified at 6 U.S.C. § 223). Recognizing that migration flows respond to consequences, Congress also required reporting on the effectiveness of the "consequence delivery system," which includes expedited removal. *Id.*

THE BIDEN ADMINISTRATION SIDELINES THE BORDER PATROL

Notwithstanding Congress's clear, long-standing command to secure the border, former Border Patrol Chief Rodney Scott testified the Biden Administration's consistent focus "was on expediting the flow of people into the United States." St. John Decl. Exh. 250 ("Scott Dep.") 51:21-52:3; *see also id.* at 59:10-19. "Immediately upon inauguration, the new chief of staff [Lise Clavel] showed up within [U.S. Customs and Border Protection ("CBP")] … and she made it pretty clear that

they didn't really have any interest in [the Border Patrol's] opinion." *Id.* at 79:16-19. Indeed, the Chief Operating Officer of CBP—Blas Neto—bluntly told Chief Scott "they weren't looking for [the Border Patrol's] input and opinions on policies." *Id.* at 80:16-19.

"Any focus on actually … weeding out fraud or minimizing the flow was off the table[,] and the conversation was just about speeding up the process." *Id.* at 53:9-11. If Border Patrol officials "brought up anything about the threats involved at the border, deterrents, [they] were not allowed to talk about deterrents, [and] there was no conversation[] allowed whatsoever about slowing down the flow." *Id.* at 61:3-16. So although the Border Patrol officials "would brief out statistically what was going on [at] the border," "as soon as [those officials] started talking about any type of solutions or reducing the flow, the conversation was shut down and stymied." *Id.* at 81:10-13. Far from attempting to reduce migrant flow, the Border Patrol was "ordered … to redirect significant financial funding from enforcement operations … to bolster and beef up what the administration wanted to call welcoming centers" and avoid detaining migrants. *Id.* at 61:17-62:21.

### THE ASYLUM IFR

As part of the Biden Administration's focus on expediting the flow of people into the United States, the "idea of a rule change to give asylum officers [additional] authority … was coming up in meetings." Scott Dep. 51:15-52:3. The Administration's political appointees did not seek advice from the Border Patrol. Rather—in a sharp departure from decades of practice—major policies came down "in an edict form" from "the political appointees" without "any kind of engagement" with the Border Patrol's experts. *Id.* at 81:13-17. In particular, Chief Scott testified the proposal to alter the asylum rules was not subject to the formal "executive secretary" or "blue sheet" process for new policies, which includes review by the Border Patrol Chief. *Id.* at 81:19-83:1; 144:7-146:21; *see also id.* at 86:11-15 ("Traditionally the chief of the border patrol, as the senior most official in the country responsible for securing the borders, my opinion and that of my staff would normally be factored in and

considered."). A senior Border Patrol official nevertheless advised the Biden Administration's political appointees in "no uncertain terms that [the proposed asylum officer rule] would increase cross border flow unless they factored in detention or remain outside the country." *Id.* 82:6-83:20.

Nothwithstanding that advice, USCIS and EOIR proceeded with their proposal to amend the rules governing claims for protection, including asylum. *Procedures for Credible Fear Screening*, 86 Fed. Reg. 46,906 (Aug. 20, 2021). The purpose was speed: "to begin replacing the current system … with a better and more efficient one that will adjudicate protection claims … expeditiously," thus yielding "more expeditious grants of asylum." *Id.* at 49,907, 46,923 Table 1. Louisiana, Florida, *et al* submitted a comment letter objecting to the proposed rule's impact on migration rates, increase in fraud, impact to States, and the incredible claim that there were no federalism concerns. RJN Exh. 217.

USCIS and EOIR nevertheless proceeded to issue the Asylum IFR, albeit with numerous changes. *Procedures for Credible Fear Screening*, 87 Fed. Reg. 18,078 (Mar. 29, 2022). Among other things, the Asylum IFR provides (1) "USCIS the authority to adjudicate in the first instance the asylum claims of individuals who receive a positive credible fear determination, and further provides that USCIS does so following a nonadversarial interview by an asylum officer," rather than having those proceedings conducted by EOIR in an adversarial proceeding before an immigration judge, *id.* at 18,089 (referencing 8 CFR 208.2(a)(1)(ii), 208.9); (2) "that the record of a credible fear interview will serve as an asylum application," rather than requiring the distinct filing of a Form I-589 within the one-year period set by statute (referencing 8 CFR 208.3(a)(2)), and thereby starts the 180-day clock for employment authorization; and (3) "that USCIS shall not schedule an Asylum Merits interview … fewer than 21 days after the noncitizen has been served a record of the positive credible fear determination" (referencing 8 CFR 208.9(a)(1)), *id.* at 18,082, which effectively mandates pre-Asylum Merits Interview ("AMI") release for minors and family units when read together with the 20-day

release requirement imposed via the *Flores* consent decree, *see Flores v. Barr*, 2020 WL 3488040, at *3-4 (C.D. Cal. June 26, 2020).

EOIR and USCIS acknowledged "[o]ne result of this rule is that asylum applications for some individuals pursuant to this rule could be granted asylum earlier than they would be under current conditions," 87 Fed. Reg. at 18,203, "with timelines potentially decreasing significantly," 86 Fed. Reg. at 46,924 Table 2. EOIR and USCIS also acknowledged that because a grant of asylum also grants employment authorization, the earlier grant of asylum could result in a net benefit of $225.44 per workday to the alien. 87 Fed. Reg. at 18,197; *see also id.* at 18,201. But the agencies dismissed comments pointing out that States bear the cost of providing public benefits that—like employment authorization—are tied to the grant of asylum. *Id.* at 18,194. EOIR and USCIS merely repeated their claim that—contrary to the Border Patrol's expert advice—the Asylum IFR "is not expected to create any significant new incentives that would drive increased irregular migration" and opined that "[t]o the extent that States and local communities bear social or economic costs associated with … noncitizens entering the United States without documentation and seeking asylum, those are not costs associated with this rule." *Id.* In doing so, EOIR and USCIS ignored the public benefits-related concerns that underlay IIRIRA and PRWORA, the accompanying findings, and the statutory provisions intended to protect States from the burden of supporting aliens. Indeed, EOIR and USCIS dismissed the States' concerns with a blithe response that "immigration generally is an area of Federal regulation in which the Federal Government, rather than the States, has the preeminent role." *Id.* at 18,193.[2]

---

[2] EOIR's and USCIS's analysis is rife with abuse of discretion. The undisputed testimony is that the impact of an immigration policy on States is an important aspect of the problem that "must or should be considered." Scott Dep. 128:20-129:19. "[T]he impact of an immigration policy on border flow" is a "critical aspect" of that problem. *Id.* A rule is arbitrary and capricious if it "failed to consider an important aspect of the problem, offered an explanation … that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view." *State Farm*,

IMPLEMENTATION

The Asylum IFR became effective on May 31, 2022. 87 Fed. Reg. at 18,078. Implementation

started "in a phased manner," with DHS aiming "to refer … a few hundred noncitizens each month

to USCIS for an Asylum Merits Interview," and the referrals "limited to those individuals who indicate

… an intention of residing in … Boston, Los Angeles, Miami, New York, Newark, or San Francisco."

RJN Exh. 214. At some point, implementation was expanded to include Chicago, New Orleans, and

Washington. RJN Exh. 215. Implementation was halted in April 2023 then restarted several months

later, but Defendants refuse to explain that halt. RJN Exhs. 205, 206 at 7; St. John Decl. Exh. 257 at

5. Eligibility for AMIs was initially limited to single adults, but expanded to "certain non-detained

family units" in October 2023. St. John Decl. Exh. 260; RJN Exh. 4.

As Defendants concede, the Asylum IFR has so far "been applied only to … a limited group."

ECF 214-1 at 6. In FY2022, only 757 AMI cases were received by USCIS, out of 331,761 total asylum

cases. RJN Exh. 203 at 6. Even accepting that the Asylum IFR was only operative for four months,

AMIs accounted for less than 1% of asylum cases. Indeed, from inception through August 2023, only

5,884 claims were *potentially* eligible for the limited AMI rollout. ECF 214-2. Some of those were in

Miami and New Orleans, and at least 56 aliens in Florida were processed under the rule. RJN Exh.

205; St. John Sealed Decl. Exh. 11; St. John Decl. at USA13154-55. At least one received Florida-

funded medical benefits for 14 claims totaling $532.29. Ford Decl.; St. John Sealed Decl. Exh. 11.

CURRENT STATUS OF THE BORDER

After President Biden took office, Southwest Land Border Encounters surged from 458,088,

in FY2020, to 1,734,686, in FY2021, to 2,378,944 in FY2022, then 2,475,669 in FY 2023. RJN Exhs

208, 209. ICE's non-detained docket similarly surged from 3,274,244 in FY 2019 to 6,199,629 in FY

---

463 U.S. at 43. "Stating that a factor was considered … is not a substitute for [actually] considering
it." *Texas v. United States*, 40 F. 4th 205, 228 (5th Cir. 2022).

