# EXHIBIT 2



# Transcript of **Michael Clemens**

Thursday, December 7, 2023

*State of Arizona, et al. v. Merrick Garland, et al.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 136275

1          UNITED STATES COURT OF FEDERAL CLAIMS

2              WESTERN DISTRICT OF LOUISIANA

3                  LAFAYETTE DIVISION

4

    ------------------------------
5                                 :
    STATE OF ARIZONA, et al.,     :
6                                 :
            Plaintiffs,           :
7                                 :
        v.                        :   Case No.
8                                 :
    MERRICK GARLAND, et al.,      :   6:22-cv-01130
9                                 :
            Defendants.           :
10  ------------------------------

11

12

13        Video deposition of MICHAEL CLEMENS, an

14   expert witness herein, held at 1629 K Street, N.W.,

15   Washington, D.C., commencing at 9:01 a.m. on

16   Thursday, December 7, 2023 and the proceedings being

17   taken down by stenotype and transcribed by Catherine

18   B. Crump, a Notary Public in and for the District of

19   Columbia.

20

21

22

```
 1    APPEARANCES:

 2   On behalf of the Plaintiffs:

 3      JOSEPH SCOTT ST. JOHN, ESQ.

 4      Louisiana Department of Justice

 5      Office of the Attorney General

 6      1885 N. Third Street

 7      Baton Rouge, Louisiana  70804

 8      (225) 485-2458

 9      stjohn@ag.louisiana.gov

10

11   On behalf of the Defendants:

12      ELISSA FUDIM, ESQ.

13      U.S. Department of Justice

14      Civil Division

15      P.O. Box 868

16      Ben Franklin Station

17      Washington, D.C.  20044

18      (202) 598-6073

19      Elissa.P.Fudim@usdoj.gov

20

21

22   VIDEOGRAPHER:  DREW VELTZ
```

```
 1                    I N D E X

 2   WITNESS:  Michael Clemens

 3   EXAMINATION                           PAGE

 4       By Mr. St. John:              5, 213

 5       By Ms. Fudim:              207, 219

 6

 7   EXHIBIT NO.            DESCRIPTION            IDENTIFIED

 8   4  - Expert Report of Michael Clemens           19

 9   5  - Notice of Deposition                       40

10   6  - Handwritten Drawing                       170

11

12

13

14

15

16

17

18

19

20

21

22
```

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 6 of 265 PageID #: 10039

1              P R O C E E D I N G S

2          VIDEOGRAPHER:  We are now on the record in

3   the matter of State of Arizona v. Merrick Garland, et

4   al.  Today's date is December 7, 2023 and the time is

5   9:01.

6          This is the video-recorded deposition of

7   Michael A. Clemens, being taken at 1629 K street,

8   Northwest, Suite 600, Washington, D.C.  20006.  I'm

9   the camera operator.  My name is Drew Veltz, in

10  association with TP One.  The court reporter is Cathy

11  Crump, also in association with TP One.

12         Will all attorneys please identify themselves

13  and the parties they represent, beginning with the

14  party noticing this proceeding.

15         MR. ST. JOHN:  Joseph Scott St. John, deputy

16  solicitor for the State of Louisiana and Plaintiff

17  States.

18         MS. FUDIM:  Elissa Fudim on behalf of the

19  United States defendants.

20         MR. FLEISCHMAN:  Matthew Fleischman, DHS.

21         MR. ST. JOHN:  Will the court reporter please

22  administer the oath.



1       Whereupon,

2                       MICHAEL A. CLEMENS

3                was called to testify and, having

4               first been duly sworn, was examined

5                    and testified as follows:

6

7            EXAMINATION BY COUNSEL FOR PLAINTIFFS

8    BY MR. ST. JOHN:

9         Q.    Good morning, Mr. Clemens.

10        A.    Good morning.

11        Q.    Can you state your full name for the

12   record.

13        A.    Michael Andrew Clemens.

14        Q.    Do you understand you're under oath just

15   as if you were sitting in front of a judge and a

16   jury?

17        A.    Yes.

18        Q.    Is there any reason why you can't

19   testify truthfully today, illness, prescription

20   drugs, alcohol, anything like that?

21        A.    No.

22        Q.    Have you ever been deposed before?

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 8 of 265 PageID #: 10041

1          A.    No.

2          Q.    Okay.  Have you ever testified in court

3     before?

4          A.    No.

5          Q.    Let me go over a few rules of the road

6     just to kind of give you an idea of how this is going

7     to go.  I'll ask questions.  Ms. Fudim may object.

8     Those objections have a purpose, but you should

9     ignore them unless Ms. Fudim instructs you not to

10    answer; otherwise, you must answer the question

11    requested.

12          Understand?

13          A.    Yes.

14          Q.    On that note, let's protect our court

15    reporter.  She can't record a shake of the head.  So

16    we need a verbal yes, no, or whatever your answer is.

17    Do you understand?

18          A.    I do and I gave one.

19          Q.    If you answer the question, I'll assume

20    you understood the question.  So if you need

21    clarification, please ask.

22          A.    I don't think you can assume that I

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 9 of 265 PageID #:
10042

1  understand everything you say.  I might not

2  understand that I don't understand it.

3       Q.   I'd ask that you give questions a fair

4  meaning as they were being understood by the average

5  person.  If there is an ambiguity in the question, a

6  distinction you need to make in your answer, or a

7  particular meaning that you assign to a word, please

8  let me know.

9       Does that sound fair?

10      A.   If there's a particular meaning to a

11 word that is common to my knowledge, let you know,

12 yes, I will do that.

13      Q.   A question about a genus covers every

14 species.  So a question about dogs would include

15 golden retrievers, greyhounds, cocker spaniels, etc.

16      Do you understand?

17      If I ask you a question about a category, that

18 includes everything within the category.

19      A.   Can you give me another example besides

20 the dog, maybe one relevant to the case?  I'm not

21 sure I understand what that means.

22      That means my answer about a broader category

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 10 of 265 PageID #:
10043

1    applies to each and everything within that category?

2          Q.     Correct.

3          A.     No matter what the category is.  Okay.

4          Q.     Your answer should be complete.  If your

5    answer to a question is "A" and "B", that excludes

6    "C".  Do you understand that?

7          A.     Yes.

8          Q.     You must answer the question asked and

9    you must do so truthfully and without evasion.  Do

10   you understand?

11         A.     Yes.

12         Q.     Documents do not speak for themselves.

13   Going back to the evasive answer instruction, I would

14   highlight the difference between the, quote, does the

15   document state "X", end quote, and the question did

16   "X" happen.

17         Do you understand the difference?

18         A.     Do I understand the difference between a

19   document saying something happened and the thing

20   happening in reality?  Yes, I understand that

21   difference.

22         Q.     I already answered that question is not

1    an acceptable answer.  If you think I've asked the

2    same question twice, you can, of course, give the

3    same answer, but you can't refuse to answer the

4    question.

5              Do you understand?

6         A.    Yes.

7         Q.    We've already hit on one point

8    protecting the court reporter, so verbal answers, and

9    we also need to try not to talk over each other, so

10   one person speaking at a time.  Okay?

11        A.    Yes.

12        Q.    We'll take breaks about every hour or

13   so.  If you need a break, feel free to speak up, but

14   I would ask that you answer any pending question

15   before we take a break.

16        A.    Yes.

17        Q.    When did you first become aware of this

18   litigation?

19        A.    I first became aware of the litigation

20   in October of last year.

21        Q.    How did you first become aware of this

22   litigation?



1          A.     I got an email from the Department of

2   Justice.

3          Q.     And what did that email say?

4          MS. FUDIM:  Objection, privileged.

5          Don't answer.

6   BY MR. ST. JOHN:

7          Q.     Are you going to accept Counsel's

8   instruction not to answer?

9          A.     It was part of your instruction to me to

10  accept her instruction.  So yes.

11         Q.     No, sir.  You have an independent

12  choice.  You have -- she is rendering advice.  You

13  have to choose to accept that advice.

14         So let me ask you again.  Will you answer the

15  question or will you accept Ms. Fudim's advice?

16         MS. FUDIM:  Objection, instruction not to

17  answer the question.

18         THE WITNESS:  I will follow her advice.

19  BY MR. ST. JOHN:

20         Q.     At the time of that email, had you been

21  retained by the government as an expert?

22         A.     No.



1          MR. ST. JOHN:  Counsel, what's the basis for

2     your instruction not to answer?

3          MS. FUDIM:  Privilege.

4          MR. ST. JOHN:  To a third party that has not

5     been retained as an expert?

6          MS. FUDIM:  I believe that statements and

7     communications that are made in seeking to obtain an

8     individual who's subsequently retained as counsel are

9     covered under the privilege.  The same way as if you

10    go to a medical doctor or a lawyer and seek advice,

11    but don't ultimately retain them, that information

12    remains privileged under the respective privileges.

13         So I instruct the witness not to answer.

14         MR. ST. JOHN:  Which specific privilege are

15    asserting?

16         MS. FUDIM:  Attorney-client privilege because

17    he's an agent of the client.

18    BY MR. ST. JOHN:

19         Q.    Mr. Clemens, you're testifying as a

20    retained expert.  Correct?

21         A.    I don't know the meaning of that term.

22         Q.    You're not a fact witness; you didn't



1    see things going on relevant to this litigation.

2    Correct?

3         A.    I'm not familiar with the definition of

4    a fact witness.  Based on the definition you just

5    gave me, seeing things going on that are relevant, I

6    don't know what that means either.

7         Q.    Sir, you're being paid for your

8    testimony today.  Correct?

9         A.    I'm paid for my time at an hourly rate,

10   yes.

11        Q.    And you're being paid for the hours you

12   spend here today; is that correct?

13        A.    That's my understanding.

14        Q.    Your ultimate conclusion as a testifying

15   expert is that the Asylum IFR does not affect the

16   number of southwest border encounters.  Is that an

17   accurate summary?

18        A.    No.

19        Q.    What's your ultimate conclusion, sir?

20        A.    My conclusion is that the best available

21   evidence does not contain evidence of a positive

22   effect of the Asylum IFR on illegal migration, which

1    is fundamentally different from what you said.

2          Q.    How is that fundamentally different from

3    what I said?

4          A.    Could you repeat your statement?  I'll

5    point out the exact wording.

6          MR. ST. JOHN:  Madam Court Reporter, will you

7    read back the question.

8          [Whereupon, the pending question was read

9    back by the court reporter.]

10         THE WITNESS:  My charge was to assess whether

11   there is evidence of a positive effect.  That is

12   fundamentally different from demonstrating that there

13   is a zero effect.  I did not investigate the latter

14   question, and that's how I interpret your statement.

15   BY MR. ST. JOHN:

16         Q.    So you only investigated whether there

17   is a positive effect, an increase in illegal

18   migration, yes or no, binary?

19         A.    That's not a binary question, because

20   "only investigated" is ambiguous.  I ran three tests

21   to determine whether there is evidence of a positive

22   effect.  I did not find evidence of that positive



1    effect in any of the three tests that I ran.

2          Q.    You did not test for any other effects

3    than a positive effect?

4          MS. FUDIM:  Objection to the form.

5          You can answer.

6          THE WITNESS:  My charge in this case was to

7    assess factual statements in the complaint.  The

8    complaint claims a positive effect.  I was assessing

9    whether there is evidence of that positive effect.

10   BY MR. ST. JOHN:

11         Q.    How do you define "positive effect"?

12         A.    A rise in illegal migration caused by

13   the Asylum IFR of 2022 would be a positive effect.

14         Q.    Are there any other positive effects

15   that you tested?

16         MS. FUDIM:  Objection to form.

17         THE WITNESS:  My charge was to assess whether

18   there is evidence of a positive effect on illegal

19   migration caused by the Asylum Processing IFR of

20   2022.  That was my charge.

21         There are -- there are effects within that

22   are claimed by the complaint that I also



1    investigated, but the central claim is did the Asylum

2    Processing IFR of 2022 cause an increase in illegal

3    migration.

4    BY MR. ST. JOHN:

5         Q.    So the question you tested was did the

6    Asylum IFR cause an increase in illegal migration?

7         A.    Yes.  I determined whether there is

8    evidence of that positive effect, which is different

9    from testing whether it happened or did not happen.

10   Those are fundamentally different things.

11        Q.    Sir, you tested whether the evidence you

12   developed or provided demonstrated an increased level

13   of illegal migration tieable to the Asylum IFR?

14        A.    I don't understand what evidence that I

15   developed means.  I didn't develop evidence.

16        Q.    You used the word "evidence" as part of

17   your test.  What evidence were you looking at?

18        A.    I used a comprehensive database on all

19   inadmissible migrants encountered at the U.S.

20   southwest border published by Customs and Border

21   Protection.  I didn't develop it.  They developed it.

22        Q.    Is that the only evidence you



1    considered?

2         A.    I used also a basic and nonlegal

3    specialist knowledge of the Asylum Processing IFR,

4    very broad characteristics of that, especially its

5    timing.  That was important.  I looked at, but did

6    not ultimately use, in forming opinion data about the

7    Remain in Mexico Policy of 2019.  As I note in the

8    report, I looked it at it, but I did not use it in

9    forming my opinion.

10        Q.    Did you use any other data than the CBP

11   data, Syracuse TRAC data, and MPP data?

12        A.    I used a specific unemployment rate

13   published by the Bureau of Labor Statistics in one of

14   the assessments I did.  I used definitions of

15   unaccompanied minor and accompanied minor that were

16   not within the CBP data, but alluded to in the CPB

17   data, and there may have been others that don't come

18   to mind at this time.

19        Q.    Sir, now is the time.  Was there any

20   other data?

21        MS. FUDIM:  Objection.

22        THE WITNESS:  I told you the ones that come

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 19 of 265 PageID #:
10052

1    to mind at this time.   I cannot guarantee to you that

2    I'm not forgetting one at the moment.

3    BY MR. ST. JOHN:

4         Q.    Every piece of data you looked at would

5    be included in your expert report; is that correct?

6         A.    It depends on what you mean by data.

7    Every piece of quantitative data that I used in the

8    expert report, the CBP data, both directly from CBP

9    and via TRAC, the data on MPP that I looked at, but

10   did not use, the unemployment rate for Hispanic and

11   Latino workers published by BLS, information about

12   the timing and nature of the Asylum Processing IFR of

13   2022, those are the ones that I recall now.   I can't

14   recall any others.

15        Q.    But if I wanted an exhaustive list, I

16   could look at your expert report; is that correct?

17        A.    There is no quantitative data I

18   considered that is not referenced in the report.

19        Q.    Is there any nonquantitative data that

20   you considered that's not referenced in the report?

21        A.    I don't know what data means in this

22   context.



1          Q.    Is there anything --

2          A.    You mean information?

3          Q.    Is there any information you relied on

4    or considered that is not referenced in your expert

5    report?

6          A.    I relied on a lot of information.  I

7    relied on my training as an economist at Harvard

8    University.  I relied on my 21 years of experience in

9    doing peer-reviewed research.  I relied on my

10   background in studying international migration,

11   including movements at the U.S. border.

12         I relied on a great many things that are

13   implicit in the report, but are not explicitly listed

14   in the report.

15         Q.    Sir, have you seen the complaint in this

16   litigation?

17         A.    Yes.

18         Q.    When?

19         A.    When is the last time I saw it?

20         Q.    When is the first time you saw the

21   complaint?

22         A.    The first time I saw the complaint, I

1    think it was in March of this year, but I don't

2    recall exactly when the first time I saw it was.

3         MR. ST. JOHN:  I'm handing the witness a

4    document that we will mark as Exhibit 4.

5                        [Exhibit No. 4 was marked

6                        for identification.]

7         MS. FUDIM:  Is four a continuation of

8    numbering from a prior dep?

9         MR. ST. JOHN:  It's my internal system.

10        MS. FUDIM:  Okay.  So just to be clear for

11   the record, there is no one, two, and three at this

12   dep; we're starting at four?

13        MR. ST. JOHN:  Correct.

14        MS. FUDIM:  Okay.

15   BY MR. ST. JOHN:

16        Q.   Mr. Clemens, you've been retained as an

17   expert in this litigation.  Correct?

18        A.   I don't know the meaning of those terms,

19   "retained" or "expert".

20        Q.   Sir, you don't know what an expert is?

21   You have 21 years of experience and a Harvard degree

22   and you're testifying today you don't know the

1   meaning of the word "expert"?

2        A.    I am familiar with the word "expert" in

3   the English language.  "Retained as an expert" sounds

4   like a technical legal term.  I don't know what it

5   means.

6        Q.    Sir, you signed a contract with the

7   defendants.  The defendants are paying you for your

8   time and your testimony.  Correct?

9        A.    It is correct that the defendants are

10  paying me for my time, including this testimony.  I

11  am not familiar with "retained as an expert".  I

12  don't know if it would contradict the meaning of some

13  other legal term, and I don't recall the exact

14  wording of that contract which was signed several

15  months ago.

16       Q.    When was the contract signed?

17       A.    I think it was in March, but I can't

18  remember exactly.

19       Q.    Sir, is Exhibit 4 a copy of a report you

20  prepared?

21       [Witness peruses exhibit.]

22       THE WITNESS:  I didn't make this printout.  I

1    can't vouch for its accuracy.

2          MR. ST. JOHN:  Counsel, I'm going to

3    represent this is a printout of a document that the

4    United States produced.  Is this Mr. Clemens' expert

5    report?

6          MS. FUDIM:  To me, it appears to be, but I

7    can't substitute my own statements for that of the

8    witness, but we will accept your representation for

9    the purpose of the deposition that this is a copy of

10   the expert report.

11   BY MR. ST. JOHN:

12         Q.    Sir, I ask you to turn to page 11 of

13   Exhibit 4.

14         Sir, is that your signature?

15         A.    Yes.

16         Q.    Do you have any reason to doubt that

17   Exhibit 4 is not [sic] a complete and accurate copy

18   of your expert report?

19         A.    I can't independently vouch for it.

20         Q.    That's a different question, sir.  Do

21   you have any reason to doubt that Exhibit 4 is a

22   complete and accurate copy of your expert report?



1        A.     I would not be able to answer that

2    question without reading the whole thing.

3        Q.     How long do you think it would take you

4    to read the whole thing?

5        A.     I don't know.  To check every word in it

6    to see that nothing was changed in it might take half

7    an hour, 40 minutes.

8        MR. ST. JOHN:  Start reading, sir.  You can

9    read it and let me know if that is a copy of your

10   expert report, and if there's anything that you think

11   is not part of your expert report, please let me

12   know.

13       MS. FUDIM:  Let's go off the record if you're

14   going to review it.

15       VIDEOGRAPHER:  Off the record.  The time is

16   9:22.

17       [Recess.]

18       VIDEOGRAPHER:  On the record.  The time is

19   9:40.

20       MR. ST. JOHN:  Mr. Videographer, what time

21   did we go off record?

22       VIDEOGRAPHER:  We went off record at 9:22.

1  BY MR. ST. JOHN:

2       Q.    Mr. Clemens, having had 18 minutes or so

3  to review your Exhibit 4, is Exhibit 4 a copy of a

4  report you prepared?

5       A.    I didn't notice any difference between

6  this printout and my report.

7       Q.    Federal Rule of Civil Procedure 26

8  requires that your report include, quote, a complete

9  statement of all opinions the witness will express

10 and the basis and reasons for them, end quote.

11      Does Exhibit 4 include a complete statement of

12 all opinions you will express and the basis and

13 reasons for them?

14      A.    As I wrote in the report, I might form

15 additional opinions if I receive additional evidence.

16      Q.    Sir, is that a yes or a no?

17      MS. FUDIM:  Objection.

18 BY MR. ST. JOHN:

19      Q.    Does Exhibit 4 include a complete

20 statement of all opinions you will express and the

21 basis and reasons for them?

22      If your answer is no, you can testify to that,



1    but it's a yes or no question.

2            MS. FUDIM:  Objection.

3            THE WITNESS:  It's contingent on future

4    events.  If I receive additional information, I might

5    form additional opinions in considering that

6    information.  So I can't answer a conditional future

7    event with yes or no.

8    BY MR. ST. JOHN:

9            Q.    As of today, does Exhibit 4 include a

10   complete statement of all opinions you will express

11   and the basis and reasons for them?

12           A.    As of today, does it include all the

13   opinions I will express?  Part of that sentence

14   refers to today.  Part refers to the future.

15           I may express additional opinions in this case

16   if I receive additional information.

17           Q.    Sir, you're obligated to produce a

18   written report.  Do you understand that?

19           MS. FUDIM:  Objection.

20           THE WITNESS:  I did produce a written report.

21   I'm not familiar with whether the law obliges me to

22   do that.



1   BY MR. ST. JOHN:

2          Q.     I'm informing you it does.  I'm

3   representing to you that it does.

4          Exhibit 4 is your report.  Correct, sir?

5          A.     I did not notice any difference between

6   this printout and my report.

7          Q.     Sir, is Exhibit 4 a complete statement

8   of all opinions you will express and the basis and

9   reasons for them?

10         A.     My report is and I did not notice a

11  difference between this printout and my report.

12         I just misspoke.  Again, you referred to

13  "will" and I may or may not, as I indicated in the

14  report, form additional opinions if I receive

15  additional evidence to consider.

16         Q.     Rule 26 requires that your report

17  include, quote, the facts or data considered by the

18  witness in forming, end quote, your opinions.  Does

19  Exhibit 4 include a complete statement of all facts

20  or data considered by you in forming your opinions?

21         A.     My report does and I don't notice a

22  difference between Exhibit 4 and my report.



1          Q.    Rule 26 requires that your report

2   include, quote, any exhibits that will be used to

3   summarize or support, end quote, your opinions.  Does

4   Exhibit 4 include all of the exhibits you will use to

5   summarize or support your opinions?

6          A.    My report includes all exhibits that I

7   did use to support the opinions that I expressed in

8   the report as a matter of the past.  You referred to

9   the future with the word "will", and if I receive

10  additional evidence, I will consider it in forming

11  future opinions.

12         Q.    Well, sir, the rule uses the word

13  "will".  So the rule is referring to the future

14  tense.  Your point is a fair one, but the rule uses

15  the word "will".

16         So Rule 26 requires that your report include

17  any exhibits that will be used to summarize or

18  support your opinions.  Does Exhibit 4 include all

19  the exhibits that you will use?

20         MS. FUDIM:  Objection, calls for a legal

21  conclusion.

22         You can answer.



1          THE WITNESS:  My understanding of the word

2    "will" in that context refers to my testimony here

3    today, and between writing the report and today, I

4    have not received additional evidence that I would

5    consider in revising or creating additional opinions.

6    I can't refer to the future starting from today

7    because, as I wrote in the report, if I receive

8    additional evidence, I will -- I may form new

9    opinions.

10         Q.    Sir, are you testifying your report may

11   be incomplete?

12         A.    My report is complete given the

13   information that I had when preparing it and which I

14   summarize in it.

15         Q.    In your report, you state that you,

16   quote, specialize in research on the causes and

17   effects of international migration, end quote.  Is

18   that your expertise?

19         A.    I specialize in economic research on the

20   causes and effects of international migration, and

21   the context of that passage that you quoted is that

22   I'm an economist.



1      Q.    Do you have any other areas of

2  expertise?

3      A.    I don't have expertise relevant to this

4  case outside of the economics of international

5  migration, which comprises expertise in statistics

6  and econometrics which I do use in the report.

7      Q.    Mr. Clemens, how long did you spend

8  preparing your report?

9      A.    Preparing this report, I took scores of

10 hours.  I don't remember the exact number of hours.

11     Q.    Do you recall how much you billed the

12 defendants for work preparing your report?

13     A.    I believe the amount I've been paid to

14 date is around $60,000.

15     Q.    And your rate is $600 an hour?

16     A.    Yes.

17     Q.    So doing the math, roughly, a hundred

18 hours to date?

19     A.    Yes, including all activities relevant

20 to preparing the report, such as accessing the data.

21 I mean, I didn't spend a hundred hours writing it.

22     Q.    Did you speak with anyone in preparing

1    your report?

2         A.    I discussed everything in the report

3    with the Department of Justice.

4         Q.    Who at the Department of Justice?

5         A.    There were many DOJ officials I spoke

6    to.  I cannot remember them all, but some that were

7    important whose names I do remember include Christina

8    Greer, Evan Schultz, a man named Erez, E-R-E-Z, whose

9    last name I can't remember, and Erin Ryan.  There

10   were others who I can't recall.

11        Q.    What does Ms. Greer do?  What is her

12   role?

13        A.    I don't remember her title.

14        Q.    What does Mr. Schultz do?

15        A.    I don't recall his title and I'm not

16   sure that I ever learned his titled.

17        Q.    Is Ms. Greer an attorney?

18        A.    I don't know her educational background

19   or her title at the Department of Justice.

20        MS. FUDIM:  I'll represent that she's an

21   attorney.

22   BY MR. ST. JOHN:



1          Q.     Is Mr. Schultz an attorney?

2          A.     I did not ask him and I don't remember

3     whether or not he told me.

4          MS. FUDIM:  I'll represent that he's an

5     attorney.

6     BY MR. ST. JOHN:

7          Q.     I'm aware that Mr. Reuveni and Ms. Ryan

8     are attorneys.

9          You said there may have been others.  Were

10    they attorneys?

11         A.     I don't know.

12         Q.     For the others, what was your

13    conversation?

14         MS. FUDIM:  Objection.  I'll instruct not to

15    answer.

16         MR. ST. JOHN:  On what basis?

17         MS. FUDIM:  Privilege.

18         MR. ST. JOHN:  What privilege?

19         MS. FUDIM:  Attorney-client privilege.

20         MR. ST. JOHN:  Are you representing that each

21    other person that the witness spoke with is an

22    attorney?



1          MS. FUDIM:  Or a paralegal or otherwise

2    affiliated with the Department of Justice.

3          MR. ST. JOHN:  Affiliated with the Department

4    of Justice isn't enough.  The Department of Justice

5    is a defendant here.

6          MS. FUDIM:  I instruct the witness not to

7    answer.

8    BY MR. ST. JOHN:

9          Q.   Sir, did you rely on information

10   communicated to you by the people you spoke with at

11   the Department of Justice?

12         MS. FUDIM:  Objection to form.

13   BY MR. ST. JOHN:

14         Q.   You testified that you spoke with people

15   at the Department of Justice.

16         A.   I discussed everything in this report

17   with the people at the Department of Justice.

18         Q.   Did they communicate anything to you,

19   any information, data?

20         A.   Did they communicate information to me

21   while speaking to me?

22         Q.   Information or data that you considered

1    in preparing your report?

2          MS. FUDIM:  Objection to form.

3          THE WITNESS:  I discussed everything in this

4    report with people at the Department of Justice and

5    speaking to a person requires information exchange.

6    I don't understand the question.

7    BY MR. ST. JOHN:

8          Q.   Did anyone at the Department of Justice

9    provide data to you that you considered in preparing

10   your report?

11         A.   The data that I use are publicly

12   accessible.  I got the data from the CPB website and

13   from TRAC at Syracuse University and the information

14   contained in the Asylum Processing IFR published in

15   the Federal Register and the unemployment statistics

16   came from BLS.

17         Every piece of data used in the report comes

18   from publicly-available websites.

19         Q.   Professor Clemens, did you select that

20   day yourself?

21         MS. FUDIM:  Objection to form.

22         THE WITNESS:  Did I select it?  Did I choose

1   to download it?

2   BY MR. ST. JOHN:

3       Q.    Did you choose which datasets to use?

4       A.    Yes.

5       Q.    Did you ask the defendants for

6   additional data?

7       A.    Did I ask the Department of Justice for

8   additional data to support the conclusions in this

9   report?  I did not.

10      Q.    Did anyone affiliated with the United

11  States Government instruct you to use the particular

12  datasets that you did use?

13      A.    No.

14      Q.    Did you consider any testimony in

15  forming your opinions?

16      A.    I don't know what testimony means in

17  this context.  Did I read the court case in order

18  to --

19      Q.    Transcript of a court hearing or a

20  deposition transcript?

21      A.    I can't recall using any court documents

22  of any kind in preparing this report.



1      Q.    Are you aware of testimony by other

2   witnesses in this case?

3      A.    I received and read another expert

4   report filed in the case by a Mr. Arthur.

5      MS. FUDIM:  Can we stop for one second?  My

6   colleague is outside the door and would like to join.

7      MR. ST. JOHN:  Off the record.

8      VIDEOGRAPHER:  Off the record.  The time is

9   9:54.

10      [Ms. Jackson enters the proceeding.]

11      VIDEOGRAPHER:  On the record.  The time is

12   9:55.

13      MR. ST. JOHN:  An additional attorney for

14   defendants has entered the room and sat at the table.

15      Can you make an appearance.

16      MS. JACKSON:  Yes.  My name is Sydney

17   Jackson.  I am appearing for OIL DCS.

18   BY MR. ST. JOHN:

19      Q.    Looking at Exhibit 4, page 2, you

20   identify two paragraphs from the complaint that you

21   were asked to assess; is that correct?

22      A.    These passages refer to two different



1    complaints and they are pieced together with

2    ellipses.  So I don't recall whether they represent

3    one paragraph in the complaint or more than one

4    paragraph in the complaint.

5          Q.    Statements in page 2 of the paragraphs,

6    at the bottom of page 2, are what you were asked to

7    assess.  Correct?

8          A.    I was asked to assess those claims in

9    the context of the entire complaint, yes.

10         Q.    And for Arizona v. Garland, what you

11   were asked to assess was whether the asylum rule,

12   quote, induced a significant increase of illegal

13   migration into the United States, end quote; is that

14   correct?

15         A.    I was asked to assess whether the Asylum

16   Processing IFR of 2022 would -- caused an increase in

17   illegal migration into the U.S. in the context of the

18   entire complaint text.  Yes.

19         Q.    I think you used the same language

20   earlier.  There's no trick.  Illegal migration into

21   the United States is what you said you were

22   analyzing.  Correct?



1          A.     One of the reasons I say in the context

2     of the entire text is that the term "illegal

3     migration" in those passages can't be interpreted

4     independently of the rest of the text.  So it's not

5     possible for me say that I assessed these words and

6     these words alone.

7          Q.     So how are you defining "illegal

8     migration into the United States"?

9          A.     In my report, I test whether -- I

10    conduct three tests of whether the Asylum Processing

11    IFR of 2022 caused an increase in CPB encounters with

12    inadmissible migrants at the southwest border.

13         Q.     Well, that's a different thing from

14    illegal migration into the United States, isn't it?

15         A.     There is no technical definition of

16    illegal migration that is broadly accepted in my

17    discipline.  I used the definition that is implicit

18    in the text of the complaint.

19         Q.     Why did you limit it to the southwest

20    border?

21         A.     I -- the -- it was my understanding that

22    the -- that this is a case brought by Arizona and



1    when they were referring to an influx of migrants

2    into the state, that was the border that they were

3    speaking about.

4         Q.    Sir, I represent the State of Louisiana.

5    The State of Louisiana is a plaintiff in this case.

6    Is the State of Louisiana in the southwest border?

7         A.    I don't believe Louisiana borders

8    Mexico, no.

9         Q.    The State of Florida is a plaintiff in

10   this case.  Sir, is the State of Florida on the

11   southwest border of the United States?

12        A.    The State of Florida does not border

13   Mexico, no.

14        Q.    It's not on the southwest border; nor

15   Florida nor Louisiana are on the southwest border of

16   the United States?

17        Sir, this is -- I have a fifth grade son and

18   he would know this answer.

19        MS. FUDIM:  Objection.

20   BY MR. ST. JOHN:

21        Q.    It's a yes or no question, and if the

22   answer is you don't know, that's fine.  You can



1    testify to that.

2          Is Louisiana on the southwest border of the

3    United States?

4          MS. FUDIM:  Objection, asked and answered.

5    BY MR. ST. JOHN:

6          Q.    You can answer.

7          A.    The State of Florida does not border

8    Mexico.  So I don't believe it's on the southwest

9    border of the United States as I understand that

10   term.

11         Q.    And the same for the State of Louisiana.

12   Right?

13         A.    Right.

14         Q.    And I'm inferring your definition of the

15   southwest border is the border between the -- the

16   land border between the United States and Mexico; is

17   that correct?

18         A.    Yes.

19         Q.    Mr. Clemens, what did you do to prepare

20   for today's deposition?

21         A.    I carried out the research that I report

22   in my expert report.  I reread that report several



1    times.  I reread the complaint.  I read cursorily the

2    report by Mr. Arthur also filed in the case.

3         Nothing else comes to mind.

4         Q.    Did you meet with counsel for the United

5    States?

6         A.    During that time, I did meet with them,

7    yes.

8         Q.    Did you meet with counsel for the United

9    States in the past week?

10        A.    No.

11        Q.    Did you speak with counsel for the

12   United States in the past week?

13        A.    Before this deposition began?

14        I spoke with the Elissa and Matthew on the

15   sidewalk.

16        Q.    So in the past week, your only contact

17   with counsel for the United States is speaking with

18   Elissa and Matthew this morning on the sidewalk?

19        A.    Elissa sent me an email containing a

20   legal document describing the time and place of this

21   deposition, and if -- I can't remember exactly when

22   it arrived, but I believe it was more than a week



1    ago.   I'm not certain about that.

2         Q.    So other than maybe an email containing

3    a document about the time and place of the

4    deposition, your only contact with counsel for the

5    United States over the past week was speaking with

6    them on the sidewalk this morning?

7         A.    I believe so.   I can't remember the date

8    of our last conversation.

9         MR. ST. JOHN:   I'm going to hand the witness a

10   document that we will mark as Exhibit 5.

11                        [Exhibit No. 5 was

12                        marked for identification.]

13   BY MR. ST. JOHN:

14        Q.    It's a Notices of Deposition of Michael

15   A. Clemens.   Mr. Clemens, is the document that the

16   United States provided to you about this deposition?

17        [Witness peruses exhibit.]

18        THE WITNESS:   I don't see a difference

19   between this document and the one I got.

20   BY MR. ST. JOHN:

21        Q.    Is this document why you're here today?

22        You're testifying pursuant to a Notice of



1    Deposition.   Correct?

2         A.    I was already planning to be here when I

3    received this email.

4         Q.    You testified that you did read the

5    Asylum IFR.   Correct?

6         A.    I read it cursorily and without legal

7    expertise that would give me a deep understanding of

8    its meaning.

9         Q.    Mr. Clemens, are you familiar with the

10   terms "push" and "pull" with respect to migration?

11        A.    Those terms are often used in the

12   migration policy debates.   They don't have a

13   technical definition in economics that I know of.

14        Q.    How is the term "push" used in the

15   migration debate?

16        A.    I don't know how everybody involved in

17   the debate would use it, but many people that I've

18   spoken to in the migration policy debate refer to

19   push factors as things that happen without or outside

20   the United States that would influence people's

21   decision to migrate to the United States.

22        Q.    And how is the word "pull" or "pull

1   factor" used in the migration debate?

2          A.    I don't know what any given person in

3   the debate might mean with that term, but it's often

4   used to represent events or forces within the United

5   States that would influence the decision of people

6   outside the United States to migrate to the United

7   States.

8          Q.    I think one pull factor you recognized

9   in your report, if I recall, is the unemployment rate

10  in the United States.  Is that a fair example?

11         A.    I don't use the term "pull factor" in my

12  report to my recollection.  In the economics

13  literature, the unemployment rate in the United

14  States is recognized as a potential influence on a

15  migrant's decision to come to the United States.

16         Q.    Do you agree that domestic policy within

17  the United States can impact migration?

18         A.    Hypothetically, U.S. domestic policy

19  could impact the decision of people, of some people,

20  some of the time to migrate to the United States,

21  yes.

22         Q.    Some policies would incentivize



1    migration and some policies might disincentivize

2    migration; is that fair?

3            A.    Some policies could incentivize

4    migration.  Some policies might have no effect on

5    migration decisions.  Some policies might

6    disincentivize migration.  Yes.

7            Q.    Do you know if the -- strike that.

8            To your knowledge, is it generally accepted

9    that the likelihood that a migrant will be released

10   into the interior of the United States can

11   incentivize migration?

12           A.    In economic research, the migration

13   decisions are driven by a complex confluence of

14   relative incentives, information, perceptions, means,

15   and opportunity and it is certainly not generally

16   accepted in economics that changes in asylum policy

17   would necessarily cause changes in behavior, in

18   migration behavior.

19           Q.    Mr. Clemens, that's not the question I

20   asked.  I asked about likelihood of release.

21           If it's more likely that a migrant is going to

22   be released into the interior of the United States



1    versus detained in a prison, would that tend to

2    incentivize migration?

3           A.    Incentivize migration behavior.

4           Q.    What's the difference between migration

5    and migration behavior?

6           A.    Migration behavior is driven by a

7    complex confluence of relative incentives,

8    information, perception, means, d an opportunity.  So

9    any given change in one incentive facing a person

10   making a decision, generally, economic research need

11   not be exhibited in their behavior.

12          Q.    A complex confluence, it's difficult to

13   tease out -- your testimony is it's difficult to

14   tease out which particular factor affects migration

15   behavior; is that correct?

16          MS. FUDIM:  Objection to form.

17          THE WITNESS:  I don't know what "difficult to

18   tease out" means.

19   BY MR. ST. JOHN:

20          Q.    Sir, you used the term "complex

21   confluence".  What do you mean by complex confluence,

22   sir?



1        A.      I mean that there are many different

2   forces affecting people's decisions, including

3   migration decisions, and the effects of any element

4   of that bundle are -- could be contingent on other

5   elements of the bundle.

6        Q.      Your report does discuss employment

7   rates in the United States as impacting migration.

8   Correct?

9        A.      It does not take a position on whether

10  or not they impact it.  It notes that in the

11  economics literature, it is -- they are frequently

12  considered as a possible influence on migration

13  behavior, and I include them as a control in one of

14  the tests that I run for that reason.

15       Q.      Some policies can disincentivize

16  migration; is that correct?

17       A.      Some U.S. policy could disincentivize

18  migration for some migrants some of the time,

19  certainly.

20       Q.      Border enforcement increases, that could

21  disincentivize migration.  Correct?

22       A.      Hypothetically, various kinds of law



1   enforcement activity that could be called border

2   enforcement could affect the migration incentive of

3   some migrants some of the time.

4        Q.    Risk of detention can affect migration

5   behavior.  Correct?

6        A.    I'm not aware of any economic research

7   testing that hypothesis, but, hypothetically, that

8   could occur for some migrants some of the time.

9        Q.    Sir, there's no trick here.  It's common

10  sense that if there's a high risk you'll get caught

11  doing something, you could sit in jail or prison for

12  six months or a year, most people most of the time

13  are going to be incentivized not to do that thing.

14  Correct?

15       MS. FUDIM:  Objection.

16       THE WITNESS:  The decision of a person to do

17  a thing, including a decision to migrate to the

18  United States, is driven by a complex confluence of

19  relative incentives, information, perception, means,

20  and opportunity.

21       So, for example, if the price of a

22  cheeseburger were to go down by one cent,



1    hypothetically, that could create an economic

2    incentive to buy more cheeseburgers, but relative to

3    other incentives, such as the Burger King is on fire,

4    that would not necessarily cause a person to buy more

5    cheeseburgers.

6           So it is not possible to categorically state

7    that a change in a certain incentive would cause a

8    behavior.  As I said, it's a complex confluence of

9    relative incentives, information, perceptions, means,

10   and opportunity.

11   BY MR. ST. JOHN:

12          Q.    I think your point is that you could

13   have offsetting factors, the cheeseburger is a penny

14   cheaper versus if I go into Burger King to buy the

15   cheeseburger, I'm stepping into a building on fire.

16   I'm going to weigh those two things and my behavior,

17   my ultimate behavior, would incorporate both.  My

18   decision would incorporate both.  I'm not going go

19   buy the cheeseburger if I'm stepping into a burning

20   building.

21          Is that it?

22          A.    Your decision would incorporate the



1    relative incentives, the information and perceptions

2    that you had, the means at your disposal, and the

3    opportunity to act.  All of those things would need

4    to align for action to take place and it's not

5    possible to say that a change in incentives in one

6    dimension would necessarily be expressed as a change

7    in behavior.

8          That's not how economists think about

9    decisions in general and certainly not about the

10   decision to migrate.

11         Q.    You have a drink sitting on the table.

12   It's out of the frame of the camera.  You're a little

13   bit thirsty.  I'll take a wild guess.  You're a

14   little bit thirsty.  That's why you got the drink.

15   Right?

16         Is that fair?

17         A.    I'm not thirsty.  I like coffee.

18         Q.    You think you'll be thirsty at some

19   point this morning?

20         A.    I might be.

21         Q.    Professor, if I tell you that if you

22   take a drink of water, take a drink of that drink,

1    you can spend the next six years sitting in jail, are

2    you going to take a drink of water or drink that

3    drink?

4           A.    In the economic analysis, people's

5    decision depend on the confluence of relative

6    incentives, information, perceptions, and means and

7    opportunity.  So, for example, if I knew that there

8    was strychnine in the coffee, then I would not.

9           It depends on what is in my information set.

10   It depends on my perceptions of that information.  It

11   depends on the means at my disposal, and it depends

12   upon the opportunity I have to act.

13          Q.    Sir, I gave you a specific factor:  If

14   you take a drink of something this morning, you're

15   going to go to jail for the next six years.

16          We can talk about confluences all we want.

17   You, personally, sir, you're not going to take a

18   drink, are you?

19          MS. FUDIM:  Objection.

20          You can answer.

21          THE WITNESS:  In economic analysis, people's

22   decisions to do anything depends on the confluence of

1   relative incentives of information, perceptions and

2   means and opportunity.

3   BY MR. ST. JOHN:

4        Q.   Sir, that's a pretty strong incentive,

5   isn't it, sitting a year in jail?

6        Going to jail at all is a pretty strong

7   incentive not to do something; is that correct?

8        A.   People making decisions, including

9   migration decisions --

10       Q.   Sir, I'm not asking about migration

11  decisions.  The possibility of going to jail is a

12  pretty strong incentive not to do something?

13       MS. FUDIM:  Objection.

14       You can answer.

15       THE WITNESS:  All else equal, it depends on

16  what you mean by incentive.  Economists never think

17  of incentives in the absolute, but as relative

18  incentives.

19       So if the incentive comes along with

20  something else, such as you can take a drink, but

21  you'll be immediately shot, then there would not be

22  an incentive to do it.



1          So I can't answer this question in the

2   abstract.

3   BY MR. ST. JOHN:

4          Q.     Well, if you're going to get shot,

5   you've got a pretty strong incentive not to take a

6   drink.  Correct?

7          A.     I'm getting confused by this question.

8   You're asking me would I take a drink if was I told I

9   would get shot if I would not take the drink?

10         Q.     We're moving around and around.

11         So the judge in this case is a career DOJ

12  prosecutor.  He put a lot of people in jail.  Did he

13  spend his entire career putting people in jail for no

14  reason?

15         MS. FUDIM:  Objection.

16         THE WITNESS:  I don't know who the judge is.

17  I'm unfamiliar with his career.

18  BY MR. ST. JOHN:

19         Q.     That's not the question I asked.  That's

20  not the question I asked.  Please stick to the

21  question I asked.

22         A.     I said I'm unfamiliar with his career.

1          Q.     Is the -- for most people most of the

2     time, is the threat of jail or prison an incentive

3     not to do things that would cause them to go to jail

4     or prison?

5          A.     It depends on what other incentive

6     they're facing.

7          Q.     That's the net result.  That's the net

8     result.

9          The decision is the net result of all of the

10    different incentives.  Correct?

11         A.     Yeah.

12         Q.     That's the confluence you talked about?

13         A.     Yes.

14         Q.     Incentives are the vectors that you have

15    to sum up.  Right?

16         A.     My charge in this case was to see if

17    there was evidence of decisions reflected by actions

18    taken by people.  So that is what I studied in this

19    case, not hypothetical incentives that they might

20    have faced in a different world where all else were

21    equal.

22         Q.     Sir, I'm entitled to ask you about

1    hypotheticals.  So we're going to talk about

2    hypotheticals.

3         For most people most of the time, the risk of

4    going to jail or prison for doing a thing is a very

5    strong incentive not to do that thing; is that

6    correct?

7         MS. FUDIM:  Objection, asked and answered.

8         THE WITNESS:  It depends on what the crime

9    is.  It depends on what the punishment is and it

10   depends on what those people's alternatives are.

11   That's the way that economic analysis would approach

12   that question.

13   BY MR. ST. JOHN:

14        Q.    Those are the other factors.  Those are

15   the other factors, the other incentives.  You have to

16   sum those things up to get to your confluence.

17   Correct?

18        A.    I don't know how to express this in

19   nontechnical language, but what you're referring to

20   is called by economists an additively separable

21   utility function where you sum up the different

22   incentives to get a certain outcome, and the elements



1   of the decision need not be additively separable.

2   They could interact with each other and multiply each

3   other.

4          So it's not possible for me to state

5   categorically that the decision is the sum of

6   independent incentives that don't depend on each

7   other.

8          Q.    So sitting here today, you won't testify

9   that the risk of going to jail or prison for doing a

10  thing is not an incentive to -- strike that.

11         Sitting here today, you will not testify that

12  the risk of going to jail or prison for doing a thing

13  is an incentive not to do that thing?

14         A.    It depends on how it interacts with the

15  other incentives that that person faces.  I don't

16  think that I could categorically answer that question

17  in theory hypothetically across all human behaviors.

18         MS. FUDIM:  Can we take 30 seconds for the

19  restroom, one minute?

20         MR. ST. JOHN:  Off the record

21         VIDEOGRAPHER:  Off the record.  The time is

22  10:22.



1              [Recess.]

2              VIDEOGRAPHER:  On the record.  The time is

3     10:26.

4     BY MR. ST. JOHN:

5              Q.    Welcome back, Mr. Clemens.

6              A.    Hello.

7              Q.    You understand you're still under oath.

8     Correct?

9              A.    Yeah.

10             Q.    Things other than policies can impact

11    migration levels.  Correct?

12             A.    Things other than government policies

13    can impact people's decisions to migrant, certainly.

14             Q.    Your report acknowledges as an example

15    the clear seasonal variation in border encounters.

16    Is that --

17             A.    Economic research finds a clear seasonal

18    pattern in the border encounters, yes.

19             Q.    Presumably, economic conditions in

20    departure countries would impact migration?

21             A.    Yes.  Economic research finds that one

22    of the influences on migration behavior is economic

1      conditions in the migrant's country of origin.  Yes.

2            Q.     Economic conditions in the United States

3      can impact migration levels.  Correct?

4            A.     Yes.

5            Q.     Political conditions in departure

6      countries can impact migration levels?

7            A.     They can do that, yes.

8            Q.     Policy actions in the United States, I

9      think we've already discussed can impact migration

10     levels.  Correct?

11           A.     Yes.

12           Q.     A recent example of that is Title 42.

13     If you slam the border shut, migration slows down a

14     lot.  Right?

15           A.     I am not aware of any economic research

16     demonstrating an effect one way or the other of Title

17     42.

18           Q.     Are you familiar with the southwest

19     border encounters data?

20           A.     I have looked several times at that

21     data, including for this report.  Yes.

22           Q.     Does it show a sharp drop in migration



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 59 of 265 PageID #: 10092

1   coincides with Title 42?

2          A.    There were a great many things happening

3   in early 2020 alongside that policy change.  Economic

4   research does not contain a finding, to my knowledge,

5   of an effect on Title 42 one way or the other.

6          Q.    So despite the sharp drop associated or

7   the sharp drop in the southwest border encounters

8   that follow Title 42 being put into effect, the

9   confluence of multiple policies makes so that you

10  can't tease out whether it was Title 42; is that your

11  understanding?

12         A.    I'm not aware of a theoretical or

13  empirical reason myself or in the economic research

14  literature to assess any particular effect of Title

15  42 positive or negative on border encounters.

16         Q.    Weather can impact migration.  Correct?

17         A.    The weather can, yes.  There are -- the

18  economic literature has found that weather conditions

19  in origin countries impact migration decisions.  I'm

20  not aware of economic research documenting that

21  weather condition in destination countries can impact

22  migration decisions, but there might be.



1          Q.     Natural disasters can immigration

2   decisions?

3          A.     Yes.   Economic research finds that to be

4   the case.

5          Q.     A natural disaster in the departure

6   country might incentivize migration.   Correct?

7          A.     A natural disaster in the departure

8   country could change the relative expected welfare of

9   migrants in the departure country versus the

10  destination country and, therefore, shape the

11  incentive to migrant.   Yes.

12         Q.     And a natural disaster in an intervening

13  country can do the same thing?

14         If the road is washed out and not there

15  anymore, that's probably going to disincentivize

16  migration.   Correct?

17         A.     It depends on the relative incentives

18  faced by migrants.   If migrants face a strong

19  incentive to move, one washed-out road may or may not

20  stand in their way.

21         It also depends, as I said, on the information

22  about the natural disaster, the perceptions of the



1    natural disaster, and the means and opportunity they

2    have to act.

3         Q.    Well, there are several factors.  Some

4    of those factors are unpredictable?

5         A.    What do you mean by unpredictable?

6         Q.    You don't know six weeks in advance

7    there's going to be a natural disaster?

8         A.    Oh, certainly.

9         Q.    You probably don't know six weeks in

10   advance there's going to be a coup in a departure

11   country?

12        A.    Depending on the -- there are social

13   scientists who assert to predict coups with some

14   accuracy, but they can't be known of a certainty,

15   absolutely not.

16        Q.    Some of those factors could result in

17   large pulses of migration.  Correct?

18        MS. FUDIM:  Did you say pulses?

19        [Mr. St. John gestures in the affirmative.]

20        THE WITNESS:  You said natural disasters,

21   coups.  Is that what you mean by factors?

22   BY MR. ST. JOHN:



1          Q.     Natural disasters, weather.  Broader

2    than coups, we'll say political conditions in

3    departure country.

4          A.     Yes.

5          Q.     You can have a sudden change and that's

6    going to result in a pulse of migration?

7          A.     Those could affect migration positively

8    or negatively.

9          Q.     Substantially positively or negatively.

10   Correct?

11         A.     I don't know what you mean by

12   substantially, but they could affect migration

13   positively or negatively or both positively and

14   negatively, resulting in a zero net impact.  In the

15   abstract, it's difficult to say.

16         Q.     Are you aware that the Federal

17   Government has conducted surveys of migrants to

18   ascertain factors that drive migration?

19         A.     I'm not aware of a specific piece of

20   research published by the Federal Government on that

21   subject.

22         Q.     Are you aware that surveys on that



1    subject have been conducted by the Federal

2    Government?

3           A.    I'm aware of surveys on that subject

4    conducted by various entities and I don't know of one

5    that was conducted by the Federal Government itself.

6           Q.    Did you review or consider any of those

7    surveys in forming your opinions?

8           A.    I reviewed them -- I've reviewed

9    several, none of which were conducted by the Federal

10   Government in doing the -- during the time that I was

11   preparing this report, but I did not end up using

12   them and I did not form my conclusions based on them.

13          Q.    Are you familiar with the name Raul

14   Ortiz, O-R-T-I-Z?

15          A.    The name rings a bell.  I am not

16   certain, but I associate that name with the CPB and

17   possibly the U.S. Border Patrol, but I don't have a

18   clear recollection.

19          Q.    Mr. Ortiz was chief of the Border

20   Patrol.  Does that ring a bell or refresh your

21   recollection?

22          A.    I don't remember whether or not I ever

1    knew he was the chief of Border Patrol.

2        Q.    If Mr. Ortiz was the chief of the Border

3    Patrol, would you agree that Chief Ortiz has

4    expertise on border security?

5        MS. FUDIM:  Objection, calls for a legal

6    conclusion.

7        You can answer.

8        THE WITNESS:  I don't have the expertise to

9    assess the expertise of any Border Patrol official.

10   I couldn't form an opinion on that.

11   BY MR. ST. JOHN:

12       Q.    Are you familiar with the name Rodney

13   Scott?

14       A.    I don't recall that name.

15       Oh.  I received a document saying that there

16   was to be a second expert witness alongside Mr.

17   Arthur and it's possible that that was him, but I

18   don't -- but I don't recall clearly.

19       Q.    So you have no reason to doubt that Mr.

20   Scott is an expert in whatever he held himself out as

21   an expert in?

22       MS. FUDIM:  Objection, calls for a legal

1  conclusion.

2       THE WITNESS:  I don't know anything about him

3  and I didn't receive any report by him.  What I think

4  I received, and I'm not sure if that was his name on

5  the document.  It was a -- it seemed to be a notice

6  that he might be offering expert testimony.

7       Again, I cannot recall whether the name on

8  that document was Rodney Scott.

9  BY MR. ST. JOHN:

10       Q.  Let's turn back to Exhibit 4.  I want to

11  kind of focus on what went into your opinion, kind of

12  the box of it.

13       You tested the impact of the Asylum IFR based

14  on the date it went into effect; is that correct?

15       A.  I assessed whether the best data

16  available contained evidence of a positive effect of

17  the Asylum IFR on illegal migration, which is

18  different from what you said.

19       Q.  Well, in order to assess positive

20  effect, whether or not there was a positive effect,

21  you have to know when the Asylum IFR went into

22  effect.  Correct?



1          A.     You referred to testing the impact,

2    which could be interpreted as estimating the impact,

3    and I do not estimate the impact.  I assess whether

4    the evidence -- whether there is evidence of a

5    positive effect, which is different from estimating

6    what is the effect.

7          That's how those terms are used in economic

8    analysis and that's how I'm speaking of them.

9          Q.     In order to assess whether there is

10   evidence of a positive effect of the Asylum IFR, you

11   have to know when the Asylum IFR went into effect.

12   Correct?

13         A.     That is one of the features of the

14   Asylum IFR that would be important to conducting

15   those tests.  Yes.

16         Q.     Another feature of the Asylum IFR that

17   would be important to your analysis is that it,

18   quote, remains in effect as I write this, end quote.

19         That's in your report; is that correct?

20         A.     I recall that being in the report and I

21   recall that being true when I wrote it.  Yes.

22         Q.     So as of August 24, 2023, that's -- you



1    can look at your -- the date on your report.

2              A.    I believe that's the case.  Yes.

3              Q.    And that the rule was in effect for that

4    entire period, the entire period you were looking at

5    the data from May 31, 2022 through August 24, 2023?

6              A.    That's not correct.

7              Q.    How is it not correct?

8              A.    Because the data only extended through

9    March 2023 when I did the analysis.

10             Q.    Another key item is that CPB's southwest

11   border encounter data is a consistent data source

12   over time, meaning that it's accurately counting the

13   same thing throughout the time period you're using;

14   is that correct?

15             MS. FUDIM:  Objection to form.

16             THE WITNESS:  Accurately counting the same

17   thing?  Can you -- I don't understand this question,

18   is it accurately counting the same thing.

19             Is what portion of the data accurate?  The

20   database as a whole?

21   BY MR. ST. JOHN:

22             Q.    Well, the database needs to be recording

1    the same data, the same measurements throughout the

2    time period.  If today, it's measuring kids, and

3    tomorrow, it's measuring women, and two weeks ago, it

4    was measuring men, that's not a consistent data

5    source.

6           The data being measured, it has be the same

7    data stream being measured and that has to be

8    consistent.  Correct?

9           A.    If there are inconsistencies, it would

10   be important to account for them in forming my

11   opinion, and I am aware of a couple of

12   inconsistencies that I did account for.

13          Q.    One was the MPP data; is that correct?

14          A.    No.  I did not use those data in forming

15   my opinion.

16          Q.    So what did you account for?

17          A.    There was a change at the beginning of

18   Fiscal Year 2019 in the definition of accompanied

19   child that is used in the CPB data.

20          Q.    Were there any other changes that you

21   accounted for?

22          A.    I noticed that the CPB data that had

1  been provided to Syracuse University TRAC were only

2  complete up until May 2022, and after that, they were

3  incomplete, suggesting that they had been provided by

4  CPB not long after that, which is why I don't use the

5  TRAC data in or after June 2022.

6       Q.    Anything else?  Any other changes in the

7  data definitions?

8       A.    There may have been, but not that I

9  recall right now.

10      Q.    Another key kind of unstated assumption

11 is that there's an efficient information flow.  So

12 knowledge of the asylum rule was promptly transmitted

13 to potential migrants, is that a necessary assumption

14 to your testimony?

15      A.    It is not necessary and it depends on

16 what you mean by promptly.

17      Q.    Well, if you had a large group of

18 potential migrants that didn't have access to media

19 or anything like that -- they were living in the

20 middle of a forest somewhere in Central America --

21 and they didn't learn about the asylum rule, it

22 necessarily couldn't affect their migration



1    decisions?

2           A.    Migration decisions depend on a

3    confluence of incentives, information, perceptions,

4    means, and opportunity.  So if somebody -- if no

5    migrants had any information that the rule had

6    changed, in principle, it would be difficult to

7    imagine how their behavior could be altered by a rule

8    they didn't know about.

9           Q.    In our discussion of confluence of

10   factors, one thing that seems to underlie that is

11   that the prospective migrants are rational actors.

12   So the marginal migrant will consider all of the

13   different influences that kind of come together in a

14   rational manner to make their decision.

15          Is that correct?

16          A.    I don't make assumptions about how the

17   migrants might hypothetically behave.  I test whether

18   there is evidence for certain kind of behavior in CPB

19   data.

20          Q.    How are you defining positive effect of

21   Asylum IFR?

22          MS. FUDIM:  Objection, asked and answered.

1          THE WITNESS:  I test whether the Asylum

2    Processing IFR of 2022, I test whether there is

3    evidence that the Asylum Processing IFR of 2022

4    caused an increase in illegal migration, in the

5    number of people migrating illegally.

6    BY MR. ST. JOHN:

7          Q.    Another key thing for your analysis is

8    the asylum rule was available to, essentially, all

9    migrants who fell within its scope.  Is that pretty

10   important?

11         A.    That is not an assumption in my

12   analysis.

13         Q.    Okay.  So if there were a lottery for

14   application of the asylum rule and each asylum

15   applicant only had a one in 100 or a one in 1,000

16   chance of being subject to the asylum rule, that

17   would have very little or no impact on their decision

18   to migrate or their migration behavior?

19         A.    The complaint has factual claims that I

20   assessed asserted that there was an effect.  So I

21   tested whether or not there was evidence of that

22   effect.



1          Q.     I understand that's what you tested.

2    I'm asking a hypothetical.

3          If there was a lottery for application of the

4    asylum rule, each asylum applicant reaches into a

5    barrel of numbers and only one in a hundred asylum

6    applicants are subject to the asylum rule, the asylum

7    rule would be unlikely to impact the behavior?

8          A.     I did not make any assessment of whether

9    -- of what potential migrants' hypothetical behavior

10   would be in hypothetical situations.  I assessed the

11   factual claim in the complaint, which was that the

12   Asylum IFR did their change their incentives in a way

13   that necessarily caused more illegal migration, in

14   fact, not in principle.

15         Q.     Well, I'm asking you a hypothetical.  I

16   understand what you did assess.

17         The question is if there was a lottery such

18   that no migrant claiming asylum could be certain he

19   was going to be subject to the asylum rule, that

20   would decrease the impact of the asylum rule on his

21   behavior.  Correct?

22         A.     Migration decisions are a complex



1   confluence of relative incentives, information,

2   perceptions, means, and opportunity, and it would not

3   necessarily have an effect of the kind that you're

4   describing.  It would depend upon the situation.

5          So I can't answer that question in the

6   abstract.

7          Q.    So your testimony today is that even if

8   the asylum rule had a minimal chance of being applied

9   to any particular migrant, you can't say whether or

10  not the asylum rule would impact that migrant's

11  behavior?

12         A.    In my report, I test if there is any

13  evidence to support the claim that the asylum rule

14  did cause an immigration increase --

15         Q.    Sir, I'm not asking about your report.

16         A.    -- in illegal migration.  I don't

17  explore hypothetical scenarios.

18         Q.    Sir, I'm exploring a hypothetical.  I'm

19  entitled to explore the hypothetical.  So I'm going

20  to ask the question again.

21         Madam Court Reporter, will you read back the

22  hypothetical, please.



1           [Whereupon, the pending question was read back

2    by the court reporter.]

3           THE WITNESS:  I cannot testify to something

4    that I did not study and form a carefully considered

5    opinion about.  So no.  I can't say that.

6    BY MR. ST. JOHN:

7           Q.    One of the assumptions you expressly

8    made is, quote, the Asylum Processing IFR does apply

9    to all other children other than unaccompanied

10   children.  That's at page 9 of your report.

11          Is that correct?

12          [Witness peruses exhibit.]

13          THE WITNESS:  I'm not a legal expert, but my

14   understanding now and when I wrote that is that the

15   policy changes brought by the Asylum Processing IFR

16   could potentially change the processing of any child

17   who is not an unaccompanied child, but it would

18   depend on the circumstances of the person who is not

19   an unaccompanied child.

20   BY MR. ST. JOHN:

21          Q.    You're using a different word, sir.  In

22   your report, you said the Asylum Processing IFR does



1    apply to all other children, not could, does.

2            A.    I'm not a legal expert, but my

3    understanding at this time is that the Asylum

4    Processing IFR does not exempt, does not specifically

5    exempt, children who are not unaccompanied children.

6            Q.    So one of the facts, assumptions you

7    relied on is that, quote, the Asylum Processing IFR

8    does apply to all other children, end quote, other

9    than unaccompanied children; is that correct?

10           A.    Well, what I mean there is I am

11   contrasting accompanied children with unaccompanied

12   children.  I'm aware without legal expertise that the

13   Asylum Processing IFR specifically exempts

14   unaccompanied children, and I am indicating that

15   children who are not unaccompanied children are not

16   specifically exempted from it.

17           Q.    Your assumption is that, quote -- sir,

18   will you turn to page 9 of Exhibit 4.

19           A.    Yes.

20           Q.    Under paragraph C, the second

21   sentence --

22           A.    Paragraph 30.



1        Q.      "The Asylum Processing IFR does apply to

2    all other children."

3        Did I read that correctly?

4        A.      I lack the legal expertise to know if

5    the Asylum Processing IFR, if the policy change

6    brought by the Asylum Processing IFR, would pertain

7    to every single accompanied child.  What I meant

8    there is that the Asylum Processing IFR does not

9    specifically exempt children who are not

10   unaccompanied children.

11       Q.      That's not what you said, though, is it,

12   sir?

13       A.      The word "does" apply, the meaning of

14   "does apply", to me, does not necessarily mean that

15   it would create a change in the disposition of every

16   single other child.  It means that they are not

17   exempted from it and they could be affected by that.

18   That's what I meant by that English word.

19       Q.      Elsewhere in Exhibit 4, you state that

20   you, quote, evaluated the effects of the Asylum IFR

21   in isolation, end quote.

22       A.      What do you mean by Exhibit 4?  Which



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 77 of 265 PageID #: 10110

```
 1   paragraph?

 2           There's a Figure 4.

 3           MR. ST. JOHN:  Why don't we go off the record

 4   for just a minute.

 5           VIDEOGRAPHER:  Off the record.  The time is

 6   10:55.

 7           [Recess.]

 8           VIDEOGRAPHER:  On the record.  The time is

 9   11:07.

10   BY MR. ST. JOHN:

11           Q.    Welcome back, Mr. Clemens.

12           A.    Thank you.

13           Q.    You understand you're still under oath?

14           A.    Yes.

15           Q.    I want to go to paragraph 8 of your

16   report.

17           A.    Yes.

18           Q.    Can you read the first sentence --

19   actually, just the first phrase of paragraph 8.

20           A.    The first phrase up to the dash?

21           Q.    Yes.  Correct.

22           A.    "I evaluate the effects of Asylum
```

1    Processing IFR in isolation."

2          Q.    And you go on to say you do not examine

3    whether the Asylum IFR, quote, serves as a necessary

4    element of a bundle of policies that affect migration

5    behavior; is that correct?

6          A.    Yes.  I examined whether there is

7    evidence that the Asylum Processing IFR was a

8    necessary and sufficient condition of an increase in

9    illegal migration, which is a claim in the complaint.

10         Q.    How did you isolate the impact of the

11   Asylum IFR on migration?

12         A.    I tested whether the Asylum Processing

13   IFR by itself exhibits evidence in the CPB statistics

14   of an increase in illegal migration caused by the

15   Asylum Processing IFR alone, not in combination with

16   any other policy.

17         Q.    I understand that's what you claim you

18   did, but the question, my question, is a little bit

19   different.

20         How did you isolate the impact of the Asylum

21   IFR itself on migration?

22         A.    I conducted three different tests to



1    assess whether there is evidence of a causal impact

2    of the policy on illegal migration.  In economic

3    analysis, assessing a claim of causation involves

4    estimating what -- in this case, what the outcome,

5    which in this case is illegal migration, what that

6    would have been for people exposed to the policy if

7    they had not been exposed to the policy, and I used

8    three different ways of estimating that

9    counterfactually.

10          Q.    I understand that's what you did.  My

11   question is a little bit more narrow.

12          How did you isolate the impact of the Asylum

13   IFR?

14          MS. FUDIM:  Objection, asked and answered.

15          THE WITNESS:  Those are the tests that I run

16   and those are -- what I use are well accepted methods

17   in econometrics for testing whether there is evidence

18   of causal effect.

19   BY MR. ST. JOHN:

20          Q.    You've earlier testified that migration

21   behavior is, quote, a complex confluence, end quote,

22   or it's based on a complex confluence of factors.



 1    Correct?

 2           A.     Yes.

 3           Q.     So how did you tease out the effect or

 4    non-effect of the Asylum IFR standing alone?

 5           A.     I did not estimate the effect of the

 6    Asylum Processing IFR.  I examined whether there is

 7    evidence of a positive effect of the Asylum

 8    Processing IFR on illegal migration.  Those are two

 9    different things.

10           Q.     Really, the key thing, though, is you

11    looked at data from before the date the Asylum IFR

12    went into effect and after the date it went into

13    effect; is that it?

14           A.     There are two different, fundamentally

15    different, types of tests that I run.  Both of them

16    are applications of time series econometrics.  One of

17    them uses information only before the date to assess

18    patterns in people unaffected by the policy, because

19    the policy hadn't happened yet.  The other one uses

20    information from both before and after the policy,

21    taking advantage of a subgroup of migrants that were

22    not affected by the policy.



1           By the policy change, I should say.

2           Q.    We're going round and round, but, I

3    mean, you keep saying that these are the tests you

4    ran, but I still don't see how you isolated the

5    effect of the Asylum IFR.

6           A complex confluence of factors is your

7    testimony.  So how did you isolate this one factor?

8           A.    My testimony was that, in theory, in

9    principle, there's a complex confluence of factors

10   affecting migration decisions.  I did not seek to

11   estimate.  I did not quantitatively estimate what the

12   effect of the Asylum Processing IFR was on illegal

13   migration.

14          I sought to determine whether is evidence of

15   the positive effects, which is fundamentally

16   different.

17          Q.    So you can't even rule out a positive

18   effect; all you can say is that the analyses you

19   performed did not demonstrate a positive effect; is

20   that correct?

21          A.    I did not seek to and did not study and

22   did not estimate the quantitative effect of the



1   Asylum Processing IFR on illegal migration.  I did

2   not seek to demonstrate or demonstrate that it was

3   zero, which I interpret as being synonymous with your

4   statement of ruling out non-zero quantities.  I did

5   not seek to do any of those things.  That's not what

6   I studied.

7          Q.    What level of significance of effect

8   would you need of statistics?

9          The proper procedure, as you say ex ante, I'm

10  going to look for an effect at this level of

11  significance; can you generally calculate that?

12         Based on the data you're anticipating, Okay, I

13  need a dataset this large to generate an effect of

14  statistical significance.  Right?

15         MS. FUDIM:  Objection to form.

16         THE WITNESS:  I didn't understand that

17  question.  I did not look for any kind of effect.

18         I assessed whether there was evidence of a

19  particular effect claimed in the complaint.

20  BY MR. ST. JOHN:

21         Q.    What size of effect would you need to

22  see to establish that there was an increase?



1          A.     I conducted three different tests to

2     determine if there is evidence of a positive effect.

3     There was no evidence of a positive effect in any of

4     those three.

5          Q.     Sir, you can keep repeating this.  I'm

6     asking you a different question, and if we need to,

7     I'll get the judge on the phone and he has offered.

8     I'm asking you a very direct question.

9          What size of effect would you have needed to

10    see to conclude there was, indeed, a positive effect?

11         MS. FUDIM:  Objection.

12    BY MR. ST. JOHN:

13         Q.     A change of how many thousands of border

14    encounters would you have needed to see to establish

15    a positive effect?

16         A.     I did not see a positive effect in any

17    of three tests that I ran.  So the standard procedure

18    for a econometrician would be if they observe a

19    positive effect, to determine whether it is

20    statistically distinguishable from zero.  I did not

21    observe any positive effect.  Therefore, it would be

22    inappropriate to test whether it is a spurious



1    positive effect, because I did not detect any

2    positive effect.

3        Q.    Well, what -- here's a different way of

4    asking the question, although, a slightly different

5    question.

6        What size of effect were you capable of

7    detecting via your tests?

8        A.    I use data on the -- what statisticians

9    call the full universe of inadmissible migrants

10   encountered at the southwest border over a 12-year

11   period.  That means CPB represents that that's every

12   man, woman, and child encountered as an inadmissible

13   migrant during that period at the southwest border.

14       So there isn't in this dataset what an

15   econometrician would call a sampling error.  We're

16   looking at all of the data.  So an increase of any

17   magnitude would be an increase in that number, which

18   I do not detect in any of three tests that I ran.

19       Q.    Could you have detected an increase of a

20   thousand migrants per month?

21       A.    There is no increase that is

22   attributable to the Asylum Processing IFR of 2022 in



1   any of three tests that I ran.

2        Q.    It sounds like we're coming back to,

3   Well, there were generally fewer border encounters

4   after the rule went into effect than before, so no

5   positive effect.

6        A.    I run three different tests that are

7   much more rigorous than what you just said.  That's

8   not an accurate summary of what I did.

9        Q.    So what size positive effect could you

10  detect?

11       Could you detect one additional migrant?  Your

12  tests, could they -- if the asylum rule resulted in

13  one additional migrant, could you have detected that?

14       A.    Using the available data and the best

15  methods that I'm aware of, I don't detect any

16  additional migrants.  What I find in all three cases

17  is that the evolution of encounters with inadmissible

18  migrants after the advent of the policy was lower

19  than the three different estimates of counterfactual

20  encounters.

21       Q.    What other policies were being put into

22  effect that would impact migration during the time

1  period you examined?

2          A.     My charge in this case was not to make a

3  comprehensive list of every imaginable force that

4  could affect migration decisions in the relevant time

5  frame.  My charge was to assess whether there is any

6  evidence of an effect of this policy in the best data

7  available.

8          Q.     So other policies could have affected

9  migration during the time period you examined?

10         A.     That is possible and that is one of the

11  reasons why I ran the third test that I run.

12         Q.     So your dataset was southwest border

13  encounters data published by CPB on its public data

14  board.  Correct?

15         A.     And provided to Syracuse University via

16  the Freedom of Information Act request.  Yes.

17         Q.     Why did you go to Syracuse University?

18         A.     It's hypothetically possible I could

19  have requested it myself, but I didn't feel a need to

20  because it's a -- because I tested its correspondence

21  with the public data available starting in FY 2019,

22  and my experience with Freedom of Information Act



1   requests is that they can take several years.  My

2   longest one took five years.

3          So the best course of action was to obtain it

4   from Syracuse University.

5          Q.    Sir, why did you think you needed a

6   Freedom of Information Act request to obtain this

7   data?

8          A.    I did not independently assess whether

9   that was necessary.  I know that that is how Syracuse

10  University states that they obtained it.

11         Q.    You're working for the people that

12  collect the data.  Why didn't you email Ms. Fudim and

13  say, Hey, I need this data?

14         You could have gotten it directly from the

15  Federal Government.  Why didn't you do that?

16         MS. FUDIM:  Objection.

17         THE WITNESS:  I already had the data and I

18  didn't feel a need to request data that I already

19  had.

20  BY MR. ST. JOHN:

21         Q.    What does southwest border encounter

22  data include?  How is it defined?



1          A.     I'm not a CPB official.  I don't have

2   detailed expertise in how CPB assembles that data,

3   but they represent it as comprising inadmissible

4   migrants encountered by USBP or OFO, and the database

5   covers October 2011 through March 2023.

6          Q.     All right.  Your report indicated that

7   southwest encounter data does not include migrant

8   protection protocols enrollment.  That's at page 5

9   and page 12 if you need to check.

10         A.     Could you restate that question?  It

11  does not -- my report does not include it?

12         Q.     No.  The southwest border encounters

13  data published by CPB does not include migrant

14  protection protocols enrollment; is that correct?

15         A.     The database includes all inadmissible

16  migrants, to my knowledge.  That is how CPB

17  represents the data.

18         I don't have -- I'm not a legal expert.  So I

19  don't know whether enrollment in the MPP requires an

20  initial encounter and being ruled inadmissible.

21         Q.     Why did you drop an express footnote

22  about MPP enrollment datasets and state MPP



1    enrollments starting October 2019 are publicly

2    available directly from CPB?

3          That's part of the southwest border encounters

4    data.  Why did you call it out?

5          A.    I didn't use MPP data in forming my

6    opinion.  I considered using it at one point.  I

7    looked in it.  I noted in the report that I looked at

8    it.  I did not use it in forming my opinion, as the

9    report indicates.

10         Q.    Sir, turn to page 5 of your report.  Can

11   you read the first sentence of paragraph 15.

12         A.    "A minor source of data used only in

13   Section 24(c) contains monthly enrollments in the

14   Migration Protection Protocols from January 2019

15   through August 2022 also obtained from CPB by TRAC."

16         Q.    Is that statement correct?

17         A.    This is a typo.  There's no Figure 14 in

18   the report and there's no Section 24(c), to my

19   knowledge.

20         Q.    So you actually did some work that you

21   excluded.  Why did you exclude that?

22         A.    I was tasked initially with assessing

1   the factual claims in the complaint that I report.   I

2   drew on my economic expertise to formulate tests of

3   those factual claims.

4            Initially, I thought it might be useful to

5   consider the effect of other changes in asylum policy

6   and I later decided against that.  That's why I

7   looked initially at the MPP data, and I left that in

8   the report because I had looked at it, but I did not

9   use it in formulating my opinion.

10           Q.    Why did you decide not to go down that

11  road?

12           A.    Because of my -- this is the first time

13  I have done anything like this and I came to

14  understand that it would require legal expertise I

15  don't have to assess the relevance of other asylum

16  policy changes to an evaluation of this asylum policy

17  change.

18           Q.    Why would it require legal expertise?

19           A.    I am not familiar with the details of

20  all of the policy changes brought by the MPP policy

21  and in making a strong argument that the effects of

22  that policy are informative about the effects of the



1    policy in this case, I came to realize, but hadn't

2    realized at the beginning, would have required legal

3    expertise I don't have.

4            Q.     Well, what's the difference between

5    evaluating the impact of MPP and evaluating the

6    impact of the Asylum IFR?

7            A.     The complaint makes factual claims about

8    the effect of the Asylum Processing IFR of 2022.

9    Those were the claims that I was asked to assess, not

10   any other claims.

11           Q.     Did you talk about this other analysis

12   with the United States?

13           MS. FUDIM:   Objection, instruction not to

14   answer on the grounds of privilege.

15   BY MR. ST. JOHN:

16           Q.     Are you going to accept that

17   instruction?

18           A.     Yes.

19           Q.     But for Ms. Fudim's instruction not to

20   answer, would you be able to give me an answer?

21           Do you recall whether you talked about the MPP

22   analysis with counsel for the United States?



1        A.    I don't understand this question.  I'm

2   instructed to answer, but now you're asking me if I

3   would be able to answer had I not been instructed

4   [sic] to answer?

5        Q.    Yeah.  Do you have knowledge of whether

6   you communicated with counsel for the United States

7   about the MPP analysis?

8        MS. FUDIM:  Do you have a recollection one

9   way or the other as to whether that was discussed?

10  Without disclosing the answer to that question, you

11  can answer the limited question if you understand it.

12       THE WITNESS:  I think I understand it and the

13  subject of MPP data was discussed, yes.

14  BY MR. ST. JOHN:

15       Q.    What were the substance of those

16  discussions?

17       MS. FUDIM:  Objection, privileged.

18       Don't answer.

19  BY MR. ST. JOHN:

20       Q.    Are you going to accept that

21  instruction?

22       A.    Yes.



1        Q.     Are you familiar with the border

2   security metrics requirement of Section 1092 of the

3   National Defense Authorization Act of 2017?

4        For the record, it's Public Law 114-328.

5        A.     I'm not a legal expert.  I don't have

6   expertise about any law.

7        Q.     Did you know that the NDAA of 2017

8   requires the Secretary of Homeland Security to

9   develop certain metrics to measure the effectiveness

10  of Border Security?

11       A.     I don't know what the NDAA is.  Maybe

12  you referred to it in the previous -- maybe you

13  defined it in the previous question.  I'm aware that

14  DHS publishes metrics of interdiction effectiveness.

15  Yes.

16       Q.     Are you familiar with the term

17  "got-aways"?

18       A.     I'm not a legal expert, but my

19  understanding at this time is that in the

20  publications reporting the interdiction effectiveness

21  rate, they refer to got-aways as people who enter the

22  United States illegally and are detected by methods

1    other than encounter by CPB agents, other than direct

2    encounter by CPB agents, such as remote sensing, but

3    I don't have expertise in that area.  It's something

4    I read.

5          Q.    For the record, it's defined in NDAA

6    2017 Section 1092(a)(3) and your definition is pretty

7    close.

8          So as you defined it, got-aways are limited to

9    unlawful border crossers that are observed.  Right?

10          They have to be detected by technological

11    means or seen by a Border Patrol agent.  You've got

12    to have some way to count these folks.  Right?

13          A.    My recollection of the publication of

14    the interdiction effectiveness rate is that they

15    don't -- for security reasons, they don't provide a

16    full accounting of what information they base that

17    on.  They give examples of sensors, remote sensing,

18    at least one other method, and then there's some

19    phrase, to the best of my recollection, that refers

20    to unnamed other methods.

21          Q.    I'll make it easier for you.  So a

22    got-away is statutorily defined as, quote, an



1    unlawful border crosser who, "A", is directly or

2    indirectly observed making an unlawful entry into the

3    United States; "B", is not apprehended; and, "C" is

4    not a turn-back.  Turn-backs are further defined as,

5    quote, illegal entrants who agents have scared away

6    and fled back across the border, end quote.

7         So that's observed.  However it's detected,

8    other means, whatever, there is something to register

9    that count.  Correct?

10        MS. FUDIM:  Objection to form.

11        You can answer.

12        THE WITNESS:  I imagine -- I'm not an expert

13   in how they do it, but that sounds plausible to me.

14   BY MR. ST. JOHN:

15        Q.    Sir, again, continuing with this

16   plausibility, some common sense:  You know, if the

17   number of Border Patrol agents devoted to actual

18   patrol duties decreases, those border patrol agents

19   are less likely to observe because they're spread

20   thin on the border; is that a plausible statement?

21        MS. FUDIM:  Objection.

22        You can answer.



1          THE WITNESS:  It would depend on where they

2     were deployed to, how many hours they were working,

3     what they were doing with their time, how the

4     responsibilities were divided among agents.  I don't

5     know that that would necessarily result in an

6     increase or decrease of detention.

7     BY MR. ST. JOHN:

8          Q.    You don't know one way or another?

9          A.    I don't have a reason to think that it

10    would necessarily cause an effect one way or the

11    other.

12         Q.    If someone with that expertise were to

13    testify, you'd have no reason to doubt that

14    testimony?

15         MS. FUDIM:  Objection.

16         You can answer.

17         THE WITNESS:  I don't have expertise in that

18    area.

19    BY MR. ST. JOHN:

20         Q.    Common sense, it's -- how long is the

21    southwest border?

22         A.    I don't remember.  It's thousands of

1    miles long.

2         Q.    If you had more eyes on those thousands

3    of miles, you're more likely to see what's coming

4    across the border.  Correct?

5         MS. FUDIM:  Objection.

6         THE WITNESS:  It would depend on what the

7    eyes are doing.  So I can answer that the question in

8    the abstract and I don't have expertise in this area.

9    BY MR. ST. JOHN:

10        Q.    On the flip side, if you put more eyes

11   on the border, you're more likely to observe what's

12   coming across the border.  Correct?

13        MS. FUDIM:  Objection.

14        THE WITNESS:  It would depend on what the

15   eyes are doing, and I really have no expertise in

16   this area.

17   BY MR. ST. JOHN:

18        Q.    It's fair that if you devote those eyes

19   to patrol -- their job is to see or encounter --

20   they're more likely to observe; is that correct?

21        MS. FUDIM:  Objection.

22        THE WITNESS:  My -- I don't have legal



1   expertise.  I'm not an expert in law enforcement, but

2   my understanding is that USPB officers have many

3   responsibilities and only one of them is looking with

4   their eyes.

5   BY MR. ST. JOHN:

6       Q.    Some Border Patrol agent are instructed

7   to -- here's your pistol, here's your rifle, here's

8   your handcuffs -- go to the border and observe an

9   encounter; is that a fair statement?

10      MS. FUDIM:  Objection to form.

11      THE WITNESS:  I don't -- I'm not an expert in

12  law enforcement.  I could not provide a detailed

13  accounting of what USPB agents do with their time.

14  BY MR. ST. JOHN:

15      Q.    Do you know if the number of Border

16  Patrol agents devoted to patrol duties varied

17  substantially during the time you performed your

18  analysis or the time of your analysis?

19      A.    I tested whether the data from CPB on

20  inadmissible migrants contained evidence of an effect

21  on the Asylum Processing IFR.  That's what I

22  considered.



1      Q.      So you have no idea whether the number

2   of Border Patrol agent devoted to patrol duties

3   increased, decreased, or remained the same?

4      A.      To the extent that that affected

5   migration behavior, it would be addressed by the

6   third test that I run, and that is the reason that I

7   -- that is the most important reason why I ran that

8   test in addition to the others.

9      Q.      We talked about technological measures

10  as well, camera, Areostats.  You know what a camera

11  is.  Right?

12     A.      I don't -- I'm not familiar with the

13  kind of cameras that USBP uses.  I know what a camera

14  is.

15     Q.      Are you familiar with the word

16  "Aerostat"?

17     A.      No.  I don't know what an Aerostat is.

18     Q.      So you don't whether Aerostats are used

19  along the border or not?

20     A.      I've never heard that word before, to my

21  knowledge.

22     Q.      You don't know whether DHS or Border

1    Patrol maintain balloons called Aerostats for the

2    radar and cameras down at the border?

3        A.    I don't know what an Aerostat is still.

4        Q.    Do you know if there are cameras along

5    the border?

6        A.    I'm not an expert on law enforcement in

7    general or at the border.  I have seen photos in

8    journalistic pieces of cameras mounted at the border.

9        Q.    Those cameras or technological measures

10   -- we'll make it broader than cameras -- were taken

11   off line during the time period you analyzed.  Do you

12   know whether they were?

13       Do you know whether cameras and Aerostats were

14   taken off line during the time period of your

15   analysis?

16       A.    My charge in this case was to assess

17   whether the data on inadmissible migrants contained

18   evidence of an effect on the Asylum Processing IFR.

19   My charge was not to collect information on every

20   possible force that could hypothetically have

21   affected illegal migration during that period.

22       So I did not look at that.



1          Q.     Is the southwest border data -- strike

2    that.

3          Does the southwest border encounters data that

4    you rely on include got-aways?

5          A.     It includes only inadmissible migrants

6    who were encountered by CPB, but the got-aways as you

7    defined them earlier are not in the dataset; however,

8    my methods are robust in their absence.

9          Q.     How are they robust in the absence of

10   accounting for got-aways?

11         A.     Because when two numbers are in a fixed

12   proportion to each other, a percentage change in one

13   requires an identical percentage in another and I'm

14   aware due to the DHS publications that you mentioned

15   earlier that the interdiction effectiveness rate is

16   highly stable over time at an average of about 81

17   percent in Fiscal Years 2014 to 2021.

18         Q.     That's the period before the Asylum IFR

19   went into effect.  Correct?

20         A.     Those are all the available data

21   published by DHS.  They haven't published the data

22   for 2022 or they had not when I last looked at it,



1  which was a few weeks ago.

2      Q.    So you were projecting forward that the

3  stability continued?

4      A.    My charge was not to investigate every

5  hypothetical force that could hypothetically have

6  affected illegal migration.  My charge was to assess

7  whether there is evidence in the data that the Asylum

8  Processing IFR of 2022 caused an increase in illegal

9  migration, and the interdiction effectiveness rate

10  has been highly stable over time and I don't have a

11  reason to think that it suddenly changed in June of

12  2022.  No.

13      Q.    But if someone testified that the

14  effectiveness data did change, you would have no

15  basis one way or another to comment on that?

16      MS. FUDIM:  Objection.

17      You can answer.

18      THE WITNESS:  If I learned new information, I

19  would consider that new information.

20  BY MR. ST. JOHN:

21      Q.    Do you know if the number of got-aways

22  has been trending up, stable, or down?

1          A.     Got-aways as a fraction of -- well, I

2    don't know the -- I don't recall the technical term

3    that DHS uses in the publication for detected

4    migrants plus got-aways.  There's some collective

5    term.

6          So I need to backtrack.  I don't know what

7    that term is.

8          The interdiction effectiveness rate, which is

9    one minus the percentage of got-aways, is highly

10   stable over time, suggesting that the fraction of

11   got-aways is also highly stable over time, and that

12   makes the analysis of detected illegal migrants

13   highly informative for this purpose for two reasons.

14         One is what I mentioned before, which is that

15   numbers that are in fixed proportion to each other,

16   even when one of them is not observed, are

17   mathematically required to change in percentage terms

18   that are identical, that is a percentage change in

19   one must be reflected by an identical change in the

20   other.

21         The second is that the complaint that I was

22   asked to assess makes claims about the effectiveness



1    of the Asylum Processing IFR specifically on detected

2    illegal migrants and, separately, on undetected

3    illegal migrants.

4           So it is highly relevant for both of those

5    reasons to test the effect on detected illegal

6    migrants.

7           Q.    Do you know how many encounters there

8    were at the southwest border in Fiscal Year 2023?

9           A.    To date, it's been running something

10   like 2.4 million in 2022 and I believe, but I'm not

11   sure, it's been a little bit higher this year on a

12   monthly basis.  So I would have to make a

13   back-of-the-envelope calculation.  I don't know the

14   number off the top of my head.

15          Q.    FY 2023 is closed, by the way, at the

16   end at the end of October.

17          A.    The last time I looked at the data, the

18   full data had not been published.  So I'm not aware

19   of the full data.

20          Q.    How many encounters nationwide?

21          A.    I did not look at nationwide encounters

22   for my analysis.  I focused on the southwest border.



1          Q.    Do you know how many encounters there

2    were nationwide in FY 2023?

3          A.    I do not know.  I have not looked at FY

4    2023 data since you say it's been published.

5          Q.    Do you know how many got-aways there

6    were in FY 2023?

7          A.    I don't have a reason to think that the

8    interdiction effectiveness rate and, therefore, the

9    got-away rates changed in 2022 or 2023 that would

10   affect my analysis.

11         Q.    600,000 got-aways, does that sound about

12   right?

13         MS. FUDIM:  Objection.

14         You can answer.

15         THE WITNESS:  I -- I'm aware that DHS has

16   published the interdiction effectiveness rate, which

17   is implicitly a measure of the got-away rate, for FY

18   2014 through FY 2021, the last time that I checked,

19   which was a few weeks ago.  Since then, they might

20   have published for 2022.

21         I'm not aware of any public information about

22   2023.

1    BY MR. ST. JOHN:

2          Q.    Policy-wise, did anything big happen in

3    January 2021, January and February of 2021?

4          A.    "Policy-wise", I don't know what that

5    means.

6          Q.    Was there any big policy changes or

7    leadership changes in January and February 2021?

8          MS. FUDIM:  Objection, vague.

9          You can answer.

10         THE WITNESS:  At the national level, I

11   believe that January 2021 was the inauguration of the

12   Biden Administration.

13   BY MR. ST. JOHN:

14         Q.    And are you familiar with what happened

15   here to defendants in February of 2021?

16         MS. FUDIM:  Objection, vague.

17         You can answer.

18         THE WITNESS:  I don't understand the meaning

19   of "what happened".

20   BY MR. ST. JOHN:

21         Q.    A new Secretary of Homeland Security?

22   Are you aware of when the Biden Administration's

1    Secretary of Homeland Security took office?

2        A.    I don't know the date that the Homeland

3    Security Secretary took office, no.

4        Q.    February of 2021.

5        MS. FUDIM:  Objection.  Is there a question

6    pending?

7    BY MR. ST. JOHN:

8        Q.    Federal policy doesn't or tends to not

9    to turn on a dime.  Right?

10       MS. FUDIM:  Objection, vague.

11       THE WITNESS:  I don't know what turning on a

12   dime means and I don't know what federal policy

13   you're referring to.

14   BY MR. ST. JOHN:

15       Q.    The Federal Government is big.  Right?

16       Millions of employees?

17       A.    I don't know how many federal employees

18   there are.

19       Q.    Sir, you've got degrees from Harvard, a

20   Ph.D., and you can't give me a simple yes or no to

21   whether the Federal Government is big?

22       A.    You said millions of employees and I'm



1    not aware of that number.  So I couldn't testify to a

2    number that I don't know.

3         My understanding is that it's the largest

4    employer in the United States.  So by that criteria,

5    you know, big -- you suggested a criteria, big, that

6    I don't have information about.  So I said I don't

7    know.

8         Q.    Thousands of pages of regulations.

9    Right?

10        A.    I don't know how many pages of

11   regulation there are.

12        Q.    A lot.  Would you agree with that?

13        most citizens would say, Hey, you can look at

14   the U.S. Code and statutes alone, it's a lot of shelf

15   space.

16        A.    I don't know.

17        MS. FUDIM:  Objection to form.

18        THE WITNESS:  I don't know what lots means,

19   but I guess it would be reasonable to say there are

20   lots of regulation at the federal level.

21   BY MR. ST. JOHN:

22        Q.    And it takes time to change regulations.



```
 1   Right?

 2          A.     I'm sure it would depend on the

 3   regulation.

 4          Q.     So you don't know whether it takes weeks

 5   or months to change a regulation?

 6          A.     I'm certain that it depends on the

 7   regulation.

 8          Q.     When a new administration takes office,

 9   it takes time for its policies to be implemented;

10   would you agree with that?

11          A.     It depends on the policy.

12          Q.     It can take months?

13          A.     Depending on the policy, perhaps.  I

14   don't know what policy --

15          Q.     You just don't know one way or the

16   other?

17          A.     You're talking about policies.  A policy

18   could mean a declaration of war.  I don't know what

19   policy you're referring to.

20          Q.     Changing an immigration regulation could

21   take months.  Right?

22          A.     I don't have expertise in any legal
```

1    matter and certainly not how long it takes to

2    implement a rule in the U.S. Government.

3          Q.    Changing departmental organizations can

4    take months.  Right?

5          A.    I have no expertise in departmental

6    reorganization in the Federal Government.

7          Q.    Sir, you have no expertise one way or

8    another whether it could take eight or ten months to

9    implement policies.  Correct?

10         A.    I don't know what policies means in this

11   context.

12         Q.    A change in border policies, it could

13   take months.

14         It could.  You just don't know one way or

15   another.  Right?

16         A.    Whether it must take months to implement

17   any given change in border policy that is

18   conceivable, I don't know that.  I don't have

19   expertise on that and it doesn't sound plausible to

20   me.

21         Q.    It doesn't sound plausible that it could

22   take months to change an immigration regulation?



1          A.     I said "must".  You're saying could it,

2   hypothetically, take months to implement any

3   hypothetical regulation at the U.S. border.  I

4   imagine that it could take months, hypothetically,

5   for any given policy.

6          Q.     Migration flows change over time; you

7   would agree with that, wouldn't you?

8          A.     Migration flows certainly change over

9   time, yeah.

10          Q.     Both in quantity and in origin.

11   Correct?

12          A.     Migration flows to the United States

13   have changed over time and country of origin in

14   recent years.  Yes.

15          Q.     Does the southwest border encounter data

16   you rely on include maritime encounters?

17          A.     It does not.  My understanding is that

18   the database includes all inadmissible migrants

19   encountered at the southwest land border in the U.S.

20          Q.     So I looked at the website, Defendant's

21   website, for the encounter data and it says, quote:

22   Encounter data includes U.S. Border Patrol Title 8



1    apprehension, Office of Field Operations Title 8

2    inadmissibles, and Title 42 expulsions -- there's an

3    asterisk -- "for Fiscal Years 2020, 2021, 2022, 2023.

4    The data is available for the northern land border,

5    southwest land border, and nationwide, i.e., air,

6    land, and sea modes of transportation encounters."

7         Why southwest land border rather than

8    nationwide?  Why did you analyze southwest land

9    border encounters rather than nationwide encounters?

10        A.    I don't have the complaint in front of

11   me, but my recollection was that was clearly the most

12   relevant form of illegal migration that was being

13   referred to in my -- in the statements of fact that I

14   was asked to evaluate.

15        Q.    Why don't we turn to page 2 of your

16   report, Exhibit 4.

17        A.    Page 2.

18        Q.    And in paragraph 7, you quote what you

19   were asked to assess.

20        A.    I need a Kleenex.  Does there happen to

21   be one?

22        I apologize.  I don't mean to interrupt you.



1    It's just I don't have a Kleenex with me.

2          Q.    Because a question is pending, I'm going

3    to have to insist you answer.

4          A.    Okay.

5          MR. ST. JOHN:  No.  We can take a pause.

6          MS. FUDIM:  I'll remain in the room and he

7    can go grab a Kleenex.

8          VIDEOGRAPHER:  Off the record.  The time is

9    10:53 [sic].

10          [Recess.]

11          VIDEOGRAPHER:  On the record.  The time is

12    11:53.

13          MR. ST. JOHN:  And for the record, we did not

14    take a one-hour break.

15          MS. FUDIM:  No.

16    BY MR. ST. JOHN:

17          Q.    Mr. Clemens, we were referencing page 2,

18    paragraph 7 of your complaint.

19          A.    Yes.

20          Q.    Paragraph 7 of your report, I should

21    say, which quotes from the complaint.

22          The relevant passages of the complaint that

1    you were asked to assess read as follows in a block

2    quote.  Does it say southwest border anywhere in

3    there?

4           A.    Those passages can only be interpreted

5    in the context of the whole complaint text.

6           Q.    Sir, you're that one that identified the

7    relevant passages.  Correct?

8           It's your work.

9           A.    The meaning of these passages can only

10   been interpreted in the context of the whole

11   complaint.

12          Q.    Sir, did you start with the caption of

13   the complaint?

14          A.    I don't know what "caption of the

15   complaint" means.

16          Q.    Front page, upper left-hand corner, a

17   list of who the parties are.  We went through this

18   earlier, the State of Louisiana, State of Florida.

19          What makes you think the southwest border is

20   the most relevant?

21          A.    I did not study southwest border

22   encounters relative to nationwide encounters for the



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 115 of 265 PageID #: 10148

1   purposes of this analysis, but my general familiarity

2   with the data suggests that the large majority of

3   unauthorized migrants present in the collection of

4   states that brought this lawsuit arrived at the

5   southwest land border.

6           Q.    Including Florida?

7           A.    I'm talking about them collectively.

8           Q.    I'm talking about Florida specifically.

9           A.    I was not asked to assess the claims of

10  effect only in the portion about Florida.  I was

11  asked to assess the broad claim of fact in the

12  portion of the complaint that speaks to that group of

13  states collectively.

14          Q.    The broad claim of fact would be

15  nationwide, wouldn't it?

16          Because I don't see southwest border in the

17  paragraphs you've excerpted on page 2.

18          A.    I don't have the complaint in front of

19  me, but it was my recollection from the complaint

20  that the language in the complaint makes it clear

21  that they are talking about a group of people who, by

22  far, principally arrive in the United States via the

1    southwest border.

2         Q.    Did you independently choose what you

3    were going to analyze or did the Federal Government

4    ask you to analyze this specific subset, the

5    southwest border?

6         A.    I independently chose it and I'm not a

7    legal expert, but my recollection is that the Asylum

8    Processing IFR changed responsibility for who

9    adjudicates asylum claims for migrants encountered at

10   the border.  I'm not a hundred percent sure of the

11   details of the Asylum Processing IFR, but that's my

12   recollection of the text.

13        So the adjudication of an asylum claim by a

14   person encountered in the interior in my nonlegal

15   expert understanding of the rule wasn't changed by

16   the rule.

17        Q.    What about somebody encountered at the

18   northern border?  That's thousands of miles, isn't

19   it?

20        A.    My -- I did not look at nationwide

21   encounters versus southwest borders encounters in my

22   analysis, but my clear understanding and familiarity



1    with this data is that the vast majority of

2    unauthorized migrants that are relevant to the

3    population discussed in the complaint arrive at the

4    southwest border, making data on the southwest border

5    highly, highly relevant.

6          Q.    What's the relevant population in your

7    view?

8          A.    The complaint states several times and

9    using different language -- I don't have it in front

10   of me -- that the Asylum Processing IFR of 2022

11   causes an influx at the border, a surge to the

12   border.  I think it would be strange and unjustified

13   to believe that they were referring primarily to the

14   Canadian border.

15         Q.    You used May 31, 2022 as your before and

16   after date for your analysis; is that correct?

17         A.    May 31, 2022 is the date that, in my

18   understanding, the Asylum Processing IFR became

19   effective.  Yes.

20         Q.    So your understanding is that from that

21   point forward, all asylum applicants were, at least

22   those who were encountered at the border were,

1   eligible for processing under the asylum rule?

2          MS. FUDIM:  Objection.

3          THE WITNESS:  I'm not a legal expert and I

4   don't have a detailed understanding of what the

5   asylum -- of exactly which migrants were necessarily

6   affected by the Asylum Processing IFR.  You said all

7   and I don't have a reason to believe that all of them

8   were.

9   BY MR. ST. JOHN:

10         Q.    Well, so how -- just imagine,

11  hypothetically, it's a special rule and it only

12  applies to two asylum applicants.  The Federal

13  Government could do that, as a rule say when Joe

14  Smith and Ted Frank apply for asylum, they will be

15  subject to this special rule.

16         That special rule wouldn't be likely to impact

17  the migration flow of people not subject to it.

18  Right?

19         MS. FUDIM:  Objection to form.

20         You can answer.

21         THE WITNESS:  I didn't look at hypothetical

22  rules for this case.  I assessed whether there was



1  evidence that the real Asylum Processing IFR of 2022

2  caused an increase in illegal migration, not any

3  other policy and not any hypothetical policy.

4  BY MR. ST. JOHN:

5       Q.    I am entitled to ask you about

6  hypotheticals, sir, and I'm asking you about a

7  hypothetical.

8       My hypothetical is if the Asylum IFR applied

9  to two named individuals, when and if Joe Smith and

10  Ted Frank applied for asylum, they will be subject to

11  a special rule.  That special rule is not going to

12  impact the migration behavior of anyone else.

13  Correct?

14       A.    I didn't study this hypothetical policy

15  and I don't think I could form a carefully considered

16  opinion about it sitting here.  If you're asking me

17  whether people's behavior who are exempt from a rule

18  would be affected by that rule, then I would

19  certainly need additional evidence to believe that it

20  would be; but prima facie, I would believe that

21  people who are exempt from a rule, I would not

22  hypothetically know a mechanism by which people



1   exempt from a rule would have their behavior affected

2   by the rule that they are exempt from.

3        MS. FUDIM:  Just for a question, and I'm not

4   pressuring you to go at any particular pace, but it's

5   twelve o'clock now.  So if you think you're going to

6   go for a couple more hours, I would ask for a

7   30-minute lunch break.  If you think you've got like

8   another hour or so, then I think it makes sense to

9   carry on, but if you anticipate more than that, then

10  maybe a lunch break would be appropriate.

11       MR. ST. JOHN:  Let me finish up this section.

12  Depending on how it goes, we've got five or ten more

13  minutes, and then we can take a break.

14       Does that work for everybody?

15       MS. FUDIM:  That's fine.  Yeah, yeah, yeah.

16  I'm not suggesting we have to take a break.  I just

17  -- you know, if we're going to go to two o'clock, I'm

18  going to need to eat before then.  If we're going to

19  go to one, I can hold off.

20       MR. ST. JOHN:  The record, I hope did not

21  reflect my stomach letting everyone know that it was

22  lunchtime.  So it does now.



1   BY MR. ST. JOHN:

2          Q.     In your analysis, did you consider

3   changes in economic conditions in the United States

4   and whether that could have been a confounding

5   variable in migration behavior?

6          A.     I considered changes in economic

7   conditions in the United States by two different

8   methods, yes.

9          Q.     Which two methods?

10         A.     One is in the second test that I ran.

11  Using the ARIMA model, I include a measure of

12  unemployment in the United States, and in the third

13  test that I ran, I include a control group that would

14  be affected by economic conditions in the United

15  States.

16         Q.     The unemployment rate you considered was

17  Hispanic unemployment; is that correct?

18         A.     It's called the Hispanic Latino

19  unemployment rate published by BLS.  Yes.

20         Q.     Does that unemployment rate include

21  illegal aliens?

22         A.     The unemployment rate is calculated

1   based on the current population survey and the

2   current population survey does not ask legal status.

3   So it's not possible to know; however, illegal aliens

4   are not excluded from the current population survey.

5   So I would expect it to include some of them.

6         Q.    So this is an example where other

7   policies could impact the statistic.  If there were a

8   crackdown, for example, on employment of illegal

9   aliens, you would expect the Hispanic Latino

10  unemployment rate to rise; is that correct?

11        MS. FUDIM:  Objection.

12        You can answer.

13        THE WITNESS:  It would depend on what the

14  crackdown did.  So I don't know how to answer that

15  question.

16  BY MR. ST. JOHN:

17        Q.    If there were a nationwide crackdown on

18  employers of illegal aliens, the Federal Government

19  is going to bust down your door and shut down your

20  business and you may go to jail or at least get a big

21  fine, that would tend to increase Hispanic Latino

22  unemployment?



1          A.       Not necessarily.

2          Q.       Why not?

3          A.       The unemployment rate is calculated

4     using answers to questions in the current population

5     survey.  Broadly, those questions are asking people

6     if they are seeking employment, but not able to find

7     employment.  In order to be included in the

8     unemployment statistics, you need to be present to

9     answer the current population survey.

10         So if the crackdown resulted in, for example,

11    less employment of Hispanics and Latinos, but no

12    departures of them, then it could possibly go up.  If

13    the crackdown resulted in departures of unauthorized

14    migrants from the country, then there would be fewer

15    people to answer the current population survey and

16    the rate could go down and there could be other

17    impacts that I can't think of right now.

18         So it would be --

19         Q.       The complex confluence -- you've got a

20    confounding variable in itself that is a complex

21    confluence of factors; is that correct?

22         A.       I gave you two examples of how it might

1    be affected and I can't guarantee that I'm thinking

2    of all of the ways it could be affected, but it's not

3    obvious that it would go up or down.

4           Q.    Other than the Hispanic Latino

5    unemployment rate, did you consider any other

6    confidentially confounding variables in your

7    analysis?

8           MS. FUDIM:  Objection to form.

9           You can answer.

10          THE WITNESS:  The third test that I ran is

11   designed to incorporate the effects of any other

12   incentive on migration, on the illegal migration,

13   that could have changed around the same time of the

14   policy.

15          MR. ST. JOHN:  Why don't we take a break for

16   lunch.

17          MS. FUDIM:  Great.  How long would you like

18   to take?

19          VIDEOGRAPHER:  Off the record.  The time is

20   12:07.

21          [Whereupon, at 12:07 p.m., a lunch recess was

22   taken, to reconvene at 12:45 this same day.]

1          A F T E R N O O N         S E S S I O N

2          VIDEOGRAPHER:  On the record.  The time is

3     12:54.

4          FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

5     BY MR. ST. JOHN:

6          Q.     Welcome back, Mr. Clemens.

7          A.     Thank you.

8          Q.     You understand you're still under oath?

9          A.     Yes.

10          Q.     Looking at your report, you analyzed

11     border encounters and that was it.  Right?

12          Just border encounters, some subcategories,

13     but it was just border encounters; is that correct?

14          A.     In all three tests that I ran, the

15     outcome on which I evaluate the evidence for the

16     effect of the Asylum Processing IFR is encounters

17     with inadmissible migrants published by CPB.  Yes.

18          Q.     You did not look at the number of asylum

19     claims.  Correct?

20          A.     The factual claim I was asked to assess

21     was not about asylum claims.  It was about illegal

22     migration.

1          So, no, I did not.

2          Q.    So you don't know one way or another

3     whether asylum claims increased or decreased after

4     May 2022?

5          A.    The factual claim in the complaint that

6     I was asked to assess was not about asylum claims.

7     Therefore, I didn't look at it when assessing that

8     claim.

9          Q.    So you have no opinion about whether the

10    number of asylum claims increased or decreased after

11    May 2022?

12         A.    The factual claim in the complaint that

13    I was asked to assess regarded statements about a,

14    quote, influx of migrants at the border, unquote, and

15    other similar phrasing that could include people who

16    claim asylum and people who don't claim asylum.  So

17    it would be -- it would not be appropriate to

18    evaluate those claims using data on asylum claims

19    alone.

20         So, no, I didn't.

21         Q.    You didn't offer any opinions about the

22    number of asylum claims and whether they increased or



1   decreased?

2        A.    I was not asked to look at that and I

3   did not look at that.

4        Q.    As a first step -- well, strike that.

5        As a, quote, first step in testing the rules

6   affecting border encounters, end quote, you, quote,

7   simply checked whether the volume of migrants

8   encountered rose after the rule went into effect on

9   May 31, 2022, end quote.  Correct?

10       A.    I conducted three tests of whether the

11  evidence is compatible or whether there is evidence

12  of a positive effect on illegal migration from the

13  Asylum Processing IFR and that is the beginning of

14  the description of one of them.  Yes.

15       Q.    As a first step, you simply checked

16  whether the volume of migrants encountered rose after

17  the rule went into effect?

18       This is a yes or no question.

19       A.    That's not a full description of the

20  test that I ran.  So it can't be answered yes or no.

21  That is partial description of the first test that I

22  ran.  Yes.



1        Q.     Mr. Clemens, can you turn paragraph 17

2    of your report.   Can you read the first sentence of

3    paragraph 17.

4        A.     "A first step in testing for the rule's

5    effect on border encounters is simply to check

6    whether the volume of migrants encountered rose after

7    the rule went into effect on May 31, 2022?

8        Q.     Mr. Clemens, is that what you did?

9        A.     That is a partial description of what I

10   did.   There are many sentences to follow.

11       Q.     You wouldn't do something useless and

12   put it in your report; is that correct?

13       A.     Did I include a description of useless

14   things in my report?   I don't understand that

15   question.

16       Q.     The Federal Government paid you a lot of

17   money for this report and I'm trusting you would not

18   put something that's completely useless in that

19   report.   You would not have performed a useless

20   analysis?

21       A.     All three tests that I run are useful.

22       Q.     So is it your opinion that a simple

1   before and after count can provide at least some

2   insight?

3        A.   The force of these tests comes from

4   running all of them together and not from any one of

5   them in isolation.

6        Q.   So each test, standing alone, is not

7   sufficiently probative; you're relying on all three

8   together?

9        A.   I included in the report the most

10  appropriate tests and all of them are collectively

11  informative.

12       Q.   So would any one test be sufficiently

13  informative?

14       MS. FUDIM:  Objection to form, vague.

15  BY MR. ST. JOHN:

16       Q.   Allow me to rephrase.

17       You ran three tests.  Would any one of those

18  tests that you ran, standing alone, be sufficiently

19  informative?

20       A.   I conclude that they're -- that I did

21  not find substantial evidence of a positive effect of

22  the Asylum Processing IFR on illegal migration.  What



1   I mean by substantial there is that I did not find in

2   any of the tests evidence to support the conjecture

3   of a positive effect.

4           If I had found evidence of a positive effect

5   in any of the three, that would have been

6   informative.  So in that sense, the result of one of

7   the tests could have been important, but what is

8   crucial to my conclusion is that in none of three

9   tests was a positive effect detected.

10          Q.    I suppose your first step was a simple

11  before and after.  Your next step was to use that,

12  quote, ARIMA model, end quote, to, quote, check

13  whether advent of the rule was followed by a rise in

14  the volume of border encounters relative to the trend

15  that would have been expected, end quote.

16          Is that a summary of what you did for the

17  second step?

18          MS. FUDIM:  Objection to form.

19          You can answer.

20          THE WITNESS:  I don't think those sentences

21  alone are a helpful summary what I did.  What I did

22  was used a -- in the first and second tests, I used



1    two different versions of a very well-established and

2    peer-reviewed method for assessing the effect of a

3    policy in a univariant time series that is a variable

4    that is observed without any other variables over

5    time, and I did both of those because each of them

6    involves different tradeoffs.

7          In this case, one of them is more

8    transparent, but less rigorous.  The other is much

9    more rigorous, but much less transparent, and I

10   thought it was important to test both of them.

11   BY MR. ST. JOHN:

12         Q.    Turn to page 6 of your report, paragraph

13   21.  Can you read the first sentence, sir.

14         A.    "The next step is to check whether the

15   advent of the rule was followed by a rise in the

16   volume of border encounters relative to the trend

17   that would have been expected given typical unrelated

18   trends in border encounters."

19         Q.    That's your topic sentence.  Right?

20         A.    I don't know what "topic sentence"

21   means.  That's the first sentence of paragraph 21.

22         Q.    Sir, did you go to middle school?



1          A.     Excuse me?

2          Q.     Did you go to middle school, sir?

3          MS. FUDIM:  Objection.

4          THE WITNESS:  I went to an intermediate

5     school, if that's what you mean by middle school.

6     BY MR. ST. JOHN:

7          Q.     You took English.  Right?

8          A.     I studied English in intermediate

9     school, yes.

10          Q.     And probably later on in like high

11    school, college?

12          A.     I did not study English in college.

13          Q.     Do you know what a topic sentence is?

14          A.     I said it was the first paragraph --

15    first sentence of that paragraph.  I'm not a

16    grammarian and I don't remember what a topic sentence

17    is now.

18          Q.     Those are your words.  Right?

19          "The next step is to check whether the advent

20    of the rule was followed by a rise in the volume of

21    border encounters relative to the trend that would

22    have been expected given typical unrelated trends in

border encounters."

A.    That's a very rough description for nontechnical specialists of what the ARIMA model is doing.  Yes.

Q.    And in paragraph 22, you talk about what makes the use of an ARIMA model appropriate, and it's the end of the fifth line of paragraph 22, the sentence beginning with "They are appropriate".

Can you read that sentence, sir.

A.    "They are appropriate for studying time-varying quantities that, one, mostly exhibit smooth changes rather than erratic unpredictable jumps; two, exhibit some inertia so that unexpected changes affect future values; and, three, drift systematically upward or downward over time rather than always reverting to the same level."

Q.    That's your description of when an ARIMA model is appropriate.  Correct?

A.    That's correct.

Q.    How is "mostly smooth" defined?

Mostly smooth -- strike that.

How is "smooth changes" defined?



1        A.      Intuitively, if the evolution of border

2    encounters over time looked like the output of a

3    seismograph, going erratically, unpredictably from

4    huge positive swings in one period to huge negative

5    swings in another period over and over and over

6    again, then that is a time series that I would expect

7    to -- whose features I would not expect the ARIMA

8    model to capture a great deal of information about.

9        Q.      Is there any generally-recognized test

10   for smooth versus erratic and unpredictable?

11       A.      The test of -- the most common test for

12   the information captured by the ARIMA model is its

13   ability to make out-of-sample predictions based on

14   training data, which is the test that I carry out.

15       Q.      That's the result.  My question is about

16   the data.

17       Is there any generally-recognized test for

18   whether that data is smooth versus erratic and

19   unpredictable?

20       A.      That is what I just said.  If the data

21   did not exhibit these characteristics, then the ARIMA

22   model would capture less information about it and its



1    out-of-sample predictions would be less and less

2    likely to correspond to reality.

3         Q.    So there's no -- your testimony is

4    there's no generally-recognized test on the data to

5    determine whether application of an ARIMA model is

6    appropriate; you, instead, look at the results of the

7    ARIMA model and say, Okay, the results seem to track

8    the real world; so, ergo, the data was appropriate?

9         MS. FUDIM:  Objection to form.

10         THE WITNESS:  That's an incorrect statement.

11   BY MR. ST. JOHN:

12        Q.    So what is the test?

13        You don't know what the result is going to be.

14   You have not run the ARIMA model yet.  What is the

15   test for whether the data -- or is there a test for

16   whether the data you're looking at is sufficiently

17   smooth versus erratic and unpredictable?

18        A.    I described to you the test exactly as

19   it is most commonly done.  The most common test is to

20   fit the ARIMA model to the data and assess whether it

21   makes out-of-sample predictions in a way that is

22   reliable, which is the test that I run.  That is a



1    test on the data.

2         Q.    So without running an ARIMA model,

3    without running the model or an ARIMA model on a data

4    series, you can't evaluate ex ante whether

5    application of the ARIMA model is appropriate?

6         A.    Could I guess without running the ARIMA

7    model what the ARIMA model would predict?

8         Certainly, I could not, which is why I do run

9    the ARIMA model.

10        Q.    Well, it's not just what the ARIMA model

11   would predict.  Your testimony, your words, is the

12   ARIMA model is appropriate for studying time-varying

13   quantities that have certain characteristics.  Right?

14        A.    Um-hum.

15        Q.    Is that a yes?

16        A.    Sorry.  Yes.

17        Q.    Without running the ARIMA model, how do

18   you determine whether those time-varying quantities

19   have characteristics that render an ARIMA model

20   appropriate?

21        A.    I don't know how to explain this to you

22   more clearly than I've explained to you.  The test

1  that is most commonly used to see whether the ARIMA

2  model is capturing information about the data, which

3  it would best under these circumstances, is to

4  conduct out-of-sample -- is to compare out-of-sample

5  predictions to the truth, which is exactly what I do,

6  and that's the most well-accepted established method

7  of testing whether the ARIMA model is appropriate.

8        Q.    So the test for the model is to see if

9  the results of model match some subsequent

10  known-to-be-true data series?

11       A.    The most common test for the information

12 captured -- the most common test for the reliability

13 of the information captured by the ARIMA model is to

14 compare its ability to make out-of-sample predictions

15 to reality.  Yes.

16       Q.    I've got a data series of a thousand

17 data points.  There's no way for me to look at that

18 and say, Hmm, an ARIMA model would be appropriate for

19 studying this time-varying data series without

20 running the ARIMA model?

21       A.    There's a test called a unit root test

22 that is an independent test of whether or not the



1   time series exhibits integration which makes a

2   certain way of treating the "I" part of ARIMA, which

3   stands for integrated or integration, but the way to

4   test the other parts, auto-regressive, A-R, and

5   moving average, M-A, the way to test whether the

6   model is capturing information about the time series

7   that is informative is to make out-of-sample

8   predictions with that model and compare them to

9   reality.

10          Q.    Over a limited "X" -- you understand "X"

11   and "Y" if we're talking about a graph.  Right?

12          You have an independent and a dependent

13   variable.

14          A.    You mean "X" to be the independent

15   variable and "Y" to the dependent variable.

16          Q.    So here, the independent variable would

17   be time and then you've got a dependent variable and

18   that's why you're running the ARIMA model and that's

19   your time-varying series.  Correct?

20          A.    There are -- the ARIMA equation includes

21   -- the dependent variable in the ARIMA regression

22   equation is not time.  If you mean the graphs in the

1   reports, the X Axis in those graphs, in many of them,

2   if not all of them, is time.

3          Q.     You said time varying.  So that implies

4   that you've got some variable that varies with time.

5   Right?

6          A.     As they do in the figures, yes.

7          Q.     Time is the independent variable and

8   you've got a dependent variable?

9          A.     Not in the ARIMA model.  That's not a

10  correct statement of what the equation is, but I

11  don't -- I should let you finish the question.

12         Q.     I can -- correct me if I'm wrong.  I can

13  generate any curve I choose by summing a sufficient

14  number of sign waves.  Right?

15         A.     Can you generate any curve by summing a

16  sufficient number of sign waves?  You're asking a

17  question about mathematics in general?

18         I don't understand this question.

19         Q.     Well, you're saying that this has

20  predictive value, and over a finite interval, I can

21  generate any shape I want by summing a sufficient

22  number of sign waves; isn't that correct?



1         A.      I'm not a specialist in the mathematics

2    of Fourier compositions, but I -- that may or may not

3    be a true statement.   I certainly didn't look at it

4    for this report, which has nothing to do with what

5    you're talking about.

6         Q.      Well, you can generate any curve you

7    want by summing sign waves, a sufficient number of

8    sign waves, and then as you move away from the curve

9    that you created or the interval that you've looked

10   at, the curve you created is more likely to depart

11   from reality?

12        A.      My analysis has nothing to do with sign

13   waves and I don't understand what you're talking

14   about.

15        Q.      Well, sir, here's the problem:   What I

16   understand your testimony is is the way I figure out

17   if the data is appropriate for studying within an

18   ARIMA model is to run the ARIMA model and see if the

19   ARIMA model fits reality over some narrow interval in

20   the future.

21        A.      It is not a narrow interval.   So that's

22   not a correct statement, but it is a -- checking the



1   out-of-sample predictions of the model is the most

2   accepted way of checking whether the ARIMA model is

3   capturing information about the time series.

4        Q.    So this is an easy yes or no question:

5   Do you have a way to look a time-varying data series

6   without running the ARIMA model and telling whether

7   an ARIMA model is appropriate for that time-varying

8   data series?

9        A.    Is there a way without doing statistical

10  analysis to guess the outcome of statistical

11  analysis?

12       Q.    Not outcome.  Whether it's appropriate

13  for that statistical analysis.

14       MS. FUDIM:  Objection, vague as to the word

15  "appropriate".

16       You can answer.

17       THE WITNESS:  My charge in this case was not

18  to guess whether the ARIMA model would capture

19  information about the time series.  I demonstrate

20  that the ARIMA captures information about the time

21  series.

22       So I don't know of a way to guess by looking



1    at the data, hypothetically, what the outcome of

2    applying the ARIMA model would be.

3    BY MR. ST. JOHN:

4          Q.    Sir, you don't know how to test a

5    time-varying data series to determine whether an

6    ARIMA model is appropriate without running the ARIMA

7    model?

8          A.    I don't understand this question.  I've

9    told you the way it is most accepted to be done in my

10   discipline and you're asking me if I know how to do

11   it in a way which is not the best way to do it.  I

12   don't know how to do it in a way that is not the best

13   way to do it.  I do it in the way that is the best

14   way to do it in my discipline.

15         Q.    There is no -- your testimony here

16   today, sir, is that if you're presented with a

17   time-varying data series, you are unable to determine

18   whether an ARIMA model is appropriate for that data

19   series?

20         A.    That's the opposite what I said.  That

21   is not true.

22         Q.    Without running an ARIMA model?



1        A.      It is not possible to guess the outcome

2  of an application of a statistical tool without

3  applying it.

4        Q.      The question is whether the application

5  of that statistical tool is appropriate.  That's the

6  question.

7        A.      I demonstrate that it is.

8        Q.      By applying the statistical tool?

9        A.      That is the very well-accepted way of

10  assessing the informativeness of the ARIMA model in

11  my discipline.

12        Q.      Are you familiar with the term "circular

13  logic", sir?

14        MS. FUDIM:  Objection.

15        THE WITNESS:  I don't know what you mean by

16  it, but I --

17  BY MR. ST. JOHN:

18        Q.      What do you mean?  When you hear the

19  words "circular logic", what do you understand those

20  words to mean?

21        A.      Circular reasoning would be a deduction

22  that assumes its own premises.



1          Q.     Isn't that what you're offering; the way

2     I determine if an ARIMA model is appropriate for a

3     data series is to run the ARIMA model on the data

4     series?

5          A.     That is not circular at all.

6          Q.     Because it generates some kind of output

7     and that output, in your view, sufficiently matches

8     other data over some interval?

9          MS. FUDIM:  Objection to form.

10         THE WITNESS:  This view comes from my

11    training in econometrics at Harvard University.  It

12    comes from 21 years of research in applied economics

13    that is peer reviewed.

14         It is not my view of how the usefulness and

15    informativeness of the ARIMA model is checked.  I'm

16    describing to you the very widely-accepted and

17    well-established and peer-reviewed method for

18    checking an ARIMA model that is used in my

19    discipline.

20    BY MR. ST. JOHN:

21         Q.     Without running an ARIMA model on a

22    dataset, are you able to reliably determine whether



1    application of an ARIMA model is appropriate to that

2    time-varying dataset?

3          MS. FUDIM:  Objection, asked and answered.

4          THE WITNESS:  If by "appropriate", you mean

5    useful and informative, I will tell you again that,

6    by far, the most accepted method of checking the

7    informativeness and usefulness of an ARIMA model is

8    testing its ability to make out-of-sample

9    predictions.

10   BY MR. ST. JOHN:

11         Q.    That's a different question, sir.

12   That's a different question.

13         So I'm, once again, going to ask you to answer

14   the question asked, and the question asked is without

15   running an ARIMA model, are you able to look at a

16   time-varying data series and determine whether

17   application of an ARIMA model to that data series is

18   appropriate?

19         MS. FUDIM:  Objection, asked and answered.

20   BY MR. ST. JOHN:

21         Q.    It's a yes or no.  It's a yes or no,

22   sir.



1          A.     It is not yes or no, because I don't

2    know what you mean by appropriate.  I offered an

3    answer in which I said I defined appropriate as

4    useful and informative, and I'm telling you again

5    that the most accepted way of assessing the

6    informativeness and usefulness of an ARIMA model is

7    to check its ability to make out-of-sample

8    predictions, which is what I do.

9          Q.     There is no accepted way to look at a

10   time-varying data series and determine whether an

11   ARIMA model is, quote, appropriate for studying the

12   time-varying, end quote, data series without running

13   the ARIMA model?

14          MS. FUDIM:  Objection, asked and answered.

15          THE WITNESS:  I don't know what you mean by

16   the word "appropriate".  If what you mean is useful

17   and informative, the best accepted way to check that

18   about a given univariant time series is to check any

19   given ARIMA model's ability to make out-of-sample

20   predictions about that time series.

21   BY MR. ST. JOHN:

22          Q.     How close does the out-of-sample



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 147 of 265 PageID #: 10180

1    prediction have to be?  Is there a test for that?

2           A.    My charge in this case was not to make a

3    perfect prediction of --

4           Q.    Sir, I'm going to cut you off.  I don't

5    care what your charge was.  The question is --

6           Madam Court Reporter, would you read it back.

7           [Whereupon, the pending question was read

8    back by the court reporter.]

9           THE WITNESS:  I was interrupted.  So I'll

10   start again.

11          My charge in this case was not to make a

12   perfect prediction of counterfactual illegal

13   migration.  My charge in this case was to test

14   whether there is evidence of a positive effect on

15   illegal migration from the Asylum Processing IFR of

16   2022.

17          That does not require doing what you're

18   asking me.  So I did not do that.

19   BY MR. ST. JOHN:

20          Q.    Is there a generally accepted tightness

21   of fit for the prediction for the ARIMA model to be,

22   your word, "useful"?



1          A.     What I'm asking in the second test that

2    I run which involves the ARIMA model and the first

3    test involves a highly simplified ARIMA model is

4    whether border encounters following the advent of the

5    Asylum Processing IFR were -- whether there is

6    evidence that they were greater than how border

7    encounters would have evolved in the absence of the

8    policy.

9          That is a fundamentally different thing from

10   using the ARIMA model to make a prediction about what

11   the counterfactual would have been.  So I did not do

12   that and it would not be necessary to carry out the

13   tests that I conduct.

14         Q.     So if after the rule went into effect,

15   your model was coming out with numbers 50 percent

16   different than the real data, would the ARIMA model

17   still be useful as a predictive tool?

18         A.     So what I'm doing in the second test is

19   asking, after the policy was enacted, were -- did

20   border encounters evolve in a way that was high

21   relative to past trends in border encounters as

22   reflected in their persistence, time trends, inertia,



1    seasonality, and association with labor market

2    conditions in the U.S.  So the answer to that

3    question was no.  They were lower than the trend that

4    would have been expected based on past patterns in

5    the data in all of those respects.

6          It is a yes or no question, were they higher

7    or lower.  In fact, they were not higher and I was

8    testing for whether they would be higher.

9          Q.   Sir, I'm entitled to test the

10   reliability and the application of the ARIMA model to

11   these facts, and what I've heard so far is you can't

12   reliably apply the ARIMA model.  You can't describe

13   -- you're unable to testify whether data is

14   appropriate for an ARIMA model.  You've been unable

15   to testify or refuse to testify whether -- how close

16   the output for an ARIMA model has to be the real data

17   to make it useful.

18         So we can stop talking about you what you did.

19   I'm asking ARIMA models generally.  You're claiming

20   to be an expert in this, sir, and I'm asking you

21   questions about how to work the model, not about what

22   you did.



1          So let's focus on that.

2          MS. FUDIM:  Objection to everything just

3     stated on the record.

4          THE WITNESS:  You just made several false

5     statements.

6     BY MR. ST. JOHN:

7          Q.    Okay.  So what --

8          A.    I did not testify that I can't test the

9     model.  I described to you several times how I did

10    test the model, because that is the most accepted way

11    of testing the model in my discipline.

12         Q.    We're not talking about what you did.

13    Let's start over and hopefully we can get some

14    answers.

15         We're talking about ARIMA models generally.

16    We're not talking about immigration.  We're talking

17    about ARIMA models.

18         Is there a generally accepted way to test a

19    time-varying data series to see if application of an

20    ARIMA model is appropriate to that data series

21    without running an ARIMA model?

22         A.    The principal criterion that is widely



```
 1    accepted in my discipline for assessing the

 2    informativeness and usefulness of an ARIMA model is

 3    its ability to make out-of-sample predictions.  There

 4    is no way to look at a graph and determine whether or

 5    not an ARIMA model will make reliable out-of-sample

 6    predictions.

 7         Q.    Okay.  You testified, you just

 8    testified, that the generally-accepted way to test an

 9    ARIMA model is its, quote, ability to make

10    out-of-sample predictions?

11         A.    Yes.

12         Q.    How close do those predictions have to

13    be to known true data for the ARIMA model to be

14    useful?

15         A.    It depends on the purpose to which the

16    ARIMA model is applied.  You've specified that we're

17    speaking generally.  So I don't know what useful

18    means in an abstract context.

19         Q.    Is there any generally-accepted test

20    for, quote, the ability to make out-of-sample

21    predictions, end quote, a tightness of fit test or

22    something like that?
```



1          Is there any generally-accepted test for the

2    output of an ARIMA model?

3          A.     The generally-accepted test is to make

4    out-of-sample predictions and determine whether those

5    match reality.

6          Q.     How closely do they have to match

7    reality in order for the model to be useful?

8          A.     It depends on the purpose to which the

9    model is being apply.

10         Q.     Is a 30 percent differential from

11   reality useful?

12         A.     There's no abstract for that that is

13   independent of the application of the model.

14         Q.     So if the ARIMA model made a prediction

15   that was a thousand percent off from reality, would

16   that be useful?

17         A.     It depends on the application.  You said

18   strictly we're talking about abstract terms.   It

19   depends on the application.

20         Q.     If the ARIMA model showed a general

21   increase, predicted a general increase, in the known

22   true data or a general decrease, would the ARIMA



1   model be useful?

2          A.    You said we're talking in abstract terms

3   and that statement can't be evaluated without

4   understanding what the purpose of the ARIMA model is.

5   So there is no universal criterion corresponding to

6   what you said.

7          Q.    Is there any generally recognized test

8   for whether a time-varying quantity exhibits inertia

9   so that unexpected changes affect future values?

10         A.    Inertia, what I'm calling inertia, is

11  the degree to which the time series exhibits a moving

12  average process, meaning that a shock to the process

13  in one period either persists later or immediately

14  peters out.  That's the degree of inertia that I'm

15  referring to, and the -- a time series that did not

16  exhibit auto-regressivity or integration or a moving

17  average process would generate results that are

18  totally uninformative.

19         So the test for whether -- the test in this

20  case that is useful for whether an ARIMA model is

21  capturing important features of the data,

22  auto-regressivity, integration, and a moving average

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 154 of 265 PageID #: 10187

1  process is its ability to make out-of-sample

2  predictions, which is why I conduct that test.

3       Q.    Over how long of an interval do the

4  future values have to be affected by an unexpected

5  change?

6       A.    Do they have to be?  I don't understand

7  what that means.

8       Q.    One of your criteria for whether an

9  ARIMA model is appropriate is that the time-varying

10  data series exhibits inertia so that unexpected

11  changes affect future values.

12       A.    Um-hum.

13       Q.    Okay.  If you've got an over-damped time

14  series, it's going to affect future values, but not

15  for very long?

16       A.    I don't know what the term "over-damped"

17  means.  I can't understand your question.

18       Q.    You're not familiar with dampening in

19  the context of time-varying data series?

20       A.    "Dampening" is not a term that's used in

21  economics.  I'm not -- I have no idea what you mean

22  by that.



1       Q.     You're not familiar with the

2 mathematical term "dampening" in the context of

3 time-varying data series?

4       A.     In many years of studying mathematics,

5 including through graduate school, I never heard the

6 word "dampening" used in a classroom teaching

7 mathematics.

8       Q.     Did you take differential equations,

9 sir?

10       A.     Yes.

11       Q.     Prior to your analysis?

12       A.     Many years ago. Yes, I did.

13       Q.     And you never heard the term

14 "dampening"?

15       A.     I cannot recall a math professor ever

16 talking about dampening.

17       Q.     A tendency to return to the mean --

18       A.     "In reversion" is the term that's used

19 in econometrics for that. "Dampening" is not a term

20 that I've heard used by any economist.

21       Q.     Dampening is a measure of the degree you

22 inject and input to vary a time data series. Does it

1    instantly return?  Do you get one overshoot in return

2    or do you get a gradual petering out?

3          MS. FUDIM:  Objection to form.

4          THE WITNESS:  I don't know what "you get a

5    gradual petering out" means.  You're talking about --

6    I honestly don't understand your question.

7    BY MR. ST. JOHN:

8          Q.    Your third criteria for whether an ARIMA

9    model is appropriate is that the time-varying

10   quantity drifts systematically upward or downward

11   over time rather that always reverting to the same

12   level; is that correct?

13         A.    That would suggest that the time series

14   exhibits a property called integration.  Yes.

15         Q.    Is there a generally accepted test for

16   whether the time-varying quantity at issue drifts

17   systematically upward or downward over time rather

18   than reverting to the same level?

19         A.    Yes.  It's called a unit root test;

20   however, the border encounters in -- I believe it's

21   Figure 1 obviously have a general tendency to rise

22   over the period 2011 to 2023.  So that's why my model



1    allows for first-degree integration.

2            Q.     Why that interval?

3            A.     I referred to the entire dataset and

4    that is the time, the interval of time, on which I

5    fit the model.

6            Q.     And isn't it just as easy to look at

7    this dataset and say, Well, it seems to be returning?

8            You have waves of increasing magnitude and

9    they seem to return to a median of around 30 or 40

10   thousand encounters per month.

11           A.     I'm looking at Figure 1 now and that is

12   certainly not an accurate description of that graph.

13           Q.     Sometimes it's above it.  Sometimes it's

14   below it.

15           When I look at Figure 1, I see a wave form

16   that's -- with increasing magnitude -- I'll give you

17   that -- above and below somewhere around 30 or 40

18   thousand encounters a month.

19           So we disagree about that.  What's the test?

20   Is there a generally-accepted test to figure out

21   whether an ARIMA model is appropriate?

22           Because that data series drifts sufficiently

1    systematically upward or downward over time rather

2    than reverting.

3         MS. FUDIM:  Objection to that portion before

4    "is there a generally-accepted test?".

5         THE WITNESS:  I referred to three ways that

6    are common.  The most widely accepted would be to see

7    overall if -- to test overall whether the ARIMA model

8    makes out-of-sample predictions that correspond to

9    reality.  A second is to look at the time series that

10   clearly and unmistakably exhibits a long-term overall

11   trend.  There's no doubt in my mind, looking at the

12   graph right now, and the third is what I referred to,

13   the unit root test.

14        Q.    You're looking at the graph.  I disagree

15   with you.

16        So my question is is there an objective test

17   that's generally accepted, some version of math where

18   we can plug these numbers in and it will give a

19   thumbs up or thumbs down whether the data series

20   drifts systematically upward or downward rather than

21   reverting to the same level?

22        MS. FUDIM:  Objection to everything before



1    "So before my question to you is".

2         THE WITNESS:  There are three reasonable ways

3    to do it.  The most common in my discipline is to

4    assess overall if the ARIMA model predictions -- if

5    out-of-sample predictions made by the ARIMA

6    correspond to reality.  If you run an ARIMA model on

7    a series that is not integrated and assume

8    first-degree integration, the out-of-sample

9    predictions will not be as good and vice versa.

10        A second way is to look at the data series

11   which clearly and unmistakably, using my training in

12   econometrics at Harvard University and my 21 years of

13   experience analyzing large datasets, including time

14   series data, show me without any doubt whatsoever

15   that there is a clear long-term upward trend in

16   border encounters and it would be inappropriate to

17   simply assume no integration of this time series, and

18   third is the unit root test.

19   BY MR. ST. JOHN:

20        Q.    If you do a linear regression, there are

21   measure of goodness of fit.  Right?

22        A.    ARIMA is not a linear regression.



1          Q.     No.  Sir, I'm not asking about an ARIMA

2     model.  I'm probing your knowledge.  You're holding

3     yourself out as an expert.

4          I'm probing your knowledge, and when you do a

5     linear regression, there are tests of goodness of fit

6     to the data.  Correct?

7          A.     There are tests of goodness of fit to in

8     sample data, yes.

9          Q.     Is there any equivalent test of goodness

10    of fit for an ARIMA model, data in an ARIMA model?

11         A.     The usefulness of the model in this case

12    and the informativeness of the model for the tests

13    that I run corresponds to its out-of-sample

14    predictions, not its in sample fit.  So that would

15    not be an important statistic to report.

16         Q.     The question is can you.  Is there a

17    test?  Is there a test for goodness of fit other than

18    it fits some limited set of out-of-sample data?

19         A.     Can I report a statistic for goodness of

20    fit that would not be informative to the tests that I

21    ran?  I can and I could have, but I didn't, because

22    they would not be useful to the tests that I ran.

1        Q.      Why would it not be useful to the tests

2   that I ran?

3        A.      Because I was assessing whether the

4   evolution of border encounters over time following

5   the advent of the policy that is out of sample with

6   respect to the data used, which were up to and

7   including May 2022 only exhibited evidence of a

8   positive effect of the policy on border encounters,

9   and I failed to find that.

10       Q.      How close was the prediction from your

11  ARIMA model to actual data?

12       A.      So I conducted an out-of-sample test,

13  and let me look up the exact numbers here.

14       So if you apply, if you arbitrarily choose, a

15  cutoff date of a year before the policy after which

16  true border encounters are known and then you use the

17  same model to predict how border encounters would

18  have evolved subsequently, between June of 2021 and

19  March of 2023 when actual encounters were 200,295 per

20  month, the model predicts 203,136 per month, a

21  difference of only 1.4 percent, that suggests that

22  the ARIMA model is capturing a great deal of



1    information about patterns in this time series.

2         Q.    I read that.  Let's look back at Figure

3    2.

4         Right after your cutoff date of training data,

5    the model predicts a decrease and the actual was an

6    increase, and you didn't produce the table data.  I

7    would ask that that be produced.

8         I'm looking here and I see that's -- it looks

9    like the model is predicting somewhere around 170,000

10   and the actual is 210, 220 thousand; is that correct?

11        A.    I don't have those figures in front of

12   me.

13        Q.    It's your graph, sir.  I'm having to

14   eyeball off the graph.  So -- and it's your work.

15        So we'll start with a basic question.  The

16   model predicted a decrease and the actual was an

17   increase.  Is that correct, sir?

18        MS. FUDIM:  Objection, vague.

19        You can answer.

20        THE WITNESS:  A decrease from when to when

21   and an increase from when to when?

22   BY MR. ST. JOHN:



1          Q.     Looking at Figure 2, you've got a

2   vertical red line demarcating training data and test

3   data.   Correct?

4          A.     Yes.

5          Q.     And immediately to the right of that

6   vertical red line, your model predicts a decrease in

7   encounters per month.   The actual was an increase.

8   Is that correct?

9          A.     That is correct over a one-month period,

10  which is why I test for effects over a much longer

11  period and run concomitant tests that do not rely on

12  ARIMA model predictions.

13         Q.     And moving further right from the

14  vertical red line in Figure 2, the model was, it

15  looks like, getting close to 300,000 and then actual

16  data dropped well down into the 200,000s, below

17  200,000s, before coming back up with a delta of, I

18  mean, it looks to be around a hundred thousand per

19  month.

20         Is that correct?

21         A.     It is correct that 22 months out from

22  the cutoff date, that prediction is made.   Yes.



1          Q.     And the prediction is off by somewhere

2    in the neighborhood of a hundred thousand encounters

3    per month.   Correct?

4          A.     Although that is correct, it is not

5    informative for the test that I run, which is over a

6    10-month time horizon, not a 22-month time horizon.

7          Q.     Why did you pick 10 months, sir?

8          A.     I used all the data available at the

9    time, which were up to and including March 2023.   No

10   other data were available.

11         Q.     I mean, you got -- this is the data you

12   used.   This is the data in your report, and I'm

13   seeing a difference of a hundred thousand encounters

14   per month between model and actual.

15         We agree on that right?

16         A.     No, we don't agree on that.

17         Q.     What is it?   What is it?   What's the

18   difference?   What's the delta between model and

19   actual at the end of your test data in 2023, looking

20   at Figure 2?

21         A.     Figure 2 is not an evaluation of the

22   Asylum IFR of 2022, and the difference that you're

1  referring to occurs 22 months out from the policy,

2  from the cutoff date in this exercise.  The valuation

3  that it did was over a 10-month period.

4       So the difference between the model and

5  actuality at 22 months is irrelevant to the test that

6  I conduct on the actual data.

7       Q.   Why is it irrelevant?

8       A.   Because the time horizon that I'm

9  studying extends 10 months.

10      Q.   And doesn't it suggest your model is

11 less than accurate if it can't make the predictions?

12      A.   No.  It certainly does not.

13      Q.   Why did you pick 10 months, sir?

14      A.   As I told you, that was all the data

15 available at the time I did the analysis.

16      Q.   Then why is more data here in Figure 2?

17 You had the data.

18      Is there a -- does Figure 2 show more data

19 than what's in your analysis?

20      A.   Figure 2 stops in March 2023, as I said.

21      Q.   So within this data series, which this

22 is part of your report, sir, the data you were

1    presenting shows a difference of somewhere in the

2    order of a hundred thousand encounters per month

3    between your model and the actual.

4            Can we -- we can discuss the relevance, but do

5    you agree with that basic statement, that at the end

6    of your data series in 2023, the difference between

7    the model and the actual is somewhere around a

8    hundred thousand encounters per month?

9            A.    The ability of a model to make

10   predictions at a 22-month time horizon is not

11   informative in any way about its ability to make

12   predictions over a 10-month time horizon.  You're

13   looking only at the final month.  You're not

14   describing any information about the first 10 months,

15   which is the only information that would be -- that

16   -- I shouldn't say only -- which would be the most

17   informative portion of this comparison for the test

18   that I run.

19           Q.    Why is it the most informative?

20           Why is 10 months the most informative?

21           A.    I only had 10 months of post-policy data

22   available to me in doing this analysis.  So the

1    ability of the model to make predictions at a much

2    longer time horizon is not informative about the

3    usefulness for that analysis.

4        Q.    If the data -- I know there's a gap

5    here.  Why was the data not available to you to make

6    the analysis?  Because I see it in Figure 2.

7        A.    Figure 2 is not an evaluation of the

8    effect of the Asylum Processing IFR of 2022, as the

9    report clearly states.

10        Q.    So your only reason for not including

11    this subsequent data or this 2022 data is that you

12    didn't have it at the time you ran the analysis?

13        A.    Not including it?  It didn't exist.  So

14    there was nothing that existed to omit.

15        Q.    Sir, I'm looking at Figure 2.  Did you

16    consider all of the data reflected in Figure 2?

17        A.    In making Figure 2, did I consider all

18    of this data in Figure 2?  Yes.

19        Q.    In your analysis, did you consider all

20    of the data reflected in Figure 2?

21        A.    In my analysis, I considered the CPB

22    data on southwest border apprehensions of



1   inadmissible migrants from October 2011 through and

2   including March 2023, which were the entirety of the

3   data available when I did the analysis.

4            Q.    Okay.  So let's focus in on March 2023.

5            That's the far right end of the data series in

6   Figure 2.  Correct?

7            March 2023?

8            A.    In this validation exercise for the

9   model which is not an evaluation of the effect of the

10  Asylum Processing IFR of 2022, that is the last data

11  point on the right side of the graph, yes.

12           Q.    On the far right side of the graph, your

13  validation, there is a difference of somewhere around

14  a hundred thousand encounters per month between what

15  your model predicts and the actual data; is that

16  correct?

17           A.    At a time horizon that is not

18  informative about the predictive capacity of the

19  model on a 10-month time horizon, and in one month in

20  isolation, that is a current statement.

21           Q.    Looking at the data points, it actually

22  looks like two or three months in the series;



1    wouldn't you agree with that?

2           A.    You had asked me about a specific

3    statement that you made and I said that that

4    statement was correct.  Now you're asking me about a

5    different period.

6           Q.    So, sir, at the far right end, your

7    model is off by roughly 30 percent.  The model is

8    predicting somewhere just under 300,000 encounters

9    per month and the actual is somewhere just under

10   200,000 thousand.

11          So, actually, that's -- you could consider it

12   being 50 percent over.  Your model was 50 percent in

13   excess.  Correct?

14          A.    The fit of this ARIMA model and any

15   ARIMA model would be expected to be lower the further

16   you get from the cutoff before which information is

17   incorporated into the model, and during that time

18   period which is well beyond the horizon the data

19   analysis that I'm doing, there is a divergence, yes.

20          Q.    Well, you do fit over a longer period to

21   check the model.  Right?

22          That's the whole idea, is to -- is the model



1   actually predictive.

2         A.    I don't know what you mean by "the whole

3   idea".  What is important is that the model is

4   informative on the 10-month time horizon, because

5   that is the horizon over which I assess whether there

6   is evidence of a positive effect of this policy in

7   the analysis, which is not this figure, because this

8   figure is not an evaluation of the effect of the

9   policy.

10        Q.    It's an evaluation of the model.

11  Correct?

12        A.    It is a check to see if the ARIMA model

13  is informative about the data series, and it is very

14  strong evidence that the ARIMA model is informative

15  about this data series.

16        Q.    Is there any objective test for whether

17  it's informative other than your experience?

18        MS. FUDIM:  Objection.

19        THE WITNESS:  It depends, informative

20  depends, upon the purpose, and for the purpose that I

21  use it, it is highly informative.

22  BY MR. ST. JOHN:

1          Q.     Why?  Why do you conclude it's highly

2     informative?

3          A.     I conclude it's highly informative

4     because -- because from my decades of experience

5     doing an applied econometrics model that is capable

6     of making an out-of-sample prediction of a highly

7     varying time series over a substantial period like

8     this that matches to a degree of 1.4 percent is an

9     extraordinarily informative and predictive model.

10         Q.     It's interesting -- so there are

11    several-month periods to the right of the red line in

12    Figure 2 where your model is out of phase with the

13    actual.  Do you understand what I mean "out of

14    phase"?

15         A.     There is -- if you mean there's not a

16    perfect fit, there is certainly not a perfect fit.

17    My goal in this exercise was not to make a perfect

18    prediction and the ARIMA model is not generally

19    capable of making a perfect prediction.

20         Q.     Beyond not perfect, I see at least two

21    places where actual goes up substantially and the

22    model goes down.  Would you agree with that?



1          A.     That would be true of any ARIMA output

2    relative to the truth, that it is not a perfect fit

3    and ARIMA models are not designed to and do not

4    create perfect predictions of the future.

5          Q.     You talk about a difference of only 1.4

6    percent, but that comes by something you would

7    probably call integrating two curves that are out of

8    phase.

9          So I'll mark this Exhibit 5.

10         COURT REPORTER:  Six.

11                         [Exhibit No. 6 was marked

12                         for identification.]

13         MR. ST. JOHN:  Six.  Thank you, Madam Court

14    Reporter.

15    BY MR. ST. JOHN:

16         Q.     Exhibit 6 is a document I've drawn.

17    There's a blue curve and a black curve.

18         You would agree with me that those two curves

19    are 180 degrees out of phase.  Correct?

20         [Witness peruses exhibit.]

21    BY MR. ST. JOHN:

22         Q.     Sir, if you don't have an understanding

1   of Calculus 1, like please speak up and we can deal

2   with that, but --

3           MS. FUDIM:   Objection.

4   BY MR. ST. JOHN:

5           Q.    I see two waves 180 degrees out of

6   phase; would you agree with that?

7           [Witness further peruses exhibit.]

8   BY MR. ST. JOHN:

9           Q.    Meaning that the top of one coincides

10  with the bottom of the other or the peak, I guess to

11  be more accurate, coincides with the trough of the

12  other curve.

13          A.    I'm pausing because I'm struggling to

14  grasp the connection of the sign waves that you

15  repeatedly mentioned to my analysis, which has

16  nothing to do with mathematics of sign waves, but

17  yes.  I see a graph with curves that are out of

18  phase.

19          Q.    180 degrees out of phase.  Right?

20          A.    If you had drawn it properly.

21          Q.    Forgive the freehand.

22          If one of those were your model -- let's



1   assume one of those is your model, not of immigration

2   data.  One is your model.  The blue curve is your

3   model.  The black curve is the actual data.

4          If you sum those two curves to test the model

5   over the time period one to two, it's going to

6   exactly match, isn't it?

7          It's going to have a hundred percent

8   correctness of fit.

9          A.    This is a totally hypothetical question.

10  I don't use Fourier decomposition in my analysis.

11  Fourier decomposition in economic analysis would not

12  be an appropriate tool to apply in this case and I

13  can't sit here and come up with conjectured opinions

14  about tools that would be inappropriate in my

15  discipline and which I did not apply to this data.

16         Q.    Here's the problem:  It strikes me as

17  that's exactly what you did.  You summed up the total

18  number of encounters that your model predicted over a

19  time period and you summed up the total number of

20  actual encounters.  So you integrated both curves,

21  correct, and then compared the difference?

22         A.    I said I didn't do a Fourier analysis.



1   You said that's exactly what you did.  That's not a

2   true statement.

3          I didn't incorporate any Fourier decomposition

4   into this analysis.  It would inappropriate to do so

5   based on my training and experience, and I do not

6   incorporate sign waves or Fourier decomposition in

7   this analysis in any way, shape, or form.

8          Q.    Sir, so tell me how you got to the 1.4

9   percent.

10         So in your words, in the 22 months from June

11  '21 through March 2023, actual encounters were

12  200,295 per month on average while the model predicts

13  203,136, and you got that by comparing the average

14  value of the two curves over 22 months.  Correct?

15         A.    This is a very simple test for the

16  out-of-sample prediction ability of the model.  I

17  asked whether the -- if the policy cutoff date had

18  been a year earlier, would the model have been

19  informative about how the illegal migration would

20  have evolved in the absence of the policy over that

21  time, and the simplest, most intuitive test of that

22  question is to ask how many subsequent border



1    encounters were observed compared to how many would

2    have been predicted by the model.

3           It's not a complex mathematical exercise.

4    It's a very simple intuitive question.

5           Q.    Well, if it's a very simple intuitive

6    thing, how are you getting 1.4 percent?

7           Why don't you walk us all through that, sir.

8           A.    The 1.4 percent is the difference

9    between total encounters predicted after the

10   artificial 2021 cutoff date and actual encounters

11   after that date or, as it's reported in the text,

12   that same number divided by 12.  Both of them would

13   differ by 1.4 percent.

14          Q.    So you're saying -- or you only tested

15   your model for its ability to predict an average over

16   22 months, not its ability to predict over a shorter

17   time period.  Correct?

18          A.    I didn't report all possible tests of

19   that.  I plotted in full all of the predictions and

20   all of the actual realized value of the time series

21   in Figure 2 so that anybody could assess at any time

22   horizon they're interested in whether the model was



1    capturing information about that time series, and it

2    clearly captures a great deal of information about

3    that time series.

4         Q.    It doesn't say three- to six-month time

5    horizons.  It doesn't even capture direction.

6    Correct?

7         Not accurately?

8         There are two extended periods where your

9    model is trending down and actuals are trending up or

10   vice versa.

11        A.    The ARIMA model does not seek to and

12   does not make a perfect prediction of the time

13   series.  So even in a very close match, there are

14   going to be times where one is up and the other one

15   is down as they move with respect to each other.

16        So that is perfectly consistent with an

17   excellent fit.

18        Q.    A 50 percent difference is an excellent

19   fit?

20        A.    There is not a 50 percent difference

21   there.  As I said, the --

22        Q.    In some months, there are.  Correct?

1          A.     The ability of any of the three methods

2     that I apply to make a perfect prediction of the

3     counterfactual in any single month does not determine

4     the informativeness of three tests concurrently and

5     would not change my opinion.

6          Q.     The fact that your test is wrong by 50

7     percent in a given month doesn't change your opinion?

8          A.     That's a false statement of the

9     reliability of the model.

10          Q.     Sir, I'm going to ask on the record.  I

11     want the raw data produced, because it's a nice

12     logarithm table or logarithmic presentation of the

13     data.

14          MS. FUDIM:  If you have a request for data or

15     additional documents, please put that request in

16     writing to counsel and we'll take it under advisement

17     and respond to it in accordance with the federal

18     rules.

19          MR. ST. JOHN:  Okay.  I want the underlying

20     data, please, including from the model, please.  I

21     think that was part of your obligation, for the

22     report to include the data, not just a graph of it.



1          MS. FUDIM:  Again, please put the request in

2     writing and we'll take it under advisement and

3     respond to it pursuant to the federal rules.

4     BY MR. ST. JOHN:

5          Q.    So, sir, is your testimony that when I

6     get this data, I'm not going to see your numbers

7     being off, your model being off by 50 percent in a

8     given month?

9          A.    When you say "a given month", I

10    understood you mean any given month, which is why I

11    said that statement was false.  By "a given month",

12    are there months in which there is a substantial

13    difference?

14          As the figure transparently shows, there are

15    some months where this is a substantial difference;

16    however, the usefulness of the second test that I run

17    does not depend on the degree of match in any single

18    month.

19          Q.    But there's no objective test for that.

20    Right?

21          It's just your opinion?

22          A.    There are objective criteria for



1    building the ARIMA model, and the second test that I

2    run is asking something very -- is asking a very

3    clear and transparent question, which is did actual

4    border encounters after the advent of the Asylum

5    Processing IFR of 2022 evolve in a way that was above

6    the levels and trends that would have been predicted

7    based on past persistence, time trends, inertia,

8    seasonality, and relationship with U.S. labor market

9    conditions, and the actual apprehensions are below

10   that number.

11        That's not the only test that I run, but it's

12   an informative one especially concurrently with the

13   other tests.

14        Q.    Sir, you used a logarithmic scale for

15   the Y Axis.  Correct?

16        A.    I believe all the figures have a

17   logarithmic scale, yeah.

18        Q.    And there's pretty widespread concern in

19   the -- pretty widespread concern, period, with the

20   use of logarithmic scales as misleading.  Correct?

21        MS. FUDIM:  Objection.

22   BY MR. ST. JOHN:



1          Q.     They can be very misleading?

2          A.     Not in my discipline, certainly not in

3    economics.  It's the most common transformation to

4    use in data of this kind.

5          Q.     Well, when you're presenting to the

6    public, there is a concern with logarithmic scales

7    being misleading.  Correct?

8          A.     I'm offering my testimony as an expert

9    economist, and in my discipline, this is very

10   standard practice.

11         Q.     Just as a general citizen, are you

12   familiar with company called Purdue Pharma?

13         A.     I have heard, I think, of Purdue Pharma.

14         Q.     My recollection is that the Federal

15   Government indicted the company and a whole pile of

16   states sued them.  They're bankrupt.

17         Is that consistent with your recollection just

18   as a general citizen?

19         MS. FUDIM:  Objection.

20         THE WITNESS:  I don't know what you're

21   talking about.

22   BY MR. ST. JOHN:



1          Q.     So you don't know if part of the reason

2    a whole pile of states and the Federal Government put

3    Purdue Pharma out of business was for misleading the

4    public with logarithmic scales on drug data?

5          MS. FUDIM:   Objection.

6          THE WITNESS:   It would be misleading not to

7    use a logarithmic scale in the analysis that I do,

8    which is why I do use a logarithmic scale, and I

9    explain why in the report.

10   BY MR. ST. JOHN:

11         Q.     How many of the aliens encountered at

12   the border -- we can narrow it down to the southwest

13   border -- during the time period you looked at were

14   eligible for processing under the Asylum IFR?

15         A.     I'm not a legal expert.   I wouldn't know

16   how to assess that quantity and it's not contained in

17   the CPB statistics that I looked at.

18         Q.     Do you know in the time period you

19   looked at how many aliens were actually processed

20   under the Asylum IFR?

21         A.     The factual claims in the complaint I

22   was asked to assess do not pertain to that quantity.

1    So I did not look at that quantity.

2          Q.     Are you aware of anyone else who -- or

3    anyone who has published a study that applied an

4    ARIMA model to migration data?

5          A.     ARIMA is a set of assumptions in

6    application of time series econometrics and time

7    series econometrics are very commonly applied to

8    model migration behavior.  I, myself, have done it

9    and I'm confident that it has been applied.

10         I can't -- at the moment, I don't recall a

11   specific paper that did.

12         MR. ST. JOHN:  Why don't we take a

13   five-minute break.

14         MS. FUDIM:  All right.

15         VIDEOGRAPHER:  Off the record.  The time is

16   2:17.

17         [Recess.]

18         VIDEOGRAPHER:  On the record.  The time is

19   2:28.

20   BY MR. ST. JOHN:

21         Q.     Welcome back, Mr. Clemens.

22         A.     Thank you.



1          Q.      You understand you're still under oath?

2          A.      Yes.

3          Q.      You testified that the required accuracy

4    of the predictions depends on the specific use of the

5    ARIMA model; is that correct?

6          A.      The required accuracy of the

7    predictions?  I don't know what "required" means in

8    that context.

9          Q.      Well, my understanding of your testimony

10   is that whether the predictive value of an ARIMA

11   model is useful, how good the fit is, depends on the

12   particular use of the ARIMA model.

13         A.      Yes.

14         Q.      As used here, is there any objective

15   test for goodness of fit?

16         A.      I need to explain what the second test

17   that I run is.  The second test that I run is not can

18   I make a perfect prediction of what illegal migration

19   would have been in the absence of the policy and

20   compare illegal migration to it.

21         The test that I run is did illegal migration

22   rise relative to the trend that would have been

1    predicted based on past trends in the data as

2    reflected by persistence, time trends, inertia,

3    seasonality, and overall U.S. labor market

4    conditions.  It is useful for that purpose

5    independently of whether it make a flawless

6    prediction.

7         So the degree of confidence in its

8    flawlessness is not relevant to what I do.  What I

9    want to know is whether it contains a substantial

10   amount of information about the time series, and my

11   experience in econometrics lets me know that a model

12   with this high a degree of predictiveness is clearly

13   capturing a great deal of information about patterns

14   in the time series.

15        Q.    Is there an objective test for how

16   significant the departure from the predictive value

17   needs to be in order for you to conclude there was,

18   in fact, a positive effect from the IFR?

19        A.    I didn't detect any positive effect.

20        Q.    Different question.  The question is is

21   there an objective test for how significant the

22   departure from your prediction would have to be in



1   order for you to conclude there was a positive effect

2   from the Asylum IFR?

3        A.    You're asking me what would lead me to

4   change my conclusion that there is no evidence of a

5   positive effect?

6        Q.    Correct.

7        A.    If I saw in any of three tests that I

8   ran a trend in illegal migration following the advent

9   of the policy that was higher than counterfactual

10  illegal migration as estimated in that method, that

11  would have been evidence of a piece of evidence in

12  support of the conjecture that there was a positive

13  effect, but I didn't observe that in any of the three

14  tests.

15       Q.    How large would that trend have had to

16  be?

17       A.    I did not observe any positive --

18  evidence of any positive effect of any magnitude in

19  any of three tests that I ran, which is why I

20  conclude that there isn't evidence of any positive of

21  any magnitude.

22       Q.    That's a different question.  I



1    understand what you didn't observe.

2         The question is how large of a positive

3    magnitude change would you have observe to conclude

4    there was a positive effect from the Asylum IFR?

5         A.    You're asking if I had observed

6    something in the data that I did not observe,

7    hypothetically, how would I have modified my

8    conclusions?

9         Q.    How large of an effect would it take for

10   you to modify your conclusions?

11        A.    If I had observed a positive effect in

12   any of the three tests that I ran, I would need to

13   carefully evaluate whether that positive effect was

14   compatible or incompatible with the statements I was

15   asked to evaluate, but it was made much easier by the

16   fact that I did not observe any evidence of any

17   positive effect.

18        Q.    Is there any objective test for how

19   large the effect would need to be for you to change

20   your conclusions?

21        A.    I was asked to evaluate qualitative

22   statements about the effect of the Asylum Processing

1   IFR on a quantity, that is the factual claims I was

2   asked to assess are not -- are claims about a

3   movement in a quantity.  If they increase, there are

4   words that suggest that the -- there are words in the

5   complaint that suggest that the meaning of those

6   terms is not -- would need to be carefully assessed

7   against any given positive effect, if I had detected

8   a positive effect.

9        For example, the complaint refers to a, quote,

10  explosion of monthly border encounters.  It refers to

11  -- it makes many references to a -- that suggest a

12  large effect.

13       If I had detected a positive effect of any

14  kind, hypothetically, I would need to compare the

15  quantitative effect that I measured against those

16  qualitative statements and assessed whether the

17  quantity that I measured hypothetically corresponded

18  to the qualitative statements in the complaint;

19  however, I didn't have to do this exercise and did

20  not do that exercise because I did not detect any

21  positive effect of any kind in any of the three tests

22  that I ran.



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 189 of 265 PageID #:
10222

1      Q.     So I've repeatedly asked you, and it's

2   okay if your answer is there is none, what size of a

3   positive effect would you have to see in order to

4   conclude the Asylum IFR did have a positive effect on

5   border encounters at the southwest border?

6      A.     I didn't do that analysis and I'm not

7   going to -- I can't offer expert testimony off the

8   top of my head about an analysis that I didn't do.  I

9   didn't have to do the analysis, the analysis of

10  comparing the hypothetical positive effect that I

11  hypothetically observed in the data to the statements

12  in the complaint, because I didn't detect any effect.

13      So you're asking me about a hypothetical thing

14  that I might have done if the results had been

15  different, and I can't make an assessment off the top

16  of my head.  I would need to see that result and

17  assess it in light of the claims in the complaint.

18      Q.     Did you validate your analysis by

19  running the same analysis with other policies?

20      A.     As I mentioned earlier, I initially

21  considered doing that and then I realized that I did

22  not have the legal expertise to argue for what an



1    economist would call the external validity of those

2    tests, that is their relevance to the question I was

3    asked to assess, which is the effect of the Asylum

4    Processing IFR.  So I decided that I would not form

5    my opinion based on such analysis.

6          Q.    So the answer is, no, you did not; is

7    that correct?

8          A.    I initially considered it and I looked

9    at the data, for example, about MPP, as I indicate in

10   the report, and I ended up forming the opinion that's

11   in the report independently of those other policies.

12         Q.    How far along did you get with the MPP

13   analysis?

14         MS. FUDIM:  Objection, vague, but you can

15   answer.

16         THE WITNESS:  I don't know what you mean by

17   "how far along".  I made -- I looked at the data.  I

18   made some graphs of the data.  I -- to an economist

19   who is not conducting analysis for a legal

20   proceeding, looking at other related policies would

21   be a common thing to do.  So I was acting on

22   instincts as an economist who has not participated in



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 191 of 265 PageID #:
10224

1    legal proceedings in this way.

2             In the -- I realized when trying to describe

3    those figures in a way that I found compelling, that

4    in order to argue that evidence from other policies

5    was pertinent to the factual question I was tasked

6    with examining, I would need to make a clear argument

7    for their external validity, and as I tried to

8    formulate an argument for their external validity, I

9    found myself reading and failing to understand legal

10   documents that I would need to make a compelling

11   argument about external validity, and I ended up

12   realizing that I did not have the expertise to make a

13   clear argument for external validity and I decided

14   not to use that evidence in forming my opinion.

15   BY MR. ST. JOHN:

16            Q.    What did your analysis show with MPP?

17   Did it show an effect on border encounters by MPP?

18            A.    This was in April and I haven't looked

19   at it since and I don't remember the details.

20            Q.    You said you got your results and then

21   you were trying to -- strike that.

22            Why did you feel you had the legal knowledge

1    to look at the asylum rule, but not MPP?

2         A.    I don't have legal knowledge of any

3    kind.  I needed to know very basic facts about the

4    Asylum Processing IFR to assess it using the method I

5    used.  You don't have to argue for external validity

6    of tests of a policy when that policy is the policy

7    whose effect is being evaluated.  You do need to

8    argue for external validity of tests of other

9    policies, and I realized that I lacked the legal

10   knowledge to argue for the external validity of

11   policies that are not the policies that is described

12   in the statements of fact I was asked to assess.

13        Q.    Isn't that backwards?  The way you

14   validate a test is by running the test on something

15   with a known result.

16        Okay.  I think this test is showing me that

17   "X" causes "Y".  Let's look at another "X" and make

18   sure it causes the same "Y".

19        That's external validity.  Right?

20        A.    I didn't understand what you just said.

21        Q.    How do you define external validity?

22        A.    External validity is the -- well,



1    different economists define it differently, but a

2    common definition of external validity is the

3    informativeness of a test of a policy intervention on

4    a certain population to a test of a different policy

5    and/or on a different population and/or at a

6    different time.

7          Q.    Did you perform any test of external

8    validity on the tests you performed on the IFR?

9          A.    In the three tests that I run on the

10   Asylum Processing IFR, that is the policy of

11   interest.  So there is no question about its external

12   validity.

13         Q.    Well, there's a question about the

14   external validity of the tests themselves.  Right?

15         A.    No. No.  There's no -- in the tests that

16   I run, there is no shortcoming of external validity.

17         Q.    Why couldn't you run the same test on

18   MPP?

19         A.    The factual claims in the complaint I

20   was asked to assess are not related to MPP.  They're

21   related to the Asylum Processing IFR of 2002.

22         Q.    Well, no.  The claim is does it increase

1    migrant flow.  Okay?

2            Did MPP increase or decrease migrant flow?

3    It's pretty straightforward, isn't it?

4            A.    The factual claims I was asked to assess

5    were about the Asylum Processing IFR of 2022.

6            Q.    But you started to assess MPP?

7            A.    It would be a normal thing in economic

8    analysis to draw on evidence from other policies

9    provided that one could clearly understand the

10   external validity of those other policy changes to

11   the policy change at issue, and I initially thought I

12   would be able to develop a sufficient knowledge to

13   make a clear argument for that external validity and

14   came to understand that I didn't have that knowledge.

15   So I did not form my opinion on those other tests.

16           Q.    What knowledge were you missing

17   regarding MPP?

18           A.    MPP and the Asylum Processing IFR are

19   very complex policy changes and arguing that one is

20   analogous to the other would require a deep

21   understanding of their functionality and effect of

22   migrant incentives that I determined that I could not

Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 195 of 265 PageID #: 10228

1   achieve given my knowledge and expertise.

2          Q.    Why would you need a deep understanding?

3          I mean, I haven't seen any deep understanding

4   here.  I've seen a data series that you apply a test

5   to and you say, Well, the result of the test doesn't

6   deviate too much from, in my opinion -- your opinion,

7   actually -- the true data, good to go, no effect.

8          A.    That's false.  I conducted three

9   different tests and you described one of them in a

10  way that does not describe how I reached my

11  conclusion.

12         Q.    So what is the deep understanding you

13  have, sir, about the Asylum IFR?

14         A.    I don't have legal expertise.  I don't

15  claim or have a deep understanding of the Asylum

16  Processing IFR.  That is not necessary to conduct the

17  tests that I ran, because as I mentioned, there is no

18  concern about external validity of a test when that

19  test is testing the actual policy of interest, which

20  is what I do.

21         That concern would only arise when applying

22  the conclusions of evaluations of other policies in



1    other settings at other times to a different policy

2    in a different setting at a different time.

3         Q.    What are your concerns with external

4    validity applying the same tests to MPP?

5         A.    Because MPP is not the Asylum Processing

6    IFR of 2022 and I was asked to assess factual claims

7    about that policy.

8         Q.    That's a tautology, sir.  It's not the

9    same.  They agree.

10        MS. FUDIM:  Is there a question?

11   BY MR. ST. JOHN:

12        Q.    What about MPP would prevent you from

13   running the exact same tests and performing the

14   exactly same analysis as you did with the Asylum IFR?

15        A.    The thing that would prevent me from

16   doing that analysis is that I was asked to assess

17   factual claims about the Asylum Processing IFR of

18   2022 and not about every other migration policy ever

19   enacted at the southwest border.

20        Q.    But, sir, you at some point in preparing

21   this report thought it was a good idea to assess MPP.

22        A.    As I said, yeah.



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 197 of 265 PageID #: 10230

1          Q.    And that wasn't exactly what you were

2    asked to do, but, presumably, you did that.  You

3    spent the United States' money doing that analysis or

4    starting that analysis because you thought it was

5    relevant to what you were asked to do.

6          You would not have filed a false claim with

7    the United States for doing some work that you

8    weren't asked to do that was completely irrelevant.

9    Right?

10         MS. FUDIM:  Objection.

11   BY MR. ST. JOHN:

12         Q.    That's a simple question.  You would

13   have filed a claim -- you would have not submitted a

14   bill to the United States for doing completely

15   irrelevant work.  Right?

16         A.    [Pause.]

17         Q.    That's a yes or no question.

18         MS. FUDIM:  Objection.

19         THE WITNESS:  No, sir.  I did not file any

20   false claims.

21   BY MR. ST. JOHN:

22         Q.    Because there's a very strong incentive

1   against filing false claims.  Right?

2          MS. FUDIM:  Objection.

3          THE WITNESS:  I don't file false claims

4   because it's wrong.

5   BY MR. ST. JOHN:

6          Q.    And you go to jail for a long time.

7   Right?

8          MS. FUDIM:  Objection.

9          THE WITNESS:  I don't do that.  So I don't

10  have any idea what the legal consequences would be.

11  It would be unethical and I would never do it.

12  BY MR. ST. JOHN:

13         Q.    So you, presumably, thought the MPP

14  analysis was relevant; you did bill the United States

15  for that.  Right?

16         A.    I thought that it was possible for me to

17  attain the degree of knowledge of the structure and

18  implementation of MPP that would allow me to

19  forcefully argue for its external validity to

20  assessing the effects of Asylum Processing IFR.  As I

21  did the research, I realized that I could not, given

22  my background and expertise, achieve a degree of



1   legal expertise that would be required to make a

2   forceful argument for external validity, and for that

3   reason, I corrected my analysis.

4        Q.    At any point, did you even preliminarily

5   conclude that MPP had an effect on southwest border

6   encounters?

7        A.    I don't remember seeing that in the

8   data, but I haven't looked at it in several months

9   and I don't remember.

10        Q.    Did your data, even on a preliminary

11   basis, fail to establish a positive effect by MPP on

12   southwest border encounters?

13        A.    I don't remember any evidence in the

14   preliminary analysis that I did of any effect one way

15   or the other, but I'm not sure because it's not

16   relevant to my conclusions and I haven't looked at it

17   in six or seven months.

18        Q.    In your ARIMA analysis, is there any

19   objective test for the appropriateness of the time

20   period comparing your model to actual data other than

21   that's the data that was available to you?

22        MS. FUDIM:  Objection to form.



1    BY MR. ST. JOHN:

2         Q.    I think just -- I'll try to make it

3    easier.

4         I think, earlier, you testified you had 10

5    months of data available; so that's what you used.

6    Is that a fair summary of what you testified to?

7         A.    That was the available data and that is

8    an appropriate time horizon on which to evaluate this

9    policy's effect.

10        Q.    Is there an objective test of what

11   constitutes an appropriate time horizon?

12        A.    My expertise suggests that 10 months is

13   an appropriate time horizon over which to evaluate

14   these effects.  So I determined that 10 months of

15   available data, which was all the data available at

16   the time, was sufficient to conduct meaningful tests.

17        Q.    So there's no objective test; it's just

18   your expertise; is that correct?

19        A.    I -- is there an objective test in the

20   abstract over what time horizon?

21        Over the time horizon over which any given

22   ARIMA model's out-of-sample predictions should be



1   assessed.

2           Q.      Correct.

3           A.      It would be meaningless to assess them

4   in the abstract.  The usefulness and informativeness

5   depends on the time horizon of interest to a specific

6   application of the model.

7           Q.      So what goes into that analysis of the

8   specific application?

9           What did you consider -- other than your

10  expertise, what did you consider in concluding 10

11  months was adequate?

12          A.      My charge in this case was not to rule

13  out every possible hypothetical effect of this

14  policy, nor was it to demonstrate that the effect of

15  the policy was zero.  My charge in this case was to

16  assess whether there was evidence in the data, all of

17  the data available at the time, of an effect of the

18  policy, of a positive effect of the policy on illegal

19  migration; and for several reasons, I concluded that

20  10 month was more than sufficient to assess those

21  statements.

22          Q.      Name each of the reasons.



1        A.      So my reasons included, but are not

2    necessarily limited to, the fact that when policy

3    changes at the border have substantially affected

4    migrants' incentives, they can react very quickly to

5    those changes.  I'm thinking, for example, of the

6    changes in October of 2022 with respect to Venezuelan

7    migrants which affected their eligibility for asylum

8    when arriving at the border, changes for Cuban

9    migrants in January of 2023 and changes for

10   Nicaraguan migrants in January of 2023.  DHS publicly

11   reported that there was, roughly, a 90 percent or

12   greater drop in encounters with migrants of those

13   nationalities after policy affected their migration

14   incentives with respect to asylum eligibility.

15        So it was a very rapid effect.  It did not

16   take even one month in any of those cases, much less

17   two, three, four, six, eight, or ten months to be

18   realized.  That's one important reason.

19        A second is that the policy was announced --

20   well, the date of enactment of the policy was

21   publicly announced two months in advance.  So that

22   would be more than enough time for migrants, if they



1    were going to react to policy, to approach the border

2    in advance of the actual enactment date.

3          There was even in the initial Notice of

4    Proposed Rulemaking, which I understand was several

5    months before, there was a statement of some sort of

6    intent to change the policy.  I don't believe there

7    was a specific date there, but the date of enactment

8    was publicly announced two months in advance.

9          A second or -- excuse me -- a third reason is

10   that I'm aware that DHS has published cohort reports

11   on the number of migrants processed, whose asylum

12   claims have been processed by asylum officers and

13   adjudicated by asylum officers, and in looking at

14   those data, which I don't have in front of me, there

15   was a -- in the first month of enactment of the

16   policy, June of 2022, there were a substantial number

17   of people processed, and in the entire June-to-June

18   period that is reported in those statistics, I did

19   not observe an upward trend in that number.

20         In other words, it doesn't seem to be the case

21   in DHS's opinion that enactment of the policy, for

22   example, was just beginning to ramp up at the end of



1    the 10-month period that I looked at.  It seems to

2    have been roughly constant over the 10-month period

3    that I looked at.

4            So all of those things are suggesting that it

5    would be -- it would be strange to expect a long-term

6    effect outside the 10-month window in the absence of

7    any effect within the 10-month window.

8            A fourth reason is the complaint, the factual

9    claims in the complaint itself.  They don't refer to

10   long-term effects in any language that I'm aware of

11   in the complaint.  They refer to the potential for a,

12   quote, explosion in monthly encounters at the border.

13   That doesn't seem to be language that's compatible

14   with a claim that the effect would be zero for years

15   and then suddenly explode.

16           That didn't seem to me to be an interpretation

17   of the factual claims in the report that was -- that

18   would be reasonable.

19           So those are four reasons, and there may have

20   been others, but those are the ones that come to mind

21   now.

22           Q.    Okay.  So looking at those reasons, so

1   the first is that migrants can react very quickly.

2   They hear about a policy.   They know about the policy

3   and are very quickly going the react; is that it?

4           A.    It means that I don't have a reason to

5   think that, in general, it must take months for

6   migrants to learn that a policy changed and react to

7   it in their behavior.   Those are clear examples where

8   that happened on the time scale of weeks.

9           Q.    And if that wasn't the case, that might

10  impact the time period that you analyzed; is that

11  correct?

12          A.    I listed several reasons.   So if any one

13  of them were not the case, then I would need to

14  re-evaluate that.   I would need to consider the new

15  totality of the evidence.

16          Q.    It would impact -- if any of those

17  things weren't true, it would raise a question that

18  you would need to reanalyze; is that fair?

19          A.    It would depend on what was not true and

20  the degree to which it was inaccurate.

21          MR. ST. JOHN:  No further questions.

22          MS. FUDIM:  Okay.  I have a couple.  Can we

```
1   take a one-minute break?

2          MR. ST. JOHN:  Sure.

3          MS. FUDIM:  Thank you.

4          VIDEOGRAPHER:  Off the record.  The time is

5   2:59.

6          [Discussion held off the record.]

7          VIDEOGRAPHER:  On the record.  The time is

8   3:00.

9          MR. ST. JOHN:  While we were off the record,

10  counsel for the United States intended she indicated

11  -- indicated she intended to confer with the witness

12  before asking him questions.  The Plaintiff States

13  objected, stating the witness was on the stand and

14  there are no non-privileged conversations with the

15  witness other than whether or not to assert a

16  privilege.

17         MS. FUDIM:  And as counsel for the United

18  States, I disagree with that.  If a question is

19  pending by Plaintiffs' counsel, it would be

20  appropriate to speak with the witness; however,

21  you've concluded your questions and I wish to clarify

22  with the witness whether or not I understood
```



1    something he said, and I submit that I'm entitled to

2    do that.

3        If you disagree, you can obviously then take

4    that to the judge, and if the judge agrees with you,

5    then you may have the right to ask what that question

6    was and what the answer was; but I disagree with the

7    statement you're making.  The witness has answered

8    all your questions.  There have been no breaks

9    between questions, but I submit that I have the right

10   to ask him if I understood something he said

11   correctly so that if it's vague, I can ask the

12   witness to clarify.

13       MR. ST. JOHN:  We're on the record.  You're

14   welcome to ask the witness if you understood

15   something.

16       MS. FUDIM:  I'm not going to do it that way.

17   I'm going to ask him outside the room, but, of

18   course, if you take issue with that, you can raise it

19   with the Court, and if the Court agrees with you,

20   then the Court will agree with you and you'll have

21   the opportunity to ask what that question was and

22   what the answer was.



1          MR. ST. JOHN:  Ms. Fudim, do not coach the

2   witness.

3          MS. FUDIM:  I take offense that you think

4   that that even has to be said.

5          MR. ST. JOHN:  Then there's no need to confer

6   with the witness off the record.

7          MS. FUDIM:  I disagree and I'm going to ask

8   the witness a question outside the room and you can

9   ask any followup question you want afterwards and I

10  can instruct the witness to not answer if I believe

11  they encroach upon privilege, and you can raise the

12  issue with the Court, if necessary.

13         MR. ST. JOHN:  You don't have a privilege

14  with this witness, not after he filed his report.

15         MS. FUDIM:  I disagree.  He's an agent of a

16  party.

17         MR. ST. JOHN:  No.  He's a retained expert

18  witness.

19         MS. FUDIM:  Yes, of a party.  You can

20  challenge this with the Court, Mr. St. John.  I don't

21  want to fight with you, but we have different

22  positions.  You're certainly welcome to raise your



 1    position with the Court, and if it turns out that

 2    you're right, then, by all means, you can seek the

 3    remedy of seeking an answer to that question; but if

 4    I want to ask the question what he meant by something

 5    outside the presence of the room, I submit that I'm

 6    entitled to do that and you can probe it.

 7            MR. ST. JOHN:  If that's your position, so be

 8    it.  I will be asking you word for word what your

 9    conversation was.  I'm just letting everybody know

10    that's the question that's coming.

11            MS. FUDIM:  And I will be instructing the

12    witness not to answer, but we can get there when we

13    get there.

14            MR. ST. JOHN:  Thank you.

15            VIDEOGRAPHER:  Off the record.  The time is

16    3:03.

17            [Ms. Fudim confers with the witness.]

18            VIDEOGRAPHER:  On the record.  The time is

19    3:04.

20             EXAMINATION BY COUNSEL FOR DEFENDANT

21    BY MS. FUDIM:

22            Q.    You were asked questions by Mr. St. John

1   pertaining to data regarding MPP.  Did you perform

2   any analytic tests on that data?

3        A.    I don't recall doing anything but making

4   graphs of the number of enrollments in MPP at

5   different sectors of the border.

6        Q.    You had used the term "logarithmic

7   scale" during the course of the deposition, and it

8   wasn't a term that was defined.  So for the sake of

9   completeness, can you define what you mean by

10  "logarithmic scale" when you use that term?

11       A.    Yes.  A logarithmic scale is a scale of

12  a graph on which a given distance in movement along

13  that axis is a constant percentage of the quantity

14  being represented, so that a centimeter up on the Y

15  Axis, for example, would -- if it represented 10

16  percent at one portion of the axis, it would

17  represent 10 percent at the other portion of the

18  axis.

19       That's true in -- if the axis is not -- if the

20  numbers are not converted to logarithmic scale.  For

21  example, a scale that is untransformed to numeric, if

22  it moved, if a quantity moved, from, say, a 100 to



1  150, at the bottom of the scale, representing a 50

2  percent change, it would correspond to a much smaller

3  percentage change with the same distance at the upper

4  part of the scale.

5          So in order for a distance change along the

6  scale to be a constant percentage of the quantity

7  being represented, the logarithmic transformation is

8  essential.

9          Q.    You use the term "migrant" in your

10  report and I believe the term was also used by

11  counsel in certain questions.  How do you define the

12  word "migrant" and how are you using the term

13  "migrant" in the report and did that differ at all

14  for the sake of clarity between how that word was

15  used here today?

16          A.    The dataset that I used from Customs and

17  Border Protection is what statisticians would call

18  the universe, that is every person encountered as an

19  inadmissible migrant by CPB officers, USBP, and OFO

20  over a 12-year period.  That is the -- those are the

21  migrants that I analyzed in the dataset and I believe

22  that that is the -- when you say used here today, if



1   you mean in my statements here, I believe that I've

2   consistently referred to that group of people.

3        Q.    Does migrants include both those who

4   seek asylum and those who do not as you have used the

5   term in your report and here today?

6        A.    Yes, because the complaint refers to

7   both of those groups.  I required a statistical

8   measure comprising both of those groups, and that is

9   what is represented by the statistics that I use.

10       Q.    In the field of econometrics, is there a

11  difference between causation and correlation?

12       A.    Yes.

13       Q.    Can you explain what that difference is?

14       A.    The correlation is, simply, the

15  relationship between two things.  For example, when

16  it rains, people are more likely to be carrying an

17  umbrella on the street.  Causation is a cause and

18  effect relationship.  No one believes that people

19  carrying umbrellas actually make it rain.

20       Q.    There were questions about the ARIMA

21  model, in particular Figure 2 in your report.  In

22  considering the usefulness of the model, do you



1    consider any particular point in time in isolation?

2           A.    No.  I do not.  In all of the tests that

3    I run, I display the data on actual encounters and

4    the data on counterfactual encounters for the entire

5    10-month period between the advent of the policy and

6    the available data when I did the analysis, so that

7    although I mentioned as examples certain time points

8    in the text, anybody could look at the figures and

9    make their own assessments for any given time

10   horizon.

11          Q.    Why wouldn't you look at any particular

12   time in isolation when coming to a determination

13   about the usefulness and utility of the ARIMA model

14   for its predictive values?

15          A.    [Pause.]

16          Q.    Is that a bad question?  Do you want me

17   to rephrase it?  You look confused.

18          A.    No.  No.  I don't mean to look confused.

19   I'm thinking about how to express technical concepts

20   in nontechnical language.  I apologize for taking a

21   moment to think about it.

22          I was asked to assess factual claims in the



1   complaint.  The complaint does not refer to a

2   specific time horizon at any point.  It refers to a

3   positive effect, and I was asked to assess whether

4   the available data, which were available over a

5   10-month time horizon, contain evidence of the effect

6   asserted in the complaint.

7        The complaint does not say, for example, the

8   Asylum Processing IFR caused an increase in Month 1,

9   but a decrease in Month 2 or anything else specific

10  to any particular month.  So it would be

11  inappropriate to, in any of the three tests that I

12  run and certainly the second one, which uses the

13  ARIMA model, to analyze one specific post-policy

14  month.

15       Q.   You had testified that the ARIMA model

16  is generally not capable of making a perfect

17  prediction.  Why is that?

18       A.   I am not aware of any statistical model

19  that is capable of making perfect predictions.  If

20  that were true, if I knew of a statistical model

21  capable of making perfect predictions, I could make a

22  lot of money in the stock market tomorrow.



1          Q.     Does the inability of a model to make

2   perfect predictions mean that the model is otherwise

3   unreliable?

4          A.     Certainly not.

5          Q.     And are such models commonly used by

6   economists in your field?

7          A.     The ARIMA model is the most

8   well-established and commonly-used method for

9   assessing patterns in univariate time series and

10  making predictions based on those patterns.

11         MS. FUDIM:  Thank you.  I have nothing

12  further.

13         FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

14  BY MR. ST. JOHN:

15         Q.     Mr. Clemens, did you have a conversation

16  with Ms. Fudim during the break?

17         A.     The break a few minutes ago, yes.

18         Q.     Tell me everything that was said during

19  that break.

20         MS. FUDIM:  Objection, instruct the witness

21  not to answer.

22         MR. ST. JOHN:  Ms. Fudim, I'm going to call

 1   your attention to Federal Rule of Civil Procedure

 2   30(c) which provides that a deposition shall proceed

 3   as it does at the trial and, quote, during -- this is

 4   a quote from a case called Hall v. Clifton Precision

 5   150 F.R.D. 525.  It's from the Eastern District of

 6   Pennsylvania, 1993.  It's one of the leading cases on

 7   this issue.

 8        Quote:  During a civil trial, a witness and

 9   his lawyer are not permitted to confer at their

10   pleasure during the witness' testimony.  The same is

11   true in deposition, end quote.

12        Do you maintain your instruction that the

13   witness not answer the question?

14        MS. FUDIM:  I do.

15   BY MR. ST. JOHN:

16        Q.    Sir, are you going to take Counsel's

17   instruction?

18        A.    Yes.

19        Q.    Does Ms. Fudim represent you?

20        MS. FUDIM:  Objection, calls for a legal

21   conclusion.

22        You can answer if you know.



Case 6:22-cv-01130-DCJ-CBW   Document 217-39   Filed 01/29/24   Page 217 of 265 PageID #: 10250

1            THE WITNESS:  I don't know what "represent

2    you" means in a legal context.  I don't have legal

3    expertise.  So I would not be able to answer that.

4    BY MR. ST. JOHN:

5            Q.    Is Ms. Fudim your lawyer, sir?

6            A.    She is certainly not my personal lawyer.

7    I don't have a personal lawyer.

8            Q.    Sir, did you have conversations with Ms.

9    Fudim during other breaks today?

10           MS. FUDIM:  Objection to form.  Pertaining to

11   this case?

12           I would note that we had lunch together for

13   over an hour.

14           THE WITNESS:  Did I have a conversation with

15   her during any of the previous breaks today?  I

16   recall at least two where we talked.  Yes.

17   BY MR. ST. JOHN:

18           Q.    Did you discuss the deposition testimony

19   today during those breaks?

20           MS. FUDIM:  Objection.

21   BY MR. ST. JOHN:

22           Q.    It's a yes or no question.



1          A.     I -- I think during lunch, yes.

2          Q.     Where did you have lunch?

3          A.     It's a place across Farragut that I

4    think is called Sweet Green.

5          Q.     You sat in the dining room?

6          A.     No.  We ate here.

7          Q.     You had a conversation here in the room?

8          Where was your conversation with Ms. Fudim?

9          MS. FUDIM:  Objection.  Regarding what?

10   BY MR. ST. JOHN:

11         Q.     Where was your conversation with Ms.

12   Fudim during lunch, during the lunch where you

13   discussed the deposition?

14         A.     I -- there was certainly a moment when

15   we were walking across Farragut that the deposition

16   came up.

17         Q.     Out amongst the crowd in public, people

18   going to their lunch hours, you all were walking

19   across the street or across Farragut and you chatted

20   about the deposition?

21         MS. FUDIM:  Objection to form.

22         You can answer.



1        THE WITNESS:  I don't recall there being any

2   crowd around us or anybody around us.

3   BY MR. ST. JOHN:

4        Q.    What was the substance of your

5   conversation with Ms. Fudim about the deposition?

6        MS. FUDIM:  Objection, instruct the witness

7   not to answer.

8   BY MR. ST. JOHN:

9        Q.    Are you going to accept that

10  instruction?

11       A.    Yes.

12       Q.    But for Ms. Fudim's instruction not to

13  answer, do you recall and would you be able to

14  testify about the substance of that conversation?

15       MS. FUDIM:  Objection to form.

16       You can answer if you understand the

17  question.

18       THE WITNESS:  You asked a question of this

19  form earlier and I didn't understand it then and I

20  don't understand it now.  What would the answer be if

21  I had not been instructed not --

22  BY MR. ST. JOHN:



1        Q.    Sir, you --

2        A.    -- to answer.  It sounds to me like

3    you're asking me to answer.

4        Q.    Sir, do you remember the conversation

5    that you had with Ms. Fudim, what was said?

6        A.    I remember the general subject of the

7    conversation.

8        Q.    And but for her instruction not to

9    testify, you would be able to recount that substance

10   to me.  Correct?

11       A.    It would depend on what details you

12   wanted to know.  I don't remember every detail of

13   what we discussed.

14       Q.    You would be able to remember some

15   things.  Correct?

16       A.    I would be able to remember more than

17   nothing.  Yes.

18       MR. ST. JOHN:  We're going to leave the

19   deposition open.  This has been a square violation of

20   Rule 30.  Counsel is advised about the language of

21   Rule 30 or advised at least that substantive

22   conversations with the witness while he's on the

1   stand are impermissible.

2          Counsel for United States elected to converse

3   with the witness anyway, who's a retained expert, not

4   a client of Ms. Fudim as far as I know and she is

5   nevertheless instructing the witness not to answer.

6   We reserve the right to call the witness back at the

7   United States' or Ms. Fudim's expense and question

8   him or to seek an adverse inference or to strike any

9   testimony after those conversations.

10         Ms. Fudim, do you have anything?

11         MS. FUDIM:  I have one additional question

12   for the witness.

13         FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

14   BY MS. FUDIM:

15         Q.    Mr. Clemens, has anyone, including

16   myself or other representatives of the United States,

17   coached you at any point in time in terms of how to

18   answer questions at this deposition?

19         A.    No.

20         MS. FUDIM:  Nothing further.

21         MR. ST. JOHN:  Off the record.

22         VIDEOGRAPHER:  This concludes today's video

1    deposition.  We are officially off the record at

2    3:17.

3              [Whereupon, at 3:17 p.m., the deposition

4    concluded.]

5                              [Signature not waived.]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1              CERTIFICATE OF NOTARY PUBLIC

2          I, CATHERINE B. CRUMP, the officer before

3     whom the foregoing deposition was taken, do hereby

4     testify that the witness whose testimony appears in

5     the foregoing deposition was duly sworn by me; that

6     the testimony of said witness was taken by me

7     stenographically and thereafter reduced to

8     typewriting under my direction; that said deposition

9     is a true record of the testimony given by said

10    witness; that I am neither counsel for, related to,

11    nor employed by any of the parties to the action in

12    which this deposition was taken; and further, that I

13    am not a relative or employee of any attorney or

14    counsel employed by the parties hereto nor

15    financially or otherwise interested in the outcome of

16    the action.

17    _____
      CATHERINE B. CRUMP

18    Notary Public in and for the

19    District of Columbia

20

21

22    My Commission Expires:  October 31, 2027

Notice Date: 12/15/2023

Deposition Date: 12/7/2023

Deponent: Michael Clemens

Case Name: State of Arizona, et al. v. Merrick Garland, et al.

Page:Line          Now Reads              Should Read

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< $ >**
**$60,000** 28:*14*
**$600** 28:*15*

**< 1 >**
**1** 154:*21* 155:*11, 15* 171:*1* 212:*8*
**1,000** 69:*15*
**1.4** 159:*21* 169:*8* 170:*5* 173:*8* 174:*6, 8, 13*
**10** 162:7 163:*9, 13* 164:*14, 20, 21* 198:*4, 12, 14* 199:*10, 20* 208:*15, 17*
**10:22** 54:22
**10:26** 55:*3*
**10:53** 111:*9*
**10:55** 75:6
**100** 69:*15* 208:22
**1092** 91:2
**1092(a)(3** 92:6
**10-month** 162:6 163:*3* 164:*12* 166:*19* 168:*4* 202:*1, 2, 6, 7* 211:*5* 212:*5*
**11** 21:*12*
**11:07** 75:*9*
**11:53** 111:*12*
**114-328** 91:*4*
**12** 86:*9* 174:*12*
**12:07** 122:*20, 21*
**12:45** 122:22
**12:54** 123:*3*
**12-year** 82:*10* 209:*20*
**14** 87:*17*
**15** 87:*11*
**150** 209:*1* 214:*5*

**1629** 1:*14* 4:7
**17** 126:*1, 3*
**170** 3:*10*
**170,000** 160:9
**18** 23:2
**180** 170:*19* 171:*5, 19*
**1885** 2:6
**19** 3:8
**1993** 214:*6*

**< 2 >**
**2** 34:*19* 35:*5, 6* 110:*15, 17* 111:*17* 113:*17* 160:*3* 161:*1, 14* 162:*20, 21* 163:*16, 18, 20* 165:*6, 7, 15, 16, 17, 18, 20* 166:6 169:*12* 174:*21* 210:*21* 212:9
**2.4** 102:*10*
**2:17** 181:*16*
**2:28** 181:*19*
**2:59** 204:*5*
**200,000** 167:*10*
**200,000s** 161:*16, 17*
**200,295** 159:*19* 173:*12*
**20006** 4:*8*
**2002** 191:*21*
**20044** 2:*17*
**2011** 86:*5* 154:22 166:*1*
**2014** 99:*17* 103:*18*
**2017** 91:*3, 7* 92:6
**2019** 16:7 66:*18* 84:*21* 87:*1, 14*
**202** 2:*18*
**2020** 57:*3* 110:*3*

**2021** 99:*17* 103:*18* 104:*3, 7, 11, 15* 105:*4* 110:*3* 159:*18* 174:*10*
**2022** 14:*13, 20* 15:*2* 17:*13* 35:*16* 36:*11* 65:*5* 67:2, *5* 69:*2, 3* 82:22 87:*15* 89:8 99:22 100:*8, 12* 102:*10* 103:*9, 20* 110:*3* 115:*10, 15, 17* 117:*1* 124:*4, 11* 125:9 126:7 145:*16* 159:7 162:22 165:*8, 11* 166:*10* 178:*5* 192:5 194:*6, 18* 200:6 201:*16*
**2023** 1:*16* 4:4 64:22 65:*5, 9* 86:*5* 102:*8, 15* 103:*2, 4, 6, 9, 22* 110:*3* 154:22 159:*19* 162:*9, 19* 163:*20* 164:*6* 166:*2, 4, 7* 173:*11* 200:*9, 10*
**2027** 221:22
**203,136** 159:*20* 173:*13*
**207** 3:*5*
**21** 18:*8* 19:*21* 129:*13, 21* 142:*12* 157:*12* 173:*11*
**210** 160:*10*
**213** 3:*4*
**219** 3:*5*
**22** 131:*5, 7* 161:*21* 163:*1, 5*

**173:***10, 14* 174:*16*
**220** 160:*10*
**225** 2:*8*
**22-month** 162:6 164:*10*
**24** 64:22 65:*5*
**24(c** 87:*13, 18*
**26** 23:7 25:*16* 26:*1, 16*

**< 3 >**
**3:00** 204:*8*
**3:03** 207:*16*
**3:04** 207:*19*
**3:17** 220:2, *3*
**30** 54:*18* 73:22 150:*10* 155:*9, 17* 167:7 218:*20, 21*
**30(c** 214:2
**300,000** 161:*15* 167:*8*
**30-minute** 118:7
**31** 65:*5* 115:*15, 17* 125:9 126:7 221:22

**< 4 >**
**4** 3:8 19:*4, 5* 20:*19* 21:*13, 17, 21* 23:*3, 11, 19* 24:9 25:*4, 7, 19, 22* 26:*4, 18* 34:*19* 63:*10* 73:*18* 74:*19, 22* 75:2 110:*16*
**40** 3:*9* 22:7 155:*9, 17*
**42** 56:*12, 17* 57:*1, 5, 8, 10, 15* 110:2
**485-2458** 2:*8*

**< 5 >**

**5** 3:*4*, *9* 40:*10*, *11* 86:*8* 87:*10* 170:*9*
**50** 146:*15* 167:*12* 175:*18*, *20* 176:*6* 177:*7* 209:*1*
**525** 214:*5*
**598-6073** 2:*18*

< 6 >
**6** 3:*10* 129:*12* 170:*11*, *16*
**6:22-cv-01130** 1:*8*
**600** 4:*8*
**600,000** 103:*11*

< 7 >
**7** 1:*16* 4:*4* 110:*18* 111:*18*, *20*
**70804** 2:*7*

< 8 >
**8** 75:*15*, *19* 109:*22* 110:*1*
**81** 99:*16*
**868** 2:*15*

< 9 >
**9** 72:*10* 73:*18*
**9:01** 1:*15* 4:*5*
**9:22** 22:*16*, *22*
**9:40** 22:*19*
**9:54** 34:*9*
**9:55** 34:*12*
**90** 200:*11*

< A >
**a.m** 1:*15*
**ability** 132:*13* 135:*14* 143:*8* 144:*7*, *19* 149:*3*, *9*, *20* 152:*1* 164:*9*, *11* 165:*1*

173:*16* 174:*15*, *16* 176:*1*
**able** 22:*1* 89:*20* 90:*3* 121:*6* 142:*22* 143:*15* 192:*12* 215:*3* 217:*13* 218:*9*, *14*, *16*
**absence** 99:*8*, *9* 146:*7* 173:*20* 182:*19* 202:*6*
**absolute** 50:*17*
**absolutely** 59:*15*
**abstract** 51:*2* 60:*15* 71:*6* 95:*8* 149:*18* 150:*12*, *18* 151:*2* 198:*20* 199:*4*
**accept** 10:*7*, *10*, *13*, *15* 21:*8* 89:*16* 90:*20* 217:*9*
**acceptable** 9:*1*
**accepted** 36:*16* 43:*8*, *16* 77:*16* 139:*2* 140:*9* 143:*6* 144:*5*, *9*, *17* 145:*20* 148:*10*, *18* 149:*1* 154:*15* 156:*6*, *17*
**access** 67:*18*
**accessible** 32:*12*
**accessing** 28:*20*
**accompanied** 16:*15* 66:*18* 73:*11* 74:*7*
**account** 66:*10*, *12*, *16*
**accounted** 66:*21*
**accounting** 92:*16* 96:*13* 99:*10*
**accuracy** 21:*1* 59:*14* 182:*3*, *6*

**accurate** 12:*17* 21:*17*, *22* 65:*19* 83:*8* 155:*12* 163:*11* 171:*11*
**accurately** 65:*12*, *16*, *18* 175:*7*
**achieve** 193:*1* 196:*22*
**acknowledges** 55:*14*
**act** 48:*3* 49:*12* 59:*2* 84:*16*, *22* 85:*6* 91:*3*
**acting** 188:*21*
**action** 48:*4* 85:*3* 221:*11*, *16*
**actions** 52:*17* 56:*8*
**activities** 28:*19*
**activity** 46:*1*
**actors** 68:*11*
**actual** 93:*17* 159:*11*, *19* 160:*5*, *10*, *16* 161:*7*, *15* 162:*14*, *19* 163:*6* 164:*3*, *7* 166:*15* 167:*9* 169:*13*, *21* 172:*3*, *20* 173:*11* 174:*10*, *20* 178:*3*, *9* 193:*19* 197:*20* 201:*2* 211:*3*
**actuality** 163:*5*
**actuals** 175:*9*
**addition** 97:*8*
**additional** 23:*15* 24:*4*, *5*, *15*, *16* 25:*14*, *15* 26:*10* 27:*4*, *5*, *8* 33:*6*, *8* 34:*13* 83:*11*, *13*, *16* 117:*19* 176:*15* 219:*11*
**additively** 53:*20* 54:*1*

**addressed** 97:*5*
**adequate** 199:*11*
**adjudicated** 201:*13*
**adjudicates** 114:*9*
**adjudication** 114:*13*
**administer** 4:*22*
**Administration** 104:*12* 107:*8*
**Administration's** 104:*22*
**advance** 59:*6*, *10* 200:*21* 201:*2*, *8*
**advantage** 78:*21*
**advent** 83:*18* 128:*13* 129:*15* 130:*19* 146:*4* 159:*5* 178:*4* 184:*8* 211:*5*
**adverse** 219:*8*
**advice** 10:*12*, *13*, *15*, *18* 11:*10*
**advised** 218:*20*, *21*
**advisement** 176:*16* 177:*2*
**Aerostat** 97:*16*, *17* 98:*3*
**Aerostats** 97:*18* 98:*1*, *13*
**affect** 12:*15* 46:*2*, *4* 60:*7*, *12* 67:*22* 76:*4* 84:*4* 103:*10* 131:*14* 151:*9* 152:*11*, *14*
**affiliated** 31:*2*, *3* 33:*10*
**affirmative** 59:*19*
**agent** 11:*17* 92:*11* 96:*6* 97:*2* 206:*15*

**agents** 92:*1, 2*
93:*5, 17, 18* 94:*4*
96:*13, 16*
**ago** 20:*15* 40:*1*
66:*3* 100:*1*
103:*19* 153:*12*
213:*17*
**agree** 42:*16* 62:*3*
106:*12* 107:*10*
109:*7* 162:*15, 16*
164:*5* 167:*1*
169:*22* 170:*18*
171:*6* 194:*9*
205:*20*
**agrees** 205:*4, 19*
**air** 110:*5*
**al** 1:*5, 8* 4:*4*
**alcohol** 5:*20*
**aliens** 119:*21*
120:*3, 9, 18*
180:*11, 19*
**align** 48:*4*
**Allow** 127:*16*
196:*18*
**allows** 155:*1*
**alluded** 16:*16*
**alongside** 57:*3*
62:*16*
**altered** 68:*7*
**alternatives** 53:*10*
**ambiguity** 7:*5*
**ambiguous** 13:*20*
**America** 67:*20*
**amount** 28:*13*
183:*10*
**analogous** 192:*20*
**analyses** 79:*18*
**analysis** 49:*4, 21*
53:*11* 64:*8, 17*
65:*9* 69:*7, 12*
77:*3* 89:*11, 22*
90:*7* 96:*18*
98:*15* 101:*12*
102:*22* 103:*10*

113:*1* 114:*22*
115:*16* 119:*2*
122:*7* 126:*20*
138:*12* 139:*10,
11, 13* 153:*11*
163:*15, 19*
164:*22* 165:*3, 6,
12, 19, 21* 166:*3*
167:*19* 168:*7*
171:*15* 172:*10,
11, 22* 173:*4, 7*
180:*7* 187:*6, 8, 9,
18, 19* 188:*5, 13,
19* 189:*16* 192:*8*
194:*14, 16* 195:*3,
4* 196:*14* 197:*3,
14, 18* 199:*7*
211:*6*
**analytic** 208:*2*
**analyze** 110:*8*
114:*3, 4* 212:*13*
**analyzed** 98:*11*
123:*10* 203:*10*
209:*21*
**analyzing** 35:*22*
157:*13*
**and/or** 191:*5*
**Andrew** 5:*13*
**announced**
200:*19, 21* 201:*8*
**answer** 6:*10, 16,
19* 7:*6, 22* 8:*4, 5,
8, 13* 9:*1, 3, 14*
10:*5, 8, 14, 17*
11:*2, 13* 14:*5*
22:*1* 23:*22* 24:*6*
26:*22* 30:*15*
31:*7* 37:*18, 22*
38:*6* 49:*20*
50:*14* 51:*1*
54:*16* 62:*7* 71:*5*
89:*14, 20* 90:*2, 3,
4, 10, 11, 18*
93:*11, 22* 94:*16*

95:*7* 100:*17*
103:*14* 104:*9, 17*
111:*3* 116:*20*
120:*12, 14* 121:*9,
15* 122:*9* 128:*19*
139:*16* 143:*13*
144:*3* 147:*2*
160:*19* 187:*2*
188:*6, 15* 205:*6,
22* 206:*10* 207:*3,
12* 213:*21*
214:*13, 22* 215:*3*
216:*22* 217:*7, 13,
16, 20* 218:*2, 3*
219:*5, 18*
**answered** 8:*22*
38:*4* 53:*7* 68:*22*
77:*14* 125:*20*
143:*3, 19* 144:*14*
205:*7*
**answers** 9:*8*
121:*4* 148:*14*
**ante** 80:*9* 134:*4*
**anticipate** 118:*9*
**anticipating** 80:*12*
**anybody** 174:*21*
211:*8* 217:*2*
**anymore** 58:*15*
**anyway** 219:*3*
**apologize** 110:*22*
211:*20*
**appearance** 34:*15*
**APPEARANCES**
2:*1*
**appearing** 34:*17*
**appears** 21:*6*
221:*4*
**applicant** 69:*15*
70:*4*
**applicants** 70:*6*
115:*21* 116:*12*
**application** 69:*14*
70:*3* 133:*5*
134:*5* 141:*2, 4*

143:*1, 17* 147:*10*
148:*19* 150:*13,
17, 19* 181:*6*
199:*6, 8*
**applications**
78:*16*
**applied** 71:*8*
117:*8, 10* 142:*12*
149:*16* 169:*5*
181:*3, 7, 9*
**applies** 8:*1*
116:*12*
**apply** 72:*8* 73:*1,
8* 74:*1, 13, 14*
116:*14* 147:*12*
150:*9* 159:*14*
172:*12, 15* 176:*2*
193:*4*
**applying** 140:*2*
141:*3, 8* 193:*21*
194:*4*
**apprehended** 93:*3*
**apprehension**
110:*1*
**apprehensions**
165:*22* 178:*9*
**approach** 53:*11*
201:*1*
**appropriate**
118:*10* 124:*17*
127:*10* 131:*6, 8,
10, 18* 133:*6, 8*
134:*5, 12, 20*
135:*7, 18* 138:*17*
139:*7, 12, 15*
140:*6, 18* 141:*5*
142:*1* 143:*1, 4,
18* 144:*2, 3, 11,
16* 147:*14*
148:*20* 152:*9*
154:*9* 155:*21*
172:*12* 198:*8, 11,
13* 204:*20*

**appropriateness** 197:*19*
**April** 189:*18*
**A-R** 136:*4*
**arbitrarily** 159:*14*
**area** 92:*3* 94:*18* 95:*8*, *16*
**areas** 28:*1*
**Areostats** 97:*10*
**argue** 187:*22* 189:*4* 190:*5*, *8*, *10* 196:*19*
**arguing** 192:*19*
**argument** 88:*21* 189:*6*, *8*, *11*, *13* 192:*13* 197:*2*
**ARIMA** 119:*11* 128:*12* 131:*3*, *6*, *17* 132:*7*, *12*, *21* 133:*5*, *7*, *14*, *20* 134:*2*, *3*, *5*, *6*, *7*, *9*, *10*, *12*, *17*, *19* 135:*1*, *7*, *13*, *18*, *20* 136:*2*, *18*, *20*, *21* 137:*9* 138:*18*, *19* 139:*2*, *6*, *7*, *18*, *20* 140:*2*, *6*, *18*, *22* 141:*10* 142:*2*, *3*, *15*, *18*, *21* 143:*1*, *7*, *15*, *17* 144:*6*, *11*, *13*, *19* 145:*21* 146:*2*, *3*, *10*, *16* 147:*10*, *12*, *14*, *16*, *19* 148:*15*, *17*, *20*, *21* 149:*2*, *5*, *9*, *13*, *16* 150:*2*, *14*, *20*, *22* 151:*4*, *20* 152:*9* 154:*8* 155:*21* 156:*7* 157:*4*, *5*, *6*, *22* 158:*1*, *10* 159:*11*, *22* 161:*12* 167:*14*, *15* 168:*12*, *14*

169:*18* 170:*1*, *3* 175:*11* 178:*1* 181:*4*, *5* 182:*5*, *10*, *12* 197:*18* 198:*22* 210:*20* 211:*13* 212:*13*, *15* 213:*7*
**ARIZONA** 1:*5* 4:*3* 35:*10* 36:*22*
**arrive** 113:*22* 115:*3*
**arrived** 39:*22* 113:*4*
**arriving** 200:*8*
**Arthur** 34:*4* 39:*2* 62:*17*
**artificial** 174:*10*
**ascertain** 60:*18*
**asked** 8:*8* 9:*1* 34:*21* 35:*6*, *8*, *11*, *15* 38:*4* 43:*20* 51:*19*, *20*, *21* 53:*7* 68:*22* 77:*14* 89:*9* 101:*22* 110:*14*, *19* 112:*1* 113:*9*, *11* 123:*20* 124:*6*, *13* 125:*2* 143:*3*, *14*, *19* 144:*14* 167:*2* 173:*17* 180:*22* 185:*15*, *21* 186:*2* 187:*1* 188:*3* 190:*12* 191:*20* 192:*4* 194:*6*, *16* 195:*2*, *5*, *8* 207:*22* 211:*22* 212:*3* 217:*18*
**asking** 50:*10* 51:*8* 70:*2*, *15* 71:*15* 81:*6*, *8* 82:*4* 90:*2* 117:*6*, *16* 121:*5* 137:*16* 140:*10* 145:*18*

146:*1*, *19* 147:*19*, *20* 158:*1* 167:*4* 178:*2* 184:*3* 185:*5* 187:*13* 204:*12* 207:*8* 218:*3*
**assembles** 86:*2*
**assert** 59:*13* 204:*15*
**asserted** 69:*20* 212:*6*
**asserting** 11:*15*
**assess** 13:*10* 14:*7*, *17* 34:*21* 35:*7*, *8*, *11*, *15* 57:*14* 62:*9* 63:*19* 64:*3*, *9* 70:*16* 77:*1* 78:*17* 84:*5* 85:*8* 88:*15* 89:*9* 98:*16* 100:*6* 101:*22* 110:*19* 112:*1* 113:*9*, *11* 123:*20* 124:*6*, *13* 133:*20* 157:*4* 168:*5* 174:*21* 180:*16*, *22* 186:*2* 187:*17* 188:*3* 190:*4*, *12* 191:*20* 192:*4*, *6* 194:*6*, *16*, *21* 199:*3*, *16*, *20* 211:*22* 212:*3*
**assessed** 36:*5* 63:*15* 69:*20* 70:*10* 80:*18* 116:*22* 186:*6*, *16* 199:*1*
**assessing** 14:*8* 77:*3* 87:*22* 124:*7* 129:*2* 141:*10* 144:*5* 149:*1* 159:*3* 196:*20* 213:*9*

**assessment** 70:*8* 187:*15*
**assessments** 16:*14* 211:*9*
**assign** 7:*7*
**associate** 61:*16*
**associated** 57:*6*
**association** 4:*10*, *11* 147:*1*
**assume** 6:*19*, *22* 157:*7*, *17* 172:*1*
**assumes** 141:*22*
**assumption** 67:*10*, *13* 69:*11* 73:*17*
**assumptions** 68:*16* 72:*7* 73:*6* 181:*5*
**asterisk** 110:*3*
**Asylum** 12:*15*, *22* 14:*13*, *19* 15:*1*, *6*, *13* 16:*3* 17:*12* 32:*14* 35:*11*, *15* 36:*10* 41:*5* 43:*16* 63:*13*, *17*, *21* 64:*10*, *11*, *14*, *16* 67:*12*, *21* 68:*21* 69:*1*, *3*, *8*, *14*, *16* 70:*4*, *5*, *6*, *12*, *18*, *19*, *20* 71:*8*, *10*, *13* 72:*8*, *15*, *22* 73:*3*, *7*, *13* 74:*1*, *5*, *6*, *8*, *20* 75:*22* 76:*3*, *7*, *11*, *12*, *15*, *20* 77:*12* 78:*4*, *6*, *7*, *11* 79:*5*, *12* 80:*1* 82:*22* 83:*12* 88:*5*, *15*, *16* 89:*6*, *8* 96:*21* 98:*18* 99:*18* 100:*7* 102:*1* 114:*7*, *9*, *11*, *13* 115:*10*, *18*, *21* 116:*1*, *5*, *6*, *12*, *14* 117:*1*, *8*, *10*

123:*16, 18, 21*
124:*3, 6, 10, 16, 18, 22*  125:*13*
127:*22*  145:*15*
146:*5*  162:*22*
165:*8*  166:*10*
178:*4*  180:*14, 20*
184:*2*  185:*4, 22*
187:*4*  188:*3*
190:*1, 4*  191:*10, 21*  192:*5, 18*
193:*13, 15*  194:*5, 14, 17*  196:*20*
200:*7, 14*  201:*11, 12, 13*  210:*4*
212:*8*
**ate**  216:*6*
**attain**  196:*17*
**attention**  214:*1*
**Attorney**  2:*5*
29:*17, 21*  30:*1, 5, 22*  34:*13*  221:*13*
**Attorney-client**
11:*16*  30:*19*
**attorneys**  4:*12*
30:*8, 10*
**attributable**  82:*22*
**August**  64:*22*
65:*5*  87:*15*
**Authorization**
91:*3*
**auto-regressive**
136:*4*
**auto-regressivity**
151:*16, 22*
**available**  12:*20*
63:*16*  69:*8*
83:*14*  84:*7, 21*
87:*2*  99:*20*
110:*4*  162:*8, 10*
163:*15*  164:*22*
165:*5*  166:*3*
197:*21*  198:*5, 7,*

*15*  199:*17*  211:*6*
212:*4*
**average**  7:*4*
99:*16*  136:*5*
151:*12, 17, 22*
173:*12, 13*  174:*15*
**aware**  9:*17, 19, 21*  30:*7*  34:*1*
46:*6*  56:*15*
57:*12, 20*  60:*16, 19, 22*  61:*3*
66:*11*  73:*12*
83:*15*  91:*13*
99:*14*  102:*18*
103:*15, 21*
104:*22*  106:*1*
181:*2*  201:*10*
202:*10*  212:*18*
**Axis**  137:*1*
178:*15*  208:*13, 15, 16, 18, 19*


< B >
**back**  8:*13*  13:*7, 9*  55:*5*  63:*10*
71:*21*  72:*1*
75:*11*  83:*2*  93:*6*
123:*6*  145:*6, 8*
160:*2*  161:*17*
181:*21*  219:*6*
**background**
18:*10*  29:*18*
196:*22*
**back-of-the-envelope**  102:*13*
**backtrack**  101:*6*
**backwards**
190:*13*
**bad**  211:*16*
**balloons**  98:*1*
**bankrupt**  179:*16*
**barrel**  70:*5*
**base**  92:*16*

**Based**  12:*4*
61:*12*  63:*13*
77:*22*  80:*12*
120:*1*  132:*13*
147:*4*  173:*5*
178:*7*  183:*1*
188:*5*  213:*10*
**basic**  16:*2*
160:*15*  164:*5*
190:*3*
**basis**  11:*1*  23:*10, 12, 21*  24:*11*
25:*8*  30:*16*
100:*15*  102:*12*
197:*11*
**Baton**  2:*7*
**began**  39:*13*
**beginning**  4:*13*
66:*17*  89:*2*
125:*13*  131:*8*
201:*22*
**behalf**  2:*2, 11*
4:*18*
**behave**  68:*17*
**behavior**  43:*17, 18*  44:*3, 5, 6, 11, 15*  45:*13*  46:*5*
47:*8, 16, 17*  48:*7*
55:*22*  68:*7, 18*
69:*18*  70:*7, 9, 21*
71:*11*  76:*5*
77:*21*  97:*5*
117:*12, 17*  118:*1*
119:*5*  181:*8*
203:*7*
**behaviors**  54:*17*
**believe**  11:*6*
28:*13*  37:*7*  38:*8*
39:*22*  40:*7*  65:*2*
102:*10*  104:*11*
115:*13*  116:*7*
117:*19, 20*
154:*20*  178:*16*

201:*6*  206:*10*
209:*10, 21*  210:*1*
**believes**  210:*18*
**bell**  61:*15, 20*
**Ben**  2:*16*
**best**  12:*20*  63:*15*
83:*14*  84:*6*  85:*3*
92:*19*  135:*3*
140:*11, 12, 13*
144:*17*
**beyond**  167:*18*
169:*20*
**Biden**  104:*12, 22*
**big**  104:*2, 6*
105:*15, 21*  106:*5*
120:*20*
**bill**  195:*14*
196:*14*
**billed**  28:*11*
**binary**  13:*18, 19*
**bit**  48:*13, 14*
76:*18*  77:*11*
102:*11*
**black**  170:*17*
172:*3*
**block**  112:*1*
**BLS**  17:*11*
32:*16*  119:*19*
**blue**  170:*17*
172:*2*
**board**  84:*14*
**border**  12:*16*
15:*20*  18:*11*
36:*12, 20*  37:*2, 6, 11, 12, 14, 15*
38:*2, 7, 9, 15, 16*
45:*20*  46:*1*
55:*15, 18*  56:*13, 19*  57:*7, 15*
61:*17, 19*  62:*1, 2, 4, 9*  65:*11*  81:*13*
82:*10, 13*  83:*3*
84:*12*  85:*21*
86:*12*  87:*3*  91:*1,*

10  92:*9*, 11  93:*1*, *6*, *17*, *18*, 20  94:*21*  95:*4*, *11*, *12*  96:*6*, *8*, *15*  97:*2*, *19*, 22  98:*2*, *5*, *7*, *8*  99:*1*, *3*  102:*8*, *22*  108:*12*, *17*  109:*3*, *15*, *19*, *22*  110:*4*, *5*, *7*, *9*  112:*2*, *19*, *21*  113:*5*, *16*  114:*1*, *5*, *10*, *18*  115:*4*, *11*, *12*, *14*, *22*  123:*11*, *12*, *13*  124:*14*  125:*6*  126:*5*  128:*14*  129:*16*, *18*  130:*21*  131:*1*  132:*1*  146:*4*, *6*, *20*, *21*  154:*20*  157:*16*  159:*4*, *8*, *16*, *17*  165:*22*  173:*22*  178:*4*  180:*12*, *13*  186:*10*  187:*5*  189:*17*  194:*19*  197:*5*, *12*  200:*3*, *8*  201:*1*  202:*12*  208:*5*  209:*17*

**borders**  37:*7*  114:*21*

**bottom**  35:*6*  171:*10*  209:*1*

**Box**  2:*15*  63:*12*

**break**  9:*13*, *15*  111:*14*  118:*7*, *10*, *13*, *16*  122:*15*  181:*13*  204:*1*  213:*16*, *17*, *19*

**breaks**  9:*12*  205:*8*  215:*9*, *15*, *19*

**broad**  16:*4*  113:*11*, *14*

**broader**  7:*22*  60:*1*  98:*10*

**broadly**  36:*16*  121:*5*

**brought**  36:*22*  72:*15*  74:*6*  88:*20*  113:*4*

**building**  47:*15*, *20*  178:*1*

**bundle**  45:*4*, *5*  76:*4*

**Bureau**  16:*13*

**Burger**  47:*3*, *14*

**burning**  47:*19*

**business**  120:*20*  180:*3*

**bust**  120:*19*

**buy**  47:*2*, *4*, *14*, *19*

**< C >**

**calculate**  80:*11*

**calculated**  119:*22*  121:*3*

**calculation**  102:*13*

**Calculus**  171:*1*

**call**  82:*9*, *15*  87:*4*  170:*7*  188:*1*  209:*17*  213:*22*  219:*6*

**called**  5:*3*  46:*1*  53:*20*  98:*1*  119:*18*  135:*21*  154:*14*, *19*  179:*12*  214:*4*  216:*4*

**calling**  151:*10*

**calls**  26:*20*  62:*5*, *22*  214:*20*

**camera**  4:*9*  48:*12*  97:*10*, *13*

**cameras**  97:*13*  98:*2*, *4*, *8*, *9*, *10*, *13*

**Canadian**  115:*14*

**capable**  82:*6*  169:*5*, *19*  212:*16*, *19*, *21*

**capacity**  166:*18*

**caption**  112:*12*, *14*

**capture**  132:*8*, *22*  139:*18*  175:*5*

**captured**  132:*12*  135:*12*, *13*

**captures**  139:*20*  175:*2*

**capturing**  135:*2*  136:*6*  139:*3*  151:*21*  159:*22*  175:*1*  183:*13*

**care**  145:*5*

**career**  51:*11*, *13*, *17*, *22*

**carefully**  72:*4*  117:*15*  185:*13*  186:*6*

**carried**  38:*21*

**carry**  118:*9*  132:*14*  146:*12*

**carrying**  210:*16*, *19*

**Case**  1:*7*  7:*20*  14:*6*  24:*15*  28:*4*  33:*17*  34:*2*, *4*  36:*22*  37:*5*, *10*  39:*2*  51:*11*  52:*16*, *19*  58:*4*  65:*2*  77:*4*, *5*  84:*2*  89:*1*  98:*16*  116:*22*  129:*7*  139:*17*  145:*2*, *11*, *13*  151:*20*  158:*11*  172:*12*  199:*12*, *15*  201:*20*  203:*9*, *13*  214:*4*  215:*11*

**cases**  83:*16*  200:*16*  214:*6*

**categorically**  47:*6*  54:*5*, *16*

**category**  7:*17*, *18*, *22*  8:*1*, *3*

**Catherine**  1:*17*  221:*2*, *18*

**Cathy**  4:*10*

**caught**  46:*10*

**causal**  77:*1*, *18*

**causation**  77:*3*  210:*11*, *17*

**cause**  15:*2*, *6*  43:*17*  47:*4*, *7*  52:*3*  71:*14*  94:*10*  210:*17*

**caused**  14:*12*, *19*  35:*16*  36:*11*  69:*4*  70:*13*  76:*14*  100:*8*  117:*2*  212:*8*

**causes**  27:*16*, *20*  115:*11*  190:*17*, *18*

**CBP**  16:*10*, *16*  17:*8*

**cent**  46:*22*

**centimeter**  208:*14*

**central**  15:*1*  67:*20*

**certain**  40:*1*  47:*7*  53:*22*  61:*16*  68:*18*  70:*18*  91:*9*  107:*6*  134:*13*  136:*2*  191:*4*  209:*11*  211:*7*

**certainly**  43:*15*  45:*19*  48:*9*  55:*13*  59:*8*  108:*1*  109:*8*  117:*19*  134:*8*  138:*3*  155:*12*  163:*12*  169:*16*  179:*2*  206:*22*

212:*12*  213:*4*  215:6  216:*14*

**certainty**  59:*14*

**CERTIFICATE**  221:*1*

**challenge**  206:*20*

**chance**  69:*16*  71:*8*

**change**  44:*9*  47:7  48:5, 6  57:3  58:8  60:*5*  66:*17*  70:*12*  72:16  74:5, 15  79:*1*  81:*13*  88:*17*  99:*12*  100:*14*  101:*17, 18, 19*  106:*22*  107:5  108:*12, 17, 22*  109:6, 8  152:5  176:5, 7  184:*4*  185:*3, 19*  192:*11*  201:6  209:2, 3, 5

**changed**  22:6  68:6  100:*11*  103:*9*  109:*13*  114:8, 15  122:*13*  203:6

**changes**  43:*16, 17*  66:20  67:6  72:15  88:5, 16, 20  104:6, 7  119:3, 6  131:*12, 14, 22*  151:9  152:*11*  192:*10, 19*  200:*3, 5, 6, 8, 9*

**Changing**  107:*20*  108:*3*

**characteristics**  16:*4*  132:*21*  134:*13, 19*

**charge**  13:*10*  14:6, 17, 20  52:16  84:2, 5

98:*16, 19*  100:*4, 6, 139:17  145:2, 5, 11, 13*  199:*12, 15*

**chatted**  216:*19*

**cheaper**  47:*14*

**check**  22:5  86:9  126:5  128:*12*  129:*14*  130:*19*  144:7, 17, 18  167:*21*  168:*12*

**checked**  103:*18*  125:7, 15  142:*15*

**checking**  138:*22*  139:2  142:*18*  143:6

**cheeseburger**  46:22  47:*13, 15, 19*

**cheeseburgers**  47:*2, 5*

**chief**  61:*19*  62:*1, 2, 3*

**child**  66:*19*  72:16, 17, 19  74:7, 16  82:*12*

**children**  72:9, 10  73:*1, 5, 8, 9, 11, 12, 14, 15*  74:2, 9, 10*

**choice**  10:*12*

**choose**  10:*13*  32:22  33:3  114:2  137:*13*  159:*14*

**chose**  114:6

**Christina**  29:7

**circular**  141:*12, 19, 21*  142:5

**circumstances**  72:18  135:3

**citizen**  179:*11, 18*

**citizens**  106:*13*

**Civil**  2:*14*  23:7  214:*1, 8*

**claim**  15:*1*  70:*11*  71:*13*  76:9, 17  77:3  113:*11, 14*  114:*13*  123:20  124:5, 8, 12, 16  191:22  193:*15*  195:6, 13  202:*14*

**claimed**  14:22  80:*19*

**claiming**  70:*18*  147:*19*

**CLAIMS**  1:*1*  14:*8*  35:*8*  69:*19*  88:*1, 3*  89:7, 9, 10*  101:22  113:9  114:9  123:*19, 21*  124:*3, 6, 10, 18, 22*  180:*21*  186:*1, 2*  187:*17*  191:*19*  192:4  194:*6, 17*  195:20  196:*1, 3*  201:*12*  202:9, 17  211:22

**clarification**  6:*21*

**clarify**  204:*21*  205:12

**clarity**  209:*14*

**classroom**  153:6

**clear**  19:*10*  55:*15, 17*  61:*18*  113:20  114:22  157:*15*  178:*3*  189:6, 13*  192:*13*  203:7

**clearly**  62:*18*  110:*11*  134:22  156:*10*  157:*11*  165:9  175:2  183:*12*  192:9

**CLEMENS**  1:*13*  3:2, 8  4:7  5:2, 9, 13*  11:*19*  19:*16*

21:4  23:2  28:7  32:*19*  38:*19*  40:*15*  41:9  43:*19*  55:5  75:11  111:*17*  123:6  126:*1, 8*  181:*21*  213:*15*  219:*15*

**client**  11:*17*  219:*4*

**Clifton**  214:*4*

**close**  92:7  144:22  147:*15*  149:*12*  159:*10*  161:*15*  175:*13*

**closed**  102:*15*

**closely**  150:6

**coach**  206:*1*

**coached**  219:*17*

**cocker**  7:*15*

**Code**  106:*14*

**coffee**  48:*17*  49:8

**cohort**  201:*10*

**coincides**  57:*1*  171:9, 11*

**colleague**  34:6

**collect**  85:*12*  98:*19*

**collection**  113:3

**collective**  101:*4*

**collectively**  113:7, 13*  127:*10*

**college**  130:*11, 12*

**Columbia**  1:*19*  221:20

**combination**  76:15

**come**  16:*17, 22*  42:15  68:13  172:*13*  202:20

**comes**  32:*17*  39:*3*  50:*19*  127:3  142:*10, 12*  170:6

**coming** 83:*2*
95:*3*, *12* 146:*15*
161:*17* 207:*10*
211:*12*
**commencing** 1:*15*
**comment** 100:*15*
**Commission**
221:*22*
**common** 7:*11*
46:*9* 93:*16*
94:*20* 132:*11*
133:*19* 135:*11*,
*12* 156:*6* 157:*3*
179:*3* 188:*21*
191:*2*
**commonly**
133:*19* 135:*1*
181:*7* 213:*5*
**commonly-used**
213:*8*
**communicate**
31:*18*, *20*
**communicated**
31:*10* 90:*6*
**communications**
11:*7*
**company** 179:*12*,
*15*
**compare** 135:*4*,
*14* 136:*8* 182:*20*
186:*14*
**compared** 172:*21*
174:*1*
**comparing**
173:*13* 187:*10*
197:*20*
**comparison**
164:*17*
**compatible**
125:*11* 185:*14*
202:*13*
**compelling** 189:*3*,
*10*

**complaint** 14:*7*, *8*,
*22* 18:*15*, *21*, *22*
34:*20* 35:*3*, *4*, *9*,
*18* 36:*18* 39:*1*
69:*19* 70:*11*
76:*9* 80:*19* 88:*1*
89:*7* 101:*21*
110:*10* 111:*18*,
*21*, *22* 112:*5*, *11*,
*13*, *15* 113:*12*, *18*,
*19*, *20* 115:*3*, *8*
124:*5*, *12* 180:*21*
186:*5*, *9*, *18*
187:*12*, *17*
191:*19* 202:*8*, *9*,
*11* 210:*6* 212:*1*,
*6*, *7*
**complaints** 35:*1*
**complete** 8:*4*
21:*17*, *22* 23:*8*,
*11*, *19* 24:*10*
25:*7*, *19* 27:*12*
67:*2*
**completely**
126:*18* 195:*8*, *14*
**completeness**
208:*9*
**complex** 43:*13*
44:*7*, *12*, *20*, *21*
46:*18* 47:*8*
70:*22* 77:*21*, *22*
79:*6*, *9* 121:*19*,
*20* 174:*3* 192:*19*
**compositions**
138:*2*
**comprehensive**
15:*18* 84:*3*
**comprises** 28:*5*
**comprising** 86:*3*
210:*8*
**conceivable**
108:*18*
**concepts** 211:*19*

**concern** 178:*18*,
*19* 179:*6* 193:*18*,
*21*
**concerns** 194:*3*
**conclude** 81:*10*
127:*20* 169:*1*, *3*
183:*17* 184:*1*, *20*
185:*3* 187:*4*
197:*5*
**concluded** 199:*19*
204:*21* 220:*4*
**concludes** 219:*22*
**concluding**
199:*10*
**conclusion** 12:*14*,
*19*, *20* 26:*21*
62:*6* 63:*1* 128:*8*
184:*4* 193:*11*
214:*21*
**conclusions** 33:*8*
61:*12* 185:*8*, *10*,
*20* 193:*22* 197:*16*
**concomitant**
161:*11*
**concurrently**
176:*4* 178:*12*
**condition** 57:*21*
76:*8*
**conditional** 24:*6*
**conditions** 55:*19*
56:*1*, *2*, *5* 57:*18*
60:*2* 119:*3*, *7*, *14*
147:*2* 178:*9*
183:*4*
**conduct** 36:*10*
135:*4* 146:*13*
152:*2* 163:*6*
193:*16* 198:*16*
**conducted** 60:*17*
61:*1*, *4*, *5*, *9*
76:*22* 81:*1*
125:*10* 159:*12*
193:*8*

**conducting** 64:*14*
188:*19*
**confer** 204:*11*
206:*5* 214:*9*
**confers** 207:*17*
**confidence** 183:*7*
**confident** 181:*9*
**confidentially**
122:*6*
**confluence** 43:*13*
44:*7*, *12*, *21*
46:*18* 47:*8* 49:*5*,
*22* 52:*12* 53:*16*
57:*9* 68:*3*, *9*
71:*1* 77:*21*, *22*
79:*6*, *9* 121:*19*, *21*
**confluences** 49:*16*
**confounding**
119:*4* 121:*20*
122:*6*
**confused** 51:*7*
211:*17*, *18*
**conjecture** 128:*2*
184:*12*
**conjectured**
172:*13*
**connection** 171:*14*
**consequences**
196:*10*
**consider** 25:*15*
26:*10* 27:*5*
33:*14* 61:*6*
68:*12* 88:*5*
100:*19* 119:*2*
122:*5* 165:*16*, *17*,
*19* 167:*11* 199:*9*,
*10* 203:*14* 211:*1*
**considered** 16:*1*
17:*18*, *20* 18:*4*
25:*17*, *20* 31:*22*
32:*9* 45:*12* 72:*4*
87:*6* 96:*22*
117:*15* 119:*6*, *16*

165:*21*  187:*21*  188:*8*

**considering**  24:*5*  210:*22*

**consistent**  65:*11*  66:*4, 8*  175:*16*  179:*17*

**consistently**  210:*2*

**constant**  202:*2*  208:*13*  209:*6*

**constitutes**  198:*11*

**contact**  39:*16*  40:*4*

**contain**  12:*21*  57:*4*  212:*5*

**contained**  32:*14*  63:*16*  96:*20*  98:*17*  180:*16*

**containing**  39:*19*  40:*2*

**contains**  87:*13*  183:*9*

**context**  17:*22*  27:*2, 21*  33:*17*  35:*9, 17*  36:*1*  108:*11*  112:*5, 10*  149:*18*  152:*19*  153:*2*  182:*8*  215:*2*

**contingent**  24:*3*  45:*4*

**continuation**  19:*7*

**continued**  100:*3*

**continuing**  93:*15*

**contract**  20:*6, 14, 16*

**contradict**  20:*12*

**contrasting**  73:*11*

**control**  45:*13*  119:*13*

**conversation**  30:*13*  40:*8*  207:*9*  213:*15*  215:*14*  216:*7, 8,*

*11*  217:*5, 14*  218:*4, 7*

**conversations**  204:*14*  215:*8*  218:*22*  219:*9*

**converse**  219:*2*

**converted**  208:*20*

**copy**  20:*19*  21:*9, 17, 22*  22:*9*  23:*3*

**corner**  112:*16*

**Correct**  8:*2*  11:*20*  12:*2, 8, 12*  17:*5, 16*  19:*13, 17*  20:*8, 9*  25:*4*  34:*21*  35:*7, 14, 22*  38:*17*  41:*1, 5*  44:*15*  45:*8, 16, 21*  46:*5, 14*  50:*7*  51:*6*  52:*10*  53:*6, 17*  55:*8, 11*  56:*3, 10*  57:*16*  58:*6, 16*  59:*17*  60:*10*  63:*14, 22*  64:*12, 19*  65:*6, 7, 14*  66:*8, 13*  68:*15*  70:*21*  72:*11*  73:*9*  75:*21*  76:*5*  78:*1*  79:*20*  84:*14*  86:*14*  87:*16*  93:*9*  95:*4, 12, 20*  99:*19*  108:*9*  109:*11*  112:*7*  115:*16*  117:*13*  119:*17*  120:*10*  121:*21*  123:*13, 19*  125:*9*  126:*12*  131:*18, 19*  136:*19*  137:*10, 12, 22*  138:*22*  154:*12*  158:*6*  160:*10, 17*  161:*3, 8, 9, 20, 21*  162:*3, 4*  166:*6, 16*  167:*4, 13*

168:*11*  170:*19*  172:*21*  173:*14*  174:*17*  175:*6, 22*  178:*15, 20*  179:*7*  182:*5*  184:*6*  188:*7*  198:*18*  199:*2*  203:*11*  218:*10, 15*

**corrected**  197:*3*

**correctly**  74:*3*  205:*11*

**correctness**  172:*8*

**correlation**  210:*11, 14*

**correspond**  133:*2*  156:*8*  157:*6*  209:*2*

**corresponded**  186:*17*

**correspondence**  84:*20*

**corresponding**  151:*5*

**corresponds**  158:*13*

**COUNSEL**  5:*7*  11:*1, 8*  21:*2*  39:*4, 8, 11, 17*  40:*4*  89:*22*  90:*6*  123:*4*  176:*16*  204:*10, 17, 19*  207:*20*  209:*11*  213:*13*  218:*20*  219:*2, 13*  221:*10, 14*

**Counsel's**  10:*7*  214:*16*

**count**  92:*12*  93:*9*  127:*1*

**counterfactual**  83:*19*  145:*12*  146:*11*  176:*3*  184:*9*  211:*4*

**counterfactually**  77:*9*

**counting**  65:*12, 16, 18*

**countries**  55:*20*  56:*6*  57:*19, 21*

**country**  56:*1*  58:*6, 8, 9, 10, 13*  59:*11*  60:*3*  109:*13*  121:*14*

**coup**  59:*10*

**couple**  66:*11*  118:*6*  203:*22*

**coups**  59:*13, 21*  60:*2*

**course**  9:*2*  85:*3*  205:*18*  208:*7*

**COURT**  1:*1*  4:*10, 21*  6:*2, 14*  9:*8*  13:*6, 9*  33:*17, 19, 21*  71:*21*  72:*2*  145:*6, 8*  170:*10, 13*  205:*19, 20*  206:*12, 20*  207:*1*

**covered**  11:*9*

**covers**  7:*13*  86:*5*

**CPB**  16:*16*  32:*12*  36:*11*  61:*16*  66:*19, 22*  67:*4*  68:*18*  76:*13*  82:*11*  84:*13*  86:*1, 2, 13, 16*  87:*2, 15*  92:*1, 2*  96:*19*  99:*6*  123:*17*  165:*21*  180:*17*  209:*19*

**CPB's**  65:*10*

**crackdown**  120:*8, 14, 17*  121:*10, 13*

**create**  47:*1*  74:*15*  170:*4*

**created**  138:*9, 10*

creating 27:*5*
crime 53:*8*
criteria 106:*4, 5*
152:8 154:8
177:22
criterion 148:*22*
151:*5*
crosser 93:*1*
crossers 92:*9*
crowd 216:*17*
217:*2*
crucial 128:*8*
Crump 1:*18*
4:*11* 221:2, *18*
Cuban 200:*8*
current 120:*1, 2,*
*4* 121:*4, 9, 15*
166:*20*
cursorily 39:*1*
41:*6*
curve 137:*13, 15*
138:*6, 8, 10*
170:*17* 171:*12*
172:2, *3*
curves 170:7, *18*
171:*17* 172:*4, 20*
173:*14*
Customs 15:*20*
209:*16*
cut 145:*4*
cutoff 159:*15*
160:*4* 161:*22*
163:2 167:*16*
173:*17* 174:*10*

< D >
D.C 1:*15* 2:*17*
4:*8*
dampening
152:*18, 20* 153:2,
*6, 14, 16, 19, 21*
dash 75:*20*
data 16:6, *10, 11,*
*16, 17, 20* 17:4, *6,*

*7, 8, 9, 17, 19, 21*
25:*17, 20* 28:*20*
31:*19, 22* 32:*9,*
*11, 12, 17* 33:*6, 8*
56:*19, 21* 63:*15*
65:*5, 8, 11, 19*
66:*1, 4, 6, 7, 13,*
*14, 19, 22* 67:*5, 7*
68:*19* 78:*11*
80:*12* 82:*8, 16*
83:*14* 84:*6, 13,*
*21* 85:*7, 12, 13,*
*17, 18, 22* 86:*2, 7,*
*13, 17* 87:*4, 5, 12*
88:*7* 90:*13*
96:*19* 98:*17*
99:*1, 3, 20, 21*
100:*7, 14* 102:*17,*
*18, 19* 103:*4*
109:*15, 21, 22*
110:*4* 113:2
115:*1, 4* 124:*18*
132:*14, 16, 18, 20*
133:*4, 8, 15, 16,*
*20* 134:*1, 3*
135:*2, 10, 16, 17,*
*19* 138:*17* 139:*5,*
*8* 140:*1, 5, 17, 18*
142:*3, 8* 143:*16,*
*17* 144:*10, 12*
146:*16* 147:*5, 13,*
*16* 148:*19, 20*
149:*13* 150:*22*
151:*21* 152:*10,*
*19* 153:*3, 22*
155:*22* 156:*19*
157:*10, 14* 158:*6,*
*8, 10, 18* 159:*6,*
*11* 160:*4, 6*
161:*2, 3, 16*
162:*8, 10, 11, 12,*
*19* 163:*6, 14, 16,*
*17, 18, 21, 22*
164:*6, 21* 165:*4,*

*5, 11, 16, 18, 20,*
*22* 166:*3, 5, 10,*
*15, 21* 167:*18*
168:*13, 15* 172:*2,*
*3, 15* 176:*11, 13,*
*14, 20, 22* 177:*6*
179:*4* 180:*4*
181:*4* 183:*1*
185:*6* 187:*11*
188:*9, 17, 18*
193:*4, 7* 197:*8,*
*10, 20, 21* 198:*5,*
*7, 15* 199:*16, 17*
201:*14* 208:*1, 2*
211:*3, 4, 6* 212:*4*
database 15:*18*
65:*20, 22* 86:*4,*
*15* 109:*18*
dataset 80:*13*
82:*14* 84:*12*
99:*7* 142:*22*
143:*2* 155:*3, 7*
209:*16, 21*
datasets 33:*3, 12*
86:*22* 157:*13*
date 4:*4* 28:*14,*
*18* 40:*7* 63:*14*
65:*1* 78:*11, 12,*
*17* 102:*9* 105:*2*
115:*16, 17*
159:*15* 160:*4*
161:*22* 163:*2*
173:*17* 174:*10,*
*11* 200:*20* 201:*2,*
*7*
day 32:*20* 122:*22*
DCS 34:*17*
deal 132:*8*
159:*22* 171:*1*
175:*2* 183:*13*
debate 41:*15, 17,*
*18* 42:*1, 3*
debates 41:*12*
decades 169:*4*

December 1:*16*
4:*4*
decide 88:*10*
decided 88:*6*
188:*4* 189:*13*
decision 41:*21*
42:*5, 15, 19*
44:*10* 46:*16, 17*
47:*18, 22* 48:*10*
49:*5* 52:*9* 54:*1,*
*5* 68:*14* 69:*17*
decisions 43:*5, 13*
45:*2, 3* 48:*9*
49:*22* 50:*8, 9, 11*
52:*17* 55:*13*
57:*19, 22* 58:*2*
68:*1, 2* 70:*22*
79:*10* 84:*4*
declaration
107:*18*
decomposition
172:*10, 11* 173:*3,*
*6*
decrease 70:*20*
94:*6* 150:*22*
160:*5, 16, 20*
161:*6* 192:*2*
212:*9*
decreased 97:*3*
124:*3, 10* 125:*1*
decreases 93:*18*
deduction 141:*21*
deep 41:*7*
192:*20* 193:*2, 3,*
*12, 15*
defendant 31:*5*
207:*20* 219:*13*
Defendants 1:*9*
2:*11* 4:*19* 20:*7,*
*9* 28:*12* 33:*5*
34:*14* 104:*15*
Defendant's
109:*20*
Defense 91:*3*

**define** 14:*11*
190:*21* 191:*1*
208:*9* 209:*11*
**defined** 85:*22*
91:*13* 92:5, 8, *22*
93:4 99:7
131:*20*, 22 144:*3*
208:*8*
**defining** 36:7
68:*20*
**definition** 12:*3, 4*
36:*15, 17* 38:*14*
41:*13* 66:*18*
92:6 191:2
**definitions** 16:*14*
67:7
**degree** 19:*21*
151:*11, 14*
153:*21* 169:*8*
177:*17* 183:7, *12*
196:*17, 22* 203:*20*
**degrees** 105:*19*
170:*19* 171:5, *19*
**delta** 161:*17*
162:*18*
**demarcating**
161:2
**demonstrate**
79:*19* 80:2
139:*19* 141:7
199:*14*
**demonstrated**
15:*12*
**demonstrating**
13:*12* 56:*16*
**dep** 19:8, *12*
**depart** 138:*10*
**Department** 2:*4,
13* 10:*1* 29:*3, 4,
19* 31:2, *3, 4, 11,
15, 17* 32:4, 8
33:7
**departmental**
108:*3, 5*

**departure** 55:*20*
56:5 58:*5, 7, 9*
59:*10* 60:*3*
183:*16, 22*
**departures**
121:*12, 13*
**depend** 49:*5*
54:6 68:2 71:4
72:*18* 94:1 95:6,
*14* 107:2 120:*13*
177:*17* 203:*19*
218:*11*
**dependent**
136:*12, 15, 17, 21*
137:8
**Depending** 59:*12*
107:*13* 118:*12*
**depends** 17:6
49:*9, 10, 11, 22*
50:*15* 52:5 53:8,
*9, 10* 54:*14*
58:*17, 21* 67:*15*
107:6, *11* 149:*15*
150:8, *17, 19*
168:*19, 20* 182:4,
*11* 199:5
**deployed** 94:2
**deposed** 5:*22*
**deposition** 1:*13*
3:9 4:6 21:9
33:*20* 38:*20*
39:*13, 21* 40:*4,
14, 16* 41:*1*
208:7 214:2, *11*
215:*18* 216:*13,
15, 20* 217:5
218:*19* 219:*18*
220:*1, 3* 221:3, *5,
8, 12*
**deputy** 4:*15*
**describe** 147:*12*
189:2 193:*10*

**described** 133:*18*
148:9 190:*11*
193:9
**describing** 39:*20*
71:4 142:*16*
164:*14*
**DESCRIPTION**
3:7 125:*14, 19,
21* 126:9, *13*
131:2, *17* 155:*12*
**designed** 122:*11*
170:*3*
**despite** 57:6
**destination** 57:*21*
58:*10*
**detail** 218:*12*
**detailed** 86:2
96:*12* 116:4
**details** 88:*19*
114:*11* 189:*19*
218:*11*
**detained** 44:*1*
**detect** 82:*1, 18*
83:*10, 11, 15*
183:*19* 186:*20*
187:*12*
**detected** 82:*19*
83:*13* 91:*22*
92:*10* 93:7
101:*3, 12* 102:*1,
5* 128:9 186:7, *13*
**detecting** 82:7
**detention** 46:*4*
94:6
**determination**
211:*12*
**determine** 13:*21*
79:*14* 81:2, *19*
133:5 134:*18*
140:5, *17* 142:2,
*22* 143:*16*
144:*10* 149:*4*
150:*4* 176:*3*

**determined** 15:7
192:*22* 198:*14*
**develop** 15:*15, 21*
91:9 192:*12*
**developed** 15:*12,
15, 21*
**deviate** 193:6
**devote** 95:*18*
**devoted** 93:*17*
96:*16* 97:2
**DHS** 4:*20* 91:*14*
97:*22* 99:*14, 21*
101:*3* 103:*15*
200:*10* 201:*10*
**DHS's** 201:*21*
**differ** 174:*13*
209:*13*
**difference** 8:*14,
17, 18, 21* 23:5
25:5, *11, 22*
40:*18* 44:4 89:*4*
159:*21* 162:*13,
18, 22* 163:4
164:*1, 6* 166:*13*
170:5 172:*21*
174:8 175:*18, 20*
177:*13, 15*
210:*11, 13*
**different** 13:*1, 2,
12* 15:8, *10*
21:20 34:22
36:*13* 45:*1*
52:*10, 20* 53:*21*
63:*18* 64:5
68:*13* 72:*21*
76:*19, 22* 77:8
78:9, *14, 15*
79:*16* 81:*1, 6*
82:*3, 4* 83:6, *19*
115:9 119:7
129:*1, 6* 143:*11,
12* 146:9, *16*
167:5 183:*20*
184:22 187:*15*

191:*1, 4, 5, 6*
193:*9*  194:*1, 2*
206:*21*  208:*5*
**differential**
150:*10*  153:*8*
**differently**  191:*1*
**difficult**  44:*12, 13, 17*  60:*15*  68:*6*
**dime**  105:*9, 12*
**dimension**  48:*6*
**dining**  216:*5*
**direct**  81:*8*  92:*1*
**direction**  175:*5*
221:*8*
**directly**  17:*8*
85:*14*  87:*2*  93:*1*
**disagree**  155:*19*
156:*14*  204:*18*
205:*3, 6*  206:*7, 15*
**disaster**  58:*5, 7, 12, 22*  59:*1, 7*
**disasters**  58:*1*
59:*20*  60:*1*
**discipline**  36:*17*
140:*10, 14*
141:*11*  142:*19*
148:*11*  149:*1*
157:*3*  172:*15*
179:*2, 9*
**disclosing**  90:*10*
**discuss**  45:*6*
164:*4*  215:*18*
**discussed**  29:*2*
31:*16*  32:*3*  56:*9*
90:*9, 13*  115:*3*
216:*13*  218:*13*
**discussion**  68:*9*
204:*6*
**discussions**  90:*16*
**disincentivize**
43:*1, 6*  45:*15, 17, 21*  58:*15*
**display**  211:*3*

**disposal**  48:*2*
49:*11*
**disposition**  74:*15*
**distance**  208:*12*
209:*3, 5*
**distinction**  7:*6*
**distinguishable**
81:*20*
**DISTRICT**  1:*2, 18*  214:*5*  221:*20*
**divergence**  167:*19*
**divided**  94:*4*
174:*12*
**DIVISION**  1:*3*
2:*14*
**doctor**  11:*10*
**document**  8:*15, 19*  19:*4*  21:*3*
39:*20*  40:*3, 10, 15, 19, 21*  62:*15*
63:*5, 8*  170:*16*
**documenting**
57:*20*
**Documents**  8:*12*
33:*21*  176:*15*
189:*10*
**dog**  7:*20*
**dogs**  7:*14*
**doing**  18:*9*
28:*17*  46:*11*
53:*4*  54:*9, 12*
61:*10*  94:*3*  95:*7, 15*  131:*4*  139:*9*
145:*17*  146:*18*
164:*22*  167:*19*
169:*5*  187:*21*
194:*16*  195:*3, 7, 14*  208:*3*
**DOJ**  29:*5*  51:*11*
**domestic**  42:*16, 18*
**door**  34:*6*  120:*19*

**doubt**  21:*16, 21*
62:*19*  94:*13*
156:*11*  157:*14*
**download**  33:*1*
**downward**
131:*15*  154:*10, 17*  156:*1, 20*
**draw**  192:*8*
**Drawing**  3:*10*
**drawn**  170:*16*
171:*20*
**DREW**  2:*22*  4:*9*
88:*2*
**drift**  131:*14*
**drifts**  154:*10, 16*
155:*22*  156:*20*
**drink**  48:*11, 14, 22*  49:*2, 3, 14, 18*
50:*20*  51:*6, 8, 9*
**drive**  60:*18*
**driven**  43:*13*
44:*6*  46:*18*
**drop**  56:*22*  57:*6, 7*  86:*21*  200:*12*
**dropped**  161:*16*
**drug**  180:*4*
**drugs**  5:*20*
**due**  99:*14*
**duly**  5:*4*  221:*5*
**duties**  93:*18*
96:*16*  97:*2*

**< E >**
**earlier**  35:*20*
77:*20*  99:*7, 15*
112:*18*  173:*18*
187:*20*  198:*4*
217:*19*
**early**  57:*3*
**easier**  92:*21*
185:*15*  198:*3*
**Eastern**  214:*5*
**easy**  139:*4*  155:*6*
**eat**  118:*18*

**econometrician**
81:*18*  82:*15*
**econometrics**
28:*6*  77:*17*
78:*16*  142:*11*
153:*19*  157:*12*
169:*5*  181:*6, 7*
183:*11*  210:*10*
**economic**  27:*19*
43:*12*  44:*10*
46:*6*  47:*1*  49:*4, 21*  53:*11*  55:*17, 19, 21, 22*  56:*2, 15*  57:*3, 13, 18, 20*  58:*3*  64:*7*
77:*2*  88:*2*  119:*3, 6, 14*  172:*11*
192:*7*
**economics**  28:*4*
41:*13*  42:*12*
43:*16*  45:*11*
142:*12*  152:*21*
179:*3*
**economist**  18:*7*
27:*22*  153:*20*
179:*9*  188:*1, 18, 22*
**economists**  48:*8*
50:*16*  53:*20*
191:*1*  213:*6*
**educational**  29:*18*
**effect**  12:*22*
13:*11, 13, 17, 22*
14:*1, 3, 8, 9, 11, 13, 18*  15:*8*  43:*4*
56:*16*  57:*5, 8, 14*
63:*14, 16, 20, 22*
64:*5, 6, 10, 11, 18*
65:*3*  68:*20*
69:*20, 22*  71:*3*
77:*18*  78:*3, 5, 7, 12, 13*  79:*5, 12, 18, 19, 22*  80:*7, 10, 13, 17, 19, 21*

81:2, *3, 9, 10, 15, 16, 19, 21*  82:*1, 2, 6*  83:*4, 5, 9, 22*  84:*6*  88:*5*  89:*8*  94:*10*  96:*20*  98:*18*  99:*19*  102:*5*  113:*10*  123:*16*  125:*8, 12, 17*  126:*5, 7*  127:*21*  128:*3, 4, 9*  129:*2*  145:*14*  146:*14*  159:*8*  165:*8*  166:*9*  168:*6, 8*  183:*18, 19*  184:*1, 5, 13, 18*  185:*4, 9, 11, 13, 17, 19, 22*  186:*7, 8, 12, 13, 15, 21*  187:*3, 4, 10, 12*  188:*3*  189:*17*  190:*7*  192:*21*  193:*7*  197:*5, 11, 14*  198:*9*  199:*13, 14, 17, 18*  200:*15*  202:*6, 7, 14*  210:*18*  212:*3, 5*

**effective**  115:*19*

**effectiveness**  91:*9, 14, 20*  92:*14*  99:*15*  100:*9, 14*  101:*8, 22*  103:*8, 16*

**effects**  14:*2, 14, 21*  27:*17, 20*  45:*3*  74:*20*  75:*22*  79:*15*  88:*21, 22*  122:*11*  161:*10*  196:*20*  198:*14*  202:*10*

**efficient**  67:*11*

**eight**  108:*8*  200:*17*

**either**  12:*6*  151:*13*

**elected**  219:*2*

**element**  45:*3*  76:*4*

**elements**  45:*5*  53:*22*

**eligibility**  200:*7, 14*

**eligible**  116:*1*  180:*14*

**ELISSA**  2:*12*  4:*18*  39:*14, 18, 19*

**Elissa.P.Fudim@u sdoj.gov**  2:*19*

**ellipses**  35:*2*

**email**  10:*1, 3, 20*  39:*19*  40:*2*  41:*3*  85:*12*

**empirical**  57:*13*

**employed**  221:*11, 14*

**employee**  221:*13*

**employees**  105:*16, 17, 22*

**employer**  106:*4*

**employers**  120:*18*

**employment**  45:*6*  120:*8*  121:*6, 7, 11*

**enacted**  146:*19*  194:*19*

**enactment**  200:*20*  201:*2, 7, 15, 21*

**encounter**  65:*11*  85:*21*  86:*7, 20*  92:*1, 2*  95:*19*  96:*9*  109:*15, 21, 22*

**encountered**  15:*19*  82:*10, 12*  86:*4*  99:*6*  109:*19*  114:*9, 14, 17*  115:*22*  125:*8,*

16  126:*6*  180:*11*  209:*18*

**encounters**  12:*16*  36:*11*  55:*15, 18*  56:*19*  57:*7, 15*  81:*14*  83:*3, 17, 20*  84:*13*  86:*12*  87:*3*  99:*3*  102:*7, 20, 21*  103:*1*  109:*16*  110:*6, 9*  112:*22*  114:*21*  123:*11, 12, 13, 16*  125:*6*  126:*5*  128:*14*  129:*16, 18*  130:*21*  131:*1*  132:*2*  146:*4, 7, 20, 21*  154:*20*  155:*10, 18*  157:*16*  159:*4, 8, 16, 17, 19*  161:*7*  162:*2, 13*  164:*2, 8*  166:*14*  167:*8*  172:*18, 20*  173:*11*  174:*1, 9, 10*  178:*4*  186:*10*  187:*5*  189:*17*  197:*6, 12*  200:*12*  202:*12*  211:*3, 4*

**encroach**  206:*11*

**ended**  188:*10*  189:*11*

**enforcement**  45:*20*  46:*1, 2*  96:*1, 12*  98:*6*

**English**  20:*3*  74:*18*  130:*7, 8, 12*

**enrollment**  86:*8, 14, 19, 22*

**enrollments**  87:*1, 13*  208:*4*

**enter**  91:*21*

**entered**  34:*14*

**enters**  34:*10*

**entire**  35:*9, 18*  36:*2*  51:*13*  65:*4*  155:*3*  201:*17*  211:*4*

**entirety**  166:*2*

**entities**  61:*4*

**entitled**  52:*22*  71:*19*  117:*5*  147:*9*  205:*1*  207:*6*

**entrants**  93:*5*

**entry**  93:*2*

**equal**  50:*15*  52:*21*

**equation**  136:*20, 22*  137:*10*

**equations**  153:*8*

**equivalent**  158:*9*

**Erez**  29:*8*

**E-R-E-Z**  29:*8*

**ergo**  133:*8*

**Erin**  29:*9*

**erratic**  131:*12*  132:*10, 18*  133:*17*

**erratically**  132:*3*

**error**  82:*15*

**especially**  16:*4*  178:*12*

**ESQ**  2:*3, 12*

**essential**  209:*8*

**essentially**  69:*8*

**establish**  80:*22*  81:*14*  197:*11*

**established**  135:*6*

**estimate**  64:*3*  78:*5*  79:*11, 22*

**estimated**  184:*10*

**estimates**  83:*19*

**estimating**  64:*2, 5*  77:*4, 8*

**et**  1:*5, 8*  4:*3*

**evaluate**  75:*22*  110:*14*  123:*15*  124:*18*  134:*4*

185:*13*, *15*, *21*
198:*8*, *13*
**evaluated** 74:*20*
151:*3* 190:*7*
**evaluating** 89:*5*
**evaluation** 88:*16*
162:*21* 165:*7*
166:*9* 168:*8*, *10*
**evaluations**
193:*22*
**Evan** 29:*8*
**evasion** 8:*9*
**evasive** 8:*13*
**event** 24:*7*
**events** 24:*4* 42:*4*
**everybody** 41:*16*
118:*14* 207:*9*
**evidence** 12:*21*
13:*11*, *21*, *22*
14:*9*, *18* 15:*8*, *11*,
*14*, *15*, *16*, *17*, *22*
23:*15* 25:*15*
26:*10* 27:*4*, *8*
52:*17* 63:*16*
64:*4*, *10* 68:*18*
69:*3*, *21* 71:*13*
76:*7*, *13* 77:*1*, *17*
78:*7* 79:*14*
80:*18* 81:*2*, *3*
84:*6* 96:*20*
98:*18* 100:*7*
117:*1*, *19* 123:*15*
125:*11* 127:*21*
128:*2*, *4* 145:*14*
146:*6* 159:*7*
168:*6*, *14* 184:*4*,
*11*, *18*, *20* 185:*16*
189:*4*, *14* 192:*8*
197:*13* 199:*16*
203:*15* 212:*5*
**evolution** 83:*17*
132:*1* 159:*4*
**evolve** 146:*20*
178:*5*

**evolved** 146:*7*
159:*18* 173:*20*
**ex** 80:*9* 134:*4*
**exact** 13:*5* 20:*13*
28:*10* 159:*13*
194:*13*
**exactly** 19:*2*
20:*18* 39:*21*
116:*5* 133:*18*
135:*5* 172:*6*, *17*
173:*1* 194:*14*
195:*1*
**EXAMINATION**
3:*3* 5:*7* 123:*4*
207:*20* 213:*13*
219:*13*
**examine** 76:*2*
**examined** 5:*4*
76:*6* 78:*6* 84:*1*, *9*
**examining** 189:*6*
**example** 7:*19*
42:*10* 46:*21*
49:*7* 55:*14*
56:*12* 120:*6*, *8*
121:*10* 186:*9*
188:*9* 200:*5*
201:*22* 208:*15*,
*21* 210:*15* 212:*7*
**examples** 92:*17*
121:*22* 203:*7*
211:*7*
**excellent** 175:*17*,
*18*
**excerpted** 113:*17*
**excess** 167:*13*
**exchange** 32:*5*
**exclude** 87:*21*
**excluded** 87:*21*
120:*4*
**excludes** 8:*5*
**Excuse** 130:*1*
201:*9*

**exempt** 73:*4*, *5*
74:*9* 117:*17*, *21*
118:*1*, *2*
**exempted** 73:*16*
74:*17*
**exempts** 73:*13*
**exercise** 163:*2*
166:*8* 169:*17*
174:*3* 186:*19*, *20*
**exhaustive** 17:*15*
**EXHIBIT** 3:*7*
19:*4*, *5* 20:*19*, *21*
21:*13*, *17*, *21*
23:*3*, *11*, *19* 24:*9*
25:*4*, *7*, *19*, *22*
26:*4*, *18* 34:*19*
40:*10*, *11*, *17*
63:*10* 72:*12*
73:*18* 74:*19*, *22*
110:*16* 131:*11*,
*13* 132:*21*
151:*16* 170:*9*, *11*,
*16*, *20* 171:*7*
**exhibited** 44:*11*
159:*7*
**exhibits** 26:*2*, *4*, *6*,
*17*, *19* 76:*13*
136:*1* 151:*8*, *11*
152:*10* 154:*14*
156:*10*
**exist** 165:*13*
**existed** 165:*14*
**expect** 120:*5*, *9*
132:*6*, *7* 202:*5*
**expected** 58:*8*
128:*15* 129:*17*
130:*22* 147:*4*
167:*15*
**expense** 219:*7*
**experience** 18:*8*
19:*21* 84:*22*
157:*13* 168:*17*
169:*4* 173:*5*
183:*11*

**expert** 1:*14* 3:*8*
10:*21* 11:*5*, *20*
12:*15* 17:*5*, *8*, *16*
18:*4* 19:*17*, *19*,
*20* 20:*1*, *2*, *3*, *11*
21:*4*, *10*, *18*, *22*
22:*10*, *11* 34:*3*
38:*22* 62:*16*, *20*,
*21* 63:*6* 72:*13*
73:*2* 86:*18* 91:*5*,
*18* 93:*12* 96:*1*,
*11* 98:*6* 114:*7*,
*15* 116:*3* 147:*20*
158:*3* 179:*8*
180:*15* 187:*7*
206:*17* 219:*3*
**expertise** 27:*18*
28:*2*, *3*, *5* 41:*7*
62:*4*, *8*, *9* 73:*12*
74:*4* 86:*2* 88:*2*,
*14*, *18* 89:*3* 91:*6*
92:*3* 94:*12*, *17*
95:*8*, *15* 96:*1*
107:*22* 108:*5*, *7*,
*19* 187:*22*
189:*12* 193:*1*, *14*
196:*22* 197:*1*
198:*12*, *18*
199:*10* 215:*3*
**Expires** 221:*22*
**explain** 134:*21*
180:*9* 182:*16*
210:*13*
**explained** 134:*22*
**explicitly** 18:*13*
**explode** 202:*15*
**explore** 71:*17*, *19*
**exploring** 71:*18*
**explosion** 186:*10*
202:*12*
**exposed** 77:*6*, *7*
**express** 23:*9*, *12*,
*20* 24:*10*, *13*, *15*

25:*8*  53:*18*  86:*21*  211:*19*

**expressed**  26:7  48:*6*

**expressly**  72:7

**expulsions**  110:*2*

**extended**  65:8  175:*8*

**extends**  163:*9*

**extent**  97:*4*

**external**  188:*1*  189:*7, 8, 11, 13*  190:*5, 8, 10, 19, 21, 22*  191:2, 7, *11, 14, 16*  192:*10, 13*  193:*18*  194:*3*  196:*19*  197:*2*

**extraordinarily**  169:*9*

**eyeball**  160:*14*

**eyes**  95:2, 7, *10, 15, 18*  96:*4*


**< F >**

**F.R.D**  214:*5*

**face**  58:*18*

**faced**  52:*20*  58:*18*

**faces**  54:*15*

**facie**  117:*20*

**facing**  44:*9*  52:6

**fact**  11:*22*  12:*4*  70:*14*  110:*13*  113:*11, 14*  147:7  176:*6*  183:*18*  185:*16*  190:*12*  200:*2*

**factor**  42:*1, 8, 11*  44:*14*  49:*13*  79:7

**factors**  41:*19*  47:*13*  53:*14, 15*  59:*3, 4, 16, 21*  60:*18*  68:*10*

77:*22*  79:*6, 9*  121:*21*

**facts**  25:*17, 19*  73:*6*  147:*11*  190:*3*

**factual**  14:7  69:*19*  70:*11*  88:*1, 3*  89:7  123:*20*  124:*5, 12*  180:*21*  186:*1*  189:*5*  191:*19*  192:*4*  194:6, *17*  202:8, *17*  211:*22*

**fail**  197:*11*

**failed**  159:9

**failing**  189:*9*

**fair**  7:*3, 9*  26:*14*  42:*10*  43:2  48:*16*  95:*18*  96:*9*  198:*6*  203:*18*

**false**  148:*4*  176:*8*  177:*11*  193:*8*  195:*6, 20*  196:*1, 3*

**familiar**  12:*3*  20:*2, 11*  24:*21*  41:*9*  56:*18*  61:*13*  62:*12*  88:*19*  91:*1, 16*  97:*12, 15*  104:*14*  141:*12*  152:*18*  153:*1*  179:*12*

**familiarity**  113:*1*  114:*22*

**far**  113:*22*  143:*6*  147:*11*  166:*5, 12*  167:*6*  188:*12, 17*  219:*4*

**Farragut**  216:*3, 15, 19*

**feature**  64:*16*

**features**  64:*13*  132:*7*  151:*21*

**February**  104:*3, 7, 15*  105:*4*

**FEDERAL**  1:*1*  23:7  32:*15*  60:*16, 20*  61:*1, 5, 9*  85:*15*  105:*8, 12, 15, 17, 21*  106:*20*  108:6  114:*3*  116:*12*  120:*18*  126:*16*  176:*17*  177:*3*  179:*14*  180:*2*  214:*1*

**feel**  9:*13*  84:*19*  85:*18*  189:*22*

**fell**  69:*9*

**fewer**  83:*3*  121:*14*

**Field**  110:*1*  210:*10*  213:*6*

**fifth**  37:*17*  131:7

**fight**  206:*21*

**Figure**  75:2  87:*17*  138:*16*  154:*21*  155:*11, 15, 20*  160:*2*  161:*1, 14*  162:*20, 21*  163:*16, 18, 20*  165:6, *7, 15, 16, 17, 18, 20*  166:6  168:*7, 8*  169:*12*  174:*21*  177:*14*  210:*21*

**figures**  137:*6*  160:*11*  178:*16*  189:*3*  211:*8*

**file**  195:*19*  196:*3*

**filed**  34:*4*  39:*2*  195:*6, 13*  206:*14*

**filing**  196:*1*

**final**  164:*13*

**financially**  221:*15*

**find**  13:*22*  83:*16*  121:*6*  127:*21*  128:*1*  159:*9*

**finding**  57:*4*

**finds**  55:*17, 21*  58:*3*

**fine**  37:*22*  118:*15*  120:*21*

**finish**  118:*11*  137:*11*

**finite**  137:*20*

**fire**  47:*3, 15*

**first**  5:*4*  9:*17, 19, 21*  18:*20, 22*  19:*2*  75:*18, 19, 20*  87:*11*  88:*12*  125:*4, 5, 15, 21*  126:*2, 4*  128:*10, 22*  129:*13, 21*  130:*14, 15*  146:2  164:*14*  201:*15*  203:*1*

**first-degree**  155:*1*  157:*8*

**Fiscal**  66:*18*  99:*17*  102:*8*  110:*3*

**fit**  133:*20*  145:*21*  149:*21*  155:*5*  157:*21*  158:*5, 7, 10, 14, 17, 20*  167:*14, 20*  169:*16*  170:*2*  172:*8*  175:*17, 19*  182:*11, 15*

**fits**  138:*19*  158:*18*

**five**  85:2  118:*12*

**five-minute**  181:*13*

**fixed**  99:*11*  101:*15*

**flawless**  183:*5*

**flawlessness** 183:*8*
**fled** 93:*6*
**FLEISCHMAN**
*4*:*20*
**flip** 95:*10*
**Florida** 37:*9*, *10*,
*12*, *15* 38:*7*
*112*:*18* 113:*6*, *8*,
*10*
**flow** 67:*11*
*116*:*17* 192:*1*, *2*
**flows** 109:*6*, *8*, *12*
**focus** 63:*11*
*148*:*1* 166:*4*
**focused** 102:*22*
**folks** 92:*12*
**follow** 10:*18*
*57*:*8* 126:*10*
**followed** 128:*13*
*129*:*15* 130:*20*
**following** 146:*4*
*159*:*4* 184:*8*
**follows** 5:*5* 112:*1*
**followup** 206:*9*
**footnote** 86:*21*
**force** 84:*3* 98:*20*
*100*:*5* 127:*3*
**forceful** 197:*2*
**forcefully** 196:*19*
**forces** 42:*4* 45:*2*
**foregoing** 221:*3*, *5*
**forest** 67:*20*
**forgetting** 17:*2*
**Forgive** 171:*21*
**form** 14:*4*, *16*
*23*:*14* 24:*5*
*25*:*14* 27:*8*
*31*:*12* 32:2, *21*
*44*:*16* 61:*12*
*62*:*10* 65:*15*
*72*:*4* 80:*15*
*93*:*10* 96:*10*
*106*:*17* 110:*12*
*116*:*19* 117:*15*

*122*:*8* 127:*14*
*128*:*18* 133:*9*
*142*:*9* 154:*3*
*155*:*15* 173:*7*
*188*:*4* 192:*15*
*197*:*22* 215:*10*
*216*:*21* 217:*15*, *19*
**forming** 16:*6*, *9*
*25*:*18*, *20* 26:*10*
*33*:*15* 61:*7*
*66*:*10*, *14* 87:*5*, *8*
*188*:*10* 189:*14*
**formulate** 88:*2*
*189*:*8*
**formulating** 88:*9*
**forward** 100:*2*
*115*:*21*
**found** 57:*18*
*128*:*4* 189:*3*, *9*
**four** 19:*7*, *12*
*200*:*17* 202:*19*
**Fourier** 138:*2*
*172*:*10*, *11*, *22*
*173*:*3*, *6*
**fourth** 202:*8*
**fraction** 101:*1*, *10*
**frame** 48:*12* 84:*5*
**Frank** 116:*14*
*117*:*10*
**Franklin** 2:*16*
**free** 9:*13*
**Freedom** 84:*16*,
*22* 85:*6*
**freehand** 171:*21*
**frequently** 45:*11*
**front** 5:*15*
*110*:*10* 112:*16*
*113*:*18* 115:*9*
*160*:*11* 201:*14*
**FUDIM** 2:*12*
*3*:*5* 4:*18* 6:*7*, *9*
*10*:*4*, *16* 11:*3*, *6*,
*16* 14:*4*, *16*
*16*:*21* 19:*7*, *10*,

*14* 21:*6* 22:*13*
*23*:*17* 24:2, *19*
*26*:*20* 29:*20*
*30*:*4*, *14*, *17*, *19*
*31*:*1*, *6*, *12* 32:2,
*21* 34:*5* 37:*19*
*38*:*4* 44:*16*
*46*:*15* 49:*19*
*50*:*13* 51:*15*
*53*:*7* 54:*18*
*59*:*18* 62:*5*, *22*
*65*:*15* 68:*22*
*77*:*14* 80:*15*
*81*:*11* 85:*12*, *16*
*89*:*13* 90:*8*, *17*
*93*:*10*, *21* 94:*15*
*95*:*5*, *13*, *21*
*96*:*10* 100:*16*
*103*:*13* 104:*8*, *16*
*105*:*5*, *10* 106:*17*
*111*:*6*, *15* 116:2,
*19* 118:*3*, *15*
*120*:*11* 122:*8*, *17*
*127*:*14* 128:*18*
*130*:*3* 133:*9*
*139*:*14* 141:*14*
*142*:*9* 143:*3*, *19*
*144*:*14* 148:*2*
*154*:*3* 156:*3*, *22*
*160*:*18* 168:*18*
*171*:*3* 176:*14*
*177*:*1* 178:*21*
*179*:*19* 180:*5*
*181*:*14* 188:*14*
*194*:*10* 195:*10*,
*18* 196:2, *8*
*197*:*22* 203:*22*
*204*:*3*, *17* 205:*16*
*206*:*1*, *3*, *7*, *15*, *19*
*207*:*11*, *17*, *21*
*213*:*11*, *16*, *20*, *22*
*214*:*14*, *19*, *20*
*215*:*5*, *9*, *10*, *20*
*216*:*8*, *9*, *12*, *21*

*217*:*5*, *6*, *15*
*218*:*5* 219:*4*, *10*,
*11*, *14*, *20*
**Fudim's** 10:*15*
*89*:*19* 217:*12*
*219*:*7*
**full** 5:*11* 82:*9*
*92*:*16* 102:*18*, *19*
*125*:*19* 174:*19*
**function** 53:*21*
**functionality**
*192*:*21*
**fundamentally**
*13*:*1*, *2*, *12* 15:*10*
*78*:*14* 79:*15*
*146*:*9*
**further** 93:*4*
*123*:*4* 161:*13*
*167*:*15* 171:*7*
*203*:*21* 213:*12*,
*13* 219:*13*, *20*
*221*:*12*
**future** 24:*3*, *6*, *14*
*26*:*9*, *11*, *13* 27:*6*
*131*:*14* 138:*20*
*151*:*9* 152:*4*, *11*,
*14* 170:*4*
**FY** 84:*21* 102:*15*
*103*:2, *3*, *6*, *17*, *18*

**< G >**
**gap** 165:*4*
**GARLAND** 1:*8*
*4*:*3* 35:*10*
**General** 2:*5*
*48*:*9* 98:*7* 113:*1*
*137*:*17* 150:*20*,
*21*, *22* 154:*21*
*179*:*11*, *18* 203:*5*
*218*:*6*
**generally** 43:*8*,
*15* 44:*10* 80:*11*
*83*:*3* 145:*20*
*147*:*19* 148:*15*,

*18* 149:*17*  151:7  154:*15*  156:*17*  169:*18*  212:*16*
**generally-accepted** 149:*8, 19*  150:*1, 3*  155:*20*  156:*4*
**generally-recognized** 132:*9, 17*  133:*4*
**generate** 80:*13*  137:*13, 15, 21*  138:*6*  151:*17*
**generates** 142:*6*
**genus** 7:*13*
**gestures** 59:*19*
**getting** 51:*7*  161:*15*  174:*6*
**give** 6:*6*  7:*3, 19*  9:*2*  41:*7*  89:*20*  92:*17*  105:*20*  155:*16*  156:*18*
**given** 27:*12*  42:2  44:*9*  108:*17*  109:*5*  129:*17*  130:*22*  144:*18, 19*  176:*7*  177:*8, 9, 10, 11*  186:*7*  193:*1*  196:*21*  198:*21*  208:*12*  211:*9*  221:*9*
**go** 6:*5, 7*  11:*10*  22:*13, 21*  46:*22*  47:*14, 18*  49:*15*  52:*3*  75:*3, 15*  76:2  84:*17*  88:*10*  96:*8*  111:*7*  118:*4, 6, 17, 19*  120:*20*  121:*12, 16*  122:*3*  129:*22*  130:2  193:*7*  196:*6*
**goal** 169:*17*

**goes** 118:*12*  169:*21, 22*  199:7
**going** 6:*6*  8:*13*  10:*7*  12:*1, 5*  21:2  22:*14*  40:*9*  43:*21*  46:*13*  47:*16, 18*  49:*2, 15, 17*  50:*6, 11*  51:*4*  53:*1, 4*  54:*9, 12*  58:*15*  59:*7, 10*  60:*6*  70:*19*  71:*19*  79:*2*  80:*10*  89:*16*  90:*20*  111:*2*  114:*3*  117:*11*  118:*5, 17, 18*  120:*19*  132:*3*  133:*13*  143:*13*  145:*4*  152:*14*  172:*5, 7*  175:*14*  176:*10*  177:*6*  187:*7*  201:*1*  203:*3*  205:*16, 17*  206:*7*  213:22  214:*16*  216:*18*  217:*9*  218:*18*
**golden** 7:*15*
**Good** 5:*9, 10*  157:*9*  182:*11*  193:*7*  194:*21*
**goodness** 157:*21*  158:*5, 7, 9, 17, 19*  182:*15*
**got-away** 92:22  103:*9, 17*
**got-aways** 91:*17, 21*  92:*8*  99:*4, 6, 10*  100:*21*  101:*1, 4, 9, 11*  103:*5, 11*
**gotten** 85:*14*
**government** 10:*21*  33:*11*  55:*12*  60:*17, 20*  61:*2, 5, 10*  85:*15*

105:*15, 21*  108:*2, 6*  114:*3*  116:*13*  120:*18*  126:*16*  179:*15*  180:2
**grab** 111:*7*
**grade** 37:*17*
**gradual** 154:*2, 5*
**graduate** 153:*5*
**grammarian** 130:*16*
**graph** 136:*11*  149:*4*  155:*12*  156:*12, 14*  160:*13, 14*  166:*11, 12*  171:*17*  176:22  208:*12*
**graphs** 136:22  137:*1*  188:*18*  208:*4*
**grasp** 171:*14*
**great** 18:*12*  57:2  122:*17*  132:*8*  159:22  175:*2*  183:*13*
**greater** 146:*6*  200:*12*
**Green** 216:*4*
**Greer** 29:*8, 11, 17*
**greyhounds** 7:*15*
**grounds** 89:*14*
**group** 67:*17*  113:*12, 21*  119:*13*  210:2
**groups** 210:*7, 8*
**guarantee** 17:*1*  122:*1*
**guess** 48:*13*  106:*19*  134:*6*  139:*10, 18, 22*  141:*1*  171:*10*

**< H >**

**half** 22:*6*
**Hall** 214:*4*
**hand** 40:*9*
**handcuffs** 96:*8*
**handing** 19:*3*
**Handwritten** 3:*10*
**happen** 8:*16*  15:*9*  41:*19*  104:*2*  110:*20*
**happened** 8:*19*  15:*9*  78:*19*  104:*14, 19*  203:*8*
**happening** 8:*20*  57:2
**Harvard** 18:*7*  19:*21*  105:*19*  142:*11*  157:*12*
**head** 6:*15*  102:*14*  187:*8, 16*
**hear** 141:*18*  203:2
**heard** 97:*20*  147:*11*  153:*5, 13, 20*  179:*13*
**hearing** 33:*19*
**held** 1:*14*  62:*20*  204:*6*
**Hello** 55:*6*
**helpful** 128:*21*
**hereto** 221:*14*
**Hey** 85:*13*  106:*13*
**high** 46:*10*  130:*10*  146:*20*  183:*12*
**higher** 102:*11*  147:*6, 7, 8*  184:*9*
**highlight** 8:*14*
**highly** 99:*16*  100:*10*  101:*9, 11, 13*  102:*4*  115:*5*  146:*3*  168:*21*  169:*1, 3, 6*

**Hispanic** 17:*10*
119:*17, 18* 120:*9,
21* 122:*4*
**Hispanics** 121:*11*
**hit** 9:*7*
**Hmm** 135:*18*
**hold** 118:*19*
**holding** 158:*2*
**Homeland** 91:*8*
104:*21* 105:*1, 2*
**honestly** 154:*6*
**hope** 118:*20*
**hopefully** 148:*13*
**horizon** 162:*6*
163:*8* 164:*10, 12*
165:*2* 166:*17, 19*
167:*18* 168:*4, 5*
174:*22* 198:*8, 11,
13, 20, 21* 199:*5*
211:*10* 212:*2, 5*
**horizons** 175:*5*
**hour** 9:*12* 22:*7*
28:*15* 118:*8*
215:*13*
**hourly** 12:*9*
**hours** 12:*11*
28:*10, 18, 21*
94:*2* 118:*6*
216:*18*
**huge** 132:*4*
**human** 54:*17*
**hundred** 28:*17,
21* 70:*5* 114:*10*
161:*18* 162:*2, 13*
164:*2, 8* 166:*14*
172:*7*
**hypothesis** 46:*7*
**hypothetical**
52:*19* 70:*2, 9, 10,
15* 71:*17, 18, 19,
22* 100:*5* 109:*3*
116:*21* 117:*3, 7,
8, 14* 172:*9*
187:*10, 13* 199:*13*

**Hypothetically**
42:*18* 45:*22*
46:*7* 47:*1* 54:*17*
68:*17* 84:*18*
98:*20* 100:*5*
109:*2, 4* 116:*11*
117:*22* 140:*1*
185:*7* 186:*14, 17*
187:*11*
**hypotheticals**
53:*1, 2* 117:*6*

**< I >**
**i.e** 110:*5*
**idea** 6:*6* 97:*1*
152:*21* 167:*22*
168:*3* 194:*21*
196:*10*
**identical** 99:*13*
101:*18, 19*
**identification**
19:*6* 40:*12*
170:*12*
**IDENTIFIED**
3:*7* 112:*6*
**identify** 4:*12*
34:*20*
**IFR** 12:*15, 22*
14:*13, 19* 15:*2, 6,
13* 16:*3* 17:*12*
32:*14* 35:*16*
36:*11* 41:*5*
63:*13, 17, 21*
64:*10, 11, 14, 16*
68:*21* 69:*2, 3*
70:*12* 72:*8, 15,
22* 73:*4, 7, 13*
74:*1, 5, 6, 8, 20*
76:*1, 3, 7, 11, 13,
15, 21* 77:*13*
78:*4, 6, 8, 11*
79:*5, 12* 80:*1*
82:*22* 89:*6, 8*
96:*21* 98:*18*

99:*18* 100:*8*
102:*1* 114:*8, 11*
115:*10, 18* 116:*6*
117:*1, 8* 123:*16*
125:*13* 127:*22*
145:*15* 146:*5*
162:*22* 165:*8*
166:*10* 178:*5*
180:*14, 20*
183:*18* 184:*2*
185:*4* 186:*1*
187:*4* 188:*4*
190:*4* 191:*8, 10,
21* 192:*5, 18*
193:*13, 16* 194:*6,
14, 17* 196:*20*
212:*8*
**ignore** 6:*9*
**illegal** 12:*22*
13:*17* 14:*12, 18*
15:*2, 6, 13* 35:*12,
17, 20* 36:*2, 7, 14,
16* 63:*17* 69:*4*
70:*13* 71:*16*
76:*9, 14* 77:*2, 5*
78:*8* 79:*12* 80:*1*
93:*5* 98:*21*
100:*6, 8* 101:*12*
102:*2, 3, 5*
110:*12* 117:*2*
119:*21* 120:*3, 8,
18* 122:*12*
123:*21* 125:*12*
127:*22* 145:*12,
15* 173:*19*
182:*18, 20, 21*
184:*8, 10* 199:*18*
**illegally** 69:*5*
91:*22*
**illness** 5:*19*
**imaginable** 84:*3*
**imagine** 68:*7*
93:*12* 109:*4*
116:*10*

**immediately**
50:*21* 151:*13*
161:*5*
**immigration** 58:*1*
71:*14* 107:*20*
108:*22* 148:*16*
172:*1*
**impact** 42:*17, 19*
45:*10* 55:*10, 13,
20* 56:*3, 6, 9*
57:*16, 19, 21*
60:*14* 63:*13*
64:*1, 2, 3* 69:*17*
70:*7, 20* 71:*10*
76:*10, 20* 77:*1,
12* 83:*22* 89:*5, 6*
116:*16* 117:*12*
120:*7* 203:*10, 16*
**impacting** 45:*7*
**impacts** 121:*17*
**impermissible**
219:*1*
**implement** 108:*2,
9, 16* 109:*2*
**implementation**
196:*18*
**implemented**
107:*9*
**implicit** 18:*13*
36:*17*
**implicitly** 103:*17*
**implies** 137:*3*
**important** 16:*5*
29:*7* 64:*14, 17*
66:*10* 69:*10*
97:*7* 128:*7*
129:*10* 151:*21*
158:*15* 168:*3*
200:*18*
**inability** 213:*1*
**inaccurate** 203:*20*
**inadmissible**
15:*19* 36:*12*
82:*9, 12* 83:*17*

86:*3*, *15*, *20*
96:*20* 98:*17*
99:*5* 109:*18*
123:*17* 166:*1*
209:*19*

**inadmissibles**
110:*2*

**inappropriate**
81:*22* 157:*16*
172:*14* 173:*4*
212:*11*

**inauguration**
104:*11*

**incentive** 44:*9*
46:*2* 47:*2*, *7*
50:*4*, *7*, *12*, *16*, *19*,
*22* 51:*5* 52:*2*, *5*
53:*5* 54:*10*, *13*
58:*11*, *19* 122:*12*
195:*22*

**incentives** 43:*14*
44:*7* 46:*19* 47:*3*,
*9* 48:*1*, *5* 49:*6*
50:*1*, *17*, *18*
52:*10*, *14*, *19*
53:*15*, *22* 54:*6*,
*15* 58:*17* 68:*3*
70:*12* 71:*1*
192:*22* 200:*4*, *14*

**incentivize** 42:*22*
43:*3*, *11* 44:*2*, *3*
58:*6*

**incentivized** 46:*13*

**include** 7:*14*
23:*8*, *11*, *19* 24:*9*,
*12* 25:*17*, *19*
26:*2*, *4*, *16*, *18*
29:*7* 45:*13*
85:*22* 86:*7*, *11*,
*13* 99:*4* 109:*16*
119:*11*, *13*, *20*
120:*5* 124:*15*
126:*13* 176:*22*
210:*3*

**included** 17:*5*
121:*7* 127:*9*
200:*1*

**includes** 7:*18*
26:*6* 86:*15* 99:*5*
109:*18*, *22* 136:*20*

**including** 18:*11*
20:*10* 28:*19*
45:*2* 46:*17* 50:*8*
56:*21* 113:*6*
153:*5* 157:*13*
159:*7* 162:*9*
165:*10*, *13* 166:*2*
176:*20* 219:*15*

**incompatible**
185:*14*

**incomplete** 27:*11*
67:*3*

**inconsistencies**
66:*9*, *12*

**incorporate**
47:*17*, *18*, *22*
122:*11* 173:*3*, *6*

**incorporated**
167:*17*

**incorrect** 133:*10*

**increase** 13:*17*
15:*2*, *6* 35:*12*, *16*
36:*11* 69:*4*
71:*14* 76:*8*, *14*
80:*22* 82:*16*, *17*,
*19*, *21* 94:*6*
100:*8* 117:*2*
120:*21* 150:*21*
160:*6*, *17*, *21*
161:*7* 186:*3*
191:*22* 192:*2*
212:*8*

**increased** 15:*12*
97:*3* 124:*3*, *10*, *22*

**increases** 45:*20*

**increasing** 155:*8*,
*16*

**independent**
10:*11* 54:*6*
135:*22* 136:*12*,
*14*, *16* 137:*7*
150:*13*

**independently**
21:*19* 36:*4* 85:*8*
114:*2*, *6* 183:*5*
188:*11*

**indicate** 188:*9*

**indicated** 25:*13*
86:*6* 204:*10*, *11*

**indicates** 87:*9*

**indicating** 73:*14*

**indicted** 179:*15*

**indirectly** 93:*2*

**individual** 11:*8*

**individuals** 117:*9*

**induced** 35:*12*

**inertia** 131:*13*
146:*22* 151:*8*, *10*,
*14* 152:*10* 178:*7*
183:*2*

**inference** 219:*8*

**inferring** 38:*14*

**influence** 41:*20*
42:*5*, *14* 45:*12*

**influences** 55:*22*
68:*13*

**influx** 37:*1*
115:*11* 124:*14*

**information**
11:*11* 17:*11*
18:*2*, *3*, *6* 24:*4*, *6*,
*16* 27:*13* 31:*9*,
*19*, *20*, *22* 32:*5*,
*13* 43:*14* 44:*8*
46:*19* 47:*9* 48:*1*
49:*6*, *9*, *10* 50:*1*
58:*21* 67:*11*
68:*3*, *5* 71:*1*
78:*17*, *20* 84:*16*,
*22* 85:*6* 92:*16*
98:*19* 100:*18*, *19*

103:*21* 106:*6*
132:*8*, *12*, *22*
135:*2*, *11*, *13*
136:*6* 139:*3*, *19*,
*20* 160:*1* 164:*14*,
*15* 167:*16* 175:*1*,
*2* 183:*10*, *13*

**informative**
88:*22* 101:*13*
127:*11*, *13*, *19*
128:*6* 136:*7*
143:*5* 144:*4*, *17*
158:*20* 162:*5*
164:*11*, *17*, *19*, *20*
165:*2* 166:*18*
168:*4*, *13*, *14*, *17*,
*19*, *21* 169:*2*, *3*, *9*
173:*19* 178:*12*

**informativeness**
141:*10* 142:*15*
143:*7* 144:*6*
149:*2* 158:*12*
176:*4* 191:*3*
199:*4*

**informing** 25:*2*

**initial** 86:*20*
201:*3*

**initially** 87:*22*
88:*4*, *7* 187:*20*
188:*8* 192:*11*

**inject** 153:*22*

**input** 153:*22*

**insight** 127:*2*

**insist** 111:*3*

**instantly** 154:*1*

**instincts** 188:*22*

**instruct** 11:*13*
30:*14* 31:*6*
33:*11* 206:*10*
213:*20* 217:*6*

**instructed** 90:*2*, *3*
96:*6* 217:*21*

**instructing**
207:*11* 219:*5*

**instruction** 8:*13* 10:8, *9*, *10*, *16* 11:2 89:*13*, *17*, *19* 90:*21* 214:*12*, *17* 217:*10*, *12* 218:8

**instructs** 6:*9*

**integrated** 136:*3* 157:7 172:*20*

**integrating** 170:7

**integration** 136:*1*, *3* 151:*16*, *22* 154:*14* 155:*1* 157:8, *17*

**intended** 204:*10*, *11*

**intent** 201:*6*

**interact** 54:2

**interacts** 54:*14*

**interdiction** 91:*14*, *20* 92:*14* 99:*15* 100:9 101:8 103:8, *16*

**interest** 191:*11* 193:*19* 199:5

**interested** 174:*22* 221:*15*

**interesting** 169:*10*

**interior** 43:*10*, *22* 114:*14*

**intermediate** 130:*4*, *8*

**internal** 19:*9*

**international** 18:*10* 27:*17*, *20* 28:*4*

**interpret** 13:*14* 80:*3*

**interpretation** 202:*16*

**interpreted** 36:*3* 64:2 112:*4*, *10*

**interrupt** 110:22

**interrupted** 145:*9*

**interval** 137:*20* 138:9, *19*, *21* 142:8 152:*3* 155:2, *4*

**intervening** 58:*12*

**intervention** 191:*3*

**intuitive** 173:*21* 174:*4*, *5*

**Intuitively** 132:*1*

**investigate** 13:*13* 100:*4*

**investigated** 13:*16*, *20* 15:*1*

**involved** 41:*16*

**involves** 77:*3* 129:6 146:2, *3*

**irrelevant** 163:*5*, *7* 195:8, *15*

**isolate** 76:*10*, *20* 77:*12* 79:7

**isolated** 79:*4*

**isolation** 74:*21* 76:*1* 127:5 166:*20* 211:*1*, *12*

**issue** 154:*16* 192:*11* 205:*18* 206:*12* 214:7

**item** 65:*10*

**its** 16:*4* 21:*1* 41:8 69:9 84:*13*, *20* 107:9 132:*12*, *22* 135:*14* 141:22 143:8 144:7 149:*3*, *9* 152:*1* 158:*13*, *14* 164:*11* 174:*15*, *16* 183:7 191:*11* 196:*19* 211:*14*


**< J >**

**Jackson** 34:*10*, *16*, *17*

**jail** 46:*11* 49:*1*, *15* 50:5, *6*, *11* 51:*12*, *13* 52:2, *3* 53:*4* 54:*9*, *12* 120:20 196:6

**January** 87:*14* 104:*3*, *7*, *11* 200:*9*, *10*

**job** 95:*19*

**Joe** 116:*13* 117:*9*

**JOHN** 2:*3* 3:*4* 4:*15*, *21* 5:*8* 10:6, *19* 11:*1*, *4*, *14*, *18* 13:6, *15* 14:*10* 15:*4* 17:*3* 19:*3*, *9*, *13*, *15* 21:2, *11* 22:8, *20* 23:*1*, *18* 24:8 25:*1* 29:22 30:6, *16*, *18*, *20* 31:*3*, *8*, *13* 32:7 33:2 34:7, *13*, *18* 37:*20* 38:5 40:*9*, *13*, *20* 44:*19* 47:*11* 50:*3* 51:*3*, *18* 53:*13* 54:*20* 55:*4* 59:*19*, *22* 62:*11* 63:*9* 65:*21* 69:6 72:6, *20* 75:*3*, *10* 77:*19* 80:*20* 81:*12* 85:*20* 89:*15* 90:*14*, *19* 93:*14* 94:7, *19* 95:*9*, *17* 96:*5*, *14* 100:20 104:*1*, *13*, *20* 105:*7*, *14* 106:*21* 111:*5*, *13*, *16* 116:9 117:*4* 118:*11*, *20* 119:*1* 120:*16* 122:*15* 123:*5* 127:*15* 129:*11* 130:*6* 133:*11* 140:*3*

141:*17* 142:*20* 143:*10*, *20* 144:*21* 145:*19* 148:6 154:7 157:*19* 160:22 168:22 170:*13*, *15*, *21* 171:*4*, *8* 176:*19* 177:*4* 178:22 179:22 180:*10* 181:*12*, *20* 189:*15* 194:*11* 195:*11*, *21* 196:5, *12* 198:*1* 203:*21* 204:2, *9* 205:*13* 206:*1*, *5*, *13*, *17*, *20* 207:*7*, *14*, *22* 213:*14*, *22* 214:*15* 215:*4*, *17*, *21* 216:*10* 217:*3*, *8*, *22* 218:*18* 219:*21*

**join** 34:*6*

**JOSEPH** 2:*3* 4:*15*

**journalistic** 98:8

**judge** 5:*15* 51:*11*, *16* 81:7 205:*4*

**jumps** 131:*13*

**June** 67:*5* 100:*11* 159:*18* 173:*10* 201:*16*

**June-to-June** 201:*17*

**jury** 5:*16*

**Justice** 2:*4*, *13* 10:2 29:*3*, *4*, *19* 31:2, *4*, *11*, *15*, *17* 32:*4*, *8* 33:7


**< K >**

**keep** 79:*3* 81:5

**key** 65:*10* 67:*10* 69:*7* 78:*10*
**kids** 66:*2*
**kind** 6:*6* 33:*22* 63:*11* 67:*10* 68:*13, 18* 71:*3* 80:*17* 97:*13* 142:*6* 179:*4* 186:*14, 21* 190:*3*
**kinds** 45:*22*
**King** 47:*3, 14*
**Kleenex** 110:*20* 111:*1, 7*
**knew** 49:*7* 62:*1* 212:*20*
**know** 7:*8, 11* 11:*21* 12:*6* 17:*21* 19:*18, 20, 22* 20:*4, 12* 22:*5, 9, 12* 29:*18* 30:*11* 33:*16* 37:*18, 22* 41:*13, 16* 42:*2* 43:*7* 44:*17* 51:*16* 53:*18* 59:*6, 9* 60:*11* 61:*4* 63:*2, 21* 64:*11* 68:*8* 74:*4* 85:*9* 86:*19* 91:*7, 11* 93:*16* 94:*5, 8* 96:*15* 97:*10, 13, 17, 22* 98:*3, 4, 12, 13* 100:*21* 101:*2, 6* 102:*7, 13* 103:*1, 3, 5* 104:*4* 105:*2, 11, 12, 17* 106:*2, 5, 7, 10, 16, 18* 107:*4, 14, 15, 18* 108:*10, 14, 18* 112:*14* 117:*22* 118:*17, 21* 120:*3, 14* 124:*2* 129:*20* 130:*13* 133:*13* 134:*21* 139:*22*

140:*4, 10, 12* 141:*15* 144:*2, 15* 149:*17* 152:*16* 154:*4* 165:*4* 168:*2* 179:*20* 180:*1, 15, 18* 182:*7* 183:*9, 11* 188:*16* 190:*3* 203:*2* 207:*9* 214:*22* 215:*1* 218:*12* 219:*4*
**knowledge** 7:*11* 16:*3* 43:*8* 57:*4* 67:*12* 86:*16* 87:*19* 90:*5* 97:*21* 158:*2, 4* 189:*22* 190:*2, 10* 192:*12, 14, 16* 193:*1* 196:*17*
**known** 59:*14* 149:*13* 150:*21* 159:*16* 190:*15*
**known-to-be-true** 135:*10*

**< L >**
**Labor** 16:*13* 147:*1* 178:*8* 183:*3*
**lack** 74:*4*
**lacked** 190:*9*
**LAFAYETTE** 1:*3*
**land** 38:*16* 109:*19* 110:*4, 5, 6, 7, 8* 113:*5*
**language** 20:*3* 35:*19* 53:*19* 113:*20* 115:*9* 202:*10, 13* 211:*20* 218:*20*
**large** 59:*17* 67:*17* 80:*13* 113:*2* 157:*13*

184:*15* 185:*2, 9, 19* 186:*12*
**largest** 106:*3*
**Latino** 17:*11* 119:*18* 120:*9, 21* 122:*4*
**Latinos** 121:*11*
**law** 24:*21* 45:*22* 91:*4, 6* 96:*1, 12* 98:*6*
**lawsuit** 113:*4*
**lawyer** 11:*10* 214:*9* 215:*5, 6, 7*
**lead** 184:*3*
**leadership** 104:*7*
**leading** 214:*6*
**learn** 67:*21* 203:*6*
**learned** 29:*16* 100:*18*
**leave** 218:*18*
**left** 88:*7*
**left-hand** 112:*16*
**legal** 20:*4, 13* 26:*20* 39:*20* 41:*6* 62:*5, 22* 72:*13* 73:*2, 12* 74:*4* 86:*18* 88:*14, 18* 89:*2* 91:*5, 18* 95:*22* 107:*22* 114:*7* 116:*3* 120:*2* 180:*15* 187:*22* 188:*19* 189:*1, 9, 22* 190:*2, 9* 193:*14* 196:*10* 197:*1* 214:*20* 215:*2*
**lets** 183:*11*
**letting** 118:*21* 207:*9*
**level** 15:*12* 80:*7, 10* 104:*10*

106:*20* 131:*16* 154:*12, 18* 156:*21*
**levels** 55:*11* 56:*3, 6, 10* 178:*6*
**light** 187:*17*
**likelihood** 43:*9, 20*
**limit** 36:*19*
**limited** 90:*11* 92:*8* 136:*10* 158:*18* 200:*2*
**line** 98:*11, 14* 131:*7* 161:*2, 6, 14* 169:*11*
**linear** 157:*20, 22* 158:*5*
**list** 17:*15* 84:*3* 112:*17*
**listed** 18:*13* 203:*12*
**literature** 42:*13* 45:*11* 57:*14, 18*
**litigation** 9:*18, 19, 22* 12:*1* 18:*16* 19:*17*
**little** 48:*12, 14* 69:*17* 76:*18* 77:*11* 102:*11*
**living** 67:*19*
**logarithm** 176:*12*
**logarithmic** 176:*12* 178:*14, 17, 20* 179:*6* 180:*4, 7, 8* 208:*6, 10, 11, 20* 209:*7*
**logic** 141:*13, 19*
**long** 22:*3* 28:*7* 67:*4* 94:*20* 95:*1* 108:*1* 122:*17* 152:*3, 15* 196:*6*
**longer** 161:*10* 165:*2* 167:*20*
**longest** 85:*2*

**long-term** 156:*10*
157:*15* 202:*5, 10*
**look** 17:*16* 65:*1*
80:*10, 17* 98:*22*
102:*21* 106:*13*
114:*20* 116:*21*
123:*18* 124:*7*
125:*2, 3* 133:*6*
135:*17* 138:*3*
139:*5* 143:*15*
144:*9* 149:*4*
155:*6, 15* 156:*9*
157:*10* 159:*13*
160:*2* 181:*1*
190:*1, 17* 211:*8,
11, 17, 18*
**looked** 16:*5, 8*
17:*4, 9* 56:*20*
78:*11* 87:*7* 88:*7,
8* 99:*22* 102:*17*
103:*3* 109:*20*
132:*2* 138:*9*
180:*13, 17, 19*
188:*8, 17* 189:*18*
197:*8, 16* 202:*1, 3*
**looking** 15:*17*
34:*19* 65:*4*
82:*16* 96:*3*
123:*10* 133:*16*
139:*22* 155:*11*
156:*11, 14* 160:*8*
161:*1* 162:*19*
164:*13* 165:*15*
166:*21* 188:*20*
201:*13* 202:*22*
**looks** 160:*8*
161:*15, 18* 166:*22*
**lot** 18:*6* 51:*12*
56:*14* 106:*12, 14*
126:*16* 212:*22*
**lots** 106:*18, 20*
**lottery** 69:*13*
70:*3, 17*

**LOUISIANA** 1:*2*
2:*4, 7* 4:*16* 37:*4,
5, 6, 7, 15* 38:*2,
11* 112:*18*
**lower** 83:*18*
147:*3, 7* 167:*15*
**lunch** 118:*7, 10*
122:*16, 21*
215:*12* 216:*1, 2,
12, 18*
**lunchtime** 118:*22*

**< M >**
**M-A** 136:*5*
**Madam** 13:*6*
71:*21* 145:*6*
170:*13*
**magnitude** 82:*17*
155:*8, 16* 184:*18,
21* 185:*3*
**maintain** 98:*1*
214:*12*
**majority** 113:*2*
115:*1*
**making** 44:*10*
50:*8* 88:*21* 93:*2*
115:*4* 165:*17*
169:*6, 19* 205:*7*
208:*3* 212:*16, 19,
21* 213:*10*
**man** 29:*8* 82:*12*
**manner** 68:*14*
**March** 19:*1*
20:*17* 65:*9* 86:*5*
159:*19* 162:*9*
163:*20* 166:*2, 4,
7* 173:*11*
**marginal** 68:*12*
**maritime** 109:*16*
**mark** 19:*4* 40:*10*
170:*9*
**marked** 19:*5*
40:*12* 170:*11*

**market** 147:*1*
178:*8* 183:*3*
212:*22*
**match** 135:*9*
150:*5, 6* 172:*6*
175:*13* 177:*17*
**matches** 142:*7*
169:*8*
**math** 28:*17*
153:*15* 156:*17*
**mathematical**
153:*2* 174:*3*
**mathematically**
101:*17*
**mathematics**
137:*17* 138:*1*
153:*4, 7* 171:*16*
**matter** 4:*3* 8:*3*
26:*8* 108:*1*
**Matthew** 4:*20*
39:*14, 18*
**mean** 17:*6* 18:*2*
28:*21* 42:*3*
44:*21* 45:*1*
50:*16* 59:*5, 21*
60:*11* 67:*16*
73:*10* 74:*14, 22*
79:*3* 107:*18*
110:*22* 128:*1*
130:*5* 136:*14, 22*
141:*15, 18, 20*
143:*4* 144:*2, 15,
16* 152:*21*
153:*17* 161:*18*
162:*11* 168:*2*
169:*13, 15*
177:*10* 188:*16*
193:*3* 208:*9*
210:*1* 211:*18*
213:*2*
**meaning** 7:*4, 7,
10* 11:*21* 19:*18*
20:*1, 12* 41:*8*
65:*12* 74:*13*

104:*18* 112:*9*
151:*12* 171:*9*
186:*5*
**meaningful**
198:*16*
**meaningless**
199:*3*
**means** 7:*21, 22*
12:*6* 15:*15*
17:*21* 20:*5*
33:*16* 43:*14*
44:*8, 18* 46:*19*
47:*9* 48:*2* 49:*6,
11* 50:*2* 59:*1*
68:*4* 71:*2* 74:*16*
82:*11* 92:*11*
93:*8* 104:*5*
105:*12* 106:*18*
108:*10* 112:*15*
129:*21* 149:*18*
152:*7, 17* 154:*5*
182:*7* 203:*4*
207:*2* 215:*2*
**meant** 74:*7, 18*
207:*4*
**measure** 91:*9*
103:*17* 119:*11*
153:*21* 157:*21*
210:*8*
**measured** 66:*6, 7*
186:*15, 17*
**measurements**
66:*1*
**measures** 97:*9*
98:*9*
**measuring** 66:*2,
3, 4*
**mechanism**
117:*22*
**media** 67:*18*
**median** 155:*9*
**medical** 11:*10*
**meet** 39:*4, 6, 8*
**men** 66:*4*

**mentioned** 99:*14*
101:*14* 171:*15*
187:*20* 193:*17*
211:7
**MERRICK** 1:*8*
4:*3*
**method** 92:*18*
129:2 135:6
142:*17* 143:*6*
184:*10* 190:*4*
213:8
**methods** 77:*16*
83:*15* 91:*22*
92:20 99:8
119:8, *9* 176:*1*
**metrics** 91:2, *9*,
*14*
**Mexico** 16:7
37:8, *13* 38:8, *16*
**MICHAEL** 1:*13*
3:2, *8* 4:7 5:2,
*13* 40:*14*
**middle** 67:*20*
129:22 130:2, *5*
**migrant** 43:9, *21*
55:*13* 58:*11*
68:*12* 70:*18*
71:9 82:*13*
83:*11*, *13* 86:7,
*13* 192:1, 2, 22
209:*9*, *12*, *13*, *19*
**migrants** 15:*19*
36:*12* 37:*1*
45:*18* 46:3, 8
58:9, *18* 60:*17*
67:*13*, *18* 68:*5*,
*11*, *17* 69:9 70:9
78:*21* 82:9, *20*
83:*16*, *18* 86:4,
*16* 96:20 98:*17*
99:5 101:*4*, *12*
102:2, *3*, 6
109:*18* 113:3
114:9 115:2

116:5 121:*14*
123:*17* 124:*14*
125:7, *16* 126:6
166:*1* 200:*4*, 7, *9*,
*10*, *12*, 22 201:*11*
203:*1*, 6 209:*21*
210:*3*
**migrant's** 42:*15*
56:*1* 71:*10*
**migrate** 41:*21*
42:*6*, *20* 46:*17*
48:*10* 69:*18*
**migrating** 69:5
**migration** 12:22
13:*18* 14:*12*, *19*
15:*3*, 6, *13* 18:*10*
27:*17*, *20* 28:5
35:*13*, *17*, *20*
36:*3*, *8*, *14*, *16*
41:*10*, *12*, *15*, *18*
42:*1*, *17* 43:*1*, 2,
*4*, 5, *6*, *11*, *12*, *18*
44:2, *3*, *4*, 5, *6*, *14*
45:*3*, *7*, *12*, *16*, *18*,
*21* 46:2, *4* 50:*9*,
*10* 55:*11*, *20*, 22
56:*3*, *6*, 9, *13*, 22
57:*16*, *19*, 22
58:*6*, *16* 59:*17*
60:*6*, 7, *12*, *18*
63:*17* 67:22
68:2 69:*4*, *18*
70:*13*, 22 71:*16*
76:*4*, 9, *11*, *14*, *21*
77:*2*, 5, *20* 78:*8*
79:*10*, *13* 80:*1*
83:22 84:*4*, 9
87:*14* 97:5
98:*21* 100:6, *9*
109:6, *8*, *12*
110:*12* 116:*17*
117:2, *12* 119:5
122:*12* 123:22
125:*12* 127:22

145:*13*, 15
173:*19* 181:*4*, 8
182:*18*, *20*, *21*
184:8, *10* 194:*18*
199:*19* 200:*13*
**miles** 95:*1*, *3*
114:*18*
**million** 102:*10*
**Millions** 105:*16*,
22
**mind** 16:*18* 17:*1*
39:*3* 156:*11*
202:*20*
**minimal** 71:8
**minor** 16:*15*
87:*12*
**minus** 101:*9*
**minute** 54:*19*
75:*4*
**minutes** 22:7
23:2 118:*13*
213:*17*
**misleading**
178:*20* 179:*1*, 7
180:*3*, 6
**missing** 192:*16*
**misspoke** 25:*12*
**model** 119:*11*
128:*12* 131:*3*, 6,
*18* 132:8, *12*, 22
133:5, *7*, *14*, *20*
134:2, *3*, 5, *7*, 9,
*10*, *12*, *17*, *19*
135:2, *7*, 8, *9*, *13*,
*18*, *20* 136:6, 8,
*18* 137:*9* 138:*18*,
*19* 139:*1*, 2, 6, 7,
*18* 140:2, 6, 7, *18*,
22 141:*10* 142:2,
*3*, *15*, *18*, *21*
143:*1*, 7, *15*, *17*
144:6, *11*, *13*
145:*21* 146:2, *3*,
*10*, *15*, *16* 147:*10*,

*12*, *14*, *16*, *21*
148:9, *10*, 11, *20*,
*21* 149:2, 5, 9, *13*,
*16* 150:2, 7, 9, *13*,
*14*, *20* 151:*1*, 4,
*20* 152:9 154:9,
22 155:5, *21*
156:7 157:*4*, 6
158:2, *10*, 11, *12*
159:*11*, *17*, *20*, 22
160:5, 9, *16*
161:6, *12*, *14*
162:*14*, *18* 163:*4*,
*10* 164:*3*, 7, *9*
165:*1* 166:9, *15*,
*19* 167:7, *12*, *14*,
*15*, *17*, *21*, 22
168:3, *10*, *12*, *14*
169:5, 9, *12*, *18*,
22 171:22 172:*1*,
*2*, *3*, *4*, *18* 173:*12*,
*16*, *18* 174:2, *15*,
22 175:9, *11*
176:9, *20* 177:7
178:*1* 181:*4*, 8
182:5, *11*, *12*
183:*11* 197:*20*
199:6 210:*21*, 22
211:*13* 212:*13*,
*15*, *18*, *20* 213:*1*,
*2*, 7
**models** 147:*19*
148:*15*, *17* 170:*3*
213:5
**model's** 144:*19*
198:22
**modes** 110:6
**modified** 185:7
**modify** 185:*10*
**moment** 17:2
181:*10* 211:*21*
216:*14*
**money** 126:*17*
195:*3* 212:22

**month** 82:*20*
155:*10, 18*
159:*20* 161:7, *19*
162:*3, 14* 164:2,
*8, 13* 166:*14, 19*
167:9 173:*12*
176:*3, 7* 177:8, *9,*
*10, 11, 18* 199:*20*
200:*16* 201:*15*
212:8, *9, 10, 14*
**monthly** 87:*13*
102:*12* 186:*10*
202:*12*
**months** 20:*15*
46:*12* 107:5, *12,*
*21* 108:*4, 8, 13,*
*16, 22* 109:2, *4*
161:*21* 162:7
163:*1, 5, 9, 13*
164:*14, 20, 21*
166:22 173:*10,*
*14* 174:*16*
175:22 177:*12,*
*15* 197:8, *17*
198:5, *12, 14*
199:*11* 200:*17,*
*21* 201:5, *8* 203:5
**morning** 5:9, *10*
39:*18* 40:6
48:*19* 49:*14*
**mounted** 98:*8*
**move** 58:*19*
138:8 175:*15*
**moved** 208:22
**movement** 186:*3*
208:*12*
**movements** 18:*11*
**moving** 51:*10*
136:5 151:*11, 16,*
*22* 161:*13*
**MPP** 16:*11* 17:9
66:*13* 86:*19, 22*
87:5 88:7, *20*
89:5, *21* 90:7, *13*

188:*9, 12* 189:*16,*
*17* 190:*1* 191:*18,*
*20* 192:2, *6, 17,*
*18* 194:*4, 5, 12,*
*21* 196:*13, 18*
197:*5, 11* 208:*1, 4*
**multiple** 57:9
**multiply** 54:2

**< N >**
**N.W** 1:*14*
**name** 4:9 5:*11*
29:9 34:*16*
61:*13, 15, 16*
62:*12, 14* 63:4, 7
199:*22*
**named** 29:*8*
117:9
**names** 29:7
**narrow** 77:*11*
138:*19, 21* 180:*12*
**National** 91:*3*
104:*10*
**nationalities**
200:*13*
**nationwide**
102:*20, 21* 103:2
110:5, 8, *9*
112:22 113:*15*
114:*20* 120:*17*
**Natural** 58:*1, 5, 7,*
*12, 22* 59:*1, 7, 20*
60:*1*
**nature** 17:*12*
**NDAA** 91:7, *11*
92:5
**necessarily** 43:*17*
47:*4* 48:6 67:22
70:*13* 71:*3*
74:*14* 94:5, *10*
116:5 121:*1*
200:2
**necessary** 67:*13,*
*15* 76:*3, 8* 85:9

146:*12* 193:*16*
206:*12*
**need** 6:*16, 20*
7:6 9:9, *13*
44:*10* 48:*3* 54:*1*
80:8, *13, 21* 81:6
84:*19* 85:*13, 18*
86:9 101:6
110:*20* 117:*19*
118:*18* 121:8
182:*16* 185:*12,*
*19* 186:6, *14*
187:*16* 189:6, *10*
190:7 193:2
203:*13, 14, 18*
206:5
**needed** 81:9, *14*
85:5 190:*3*
**needs** 65:*22*
183:*17*
**negative** 57:15
132:4
**negatively** 60:8, *9,*
*13, 14*
**neighborhood**
162:2
**neither** 221:*10*
**net** 52:7, *9* 60:*14*
**never** 50:*16*
97:*20* 153:*5, 13*
196:*11*
**nevertheless**
219:5
**new** 27:8 100:*18,*
*19* 104:*21* 107:8
203:*14*
**Nicaraguan**
200:*10*
**nice** 176:*11*
**non-effect** 78:*4*
**nonlegal** 16:2
114:*14*
**non-privileged**
204:*14*

**nonquantitative**
17:*19*
**nontechnical**
53:*19* 131:*3*
211:*20*
**non-zero** 80:*4*
**normal** 192:7
**northern** 110:*4*
114:*18*
**Northwest** 4:*8*
**Notary** 1:*18*
221:*1, 19*
**note** 6:*14* 16:7
215:*12*
**noted** 87:7
**notes** 45:*10*
**Notice** 3:*9* 23:5
25:5, *10, 21*
40:22 63:5 201:*3*
**noticed** 66:22
**Notices** 40:*14*
**noticing** 4:*14*
**number** 12:*16*
28:*10* 69:5
82:*17* 93:*17*
96:*15* 97:*1*
100:*21* 102:*14*
106:*1, 2* 123:*18*
124:*10, 22*
137:*14, 16, 22*
138:7 172:*18, 19*
174:*12* 178:*10*
201:*11, 16, 19*
208:*4*
**numbering** 19:*8*
**numbers** 70:*5*
99:*11* 101:*15*
146:*15* 156:*18*
159:*13* 177:6
208:*20*
**numeric** 208:*21*

**< O >**

**oath** 4:*22* 5:*14*
55:*7* 75:*13*
123:*8* 182:*1*
**object** 6:*7*
**objected** 204:*13*
**Objection** 10:*4,*
*16* 14:*4, 16*
16:*21* 23:*17*
24:2, *19* 26:*20*
30:*14* 31:*12*
32:2, *21* 37:*19*
38:*4* 44:*16*
46:*15* 49:*19*
50:*13* 51:*15*
53:7 62:5, *22*
65:*15* 68:*22*
77:*14* 80:*15*
81:*11* 85:*16*
89:*13* 90:*17*
93:*10, 21* 94:*15*
95:5, *13, 21*
96:*10* 100:*16*
103:*13* 104:8, *16*
105:5, *10* 106:*17*
116:2, *19* 120:*11*
122:*8* 127:*14*
128:*18* 130:*3*
133:9 139:*14*
141:*14* 142:9
143:3, *19* 144:*14*
148:2 154:*3*
156:3, *22* 160:*18*
168:*18* 171:*3*
178:*21* 179:*19*
180:5 188:*14*
195:*10, 18* 196:2,
*8* 197:*22* 213:*20*
214:*20* 215:*10,*
*20* 216:9, *21*
217:6, *15*
**objections** 6:*8*
**objective** 156:*16*
168:*16* 177:*19,*
*22* 182:*14*

183:*15, 21*
185:*18* 197:*19*
198:*10, 17, 19*
**obligated** 24:*17*
**obligation** 176:*21*
**obliges** 24:*21*
**observe** 81:*18, 21*
93:*19* 95:*11, 20*
96:8 184:*13, 17*
185:*1, 3, 6, 16*
201:*19*
**observed** 92:9
93:2, 7 101:*16*
129:*4* 174:*1*
185:5, *11* 187:*11*
**obtain** 11:7 85:*3,*
*6*
**obtained** 85:*10*
87:*15*
**obvious** 122:*3*
**obviously** 154:*21*
205:*3*
**occur** 46:8
**occurs** 163:*1*
**o'clock** 118:*5, 17*
**October** 9:*20*
86:5 87:*1*
102:*16* 166:*1*
200:6 221:*22*
**offense** 206:*3*
**offer** 124:*21*
187:7
**offered** 81:7
144:2
**offering** 63:6
142:*1* 179:8
**Office** 2:5 105:*1,*
*3* 107:8 110:*1*
**officer** 221:2
**officers** 96:2
201:*12, 13* 209:*19*
**official** 62:9 86:*1*
**officially** 220:*1*

**officials** 29:*5*
**offsetting** 47:*13*
**OFO** 86:*4*
209:*19*
**Oh** 59:8 62:*15*
**OIL** 34:*17*
**Okay** 6:2 8:*3*
9:*10* 19:*10, 14*
69:*13* 80:*12*
111:4 133:7
148:7 149:7
152:*13* 166:*4*
176:*19* 187:2
190:*16* 192:*1*
202:22 203:22
**omit** 165:*14*
**once** 143:*13*
**one-hour** 111:*14*
**one-minute** 204:*1*
**one-month** 161:9
**ones** 16:22
17:*13* 202:*20*
**open** 218:*19*
**Operations** 110:*1*
**operator** 4:9
**opinion** 16:*6, 9*
62:*10* 63:*11*
66:*11, 15* 72:5
87:6, 8 88:9
117:*16* 124:9
126:22 176:5, 7
177:*21* 188:5, *10*
189:*14* 192:*15*
193:6 201:*21*
**opinions** 23:*9, 12,*
*15, 20* 24:5, *10,*
*13, 15* 25:8, *14,*
*18, 20* 26:3, *5, 7,*
*11, 18* 27:5, *9*
33:*15* 61:7
124:*21* 172:*13*
**opportunity**
43:*15* 44:8
46:*20* 47:*10*

48:*3* 49:7, *12*
50:2 59:*1* 68:*4*
71:2 205:*21*
**opposite** 140:*20*
**order** 33:*17*
63:*19* 64:9
121:7 150:7
164:2 183:*17*
184:*1* 187:*3*
189:*4* 209:*5*
**organizations**
108:*3*
**origin** 56:*1*
57:*19* 109:*10, 13*
**Ortiz** 61:*14, 19*
62:2, *3*
**O-R-T-I-Z** 61:*14*
**outcome** 53:22
77:4 123:*15*
139:*10, 12* 140:*1*
141:*1* 221:*15*
**out-of-sample**
132:*13* 133:*1, 21*
135:4, *14* 136:7
139:*1* 143:8
144:7, *19, 22*
149:3, *5, 10, 20*
150:4 152:*1*
156:8 157:5, 8
158:*13, 18*
159:*12* 169:6
173:*16* 198:22
**output** 132:2
142:6, 7 147:*16*
150:2 170:*1*
**outside** 28:*4*
34:6 41:*19* 42:6
202:6 205:*17*
206:8 207:*5*
**overall** 156:7, *10*
157:4 183:*3*
**over-damped**
152:*13, 16*

**overshoot**  154:*1*

**< P >**
**p.m**  122:*21*
220:*3*
**P.O**  2:*15*
**pace**  118:*4*
**PAGE**  3:*3*  21:*12*
34:*19*  35:*5, 6*
72:*10*  73:*18*
86:8, *9*  87:*10*
110:*15, 17*
111:*17*  112:*16*
113:*17*  129:*12*
**pages**  106:*8, 10*
**paid**  12:7, *9, 11*
28:*13*  126:*16*
**paper**  181:*11*
**paragraph**  35:*3,
4*  73:*20, 22*  75:*1,
15, 19*  87:*11*
110:*18*  111:*18,
20*  126:*1, 3*
129:*12, 21*
130:*14, 15*  131:*5,
7*
**paragraphs**
34:*20*  35:*5*
113:*17*
**paralegal**  31:*1*
**part**  10:*9*  15:*16*
22:*11*  24:*13, 14*
87:*3*  136:2
163:*22*  176:*21*
180:*1*  209:*4*
**partial**  125:*21*
126:*9*
**participated**
188:*22*
**particular**  7:7, *10*
33:*11*  44:*14*
57:*14*  71:*9*
80:*19*  118:*4*

182:*12*  210:*21*
211:*1, 11*  212:*10*
**parties**  4:*13*
112:*17*  221:*11, 14*
**parts**  136:*4*
**party**  4:*14*  11:*4*
206:*16, 19*
**passage**  27:*21*
**passages**  34:*22*
36:*3*  111:*22*
112:*4, 7, 9*
**Patrol**  61:*17, 20*
62:*1, 3, 9*  92:*11*
93:*17, 18*  95:*19*
96:*6, 16*  97:2
98:*1*  109:*22*
**pattern**  55:*18*
**patterns**  78:*18*
147:*4*  160:*1*
183:*13*  213:*9, 10*
**pause**  111:*5*
195:*16*  211:*15*
**pausing**  171:*13*
**paying**  20:7, *10*
**peak**  171:*10*
**peer**  142:*13*
**peer-reviewed**
18:*9*  129:2
142:*17*
**pending**  9:*14*
13:*8*  72:*1*  105:*6*
111:2  145:*7*
204:*19*
**Pennsylvania**
214:*6*
**penny**  47:*13*
**people**  31:*10, 14,
17*  32:4  41:*17*
42:*5, 19*  46:*12*
50:*8*  51:*12, 13*
52:*1, 18*  53:*3*
69:*5*  77:*6*  78:*18*
85:*11*  91:*21*
113:*21*  116:*17*

117:*21, 22*  121:*5,
15*  124:*15, 16*
201:*17*  210:2, *16,
18*  216:*17*
**people's**  41:*20*
45:2  49:*4, 21*
53:*10*  55:*13*
117:*17*
**percent**  99:*17*
114:*10*  146:*15*
150:*10, 15*
159:*21*  167:7, *12*
169:*8*  170:*6*
172:7  173:*9*
174:6, *8, 13*
175:*18, 20*  176:*7*
177:7  200:*11*
208:*16, 17*  209:2
**percentage**  99:*12,
13*  101:*9, 17, 18*
208:*13*  209:*3, 6*
**perception**  44:*8*
46:*19*
**perceptions**
43:*14*  47:*9*  48:*1*
49:*6, 10*  50:*1*
58:*22*  68:*3*  71:2
**perfect**  145:*3, 12*
169:*16, 17, 19, 20*
170:2, *4*  175:*12*
176:2  182:*18*
212:*16, 19, 21*
213:2
**perfectly**  175:*16*
**perform**  191:*7*
208:*1*
**performed**  79:*19*
96:*17*  126:*19*
191:*8*
**performing**
194:*13*
**period**  65:*4, 13*
66:2  82:*11, 13*
84:*1, 9*  98:*11, 14,*

*21*  99:*18*  132:*4,
5*  151:*13*  154:*22*
161:*9, 11*  163:*3*
167:*5, 18, 20*
169:*7*  172:*5, 19*
174:*17*  178:*19*
180:*13, 18*
197:*20*  201:*18*
202:*1, 2*  203:*10*
209:*20*  211:*5*
**periods**  169:*11*
175:*8*
**permitted**  214:*9*
**persistence**
146:*22*  178:*7*
183:2
**persists**  151:*13*
**person**  7:*5*  9:*10*
30:*21*  32:*5*  42:2
44:*9*  46:*16*  47:*4*
54:*15*  72:*18*
114:*14*  209:*18*
**personal**  215:*6, 7*
**personally**  49:*17*
**pertain**  74:*6*
180:*22*
**pertaining**  208:*1*
215:*10*
**pertinent**  189:*5*
**peruses**  20:*21*
40:*17*  72:*12*
170:*20*  171:*7*
**petering**  154:*2, 5*
**peters**  151:*14*
**Ph.D**  105:*20*
**Pharma**  179:*12,
13*  180:*3*
**phase**  169:*12, 14*
170:*8, 19*  171:*6,
18, 19*
**phone**  81:*7*
**photos**  98:*7*
**phrase**  75:*19, 20*

92:*19*

**phrasing** 124:*15*

**pick** 162:*7*
163:*13*

**piece** 17:*4, 7*
32:*17* 60:*19*
184:*11*

**pieced** 35:*1*

**pieces** 98:*8*

**pile** 179:*15* 180:*2*

**pistol** 96:*7*

**place** 39:*20* 40:*3*
48:*4* 216:*3*

**places** 169:*21*

**Plaintiff** 4:*16*
37:*5, 9* 204:*12*

**Plaintiffs** 1:*6*
2:*2* 5:*7* 123:*4*
204:*19* 213:*13*

**planning** 41:*2*

**plausibility** 93:*16*

**plausible** 93:*13,
20* 108:*19, 21*

**please** 4:*12, 21*
6:*21* 7:*7* 22:*11*
51:*20* 71:*22*
171:*1* 176:*15, 20*
177:*1*

**pleasure** 214:*10*

**plotted** 174:*19*

**plug** 156:*18*

**plus** 101:*4*

**point** 9:*7* 13:*5*
26:*14* 47:*12*
48:*19* 87:*6*
115:*21* 166:*11*
194:*20* 197:*4*
211:*1* 212:*2*
219:*17*

**points** 135:*17*
166:*21* 211:*7*

**policies** 42:*22*
43:*1, 3, 4, 5*
45:*15* 55:*10, 12*

57:*9* 76:*4* 83:*21*
84:*8* 107:*9, 17*
108:*9, 10, 12*
120:*7* 187:*19*
188:*11, 20* 189:*4*
190:*9, 11* 192:*8*
193:*22*

**Policy** 16:*7*
41:*12, 18* 42:*16,
18* 43:*16* 45:*17*
56:*8* 57:*3* 72:*15*
74:*5* 76:*16* 77:*2,
6, 7* 78:*18, 19, 20,
22* 79:*1* 83:*18*
84:*6* 88:*5, 16, 20,
22* 89:*1* 104:*6*
105:*8, 12* 107:*11,
13, 14, 17, 19*
108:*17* 109:*5*
117:*3, 14* 122:*14*
129:*3* 146:*8, 19*
159:*5, 8, 15*
163:*1* 168:*6, 9*
173:*17, 20*
182:*19* 184:*9*
190:*6* 191:*3, 4,
10* 192:*10, 11, 19*
193:*19* 194:*1, 7,
18* 199:*14, 15, 18*
200:*2, 13, 19, 20*
201:*1, 6, 16, 21*
203:*2, 6* 211:*5*

**policy's** 198:*9*

**Policy-wise** 104:*2,
4*

**Political** 56:*5*
60:*2*

**population** 115:*3,
6* 120:*1, 2, 4*
121:*4, 9, 15*
191:*4, 5*

**portion** 65:*19*
113:*10, 12* 156:*3*
164:*17* 208:*16, 17*

**position** 45:*9*
207:*1, 7*

**positions** 206:*22*

**positive** 12:*21*
13:*11, 17, 21, 22*
14:*3, 8, 9, 11, 13,
14, 18* 15:*8*
57:*15* 63:*16, 19,
20* 64:*5, 10*
68:*20* 78:*7*
79:*15, 17, 19*
81:*2, 3, 10, 15, 16,
19, 21* 82:*1, 2*
83:*5, 9* 125:*12*
127:*21* 128:*3, 4,
9* 132:*4* 145:*14*
159:*8* 168:*6*
183:*18, 19* 184:*1,
5, 12, 17, 18, 20*
185:*2, 4, 11, 13,
17* 186:*7, 8, 13,
21* 187:*3, 4, 10*
197:*11* 199:*18*
212:*3*

**positively** 60:*7, 9,
13*

**possibility** 50:*11*

**possible** 36:*5*
45:*12* 47:*6* 48:*5*
54:*4* 62:*17*
84:*10, 18* 98:*20*
120:*3* 141:*1*
174:*18* 196:*16*
199:*13*

**possibly** 61:*17*
121:*12*

**post-policy**
164:*21* 212:*13*

**potential** 42:*14*
67:*13, 18* 70:*9*
202:*11*

**potentially** 72:*16*

**practice** 179:*10*

**Precision** 214:*4*

**predict** 59:*13*
134:*7, 11* 159:*17*
174:*15, 16*

**predicted** 150:*21*
160:*16* 172:*18*
174:*2, 9* 178:*6*
183:*1*

**predicting** 160:*9*
167:*8*

**prediction** 145:*1,
3, 12, 21* 146:*10*
150:*14* 159:*10*
161:*22* 162:*1*
169:*6, 18, 19*
173:*16* 175:*12*
176:*2* 182:*18*
183:*6, 22* 212:*17*

**predictions**
132:*13* 133:*1, 21*
135:*5, 14* 136:*8*
139:*1* 143:*9*
144:*8, 20* 149:*3,
6, 10, 12, 21*
150:*4* 152:*2*
156:*8* 157:*4, 5, 9*
158:*14* 161:*12*
163:*11* 164:*10,
12* 165:*1* 170:*4*
174:*19* 182:*4, 7*
198:*22* 212:*19,
21* 213:*2, 10*

**predictive** 137:*20*
146:*17* 166:*18*
168:*1* 169:*9*
182:*10* 183:*16*
211:*14*

**predictiveness**
183:*12*

**predicts** 159:*20*
160:*5* 161:*6*
166:*15* 173:*12*

**preliminarily**
197:*4*

**preliminary** 197:*10*, *14*
**premises** 141:*22*
**prepare** 38:*19*
**prepared** 20:*20* 23:*4*
**preparing** 27:*13* 28:*8, 9, 12, 20, 22* 32:*1, 9* 33:*22* 61:*11* 194:*20*
**prescription** 5:*19*
**presence** 207:*5*
**present** 113:*3* 121:*8*
**presentation** 176:*12*
**presented** 140:*16*
**presenting** 164:*1* 179:*5*
**pressuring** 118:*4*
**Presumably** 55:*19* 195:*2* 196:*13*
**pretty** 50:*4, 6, 12* 51:*5* 69:*9* 92:*6* 178:*18, 19* 192:*3*
**prevent** 194:*12, 15*
**previous** 91:*12, 13* 215:*15*
**price** 46:*21*
**prima** 117:*20*
**primarily** 115:*13*
**principal** 148:*22*
**principally** 113:*22*
**principle** 68:*6* 70:*14* 79:*9*
**printout** 20:*22* 21:*3* 23:*6* 25:*6, 11*
**prior** 19:*8* 153:*11*

**prison** 44:*1* 46:*11* 52:*2, 4* 53:*4* 54:*9, 12*
**Privilege** 11:*3, 9, 14, 16* 30:*17, 18, 19* 89:*14* 204:*16* 206:*11, 13*
**privileged** 10:*4* 11:*12* 90:*17*
**privileges** 11:*12*
**probably** 58:*15* 59:*9* 130:*10* 170:*7*
**probative** 127:*7*
**probe** 207:*6*
**probing** 158:*2, 4*
**problem** 138:*15* 172:*16*
**Procedure** 23:*7* 80:*9* 81:*17* 214:*1*
**proceed** 214:*2*
**proceeding** 4:*14* 34:*10* 188:*20*
**proceedings** 1:*16* 189:*1*
**process** 151:*12, 17* 152:*1*
**processed** 180:*19* 201:*11, 12, 17*
**Processing** 14:*19* 15:*2* 16:*3* 17:*12* 32:*14* 35:*16* 36:*10* 69:*2, 3* 72:*8, 15, 16, 22* 73:*4, 7, 13* 74:*1, 5, 6, 8* 76:*1, 7, 12, 15* 78:*6, 8* 79:*12* 80:*1* 82:*22* 89:*8* 96:*21* 98:*18* 100:*8* 102:*1* 114:*8, 11* 115:*10, 18* 116:*1, 6* 117:*1* 123:*16* 125:*13* 127:*22*

145:*15* 146:*5* 165:*8* 166:*10* 178:*5* 180:*14* 185:*22* 188:*4* 190:*4* 191:*10, 21* 192:*5, 18* 193:*16* 194:*5, 17* 196:*20* 212:*8*
**produce** 24:*17, 20* 160:*6*
**produced** 21:*4* 160:*7* 176:*11*
**Professor** 32:*19* 48:*21* 153:*15*
**projecting** 100:*2*
**promptly** 67:*12, 16*
**proper** 80:*9*
**properly** 171:*20*
**property** 154:*14*
**proportion** 99:*12* 101:*15*
**Proposed** 201:*4*
**prosecutor** 51:*12*
**prospective** 68:*11*
**protect** 6:*14*
**protecting** 9:*8*
**Protection** 15:*21* 86:*8, 14* 87:*14* 209:*17*
**protocols** 86:*8, 14* 87:*14*
**provide** 32:*9* 92:*15* 96:*12* 127:*1*
**provided** 15:*12* 40:*16* 67:*1, 3* 84:*15* 192:*9*
**provides** 214:*2*
**Public** 1:*18* 84:*13, 21* 91:*4* 103:*21* 179:*6* 180:*4* 216:*17* 221:*1, 19*

**publication** 92:*13* 101:*3*
**publications** 91:*20* 99:*14*
**publicly** 32:*11* 87:*1* 200:*10, 21* 201:*8*
**publicly-available** 32:*18*
**published** 15:*20* 16:*13* 17:*11* 32:*14* 60:*20* 84:*13* 86:*13* 99:*21* 102:*18* 103:*4, 16, 20* 119:*19* 123:*17* 181:*3* 201:*10*
**publishes** 91:*14*
**pull** 41:*10, 22* 42:*8, 11*
**pulse** 60:*6*
**pulses** 59:*17, 18*
**punishment** 53:*9*
**Purdue** 179:*12, 13* 180:*3*
**purpose** 6:*8* 21:*9* 101:*13* 149:*15* 150:*8* 151:*4* 168:*20* 183:*4*
**purposes** 113:*1*
**pursuant** 40:*22* 177:*3*
**push** 41:*10, 14, 19*
**put** 51:*12* 57:*8* 83:*21* 95:*10* 126:*12, 18* 176:*15* 177:*1* 180:*2*
**putting** 51:*13*

**< Q >**
**qualitative** 185:*21* 186:*16, 18*

**quantitative** 17:7, *17* 79:22 186:*15*
**quantitatively** 79:*11*
**quantities** 80:*4* 131:*11* 134:*13*, *18*
**quantity** 109:*10* 151:*8* 154:*10*, *16* 180:*16*, *22* 181:*1* 186:*1*, *3*, *17* 208:*13*, *22* 209:*6*
**question** 6:*10*, *19*, *20* 7:5, *13*, *14*, *17* 8:5, *8*, *15*, *22* 9:2, *4*, *14* 10:*15*, *17* 13:7, *8*, *14*, *19* 15:5 21:20 22:2 24:*1* 32:6 37:*21* 43:*19* 51:*1*, *7*, *19*, *20*, *21* 53:*12* 54:*16* 65:*17* 70:*17* 71:5, *20* 72:*1* 76:*18* 77:*11* 80:*17* 81:6, *8* 82:*4*, *5* 86:*10* 90:*1*, *10*, *11* 91:*13* 95:7 105:5 111:2 118:*3* 120:*15* 125:*18* 126:*15* 132:*15* 137:*11*, *17*, *18* 139:*4* 140:8 141:*4*, *6* 143:*11*, *12*, *14* 145:5, *7* 147:*3*, *6* 152:*17* 154:*6* 156:*16* 157:*1* 158:*16* 160:*15* 172:9 173:22 174:*4* 178:*3* 183:*20* 184:*22* 185:2 188:2 189:5 191:*11*, *13* 194:*10* 195:*12*,

*17* 203:*17* 204:*18* 205:5, *21* 206:*8*, *9* 207:*3*, *4*, *10* 211:*16* 214:*13* 215:22 217:*17*, *18* 219:7, *11*
**questions** 6:7 7:*3* 121:*4*, *5* 147:*21* 203:*21* 204:*12*, *21* 205:*8*, *9* 207:22 209:*11* 210:*20* 219:*18*
**quickly** 200:*4* 203:*1*, *3*
**quote** 8:*14*, *15* 23:*8*, *10* 25:*17*, *18* 26:*2*, *3* 27:*16*, *17* 35:*12*, *13* 64:*18* 72:8 73:7, *8*, *17* 74:*20*, *21* 76:*3* 77:*21* 92:22 93:5, *6* 109:*21* 110:*18* 112:*2* 124:*14* 125:5, *6*, *9* 128:*12*, *15* 144:*11*, *12* 149:9, *20*, *21* 186:9 202:*12* 214:*3*, *4*, *8*, *11*
**quoted** 27:*21*
**quotes** 111:*21*

**< R >**
**radar** 98:*2*
**rain** 210:*19*
**rains** 210:*16*
**raise** 203:*17* 205:*18* 206:*11*, 22
**ramp** 201:22
**ran** 13:*20* 14:*1* 79:*4* 81:*17* 82:*18* 83:*1*

84:*11* 97:7 119:*10*, *13* 122:*10* 123:*14* 125:20, *22* 127:*17*, *18* 158:*21*, *22* 159:2 165:*12* 184:*8*, *19* 185:*12* 186:22 193:*17*
**rapid** 200:*15*
**rate** 12:9 16:*12* 17:*10* 28:*15* 42:9, *13* 91:*21* 92:*14* 99:*15* 100:9 101:*8* 103:*8*, *16*, *17* 119:*16*, *19*, *20*, *22* 120:*10* 121:*3*, *16* 122:5
**rates** 45:7 103:9
**rational** 68:*11*, *14*
**Raul** 61:*13*
**raw** 176:*11*
**reached** 193:*10*
**reaches** 70:*4*
**react** 200:*4* 201:*1* 203:*1*, *3*, *6*
**read** 13:7, *8* 22:*4*, *9* 33:*17* 34:*3* 39:*1* 41:*4*, *6* 71:*21* 72:*1* 74:*3* 75:*18* 87:*11* 92:*4* 112:*1* 126:2 129:*13* 131:9 145:*6*, *7* 160:2
**reading** 22:2, *8* 189:9
**real** 117:*1* 133:8 146:*16* 147:*16*
**reality** 8:*20* 133:2 135:*15* 136:9 138:*11*, *19*

150:5, *7*, *11*, *15* 156:9 157:6
**realize** 89:*1*
**realized** 89:2 174:*20* 187:*21* 189:2 190:9 196:*21* 200:*18*
**realizing** 189:*12*
**Really** 78:*10* 95:*15*
**reanalyze** 203:*18*
**reason** 5:*18* 21:*16*, *21* 45:*14* 51:*14* 57:*13* 62:*19* 94:9, *13* 97:6, *7* 100:*11* 103:7 116:7 165:*10* 180:*1* 197:*3* 200:*18* 201:9 202:*8* 203:*4*
**reasonable** 106:*19* 157:2 202:*18*
**reasoning** 141:*21*
**reasons** 23:*10*, *13*, *21* 24:*11* 25:9 36:*1* 84:*11* 92:*15* 101:*13* 102:5 199:*19*, *22* 200:*1* 202:*19*, *22* 203:*12*
**recall** 17:*13*, *14* 19:2 20:*13* 28:*11* 29:*10*, *15* 33:*21* 35:2 42:9 62:*14*, *18* 63:7 64:*20*, *21* 67:9 89:*21* 101:2 153:*15* 181:*10* 208:*3* 215:*16* 217:*1*, *13*

receive 23:*15*
24:*4, 16* 25:*14*
26:*9* 27:*7* 63:*3*
**received** 27:*4*
34:*3* 41:*3* 62:*15*
63:*4*
**Recess** 22:*17*
55:*1* 75:*7*
111:*10* 122:*21*
181:*17*
**recognized** 42:*8,*
*14* 151:*7*
**recollection**
42:*12* 61:*18, 21*
90:*8* 92:*13, 19*
110:*11* 113:*19*
114:*7, 12* 179:*14,*
*17*
**reconvene** 122:*22*
**record** 4:*2* 5:*12*
6:*15* 19:*11*
22:*13, 15, 18, 21,*
*22* 34:*7, 8, 11*
54:*20, 21* 55:*2*
75:*3, 5, 8* 91:*4*
92:*5* 111:*8, 11,*
*13* 118:*20*
122:*19* 123:*2*
148:*3* 176:*10*
181:*15, 18* 204:*4,*
*6, 7, 9* 205:*13*
206:*6* 207:*15, 18*
219:*21* 220:*1*
221:*9*
**recording** 65:*22*
**recount** 218:*9*
**red** 161:*2, 6, 14*
169:*11*
**reduced** 221:*7*
**re-evaluate**
203:*14*
**refer** 27:*6* 34:*22*
41:*18* 91:*21*
202:*9, 11* 212:*1*

**referenced** 17:*18,*
*20* 18:*4*
**references** 186:*11*
**referencing**
111:*17*
**referred** 25:*12*
26:*8* 64:*1* 91:*12*
110:*13* 155:*3*
156:*5, 12* 210:*2*
**referring** 26:*13*
37:*1* 53:*19*
105:*13* 107:*19*
115:*13* 151:*15*
163:*1*
**refers** 24:*14*
27:*2* 92:*19*
186:*9, 10* 210:*6*
212:*2*
**reflect** 118:*21*
**reflected** 52:*17*
101:*19* 146:*22*
165:*16, 20* 183:*2*
**refresh** 61:*20*
**refuse** 9:*3* 147:*15*
**regarded** 124:*13*
**regarding** 192:*17*
208:*1* 216:*9*
**Register** 32:*15*
93:*8*
**regression** 136:*21*
157:*20, 22* 158:*5*
**regulation** 106:*11,*
*20* 107:*3, 5, 7, 20*
108:*22* 109:*3*
**regulations** 106:*8,*
*22*
**related** 188:*20*
191:*20, 21* 221:*10*
**relationship**
178:*8* 210:*15, 18*
**relative** 43:*14*
44:*7* 46:*19* 47:*2,*
*9* 48:*1* 49:*5*
50:*1, 17* 58:*8, 17*

71:*1* 112:*22*
128:*14* 129:*16*
130:*21* 146:*21*
170:*2* 182:*22*
221:*13*
**release** 43:*20*
**released** 43:*9, 22*
**relevance** 88:*15*
164:*4* 188:*2*
**relevant** 7:*20*
12:*1, 5* 28:*3, 19*
84:*4* 102:*4*
110:*12* 111:*22*
112:*7, 20* 115:*2,*
*5, 6* 183:*8* 195:*5*
196:*14* 197:*16*
**reliability** 135:*12*
147:*10* 176:*9*
**reliable** 133:*22*
149:*5*
**reliably** 142:*22*
147:*12*
**relied** 18:*3, 6, 7,*
*8, 9, 12* 73:*7*
**rely** 31:*9* 99:*4*
109:*16* 161:*11*
**relying** 127:*7*
**Remain** 16:*7*
111:*6*
**remained** 97:*3*
**remains** 11:*12*
64:*18*
**remedy** 207:*3*
**remember** 20:*18*
28:*10* 29:*6, 7, 9,*
*13* 30:*2* 39:*21*
40:*7* 61:*22*
94:*22* 130:*16*
189:*19* 197:*7, 9,*
*13* 218:*4, 6, 12,*
*14, 16*
**remote** 92:*2, 17*
**render** 134:*19*
**rendering** 10:*12*

**reorganization**
108:*6*
**repeat** 13:*4*
**repeatedly**
171:*15* 187:*1*
**repeating** 81:*5*
**rephrase** 127:*16*
211:*17*
**Report** 3:*8* 16:*8*
17:*5, 8, 16, 18, 20*
18:*5, 13, 14*
20:*19* 21:*5, 10,*
*18, 22* 22:*10, 11*
23:*4, 6, 8, 14*
24:*18, 20* 25:*4, 6,*
*10, 11, 14, 16, 21,*
*22* 26:*1, 6, 8, 16*
27:*3, 7, 10, 12, 15*
28:*6, 8, 9, 12, 20*
29:*1, 2* 31:*16*
32:*1, 4, 10, 17*
33:*9, 22* 34:*4*
36:*9* 38:*21, 22*
39:*2* 42:*9, 12*
45:*6* 55:*14*
56:*21* 61:*11*
63:*3* 64:*19, 20*
65:*1* 71:*12, 15*
72:*10, 22* 75:*16*
86:*6, 11* 87:*7, 9,*
*10, 18* 88:*1, 8*
110:*16* 111:*20*
123:*10* 126:*2, 12,*
*14, 17, 19* 127:*9*
129:*12* 138:*4*
158:*15, 19*
162:*12* 163:*22*
165:*9* 174:*18*
176:*22* 180:*9*
188:*10, 11*
194:*21* 202:*17*
206:*14* 209:*10,*
*13* 210:*5, 21*

reported 174:*11*
200:*11* 201:*18*
reporter 4:*10*, *21*
6:*15* 9:*8* 13:*6*, *9*
71:*21* 72:2
145:*6*, *8* 170:*10*,
*14*
reporting 91:*20*
reports 137:*1*
201:*10*
represent 4:*13*
21:*3* 29:*20* 30:*4*
35:2 37:*4* 42:*4*
86:*3* 208:*17*
214:*19* 215:*1*
representation
21:*8*
representatives
219:*16*
represented
208:*14*, *15* 209:*7*
210:*9*
representing 25:*3*
30:*20* 209:*1*
represents 82:*11*
86:*17*
request 84:*16*
85:*6*, *18* 176:*14*,
*15* 177:*1*
requested 6:*11*
84:*19*
requests 85:*1*
require 88:*14*, *18*
145:*17* 192:*20*
required 89:2
101:*17* 182:*3*, *6*,
*7* 197:*1* 210:*7*
requirement 91:2
requires 23:*8*
25:*16* 26:*1*, *16*
32:5 86:*19* 91:*8*
99:*13*
reread 38:*22*
39:*1*

research 18:*9*
27:*16*, *19* 38:*21*
43:*12* 44:*10*
46:*6* 55:*17*, *21*
56:*15* 57:*4*, *13*,
*20* 58:*3* 60:*20*
142:*12* 196:*21*
reserve 219:*6*
respect 41:*10*
159:*6* 175:*15*
200:*6*, *14*
respective 11:*12*
respects 147:*5*
respond 176:*17*
177:*3*
responsibilities
94:*4* 96:*3*
responsibility
114:*8*
rest 36:*4*
restate 86:*10*
restroom 54:*19*
result 52:7, *8*, *9*
59:*16* 60:*6* 94:*5*
128:*6* 132:*15*
133:*13* 187:*16*
190:*15* 193:*5*
resulted 83:*12*
121:*10*, *13*
resulting 60:*14*
results 133:*6*, *7*
135:*9* 151:*17*
187:*14* 189:*20*
retain 11:*11*
retained 10:*21*
11:*5*, *8*, *20* 19:*16*,
*19* 20:*3*, *11*
206:*17* 219:*3*
retrievers 7:*15*
return 153:*17*
154:*1* 155:*9*
returning 155:*7*
Reuveni 30:*7*
reversion 153:*18*

reverting 131:*16*
154:*11*, *18* 156:2,
*21*
review 22:*14*
23:*3* 61:*6*
reviewed 61:*8*
142:*13*
revising 27:*5*
rifle 96:7
Right 38:*12*, *13*
48:*15* 52:*15*
56:*14* 67:*9*
80:*14* 86:*6* 92:*9*,
*12* 97:*11* 103:*12*
105:*9*, *15* 106:*9*
107:*1*, *21* 108:*4*,
*15* 116:*18*
121:*17* 123:*11*
129:*19* 130:*7*, *18*
134:*13* 136:*11*
137:*5*, *14* 156:*12*
157:*21* 160:*4*
161:*5*, *13* 162:*15*
166:*5*, *11*, *12*
167:*6*, *21* 169:*11*
171:*19* 177:*20*
181:*14* 190:*19*
191:*14* 195:*9*, *15*
196:*1*, *7*, *15*
205:*5*, *9* 207:*2*
219:*6*
rigorous 83:*7*
129:*8*, *9*
ring 61:*20*
rings 61:*15*
rise 14:*12*
120:*10* 128:*13*
129:*15* 130:*20*
154:*21* 182:*22*
Risk 46:*4*, *10*
53:*3* 54:*9*, *12*
road 6:*5* 58:*14*,
*19* 88:*11*
robust 99:*8*, *9*

Rodney 62:*12*
63:*8*
role 29:*12*
room 34:*14*
111:*6* 205:*17*
206:*8* 207:*5*
216:*5*, *7*
root 135:*21*
154:*19* 156:*13*
157:*18*
rose 125:*8*, *16*
126:*6*
Rouge 2:*7*
rough 131:2
roughly 28:*17*
167:*7* 200:*11*
202:2
round 79:2
Rule 23:7 25:*16*
26:*1*, *12*, *13*, *14*,
*16* 35:*11* 65:*3*
67:*12*, *21* 68:*5*, *7*
69:*8*, *14*, *16* 70:*4*,
*6*, *7*, *19*, *20* 71:*8*,
*10*, *13* 79:*17*
83:*4*, *12* 108:2
114:*15*, *16* 116:*1*,
*11*, *13*, *15*, *16*
117:*11*, *17*, *18*, *21*
118:*1*, *2* 125:*8*,
*17* 126:7 128:*13*
129:*15* 130:*20*
146:*14* 190:*1*
199:*12* 214:*1*
218:*20*, *21*
ruled 86:*20*
Rulemaking
201:*4*
rules 6:*5* 116:*22*
125:*5* 176:*18*
177:*3*
rule's 126:*4*
ruling 80:*4*

**run** 45:*14* 77:*15*
78:*15* 83:*6*
84:*11* 97:*6*
126:*21* 133:*14*,
*22* 134:*8* 138:*18*
142:*3* 146:*2*
157:*6* 158:*13*
161:*11* 162:*5*
164:*18* 177:*16*
178:2, *11* 182:*17*,
*21* 191:9, *16*, *17*
211:*3* 212:*12*
**running** 102:*9*
127:*4* 134:2, *3*, 6,
*17* 135:*20*
136:*18* 139:*6*
140:6, *22* 142:*21*
143:*15* 144:*12*
148:*21* 187:*19*
190:*14* 194:*13*
**Ryan** 29:*9* 30:7

< S >
**sake** 208:*8*
209:*14*
**sample** 158:*8*, *14*
159:*5*
**sampling** 82:*15*
**sat** 34:*14* 216:*5*
**saw** 18:*19*, 20, 22
19:2 184:7
**saying** 8:*19*
62:*15* 79:*3*
109:*1* 137:*19*
174:*14*
**says** 109:*21*
**scale** 178:*14*, *17*
180:7, *8* 203:*8*
208:7, *10*, *11*, *20*,
*21* 209:*1*, *4*, *6*
**scales** 178:*20*
179:*6* 180:*4*
**scared** 93:*5*
**scenarios** 71:*17*

**school** 129:*22*
130:2, *5*, 9, *11*
153:*5*
**Schultz** 29:*8*, *14*
30:*1*
**scientists** 59:*13*
**scope** 69:*9*
**scores** 28:*9*
**SCOTT** 2:*3*
4:*15* 62:*13*, *20*
63:*8*
**sea** 110:*6*
**seasonal** 55:*15*, *17*
**seasonality** 147:*1*
178:*8* 183:*3*
**second** 34:*5*
62:*16* 73:*20*
101:*21* 119:*10*
128:*17*, *22* 146:*1*,
*18* 156:*9* 157:*10*
177:*16* 178:*1*
182:*16*, *17*
200:*19* 201:*9*
212:*12*
**seconds** 54:*18*
**Secretary** 91:*8*
104:*21* 105:*1*, *3*
**Section** 87:*13*, *18*
91:2 92:*6* 118:*11*
**sectors** 208:*5*
**security** 62:*4*
91:2, *8*, *10* 92:*15*
104:*21* 105:*1*, *3*
**see** 12:*1* 22:*6*
40:*18* 52:*16*
79:*4* 80:*22*
81:*10*, *14*, *16*
95:*3*, *19* 113:*16*
135:*1*, *8* 138:*18*
148:*19* 155:*15*
156:*6* 160:*8*
165:*6* 168:*12*
169:*20* 171:*5*, *17*
177:*6* 187:*3*, *16*

**seeing** 12:*5*
162:*13* 197:*7*
**seek** 11:*10* 79:*10*,
*21* 80:*2*, *5*
175:*11* 207:*2*
210:*4* 219:*8*
**seeking** 11:*7*
121:*6* 207:*3*
**seen** 18:*15* 92:*11*
98:*7* 193:*3*, *4*
**seismograph**
132:*3*
**select** 32:*19*, *22*
**sense** 46:*10*
93:*16* 94:*20*
118:*8* 128:*6*
**sensing** 92:2, *17*
**sensors** 92:*17*
**sent** 39:*19*
**sentence** 24:*13*
73:*21* 75:*18*
87:*11* 126:*2*
129:*13*, *19*, *20*, *21*
130:*13*, *15*, *16*
131:8, *9*
**sentences** 126:*10*
128:*20*
**separable** 53:*20*
54:*1*
**separately** 102:2
**series** 78:*16*
129:*3* 132:*6*
134:*4* 135:*10*, *16*,
*19* 136:*1*, *6*, *19*
139:*3*, *5*, *8*, *19*, *21*
140:*5*, *17*, *19*
142:*3*, *4* 143:*16*,
*17* 144:*10*, *12*, *18*,
*20* 148:*19*, *20*
151:*11*, *15*
152:*10*, *14*, *19*
153:*3*, *22* 154:*13*
155:*22* 156:*9*, *19*
157:*7*, *10*, *14*, *17*

160:*1* 163:*21*
164:*6* 166:*5*, *22*
168:*13*, *15* 169:*7*
174:*20* 175:*1*, *3*,
*13* 181:*6*, *7*
183:*10*, *14* 193:*4*
213:*9*
**serves** 76:*3*
**set** 49:*9* 158:*18*
181:*5*
**setting** 194:*2*
**settings** 194:*1*
**seven** 197:*17*
**several-month**
169:*11*
**shake** 6:*15*
**shape** 58:*10*
137:*21* 173:7
**sharp** 56:22
57:6, 7
**shelf** 106:*14*
**shock** 151:*12*
**shortcoming**
191:*16*
**shorter** 174:*16*
**shot** 50:*21* 51:*4*,
*9*
**show** 56:22
157:*14* 163:*18*
189:*16*, *17*
**showed** 150:*20*
**showing** 190:*16*
**shows** 164:*1*
177:*14*
**shut** 56:*13*
120:*19*
**sic** 21:*17* 90:*4*
111:*9*
**side** 95:*10*
166:*11*, *12*
**sidewalk** 39:*15*,
*18* 40:*6*

**sign** 137:*14, 16,
22* 138:*7, 8, 12*
171:*14, 16* 173:*6*
**signature** 21:*14*
220:*5*
**signed** 20:*6, 14,
16*
**significance** 80:*7,
11, 14*
**significant** 35:*12*
183:*16, 21*
**similar** 124:*15*
**simple** 105:*20*
126:*22* 128:*10*
173:*15* 174:*4, 5*
195:*12*
**simplest** 173:*21*
**simplified** 146:*3*
**simply** 125:*7, 15*
126:*5* 157:*17*
210:*14*
**single** 74:*7, 16*
176:*3* 177:*17*
**sir** 10:*11* 12:*7,
19* 15:*11* 16:*19*
18:*15* 19:*20*
20:*6, 19* 21:*12,
14, 20* 22:*8*
23:*16* 24:*17*
25:*4, 7* 26:*12*
27:*10* 31:*9* 37:*4,
10, 17* 44:*20, 22*
46:*9* 49:*13, 17*
50:*4, 10* 52:*22*
71:*15, 18* 72:*21*
73:*17* 74:*12*
81:*5* 85:*5* 87:*10*
93:*15* 105:*19*
108:*7* 112:*6, 12*
117:*6* 129:*13, 22*
130:*2* 131:*9*
138:*15* 140:*4, 16*
141:*13* 143:*11,
22* 145:*4* 147:*9,*

*20* 153:*9* 158:*1*
160:*13, 17* 162:*7*
163:*13, 22*
165:*15* 167:*6*
170:*22* 173:*8*
174:*7* 176:*10*
177:*5* 178:*14*
193:*13* 194:*8, 20*
195:*19* 214:*16*
215:*5, 8* 218:*1, 4*
**sit** 46:*11* 172:*13*
**sitting** 5:*15*
48:*11* 49:*1* 50:*5*
54:*8, 11* 117:*16*
**situation** 71:*4*
**situations** 70:*10*
**six** 46:*12* 49:*1,
15* 59:*6, 9*
170:*10, 13*
197:*17* 200:*17*
**six-month** 175:*4*
**size** 80:*21* 81:*9*
82:*6* 83:*9* 187:*2*
**slam** 56:*13*
**slightly** 82:*4*
**slows** 56:*13*
**smaller** 209:*2*
**Smith** 116:*14*
117:*9*
**smooth** 131:*12,
20, 21, 22* 132:*10,
18* 133:*17*
**social** 59:*12*
**solicitor** 4:*16*
**somebody** 68:*4*
114:*17*
**son** 37:*17*
**Sorry** 134:*16*
**sort** 201:*5*
**sought** 79:*14*
**sound** 7:*9*
103:*11* 108:*19, 21*
**sounds** 20:*3*
83:*2* 93:*13* 218:*2*

**source** 65:*11*
66:*5* 87:*12*
**southwest** 12:*16*
15:*20* 36:*12, 19*
37:*6, 11, 14, 15*
38:*2, 8, 15* 56:*18*
57:*7* 65:*10*
82:*10, 13* 84:*12*
85:*21* 86:*7, 12*
87:*3* 94:*21* 99:*1,
3* 102:*8, 22*
109:*15, 19* 110:*5,
7, 8* 112:*2, 19, 21*
113:*5, 16* 114:*1,
5, 21* 115:*4*
165:*22* 180:*12*
187:*5* 194:*19*
197:*5, 12*
**space** 106:*15*
**spaniels** 7:*15*
**speak** 8:*12* 9:*13*
28:*22* 39:*11*
171:*1* 204:*20*
**speaking** 9:*10*
31:*21* 32:*5* 37:*3*
39:*17* 40:*5* 64:*8*
149:*17*
**speaks** 113:*12*
**special** 116:*11, 15,
16* 117:*11*
**specialist** 16:*3*
138:*1*
**specialists** 131:*3*
**specialize** 27:*16,
19*
**species** 7:*14*
**specific** 11:*14*
16:*12* 49:*13*
60:*19* 114:*4*
167:*2* 181:*11*
182:*4* 199:*5, 8*
201:*7* 212:*2, 9, 13*

**specifically** 73:*4,
13, 16* 74:*9*
102:*1* 113:*8*
**specified** 149:*16*
**spend** 12:*12*
28:*7, 21* 49:*1*
51:*13*
**spent** 195:*3*
**spoke** 29:*5*
30:*21* 31:*10, 14*
39:*14*
**spoken** 41:*18*
**spread** 93:*19*
**spurious** 81:*22*
**square** 218:*19*
**ST** 2:*3* 3:*4* 4:*15,
21* 5:*8* 10:*6, 19*
11:*1, 4, 14, 18*
13:*6, 15* 14:*10*
15:*4* 17:*3* 19:*3,
9, 13, 15* 21:*2, 11*
22:*8, 20* 23:*1, 18*
24:*8* 25:*1* 29:*22*
30:*6, 16, 18, 20*
31:*3, 8, 13* 32:*7*
33:*2* 34:*7, 13, 18*
37:*20* 38:*5* 40:*9,
13, 20* 44:*19*
47:*11* 50:*3* 51:*3,
18* 53:*13* 54:*20*
55:*4* 59:*19, 22*
62:*11* 63:*9*
65:*21* 69:*6* 72:*6,
20* 75:*3, 10*
77:*19* 80:*20*
81:*12* 85:*20*
89:*15* 90:*14, 19*
93:*14* 94:*7, 19*
95:*9, 17* 96:*5, 14*
100:*20* 104:*1, 13,
20* 105:*7, 14*
106:*21* 111:*5, 13,
16* 116:*9* 117:*4*
118:*11, 20* 119:*1*

120:*16* 122:*15* 123:*5* 127:*15* 129:*11* 130:*6* 133:*11* 140:*3* 141:*17* 142:*20* 143:*10, 20* 144:*21* 145:*19* 148:*6* 154:*7* 157:*19* 160:*22* 168:*22* 170:*13, 15, 21* 171:*4, 8* 176:*19* 177:*4* 178:*22* 179:*22* 180:*10* 181:*12, 20* 189:*15* 194:*11* 195:*11, 21* 196:*5, 12* 198:*1* 203:*21* 204:2, *9* 205:*13* 206:*1, 5, 13, 17, 20* 207:7, *14, 22* 213:*14, 22* 214:*15* 215:*4, 17, 21* 216:*10* 217:*3, 8, 22* 218:*18* 219:*21*

**stability** 100:*3*
**stable** 99:*16* 100:*10, 22* 101:*10, 11*
**stand** 58:*20* 204:*13* 219:*1*
**standard** 81:*17* 179:*10*
**standing** 78:*4* 127:*6, 18*
**stands** 136:*3*
**Start** 22:*8* 112:*12* 145:*10* 148:*13* 160:*15*
**started** 192:*6*
**starting** 19:*12* 27:*6* 84:*21* 87:*1* 195:*4*

**STATE** 1:*5* 4:*3, 16* 5:*11* 8:*15* 27:*15* 37:2, *4, 5, 6, 9, 10, 12* 38:*7, 11* 47:*6* 54:*4* 74:*19* 86:*22* 112:*18*
**stated** 148:*3*
**statement** 13:*4, 14* 23:9, *11, 20* 24:*10* 25:*7, 19* 80:*4* 87:*16* 93:*20* 96:*9* 133:*10* 137:*10* 138:*3, 22* 151:*3* 164:*5* 166:*20* 167:*3, 4* 173:*2* 176:*8* 177:*11* 201:*5* 205:*7*
**statements** 11:*6* 14:*7* 21:*7* 35:*5* 110:*13* 124:*13* 148:*5* 185:*14, 22* 186:*16, 18* 187:*11* 190:*12* 199:*21* 210:*1*
**STATES** 1:*1* 4:*17, 19* 21:*4* 33:*11* 35:*13, 21* 36:*8, 14* 37:*11, 16* 38:*3, 9, 16* 39:*5, 9, 12, 17* 40:*5, 16* 41:*20, 21* 42:*5, 6, 7, 10, 14, 15, 17, 20* 43:*10, 22* 45:*7* 46:*18* 56:*2, 8* 85:*10* 89:*12, 22* 90:*6* 91:*22* 93:*3* 106:*4* 109:*12* 113:*4, 13, 22* 115:*8* 119:*3, 7, 12, 15* 165:*9* 179:*16* 180:*2*

195:*3, 7, 14* 196:*14* 204:*10, 12, 18* 219:*2, 7, 16*
**stating** 204:*13*
**Station** 2:*16*
**statistic** 120:*7* 158:*15, 19*
**statistical** 80:*14* 139:9, *10, 13* 141:*2, 5, 8* 210:*7* 212:*18, 20*
**statistically** 81:*20*
**statisticians** 82:*8* 209:*17*
**Statistics** 16:*13* 28:*5* 32:*15* 76:*13* 80:*8* 121:*8* 180:*17* 201:*18* 210:*9*
**status** 120:*2*
**statutes** 106:*14*
**statutorily** 92:*22*
**stenographically** 221:*7*
**stenotype** 1:*17*
**step** 125:*4, 5, 15* 126:*4* 128:*10, 11, 17* 129:*14* 130:*19*
**stepping** 47:*15, 19*
**stick** 51:*20*
**stjohn@ag.louisiana.gov** 2:*9*
**stock** 212:*22*
**stomach** 118:*21*
**stop** 34:*5* 147:*18*
**stops** 163:*20*
**straightforward** 192:*3*
**strange** 115:*12* 202:*5*
**stream** 66:*7*
**Street** 1:*14* 2:*6* 4:*7* 210:*17*

216:*19*
**strictly** 150:*18*
**strike** 43:*7* 54:*10* 99:*1* 125:*4* 131:*21* 189:*21* 219:*8*
**strikes** 172:*16*
**strong** 50:*4, 6, 12* 51:*5* 53:*5* 58:*18* 88:*21* 168:*14* 195:*22*
**structure** 196:*17*
**struggling** 171:*13*
**strychnine** 49:*8*
**studied** 52:*18* 80:*6* 130:*8*
**study** 72:*4* 79:*21* 112:*21* 117:*14* 130:*12* 181:*3*
**studying** 18:*10* 131:*10* 134:*12* 135:*19* 138:*17* 144:*11* 153:*4* 163:*9*
**subcategories** 123:*12*
**subgroup** 78:*21*
**subject** 60:*21* 61:*1, 3* 69:*16* 70:*6, 19* 90:*13* 116:*15, 17* 117:*10* 218:*6*
**submit** 205:*1, 9* 207:*5*
**submitted** 195:*13*
**subsequent** 135:*9* 165:*11* 173:*22*
**subsequently** 11:*8* 159:*18*
**subset** 114:*4*
**substance** 90:*15* 217:*4, 14* 218:*9*
**substantial** 127:*21* 128:*1*

169:7  177:*12, 15*
183:*9*  201:*16*
**Substantially**
60:*9, 12*  96:*17*
169:*21*  200:*3*
**substantive**
218:*21*
**substitute**  21:*7*
**sudden**  60:*5*
**suddenly**  100:*11*
202:*15*
**sued**  179:*16*
**sufficient**  76:*8*
137:*13, 16, 21*
138:*7*  192:*12*
198:*16*  199:*20*
**sufficiently**  127:*7,
12, 18*  133:*16*
142:*7*  155:*22*
**suggest**  154:*13*
163:*10*  186:*4, 5,
11*
**suggested**  106:*5*
**suggesting**  67:*3*
101:*10*  118:*16*
202:*4*
**suggests**  113:*2*
159:*21*  198:*12*
**Suite**  4:*8*
**sum**  52:*15*  53:*16,
21*  54:*5*  172:*4*
**summarize**  26:*3,
5, 17*  27:*14*
**summary**  12:*17*
83:*8*  128:*16, 21*
198:*6*
**summed**  172:*17,
19*
**summing**  137:*13,
15, 21*  138:*7*
**support**  26:*3, 5, 7,
18*  33:*8*  71:*13*
128:*2*  184:*12*
**suppose**  128:*10*

**sure**  7:*21*  29:*16*
63:*4*  102:*11*
107:*2*  114:*10*
190:*18*  197:*15*
204:*2*
**surge**  115:*11*
**survey**  120:*1, 2, 4*
121:*5, 9, 15*
**surveys**  60:*17, 22*
61:*3, 7*
**Sweet**  216:*4*
**swings**  132:*4, 5*
**sworn**  5:*4*  221:*5*
**Sydney**  34:*16*
**synonymous**  80:*3*
**Syracuse**  16:*11*
32:*13*  67:*1*
84:*15, 17*  85:*4, 9*
**system**  19:*9*
**systematically**
131:*15*  154:*10,
17*  156:*1, 20*


**< T >**
**table**  34:*14*
48:*11*  160:*6*
176:*12*
**take**  9:*12, 15*
22:*3, 6*  45:*9*
48:*4, 13, 22*  49:*2,
14, 17*  50:*20*
51:*5, 8, 9*  54:*18*
85:*1*  107:*12, 21*
108:*4, 8, 13, 16,
22*  109:*2, 4*
111:*5, 14*  118:*13,
16*  122:*15, 18*
153:*8*  176:*16*
177:*2*  181:*12*
185:*9*  200:*16*
203:*5*  204:*1*
205:*3, 18*  206:*3*
214:*16*

**taken**  1:*17*  4:*7*
52:*18*  98:*10, 14*
122:*22*  221:*3, 6,
12*
**takes**  106:*22*
107:*4, 8, 9*  108:*1*
**talk**  9:*9*  49:*16*
53:*1*  89:*11*
131:*5*  170:*5*
**talked**  52:*12*
89:*21*  97:*9*
215:*16*
**talking**  107:*17*
113:*7, 8, 21*
136:*11*  138:*5, 13*
147:*18*  148:*12,
15, 16*  150:*18*
151:*2*  153:*16*
154:*5*  179:*21*
**tasked**  87:*22*
189:*5*
**tautology**  194:*8*
**teaching**  153:*6*
**tease**  44:*13, 14,
18*  57:*10*  78:*3*
**technical**  20:*4*
36:*15*  41:*13*
101:*2*  211:*19*
**technological**
92:*10*  97:*9*  98:*9*
**Ted**  116:*14*
117:*10*
**tell**  48:*21*  143:*5*
173:*8*  213:*18*
**telling**  139:*6*
144:*4*
**ten**  108:*8*  118:*12*
200:*17*
**tend**  44:*1*  120:*21*
**tendency**  153:*17*
154:*21*
**tends**  105:*8*
**tense**  26:*14*

**term**  11:*21*  20:*4,
13*  36:2  38:*10*
41:*14*  42:*3, 11*
44:*20*  91:*16*
101:2, *5, 7*
141:*12*  152:*16,
20*  153:*2, 13, 18,
19*  208:*6, 8, 10*
209:*9, 10, 12*
210:*5*
**terms**  19:*18*
41:*10, 11*  64:*7*
101:*17*  150:*18*
151:*2*  186:*6*
219:*17*
**test**  14:2  15:*17*
36:*9*  68:*17*  69:*1,
2*  71:*12*  81:*22*
84:*11*  97:*6, 8*
102:*5*  119:*10, 13*
122:*10*  125:*20,
21*  127:*6, 12*
129:*10*  132:*9, 11,
14, 17*  133:*4, 12,
15, 18, 19, 22*
134:*1, 22*  135:*8,
11, 12, 21, 22*
136:*4, 5*  140:*4*
145:*1, 13*  146:*1,
3, 18*  147:*9*
148:*8, 10, 18*
149:*8, 19, 21*
150:*1, 3*  151:*7,
19*  152:*2*  154:*15,
19*  155:*19, 20*
156:*4, 7, 13, 16*
157:*18*  158:*9, 17*
159:*12*  161:*2, 10*
162:*5, 19*  163:*5*
164:*17*  168:*16*
172:*4*  173:*15, 21*
176:*6*  177:*16, 19*
178:*1, 11*  182:*15,
16, 17, 21*  183:*15,*

*21* 185:*18* 190:*14*, *16* 191:*3*, *4*, *7*, *17* 193:*4*, *5*, *18*, *19* 197:*19* 198:*10*, *17*, *19*

**tested** 14:*15* 15:*5*, *11* 63:*13* 69:*21* 70:*1* 76:*12* 84:*20* 96:*19* 174:*14*

**testified** 5:*5* 6:*2* 31:*14* 41:*4* 77:*20* 100:*13* 149:*7*, *8* 182:*3* 198:*4*, *6* 212:*15*

**testify** 5:*3*, *19* 23:*22* 38:*1* 54:*8*, *11* 72:*3* 94:*13* 106:*1* 147:*13*, *15* 148:*8* 217:*14* 218:*9* 221:*4*

**testifying** 11:*19* 12:*14* 19:*22* 27:*10* 40:*22*

**testimony** 12:*8* 20:*8*, *10* 27:*2* 33:*14*, *16* 34:*1* 44:*13* 63:*6* 67:*14* 71:*7* 79:*7*, *8* 94:*14* 133:*3* 134:*11* 138:*16* 140:*15* 177:*5* 179:*8* 182:*9* 187:*7* 214:*10* 215:*18* 219:*9* 221:*4*, *6*, *9*

**testing** 15:*9* 46:*7* 64:*1* 77:*17* 125:*5* 126:*4* 135:*7* 143:*8* 147:*8* 148:*11* 193:*19*

**tests** 13:*20* 14:*1* 36:*10* 45:*14*

64:*15* 76:*22* 77:*15* 78:*15* 79:*3* 81:*1*, *17* 82:*7*, *18* 83:*1*, *6*, *12* 88:*2* 123:*14* 125:*10* 126:*21* 127:*3*, *10*, *17*, *18* 128:*2*, *7*, *9*, *22* 146:*13* 158:*5*, *7*, *12*, *20*, *22* 159:*1* 161:*11* 174:*18* 176:*4* 178:*13* 184:*7*, *14*, *19* 185:*12* 186:*21* 188:*2* 190:*6*, *8* 191:*8*, *9*, *14*, *15* 192:*15* 193:*9*, *17* 194:*4*, *13* 198:*16* 208:*2* 211:*2* 212:*11*

**text** 35:*18* 36:*2*, *4*, *18* 112:*5* 114:*12* 174:*11* 211:*8*

**Thank** 75:*12* 123:*7* 170:*13* 181:*22* 204:*3* 207:*14* 213:*11*

**theoretical** 57:*12*

**theory** 54:*17* 79:*8*

**thin** 93:*20*

**thing** 8:*19* 22:*2*, *4* 36:*13* 46:*13*, *17* 53:*4*, *5* 54:*10*, *12*, *13* 58:*13* 65:*13*, *17*, *18* 68:*10* 69:*7* 78:*10* 146:*9* 174:*6* 187:*13* 188:*21* 192:*7* 194:*15*

**things** 12:*1*, *5* 15:*10* 18:*12*

41:*19* 47:*16* 48:*3* 52:*3* 53:*16* 55:*10*, *12* 57:*2* 78:*9* 80:*5* 126:*14* 202:*4* 203:*17* 210:*15* 218:*15*

**think** 6:*22* 9:*1* 19:*1* 20:*17* 22:*3*, *10* 35:*19* 42:*8* 47:*12* 48:*8*, *18* 50:*16* 54:*16* 56:*9* 63:*3* 85:*5* 90:*12* 94:*9* 100:*11* 103:*7* 112:*19* 115:*12* 117:*15* 118:*5*, *7*, *8* 121:*17* 128:*20* 176:*21* 179:*13* 190:*16* 198:*2*, *4* 203:*5* 206:*3* 211:*21* 216:*1*, *4*

**thinking** 122:*1* 200:*5* 211:*19*

**Third** 2:*6* 11:*4* 84:*11* 97:*6* 119:*12* 122:*10* 154:*8* 156:*12* 157:*18* 201:*9*

**thirsty** 48:*13*, *14*, *17*, *18*

**thought** 88:*4* 129:*10* 192:*11* 194:*21* 195:*4* 196:*13*, *16*

**thousand** 82:*20* 135:*16* 150:*15* 155:*10*, *18* 160:*10* 161:*18* 162:*2*, *13* 164:*2*, *8* 166:*14* 167:*10*

**thousands** 81:*13* 94:*22* 95:*2*

106:*8* 114:*18*

**threat** 52:*2*

**three** 13:*20* 14:*1* 19:*11* 36:*10* 76:*22* 77:*8* 81:*1*, *4*, *17* 82:*18* 83:*1*, *6*, *16*, *19* 123:*14* 125:*10* 126:*21* 127:*7*, *17* 128:*5*, *8* 131:*14* 156:*5* 157:*2* 166:*22* 175:*4* 176:*1*, *4* 184:*7*, *13*, *19* 185:*12* 186:*21* 191:*9* 193:*8* 200:*17* 212:*11*

**thumbs** 156:*19*

**Thursday** 1:*16*

**tieable** 15:*13*

**tightness** 145:*20* 149:*21*

**time** 4:*4* 9:*10* 10:*20* 12:*9* 16:*18*, *19* 17:*1* 18:*19*, *20*, *22* 19:*2* 20:*8*, *10* 22:*15*, *18*, *20* 34:*8*, *11* 39:*6*, *20* 40:*3* 42:*20* 45:*18* 46:*3*, *8*, *12* 52:*2* 53:*3* 54:*21* 55:*2* 61:*10* 65:*12*, *13* 66:*2* 73:*3* 75:*5*, *8* 78:*16* 83:*22* 84:*4*, *9* 88:*12* 91:*19* 94:*3* 96:*13*, *17*, *18* 98:*11*, *14* 99:*16* 100:*10* 101:*10*, *11* 102:*17* 103:*18* 106:*22* 107:*9* 109:*6*, *9*, *13* 111:*8*, *11*

122:*13*, *19*  123:2
129:*3*, *5*  131:*15*
132:2, *6*  136:*1*, *6*,
*17*, *22*  137:2, *3*, *4*,
*7*  139:*3*, *19*, *20*
144:*18*, *20*
146:22  151:*11*,
*15*  152:*13*
153:22  154:*11*,
*13*, *17*  155:*4*
156:*1*, *9*  157:*13*,
*17*  159:4  160:*1*
162:6, *9*  163:*8*,
*15*  164:*10*, *12*
165:2, *12*  166:*17*,
*19*  167:*17*  168:*4*
169:*7*  172:*5*, *19*
173:*21*  174:*17*,
*20*, *21*  175:*1*, *3*, *4*,
*12*  178:7  180:*13*,
*18*  181:6, *15*, *18*
183:2, *10*, *14*
191:6  194:2
196:6  197:*19*
198:8, *11*, *13*, *16*,
*20*, *21*  199:*5*, *17*
200:22  203:8, *10*
204:*4*, *7*  207:*15*,
*18*  211:*1*, *7*, *9*, *12*
212:2, *5*  213:*9*
219:*17*
**times**  39:*1*  56:*20*
115:8  148:*9*
175:*14*  194:*1*
**time-varying**
131:*11*  134:*12*,
*18*  135:*19*
136:*19*  139:*5*, *7*
140:5, *17*  143:2,
*16*  144:*10*, *12*
148:*19*  151:8
152:9, *19*  153:*3*
154:9, *16*

**timing**  16:*5*
17:*12*
**title**  29:*13*, *15*, *19*
56:*12*, *16*  57:*1*, *5*,
*8*, *10*, *14*  109:22
110:*1*, 2
**titled**  29:*16*
**today**  5:*19*  12:*8*,
*12*  19:22  24:*9*,
*12*, *14*  27:*3*, *6*
40:*21*  54:*8*, *11*
66:2  71:7
140:*16*  209:*15*,
*22*  210:5  215:*9*,
*15*, *19*
**Today's**  4:*4*
38:*20*  219:22
**told**  16:22  30:*3*
51:8  140:*9*
163:*14*
**tomorrow**  66:*3*
212:22
**tool**  141:2, *5*, *8*
146:*17*  172:*12*
**tools**  172:*14*
**top**  102:*14*
171:*9*  187:8, *15*
**topic**  129:*19*, *20*
130:*13*, *16*
**total**  172:*17*, *19*
174:*9*
**totality**  203:*15*
**totally**  151:*18*
172:*9*
**TP**  4:*10*, *11*
**TRAC**  16:*11*
17:9  32:*13*  67:*1*,
*5*  87:*15*
**track**  133:*7*
**tradeoffs**  129:*6*
**training**  18:7
132:*14*  142:*11*
157:*11*  160:*4*

161:2  173:*5*
**transcribed**  1:*17*
**Transcript**  33:*19*,
*20*
**transformation**
179:*3*  209:*7*
**transmitted**  67:*12*
**transparent**
129:8, *9*  178:*3*
**transparently**
177:*14*
**transportation**
110:6
**treating**  136:2
**trend**  128:*14*
129:*16*  130:*21*
147:*3*  156:*11*
157:*15*  182:22
184:8, *15*  201:*19*
**trending**  100:22
175:9
**trends**  129:*18*
130:22  146:*21*,
*22*  178:*6*, *7*
183:*1*, 2
**trial**  214:*3*, *8*
**trick**  35:*20*  46:*9*
**tried**  189:7
**trough**  171:*11*
**true**  64:*21*  138:*3*
140:*21*  149:*13*
150:22  159:*16*
170:*1*  173:2
193:7  203:*17*, *19*
208:*19*  212:20
214:*11*  221:*9*
**trusting**  126:*17*
**truth**  135:*5*
170:2
**truthfully**  5:*19*
8:9
**try**  9:9  198:2
**trying**  189:*2*, *21*

**turn**  21:*12*
63:*10*  73:*18*
87:*10*  105:*9*
110:*15*  126:*1*
129:*12*
**turn-back**  93:*4*
**Turn-backs**  93:*4*
**turning**  105:*11*
**turns**  207:*1*
**twelve**  118:*5*
**twice**  9:2
**two**  19:*11*  34:*20*,
*22*  47:*16*  66:*3*
78:8, *14*  99:*11*
101:*13*  116:*12*
117:9  118:*17*
119:*7*, *9*  121:22
129:*1*  131:*13*
166:22  169:*20*
170:*7*, *18*  171:*5*
172:*4*, *5*  173:*14*
175:8  200:*17*, *21*
201:8  210:*15*
215:*16*
**types**  78:*15*
**typewriting**  221:*8*
**typical**  129:*17*
130:22
**typo**  87:*17*

**< U >**
**U.S**  2:*13*  15:*19*
18:*11*  35:*17*
42:*18*  45:*17*
61:*17*  106:*14*
108:2  109:*3*, *19*,
*22*  147:2  178:*8*
183:*3*
**ultimate**  12:*14*,
*19*  47:*17*
**ultimately**  11:*11*
16:6
**umbrella**  210:*17*
**umbrellas**  210:*19*

**Um-hum** 134:*14*
152:*12*
**unable** 140:*17*
147:*13, 14*
**unaccompanied**
16:*15* 72:9, *17,
19* 73:*5, 9, 11, 14,
15* 74:*10*
**unaffected** 78:*18*
**unauthorized**
113:*3* 115:2
121:*13*
**underlie** 68:*10*
**underlying**
176:*19*
**understand** 5:*14*
6:*12, 17* 7:*1, 2,
16, 21* 8:*6, 10, 17,
18, 20* 9:*5* 15:*14*
24:*18* 32:6 38:*9*
55:7 65:*17* 70:*1,
16* 75:13 76:*17*
77:*10* 80:*16*
88:*14* 90:*1, 11,
12* 104:*18* 123:8
126:*14* 136:*10*
137:*18* 138:*13,
16* 140:8 141:*19*
152:6, *17* 154:6
169:*13* 182:*1*
185:*1* 189:9
190:*20* 192:9, *14*
201:*4* 217:*16, 19,
20*
**understanding**
12:*13* 27:*1*
36:*21* 41:7
57:*11* 72:*14*
73:*3* 91:*19* 96:2
106:*3* 109:*17*
114:*15, 22*
115:*18, 20* 116:*4*
151:*4* 170:22

182:9 192:*21*
193:*2, 3, 12, 15*
**understood** 6:*20*
7:*4* 177:*10*
204:*22* 205:*10, 14*
**undetected** 102:2
**unemployment**
16:*12* 17:*10*
32:*15* 42:9, *13*
119:*12, 16, 17, 19,
20, 22* 120:*10, 22*
121:*3, 8* 122:5
**unethical** 196:*11*
**unexpected**
131:*13* 151:9
152:*4, 10*
**unfamiliar** 51:*17,
22*
**uninformative**
151:*18*
**unit** 135:*21*
154:*19* 156:*13*
157:*18*
**UNITED** 1:*1*
4:*19* 21:4 33:*10*
35:*13, 21* 36:8,
14* 37:*11, 16*
38:*3, 9, 16* 39:*4,
8, 12, 17* 40:*5, 16*
41:*20, 21* 42:*4, 6,
10, 13, 15, 17, 20*
43:*10, 22* 45:7
46:*18* 56:*2, 8*
89:*12, 22* 90:6
91:22 93:*3*
106:*4* 109:*12*
113:22 119:*3, 7,
12, 14* 195:*3, 7,
14* 196:*14*
204:*10, 17* 219:*2,
7, 16*
**univariant** 129:*3*
144:*18*

**univariate** 213:*9*
**universal** 151:*5*
**universe** 82:9
209:*18*
**University** 18:*8*
32:*13* 67:*1*
84:*15, 17* 85:*4,
10* 142:*11* 157:*12*
**unjustified** 115:*12*
**unlawful** 92:9
93:*1, 2*
**unmistakably**
156:*10* 157:*11*
**unnamed** 92:*20*
**unpredictable**
59:*4, 5* 131:*12*
132:*10, 19* 133:*17*
**unpredictably**
132:*3*
**unquote** 124:*14*
**unrelated** 129:*17*
130:22
**unreliable** 213:*3*
**unstated** 67:*10*
**untransformed**
208:*21*
**upper** 112:*16*
209:*3*
**upward** 131:*15*
154:*10, 17* 156:*1,
20* 157:*15* 201:*19*
**USBP** 86:*4*
97:*13* 209:*19*
**use** 16:*6, 8, 10*
17:*10* 26:*4, 7, 19*
28:6 32:*11* 33:*3,
11, 12* 41:*17*
42:*11* 66:*14*
67:*4* 77:*16* 82:8
87:*5, 8* 88:9
128:*11* 131:6
159:*16* 168:*21*
172:*10* 178:*20*
179:*4* 180:*7, 8*

182:*4, 12* 189:*14*
208:*10* 209:9
210:9
**useful** 88:*4*
126:*21* 143:*5*
144:*4, 16* 145:22
146:*17* 147:*17*
149:*14, 17* 150:*7,
11, 16* 151:*1, 20*
158:22 159:*1*
182:*11* 183:*4*
**usefulness** 142:*14*
143:7 144:*6*
149:2 158:*11*
165:*3* 177:*16*
199:*4* 210:22
211:*13*
**useless** 126:*11, 13,
18, 19*
**uses** 26:*12, 14*
78:*17, 19* 97:*13*
101:*3* 212:*12*
**USPB** 96:2, *13*
**utility** 53:*21*
211:*13*

**< V >**
**vague** 104:*8, 16*
105:*10* 127:*14*
139:*14* 160:*18*
188:*14* 205:*11*
**validate** 187:*18*
190:*14*
**validation** 166:*8,
13*
**validity** 188:*1*
189:*7, 8, 11, 13*
190:*5, 8, 10, 19,
21, 22* 191:*2, 8,
12, 14, 16* 192:*10,
13* 193:*18* 194:*4*
196:*19* 197:*2*
**valuation** 163:*2*



**value** 137:*20*
173:*14* 174:*20*
182:*10* 183:*16*
**values** 131:*14*
151:*9* 152:*4*, *11*,
*14* 211:*14*
**variable** 119:*5*
121:*20* 129:*3*
136:*13*, *15*, *16*, *17*,
*21* 137:*4*, *7*, *8*
**variables** 122:*6*
129:*4*
**variation** 55:*15*
**varied** 96:*16*
**varies** 137:*4*
**various** 45:*22*
61:*4*
**vary** 153:*22*
**varying** 137:*3*
169:*7*
**vast** 115:*1*
**vectors** 52:*14*
**VELTZ** 2:*22* 4:*9*
**Venezuelan** 200:*6*
**verbal** 6:*16* 9:*8*
**versa** 157:*9*
175:*10*
**version** 156:*17*
**versions** 129:*1*
**versus** 44:*1*
47:*14* 58:*9*
114:*21* 132:*10*,
*18* 133:*17*
**vertical** 161:*2*, *6*,
*14*
**vice** 157:*9*
175:*10*
**Video** 1:*13*
219:*22*
**VIDEOGRAPHE**
**R** 2:*22* 4:*2*
22:*15*, *18*, *20*, *22*
34:*8*, *11* 54:*21*
55:*2* 75:*5*, *8*

111:*8*, *11* 122:*19*
123:*2* 181:*15*, *18*
204:*4*, *7* 207:*15*,
*18* 219:*22*
**video-recorded**
4:*6*
**view** 115:*7*
142:*7*, *10*, *14*
**violation** 218:*19*
**volume** 125:*7*, *16*
126:*6* 128:*14*
129:*16* 130:*20*
**vouch** 21:*1*, *19*

**< W >**
**waived** 220:*5*
**walk** 174:*7*
**walking** 216:*15*,
*18*
**want** 49:*16*
63:*10* 75:*15*
137:*21* 138:*7*
176:*11*, *19* 183:*9*
206:*9*, *21* 207:*4*
211:*16*
**wanted** 17:*15*
218:*12*
**war** 107:*18*
**washed** 58:*14*
**washed-out** 58:*19*
**Washington** 1:*15*
2:*17* 4:*8*
**water** 48:*22* 49:*2*
**wave** 155:*15*
**waves** 137:*14*, *16*,
*22* 138:*7*, *8*, *13*
155:*8* 171:*5*, *14*,
*16* 173:*6*
**way** 11:*9* 53:*11*
56:*16* 57:*5*
58:*20* 70:*12*
82:*3* 90:*9* 92:*12*
94:*8*, *10* 100:*15*
102:*15* 107:*15*

108:*7*, *14* 124:*2*
133:*21* 135:*17*
136:*2*, *3*, *5*
138:*16* 139:*2*, *5*,
*9*, *22* 140:*9*, *11*,
*12*, *13*, *14* 141:*9*
142:*1* 144:*5*, *9*,
*17* 146:*20*
148:*10*, *18* 149:*4*,
*8* 157:*10* 164:*11*
173:*7* 178:*5*
189:*1*, *3* 190:*13*
193:*10* 197:*14*
205:*16*
**ways** 77:*8* 122:*2*
156:*5* 157:*2*
**Weather** 57:*16*,
*17*, *18*, *21* 60:*1*
**website** 32:*12*
109:*20*, *21*
**websites** 32:*18*
**week** 39:*9*, *12*, *16*,
*22* 40:*5*
**weeks** 59:*6*, *9*
66:*3* 100:*1*
103:*19* 107:*4*
203:*8*
**weigh** 47:*16*
**Welcome** 55:*5*
75:*11* 123:*6*
181:*21* 205:*14*
206:*22*
**welfare** 58:*8*
**Well** 26:*12*
36:*13* 51:*4* 59:*3*
63:*19* 65:*22*
67:*17* 70:*15*
73:*10* 77:*16*
82:*3* 83:*3* 89:*4*
97:*10* 101:*1*
116:*10* 125:*4*
134:*10* 137:*19*
138:*6*, *15* 155:*7*
161:*16* 167:*18*,

*20* 174:*5* 179:*5*
182:*9* 190:*22*
191:*13*, *22* 193:*5*
200:*20*
**well-accepted**
135:*6* 141:*9*
**well-established**
129:*1* 142:*17*
213:*8*
**went** 22:*22*
63:*11*, *14*, *21*
64:*11* 78:*12*
83:*4* 99:*19*
112:*17* 125:*8*, *17*
126:*7* 130:*4*
146:*14*
**we're** 19:*12*
51:*10* 53:*1* 79:*2*
82:*15* 83:*2*
118:*17*, *18*
136:*11* 148:*12*,
*15*, *16* 149:*16*
150:*18* 151:*2*
205:*13* 218:*18*
**WESTERN** 1:*2*
**We've** 9:*7* 56:*9*
118:*12*
**whatsoever**
157:*14*
**widely** 148:*22*
156:*6*
**widely-accepted**
142:*16*
**widespread**
178:*18*, *19*
**wild** 48:*13*
**window** 202:*6*, *7*
**wish** 204:*21*
**witness** 1:*14* 3:*2*
10:*18* 11:*13*, *22*
12:*4* 13:*10* 14:*6*,
*17* 16:*22* 19:*3*
20:*21*, *22* 21:*8*
23:*9* 24:*3*, *20*

25:*18*   27:*1*
30:*21*   31:*6*   32:*3,*
*22*   40:*9, 17, 18*
44:*17*   46:*16*
49:*21*   50:*15*
51:*16*   53:*8*
59:*20*   62:*8, 16*
63:*2*   65:*16*   69:*1*
72:*3, 12, 13*
77:*15*   80:*16*
85:*17*   90:*12*
93:*12*   94:*1, 17*
95:*6, 14, 22*
96:*11*   100:*18*
103:*15*   104:*10,*
*18*   105:*11*
106:*18*   116:*3, 21*
120:*13*   122:*10*
128:*20*   130:*4*
133:*10*   139:*17*
141:*15*   142:*10*
143:*4*   144:*15*
145:*9*   148:*4*
154:*4*   156:*5*
157:*2*   160:*20*
168:*19*   170:*20*
171:*7*   179:*20*
180:*6*   188:*16*
195:*19*   196:*3, 9*
204:*11, 13, 15, 20,*
*22*   205:*7, 12, 14*
206:*2, 6, 8, 10, 14,*
*18*   207:*12, 17*
213:*20*   214:*8, 10,*
*13*   215:*1, 14*
217:*1, 6, 18*
218:*22*   219:*3, 5,*
*6, 12*   221:*4, 6, 10*
**witnesses**   34:*2*
**woman**   82:*12*
**women**   66:*3*
**word**   7:*7, 11*
15:*16*   20:*1, 2*
22:*5*   26:*9, 12, 15*

27:*1*   41:*22*
72:*21*   74:*13, 18*
97:*15, 20*   139:*14*
144:*16*   145:*22*
153:*6*   207:*8*
209:*12, 14*
**wording**   13:*5*
20:*14*
**words**   36:*5, 6*
130:*18*   134:*11*
141:*19, 20*
173:*10*   186:*4*
201:*20*
**work**   28:*12*
87:*20*   112:*8*
118:*14*   147:*21*
160:*14*   195:*7, 15*
**workers**   17:*11*
**working**   85:*11*
94:*2*
**world**   52:*20*
133:*8*
**write**   64:*18*
**writing**   27:*3*
28:*21*   176:*16*
177:*2*
**written**   24:*18, 20*
**wrong**   137:*12*
176:*6*   196:*4*
**wrote**   23:*14*
27:*7*   64:*21*   72:*14*

**< Y >**
**Yeah**   52:*11*   55:*9*
90:*5*   109:*9*
118:*15*   178:*17*
194:*22*
**year**   9:*20*   19:*1*
46:*12*   50:*5*
66:*18*   102:*8, 11*
159:*15*   173:*18*
**years**   18:*8*   19:*21*
49:*1, 15*   85:*1, 2*
99:*17*   109:*14*

110:*3*   142:*12*
153:*4, 12*   157:*12*
202:*14*

**< Z >**
**zero**   13:*13*   60:*14*
80:*3*   81:*20*
199:*15*   202:*14*