# EXHIBIT 250

Rodney Scott                                      December 5, 2023

Page 1

1                    UNITED STATES DISTRICT COURT

                   WESTERN DISTRICT OF LOUISIANA

2                        LAFAYETTE DIVISION

3      _____

                                          )

4      STATE OF ARIZONA,                  )

       By and through its Attorney General )

5      Mark Brnovich, et al.              )

                                          )

6                 Plaintiffs              )

                                          )

7      vs.                                )

                                          )

8      MERRICK GARLAND, in his            )

       official capacity as Attorney      )

9      General of the United States,      )

       et al.                             )

10                                        )

                  Defendants              )

11                                        )

       _____)

12

13

14             The Teams teleconferenced deposition of

15     RODNEY SCOTT was held on Tuesday, December 5, 2023,

16     commencing at 10:11 A.M., at virtual location before

17     Louisa B. McIntire-Brooks, Notary Public.

18

19

20     Job No. CS6342615

21     REPORTED BY:  Louisa B. McIntire-Brooks

                                            Page 2

 1    APPEARANCES:

 2              ON BEHALF OF THE PLAINTIFFS:

                JOSEPH SCOTT ST. JOHN, ESQUIRE

 3              Deputy Solicitor General

                    Office of Attorney General Jeff

 4                  Landry

                    1885 North Third Street

 5                  Baton Rouge, Louisiana 70802

                    Telephone:  225-485-2458

 6                  stjohnj@ag.louisiana.gov

 7              ON BEHALF OF THE WITNESS:

                ANDREW BLOCK, ESQUIRE

 8                  America First Legal

                    611 Pennsylvania Avenue, SE, #231

 9                  Washington, DC 20003

                    andrew.block@aflegal.org

10

                ON BEHALF OF U.S. DEPARTMENT OF JUSTICE:

11              ELISSA P. FUDIM, ESQUIRE

                    U.S. Department of Justice

12                  Civil Division

                    Office of Immigration Litigation

13                  District Court Section

                    P.O. Box 868, Ben Franklin Station

14                  Washington, DC 20044

                    Telephone:  202-598-6073

15                  elissa.p.fudim@usdoj.gov

16

17

18

19

20

21

                                                          Page 3

 1                              INDEX

 2              Deposition of:   Rodney Scott

 3                       December 5, 2023

 4

 5    Examination by:                                Page:

 6    Ms. Fudim                                      4, 148

 7    Mr. St. John                                      112

 8    Mr. Block                                         144

 9

10    Exhibit No.                                   Marked:

11    Exhibit A    Biography document                    29

12    Exhibit B    Disclosure of Rodney Scott           58

13    Exhibit C    MOU document                         139

14    Exhibit D    Biography document                  142

15

16

17

18

19

20

21

Rodney Scott                                                    December 5, 2023

Page 4

```
 1                            STIPULATION

 2                  It is stipulated and agreed by and

 3    between counsel for the respective parties that the

 4    witness may be remotely sworn.

 5                           PROCEEDINGS

 6    Whereupon,

 7                           RODNEY SCOTT,

 8    called as a witness, having been first duly sworn

 9    to tell the truth, the whole truth, and nothing but the

10    truth, was examined and testified as follows:

11                  EXAMINATION BY MS. FUDIM:

12         Q.    Good morning, Chief Scott.  I'm going to be

13    asking you some questions today at this deposition

14    which we're holding virtually.  First question I have

15    for you, have you ever had your deposition taken

16    before?

17         A.    Yes, I have.

18         Q.    When was the last time?

19         A.    Probably August, the week of maybe

20    August 10th, 2021, it was just before I retired as

21    Chief of the Border Patrol.
```

1      Q.    So I'm going to go over some ground rules

2   with you.  This may sound familiar to you based on your

3   experience having done this before, perhaps your

4   attorney has gone over with you, but in this case I

5   think repetition won't be a bad thing.  So I'm going to

6   be asking you questions and I'm going to ask that you

7   give verbal answers to those questions.  I say that

8   only because sometimes people will nod or shake their

9   head and there is a court reporter here and she's not

10   going to be able to take that down.  So please give

11   verbal answers to all my questions.  Okay?

12      A.    Understood.

13      Q.    If there is a question that I ask that you

14   don't understand, please let me know that you don't

15   understand and that could be either because you can't

16   hear me properly or because what I'm saying makes no

17   sense.  I won't take offense.  Just let me know you

18   don't understand the question and I'll be happy to

19   rephrase.  Okay?

20      A.    Yes, understood.

21      Q.    Now, we also can't talk over each other

                                                                    Page 6

1    because of the presence of the court reporter and

2    particularly because we're doing this remotely.  So,

3    even if you know where I am going with the end of my

4    question, please let me finish asking the question so

5    that you can get an answer, and by the same token, I'm

6    obviously going to allow you to finish providing an

7    answer.  Okay?

8          A.    Yes, understood.

9          Q.    If you answer a question and later on in

10   the deposition something occurs to you, that your prior

11   answer was incomplete, it was wrong, you want to

12   correct something you said earlier, you have an

13   epiphany you want to share, just let me know.  I would

14   rather it be out of order than us to have something on

15   the record that you believe is incorrect.  Okay?

16         A.    Yes, understood.

17         Q.    If you want to take a break at any point in

18   time, that's fine, just let me know and we'll take a

19   break.  I think that's all my general instructions for

20   you.  Does that all make sense to you?

21         A.    Yes, it does.  Thank you.

Page 7

```
 1          Q.    One more I will add is that I'm going to be

 2     asking you questions and there may be questions I ask

 3     you that you don't know the answer to.  That's fine.

 4     You can just let me know that you don't know the answer

 5     and we will move on.  I'm not looking for you to guess.

 6     So, if you don't know, you don't have to make up an

 7     answer, you can just tell me you don't know and we'll

 8     move onto a different area of questioning.  Okay?

 9          A.    Yes, understood.

10          Q.    I see that sitting to your right, my left,

11     is Andrew Block.  Is he your counsel here today?

12          A.    Yes, he is.

13          Q.    Have you had a chance to meet with him

14     prior to this deposition?

15          A.    Yes, I did.

16          Q.    Do you feel comfortable that you're able to

17     give accurate and complete testimony here today as a

18     result of meeting with your counsel?

19          A.    Yes, I am.

20          Q.    When did you meet with Mr. Block?

21          A.    Yesterday.
```

Rodney Scott                                    December 5, 2023

                                                        Page 8

1        Q.    How long did you meet with him?

2        A.    Maybe an hour, hour and a half.

3        Q.    How did you first become familiar with this

4   lawsuit?

5        A.    General awareness from the public and then

6   specifically I was contacted by Scott.  I believe my

7   name was referred to him by one of the other witnesses.

8        Q.    By Scott, are you referring to Scott

9   St. John, counsel for the State of Louisiana?

10       A.    Yes, I am.

11       Q.    When was it that you were contacted by him?

12       A.    I do not remember the date, but it's been a

13  couple months probably.  At least a month.

14       Q.    What was the nature of that conversation

15  that you had?

16       A.    Identifying my work experience, any

17  involvement that I had with what is commonly referred

18  to as the Asylum Officer Rule and just my general

19  background in border security immigration.

20       Q.    How long was that conversation?

21       A.    Probably the initial conversation, probably

1  every conversation no more than five minutes.  They

2  have been on phone only.  And then I was usually

3  between meetings just -- I don't think we have ever had

4  a conversation longer than ten minutes.

5       Q.    How many conversations have you had?

6       A.    I do not remember that either.  I would say

7  between three to six, maybe.  And the reason I say that

8  is it was -- the dates were changing from when we could

9  possibly be -- there was a couple of different

10 engagements there, one via text, I think, but most were

11 verbal.

12      Q.    What is your understanding of the claims in

13 this case?

14      A.    I believe the claims in this case, and

15 again, from my perspective, is that it was not properly

16 adjudicated, if you will.  I'm not testifying to how

17 every step of the process went.  My piece of it is the

18 border patrol's involvement or questions about the rule

19 and how it was developed and if border control was

20 involved or not.

21      Q.    When you say it was not properly

Rodney Scott                                    December 5, 2023

                                                         Page 10

1    adjudicated, what is the it that you're referring to?

2          A.    The asylum rule.  The new rule that we're

3    not in the Federal Register, if you will, it was

4    ultimately implemented allowing asylum officers to

5    adjudicate the entire asylum claim as opposed to the

6    historic perspective which is where an immigration

7    judge would adjudicate the claim.

8          Q.    When you say it wasn't properly

9    adjudicated, what do you mean by that?

10         A.    I was alluding to the allegations in the

11   case and if all the people that should have been asked

12   in the federal government and outside were asked,

13   there's certain processes and procedures with a notice

14   of record, basically what are the implications of the

15   rule, very, very administrative and a lot of that is

16   the legal aspects.  My understanding is that people, to

17   include the state of Louisiana in this case, do not

18   believe that all those steps that should have taken

19   place did.

20         Q.    Did you review the complaint at any point

21   in time?

Page 11

1          A.     I have not reviewed the entire complaint,

2     no.

3          Q.     Have you reviewed portions of it?

4          A.     I have had access to it and I skimmed over

5     some of the complaint, yes.  But I don't really

6     remember verbiage per se.

7          Q.     When was that?

8          A.     Within the last month.  Probably last two

9     months.  Right after Scott St. John reached out to me.

10     I did some cursory Open-source public research.  So I

11     don't know that it was the actual complaint either or

12     just excerpts.  I believe it was just excerpts of the

13     complaint.

14          Q.     Do you know whether it was excerpts of the

15     first complaint or the amended complaint?

16          A.     I do not know.

17          Q.     Are you aware that you have been disclosed

18     as a non-retained expert in this case?

19          A.     Yes.

20          Q.     What is your understanding of your role in

21     this litigation, if any, going forward?

1          A.    My role would be to just testify to my

2     involvement or lack thereof while serving as chief of

3     the United States border patrol in any deliberations or

4     discussions about this new rule and the implications

5     that it would have on border security and specifically

6     border patrol's mission and workload.

7          Q.    When you say testify, are you referring to

8     at a potential trial or something else?

9          A.    At a potential trial, that's what I was

10    asked if I was willing to do.

11         Q.    Were you ever asked if you would be willing

12    to provide a declaration in support of any potential

13    motion filed in this case?

14         A.    I believe that may have come up initially.

15    But to date, I have not taken action on that.  I have

16    not submitted a declaration.

17         Q.    In the event of your potential testimony in

18    a trial in this matter, have you discussed with

19    plaintiff's counsel charging them for your time for

20    testifying at a trial?

21         A.    We have not had that discussion.  When I

Page 13

1   was asked to do this deposition, I brought up the fact

2   that -- when I was asked about doing this deposition,

3   Scott St. John indicated that the governor wanted a

4   full eight hour day.  So I did bring up with him at

5   that point in time that that means I'm not going to be

6   able to make actual money, and then normally I contract

7   services.  That's the only conversation we had.  We did

8   not talk about trial per se.  We talked about this

9   deposition specifically.

10        Q.    In turning to how you make actual money

11  right now, are you currently employed somewhere as a

12  W-2 employee anywhere?

13        A.    No, I'm not.

14        Q.    I notice on your LinkedIn profile it notes

15  that you're currently affiliated with the Texas Public

16  Policy Foundation; is that accurate?

17        A.    That is correct.  I have my own LLC and I

18  contract with Texas Public Policy as a border security

19  immigration, Senior Fellow is the title that I have

20  with them.

21        Q.    Okay.  I want to ask you about both, but

1    let's start with the Texas Public Policy Foundation.

2    What is that foundation?

3         A.    It is a nonprofit conservative organization

4    in the state of Texas that advocates broadly for

5    conservative initiatives, and one of those initiatives,

6    the one I'm involved in is border security, and the

7    specific, they just renamed it, it's called Secure &

8    Sovereign Frontier, and it deals with primarily border

9    security immigration.  But Texas public policy is much

10   broader than that.

11        Q.    Your role, that was limited to that which

12   you just described?

13        A.    Correct, that and then occasionally I'll do

14   some leadership, mentorship type stuff with some of the

15   interns, some of the staff, but my primary role is

16   border security immigration.

17        Q.    Do you travel to Texas for that role?

18        A.    I work virtually and I travel to Texas and

19   occasionally to other locations to speak and then -- to

20   include Washington, D.C.

21        Q.    You're in Oklahoma right now; is that

Rodney Scott                                          December 5, 2023

                                                        Page 15

1    accurate?

2          A.    Correct.

3          Q.    When did you begin working with the Texas

4    Public Policy Foundation?

5          A.    I signed a contract with them in November

6    of 2021.  So, shortly after I retired.

7          Q.    How do you engage in speaking engagements

8    on their behalf?

9          A.    On their behalf, they will reach out to me

10   and ask if I'm available to either speak at a

11   conference or at a specific event, depending on my

12   schedule, I'll agree or I won't agree.

13         Q.    Are those paid speaking engagements

14   generally?

15         A.    If it's through Texas Public Policy, no,

16   that's covered under my contract.  So technically it's

17   paid because they're paying me a retainer fee, a

18   monthly fee.  So I don't charge by individual event if

19   they coordinated the event.

20         Q.    You also mentioned you have your own LLC.

21   Is that Honor Consulting?

Rodney Scott                                                December 5, 2023

Page 16

1          A.     That is correct, Honor Consulting Plus,

2     but, yes.

3          Q.     What is Honor Consulting?

4          A.     It's basically a limited liability company.

5     I'm the sole proprietor, if you will.  But basically it

6     provides an avenue for me to get income by doing

7     speaking events over a website, I just try to share

8     facts and truth about border security initiative.  But

9     primarily it's that information sharing aspect for

10    marketing so that I can get other employment

11    opportunities.

12         Q.     Have you gotten other employment

13    opportunities as a result of the marketing that you

14    have done through Honor Consulting?

15         A.     Yes, I've gotten numerous speaking

16    engagements and I have two additional contracts that

17    aren't specific to speaking, but they're aligned with

18    giving technical advice and guidance to organizations

19    based on my experience.

20         Q.     What are those two contracts that you just

21    referenced?

Rodney Scott                                    December 5, 2023

Page 17

1          A.     One is A1C Partners.   It's Open-source

2    intel, intelligence organization, and the second one is

3    called Defend USA and they're a performance sportswear

4    company that works with the Department of Defense,

5    special forces, it's focused on like prescription grade

6    compression wear, if you will, but it's all about the

7    health and -- mental health and physical health of

8    personnel.

9          Q.     What was your most recent speaking

10   engagement for which you received compensation either

11   through Honor Consulting or through the Texas Public

12   Policy Foundation?  Well, you said those aren't paid.

13   How about let me clarify.  What was your most recent

14   speaking engagement?

15         A.     Just to clarify, Texas Public Policy is

16   paid, it's just paid as a retainer.  I market my

17   services in two ways:  I prefer to do the retainer

18   route.  I'll also do a case by case fee.  I just

19   actually canceled one, but I think the most recent was

20   -- I don't have a date so I'm not going to guess for

21   you.

Rodney Scott                                    December 5, 2023

1        Q.    Don't guess.

2        A.    It's been a while since the last paid

3    engagement.  I have to look at my calendar.  I didn't

4    think about that.  Sorry.

5        Q.    What was the topic of your last speaking

6    engagement?

7        A.    Border security and immigration, primarily

8    border security.

9        Q.    Have all of your speaking engagements

10   focused on border security and immigration?

11       A.    99 percent of them, yes.  I have had a

12   couple of specific engagements focused more on the

13   leadership aspect of being the chief of the border

14   patrol and managing personnel.  But the vast majority

15   are -- like 99 percent are border security related.

16       Q.    When you speak at engagements that you

17   organize yourself through Honor Consulting, what is the

18   fee that you charge for such engagements?

19       A.    It varies.  I advertise a flat fee of

20   $2,500, but depending on the size of the organization,

21   that is varied.  What I mean by that is there is a lot

Rodney Scott                                    December 5, 2023

Page 19

1    of smaller clubs, like some republican, like women's

2    club, for example, that's one I recently did down in

3    San Antonio.  They couldn't afford that fee so we

4    worked out a lower fee because I was able to do other

5    speaking engagements at the same time.  I think they

6    ended up paying me $1,250 and then made a donation to

7    the border patrol academy.

8         Q.   Are those speaking engagements generally

9    for like an hour?

10        A.   That also varies in that I factor into the

11   fee as well.  If I can combine them with other events

12   and I don't have to have a long travel time.  But most

13   of the time the event is minimum of about an hour and

14   then I do usually provide a question and answer time.

15   On a couple of occasions they have asked me to dedicate

16   more time to actually meet with some of their people

17   individually.  And that's why I'm kind of wishy-washy

18   on the fee.  It has varied based on the amount of time,

19   not just the specific event.  But the 2500 is based on

20   an one hour engagement with question and answer and

21   travel expenses are added on top of that.

1        Q.      In your various speaking engagements, have

2    you ever been called upon to speak about the Asylum

3    Officer Rule?

4        A.      No, not before this event here, no.

5        Q.      I want to turn to your prior work at border

6    patrol.  Border patrol is the operational component of

7    CBP that's responsible for securing our nation's

8    borders between ports of entry; is that correct?

9        A.      That's correct.

10       Q.      You were the chief of border patrol until

11   August 14th of 2021?

12       A.      That is correct.

13       Q.      When were you promoted to the position of

14   chief?

15       A.      February 2nd, 2020.

16       Q.      How many years did you serve with the U.S.

17   Border Patrol?

18       A.      It was just under 30, it was like 29 and

19   eight months or something like that, 29 and a half

20   years.

21       Q.      Is the border patrol the only operational

Page 21

1   component of CBP for whom you've worked?

2          A.    There is a nuance answer.  So, yes, yes,

3   the operational office, even though my title was still

4   border patrol agent, I spent several years outside what

5   we would commonly refer to as U.S. Border Patrol or the

6   Office of Border Patrol, working in the Office of the

7   Commissioner, but it was still within Customs and

8   Border Protection and my title was still officially

9   GS-1896 which is a border patrol agent.

10         Q.    Did you ever work for the Office of Field

11  Operations, OFO?

12         A.    No, I did not.  I interacted with them and

13  spoke on their behalf significantly when I was working

14  in the Office of the Commissioner's, Office of

15  Anti-Terrorism, as I just spoke about, but I have not

16  been a CBP officer or assigned directly to field

17  operations.

18         Q.    What were the years that you held that

19  temporary post?

20         A.    2003 to 2008, it was various positions with

21  the same responsibility.  Focused primarily on CBP

Rodney Scott                                December 5, 2023

1    level anti-terrorism and interagency coordination

2    issues.

3         Q.    Is it correct that you've never held any

4    roles at the Department of Homeland Security or

5    Immigration and Naturalization Service before that?

6         A.    No, at the department level, that is

7    correct, I have not.

8         Q.    Have you ever held any roles at USCIS, U.S.

9    Citizenship and Immigration Services?

10        A.    No, I have not.  And to clarify your last

11   question, I have not held any official position at DHS

12   however, you used the term role the second time.  On

13   numerous occasions I have been detailed and performed a

14   role at DHS but not an official position.

15        Q.    Okay.  Did you ever hold any official

16   positions at ICE, Immigration and Customs Enforcement?

17        A.    No.

18        Q.    Did you ever have any details to ICE?

19        A.    No.

20        Q.    Did you ever hold any roles officially at

21   the Executive Office for Immigration Review?

Rodney Scott                                December 5, 2023

Page 23

1        A.      No, I did not.

2        Q.      Have you ever had any details to the

3   Executive Office for Immigration Review?

4        A.      No, I have not.

5        Q.      The details that you referred to at the

6   Department of Homeland Security, what was the nature of

7   those positions?

8        A.      2019, I was detailed to DHS to be a senior

9   advisor directly for the Secretary and I was assigned

10  to coordinate all southwest border enforcements and

11  programs on behalf of the Secretary.

12       Q.      What was the length of that detail?

13       A.      I would have to go back and look at actual

14  dates.  It was just short of a year.  I stayed in that

15  position until selected as chief of the U.S. Border

16  Patrol.

17       Q.      During your years with border patrol, did

18  there come a point in time when you became involved

19  with policy making?

20       A.      Yes.  So, back when DHS was initially

21  created in 2003, the commissioner at that point in time

Rodney Scott                                                December 5, 2023

1    put out an edict, if you will, agency wide, it was

2    Commissioner Robert Bonner, to review all policies.  I

3    was current -- at that time I was a field operations

4    supervisor at the Nogales border patrol station out in

5    the field.  I was assigned by my sector staff.  A

6    couple of specific assignments, it was looking at some

7    checkpoint policies and pursuit policy.

8             The reason I gave you that background,

9    after briefing the commissioner in Arizona, I was asked

10   to go to Washington, D.C. and work on antiterrorism and

11   CBP broader policies.  That was the assignment I

12   discussed a second ago in 2003 when I ended up working

13   in the Commissioner's Office.  And then through that

14   entire time, a significant role, a daily function was

15   working at the DHS level and the CBP level, across all

16   CBP, not just border patrol, to develop appropriate

17   policies to be able to meet our new antiterrorism

18   mission and to take all those agencies, U.S. Border

19   Patrol, Legacy Immigration Naturalization Service and

20   Customs and then build them into one agency.  So, I

21   focused heavily on policy for several years.

Rodney Scott                                    December 5, 2023

Page 25

1       Q.    At the conclusion of your time with the

2  Commissioner's Office, from that point going forward to

3  when you left the border patrol, were there other

4  points in time when you held policy making roles?

5       A.    So, a lot of leadership positions within

6  the border patrol overlap with policy making roles.  So

7  that's a vague question.  I'm going to answer it from

8  engagement, not necessarily the person who owned the

9  pen.  But when I left headquarters, I went to San Diego

10  Sector as an assistant chief at San Diego Sector.

11  Again, at that level, it's pretty much administrative

12  and policy implementation.  But I would constantly have

13  conversations with headquarters personnel on different

14  issues about national level policy.  From that -- I did

15  that for one year.  And then I moved into -- I moved

16  into the commander of the Brown Field Station.  Much

17  more tactical at that point.  Because of the

18  relationships I had and the assignments before, I was

19  still asked for input.  I had a couple of projects that

20  had national level implications.  We were building out

21  what is now border patrol's tracking, sign cutting and

Rodney Scott                                          December 5, 2023

Page 26

1    modeling system and the policies that went with it.

2    But much more at the operational level.  As soon as I

3    transitioned back, I ended up moving into the deputy

4    chief patrol agent position in San Diego Sector.  A

5    large part of your role there is to interact with

6    headquarters and provide your expertise and background

7    to influence policy.  Again, not holding the pen, that

8    was done at headquarters level, but providing

9    appropriate input was part of my career from then on in

10   all those leadership positions.

11        Q.    Are there any policies that were ultimately

12   promulgated that you consider yourself to have played

13   an important role with respect to policy making?

14        A.    Yes.  So backing up to what took me up to

15   headquarters, rewriting U.S. Border Patrol and Customs

16   and Border Protection's policy for checkpoint

17   operations nationwide, I had the pen for that.  Writing

18   the United States Border Patrol's -- I'm sorry, the

19   U.S. Customs and Border Protection's Vehicle for

20   Student Emergency Driving Policy.  I worked on that for

21   about five years straight.  I had the pen for that for

1    the majority of time, not at the final phases.  I was

2    key with the joint terrorism task force and the

3    terrorism policies pushed out across CBP on how CBP

4    would interact and respond to any type of known watch

5    list alert as well as building out training programs to

6    address the unknowns, if you will.

7              And then more recently, as I just

8    mentioned, even when I was the patrol agent in charge

9    of the Brown Field Station, we built out what is

10   currently -- or we initiated and then built out what is

11   currently border patrol's tracking, sign cutting and

12   modeling system, and then the policies that go with

13   that so that there would be increased integrity behind

14   the data that the United States Border Patrol has and

15   shares publicly.  And then also we would have a

16   systematic way to be able to answer some questions

17   Congress was asking us specifically about what's

18   actually going on at the border.  I was in the middle

19   of that right up until the time I retired.

20        Q.    That was going to be my question.  You

21   mentioned when you were the patrol agent at the Brown

Page 28

1    Field Station, when did that begin?

2          A.    Do you mind if I look at my sheet here?

3    Because I knew you were going to ask me dates that I

4    couldn't remember.  I can share this with you if you

5    want.  I literally just typed out the dates of when

6    each one of my positions started.  The reason that I

7    hesitate there is you're probably familiar enough with

8    Customs and Border Protection, we do a lot details.  So

9    the some time you start via detail versus when you

10   really start isn't always the same.  So my official

11   start at Brown Field Station was August 2nd, 2009.

12   That program, the tracking, sign cutting and modeling,

13   it was under a different name then, started probably

14   mid, early 2010.  I was in that local program, but it

15   literally just rolled out nationally probably in

16   January or February of 2020 right when I was taking

17   over as chief.

18         Q.    You mentioned that you brought with you a

19   document that lists a bunch of dates and different

20   roles that you had.  I'm going to ask that we mark that

21   document, that the court reporter mark it as Exhibit 1,

Rodney Scott                                                      December 5, 2023

                                                                    Page 29

1    or Exhibit A, rather.  Because we're doing this

2    remotely, I'm going to suggest if this works for

3    everybody, that Mr. Block just e-mail a copy of it to

4    the court reporter and then she can mark it as Exhibit

5    A and then we'll have it if that works for everybody.

6              MR. BLOCK:  Yeah.  I can do an Adobe scan

7    basically at some point.  Do you need it like right now

8    or just for the record afterwards?

9         Q.   Are you representing -- Chief Scott, are

10   you representing to me that the only thing on it is

11   basically CV information in terms of dates that you

12   held various positions?

13             MR. BLOCK:  Do you mind if I just hold it

14   up?

15        A.   We can hold it up, that's exactly what it

16   is.

17        Q.   We can just mark it and then we'll have it

18   for the record.

19             (Deposition Exhibit A was marked for

20   purposes of identification.)

21        Q.   Did you bring any other documents with you

Page 30

1    today?

2          A.    No, I did not.  I assumed you would want

3    those dates.

4          Q.    I appreciate that.  Is it fair to say that

5    you have never conducted an Asylum Merits Interview?

6          A.    Correct.

7          Q.    Have you ever conducted a credible fear

8    interview?

9          A.    No, I have not.

10         Q.    I assume that, at least in your early days

11   with border patrol, you were tasked with paroling

12   individual noncitizens encountered between ports of

13   entry, at some point in time in your career you have

14   done that; is that right?

15         A.    My policy within Customs and Border

16   Protection while I was the chief, my entire career, the

17   only official that had the authority to parole someone

18   in the United States was the chief patrol agent of a

19   sector or higher.  So as the chief patrol agent in San

20   Diego Sector and as the chief patrol agent in El

21   Centro, I did effect approve paroles into the United

Page 31

1    States.

2         Q.    I want to shift a bit.  Hold on.  I want to

3    shift a bit to your role as an expert both in this case

4    and potentially in other cases.  Has a court ever

5    accepted you as an expert witness in any case?

6         A.    Not to my knowledge.

7         Q.    Have you ever prepared an expert report for

8    a lawsuit -- in the context of a lawsuit, have you ever

9    prepared an expert report?

10        A.    No.

11        Q.    Have you ever given expert testimony at a

12   deposition in a lawsuit?

13        A.    No.

14        Q.    Obviously I'm not including this one.

15   Other than this one, if that's a fair clarification.

16        A.    Other than this one, no, I've usually been

17   a government witness in the past.

18        Q.    How many times have you given testimony as

19   a government witness, not in your personal capacity,

20   but as a government witness in your career?

21        A.    On numerous occasions.  I cannot give you a

1   number.  Different lawsuits and then tons of personnel

2   actions that were also taken to the lawsuit level.

3        Q.    More than ten do you estimate in your

4   career?

5        A.    I'm not comfortable putting a number on it

6   because until issues like this came up, I never really

7   thought about it and tried to keep track.  And I spent

8   more of my career as a manager and a leader than I did

9   as an agent.  So, that time goes back many years.

10        Q.    Okay.  That's fine.  I don't want you to

11   guess if you don't know.

12        A.    I do not know.

13        Q.    That's fair.  That's what I told you at the

14   beginning.  Has a court ever precluded you as an expert

15   in any case?

16        A.    No, not to my knowledge.

17        Q.    Have you ever appeared as a non-retained

18   expert in any case like you're doing in this case?

19        A.    No, I have not.

20        Q.    What subject matters, if any, do you

21   consider yourself to be an expert on?

Page 33

1       A.    Border security and the implications of

2    immigration policies on flow and border security

3    operations.

4       Q.    Your expertise on those two particular

5    subject areas, are they derived from your experience in

6    border patrol over the course of your career or from

7    something else?

8       A.    Primarily from border patrol over the

9    course of my career.

10      Q.    You said primarily.  Is there something

11   else?

12      A.    I say primarily because as a -- I lived on

13   the border before I was a border patrol agent.  And

14   border communities crossed back and forth across the

15   border, keenly aware of how the communities interact

16   with each other.  And that experience, that life

17   experience, if you will, took place outside the border

18   patrol.  While it's nothing compared to my experience

19   in the border patrol, it does influence my opinions on

20   border security operations and how they affect the

21   communities on both sides of the border, not just the

Page 34

1    United States.  So that's why I say primarily.

2         Q.    Have you ever studied, in terms of formal

3    courses of study, anything with respect to border

4    policy or immigration law?

5         A.    Immigration law throughout the academy, of

6    course.  Follow on additional training, of course.

7    When you say formal, as in like a college typesetting?

8    No.

9         Q.    Do you consider yourself to be an expert in

10   immigration law?

11        A.    No.

12        Q.    Do you consider yourself to be an expert in

13   immigration policy?

14        A.    As -- I consider myself to be an expert in

15   the relationship between immigration policy and border

16   security operations and how it affects the real life

17   environment on the border.

18        Q.    When you use the phrase border security

19   operations, how do you define that, that phrase, that

20   term?

21        A.    I define border security operations in the

Rodney Scott                                                    December 5, 2023

Page 35

1    most simplistic form of being able to identify and know

2    what's going on along the border and then make informed

3    decisions that allow us to enforce the law.  But to the

4    extent that border control can then detect and

5    interdict people crossing into the United States, which

6    is the primary mission.  So the ability to do that is

7    how I define border security.

8         Q.    You also mentioned that you consider

9    yourself to be an expert on the effects of policy on

10   flow.  Is that accurate?  I'm paraphrasing, you can

11   correct the paraphrasing, but.

12        A.    Yeah.  I consider myself an expert, again,

13   based on 30 years of experience on how specific policy

14   decisions or policies relating to immigration are

15   interpreted and then affect the cross border illegal

16   flow, yes.

17        Q.    When you say cross border illegal flow,

18   what do you mean by illegal flow?

19        A.    Under 8 U.S.C. 1325, anybody that crosses

20   in between the ports of entry without having -- anybody

21   that crosses in between the points of entry, that's an

Rodney Scott                                    December 5, 2023

Page 36

1   unauthorized location, that's a violation of law, that

2   is an illegal entry, regardless of what happens after

3   the fact.

4        Q.    If that individual ends up making a claim

5   for asylum and the asylum claim is found to be

6   meritorious or they're found to be entitled to

7   protections under the Convention Against Torture, in

8   your definition, you're including those individuals

9   within unlawful immigration because the initial

10  crossing was between ports of entry in violation of

11  law; is that accurate?

12       A.    That is in violation of law and it's

13  separate and apart.  So that's why I say the effect of

14  immigration policy on that flow because they are

15  somewhat different.  But, yes, the illegal entry itself

16  is a violation of law.  That's border security.  That's

17  border patrol's primary role is to prevent that.

18       Q.    I want to talk about, what I am going to

19  refer to probably interchangeably as the Asylum Officer

20  Rule or the IFR, and when I use those terms, I'm

21  referring to the policy that was created, the formal

Page 37

 1   name for which is Procedures for Credible Fear

 2   Screening and Consideration of Asylum, Withholding of

 3   Removal, and CAT, C-A-T, Protection Claims by Asylum

 4   Officers.  Are you familiar with what I am talking

 5   about?

 6        A.    I am familiar and I understand what you're

 7   saying.

 8        Q.    So if I say AO rule, AOR or IFR, I'm

 9   talking about that.  Does that make sense to you?

10        A.    Yes, it does.

11        Q.    What is your understanding of what the

12   Asylum Officer Rule does?

13        A.    My understanding of the Asylum Officer Rule

14   is that it moves the final -- the most important part,

15   it moves the final adjudication potentially from an

16   immigration judge to the asylum officer.  In a positive

17   way.  If there is a negative determination, the

18   individual alien still has an opportunity to go to an

19   asylum judge for review.  But the asylum officers will

20   be able to adjudicate cases in favor of the alien

21   without going to an immigration judge.

Rodney Scott                                    December 5, 2023

                                                        Page 38

1        Q.    Is it fair to say that the Asylum Officer

2   Rule was implemented after your departure from the

3   border patrol?

4        A.    Yes.  My understanding is that the initial

5   publication in the Federal Register, the notice, if you

6   will, the Notice of Proposed Rulemaking, was published

7   on August 20th, I think, and again, I'm pulling that

8   from Open-source, in 2021, and I retired on

9   August 14th, 2021.  But it takes a lot of time before

10   something makes it to the Federal Register.  So it was

11   in process well before I retired.

