# EXHIBIT 256

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF LOUISIANA
2                     LAFAYETTE DIVISION
3      STATE OF ARIZONA, et al., )
                                 )
4           Plaintiffs,          )
                                 )
5       v.                       )Civil Action
                                 )No. 6:22-cv-01130
6      MERRICK GARLAND, in his   )
       official capacity as      )
7      Attorney General of the   )
       United States, et al.,    )
8                                 )
            Defendants.          )
9      _____)
10
11     30(b)(6) VIDEOCONFERENCE DEPOSITION OF ANDREW ARTHUR
                  ON BEHALF OF STATE OF LOUISIANA
12
                      (Taken by Defendants)
13
                      Via Videoconference
14
                  Thursday, November 30, 2023
15
16
17
18
19
20
21
22
23
24              Reported in Stenotype by
            Diane Pressley, Shorthand Reporter
25      Transcript produced by computer-aided transcription

Page 2

```
 1                        APPEARANCES
 2      ON BEHALF OF PLAINTIFFS:
 3          SCOTT ST. JOHN, Esquire
            Louisiana Department of Justice
 4          1885 N. Third Street
            Baton Rouge, Louisiana 70802
 5          (225) 326-6766
            StjohnJ@ag.louisiana.gov
 6
        ON BEHALF OF DEFENDANTS:
 7
            ERIN T. RYAN, Esquire
 8          U.S. Department of Justice
            Civil Division
 9          District Court Section
            P.O. Box 868, Ben Franklin Station
10          Washington, DC 20044
            (202) 532-5802
11          Erin.t.ryan@usdoj.gov
12      ALSO PRESENT:
13          SYDNEY JACKSON
            MARIA LATIMER
14
15
16
17
18
19
20
21
22
23
24
25
```

Andrew Arthur , 30(b)(6)                                    November 30, 2023

                                                              Page 3

1      30(b)(6) ZOOM VIDEOCONFERENCE DEPOSITION OF ANDREW

2      ARTHUR ON BEHALF OF STATE OF LOUISIANA, a witness called

3      on behalf of Plaintiffs, before Diane Pressley, Notary

4      Public, in and for the State of North Carolina, all

5      parties appearing via videoconference, held on Thursday,

6      November 30, 2023, commencing at 11:01 a.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Andrew Arthur , 30(b)(6)                                    November 30, 2023

 1                    INDEX OF EXAMINATIONS

 2                                                     PAGE

 3     By Ms. Ryan                                      5

 4     By Mr. St. John                               124

 5

 6

 7                      INDEX OF EXHIBITS

 8     NUMBER       DESCRIPTION                      MARKED

 9     Exhibit A    Notice of Deposition               20

10     Exhibit B    Department of Education Document    31

11     Exhibit C    MFP Presentation 2021 to 2022       39

12     Exhibit D    Resolution BESE Adopted
                    Submitted 3/15/23                   48

13

       Exhibit E    FY2022 to 2023 Circular NO116
14                  MFP Budget Letter May of 2023       57

15     Exhibit F    Asylee Issuance Amount              78

16     Exhibit G    House Bill 1
                    LADOJ-ASYLUM3588                    83

17

       Exhibit H    Second Amended Complaint           110

18

       Exhibit I    Corrected Memorandum in Support
19                  of Motion to Postpone the
                    Effective Date of Asylum IFR,
20                  or in the Alternative, for a
                    Preliminary Injunction            119

21

22

23

24

25

Page 5

```
 1                       ANDREW ARTHUR,

 2          having been first duly sworn, was examined and

 3                     testified as follows:

 4                          EXAMINATION

 5     BY MS. RYAN:

 6          Q.  Good morning, Mr. Arthur.

 7          A.  Good morning, Ms. Ryan.

 8          Q.  Before we start I want to go over just a few

 9     ground rules so we're on the same page for today.

10          I will be asking you a series of questions.  The

11     court reporter will be recording your answers so you

12     must give verbal responses.  Please do not nod your head

13     or say "uh-uh."  Do you understand?

14          A.  Yes, ma'am.

15          Q.  Please keep your voice up and speak clearly so

16     the court reporter can transcribe the deposition

17     accurately.  Please wait for me to finish asking a

18     question before you answer, that will help the court

19     reporter take down what we say and get us through the

20     deposition a little quicker.  Do you understand?

21          A.  Yes, ma'am.

22          Q.  If you do not understand a question please tell

23     me and I will rephrase it.  If you do not hear any part

24     of a question please tell me and I will repeat it.  Do

25     you understand?
```

Page 6

1        A.  Yes, I do, Counsel.

2        Q.  Unless you tell me otherwise, I will assume that

3    you have understood and heard the entire question.

4    Please do not guess.  If you do not know the answer to a

5    question tell me that you do not know.  Do you

6    understand?

7        A.  I do.

8        Q.  This testimony is given under oath, which is

9    similar to the oath you would take on the stand at

10   trial.  Do you understand you took an oath to give

11   complete and truthful answers?

12       A.  I do.

13       Q.  If you realize during the deposition that an

14   earlier answer was inaccurate or incomplete, please let

15   me know and I will give you a chance to correct it.

16            You may review the transcript that will be

17   generated by the court reporter, and after your review

18   you can correct any errors you may find, but if you make

19   changes to the transcript I may be able to comment on

20   those changes at trial.  Do you understand?

21       A.  I do.

22       Q.  We can take breaks during the deposition.  If you

23   need a break just let me know, but we cannot take a

24   break while a question is pending, so if a question has

25   been asked, please answer the question and then we can

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 7

1      take whatever break you need.  Do you understand?

2          A.  I do.

3          Q.  We're holding this deposition virtually.  The

4      parties agree that the remote deposition of the deponent

5      may be used at trial or a hearing to the same extent

6      that an in-person deposition may be used, and the

7      parties agree not to object to the use of the record

8      from today's deposition on the basis that it was taken

9      remotely.

10              MS. RYAN:  To counsel, do you agree?

11         A.  I do.

12     BY MS. RYAN:

13         Q.  Sorry, that was to Mr. St. John.

14              MR. ST. JOHN:  We will -- we're not

15     stipulating to anything beyond the federal rules.  The

16     rules are the rules.

17              MS. RYAN:  So you won't agree that you won't

18     object just on the basis of this deposition was taken

19     remotely?

20              MR. ST. JOHN:  Counsel, the rules are the

21     rules, and we will comply with the rules.  Nothing more,

22     nothing less.

23     BY MS. RYAN:

24         Q.  Also because the deposition is virtual the court

25     reporter is obviously not in the same room as you,

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 8

1    Mr. Arthur.

2              MS. RYAN:  To counsel, do we agree that the

3    court reporter is an officer and is permitted to

4    administer the oath to you -- to the witness by video

5    conference?

6              MR. ST. JOHN:  We will agree to the rules,

7    nothing more, nothing less.

8    BY MS. RYAN:

9       Q.  Mr. Arthur, are you currently in a quiet place

10   where you will not be disturbed or overheard?

11      A.  I am, ma'am.

12      Q.  Do you agree not to text, call, email, or instant

13   message any other person during the deposition unless we

14   are on a break and no question is pending except for the

15   purpose of determining whether a privilege should be

16   asserted?

17      A.  Yes, ma'am.

18      Q.  And do you agree not to record any portions of

19   today's deposition?

20      A.  I do.

21      Q.  Do you understand the rules of the deposition or

22   have any questions before we proceed?

23      A.  I understand.  Thank you, Counsel.

24      Q.  Are there any physical or mental conditions that

25   could interfere with your testimony today?

Page 9

1      A.   There are not.

2      Q.   Is there any reason you cannot give full,

3   accurate, or truthful testimony today?

4      A.   There is not.

5      Q.   When did the become aware of this lawsuit?

6      A.   I have to actually think about that.  I track

7   lawsuits generally with respect to the immigration law

8   so I can't tell you a specific time.

9      Q.   So you were aware of the lawsuit before you were,

10   became a witness?

11      A.   Honestly, I can't tell you that.  In my current

12   position I'm the Resident Fellow in Law and Policy for

13   the Center for Immigration Studies, so I keep track of

14   litigation, a number of cases that involve immigration.

15   I can't tell you whether it was before or after.

16      Q.   Did you review any documents to prepare for

17   today's deposition?

18      A.   I did.

19      Q.   What did you review?

20      A.   I reviewed documents that were provided to me by

21   the Department of Justice of the State of Louisiana that

22   are, as I understand it, marked into evidence.

23          I have also reviewed some general statistical

24   data.

25      Q.   What do you mean by general statistical data?

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 10

1       A.  Department of Justice published data, data

2    published by the Department of Homeland Security.  That

3    is generally it.

4       Q.  And when you say you reviewed documents marked

5    into evidence --

6       A.  Actually to be -- let me correct.

7           Online.  I didn't review any physical documents.

8    Part of my job is to -- in my current position is I

9    review a large number of published data that are

10   provided by the Department of Homeland Security, the

11   Department of Justice, and other places.

12           MR. ST. JOHN:  And just so that the record

13   is clear, you reviewed documents online that were

14   published by the Federal Government, Department of

15   Justice, but then you were also provided some hardcopy

16   documents that were produced in the litigation, Bates

17   stamped.  I think that's what you're referring to by in

18   evidence.

19           THE WITNESS:  That's correct, Mr. St. John.

20   BY MS. RYAN:

21      Q.  Do you remember documents, the specific documents

22   you reviewed that were produced during the litigation?

23      A.  I do actually, yes.

24      Q.  Could you tell me what documents you reviewed?

25      A.  These were documents that were provided to me by

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 11

1   the State of Louisiana that are in evidence in this

2   matter.

3       Q.  Can you tell me specifically which documents you

4   looked at?

5       A.  Yeah, I looked at documents -- I looked at the

6   documents.  I looked at the complaint in this matter.  I

7   looked at -- re-reviewed my statement, which, of course,

8   I'd seen already.  I looked at documents that relate to

9   the Louisiana Department of Health Medicare Program.  I

10  looked at documents that were provided by the Department

11  of Education of Louisiana with respect to the school

12  enrollment in the Minimum Foundation Program.  I looked

13  at documents that guide the issuance of means-tested

14  public benefits.  Temporary assistance to needy

15  families, which in Louisiana is the family independence

16  and temporary assistance program.  And also SNAP, the

17  Supplemental Nutrition Access Program, as well as

18  background documents which I believe are in evidence in

19  this matter.

20      Q.  Okay.  You mentioned your statement.  Can you

21  clarify what you meant by your statement that you

22  reviewed?

23      A.  That I submitted in this matter for this case.

24      Q.  Your expert report?

25      A.  That is correct, Counsel.

Andrew Arthur, 30(b)(6)                                    November 30, 2023

Page 12

1      Q.  Okay.  You mentioned the complaint, so you have

2   reviewed the current complaint in this matter?

3      A.  I believe it's the current one, yes, Counsel.

4      Q.  Okay.  Did you review Louisiana's responses to

5   defendant's request for production?

6      A.  Yes, I did.

7      Q.  And were you involved in finding documents

8   responsive to those requests?

9      A.  No, I was not.

10     Q.  Did you review Louisiana's responses to

11  defendant's interrogatories?

12     A.  I don't believe that I did.

13     Q.  And did you meet with the attorneys for the State

14  of Louisiana prior to this deposition?

15     A.  I did.

16     Q.  Knowing that I'm not asking about the content of

17  any of those meetings or conversations, how many times

18  did you meet with the attorneys for the State of

19  Louisiana?

20     A.  The attorney for the State of Louisiana came up

21  to Gastonia, North Carolina and met with me yesterday.

22  I've also been involved with call -- on calls with

23  Department of officials in which Mr. St. John was

24  present, or online.

25          MS. RYAN:  Mr. St. John, before we get into

Andrew Arthur , 30(b)(6)                                November 30, 2023

Page 13

1      more substance, can I just get a yes or a no whether you

2      object to this deposition being held virtually?

3                    MR. ST. JOHN:  We will -- whether a

4      deposition will be held virtually is a question of law,

5      the rules are the rules.  We'll comply with the rules,

6      nothing more, nothing less.  I mean, you chose a virtual

7      deposition, I assume that you've complied with the

8      rules.

9                    MS. RYAN:  So that's a yes.

10                    MR. ST. JOHN:  That's not what I said.  I

11     said the state will require strict adherence with the

12     rules, nothing more, nothing less.  That's been our

13     consistent position for the entire case.

14                    MS. RYAN:  Do you have any reason to think

15     that we do not comply with the rules for this

16     deposition?

17                    MR. ST. JOHN:  Ms. Ryan, I'm not being

18     deposed here today.

19                    MS. RYAN:  No, but we can't proceed.  If

20     you're -- if you're saying you don't consent to a

21     virtual deposition then, you know, I'm not going to

22     waste all of our time, so if you can't tell me that you

23     like at the most basic level don't object to this

24     deposition being held virtually then we might have an

25     issue.

Andrew Arthur , 30(b)(6)                                      November 30, 2023

Page 14

1              MR. ST. JOHN:  Erin, I'm not -- the law

2    either authorizes it or it doesn't, and I'm not going to

3    comment on a legal issue.  You've noticed a virtual

4    deposition, that was your choice.  You know, we are not

5    stipulating to anything, I'll tell you straight up.  The

6    State is not stipulating to anything.  You made your

7    choice, our witness is available, you're on the clock,

8    the witness will not be produced again, so if you want

9    to proceed with the deposition feel free.  The State is

10   not stipulating to anything, though.

11             MS. RYAN:  All right.  Let's just take a

12   moment.

13             (Recess was taken.)

14             MS. RYAN:  All right.  So Scott, if we're

15   looking at the final rules, 30(b)(4) permits a remote

16   deposition by stipulation or court order.  If you're

17   saying you do not stipulate you will not produce the

18   witness again, then we need to call the court and make a

19   motion, if it's what this takes, since we can't act like

20   civilized adults and just agree to do a remote

21   deposition.

22             MR. ST. JOHN:  Well, are we on the record,

23   Madame Court Reporter?

24             THE COURT REPORTER:  Yes.

25             MR. ST. JOHN:  Okay.  One, the invective is

Andrew Arthur, 30(b)(6)                                    November 30, 2023

                                                              Page 15

1      unnecessary, Counsel.  The State does not appreciate

2      being asked in the course of a deposition to make

3      stipulations, that's not the way we operate.  We will

4      stipulate to a remote deposition, the conduct of a

5      remote deposition per Rule 30(b)(4) for this deposition

6      only, that is the only stipulation that the State will

7      make.

8                  MS. RYAN:  I appreciate that.  We -- if we

9      have this issue for any future depositions we will raise

10     it before.  We note we informed you it will be remote

11     weeks ago at your request since the witnesses were out

12     of state for you, so for any future depositions we will

13     e-mail you and work this out ahead of time.

14                 MR. ST. JOHN:  That statement is not

15     entirely correct.  I don't believe that the remote

16     deposition was at our request, but as that may be,

17     please proceed with the deposition.

18     BY MS. RYAN:

19        Q.  Okay.  Mr. Arthur, you're here today as a

20     30(b)(6) witness for the State of Louisiana, correct?

21        A.  That is correct, Counsel.

22        Q.  Did you review the 30(b)(6) deposition notice

23     that the defendant sent?

24        A.  Yes, I did.

25        Q.  I have a copy of it I can show you as well.  I

 1    know there are a lot of documents in this case so you

 2    may not have them all.

 3         A.  I got more documents than --

 4             (Voices overlapping)

 5         Q.  All right.  Let's see.  Let me find the right

 6    document for you here.

 7             Okay.

 8         A.  Do you have it, Counsel?

 9         Q.  Yes, just as is the case, we are having some

10    technical issues.

11             Okay.  Can you see that?

12         A.  My screen is blank.  Oh, there we go.

13         Q.  Yeah, it might take a moment.

14             Okay.  Did you review this document?

15         A.  I am not sure if I've reviewed that document.

16         Q.  Scrolling down this is the notice of 30(b)(6)

17    deposition with Attachment A with the topics that you

18    are set to testify about today.

19             MR. ST. JOHN:  And Counsel, if you'll allow

20    me to assist Mr. Arthur.  I believe he was provided a

21    copy of the responses and objections, so he's seen -- I

22    believe he's seen the topics, but not this particular

23    notice.

24             MS. RYAN:  But he has seen the topics for

25    his deposition today?

1              MR. ST. JOHN:  Yes.  I don't want to testify

2     for you Arthur.

3         A.  That is correct, I have seen the topics for the

4     deposition today, Counsel.

5     BY MS. RYAN:

6         Q.  Okay.

7         A.  I believe there are 94 of them, is that correct?

8     I don't know how many are for today's deposition.

9              MR. ST. JOHN:  Mr. Arthur, that was the

10    previous version.

11             Fair enough.  I'll let you go.

12    BY MS. RYAN:

13        Q.  So no, that was an old version of topics.  This

14    has 11 topics directed to the State of Louisiana, and

15    then I believe 28 topics broken up between the programs

16    that we're going to discuss today.

17        A.  Very good, Counsel.

18        Q.  Throughout this deposition notice there is a

19    reference to the IFR.  Are you familiar with the program

20    that I'm referring to there?

21        A.  Yes, Counsel.

22        Q.  And what is your understanding of that program?

23        A.  The IFR is the Interim Final Rule.  It's also

24    known as the Asylum Officer Rule.  It changes the

25    adjudicator of applications that are made by aliens who

Andrew Arthur, 30(b)(6)                              November 30, 2023

Page 18

1    are subject to expedited removal proceedings who have

2    made credible fear claims.  Pursuant to the IFR

3    traditionally between 1996 and the issuance of the IFR

4    in 2022, immigration judges in removal proceedings had

5    jurisdiction over applications for asylum statutory

6    withholding under Section 241(b)(3) of the INA and

7    protection under the convention against torture for

8    noncitizens who were encountered at the border in the

9    ports of entry by U.S. Customs and Border Protection.

10         The IFR changed that to allow asylum officers who

11   had actually conducted the credible fear interviews

12   which is provided for in the statute Section 235(b)(1)

13   of the INA, to conduct the asylum to actually perform a

14   non-adversarial interview with which they would assess

15   whether the noncitizen encountered by CBP at the border

16   is eligible for asylum.  If they're not eligible for

17   asylum then to make a determination as to whether they

18   would be eligible for statutory withholding under

19   Section 241(b)(3) of the INA and for statutory

20   withholding under the convention against torture.  They

21   would do that on an expedited basis.  And that would

22   then be passed over to the court.  The court would have

23   limited ability to make determinations with respect to

24   the applications for withholding and reconsider the

25   asylum application.

Andrew Arthur , 30(b)(6)                                November 30, 2023

Page 19

1            And by asylum application, I mean the application

2       under Section 208 of the Immigration and Nationality

3       Act.  It also changed the rules -- or it changed the

4       regulation with respect to parole for aliens who were

5       pending a credible fear interview and for aliens who had

6       received a positive fear credibility determination.

7            In addition, it also changed the regulations with

8       respect to the ability of USC IS U.S. Citizenship and

9       Immigration Services to reconsider a negative credible

10      fear determination made by an asylum officer for which

11      the noncitizen request review by an immigration judge

12      that also received a negative creditability

13      determination, again, after the negative credibility

14      determination had been made.

15      Q.  So if I refer to the IFR throughout this

16      deposition you will understand that I'm referring to

17      that Interim Final Rule or the Asylum Officer Rule that

18      we just talked about?

19      A.  That is correct, Counsel.

20           Can you give me the date of that Interim Final

21      Rule.

22      Q.  March 29th, 2022.

23      A.  That's correct, March 29, 2022.

24      Q.  I'm going to drop that 30(b)(6) notice into the

25      chat, I think that'll probably be an easier way for you

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 20

```
 1    to review it so that you don't have to wait for me to

 2    scroll.

 3           So this is the 30(b)(6) deposition notice we just

 4    looked at, and I'd like to mark this as Exhibit A.

 5               (Exhibit A is marked for identification.)

 6    A.   I don't see a chat on my -- I see more.  Oh,

 7    chat, right there.

 8           I don't have any documents in the chat.

 9               MS. RYAN:  St. John, did it show up for you?

10               MR. ST. JOHN:  It did not.

11               MS. RYAN:  Lovely.  It said it showed up.

12    One more time, and if not, we'll go back to the -- still

13    there.

14    A.   Still not seeing it, Counsel.

15    BY MS. RYAN:

16    Q.   Okay.  I thought that would be easier, but if

17    that's not going through for you then...

18           All right.  So we'll go back.  Please let me know

19    if you can you see this, I'm sharing it back on my

20    screen for you.

21    A.   Yes, I can, Counsel.

22    Q.   Okay.  So I'll go back up to the top here and

23    we'll scroll down.  And I'd like you to please take a

24    look at the topics.

25    A.   You're going to need to go a little -- you're
```

Andrew Arthur , 30(b)(6)                              November 30, 2023

                                                              Page 21

1     going to need to go a little bit slower, Counsel.

2        Q.   Yeah, I'm going up to the top and we'll start up

3     here.

4        A.   Very good.

5        Q.   Okay.  So as we go through these, please take a

6     look at the topics, and let me know if you believe

7     you're knowledgeable to speak on all of these topics.

8     And if not, the ones that you lack information on.

9        A.   You can keep going, Counsel.

10           I'm sorry, you're skipping over things.  Let me

11    see if I can go full screen on this.

12       Q.   Sure.

13       A.   You can keep going, Counsel.

14       Q.   Okay.

15       A.   Keep going.  You can keep going, Counsel.

16       Q.   So we just looked at the first 11 topics that are

17    specific to the State of Louisiana.  Do you believe

18    you're knowledgeable to speak on all 11 of those topics?

19       A.   I am, Counsel.

20       Q.   Okay.  We'll go to the specific agency topics.

21           These first 10 topics are specific to SNAP and

22    TANF.  Do you believe you're knowledgeable to testify

23    about all of those topics?

24       A.   Yes, Counsel.

25       Q.   I'm stopping at topic 19.  Those are the topics

1     for the Minimum Foundation Program.

2           Do you believe you're knowledgeable to testify

3     about those topics?

4     A.  Yes, Counsel.

5     Q.  Okay.  And the remaining topics are for the

6     Medicaid program.  Are you knowledgeable to testify on

7     all of those topics?

8     A.  I am, Counsel.

9     Q.  Okay.  Let me stop sharing.

10          So for those topics that you are knowledgeable,

11    did you have the knowledge already prior to preparing

12    for the deposition or did you obtain the information and

13    knowledge specifically for the purposes of this

14    deposition?

15    A.  Some of the knowledge that I had in response to

16    those questions was information that I obtained prior to

17    this deposition.  Some of it was gained through

18    conversations that I have had with state agencies in the

19    State of Louisiana that administered those programs,

20    specifically the Louisiana Department of Health, the

21    Louisiana Department of Children and Family Services,

22    and with the Louisiana Department of Education.

23    Q.  Are you currently employed by the State of

24    Louisiana?

25    A.  I am currently retained as an expert by the State

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 23

1    of Louisiana.

2        Q.  But you are not employed by the State of

3    Louisiana?

4        A.  Except to the degree that I am retained as an

5    expert witness for purposes of this litigation, I am not

6    a employee of the State of Louisiana.

7        Q.  And I believe you mentioned it before, but where

8    are you currently employed?

9        A.  I am employed by the Center for Immigration

10   Studies, which is a nonpartisan nonprofit think tank in

11   Washington, D.C.

12       Q.  And what's your job title there?

13       A.  I am the resident Fellow in Law and Policy.

14       Q.  And you mentioned it, but you're also testifying

15   as an expert witness in this case, correct?

16       A.  That is correct, Counsel.

17       Q.  But your testimony today will be in your capacity

18   as a 30(b)(6) representative and not in your expert

19   opinion?

20       A.  Based on the expertise that I gained in order to

21   prepare for this deposition it is in that position, yes.

22   And I also find it very helpful for the other work that

23   I do with my day job.

24       Q.  Just making sure we have two different hats,

25   right?  Today's 30(b)(6) on behalf of the State of

Andrew Arthur, 30(b)(6)                          November 30, 2023

Page 24

```
 1      Louisiana, your next deposition will be as an expert

 2      retained for your expert opinion?

 3          A.  Correct.

 4          Q.  Okay.  So let's get started with the specific

 5      agencies.

 6              So in this lawsuit Louisiana is alleging that

 7      they suffered injury to their Minimum Foundation

 8      Program, as a result of noncitizen students released

 9      under the IFR coming to Louisiana, correct?

10          A.  That is correct.

11              MR. ST. JOHN:  Objection.

12              I said objection calls for a legal

13      conclusion.  The allegations are in the complaint, it

14      speaks for itself.

15      BY MS. RYAN:

16          Q.  Can you repeat your answer, Mr. Arthur?

17          A.  I defer to counsel for the State of Louisiana.

18              MR. ST. JOHN:  Mr. Arthur, you can answer

19      the question.

20          A.  That is correct.

21      BY MS. RYAN:

22          Q.  So throughout this deposition Mr. St John may

23      make objections for the record, but unless he directs

24      you not to answer you can answer the question.

25          A.  Very good, Counsel.  Thank you.
```

1      Q.  What are those injuries that Louisiana claims its

2   Minimum Foundation Program suffers as a result of the

3   IFR?

4      A.  So the State of Louisiana under the Louisiana

5   constitution is required to provide for public education

6   for the people of Louisiana.  As the number of

7   individuals who come into the State of Louisiana who are

8   students increases, the cost of the State of Louisiana

9   are going to increase.  Louisiana does its school

10   funding on an annual basis.

11        The Board of Elementary and Secondary Education

12   prepares what it anticipates is going to be the amount

13   of money that's going to be required to provide public

14   education to the people of Louisiana in the next year.

15   They actually do it in October, and then they reassess

16   it in February.  It is anticipated that the number of

17   students who are enrolled will increase at more or less

18   historic levels.  If there is an increase in the number

19   of students in the State of Louisiana who are going to

20   be either beginning during the school year or beginning

21   at the beginning of the next school year, that's going

22   to reversely affect the State of Louisiana.

23        Louisiana also uses the Minimum Foundation

24   Program in which it's been static for the last few

25   years.  The amount of money that its apportioned per

Case 6:22-cv-01130-DCJ-CBW   Document 217-50   Filed 01/29/24   Page 27 of 177 PageID #:
10559
Andrew Arthur, 30(b)(6)                                    November 30, 2023

Page 26

1      student is $4,015.

2            However, there are increases that are made per

3      student based upon the specific situation of the

4      student.  Economically disadvantaged students in the

5      State of Louisiana count as .22 or 22 percent higher, so

6      they're basically 1.22 students included under the

7      economically disadvantaged or what are called English

8      language learners under the MFP.

9            And you do understand what I mean when I say MFP,

10     correct?

11        Q.  Yes.

12        A.  Okay.  Thank you, Counsel.

13           And those who are unaccounted for -- if students

14     move in who are English language learners, that would

15     increase not just by one student but by 1.22 students.

16     And there are certain parishes in Louisiana in which

17     they have a large number of English language learner

18     students, specifically Jefferson Parish has had to

19     create what are called newcomer schools, which is they

20     explain is for recent immigrants for whom English is not

21     the first language and who may not have had the benefits

22     of formal education.

23           The more individuals who enter under that, not

24     only will it increase unexpectedly the amount of money

25     that has to be apportioned, but it will actually

Andrew Arthur , 30(b)(6)                                    November 30, 2023

1        increase it by more than just one student.

2              There are 17 newcomer schools in Jefferson Parish

3        or at least there were as of the 2019-2020 year.

4              I say there were because at the time that

5        Jefferson Parish issued a press release about those

6        newcomer schools they stated that 14 percent of the

7        students in Jefferson Parish were English language

8        learners.  The most recent documents which I believe are

9        for the 2022 -- 2021-2022 school year indicates that

10       more than 19 percent of the students in Jefferson Parish

11       are English language learners.  And this is the affect

12       that that has.

13             If in the middle -- like I said before, do an

14       accounting in February for the next school year and then

15       they reconsider it in October for the current school

16       year.

17             If there is a shortfall of the funding that is

18       provided again it's Constitution -- it's core function

19       of the State of Louisiana to provide public education to

20       the people of Louisiana.

21             The Board of Elementary and Secondary Education

22       then has to go to the Legislature to ask for more money,

23       and the Legislature considers that as a bill.  If they

24       refuse to fund that then it comes back to the board

25       of -- BESE is what's called, Board of Elementary and

1    Secondary Education, for them to reconsider based upon

2    any objections that the Legislature may have.

3         If the Board of Elementary and Secondary

4    Education concurs with its assessment then it concludes

5    that it was correct, the Legislature of the State of

6    Louisiana is forced to fund that additional money.

7    Q.  So we will talk about some of the budgeting

8    processes, but that was a lot of information so I just

9    want to synthesize that quickly.

10        So the injuries that Louisiana is claiming is

11   more students means less money to go around per student,

12   and more English language students increases the need

13   for more funding, is that accurate to say?

14   A.  It's actually the opposite of the last thing that

15   you said.  English language learner students impose a

16   higher cost.  But again, during that budgetary cycle

17   it's possible that the Legislature of Louisiana would

18   refuse to fund it, there would be a budgetary shortfall

19   until that second BESE process takes place.

20        Let me just explain to you that the BESE is not

21   actually part of the Attorney General's Office, they

22   don't have a unitary executive in the State of

23   Louisiana.  The BESE is actually a panel of 11

24   individuals, 8 of whom are elected, 3 of whom are

25   appointed by the Governor, and the Governor does not

Andrew Arthur , 30(b)(6)                          November 30, 2023

Page 29

1    supervisor the Department of Justice in Louisiana.

2        Q.  Any other injuries that Louisiana is claiming

3    it's Minimum Foundation Program suffers as a result of

4    the IFR?

5        A.  It's possible that there could be increased class

6    sizes.  Needless to say, there's going to be lag time in

7    the hiring of new teachers, particularly teachers who

8    are qualified to be English language learner teachers,

9    and so that would increase the class sizes in the State

10   of Louisiana until that process can work itself out.

11       Q.  So what is the Minimum Foundation Program?

12       A.  The Minimum Foundation Program is the process by

13   which the Louisiana Department of Education, the BESE,

14   determined how much funding will go to schools in each

15   individual parish.  As I mentioned before, they

16   generally come up with a amount of money that will be

17   paid per student, per student.  In Louisiana it's

18   $4,015.  Currently it has been $4,015 in prior years.

19            After that an assessment is made based upon

20   statements that are made by the various schools about

21   the number of differently advantaged individuals who

22   will be in that school.

23            So again, economically disadvantaged children who

24   are there will increase the amount of money that the

25   school asked for.  English language learners will

Page 30

1    increase the amount of money that is asked for.

2         Gifted and talented programs will increase the

3    amount of money that the schools will ask for.

4         And so all of that is compiled and a budgetary

5    figure is reached that is then sent to the Legislature

6    for them to apportion the money.

7         And this, as I mentioned before, this is a core

8    function of the Louisiana Governor, it's included in the

9    Louisiana Constitution that they provide that funding.

10        And so again, it goes through that Level 1

11   assessment under the Minimum Foundation plan with

12   respect to those children in different circumstances.

13   There are also additional funding that's provided to

14   school districts that have less than 7500 students, and

15   then an assessment is made of where the next closest

16   school is that those additional children can go to with

17   respect to the funding for that school district.

18        There are three other levels, there's a Level 2,

19   Level 3, Level 4 that go into things like hiring new

20   teachers, hiring bilingual teachers, paying for

21   pensions, and things like that.

22   Q.  And we're going to go through all of that.

23        So the Minimum Foundation Program is administered

24   by the Department of Education?

25   A.  That is correct.  And also overseen by the Board

Andrew Arthur , 30(b)(6)                                  November 30, 2023

Page 31

1    of Elementary and Secondary Education, which as I

2    mentioned before is consists of 11 members, some of them

3    are elected, some of them are appointed.

4       Q.  Let me show you a document I'm going to mark this

5    as Exhibit B.

6              (Exhibit B was marked for identification.)

7    BY MS. RYAN:

8       Q.  For the record, this is Bates stamped 3235

9    through 3340.  Do you see this on your screen,

10   Mr. Arthur?

11      A.  I do.

12      Q.  Okay.

13      A.  I could see the top of it.

14      Q.  Yes.  Okay.  Have you ever seen this document

15   before?

16      A.  I am not sure that I've seen it.  If you keep

17   scrolling down I will tell you.

18      Q.  Sure.  So there's 106 pages so I won't scroll the

19   whole thing, but let me know if this looks familiar to

20   you or not.

21      A.  Can you go back up real quick?  I apologize.

22      Q.  Sure.  To the top?

23      A.  No, not all the way to the top, I'll tell you

24   when to stop.

25              I believe that I had seen that document before.

Andrew Arthur , 30(b)(6)                          November 30, 2023

1        Q.   Okay.   So this is a Department of Education

2    document --

3        A.   I seen that in a different context.   I may have

4    seen that as the bill itself.

5        Q.   Okay.   So down here at the bottom it says this is

6    the proposed budget supporting document for fiscal year

7    2020 through 2021 for the Department of Education.

8    Looking at the top here it mentions that there are six

9    budget units within the Department of Education.   What

10   is a budget unit?

