EXHIBIT 203



# Asylum Application Processing

Fiscal Year 2022

*July 17, 2023*

Fiscal Year 2022 Report to Congress



*U.S. Citizenship and Immigration Services*

# Message from the Director

July 17, 2023

I am pleased to present the following report, "Asylum Application Processing," for Fiscal Year (FY) 2022, which has been prepared by U.S. Citizenship and Immigration Services (USCIS).

This report was compiled pursuant to direction in the Joint Explanatory Statement accompanying the FY 2022 Department of Homeland Security (DHS) Appropriations Act (P. L. 117-103).

Pursuant to congressional requirements, this report is provided to the following Members of Congress:

> The Honorable David Joyce
> Chairman, House Appropriations Subcommittee on Homeland Security
>
> The Honorable Henry Cuellar
> Ranking Member, House Appropriations Subcommittee on Homeland Security
>
> The Honorable Chris Murphy
> Chair, Senate Appropriations Subcommittee on Homeland Security
>
> The Honorable Katie Britt
> Ranking Member, Senate Appropriations Subcommittee on Homeland Security

If you have any questions, please do not hesitate to contact me at (240) 721-1500.

Sincerely,

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

i

# Executive Summary

With the support of Congress in the form of discretionary funding, in FY 2022, USCIS expanded efforts to increase capacity of affirmative asylum case processing and to eliminate the affirmative asylum backlog.  This report details the efforts and specific actions that USCIS took in FY 2022 to reduce the backlog of affirmative asylum applications while ensuring the integrity of the asylum process.

In addition to affirmative asylum adjudications, USCIS handles credible fear screenings of individuals apprehended at the southwest border and placed in expedited removal proceedings who claimed fear of return to their home countries.  Such individuals are entitled to an interview with a USCIS asylum officer to determine if they have a credible fear of persecution or torture.  Under the Asylum Processing Interim Final Rule, as of May 31, 2022, USCIS may retain the asylum and withholding of removal application of certain individuals found to have a credible fear, rather than placing the individuals into removal proceedings with an immigration judge.[1]  A specialized corps of asylum officers was established in FY 2022 in order to conduct Asylum Merits Interviews under the rule.

As USCIS reported in the FY 2021 report, *Backlog Reduction of Pending Affirmative Asylum Cases*,[2] the backlog of affirmative asylum applications began to grow starting in 2012 because of the dramatic increase in the number credible fear screenings.  The ongoing growth in the credible fear caseload at times requires a majority of USCIS asylum officers to conduct those screening determinations, thus reducing the number of officers available to conduct affirmative asylum adjudications.

The diversion of asylum office staff from affirmative asylum processing to other critical and urgent humanitarian caseloads has been a continuing challenge to addressing the full scope of pending affirmative asylum applications.  Through the discretionary funding received with the enactment of the FY 2022 DHS Appropriations Act (P. L. 117-103), USCIS was able in FY 2022 to focus on increasing staffing for the affirmative asylum program with a new cadre of asylum officers and support staff who were solely dedicated to administering affirmative asylum applications.  This staffing was devoted, as directed by Congress, to the completion of affirmative asylum applications that have been pending for the longest period, including applications of individuals who first filed for asylum in 2014 and in 2015.

While USCIS currently is prioritizing protection screenings at the southwest border, USCIS was placed in a strong position in FY 2022—with the help of Congress—to make progress in completing the longest pending applications and to devoting more of its expanded workforce to affirmative asylum processing.

---

[1] *See* DHS and Department of Justice, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT [Convention Against Torture] Protection Claims by Asylum Officers, 87 Federal Register 18078 (March 29, 2022).

[2] https://www.dhs.gov/sites/default/files/2021-12/USCIS%20-%20Backlog%20Reduction%20of%20Pending%20Affirmative%20Asylum%20Cases.pdf



# Asylum Application Processing

# Table of Contents

I.   Legislative Language ................................................................................................ 1

II.  Background .............................................................................................................. 2

III. Status Report .......................................................................................................... 9

   A.   Congressional Funding Expenditure Plan................................................. 9

   B.   Other Actions Taken to Reduce the Backlog.......................................... 10

   C.   Integrity Measures ................................................................................... 14

IV.  Conclusion ........................................................................................................... 18

V.   Appendix…………………………………………………………………………….. 19

# I.   Legislative Language

This report responds to the direction set forth in the Joint Explanatory Statement accompanying the Fiscal Year (FY) 2022 Department of Homeland Security (DHS) Appropriations Act (P. L. 117-103), which states:

> *Asylum Processing.*—Not later than 90 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that details its efforts and specific actions, if any, to reduce the backlog of asylum applications, while ensuring that asylum applicants are properly reviewed for security purposes.

# II.   Background

U.S. Citizenship and Immigration Services (USCIS), a Component of DHS, has jurisdiction over affirmative asylum applications.  An individual affirmatively seeking asylum may file Form I-589, Application for Asylum and for Withholding of Removal, with USCIS if the individual is currently in the United States and has not been placed in removal proceedings.  The USCIS Asylum Division adjudicates all affirmative asylum applications.  In addition, the USCIS Asylum Division has initial jurisdiction over asylum applications filed by unaccompanied children, regardless of whether they are in removal proceedings before the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

The affirmative asylum process begins when an asylum applicant files an application by mail or electronically with USCIS.  The applicant later receives a notice to report to a designated USCIS location to have his or her biometrics taken.  Next, the applicant receives a notice stating the date, location, and time of the asylum interview.  An asylum applicant may apply for employment authorization if 150 days have passed since submitting a complete asylum application.  The asylum applicant is eligible to receive an Employment Authorization Document (EAD) if the asylum application has been pending for a total of 180 days, excluding any delays caused by the applicant, and if no USCIS decision has been made on the application.[3]  An asylum office's jurisdiction to adjudicate a particular asylum applicant's case is determined by the applicant's place of residence.  Most applicants within an asylum office's jurisdiction are interviewed at the asylum office's principal office.  There are currently 11 principal asylum offices:  Arlington, Virginia; Bethpage (Long Island), New York; Boston, Massachusetts; Chicago, Illinois; Houston, Texas; Miami, Florida; Newark, New Jersey; New Orleans, Louisiana; San Francisco, California; Tampa, Florida; and Tustin (Los Angeles), California.  Those applicants who live far from the principal office may be scheduled to be interviewed at a temporarily staffed circuit ride[4] location in another USCIS location closer to the applicant's residence.