2023, with over 1.4 million aliens added to the non-detained docket in FY 2023 alone. RJN Exh. 210 at 17-18. ICE's *detained* docket, however, has fallen from 510,854 in FY 2019 to 273,220 in FY 2023, and removals have fallen from 267,258 to 142,580. *Id.* at 18-19, 26. Likewise detention capacity. RJN Exh. In short, the doors are open, and former Border Patrol Chief Rodney Scott testified that the Asylum IFR is contributing to increased migrant flow. Scott Dep. 72:1-73:11.

"The southwest border is in crisis, that crisis is attributable to actions taken by the Biden Administration, cartels effectively control who and what enters the United States, and the federal government lacks operational control of the southwest border." Scott Dep. 91:10-19; RJN Exh. 200 at 28. Border Patrol agents are being pulled off the border "to process illegal aliens," and funding for border-observing technology was reprogrammed "to set up these processing centers to expedite the processing of migrants already in custody." Scott Dep. 71:2-21; 134:11-137:3. "[T]here's hundreds and hundreds of miles of border that are completely going unpatrolled" "[t]hat could have been and should have been effectively patrolled." *Id.* 92:14–20. In those areas, the federal government "will have no idea what crossed the border," despite "a lot of illegal activity." *Id.* 135:1-136:7.

The human cost is horrific. The flow of asylum-claiming migrants is controlled by cartels. *Id.* 92:21-93:19. "Migrants are being abused at a level that we haven't seen before," and "[w]e have shut down the DNA testing so increased child trafficking I guarantee is going on." Scott Dep. 92:7-10; *see also* Bensman Decl. ¶ 8 (discussing role of cartels and noting consistent one child-one adult pairings).

Then-Defendant Border Patrol Chief Raul Ortiz testified about the situation in a March 15, 2023, hearing before the House Committee on Homeland Security. Chief Ortiz noted that, in addition to recorded encounters, there had been 385,000 "gotaways" in FY 2023 as of that date, and he estimated the real number was likely 10-20% higher. Chief Ortiz was asked about control of the border:

> Chairman Green: Chief Ortiz, does DHS have operational control of our entire border?
> Chief Ortiz: No, sir.

* * * * *
Chairman Green: We don't have operational control?
Chief Ortiz: No, sir.

RJN Exh. 218 42:50 – 44:25; Exh. 201 at 2. When pressed about policies that would help with the border crisis, Chief Ortiz recited a litany of asylum-related policies that the Biden Administration had repealed: "whatever consequences… you can call it Migrant Protection Protocols, you can call it Remain in Mexico, you can call it a Safe Third Country, all of the tools that the Border Patrol and DHS have at their disposal are going to allow us to do a better job of managing this border." Exh. 218 at 139:35 – 140:08; Exh. 201 at 7. The status quo, however, is to process and release aliens as quickly as possible. Indeed, as little as 15 minutes may be devoted to processing before an alien is released into the interior. ECF 214-9 (Ortiz Decl.) ¶ 9(c).

Recent Congressional testimony by Border Patrol Sector Chiefs is in accord. "More people … are being released on their own recognizance to await their immigration hearing than I have ever seen in my career." RJN Exh. 200 at 10. "By virtue of the fact that I don't have as many agents out on patrol because they're addressing that flow, then it can provoke the gotaway numbers higher because we're not out there." *Id.* at 18. And "because we're not out there … we might be missing some of the gotaways and not know as many as are actually getting away." *Id.* When asked about reasons migrants are coming to the United States, one sector chief noted "the belief that they are going to be released with no consequences is certainly something that many migrants tell our agents." *Id.* at 9. And with respect to how the migrants get across the border, "the cartels … determine when people cross …. How many people cross at a time, all that. It's all -- it's all controlled by them." *Id.* at 28. Indeed, the involvement of cartels in migrant flow is well-known among Border Patrol agents, as are fraudulent asylum claims and the link between asylum claims and public benefits. Bensman Decl. ¶ 8.

While "[t]here [are] undoubtedly geopolitical and other factors that [have] contributed to the surge of aliens at the Southwest Border," "persuasive evidence establishes that Defendants effectively

incentivized what they call 'irregular migration' that has been going on since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border … would not be detained and would instead be quickly released into the country where they would be allowed to stay … while their asylum claims were processed or their removal proceedings ran their course—assuming, of course, that the aliens do not simply abscond before even being placed in removal proceedings, as many thousands have done." *Florida*, 660 F. Supp. 3d at 1254-55.

## LEGAL STANDARDS

"As the parties invoking federal jurisdiction, the [S]tates have the burden of establishing standing." *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) ("*Texas DAPA*"). "They must show an injury that is concrete, particularlized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* "When a litigant is vested with a procedural right" like the APA, "that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). Moreover, a State is entitled to special solicitude vis-à-vis standing in challenges to agency actions related to alien classification. *Texas v. United States*, 50 F. 4th 498, 517 (5th Cir. 2022) ("*Texas DACA*"). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In an APA case, the Court must "assume, for purposes of the standing analysis, that [the plaintiff] is correct on the merits of its claim[s] that [a rule] was promulgated in violation of the Administrative Procedure Act." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *see also Young Conserv. of Tex. Found'n v. Smatresk*, 73 F. 4th 304, 309 (5th Cir. 2023).

Under the APA, a court "shall … hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory

jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). An agency acts in an arbitrary and capricious manner if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.   DEFENDANTS FAIL TO IDENTIFY AND APPLY THE CORRECT LEGAL STANDARDS FOR A "FACTUAL" MOTION TO DISMISS.

### A.   In ruling on a "factual" motion to dismiss, the Court must accept as true all allegations not specifically disputed.

A defendant typically responds to litigation by answering the complaint or moving to dismiss. With either mechanism, the defendant must make a reasonable inquiry—which includes his own knowledge—before disputing the allegations. Fed. R. Civ. P. 7, 11; *see also United States ex rel Bernard Lumber Co. v. Lanier-Gervais Corp.*, 896 F.2d 162, 167 n.11 (5th Cir. 1990) (suggesting sanctions were appropriate for denying allegations that were obviously true). Factual disputes are thus narrowed, either by judicial admissions in the answer or by the defendant specifically identifying contested jurisdictional facts and introducing admissible contrary evidence in support of a factual motion to dismiss. *See State Farm Fire & Cas. v. Flowers*, 854 F.3d 842, 845 (5th Cir. 2017); *Welsh v. Am. Sur. Co. of N.Y.*, 186 F.2d 16 (5th Cir. 1951); *Town of Lantana v. Hopper*, 102 F.2d 118, 119-120 (5th Cir. 1939).

Consistent with that process, "[a] district court may 'dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Pickett v. Tex. Tech Univ.*, 37 F.4th 1013, 1029 (5th Cir. 2022) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981), and affirming denial of motion to dismiss); *see also Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)

(quoting *Williamson* and reversing dismissal). Defendants nevertheless imply no presumption of truth attaches to any of the Plaintiff States' allegations. That's incorrect. The consistent references to "the complaint" in each basis for dismissal make clear that the complaint controls except as to facts actually put at issue. Thus, in *Town of Lantana*, the Fifth Circuit carefully noted certain jurisdictional facts "were not denied" and focused on the single jurisdictional fact the defendant put at issue in moving to dismiss. 102 F.2d at 119-120. The Court must do the same here: It must accept as true for purposes of Defendants' motion to dismiss all factual allegations that Defendants have not put at issue.

### B. The Court cannot consider post-complaint events in analyzing standing.

Not only do Defendants fail to identify the correct legal standard, they also fail to identify the correct set of facts. "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Lujan v. Defenders of Wildlife*, 504 U.S. 575, 569 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction."). Thus, "[w]hile the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Moreover, "the injury required for standing need not be actualized," *i.e.*, "[a] party facing prospective injury has standing to sue." *Id.*

## II.   THE FACTS ESTABLISH PLAINTIFF STATES HAVE STANDING.

Notwithstanding the Supreme Court's and the Fifth Circuit's clear standards, Defendants purport to make a "factual" attack with precious little affirmative evidence. What little evidence Defendants do put forward reflects events after Plaintiff States' filed their complaint, *i.e.*, after April 28, 2022. ECF 2. No facts after that date can defeat standing retroactively. *See GLO v. Biden*, 74 F. 4th 264, 272 n.12 (5th Cir. 2023) ("As this action was filed in October 2021, developments since then,

such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing). Even those post-complaint assertions are advanced via a purported expert rather than with testimony from Defendants' own employees, and Defendants fail to put forward data they routinely collect. That void mandates an adverse inference.

### A. Defendants executed a MOU acknowledging the impact to Louisiana and other States of changes to immigration policy, and the undisputed testimony of former Border Patrol Chief Rodney Scott is that those acknowledgements are correct.