12        Q.    The rule was actually implemented, and you

13   can tell me, if you don't know this, that's fine, you

14   don't have to agree with me, but I guess I'm asking, is

15   it consistent with your recollection that the rule was

16   implemented on May 31st, 2022 for the first time?

17        A.    I do not know the specific dates, and just

18   for clarification, I don't intend to testify on that

19   aspect of it.  My testimony is primarily -- well, I'm

20   going to testify on my knowledge.  I don't know

21   specific dates it finally went into the publication.

Rodney Scott                                            December 5, 2023

Page 39

1          Q.    That's fine, and I'll clarify again.  I'm

2     only asking -- for everything here, I'm only asking for

3     your knowledge.  If you don't know something, you don't

4     need to guess.  There's no extra credit for correct

5     guesses.  It's not the SATs.  If you know something,

6     you can tell me.  If you don't know something, tell me

7     you don't know something and we'll move on.  Are you

8     aware that the rule was paused in April of 2023 until

9     October of 2023?

10         A.    I'm generally aware of a pause, some of the

11    legal issues and internal, but I do not know specific

12    dates or all the details of why.

13         Q.    Is it correct and consistent with your

14    understanding that the rule applies to adults and

15    family who are placed in expedited removal proceedings

16    and indicate an intent to apply for asylum fear of

17    persecution or torture or a fear of return to their

18    home country?

19         A.    That is my general understanding.

20         Q.    You mentioned that there was a shift from

21    responsibilities previously held by immigration judges

Page 40

1    to asylum officers; is that accurate?

2          A.    That is my understanding.

3          Q.    And those asylum officers are employed by

4    CIS; is that right?

5          A.    That is also my understanding, yes.

6          Q.    Is it correct that individuals who are

7    placed in expedited removal proceedings receive a

8    positive credible fear determination and are

9    individuals who ICE determines it's appropriate to

10   release are then referred for Asylum Merits Interviews

11   to those individuals at CIS, the asylum officers?  Is

12   that correct?

13         A.    Would you rephrase exactly what you're

14   asking me?

15         Q.    Sure.  We talked a moment ago about the

16   individuals that the rule applies to, adults and

17   families placed in expedited removal proceedings who

18   indicate an intention to apply for certain

19   classifications, for asylum, for fear of persecution or

20   torture or fear of return to their home country.  And

21   what they're being referred for at that point are

1    Asylum Merits Interviews.  Is that consistent with your

2    understanding?

3            A.    Yes, it is.

4            Q.    And those are also going to be individuals

5    whom ICE has determined it's appropriate to release

6    from custody; is that accurate?

7            A.    That was the part of your question that I

8    don't know that I can answer.  The decision to release

9    somebody or not to release somebody is based on an

10   individual case by case.  It's not -- it's not supposed

11   to be a blanket.  But in many cases it does -- this

12   process does result in people being released in to the

13   United States pending the next phase of their

14   immigration process.  But that's supposed to be a case

15   by case determination, not a blanket.

16           Q.    I wasn't referring to a blanket, I was just

17   referring to individuals on a case by case basis who

18   ICE releases maybe subject to the Asylum Merits

19   Interview?

20           A.    That is a possibility, yes.

21           Q.    And is it correct or consistent with your

Rodney Scott                                    December 5, 2023

Page 42

1    understanding that the interview under the Asylum

2    Officer Rule, not before, I'm talking now, these

3    questions I'm about to ask you, let me caveat this,

4    since the rule has been implemented, that the

5    interviews, is it consistent with your understanding

6    that the Asylum Merits Interview takes place in a city

7    in the interior of the United States where the

8    particular noncitizen expresses an intention to go?

9         A.    Again, that is my general understanding.  I

10   don't think that that's mandated, but I believe that is

11   my general understanding, yes.

12        Q.    Before the Asylum Officer Rule was

13   implemented, as a general matter, those Asylum Merits

14   Interviews would have taken place before an immigration

15   judge who most likely would have been in a border state

16   if that's where the migrant was encountered crossing

17   the southwest border; is that accurate?

18        A.    I don't know if that's accurate or not.

19        Q.    Do you have an understanding that one of

20   the things that the Asylum Officer Rule does is shift

21   some of the asylum processing that used to occur at or

1   near the southwest border to interior cities?

2        A.    I do not.  I believe that that is implied,

3   but my understanding is based more on the asylum

4   officer than the specific location.

5        Q.    Do you agree or have an understanding that

6   the Asylum Officer Rule was implemented in a phase

7   manner since the time it was first announced?

8        A.    I do know that it was implemented in a

9   phase manner.

10        Q.    By that I mean that it was applied in some

11   cities before other cities; right?

12        A.    Correct.

13        Q.    As you're sitting here today, do you know

14   how many cities the Asylum Officer Rule was implemented

15   in prior to the pause?

16        A.    I do not.

17        Q.    What about as of today, so just in general,

18   do you have an understanding as to how many cities the

19   Asylum Officer Rule has been implemented in?

20        A.    I do not.

21        Q.    Do you know when the Asylum Officer Rule

Rodney Scott                                          December 5, 2023

Page 44

1    was implemented in any cities in the State of Florida?

2          A.    I do not.

3          Q.    What about Louisiana?

4          A.    I do not.

5          Q.    You mentioned earlier that another

6    significant change, or a change, I don't want to put

7    words in your mouth, that the Asylum Officer Rule

8    affected was it moved responsibility for the initial

9    Asylum Merits Interview from immigration judges to

10   asylum officers; right?

11         A.    Yes, I believe that is accurate.

12         Q.    Do you know how long it takes to get an

13   Asylum Merits Interview under the Asylum Officer Rule?

14         A.    I do not.

15         Q.    Are you aware of any time limits the rule

16   sets forth for resolving claims?

17         A.    I read in the initial notice times.  I do

18   not remember off the top of my head what they were.

19         Q.    Do you know how many Asylum Merits

20   Interviews took place pursuant to the new processes

21   announced in the rule prior to its pause in April of

Page 45

1    2023?

2         A.    I do not.

3         Q.    What about total?  Do you have any

4    understanding as to the total number of Asylum Merits

5    Interviews that have taken place under the rule?

6         A.    I do not.

7         Q.    So would it be fair to say then that you

8    don't know how many Asylum Merits Interviews have taken

9    place in the states of Florida or Louisiana?

10        A.    Yes, that would be fair.  I do not know.

11        Q.    Do you know what the total grant rate is

12   for Asylum Merits Interviews conducted by asylum

13   officers under the rule?

14        A.    I do not.

15        Q.    And so again, fair to say that you don't

16   know what the total grant rates are for Asylum Merits

17   Interviews conducted under the rule in Louisiana or in

18   Florida?

19        A.    That's accurate.

20        Q.    So would it be similarly fair to say that

21   you do not know and cannot speak to how those grant

1   rates compare -- how those grant rates for asylum

2   claims under the rule compare to the rates for

3   individuals placed in expedited removal proceedings who

4   passed credible fear before the rule was in effect?

5        A.    No, I do not.

6        Q.    Would you agree or do you have any opinion

7   on whether changes in substantive asylum law based on

8   court decisions could affect the grant rates of asylum

9   claims over time?

10        A.    Could you rephrase that question please?

11        Q.    Yeah.  It was a bad question.  So I

12   appreciate that.  Would you agree that changes in

13   asylum law based on court decisions, legal precedent

14   could affect the rate at which asylum claims are

15   granted over the span of time?

16        A.    Yeah, I believe that part of the asylum

17   officer's job or an immigration judge's job is to apply

18   the current law.  So as judicial decisions are made, as

19   case law changes, then the application of that would

20   also change.  That makes sense to me.

21        Q.    Now, over periods of time, is it fair to

Page 47

1    say that the nationality of the populations crossing

2    the border and claiming asylum, and when I say the

3    border, I'm referring to the southwest border, that

4    those change over time?  Is that accurate?

5         A.    I do not believe you need to limit that to

6    the southwest border, but the populations do change and

7    have changed dramatically.  But it involves all of our

8    borders, not just the southwest border.

9         Q.    Fair.  In terms of the nature of the

10   changing population, you may see changes with respect

11   to the age of individuals, whether they're family units

12   or single adults, unaccompanied children, the

13   nationalities of populations, men versus women, would

14   you agree those are all demographics that change over

15   periods of time?

16        A.    Yes.

17        Q.    And would you agree that changes in the

18   population demographics of those arriving at the

19   southern border or any border can affect the grant

20   rates for asylum over time?

21        A.    Statically it would, but the reverse is

Page 48

1   also true.  It's not necessarily the grant rates.  From

2   my experience, the population and the demographics that

3   arrive at our borders and cross illegally is very --

4   it's very often related to perceived or real loopholes

5   that result in people being released in to the United

6   States.  So as policies or laws have changed, there's

7   been a predictable increase in illegal crossings by

8   people within that -- the group affected by whatever

9   that policy or law change was.

10        Q.    Can you identify any specific individuals

11   who were granted asylum by an asylum officer where you

12   believe the claim of asylum was not meritorious?

13        A.    No.

14        Q.    Do you have any knowledge as to whether the

15   implementation of the Asylum Officer Rule has sped up

16   processing times for review of asylum claims by those

17   in expedited removal proceedings?

18        A.    My understanding is that the entire intent

19   was to speed up that process.  But since I'm retired, I

20   do not have specifics on how effective that was, if it

21   actually sped up the entire process or not.

1      Q.    So you just don't know one way or the

2  other?

3      A.    Correct.

4      Q.    Do you know how many, if any, noncitizens

5  processed under the Asylum Officer Rule have been

6  denied asylum and removed from the United States?

7      A.    I do not.

8      Q.    Do you know how their time in the country,

9  and by that I mean, length of time, span of time,

10  compares to the time in the country on average for

11  noncitizens denied asylum under the expedited removal

12  process prior to the rule's implementation?

13      A.    That's a long question.  Can you just

14  restate it please?

15      Q.    Sure.  Individuals who have been processed

16  under the Asylum Officer Rule, denied asylum and

17  removed from the country, assuming for the sake of

18  argument that there are such individuals, whatever

19  number that is, you said you don't know what it is, but

20  whatever number that is, do you know how the amount of

21  time on average they spent in the United States

Rodney Scott                                                    December 5, 2023

Page 50

1    compares to the average amount of time noncitizens

2    denied asylum under the expedited removal processes

3    prior to the rule's implementation on average spent in

4    the United States?

5         A.    I do not have that factual data, no.

6         Q.    I want to pivot a bit to talk about the

7    NPRM, it's N like Nancy, and I'm saying it's the Notice

8    of Proposed Rulemaking.  So if I say NPRM, do you

9    understand, Chief Scott, that that's what I am

10   referring to?

11        A.    Yes, I do.

12        Q.    I believe you said earlier that it was on

13   or about August 20th that the NPRM was published; is

14   that correct?

15        A.    That is correct.  That's my belief.

16        Q.    The rule was promulgated by the Department

17   of Homeland Security and the Executive Office for

18   Immigration Review; is that right?

19        A.    Correct.

20        Q.    Now, did you ever read the NPRM as it

21   appeared in the Federal Register?

Rodney Scott                                    December 5, 2023

Page 51

1      A.    After it appeared in the Federal Register,

2   yes.

3      Q.    What was your understanding, either from

4   reading it or from prior knowledge of it, you can let

5   me know which one it is, of what the purpose of the

6   NPRM was?

7      A.    So, from prior knowledge specifically, and

8   when I am talking about prior knowledge, I participated

9   in the transition from the Trump administration to the

10  Biden administration so myself and my staff were

11  constantly briefing people on current initiatives,

12  different issues coming up, and then immediately

13  following the inauguration, we implement -- we were

14  basically in meetings, having conversations, this, the

15  idea of a rule change to give asylum officers this

16  authority was what I would call a hallway chatter or it

17  was coming up in meetings.  It was acknowledged and

18  well known.  So, I knew about it from that aspect.  And

19  then consistent with my experience, every single

20  conversation we had with -- that I personally had with

21  anybody in the new administration, their focus was on

Page 52

1    expediting the flow of people into the United States

2    and then this was supposed to expedite that flow as

3    well.

4         Q.    When did you first become aware of the

5    purpose or goals connected with the NPRM?  Those

6    objectives, as you understood them to be, when did you

7    first, you said you heard hallway chatter and there was

8    discussions about what the subject matter that led up

9    to being the NPRM.  When was that, that you first

10   became aware of those objectives or conversations?

11        A.    So in a vague manner, honestly during

12   campaign for the current administration and the

13   election cycle, just general awareness as we're

14   watching what could possibly affect border security.

15   More specifically in conversations throughout the

16   transition, and again, I was managing a 20,000 person

17   organization so I did not personally brief every one of

18   those conversations.  But any time that my staff

19   interacted with the transition teams, they would come

20   back and back brief me.  And this idea of streamlining

21   or speeding up this process was not anything new.  In

1    the last administration, they had trained border patrol

2    agents to have more resources, if you will, available.

3    Basically they gave them the same training as asylum

4    officers, from what they believed at the time was the

5    same training, with the idea of relieving the backlog.

6    So this kind of conversation had been ongoing for a

7    while about the asylum process.  But this

8    administration took a significantly different approach.

9    Any focus on actually like weeding out fraud or

10   minimizing the flow was off the table and the

11   conversation was just about speeding up the process.

12        Q.    What was the nature of the backlog that you

13   referred to a moment ago?

14        A.    Of the asylum applicants?

15        Q.    No, you mentioned a backlog.  And when you

16   talk about a backlog, are you referring to a backlog in

17   terms of processing people for expedited removal before

18   immigration judges or is your reference to a backlog

19   referring to something else?

20        A.    My specific reference is the backlog to the

21   entire immigration process for the conversation we're

Rodney Scott                                    December 5, 2023

Page 54

1    having right now, specifically it is the asylum

2    process.  In my experience, and this is well

3    established beyond my experience going back to people

4    like Alan Bersin and Janet Reno, anytime that someone

5    crosses the border and is released into the United

6    States pending immigration hearing or for any other

7    reason, that results in an increased flow across the

8    border which further backs up the system and it just

9    becomes this domino effect.  That's what I'm referring

10   to.  There's different approaches from different

11   administrations on how to relieve or they believe to

12   relieve that backlog.  The conversations that we were

13   having with the transition team, the conversations that

14   I had that went beyond this asylum rule, but also

15   encompassed it, was trying to explain to them and show

16   them that anything that speeds up a process that

17   results in a release is going to have cascading

18   negative effects on border security that we will not be

19   able to control and that is exactly what's happened.

20        Q.   After the NPRM was published, there was an

21   opportunity to submit comments with respect to it; is

Rodney Scott                                December 5, 2023

Page 55

1    that accurate?

2         A.    That is accurate.

3         Q.    And at that time, when the NPRM was

4    published you were no longer employed by the border

5    control; is that correct?

6         A.    That's correct.

7         Q.    Did you summit any comments in response to

8    the NPRM?

9         A.    I did not.

10         Q.    The interim final rule, that was announced

11    on or about May 29th -- March 29th, excuse me, of 2022.

12    Does that sound right to your years?

13         A.    I do not know the specific date, but that

14    sounds reasonable, yes.

15         Q.    Were you aware of that at or about the time

16    the IFR was announced?

17         A.    Generally, yes.

18         Q.    Was that from watching the news or

19    something else?

20         A.    Yeah, just watching the news and staying up

21    to date on current events.

1      Q.    Is it correct that the IFR made revisions

2  to the process of adjudication of certain asylum

3  applicants and those seeking withholding and removal

4  and protection under the CAT?

5      A.    Could you rephrase that please, or just --

6      Q.    Fair.  No problem.  Is it correct that the

7  IFR made revisions to the processes that had been set

8  forth in the NPRM?

9      A.    I believe so, yes.  I don't have the

10  specifics, but I believe there were changes.

11      Q.    My next question was going to be:  Do you

12  have any understanding of what those changes were?

13      A.    Not specifically, no.

14      Q.    Do you have any understanding generally?

15      A.    Yes, I do, but not to the detail that I

16  would be willing or wanting to testify to what that is.

17      Q.    Well, broadly speaking, is there any

18  category of change between the NPRM and IFR that you

19  feel comfortable that you have a sufficient

20  understanding of to summarize in a broad brushstroke or

21  not?

Rodney Scott                                          December 5, 2023

Page 57

1          A.    So, conceptually, broad brush, the actual

2     level of fear, whether it's more likely than not, if

3     you will, or it's plausible, I believe that was

4     adjusted.  I couldn't -- I'm not going to testify

5     beyond that.  That level of detail isn't something that

6     I was focused on.

7          Q.    Did you read the IFR after it was

8     published?

9          A.    I read the public excerpts of it.  I did

10    not read the entire thing, no.

11         Q.    There was another opportunity after the IFR

12    was issued for further comments from the public to be

13    submitted; is that accurate?

14         A.    That's the normal process so I believe it's

15    accurate.

16         Q.    Did you submit any comments in response to

17    the IFR?

18         A.    I did not.

19              MS. FUDIM:  I want to mark as Exhibit B

20    now, since we already have an Exhibit A, what I am

21    calling the Disclosure of Rodney Scott by Plaintiffs.

Rodney Scott                                    December 5, 2023

Page 58

1    I sent it to you, Mr. Block, and to everybody by e-mail

2    in advance so we don't have to do a share screen.  And

3    I will send a copy, Ms. Brooks, I will e-mail you a

4    copy of the document, let me do that right now.  So the

5    court reporter has it.  Rather than doing a share

6    screen, I think that will be easier.  I just e-mailed

7    the court reporter the document.  I'm referring to the

8    disclosure of Rodney Scott.  I e-mailed it to you,

9    Mr. Block.  Do you have it for the client there?

10                MR. BLOCK:  Yeah, I have it up on the

11   screen.

12                MS. FUDIM:  Mr. St. John, are you all set?

13   Do you have a copy of it in front of you?

14       Q.    I'm referring to this document, we're going

15   to mark it as Exhibit B, have you seen this document

16   before, Chief Scott?

17                (Deposition Exhibit B was marked for

18   purposes of identification.)

19       A.    Yes, I have.

20       Q.    When was the first time?

21       A.    Yesterday my attorney shared it with me.

Rodney Scott                                          December 5, 2023

                                                            Page 59

1          Q.     Now, would you agree with me that this

2    document, it's a two-page document, and there is G, and

3    by G I mean, ABCDEFG, there are G statements contained

4    in this document?

5          A.     Yes, I would.

6          Q.     Are these all statements that you either --

7    well, withdrawn.  Do you agree that these are all

8    either facts or opinions that you believe to be true?

9          A.     Yes.

10         Q.     I want to go through them one at a time.

11   So, let's start with A.  I'm going to read them into

12   the record and we can talk about them.  It says "the

13   Biden Administration consistently focused on expediting

14   processing and increasing opportunities for migrants to

15   enter the United States, and has acted to undermine

16   border security".  Did I read that correctly?

17         A.     Yes.

18         Q.     Do you agree with that statement?

19         A.     Yes.

20         Q.     What period of time does that statement

21   pertain to?

Page 60

1          A.     It pertains to the entire Biden

2    Administration, from what I have seen, but specifically

3    it pertains to my direct engagement as the Chief of the

4    United States Border Patrol.  From the transitions

5    prior to the inauguration, through the inauguration and

6    up to August 14th, the day that I retired.

7          Q.     Do you believe this statement to be a

8    statement of fact or a statement of your opinion?

9          A.     I believe it to be a statement of fact

10   based on evidence and conversations with people well

11   beyond myself involved in border security.

12         Q.     What do you mean by expedited processing in

13   this statement?

14         A.     So, like any business whatsoever, you have

15   limited or you have -- everybody has limited resources

16   and you have to decide where to apply those.  Over my

17   entire 30 year career, every conversation that I was in

18   about border security and where we should apply

19   resources had a component to that that was about

20   securing the border and then making sure we could do

21   our fundamental mission of knowing who and what crosses

Rodney Scott                                    December 5, 2023

Page 61

1    the border.  And we also talked about processing times

2    and time in custody and everything else.

3           The Biden Administration shifted that

4    dynamic completely and we were not allowed, and when I

5    say allowed, if we brought up anything about the

6    threats involved at the border, deterrents, we were not

7    allowed to talk about deterrents, there was no

8    conversations allowed whatsoever about slowing down the

9    flow.  And again, just for clarification, when I say

10   that, I mean literally in a meeting if the U.S. Border

11   Patrol, myself or others would talk about this decision

12   of allowing, I'll use a different example, of allowing

13   just a blanket, a waiver of juveniles to come in under

14   Title 42 will result in more.  Like I don't want to

15   hear it.  That's not what we're here to talk about.

16   Our conversations were literally shut down.

17          Then we were -- I was ordered and forced to

18   redirect significant financial funding from enforcement

19   operations, from proposed technology initiatives to

20   bolster and beef up what the administration wanted to

21   call welcoming centers.  They literally wanted to call

Rodney Scott                                    December 5, 2023

Page 62

1    them welcoming centers and we pushed back.  And now

2    that's what you commonly are here to talk about

3    processing centers or short-term detention soft-sided

4    facilities within the border patrol.

5         Q.    I'm going to stop you there only because my

6    question was what do you mean by expedited processing.

7    And so I just want to stick to that particular

8    question.  Is there a defined meaning in your mind as

9    to what that phrase means as used in subsection A?

10   Just the phrase expedited processing.

11        A.    Yes, but I think it's very important to

12   have the context that I just gave you.  So the reason

13   the funding and the soft-sided facilities were pushed

14   was solely, and this was a statement that was given to

15   me, to reduce time in custody and speed up the

16   processing so that we don't have backups into border

17   patrol stations.  It literally was about, and this

18   isn't made up, this is an opinion, this is factual

19   statements, we don't want people backed up along the

20   border, we want them processed and we do not want

21   people detained.

Rodney Scott                                        December 5, 2023

Page 63

1      Q.    Did you ever experience a problem with the

2   fact that there were a backup of individuals at border

3   patrol stations?

4      A.    Constantly.

5      Q.    Let me ask you this:  It sounds like, and

6   you can correct me if I'm wrong, but it sounds like to

7   me when you're speaking about the focus on expedited

8   processing that you're speaking to a range of different

9   pathways.  So including those placed into forwarding

10   proceedings.  Is that accurate?

11      A.    Correct, in general terms, and when I'm say

12   processing right now, I'm talking about any processing

13   pathway between prosecution, which would be best case

14   scenario, to immigration hearings to just being

15   released.

16      Q.    So not just expedited --

17      A.    Get deported.  Sorry.  I didn't mean to

18   talk over you.

19      Q.    So not just expedited removal proceedings?

20      A.    Correct.

21      Q.    Now, you also have -- there is also a

Rodney Scott                                      December 5, 2023

Page 64

1    reference here to migrants, the word migrants.  What

2    migrants are you referring to?

3              MR. BLOCK:  Can I just seek a

4    clarification?

5              MS. FUDIM:  Yes.

6              MR. BLOCK:  I don't believe Mr. Scott wrote

7    this disclosure so if you just phrase not that he's

8    referring to, because I don't believe he wrote it.  I

9    just don't want --

10             MS. FUDIM:  I appreciate that.  Let me

11   circle back.

12        Q.    You mentioned that the first time you saw

13   this document was yesterday; is that correct?

14        A.    That's correct.

15        Q.    Did you have an understanding prior to

16   yesterday, in the past several months, that a document

17   of this type was going to be drawn up and shared with

18   defendants in this matter?

19        A.    Generally by procedure, yes.

20        Q.    What did you understand that that document

21   was going to be?

Page 65

1        A.    It would outline what Rodney Scott as a

2    witness would potentially testify to in this

3    proceeding.

4        Q.    What role, if any, did you have with

5    respect to the creation of this document including the

6    ideas that are contained within it?

7        A.    As stated earlier when Scott St. John from

8    the state of Louisiana reached out to me, told me that

9    my name was referred by another witness, he asked what

10   I would be able to offer as far as factual information

11   about the process and I outlined for him that

12   information.  And that's what's pretty much in this

13   document.

14       Q.    And the question was, what factual

15   information you would be able to offer?

16       A.    Yes, testimony.  So, based on my

17   professional experience and my direct engagements, what

18   could I testify to?  What would I be willing to testify

19   to?

20       Q.    You mentioned you were referred by another

21   witness.  Do you know who that was?

Rodney Scott                                          December 5, 2023

Page 66

1          A.     I believe it was Art Arthur.  He was a

2    prior immigration judge and he's part of some of the

3    border coalition work that I have done.

4          Q.     Have you spoken to Mr. Arthur recently?

5          A.     I have.

6          Q.     When was the most recent time you spoke to

7    Mr. Arthur?

8          A.     Via texts, he's on a group chat so it would

9    have been probably yesterday.  Verbally, it's probably

10   been months.

11         Q.     Did Mr. Arthur share with you that he was

12   deposed in this case last week?

13         A.     He did not.

14         Q.     Were you aware of that?

15         A.     Yes, I was.

16         Q.     How did you become aware of that?

17         A.     I believe Scott St. John told me that he

18   was a witness and that he was going to be deposed.  My

19   understanding of sharing that information with me was,

20   one, to know how they got my contact, and two, was so

21   that I would know not to have conversations or share

Rodney Scott                                           December 5, 2023

Page 67

1    information or anything that would potentially hurt

2    this case or anything in any way.

3         Q.    Fair to say that you complied with that and

4    you haven't discussed your testimony with Mr. Arthur?

5         A.    I have not discussed it with Mr. Arthur at

6    all.

7         Q.    Going back to the document that we have

8    marked as Exhibit B, and looking at the first bullet

9    pointed item which is labeled A, there is a reference

10   to the word migrants.  Understanding that you didn't

11   write it, but that you indicated you agree with this

12   statement as written, who does the word migrants refer

13   to as used in statement A?

14        A.    So, specific to this and my interpretation,

15   migrant is referencing illegal aliens in the United

16   States, generally that term is used much broader.  But

17   I'm interpreting it as people that border patrol were

18   engaged with and that would be illegal aliens.

19        Q.    So as used in sub A, migrants would refer

20   to, for example, those who present at ports of entry

21   and interact with OFO?

Rodney Scott                                    December 5, 2023

Page 68

1          A.    If they lacked immigration documents when

2     they arrived, yes.

3          Q.    So --

4                MS. FUDIM:  I have 11:22, do we want to

5     come back at 11:30?

6                THE WITNESS:  Works for me.

7                (A discussion was held off the record.)

8          Q.    When we left off, we were taking about

9     statement A on the document that we have marked as

10    Exhibit B to the deposition.  We were talking about

11    what the word migrants refers to, and I believe you

12    said that it includes, in your mind as accurate within

13    that statement, individuals who present at ports of

14    entry and claim asylum and may even get asylum, but if

15    they're undocumented when they appear at ports of

16    entry, you believe that that would be subsumed within

17    what the word migrants means as used in statement A; is

18    that accurate?

19         A.    That is accurate.

20         Q.    There's a statement here that the Biden

21    Administration has acted to undermine border security.

Page 69

1    What do you mean by that?  And I say you, and I

2    understand you didn't write this, but given that you

3    have stated that you agree with this statement, I may

4    colloquially ask you in connection with this statement

5    and others, what do you mean by that?  Just for the

6    record, I understand you didn't write this.  But I'm

7    going to say the word you because it seems like you

8    have adopted these statements as accurate.  Is that

9    fair?

10         A.    That is fair, yes.

11         Q.    So, what do you mean by that statement with

12   respect to undermining border security?

13         A.    So going back to our conversation a minute

14   ago, border security is our ability to basically

15   control who and what enters our country.  And in this

16   context, because you brought up ports of entry, at the

17   ports of entry and in between the ports of entry.  We

18   have limited resources.  So every decision we make to

19   basically to take an agent or an officer off of

20   enforcement duties, and when I say enforcement duties

21   for a port of entry, that's literally talking to

1    somebody at primary, inspecting a vehicle that's been

2    sent to secondary, running an x-ray machine, basically

3    trying to make sure we know who and what is coming into

4    the country.

5              In between the ports of entry, that

6    includes patrolling the border, monitoring surveillance

7    equipment, and then of course in both contexts when you

8    see something happening, be able to respond to that.

9    We explained -- I explained to the administration time

10   and time again, and actually several people in the

11   administration like Blas Neto in CBP have been in CBP

12   before and already knew a lot of this information and

13   acknowledged it, that any time you knowingly increase

14   the flow, and you have to pull people off at the port

15   of entry and CBP officers to process these

16   administrative cases.  This is why the ports of

17   entry -- overcrowding and actually making sure we can

18   focus on border security issues because there are real

19   threats, was a key part of limiting the amount of

20   people that could come into a port at any given time

21   without immigration documents because it also slows

Rodney Scott                                                    December 5, 2023

Page 71

1   down legitimate travel.

2               In between the ports of entry, it's

3   actually almost significantly worse.  Because at a port

4   of entry, things get backed up.  But in between the

5   ports of entry, things get missed.  And the more that

6   border patrol agents get pulled aside to actually

7   process administrative immigration cases, or for any

8   reason to be quite honest, they're not patrolling the

9   border and the vast majority of the northern border and

10  huge sections of the southwest border still lack

11  infrastructure and technology.  And this was at the

12  same exact time that the Biden Administration stopped

13  the wall construction, which no one talks about it, but

14  it had a very significant technology package in it as

15  well.  So by pulling an agent aside to process illegal

16  aliens coming into the United States in these

17  massive -- increasing numbers at that point in time, it

18  directly undercuts border security because it undercuts

19  the ability of the United States Border Patrol to

20  patrol the border and to stop the cartels or anybody

21  from being able to enter our country unabated.

Rodney Scott                                    December 5, 2023

Page 72

1        Q.     Do you have any evidence that the Asylum

2    Officer Rule in particular has undermined border

3    security?

4        A.     I believe we do.  But it's in a bigger

5    context.  The problem with this entire discussion, and

6    I don't mean this lawsuit, I mean, border security in

7    general is every decision has second and third level

8    effects.  So the border -- the Asylum Officer Rule is

9    just one of many.  But anything that results in people

10   being processed, very quickly, the faster somebody gets

11   released into the United States, the more the flow

12   increases.  So if the asylum rule, for example, had

13   been properly framed with detention or something like

14   the Remain in Mexico program, anything that basically

15   made sure that the people were not released into the

16   United States before their case was adjudicated would

17   not have undercut border security like this.  But the

18   conversation about what was commonly referred to as

19   catch and release for any reason, which the Asylum

20   Officer Rule potentially speeds up, directly affects

21   cross border flow, and again, I'm testifying to this

Rodney Scott                                    December 5, 2023

Page 73

1    today, but this goes well beyond me.  These are

2    nonpartisan issues going back to Janet Reno and Alan

3    Bersin days under the Clinton Administration where a

4    lot of my border security experience was developed.

5              I do believe that the Asylum Officer Rule

6    speeds up the process, speeds up the amount of time or

7    shortens the time in custody, if you will, and

8    potentially results in people being released quicker

9    which will dramatically increase the flow because every

10   one of them calls home and tells their family and

11   friends what happened.

12        Q.   Do you have any evidence that anyone has

13   called home and told their friends about what has

14   happened specifically with respect to the Asylum

15   Officer Rule?

16        A.   Specific to the Asylum Officer Rule, no,

17   because most -- again, this is now my experience, most

18   migrants, is the term we used here, but most illegal

19   aliens that cross the border and get released, they

20   don't really even understand the process, they don't

21   know anything about the Asylum Officer Rule, they just

Rodney Scott                                    December 5, 2023

Page 74

1    know they were released.  So my testimony is about the

2    effects.  When someone is released into the United

3    States, even for whatever reason, and in this case it's

4    specifically to the Asylum Officer Rule, what affect

5    does that have on border security?  There is an

6    unquestionable, there's unquestionable evidence it

7    dramatically increases the flow and it's done it for

8    decades because it's basic human nature.

9         Q.    Do you have any evidence that the Asylum

10   Officer Rule in particular has increased flow of

11   migrants?

12        A.    I'm going to stick with the testimony I

13   already gave.  As part of a bigger scheme, the Asylum

14   Officer Rule speeding up the release, I believe, based

15   on my experience, is part of the reason that we saw

16   3.2 million illegal encounters last year.  One of many

17   factors.  It's not the sole factor.

18        Q.    In your belief, policies work together with

19   other policies and have interplay with socioeconomic

20   conditions going on in the world and all of these

21   factors work together and you have to consider them in

Page 75

1    totality?  Is that fair to say?  Is that fair to say

2    that's your belief?

3         A.    I'm going to rephrase that slightly.  I

4    believe what you said minus the socioeconomic issues

5    around the world, yes.  I do believe that we also have

6    to factor in those when we're talking operational.

7    But, again, from my experience, those are big, big

8    issues outside the boundaries of the United States that

9    we cannot control.  We can only influence.  So when it

10   comes to what can we control, everything else that you

11   stated is accurate.

12        Q.    Is it fair to say that you cannot isolate

13   the effects of the Asylum Officer Rule to the rule

14   itself without considering in your view other policies

15   or actions of the government that exist during, before

16   or after?