11       A.   Budget units are the way that -- they are the

12   individual activities for the Department of Education.

13       Q.   Okay.

14       A.   And the Minimum Foundation Program is one of

15   them.

16       Q.   That was going to be my next question.

17            So taking a looking at Bates No. 3301.

18            This is specific for the Minimum Foundation

19   Program, and it lays out three goals for the program:

20   Sufficient contribution of local dollars.   The

21   requirement of that 70 percent of each district's

22   general fund to be directed to institutional activities.

23   And the equitable distribution of state dollars,

24   correct?

25       A.   That is what the document says, yes, Counsel.

Andrew Arthur, 30(b)(6)                                November 30, 2023

Page 33

1          Q.   Okay.  So what is the sufficient contribution of

2     local dollars?

3          A.   So what they do, or what they do in Louisiana is

4     there is an assessment of how much each of the school

5     districts can pay, and that is based on local sales tax,

6     local property tax, and other revenues that the state

7     generates.  In some of the school districts in Louisiana

8     they're struggling simply to provide basic services to

9     the people of Louisiana and they don't have the ability

10    to get that money, so the whole idea behind the Minimum

11    Foundation Program is that the State and the parishes or

12    the school districts working together then will

13    apportion the appropriate amount based upon the amount

14    that the school district itself collects in revenue.

15         So if it's a poor school district, the state's

16    going to pay more.  If it's a school district that has

17    higher -- that can make more sales tax revenue that can

18    collect more on property taxes and that has higher other

19    revenues that's balanced against the amount of money

20    that they receive from the State of Louisiana, from the

21    Louisiana Legislature.

22         Q.   So it differs by school district?

23         A.   It does.

24         Q.   This also mentions a general fund.  What is that

25    referring to?

Page 34

1        A.  With respect to the general fund I'm going to

2    conclude that in this particular situation that is the

3    what I've referenced before, which is the local sales

4    taxes, the local property taxes, and the other local

5    revenues that they have.

6        Q.  Okay.  And how does the Minimum Foundation

7    Program ensure that 70 percent of the funds are used as

8    they direct?

9        A.  Because they assess the amount of money that the

10   school district has available to it through the sales

11   taxes, local sales taxes, the local property taxes, and

12   the other locality revenue that is available at the

13   school district.

14       Q.  And by instructional activities is that referring

15   to the direct education of students or something else?

16       A.  So instructional activities can include

17   education, vocational training, and other activities in

18   the State of Louisiana.

19       Q.  Are the local funds the only source of funding

20   that the schools receive for that purpose or do they

21   also receive money from the state Legislature for

22   instructional activities?

23              MR. ST. JOHN:  Objection.  Beyond the scope.

24              You can answer.

25       A.  I know that they receive money from the state

Page 35

1      Legislature with respect to the balancing under the

2      Minimum Foundation Program.

3      BY MS. RYAN:

4          Q.   And then if we keep scrolling down we see budget

5      summaries for fiscal year 2018, 2019, which is listed as

6      prior year actuals.  Enacted fiscal year 2019 to 2020,

7      budget -- existing open budget as of 12/1/19, a

8      continuation for fiscal year 2020 to 2021, and a

9      recommended for that same fiscal year with a total

10     recommended over or under.

11         Do you see those categories?

12         A.   I do, Counsel.

13         Q.   When a document refers to prior year actual

14     versus enacted, what is the difference between those two

15     columns?

16              MR. ST. JOHN:  Objection.  Beyond the scope.

17              Go ahead, Mr. Arthur.

18         A.   This particular instance I'm not entirely sure.

19     I'm not that familiar with budgeting having been a

20     congressional staffer for a number of years, so I'm

21     going to guess that the difference is unspent moneys

22     that are returned to the general fund.

23         But again, that's just -- that is nothing that's

24     within my expertise.

25     BY MS. RYAN:

Andrew Arthur , 30(b)(6)                                November 30, 2023

                                                              Page 36

1        Q.  And if you don't know that's fine you can say

2    that.

3        A.  Okay.

4        Q.  What does existing open budget mean?

5                MR. ST. JOHN:  Objection.  Beyond the scope.

6        A.  I'm unaware of that.  I could make a guess but I

7    don't want to give you a guess.

8    BY MS. RYAN:

9        Q.  I apologize.  It says O-P-E-R, I guess my

10   eyesight is going, I thought it says open, it refers to

11   operating, just for the record.

12       And do you know what continuation means versus

13   recommended?

14                MR. ST. JOHN:  Objection.  Beyond the scope.

15                The document speaks for itself.

16       A.  I could make a guess with respect to that,

17   Counsel, but it's outside of my expertise.

18   BY MS. RYAN:

19       Q.  If we look down at the rows we see there's a

20   general state -- excuse me.  State general fund, what is

21   that referring to?

22       A.  That is the amount of money that goes into the

23   state education, to the school districts.

24       Q.  And then we see a number of subcategories which

25   are all zero except for statutory dedications, do you

Page 37

1    know what that is?

2        A.  That is --

3                MR. ST. JOHN:  Objection.  Beyond the scope.

4    The document speaks for itself.

5                You can answer.

6        A.  That is, to the best of my knowledge, the amount

7    of money that is paid by the State of Louisiana,

8    although that -- those figures actually look a little

9    low unless it's in thousands of dollars.

10   BY MS. RYAN:

11       Q.  And so then down here we see a total --

12       A.  Go ahead.

13       Q.  Nope, go ahead, please finish your answer.

14       A.  No, that's fine.  Please proceed.

15       Q.  So we see the state general fund direct, and the

16   statutory dedications, which are added together for

17   total means of financing, correct?

18       A.  Correct, Counsel.

19       Q.  Okay.  So this budget summary is showing for

20   fiscal year 2018 to 2019, and then fiscal year 2019 to

21   2020, the amount actually went up, correct?

22       A.  It did.

23       Q.  When does the fiscal year start for Louisiana

24   Department of Education?

25               MR. ST. JOHN:  Objection.  Beyond the scope.

Page 38

```
 1        A.  I don't know.

 2              MR. ST. JOHN:  Calls for legal conclusion.

 3        A.  I -- i can tell you when the budgetary

 4    assessments are made.

 5    BY MS. RYAN:

 6        Q.  When we're referring to recommendations, who is

 7    making that recommendation?

 8        A.  This would be the Department of Education.

 9        Q.  Recommending to the state Legislature how much

10    money should be budgeted for the upcoming year?

11        A.  Correct.

12        Q.  If we then keep scrolling down we see the same

13    numbers and the same total expenditures and requests,

14    but then we see a section for authorized full-time

15    equivalents, what does that mean?

16              MR. ST. JOHN:  Objection.  Beyond the scope.

17    Document speaks for itself.

18        A.  I'm unclear what that means in this context,

19    Counsel.

20    BY MS. RYAN:

21        Q.  Do you know what classified versus unclassified

22    that we see here means?

23              MR. ST. JOHN:  Objection.  Beyond the scope.

24    Question of law.

25        A.  I do not.
```

Page 39

1    BY MS. RYAN:

2       Q.  Okay.  All right.  I'm going to show you another

3    document which we will mark as Exhibit C.  So this a

4    Titled MFP presentation 2021 to 2022.  There are no

5    Bates numbers on this document.

6               (Exhibit C was marked for identification.)

7    BY MS. RYAN:

8       Q.  Have you seen this document before?

9       A.  You're going to have to go down.  I apologize,

10   Counsel.

11      Q.  Looks like a PowerPoint.  Let me know if this

12   looks familiar.

13      A.  It does look familiar, Counsel.

14      Q.  Okay.  What is this document?

15      A.  That is a document that lays out, I believe it is

16   a PowerPoint, it looks like a slide deck.  I've seen a

17   hardcopy of this document, it lays out the four levels

18   of the Minimum Foundation Program formula.

19      Q.  Who created this presentation?

20      A.  The Louisiana Department of Education.

21      Q.  For what purpose?

22               MR. ST. JOHN:  Objection.  Beyond the scope.

23      A.  I have no idea why that was created, Counsel.

24   BY MS. RYAN:

25      Q.  When was this document created?

Page 40

1            MR. ST. JOHN:  Objection.  Beyond the scope.

2       A.  It's not dated.

3    BY MS. RYAN:

4       Q.  So as you said, this document discusses the

5    formula used to determine funding for the Minimum

6    Foundation Program, correct?

7       A.  Yes.  That's what I understand, Counsel, yes.

8       Q.  Okay.  Now you mentioned this before, the Board

9    of Elementary and Secondary Education.  Is that part of

10   the Department of Education?

11      A.  That is the --

12           MR. ST. JOHN:  Objection.  Question of law.

13   BY MS. RYAN:

14      Q.  Go ahead, Mr. Arthur.

15      A.  The Board of Elementary and Secondary Education

16   is a board that is, again, three members are appointed

17   by the Governor, three board -- three members are voted

18   by the people of Louisiana to the board.

19      Q.  Is it a board that oversees the Department of

20   Education or is it within the Department of Education?

21           I'm just trying to get a sense of the structure

22   of where it falls in relation to the Minimum Foundation

23   Program.

24           MR. ST. JOHN:  Objection.  Question of law.

25      A.  Yeah, with respect to that I know that it works

Case 6:22-cv-01130-DCJ-CBW  Document 217-50  Filed 01/29/24  Page 42 of 177 PageID #: 10574
Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 41

1      in conjunction with the Department of Education.  I

2      don't know whether it is under the aegis of the

3      Department of Education, but I would conclude that it

4      is.

5      BY MS. RYAN:

6          Q.  Looking here on page 3, this is giving the cycle

7      and timing of the budgetary formula.  It mentions a task

8      force, do you know what that's referring to?

9          A.  That is the task force that reviews the ongoing

10     activities of the number of students who are actually

11     enrolled in the school during the year.  As I mentioned

12     before, assessment is made in October, assessment is

13     made in February.

14         Q.  And then the BESE submits its proposal to the

15     Legislature who makes the ultimate decision of how much

16     to fund for the upcoming school year, is that right?

17             MR. ST. JOHN:  Objection.  Question of law.

18     Asked and answered.

19             You can answer, Mr. Arthur.

20         A.  The document itself says in March that the BESE

21     makes final decision on formula components and submits

22     proposed formula and estimated cost to the Legislature

23     in March.

24     BY MS. RYAN:

25         Q.  But the Legislature makes the final decision

Page 42

1     about the budget amounts?

2         A.  It does, except as I mentioned before, if there

3     is a shortfall the BESE then goes back to the

4     Legislature, it is considered as a bill in the

5     Legislature, and if the bill -- if the amount that the

6     BESE asked for is not provided as supplemental funding

7     it goes back to BESE, and then the BESE can send it back

8     to the Legislature and the Legislature is forced to

9     accept it.

10        Q.  Now, this formula that we're talking about this

11    is only for the Minimum Foundation Program, correct?

12        A.  With respect to the formula, yes, Counsel.

13        Q.  Okay.  So looking at page 5 we'll briefly look at

14    the different levels of the formula.  So this is talking

15    about Level 1, which determines the cost of education of

16    each city and parish, and then determines the State's

17    share for education funding, is that correct?

18        A.  That's correct.

19        Q.  And this is a projected cost of education?

20        A.  Yeah, yeah, based upon the ability of the school

21    district to pay.

22        Q.  Okay.  And we've talked about local funding,

23    we've talked about the State's share, are there other

24    sources of funding beyond that?

25                MR. ST. JOHN:  Objection.  It's beyond the

Andrew Arthur , 30(b)(6)                          November 30, 2023

                                                          Page 43

1    scope.

2         A.   So again, they consider the local sales taxes,

3    the local property taxes, and the local revenues that

4    are available to the school district.   There may be more

5    than that.

6    BY MS. RYAN:

7         Q.   So Level 1 they look at the base count and the

8    weighted count which I know you discussed earlier?

9         A.   Correct.

10        Q.   Most students are a 1 unless they have some sort

11   of category that gives them more weight than a single

12   student, is that correct?

13        A.   The base unit that they use is one, and then

14   there is an apportionment based upon the factors that I

15   discussed before.

16        Q.   Okay.   And you see here on page 7 some examples

17   of weighted counts that would be used for those

18   students.

19             And on page 8 and 9 we see specific examples, the

20   first one being the economically disadvantaged weight

21   which you had mentioned earlier.

22             There's no weighted category for immigrant

23   students, is that correct?

24                  MR. ST. JOHN:   Objection.   Question of law.

25                  You can answer.

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 44

 1        A.   Under Plyler vs. Doe, all school aged students

 2     below the college level have to be provided an

 3     education.   The Department of Education and the

 4     Department of Justice Civil Rights Division they've

 5     actually sent letters to the states informing them that

 6     they don't have the ability to inquire into the

 7     immigration status of individuals or parents of

 8     individuals who are registering for school in the

 9     states.   And that includes asking for a social security

10     number if one is not provided.

11        Q.   So that's a no to my question?

12        A.   I'm sorry, Counsel?

13        Q.   My question was a simple factual question, is

14     there a weighted category for immigrant students?

15        A.   There is no way for the State of Louisiana to ask

16     about the immigration status of school students, so for

17     that reason there is not a weighted average.   There is

18     the English language learner percentage.

19        Q.   Where do you see that?   Because I see five

20     categories:   Economically disadvantaged.   Career and

21     technical education weight.   Students with disability.

22     Gifted and talented.   And economy of scale weight.

23        There is no category for English as a second

24     language, is there?

25                  MR. ST. JOHN:   Objection.   This is a

1    question of law, but Mr. Arthur can testify.

2        A.  English language learners are included under the

3    economically disadvantaged weight.  Economically

4    disadvantaged also includes children from families that

5    receive certain means-tested public benefits which

6    includes Medicare, TANF, and SNAP.

7    BY MS. RYAN:

8        Q.  How is economically disadvantaged determined?

9            MR. ST. JOHN:  Objection.  Calls for a --

10   calls for testimony about a question of law.

11           Mr. Arthur, you can answer.

12       A.  As I mentioned before, Counsel, and I apologize,

13   if it didn't come through.

14       The economically disadvantaged is determined

15   upon -- is based upon certain factors, the receipt of

16   certain public benefits including Medicaid, TANF, and

17   SNAP, and English language learners are included under

18   that category.

19   BY MS. RYAN:

20       Q.  Is that an automatic category that if a student

21   needs English learning -- excuse me, English as a second

22   language learning they're automatically lumped in with

23   the economically disadvantaged students?

24           MR. ST. JOHN:  Objection.  Calls for

25   testimony about a question of law.

Page 46

1          You can answer, Mr. Arthur.

2     A.   As I understand it, English language learners,

3   from what I've been told by representatives of the State

4   of Louisiana, the English language learners are included

5   in the economically disadvantaged category.

6   BY MS. RYAN:

7     Q.   All right.  So going back to the formula.  Once

8   the total count of students base and weighted are

9   determined that is then multiplied by the amount per

10  student which you mentioned previously, and that number

11  is the first level of this formula, correct?

12    A.   That is correct, Counsel.

13    Q.   Okay.  The formula then looks at the local tax

14  revenue, specifically the property tax and the sales

15  tax, and that is factored at Level 1, correct?

16    A.   That is correct, Counsel.

17    Q.   So if someone buys property in or shops in a

18  certain town or parish they're contributing to school

19  funding?

20    A.   Yes, they are, Counsel.

21    Q.   Okay.  And if a city or a parish generates more

22  tax revenue because people are spending more money in

23  the stores or on property, then the less the State's

24  portion will be for that parish, correct?

25    A.   Based upon the next assessment, yes, Counsel.

Andrew Arthur, 30(b)(6)                          November 30, 2023

Page 47

1      Q.  Okay.  Looking at page 15 which we're going to

2   start talking about Level 2, this is talking about

3   incentives for local school systems, and it mentions

4   that some school systems are no longer eligible to

5   receive this due to recent extraordinary growth in their

6   local revenues.  What is that referring to?

7      A.  It's self-explanatory, Counsel, but I can explain

8   it, if you'd like.

9          If a locality has seen an increase in, again,

10  sales tax revenue, property tax revenue, or other

11  revenues that they receive, then it's going to -- the

12  local school district's share is going to increase in

13  the next budgetary cycle, the state's contribution will

14  decrease.

15     Q.  What parishes are no longer eligible to receive

16  this award because of their recent extraordinary growth?

17          MR. ST. JOHN:  Objection.  Beyond the scope

18  and this is starting to steer close to what Judge Joseph

19  warned about.

20     A.  I'm not aware, Counsel.

21  BY MS. RYAN:

22     Q.  All right.  So then Level 3 is allocations

23  requested by the Legislature for pay raises and benefits

24  for staff, is that correct?

25     A.  That is what it says, yes, Counsel.

Page 48

1      Q.   Okay.  And then Level 4, it's funding for six

2    specific programs which are discussed here on this slide

3    page 17, and then page 18.  And there are Level 4

4    allocations for other types of schools such as charter

5    schools, juvenile justice schools, and creative arts

6    schools, correct?

7      A.   That is correct.  I believe that vocational

8    schools also receive above for that.  I think that's

9    within the creative arts.

10     Q.   Okay.  I'm showing you another document we're

11   going to mark as Exhibit D.  This is titled MFP

12   Resolution BESE Adopted Submitted 3/15/23.

13             (Exhibit D was marked for identification.)

14   BY MS. RYAN:

15     Q.   Do you see that document on your screen?

16     A.   I do, Counsel.

17     Q.   Have you ever seen this document before?

18     A.   I believe I have, but you're going to need to

19   scroll down.

20     Q.   Sure.

21     A.   Yes, I have.

22     Q.   Okay.  For the record, there are no Bates numbers

23   on this document.

24             Do you know who created this document?

25                  MR. ST. JOHN:  Objection.  Beyond the scope.

 1        A.  I do not, Counsel.

 2     BY MS. RYAN:

 3        Q.  But you would agree there's no header or date

 4     indicating when it was created, correct?

 5        A.  It is the Minimum Foundation Program formula for

 6     FY2023 to FY2024.  Based upon the expertise that I've

 7     gained into the State of Louisiana I'm going to guess.

 8     I will posit that that was created for the fiscal year

 9     2023-2024 school cycle.

10        Q.  Okay.  So just looking at this first paragraph

11     here, this document goes on, we see the levels that we

12     just talked about, but this paragraph defines the

13     schools that are included within the Minimum Foundation

14     Program here, correct?

15             MR. ST. JOHN:  Objection.  The document

16     speaks for itself.

17        A.  That is what the document says, Counsel.

18     BY MS. RYAN:

19        Q.  And this includes state universities as well, so

20     the Minimum Foundation Program covers any type of

21     student in Louisiana, K through 12 or college level, is

22     that accurate?

23             MR. ST. JOHN:  Objection.  Beyond the scope.

24     Calls for testimony about a question of law.

25     BY MS. RYAN:

Andrew Arthur , 30(b)(6)                        November 30, 2023

Page 50

1        Q.  Go ahead, Mr. Arthur.

2        A.  That appears to be what the document says, yes,

3    Counsel.

4        Q.  And if we scroll down here to the third page, and

5    here we see what you were mentioning, the low income and

6    English language learner weight grouped together.

7            English language learner, that means any student

8    with a native language other than English, correct?

9        A.  That is correct.

10           MR. ST. JOHN:  Objection.  Calls for

11   testimony about a question of law.

12   BY MS. RYAN:

13       Q.  Mr. Arthur, can you repeat your answer?

14       A.  As I understand the way that the state defines

15   English language learner, it is either students proving

16   English is not the primary language or students with no

17   proficiency in the English language.

18       Q.  Let me stop sharing.

19           So when we're looking at the formula for the

20   Minimum Foundation Program more students enrolled means

21   the state has to provide more money for education, but

22   less students they would have less money, is that an

23   accurate way to sum it up?

24       A.  Except for the fact that school systems under the

25   Minimum Foundation Program that have fewer than 7500

1    students actually are apportioned differently.

2        Q.  How many noncitizens released under the IFR are

3    enrolled in schools covered by the Minimum Foundation

4    Program?

5        A.  As I mentioned before, Counsel, under the Supreme

6    Court's 1982 decision in Plyler vs. Doe, the State of

7    Louisiana is required to provide that primary and

8    secondary education for all students seeking public

9    education in the State of Louisiana.

10           The Department of Justice Civil Rights Division

11   and the Department of Education have both under the

12   Obama administration, as I understand, or under the

13   Biden administration, they advised school districts that

14   they can't inquire into the immigration status of the

15   students or the parents of those students who are in

16   that school district.

17           Moreover, under 8CFR Section 208.6 information

18   relating -- which is a federal regulation.

19           The information relating to asylum applications

20   and with respect to credible fear claims cannot be

21   disclosed except under limited circumstances, this

22   wouldn't be one of those limited circumstances that it

23   would be allowed.  This is information that would

24   logically be within the possession of the Department of

25   Homeland Security and the Department of Justice.  It's

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 52

1      not information that would be within the possession of

2      the State of Louisiana.

3          Q.  You need a break or --

4          A.  I'm good.

5              MS. RYAN:  Okay.  Scott, are you all set?

6      Do you need a break?

7              MR. ST. JOHN:  I'm okay.  Let's keep going.

8      BY MS. RYAN:

9          Q.  So just to be clear, just because a student does

10     not speak English does not automatically mean they're an

11     immigrant, correct?

12         A.  That is correct.

13         Q.  It doesn't mean --

14         A.  I will note that the State of -- the State

15     Department of Education has told me that it is a rough

16     proxy for the, for noncitizens in certain school

17     districts.  It's not a one for one, but it's pretty

18     close.  It's a true proxy that can be used.  But I'll

19     also note that in Jefferson Parish schools they do have

20     newcomer programs which are basically schools within

21     schools which are specifically for immigrants who are

22     not fluent in English and who may not have received the

23     benefits of a formal education, and there are 17

24     schools, 9 middle schools, 8 primary schools -- or 8

25     secondary schools.

Andrew Arthur, 30(b)(6)                                    November 30, 2023

Page 53

1       Q.   So the Louisiana Department of Education you said

2    uses English language students as a proxy for

3    immigration students?

4       A.   No, they don't.  And let me be clear about that.

5          They agree to the fact that it could be a rough

6    proxy for immigrant students, but I can tell you that in

7    Jefferson Parish schools they do actually have those

8    newcomer programs that are specifically tailored toward

9    immigrants.  As I mentioned before, the State of

10   Louisiana doesn't have the ability to inquire into the

11   immigration status of any of its students.

12      Q.   Isn't French an important language in Louisiana?

13             MR. ST. JOHN:  Objection.  Beyond the scope.

14   BY MS. RYAN:

15      Q.   Mr. Arthur?

16      A.   With respect to French proficiency I believe that

17   there is a small minority of individuals who speak a

18   dialect of French, which is commonly referred to as

19   Cajun, but it is a very limited majority of individuals

20   who speak that as their primary language.  In fact, I

21   don't even know if today there is anyone who speaks

22   Cajun as their sole language.

23          One of the things that I can tell you based upon

24   my experience as an immigration judge is that American

25   culture is pervasive and that English language fluency

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 54

1    is one of those things that most people who reside in

2    the United States, even for a short period of time, can

3    generally gain proficiency in.

4        Q.  You said it was a small percentage of students

5    but that French --

6        A.  I'm not saying a small percentage of students.

7    I'm saying that there a small population of students,

8    from what I understand.  This is nothing that I've been

9    told.  I've certainly never done any studies on the

10   prevalence of Cajun speakers in Louisiana.

11       And to the best of my knowledge, I know that I

12   never reviewed anything like that.  I don't know that

13   it's ever been captured, and I don't know if any

14   assessment has ever been made of the number of people in

15   Louisiana who'd speak French or some variation, Acadian

16   French as their sole language.

17       Q.  One second.

18       So just to --

19       A.  And let me just clarify again, Counsel.  With

20   respect to the Jefferson Parish schools, they do not

21   inquire, to the best of my knowledge, into the immigrant

22   status of the people who are in the newcomer program,

23   that is provided to the students and the parents, as

24   well as an accommodation that is made by Jefferson

25   Parish.

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 55

1     Q.  Okay.  So just to confirm.  English language

2     students are students with a native language other than

3     English, it could be any language?

4     A.  Who are not fluent in English as well.

5     Q.  Beyond general education funding that we

6     discussed, are there any other specific services

7     provided by the Minimum Foundation Program?

8     A.  The ones that we discussed before that they

9     provide for pensions for certain bilingual teachers is

10    another thing that is provided for under the Minimum

11    Foundation Program.  So yes, there are a number of

12    things that are provided for.

13    Q.  And that funding that ultimately comes out of the

14    Minimum Foundation Program that is distributed to the

15    schools covers all of their educational and operational

16    costs, correct?

17            MR. ST. JOHN:  Objection.  I think that

18    misstates his prior testimony, but okay.

19    A.  Yes, it is.  Although, I note that there are also

20    contributions that are made by individuals which are

21    reflected in the budgetary documents.  Again, this is

22    sort of much the same -- I don't want to say charitable

23    contributions, but individuals do make contributions to

24    the school districts.

25            MR. ST. JOHN:  Counsel, I think he may have

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 56

1     misunderstood the question, can I clarify?

2                    MS. RYAN:  Yeah.

3                    MR. ST. JOHN:  Mr. Arthur, I think she's

4     asking are -- is the Minimum Foundation Program the sole

5     source of funding for the local schools, are the local

6     schools also --

7                    Is this what you're trying to get at?

8                    MS. RYAN:  Yes.

9                    MR. ST. JOHN:  Are the local schools also --

10                   Are the local schools also -- is there local

11    funding for schools?

12                   You have MFP funds and local funds, is that

13    --

14       A.   Yes.   Right.   So the local school district is

15    obligated to provide based upon the assessment that is

16    made by the Department of Education for the funding of

17    the local schools.   All of the funding for the schools

18    does not come directly from the Legislature of the State

19    of Louisiana, the local school districts are supposed to

20    provide according to the revenues, tax, sales tax that

21    they have available too.

22    BY MS. RYAN:

23       Q.   Are there any services provided by the Minimum

24    Foundation Program or educational services by the local

25    schools that noncitizen or immigrant students would not

Andrew Arthur , 30(b)(6)                    November 30, 2023

Page 57

1     be eligible to receive?

2             MR. ST. JOHN:  Objection.  Beyond the scope.

3        A.  The State -- the State of Louisiana doesn't

4     inquire into the immigration status of the students.

5        Q.  One second let me open up the next document.

6             MS. RYAN:  Diane, I believe we're up to

7     Exhibit E, is that correct?

8             THE COURT REPORTER:  That is correct, yes.

9             (Exhibit E was marked for identification.)

10    BY MS. RYAN:

11       Q.  Okay.  Marking this as Exhibit E.  This a

12    spreadsheet entitled, FY2022 to 2023 Circular NO116 MFP

13    Budget Letter May of 2023.

14            Do you see this document on your screen?

15       A.  I do, Counsel.

16       Q.  Okay.  Have you ever seen this document before?

17       A.  I believe that I have seen that document before,

18    Counsel.

19       Q.  Do you know who created this document?

20            MR. ST. JOHN:  Objection.  Beyond the scope.

21       A.  I do not know.  I believe it was the Department

22    of Education.

23    BY MS. RYAN:

24       Q.  And do you know what the purpose of this document

25    is?

Page 58

```
 1              MR. ST. JOHN:  Objection.  Beyond the scope.

 2        A.   This appears to be the document that sets the

 3   state and local allocations with respect to the

 4   education under the MFP Levels 1, 2, and 3.

 5   BY MS. RYAN:

 6        Q.   And I promise I'm not going to make you go

 7   through all these numbers, I just want to make sure I'm

 8   clear on what some of the columns mean.

 9             So you see down at the bottom there are a number

10   of different tabs.  On this first tab we see a column as

11   you said discussing Levels 1, 2, and 3, correct?

12        A.   That's correct, Counsel.  And I can't -- just to

13   be clear, I can't see the entire document.  I can see

14   the top of the document and parts of the document over

15   to something that says, Minus state cost," and I can't

16   read the rest, sorry.

17        Q.   Yes, it's very long so I can -- we see minus

18   state cost allocations to other public schools, and we

19   see different schools underneath those as we scroll all

20   the way to the right, and it continues on.

21             So we have that first column discussing Levels 1,

22   2 and 3, and then it subtracts funding from local

23   schools, and then we see Level 4 funds here at the end

24   with a total column all the way over here to the right,

25   is that correct?
```

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 59

1          A.   That's correct, Counsel.

2          Q.   Okay.  If we look at this next tab, 2A-1 EFT

3     Annual.  Here we see a column discussing the total

4     allocation minus the state cost to other public schools,

5     plus or minus adjustments and adding total Level 4, is

6     that right?

7          A.   Correct, Counsel.

8          Q.   Okay.  So this number in this yellow column here

9     should be the final number from the formula, correct?

10         A.   There are four levels in the formula so that

11    should be the final level.

12         Q.   And then if you scroll to the right again we see

13    it's subtracting local revenue due to other public

14    schools.  And all the way here at the end in green we

15    see the total MFP payment minus local revenue due to

16    other public schools, is that correct?

17         A.   That's what it says, Counsel, yes.

18         Q.   Okay.  So this is the total payment that should

19    be paid out and we see for the state total for the year

20    2020 to 2023 it was 3.59 billion --

21         A.   That is correct.

22         Q.   -- is that right?

23         A.   Yes.

24         Q.   And this is annually for the entire year?

25         A.   That is correct, Counsel.

1      Q.  Okay.

2      A.  As I mentioned before it's about 40 percent of

3   the Louisiana state budget.

4      Q.  Has the cost of educational services for the

5   State of Louisiana changed since March of 2022?

6      A.  Could you ask -- I apologize, Counsel, can you

7   ask the question again?

8      Q.  Sure.  The total amount of educational services

9   for the State of Louisiana has that changed in any way

10  since March of 2022?

11     A.  In the new budgetary cycle the most recent budget

12  is actually higher.

13     Q.  And do you know why it is higher?

14          MR. ST. JOHN:  Objection.  Beyond the scope.

15     A.  I'm -- I would conclude that it's because more

16  students and more weighted students are entering the

17  school system.

18  BY MS. RYAN:

19     Q.  Can you articulate any harm to the Minimum

20  Foundation Program that is only attributable to the IFR?

21     A.  Because the State of Louisiana doesn't have the

22  ability to inquire into the citizenship status of the

23  students in the schools, that would be a very difficult

24  calculation to make.

25          However, the Department of Justice and the

 1    Department of Homeland Security would actually have the

 2    ability to make that assessment based upon the number of

 3    students that they know are in the school district.

 4         Q.   But as you said --

 5         A.   The number of school districts in Louisiana.

 6         Q.   But as you said, the State of Louisiana doesn't

 7    know immigration status so they can't articulate harm

 8    directly attributable to the IFR?

 9         A.   Right.  So with respect to the IFR there are a

10    couple of different things that would pose or that would

11    impose additional costs.  Because under the IFR asylum

12    can be granted more quickly and because the IFR allows

13    for the parole of individuals pending credible fear

14    reviews, the number of people who show up at the border

15    and be released would increase.

16              In addition, it is my conclusion that the IFR

17    itself would create a magnet that would bring additional

18    individuals, foreign nationals to enter the United

19    States and then become noncitizens in this country.

20    Foreign nationals, by the way, for the record, refers to

21    individuals who are not citizens or nationals of the

22    United States.

23         Q.   The testimony today is not your opinion, we're

24    speaking in the position of the 30(b)(b) for the State

25    of Louisiana.

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 62

1          So you said you think it will be an additional

2     cost because of the parole pending, credible fear

3     reviews, and fast asylum, but isn't it also true that

4     non-meritorious asylum claims will be removed better

5     because they're going through the process faster so that

6     would alleviate potential costs to the State of

7     Louisiana?

8        A.   Actually looking at the -- the rule as set forth

9     in Section 235(b)(1) of the INA is that individuals who

10    enter the United States who are inadmissible applicants

11    for admission as determined upon in Section 235 of the

12    INA are supposed to be detained, that would impose no

13    cost on the State of Louisiana at all.  Because the IFR

14    allows for the parole of those individuals it would

15    be -- it would actually increase the number of people.

16    That's one consequence.

17          Another consequence is because individuals would

18    be -- would have their applications for asylum

19    adjudicated, they would then be able to petition for

20    immediate relative to follow and join them in -- follow

21    to join them in the United States, and that includes

22    children, including minor children of those individuals.

23          With -- so with respect to that, I believe that

24    it would impose real asylum cost on the State of

25    Louisiana's Department of Education and under the

Page 63

1    projections made under the Minimum Foundation Program.

2         Q.   The IFR isn't the only program that allows parole

3    of noncitizens, is it?

4         A.   The IFR changes the status for parole of

5    noncitizens who are pending credible fear review.

6         Q.   Mr. Arthur, but my question was it's not the only

7    program that allows for parole, is it?

8         A.   No.  Congress actually permits parole under

9    Section 212(d)(5)(a) of the INA for significant public

10   benefit or urgent humanitarian reasons, but

11   traditionally that has been interpreted with respect to

12   urgent humanitarian reasons to being medical treatment

13   with respect to significant public benefit for

14   individuals to appear as witnesses or as defendants in

15   criminal proceedings.