Asylum offices administer several workloads.  USCIS prioritizes the numerous workloads of the Asylum Division according to statutory directives, operational capacity, and other policy considerations, such as the workload's immediate and long-term effects on applicants.

---

[3] This waiting period was in effect through various versions of the relevant regulation until August 25, 2020, when the waiting period was extended by regulation to 365 days.  8 Code of Federal Regulations (C.F.R.) § 208.7(a)(1)(ii) (2020).  However, this rule was vacated on February 7, 2022, by a decision in *Asylumworks v. Mayorkas*, 2022 WL 355213 (D.D.C. Feb. 7, 2022), and USCIS reverted to applying the provisions governing employment authorization that were in place before the final rule took effect in August 2020.  Subsequently, on September 21, 2022, DHS announced the publication of a final rule consistent with the court-ordered vacatur in *Asylumworks v. Mayorkas*, and the final rule is effective Feb. 7, 2022.

[4] A circuit ride is an alternate, non-asylum office, interview location usually located in a USCIS field office.  Although the USCIS field offices host the asylum interview, field office staff do not conduct asylum interviews, do not schedule asylum interviews, and do not provide updates on the status of asylum applications.

In FY 2022, the Asylum Division's highest-volume workloads are:[5]

- Credible Fear
- Asylum Merits Interviews (AMI)
- Reasonable Fear
- Operation Allies Welcome (OAW) Parolees' Affirmative Asylum Applications
- Non-OAW Affirmative Asylum Applications

Individuals placed in expedited removal proceedings who indicate an intention to apply for asylum, or who express a fear of persecution, torture, or return to their home country are referred to an asylum officer for a credible fear interview. Prior to May 31, 2022, noncitizens found to have a credible fear of persecution or torture were placed into original section 240 removal proceedings, where they could seek asylum or other protection from removal before an immigration judge. However, the Interim Final Rule titled, "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers," now authorizes USCIS to consider the asylum applications of certain individuals who are placed in expedited removal proceedings after May 31, 2022, and who receive a positive credible fear determination.[6] The interview for this asylum adjudication is an AMI. Under the rule, the AMI takes place no earlier than 21 days and no later than 45 days after the positive credible fear determination. In most instances, the asylum office serves the asylum merits decision within 60 days after service of the positive credible fear determination. The Interim Final Rule is being implemented in a phased approach.[7]

In addition to credible fear screenings, USCIS conducts reasonable fear screenings for noncitizens who are subject to a reinstated order of removal or final administrative removal order under section 238(b) of the Immigration and Nationality Act and who claim a fear of return to their designated country of removal. On a yearly basis, the volume of fear screenings for these programs regularly has reached levels beyond agency projections. In peak screening volume periods, a majority of all available USCIS Asylum Division staff may be assigned temporarily to the administration of the credible fear and reasonable fear programs.

Affirmative asylum applications filed by individuals who were paroled into the United States as part of OAW are being processed on an expedited basis as required under the Extending Government Funding and Delivering Emergency Assistance Act (P. L. 117-43). The number of affirmative asylum applications filed by OAW parolees reached 3,000 per month in August 2022

---

[5] Migrant Protection Protocols (MPP) screenings were the first priority until August 8, 2022, when the U.S. District Court for the Northern District of Texas lifted its injunction requiring DHS to reimplement MPP in good faith. The lifting of the injunction occurred after the U.S. Supreme Court issued a ruling on June 30, 2022, in *Biden v. Texas*, holding that the Immigration and Nationality Act confers discretion on Secretary Mayorkas to terminate the MPP program. Individuals no longer are being newly enrolled in MPP, and individuals currently in MPP in Mexico are disenrolled when they return for their next scheduled immigration court hearing date. DHS disenrolled all individuals in MPP who returned to a port of entry as of November 1, 2022. USCIS no longer is receiving referrals for fear assessments in conjunction with MPP.

[6] *See* DHS and DOJ, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078 (March 29, 2022).

[7] *See* FACT SHEET: Implementation of the Credible Fear and Asylum Processing Interim Final Rule | USCIS.

followed by a reduction in receipts by September.  Asylum offices are prepared to address any receipt increases in FY 2023.  Capacity for this OAW workload is drawn first from other affirmative asylum processing before staffing is reassigned from other high-volume caseloads.

**Affirmative Asylum Backlog**

As described in detail below, the affirmative asylum backlog is due to a prolonged, significant increase in affirmative asylum application filings, particularly during a period when USCIS prioritized older asylum applications over newer ones, as well as growing numbers of credible fear screenings, both of which are processed by USCIS asylum officers.  USCIS responded to this growth in receipts with significant investment in new facilities, staffing increases, operational changes, and modernization projects.