In 2021, DHS executed a MOU with Louisiana reciting that "like other States and municipalities, [Louisiana] is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement," and such changes "can negatively impact [Louisiana's] medical, education, employment … and healthcare needs and budgets." St. John Decl. Exh. 254. The MOU identified policy actions like "relaxation of the standards for granting relief from return or removal, such as asylum," "relaxation for granting release from detention," and "changes to immigration benefits or eligibility" as actions that "result in direct and concrete injury" to Louisiana. *Id.* A copy of that MOU was appended to the complaint. ECF 86-2.

Former Border Patrol Chief Rodney Scott reviewed the MOU, and he agreed "that states and municipalities are directly and concretely affected by changes to policies that have the effect of easing or relaxing or limiting immigration enforcement." Scott Dep. 139:3-140:12. Chief Scott agreed with other recitals in the MOU, too, including that "a relaxation of the standards for granting [relief] from return or removal, such as asylum," "a decrease in immigration enforcement," "a reduction in the number of DHS agents performing immigration enforcement functions," a "relaxation of the standards for granting release from detention," "an increase in releases from detention," and "changes to immigration benefits or eligibility … can adversely impact states." *Id.* 139:8-142:3.[3]

---

[3] It's no answer that Chief Scott's testimony took place after the complaint was filed; it is evidence of the state of affairs at and before the complaint was filed. His testimony also rebuts Defendants' suggestion that the MOU was improper or an attempt to contract away federal power.

Defendants don't dispute the existence or contents of the MOU, but they contend the MOU was void and terminated. ECF 214-1 at 15. Defendants are correct that standing cannot be manufactured by agreement and must be established as a matter of fact. But parties can "admit the existence of facts which show jurisdiction, and the courts may act upon such an admission." *Durbois v. Deutsche Bank Nat'l Trust Co.*, 37 F.4th 1053, 1060 (5th Cir. 2022) (quoting *Ry. Co. v. Ramsey*, 89 U.S. 322, 327 (1874)); *see also Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006) ("Jurisdiction itself is a legal conclusion, a *consequence* of facts rather than a provable 'fact.'"). Even a void or terminated contract is admissible evidence of the facts recited therein. *See, e.g.*, *Clark v. United States*, 95 U.S. 539 (1877) (holding that a void parol contract by a federal officer was admissible as evidence of value in quantum meruit). Defendants' contrary arguments are academic in view of Chief Scott's testimony that the recitals in the MOU are substantively correct, which Defendants do not dispute.

### B.  The undisputed evidence is that the Biden Administration is committed to a non-enforcement policy, including expediting the flow of aliens into the United States.

Immediately upon taking office the Biden Administration acted to lift restrictions on entry to the United States. Restrictions on issuing visas to citizens of hostile countries were proclaimed a "stain on our national conscience and … inconsistent with our long history of welcoming people." 86 Fed. Reg. 7,005 (Jan. 25, 2021). The President then halted construction of a wall along the Southwest Border, declaring that his "administration is committed to ensuring that the United States has a comprehensive and humane immigration system," and "[i]t shall be the policy of my Administration that no more American taxpayer dollars shall be diverted to construct a border wall." 86 Fed. Reg. 7,225 (Jan. 27, 2021). He took that action despite Border Patrol officials characterizing border wall infrastructure as one of the "force multipliers" that "certainly works" and can "almost completely eliminate[] the cross-border traffic." RJN Exh. 200 at 12-17; *see also* Exh. 201 at 9. The Administration

---

ECF 214-1 at 15 & n.7. Rather, the recitals in the MOU accurately state the views of expert federal officials.

also decreased space for detaining aliens, and funding was reprogrammed away from border enforcement to "welcoming centers" for aliens. Scott Dep. 61:17-62:4, 76:2-6; *see also Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023) (recounting closures).[4]

Discovery made the underlying intent plain. Even during the transition period before taking office, the Biden Administration's focus "was on expediting the flow of people into the United States." Scott Dep. 51:21-52:3; *see also id.* 59:10-19. Border Patrol officials were "not allowed to talk about deterrents, [and] there was no conversation allowed whatsoever about slowing down the flow." *Id.* 61:3-16. "Any focus on actually … weeding out fraud or minimizing the flow was off the table[,] and the conversation was just about speeding up the process." *Id.* 53:9-11. Chief Scott recounted that "[i]mmediately upon inauguration, the new chief of staff [Lise Clavel] showed up within [CBP] … and she made it pretty clear that they didn't really have any interest in [the Border Patrol's] opinion." *Id.* 79:16-19. Indeed, when career employees warned Administration officials that proposed policies "would lead to a resurgence of illegal aliens attempting to illegally enter our [southwest border]" and that "smuggling organizations would exploit [that action]" with the "predictable" result of increased volume, Biden Administration officials simply ignored those warnings. *Texas v. Biden*, 554 F. Supp. 3d 818, 836 (N.D. Tex. 2021), *aff'd* 20 F. 4th 928 (5th Cir. 2022), *rev'd on other grounds*, 597 U.S. 785 (2022), *on remand Texas v. Biden*, 646 F. Supp. 3d 753, 774 (N.D. Tex. 2022).

### C. The undisputed evidence is that the impact of immigration policies on migration is predictable, that predictability is the agency's position, and a senior Border Patrol official advised the Biden Administration that the Asylum IFR "would increase cross-border flow."

As *Texas MPP* makes clear, the impact of immigration policies is generally predictable. Chief Scott explained that the Border Patrol can evaluate whether a particular policy is a so-called "pull

---

[4] Plaintiff States assert issue preclusion as to the facts determined adversely to the United States and DHS in *Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla.). *See* St. John Decl. Exh. 219; *Montana v. United States*, 440 U.S. 147, 163-64 (1979).

factor," *i.e.*, something "that encourages migration in a bigger context, but specifically … illegal immigration into the United States." Scott Dep. 115:16-119:13. When citizens of other countries perceive that immigration policy has become more favorable to them, they are more likely to cross U.S. borders illegally. SAC ¶ 67 (citing Ortiz Dep. (ECF 214-4) 59:12-60:5, 67:22-68:5, 171:13-172:9, 173:7-12)). "[A]ny time people are released in the United States after they were encountered by Border Patrol … when they arrived without documentation, there is always a significant increase in the illegal cross border [*sic*] of future people within that same group or class." Scott Dep. 116:18-117:4; *see also* ECF 214-8 (Hudak Decl.) ¶ 11 ("The termination of Title 42 is expected to lead to a further surge in migrants."); ECF 214-5. "[L]egal work or illegal work are both pull factors [too], but the ability to get legal employment or any type of legal document to move about the United States is a … very, very significant pull factor." *Id.* 122:13-123:5; *see also* ECF 214-14 at 13 n.11. Likewise the ability for an alien "to bring their children or their wife." Scott Dep. 124:15-125. The ability to evaluate pull factors and predict the impact of policies is so clear that Defendants have used it to support their administrative actions. *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705-06 (Feb. 23, 2023).

Defendants' *counsel* try to dismiss evidence of predictability as merely "stemming from *other* policies and border issues, *not* the IFR." ECF 214-1 at 10. That's no answer. The Defendant *agencies'* position is that the impact of immigration policy on border flow is predictable enough to support administrative actions; that position can't be explained away by attorney argument; and an unexplained change in that position would itself be arbitrary and capricious. *See Wages & White Lion Invs., LLC v. FDA*, -- F.4th --, 2024 WL 30287, at *8-9 (5th Cir. Jan. 3, 2024) (en banc).

More to the point, the Asylum IFR was evaluated by Border Patrol. The undisputed evidence is that a senior Border Patrol official advised the Biden Administration in "no uncertain terms that [the proposed rule] would increase cross border flow unless they factored in detention or remain outside the country," and that "anything that resulted in people getting released quicker would …

increase the flow and we would not be able to … actually effectively patrol the border." Scott Dep. 83:1-20, 130. That advice was an admission by a party opponent, and it reflects the state of affairs when Plaintiff States filed their complaint.

### D.  The undisputed evidence is that the Asylum IFR will increase fraudulent claims.

Not only is there undisputed evidence that the Asylum IFR will increase border flow, it's also undisputed that the Asylum IFR will increase the number of fraudulent and frivolous claims. Defendants don't dispute that "[t]he current system is rife with fraud and frivolous claims," and "EOIR review—conducted through an adversarial process in which an alien's case is subjected to vigorous scrutiny—thus provides an essential safeguard against granting fraudulent and otherwise unmeritorious asylum claims, which the Asylum IFR abolishes." SAC ¶¶ 3, 188.

Those allegations are well-supported. The Supreme Court has recognized "[m]ost asylum claims … ultimately fail, and some are fraudulent." *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1963 (2020). "Fraudulent asylum claims can … be difficult to detect, especially in a screening process that is designed to be expedited." *Id.* And the Court cited with approval a study "in which 58% of randomly selected asylum applications exhibited indicators of possible fraud and 12% were determined to be fraudulent." *Id.* A 2015 GAO report—also cited with approval in *Thuraissigiam*—concluded that even under the adversarial system, there were insufficient protections against fraudulent asylum claims. RJN Exh. 220 at 22. As former Immigration Judge Art Arthur testified, "fraud is a thing in immigration court," "[a]nd we know that unscrupulous practitioners have in fact coached and drafted applications for aliens." St. John Decl. Exh. 257 ("Arthur Expert Dep.") 155:14-17. Even line Border Patrol agents know there is coaching, and it starts before aliens cross the border. Bensman Decl. ¶ 8.