17        A.    I would not state cannot, but in my

18   experience, they all interact with each other.  And in

19   this case, the Asylum Officer Rule directly aligns

20   ideology-wise with many of the other initiatives that

21   the Biden Administration has put in place.  So would

1   have the same effect, a dramatic increase in cross

2   border illegal activities.  So it's hard for me to

3   carve out how much of that had to do with the asylum

4   rule and how much of that had to do with shutting down

5   Remain in Mexico, reducing detention space, and several

6   of the other initiatives that they have done.

7          Q.    Then would it be fair to say that you don't

8   have evidence, when I'm using the word evidence here,

9   I'm using it in a narrow sense in terms of data.  You

10   don't have data.  Let me rephrase the question that

11   way.  Is it fair to say then that you don't have data

12   to show that the Asylum Officer Rule individually has

13   increased migrant flows?

14          A.    I argue the premise of the question is

15   skewed, that just like border security, there are

16   multiple factors involved.  If you can't delineate

17   exactly 9 percent or 10 percent of activities is

18   because of a specific policy.  That doesn't change the

19   fact that in the bigger picture and in the scheme of

20   things that it affected it.  I believe that the Asylum

21   Officer Rule was one of multiple factors that you can't

Rodney Scott                                    December 5, 2023

Page 77

1    separate out now because many things were done at the

2    exact same time.  However, based on my experience, and

3    many others, releasing people into the United States

4    has always had a direct impact on flow.  So I believe

5    there is evidence that the Asylum Officer Rule has

6    played a role in increased illegal flow across the

7    southwest border.  I cannot tell you the specific

8    number of people because that gets into human nature

9    and no one can tell that you number.

10        Q.   Do you have any evidence that more people

11   have been released pursuant to the Asylum Officer Rule.

12   So, again, speaking to population of individuals who

13   are subject to it in the first place.  So we're talking

14   about expedited removal, people express credible fear,

15   as we discussed it earlier, do you have an

16   understanding that more individuals have been released

17   under the Asylum Officer Rule that would have been

18   released had the rule not existed?

19        A.   I do not have that specific data.

20        Q.   Do you have any evidence that or are you

21   aware of any evidence or can you point me to any

1    evidence that by decreasing processing times for Asylum

2    Merits Interviews for certain noncitizens in expedited

3    removal proceedings who are subject to the Asylum

4    Officer Rule, more non-meritorious claims have been

5    granted than otherwise would have been had the system

6    remained adjudicatory in front of an immigration judge

7    in the first instance?

8             MR. ST. JOHN:  Objection.  Vague.  The

9    Chief's testimony is evidence.  So you need to clarify

10   when you're asking about data.

11        Q.   Let me ask you this.  I'll rephrase the

12   question.  Do you believe that as a result of the

13   Asylum Officer Rule, more non-meritorious claims have

14   been granted or is that a subject in which you have no

15   opinion?

16        A.   That is a subject that I'm not going to

17   testify to that I have not monitored.

18        Q.   I want to go down to B on the list.  So you

19   can take a look at the Exhibit B in front of you and

20   I'm looking at point B.  I'm going to read it and you

21   can let me know if I read it incorrectly.  "The Biden

Rodney Scott                                           December 5, 2023

1      Administration's immigration and border policies were

2      developed and drafted by political appointees".  Did I

3      read that correctly?

4              A.     Yes.

5              Q.     Is this a statement that you agree with?

6              A.     Yes.

7              Q.     Is it a fact or an opinion?

8              A.     I believe it's a fact.

9              Q.     Who are the political appointees that you

10     are referring to?  And again, I say you with the same

11     caveat, I understand you didn't write this.

12             A.     Correct, but I do agree with them that is

13     my statement.  In prior -- in my experience, border

14     patrol government, career government officials were

15     always included in policy-type development.

16     Immediately upon inauguration, the new chief of staff

17     showed up within CBP, and you asked for specifics, her

18     name was Lise Clavel, and she made it pretty clear that

19     they didn't really have any interest in our opinion.

20     She wasn't going to travel down to the border, that

21     they were there to make sure that the Biden policies

Page 80

1    were implemented.  Shortly thereafter, which is fine,

2    but shortly thereafter I realized very, very quickly in

3    meetings, normally we are going to -- I'll give you an

4    example, a morning briefing about the border, with

5    White House personnel, with DHS personnel, and we would

6    talk about different issues and we would talk about

7    solution sets.  Border patrol, me specifically, we were

8    allowed and tasked to brief out data and then more

9    basically shut down any time we wanted to talk about,

10   hey, the effects of it or policy or implementations.  I

11   quickly found that my staff was being left out of

12   meetings left and right.  I was being left out of

13   meetings left and right.

14            In March, I believe it was, of 2021, they

15   brought on Blas Neto as the chief operating officer of

16   CBP.  Blas told me to my face that they did not -- the

17   administration did not trust the border patrol and,

18   therefore, did not trust me.  And they weren't looking

19   for our input and opinions on policies.  It went from a

20   situation, again, where my entire career when we were

21   participating, and even if you didn't agree with me, at

Rodney Scott                                    December 5, 2023

Page 81

1    least you had a chance to make your argument, to where

2    I was getting e-mails through Lise Clavel that

3    supposedly came directly from the Secretary telling us

4    specific new policies or operational guidelines that we

5    would employ the next day.  With no engagement

6    whatsoever.

7              At the DHS level, there was a gentleman

8    named Dave Shahoulian.  We would have conference calls

9    and this involved ICE and many other agencies, where we

10   would brief out statistically what was going on on the

11   border.  But, again, as soon as we started talking

12   about any type of solutions or reducing the flow, the

13   conversation was shut down and stymied.  Any time I got

14   any guidance or direction on new groups of aliens that

15   we were going to exclude from Title 42, for example,

16   that came to me in an edict form without any kind of

17   conversation.  It was always the political appointees.

18   So that is why I believe that statement is factual.

19        Q.    Let's look at number C, letter C.  It says

20   "the Biden Administration did not seek advice from or

21   ignored advice from experts regarding immigration and

Rodney Scott                                December 5, 2023

Page 82

1    border policy including with respect to the asylum

2    IFR".  Did I read that correctly?

3         A.    You did.

4         Q.    Do you agree with that statement?

5         A.    I do agree with that statement.

6         Q.    Is it a fact or is it an opinion?

7         A.    I believe it is a fact.  Again, going back

8    to prior statements earlier in this conversation, we,

9    and I say we, myself and my staff knew about the idea

10   of this IFR.  We had heard and it was brought up kind

11   of sidebar issues in a few meetings.  But there was no

12   specific meeting about it.  Within CBP and within DHS,

13   there is a process called exec sec where any kind of

14   big policies or procedures are normally, and this is

15   after some kind of work group meetings and

16   conversations, once it's formalized, that is then sent

17   around to the executive assistant commissioners, which

18   the chief is one of, by position, by definition, in a

19   formal written process, then the border patrol, we

20   nicknamed it a blue sheet process, and you get to

21   review that, comment on it, concur with it, you don't

1    concur with it.  That didn't take place.  But beyond

2    that, one of my staff members vented directly to me

3    that the Asylum Officer Rule, idea, this is before

4    publication, came up.  He was talking to one of the

5    political appointees, I do not know which one, but in

6    this case it would normally have been Blas or Lise

7    Clavel, and he told them, with no uncertain terms, that

8    this would increase cross border flow unless they

9    factored in detention or remain outside the country.

10   That anything, based on our experience, anything that

11   resulted in people getting released quicker would have

12   a very rapid effect on border security, negative effect

13   because it would increase the flow and we would not be

14   able to then be able to actually effectively patrol the

15   border because our resources would be pulled away.  And

16   he said that the individual, even joked about putting

17   border patrol agents back -- that we would want border

18   patrol agents back in those positions or whatever and

19   then shut down the conversation.  So that is why I

20   believe that is a factual statement.

21        Q.    Who are the experts that you believe the

Rodney Scott                                              December 5, 2023

Page 84

1    administration ignored advice from?

2         A.    Career government personnel.  I don't --

3    I'm sorry, I didn't mean to talk over you.

4         Q.    Ignored advice means someone thought to

5    give it and it was rejected.  Is that what you mean by

6    ignored advice?

7         A.    That's exactly what I mean, and I believe

8    I'm on record with congressional testimony, I wrote a

9    letter to Congress immediately upon on my retirement

10   identifying this and asking the Oversight Committees to

11   look into it.  I believe it's well documented through

12   testimony of other former government officials and

13   public statements, that throughout the entire

14   transition, we were explaining border security,

15   explained the push/pull to the certain extent, what we

16   could and couldn't control, but how releasing people

17   has a direct impact on the flow.  And over and over

18   again what -- and again, I'm going off public

19   information now, but on the ICE side they ignored them

20   and on the CBP side.  Now, personal firsthand

21   information, on the initial conference calls with Dave

Page 85

1    Shahoulian, directly with Blas Neto, with Lise Clavel.

2    They ignored us.  They did not want to have any

3    conversation whatsoever about threats that could

4    possibly be crossing the border or deterring or slowing

5    down the flow.

6         Q.    My question is a fairly narrow one though.

7    Can you identify the experts by name, specific

8    individuals, that you believe the administration

9    ignored advice from with regard to the IFR?

10        A.    Rodney Scott, Raul Ortiz, Tony Barker,

11   probably Robert Danley.  These were all people on my

12   staff that interacted directly throughout the

13   transition and directly with the political appointees

14   after they came into CBP.  It goes beyond that, but

15   those are just a few.

16        Q.    Now, are you aware that after the NPRM was

17   published, are you aware of how many comments were

18   received?

19        A.    No.

20        Q.    If I said that it was approximately 5,000,

21   does that ring any bells or you just don't know one way

Rodney Scott                                    December 5, 2023

                                                    Page 86

1    or the other?

2         A.    No, I didn't pay any attention.  I don't

3    know one way or the other.

4         Q.    At that time when comments would have been

5    received in response to the NPRM, you were no longer

6    employed by the border patrol; correct?

7         A.    Correct.  And for clarity, I wouldn't have

8    paid attention to it then either because of some of the

9    things you identified earlier.  That was outside of my

10   traditional scope.  Those comments wouldn't have come

11   to me anyway.  Traditionally the chief of the border

12   patrol, as the senior most official in the country

13   responsible for securing the borders, my opinion and

14   that of my staff would normally be factored in and

15   considered.  That's what I'm testifying about.  Not

16   the --

17        Q.    So when you're saying experts, you are

18   including yourself within that group as it relates

19   to --

20        A.    Yes.

21        Q.    Now, is it fair to say that you're not

Rodney Scott                                              December 5, 2023

                                                              Page 87

1    aware of what consideration was given to any of the

2    comments that were received in response to the NPRM?

3           A.    That's correct.  I was not part of that

4    process.

5           Q.    I want to move to point D.  "Migration has

6    exploded due to Biden Administration policies,

7    statistics released by Biden Administration downplayed

8    the level of migration and releases into the interior".

9    Do you see that?

10          A.    Yes.

11          Q.    Did I read it correctly?

12          A.    Yes.

13          Q.    Do you agree with that statement?

14          A.    Absolutely.  Yes.

15          Q.    Is it a fact or an opinion in your view?

16          A.    It's a fact.

17          Q.    Maybe just to speed this up as well, I'll

18   ask you, obviously you see a pattern here, so I'm going

19   to ask you that question about each one of these

20   statements so we can speed it up.  If you'd like, you

21   can take a look at all the statements and tell me, do

Page 88

1    you believe them all to be fact?  And then I can stop

2    asking you that question individually.

3         A.    Yeah, every one of them is fact.  I believe

4    every one of them is fact.

5         Q.    So going back to D, where it says migration

6    has exploded.  So the first question I have is:

7    Migration, are you referring to lawful migration,

8    unlawful migration, both, something else?

9         A.    Illegal migration.

10        Q.    As we defined that term earlier?

11        A.    Yes.

12        Q.    What do you mean by exploded?

13        A.    Significantly increase to levels that were

14   -- I don't even think this was predicted.  We knew it

15   was going to go up.  But levels never seen before.

16        Q.    What policies are you referring to?

17        A.    The group of policies, the package of

18   policies that resulted in what we commonly refer to as

19   catch and release.  So anything that speeds up the

20   release.  Striking the detention space, prioritizing

21   releases, blanket waivers of individuals and

Page 89

1    specifically removing the Remain in Mexico, Migrant

2    Protection Protocols Program and getting rid of the

3    Asylum Cooperative Agreements, all together play a part

4    in this massive increase in illegal immigration.

5            Q.    In your view it's due to the confluence of

6    different programs?

7            A.    That's fair, yes.

8            Q.    What statistics are you referring to in D?

9            A.    Specifically how information is released,

10   but a good place to go is CBP.gov, on their website

11   they have probably the most in depth information about

12   cross border illegal activities.  There's specific

13   statistics on there.  When I talk about downplay, I

14   talk about ignoring specific data.  For example, this

15   administration continually makes statements in Congress

16   and public telling people that basically all fentanyl

17   comes through the ports of entry, nothing comes in

18   between the ports of entry.  They don't make that exact

19   statement.  They allude to it by talking about seizures

20   and statistics.

21            And they talk about everything crossing in

Rodney Scott                                    December 5, 2023

Page 90

1    between the ports of entry in the context of asylum

2    seekers or economic -- they actually don't even talk

3    about economic migrants, they talk about asylum

4    seekers, and they completely ignore these other

5    significant, significant factors such as the terrorism

6    watch list hits, the criminal aliens, the over 1.7

7    million documented got aways that border patrol has and

8    the hundreds of miles of border that are completely

9    going unpatrolled.  That's what I mean by downplaying.

10   Statistics factual downplaying is how the information

11   is delivered to the public.

12        Q.   Are you suggesting that the numbers

13   reported on CBP's website and made available to the

14   public are false?

15        A.   No, I'm saying those numbers are real, that

16   those numbers come right out of a system and that they

17   tell the story.  That's factual evidence.  I'll saying

18   the downplaying part is the spin put on those numbers

19   when they do public releases from CBP and DHS.  That

20   they choose to ignore these other aspects and they try

21   to caveat it as all asylum seekers when that is not

Rodney Scott                                    December 5, 2023

Page 91

1    even true.

2         Q.    But you're not suggesting that the public

3    numbers that are reported have been falsified?

4         A.    No, I believe the numbers that CBP are

5    putting out are the best that they can possibly put out

6    at the time.  There's more information there, but I

7    believe those numbers are as factual as possible.  CBP

8    would never put out information that was not true.  Not

9    intentionally.  Government personnel.

10        Q.    I'm going to number E, letter E, letter E.

11   I'm going to read it.  "The southwest border is in

12   crisis, that crisis is attributable to actions taken by

13   the Biden Administration, cartels effectively control

14   who and what enters the United States, and the federal

15   government lacks operational control of the southwest

16   border".  Did I read that accurately and do you agree

17   with that statement?

18        A.    You did read that accurately and I do agree

19   with that statement.

20        Q.    What is in crisis mean?

21        A.    In crisis means that we have absolutely no

Rodney Scott                                                    December 5, 2023

Page 92

1    control, probably less than we have ever had before,

2    about mainly the United States Border Patrol and the US

3    government about who and what can enter our country.

4    On top of that, the U.S. Border Patrol, and this is

5    documented currently through Twitter, through Facebook

6    messages and through a lot of public media accounts,

7    migrants are being abused at a level that we haven't

8    seen before.  They're putting their families at risk.

9    We have shut down the DNA testing so increased child

10   trafficking I guarantee is going on.  Again, how do I

11   say that?  That's based on my experience and how we

12   have identified trafficking cases before versus the

13   lack of the ability to do that now.

14             Right now, as we speak, there's hundreds

15   and hundreds of miles of border that are completely

16   going unpatrolled.  Here is the difference.  That could

17   have been and should have been effectively patrolled.

18   I'm not comparing this to like Utopia, I'm comparing it

19   to what strategy the border patrol had in place, where

20   we were going.

21             The Lukeville point of entry was completely

Page 93

1    shut down yesterday to all legal trade and travel just

2    to process illegal aliens who are crossing through this

3    remote area.  And one only has to look a map and look

4    at geography in Mexico and Arizona to realize nobody,

5    no migrant that really was coming to the United States

6    to just claim asylum would pick that place on their

7    own.  They were taken out there by the cartels.

8              And to that aspect of it, over my career,

9    and I think this is well documented, well outside the

10   border patrol, the Mexican cartels have significantly

11   expanded and constantly increase their control of the

12   southwest border.  I'm not, I want to be clear, I'm not

13   alleging that every single migrant pays the cartel.

14   What I am saying is that the cartel monitors every mile

15   of that border and they control who and what crosses

16   the border very, very intentionally to overwhelm US law

17   enforcement, create gaps in border security so they can

18   bring in the second wave of whatever it is, people or

19   narcotics or drugs.

20             The FBI director acknowledged that exact

21   tactic in federal testimony recently.  So I'm not

Rodney Scott                                    December 5, 2023

Page 94

1    making this up.  This is fact.  The massive amount of

2    illegal immigration combined with everything else we've

3    talked about, combined with shutting off the technology

4    package on the southwest border that was going in with

5    the border wall system has made what was already a

6    challenging environment a complete crisis and it has

7    now put the cartel in a position where they literally

8    get to pick and choose where border patrol agents are

9    by pushing illegal aliens across the border and that

10   opens up the rest of the border for whatever nefarious

11   activities that they want to do.

12           I believe that is fact.  Again, I believe

13   it's backed up by Director Wray of the FBI's testimony

14   to Congress not too long ago sitting beside Secretary

15   of DHS.

16       Q.    You talked about cartels and their

17   functions and increase prevalence of their rule at the

18   southwest border.  Do you have any evidence that the

19   Asylum Officer Rule has contributed to what you view as

20   the increased control by cartels?

21       A.    I believe anything that actually, again,

Page 95

1    results in people being released into the United States

2    before their case is completely and fully adjudicated,

3    their immigration case, directly results in more people

4    being willing to come to the southwest border and try

5    to get in.  That is directly related to the customer

6    base that the cartel has for two reasons.  One, to make

7    money, and more importantly though, two, to use as

8    distractions to overwhelm law enforcement.

9              So as a larger package of multiple

10   initiatives rolled out at almost the same time that

11   created the border crisis we have today, yes, I believe

12   that the Asylum Officer Rule plays a role in this,

13   minus detention capability or Remain in Mexico program

14   tied to it.

15       Q.   I hear you saying, I believe.  And

16   everything you just said.  But I'm wondering if you

17   have any specific evidence to support that the Asylum

18   Officer Rule has contributed to the prevalence of

19   cartel control at the southwest border, specific

20   evidence?

21              MR. ST. JOHN:  Objection, mischaracterizes,

Page 96

1    his testimony is evidence.

2           Q.    You can answer.

3           A.    I believe the statistics bear out my

4    belief, and my belief was built over almost 30 years of

5    in the border control experience of cause and effect.

6    And, therefore, I believe that it is evidence and

7    factual.  Do I have a number to provide you?  If this

8    was the only change that the administration had made, I

9    believe that that number would be easier to find, while

10   still difficult, but the administration changed

11   multiple different programs and factors to include this

12   that resulted in an increased number of people getting

13   released into the United States which created the

14   crisis we have on the border today.  I cannot give you

15   a specific number.

16          Q.    You can't point me to what those statistics

17   are?

18          A.    I challenge you to find anybody that can

19   give you a specific number when so many factors

20   changed.

21          Q.    Same question, and I assume the answer is

1   the same, but for the sake of the record, same question

2   with regard to child trafficking and the Asylum Officer

3   Rule.  Same answers?

4        A.    Yeah, same answers, and specific to child

5   trafficking, this one is near and dear to my heart, I

6   think most people understand, that most people don't

7   understand the situation.  Most migrants or illegal

8   aliens don't understand the situation they're in when

9   the border control encounters them.  So the only way

10  agents have historically been able to identify

11  trafficked -- children trafficking schemes is by doing

12  in depth face to face interviews.

13             The Asylum Officer Rule without appropriate

14  detention or Remain in Mexico plays a role in

15  increasing the flow that we're seeing on the border

16  today.  That flow has overwhelmed law enforcement on

17  the border, border patrol specifically, to the point

18  they can no longer do those face to face interviews.

19  They just don't have time.  Based on my experience, and

20  this is a belief, I do not have a number for you, based

21  on my belief on how every trafficking case we

Rodney Scott                                                    December 5, 2023

1    identified before has been identified and then combined

2    with shutting down the DNA testing program, I believe

3    statistically that there is more child trafficking,

4    human trafficking going on today than ever before.

5         Q.    Is it correct when I say that the Asylum

6    Officer Rule does not apply to unaccompanied minors, is

7    that consistent with your understanding?

8         A.    Correct.

9         Q.    Let's go to number F, or letter F, I keep

10   saying number F, letter F.  "The crisis and mass

11   migration at the southwest border adversely impacts

12   Plaintiff states".  Do you see that?

13        A.    Yes.

14        Q.    Do you agree with that statement?

15        A.    I agree with that statement based on my

16   experience and then just statistical data.

17        Q.    Let's talk about both.  One, your

18   experience, and two, what statistical data are you

19   relying upon in support of that statement?

20        A.    So based on my experience, nothing stays at

21   the border.  Very, very few illegal aliens crossing the

Page 99

1    southwest border stay at the border.  As chief of the

2    border patrol, I was also, one of my many roles, I'm

3    managing all the sector chiefs, the U.S. Border Patrol

4    has 20 different sectors, one on them is New Orleans

5    Sector which covers basically the entire state of

6    Louisiana, a little bit into Mississippi.  Looking at

7    the statistics, historically the statistics from that

8    sector and then having conversations with the chiefs of

9    those sectors as the illegal immigration increased to

10   the level it is today, there are direct impacts

11   because, back to the beginning, first off, nothing

12   stays at the border.  Their main, Interstate 10 is a

13   main artery away from the border to other parts of the

14   country, the New Orleans Sector used to patrol very,

15   very heavily, and those resources, if for nothing else,

16   those resources have now been redirected.  They're

17   being detailed to the southwest border and/or they're

18   doing virtual processing.  So they're no longer doing

19   the law enforcement functions in the state of Louisiana

20   or many other places that they were doing before.

21            Additionally, nothing stays at the border.

Page 100

```
 1   So we have no idea once an individual is released into

 2   the United States or once the 1.7 million illegal

 3   aliens that made it past border patrol are illegal

 4   entries, we have no idea exactly where they went.  But

 5   statically, I would believe, and this is my belief,

 6   that some of them ended up in Louisiana.  How many?

 7   There's no way to track that.

 8        Q.   So when you say, and again, you say

 9   colloquially, I know you didn't write this, but that

10   mass migration at the southwest border adversely

11   impacts Plaintiff states.  Fair to say that you believe

12   it adversely impacts all states, that you're not

13   differentiating between any particular states with

14   respect to that statement?

15        A.   Yes and no.  I do believe it affects all

16   states.  But specific to states that actually have

17   border patrol personnel assigned to them currently, and

18   that were fully and gainfully employed working within

19   that area, if that is not the southwest border now,

20   many of those resources have been pulled from doing law

21   enforcement functions within that state to help protect
```

Page 101

1    that state and they have been reassigned to do

2    processing, care and feeding and/or -- it would be

3    nice, but they're not doing patrols, but they have been

4    reassigned to south Texas.

5             So even if they're physically in New

6    Orleans, the majority of their time is now dealing

7    directly with the mass cross border flow and they're no

8    longer helping to protect and secure the state of

9    Louisiana in a federal capacity.  So I think it's both.

10   I'm sorry.

11        Q.    You're fine.  You had said at the beginning

12   that your answer had two components and one was the

13   statistics.  Do you recall that?

14        A.    Yeah.

15        Q.    So let's talk about that second part.  What

16   are the statistics to which you're referring?

17        A.    So when I used it in general terms,

18   statistically how many illegal aliens end up in

19   different states.  And again, depends on where you go

20   for that source of information.  I would call that more

21   of an opinion sometimes than a fact.  But

Rodney Scott                                    December 5, 2023

Page 102

1    statistically, there are illegal aliens that have

2    crossed the border and families and relatives in almost

3    all states.  And little bit outside of BP, but in

4    briefings that I was interacting with ICE and with HHS,

5    Health and Human Services, about unaccompanied migrants

6    and those aspects, where the families were, I can't

7    think of a single state where there weren't identified

8    illegal aliens.

9           So that's why I'm saying statistically I

10   think it involves every state, but specific to

11   Louisiana, they have lost the law enforcement

12   capability.  Not just Louisiana.  Florida can make the

13   arguments, some of the states in northern border can

14   make the same argument.  Because the southwest border

15   has become the focus.

16      Q.    Fair to say, once again, you can't trace

17   any of those effects, specifically the ones you have

18   spoke to about losing the law enforcement capabilities,

19   on any particular states to the Asylum Officer Role in

20   particular?

21      A.    No, only as part of the scheme that the

1    Asylum Officer Rule is part of it.

2            Q.    It says in the statement "adversely impacts

3    the Plaintiff states".  Might there be states that

4    enjoy benefits from increased immigration, for example,

5    by filling critical labor shortages or from the receipt

6    of the payment of taxes, sales tax, property, income

7    taxes, et cetera?

8            A.    I'm testifying to implications on border

9    security and basically my entire career has been border

10   security and the effects of immigration policies on

11   border security and our ability to know who and what is

12   entering our country.  I'm not an economic expert.  I'm

13   not going to testify on those aspects.

14           Q.    When you're talking about the negative

15   impact, you're speaking specifically to border

16   security, not financial impacts that may or may not be

17   suffered or enjoyed by any particular state?

18           A.    I'm not testifying to a balance of the pros

19   and cons.  I just know the loss of the law enforcement

20   resources and then there are negative impacts with --

21   and again, this is my opinion now, there are negative

Page 104

1   impacts with illegal immigration just like other people

2   would argue that there may be some positive impacts.

3   I'm not going to testify to that weight or that

4   balance.

5        Q.    So, is it fair to say that you don't have

6   any firsthand knowledge of financial losses, alleged

7   financial losses sustained by any of the Plaintiffs

8   states as a result of the Asylum Officer Rule?

9        A.    I don't have that information, no.

10       Q.    Just give me a second.  As I said, I told

11  you if you said you didn't know something, that might

12  cut out other questions.

13       A.    That's fine.

14       Q.    Did you conduct any tests or studies to

15  determine whether but for the Asylum Officer Rule, more

16  or fewer migrants would have sought to enter the

17  country unlawfully, as you used the word, unlawfully?

18       A.    No, for two reasons:  One, I was not

19  officially asked or allowed to add any real input into

20  this process.  And then, again, carving out that one

21  specific action to have the numbers associated with it,

Page 105

1   one, there are multiple other actions would be

2   challenging.  I base my testimony on my experience and

3   watching the cause and effect of catch and release

4   policy in general.

5        Q.    So I suppose it's fair to say from your

6   testimony today, you disagree with the immigration

7   policy choices of this administration?  Is that

8   accurate?

9        A.    I believe that the immigration policy

10  choices they have made have had a direct and

11  predictable consequence of a massive amount of illegal

12  immigration that has undermined the security of our

13  nation.

14       Q.    And would it be fair to say that you

15  disagree with the policy choice to implement the IFR?

16       A.    I disagree with the policy choice to

17  implement the IFR to the extent that it at least does

18  not include a detention aspect.  It did not mitigate

19  the catch and release, that it made the catch and

20  release worse.

21       Q.    But again, you don't have any statistics to

Page 106

1   point to to that to show what the effects of the policy

2   have been in the real world?

3       A.   Other than my 30 years of experience of

4   cause and effect, no.

5       Q.   I notice on this disclosure, which is

6   intended to be subjects upon which Mr. Scott may

7   testify, there is -- there is no statement that the

8   Asylum Officer Rule has increased unlawful migration.

9   That's not there; right?

10      A.   I did not include that in there, no.  I

11  didn't ask for it to be included and I don't see it.

12      Q.   Is that because that's not something that

13  you could creditably testify to for the reasons we have

14  discussed, that you can't discuss a single policy?

15           MR. ST. JOHN:  Objection, asked and

16  answered.

17      Q.   You can answer.

18           MR. BLOCK:  Can you just rephrase the

19  question, sorry, just so we're familiar with what the

20  question was?

21           MS. FUDIM:  Can the court reporter read

Rodney Scott                                    December 5, 2023

Page 107

1    that one back?

2              (Court reporter read back question.)

3         A.   I believe the Asylum Officer Rule plays an

4    important part in this bigger scheme.  But specifically

5    the Asylum Officer Rule improves the speed or it

6    reduces the amount of time in custody that an alien

7    will spend, and then --

8              MR. BLOCK:  Sorry.  She put in the chat,

9    "can you repeat your objection?"  I believe that's to

10   Scott.

11             MR. ST. JOHN:  The question is vague and

12   it's been asked and answered.

13             MR. BLOCK:  And question.  We had a read

14   back of the question, I believe the objection was to

15   vague and asked and answered and now Chief Scott is

16   going to answer that question which I believe was about

17   the stats and --

18        A.   So I believe that the Asylum Officer Rule

19   plays an important role in what resulted in

20   increased -- significant increase in cross border

21   illegal immigration.  That, for a couple of reasons,

Page 108

1    the speed of which people are potentially released into

2    the United States, the fact that any kind of a positive

3    determination in favor of the alien being released into

4    the United States does not get reviewed, only negative

5    findings get reviewed.  And again, increases the

6    potential that they're going to be released.  But it's

7    part of the larger scheme, that it's consistent with

8    the administration's public statements and all their

9    other actions that basically dramatically resulted in

10   what we see today, which is over 7,000 -- I'm sorry,

11   7 million illegal alien encounters since the Biden

12   Administration took over, which is unheard of, but ten

13   times worse than that is the 1.7 million known got

14   aways in the hundreds of miles of border that are

15   completely unmanned.

16           I can't give you a number, ten, 20,

17   2 million, 3 million that are directly associated with

18   IFR, but I can tell you that the IFR and the way it was

19   rolled out and the process -- they're consistent with

20   the other discussions that I had with this

21   administration which were all focused on expediting the

Rodney Scott                                    December 5, 2023

Page 109

1    processing, reducing detention, which was a stated

2    objective by this administration, and getting away from

3    detention, that has resulted in this massive increase

4    in illegal immigration.  So from that aspect, I believe

5    it, there are stats.  You just can't give it a specific

6    percentage, if you will.  It's part of a bigger scheme,

7    same as I had mentioned earlier.

8          Q.    Do you know what a counter factual study

9    is?

10         A.    To a certain extent.  I'm not an expert in

11   that area.  But, yeah.

12         Q.    What is your understanding of what it is?

13         A.    That basically -- it's kind of

14   self-explanatory, it's a study that basically looks at

15   facts against your argument or against an issue to

16   argue from a different perspective.

17         Q.    Did you conduct any studies to determine

18   whether migration patterns would have been different in

19   the absence of the IFR?

20         A.    I retired in August 2021.  The IFR came out

21   after I had already retired and there was no formal

Page 110

1    inclusion of U.S. Border Patrol in that process.  So I

2    was not even given the opportunity to do that.  No, I

3    have not.

4           Q.    What about since leaving border patrol?

5    Have you conducted any such studies?

6           A.    No.

7           Q.    Did you conduct any, and I assume the

8    answer to this is no since you said you didn't conduct

9    any such studies, but for the sake of the record, did

10   you conduct any studies comparing border patrol's

11   encounters of migrants affected by the rule compared to

12   border patrol's encounters of similar migrants who were

13   not affected by the rule?

14          A.    No.  I was already retired.

15          Q.    You haven't done that since you retired

16   either?

17          A.    No, I don't have access to those

18   statistics.

19          Q.    You've testified in front of Congress a

20   number of times; correct?

21          A.    Correct.

Rodney Scott                                           December 5, 2023

Page 111

1          Q.    And have you ever provided testimony on the

2     subject of the IFR?  I will tell you I listened to a

3     lot of your testimony and I didn't hear any, but I

4     can't purport to have listened to all of it.  So let me

5     ask you that.  Have you ever given congressional

6     testimony on the subject of the IFR?

7          A.    No, I have not.

8                MR. BLOCK:  I was just going to say, as a

9     point of clarification, do you mean in the written

10    remarks or do you also mean any kind of question from

11    any members?

12         Q.    I mean in response to any questions or in

13    written remarks, either way, to Congress.  Have you

14    ever provided testimony on the IFR?

15         A.    So, no.  And for clarity's sake, the IFR

16    specifically was not a subject of any of the testimony

17    that I provided nor was I asked specifically, to my

18    recollection in any way, by any members' questions

19    directly relating to the IFR.  They were more general

20    border security context.

21               MS. FUDIM:  Okay.  I think that that's all

Page 112

1    I have, but I want to just take a minute to review my

2    notes and confer with my co-counsel who have been

3    visibly listening in to see if I have goofed along the

4    way and completely missed anything.  So if we could

5    just take a five minute break, it's 12:27, can we say

6    like 1:05?

7                    MR. BLOCK:  Thirty-five?

8                    MS. FUDIM:  Yes.  Thirty-five, yes.

9                    MR. BLOCK:  That works.  That works.

10                   (Whereupon a brief recess was taken.)

11                   MS. FUDIM:  That's all the questions I have

12   for now, subject to whether plaintiff's counsel or your

13   own attorney have any follow-up questions that they

14   want to ask.

15                   THE WITNESS:  Thank you.

16                   MR. ST. JOHN:  I would like to ask a few

17   questions.