16            MS. RYAN:  Why don't we take a ten-minute

17   break, we've been going for a little while, so we'll

18   come back on at 12:45.

19            Does that work, Mr. Arthur?

20            THE WITNESS:  I'm happy to keep going if you

21   want, Counsel.

22            MS. RYAN:  Let's take a 10.  I'll turn off

23   my camera and mute, but we'll go off the record.

24            MR. ST. JOHN:  Off the record.

25            (Recess was taken.)

Page 64

1    BY MS. RYAN:

2        Q.  One follow up question for you, Mr. Arthur before

3    we move on to a different topic.  You mentioned the

4    newcomer schools in Jefferson Parish, what determines

5    the eligibility for those schools?

6                MR. ST. JOHN:  Objection.  Beyond the scope.

7        A.  The press release simply mentions the fact that

8    Jefferson Parish offers those newcomer schools for

9    recent immigrants for students who are not fluent in

10   English and who have not had the benefits of a formal

11   education that's offered.  As I understand, as an

12   amenity in the interest as equity, which is actually the

13   term that they use to ensure the proper education of

14   those children and that they're set to learn.

15       Q.  Let's talk about SNAP, TANF.  In this lawsuit

16   Louisiana's alleging they suffered injury to those

17   programs as a result of noncitizens released under the

18   IFR coming to Louisiana, correct?

19       A.  That is correct, Counsel.

20       Q.  Okay.  Briefly, what are those injuries that

21   Louisiana claims to those programs as a result of the

22   IFR?  And we'll go into more detail so you don't have to

23   feel like you have to give me all the details right now,

24   but generally what are the injuries that it's alleging?

25       A.  Okay.  So SNAP, which is the supplemental

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 65

1       nutrition, that's SNAP, is a what used to be called food

2       stamps, and it is supervised by the Louisiana Department

3       of Children and Families, and it offers supplemental

4       nutrition to individuals who are of limited means.

5               There are eligibility criteria for SNAP, however.

6       It is available to residents of Louisiana, it is who are

7       United States citizens and who meet the criteria under

8       the program.

9               With respect to noncitizens, noncitizens are

10      broken down into qualified noncitizens and nonqualified

11      noncitizens.  Certain qualified noncitizens, however,

12      have to wait a period of time before they become

13      eligible for those benefits, and those were under

14      requirements that were implemented by The Personal

15      Responsibility and Work Opportunity Reconciliation Act

16      of 1996, so lawful permanent residents are what most

17      people refer to as green card holders, have to wait five

18      years or have accrued 40 work quarters before they're

19      eligible, and that 40 work quarter part is, can be work

20      that was done by a spouse or a parent where the child

21      was not old enough to work.

22          Q.  Mr. Arthur, I apologize, but just in the interest

23      of time, my question was what is the injury being

24      alleged, not what the program is about.

25          A.  I'll get to that, Counsel.

Page 66

1           With respect to qualified noncitizens there are

2      individuals who are qualified noncitizens without that

3      five year bar, and that includes individuals who have

4      been granted asylum.

5           It also includes Cuban and Haitian entrants who

6      have been paroled into the United States who have

7      pending asylum applications.  So with respect to the

8      quicker adjudication of the asylum applications

9      noncitizens generally who are granted asylum more

10     quickly will be eligible for that SNAP benefit more

11     quickly.

12          To the degree that they are Cuban and Haitian

13     entrants, if they are paroled out of custody under the

14     terms of the IFR, they also would become immediately

15     eligible.

16          Particularly if they are paroled after they have

17     gone through the credible fear determination, because

18     under the IFR, and this is a break from the way that

19     it's always been done in the past, traditionally in

20     order for an individual to apply for asylum the

21     individual had to file what's called a Form-I589

22     application for asylum and for withholding of removal,

23     under the IFR the signed copy of the credible fear

24     determination, positive credible fear determination, is

25     a application for asylum.

Andrew Arthur, 30(b)(6)                                    November 30, 2023

Page 67

```
1              And, again, that's a break from traditional
2       practice for as long as I know, and I've been doing this
3       for 32 years.
4          Q.  Okay.  So --
5          A.  So by --
6          Q.  Let me ask the question please.
7          A.  I apologize.
8          Q.  So the injury being alleged is that they will be
9       eligible for SNAP benefits faster under the IFR?
10              MR. ST. JOHN:  Objection.  I was going to
11      say incomplete recitation of his testimony, asked and
12      answered.
13              MS. RYAN:  It's not asked and answered,
14      actually, Scott, because he didn't answer the question
15      directly.
16      BY MS. RYAN:
17         Q.  So I'm just trying to summarize -- if I could
18      just get a quick response, what is the injury being
19      alleged?
20              MR. ST. JOHN:  Counsel, he's entitled to
21      answer the question.  I was able to pick out the
22      injuries that he recited.  He gave you the explanation
23      for why there are injuries and he's entitled to give the
24      complete answer.
25         A.  With respect to individuals who were granted
```

Andrew Arthur, 30(b)(6)                                    November 30, 2023

Page 68

1    asylum more quickly they're going to become eligible for

2    SNAP benefits more quickly.

3          With respect to Cuban and Haitians entrants,

4    those individuals as soon as they pass the credible fear

5    screening and receive a positive credible fear

6    determination will have been deemed to have applied for

7    asylum, and therefore will become eligible.  If they're

8    paroled from custody they're going to be eligible.

9    BY MS. RYAN:

10     Q.  And what about for TANF, what injuries are

11   alleged in regards to that program?

12     A.  With respect to -- with respect to SNAP, the

13   administrative cost of that program are born by the

14   State of Louisia- -- or actually, split between the

15   Federal Government, the United States Department of

16   Agriculture, and the State.  So the more people who are

17   eligible for that, the more that the funding is going to

18   go up, or the more that the cost of the State of

19   Louisiana are going to go up.  It's also going to draw

20   upon the time of employees that the Department of

21   Children and Family Services.  DCFS and Louisiana is

22   unfortunately one of those agencies that has trouble

23   keeping employees, and so they have been -- you know,

24   they are short staffed and that imposes a tangible

25   impact on them.

Andrew Arthur , 30(b)(6)                        November 30, 2023

Page 69

1          With respect to TANF, Temporary Assistance to

2     Needy Families, the program in Louisiana is called

3     FITAP, which is Financial Independence Temporary

4     Assistance Program.  Again, that one is fully funded by

5     the Federal Government including the administrative

6     cost, but with respect to the employee time that is

7     taken, again, those applications are adjudicated by

8     employees of the, of the DCFS, and so it will take their

9     time.

10         The government is actually, the State of

11    Louisiana is reimbursed for the time for those

12    individuals, but it takes them away from other

13    activities.

14         In addition, with respect to the application --

15         Do you want me to go through the application

16    process, because there actually will be cost there

17    associated with that now?

18    Q.  Not at this moment, we'll go through it.

19    A.  Okay.  Please remind me to come back to that

20    because there are costs, because the interview process

21    for individuals who weren't fluent in English is

22    actually longer because they have to verify eligibility.

23    Q.  Okay.  So you said the FITAP program is fully

24    funded by the Federal Government including

25    administrative costs and they do get reimbursed for the

Andrew Arthur , 30(b)(6)                                November 30, 2023

1      employee's time in going through those applications, is

2      that correct?

3          A.   True, but it also draws upon the availability of

4      that individual to do other things.  FITAP actually has

5      another discrete affect on DCFS, because, again, it's

6      fully funded by the Federal Government, except if the

7      individual who receives FITAP isn't able to comply with

8      the minimum work participation rate then the State of

9      Louisiana can actually have funding taken away by the

10     Federal Government, it's called WPR.  And WPR requires

11     50 percent of all families and 90 percent of all

12     two-parent families to satisfy certain work

13     requirements.  It's 20 hours a week in conjunction with

14     it can, you know, be training, it can be work, it can

15     be, you know, other work that they do not for pay, but

16     they have to do that.

17          So DCFS, which as I mentioned before, is a

18     understaffed agency.  If they have to spend more time

19     adjudicating those applications and going through the

20     process it's less time that they had to ensure

21     compliance with the minimum work participation rate.

22          The Federal Government can take away 2 percent of

23     the block grant per year up to 21 percent for states

24     that are not in compliance with those minimum work

25     participation rate levels.

Andrew Arthur , 30(b)(6)                              November 30, 2023

                                                              Page 71

1        Q.  Now SNAP you mentioned also commonly referred to

2   as food stamps but FITAP is cash assistance, correct?

3        A.  FITAP is cash assistance.  There's a company

4   called INMAR that if you receive both, SNAP and TANF,

5   will give you one card.  That card actually has -- it's

6   a credit card, basically, that could be used for SNAP or

7   TANF.  INMAR charges 42 million dollars per year.  And

8   again, half the cost of that INMAR program are born by

9   the State of Louisiana.

10       Q.  Looking just at SNAP, what are the eligibility

11  requirements for SNAP in Louisiana?

12       A.  They have --

13            MR. ST. JOHN:  Objection.  Best Evidence

14  Rule.  This is set forth in the document.

15            But you can testify, Mr. Arthur.

16       A.  Right.  They have to be residents of the State of

17  Louisiana.  They have to have certain -- they have to

18  fall below a certain level based upon a formula for the

19  receipt of the benefits to show that they're needy.

20          Again, these are means-tested public benefits,

21  those are the -- that's what the means-tested part

22  means.

23  BY MS. RYAN:

24       Q.  I know that a person's immigration status plays a

25  part in the eligibility.  Are there any other

Andrew Arthur , 30(b)(6)                                    November 30, 2023

                                                                    Page 72

1    eligibility requirements based on things like age,

2    gender, or nationality?

3                    MR. ST. JOHN:   Objection.   Beyond the scope.

4        A.   With respect to elderly individuals who are

5    allowed to provide for themselves, there are.   With

6    respect to nationality I assume that you're using that

7    in the -- in what sense, Counsel?   I don't understand

8    that word in this context.

9            Is there a need for a proxy for immigration

10   status?

11       Q.   No, if someone's immigration status is different

12   than their nationality?

13       A.   That's what I assume.   Thank you for clarifying.

14           So with respect to nationality, no, there are no

15   bars with respect to that.

16           Although certain individuals who are Asian,

17   certain Hmong, Laotian individuals actually fall outside

18   of the requirements.   In addition, Iraqi and Afghani

19   arrivals and Ukrainian individuals who have been paroled

20   in under the Ukrainian parole program, so from that

21   perspective, yes, there are actually nationality things.

22       Q.   I think you mentioned this before, but --

23       A.   Also, members of Indian tribes recognize the

24   United States who are not United States citizens or

25   nationals.

Andrew Arthur, 30(b)(6)                                November 30, 2023

Page 73

1        Q.  So to clarify something you said before, certain

2   immigration statuses are immediately eligible for SNAP,

3   and some there is a wait period, and if the person was

4   granted asylum they are immediately eligible, but if

5   they are a parolee they have to wait five years,

6   correct?

7        A.  Except for Cuban and Haitian entrants.

8            There is -- there was a law that was passed in

9   1980 with respect to Cuban and Haitian entrants that

10  actually give them special consideration with respect to

11  that if they've been paroled, if they been placed in

12  removal proceedings if they've applied for asylum.

13       Q.  Are you eligibility requirements for FITAP

14  different than the eligibility requirements for SNAP?

15           MR. ST. JOHN:  Objection.  Best Evidence

16  Rule.  All of this -- all of the eligibility is set

17  forth in written documents.

18       A.  So there's a document that's issued by the State

19  of Louisiana B220 SNAP and B220 FITAP, and the agencies

20  follow the eligibility of requirements for those.

21           With respect to assessing the eligibility of

22  those individuals, that's done through the SAVE system.

23  There are two to three people that are employed by the

24  Department of Child and Family Services that actually

25  run those verification systems.

Page 74

1              In addition, if an individual's received Medicaid

2      under Louisiana Law and they received -- a button will

3      appear when they apply for SNAP and FITAP that will

4      allow the reviewer to populate the fields to assess the

5      eligibility of that individual.

6      BY MS. RYAN:

7         Q.  What would make someone eligible for SNAP or

8      FITAP but not the other?

9              MR. ST. JOHN:  Objection.  Best Evidence

10     Rule.

11        A.  With respect to the -- with respect to the

12     immigration status of that individual?

13     BY MS. RYAN:

14        Q.  No, in general.  Because you mentioned if someone

15     is enrolled in both, SNAP and FITAP, so that implies

16     that someone could be enrolled in one or the other but

17     not both, and so I'm asking why someone may be eligible

18     for one program but not the other?

19             MR. ST. JOHN:  Objection.  Best Evidence

20     Rule.

21        A.  Because of the eligibility requirements for that

22     and Louisiana does comply with the eligibility

23     requirements for that as set out in the statute and

24     regulation.

25     BY MS. RYAN:

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 75

1          Q.  Can you articulate for me the difference in

2     eligibility between those two programs that would make

3     someone eligible for one and not the other?

4                 MR. ST. JOHN:  Objection.  Best Evidence

5     Rule.  Beyond the scope.

6          A.  It's based upon the income and the family size

7     and the number of eligible individuals in the household

8     for both.

9               And there are different things.  Some people

10    don't apply for both.  In fact, there are about 440,000,

11    I believe Louisianians who receive SNAP, which is a much

12    larger number than the number of people who receive

13    FITAP.

14              FITAP, by the way, I probably should have

15    mentioned this before, is a block grant that is provided

16    as 164 million dollars that is provided annually and

17    that has remained static ever since in recent years and

18    I believe going back to PRWORA, which is the Personal

19    Responsibility -- as I mentioned before.

20         Q.  And the --

21         A.  Work Opportunity Reconciliation Act.  I'm sorry.

22         Q.  Sure.  So the asylees being immediately eligible

23    but parolees, except for Cuban and Haitians, have in 25

24    years, does that also apply to FITAP?

25         A.  Yes, it does.

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 76

1              MR. ST. JOHN:  Objection.  Best Evidence

2        Rule.

3        A.  And, Counsel, there's a document that I reviewed,

4        which I believe is in the record, B220 SNAP, and B220

5        FITAP and the agencies have assured me that they follow

6        the eligibility requirements in those documents.

7        BY MS. RYAN:

8        Q.  Is there a specific portion of the Department of

9        Children and Family Services that's responsible for

10       administering SNAP and FITAP?

11       A.  There are separate employment trees that are

12       eligible -- that have responsibility for SNAP and FITAP

13       and I've spoken to individuals from both of those

14       agencies.

15       Q.  So they're separate, one is for SNAP and one is

16       for FITAP?

17       A.  But they're both under DCFS.

18       Q.  But that's a yes, they are separate?

19       A.  They are separate, yes, Counsel.

20       Q.  Does -- is the State of Louisiana alleging injury

21       to any other portion of the Department of Children and

22       Families besides those two employment trees you just

23       mentioned?

24              MR. ST. JOHN:  Asked and answered.

25       A.  Not that I'm aware of.

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 77

1    BY MS. RYAN:

2        Q.  How many noncitizens released under the IFR are

3    enrolled in the SNAP program in Louisiana?

4        A.  As I mentioned before, 8CFR 208.6 actually limits

5    the disclosure of information related to an individual

6    who has applied for asylum or has gone through a

7    credible fear review provision.

8            This is a -- so consequently the only thing that

9    the State of Louisiana is going to know is that an

10   individual has applied for asylum or has been paroled

11   into the United States with respect to the eligibility

12   for those people.  That would be information that would

13   be within the knowledge of the Department of Justice and

14   the Department of Homeland Security.

15       Q.  But they don't know under what program or policy

16   that person was paroled or granted asylum?

17       A.  No, under the policy that is followed by the

18   State of Louisiana they don't inquire into which of

19   those things.  The eligibility is a federal matter

20   rolled into state law and they comply with those

21   requirements.

22       Q.  How many noncitizens released under the IFR are

23   enrolled in the FITAP program in Louisiana?

24       A.  Again, as I mentioned before, 8CFR 208.6 is a

25   confidentiality provision.  There's a separate

Page 78

1    confidentiality provision 8CFR 1208.6, they mirror one

2    another, and they bar the disclosure of information

3    relating to asylum applicants, any information that the

4    asylum applicant provides, or with respect to credible

5    fear determinations, so that would be information that

6    would be known to the federal but not for the State of

7    Louisiana.

8        Q.   I'm going to show a document, I believe we're up

9    to Exhibit F.

10                THE COURT REPORTER:   That's correct.

11                (Exhibit F was marked for identification.)

12                MS. RYAN:   If I start jumping around the

13   alphabet, please let me know.

14   BY MS. RYAN:

15       Q.   Do you see this document on your screen?

16       A.   I've got a blank screen.

17       Q.   Okay.  One second.

18       A.   Yes, ma'am, I do.

19       Q.   Okay.  So this is a spreadsheet entitled Asylee

20   Issuance Amount with no Bates number.

21            Have you seen this document before?

22       A.   I believe that I've seen that document before.

23       Q.   And for the record, there's no Bates number but

24   it was produced to defendants on July 27, 2023.

25            What is this document?

Page 79

1      A.  That is the document that was prepared at the

2  request of the Attorney General's Office of the

3  Department -- of the Department of Justice of Louisiana

4  of DCFS to determine the number of asylees who have

5  received SNAP, which unfortunately this is an old

6  computer code it shows up as FS for food stamps.  And

7  then I believe there is -- there are individuals who

8  show up as TF, I think is the code that they use for

9  TANF.

10     Q.  Those were going to be some of my questions, so

11  thank you.

12          Can you explain -- all right.  So you explained

13  this.

14          Let me see if I have any --

15          So are these case numbers for the Department of

16  Children and Family Services?

17     A.  The individual ID number, as I understand, are --

18  they are individual numbers that relate to the

19  individual.  I believe the case number -- the individual

20  ID number is the one that is used by DCFS to keep track

21  of them and the case number is the individual case.

22          So yes, these numbers are -- they match one

23  another.  They match a specific individual in separate

24  systems.

25     Q.  Okay.  So we see just for this first entry here,

Andrew Arthur , 30(b)(6)                                     November 30, 2023

Page 80

1      the same case number repeated, the same individual ID
2      repeated, but with different payment amounts and
3      different payment dates, is that correct?
4          A.   That is correct, Counsel.
5          Q.   Okay.  So these would be different payments to
6      this individual with this ID number?
7          A.   As I understand the document.  I didn't run the,
8      the document itself.
9          Q.   Okay.  And you said these are for asylees
10     generally?
11         A.   This is the asylee issuance amount, yes.
12         Q.   But that is not specific to asylees released
13     under the IFR?
14         A.   There's no way for the State of Louisiana to know
15     which individuals were released under the IFR because it
16     doesn't differentiate with respect to the documents.
17             Louisiana doesn't request specific documents.
18     They request specific documents, but that can include a
19     employment code on a employment authorization document.
20     It can include a stamped version of a judge's order
21     granting asylum, so there's no way for the State of
22     Louisiana to know that.  And they verify that through
23     the SAVE system.
24         Q.   When somebody is eligible for SNAP you've
25     mentioned food assistance or you've mentioned like a

1    payment card, but what services does someone receive

2    when they are determined to be eligible for SNAP?

3        A.  So they receive the payment card for SNAP, which

4    as I noted is produced by a company called INMAR, which

5    is a state contractor.

6        Q.  And does that payment card function like a credit

7    card?

8        A.  You can use it -- it functions more or less as a

9    credit card.  EBT is the actual term that's used,

10   Electronic Benefit Transfer.

11       Q.  And is that the same for the FITAP program they

12   get a payment card?

13       A.  Yes, it is.  And, again, if they receive both

14   then they get one card.

15       Q.  Are there any services within the SNAP or FITAP

16   program that only noncitizens are eligible for?

17       A.  Not that I'm aware of.  The one service that

18   would be provided to a noncitizen would be the

19   interpreter services through the course of the

20   verification process for eligibility.

21       Q.  Are there any services within SNAP and FITAP that

22   a noncitizen would not be eligible for?

23       A.  It all depends on the status of the noncitizen.

24   If it's a nonqualified noncitizen or a qualified

25   noncitizen subject to a bar, they wouldn't be eligible

Page 82

1      for either.

2             But again, with respect to -- excuse me.  So long

3      as they are qualified noncitizens it's based upon the

4      formulas that are in place for each of the programs.

5      Q.  Are there any services that were added because of

6      noncitizens using the SNAP or FITAP programs?

7      A.  I believe with respect to the interpreter

8      services I assume that that's probably been something

9      that has been in place for a number of years.  And

10     again, they have to do the special level of eligibility

11     to verify the eligibility of the individual for the

12     individual benefit.

13     Q.  But the interpreter is for anyone who needs help

14     with the English language, not necessarily only

15     noncitizens?

16     A.  That is correct.

17     Q.  And they would have to verify the citizenship of

18     anyone applying, not just noncitizens?

19     A.  Right.  So, again, there are two to three people

20     who do the verification for the, for individuals who

21     identify as noncitizens.  There are two to three of them

22     that are employed by DCFS and they run it through the

23     Systematic Alien Verification for Entitlement system,

24     which is also known as SAVE.

25     Q.  I'm going to show you what we're marking as

 1    Exhibit F.

 2              MS. RYAN:  And, Counsel, I will email the

 3    PDFs of all of these after the deposition as well.

 4              THE COURT REPORTER:  One moment.  I think we

 5    just marked F, so you're up to G.

 6              MS. RYAN:  Oh, thank you, Diane.

 7              THE COURT REPORTER:  You're welcome.

 8              MS. RYAN:  I spoke too soon earlier about my

 9    alphabet skills.

10              (Exhibit G was marked for identification.)

11    BY MS. RYAN:

12      Q.  Let me know when you can see that on your screen.

13      A.  I can see that, Counsel.

14      Q.  Okay.  I'm showing you Bates numbers 3588 through

15    35 -- 3825, which is entitled, House Bill No. 1, for

16    2021.

17          Have you seen this document before?

18      A.  I have seen that document before.

19      Q.  What is this?

20      A.  House Bill 1 is the funding bill that is done

21    biannually by the Louisiana Legislature with respect to

22    the funding of the state government throughout the year,

23    throughout the two-year period.

24      Q.  Okay.  So this would be appropriations for a

25    number of different offices and departments within the

Page 84

1       State of Louisiana?

2           A.  That is correct, Counsel.

3           Q.  Okay.  Jumping ahead to page 112.  Halfway down

4       the page we see, Schedule 10:  Department of Children

5       and Family Services.  Do you see that?

6           A.  I do, Counsel.

7           Q.  Okay.  So this is laying out different

8       expenditures for the Department of Children and

9       Families, and we saw these budgeting terms before, but

10      for the record I'll just ask you, what is the difference

11      between EOB and REC that we see here?

12              MR. ST. JOHN:  Objection.  This is literally

13      what the subject of Judge Joseph's caution was.

14              MS. RYAN:  Your objection's been noted.

15      BY MS. RYAN:

16          Q.  You can go ahead, Mr. Arthur, if you know.

17          A.  I'm not familiar with what those terms are.

18          Q.  Okay.  Are these requests made by the department

19      to the Legislature or are these the actual amounts that

20      are provided by the Legislature to the department?

21          A.  The bill is premised upon requests that are made

22      by the individual departments for funding for the

23      two-year period under HB1.

24          Q.  So this is the actual amount that was paid but

25      that amount is based on requests that had been

Page 85

1     previously made by the departments?

2         A.   That is correct.

3              MR. ST. JOHN:   Objection.

4         A.   I believe.

5     BY MS. RYAN:

6         Q.   Okay.  And then we see these expenditures are

7     broken up by different divisions within the department:

8     We have the Division of Management and Finance.  The

9     Division of Child Welfare.  The Division of Family

10    Support.  And under Division for Family Support we see

11    references to FITAP and SNAP, correct?

12        A.   That's correct, Counsel.

13        Q.   Okay.  Here we see authorized positions, do you

14    know what that's referring to?

15        A.   The number of individuals who are authorized to

16    be employed, that's -- its a common budgeting term.

17        Q.   And under that we see nondiscretionary and

18    discretionary, do you know what the difference between

19    that is?

20        A.   With respect to nondiscretionary, discretionary

21    expenditures, I would posit that the nondiscretionary

22    expenditures are ones that are required to be paid based

23    upon previous obligations.

24             The discretionary expenditures would be

25    non-obligated expenditures that they would have to make.

Page 86

1      Q.   Okay.  So if you go down here.  Let me stop

2  sharing my screen.

3          So the Department of Children and Families

4  request a specific amount specifically for the SNAP and

5  FITAP programs, correct?

6      A.   With respect to the individuals who would

7  administer those programs.

8      Q.   So it's for personnel funds?

9      A.   Right.

10          MR. ST. JOHN:  Objection.  Objection.  This

11  is literally a bill.  It's a legal document, it speaks

12  entirely for itself.

13          MS. RYAN:  We're past the bill, Mr. St.

14  John.

15  BY MS. RYAN:

16      Q.   But go ahead, Mr. Arthur.

17      A.   With respect to FITAP, again, that is funded out

18  of a block grant that is provided by the Federal

19  Government with respect to SNAP.  The administrative

20  cost of the administrative program are split between the

21  State of Louisiana and the Federal Government.

22      Q.   How does the department determine how much money

23  it needs to request?

24      A.   Based upon historical standards that they've had,

25  and anticipated needs.

1    Q.  Do they request a flat amount or is it per

2    person?

3    A.  Per person, employee, beneficiary.

4    Q.  Let me -- yeah, so let me break that for you.

5        So does the number of people enrolled in the

6    programs affect how much money they request from the

7    Legislature?

8    A.  Based upon the statement that I made before with

9    respect to the administration of the SNAP program, it

10   would be the number of employees that they would need

11   with the amount of money that they received, that they

12   split with the federal with respect to SNAP.

13       With respect to FITAP those administrative costs

14   should be covered.  But again, there's the employee time

15   part.

16   Q.  So you mentioned the FITAP federal funding.  Does

17   the Federal Government provide funding for SNAP

18   benefits?

19   A.  It does.  That is through the United States

20   Department of Agriculture.  The administrative costs are

21   split.

22   Q.  And is that money provided proactively for the

23   upcoming fiscal year or retroactively based on the

24   amount actually spent in the previous fiscal year?

25            MR. ST. JOHN:  Objection.  Beyond the scope.

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 88

1       A.  With respect to FITAP, the State of Louisiana

2    receives a block rate, it's been 164 million dollars for

3    a number of years.

4            With respect to SNAP, I believe that those are

5    projections that are made with direct billing back to

6    the Federal Government or with respect to the

7    administrative costs.

8    BY MS. RYAN:

9       Q.  Does the federal funding for SNAP impact the

10   state budget allocated to the SNAP program?

11      A.  I'm sorry, could you ask the question again?

12      Q.  Sure.  Does the federal funding provided for the

13   SNAP program impact the state funding that's provided

14   for the SNAP program?

15      A.  To the degree that the state has to pay its share

16   of the administrative cost, yes.

17      Q.  But only for those administrative costs, meaning

18   the employee's salary?

19      A.  And also INMAR.  Again, it's a 42 million dollar

20   contract that the state has with INMAR to actually

21   provide that benefit, and there were other

22   administrative costs that are included.

23      Q.  But the actual money given to the enrollees comes

24   from the Federal Government?

25      A.  It does, through the United States Department of

Andrew Arthur, 30(b)(6)                                    November 30, 2023

Page 89

1    Agriculture.

2        Q.  Has the cost of administering SNAP or FITAP

3    programs changed since March of 2022?

4        A.  With respect to that it's going to be reflected

5    in the budget.  And, again, it's a two-year budget, one

6    was done in 2021, one was done in 2023, and I believe

7    the funding has increased to those agencies over that

8    period of time.

9        Q.  Has the federal funding that the State of

10   Louisiana received for SNAP and FITAP changed since

11   March of 2022?

12       A.  With respect to FITAP it hasn't changed.  With

13   respect to SNAP I would need to take a look at the

14   budget documents to see the change for that.

15       Q.  Can you articulate any specific harm to Louisiana

16   SNAP or FITAP programs that is only attributable to the

17   IFR?

18       A.  As I mentioned before, and I may have packaged

19   this up in a response or something that I said before,

20   by making the individuals eligible for asylum and by

21   paroling in Cuban and Haitian enrollees, it will

22   actually increase the administrative cost with respect

23   to SNAP that they would have to share.

24           In addition, again this is an underfunded state

25   agency or understaffed state agency, so it will draw

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 90

1      upon the limited time of the employees that are

2      currently employed by DCFS.

3          Q.  Let's -- just one moment.

4               (Recess was taken.)

5      BY MS. RYAN:

6          Q.  You mentioned INMAR as the -- that's the type of

7      credit card that the state uses to provide its benefits

8      for SNAP and FITAP, correct?

9          A.  That's the name of the contractor.

10         Q.  Okay.  Does Louisiana pay to license that

11     technology or is it a per user amount that you need to

12     pay for everyone who gets an INMAR card?

13              MR. ST. JOHN:  Objection.  Beyond the scope.

14         A.  To the best of my knowledge, the contract with

15     INMAR is a flat fee.  There is a fee that they pay based

16     upon reconsideration for the term of the contract.

17     BY MS. RYAN:

18         Q.  Okay.  Turning to Medicaid.

19              So in this lawsuit Louisiana is alleging that

20     they suffered injury to their Medicaid program as a

21     result of noncitizens released under the IFR coming to

22     Louisiana, correct?

23         A.  That's correct, Counsel.

24         Q.  Can you summarize what are the injuries that

25     Louisiana is claiming to its Medicaid program as a

Andrew Arthur , 30(b)(6)                                November 30, 2023

Page 91

1       result of the IFR?

2           A.  With respect to Medicaid as with SNAP, and TANF,

3       or FITAP, United States citizens and nationals are

4       eligible for Medicaid assuming that they meet the

5       residency and qualification standards.  There is an

6       exception for what's called emergency Medicaid for

7       individuals who need emergency medical care.

8               The -- with respect to noncitizens -- there are

9       qualified noncitizens and there are non --

10              Or there are nonqualified noncitizens and then

11      there are qualified citizens who are subject to a bar,

12      to a five year bar, again, similar to the ones that

13      apply to SNAP and TANF.

14              Individuals who have been -- who are qualified

15      noncitizens who have green cards or fall within other

16      categories have to wait five years before they're

17      eligible for the benefits.

18              With respect to other noncitizens, including

19      asylees and Cuban and Haitian entrants, they are

20      eligible for those benefits as soon as they attain those

21      statuses.  So the more quickly that a applicant, an

22      alien applicant receives the benefit the more quickly

23      they're going to be eligible to draw upon the Medicaid

24      program.

25              Same is true with respect to the release of Cuban

Page 92

1      and Haitian entrants either on parole or, which again is

2      impacted by the IFR, or the filing of the asylum

3      application, which again is going to also be impacted by

4      the change by the waiving of the I-589 Rule in the IFR.

5          Q.  What are the different types of Medicaid programs

6      that the State of Louisiana offers?

7          A.  So they offer emergency Medicaid, which I

8      referenced before.  They also reference -- they also

9      offer CHIP, the Children's Health Insurance Program.

10             In fact, they offer expanded CHIP for certain

11     nonqualified, non -- or for certain qualified

12     noncitizens not subject to the bar.

13             Emergency -- there's also CHIP Level 4, which is

14     something that's available to pregnant women.

15         Q.  So there's regular expansion, CHIP, and

16     emergency?

17         A.  Yes.  And then there's also a Affordable Care Act

18     one that is an expanded Medicare program.

19         Q.  And which portions of those -- strike that.

20             Which portions of the Medicaid program is

21     Louisiana claiming injury to as a result of the IFR?

22         A.  With respect to regular Medicaid, with respect to

23     expanded Medicaid, and with respect to the CHIP program.

24             Again, if an individual receives asylum status

25     they are eligible to petition under Section 2A, the INA,

Andrew Arthur , 30(b)(6)                          November 30, 2023

Page 93

1    for their children to follow to join they will come to

2    the United States as well.  And the more quickly that

3    that asylum is granted, the more quickly they can

4    petition for those children to come to the United

5    States.

6        Q.  What are the conditions of eligibility for

7    regular Medicaid?

8        A.  With respect to --

9            MR. ST. JOHN:  Objection.  Best Evidence

10   Rule.  There is a -- there is a written policy.

11           You can answer.

12       A.  Yeah, there are federal requirements for

13   eligibility for Medicaid based upon the size of the

14   household and the income of the household.

15   BY MS. RYAN:

16       Q.  For regular Medicaid does it look at the

17   immigration status of the individual?

18       A.  It does with respect to differentiating between

19   qualified and nonqualified.  Or qualified and

20   nonqualified noncitizens, and also qualified noncitizens

21   subject to the bar.

22       Q.  Are asylum seekers qualified or nonqualified for

23   Medicaid?

24           MR. ST. JOHN:  Objection.  Best Rule

25   Evidence.

Andrew Arthur, 30(b)(6)                                November 30, 2023

Page 94

1              You can answer.

2      A.  If they are Cuban or Haitian entrants then they

3   immediately become qualified for Medicaid.