### 1. Receipt Increases

Starting in FY 2012, resource and case-scheduling decisions for asylum offices resulted in backlog growth.  For example, beginning in FY 2012, asylum offices began to receive a growing number of credible fear screenings, which required the assignment of a high proportion of asylum office staff and significant expansion in capacity.  In addition, in response to an increase in the refugee ceiling, USCIS temporarily diverted asylum officers to assist in overseas refugee processing in FY 2016.  Another factor in the backlog growth was the temporary shift to a first in, first out (FIFO) scheduling system for asylum applications between 2014 and 2017, from the last in, first out (LIFO) scheduling system used beginning in January 1995.  Since the re-implementation of LIFO scheduling in January 2018, USCIS has prioritized for interviews asylum applications that were most recently filed.  USCIS uses the LIFO system to discourage individuals potentially from filing non-meritorious asylum applications primarily to take advantage of the backlog to obtain employment authorization during the pendency of their applications.  Under this system, applicants who may have filed non-meritorious asylum applications risk having their applications adjudicated more quickly and denied or referred to DOJ EOIR during the waiting period, meaning that efforts to obtain employment authorization are less likely to succeed.

But even before the shift to FIFO, a confluence of factors came to a head in 2014 that made the LIFO scheduling system less effective at that time.  Specifically, most USCIS asylum officers were assigned to address a surge of credible fear, reasonable fear, and unaccompanied child asylum cases.  Further, because the specter of speedy removal is necessary for LIFO to effectively dissuade individuals from filing non-meritorious asylum applications primarily to obtain employment authorization, DOJ EOIR, prior to 2014, prioritized removal proceedings of asylum applicants whom USCIS had referred to immigration court, enabling immigration judges in most cases to adjudicate those noncitizens' asylum applications before the 180-day EAD clock expired.  But in 2014, owing to factors beyond its control, DOJ EOIR had to stop prioritizing removal proceedings of individuals whom USCIS had referred.  The asylum applications of many such individuals therefore would remain pending for more than 180 days, enabling those individuals to qualify for employment authorization and dampening LIFO's effectiveness at controlling non-meritorious filings.  With the diversion of resources to the border, and fewer adjudications of affirmative asylum applications, the affirmative asylum backlog increased.

4

Consequently, LIFO's effectiveness in discouraging frivolous, fraudulent, or otherwise non-meritorious filings decreased.

The institution of FIFO on December 26, 2014, was followed by expansion of receipts both in affirmative asylum filings and in asylum-based employment authorization documents.  In the 12 months prior to the December 26, 2014, institution of FIFO, affirmative asylum applications averaged 5,000 per month.  Following the change to FIFO, monthly asylum receipts began to exceed 7,000 filings regularly for the first time since 1996.[8]  The backlog had grown by more than 1,750 percent during the 5 years prior to the re-implementation of LIFO, and the number of new asylum applications had more than tripled.  EAD receipts also increased by more than six times after this change, reaching 261,447 annual applications by FY 2017.

In light of these trends, USCIS announced on January 31, 2018, that it would return to the LIFO scheduling system.  After reverting to LIFO scheduling in January 2018, receipts immediately fell, going from 12,282 in the month of January 2018 to 8,696 in the month of February 2018.  The number of affirmative asylum applications filed per year decreased from 141,695 in FY 2017 to 106,147 in FY 2018 (-25 percent); to 95,959 in FY 2019 (-10 percent); to 94,077 in FY 2020 (-2 percent); and to 59,416 (-37 percent) in FY 2021.  Since reinstituting LIFO, the annual rate of backlog growth has dropped, increasing just 10 percent in FY 2018, 7 percent in FY 2019, 13 percent in FY 2020, and 7 percent in FY 2021.[9]  Compared to an average annual increase of 37 percent while FIFO was in effect, LIFO remains a critical tool in controlling non-meritorious applications filed primarily to obtain employment authorization.

In FY 2022, affirmative asylum receipts increased approximately 302 percent and the asylum backlog increased 39 percent to 572,022 cases.  Although the Asylum Division has observed an increase in total receipts, the data nevertheless indicate that LIFO continues to disincentivize non-meritorious applications filed primarily to obtain employment authorization, as the uptick in current receipts compared to prior years in which UCIS prioritized new filings over older ones is a result of new developments.  Specifically, USCIS now is experiencing a significant surge in asylum applications filed by nationals of Cuba and Venezuela, both of which are currently experiencing documented humanitarian crises catalyzing increased emigration from those countries.  Between FY 2021 and FY 2022, annual affirmative asylum receipts from Cuban nationals increased from approximately 2,800 to 64,600 cases (2,207 percent) while receipts from Venezuelan nationals increased from 9,200 to 47,300 cases (414 percent).  Applications from just these two countries alone comprise approximately 44 percent of total receipts in FY 2022.

As depicted in the following chart, between FY 2013 and FY 2017, when USCIS utilized a FIFO scheduling policy for affirmative asylum interviews, despite significant staffing increases, receipt growth in asylum office workloads outpaced the expansion of asylum office staffing and the establishment of new or expanded facilities needed to support additional staffing growth.

---

[8] Between 1997 and 2014, affirmative asylum receipts exceeded 7,000 or more in only 2 months.  In June 2001, monthly affirmative asylum receipts reached 7,293.  In April 1998, affirmative asylum receipts reached 9,171.

[9] The reduced number of affirmative asylum applications filed in FY 2021 may be due in part to the continued travel restrictions resulting from the Coronavirus Disease 2019 (COVID-19) pandemic.