Judge Arthur explained that in his experience, "the adversarial nature of IJ proceedings—including cross-examination—[is] critical to rooting out meritless or fraudulent asylum claims." Arthur Decl. ¶ 90. "The absence of adversarial proceedings [under the Asylum IFR] will necessarily increase

the rate of grants of asylum to aliens with claims that are meritless or fraudulent." *Id.* Likewise, the lack of delay and the lack of a distinct asylum application under the Asylum IFR, which will effectively deprive the USCIS fraud unit of the opportunity to detect and assess fraud. *See* Arthur Expert Dep. 154:20-157:10, 236:7-237:10.

Cross-examination in an adversarial proceeding is "the greatest engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting John Henry Wigmore 5 *Evidence* § 1367). To the degree Defendants dispute the importance and impact of an adversarial process, the irony of their doing so after having demanded discovery and depositions rather than simply responding to Plaintiff States' Complaint should not be lost on the Court.

**E. Plaintiff States spend substantial sums providing public benefits to aliens, and increases in alien population or more rapid grants of asylum will increase that spending**.

**1. Aliens are eligible for some public benefits regardless of status, such that State expenditures for those benefits increase directly with the population of aliens.**

States "bear[] many of the consequences of unlawful immigration." SAC ¶ 63 (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)). A significant portion of aliens use state-financed public benefits, some of which are available regardless of immigration status. And those benefits are disproportionately used by aliens. That's because aliens have a higher poverty rate (18.8%) compared to native U.S. citizens (11.0%). RJN Exh. 221. State expenditures on those benefit programs thus increase directly and disproportionately with the population of aliens.

Take education, which the Congressional Budget Office ("CBO") identified as "the largest single expenditure in state and local budgets." RJN Exh. 222 at 7. Both the Louisiana and Florida constitutions require those states to provide public education. La. Const. art. VIII, § 13; Fla. Const. art. IX, § 1. And the Supreme Court has mandated that public education be extended to aliens, the presence of which the Court attributed to, *inter alia*, "lax enforcement of the laws barring entry into

this country, coupled with the failure to establish an effective bar to the employment of undocumented aliens." *See Plyler v. Doe*, 457 U.S. 202, 218-19, 230 (1982). Further increasing the burden on States, the high percentage of alien children who are not English speakers makes them more expensive to educate as compared to native children. Louisiana, for example, allocates a baseline of $4,015 per student, but provides an additional 22% per student to educate "English Language Learner" students. Scioneaux Dec. ¶¶ 5-6; *see also* St. John Decl. Exh. 256 ("Arthur 30(b)(6) Dep.") 52:14-53:11 (explaining ELL is a "rough proxy" for immigrant students); Arthur Decl. ¶¶ 102-116. Florida similarly allocated a baseline of $4,587, but provides an additional 20.6% for each English as a Second Language Student. Arthur Decl. ¶ 106. The number of those students is not small. Louisiana has more than 33,000 ELL students, with experts estimating that 6% of Louisiana public school students are from alien households. Scioneaux Decl. Exh. 150; Arthur Decl. ¶¶ 109-113. And Florida has over 116,000 immigrant students, with experts estimating that that 31% of Florida public school students are from such households. Burns Decl. ¶ 3 & Exh. 110; Arthur Decl. ¶¶ 109-113.[5]

Plaintiff States also spend substantial funds providing emergency medical care to aliens. According to the CBO, "immigrants in the United States, both authorized and unauthorized, are less likely than their native-born counterparts to have health insurance." Arthur Decl. ¶ 117 (quoting RJN Exh. 222 at 1). "As a result, they are more likely to rely on emergency rooms or public clinics for health care." *Id.* For unauthorized aliens, that's funded through so-called "emergency Medicaid" or "emergency medical services" that the federal government requires States to provide as part of their Medicaid program. RJN Exh. 223; *see also* 42 C.F.R. 440.255(c). Although those benefits are limited as compared to the benefits available for citizens and asylees, the cost is still substantial. Florida, for

---

[5] The U.S. Department of Justice and U.S. Department of Education have told states that inquiring about students or their parents' immigration status is illegal under federal law. RJN Exh. 227. Accordingly, the States must use proxies like ESL status or "Immigrant Children and Youth" counts to estimate the number of alien school children. *See* Arthur Decl. ¶¶ 107-108. Defendants should be precluded from demanding more detailed information than Louisiana and Florida have provided.

example, generally has over 3,000 aliens (and at times over 8,000 aliens) receiving emergency medical services every month, and Florida's share being $1M and $6M every month. Ford Decl. & Exhs. 115-120; *see also, e.g.*, 86 Fed. Reg. 67,479 (Nov. 26, 2021) (setting forth Federal Medical Assistance Percentage for Oct. 1, 2022 – Sept. 30, 2023).[6]

### 2. Asylees are eligible for additional benefits, such that speeding grants of asylum will increase expenditures on those benefits.

States spend yet more on benefits for which eligibility hinges on immigration status. Generally, noncitizen eligibility for federal public benefits—including Medicaid—is governed by the term "qualified alien" (8 U.S.C. §1641), which was created in PRWORA, as amended. Arthur Decl. ¶ 121 (citing RJN Exh. 223). Qualified aliens include lawful permanent residents (LPRs), refugees, aliens paroled into the United States for at least one year, <u>aliens granted asylum or related relief</u>, certain abused spouses and children, and Cuban-Haitian entrants. *Id.* Many qualified aliens are nevertheless prohibited from receiving Medicaid for the first five years after entry/grant of status (often referred to as the "five-year bar"). *Id.* Nonimmigrants, those with Temporary Protected Status (TPS), short-term (less than one year) parolees, <u>asylum applicants</u>, those granted Deferred Action for Childhood Arrivals (DACA), <u>unauthorized immigrants</u>, and various other classes of noncitizens granted temporary permission to remain in the United States are nonqualified aliens. *Id.* ¶ 122. These statuses and are generally barred from Medicaid. *Id.* Eligibility for the Supplemental Nutrition Assistance Program ("SNAP" a/k/a "food stamps") is similar, with asylees and asylee family members eligible for SNAP without a five year bar; parolees if paroled into the United States for one year or more eligible for SNAP but subject to a five year bar; and unauthorized immigrants, TPS beneficiaries, DACA beneficiaries, and aliens with pending asylum claims ineligible for SNAP. RJN Exh. 224-225; Brown Decl. Exhs. 140-141; Arthur Decl. ¶¶ 130-135. Defendants encourage asylees to apply for

---

[6] The federal government's share is known as the Federal Medical Assistance Percentage ("FMAP"). It is set annually, and varies by program. *See* Arthur Decl. ¶ 118.

those benefits. RJN Exh. 229. And Plaintiff States spend Medicaid funds on asylees via programs that those asylees are eligible for as a result of their immigration status. Sullivan Decl. ¶ 7. The numbers are substantial: By way of quantification, over 190,000 individuals with Florida addresses applied for asylum in 2022, ECF 214-20, with over 1,500 asylum grants to individuals with Florida or Louisiana addresses in 2022, St. John Decl. Exh. 259 at USA13148.

As with the increased Medicaid services available to asylees, their eligibility for SNAP imposes costs on the State, including increased compliance activities for Louisiana DCFS's limited staff. *See* Brown Decl. ¶¶ 9-11; Arthur Decl. ¶¶ 130-140; Arthur 30(b)(6) Dep. 64:15-71:9, 73:1-25. And, at least for SNAP, the States are responsible for 50% of the administrative costs, which Florida was able to quantify as $2.17 per alien, per month. Bivens Decl. ¶ 3; Brown Decl. ¶ 11. Asylees using TANF/FITAP draw down a fixed block grant, leaving fewer benefits for citizens. Arthur 30(b)(6) Dep. 87:4-89:23; Bivens Decl. Exh. 101. In Florida, the costs are higher. Florida has hundreds of thousands of aliens receiving SNAP or TANF and costing the State hundreds of thousands of dollars every month. Bivens Decl. Exh. 102. Records produced by the Louisiana Department of Children and Family Services identify 380 individuals in 223 asylee case files who received food stamps between March 2020 and June 2023. Brown Decl. ¶ 8 & Exh. 142. And the acknowledged benefit to businesses and aliens of faster work authorization via the Asylum IFR will have an adverse effect on American workers, thereby also causing a second order increase in SNAP, Medicaid, and other benefit expenditures for American citizens. Arthur Expert Dep. 148:2-9; *see also DeCanas v. Bica*, 424 U.S. 351 (1976), *superseded by statute on other grounds as stated in Kansas v. Garcia*, 140 S. Ct. 791, 797 (2020) ("Employment of illegal aliens … deprives citizens and legally admitted aliens of jobs; [and] acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens….").