18                   EXAMINATION BY MR. ST. JOHN:

19       Q.    Chief Scott, I apologize for the voice

20   problems, do you understand me?

21       A.    Sure.  I taught maybe it was just your

Rodney Scott                                                December 5, 2023

                                                              Page 113

1    normal voice.

2          Q.    Sir, you served as the border patrol chief

3    from February of 2020 to August of 2021; correct?

4          A.    That is correct.

5          Q.    Under the previous and the Biden

6    Administrations?

7          A.    Yes, both administrations.

8          Q.    How many agents did you have under your

9    command?

10         A.    It fluctuated.  There were about 19,500

11   plus agents and then just short of another 3,000

12   mission support personnel and civilian personnel.

13         Q.    So your job was not to total wrap them in

14   handcuffs down on the border?  Is that fair to say?

15         A.    That's fair to say, it's basically like CEO

16   of a company, all aspects of the organization, but

17   unfortunately not the enforcement part.

18         Q.    You relied on the men and women working for

19   you to execute your directives?

20         A.    That is correct.  I had a significant

21   leadership team of, I think a total of about 350 people

Page 114

1   in Washington, D.C. that I worked directly through to

2   get all the policies implemented out in the field and

3   to run the organization.

4          Q.    On the flip side when your subordinates

5   reported back that they had executed your directives,

6   you trusted that they had; is that fair?

7          A.    Yes, that's fair.

8          Q.    Is it fair to say that Customs and Border

9   Protection generally, and the Border Patrol

10  specifically, is the expert agency on border security?

11         A.    I believe it is.  It's the only agency

12  that --

13                MS. FUDIM:   Objection.

14         Q.    You can answer.

15         A.    I believe it is.  It's the only agency

16  that's on the front line that's been doing this job day

17  in and day out.  For example, myself, I had just under

18  30 years of experience when I retired.  But there are

19  other individuals that have been doing it far longer

20  than I have.  Nobody else has that experience outside

21  of the U.S. Border Patrol.

Rodney Scott                                                December 5, 2023

Page 115

1        Q.    Based on that, it's fair to say USCIS is

2    not an expert agency on border security?

3              MS. FUDIM:   Objection.

4        A.    I would agree with that statement.  Border

5    patrol's job is literally physical border security, CIS

6    was more the immigration policy, immigration

7    implementation side, but they had nothing to do with

8    actually patrolling the border.

9        Q.    Likewise, the Executive Office for

10   Immigration Review, EOIR, is not an expert agency on

11   border security; is that correct?

12       A.    I believe that's correct.

13       Q.    Are you familiar with a woman named Ur

14   Jaddou?

15       A.    No, I'm not.

16       Q.    Are you familiar with the terms push and

17   pull in the context of border control?

18       A.    Yes, I am.

19       Q.    What is a pull factor?

20       A.    A pull factor is anything that encourages

21   migration in a bigger context, but specifically the

Page 116

1    border security, illegal immigration into the United

2    States.  So it could be, the opportunity to have jobs

3    or to perceived ease to get into the United States or

4    the lack -- it's basically a balance of, you know, good

5    factors or bad factors for the individual.  When the

6    factors outweigh -- the good factors to come to the US

7    outweigh the negative factors, that's a pull factor.

8        Q.    You indicated that the border patrol or you

9    based on your experience should evaluate generally

10   whether a policy would be a pull factor; is that

11   correct?

12       A.    That is correct.

13       Q.    Is that based on the pattern responses over

14   decades of experience with migration?

15       A.    That is accurate, and that's irregardless

16   of any political party and it's beyond my personal

17   experience, it's the experience of the U.S. Border

18   Patrol.  There are certain things you can draw a direct

19   correlation to, and specifically to this context, any

20   time people are released in the United States after

21   they were encountered by border patrol or Customs and

1    Border Protection when they arrived without

2    documentation, there is always a significant increase

3    in the illegal cross border of future people within

4    that same group or class.

5          Q.    Is it possible to forecast actual border

6    flow months or years into the future?

7          A.    Absolutely not.  And --

8                MS. FUDIM:  Objection.

9          A.    So from my personal experience, absolutely

10   not.  You talked about the pull factors, and the pull

11   factors are by definition things within the geographic

12   borders of the United States.  So there are things we

13   can control.  The push factors are things that happen

14   geographically outside the boundaries of the United

15   States.  So we may potentially be able to influence

16   those, but we cannot control those in any way.  And

17   because of the uncontrollable aspects of those push

18   factors, it makes it extremely difficult to predict

19   what will happen illegal immigration-wise in the future

20   assuming that the pull factors remain consistent.

21          Q.    Is it fair to say the weight of the push

Rodney Scott                                          December 5, 2023

Page 118

1    and the pull can affect flow?  So you might have a

2    strong push factor and a weak pull or you might have a

3    strong pull and a weak push might yield generally the

4    same result?

5           A.    I would agree, and that's a big part, as

6    chief of the board patrol, that's where policy comes

7    in.  That's a big part of the discussions we have on

8    how to control the border.  It was a constant effort to

9    manage those push pull factors so that the pull factors

10   were not significantly below the push factors because

11   there's always going to be another earthquake, there's

12   always going to be a country around the world in

13   crisis.  We know we can't control that.  So we have to

14   make sure that the consequences for illegal entry

15   outweigh the potential benefit of somebody trying to

16   come in.  And that's literally what the job of border

17   patrol and Customs and Border Protection, really DHS is

18   all the time, to protect the country.

19          Q.    So let me ask it this way:  You can have a

20   policy that's a very, very strong pull factor, but if

21   for whatever reason, a push factor went to zero, you

Rodney Scott                                    December 5, 2023

Page 119

1  could actually have in theory a decrease in migration

2  flow?  Is that fair?

3          MS. FUDIM:  Objection, form.

4      A.   I would argue, in theory, yes.  But it's

5  just that, in theory.  The world is so big that there's

6  never no push factors.  Like that's never existed since

7  the United States has been in existence.

8      Q.   Push factors could be very small, and the

9  point I'm trying to get at is -- the factors work

10  together to yield a flow, but you can't say oh, this

11  push and this pull is going to yield an increase of

12  10,000?  It just doesn't work like that?

13      A.   I agree.

14      Q.   Former border patrol Chief Raul Ortiz, I'll

15  represent he testified that migrants follow social

16  media and are aware of postings.  Is that consistent

17  with your experience?

18      A.   Yes.

19      Q.   Underlying theme in everything that you

20  said, and I just want to make sure we're capturing it,

21  is that migrants are rational actors in the sense that

Rodney Scott                                    December 5, 2023

                                                        Page 120

1    they respond to information, if there is a gap in the

2    border, they're going to flow into it.  Is that fair?

3         A.    That is fair.  And just to build on that a

4    little bit, I think I touched on this before, but I

5    want to be clear, regardless of any outside factors,

6    human nature as rational human beings, they communicate

7    with their friends and family, whether it be social

8    media or anything else, and the social media aspect has

9    made it immediate where early in my career this exact

10   same thing, I want to explain, happened, but it took

11   place via letter that took weeks, sometimes months

12   depending on where people came from to get the message

13   back.  But today that message is immediate.  So the

14   minute that someone is released into the United States,

15   they do the exact same thing, and I'm not saying

16   everybody, but human nature, that you or I would do,

17   and that's simply just call home and let their friends

18   and relatives know what happened.  Rarely do they

19   understand the full process.  They just understand that

20   they have been released into the United States.  That

21   becomes a huge pull factor immediately, that then has

Page 121

1    cascading effects as each one of those calls go out and

2    that's what we're seeing today.

3           Q.    Do human traffickers respond to information

4    in a similar manner?

5           A.    Correct.  Although, you add a factor there

6    that part of their business model is encouraging people

7    to come to the border.  So regardless of factual

8    information, nonfactual, they're constantly trying to

9    convince people to come to the border for two reasons.

10              One, they make money off of them.  But,

11   again, as I tried to explain earlier, the border has

12   changed over the years and the cartel, Mexican cartel

13   specifically now controls the entire southwest border.

14   And they not only use the illegal migrant flows to make

15   money off of, to smuggle them, more importantly, they

16   use them to overwhelm law enforcement as a operational

17   tool, as a tactical tool.  If you were in the military

18   you'd call it shaping the battle, environment, or

19   shaping the environment.  So they are constantly

20   recruiting people to come to the border with or without

21   the additional negative factor of the pull factors that

Page 122

 1   are created here.

 2        Q.    I don't want to mischaracterize your

 3   testimony, but I think you testified that an increased

 4   likelihood of release into the interior of United

 5   States instead of being detained, that is a pull

 6   factor; is that correct?

 7        A.    In my experience and in the testimony of

 8   numerous other border security experts from ICE, from

 9   Legacy Immigration and border control, specifically my

10   testimony, that is the number one factor.  The number

11   one controllable factor is the likelihood of being

12   released into the United States.

13        Q.    In your experience, or to your knowledge,

14   your expertise, is the availability of employment a

15   pull factor?

16        A.    The availability of employment is a pull

17   factor.

18        Q.    Do you think the availability of legal

19   employment, so employment authorization, is that a pull

20   factor?

21        A.    I believe it is a pull factor.  In my

Rodney Scott                                    December 5, 2023

Page 123

1    experience, border security specifically, again, legal

2    work or illegal work are both pull factors, but the

3    ability to get legal employment or any type of legal

4    document to move about the United States is a

5    significant -- is very, very significant pull factor.

6            Q.    Are you familiar with the immigration law

7    concept of follow to join --

8            A.    I don't think I heard you.

9            Q.    Are you familiar with the concept of follow

10   to join in the immigration law?

11           A.    I'm not familiar with that specific term,

12   no.  Are you talking about like chain migration or

13   family reunification follow to join?  Okay.  So, I saw

14   him shake his head for the record, yes.  I am very,

15   very familiar with that and it's both in immigration

16   law and in national human nature.  But the way our laws

17   are set up, we focus legal immigration on what we would

18   call chain migration, the ability to sponsor others.

19   But in the illegal arena, it's very, very consistent

20   with my experience that whatever current loopholes

21   there are in immigration law, the family member that is

Rodney Scott                                              December 5, 2023

Page 124

```
 1   best situated for that will actually be the first one

 2   to come into the United States.

 3              For example, when Title 42 was fully -- was

 4   still fully employed and then this administration

 5   arbitrarily decided to exempt juveniles, we saw

 6   significant increase in unaccompanied minors coming

 7   into the United States, and then based on my

 8   experience, the rest of the family would try to cross

 9   illegally to meet up with them later.  Sometimes

10   before, but in that case, now.  The same thing would be

11   here, whoever met any of the loopholes would come first

12   and then the rest of the family after that individual

13   was situated would come later.  And I would just argue

14   again, it's normal human behavior.

15        Q.   You mentioned the context of legal

16   immigration.  Follow to join.  Would that incentivize,

17   the availability of that, if someone can legalize their

18   presence, does that incentivize greater flow because

19   they're going to bring their children or their wife and

20   so on and so forth?

21              MS. FUDIM:  Objection.
```

Page 125

1          A.     From my experience, and when I say

2    experience, my firsthand experience living along the

3    border, even before I was in the border patrol, my

4    experience in the border patrol and then the lessons

5    handed down by leadership before, I would say that

6    the -- in 1986, when we did the amnesty, that was a

7    perfect example that, yes, it does.  And any

8    discussion, any time there has been a discussion about

9    amnesty or legalizing people that are already in the

10   United States so that then they could potentially avail

11   themselves to the legal immigration processes later.

12   Again, there has been a systematic increase in illegal

13   cross border activity and the false doc industry has

14   boomed as well.  Again, this is what I talk about.  You

15   can't carve out one specific policy very often because

16   too many factors happen at the exact same time.  But,

17   yes.

18          Q.     Rewinding a little bit.  You talked about,

19   or you testified about how it was the phone call that

20   this is what I experienced is how it's communicated.

21   Something like that.  It's a very course level of

Rodney Scott                                                    December 5, 2023

Page 126

1    communication between the migrant in the United States

2    and whoever is remaining in their home country.  It's

3    course.  It's simplistic.  Is that a fair summary of

4    what you testified?

5              MS. FUDIM:  Objection to form.

6         A.    Yes.  So, yes, my testimony is really that

7    it's fast and it's simple.  It's not that it's just

8    phone, but that it's because of modern technology and

9    the fact that international calls are so much cheaper

10   than they used to be, it's all aspects.  I would argue

11   the quickest is usually the messaging apps, but it

12   incorporates phone calls, it incorporates Facebook

13   Messaging.  But the messages are faster than ever

14   before and the messages are pretty consistent.  It's

15   just updating people that they made it, they made it

16   here safe, and then, yes.

17        Q.    So let me offer you another hypothetical.

18   You said fast and simple.  If a pull factor were only

19   available to a tiny subset of migrants, say one in a

20   thousand, it would probably be irrelevant or nearly

21   irrelevant to the overall flow.  Is that a fair

Rodney Scott                                December 5, 2023

Page 127

1    assumption?

2              MS. FUDIM:   Objection to form.

3         A.    I believe that is a fair assumption with

4    adding one aspect to it, the marketing piece of it.

5    So, depending on how, are there other avenues that the

6    message is going out?  If there's not like a DHS

7    campaign, you know, talking about something, or where

8    there's clear, like people of authority pushing

9    something, without that extra aspect, the lower the

10   numbers, I think it's again common sense, that the

11   lower response or the lower the pull factor would be.

12        Q.    To your knowledge, has the Biden

13   Administration reduced detention capacity for illegal

14   aliens?

15        A.    Yes, and again I believe the public record

16   based on appropriation requests and actual size, some

17   of the testimony in Congress, public record is they

18   have decreased detention capability across the border.

19        Q.    Are you familiar with the reprogram --

20        A.    I heard part of that and then, no offense,

21   the cough, I missed the middle, I just want to make

Rodney Scott                                    December 5, 2023

Page 128

1    sure it's clear.

2           Q.    Are you familiar with the budgetary term

3    reprogramming?

4           A.    Yes, I am.

5           Q.    What is reprogramming?

6           A.    A reprogram is when basically a component

7    like CBP or DHS takes money that was intended for one

8    specific function that Congress usually delineates the

9    money and then you take it out of that function and you

10   move it to something else.  For example, from

11   enforcement over to personnel, for example,

12   potentially, or from data technology to soft-sided

13   facilities, would many times require some type of a

14   reprogram.

15          Q.    Did the Trump Administration reprogram

16   funds to expand detention capacity when necessary to do

17   so?

18          A.    That was outside my specific scope.  But my

19   general knowledge is, yes.

20          Q.    In your opinion, based on your 29 years of

21   experience in the border patrol, is the impact of an

Page 129

1    immigration related policy on border flow an important

2    aspect of the problem that a policy must address?

3         A.    I believe it's a critical aspect.  The

4    second and third level effects many times outweigh the

5    initial intent or the objective and I think that's the

6    concept behind making sure everybody is involved in the

7    conversation.  So, yes.

8         Q.    You testified a little bit about the impact

9    to states.  In your opinion, based on your 29 years of

10   experience in the border patrol, is impact of an

11   immigration related policy on states an important

12   aspect of the problem a policy must address?

13              MS. FUDIM:  Objection.

14        A.    Based on my experience, yes, it is.  And as

15   a federal entity responsible for basically immigration

16   policy and border security, by definition, is deciding

17   and controlling who and what can come into the entire

18   United States, by default, it always affects a state

19   and, therefore, must be or should be considered.

20        Q.    Somebody has to enforce the law; correct?

21        A.    Correct, somebody has to enforce the law

Rodney Scott                                                    December 5, 2023

Page 130

1    and then there is always, whether they're good or bad,

2    and I'll stay out of the balance, there's always

3    negative factors to increasing populations in areas,

4    legal or illegal, but legal obviously was outside my

5    scope as U.S. Border Patrol, illegal was my job to

6    basically try to minimize that population set.

7    Statistically you're going to have, other than the

8    initial cross border violation, you're going to have

9    people that maybe just want to go to work, but you're

10   also going to have criminals and everything else.  That

11   is going to be an effect.

12        Q.    Somebody is going to have to educate the

13   kids and somebody is going to have to take care of

14   health problems?

15        A.    Correct.

16        Q.    The Asylum rule preamble states that "it is

17   not expected to create any significant new incentives

18   that would drive increase to regular migration".  Based

19   on your 29 years of experience in the border patrol, is

20   that contention plausible?

21        A.    No.  And I have direct information from one

Rodney Scott                                December 5, 2023

Page 131

1   of my staff that, again, not a formal setting, but in

2   an informal setting, told political appointees, part of

3   this administration, the exact opposite, that it would

4   undoubtedly result in an increase in cross border

5   illegal flow.

6          Q.    Is that contention so implausible that it's

7   not just a difference of view, it's the professional

8   advice would be the Asylum Rule will drive increase to

9   regular migration?

10                MS. FUDIM:   Objection to form.

11         A.    I believe it's implausible and no one

12   that's ever been involved in border security can

13   consciously and knowingly make that statement.  Yet

14   there were people in this current administration that

15   had been in prior administrations and made the exact

16   opposite statements.  They acknowledge that anything

17   that results in catch and release would directly impact

18   illegal cross border flow.  That they called it

19   irregular migration.

20         Q.    I want to draw your attention to a

21   different statement in the Asylum Rule preamble, it

Rodney Scott                                December 5, 2023

Page 132

1    states that "the defendants did not, quote, expect this

2    rule to encourage or cause an increase in number of

3    individuals seeking asylum in the United States."

4    Based on your 29 years of experience in the border

5    patrol, is that contention plausible?

6            A.    I do not believe that's plausible.

7                  MS. FUDIM:  Objection.

8                  THE WITNESS:  Oh, sorry.

9                  MS. FUDIM:  It's okay.

10           Q.    Concerning statistics, you mentioned got

11   aways.  What is a got away?

12           A.    So got away, the term got away is used kind

13   of generally by the public, but it is used specifically

14   within United States Border Patrol in two ways:  A got

15   away is not a term border patrol uses officially.

16   Known got aways is the term that U.S. Border Patrol

17   uses officially.  A known got away, there is actually a

18   policy within Customs and Border Protection within U.S.

19   Border Patrol that defines the criteria that have to

20   take place before a known got away can be put into the

21   system.

Rodney Scott                                        December 5, 2023

Page 133

1              But basically that means we have evidence

2       of an illegal crossing, it's either by video, for

3       example, a sensor went off, agents actually saw them,

4       footprints on the ground, vehicle tire prints,

5       whatever, there's evidence of that illegal crossing,

6       verified, but there were no agents available to respond

7       and effect an interdiction.  So they literally got

8       away.  But I want to make sure we caveat this.  This

9       has actually kind of have been reported to Congress

10      quietly for years because of what is called an

11      effectiveness ratio that Congress mandated border

12      patrol to report when I was still in field leadership

13      years ago and we had to report how effective or just a

14      percentage.  By default, that made us start tracking

15      got aways.

16              But the system that I helped roll out that

17      we talked about earlier in San Diego called tracking,

18      sign cutting and modeling improved the integrity of all

19      that data to the point where in the last

20      administration, during the Trump Administration we were

21      starting to talk about it publicly and explain to

Page 134

1    people what it meant.  But it's confused many, many

2    times in the public with this general like estimate of

3    got aways.  It has nothing to do with an estimate

4    whatsoever.  That 1.7 million that the border patrol

5    reported out through court documents and through

6    testimony, those are known verified got aways that

7    crossed the border illegally and got away from the

8    border patrol.  I just want to make sure that we know

9    we're not talking about any kind of estimate, it's

10   based on fact and evidence.

11        Q.   That's what I wanted to ask you about

12   specifically.  At one point this morning you testified

13   that "things get missed" when agents get pulled off the

14   border.  So, if you are pulling agents off the border,

15   they're not going to see those footprints and the got

16   away count will be progressively lower even though the

17   actual count may be increased?

18        A.   That is factual and it also depends on the

19   areas.  So, certain parts of the southwest border, say

20   San Diego Sector, El Paso, closer to a port of entry in

21   an urban area, we will have -- we'll usually have

Rodney Scott                                           December 5, 2023

Page 135

1    cameras and some sensor systems.  But there are many,

2    many areas along the southwest border where there is no

3    persistent surveillance whatsoever.  For example, I'll

4    use south Texas.  The river is a very challenging

5    environment to work because of the Carizzo Cane,

6    creates cover and the river has so many bends in it.

7    We have aerostats which is basically like a hot air

8    balloon with a camera system looking down.  That's what

9    would have been recording any kind of cross border

10   illegal activity in that area.  And then border patrol,

11   if they documented something and they missed it, then

12   that will be the got away.

13              Unfortunately, funding for those aerostats

14   got reappropriated to soft-sided facilities to set up

15   these processing centers to expedite the processing of

16   migrants already in custody and only a couple of those

17   aerostats are down now.  So those areas specifically

18   without a patrol will have no idea what crossed the

19   border.

20              The Big Bend Sector is extremely remote,

21   but has a lot of illegal activity.  Similar.  And then

Page 136

1   unfortunately even in southern Arizona, if you have

2   been watching anything lately, areas where we built the

3   new border wall, the state was shut off, the

4   construction process was shut off midstream and the

5   technology and sensor package that was going in with

6   that wall system got shut off.  So we are blind in many

7   of those areas as well.

8        Q.    You just used the word reappropriated.

9   With respect to aerostats, was the funding

10  reappropriated or was it reprogrammed?

11       A.    I believe the funding was reprogrammed.

12  Sorry.  Reprogrammed.

13       Q.    So at the political level, the Biden

14  Administration took that funding away from the

15  aerostats observing the border and diverted it to a

16  different use?

17       A.    Correct, and again, I believe there is

18  plenty of public statements on record of this.  The

19  Biden Administration from day one, even before, was

20  very vocal, they wanted to shut down the border

21  infrastructure construction projects to include the

Rodney Scott                                    December 5, 2023

Page 137

1    border wall and they wanted to prioritize the

2    processing, and I mentioned earlier, they wanted to

3    create what they call these welcome centers.

4                We didn't have enough money for all that,

5    and as the flow increased significantly, money was

6    constantly being reprogrammed or even just diverted

7    internally.  The reprogramming is a very formal process

8    to move money from one account to another and there's

9    still latitude within CBP if money fits in to a bigger

10   realm, if you will, to be able to move it internally.

11   Before we did any reprogramming, we basically

12   completely exhausted all of our funds internally and I

13   had actually started spending salary money to pay for

14   the soft-sided facilities before I even retired as

15   chief and then money had to be reprogrammed to backfill

16   that salary deficit.

17               MR. ST. JOHN:  I e-mailed everyone a couple

18   of documents.  Are you able to pull those up, Mr. Block

19   and Ms. Fudim?

20               MR. BLOCK:  Yeah.  Give me two seconds

21   here.

Page 138

1              MS. FUDIM:  I am.  I will say that I'm

2     going to record an objection, I'm not suggesting that

3     Mr. Scott not testify because we're here, but I'm just

4     going to note an objection for the record that the Memo

5     of Understanding, which is attached to your e-mail,

6     subject matter of it as well as a lot of the questions

7     that have been posed to Mr. Scott in the last 20 or so

8     minutes fall outside the list of subject matters on the

9     Scott disclosure, and for that reason, I object.

10    Though my objection is not going to be to seek to

11    preclude him to testify.  I'm just noting that for the

12    record.

13             MR. ST. JOHN:  The state's position is that

14    the federal government elicited testimony on these

15    topics and we're entitled to delve into them on top of

16    what we believe they are fairly within the scope of his

17    disclosure.  So I think we're up to Exhibit D, let's

18    mark the Memorandum of Understanding as D.

19             MR. BLOCK:  I think it will be C.  I don't

20    know what otherwise C would have been.

21             MS. FUDIM:  I agree.

Rodney Scott                                    December 5, 2023

Page 139

1          (Deposition Exhibit C was marked for

2     purposes of identification.)

3          Q.    My apologies.  So the MOU will be Exhibit

4     C.  Chief Scott, are you aware that certain states

5     entered a Memorandum of understanding with DHS toward

6     the end of the Trump Administration?

7          A.    I'm generally aware, yes.

8          Q.    For the record, this is a document that was

9     filed in docket 1-2, it's an MOU between the DHS and

10    the state of Louisiana -- or the Louisiana Department

11    of Justice.  I'd like to scroll down to Roman numeral

12    two, it's on the bottom of page two, and extends onto

13    page three.  Take a couple of minutes and read through

14    that.

15              MR. BLOCK:  Read through to where, Scott?

16              MR. ST. JOHN:  The bottom, I think it's

17    bullets one through nine on the top of page three.

18         A.    I read through bullet nine.

19         Q.    As you already testified, but to make a

20    clear record, do you agree that states and

21    municipalities are directly and concretely affected by

Rodney Scott                                    December 5, 2023

Page 140

1  changes to policies that have the effect of easing or

2  relaxing or limiting immigration enforcement?

3        A.   Yes, with the caveat that they -- that

4  federal government's enforcement and policies affect

5  both negative and positive potentially, but they

6  directly affect the states.  Now, I'll also just add to

7  that, beyond my testimony, it's very consistent, we had

8  an Office of State and Liaison.  As chief of the border

9  patrol, I had continual conversations with state and

10 local sheriffs and state and local officials to remain

11 aware of their input.  So it seems very consistent with

12 that as well.

13       Q.   Some of the things that were specifically

14 called out in the bullet points as affecting states

15 would be a decrease of immigration enforcement

16 priorities.  Would you agree that that can adversely

17 affect states or affect states?

18       A.   Yes.

19       Q.   Would you agree that a reduction in the

20 number of DHS agents performing immigration enforcement

21 functions can impact states?

Rodney Scott                                          December 5, 2023

Page 141

1          A.    Yes.

2          Q.    Would you agree that a decrease or pause on

3    return to removables -- of removable or inadmissible

4    aliens can adversely impact states?

5          A.    Yes, I do.

6          Q.    Would you agree that a decrease or pause on

7    apprehensions or administrative arrests can adversely

8    impact states?

9          A.    Yes.

10         Q.    Would you agree that a relaxation of the

11   standards for granting release from return or removal

12   such as asylum can adversely impact states?

13         A.    Yes, it definitely, yes.

14         Q.    Would you agree that an increase in

15   releases from detention can adversely impact states?

16         A.    Yes.

17         Q.    Would you agree that a relaxation of the

18   standards for granting release from detention can

19   adversely impact states?

20         A.    Yes.

21         Q.    Would you agree that changes to immigration

Page 142

1    benefits or eligibility, including work authorization

2    or discretionary actions, can adversely impact states?

3           A.    Yes.

4                 (Deposition Exhibit D was marked for

5    purposes of identification.)

6           Q.    Let's turn to, there was an additional

7    document, we'll mark it as Exhibit D, it's a biography

8    I think you attached to one of your congressional

9    testimonies.  Can you confirm that Exhibit D is an

10   accurate accounting of your biography?

11          A.    Yes.  I did not just read the whole thing,

12   but it appears it is the document that I did provide

13   and publish.  So as long as it has not been edited,

14   it's an accurate account.  Looks like a PDF so it

15   shouldn't have been edited.  Would you like me to read

16   it?

17          Q.    My apologies, Chief.

18          A.    I was just asking if you just wanted me to

19   look at, glance or if you wanted me to read it, make

20   sure there's no edits.  It's a synopsis and it looks

21   accurate.  It looks like the one I wrote.

Page 143

1          Q.    You're here today to testify pursuant to

2     subpoena issued by the federal --

3          A.    Correct.

4                (Deposition Exhibit E was marked for

5     purposes of identification.)

6          Q.    I'm going to ask the court reporter to mark

7     the subpoena as Exhibit E.  You reside in Oklahoma; is

8     that correct, Chief?

9          A.    That is correct.

10         Q.    Chief Scott, you do not reside in

11    Louisiana; is that correct?

12         A.    I do not reside in Louisiana, no.

13         Q.    You don't regularly do business in

14    Louisiana; is that correct?

15         A.    That is correct.  I have never resided in

16    Louisiana.

17               MR. ST. JOHN:  No further questions from

18    the state.

19               MS. FUDIM:  I have some additional

20    questions, but, Mr. Block, I don't know if you'd like

21    to have, if you have any questions, you'd like to go

Rodney Scott                                    December 5, 2023

                                                    Page 144

1    first.

2              MR. BLOCK:  Yeah.  If you don't mind.

3    Thank you.  Just a few questions based on some of the

4    questions that have been asked and mostly for

5    clarification.

6              EXAMINATION BY MR. BLOCK:

7         Q.   Chief Scott, you referenced at one point

8    during the government's or I guess -- government, the

9    defendant's questioning about a blue sheet and the exec

10   sec.  What is the exec sec?  Can you explain that

11   process?

12        A.   I apologize.  Yes.

13             MS. FUDIM:  Objection.  I think you said in

14   response to defendant's questioning, I think you meant

15   plaintiff's questioning.

16             MR. BLOCK:  No, I meant yours.

17             MS. FUDIM:  Can you rephrase it because I'm

18   not sure, I don't remember asking?

19             MR. BLOCK:  In one of his answers, he

20   talked about exec sec and blue sheet.

21             MS. FUDIM:  Oh, in the answer.

Page 145

1            MR. BLOCK:  In the answer, it was kind of

2    just a glancing touch on it.  So I just wanted him to

3    explain what exec sec is.

4            A.    Sure.  So exec sec is an executive

5    secretary, is what it stands for, but it's basically a

6    very administrative process within DHS to make sure

7    that things are done and done properly.  So it's, in

8    it's most rudimentary form it's like document tracking,

9    but it also makes sure you get proper input.  So if

10   something comes from the White House, for example, like

11   a policy or idea, anything being reviewed, it goes from

12   like White House exec sec to DHS's exec sec and then it

13   gets farmed out, if you will, to make sure they get

14   proper input from anybody who would be affected by

15   whatever that document is or whatever that policy is.

16            When it comes to CBP, we have CBP exec sec,

17   but there it gets a blue sheet, literally, put on top

18   of it, and the blue sheet, similar to other agencies,

19   has boxes on it for the chief, executive commissioner,

20   field operations, the key leadership, and then it's

21   basically asking you to review whatever that is and you

Rodney Scott                                        December 5, 2023

                                                        Page 146

1    can concur with it, or if you're not going to concur

2    with it, then you have to actually say I do not agree,

3    I don't concur, and then you have to provide a written

4    explanation that -- then higher up, all the way to the

5    secretary or the White House, potentially, they can

6    take your advice or leave it.  That's still up to them?

7              But the exec sec process is a very

8    systematic bureaucratic process to make sure that we

9    can document all the work that is going on within DHS

10   and who had an opportunity to see what, what did they

11   say to document functions of the federal government.

12        Q.    Did you see in your time as border patrol

13   chief a blue sheet or exec sec process of the Asylum

14   rule?

15        A.    No, I did not.  I actually asked my prior

16   deputy chief, because I'm a little worried -- as the

17   chief of the border patrol, 20,000 people, I travel, so

18   I'm not sitting in that office every single day.  So I

19   asked my deputy chief at the time, Raul Ortiz, if he

20   saw it in my absence.  He's now retired as well and he

21   said no.  He did not see it either.

Page 147

1        Q.    Would you consider the Asylum rule we're

2    discussing today a push or a pull factor?

3        A.    It's a pull factor.

4        Q.    Why?

5        A.    It's a pull factor because it speeds up --

6    it shortens the amount of time to have somebody

7    released into the United States.  It also increases the

8    likelihood of somebody being released into the United

9    States because the asylum officer is making the entire

10   adjudication process now.  If they can say yes, with no

11   review, if they say no, it still delays it and it goes

12   to an immigration judge.

13            But definition, it will speed up how

14   quickly people are released into the United States.

15       Q.    To your knowledge, did the Biden

16   Administration seek the advice of career border control

17   on the impact of the IFR?

18       A.    No, it did not.

19            MR. BLOCK:  No further questions.

20            MS. FUDIM:  Okay.  I have some.

21            EXAMINATION BY MS. FUDIM:

Rodney Scott                                    December 5, 2023

                                                    Page 148

1        Q.    Turning your attention back to the

2   Memorandum of Understanding that I believe was marked

3   as Exhibit C by Mr. St. John, this was a Memo of

4   Understanding that was terminated in 2001 after a

5   waiting period; is that correct?

6        A.    I'm not familiar with the termination

7   process.

8        Q.    Do you believe -- I'm sorry.  I

9   interrupted.  Go ahead.

10       A.    I was just going to explain, my role was

11  not in that administrative aspect of this.

12       Q.    When you say you're not familiar with the

13  termination process, does that mean that you're not

14  aware that this agreement was terminated at all or

15  you're just not aware of the timing of the

16  determination?

17       A.    Either one.  I was not, just to clarify,

18  just so it's clear for you, I was not familiar with the

19  specific termination.  I only read the aspects of the

20  memo that we just now talked about.  Nor am I familiar

21  with any type of a specific automatic termination

Page 149

1   period.  Like administrative or otherwise.

2        Q.    I just saw a comment popped up, I just want

3   to make sure it's nothing critical.  Okay.

4             MR. BLOCK:  I think Scott, his phone

5   dropped, I believe, is what it would look like, and he

6   was participating via -- he was talking via telephone.

7             MS. FUDIM:  Right.

8             MR. BLOCK:  I think if you go to the

9   settings into your audio settings, it would be

10  participate by phone or call me maybe.