4   BY MS. RYAN:

5      Q.  And if they're not?

6      A.  If they're not Cuban and Haitian entrants?

7          All with respect to that, again, there is the --

8   there is an Afghani, Iraqi provision, there is a

9   Ukrainian provision, but with respect to all other

10  individuals they are subject to the five year bar until

11  they're granted asylum.

12     Q.  And once they're granted asylum they are

13  automatically qualified?

14     A.  Once --

15             MR. ST. JOHN:  Objection.  Best Evidence

16  Rule.

17     A.  Once they're granted asylum they're automatically

18  eligible.

19  BY MS. RYAN:

20     Q.  And what about parolees, are they qualified or

21  nonqualified?

22             MR. ST. JOHN:  Objection.  Best Evidence

23  Rule.

24     A.  Parolees are qualified noncitizens provided that

25  they've been paroled for a year or more, subject to the

Page 95

1    five year bar.  And, of course, the Cuban and Haitian

2    parolees, as I mentioned before.

3    BY MS. RYAN:

4         Q.  Right.  But if they're not of a specific

5    nationality that is excluded from the five year bar

6    parolees are eligible after a five year wait if their

7    parole is for one year or longer?

8                   MR. ST. JOHN:  Objection.  Best Evidence

9    Rule.  Calls for testimony about a question of law.

10                  You can answer.

11        A.  The State of Louisiana follows the standards that

12   are set forth in a document issued by the Department of

13   Health.  The I-300, it's I-300, that's it, and they

14   complied with those requirements with respect to

15   qualified and nonqualified noncitizens.

16        Again, with the exception of CHIP, but you

17   haven't asked me about CHIP, we can talk about that.

18        Q.  Yes, we'll get there.

19        The conditions of eligibility for expansion

20   Medicaid, are they the same or different than for

21   regular Medicaid?

22                  MR. ST. JOHN:  Same objection.

23        A.  Yeah, the State of Louisiana follows the ACA with

24   respect to eligibility for expanded Medicaid.  But with

25   respect to eligibility, again, the same eligibility

Andrew Arthur , 30(b)(6)                                    November 30, 2023

                                                        Page 96

1    standards apply.

2    BY MS. RYAN:

3       Q.  So you said they follow the rules, but my

4    question is, is it the same eligibility for regular

5    Medicaid and expansion Medicaid, or are they different?

6       A.  Well --

7                MR. ST. JOHN:  Same objection.

8                Give me a potato before you start answering,

9    okay?  Just so we can make sure we get the objection in.

10      A.  With respect to the income standards they are

11   lower between expanded Medicaid and regular Medicaid.

12   But again, they're all set forth in federal statute.

13   BY MS. RYAN:

14      Q.  And what are the conditions of eligibility for

15   CHIP?

16                MR. ST. JOHN:  Same objection.

17      A.  With respect to CHIP, CHIP is administered for

18   children under the age of 19, except for CHIP Level 4,

19   which applies to pregnant women.  And again, those are

20   all set forth in the Federal Law with respect to the

21   eligibility for it.

22   BY MS. RYAN:

23      Q.  And does the immigration status impact

24   eligibility for CHIP like it does for regular and

25   expansion Medicaid?

1          MR. ST. JOHN:  Objection.  Best Evidence

2     Rule.  Calls for testimony about a question of law.

3               You can answer.

4     A.  With respect to CHIP, Louisiana has expanded CHIP

5     eligibility for noncitizens who are 19 and younger under

6     certain circumstances, including that they are

7     applicants for asylum.

8     BY MS. RYAN:

9     Q.  How are the income requirements verified?

10    A.  Based upon the representations of the individuals

11    who are applying and they have to provide documents that

12    verify those eligibility requirements.

13    Q.  Do they also have to provide documents of their

14    immigration status to be verified?

15    A.  If they are -- everybody has to provide some sort

16    of document to show that they fit, either that they're a

17    United States citizen or that they're a United States

18    national under Section 308 of the INA.  If they are an

19    alien not able to provide that information, then they

20    have to provide proof of their qualified status.

21    Emergency Medicaid is available to individuals who are

22    unauthorized noncitizens, but only on an emergency

23    basis.

24    Q.  And these Medicaid programs are administered by

25    the Louisiana Department of Health?

Andrew Arthur, 30(b)(6)                              November 30, 2023

Page 98

1        A.   That is correct, Counsel.

2        Q.   Is there a specific part of the Department of

3   Health that is responsible for the administration of

4   these programs?

5        A.   So there is a Medicaid director within the

6   Department of Health.

7        Q.   Are all these Medicaid programs administered

8   within that same department or are they separate like

9   SNAP and FITAP were?

10       A.   They're administered within the same department,

11   to the best of my knowledge.

12       Q.   How many noncitizens released under the IFR are

13   enrolled in Medicaid in Louisiana?

14       A.   With respect to that information, again, 8CFR

15   Section 208.6 and 8CFR Section 1208.6, bar the

16   disclosure of information related to asylum applications

17   and with respect to individuals who have applied for

18   credible fear.  The State of Louisiana doesn't have the

19   ability to determine that.

20            However, there is a company called

21   Gainswell(phonetic), which is a financial intermediator

22   that provides information about the individuals who

23   receive Medicare in the State of Louisiana back to the

24   Center for Medicaid and Medicare services, which is not

25   called CMMS, but CMS.  So that is information that is

Page 99

1      available to the Department of Health and Human

2      Services, and available to the Department of Justice,

3      and the Department of Homeland Security.

4          Q.  Can you repeat the name of that company you

5      mentioned?

6          A.  Gainswell.  Gainwell.  Gainwell Technology.

7          Q.  And can you spell that for the record?

8          A.  G-A-I-N-W-E-L-L, I believe.

9          Q.  And you said it reports back to the State of

10     Louisiana about the individuals receiving Medicaid?

11         A.  Other way around.  It reports back to -- they're

12     the financial intermediary between HHS and the State, so

13     they report back to HHS.

14         Q.  And where did you get that information from?

15         A.  I obtained that information through conversations

16     that I've had with employees of the Department of

17     Health.

18         Q.  So my question was whether the state can identify

19     the number of people released under the IFR who are

20     using Medicaid.  Are you implying that this company

21     would somehow know that information?

22         A.  No, they would report back on the individuals who

23     have been granted Medicaid, that information would then

24     go to the Federal Government, and the Federal Government

25     could verify the how those individuals obtained asylum

Page 100

1    status, the reasons for which they were paroled.

2        Q.  So the --

3        A.  But the State of Louisiana wouldn't have access

4    to the information about the individuals with respect to

5    the IFR because the only thing that they look at is the

6    status of the individual of the noncitizen qualified or

7    not qualified subject to five year bar.

8        Q.  When an individual is eligible for Medicaid, do

9    they receive a payment like the SNAP and FITAP program

10   or is it similar to a health insurance where it would

11   pay out claims if they need to receive medical

12   treatment?

13       A.  Louisiana actually does it both ways, so they

14   have what's called a fee for service or FFS, which is

15   somebody goes to the hospital, they receive the

16   treatment, Louisiana gets billed with that, for that.

17           With respect to other individuals, there are six

18   managed care organizations that the State of Louisiana

19   contracts for that provided medical services and that's

20   on a per member, per month basis.  PMPM is what it's

21   called.

22       Q.  PMPM.  So if they're eligible for Medicaid they

23   are a member of these managed care facilities?

24       A.  They're not facilities, they're organizations.

25   MCOs is what they're called, and basically the MCO

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 101

1    provides the care to the individual based on a per

2    member, per month basis, PMPM.

3        Q.  So if somebody is eligible for Medicaid they are

4    a member of these organizations?

5        A.  Some are.  Louisiana also does fee for service

6    for other individuals, FFS.

7        Q.  Are there any other specific services provided

8    through the Medicaid program?

9        A.  Other than Medicaid services?

10       Q.  Well we've talked about FFS and the PMPM.  Are

11   there any other services that these individuals would

12   receive if they're eligible for Medicaid?

13              MR. ST. JOHN:  Objection.  I'm looking at

14   Arthur's face and he's having the same reaction that I

15   am, which is the question is nonsensical.

16              MS. RYAN:  And he can say that, Scott.  We

17   can keep the speaking objections to a minimum.  If the

18   witness does not understand the question, as I said at

19   the beginning, he can tell me he does not understand the

20   question.

21              MR. ST. JOHN:  I don't understand the

22   question.  I'm his counsel and I don't understand the

23   question.

24              MS. RYAN:  Okay.  But you're not testifying,

25   so...

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 102

```
1      A.  And Ms. Ryan, if I could, can you give me an

2    example of something that would fall within that group?

3          Medicare is a, is a health program it provides

4    health benefits to individuals.

5    BY MS. RYAN:

6      Q.  Is there cash assistance provided through the

7    Medicaid program?

8      A.  Not to the best of my knowledge.  But if it is it

9    would be under the standards that are set forth in

10   Federal Law.

11     Q.  Are there any services or treatments that

12   noncitizens are not eligible for if they're entitled to

13   Medicaid?

14     A.  Are you talking about medical services?

15     Q.  Yes.  I'm trying to understand if a noncitizen is

16   eligible for Medicaid, right, they've met the other

17   requirements, is there any other bars to what they can

18   or cannot receive once they are eligible for Medicaid

19   because of their immigration status?

20     A.  Right.  So if you are a qualified noncitizen not

21   subject to a bar you receive Medicaid on the same basis

22   as United States citizen or national.

23          With respect to individuals who are either

24   nonqualified, noncitizens, or qualified noncitizens

25   subject to the bar, they are eligible for emergency
```

Page 103

1    Medicaid.

2         And in the case of children under the age of 18

3    under Louisiana's expansion of CHIP they'd be eligible

4    for CHIP.

5         And if it's a pregnant woman subject to

6    restrictions, they would be eligible for CHIP Level 4.

7    Q.  Is there any federal funding that is provided to

8    the State of Louisiana for the Medicaid program?

9    A.  Yes, there is.

10   Q.  And what is that?

11   A.  So it is subject to a federal Medicaid assistance

12   percentage.  The -- or FMEP.  With respect to Louisiana

13   the FMEP is 67.23 percent for regular Medicaid, which

14   means that the remainder of that is money that it gets

15   picked up by the State of Louisiana Department of

16   Health.

17   Q.  So the Federal Government pays 67.23 percent and

18   Louisiana pays the rest?

19   A.  Yes, that's actually published in the Federal

20   Register by HHSCS.

21   Q.  Is that money proactive or retroactive?

22        MR. ST. JOHN:  Objection.  Beyond the scope.

23   Calls for testimony about a question of law.

24   A.  I don't doubt of whether that's proactive or

25   retroactive, I just don't know.

Page 104

BY MS. RYAN:

Q.   Okay.  And is that a flat amount that the feds
pay or is it based on the number of enrollees in the
Medicaid program?

A.   It's a percentage so it's based upon the amount
of the Medicaid services that are provided.

          MS. RYAN:  Give me one second guys.  We can
--

          THE WITNESS:  Are we off the record?

          MS. RYAN:  We can be.  I just -- I'm trying
to see if I can cut some stuff and, you know, get us
done by 2:30.  So I just wanted to consult with my
colleague for a moment, so let's go off the record.

          THE WITNESS:  So let's go off the record.

          MS. RYAN:  Yeah, just for a moment.

          (Recess was taken.)

BY MS. RYAN:

Q.   Does the Department of Health request a specific
amount from the State Legislature for the Medicaid
program?

A.   It does to administer the Medicaid program.

          In addition, as I mentioned before, there are
MCOs that pay per member per month.

Q.   And so does the number of members factor into how
much money is requested from the Legislature?

Andrew Arthur , 30(b)(6)                                November 30, 2023

                                                      Page 105

1        A.  It factors into -- well, so they do it based on

2    historical perspectives based upon the amount of money

3    that they have requested previously, and projections to

4    that money?

5        Q.  So based on money needed historically they make a

6    projection of how much they might need for the upcoming

7    year?

8        A.  Going forward, yes.

9        Q.  Does more people becoming eligible for Medicaid

10   impact the amount of money that the Department requests

11   from the Legislature?

12       A.  To the best of my knowledge, yes, but it should

13   be in the budget documents.

14       Q.  Has the cost of --

15       A.  But it definitely impacts -- it definitely

16   impacts the amount of money that they have to pay

17   subject to the FMAP, the Federal Medicaid Assistance

18   Percentage.

19       Q.  Because if there's more money -- excuse me.

20           If there's more enrollees then there's less money

21   to go around, correct?

22       A.  Exactly.

23       Q.  Has the cost of the Medicaid program changed

24   since March of 2022?

25       A.  So that is part of HB1, that would actually be

Page 106

1    contained, let's see, it would have been in 2021.  It

2    would have been done in 2023, I believe that the amount

3    of money for administrating the Medicaid program has

4    gone up, but it should be in the budget documents.

5        Q.  Are you able to articulate any specific harm to

6    the Medicaid program that's only attributable to the

7    IFR?

8        A.  It would be the amount of money that the State of

9    Louisiana would have to pay as its part of the FMAP with

10    respect to that.  In addition, medical care, of course,

11    is a limited quantity as we all saw during COVID.  So

12    the more people that draw upon the medical system it's

13    going to have a direct impact upon all people who seek

14    medical services.

15        Q.  But couldn't that generally be about immigrants

16    in the state and not specific to the IFR?

17        A.  To the degree that individuals are granted asylum

18    more quickly, to the degree that they are Haitian and

19    Cuban entrants who are released either because they

20    filed asylum applications or under the parole provision

21    in the IFR, that would actually be a real affect.

22        Q.  But if you are unable to know which individuals

23    came in under the IFR because of the CFR cites you have

24    provided, how can the state say these harms are

25    attributable only to the IFR?

Page 107

```
 1        A.  We could project it out based upon the number of

 2   people -- we can't project out the number, but we can

 3   project out that there would be an affect based upon

 4   more people becoming eligible for asylum more quickly.

 5             Currently for non-detained cases people wait

 6   about four years according to track the transactional

 7   record access clearinghouse at Syracuse University.

 8             The IFR sets a goal of completion by the asylum

 9   officer within 60 days, so, you know, that's a much more

10   quick process.

11             Moreover, as I think as I noted before, under

12   Section 208 of the INA foreign nationals who are granted

13   asylum, or actually noncitizens in this context who are

14   granted asylum, can petition for immediate family

15   members to follow to join.

16        Q.  But you don't know if any individuals under the

17   IFR are even in Louisiana so you don't know if they're

18   using the Medicaid program?

19        A.  Well, I know that Louisiana was actually one of

20   the spots that was specified for the initial rollout of

21   the asylum officer rule, and we know from documents from

22   the Department of Homeland Securities asylum process in

23   rule cohort that six individuals have been subject to

24   the IFR in the State of Louisiana.  We know that four of

25   those individuals were actually referred to an
```

Page 108

1    immigration judge, the two of the others had their case

2    administratively closed.

3         Honestly, Ms. Ryan, I don't understand the

4    administrative closure part because there's nothing in

5    the IFR that allows for administrative closure.  But we

6    also know that there are asylum applicants within the

7    State of Louisiana.

8    Q.  Just to clarify, you've said multiple times in

9    this deposition that you are unable to know whether

10   these asylum seekers, these asylees, were released or

11   granted asylum under the IFR, correct?  You said that

12   multiple times during this deposition.

13   A.  That's correct, Counsel, because that's not

14   something --

15   Q.  Okay.  So --

16   A.  -- that would be knowable to the State of

17   Louisiana.

18   Q.  Exactly, so it is not knowable whether the person

19   came in or was released under the IFR, so how can you

20   say that you have specific harms to the Medicaid program

21   specific to people coming in under the IFR?

22   A.  With respect to that, we could project out the

23   more quickly people are granted asylum.

24   Q.  I didn't ask about projections, Mr. Arthur.  I

25   asked if you can articulate a specific harm to the

Andrew Arthur , 30(b)(6)                           November 30, 2023

Page 109

1     Medicaid program from the IFR?

2         A.  With respect --

3                   THE WITNESS:  You're on mute.

4                   MR. ST. JOHN:  Counsel, please speak

5     respectfully to the witness.  It's misleading to suggest

6     it has to be a past harm.  He is testifying about a

7     harm.  Please let the witness answer the question.

8                   You can answer, Mr. Arthur.

9         A.  With respect to the quantum of harm to the State

10    of Louisiana, because the State of Louisiana has no way

11    of knowing which of those people have been subject to

12    the IFR, only the Federal Government only in this

13    situation CMS, HHS, DOH, DHS would actually know the

14    number of individuals who have come into Louisiana who

15    would have applied for those benefits within the State

16    of Louisiana.  There's no special code that appears on

17    the employment documents for those individuals.  It's an

18    unknowable fact, but it is one that's in the possession

19    of the Federal Government of the executive branch.

20    BY MS. RYAN:

21        Q.  Switching to general state topics.

22                  Are you able to say how many noncitizens released

23    under the IFR have established residence in Louisiana?

24        A.  As I think I mentioned before, with respect to

25    that I can tell you that there are individuals who are

Page 110

 1    processed in Louisiana under the IFR.  I know that two

 2    of those individuals cases were administratively closed.

 3          With respect to other individuals who have

 4    relocated within Louisiana after being granted benefits

 5    from the IFR, I can't tell you.  But I can tell you that

 6    the only individual that would know that, the only

 7    entity that would know that, would be the executive

 8    branch.

 9    Q.  I'm showing you what will be marked as Exhibit F,

10    I believe.  H.  I'll pull it up here.

11              (Exhibit H was marked for identification.)

12    A.  And if I could just to clarify the statement that

13    I made before.  The DHS asylum processing rule cohort is

14    only current to April of 2023.

15    BY MS. RYAN:

16    Q.  I'm sorry, you cut out at the beginning, can you

17    just repeat the beginning of your answer for that?

18    A.  I apologize.  The DHS asylum processing cohort

19    is only current through April of 2023.  It was last

20    issued in October of 2023, but it's not current.

21    Q.  Okay.  Do you see a document on your screen?

22    A.  I do.

23    Q.  Okay.  Scrolling down.

24          One second.  I don't know why it's -- let me try

25    that again.

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 111

1          Okay.  Do you see that on your screen,

2     Mr. Arthur?

3          A.  I do, Counsel.  Thank you.

4          Q.  Okay.  So this is the Second Amended Complaint

5     for this case, correct?

6          A.  That's the header, yes, ma'am.

7          Q.  Okay.  And for the record, it's ECF86.

8          You said you reviewed this document?

9          A.  I did, Counsel, yes.

10         Q.  Okay.  So if we look down at paragraph 2, we can

11    see this claim right here.  "Asylum IFR makes it

12    substantially easier for unauthorized economic migrants

13    to enter the United States and obtain asylum through

14    false claims."

15         Do you see that sentence?

16         A.  I do.

17         Q.  What is the State of Louisiana's basis for that

18    claim?

19         A.  With respect to that claim the asylum IFR strips

20    away several key procedural safeguards that were on the

21    system with respect to identifying non-meritorious and

22    fraudulent claims that existed under the preexisting

23    removal proceeding adjudication under Section 240 of the

24    INA.

25         As the Supreme Court noted in Thuraissigiam vs.

Page 112

1    DHS many people come to the border illegally, and I'm

2    going to -- this is Justice Alito's entry, I don't have

3    the document in front of me.  But, you know, he noted

4    that many of them applied for asylum, most of them are

5    denied and some of them are fraudulent.

6         The best mechanism that I'm aware of with respect

7    to determining the validity of a claim is the

8    confrontational system that exists in the immigration

9    core.

10        Asylum officer adjudications at AMIs are not

11   adversarial.  There is no attorney present on behalf of

12   the United States.  The only attorney that is present,

13   if at all, is the one on behalf of the respondent.  And

14   I've been an immigration lawyer, been an immigration

15   judge, and I conclude -- and a lawyer, and I conclude

16   that it is the best method of fact finding that there is

17   in this context.

18   Q.   Look down here at paragraph 3.

19   A.   I'll also not that there were studies that were

20   done by USCIS that says fraud in the removal process and

21   found high levels of fraud in that process.

22   Q.   So here in paragraph 3 it says that the IFR will

23   substantially increase the approval rate of

24   non-meritorious asylum claims.

25        What evidence does Louisiana have for that?

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 113

1          A.   With respect to that, the Department of Justice

2     actually Executive Officer of Immigration Review

3     publishes rates of asylum approvals and denials, and

4     other things that happen in asylum cases, with respect

5     to aliens who have been subject to a credible fear

6     claim.

7               The -- for the first three quarters of the

8     FY2023, the asylum grant rate in those cases is 12.54

9     percent.  With respect to the asylum processing rule

10    under the DHS asylum processing rule cohort document,

11    they indicate that the grant rate is anywhere between

12    34.7 percent and 23 percent, and the delta between those

13    two numbers is something that I alluded to before which

14    is administrative closure.

15              Administrative closure is one of those things

16    that's permitted before immigration courts to close

17    cases for various reasons, but generally to allow

18    someone to become eligible for a benefit somewhere else.

19    I'm really not entirely clear why that would be

20    appropriate in this instance, but the cohort report does

21    indicate that some of them are because the alien failed

22    to appear at the -- the alien applicant failed to appear

23    at the interview, but they don't break it down anymore

24    than that.

25              So there's a significant difference between the

Page 114

1    asylum grant rate before immigration judges and the

2    asylum grant rate is reported by DHS in the cohort

3    report.

4           And I think that's actually written on this

5    before and I believe that that appears in the record.

6        Q.  Yes, well, in your expert testimony that was --

7    you covered, but we're speaking on behalf of the State

8    of Louisiana today, so we won't go into that.

9        A.  I'll also note that the State of Louisiana does

10   actually have within the Department of Justice it's own

11   expertise with respect to these matters.  Tracy Short,

12   who is an assistant AG in DOJ was a former trial

13   attorney with both, INS and ICE.  He was a Former Deputy

14   District Counsel with ICE.  He was the Former Principal

15   Legal Adviser at ICE.  And he was a Former Chief

16   Immigration Judge with the United States.

17       Q.  And he works for the State of Louisiana now?

18       A.  To the best of my knowledge, I believe that he's

19   an Assistant Attorney General there.

20       Q.  Okay.  So if we look back at paragraph 3.  "The

21   increase in asylum approval rates will incentivize even

22   higher rates of illegal immigration into the United

23   States."

24           What is illegal immigration in this context mean?

25       A.  Illegal immigration means the unlawful entry of a

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 115

1    foreign national into the United States in violation of

2    Section 212(a) of the INA, particularly Section

3    212(a)(7), and Section 212(a)(6)(a), unlawful entry.

4         Also with respect to inadmissibility under

5    Section 212(a)(7), at the ports of entry.

6         Collectively we refer to those as encounters, so

7    encounters is the sum total of aliens apprehended by

8    border patrol after entering illegally, plus those

9    noncitizens who are deemed inadmissible at the ports of

10   entry.

11   Q.  What evidence do you have that migrants are aware

12   of the IFR?

13   A.  The -- there are a -- most -- many of the

14   noncitizens who enter the United States come with

15   snuggling organizations.  Those smugglers induce

16   individuals to come to the United States based upon

17   promises that they've made.

18        In fact, President Biden when he was vice

19   president, I believe talked about this in Guatemala City

20   in June of 2014, so the greater availability of this is

21   one of those things that, you know, is common knowledge

22   within individuals who have expertise in immigration.

23   The individuals are enticed to enter the United States,

24   at the past, of smugglers.

25        Moreover, one of my colleagues, Todd Benzman, was

Page 116

1    down at the southwest border in during the summer, and

2    Mr. Benzman asked an asylum officer why so many people

3    were coming now.  And he was told by the asylum officer

4    -- not by the asylum officer.  By the boarder patrol

5    agent, let me correct that -- that individuals were

6    coming to receive cash payments in the United States.

7            Mr. Benzman wasn't really sure what they were

8    talking about.  He spoke to a woman who was a Venezuela

9    national who said that the availability of such benefits

10   was actually broadcast in the media in Venezuela and

11   should come directly to this country from Venezuela.

12       Q.  But your friend heard from an asylum officer, who

13   heard from migrants that they are aware of certain

14   things but not specifically the IFR?

15       A.  With respect to the IFR, no, but they did talk

16   about cash benefits which really didn't make any sense

17   in this context.

18       Q.  Okay.  But my question was about the IFR.  And I

19   -- you know, I'm just looking at the clock and I want to

20   get you out of here in time.

21          What --

22       A.  The greater -- the greater --

23       Q.  What evidence or -- I'm sorry.

24          What evidence, or data, or documents can you

25   point to that this IFR is incentivizing migration?

Page 117

1          A.   Anything that facilitates the entry and presence

2     in the receipt of benefits in the United States is

3     something that will encourage people to come to the

4     United States.  We refer to them as push factors that

5     push people out of their country and pull factors that

6     bring them to the United States.

7               Judge T. Kent Wetherell, II, in Florida vs.

8     United States, actually talked about the fact that the

9     release of migrants into the country was actually

10    encouraging more migrants to come to this country.

11              In the National Defense Authorization Act of

12    2017, Section 1092 of that which is called NDA 2017, the

13    Congress set forth metrics to determine the

14    effectiveness of what was called the consequence

15    delivery system, and reports have to be filed annually

16    by DHS to Congress, and also to the government

17    accountability office with respect to that.

18              And what that indicates is that individuals who

19    enter the United States unlawfully in violation of

20    Section 212 of the INA respond to consequences that will

21    be imposed on them, as well as to non-consequences that

22    would be imposed on them.

23         Q.   Okay.  So my question was what documents or

24    evidence do you have that this IFR is incentivizing

25    migration, you cited to a decision from a court in the

Andrew Arthur , 30(b)(6)                              November 30, 2023

Page 118

1    Northern District of Florida in a lawsuit that did not

2    have anything to do with the IFR, and you cited to a

3    document from 2017 which was five years before the IFR

4    took place.

5         So --

6    A.   Well, actually that's an annual reporting that is

7    required of DHS every year, so it's in NDA 2017, it's

8    now in federal statute, it's 6USC, I think it's 223, but

9    don't quote me on that.

10        It's in Title 6 of the U.S. Code, and it is the

11   statement of Congress with respect to an understanding

12   that consequences encourage people to come to the United

13   States.  Or discourage people from coming to the United

14   States.

15        And with respect to the current statement that I

16   made about Mr. Benzman.  Mr. Benzman actually recorded

17   the border patrol agent while he was telling him that

18   and actually spoke directly to the Venezuela national

19   who told him that as well.

20             MS. RYAN:  Okay.  Well, we're going to call

21   for production of that then.  If you're saying that's

22   relevant to showing incentivizing migration under the

23   IFR, then, Counsel, we would call for production of that

24   recording.

25   BY MS. RYAN:

Andrew Arthur , 30(b)(6)                    November 30, 2023

                                                    Page 119

1        Q.  I'm showing you what we're marking as Exhibit I.

2        A.  It's on Twitter, by the way.

3        Q.  I'm showing you what we're marking as Exhibit I.

4    For the record this is ECF22.

5             (Exhibit I was marked for identification.)

6    BY MS. RYAN:

7        Q.  Have you ever seen this document before, Mr.

8    Arthur?

9        A.  I don't know that I have.

10       Q.  You can see here from the title this is a

11   memorandum in support of a motion to postpone the

12   effective date of the asylum IFR or in the alternative a

13   preliminary injunction.  This was filed in the docket in

14   this case.

15            Looking at page -- looking at page 12, if I can

16   get my keyboard to work.

17            Can you read that?  Do you need me to zoom in?

18       A.  I can read, I wear bifocals.

19       Q.  Just looking right here.  Referring to AO's

20   asylum officers, who have an infamously lax track

21   record.  Do you know what that means?

22       A.  In this particular context we can review the

23   credible fear grant rates, the Department of Justice

24   publishes that.  And the document that I think is in the

25   record, between FY2008 and the fourth quarter of FY2019.

Andrew Arthur , 30(b)(6)                                    November 30, 2023

Page 120

1    And it shows that asylum officers find credible fear in

2    about 81 percent of all cases, but out of a hundred

3    individuals who claim a fear of harm or request asylum,

4    but at the end of the day, only about 14 percent of that

5    100 were just less than 17 percent of them were granted

6    asylum.

7          With respect to the lax track record, we know

8    that USCIS, asylum officers were actually represented by

9    a union, I think it's called Local 116.

10         Local 116 has filed amicus briefs and most

11   recently, I think it was most recently, filed a comment

12   in response to what was called the Circumvention of

13   Lawful Pathways rule, in which they made statements

14   about the safety of foreign nationals in foreign

15   countries.  You know, having been an adjudicator myself,

16   having been a member of an immigration judge union that

17   suggests a certain lack of objectivity with respect to

18   those individuals.

19         In fact, as an immigration judge I was under very

20   tight restrictions to make any public statement on

21   social media.

22         I also note that Jaddou, who is the current

23   director of USCIS, who was also a former colleague of

24   mine when I was on the judiciary committee.  I can't

25   remember whether she worked for Zoe Lofgren, who was a

Page 121

1    member of the committee or who was a committee staffer,

2    but she is currently the director of USCIS.

3         Ms. Jaddou was previously the head of something

4    called Department of Homeland Security Watch and

5    America's Voice, which is an activist organization.  And

6    when she was in that role she talked about CBP being

7    President Trump's I think personal malitia was the

8    phrase that she used.  She is the person --

9    Q.  Mr. Arthur --

10   A.  I'm sorry.

11   Q.  -- I think we've gotten very far off topic, so

12   let's just focus back in.

13        You said the track record is related to asylum

14   officers finding of credible fear, right?

15   A.  Lack of objectivity.  And if you take a look at

16   the asylum officer manual with respect to any review

17   process in the affirmative application process, the

18   review consists of at the senior asylum officer level of

19   ensuring that the -- that the, that the grant is clear,

20   concise, complete and correct, but that is just one of

21   several factors, including the fact that the A-file for

22   the case is in neat order and that it doesn't have any

23   loose papers and that it has other documents that are

24   attached.

25        That's very different from the immigration court

Andrew Arthur, 30(b)(6)                          November 30, 2023

Page 122

1    system in which either party can appeal a decision of

2    the asylum grant or an asylum denial to the Board of

3    Immigration Appeals.

4            And then the Department of Homeland Security,

5    ICE, can seek certification from the Attorney General or

6    the alien respondent can seek, can file a petition for

7    review with the Circuit Courts under Section 242 of the

8    INA.

9        Q.  There's a different standard for granting asylum

10   than there is for finding credible fear, isn't there?

11       A.  There is.  But the credible fear standard is

12   lower, but it's not that much lower.  It's a substantial

13   likelihood that the person is going to be eligible for

14   asylum.  Substantial likelihood is lower than the well

15   founded fear statute, but it's not significantly lower

16   that it would account for a huge drop off from 81

17   percent to 14 percent or 17, just less than 17 percent,

18   depending on how you would assess it.

19       Q.  Okay.  So the credible fear standard is lower

20   than the asylum standard?

21       A.  It is, but in my expert opinion it's not

22   significantly lower.

23           I also -- and again, this is going to be not

24   expert -- I'm sorry.  Not expert testimony for the

25   state, but in my own individual --

Page 123

1      Q.  Mr. Arthur, you're speaking on behalf of the

2   State today.

3      A.  Okay.

4      Q.  So you will have a deposition to speak to your

5   expert opinion, but if it's not on behalf of the State

6   of Louisiana, then we shouldn't talk about it today.

7      A.  Okay.

8      Q.  Individuals who work in Louisiana have to pay

9   income tax, right?

10     A.  I believe they do.  I don't know what the minimum

11  level for income tax is, and there's an earned income

12  tax credit that's available.

13     Q.  Okay.  But that's a yes, they pay income tax?

14     A.  Some do.

15     Q.  And if an individual buys property they pay

16  property tax?

17     A.  Yes, they do.

18     Q.  And if they shop in the state they pay sales tax?

19     A.  Yes, they do.

20     Q.  And that includes noncitizens, they are not

21  exempt from those taxes based on their immigration

22  status?

23     A.  No, there's no real way to assess that except

24  with respect to the ITC.

25     Q.  So the State of Louisiana collects income tax,

Andrew Arthur , 30(b)(6)                                  November 30, 2023

                                                          Page 124

1        property tax, and sales tax from noncitizens who are

2        within their state, correct?

3            A.  That is correct.  But if I may --

4            Q.  Mr. Arthur, there's no question pending.

5            A.  Sorry, Counsel.

6                 MS. RYAN:  Give me one moment.  I believe we

7        should be all set, but let me just double check with the

8        team.

9                 (Recess was taken.)

10       BY MS. RYAN:

11           Q.  Mr. Arthur, would you like to revise, or change

12       any of the answers that you gave today?

13           A.  I don't believe so, Counsel.

14                MR. ST. JOHN:  The witness reserves the

15       right to review.

16           A.  Of course I reserve the right to review.

17           Q.  Yes, of course.  But while we're still on the

18       record --

19           A.  You said that at the outset, yes, ma'am.

20           Q.  Yes.

21                MS. RYAN:  Okay.  Scott, did you have any

22       follow up questions?