*Exhibit 1, Asylum Office Receipts and Staffing*

| Fiscal Year | Case Type | | | | | Total Cases | Annual % Change | Asylum Officers Onboard (Year End) |
|---|---|---|---|---|---|---|---|---|
| | Affirmative | Credible Fear | Reasonable Fear | MPP | AMI[10] | | | |
| 2012 | 41,900 | 13,880 | 5,070 | n/a | n/a | 60,850 | n/a | 238 |
| 2013 | 44,453 | 36,035 | 7,735 | n/a | n/a | 88,223 | 45% | 245 |
| 2014 | 56,898 | 51,001 | 9,084 | n/a | n/a | 116,983 | 33% | 337 |
| 2015 | 83,197 | 48,052 | 8,015 | n/a | n/a | 139,264 | 19% | 349 |
| 2016 | 114,965 | 94,048 | 9,632 | n/a | n/a | 218,645 | 57% | 500 |
| 2017 | 141,695 | 78,564 | 10,273 | n/a | n/a | 230,532 | 5% | 546 |
| 2018 | 106,147 | 99,035 | 11,101 | n/a | n/a | 216,283 | -6% | 542 |
| 2019 | 95,959 | 105,301 | 13,177 | 11,704 | n/a | 226,141 | 5% | 552 |
| 2020 | 94,077 | 30,839 | 8,721 | 12,352 | n/a | 145,989 | -35% | 840 |
| 2021 | 59,416 | 58,947 | 5,106 | 1,470 | n/a | 124,939 | -14% | 736 |
| 2022[11] | 239,121[12] | 68,330 | 6,930 | 16,623 | 757 | 331,761 | 166% | 826 |

## 2.  Staffing Allocation Increases

USCIS utilizes an annual workforce planning process to assess staffing requirements, known as the Staffing Allocation Model (SAM).  The SAM is focused on allocating staff to process the anticipated number of new/incoming receipts for all workloads for the next fiscal year.  Since 2015, asylum office staffing authorizations in the SAM have not included staffing requirements for the completion of any prior-year receipts.  Following the suspension of LIFO processing in 2014, new receipts rose too rapidly to provide new staffing allocations within the SAM for both new receipts and backlog cases.  Separate planning was initiated to address the need to reduce

---

[10] Generally, Asylum Officers and Supervisory Asylum Officers who complete AMI cases and review AMI cases, respectively, were hired specifically to implement the Interim Final Rule titled, "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers," and normally are not assigned to other workloads so long as their offices have AMI cases.  *See* FACT SHEET: Implementation of the Credible Fear and Asylum Processing Interim Final Rule | USCIS.

[11] FY 2022 credible fear, reasonable fear, and MPP statistics were extracted from USCIS systems on October 31, 2022, for cases received through September 30, 2022.  AMI statistics are through September 30, 2022, from the DHS Office of Immigration Statistics.  *See* Asylum Processing Rule Cohort Reports | Homeland Security (dhs.gov) last updated April 20, 2023.

[12] This is the number of asylum applications that USCIS Service Centers or the Asylum Vetting Center (collectively, the "Centers") entered into the asylum case management system (called "Global"), as of April 5, 2023, with receipt dates through September 30, 2022, and includes applications filed online through September 30, 2022.

the backlog of pending cases.  USCIS now relies on a combination of internal processes and plans, unrelated to the SAM, to plan for backlog reduction.

Workforce planning is based on USCIS estimates for each adjudication workload for the coming year.  These workload estimates are established through the Volume Projection Committee, a cross-disciplinary committee that forecasts receipts based on statistical modeling and any recent policy changes.  The following volume estimates for FY 2022 were established in June 2021.

| FY 2022 New Receipt Estimates, by Program – *June 2021* | Total Receipt Estimates |
|---|---|
| Affirmative Asylum | 70,000 |
| Credible Fear | 90,000 |
| Reasonable Fear | 12,100 |

Using the SAM process, USCIS increased the Asylum Division's overall staff from 600 total positions in FY 2012 to approximately 1,700 total authorized[13] positions in FY 2020. Significantly, with the latest staffing approvals in FY 2021, USCIS increased the number of asylum officer positions from 840 to 950 by the end of FY 2021.

In terms of staffing levels, as of June 2019, the USCIS Asylum Division's onboard rate was 75 percent.  Following the hiring surge between the fourth quarter of FY 2019 through the third quarter of FY 2020, the Asylum Division reached a 100-percent onboard rate overall. USCIS then implemented a lengthy hiring freeze due to major financial issues in FY 2020 that depleted its pipeline of selections and resulted in staffing losses because of attrition for vacancies that could not be filled.  Since July 2021, the Asylum Division has experienced significant staffing growth with a total of 370 additional positions, and as of October 7, 2022, stands at an 81 percent onboard rate for asylum officers.

Because of multiple budget priorities to address all USCIS operations, USCIS regularly evaluates staffing enhancements recommended by the SAM.

### 3.  Backlog Reduction Staffing

Staffing for adjudication of applications received in prior years is not part of the annual SAM process described above.  Rather, USCIS analyzes staffing requirements for backlog reduction as part of the agency's internal backlog planning effort.  Further, authorizations to hire backlog reduction staff are considered separately from the annual SAM process.[14]  Staffing requirements for the reduction of affirmative asylum backlogs are updated annually as part of the USCIS backlog elimination planning effort.  These reviews have found that although staffing exists to

---

[13] Changes to staffing levels for USCIS Directorates and Program Offices are reviewed and subject to the approval of the USCIS Office of the Chief Financial Officer and based on the priorities of the USCIS Strategic Plan and available resources.  Such approved staffing is considered "authorized" for funding within USCIS.

[14] The SAM is limited to future workloads in order to inform annual budget planning most appropriately with projected annual fee receipts and the expected costs to administer those receipts.

begin reducing the affirmative asylum backlog, this effort often is delayed because high volumes of priority caseloads currently require the reassignment of this staff to other workloads.