**F. Defendants limited evidence at most confirms that implementation of the Asylum IFR has been limited.**

    **1. Professor Clemens's expert report cannot be considered. In any event, it merely confirms that implementation of the Asylum IFR has been limited.**

Confronted with an overwhelming factual record, Defendants offer an underwhelming response focused on post-complaint events that are irrelevant to standing. *See GLO*, 74 F. 4th at 272 n.12. Their principal contention is that a professor's unsworn analysis of post-complaint data shows "the IFR does not cause an increase in immigration." ECF 214-1 at 11. But their expert expressly disclaimed that's what he did. Clemens Dep. 79:3-80:6.

Regardless, in a factual 12(b)(1) attack, "materials outside the pleadings must conform to the rules and standards of admissibility." *Jackson v. U.S. Dep't of Housing & Urban Dev.*, 116 F.3d 477, 1997 WL 256046, at *2 (5th Cir. Apr. 17, 1997) (unpublished). The unsworn expert report proffered by Defendants is inadmissible. *See Smith v. Palafox*, 728 F. App'x 270, 275-76 (5th Cir. 2018); *Winstead v. Georgia Gulf Corp.*, 77 F. App'x 267, 271 (5th Cir. 2003). And it's dubious that the contents of that report could be presented in a form that would be admissible. *See* Fed. R. Evid. 702.[7]

*First*, the report relies on an oddly limited set of data. Defendants are required by statute to collect data not just on border encounters, but also "gotaways" and the number of estimated undetected unlawful entries, 6 U.S.C. § 223. They do so in near-real time. Arthur Expert Dep. 219:13-221:1; *see also* St. John Decl. Exh. 270. The numbers of gotaways and undetected unlawful entries are large.[8] Yet Defendants did not supply their expert—Prof. Clemens—with that data. He instead pieced together border encounters data from Defendants' website with older encounters data obtained by

---

    [7] For the avoidance of doubt: Plaintiff States object to all materials proffered by Defendants that do not conform to the rules and standards of admissibility.

    [8] A "got away" is "an unlawful border crosser who--(A) is directly or indirectly observed making an unlawful entry into the United States; (B) is not apprehended; and (C) is not a turn back." 6 U.S.C. § 223(a)(3). There have been more than 1.7 million gotaways since January 2021. *See* Scott Dep. 134:4-10. In March 2023, then Border Patrol Chief Raul Ortiz estimated the percentage of undetected unlawful entries was "probably between 10 to 20 percent." RJN Exh. 201 at 6.

Syracuse University via FOIA, then purported to test whether that limited data established the Asylum IFR "caused an increase in [CBP] encounters," *i.e.*, he did not and could not consider gotaways or estimated undetected unlawful entries. Clemens Dep. 16:10-17:18, 36:9-12. Prof. Clemens then assumed the number of border encounters is "in a fixed proportion" to the number of gotaways, based on a further assumption that "the interdiction effectiveness rate is highly stable over time," in turn based on data that is several years old. *Id.* 99:5-17. He then admitted that "[i]f there are inconsistences [in the data being measured], it would be important to account for them." *Id.*

The undisputed evidence is that Professor Clemens's assumptions were not correct. The Chief Patrol Agent of the Del Rio Sector explained:

> So, by virtue of the fact that I don't have as many agents out on patrol because they're addressing that flow, then **it can provoke the gotaway numbers to be higher** because we're not out there. * * * * At the same time, because we're not out there … **we might be missing some of the gotaways and not know as many as are actually getting away**.

RJN Exh. 200 at 19. Chief Scott's testimony is in accord. Scott Dep. 70:5-71:21. Indeed, Chief Scott pointed to South Texas as an area that historically had "aerostats which [are] basically like a hot air balloon with a camera system looking down" to record gotaways. *Id.* 134:11-136:10. The funding for those aerostats was reprogrammed "to expedite the processing of migrants," "[s]o those areas … without a patrol will have no idea what crossed the border." *Id.* 135:13-19.

Prof. Clemens was unaware of those facts or their impact on his assumption that gotaways were in "fixed proportion" to encounters. When asked if he knew "whether cameras and aerostats were taken off line during the time period of his analysis," Prof. Clemens did not know what an aerostat was and admitted he "did not look at that." Clemens Dep. 98:9-22. And when questioned about factors that might impact gotaway counts, Prof. Clemens demurred that he "had no expertise" on whether "if you had more eyes on those thousands of miles of border, you're more likely to see what's coming across the border," and is "not an expert" in "law enforcement," "what USBP agents

25

do," or how alien counts are registered. *Id.* 91:1-100:15. In short, Prof. Clemens disclaims the expertise necessary to understand whether the data he analyzed is consistent. That his analysis is based on an artificially limited dataset and an incorrect assumption about that data renders it unreliable, inadmissible, and irrelevant. *See Paz v. Brush Eng'd Materials, Inc.*, 555 F.3d 383, 388-89 (5th Cir. 2009); *Guillory v. Dotmar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

*Second*, Prof. Clemens emphasized the limited nature of his analysis. He disclaimed "estimat[ing] what the effect of the [Asylum IFR] was on illegal migration" and "did *not* seek to demonstrate … that it was zero," but only "to determine whether [there] is evidence of the positive effects, which is fundamentally different." Clemens Dep. 79:3-80:6. He even conceded that "[t]he evidence is not inconsistent with the possibility that changes to asylum procedure or processing can be a necessary element of a larger bundle of policies that, together, are sufficient to cause substantial changes in migration behavior." ECF 214-14. And even that limited analysis is undermined by his only having analyzed border encounters (rather than including gotaways and estimates), as well as his concession that border flow is driven by a "complex confluence" of factors. *Id.* 77:19-78:4.[9]

---

[9] Professor Clemens concedes that a simple before-and-after analysis "may not account for underlying trends." ECF 214-14 at 5. *Cf. Tampa Times Co. v. NLRB*, 193 F.2d 582, 583 (5th Cir. 1952) (a simple before-and-after analysis is "not sound logic"). His attempts at technical analyses are also unilluminating. For his second analysis, Prof. Clemens purports to have built "a forecasting model of border encounters of a type known as ARIMA." *Id.* at 5-6. But when asked if there is "a generally accepted way to test a time-varying data series to see if application of an ARIMA model is appropriate," *i.e.*, to test whether the input data is appropriate for an ARIMA model, Prof. Clemens averred "[t]here is no way to look at a graph [of input data] and determine whether or not an ARIMA model will make reliable out-of-sample predictions." Clemens Dep. 148:18 -149:6. He instead pointed to the resulting model's "ability to make out of sample predictions." *Id.* But Prof. Clemens then repeatedly dodged identifying any objective test for that, too, was unable to state what size of a positive effect he would need  to conclude the Asylum IFR impacted border encounters, and pointed only to his "decades of experience" to support his model being informative. *Id.* 156:5-158:21; 168:16-169:9; 182:9-187:17. Prof. Clemens was unable to identify a single published study that applied an ARIMA model to migration data, *id.* 181:2-11, and his claims of experience and general acceptance aren't enough. Such "assurances that he has utilized generally accepted scientific methodology [are] insufficient." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). There must be "some objective, independent validation of [his] methodology." *Id.* Indeed, Prof. Clemens's model errs in direction – it goes up when actual border flow goes down and vice-versa, and his model deviates from

*Third*, Prof. Clemens made clear he "did not look at" "how many of the aliens encountered at the border … during the time period [he] looked at were eligible for processing under the Asylum IFR" or "were actually processed under the Asylum IFR." Clemens Dep. 180:11-181:1. He accordingly refused to testify about whether or not the Asylum IFR would impact migrant behavior if it was only applied to a limited number of asylum applicants. *Id.* 70:1-72:5; 117:16-20. Chief Scott, however, confirmed the obvious: If a pull factor is only available to a tiny subset of migrants, it would be irrelevant or nearly irrelevant to overall border flow, at least in the absence of marketing. Scott Dep. 126:17-127:11. "It's common sense." *Id.* That makes clear that Professor Clemens's limited analysis— at best—confirms what Defendants' themselves concede: The Asylum IFR has only been implemented for a tiny percentage of asylum applicants. But the Asylum IFR is not intended to stay limited, and the presumption of regularity requires the Court to presume it will be fully implemented.

### 2.   The Asylum IFR has increased the asylum grant rate.

Defendants don't dispute that—pre-Asylum IFR—of every 100 credible fear claimants, 81 would be forwarded by USCIS to EOIR for adjudication, but only 45 would the actually file for asylum, of whom only 14 would actually receive asylum from EOIR, *i.e.*, a grant rate of 31% of actual applicants. RJN Exh. 213. In short, 46% (36 of 81) of aliens found to have credible fear didn't even

---

reality by as much as a hundred thousand encounters per month, *i.e.*, approximately 50%. Clemens. Dep. 161:1-162:6. He tried obfuscate those deficiencies by using a logarithmic scale on the graph in his report and averaging the diverging, out-of-phase curves over an extended period of time. ECF 214-14 Fig. 2; *see also* Clemens Dep. 174:5-175:16.