11            MR. ST. JOHN:  This is Scott, I lagged.

12  I'm back.

13            MR. BLOCK:  You were asking about the MOU

14  and about the termination process.

15            MS. FUDIM:  Yes.  Let me just get my

16  bearings for a second.

17       Q.    So, is it correct that you're not aware

18  that this Memorandum of Understanding was terminated

19  prior to the promulgation of the IFR?

20       A.    No, I was not aware.

21       Q.    Certainly you would agree with me that

Rodney Scott                                          December 5, 2023

Page 150

1   there's no reference to the Asylum Officer Rule in this

2   Memorandum of Understanding; correct?

3        A.    The document doesn't -- the document from

4   what I just reviewed doesn't identify any specific

5   program, it's more generalities.  So, in that context,

6   it does not, to my knowledge, specifically identify the

7   IFR rule.

8        Q.    If it was created before the IFR rule, it

9   necessarily couldn't; right?

10       A.    I think that's why -- so, yes.  I don't

11  want to speculate.

12       Q.    Do you know who on behalf of the federal

13  government put together or negotiated this Memo of

14  Understanding to the state of Louisiana?

15       A.    Specifically, no.  But in -- I know Ken

16  Cuccinelli, and in his time, he was the acting deputy

17  secretary of DHS, when he signed it, he might have been

18  acting.  But this doesn't surprise me.  I just want to

19  caveat because the engagement was state and locals was

20  always being pushed as a huge priority regardless of

21  the IFR or anything else and to making sure that we

Page 151

1    always worked as a team.  You'll hear conversations

2    that the border security is a team effort, it's a

3    coalition of government, federal government, you'll

4    always hear these concepts.  So nothing in this

5    document is like outside the context of that

6    conversation.  But I do not know the specific

7    individuals that would have done it, but it would have

8    been through that office of state and local liaison and

9    then DHS HKU traditionally.

10        Q.    You weren't a party to that though?

11        A.    No, I would be brought in as the chief,

12   having conversations, they would host, and when I say

13   host, the Office of State and Local Affairs, we would

14   routinely host conference calls, video conferences like

15   this, with different states, and have these

16   conversations, but then similar to most other policies

17   and rules, the pen to paper agreements, MOUs, stuff

18   like that, after that input, that would be done through

19   the state and local office or the DHS secretary's

20   office, more administratively.

21        Q.    You mentioned a moment ago in response to a

Rodney Scott                                    December 5, 2023

Page 152

1    question by Mr. Block that you would categorize the

2    Asylum Officer Rule as a pull factor because it

3    increases the likelihood of releases.  Do you recall

4    that testimony?

5         A.    Yes.

6         Q.    You have no data to point to to show that

7    it actually has increased the number of individuals who

8    have been released into the country; do you?

9         A.    I retired.  I do not have access to that

10   data.

11        Q.    So that's a no?

12        A.    I'm testifying off of my 30 years of

13   experience of cause and effect of any policy that does

14   increase and then how this one works, the likelihood

15   that more people are going to be released.  But I don't

16   have access to CBP or DOJ data anymore.  So I cannot

17   testify to a specific number.

18        Q.    So if it were the case that it had not

19   increased the number of, individuals released into the

20   country had not increased the number of asylum awards,

21   would that affect the opinions that you offered today

Rodney Scott                                          December 5, 2023

Page 153

1    with respect to the Asylum Officer Rule being a pull

2    factor?

3         A.    I always smile and hesitate because of the

4    what ifs.  That's inconsistent with my experience with

5    that process.  But, if anything, and consistent with my

6    testimony, but if any decision actually resulted in a

7    decrease of people being released into the United

8    States, that's fewer people calling back home, that

9    usually has a positive effect, meaning slowing down

10   cross border illegal activity.  But I'm not comfortable

11   testifying to a what if without looking at the specific

12   data because it just doesn't seem consistent with my

13   experience that this rule would change 30 years of

14   experience and all of a sudden have less people being

15   released instead of more with less adjudication.

16        Q.    Your testimony with respect to the effects

17   of the Asylum IFR or the probable effects of the Asylum

18   IFR are based on your experience in border patrol and

19   other policies rather than with respect to actual data

20   with respect to the implementation of the rule; is that

21   accurate?

Page 154

 1          A.     I believe that is accurate.  It's compiled

 2     over my career, various policies and how that affected

 3     border security and then comparing this one to it.  As

 4     I stated earlier, based on my retirement date and lack

 5     of specific data, I don't have that micro tactical

 6     information that you alluded to.

 7                  MS. FUDIM:  I have nothing further.  I

 8     guess that that's it.  I thank you for your time, Chief

 9     Scott.

10                  THE WITNESS:  Thank you.

11                  (Deposition concluded at 1:28 p.m.)

12

13

14

15

16

17

18

19

20

21

Rodney Scott                                                    December 5, 2023

Page 155

1  State of Maryland

2  City of Baltimore, to wit:

3            I, Louisa B. McIntire-Brooks, a Notary

4  Public of the State of Maryland, County of Anne

5  Arundel, do hereby certify that the within-named

6  witness personally appeared before me at the time

7  and place herein set out, and after having been duly

8  sworn by me, according to law, was examined by

9  counsel.

10           I further certify that the examination

11 was recorded stenographically by me and this

12 transcript is a true record of the proceedings.

13           I further certify that I am not of

14 counsel to any of the parties, nor in any way

15 interested in the outcome of this action.

16           As witness my hand and notarial seal

17 this 19th day of December, 2023.

18                    *Louisa B. McIntire-Brooks*

19                    Louisa B. McIntire-Brooks

                           Notary Public

20

   My Commission Expires:

21 November 13, 2027

Rodney Scott                                December 5, 2023

[& - accurate]                                        Page 1

| & | | | a |
|---|---|---|---|

**&**

**&**   14:7

**1**

**1**   28:21
**1,250**   19:6
**1-2**   139:9
**1.7**   90:6 100:2
   108:13 134:4
**10**   76:17 99:12
**10,000**   119:12
**10:11**   1:16
**10th**   4:20
**112**   3:7
**11:22**   68:4
**11:30**   68:5
**12:27**   112:5
**13**   155:21
**1325**   35:19
**139**   3:13
**142**   3:14
**144**   3:8
**148**   3:6
**14th**   20:11 38:9
   60:6
**17781**   155:18
**1885**   2:4
**1896**   21:9
**19,500**   113:10
**1986**   125:6
**19th**   155:17
**1:05**   112:6
**1:28**   154:11

**2**

**2**   13:12 108:17
**2,500**   18:20

**20**   99:4 108:16
   138:7
**20,000**   52:16
   146:17
**20003**   2:9
**2001**   148:4
**2003**   21:20
   23:21 24:12
**20044**   2:14
**2008**   21:20
**2009**   28:11
**2010**   28:14
**2019**   23:8
**202-598-6073**
   2:14
**2020**   20:15
   28:16 113:3
**2021**   4:20 15:6
   20:11 38:8,9
   80:14 109:20
   113:3
**2022**   38:16
   55:11
**2023**   1:15 3:3
   39:8,9 45:1
   155:17
**2027**   155:21
**20th**   38:7 50:13
**225-485-2458**
   2:5
**231**   2:8
**2500**   19:19
**29**   3:11 20:18
   20:19 128:20
   129:9 130:19
   132:4
**29th**   55:11,11

**2nd**   20:15
   28:11

**3**

**3**   108:17
**3,000**   113:11
**3.2**   74:16
**30**   20:18 35:13
   60:17 96:4
   106:3 114:18
   152:12 153:13
**31st**   38:16
**350**   113:21

**4**

**4**   3:6
**42**   61:14 81:15
   124:3

**5**

**5**   1:15 3:3
**5,000**   85:20
**58**   3:12

**6**

**611**   2:8

**7**

**7**   108:11
**7,000**   108:10
**70802**   2:5

**8**

**8**   35:19
**868**   2:13

**9**

**9**   76:17
**99**   18:11,15

**a**

**a.m.**   1:16
**a1c**   17:1
**abcdefg**   59:3
**ability**   35:6
   69:14 71:19
   92:13 103:11
   123:3,18
**able**   5:10 7:16
   13:6 19:4
   24:17 27:16
   35:1 37:20
   54:19 65:10,15
   70:8 71:21
   83:14,14 97:10
   117:15 137:10
   137:18
**absence**   109:19
   146:20
**absolutely**
   87:14 91:21
   117:7,9
**abused**   92:7
**academy**   19:7
   34:5
**accepted**   31:5
**access**   11:4
   110:17 152:9
   152:16
**account**   137:8
   142:14
**accounting**
   142:10
**accounts**   92:6
**accurate**   7:17
   13:16 15:1
   35:10 36:11

40:1 41:6
42:17,18 44:11
45:19 47:4
55:1,2 57:13
57:15 63:10
68:12,18,19
69:8 75:11
105:8 116:15
142:10,14,21
153:21 154:1
**accurately**
91:16,18
**acknowledge**
131:16
**acknowledged**
51:17 70:13
93:20
**acted** 59:15
68:21
**acting** 150:16
150:18
**action** 12:15
104:21 155:15
**actions** 32:2
75:15 91:12
105:1 108:9
142:2
**activities** 76:2
76:17 89:12
94:11
**activity** 125:13
135:10,21
153:10
**actors** 119:21
**actual** 11:11
13:6,10 23:13
57:1 117:5
127:16 134:17

153:19
**actually** 17:19
19:16 27:18
38:12 48:21
53:9 70:10,17
71:3,6 83:14
90:2 94:21
100:16 115:8
119:1 124:1
132:17 133:3,9
137:13 146:2
146:15 152:7
153:6
**add** 7:1 104:19
121:5 140:6
**added** 19:21
**adding** 127:4
**additional**
16:16 34:6
121:21 142:6
143:19
**additionally**
99:21
**address** 27:6
129:2,12
**adjudicate**
10:5,7 37:20
**adjudicated**
9:16 10:1,9
72:16 95:2
**adjudication**
37:15 56:2
147:10 153:15
**adjudicatory**
78:6
**adjusted** 57:4
**administration**
51:9,10,21

52:12 53:1,8
59:13 60:2
61:3,20 68:21
70:9,11 71:12
73:3 75:21
80:17 81:20
84:1 85:8 87:6
87:7 89:15
91:13 96:8,10
105:7 108:12
108:21 109:2
124:4 127:13
128:15 131:3
131:14 133:20
133:20 136:14
136:19 139:6
147:16
**administratio...**
79:1 108:8
**administratio...**
54:11 113:6,7
131:15
**administrative**
10:15 25:11
70:16 71:7
141:7 145:6
148:11 149:1
**administrativ...**
151:20
**adobe** 29:6
**adopted** 69:8
**adults** 39:14
40:16 47:12
**advance** 58:2
**adversely**
98:11 100:10
100:12 103:2
140:16 141:4,7

141:12,15,19
142:2
**advertise** 18:19
**advice** 16:18
81:20,21 84:1
84:4,6 85:9
131:8 146:6
147:16
**advisor** 23:9
**advocates** 14:4
**aerostats** 135:7
135:13,17
136:9,15
**affairs** 151:13
**affect** 33:20
35:15 46:8,14
47:19 52:14
74:4 118:1
140:4,6,17,17
152:21
**affected** 44:8
48:8 76:20
110:11,13
139:21 145:14
154:2
**affecting**
140:14
**affects** 34:16
72:20 100:15
129:18
**affiliated** 13:15
**afford** 19:3
**aflegal.org** 2:9
**ag.louisiana....**
2:6
**age** 47:11
**agencies** 24:18
81:9 145:18

**agency** 24:1,20 114:10,11,15 115:2,10
**agent** 21:4,9 26:4 27:8,21 30:18,19,20 32:9 33:13 69:19 71:15
**agents** 53:2 71:6 83:17,18 94:8 97:10 113:8,11 133:3 133:6 134:13 134:14 140:20
**ago** 24:12 40:15 53:13 69:14 94:14 133:13 151:21
**agree** 15:12,12 38:14 43:5 46:6,12 47:14 47:17 59:1,7 59:18 67:11 69:3 79:5,12 80:21 82:4,5 87:13 91:16,18 98:14,15 115:4 118:5 119:13 138:21 139:20 140:16,19 141:2,6,10,14 141:17,21 146:2 149:21
**agreed** 4:2
**agreement** 148:14
**agreements** 89:3 151:17

**ahead** 148:9
**air** 135:7
**al** 1:5,9
**alan** 54:4 73:2
**alert** 27:5
**alien** 37:18,20 107:6 108:3,11
**aliens** 67:15,18 71:16 73:19 81:14 90:6 93:2 94:9 97:8 98:21 100:3 101:18 102:1,8 127:14 141:4
**aligned** 16:17
**aligns** 75:19
**allegations** 10:10
**alleged** 104:6
**alleging** 93:13
**allow** 6:6 35:3
**allowed** 61:4,5 61:7,8 80:8 104:19
**allowing** 10:4 61:12,12
**allude** 89:19
**alluded** 154:6
**alluding** 10:10
**amended** 11:15
**america** 2:8
**amnesty** 125:6 125:9
**amount** 19:18 49:20 50:1 70:19 73:6 94:1 105:11 107:6 147:6

**andrew** 2:7 7:11
**andrew.block** 2:9
**anne** 155:4
**announced** 43:7 44:21 55:10,16
**answer** 6:5,7,9 6:11 7:3,4,7 19:14,20 21:2 25:7 27:16 41:8 96:2,21 101:12 106:17 107:16 110:8 114:14 144:21 145:1
**answered** 106:16 107:12 107:15
**answers** 5:7,11 97:3,4 144:19
**anti** 21:15 22:1
**antiterrorism** 24:10,17
**antonio** 19:3
**anybody** 35:19 35:20 51:21 71:20 96:18 145:14
**anymore** 152:16
**anytime** 54:4
**anyway** 86:11
**ao** 37:8
**aor** 37:8
**apart** 36:13

**apologies** 139:3 142:17
**apologize** 112:19 144:12
**appear** 68:15
**appearances** 2:1
**appeared** 32:17 50:21 51:1 155:6
**appears** 142:12
**applicants** 53:14 56:3
**application** 46:19
**applied** 43:10
**applies** 39:14 40:16
**apply** 39:16 40:18 46:17 60:16,18 98:6
**appointees** 79:2,9 81:17 83:5 85:13 131:2
**appreciate** 30:4 46:12 64:10
**apprehensions** 141:7
**approach** 53:8
**approaches** 54:10
**appropriate** 24:16 26:9 40:9 41:5 97:13

Case 6:22-cv-01130-DCJ-CBW  Document 217-44  Filed 01/29/24  Page 160 of 201 PageID #: 10470
Rodney Scott                                                    December 5, 2023
[appropriation - authority]                                              Page 4

| | | | |
|---|---|---|---|
| **appropriation** 127:16 | **arthur** 66:1,4,7 66:11 67:4,5 | **assignments** 24:6 25:18 | 74:4,9,13 75:13,19 76:3 |
| **approve** 30:21 | **arundel** 155:5 | **assistant** 25:10 | 76:12,20 77:5 |
| **approximately** 85:20 | **aside** 71:6,15 | 82:17 | 77:11,17 78:1 |
| **apps** 126:11 | **asked** 10:11,12 12:10,11 13:1 | **associated** 104:21 108:17 | 78:3,13 82:1 |
| **april** 39:8 44:21 | 13:2 19:15 24:9 25:19 | **assume** 30:10 96:21 110:7 | 83:3 89:3 90:1 90:3,21 93:6 |
| **arbitrarily** 124:5 | 65:9 79:17 104:19 106:15 | **assumed** 30:2 | 94:19 95:12,17 97:2,13 98:5 |
| **area** 7:8 93:3 100:19 109:11 | 107:12,15 111:17 144:4 | **assuming** 49:17 117:20 | 102:19 103:1 104:8,15 106:8 |
| 134:21 135:10 | 146:15,19 | **assumption** 127:1,3 | 107:3,5,18 130:16 131:8 |
| **areas** 33:5 130:3 134:19 | **asking** 4:13 5:6 6:4 7:2 27:17 | **asylum** 8:18 10:2,4,5 20:2 | 131:21 132:3 141:12 146:13 |
| 135:2,17 136:2 136:7 | 38:14 39:2,2 40:14 78:10 | 30:5 36:5,5,19 37:2,3,12,13 | 147:1,9 150:1 152:2,20 153:1 |
| **arena** 123:19 | 84:10 88:2 | 37:16,19,19 38:1 39:16 | 153:17,17 |
| **argue** 76:14 104:2 109:16 | 142:18 144:18 145:21 149:13 | 40:1,3,10,11 40:19 41:1,18 | **attached** 138:5 142:8 |
| 119:4 124:13 126:10 | **aspect** 16:9 18:13 38:19 | 42:1,6,12,13 42:20,21 43:3 | **attention** 86:2 86:8 131:20 |
| **argument** 49:18 81:1 | 51:18 93:8 105:18 109:4 | 43:6,14,19,21 44:7,9,10,13 | 148:1 |
| 102:14 109:15 | 120:8 127:4,9 | 44:13,19 45:4 45:8,12,12,16 | **attorney** 1:4,8 2:3 5:4 58:21 |
| **arguments** 102:13 | 129:2,3,12 148:11 | 46:1,7,8,13,14 46:16 47:2,20 | 112:13 |
| **arizona** 1:4 24:9 93:4 | **aspects** 10:16 90:20 102:6 | 48:11,11,12,15 48:16 49:5,6 | **attributable** 91:12 |
| 136:1 | 103:13 113:16 117:17 126:10 | 49:11,16,16 50:2 51:15 | **audio** 149:9 |
| **arrests** 141:7 | 148:19 | 53:3,7,14 54:1 54:14 56:2 | **august** 4:19,20 20:11 28:11 |
| **arrive** 48:3 | **assigned** 21:16 23:9 24:5 | 68:14,14 72:1 72:8,12,19 | 38:7,9 50:13 60:6 109:20 |
| **arrived** 68:2 117:1 | 100:17 | 73:5,14,16,21 | 113:3 |
| **arriving** 47:18 | **assignment** 24:11 | | **authority** 30:17 51:16 |
| **art** 66:1 | | | 127:8 |
| **artery** 99:13 | | | |

[authorization - believe]                                          Page 5

| | | | |
|---|---|---|---|
| **authorization** | 155:3,19 | 43:3 46:7,13 | 23:11 150:12 |
| 122:19 142:1 | **back** 23:13,20 | 60:10 65:16 | **behavior** |
| **automatic** | 26:3 32:9 | 74:14 77:2 | 124:14 |
| 148:21 | 33:14 52:20,20 | 83:10 92:11 | **beings** 120:6 |
| **avail** 125:10 | 54:3 62:1 | 97:19,20 98:15 | **belief** 50:15 |
| **availability** | 64:11 67:7 | 98:20 115:1 | 74:18 75:2 |
| 122:14,16,18 | 68:5 69:13 | 116:9,13 124:7 | 96:4,4 97:20 |
| 124:17 | 73:2 82:7 | 127:16 128:20 | 97:21 100:5 |
| **available** 15:10 | 83:17,18 88:5 | 129:9,14 | **believe** 6:15 8:6 |
| 53:2 90:13 | 99:11 107:1,2 | 130:18 132:4 | 9:14 10:18 |
| 126:19 133:6 | 107:14 114:5 | 134:10 144:3 | 11:12 12:14 |
| **avenue** 2:8 | 120:13 148:1 | 153:18 154:4 | 42:10 43:2 |
| 16:6 | 149:12 153:8 | **basic** 74:8 | 44:11 46:16 |
| **avenues** 127:5 | **backed** 62:19 | **basically** 10:14 | 47:5 48:12 |
| **average** 49:10 | 71:4 94:13 | 16:4,5 29:7,11 | 50:12 54:11 |
| 49:21 50:1,3 | **backfill** 137:15 | 51:14 53:3 | 56:9,10 57:3 |
| **awards** 152:20 | **background** | 69:14,19 70:2 | 57:14 59:8 |
| **aware** 11:17 | 8:19 24:8 26:6 | 72:14 80:9 | 60:7,9 64:6,8 |
| 33:15 39:8,10 | **backing** 26:14 | 89:16 99:5 | 66:1,17 68:11 |
| 44:15 52:4,10 | **backlog** 53:5 | 103:9 108:9 | 68:16 72:4 |
| 55:15 66:14,16 | 53:12,15,16,16 | 109:13,14 | 73:5 74:14 |
| 77:21 85:16,17 | 53:18,20 54:12 | 113:15 116:4 | 75:4,5 76:20 |
| 87:1 119:16 | **backs** 54:8 | 128:6 129:15 | 77:4 78:12 |
| 139:4,7 140:11 | **backup** 63:2 | 130:6 133:1 | 79:8 80:14 |
| 148:14,15 | **backups** 62:16 | 135:7 137:11 | 81:18 82:7 |
| 149:17,20 | **bad** 5:5 46:11 | 145:5,21 | 83:20,21 84:7 |
| **awareness** 8:5 | 116:5 130:1 | **basis** 41:17 | 84:11 85:8 |
| 52:13 | **balance** 103:18 | **baton** 2:5 | 88:1,3 91:4,7 |
| **aways** 90:7 | 104:4 116:4 | **battle** 121:18 | 94:12,12,21 |
| 108:14 132:11 | 130:2 | **bear** 96:3 | 95:11,15 96:3 |
| 132:16 133:15 | **balloon** 135:8 | **bearings** | 96:6,9 98:2 |
| 134:3,6 | **baltimore** | 149:16 | 100:5,11,15 |
| | 155:2 | **beef** 61:20 | 105:9 107:3,9 |
| **b** | **barker** 85:10 | **beginning** | 107:14,16,18 |
| | **base** 95:6 105:2 | 32:14 99:11 | 109:4 114:11 |
| **b** 1:17,21 3:12 | **based** 5:2 | 101:11 | 114:15 115:12 |
| 57:19 58:15,17 | 16:19 19:18,19 | **behalf** 2:2,7,10 | 122:21 127:3 |
| 67:8 68:10 | 35:13 41:9 | 15:8,9 21:13 | 127:15 129:3 |
| 78:18,19,20 | | | |

[believe - border]                                                                Page 6

131:11 132:6
136:11,17
138:16 148:2,8
149:5 154:1
**believed** 53:4
**bells** 85:21
**ben** 2:13
**bend** 135:20
**bends** 135:6
**benefit** 118:15
**benefits** 103:4
142:1
**bersin** 54:4
73:3
**best** 63:13 91:5
124:1
**beyond** 54:3,14
57:5 60:11
73:1 83:1
85:14 116:16
140:7
**biden** 51:10
59:13 60:1
61:3 68:20
71:12 75:21
78:21 79:21
81:20 87:6,7
91:13 108:11
113:5 127:12
136:13,19
147:15
**big** 75:7,7
82:14 118:5,7
119:5 135:20
**bigger** 72:4
74:13 76:19
107:4 109:6
115:21 137:9

**biography** 3:11
3:14 142:7,10
**bit** 31:2,3 50:6
99:6 102:3
120:4 125:18
129:8
**blanket** 41:11
41:15,16 61:13
88:21
**blas** 70:11
80:15,16 83:6
85:1
**blind** 136:6
**block** 2:7 3:8
7:11,20 29:3,6
29:13 58:1,9
58:10 64:3,6
106:18 107:8
107:13 111:8
112:7,9 137:18
137:20 138:19
139:15 143:20
144:2,6,16,19
145:1 147:19
149:4,8,13
152:1
**blue** 82:20
144:9,20
145:17,18
146:13
**board** 118:6
**bolster** 61:20
**bonner** 24:2
**boomed** 125:14
**border** 4:21
8:19 9:18,19
12:3,5,6 13:18
14:6,8,16 16:8

18:7,8,10,13
18:15 19:7
20:5,6,10,17
20:21 21:4,5,6
21:8,9 23:10
23:15,17 24:4
24:16,18 25:3
25:6,21 26:15
26:16,18,19
27:11,14,18
28:8 30:11,15
33:1,2,6,8,13
33:13,14,15,17
33:19,20,21
34:3,15,17,18
34:21 35:2,4,7
35:15,17 36:16
36:17 38:3
42:15,17 43:1
47:2,3,3,6,8,19
47:19 52:14
53:1 54:5,8,18
55:4 59:16
60:4,11,18,20
61:1,6,10 62:4
62:16,20 63:2
66:3 67:17
68:21 69:12,14
70:6,18 71:6,9
71:9,10,18,19
71:20 72:2,6,8
72:17,21 73:4
73:19 74:5
76:2,15 77:7
79:1,13,20
80:4,7,17
81:11 82:1,19
83:8,12,15,17

83:17 84:14
85:4 86:6,11
89:12 90:7,8
91:11,16 92:2
92:4,15,19
93:10,12,15,16
93:17 94:4,5,8
94:9,10,18
95:4,11,19
96:5,14 97:9
97:15,17,17
98:11,21 99:1
99:1,2,3,12,13
99:17,21 100:3
100:10,17,19
101:7 102:2,13
102:14 103:8,9
103:11,15
107:20 108:14
110:1,4,10,12
111:20 113:2
113:14 114:8,9
114:10,21
115:2,4,5,8,11
115:17 116:1,8
116:17,21
117:1,3,5
118:8,16,17
119:14 120:2
121:7,9,11,13
121:20 122:8,9
123:1 125:3,3
125:4,13
127:18 128:21
129:1,10,16
130:5,8,19
131:4,12,18
132:4,14,15,16

132:18,19
133:11 134:4,7
134:8,14,14,19
135:2,9,10,19
136:3,15,20
137:1 140:8
146:12,17
147:16 151:2
153:10,18
154:3
**borders** 20:8
47:8 48:3
86:13 117:12
**bottom** 139:12
139:16
**boundaries**
75:8 117:14
**box** 2:13
**boxes** 145:19
**bp** 102:3
**break** 6:17,19
112:5
**brief** 52:17,20
80:8 81:10
112:10
**briefing** 24:9
51:11 80:4
**briefings** 102:4
**bring** 13:4
29:21 93:18
124:19
**brnovich** 1:5
**broad** 56:20
57:1
**broader** 14:10
24:11 67:16
**broadly** 14:4
56:17

**brooks** 1:17,21
58:3 155:3,19
**brought** 13:1
28:18 61:5
69:16 80:15
82:10 151:11
**brown** 25:16
27:9,21 28:11
**brush** 57:1
**brushstroke**
56:20
**budgetary**
128:2
**build** 24:20
120:3
**building** 25:20
27:5
**built** 27:9,10
96:4 136:2
**bullet** 67:8
139:18 140:14
**bullets** 139:17
**bunch** 28:19
**bureaucratic**
146:8
**business** 60:14
121:6 143:13

**c**

**c** 3:13 37:3
81:19,19
138:19,20
139:1,4 148:3
**calendar** 18:3
**call** 51:16
61:21,21
101:20 120:17
121:18 123:18

125:19 137:3
149:10
**called** 4:8 14:7
17:3 20:2
73:13 82:13
131:18 133:10
133:17 140:14
**calling** 57:21
153:8
**calls** 73:10 81:8
84:21 121:1
126:9,12
151:14
**camera** 135:8
**cameras** 135:1
**campaign**
52:12 127:7
**canceled** 17:19
**cane** 135:5
**capabilities**
102:18
**capability**
95:13 102:12
127:18
**capacity** 1:8
31:19 101:9
127:13 128:16
**capturing**
119:20
**care** 101:2
130:13
**career** 26:9
30:13,16 31:20
32:4,8 33:6,9
60:17 79:14
80:20 84:2
93:8 103:9
120:9 147:16

154:2
**carizzo** 135:5
**cartel** 93:13,14
94:7 95:6,19
121:12,12
**cartels** 71:20
91:13 93:7,10
94:16,20
**carve** 76:3
125:15
**carving** 104:20
**cascading**
54:17 121:1
**case** 5:4 9:13
9:14 10:11,17
11:18 12:13
17:18,18 31:3
31:5 32:15,18
32:18 41:10,10
41:14,15,17,17
46:19 63:13
66:12 67:2
72:16 74:3
75:19 83:6
95:2,3 97:21
124:10 152:18
**cases** 31:4
37:20 41:11
70:16 71:7
92:12
**cat** 37:3 56:4
**catch** 72:19
88:19 105:3,19
105:19 131:17
**categorize**
152:1
**category** 56:18

Rodney Scott                                              December 5, 2023

[cause - combined]                                               Page 8

| | | | |
|---|---|---|---|
| **cause** 96:5 105:3 106:4 132:2 152:13 | **challenge** 96:18 | 60:3 79:16 80:15 82:18 86:11 99:1 | **claiming** 47:2 |
| **caveat** 42:3 79:11 90:21 133:8 140:3 150:19 | **challenging** 94:6 105:2 135:4 | 107:15 112:19 113:2 118:6 119:14 137:15 | **claims** 9:12,14 37:3 44:16 46:2,9,14 48:16 78:4,13 |
| **cbp** 20:7 21:1 21:16,21 24:11 24:15,16 27:3 27:3 70:11,11 70:15 79:17 80:16 82:12 84:20 85:14 90:19 91:4,7 128:7 137:9 145:16,16 152:16 | **chance** 7:13 81:1 | 139:4 140:8 142:17 143:8 143:10 144:7 145:19 146:13 146:16,17,19 151:11 154:8 | **clarification** 31:15 38:18 61:9 64:4 111:9 144:5 |
| | **change** 44:6,6 46:20 47:4,6 47:14 48:9 51:15 56:18 76:18 96:8 153:13 | **chief's** 78:9 | **clarify** 17:13 17:15 22:10 39:1 78:9 148:17 |
| | **changed** 47:7 48:6 96:10,20 121:12 | **chiefs** 99:3,8 | **clarity** 86:7 |
| | | **child** 92:9 97:2 97:4 98:3 | **clarity's** 111:15 |
| | **changes** 46:7 46:12,19 47:10 47:17 56:10,12 140:1 141:21 | **children** 47:12 97:11 124:19 | **class** 117:4 |
| **cbp's** 90:13 | | **choice** 105:15 105:16 | **classifications** 40:19 |
| **cbp.gov** 89:10 | **changing** 9:8 47:10 | **choices** 105:7 105:10 | **clavel** 79:18 81:2 83:7 85:1 |
| **centers** 61:21 62:1,3 135:15 137:3 | **charge** 15:18 18:18 27:8 | **choose** 90:20 94:8 | **clear** 79:18 93:12 120:5 127:8 128:1 139:20 148:18 |
| **centro** 30:21 | **charging** 12:19 | **circle** 64:11 | **client** 58:9 |
| **ceo** 113:15 | **chat** 66:8 107:8 | **cis** 40:4,11 115:5 | **clinton** 73:3 |
| **certain** 10:13 40:18 56:2 78:2 84:15 109:10 116:18 134:19 139:4 | **chatter** 51:16 52:7 | **cities** 43:1,11 43:11,14,18 44:1 | **closer** 134:20 |
| | **cheaper** 126:9 | | **club** 19:2 |
| | **checkpoint** 24:7 26:16 | **citizenship** 22:9 | **clubs** 19:1 |
| **certainly** 149:21 | **chief** 4:12,21 12:2 18:13 20:10,14 23:15 25:10 26:4 28:17 29:9 30:16,18,19,20 50:9 58:16 | **city** 42:6 155:2 | **coalition** 66:3 151:3 |
| **certify** 155:5 155:10,13 | | **civil** 2:12 | **college** 34:7 |
| **cetera** 103:7 | | **civilian** 113:12 | **colloquially** 69:4 100:9 |
| **chain** 123:12 123:18 | | **claim** 10:5,7 36:4,5 48:12 68:14 93:6 | **combine** 19:11 |
| | | | **combined** 94:2 94:3 98:1 |

Rodney Scott                                                     December 5, 2023

[come - consistent]                                                    Page 9

come   12:14
  23:18 52:19
  61:13 68:5
  70:20 86:10
  90:16 95:4
  116:6 118:16
  121:7,9,20
  124:2,11,13
  129:17
comes   75:10
  89:17,17 118:6
  145:10,16
comfortable
  7:16 32:5
  56:19 153:10
coming   51:12
  51:17 70:3
  71:16 93:5
  124:6
command
  113:9
commander
  25:16
commencing
  1:16
comment   82:21
  149:2
comments
  54:21 55:7
  57:12,16 85:17
  86:4,10 87:2
commission
  155:20
commissioner
  21:7 23:21
  24:2,9 145:19
commissione...
  21:14 24:13

25:2
commissioners
  82:17
committees
  84:10
common
  127:10
commonly   8:17
  21:5 62:2
  72:18 88:18
communicate
  120:6
communicated
  125:20
communicati...
  126:1
communities
  33:14,15,21
company   16:4
  17:4 113:16
compare   46:1,2
compared
  33:18 110:11
compares
  49:10 50:1
comparing
  92:18,18
  110:10 154:3
compensation
  17:10
compiled   154:1
complaint
  10:20 11:1,5
  11:11,13,15,15
complete   7:17
  94:6
completely
  61:4 90:4,8