23                MR. ST. JOHN:  Yes, very briefly.

24                          EXAMINATION

25       BY MR. ST. JOHN:

Andrew Arthur , 30(b)(6)                                    November 30, 2023

                                                                Page 125

1          Q.  Mr. Arthur, you talked to -- in preparation for

2     the deposition today, you talked to the director of

3     Medicaid at the Louisiana Department of Health, correct?

4          A.  That is correct.

5          Q.  And members of her staff, correct?

6          A.  I did, sir.

7          Q.  You talked to the TANF director and the SNAP

8     director at the Department of Children and Family

9     Services, correct?

10         A.  That is correct, sir.

11         Q.  You talked to the deputy superintendent for

12    finance of the Louisiana Department of Education,

13    correct?

14         A.  That is correct.

15         Q.  You talked to Former Chief Immigration Judge

16    Tracy Short of the Louisiana Department of Justice,

17    correct?

18         A.  That is correct.

19         Q.  And Mr. Short is it's fair to say an expert on

20    immigration law and issues related to immigration?

21              MS. RYAN:  Objection.

22         A.  With respect to my resume I'm pretty proud of it,

23    but Mr. Short's resume puts mine to shame, in all

24    modesty.

25    BY MR. ST. JOHN:

Page 126

1      Q.  You reviewed documents in preparation for today's

2   deposition, correct?

3      A.  That is correct.

4      Q.  Hundreds and maybe thousands of pages?

5      A.  I did, Counsel, yes.

6      Q.  How many hours did you spend reviewing documents?

7      A.  I spent somewhere between 40 and 80 hours

8   reviewing documents.

9          And, again, I wish I can give you a set time.  I

10  didn't sit down for a 40-hour period, but I would review

11  the documents so that I would be as adept as an expert

12  on these issues as I could be.

13     Q.  And in developing knowledge you learned that

14  there are a large number of asylees who participate in

15  Louisiana's SNAP program, correct?

16     A.  I did.  There was a document to that effect in

17  the record.

18     Q.  And you learned that there are a large number of

19  asylees and asylum applicants that participate in the

20  Louisiana's Medicaid program, correct?

21     A.  That is correct as well, sir.

22     Q.  And --

23     A.  And, in fact, the numbers have increased, I

24  believe it was -- in the time frame that I was looking

25  at hasn't quite doubled but it's increased by about 45

Page 127

1    percent since 2019.

2        Q.  And the State has ever reason to believe that

3    those large numbers will continue, correct?

4        A.  Yes.  They have -- nothing that anyone told me

5    indicated that they were going to decrease.  And quite

6    frankly, it is a conclusion that they will increase.

7        Q.  Mr. Arthur, is the State of Louisiana aware of a

8    CBO study regarding the impact on taxes from immigrants?

9        A.  In December of 2007 -- and by CBO you're

10   referring to the Congressional Budget Office?

11       Q.  Yes, Mr. Arthur.

12       A.  Yeah, the Congressional Budget Office actually

13   did an analysis of taxes that are paid by unauthorized

14   noncitizens in the United States, and it was a survey

15   and an analysis of various studies that had been done by

16   other organizations, and it concluded that the amount of

17   taxes that those individuals pay didn't actually -- were

18   lower than the amount of the services that they

19   received.  Primarily -- not primarily, but a lot of that

20   was education.

21       Q.  And Mr. Arthur, you were asked a series of

22   questions about incentivization and push, pull.  Is the

23   State of Louisiana aware of then Chief Ortiz's testimony

24   in Florida of the United States on this issue?

25       A.  When you refer to Chief Ortiz, I assume you're

1    referring to border patrol Chief Raul Ortiz?

2        Q.  Correct.

3        A.  Yeah, so Raul Ortiz was deposed in the course of

4    the litigation in United States vs. Florida, and he made

5    several statements with respect to the flow and the

6    incentivization of the flow.

7        Q.  And the statements -- Chief Ortiz's statements,

8    and forgive me I don't have his testimony in front of

9    me, were part of -- addressed a broader principal that

10   border flow response to policy, is that a fair

11   statement?

12       A.  Yes.  And honestly that's always been known.

13   Border patrol does assessments of what they anticipate

14   the flow was going to be in time.

15           And, again, I was -- served as an Associate

16   General Counsel at the INS on the enforcement team, I

17   had jurisdiction over border patrol and I'm familiar

18   with those analyses.

19       Q.  And that Chief Ortiz's testimony was supported by

20   documents produced, I believe, in connection with the

21   MPP litigation surveys of migrants, is that correct?

22           MS. RYAN:  Objection.

23       A.  With respect to --

24           Can you ask the question again, Counsel?  I

25   apologize.

Andrew Arthur , 30(b)(6)                                    November 30, 2023

                                                            Page 129

1     BY MR. ST. JOHN:

2          Q.   Is the State of Louisiana aware of Federal

3     Government documents related to surveys of migrants on

4     push/pull factors?

5               MS. RYAN:  Objection.

6     BY MR. ST. JOHN:

7          Q.  You can answer, Mr. Arthur.

8          A.  Yeah, documents that were presented in force of

9     that litigation I think it was more than a year of

10    discovery and analysis.

11              MR. ST. JOHN:  Thank you, Mr. Arthur.  I

12    have no further questions.

13              MS. RYAN:  Nothing further.  Thank you very

14    much, Mr. Arthur.  I appreciate your time.

15              (Deposition concluded at 2:36 p.m.)

16              (Signature reserved)

17

18

19

20

21

22

23

24

25

Page 130

1    STATE OF NORTH CAROLINA

2    COUNTY OF WAKE

3

4                    REPORTER'S CERTIFICATE

5

6        I, Diane Pressley, Court Reporter and Notary

7    Public, do hereby certify that the above-named witness

8    was duly sworn by me prior to the taking of the

9    foregoing deposition; and that said deposition was taken

10   and transcribed under my supervision, to the best of my

11   ability; and that the foregoing pages, inclusive,

12   constitute a true and accurate transcription of the

13   testimony of the witness.

14       I do further certify that the persons were

15   present as stated in the caption.

16       I do further certify that I am not of counsel for

17   or in the employment of any of the parties to this

18   action, nor am I interested in the results of this

19   action.

20

21

22

23

24       DIANE PRESSLEY

25       Notary Public #201019500159

Page 131

1    Scott St. John, Esquire

2    Stjohnj@ag.louisiana.gov

3                          December 3rd, 2023

4    RE:    State Of Arizona Et Al v. Garland, Merrick Et Al

5          11/30/2023, Andrew Arthur , 30(b)(6) (#6327624)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   (erratas-cs@veritext.com).

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

Page 132

1    State Of Arizona Et Al v. Garland, Merrick Et Al

2    Andrew Arthur , 30(b)(6) (#6327624)

3                  E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Andrew Arthur , 30(b)(6)                    Date

25

                                                      Page 133

1    State Of Arizona Et Al v. Garland, Merrick Et Al

2    Andrew Arthur , 30(b)(6) (#6327624)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Andrew Arthur , 30(b)(6), do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Andrew Arthur , 30(b)(6)                    Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

| **0** |
| --- |
| **01130**  1:5 |

**1**

**1**  4:16 18:12
30:10 42:15
43:7,10 46:15
58:4,11,21
59:2 62:9
83:15,20
**1.22**  26:6,15
**10**  21:21 63:22
84:4
**100**  120:5
**106**  31:18
**1092**  117:12
**11**  17:14 21:16
21:18 28:23
31:2
**11/30/2023**
131:5
**110**  4:17
**112**  84:3
**116**  120:9,10
**119**  4:20
**11:01**  3:6
**12**  49:21
119:15
**12.54**  113:8
**12/1/19**  35:7
**1208.6**  78:1
98:15
**124**  4:4
**12:45**  63:18
**14**  27:6 120:4
122:17
**1445**  130:23

**15**  47:1
**164**  75:16 88:2
**17**  27:2 48:3
52:23 120:5
122:17,17
**18**  48:3 103:2
**1885**  2:4
**19**  21:25 27:10
96:18 97:5
**1980**  73:9
**1982**  51:6
**1996**  18:3
65:16

**2**

**2**  30:18 47:2
58:4,11,22
70:22 111:10
**20**  4:9 70:13
133:15
**20044**  2:10
**2007**  127:9
**201019500159**
130:25
**2014**  115:20
**2017**  117:12,12
118:3,7
**2018**  35:5
37:20
**2019**  35:5,6
37:20,20 127:1
**2019-2020**  27:3
**202**  2:10
**2020**  32:7 35:6
35:8 37:21
59:20
**2021**  4:11 32:7
35:8 39:4

83:16 89:6
106:1
**2021-2022**  27:9
**2022**  4:11 18:4
19:22,23 27:9
39:4 60:5,10
89:3,11 105:24
**2023**  1:14 3:6
4:13,14 57:12
57:13 59:20
78:24 89:6
106:2 110:14
110:19,20
131:3
**2023-2024**  49:9
**208**  19:2
107:12
**208.6**  51:17
77:4,24 98:15
**21**  70:23
**212**  63:9 115:2
115:3,3,5
117:20
**22**  26:5,5
**223**  118:8
**225**  2:5
**23**  113:12
**235**  18:12 62:9
62:11
**240**  111:23
**241**  18:6,19
**242**  122:7
**25**  75:23
**27**  78:24
**28**  17:15
**29**  19:23
**29th**  19:22

**2:30**  104:12
**2:36**  129:15
**2a**  59:2 92:25

**3**

**3**  18:6,19 28:24
30:19 41:6
47:22 58:4,11
58:22 112:18
112:22 114:20
**3.59**  59:20
**3/15/23**  4:12
48:12
**30**  1:11,14 3:1
3:6 14:15 15:5
15:20,22 16:16
19:24 20:3
23:18,25 61:24
131:5,17 132:2
132:24 133:2,4
133:12
**300**  95:13,13
**308**  97:18
**31**  4:10
**32**  67:3
**3235**  31:8
**326-6766**  2:5
**3301**  32:17
**3340**  31:9
**34.7**  113:12
**35**  83:15
**3588**  83:14
**3825**  83:15
**39**  4:11
**3rd**  131:3

[4 - additional]                                                          Page 2

| 4 | 6usc 118:8 | above 48:8 | actually 9:6 |
|---|---|---|---|

**4**

**4**  14:15 15:5
30:19 48:1,3
58:23 59:5
92:13 96:18
103:6
**4,015**  26:1
29:18,18
**40**  60:2 65:18
65:19 126:7,10
**42**  71:7 88:19
**440,000**  75:10
**45**  126:25
**48**  4:12

**5**

**5**  4:3 42:13
63:9
**50**  70:11
**532-5802**  2:10
**57**  4:14
**589**  92:4

**6**

**6**  1:11 3:1
15:20,22 16:16
19:24 20:3
23:18,25 115:3
118:10 131:5
132:2,24 133:2
133:4,12
**60**  107:9
**6327624**  131:5
132:2 133:2
**67.23**  103:13
103:17
**6:22**  1:5

**7**

**7**  43:16 115:3,5
**70**  32:21 34:7
**70802**  2:4
**7500**  30:14
50:25
**78**  4:15

**8**

**8**  28:24 43:19
52:24,24
**80**  126:7
**81**  120:2
122:16
**83**  4:16
**868**  2:9
**8cfr**  51:17 77:4
77:24 78:1
98:14,15

**9**

**9**  43:19 52:24
**90**  70:11
**94**  17:7

**a**

**a.m.**  3:6
**ability**  18:23
19:8 33:9
42:20 44:6
53:10 60:22
61:2 98:19
130:11
**able**  6:19 62:19
67:21 70:7
97:19 106:5
109:22

**above**  48:8
130:7 131:6
133:7
**aca**  95:23
**acadian**  54:15
**accept**  42:9
**access**  11:17
100:3 107:7
**accommodati...**
54:24
**account**  122:16
**accountability**
117:17
**accounting**
27:14
**accrued**  65:18
**accuracy**  131:9
**accurate**  9:3
28:13 49:22
50:23 130:12
**accurately**  5:17
**acknowledge...**
133:3
**acknowledg...**
131:12
**act**  14:19 19:3
65:15 75:21
92:17 117:11
**action**  1:5
130:18,19
**activist**  121:5
**activities**  32:12
32:22 34:14,16
34:17,22 41:10
69:13
**actual**  35:13
81:9 84:19,24
88:23

**actually**  9:6
10:6,23 18:11
18:13 25:15
26:25 28:14,21
28:23 37:8,21
41:10 44:5
51:1 53:7
60:12 61:1
62:8,15 63:8
64:12 67:14
68:14 69:10,16
69:22 70:4,9
71:5 72:17,21
73:10,24 77:4
87:24 88:20
89:22 100:13
103:19 105:25
106:21 107:13
107:19,25
109:13 113:2
114:4,10
116:10 117:8,9
118:6,16,18
120:8 127:12
127:17
**actuals**  35:6
**added**  37:16
82:5
**adding**  59:5
**addition**  19:7
61:16 69:14
72:18 74:1
89:24 104:22
106:10
**additional**  28:6
30:13,16 61:11
61:17 62:1

Case 6:22-cv-01130-DCJ-CBW   Document 217-50   Filed 01/29/24   Page 137 of 177 PageID #:
10669
Andrew Arthur , 30(b)(6)                                    November 30, 2023
[additions - amount]                                              Page 3

additions   133:6
addressed
   128:9
adept   126:11
adherence
   13:11
adjudicated
   62:19 69:7
adjudicating
   70:19
adjudication
   66:8 111:23
adjudications
   112:10
adjudicator
   17:25 120:15
adjustments
   59:5
administer   8:4
   86:7 104:21
administered
   22:19 30:23
   96:17 97:24
   98:7,10
administering
   76:10 89:2
administrating
   106:3
administration
   51:12,13 87:9
   98:3
administrative
   68:13 69:5,25
   86:19,20 87:13
   87:20 88:7,16
   88:17,22 89:22
   108:4,5 113:14
   113:15

administrativ...
   108:2 110:2
admission
   62:11
adopted   4:12
   48:12
adults   14:20
advantaged
   29:21
adversarial
   18:14 112:11
advised   51:13
adviser   114:15
aegis   41:2
affect   25:22
   27:11 70:5
   87:6 106:21
   107:3
affirmative
   121:17
affordable
   92:17
afghani   72:18
   94:8
ag   114:12
ag.louisiana....
   2:5 131:2
age   72:1 96:18
   103:2
aged   44:1
agencies   22:18
   24:5 68:22
   73:19 76:5,14
   89:7
agency   21:20
   70:18 89:25,25
agent   116:5
   118:17

ago   15:11
agree   7:4,7,10
   7:17 8:2,6,12
   8:18 14:20
   49:3 53:5
agriculture
   68:16 87:20
   89:1
ahead   15:13
   35:17 37:12,13
   40:14 50:1
   84:3,16 86:16
aided   1:25
al   1:3,7 131:4,4
   132:1,1 133:1
   133:1
alien   82:23
   91:22 97:19
   113:21,22
   122:6
aliens   17:25
   19:4,5 113:5
   115:7
alito's   112:2
allegations
   24:13
alleged   65:24
   67:8,19 68:11
alleging   24:6
   64:16,24 76:20
   90:19
alleviate   62:6
allocated   88:10
allocation   59:4
allocations
   47:22 48:4
   58:3,18

allotted   131:20
allow   16:19
   18:10 74:4
   113:17
allowed   51:23
   72:5
allows   61:12
   62:14 63:2,7
   108:5
alluded   113:13
alphabet   78:13
   83:9
alternative
   4:20 119:12
amended   4:17
   111:4
amenity   64:12
america's
   121:5
american
   53:24
amicus   120:10
amis   112:10
amount   4:15
   25:12,25 26:24
   29:16,24 30:1
   30:3 33:13,13
   33:19 34:9
   36:22 37:6,21
   42:5 46:9 60:8
   78:20 80:11
   84:24,25 86:4
   87:1,11,24
   90:11 104:2,5
   104:19 105:2
   105:10,16
   106:2,8 127:16
   127:18

| | | | |
|---|---|---|---|
| **amounts** 42:1 | **anymore** | 66:7,8 69:7 | 133:1 |
| 80:2 84:19 | 113:23 | 70:1,19 98:16 | **arrivals** 72:19 |
| **analyses** | **ao's** 119:19 | 106:20 | **arthur** 1:11 3:2 |
| 128:18 | **apologize** | **applied** 68:6 | 5:1,6 8:1,9 |
| **analysis** 127:13 | 31:21 36:9 | 73:12 77:6,10 | 15:19 16:20 |
| 127:15 129:10 | 39:9 45:12 | 98:17 109:15 | 17:2,9 24:16 |
| **andrew** 1:11 | 60:6 65:22 | 112:4 | 24:18 31:10 |
| 3:1 5:1 131:5 | 67:7 110:18 | **applies** 96:19 | 35:17 40:14 |
| 132:2,24 133:2 | 128:25 | **apply** 66:20 | 41:19 45:1,11 |
| 133:4,12 | **appeal** 122:1 | 74:3 75:10,24 | 46:1 50:1,13 |
| **annual** 25:10 | **appeals** 122:3 | 91:13 96:1 | 53:15 56:3 |
| 59:3 118:6 | **appear** 63:14 | **applying** 82:18 | 63:6,19 64:2 |
| **annually** 59:24 | 74:3 113:22,22 | 97:11 | 65:22 71:15 |
| 75:16 117:15 | **appearances** | **appointed** | 84:16 86:16 |
| **answer** 5:18 | 2:1 | 28:25 31:3 | 108:24 109:8 |
| 6:4,14,25 | **appearing** 3:5 | 40:16 | 111:2 119:8 |
| 24:16,18,24,24 | **appears** 50:2 | **apportion** 30:6 | 121:9 123:1 |
| 34:24 37:5,13 | 58:2 109:16 | 33:13 | 124:4,11 125:1 |
| 41:19 43:25 | 114:5 | **apportioned** | 127:7,11,21 |
| 45:11 46:1 | **appended** | 25:25 26:25 | 129:7,11,14 |
| 50:13 67:14,21 | 133:7 | 51:1 | 131:5 132:2,24 |
| 67:24 93:11 | **applicable** | **apportionment** | 133:2,4,12 |
| 94:1 95:10 | 131:8 | 43:14 | **arthur's** |
| 97:3 109:7,8 | **applicant** 78:4 | **appreciate** | 101:14 |
| 110:17 129:7 | 91:21,22 | 15:1,8 129:14 | **articulate** |
| **answered** | 113:22 | **apprehended** | 60:19 61:7 |
| 41:18 67:12,13 | **applicants** | 115:7 | 75:1 89:15 |
| 76:24 | 62:10 78:3 | **appropriate** | 106:5 108:25 |
| **answering** 96:8 | 97:7 108:6 | 33:13 113:20 | **arts** 48:5,9 |
| **answers** 5:11 | 126:19 | **appropriations** | **asian** 72:16 |
| 6:11 124:12 | **application** | 83:24 | **asked** 6:25 15:2 |
| **anticipate** | 18:25 19:1,1 | **approval** | 29:25 30:1 |
| 128:13 | 66:22,25 69:14 | 112:23 114:21 | 41:18 42:6 |
| **anticipated** | 69:15 92:3 | **approvals** | 67:11,13 76:24 |
| 25:16 86:25 | 121:17 | 113:3 | 95:17 108:25 |
| **anticipates** | **applications** | **april** 110:14,19 | 116:2 127:21 |
| 25:12 | 17:25 18:5,24 | **arizona** 1:3 | **asking** 5:10,17 |
| | 51:19 62:18 | 131:4 132:1 | 12:16 44:9 |

[asking - based]                                                                              Page 5

| | | | b |
|---|---|---|---|
| 56:4 74:17 | **asylum** 4:19 | **attorney** 1:7 | **b** 1:11 3:1 4:10 |
| **asserted** 8:16 | 17:24 18:5,10 | 12:20 28:21 | 14:15 15:5,20 |
| **assess** 18:14 | 18:13,16,17,25 | 79:2 112:11,12 | 15:22 16:16 |
| 34:9 74:4 | 19:1,10,17 | 114:13,19 | 18:6,12,19 |
| 122:18 123:23 | 51:19 61:11 | 122:5 131:13 | 19:24 20:3 |
| **assessing** 73:21 | 62:3,4,18,24 | **attorneys** | 23:18,25 31:5 |
| **assessment** | 66:4,7,8,9,20 | 12:13,18 | 31:6 61:24,24 |
| 28:4 29:19 | 66:22,25 68:1 | **attributable** | 62:9 131:5 |
| 30:11,15 33:4 | 68:7 73:4,12 | 60:20 61:8 | 132:2,24 133:2 |
| 41:12,12 46:25 | 77:6,10,16 | 89:16 106:6,25 | 133:4,12 |
| 54:14 56:15 | 78:3,4 80:21 | **authorization** | **b220** 73:19,19 |
| 61:2 | 89:20 92:2,24 | 80:19 117:11 | 76:4,4 |
| **assessments** | 93:3,22 94:11 | **authorized** | **back** 20:12,18 |
| 38:4 128:13 | 94:12,17 97:7 | 38:14 85:13,15 | 20:19,22 27:24 |
| **assist** 16:20 | 98:16 99:25 | **authorizes** 14:2 | 31:21 42:3,7,7 |
| **assistance** | 106:17,20 | **automatic** | 46:7 63:18 |
| 11:14,16 69:1 | 107:4,8,13,14 | 45:20 | 69:19 75:18 |
| 69:4 71:2,3 | 107:21,22 | **automatically** | 88:5 98:23 |
| 80:25 102:6 | 108:6,10,11,23 | 45:22 52:10 | 99:9,11,13,22 |
| 103:11 105:17 | 110:13,18 | 94:13,17 | 114:20 121:12 |
| **assistant** | 111:11,13,19 | **availability** | **background** |
| 114:12,19 | 112:4,10,24 | 70:3 115:20 | 11:18 |
| **associate** | 113:3,4,8,9,10 | 116:9 | **balanced** 33:19 |
| 128:15 | 114:1,2,21 | **available** 14:7 | **balancing** 35:1 |
| **associated** | 116:2,3,4,12 | 34:10,12 43:4 | **bar** 66:3 78:2 |
| 69:17 | 119:12,20 | 56:21 65:6 | 81:25 91:11,12 |
| **assume** 6:2 | 120:1,3,6,8 | 92:14 97:21 | 92:12 93:21 |
| 13:7 72:6,13 | 121:13,16,18 | 99:1,2 123:12 | 94:10 95:1,5 |
| 82:8 127:25 | 122:2,2,9,14 | 131:6 | 98:15 100:7 |
| **assuming** 91:4 | 122:20 126:19 | **average** 44:17 | 102:21,25 |
| **assured** 76:5 | **asylum3588** | **award** 47:16 | **bars** 72:15 |
| **asylee** 4:15 | 4:16 | **aware** 9:5,9 | 102:17 |
| 78:19 80:11 | **attached** | 47:20 76:25 | **base** 43:7,13 |
| **asylees** 75:22 | 121:24 131:11 | 81:17 112:6 | 46:8 |
| 79:4 80:9,12 | **attachment** | 115:11 116:13 | **based** 23:20 |
| 91:19 108:10 | 16:17 | 127:7,23 129:2 | 26:3 28:1 |
| 126:14,19 | **attain** 91:20 | | |

29:19 33:5,13
42:20 43:14
45:15 46:25
49:6 53:23
56:15 61:2
71:18 72:1
75:6 82:3
84:25 85:22
86:24 87:8,23
90:15 93:13
97:10 101:1
104:3,5 105:1
105:2,5 107:1
107:3 115:16
123:21
**basic**   13:23
33:8
**basically**   26:6
52:20 71:6
100:25
**basis**   7:8,18
18:21 25:10
97:23 100:20
101:2 102:21
111:17
**bates**   10:16
31:8 32:17
39:5 48:22
78:20,23 83:14
**baton**   2:4
**becoming**
105:9 107:4
**beginning**
25:20,20,21
101:19 110:16
110:17
**behalf**   1:11 2:2
2:6 3:2,3 23:25

112:11,13
114:7 123:1,5
**believe**   11:18
12:3,12 15:15
16:20,22 17:7
17:15 21:6,17
21:22 22:2
23:7 27:8
31:25 39:15
48:7,18 53:16
57:6,17,21
62:23 75:11,18
76:4 78:8,22
79:7,19 82:7
85:4 88:4 89:6
99:8 106:2
110:10 114:5
114:18 115:19
123:10 124:6
124:13 126:24
127:2 128:20
**ben**   2:9
**beneficiary**
87:3
**benefit**   63:10
63:13 66:10
81:10 82:12
88:21 91:22
113:18
**benefits**   11:14
26:21 45:5,16
47:23 52:23
64:10 65:13
67:9 68:2
71:19,20 87:18
90:7 91:17,20
102:4 109:15
110:4 116:9,16

117:2
**benzman**
115:25 116:2,7
118:16,16
**bese**   4:12 27:25
28:19,20,23
29:13 41:14,20
42:3,6,7,7
48:12
**best**   37:6 54:11
54:21 71:13
73:15 74:9,19
75:4 76:1
90:14 93:9,24
94:15,22 95:8
97:1 98:11
102:8 105:12
112:6,16
114:18 130:10
**better**   62:4
**beyond**   7:15
34:23 35:16
36:5,14 37:3
37:25 38:16,23
39:22 40:1
42:24,25 47:17
48:25 49:23
53:13 55:5
57:2,20 58:1
60:14 64:6
72:3 75:5
87:25 90:13
103:22
**biannually**
83:21
**biden**   51:13
115:18

**bifocals**   119:18
**bilingual**   30:20
55:9
**bill**   4:16 27:23
32:4 42:4,5
83:15,20,20
84:21 86:11,13
**billed**   100:16
**billing**   88:5
**billion**   59:20
**bit**   21:1
**blank**   16:12
78:16
**block**   70:23
75:15 86:18
88:2
**board**   25:11
27:21,24,25
28:3 30:25
40:8,15,16,17
40:18,19 122:2
**boarder**   116:4
**border**   18:8,9
18:15 61:14
112:1 115:8
116:1 118:17
128:1,10,13,17
**born**   68:13
71:8
**bottom**   32:5
58:9
**box**   2:9
**branch**   109:19
110:8
**break**   6:23,24
7:1 8:14 52:3,6
63:17 66:18
67:1 87:4

113:23
**breaks** 6:22
**briefly** 42:13
64:20 124:23
**briefs** 120:10
**bring** 61:17
117:6
**broadcast**
116:10
**broader** 128:9
**broken** 17:15
65:10 85:7
**budget** 4:14
32:6,9,10,11
35:4,7,7 36:4
37:19 42:1
57:13 60:3,11
88:10 89:5,5
89:14 105:13
106:4 127:10
127:12
**budgetary**
28:16,18 30:4
38:3 41:7
47:13 55:21
60:11
**budgeted** 38:10
**budgeting** 28:7
35:19 84:9
85:16
**button** 74:2
**buys** 46:17
123:15

**c**

**c** 4:11 39:3,6
**cajun** 53:19,22
54:10

**calculation**
60:24
**call** 8:12 12:22
14:18 118:20
118:23
**called** 3:2 26:7
26:19 27:25
65:1 66:21
69:2 70:10
71:4 81:4 91:6
98:20,25
100:14,21,25
117:12,14
120:9,12 121:4
**calls** 12:22
24:12 38:2
45:9,10,24
49:24 50:10
95:9 97:2
103:23
**camera** 63:23
**capacity** 1:6
23:17
**caption** 130:15
**captured** 54:13
**card** 65:17
71:5,5,6 81:1,3
81:6,7,9,12,14
90:7,12
**cards** 91:15
**care** 91:7 92:17
100:18,23
101:1 106:10
**career** 44:20
**carolina** 3:4
12:21 130:1
**case** 11:23
13:13 16:1,9

23:15 79:15,19
79:21,21 80:1
103:2 108:1
111:5 119:14
121:22
**cases** 9:14
107:5 110:2
113:4,8,17
120:2
**cash** 71:2,3
102:6 116:6,16
**categories**
35:11 44:20
91:16
**category** 43:11
43:22 44:14,23
45:18,20 46:5
**caution** 84:13
**cbo** 127:8,9
**cbp** 18:15
121:6
**center** 9:13
23:9 98:24
**certain** 26:16
45:5,15,16
46:18 52:16
55:9 65:11
70:12 71:17,18
72:16,17 73:1
92:10,11 97:6
116:13 120:17
**certainly** 54:9
**certificate**
130:4
**certification**
122:5
**certify** 130:7
130:14,16

**cfr** 106:23
**chance** 6:15
**change** 89:14
92:4 124:11
132:4,7,10,13
132:16,19
**changed** 18:10
19:3,3,7 60:5,9
89:3,10,12
105:23
**changes** 6:19
6:20 17:24
63:4 131:10
133:6
**charges** 71:7
**charitable**
55:22
**charter** 48:4
**chat** 19:25 20:6
20:7,8
**check** 124:7
**chief** 114:15
125:15 127:23
127:25 128:1,7
128:19
**child** 65:20
73:24 85:9
**children** 22:21
29:23 30:12,16
45:4 62:22,22
64:14 65:3
68:21 76:9,21
79:16 84:4,8
86:3 93:1,4
96:18 103:2
125:8
**children's** 92:9

Andrew Arthur , 30(b)(6)                    November 30, 2023

chip 92:9,10,13
  92:15,23 95:16
  95:17 96:15,17
  96:17,18,24
  97:4,4 103:3,4
  103:6
choice 14:4,7
chose 13:6
circuit 122:7
circular 4:13
  57:12
circumstances
  30:12 51:21,22
  97:6
circumvention
  120:12
cited 117:25
  118:2
cites 106:23
citizen 97:17
  102:22
citizens 61:21
  65:7 72:24
  91:3,11
citizenship
  19:8 60:22
  82:17
city 42:16
  46:21 115:19
civil 1:5 2:8
  44:4 51:10
civilized 14:20
claim 111:11
  111:18,19
  112:7 113:6
  120:3
claiming 28:10
  29:2 90:25

92:21
claims 18:2
  25:1 51:20
  62:4 64:21
  100:11 111:14
  111:22 112:24
clarify 11:21
  54:19 56:1
  73:1 108:8
  110:12
clarifying
  72:13
class 29:5,9
classified 38:21
clear 10:13
  52:9 53:4 58:8
  58:13 113:19
  121:19
clearinghouse
  107:7
clearly 5:15
clock 14:7
  116:19
close 47:18
  52:18 113:16
closed 108:2
  110:2
closest 30:15
closure 108:4,5
  113:14,15
cmms 98:25
cms 98:25
  109:13
code 79:6,8
  80:19 109:16
  118:10
cohort 107:23
  110:13,18

113:10,20
  114:2
colleague
  104:13 120:23
colleagues
  115:25
collect 33:18
collectively
  115:6
collects 33:14
  123:25
college 44:2
  49:21
column 58:10
  58:21,24 59:3
  59:8
columns 35:15
  58:8
come 25:7
  29:16 45:13
  56:18 63:18
  69:19 93:1,4
  109:14 112:1
  115:14,16
  116:11 117:3
  117:10 118:12
comes 27:24
  55:13 88:23
coming 24:9
  64:18 90:21
  108:21 116:3,6
  118:13
commencing
  3:6
comment 6:19
  14:3 120:11
committee
  120:24 121:1,1

common 85:16
  115:21
commonly
  53:18 71:1
company 71:3
  81:4 98:20
  99:4,20
compiled 30:4
complaint 4:17
  11:6 12:1,2
  24:13 111:4
complete 6:11
  67:24 121:20
  133:8
completed
  131:17
completion
  107:8
compliance
  70:21,24
complied 13:7
  95:14
comply 7:21
  13:5,15 70:7
  74:22 77:20
components
  41:21
computer 1:25
  79:6
concise 121:20
conclude 34:2
  41:3 60:15
  112:15,15
concluded
  127:16 129:15
concludes 28:4
conclusion
  24:13 38:2

61:16 127:6
**concurs**  28:4
**conditions**  8:24
93:6 95:19
96:14
**conduct**  15:4
18:13
**conducted**
18:11
**conference**  8:5
**confidentiality**
77:25 78:1
**confirm**  55:1
**confrontational**
112:8
**congress**  63:8
117:13,16
118:11
**congressional**
35:20 127:10
127:12
**conjunction**
41:1 70:13
**connection**
128:20
**consent**  13:20
**consequence**
62:16,17
117:14
**consequences**
117:20,21
118:12
**consequently**
77:8
**consider**  43:2
**consideration**
73:10

**considered**
42:4
**considers**
27:23
**consistent**
13:13
**consists**  31:2
121:18
**constitute**
130:12
**constitution**
25:5 27:18
30:9
**consult**  104:12
**contained**
106:1
**content**  12:16
**context**  32:3
38:18 72:8
107:13 112:17
114:24 116:17
119:22
**continuation**
35:8 36:12
**continue**  127:3
**continues**
58:20
**contract**  88:20
90:14,16
**contractor**
81:5 90:9
**contracts**
100:19
**contributing**
46:18
**contribution**
32:20 33:1
47:13