Prior to the COVID-19 pandemic, affirmative asylum completions reached an historic high, with rapid increases projected into the third and fourth quarters of FY 2020. Specifically, total affirmative asylum completions reached 78,580 in FY 2019 and 56,047 in FY 2020, with 33,140 completed before March 18, 2020. These significant total completions in FY 2019 and FY 2020 likely would have produced a meaningful and steady reduction of the affirmative asylum backlog prior to the end of FY 2020 had the pandemic not occurred. Because of the pandemic, however, asylum offices were closed to the public between March 2020 and June 2020. And even after reopening, asylum offices continued to observe social distancing protocols through March 2022 that limited the capacity to conduct in-person interviews of asylum applicants. During this period, USCIS pivoted and focused on case completions where interviews were not conducted and also conducted video-assisted interviews as a COVID mitigation measure, thereby continuing to complete asylum cases to the extent possible amidst the pandemic. Nonetheless, a hiring freeze restricted the ability to recruit asylum officers, and staffing levels fell from more than 800 officers to less than 700 officers through attrition over the same period. As a result of all these factors, affirmative asylum completions fell, and the asylum backlog increased during this period.

The return to pre-pandemic in-person case processing in FY 2022 has allowed asylum offices to increase in-person processing of affirmative asylum cases. As of March 2022, asylum office social distancing protocols have been aligned with the Centers for Disease Control and Prevention (CDC) COVID-19 Community Levels. In November 2022, USCIS ended physical distancing restrictions and overall occupancy limits.

# III.  Status Report

## A.   Congressional Funding Expenditure Plan

Addressing the USCIS backlog is a priority for the Administration and USCIS senior leadership. USCIS recognizes that the backlog is a significant concern for asylum applicants who have applied for asylum during the highest years of receipts.  During periods when the backlog increases, applicants experience longer wait times to receive a decision on their benefit requests. USCIS understands the impact that delays in receiving decisions have on applicants.

Congress appropriated $275 million in FY 2022 to support USCIS refugee processing efforts and backlog reduction, including the reduction of the affirmative asylum backlog.  The Asylum Division was allotted a portion of this amount for general expenses and staffing resources to complete a multi-year plan to eliminate the affirmative asylum backlog.  The Asylum Division expended $5.1 million to support backlog reduction activities:  $3.1 million to support new positions; $219,000 for overtime; and $1.8 million in contractual services.  The Office of Information Technology expended $3.7 million in contractual services related to the Global Case Management System, and the Fraud Detection and National Security Directorate expended $229,000 in payroll to support asylum backlog reduction activities.  While other USCIS directorates or offices contribute to asylum backlog reduction efforts, those directorates or offices did not have expenses specifically categorized for asylum backlog reduction.

| General Expenses | |
|---|---|
| Interpreter Contract | $996,534 |
| Backlog Reduction Travel | $69,995 |
| Backlog Reduction Rent-Related | $65,134 |
| Iron Mountain Files Contract | $676,710 |
| Global Case Management System | $3,700,000 |
| **Total General Expenses** | **$5,508,373** |
| Payroll | |
| Overtime | $221,936 |
| Staffing Expansion | $3,326,216 |
| **Total Payroll** | **$3,548,152** |
| **Total Funds** | **$9,056,525** |

This appropriation is transformational in developing a way to address the asylum backlog.  Since 1996, when the asylum offices first began backlog reduction efforts following the 1995 Asylum Reforms, it has been clear that having dedicated staff assigned to process new asylum applications and also to process the longest-pending applications is necessary to control and prevent a rise in the affirmative asylum backlog.  The appropriated positions provide dedicated staffing to the completion of the longest pending applications, providing a consistent workforce dedicated to reducing the backlog.  With the March 2022 change in USCIS COVID-19 protocols consistent with the updated CDC guidelines, asylum offices generally can schedule more in-

9

person interviews, which resulted in an increase in affirmative asylum completions in FY 2022. With facilities fully open when the community levels are at "low" and "medium", asylum offices were able to assign more fee-funded staff to processing new affirmative asylum filings, which prevents affirmative asylum backlog growth.

Asylum offices dedicated 152 positions funded by an appropriation provided in the FY 2022 DHS Appropriations Act (P. L. 117-103) to backlog reduction.  Of those positions, 80 were asylum officers, who were assigned to the interview and adjudication of the longest pending affirmative asylum applications, beginning with the oldest applications and working forward. Another 59 positions include supervisory and support staff who were responsible for pre-and post-interview portions of the adjudication process.  The remaining 13 positions increased USCIS's capacity to train backlog reduction staff and to support the operations necessary for affirmative asylum backlog reduction, including increased human resources.

As of the end of FY 2022, hiring for these appropriations-funded positions was the highest priority of all Asylum Division recruitment activities.  As of October 7, 2022, 97 of the 152 positions were filled, including 53 asylum officer positions.  With this staff, asylum offices were able to devote a substantial and consistent level of staffing to the completion of the longest pending affirmative asylum applications.  Initially, this effort was focused on the completion of applications received on or before January 31, 2018.  The volume of applications received and pending before this date, approximately 200,000, is particularly high because of increased receipts between December 26, 2014, and January 31, 2018, when USCIS utilized FIFO processing.  USCIS recognizes that its core mission is to ensure the timely processing of immigration requests with fairness, integrity, and respect for all we serve.  Without appropriations for backlog reduction this fiscal year, USCIS is currently supporting the backlog reduction efforts through fee collections, but current fee collections are not sufficient to have a large impact on backlog reduction.  Sustained, multi-year appropriated funding for backlog reduction is necessary to ultimately eliminate the current backlog.

In FY 2021, 26 percent of all affirmative asylum interviews conducted were on applications pending for 36 months or more, and 38 percent of the adjudications completed were on applications pending for 36 months or more.  USCIS completed another 14,495 of the longest-pending applications in FY 2022.  By the end of FY 2022, the Asylum Division had met its goal of completing 1,000 or more of the longest pending asylum applications per month.  USCIS continues to track its ability to meet this target on a monthly basis.

# B. Other Actions Taken to Reduce the Backlog

As part of workload planning for asylum offices, USCIS has expanded asylum facilities, has increased staffing, and has continued to pursue process improvements for case adjudication as well as for staffing recruitment.