Prof. Clemens's third test fares even worse. He assumed the Asylum IFR applies "to all other children" than "unaccompanied children" and claimed that if "[m]igrants understanding of the … Asylum Processing IFR caused a greater incentive to arrive at the border and attempt entry, [he] expect[ed] to observe a rise in attempted entry by the group subject to the rule (accompanied children) relative to the group unaffected by the rule (unaccompanied children)." ECF 214-14. Defendants concede, however, that "only single adults were processed under the first implementation of the IFR." ECF 214-1 at ECF p.29, a fact of which Prof. Clemens was apparently unaware. *See also* Clemens Dep. 180:11-20. Prof. Clemens repeatedly disavowed expertise vis-à-vis the ins-and-outs of border policies, to the point where he abandoned an attempt to validate his analysis, despite thinking "it might be useful to consider the effect of other changes in asylum policy" like MPP. *Id.* 87:5-89:3. That's because he "came to understand that it would require legal expertise" he did not have. *Id.*

bother to actually apply for asylum, and thus had no chance of receiving asylum and status-dependent benefits. But due to the Asylum IFR's treatment of an credible fear claim as itself an application for asylum, some portion of that 46% will undoubtedly be granted asylum or other relief, with the upshot that the Asylum IFR eliminates the requirement for the alien make written statements about his claim and the ability to cross-examine those statements. *See* 8 C.F.R. 1003.10(b) ("Immigration judges shall … interrogate, examine, and cross-examine aliens and any witnesses.").

Seeking to cook the books, Defendants re-define grant rate to exclude the 46% who would have abandoned their asylum claims under the prior system. ECF 214-1 at 6-7, 13-14. Even that isn't enough. Defendants offer the grant rate pre-Asylum IFR grant rate by asylum officers in <u>affirmative</u> asylum cases as a comparison. Suffice it to say, affirmative asylum applicants are a different category that applicants defensively seeking to avoid removal. *See* RJN Exh. 226. Focusing on data for the Asylum IFR, out of 1,824 AMI Eligible individuals, 404 were granted relief, with 81 more still pending, *i.e.*, a grant rate of at least 22%, as Defendants concede. ECF. 214-1 at 13; ECF 214-2. But an additional 640 of those 1,824 cases were then referred to EOIR for a second bite at the apple, resulting in an additional 159 grants of asylum, *i.e.*, an additional 8.7% of AMI eligible claims. ECF 214-2; *see also* St. John Decl. Exh. 261 at USA12233. So far so good: that 31% grant rate (22% + 8.7%) under the Asylum IFR is about equal to the long-term grant rate of filed asylum applications under the old rule. But that 31% of AMI-eligible cases doesn't include the 81 cases that were still pending AMIs, or the 125 cases that were still pending a second bite at EOIR. Assuming a 31% grant rates in those cases, too, yields an overall grant rate of 34-35% of AMI eligible cases, *i.e.*, higher than under the old system. But the better comparison is the methodology used by the Supreme Court in *Thuraissigiam*: the number of grants compared to the number of referrals from initial credible fear screenings, *i.e.*, 14 grants for every 83 eligible individuals referred to EOIR under the old system, which yields a grant rate of 16.8%.

RJN Exh. 213; *Thuraissigiam*, 140 S.Ct. at 1967 ("In 2019, a grant of asylum followed a finding of credible fear just 15% of the time."). So the grant rate more than doubled under the Asylum IFR.

There was and is good reason to believe grant rates would be higher under the Asylum IFR. The director of USCIS views the mission of USCIS as "services" not "enforcement" of immigration law; she condemned the Border Patrol as a "personal militia" of then-President Trump; and she sought to pause CBP funding. Arthur Decl. ¶88 (citing, *e.g,* St. John Decl. Exh. 271). AOs have well-known ideological predilections, too, with their union repeatedly arguing for fewer restrictions on immigration. *Id.* And simple common sense rejects the contention that an adversarial proceeding has no truth-finding value. Arthur Decl. ¶ 89-92. The post-filing data are in accord with those expectations.

### G.  The Court should draw an adverse inference from Defendants' silence.

Defendants offer no affirmative testimony of their own, instead proffering a small number of documents and an unsworn expert report. Defendants didn't even provide that expert with the border data they possess. "The failure of a [party] to produce relevant important evidence within its peculiar control raises the presumption that if produced the evidence would be unfavorable to its cause." *United States v. Johnson*, 288 F.2d 40, 45 (5th Cir. 1961). And "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.... Silence then becomes evidence of the most convincing character." *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939); *accord Wetmore v. Rymer*, 169 U.S. 115, 127 (1898). So it is here.[10]

## III.   PLAINTIFF STATES HAVE STANDING.

### A.  Plaintiff States suffer financial injuries from the Asylum IFR.

"It is well established that a financial loss generally constitutes an injury," as is any resulting pressure to change State law. *Texas v. United States*, 787 F.3d 733, 748-49 (5th Cir. 2015). Accordingly,

---

[10] Plaintiffs can't be faulted for not anticipating Defendants' arguments: Defendants refused to answer interrogatories on that point. *See* Mot. (ECF 203) & Mem. (ECF 203-1).

a State has standing to challenge an immigration policy that enables additional aliens to obtain a benefit paid for by the State. *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) ("*Texas DAPA*"), *aff'd by an equally divided court*, 579 U.S. 547 (2016). Defendants acknowledge the Fifth Circuit held as much, ECF 214-1 at 23, but insist the Fifth Circuit's controlling cases were undermined by *Priorities*, 599 U.S. 670. That case did no such thing.

In *Priorities*, the Supreme Court acknowledged "[m]onetary costs are of course an injury." *Id.* at 676. It noted, however, "that the alleged injury must [also] be legally and judicially cognizable." *Id.* The plaintiff states in *Priorities* had "not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies," and the Court "has previously ruled that a plaintiff lacks standing to bring such a suit." *Id.* at 677 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). So the Court simply applied its precedent in *Linda R.S.* anew.

The Supreme Court emphasized the limited nature of its holding: even in the context of arrests and prosecutions, "the standing calculus might change [1] if the Executive Branch wholly abandoned its statutory responsibilities," [2] if the challenged policy "involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status," or [3] the challenged policy was "governing the continued detention of noncitizens who have already been arrested." *Id.* at 683 (emphasis in original). That's because in those circumstances, "the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id.* The Court then cited *Department of Homeland Security v. Regents of the University of California*, 140 S.Ct. 1891 (2020), for the proposition that "benefits such as work authorization and Medicare eligibility accompanied by non-enforcement mean that the policy was 'more than simply a non-enforcement policy.'" It similarly cited *Texas DAPA* for the proposition that *Linda R.S.* "'concerned only nonprosecution,' which is distinct from 'both nonprosecution and conferral of benefits.'"

30

Here, Plaintiff States suffer financial injury—via education and emergency medical services—arising from aliens who were or will be detained then released, in at least some cases pursuant to provisions in the Asylum IFR that reflect wholesale abandonment of the statutory requirements for detention and for parole to be determined on a case-by-case basis, as well as a change in standards for that determination. Plaintiff States also are suffering are or will suffer increased expenditures on costly, status-dependent benefits—Medicaid, SNAP, and TANF—via more and expedited grants of asylum, including via the increase in fraudulent and non-meritorious grants inherent in switching to a non-adversarial process. Those benefits-based injuries are of the type held sufficient for standing in *Regents* and *Texas DAPA*, and that the Court expressly distinguished in *Priorities*. And Plaintiff States' evidence of increased cost from the Asylum IFR distinguishes *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

Falling back, Defendants urge *Regents* and *Texas DAPA* weren't about asylum, ECF 214-1 at 30-31, but both cases were challenges to policies affecting immigration status. In *Regents*, the Court distinguished the non-enforcement cases that subsequently underlay *Priorities* and characterized the case as being about an "affirmative act of approval" that resulted in "access to … benefits." 140 S. Ct. at 1906. *Texas DAPA* was similarly about an immigration "classification" that "makes otherwise ineligible persons eligible to qualify" for benefits. 809 F.3d at 148-149. Courts routinely resolve disputes about the rules governing asylum, withholding of removal, and CAT eligibility, *e.g.*, *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020), as well as the application of those rules to individual applicants, *e.g.*, *Kaboh v. Barr*, 826 Fed. App'x 381 (5th Cir. 2020), and at least one court has already rejected Defendants' argument, *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278, at *6 (N.D. Cal. July 25, 2023). Contrary to Defendants' suggestion, nothing in *Priorities* suggests cognizability requires the exact same issue to have been litigated before. It's not qualified immunity.