92:15,21 95:2
  108:15 112:4
  137:12
complied   67:3
component
  20:6 21:1
  60:19 128:6
components
  101:12
compression
  17:6
concept   123:7
  123:9 129:6
concepts   151:4
conceptually
  57:1
concerning
  132:10
concluded
  154:11
conclusion
  25:1
concretely
  139:21
concur   82:21
  83:1 146:1,1,3
conditions
  74:20
conduct   104:14
  109:17 110:7,8
  110:10
conducted   30:5
  30:7 45:12,17
  110:5
confer   112:2
conference
  15:11 81:8
  84:21 151:14

conferences
  151:14
confirm   142:9
confluence
  89:5
confused   134:1
congress   27:17
  84:9 89:15
  94:14 110:19
  111:13 127:17
  128:8 133:9,11
congressional
  84:8 111:5
  142:8
connected   52:5
connection
  69:4
cons   103:19
consciously
  131:13
consequence
  105:11
consequences
  118:14
conservative
  14:3,5
consider   26:12
  32:21 34:9,12
  34:14 35:8,12
  74:21 147:1
consideration
  37:2 87:1
considered
  86:15 129:19
considering
  75:14
consistent
  38:15 39:13

41:1,21 42:5
51:19 98:7
108:7,19
117:20 119:16
123:19 126:14
140:7,11 153:5
153:12
**consistently**
59:13
**constant** 118:8
**constantly**
25:12 51:11
63:4 93:11
121:8,19 137:6
**construction**
71:13 136:4,21
**consulting**
15:21 16:1,3
16:14 17:11
18:17
**contact** 66:20
**contacted** 8:6
8:11
**contained** 59:3
65:6
**contention**
130:20 131:6
132:5
**context** 31:8
62:12 69:16
72:5 90:1
111:20 115:17
115:21 116:19
124:15 150:5
151:5
**contexts** 70:7
**continual**
140:9

**continually**
89:15
**contract** 13:6
13:18 15:5,16
**contracts** 16:16
16:20
**contributed**
94:19 95:18
**control** 9:19
35:4 54:19
55:5 69:15
75:9,10 84:16
91:13,15 92:1
93:11,15 94:20
95:19 96:5
97:9 115:17
117:13,16
118:8,13 122:9
147:16
**controllable**
122:11
**controlling**
129:17
**controls** 121:13
**convention**
36:7
**conversation**
8:14,20,21 9:1
9:4 13:7 51:20
53:6,11,21
60:17 69:13
72:18 81:13,17
82:8 83:19
85:3 129:7
151:6
**conversations**
9:5 25:13
51:14 52:10,15

52:18 54:12,13
60:10 61:8,16
66:21 82:16
99:8 140:9
151:1,12,16
**convince** 121:9
**cooperative**
89:3
**coordinate**
23:10
**coordinated**
15:19
**coordination**
22:1
**copy** 29:3 58:3
58:4,13
**correct** 6:12
13:17 14:13
15:2 16:1 20:8
20:9,12 22:3,7
30:6 35:11
39:4,13 40:6
40:12 41:21
43:12 49:3
50:14,15,19
55:5,6 56:1,6
63:6,11,20
64:13,14 79:12
86:6,7 87:3
98:5,8 110:20
110:21 113:3,4
113:20 115:11
115:12 116:11
116:12 121:5
122:6 129:20
129:21 130:15
136:17 143:3,8
143:9,11,14,15

148:5 149:17
150:2
**correctly** 59:16
79:3 82:2
87:11
**correlation**
116:19
**cough** 127:21
**counsel** 4:3
7:11,18 8:9
12:19 112:2,12
155:9,14
**count** 134:16
134:17
**counter** 109:8
**country** 39:18
40:20 49:8,10
49:17 69:15
70:4 71:21
83:9 86:12
92:3 99:14
103:12 104:17
118:12,18
126:2 152:8,20
**county** 155:4
**couple** 8:13 9:9
18:12 19:15
24:6 25:19
107:21 135:16
137:17 139:13
**course** 33:6,9
34:6,6 70:7
125:21 126:3
**courses** 34:3
**court** 1:1 2:13
5:9 6:1 28:21
29:4 31:4
32:14 46:8,13

Rodney Scott                                December 5, 2023

[court - defendants]                                        Page 11

58:5,7 106:21
107:2 134:5
143:6
**cover** 135:6
**covered** 15:16
**covers** 99:5
**create** 93:17
130:17 137:3
**created** 23:21
36:21 95:11
96:13 122:1
150:8
**creates** 135:6
**creation** 65:5
**credible** 30:7
37:1 40:8 46:4
77:14
**credit** 39:4
**creditably**
106:13
**criminal** 90:6
**criminals**
130:10
**crisis** 91:12,12
91:20,21 94:6
95:11 96:14
98:10 118:13
**criteria** 132:19
**critical** 103:5
129:3 149:3
**cross** 35:15,17
48:3 72:21
73:19 76:1
83:8 89:12
101:7 107:20
117:3 124:8
125:13 130:8
131:4,18 135:9

153:10
**crossed** 33:14
102:2 134:7
135:18
**crosses** 35:19
35:21 54:5
60:21 93:15
**crossing** 35:5
36:10 42:16
47:1 85:4
89:21 93:2
98:21 133:2,5
**crossings** 48:7
**cs6342615** 1:20
**cuccinelli**
150:16
**current** 24:3
46:18 51:11
52:12 55:21
123:20 131:14
**currently**
13:11,15 27:10
27:11 92:5
100:17
**cursory** 11:10
**custody** 41:6
61:2 62:15
73:7 107:6
135:16
**customer** 95:5
**customs** 21:7
22:16 24:20
26:15,19 28:8
30:15 114:8
116:21 118:17
132:18
**cut** 104:12

**cutting** 25:21
27:11 28:12
133:18
**cv** 29:11
**cycle** 52:13

**d**

**d** 3:14 87:5
88:5 89:8
138:17,18
142:4,7,9
**d.c.** 14:20
24:10 114:1
**daily** 24:14
**danley** 85:11
**data** 27:14 50:5
76:9,10,11
77:19 78:10
80:8 89:14
98:16,18
128:12 133:19
152:6,10,16
153:12,19
154:5
**date** 8:12 12:15
17:20 55:13,21
154:4
**dates** 9:8 23:14
28:3,5,19
29:11 30:3
38:17,21 39:12
**dave** 81:8
84:21
**day** 13:4 60:6
81:5 114:16,17
136:19 146:18
155:17

**days** 30:10
73:3
**dc** 2:9,14
**dealing** 101:6
**deals** 14:8
**dear** 97:5
**decades** 74:8
116:14
**december** 1:15
3:3 155:17
**decide** 60:16
**decided** 124:5
**deciding**
129:16
**decision** 41:8
61:11 69:18
72:7 153:6
**decisions** 35:3
35:14 46:8,13
46:18
**declaration**
12:12,16
**decrease** 119:1
140:15 141:2,6
153:7
**decreased**
127:18
**decreasing**
78:1
**dedicate** 19:15
**default** 129:18
133:14
**defend** 17:3
**defendant's**
144:9,14
**defendants**
1:10 64:18
132:1

Case 6:22-cv-01130-DCJ-CBW Document 217-44 Filed 01/29/24 Page 168 of 201 PageID #: 10478
Rodney Scott December 5, 2023
[defense - discuss] Page 12

**defense** 17:4
**deficit** 137:16
**define** 34:19,21
  35:7
**defined** 62:8
  88:10
**defines** 132:19
**definitely**
  141:13
**definition** 36:8
  82:18 117:11
  129:16 147:13
**delays** 147:11
**deliberations**
  12:3
**delineate** 76:16
**delineates**
  128:8
**delivered** 90:11
**delve** 138:15
**demographics**
  47:14,18 48:2
**denied** 49:6,11
  49:16 50:2
**department**
  2:10,11 17:4
  22:4,6 23:6
  50:16 139:10
**departure** 38:2
**depending**
  15:11 18:20
  120:12 127:5
**depends**
  101:19 134:18
**deported** 63:17
**deposed** 66:12
  66:18

**deposition** 1:14
  3:2 4:13,15
  6:10 7:14 13:1
  13:2,9 29:19
  31:12 58:17
  68:10 139:1
  142:4 143:4
  154:11
**depth** 89:11
  97:12
**deputy** 2:3
  26:3 146:16,19
  150:16
**derived** 33:5
**described**
  14:12
**detail** 23:12
  28:9 56:15
  57:5
**detailed** 22:13
  23:8 99:17
**details** 22:18
  23:2,5 28:8
  39:12
**detained** 62:21
  122:5
**detect** 35:4
**detention** 62:3
  72:13 76:5
  83:9 88:20
  95:13 97:14
  105:18 109:1,3
  127:13,18
  128:16 141:15
  141:18
**determination**
  37:17 40:8
  41:15 108:3

  148:16
**determine**
  104:15 109:17
**determined**
  41:5
**determines**
  40:9
**deterrents** 61:6
  61:7
**deterring** 85:4
**develop** 24:16
**developed** 9:19
  73:4 79:2
**development**
  79:15
**dhs** 22:11,14
  23:8,20 24:15
  80:5 81:7
  82:12 90:19
  94:15 118:17
  127:6 128:7
  139:5,9 140:20
  145:6 146:9
  150:17 151:9
  151:19
**dhs's** 145:12
**diego** 25:9,10
  26:4 30:20
  133:17 134:20
**difference**
  92:16 131:7
**different** 7:8
  9:9 25:13
  28:13,19 32:1
  36:15 51:12
  53:8 54:10,10
  61:12 63:8
  80:6 89:6

  96:11 99:4
  101:19 109:16
  109:18 131:21
  136:16 151:15
**differentiating**
  100:13
**difficult** 96:10
  117:18
**direct** 60:3
  65:17 77:4
  84:17 99:10
  105:10 116:18
  130:21
**direction** 81:14
**directives**
  113:19 114:5
**directly** 21:16
  23:9 71:18
  72:20 75:19
  81:3 83:2 85:1
  85:12,13 95:3
  95:5 101:7
  108:17 111:19
  114:1 131:17
  139:21 140:6
**director** 93:20
  94:13
**disagree** 105:6
  105:15,16
**disclosed** 11:17
**disclosure** 3:12
  57:21 58:8
  64:7 106:5
  138:9,17
**discretionary**
  142:2
**discuss** 106:14

Rodney Scott                                                    December 5, 2023

[discussed - elissa.p.fudim]                                    Page 13

discussed
  12:18 24:12
  67:4,5 77:15
  106:14
discussing
  147:2
discussion
  12:21 68:7
  72:5 125:8,8
discussions
  12:4 52:8
  108:20 118:7
distractions
  95:8
district   1:1,1
  2:13
diverted
  136:15 137:6
division   1:2
  2:12
dna   92:9 98:2
doc   125:13
docket   139:9
document   3:11
  3:13,14 28:19
  28:21 58:4,7
  58:14,15 59:2
  59:2,4 64:13
  64:16,20 65:5
  65:13 67:7
  68:9 123:4
  139:8 142:7,12
  145:8,15 146:9
  146:11 150:3,3
  151:5
documentation
  117:2

documented
  84:11 90:7
  92:5 93:9
  135:11
documents
  29:21 68:1
  70:21 134:5
  137:18
doing   6:2 13:2
  16:6 29:1
  32:18 58:5
  97:11 99:18,18
  99:20 100:20
  101:3 114:16
  114:19
doj   152:16
domino   54:9
donation   19:6
downplay
  89:13
downplayed
  87:7
downplaying
  90:9,10,18
drafted   79:2
dramatic   76:1
dramatically
  47:7 73:9 74:7
  108:9
draw   116:18
  131:20
drawn   64:17
drive   130:18
  131:8
driving   26:20
dropped   149:5
drugs   93:19

due   87:6 89:5
duly   4:8 155:7
duties   69:20,20
dynamic   61:4

e

e   29:3 58:1,3,6
  58:8 81:2
  91:10,10,10
  137:17 138:5
  143:4,7
earlier   6:12
  44:5 50:12
  65:7 77:15
  82:8 86:9
  88:10 109:7
  121:11 133:17
  137:2 154:4
early   28:14
  30:10 120:9
earthquake
  118:11
ease   116:3
easier   58:6
  96:9
easing   140:1
economic   90:2
  90:3 103:12
edict   24:1
  81:16
edited   142:13
  142:15
edits   142:20
educate   130:12
effect   30:21
  36:13 46:4
  54:9 76:1
  83:12,12 96:5

105:3 106:4
  130:11 133:7
  140:1 152:13
  153:9
effective   48:20
  133:13
effectively
  83:14 91:13
  92:17
effectiveness
  133:11
effects   35:9
  54:18 72:8
  74:2 75:13
  80:10 102:17
  103:10 106:1
  121:1 129:4
  153:16,17
effort   118:8
  151:2
eight   13:4
  20:19
either   5:15 9:6
  11:11 15:10
  17:10 51:3
  59:6,8 86:8
  110:16 111:13
  133:2 146:21
  148:17
el   30:20 134:20
election   52:13
elicited   138:14
eligibility
  142:1
elissa   2:11
elissa.p.fudim
  2:15

Case 6:22-cv-01130-DCJ-CBW   Document 217-44   Filed 01/29/24   Page 170 of 201 PageID #: 10480
Rodney Scott                                          December 5, 2023
[emergency - exclude]                                          Page 14

emergency
  26:20
employ  81:5
employed
  13:11 40:3
  55:4 86:6
  100:18 124:4
employee
  13:12
employment
  16:10,12
  122:14,16,19
  122:19 123:3
encompassed
  54:15
encountered
  30:12 42:16
  116:21
encounters
  74:16 97:9
  108:11 110:11
  110:12
encourage
  132:2
encourages
  115:20
encouraging
  121:6
ended  19:6
  24:12 26:3
  100:6
ends  36:4
enforce  35:3
  129:20,21
enforcement
  22:16 61:18
  69:20,20 93:17
  95:8 97:16

99:19 100:21
102:11,18
103:19 113:17
121:16 128:11
140:2,4,15,20
enforcements
  23:10
engage  15:7
engaged  67:18
engagement
  17:10,14 18:3
  18:6 19:20
  25:8 60:3 81:5
  150:19
engagements
  9:10 15:7,13
  16:16 18:9,12
  18:16,18 19:5
  19:8 20:1
  65:17
enjoy  103:4
enjoyed  103:17
enter  59:15
  71:21 92:3
  104:16
entered  139:5
entering
  103:12
enters  69:15
  91:14
entire  10:5
  11:1 24:14
  30:16 48:18,21
  53:21 57:10
  60:1,17 72:5
  80:20 84:13
  99:5 103:9
  121:13 129:17

147:9
entitled  36:6
  138:15
entity  129:15
entries  100:4
entry  20:8
  30:13 35:20,21
  36:2,10,15
  67:20 68:14,16
  69:16,17,17,21
  70:5,15,17
  71:2,4,5 89:17
  89:18 90:1
  92:21 118:14
  134:20
environment
  34:17 94:6
  121:18,19
  135:5
eoir  115:10
epiphany  6:13
equipment
  70:7
esquire  2:2,7
  2:11
established
  54:3
estimate  32:3
  134:2,3,9
et  1:5,9 103:7
evaluate  116:9
event  12:17
  15:11,18,19
  19:13,19 20:4
events  16:7
  19:11 55:21
everybody  29:3
  29:5 58:1

60:15 120:16
129:6
evidence  60:10
  72:1 73:12
  74:6,9 76:8,8
  77:5,10,20,21
  78:1,9 90:17
  94:18 95:17,20
  96:1,6 133:1,5
  134:10
exact  71:12
  77:2 89:18
  93:20 120:9,15
  125:16 131:3
  131:15
exactly  29:15
  40:13 54:19
  76:17 84:7
  100:4
examination
  3:5 4:11
  112:18 144:6
  147:21 155:10
examined  4:10
  155:8
example  19:2
  61:12 67:20
  72:12 80:4
  81:15 89:14
  103:4 114:17
  124:3 125:7
  128:10,11
  133:3 135:3
  145:10
excerpts  11:12
  11:12,14 57:9
exclude  81:15

excuse 55:11
exec 82:13
   144:9,10,20
   145:3,4,12,12
   145:16 146:7
   146:13
execute 113:19
executed 114:5
executive 22:21
   23:3 50:17
   82:17 115:9
   145:4,19
exempt 124:5
exhausted
   137:12
exhibit 3:10,11
   3:12,13,14
   28:21 29:1,4
   29:19 57:19,20
   58:15,17 67:8
   68:10 78:19
   138:17 139:1,3
   142:4,7,9
   143:4,7 148:3
exist 75:15
existed 77:18
   119:6
existence 119:7
expand 128:16
expanded
   93:11
expect 132:1
expected
   130:17
expedite 52:2
   135:15
expedited
   39:15 40:7,17

46:3 48:17
49:11 50:2
53:17 60:12
62:6,10 63:7
63:16,19 77:14
78:2
expediting 52:1
59:13 108:21
expenses 19:21
experience 5:3
8:16 16:19
33:5,16,17,18
35:13 48:2
51:19 54:2,3
63:1 65:17
73:4,17 74:15
75:7,18 77:2
79:13 83:10
92:11 96:5
97:19 98:16,18
98:20 105:2
106:3 114:18
114:20 116:9
116:14,17,17
117:9 119:17
122:7,13 123:1
123:20 124:8
125:1,2,2,4
128:21 129:10
129:14 130:19
132:4 152:13
153:4,13,14,18
experienced
125:20
expert 11:18
31:3,5,7,9,11
32:14,18,21
34:9,12,14

35:9,12 103:12
109:10 114:10
115:2,10
expertise 26:6
33:4 122:14
experts 81:21
83:21 85:7
86:17 122:8
expires 155:20
explain 54:15
120:10 121:11
133:21 144:10
145:3 148:10
explained 70:9
70:9 84:15
explaining
84:14
explanation
146:4
explanatory
109:14
exploded 87:6
88:6,12
express 77:14
expresses 42:8
extends 139:12
extent 35:4
84:15 105:17
109:10
extra 39:4
127:9
extremely
117:18 135:20

**f**

f 98:9,9,10,10
face 80:16
97:12,12,18,18

facebook 92:5
126:12
facilities 62:4
62:13 128:13
135:14 137:14
fact 13:1 36:3
60:8,9 63:2
76:19 79:7,8
82:6,7 87:15
87:16 88:1,3,4
94:1,12 101:21
108:2 126:9
134:10
factor 19:10
74:17 75:6
115:19,20
116:7,10 118:2
118:20,21
120:21 121:5
121:21 122:6
122:10,11,15
122:17,20,21
123:5 126:18
127:11 147:2,3
147:5 152:2
153:2
factored 83:9
86:14
factors 74:17
74:21 76:16,21
90:5 96:11,19
116:5,5,6,6,7
117:10,11,13
117:18,20
118:9,9,10
119:6,8,9
120:5 121:21
123:2 125:16

Rodney Scott                                        December 5, 2023

[factors - follows]                                           Page 16

130:3

**facts** 16:8 59:8
109:15

**factual** 50:5
62:18 65:10,14
81:18 83:20
90:10,17 91:7
96:7 109:8
121:7 134:18

**fair** 30:4 31:15
32:13 38:1
45:7,10,15,20
46:21 47:9
56:6 67:3 69:9
69:10 75:1,1
75:12 76:7,11
86:21 89:7
100:11 102:16
104:5 105:5,14
113:14,15
114:6,7,8
115:1 117:21
119:2 120:2,3
126:3,21 127:3

**fairly** 85:6
138:16

**fall** 138:8

**false** 90:14
125:13

**falsified** 91:3

**familiar** 5:2 8:3
28:7 37:4,6
106:19 115:13
115:16 123:6,9
123:11,15
127:19 128:2
148:6,12,18,20

**families** 40:17
92:8 102:2,6

**family** 39:15
47:11 73:10
120:7 123:13
123:21 124:8
124:12

**far** 65:10
114:19

**farmed** 145:13

**fast** 126:7,18

**faster** 72:10
126:13

**favor** 37:20
108:3

**fbi** 93:20

**fbi's** 94:13

**fear** 30:7 37:1
39:16,17 40:8
40:19,20 46:4
57:2 77:14

**february** 20:15
28:16 113:3

**federal** 10:3,12
38:5,10 50:21
51:1 91:14
93:21 101:9
129:15 138:14
140:4 143:2
146:11 150:12
151:3

**fee** 15:17,18
17:18 18:18,19
19:3,4,11,18

**feeding** 101:2

**feel** 7:16 56:19

**fellow** 13:19

**fentanyl** 89:16

**fewer** 104:16
153:8

**field** 21:10,16
24:3,5 25:16
27:9 28:1,11
114:2 133:12
145:20

**filed** 12:13
139:9

**filling** 103:5

**final** 27:1
37:14,15 55:10

**finally** 38:21

**financial** 61:18
103:16 104:6,7

**find** 96:9,18

**findings** 108:5

**fine** 6:18 7:3
32:10 38:13
39:1 80:1
101:11 104:13

**finish** 6:4,6

**first** 2:8 4:8,14
8:3 11:15
38:16 43:7
52:4,7,9 58:20
64:12 67:8
77:13 78:7
88:6 99:11
124:1,11 144:1

**firsthand** 84:20
104:6 125:2

**fits** 137:9

**five** 9:1 26:21
112:5,7,8

**flat** 18:19

**flip** 114:4

**florida** 44:1
45:9,18 102:12

**flow** 33:2 35:10
35:16,17,18
36:14 52:1,2
53:10 54:7
61:9 70:14
72:11,21 73:9
74:7,10 77:4,6
81:12 83:8,13
84:17 85:5
97:15,16 101:7
117:6 118:1
119:2,10 120:2
124:18 126:21
129:1 131:5,18
137:5

**flows** 76:13
121:14

**fluctuated**
113:10

**focus** 51:21
53:9 63:7
70:18 102:15
123:17

**focused** 17:5
18:10,12 21:21
24:21 57:6
59:13 108:21

**follow** 34:6
112:13 119:15
123:7,9,13
124:16

**following**
51:13

**follows** 4:10

**footprints** 133:4 134:15
**force** 27:2
**forced** 61:17
**forces** 17:5
**forecast** 117:5
**form** 35:1 81:16 119:3 126:5 127:2 131:10 145:8
**formal** 34:2,7 36:21 82:19 109:21 131:1 137:7
**formalized** 82:16
**former** 84:12 119:14
**forth** 33:14 44:16 56:8 124:20
**forward** 11:21 25:2
**forwarding** 63:9
**found** 36:5,6 80:11
**foundation** 13:16 14:1,2 15:4 17:12
**framed** 72:13
**franklin** 2:13
**fraud** 53:9
**friends** 73:11 73:13 120:7,17
**front** 58:13 78:6,19 110:19 114:16

**frontier** 14:8
**fudim** 2:11 3:6 4:11 57:19 58:12 64:5,10 68:4 106:21 111:21 112:8 112:11 114:13 115:3 117:8 119:3 124:21 126:5 127:2 129:13 131:10 132:7,9 137:19 138:1,21 143:19 144:13 144:17,21 147:20,21 149:7,15 154:7
**full** 13:4 120:19
**fully** 95:2 100:18 124:3,4
**function** 24:14 128:8,9
**functions** 94:17 99:19 100:21 140:21 146:11
**fundamental** 60:21
**funding** 61:18 62:13 135:13 136:9,11,14
**funds** 128:16 137:12
**further** 54:8 57:12 143:17 147:19 154:7 155:10,13

**future** 117:3,6 117:19

**g**

**g** 59:2,3,3
**gainfully** 100:18
**gap** 120:1
**gaps** 93:17
**garland** 1:8
**general** 1:4,9 2:3,3 6:19 8:5 8:18 39:19 42:9,11,13 43:17 52:13 63:11 72:7 101:17 105:4 111:19 128:19 134:2
**generalities** 150:5
**generally** 15:14 19:8 39:10 55:17 56:14 64:19 67:16 114:9 116:9 118:3 132:13 139:7
**gentleman** 81:7
**geographic** 117:11
**geographically** 117:14
**geography** 93:4
**getting** 81:2 83:11 89:2 96:12 109:2

**give** 5:7,10 7:17 31:21 51:15 80:3 84:5 96:14,19 104:10 108:16 109:5 137:20
**given** 31:11,18 62:14 69:2 70:20 87:1 110:2 111:5
**giving** 16:18
**glance** 142:19
**glancing** 145:2
**go** 5:1 23:13 24:10 27:12 37:18 42:8 59:10 78:18 88:15 89:10 98:9 101:19 121:1 130:9 143:21 148:9 149:8
**goals** 52:5
**goes** 32:9 73:1 85:14 145:11 147:11
**going** 4:12 5:1 5:5,6,10 6:3,6 7:1 11:21 13:5 17:20 25:2,7 27:18,20 28:3 28:20 29:2 35:2 36:18 37:21 38:20 41:4 54:3,17 56:11 57:4 58:14 59:11 62:5 64:17,21

66:18 67:7
69:7,13 73:2
74:12,20 75:3
78:16,20 79:20
80:3 81:10,15
82:7 84:18
87:18 88:5,15
90:9 91:10,11
92:10,16,20
94:4 98:4
103:13 104:3
107:16 108:6
111:8 118:11
118:12 119:11
120:2 124:19
127:6 130:7,8
130:10,11,12
130:13 134:15
136:5 138:2,4
138:10 143:6
146:1,9 148:10
152:15
**good** 4:12
89:10 116:4,6
130:1
**goofed** 112:3
**gotten** 16:12,15
**government**
10:12 31:17,19
31:20 75:15
79:14,14 84:2
84:12 91:9,15
92:3 138:14
144:8 146:11
150:13 151:3,3
**government's**
140:4 144:8

**governor** 13:3
**grade** 17:5
**grant** 45:11,16
45:21 46:1,8
47:19 48:1
**granted** 46:15
48:11 78:5,14
**granting**
141:11,18
**greater** 124:18
**ground** 5:1
133:4
**group** 48:8
66:8 82:15
86:18 88:17
117:4
**groups** 81:14
**gs** 21:9
**guarantee**
92:10
**guess** 7:5 17:20
18:1 32:11
38:14 39:4
144:8 154:8
**guesses** 39:5
**guidance** 16:18
81:14
**guidelines** 81:4

**h**

**half** 8:2 20:19
**hallway** 51:16
52:7
**hand** 155:16
**handcuffs**
113:14
**handed** 125:5

**happen** 117:13
117:19 125:16
**happened**
54:19 73:11,14
120:10,18
**happening**
70:8
**happens** 36:2
**happy** 5:18
**hard** 76:2
**head** 5:9 44:18
123:14
**headquarters**
25:9,13 26:6,8
26:15
**health** 17:7,7,7
102:5 130:14
**hear** 5:16
61:15 95:15
111:3 151:1,4
**heard** 52:7
82:10 123:8
127:20
**hearing** 54:6
**hearings** 63:14
**heart** 97:5
**heavily** 24:21
99:15
**held** 1:15 21:18
22:3,8,11 25:4
29:12 39:21
68:7
**help** 100:21
**helped** 133:16
**helping** 101:8
**hesitate** 28:7
153:3

**hey** 80:10
**hhs** 102:4
**higher** 30:19
146:4
**historic** 10:6
**historically**
97:10 99:7
**hits** 90:6
**hku** 151:9
**hold** 22:15,20
29:13,15 31:2
**holding** 4:14
26:7
**home** 39:18
40:20 73:10,13
120:17 126:2
153:8
**homeland** 22:4
23:6 50:17
**honest** 71:8
**honestly** 52:11
**honor** 15:21
16:1,3,14
17:11 18:17
**host** 151:12,13
151:14
**hot** 135:7
**hour** 8:2,2 13:4
19:9,13,20
**house** 80:5
145:10,12
146:5
**huge** 71:10
120:21 150:20
**human** 74:8
77:8 98:4
102:5 120:6,6
120:16 121:3

123:16 124:14

**hundreds** 90:8
92:14,15
108:14

**hurt** 67:1

**hypothetical**
126:17

**i**

**ice** 22:16,18
40:9 41:5,18
81:9 84:19
102:4 122:8

**idea** 51:15
52:20 53:5
82:9 83:3
100:1,4 135:18
145:11

**ideas** 65:6

**identification**
29:20 58:18
139:2 142:5
143:5

**identified** 86:9
92:12 98:1,1
102:7

**identify** 35:1
48:10 85:7
97:10 150:4,6

**identifying**
8:16 84:10

**ideology** 75:20

**ifr** 36:20 37:8
55:16 56:1,7
56:18 57:7,11
57:17 82:2,10
85:9 105:15,17
108:18,18

109:19,20
111:2,6,14,15
111:19 147:17
149:19 150:7,8
150:21 153:17
153:18

**ifs** 153:4

**ignore** 90:4,20

**ignored** 81:21
84:1,4,6,19
85:2,9

**ignoring** 89:14

**illegal** 35:15,17
35:18 36:2,15
48:7 67:15,18
71:15 73:18
74:16 76:2
77:6 88:9 89:4
89:12 93:2
94:2,9 97:7
98:21 99:9
100:2,3 101:18
102:1,8 104:1
105:11 107:21
108:11 109:4
116:1 117:3,19
118:14 121:14
123:2,19
125:12 127:13
130:4,5 131:5
131:18 133:2,5
135:10,21
153:10

**illegally** 48:3
124:9 134:7

**immediate**
120:9,13

**immediately**
51:12 79:16
84:9 120:21

**immigration**
2:12 8:19 10:6
13:19 14:9,16
18:7,10 22:5,9
22:16,21 23:3
24:19 33:2
34:4,5,10,13
34:15 35:14
36:9,14 37:16
37:21 39:21
41:14 42:14
44:9 46:17
50:18 53:18,21
54:6 63:14
66:2 68:1
70:21 71:7
78:6 79:1
81:21 89:4
94:2 95:3 99:9
103:4,10 104:1
105:6,9,12
107:21 109:4
115:6,6,10
116:1 117:19
122:9 123:6,10
123:15,17,21
124:16 125:11
129:1,11,15
140:2,15,20
141:21 147:12

**impact** 77:4
84:17 103:15
128:21 129:8
129:10 131:17
140:21 141:4,8

141:12,15,19
142:2 147:17

**impacts** 98:11
99:10 100:11
100:12 103:2
103:16,20
104:1,2

**implausible**
131:6,11

**implement**
51:13 105:15
105:17

**implementati...**
25:12 48:15
49:12 50:3
115:7 153:20

**implementati...**
80:10

**implemented**
10:4 38:2,12
38:16 42:4,13
43:6,8,14,19
44:1 80:1
114:2

**implications**
10:14 12:4
25:20 33:1
103:8

**implied** 43:2

**important**
26:13 37:14
62:11 107:4,19
129:1,11

**importantly**
95:7 121:15

**improved**
133:18

**improves** 107:5
**inadmissible**
  141:3
**inauguration**
  51:13 60:5,5
  79:16
**incentives**
  130:17
**incentivize**
  124:16,18
**include** 10:17
  14:20 96:11
  105:18 106:10
  136:21
**included** 79:15
  106:11
**includes** 68:12
  70:6
**including**
  31:14 36:8
  63:9 65:5 82:1
  86:18 142:1
**inclusion** 110:1
**income** 16:6
  103:6
**incomplete**
  6:11
**inconsistent**
  153:4
**incorporates**
  126:12,12
**incorrect** 6:15
**incorrectly**
  78:21
**increase** 48:7
  70:13 73:9
  76:1 83:8,13
  88:13 89:4

93:11 94:17
107:20 109:3
117:2 119:11
124:6 125:12
130:18 131:4,8
132:2 141:14
152:14
**increased**
  27:13 54:7
  74:10 76:13
  77:6 92:9
  94:20 96:12
  99:9 103:4
  106:8 107:20
  122:3 134:17
  137:5 152:7,19
  152:20
**increases** 72:12
  74:7 108:5
  147:7 152:3
**increasing**
  59:14 71:17
  97:15 130:3
**index** 3:1
**indicate** 39:16
  40:18
**indicated** 13:3
  67:11 116:8
**individual**
  15:18 30:12
  36:4 37:18
  41:10 83:16
  100:1 116:5
  124:12
**individually**
  19:17 76:12
  88:2

**individuals**
  36:8 40:6,9,11
  40:16 41:4,17
  46:3 47:11
  48:10 49:15,18
  63:2 68:13
  77:12,16 85:8
  88:21 114:19
  132:3 151:7
  152:7,19
**industry**
  125:13
**influence** 26:7
  33:19 75:9
  117:15
**informal** 131:2
**information**
  16:9 29:11
  65:10,12,15
  66:19 67:1
  70:12 84:19,21
  89:9,11 90:10
  91:6,8 101:20
  104:9 120:1
  121:3,8 130:21
  154:6
**informed** 35:2
**infrastructure**
  71:11 136:21
**initial** 8:21
  36:9 38:4 44:8
  44:17 84:21
  129:5 130:8
**initially** 12:14
  23:20
**initiated** 27:10
**initiative** 16:8

**initiatives** 14:5
  14:5 51:11
  61:19 75:20
  76:6 95:10
**input** 25:19
  26:9 80:19
  104:19 140:11
  145:9,14
  151:18
**inspecting** 70:1
**instance** 78:7
**instructions**
  6:19
**integrity** 27:13
  133:18
**intel** 17:2
**intelligence**
  17:2
**intend** 38:18
**intended** 106:6
  128:7
**intent** 39:16
  48:18 129:5
**intention** 40:18
  42:8
**intentionally**
  91:9 93:16
**interact** 26:5
  27:4 33:15
  67:21 75:18
**interacted**
  21:12 52:19
  85:12
**interacting**
  102:4
**interagency**
  22:1