**contributions**
55:20,23,23
**convention**
18:7,20
**conversations**
12:17 22:18
99:15
**copies**  131:14
**copy**  15:25
16:21 66:23
**core**  27:18 30:7
112:9
**correct**  6:15,18
10:6,19 11:25
15:15,20,21
17:3,7 19:19
19:23 23:15,16
24:3,9,10,20
26:10 28:5
30:25 32:24
37:17,18,21
38:11 40:6
42:11,17,18
43:9,12,23
46:11,12,15,16
46:24 47:24
48:6,7 49:4,14
50:8,9 52:11
52:12 55:16
57:7,8 58:11
58:12,25 59:1
59:7,9,16,21
59:25 64:18,19
70:2 71:2 73:6
78:10 80:3,4
82:16 84:2
85:2,11,12
86:5 90:8,22

90:23 98:1
105:21 108:11
108:13 111:5
116:5 121:20
124:2,3 125:3
125:4,5,9,10
125:13,14,17
125:18 126:2,3
126:15,20,21
127:3 128:2,21
133:8
**corrected**  4:18
**corrections**
133:6
**cost**  25:8 28:16
41:22 42:15,19
58:15,18 59:4
60:4 62:2,13
62:24 68:13,18
69:6,16 71:8
86:20 88:16
89:2,22 105:14
105:23
**costs**  55:16
61:11 62:6
69:20,25 87:13
87:20 88:7,17
88:22
**counsel**  6:1
7:10,20 8:2,23
11:25 12:3
15:1,21 16:8
16:19 17:4,17
17:21 19:19
20:14,21 21:1
21:9,13,15,19
21:24 22:4,8
23:16 24:17,25

[counsel - defendants]                                                      Page 10

| | | | |
|---|---|---|---|
| 26:12 32:25 | 95:1 106:10 | **credit** 71:6 | **d.c.** 23:11 |
| 35:12 36:17 | 124:16,17 | 81:6,9 90:7 | **data** 9:24,25 |
| 37:18 38:19 | 128:3 | 123:12 | 10:1,1,9 |
| 39:10,13,23 | **court** 1:1 2:9 | **creditability** | 116:24 |
| 40:7 42:12 | 5:11,16,18 | 19:12 | **date** 4:19 19:20 |
| 44:12 45:12 | 6:17 7:24 8:3 | **criminal** 63:15 | 49:3 119:12 |
| 46:12,16,20,25 | 14:16,18,23,24 | **criteria** 65:5,7 | 132:24 133:12 |
| 47:7,20,25 | 18:22,22 57:8 | **cs** 131:15 | **dated** 40:2 |
| 48:16 49:1,17 | 78:10 83:4,7 | **cuban** 66:5,12 | **dates** 80:3 |
| 50:3 51:5 | 111:25 117:25 | 68:3 73:7,9 | **day** 23:23 |
| 54:19 55:25 | 121:25 130:6 | 75:23 89:21 | 120:4 133:15 |
| 57:15,18 58:12 | **court's** 51:6 | 91:19,25 94:2 | **days** 107:9 |
| 59:1,7,17,25 | **courts** 113:16 | 94:6 95:1 | 131:17 |
| 60:6 63:21 | 122:7 | 106:19 | **dc** 2:10 |
| 64:19 65:25 | **covered** 51:3 | **culture** 53:25 | **dcfs** 68:21 69:8 |
| 67:20 72:7 | 87:14 114:7 | **current** 9:11 | 70:5,17 76:17 |
| 76:3,19 80:4 | **covers** 49:20 | 10:8 12:2,3 | 79:4,20 82:22 |
| 83:2,13 84:2,6 | 55:15 | 27:15 110:14 | 90:2 |
| 85:12 90:23 | **covid** 106:11 | 110:19,20 | **december** |
| 98:1 101:22 | **create** 26:19 | 118:15 120:22 | 127:9 131:3 |
| 108:13 109:4 | 61:17 | **currently** 8:9 | **decision** 41:15 |
| 111:3,9 114:14 | **created** 39:19 | 22:23,25 23:8 | 41:21,25 51:6 |
| 118:23 124:5 | 39:23,25 48:24 | 29:18 90:2 | 117:25 122:1 |
| 124:13 126:5 | 49:4,8 57:19 | 107:5 121:2 | **deck** 39:16 |
| 128:16,24 | **creative** 48:5,9 | **custody** 66:13 | **declare** 133:4 |
| 130:16 131:14 | **credibility** 19:6 | 68:8 | **decrease** 47:14 |
| **count** 26:5 43:7 | 19:13 | **customs** 18:9 | 127:5 |
| 43:8 46:8 | **credible** 18:2 | **cut** 104:11 | **dedications** |
| **countries** | 18:11 19:5,9 | 110:16 | 36:25 37:16 |
| 120:15 | 51:20 61:13 | **cv** 1:5 | **deemed** 68:6 |
| **country** 61:19 | 62:2 63:5 | **cycle** 28:16 | 115:9 133:6 |
| 116:11 117:5,9 | 66:17,23,24 | 41:6 47:13 | **defendant** |
| 117:10 | 68:4,5 77:7 | 49:9 60:11 | 15:23 |
| **counts** 43:17 | 78:4 98:18 | | **defendant's** |
| **county** 130:2 | 113:5 119:23 | **d** | 12:5,11 |
| **couple** 61:10 | 120:1 121:14 | | **defendants** 1:8 |
| **course** 11:7 | 122:10,11,19 | **d** 4:12 48:11,13 | 1:12 2:6 63:14 |
| 15:2 81:19 | | 63:9 | 78:24 |

| | | | |
|---|---|---|---|
| **defense** 117:11 | 98:10 99:1,2,3 | **depositions** | **difference** |
| **defer** 24:17 | 99:16 103:15 | 15:9,12 | 35:14,21 75:1 |
| **defines** 49:12 | 104:18 105:10 | **deputy** 114:13 | 84:10 85:18 |
| 50:14 | 107:22 113:1 | 125:11 | 113:25 |
| **definitely** | 114:10 119:23 | **description** 4:8 | **different** 23:24 |
| 105:15,15 | 121:4 122:4 | **detail** 64:22 | 30:12 32:3 |
| **degree** 23:4 | 125:3,8,12,16 | **details** 64:23 | 42:14 58:10,19 |
| 66:12 88:15 | **departments** | **detained** 62:12 | 61:10 64:3 |
| 106:17,18 | 83:25 84:22 | 107:5 | 72:11 73:14 |
| **delivery** 117:15 | 85:1 | **determination** | 75:9 80:2,3,5 |
| **delta** 113:12 | **depending** | 18:17 19:6,10 | 83:25 84:7 |
| **denial** 122:2 | 122:18 | 19:13,14 66:17 | 85:7 92:5 |
| **denials** 113:3 | **depends** 81:23 | 66:24,24 68:6 | 95:20 96:5 |
| **denied** 112:5 | **deponent** 7:4 | **determinations** | 121:25 122:9 |
| **department** | 131:13 133:3 | 18:23 78:5 | **differentiate** |
| 2:3,8 4:10 9:21 | **deposed** 13:18 | **determine** 40:5 | 80:16 |
| 10:1,2,10,11 | 128:3 | 79:4 86:22 | **differentiating** |
| 10:14 11:9,10 | **deposing** | 98:19 117:13 | 93:18 |
| 12:23 22:20,21 | 131:13 | **determined** | **differently** |
| 22:22 29:1,13 | **deposition** 1:11 | 29:14 45:8,14 | 29:21 51:1 |
| 30:24 32:1,7,9 | 3:1 4:9 5:16,20 | 46:9 62:11 | **differs** 33:22 |
| 32:12 37:24 | 6:13,22 7:3,4,6 | 81:2 | **difficult** 60:23 |
| 38:8 39:20 | 7:8,18,24 8:13 | **determines** | **direct** 34:8,15 |
| 40:10,19,20 | 8:19,21 9:17 | 42:15,16 64:4 | 37:15 88:5 |
| 41:1,3 44:3,4 | 12:14 13:2,4,7 | **determining** | 106:13 |
| 51:10,11,24,25 | 13:16,21,24 | 8:15 112:7 | **directed** 17:14 |
| 52:15 53:1 | 14:4,9,16,21 | **developing** | 32:22 |
| 56:16 57:21 | 15:2,4,5,5,16 | 126:13 | **directly** 56:18 |
| 60:25 61:1 | 15:17,22 16:17 | **dhs** 109:13 | 61:8 67:15 |
| 62:25 65:2 | 16:25 17:4,8 | 110:13,18 | 116:11 118:18 |
| 68:15,20 73:24 | 17:18 19:16 | 112:1 113:10 | **director** 98:5 |
| 76:8,21 77:13 | 20:3 22:12,14 | 114:2 117:16 | 120:23 121:2 |
| 77:14 79:3,3 | 22:17 23:21 | 118:7 | 125:2,7,8 |
| 79:15 84:4,8 | 24:1,22 83:3 | **dialect** 53:18 | **directs** 24:23 |
| 84:18,20 85:7 | 108:9,12 123:4 | **diane** 1:24 3:3 | **disability** 44:21 |
| 86:3,22 87:20 | 125:2 126:2 | 57:6 83:6 | **disadvantaged** |
| 88:25 95:12 | 129:15 130:9,9 | 130:6,24 | 26:4,7 29:23 |
| 97:25 98:2,6,8 | | | 43:20 44:20 |

45:3,4,8,14,23
46:5
**disclosed**  51:21
**disclosure**  77:5
78:2 98:16
**discourage**
118:13
**discovery**
129:10
**discrete**  70:5
**discretionary**
85:18,20,24
**discuss**  17:16
**discussed**  43:8
43:15 48:2
55:6,8
**discusses**  40:4
**discussing**
58:11,21 59:3
**distributed**
55:14
**distribution**
32:23
**district**  1:1,1
2:9 30:17
33:14,15,16,22
34:10,13 42:21
43:4 51:16
56:14 61:3
114:14 118:1
**district's**  32:21
47:12
**districts**  30:14
33:5,7,12
36:23 51:13
52:17 55:24
56:19 61:5

**disturbed**  8:10
**division**  1:2 2:8
44:4 51:10
85:8,9,9,10
**divisions**  85:7
**docket**  119:13
**document**  4:10
16:6,14,15
31:4,14,25
32:2,6,25
35:13 36:15
37:4 38:17
39:3,5,8,14,15
39:17,25 40:4
41:20 48:10,15
48:17,23,24
49:11,15,17
50:2 57:5,14
57:16,17,19,24
58:2,13,14,14
71:14 73:18
76:3 78:8,15
78:21,22,25
79:1 80:7,8,19
83:17,18 86:11
95:12 97:16
110:21 111:8
112:3 113:10
118:3 119:7,24
126:16
**documents**
9:16,20 10:4,7
10:13,16,21,21
10:24,25 11:3
11:5,6,8,10,13
11:18 12:7
16:1,3 20:8
27:8 55:21

73:17 76:6
80:16,17,18
89:14 97:11,13
105:13 106:4
107:21 109:17
116:24 117:23
121:23 126:1,6
126:8,11
128:20 129:3,8
**doe**  44:1 51:6
**doh**  109:13
**doing**  67:2
**doj**  114:12
**dollar**  88:19
**dollars**  32:20
32:23 33:2
37:9 71:7
75:16 88:2
**double**  124:7
**doubled**  126:25
**doubt**  103:24
**draw**  68:19
89:25 91:23
106:12
**draws**  70:3
**drop**  19:24
122:16
**due**  47:5 59:13
59:15
**duly**  5:2 130:8

**e**

**e**  4:13 15:13
36:9 57:7,9,11
99:8 132:3,3,3
**earlier**  6:14
43:8,21 83:8

**earned**  123:11
**easier**  19:25
20:16 111:12
**ebt**  81:9
**ecf22**  119:4
**ecf86**  111:7
**economic**
111:12
**economically**
26:4,7 29:23
43:20 44:20
45:3,3,8,14,23
46:5
**economy**  44:22
**education**  4:10
11:11 22:22
25:5,11,14
26:22 27:19,21
28:1,4 29:13
30:24 31:1
32:1,7,9,12
34:15,17 36:23
37:24 38:8
39:20 40:9,10
40:15,20,20
41:1,3 42:15
42:17,19 44:3
44:3,21 50:21
51:8,9,11
52:15,23 53:1
55:5 56:16
57:22 58:4
62:25 64:11,13
125:12 127:20
**educational**
55:15 56:24
60:4,8

effect  126:16
effective  4:19
  119:12
effectiveness
  117:14
eft  59:2
either  14:2
  25:20 50:15
  82:1 92:1
  97:16 102:23
  106:19 122:1
elderly  72:4
elected  28:24
  31:3
electronic
  81:10
elementary
  25:11 27:21,25
  28:3 31:1 40:9
  40:15
eligibility  64:5
  65:5 69:22
  71:10,25 72:1
  73:13,14,16,20
  73:21 74:5,21
  74:22 75:2
  76:6 77:11,19
  81:20 82:10,11
  93:6,13 95:19
  95:24,25,25
  96:4,14,21,24
  97:5,12
eligible  18:16
  18:16,18 47:4
  47:15 57:1
  65:13,19 66:10
  66:15 67:9
  68:1,7,8,17

73:2,4 74:7,17
75:3,7,22
76:12 80:24
81:2,16,22,25
89:20 91:4,17
91:20,23 92:25
94:18 95:6
100:8,22 101:3
101:12 102:12
102:16,18,25
103:3,6 105:9
107:4 113:18
122:13
email  8:12 83:2
emergency
  91:6,7 92:7,13
  92:16 97:21,22
  102:25
employed
  22:23 23:2,8,9
  73:23 82:22
  85:16 90:2
employee  23:6
  69:6 87:3,14
employee's
  70:1 88:18
employees
  68:20,23 69:8
  87:10 90:1
  99:16
employment
  76:11,22 80:19
  80:19 109:17
  130:17
enacted  35:6
  35:14
encountered
  18:8,15

encounters
  115:6,7
encourage
  117:3 118:12
encouraging
  117:10
enforcement
  128:16
english  26:7,14
  26:17,20 27:7
  27:11 28:12,15
  29:8,25 44:18
  44:23 45:2,17
  45:21,21 46:2
  46:4 50:6,7,8
  50:15,16,17
  52:10,22 53:2
  53:25 55:1,3,4
  64:10 69:21
  82:14
enrolled  25:17
  41:11 50:20
  51:3 74:15,16
  77:3,23 87:5
  98:13
enrollees  88:23
  89:21 104:3
  105:20
enrollment
  11:12
ensure  34:7
  64:13 70:20
ensuring
  121:19
enter  26:23
  61:18 62:10
  111:13 115:14
  115:23 117:19

entering  60:16
  115:8
enticed  115:23
entire  6:3
  13:13 58:13
  59:24
entirely  15:15
  35:18 86:12
  113:19
entitled  57:12
  67:20,23 78:19
  83:15 102:12
entitlement
  82:23
entity  110:7
entrants  66:5
  66:13 68:3
  73:7,9 91:19
  92:1 94:2,6
  106:19
entry  18:9
  79:25 112:2
  114:25 115:3,5
  115:10 117:1
eob  84:11
equitable  32:23
equity  64:12
equivalents
  38:15
erin  2:7 14:1
erin.t.ryan
  2:11
errata  131:11
  131:13,17
erratas  131:15
errors  6:18
esquire  2:3,7
  131:1

established
109:23
estimated
41:22
et  1:3,7 131:4,4
132:1,1 133:1
133:1
everybody
97:15
evidence  9:22
10:5,18 11:1
11:18 71:13
73:15 74:9,19
75:4 76:1 93:9
93:25 94:15,22
95:8 97:1
112:25 115:11
116:23,24
117:24
exactly  105:22
108:18
examination
5:4 124:24
examinations
4:1
examined  5:2
example  102:2
examples  43:16
43:19
except  8:14
23:4 36:25
42:2 50:24
51:21 70:6
73:7 75:23
96:18 123:23
exception  91:6
95:16

excluded  95:5
excuse  36:20
45:21 82:2
105:19
executive  28:22
109:19 110:7
113:2
exempt  123:21
exhibit  4:9,10
4:11,12,13,15
4:16,17,18
20:4,5 31:5,6
39:3,6 48:11
48:13 57:7,9
57:11 78:9,11
83:1,10 110:9
110:11 119:1,3
119:5
exhibits  4:7
existed  111:22
existing  35:7
36:4
exists  112:8
expanded
92:10,18,23
95:24 96:11
97:4
expansion
92:15 95:19
96:5,25 103:3
expedited  18:1
18:21
expenditures
38:13 84:8
85:6,21,22,24
85:25
experience
53:24

expert  11:24
22:25 23:5,15
23:18 24:1,2
114:6 122:21
122:24,24
123:5 125:19
126:11
expertise  23:20
35:24 36:17
49:6 114:11
115:22
explain  26:20
28:20 47:7
79:12
explained
79:12
explanation
67:22
explanatory
47:7
extent  7:5
extraordinary
47:5,16
eyesight  36:10

f

f  4:15 78:9,11
83:1,5 110:9
face  101:14
facilitates
117:1
facilities
100:23,24
fact  50:24 53:5
53:20 64:7
75:10 92:10
109:18 112:16
115:18 117:8

120:19 121:21
126:23
factor  104:24
factored  46:15
factors  43:14
45:15 105:1
117:4,5 121:21
129:4
factual  44:13
failed  113:21
113:22
fails  131:19
fair  17:11
125:19 128:10
fall  71:18 72:17
91:15 102:2
falls  40:22
false  111:14
familiar  17:19
31:19 35:19
39:12,13 84:17
128:17
families  11:15
45:4 65:3 69:2
70:11,12 76:22
84:9 86:3
family  11:15
22:21 68:21
73:24 75:6
76:9 79:16
84:5 85:9,10
107:14 125:8
far  121:11
fast  62:3
faster  62:5
67:9
fear  18:2,11
19:5,6,10

Andrew Arthur , 30(b)(6)                                November 30, 2023

[fear - foundation]                                                  Page 15

51:20 61:13
62:2 63:5
66:17,23,24
68:4,5 77:7
78:5 98:18
113:5 119:23
120:1,3 121:14
122:10,11,15
122:19
**february** 25:16
27:14 41:13
**federal** 7:15
10:14 51:18
68:15 69:5,24
70:6,10,22
77:19 78:6
86:18,21 87:12
87:16,17 88:6
88:9,12,24
89:9 93:12
96:12,20 99:24
99:24 102:10
103:7,11,17,19
105:17 109:12
109:19 118:8
129:2
**feds** 104:2
**fee** 90:15,15
100:14 101:5
**feel** 14:9 64:23
**fellow** 9:12
23:13
**fewer** 50:25
**ffs** 100:14
101:6,10
**fields** 74:4
**figure** 30:5

**figures** 37:8
**file** 66:21
121:21 122:6
**filed** 106:20
117:15 119:13
120:10,11
**filing** 92:2
**final** 14:15
17:23 19:17,20
41:21,25 59:9
59:11
**finance** 85:8
125:12
**financial** 69:3
98:21 99:12
**financing**
37:17
**find** 6:18 16:5
23:22 120:1
**finding** 12:7
112:16 121:14
122:10
**fine** 36:1 37:14
**finish** 5:17
37:13
**first** 5:2 21:16
21:21 26:21
43:20 46:11
49:10 58:10,21
79:25 113:7
**fiscal** 32:6 35:5
35:6,8,9 37:20
37:20,23 49:8
87:23,24
**fit** 97:16
**fitap** 69:3,23
70:4,7 71:2,3
73:13,19 74:3

74:8,15 75:13
75:14,24 76:5
76:10,12,16
77:23 81:11,15
81:21 82:6
85:11 86:5,17
87:13,16 88:1
89:2,10,12,16
90:8 91:3 98:9
100:9
**five** 44:19
65:17 66:3
73:5 91:12,16
94:10 95:1,5,6
100:7 118:3
**flat** 87:1 90:15
104:2
**florida** 117:7
118:1 127:24
128:4
**flow** 128:5,6,10
128:14
**fluency** 53:25
**fluent** 52:22
55:4 64:9
69:21
**fmap** 105:17
106:9
**fmep** 103:12,13
**focus** 121:12
**follow** 62:20,20
64:2 73:20
76:5 93:1 96:3
107:15 124:22
**followed** 77:17
**follows** 5:3
95:11,23

**food** 65:1 71:2
79:6 80:25
**force** 41:8,9
129:8
**forced** 28:6
42:8
**foregoing**
130:9,11 133:5
**foreign** 61:18
61:20 107:12
115:1 120:14
120:14
**forgive** 128:8
**form** 66:21
**formal** 26:22
52:23 64:10
**former** 114:12
114:13,14,15
120:23 125:15
**formula** 39:18
40:5 41:7,21
41:22 42:10,12
42:14 46:7,11
46:13 49:5
50:19 59:9,10
71:18
**formulas** 82:4
**forth** 62:8
71:14 73:17
95:12 96:12,20
102:9 117:13
**forward** 105:8
**found** 112:21
**foundation**
11:12 22:1
24:7 25:2,23
29:3,11,12
30:11,23 32:14

[foundation - going]                                                    Page 16

32:18 33:11
34:6 35:2
39:18 40:6,22
42:11 49:5,13
49:20 50:20,25
51:3 55:7,11
55:14 56:4,24
60:20 63:1
**founded**
122:15
**four** 39:17
59:10 107:6,24
**fourth** 119:25
**frame** 126:24
**franklin** 2:9
**frankly** 127:6
**fraud** 112:20
112:21
**fraudulent**
111:22 112:5
**free** 14:9
**french** 53:12
53:16,18 54:5
54:15,16
**friend** 116:12
**front** 112:3
128:8
**fs** 79:6
**full** 9:2 21:11
38:14
**fully** 69:4,23
70:6
**function** 27:18
30:8 81:6
**functions** 81:8
**fund** 27:24
28:6,18 32:22
33:24 34:1

35:22 36:20
37:15 41:16
**funded** 69:4,24
70:6 86:17
**funding** 25:10
27:17 28:13
29:14 30:9,13
30:17 34:19
40:5 42:6,17
42:22,24 46:19
48:1 55:5,13
56:5,11,16,17
58:22 68:17
70:9 83:20,22
84:22 87:16,17
88:9,12,13
89:7,9 103:7
**funds** 34:7,19
56:12,12 58:23
86:8
**further** 129:12
129:13 130:14
130:16
**future** 15:9,12
**fy2008** 119:25
**fy2019** 119:25
**fy2022** 4:13
57:12
**fy2023** 49:6
113:8
**fy2024** 49:6

| g |
|---|

**g** 4:16 83:5,10
99:8
**gain** 54:3
**gained** 22:17
23:20 49:7

**gainswell** 98:21
99:6
**gainwell** 99:6,6
**garland** 1:6
131:4 132:1
133:1
**gastonia** 12:21
**gender** 72:2
**general** 1:7
9:23,25 32:22
33:24 34:1
35:22 36:20,20
37:15 55:5
74:14 109:21
114:19 122:5
128:16
**general's** 28:21
79:2
**generally** 9:7
10:3 29:16
54:3 64:24
66:9 80:10
106:15 113:17
**generated** 6:17
**generates** 33:7
46:21
**gifted** 30:2
44:22
**give** 5:12 6:10
6:15 9:2 19:20
36:7 64:23
67:23 71:5
73:10 96:8
102:1 104:7
124:6 126:9
**given** 6:8 88:23
133:9

**gives** 43:11
**giving** 41:6
**go** 5:8 16:12
17:11 20:12,18
20:22,25 21:1
21:5,11,20
27:22 28:11
29:14 30:16,19
30:22 31:21
35:17 37:12,13
39:9 40:14
50:1 58:6
63:23 64:22
68:18,19 69:15
69:18 84:16
86:1,16 99:24
104:13,14
105:21 114:8
**goal** 107:8
**goals** 32:19
**goes** 30:10
36:22 42:3,7
49:11 100:15
**going** 13:21
14:2 17:16
19:24 20:17,25
21:1,2,9,13,15
21:15 25:9,12
25:13,19,21
29:6 30:22
31:4 32:16
33:16 34:1
35:21 36:10
39:2,9 46:7
47:1,11,12
48:11,18 49:7
52:7 58:6 62:5
63:17,20 67:10

68:1,8,17,19
68:19 70:1,19
75:18 77:9
78:8 79:10
82:25 89:4
91:23 92:3
105:8 106:13
112:2 118:20
122:13,23
127:5 128:14
**good** 5:6,7
17:17 21:4
24:25 52:4
**gotten** 121:11
**government**
10:14 68:15
69:5,10,24
70:6,10,22
83:22 86:19,21
87:17 88:6,24
99:24,24
103:17 109:12
109:19 117:16
129:3
**governor** 28:25
28:25 30:8
40:17
**grant** 70:23
75:15 86:18
113:8,11 114:1
114:2 119:23
121:19 122:2
**granted** 61:12
66:4,9 67:25
73:4 77:16
93:3 94:11,12
94:17 99:23
106:17 107:12

107:14 108:11
108:23 110:4
120:5
**granting** 80:21
122:9
**greater** 115:20
116:22,22
**green** 59:14
65:17 91:15
**ground** 5:9
**group** 102:2
**grouped** 50:6
**growth** 47:5,16
**guatemala**
115:19
**guess** 6:4 35:21
36:6,7,9,16
49:7
**guide** 11:13
**guys** 104:7

**h**

**h** 4:17 110:10
110:11 132:3
**haitian** 66:5,12
73:7,9 89:21
91:19 92:1
94:2,6 95:1
106:18
**haitians** 68:3
75:23
**half** 71:8
**halfway** 84:3
**happen** 113:4
**happy** 63:20
**hardcopy**
10:15 39:17

**harm** 60:19
61:7 89:15
106:5 108:25
109:6,7,9
120:3
**harms** 106:24
108:20
**hats** 23:24
**hb1** 84:23
105:25
**head** 5:12
121:3
**header** 49:3
111:6
**health** 11:9
22:20 92:9
95:13 97:25
98:3,6 99:1,17
100:10 102:3,4
103:16 104:18
125:3
**hear** 5:23
**heard** 6:3
116:12,13
**hearing** 7:5
**held** 3:5 13:2,4
13:24
**help** 5:18 82:13
**helpful** 23:22
**hereto** 133:7
**hhs** 99:12,13
109:13
**hhscs** 103:20
**high** 112:21
**higher** 26:5
28:16 33:17,18
60:12,13
114:22

**hiring** 29:7
30:19,20
**historic** 25:18
**historical**
86:24 105:2
**historically**
105:5
**hmong** 72:17
**holders** 65:17
**holding** 7:3
**homeland** 10:2
10:10 51:25
61:1 77:14
99:3 107:22
121:4 122:4
**honestly** 9:11
108:3 128:12
**hospital** 100:15
**hour** 126:10
**hours** 70:13
126:6,7
**house** 4:16
83:15,20
**household** 75:7
93:14,14
**huge** 122:16
**human** 99:1
**humanitarian**
63:10,12
**hundred** 120:2
**hundreds**
126:4

**i**

**i589** 66:21
**ice** 114:13,14
114:15 122:5

| | | | |
|---|---|---|---|
| **idea** 33:10 | **ii** 117:7 | **impact** 68:25 | 118:22 |
| 39:23 | **illegal** 114:22 | 88:9,13 96:23 | **include** 34:16 |
| **identification** | 114:24,25 | 105:10 106:13 | 80:18,20 |
| 20:5 31:6 39:6 | **illegally** 112:1 | 127:8 | **included** 26:6 |
| 48:13 57:9 | 115:8 | **impacted** 92:2 | 30:8 45:2,17 |
| 78:11 83:10 | **immediate** | 92:3 | 46:4 49:13 |
| 110:11 119:5 | 62:20 107:14 | **impacts** 105:15 | 88:22 |
| **identify** 82:21 | **immediately** | 105:16 | **includes** 44:9 |
| 99:18 | 66:14 73:2,4 | **implemented** | 45:4,6 49:19 |
| **identifying** | 75:22 94:3 | 65:14 | 62:21 66:3,5 |
| 111:21 | **immigrant** | **implies** 74:15 | 123:20 |
| **ifr** 4:19 17:19 | 43:22 44:14 | **implying** 99:20 | **including** |
| 17:23 18:2,3 | 52:11 53:6 | **important** | 45:16 62:22 |
| 18:10 19:15 | 54:21 56:25 | 53:12 | 69:5,24 91:18 |
| 24:9 25:3 29:4 | **immigrants** | **impose** 28:15 | 97:6 121:21 |
| 51:2 60:20 | 26:20 52:21 | 61:11 62:12,24 | **inclusive** |
| 61:8,9,11,12 | 53:9 64:9 | **imposed** | 130:11 |
| 61:16 62:13 | 106:15 127:8 | 117:21,22 | **income** 50:5 |
| 63:2,4 64:18 | **immigration** | **imposes** 68:24 | 75:6 93:14 |
| 64:22 66:14,18 | 9:7,13,14 18:4 | **ina** 18:6,13,19 | 96:10 97:9 |
| 66:23 67:9 | 19:2,9,11 23:9 | 62:9,12 63:9 | 123:9,11,11,13 |
| 77:2,22 80:13 | 44:7,16 51:14 | 92:25 97:18 | 123:25 |
| 80:15 89:17 | 53:3,11,24 | 107:12 111:24 | **incomplete** |
| 90:21 91:1 | 57:4 61:7 | 115:2 117:20 | 6:14 67:11 |
| 92:2,4,21 | 71:24 72:9,11 | 122:8 | **increase** 25:9 |
| 98:12 99:19 | 73:2 74:12 | **inaccurate** | 25:17,18 26:15 |
| 100:5 106:7,16 | 93:17 96:23 | 6:14 | 26:24 27:1 |
| 106:21,23,25 | 97:14 102:19 | **inadmissibility** | 29:9,24 30:1,2 |
| 107:8,17,24 | 108:1 112:8,14 | 115:4 | 47:9,12 61:15 |
| 108:5,11,19,21 | 112:14 113:2 | **inadmissible** | 62:15 89:22 |
| 109:1,12,23 | 113:16 114:1 | 62:10 115:9 | 112:23 114:21 |
| 110:1,5 111:11 | 114:16,22,24 | **incentives** 47:3 | 127:6 |
| 111:19 112:22 | 114:25 115:22 | **incentivization** | **increased** 29:5 |
| 115:12 116:14 | 120:16,19 | 127:22 128:6 | 89:7 126:23,25 |
| 116:15,18,25 | 121:25 122:3 | **incentivize** | **increases** 25:8 |
| 117:24 118:2,3 | 123:21 125:15 | 114:21 | 26:2 28:12 |
| 118:23 119:12 | 125:20,20 | **incentivizing** | **independence** |
| | | 116:25 117:24 | 11:15 69:3 |

**index** 4:1,7
**indian** 72:23
**indicate** 113:11
113:21
**indicated** 127:5
**indicates** 27:9
117:18
**indicating** 49:4
**individual**
29:15 32:12
66:20,21 70:4
70:7 74:5,12
77:5,10 79:17
79:18,19,19,21
79:23 80:1,6
82:11,12 84:22
92:24 93:17
100:6,8 101:1
110:6 122:25
123:15
**individual's**
74:1
**individuals**
25:7 26:23
28:24 29:21
44:7,8 53:17
53:19 55:20,23
61:13,18,21
62:9,14,17,22
63:14 65:4
66:2,3 67:25
68:4 69:12,21
72:4,16,17,19
73:22 75:7
76:13 79:7
80:15 82:20
85:15 86:6
89:20 91:7,14

94:10 97:10,21
98:17,22 99:10
99:22,25 100:4
100:17 101:6
101:11 102:4
102:23 106:17
106:22 107:16
107:23,25
109:14,17,25
110:2,3 115:16
115:22,23
116:5 117:18
120:3,18 123:8
127:17
**induce** 115:15
**infamously**
119:20
**information**
21:8 22:12,16
28:8 51:17,19
51:23 52:1
77:5,12 78:2,3
78:5 97:19
98:14,16,22,25
99:14,15,21,23
100:4
**informed** 15:10
**informing** 44:5
**initial** 107:20
**injunction** 4:20
119:13
**injuries** 25:1
28:10 29:2
64:20,24 67:22
67:23 68:10
90:24
**injury** 24:7
64:16 65:23

67:8,18 76:20
90:20 92:21
**inmar** 71:4,7,8
81:4 88:19,20
90:6,12,15
**inquire** 44:6
51:14 53:10
54:21 57:4
60:22 77:18
**ins** 114:13
128:16
**instance** 35:18
113:20
**instant** 8:12
**institutional**
32:22
**instructional**
34:14,16,22
**insurance** 92:9
100:10
**interest** 64:12
65:22
**interested**
130:18
**interfere** 8:25
**interim** 17:23
19:17,20
**intermediary**
99:12
**intermediator**
98:21
**interpreted**
63:11
**interpreter**
81:19 82:7,13
**interrogatories**
12:11

**interview**
18:14 19:5
69:20 113:23
**interviews**
18:11
**invective** 14:25
**involve** 9:14
**involved** 12:7
12:22
**iraqi** 72:18
94:8
**issuance** 4:15
11:13 18:3
78:20 80:11
**issue** 13:25
14:3 15:9
127:24
**issued** 27:5
73:18 95:12
110:20
**issues** 16:10
125:20 126:12
**itc** 123:24

**j**

**jackson** 2:13
**jaddou** 120:22
121:3
**jefferson** 26:18
27:2,5,7,10
52:19 53:7
54:20,24 64:4
64:8
**job** 10:8 23:12
23:23
**john** 2:3 4:4
7:13,14,20 8:6
10:12,19 12:23