**Facilities Expansion**

USCIS has been working with its U.S. Government partners to identify available facilities and development projects to provide sufficient in person-facilities to maximize the number of

asylum officers who can be assigned at the same time in the same facility to affirmative asylum case processing. This effort builds upon a longer planning process to expand asylum offices in order to accommodate the rapid growth in staffing. Specifically, USCIS has approved new projects for the following asylum offices to ensure dedicated workspace for all field staff positions that were allocated before August 2022: Arlington, Virginia; Chicago, Illinois; Houston, Texas; Los Angeles, California; Miami, Florida; New Orleans, Louisiana; Newark, New Jersey; New York, New York; and San Francisco, California. Projects also were approved to create new asylum field offices in: Dallas, Texas (May 2023); Seattle, Washington (January 2025); and Denver, Colorado (October 2025). The total one-time costs of these projects are $20.2 million. Of the $20.2 million, $11.9 million was obligated. The facilities lease acquisition program (LAP) budget has $8.3 million to cover the remaining one-time cost. The $5.9 million of remaining cost is planned in FY 2023 and $2.3 million in FY 2024. The LAP budget includes both premium processing and Immigration Examinations Fee Account (IEFA) funding. The above-noted locations and projects have been selected based on the workload volumes within the jurisdiction, including the pending affirmative asylum caseload. These new asylum offices will reduce government travel costs and add capacity in underserved communities.

**Dallas Asylum Sub-Office Temporary Space:**

- This project is for the temporary occupancy of the Farmers Branch Office until the renovations at the Texas Service Center are complete. The project includes 9 workstations, 2 check-in/biometric stations, and 5 offices.
- Total Project Cost: $9,743,692
    - In September 2022, $7,342,618 in premium processing was obligated. Also, in September 2022, there was $68,706 in IEFA funding obligated.
    - In FY 2023, there is $2,332,368 in funding planned.
- Projected Occupancy Date: May 26, 2023.

**Seattle:**

- This project is to procure space to accommodate 107 employees: 64 offices and 43 cubicles. A location for this project has not yet been determined. USCIS is waiting to see if the Columbia building occupied by the Social Security Administration is an option; otherwise, USCIS will need to conduct a market survey.
- Total Project Cost: $4,800,827
    - In FY 2023, there is $3,606,910 in funding planned.
    - In FY 2024, there is $1,193,917 in funding planned.
- Projected Occupancy Date: January 24, 2025.

**Denver:**

- This project is to establish a new asylum office to accommodate 90 staff members. The space to be acquired will be approximately 44,000 square feet, which will be for new staff.

11

- Total Project Cost: $5,702,292
  - In August 2022, $4,510,921 in IEFA was obligated.
  - In FY 2024, there is $1,191,371 in funding planned.
- Projected Occupancy Date: October 14, 2025.

In addition to the 11 current asylum offices and the three new above-noted asylum offices, ongoing facilities projects include new offices in Atlanta, Georgia (estimated second quarter of FY 2023) and in San Antonio, Texas (estimated November 2023), and an additional interview location for the New York Asylum Office in Queens, New York (projected occupancy is February 2024).

**Program Enhancements**

Although a large focus of backlog reduction has been increasing the Asylum Division's capacity in terms of staff and facilities, USCIS also has implemented operational changes designed to improve program security measures, to increase the number of interviews that it can complete, to realize other efficiency gains, and to mitigate backlog growth.

Examples include:
- **Post-Interview Case Processing** – The Asylum Division has placed new focus on reviewing pending asylum applications that were not completed immediately following the affirmative asylum interview. USCIS established a goal in FY 2021 to monitor applications pending post-interview, which has enabled offices to move these applications forward to completion. Asylum offices also use new reports and dashboards to track their performance against this goal and to identify applications that can be worked toward completion. In FY 2022, asylum offices completed 72 percent of asylum adjudications within 20 days after the interview for cases filed since June 4, 2020.
- **Centralized Case Vetting** – USCIS established a new office in Atlanta, Georgia, to centralize intake and prescreening (such as background checks, security vetting, fraud analysis, jurisdictional issues). USCIS estimates substantial completion of the facility that houses the center will occur before the end of FY 2023. USCIS's vision for the center is to deliver interview-ready files to the asylum offices so that all field resources are focused on interviewing and completing applications instead of on conducting necessary but time-consuming pre-interview adjudication processes. Centralizing functions that currently are spread across the asylum offices will allow USCIS to take advantage of economies of scale, while ensuring a consistent and holistic approach to pre-interview preparation and intake. This change will ensure that applications are readied for completion in a timely manner. Once these facilities and staffing allow for the beginning of providing interview-ready files, timeliness will be tracked with benchmarks that account for center capacity and processes. This office also is intended to support text analytics operations (a new technology that assists in detection of possible fraud indicators across affirmative asylum applications), terminations, and other non-interview functions.
- **Backlog Sweeps** – USCIS has initiated several data sweeps of the backlog to identify applications that may be amenable to expedited or non-interview processing. These include identifying for expedited scheduling, if appropriate, pending applications of

principal applicants:  who have gained lawful permanent resident status; who have approved immigrant visa petitions; over whom USCIS may lack jurisdiction; who may have serious criminal histories; or who may have abandoned their asylum applications. In the fourth quarter of FY 2021, USCIS developed a reporting tool whereby asylum offices may conduct their own "sweeps" at any time to identify applications in these categories for expedited or non-interview processing.  These activities are evaluated according to how many applications are identified for possible action during each review. In FY 2022, USCIS completed approximately 7,000 cases within these categories. USCIS also extended approximately 1,900 interview waivers in FY 2022 to individuals who appeared to be using the asylum process to request cancellation of removal in immigration court.  This project has allowed for streamlined application processing and has deterred similar filings.