Even if Defendants were correct that a State cannot be injured by "the presence of additional non-citizens who were *properly* granted asylum," ECF 214-1 at ECF p.27 n.11, Plaintiff States would

31

still have standing. That's because Plaintiff States contend only Immigration Judges have statutory authority to grant asylum, withholding of removal, or CAT protection in expedited removal proceedings, and the Court must accept that merits point as true for purposes of analyzing standing. *EEOC*, 933 F.3d at 447. Purported grants of relief by Asylum Officers in expedited removal proceedings are not merely improper, they are void ab initio. And those void grants burden States with providing status-dependent benefits to aliens not entitled to them. *Cf. Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220, 225 (5th Cir. 2013) (an obligor has standing to challenge an assignment as being void). The States have standing.

### B.  Plaintiff States' sovereign or quasi-sovereign interests are harmed.

Defendants' arguments about the federal governments' role in immigration highlight yet another injury to Plaintiff States. "The federal government alone … has the power to classify non-citizens." *Texas DACA*, 50 F. 4th at 516 (citations omitted). An attempt by Plaintiff States "to establish an alternative classification system or work authorizations would be preempted, despite [Plaintiff States'] likely interest in doing so." *Id.* Under Fifth Circuit law, "[t]he importance of immigration policy and its consequences to [Plaintiff States], coupled with the restraints on [Plaintiff States'] power to make it, create a quasi-sovereign interest" sufficient to support standing. *Id.* Defendants' argument based on out-of-circuit precedent is foreclosed. *See* ECF 214-1 at ECF pp.22-23.

### C.  Plaintiff States suffer procedural harm.

Plaintiff States also assert procedural injuries based on violations of the APA. Notwithstanding the associated pocketbook and quasi-sovereign injuries to Plaintiff States, *supra*, Defendants intone that a bare procedural violation, divorced from any concrete harm, isn't enough for standing. ECF 214-1 at 23 (citing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), and *Spokeo, Inc. v. Robbins*, 578 U.S. 330 (2016)). But the cases Defendants cite are unilluminating.

In *Spokeo*, the plaintiff sought relief for "incorrect" statements that violated a federal statute. The Court of Appeals "did not address … whether the particular procedural violations alleged … entail a degree of risk sufficient to meet the concreteness requirement," *i.e.*, establish a *de facto* harm. 578 U.S. at 336, 339-40, 342-43. So the Supreme Court vacated and remanded, noting the limits of its holding: "[T]he violation of a procedural right granted by statute can be sufficient … to constitute injury in fact," and "a plaintiff in such a case need not allege any additional harm beyond the one Congress identified." *Id.* at 341-42. A "risk of real harm" can be enough, and standing is not precluded "even if … harms may be difficult to prove or measure." *Id.* at 342. Far from helping Defendants, *Spokeo* undercuts their argument that standing requires detailed proof of an injury that has already occurred. *Summers* is even further afield. In that case, the plaintiff originally had standing. 555 U.S. at 494. His standing abated, however, when the parties settled their differences on the project at issue. *See id.* "[W]hen a plaintiff has sued to challenge the lawfulness of a certain action or threatened action but has settled that suit," there is no basis for his retaining "standing to challenge the basis for that action," *i.e.*, "the regulation in the abstract … apart from any concrete application." 555 U.S. at 1149-50. Here, in contrast, Plaintiff States assert actual fiscal harm—or a real risk of that harm—by a regulation that continues to affect them.

Defendants' arguments run headlong into the requirement that the Court must "assume, for purposes of the standing analysis, that [Plaintiff States are] correct on the merits of [their] claim[s] that [a rule] was promulgated in violation of the Administrative Procedure Act." *EEOC*, 933 F.3d at 447. Here, Plaintiff States allege Defendants violated the APA by, *inter alia*, acting in excess of statutory authority and contrary to law by permitting AO's to grant defensive asylum, failing to estimate or account for costs to the States of the Asylum IFR, failing to consider obvious alternatives such as hiring more Immigration Judges, ignoring statutory factors such as IIRIRA and the Secure Fence Act, failing to fully consider the effects of eliminating the adversarial nature of asylum proceedings, failing

to consider the impact of eliminating the requirement for a distinct asylum application, failing to consider the impact on illegal immigration rates, failing to consider Defendants' own failure to maintain and utilize detention capacity, denying Plaintiff States notice and the opportunity to comment via twenty-three major changes, and failing to address the comments the Plaintiff States did make. ECF 86 ¶¶ 144-215. And even if the Fifth Circuit did not require the Court to accept those merits allegations as true, the undisputed evidence supports them. It's undisputed, for example, that EOIR and USCIS failed to consult the Border Patrol, then disregarded the adverse advice the Border Patrol provided anyway. And on its face, the Asylum IFR acknowledges it will result in the more rapid grant of status-dependent benefits, but inconsistently claims the financial impact to States will be zero.

Moreover, "'States are not normal litigants for the purposes of invoking federal jurisdiction' and may be 'entitled to special solicitude'" in the standing analysis. *Texas DACA*, 50 F. 4th at 514. Here, Plaintiff States "assert a procedural right under the APA to challenge agency action," and the Asylum IFR implicates Plaintiff States' "quasi-sovereign interest in classifying aliens." *Id.* at 515. Special solicitude applies.[11] Even without special solicitude, "a litigant to whom Congress has accorded a procedural right to protect his concrete interests" "can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007).

### D.  Plaintiff States' injuries satisfy the imminence and traceability requirements.

The real meat of Defendants' arguments touch on imminence and traceability. Their central premise is that Plaintiff States lack standing to assert a facial APA challenge brought before the Asylum IFR went into effect. If Defendants were correct, there could almost never be a pre-enforcement challenge to a rule. That's not the law. It is enough that there is a "substantial risk" of injury such that

---

[11] Contra Defendants, that the Supreme Court did not apply special solicitude in *Priorities* does not undercut that doctrine. *Massachusetts* has not been overruled, and it is the Supreme Court's "prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016).

"future injury is fairly likely." *Alliance for Hippocratic Med. v. FDA*, 78 F. 4th 210, 227-28 (5th Cir. 2023), *cert. granted* 2023 WL 8605744 (Dec. 13, 2023).

Here, Defendants conceded in the MOU that policies like the Asylum IFR can adversely impact States, Chief Scott confirmed that was correct, Defendants' own employees advised them the Asylum IFR would increase border flow, and both Chief Scott and Judge Arthur reached the same conclusion. Indeed, the undisputed evidence is that Defendants' position—as distinguished from the arguments of their counsel—is that border flow responds to policy in predictable ways. With respect to effects on Plaintiff States, the Asylum IFR concedes it will speed the grant of status-dependent benefits, which will inherently cost Plaintiff States more money for State-paid status-dependent benefits like Medicaid, SNAP, and TANF. Nothing Defendants have proffered counters that evidence. And the Supreme Court made clear in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), that such large-scale evidence regarding the predictable responses of third parties is fully sufficient to demonstrate standing.

Nor does standing require tying particular costs to particular aliens. Standing certainly does not require Plaintiff States to themselves track data needed to do so. ECF 214-1 at 231. Plaintiff States need only show by a preponderance of the evidence that some quantum—not a specific amount—of those costs have been or are likely to be incurred as a result of the Asylum IFR. *Texas DACA*, 50 F.4th at 517–18 ("The record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no one doubts that some are"); *Texas DAPA*, 809 F.3d at 155 (precise quantification of costs not required). Even a small amount of money is ordinarily a sufficient injury for standing purposes. *E.g.*, *Czyzewski v. Jevic Holding Corp.,* 137 S. Ct. 973, 983 (2017).

Florida has, in fact, shown it spent identifiable funds on an alien granted asylum under the Asylum IFR. And the number of asylum claims is vast, now totaling hundreds of thousands per year in Florida and Louisiana alone. Any argument that the number of aliens attracted by the Asylum IFR,

granted parole or otherwise released under Asylum IFR, or granted relief under the Asylum IFR are only a fraction of the large number of aliens that cost Plaintiff States millions of dollars per year does not detract from Plaintiff States' standing. *Texas DACA*, 50 F.4th at 519 ("DACA is not the sole cause of the State's injury, but DACA has exacerbated it. That is sufficient"). No alien subject to expedited removal can receive a lawful grant of asylum from an Asylum Officer. Worse, the undisputed testimony is that the Asylum IFR will act as a significant pull factor when more fully implemented.[12]

Standing is also not an accounting exercise. *See, e.g.*, *Texas DAPA*, 809 F.3d at 155–56 ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant."). Defendants nevertheless urge the Asylum IFR has some type of net benefit, but they offer no evidence of it. Defendants instead speculate that "individuals who are denied asylum *may* be removed … more quickly." Dkt. 214-1 at 19. But the actual evidence is that the removal rate has collapsed even as the influx of aliens surges. RJN Exh. 210.