**interchangea...**
36:19
**interdict**  35:5
**interdiction**
133:7
**interest**  79:19
**interested**
155:15
**interim**  55:10
**interior**  42:7
43:1 87:8
122:4
**internal**  39:11
**internally**
137:7,10,12
**international**
126:9
**interns**  14:15
**interplay**  74:19
**interpretation**
67:14
**interpreted**
35:15
**interpreting**
67:17
**interrupted**
148:9
**interstate**
99:12
**interview**  30:5
30:8 41:19
42:1,6 44:9,13
**interviews**
40:10 41:1
42:5,14 44:20
45:5,8,12,17
78:2 97:12,18

**involved**  9:20
14:6 23:18
60:11 61:6
76:16 81:9
129:6 131:12
**involvement**
8:17 9:18 12:2
**involves**  47:7
102:10
**irregardless**
116:15
**irregular**
131:19
**irrelevant**
126:20,21
**isolate**  75:12
**issue**  109:15
**issued**  57:12
143:2
**issues**  22:2
25:14 32:6
39:11 51:12
70:18 73:2
75:4,8 80:6
82:11
**item**  67:9

**j**

**jaddou**  115:14
**janet**  54:4 73:2
**january**  28:16
**jeff**  2:3
**job**  1:20 46:17
46:17 113:13
114:16 115:5
118:16 130:5
**jobs**  116:2

**john**  2:2 3:7
8:9 11:9 13:3
58:12 65:7
66:17 78:8
95:21 106:15
107:11 112:16
112:18 137:17
138:13 139:16
143:17 148:3
149:11
**join**  123:7,10
123:13 124:16
**joint**  27:2
**joked**  83:16
**joseph**  2:2
**judge**  10:7
37:16,19,21
42:15 66:2
78:6 147:12
**judge's**  46:17
**judges**  39:21
44:9 53:18
**judicial**  46:18
**justice**  2:10,11
139:11
**juveniles**  61:13
124:5

**k**

**keenly**  33:15
**keep**  32:7 98:9
**ken**  150:15
**key**  27:2 70:19
145:20
**kids**  130:13
**kind**  19:17
53:6 81:16
82:10,13,15

108:2 109:13
111:10 132:12
133:9 134:9
135:9 145:1
**knew**  28:3
51:18 70:12
82:9 88:14
**know**  5:14,17
6:3,13,18 7:3,4
7:4,6,7 11:11
11:14,16 32:11
32:12 35:1
38:13,17,20
39:3,5,6,7,11
41:8 42:18
43:8,13,21
44:12,19 45:8
45:10,11,16,21
49:1,4,8,19,20
51:5 55:13
65:21 66:20,21
70:3 73:21
74:1 78:21
83:5 85:21
86:3 100:9
103:11,19
104:11 109:8
116:4 118:13
120:18 127:7
134:8 138:20
143:20 150:12
150:15 151:6
**knowing**  60:21
**knowingly**
70:13 131:13
**knowledge**
31:6 32:16
38:20 39:3

48:14 51:4,7,8
104:6 122:13
127:12 128:19
147:15 150:6
**known** 27:4
51:18 108:13
132:16,17,20
134:6

**l**

**labeled** 67:9
**labor** 103:5
**lack** 12:2 71:10
92:13 116:4
154:4
**lacked** 68:1
**lacks** 91:15
**lafayette** 1:2
**lagged** 149:11
**landry** 2:4
**large** 26:5
**larger** 95:9
108:7
**lately** 136:2
**latitude** 137:9
**law** 34:4,5,10
35:3 36:1,11
36:12,16 46:7
46:13,18,19
48:9 93:16
95:8 97:16
99:19 100:20
102:11,18
103:19 121:16
123:6,10,16,21
129:20,21
155:8

**lawful** 88:7
**laws** 48:6
123:16
**lawsuit** 8:4
31:8,8,12 32:2
72:6
**lawsuits** 32:1
**leader** 32:8
**leadership**
14:14 18:13
25:5 26:10
113:21 125:5
133:12 145:20
**leave** 146:6
**leaving** 110:4
**led** 52:8
**left** 7:10 25:3,9
68:8 80:11,12
80:12,13
**legacy** 24:19
122:9
**legal** 2:8 10:16
39:11 46:13
93:1 122:18
123:1,3,3,17
124:15 125:11
130:4,4
**legalize** 124:17
**legalizing**
125:9
**legitimate** 71:1
**length** 23:12
49:9
**lessons** 125:4
**letter** 81:19
84:9 91:10,10
98:9,10 120:11

**level** 22:1,6
24:15,15 25:11
25:14,20 26:2
26:8 32:2 57:2
57:5 72:7 81:7
87:8 92:7
99:10 125:21
129:4 136:13
**levels** 88:13,15
**liability** 16:4
**liaison** 140:8
151:8
**life** 33:16 34:16
**likelihood**
122:4,11 147:8
152:3,14
**likely** 42:15
57:2
**likewise** 115:9
**limit** 47:5
**limited** 14:11
16:4 60:15,15
69:18
**limiting** 70:19
140:2
**limits** 44:15
**line** 114:16
**linkedin** 13:14
**lise** 79:18 81:2
83:6 85:1
**list** 27:5 78:18
90:6 138:8
**listened** 111:2
111:4
**listening** 112:3
**lists** 28:19
**literally** 28:5
28:15 61:10,16

61:21 62:17
69:21 94:7
115:5 118:16
133:7 145:17
**litigation** 2:12
11:21
**little** 99:6
102:3 120:4
125:18 129:8
146:16
**lived** 33:12
**living** 125:2
**llc** 13:17 15:20
**local** 28:14
140:10,10
151:8,13,19
**locals** 150:19
**location** 1:16
36:1 43:4
**locations** 14:19
**long** 8:1,20
19:12 44:12
49:13 94:14
142:13
**longer** 9:4 55:4
86:5 97:18
99:18 101:8
114:19
**look** 18:3 23:13
28:2 78:19
81:19 84:11
87:21 93:3,3
142:19 149:5
**looking** 7:5
24:6 67:8
78:20 80:18
99:6 135:8
153:11

Rodney Scott                                                    December 5, 2023

[looks - memorandum]                                                  Page 23

**looks** 109:14
142:14,20,21
**loopholes** 48:4
123:20 124:11
**losing** 102:18
**loss** 103:19
**losses** 104:6,7
**lost** 102:11
**lot** 10:15 18:21
25:5 28:8 38:9
70:12 73:4
92:6 111:3
135:21 138:6
**louisa** 1:17,21
155:3,19
**louisiana** 1:1
2:5 8:9 10:17
44:3 45:9,17
65:8 99:6,19
100:6 101:9
102:11,12
139:10,10
143:11,12,14
143:16 150:14
**lower** 19:4
127:9,11,11
134:16
**lukeville** 92:21

**m**

**machine** 70:2
**made** 19:6
46:18 56:1,7
62:18 72:15
79:18 90:13
94:5 96:8
100:3 105:10
105:19 120:9

126:15,15
131:15 133:14
**mail** 29:3 58:1
58:3 138:5
**mailed** 58:6,8
137:17
**mails** 81:2
**main** 99:12,13
**majority** 18:14
27:1 71:9
101:6
**make** 6:20 7:6
13:6,10 35:2
37:9 69:18
70:3 79:21
81:1 89:18
95:6 102:12,14
118:14 119:20
121:10,14
127:21 131:13
133:8 134:8
139:19 142:19
145:6,13 146:8
149:3
**makes** 5:16
38:10 46:20
89:15 117:18
145:9
**making** 23:19
25:4,6 26:13
36:4 60:20
70:17 94:1
129:6 147:9
150:21
**manage** 118:9
**manager** 32:8
**managing**
18:14 52:16

99:3
**mandated**
42:10 133:11
**manner** 43:7,9
52:11 121:4
**map** 93:3
**march** 55:11
80:14
**mark** 1:5 28:20
28:21 29:4,17
57:19 58:15
138:18 142:7
143:6
**marked** 3:10
29:19 58:17
67:8 68:9
139:1 142:4
143:4 148:2
**market** 17:16
**marketing**
16:10,13 127:4
**maryland**
155:1,4
**mass** 98:10
100:10 101:7
**massive** 71:17
89:4 94:1
105:11 109:3
**matter** 12:18
42:13 52:8
64:18 138:6
**matters** 32:20
138:8
**mcintire** 1:17
1:21 155:3,19
**mean** 10:9
18:21 35:18
43:10 49:9

59:3 60:12
61:10 62:6
63:17 69:1,5
69:11 72:6,6
84:3,5,7 88:12
90:9 91:20
111:9,10,12
148:13
**meaning** 62:8
153:9
**means** 13:5
62:9 68:17
84:4 91:21
133:1
**meant** 134:1
144:14,16
**media** 92:6
119:16 120:8,8
**meet** 7:13,20
8:1 19:16
24:17 124:9
**meeting** 7:18
61:10 82:12
**meetings** 9:3
51:14,17 80:3
80:12,13 82:11
82:15
**member**
123:21
**members** 83:2
111:11,18
**memo** 138:4
148:3,20
150:13
**memorandum**
138:18 139:5
148:2 149:18
150:2

| | | | |
|---|---|---|---|
| **men** 47:13 | **mid** 28:14 | 68:12 144:2 | 137:5,8,9,13 |
| 113:18 | **middle** 27:18 | **minimize** 130:6 | 137:15 |
| **mental** 17:7 | 127:21 | **minimizing** | **monitored** |
| **mentioned** | **midstream** | 53:10 | 78:17 |
| 15:20 27:8,21 | 136:4 | **minimum** | **monitoring** |
| 28:18 35:8 | **migrant** 42:16 | 19:13 | 70:6 |
| 39:20 44:5 | 67:15 76:13 | **minors** 98:6 | **monitors** 93:14 |
| 53:15 64:12 | 89:1 93:5,13 | 124:6 | **month** 8:13 |
| 65:20 109:7 | 121:14 126:1 | **minus** 75:4 | 11:8 |
| 124:15 132:10 | **migrants** 59:14 | 95:13 | **monthly** 15:18 |
| 137:2 151:21 | 64:1,1,2 67:10 | **minute** 69:13 | **months** 8:13 |
| **mentorship** | 67:12,19 68:11 | 112:1,5 120:14 | 11:9 20:19 |
| 14:14 | 68:17 73:18 | **minutes** 9:1,4 | 64:16 66:10 |
| **meritorious** | 74:11 90:3 | 138:8 139:13 | 117:6 120:11 |
| 36:6 48:12 | 92:7 97:7 | **mischaracteri...** | **morning** 4:12 |
| 78:4,13 | 102:5 104:16 | 122:2 | 80:4 134:12 |
| **merits** 30:5 | 110:11,12 | **mischaracteri...** | **motion** 12:13 |
| 40:10 41:1,18 | 119:15,21 | 95:21 | **mou** 3:13 139:3 |
| 42:6,13 44:9 | 126:19 135:16 | **missed** 71:5 | 139:9 149:13 |
| 44:13,19 45:4 | **migration** 87:5 | 112:4 127:21 | **mous** 151:17 |
| 45:8,12,16 | 87:8 88:5,7,7,8 | 134:13 135:11 | **mouth** 44:7 |
| 78:2 | 88:9 98:11 | **mission** 12:6 | **move** 7:5,8 |
| **merrick** 1:8 | 100:10 106:8 | 24:18 35:6 | 39:7 87:5 |
| **message** | 109:18 115:21 | 60:21 113:12 | 123:4 128:10 |
| 120:12,13 | 116:14 119:1 | **mississippi** | 137:8,10 |
| 127:6 | 123:12,18 | 99:6 | **moved** 25:15 |
| **messages** 92:6 | 130:18 131:9 | **mitigate** | 25:15 44:8 |
| 126:13,14 | 131:19 | 105:18 | **moves** 37:14,15 |
| **messaging** | **mile** 93:14 | **model** 121:6 | **moving** 26:3 |
| 126:11,13 | **miles** 90:8 | **modeling** 26:1 | **multiple** 76:16 |
| **met** 124:11 | 92:15 108:14 | 27:12 28:12 | 76:21 95:9 |
| **mexican** 93:10 | **military** 121:17 | 133:18 | 96:11 105:1 |
| 121:12 | **million** 74:16 | **modern** 126:8 | **municipalities** |
| **mexico** 72:14 | 90:7 100:2 | **moment** 40:15 | 139:21 |
| 76:5 89:1 93:4 | 108:11,13,17 | 53:13 151:21 | |
| 95:13 97:14 | 108:17 134:4 | **money** 13:6,10 | **n** |
| **micro** 154:5 | **mind** 28:2 | 95:7 121:10,15 | **n** 50:7 |
| | 29:13 62:8 | 128:7,9 137:4 | |

name 8:7 28:13
  37:1 65:9
  79:18 85:7
named 81:8
  115:13 155:5
nancy 50:7
narcotics 93:19
narrow 76:9
  85:6
nation 105:13
nation's 20:7
national 25:14
  25:20 123:16
nationalities
  47:13
nationality
  47:1
nationally
  28:15
nationwide
  26:17
naturalization
  22:5 24:19
nature 8:14
  23:6 47:9
  53:12 74:8
  77:8 120:6,16
  123:16
near 43:1 97:5
nearly 126:20
necessarily
  25:8 48:1
  150:9
necessary
  128:16
need 29:7 39:4
  47:5 78:9

nefarious
  94:10
negative 37:17
  54:18 83:12
  103:14,20,21
  108:4 116:7
  121:21 130:3
  140:5
negotiated
  150:13
neto 70:11
  80:15 85:1
never 22:3 30:5
  32:6 88:15
  91:8 119:6,6
  143:15
new 10:2 12:4
  24:17 44:20
  51:21 52:21
  79:16 81:4,14
  99:4,14 101:5
  130:17 136:3
news 55:18,20
nice 101:3
nicknamed
  82:20
nine 139:17,18
nod 5:8
nogales 24:4
non 11:18
  32:17 78:4,13
noncitizen 42:8
noncitizens
  30:12 49:4,11
  50:1 78:2
nonfactual
  121:8

nonpartisan
  73:2
nonprofit 14:3
normal 57:14
  113:1 124:14
normally 13:6
  80:3 82:14
  83:6 86:14
north 2:4
northern 71:9
  102:13
notarial 155:16
notary 1:17
  155:3,19
note 138:4
notes 13:14
  112:2
notice 10:13
  13:14 38:5,6
  44:17 50:7
  106:5
noting 138:11
november 15:5
  155:21
nprm 50:7,8,13
  50:20 51:6
  52:5,9 54:20
  55:3,8 56:8,18
  85:16 86:5
  87:2
nuance 21:2
number 32:1,5
  45:4 49:19,20
  77:8,9 81:19
  91:10 96:7,9
  96:12,15,19
  97:20 98:9,10
  108:16 110:20

122:10,10
  132:2 140:20
  152:7,17,19,20
numbers 71:17
  90:12,15,16,18
  91:3,4,7
  104:21 127:10
numeral
  139:11
numerous
  16:15 22:13
  31:21 122:8

o

object 138:9
objection 78:8
  95:21 106:15
  107:9,14
  114:13 115:3
  117:8 119:3
  124:21 126:5
  127:2 129:13
  131:10 132:7
  138:2,4,10
  144:13
objective 109:2
  129:5
objectives 52:6
  52:10
observing
  136:15
obviously 6:6
  31:14 87:18
  130:4
occasionally
  14:13,19
occasions
  19:15 22:13

31:21
occur 42:21
occurs 6:10
october 39:9
offense 5:17
  127:20
offer 65:10,15
  126:17
offered 152:21
office 2:3,12
  21:3,6,6,10,14
  21:14 22:21
  23:3 24:13
  25:2 50:17
  115:9 140:8
  146:18 151:8
  151:13,19,20
officer 8:18
  20:3 21:16
  36:19 37:12,13
  37:16 38:1
  42:2,12,20
  43:4,6,14,19
  43:21 44:7,13
  48:11,15 49:5
  49:16 69:19
  72:2,8,20 73:5
  73:15,16,21
  74:4,10,14
  75:13,19 76:12
  76:21 77:5,11
  77:17 78:4,13
  80:15 83:3
  94:19 95:12,18
  97:2,13 98:6
  102:19 103:1
  104:8,15 106:8
  107:3,5,18

147:9 150:1
  152:2 153:1
officer's 46:17
officers 10:4
  37:4,19 40:1,3
  40:11 44:10
  45:13 51:15
  53:4 70:15
official 1:8
  22:11,14,15
  28:10 30:17
  86:12
officially 21:8
  22:20 104:19
  132:15,17
officials 79:14
  84:12 140:10
ofo 21:11 67:21
oh 119:10
  132:8 144:21
okay 5:11,19
  6:7,15 7:8
  13:21 22:15
  32:10 111:21
  123:13 132:9
  147:20 149:3
oklahoma
  14:21 143:7
once 82:16
  100:1,2 102:16
ones 102:17
ongoing 53:6
open 11:10
  17:1 38:8
opens 94:10
operating
  80:15

operational
  20:6,21 21:3
  26:2 75:6 81:4
  91:15 121:16
operations
  21:11,17 24:3
  26:17 33:3,20
  34:16,19,21
  61:19 145:20
opinion 46:6
  60:8 62:18
  78:15 79:7,19
  82:6 86:13
  87:15 101:21
  103:21 128:20
  129:9
opinions 33:19
  59:8 80:19
  152:21
opportunities
  16:11,13 59:14
opportunity
  37:18 54:21
  57:11 110:2
  116:2 146:10
opposed 10:5
opposite 131:3
  131:16
order 6:14
ordered 61:17
organization
  14:3 17:2
  18:20 52:17
  113:16 114:3
organizations
  16:18
organize 18:17

orleans 99:4,14
  101:6
ortiz 85:10
  119:14 146:19
outcome
  155:15
outline 65:1
outlined 65:11
outside 10:12
  21:4 33:17
  75:8 83:9 86:9
  93:9 102:3
  114:20 117:14
  120:5 128:18
  130:4 138:8
  151:5
outweigh 116:6
  116:7 118:15
  129:4
overall 126:21
overcrowding
  70:17
overlap 25:6
oversight 84:10
overwhelm
  93:16 95:8
  121:16
overwhelmed
  97:16
own 13:17
  15:20 93:7
  112:13
owned 25:8

p

p 2:11
p.m. 154:11

**p.o.** 2:13
**package** 71:14
  88:17 94:4
  95:9 136:5
**page** 3:5 59:2
  139:12,13,17
**paid** 15:13,17
  17:12,16,16
  18:2 86:8
**paper** 151:17
**paraphrasing**
  35:10,11
**parole** 30:17
**paroles** 30:21
**paroling** 30:11
**part** 26:5,9
  37:14 41:7
  46:16 66:2
  70:19 74:13,15
  87:3 89:3
  90:18 101:15
  102:21 103:1
  107:4 108:7
  109:6 113:17
  118:5,7 121:6
  127:20 131:2
**participate**
  149:10
**participated**
  51:8
**participating**
  80:21 149:6
**particular** 33:4
  42:8 62:7 72:2
  74:10 100:13
  102:19,20
  103:17

**particularly**
  6:2
**parties** 4:3
  155:14
**partners** 17:1
**parts** 99:13
  134:19
**party** 116:16
  151:10
**paso** 134:20
**passed** 46:4
**past** 31:17
  64:16 100:3
**pathway** 63:13
**pathways** 63:9
**patrol** 4:21
  12:3 18:14
  19:7 20:6,6,10
  20:17,21 21:4
  21:5,6,9 23:16
  23:17 24:4,16
  24:19 25:3,6
  26:4,15 27:8
  27:14,21 30:11
  30:18,19,20
  33:6,8,13,18
  33:19 38:3
  53:1 60:4
  61:11 62:4,17
  63:3 67:17
  71:6,19,20
  79:14 80:7,17
  82:19 83:14,17
  83:18 86:6,12
  90:7 92:2,4,19
  93:10 94:8
  97:17 99:2,3
  99:14 100:3,17

110:1,4 113:2
114:9,21 116:8
116:18,21
118:6,17
119:14 125:3,4
128:21 129:10
130:5,19 132:5
132:14,15,16
132:19 133:12
134:4,8 135:10
135:18 140:9
146:12,17
153:18
**patrol's** 9:18
  12:6 25:21
  26:18 27:11
  36:17 110:10
  110:12 115:5
**patrolled** 92:17
**patrolling** 70:6
  71:8 115:8
**patrols** 101:3
**pattern** 87:18
  116:13
**patterns**
  109:18
**pause** 39:10
  43:15 44:21
  141:2,6
**paused** 39:8
**pay** 86:2
  137:13
**paying** 15:17
  19:6
**payment** 103:6
**pays** 93:13
**pdf** 142:14

**pen** 25:9 26:7
  26:17,21
  151:17
**pending** 41:13
  54:6
**pennsylvania**
  2:8
**people** 5:8
  10:11,16 19:16
  35:5 41:12
  48:5,8 51:11
  52:1 53:17
  54:3 60:10
  62:19,21 67:17
  70:10,14,20
  72:9,15 73:8
  77:3,8,10,14
  83:11 84:16
  85:11 89:16
  93:18 95:1,3
  96:12 97:6,6
  104:1 108:1
  113:21 116:20
  117:3 120:12
  121:6,9,20
  125:9 126:15
  127:8 130:9
  131:14 134:1
  146:17 147:14
  152:15 153:7,8
  153:14
**perceived** 48:4
  116:3
**percent** 18:11
  18:15 76:17,17
**percentage**
  109:6 133:14

Rodney Scott                                                    December 5, 2023

[perfect - ports]                                                    Page 28

| | | | |
|---|---|---|---|
| **perfect** 125:7 | **phone** 9:2 | **play** 89:3 | **policy** 13:16,18 |
| **performance** | 125:19 126:8 | **played** 26:12 | 14:1,9 15:4,15 |
| 17:3 | 126:12 149:4 | 77:6 | 17:12,15 23:19 |
| **performed** | 149:10 | **plays** 95:12 | 24:7,21 25:4,6 |
| 22:13 | **phrase** 34:18 | 97:14 107:3,19 | 25:12,14 26:7 |
| **performing** | 34:19 62:9,10 | **please** 5:10,14 | 26:13,16,20 |
| 140:20 | 64:7 | 6:4 46:10 | 30:15 34:4,13 |
| **period** 59:20 | **physical** 17:7 | 49:14 56:5 | 34:15 35:9,13 |
| 148:5 149:1 | 115:5 | **plenty** 136:18 | 36:14,21 48:9 |
| **periods** 46:21 | **physically** | **plus** 16:1 | 76:18 79:15 |
| 47:15 | 101:5 | 113:11 | 80:10 82:1 |
| **persecution** | **pick** 93:6 94:8 | **point** 6:17 | 105:4,7,9,15 |
| 39:17 40:19 | **picture** 76:19 | 10:20 13:5 | 105:16 106:1 |
| **persistent** | **piece** 9:17 | 23:18,21 25:2 | 106:14 115:6 |
| 135:3 | 127:4 | 25:17 29:7 | 116:10 118:6 |
| **person** 25:8 | **pivot** 50:6 | 30:13 40:21 | 118:20 125:15 |
| 52:16 | **place** 10:19 | 71:17 77:21 | 129:1,2,11,12 |
| **personal** 31:19 | 33:17 42:6,14 | 78:20 87:5 | 129:16 132:18 |
| 84:20 116:16 | 44:20 45:5,9 | 92:21 96:16 | 145:11,15 |
| 117:9 | 75:21 77:13 | 97:17 106:1 | 152:13 |
| **personally** | 83:1 89:10 | 111:9 119:9 | **political** 79:2,9 |
| 51:20 52:17 | 92:19 93:6 | 133:19 134:12 | 81:17 83:5 |
| 155:6 | 120:11 132:20 | 144:7 152:6 | 85:13 116:16 |
| **personnel** 17:8 | 155:7 | **pointed** 67:9 | 131:2 136:13 |
| 18:14 25:13 | **placed** 39:15 | **points** 25:4 | **popped** 149:2 |
| 32:1 80:5,5 | 40:7,17 46:3 | 35:21 140:14 | **population** |
| 84:2 91:9 | 63:9 | **policies** 24:2,7 | 47:10,18 48:2 |
| 100:17 113:12 | **places** 99:20 | 24:11,17 26:1 | 77:12 130:6 |
| 113:12 128:11 | **plaintiff** 98:12 | 26:11 27:3,12 | **populations** |
| **perspective** | 100:11 103:3 | 33:2 35:14 | 47:1,6,13 |
| 9:15 10:6 | **plaintiff's** | 48:6 74:18,19 | 130:3 |
| 109:16 | 12:19 112:12 | 75:14 79:1,21 | **port** 69:21 |
| **pertain** 59:21 | 144:15 | 80:19 81:4 | 70:14,20 71:3 |
| **pertains** 60:1,3 | **plaintiffs** 1:6 | 82:14 87:6 | 134:20 |
| **phase** 41:13 | 2:2 57:21 | 88:16,17,18 | **portions** 11:3 |
| 43:6,9 | 104:7 | 103:10 114:2 | **ports** 20:8 |
| **phases** 27:1 | **plausible** 57:3 | 140:1,4 151:16 | 30:12 35:20 |
| | 130:20 132:5,6 | 153:19 154:2 | 36:10 67:20 |

[ports - processing]                                          Page 29

68:13,15 69:16
69:17,17 70:5
70:16 71:2,5
89:17,18 90:1
**posed** 138:7
**position** 20:13
22:11,14 23:15
26:4 82:18
94:7 138:13
**positions** 21:20
22:16 23:7
25:5 26:10
28:6 29:12
83:18
**positive** 37:16
40:8 104:2
108:2 140:5
153:9
**possibility**
41:20
**possible** 91:7
117:5
**possibly** 9:9
52:14 85:4
91:5
**post** 21:19
**postings**
119:16
**potential** 12:8
12:9,12,17
108:6 118:15
**potentially**
31:4 37:15
65:2 67:1
72:20 73:8
108:1 117:15
125:10 128:12
140:5 146:5

**preamble**
130:16 131:21
**precedent**
46:13
**preclude**
138:11
**precluded**
32:14
**predict** 117:18
**predictable**
48:7 105:11
**predicted**
88:14
**prefer** 17:17
**premise** 76:14
**prepared** 31:7
31:9
**prescription**
17:5
**presence** 6:1
124:18
**present** 67:20
68:13
**pretty** 25:11
65:12 79:18
126:14
**prevalence**
94:17 95:18
**prevent** 36:17
**previous** 113:5
**previously**
39:21
**primarily** 14:8
16:9 18:7
21:21 33:8,10
33:12 34:1
38:19

**primary** 14:15
35:6 36:17
70:1
**prints** 133:4
**prior** 6:10 7:14
20:5 43:15
44:21 49:12
50:3 51:4,7,8
60:5 64:15
66:2 79:13
82:8 131:15
146:15 149:19
**priorities**
140:16
**prioritize**
137:1
**prioritizing**
88:20
**priority** 150:20
**probable**
153:17
**probably** 4:19
8:13,21,21
11:8 28:7,13
28:15 36:19
66:9,9 85:11
89:11 92:1
126:20
**problem** 56:6
63:1 72:5
129:2,12
**problems**
112:20 130:14
**procedure**
64:19
**procedures**
10:13 37:1
82:14

**proceeding**
65:3
**proceedings**
4:5 39:15 40:7
40:17 46:3
48:17 63:10,19
78:3 155:12
**process** 9:17
38:11 41:12,14
48:19,21 49:12
52:21 53:7,11
53:21 54:2,16
56:2 57:14
65:11 70:15
71:7,15 73:6
73:20 82:13,19
82:20 87:4
93:2 104:20
108:19 110:1
120:19 136:4
137:7 144:11
145:6 146:7,8
146:13 147:10
148:7,13
149:14 153:5
**processed** 49:5
49:15 62:20
72:10
**processes**
10:13 44:20
50:2 56:7
125:11
**processing**
42:21 48:16
53:17 59:14
60:12 61:1
62:3,6,10,16
63:8,12,12

Rodney Scott
December 5, 2023

[processing - questions]

Page 30

78:1 99:18
101:2 109:1
135:15,15
137:2
**professional**
65:17 131:7
**profile** 13:14
**program** 28:12
28:14 72:14
89:2 95:13
98:2 150:5
**programs**
23:11 27:5
89:6 96:11
**progressively**
134:16
**projects** 25:19
136:21
**promoted**
20:13
**promulgated**
26:12 50:16
**promulgation**
149:19
**proper** 145:9
145:14
**properly** 5:16
9:15,21 10:8
72:13 145:7
**property** 103:6
**proposed** 38:6
50:8 61:19
**proprietor**
16:5
**pros** 103:18
**prosecution**
63:13

**protect** 100:21
101:8 118:18
**protection** 21:8
28:8 30:16
37:3 56:4 89:2
114:9 117:1
118:17 132:18
**protection's**
26:16,19
**protections**
36:7
**protocols** 89:2
**provide** 12:12
19:14 26:6
96:7 142:12
146:3
**provided** 111:1
111:14,17
**provides** 16:6
**providing** 6:6
26:8
**public** 1:17 8:5
11:10 13:15,18
14:1,9 15:4,15
17:11,15 57:9
57:12 84:13,18
89:16 90:11,14
90:19 91:2
92:6 108:8
127:15,17
132:13 134:2
136:18 155:4
155:19
**publication**
38:5,21 83:4
**publicly** 27:15
133:21

**publish** 142:13
**published** 38:6
50:13 54:20
55:4 57:8
85:17
**pull** 70:14
84:15 115:17
115:19,20
116:7,10
117:10,10,20
118:1,2,3,9,9
118:20 119:11
120:21 121:21
122:5,15,16,19
122:21 123:2,5
126:18 127:11
137:18 147:2,3
147:5 152:2
153:1
**pulled** 71:6
83:15 100:20
134:13
**pulling** 38:7
71:15 134:14
**purport** 111:4
**purpose** 51:5
52:5
**purposes** 29:20
58:18 139:2
142:5 143:5
**pursuant** 44:20
77:11 143:1
**pursuit** 24:7
**push** 84:15
115:16 117:13
117:17,21
118:2,3,9,10
118:21 119:6,8

119:11 147:2
**pushed** 27:3
62:1,13 150:20
**pushing** 94:9
127:8
**put** 24:1 44:6
75:21 90:18
91:5,8 94:7
107:8 132:20
145:17 150:13
**putting** 32:5
83:16 91:5
92:8

---

**q**

**question** 4:14
5:13,18 6:4,4,9
19:14,20 22:11
25:7 27:20
41:7 46:10,11
49:13 56:11
62:6,8 65:14
76:10,14 78:12
85:6 87:19
88:2,6 96:21
97:1 106:19,20
107:2,11,13,14
107:16 111:10
152:1
**questioning** 7:8
144:9,14,15
**questions** 4:13
5:6,7,11 7:2,2
9:18 27:16
42:3 104:12
111:12,18
112:11,13,17
138:6 143:17

143:20,21
144:3,4 147:19
**quicker** 73:8
83:11
**quickest**
126:11
**quickly** 72:10
80:2,11 147:14
**quietly** 133:10
**quite** 71:8
**quote** 132:1

**r**

**range** 63:8
**rapid** 83:12
**rarely** 120:18
**rate** 45:11
46:14
**rates** 45:16
46:1,1,2,8
47:20 48:1
**rather** 6:14
29:1 58:5
153:19
**ratio** 133:11
**rational** 119:21
120:6
**raul** 85:10
119:14 146:19
**ray** 70:2
**reach** 15:9
**reached** 11:9
65:8
**read** 44:17
50:20 57:7,9
57:10 59:11,16
78:20,21 79:3
82:2 87:11

91:11,16,18
106:21 107:2
107:13 139:13
139:15,18
142:11,15,19
148:19
**reading** 51:4
**real** 34:16 48:4
70:18 90:15
104:19 106:2
**realize** 93:4
**realized** 80:2
**really** 11:5
28:10 32:6
73:20 79:19
93:5 118:17
126:6
**realm** 137:10
**reappropriated**
135:14 136:8
136:10
**reason** 9:7 24:8
28:6 54:7
62:12 71:8
72:19 74:3,15
118:21 138:9
**reasonable**
55:14
**reasons** 95:6
104:18 106:13
107:21 121:9
**reassigned**
101:1,4
**recall** 101:13
152:3
**receipt** 103:5
**receive** 40:7

**received** 17:10
85:18 86:5
87:2
**recent** 17:9,13
17:19 66:6
**recently** 19:2
27:7 66:4
93:21
**recess** 112:10
**recollection**
38:15 111:18
**record** 6:15
10:14 29:8,18
59:12 68:7
69:6 84:8 97:1
110:9 123:14
127:15,17
136:18 138:2,4
138:12 139:8
139:20 155:12
**recorded**
155:11
**recording**
135:9
**recruiting**
121:20
**redirect** 61:18
**redirected**
99:16
**reduce** 62:15
**reduced** 127:13
**reduces** 107:6
**reducing** 76:5
81:12 109:1
**reduction**
140:19
**refer** 21:5
36:19 67:12,19