12:25 13:3,10
13:17 14:1,22
14:25 15:14
16:19 17:1,9
20:9,10 24:11
24:18,22 34:23
35:16 36:5,14
37:3,25 38:2
38:16,23 39:22
40:1,12,24
41:17 42:25
43:24 44:25
45:9,24 47:17
48:25 49:15,23
50:10 52:7
53:13 55:17,25
56:3,9 57:2,20
58:1 60:14
63:24 64:6
67:10,20 71:13
72:3 73:15
74:9,19 75:4
76:1,24 84:12
85:3 86:10,14
87:25 90:13
93:9,24 94:15
94:22 95:8,22
96:7,16 97:1
101:13,21
103:22 109:4
124:14,23,25
125:25 129:1,6
129:11 131:1
**join**  62:20,21
93:1 107:15
**joseph**  47:18
**joseph's**  84:13

**judge**  19:11
47:18 53:24
84:13 108:1
112:15 114:16
117:7 120:16
120:19 125:15
**judge's**  80:20
**judges**  18:4
114:1
**judiciary**
120:24
**july**  78:24
**jumping**  78:12
84:3
**june**  115:20
**jurisdiction**
18:5 128:17
**justice**  2:3,8
9:21 10:1,11
10:15 29:1
44:4 48:5
51:10,25 60:25
77:13 79:3
99:2 112:2
113:1 114:10
119:23 125:16
**juvenile**  48:5

**k**

**k**  49:21
**keep**  5:15 9:13
21:9,13,15,15
31:16 35:4
38:12 52:7
63:20 79:20
101:17
**keeping**  68:23

**kent**  117:7
**key**  111:20
**keyboard**
119:16
**know**  6:4,5,15
6:23 13:21
14:4 16:1 17:8
20:18 21:6
31:19 34:25
36:1,12 37:1
38:1,21 39:11
40:25 41:2,8
43:8 48:24
53:21 54:11,12
54:13 57:19,21
57:24 60:13
61:3,7 67:2
68:23 70:14,15
71:24 77:9,15
78:13 80:14,22
83:12 84:16
85:14,18 99:21
103:25 104:11
106:22 107:9
107:16,17,19
107:21,24
108:6,9 109:13
110:1,6,7,24
112:3 115:21
116:19 119:9
119:21 120:7
120:15 123:10
**knowable**
108:16,18
**knowing**  12:16
109:11
**knowledge**
22:11,13,15

37:6 54:11,21
77:13 90:14
98:11 102:8
105:12 114:18
115:21 126:13
**knowledgeable**
21:7,18,22
22:2,6,10
**known**  17:24
78:6 82:24
128:12

**l**

**l**  99:8,8
**lack**  21:8
120:17 121:15
**ladoj**  4:16
**lafayette**  1:2
**lag**  29:6
**language**  26:8
26:14,17,21
27:7,11 28:12
28:15 29:8,25
44:18,24 45:2
45:17,22 46:2
46:4 50:6,7,8
50:15,16,17
53:2,12,20,22
53:25 54:16
55:1,2,3 82:14
**laotian**  72:17
**large**  10:9
26:17 126:14
126:18 127:3
**larger**  75:12
**latimer**  2:13
**law**  9:7,12 13:4
14:1 23:13

Andrew Arthur , 30(b)(6)                                    November 30, 2023

| | | | |
|---|---|---|---|
| 38:24 40:12,24 | 131:23 | **limits**  77:4 | **looked**  11:4,5,5 |
| 41:17 43:24 | **legislature** | **line**  132:4,7,10 | 11:6,7,8,10,12 |
| 45:1,10,25 | 27:22,23 28:2 | 132:13,16,19 | 20:4 21:16 |
| 49:24 50:11 | 28:5,17 30:5 | **listed**  35:5 | **looking**  14:15 |
| 73:8 74:2 | 33:21 34:21 | **literally**  84:12 | 32:8,17 41:6 |
| 77:20 95:9 | 35:1 38:9 | 86:11 | 42:13 47:1 |
| 96:20 97:2 | 41:15,22,25 | **litigation**  9:14 | 49:10 50:19 |
| 102:10 103:23 | 42:4,5,8,8 | 10:16,22 23:5 | 62:8 71:10 |
| 125:20 | 47:23 56:18 | 128:4,21 129:9 | 101:13 116:19 |
| **lawful**  65:16 | 83:21 84:19,20 | **little**  5:20 | 119:15,15,19 |
| 120:13 | 87:7 104:19,25 | 20:25 21:1 | 126:24 |
| **lawsuit**  9:5,9 | 105:11 | 37:8 63:17 | **looks**  31:19 |
| 24:6 64:15 | **letter**  4:14 | **local**  32:20 | 39:11,12,16 |
| 90:19 118:1 | 57:13 | 33:2,5,6 34:3,4 | 46:13 |
| **lawsuits**  9:7 | **letters**  44:5 | 34:4,11,11,19 | **loose**  121:23 |
| **lawyer**  112:14 | **level**  13:23 | 42:22 43:2,3,3 | **lot**  16:1 28:8 |
| 112:15 | 30:10,18,19,19 | 46:13 47:3,6 | 127:19 |
| **lax**  119:20 | 42:15 43:7 | 47:12 56:5,5,9 | **louisia**  68:14 |
| 120:7 | 44:2 46:11,15 | 56:10,10,12,14 | **louisiana**  1:1 |
| **laying**  84:7 | 47:2,22 48:1,3 | 56:17,19,24 | 1:11 2:3,4 3:2 |
| **lays**  32:19 | 49:21 58:23 | 58:3,22 59:13 | 9:21 11:1,9,11 |
| 39:15,17 | 59:5,11 71:18 | 59:15 120:9,10 | 11:15 12:14,19 |
| **learn**  64:14 | 82:10 92:13 | **locality**  34:12 | 12:20 15:20 |
| **learned**  126:13 | 96:18 103:6 | 47:9 | 17:14 21:17 |
| 126:18 | 121:18 123:11 | **lofgren**  120:25 | 22:19,20,21,22 |
| **learner**  26:17 | **levels**  25:18 | **logically**  51:24 | 22:24 23:1,3,6 |
| 28:15 29:8 | 30:18 39:17 | **long**  58:17 67:2 | 24:1,6,9,17 |
| 44:18 50:6,7 | 42:14 49:11 | 82:2 | 25:1,4,4,6,7,8 |
| 50:15 | 58:4,11,21 | **longer**  47:4,15 | 25:9,14,19,22 |
| **learners**  26:8 | 59:10 70:25 | 69:22 95:7 | 25:23 26:5,16 |
| 26:14 27:8,11 | 112:21 | **look**  20:24 21:6 | 27:19,20 28:6 |
| 29:25 45:2,17 | **license**  90:10 | 36:19 37:8 | 28:10,17,23 |
| 46:2,4 | **likelihood** | 39:13 42:13 | 29:1,2,10,13 |
| **learning**  45:21 | 122:13,14 | 43:7 59:2 | 29:17 30:8,9 |
| 45:22 | **limited**  18:23 | 89:13 93:16 | 33:3,7,9,20,21 |
| **legal**  14:3 | 51:21,22 53:19 | 100:5 111:10 | 34:18 37:7,23 |
| 24:12 38:2 | 65:4 90:1 | 112:18 114:20 | 39:20 40:18 |
| 86:11 114:15 | 106:11 | 121:15 | 44:15 46:4 |

49:7,21 51:7,9
52:2 53:1,10
53:12 54:10,15
56:19 57:3
60:3,5,9,21
61:5,6,25 62:7
62:13 64:18,21
65:2,6 68:19
68:21 69:2,11
70:9 71:9,11
71:17 73:19
74:2,22 76:20
77:3,9,18,23
78:7 79:3
80:14,17,22
83:21 84:1
86:21 88:1
89:10,15 90:10
90:19,22,25
92:6,21 95:11
95:23 97:4,25
98:13,18,23
99:10 100:3,13
100:16,18
101:5 103:8,12
103:15,18
106:9 107:17
107:19,24
108:7,17
109:10,10,14
109:16,23
110:1,4 112:25
114:8,9,17
123:6,8,25
125:3,12,16
127:7,23 129:2
**louisiana's**
12:4,10 62:25

64:16 103:3
111:17 126:15
126:20
**louisianians**
75:11
**lovely** 20:11
**low** 37:9 50:5
**lower** 96:11
122:12,12,14
122:15,19,22
127:18
**lumped** 45:22

### m

**ma'am** 5:14,21
8:11,17 78:18
111:6 124:19
**madame** 14:23
**made** 14:6
17:25 18:2
19:10,14 26:2
29:19,20 30:15
38:4 41:12,13
54:14,24 55:20
56:16 63:1
84:18,21 85:1
87:8 88:5
110:13 115:17
118:16 120:13
128:4 133:5
**magnet** 61:17
**mail** 15:13
**majority** 53:19
**make** 6:18
14:18 15:2,7
18:17,23 24:23
33:17 36:6,16
55:23 58:6,7

60:24 61:2
74:7 75:2
85:25 96:9
105:5 116:16
120:20
**makes** 41:15,21
41:25 111:11
**making** 23:24
38:7 89:20
**malitia** 121:7
**managed**
100:18,23
**management**
85:8
**manual** 121:16
**march** 19:22
19:23 41:20,23
60:5,10 89:3
89:11 105:24
**maria** 2:13
**mark** 20:4 31:4
39:3 48:11
**marked** 4:8
9:22 10:4 20:5
31:6 39:6
48:13 57:9
78:11 83:5,10
110:9,11 119:5
**marking** 57:11
82:25 119:1,3
**match** 79:22,23
**matter** 11:2,6
11:19,23 12:2
77:19
**matters** 114:11
**mco** 100:25
**mcos** 100:25
104:23

**mean** 9:25 13:6
19:1 26:9 36:4
38:15 52:10,13
58:8 114:24
**meaning** 88:17
**means** 11:13
28:11 36:12
37:17 38:18,22
45:5 50:7,20
65:4 71:20,21
71:22 103:14
114:25 119:21
**meant** 11:21
**mechanism**
112:6
**media** 116:10
120:21
**medicaid** 22:6
45:16 74:1
90:18,20,25
91:2,4,6,23
92:5,7,20,22
92:23 93:7,13
93:16,23 94:3
95:20,21,24
96:5,5,11,11
96:25 97:21,24
98:5,7,13,24
99:10,20,23
100:8,22 101:3
101:8,9,12
102:7,13,16,18
102:21 103:1,8
103:11,13
104:4,6,19,21
105:9,17,23
106:3,6 107:18
108:20 109:1

125:3 126:20
**medical** 63:12
91:7 100:11,19
102:14 106:10
106:12,14
**medicare** 11:9
45:6 92:18
98:23,24 102:3
**meet** 12:13,18
65:7 91:4
**meetings** 12:17
**member**
100:20,23
101:2,4 104:23
120:16 121:1
**members** 31:2
40:16,17 72:23
104:24 107:15
125:5
**memorandum**
4:18 119:11
**mental** 8:24
**mentioned**
11:20 12:1
23:7,14 29:15
30:7 31:2 40:8
41:11 42:2
43:21 45:12
46:10 51:5
53:9 60:2 64:3
70:17 71:1
72:22 74:14
75:15,19 76:23
77:4,24 80:25
80:25 87:16
89:18 90:6
95:2 99:5
104:22 109:24

**mentioning**
50:5
**mentions** 32:8
33:24 41:7
47:3 64:7
**meritorious**
62:4 111:21
112:24
**merrick** 1:6
131:4 132:1
133:1
**message** 8:13
**met** 12:21
102:16
**method** 112:16
**metrics** 117:13
**mfp** 4:11,14
26:8,9 39:4
48:11 56:12
57:12 58:4
59:15
**middle** 27:13
52:24
**migrants**
111:12 115:11
116:13 117:9
117:10 128:21
129:3
**migration**
116:25 117:25
118:22
**million** 71:7
75:16 88:2,19
**mine** 120:24
125:23
**minimum**
11:12 22:1
24:7 25:2,23

29:3,11,12
30:11,23 32:14
32:18 33:10
34:6 35:2
39:18 40:5,22
42:11 49:5,13
49:20 50:20,25
51:3 55:7,10
55:14 56:4,23
60:19 63:1
70:8,21,24
101:17 123:10
**minor** 62:22
**minority** 53:17
**minus** 58:15,17
59:4,5,15
**minute** 63:16
**mirror** 78:1
**misleading**
109:5
**misstates** 55:18
**misunderstood**
56:1
**modesty**
125:24
**moment** 14:12
16:13 69:18
83:4 90:3
104:13,15
124:6
**money** 25:13
25:25 26:24
27:22 28:6,11
29:16,24 30:1
30:3,6 33:10
33:19 34:9,21
34:25 36:22
37:7 38:10

46:22 50:21,22
86:22 87:6,11
87:22 88:23
103:14,21
104:25 105:2,4
105:5,10,16,19
105:20 106:3,8
**moneys** 35:21
**month** 100:20
101:2 104:23
**morning** 5:6,7
**motion** 4:19
14:19 119:11
**move** 26:14
64:3
**mpp** 128:21
**multiple** 108:8
108:12
**multiplied** 46:9
**mute** 63:23
109:3

|  **n**  |
| --- |

**n** 2:4 99:8
**name** 90:9 99:4
**named** 130:7
**national** 97:18
102:22 115:1
116:9 117:11
118:18
**nationality**
19:2 72:2,6,12
72:14,21 95:5
**nationals** 61:18
61:20,21 72:25
91:3 107:12
120:14

**native** 50:8
55:2
**nda** 117:12
118:7
**neat** 121:22
**necessarily**
82:14
**necessary**
133:6
**need** 6:23 7:1
14:18 20:25
21:1 28:12
48:18 52:3,6
72:9 87:10
89:13 90:11
91:7 100:11
105:6 119:17
**needed** 105:5
**needless** 29:6
**needs** 45:21
82:13 86:23,25
**needy** 11:14
69:2 71:19
**negative** 19:9
19:12,13
**never** 54:9,12
**new** 29:7 30:19
60:11
**newcomer**
26:19 27:2,6
52:20 53:8
54:22 64:4,8
**no116** 4:13
57:12
**nod** 5:12
**non** 18:14 62:4
85:25 91:9
92:11 107:5

111:21 112:24
117:21
**noncitizen**
18:15 19:11
24:8 56:25
81:18,22,23,24
81:25 100:6
102:15,20
**noncitizens**
18:8 51:2
52:16 61:19
63:3,5 64:17
65:9,9,10,11
65:11 66:1,2,9
77:2,22 81:16
82:3,6,15,18
82:21 90:21
91:8,9,10,15
91:18 92:12
93:20,20 94:24
95:15 97:5,22
98:12 102:12
102:24,24
107:13 109:22
115:9,14
123:20 124:1
127:14
**nondiscretio...**
85:17,20,21
**nonpartisan**
23:10
**nonprofit**
23:10
**nonqualified**
65:10 81:24
91:10 92:11
93:19,20,22
94:21 95:15

102:24
**nonsensical**
101:15
**nope** 37:13
**north** 3:4 12:21
130:1
**northern** 118:1
**notary** 3:3
130:6,25
133:13,19
**note** 15:10
52:14,19 55:19
114:9 120:22
131:10
**noted** 81:4
84:14 107:11
111:25 112:3
133:7
**notice** 4:9
15:22 16:16,23
17:18 19:24
20:3
**noticed** 14:3
**november** 1:14
3:6
**number** 4:8
9:14 10:9 25:6
25:16,18 26:17
29:21 35:20
36:24 41:10
44:10 46:10
54:14 55:11
58:9 59:8,9
61:2,5,14
62:15 75:7,12
75:12 78:20,23
79:4,17,19,20
79:21 80:1,6

82:9 83:25
85:15 87:5,10
88:3 99:19
104:3,24 107:1
107:2 109:14
126:14,18
**numbers** 38:13
39:5 48:22
58:7 79:15,18
79:22 83:14
113:13 126:23
127:3
**nutrition** 11:17
65:1,4

**o**

**o** 36:9
**oath** 6:8,9,10
8:4
**obama** 51:12
**object** 7:7,18
13:2,23
**objection** 24:11
24:12 34:23
35:16 36:5,14
37:3,25 38:16
38:23 39:22
40:1,12,24
41:17 42:25
43:24 44:25
45:9,24 47:17
48:25 49:15,23
50:10 53:13
55:17 57:2,20
58:1 60:14
64:6 67:10
71:13 72:3
73:15 74:9,19

75:4 76:1
84:12 85:3
86:10,10 87:25
90:13 93:9,24
94:15,22 95:8
95:22 96:7,9
96:16 97:1
101:13 103:22
125:21 128:22
129:5
**objection's**
84:14
**objections**
16:21 24:23
28:2 101:17
**objectivity**
120:17 121:15
**obligated** 56:15
85:25
**obligations**
85:23
**obtain** 22:12
111:13
**obtained** 22:16
99:15,25
**obviously** 7:25
**october** 25:15
27:15 41:12
110:20
**offer** 92:7,9,10
**offered** 64:11
**offers** 64:8
65:3 92:6
**office** 28:21
79:2 117:17
127:10,12
**officer** 8:3
17:24 19:10,17

107:9,21
112:10 113:2
116:2,3,4,12
121:16,18
**officers** 18:10
119:20 120:1,8
121:14
**offices** 83:25
**official** 1:6
**officials** 12:23
**oh** 16:12 20:6
83:6
**okay** 11:20
12:1,4 14:25
15:19 16:7,11
16:14 17:6
20:16,22 21:5
21:14,20 22:5
22:9 24:4
26:12 31:12,14
32:1,5,13 33:1
34:6 36:3
37:19 39:2,14
40:8 42:13,22
43:16 46:13,21
47:1 48:1,10
48:22 49:10
52:5,7 55:1,18
57:11,16 59:2
59:8,18 60:1
64:20,25 67:4
69:19,23 78:17
78:19 79:25
80:5,9 83:14
83:24 84:3,7
84:18 85:6,13
86:1 90:10,18
96:9 101:24

104:2 108:15
110:21,23
111:1,4,7,10
114:20 116:18
117:23 118:20
122:19 123:3,7
123:13 124:21
**old** 17:13 65:21
79:5
**once** 46:7
94:12,14,17
102:18
**ones** 21:8 55:8
85:22 91:12
**ongoing** 41:9
**online** 10:7,13
12:24
**open** 35:7 36:4
36:10 57:5
**operate** 15:3
**operating**
36:11
**operational**
55:15
**opinion** 23:19
24:2 61:23
122:21 123:5
**opportunity**
65:15 75:21
**opposite** 28:14
**order** 14:16
23:20 66:20
80:20 121:22
**organization**
121:5
**organizations**
100:18,24
101:4 115:15

127:16
**ortiz** 127:25
128:1,3
**ortiz's** 127:23
128:7,19
**outset** 124:19
**outside** 36:17
72:17
**overheard** 8:10
**overlapping**
16:4
**overseen** 30:25
**oversees** 40:19
**own** 114:10
122:25

**p**

**p** 36:9
**p.m.** 129:15
**p.o.** 2:9
**packaged**
89:18
**page** 4:2 5:9
41:6 42:13
43:16,19 47:1
48:3,3 50:4
84:3,4 119:15
119:15 132:4,7
132:10,13,16
132:19
**pages** 31:18
126:4 130:11
**paid** 29:17 37:7
59:19 84:24
85:22 127:13
**panel** 28:23
**papers** 121:23

Andrew Arthur , 30(b)(6)                                                November 30, 2023

**[paragraph - physical]**                                                            Page 26

| | | | |
|---|---|---|---|
| **paragraph** | **participate** | 100:9 | **percentage** |
| 49:10,12 | 126:14,19 | **payments** 80:5 | 44:18 54:4,6 |
| 111:10 112:18 | **participation** | 116:6 | 103:12 104:5 |
| 112:22 114:20 | 70:8,21,25 | **pays** 103:17,18 | 105:18 |
| **parent** 65:20 | **particular** | **pdfs** 83:3 | **perform** 18:13 |
| 70:12 | 16:22 34:2 | **pending** 6:24 | **period** 54:2 |
| **parents** 44:7 | 35:18 119:22 | 8:14 19:5 | 65:12 73:3 |
| 51:15 54:23 | **particularly** | 61:13 62:2 | 83:23 84:23 |
| **parish** 26:18 | 29:7 66:16 | 63:5 66:7 | 89:8 126:10 |
| 27:2,5,7,10 | 115:2 | 124:4 | **permanent** |
| 29:15 42:16 | **parties** 3:5 7:4 | **pensions** 30:21 | 65:16 |
| 46:18,21,24 | 7:7 130:17 | 55:9 | **permits** 14:15 |
| 52:19 53:7 | **parts** 58:14 | **people** 25:6,14 | 63:8 |
| 54:20,25 64:4 | **party** 122:1 | 27:20 33:9 | **permitted** 8:3 |
| 64:8 | **pass** 68:4 | 40:18 46:22 | 113:16 |
| **parishes** 26:16 | **passed** 18:22 | 54:1,14,22 | **person** 7:6 8:13 |
| 33:11 47:15 | 73:8 | 61:14 62:15 | 73:3 77:16 |
| **parole** 19:4 | **past** 66:19 | 65:17 68:16 | 87:2,3 108:18 |
| 61:13 62:2,14 | 86:13 109:6 | 73:23 75:9,12 | 121:8 122:13 |
| 63:2,4,7,8 | 115:24 | 77:12 82:19 | **person's** 71:24 |
| 72:20 92:1 | **pathways** | 87:5 99:19 | **personal** 65:14 |
| 95:7 106:20 | 120:13 | 105:9 106:12 | 75:18 121:7 |
| **paroled** 66:6 | **patrol** 115:8 | 106:13 107:2,4 | **personnel** 86:8 |
| 66:13,16 68:8 | 116:4 118:17 | 107:5 108:21 | **persons** 130:14 |
| 72:19 73:11 | 128:1,13,17 | 108:23 109:11 | **perspective** |
| 77:10,16 94:25 | **pay** 33:5,16 | 112:1 116:2 | 72:21 |
| 100:1 | 42:21 47:23 | 117:3,5 118:12 | **perspectives** |
| **parolee** 73:5 | 70:15 88:15 | 118:13 | 105:2 |
| **parolees** 75:23 | 90:10,12,15 | **percent** 26:5 | **pervasive** |
| 94:20,24 95:2 | 100:11 104:3 | 27:6,10 32:21 | 53:25 |
| 95:6 | 104:23 105:16 | 34:7 60:2 | **petition** 62:19 |
| **paroling** 89:21 | 106:9 123:8,13 | 70:11,11,22,23 | 92:25 93:4 |
| **part** 5:23 10:8 | 123:15,18 | 103:13,17 | 107:14 122:6 |
| 28:21 40:9 | 127:17 | 113:9,12,12 | **phonetic** 98:21 |
| 65:19 71:21,25 | **paying** 30:20 | 120:2,4,5 | **phrase** 121:8 |
| 87:15 98:2 | **payment** 59:15 | 122:17,17,17 | **physical** 8:24 |
| 105:25 106:9 | 59:18 80:2,3 | 127:1 | 10:7 |
| 108:4 128:9 | 81:1,3,6,12 | | |

| | | | |
|---|---|---|---|
| **pick** 67:21 | **pose** 61:10 | **present** 2:12 | **probably** 19:25 |
| **picked** 103:15 | **posit** 49:8 | 12:24 112:11 | 75:14 82:8 |
| **place** 8:9 28:19 | 85:21 | 112:12 130:15 | **procedural** |
| 82:4,9 118:4 | **position** 9:12 | **presentation** | 111:20 |
| **placed** 73:11 | 10:8 13:13 | 4:11 39:4,19 | **proceed** 8:22 |
| **places** 10:11 | 23:21 61:24 | **presented** | 13:19 14:9 |
| **plaintiffs** 1:4 | **positions** 85:13 | 129:8 | 15:17 37:14 |
| 2:2 3:3 | **positive** 19:6 | **president** | **proceeding** |
| **plan** 30:11 | 66:24 68:5 | 115:18,19 | 111:23 |
| **plays** 71:24 | **possession** | 121:7 | **proceedings** |
| **please** 5:12,15 | 51:24 52:1 | **press** 27:5 64:7 | 18:1,4 63:15 |
| 5:17,22,24 6:4 | 109:18 | **pressley** 1:24 | 73:12 |
| 6:14,25 15:17 | **possible** 28:17 | 3:3 130:6,24 | **process** 28:19 |
| 20:18,23 21:5 | 29:5 | **pretty** 52:17 | 29:10,12 62:5 |
| 37:13,14 67:6 | **postpone** 4:19 | 125:22 | 69:16,20 70:20 |
| 69:19 78:13 | 119:11 | **prevalence** | 81:20 107:10 |
| 109:4,7 | **potato** 96:8 | 54:10 | 107:22 112:20 |
| **plus** 59:5 115:8 | **potential** 62:6 | **previous** 17:10 | 112:21 121:17 |
| **plyler** 44:1 | **powerpoint** | 85:23 87:24 | 121:17 |
| 51:6 | 39:11,16 | **previously** | **processed** |
| **pmpm** 100:20 | **practice** 67:2 | 46:10 85:1 | 110:1 |
| 100:22 101:2 | **preexisting** | 105:3 121:3 | **processes** 28:8 |
| 101:10 | 111:22 | **primarily** | **processing** |
| **point** 116:25 | **pregnant** 92:14 | 127:19,19 | 110:13,18 |
| **policy** 9:12 | 96:19 103:5 | **primary** 50:16 | 113:9,10 |
| 23:13 77:15,17 | **preliminary** | 51:7 52:24 | **produce** 14:17 |
| 93:10 128:10 | 4:20 119:13 | 53:20 | **produced** 1:25 |
| **poor** 33:15 | **premised** 84:21 | **principal** | 10:16,22 14:8 |
| **populate** 74:4 | **preparation** | 114:14 128:9 | 78:24 81:4 |
| **population** | 125:1 126:1 | **prior** 12:14 | 128:20 |
| 54:7 | **prepare** 9:16 | 22:11,16 29:18 | **production** |
| **portion** 46:24 | 23:21 | 35:6,13 55:18 | 12:5 118:21,23 |
| 76:8,21 | **prepared** 79:1 | 130:8 | **proficiency** |
| **portions** 8:18 | **prepares** 25:12 | **privilege** 8:15 | 50:17 53:16 |
| 92:19,20 | **preparing** | **proactive** | 54:3 |
| **ports** 18:9 | 22:11 | 103:21,24 | **program** 11:9 |
| 115:5,9 | **presence** 117:1 | **proactively** | 11:12,16,17 |
| | | 87:22 | 17:19,22 22:1 |

Andrew Arthur , 30(b)(6)                                          November 30, 2023

[program - question]                                                    Page 28

22:6 24:8 25:2
25:24 29:3,11
29:12 30:23
32:14,19,19
33:11 34:7
35:2 39:18
40:6,23 42:11
49:5,14,20
50:20,25 51:4
54:22 55:7,11
55:14 56:4,24
60:20 63:1,2,7
65:8,24 68:11
68:13 69:2,4
69:23 71:8
72:20 74:18
77:3,15,23
81:11,16 86:20
87:9 88:10,13
88:14 90:20,25
91:24 92:9,18
92:20,23 100:9
101:8 102:3,7
103:8 104:4,20
104:21 105:23
106:3,6 107:18
108:20 109:1
126:15,20
**programs**
  17:15 22:19
  30:2 48:2
  52:20 53:8
  64:17,21 75:2
  82:4,6 86:5,7
  87:6 89:3,16
  92:5 97:24
  98:4,7

**project**  107:1,2
  107:3 108:22
**projected**
  42:19
**projection**
  105:6
**projections**
  63:1 88:5
  105:3 108:24
**promise**  58:6
**promises**
  115:17
**proof**  97:20
**proper**  64:13
**property**  33:6
  33:18 34:4,11
  43:3 46:14,17
  46:23 47:10
  123:15,16
  124:1
**proposal**  41:14
**proposed**  32:6
  41:22
**protection**  18:7
  18:9
**proud**  125:22
**provide**  25:5
  25:13 27:19
  30:9 33:8
  50:21 51:7
  55:9 56:15,20
  72:5 87:17
  88:21 90:7
  97:11,13,15,19
  97:20
**provided**  9:20
  10:10,15,25
  11:10 16:20

18:12 27:18
30:13 42:6
44:2,10 54:23
55:7,10,12
56:23 75:15,16
81:18 84:20
86:18 87:22
88:12,13 94:24
100:19 101:7
102:6 103:7
104:6 106:24
**provides**  78:4
  98:22 101:1
  102:3
**proving**  50:15
**provision**  77:7
  77:25 78:1
  94:8,9 106:20
**proxy**  52:16,18
  53:2,6 72:9
**prwora**  75:18
**public**  3:4
  11:14 25:5,13
  27:19 45:5,16
  51:8 58:18
  59:4,13,16
  63:9,13 71:20
  120:20 130:7
  130:25 133:19
**published**  10:1
  10:2,9,14
  103:19
**publishes**
  113:3 119:24
**pull**  110:10
  117:5 127:22
  129:4

**purpose**  8:15
  34:20 39:21
  57:24
**purposes**  22:13
  23:5
**pursuant**  18:2
**push**  117:4,5
  127:22 129:4
**puts**  125:23

**q**

**qualification**
  91:5
**qualified**  29:8
  65:10,11 66:1
  66:2 81:24
  82:3 91:9,11
  91:14 92:11
  93:19,19,20,22
  94:3,13,20,24
  95:15 97:20
  100:6,7 102:20
  102:24
**quantity**
  106:11
**quantum**  109:9
**quarter**  65:19
  119:25
**quarters**  65:18
  113:7
**question**  5:18
  5:22,24 6:3,5
  6:24,24,25
  8:14 13:4
  24:19,24 32:16
  38:24 40:12,24
  41:17 43:24
  44:11,13,13

45:1,10,25
49:24 50:11
56:1 60:7 63:6
64:2 65:23
67:6,14,21
88:11 95:9
96:4 97:2
99:18 101:15
101:18,20,22
101:23 103:23
109:7 116:18
117:23 124:4
128:24
**questions** 5:10
8:22 22:16
79:10 124:22
127:22 129:12
**quick** 31:21
67:18 107:10
**quicker** 5:20
66:8
**quickly** 28:9
61:12 66:10,11
68:1,2 91:21
91:22 93:2,3
106:18 107:4
108:23
**quiet** 8:9
**quite** 126:25
127:5
**quote** 118:9

**r**

**r** 36:9 132:3,3
**raise** 15:9
**raises** 47:23
**rate** 70:8,21,25
88:2 112:23

113:8,11 114:1
114:2
**rates** 113:3
114:21,22
119:23
**raul** 128:1,3
**reached** 30:5
**reaction**
101:14
**read** 58:16
119:17,18
131:9 133:5
**real** 31:21
62:24 106:21
123:23
**realize** 6:13
**really** 113:19
116:7,16
**reason** 9:2
13:14 44:17
127:2 131:11
132:6,9,12,15
132:18,21
**reasons** 63:10
63:12 100:1
113:17
**reassess** 25:15
**rec** 84:11
**receipt** 45:15
71:19 117:2
131:18
**receive** 33:20
34:20,21,25
45:5 47:5,11
47:15 48:8
57:1 68:5 71:4
75:11,12 81:1
81:3,13 98:23

100:9,11,15
101:12 102:18
102:21 116:6
**received** 19:6
19:12 52:22
74:1,2 79:5
87:11 89:10
127:19
**receives** 70:7
88:2 91:22
92:24
**receiving** 99:10
**recent** 26:20
27:8 47:5,16
60:11 64:9
75:17
**recently** 120:11
120:11
**recess** 14:13
63:25 90:4
104:16 124:9
**recitation**
67:11
**recited** 67:22
**recognize**
72:23
**recommenda...**
38:7
**recommenda...**
38:6
**recommended**
35:9,10 36:13
**recommending**
38:9
**reconciliation**
65:15 75:21
**reconsider**
18:24 19:9

27:15 28:1
**reconsiderati...**
90:16
**record** 7:7 8:18
10:12 14:22
24:23 31:8
36:11 48:22
61:20 63:23,24
76:4 78:23
84:10 99:7
104:9,13,14
107:7 111:7
114:5 119:4,21
119:25 120:7
121:13 124:18
126:17
**recorded**
118:16
**recording** 5:11
118:24
**refer** 19:15
65:17 115:6
117:4 127:25
**reference** 17:19
92:8
**referenced**
34:3 92:8
131:6
**references**
85:11
**referred** 53:18
71:1 107:25
**referring** 10:17
17:20 19:16
33:25 34:14
36:21 38:6
41:8 47:6
85:14 119:19

127:10 128:1
**refers** 35:13
36:10 61:20
**reflected** 55:21
89:4
**refuse** 27:24
28:18
**regarding**
127:8
**regards** 68:11
**register** 103:20
**registering**
44:8
**regular** 92:15
92:22 93:7,16
95:21 96:4,11
96:24 103:13
**regulation** 19:4
51:18 74:24
**regulations**
19:7
**reimbursed**
69:11,25
**relate** 11:8
79:18
**related** 77:5
98:16 121:13
125:20 129:3
**relating** 51:18
51:19 78:3
**relation** 40:22
**relative** 62:20
**release** 27:5
64:7 91:25
117:9
**released** 24:8
51:2 61:15
64:17 77:2,22