- **Technology** – USCIS worked closely with its technology partners to develop several tools to streamline application processing and to strengthen the integrity of the process. Many of these new tools were developed in the Asylum Division's recently modernized case management system, Global, and include:  the Assessment Generator Tool, which assists officers with conducting legal analyses effectively and efficiently; the Pre-Interview Fraud Detection and National Security (FDNS) Review function, which centralizes fraud and security sweeps of backlog asylum applications for potential vulnerabilities; and the Global Interview Notes and Assessment (GINA) tool.  The Assessment Generator also improves the efficiency of post-interview case review, a common processing bottleneck.  These bottlenecks are monitored with metrics to identify pending caseloads in each stage of the adjudication process.  Following a process improvement, the particular stage in the process is monitored for changes in volumes. The GINA streamlines and facilitates interview notetaking and can be expanded to support other adjudicative functions.  USCIS is always looking for ways continually to improve Global and the new tools, such as developing enhanced scheduling functions.

- **Digitization and Data Analysis** – USCIS has transitioned receipt of paper applications to a USCIS Lockbox, to scan A-files containing asylum applications in the backlog, and to make enhancements to Global focusing on the interview and decision-making processes.  With an increased amount of data available in Global through these initiatives, USCIS now has new data sources to monitor for and correct problems that generally may affect asylum processing and, more specifically, the affirmative asylum backlog.  These tools will reduce or eliminate manual data entry and the management of paper files, providing greater insight into steps that may cause delays in application processing.  By having more of the process in Global rather than in paper files, USCIS will be able to review and compare processing times between offices and applicants to identify result-based best practices and the underlying reasons for any new delays in application processing.  Furthermore, online-filed applications and these enhancements to Global will allow USCIS to flexibly assign staff virtually, both locally and across offices, using video-assisted interviewing methods.  The uniform use of technology, processes, and efficiencies developed for online processing for all asylum applications—new and old—will promote more consistency and productive decision-making by asylum officers. The filing process is being monitored through metrics in several ways:  the adoption of online filing is being tracked to understand past and future volumes of this filing method; the receipt of paper applications is monitored for volume and intake delays; and the

impact that this transition from paper to online filing has on asylum adjudication is being monitored through regular quality and efficiency assessments at each office overseen by the Asylum Division's operational leads.

- **Video-assisted Interviewing** – Video-assisted interviewing was first deployed as a COVID-19 mitigation measure when asylum offices reopened on June 4, 2020, as it allows the officer, applicant, and other interview participants each to sit in separate offices and to communicate through videoconferencing to maintain social distancing. From June 4, 2020, through September 30, 2022, asylum offices have conducted more than 33,829 video-assisted interviews, including 10,635 conducted in FY 2022. Currently, a small-scale variation of this interviewing method—office-to-office interviews—allows offices to conduct circuit-ride interviews with minimal travel, providing a cost-effective means of maximizing staffing resources. During a video-assisted interview, an asylum officer may conduct the asylum interview or may complete the adjudication from another asylum office or from home while on telework. This practice was tested for quality, performance, and reliability prior to rollout on a large scale. Testing was performed at each office and involved regular feedback and improvements to ensure that the practice was effective, scalable, and sustainable. As video-assisted interviewing increases for online-filed or otherwise digitized asylum applications, it will allow for more flexible work assignments, both locally and across offices.

- **Remote Interview Participation** – As a safety measure during the COVID-19 pandemic, a temporary final rule titled "Asylum Interview Interpreter Requirement Modification Due to COVID-19", currently effective until March 16, 2023, permits the use of USCIS-contracted telephonic interpreters for affirmative asylum interviews, thereby reducing the number of individuals who must accompany applicants to their interview. This reduction in the number of individuals coming into the offices has freed up office space, allowing for additional interviews to be scheduled. In addition, as a safety measure during the pandemic, USCIS allowed for remote attorney or accredited representative interview participation, which further provided additional interview space while maintaining social distancing measures when required because of local community levels. This practice is being tested for quality, performance, and reliability at each office prior to rollout on a large scale. Recently, USCIS decided to make remote attorney or accredited representative interview participation a permanent option for asylum interviews, subject to local office discretion.

- **Expanded Telework** – Expanded telework opportunities have maximized both administrative and adjudicative functions, allowing USCIS to reexamine operations and to provide asylum offices with more flexibility to complete appropriate tasks remotely. USCIS continues to look for ways to maximize telework to free up more office space for additional affirmative asylum interviews.

## C. Integrity Measures

Asylum office adjudications involve numerous measures to prevent abuse of the asylum process. These measures include mandatory biographical and biometric checks and mandatory manual file reviews for all asylum applicants. USCIS must receive and review the results of all security

checks prior to granting asylum; in fact, the asylum case management system will not allow a grant of asylum to be entered until each security check issue is resolved. Equally important as the security checks outlined in this document, USCIS also considers timely case processing to be a significant deterrent to individuals who might otherwise use the existence of the backlog to remain in the United States under color of law. The efforts made to increase operational capacity are critical for this purpose. The following is a list of measures is in place to preserve the integrity of the USCIS asylum process.

**Mandatory Biographical Checks (checks using the applicant's name, date of birth, and aliases):** When a new asylum application is entered, the USCIS asylum case management system automatically initiates checks against numerous immigration, national security, terrorist and law enforcement databases to determine if the applicant, for example, has made previous undisclosed immigration filings, has been subject to immigration enforcement, is wanted by law enforcement agencies, or is a national security threat. In addition, officers must document completion of security checks for each case by making a record of the completion and by recording the results of all required security checks. This documentation then is reviewed and initialed by a supervisor.