**E.  Plaintiffs States' injuries are redressable.**

Once again, the undisputed evidence is that the Asylum IFR is a pull factor or will be a pull factor when more fully implemented, and that the faster grants of asylum under the Asylum IFR will result in increased expenditures to States. And, once again, the Plaintiff States contend any grant of relief by an Asylum Officer is void, such that the States will be unlawfully forced to provide benefits to aliens who were not properly granted asylum, withholding of removal, or CAT relief. Setting aside the Asylum IFR will remedy those injuries. *See State v. Rettig*, 987 F.3d 518, 528-29 (5th Cir. 2021); *see also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (finding redressability because executive officials "would abide by an authoritative interpretation of the census statute … by the district court"). With

---

[12] Defendants suggest Plaintiff States must establish detailed ties between funds spent and individual aliens, but then point to decreases overall expenditures by Florida agencies and the total number of students in Louisiana schools (including citizens) as somehow relevant to standing. A consistent approach to standing and evidence is not Defendants' strong suit.

respect to procedural injuries, "[w]hen a litigant is vested with a procedural right, the litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 517-18. A grant of APA relief creates just that possibility. *Id.* at 526. Plaintiff States' injuries are redressable.

### F.   Plaintiff States pass the lenient zone-of-interests test.

"The INA encompasses [Plaintiff States'] concerns about the financial burdens of illegal immigration." *Texas DACA*, 50 F. 4th at 521. "It's clear that the INA aimed, at least in part, to protect States from just those kinds of fiscal harms." *Id.* That's even more clear in view of PRWORA, IIRIRA, their legislative history, and their statutory findings. Likewise the Secure Fence Act, which amends IIRIRA. 120 Stat. at 2638-39. Plaintiff States "pass the lenient zone-of-interests test." *Texas DACA*, 50 F. 4th at 521.

### G.   Each Plaintiff State need not prove standing.

Defendants' argument that States other than Louisiana and Florida should be dismissed appears entirely vexatious and frivolous. To simplify discovery, the parties agreed that Plaintiffs States would rely on "certain discrete programs in the states of Louisiana and Florida" as representative. ECF 98. The parties could do so because "[i]f one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs." *Rettig*, 987 F.3d at 528 (citing *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006)). Nor is there any issue with the scope of relief. On its face, the APA calls for unlawful action to be "set aside" without reference to geography. The same would be true for an injunction. "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas DACA*, 50 F. 4th at 530. "A more limited remedy" than nationwide relief "would detract from the integrated scheme of regulation created by Congress." *Id.*

### H.  Venue is not limited by 8 U.S.C. 1252(e)(3).

As a last gasp, Defendants seek to re-litigate their venue motion. ECF 214-1 at ECF pp.47-48. The Fifth Circuit squarely held, however, that "the *entirety* of the text and structure of § 1252 indicates that it *operates only on denials of relief for individual aliens*." *Texas v. Biden*, 20 F. 4th 928, 977 & n.11 (5th Cir. 2021) (emphasis added), *rev'd* 597 U.S. 785 (2022) ("*Texas MPP*"). The portion of § 1252 at issue in *Texas MPP* is the exception that proves the rule: it bars injunctions "other than with respect to the application of [specified INA] provisions to an individual alien." 8 U.S.C. § 1252(f)(1). Even then, the Supreme Court construed the bar narrowly to permit declaratory judgments by district courts and injunctions by the Supreme Court, 597 U.S at 800-801, analogous to the Court's narrow construction of other provisions of § 1252, *see Jennings v. Rodriguez*, 583 U.S. 281, 292-96 (2018).

Defendants' venue challenge also fails in the details. The provision Defendants point to limits venue for "review of determinations under section 1225(b) … and its implementation." 8 U.S.C. § 1252(e)(3). This suit does not involve any "determination," and it certainly does not involve a determination or implementation "under section 1225(b)." That's because Section 1225(b) governs the initial inspection of aliens and the initial credible fear interview of aliens claiming asylum, *i.e.*, the "expedited removal" portion of the INA. Defendants agree. Since 1997, the considered position of EOIR and USCIS's predecessor has been that the "further consideration" proceedings that come next—and which are at issue in this case—are not part of expedited removal:

> Once an alien establishes a credible fear of persecution, the purpose behind the expedited removal provisions of section 235 of the Act [8 U.S.C. § 1225]  to screen out arriving aliens with fraudulent documents or no documents and with no significant possibility of establishing a claim to asylum has been satisfied. Therefore, the further consideration of the application for asylum by an alien who has established a credible fear of persecution will be provided for in the context of removal proceedings under section 240 of the Act [8 U.S.C. § 1229a].

*Inspection and Expedited Removal of Aliens*, 44 Fed. Reg. 10,313, 10,320 (Mar. 6, 1997). Defendants' counsel can't argue that position away. *See Wages & White Lion Invs., LLC v. FDA*, -- F.4th --, 2024

WL 30287, at *8-9 (5th Cir. Jan. 3, 2024) (en banc). The Defendant agencies can't deviate from it, either, without acknowledging their prior position and explaining the change. *See id.* And the question is one of law that can't be illuminated by remarks in a deposition.[13]

## IV.   NONE OF PLAINTIFF STATES' CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

### A. Plaintiff States state a claim that the Asylum Rule is arbitrary and capricious because it violates the Secure Fence Act.

Defendants next move to dismiss Plaintiff States' Secure Fence Act claim as implicating the Secretary's statutory discretion, citing *Webster v. Doe*, 486 U.S. 592, 600 (1988). Defendants tellingly premise their argument on the Secure Fence Act "vest[ing] discretion *in the administration of the SFA* in the Secretary" of DHS. ECF 214-1 at ECF p.48. Consistent with that argument, the Court held in *Webster* that APA review is precluded if the statue under which those decisions were made commits the decisions to agency discretion. 486 U.S. at 601 (applying 5 U.S.C. § 701(a)(2)). But the exception in *Webster* is read "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhauser Co. v. U.S.F.W.S.*, 139 S. Ct. 361, 30 (2018).

Here, the relevant statute is the INA, not the SFA. And the SFA provides a meaningful standard of review in any event: "achiev[ing] and maintaining operational control over the entire international … borders of the United States," with "operational control" further defined as "the prevention of all unlawful entries into the United States, including entries by … unlawful aliens …." 120 Stat. at 2638. The Secure Fence Act may give the Secretary discretion in *how* to achieve Congress's objective, but it forecloses the Secretary from taking action *contrary* to that objective. That's precisely what Plaintiff States allege the Asylum IFR does: "[R]ather than preventing unlawful entries into the

---

[13] Given that accepting Defendants' arguments on venue would likely trigger yet another APA violation, Plaintiff States request that the Court stay any order transferring venue so that Plaintiff States can seek orderly review. *Cf. Defense Distributed v. Platkin*, 55 F. 4th 486 (5th Cir. 2022).

United States, it incentivizes them." ECF 86 ¶ 170. Plaintiff States do not seek "a general order compelling compliance with the broad statutory objective of 'operational control.'" They instead seek to have the Court set aside a discrete agency action as contrary to that statutory objective.

**B.  Plaintiff States state a Take Care Clause claim.**

The President has a constitutional duty to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. Plaintiff States allege "[t]he Asylum IFR represents an abdication of multiple duties placed upon DHS to enforce immigration law, including clear statutory mandates." ECF 86 ¶¶ 216-220. Defendants' coyly urge that "no court has yet held that the Take Care Clause provides a private right to sue or cause of action." Of course, States are neither private nor normal litigants. And the cases Defendants cite make clear the question is an open one. The Fifth Circuit offers the better path: wait and see if it is necessary to rule on the Take Care Clause claim. *Texas DAPA*, 809 F.3d at 146 & n.9, 149; *see also Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (withholding consideration of Take Care Clause claim because APA claims established necessary likelihood of success).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion to Dismiss should be denied, and summary judgment briefing ordered forthwith.

Dated:  January 29, 2024

Respectfully submitted,

By: */s/ Joseph S. St. John*

STEVE MARSHALL
  Alabama Attorney General
EDMUND G. LACOUR JR.*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

TIM GRIFFIN
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

ELIZABETH B. MURRILL (La #20685)
  Attorney General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ANDREW BAILEY
  Attorney General
MARIA A. LANAHAN*
  OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (314) 340-4978
Maria.Lanahan@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

TREG R. TAYLOR
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
Christopher A. Robison*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

41

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
  Indiana Attorney General
BETSY M. DENARDI*
  Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

MIKE HILGERS
  Attorney General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

RAÚL LABRADOR
  Attorney General,
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KRIS KOBACH
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AUSTIN KNUDSEN
  Attorney General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026

*Counsel for Plaintiff State of Montana*

ALAN WILSON
   South Carolina Attorney General
THOMAS T. HYDRICK*
   Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

BRIDGET HILL
   Attorney General of Wyoming
RYAN SCHELHAAS*
   Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*


* Pro hac vice

GENTNER DRUMMOND
   Attorney General of Oklahoma
ZACH WEST*
   OKLAHOMA   ATTORNEY   GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 522-4798

*Counsel for Plaintiff State of Oklahoma*

SEAN D. REYES
   Utah Attorney General
MELISSA HOLYOAK
   Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

*/s/ Michael Williams*
PATRICK MORRISEY
   Attorney General
LINDSAY SEE*
   Solicitor General
MICHAEL WILLIAMS
   Deputy Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*