88:18
**reference** 53:18
53:20 64:1
67:9 150:1
**referenced**
16:21 144:7
**referencing**
67:15
**referred** 8:7,17
23:5 40:10,21
53:13 65:9,20
72:18
**referring** 8:8
10:1 12:7
36:21 41:16,17
47:3 50:10
53:16,19 54:9
58:7,14 64:2,8
79:10 88:7,16
89:8 101:16
**refers** 68:11
**regard** 85:9
97:2
**regarding**
81:21
**regardless** 36:2
120:5 121:7
150:20
**register** 10:3
38:5,10 50:21
51:1
**regular** 130:18
131:9
**regularly**
143:13
**rejected** 84:5
**related** 18:15
48:4 95:5

129:1,11
**relates** 86:18
**relating** 35:14
111:19
**relationship**
34:15
**relationships**
25:18
**relatives** 102:2
120:18
**relaxation**
141:10,17
**relaxing** 140:2
**release** 40:10
41:5,8,9 54:17
72:19 74:14
88:19,20 105:3
105:19,20
122:4 131:17
141:11,18
**released** 41:12
48:5 54:5
63:15 72:11,15
73:8,19 74:1,2
77:11,16,18
83:11 87:7
89:9 95:1
96:13 100:1
108:1,3,6
116:20 120:14
120:20 122:12
147:7,8,14
152:8,15,19
153:7,15
**releases** 41:18
87:8 88:21
90:19 141:15
152:3

**releasing** 77:3
84:16
**relied** 113:18
**relieve** 54:11
54:12
**relieving** 53:5
**relying** 98:19
**remain** 72:14
76:5 83:9 89:1
95:13 97:14
117:20 140:10
**remained** 78:6
**remaining**
126:2
**remarks**
111:10,13
**remember** 8:12
9:6 11:6 28:4
44:18 144:18
**remote** 93:3
135:20
**remotely** 4:4
6:2 29:2
**removable**
141:3
**removables**
141:3
**removal** 37:3
39:15 40:7,17
46:3 48:17
49:11 50:2
53:17 56:3
63:19 77:14
78:3 141:11
**removed** 49:6
49:17
**removing** 89:1

**renamed** 14:7
**reno** 54:4 73:2
**repeat** 107:9
**repetition** 5:5
**rephrase** 5:19
40:13 46:10
56:5 75:3
76:10 78:11
106:18 144:17
**report** 31:7,9
133:12,13
**reported** 1:21
90:13 91:3
114:5 133:9
134:5
**reporter** 5:9
6:1 28:21 29:4
58:5,7 106:21
107:2 143:6
**represent**
119:15
**representing**
29:9,10
**reprogram**
127:19 128:6
128:14,15
**reprogrammed**
136:10,11,12
137:6,15
**reprogrammi...**
128:3,5 137:7
137:11
**republican**
19:1
**requests**
127:16
**require** 128:13

**research** 11:10
**reside** 143:7,10
143:12
**resided** 143:15
**resolving** 44:16
**resources** 53:2
60:15,19 69:18
83:15 99:15,16
100:20 103:20
**respect** 26:13
34:3 47:10
54:21 65:5
69:12 73:14
82:1 100:14
136:9 153:1,16
153:19,20
**respective** 4:3
**respond** 27:4
70:8 120:1
121:3 133:6
**response** 55:7
57:16 86:5
87:2 111:12
127:11 144:14
151:21
**responses**
116:13
**responsibilities**
39:21
**responsibility**
21:21 44:8
**responsible**
20:7 86:13
129:15
**rest** 94:10
124:8,12
**restate** 49:14

[result - saying]

**result** 7:18
16:13 41:12
48:5 61:14
78:12 104:8
118:4 131:4
**resulted** 83:11
88:18 96:12
107:19 108:9
109:3 153:6
**results** 54:7,17
72:9 73:8 95:1
95:3 131:17
**retained** 11:18
32:17
**retainer** 15:17
17:16,17
**retired** 4:20
15:6 27:19
38:8,11 48:19
60:6 109:20,21
110:14,15
114:18 137:14
146:20 152:9
**retirement**
84:9 154:4
**return** 39:17
40:20 141:3,11
**reunification**
123:13
**reverse** 47:21
**review** 10:20
22:21 23:3
24:2 37:19
48:16 50:18
82:21 112:1
115:10 145:21
147:11

**reviewed** 11:1
11:3 108:4,5
145:11 150:4
**revisions** 56:1
56:7
**rewinding**
125:18
**rewriting**
26:15
**rid** 89:2
**right** 7:10 11:9
13:11 14:21
27:19 28:16
29:7 30:14
40:4 43:11
44:10 50:18
54:1 55:12
58:4 63:12
80:12,13 90:16
92:14 106:9
149:7 150:9
**ring** 85:21
**risk** 92:8
**river** 135:4,6
**robert** 24:2
85:11
**rodney** 1:15
3:2,12 4:7
57:21 58:8
65:1 85:10
**role** 11:20 12:1
14:11,15,17
22:12,14 24:14
26:5,13 31:3
36:17 65:4
77:6 95:12
97:14 102:19
107:19 148:10

**roles** 22:4,8,20
25:4,6 28:20
99:2
**roll** 133:16
**rolled** 28:15
95:10 108:19
**roman** 139:11
**rouge** 2:5
**route** 17:18
**routinely**
151:14
**rudimentary**
145:8
**rule** 8:18 9:18
10:2,2,15 12:4
20:3 36:20
37:8,12,13
38:2,12,15
39:8,14 40:16
42:2,4,12,20
43:6,14,19,21
44:7,13,15,21
45:5,13,17
46:2,4 48:15
49:5,16 50:16
51:15 54:14
55:10 72:2,8
72:12,20 73:5
73:15,16,21
74:4,10,14
75:13,13,19
76:4,12,21
77:5,11,17,18
78:4,13 83:3
94:17,19 95:12
95:18 97:3,13
98:6 103:1
104:8,15 106:8

107:3,5,18
110:11,13
130:16 131:8
131:21 132:2
146:14 147:1
150:1,7,8
152:2 153:1,13
153:20
**rule's** 49:12
50:3
**rulemaking**
38:6 50:8
**rules** 5:1
151:17
**run** 114:3
**running** 70:2

**s**

**safe** 126:16
**sake** 49:17 97:1
110:9 111:15
**salary** 137:13
137:16
**sales** 103:6
**san** 19:3 25:9
25:10 26:4
30:19 133:17
134:20
**sats** 39:5
**saw** 64:12
74:15 123:13
124:5 133:3
146:20 149:2
**saying** 5:16
37:7 50:7
86:17 90:15,17
93:14 95:15
98:10 102:9

Rodney Scott                                                    December 5, 2023

[saying - shared]                                                      Page 34

120:15
says  59:12
  81:19 88:5
  103:2
scan  29:6
scenario  63:14
schedule  15:12
scheme  74:13
  76:19 102:21
  107:4 108:7
  109:6
schemes  97:11
scope  86:10
  128:18 130:5
  138:16
scott  1:15 2:2
  3:2,12 4:7,12
  8:6,8,8 11:9
  13:3 29:9 50:9
  57:21 58:8,16
  64:6 65:1,7
  66:17 85:10
  106:6 107:10
  107:15 112:19
  138:3,7,9
  139:4,15
  143:10 144:7
  149:4,11 154:9
screen  58:2,6
  58:11
screening  37:2
scroll  139:11
se  2:8 11:6 13:8
seal  155:16
sec  82:13
  144:10,10,20
  145:3,4,12,12
  145:16 146:7

146:13
second  17:2
  22:12 24:12
  72:7 93:18
  101:15 104:10
  129:4 149:16
secondary  70:2
seconds  137:20
secretary  23:9
  23:11 81:3
  94:14 145:5
  146:5 150:17
secretary's
  151:19
section  2:13
sections  71:10
sector  24:5
  25:10,10 26:4
  30:19,20 99:3
  99:5,8,14
  134:20 135:20
sectors  99:4,9
secure  14:7
  101:8
securing  20:7
  60:20 86:13
security  8:19
  12:5 13:18
  14:6,9,16 16:8
  18:7,8,10,15
  22:4 23:6 33:1
  33:2,20 34:16
  34:18,21 35:7
  36:16 50:17
  52:14 54:18
  59:16 60:11,18
  68:21 69:12,14
  70:18 71:18

72:3,6,17 73:4
  74:5 76:15
  83:12 84:14
  93:17 103:9,10
  103:11,16
  105:12 111:20
  114:10 115:2,5
  115:11 116:1
  122:8 123:1
  129:16 131:12
  151:2 154:3
see  7:10 47:10
  70:8 87:9,18
  98:12 106:11
  108:10 112:3
  134:15 146:10
  146:12,21
seeing  97:15
  121:2
seek  64:3 81:20
  138:10 147:16
seekers  90:2,4
  90:21
seeking  56:3
  132:3
seem  153:12
seems  69:7
  140:11
seen  58:15 60:2
  88:15 92:8
seizures  89:19
selected  23:15
self  109:14
send  58:3
senior  13:19
  23:8 86:12
sense  5:17 6:20
  37:9 46:20

76:9 119:21
  127:10
sensor  133:3
  135:1 136:5
sent  58:1 70:2
  82:16
separate  36:13
  77:1
serve  20:16
served  113:2
service  22:5
  24:19
services  13:7
  17:17 22:9
  102:5
serving  12:2
set  56:7 58:12
  123:17 130:6
  135:14 155:7
sets  44:16 80:7
setting  131:1,2
settings  149:9
  149:9
several  21:4
  24:21 64:16
  70:10 76:5
shahoulian
  81:8 85:1
shake  5:8
  123:14
shaping  121:18
  121:19
share  6:13 16:7
  28:4 58:2,5
  66:11,21
shared  58:21
  64:17

shares  27:15
sharing  16:9
  66:19
sheet  28:2
  82:20 144:9,20
  145:17,18
  146:13
sheriffs  140:10
shift  31:2,3
  39:20 42:20
shifted  61:3
short  23:14
  62:3 113:11
shortages
  103:5
shortens  73:7
  147:6
shortly  15:6
  80:1,2
show  54:15
  76:12 106:1
  152:6
showed  79:17
shut  61:16 80:9
  81:13 83:19
  92:9 93:1
  136:3,4,6,20
shutting  76:4
  94:3 98:2
side  84:19,20
  114:4 115:7
sidebar  82:11
sided  62:3,13
  128:12 135:14
  137:14
sides  33:21
sign  25:21
  27:11 28:12

133:18
signature
  155:18
signed  15:5
  150:17
significant
  24:14 44:6
  61:18 71:14
  90:5,5 107:20
  113:20 117:2
  123:5,5 124:6
  130:17
significantly
  21:13 53:8
  71:3 88:13
  93:10 118:10
  137:5
similar  110:12
  121:4 135:21
  145:18 151:16
similarly  45:20
simple  126:7
  126:18
simplistic  35:1
  126:3
simply  120:17
single  47:12
  51:19 93:13
  102:7 106:14
  146:18
sir  113:2
sitting  7:10
  43:13 94:14
  146:18
situated  124:1
  124:13
situation  80:20
  97:7,8

six  9:7
size  18:20
  127:16
skewed  76:15
skimmed  11:4
slightly  75:3
slowing  61:8
  85:4 153:9
slows  70:21
small  119:8
smaller  19:1
smile  153:3
smuggle
  121:15
social  119:15
  120:7,8
socioeconomic
  74:19 75:4
soft  62:3,13
  128:12 135:14
  137:14
sole  16:5 74:17
solely  62:14
solicitor  2:3
solution  80:7
solutions  81:12
somebody  41:9
  41:9 70:1
  72:10 118:15
  129:20,21
  130:12,13
  147:6,8
somewhat
  36:15
soon  26:2
  81:11
sorry  18:4
  26:18 63:17

84:3 101:10
  106:19 107:8
  108:10 132:8
  136:12 148:8
sought  104:16
sound  5:2
  55:12
sounds  55:14
  63:5,6
source  11:10
  17:1 38:8
  101:20
south  101:4
  135:4
southern  47:19
  136:1
southwest
  23:10 42:17
  43:1 47:3,6,8
  71:10 77:7
  91:11,15 93:12
  94:4,18 95:4
  95:19 98:11
  99:1,17 100:10
  100:19 102:14
  121:13 134:19
  135:2
sovereign  14:8
space  76:5
  88:20
span  46:15
  49:9
speak  14:19
  15:10 18:16
  20:2 45:21
  92:14
speaking  15:7
  15:13 16:7,15

[speaking - states]                                                Page 36

16:17 17:9,14
18:5,9 19:5,8
20:1 56:17
63:7,8 77:12
103:15
**special** 17:5
**specific** 14:7
15:11 16:17
18:12 19:19
24:6 35:13
38:17,21 39:11
43:4 48:10
53:20 55:13
67:14 73:16
76:18 77:7,19
81:4 82:12
85:7 89:12,14
95:17,19 96:15
96:19 97:4
100:16 102:10
104:21 109:5
123:11 125:15
128:8,18
148:19,21
150:4 151:6
152:17 153:11
154:5
**specifically** 8:6
12:5 13:9
27:17 51:7
52:15 54:1
56:13 60:2
73:14 74:4
80:7 89:1,9
97:17 102:17
103:15 107:4
111:16,17
114:10 115:21

116:19 121:13
122:9 123:1
132:13 134:12
135:17 140:13
150:6,15
**specifics** 48:20
56:10 79:17
**speculate**
150:11
**sped** 48:15,21
**speed** 48:19
62:15 87:17,20
107:5 108:1
147:13
**speeding** 52:21
53:11 74:14
**speeds** 54:16
72:20 73:6,6
88:19 147:5
**spend** 107:7
**spending**
137:13
**spent** 21:4 32:7
49:21 50:3
**spin** 90:18
**spoke** 21:13,15
66:6 102:18
**spoken** 66:4
**sponsor** 123:18
**sportswear**
17:3
**st** 2:2 3:7 8:9
11:9 13:3
58:12 65:7
66:17 78:8
95:21 106:15
107:11 112:16
112:18 137:17

138:13 139:16
143:17 148:3
149:11
**staff** 14:15 24:5
51:10 52:18
79:16 80:11
82:9 83:2
85:12 86:14
131:1
**standards**
141:11,18
**stands** 145:5
**start** 14:1 28:9
28:10,11 59:11
133:14
**started** 28:6,13
81:11 137:13
**starting** 133:21
**state** 1:4 8:9
10:17 14:4
42:15 44:1
65:8 75:17
99:5,19 100:21
101:1,8 102:7
102:10 103:17
129:18 136:3
139:10 140:8,9
140:10 143:18
150:14,19
151:8,13,19
155:1,4
**state's** 138:13
**stated** 65:7
69:3 75:11
109:1 154:4
**statement**
59:18,20 60:7
60:8,8,9,13

62:14 67:12,13
68:9,13,17,20
69:3,4,11 79:5
79:13 81:18
82:4,5 83:20
87:13 89:19
91:17,19 98:14
98:15,19
100:14 103:2
106:7 115:4
131:13,21
**statements**
59:3,6 62:19
69:8 82:8
84:13 87:20,21
89:15 108:8
131:16 136:18
**states** 1:1,9
12:3 26:18
27:14 30:18
31:1 34:1 35:5
41:13 42:7
45:9 48:6 49:6
49:21 50:4
52:1 54:6
59:15 60:4
67:16 71:16,19
72:11,16 74:3
75:8 77:3
91:14 92:2
93:5 95:1
96:13 98:12
100:2,11,12,13
100:16,16
101:19 102:3
102:13,19
103:3,3 104:8
108:2,4 116:2

Case 6:22-cv-01130-DCJ-CBW Document 217-44 Filed 01/29/24 Page 193 of 201 PageID #: 10503
Rodney Scott                                            December 5, 2023
[states - systems]                                      Page 37

116:3,20
117:12,15
119:7 120:14
120:20 122:5
122:12 123:4
124:2,7 125:10
126:1 129:9,11
129:18 130:16
132:1,3,14
139:4,20 140:6
140:14,17,17
140:21 141:4,8
141:12,15,19
142:2 147:7,9
147:14 151:15
153:8
**statically** 47:21
100:5
**station** 2:13
24:4 25:16
27:9 28:1,11
**stations** 62:17
63:3
**statistical**
98:16,18
**statistically**
81:10 98:3
101:18 102:1,9
130:7
**statistics** 87:7
89:8,13,20
90:10 96:3,16
99:7,7 101:13
101:16 105:21
110:18 132:10
**stats** 107:17
109:5

**stay** 99:1 130:2
**stayed** 23:14
**staying** 55:20
**stays** 98:20
99:12,21
**stenographic...**
155:11
**step** 9:17
**steps** 10:18
**stick** 62:7
74:12
**stipulated** 4:2
**stipulation** 4:1
**stjohnj** 2:6
**stop** 62:5 71:20
88:1
**stopped** 71:12
**story** 90:17
**straight** 26:21
**strategy** 92:19
**streamlining**
52:20
**street** 2:4
**striking** 88:20
**strong** 118:2,3
118:20
**student** 26:20
**studied** 34:2
**studies** 104:14
109:17 110:5,9
110:10
**study** 34:3
109:8,14
**stuff** 14:14
151:17
**stymied** 81:13
**sub** 67:19

**subject** 32:20
33:5 41:18
52:8 77:13
78:3,14,16
111:2,6,16
112:12 138:6,8
**subjects** 106:6
**submit** 54:21
57:16
**submitted**
12:16 57:13
**subordinates**
114:4
**subpoena**
143:2,7
**subsection** 62:9
**subset** 126:19
**substantive**
46:7
**subsumed**
68:16
**sudden** 153:14
**suffered**
103:17
**sufficient** 56:19
**suggest** 29:2
**suggesting**
90:12 91:2
138:2
**summarize**
56:20
**summary**
126:3
**summit** 55:7
**supervisor**
24:4
**support** 12:12
95:17 98:19

113:12
**suppose** 105:5
**supposed** 41:10
41:14 52:2
**supposedly**
81:3
**sure** 40:15
49:15 60:20
70:3,17 72:15
79:21 112:21
118:14 119:20
128:1 129:6
133:8 134:8
142:20 144:18
145:4,6,9,13
146:8 149:3
150:21
**surprise**
150:18
**surveillance**
70:6 135:3
**sustained**
104:7
**sworn** 4:4,8
155:8
**synopsis**
142:20
**system** 26:1
27:12 54:8
78:5 90:16
94:5 132:21
133:16 135:8
136:6
**systematic**
27:16 125:12
146:8
**systems** 135:1

Rodney Scott                                                                December 5, 2023

**[t - thing]**                                                              Page 38

| t | | temporary | testifying 9:16 |
|---|---|---|---|
| **t** 37:3 | 63:12 68:10 | **temporary** | 12:20 72:21 |
| **table** 53:10 | 69:21 75:6 | 21:19 | 86:15 103:8,18 |
| **tactic** 93:21 | 77:13 81:11 | **ten** 9:4 32:3 | 152:12 153:11 |
| **tactical** 25:17 | 83:4 89:19 | 108:12,16 | **testimonies** |
| 121:17 154:5 | 103:14 123:12 | **term** 22:12 | 142:9 |
| **take** 5:10,17 | 127:7 134:9 | 34:20 62:3 | **testimony** 7:17 |
| 6:17,18 24:18 | 149:6 | 67:16 73:18 | 12:17 31:11,18 |
| 69:19 78:19 | **talks** 71:13 | 88:10 123:11 | 38:19 65:16 |
| 83:1 87:21 | **task** 27:2 | 128:2 132:12 | 67:4 74:1,12 |
| 112:1,5 128:9 | **tasked** 30:11 | 132:15,16 | 78:9 84:8,12 |
| 130:13 132:20 | 80:8 | **terminated** | 93:21 94:13 |
| 139:13 146:6 | **taught** 112:21 | 148:4,14 | 96:1 105:2,6 |
| **taken** 4:15 | **tax** 103:6 | 149:18 | 111:1,3,6,14 |
| 10:18 12:15 | **taxes** 103:6,7 | **termination** | 111:16 122:3,7 |
| 32:2 42:14 | **team** 54:13 | 148:6,13,19,21 | 122:10 126:6 |
| 45:5,8 91:12 | 113:21 151:1,2 | 149:14 | 127:17 134:6 |
| 93:7 112:10 | **teams** 1:14 | **terms** 29:11 | 138:14 140:7 |
| **takes** 38:9 42:6 | 52:19 | 34:2 36:20 | 152:4 153:6,16 |
| 44:12 128:7 | **technical** 16:18 | 47:9 53:17 | **testing** 92:9 |
| **talk** 5:21 13:8 | **technically** | 63:11 76:9 | 98:2 |
| 36:18 50:6 | 15:16 | 83:7 101:17 | **tests** 104:14 |
| 53:16 59:12 | **technology** | 115:16 | **texas** 13:15,18 |
| 61:7,11,15 | 61:19 71:11,14 | **terrorism** | 14:1,4,9,17,18 |
| 62:2 63:18 | 94:3 126:8 | 21:15 22:1 | 15:3,15 17:11 |
| 80:6,6,9 84:3 | 128:12 136:5 | 27:2,3 90:5 | 17:15 101:4 |
| 89:13,14,21 | **teleconferenc...** | **testified** 4:10 | 135:4 |
| 90:2,3 98:17 | 1:14 | 110:19 119:15 | **text** 9:10 |
| 101:15 125:14 | **telephone** 2:5 | 122:3 125:19 | **texts** 66:8 |
| 133:21 | 2:14 149:6 | 126:4 129:8 | **thank** 6:21 |
| **talked** 13:8 | **tell** 4:9 7:7 | 134:12 139:19 | 112:15 144:3 |
| 40:15 61:1 | 38:13 39:6,6 | **testify** 12:1,7 | 154:8,10 |
| 94:3,16 117:10 | 77:7,9 87:21 | 38:18,20 56:16 | **theme** 119:19 |
| 125:18 133:17 | 90:17 108:18 | 57:4 65:2,18 | **theory** 119:1,4 |
| 144:20 148:20 | 111:2 | 65:18 78:17 | 119:5 |
| **talking** 37:4,9 | **telling** 81:3 | 103:13 104:3 | **thereof** 12:2 |
| 42:2 51:8 | 89:16 | 106:7,13 138:3 | **thing** 5:5 29:10 |
| | **tells** 73:10 | 138:11 143:1 | 57:10 120:10 |
| | | 152:17 | |

Rodney Scott                                                    December 5, 2023

[thing - travel]                                                    Page 39

120:15 124:10
142:11
**things**  42:20
71:4,5 76:20
77:1 86:9
116:18 117:11
117:12,13
134:13 140:13
145:7
**think**  5:5 6:19
9:3,10 17:19
18:4 19:5 38:7
42:10 58:6
62:11 88:14
93:9 97:6
101:9 102:7,10
111:21 113:21
120:4 122:3,18
123:8 127:10
129:5 138:17
138:19 139:16
142:8 144:13
144:14 149:4,8
150:10
**third**  2:4 72:7
129:4
**thirty**  112:7,8
**thought**  32:7
84:4
**thousand**
126:20
**threats**  61:6
70:19 85:3
**three**  9:7
139:13,17
**tied**  95:14
**time**  4:18 6:18
10:21 12:19

13:5 19:5,12
19:13,14,16,18
22:12 23:18,21
24:3,14 25:1,4
27:1,19 28:9
30:13 32:9
38:9,16 43:7
44:15 46:9,15
46:21 47:4,15
47:20 49:8,9,9
49:10,21 50:1
52:18 53:4
55:3,15 58:20
59:10,20 61:2
62:15 64:12
66:6 70:9,10
70:13,20 71:12
71:17 73:6,7
77:2 80:9
81:13 86:4
91:6 95:10
97:19 101:6
107:6 116:20
118:18 125:8
125:16 146:12
146:19 147:6
150:16 154:8
155:6
**times**  31:18
44:17 48:16
61:1 78:1
108:13 110:20
128:13 129:4
134:2
**timing**  148:15
**tiny**  126:19
**tire**  133:4

**title**  13:19 21:3
21:8 61:14
81:15 124:3
**today**  4:13 7:11
7:17 30:1
43:13,17 73:1
95:11 96:14
97:16 98:4
99:10 105:6
108:10 120:13
121:2 143:1
147:2 152:21
**together**  74:18
74:21 89:3
119:10 150:13
**token**  6:5
**told**  32:13 65:8
66:17 73:13
80:16 83:7
104:10 131:2
**tons**  32:1
**tony**  85:10
**took**  26:14
33:17 44:20
53:8 108:12
120:10,11
136:14
**tool**  121:17,17
**top**  19:21 44:18
92:4 138:15
139:17 145:17
**topic**  18:5
**topics**  138:15
**torture**  36:7
39:17 40:20
**total**  45:3,4,11
45:16 113:13
113:21

**totality**  75:1
**touch**  145:2
**touched**  120:4
**toward**  139:5
**trace**  102:16
**track**  32:7
100:7
**tracking**  25:21
27:11 28:12
133:14,17
145:8
**trade**  93:1
**traditional**
86:10
**traditionally**
86:11 151:9
**trafficked**
97:11
**traffickers**
121:3
**trafficking**
92:10,12 97:2
97:5,11,21
98:3,4
**trained**  53:1
**training**  27:5
34:6 53:3,5
**transcript**
155:12
**transition**  51:9
52:16,19 54:13
84:14 85:13
**transitioned**
26:3
**transitions**
60:4
**travel**  14:17,18
19:12,21 71:1

79:20 93:1
146:17
**trial**  12:8,9,18
12:20 13:8
**tried**  32:7
121:11
**true**  48:1 59:8
91:1,8 155:12
**trump**  51:9
128:15 133:20
139:6
**trust**  80:17,18
**trusted**  114:6
**truth**  4:9,9,10
16:8
**try**  16:7 90:20
95:4 124:8
130:6
**trying**  54:15
70:3 118:15
119:9 121:8
**tuesday**  1:15
**turn**  20:5 142:6
**turning**  13:10
148:1
**twitter**  92:5
**two**  11:8 16:16
16:20 17:17
33:4 59:2
66:20 95:6,7
98:18 101:12
104:18 121:9
132:14 137:20
139:12,12
**type**  14:14 27:4
64:17 79:15
81:12 123:3
128:13 148:21

**typed**  28:5
**typesetting**
34:7

**u**

**u.s.**  2:10,11
20:16 21:5
22:8 23:15
24:18 26:15,19
61:10 92:4
99:3 110:1
114:21 116:17
130:5 132:16
132:18
**u.s.c.**  35:19
**ultimately**  10:4
26:11
**unabated**
71:21
**unaccompani...**
47:12 98:6
102:5 124:6
**unauthorized**
36:1
**uncertain**  83:7
**uncontrollable**
117:17
**under**  15:16
20:18 28:13
35:19 36:7
42:1 44:13
45:5,13,17
46:2 49:5,11
49:16 50:2
56:4 61:13
73:3 77:17
113:5,8 114:17

**undercut**  72:17
**undercuts**
71:18,18
**underlying**
119:19
**undermine**
59:15 68:21
**undermined**
72:2 105:12
**undermining**
69:12
**understand**
5:14,15,18
37:6 50:9
64:20 69:2,6
73:20 79:11
97:6,7,8
112:20 120:19
120:19
**understanding**
9:12 10:16
11:20 37:11,13
38:4 39:14,19
40:2,5 41:2
42:1,5,9,11,19
43:3,5,18 45:4
48:18 51:3
56:12,14,20
64:15 66:19
67:10 77:16
98:7 109:12
138:5,18 139:5
148:2,4 149:18
150:2,14
**understood**
5:12,20 6:8,16
7:9 52:6

**undocumented**
68:15
**undoubtedly**
131:4
**unfortunately**
113:17 135:13
136:1
**unheard**
108:12
**united**  1:1,9
12:3 26:18
27:14 30:18,21
34:1 35:5
41:13 42:7
48:5 49:6,21
50:4 52:1 54:5
59:15 60:4
67:15 71:16,19
72:11,16 74:2
75:8 77:3
91:14 92:2
93:5 95:1
96:13 100:2
108:2,4 116:1
116:3,20
117:12,14
119:7 120:14
120:20 122:4
122:12 123:4
124:2,7 125:10
126:1 129:18
132:3,14 147:7
147:8,14 153:7
**units**  47:11
**unknowns**  27:6
**unlawful**  36:9
88:8 106:8

**unlawfully**
 104:17,17
**unmanned**
 108:15
**unpatrolled**
 90:9 92:16
**unquestionable**
 74:6,6
**updating**
 126:15
**ur** 115:13
**urban** 134:21
**usa** 17:3
**uscis** 22:8
 115:1
**usdoj.gov** 2:15
**use** 34:18 36:20
 61:12 95:7
 121:14,16
 135:4 136:16
**used** 22:12
 42:21 62:9
 67:13,16,19
 68:17 73:18
 99:14 101:17
 104:17 126:10
 132:12,13
 136:8
**uses** 132:15,17
**using** 76:8,9
**usually** 9:2
 19:14 31:16
 126:11 128:8
 134:21 153:9
**utopia** 92:18

**v**

**vague** 25:7
 52:11 78:8
 107:11,15
**varied** 18:21
 19:18
**varies** 18:19
 19:10
**various** 20:1
 21:20 29:12
 154:2
**vast** 18:14 71:9
**vehicle** 26:19
 70:1 133:4
**vented** 83:2
**verbal** 5:7,11
 9:11
**verbally** 66:9
**verbiage** 11:6
**verified** 133:6
 134:6
**versus** 28:9
 47:13 92:12
**video** 133:2
 151:14
**view** 75:14
 87:15 89:5
 94:19 131:7
**violation** 36:1
 36:10,12,16
 130:8
**virtual** 1:16
 99:18
**virtually** 4:14
 14:18
**visibly** 112:3

**vocal** 136:20
**voice** 112:19
 113:1
**vs** 1:7

**w**

**w** 13:12
**waiting** 148:5
**waiver** 61:13
**waivers** 88:21
**wall** 71:13 94:5
 136:3,6 137:1
**want** 6:11,13
 6:17 13:21
 20:5 28:5 30:2
 31:2,2 32:10
 36:18 44:6
 50:6 57:19
 59:10 61:14
 62:7,19,20,20
 64:9 68:4
 78:18 83:17
 85:2 87:5
 93:12 94:11
 112:1,14
 119:20 120:5
 120:10 122:2
 127:21 130:9
 131:20 133:8
 134:8 149:2
 150:11,18
**wanted** 13:3
 61:20,21 80:9
 134:11 136:20
 137:1,2 142:18
 142:19 145:2
**wanting** 56:16

**washington** 2:9
 2:14 14:20
 24:10 114:1
**washy** 19:17
**watch** 27:4
 90:6
**watching** 52:14
 55:18,20 105:3
 136:2
**wave** 93:18
**way** 27:16
 37:17 49:1
 67:2 76:11
 85:21 86:3
 97:9 100:7
 108:18 111:13
 111:18 112:4
 117:16 118:19
 123:16 146:4
 155:14
**ways** 17:17
 132:14
**we've** 94:2
**weak** 118:2,3
**wear** 17:6
**website** 16:7
 89:10 90:13
**weeding** 53:9
**week** 4:19
 66:12
**weeks** 120:11
**weight** 104:3
 117:21
**welcome** 137:3
**welcoming**
 61:21 62:1
**went** 9:17 25:9
 26:1 38:21

Rodney Scott                                               December 5, 2023

**[went - zero]**                                                  Page 42

54:14 80:19
100:4 118:21
133:3
**western**  1:1
**whatsoever**
60:14 61:8
81:6 85:3
134:4 135:3
**white**  80:5
145:10,12
146:5
**wide**  24:1
**wife**  124:19
**willing**  12:10
12:11 56:16
65:18 95:4
**wise**  75:20
117:19
**wishy**  19:17
**wit**  155:2
**withdrawn**
59:7
**withholding**
37:2 56:3
**witness**  2:7 4:4
4:8 31:5,17,19
31:20 65:2,9
65:21 66:18
68:6 112:15
132:8 154:10
155:6,16
**witnesses**  8:7
**woman**  115:13
**women**  47:13
113:18
**women's**  19:1
**wondering**
95:16

**word**  64:1
67:10,12 68:11
68:17 69:7
76:8 104:17
136:8
**words**  44:7
**work**  8:16
14:18 20:5
21:10 24:10
66:3 74:18,21
82:15 119:9,12
123:2,2 130:9
135:5 142:1
146:9
**worked**  19:4
21:1 26:20
114:1 151:1
**working**  15:3
21:6,13 24:12
24:15 100:18
113:18
**workload**  12:6
**works**  17:4
29:2,5 68:6
112:9,9 152:14
**world**  74:20
75:5 106:2
118:12 119:5
**worried**  146:16
**worse**  71:3
105:20 108:13
**wrap**  113:13
**wray**  94:13
**write**  67:11
69:2,6 79:11
100:9
**writing**  26:17

**written**  67:12
82:19 111:9,13
146:3
**wrong**  6:11
63:6
**wrote**  64:6,8
84:8 142:21

**x**

**x**  70:2

**y**

**yeah**  29:6
35:12 46:11,16
55:20 58:10
88:3 97:4
101:14 109:11
137:20 144:2
**year**  23:14
25:15 60:17
74:16
**years**  20:16,20
21:4,18 23:17
24:21 26:21
32:9 35:13
55:12 96:4
106:3 114:18
117:6 121:12
128:20 129:9
130:19 132:4
133:10,13
152:12 153:13
**yesterday**  7:21
58:21 64:13,16
66:9 93:1
**yield**  118:3
119:10,11

**z**

**zero**  118:21

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.