80:12,15 90:21
98:12 99:19
106:19 108:10
108:19 109:22
**relevant**
118:22
**relocated** 110:4
**remainder**
103:14
**remained**
75:17
**remaining** 22:5
**remember**
10:21 120:25
**remind** 69:19
**remote** 7:4
14:15,20 15:4
15:5,10,15
**remotely** 7:9
7:19
**removal** 18:1,4
66:22 73:12
111:23 112:20
**removed** 62:4
**repeat** 5:24
24:16 50:13
99:4 110:17
**repeated** 80:1,2
**rephrase** 5:23
**report** 11:24
99:13,22
113:20 114:3
**reported** 1:24
114:2
**reporter** 1:24
5:11,16,19
6:17 7:25 8:3
14:23,24 57:8

78:10 83:4,7
130:6
**reporter's**
130:4
**reporting**
118:6
**reports** 99:9,11
117:15
**representations**
97:10
**representative**
23:18
**representatives**
46:3
**represented**
120:8
**request** 12:5
15:11,16 19:11
79:2 80:17,18
86:4,23 87:1,6
104:18 120:3
**requested**
47:23 104:25
105:3
**requests** 12:8
38:13 84:18,21
84:25 105:10
**require** 13:11
**required** 25:5
25:13 51:7
85:22 118:7
133:13
**requirement**
32:21
**requirements**
65:14 70:13
71:11 72:1,18
73:13,14,20

74:21,23 76:6
77:21 93:12
95:14 97:9,12
102:17
**requires** 70:10
**reserve** 124:16
**reserved**
129:16
**reserves**
124:14
**reside** 54:1
**residence**
109:23
**residency** 91:5
**resident** 9:12
23:13
**residents** 65:6
65:16 71:16
**resolution** 4:12
48:12
**respect** 9:7
11:11 18:23
19:4,8 30:12
30:17 34:1
35:1 36:16
40:25 42:12
51:20 53:16
54:20 58:3
61:9 62:23
63:11,13 65:9
66:1,7 67:25
68:3,12,12
69:1,6,14 72:4
72:6,14,15
73:9,10,21
74:11,11 77:11
78:4 80:16
82:2,7 83:21

| | | | |
|---|---|---|---|
| 85:20 86:6,17 | **responsible** | 113:2 119:22 | **room**   7:25 |
| 86:19 87:9,12 | 76:9 98:3 | 121:16,18 | **rouge**   2:4 |
| 87:13 88:1,4,6 | **responsive** | 122:7 124:15 | **rough**   52:15 |
| 89:4,12,13,22 | 12:8 | 124:16 126:10 | 53:5 |
| 91:2,8,18,25 | **rest**   58:16 | 131:7 | **rows**   36:19 |
| 92:22,22,23 | 103:18 | **reviewed**   9:20 | **rule**   15:5 17:23 |
| 93:8,18 94:7,9 | **restrictions** | 9:23 10:4,13 | 17:24 19:17,17 |
| 95:14,24,25 | 103:6 120:20 | 10:22,24 11:7 | 19:21 62:8 |
| 96:10,17,20 | **result**   24:8 | 11:22 12:2 | 71:14 73:16 |
| 97:4 98:14,17 | 25:2 29:3 | 16:15 54:12 | 74:10,20 75:5 |
| 100:4,17 | 64:17,21 90:21 | 76:3 111:8 | 76:2 92:4 |
| 102:23 103:12 | 91:1 92:21 | 126:1 | 93:10,24 94:16 |
| 106:10 108:22 | **results**   130:18 | **reviewer**   74:4 | 94:23 95:9 |
| 109:2,9,24 | **resume**   125:22 | **reviewing** | 97:2 107:21,23 |
| 110:3 111:19 | 125:23 | 126:6,8 | 110:13 113:9 |
| 111:21 112:6 | **retained**   22:25 | **reviews**   41:9 | 113:10 120:13 |
| 113:1,4,9 | 23:4 24:2 | 61:14 62:3 | **rules**   5:9 7:15 |
| 114:11 115:4 | **retroactive** | **revise**   124:11 | 7:16,16,20,21 |
| 116:15 117:17 | 103:21,25 | **right**   14:11,14 | 7:21 8:6,21 |
| 118:11,15 | **retroactively** | 16:5,5 20:7,18 | 13:5,5,5,8,12 |
| 120:7,17 | 87:23 | 23:25 39:2 | 13:15 14:15 |
| 121:16 123:24 | **return**   131:13 | 41:16 46:7 | 19:3 96:3 |
| 125:22 128:5 | 131:17 | 47:22 56:14 | **run**   73:25 80:7 |
| 128:23 | **returned**   35:22 | 58:20,24 59:6 | 82:22 |
| **respectfully** | **revenue**   33:14 | 59:12,22 61:9 | **ryan**   2:7 4:3 |
| 109:5 | 33:17 34:12 | 64:23 71:16 | 5:5,7 7:10,12 |
| **respond**   117:20 | 46:14,22 47:10 | 79:12 82:19 | 7:17,23 8:2,8 |
| **respondent** | 47:10 59:13,15 | 86:9 95:4 | 10:20 12:25 |
| 112:13 122:6 | **revenues**   33:6 | 102:16,20 | 13:9,14,17,19 |
| **response**   22:15 | 33:19 34:5 | 111:11 119:19 | 14:11,14 15:8 |
| 67:18 89:19 | 43:3 47:6,11 | 121:14 123:9 | 15:18 16:24 |
| 120:12 128:10 | 56:20 | 124:15,16 | 17:5,12 20:9 |
| **responses**   5:12 | **reversely**   25:22 | **rights**   44:4 | 20:11,15 24:15 |
| 12:4,10 16:21 | **review**   6:16,17 | 51:10 | 24:21 31:7 |
| **responsibility** | 9:16,19 10:7,9 | **role**   121:6 | 35:3,25 36:8 |
| 65:15 75:19 | 12:4,10 15:22 | **rolled**   77:20 | 36:18 37:10 |
| 76:12 | 16:14 19:11 | **rollout**   107:20 | 38:5,20 39:1,7 |
| | 20:1 63:5 77:7 | | 39:24 40:3,13 |

41:5,24 43:6
45:7,19 46:6
47:21 48:14
49:2,18,25
50:12 52:5,8
53:14 56:2,8
56:22 57:6,10
57:23 58:5
60:18 63:16,22
64:1 67:13,16
68:9 71:23
74:6,13,25
76:7 77:1
78:12,14 83:2
83:6,8,11
84:14,15 85:5
86:13,15 88:8
90:5,17 93:15
94:4,19 95:3
96:2,13,22
97:8 101:16,24
102:1,5 104:1
104:7,10,15,17
108:3 109:20
110:15 118:20
118:25 119:6
124:6,10,21
125:21 128:22
129:5,13

**s**

**s**   132:3
**safeguards**
111:20
**safety**   120:14
**salary**   88:18
**sales**   33:5,17
34:3,10,11

43:2 46:14
47:10 56:20
123:18 124:1
**satisfy**   70:12
**save**   73:22
80:23 82:24
**saw**   84:9
106:11
**saying**   13:20
14:17 54:6,7
118:21
**says**   32:5,25
36:9,10 41:20
47:25 49:17
50:2 58:15
59:17 112:20
112:22
**scale**   44:22
**schedule**   84:4
**school**   11:11
25:9,20,21
27:9,14,15
29:22,25 30:14
30:16,17 33:4
33:7,12,14,15
33:16,22 34:10
34:13 36:23
41:11,16 42:20
43:4 44:1,8,16
46:18 47:3,4
47:12 49:9
50:24 51:13,16
52:16 55:24
56:14,19 60:17
61:3,5
**schools**   26:19
27:2,6 29:14
29:20 30:3

34:20 48:4,5,5
48:6,8 49:13
51:3 52:19,20
52:21,24,24,24
52:25 53:7
54:20 55:15
56:5,6,9,10,11
56:17,17,25
58:18,19,23
59:4,14,16
60:23 64:4,5,8
**scope**   34:23
35:16 36:5,14
37:3,25 38:16
38:23 39:22
40:1 43:1
47:17 48:25
49:23 53:13
57:2,20 58:1
60:14 64:6
72:3 75:5
87:25 90:13
103:22
**scott**   2:3 14:14
52:5 67:14
101:16 124:21
131:1
**screen**   16:12
20:20 21:11
31:9 48:15
57:14 78:15,16
83:12 86:2
110:21 111:1
**screening**   68:5
**scroll**   20:2,23
31:18 48:19
50:4 58:19
59:12

**scrolling**   16:16
31:17 35:4
38:12 110:23
**second**   4:17
28:19 44:23
45:21 54:17
57:5 78:17
104:7 110:24
111:4
**secondary**
25:11 27:21
28:1,3 31:1
40:9,15 51:8
52:25
**section**   2:9
18:6,12,19
19:2 38:14
51:17 62:9,11
63:9 92:25
97:18 98:15,15
107:12 111:23
115:2,2,3,5
117:12,20
122:7
**securities**
107:22
**security**   10:2
10:10 44:9
51:25 61:1
77:14 99:3
121:4 122:4
**see**   16:5,11
20:6,6,19
21:11 31:9,13
35:4,11 36:19
36:24 37:11,15
38:12,14,22
43:16,19 44:19

44:19 48:15
49:11 50:5
57:14 58:9,10
58:13,13,17,19
58:23 59:3,12
59:15,19 78:15
79:14,25 83:12
83:13 84:4,5
84:11 85:6,10
85:13,17 89:14
104:11 106:1
110:21 111:1
111:11,15
119:10
**seeing** 20:14
**seek** 106:13
122:5,6
**seekers** 93:22
108:10
**seeking** 51:8
**seen** 11:8 16:21
16:22,24 17:3
31:14,16,25
32:3,4 39:8,16
47:9 48:17
57:16,17 78:21
78:22 83:17,18
119:7
**self** 47:7
**send** 42:7
**senior** 121:18
**sense** 40:21
72:7 116:16
**sent** 15:23 30:5
44:5 131:14
**sentence**
111:15

**separate** 76:11
76:15,18,19
77:25 79:23
98:8
**series** 5:10
127:21
**served** 128:15
**service** 81:17
100:14 101:5
**services** 19:9
22:21 33:8
55:6 56:23,24
60:4,8 68:21
73:24 76:9
79:16 81:1,15
81:19,21 82:5
82:8 84:5
98:24 99:2
100:19 101:7,9
101:11 102:11
102:14 104:6
106:14 125:9
127:18
**set** 16:18 52:5
62:8 64:14
71:14 73:16
74:23 95:12
96:12,20 102:9
117:13 124:7
126:9
**sets** 58:2 107:8
**several** 111:20
121:21 128:5
**shame** 125:23
**share** 42:17,23
47:12 88:15
89:23

**sharing** 20:19
22:9 50:18
86:2
**sheet** 131:11
**shop** 123:18
**shops** 46:17
**short** 54:2
68:24 114:11
125:16,19
**short's** 125:23
**shortfall** 27:17
28:18 42:3
**shorthand** 1:24
**show** 15:25
20:9 31:4 39:2
61:14 71:19
78:8 79:8
82:25 97:16
**showed** 20:11
**showing** 37:19
48:10 83:14
110:9 118:22
119:1,3
**shows** 79:6
120:1
**sign** 131:12
**signature**
129:16 130:23
**signed** 66:23
131:20
**significant** 63:9
63:13 113:25
**significantly**
122:15,22
**similar** 6:9
91:12 100:10
**simple** 44:13

**simply** 33:8
64:7
**single** 43:11
**sir** 125:6,10
126:21
**sit** 126:10
**situation** 26:3
34:2 109:13
**six** 32:8 48:1
100:17 107:23
**size** 75:6 93:13
**sizes** 29:6,9
**skills** 83:9
**skipping** 21:10
**slide** 39:16
48:2
**slower** 21:1
**small** 53:17
54:4,6,7
**smugglers**
115:15,24
**snap** 11:16
21:21 45:6,17
64:15,25 65:1
65:5 66:10
67:9 68:2,12
71:1,4,6,10,11
73:2,14,19
74:3,7,15
75:11 76:4,10
76:12,15 77:3
79:5 80:24
81:2,3,15,21
82:6 85:11
86:4,19 87:9
87:12,17 88:4
88:9,10,13,14
89:2,10,13,16

Andrew Arthur , 30(b)(6)                                              November 30, 2023

[snap - state]                                                              Page 34

| | | | |
|---|---|---|---|
| 89:23 90:8 | **speaking** 61:24 | **spoke** 83:8 | 101:13,21 |
| 91:2,13 98:9 | 101:17 114:7 | 116:8 118:18 | 103:22 109:4 |
| 100:9 125:7 | 123:1 | **spoken** 76:13 | 124:14,23,25 |
| 126:15 | **speaks** 24:14 | **spots** 107:20 | 125:25 129:1,6 |
| **snuggling** | 36:15 37:4 | **spouse** 65:20 | 129:11 131:1 |
| 115:15 | 38:17 49:16 | **spreadsheet** | **staff** 47:24 |
| **social** 44:9 | 53:21 86:11 | 57:12 78:19 | 125:5 |
| 120:21 | **special** 73:10 | **st** 2:3 4:4 7:13 | **staffed** 68:24 |
| **sole** 53:22 | 82:10 109:16 | 7:14,20 8:6 | **staffer** 35:20 |
| 54:16 56:4 | **specific** 9:8 | 10:12,19 12:23 | 121:1 |
| **solutions** | 10:21 21:17,20 | 12:25 13:3,10 | **stamped** 10:17 |
| 131:23 | 21:21 24:4 | 13:17 14:1,22 | 31:8 80:20 |
| **somebody** | 26:3 32:18 | 14:25 15:14 | **stamps** 65:2 |
| 80:24 100:15 | 43:19 48:2 | 16:19 17:1,9 | 71:2 79:6 |
| 101:3 | 55:6 76:8 | 20:9,10 24:11 | **stand** 6:9 |
| **someone's** | 79:23 80:12,17 | 24:18,22 34:23 | **standard** 122:9 |
| 72:11 | 80:18 86:4 | 35:16 36:5,14 | 122:11,19,20 |
| **soon** 68:4 83:8 | 89:15 95:4 | 37:3,25 38:2 | **standards** |
| 91:20 | 98:2 101:7 | 38:16,23 39:22 | 86:24 91:5 |
| **sorry** 7:13 | 104:18 106:5 | 40:1,12,24 | 95:11 96:1,10 |
| 21:10 44:12 | 106:16 108:20 | 41:17 42:25 | 102:9 |
| 58:16 75:21 | 108:21,25 | 43:24 44:25 | **start** 5:8 21:2 |
| 88:11 110:16 | **specifically** | 45:9,24 47:17 | 37:23 47:2 |
| 116:23 121:10 | 11:3 22:13,20 | 48:25 49:15,23 | 78:12 96:8 |
| 122:24 124:5 | 26:18 46:14 | 50:10 52:7 | **started** 24:4 |
| **sort** 43:10 | 52:21 53:8 | 53:13 55:17,25 | **starting** 47:18 |
| 55:22 97:15 | 86:4 116:14 | 56:3,9 57:2,20 | **state** 1:3,11 3:2 |
| **source** 34:19 | **specified** | 58:1 60:14 | 3:4 9:21 11:1 |
| 56:5 | 107:20 | 63:24 64:6 | 12:13,18,20 |
| **sources** 42:24 | **spell** 99:7 | 67:10,20 71:13 | 13:11 14:6,9 |
| **southwest** | **spend** 70:18 | 72:3 73:15 | 15:1,6,12,20 |
| 116:1 | 126:6 | 74:9,19 75:4 | 17:14 21:17 |
| **speak** 5:15 21:7 | **spending** 46:22 | 76:1,24 84:12 | 22:18,19,23,25 |
| 21:18 52:10 | **spent** 87:24 | 85:3 86:10,13 | 23:2,6,25 |
| 53:17,20 54:15 | 126:7 | 87:25 90:13 | 24:17 25:4,7,8 |
| 109:4 123:4 | **split** 68:14 | 93:9,24 94:15 | 25:19,22 26:5 |
| **speakers** 54:10 | 86:20 87:12,21 | 94:22 95:8,22 | 27:19 28:5,22 |
| | | 96:7,16 97:1 | 29:9 32:23 |

| | | | |
|---|---|---|---|
| 33:6,11,20 | 130:1 131:4 | **status** 44:7,16 | **strict** 13:11 |
| 34:18,21,25 | 132:1 133:1 | 51:14 53:11 | **strike** 92:19 |
| 36:20,20,23 | **state's** 33:15 | 54:22 57:4 | **strips** 111:19 |
| 37:7,15 38:9 | 42:16,23 46:23 | 60:22 61:7 | **structure** 40:21 |
| 44:15 46:3 | 47:13 | 63:4 71:24 | **struggling** 33:8 |
| 49:7,19 50:14 | **stated** 27:6 | 72:10,11 74:12 | **student** 26:1,3 |
| 50:21 51:6,9 | 130:15 | 81:23 92:24 | 26:4,15 27:1 |
| 52:2,14,14 | **statement** 11:7 | 93:17 96:23 | 28:11 29:17,17 |
| 53:9 56:18 | 11:20,21 15:14 | 97:14,20 100:1 | 43:12 45:20 |
| 57:3,3 58:3,15 | 87:8 110:12 | 100:6 102:19 | 46:10 49:21 |
| 58:18 59:4,19 | 118:11,15 | 123:22 | 50:7 52:9 |
| 60:3,5,9,21 | 120:20 128:11 | **statuses** 73:2 | **students** 24:8 |
| 61:6,24 62:6 | **statements** | 91:21 | 25:8,17,19 |
| 62:13,24 68:14 | 29:20 120:13 | **statute** 18:12 | 26:4,6,13,15 |
| 68:16,18 69:10 | 128:5,7,7 | 74:23 96:12 | 26:18 27:7,10 |
| 70:8 71:9,16 | **states** 1:1,7 | 118:8 122:15 | 28:11,12,15 |
| 73:18 76:20 | 44:5,9 54:2 | **statutory** 18:5 | 30:14 34:15 |
| 77:9,18,20 | 61:19,22 62:10 | 18:18,19 36:25 | 41:10 43:10,18 |
| 78:6 80:14,21 | 62:21 65:7 | 37:16 | 43:23 44:1,14 |
| 81:5 83:22 | 66:6 68:15 | **steer** 47:18 | 44:16,21 45:23 |
| 84:1 86:21 | 70:23 72:24,24 | **stenotype** 1:24 | 46:8 50:15,16 |
| 88:1,10,13,15 | 77:11 87:19 | **stipulate** 14:17 | 50:20,22 51:1 |
| 88:20 89:9,24 | 88:25 91:3 | 15:4 | 51:8,15,15 |
| 89:25 90:7 | 93:2,5 97:17 | **stipulating** | 53:2,3,6,11 |
| 92:6 95:11,23 | 97:17 102:22 | 7:15 14:5,6,10 | 54:4,6,7,23 |
| 98:18,23 99:9 | 111:13 112:12 | **stipulation** | 55:2,2 56:25 |
| 99:12,18 100:3 | 114:16,23 | 14:16 15:6 | 57:4 60:16,16 |
| 100:18 103:8 | 115:1,14,16,23 | **stipulations** | 60:23 61:3 |
| 103:15 104:19 | 116:6 117:2,4 | 15:3 | 64:9 |
| 106:8,16,24 | 117:6,8,19 | **stjohnj** 2:5 | **studies** 9:13 |
| 107:24 108:7 | 118:13,14 | 131:2 | 23:10 54:9 |
| 108:16 109:9 | 127:14,24 | **stop** 22:9 31:24 | 112:19 127:15 |
| 109:10,15,21 | 128:4 | 50:18 86:1 | **study** 127:8 |
| 111:17 114:7,9 | **static** 25:24 | **stopping** 21:25 | **stuff** 104:11 |
| 114:17 122:25 | 75:17 | **stores** 46:23 | **subcategories** |
| 123:2,5,18,25 | **station** 2:9 | **straight** 14:5 | 36:24 |
| 124:2 127:2,7 | **statistical** 9:23 | **street** 2:4 | **subject** 18:1 |
| 127:23 129:2 | 9:25 | | 81:25 84:13 |

91:11 92:12
93:21 94:10,25
100:7 102:21
102:25 103:5
103:11 105:17
107:23 109:11
113:5
**submits** 41:14
41:21
**submitted** 4:12
11:23 48:12
**subscribed**
133:14
**substance** 13:1
**substantial**
122:12,14
**substantially**
111:12 112:23
**subtracting**
59:13
**subtracts** 58:22
**suffered** 24:7
64:16 90:20
**suffers** 25:2
29:3
**sufficient** 32:20
33:1
**suggest** 109:5
**suggests**
120:17
**sum** 50:23
115:7
**summaries**
35:5
**summarize**
67:17 90:24
**summary**
37:19

**summer** 116:1
**superintendent**
125:11
**supervised**
65:2
**supervision**
130:10
**supervisor**
29:1
**supplemental**
11:17 42:6
64:25 65:3
**support** 4:18
85:10,10
119:11
**supported**
128:19
**supporting**
32:6
**supposed** 56:19
62:12
**supreme** 51:5
111:25
**sure** 16:15
21:12 23:24
31:16,18,22
35:18 48:20
58:7 60:8
75:22 88:12
96:9 116:7
**survey** 127:14
**surveys** 128:21
129:3
**switching**
109:21
**sworn** 5:2
130:8 133:14

**sydney** 2:13
**synthesize** 28:9
**syracuse** 107:7
**system** 60:17
73:22 80:23
82:23 106:12
111:21 112:8
117:15 122:1
**systematic**
82:23
**systems** 47:3,4
50:24 73:25
79:24

**t**

**t** 2:7 117:7
132:3,3
**tab** 58:10 59:2
**tabs** 58:10
**tailored** 53:8
**take** 5:19 6:9
6:22,23 7:1
14:11 16:13
20:23 21:5
63:16,22 69:8
70:22 89:13
121:15
**taken** 1:12 7:8
7:18 14:13
63:25 69:7
70:9 90:4
104:16 124:9
130:9
**takes** 14:19
28:19 69:12
**talented** 30:2
44:22

**talk** 28:7 64:15
95:17 116:15
123:6
**talked** 19:18
42:22,23 49:12
101:10 115:19
117:8 121:6
125:1,2,7,11
125:15
**talking** 42:10
42:14 47:2,2
102:14 116:8
**tanf** 21:22 45:6
45:16 64:15
68:10 69:1
71:4,7 79:9
91:2,13 125:7
**tangible** 68:24
**tank** 23:10
**task** 41:7,9
**tax** 33:5,6,17
46:13,14,15,22
47:10,10 56:20
56:20 123:9,11
123:12,13,16
123:18,25
124:1,1
**taxes** 33:18
34:4,4,11,11
34:11 43:2,3
123:21 127:8
127:13,17
**teachers** 29:7,7
29:8 30:20,20
55:9
**team** 124:8
128:16

Andrew Arthur , 30(b)(6)                                    November 30, 2023

technical 16:10
  44:21
technology
  90:11 99:6
tell 5:22,24 6:2
  6:5 9:8,11,15
  10:24 11:3
  13:22 14:5
  31:17,23 38:3
  53:6,23 101:19
  109:25 110:5,5
telling 118:17
temporary
  11:14,16 69:1
  69:3
ten 63:16
term 64:13
  81:9 85:16
  90:16
terms 66:14
  84:9,17
tested 11:13
  45:5 71:20,21
testified 5:3
testify 16:18
  17:1 21:22
  22:2,6 45:1
  71:15
testifying 23:14
  101:24 109:6
testimony 6:8
  8:25 9:3 23:17
  45:10,25 49:24
  50:11 55:18
  61:23 67:11
  95:9 97:2
  103:23 114:6
  122:24 127:23

128:8,19
  130:13 131:9
  131:18 133:8
text 8:12
tf 79:8
thank 8:23
  24:25 26:12
  72:13 79:11
  83:6 111:3
  129:11,13
thing 28:14
  31:19 55:10
  77:8 100:5
things 21:10
  30:19,21 53:23
  54:1 55:12
  61:10 70:4
  72:1,21 75:9
  77:19 113:4,15
  115:21 116:14
think 9:6 10:17
  13:14 19:25
  23:10 48:8
  55:17,25 56:3
  62:1 72:22
  79:8 83:4
  107:11 109:24
  114:4 118:8
  119:24 120:9
  120:11 121:7
  121:11 129:9
third 2:4 50:4
thought 20:16
  36:10
thousands 37:9
  126:4
three 30:18
  32:19 40:16,17

40:17 73:23
  82:19,21 113:7
thuraissigiam
  111:25
thursday 1:14
  3:5
tight 120:20
time 9:8 13:22
  15:13 20:12
  27:4 29:6
  38:14 54:2
  65:12,23 68:20
  69:6,9,11 70:1
  70:18,20 87:14
  89:8 90:1
  116:20 126:9
  126:24 128:14
  129:14 131:19
timeframe
  131:8
times 12:17
  108:8,12
timing 41:7
title 23:12
  118:10 119:10
titled 39:4
  48:11
today 5:9 8:25
  9:3 13:18
  15:19 16:18,25
  17:4,16 23:17
  53:21 61:23
  114:8 123:2,6
  124:12 125:2
today's 7:8
  8:19 9:17 17:8
  23:25 126:1

todd 115:25
together 33:12
  37:16 50:6
told 46:3 52:15
  54:9 116:3
  118:19 127:4
took 6:10 118:4
top 20:22 21:2
  31:13,22,23
  32:8 58:14
topic 21:25
  64:3 121:11
topics 16:17,22
  16:24 17:3,13
  17:14,15 20:24
  21:6,7,16,18
  21:20,21,23,25
  22:3,5,7,10
  109:21
torture 18:7,20
total 35:9
  37:11,17 38:13
  46:8 58:24
  59:3,5,15,18
  59:19 60:8
  115:7
toward 53:8
town 46:18
track 9:6,13
  79:20 107:6
  119:20 120:7
  121:13
tracy 114:11
  125:16
traditional
  67:1
traditionally
  18:3 63:11

66:19
**training**   34:17
70:14
**transactional**
107:6
**transcribe**   5:16
**transcribed**
130:10
**transcript**   1:25
6:16,19 131:6
131:20 133:5,8
**transcription**
1:25 130:12
**transfer**   81:10
**treatment**
63:12 100:12
100:16
**treatments**
102:11
**trees**   76:11,22
**trial**   6:10,20
7:5 114:12
**tribes**   72:23
**trouble**   68:22
**true**   52:18 62:3
70:3 91:25
130:12 133:8
**trump's**   121:7
**truthful**   6:11
9:3
**try**   110:24
**trying**   40:21
56:7 67:17
102:15 104:10
**turn**   63:22
**turning**   90:18
**twitter**   119:2

**two**   23:24
35:14 70:12
73:23 75:2
76:22 82:19,21
83:23 84:23
89:5 108:1
110:1 113:13
**type**   49:20 90:6
**types**   48:4 92:5

**u**

**u.s.**   2:8 18:9
19:8 118:10
**uh**   5:13,13
**ukrainian**
72:19,20 94:9
**ultimate**   41:15
**ultimately**
55:13
**unable**   106:22
108:9
**unaccounted**
26:13
**unauthorized**
97:22 111:12
127:13
**unaware**   36:6
**unclassified**
38:21
**unclear**   38:18
**under**   6:8 18:6
18:7,18,20
19:2 24:9 25:4
26:6,8,23
30:11 35:1,10
41:2 44:1 45:2
45:17 50:24
51:2,5,11,12

51:17,21 55:10
58:4 61:11
62:25 63:1,8
64:17 65:7,13
66:13,18,23
67:9 72:20
74:2 76:17
77:2,15,17,22
80:13,15 84:23
85:10,17 90:21
92:25 96:18
97:5,18 98:12
99:19 102:9
103:2,3 106:20
106:23 107:11
107:16 108:11
108:19,21
109:23 110:1
111:22,23
113:10 115:4
118:22 120:19
122:7 130:10
**underfunded**
89:24
**underneath**
58:19
**understaffed**
70:18 89:25
**understand**
5:13,20,22,25
6:6,10,20 7:1
8:21,23 9:22
19:16 26:9
40:7 46:2
50:14 51:12
54:8 64:11
72:7 79:17
80:7 101:18,19

101:21,22
102:15 108:3
**understanding**
17:22 118:11
**understood**   6:3
**unexpectedly**
26:24
**unfortunately**
68:22 79:5
**union**   120:9,16
**unit**   32:10
43:13
**unitary**   28:22
**united**   1:1,7
54:2 61:18,22
62:10,21 65:7
66:6 68:15
72:24,24 77:11
87:19 88:25
91:3 93:2,4
97:17,17
102:22 111:13
112:12 114:16
114:22 115:1
115:14,16,23
116:6 117:2,4
117:6,8,19
118:12,13
127:14,24
128:4
**units**   32:9,11
**universities**
49:19
**university**
107:7
**unknowable**
109:18

**unlawful** 114:25 115:3
**unlawfully** 117:19
**unnecessary** 15:1
**unspent** 35:21
**upcoming** 38:10 41:16 87:23 105:6
**urgent** 63:10 63:12
**usc** 19:8
**uscis** 112:20 120:8,23 121:2
**usdoj.gov** 2:11
**use** 7:7 43:13 64:13 79:8 81:8
**used** 7:5,6 34:7 40:5 43:17 52:18 65:1 71:6 79:20 81:9 121:8 131:20
**user** 90:11
**uses** 25:23 53:2 90:7
**using** 72:6 82:6 99:20 107:18

**v**

**v** 1:5 131:4 132:1 133:1
**validity** 112:7
**variation** 54:15
**various** 29:20 113:17 127:15

**venezuela** 116:8,10,11 118:18
**verbal** 5:12
**verification** 73:25 81:20 82:20,23
**verified** 97:9 97:14
**verify** 69:22 80:22 82:11,17 97:12 99:25 131:9
**veritext** 131:14 131:23
**veritext.com** 131:15
**version** 17:10 17:13 80:20
**versus** 35:14 36:12 38:21
**vice** 115:18
**video** 8:4
**videoconfere...** 1:11,13 3:1,5
**violation** 115:1 117:19
**virtual** 7:24 13:6,21 14:3
**virtually** 7:3 13:2,4,24
**vocational** 34:17 48:7
**voice** 5:15 121:5
**voices** 16:4
**voted** 40:17

**vs** 44:1 51:6 111:25 117:7 128:4

**w**

**w** 99:8
**wait** 5:17 20:1 65:12,17 73:3 73:5 91:16 95:6 107:5
**waiving** 92:4
**wake** 130:2
**want** 5:8 14:8 17:1 28:9 36:7 55:22 58:7 63:21 69:15 116:19
**wanted** 104:12
**warned** 47:19
**washington** 2:10 23:11
**waste** 13:22
**watch** 121:4
**way** 15:3 19:25 31:23 32:11 44:15 50:14,23 58:20,24 59:14 60:9 61:20 66:18 75:14 80:14,21 99:11 109:10 119:2 123:23
**ways** 100:13
**we've** 42:22,23 63:17 101:10 121:11
**wear** 119:18

**week** 70:13
**weeks** 15:11
**weight** 43:11 43:20 44:21,22 45:3 50:6
**weighted** 43:8 43:17,22 44:14 44:17 46:8 60:16
**welcome** 83:7
**welfare** 85:9
**went** 37:21
**western** 1:1
**wetherell** 117:7
**wish** 126:9
**withholding** 18:6,18,20,24 66:22
**witness** 3:2 8:4 9:10 10:19 14:7,8,18 15:20 23:5,15 63:20 101:18 104:9,14 109:3 109:5,7 124:14 130:7,13 131:8 131:10,12,19
**witnesses** 15:11 63:14
**woman** 103:5 116:8
**women** 92:14 96:19
**word** 72:8
**work** 15:13 23:22 29:10 63:19 65:15,18 65:19,19,21

[work - zoom]                                                        Page 40

70:8,12,14,15
70:21,24 75:21
119:16 123:8
**worked** 120:25
**working** 33:12
**works** 40:25
114:17
**wpr** 70:10,10
**written** 73:17
93:10 114:4

**y**

**yeah** 11:5
16:13 21:2
40:25 42:20,20
56:2 87:4
93:12 95:23
104:15 127:12
128:3 129:8
**year** 25:14,20
25:21 27:3,9
27:14,16 32:6
35:5,6,6,8,9,13
37:20,20,23
38:10 41:11,16
49:8 59:19,24
66:3 70:23
71:7 83:22,23
84:23 87:23,24
89:5 91:12
94:10,25 95:1
95:5,6,7 100:7
105:7 118:7
129:9
**years** 25:25
29:18 35:20
65:18 67:3
73:5 75:17,24

82:9 88:3
91:16 107:6
118:3
**yellow** 59:8
**yesterday**
12:21
**younger** 97:5

**z**

**zero** 36:25
**zoe** 120:25
**zoom** 3:1
119:17

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.