**Mandatory Biometric Checks (checks using the applicant's fingerprints and photograph):** USCIS schedules all asylum applicants for fingerprinting appointments prior to interview. These fingerprints are checked against DHS, DOJ, Department of Defense (DOD), and Department of State (DOS) databases to verify the applicant's identity at the time of interview and to screen for criminal records. USCIS may not grant asylum until a response from the Federal Bureau of Investigation is received and reviewed. Fingerprints also are run against DOD's holdings to screen for overseas encounters with the U.S. military.

In addition, asylum applicants' fingerprints are enrolled and checked electronically against the vast network of biometric data contained in DHS databases, which include criminal and national security related records; other DHS immigration-related encounters; DOS's consular records; and DHS entry/exit information. This check is vital in verifying the asylum applicant's identity at the earliest stage possible. For instance, the asylum office can determine immediately if an asylum applicant applied for a visa under a different name, or if an applicant entered the United States at a different time and place than reported on the asylum application. In addition, an alert system notifies the asylum office if the individual is wanted by the U.S. Marshals. Through this kind of biometric verification, offices have assisted in apprehensions of criminals and absconders and have identified individuals who attempted to change their identities after previously having been denied asylum.

In addition, all asylum applicants appearing for an interview are verified biometrically. Verification allows asylum offices to compare an individual's biometrics (fingerprint and photograph) and biographic information to information previously captured at an Application Support Center (ASC), ensuring that the person who appeared at the ASC is the same person appearing at the USCIS asylum office.

**Internal Controls:** All applications are randomly assigned to asylum officers. This prevents any individual employee from pre-arranging receipt of a particular asylum claim. In addition,

each officer leaves an electronic imprint in the case management system for each decision made, enabling USCIS management to track the individuals who updated the system for all asylum decisions.

**Fraud Prevention and National Security Teams:**  Teams of USCIS FDNS personnel specializing in asylum workloads are stationed full-time at each asylum office, the new office in Atlanta, Georgia, and Asylum Division headquarters to detect, deter, and investigate fraud, national security, and public safety issues administratively.  FDNS staff monitors the asylum caseload for fraud, national security, and public safety concerns through pre-interview screening and post-interview review of asylum files and information sharing with other agencies and law enforcement partners to identify cases and trends for further investigation.  In addition, when asylum officers identify possible fraud, national security, or public safety issues, they refer the suspected cases to FDNS staff for further review and analysis.  FDNS leverages specialized tools and partnerships to conduct in-depth administrative investigations of suspected fraud, including through pattern recognition software and relationships with U.S. Immigration and Customs Enforcement Homeland Security Investigations and DOJ, which can prosecute asylum fraud.  In addition, when an application has been identified through interview or security checks as potentially involving national security or public safety risks, FDNS personnel liaise with local and national law enforcement and intelligence community partners to obtain any relevant information.  No application presenting such risks may be approved until Asylum Division headquarters, in consultation with appropriate partners, has concurred with the decision.

FDNS officers and field and headquarters adjudications staff work together to combat fraud and to maintain vigilance over national security and public safety matters, both at the local asylum offices and at the national level.  Asylum Division headquarters staff coordinate fraud prevention and national security efforts at a national level with their counterparts at FDNS headquarters as well as with FDNS officers and other asylum office staff in the field.

**Government-Funded Interpreters:**  The Asylum Division currently, on a temporary basis through March 16, 2023, has instituted the use of neutral, government-paid interpreters to interpret during affirmative asylum interviews for applicants who speak one of 47 identified languages set out in 8 C.F.R. 208.9(h).  Prior to the implementation of the temporary final rule that permitted this practice, the Asylum Division was using neutral, government-funded interpreters to monitor the interpretation of asylum interviews at all Asylum Offices, thereby ensuring that interpreters brought by applicants were interpreting interview questions and answers correctly.  Both practices act as a strong deterrent to asylum fraud.

**Information Sharing with Canada:**  Under a bilateral agreement between the United States and Canada, both countries are authorized to share information with each other on asylum applicants.  USCIS now exchanges information with Canada on individual asylum applications, where warranted, to confirm aspects of the claim and to follow leads on criminal histories.  Additionally, USCIS has a similar program for the systematic exchange of biometric information on asylum seekers with the United Kingdom, Australia, and New Zealand.  The results of these programs have shown that information sharing with other countries helps to preserve the integrity of each nation's respective asylum programs by expanding the sources of information

available regarding asylum applicants, their identities, background, and prior immigration histories.

# IV.  Conclusion

Given the size of the affirmative asylum backlog, asylum offices must engage in a sustained, multi-year effort to reduce significantly and ultimately to eliminate the current backlog.  USCIS' long-term plans focus on enhancing the staffing levels, prioritizing information technology investments, and assessing operational enhancements designed to improve case processing efficiencies and mitigate backlog growth.  USCIS is continuing to move forward on implementing numerous efficiencies and program integrity measures to improve current processing, while operating in a manner that is safe for the workforce and the public.

# V.   Appendix:  Abbreviations

| Abbreviation | Definition |
|---|---|
| AMI | Asylum Merits Interview |
| ASC | Application Support Center |
| CAT | Convention Against Torture |
| CDC | Centers for Disease Control and Prevention |
| COVID-19 | Coronavirus Disease 2019 |
| C.F.R. | Code of Federal Regulations |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| DOJ | Department of Justice |
| DOS | Department of State |
| EAD | Employment Authorization Document |
| EOIR | Executive Office for Immigration Review |
| FDNS | Fraud Detection and National Security |
| FIFO | First In, First Out |
| FY | Fiscal Year |
| GINA | Global Interview Notes and Assessment |
| IEFA | Immigration Examinations Fee Account |
| LAP | Lease Acquisition Program |
| LIFO | Last In, First Out |
| MPP | Migrant Protection Protocol |
| OAW | Operation Allies Welcome |
| SAM | Staffing Allocation Model |
| USCIS | U.S. Citizenship and Immigration Services |