# EXHIBIT 211

| 104TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |
|---|---|---|

# IMMIGRATION IN THE
# NATIONAL INTEREST ACT OF 1995

———————

# R E P O R T

OF THE

# COMMITTEE ON THE JUDICIARY
# HOUSE OF REPRESENTATIVES

ON

# H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

| 104TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPT. 104–469 Part 1 |
| --- | --- | --- |

# IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

————

R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ON

## H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

————

U.S. GOVERNMENT PRINTING OFFICE

22–948                WASHINGTON : 1996

# CONTENTS

——————

|  | Page |
|---|---|
| The Amendment ................................................................................................ | 1 |
| Explanation of Amendment ............................................................................. | 106 |
| Purpose and Summary ..................................................................................... | 106 |
| Background and Need for Legislation ............................................................. | 110 |
| Hearings ........................................................................................................... | 182 |
| Committee Consideration ................................................................................ | 182 |
| Vote of the Committee ..................................................................................... | 182 |
| Committee Oversight Findings ........................................................................ | 205 |
| Committee on Government Reform and Oversight Findings ........................... | 205 |
| New Budget Authority and Tax Expenditures ............................................... | 205 |
| Congressional Budget Office Cost Estimate ................................................... | 205 |
| Inflationary Impact Statement ....................................................................... | 218 |
| Section-by-Section Analysis and Discussion ................................................. | 219 |
| Agency Views ................................................................................................... | 278 |
| Changes in Existing Law Made by the Bill, as Reported ............................... | 282 |
| Additional/Minority Views .............................................................................. | 512 |

| 104TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |
| --- | --- | --- |

## IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

———————————

MARCH 4, 1996.—Ordered to be printed

———————————

Mr. HYDE, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## ADDITIONAL AND DISSENTING VIEWS

[To accompany H.R. 2202]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 2202) to amend the Immigration and Nationality Act to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Immigration in the National Interest Act of 1995".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—

(1) whenever in this Act an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered

2

to be made to that section or provision in the Immigration and Nationality Act, and

(2) amendments to a section or other provision are to such section or other provision as in effect on the date of the enactment of this Act and before any amendment made to such section or other provision elsewhere in this Act.

(c) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; amendments to Immigration and Nationality Act; table of contents.

### TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

#### Subtitle A—Improved Enforcement at Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Prosecution of aliens repeatedly reentering the United States unlawfully.
Sec. 107. Inservice training for the border patrol.

#### Subtitle B—Pilot Programs

Sec. 111. Pilot program on interior repatriation.
Sec. 112. Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.
Sec. 113. Pilot program to collect records of departing passengers.

#### Subtitle C—Interior Enforcement

Sec. 121. Increase in personnel for interior enforcement.

### TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

#### Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

Sec. 201. Wiretap authority for alien smuggling investigations.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of Assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

#### Subtitle B—Deterrence of Document Fraud

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New civil penalties for document fraud.
Sec. 213. New civil penalty for failure to present documents and for preparing immigration documents without authorization.
Sec. 214. New criminal penalties for failure to disclose role as preparer of false application for asylum and for preparing certain post-conviction applications.
Sec. 215. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 216. Criminal penalties for false claim to citizenship.

#### Subtitle C—Asset Forfeiture for Passport and Visa Offenses

Sec. 221. Criminal forfeiture for passport and visa related offenses.
Sec. 222. Subpoenas for bank records.
Sec. 223. Effective date.

### TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

#### Subtitle A—Revision of Procedures for Removal of Aliens

Sec. 300. Overview of changes in removal procedures.
Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary departure (revised and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

#### Subtitle B—Removal of Alien Terrorists

##### PART 1—REMOVAL PROCEDURES FOR ALIEN TERRORISTS

Sec. 321. Removal procedures for alien terrorists.

##### "TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

"Sec. 501. Definitions.
"Sec. 502. Establishment of special removal court; panel of attorneys to assist with classified information.
"Sec. 503. Application for initiation of special removal proceeding.
"Sec. 504. Consideration of application.
"Sec. 505. Special removal hearings.

3

"Sec. 506. Consideration of classified information.
"Sec. 507. Appeals.
"Sec. 508. Detention and custody.
Sec. 322. Funding for detention and removal of alien terrorists.

PART 2—INADMISSIBILITY AND DENIAL OF RELIEF FOR ALIEN TERRORISTS

Sec. 331. Membership in terrorist organization as ground of inadmissibility.
Sec. 332. Denial of relief for alien terrorists.

**Subtitle C—Deterring Transportation of Unlawful Aliens to the United States**

Sec. 341. Definition of stowaway.
Sec. 342. List of alien and citizen passengers arriving.

**Subtitle D—Additional Provisions**

Sec. 351. Definition of conviction.
Sec. 352. Immigration judges and compensation.
Sec. 353. Rescission of lawful permanent resident status.
Sec. 354. Civil penalties for failure to depart.
Sec. 355. Clarification of district court jurisdiction.
Sec. 356. Use of retired Federal employees for institutional hearing program.
Sec. 357. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.
Sec. 358. Authorization of additional funds for removal of aliens.
Sec. 359. Application of additional civil penalties to enforcement.
Sec. 360. Prisoner transfer treaties.
Sec. 361. Criminal alien identification system.
Sec. 362. Waiver of exclusion and deportation ground for certain section 274C violators.
Sec. 363. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 364. Confidentiality provision for certain alien battered spouses and children.

**TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT**

Sec. 401. Strengthened enforcement of the employer sanctions provisions.
Sec. 402. Strengthened enforcement of wage and hour laws.
Sec. 403. Changes in the employer sanctions program.
Sec. 404. Reports on earnings of aliens not authorized to work.
Sec. 405. Authorizing maintenance of certain information on aliens.
Sec. 406. Limiting liability for certain technical violations of paperwork requirements.
Sec. 407. Unfair immigration-related employment practices.

**TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM**

Sec. 500. Overview of new legal immigration system.

**Subtitle A—Worldwide Numerical Limits**

Sec. 501. Worldwide numerical limitation on family-sponsored immigrants.
Sec. 502. Worldwide numerical limitation on employment-based immigrants.
Sec. 503. Worldwide numerical limitation on diversity immigrants.
Sec. 504. Establishment of numerical limitation on humanitarian immigrants.
Sec. 505. Requiring congressional review and reauthorization of worldwide levels every 5 years.

**Subtitle B—Changes in Preference System**

Sec. 511. Limitation of immediate relatives to spouses and children.
Sec. 512. Change in family-sponsored classification.
Sec. 513. Change in employment-based classification.
Sec. 514. Changes in diversity immigrant program.
Sec. 515. Authorization to require periodic confirmation of classification petitions.
Sec. 516. Changes in special immigrant status.
Sec. 517. Requirements for removal of conditional status of entrepreneurs.
Sec. 518. Adult disabled children.
Sec. 519. Miscellaneous conforming amendments.

**Subtitle C—Refugees, Parole, and Humanitarian Admissions**

Sec. 521. Changes in refugee annual admissions.
Sec. 522. Persecution for resistance to coercive population control methods.
Sec. 523. Parole available only on a case-by-case basis for humanitarian reasons or significant public benefit.
Sec. 524. Admission of humanitarian immigrants.

**Subtitle D—Asylum Reform**

Sec. 531. Asylum reform.
Sec. 532. Fixing numerical adjustments for asylees at 10,000 each year.
Sec. 533. Increased resources for reducing asylum application backlogs.

**Subtitle E—General Effective Date; Transition Provisions**

Sec. 551. General effective date.
Sec. 552. General transition for current classification petitions.
Sec. 553. Special transition for certain backlogged spouses and children of lawful permanent resident aliens.
Sec. 554. Special treatment of certain disadvantaged family first preference immigrants.
Sec. 555. Authorization of reimbursement of petitioners for eliminated family-sponsored categories.

**TITLE VI—RESTRICTIONS ON BENEFITS FOR ALIENS**

Sec. 600. Statements of national policy concerning welfare and immigration.

**Subtitle A—Eligibility of Illegal Aliens for Public Benefits**

PART 1—PUBLIC BENEFITS GENERALLY

Sec. 601. Making illegal aliens ineligible for public assistance, contracts, and licenses.

4

Sec. 602. Making unauthorized aliens ineligible for unemployment benefits.
Sec. 603. General exceptions.
Sec. 604. Treatment of expenses subject to emergency medical services exception.
Sec. 605. Report on disqualification of illegal aliens from housing assistance programs.
Sec. 606. Verification of student eligibility for postsecondary Federal student financial assistance.
Sec. 607. Payment of public assistance benefits.
Sec. 608. Definitions.
Sec. 609. Regulations and effective dates.

PART 2—EARNED INCOME TAX CREDIT

Sec. 611. Earned income tax credit denied to individuals not authorized to be employed in the United States.

Subtitle B—Expansion of Disqualification From Immigration Benefits on the Basis of Public Charge

Sec. 621. Ground for inadmissibility.
Sec. 622. Ground for deportability.

Subtitle C—Attribution of Income and Affidavits of Support

Sec. 631. Attribution of sponsor's income and resources to family-sponsored immigrants.
Sec. 632. Requirements for sponsor's affidavit of support.

TITLE VII—FACILITATION OF LEGAL ENTRY

Sec. 701. Additional land border inspectors; infrastructure improvements.
Sec. 702. Commuter lane pilot programs.
Sec. 703. Preinspection at foreign airports.
Sec. 704. Training of airline personnel in detection of fraudulent documents.

TITLE VIII—MISCELLANEOUS PROVISIONS

Subtitle A—Amendments to the Immigration and Nationality Act

Sec. 801. Nonimmigrant status for spouses and children of members of the Armed Services.
Sec. 802. Amended definition of aggravated felony.
Sec. 803. Authority to determine visa processing procedures.
Sec. 804. Waiver authority concerning notice of denial of application for visas.
Sec. 805. Treatment of Canadian landed immigrants.
Sec. 806. Changes relating to H–1B nonimmigrants.
Sec. 807. Validity of period of visas.
Sec. 808. Limitation on adjustment of status of individuals not lawfully present in the United States.
Sec. 809. Limited access to certain confidential INS files.
Sec. 810. Change of nonimmigrant classification.

Subtitle B—Other Provisions

Sec. 831. Commission report on fraud associated with birth certificates.
Sec. 832. Uniform vital statistics.
Sec. 833. Communication between State and local government agencies, and the Immigration and Naturalization Service.
Sec. 834. Criminal alien reimbursement costs.
Sec. 835. Female genital mutilation.
Sec. 836. Designation of Portugal as a visa waiver pilot program country with probationary status.

Subtitle C—Technical Corrections

Sec. 851. Miscellaneous technical corrections.

# TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

## Subtitle A—Improved Enforcement at Border

**SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.**

(a) INCREASED NUMBER OF BORDER PATROL POSITIONS.—The number of border patrol agents shall be increased, for each fiscal year beginning with the fiscal year 1996 and ending with the fiscal year 2000, by 1,000 full-time equivalent positions above the number of equivalent positions as of September 30, 1994.

(b) INCREASE IN SUPPORT PERSONNEL.—The number of full-time support positions for personnel in support of border enforcement, investigation, detention and deportation, intelligence, information and records, legal proceedings, and management and administration in the Immigration and Naturalization Service shall be increased, beginning with fiscal year 1996, by 800 positions above the number of equivalent positions as of September 30, 1994.

(c) DEPLOYMENT OF NEW BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that the border patrol agents hired pursuant to subsection (a) shall—

5

(1) be deployed among the various Immigration and Naturalization Service sectors in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year, and

(2) be actively engaged in law enforcement activities related to such illegal crossings.

### SEC. 102. IMPROVEMENT OF BARRIERS AT BORDER.

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of the Immigration and Naturalization Service, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 are waived to the extent the Attorney General determines necessary to assure expeditious construction of the barriers and roads under this section.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis.

(2) REPORT.—By not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the appropriate committees of Congress a report on the progress and effectiveness of such forward deployments.

### SEC. 103. IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.

The Attorney General is authorized to acquire and utilize, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

### SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

(b) EFFECTIVE DATES.—

(1) Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 6 months after the date of the enactment of this Act.

(2) Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

(c) REPORT.—Not later than one year after the implementation of clause (A) of the sentence added by the amendment made by subsection (a) the Attorney General shall submit to Congress a report on the impact of such clause on border crossing activities.

6

**SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.**

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively, and

(2) by inserting after subsection (a) the following new subsection:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

"(1) at least $50 and not more than $250 for each such entry (or attempted entry), or

"(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.

Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to illegal entries or attempts to enter occurring on or after the first day of the sixth month beginning after the date of the enactment of this Act.

**SEC. 106. PROSECUTION OF ALIENS REPEATEDLY REENTERING THE UNITED STATES UNLAW- FULLY.**

(a) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Attorney General such sums as may be necessary to provide for detention and prosecution of each alien who commits an act that constitutes a violation of section 275(a) of the Immigration and Nationality Act if the alien has committed such an act on two previous occasions. Funds appropriated pursuant to this subsection are authorized to remain available until expended.

(b) SENSE OF CONGRESS.—It is the sense of Congress that the Attorney General should use available resources to assure detention and prosecution of aliens in the cases described in subsection (a).

**SEC. 107. INSERVICE TRAINING FOR THE BORDER PATROL.**

(a) REQUIREMENT.—Section 103 (8 U.S.C. 1103) is amended by adding at the end the following new subsection:

"(e)(1) The Attorney General shall continue to provide for such programs (including intensive language training programs) of inservice training for full-time and part-time personnel of the Border Patrol in contact with the public as will familiarize the personnel with the rights and varied cultural backgrounds of aliens and citizens in order to ensure and safeguard the constitutional and civil rights, personal safety, and human dignity of all individuals, aliens as well as citizens, within the jurisdiction of the United States with whom such personnel have contact in their work.

"(2) The Attorney General shall provide that the annual report of the Service include a description of steps taken to carry out paragraph (1).".

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Attorney General such sums as may be necessary for fiscal year 1996 to carry out the inservice training described in section 103(e)(1) of the Immigration and Nationality Act. The funds appropriated pursuant to this subsection are authorized to remain available until expended.

# Subtitle B—Pilot Programs

**SEC. 111. PILOT PROGRAM ON INTERIOR REPATRIATION.**

(a) ESTABLISHMENT.—Not later than 120 days after the date of the enactment of this Act, the Attorney General, after consultation with the Secretary of State, shall establish a pilot program for up to 2 years which provides for methods to deter multiple illegal entries by aliens into the United States. The pilot program may include the development and use of interior repatriation, third country repatriation, and other disincentives for multiple illegal entries into the United States.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of the pilot program under this section and whether the pilot program or any part thereof should be extended or made permanent.

**SEC. 112. PILOT PROGRAM ON USE OF CLOSED MILITARY BASES FOR THE DETENTION OF IN- ADMISSIBLE OR DEPORTABLE ALIENS.**

(a) ESTABLISHMENT.—The Attorney General and the Secretary of Defense shall establish one or more pilot programs for up to 2 years each to determine the feasibility

7

of the use of military bases available because of actions under a base closure law as detention centers by the Immigration and Naturalization Service.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, and the Committees on Armed Services of the House of Representatives and of the Senate, on the feasibility of using military bases closed under a base closure law as detention centers by the Immigration and Naturalization Service.

(c) DEFINITION.—For purposes of this section, the term "base closure law" means each of the following:

(1) The Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note).

(2) Title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).

(3) Section 2687 of title 10, United States Code.

(4) Any other similar law enacted after the date of the enactment of this Act.

**SEC. 113. PILOT PROGRAM TO COLLECT RECORDS OF DEPARTING PASSENGERS.**

(a) ESTABLISHMENT.—The Commissioner of the Immigration and Naturalization Service shall, within 180 days after the date of the enactment of this Act, establish a pilot program in which officers of the Service collect a record of departure for every alien departing the United States and match the records of departure with the record of the alien's arrival in the United States. The program shall be operated in as many air ports of entry as is deemed appropriate, but at no less than 3 of the 5 air ports of entry with the heaviest volume of incoming traffic from foreign territories.

(b) REPORT.—

(1) DEADLINE.—The Commissioner shall submit a report to Congress not later than 2 years after the date the pilot program is implemented under subsection (a).

(2) INFORMATION.—The report shall include the following information for each participating port of entry:

(A) The number of departure records collected, with an accounting by country of nationality of the departing alien.

(B) The number of departure records that were successfully matched to records of the alien's prior arrival in the United States, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant.

(C) The number of aliens who arrived at the port of entry as nonimmigrants, or as a visitor under the visa waiver program under section 217 of the Immigration and Nationality Act, for whom no matching departure record has been obtained through the pilot program or through other means, with an accounting by the alien's country of nationality and date of arrival in the United States.

(D) The estimated cost of establishing a national system to verify the departure from the United States of aliens admitted temporarily as nonimmigrants.

(3) RECOMMENDATIONS.—The report also shall include specific recommendations for implementation of the pilot program on a permanent basis.

(c) USE OF INFORMATION ON VISA OVERSTAYS.—Information on instances of visa overstay identified through the pilot program shall be integrated into appropriate data bases of the Immigration and Naturalization Service and the Department of State, including those used at ports of entry and at consular offices.

# Subtitle C—Interior Enforcement

**SEC. 121. INCREASE IN PERSONNEL FOR INTERIOR ENFORCEMENT.**

Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of investigators and enforcement personnel of the Immigration and Naturalization Service who are deployed in the interior so that the number of such personnel is adequate properly to investigate violations of, and to enforce, immigration laws.

8

# TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

## Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

**SEC. 201. WIRETAP AUTHORITY FOR ALIEN SMUGGLING INVESTIGATIONS.**

Section 2516(1) of title 18, United States Code, is amended—

(1) by striking "and" at the end of paragraph (n),

(2) by redesignating paragraph (o) as paragraph (p), and

(3) by inserting after paragraph (n) the following new paragraph:

"(o)(1) a felony violation of section 1028 (relating to production of false identification documentation), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud or misuse of visas, permits, or other documents) of this title; or

"(2) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (relating to the smuggling of aliens); or".

**SEC. 202. RACKETEERING OFFENSES RELATING TO ALIEN SMUGGLING.**

Section 1961(1) of title 18, United States Code, is amended—

(1) by inserting "section 1028 (relating to fraud and related activity in connection with identification documents)," before "section 1029";

(2) by inserting "section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1588 (relating to peonage and slavery)," after "section 1513 (relating to retaliating against a witness, victim, or an informant),";

(3) by striking "or" before "(E)"; and

(4) by inserting before the period at the end the following: ", or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose)".

**SEC. 203. INCREASED CRIMINAL PENALTIES FOR ALIEN SMUGGLING.**

(a) IN GENERAL.—Section 274(a)(1) (8 U.S.C. 1324(a)(1)) is amended—

(1) in subparagraph (B)(i), by inserting "or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain" after "subparagraph (A)(i)", and

(2) by adding at the end the following new subparagraph:

"(C) Any person who engages in any conspiracy to commit, or aids or abets the commission of, any of the acts described in—

"(i) subparagraph (A)(i) shall be fined under title 18, United States Code, imprisoned not more than 10 years, or both; or

"(ii) clause (ii), (iii), or (iv) of subparagraph (A) shall be fined under title 18, United States Code, imprisoned not more than 5 years, or both.".

(b) SMUGGLING OF ALIENS WHO WILL COMMIT CRIMES.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended—

(1) in subparagraph (B)—

(A) by striking "or" at the end of clause (ii),

(B) by adding "or" at the end of clause (iii), and

(C) by inserting after clause (iii) the following:

"(iv) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,"; and

(2) by striking "be fined" and all that follows through the final period at the end and inserting the following: "be fined under title 18, United States Code, and shall be imprisoned not less than 3 years or more than 10 years.".

(c) APPLYING CERTAIN PENALTIES ON A PER ALIEN BASIS.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended by striking "for each transaction constituting a viola-

9

tion of this paragraph, regardless of the number of aliens involved" and inserting "for each alien in respect to whom a violation of this paragraph occurs".

**SEC. 204. INCREASED NUMBER OF ASSISTANT UNITED STATES ATTORNEYS.**

(a) IN GENERAL.—The number of Assistant United States Attorneys employed by the Department of Justice for the fiscal year 1996 shall be increased by 25 above the number of Assistant United States Attorneys that were authorized to be employed as of September 30, 1994.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall be specially trained to be used for the prosecution of persons who bring into the United States or harbor illegal aliens, fraud, and other criminal statutes involving illegal aliens.

**SEC. 205. UNDERCOVER INVESTIGATION AUTHORITY.**

(a) IN GENERAL.—Title II is amended by adding at the end the following new section:

"UNDERCOVER INVESTIGATION AUTHORITY

"SEC. 294. (a) IN GENERAL.—With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—

"(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

"(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),

"(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),

"(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),

"(D) the third undesignated paragraph under the heading 'Miscellaneous' of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),

"(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),

"(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and

"(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254 (a) and (c));

"(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);

"(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and

"(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

"(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

"(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection (a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

"(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.".

10

(b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 293 the following:

"Sec. 294.  Undercover investigation authority.".

# Subtitle B—Deterrence of Document Fraud

**SEC. 211. INCREASED CRIMINAL PENALTIES FOR FRAUDULENT USE OF GOVERNMENT-ISSUED DOCUMENTS.**

(a) FRAUD AND MISUSE OF GOVERNMENT-ISSUED IDENTIFICATION DOCUMENTS.—Section 1028(b) of title 18, United States Code, is amended—

(1) in paragraph (1), by inserting "except as provided in paragraphs (3) and (4)," after "(1)" and by striking "five years" and inserting "15 years";

(2) in paragraph (2), by inserting "except as provided in paragraphs (3) and (4)," after "(2)" and by striking "and" at the end;

(3) by redesignating paragraph (3) as paragraph (5); and

(4) by inserting after paragraph (2) the following new paragraphs:

"(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);

"(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and".

(b) CHANGES TO THE SENTENCING LEVELS.—Pursuant to section 944 of title 28, United States Code, and section 21 of the Sentencing Act of 1987, the United States Sentencing Commission shall promulgate guidelines, or amend existing guidelines, relating to defendants convicted of violating, or conspiring to violate, sections 1546(a) and 1028(a) of title 18, United States Code. The basic offense level under section 2L2.1 of the United States Sentencing Guidelines shall be increased to—

(1) not less than offense level 15 if the offense involves 100 or more documents;

(2) not less than offense level 20 if the offense involves 1,000 or more documents, or if the documents were used to facilitate any other criminal activity described in section 212(a)(2)(A)(i)(II) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(A)(i)(II)) or in section 101(a)(43) of such Act; and

(3) not less than offense level 25 if the offense involves—

(A) the provision of documents to a person known or suspected of engaging in a terrorist activity (as such terms are defined in section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B));

(B) the provision of documents to facilitate a terrorist activity or to assist a person to engage in terrorist activity (as such terms are defined in section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)); or

(C) the provision of documents to persons involved in racketeering enterprises (described in section 1952(a) of title 18, United States Code).

**SEC. 212. NEW CIVIL PENALTIES FOR DOCUMENT FRAUD.**

(a) ACTIVITIES PROHIBITED.—Section 274C(a) (8 U.S.C. 1324c(a)) is amended—

(1) by striking "or" at the end of paragraph (3);

(2) by striking the period at the end of paragraph (4) and inserting ", or"; and

(3) by adding at the end the following:

"(5) in reckless disregard of the fact that the information is false or does not relate to the applicant, to prepare, to file, or to assist another in preparing or filing, documents which are falsely made for the purpose of satisfying a requirement of this Act.

For purposes of this section, the term 'falsely made' includes, with respect to a document or application, the preparation or provision of the document or application with knowledge or in reckless disregard of the fact that such document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a material fact pertaining to the document or application.".

(b) CONFORMING AMENDMENTS FOR CIVIL PENALTIES.—Section 274C(d)(3) (8 U.S.C. 1324c(d)(3)) is amended by striking "each document used, accepted, or created and each instance of use, acceptance, or creation" both places it appears and inserting "each instance of a violation under subsection (a)".

11

(c) EFFECTIVE DATES.—(1) The amendments made by subsection (a) shall apply to the preparation or filing of documents, and assistance in such preparation or filing, occurring on or after the date of the enactment of this Act.

(2) The amendment made by subsection (b) shall apply to violations occurring on or after the date of the enactment of this Act.

**SEC. 213. NEW CIVIL PENALTY FOR FAILURE TO PRESENT DOCUMENTS AND FOR PREPARING IMMIGRATION DOCUMENTS WITHOUT AUTHORIZATION.**

(a) IN GENERAL.—Section 274C(a) (8 U.S.C. 1324c(a)), as amended by section 212(a), is further amended—

(1) by striking "or" at the end of paragraph (4);

(2) by striking the period at the end of paragraph (5) and inserting a comma; and

(3) by inserting after paragraph (5) the following new paragraphs:

"(6) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States and to fail to present such document to an immigration officer upon arrival at a United States port of entry, or

"(7) to prepare or assist in the preparation and submission of immigration forms, petitions, and applications if the person or entity is not authorized to represent aliens, or to prepare or assist in the preparation and submission of such forms, petitions, and applications pursuant to regulations promulgated by the Attorney General."; and

(4) by adding at the end the following:

"The Attorney General may, in the discretion of the Attorney General, waive the penalties of this section with respect to an alien who knowingly violates paragraph (6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to individuals who board a common carrier on or after 30 days after the date of the enactment of this Act.

**SEC. 214. NEW CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS PREPARER OF FALSE APPLICATION FOR ASYLUM AND FOR PREPARING CERTAIN POST-CONVICTION APPLICATIONS.**

Section 274C (8 U.S.C. 1324c) is amended by adding at the end the following new subsection:

"(e) CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS DOCUMENT PREPARER.—

"(1) If a person is required by law or regulation to disclose the fact that the person, on behalf of another person and for a fee or other remuneration, has prepared or assisted in preparing an application for asylum pursuant to section 208, or the regulations promulgated thereunder, and the person knowingly and willfully fails to disclose, conceals, or covers up such fact, and the application was falsely made, the person shall—

"(A) be imprisoned for not less than 2 nor more than 5 years, fined in accordance with title 18, United States Code, or both, and

"(B) be prohibited from preparing or assisting in preparing, regardless of whether for a fee or other remuneration, any other such application for a period of at least 5 years and not more than 15 years.

"(2) Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for asylum pursuant to section 208, or the regulations promulgated thereunder, regardless of whether for a fee or other remuneration, in violation of paragraph (1)(B) shall be imprisoned for not less than 5 years or more than 15 years, fined in accordance with title 18, United States Code, or both, and prohibited from preparing or assisting in preparing any other such application.".

**SEC. 215. CRIMINAL PENALTY FOR KNOWINGLY PRESENTING DOCUMENT WHICH FAILS TO CONTAIN REASONABLE BASIS IN LAW OR FACT.**

The fourth paragraph of section 1546(a) of title 18, United States Code, is amended by striking "containing any such false statement" and inserting "which contains any such false statement or which fails to contain any reasonable basis in law or fact".

**SEC. 216. CRIMINAL PENALTIES FOR FALSE CLAIM TO CITIZENSHIP.**

Section 1015 of title 18, United States Code, is amended—

(1) by striking the dash at the end of paragraph (d) and inserting "; or", and

(2) by inserting after paragraph (d) the following:

12

"(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal benefit or service, or to engage unlawfully in employment in the United States; or

"(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—".

## Subtitle C—Asset Forfeiture for Passport and Visa Offenses

**SEC. 221. CRIMINAL FORFEITURE FOR PASSPORT AND VISA RELATED OFFENSES.**

Section 982 of title 18, United States Code, is amended—

    (1) in subsection (a), by inserting after paragraph (5) the following new paragraph:

"(6) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States any property, real or personal, which the person used, or intended to be used, in committing, or facilitating the commission of, the violation, and any property constituting, or derived from, or traceable to, any proceeds the person obtained, directly or indirectly, as a result of such violation.", and

    (2) in subsection (b)(1)(B), by inserting "or (a)(6)" after "(a)(2)".

**SEC. 222. SUBPOENAS FOR BANK RECORDS.**

Section 986(a) of title 18, United States Code, is amended by inserting "1028, 1541, 1542, 1543, 1544, 1546," before "1956".

**SEC. 223. EFFECTIVE DATE.**

The amendments made by this subtitle shall take effect on the first day of the first month that begins more than 90 days after the date of the enactment of this Act.

## TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

## Subtitle A—Revision of Procedures for Removal of Aliens

**SEC. 300. OVERVIEW OF CHANGES IN REMOVAL PROCEDURES.**

This subtitle amends the provisions of the Immigration and Nationality Act relating to procedures for inspection, exclusion, and deportation of aliens so as to provide for the following:

    (1) EXPEDITED REMOVAL FOR UNDOCUMENTED ALIENS.—Aliens arriving without valid documents are subject to an expedited removal process, without an evidentiary hearing and subject to strictly limited judicial review.

    (2) NO REWARD FOR ILLEGAL ENTRANTS OR VISA OVERSTAYERS.—Aliens who enter illegally or who overstay the period of authorized admission will have a greater burden of proof in removal proceedings and will face tougher standards for most discretionary immigration benefits, such as suspension of removal and work authorization.

    (3) STRICTER STANDARDS TO ASSURE DETENTION OF ALIENS.—There are more stringent standards for the release of aliens (particularly aliens convicted of aggravated felonies) during and after removal proceedings.

    (4) SIMPLIFIED, SINGLE REMOVAL PROCEEDING (IN PLACE OF SEPARATE EXCLUSION AND DEPORTATION PROCEEDINGS).—The procedures for exclusion and deportation are consolidated into a simpler, single procedure for removal of inadmissible and deportable aliens.

    (5) STREAMLINED JUDICIAL REVIEW.—Judicial review is streamlined through removing a layer of review in exclusion cases, shortening the time period to file

13

for review, and permitting the removal of inadmissible aliens pending the review.

(6) INCREASED PENALTIES TO ASSURE REMOVAL AND PREVENT FURTHER REENTRY.—Aliens who are ordered removed are subject to civil money penalties for failure to depart on time and if they seek reentry they are subject to immediate removal under the prior order.

(7) PROTECTION OF APPLICANTS FOR ASYLUM.—Throughout the process, the procedures protect those aliens who present credible claims for asylum by giving them an opportunity for a full hearing on their claims.

(8) REORGANIZATION.—The provisions of the Act are reorganized to provide a more logical progression from arrival and inspection through proceedings and removal.

**SEC. 301. TREATING PERSONS PRESENT IN THE UNITED STATES WITHOUT AUTHORIZATION AS NOT ADMITTED.**

(a) "ADMISSION" DEFINED.—Paragraph (13) of section 101(a) (8 U.S.C. 1101(a)) is amended to read as follows:

"(13)(A) The terms 'admission' and 'admitted' mean, with respect to an alien, the entry of the alien into the United States after inspection and authorization by an immigration officer.

"(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

"(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—

"(i) has abandoned or relinquished that status,

"(ii) has engaged in illegal activity after having departed the United States,

"(iii) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,

"(iv) has been convicted of an aggravated felony, unless since such conviction the alien has been granted relief under section 240A(a), or

"(v) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.".

(b) INADMISSIBILITY OF ALIENS PRESENT WITHOUT ADMISSION OR PAROLE.—

(1) IN GENERAL.—Section 212(a) (8 U.S.C. 1182(a)) is amended by redesignating paragraph (9) as paragraph (10) and by inserting after paragraph (8) the following new paragraph:

"(9) PRESENT WITHOUT ADMISSION OR PAROLE.—

"(A) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

"(B) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Subparagraph (A) shall not apply to an alien who can demonstrate that—

"(i) the alien qualifies for immigrant status under subparagraphs (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),

"(ii)(I) the alien has been battered or subject to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

"(iii) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.".

(2) TRANSITION FOR BATTERED SPOUSE OR CHILD PROVISION.—The requirements of clauses (ii) and (iii) of section 212(a)(9)(B) of the Immigration and Nationality Act, as inserted by paragraph (1), shall not apply to an alien who demonstrates that the alien first arrived in the United States before the title III–A effective date (described in section 309(a)).

(c) REVISION TO GROUND OF INADMISSIBILITY FOR ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—Subparagraphs (A) and (B) of section 212(a)(6) (8 U.S.C. 1182(a)(6)) are amended to read as follows:

14

"(A) ALIENS PREVIOUSLY REMOVED.—

"(i) ARRIVING ALIENS.—Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal is inadmissible.

"(ii) OTHER ALIENS.—Any alien not described in clause (i) who has been ordered removed under section 240 or any other provision of law and who again seeks admission within 10 years of the date of such removal (or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(iii) EXCEPTION.—Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

"(B) ALIENS PRESENT UNLAWFULLY FOR MORE THAN 1 YEAR.—

"(i) IN GENERAL.—Any alien who was unlawfully present in the United States for an aggregate period totaling 1 year is inadmissible unless the alien has remained outside the United States for a period of 10 years.

"(ii) EXCEPTIONS.—

"(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(III) ALIENS WITH WORK AUTHORIZATION.—No period of time in which an alien is provided authorization to engage in employment in the United States (including such an authorization under section 244A(a)(1)(B)), or in which the alien is the spouse of such an alien, shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(IV) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(V) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien described in paragraph (9)(B).

"(iii) EXTENSION.—The Attorney General may extend the period of 1 year under clause (i) to a period of 15 months in the case of an alien who applies to the Attorney General (before the alien has been present unlawfully in the United States for a period totaling 1 year) and establishes to the satisfaction of the Attorney General that—

"(I) the alien is not inadmissible under clause (i) at the time of the application, and

"(II) the failure to extend such period would constitute an extreme hardship for the alien.

"(iv) WAIVER.—In the case of an alien who is the spouse, parent, or child of a United States citizen or the spouse or child of a permanent resident alien, the Attorney General may waive clause (i) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

"(v) NATIONAL INTEREST WAIVER.—The Attorney General may waive clause (i) if the Attorney General determines that such a waiver is necessary to substantially benefit—

"(I) the national security, national defense, or Federal, State, or local law enforcement;

"(II) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;

"(III) economic or employment opportunities for a specific industry or specific geographical area;

"(IV) the development of new technologies; or

15

"(V) environmental protection or the productive use of natural resources; and

the alien will engage in a specific undertaking to advance one or more of the interests identified in subclauses (I) through (V).".

(d) WAIVER OF MISREPRESENTATION GROUND OF INADMISSIBILITY FOR CERTAIN ALIENS.—Subsection (i) of section 212 is amended to read as follows:

"(i) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C)—

"(1) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen; or

"(2) in the case of an immigrant who is the spouse or son or daughter of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the lawfully resident spouse or parent of such an alien.".

(e) PROHIBITION ON ISSUANCE OF VISAS FOR FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID UNITED STATES TAXATION.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by subsection (b)(1), is amended by adding at the end the following:

"(D) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounced United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.".

(f) PROOF OF VACCINATION REQUIREMENT FOR IMMIGRANTS.—

(1) IN GENERAL.—Section 212(a)(1)(A) (8 U.S.C. 1182(a)(1)(A)) is amended—

(A) by redesignating clauses (ii) and (iii) as clauses (iii) and (iv), respectively, and

(B) by inserting after clause (i) the following new clause:

"(ii) who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,".

(2) WAIVER.—Section 212(g) (8 U.S.C. 1182(g) is amended by striking ", or" at the end of paragraph (1) and all that follows and inserting a semicolon and the following:

"in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

"(2) subsection (a)(1)(A)(ii) in the case of any alien—

"(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination, or

"(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by 42 C.F.R. 34.2) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate; or

"(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.".

(3) EFFECTIVE DATE.—The amendments made by this subsection shall apply with respect to applications for immigrant visas or for adjustment of status filed after September 30, 1996.

(g) ADJUSTMENT IN GROUNDS FOR DEPORTATION.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended—

(1) in the matter before paragraph (1) of subsection (a), by striking "in the United States" and inserting "in and admitted to the United States";

(2) in subsection (a)(1), by striking "EXCLUDABLE" each place it appears and inserting "INADMISSIBLE";

(3) in subsection (a)(1)(A), by striking "excludable" and inserting "inadmissible"; and

(4) by amending subparagraph (B) of subsection (a)(1) to read as follows:

16

"(B) PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.".

SEC. 302. INSPECTION OF ALIENS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING (REVISED SECTION 235).

Section 235 (8 U.S.C. 1225) is amended to read as follows:

"INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING

"SEC. 235. (a) INSPECTION.—

"(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—An alien present in the United States who has not been admitted, who arrives in the United States (whether or not at a designated port of arrival), or who is brought to the United States after having been interdicted in international or United States waters shall be deemed for purposes of this Act an applicant for admission.

"(2) STOWAWAYS.—An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.

"(3) INSPECTION.—All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

"(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

"(5) STATEMENTS.—An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

"(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

"(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES.—

"(A) SCREENING.—If the examining immigration officer determines that an alien arriving in the United States (whether or not at a port of entry) is inadmissible under section 212(a)(6)(C) or 212(a)(7) and the alien—

"(i) does not indicate either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall order the alien removed from the United States without further hearing or review; or

"(ii) indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

"(B) ASYLUM INTERVIEWS.—

"(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall promptly conduct interviews of aliens referred under subparagraph (A)(ii).

"(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

"(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

"(I) IN GENERAL.—Subject to subclause (II), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

"(II) REVIEW OF DETERMINATION BY SUPERVISORY OFFICER.—The Attorney General shall promulgate regulations to provide for the immediate review by a supervisory asylum officer at the port of entry of a determination under subclause (I).

"(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible

17

for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not delay the process.

"(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term 'credible fear of persecution' means (I) that it is more probable than not that the statements made by the alien in support of the alien's claim are true, and (II) that there is a significant possibility, in light of such statements and of such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

"(C) LIMITATION ON ADMINISTRATIVE REVIEW.—A removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence.

"(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii)(I).

"(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term 'asylum officer' means an immigration officer who—

"(i) has had professional training in country conditions, asylum law, and interview techniques, and

"(ii) is supervised by an officer who meets the condition described in clause (i).

"(2) INSPECTION OF OTHER ALIENS.—

"(A) IN GENERAL.—Subject to subparagraph (B), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a hearing under section 240.

"(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a hearing under section 240.

"(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

"(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

"(A) order the alien removed, subject to review under paragraph (2);

"(B) report the order of removal to the Attorney General; and

"(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

"(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

"(B) If the Attorney General—

"(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

"(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

"(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

18

"(3) SUBMISSION OF STATEMENT AND INFORMATION.—The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

"(d) AUTHORITY RELATING TO INSPECTIONS.—

"(1) AUTHORITY TO SEARCH CONVEYANCES.—Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

"(2) AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.—Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

"(A) to detain the alien on the vessel or at the airport of arrival, and

"(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

"(3) ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.—The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.

"(4) SUBPOENA AUTHORITY.—(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.

"(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.".

**SEC. 303. APPREHENSION AND DETENTION OF ALIENS NOT LAWFULLY IN THE UNITED STATES (REVISED SECTION 236).**

(a) IN GENERAL.—Section 236 (8 U.S.C. 1226) is amended to read as follows:

"APPREHENSION AND DETENTION OF ALIENS NOT LAWFULLY IN THE UNITED STATES

"SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole; but

"(3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

"(b) REVOCATION OF BOND OR PAROLE.—The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

"(c) ALIENS CONVICTED OF AGGRAVATED FELONIES.—

"(1) CUSTODY.—The Attorney General shall take into custody any alien convicted of an aggravated felony when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) RELEASE.—The Attorney General may release the alien only if—

"(A) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding;

19

"(B) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding; or

"(C) the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation.

A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

"(d) IDENTIFICATION OF ALIENS CONVICTED OF AGGRAVATED FELONIES.—(1) The Attorney General shall devise and implement a system—

"(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

"(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

"(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony and who have been removed.

"(2) The record under paragraph (1)(C) shall be made available—

"(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any such previously removed alien seeking to reenter the United States, and

"(B) to officials of the Department of State for use in its automated visa lookout system.".

(b) INCREASE IN INS DETENTION FACILITIES.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the detention facilities of the Immigration and Naturalization Service to at least 9,000 beds by fiscal year 1997.

**SEC. 304. REMOVAL PROCEEDINGS; CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS; VOLUNTARY DEPARTURE (REVISED AND NEW SECTIONS 239 TO 240C).**

(a) IN GENERAL.—Chapter 4 of title II is amended—

(1) by redesignating section 239 as section 234 and by moving such section to immediately follow section 233;

(2) by redesignating section 240 (8 U.S.C. 1230) as section 240C; and

(3) by inserting after section 238 the following new sections:

"INITIATION OF REMOVAL PROCEEDINGS"

"SEC. 239. (a) NOTICE TO APPEAR.—

"(1) IN GENERAL.—In removal proceedings under section 240, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged to have been violated.

"(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

"(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.

"(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

"(iii) The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.

"(G)(i) The time and place at which the proceedings will be held.

20

"(ii) The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.

"(2) NOTICE OF CHANGE IN TIME OR PLACE OF PROCEEDINGS.—

"(A) IN GENERAL.—In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—

"(i) the new time or place of the proceedings, and

"(ii) the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.

"(B) EXCEPTION.—In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F).

"(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

"(b) SECURING OF COUNSEL.—

"(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.

"(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

"(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).

"(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.

"(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

"REMOVAL PROCEEDINGS

"SEC. 240. (a) PROCEEDING.—

"(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

"(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).

"(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.

"(b) CONDUCT OF PROCEEDING.—

"(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this Act.

"(2) FORM OF PROCEEDING.—

"(A) IN GENERAL.—The proceeding may take place—

"(i) in person,

"(ii) through video conference, or

"(iii) subject to subparagraph (B), through telephone conference.

"(B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

21

"(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

"(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

"(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

"(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government, and

"(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

"(5) CONSEQUENCES OF FAILURE TO APPEAR.—

"(A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

"(B) NO NOTICE IF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

"(C) RESCISSION OF ORDER.—Such an order may be rescinded only—

"(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

"(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 239(a) or the alien demonstrates that the alien was in Federal or State custody and did not appear through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion.

"(D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

"(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

"(A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

"(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

"(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

"(7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

"(c) DECISION AND BURDEN OF PROOF.—

"(1) DECISION.—

22

"(A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

"(B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

"(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

"(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or

"(B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

"(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"(4) NOTICE.—If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

"(5) MOTIONS TO RECONSIDER.—

"(A) IN GENERAL.—The alien may file one motion to reconsider a decision that the alien is removable from the United States.

"(B) DEADLINE.—The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

"(C) CONTENTS.—The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

"(6) MOTIONS TO REOPEN.—

"(A) IN GENERAL.—An alien may file one motion to reopen proceedings under this section.

"(B) CONTENTS.—The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

"(C) DEADLINE.—

"(i) IN GENERAL.—Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

"(ii) ASYLUM.—There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

"(iii) FAILURE TO APPEAR.—A motion to reopen may be filed within 180 days after the date of the final order of removal if the order has been entered pursuant to subsection (b)(5) due to the alien's failure to appear for proceedings under this section and the alien establishes that the alien's failure to appear was because of exceptional circumstances beyond the control of the alien or because the alien did not receive the notice required under section 239(a)(2).

"(d) STIPULATED REMOVAL.—The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.

"(e) DEFINITIONS.—In this section and section 240A:

"(1) EXCEPTIONAL CIRCUMSTANCES.—The term 'exceptional circumstances' refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.

23

"(2) REMOVABLE.—The term 'removable' means—
    "(A) in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or
    "(B) in the case of an alien admitted to the United States, that the alien is deportable under section 237.

"CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS"

"SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
    "(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,
    "(2) has resided in the United States continuously for 7 years after having been admitted in any status, and
    "(3) has not been convicted of an aggravated felony or felonies for which the alien has been sentenced, in the aggregate, to a term of imprisonment of at least 5 years.

"(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—
    "(1) IN GENERAL.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
        "(A) has been physically present in the United States for a continuous period of not less than 7 years immediately preceding the date of such application;
        "(B) has been a person of good moral character during such period;
        "(C) has not been convicted of an aggravated felony; and
        "(D) establishes that removal would result in extreme hardship to the alien or to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.
    "(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
        "(A) has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);
        "(B) has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;
        "(C) has been a person of good moral character during such period;
        "(D) is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and
        "(E) establishes that removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.
In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.
    "(3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

"(c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:
    "(1) An alien who entered the United States as a crewman subsequent to June 30, 1964.
    "(2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is

24

subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

"(3) An alien who—

"(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

"(B) is subject to the two-year foreign residence requirement of section 212(e), and

"(C) has not fulfilled that requirement or received a waiver thereof.

"(4) An alien who is inadmissible under section 212(a)(3) or deportable under subparagraph (B) or (D) of section 237(a)(4).

"(d) SPECIAL RULES RELATING TO CONTINUOUS RESIDENCE OR PHYSICAL PRESENCE.—

"(1) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a).

"(2) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless the Attorney General finds that return could not be accomplished within that time period due to emergent reasons.

"(3) CONTINUITY NOT REQUIRED BECAUSE OF HONORABLE SERVICE IN ARMED FORCES AND PRESENCE UPON ENTRY INTO SERVICE.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

"(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

"(B) at the time of the alien's enlistment or induction was in the United States.

"VOLUNTARY DEPARTURE

"SEC. 240B. (a) CERTAIN CONDITIONS.—

"(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

"(3) BOND.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(4) TREATMENT OF ALIENS ARRIVING IN THE UNITED STATES.—In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

"(b) AT CONCLUSION OF PROCEEDINGS.—

"(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the immigration judge enters an order granting voluntary departure in lieu of removal and finds that—

"(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);

"(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

"(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and

25

"(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.

"(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(9).

"(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249.

"(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens.

"(f) APPEALS OF DENIALS.—An alien may appeal from denial of a request for an order of voluntary departure under subsection (b) in accordance with the procedures in section 242. Notwithstanding the pendency of such appeal, the alien shall be removable from the United States 60 days after entry of the order of removal. The alien's removal from the United States shall not moot the appeal.".

(b) REPEAL OF SECTION 212(c).—Section 212(c) (8 U.S.C. 1182(c)) is repealed.

**SEC. 305. DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED (NEW SECTION 241).**

(a) IN GENERAL.—Title II is further amended—

(1) by striking section 237 (8 U.S.C. 1227),

(2) by redesignating section 241 as section 237 and by moving such section to immediately follow section 236, and

(3) by inserting after section 240C (as redesignated by section 304(a)(2)) the following new section:

"DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED

"SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS ORDERED REMOVED.—

"(1) REMOVAL PERIOD.—

"(A) IN GENERAL.—Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').

"(B) BEGINNING OF PERIOD.—The removal period begins on the latest of the following:

"(i) The date the order of removal becomes administratively final.

"(ii) If the removal order is judicially reviewed and such review serves to stay the removal of the alien, the date of the court's final order.

"(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

"(C) SUSPENSION OF PERIOD.—The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

"(2) DETENTION AND RELEASE BY THE ATTORNEY GENERAL.—During the removal period, the Attorney General shall detain the alien. If there is insufficient detention space to detain the alien, the Attorney General shall make a specific finding to this effect and may release the alien on a bond containing such conditions as the Attorney General may prescribe.

"(3) SUPERVISION AFTER 90-DAY PERIOD.—If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

"(A) to appear before an immigration officer periodically for identification;

"(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

26

"(C) to give information under oath about the alien's nationality, circumstances, habits, and activities, and other information the Attorney General considers appropriate; and

"(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

"(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPERVISED RELEASE, OR PROBATION.—Except as provided in section 343(a) of the Public Health Service Act (42 U.S.C. 259(a)), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

"(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS ILLEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, and the alien shall be removed under the prior order at any time after the reentry.

"(6) INADMISSIBLE ALIENS.—An alien ordered removed who is inadmissible under section 212 may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

"(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—

"(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

"(B) the removal of the alien is otherwise impracticable or contrary to the public interest.

"(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—

"(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—

"(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

"(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

"(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

"(i) The country of which the alien is a citizen, subject, or national.

"(ii) The country in which the alien was born.

"(iii) The country in which the alien has a residence.

"(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

"(2) OTHER ALIENS.—Subject to paragraph (3)—

"(A) SELECTION OF COUNTRY BY ALIEN.—Except as otherwise provided in this paragraph—

"(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

"(ii) the Attorney General shall remove the alien to the country the alien so designates.

"(B) LIMITATION ON DESIGNATION.—An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

"(C) DISREGARDING DESIGNATION.—The Attorney General may disregard a designation under subparagraph (A)(i) if—

27

"(i) the alien fails to designate a country promptly;

"(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

"(iii) the government of the country is not willing to accept the alien into the country; or

"(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

"(D) ALTERNATIVE COUNTRY.—If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—

"(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

"(ii) is not willing to accept the alien into the country.

"(E) ADDITIONAL REMOVAL COUNTRIES.—If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

"(i) The country from which the alien was admitted to the United States.

"(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

"(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

"(iv) The country in which the alien was born.

"(v) The country that had sovereignty over the alien's birthplace when the alien was born.

"(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

"(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

"(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

"(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

"(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

"(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—

"(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—

"(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

"(B) the alien is a stowaway—

"(i) who has been ordered removed in accordance with section 235(a)(1),

"(ii) who has requested asylum, and

"(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

"(2) STAY OF REMOVAL.—

"(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—

28

"(i) immediate removal is not practicable or proper; or

"(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

"(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'—

"(i) the cost of maintenance of the alien; and

"(ii) a witness fee of $1 a day.

"(C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

"(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

"(ii) condition that the alien appear when required as a witness and for removal; and

"(iii) other conditions the Attorney General may prescribe.

"(3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

"(i) while the alien is detained under subsection (d)(1), and

"(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

"(I) subsection (d)(2)(A) or (d)(2)(B)(i),

"(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

"(III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

"(B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

"(i) the alien is a crewmember;

"(ii) the alien has an immigrant visa;

"(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

"(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

"(v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

"(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

"(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

"(vi) the individual claims to be a national of the United States and has a United States passport.

"(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

"(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

"(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

"(B) take the alien to the foreign country to which the alien is ordered removed.

29

"(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

"(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

"(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

"(i) for medical treatment,

"(ii) for detention of the stowaway by the Attorney General, or

"(iii) for departure or removal of the stowaway; and

"(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if any travel documents necessary for departure or repatriation of the stowaway have been obtained and removal of the stowaway will not be unreasonably delayed.

"(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

"(e) PAYMENT OF EXPENSES OF REMOVAL.—

"(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—

"(A) pay the cost from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'; and

"(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

"(2) COSTS OF REMOVAL TO PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

"(A) THROUGH APPROPRIATION.—Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(B) THROUGH OWNER.—

"(i) IN GENERAL.—In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

"(ii) ALIENS DESCRIBED.—An alien described in this clause is an alien who—

"(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or

"(II) is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.

"(C) COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the

30

best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.

"(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

"(1) IN GENERAL.—If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

"(2) COSTS.—The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

"(g) PLACES OF DETENTION.—

"(1) IN GENERAL.—The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses', without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

"(2) DETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

"(h) STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) MODIFICATION OF AUTHORITY.—

(1) Section 241(i), as redesignated by section 306(a)(1), is amended—

(A) in paragraph (3)(A) by striking "felony and sentenced to a term of imprisonment" and inserting "felony or two or more misdemeanors", and

(B) by adding at the end the following new paragraph:

"(6) In this subsection, the term 'incarceration' includes imprisonment in a State or local prison or jail the time of which is counted towards completion of a sentence or the detention of an alien previously convicted of a felony or misdemeanor who has been arrested and is being held pending judicial action on new charges or pending transfer to Federal custody.".

(2) The amendments made by paragraph (1) shall apply beginning with fiscal year 1996.

(c) MISCELLANEOUS CONFORMING AMENDMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a), is amended by striking "241(a)(5)(B)" each place it appears and inserting "237(a)(5)(B)".

**SEC. 306. APPEALS FROM ORDERS OF REMOVAL (NEW SECTION 242).**

(a) IN GENERAL.—Section 242 (8 U.S.C. 1252) is amended—

(1) by redesignating subsection (j) as subsection (i) and by moving such subsection and adding it at the end of section 241, as inserted by section 305(a)(3); and

(2) by amending the remainder of section 242 to read as follows:

"JUDICIAL REVIEW OF ORDERS OF REMOVAL

"SEC. 242. (a) APPLICABLE PROVISIONS.—

"(1) GENERAL ORDERS OF REMOVAL.—Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

"(2) LIMITATIONS ON REVIEW RELATING TO SECTION 235(b)(1).—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(A) except as provided in subsection (f), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

"(B) a decision by the Attorney General to invoke the provisions of such section,

"(C) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

31

"(D) procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

"(3) TREATMENT OF CERTAIN DECISIONS.—No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).

"(b) REQUIREMENTS FOR ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

"(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

"(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

"(3) SERVICE.—

"(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the initial proceedings under section 240 were conducted.

"(B) STAY OF ORDER.—

"(i) IN GENERAL.—Except as provided in clause (ii), service of the petition on the officer or employee stays the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

"(ii) EXCEPTION.—If the alien has been convicted of an aggravated felony, or the alien has been ordered removed pursuant to a finding that the alien is inadmissible under section 212, service of the petition does not stay the removal unless the court orders otherwise.

"(4) DECISION.—Except as provided in paragraph (5)(B)—

"(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

"(B) the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole, and

"(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law.

"(5) TREATMENT OF NATIONALITY CLAIMS.—

"(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

"(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

"(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

"(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.— When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

"(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

"(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

"(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

"(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administra-

32

tive findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

"(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

"(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

"(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

"(8) CONSTRUCTION.—This subsection—

"(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

"(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

"(C) except as provided in paragraph (3), does not require the Attorney General to defer removal of the alien.

"(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

"(d) REVIEW OF FINAL ORDERS.—A court may review a final order of removal only if—

"(1) the alien has exhausted all administrative remedies available to the alien as of right, and

"(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

"(e) LIMITED REVIEW FOR NON-PERMANENT RESIDENTS CONVICTED OF AGGRAVATED FELONIES.—

"(1) IN GENERAL.—A petition for review filed by an alien against whom a final order of removal has been issued under section 238 may challenge only whether—

"(A) the alien is the alien described in the order,

"(B) the alien is an alien described in section 238(b)(2) and has been convicted after entry into the United States of an aggravated felony, and

"(C) proceedings against the alien complied with section 238(b)(4).

"(2) LIMITED JURISDICTION.—A court reviewing the petition has jurisdiction only to review the issues described in paragraph (1).

"(f) JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).—

"(1) APPLICATION.—The provisions of this subsection apply with respect to judicial review of orders of removal effected under section 235(b)(1).

"(2) LIMITATIONS ON RELIEF.—Regardless of the nature of the action or claim and regardless of the identity of the party or parties bringing the action, no court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief not specifically authorized in this subsection, or to certify a class under Rule 23 of the Federal Rules of Civil Procedure.

"(3) LIMITATION TO HABEAS CORPUS.—Judicial review of any matter, cause, claim, or individual determination made or arising under or pertaining to section 235(b)(1) shall only be available in habeas corpus proceedings, and shall be limited to determinations of—

"(A) whether the petitioner is an alien,

"(B) whether the petitioner was ordered removed under such section, and

"(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

"(4) DECISION.—In any case where the court determines that the petitioner—

"(A) is an alien who was not ordered removed under section 235(b)(1), or

"(B) has demonstrated by a preponderance of the evidence that the alien is a lawful permanent resident,

33

the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

"(5) Scope of inquiry.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

"(g) Limit on Injunctive Relief.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Immigration in the National Interest Act of 1995, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.".

(b) Repeal of Section 106.—Section 106 (8 U.S.C. 1105a) is repealed.

**SEC. 307. PENALTIES RELATING TO REMOVAL (REVISED SECTION 243).**

(a) In General.—Section 243 (8 U.S.C. 1253) is amended to read as follows:

"penalties related to removal"

"Sec. 243. (a) Penalty for Failure to Depart.—

"(1) In general.—Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—

"(A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

"(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

"(C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

"(D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

"(2) Exception.—It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

"(3) Suspension.—The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—

"(A) the age, health, and period of detention of the alien;

"(B) the effect of the alien's release upon the national security and public peace or safety;

"(C) the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;

"(D) the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;

"(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

"(F) the eligibility of the alien for discretionary relief under the immigration laws.

"(b) Willful Failure to Comply with Terms of Release Under Supervision.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

34

"(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—

"(1) CIVIL PENALTIES.—

"(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.

"(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

"(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.

"(2) CLEARING VESSELS AND AIRCRAFT.—

"(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

"(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

"(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.".

**SEC. 308. REDESIGNATION AND REORGANIZATION OF OTHER PROVISIONS; ADDITIONAL CONFORMING AMENDMENTS.**

(a) CONFORMING AMENDMENT TO TABLE OF CONTENTS; OVERVIEW OF REORGANIZED CHAPTERS.—The table of contents, as amended by section 851(d)(1), is amended—

(1) by striking the item relating to section 106, and

(2) by striking the item relating to chapter 4 of title II and all that follows through the item relating to section 244A and inserting the following:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL"

"Sec. 231.  Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.
"Sec. 232.  Detention of aliens for physical and mental examination.
"Sec. 233.  Entry through or from foreign contiguous territory and adjacent islands; landing stations.
"Sec. 234.  Designation of ports of entry for aliens arriving by civil aircraft.
"Sec. 235.  Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.
"Sec. 236.  Apprehension and detention of aliens not lawfully in the United States.
"Sec. 237.  General classes of deportable aliens.
"Sec. 238.  Expedited removal of aliens convicted of committing aggravated felonies.
"Sec. 239.  Initiation of removal proceedings.
"Sec. 240.  Removal proceedings.
"Sec. 240A.  Cancellation of removal; adjustment of status.
"Sec. 240B.  Voluntary departure.
"Sec. 240C.  Records of admission.
"Sec. 241.  Detention and removal of aliens ordered removed.
"Sec. 242.  Judicial review of orders of removal.
"Sec. 243.  Penalties relating to removal.
"Sec. 244.  Temporary protected status.

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS"

(b) REORGANIZATION OF OTHER PROVISIONS.—Chapters 4 and 5 of title II are amended as follows:

(1) AMENDING CHAPTER HEADING.—Amend the heading for chapter 4 of title II to read as follows:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL"

(2) REDESIGNATING SECTION 232 AS SECTION 232(a).—Amend section 232 (8 U.S.C. 1222)—

(A) by inserting "(a) DETENTION OF ALIENS.—" after "SEC. 232.", and

(B) by amending the section heading to read as follows:

"DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION".

(3) REDESIGNATING SECTION 234 AS SECTION 232(b).—Amend section 234 (8 U.S.C. 1224)—

35

(A) by striking the heading,

(B) by striking "SEC. 234." and inserting the following: "(b) PHYSICAL AND MENTAL EXAMINATION.—", and

(C) by moving such provision to the end of section 232.

(4) REDESIGNATING SECTION 238 AS SECTION 233.—Redesignate section 238 (8 U.S.C. 1228) as section 233 and move the section to immediately follow section 232.

(5) REDESIGNATING SECTION 242A AS SECTION 238.—Redesignate section 242A as section 238, strike "DEPORTATION" in its heading and insert "REMOVAL", and move the section to immediately follow section 237 (as redesignated by section 305(a)(2)).

(6) STRIKING SECTION 242B.—Strike section 242B (8 U.S.C. 1252b).

(7) STRIKING SECTION 244 AND REDESIGNATING SECTION 244A AS SECTION 244.—Strike section 244 and redesignate section 244A as section 244.

(8) AMENDING CHAPTER HEADING.—Amend the heading for chapter 5 of title II to read as follows:

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".

(c) ADDITIONAL CONFORMING AMENDMENTS.—

(1) EXPEDITED PROCEDURES FOR AGGRAVATED FELONS (FORMER SECTION 242A).—Section 238 (which, previous to redesignation under section 308(b)(5), was section 242A) is amended—

(A) in subsection (a)(1), by striking "section 242" and inserting "section 240";

(B) in subsection (a)(2), by striking "section 242(a)(2)" and inserting "section 236(c)"; and

(C) in subsection (b)(1), by striking "section 241(a)(2)(A)(iii)" and inserting "section 237(a)(2)(A)(iii)".

(2) TREATMENT OF CERTAIN HELPLESS ALIENS.—

(A) CERTIFICATION OF HELPLESS ALIENS.—Section 232, as amended by section 308(b)(2), is further amended by adding at the end the following new subsection:

"(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.—If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.".

(B) GROUND OF INADMISSIBILITY FOR PROTECTION AND GUARDIANSHIP OF ALIENS DENIED ADMISSION FOR HEALTH OR INFANCY.—Subparagraph (B) of section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(a)(1), is amended to read as follows:

"(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—

"(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and

"(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.".

(3) CONTINGENT CONSIDERATION IN RELATION TO REMOVAL OF ALIENS.—Section 273(a) (8 U.S.C. 1323(a)) is amended—

(A) by inserting "(1)" after "(a)", and

(B) by adding at the end the following new paragraph:

"(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.".

(4) CLARIFICATION.—(A) Section 238(a)(1), which, previous to redesignation under section 308(b)(5), was section 242A(a)(1), is amended by adding at the end the following: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(B) Section 225 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), as amended by section 851(b)(15), is amended by striking "and nothing in" and all that follows up to "shall".

36

(d) Additional Conforming Amendments Relating to Exclusion and Inadmissibility.—

(1) Section 212.—Section 212 (8 U.S.C. 1182(a)) is amended—

(A) in the heading, by striking "EXCLUDED FROM" and inserting "INELIGIBLE FOR";

(B) in the matter in subsection (a) before paragraph (1), by striking all that follows "(a)" and inserting the following: "CLASSES OF ALIENS INELIGIBLE FOR VISAS OR ADMISSION.—Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:";

(C) in subsection (a), by striking "is excludable" and inserting "is inadmissible" each place it appears;

(D) in subsections (a)(5)(C), (d)(1), (k), by striking "exclusion" and inserting "inadmissibility";

(E) in subsections (b), (d)(3), (h)(1)(A)(i), and (k), by striking "excludable" each place it appears and inserting "inadmissible";

(F) in subsection (b)(2), by striking "or ineligible for entry";

(G) in subsection (d)(7), by striking "excluded from" and inserting "denied"; and

(H) in subsection (h)(1)(B), by striking "exclusion" and inserting "denial of admission".

(2) Section 241.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended—

(A) in subsection (a)(1)(H), by striking "excludable" and inserting "inadmissible";

(B) in subsection (a)(4)(C)(ii), by striking "excludability" and inserting "inadmissibility"; and

(C) in subsection (c), by striking "exclusion" and inserting "inadmissibility".

(3) Other general references.—The following provisions are amended by striking "excludability" and "excludable" each place each appears and inserting "inadmissibility" and "inadmissible", respectively:

(A) Sections 101(f)(3), 213, 234 (before redesignation by section 308(b)), 241(a)(1) (before redesignation by section 305(a)(2)), 272(a), 277, 286(h)(2)(A)(v), and 286(h)(2)(A)(vi).

(B) Section 601(c) of the Immigration Act of 1990.

(C) Section 128 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138).

(D) Section 1073 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337).

(E) Section 221 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).

(4) Related terms.—

(A) Section 101(a)(17) (8 U.S.C. 1101(a)(17)) is amended by striking "or expulsion" and inserting "expulsion, or removal".

(B) Section 102 (8 U.S.C. 1102) is amended by striking "exclusion or deportation" and inserting "removal".

(C) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "been excluded or deported" and inserting "not been admitted or have been removed".

(D) Section 206 (8 U.S.C. 1156) is amended by striking "excluded from admission to the United States and deported" and inserting "denied admission to the United States and removed".

(E) Section 216(f) (8 U.S.C. 1186a) is amended by striking "exclusion" and inserting "inadmissibility".

(F) Section 217 (8 U.S.C. 1187) is amended by striking "excluded from admission" and inserting "denied admission at the time of arrival" each place it appears.

(G) Section 221(f) (8 U.S.C. 1201) is amended by striking "exclude" and inserting "deny admission to".

(H) Section 232(a) (8 U.S.C. 1222(a)), as redesignated by subsection (b)(2), is amended by striking "excluded by" and "the excluded classes" and inserting "inadmissible under" and "inadmissible classes", respectively.

(I)(i) Section 272 (8 U.S.C. 1322) is amended—

(I) by striking "EXCLUSION" in the heading and inserting "DENIAL OF ADMISSION",

(II) in subsection (a), by striking "excluding condition" and inserting "condition causing inadmissibility", and

37

(III) in subsection (c), by striking "excluding".

(ii) The item in the table of contents relating to such section is amended by striking "exclusion" and inserting "denial of admission".

(J) Section 276(a) (8 U.S.C. 1326) is amended—

(i) in paragraph (1), by striking "deported or excluded and deported" and inserting "denied admission or removed", and

(ii) in paragraph (2)(B), by striking "excluded and deported" and inserting "denied admission and removed".

(K) Section 286(h)(2)(A)(vi) (8 U.S.C. 1356(h)(2)(A)(vi)) is amended by striking "exclusion" each place it appears and inserting "removal".

(L) Section 287 (8 U.S.C. 1357) is amended—

(i) in subsection (a), by striking "or expulsion" each place it appears and inserting "expulsion, or removal", and

(ii) in subsection (c), by striking "exclusion from" and inserting "denial of admission to".

(M) Section 290(a) (8 U.S.C. 1360(a)) is amended by striking "admitted to the United States, or excluded therefrom" each place it appears and inserting "admitted or denied admission to the United States".

(N) Section 291 (8 U.S.C. 1361) is amended by striking "subject to exclusion" and inserting "inadmissible" each place it appears.

(O) Section 292 (8 U.S.C. 1362) is amended by striking "exclusion or deportation" each place it appears and inserting "removal".

(P) Section 360 (8 U.S.C. 1503) is amended—

(i) in subsection (a), by striking "exclusion" each place it appears and inserting "removal", and

(ii) in subsection (c), by striking "excluded from" and inserting "denied".

(Q) Section 301(a)(1) of the Immigration Act of 1990 is amended by striking "exclusion" and inserting "inadmissibility".

(R) Section 401(c) of the Refugee Act of 1980 is amended by striking "deportation or exclusion" and inserting "removal".

(S) Section 501(e)(2) of the Refugee Education Assistance Act of 1980 (Public Law 96–422) is amended—

(i) by striking "exclusion or deportation" each place it appears and inserting "removal", and

(ii) by striking "deportation or exclusion" each place it appears and inserting "removal".

(T) Section 4113(c) of title 18, United States Code, is amended by striking "exclusion and deportation" and inserting "removal".

(e) REVISION OF TERMINOLOGY RELATING TO DEPORTATION.—

(1) Each of the following is amended by striking "deportation" each place it appears and inserting "removal":

(A) Subparagraphs (A)(iii)(II), (A)(iv)(II), and (B)(iii)(II) of section 204(a)(1) (8 U.S.C. 1154(a)(1)).

(B) Section 212(d)(1) (8 U.S.C. 1182(d)(1)).

(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)).

(D) Section 214(k)(4)(C) (8 U.S.C. 1184(k)(4)(C)), as redesignated by section 851(a)(3)(A).

(E) Section 241(a)(1)(H) (8 U.S.C. 1251(a)(1)(H)), before redesignation as section 237 by section 305(a)(2).

(F) Section 242A (8 U.S.C. 1252a, before redesignation as section 238 by subsection (b)(5).

(G) Subsections (a)(3) and (b)(5)(B) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by subsection (b)(7).

(H) Section 246(a) (8 U.S.C. 1256(a)).

(I) Section 254 (8 U.S.C. 1284).

(J) Section 263(a)(4) (8 U.S.C. 1303(a)(4)).

(K) Section 276(b) (8 U.S.C. 1326(b)).

(L) Section 286(h)(2)(A)(v) (8 U.S.C. 1356(h)(2)(A)(v)).

(M) Section 291 (8 U.S.C. 1361).

(N) Section 318 (8 U.S.C. 1429).

(O) Section 130005(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322).

(P) Section 4113(b) of title 18, United States Code.

(2) Each of the following is amended by striking "deported" each place it appears and inserting "removed":

(A) Section 212(d)(7) (8 U.S.C. 1182(d)(7)).

(B) Section 214(d) (8 U.S.C. 1184(d)).

38

(C) Section 241(a) (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2).

(D) Section 242A(c)(2)(D)(iv) (8 U.S.C. 1252a(c)(2)(D)(iv)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5).

(E) Section 252(b) (8 U.S.C. 1282(b)).

(F) Section 254 (8 U.S.C. 1284).

(G) Subsections (b) and (c) of section 266 (8 U.S.C. 1306).

(H) Section 301(a)(1) of the Immigration Act of 1990.

(I) Section 4113 of title 18, United States Code.

(3) Section 101(g) (8 U.S.C. 1101(g)) is amended by inserting "or removed" after "deported" each place it appears.

(4) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "suspension of deportation" and inserting "cancellation of removal".

(5) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) is amended by striking "deportation is suspended" and inserting "removal is canceled".

(6) Section 212(l)(2)(B) (8 U.S.C. 1182(l)(2)(B)) is amended by striking "deportation against" and inserting "removal of".

(7) Subsections (b)(2), (c)(2)(B), (c)(3)(D), (c)(4)(A), and (d)(2)(C) of section 216 (8 U.S.C. 1186a) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" each place each appears and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

(8) Subsections (b)(2), (c)(2)(B), (c)(3)(D), and (d)(2)(C) of section 216A (8 U.S.C. 1186b) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

(9) Section 217(b)(2) (8 U.S.C. 1187(b)(2)) is amended by striking "deportation against" and inserting "removal of".

(10) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(6), is amended, in the headings to various subdivisions, by striking "DEPORTATION" and "DEPORTATION" and inserting "REMOVAL" and "REMOVAL", respectively.

(11) Section 244A(a)(1)(A) (8 U.S.C. 1254a(a)(1)(A)), before redesignation as section 244 by subsection (b)(8), is amended—

(A) in subsection (a)(1)(A), by striking "deport" and inserting "remove", and

(B) in subsection (e), by striking "SUSPENSION OF DEPORTATION" and inserting "CANCELLATION OF REMOVAL".

(12) Section 254 (8 U.S.C. 1284) is amended by striking "deport" each place it appears and inserting "remove".

(13) Section 273(d) (8 U.S.C. 1323(d)) is repealed.

(14)(A) Section 276 (8 U.S.C. 1326) is amended by striking "DEPORTED" and inserting "REMOVED".

(B) The item in the table of contents relating to such section is amended by striking "deported" and inserting "removed".

(15) Section 318 (8 U.S.C. 1429) is amended by striking "suspending" and inserting "canceling".

(16) Section 301(a) of the Immigration Act of 1990 is amended by striking "DEPORTATION" and inserting "REMOVAL".

(17) The heading of section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended by striking "deportation" and inserting "removal".

(18) Section 9 of the Peace Corps Act (22 U.S.C. 2508) is amended by striking "deported" and all that follows through "Deportation" and inserting "removed pursuant to chapter 4 of title II of the Immigration and Nationality Act".

(19) Section 8(c) of the Foreign Agents Registration Act (22 U.S.C. 618(c)) is amended by striking "deportation" and all that follows and inserting "removal pursuant to chapter 4 of title II of the Immigration and Nationality Act.".

(f) REVISION OF REFERENCES TO ENTRY.—

(1) The following provisions are amended by striking "entry" and inserting "admission" each place it appears:

(A) Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)).

(B) Section 101(a)(30) (8 U.S.C. 1101(a)(30)).

(C) Section 212(a)(2)(D) (8 U.S.C. 1182(a)(2)(D)).

(D) Section 212(a)(6)(C)(i) (8 U.S.C. 1182(a)(6)(C)(i)).

(E) Section 212(h)(1)(A)(i) (8 U.S.C. 1182(h)(1)(A)(i)).

(F) Section 212(j)(1)(D) (8 U.S.C. 1182(j)(1)(D)).

(G) Section 214(c)(2)(A) (8 U.S.C. 1184(c)(2)(A)).

39

(H) Section 214(d) (8 U.S.C. 1184(d)).

(I) Section 216(b)(1)(A)(i) (8 U.S.C. 1186a(b)(1)(A)(i)).

(J) Section 216(d)(1)(A)(i)(III) (8 U.S.C. 1186a(d)(1)(A)(i)(III)).

(K) Subsection (b) of section 240 (8 U.S.C. 1230), before redesignation as section 240C by section 304(a)(2).

(L) Subsection (a)(1)(G) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2).

(M) Subsection (a)(1)(H) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), other than the last time it appears.

(N) Paragraphs (2) and (4) of subsection (a) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2).

(O) Section 245(e)(3) (8 U.S.C. 1255(e)(3)).

(P) Section 247(a) (8 U.S.C. 1257(a)).

(Q) Section 601(c)(2) of the Immigration Act of 1990.

(2) The following provisions are amended by striking "enter" and inserting "be admitted":

(A) Section 204(e) (8 U.S.C. 1154(e)).

(B) Section 221(h) (8 U.S.C. 1201(h)).

(C) Section 245(e)(2) (8 U.S.C. 1255(e)(2)).

(3) The following provisions are amended by striking "enters" and inserting "is admitted to":

(A) Section 212(j)(1)(D)(ii) (8 U.S.C. 1154(e)).

(B) Section 214(c)(5)(B) (8 U.S.C. 1184(c)(5)(B)).

(4) Subsection (a) of section 238 (8 U.S.C. 1228), before redesignation as section 233 by section 308(b)(4), is amended by striking "entry and inspection" and inserting "inspection and admission".

(5) Subsection (a)(1)(H)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended by striking "at entry".

(6) Section 7 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 403h) is amended by striking "that the entry", "given entry into", and "entering" and inserting "that the admission", "admitted to", and "admitted to".

(7) Section 4 of the Atomic Weapons and Special Nuclear Materials Rewards Act (50 U.S.C. 47c) is amended by striking "entry" and inserting "admission".

(g) CONFORMING REFERENCES TO REORGANIZED SECTIONS.—

(1) REFERENCES TO SECTIONS 232, 234, 238, 239, 240, 241, 242A, AND 244A.—Any reference in law in effect on the day before the date of the enactment of this Act to section 232, 234, 238, 239, 240, 241, 242A, or 244A of the Immigration and Nationality Act (or a subdivision of such section) is deemed, as of the title III–A effective date, to refer to section 232(a), 232(b), 233, 234, 234A, 237, 238, or 244 of such Act (or the corresponding subdivision of such section), as redesignated by this subtitle. Any reference in law to section 241 (or a subdivision of such section) of the Immigration and Nationality Act in an amendment made by a subsequent subtitle of this title is deemed a reference (as of the title III–A effective date) to section 237 (or the corresponding subdivision of such section), as redesignated by this subtitle.

(2) REFERENCES TO SECTION 106.—

(A) Sections 242A(b)(3) and 242A(c)(3)(A)(ii) (8 U.S.C. 1252a(b)(3), 1252a(c)(3)(A)(ii)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), are each amended by striking "106" and inserting "242".

(B) Sections 210(e)(3)(A) and 245A(f)(4)(A) (8 U.S.C. 1160(e)(3)(A), 1255a(f)(4)(A)) are amended by inserting "(as in effect before October 1, 1996)" after "106".

(C) Section 242A(c)(3)(A)(iii) (8 U.S.C. 1252a(c)(3)(A)(iii)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), is amended by striking "106(a)(1)" and inserting "242(b)(1)".

(3) REFERENCES TO SECTION 236.—

(A) Sections 205 and 209(a)(1) (8 U.S.C. 1155, 1159(a)(1)) are each amended by striking "236" and inserting "240".

(B) Section 4113(c) of title 18, United States Code, is amended by striking "1226 of title 8, United States Code" and inserting "240 of the Immigration and Nationality Act".

(4) REFERENCES TO SECTION 237.—

(A) Section 209(a)(1) (8 U.S.C. 1159(a)(1)) is amended by striking "237" and inserting "241".

(B) Section 212(d)(7) (8 U.S.C. 1182(d)(7)) is amended by striking "237(a)" and inserting "241(c)".

40

(C) Section 280(a) (8 U.S.C. 1330(a)) is amended by striking "237, 239, 243" and inserting "234, 243(c)(2)".

(5) REFERENCES TO SECTION 242.—

(A)(i) Sections 214(d), 252(b), and 287(f)(1) (8 U.S.C. 1184(d), 1282(b), 1357(f)(1)) are each amended by striking "242" and inserting "240".

(ii) Subsection (c)(4) of section 242A (8 U.S.C. 1252a), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), are each amended by striking "242" and inserting "240".

(iii) Section 245A(a)(1)(B) (8 U.S.C. 1255a(a)(1)(B)) is amended by inserting "(as in effect before October 1, 1996)" after "242".

(iv) Section 4113 of title 18, United States Code, is amended—

(I) in subsection (a), by striking "section 1252(b) or section 1254(e) of title 8, United States Code," and inserting "section 240B of the Immigration and Nationality Act"; and

(II) in subsection (b), by striking "section 1252 of title 8, United States Code," and inserting "section 240 of the Immigration and Nationality Act".

(B) Section 130002(a) of Public Law 103–322, as amended by section 361(a), is amended by striking "242(a)(3)(A)" and inserting "236(d)".

(C) Section 242A(b)(1) (8 U.S.C. 1252a(b)(1)), before redesignation as section 238 by section 308(b)(5), is amended by striking "242(b)" and inserting "240".

(D) Section 242A(c)(2)(D)(ii) (8 U.S.C. 1252a(c)(2)(D)(ii)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), is amended by striking "242(b)" and inserting "240".

(E) Section 1821(e) of title 28, United States Code, is amended by striking "242(b)" and inserting "240".

(F) Section 130007(a) of Public Law 103–322 is amended by striking "242(i)" and inserting "239(d)".

(G) Section 20301(c) of Public Law 103–322 is amended by striking "242(j)(5)" and "242(j)" and inserting "241(h)(5)" and "241(h)", respectively.

(6) REFERENCES TO SECTION 242B.—

(A) Section 303(d)(2) of the Immigration Act of 1990 is amended by striking "242B" and inserting "240(b)(5)".

(B) Section 545(g)(1)(B) of the Immigration Act of 1990 is amended by striking "242B(a)(4)" and inserting "239(a)(4)".

(7) REFERENCES TO SECTION 243.—

(A) Section 214(d) (8 U.S.C. 1184(d)) is amended by striking "243" and inserting "241".

(B)(i) Section 315(c) of the Immigration Reform and Control Act of 1986 is amended by striking "243(g)" and "1253(g)"and inserting "243(d)" and "1253(d)" respectively.

(ii) Section 702(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1988 is amended by striking "243(g)" and inserting "243(d)".

(iii) Section 903(b) of Public Law 100–204 is amended by striking "243(g)" and inserting "243(d)".

(C)(i) Section 6(f)(2)(F) of the Food Stamp Act of 1977 (7 U.S.C. 2015(f)(2)(F)) is amended by striking "243(h)" and inserting "241(b)(3)".

(ii) Section 214(a)(5) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(a)(5)) is amended by striking "243(h)" and inserting "241(b)(3)".

(D)(i) Subsection (c)(2)(B)(ii) of section 244A (8 U.S.C. 1254a), before redesignated as section 244 by section 308(b)(7), is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

(ii) Section 301(e)(2) of the Immigration Act of 1990 is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

(E) Section 316(f) (8 U.S.C. 1427(f)) is amended by striking "subparagraphs (A) through (D) of paragraph 243(h)(2)" and inserting "clauses (i) through (v) of section 208(b)(2)(A)".

(8) REFERENCES TO SECTION 244.—

(A)(i) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) and subsection (e) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by section 308(b)(7), are each amended by striking "244(a)" and inserting "240A(a)".

(ii) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(a)" and inserting "240A(a)".

41

(B) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(b)(2)" and inserting "240A(b)(2)".

(C) Section 364(a)(2) of this Act is amended by striking "244(a)(3)" and inserting "240A(a)(3)".

(9) REFERENCES TO CHAPTER 5.—

(A) Sections 266(b), 266(c), and 291 (8 U.S.C. 1306(b), 1306(c), 1361) are each amended by striking "chapter 5" and inserting "chapter 4".

(B) Section 6(b) of the Act of August 1, 1956 (50 U.S.C. 855(b)) is amended by striking "chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)" and inserting "chapter 4 of title II of the Immigration and Nationality Act".

(10) MISCELLANEOUS CROSS-REFERENCE CORRECTIONS FOR NEWLY ADDED PROVISIONS.—

(A) Section 245(c)(6), as amended by section 332(d), is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

(B) Section 249(d), as amended by section 332(e), is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

(C) Section 276(b)(3), as inserted by section 321(b), is amended by striking "excluded" and "excludable" and inserting "removed" and "inadmissible", respectively.

(D) Section 505(c)(7), as added by section 321(a)(1), is amended by amending subparagraphs (B) through (D) to read as follows:

"(B) Withholding of removal under section 241(b)(3).

"(C) Cancellation of removal under section 240A.

"(D) Voluntary departure under section 240B.".

(E) Section 506(b)(2)(B), as added by section 321(a)(1), is amended by striking "deportation" and inserting "removal".

(F) Section 508(c)(2)(D), as added by section 321(a)(1), is amended by striking "exclusion because such alien is excludable" and inserting "removal because such alien is inadmissible".

(G) Section 130007(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 851(a)(6), is amended by striking "242A(a)(3)" and inserting "238(a)(3)".

**SEC. 309. EFFECTIVE DATES; TRANSITION.**

(a) IN GENERAL.—Except as provided in this section and section 301(f), this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act (in this title referred to as the "title III–A effective date").

(b) PROMULGATION OF REGULATIONS.—The Attorney General shall first promulgate regulations to carry out this subtitle by not later than 30 days before the title III–A effective date.

(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

(2) ATTORNEY GENERAL OPTION TO ELECT TO APPLY NEW PROCEDURES.—In a case described in paragraph (1) in which an evidentiary hearing under section 236 or 242 and 242B of the Immigration and Nationality Act has not commenced as of the title III–A effective date, the Attorney General may elect to proceed under chapter 4 of title II of such Act (as amended by this subtitle). The Attorney General shall provide notice of such election to the alien involved not later than 30 days before the date any evidentiary hearing is commenced. If the Attorney General makes such election, the notice of hearing provided to the alien under section 235 or 242(a) of such Act shall be valid as if provided under section 239 of such Act (as amended by this subtitle) to confer jurisdiction on the immigration judge.

(3) ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1), the Attorney General may elect to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings under chapter 4 of title II the Immigration and Nationality Act (as amended by this subtitle). Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding.

42

(4) TRANSITIONAL CHANGES IN JUDICIAL REVIEW.—In the case described in paragraph (1) in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act, notwithstanding any provision of section 106 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act) to the contrary—

(A) in the case of judicial review of a final order of exclusion, subsection (b) of such section shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of such in the same manner as they apply to judicial review of orders of deportation;

(B) a court may not order the taking of additional evidence under section 2347(c) of title 28, United States Code;

(C) the petition for judicial review must be filed not later than 30 days after the date of the final order of exclusion or deportation; and

(D) the petition for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed.

(5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued after the date of the enactment of this Act.

(6) TRANSITION FOR CERTAIN FAMILY UNITY ALIENS.—The Attorney General may waive the application of section 212(a)(9) of the Immigration and Nationality Act, as inserted by section 301(b)(1), in the case of an alien who is provided benefits under the provisions of section 301 of the Immigration Act of 1990 (relating to family unity).

(d) TRANSITIONAL REFERENCES.—For purposes of carrying out the Immigration and Nationality Act, as amended by this subtitle—

(1) any reference in section 212(a)(1)(A) of such Act to the term "inadmissible" is deemed to include a reference to the term "excludable", and

(2) any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation.

(e) TRANSITION.—No period of time before the date of the enactment of this Act shall be included in the period of 1 year described in section 212(a)(6)(B)(i) of the Immigration and Nationality Act (as amended by section 301(c)).

# Subtitle B—Removal of Alien Terrorists

## PART 1—REMOVAL PROCEDURES FOR ALIEN TERRORISTS

**SEC. 321. REMOVAL PROCEDURES FOR ALIEN TERRORISTS.**

(a) IN GENERAL.—The Immigration and Nationality Act is amended—

(1) by adding at the end of the table of contents the following:

"TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

"Sec. 501. Definitions.
"Sec. 502. Establishment of special removal court; panel of attorneys to assist with classified information.
"Sec. 503. Application for initiation of special removal proceeding.
"Sec. 504. Consideration of application.
"Sec. 505. Special removal hearings.
"Sec. 506. Consideration of classified information.
"Sec. 507. Appeals.
"Sec. 508. Detention and custody.",

and

(2) by adding at the end the following new title:

"TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

"DEFINITIONS

"SEC. 501. In this title:

"(1) The term 'alien terrorist' means an alien described in section 241(a)(4)(B).

"(2) The term 'classified information' has the meaning given such term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.).

"(3) The term 'national security' has the meaning given such term in section 1(b) of the Classified Information Procedures Act (18 U.S.C. App.).

"(4) The term 'special attorney' means an attorney who is on the panel established under section 502(e).

43

"(5) The term 'special removal court' means the court established under section 502(a).
"(6) The term 'special removal hearing' means a hearing under section 505.
"(7) The term 'special removal proceeding' means a proceeding under this title.

"ESTABLISHMENT OF SPECIAL REMOVAL COURT; PANEL OF ATTORNEYS TO ASSIST WITH CLASSIFIED INFORMATION

"SEC. 502. (a) IN GENERAL.—The Chief Justice of the United States shall publicly designate 5 district court judges from 5 of the United States judicial circuits who shall constitute a court which shall have jurisdiction to conduct all special removal proceedings.
"(b) TERMS.—Each judge designated under subsection (a) shall serve for a term of 5 years and shall be eligible for redesignation, except that the four associate judges first so designated shall be designated for terms of one, two, three, and four years so that the term of one judge shall expire each year.
"(c) CHIEF JUDGE.—The Chief Justice shall publicly designate one of the judges of the special removal court to be the chief judge of the court. The chief judge shall promulgate rules to facilitate the functioning of the court and shall be responsible for assigning the consideration of cases to the various judges.
"(d) EXPEDITIOUS AND CONFIDENTIAL NATURE OF PROCEEDINGS.—The provisions of section 103(c) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(c)) shall apply to proceedings under this title in the same manner as they apply to proceedings under such Act.
"(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The special removal court shall provide for the designation of a panel of attorneys each of whom—
"(1) has a security clearance which affords the attorney access to classified information, and
"(2) has agreed to represent permanent resident aliens with respect to classified information under section 506 in accordance with (and subject to the penalties under) this title.

"APPLICATION FOR INITIATION OF SPECIAL REMOVAL PROCEEDING

"SEC. 503. (a) IN GENERAL.—Whenever the Attorney General has classified information that an alien is an alien terrorist, the Attorney General, in the Attorney General's discretion, may seek removal of the alien under this title through the filing of a written application described in subsection (b) with the special removal court seeking an order authorizing a special removal proceeding under this title. The application shall be submitted in camera and ex parte and shall be filed under seal with the court.
"(b) CONTENTS OF APPLICATION.—Each application for a special removal proceeding shall include all of the following:
"(1) The identity of the Department of Justice attorney making the application.
"(2) The approval of the Attorney General or the Deputy Attorney General for the filing of the application based upon a finding by that individual that the application satisfies the criteria and requirements of this title.
"(3) The identity of the alien for whom authorization for the special removal proceedings is sought.
"(4) A statement of the facts and circumstances relied on by the Department of Justice to establish that—
"(A) the alien is an alien terrorist and is physically present in the United States, and
"(B) with respect to such alien, adherence to the provisions of title II regarding the removal of aliens would pose a risk to the national security of the United States.
"(5) An oath or affirmation respecting each of the facts and statements described in the previous paragraphs.
"(c) RIGHT TO DISMISS.—The Department of Justice retains the right to dismiss a removal action under this title at any stage of the proceeding.

"CONSIDERATION OF APPLICATION

"SEC. 504. (a) IN GENERAL.—In the case of an application under section 503 to the special removal court, a single judge of the court shall be assigned to consider the application. The judge, in accordance with the rules of the court, shall consider the application and may consider other information, including classified information, presented under oath or affirmation. The judge shall consider the application (and

44

any hearing thereof) in camera and ex parte. A verbatim record shall be maintained of any such hearing.

"(b) Approval of Order.—The judge shall enter ex parte the order requested in the application if the judge finds, on the basis of such application and such other information (if any), that there is probable cause to believe that—

"(1) the alien who is the subject of the application has been correctly identified and is an alien terrorist, and

"(2) adherence to the provisions of title II regarding the removal of the identified alien would pose a risk to the national security of the United States.

"(c) Denial of Order.—If the judge denies the order requested in the application, the judge shall prepare a written statement of the judge's reasons for the denial.

"(d) Exclusive Provisions.—Whenever an order is issued under this section with respect to an alien—

"(1) the alien's rights regarding removal and expulsion shall be governed solely by the provisions of this title, and

"(2) except as they are specifically referenced, no other provisions of this Act shall be applicable.

"SPECIAL REMOVAL HEARINGS

"Sec. 505. (a) In General.—In any case in which the application for the order is approved under section 504, a special removal hearing shall be conducted under this section for the purpose of determining whether the alien to whom the order pertains should be removed from the United States on the grounds that the alien is an alien terrorist. Consistent with section 506, the alien shall be given reasonable notice of the nature of the charges against the alien and a general account of the basis for the charges. The alien shall be given notice, reasonable under all the circumstances, of the time and place at which the hearing will be held. The hearing shall be held as expeditiously as possible.

"(b) Use of Same Judge.—The special removal hearing shall be held before the same judge who granted the order pursuant to section 504 unless that judge is deemed unavailable due to illness or disability by the chief judge of the special removal court, or has died, in which case the chief judge shall assign another judge to conduct the special removal hearing. A decision by the chief judge pursuant to the preceding sentence shall not be subject to review by either the alien or the Department of Justice.

"(c) Rights in Hearing.—

"(1) Public hearing.—The special removal hearing shall be open to the public.

"(2) Right of counsel.—The alien shall have a right to be present at such hearing and to be represented by counsel. Any alien financially unable to obtain counsel shall be entitled to have counsel assigned to represent the alien. Such counsel shall be appointed by the judge pursuant to the plan for furnishing representation for any person financially unable to obtain adequate representation for the district in which the hearing is conducted, as provided for in section 3006A of title 18, United States Code. All provisions of that section shall apply and, for purposes of determining the maximum amount of compensation, the matter shall be treated as if a felony was charged.

"(3) Introduction of evidence.—The alien shall have a right to introduce evidence on the alien's own behalf.

"(4) Examination of witnesses.—Except as provided in section 506, the alien shall have a reasonable opportunity to examine the evidence against the alien and to cross-examine any witness.

"(5) Record.—A verbatim record of the proceedings and of all testimony and evidence offered or produced at such a hearing shall be kept.

"(6) Decision based on evidence at hearing.—The decision of the judge in the hearing shall be based only on the evidence introduced at the hearing, including evidence introduced under subsection (e).

"(7) No right to ancillary relief.—In the hearing, the judge is not authorized to consider or provide for relief from removal based on any of the following:

"(A) Asylum under section 208.

"(B) Withholding of deportation under section 243(h).

"(C) Suspension of deportation under section 244(a).

"(D) Voluntary departure under section 244(e).

"(E) Adjustment of status under section 245.

"(F) Registry under section 249.

"(d) Subpoenas.—

45

"(1) REQUEST.—At any time prior to the conclusion of the special removal hearing, either the alien or the Department of Justice may request the judge to issue a subpoena for the presence of a named witness (which subpoena may also command the person to whom it is directed to produce books, papers, documents, or other objects designated therein) upon a satisfactory showing that the presence of the witness is necessary for the determination of any material matter. Such a request may be made ex parte except that the judge shall inform the Department of Justice of any request for a subpoena by the alien for a witness or material if compliance with such a subpoena would reveal evidence or the source of evidence which has been introduced, or which the Department of Justice has received permission to introduce, in camera and ex parte pursuant to subsection (e) and section 506, and the Department of Justice shall be given a reasonable opportunity to oppose the issuance of such a subpoena.

"(2) PAYMENT FOR ATTENDANCE.—If an application for a subpoena by the alien also makes a showing that the alien is financially unable to pay for the attendance of a witness so requested, the court may order the costs incurred by the process and the fees of the witness so subpoenaed to be paid from funds appropriated for the enforcement of title II.

"(3) NATIONWIDE SERVICE.—A subpoena under this subsection may be served anywhere in the United States.

"(4) WITNESS FEES.—A witness subpoenaed under this subsection shall receive the same fees and expenses as a witness subpoenaed in connection with a civil proceeding in a court of the United States.

"(5) NO ACCESS TO CLASSIFIED INFORMATION.—Nothing in this subsection is intended to allow an alien to have access to classified information.

"(e) INTRODUCTION OF CLASSIFIED INFORMATION.—

"(1) IN GENERAL.—When classified information has been summarized pursuant to section 506(b) or where a finding has been made under section 506(b)(5) that no summary is possible, classified information shall be introduced (either in writing or through testimony) in camera and ex parte and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to such section. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.

"(2) TREATMENT OF ELECTRONIC SURVEILLANCE INFORMATION.—

"(A) USE OF ELECTRONIC SURVEILLANCE.—The Government is authorized to use in a special removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act.

"(B) NO DISCOVERY OF ELECTRONIC SURVEILLANCE INFORMATION.—An alien subject to removal under this title shall have no right of discovery of information derived from electronic surveillance authorized under the Foreign Intelligence Surveillance Act of 1978 or otherwise for national security purposes. Nor shall such alien have the right to seek suppression of evidence.

"(C) CERTAIN PROCEDURES NOT APPLICABLE.—The provisions and requirements of section 3504 of title 18, United States Code, shall not apply to procedures under this title.

"(3) RIGHTS OF UNITED STATES.—Nothing in this section shall prevent the United States from seeking protective orders and from asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and state secrets privileges.

"(f) INCLUSION OF CERTAIN EVIDENCE.—The Federal Rules of Evidence shall not apply to hearings under this section. Evidence introduced at the special removal hearing, either in open session or in camera and ex parte, may, in the discretion of the Department of Justice, include all or part of the information presented under section 504 used to obtain the order for the hearing under this section.

"(g) ARGUMENTS.—Following the receipt of evidence, the attorneys for the Department of Justice and for the alien shall be given fair opportunity to present argument as to whether the evidence is sufficient to justify the removal of the alien. The attorney for the Department of Justice shall open the argument. The attorney for the alien shall be permitted to reply. The attorney for the Department of Justice shall then be permitted to reply in rebuttal. The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.

46

"(h) BURDEN OF PROOF.—In the hearing the Department of Justice has the burden of showing by clear and convincing evidence that the alien is subject to removal because the alien is an alien terrorist. If the judge finds that the Department of Justice has met this burden, the judge shall order the alien removed and detained pending removal from the United States. If the alien was released pending the special removal hearing, the judge shall order the Attorney General to take the alien into custody.

"(i) WRITTEN ORDER.—At the time of rendering a decision as to whether the alien shall be removed, the judge shall prepare a written order containing a statement of facts found and conclusions of law. Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.

"CONSIDERATION OF CLASSIFIED INFORMATION

"SEC. 506. (a) CONSIDERATION IN CAMERA AND EX PARTE.—In any case in which the application for the order authorizing the special procedures of this title is approved, the judge who granted the order shall consider each item of classified information that the Department of Justice proposes to introduce in camera and ex parte at the special removal hearing and shall order the introduction of such information pursuant to section 505(e) if the judge determines the information to be relevant.

"(b) PREPARATION AND PROVISION OF WRITTEN SUMMARY.—

"(1) PREPARATION.—The Department of Justice shall prepare a written summary of such classified information which does not pose a risk to national security.

"(2) CONDITIONS FOR APPROVAL BY JUDGE AND PROVISION TO ALIEN.—The judge shall approve the summary so long as the judge finds that the summary is sufficient—

"(A) to inform the alien of the general nature of the evidence that the alien is an alien terrorist, and

"(B) to permit the alien to prepare a defense against deportation.

The Department of Justice shall cause to be delivered to the alien a copy of the summary.

"(3) OPPORTUNITY FOR CORRECTION AND RESUBMITTAL.—If the judge does not approve the summary, the judge shall provide the Department a reasonable opportunity to correct the deficiencies identified by the court and to submit a revised summary.

"(4) CONDITIONS FOR TERMINATION OF PROCEEDINGS IF SUMMARY NOT APPROVED.—

"(A) IN GENERAL.—If, subsequent to the opportunity described in paragraph (3), the judge does not approve the summary, the judge shall terminate the special removal hearing unless the judge makes the findings described in subparagraph (B).

"(B) FINDINGS.—The findings described in this subparagraph are, with respect to an alien, that—

"(i) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

"(ii) the provision of the required summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.

"(5) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in paragraph (4)(B)—

"(A) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subsection (c) shall apply; and

"(B) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to section 505(e).

"(c) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

"(1) IN GENERAL.—The procedures described in this subsection are that the judge (under rules of the special removal court) shall designate a special attorney to assist the alien—

"(A) by reviewing in camera the classified information on behalf of the alien, and

"(B) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

47

"(2) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under paragraph (1)—

"(A) shall not disclose the information to the alien or to any other attorney representing the alien, and

"(B) who discloses such information in violation of subparagraph (A) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.

"APPEALS

"SEC. 507. (a) APPEALS OF DENIALS OF APPLICATIONS FOR ORDERS.—The Department of Justice may seek a review of the denial of an order sought in an application by the United States Court of Appeals for the District of Columbia Circuit by notice of appeal which must be filed within 20 days after the date of such denial. In such a case the entire record of the proceeding shall be transmitted to the Court of Appeals under seal and the Court of Appeals shall hear the matter ex parte. In such a case the Court of Appeals shall review questions of law de novo, but a prior finding on any question of fact shall not be set aside unless such finding was clearly erroneous.

"(b) APPEALS OF DETERMINATIONS ABOUT SUMMARIES OF CLASSIFIED INFORMATION.—Either party may take an interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit of—

"(1) any determination by the judge pursuant to section 506(a)—

"(A) concerning whether an item of evidence may be introduced in camera and ex parte, or

"(B) concerning the contents of any summary of evidence to be introduced in camera and ex parte prepared pursuant to section 506(b); or

"(2) the refusal of the court to make the findings permitted by section 506(b)(4)(B).

In any interlocutory appeal taken pursuant to this subsection, the entire record, including any proposed order of the judge or summary of evidence, shall be transmitted to the Court of Appeals under seal and the matter shall be heard ex parte.

"(c) APPEALS OF DECISION IN HEARING.—

"(1) IN GENERAL.—Subject to paragraph (2), the decision of the judge after a special removal hearing may be appealed by either the alien or the Department of Justice to the United States Court of Appeals for the District of Columbia Circuit by notice of appeal.

"(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

"(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 506(b)(4) and with respect to which the procedures described in section 506(c) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

"(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 506(c)(1) on behalf of the alien.

"(d) GENERAL PROVISIONS RELATING TO APPEALS.—

"(1) NOTICE.—A notice of appeal pursuant to subsection (b) or (c) (other than under subsection (c)(2)) must be filed within 20 days after the date of the order with respect to which the appeal is sought, during which time the order shall not be executed.

"(2) TRANSMITTAL OF RECORD.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c)—

"(A) the entire record shall be transmitted to the Court of Appeals, and

"(B) information received pursuant to section 505(e), and any portion of the judge's order that would reveal the substance or source of such information, shall be transmitted under seal.

"(3) EXPEDITED APPELLATE PROCEEDING.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

"(A) REVIEW.—The appeal or review shall be heard as expeditiously as practicable and the Court may dispense with full briefing and hear the matter solely on the record of the judge of the special removal court and on such briefs or motions as the Court may require to be filed by the parties.

"(B) DISPOSITION.—The Court shall uphold or reverse the judge's order within 60 days after the date of the issuance of the judge's final order.

48

"(4) STANDARD FOR REVIEW.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

"(A) QUESTIONS OF LAW.—The Court of Appeals shall review all questions of law de novo.

"(B) QUESTIONS OF FACT.—(i) Subject to clause (ii), a prior finding on any question of fact shall not be set aside unless such finding was clearly erroneous.

"(ii) In the case of a review under subsection (c)(2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 506(b)(4), the Court of Appeals shall review questions of fact de novo.

"(e) CERTIORARI.—Following a decision by the Court of Appeals pursuant to subsection (b) or (c), either the alien or the Department of Justice may petition the Supreme Court for a writ of certiorari. In any such case, any information transmitted to the Court of Appeals under seal shall, if such information is also submitted to the Supreme Court, be transmitted under seal. Any order of removal shall not be stayed pending disposition of a writ of certiorari except as provided by the Court of Appeals or a Justice of the Supreme Court.

"(f) APPEALS OF DETENTION ORDERS.—

"(1) IN GENERAL.—The provisions of sections 3145 through 3148 of title 18, United States Code, pertaining to review and appeal of a release or detention order, penalties for failure to appear, penalties for an offense committed while on release, and sanctions for violation of a release condition shall apply to an alien to whom section 508(b)(1) applies. In applying the previous sentence—

"(A) for purposes of section 3145 of such title an appeal shall be taken to the United States Court of Appeals for the District of Columbia Circuit, and

"(B) for purposes of section 3146 of such title the alien shall be considered released in connection with a charge of an offense punishable by life imprisonment.

"(2) NO REVIEW OF CONTINUED DETENTION.—The determinations and actions of the Attorney General pursuant to section 508(c)(2)(C) shall not be subject to judicial review, including application for a writ of habeas corpus, except for a claim by the alien that continued detention violates the alien's rights under the Constitution. Jurisdiction over any such challenge shall lie exclusively in the United States Court of Appeals for the District of Columbia Circuit.

"DETENTION AND CUSTODY

"SEC. 508. (a) INITIAL CUSTODY.—

"(1) UPON FILING APPLICATION.—Subject to paragraph (2), the Attorney General may take into custody any alien with respect to whom an application under section 503 has been filed and, notwithstanding any other provision of law, may retain such an alien in custody in accordance with the procedures authorized by this title.

"(2) SPECIAL RULES FOR PERMANENT RESIDENT ALIENS.—An alien lawfully admitted for permanent residence shall be entitled to a release hearing before the judge assigned to hear the special removal hearing. Such an alien shall be detained pending the special removal hearing, unless the alien demonstrates to the court that—

"(A) the alien, if released upon such terms and conditions as the court may prescribe (including the posting of any monetary amount), is not likely to flee, and

"(B) the alien's release will not endanger national security or the safety of any person or the community.

The judge may consider classified information submitted in camera and ex parte in making a determination under this paragraph.

"(3) RELEASE IF ORDER DENIED AND NO REVIEW SOUGHT.—

"(A) IN GENERAL.—Subject to subparagraph (B), if a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice does not seek review of such denial, the alien shall be released from custody.

"(B) APPLICATION OF REGULAR PROCEDURES.—Subparagraph (A) shall not prevent the arrest and detention of the alien pursuant to title II.

"(b) CONDITIONAL RELEASE IF ORDER DENIED AND REVIEW SOUGHT.—

"(1) IN GENERAL.—If a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice seeks review of such denial, the judge shall release the alien from custody sub-

49

ject to the least restrictive condition or combination of conditions of release described in section 3142(b) and clauses (i) through (xiv) of section 3142(c)(1)(B) of title 18, United States Code, that will reasonably assure the appearance of the alien at any future proceeding pursuant to this title and will not endanger the safety of any other person or the community.

"(2) No release for certain aliens.—If the judge finds no such condition or combination of conditions, the alien shall remain in custody until the completion of any appeal authorized by this title.

"(c) Custody and Release After Hearing.—

"(1) Release.—

"(A) In general.—Subject to subparagraph (B), if the judge decides pursuant to section 505(i) that an alien should not be removed, the alien shall be released from custody.

"(B) Custody pending appeal.—If the Attorney General takes an appeal from such decision, the alien shall remain in custody, subject to the provisions of section 3142 of title 18, United States Code.

"(2) Custody and removal.—

"(A) Custody.—If the judge decides pursuant to section 505(i) that an alien shall be removed, the alien shall be detained pending the outcome of any appeal. After the conclusion of any judicial review thereof which affirms the removal order, the Attorney General shall retain the alien in custody and remove the alien to a country specified under subparagraph (B).

"(B) Removal.—

"(i) In general.—The removal of an alien shall be to any country which the alien shall designate if such designation does not, in the judgment of the Attorney General, in consultation with the Secretary of State, impair the obligation of the United States under any treaty (including a treaty pertaining to extradition) or otherwise adversely affect the foreign policy of the United States.

"(ii) Alternate countries.—If the alien refuses to designate a country to which the alien wishes to be removed or if the Attorney General, in consultation with the Secretary of State, determines that removal of the alien to the country so designated would impair a treaty obligation or adversely affect United States foreign policy, the Attorney General shall cause the alien to be removed to any country willing to receive such alien.

"(C) Continued detention.—If no country is willing to receive such an alien, the Attorney General may, notwithstanding any other provision of law, retain the alien in custody. The Attorney General, in coordination with the Secretary of State, shall make periodic efforts to reach agreement with other countries to accept such an alien and at least every 6 months shall provide to the attorney representing the alien at the special removal hearing a written report on the Attorney General's efforts. Any alien in custody pursuant to this subparagraph shall be released from custody solely at the discretion of the Attorney General and subject to such conditions as the Attorney General shall deem appropriate.

"(D) Fingerprinting.—Before an alien is transported out of the United States pursuant to this subsection, or pursuant to an order of exclusion because such alien is excludable under section 212(a)(3)(B), the alien shall be photographed and fingerprinted, and shall be advised of the provisions of subsection 276(b).

"(d) Continued Detention Pending Trial.—

"(1) Delay in removal.—Notwithstanding the provisions of subsection (c)(2), the Attorney General may hold in abeyance the removal of an alien who has been ordered removed pursuant to this title to allow the trial of such alien on any Federal or State criminal charge and the service of any sentence of confinement resulting from such a trial.

"(2) Maintenance of custody.—Pending the commencement of any service of a sentence of confinement by an alien described in paragraph (1), such an alien shall remain in the custody of the Attorney General, unless the Attorney General determines that temporary release of the alien to the custody of State authorities for confinement in a State facility is appropriate and would not endanger national security or public safety.

"(3) Subsequent removal.—Following the completion of a sentence of confinement by an alien described in paragraph (1) or following the completion of State criminal proceedings which do not result in a sentence of confinement of an alien released to the custody of State authorities pursuant to paragraph (2), such an alien shall be returned to the custody of the Attorney General who

50

shall proceed to carry out the provisions of subsection (c)(2) concerning removal of the alien.

"(e) APPLICATION OF CERTAIN PROVISIONS RELATING TO ESCAPE OF PRISONERS.— For purposes of sections 751 and 752 of title 18, United States Code, an alien in the custody of the Attorney General pursuant to this title shall be subject to the penalties provided by those sections in relation to a person committed to the custody of the Attorney General by virtue of an arrest on a charge of a felony.

"(f) RIGHTS OF ALIENS IN CUSTODY.—

"(1) FAMILY AND ATTORNEY VISITS.—An alien in the custody of the Attorney General pursuant to this title shall be given reasonable opportunity to communicate with and receive visits from members of the alien's family, and to contact, retain, and communicate with an attorney.

"(2) DIPLOMATIC CONTACT.—An alien in the custody of the Attorney General pursuant to this title shall have the right to contact an appropriate diplomatic or consular official of the alien's country of citizenship or nationality or of any country providing representation services therefore. The Attorney General shall notify the appropriate embassy, mission, or consular office of the alien's detention.".

(b) CRIMINAL PENALTY FOR REENTRY OF ALIEN TERRORISTS.—Section 276(b) (8 U.S.C. 1326(b)) is amended—

(1) by striking "or" at the end of paragraph (1),

(2) by striking the period at the end of paragraph (2) and inserting "; or", and

(3) by inserting after paragraph (2) the following new paragraph:

"(3) who has been excluded from the United States pursuant to subsection 235(c) because the alien was excludable under subsection 212(a)(3)(B) or who has been removed from the United States pursuant to the provisions of title V, and who thereafter, without the permission of the Attorney General, enters the United States or attempts to do so shall be fined under title 18, United States Code, and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence.".

(c) ELIMINATION OF CUSTODY REVIEW BY HABEAS CORPUS.—Section 106(a) (8 U.S.C. 1105a(a)) is amended—

(1) by adding "and" at the end of paragraph (8),

(2) by striking "; and" at the end of paragraph (9) and inserting a period, and

(3) by striking paragraph (10).

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to all aliens without regard to the date of entry or attempted entry into the United States.

**SEC. 322. FUNDING FOR DETENTION AND REMOVAL OF ALIEN TERRORISTS.**

In addition to amounts otherwise appropriated, there are authorized to be appropriated for each fiscal year (beginning with fiscal year 1996) $5,000,000 to the Immigration and Naturalization Service for the purpose of detaining and removing alien terrorists.

## PART 2—INADMISSIBILITY AND DENIAL OF RELIEF FOR ALIEN TERRORISTS

**SEC. 331. MEMBERSHIP IN TERRORIST ORGANIZATION AS GROUND OF INADMISSIBILITY.**

(a) IN GENERAL.—Section 212(a)(3)(B) (8 U.S.C. 1182(a)(3)(B)) is amended—

(1) in clause (i)—

(A) by striking "or" at the end of subclause (I),

(B) in subclause (II), by inserting "engaged in or" after "believe,", and

(C) by inserting after subclause (II) the following:

"(III) is a representative of a terrorist organization, or

"(IV) is a member of a terrorist organization which the alien knows or should have known is a terrorist organization,"; and

(2) by adding at the end the following:

"(iv) TERRORIST ORGANIZATION DEFINED.—

"(I) DESIGNATION.—For purposes of this Act, the term 'terrorist organization' means a foreign organization designated in the Federal Register as a terrorist organization by the Secretary of State, in consultation with the Attorney General, based upon a finding that the organization engages in, or has engaged in, terrorist activity that threatens the national security of the United States.

"(II) PROCESS.—At least 3 days before designating an organization as a terrorist organization through publication in the Federal

51

Register, the Secretary of State, in consultation with the Attorney General, shall notify the Committees on the Judiciary of the House of Representatives and the Senate of the intent to make such designation and the findings and basis for designation. The Secretary of State, in consultation with the Attorney General, shall create an administrative record and may use classified information in making such a designation. Such information is not subject to disclosure so long as it remains classified, except that it may be disclosed to a court ex parte and in camera under subclause (III) for purposes of judicial review of such a designation. The Secretary of State, in consultation with the Attorney General, shall provide notice and an opportunity for public comment prior to the creation of the administrative record under this subclause.

"(III) JUDICIAL REVIEW.—Any organization designated as a terrorist organization under the preceding provisions of this clause may, not later than 30 days after the date of the designation, seek judicial review thereof in the United States Court of Appeals for the District of Columbia Circuit. Such review shall be based solely upon the administrative record, except that the Government may submit, for ex parte and in camera review, classified information considered in making the designation. The court shall hold unlawful and set aside the designation if the court finds the designation to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under the previous sentence, contrary to constitutional right, power, privilege, or immunity, or not in accord with the procedures required by law.

"(IV) CONGRESSIONAL REMOVAL AUTHORITY.—The Congress reserves the authority to remove, by law, the designation of an organization as a terrorist organization for purposes of this Act.

"(V) SUNSET.—Subject to subclause (IV), the designation under this clause of an organization as a terrorist organization shall be effective for a period of 2 years from the date of the initial publication of the terrorist organization designation by the Secretary of State. At the end of such period (but no sooner than 60 days prior to the termination of the 2-year-designation period), the Secretary of State, in consultation with the Attorney General, may redesignate the organization in conformity with the requirements of this clause for designation of the organization.

"(VI) REMOVAL AUTHORITY.—The Secretary of State, in consultation with the Attorney General, may remove the terrorist organization designation from any organization previously designated as such an organization, at any time, so long as the Secretary publishes notice of the removal in the Federal Register. The Secretary is not required to report to Congress prior to so removing such designation.

"(v) REPRESENTATIVE DEFINED.—

"(I) IN GENERAL.—In this subparagraph, the term 'representative' includes an officer, official, or spokesman of the organization and any person who directs, counsels, commands or induces the organization or its members to engage in terrorist activity.

"(II) JUDICIAL REVIEW.—The determination under this subparagraph that an alien is a representative of a terrorist organization shall be subject to judicial review under section 706 of title 5, United States Code.".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act.

**SEC. 332. DENIAL OF RELIEF FOR ALIEN TERRORISTS.**

(a) WITHHOLDING OF DEPORTATION.—Subsection (h)(2) of section 243 (8 U.S.C. 1253), before amendment by section 307(a), is amended by adding at the end the following new sentence: "For purposes of subparagraph (D), an alien who is described in section 241(a)(4)(B) shall be considered to be an alien for whom there are reasonable grounds for regarding as a danger to the security of the United States.".

(b) SUSPENSION OF DEPORTATION.—Section 244(a) (8 U.S.C. 1254(a)), before amendment by section 308(b), is amended by striking "section 241(a)(4)(D)" and inserting "subparagraph (B) or (D) of section 241(a)(4)".

52

(c) VOLUNTARY DEPARTURE.—Section 244(e)(2) (8 U.S.C. 1254(e)(2)), before amendment by section 308(b), is amended by inserting "under section 241(a)(4)(B) or" after "who is deportable".

(d) ADJUSTMENT OF STATUS.—Section 245(c) (8 U.S.C. 1255(c)) is amended—

(1) by striking "or" before "(5)", and

(2) by inserting before the period at the end the following: ", or (6) an alien who is deportable under section 241(a)(4)(B)".

(e) REGISTRY.—Section 249(d) (8 U.S.C. 1259(d)) is amended by inserting "and is not deportable under section 241(a)(4)(B)" after "ineligible to citizenship".

(f) EFFECTIVE DATE.—(1) The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date.

(2) The amendments made by subsections (a) through (c) are subsequently superseded by the amendments made by subtitle A.

# Subtitle C—Deterring Transportation of Unlawful Aliens to the United States

### SEC. 341. DEFINITION OF STOWAWAY.

(a) STOWAWAY DEFINED.—Section 101(a) (8 U.S.C. 1101(a)) is amended by adding the following new paragraph:

"(47) The term 'stowaway' means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act.

### SEC. 342. LIST OF ALIEN AND CITIZEN PASSENGERS ARRIVING.

(a) IN GENERAL.—Section 231(a) (8 U.S.C. 1221(a)) is amended—

(1) by amending the first sentence to read as follows: "In connection with the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having such person on board to deliver to the immigration officers at the port of arrival, or other place designated by the Attorney General, electronic, typewritten, or printed lists or manifests of the persons on board such vessel or aircraft.";

(2) in the second sentence, by striking "shall be prepared" and inserting "shall be prepared and submitted"; and

(3) by inserting after the second sentence the following sentence: "Such lists or manifests shall contain, but not be limited to, for each person transported, the person's full name, date of birth, gender, citizenship, travel document number (if applicable) and arriving flight number.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to vessels or aircraft arriving at ports of entry on or after such date (not later than 60 days after the date of the enactment of this Act) as the Attorney General shall specify.

# Subtitle D—Additional Provisions

### SEC. 351. DEFINITION OF CONVICTION.

(a) IN GENERAL.—Section 101(a) (8 U.S.C. 1101(a)), as amended by section 341(a), is amended by adding at the end the following new paragraph:

"(48) The term 'conviction' means a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where all of the following elements are present:

"(A) A judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt.

"(B) The judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

"(C) A judgment or adjudication of guilt may be entered if the alien violates the terms of the probation or fails to comply with the requirements

53

of the court's order, without availability of further proceedings regarding the alien's guilt or innocence of the original charge.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to convictions entered before, on, or after the date of the enactment of this Act.

**SEC. 352. IMMIGRATION JUDGES AND COMPENSATION.**

(a) DEFINITION OF TERM.—Paragraph (4) of section 101(b) (8 U.S.C. 1101(b)) is amended to read as follows:

"(4) The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.".

(b) SUBSTITUTION FOR TERM "SPECIAL INQUIRY OFFICER".—The Immigration and Nationality Act is amended by striking "a special inquiry officer", "special inquiry officer", and "special inquiry officers" and inserting "an immigration judge", "immigration judge", and "immigration judges", respectively, each place it appears in the following sections:

(1) Section 106(a)(2) (8 U.S.C. 1105a(a)(2)).

(2) Section 209(a)(2) (8 U.S.C. 1159(a)(2)).

(3) Section 234 (8 U.S.C. 1224), before redesignation by section 308(b).

(4) Section 235 (8 U.S.C. 1225), before redesignation by section 308(b).

(5) Section 236 (8 U.S.C. 1226), before amendment by section 303.

(6) Section 242(b) (8 U.S.C. 1252(b)), before amendment by section 306(a)(2).

(7) Section 242(d)(1) (8 U.S.C. 1252(d)(1)), before amendment by section 306(a)(2).

(8) Section 292 (8 U.S.C. 1362).

(c) COMPENSATION FOR IMMIGRATION JUDGES.—

(1) IN GENERAL.—There shall be four levels of pay for immigration judges, under the Immigration Judge Schedule (designated as IJ–1, 2, 3, and 4, respectively), and each such judge shall be paid at one of those levels, in accordance with the provisions of this subsection.

(2) RATES OF PAY.—

(A) The rates of basic pay for the levels established under paragraph (1) shall be as follows:

| | |
|---|---|
| IJ–1 ................................................................ | 70% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–2 ................................................................ | 80% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–3 ................................................................ | 90% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–4 ................................................................ | 92% of the next to highest rate of basic pay for the Senior Executive Service. |

(B) Locality pay, where applicable, shall be calculated into the basic pay for immigration judges.

(3) APPOINTMENT.—

(A) Upon appointment, an immigration judge shall be paid at IJ–1, and shall be advanced to IJ–2 upon completion of 104 weeks of service, to IJ–3 upon completion of 104 weeks of service in the next lower rate, and to IJ–4 upon completion of 52 weeks of service in the next lower rate.

(B) The Attorney General may provide for appointment of an immigration judge at an advanced rate under such circumstances as the Attorney General may determine appropriate.

(4) TRANSITION.—Judges serving on the Immigration Court as of the effective date shall be paid at the rate that corresponds to the amount of time, as provided under paragraph (3)(A), that they have served as an immigration judge.

(d) EFFECTIVE DATES.—

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act.

(2) Subsection (c) shall take effect 90 days after the date of the enactment of this Act.

**SEC. 353. RESCISSION OF LAWFUL PERMANENT RESIDENT STATUS.**

(a) IN GENERAL.—Section 246(a) (8 U.S.C. 1256(a)) is amended by adding at the end the following sentence: "Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.".

54

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the title III–A effective date (as defined in section 309(a)).

**SEC. 354. CIVIL PENALTIES FOR FAILURE TO DEPART.**

(a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 274C the following new section:

"CIVIL PENALTIES FOR FAILURE TO DEPART

"SEC. 274D. (a) IN GENERAL.—Any alien subject to a final order of removal who—
    "(1) willfully fails or refuses to—
        "(A) depart from the United States pursuant to the order,
        "(B) make timely application in good faith for travel or other documents necessary for departure, or
        "(C) present for removal at the time and place required by the Attorney General; or
    "(2) conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,
shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.

"(b) CONSTRUCTION.—Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.".

(b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 274C the following new item:

"Sec. 274D.  Civil penalties for failure to depart.".

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions occurring on or after the title III–A effective date (as defined in section 309(a)).

**SEC. 355. CLARIFICATION OF DISTRICT COURT JURISDICTION.**

(a) IN GENERAL.—Section 279 (8 U.S.C. 1329) is amended—
    (1) by amending the first sentence to read as follows: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this title.", and
    (2) by adding at the end the following new sentence: "Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions filed after the date of the enactment of this Act.

**SEC. 356. USE OF RETIRED FEDERAL EMPLOYEES FOR INSTITUTIONAL HEARING PROGRAM.**

(a) AUTHORIZATION OF TEMPORARY EMPLOYMENT OF CERTAIN ANNUITANTS AND RETIREES.—For the purpose of performing duties in connection with supporting the enhanced Institutional Hearing Program, the Attorney General may employ for a period not to exceed 24 months (beginning 3 months after the date of the enactment of this Act) not more than 300 individuals (at any one time) who, by reason of separation from service on or before January 1, 1995, are receiving—
    (1) annuities under the provisions of subchapter III of chapter 83 of title 5, United States Code, or chapter 84 of such title;
    (2) annuities under any other retirement system for employees of the Federal Government; or
    (3) retired or retainer pay as retired officers of regular components of the uniformed services.

(b) NO REDUCTION IN ANNUITY OR RETIREMENT PAY OR REDETERMINATION OF PAY DURING TEMPORARY EMPLOYMENT.—
    (1) RETIREES UNDER CIVIL SERVICE RETIREMENT SYSTEM AND FEDERAL EMPLOYEES' RETIREMENT SYSTEM.—In the case of an individual employed under subsection (a) who is receiving an annuity described in subsection (a)(1)—
        (A) such individual's annuity shall continue during the employment under subsection (a) and shall not be increased as a result of service performed during that employment;
        (B) retirement deductions shall not be withheld from such individual's pay; and
        (C) such individual's pay shall not be subject to any deduction based on the portion of such individual's annuity which is allocable to the period of employment.
    (2) OTHER FEDERAL RETIREES.—The President shall apply the provisions of paragraph (1) to individuals who are receiving an annuity described in subsection (a)(2) and who are employed under subsection (a) in the same manner

55

and to the same extent as such provisions apply to individuals who are receiving an annuity described in subsection (a)(1) and who are employed under subsection (a).

(3) RETIRED OFFICERS OF THE UNIFORM SERVICES.—The retired or retainer pay of a retired officer of a regular component of a uniformed service shall not be reduced under section 5532 of title 5, United States Code, by reason of temporary employment authorized under subsection (a).

**SEC. 357. ENHANCED PENALTIES FOR FAILURE TO DEPART, ILLEGAL REENTRY, AND PASSPORT AND VISA FRAUD.**

(a) FAILING TO DEPART.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under section 242(e) and 276(b) of the Immigration and Nationality Act (8 U.S.C. 1252(e) and 1326(b)) to reflect the amendments made by section 130001 of the Violent Crime Control and Law Enforcement Act of 1994.

(b) PASSPORT AND VISA OFFENSES.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under chapter 75 of title 18, United States Code to reflect the amendments made by section 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

**SEC. 358. AUTHORIZATION OF ADDITIONAL FUNDS FOR REMOVAL OF ALIENS.**

In addition to the amounts otherwise authorized to be appropriated for each fiscal year beginning with fiscal year 1996, there are authorized to be appropriated to the Attorney General $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal, the hiring of more investigators, and the hiring of more detention and deportation officers.

**SEC. 359. APPLICATION OF ADDITIONAL CIVIL PENALTIES TO ENFORCEMENT.**

(a) IN GENERAL.—Subsection (b) of section 280 (8 U.S.C. 1330(b)) is amended to read as follows:

"(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Enforcement Account'. Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.

"(2) The amounts described in this paragraph are the following:

"(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.

"(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).

"(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title, including—

"(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;

"(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and

"(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.

"(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).".

(b) IMMIGRATION USER FEE ACCOUNT.—Section 286(h)(1)(B) (8 U.S.C. 1356(h)(1)(B)) is amended by striking "271" and inserting "243(c), 271,".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to fines and penalties collected on or after the date of the enactment of this Act.

56

### SEC. 360. PRISONER TRANSFER TREATIES.

(a) NEGOTIATION.—Congress advises the President to begin to negotiate and re-negotiate, not later than 90 days after the date of the enactment of this Act, bilateral prisoner transfer treaties. The focus of such negotiations shall be—

(1) to expedite the transfer of aliens unlawfully in the United States who are (or are about to be) incarcerated in United States prisons,

(2) to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States courts,

(3) to eliminate any requirement of prisoner consent to such a transfer, and

(4) to allow the Federal Government or the States to keep their original prison sentences in force so that transferred prisoners who return to the United States prior to the completion of their original United States sentences can be returned to custody for the balance of their prison sentences.

In entering into such negotiations, the President may consider providing for appropriate compensation in cases where the United States is able to independently verify the adequacy of the sites where aliens will be imprisoned and the length of time the alien is actually incarcerated in the foreign country under such a treaty.

(b) CERTIFICATION.—The President shall submit to the Congress, annually, a certification as to whether each prisoner transfer treaty in force is effective in returning aliens unlawfully in the United States who have committed offenses for which they are incarcerated in the United States to their country of nationality for further incarceration.

### SEC. 361. CRIMINAL ALIEN IDENTIFICATION SYSTEM.

(a) OPERATION AND PURPOSE.—Subsection (a) of section 130002 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended to read as follows:

"(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.".

(b) IDENTIFICATION OF CRIMINAL ALIENS UNLAWFULLY PRESENT IN THE UNITED STATES.—Upon the request of the governor or chief executive officer of any State, the Immigration and Naturalization Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

### SEC. 362. WAIVER OF EXCLUSION AND DEPORTATION GROUND FOR CERTAIN 274C VIOLATORS.

(a) EXCLUSION GROUNDS.—Section 212 (8 U.S.C. 1182) is amended—

(1) by amending subparagraph (F) of subsection (a)(6) to read as follows:

"(F) SUBJECT OF CIVIL PENALTY.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.

"(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12)."; and

(2) by adding at the end of subsection (d) the following new paragraph:

"(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(F)—

"(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation and who is otherwise admissible to the United States as a returning resident under section 211(b), and

"(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),

if the violation under section 274C was committed solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and not another individual).".

(b) GROUND OF DEPORTATION.—Subparagraph (C) of section 241(a)(3) (8 U.S.C. 1251(a)(3)), before redesignation by section 305(a)(2), is amended to read as follows:

"(C) DOCUMENT FRAUD.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.

57

"(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if the alien's civil money penalty under section 274C was incurred solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and no other individual).".

**SEC. 363. AUTHORIZING REGISTRATION OF ALIENS ON CRIMINAL PROBATION OR CRIMINAL PAROLE.**

Section 263(a) (8 U.S.C. 1303(a)) is amended by striking "and (5)" and inserting "(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)".

**SEC. 364. CONFIDENTIALITY PROVISION FOR CERTAIN ALIEN BATTERED SPOUSES AND CHILDREN.**

(a) IN GENERAL.—Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice (including any bureau or agency of such Department)—

(1) make an adverse determination of admissibility or deportability of an alien under the Immigration and Nationality Act using information furnished solely by—

(A) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty,

(B) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty,

(C) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty), or

(D) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

unless the alien has been convicted of a crime or crimes listed in section 241(a)(2) of the Immigration and Nationality Act; or

(2) permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under clause (iii) or (iv) of section 204(a)(1)(A), clause (ii) or (iii) of section 204(a)(1)(B), section 216(c)(4)(C), or section 244(a)(3) of such Act as an alien (or the parent of a child) who has been battered or subjected to extreme cruelty.

The limitation under paragraph (2) ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

(b) EXCEPTIONS.—

(1) The Attorney General may provide, in the Attorney General's discretion, for the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

(2) The Attorney General may provide in the discretion of the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.

(3) Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information.

(4) Subsection (a)(2) shall not apply if all the battered individuals in the case are adults and they have all waived the restrictions of such subsection.

(c) PENALTIES FOR VIOLATIONS.—Anyone who uses, publishes, or permits information to be disclosed in violation of this section shall be fined in accordance with title 18, United States Code, or imprisoned not more than 5 years, or both.

58

# TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

**SEC. 401. STRENGTHENED ENFORCEMENT OF THE EMPLOYER SANCTIONS PROVISIONS.**

(a) IN GENERAL.—The number of full-time equivalent positions in the Investigations Division within the Immigration and Naturalization Service of the Department of Justice beginning in fiscal year 1996 shall be increased by 350 positions above the number of full-time equivalent positions available to such Division as of September 30, 1994.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall be assigned to investigate violations of the employer sanctions provisions contained in section 274A of the Immigration and Nationality Act, including investigating reports of violations received from officers of the Employment Standards Administration of the Department of Labor.

**SEC. 402. STRENGTHENED ENFORCEMENT OF WAGE AND HOUR LAWS.**

(a) IN GENERAL.—The number of full-time equivalent positions in the Wage and Hour Division with the Employment Standards Administration of the Department of Labor beginning in fiscal year 1996 shall be increased by 150 positions above the number of full-time equivalent positions available to the Wage and Hour Division as of September 30, 1994.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall be assigned to investigate violations of wage and hour laws in areas where the Attorney General has notified the Secretary of Labor that there are high concentrations of undocumented aliens.

**SEC. 403. CHANGES IN THE EMPLOYER SANCTIONS PROGRAM.**

(a) REDUCING THE NUMBER OF DOCUMENTS ACCEPTED FOR EMPLOYMENT VERIFICATION.—Section 274A(b) (8 U.S.C. 1324a(b)) is amended—

(1) in paragraph (1)(B)—

(A) by adding "or" at the end of clause (i),

(B) by striking clauses (ii) through (iv), and

(C) in clause (v), by striking "or other alien registration card, if the card" and inserting ", alien registration card, or other document designated by regulation by the Attorney General, if the document" and redesignating such clause as clause (ii);

(2) by amending subparagraph (C) of paragraph (1) to read as follows:

"(C) SOCIAL SECURITY ACCOUNT NUMBER CARD AS EVIDENCE OF EMPLOYMENT AUTHORIZATION.—A document described in this subparagraph is an individual's social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States)."; and

(3) by amending paragraph (2) to read as follows:

"(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZATION AND PROVISION OF SOCIAL SECURITY ACCOUNT NUMBER.—The individual must—

"(A) attest, under penalty of perjury on the form designated or established for purposes of paragraph (1), that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this Act or by the Attorney General to be hired, recruited, or referred for such employment; and

"(B) provide on such form the individual's social security account number.".

(b) EMPLOYMENT ELIGIBILITY CONFIRMATION PROCESS.—Section 274A (8 U.S.C. 1324a) is amended—

(1) in subsection (a)(3), by inserting "(A)" after "DEFENSE.—", and by adding at the end the following:

"(B) FAILURE TO SEEK AND OBTAIN CONFIRMATION.—Subject to subsection (b)(7), in the case of a hiring of an individual for employment in the United States by a person or entity that employs more than 3 employees, the following rules apply:

"(i) FAILURE TO SEEK CONFIRMATION.—

"(I) IN GENERAL.—If the person or entity has not made an inquiry, under the mechanism established under subsection (b)(6), seeking confirmation of the identity, social security number, and work eligibility of the individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring, the defense under subparagraph (A) shall not be considered to apply with respect to any

59

employment after such 3 working days, except as provided in subclause (II).

"(II) SPECIAL RULE FOR FAILURE OF CONFIRMATION MECHANISM.—If such a person or entity in good faith attempts to make an inquiry during such 3 working days in order to qualify for the defense under subparagraph (A) and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses and qualify for the defense.

"(ii) FAILURE TO OBTAIN CONFIRMATION.—If the person or entity has made the inquiry described in clause (i)(I) but has not received an appropriate confirmation of such identity, number, and work eligibility under such mechanism within the time period specified under subsection (b)(6)(D)(iii) after the time the confirmation inquiry was received, the defense under subparagraph (A) shall not be considered to apply with respect to any employment after the end of such time period.";

(2) by amending paragraph (3) of subsection (b) to read as follows:

"(3) RETENTION OF VERIFICATION FORM AND CONFIRMATION.—After completion of such form in accordance with paragraphs (1) and (2), the person or entity must—

"(A) retain the form and make it available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending—

"(i) in the case of the recruiting or referral for a fee (without hiring) of an individual, three years after the date of the recruiting or referral, and

"(ii) in the case of the hiring of an individual—

"(I) three years after the date of such hiring, or

"(II) one year after the date the individual's employment is terminated,

whichever is later; and

"(B) subject to paragraph (7), if the person employs more than 3 employees, seek to have (within 3 working days of the date of hiring) and have (within the time period specified under paragraph (6)(D)(iii)) the identity, social security number, and work eligibility of the individual confirmed in accordance with the procedures established under paragraph (6), except that if the person or entity in good faith attempts to make an inquiry in accordance with the procedures established under paragraph (6) during such 3 working days in order to fulfill the requirements under this subparagraph, and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity shall make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses."; and

(3) by adding at the end of subsection (b) the following new paragraphs:

"(6) EMPLOYMENT ELIGIBILITY CONFIRMATION PROCESS.—

"(A) IN GENERAL.—Subject to paragraph (7), the Attorney General shall establish a confirmation mechanism through which the Attorney General (or a designee of the Attorney General which may include a nongovernmental entity)—

"(i) responds to inquiries by employers, made through a toll-free telephone line or other electronic media in the form of an appropriate confirmation code or otherwise, on whether an individual is authorized to be employed by that employer, and

"(ii) maintains a record that such an inquiry was made and the confirmation provided (or not provided).

"(B) EXPEDITED PROCEDURE IN CASE OF NO CONFIRMATION.—In connection with subparagraph (A), the Attorney General shall establish, in consultation with the Commissioner of Social Security and the Commissioner of the Service, expedited procedures that shall be used to confirm the validity of information used under the confirmation mechanism in cases in which the confirmation is sought but is not provided through the confirmation mechanism.

"(C) DESIGN AND OPERATION OF MECHANISM.—The confirmation mechanism shall be designed and operated—

"(i) to maximize the reliability of the confirmation process, and the ease of use by employers, recruiters, and referrers, consistent with in-

60

sulating and protecting the privacy and security of the underlying information, and

"(ii) to respond to all inquiries made by employers on whether individuals are authorized to be employed by those employers, recruiters, or referrers registering all times when such response is not possible.

"(D) CONFIRMATION PROCESS.—(i) As part of the confirmation mechanism, the Commissioner of Social Security shall establish a reliable, secure method, which within the time period specified under clause (iii), compares the name and social security account number provided against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided and whether the individual has presented a social security account number that is not valid for employment. The Commissioner shall not disclose or release social security information.

"(ii) As part of the confirmation mechanism, the Commissioner of the Service shall establish a reliable, secure method, which, within the time period specified under clause (iii), compares the name and alien identification number (if any) provided against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided and whether the alien is authorized to be employed in the United States.

"(iii) For purposes of this section, the Attorney General (or a designee of the Attorney General) shall provide through the confirmation mechanism confirmation or a tentative nonconfirmation of an individual's employment eligibility within 3 working days of the initial inquiry. In cases of tentative nonconfirmation, the Attorney General shall specify, in consultation with the Commissioner of Social Security and the Commissioner of the Service, an expedited time period not to exceed 10 working days within which final confirmation or denial must be provided through the confirmation mechanism in accordance with the procedures under subparagraph (B).

"(iv) The Commissioners shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information.

"(E) PROTECTIONS.—(i) In no case shall an individual be denied employment because of inaccurate or inaccessible data under the confirmation mechanism.

"(ii) The Attorney General shall assure that there is a timely and accessible process to challenge nonconfirmations made through the mechanism.

"(iii) If an individual would not have been dismissed from a job but for an error of the confirmation mechanism, the individual will be entitled to compensation through the mechanism of the Federal Tort Claims Act.

"(F) TESTER PROGRAM.—As part of the confirmation mechanism, the Attorney General shall implement a program of testers and investigative activities (similar to testing and other investigative activities assisted under the fair housing initiatives program under section 561 of the Housing and Community Development Act of 1987 to enforce rights under the Fair Housing Act) in order to monitor and prevent unlawful discrimination under the mechanism.

"(G) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE EMPLOYMENT ELIGIBILITY CONFIRMATION MECHANISM.—No person shall be civilly or criminally liable for any action taken in good faith reliance on information provided through the employment eligibility confirmation mechanism established under this paragraph (including any pilot program established under paragraph (7)).

"(7) APPLICATION OF CONFIRMATION MECHANISM THROUGH PILOT PROJECTS.—

"(A) IN GENERAL.—Subsection (a)(3)(B) and paragraph (3) shall only apply to individuals hired if they are covered under a pilot project established under this paragraph.

"(B) UNDERTAKING PILOT PROJECTS.—For purposes of this paragraph, the Attorney General shall undertake pilot projects for all employers in at least 5 of the 7 States with the highest estimated population of unauthorized aliens, in order to test and assure that the confirmation mechanism described in paragraph (6) is reliable and easy to use. Such projects shall be initiated not later than 6 months after the date of the enactment of this paragraph. The Attorney General, however, shall not establish such mechanism in other States unless Congress so provides by law. The pilot projects shall terminate on such dates, not later than October 1, 1999, as the Attor-

61

ney General determines. At least one such pilot project shall be carried out through a nongovernmental entity as the confirmation mechanism.

"(C) REPORT.—The Attorney General shall submit to the Congress annual reports in 1997, 1998, and 1999 on the development and implementation of the confirmation mechanism under this paragraph. Such reports may include an analysis of whether the mechanism implemented—

"(i) is reliable and easy to use;

"(ii) limits job losses due to inaccurate or unavailable data to less than 1 percent;

"(iii) increases or decreases discrimination;

"(iv) protects individual privacy with appropriate policy and technological mechanisms; and

"(v) burdens individual employers with costs or additional administrative requirements.".

(c) REDUCTION OF PAPERWORK FOR CERTAIN EMPLOYEES.—Section 274A(a) (8 U.S.C. 1324a(a)) is amended by adding at the end the following new paragraph:

"(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOYEES.—

"(A) IN GENERAL.—For purposes of paragraphs (1)(B) and (3), if—

"(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

"(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

"(B) PERIOD.—The period described in this subparagraph is—

"(i) up to 5 years in the case of an individual who has presented documentation identifying the individual as a national of the United States or as an alien lawfully admitted for permanent residence; or

"(ii) up to 3 years (or, if less, the period of time that the individual is authorized to be employed in the United States) in the case of another individual.

"(C) LIABILITY.—

"(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an unauthorized alien, then for the purposes of paragraph (1)(A), subject to clause (ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an unauthorized alien.

"(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and could not reasonably have known) that the individual at the time of hiring or afterward was an unauthorized alien.".

(d) ELIMINATION OF DATED PROVISIONS.—Section 274A (8 U.S.C. 1324a) is amended by striking subsections (i) through (n).

(e) EFFECTIVE DATES.—

(1) Except as provided in this subsection, the amendments made by this section shall apply with respect to hiring (or recruiting or referring) occurring on or after such date (not later than 180 days after the date of the enactment of this Act) as the Attorney General shall designate.

(2) The amendments made by subsections (a)(1) and (a)(2) shall apply with respect to the hiring (or recruiting or referring) occurring on or after such date (not later than 18 months after the date of the enactment of this Act) as the Attorney General shall designate.

(3) The amendment made by subsection (c) shall apply to individuals hired on or after 60 days after the date of the enactment of this Act.

(4) The amendment made by subsection (d) shall take effect on the date of the enactment of this Act.

(5) Not later than 180 days after the date of the enactment of this Act, the Attorney General shall issue regulations which shall provide for the electronic

62

storage of forms I-9, in satisfaction of the requirements of section 274A(b)(3) of the Immigration and Nationality Act as amended by this Act.

**SEC. 404. REPORTS ON EARNINGS OF ALIENS NOT AUTHORIZED TO WORK.**

Subsection (c) of section 290 (8 U.S.C. 1360) is amended to read as follows:

"(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1995), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate number of social security account numbers issued to aliens not authorized to be employed to which earnings were reported to the Social Security Administration in such fiscal year.

"(2) If earnings are reported on or after January 1, 1996, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.".

**SEC. 405. AUTHORIZING MAINTENANCE OF CERTAIN INFORMATION ON ALIENS.**

Section 264 (8 U.S.C. 1304) is amended by adding at the end the following new subsection:

"(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.".

**SEC. 406. LIMITING LIABILITY FOR CERTAIN TECHNICAL VIOLATIONS OF PAPERWORK REQUIREMENTS.**

(a) IN GENERAL.—Section 274A(e)(1) (8 U.S.C. 1324a(e)(1)) is amended—

(1) by striking "and" at the end of subparagraph (C),

(2) by striking the period at the end of subparagraph (D) and inserting ", and", and

(3) by adding at the end the following new subparagraph:

"(E) under which a person or entity shall not be considered to have failed to comply with the requirements of subsection (b) based upon a technical or procedural failure to meet a requirement of such subsection in which there was a good faith attempt to comply with the requirement unless (i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure, (ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and (iii) the person or entity has not corrected the failure voluntarily within such period, except that this subparagraph shall not apply with respect to the engaging by any person or entity of a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to failures occurring on or after the date of the enactment of this Act.

**SEC. 407. UNFAIR IMMIGRATION-RELATED EMPLOYMENT PRACTICES.**

(a) REQUIRING CERTAIN REMEDIES IN UNFAIR IMMIGRATION-RELATED DISCRIMINATION ORDERS.—Section 274B(g)(2) (8 U.S.C. 1324b(g)(2)) is amended—

(1) in subparagraph (A), by adding at the end the following: "Such order also shall require the person or entity to comply with the requirements of clauses (ii) and (vi) of subparagraph (B).";

(2) in subparagraph (B), by striking "Such an order" and inserting "Subject to the second sentence of subparagraph (A), such an order"; and

(3) in subparagraph (B)(vi), by inserting before the semicolon at the end the following: "and to certify the fact of such education".

(b) TREATMENT OF CERTAIN DOCUMENTARY PRACTICE AS EMPLOYMENT PRACTICES.—Section 274B(a)(6) (8 U.S.C. 1324b(a)(6)) is amended—

(1) by striking "For" and inserting "(A) Subject to subparagraph (B), for", and

(2) by adding at the end the following new subparagraph:

"(B) A person or other entity—

"(i) may request a document proving a renewal of employment authorization when an individual has previously submitted a time-limited document to satisfy the requirements of section 274A(b)(1); or

"(ii) if possessing reason to believe that an individual presenting a document which reasonably appears on its face to be genuine is nonetheless an

63

unauthorized alien, may (I) inform the individual of the question about the document's validity, and of such person or other entity's intention to verify the validity of such document, and (II) upon receiving confirmation that the individual is unauthorized to work, may dismiss the individual with no benefits or rights accruing on the basis of the period employed.

Nothing in this provision prohibits an individual from offering alternative documents that satisfy the requirements of section 274A(b)(1).".

(c) Effective Date.—The amendments made by subsection (a) shall apply to orders issued on or after the first day of the first month beginning at least 90 days after the date of the enactment of this Act.

# TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

**SEC. 500. OVERVIEW OF NEW LEGAL IMMIGRATION SYSTEM.**

This title amends the legal immigration provisions of the Immigration and Nationality Act so as to provide for the following (beginning with fiscal year 1997):

(1) Division of immigration among 3 categories.—There will be a worldwide level of immigration of approximately 562,000, divided among—

(A) family-sponsored immigrants, with a worldwide annual numerical limitation (after a transition) of approximately 330,000,

(B) employment-based immigrants, with a worldwide annual numerical limitation of 135,000,

(C) diversity immigrants, with a worldwide annual numerical limitation of 27,000, and

(D) humanitarian immigrants, with a worldwide annual numerical limitation (after a transition) of approximately 70,000.

Congress is required to reevaluate and reauthorize these numbers every 5 years.

(2) Family-sponsored immigrants.—

(A) Categories.—Family-sponsored immigrants are (i) spouses and children of citizens, (ii) spouses and children of permanent resident aliens, (iii) parents of adult United States citizens if the parents meet certain insurance requirements, and (iv) sons or daughters of United States citizens or sons or daughters of permanent resident aliens who have never been married, are childless, but for the residence requirements would qualify as dependents for Federal income tax purposes, and are at least 21 but not more than 25 years of age.

(B) Numerical limitations.—

(i) There will be no direct numerical limit on admission of spouses and children of United States citizens.

(ii) The annual numerical limit on admission of spouses and children of permanent residents will not be below 85,000.

(iii) The annual numerical limit on admission of parents of United States citizens will not be below 25,000.

(3) Employment-based immigrants.—Employment-based immigrants will fall within the following categories and numerical limitations:

(A) Extraordinary immigrants.—First, aliens with extraordinary ability, up to 15,000 each year.

(B) Outstanding professors and researchers and multinational executives.—Second, aliens who are outstanding professors and researchers or multinational executives or managers, up to 30,000 each year, plus any left from the previous category.

(C) Professionals with advanced degrees or exceptional ability aliens.—Third, aliens who are members of the professions holding advanced degrees or who have exceptional ability, up to 30,000 each year, plus any left from the previous categories.

(D) Other professionals and skilled workers.—Fourth, aliens who are skilled workers with at least 4 years of training and work experience or are professionals with a baccalaureate degree and at least 2 years' experience, up to 45,000 each year, plus any left from the previous categories.

(E) Investors.—Fifth, aliens who are investing at least $1,000,000 in enterprises in the United States that will employ at least 10 workers, up to 10,000 each year (with a 2-year pilot program for those investing at least $500,000 in enterprises employing at least 5 workers).

64

(F) CERTAIN SPECIAL IMMIGRANTS.—Lastly, aliens who fall within certain classes of special immigrants (such as religious ministers, aliens who have worked for the Government abroad, certain long-term alien employees of international organizations, certain dependent juveniles, and certain long-term alien members of the Armed Forces), up to 5,000 each year.

(4) DIVERSITY IMMIGRANTS.—Diversity immigrants are chosen from the 10 countries in each region with the highest demand for diversity visas by random selection.

(5) HUMANITARIAN IMMIGRANTS.—Humanitarian immigrants will fall within the following categories and numerical limitations:

(A) REFUGEES.—Refugees, subject to a numerical limitation (after a transition and excluding emergency refugees) of 50,000 or such higher number as the Congress may provide by law.

(B) ASYLEES.—Aliens seeking asylum, subject to no numerical limitation in any year. As under current law, asylees may adjust to permanent residence status at a rate of up to 10,000 each year.

(C) OTHER HUMANITARIAN IMMIGRANTS.—Other immigrants who are of special humanitarian concern to the United States, up to 10,000 each year.

(6) TRANSITION.—

(A) ADDITIONAL VISA NUMBERS FOR SPOUSES AND MINOR, UNMARRIED CHILDREN OF PERMANENT RESIDENT ALIENS.—In order to reduce the current backlog for spouses and minor, unmarried children of lawful permanent residents, there will be at least an additional 50,000 immigrant visa numbers made available for these aliens for each of 5 fiscal years, with priority for spouses and children of aliens who did not participate in a legalization program.

(B) PHASE-DOWN IN NORMAL FLOW REFUGEE NUMERICAL LIMITATION.—The annual numerical limitation on non-emergency refugees (without specific approval of Congress) will be phased down to 75,000 in fiscal year 1997 and 50,000 in fiscal year 1998 and thereafter.

## Subtitle A—Worldwide Numerical Limits

SEC. 501. WORLDWIDE NUMERICAL LIMITATION ON FAMILY-SPONSORED IMMIGRANTS.

(a) OVERVIEW.—

(1) The amendment made by subsection (b) provides for a worldwide level of family-sponsored immigrants of 330,000 less the number of spouses and children of citizens admitted in the previous year.

(2) However, there will be no limit on spouses and children of citizens, nor would the number of visas available to spouses and children of lawful permanent residents go below 85,000, nor would the number of visas available to parents of citizens go below 25,000.

(3) Any excess in family immigration above 330,000 would come from other unused visas and, if necessary, from future visa numbers.

(4) If there are any remaining family visas, these visas would be added to the visas made available to spouses and children of lawful permanent resident aliens.

(b) AMENDMENT.—Subsection (c) of section 201 (8 U.S.C. 1151) is amended to read as follows:

"(c) WORLDWIDE LEVEL OF FAMILY-SPONSORED IMMIGRANTS.—

"(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of family-sponsored immigrants under this subsection (in this subsection referred to as the 'worldwide family level') for a fiscal year is 330,000.

"(2) REDUCTION FOR SPOUSES AND CHILDREN OF UNITED STATES CITIZENS AND CERTAIN OTHER FAMILY-RELATED IMMIGRANTS.—The worldwide family level for a fiscal year shall be reduced (but not below a number sufficient to provide for the minimum visa numbers described in paragraph (4)) by the number of aliens described in subsection (b)(2) who were issued immigrant visas or who otherwise acquired the status of aliens lawfully admitted to the United States for permanent residence in the previous fiscal year.

"(3) FURTHER REDUCTION FOR ANY PREVIOUS EXCESS FAMILY IMMIGRATION.—

"(A) IN GENERAL.—If there are excess family admissions in a particular fiscal year (as determined under subparagraph (B)) beginning with fiscal year 1997, then for the following fiscal year the worldwide family level shall be reduced (but not below a number sufficient to provide for the minimum

65

visa numbers described in paragraph (4)) by the net number of excess admissions in that particular fiscal year (as defined in subparagraph (C)).

"(B) DETERMINATION OF EXCESS FAMILY ADMISSIONS.—For purposes of subparagraph (A), there are excess family admissions in a fiscal year if—

"(i) the number of aliens who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(a) or subsection (b)(2) in a fiscal year, exceeds

"(ii) 330,000, less the carryforward number of excess admissions for the previous fiscal year (as defined in subparagraph (D)).

For purposes of this subparagraph, immigrant visa numbers issued under section 553 of the Immigration in the National Interest Act of 1995 (relating to certain transition immigrants) shall not be counted under clause (i).

"(C) NET NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (A), the 'net number of excess admissions' for a fiscal year is—

"(i) the excess described in subparagraph (B) for the fiscal year, reduced (but not below zero) by

"(ii) the number (if any) by which the worldwide level under subsection (d) for the previous fiscal year exceeds the number of immigrants who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(b) in that previous fiscal year.

"(D) CARRYFORWARD NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (B)(ii), the carryforward number of excess admissions for a particular fiscal year is the net number of excess admissions for the previous fiscal year (as defined in subparagraph (C)), reduced by the reductions effected under subparagraph (A) and paragraph (5) in visa numbers for the particular fiscal year.

"(4) NO REDUCTION IN NUMBER OF SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENTS OR PARENTS OF UNITED STATES CITIZENS.—

"(A) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENTS.—Any reductions in the worldwide family level for a fiscal year under paragraph (2) or (3) shall not reduce the number of visas available to spouses and children of lawful permanent residents below 85,000.

"(B) PARENTS OF UNITED STATES CITIZENS.—Any reductions in the worldwide family level for a fiscal year under paragraph (2) or (3) shall not reduce the number of visas available to parents of United States citizens below 25,000.

"(5) ADJUSTMENT IN CERTAIN EMPLOYMENT-BASED VISA NUMBERS IN CASE OF REMAINING EXCESS FAMILY ADMISSIONS.—

"(A) IN GENERAL.—If there is a remaining excess number of family admissions (as described in subparagraph (B)) in a fiscal year (beginning with fiscal year 1997) that is greater than zero, then for the following fiscal year there shall be reductions in immigrant visa numbers made available under subsection (d) and section 203(b)(4) by the lesser of—

"(i) the remaining excess number of family admissions (described in subparagraph (B)), or

"(ii) ½ of the maximum number of visa numbers that could (but for this paragraph) otherwise be made available under section 203(b)(5) in such following fiscal year.

"(B) REMAINING EXCESS NUMBER OF FAMILY ADMISSIONS DESCRIBED.—For purposes of subparagraph (A), the 'remaining excess number of family admissions' in a fiscal year is the net number of excess admissions for the fiscal year (as defined in paragraph (3)(C)), reduced by the reduction (if any) effected under paragraph (3) in visa numbers for the succeeding fiscal year.".

**SEC. 502. WORLDWIDE NUMERICAL LIMITATION ON EMPLOYMENT-BASED IMMIGRANTS.**

Subsection (d) of section 201 (8 U.S.C. 1151) is amended to read as follows:

"(d) WORLDWIDE LEVEL OF EMPLOYMENT-BASED IMMIGRANTS.—The worldwide level of employment-based immigrants under this subsection for a fiscal year is—

"(1) 135,000, minus

"(2) beginning with fiscal year 1998, the total of the reductions (if any) in visa numbers under section 203(a)(3)(C) made for the fiscal year pursuant to subsection (c)(5) and in visa numbers under this subsection for the fiscal year pursuant to section 203(a)(3)(B)(ii)(II).".

**SEC. 503. WORLDWIDE NUMERICAL LIMITATION ON DIVERSITY IMMIGRANTS.**

Subsection (e) of section 201 (8 U.S.C. 1151) is amended to read as follows:

66

"(e) WORLDWIDE LEVEL OF DIVERSITY IMMIGRANTS.—The worldwide level of diversity immigrants is equal to 27,000 for each fiscal year.".

**SEC. 504. ESTABLISHMENT OF NUMERICAL LIMITATION ON HUMANITARIAN IMMIGRANTS.**

(a) IN GENERAL.—Section 201 (8 U.S.C. 1151) is amended—

(1) in subsection (a)—

(A) by striking "and" at the end of paragraph (2),

(B) by striking the period at the end of paragraph (3) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(4) for fiscal years beginning with fiscal year 1997, humanitarian immigrants described in section 203(e) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(e)) in a number not to exceed in any fiscal year the number specified in subsection (f) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year."; and

(2) by adding at the end the following new subsection:

"(f) WORLDWIDE LEVEL OF HUMANITARIAN IMMIGRANTS.—

"(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of humanitarian immigrants (in this subsection referred to as the 'worldwide humanitarian level') under this subsection for a fiscal year is equal to 70,000.

"(2) REDUCTION FOR HUMANITARIAN IMMIGRANTS WHO ARE REFUGEES OR ASYLEES.—The worldwide humanitarian level for a fiscal year shall be reduced by the sum of—

"(A) 50,000, or, if less, the number of aliens who were admitted as refugees under section 207 in the previous fiscal year, and

"(B) the number of aliens who had been granted asylum whose status was adjusted in the previous fiscal year under section 209(b).

"(3) REDUCTION FOR PRIOR YEAR CANCELLATION OF REMOVAL AND REGISTRY.— The worldwide humanitarian level for a fiscal year shall be further reduced by the sum of—

"(A) the number of aliens whose removal was canceled and who were provided lawful permanent resident status in the previous fiscal year under section 240A, and

"(B) the number of aliens who were provided permanent resident status in the previous fiscal year under section 249.

"(4) LIMITATION.—In no case shall the worldwide humanitarian level for a fiscal year (taking into account any reductions under paragraphs (2) and (3)) exceed 10,000.".

(b) TRANSITION.—In determining the worldwide humanitarian level under section 201(f) of the Immigration and Nationality Act for fiscal year 1997, the reference in paragraph (3)(A) of such section to 'section 240A' is deemed a reference to 'section 244(a)'.

**SEC. 505. REQUIRING CONGRESSIONAL REVIEW AND REAUTHORIZATION OF WORLDWIDE LEVELS EVERY 5 YEARS.**

Section 201 (8 U.S.C. 1151) is further amended by adding at the end the following new subsection:

"(g) REQUIREMENT FOR PERIODIC REVIEW AND REAUTHORIZATION OF WORLDWIDE LEVELS.—

"(1) CONGRESSIONAL REVIEW.—The Committees on the Judiciary of the House of Representatives and of the Senate shall undertake during fiscal year 2004 (and each fifth fiscal year thereafter) a thorough review of the appropriate worldwide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.

"(2) CONGRESSIONAL REAUTHORIZATION.—The Congress, after consideration of the reviews under paragraph (1) and by amendment to this section, shall specify the appropriate worldwide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.

"(3) SUNSET IN ABSENCE OF REAUTHORIZATION.—The worldwide levels specified under the previous provisions of this section are applicable only to fiscal years 1997 through 2005. Immigrant visa numbers for fiscal years after fiscal year 2005 that are subject to such levels are only authorized to the extent provided by amendment under paragraph (2) made to this section.".

67

# Subtitle B—Changes in Preference System

**SEC. 511. LIMITATION OF IMMEDIATE RELATIVES TO SPOUSES AND CHILDREN.**

(a) RECLASSIFICATION.—Section 201(b)(2)(A) (8 U.S.C. 1151(b)(2)(A)) is amended—

(1) in clause (i)—

(A) by striking "IMMEDIATE RELATIVES.—" and all that follows through the end of the first sentence and inserting "An alien who is a spouse or child of a citizen of the United States.", and

(B) in the second sentence, by striking "an immediate relative" and inserting "a spouse of a citizen of the United States"; and

(2) in clause (ii), by striking "such an immediate relative" and inserting "a spouse of a citizen of the United States".

(b) PROTECTION OF CERTAIN CHILDREN FROM AGING OUT OF PREFERENCE STATUS.—

(1) IN GENERAL.—Section 204 (8 U.S.C. 1154) is amended by adding at the end the following new subsection:

"(i) For purposes of applying section 101(b)(1) in the case of issuance of an immigrant visa to, or admission or adjustment of status of, an alien under section 201(b)(2)(A), section 203(a)(1), or 203(e) as a child of a citizen of the United States or a permanent resident alien, the age of the alien shall be determined as of the date of the filing of the classification petition under section 204(a)(1) as such a child of a citizen of the United States or a permanent resident alien.".

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply to immigrant visas issued on or after October 1, 1996.

**SEC. 512. CHANGE IN FAMILY-SPONSORED CLASSIFICATION.**

(a) IN GENERAL.—Section 203(a) (8 U.S.C. 1153(a)) is amended by striking paragraphs (1) through (4) and inserting the following:

"(1) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—Immigrants who are the spouses and children of an alien lawfully admitted for permanent residence shall be allocated visas in a number not to exceed 85,000, plus any immigrant visas not used under paragraphs (2) and (3).

"(2) PARENTS OF UNITED STATES CITIZENS.—

"(A) IN GENERAL.—Immigrants who are the parents of an individual who is at least 21 years of age and a citizen of the United States shall be allocated visas in a number, which is not less than 25,000 and does not exceed the lesser of—

"(i) 45,000, or

"(ii) the number by which the worldwide level exceeds 85,000.

"(B) REFERENCE TO INSURANCE REQUIREMENT.—For requirement relating to insurance for parents, see section 212(a)(4)(D).

"(3) ADULT SONS AND DAUGHTERS.—

"(A) IN GENERAL.—Immigrants who are the qualifying adult sons or daughters (as defined in subparagraph (C)) of an individual who is (i) at least 21 years of age and (ii) either a citizen of the United States or an alien lawfully admitted for permanent residence shall be allocated visas according to the levels established in subparagraph (B).

"(B) ALLOCATION OF VISAS TO ADULT SONS AND DAUGHTERS OF UNITED STATES CITIZENS AND PERMANENT RESIDENT ALIENS.—

"(i) IN GENERAL.—Subject to clause (ii), any remaining visas shall be allocated under this paragraph in a number not to exceed the lesser of—

"(I) 5,000, or

"(II) the number by which the worldwide level exceeds the sum of 85,000 and the number of immigrant visas used under paragraph (2).

"(ii) ALLOCATION OF ADDITIONAL VISA NUMBERS.—

"(I) IN GENERAL.—If the demand for visa numbers under this paragraph exceeds the number (if any) available under clause (i) in any fiscal year, an additional number of visas shall be made available under this paragraph, but not to exceed 5,000 additional visas numbers in any fiscal year.

"(II) OFFSETTING REDUCTION IN THE LEVELS OF EMPLOYMENT-BASED VISAS.—If an additional number of visa numbers are made available under subclause (I) in a fiscal year, the number of visas made available under section 201(a)(2) and paragraphs (1) through (6) of subsection (b) in the fiscal year shall be reduced by a number

68

equal to such additional number reduced by the amount (if any) by which 110,000 exceeds the number of immigrant visas used under paragraphs (1) and (2) of this subsection in the fiscal year. The reduction under each such paragraph of subsection (b) shall be in the same proportion to the total reduction as the ratio of the numerical limitation under each such paragraph specified under such subsection to the worldwide level of employment-based immigrants (as specified in section 201(d)).

"(C) QUALIFICATIONS.—For purposes of this paragraph, the term 'qualifying adult son or daughter' means an immigrant who, as of the date of approval of the classification petition under section 204(a)(1)—

"(i) is at least 21, but not more than 25 years of age,

"(ii) has never been married,

"(iii) is childless, and

"(iv) would qualify as a dependent of the petitioning individual for Federal income tax purposes, except that the immigrant does not meet the residence requirements.

"(D) THREE-YEAR CONDITIONAL REQUIREMENT.—

"(i) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of this Act, an alien provided lawful permanent residence status on the basis of being a qualifying adult son or daughter shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this subparagraph.

"(ii) REQUIREMENTS OF NOTICE AND PETITIONING FOR REMOVAL OF CONDITIONAL STATUS.—The Attorney General shall establish, by regulation, procedures which incorporate the requirements of notice and petitioning for removal of conditional status similar to the requirements for removal of conditional status under section 216A.

"(iii) TERMINATION OF STATUS.—In the case of an alien with permanent resident status on a conditional basis under clause (i), the alien must demonstrate that the alien met the qualifications set forth in subparagraph (C) as of the date of approval of the classification petition under section 204(a). In the absence of such a demonstration by the alien, the alien's status shall be terminated.

"(iv) SPECIAL RULE.—In applying section 216A under this subparagraph, any reference to the 'second' anniversary in such section is deemed a reference to the 'third' anniversary.".

(b) INSURANCE REQUIREMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a), is amended by adding at the end the following new subparagraph:

"(D) INSURANCE REQUIREMENTS FOR PARENTS.—

"(i) IN GENERAL.—Any alien who seeks admission as a parent under section 203(a)(2) is inadmissible unless the alien demonstrates at the time of issuance of the visa (and at the time of admission) to the satisfaction of the consular officer and the Attorney General that the alien—

"(I) will have coverage under an adequate health insurance policy (at least comparable to coverage provided under the medicare program under title XVIII of the Social Security Act), and

"(II) will have coverage with respect to long-term health needs (at least comparable to such coverage provided under the medicaid program under title XIX of such Act for the State in which either the alien intends to reside or in which the petitioner, on behalf of the alien under section 204(a)(1), resides),

throughout the period the individual is residing in the United States.

"(ii) FACTORS TO BE TAKEN INTO ACCOUNT.—In making a determination under clause (i), the Attorney General shall take into account the age of the parent and the likelihood of the parent securing health insurance coverage through employment.".

**SEC. 513. CHANGE IN EMPLOYMENT-BASED CLASSIFICATION.**

(a) IN GENERAL.—Section 203(b) (8 U.S.C. 1153(b)) is amended—

(1) by redesignating paragraph (6) as paragraph (7);

(2) by striking paragraphs (1) through (5) and inserting the following:

"(1) ALIENS WITH EXTRAORDINARY ABILITY.—Visas shall first be made available in a number not to exceed 15,000 of such worldwide level to immigrants—

"(A) who have extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or

69

international acclaim and whose achievements have been recognized in the field through sufficient documentation,

"(B) who seek to be admitted into the United States to continue work in the area of extraordinary ability, and

"(C) whose admission into the United States will substantially benefit prospectively the United States.

"(2) ALIENS WHO ARE OUTSTANDING PROFESSORS AND RESEARCHERS OR MULTINATIONAL EXECUTIVES AND MANAGERS.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the class specified in paragraph (1), to immigrants who are aliens described in subparagraph (B) or (C).

"(B) OUTSTANDING PROFESSORS AND RESEARCHERS.—An alien is described in this subparagraph if—

"(i) the alien is recognized internationally as outstanding in a specific academic area,

"(ii) the alien has at least 3 years of experience in teaching or research in the academic area, and

"(iii) the alien seeks to enter the United States—

"(I) for a tenured position (or tenure-track position) within a university or institution of higher education to teach in the academic area,

"(II) for a comparable position with a university or institution of higher education to conduct research in the area, or

"(III) for a comparable position to conduct research in the area with a department, division, or institute of a private employer, if the department, division, or institute employs at least 3 persons full-time in research activities and has achieved documented accomplishments in an academic field.

"(C) CERTAIN MULTINATIONAL EXECUTIVES AND MANAGERS.—An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

"(3) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) and (2), to immigrants who are aliens described in subparagraph (B).

"(B) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

"(i) IN GENERAL.—An alien is described in this subparagraph if the alien is a member of a profession holding an advanced degree or its equivalent or who because of exceptional ability in the sciences, arts, or business will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

"(ii) DETERMINATION OF EXCEPTIONAL ABILITY.—In determining under clause (i) whether an immigrant has exceptional ability, the possession of a degree, diploma, certificate, or similar award from a college, university, school, or other institution of learning or a license to practice or certification for a particular profession or occupation shall not by itself be considered sufficient evidence of such exceptional ability.

"(iii) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this subparagraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

"(iv) NATIONAL INTEREST WAIVER.—The Attorney General may waive the requirement under clause (iii) and the requirement under clause (i) that an alien's services be sought by an employer in the United States only if—

"(I) such a waiver is necessary to substantially benefit—

70

"(aa) the national security, national defense, or Federal, State, or local law enforcement;

"(bb) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;

"(cc) economic or employment opportunities for a specific industry or a specific geographical area;

"(dd) the development of new technologies; or

"(ee) environmental protection or the productive use of natural resources, and

"(II) the alien will engage in a specific undertaking to advance one or more of the interests under subclause (I).

"(4) SKILLED WORKERS AND PROFESSIONALS.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 45,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) through (3) to immigrants who are described in subparagraph (B) or (C).

"(B) SKILLED WORKERS.—An alien described in this subparagraph is an immigrant who is capable, at the time a petition is filed, of performing skilled labor (requiring at least 2 years of training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States, and who has a total of 4 years of training or experience (or both) with respect to such labor.

"(C) PROFESSIONALS.—

"(i) IN GENERAL.—An alien described in this subparagraph is an immigrant who holds a baccalaureate degree and is a member of the professions and, subject to clause (ii), has at least 2 years of experience in the profession after the receipt of the degree.

"(ii) SPECIAL RULE FOR LANGUAGE TEACHERS.—An alien who is a teacher and has (within the previous 5 years) at least 2 years of experience teaching a language (other than English) full-time at an accredited elementary or middle school may be classified and admitted as a professional under this subparagraph if the alien is seeking admission to teach such language full-time in an accredited elementary or middle school.

"(D) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this paragraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

"(E) EXPERIENCE REQUIREMENT.—Any period of experience acquired as a nonimmigrant under section 101(a)(15)(E), 101(a)(15)(H)(i), or 101(a)(15)(L) may be used to fulfill a requirement for experience under this paragraph.

"(5) INVESTORS IN JOB CREATION.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 10,000 of such worldwide level less the reduction in visa numbers under this paragraph required to be effected under section 201(c)(5)(A) for the fiscal year involved, to immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise—

"(i) which the alien has established,

"(ii) in which the alien has invested (after the date of the enactment of the Immigration Act of 1990), or is actively in the process of investing, capital in an amount not less $1,000,000, and

"(iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

"(B) PILOT PROGRAM.—For each of fiscal years 1997 and 1998, up to 2,000 visas otherwise made available under this paragraph shall be made available to immigrants who would be described in subparagraph (A) if '$500,000' were substituted for '$1,000,000' in subparagraph (A)(ii) and if 'for not fewer than 5' were substituted for 'for not fewer than 10' in subparagraph (A)(iii). By not later than April 1, 1998, the Attorney General shall submit to Congress a report on the operation of this subparagraph and shall include in the report information describing the immigrants admitted under this paragraph and the enterprises they invest in and a recommendation on whether the pilot program under this subparagraph should be continued or modified.

71

"(6) CERTAIN SPECIAL IMMIGRANTS.—Visas shall be made available, in a number not to exceed 5,000 of such worldwide level, to qualified special immigrants described in section 101(a)(27) (other than those described in subparagraph (A) thereof), of which not more than 4,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of section 101(a)(27)(C)(ii)."; and

(3) by adding at the end the following new paragraph:

"(8) NOT COUNTING WORK EXPERIENCE AS AN UNAUTHORIZED ALIEN.—For purposes of this subsection, work experience obtained in employment in the United States with respect to which the alien was an unauthorized alien (as defined in section 274A(h)(3)) shall not be taken into account.".

(b) CONDITIONAL STATUS FOR CERTAIN FOREIGN LANGUAGE TEACHERS.—

(1) IN GENERAL.—Title II is amended by inserting after section 216A the following new section:

"CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN FOREIGN LANGUAGE
TEACHERS

"SEC. 216B. (a) IN GENERAL.—Subject to the succeeding provisions of this section, section 216A shall apply to an alien foreign language teacher (as defined in subsection (d)(1)) and to an alien spouse or alien child (as defined in subsection (d)(2)) in the same manner as such section applies to an alien entrepreneur and an alien spouse or alien child.

"(b) TIMING FOR PETITION.—

"(1) IN GENERAL.—In applying section 216A under subsection (a), any reference to a 'second anniversary of an alien's lawful admission for permanent residence' is deemed a reference to the end of the time period described in paragraph (2).

"(2) TIME PERIOD FOR DETERMINATION.—The time period described in this paragraph is 5 years less the period of experience, during the 5-year period ending on the date the alien foreign language teacher obtains permanent resident status, of teaching a language (other than English) full-time at an accredited elementary or middle school.

"(c) REQUIREMENT FOR TOTAL OF 5 YEARS' TEACHING EXPERIENCE.—In applying section 216A under subsection (a), the determination of the Attorney General under section 216A(b)(1) shall be whether (and the facts and information under section 216A(d)(1) shall demonstrate that) the alien has been employed on a substantially full-time basis as a foreign language teacher at an accredited elementary or middle school in the United States during the period since obtaining permanent residence status (instead of the determinations described in section 216A(b)(1) and of the facts and information described in section 216A(d)(1)).

"(d) DEFINITIONS.—In this section:

"(1) The term 'alien foreign language teacher' means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) under section 203(b)(4)(C)(ii) on the basis of less than 5 years' teaching experience.

"(2) The term 'alien spouse' and the term 'alien child' mean an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) by virtue of being the spouse or child, respectively, of an alien foreign language teacher.".

(2) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 216A the following:

"Sec. 216B. Conditional permanent resident status for certain foreign language teachers.".

**SEC. 514. CHANGES IN DIVERSITY IMMIGRANT PROGRAM.**

(a) APPLICATION ONLY TO 10 COUNTRIES WITH HIGHEST REGISTRANTS.—Section 203(c) (8 U.S.C. 1153(c)) is amended—

(1) in paragraph (1)(B)(ii), by striking "and" at the end of subclause (I), by striking the period at the end of subclause (II) and inserting ", and", and by adding at the end the following new subclause:

"(III) within each region, the 10 foreign states which had the highest number of registrants for the diversity immigrant program under this subsection for the period beginning October 1, 1994, and ending September 30, 1996, and which are not high-admission states."; and

(2) by adding at the end of paragraph (1)(E) the following new clause:

72

"(vi) Ten states eligible in each region.—Only natives of the 10 states identified for each region in subparagraph (B)(ii)(III) are eligible for diversity visas.".

(b) Change in Definition of Region.—Section 203(c)(1)(F) (8 U.S.C. 1153(c)(1)(F)) is amended—

(1) by striking "Northern Ireland shall be treated as a separate foreign state,",

(2) by striking the comma after "foreign state",

(3) in clause (iv), by striking "(other than Mexico)",

(4) in clause (vi), by striking "Mexico,".

(c) Establishing Job Offer Requirement.—Paragraph (2) of section 203(c) (8 U.S.C. 1153(c)) is amended to read as follows:

"(2) Requirement of job offer and education or skilled worker.—An alien is not eligible for a visa under this subsection unless the alien—

"(A) has a job offer in the United States which has been verified;

"(B) has at least a high school education or its equivalent; and

"(C) has at least 2 years of work experience in an occupation which requires at least 2 years of training.".

(d) Additional Provisions.—Section 203(c) (8 U.S.C. 1153) is further amended by adding at the end the following new paragraphs:

"(4) Fees.—Fees for the furnishing and verification of applications for visas under this subsection and for the issuance of visas under this subsection may be prescribed by the Secretary of State in such amounts as are adequate to compensate the Department of State for the costs of administering the diversity immigrant program. Any such fees collected may be deposited as an offsetting collection to the appropriate Department of State appropriation to recover the costs of such program and shall remain available for obligation until expended.

"(5) Ineligibility of aliens unlawfully present in the United States.—An alien who is unlawfully present in the United States at the time of filing of an application, within 5 years prior to the filing of such application, or at any time subsequent to the filing of the application is ineligible for a visa under this subsection.".

**SEC. 515. AUTHORIZATION TO REQUIRE PERIODIC CONFIRMATION OF CLASSIFICATION PETITIONS.**

(a) In General.—Section 204(b) (8 U.S.C. 1154(b)) is amended by inserting "(1)" after "(b)" and by adding at the end the following new paragraph:

"(2)(A) The Attorney General may provide that a petition approved with respect to an alien (and the priority date established with respect to the petition) shall expire after a period (specified by the Attorney General and of not less than 2 years) following the date of approval of the petition, unless the petitioner files with the Attorney General a form described in subparagraph (B).

"(B) The Attorney General shall specify the form to be used under this paragraph. Such form shall be designed—

"(i) to reconfirm the continued intention of the petitioner to seek admission of the alien based on the classification involved, and

"(ii) as may be provided by the Attorney General, to update the contents of the original classification petition.

"(C) The Attorney General may apply subparagraph (A) to one or more classes of classification petitions and for different periods of time for different classes of such petitions, as specified by the Attorney General.".

(b) Effective Date.—(1) Except as provided in paragraph (2), the amendments made by subsection (a) shall not apply to classification petitions filed before October 1, 1996.

(2) The Attorney General may apply such amendments to such classification petitions, but only in a manner so that no such petition expires under such amendments before October 1, 2000.

**SEC. 516. CHANGES IN SPECIAL IMMIGRANT STATUS.**

(a) Repealing Certain Obsolete Provisions.—Section 101(a)(27) (8 U.S.C. 1101(a)(27)) is amended by striking subparagraphs (B), (E), (F), (G), and (H).

(b) Special Immigrant Status for Certain NATO Civilian Employees.—Section 101(a)(27) (8 U.S.C. 1101(a)(27)) is further amended—

(1) by striking "or" at the end of subparagraph (J),

(2) by striking the period at the end of subparagraph (K) and inserting "; or", and

(3) by adding at the end the following new subparagraph:

"(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause—

73

"(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North American Treaty Organization (NATO);

"(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO–6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the 'Protocol on the Status of International Military Headquarters' set up pursuant to the North Atlantic Treaty, or as a dependent); and

"(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the Immigration in the National Interest Act of 1995.".

(c) CONFORMING NONIMMIGRANT STATUS FOR CERTAIN PARENTS OF SPECIAL IMMIGRANT CHILDREN.—Section 101(a)(15)(N) (8 U.S.C. 1101(a)(15)(N)) is amended—

(1) by inserting "(or under analogous authority under paragraph (27)(L))" after "(27)(I)(i)", and

(2) by inserting "(or under analogous authority under paragraph (27)(L))" after "(27)(I)".

(d) EXTENSION OF SUNSET FOR RELIGIOUS WORKERS.—Section 101(a)(27)(C)(ii) (8 U.S.C. 1101(a)(27)(C)(ii)) is amended by striking "1997" and inserting "2005" each place it appears.

(e) ADDITIONAL CONFORMING AMENDMENTS.—

(1) Section 201(b)(1)(A) (8 U.S.C. 1151(b)(1)(A)) is amended by striking "or (B)".

(2) Section 203(b)(4) (8 U.S.C. 1153(b)(4)) is amended by striking "or (B)".

(3) Section 214(l)(3) (8 U.S.C. 1184(l)(3)), as redesignated by section 851(a)(3)(A), is amended by striking ", who has not otherwise been accorded status under section 101(a)(27)(H),".

(4) Section 245(c)(2) (8 U.S.C. 1255(c)(2)) is amended by striking "101(a)(27)(H), (I)," and inserting "101(a)(27)(H),".

(f) EFFECTIVE DATES.—(1) Except as provided in this section, the amendments made by this section shall take effect on the date of the enactment of this Act.

(2) The amendments made by subsection (a) shall not apply to any alien with respect to whom an application for special immigrant status under a subparagraph repealed by such amendments has been filed by not later than September 30, 1996.

**SEC. 517. REQUIREMENTS FOR REMOVAL OF CONDITIONAL STATUS OF ENTREPRENEURS.**

(a) IN GENERAL.—Section 216A(b) (8 U.S.C. 1186b(b)) is amended—

(1) by amending clause (ii) of paragraph (1)(B) to read as follows:

"(ii) subject to paragraph (3), the alien did not invest (and maintain investment of) the requisite capital, or did not employ the requisite number of employees, throughout substantially the entire period since the alien's admission; or", and

(2) by adding at the end the following new paragraph:

"(3) EXCEPTIONS.—

"(A) GOOD FAITH EXCEPTION.—Paragraph (1)(B)(ii) shall not apply to an alien to the extent that the alien continues to attempt in good faith throughout the period since admission to invest (and maintain investment of) the requisite capital, and to employ the requisite number of employees, but was unable to do so due to circumstances for which the alien should not justly be held responsible.

"(B) EXTENSION.—In the case of an alien to whom the exception under subparagraph (A) applies, the application period under subsection (d)(2) (and period for termination under paragraph (1)) shall be extended (for up to 3 additional years) by such additional period as may be necessary to enable the alien to have had the requisite capital and number of employees throughout a 2-year period. Such extension shall terminate at any time at which the Attorney General finds that the alien has not continued to attempt in good faith to invest such capital and employ such employees.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to aliens admitted on or after the date of the enactment of this Act.

**SEC. 518. ADULT DISABLED CHILDREN.**

Section 101(b)(1) (8 U.S.C. 1101(b)(1)) is amended—

(1) in subparagraph (E) by striking "or" at the end,

(2) in subparagraph (F) by striking the period at the end and inserting "; or", and

(3) by adding at the end the following new subparagraph:

74

"(G) a child of a citizen or national of the United States or lawful permanent resident alien, regardless of age, who has never been married, and who has a severe mental or physical impairment, or combination of mental or physical impairments, which—

"(i) is likely to continue indefinitely; and

"(ii) causes substantially total inability to perform functions necessary for independent living, including but not necessarily limited to 3 or more of the following areas of major life activity—

"(I) self-care,

"(II) interpersonal communication,

"(III) learning,

"(IV) mobility, and

"(V) self-direction:

*Provided*, That no child may be considered to be a child within the meaning of this subparagraph on the basis, in whole or in part, of any physical or mental impairment that is not being ameliorated through medical treatment to the maximum extent reasonably possible given the ability and resources of such child and the citizen, national, or lawful permanent resident alien who is the child's parent.".

### SEC. 519. MISCELLANEOUS CONFORMING AMENDMENTS.

(a) CONFORMING AMENDMENTS RELATING TO IMMEDIATE RELATIVES.—

(1) Section 101(b)(1)(F) (8 U.S.C. 1101(b)(1)(F)) is amended by striking "as an immediate relative under section 201(b)" and inserting "as a child of a citizen of the United States".

(2) Section 204 (8 U.S.C. 1154) is amended—

(A) in subsection (a)(1)(A)(i), by striking "to an immediate relative status" and inserting "to status as the spouse or child of a citizen of the United States";

(B) in subsection (a)(1)(A)(iii), by striking "as an immediate relative" and inserting "as the spouse of a citizen of the United States";

(C) in subsection (a)(1)(iv), by striking "as an immediate relative" and inserting "as a child of a citizen of the United States";

(D) in subsection (b), by striking "an immediate relative specified in section 201(b)" and inserting "a spouse or child of a citizen of the United States under section 201(b)";

(E) in subsection (c), by striking "an immediate relative or preference" and inserting "a preferential";

(F) in subsection (e)—

(i) by striking "an immediate relative" and inserting "a spouse or child of a citizen of the United States", and

(ii) by striking "his" and "he" and inserting "the alien's" and "the alien", respectively; and

(G) in subsection (g), by striking "immediate relative status" and inserting "status as a spouse or child of a citizen of the United States or other".

(3) Section 212(a)(6)(E)(ii) (8 U.S.C. 1182(a)(6)(E)(ii)) is amended by striking "an immediate relative" and inserting "a spouse, child, or parent of a citizen of the United States".

(4) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by striking "an immediate relative" and inserting "a spouse or child of a citizen of the United States".

(5) Section 216(g)(1)(A) (8 U.S.C. 1186a(g)(1)(A)) is amended by striking "an immediate relative (described in section 201(b)) as the spouse of a citizen of the United States" and inserting "the spouse of a citizen of the United States (described in section 201(b))".

(6) Section 221(a) (8 U.S.C. 1201(a)) is amended by striking ", immediate relative,".

(7)(A) Section 224 (8 U.S.C. 1204) is amended—

(i) by amending the heading to read as follows:

"VISAS FOR SPOUSES AND CHILDREN OF CITIZENS AND SPECIAL IMMIGRANTS",

(ii) by striking "immediate relative" the first place it appears and inserting "a spouse or child of a citizen of the United States", and

(iii) by striking "immediate relative status" and inserting "status or status as a spouse or child of a citizen of the United States".

(B) The item in the table of contents relating to section 224 is amended to read as follows:

"Sec.  224.  Visas for spouses and children of citizens and special immigrants.".

75

(8) Subsection (a)(1)(E)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended by striking "an immediate relative" and inserting "a spouse, child, or parent of a citizen of the United States under section 201(b) or 203(a)(2)".

(9) Section 245(c) (8 U.S.C. 1255(c)) is amended by striking "an immediate relative as defined in section 201(b)" and inserting "a spouse or child of a citizen of the United States under section 201(b) or a parent of a citizen under section 203(a)(2)" each place it appears.

(10) Section 291 (8 U.S.C. 1361) is amended by striking "immigrant, special immigrant, immediate relative" and inserting "immigrant status, special immigrant status, status as a spouse or child of a citizen of the United States".

(11) Section 401 of the Immigration Reform and Control Act of 1986 is amended by striking "immediate relatives" and inserting "spouses and children of citizens".

(b) CONFORMING AMENDMENTS FOR OTHER FAMILY-SPONSORED IMMIGRANTS.—

(1) PETITIONING REQUIREMENTS.—Section 204 (8 U.S.C. 1154) is amended—

(A) in subsection (a)(1)(A)(i), by striking "paragraph (1), (3), or (4)" and inserting "paragraph (2) or (3)";

(B) in subsection (a)(1)(B)(i), by striking "section 203(a)(2)" and inserting "paragraph (1) or (3) of section 203(a)(1)";

(C) in clauses (ii) and (iii) of subsection (a)(1)(B), by striking "203(a)(2)(A)" and inserting "203(a)(1)"; and

(D) in subsection (f)(1), by striking ", 203(a)(1), or 203(a)(3)" and inserting "or 203(a)(2)".

(2) APPLICATION OF PER COUNTRY LEVELS.—Section 202 (8 U.S.C. 1152) is amended—

(A) by amending paragraph (4) of subsection (a) to read as follows:

"(4) SPECIAL RULES FOR SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—

"(A) 75 PERCENT OF 1ST PREFERENCE NOT SUBJECT TO PER COUNTRY LIMITATION.—Of the visa numbers made available under section 203(a) to immigrants described in paragraph (1) of that section in any fiscal year, 63,750 shall be issued without regard to the numerical limitation under paragraph (2).

"(B) LIMITING PASS DOWN FOR CERTAIN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 203(a)(1) exceeds the maximum number of visas that may be made available to immigrants of the state or area under such section consistent with subsection (e) (determined without regard to this paragraph), in applying paragraph (2) of section 203(a) under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraph (1) of such section."; and

(B) in subsection (e)—

(i) in paragraph (1), by inserting before the semicolon the following: "(determined without regard to subsections (c)(4) and (d)(2) of section 201)";

(ii) in paragraph (2), by striking "paragraphs (1) through (4)" and inserting "paragraphs (1) and (2)", and

(iii) in the last sentence, by striking "203(a)(2)(A)" and inserting "203(a)(1)".

(3) ADDITIONAL CONFORMING AMENDMENTS.—

(A) Subsection (d) of section 203 (8 U.S.C. 1153), before redesignation by section 524(a)(1), is amended by striking "(a)" and inserting "(a)(2)".

(B) Section 212(a)(6)(E)(iii) (8 U.S.C. 1182(a)(6)(E)(iii)) and subsection (a)(1)(E)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 under section 305(a)(2), are each amended by striking "203(a)(2)" and inserting "203(a)(1)".

(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by striking "immigrant under section 203(a) (other than paragraph (4) thereof)" and inserting "an immigrant under section 203(a)".

(D) Section 216(g)(1)(C) (8 U.S.C. 1186a(g)(1)(C)) is amended by striking "203(a)(2)" and inserting "203(a)(1)".

(E) Section 2(c) of the Virgin Islands Nonimmigrant Alien Adjustment Act of 1982 (Public Law 97–271) is amended—

(i) in paragraph (2), by inserting "or first or third family preference petitions" after "second preference petitions";

(ii) in paragraph (3)(A), by striking "or" at the end;

76

(iii) in paragraph (3)(B), by striking the period at the end and inserting "; or";

(iv) by adding at the end of paragraph (3) the following new subparagraph:

"(C) by virtue of a first or third family preference petition filed by an individual who was admitted to the United States as an immigrant by virtue of a second family preference petition filed by the son or daughter of the individual, if that son or daughter had his or her status adjusted under this section."; and

(v) in paragraph (4), by striking "on or after such date." and inserting the following: "on or after such date and before October 1, 1996). For purposes of this subsection, the terms 'first family preference petition', 'second family preference petition', and 'third family preference petition' mean, in the case of an alien, a petition filed under section 204(a) of the Act to grant preference status to the alien by reason of the relationship described in section 203(a)(1), 203(a)(2), or 203(a)(3), respectively (as in effect on and after October 1, 1996).".

(c) CONFORMING AMENDMENTS RELATING TO EMPLOYMENT-BASED IMMIGRANTS.—

(1) TREATMENT OF SPECIAL K IMMIGRANTS.—Subparagraph (B) of section 203(b)(7) (8 U.S.C. 1153(b)(7)), as redesignated by section 513(a)(1), is amended—

(A) in clause (i), by striking "and (3) shall each be reduced by ⅓" and inserting "(3), and (4) shall each be reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs) that were made available under each respective paragraph,", and

(B) in clause (iii), by striking "(3) of this subsection in the fiscal year shall be reduced by ⅓" and inserting "(4) in the fiscal year reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs to natives of the foreign state) that were made available under each respective paragraph to such natives,".

(2) CONFORMING AMENDMENTS RELATING TO PETITIONING RIGHTS.—Section 204(a)(1) (8 U.S.C. 1154(a)(1)) is amended—

(A) in subparagraph (C), by striking "203(b)(1)(A)" and inserting "203(b)(1)";

(B) in subparagraph (D), by striking "section 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), or 203(b)(3)" and inserting "section 203(b)(2), 203(b)(3), or 203(b)(4)";

(C) in subparagraph (E)(i), by striking "203(b)(4)" and inserting "203(b)(6)"; and

(D) by redesignating subparagraphs (E) and (F) as subparagraphs (F) and (E), respectively, and by moving subparagraph (E) (as so redesignated) to precede subparagraph (F) (as so redesignated).

(3) GROUND FOR INADMISSIBILITY.—Section 212(a)(5)(C) (8 U.S.C. 1182(a)(5)(C)) is amended by striking "(2) or (3)" and inserting "(3) or (4)".

(4) OTHER CONFORMING AMENDMENTS.—

(A) Section 202(e)(3) (8 U.S.C. 1152(e)(3)) is amended by striking "through (5)" and inserting "through (6)".

(B) Section 245(j)(3) (8 U.S.C. 1255(j)(3)), as added by section 130003(c)(1) Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) and as redesignated by section 851(a)(3)(A) of this Act, is amended by striking "203(b)(4)" and inserting "203(b)(6)".

(C) Section 154(b)(1)(B)(i) of the Immigration Act of 1990 is amended by striking "1991" and inserting "1991, and before October 1, 1996) or under section 203(a), 203(b)(1), or 203(b)(2) (as in effect on and after October 1, 1996]".

(D) Section 206(a) of the Immigration Act of 1990 is amended by striking "203(b)(1)(C)" and inserting "203(b)(2)(C)".

(E) Section 2(d)(2)(A) of the Chinese Student Protection Act of 1992 (Public Law 102–404) is amended by striking "203(b)(3)(A)(i)" and inserting "203(b)(4)(B)".

(F) The Soviet Scientists Immigration Act of 1992 (Public Law 102–509) is amended—

(i) in sections 3 and 4(a), by striking "203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))" and inserting "203(b)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(3)(B)(i))", and

(ii) in section 4(c), by striking "203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))" and inserting "203(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2))".

77

(d) Repeal of Certain Outdated Provisions.—The following provisions of law are repealed:

(1) Section 9 of Public Law 94–571 (90 Stat. 2707).

(2) Section 19 of Public Law 97-116 (95 Stat. 1621).

# Subtitle C—Refugees, Parole, and Humanitarian Admissions

**SEC. 521. CHANGES IN REFUGEE ANNUAL ADMISSIONS.**

(a) In General.—Paragraphs (1) and (2) of section 207(a) (8 U.S.C. 1157(a)) are amended to read as follows:

"(1) Except as provided in paragraph (2) and subsection (b), the number of refugees who may be admitted under this section in any fiscal year shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

"(2)(A) Except as provided in subparagraph (B), the number determined under paragraph (1) for a fiscal year may not exceed—

"(i) 75,000 in the case of fiscal year 1997, or

"(ii) 50,000 in the case of any succeeding fiscal year.

"(B) The number determined under paragraph (1) for a fiscal year may exceed the limit specified under subparagraph (A) if Congress enacts a law providing for a higher number.".

(b) Admissions in Emergency Refugee Situations and Timing of the Refugee Consultation Process.—

(1) Section 207(b) (8 U.S.C. 1157(b)) and section 207(d)(3)(B) (8 U.S.C. 1157(d)(3)(B)) are amended by striking "unforeseen".

(2) Section 207(d)(1) (8 U.S.C. 1157(d)(1)) is amended by striking "Before the start of each fiscal year" and inserting "Before June 1 of the preceding fiscal year".

(3) Section 207(e) (8 U.S.C. 1157(e)) is amended by adding at the end the following:

"Such discussions shall occur before July 1 of the fiscal year preceding the fiscal year of admissions, except that discussions relating to an emergency refugee situation shall occur not more than 30 days after the President proposes admissions in response to the emergency.".

(c) Effective Date.—The amendments made by subsections (a) and (b) shall apply beginning with fiscal year 1997.

**SEC. 522. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.**

(a) Definition of Refugee.—Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended by adding at the end the following: "For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.".

(b) Numerical Limitation.—Section 207(a) (8 U.S.C. 1157(a)), as amended by section 532(b), is amended by adding at the end the following new paragraph:

"(4) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the last sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).".

**SEC. 523. PAROLE AVAILABLE ONLY ON A CASE-BY-CASE BASIS FOR HUMANITARIAN REASONS OR SIGNIFICANT PUBLIC BENEFIT.**

(a) In General.—Paragraph (5) of section 212(d) (8 U.S.C. 1182(d)) is amended to read as follows:

"(5)(A) Subject to the provisions of this paragraph and section 214(f)(2), the Attorney General, in the sole discretion of the Attorney General, may on a case-by-case basis parole an alien into the United States temporarily, under such conditions as the Attorney General may prescribe, only—

"(i) for an urgent humanitarian reason (as described under subparagraph (B)); or

78

"(ii) for a reason deemed strictly in the public interest (as described under subparagraph (C)).

"(B) The Attorney General may parole an alien based on an urgent humanitarian reason described in this subparagraph only if—

"(i) the alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted through the normal visa process;

"(ii) the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member; or

"(iii) the alien has a close family member in the United States whose death is imminent and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted through the normal visa process.

"(C) The Attorney General may parole an alien based on a reason deemed strictly in the public interest described in this subparagraph only if—

"(i) the alien has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States; or

"(ii) the alien is to be prosecuted in the United States for a crime.

"(D) The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.

"(E) Parole of an alien under this paragraph shall not be considered an admission of the alien into the United states. When the purposes of the parole of an alien have been served, as determined by the Attorney General, the alien shall immediately return or be returned to the custody from which the alien was paroled and the alien shall be considered for admission to the United States on the same basis as other similarly situated applicants for admission.

"(F) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and the Senate describing the number and categories of aliens paroled into the United States under this paragraph. Each such report shall contain information and data concerning the number and categories of aliens paroled, the duration of parole, and the current status of aliens paroled during the preceding fiscal year.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to individuals paroled into the United States on or after the first day of the first month beginning more than 60 days after the date of the enactment of this Act.

**SEC. 524. ADMISSION OF HUMANITARIAN IMMIGRANTS.**

(a) IN GENERAL.—Section 203 (8 U.S.C. 1153) is amended—

(1) by redesignating subsections (d) through (g) as subsections (e) through (h), respectively, and

(2) by inserting after subsection (c) the following new subsection:

"(d) HUMANITARIAN IMMIGRANTS.—

"(1) IN GENERAL.—Aliens subject to the worldwide humanitarian level specified in section 201(e) shall be allotted visas only if the aliens have been selected by the Attorney General under paragraph (2) as of special humanitarian concern to the United States.

"(2) SELECTION OF IMMIGRANTS.—

"(A) IN GENERAL.—The Attorney General shall, on a case-by-case basis and based on humanitarian concerns and the public interest, select aliens for purposes of this subsection.

"(B) RESTRICTION.—The Attorney General may not select an alien under this paragraph if the alien is a refugee (within the meaning of section 101(a)(42)) unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be admitted into the United States as a humanitarian immigrant under this subsection rather than as a refugee under section 207.

"(3) ANNUAL REPORT.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing the number of immigrant visas issued under this subsection and the individuals to whom the visas were issued.".

79

(b) PETITIONING.—Section 204(a)(1) (8 U.S.C. 1154(a)(1)) is amended by adding at the end the following new subparagraph:

"(I) Any alien desiring to be provided an immigrant visa under section 203(d) may file a petition with the Attorney General for such classification, but only if the Attorney General has identified the alien as possibly qualifying for such a visa.".

(c) ORDER OF CONSIDERATION.—Subsection (f) of section 203 (8 U.S.C. 1153), as redesignated by subsection (a)(1), is amended by redesignating paragraph (3) as paragraph (4) and by inserting after paragraph (2) the following new paragraph:

"(3) Immigrant visa numbers made available under subsection (d) (relating to humanitarian immigrants) shall be issued to eligible immigrants in an order specified by the Attorney General.".

(d) APPLICATION OF PER COUNTRY NUMERICAL LIMITATIONS.—Section 202(a) (8 U.S.C. 1152(a)) is amended by adding at the end the following new paragraph:

"(5) PER COUNTRY LEVELS FOR HUMANITARIAN IMMIGRANTS.—The total number of immigrant visas made available to natives of any single foreign state or dependent area under section 203(d) in any fiscal year may not exceed 50 percent (in the case of a single foreign state) or 15 percent (in the case of a dependent area) of the total number of such visas made available under such subsection in that fiscal year.".

(e) WAIVER OF CERTAIN GROUNDS OF INADMISSIBILITY.—Section 212(a) (8 U.S.C. 1182(a)) is amended—

(1) in paragraph (4), as amended by sections 621(a) and 512(b), by adding at the end the following new subparagraph:

"(E) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under subparagraph (A) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).";

(2) in paragraph (5)(C), by inserting before the period at the end the following: ", and shall not apply to immigrants seeking admissions as humanitarian immigrants under section 203(d)"; and

(3) in paragraph (7)(A), by redesignating clause (ii) as clause (iii) and by inserting after clause (i) the following new clause:

"(ii) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under clause (i) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).".

(f) CONFORMING AMENDMENT.—Section 216(g)(1) (8 U.S.C. 1186a(g)(1)) is amended by striking "203(d)" and inserting "203(e)".

# Subtitle D—Asylum Reform

**SEC. 531. ASYLUM REFORM.**

(a) ASYLUM REFORM.—Section 208 (8 U.S.C. 1158) is amended to read as follows:

"ASYLUM

"SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

"(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival), irrespective of such alien's status, may apply for asylum in accordance with this section.

"(2) EXCEPTIONS.—

"(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

"(B) TIME LIMIT.—Paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 30 days after the alien's arrival in the United States.

80

"(C) Previous asylum applications.—Paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

"(D) Changed conditions.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General the existence of fundamentally changed circumstances which affect the applicant's eligibility for asylum.

"(3) Limitation on judicial review.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

"(b) Conditions for Granting Asylum.—

"(1) In general.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

"(2) Exceptions.—

"(A) In general.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

"(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

"(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

"(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

"(vi) the alien was firmly resettled in another country prior to arriving in the United States.

"(B) Special rules.—

"(i) Conviction of aggravated felony.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

"(ii) Offenses.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

"(C) Additional limitations.—The Attorney General may by regulation establish additional limitations and conditions under which an alien shall be ineligible for asylum under paragraph (1).

"(D) No judicial review.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

"(3) Treatment of spouse and children.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

"(c) Asylum Status.—

"(1) In general.—In the case of an alien granted asylum under subsection (b), the Attorney General—

"(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

"(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

"(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

81

"(2) TERMINATION OF ASYLUM.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

"(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

"(B) the alien meets a condition described in subsection (b)(2);

"(C) the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien cannot establish that it is more likely than not that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

"(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

"(E) the alien has acquired a new nationality and enjoys the protection of the country of his new nationality.

"(3) REMOVAL WHEN ASYLUM IS TERMINATED.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

"(4) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

"(d) ASYLUM PROCEDURE.—

"(1) APPLICATIONS.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). An application for asylum shall not be considered unless the alien submits fingerprints and a photograph in a manner to be determined by regulation by the Attorney General.

"(2) EMPLOYMENT.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

"(3) FEES.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

"(4) NOTICE OF PRIVILEGE OF COUNSEL AND CONSEQUENCES OF FRIVOLOUS APPLICATION.—At the time of filing an application for asylum, the Attorney General shall—

"(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

"(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

"(5) CONSIDERATION OF ASYLUM APPLICATIONS.—

"(A) PROCEDURES.—The procedure established under paragraph (1) shall provide that—

"(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

"(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

82

"(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

"(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and

"(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

"(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.

"(6) FRIVOLOUS APPLICATIONS.—

"(A) IN GENERAL.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.

"(B) MATERIAL MISREPRESENTATIONS.—An application shall be considered to be frivolous if the Attorney General determines that the application contains a willful misrepresentation or concealment of a material fact.

"(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) CONFORMING AND CLERICAL AMENDMENTS.—

(1) The item in the table of contents relating to section 208 is amended to read as follows:

"Sec. 208. Asylum.".

(2) Section 104(d)(1)(A) of the Immigration Act of 1990 (Public Law 101–649) is amended by striking "208(b)" and inserting "208".

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications for asylum filed on or after the first day of the first month beginning more than 180 days after the date of the enactment of this Act.

**SEC. 532. FIXING NUMERICAL ADJUSTMENTS FOR ASYLEES AT 10,000 EACH YEAR.**

(a) IN GENERAL.—Section 209(b) (8 U.S.C. 1159(b)) is amended by striking "Not more than" and all that follows through "adjust" and inserting the following: "The Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, and in a number not to exceed 10,000 aliens in any fiscal year, may adjust".

(b) CONFORMING AMENDMENT.—Section 207(a) (8 U.S.C. 1157(a)) is amended by striking paragraph (4).

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on October 1, 1996.

**SEC. 533. INCREASED RESOURCES FOR REDUCING ASYLUM APPLICATION BACKLOGS.**

(a) AUTHORIZATION OF TEMPORARY EMPLOYMENT OF CERTAIN ANNUITANTS AND RETIREES.—

(1) IN GENERAL.—For the purpose of performing duties in connection with adjudicating applications for asylum pending as of the date of the enactment of this Act, the Attorney General may employ for a period not to exceed 24 months (beginning 3 months after the date of the enactment of this Act) not more than 300 individuals (at any one time) who, by reason of separation from service on or before January 1, 1995, are receiving—

(A) annuities under the provisions of subchapter III of chapter 83 of title 5, United States Code, or chapter 84 of such title;

(B) annuities under any other retirement system for employees of the Federal Government; or

(C) retired or retainer pay as retired officers of regular components of the uniformed services.

(2) NO REDUCTION IN ANNUITY OR RETIREMENT PAY OR REDETERMINATION OF PAY DURING TEMPORARY EMPLOYMENT.—

83

(A) Retirees under civil service retirement system and federal employees' retirement system.—In the case of an individual employed under paragraph (1) who is receiving an annuity described in paragraph (1)(A)—

(i) such individual's annuity shall continue during the employment under paragraph (1) and shall not be increased as a result of service performed during that employment;

(ii) retirement deductions shall not be withheld from such individual's pay; and

(iii) such individual's pay shall not be subject to any deduction based on the portion of such individual's annuity which is allocable to the period of employment.

(B) Other federal retirees.—The President shall apply the provisions of subparagraph (A) to individuals who are receiving an annuity described in paragraph (1)(B) and who are employed under paragraph (1) in the same manner and to the same extent as such provisions apply to individuals who are receiving an annuity described in paragraph (1)(A) and who are employed under paragraph (1).

(C) Retired officers of the uniform services.—The retired or retainer pay of a retired officer of a regular component of a uniformed service shall not be reduced under section 5532 of title 5, United States Code, by reason of temporary employment authorized under paragraph (1).

(b) Procedures for Property Acquisition on Leasing.—Notwithstanding the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.), the Attorney General is authorized to expend out of funds made available to the Department of Justice for the administration of the Immigration and Nationality Act such amounts as may be necessary for the leasing or acquisition of property to carry out the purpose described in subsection (a)(1).

(c) Increase in Asylum Officers.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of asylum officers to at least 600 asylum officers by fiscal year 1997.

## Subtitle E—General Effective Date; Transition Provisions

**SEC. 551. GENERAL EFFECTIVE DATE.**

(a) In General.—Except as otherwise provided in subsection (b) or in this title, this title and the amendments made by this title shall take effect on October 1, 1996, and shall apply beginning with fiscal year 1997.

(b) Provisions Taking Effect Upon Enactment.—Sections 523 and 554 shall take effect on the date of the enactment of this Act.

**SEC. 552. GENERAL TRANSITION FOR CURRENT CLASSIFICATION PETITIONS.**

(a) Family-Sponsored Immigrants.—

(1) Immediate relatives.—Any petition filed under section 204(a) of the Immigration and Nationality Act before October 1, 1996, for immediate relative status under section 201(b)(2)(A) of such Act (as in effect before such date) as a spouse or child of a United States citizen or as a parent of a United States citizen shall be deemed, as of such date, to be a petition filed under such section for status under section 201(b)(2)(A) (as such a spouse or child) or under section 203(a)(2), respectively, of such Act (as amended by this title).

(2) Spouses and children of permanent residents.—Any petition filed under section 204(a) of the Immigration and Nationality Act before October 1, 1996, for preference status under section 203(a)(2) of such Act as a spouse or child of an alien lawfully admitted for permanent residence shall be deemed, as of such date, to be a petition filed under such section for preference status under section 203(a)(1) of such Act (as amended by this title).

(b) Employment-Based Immigrants.—

(1) In general.—Subject to paragraph (2), any petition filed before October 1, 1996, and approved on any date, to accord status under section 203(b)(1)(A), 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), 203(b)(3)(A)(i), 203(b)(3)(A)(ii), 203(b)(4), 203(b)(5) of the Immigration and Nationality Act (as in effect before such date) shall be deemed, on and after October 1, 1996 (or, if later, the date of such approval), to be a petition approved to accord status under section 203(b)(1), 203(b)(2)(B), 203(b)(2)(C), 203(b)(3), 203(b)(4)(B), 203(b)(4)(C), 203(b)(6), or 203(b)(5), respectively, of such Act (as in effect on and after such date). Nothing

84

in this paragraph shall be construed as exempting the beneficiaries of such petitions from the numerical limitations under section 203(b) (as amended by section 513).

(2) TIME LIMITATION.—Paragraph (1) shall not apply more than two years after the date the priority date for issuance of a visa on the basis of such a petition has been reached.

(c) ADMISSIBILITY STANDARDS.—When an immigrant, in possession of an unexpired immigrant visa issued before October 1, 1996, makes application for admission, the immigrant's admissibility under paragraph (7)(A) of section 212(a) of the Immigration and Nationality Act shall be determined under the provisions of law in effect on the date of the issuance of such visa.

(d) CONSTRUCTION.—Nothing in this title shall be construed as affecting the provisions of section 19 of Public Law 97–116, section 2(c)(1) of Public Law 97–271, or section 202(e) of Public Law 99–603.

**SEC. 553. SPECIAL TRANSITION FOR CERTAIN BACKLOGGED SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.**

(a) IN GENERAL.—(1) In addition to any immigrant visa numbers otherwise available, immigrant visa numbers in a number not to exceed 50,000 (or, if greater, ⅕ of the number of aliens described in paragraph (2)) immigrant visa numbers shall be made available in each of fiscal years 1997 through 2001 for aliens who have petitions approved for classification under section 203(a)(1) of the Immigration and Nationality Act (as amended by this title) for the fiscal year.

(2) Aliens described in this paragraph are aliens, for whom petitions are pending as of the beginning of the fiscal year involved, with respect to whom the petitioning alien became an alien admitted for lawful permanent residence through the operation of section 210 or 245A of the Immigration and Nationality Act.

(b) ORDER.—(1) Subject to paragraph (2), visa numbers under this section shall be made available in the order in which a petition, in behalf of each such immigrant for classification under section 203(a)(1) of the Immigration and Nationality Act, is filed with the Attorney General under section 204 of such Act.

(2) Visa numbers shall first be made available to aliens for whom the petitioning alien did not become an alien lawfully admitted for permanent residence thorough the operation of section 210 or 245A of the Immigration and Nationality Act.

(3) The per country numerical limitations of section 202 of such Act shall not apply with respect to visa numbers made available under this section, and visa numbers made available under this section shall not be counted in determining whether there are excess family admissions in a fiscal year under section 201(c)(3)(B) of the Immigration and Nationality Act (as amended by section 501(b)).

(c) REPORT.—The Attorney General shall submit to Congress, by April 1, 2001, a report on the operation of this section and the extent to which this section will, by October 1, 2001, have resulted in visa numbers being available to immigrants described in paragraphs (1) and (2) of subsection (b) being available on a current basis.

**SEC. 554. SPECIAL TREATMENT OF CERTAIN DISADVANTAGED FAMILY FIRST PREFERENCE IMMIGRANTS.**

(a) DISREGARD OF PER COUNTRY LIMITS FOR LAST HALF OF FISCAL YEAR 1996.—The per country numerical limitations specified in section 202(a) of the Immigration and Nationality Act shall not apply to immigrant numbers made available under section 203(a)(1) of such Act (as in effect before the date of the enactment of this Act) on or after April 1, 1996, but only to the extent necessary to assure that the priority date for aliens classified under such section who are nationals of a country is not earlier than the priority date for aliens classified under section 203(a)(2)(B) of such Act for aliens who are nationals of that country.

(b) ADDITIONAL VISA NUMBERS POTENTIALLY AVAILABLE TO ASSURE EQUITABLE TREATMENT FOR UNMARRIED SONS AND DAUGHTERS OF UNITED STATES CITIZENS.—

(1) IN GENERAL.—In addition to any immigrant visa otherwise available, immigrant visa numbers shall be made available during fiscal year 1997 for disadvantaged family first preference aliens (as defined in paragraph (2)) and for spouses and children of such aliens who would otherwise be eligible to immigrant status under section 203(e) of the Immigration and Nationality Act in relation to such aliens if the aliens remained entitled to immigrant status under section 203(a) of such Act.

(2) DISADVANTAGED FAMILY FIRST PREFERENCE ALIEN DEFINED.—In this subsection, the term "disadvantaged family first preference alien" means an alien—

(A) with respect to whom a petition for classification under section 203(a)(1) of the Immigration and Nationality Act (as in effect on the date of the enactment of this Act) was approved as of September 30, 1996, and

85

(B) whose priority date, as of September 30, 1996, under such classification was earlier than the priority date as of such date for aliens of the same nationality with respect to whom a petition for classification under section 203(a)(2)(B) of such Act (as in effect on such date) had been approved.

(3) DISREGARD OF PER COUNTRY NUMERICAL LIMITATIONS.—Additional visa numbers made available under this subsection shall not be taken into account for purposes of applying any numerical limitation applicable to the country under section 202 of such Act, and visa numbers made available under this subsection shall not be counted in determining whether there are excess family admissions in a fiscal year under section 201(c)(3)(B) of the Immigration and Nationality Act (as amended by section 501(b) of this Act).

**SEC. 555. AUTHORIZATION OF REIMBURSEMENT OF PETITIONERS FOR ELIMINATED FAMILY-SPONSORED CATEGORIES.**

(a) IN GENERAL.—Subject to the availability of appropriations, after the effective date of this title, the Attorney General shall establish a process to provide for the reimbursement to each petitioner of all fees paid to the United States, and which were required to be paid under the Immigration and Nationality Act, for a petition, which was not disapproved as of such date and for which a visa has not been issued, for a family-sponsored immigrant category which is eliminated by this title or the amendments made by this title. Any such process shall provide that such a petitioner shall present any required documentation or other proof of such claim, in person, to the Immigration and Naturalization Service.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

# TITLE VI—RESTRICTIONS ON BENEFITS FOR ALIENS

**SEC. 600. STATEMENTS OF NATIONAL POLICY CONCERNING WELFARE AND IMMIGRATION.**

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) Where States are authorized to follow Federal eligibility rules for public assistance programs, the Congress strongly encourages the States to adopt the Federal eligibility rules.

86

# Subtitle A—Eligibility of Illegal Aliens for Public Benefits

## PART 1—PUBLIC BENEFITS GENERALLY

**SEC. 601. MAKING ILLEGAL ALIENS INELIGIBLE FOR PUBLIC ASSISTANCE, CONTRACTS, AND LICENSES.**

(a) FEDERAL PROGRAMS.—Notwithstanding any other provision of law, except as provided in section 603, any alien who is not lawfully present in the United States shall not be eligible for any of the following:

(1) FEDERAL ASSISTANCE PROGRAMS.—To receive any benefits under any program of assistance provided or funded, in whole or in part, by the Federal Government for which eligibility (or the amount of assistance) is based on financial need.

(2) FEDERAL CONTRACTS OR LICENSES.—To receive any grant, to enter into any contract or loan agreement, or to be issued (or have renewed) any professional or commercial license, if the grant, contract, loan, or license is provided or funded by any Federal agency.

(b) STATE PROGRAMS.—Notwithstanding any other provision of law, except as provided in section 603, any alien who is not lawfully present in the United States shall not be eligible for any of the following:

(1) STATE ASSISTANCE PROGRAMS.—To receive any benefits under any program of assistance (not described in subsection (a)(1)) provided or funded, in whole or in part, by a State or political subdivision of a State for which eligibility (or the amount of assistance) is based on financial need.

(2) STATE CONTRACTS OR LICENSES.—To receive any grant, to enter into any contract or loan agreement, or to be issued (or have renewed) any professional or commercial license, if the grant, contract, loan, or license is provided or funded by any State agency.

(c) REQUIRING PROOF OF IDENTITY FOR FEDERAL CONTRACTS, GRANTS, LOANS, LICENSES, AND PUBLIC ASSISTANCE.—

(1) IN GENERAL.—In considering an application for a Federal contract, grant, loan, or license, or for public assistance under a program described in paragraph (2), a Federal agency shall require the applicant to provide proof of identity under paragraph (3) to be considered for such Federal contract, grant, loan, license, or public assistance.

(2) PUBLIC ASSISTANCE PROGRAMS COVERED.—The requirement of proof of identity under paragraph (1) shall apply to the following Federal public assistance programs:

(A) SSI.—The supplemental security income program under title XVI of the Social Security Act, including State supplementary benefits programs referred to in such title.

(B) AFDC.—The program of aid to families with dependent children under part A or E of title IV of the Social Security Act.

(C) SOCIAL SERVICES BLOCK GRANT.—The program of block grants to States for social services under title XX of the Social Security Act.

(D) MEDICAID.—The program of medical assistance under title XIX of the Social Security Act.

(E) FOOD STAMPS.—The program under the Food Stamp Act of 1977.

(F) HOUSING ASSISTANCE.—Financial assistance as defined in section 214(b) of the Housing and Community Development Act of 1980.

(3) DOCUMENTS THAT SHOW PROOF OF IDENTITY.—

(A) IN GENERAL.—Any one of the documents described in subparagraph (B) may be used as proof of identity under this subsection if the document is current and valid. No other document or documents shall be sufficient to prove identity.

(B) DOCUMENTS DESCRIBED.—The documents described in this subparagraph are the following:

(i) A United States passport (either current or expired if issued both within the previous 20 years and after the individual attained 18 years of age).

(ii) A resident alien card.

(iii) A State driver's license, if presented with the individual's social security account number card.

(iv) A State identity card, if presented with the individual's social security account number card.

87

(d) AUTHORIZATION FOR STATES TO REQUIRE PROOF OF ELIGIBILITY FOR STATE PROGRAMS.—In considering an application for contracts, grants, loans, licenses, or public assistance under any State program, a State is authorized to require the applicant to provide proof of eligibility to be considered for such State contracts, grants, loans, licenses, or public assistance.

(e) EXCEPTION FOR BATTERED ALIENS.—

(1) EXCEPTION.—The limitations on eligibility for benefits under subsection (a) or (b) shall not apply to an alien if—

(A)(i) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or

(ii) the alien's child has been battered or subject to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty) or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to, and the alien did not actively participate in, such battery or cruelty; and

(B)(i) the alien has petitioned (or petitions within 45 days after the first application for assistance subject to the limitations under subsection (a) or (b)) for—

(I) status as a spouse or child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A) of the Immigration and Nationality Act,

(II) classification pursuant to clauses (ii) or (iii) of section 204(a)(1)(B) of such Act, or

(III) cancellation of removal and adjustment of status pursuant to section 240A(b)(2) of such Act ; or

(ii) the alien is the beneficiary of a petition filed for status as a spouse or child of a United States citizen pursuant to clause (i) of section 204(a)(1)(A) of the Immigration and Nationality Act, or of a petition filed for classification pursuant to clause (i) of section 204(a)(1)(B) of such Act.

(2) TERMINATION OF EXCEPTION.—The exception under paragraph (1) shall terminate if no complete petition which sets forth a prima facie case is filed pursuant to the requirement of paragraph (1)(B) or (1)(C) or when an petition is denied.

**SEC. 602. MAKING UNAUTHORIZED ALIENS INELIGIBLE FOR UNEMPLOYMENT BENEFITS.**

(a) IN GENERAL.—Notwithstanding any other provision of law, no unemployment benefits shall be payable (in whole or in part) out of Federal funds to the extent the benefits are attributable to any employment of the alien in the United States for which the alien was not granted employment authorization pursuant to Federal law.

(b) PROCEDURES.—Entities responsible for providing unemployment benefits subject to the restrictions of this section shall make such inquiries as may be necessary to assure that recipients of such benefits are eligible consistent with this section.

**SEC. 603. GENERAL EXCEPTIONS.**

Sections 601 and 602 shall not apply to the following:

(1) EMERGENCY MEDICAL SERVICES.—The provision of emergency medical services (as defined by the Attorney General in consultation with the Secretary of Health and Human Services).

(2) PUBLIC HEALTH IMMUNIZATIONS.—Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment for communicable diseases.

(3) SHORT-TERM EMERGENCY RELIEF.—The provision of non-cash, in-kind, short-term emergency relief.

(4) FAMILY VIOLENCE SERVICES.—The provision of any services directly related to assisting the victims of domestic violence or child abuse.

(5) SCHOOL LUNCH ACT.—Programs carried out under the National School Lunch Act.

(6) CHILD NUTRITION ACT.—Programs of assistance under the Child Nutrition Act of 1966.

**SEC. 604. TREATMENT OF EXPENSES SUBJECT TO EMERGENCY MEDICAL SERVICES EXCEPTION.**

(a) IN GENERAL.—Subject to such amounts as are provided in advance in appropriation Acts, each State or local government that provides emergency medical services (as defined for purposes of section 603(1)) through a public hospital or other

88

public facility (including a nonprofit hospital that is eligible for an additional payment adjustment under section 1886 of the Social Security Act) or through contract with another hospital or facility to an individual who is an alien not lawfully present in the United States is entitled to receive payment from the Federal Government of its costs of providing such services, but only to the extent that such costs are not otherwise reimbursed through any other Federal program and cannot be recovered from the alien or another person.

(b) CONFIRMATION OF IMMIGRATION STATUS REQUIRED.—No payment shall be made under this section with respect to services furnished to an individual unless the identity and immigration status of the individual has been verified with the Immigration and Naturalization Service in accordance with procedures established by the Attorney General.

(c) ADMINISTRATION.—This section shall be administered by the Attorney General, in consultation with the Secretary of Health and Human Services.

(d) EFFECTIVE DATE.—Subsection (a) shall not apply to emergency medical services furnished before October 1, 1995.

**SEC. 605. REPORT ON DISQUALIFICATION OF ILLEGAL ALIENS FROM HOUSING ASSISTANCE PROGRAMS.**

Not later than 90 days after the date of the enactment of this Act, the Secretary of Housing and Urban Development shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on Banking of the House of Representatives, and the Committee on Banking, Housing, and Urban Affairs of the Senate, describing the manner in which the Secretary is enforcing section 214 of the Housing and Community Development Act of 1980. The report shall contain statistics with respect to the number of aliens denied financial assistance under such section.

**SEC. 606. VERIFICATION OF STUDENT ELIGIBILITY FOR POSTSECONDARY FEDERAL STUDENT FINANCIAL ASSISTANCE.**

No student shall be eligible for postsecondary Federal student financial assistance unless the student has certified that the student is a citizen or national of the United States or an alien lawfully admitted for permanent residence and the Secretary of Education has verified such certification through an appropriate procedure determined by the Attorney General.

**SEC. 607. PAYMENT OF PUBLIC ASSISTANCE BENEFITS.**

In carrying out this part, the payment or provision of benefits (other than those described in section 603 under a program of assistance described in section 601(a)(1)) shall be made only through an individual or person who is not ineligible to receive such benefits under such program on the basis of immigration status pursuant to the requirements and limitations of this part.

**SEC. 608. DEFINITIONS.**

For purposes of this part:

(1) LAWFUL PRESENCE.—The determination of whether an alien is lawfully present in the United States shall be made in accordance with regulations of the Attorney General. An alien shall not be considered to be lawfully present in the United States for purposes of this title merely because the alien may be considered to be permanently residing in the United States under color of law for purposes of any particular program.

(2) STATE.—The term "State" includes the District of Columbia, Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa.

**SEC. 609. REGULATIONS AND EFFECTIVE DATES.**

(a) REGULATIONS.—The Attorney General shall first issue regulations to carry out this part (other than section 605) by not later than 60 days after the date of the enactment of this Act. Such regulations shall take effect on an interim basis, pending change after opportunity for public comment.

(b) EFFECTIVE DATE FOR RESTRICTIONS ON ELIGIBILITY FOR PUBLIC BENEFITS.—(1) Except as provided in this subsection, section 601 shall apply to benefits provided, contracts or loan agreements entered into, and professional and commercial licenses issued (or renewed) on or after such date as the Attorney General specifies in regulations under subsection (a). Such date shall be at least 30 days, and not more than 60 days, after the date the Attorney General first issues such regulations.

(2) The Attorney General, in carrying out section 601(a)(2), may permit such section to be waived in the case of individuals for whom an application for the grant, contract, loan, or license is pending (or approved) as of a date that is on or before the effective date specified under paragraph (1).

89

(c) EFFECTIVE DATE FOR RESTRICTIONS ON ELIGIBILITY FOR UNEMPLOYMENT BENE-FITS.—(1) Except as provided in this subsection, section 602 shall apply to unemployment benefits provided on or after such date as the Attorney General specifies in regulations under subsection (a). Such date shall be at least 30 days, and not more than 60 days, after the date the Attorney General first issues such regulations.

(2) The Attorney General, in carrying out section 602, may permit such section to be waived in the case of an individual during a continuous period of unemployment for whom an application for unemployment benefits is pending as of a date that is on or before the effective date specified under paragraph (1).

(d) BROAD DISSEMINATION OF INFORMATION.—Before the effective dates specified in subsections (b) and (c), the Attorney General shall broadly disseminate information regarding the restrictions on eligibility established under this part.

## PART 2—EARNED INCOME TAX CREDIT

### SEC. 611. EARNED INCOME TAX CREDIT DENIED TO INDIVIDUALS NOT AUTHORIZED TO BE EMPLOYED IN THE UNITED STATES.

(a) IN GENERAL.—Section 32(c)(1) of the Internal Revenue Code of 1986 (relating to individuals eligible to claim the earned income tax credit) is amended by adding at the end the following new subparagraph:

"(F) IDENTIFICATION NUMBER REQUIREMENT.—The term 'eligible individual' does not include any individual who does not include on the return of tax for the taxable year—

"(i) such individual's taxpayer identification number, and

"(ii) if the individual is married (within the meaning of section 7703), the taxpayer identification number of such individual's spouse."

(b) SPECIAL IDENTIFICATION NUMBER.—Section 32 of the Internal Revenue Code of 1986 (relating to earned income) is amended by adding at the end the following new subsection:

"(k) IDENTIFICATION NUMBERS.—For purposes of subsections (c)(1)(F) and (c)(3)(D), a taxpayer identification number means a social security number issued to an individual by the Social Security Administration (other than a social security number issued pursuant to clause (II) (or that portion of clause (III) that relates to clause (II)) of section 205(c)(2)(B)(i) of the Social Security Act)."

(c) EXTENSION OF PROCEDURES APPLICABLE TO MATHEMATICAL OR CLERICAL ERRORS.—Section 6213(g)(2) of the Internal Revenue Code of 1986 (relating to the definition of mathematical or clerical errors) is amended by striking "and" at the end of subparagraph (D), by striking the period at the end of subparagraph (E) and inserting ", and", and by inserting after subparagraph (E) the following new subparagraph:

"(F) an omission of a correct taxpayer identification number required under section 23 (relating to credit for families with younger children) or section 32 (relating to the earned income tax credit) to be included on a return.".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1995.

## Subtitle B—Expansion of Disqualification From Immigration Benefits on the Basis of Public Charge

### SEC. 621. GROUND FOR INADMISSIBILITY.

(a) IN GENERAL.—Paragraph (4) of section 212(a) (8 U.S.C. 1182(a)) is amended to read as follows:

"(4) PUBLIC CHARGE.—

"(A) FAMILY-SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(a), who cannot demonstrate to the consular officer at the time of application for a visa, or to the Attorney General at the time of application for admission or adjustment of status, that the alien's age, health, family status, assets, resources, financial status, education, skills, or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

90

"(B) NONIMMIGRANTS.—Any alien who seeks admission under a visa number issued under section 214, who cannot demonstrate to the consular officer at the time of application for the visa that the alien's age, health, family status, assets, resources, financial status, education, skills or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

"(C) EMPLOYMENT-BASED IMMIGRANTS.—

"(i) IN GENERAL.—Any alien who seeks admission or adjustment of status under a visa number issued under paragraph (2) or (3) of section 203(b) who cannot demonstrate to the consular officer at the time of application for a visa, or to the Attorney General at the time of application for admission or adjustment of status, that the immigrant has a valid offer of employment is inadmissible.

"(ii) CERTAIN EMPLOYMENT-BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible unless such relative has executed an affidavit of support described in section 213A with respect to such alien.".

(b) EFFECTIVE DATE.—(1) Subject to paragraph (2), the amendment made by subsection (a) shall apply to applications submitted on or after such date, not earlier than 30 days and not later than 60 days after the date the Attorney General promulgates under section 632(f) a standard form for an affidavit of support, as the Attorney General shall specify.

(2) Section 212(a)(4)(C)(i) of the Immigration and Nationality Act, as amended by subsection (a), shall apply only to aliens seeking admission or adjustment of status under a visa number issued on or after October 1, 1996.

**SEC. 622. GROUND FOR DEPORTABILITY.**

(a) IN GENERAL.—Paragraph (5) of subsection (a) of section 241 (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2), is amended to read as follows:

"(5) PUBLIC CHARGE.—

"(A) IN GENERAL.—Any alien who, within 7 years after the date of entry or admission, becomes a public charge is deportable.

"(B) EXCEPTIONS.—(i) Subparagraph (A) shall not apply if the alien establishes that the alien has become a public charge from causes that arose after entry or admission. A condition that the alien knew (or had reason to know) existed at the time of entry or admission shall be deemed to be a cause that arose before entry or admission.

"(ii) The Attorney General, in the discretion of the Attorney General, may waive the application of subparagraph (A) in the case of an alien who is admitted as a refugee under section 207 or granted asylum under section 208.

"(C) INDIVIDUALS TREATED AS PUBLIC CHARGE.—

"(i) IN GENERAL.—For purposes of this title, an alien is deemed to be a 'public charge' if the alien receives benefits (other than benefits described in subparagraph (E)) under one or more of the public assistance programs described in subparagraph (D) for an aggregate period, except as provided in clauses (ii) and (iii), of at least 12 months within 7 years after the date of entry. The previous sentence shall not be construed as excluding any other bases for considering an alien to be a public charge, including bases in effect on the day before the date of the enactment of the Immigration in the National Interest Act of 1995. The Attorney General, in consultation with the Secretary of Health and Human Services, shall establish rules regarding the counting of health benefits described in subparagraph (D)(iv) for purposes of this subparagraph.

"(ii) DETERMINATION WITH RESPECT TO BATTERED WOMEN AND CHILDREN.—For purposes of a determination under clause (i) and except as provided in clause (iii), the aggregate period shall be 48 months within 7 years after the date of entry if the alien can demonstrate that (I) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty in the

91

United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the need for the public benefits received has a substantial connection to the battery or cruelty described in subclause (I) or (II).

"(iii) SPECIAL RULE FOR ONGOING BATTERY OR CRUELTY.—For purposes of a determination under clause (i), the aggregate period may exceed 48 months within 7 years after the date of entry if the alien can demonstrate that any battery or cruelty under clause (ii) is ongoing, has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service, and that the need for the benefits received has a substantial connection to such battery or cruelty.

"(D) PUBLIC ASSISTANCE PROGRAMS.—For purposes of subparagraph (B), the public assistance programs described in this subparagraph are the following (and include any successor to such a program as identified by the Attorney General in consultation with other appropriate officials):

"(i) SSI.—The supplemental security income program under title XVI of the Social Security Act, including State supplementary benefits programs referred to in such title.

"(ii) AFDC.—The program of aid to families with dependent children under part A or E of title IV of the Social Security Act.

"(iii) MEDICAID.—The program of medical assistance under title XIX of the Social Security Act.

"(iv) FOOD STAMPS.—The program under the Food Stamp Act of 1977.

"(v) STATE GENERAL CASH ASSISTANCE.—A program of general cash assistance of any State or political subdivision of a State.

"(vi) HOUSING ASSISTANCE.—Financial assistance as defined in section 214(b) of the Housing and Community Development Act of 1980.

"(E) CERTAIN ASSISTANCE EXCEPTED.—For purposes of subparagraph (B), an alien shall not be considered to be a public charge on the basis of receipt of any of the following benefits:

"(i) EMERGENCY MEDICAL SERVICES.—The provision of emergency medical services (as defined by the Attorney General in consultation with the Secretary of Health and Human Services).

"(ii) PUBLIC HEALTH IMMUNIZATIONS.—Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment for communicable diseases.

"(iii) SHORT-TERM EMERGENCY RELIEF.—The provision of non-cash, in-kind, short-term emergency relief.".

(b) EFFECTIVE DATE.—(1) The amendment made by subsection (a) shall take effect as of the first day of the first month beginning at least 30 days after the date of the enactment of this Act.

(2) In applying section 241(a)(5)(C) of the Immigration and Nationality Act (which is subsequently redesignated as section 237(a)(5)(C) of such Act), as amended by subsection (a), no receipt of benefits under a public assistance program before the effective date described in paragraph (1) shall be taken into account.

## Subtitle C—Attribution of Income and Affidavits of Support

### SEC. 631. ATTRIBUTION OF SPONSOR'S INCOME AND RESOURCES TO FAMILY-SPONSORED IMMIGRANTS.

(a) FEDERAL PROGRAMS.—Notwithstanding any other provision of law, in determining the eligibility and the amount of benefits of an alien for any Federal means-tested public benefits program (as defined in subsection (d)) the income and resources of the alien shall be deemed to include—

(1) the income and resources of any individual who executed an affidavit of support pursuant to section 213A of the Immigration and Nationality Act (as inserted by section 632(a)) in behalf of such alien, and

(2) the income and resources of the spouse (if any) of the individual.

(b) PERIOD OF ATTRIBUTION.—

(1) PARENTS OF UNITED STATES CITIZENS.—Subsection (a) shall apply with respect to an alien who is admitted to the United States as the parent of a United

92

States citizen under section 203(a)(2) of the Immigration and Nationality Act, as amended by section 512(a), until the alien is naturalized as a citizen of the United States.

(2) SPOUSES OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS.—Subsection (a) shall apply with respect to an alien who is admitted to the United States as the spouse of a United States citizen or lawful permanent resident under section 201(b)(2) of 203(a)(1) of the Immigration and Nationality Act until—

(A) 7 years after the date the alien is lawfully admitted to the United States for permanent residence, or

(B) the alien is naturalized as a citizen of the United States,

whichever occurs first.

(3) MINOR CHILDREN OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS.—Subsection (a) shall apply with respect to an alien who is admitted to the United States as the minor child of a United States citizen or lawful permanent resident under section 201(b)(2) of 203(a)(1) of the Immigration and Nationality Act until the child attains the age of 21 years or, if earlier, the date the child is naturalized as a citizen of the United States.

(4) ATTRIBUTION OF SPONSOR'S INCOME AND RESOURCES ENDED IF SPONSORED ALIEN BECOMES ELIGIBLE FOR OLD-AGE BENEFITS UNDER TITLE II OF THE SOCIAL SECURITY ACT.—

(A) Notwithstanding any other provision of this section, subsection (a) shall not apply and the period of attribution of a sponsor's income and resources under this subsection shall terminate if the alien is employed for a period sufficient to qualify for old age benefits under title II of the Social Security Act and the alien is able to prove to the satisfaction of the Attorney General that the alien so qualifies.

(B) The Attorney General shall ensure that appropriate information pursuant to subparagraph (A) is provided to the System for Alien Verification of Eligibility (SAVE).

(5) BATTERED WOMEN AND CHILDREN.—Notwithstanding any other provision of this section, subsections (a) and (c) shall not apply and the period of attribution of the income and resources of any individual under paragraphs (1) or (2) of subsection (a) or paragraph (1) shall not apply—

(A) for up to 48 months if the alien can demonstrate that (i) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (ii) the alien's child has been battered or subject to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and need for the public benefits applied for has a substantial connection to the battery or cruelty described in clause (i) or (ii); and

(B) for more than 48 months if the alien can demonstrate that any battery or cruelty under subparagraph (A) is ongoing, has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service, and that need for such benefits has a substantial connection to such battery or cruelty.

(c) OPTIONAL APPLICATION TO STATE PROGRAMS.—

(1) AUTHORITY.—Notwithstanding any other provision of law, in determining the eligibility and the amount of benefits of an alien for any State means-tested public benefits program, the State or political subdivision that offers the program is authorized to provide that the income and resources of the alien shall be deemed to include—

(A) the income and resources of any individual who executed an affidavit of support pursuant to section 213A of the Immigration and Nationality Act (as inserted by section 632(a)) in behalf of such alien, and

(B) the income and resources of the spouse (if any) of the individual.

(2) PERIOD OF ATTRIBUTION.—The period of attribution of a sponsor's income and resources in determining the eligibility and amount of benefits for an alien under any State means-tested public benefits program pursuant to paragraph (1) may not exceed the Federal period of attribution with respect to the alien.

(d) MEANS-TESTED PROGRAM DEFINED.—In this section:

93

(1) The term "means-tested public benefits program" means a program of public benefits (including cash, medical, housing, and food assistance and social services) of the Federal Government or of a State or political subdivision of a State in which the eligibility of an individual, household, or family eligibility unit for benefits under the program, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit.

(2) The term "Federal means-tested public benefits program" means a means-tested public benefits program of (or contributed to by) the Federal Government.

(3) The term "State means-tested public benefits program" means a means-tested public benefits program that is not a Federal means-tested program.

**SEC. 632. REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT.**

(a) IN GENERAL.—Title II is amended by inserting after section 213 the following new section:

"REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT

"SEC. 213A. (a) ENFORCEABILITY.—(1) No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not inadmissible as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—

"(A) that is legally enforceable against the sponsor by the Federal Government and by any State (or any political subdivision of such State) that provides any means-tested public benefits program, subject to subsection (b)(4); and

"(B) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).

"(2)(A) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the parent of a United States citizen under section 203(a)(2) until the alien is naturalized as a citizen of the United States.

"(B) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the spouse of a United States citizen or lawful permanent resident under section 201(b)(2) or 203(a)(2) until—

"(i) 7 years after the date the alien is lawfully admitted to the United States for permanent residence, or

"(ii) such time as the alien is naturalized as a citizen of the United States, whichever occurs first.

"(C) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the minor child of a United States citizen or lawful permanent resident under section 201(b)(2) or section 203(a)(2) until the child attains the age of 21 years.

"(D)(i) Notwithstanding any other provision of this subparagraph, a sponsor shall be relieved of any liability under an affidavit of support if the sponsored alien is employed for a period sufficient to qualify for old age benefits under title II of the Social Security Act and the sponsor or alien is able to prove to the satisfaction of the Attorney General that the alien so qualifies.

"(ii) The Attorney General shall ensure that appropriate information pursuant to clause (i) is provided to the System for Alien Verification of Eligibility (SAVE).

"(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—(1)(A) Upon notification that a sponsored alien has received any benefit under any means-tested public benefits program, the appropriate Federal, State, or local official shall request reimbursement by the sponsor in the amount of such assistance.

"(B) The Attorney General, in consultation with the Secretary of Health and Human Services, shall prescribe such regulations as may be necessary to carry out subparagraph (A).

"(2) If within 45 days after requesting reimbursement, the appropriate Federal, State, or local agency has not received a response from the sponsor indicating a willingness to commence payments, an action may be brought against the sponsor pursuant to the affidavit of support.

"(3) If the sponsor fails to abide by the repayment terms established by such agency, the agency may, within 60 days of such failure, bring an action against the sponsor pursuant to the affidavit of support.

"(4) No cause of action may be brought under this subsection later than 10 years after the alien last received any benefit under any means-tested public benefits program.

94

"(5) If, pursuant to the terms of this subsection, a Federal, State, or local agency requests reimbursement from the sponsor in the amount of assistance provided, or brings an action against the sponsor pursuant to the affidavit of support, the appropriate agency may appoint or hire an individual or other person to act on behalf of such agency acting under the authority of law for purposes of collecting any moneys owed. Nothing in this subsection shall preclude any appropriate Federal, State, or local agency from directly requesting reimbursement from a sponsor for the amount of assistance provided, or from bringing an action against a sponsor pursuant to an affidavit of support.

"(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.

"(d) NOTIFICATION OF CHANGE OF ADDRESS.—(1) The sponsor of an alien shall notify the Federal Government and the State in which the sponsored alien is currently residing within 30 days of any change of address of the sponsor during the period specified in subsection (a)(1).

"(2) Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall be subject to a civil penalty of—

"(A) not less than $250 or more than $2,000, or

"(B) if such failure occurs with knowledge that the sponsored alien has received any benefit under any means-tested public benefits program, not less than $2,000 or more than $5,000.

"(e) DEFINITIONS.—For the purposes of this section—

"(1) SPONSOR.—The term 'sponsor' means, with respect to an alien, an individual who—

"(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

"(B) is 18 years of age or over;

"(C) is domiciled in any State;

"(D) demonstrates, through presentation of a certified copy of a tax return or otherwise, (i) the means to maintain an annual income equal to at least 200 percent of the poverty level for the individual and the individual's family (including the alien and any other aliens with respect to whom the individual is a sponsor), or (ii) for an individual who is on active duty (other than active duty for training) in the Armed Forces of the United States, the means to maintain an annual income equal to at least 100 percent of the poverty level for the individual and the individual's family including the alien and any other aliens with respect to whom the individual is a sponsor); and

"(E) is petitioning for the admission of the alien under section 204 (or is an individual who accepts joint and several liability with the petitioner).

"(2) FEDERAL POVERTY LINE.—The term 'Federal poverty line' means the income official poverty line (as defined in section 673(2) of the Community Services Block Grant Act) that is applicable to a family of the size involved.

"(3) MEANS-TESTED PUBLIC BENEFITS PROGRAM.—The term 'means-tested public benefits program' means a program of public benefits (including cash, medical, housing, and food assistance and social services) of the Federal Government or of a State or political subdivision of a State in which the eligibility of an individual, household, or family eligibility unit for benefits under the program, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit.".

(b) REQUIREMENT OF AFFIDAVIT OF SUPPORT FROM EMPLOYMENT SPONSORS.—For requirement for affidavit of support from individuals who file classification petitions for a relative as an employment-based immigrant, see the amendment made by section 621(a).

(c) SETTLEMENT OF CLAIMS PRIOR TO NATURALIZATION.—Section 316 (8 U.S.C. 1427) is amended—

(1) in subsection (a), by striking "and" before "(3)", and by inserting before the period at the end the following: ", and (4) in the case of an applicant that has received assistance under a means-tested public benefits program (as defined in subsection (f)(3) of section 213A) administered by a Federal, State, or local agency and with respect to which amounts may be owing under an affidavit of support executed under such section, provides satisfactory evidence that there are no outstanding amounts that may be owed to any such Federal, State, or

95

local agency pursuant to such affidavit by the sponsor who executed such affidavit, except as provided in subsection (g)"; and

(2) by adding at the end the following new subsection:

"(g) Clause (4) of subsection (a) shall not apply to an applicant where the applicant can demonstrate that—

"(A) either—

"(i) the applicant has been battered or subject to extreme cruelty in the United States by a spouse or parent or by a member of the spouse or parent's family residing in the same household as the applicant and the spouse or parent consented or acquiesced to such battery or cruelty, or

"(ii) the applicant's child has been battered or subject to extreme cruelty in the United States by the applicant's spouse or parent (without the active participation of the applicant in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the applicant when the spouse or parent consented or acquiesced to and the applicant did not actively participate in such battery or cruelty;

"(B) such battery or cruelty has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service; and

"(C) the need for the public benefits received as to which amounts are owing had a substantial connection to the battery or cruelty described in subparagraph (A).".

(d) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 213 the following:

"Sec. 213A.   Requirements for sponsor's affidavit of support.".

(e) EFFECTIVE DATE.—Subsection (a) of section 213A of the Immigration and Nationality Act, as inserted by subsection (a) of this section, shall apply to affidavits of support executed on or after a date specified by the Attorney General, which date shall be not earlier than 60 days (and not later than 90 days) after the date the Attorney General formulates the form for such affidavits under subsection (f) of this section.

(f) PROMULGATION OF FORM.—Not later than 90 days after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of State and the Secretary of Health and Human Services, shall promulgate a standard form for an affidavit of support consistent with the provisions of section 213A of the Immigration and Nationality Act.

# TITLE VII—FACILITATION OF LEGAL ENTRY

**SEC. 701. ADDITIONAL LAND BORDER INSPECTORS; INFRASTRUCTURE IMPROVEMENTS.**

(a) INCREASED PERSONNEL.—

(1) IN GENERAL.—In order to eliminate undue delay in the thorough inspection of persons and vehicles lawfully attempting to enter the United States, the Attorney General and Secretary of the Treasury shall increase, by approximately equal numbers in each of the fiscal years 1996 and 1997, the number of full-time land border inspectors assigned to active duty by the Immigration and Naturalization Service and the United States Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes now in use, under construction, or construction of which has been authorized by Congress.

(2) DEPLOYMENT OF PERSONNEL.—The Attorney General and the Secretary of the Treasury shall, to the maximum extent practicable, ensure that the personnel hired pursuant to this subsection shall be deployed among the various Immigration and Naturalization Service sectors in proportion to the number of land border crossings measured in each such sector during the preceding fiscal year.

(b) IMPROVED INFRASTRUCTURE.—

(1) IN GENERAL.—The Attorney General may, from time to time, in consultation with the Secretary of the Treasury, identify those physical improvements to the infrastructure of the international land borders of the United States necessary to expedite the inspection of persons and vehicles attempting to lawfully enter the United States in accordance with existing policies and procedures of the Immigration and Naturalization Service, the United States Customs Service, and the Drug Enforcement Agency.

(2) PRIORITIES.—Such improvements to the infrastructure of the land border of the United States shall be substantially completed and fully funded in those portions of the United States where the Attorney General, in consultation with

96

the Committees on the Judiciary of the House of Representatives and the Senate, objectively determines the need to be greatest or most immediate before the Attorney General may obligate funds for construction of any improvement otherwise located.

### SEC. 702. COMMUTER LANE PILOT PROGRAMS.

(a) MAKING LAND BORDER INSPECTION FEE PERMANENT.—Section 286(q) (8 U.S.C. 1356(q)) is amended—

(1) in paragraph (1), by striking "a project" and inserting "projects";

(2) in paragraph (1), by striking "Such project" and inserting "Such projects"; and

(3) by striking paragraph (5).

(b) CONFORMING AMENDMENT.—The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1994 (Public Law 103–121, 107 Stat. 1161) is amended by striking the fourth proviso under the heading "Immigration and Naturalization Service, Salaries and Expenses".

### SEC. 703. PREINSPECTION AT FOREIGN AIRPORTS.

(a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 235 the following new section:

"PREINSPECTION AT FOREIGN AIRPORTS

"SEC. 235A. (a) ESTABLISHMENT OF PREINSPECTION STATIONS.—(1) Subject to paragraph (4), not later than 2 years after the date of the enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of passengers who arrive from abroad by air at ports of entry within the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of this section.

"(2) Not later than November 1, 1995, and each subsequent November 1, the Attorney General shall compile data identifying—

"(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years,

"(B) the number and nationality of such aliens arriving from each such foreign airport, and

"(C) the primary routes such aliens followed from their country of origin to the United States.

"(3) Subject to paragraph (4), not later than 4 years after the date of enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines based on the data compiled under paragraph (2) and such other information as may be available would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States without valid documentation. Such preinspection stations shall be in addition to those established prior to or pursuant to paragraph (1).

"(4) Prior to the establishment of a preinspection station the Attorney General, in consultation with the Secretary of State, shall ensure that—

"(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection,

"(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety, and

"(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967).

"(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(2), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.".

97

(c) CLERICAL AMENDMENT.—The table of contents, as amended by section 308(a)(2), is further amended by inserting after the item relating to section 235 the following new item:

"Sec. 235A.   Preinspection at foreign airports.".

**SEC. 704. TRAINING OF AIRLINE PERSONNEL IN DETECTION OF FRAUDULENT DOCUMENTS.**

(a) USE OF FUNDS.—Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

(1) in clause (iv), by inserting ", including training of, and technical assistance to, commercial airline personnel regarding such detection" after "United States", and

(2) by adding at the end the following:

"The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.".

(b) COMPLIANCE WITH DETECTION REGULATIONS.—Section 212(f) (8 U.S.C. 1182(f)) is amended by adding at the end the following: "Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.".

(c) EFFECTIVE DATES.—

(1) The amendments made by subsection (a) shall apply to expenses incurred during or after fiscal year 1996.

(2) The Attorney General shall first issue, in proposed form, regulations referred to in the second sentence of section 212(f) of the Immigration and Nationality Act, as added by the amendment made by subsection (b), by not later than 90 days after the date of the enactment of this Act.

# TITLE VIII—MISCELLANEOUS PROVISIONS

# Subtitle A—Amendments to the Immigration and Nationality Act

**SEC. 801. NONIMMIGRANT STATUS FOR SPOUSES AND CHILDREN OF MEMBERS OF THE ARMED SERVICES.**

Section 101(a)(15) (8 U.S.C. 1101(a)(15)) is amended—

(1) by striking "or" at the end of subparagraph (R),

(2) by striking the period at the end of subparagraph (S) and inserting "; or", and

(3) by inserting after subparagraph (S) the following new subparagraph:

"(T) an alien who is the spouse or child of a another alien who is serving on active duty in the Armed Forces of the United States during the period in which the other alien is stationed in the United States.".

**SEC. 802. AMENDED DEFINITION OF AGGRAVATED FELONY.**

(a) IN GENERAL.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 222 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), is amended—

(1) in subparagraph (N), by striking "of title 18, United States Code" and inserting "of this Act", and

(2) in subparagraph (O), by striking "which constitutes" and all that follows up to the semicolon at the end and inserting ", for the purpose of commercial advantage".

(b) EFFECTIVE DATE OF CONVICTION.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 222(a) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), is amended by adding at the end the following sentence: "Notwithstanding any other provision of law, the term applies for all purposes to convictions entered before, on, or after the date of enactment of the Immigration and Nationality Technical Corrections Act of 1994.".

(c) EFFECTIVE DATE.—The amendments made by this section shall be effective as if included in the enactment of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).

98

### SEC. 803. AUTHORITY TO DETERMINE VISA PROCESSING PROCEDURES.

(a) IN GENERAL.—Section 202(a) (8 U.S.C. 1152(a)), as amended by section 524(d), is amended—

(1) in paragraph (1), by striking "paragraph (2)" and inserting "paragraphs (2) and (6)", and

(2) by adding at the end the following new paragraph:

"(6) CONSTRUCTION.—Nothing in paragraph (1) shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.".

(b) ELIMINATION OF CONSULATE SHOPPING FOR VISA OVERSTAYS.—Section 222 (8 U.S.C. 1202) is amended by adding at the end the following new subsection:

"(g) In the case of an alien who has entered and remained in the United States beyond the authorized period of stay, the alien is not eligible to be admitted to the United States as a nonimmigrant on the basis of a visa issued other than in a consular office located in the country of the alien's nationality (or, if there is no office in such country, at such other consular office as the Secretary of State shall specify).".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to visas issued before, on, or after the date of the enactment of this Act.

### SEC. 804. WAIVER AUTHORITY CONCERNING NOTICE OF DENIAL OF APPLICATION FOR VISAS.

Section 212(b) (8 U.S.C. 1182(b)) is amended—

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B);

(2) by striking "If" and inserting "(1) Subject to paragraph (2), if"; and

(3) by inserting at the end the following paragraph:

"(2) With respect to applications for visas, the Secretary of State may waive the application of paragraph (1) in the case of a particular alien or any class or classes of aliens inadmissible under subsection (a)(2) or (a)(3).".

### SEC. 805. TREATMENT OF CANADIAN LANDED IMMIGRANTS.

Section 212(d)(4)(B) (8 U.S.C. 1182(d)(4)(B)) is amended—

(1) by striking "and residents" and inserting ", residents", and

(2) by striking "nationals," and inserting "nationals, and aliens who are granted permanent residence by the government of the foreign contiguous territory and who are residing in that territory".

### SEC. 806. CHANGES RELATING TO H–1B NONIMMIGRANTS.

(a) PROVISIONS RELATING TO WAGE DETERMINATIONS.—Section 212(n) (8 U.S.C. 1182(n)) is amended by adding at the end the following new paragraphs:

"(3) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), an employer shall not be required to have and document an objective system to determine the wages of workers.

"(4) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), a non-H–1B-dependent employer of more than 1,000 full-time equivalent employees in the United States may demonstrate that in determining the wages of H–1B nonimmigrants, it utilizes a compensation and benefits system that has been previously certified by the Secretary of Labor (and recertified at such intervals the Secretary of Labor may designate) to satisfy all of the following conditions:

"(A) The employer has a company-wide compensation policy for its full-time equivalent employees which ensures salary equity among employees similarly employed.

"(B) The employer has a company-wide benefits policy under which all full-time equivalent employees similarly employed are eligible for substantially the same benefits or under which some employees may accept higher pay, at least equal in value to the benefits, in lieu of benefits.

"(C) The compensation and benefits policy is communicated to all employees.

"(D) The employer has a human resources or compensation function that administers its compensation system.

"(E) The employer has established documentation for the job categories in question.

An employer's payment of wages consistent with a system which meets the conditions of subparagraphs (A) through (E) of this paragraph which has been certified by the Secretary of Labor pursuant to this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(I).

"(5) For purposes of determining the prevailing wage level paid under paragraph (1)(A)(i)(II), employers may provide a published survey, a State Employment Security Agency determination, a determination by an accepted private source, or any other legitimate source. The Secretary of Labor shall, not later than 180 days from

99

the date of enactment of this paragraph, provide for acceptance of prevailing wage determinations not made by a State Employment Security Agency. The Secretary of Labor or the Secretary's designate must either accept such a non-State Employment Security Agency wage determination or issue a written decision rejecting the determination and detailing the legitimate reasons that the determination is not acceptable. If a detailed rejection is not issued within 45 days of the date of the Secretary's receipt of such determination, the determination will be deemed accepted. An employer's payment of wages consistent with a prevailing wage determination not rejected by the Secretary of Labor under this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(II).".

(b) INAPPLICABILITY OF CERTAIN REGULATIONS TO NON-H–1B-DEPENDENT EMPLOYERS.—

(1) DEFINITION OF H–1B-DEPENDENT EMPLOYER.—Section 212(n)(2) (8 U.S.C. 1182(n)(2)) is amended by inserting after subparagraph (D) the following new subparagraphs:

"(E) In this subsection, the term 'H–1B-dependent employer' means an employer that—

"(i)(I) has fewer than 21 full-time equivalent employees who are employed in the United States, and (II) employs 4 or more H–1B nonimmigrants; or

"(ii)(I) has at least 21 but not more than 150 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 20 percent of the number of such full-time equivalent employees; or

"(iii)(I) has at least 151 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

In applying this subparagraph, any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 shall be treated as a single employer. Aliens employed under a petition for H–1B nonimmigrants shall be treated as employees, and counted as nonimmigrants under section 101(a)(15)(H)(i)(b) under this subparagraph. In this subsection, the term 'non-H–1B-dependent employer' means an employer that is not an H–1B-dependent employer.

"(F)(i) An employer who is an H–1B-dependent employer as defined in subparagraph (E) can nevertheless be treated as a non-H–1B-dependent employer for five years on a probationary status if—

"(I) the employer has demonstrated to the satisfaction of the Secretary of Labor that it has developed a reasonable plan for reducing its use of H–1B nonimmigrants over a five-year period to the level of a non-H–1B-dependent employer, and

"(II) annual reviews of that plan by the Secretary of Labor indicate successful implementation of that plan.

If the employer has not met the requirements established in this clause, the probationary status ends and the employer shall be treated as an H–1B-dependent employer until such time as the employer can prove to the Secretary of Labor that it no longer is an H–1B-dependent employer as defined in subparagraph (E).

"(ii) The probationary program set out in clause (i) shall be effective for no longer than five years after the date of the enactment of this subparagraph.".

(2) LIMITING APPLICATION OF CERTAIN REQUIREMENTS FOR NON-H–1B-DEPENDENT EMPLOYERS.—Section 212(n) (8 U.S.C. 1182(n)), as amended by subsection (a), is further amended by adding at the end the following new paragraph:

"(6) In carrying out this subsection in the case of an employer that is a non-H–1B-dependent employer—

"(A) the employer is not required to post a notice at a worksite that was not listed on the application under paragraph (1) if the worksite is within the area of intended employment listed on such application for such nonimmigrant; and

"(B) if the employer has filed and had certified an application under paragraph (1) with respect to one or more H–1B nonimmigrants for one or more areas of employment—

"(i) the employer is not required to file and have certified an additional application under paragraph (1) with respect to such a nonimmigrant for an area of employment not listed in the previous application because the employer has placed one or more such nonimmigrants in such a nonlisted area so long as either (I) each such nonimmigrant is not placed in such nonlisted areas for a period exceeding 45 workdays in any 12-month period and not to exceed 90 workdays in any 36-month period, or (II) each such

100

nonimmigrant's principal place of employment has not changed to a nonlisted area, and

"(ii) the employer is not required to pay per diem and transportation costs at any specified rates for work performed in such a nonlisted area.".

(3) LIMITATION ON AUTHORITY TO INITIATE COMPLAINTS AND CONDUCT INVESTIGATIONS FOR NON-H–1B-DEPENDENT EMPLOYERS.—Section 212(n)(2)(A) (8 U.S.C. 1182(n)(2)(A)) is amended—

(A) in the second sentence, by inserting before the period at the end the following: ", except that the Secretary may only file such a complaint in the case of an H–1B-dependent employer (as defined in subparagraph (E)) or when conducting an annual review of a plan pursuant to subparagraph (F)(i) if there appears to be a violation of an attestation or a misrepresentation of a material fact in an application", and

(B) by inserting after the second sentence the following new sentence: "No investigation or hearing shall be conducted with respect to a non-H–1B-dependent employer except in response to a complaint filed under the previous sentence.".

(c) NO DISPLACEMENT OF AMERICAN WORKERS PERMITTED.—(1) Section 212(n)(1) (8 U.S.C. 1182(n)(1)) is amended by inserting after subparagraph (D) the following new subparagraph:

"(E)(i) If the employer, within the period beginning 6 months before and ending 90 days of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has laid off or lays off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the nonimmigrant is sought or is employed, the employer will pay a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

"(ii) Except as provided in clause (iii), in the case of an H–1B-dependent employer which employs an H–1B nonimmigrant, the employer shall not place the nonimmigrant with another employer where—

"(I) the nonimmigrant performs his or her duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer, and

"(II) there are indicia of an employment relationship between the nonimmigrant and such other employer.

"(iii) Clause (ii) shall not apply to an employer's placement of an H–1B nonimmigrant with another employer if—

"(I) the other employer has executed an attestation that it, within the period beginning 6 months before and ending 90 days following the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has not laid off and will not lay off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the H–1B nonimmigrant is being sought or is employed, or

"(II) the employer pays a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the other employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

"(iv) For purposes of this subparagraph, the term 'laid off', with respect to an individual—

"(I) refers to the individual's loss of employment, other than a discharge for inadequate performance, cause, voluntary departure, or retirement, and

"(II) does not include any situation in which the individual involved is offered, as an alternative to such loss of employment, a similar job opportunity with the same employer (or with the H–1B-dependent employer described in clause (ii)) carrying equivalent or higher compensation and benefits as the position from which the employee was laid off, regardless of whether or not the employee accepts the offer.

101

"(v) For purposes of this subparagraph, the term 'protected individual' means an individual who—

"(I) is a citizen or national of the United States, or

"(II) is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a), 210A(a), or 245(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208.".

(2) Section 212(n)(2) (8 U.S.C. 1182(n)(2)), as amended by subsection (b)(1), is amended by adding at the end the following new subparagraph:

"(G) Under regulations of the Secretary, the previous provisions of this paragraph shall apply to complaints respecting a failure of an other employer to comply with an attestation described in paragraph (1)(E)(iii)(I) in the same manner that they apply to complaints with respect to a failure to comply with a condition described in paragraph (1)(E)(i).".

(3) Section 212(n)(2)(C) (8 U.S.C. 1182(n)(2)(C)) is amended by inserting "or (1)(E)" after "(1)(B)".

(d) INCREASED PENALTIES.—Section 212(n)(2) is amended—

(1) in subparagraph (C)(i), by striking "$1,000" and inserting "$5,000";

(2) by amending subparagraph (C)(ii) to read as follows:

"(ii) the Attorney General shall not approve petitions filed with respect to that employer (or any employer who is a successor in interest) under section 204 or 214(c) for aliens to be employed by the employer—

"(I) during a period of at least 1 year in the case of the first determination of a violation or any subsequent determination of a violation occurring within 1 year of that first violation or any subsequent determination of a nonwillful violation occurring more than 1 year after the first violation;

"(II) during a period of at least 5 years in the case of a determination of a willful violation occurring more than 1 year after the first violation; and

"(III) at any time in the case of a determination of a willful violation occurring more than 5 years after a violation described in subclause (II).'; and

(3) in subparagraph (D), by adding at the end the following: "If a penalty under subparagraph (C) has been imposed in the case of a willful violation, the Secretary shall impose on the employer a civil monetary penalty in an amount equalling twice the amount of backpay.".

(e) COMPUTATION OF PREVAILING WAGE LEVEL.—Section 212(n) (8 U.S.C. 1182(n)), as amended by subsections (a) and (b)(2), is further amended by adding at the end the following new paragraph:

"(7) In computing the prevailing wage level for an occupational classification in an area of employment for purposes of paragraph (1)(A)(i)(II) and subsection (a)(5)(A) in the case of an employee of (A) an institution of higher education (as defined in section 1201(a) of the Higher Education Act of 1965), or a related or affiliated nonprofit entity, or (B) a nonprofit scientific research organization, the prevailing wage level shall only take into account employees at such institutions and entities in the area of employment.".

(f) CONFORMING AMENDMENTS.—Section 212(n) (8 U.S.C. 1182(n)) is further amended—

(1) in the matter in paragraph (1) before subparagraph (A), by inserting "(in this subsection referred to as an 'H–1B nonimmigrant')" after "101(a)(15)(H)(i)(b)"; and

(2) in paragraph (1)(A), by striking "nonimmigrant described in section 101(a)(15)(H)(i)(b)" and inserting "H–1B nonimmigrant".

(g) EFFECTIVE DATES.—

(1) Except as otherwise provided in this subsection, the amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed with the Secretary of Labor on or after 30 days after the date of the enactment of this Act.

(2) The amendments made by subsection (b)(3) shall apply to complaints filed, and to investigations or hearings initiated, on or after January 19, 1995.

SEC. 807. VALIDITY OF PERIOD OF VISAS.

(a) EXTENSION OF VALIDITY OF IMMIGRANT VISAS TO 6 MONTHS.—Section 221(c) (8 U.S.C. 1201(c)) is amended by striking "four months" and inserting "six months".

(b) AUTHORIZING APPLICATION OF RECIPROCITY RULE FOR NONIMMIGRANT VISA IN CASE OF REFUGEES AND PERMANENT RESIDENTS.—Such section is further amended by inserting before the period at the end of the third sentence the following: "; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are

102

granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States".

**SEC. 808. LIMITATION ON ADJUSTMENT OF STATUS OF INDIVIDUALS NOT LAWFULLY PRESENT IN THE UNITED STATES.**

(a) IN GENERAL.—Section 245(i)(1) (8 U.S.C. 1255), as added by section 506(b) of the Department of State and Related Agencies Appropriations Act, 1995 (Public Law 103–317, 108 Stat. 1765), is amended by striking all that follows "equalling" through "application," and inserting "$2,500".

(b) ELIMINATION OF LIMITATION.—Section 212 (8 U.S.C. 1182) is amended by striking subsection (o).

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications for adjustment of status filed after September 30, 1996.

**SEC. 809. LIMITED ACCESS TO CERTAIN CONFIDENTIAL INS FILES.**

(a) LEGALIZATION PROGRAM.—Section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) is amended—

(1) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively;

(2) by striking "Neither" and inserting "(A) Except as provided in this paragraph, neither";

(3) by redesignating the last sentence as subparagraph (D);

(4) by striking the semicolon and inserting a period;

(5) by striking "except that the" and inserting the following:

"(B) The";

(6) by inserting after subparagraph (B), as created by the amendment made by paragraph (5), the following:

"(C) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien under this section to be used—

"(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated; or

"(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the legalization application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant."; and

(7) by adding at the end the following new subparagraph:

"(E) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:

"(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work) but only for purposes of a determination of whether the applicant is eligible for relief from deportation or removal and not otherwise.

"(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.

"(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.

"(iv) The date or disposition of the application.".

(b) SPECIAL AGRICULTURAL WORKER PROGRAM.—Section 210(b) of such Act (8 U.S.C. 1160(b)) is amended—

(1) in paragraph (5), by inserting ", except as permitted under paragraph (6)(B)" after "consent of the alien"; and

(2) in paragraph (6)—

(A) in subparagraph (A), by striking the period at the end and inserting a comma,

(B) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively,

(C) by striking "Neither" and inserting "(A) Except as provided in subparagraph (B), neither",

(D) by striking "Anyone" and inserting the following:

"(C) Anyone",

(E) by inserting after the first sentence the following:

103

"(B) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien to be used—

"(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated, or

"(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the special agricultural worker application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant.", and

"(F) by adding at the end the following new subparagraph:

"(D) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:

"(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work).

"(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.

"(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.

"(iv) The date or disposition of the application.".

**SEC. 810. CHANGE OF NONIMMIGRANT CLASSIFICATION.**

Section 248 (8 U.S.C. 1258) is amended by inserting at the end the following: "Any alien whose status is changed under this section may apply to the Secretary of State for a visa without having to leave the United States and apply at the visa office.".

# Subtitle B—Other Provisions

**SEC. 831. COMMISSION REPORT ON FRAUD ASSOCIATED WITH BIRTH CERTIFICATES.**

Section 141 of the Immigration Act of 1990 is amended—

(1) in subsection (b)—

(A) by striking "and" at the end of paragraph (1),

(B) by striking the period at the end of paragraph (2) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(3) transmit to Congress, not later than January 1, 1997, a report containing recommendations (consistent with subsection (c)(3)) of methods of reducing or eliminating the fraudulent use of birth certificates for the purpose of obtaining other identity documents that may be used in securing immigration, employment, or other benefits."; and

(2) by adding at the end of subsection (c), the following new paragraph:

"(3) FOR REPORT ON REDUCING BIRTH CERTIFICATE FRAUD.—In the report described in subsection (b)(3), the Commission shall consider and analyze the feasibility of—

"(A) establishing national standards for counterfeit-resistant birth certificates, and

"(B) limiting the issuance of official copies of a birth certificate of an individual to anyone other than the individual or others acting on behalf of the individual.".

**SEC. 832. UNIFORM VITAL STATISTICS.**

(a) PILOT PROGRAM.—The Secretary of Health and Human Services shall consult with the State agency responsible for registration and certification of births and deaths and, within 2 years of the date of enactment of this Act, shall establish a pilot program for 3 of the 5 States with the largest number of undocumented aliens of an electronic network linking the vital statistics records of such States. The network shall provide, where practical, for the matching of deaths with births and shall enable the confirmation of births and deaths of citizens of such States, or of aliens within such States, by any Federal or State agency or official in the performance of official duties. The Secretary and participating State agencies shall institute measures to achieve uniform and accurate reporting of vital statistics into the pilot program network, to protect the integrity of the registration and certification proc-

104

ess, and to prevent fraud against the Government and other persons through the use of false birth or death certificates.

(b) REPORT.—Not later than 180 days after the establishment of the pilot program under subsection (a), the Secretary shall issue a written report to Congress with recommendations on how the pilot program could effectively be instituted as a national network for the United States.

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for fiscal year 1996 and for subsequent fiscal years such sums as may be necessary to carry out this section.

**SEC. 833. COMMUNICATION BETWEEN STATE AND LOCAL GOVERNMENT AGENCIES, AND THE IMMIGRATION AND NATURALIZATION SERVICE.**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity shall prohibit, or in any way restrict, any government entity or any official within its jurisdiction from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States. Notwithstanding any other provision of Federal, State, or local law (and excepting the attorney-client privilege), no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**SEC. 834. CRIMINAL ALIEN REIMBURSEMENT COSTS.**

Amounts appropriated to carry out section 501 of the Immigration and Reform Act of 1986 for fiscal year 1995 shall be available to carry out section 242(j) of the Immigration and Nationality Act in that fiscal year with respect to undocumented criminal aliens incarcerated under the authority of political subdivisions of a State.

**SEC. 835. FEMALE GENITAL MUTILATION.**

(a) INFORMATION REGARDING FEMALE GENITAL MUTILATION.—The Immigration and Naturalization Service (in cooperation with the Department of State) shall make available for all aliens who are issued immigrant or nonimmigrant visas, prior to or at the time of entry into the United States, the following information:

(1) Information on the severe harm to physical and psychological health caused by female genital mutilation which is compiled and presented in a manner which is limited to the practice itself and respectful to the cultural values of the societies in which such practice takes place.

(2) Information concerning potential legal consequences in the United States for (A) performing female genital mutilation, or (B) allowing a child under his or her care to be subjected to female genital mutilation, under criminal or child protection statutes or as a form of child abuse.

(b) LIMITATION.—In consultation with the Secretary of State, the Commissioner of Immigration and Naturalization shall identify those countries in which female genital mutilation is commonly practiced and, to the extent practicable, limit the provision of information under subsection (a) to aliens from such countries.

(c) DEFINITION.—For purposes of this section, the term "female genital mutilation" means the removal or infibulation (or both) of the whole or part of the clitoris, the labia minora, or labia majora.

**SEC. 836. DESIGNATION OF PORTUGAL AS A VISA WAIVER PILOT PROGRAM COUNTRY WITH PROBATIONARY STATUS.**

Notwithstanding any other provision of law, Portugal is designated as a visa waiver pilot program country with probationary status under section 217(g) of the Immigration and Nationality Act for each of the fiscal years 1996, 1997, and 1998.

# Subtitle C—Technical Corrections

**SEC. 851. MISCELLANEOUS TECHNICAL CORRECTIONS.**

(a) AMENDMENTS RELATING TO PUBLIC LAW 103–322 (VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994).—

(1) Section 60024(1)(F) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) (in this subsection referred to as "VCCLEA") is amended by inserting "United States Code," after "title 18,".

(2) Section 130003(b)(3) of VCCLEA is amended by striking "Naturalization" and inserting "Nationality".

(3)(A) Section 214 (8 U.S.C. 1184) is amended by redesignating the subsection (j), added by section 130003(b)(2) of VCCLEA (108 Stat. 2025), and the sub-

105

section (k), added by section 220(b) of the Immigration and Nationality Technical Amendments Act of 1994 (Public Law 103–416, 108 Stat. 4319), as subsections (k) and (l), respectively.

(B) Section 101(a)(15)(S) (8 U.S.C. 1101(a)(15)(S)) is amended by striking "214(j)" and inserting "214(k)".

(4)(A) Section 245 (8 U.S.C. 1255) is amended by redesignating the subsection (i) added by section 130003(c)(1) of VCCLEA as subsection (j).

(B) Section 241(a)(2)(A)(i)(I) (8 U.S.C. 1251(a)(2)(A)(i)(I)), as amended by section 130003(d) of VCCLEA and before redesignation by section 305(a)(2), is amended by striking "245(i)" and inserting "245(j)".

(5) Section 245(j)(3), as added by section 130003(c)(1) of VCCLEA and as redesignated by paragraph (4)(A), is amended by striking "paragraphs (1) or (2)" and inserting "paragraph (1) or (2)".

(6) Section 130007(a) of VCCLEA is amended by striking "242A(d)" and inserting "242A(a)(3)".

(7) The amendments made by this subsection shall be effective as if included in the enactment of the VCCLEA.

(b) AMENDMENTS RELATING TO IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994.—

(1) Section 101(d) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) (in this subsection referred to as "INTCA") is amended—

(A) by striking "APPLICATION" and all that follows through "This" and inserting "APPLICABILITY OF TRANSMISSION REQUIREMENTS.—This";

(B) by striking "any residency or other retention requirements for" and inserting "the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States"; and

(C) by striking "as in effect" and all that follows through the end and inserting "to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.".

(2) Section 102 of INTCA is amended by adding at the end the following new subsection:

"(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to 'five years, at least two of which' is deemed a reference to '10 years, at least 5 of which'.".

(3) Section 351(a) (8 U.S.C. 1483(a)), as amended by section 105(a)(2)(A) of INTCA, is amended by striking the comma after "nationality".

(4) Section 207(2) of INTCA is amended by inserting a comma after "specified".

(5) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended—

(A) in subparagraph (K)(ii), by striking the comma after "1588", and

(B) in subparagraph (O), by striking "suspicion" and inserting "suspension".

(6) Section 273(b) (8 U.S.C. 1323(b)), as amended by section 209(a) of INTCA, is amended by striking "remain" and inserting "remains".

(7) Section 209(a)(1) of INTCA is amended by striking "$3000" and inserting "$3,000".

(8) Section 209(b) of INTCA is amended by striking "subsection" and inserting "section".

(9) Section 217(f) (8 U.S.C. 1187(f)), as amended by section 210 of INTCA, is amended by adding a period at the end.

(10) Section 219(cc) of INTCA is amended by striking " 'year 1993 the first place it appears' " and inserting " 'year 1993' the first place it appears".

(11) Section 219(ee) of INTCA is amended by adding at the end the following new paragraph:

"(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.".

(12) Paragraphs (4) and (6) of section 286(r) (8 U.S.C. 1356(r)) are amended by inserting "the" before "Fund" each place it appears.

(13) Section 221 of INTCA is amended—

(A) by striking each semicolon and inserting a comma,

(B) by striking "disasters." and inserting "disasters,", and

(C) by striking "The official" and inserting "the official".

(14) Section 242A (8 U.S.C. 1252a), as added by section 224(a) of INTCA and before redesignation as section 238 by section 308(b)(5), is amended by redesignating subsection (d) as subsection (c).

106

(15) Section 225 of INTCA is amended—

(A) by striking "section 242(i)" and inserting "sections 242(i) and 242A", and

(B) by inserting ", 1252a" after "1252(i)".

(16) Except as otherwise provided in this subsection, the amendments made by this subsection shall take effect as if included in the enactment of INTCA.

(c) STRIKING REFERENCES TO SECTION 210A.—

(1)(A) Section 201(b)(1)(C) (8 U.S.C. 1151(b)(1)(C)) and section 274B(a)(3)(B) (8 U.S.C. 1324b(a)(3)(B)) are each amended by striking ", 210A,".

(B) Section 241(a)(1) (8 U.S.C. 1251(a)(1)), before redesignation by section 305(a)(2), is amended by striking subparagraph (F).

(2) Sections 204(c)(1)(D)(i) and 204(j)(4) of Immigration Reform and Control Act of 1986 are each amended by striking ", 210A,".

(d) MISCELLANEOUS CHANGES IN THE IMMIGRATION AND NATIONALITY ACT.—

(1) Before being amended by section 308(a), the item in the table of contents relating to section 242A is amended to read as follows:

"Sec. 242A. Expedited deportation of aliens convicted of committing aggravated felonies.".

(2) Section 101(c)(1) (8 U.S.C. 1101(c)(1)) is amended by striking ", 321, and 322" and inserting "and 321".

(3) Pursuant to section 6(b) of Public Law 103–272 (108 Stat. 1378)—

(A) section 214(f)(1) (8 U.S.C. 1184(f)(1)) is amended by striking "section 101(3) of the Federal Aviation Act of 1958" and inserting "section 40102(a)(2) of title 49, United States Code"; and

(B) section 258(b)(2) (8 U.S.C. 1288(b)(2)) is amended by striking "section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)" and inserting "section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code".

(4) Section 286(h)(1)(A) (8 U.S.C. 1356(h)(1)(A)) is amended by inserting a period after "expended".

(5) Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

(A) by striking "and" at the end of clause (iv),

(B) by moving clauses (v) and (vi) 2 ems to the left,

(C) by striking "; and" in clauses (v) and (vi) and inserting "and for",

(D) by striking the colons in clauses (v) and (vi), and

(E) by striking the period at the end of clause (v) and inserting "; and".

(6) Section 412(b) (8 U.S.C. 1522(b)) is amended by striking the comma after "is authorized" in paragraph (3) and after "The Secretary" in paragraph (4).

(e) MISCELLANEOUS CHANGE IN THE IMMIGRATION ACT OF 1990.—Section 161(c)(3) of the Immigration Act of 1990 is amended by striking "an an" and inserting "of an".

(f) MISCELLANEOUS CHANGES IN OTHER ACTS.—

(1) Section 506(a) of the Intelligence Authorization Act, Fiscal Year 1990 (Public Law 101–193) is amended by striking "this section" and inserting "such section".

(2) Section 140 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, as amended by section 505(2) of Public Law 103–317, is amended—

(A) by moving the indentation of subsections (f) and (g) 2 ems to the left, and

(B) in subsection (g), by striking "(g)" and all that follows through "shall" and inserting "(g) Subsections (d) and (e) shall".

## EXPLANATION OF AMENDMENT

Because H.R. 2202 was ordered reported with a single amendment in the nature of a substitute, the contents of this report constitute an explanation of that amendment.

## PURPOSE AND SUMMARY

### TITLE I—BORDER ENFORCEMENT

The first step in asserting our national sovereignty and controlling illegal immigration is to secure our nation's land borders. This fundamental mission has been undermined in recent decades by a lack of clear policy, inadequate resources, and a defeatist attitude.

107

The result is a crisis at the land border, allowing hundreds of thousands of illegal aliens to cross each year, and contributing more than half of the 300,000 to 400,000 annual growth in the illegal alien population. The problem is not limited to illegal immigration from this hemisphere: alien smugglers from around the globe have set routes through Latin America and Canada to smuggle people into the United States.

More border patrol agents, enhanced training, and improved border technology are all critical to regaining control over our nation's borders. H.R. 2202 includes all of these reforms, including a 1,000 annual increase in Border Patrol agents from now until the end of the century. But H.R. 2202 does something more—it requires a focus on prevention and deterrence of illegal immigration, modeled after the successful "Operation Hold-the-Line" in El Paso, Texas. H.R. 2202 also improves the security of Border Crossing Identification Cards, so that such cards will only be used by those who have been granted the privilege of carrying them.

Finally, illegal immigration control is not simply a matter of securing the land border. Close to half of illegal immigrants enter on temporary visas and overstay. H.R. 2202 authorizes new resources for the prosecution of aliens with multiple illegal entries, and establishes pilot programs: (1) to deter multiple illegal entries into the United States through strategies such as interior repatriation or third country repatriation; (2) to use closed military facilities for detention of illegal aliens; and (3) to create a system for tracking the departures of temporary visitors.

TITLE II—ENFORCEMENT AGAINST ALIEN SMUGGLING AND DOCUMENT FRAUD

Illegal immigration is facilitated through criminal activity: alien smuggling, often carried out by organized criminal elements, and document fraud, including visa and passport fraud. Federal law enforcement should have the same tools to combat immigration crimes it does to combat other serious crimes that threaten public safety and national security. Thus, H.R. 2202 extends current wiretap and undercover investigation authority to the investigation of alien smuggling, document fraud, and other immigration-related crimes. It increases criminal penalties for alien smuggling and document fraud, establishes new civil penalties for document fraud, and extends coverage of the federal anti-racketeering statute (RICO) to organized criminal enterprises engaging in such activity.

TITLE III—REFORMING PROCEDURES FOR REMOVAL OF ILLEGAL ALIENS

Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative. Removal of aliens who enter the United States illegally, even those who are ordered deported after a full due process hearing, is an all-too-rare event. The asylum system has been abused by those who seek to use it as a means of "backdoor" immigration.

H.R. 2202 streamlines rules and procedures for removing illegal aliens, and establishes special procedures for removing alien terrorists. Aliens who arrive in the United States with no valid documents will be removed on an expedited basis; arriving aliens with

108

credible asylum claims will be allowed to pursue those claims. For illegal aliens already present in the U.S., there will be a single form of removal proceeding, with a streamlined appeal and removal process. To avoid removal, aliens must establish in such proceedings that they are entitled to be admitted or to remain in the United States. Relief from deportation will be more strictly limited. Aliens ordered removed who do not depart on time will be subject to civil penalties and excluded from certain immigration benefits.

### TITLE IV—PREVENTING EMPLOYMENT OF ILLEGAL ALIENS

The magnet of jobs is a driving force behind illegal immigration. Despite federal laws prohibiting the hiring of illegal aliens, and requiring the verification of eligibility for all employees, an underground market in fraudulent documents permits illegal aliens to gain employment. Recent INS crackdowns demonstrate that illegal aliens work in a variety of industries and take jobs that could otherwise be filled by American workers. Enforcement, however, is hampered by a system that is difficult to implement and invites document fraud.

H.R. 2202 cuts from 29 to 6 the number of acceptable documents to establish eligibility to work. It also establishes pilot projects, to be operated in States with high levels of illegal immigration, for employers to verify through a simple phone call or computer message an employee's authorization to work. The system will work through existing databases, and not require creation of any new government database. The system also will assure employers that the employment eligibility information provided to them by employees is genuine. The system could not be established on a national basis without prior approval by Congress. H.R. 2202 also establishes pilot projects to improve the security of birth certificates and birth/death registries, all of which have been subject to fraudulent use by illegal immigrants for gaining work, public benefits, and even, in some cases, voting privileges.

### TITLE V—LEGAL IMMIGRATION REFORM

Congress has the task to set legal immigration policy that serves the national interest. As a result of the immigration bills passed in 1965, 1986, and 1990, there has been a dramatic increase in the overall levels of legal immigration. In addition, the percentage of immigrants admitted without regard to their level of education or skills now exceeds 80 percent. Since 1981, we have admitted a total of 12.5 million legal immigrants. During this period, we have admitted at least 500,000 immigrants each year, and during the past 5 years, an average of close to 1 million per year.

Such sustained, uninterrupted growth in immigration is without precedent in American history. So is the underlying rationale of many that immigration is a right, not a privilege. The entitlement theory, which seeks to fit immigration policy to the demands of those who would like to immigrate to the United States, has made it increasingly difficult to establish a policy that selects immigrants according to their ability to advance our national interests.

A central failure of the current system is the admissions backlog for spouses and minor children of lawful permanent residents, which now numbers 1.1 million. This means that nuclear family

109

members can be kept separated for years. Even larger backlogs exist in categories for adult, "extended family" immigrants. These backlogs undermine the credibility of the system by forcing people who are technically eligible to immigrate to wait for years, sometimes decades, before they can legally come to the U.S. The existence of these categories thus creates expectations that cannot possibly be met within the capacity of the current system. These failed expectations encourage many waiting in line to immigrate illegally to the U.S.

The key to legal immigration reform is stating clear priorities that reflect the national interest. H.R. 2202 will better match the attributes of immigrants with the needs of the American economy, by increasing the number of visas available for highly-skilled and educated immigrants and by decreasing the proportion of immigrants admitted without regard to their level of skill and education. The bill also will put nuclear families first by giving priority to the admission of spouses and children of United States citizens, and for 5 years, doubling the number of visas for nuclear family members of legal permanent residents. The bill also preserves America's traditional role of leadership in refugee and other humanitarian immigration. While reforming legal immigration to end the "entitlement" attitude, H.R. 2202 maintains levels of legal immigration that are generous by historic standards: approximately 3.5 million immigrants would be admitted during the first 5 years.

### TITLE VI—IMMIGRANTS AND PUBLIC BENEFITS

Immigrants should be self-sufficient. Yet, the most reliable studies show that immigrants receive $25 billion more in direct public benefits than they contribute in taxes—$16 billion for direct cash benefits and $9 billion for non-cash benefits such as Food Stamps and Medicaid. In addition, immigrant participation in Supplemental Security Income (SSI) has risen 580 percent during the past dozen years. H.R. 2202 reinforces prohibitions against receipt of public benefits by illegal immigrants, makes enforceable the grounds for denying entry or removing aliens who are or are likely to become a public charge, and makes those who agree to sponsor immigrants legally responsible to support them.

### TITLE VII—FACILITATION OF LEGAL ENTRY

To facilitate legal entry and deter fraud, H.R. 2202 will increase the number of INS and Customs Service inspectors at border ports of entry, expand preinspection services at overseas airports, and require more training of airline personnel in detecting fraudulent documents.

### TITLE VIII—TEMPORARY SKILLED WORKERS AND MISCELLANEOUS PROVISIONS

To remain competitive in world markets, American business needs access to skilled foreign workers. The nonimmigrant H-1B visa permits such persons to work in the United States for up to six years. However, American workers need protection against abuse of the H-1B program by those employers who seek to replace native workers with lower-paid foreign workers. H.R. 2202 strikes

110

a balance between these interests, removing excessive regulatory burdens from businesses who are not dependent on H-1B workers and who do not abuse the program, while prohibiting the use of the program to replace laid-off American workers.

### Background and Need for the Legislation

As a nation of immigrants, the United States has a singular interest that its immigration laws encourage the admission of persons who will enrich our society. President Ronald Reagan aptly observed that our nation is "an island of freedom," political and economic, toward which the world has looked as both protector and exemplar. Unlimited immigration, however, is a moral and practical impossibility. We live in an age where the nations of the world are called upon to resolve the root causes—political, economic, and humanitarian—of migration pressures. In this context, the United States must exercise its national sovereignty to control its borders and pursue an immigration policy that serves the fundamental needs of the nation. In the words of the 1981 report of the Select Commission on Immigration and Refugee Policy ("Select Commission"), "[o]ur policy—while providing opportunity for a portion of the world's population—must be guided by the basic national interests of the United States." [1]

During the ensuing 15 years, that basic message has been lost. Serious immigration reform has been frustrated by our failure to define the national interests that must be served by U.S. immigration policy. A pervasive sense exists among the public that the Federal Government lacks the will and the means to enforce existing immigration laws.

The symptoms of this failure are manifest: four million illegal aliens residing in the United States, with an annual increase in illegal immigration of more than 300,000; tens of thousands of overseas visitors each year who overstay their visas and remain in the United States illegally; a deportation process that removes only a small fraction of illegal aliens; an asylum adjudications backlog of over 400,000; a program of employer sanctions that is confusing for employers, riddled with document fraud, and ineffective in deterring both the hiring of illegal aliens and the illegal entry of aliens seeking employment; and a legal immigration system that fails to unite nuclear families promptly, encourages the "chain migration" of extended families, and admits a vast majority of immigrants without any regard to levels of education or job skills.

H.R. 2202 seeks a fundamental re-orientation of immigration policy in the direction of the national interest. The Act will curb illegal immigration and establish a legal immigration system that is generous by historic standards and serves fundamental family, economic, and humanitarian needs. The bill is comprehensive because the crisis is so deep and the challenges presented by legal and illegal immigration so closely intertwined. All aspects of immigration law must be reformed to provide clear direction and purpose to those responsible for their enforcement, and to eliminate to the

---

[1] "Select Commission on Immigration and Refugee Policy, U.S. Immigration Policy and the National Interest," Joint Committee Print No. 8, Committees on the Judiciary of the House of Representatives and the United States Senate, 97th Cong., 1st Sess. 3 (1981) (referred to hereinafter as 1991 Select Commission Report).

111

greatest possible extent special provisions and exceptions that detract from these fundamental purposes. In short, our immigration laws should enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and the clear distinction between these categories.

To place H.R. 2202 in its proper context, a more detailed assessment of current immigration problems and past efforts and proposals for reform is appropriate.

### I. ILLEGAL IMMIGRATION

The challenge of combatting illegal immigration is but one facet of the vast overall demand on the United States immigration system. As explained by the U.S. Commission on Immigration Reform in its 1994 report to Congress:

> Each year U.S. land and air borders face inspection of approximately *500 million people seeking entry.* In 1993, approximately 409 million people were inspected at U.S. land ports of entry, 55 million at airports, and 9 million at seaports. This number does not include illegal entrants or individuals apprehended while attempting to enter illegally. The Immigration and Naturalization Service (INS) estimated in 1992 that there were 3.4 million "permanent" illegal aliens in the U.S. Of this population, *roughly one-half entered legally by air and overstayed their visas and the other one-half entered without inspection by land or sea.*[2]

The INS estimates that there is a net annual increase of 300,000 in the illegal alien population. Thus, the number of "permanent" illegal aliens exceeds 4 million. To halt this increase and make actual cuts in the size of the illegal immigrant population, immigration policy must address both illegal border crossings and the phenomenon of "visa overstays."

### *Illegal border-crossing*

Perhaps the most visible illustration of the failures of immigration enforcement is the continued high level of illegal migration across the land borders of the United States, particularly in the Southwest. Precise measurement of this migration flow is elusive. The INS traditionally has relied upon apprehension statistics for this task, but such statistics are a flawed measure of both the rate of illegal migration and the success of enforcement. As the U.S. Commission on Immigration Reform has stated, "[t]he most effective border control strategy would produce an apprehension rate of zero. So, too, would a complete failure of border control."[3] Despite these shortcomings, apprehension statistics show the growing extent of the problem.

| Years | Apprehensions |
|---|---|
| 1931–1940 ................................................................................ | 147,457 |
| 1941–1950 ................................................................................ | 1,377,210 |
| 1951–1960 ................................................................................ | 3,598,949 |

---

[2] U.S. Commission on Immigration Reform, U.S. Immigration Policy: Restoring Credibility 47 (1994) (emphasis supplied) (referred to hereinafter as 1994 Commission Report).
[3] 1994 Commission Report at 57.

112

| Years | Apprehensions |
|---|---|
| 1961–1970 ................................................................ | 1,608,356 |
| 1971–1980 ................................................................ | 8,321,498 |
| 1981–1990 ................................................................ | 11,883,328 |
| 1991–1994 ................................................................ | 4,778,333 |

For virtually all of this period, apprehension of aliens shortly after they have crossed the border, or at destinations further in the interior, has been the backbone of INS and Border Patrol enforcement strategy. Deterrent-based strategies had not been attempted, despite the 1981 observation of the Select Commission that "[i]t is both more humane and cost effective to deter people from entering the United States than it is to locate and remove them from the interior." [4] The choice of strategy was dictated in part by a lack of resources: the Select Commission noted that "[a]t any given hour no more than 450 Border Patrol agents are directly engaged in activities to stop persons attempting to enter the United States without inspection." [5]

Another symbol of America's past failure to take seriously the problem of illegal immigration has been the reluctance to use secure fences to prevent illegal border crossings. In general, physical barriers can assist the Border Patrol to deter illegal crossings, channel aliens to locations where they can be most easily apprehended, and reduce crime and violence at the border.

In recent years, the approach to border enforcement has changed. Chain-link fences have been replaced in certain high-traffic areas by more resistant structures. Section 542 of the Immigration Act of 1990 authorized the appropriation of funds for the "repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry to the United States." Just as visible has been the deployment of border patrol agents directly on or in close vicinity to the border, to create a visible deterrent to potential illegal immigrants. This approach was initiated by Chief Silvestre Reyes of the El Paso Border Patrol Sector in September 1993, when he ordered 400 of his 650 agents to be deployed on a 24-hour basis directly on the border, stationed in their vehicles at distances ranging from 50 yards to a quarter mile. Regular helicopter patrols were established. The border fence, which has numerous holes and was breachable in 125 locations, was repaired and maintained. Originally conceived as a two-week pilot program called "Operation Blockade," Chief Reyes' strategy has become a standing initiative, "Operation Hold-the-Line."

Operation Hold-the-Line represented a fundamental change in strategy for control of the border. As in other areas, illegal crossings into El Paso had been largely tolerated and enforcement efforts were directed at apprehending aliens who attempted to remain in the United States for extended periods of time. Only about 15 percent of the estimated 8,000 to 10,000 persons who crossed the border illegally each day in the El Paso Sector were apprehended. Under Operation Hold-the-Line, illegal crossings have been substantially deterred, with apprehensions of illegal aliens within El Paso dropping by as much as 75 percent. Petty street crime and

---

[4] 1981 Select Commission Report at 47.
[5] 1981 Select Commission Report at 48.

113

property crime has been reduced, as has the occurrence of more serious property and violent crimes. The Operation also has led to the seizure of more illegal drugs and other contraband. The Operation has had overwhelming public support in El Paso, including in the Mexican American community. Complaints against the Border Patrol have been reduced because there are fewer apprehensions and pursuits of aliens. The change has been particularly noticed in schools lying close to the border, which are now considered safer for students.[6]

The success of Operation Hold-the-Line has led both the Commission on Immigration Reform and the General Accounting Office to urge adoption of similar deterrence strategies as the prevalent form of enforcement along the southern border.[7] The Commission recommended a comprehensive approach to deal with the changing crossing patterns that resulted from stepped-up enforcement in the El Paso area. The GAO concluded that the national border patrol strategy adopted by the INS shows promise for success in reducing illegal immigration and is consistent with previous recommendations for securing the border.

The INS also has recently adopted a deterrence strategy in the heavily-travelled San Diego sector. This initiative, called "Operation Gatekeeper," entails assignment of additional Border Patrol agents in the sector, deployment of agents in close proximity to the border, although not directly on the border as in El Paso, completion of new fences and roads along the border (an initiative started and substantially completed during the Bush Administration), and installation of additional lighting. The INS now also fingerprints all aliens apprehended in the sector in order to identify aliens with criminal records, track aliens who repeatedly try to cross the border illegally, and measure the effectiveness of the new border control measures.

The impact of Operation Gatekeeper has been favorable, but not as dramatic as Operation Hold-the-Line. Border Patrol agents have been concentrated in the western end of the sector, and construction of a steel fence extending into the Pacific Ocean and to a point 14 miles inland from the coast, is nearly complete. As a result, apprehensions of illegal aliens have fallen most markedly in the Imperial Beach area, adjacent to the Pacific Ocean, but illegal alien traffic has greatly increased in the eastern portion of the San Diego sector, and overall apprehensions in the sector have actually increased. The fingerprinting process has identified large numbers of repeat border-crossers, some of whom are being prosecuted.

Despite these initial successes, the challenge of securing the border over the long term will prove to be difficult. One seemingly intractable problem is repeat border-crossings. Many of these aliens eventually escape apprehension and thus add to the illegal alien

---

[6] Bean, et al., Illegal Mexican Migration and the United States/Mexico Border: The Effects of Operation Hold-the-Line on El Paso/Juarez (July 1994) (Report prepared for the U.S. Commission on Immigration Reform by the Population Research Center at the University of Texas at Austin); General Accounting Office, Border Control: Revised Strategy is Showing Some Positive Results (December 1994) (Report to the Subcommittee on Information, Justice, Transportation and Agriculture of the House Committee on Government Operations).

[7] 1994 Commission Report at 49; Border Control: Revised Strategy Is Showing Some Results, supra note 6. See also "Border Security: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 102-110 (March 10, 1995) (Statement of Laurie E. Ekstrand, General Accounting Office).

114

population. All of them add to the enforcement burdens of the INS. The INS has previously attempted efforts at interior repatriation of such aliens, returning them to places hundreds of miles from the border rather than directly across the border where they are free immediately to attempt another illegal entry. This program was dropped, but should be reinstituted as part of the broader deterrence strategy. In addition, stronger bilateral efforts with the Mexican Government should be undertaken, especially in the area of cross-border crimes and alien smuggling. These are genuine issues of national security and public safety exacerbated by the U.S. government's failure to control the border.

Based on the experience in El Paso and San Diego, Congress should establish as a fundamental strategy for immigration enforcement the deterrence of illegal migration across the land borders of the United States. Such a strategy is preferable to one based on interior apprehension of illegal aliens because of the costs associated with apprehending and deporting an alien from the interior. The INS should be given the resources to carry out a deterrence strategy at all appropriate locations along the borders, as well as the necessary direction from Congress to use the resources in this fashion. A pilot program for interior repatriation should be reinstituted, along with technological measures to combat illegal border crossing.

An additional problem in border enforcement has been abuse of the Border Crossing Identification Card, used primarily by citizens of Mexico in lieu of visas for visits to the United States within 25 miles of the border for up to 72 hours. (Canadian citizens and landed immigrants from Commonwealth nations are not required to have a visa to enter the United States, and thus generally do not require a border crossing card.) Approximately 200,000 cards are issued annually. The Commission on Immigration Reform and the INS have both identified a troubling instance of fraud associated with these cards. In 1993, 24,236 cards were intercepted after issuance for counterfeiting, alteration, use by impostors, or violations of the conditions of usage, such as engaging in employment. These problems should come as little surprise. Despite the high incidence of illegal immigration across the land border with Mexico, the cards have heretofore been issued without security features. Until recently, in fact, border crossing cards were issued on a permanent basis, meaning that aliens could hold a card for years or even decades without renewal. The high demand for the cards has resulted both in backlogs of individuals waiting to receive cards and hasty adjudication of applications. In some recent cases, individuals with criminal records have been issued border crossing cards.

The INS has recently taken some steps to improve the security of these cards and to ensure that only aliens entitled to the privilege are issued cards. H.R. 2202 requires specific improvements to be made in all new and existing cards within 3 years.

*Visa overstays*

A "visa overstay" is an alien who has been admitted to the United States as a nonimmigrant visitor (often as a student, tourist, or businessperson) but who stays in the United States beyond the ex-

115

piration of the visa and lives here as an illegal alien.[8] Despite the magnitude of this problem, it has only recently been recognized as a leading component of the illegal alien population in the U.S. Moreover, no one is certain of how many people overstay their visas, how long they do so, and how they support themselves. Methods of calculating if and when persons with temporary visas leave the U.S. are haphazard.[9]

Without a reliable system, the INS has no means to determine exactly how many people who arrive in the United States as visitors actually depart, and who they are. Currently, all foreign visitors complete an I–94 arrival/departure form prior to arrival in the United States. The arrival portion of the I–94 is turned over to the INS inspector at the port of entry. However, because the departure portion of the form is collected by the air carrier when the alien departs, and the collection process by carriers is uneven, the data is not reliable.

The INS can estimate "apparent overstays" by simply counting the number of arrival forms without matching departure forms. However, the INS has concluded that the majority of "apparent overstays" are actually the result of incomplete collection of the departure forms. After correcting for this high rate of system error, the INS calculated that the number of visa overstays in 1992 was 305,000, and the visa overstay rate is 1.5 percent. The number of overstays has increased since the mid-1980s, while the rate has decreased, owing to the overall growth in the number of visas issued to foreign visitors. The INS estimates that more than 80 percent of nonimmigrant overstays have received a B–2 (tourist) visa. Most of the remaining percentage entered on a B–1 (business visitor) visa.

Visa overstay rates vary among regions of the world. Overstay percentages from Europe are always well below the average percentage for other countries, but nevertheless account for 15–20 percent of the aggregate total. Leading countries are Italy, Poland, and, recently, the former Soviet Union. Overstay rates from Asia run slightly below the average percentage for other countries, and account for numbers roughly equal to those of Europe. The leading country from the region by far is the Philippines, with India, China, and Hong Kong also contributing significant numbers. North America (including Central America) produces both the highest rate and highest percentage of visa overstays. This is chiefly attributable to Mexico, where the estimated number of overstays rose from 25,000 in 1985 to 60,000 in 1992. The Bahamas (13,000 in 1992), Jamaica (9,000), Haiti (9,000) and Central America (22,000) also produce significant numbers, especially given their limited populations. Overstay rates from Africa are relatively high, but the

---

[8] Although they are "legally" admitted, nonimmigrant visa holders who intend to come to the United States and stay permanently are technically "illegal" immigrants from the time of their arrival in the United States. A person who obtains a nonimmigrant visa intending to remain in the U.S. indefinitely has committed visa fraud and is excludable under INA §212(a)(6)(C)(i). Most aliens who intend to overstay their visas are not apprehended upon entry, and still others make the decision to overstay after they have arrived. Such aliens are subject to deportation under section 241(a)(1)(C).

[9] See generally, "Foreign Visitors Who Violate the Terms of the Their Visas by Remaining in the United States Indefinitely: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (Feb. 24, 1995) (cited hereinafter as Hearing: Foreign Visitors Who Overstay).

116

overall numbers are relatively low. This may be due in part to the limited number of nonimmigrant visas issued in some African nations. Both the overstay rate and overstay numbers from South America are modest.

The phenomenon of visa overstays presents specific problems for immigration enforcement. First, visa overstayers spread the illegal immigration problem to regions outside of the border states, and due to their diverse character (many visa overstayers have more advanced education and skills than typical illegal land border entrants), to various sectors of the economy. Second, visa overstayers account for a substantial portion of those waiting in the "asylum backlog"—the estimated 400,000 persons who are waiting for adjudication by the INS of their asylum claims. While some of these people have legitimate claims, many have filed the asylum claim as a means of remaining in the United States indefinitely. Third, obstacles to enforcement against this phenomenon are likely to remain (or increase) with the further globalization of the economy and rise in the number of legitimate visitors to the United States. A more lengthy or intrusive inspections process at ports of entry might identify more aliens who intend to overstay, but at the price of convenience for the vast majority of legitimate visitors. Another alternative would be more extensive processing by consular officers of requests for nonimmigrant visas. This would require a greater commitment of resources to the consular bureau within the Department of State.

Perhaps as a result of these difficulties, there have been fewer specific recommendations regarding enforcement measures against visa overstays. The Commission on Immigration Reform indicated that the solution lies in improved interior enforcement, chiefly by preventing employment of illegal aliens. (This topic is treated at greater length below.) The State Department now processes a vast majority of visas through an automated system that allows for quicker background checks, and most newly-issued visas are machine-readable, an additional security feature.[10] Stricter standards for issuing visas have been suggested. However, in many countries with a high visa overstay rate, State Department consular officers already deny a substantial percentage of visa applications.[11]

*Alien smuggling*

Alien smuggling contributes greatly to the overall problem of illegal immigration. Whether carried out by so-called coyotes (smugglers) along the Southwest border, or through sophisticated organized crime rings that smuggle aliens into the United States by land, sea, and air, alien smuggling both adds to the overall numbers of illegal aliens in the United States and increases the financial and other incentives for such trafficking to continue. Alien smuggling is often linked to other crimes, such as drug smuggling and trafficking, prostitution, racketeering, and severe labor law violations. Due to the inhumane living and working conditions they

---

[10] Hearing: Foreign Visitors Who Overstay, supra note 9, at 20 (Statement of Diane Dillard, Deputy Assistant Secretary for Visa Services, Bureau of Consular Affairs, Department of State).
[11] Id. at 32–33.

117

face, many smuggled aliens are victims, more than beneficiaries, of this criminal activity.[12]

Smuggling by boat is perhaps the most visible recent manifestation of alien smuggling carried out by organized crime syndicates. The arrival of the *Golden Venture* in New York City in June 1993 brought this problem to national attention: the vessel foundered on a sand bar, and hundreds of Chinese nationals struggled to reach the shore and escape, several of them drowning in the process. The remainder were apprehended and detained for exclusion proceedings, in which most claimed political asylum. Due to procedural delays inherent in the immigration hearing process, and the difficulty of arranging return travel to the People's Republic of China, most of these aliens remained in the United States more than 2 years after their arrival.

Other smuggling boats have landed or been apprehended in United States waters, while still others have been interdicted in international waters. However, due to greater enforcement efforts, the organized smuggling by sea from Asia has decreased somewhat since the arrival of the *Golden Venture*. (Illegal immigration by sea has long been prevalent from countries in the Caribbean, and this continues to be the case.)

Notwithstanding the public visibility of alien smuggling by boat, the vast majority of smuggled aliens arrive by more conventional means. Some travel directly to the United States, using fraudulent passports and visas, and attempt entry at international airports. Many such aliens have presented passports and visas prior to embarking overseas, but destroy the documents en route or surrender them to confederates. Probably the greatest number travel through more circuitous routes, travelling to other countries in the Western Hemisphere and then arranging onward travel to the United States either by air or through surreptitious crossing of the land border.

Whether they arrive by boat, directly by air, or through more complex routes, smuggled aliens (often with the assistance of smugglers) abuse immigration procedures to extend their stay in the United States. Thousands of smuggled aliens arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival. Due to lack of detention space and overcrowded immigration court dockets, many have been released into the general population. Not surprisingly, a majority of such aliens do not return for their hearings. In recent years, however, the number of aliens arriving at airports with no valid documents has decreased in districts, particularly in New York and Los Angeles, where detention capacity has increased and most mala fide aliens can be detained. The threat of expedited exclusion, which has been considered by Congress since 1993, may also have had a deterrent effect.

Finally, many aliens successfully smuggled into the United States have filed asylum claims as a means not only to extend their stay, but, under regulations in effect until January 1995, to obtain work authorization. Due to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are

---

[12] See generally, "Alien Smuggling: Hearing Before the Subcomm. on International Law, Immigration, and Refugees of the House Comm. on the Judiciary," 103rd Cong., 1st Sess. (June 30, 1993).

118

deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States. Under regulations effective in January 1995, asylum applicants no longer are entitled to receive work authorization. This has led to a substantial reduction in filing of new asylum applications. (The new asylum regulations are discussed below in more detail.)

II. INSPECTION, APPREHENSION, AND REMOVAL OF CRIMINAL AND ILLEGAL ALIENS

## A. Populations of Criminal and Illegal Aliens

*Criminal aliens*

The number of criminal aliens incarcerated in Federal and State prisons has grown dramatically in recent years, and is now estimated as 100,000.[13] The "foreign-born"[14] population in institutions operated by the Bureau of Prisons (BOP) is 27,938, or 29 percent of all inmates (95,997). An estimated 75 percent are subject to deportation.[15] Compared to FY 1980, this is an increase from approximately 1,000, or less than 4 percent of all BOP inmates (27,825). According to the BOP, the increase in the Federal alien prisoner population is due largely to drug convictions; 75 percent of alien inmates are incarcerated for such offenses, compared to 61 percent of all Federal inmates. Foreign-born prisoners serve an average of 7.7 years. More than 85 percent are from Mexico, Central America, South America, and the Caribbean. The leading individual countries of origin are, in order, Mexico, Colombia, Cuba, the Dominican Republic, Jamaica, and Nigeria.

The INS reports that there are an estimated 69,926 foreign-born inmates in State prisons, and that 80 percent of these, or 55,640, are deportable.[16] (The remainder are not deportable because they are either naturalized citizens or lawful permanent residents with protection from deportation.) More than 81 percent (56,391) of the overall foreign-born state prison population are in seven high immigration states: California, Texas, Florida, New York, Illinois, New Jersey, and Arizona.[17] The INS believes that the number of criminal aliens in Federal or State prisons who are subject to final orders of deportation is small. The INS and the Executive Office for Immigration Review (EOIR) complete deportation proceedings

[13] See "Removal of Criminal and Illegal Aliens: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 4 (Statement of T. Alexander Aleinikoff, General Counsel, Immigration and Naturalization Service) (Hearing: Criminal and Illegal Aliens).

[14] "Foreign-born" prisoners may include naturalized citizens and certainly includes both legal permanent residents and people who are in violation of their immigration status (including visa overstays) or who entered the U.S. without permission. See "Criminal Aliens: Hearing Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary," February 23, 1994, at 188–189 (Testimony of INS Deputy Commissioner Chris Sale). The Director of the BOP has testified that "[a]s of January 29, 1994, our inmate data base reflects that there were 22,326 inmates in BOP custody who were non-United States citizens (24.8 percent of the population). Id. at 166–167 (Statement of Kathleen M. Hawk). The BOP confirmed to the Committee by telephone in November 1995 that the non-citizen population remains at approximately 24 percent.

[15] Id.; "Management Practices of the Immigration and Naturalization Service: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 41 (February 8, 1995) (Hearing: Management Practices).

[16] Hearing: Criminal and Illegal Aliens, supra note 13, at 8 (Statement of T. Alexander Aleinikoff).

[17] Id.

119

against incarcerated criminal aliens through the Institutional Hearing Program (IHP); most IHP proceedings are completed close to the alien's scheduled release from prison.

*Illegal aliens*

The overall population of illegal aliens in the United States is now estimated at 4,000,000 or more, with an annual increase of 300,000 to 400,000. Only a fraction face immigration enforcement proceedings. In FY 1995, deportation proceedings resulted in orders of deportation against 82,915 aliens. An additional 22,815 aliens were ordered deported by immigration judges after being found excludable from the U.S. Finally, 19,040 aliens were granted voluntary departure after being found deportable. These deportation and exclusion figures represent substantial increases from the same figures for FY 1994, when 67,352 were ordered deported, 16,730 were found excludable, and 13,416 were granted voluntary departure. The principal reason is additional resources that have permitted the hiring of new immigration judges and INS trial counsel. The direct referral of unsuccessful asylum applicants to deportation proceedings under the new asylum regulations will lead to further increases in the number of deportation proceedings.

In FY 1995, a total of 17,464 aliens filed appeals to the Board of Immigration Appeals; the BIA affirms the vast majority of deportation and exclusion orders. A smaller number—approximately 1200 in recent years—appeal their cases to the Federal courts.

The number of aliens ordered deported, moreover, greatly exceeds the number who actually are removed from the U.S. In 1995, the INS removed 49,311 illegal aliens, 41,451 of which had received deportation hearings, and 7,860 of which had been processed through exclusion hearings. Approximately 32,000 (29,255 from deportation cases, and 2,738 from exclusion cases) of these aliens were criminals. Thus, an important subset of the annual growth in the number of illegal aliens—as many as 50,000 or more—consists of those who have been ordered deported, but are not actually removed.

A critical question, for which there is no precise answer, is how many of the aliens ordered deported but not removed are criminals. The INS claims that this figure is very low, because criminal aliens who are in INS custody and have received final orders of deportation are kept in custody and deported. However, the INS admits that some convicted criminal aliens with final orders of deportation are released. The INS explains that these are generally lawful permanent residents who are deemed unlikely to abscond. The INS also admits that some criminal aliens are released from custody prior to having their deportation proceedings completed. This is often done because of a lack of detention space. These aliens are generally released on bond; however, some of them do not appear for their deportation hearings and thus disappear into the general population of illegal aliens.[18]

---

[18] See generally Hearing: Criminal and Illegal Aliens, *supra* note 13 at 45–48; Hearing: Management Practices, *supra* note 15, at 49–50.

120

*Summary*

The number of aliens incarcerated in Federal and State prisons has risen dramatically in the past 15 years to close to 100,000. Approximately 45,000 criminal aliens are placed in deportation proceedings each year, and in the last fiscal year, 29,000 were removed from the country. A certain number of criminal aliens, including a small number with final orders of deportation, are released from INS detention each year.

The overall population of illegal aliens is growing much more rapidly (300,000–400,000 per year) than the number of aliens that the INS seeks to remove through deportation proceedings. More than 100,000 aliens are ordered deported or excluded each year, but only about 50,000 (32,000 of which are criminals) are actually removed from the United States. Thus, in addition to the general illegal immigrant population, there are growing numbers of aliens remaining in the United States who are not only illegally present, but who have ignored final orders of deportation to leave the U.S. (These figures do not include aliens granted voluntary departure who do not, in fact, depart from the U.S.)

### B. Legal Issues Pertaining to Removal of Aliens

The vast majority of illegal aliens apprehended in the United States are those who have crossed the Mexican border and are allowed to return voluntarily without being placed in formal deportation proceedings. Other aliens may be placed in deportation proceedings under section 242 of the Immigration and Nationality Act (INA), 8 U.S.C. 1252, through issuance of an "Order to Show Cause." (OSC) [19] An OSC requires an alien to appear for hearing before an immigration judge within the Executive Office for Immigration Review.

An alien is entitled to be represented by counsel, at no expense to the Government, and to examine evidence and cross-examine witnesses at the deportation proceeding. At most hearings, the issue of deportability is conceded: the alien essentially admits that he or she is here illegally, but seeks relief from deportation under one of the provisions of the INA. The following are the most common forms of relief:

*Voluntary departure*

Under section 244(e) of the INA, a deportable alien may be granted the option to voluntarily depart the United States, in lieu of deportation. This option is attractive because it allows the alien to leave without bearing the consequences of having been deported, which include restrictions on subsequent legal entries to the United States. An alien may be granted voluntary departure if the alien has been a person of good moral character for the previous five years. The grant of voluntary departure gives the alien a specific amount of time to leave the U.S., after which the alien becomes subject automatically to an order of deportation.

---

[19] See INA § 242B.

121

*Asylum*

The alien may state a "defensive" claim for asylum (as opposed to an "affirmative" claim presented in the first instance to an INS asylum officer). The immigration judge rules on the asylum claim in accordance with section 208 of the INA, which permits the granting of asylum to any alien present in the U.S. who meets the definition of a "refugee" under section 101(a)(42) of the INA.[20]

Under new INS regulations effective in January 1995,[21] failed applicants in the "affirmative" asylum system will be directly referred to an immigration judge for deportation hearing and be able to renew their asylum claim in that proceeding. This is expected to ensure that failed asylum seekers remain under INS docket control and are ordered to leave the country.

Aggravated felons are barred from seeking asylum and are ineligible for withholding of deportation.

*Suspension of deportation*

Under section 244 of the INA, aliens who have been present in the United States for seven years or longer may qualify for suspension of deportation if deportation would result in extreme hardship to the alien, or to a family member who is a citizen or a lawful permanent resident. Aliens convicted of crimes (but not aggravated felons) are eligible for suspension of deportation only if they have shown 10 years of good moral character since the conviction and can show extreme and unusual hardship. A person granted suspension of deportation is permitted to become a lawful permanent resident of the United States.

Aggravated felons are ineligible for suspension of deportation.

*"Section 212(c)" relief*

Section 212(c) of the INA provides that a lawful permanent resident returning to an "unrelinquished domicile" in the United States of at least seven years standing may be admitted to the United States even if he or she is excludable for having committed a crime. This provision has been interpreted to apply to deportation proceedings as well, on the ground that it is unconstitutional to limit the relief to a lawful permanent resident who has departed the U.S.[22] In these cases, the immigration judge decides whether the lawful permanent resident has established sufficient "equities" (including rehabilitation and non-recidivism) to outweigh the crime committed. A person granted this relief retains lawful permanent resident status.

Aggravated felons are ineligible for this form of relief if they have been convicted of crimes for which they have served, in the aggregate, five years in prison.

---

[20] An asylum claim also is considered a claim for withholding of deportation under section 243(h) of the INA; but very few aliens are granted withholding of deportation because if they are eligible for that form of relief, they are probably eligible for the more permanent relief of asylum. Withholding of deportation, which conveys no right to remain in the United States permanently, must be granted when the immigration judge finds that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. (An asylee, by contrast, need only show a "well-founded fear" of persecution on account of one of these five grounds.)

[21] 59 Fed. Reg. 62284 (Dec. 5, 1994).

[22] *Francis* v. *INS*, 532 F.2d 268 (2d Cir. 1976); Matter of Silva, 16 I&N Dec. 26 (BIA 1976).

122

Each of these forms of relief may be exploited by illegal aliens to extend their stay in the United States. Voluntary departure is subject to abuse because there is very little assurance that aliens actually leave the United States, and very little incentive for them to do so. In addition, the Government often gets nothing in return for granting this form of relief. Voluntary departure could be used to "settle" deportation cases expeditiously and ensure that people actually leave the United States, but this is not frequently done under the current system.

Asylum is often claimed by persons who have not suffered persecution, but who know that delays in adjudication (particularly in the affirmative asylum system) will allow them to remain in the United States indefinitely, meanwhile accruing time so that they will be eligible for suspension of deportation if they are ever placed in deportation proceedings.

Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued. This includes aliens who failed to appear for their deportation proceedings and were ordered deported in absentia, and then seek to re-open proceedings once the requisite time has passed. Such tactics are possible because some Federal courts permit aliens to continue to accrue time toward the seven year threshold even after they have been placed in deportation proceedings. Similar delay strategies are adopted by aliens in section 212(c) cases, where persons who have been in the United States for a number of years, but have only been lawful permanent residents for a short period of time, seek and obtain this form of relief.

C. Procedural Issues Pertaining to Removal of Illegal Aliens

Illegal aliens also may frustrate removal through taking advantage of certain procedural loopholes in the current removal process.

First, aliens may request and obtain multiple continuances, in order to change the venue of their hearing, obtain an attorney, or prepare an application for relief. Due to the crowded dockets in the immigration courts, delays can stretch out over weeks and months.

Second, many aliens simply fail to appear for their deportation hearing. A 1989 study by the General Accounting Office estimated that 27 percent of deportation proceedings are closed because aliens fail to appear for their hearings. The "no-show" rate can exceed 50 percent in venues such as New York, Los Angeles, and Miami. Bonds apparently do not have a strong deterrent effect against no-shows.

Third, lapses (perceived or genuine) in the procedures for notifying aliens of deportation proceedings lead some immigration judges to decline to exercise their authority to order an alien deported in absentia. These problems are exacerbated by the fact that aliens may request a change of venue of their proceeding. Often, an alien who has changed venue will not inform the INS of a changed address (or of subsequent address changes) despite the legal obligation to do so.

Fourth, there are few consequences (other than forfeiture of bond) for aliens who fail to appear for their hearings. Failure to appear for earlier proceedings is rarely if ever cited as an example of misconduct in future hearings if the alien is applying for relief such

123

as suspension of deportation. Furthermore, aliens expect that the INS is unlikely to mount any serious effort to apprehend them if they fail to appear.

Fifth, although only a small percentage of aliens appeal their deportation orders to the Board of Immigration Appeals or to the Federal courts, those who do can count on significant delays in the disposition of their appeal.

Sixth, illegal aliens apprehended at worksites have, as a result of being placed in deportation proceedings, acquired the right to obtain work authorization pending the completion of their hearings. This leads to the anomalous situation in which an alien who was illegally working for an employer one week may be legally re-hired the following week after being apprehended by INS. Cases like this should be rare in the future, however, since the INS in January 1995 repealed the regulatory provision that granted work authorization to all aliens in deportation proceedings.[23] Aliens seeking certain forms of relief from deportation (though not asylum) continue to be eligible for work authorization.

### D. Detention Issues Pertaining to Removal of Criminal and Illegal Aliens

A chief reason why many deportable aliens are not removed from the United States is the inability of the INS to detain such aliens through the course of their deportation proceedings. The INS plans to increase its detention space to about 8,500 beds in FY 1996, an increase of close to 50 percent.[24] This enables the INS to detain approximately 100,000 aliens per year, with an average stay of 28 days.[25] Detained cases are given priority in the immigration system, both by immigration judges and the BIA. However, relatively few deportable aliens, outside of criminals, are detained at all. In order to manage its limited resources, the INS has adopted the following detention priorities:

1. Aliens convicted of crimes or identified as alien smugglers;
2. Excludable aliens, with priority to those with criminal or terrorist histories or those attempting to enter the United States with fraudulent documents;
3. Deportable aliens who have committed fraud against the INS, such as those who have entered with fraudulent visas;
4. Deportable aliens who have failed to appear for their hearings or who have been previously ordered deported;
5. Deportable aliens apprehended while trying to enter illegally;
6. Other deportable aliens, including those working illegally;

These priorities lead to disparities of treatment among aliens who might be considered as having committed similar immigration violations. For example, an alien who is caught at a port of entry with a fraudulent document is more likely to be detained than an alien who has entered the United States on a nonimmigrant visa,

---

[23] 59 Fed. Reg. 62284 (Dec. 5, 1994).

[24] Hearing: Removal of Criminal and Illegal Aliens, supra note 13, at 35.

[25] The INS reported to the Committee in December 1995 that approximately 83,400 aliens were detained in 6,418 funded detention beds in FY 1995, with an average stay of 28.3 days. Increasing the available beds to 8,500 actually will enable the detention of more than 100,000 aliens, based on the same average length of stay.

124

overstayed, and been apprehended while working illegally. A criminal alien is likely to be detained for at least some period of time; an alien who has actually been ordered deported is unlikely to be detained at all. In fact, at the conclusion of a deportation proceeding, it is exceedingly rare that an alien is taken into custody after being ordered deported, unless the alien is already in INS detention.

Another issue related to the release of deportable aliens is the use of bonds. The INA provides that bonds can be required for those released pending their hearings. Bond amounts in immigration cases are often "absolute"—bonding companies are reluctant to underwrite the high risk of aliens failing to appear, and thus, aliens must put up the full amount of the bond. In addition, the INS is sometimes reluctant to set bonds too high because if the alien is not able to pay, the alien cannot be released, and a needed bed space is lost. In essence, in deciding to release a deportable alien, the INS is making a decision that the alien cannot be detained given its limited resources. A bond requirement under such circumstances is an empty threat. In addition, an alien may contest the amount of bond before an immigration judge.[26]

### E. Recent Strategies to Expedite Removal of Criminal Aliens

*The Institutional Hearing Program*

The Institutional Hearing Program (IHP) is a joint effort between the INS, the Executive Office for Immigration Review (EOIR), and State and Federal correctional officials to ensure that alien inmates receive orders of deportation prior to the end of their criminal sentences. The goal is to conclude exclusion and deportation hearings against criminal aliens before they complete their prison terms, making them amenable to deportation upon release.[27] The hearings are similar in procedure to other deportation hearings.

The program began in 1986 after the passage of the Immigration Reform and Control Act. It has since expanded so that hearings can be held in a number of Federal facilities, and in every State, D.C., and Puerto Rico. The IHP expedites hearings in Federal prisons by centralizing the alien inmate populations in six facilities. In the States, IHP hearings have been expedited through similar patterns of centralizing inmates at particular facilities.

In FY 1995, a total of 9,557 criminal aliens were removed from the U.S. based on completion of IHP proceedings in federal, state, and county facilities. A larger number were interviewed and processed for a final removal order. In FY 1995, the INS and EOIR have moved to expand the IHP in 5 states with the largest criminal alien populations: California, Florida, Illinois, New York, and Texas. The expansion includes the permanent assignment of immigration judges and INS trial attorneys to IHP hearing sites. In these 5 states in FY 1995, approximately 24,000 foreign-born inmates were interviewed and approximately 15,000 removal proceedings were commenced.

---

[26] The procedures for setting and redetermining the amounts of bonds is one of the most complex procedural aspects of the deportation and removal process.

[27] Hearing: Removal of Criminal and Illegal Aliens, supra note 13, at 183 (Statement of Gerald S. Hurwitz, Counsel to the Director, Executive Office for Immigration Review).

125

*Expedited administrative deportation*

Section 130004 of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103–322, Sept. 13, 1994) amended section 242A of the INA to provide for expedited deportation procedures for aliens convicted of aggravated felonies who are not lawfully admitted for permanent residence to the United States and are not eligible for any relief from deportation. Under these procedures, an INS District Director will be able to issue an order of deportation without the need for a hearing before an immigration judge. The alien shall be provided notice of the grounds for deportation and of his right to contest the deportation, and shall have the opportunity to inspect the evidence. The alien may not be deported for a period of 30 days, in order to have time to contest the order or seek judicial review. However, judicial review is limited to whether the alien: (1) has been correctly identified; (2) has been convicted of an aggravated felony; and (3) has been afforded the limited procedural rights under this new provision.[28]

*Judicial deportation*

Section 224 of the Immigration and Nationality Technical Corrections Act of 1994 (enacted October 25, 1994) amended section 242A of the INA to provide that Federal judges may, at the time of sentencing of a criminal alien, order the alien to be deported. This obviates the need for a separate deportation proceeding. A United States Attorney must file a notice upon the defendant and the INS stating his or her intention to seek judicial deportation; the INS must concur with the United States Attorney's intention to seek an order of deportation. The alien must be provided notice of the grounds for deportation and the opportunity to examine the evidence and rebut the charges.

## F. Alien Terrorists

The removal of alien terrorists from the U.S., and the prevention of alien terrorists from entering the U.S. in the first place, present among the most intractable problems of immigration enforcement. The stakes in such cases are compelling: protecting the very lives and safety of U.S. residents, and preserving the national security. Yet, alien terrorists, while deportable under section 241(a)(4)(D) of the INA, are able to exploit many of the substantive and procedural provisions available to all deportable aliens in order to delay their removal from the U.S. In addition, alien terrorists, including representatives and members of terrorist organizations, often are able to enter the U.S. under a legitimate guise, despite the fact that their entry is inimical to the national interests of the U.S. In several noteworthy cases, the Department of Justice has consumed years of time and hundreds of thousands (if not millions) of dollars seeking to secure the removal of such aliens from the U.S.

Starting in the first Administration of President Reagan, the Department of Justice has sought reform of immigration law and procedures to better enable this country to protect itself against the threat of alien terrorists. The chief target of these reforms are the

---

[28] Final regulations to implement the administrative deportation process were issued in August 1995. 60 Fed. Reg. 43954 (Aug. 24, 1995).

126

statutory and administrative protections given to such aliens, many of which are not required by the due process clause of the Fifth or Fourteenth Amendment or any other provision of law, that enable alien terrorists to delay their removal from the U.S.

The need for special procedures to adjudicate deportation charges against alien terrorists is manifest. Terrorist organizations have developed sophisticated international networks that allow their members great freedom of movement and opportunity to strike, including within the United States. Several terrorist groups have established footholds within immigrant communities in the U.S.

The nature of these groups tend to shield the participants from effective counterterrorism efforts—including the most basic measure of removing them from our soil. The U.S. relies heavily upon close and continued cooperation of friendly nations who provide information on the identity of such terrorists. Such information will only be forthcoming if its sources continue to be protected. Thus, it is essential to the national security of the U.S. that procedures be established to permit the use of classified information in appropriate cases to establish the deportability of an alien terrorist.

Such procedures also must be crafted to meet constitutional requirements. The government's efforts to safeguard lives and property and to protect the national security may be contested on the grounds that they conflict with the procedural rights of aliens. The interests of the government must therefore be balanced against the legitimate rights of those privileged to be present within the United States.[29]

### III. EMPLOYER SANCTIONS AND VERIFICATION

The availability of jobs in the U.S. economy is a primary magnet for illegal immigration. The employment of illegal aliens, in turn, causes deleterious effects for U.S. workers.

First, illegal immigrants by and large are attracted to America by the lure of jobs. As Vernon M. Briggs, Jr., professor of labor economics at Cornell University, stated in testimony before the Subcommittee on Immigration and Claims on April 5, 1995, "It has long been conceded that the driving force behind illegal immigration is access to the U.S. labor market."[30] The U.S. Commission on Immigration Reform stated:

> Employment opportunity is commonly viewed as the principal magnet which draws illegal aliens to the United States. Since the beginning of U.S. history, foreigners have come to the United States in search of a better life. Whatever initially motivated them to come here, they often ended up seeking and finding employment. For years, U.S. policy tacitly accepted illegal immigration, as it was

---

[29] *Fiallo* v. *Levi*, 406 F. Supp. 162 (S.D.N.Y.), aff'd, 430 U.S. 787 (1975); *Jean* v. *Nelson*, 472 U.S. 846, aff'g, 727 F.2d 957 (11th Cir. 1984); *Kleindienst* v. *Mandel*, 408 U.S. 753 (1972) (alien's presence in U.S. is privilege extended by Congress and not fundamental right.) See also *Alvarez* v. *INS*, 539 F.2d 1220 (9th Cir.), cert. denied, 430 U.S. 918 (1976) (applying rational basis test to equal protection claim for impermissible classification of aliens).

[30] "Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (1995) (Statement of Vernon M. Briggs, Jr.).

127

viewed by some to be in the interests of certain employers and the American public to do so.[31]

This "tacit acceptance" of illegal immigration was reflected in the fact that, until the last decade, no law prohibited the employment of illegal aliens. The Select Commission on Immigration and Refugee Policy (1981) stated that "[a]s long as the possibility of employment exists, men and women seeking economic opportunities will continue to take great risks to come to the United States, and curbing illegal immigration will be extremely difficult."[32] The Select Commission concluded that economic deterrents—specifically, a law prohibiting the hiring of undocumented or illegal aliens—were necessary to curb illegal immigration.

Second, employment of illegal aliens is having a detrimental effect on low skilled American workers. Professor Briggs testified further that:

> Every study of illegal immigration of which I am aware has concluded that it is the low skilled sector of the U.S. labor force that bears the brunt of the economic burden. For illegal immigrants are overwhelmingly found in the secondary labor market of the U.S. economy. This segment of the labor market is characterized by jobs that require little in the way of skill to do them and the workers have little in the way of human capital to offer. The concentration of illegals in the secondary labor market occurs because most of the illegal immigrants themselves are unskilled, poorly educated, and non-English speaking which restricts the range of jobs . . . they can seek. . . . Although occupational definitions vary, it can be crudely estimated that about one quarter to one-third of the U.S. labor force are employed in jobs that are predominately concentrated in the secondary labor market. This high percentage certainly belies the claim that U.S. citizens and resident aliens will not work in these low skilled occupations.[33]

Dean Frank Morris of Morgan State University concluded at the same hearing that "it is time that the labor market effects, especially the labor market effects of illegal immigration on African Americans and other low income workers be addressed as a top priority."[34] More recently, a paper from the Bureau of Labor Statistics reported that immigration accounts for as much as 50 percent of the decline in real wages of high school dropouts, and for approximately 25 percent of the increase in the wage gap between low- and high-skilled workers.[35]

---

[31] 1994 Commission Report at 88 (1994).
[32] 1981 Select Commission Report, supra note 1, at 59.
[33] See Briggs testimony, supra note 30.
[34] "Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (1995) (Statement of Frank Morris).
[35] David A. Jaeger, "Skill Differences and the Effect of Immigrants on the Wages of Natives," U.S. Dep't of Labor, Bureau of Labor Statistics, Office of Employment Research and Program Development, Working Paper 273 (Dec. 1995).

128

*The Immigration Reform and Control Act*

Laws against the employment of illegal aliens ("employer sanctions") were considered by Congress as early as the 1952 Immigration and Nationality Act. The endorsement by the Select Commission in 1981 provided a strong impetus for the passage of such measures, and employer sanctions became a part of the Simpson-Mazzoli immigration reform bill, eventually enacted as the Immigration Reform and Control Act of 1986 (IRCA).

IRCA's employer sanctions and verification provisions prohibit employers from knowingly hiring aliens who are not authorized to work in the United States.[36] IRCA also requires that employers verify the employment eligibility and identity of all new employees by examining documents provided by new employees, and by completing the Employment Eligibility Verification Form (INS Form I-9). IRCA also prohibited discrimination in employment based on national origin or citizenship status, except with respect to persons not authorized to work in the United States.[37] Enforcement of the IRCA provisions, however, has been hampered by rampant use of fraudulent documents, confusion on the part of employers, and continued access by illegal aliens to jobs and public benefits.[38]

*Work eligibility documents and document fraud*

The 29 documents that may be used to establish identification and eligibility to work are divided by statute and regulation into three categories:

So-called "A List" documents establish both work eligibility and identification. An employee producing one of these 12 documents does not need to produce any other document.[39]

"B List" documents establish identity only. The most common document produced from this list is the driver's license.[40]

---

[36] Title I of Pub.L. 99-603, Nov. 6, 1986, as amended, enacting section 274A of the Immigration and Nationality Act (INA). The penalties include fines from $100 to $1000 per individual for "paperwork" violations (failure to properly complete the Form I–9); fines of $250 to $10,000 for knowingly hiring, continuing to employ, recruiting, or referring an unauthorized alien to work; and criminal penalties for engaging in a pattern or practice of violating the employer sanctions provisions.

Generally, those unauthorized to work are illegal aliens and holders of certain nonimmigrant visas that do not permit employment. However, one may be a "legal alien" (for example someone who is present legally in the United States pursuant to a type of nonimmigrant visa that does not authorize employment) but not be authorized to work. Similarly, one can be an illegal alien, but be authorized to work. (This latter category would include certain asylum applicants and aliens awaiting completion of deportation proceedings.) Lawful permanent residents are always authorized to work.

[37] Section 102 of IRCA, adding section 274B of the INA. Section 274B provides for creation within the Department of Justice of a Special Counsel for Immigration-Related Unfair Employment Practices ("Special Counsel" or "OSC"). The Special Counsel employs approximately 14 attorneys and 3 investigators to investigate charges of discrimination received from the public. The Immigration Act of 1990 increased the fines that may be imposed for discrimination violations to levels equivalent to those imposed for employer sanctions violations.

[38] See generally "Verification of Eligibility for Employment and Benefits: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (March 30, 1995).

[39] These include a U.S passport, certificate of citizenship, certificate of naturalization, Alien Registration Receipt Card (I–151) or Resident Alien Card (I–551—"Green Card"), unexpired foreign passport stamped by the INS to indicate employment authorization, Temporary Resident Card (INS Form 688), Employment Authorization Card (Form I–688A), reentry permit (Form I–327), Refugee Travel document (Form I–571), employment authorization document issued by INS bearing a photograph. See 8 C.F.R. 274a.2(b)(1)(v)(A).

[40] There are 10 such documents, including a state driver's license or identification card with a photograph or identifying information, a school ID card with photograph, a voter registration card, and a U.S. military or dependent's ID card. See 8 CFR 274a.2(b)(v)(B).

129

"C List" documents establish employment eligibility only. The most common documents produced from this list are birth certificates and the social security card.[41]

The employer's responsibility is limited to determining whether or not the documents "appear" to be genuine; they are allowed a good faith defense and are not liable for verifying the validity of the documents. However, employers are the initial enforcers of the employment eligibility restrictions.

The number of permissible documents has long been subject to criticism. The INS published a proposed regulation in 1993 (with a supplement published on June 22, 1995) to reduce the number of documents from 29 to 16. This proposal, however, does not reflect the consensus of opinion that documents should be reduced even further, and that documents that are easily counterfeited should be eliminated entirely.

The problem of document fraud is pervasive. Social security cards, birth certificates, and the alien registration cards ("green cards") are the most commonly used employment eligibility documents. They are also the ones most prone to counterfeit, the incidence of which has increased sharply since the passage of IRCA. Birth certificates, even if issued by lawful authority, may be fraudulent in that they do not belong to the person who has requested that one be issued. This problem is exacerbated by the large number of authorities—numbering in the thousands—that issue birth certificates.

*Enforcement issues*

A majority of employers comply with both the employment restriction and verification requirements of IRCA. Nevertheless, enforcement of employer sanctions has been beset by difficulty from the start. Among the chief problems have been:

The fact that workers may present any of a large number of documents, some of which may be obscure or unfamiliar, in order to establish the worker's identification and eligibility to be employed;

A proliferation of fraudulent documents, particularly birth certificates, social security cards, drivers' licenses, and INS work authorization cards, that are used to establish identity and eligibility to be employed;

Employer confusion regarding the requirements for verification of work eligibility;

Allegations that fear of liability for hiring unauthorized workers has led some employers to discriminate against job applicants who appear to be foreign-born;

Tepid enforcement efforts by the INS on the hiring of unauthorized workers and an overemphasis on paperwork violations (failure to fully or correctly complete the I–9 form).

Employers also report feeling trapped between the work verification and anti-discrimination provisions of IRCA. "As a result of inconsistent and confused government regulations, policies or pro-

[41] There are 7 such documents, including the social security card, a certificate of birth abroad issued by the Department of State, an original or certified copy of a birth certificate, or an employment authorization card issued by the INS, but not included in List A. See 8 CFR 274a.2(b)(v)(C).

130

nouncements, compliance with one of these precepts sometimes inevitably means violation of the other."[42] As a result, some businesses take a less aggressive posture in identifying fraudulent documents, and thus hire (even if unknowingly) aliens not authorized to work.

IV. LEGAL IMMIGRATION

## A. Sources of Current Immigration Policy

Legal immigration to the United States has steadily increased from the end of the Second World War (during which virtually no immigration took place) to the current decade, in which an average of nearly 1,000,000 persons have legally immigrated (or been granted permanent resident status) each year. During that time, the composition of the immigration population also has changed. Between 1941 and 1960, the top five countries sending immigrants to the United States were Germany, Canada, Cuba, the Philippines, and the United Kingdom. From 1981 to 1993, the top five were Mexico, the Philippines, China, Korea, and Vietnam.

These changes in immigration are due in large part to three major legislative enactments.

*The Immigration Act of 1965*

The Immigration Act of 1965, Pub. L. 89-236, abolished the national origins quota system established by the Immigration Act of May 26, 1924. The 1924 law prohibited virtually all immigration from Asian countries and imposed quotas on non-Western Hemisphere countries. These measures were intended to preserve the ethnic balance existing in the country at the time of the 1890 census. As a result, Southern and Eastern Europeans, who had comprised the majority of immigration during the period 1901-1920, were largely excluded under the quota system. Immigration from the Western Hemisphere, however, was virtually unrestricted.

In place of the national origins quota system, the 1965 Act established a system based on overall ceilings and preference categories. There was an annual ceiling of 170,000 on Eastern Hemisphere migration with a 20,000 per country limit. Within these restrictions, immigrant visas were distributed according to a seven-category preference system placing priority, in order, on family reunification, needed skills, and refugees. The 1965 law also provided that Western Hemisphere immigration would be limited by an annual ceiling of 120,000, without per-country limits or a preference system. Congressional amendments in 1976 extended the per-country limits and preference system to the Western Hemisphere, and in 1978 established a single worldwide immigrant ceiling of 270,000, exclusive of refugees.

The principal effects of the 1965 law and these amendments were to make family unification the dominant principle of United States immigration law, and to change the ethnic composition of immigration. By the mid-1980s, nearly 75 percent of all legal immigrant admissions were admitted as immediate or extended family members.

---

[42] Hearing before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 103rd Cong., 2d Sess. 83-84 (Oct. 3, 1994) (statement of Daryl Buffenstein, President-Elect of the American Immigration Lawyers Association).

131

In addition, 85 percent of immigrants now come from Asia, Latin America (including Mexico), Oceania, and Africa; 15 percent came from Europe and Canada.

*The Refugee Act of 1980*

The next major change in immigration law was the Refugee Act of 1980 (Pub. L. 96-212). The law removed refugee admissions from the preference system and established a system whereby the President, after "appropriate consultations," establishes the number of refugees to be admitted in a given year. The law also enacted section 208 of the INA, requiring the Attorney General to establish a procedure for granting asylum to persons present in the United States or at our borders who meet the definition of refugee.

During the past 15 years, the number of refugees admitted from overseas has increased. A record 354,000 refugees arrived in the United States in 1980, which included approximately 150,000 Cuban marielitos and large numbers of Southeast Asian refugees. A record 155,000 refugees adjusted to permanent resident status in 1982. A yearly average of 110,000 refugees, and an additional 11,000 asylees, adjusted to permanent resident status in 1990 through 1994. The Administration has projected that there will be 90,000 refugee admissions in FY 1996, with a gradual decrease to 50,000 per year later in the decade.[43]

The number of asylum applications has increased more dramatically, from approximately 30,000 in the early 1980s to 150,000 per year by the early 1990s. Most of these were meritless applications filed by illegal aliens in order to prolong their stay in the U.S. and to receive work authorization. Thus, abuse of the asylum system has had a profound effect on illegal immigration. On the other hand, legitimate use of the asylum system has not dramatically increased the amount of legal immigration: the number of persons granted asylum each year has been 15,000–20,000 or less. The asylum reform regulations effective in January 1995 were intended to discourage the filing of nonmeritorious asylum applications by illegal immigrants and to expedite the removal of applicants who are denied. The number of asylum applications has significantly declined since these regulations went into effect.

*The Immigration Reform and Control Act of 1986*

The Immigration Reform and Control Act of 1986 (IRCA) included a program for legalization of long-term resident illegal aliens that will affect the flow of legal immigration for years to come. IRCA's legalization program included aliens who had resided continuously in the United States in an unlawful status since before January 1, 1982. In addition, the Special Agricultural Workers program provided for the legalization of certain agricultural workers (SAWs) present in the United States during 1985 and 1986. Approximately 2.7 million persons received lawful permanent resident status through the legalization program in 1989 through 1993: about 1.6 million as long-term illegal resident aliens and 1.1 million as SAWs. While these numbers do not represent new admis-

---

[43] U.S. Commission on Immigration Reform, Legal Immigration: Setting Priorities 136 (1995) (Hereinafter referred to as 1995 Commission Report).

132

sions to the United States, the beneficiaries of legalization gain the ability to petition for relatives under the family preference system.

*The Immigration Act of 1990*

The Immigration Act of 1990 included the first comprehensive reform of the legal immigration system since the Immigration Act of 1965. Major changes included a separation of family preference and employment-based preference categories, an increase in total immigration under an overall pierceable cap, an increase in employment-based immigration from 54,000 to 140,000, and a provision for the admission of "diversity immigrants" from countries that have been underrepresented in United States immigration since 1965.

Serious consideration of changes in the system established in 1965 began with the report of the Select Commission in 1981. Legislation was introduced in the Senate after the passage of IRCA that would have lessened the dominance of family-based immigration and provided more opportunity for "traditional immigrants"— those without family ties in the United States.

As a result of the 1990 Act, there is now a worldwide annual level of at least 675,000 immigrants, not including refugees and several other categories. Of this total, 480,000 are family-related immigrants, 140,000 are employment-based immigrants, and 55,000 are diversity immigrants. In the family-related category, there is no limit on the number of immediate relatives (spouses, unmarried minor children, and parents) of United States citizens who can be admitted in a given year. The number of admissions for immediate relatives of citizens counts against the total of 480,000 to a "floor" of 226,000; that is, at least 226,000 immigrant visas are reserved for other family preference categories, including unmarried (adult) sons and daughters of citizens (allocation=23,400), spouses and children of permanent resident aliens (114,200), married sons and daughters of citizens (23,400), and brothers and sisters of adult citizens (65,000).

The 1986 amnesty provisions and the increases in the 1990 act have resulted in high levels of admissions in recent years. The highest admissions level, including amnestied aliens adjusting to lawful status, occurred in 1991: 1,827,167. The highest admissions figure not counting amnestied aliens occurred in 1993: 880,014.

## B. The Need for Legal Immigration Reform

Congress has the Constitutional task to set immigration policy in the national interest. As a result of legislation enacted in 1965, 1986, and 1990, the United States has dramatically increased overall levels of legal immigration. During the past 15 years, we have admitted or legalized almost 12 million immigrants: an average of 733,000 each year legal immigrants were admitted or legalized from 1981–1990, and a whopping 1.13 million per year from 1991–1994. These numbers include the amnesty granted to 2.7 million illegal aliens under the 1986 Immigration Reform and Control Act. There is no comparable sustained period of immigration growth in American history.

Such large increases in immigration create problems as well as opportunities for the American society and economy. The Commis-

133

sion on Immigration Reform noted that "immigrants often are a bright spot in today's all too often bleak urban environment," and that in areas where they concentrate, immigrants "frequently establish new businesses and other employment-generating activities that promote the renewal of city neighborhoods and commercial districts." [44] On the other hand, immigration has costs as well, many related to the fact that such a preponderance of immigrants (close to 9 million since 1980) are admitted without reference to their level of education or skills. The current cohort of immigrants is far more likely to have less than a high-school education than native-born Americans. This can have the effect of flooding the labor market for unskilled work, as well as creating pockets of impoverished immigrants who will be less likely to assimilate into the broader American society.[45] The rise of immigrant-based organized crime groups suggests that screening of potential immigrants is not as rigorous as it ought to be. These negative impacts are most keenly felt in the handful of States in which a vast majority of immigrants choose to live,[46] and, ironically, cause most direct harm to recent immigrants.[47] Legal immigration policy must strike a proper balance so that these problems do not overwhelm the opportunities that immigration brings to the nation, and result in job loss and displacement for American workers.

There also are legitimate concerns that the Government's and society's capacity for admitting, assimilating, and naturalizing immigrants have been strained by current levels of legal immigration. Again, these problems are heightened in high-immigration States. Our education system, for example, is burdened by the needs of immigrants who either are not proficient in English or illiterate in their own language or both. In Los Angeles county, education is provided in over 70 languages at a larger "per student" cost to the taxpayer. While we should expect a great deal of diversity in immigration, the U.S.'s capacity to absorb immigrants is not unlimited.

*Reform of family-based immigration*

Family-based immigration is the dominant category of immigration growth. Demand in these categories has grown dramatically due to the beneficiaries of legalization under IRCA obtaining permanent resident status, and in some cases citizenship, thus allowing them to petition for relatives abroad. In FY 1994, for example, 497,000 family-sponsored immigrants were admitted, as opposed to 123,000 employment-based immigrants. Many of these employment-based immigrants were the spouses and children of the principal immigrants admitted for employment purposes. In addition, a significant portion of refugee admissions and asylum adjustments (121,000 in 1994) consist of the relatives of principal refugee applicants. The primary beneficiaries of family-sponsored immigration are the families of recently-arrived immigrants, not of native-born U.S. citizens. This, combined with the share of family-sponsored

---

[44] 1995 Commission Report at 20.
[45] 1995 Commission Report at 25.
[46] Seventy percent of legal immigrants intend to live in the six states of California (25.8 percent); New York (18.0); Texas (7.3); Florida (6.9); New Jersey (5.5), and Illinois (5.3). 1995 Commission Report at 15–16.
[47] 1995 Commission Report at 27.

134

immigration, means that most immigrants are admitted solely on the basis of their relationship to another immigrant.

Supporters of family unification as an objective in immigration policy state that this pattern of immigration, in addition to serving the humanitarian interest in keeping families intact, helps immigrants to establish networks and put down roots that make them more productive members of society. However, because current family unification policy also permits the creation of migration "chains"—immigrants petitioning for their parents and brothers and sisters, who may in turn petition for their children and other relatives—family immigration has become a form of entitlement that may crowd out other types of immigration that would be equally or more beneficial to American society. In addition, "chain migration" allows the demand for family immigration to grow exponentially.

The availability of "chain migration" not only distorts the selection criteria for legal immigrants, but may add additional incentive for people to attempt illegal immigration to the U.S. There is growing evidence that some families overseas pool their resources to pay the smuggling fee for one family member to illegally enter the U.S., in the hope that this family member will eventually gain legal status, and be able to petition for other family members.[48]

There are other compelling signs that this aspect of the legal immigration system is broken and in need of repair. Since 1965, family unification has been a primary goal of our immigration policy. Currently, however, there is a backlog of 1.1 million spouses and minor children of lawful permanent residents waiting for admission or for legal status. This means that many legal resident aliens are physically separated from their husbands, wives, and children for up to four years, and those applying today may wait up to 10 years. Even if the spouses and minor children are present in the U.S., their immigration status is uncertain.

The basic failure of the current system, therefore, is that while it sets preferences, it fails to set priorities. For example, with a finite number of immigrant admissions, numbers allocated to brothers and sisters and other categories mean fewer numbers are allocated to the spouses and minor children of lawful permanent residents. The number of visas now used to admit brothers and sisters and adult children should be used instead to reduce the backlog for nuclear family members.

The preservation of the nuclear family, therefore, should continue to be a cornerstone of U.S. immigration policy. The same priority cannot be given, and should not be given, to the admission of brothers and sisters and adult sons and daughters, solely on the basis of their family relationship to an immigrant. When an adult leaves his native land to emigrate to America, he or she makes a decision to be separated from brothers and sisters, parents, and adult children. We realize that this is a difficult decision in many cases, but ultimately, it is a decision that the immigrant has made.

Immigration policy cannot and should not attempt to soften the blow by holding out the hope that these adult family members will

---

[48] See, e.g., William Branigin, "A Cottage Industry of Counterfeit People and Papers," Wash. Post, Nov. 25, 1995, A1, A12.

135

be eligible to immigrate to the U.S. Clear evidence of this fact are the enormous backlogs that now exist in virtually all extended family categories. As of January 1994, the State Department estimates the following number of persons waiting for admission to the U.S.: (1) unmarried adult sons and daughters of U.S. citizens: 63,499 (current law allows 23,400 annual admissions); (2) unmarried adult sons and daughters of permanent resident aliens: 450,579 (36,266 annual admissions); (3) married adult sons and daughters of U.S. citizens: 257,110 (23,400 annual admissions); and (4) brothers and sisters of U.S. citizens: 1,643,463 (65,000 annual admissions). To clear out these backlogs, immigration law would have to provide up to an additional 2.4 million visas: a dramatic increase in legal immigration at a time when stabilization of immigrant numbers is called for. To compound the problem, these 2.4 million immigrants could petition for admission of their relatives, thus raising demand on the legal immigration system to an unprecedented level and creating new, exponentially larger backlogs.

Excessive backlogs in these admission categories undermine the credibility and integrity of U.S. immigration policy because they hold out a promise of opportunity to immigrate that cannot be met in the foreseeable future. For most, the opportunity to immigrate to the U.S. as the adult relative of a citizen or lawful permanent resident is theoretical at best: a newly-arriving immigrant or newly-naturalized citizen can expect to wait 10 years, or longer in many cases, from the time an immigrant visa petition is filed for his or her relative to the time a visa for that relative becomes available. Thus, these categories often do not create an opportunity to immigrate, but an opportunity to wait in line. Some do not wait their turn, but instead immigrate illegally to the U.S., hoping (and in many cases succeeding) to wait here until their visa number becomes available. Thus, the unrealistic expectations created by the failure to set firm priorities in the system of legal immigration causes further incentive for illegal immigration.

Finally, the permanent excessive demand on the immigration system represented by these backlogs makes it difficult if not impossible to alter course and give greater priority to immigration categories that are more closely tied to the national interest. We can sympathize with people who have been waiting in line and may no longer be eligible for admission. But immigration is a privilege, not a right, and not all those eligible at one time for a visa can be guaranteed to receive one. Otherwise, immigration policy would be forever "locked in" to decisions and priorities of the past.

*Reform of employment-based immigration*

A reformed legal immigration system should make generous provision for the admission of highly-skilled and educated workers who will bring needed expertise to the American economy. For the most part, business immigration serves important economic and social objectives. It gives employers access to the increasingly global labor market and enables pursuit of international business opportunities, expansion in international markets, and overall enhancement of competitiveness. Business immigration can also expand job opportunities for U.S. workers by admitting top-flight talent which helps maintain U.S. leadership in developing technologies.

136

At the same time, business immigration policies must protect U.S. workers from displacement or adverse effects on wages and working conditions. The labor certification process is the primary means to meet this objective. However, it should be recognized that a large influx of workers in and of itself may have some negative economic impacts. The admission of less-skilled workers, for example, may hurt the domestic labor force by increasing competition for scarce jobs at the lower end of the economic ladder.[49] Thus, the current system ill-serves the American economy by allowing for the admission of 10,000 unskilled workers per year. This is particularly true since large numbers of unskilled workers are admitted through the family-based and humanitarian categories each year.

In addition, the business immigration categories should more clearly define those immigrants who, for the sake of protecting the American work force, can only be admitted after their sponsoring employer completes the labor certification process.[50] Under current law, aliens with advanced degrees or exceptional ability must have a job offer and are subject to the labor certification process. However, these requirements can be waived when admission of the alien is deemed by the INS to be "in the national interest." The problem is that the statute fails to define what constitutes the national interest, which has led to absurd results: among the aliens admitted on the national interest waiver in recent years are a golf course designer, a deer farmer, a children's musician, and numerous corporate employees whose only claim to "national interest" is improving the profitability of their own companies. All of these persons were presumably eligible for admission to the U.S., but it appears doubtful that waiver of the labor certification process was required by any national interest.

*Reform of refugee admissions*

The current level of refugee admissions, which has exceeded 100,000 per year for the past decade, is set by the President and reviewed by Congress through the consultation process established in the Refugee Act of 1980. A prime difficulty with this process is that Congress has virtually no influence in setting the refugee admissions numbers or allocations for any given fiscal year. The required consultations often take place weeks, if not days, before the start of the fiscal year, thus rendering moot the opportunity for meaningful input.

The Refugee Act of 1980[51] was intended to establish a comprehensive yet flexible procedure for the admission and resettlement of refugees in the United States.[52] To this end, Congress delegated authority for setting the number and allocation of refugee ad-

---

[49] One recent government study found that immigration accounted for roughly half of the decline in real wages among workers with less than a high school education. See David Jaeger, "Skill Differences and the Effect of Immigrants on the Wages of Natives," U.S. Department of Labor, Bureau of Labor Statistics, Working Paper 273 (Dec. 1995).

[50] See INA § 212(a)(5)(A)(i).

[51] Pub. L. No. 96–212, 94 Stat. 102, in part adding INA §§ 101(a)(42), 207–209, 411–414, 8 U.S.C. §§ 1101(a)(42), 1157–1159, 1521–1524.

[52] See, e.g., H.R. Rep. No. 96–608, 96th Cong., 1st Sess. 1 (1979) [hereinafter House Report 96–608].

137

missions to the President.[53] At the same time, Congress retained for itself a broad consultative role in the process.[54]

Under section 207(d) of the INA, the President must consult with certain members of the House and Senate Judiciary Committees prior to making any of the following determinations: setting the number of refugee admissions for the upcoming fiscal year; allocating refugee admissions within this overall number; that there exists an unforeseen refugee emergency situation justifying the admission of additional refugees over the limit for the current fiscal year; and allocating emergency refugee admissions.

In addition to these consultation provisions, section 207(d)(1) requires the President to report annually to the Judiciary Committees on anticipated allocations and to provide for periodic consultation between the President's representatives and members of those committees on the possible need for adjustments in the current allocation. Neither the allocation provision nor the report and discussion provision expressly confers authority to reallocate admissions or sets forth the procedures to be followed in effectuating a reallocation.

The Refugee Act of 1980 intended to provide Congress with a meaningful role in the process of determining refugee admissions. In the words of former Representative Elizabeth Holtzman, then Chair of the House Subcommittee on Immigration, Refugees and International Law, "Importantly, for the first time, the bill requires that Congress be consulted before refugees are admitted, and spells out in detail the elements of that consultation."[55] Additionally, the Report of the House Committee on the Judiciary regarding the Refugee Act of 1980 stated the following:

> The Committee has made every effort to assure that Congress has a proper and substantial role in all decisions on refugee admissions. In the past, the Attorney General's consultation with this committee regarding admissions has been merely a matter of courtesy or custom. * * * The Committee cannot overemphasize the importance it attaches to consultation. The Congress is charged under the Constitution with the responsibility for the regulation of immigration, and this responsibility continues with respect to refugee admissions.[56]

In the past several years, the refugee consultation process has devolved into a single meeting between the Executive Branch and the House and Senate Judiciary Committees near the end of the fiscal year—the very type of process which the 1980 Act expressly rejected. As an example, the refugee consultation for fiscal year 1996 occurred in the middle of September 1995—two weeks prior to the beginning of fiscal year 1996. The failure of the Administration to consult with Congress on the number and allocation of refugee admissions until just prior to the beginning of the fiscal year meant that the series of discussions between the President and

---

[53] INA § 207(a), (b), 8 U.S.C. §§ 1157(a), (b).
[54] Id.
[55] 125 Cong. Rec. H11966, H1167 (daily ed. Dec. 13, 1979) (statement of Rep. Holtzman).
[56] House Report 96–608 at 12–14 (1979).

138

Congress called for in section 207(d)(1) of the INA did not take place.

The current process of determining refugee admissions does not provide Congress with a meaningful role in this process, as intended in the Refugee Act of 1980. The number of refugee admissions for a particular fiscal year should not be set unilaterally by the President. As former Chairwoman Holtzman stated: "* * * there is no substitute for public scrutiny, public disclosure, public debate on an issue of such importance as the admission of refugees to the United States."[57] The only way to have an adequate public debate on the issue of refugees is to give Congress a more meaningful role in determining number and allocation of refugee admissions.

Some may argue that Congress exercises adequate control over the numbers of refugees admitted through its power over the appropriations process. However, it is virtually impossible for Congress to reduce the number of refugees admitted by failing to fund programs for persons often already in this country or whom the President has already promised to admit. In the past, attempts by Congress to exercise control over refugee admissions through the appropriations process have only resulted in shifting a majority of the costs for resettling refugees to the State and local levels. Reducing federal funding for refugee resettlement has had no effect on the number of refugee admissions.

Congress also should re-assess the appropriate level of refugee resettlement in the United States. The United Nations High Commissioner for Refugees has estimated that the total population of refugees requiring resettlement may be under 50,000 per year. Even if the U.S. took half or more of this number, it would be much less than our current refugee admissions, which have averaged over 100,000 in recent years.

In addition, the U.S. admits large numbers of persons, particularly from the former Soviet Union, who would not be considered "refugees" by the UNHCR. In fact, the vast majority of refugees admitted to the U.S. in recent years have been admitted under a program which establishes a threshold for determining refugee status that is lower and thus significantly more generous than that contained in the INA or in international law.[58] Without this program, U.S. refugee admissions would be significantly below the 50,000 target originally established in the Refugee Act of 1980. The U.S. refugee programs in the former Soviet Union and Vietnam are expected to phase out during the next few years, leading the State

---

[57] 125 Cong. Rec. H37203 (daily ed. Dec. 20, 1979).

[58] The so-called Lautenberg Amendment—named after its author, Sen. Frank Lautenberg (D–N.J.)—allows certain residents of the former Soviet Union and Southeast Asia to be deemed refugees by merely asserting, not establishing, a fear of persecution. See §§599D, 599E, Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990 (Pub. L. 101–167, Nov. 21, 1989), as amended by §598 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, (Pub. L. 101–513, Nov. 5, 1990), the Miscellaneous Technical Immigration and Naturalization Amendments of 1991, (Pub. L. 102–232, Dec. 12, 1991), §582 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1993 (Pub. L. 102–391, Oct. 6, 1992), §905 of the FREEDOM Support Act (Pub. L. 102–511, Oct. 24, 1992), §512 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Pub. L. 103–236, April 30, 1994), and §219(bb) of the Immigration and Nationality Technical Corrections Act of 1994 (Pub. L. 103–416, 108 Stat., Oct. 25, 1994)); 8 U.S.C. 1157 note. The standard applied to all other applicants is whether the applicant has demonstrated a well-founded fear of persecution. See INA §101(a)(42). See also Article I of the Protocol Relating to the Status of Refugees, 19 UST 6223, TIAS 6577 (1968).

139

Department to project that the Administration's refugee target will be 50,000 by FY 1998. Thus, under the State Department's plans, there would be no need for additional legislation authorizing higher refugee admissions should the provisions of this bill be enacted.

*Reform of asylum*

The asylum system established in the 1980 Refugee Act has provided protection to thousands of legitimate claimants, but has been subject to abuse by tens of thousands more who filed non-legitimate claims simply in order to extend their stay in the U.S. and to receive work authorization. Recently, as many as 140,000 "affirmative" asylum applications have been filed per year with the INS. This is in addition to the thousands of "defensive" asylum applications filed by aliens in exclusion and deportation proceedings. The INS has been able to resolve only one-third of these new filings in recent years, meaning that a huge backlog of claims, over 400,000, had developed by the end of FY 1994.

The Administration has taken significant steps to resolve these problems, principally through regulations effective in January 1995. Under these new rules, asylum applicants no longer will be eligible for work authorization unless they are granted asylum or there are unusual delays in completing adjudication of their claims. Asylum claims are scheduled for interview within 45 days of the application. The asylum officer will either grant the claim, or refer the case without decision to an immigration judge. (The vast majority of asylum applicants are not lawfully present in the U.S., and under the administrative reforms, the final decision on referred cases will be made by the immigration judge in the context of a deportation proceeding.) The entire system is streamlined, with the objective of completing proceedings before the immigration judge within 180 days of the original application.

These reforms are a strong step in the right direction, and have apparently resulted in a 50 percent or greater reduction in the filing of new asylum claims. However, the regulations do not address several significant issues. First, aliens remain able to file an asylum application regardless of how long they have resided in the United States, and many applications are filed by aliens who have been here for years. International law anticipates that aliens who have illegally entered a country in order to flee persecution should present themselves "without delay" to the authorities.[59] This is the exception, rather than the rule, under the U.S. asylum system.

Second, the U.S. system includes no meaningful provision for the return or removal of aliens to countries (including countries through which they have travelled prior to reaching the U.S.), in which they would not be persecuted and in which they would have access to proper asylum procedures. Refugees fleeing persecution should ordinarily seek protection in the first safe country to which they travel. Many people seeking asylum in the U.S. have travelled

---

[59] Article 31 of the United Nations Convention Relating to the Status of Refugees (1951) states in part:

    The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened * * * enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

140

through one or more countries in which comparable asylum procedures and protection are available.

Third, despite greater efficiency in the process, there are no firm targets for completion of asylum cases. The problem with delay in the asylum system has been so pervasive that nothing short of firm, legislated deadlines will be sufficient to ensure that this problem does not persist into the future.

Fourth, legislation is required to ensure that illegal aliens denied asylum are actually removed from the U.S. The reforms in Title III of this bill address this concern.

Finally, asylum legislation should codify the best features of the administrative reforms of the asylum process, including the new rules on employment authorization. This will clarify the firm Congressional support for asylum reform and prevent court challenges to the administrative reforms on the grounds that they have not been authorized by Congress.

*Reform of parole*

Section 212(d)(5) of the INA grants the Attorney General broad discretion to "temporarily" parole aliens applying for admission to the United States into the country for "emergent reasons or reasons deemed strictly in the public interest." Under this section, parole is not to be regarded as an admission of the alien. Once the purposes for such parole are served, the alien must be returned to the custody from which he or she was paroled.

The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

Additionally, the Attorney General has not kept accurate records in the past of the way in which parole authority is used. Consequently, Congress has no way to effectively exercise its oversight authority over the use of parole. Without an effective control mechanism, the Attorney General can continue to use the parole authority to implement immigration policy without Congressional knowledge or approval.

An example of a recent abuse of the parole authority stems from the September 1994 migration agreement negotiated by the Clinton Administration with Cuba. To implement this agreement, the Administration is using the parole authority to admit up to 20,000 Cuban nationals annually. The paroled Cubans will eventually be entitled to adjust to permanent resident status.[60]

---

[60] Under the provisions of the Cuban Adjustment Act of 1966, natives or citizens of Cuba who are admitted or paroled into the United States after Jan. 1, 1959 are eligible to adjust to permanent resident status without leaving the U.S. after residing in the country for a period of one year. See Act of Nov. 2, 1966, 80 Stat. 1161, H.R. Rep. No. 89–178, 89th Cong., 2d Sess. 3 (1966).

141

In this case, the use of parole to fulfill the terms of the Cuban migration agreement is a misuse and intentionally admits, on a permanent basis, aliens who are not otherwise eligible for immigrant visas. According to the Supreme Court, Congress has plenary power over immigration policy: a power that is largely immune from interference.[61] Such use of the parole authority has not been authorized by Congress. Indeed, the Clinton Administration did not even attempt to consult with Congress in negotiating the Cuban migration agreement.

Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

*The need for humanitarian admissions*

The United States has traditionally admitted immigrants who are of special humanitarian concern to our nation. While provisions exist in the law to admit refugees and aliens granted asylum, there are aliens of humanitarian concern to the U.S. that do not meet the definition of a refugee. The lack of a single, transparent category for the admission of such aliens has also contributed to the improper use of parole authority by the Attorney General, as in the case of the implementation of the Cuban migration agreement. If a category existed in the law to provide for a limited number of humanitarian visas each year at the discretion of the Attorney General, migration agreements such as the recent agreement with Cuba could be negotiated without violating other existing provisions in immigration law.

C. Reform Proposals

*Commission on immigration reform*

The Commission on Immigration Reform has recommended a significant redefinition of priorities and a reallocation of existing admission numbers to ensure that immigration continues to serve our national interests. The Commission defined several principles that should guide immigration policy: the establishment of clear goals and priorities; the enforcement of immigration limits; regular periodic review; clarity and efficiency; enforcement of the financial responsibility of sponsors to prevent immigrants from becoming dependent on public benefits; protection of American workers; coherence; and "Americanization"—the assimilation of immigrants to become effective citizens.

The Commission recommended that there be three major categories of legal immigration—family-based, skills-based, and refugees. The current category for diversity admissions would be eliminated.

Within the family category, the spouses and minor children of U.S. citizens would be admitted on an unlimited basis, as under

---

[61] Harisiades v. Shaughnessy, 342 U.S. 580 (1952); Fiallo v. Bell, 430 U.S. 787 (1977); Plyler v. Doe, 457 U.S. 202 (1982).

142

current law. The parents of citizens could also be admitted, but with stricter sponsorship requirements than currently exist. Third priority would be given to the spouses and minor children of lawful permanent residents. The proposed 400,000 cap for family admissions would accommodate current demand in these categories and allow for growth in the unlimited category of spouses and children of citizens. In addition, the Commission would make available 150,000 additional visas during each of the first 5 years to clear the backlog of spouses and children ("nuclear family") of lawful permanent residents.

The Commission also proposed the elimination of the following family categories: adult unmarried sons and daughters of U.S. citizens; adult unmarried sons and daughters of lawful permanent residents; adult married sons and daughters of citizens; and brothers and sisters of adult U.S. citizens. This was done for several reasons: to focus priority on the admission of nuclear family members; to reduce the waiting time for nuclear family members of lawful permanent residents without raising overall immigration numbers; and to eliminate the extraordinary backlogs in these categories that undermine credibility of the immigration system. Most importantly, the Commission believes that "[u]nless there is a compelling national interest to do otherwise, immigrants should be chosen on the basis of the skills they contribute to the U.S. economy." Admission of nuclear family members and refugees present such a compelling interest, but admission of more extended family members solely on the basis of their family relationship is not as compelling.[62]

The Commission recommended that up to 100,000 skills-based immigrants be admitted each year in two basic categories: those exempt from labor market testing, and those subject to labor testing. The exempt category would include aliens with extraordinary ability, multinational executives and managers, entrepreneurs, and ministers and religious workers. Others that would be subject to labor market testing include professionals with advanced degrees and baccalaureate degrees, and skilled workers with 5 years specialized experience. The category for unskilled workers would be eliminated. In place of the current labor certification process, those immigrants subject to labor market testing could only be admitted if their prospective employer paid a substantial fee and demonstrated appropriate attempts to find qualified U.S. workers. The fee would be used to support private sector initiatives for the education and training of U.S. workers. In addition, such immigrants would be admitted on a conditional basis that would convert to permanent status after 2 years if the immigrant was still employed by the same employer at the attested original wage or higher.

The Commission recommended that 50,000 admission numbers be allocated each year to refugees, not including the adjustment to permanent resident status of aliens already present in the U.S. who are granted asylum. Refugee admissions could exceed 50,000 in the case of an emergency, or through approval by Congress.

---

[62] 1995 Commission Report at 72.

143

*Administration*

The Clinton Administration has not formally submitted to Congress recommended legislation on legal immigration reform. However, in testimony before the Senate Subcommittee on Immigration in September 1995, the Commissioner of the INS outlined the Administration's proposal on this subject.[63] The proposal would call for a flexible annual admissions ceiling of approximately 500,000, including family and employment-based admissions, but not refugees. The diversity category would be eliminated.

The Administration would maintain the current unlimited admissions for spouses, minor children, and parents of U.S. citizens, and also preserve categories for the adult children of U.S. citizens and lawful permanent residents. The category for brothers and sisters of citizens would be eliminated. The plan makes no specific provision for backlog clearance for nuclear family members of lawful permanent residents. However, the Administration believes that recent increases in applications for naturalization, combined with a new "Naturalization 2000" program being implemented by the INS, will result in naturalization of most of the sponsoring aliens who are currently lawful permanent residents. This will "move" the backlog into the unlimited category for admission of spouses and minor children of U.S. citizens. The Administration has estimated that this may increase the number of admissions in this unlimited category by as much as 60,000 per year, which would cause a concomitant increase in the overall annual admissions figure. The Administration would admit 100,000 employment-based immigrants and eliminate the current category for unskilled workers.

On refugees, the Administration would retain current law, which permits the ceiling to be set by the President on an annual basis after consultation with Congress. The State Department has projected that refugee admissions, which are to be 90,000 in FY 1996, will decrease to 70,000 in FY 1997 and 50,000 thereafter.[64]

### V. PUBLIC BENEFITS

As a matter of national policy regarding immigration and welfare, self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes. It continues to be the immigration policy of the United States that aliens within the nation's borders not depend on taxpayer-funded public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations. The availability of taxpayer-funded public benefits should not constitute an incentive for immigration to the United States.

Since 1882, aliens have been excludable from admission to the U.S. if found likely to become "public charges."[65] Since 1917, aliens have been subject to deportation from the U.S. for becoming public charges after entry from causes arising before entry. By regulation and administrative practice, the State Department and the INS

---

[63] "Legal Immigration Reform: Hearing Before the Subcommittee on Immigration of the Senate Judiciary Committee", 104th Cong., 1st Sess. (September 13, 1995) (Statement of Doris Meissner, Commissioner, Immigration and Naturalization Service).
[64] 1995 Commission Report at 136.
[65] INA § 212(a)(4), 8 U.S.C. § 1182(a)(4).

144

permit those immigrants who would otherwise be excluded as public charges to overcome exclusion through an affidavit of support, which is executed by a person who agrees to provide financial support for the alien (the alien's "sponsor").

Despite the long-standing principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State and local governments at increasing rates. Only a negligible number of aliens are deported on public charge grounds. Further, various State court decisions by immigration courts have held that the affidavits of support, as currently constituted, do not impose a binding obligation on sponsors to reimburse welfare agencies that provide public benefits to sponsored aliens. As a result, these provisions have been wholly incapable of assuring that individual aliens not burden the public benefits system and, consequently, the taxpayer.

Many studies at the national, State, and local levels have examined the use of public benefits by non-citizens. One of the better of these studies was recently conducted by Professor George J. Borjas, formerly of the University of California at San Diego and presently at Harvard University. Professor Borjas, a Cuban immigrant to the U.S. who specializes in economics, concluded in his study "Immigration and Welfare, 1970–1990" that immigrants use public benefits to a greater degree than citizens, and estimated that the annual cost to the American taxpayer of providing means-tested public assistance to immigrants, deducting the amount they pay in taxes, is $16 billion.[66] Professor Borjas cites that 9.1 percent of immigrant households received cash welfare assistance in 1990, compared with 7.4 percent of native households.[67] The average amount of cash assistance received by an immigrant household was $5,400 annually, compared with $4,000 for a native household.[68] Further, from 1970–1990 the total amount of cash assistance received by immigrant households was 56 percent higher than would have been the case if immigrants used the welfare system to the same extent as natives.[69] In a more recent study, Professor Borjas has found that 26 percent of immigrant households receive some form of public benefits. In the Supplemental Security Income program alone, immigrant applications increased 580 percent from 1982–1994, compared to a 49 percent increase for natives.[70]

Allowing immigrants to become dependent on public assistance undermines America's historic immigration policy that those who come to the country be and remain self-sufficient. Welfare destroys the recipient's work incentives, encourages the breakdown of the family unit, and transmits dependency across generations. Further, it keeps immigrants from becoming productive participants in American society.

The Committee believes that it is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with the longstanding tenets of national immigration policy. It is also a com-

---

[66] George J. Borjas, Immigration and Welfare, 1970–1990 23 (Nat'l Bur. Econ. Res. Working Paper No. 4872, Sept. 1994).
[67] Id. at 4-5.
[68] Id. at 9.
[69] Id. at 20.
[70] Social Security Administration.

145

pelling government interest to remove the incentive for illegal immigration provided by the easy availability of public benefits. Finally, with respect to the State authority to make determinations concerning alien eligibility for public benefits in this legislation, a State that chooses to follow the Federal classification in determining the eligibility of aliens for public benefits shall be deemed by any Federal or State court to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

### VI. SKILLED NONIMMIGRANTS (H VISAS)

## The H–1B Program

*Background*

Up to 65,000 "H–1B" visas[71] are granted each year for foreign workers coming to perform work in specialty occupations (requiring at least a baccalaureate degree or its equivalent) or as fashion models. Since the visas are good for up to 6 years, a total of 390,000 H–1B aliens can be working in the United States at any one time. Typical occupations are computer programmers, engineers, physical therapists and university professors and researchers.

In order to enable H–1B aliens to be brought on board promptly, employers are not required to engage in a lengthy labor certification process (such as that used for employment-based immigrants) prior to the arrival of the alien in the United States. Protection of American workers from unfair competition in the H–1B program is accomplished by requiring employers to file a "labor condition application" ("LCA") making certain basic attestations. The Secretary of Labor is empowered to investigate complaints alleging noncompliance with these attestations.[72]

The attestations include:

(1) the employer will pay the H–1B alien wages which will be the higher of the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question or the prevailing wage level for the occupational classification in the area of employment, and the employer will provide working conditions for the H–1B that will not adversely affect those of workers similarly employed;

(2) there is no strike or lockout in the course of a labor dispute in the occupational classification at the place of employment;

(3) the employer has provided notice of the filing of the application to the bargaining representative of the employer's employees in the occupational classification and area for which the H–1Bs are sought, or if there is no such bargaining representative, has posted notice in conspicuous locations at the place of employment; and

---

[71] See INA §§ 101(a)(15)(H)(i)(b) and 214(g)–(i).
[72] See INA § 212(n).

146

(4) the LCA will identify the number of workers sought, the occupational classification in which the workers will be employed, and the wage rate and conditions under which they will be employed. Department of Labor regulations require that the employer also identify the place of intended employment and the specific source relied upon to determine the prevailing wage.[73]

The Secretary of Labor must accept the LCA within 7 days unless it is incomplete or obviously inaccurate. Departmental investigations as to whether the employer has failed to fulfill its attestations or has misrepresented material facts in its LCA are triggered by complaints filed by aggrieved persons or organizations. The employer can be subject to penalties including civil monetary fines of up to $1,000 per violation and an inability to have petitions approved for alien workers (both immigrant and nonimmigrant) for at least 1 year. In addition, if wages were not paid at the required wage level, back pay can be awarded to an H–1B alien.

*The current controversy*

The H–1B program has recently become embroiled in controversy. Certain employers appear to be using H–1B aliens in ways contrary to the intent of the program. They are building workforces almost entirely composed of H–1Bs instead of using the aliens to ameliorate temporary skills shortages in the American labor force, and are often serving as "job contractors," leasing out these pooled H–1Bs to other firms. Since the job contractor, not the business where the H–1B employee will actually work, is considered the employer, it is the contractor's responsibility to make and fulfill the required attestations. This can have the effect of defeating the H–1B program's safeguards. Finally, in many instances American employees are being fired and replaced with H–1Bs at lower wages. Secretary of Labor Robert Reich recently expressed worry over these practices:

> Our experience with the practical operation of the H–1B program has raised serious concerns * * * that what was conceived as a means to meet temporary business needs for unique, highly skilled professionals from abroad is, in fact, being used by some employers to bring in relatively large numbers of foreign workers who may well be displacing U.S. workers and eroding employers' commitment to the domestic workforce. Some employers * * * seek the admission of scores, even hundreds of [H–1Bs], especially for work in relatively low-level computer-related and health care occupations. These employers include "job contractors," some of which have a workforce composed predominantly or even entirely of H–1B workers, which then lease these employees to other U.S. companies or use them to provide services previously provided by laid-off U.S. workers.[74]

---

[73] See 59 Fed. Reg. 65646, 65662 (Dec. 20, 1994); 20 CFR 655.730 (1995).
[74] "Nonimmigrant Visas: Hearings Before the Subcomm. on Immigration of the Senate Comm, on the Judiciary," 104th Cong., 1st Sess. (Sept. 28, 1995) (Statement of Robert Reich, Secretary of Labor).

147

*The Department of Labor response*

Responding to such concerns, the Department of Labor promulgated a set of final rules which went into effect on January 19, 1995.[75] Instead of targeting job contractors or companies relying to an inordinate degree on H–1B aliens, the regulations imposed new requirements on all employers of H–1B aliens. The Committee believes that four of the regulations and a section of the appendix to the regulations are unduly burdensome to legitimate users of H–1Bs.

The first of the regulations requires that "[w]here the employer places any H–1B nonimmigrant(s) at one or more worksites not contemplated at the time of filing the application, but which are within the area of intended employment listed on the [application],[76] the employer is required to post notice(s) at such worksite(s) * * * ."[77]

This regulation has a defensible purpose. If an employer is a job contractor and places H–1Bs at other firms, a posting at the contractor's headquarters will not necessarily provide adequate notice to the employees of the other firms, who are the ones who might be negatively impacted and who must file complaints for the enforcement program to work. A regulation requiring additional postings in such circumstances makes sense, and was in fact once proposed by the Department.[78] But the regulation does not stop there. It requires that all employers employing H–1Bs must ensure that notice is posted at whatever worksites an H–1B alien ventures to in the course of his or her employment. Thus, if an H–1B goes to a client of his or her employer to service equipment or make a sales pitch, notice has to be posted at the client's location. If an H–1B goes to a potential client to prospect for business, to a law firm to give a deposition, to a university for training, or to a convention, notice has to be posted at the respective locations. In all these instances, the employer must obtain the consent from the owners of the subject property to post notice (including the wages of the H–1B) on their property. This mandate requires more than customary and reasonable business norms would allow.

The second of the problematic regulations requires an employer to file a new LCA if any H–1B or combination of H–1Bs is placed in an area of employment not listed in their original LCA(s) for a cumulative period of more than 90 workdays within a 3-year period. A "workday" means any day on which any H–1B performs any work in a non-listed area of employment.[79] Thus, if New York City is not listed on the employer's LCA(s), the employer may not permit any H–1B to work in that area (without filing a new LCA listing New York City) if, in the previous 3 years, any H–1B(s) em-

---

[75] See 59 Fed. Reg. 65646 (Dec. 20, 1994).
[76] The area of intended employment is defined as the area "within normal commuting distance of the place (address) of employment." 20 CFR 655.715 (1995).
[77] 20 CFR 655.734(a)(1)(ii)(D) (1995).
[78] See 58 Fed. Reg. 52152, 52161 (Oct. 6, 1993)(§———.735). The proposed regulation defined a job contractor as "an employer whose employees perform their duties in whole or in part at worksites that are owned, operated, and controlled not by the job contractor, but by an entity with which the job contractor has a contractual relationship and which displays indicia of an employment relationship with the job contractor's employees (e.g., assignment of tasks; day to day supervision of performance; evaluation of performance)." Id. at §———.715.
[79] 20 CFR 655.735(a), (b)(4) (1995).

148

ployed by that employer have worked in New York City for a cumulative total of 90 days.

This regulation also has a defensible purpose, to ensure that the notice and prevailing wage requirements of an attestation apply to the location where an H–1B alien actually works. For example, if an H–1B is brought to the country by a job contractor in Baltimore and placed at a firm in San Francisco, the notice attestation in the original LCA will only require notice in Baltimore and the wage requirement will require the payment of the wage prevailing in Baltimore. Requiring a new LCA with San Francisco listed as the area of employment will result in notice to co-workers in San Francisco and the payment of the San Francisco prevailing wage. For the same reasons, an additional application also makes some sense when a company sends an H–1B to work permanently at its San Francisco branch, where the initial LCA stated that he or she would work in its Baltimore headquarters.

Again, however, the regulation covers all instances in which an H–1B is sent out of the office. In business today, success in many occupations requires frequent travel around the country and the Committee recognizes two undue burdens with the application of this regulation to all employers of H–1B nonimmigrants. First is requiring an employer to file a new LCA whenever it sends H–1Bs on legitimate business trips exceeding some arbitrary period of time to cities not listed on their LCAs. Second is the administrative burden of having to track every city in the country to which it sends H–1Bs (on whose LCAs the city is not listed) to ensure that no city receives any combination of such H–1Bs for a total of more than 90 days every three years.

The third provision of concern to the Committee requires employers who send H–1Bs to a non-listed area of employment to pay the H–1B per diem and transportation expenses (for both work and non-work days) at rates no lower than those prescribed for Federal Government employees on travel or temporary assignment.[80] This provision appears designed to ensure that the salaries of H–1Bs are not indirectly lowered by forcing them to pay their own travel expenses, and to ensure that "travelling" employees are, in fact, on temporary assignment. However, to require that such expenses be reimbursed at Government rates is unacceptable micromanagement of corporate travel policy for companies that are not prone to abusing the H–1B program: non-H–1B dependent employers.

The fourth area of concern involves investigations by the Department of Labor. Section 212(n)(2)(A) of the INA states that "complaints may be filed by any aggrieved person or organization (including bargaining representatives)." Congress clearly intended to implement a complaint-driven system in which co-workers, unions, and competitors would be the parties authorized to complain and thus set into motion Department of Labor investigations. However, the regulations now define aggrieved party to include "[a] government agency which has a program that is impacted by the employer's alleged non-compliance with the labor condition application"[81]—i.e., the Department of Labor. Then, the regulations state

---

[80] 20 CFR 655.735(b)(3) (1995).
[81] 20 CFR 655.715 (1995).

149

that the Secretary shall investigate misrepresentation or failure of an employer to meet an attestation "either pursuant to a complaint or otherwise".[82] This action by the Department of Labor contravenes the legislative intent of the Immigration Act of 1990.

Lastly, the appendix to the regulations states that in determining the actual wage level paid by the employer to workers similarly employed as an H–1B, "[t]he employer must have and document an objective system used to determine the wages of non-H–1B workers, and apply that system to H–1B nonimmigrants as well." [83] Whether the intent of this requirement was just to make it easier for the Department to determine the actual wage paid in various instances or whether broader policy goals were in mind, the move was unwarranted. It was clearly never the intent of Congress to use the H–1B program as a way of mandating how employers pay their non-H–1B employees. As long as an employer pays its H–1Bs the actual wage (assuming it is higher than the appropriate prevailing wage), the employer should be free to determine its wage scale, constrained by factors such as market forces, contractual agreements, collective bargaining, and the minimum wage.

In summary, the newly promulgated regulations are somewhat successful in dealing with abusive employers and with the problems that the job contractor phenomenon and the existence of firms with multiple worksites pose to the H–1B enforcement scheme. However, they do so at a cost which may be too high for the legitimate employer hiring a relatively small number of H–1B aliens. Further, they do not address the specter of employers laying off American workers and replacing them with lower-cost H–1Bs or treat the heavy user of H–1Bs any more severely than they do the employer who only uses the aliens to fill temporary skills gaps.

### The H–1A Program

The special pilot program created by the Immigration Nursing Relief Act of 1989 ("INRA", Pub. L. 101–238) to permit foreign nurses to come to work temporarily in the United State expired on August 31, 1995. Prior to the creation of this special program, nurses had been admitted under what is now the H–1B temporary non-immigrant program. The Committee expects that eligible foreign non-immigrant nurses will again be admitted under the H–1B program.

The valuable screening and competency requirements contained in the pilot program should be retained. The authentication of applications and supporting documents for foreign health care workers is of vital importance to consumers, and can serve as an important mechanism to reduce illegal immigration as well. For example, prior to the enactment of the Immigration Nursing Relief Act of 1989 (INRA), the Department of Health, Education, and Welfare reported that more than 80 percent of all foreign-licensed nurses were unable to pass the U.S. Registered Nurse examination of the first try.[84] Foreign nurses who were unable to pass the exam were more likely to remain illegally in the U.S. Following the imposition

---

[82] 20 CFR 655.710 (1995).
[83] 20 CFR Appendix A to Subpart H to Part 655 (1995).
[84] Survey of Foreign Nurse Graduates, DHEW Publication No. HRA 76–13 (1976).

150

of a requirement that applicants' credentials be authenticated, the number of foreign nurses who failed the U.S. nursing exam fell to 20 percent.[85] Pursuant to the pilot program, the successful authentication process was conducted by a non-governmental body, the Commission on Graduates of Foreign Nursing Schools, and funded by a fee paid by the applicant and at no cost to the U.S. government. Additionally, the Commission's work saved valuable governmental resources by also substantially reducing the burden on consular officers to authenticate credentials.

The Department of State has statutory authority under Section 222 of the INS (8 U.S. C. Section 1202) to require authentication of applications for both immigrant and non-immigrant visas. Again, because the protection of the public health and safety must be paramount, the Committee believes that the Department of State should revise its visa application procedures under Section 222 to require health care workers to authenticate their visa application and supporting documents in the same manner as under INRA. The health care workers covered by this requirement should include nurses, physical therapists, and occupational therapists, as well as both licensed and unlicensed health occupations in which the practitioner diagnoses, delivers care, or supports the delivery of care such that incompetent practitioners in those occupations might jeopardize public health.

Similarly, the Committee expects, therefore, that the INS, in consultation with the DOL, will promulgate separate H–1B standards for nurses which will require that foreign nurses admitted non-immigrants under the H–1B category meet requirements identical to those now imposed on foreign nurses seeking admission as immigrants, including the successful completion of the examination recognized by the DOL in 20 CFR §656.10 (a)(2)(I).

The Committee recommends that the Departments of State and Labor use an independent credentialing organization with sufficient experience and resources on health care-related foreign educational institutions, ministries of health and licensing jurisdictions. The organization should have a proven record of consistent and accurate credentialing. One such organization is the Commission on Graduates of Foreign Nursing Schools which has both the experience and resources to provide this service.

PREVIOUS CONSIDERATION AND HEARINGS

On February 8, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on the Management Practices of the Immigration and Naturalization Service. Witnesses were Laurie Ekstrand, Associate Director, Administration of Justice Issues, General Government Division, accompanied by James Blume, Assistant Director, Administration of Justice Issues, General Government Division, General Accounting Office; and Chris Sale, Deputy Commissioner, Immigration and Naturalization Service.

On February 24, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Foreign Visitors Who Violate

---

[85] Barbara S. Jacobsen and Theresa M. Kowalski, "Validity Study: CGFNS Qualifying Examinations as Predictors of Success on United States Registered Nurse Licensing Examination," Commission on Graduates of Foreign Nursing Schools (1994).

151

the Terms of Their Visas by Remaining in the United States indefinitely. Witnesses were Honorable Barbara Jordan, Chair, accompanied by Robert Hill, Commissioner, and Susan Martin, Executive Director, Commission on Immigration Reform; Diane Dillard, Deputy Assistant Secretary for Consular Affairs, Department of State; James Puleo, Executive Associate Commissioner, Programs, Immigration and Naturalization Service; and Robert Warren, Director, Statistics Branch, Immigration and Naturalization Service.

On March 3, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Work Site Enforcement of Employer Sanctions. Witnesses were James Puleo, Executive Associate Commissioner, Programs, U.S. Immigration and Naturalization Service, accompanied by Brian J. Vaillancourt, Director Civil Matters, Investigations Division, U.S. Immigration and Naturalization Service; Maria Echeveste, Administrator, Wage and Hour Division, U.S. Department of Labor; Shirley S. Chater, Commissioner, Social Security Administration, U.S. Department of Health and Human Services; Robert Rasor, Special Agent, Secret Service, U.S. Department of the Treasury; Robert Charles Hill, Member, U.S. Commission on Immigration Reform, accompanied by Susan Forbes Martin, Executive Director, U.S. Commission on Immigration Reform; Wade Avondoglio, Owner, Perona Farms Restaurant, Member, National Restaurant Association; Richard Holcomb, Commissioner, Virginia Department of Motor Vehicles; W. Marshall Rickert, Motor Vehicle Administrator, Maryland Motor Vehicle Administration; A. Torrey McLean, State Registrar, North Carolina Department of Vital Records.

On March 10, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Border Security. The Members of Congress testifying were Honorable Duncan Hunter, Honorable Brian Bilbray, and Honorable Ronald Coleman. Other witnesses were Mary Ryan, Assistant Secretary of State for Consular Affairs, Department of State, accompanied by Frank Moss, Special Assistant for Border Security, Bureau for Consular Affairs; Honorable Doris Meissner, Commissioner, Immigration and Naturalization Service, accompanied by Silvestre Reyes, Sector Chief, U.S. Border Patrol, El Paso Sector, and Gus de la Vina, Regional Director, Western Region, Immigration and Naturalization Service; Laurie Ekstrand, Associate Director, Administration of Justice Issues, General Government Division, General Accounting Office; Brigadier General Edmund Zysk, Deputy Commander, California National Guard, accompanied by Lieutenant Colonel Bill Hipsley, Training Officer, California National Guard.

On March 23, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Removal of Criminal and Illegal Aliens. Witnesses were T. Alexander Aleinikoff, General Counsel, Immigration and Naturalization Service, accompanied by James Puleo, Executive Associate Commissioner, Programs, and Joan Higgins, Assistant Commissioner, Detention and Deportation; Anthony C. Moscato, Director, Executive Office for Immigration Review, accompanied by Paul Schmidt, Chairman, Board of Immigration Appeals, and Michael J. Creppy, Chief Immigration Judge.

On March 30, 1995 the Subcommittee on Immigration and Claims held an oversight hearing on Verification of Eligibility for

152

Employment and Benefits. Witnesses were Honorable Barbara Jordan, Chair, Commission on Immigration Reform, accompanied by Susan Martin, Ph.D., Executive Director; Robert L. Bach, Ph.D., Executive Associate Commissioner, Policy and Planning, U.S. Immigration and Naturalization Service, accompanied by John E. Nahan, Director, Systematic Alien Verification for Entitlements (SAVE) Program; William Ludwig, Administrator, Food and Consumer Service, U.S. Department of Agriculture; Wendell E. Primus, Deputy Assistant Secretary for Human Services Policy, U.S. Department of Health and Human Services, accompanied by Sandy Crank, Associate Commissioner, Social Security Administration, and Mack Storrs, Division Director for AFDC Policy; Nelson Diaz, General Counsel, U.S. Department of Housing and Urban Development; Richard W. Velde, Esq.; Austin T. Fragomen, Jr., Chairman, American Council on International Personnel; Joseph A. Antolin, Deputy Director of Field Operations, Illinois Department of Public Aid; Esperita Johnson-Bullard, Eligibility Supervisor, Division of Social Services, Department of Human Services, City of Alexandria, Virginia.

On April 5, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on the Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force. Witnesses were Michael Fix, Esq., The Urban Institute, accompanied by Jeffrey Passel; Dr. Donald Huddle, Rice University; Dr. Georges Vernez, RAND; Dr. George Borjas, University of California at San Diego; Dr. Joseph Altonji, Northwestern University; Dr. B. Lindsay Lowell; Dr. Vernon Briggs, Jr., Cornell University; Dr. Frank Morris, Morgan State University; Dr. Norman Matloff, University of California at Davis; Dr. Peter Skerry, Woodrow Wilson International Center for Scholars.

On May 17, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Legal Immigration Reform Proposals. Witnesses were Susan Martin, Ph.D., Executive Director, Commission on Immigration Reform; Peter Brimelow, Author, "Alien Nation"; Peter Skerry, Wilson Center, Philip Martin, Professor of Agricultural Economics, University of California at Davis; Harris Miller, President, Information Technology Association of America; Markley Roberts, Assistant Director, Economic Research Department, AFL–CIO; Demetrios Papademetriou, Carnegie Endowment for International Peace; Mark Krikorian, Executive Director, Center for Immigration Studies; Professor John Guendelsberger, Pettit College of Law, Ohio Northern University; Michael Lempres, Esq., Akin, Gump, Strauss, Hauer, & Feld.

On April 24, 1995, the Subcommittee on Immigration and Claims held a Members' Forum on Immigration. The following Members testified. Hon. Ronald Packard; Hon. Zoe Lofgren; Hon. Brian Bilbray; Hon. Dana Rohrabacher; Hon. William Martini; Hon. Mark Foley; Hon. Porter Goss; Hon. Jay Kim; Hon. Owen Pickett; Hon. Robert Underwood; Hon. Susan Molinari; Hon. Patsy Mink; Hon. Anthony Beilenson; Hon. Andrea Seastrand; Hon. Esteban Edward Torres; Hon. Bob Filner; Hon. Tim Hutchinson; Hon. Ronald Coleman.

On June 28, 1995, the Subcommittee on Immigration and Claims held a joint hearing with the Senate Subcommittee on Immigration

153

to receive testimony from the Commission on Immigration Reform regarding the Commission's interim recommendations on legal immigration reform. Testifying was the Honorable Barbara Jordan, Chair, accompanied by Michael Teitelbaum, Vice Chair; Bruce Morrison, Commissioner; Robert Charles Hill, Commissioner; and Susan Martin, Executive Director.

On June 29, 1995, the Subcommittee on Immigration and Claims held a hearing on H.R. 1915, the Immigration in the National Interest Act of 1995. Witnesses were T. Alexander Aleinikoff, Executive Associate Commissioner for Programs, Immigration and Naturalization Service; Anthony C. Moscato, Director, Executive Office for Immigration Review; Diane Dillard, Acting Assistant Secretary for Consular Affairs, Department of State; John R. Fraser, Deputy Administrator, Wage and Hour Division, Department of Labor; Dr. Lawrence H. Thompson, Principal Deputy Commissioner, Social Security Administration; Robert Rector, Senior Policy Analyst, The Heritage Foundation; Dr. Vernon Briggs, Jr., School of Industrial Relations, Cornell University; Austin T. Fragomen, Jr., Chairman, American Council on International Personnel; Daryl R. Buffenstein, President, American Immigration Lawyers Association; David Simcox, Research Director, Negative Population Growth; Dr. Frank Morris, Dean, Morgan State University; Carl Hampe, Esq., Paul, Weiss, Rifkind, Wharton & Garrison; John Swenson, Executive Director, Migration and Refugee Services, U.S. Catholic Conference; Raul Yzaguirre, President, National Council of La Raza; Dr. Michael Teitelbaum, Program Officer, Alfred P. Sloan Foundation; David North, Independent Immigration Researcher; Bill Frelick, Senior Policy Analyst, U.S. Committee for Refugees; Karen K. Narasaki, Executive Director, National Asian Pacific American Legal Consortium; Dan Stein, Executive Director, The Federation for American Immigration Reform.

### Provisions of H.R. 2202

The goal of H.R. 2202 is to curb illegal immigration and reform legal immigration in the national interest. H.R. 2202 mandates specific enforcement measures against illegal immigration, including the hiring of new Border Patrol agents as well as interior enforcement personnel, authorizes the acquisition of additional resources for immigration enforcement and control, and overhauls procedures to allow the prompt identification, apprehension, and removal of illegal aliens from the United States. On the legal immigration front, H.R. 2202 reorients current admission priorities to directly advance U.S. interests in the preservation of the nuclear family, the admission of highly-skilled individuals, the protection of U.S. workers from unfair competition, and the safety of refugees.

### Title I—Border Control

Immigration control is a fundamental aspect of national sovereignty, and protection of that sovereignty begins with securing its borders. Title I of H.R. 2202 authorizes the addition of 1,000 border patrol agents each year through FY 2000, the hiring of support personnel for border enforcement, and the procurement of advanced technologies to prevent illegal border crossings.

154

Section 101 increases the number of Border Patrol agents by 1000 per year from 1996 through 2000, raises by 800 the number of support personnel for border enforcement, and requires that new personnel be deployed in sectors along the border in proportion to the level of illegal immigration through those sectors. Section 130006 of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103-322, Sept. 13, 1994), authorized the appropriation of increased resources for INS enforcement efforts, and specified that funds be allocated to increase the Border Patrol by 1,000 agents per year from FY 1995 through FY 1998. This section requires that such agents be hired and that the 1,000 per year increase continue through FY 2000. In addition, by requiring deployment on the border, this section states a clear policy that Border Patrol resources should be used primarily at the border to deter illegal crossings and to apprehend those illegal aliens who do cross at the earliest possible juncture. This does not mean, however, that efforts at interior enforcement should be reduced. Section 358, in fact, authorizes the expenditure of $150 million to hire new personnel for interior enforcement, including investigators and detention and deportation officers.

Section 102 requires the Attorney General to install additional fences and roads to deter illegal immigration. In the San Diego sector, it calls for extension of the new fencing to a point 14 miles east of the Pacific Ocean, and the construction of second and third fences, with roads between the fences, to provide an additional deterrent. This adopts the recommendations of the Sandia Laboratories in New Mexico, in a January 1993 report, that a series of fences, with interspersed roads, be constructed in areas with the highest concentration of illegal immigration.

This section also provides for a limited waiver of the Endangered Species Act. This is necessary because the Committee has learned that roads and fences have not been built in certain areas along the border because of concern that animal habitats might be affected. Without these roads and fences, Border Patrol agents are unable to properly patrol these areas. Furthermore, the national interest requires that the Border Patrol be able to deter entry at any feasible point of entry along the land border. The International Boundary and Water Commission already provides guidance to the INS and other agencies regarding the construction of barriers, and potential environmental impacts may be discussed and resolved in that context.

Section 102 also requires the forward deployment of Border Patrol agents to provide a visible deterrent to illegal immigration. The Committee is concerned that notwithstanding the success of Operation Hold-the-Line in El Paso, the INS has been reluctant to adopt similar forward deployment of agents in other border sectors. At the same time, the Committee recognizes that forward deployment may work better in certain sectors than in others due to factors such as topography and established migration patterns. Accordingly, section 102(d) requires the Attorney General to report to Congress on the success of forward deployment. This report will enable Congress to better exercise its oversight authority in this critical area of immigration enforcement and make appropriate adjustments in policy and available resources.

155

Section 104 requires improvement in the Border Crossing Identification Card. Amendments adopted by the Committee at the request of the INS will give the INS a longer time period to implement these new improvements. However, the Committee intends that the INS move as rapidly as possible to: (1) ensure that all newly-issued border crossing cards include additional security features; (2) replace existing cards with new secure cards; and (3) require verification of the identity of the holder of the border crossing card each time it is used to seek admission into the U.S. Although not specifically addressed in this legislation, the Committee also believes that it would be appropriate to impose a fee for the new secure card. The Committee understands that pursuant to an existing exchange of letters between the United States and Mexico, no fee may be charged for issuance of the border crossing card. Issuance of a more secure border crossing card is in the interests of both nations, since it will deter illegal migration and facilitate legitimate border traffic. The cost per card should be modest, but it is most appropriately borne by those who benefit from use of the card. The Attorney General and the Secretary of State should cooperate in discussions with the Government of Mexico to remove any existing restrictions on the collection of a fee for the border crossing card.

A number of provisions address the problem of the "revolving door" at the southern land border. Apprehended illegal aliens who agree to voluntarily return to Mexico in lieu of being placed in removal proceedings often make repeated attempts to cross the border, with no consequences attached. While prompt removal of illegal aliens should be the goal of immigration enforcement, the ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border.

Section 105 sets a civil penalty for attempted illegal entry into the U.S. Under this provision, illegal aliens would be liable for a significant fine each time they attempt to cross. This provision is not intended to require that indigent aliens be detained in the United States until they are able to obtain sufficient funds to pay the fine. Prosecutorial discretion should be exercised in favor of rapid removal of illegal aliens from the United States. However, the civil penalty is intended to act as a deterrent to those who are otherwise determined to make repeated attempts to cross illegally into the United States.

Section 106 authorizes the appropriation of funds necessary to detain and prosecute any alien who has attempted illegal entry into the U.S. on more than two occasions.

Section 111 requires establishment of a pilot program to repatriate illegal aliens to the interior of their home countries. Release of aliens at the border, from where they can easily and immediately attempt re-entry, is particularly inappropriate in the case of aliens who have been ordered deported after proceedings before an immigration judge, and especially in the case of aliens involved in criminal activity. Releasing such deported aliens to a situation where they can immediately attempt re-entry undermines immigration enforcement, weakens border security, and increases the risk of crime.

156

The Committee believes that the INS, in cooperation with other law enforcement agencies, should implement a number of approaches to make deportation more effective by reducing the likelihood that aliens physically removed from the United States will attempt re-entry. Primary effort should be given to programs for repatriating illegal aliens to the interior of the countries to which they are deported, thus making it more difficult for them to attempt illegal reentry. Repatriation to third countries, where the alien is removed to a country other than that from which the alien has arrived directly to the United States, also should be considered. For example, if a national of a third country crosses into the United States from Canada and is apprehended at the border, procedures should exist for removing that alien expeditiously to the alien's country of nationality. The Committee believes that the reforms of the removal process adopted in Title III of this bill would facilitate such efforts by the INS, and that pilot projects with a required report to Congress offer the best opportunity to identify sound approaches to this problem.

Title I also addresses interior enforcement issues which relate directly to the problem of visa overstays and criminal aliens. Section 112 requires a pilot program to determine the feasibility of using closed military bases as INS detention centers. Lack of detention space is frequently cited as a reason why the INS is able to remove only a small fraction of deportable aliens. This problem is particularly acute when the INS is unable to detain criminal aliens. Use of converted military facilities may help bridge the gap between the need for detention space and available capacity. The INS already has planned to use one closed military facility as a site for training of new immigration officers and Border Patrol agents. Other uses of such facilities to aid in immigration enforcement should be pursued.

Section 113 seeks to improve tracking of visa overstays by requiring pilot projects at 3 major international airports under which the INS would directly collect records of departure from every departing alien passenger. As previously discussed, the INS lacks the ability to accurately track whether aliens with permission to enter the United States temporarily leave within the time limit set for their departure. This makes it more difficult for the INS to assess the extent of the overstay problem, and more importantly, to determine if individual aliens are violating, or have violated, their nonimmigrant status. The United States should test the feasibility of a system of uniform departure controls for all aliens. Initial pilot projects should focus on airports with the highest volume of international travel. A pilot program should first be implemented in order to test the cost and effectiveness of a comprehensive departure control system before a decision is made to make such a program permanent. The pilot program, however, should be seen as a first step toward eventual implementation of a system that will enable INS to readily identify all aliens who violate their nonimmigrant status by overstaying.

Section 121 authorizes the appropriation of funds to increase the number of investigators and other enforcement personnel deployed in the interior of the United States.

157

Sections 201 through 205 permit the INS to seek wiretap authorization under 18 U.S.C. 2516(1) in investigations of alien smuggling and document fraud; make document fraud and alien smuggling crimes indictable as racketeering offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO); increase criminal penalties for alien smuggling, particularly where the smuggling is done for financial gain, involves criminal aliens, or multiple illegal entries; increase the number of U.S. attorneys available for the prosecution of immigration crimes; and expand the undercover investigations authority of the INS.

Section 211 through 216 increase civil and criminal penalties for document fraud, and establish new penalties for knowing preparation or presentation of fraudulent documents, and for making false claims to citizenship. Section 221 extends asset forfeiture authority under 18 U.S.C. 982(a) in the case of aliens convicted of passport or visa fraud, and section 222 permits the issuance of subpoenas for bank records in investigating such crimes.

### Subtitle A—Reform of Removal Procedures

Subtitle A of Title III (sections 301 through 309) streamlines rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States. (Due to complexity of these provisions, detailed analysis and comment of some provisions is reserved to the section-by-section analysis.)

Section 301 provides that aliens who have entered the United States without being legally admitted are now classified as "inadmissible" and, if apprehended, bear the same burden of proof as an alien seeking to be admitted at a port of entry: to establish clearly and beyond doubt that they are entitled to be legally admitted. Aliens who have been legally admitted, but who overstay their visas or otherwise violate their immigration status (such as by committing crimes), must establish by clear and convincing evidence that they are lawfully present. Aliens who have been illegally present in the U.S. for an aggregate of 12 months will, with certain exceptions, not be eligible for permanent residence or other immigration benefits for 10 years.

Section 301(e) makes inadmissible to the United States any former U.S. citizen who officially renounces United States citizenship for the purpose of avoiding taxation by the United States. The Committee intends that this section shall apply solely to those individuals who officially renounce their U.S. citizenship after the date on which this section becomes effective.

Section 302 provides that an arriving alien can be denied entry into the U.S. by an immigration officer because of misrepresentation, use of fraudulent documents, or lack of any documents. The alien may be ordered removed without a hearing before an immigration judge, and without administrative or judicial review. This provision is based upon legislation approved by the Subcommittee

158

on International Law, Immigration, and Refugees during the 103rd Congress.

This provision is necessary because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S. Unless such aliens claim to be U.S. nationals, or state a fear of persecution, there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here. Neither international law nor the Due Process Clause of the Fifth Amendment require that such aliens be given a hearing before an immigration judge or a right to appeal.

Section 302 also requires that an alien subject to expedited removal who claims persecution or otherwise indicates a desire to apply for asylum be interviewed by an asylum officer to determine if the alien has a "credible fear" of persecution. A "credible fear" is established if the alien is more likely than not telling the truth, and if there is a reasonable probability that the alien will meet the definition of refugee and otherwise qualify for asylum. This standard, therefore, is lower than the "well-founded fear" standard needed to ultimately be granted asylum in the U.S.—the arriving alien need only show a probability that he will meet the well-founded fear standard. The credible fear standard is designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process. If the alien meets this threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim—the same as any other alien in the U.S.

Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution. The initial screening, which should take place in the form of a confidential interview, will focus on two questions: is the alien telling the truth; and does the alien have some characteristic that would qualify the alien as a refugee. As in other cases, the asylum officer should attempt to elicit all facts relevant to the applicant's claim. It is not unreasonable to expect the applicant to be truthful in such an interview. Nor is it unreasonable to expect that, in the case of a person genuinely fleeing persecution, that the interview will yield sufficient facts to determine that the alien has a reasonable likelihood of being successful in the full asylum process.

Section 302 permits the interview itself to be carried out by a full-time INS asylum officer, or by an INS inspector or other official who has received the complete training provided to full-time asylum officers and has reasonable access to country condition reports and other resources that are used by asylum officers to assess the credibility and foundation of asylum claims.

Section 304 provides that there will be a single, streamlined "removal proceeding" before an immigration judge for all inadmissible and deportable aliens. This will replace the current exclusion proceedings under section 236 of the INA, and deportation proceedings under section 242. The consolidation will end procedural disputes contesting the type of proceeding an alien should be subject to, disputes that often turn on the elusive question of whether an illegal alien has been apprehended immediately upon entry, or evaded government control for a period of time. Instead, the focus will be

159

upon whether the alien has or has not been lawfully admitted to the U.S.

Section 304 also will simplify procedures for initiating removal proceedings against an alien. There will be a single form of notice, stating the nature and legal authority for the proceedings, the charges against the alien, the fact that the alien may be represented by counsel at no expense to the government, and, importantly, the specific requirement that the alien immediately provide the Attorney General with an address and phone number at which the alien may be contacted, as well as any change in that address or phone number. The Committee is particularly concerned with two problems regarding lack of accurate information on alien's addresses. First, many aliens do not leave forwarding addresses, thus making delivery of notice impossible. Second, there often are protracted disputes concerning whether an alien has been provided proper notice of a proceeding. This impairs the ability of the government to secure in absentia deportation orders in cases where aliens fail to appear for their hearings; in many such cases, aliens will petition to reopen their hearings on the grounds that they never received proper notice.

Section 304 addresses these problems with a number of new requirements. First, it requires the INS to establish a central address file to accurately record address information, including changes, provided by aliens. Second, it provides that service by mail of the required notice of hearing is sufficient if there is proof of delivery to the most recent address provided by the alien. Third, it authorizes the immigration judge to enter an in absentia order if the alien fails to appear provided that there is proof of attempted delivery at this address. Fourth, it allows an alien to rescind an in absentia order only in the case of specified exceptional circumstances or if the alien demonstrates that notice was not received notwithstanding the alien's compliance with the notice of address requirements.

At the time of the service of notice of hearing, or at any time thereafter, an alien must be provided oral notice, in a language the alien understands, of the time and place of the proceedings, and the consequences of failing to appear for the hearing. An alien who has been provided such notice and who nevertheless fails to appear also shall be ineligible for various immigration benefits, including voluntary departure, cancellation of removal, adjustment of status, and registry, for a period of 10 years.

The burden of proof shall be on the alien at the hearing either to establish by clear and convincing evidence that he or she is lawfully present pursuant to a prior lawful admission or, in the case of an alien who has never been lawfully admitted, to establish beyond a doubt that he or she is entitled to be admitted. If the alien establishes that he or she has been lawfully admitted, the burden of proof shifts to the INS to establish by clear and convincing evidence that the alien is deportable. Aliens are limited to a single motion to reconsider and a single motion to reopen removal proceedings.

Section 304 also removes the requirement that the written notice of hearing be provided in Spanish as well as English. The increased administrative burdens on the INS imposed by this requirement are not justified, especially in light of the fact that many immi-

160

grants served such notices do not speak Spanish. Section 304 also authorizes an immigration judge to enter an order of removal stipulated to by the alien (or representative) and the INS.

Section 304 also redefines the relief available to aliens in removal proceedings. New limitations are placed on the practice of "voluntary departure," to ensure that aliens granted this form of relief actually and timely depart the United States. An alien who is removable may apply for cancellation of removal if he or she has been a lawful permanent resident for not less than 5 years and has not been sentenced for 5 years due to commission of an aggravated felony; if he or she is a battered spouse or child of a citizen or lawful permanent resident and has been physically present for 3 years; or if the alien has been physically present for and has been a person of good moral character for 7 years preceding the application. The time period for continuous physical presence terminates on the date a person is served a notice to appear for a removal proceeding or if the alien is absent from the United States for an aggregate period in excess of 180 days. There is an annual cap of 4,000 on cancellations of removal, to be effective immediately, and to include the cases of persons who are eligible for suspension of deportation because they were served a notice of hearing prior to the enactment of this bill.

Section 305 seeks to ensure that aliens with a final order of removal under the streamlined procedures established in section 304 are removed from the U.S. within a target period of 90 days from the entry of such order and, during that time, are either detained or released on conditions that ensure they will appear for removal. These mandates represent a significant departure from current law and practice, which often permit aliens who have final orders of deportation to remain in the U.S. indefinitely. Numerous factors are cited for this failure to deport: insufficient detention space, lack of resources to apprehend aliens for deportation, and archaic procedures which provide advance notice to aliens of when they must report for deportation—a practice charitably characterized as a "run letter." H.R. 2202 specifically addresses all of these factors, by increasing detention space (including the use of closed military facilities on a pilot basis), increasing the number of interior enforcement personnel, including specifically detention and deportation officers, and, in this section, establishing procedures that will ensure that an order of removal is no longer a dead letter, but results in an actual physical removal of the alien.

Yet, perhaps the most critical factor in lax enforcement of deportation orders is what happens—or, more precisely, does not happen—when an immigration judge enters an order of deportation. Unless the alien is currently under detention (which is the exception, not the rule), the alien walks out of court scot-free: the immigration judge imposes no bond requirement, establishes no firm date for departure, and obtains no assurance that the alien will be prepared to depart when the INS is ready to remove him. With such lax procedures, it should come as no surprise that a high percentage of aliens abscond. As a result, the resources expended to identify, apprehend, and provide a hearing to a deportable alien are all too often wasted.

161

Under section 305, an alien must be detained during the 90-day "removal period," which commences when an order of deportation is final. Since most aliens ordered deported do not file appeals, this detention can ordinarily begin when the order is entered. (Such detention, of course, would not prevent the alien from filing an appeal, in which case the alien could be released on bond.) If detention space is not available, the alien may be released on bond and under conditions prescribed by the Attorney General in order to ensure that the alien appears for deportation. The Committee strongly recommends that the INS and immigration judges be charged with the requirement to impose conditions that will ensure the alien is available for deportation when all proceedings are complete and travel documents have been obtained. An alien under an order of deportation, moreover, may not be granted work authorization unless the alien cannot be removed because there is no country willing to accept the alien or if the Attorney General determines that deportation is contrary to the public interest.

The objective of section 305 is that the entry of an order of removal be accompanied by specific requirements to ensure that the alien will depart the U.S. No set of reforms in this legislation is more important to establishing credibility in enforcement against illegal immigration.

Section 306 preserves the right to appeal from a final administrative order of removal (first issued by an immigration judge, then reviewed by the Board of Immigration Appeals) to one of the Federal circuit courts of appeals. The bill limits rights in cases where the alien's right to relief is limited by statute: arriving aliens who clearly have no right to enter the U.S.; illegal aliens who also have committed aggravated felonies; and aliens who have failed to appear for their immigration hearings. Judicial review in such cases is limited to whether the alien has been correctly identified as being subject to expedited procedures for removal, and whether the appropriate procedures have been followed.

Section 306 also limits the authority of Federal courts other than the Supreme Court to enjoin the operation of the new removal procedures established in this legislation. These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending. In addition, courts may issue injunctive relief pertaining to the case of an individual alien, and thus protect against any immediate violation of rights. However, single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S.

Section 307 provides that aliens who are ordered removed or granted voluntary departure and do not depart the U.S. on time are subject to civil penalties and excludes them from most immigration benefits. Members of terrorist organizations are deemed inadmissible to the U.S., and alien terrorists are ineligible for asylum or withholding of deportation. Arriving aliens who are inadmissible on terrorist grounds are subjected to an expedited removal procedure under the jurisdiction of the Attorney General.

162

Subtitle B—Removal and Inadmissibility of Alien Terrorists

Subtitle B of Title III (sections 321 through 332) provides that in cases where the use of normal removal proceedings would risk national security, the deportation charges against suspected alien terrorists may be adjudicated in special procedures conducted before one of five Federal district court judges specially appointed to serve in such cases by the Chief Justice of the Supreme Court. The special hearings will be open to the public but conducted to ensure the confidentiality of classified national security information. Aliens have the right to court-appointed attorneys, to confront adverse evidence, and to present evidence. The judges may consider classified evidence in camera, and provide a summary of such evidence to the alien, unless providing the summary would cause harm to the national security or to any person. Aliens may be detained in most cases throughout the proceeding and expeditiously removed after entry of an order of removal.

These special procedures are intended to address the rare circumstance when the government is not able to establish the deportability of an alien under section 241(a)(4)(D) of the INA without recourse to evidence the disclosure of which would pose a risk to the national security of the United States. They are exclusively to be used in cases where the alien is deportable under section 241(a)(4)(D). The Committee expects that these procedures will be used infrequently, and requests that the government will exercise utmost discretion in seeking to initiate proceedings under Subtitle B. Moreover, with the enactment of the provisions of Title I and Title II directed at securing the nation's borders and preventing immigration-related crimes, and the remaining provisions of Title III which streamline the administrative removal process, the numbers of cases in which these special deportation procedures must be used hopefully will be further diminished.

These special procedures are designed to protect the "fundamental requirement of due process[:] . . . the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"[86] The Supreme Court has acknowledged that "'due process is flexible and calls for such procedural protections as the particular situation demands.'"[87] The Court's decisions indicate that three factors must be weighed in determining if the procedures to which one is subjected meets the constitutional threshold.

[T]he private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the * * * burdens that the additional or substitute procedural requirement would entail.[88]

These factors have been taken into full account in drafting section 321.

---

[86] *Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976) (citing *Armstrong* v. *Manzo,* 380 U.S. 545, 552 (1965); *Grannis* v. *Ordean,* 234 U.S. 385, 394 (1914)).
[87] *Mathews,* 424 U.S. at 334 (quoting *Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972)).
[88] *Mathews,* 424 U.S. at 335, 347.

163

First, section 321 recognizes that an alien present in the U.S. has a constitutional liberty interest to remain in the U.S., and that this liberty interest is most significant in the case of a lawful permanent resident alien.

> [I]t is clear that, in defining an alien's right to due process, the Supreme Court is concerned with whether he is a permanent resident. * * * A permanent resident alien [has] a stake in the United States substantial enough to command a higher level of protection under the due process clause before he may be deported. The result of such an action after all, may be to separate him from family, friends, property, and career, and to remit him to starting a new life in a new land. * * * [E]ven a manifest national security interest of the United States cannot support an argument that [a permanent resident alien] is not entitled, as a threshold matter, to protection under the due process clause. Once across that threshold, the calculus of just how much process is due involves a consideration of the Government's interests in dispensing with procedural safeguards.[89]

No alien, in particular a permanent resident alien, would be subject to deportation without an opportunity to contest that deportation. Even in the case where confidential information may be used without disclosure to the alien, section 321 provides protections adequate under the due process clause of the Fifth and Fourteenth Amendment, by permitting, in the case of a lawful permanent resident, a special attorney representing the alien to review and contest the information.

Second, the risk of an erroneous deprivation of the liberty interest is remote. The government's burden of proof, as in regular deportation proceedings, is to establish by clear and convincing evidence that the alien is deportable. This determination, moreover, is to be made in the first instance by a judge serving pursuant to Article III of the Constitution, which enhances the due process provided to an alien terrorist above that provided in regular deportation proceedings, in which the presiding immigration judge is an employee of the Department of Justice. Furthermore, the alien is entitled to be represented by counsel at government expense, a privilege that is not extended to aliens under Title II of the INA, which stipulates that the alien's representation is to be at no expense to the government. Finally, the determination is subject to appellate review. As discussed in greater detail below, the risk of error arising from in camera and ex parte consideration of classified evidence is minimized through the procedural safeguards limiting reliance on such evidence without any disclosure to the alien.

Third, there can be no gainsaying the compelling nature of the government's interest in the prompt removal of alien terrorists from U.S. soil, or in protecting the ability of the government to collect and rely upon confidential information regarding alien terror-

---

[89] *Rafeedie* v. *INS*, 880 F.2d 506, 522 (D.C. Cir. 1989). See also *Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982) ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly."); *Mathews*, 424 U.S. at 333.

164

ists who may be present in the U.S. Piercing this provision's limited veil of secrecy over classified evidence will clearly make it more difficult to gather evidence against suspected terrorists and to convince international sources that such information will be secure in the hands of our government, and ultimately lead to alien terrorists being able to remain in the U.S. to harm our citizens and lawful residents, while the Government waits, hoping that another ground for deportation is made available.

The most salient distinction between the procedures constructed in section 321 and those normally available under Title II of the INA is the provision for use of classified information. All of the procedures and procedural protections in section 321 flow from this fundamental policy decision: that reliable and relevant classified information should be available to be used to establish the deportability of an alien terrorist. This policy in itself causes no constitutional difficulty, and the protections against abuse of that policy by the government are more than adequate to protect the constitutional interests at stake.

The Supreme Court and lower federal courts have upheld the authority of the INS to use classified information in the cases of aliens who seek discretionary relief from deportation, without disclosing such information to the applicant.[90] Thus, the use of nondisclosed classified information to inform a court's decision whether or not to order deportation has precedent and is not unconstitutional on its face.

Furthermore, the clear intent of section 321 is that all information used to support the charge of deportability will be disclosed to the applicant. This intent is most clearly seen by considering the substantive and procedural hurdles the government must satisfy before confidential information may be considered in camera as part of the record. First, in order to even convene a special deportation proceeding, the government must present a petition personally approved by the Attorney General or the Deputy Attorney General to one of the federal district court judges serving on the special deportation court. Placing these proceedings before an Article III judge provides such aliens an enhanced measure of due process that is not accorded to other deportable aliens, whose cases are heard by administrative judges under the direction of the Attorney General.

Second, the proceeding cannot commence unless the judge finds probable cause to believe that the alien has been correctly identified, is a terrorist, and that the use of normal deportation procedures under Title II of the INA would pose a risk to national security.

Third, the Department of Justice has the burden to prove by clear and convincing evidence that the alien is deportable. Classified information may be presented in camera and ex parte. However, a summary of such evidence sufficient to inform the alien of the nature of the evidence and to permit the alien to prepare a defense must be approved by the judge and provided to the alien. If the judge does not believe the summary to be adequate, and the

---

[90] *Jay* v. *Boyd*, 351 U.S. 345, 358-60 (1956); *Suciu* v. *INS*, 755 F.2d 127, 128 (8th Cir. 1985)(per curiam). See also *Naji* v. *Nelson*, 113 F.R.D. 548, 551-552 (N.D. Ill. 1986).

165

government cannot correct the deficiencies, the proceedings will be terminated.

Fourth, the only circumstance in which the consideration of classified information in camera can proceed without providing a summary to the alien is if the judge finds that the continued presence of the alien in the U.S., or the provision of the summary, would cause serious and irreparable harm to the national security or death or serious bodily injury to any person. This is, intentionally, a strict standard, designed to emphasize the clear policy of this legislation that the alien have appropriate notice of the evidence against him and an opportunity to prepare and present a defense.

Fifth, as an additional protection, section 321 provides, in the case of an alien lawfully admitted for permanent residence, that confidential information may be disclosed to a special attorney appointed for this purpose by the judge. The attorney may not disclose such information to the alien or any other party under pain of fine and imprisonment, but may present all relevant arguments against the admissibility, relevance, credibility, or probative value of the evidence.

As noted previously, the Constitution does not forbid the use of classified information in rendering decisions on the right of an alien to remain in the United States. The procedures established in section 321 permit use of classified information in deportation proceedings, while protecting to the maximum extent possible consistent with the classified nature of such information the ability of the alien to examine, confront, and cross-examine such evidence. Any further protection of the alien's rights in this regard would eviscerate the ability of the government to rely upon such information and protect its classified nature, an objective that is grounded on national interests of the most compelling nature.

Subtitle B also makes representatives and members of organizations designated by the Secretary of State as terrorist organizations inadmissible to the U.S. and ineligible for asylum, withholding of deportation, suspension of deportation (cancellation of removal), voluntary departure, and registry.

The objective of preventing terrorist aliens from entering the U.S. is equally important to the national interest as the removal of alien terrorists. On this question, the demands of due process are negligible, and Congress is free to set criteria for admission and screening procedures that it deems to be in the national interest. "Aliens seeking admission to the United States cannot demand that their application for entry be determined in a particular manner or by use of a particular type of proceeding. For those aliens, the procedure fixed by Congress is deemed to be due process of law." [91] The Supreme Court observed in *Knauff* v. *Shaughnessy* "that an initial entrant has no liberty (or any other) interest in entering the United States, and thus has no constitutional right to any process in that context; whatever Congress by statute provides is obviously sufficient, so far as the Constitution goes." [92] "Our starting point, therefore, is that an applicant for initial entry has no constitu-

---

[91] *Rafeedie* v. *INS*, 880 F.2d 506, 513 (D.C. Cir. 1989) (citing *Knauff* v. *Shaughnessy*, 338 U.S. 537 (1950)) (emphasis in original).
[92] *Rafeedie*, 880 F.2d at 520.

166

tionally cognizable liberty interest in being permitted to enter the United States." [93]

Under these provisions, an alien will be inadmissible if the alien is a representative of a terrorist organization or a member of an organization that the alien knew or should have known was a terrorist organization. This distinction is intended to ensure that aliens who are most active as directors, officers, commanders, or spokespersons for terrorist organizations are strictly barred from entering the U.S. An alien who is merely a member of a terrorist organization will be considered under a slightly less strict standard that incorporates a scienter requirement that the alien knew or should have known that the organization is terrorist in nature. Thus, an alien innocent of involvement with or knowledge of terrorist activity on the part of an organization of which he or she was merely a member would not necessarily be inadmissible to the U.S.

An organization will be considered "terrorist" for purposes of these provisions only if it has been designated as such by the Secretary of State after consultation with the Attorney General, and after consultation with the Committees on the Judiciary of the House of Representatives and the Senate. Only foreign organizations and subsidiary foreign groups that have engaged in, or are engaging in, terrorist activity (as that term is currently defined in the INA) and whose acts pose a threat to the national security of the United States, can be so designated. The Secretary of State, in consultation with the Attorney General, may remove any such designation once made. The designation is subject to judicial review upon its being made public and, by law, may be removed by Congress.

## Subtitles C and D—Miscellaneous

The remainder of title III contains a number of miscellaneous provisions, including a definition of "stowaway;" a clarification of the definition of "conviction" for immigration law purposes; a definition of "immigration judge" together with a salary schedule for the position; the establishment of an "Immigration Enforcement Account" for the deposit of civil penalties; an authorization for use of retired Federal employees in the Institutional Hearing Program; the setting of conditions for prisoner transfer treaties with foreign states; amendments to the criminal alien identification system; and provisions to protect the confidentiality of battered women and children.

### TITLE IV—EMPLOYER SANCTIONS AND VERIFICATION

H.R. 2202 recognizes that the solution to the problems in employer sanctions is twofold. First, the number of employment eligibility documents employers are required to review must be reduced. Currently, employees can submit one or more of 29 different documents. Title IV reduces this to six: a passport or alien registration card or resident alien card, or a social security card in combination with a driver's license or state ID card.

More importantly, there must be an authoritative check of the veracity of the documents provided by new employees. Such a ver-

---

[93] Id.

167

ification mechanism will be instituted on a pilot basis, using existing databases of the SSA and the INS. Every person in America authorized to work receives a social security number. Aliens legally in this country (and many illegal aliens) have alien identification numbers issued by the INS. If a verification mechanism could compare the social security (and, for a noncitizen, alien number) provided by new employees against the existing databases, individuals presenting fictitious numbers and counterfeit documents, or who are not authorized to be employed, would be identified. A verification system could "prevent use of never-issued numbers, numbers restricted to nonwork purposes, and numbers belonging to deceased people." [94]

Title IV will institute pilot projects testing this verification mechanism in at least five of the seven states with the highest estimated populations of illegal aliens. All employers in such states having 4 or more employees will be involved. The pilots will terminate no later than October 1, 1999. The mechanism cannot be expanded nationwide without authorization by Congress.

The verification mechanism would work as follows: As under current law, once an applicant has accepted a job offer, he or she will present certain documents to the employer. The employer, within three days of the hire, must examine the document(s) to determine whether they reasonably appear on their face(s) to be genuine and complete an I–9 form attesting to this examination.

The employer will also have three days from the date of hire (which can be before the date the new employee actually reports to work) to make an inquiry by phone or other electronic means to the confirmation office established to run the mechanism. Additional time will be provided in the event the confirmation office cannot respond to all inquiries. If the new hire claims to be a citizen, the employer will transmit his or her name and social security number. The confirmation office will compare the name and social security number provided against information contained in the Social Security Administration database. If the new hire claims to be a noncitizen, the employer will transmit his or her name, social security number and alien identification number. The alien number is needed despite the fact that all work authorized aliens have social security numbers because (1) in some instances a social security number will not have been issued by the time of the verification attempt and (2) the SSA database does not provide information on changes in work eligibility status occurring after the number is issued. The confirmation office will compare the name and social security number provided against information contained in the SSA database and will compare the name and alien number provided against information contained in the INS database.

When the confirmation office ascertains that the new hire is eligible to work, the operator will within three days so inform the employer and provide a confirmation number. If the confirmation office cannot confirm the work eligibility of the new hire, it will within three days so inform the employer of a tentative nonconfirmation and provide a tentative nonconfirmation number.

---

[94] Social Security Administration, Department of Health and Human Services, A Social Security Number Validation System: Feasibility, Costs, and Privacy Considerations 2 (1988) (hereinafter cited as Social Security Number Validation System).

168

If the new hire wishes to contest this finding, "secondary verification" will be undertaken. Secondary verification is an expedited procedure set up to confirm the validity of information contained in the government databases and provided by the new hire. Under this process, the new hire will typically contact or visit the SSA and/or INS to see why the government records disagree with the information he or she has provided. If the new hire requests secondary verification, he or she cannot be fired on the basis of the tentative nonconfirmation. The employee has 10 days to reconcile the discrepancy. If the discrepancy is reconciled, then confirmation of work eligibility and a confirmation number is given to the employer by the end of this period. If the discrepancy is not reconciled or the employee does not attempt to reconcile the information, then final denial of confirmation and a final nonconfirmation number will be given by the end of this period; the employer must then dismiss the new hire as being ineligible to work in the United States.[95]

Title IV provides protection to both employers and employees. Employers will be shielded from liability for actions they take in good faith reliance on information provided by the confirmation mechanism. Employees who would not have been dismissed from their jobs but for errors contained in the databases or made by the verification mechanism will be entitled to compensation through the Federal Tort Claims Act.

Title IV's verification mechanism will most likely reduce any temptation to engage in employment discrimination based on considerations of national origin. Currently, employers might be tempted not to hire job applicants who look or sound "foreign" in order to protect themselves from being penalized for hiring illegal aliens. After the verification mechanism is implemented, employers will receive independent confirmation that their new hires are work-authorized. The temptation to worry—and to discriminate— will be greatly reduced. As to any burden secondary verification may place on employers, it must be remembered that verification can only take place after an employee is offered a job. Thus, if an employer were to revoke a job offer because secondary verification were required, the employee would immediately know that illegal verification-related discrimination had taken place and could file a complaint with the Justice Department's Office of Special Counsel.

The verification mechanism also does not present civil liberties concerns. The system requires no new document, let alone anything approaching a "national ID" card. It requires no modification of existing identification documents. It requires no new federal government database and entails the collection by the federal government of no new data. It relies on information that the SSA and the INS have been recording for years. Employees' privacy is protected since the information contained in the existing government databases cannot be disseminated, under penalty of law to employers or anyone else. Employers will merely be told yes (information provided by an employee matches information contained in the databases and the person is eligible to work), or that secondary verification

---

[95] The process under which discrepancies are investigated and either reconciled or not reconciled is called "secondary verification." See notes 100–103 and accompanying text.

169

is required (the information indicates that the employee is not authorized to work or that there is a discrepancy) and later, whether secondary verification was or was not successful in confirming the identity and work eligibility of the employee.

Verification mechanisms like that proposed by Title IV have in fact been tested in recent years. In the late 1980's, the Social Security Administration tested a system in which about 1,500 volunteer employers received confirmation of work authorization of prospective employees and new hires by telephoning Social Security and transmitting social security numbers.[96] Upon evaluation of the pilot, it was determined that "given sufficient leadtime and resources, a [social security number] validation system using public telephone lines could be developed."[97] Since 1992, the INS has been testing a "telephone verification system" with first nine and now 223 volunteer employers who check the eligibility to work of new hires identifying themselves as aliens by contacting the system through telephones and "point-of-sale" devices and transmitting alien numbers.[98]

Employers who took part in the first phase of the INS' pilot program: (1) unanimously recommended that it be implemented as a permanent program; (2) unanimously indicated that they would be willing to pay for the service; (3) indicated in 100 percent of the monthly survey responses that overall procedures were beneficial; (4) indicated in 100 percent of the monthly survey responses that primary verification was easy to use; (5) indicated in 99 percent of the monthly survey responses that primary verification was useful; and (6) indicated in 99 percent of the monthly survey responses that secondary verification response was satisfactory.[99]

Questions have been raised about the accuracy of data in the SSA and INS databases, based on the apparently high rates of secondary verification required in both the SAVE program (Systematic Alien Verification for Entitlements) and the INS and Social Security pilot projects testing verification.[100] The concern is misplaced. Secondary verification is ordered whenever an employee or benefits applicant provided information that does not match that in the database. It typically involves a review of the files by the applicable government agency and can take from a few days to a few weeks. Secondary verification does not necessarily mean database error; it is often the fault of the employee or the applicant for mistakenly

[96] See Social Security Number Validation System.
[97] Id. at 7.
[98] Office of Information Resources Management, Records Systems Division, SAVE Program Branch, Immigration and Naturalization Service, Telephone Verification System (TVS) Pilot: Report on the Demonstration Pilot-Phase 1 (1993) (hereinafter cited as Telephone Verification System).
[99] Id. at 9–10, 16.
[100] The SAVE program, established by section 121 of IRCA, requires state social service agencies to check alien eligibility for federal benefits through an INS database. See Verification of Eligibility for Employment and Benefits: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong., 1st Sess. 36–37 (March 30, 1995) (Statement of Robert L. Bach, Executive Associate Commissioner, Policy and Planning, Immigration and Naturalization Service).
   In FY 1994, the SAVE system secondary verification rate was 17 percent. See 1994 Commission Report at 74. The INS pilot project registered a 28 percent secondary verification rate from April to December 1993. See Telephone Verification System at 11. The Social Security Administration pilot project (conducted from January 1987 to October 1988) registered a 17 percent secondary verification rate. See Social Security Number Validation System at 6.

170

providing erroneous information or deliberately providing fictitious information.[101]

In cases where the alien has assumed a fictitious identity or is legally present but not authorized to work, secondary verification will reveal that the system worked properly in declining to provide employment eligibility confirmation. In cases where the alien is eligible to work but provided incorrect information or there was an error in the INS database, secondary verification should result in confirmation of employment eligibility. In the Social Security Administration pilot, only 12 percent of individuals initially denied confirmation bothered to contact the Administration,[102] indicating the other 88 percent were probably not eligible to work to begin with. In the first phase of the INS pilot, secondary verification confirmed noneligibility to work 43 percent of the time.[103]

The Principal Deputy Commissioner of the Social Security Administration testified before the Subcommittee on Immigration and Claims on June 29, 1995, that "[o]ur information on name, social security number, and so forth, so far as we know is absolutely accurate." Asked whether he "perceive[d] any problem being able to identify whether there's an individual with a particular social security number", he responded in the negative.[104] The Executive Associate Commissioner for Policy and Planning of the INS testified before the Subcommittee on March 30, 1995, that the INS is pursuing initiatives to "reduce[] error and creat[e] a capacity for resolving any errors which might now exist. The goal of these improvements is to enable INS to provide timely and accurate responses to verification requests."[105]

TITLE V—LEGAL IMMIGRATION REFORM

Title V reforms the legal immigration system of the United States. Any alien who seeks to immigrate to the U.S. must be admitted under one of these four categories: (1) family-sponsored immigrants; employment-based immigrants; humanitarian immigrants; and diversity immigrants. (Due to the complexity of these provisions, detailed analysis and comment on some provisions is reserved to the section-by-section analysis.)

Sections 501 through 504 establish worldwide levels for family-sponsored (330,000), employment-based (135,000), diversity (27,000) and humanitarian (70,000) immigrants. Section 505 specifies that these worldwide levels are effective only through FY 2005, by which time Congress must review and reauthorize new legal im-

---

[101] For example, an inquiry to INS could require secondary verification for any of the following reasons: (1) the INS database correctly indicates the alien is not eligible to work; (2) the INS database has no information on the alien because the alien has provided a false alien number; (3) the alien gave the employer a different spelling of his name from that in the INS database; (4) the INS has been tardy in entering the immigrant's alien number into its database; or (5) the INS database is in error. As part of the pilot program, the INS must review and update its data in order to "promote[] . . . maximum accuracy and shall provide a process for the prompt correction of erroneous information." Additionally, computer programs can be designed to allow for common alternative spellings of names.

[102] See A Social Security Number Validation System at appendix C.

[103] Telephone Verification System at 12.

[104] H.R. 1915, the Immigration in the National Interest Act of 1995: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong., 1st Sess. (1995) (statement of Lawrence H. Thompson).

[105] Hearing: Verification of Eligibility for Employment and Benefits, supra note 100, at 36 (statement of Robert L. Bach).

171

migration levels. Furthermore, the review and reauthorization process is to take place every five years thereafter.

Under sections 511 and 512, family-sponsored immigrants are: (1) spouses and unmarried children under 21 of U.S. citizens; (2) spouses and unmarried children under 21 of lawful permanent residents; (3) parents of U.S. citizens; and (4) dependent adult sons and daughters of U.S. citizens and lawful permanent residents, who are under age 26, never-married, and childless. Section 518 provides for the admission of disabled adult sons and daughters as "children." Section 501 sets an approximate annual ceiling for family-sponsored immigrants at 330,000, allocated as follows: for nuclear family of U.S. citizens, no annual limitation; for nuclear family of lawful permanent residents, 85,000; for parents of U.S. citizens, 50,000; and for dependent adult sons and daughters, 10,000. Section 553 provides that the current backlog of spouses and children of permanent resident aliens is to be reduced by an average of 110,000 per year (based on current estimates of the backlog) over a five-year period.

These provisions will give highest priority in the immigration system to unification of the nuclear family, and shift the emphasis from chain migration of extended families to preservation of the nuclear family, which should be a cornerstone of our immigration policy. The spouses and minor children of U.S. citizens will be admitted without any numerical limits. The spouses and children of lawful permanent residents will be the first family-preference category, and the special backlog reduction provisions in section 553 will ensure that the backlog in this category is eliminated. The category should then be sufficient to meet current demand.

Section 512 also requires that the parents of citizens being sponsored as immigrants must have insurance to cover their health care costs and potential long-term care needs. This requirement is imposed because of substantial evidence that many immigrant parents come to the U.S. to take advantage of welfare benefits for which they have not contributed. The number of immigrants receiving Supplemental Security Income (SSI) has risen 580 percent during the past twelve years. Impoverished immigrant parents also become eligible for Medicaid, which provides health care virtually without cost. In many cases, sponsoring children abandon financial responsibility for their parents just so that they can be eligible for these benefits.

Requiring the purchase of health insurance and long-term care insurance will ensure that the children who sponsor their parents do not incur obligations that they cannot meet, and protect American taxpayers from footing the bill for the health care costs of immigrants who have not contributed to the system.

Under section 513, employment-based immigrants are: (1) aliens with extraordinary ability (visas not to exceed 15,000); (2) aliens who are outstanding professors and researchers, or who are multinational executives and managers (visas not to exceed 30,000, plus unused visas from category (1)); (3) aliens who are professionals with advanced degrees, and aliens of exceptional ability (30,000, plus unused visas from previous categories); (4) professionals and skilled immigrants, who are either professionals with a baccalaureate degree and experience or skilled workers with training

172

and work experience (45,000 visas, plus unused visas from previous categories); (5) investor immigrants (10,000 visas), who invest at least $1 million in a U.S. company that employs at least 10 workers (with a pilot program through 1998 allowing for a $500,000 investment and the hiring of 5 workers); and (6) special immigrants (5,000 visas). Section 502 sets the annual limit for employment-based immigrants at 135,000.

Experience requirements are increased for immigrants in category (4): skilled workers are required to have 4 years experience, and professionals with baccalaureate degrees, 2 years. (These new requirements refer to the background of the alien as of the time the immigrant petition is filed, and not to the requirements of the job, which must, as under current law, require at least 2 years of training or experience for a skilled worker and a baccalaureate degree for a professional position.) This experience (in the relevant profession or field) can be obtained with the petitioning employer, including (but not necessarily) during a period of lawful admission as a nonimmigrant worker, such as an H–1B, but cannot be obtained during a period of illegal residence in the U.S. The "national interest" waiver for immigrants in category (3) is also reformed, to prevent current abuses in the granting of such waivers. The labor certification requirement can be waived for category (3) if the alien's particular skills or education are uniquely necessary and substantially benefit the national interest in several specifically-defined areas, including national security, national defense, the provision of health care or other services to low income Americans, and the development of new technologies.

Section 514 reforms the diversity immigrant program established in the Immigration Act of 1990. The revised program will allow admission of 27,000 immigrants each year from a maximum of 10 countries designated as "low admission states" within each of six regions. To be eligible for a diversity visa, the alien must have a verified job offer in the U.S., a high school education or its equivalent, and a minimum of two years experience in an occupation that requires at least two years of training. No alien who at the time of application or at any time during the previous five years has been illegally present in the U.S. is eligible to receive a diversity visa.

Sections 521 and 524 establish categories for refugees and other humanitarian immigrants. The annual level for such immigrants is 70,000 (95,000 in 1997), consisting of: refugees, 50,000 (75,000 in 1997), unless Congress sets a higher number by law, or the President declares an emergency; and other humanitarian immigrants, 10,000. Section 521 also reforms the refugee consultation process by requiring that the annual consultations take place by July 1. The refugee provisions in section 521 accomplish several important goals. First, they ensure the availability of a minimum number of visas sufficient to meet the State Department's anticipated demand for refugee resettlement. Second, they will involve Congress more directly in decisions to set refugee policy, by setting a reasonable deadline for the consultation process and requiring legislation to raise the refugee target except in emergency situations. Third, they preserve flexibility by permitting the President to admit additional refugees in the case of an emergency (not merely an "unforeseen"

173

emergency, as under current law.) Section 521 provides that the number of annual refugee admissions designated by the President may not exceed 75,000 in fiscal year 1997 or 50,000 in any succeeding fiscal year thereafter. These levels may be exceeded only if: (1) Congress provides by law for a higher number; or (2) the President declares the existence of an emergency which requires additional refugee admissions. The current requirement that an emergency be "unforeseen" for the purpose of admitting refugees outside of the set limits for a particular fiscal year is deleted.

By deleting the "unforeseen" requirement, the President will have more flexibility in increasing the refugee numbers when circumstances indicate that a true emergency has created an immediate need to process and resettle additional refugees. This change does not obviate the need for consultation between the President and the House and Senate Committees on the Judiciary.

Additionally, this section amends section 207(d)(1) of the INA to require the President to report to the House and Senate Judiciary Committees by June 1 of the preceding fiscal year on the number and allocation of refugee admissions for the subsequent fiscal year, and requires the series of discussions on this report under subsection (e) to occur by July 1.

The category for humanitarian visas in section 524 is designed to meet the need for a flexible, transparent category that will be available for any specific situation in which admission of an alien is of special humanitarian concern to the United States. This category is specifically intended to replace the need for special admission categories tailored to special interests, and particularly to end the practice of admitting aliens on a permanent basis through grants of parole under section 212(d)(5).

The Attorney General may use this discretionary category, for example, to admit specific individuals of humanitarian concern to the U.S. who has assisted the government in past legitimate military operations. In many cases, these individuals do not qualify as refugees and can only come to the country if the Attorney General chooses to grant parole on a long-term basis. As noted earlier, however, parole was intended to be and should be temporary and is not designed to admit aliens who do not otherwise qualify for admission to the U.S. The humanitarian visa category ensures, therefore, that aliens in these types of situations, and others can be admitted to the U.S. on a case-by-case basis without improper use of her statutorily-prescribed parole authority.

Section 522 amends the definition of "refugee" to extend protection to aliens who have been subjected (or have a well-founded fear of being subjected) to coercive abortion or sterilization under a government-sanctioned program of coercive family planning, or has been persecuted (or has a well-founded fear of being persecuted) for refusal or resistance to such a program. There is much confusion about this provision, and this should be clarified. The primary intent of section 522 is to overturn several decisions of the Board of Immigration Appeals, principally *Matter of Chang* and *Matter of G–*.[106] These decisions, which are binding on all immigration judges

---

[106] Matter of Chang, Int. Dec. 3107 (BIA, 1989); Matter of G–, Int. Dec. 3215 (1993). See also *Zheng* v. *INS*, 44 F.3d 379 (5th Cir. 1995); Chen v. Carroll, 1995 WL 88164 (4th Cir. 1995).

174

and INS asylum and refugee officers, hold that a person who has
been compelled to undergo an abortion or sterilization, or has been
severely punished for refusal to submit to such a procedure, cannot
be eligible on that basis for refugee or asylee status unless the
alien was singled out for such treatment on account of factors such
as religious belief or political opinion.

The Committee believes that the BIA's rationale for these opin-
ions—that policies of coercive family planning are "laws of general
application" motivated by concerns over population growth, and
thus are not "persecutory"—is unduly restrictive. The BIA opinion
effectively precludes from protection persons who have been sub-
mitted to undeniable and grotesque violations of fundamental
human rights. As stated by First Lady Hilary Clinton in her Sep-
tember 1995 address to the U.N. Conference on Women in Beijing,
policies of coercive family planning violate human rights and must
be resisted. However, the Administration, which has the authority
to overrule the BIA decisions through regulation or through deci-
sion of the Attorney General, has not done so. Nor has it offered
adequate relief to persons who have undergone such coercion.

In the People's Republic of China, some women with "unauthor-
ized" second or third pregnancies are subjected to involuntary abor-
tions, often late in their pregnancies. Both men and women who
have met their "quota" for children may be forcibly sterilized. Cou-
ples with unauthorized children are subjected to excessive fines,
and sometimes their homes and possessions are destroyed. These
measures are carried out by government agents, at the regional or
local level.

The United States should not deny protection to persons sub-
jected to such treatment. Nor, however, should the U.S. grant pro-
tection to anyone who presents such a claim. Nothing in section
522 is intended to lower the evidentiary burden of proof for any
alien, no matter how serious the nature of the claim. The Commit-
tee emphasizes that the burden of proof remains on the applicant,
as in every other case, to establish by credible evidence that he or
she has been subject to persecution—in this case, to coercive abor-
tion or sterilization—or has a well-founded fear of such treatment.
The Committee is aware that asylum claims based on coercive fam-
ily planning are often made by entire groups of smuggled aliens,
thus suggesting that at least some of the claims, if not the major-
ity, have been "coached." Section 522 is not intended to protect per-
sons who have not actually been subjected to coercive measures or
specifically threatened with such measures, but merely speculate
that they will be so mistreated at some point in the future.

Determining the credibility of the applicant and whether the ac-
tual or threatened harm rises to the level of persecution is a dif-
ficult and complex task, but no more so in the case of claims based
on coercive family planning than in cases based on other factual
situations. Asylum officers and immigration judges are capable of
making such judgments.

Finally, section 522 limits the number of refugee admissions and
asylum grants on the basis of coercive family planning claims to
1,000 in any given fiscal year.

Section 523 restricts the use of parole authority to allow aliens
to enter the U.S. to specific reasons that are strictly in the public

175

interest or are matters of urgent humanitarian concern, such as for the prosecution of an alien, to obtain an alien's testimony in a criminal proceeding, or to permit an alien to visit a dying relative. This section is intended to end the use of parole authority to create an ad hoc immigration policy or to supplement current immigration categories without Congressional approval. Section 524, establishing a category for humanitarian immigrants, is intended to allow the admission of immigrants that may currently be admitted through improper application of the parole authority, but to place such admissions within the overall immigration ceilings established by Congress.

Section 531 reforms the asylum process, requiring that applications be filed within 30 days of arrival in the U.S., unless circumstances in the alien's home country or in the alien's personal circumstances that relate to the alien's eligibility for asylum have fundamentally changed. This section also provides that an application not be accepted if the alien may be removed to a safe third country in which the alien would have access to a fair asylum process, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States, and that asylum applications be adjudicated on a specific timetable that will result in completion of most cases within 6 months of filing.

This report has previously discussed the need for such measures to supplement the administrative reforms of the asylum process that were effective in January 1995. This section is intended to build upon the success of such provisions in streamlining the asylum process, while ensuring that no alien will be returned to persecution.

There has been some question whether the imposition of a time deadline for filing an asylum application will close off from protection those aliens who miss the deadline. Section 531 includes an exception from the deadline in cases where there are fundamentally changed circumstances affecting eligibility for asylum. In cases where this exception does not apply, and the alien would be subject to persecution if returned to his or her home country, the Committee recognizes that some provision for protection must be made.

Even in its present form, however, H.R. 2202 does not require the deportation of an alien to a place where he would face persecution. The alien may designate any country for deportation, and deportation to such country is contingent upon acceptance of the alien by that country. Otherwise-qualified applicants who have missed the deadline may be eligible for a humanitarian visa, as established in section 524. This, the Committee believes, could be applied by the Attorney General to satisfy any international obligations of the U.S. regarding the protection of those who would be subject to persecution if returned to their homelands.

Finally, the Committee believes that the interest in filing a timely application supersedes the interest in filing a comprehensive application. The Committee is aware that current INS regulations require a relatively long and detailed application for asylum. While it may be important for an applicant to be able to commit the details of his or her case to writing prior to an interview with an asylum officer, it is more important that the case be commenced as

176

soon as possible after the alien's arrival in the U.S. Thus, the Committee encourages the INS to adopt a simpler form of application for asylum, with generous allowance for amendment. Furthermore, the INS should take affirmative steps to notify the public of the 30-day filing requirement.

TITLE VI—ELIGIBILITY FOR BENEFITS AND SPONSORSHIP

This title is designed to continue the long-standing principle in U.S. immigration policy that immigrants be self-reliant and not depend on the American taxpayer for financial support. Current eligibility rules, unenforceable financial support agreements, and poorly-defined public charge provisions have undermined the tradition of self-sufficiency among the immigrant community. As a result, the cost to the American taxpayer of providing public benefits to immigrants has been in the tens of billions of dollars every year. Title VI specifies that illegal aliens are not eligible for most public benefits, makes enforceable the grounds for denying entry or removing aliens who are or are likely to become public charges, and makes those who agree to sponsor immigrants legally responsible to support them.

Section 601 makes illegal aliens ineligible for means-tested public benefits and government contracts. Federal agencies must require that applicants show one of six documents to prove eligibility to receive benefits, and State agencies are authorized to require documentation of eligibility to receive benefits. This section also requires verification of citizenship or legal resident status for the receipt of any Federal student financial assistance.

Section 621 strengthens the grounds for inadmissibility as a public charge by stating that a family-sponsored immigrant or a nonimmigrant is inadmissible if the alien cannot demonstrate that the alien's age, health, family status, education, skills, affidavit of support, or a combination thereof make it unlikely that the alien will become a public charge. An employment-based immigrant, other than an immigrant of extraordinary ability, is inadmissible unless the immigrant has employment at the time of immigration. An employment-sponsored immigrant working in a business owned by a member of his family must obtain a affidavit of support.

Section 622 strengthens the grounds for removal as a public charge by extending the time period within which such removal may occur to seven years from the date of admission, provided the alien's public charge status stems from causes arising before admission. An alien is considered to be a public charge if the alien receives benefits under Supplemental Security Income, Aid to Families with Dependent Children, Medicaid, Food Stamps, State general assistance or Federal Housing Assistance for an aggregate of twelve months within the seven-year period. More flexible standards are established for battered spouses and children.

Section 631 specifies that a sponsor's income and resources are available to the sponsored alien for the purpose of qualifying for public benefits. A legally binding affidavit of support is created for those who wish to sponsor immigrants into the U.S. The length of time for deeming income and for which the sponsorship contract is enforceable is as follows: for parents of U.S. citizens, through the time the parent becomes a citizen; for spouses of U.S. citizens and

177

lawful permanent residents, until the earlier of seven years after the date the spouse becomes a permanent resident or the date the spouse becomes a citizen; and for minor children, until the child reaches 21 years of age. The deeming period may end earlier if the alien works long enough to qualify for social security retirement income.

Section 632 requires that a sponsor must be the individual who is petitioning for the alien's admission (or an individual who accepts joint and several liability with the petitioner under the affidavit of sponsorship); be a U.S. citizen or permanent resident; be at least 18 years old; live in the U.S.; and demonstrate the means to maintain an annual income equal to at least 200 percent of the poverty level (unless the sponsor is on active-duty status in the U.S. military, in which case the requirement is 100 percent) for the individual and the sponsored alien. Certain provisions also were modified to provide greater flexibility to grant benefits to battered spouses and children.

TITLE VII—FACILITATION OF LEGAL ENTRY

Immigration reform not only must address the challenges of illegal and legal immigration, but also must ensure that U.S. ports of entry are capable of receiving the hundreds of millions of foreign visitors who seek legitimate entry into our country each year. Enhancing our enforcement capability at land, air, and sea ports must go hand in hand with improving the service functions at such ports. This is important first because of the economic benefits brought to this country by international commerce and travel, and second because smooth functioning of our ports will enable enforcement resources to be strategically deployed in order to maximize the prevention of unauthorized entries into the U.S. In addition, curbing the number of people who attempt to enter on fraudulent documents should enable further streamlining of procedures for legitimate travellers.

Section 701 requires an increase in both INS and Customs Service inspectors at land borders sufficient to ensure full staffing at peak crossing hours in all travel lanes, and that inspectors be deployed to areas with the greatest need. Section 702 authorizes further expansion of the commuter lane pilot programs now being operated successfully at several land border crossing points. These programs permit frequent crossers who meet eligibility criteria to travel through express lanes that verify identity through scanners and other advanced technology. Special care must be taken to thoroughly screen applicants for special programs (such as commuter lane pilot programs and border crossing cards) allowing, ultimately, freer border crossings. Once an alien is granted this special treatment, further monitoring for abuse of the special benefits is difficult.

Section 703 adds to the INA a new section 235A, mandating the operation of pre-inspection stations at 5 of the 10 foreign airports having the greatest number of departures for the U.S. The Committee believes that pre-inspection services should, to the greatest extent possible, result in the clearance of all passengers permitted to board to be admitted to the U.S. The converse, of course, is that passengers refused permission to board, on the ground that they do

178

not have valid documents to be admitted or are otherwise inadmissible, will be prevented from even reaching a U.S. port of entry, thus reducing the burden on INS inspection facilities and the likelihood that unauthorized aliens will enter the U.S. The Committee encourages the INS to work closely with the Customs Service and the Department of State in the planning and operation of such preinspection stations, particularly in seeing to it that the stations have access to all relevant information in government databases regarding persons applying for admission to the U.S.

Section 704, which requires the INS to expend funds from the Immigration User Fee Account to train airline personnel in the detection of fraudulent documents, and imposes sanctions upon airlines for failure to comply with regulations regarding the detection of such documents, is intended to provide air carriers with the means and the incentive to cooperate with the U.S. government in ensuring that only persons with legitimate admission documents are permitted to board aircraft bound for the U.S.

The Committee is concerned that disputes between air carriers and the INS regarding the treatment of certain small classes of illegal aliens may have led to a less than cooperative approach on the urgent goal of preventing the boarding of international passengers with no right to be admitted to the U.S. Communications from the INS and the air carriers during the course of the Committee's considerations of this bill confirm this impression. The mandates contained in this section are equitable, requiring the government and the carriers to fully bear their respective responsibilities on this issue. The Committee believes that optimum implementation of these mandates will occur only through a spirit of cooperation greater than that displayed in recent years. These mandates are clear: the INS must issue regulations within 90 days of enactment of this legislation, and must provide substantial funds for the training of personnel. The carriers must in turn comply with these regulations, at the risk of losing their right to transport aliens to the U.S.

### TITLE VIII—SKILLED NONIMMIGRANTS (H–1B)

Section 806 is designed to end the abuses which have recently plagued the H–1B program while providing regulatory relief for employers who do not abuse the program. Section 806 requires an employer to attest that it will not fire and replace an American worker with an H–1B alien unless the company is willing to pay the H–1B 110 percent of what the fired American was making. The time period in which an employer is subject to this requirement is consistent with the United States' international obligations under the General Agreement on Trade in Services. This provision is intended to curtail any possible incentive which may exist currently for employers to lay off Americans because of the lure of cheap foreign labor. If an employer is willing to pay an H–1B a premium wage, then this is evidence that the H–1B is being recruited for reasons of superior skills.

In addition, penalties for violations of the H–1B provisions will be enhanced to provide an additional disincentive to abuse. Among the changes, maximum civil fines are increased fivefold and the pe-

179

riod in which a company cannot get visa petitions approved for foreign workers can be extended to a permanent ban.

The employers most prone to abuse are "H–1B dependent employers"—a significant percentage of whose work forces are composed of H–1Bs. The H–1B program is designed to ameliorate temporary shortages of specialized skills in the American work force. While it is conceivable that a company would need to stock its workforce predominantly with H–1Bs because of such shortages, this is unlikely. In many cases, the fact that firms are H–1B dependent cannot be attributed to any domestic skills shortage. It is evident that large pools of H–1Bs are being created to do precisely the work of—and often to replace—widely available American workers, presumably for cost-saving reasons. American workers can be replaced through direct hiring of H–1Bs, through utilization of a job contractor that is itself largely composed of H–1Bs, or through subcontracting work to a firm largely composed of H–1Bs.

There is nothing inherently wrong with a firm relying on subcontracting or outsourcing, i.e., having another company produce a product or provide a service which it used to produce or provide on its own. Such reliance can generate great efficiencies. However, this practice is suspect when it is accomplished through the utilization of an H–1B dependent firm. Extensive reliance on foreign labor for cost savings alone (and not to provide needed, hard-to-find skills) is not in the nation's best interests.

Neither is job contracting inherently wrong. There exist many job contractors which perform valuable services for the economy and do not rely inordinately on H–1B aliens. However, H–1B dependent job contractors are suspect. The service they provide is often access to a pool of cut rate foreign labor. In addition, the employer-job contractor relationship is one which can defeat the protection of the H–1B attestation system. As discussed earlier, the complaint-driven system relies on notice to impacted employees. When a job contractor places workers at another firm, it is imperative that the workers at the other firm are given notice.

Section 806 provides regulatory relief to firms which are non-H–1B dependent, while maintaining strict regulatory standards for H–1B dependent employers. Certain of the January 1995 Department of Labor regulations, described in an earlier section of this report, do have beneficial effects. However, the Committee believes that the good which the regulations do is outweighed by the burden they place on non-H–1B dependent employers. Therefore, the regulations are kept effective only as to H–1B dependent employers.

Except for the smallest employers, the bill sets the percentage test for H–1B dependence at 15 or 20 percent (depending on the size of the firm), which ensures that mainstream, legitimate users of H–1Bs are classified as non-dependent. About ten percent of the instructional faculties of major universities are composed of H–1Bs. About one percent of the workforces at major computer corporations are so composed.

The bill recognizes, however, that certain employers have become dependent on H–1B aliens not out of an abusive intent, but because they had legitimate business reasons and there never was any prohibition or penalty for doing such. Therefore, the bill provides employers which are H–1B dependent a transition period

180

(lasting until five years after enactment) during which they will be accorded probationary status as non-H–1B dependent employers if they utilize a pre-approved plan and systematically reduce, to the satisfaction of the Secretary of Labor, their reliance on H–1B aliens.

The regulatory relief provided to non-H–1B dependent employers is as follows:

(1) A non-H–1B dependent employer does not have to post notice at worksites visited by an H–1B alien which are in the area of employment listed on the labor condition application (LCA) but not themselves listed. As discussed previously, the regulation has an important goal, especially in the context of job contractors. But the Committee believes that only with those employers where the potential for abuse is greatest—H–1B dependent employers—is the burden justified.

(2) A non-H–1B dependent employer is not required to file additional LCAs when sending H–1B aliens to areas of employment not listed in their initial LCAs, so long as the H–1Bs' principal places of employment have not changed to non-listed areas. Again, this regulation has an important purpose, but because of its burden, it is best reserved for H–1B dependent employers, where the potential for abuse is greatest.

(3) A non-H–1B dependent employer does not have to pay per diem and transportation costs at any specified rates when sending H–1Bs to areas of employment not listed in their labor condition applications.

(4) The Secretary of Labor can conduct an investigation of a non-H–1B dependent employer only after receiving a complaint filed by an aggrieved party outside of the Department of Labor. Self-directed investigations will prove to be a better use of limited investigatory resources when focused on those employers where the potential for abuse is highest.

Additionally, no employer shall be required to pay its non-H–1B workers according to an objective wage scale.

The bill requires that when an H–1B dependent "job contractor" (meaning an employer who places an employee with another employer where the employee performs duties at worksites owned, operated, or controlled by the other employer and there are indicia of an employment relationship between the employee and the other employer) places an H–1B alien at another firm, it attest that either the other firm has executed an attestation stating that the other firm has not and will not lay off an American employee and replace him or her with an H–1B alien for the time periods specified in the General Agreement on Trade in Services, or the job contractor will pay the H–1B at 110 percent of the level of the laid off employee. The other employer will be subject to the section 212(n)(2) penalties for violating its attestation. This provision is designed to make sure that employers do not evade the no-layoff provision by simply firing American workers and replacing them with H–1Bs who are technically employees of job contractors. Some businesses may likely refuse to sign such an attestation with potentially severe legal consequences for noncompliance just for the privilege of doing business with a job contractor. It is for this reason that the additional attestation is only required with an H–1B

181

dependent job contractor, where the provision, in this limited form, is necessary to prevent wholesale abuse.

Under current regulations, a safe harbor (i.e., protection from liability) exists for prevailing wage determinations made by a State Employment Security Agency:

> In all situations where the employer obtains the prevailing wage determination from the SESA, the Department will accept that prevailing wage determination as correct and will not question its validity where the employer has maintained a copy of the SESA prevailing wage determination. A complaint alleging inaccuracy of a SESA prevailing wage determination, in such cases, will not be investigated.[107]

If a complaint is filed and the employer has relied upon a non-SESA source to determine the prevailing wage, the Labor Department may find that an incorrect determination was made and that penalties and back wages may be assessed against the employer.[108] Given the long delays sometimes associated with obtaining SESA determinations and the high quality of many alternative sources of prevailing wage data, the Committee finds it appropriate to enlarge the current safe harbor. Section 806 provides that if the Secretary of Labor does not issue a written rejection of an alternate source prevailing wage determination submitted by an employer within 45 days, then that wage shall be deemed to satisfy the requirement of section 212(n)(1)(A)(i)(II) of the Immigration and Nationality Act. The safe harbor will have an effect identical to that of the quoted language above.

Similarly, the bill provides protection from liability for employers in determining the actual wage paid to workers similarly employed as the H–1B alien. Certain large employers who have regularized compensation systems certified by the Secretary of Labor will be presumed to be paying the actual wage (assuming it is higher than the prevailing wage) to H–1Bs if they pay the H–1Bs in accordance with such systems. This provision allows employers with sophisticated pay systems relief from constructing artificial "actual" wages to the Secretary of Labor's satisfaction for the sake of compliance with the H–1B regulations.

Last, section 806 partially overturns the Department of Labor Board of Alien Labor Certification Appeals' decision in *Hathaway Children's Services*.[109] In *Hathaway*, BALCA ruled that in determining whether a non-profit organization or other entity having "special circumstances" was offering the prevailing wage to a prospective employment-based immigrant (and presumably for H–1Bs), the Department of Labor must look to the wage levels for jobs in the overall job market. *Hathaway* itself reversed BALCA's ruling in *Tuskegee University,*[110] which stated that "it is not only the job titles, but the nature of the business or institution where the jobs are located—for example, public or private, secular or religious, profit or non-profit, multi-national corporation or individual propri-

---

[107] 70 CFR 655.731(a)(2)(iii)(A)(3) (1995).
[108] 20 CFR 655.731(d) (1995).
[109] 91–INA–388 (1994).
[110] 5 Bender's Immigr. L. and Proc. Rep. B3–172 (87–INA–561, 1988).

182

etorship—which must be evaluated in determining whether the jobs are 'substantially comparable' " [111] for purposes of determining the prevailing wage.

Were *Hathaway* to stand, the Committee believes it would have a severely detrimental impact on our research universities and institutions, which must obtain H–1B visas for temporary workers or labor certification for permanent immigrants to place foreign researchers and post-doctoral students in their research labs. University researchers, foreign or American, typically work for much less than industry scale. If universities were required to pay industry-standard wages for these individuals, they would in effect be prevented from utilizing foreign scientific talent. *Hathaway* fails to recognize the intangible benefits that one receives from working at a university rather than in industry. This benefit often makes salary a secondary factor in an employee's decision whether to work in academia. Thus, the bill provides that jobs at universities and scientific research institutions be only compared with jobs at similar entities when determining the prevailing wage.

### Hearings

The Committee's Subcommittee on Immigration and Claims held one day of hearings on H.R. 1915 on June 29, 1995. Testimony was received from 19 witnesses, representing 19 organizations, with additional material submitted by 5 individuals and organizations.

### Committee Consideration

On July 20, 1995, the Subcommittee on Immigration and Claims met in open session and ordered reported the bill H.R. 1915, as amended and as a clean bill, by a voice vote, a quorum being present. The clean bill was introduced on August 4, 1995, as H.R. 2202. On October 24, 1995, the Committee met in open session and ordered reported the bill H.R. 2202 with an amendment by a recorded vote of 23 to 10, a quorum being present.

### Vote of the Committee

*Voice votes*

Sixty-four amendments were adopted by a voice vote. These were: (1) An amendment by Mr. Smith of Texas to extend the effective date for new border crossing card requirements; (2) an amendment by Mr. Canady to provide specific penalties for making false claims of citizenship when registering to vote or voting; (3A) an amendment by Mr. Goodlatte to strike section 212(i) of the Immigration and Nationality Act, thus eliminating waivers of exclusion for aliens who have previously committed misrepresentations to immigration officials; (3B) an amendment by Mr. Berman to restore a modified version of the waiver under section 212(i) of the INA; (4) an amendment by Mr. Berman to provide an exception for aliens with work authorization and an exception for aliens under family unity protection to the 10 year bar on admission for aliens residing illegally in the United States for greater than 1 year; (5) an amendment by Mr. Smith of Texas to extend expedited removal

---

[111] Id. at B3–176.

183

procedures to aliens interdicted at sea and brought to the United States; (6) an amendment by Mr. Smith of Texas to preclude any private right of action arising out of mandates imposed on government officials under section 305; (7) an amendment by Mr. Smith of Texas to specify procedures for the detention and removal of stowaways; (8) an amendment by Mr. Smith of Texas to provide that a stowaway's application for asylum shall be considered under procedures for expedited removal; (9) an amendment by Mr. Bryant of Tennessee to the definition of a stowaway; (10) an amendment by Mr. Bryant of Tennessee to strike increased penalties on airlines; (11) an amendment by Mr. McCollum to the definition of immigration judge and to specify compensation for immigration judges; (12) an amendment by Mr. Gallegly to strike amended requirements regarding transit without visa aliens; (13) an amendment by Mr. Gallegly to extend federal reimbursement of state expenses for incarceration to cases involving aliens with two or more misdemeanor convictions, and to include certain pre-trial detention; (14) an amendment by Mr. Smith of Texas to exempt alien women and children who have been battered or subject to extreme cruelty from being inadmissible to the United States on the ground that they are present without being lawfully admitted; (15) an amendment by Mrs. Schroeder to protect the confidentiality of claims for relief by a person who has been battered or subject to extreme cruelty, and to prevent the use of information provided solely by an abusive spouse or family member to make a determination of admissibility or deportability; (16) an amendment by Mr. Goodlatte to state that a returning lawful permanent resident shall be regarded as applying for admission if the alien attempts to enter the United States at a time or place other than as designated by an immigration officer or has not been admitted after inspection and authorization by an immigration officer; (17) an amendment by Mr. Goodlatte to state that, for purposes of the 10-year exclusion for aliens who have been unlawfully present for more than one year, no time in which an alien is under the age of 18 (original text specified age 21) shall be taken into account in determining the period of unlawful presence; (18) an amendment by Mr. Gallegly to provide that prisoner transfer treaties shall allow the Federal Government and States to keep original prison sentences in force in the event that transferred prisoners return to the United States prior to the completion of their prison terms; to provide that independent verification shall include the length of time a transferred alien is actually incarcerated in the foreign country; and to require that upon the request of a governor, the INS shall assist State courts in identifying aliens unlawfully present in the United States pending criminal prosecution; (19) an amendment by Mr. Frank to provide for judicial review of a determination that an alien is a representative of a terrorist organization; (20) an amendment by Mr. Berman to strike the requirement that an alien have been lawfully admitted to the United States to be eligible for cancellation of removal; to provide, for purposes of meeting the seven-year continuous physical presence requirement for cancellation of removal, that an alien who has departed the United States for 180 days shall not be considered to have broken continuous physical presence if the Attorney General finds that return could not be accomplished due

184

to emergent reasons; to provide that the provisions regarding calculation of continuous physical presence shall apply only to notices to appear for a deportation or removal proceeding filed after the date of enactment; and to limit to 4,000 in each year the number of aliens granted cancellation of removal; (21) an amendment by Mr. Hyde to provide that the amendments reducing the number of documents that may be presented by employees to establish identity and eligibility for employment shall take effect on a date designated by the Attorney General not later than 18 months after the date of enactment; (22) an amendment offered by Mr. Goodlatte to exempt from civil or criminal liability the action of any person taken in good faith reliance on information provided through the employment eligibility confirmation mechanism; (23) an amendment by Mr. Barr, with a perfecting amendment by Mr. Goodlatte, to state that the confirmation mechanism shall confirm whether an individual has presented a social security account number or an alien identification number that is not valid for employment; (24) an amendment by Mr. Goodlatte to change from 2 days to 3 days after date of employment the period within which an employer must make an inquiry into the confirmation mechanism; (25) an en bloc amendment by Mr. Goodlatte to make a conforming change to require that the employer inquire into the confirmation mechanism within 3 days of employment; to provide that operation of the confirmation mechanism may be carried out by a nongovernmental entity designated by the Attorney General; to require that the confirmation mechanism be designed to maximize reliability and ease of use, to respond to all inquiries and to register when such response is not possible; to provide that if an employer attempts to make an inquiry within the required 3 days of employment and the confirmation mechanism has registered that not all inquiries were responded to during that time, the employer can meet requirements for making such inquiries and qualify for the defense from liability extended to those who use the confirmation mechanism, if the employer makes the inquiry on the first subsequent working day in which the confirmation mechanism registers no nonresponses; to provide that the confirmation mechanism shall provide a confirmation or tentative nonconfirmation of an individual's employment eligibility within 3 days of the initial inquiry and that in the case of a tentative nonconfirmation, the Attorney General, in consultation with the Commissioner of Social Security and the Commissioner of the INS, shall provide an expedited time period, not more than 10 days, within which final confirmation or nonconfirmation must be provided; to require that within 180 days of enactment, the Attorney General shall issue regulations providing for the electronic storage of I–9 forms; to conform to current law the bill's references to "hiring" and "employment" by adding references to recruitment and referral for employment; (26) an amendment by Mr. Hoke, with an amendment by Mr. Becerra and a perfecting amendment by Mr. Hyde, to implement the confirmation mechanism as a series of pilot projects in 5 of the 7 States with the highest estimated population of unauthorized aliens, to terminate not later than October 1, 1999, and to require the Attorney General to submit annual reports on the pilot projects which may include analysis of whether the mechanism is reliable and

185

easy to use, limits job losses due to inaccurate data, increases or decreases discrimination, protects individual privacy, and burdens employers; (27) an amendment by Mr. Goodlatte to state that an employer's request for more or different documents than are required under section 274A(b) of the INA shall constitute an unfair immigration-related employment practice if done for the purpose of discriminating; (28) an amendment by Mr. Hyde to create a new second employment-based immigration preference for outstanding professors and researchers and multinational executives and managers; (29) an amendment by Mr. Hyde to provide a waiver from the requirement for labor certification for certain aliens who are members of the professions holding advanced degrees or aliens of exceptional ability if such waiver is necessary to advance the national interest in one of several specific areas; (30) an amendment by Mr. Hyde to strike the requirement that at least 50 percent of an immigrant's sons and daughters are lawful permanent residents or citizens residing in the United States in order for the immigrant to be admitted as the parent of a United States citizen; (31) an amendment by Mr. Gekas, with an amendment by Mr. Smith of Texas which was adopted on a roll call vote, to create a category for the admission as immigrants of the adult sons and daughters of United States citizens and lawful permanent residents if such immigrants are under age 26, never-married, childless, and considered as dependents for Federal income tax purposes, and to set numerical limits for the admission of such immigrants; (32) an amendment by Mr. Gekas, with an amendment by Mr. Smith of Texas which was adopted on a roll call vote, to change the experience requirements for immigrants admitted as professionals and skilled workers; an amendment by Ms. Lofgren to provide a waiver of the 10-year exclusion for aliens unlawfully present if the Attorney General determined that such waiver is necessary to substantially benefit the national interest in one of several specified areas; (33) an amendment by Mr. Gallegly to provide that work experience obtained while an alien is unauthorized to work in the United States shall not count to meet the experience requirements for immigrants admitted as professionals and skilled workers; (34) an amendment by Mr. Smith of Texas to provide for the admission as immigrants of certain adult disabled children of United States nationals and lawful permanent residents; (35) an amendment by Mr. Hyde to extend refugee protection to aliens who have resisted implementation of coercive population control measures; (36) an amendment by Mr. Smith of Texas to establish that not less than 25,000 immigrant visas will be available for the parents of United States citizens; (37) an amendment by Mr. McCollum to strike provisions for the adjustment of visa numbers for professionals and skilled workers to offset excess family admissions; (38) an amendment by Mr. McCollum to change deadlines for the filing of asylum applications, and to make other reforms to the asylum process, with an amendment by Mr. Frank adopted by a roll call vote to the provision for return of an alien to a safe third country; (39) an amendment by Mr. Schiff, with a substitute amendment by Mr. Hyde, to establish deadlines for the refugee consultation process; (40) an amendment by Mr. Bryant of Tennessee to permit the use of parole authority for the prosecution of aliens in U.S. courts; (41)

186

an en bloc amendment by Mr. Smith of Texas to exempt family vio-
lence services from the prohibition on receipt of public benefits by
illegal aliens and to, in the case of an alien battered or subject to
extreme cruelty by a spouse or parent (or, under certain conditions,
another family member residing in the household); exempt the
alien from the prohibition on receipt of public benefits if the alien
has applied for a change in immigration status within 45 days of
the first application for such public benefits; lengthen to 48 months
the period of receipt of public benefits which would render the alien
deportable as a public charge; modify the rules for attribution of a
sponsor's income to the alien; exempt the alien from the require-
ment that public benefits paid to the alien be reimbursed prior to
naturalization of the alien in the event that the battery or cruelty
resulted in issuance of a judicial or administrative order and the
need for the public benefits had a substantial nexus to the battery
or cruelty; (42) an amendment by Mr. Smith of Texas to exempt
school lunch and child nutrition benefits from the prohibition on re-
ceipt of public benefits by illegal aliens; (43) an amendment by Mr.
Smith of Texas to provide that active-duty military personnel, in
order to qualify as sponsors, must maintain an income at 100 per-
cent of the poverty level; (44) an amendment by Mr. Smith of Texas
to remove social services block grants from the list of public bene-
fits receipt of which can be used to establish that an alien is a pub-
lic charge; (45) an en bloc amendment by Mr. Smith of Texas to
provisions regarding the protection of American workers from dis-
placement through the H–1B nonimmigrant program, and other
conforming changes; (46) an amendment by Mrs. Schroeder to re-
quire notification to arriving aliens from certain countries regard-
ing female genital mutilation; (47) an amendment by Mr. McCol-
lum offered to require immigrants to submit proof of vaccination
against specified diseases; (48) an amendment by Mr. Gallegly to
provide that reimbursement to hospitals for emergency medical
services may be made for such services provided through a contract
with another hospital or facility; (49) an amendment by Mr.
Gallegly to require that the pilot project for linking vital statistics
records in certain States be implemented within two years of the
date of enactment; (50) an amendment by Mr. Gallegly to require
verification of student eligibility for post-secondary federal student
financial assistance; (51) an amendment by Mr. Gallegly, with an
amendment by Mr. Hyde, regarding communication between State
and local government agencies and the INS; (52) an amendment by
Mr. Smith of Texas to exempt from limitations on adjustment of
status an alien who has reasonable grounds to fear that he or she
will be subject to battery or extreme cruelty if he or she departs
from the United States; (53) an amendment by Mr. Reed to require
that prior to the construction of new detention facilities for aliens,
that the Commissioner of the INS consider the availability for pur-
chase or lease of existing facilities; (54) an amendment by Ms.
Lofgren to provide that an alien whose status is changed under sec-
tion 248 of the INA may obtain a visa without departing from the
United States; (55) an amendment by Mr. Nadler to provide that
an illegal alien may receive emergency relief not limited to disaster
relief; (56) an amendment by Mr. Reed to designate Portugal as a
country eligible for the visa waiver pilot program; (57) an amend-

187

ment by Mr. Berman to strike the limitation on adjustment of status under section 245(i) of the INA and increase the charge for adjustment of status to $2,500; (58) an amendment by Mr. Becerra, with an amendment by Mr. Smith of Texas adopted by a voice vote, to provide reimbursement, subject to available appropriations, of fees paid by petitioners for eliminated family-sponsored categories; (59) an amendment by Mr. Berman regarding the confidentiality of the files of legalization applicants; (60) an en bloc amendment by Mr. Goodlatte to amend requirements on the hiring of H–1B nonimmigrants by removing the expanded 30-day period to approve a labor condition application for an H–1B-dependent employer; increasing the penalties for not fulfilling H–1B attestations; clarifying that firing an employee for poor performance does not violate the no-layoff provisions; establishing criteria for the determination of prevailing wages; and making other changes; (61) an amendment by Mr. Berman to extend civil penalties for document fraud to unauthorized preparers of forms, petitions, or applications; (62) an amendment by Mr. Frank to allow relief under the Federal Tort Claims Act for persons wrongly denied employment through operation of the employment eligibility verification mechanism; (63) an amendment by Mr. Berman to permit execution of an affidavit of support for an immigrant by an individual who will accept joint and several liability with the petitioner for the immigrant; (64) an amendment by Mr. Frank to establish criteria under which an employer may request additional employment eligibility documents from an employee.

*Recorded votes*

There were forty recorded votes (thirty-nine on amendments and one on final passage) during the Committee's consideration of H.R. 2202, as follows:

1. Amendment offered by Mr. Watt to strike the provisions regarding construction of fencing in the border area near San Diego. Defeated 11–17.

| AYES | NAYS |
| --- | --- |
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Mr. Serrano | Mr. Inglis |
| Ms. Lofgren | Mr. Goodlatte |
| Ms. Jackson Lee | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Barr |
| | Mr. Bryant (TX) |

188

2. Amendment offered by Mr. Becerra to strike the 10-year re-admission bar for aliens who have been present unlawfully in the U.S. for more than one year. Defeated 13–19.

| AYES | NAYS |
|------|------|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Boucher | Mr. McCollum |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Schiff |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Mr. Serrano | Mr. Goodlatte |
| Ms. Lofgren | Mr. Buyer |
| Ms. Jackson Lee | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

3. Amendment offered by Mr. Goodlatte to permanently exclude aliens from readmission into the U.S. if convicted of an aggravated felony. Adopted 14–8.[112]

| AYES | NAYS |
|------|------|
| Mr. Hyde | Mr. Bono |
| Mr. Moorhead | Mr. Conyers |
| Mr. Sensenbrenner | Mrs. Schroeder |
| Mr. McCollum | Mr. Frank |
| Mr. Coble | Mr. Berman |
| Mr. Smith (TX) | Mr. Nadler |
| Mr. Schiff | Mr. Scott |
| Mr. Gallegly | Mr. Watt |
| Mr. Canady | |
| Mr. Goodlatte | |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Reed | |

4. Amendment offered by Mr. Watt to strike the provisions re-garding the introduction of electronic surveillance information in special proceedings to remove an alien terrorist from the U.S. Defeated 10–16.[113]

| AYES | NAYS |
|------|------|
| Mr. Bono | Mr. Hyde |
| Mr. Conyers | Mr. Sensenbrenner |

[112] Ms. Jackson Lee stated for record that, had she been present, she would have voted "nay" on this amendment.

[113] Ms. Jackson Lee stated for record that, had she been present, she would have voted "aye" on this amendment.

189

| | |
|---|---|
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Gekas |
| Mr. Berman | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Serrano | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| | Mr. Goodlatte |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Boucher |
| | Mr. Reed |

5. Amendment offered by Mr. Nadler to limit the introduction of classified information in special proceedings for the removal of alien terrorists. Defeated 11–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Berman | Mr. McCollum |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Mr. Serrano | Mr. Buyer |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mrs. Schroeder |
| | Mr. Schumer |

6. Amendment offered by Mr. Watt to require judicial review of an order to exclude an alien under procedures for expedited removal, including review of an asylum officer's determination that an inadmissible alien does not have a credible fear of persecution. Defeated 9–15.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Inglis |
| Mr. Becerra | Mr. Buyer |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |

190

Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Schumer
Mr. Bryant (TX)

7. Amendment offered by Mr. Chabot to strike provisions for an employment eligibility verification system. Defeated 15–17.[114]

| AYES | NAYS |
|------|------|
| Mr. Sensenbrenner | Mr. Hyde |
| Mr. Inglis | Mr. Moorhead |
| Mr. Buyer | Mr. McCollum |
| Mr. Hoke | Mr. Gekas |
| Mr. Heineman | Mr. Coble |
| Mr. Chabot | Mr. Smith (TX) |
| Mr. Flanagan | Mr. Schiff |
| Mr. Conyers | Mr. Gallegly |
| Mrs. Schroeder | Mr. Canady |
| Mr. Reed | Mr. Goodlatte |
| Mr. Nadler | Mr. Bono |
| Mr. Watt | Mr. Bryant (TN) |
| Mr. Becerra | Mr. Barr |
| Mr. Serrano | Mr. Frank |
| Ms. Lofgren | Mr. Schumer |
| | Mr. Berman |
| | Mr. Bryant (TX) |

8. Amendment offered by Mr. Berman to expand enforcement authority and penalties against labor standards violations. Defeated 13–18.

| AYES | NAYS |
|------|------|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Boucher | Mr. Gekas |
| Mr. Bryant (TX) | Mr. Smith (TX) |
| Mr. Reed | Mr. Schiff |
| Mr. Nadler | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Mr. Serrano | Mr. Goodlatte |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

9. Amendment offered by Mr. Barr to exempt employers of three or less employees from the requirement to verify employment eligi-

---

[114]Ms. Jackson Lee stated for record that, had she been present, she would have voted "aye" on this amendment.

191

bility through the electronic verification mechanism. Adopted 16–13.[115]

| AYES | NAYS |
|---|---|
| Mr. Moorhead | Mr. Hyde |
| Mr. Gekas | Mr. Sensenbrenner |
| Mr. Smith (TX) | Mr. McCollum |
| Mr. Gallegly | Mr. Schiff |
| Mr. Canady | Mr. Goodlatte |
| Mr. Inglis | Mr. Hoke |
| Mr. Bono | Mr. Bryant (TN) |
| Mr. Heineman | Mr. Frank |
| Mr. Flanagan | Mr. Schumer |
| Mr. Barr | Mr. Berman |
| Mr. Conyers | Mr. Watt |
| Mrs. Schroeder | Mr. Becerra |
| Mr. Boucher | Mr. Serrano |
| Mr. Reed | |
| Mr. Nadler | |
| Ms. Jackson Lee | |

10. A perfecting amendment offered by Mr. Berman to remove from the substitute amendment offered by Mr. Smith of Texas to the amendment offered by Mr. Gekas the requirement that, in order to be eligible for an immigrant visa, the adult unmarried sons and daughters be claimed as dependents for Federal Income Tax purposes. Defeated 11–17.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Sensenbrenner |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Gekas |
| Mr. Nadler | Mr. Coble |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Schiff |
| Mr. Becerra | Mr. Gallegly |
| Mr. Serrano | Mr. Canady |
| Ms. Lofgren | Mr. Goodlatte |
| Ms. Jackson Lee | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

11. A perfecting amendment offered by Mr. Becerra to remove from the substitute amendment offered by Mr. Smith of Texas to the amendment offered by Mr. Gekas the requirement that, in order to be eligible for an immigrant visa, a son or daughter be "never married" and to insert a requirement that the son or daughter be "unmarried." Defeated 11–19.

---

[115] Ms. Lofgren voted "present".

192

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Sensenbrenner |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Gekas |
| Mr. Nadler | Mr. Coble |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Schiff |
| Mr. Becerra | Mr. Gallegly |
| Mr. Serrano | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Boucher |

12. A substitute amendment offered by Mr. Smith of Texas to the amendment offered by Mr. Gekas to create a category for the admission of certain adult sons and daughters of citizens and permanent resident aliens. Adopted 17–12.

| AYES | NAYS |
|---|---|
| Mr. Sensenbrenner | Mr. Hyde |
| Mr. McCollum | Mr. Conyers |
| Mr. Gekas | Mrs. Schroeder |
| Mr. Coble | Mr. Frank |
| Mr. Smith (TX) | Mr. Berman |
| Mr. Schiff | Mr. Boucher |
| Mr. Gallegly | Mr. Scott |
| Mr. Canady | Mr. Watt |
| Mr. Inglis | Mr. Becerra |
| Mr. Goodlatte | Mr. Serrano |
| Mr. Buyer | Ms. Lofgren |
| Mr. Hoke | Ms. Jackson Lee |
| Mr. Bono | |
| Mr. Heineman | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |

13. A substitute amendment offered by Mr. Smith of Texas to an amendment offered by Mr. Gekas to change the work experience requirements for aliens admitted as professionals or skilled workers. Adopted 17–9.

| AYES | NAYS |
|---|---|
| Mr. Moorhead | Mr. Hyde |
| Mr. McCollum | Mr. Gekas |
| Mr. Coble | Mr. Inglis |
| Mr. Smith (TX) | Mr. Bono |
| Mr. Schiff | Mr. Chabot |

193

| | |
|---|---|
| Mr. Gallegly | Mr. Flanagan |
| Mr. Buyer | Mr. Barr |
| Mr. Hoke | Mr. Frank |
| Mr. Heineman | Ms. Lofgren |
| Mr. Conyers | Mrs. Schroeder |
| Mr. Schumer | |
| Mr. Berman | |
| Mr. Bryant (TX) | |
| Mr. Reed | |
| Mr. Watt | |
| Ms. Jackson Lee | |

14. Amendment offered by Mr. Watt to eliminate the investor visa program. Defeated 8–20.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Bryant (TX) | Mr. McCollum |
| Mr. Reed | Mr. Gekas |
| Mr. Scott | Mr. Coble |
| Mr. Watt | Mr. Smith (TX) |
| Mr. Becerra | Mr. Schiff |
| Mr. Serrano | Mr. Gallegly |
| | Mr. Canady |
| | Mr. Inglis |
| | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Berman |
| | Ms. Lofgren |

15. Amendment offered by Mr. Watt to limit to 2,000 the numbers of visas available for investors. Defeated 10–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Bryant (TX) | Mr. McCollum |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Mr. Serrano | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |

194

Mr. Barr
Mr. Berman
Mr. Boucher

16. Amendment offered by Ms. Jackson Lee to extend the asylum filing deadline from 60 to 180 days. Defeated: 9–14.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Gekas |
| Mr. Berman | Mr. Smith (TX) |
| Mr. Boucher | Mr. Gallegly |
| Mr. Nadler | Mr. Canady |
| Mr. Serrano | Mr. Goodlatte |
| Ms. Lofgren | Mr. Buyer |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

17. Amendment offered by Mr. Berman to strike the provisions reforming the legal immigration system (sections 500 through 517). Defeated 14–20.

| AYES | NAYS |
|---|---|
| Mr. Chabot | Mr. Hyde |
| Mr. Conyers | Mr. Moorhead |
| Mrs. Schroeder | Mr. Sensenbrenner |
| Mr. Frank | Mr. McCollum |
| Mr. Schumer | Mr. Gekas |
| Mr. Berman | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Gallegly |
| Mr. Scott | Mr. Canady |
| Mr. Watt | Mr. Inglis |
| Mr. Becerra | Mr. Goodlatte |
| Mr. Serrano | Mr. Buyer |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Boucher |
| | Mr. Bryant (TX) |

18. Amendment offered by Mr. Frank to the amendment offered by McCollum to section 526 [now section 531] regarding the eligibility of aliens to apply for asylum. Adopted 18–11.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Sensenbrenner |
| Mr. Moorhead | Mr. McCollum |
| Mr. Schiff | Mr. Coble |

195

| | |
|---|---|
| Mr. Canady | Mr. Smith (TX) |
| Mr. Bono | Mr. Gallegly |
| Mr. Flanagan | Mr. Inglis |
| Mr. Conyers | Mr. Goodlatte |
| Mrs. Schroeder | Mr. Buyer |
| Mr. Frank | Mr. Heineman |
| Mr. Schumer | Mr. Bryant (TN) |
| Mr. Berman | Mr. Chabot |
| Mr. Boucher | |
| Mr. Reed | |
| Mr. Scott | |
| Mr. Watt | |
| Mr. Serrano | |
| Ms. Lofgren | |
| Ms. Jackson Lee | |

19. Perfecting amendment offered by Mr. Schiff to the substitute amendment offered by Mr. Hyde to the amendment offered by Mr. Schiff concerning the refugee consultation process, to permit the establishment of a higher refugee ceiling through the consultation process. Defeated 15–16.[116]

| AYES | NAYS |
|---|---|
| Mr. Schiff | Mr. Hyde |
| Mr. Hoke | Mr. Moorhead |
| Mr. Chabot | Mr. Sensenbrenner |
| Mr. Flanagan | Mr. McCollum |
| Mr. Conyers | Mr. Smith (TX) |
| Mrs. Schroeder | Mr. Gallegly |
| Mr. Frank | Mr. Canady |
| Mr. Schumer | Mr. Inglis |
| Mr. Berman | Mr. Goodlatte |
| Mr. Reed | Mr. Buyer |
| Mr. Nadler | Mr. Bono |
| Mr. Scott | Mr. Heineman |
| Mr. Watt | Mr. Bryant (TN) |
| Mr. Becerra | Mr. Barr |
| Ms. Lofgren | Mr. Boucher |
| | Mr. Bryant (TX) |

21. Amendment offered by Ms. Jackson Lee eliminating the cap on immediate relatives, restoring parents of citizens to the category of immediate relatives, and eliminating borrowing from employment based visas for family admissions. Defeated 16–16.

| AYES | NAYS |
|---|---|
| Mr. Chabot | Mr. Hyde |
| Mr. Flanagan | Mr. Moorhead |
| Mr. Conyers | Mr. Sensenbrenner |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Coble |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Schiff |
| Mr. Boucher | Mr. Canady |

---

[116]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "aye" on this amendment.

196

| | |
|---|---|
| Mr. Reed | Mr. Inglis |
| Mr. Nadler | Mr. Goodlatte |
| Mr. Scott | Mr. Buyer |
| Mr. Watt | Mr. Hoke |
| Mr. Becerra | Mr. Bono |
| Mr. Serrano | Mr. Heineman |
| Ms. Lofgren | Mr. Bryant (TN) |
| Ms. Jackson Lee | Mr. Bryant TX) |

20. Amendment offered by Mr. Berman regarding the admission of the spouses and children of aliens admitted as employment-based immigrants. Defeated 13–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Boucher | Mr. Smith (TX) |
| Mr. Bryant (TX) | Mr. Schiff |
| Mr. Reed | Mr. Canady |
| Mr. Nadler | Mr. Inglis |
| Mr. Scott | Mr. Goodlatte |
| Mr. Watt | Mr. Buyer |
| Mr. Becerra | Mr. Hoke |
| Mr. Serrano | Mr. Bono |
| Ms. Jackson Lee | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Ms. Lofgren |

21. Amendment offered by Ms. Jackson Lee eliminating the cap on immediate relatives, restoring parents of citizens to the category of immediate relatives, and eliminating borrowing from employment based visas for family admissions. Defeated 16–16.

| AYES | NAYS |
|---|---|
| Mr. Chabot | Mr. Hyde |
| Mr. Flanagan | Mr. Moorhead |
| Mr. Conyers | Mr. Sensenbrenner |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Coble |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Schiff |
| Mr. Boucher | Mr. Canady |
| Mr. Reed | Mr. Inglis |
| Mr. Nadler | Mr. Goodlatte |
| Mr. Scott | Mr. Buyer |
| Mr. Watt | Mr. Hoke |
| Mr. Becerra | Mr. Bono |
| Mr. Serrano | Mr. Heineman |
| Ms. Lofgren | Mr. Bryant (TN) |
| Ms. Jackson Lee | Mr. Bryant (TX) |

197

22. Amendment offered by Mr. Schiff to permit an increase in the limit on refugee admissions through the refugee consultation process. Defeated 14–16.[117]

| AYES | NAYS |
|---|---|
| Mr. Schiff | Mr. Hyde |
| Mr. Hoke | Mr. Moorhead |
| Mr. Chabot | Mr. Sensenbrenner |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Gekas |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Gallegly |
| Mr. Boucher | Mr. Canady |
| Mr. Reed | Mr. Inglis |
| Mr. Nadler | Mr. Goodlatte |
| Mr. Scott | Mr. Buyer |
| Mr. Watt | Mr. Bono |
| Mr. Serrano | Mr. Heineman |
| Ms. Lofgren | Mr. Bryant (TN) |
| | Mr. Barr |
| | Mr. Bryant (TX) |

23. Amendment offered by Mr. Nadler providing that the "public charge" ground for deportability would not apply in the case of a refugee or asylee. Defeated 7–14.[118]

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Berman | Mr. Moorhead |
| Mr. Nadler | Mr. Sensenbrenner |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Goodlatte |
| Ms. Lofgren | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Bryant (TX) |
| | Mr. Reed |

24. Amendment offered by Mr. Bryant of TN requiring hospitals to provide that hospitals seeking federal reimbursement for the emergency treatment of illegal aliens shall promptly provide the INS with identifying information regarding the illegal alien. Defeated 11–15.[119]

| AYES | NAYS |
|---|---|
| Mr. McCollum | Mr. Hyde |
| Mr. Smith (TX) | Mr. Moorhead |
| Mr. Inglis | Mr. Sensenbrenner |

---

[117]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "aye" on this amendment.
[118]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "aye" on this amendment.
[119]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "nay" on this amendment.

198

| | |
|---|---|
| Mr. Buyer | Mr. Goodlatte |
| Mr. Hoke | Mr. Conyers |
| Mr. Bono | Mrs. Schroeder |
| Mr. Heineman | Mr. Schumer |
| Mr. Bryant (TN) | Mr. Berman |
| Mr. Chabot | Mr. Boucher |
| Mr. Flanagan | Mr. Bryant (TX) |
| Mr. Barr | Mr. Reed |
| | Mr. Nadler |
| | Mr. Watt |
| | Mr. Becerra |
| | Ms. Lofgren |

25. Amendment offered by Mr. Moorhead providing that for purposes of computing prevailing wages in the H–1B program for non-profit independent research organizations, the calculation shall take into account only employees at similar institutions and entities. Adopted 21–10.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Conyers |
| Mr. Moorhead | Mr. Frank |
| Mr. Sensenbrenner | Mr. Schumer |
| Mr. McCollum | Mr. Berman |
| Mr. Coble | Mr. Boucher |
| Mr. Smith (TX) | Mr. Bryant (TX) |
| Mr. Schiff | Mr. Reed |
| Mr. Gallegly | Mr. Nadler |
| Mr. Canady | Mr. Becerra |
| Mr. Inglis | Ms. Jackson Lee |
| Mr. Goodlatte | |
| Mr. Buyer | |
| Mr. Hoke | |
| Mr. Bono | |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |
| Mrs. Schroeder | |
| Ms. Lofgren | |

26. Amendment offered by Mr. Schumer limiting to 20 percent the number of H–1B immigrants that may be employed in any single employer's workforce. Defeated 8–18–1.[120].

| AYES | NAYS |
|---|---|
| Mrs. Schroeder | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Schumer | Mr. Sensenbrenner |
| Mr. Berman | Mr. Smith (TX) |
| Mr. Bryant (TX) | Mr. Gallegly |
| Mr. Reed | Mr. Canady |
| Mr. Nadler | Mr. Inglis |

_____

[120] Mr. Becerra voted "present".

199

| Mr. Watt | Mr. Goodlatte |
|---|---|
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Serrano |
| | Ms. Lofgren |

27. An en bloc amendment offered by Ms. Lofgren to change the limitations in section 212(e) on the ability of participants in the Exchange Visitor Visa Program to apply for an immigrant visa. Defeated 10–15.

| AYES | NAYS |
|---|---|
| Mr. Goodlatte | Mr. Hyde |
| Mr. Conyers | Mr. Moorhead |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Gekas |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| Ms. Jackson Lee | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

28. Amendment offered by Mr. Goodlatte to the amendment offered by Mr. Schumer to restore the diversity immigrant program, to limit the foreign states whose nationals would be eligible for the program. Defeated 14–15.

| AYES | NAYS |
|---|---|
| Mr. Moorhead | Mr. Hyde |
| Mr. Sensenbrenner | Mr. McCollum |
| Mr. Smith (TX) | Mr. Hoke |
| Mr. Canady | Mr. Bono |
| Mr. Inglis | Mr. Chabot |
| Mr. Goodlatte | Mr. Flanagan |
| Mr. Buyer | Mr. Conyers |
| Mr. Heineman | Mrs. Schroeder |
| Mr. Bryant (TN) | Mr. Frank |
| Mr. Barr | Mr. Schumer |
| Mr. Bryant (TX) | Mr. Berman |
| Mr. Watt | Mr. Boucher |
| Mr. Becerra | Mr. Reed |
| Ms. Lofgren | Mr. Nadler |
| | Ms. Jackson Lee |

200

29. Amendment offered by Mr. Schumer, as amended by an amendment offered by Mr. Becerra and adopted by unanimous consent, to establish a diversity immigration program. Adopted 18–11.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Moorhead |
| Mr. McCollum | Mr. Sensenbrenner |
| Mr. Hoke | Mr. Gekas |
| Mr. Bono | Mr. Smith (TX) |
| Mr. Bryant (TN) | Mr. Gallegly |
| Mr. Flanagan | Mr. Canady |
| Mr. Barr | Mr. Inglis |
| Mr. Conyers | Mr. Goodlatte |
| Mr. Frank | Mr. Buyer |
| Mr. Schumer | Mr. Heineman |
| Mr. Berman | Mr. Bryant (TX) |
| Mr. Boucher | |
| Mr. Reed | |
| Mr. Nadler | |
| Mr. Watt | |
| Mr. Becerra | |
| Ms. Lofgren | |
| Ms. Jackson Lee | |

30. Amendment offered by Mr. Becerra to limit actions that may be taken by an employer pending completion of the secondary verification process. Defeated 12–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Boucher | Mr. Gekas |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Barr |

31. Amendment offered by Mr. Goodlatte to change the percentage threshold for H–1B dependent employers and to provide a transitional program for certain H–1B dependent employers to become H–1B non-dependent employers. Adopted 22–11.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Conyers |
| Mr. Moorhead | Mr. Frank |

201

Mr. Sensenbrenner
Mr. McCollum
Mr. Gekas
Mr. Coble
Mr. Smith (TX)
Mr. Schiff
Mr. Gallegly
Mr. Canady
Mr. Inglis
Mr. Goodlatte
Mr. Buyer
Mr. Hoke
Mr. Bono
Mr. Heineman
Mr. Bryant (TN)
Mr. Chabot
Mr. Flanagan
Mr. Barr
Mrs. Schroeder
Ms. Lofgren

Mr. Schumer
Mr. Berman
Mr. Boucher
Mr. Bryant (TX)
Mr. Reed
Mr. Nadler
Mr. Watt
Mr. Becerra
Ms. Jackson Lee

32. A perfecting amendment offered by Mr. Smith of Texas to an amendment offered by Mr. Becerra Amendment regarding reimbursement of fees to petitioners for immigrants in the eliminated family-sponsored categories. Adopted 18–13.

AYES
Mr. Hyde
Mr. Moorhead
Mr. Sensenbrenner
Mr. McCollum
Mr. Gekas
Mr. Coble
Mr. Smith (TX)
Mr. Gallegly
Mr. Canady
Mr. Inglis
Mr. Goodlatte
Mr. Buyer
Mr. Hoke
Mr. Bono
Mr. Bryant (TN)
Mr. Chabot
Mr. Barr
Mr. Bryant (TX)

NAYS
Mr. Heineman
Mr. Flanagan
Mr. Conyers
Mrs. Schroeder
Mr. Schumer
Mr. Berman
Mr. Boucher
Mr. Reed
Mr. Nadler
Mr. Watt
Mr. Becerra
Ms. Lofgren
Ms. Jackson Lee

33. Amendment offered by Mr. Reed excluding from entry persons who renounce U.S. citizenship to avoid paying taxes. Adopted 25–5.

AYES
Mr. Hyde
Mr. Sensenbrenner
Mr. Schiff
Mr. Gallegly
Mr. Canady

NAYS
Mr. Moorhead
Mr. McCollum
Mr. Gekas
Mr. Coble
Mr. Smith (TX)

202

Mr. Inglis
Mr. Goodlatte
Mr. Buyer
Mr. Bono
Mr. Heineman
Mr. Bryant (TN)
Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Conyers
Mrs. Schroeder
Mr. Schumer
Mr. Berman
Mr. Bryant (TX)
Mr. Reed
Mr. Nadler
Mr. Watt
Mr. Becerra
Ms. Lofgren
Ms. Jackson Lee

34. Amendment offered by Mr. Gallegly providing that payments of public assistance benefits only be made to individuals who are personally eligible to receive such benefits. Adopted 16–11.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Moorhead |
| Mr. Gekas | Mr. Conyers |
| Mr. Coble | Mrs. Schroeder |
| Mr. Smith (TX) | Mr. Berman |
| Mr. Schiff | Mr. Bryant (TX) |
| Mr. Gallegly | Mr. Nadler |
| Mr. Canady | Mr. Scott |
| Mr. Inglis | Mr. Watt |
| Mr. Goodlatte | Mr. Becerra |
| Mr. Buyer | Ms. Lofgren |
| Mr. Bono | Ms. Jackson Lee |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |

35. Amendment offered by Mr. Becerra to provide for a study to examine the cost to small businesses for participation in the employment eligibility verification system. Defeated 11–19.

| AYES | NAYS |
|---|---|
| Mr. Inglis | Mr. Hyde |
| Mr. Chabot | Mr. Moorhead |
| Mr. Flanagan | Mr. Sensenbrenner |
| Mr. Conyers | Mr. Gekas |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |

203

| | |
|---|---|
| Mr. Becerra | Mr. Canady |
| Ms. Lofgren | Mr. Goodlatte |
| Ms. Jackson Lee | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Barr |
| | Mr. Schumer |
| | Mr. Berman |
| | Mr. Boucher |
| | Mr. Bryant (TX) |

36. Amendment offered by Mr. Berman regarding employer responsibility in case of H–1B employees. Defeated 11–17.

| AYES | NAYS |
|---|---|
| Mrs. Schroeder | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Boucher | Mr. McCollum |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Schiff |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |

37. An amendment offered by Ms. Jackson Lee providing for an exemption from expedited removal for persons fleeing a country where there is civil strife, or other, temporary unsafe conditions, or where the Secretary of State has not certified that human rights violations do not occur. Defeated 10–22.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Nadler | Mr. Coble |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Schiff |
| Mr. Becerra | Mr. Gallegly |
| Ms. Lofgren | Mr. Canady |
| Ms. Jackson Lee | Mr. Inglis |
| | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |

204

Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Schumer
Mr. Boucher
Mr. Bryant (TX)
Mr. Reed

38. An amendment offered by Mr. Berman to provide visas for eliminated family preference categories whose priority date falls within 2 years of the bill's effective date. Defeated 15–18.

| AYES | NAYS |
|---|---|
| Mr. Schiff | Mr. Hyde |
| Mr. Chabot | Mr. Moorhead |
| Mr. Flanagan | Mr. Sensenbrenner |
| Mr. Conyers | Mr. McCollum |
| Mrs. Schroeder | Mr. Gekas |
| Mr. Frank | Mr. Coble |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Gallegly |
| Mr. Reed | Mr. Canady |
| Mr. Nadler | Mr. Inglis |
| Mr. Scott | Mr. Goodlatte |
| Mr. Watt | Mr. Buyer |
| Mr. Becerra | Mr. Bono |
| Ms. Lofgren | Mr. Heineman |
| Ms. Jackson Lee | Mr. Bryant (TN) |
| | Mr. Barr |
| | Mr. Boucher |
| | Mr. Bryant (TX) |

39. An amendment offered by Mr. Becerra to decrease the level of annual income required by a sponsor from 200 percent to 150 percent of the poverty level. Defeated 6–14.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Watt | Mr. Gekas |
| Mr. Becerra | Mr. Coble |
| Ms. Lofgren | Mr. Smith (TX) |
| | Mr. Schiff |
| | Mr. Inglis |
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Boucher |

40. Vote on Final Passage: Adopted 23–10.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Conyers |
| Mr. Moorhead | Mrs. Schroeder |

205

Mr. Sensenbrenner
Mr. McCollum
Mr. Gekas
Mr. Coble
Mr. Smith (TX)
Mr. Schiff
Mr. Gallegly
Mr. Canady
Mr. Inglis
Mr. Goodlatte
Mr. Buyer
Mr. Hoke
Mr. Bono
Mr. Heineman
Mr. Bryant (TN)
Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Boucher
Mr. Bryant (TX)
Mr. Reed

Mr. Frank
Mr. Schumer
Mr. Berman
Mr. Nadler
Mr. Scott
Mr. Watt
Mr. Becerra
Ms. Lofgren

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 2202, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

206

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, March 4, 1996.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 2202, the Immigration and the National Interest Act of 1995. Because enactment of the bill would affect direct spending, pay-as-you-go procedures would apply.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

JUNE E. O'NEILL, *Director.*

Enclosure.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 2202.
2. Bill Title: Immigration in the National Interest Act of 1995.
3. Bill status: As ordered reported by the House Committee on the Judiciary on October 24, 1995.
4. Bill purpose: H.R. 2202 would make many changes and additions to federal laws relating to immigration. Provisions having a potentially significant budgetary impact are highlighted below.

Title I would:

specify that the number of Immigration and Naturalization (INS) border patrol agents would be increased by 1,000 in each of the fiscal years 1996 through 2000 relative to the number as of September 30, 1995; in addition, the number of full-time support positions for border patrol agents would be increased by 800;

authorize appropriations of $12 million for improvements in barriers along the U.S.-Mexico border;

require that border crossing identification cards include a biometric identifier (such as a fingerprint) that is machine-readable;

direct the Attorney General to train border patrol personnel on the rights and various cultural backgrounds of aliens and U.S. citizens;

establish several pilot programs relating to inadmissible or deportable aliens; and

direct the Attorney General to deploy enough INS investigators and enforcement personnel in the interior of the United States to properly investigate and enforce immigration laws.

Title II would:

increase by 25 the number of Assistant United States Attorneys that may be employed by the Department of Justice for fiscal year 1996; and

provide for new and increased penalties for a number of crimes related to immigration.

Title III would:

207

permit the Attorney General to reemploy up to 300 federal retirees for as long as two years to support the Institutional Hearing Program;

direct the Attorney General to increase the detention facilities of the INS to at least 9,000 beds by fiscal year 1997;

authorize appropriations of $5 million annually for the INS and $150 million annually for the Attorney General, beginning in fiscal year 1996, for costs related to detention and removal of aliens;

provide for an increase in pay for immigration judges;

establish in the general fund of the Treasury an Immigration Enforcement Account, and

provide for new and increased penalties for a number of crimes related to immigration.

Title IV would:

direct the INS to increase the number of positions in the Investigations Division by 350 above the number of such positions available as of September 30, 1994;

direct the Department of Labor (DOL) to increase the number of full-time equivalent positions in the Wage and Hour Division of the Employment Standards Administration by 150 above the number of such positions available as of September 30, 1994; and

direct the Attorney General to devise a system, such as a toll-free telephone line or other electronic media, by which employers could confirm the eligibility of prospective employees. This system would be implemented via pilot projects in five states through the end of fiscal year 1999; continuation of the projects would be subject to Congressional action.

Title V would:

reduce the number of legal immigrants allowed to enter the United States each year;

set a statutory cap on the number of refugees admitted into the United States;

permit the Attorney General to reemploy up to 300 federal retirees for as long as two years to reduce the backlog in asylum applications;

direct the Attorney General to increase the number of INS asylum officers to at least 600 by fiscal year 1997; and

require the Attorney General, subject to the availability of appropriations, to reimburse visa application fees paid by petitioners for family-sponsored immigrant categories that are eliminated by this bill before the petitioner receives the visa.

Title VI would affect various benefit programs. It would:

curtail the eligibility of non-legal aliens, including those permanently residing under color of law (PRUCOL), in the narrow instances where they are now eligible for federal benefits;

put sponsors of future immigrants on notice that they are expected to support them for a longer period than current law provides, by extending the period in which a sponsor's income is presumed or deemed to be available to the alien and by making affidavits of support legally enforceable;

deny the earned income tax credit to individuals not authorized to be employed in the United States; and

208

change federal coverage of emergency Medicaid services for illegal aliens.

Title VII would:

direct the Attorney General and the Secretary of the Treasury to increase the number of land border inspectors in fiscal years 1996 and 1997 to assure full staffing during peak border crossing hours; and

direct the Attorney General, within two years of enactment of this bill, to establish preinspection stations in at least five of the foreign airports that serve as departure points for the greatest number of air passengers traveling to the U.S. In addition, this title would direct the Attorney General, within four years of enactment, to establish preinspection stations in at least five foreign airports that would most effectively reduce the number of aliens who arrive by air without valid documentation.

5. Estimated cost to the Federal Government: Assuring appropriation of the entire amounts authorized, enacting H.R. 2202 would increase discretionary spending over fiscal years 1996 through 2002 by a total of about $5 billion. Several provisions of H.R. 2202, mainly those in Title VI affecting benefit programs, would result in changes to mandatory spending and federal revenues. CBO estimates that the changes in mandatory spending would reduce outlays by about $6 billion over the 1996–2002 period, and that revenues would increase by about $80 million over the same period. The estimated budgetary effects of the legislation are summarized in Table 1. Table 2 shows projected outlays for direct spending programs under current law, the changes that would stem from the bill, and the projected outlays for each program if the bill were enacted.

TABLE 1.—ESTIMATED BUDGETARY EFFECTS OF H.R. 2202

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| SPENDING SUBJECT TO APPROPRIATIONS ACTION | | | | | | | |
| Authorizations: | | | | | | | |
| Estimated authorization level ............... | 129 | 699 | 774 | 856 | 960 | 978 | 996 |
| Estimated outlays ..................................... | 0 | 532 | 637 | 940 | 994 | 956 | 976 |
| MANDATORY SPENDING AND RECEIPTS | | | | | | | |
| Direct Spending: | | | | | | | |
| Estimated budget authority ................... | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |
| Estimated outlays ..................................... | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |
| Estimated Revenues .............................. | 0 | 14 | 13 | 12 | 13 | 13 | 13 |

The costs of this bill fall within budget functions 550, 600, 750, and 950.

209

TABLE 2.—ESTIMATED EFFECTS OF H.R. 2202 ON DIRECT SPENDING PROGRAMS

[By fiscal years, in millions of dollars]

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| **PROJECTED SPENDING UNDER CURRENT LAW** | | | | | | | | |
| Supplemental Security Income [1] | 24,509 | 24,497 | 29,894 | 32,967 | 36,058 | 42,612 | 39,287 | 46,511 |
| Food Stamps [1] | 25,554 | 26,935 | 28,620 | 30,164 | 31,706 | 33,406 | 35,035 | 36,603 |
| Family Support Payments [2] | 18,086 | 18,544 | 19,048 | 19,534 | 20,132 | 20,793 | 21,477 | 22,184 |
| Medicaid | 89,070 | 99,292 | 110,021 | 122,060 | 134,827 | 148,110 | 162,590 | 177,786 |
| Earned Income Tax Credit (outlay portion) | 15,244 | 20,392 | 22,904 | 23,880 | 24,938 | 25,982 | 26,794 | 27,546 |
| Receipts of Employer Contributions | −27,960 | −27,365 | −28,081 | −28,907 | −29,621 | −30,938 | −32,428 | −33,910 |
| Total | 144,503 | 162,295 | 182,406 | 199,698 | 218,040 | 239,965 | 252,755 | 276,720 |
| **PROPOSED CHANGES** | | | | | | | | |
| Supplemental Security Income [1] | | 0 | −10 | −80 | −160 | −260 | −370 | −670 |
| Food Stamps [1] | | 0 | 0 | −15 | −45 | −100 | −170 | −250 |
| Family Support Payments [2] | | 0 | −1 | −13 | −23 | −48 | −63 | −78 |
| Medicaid | | 0 | −5 | −110 | −240 | −390 | −570 | −830 |
| Earned Income Tax Credit (outlay portion) | | 0 | −216 | −214 | −218 | −222 | −224 | −229 |
| Receipts of Employer Contributions | | 0 | 2 | 4 | 2 | 0 | 0 | 0 |
| Total | | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |
| **PROJECTED SPENDING UNDER H.R. 2202** | | | | | | | | |
| Supplemental Security Income [1] | 24,509 | 24,497 | 29,884 | 32,887 | 35,898 | 42,352 | 38,917 | 45,841 |
| Food Stamps [1] | 22,554 | 26,935 | 28,620 | 30,149 | 31,661 | 33,306 | 34,865 | 36,353 |
| Family Support Payments [2] | 18,086 | 18,544 | 19,047 | 19,521 | 20,109 | 20,745 | 21,414 | 22,106 |
| Medicaid | 89,070 | 99,292 | 110,016 | 121,950 | 134,587 | 147,720 | 162,020 | 176,956 |
| Earned Income Tax Credit (outlay portion) | 15,244 | 20,392 | 22,688 | 23,666 | 24,720 | 25,760 | 26,570 | 27,317 |
| Receipts of Employer Contributions | −27,960 | −27,365 | −28,079 | −28,903 | −29,619 | −30,938 | −32,428 | −33,910 |
| Total | 144,503 | 162,295 | 182,176 | 199,270 | 217,356 | 238,945 | 251,358 | 274,663 |
| Changes to revenues | | | 14 | 13 | 12 | 13 | 13 | 13 |
| Net deficit effect | | | −244 | −441 | −696 | −1,033 | −1,410 | −2,070 |

[1] Food Stamps includes Nutrition Assistance for Puerto Rico. Spending under current law includes the provisions of the fiscal year 1996 Agriculture appropriations.

[2] Family Support Payments includes spending on Aid to Families with Dependent Children (AFDC), AFDC-related child care, administrative costs for child support enforcement, net federal savings from child support collections, and the Job Opportunities and Basic Skills Training program (JOBS).

Notes.—Assumes enactment date of August 1, 1996. Estimates will change with later effective date. Details may not add to totals because of rounding.

210

6. Basis of Estimate: For purposes of this estimate, CBO assumes that H.R. 2202 will be enacted by August 1, 1996.

*Spending subject to appropriations*

The following estimates assume that all specific amounts authorized by the bill would be appropriated for each fiscal year. For programs in the bill for which authorizations are not specified, or for programs whose specific authorizations do not provide sufficient funding, CBO estimated the cost based on information from the agencies involved. We assumed that few of the bill's programs would be implemented until fiscal year 1997. (Hence, we estimate that outlays in 1996 would not be affected by enactment.) Estimated outlays, beginning in 1997, are based on historical rates for these or similar activities.

The provisions in this bill that affect discretionary spending would increase costs to the federal government by the amounts shown in Table 3, assuming appropriation of the necessary funds. In many cases, the bill authorizes funding for programs already authorized in the violent Crime Control and Law Enforcement Act of 1994 (1994 crime bill) or already funded by fiscal year 1996 appropriations action. For example, the additional border patrol agents and support personnel in Title I already were authorized in the 1994 crime bill through fiscal year 1998. For such provisions, the amounts shown in Table 3 reflect only the cost above funding authorized in current law.

In the most recent continuing resolution enacted for fiscal year 1996, appropriations for the Department of Justice total about $14 billion, of which about $1.7 billion is for the INS.

TABLE 3.—SPENDING SUBJECT TO APPROPRIATIONS ACTION

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Estimated authorization levels: | | | | | | | |
| Title I: | | | | | | | |
| Additional border patrol agents | 0 | .......... | .......... | 116 | 119 | 123 | 127 |
| Barrier improvements | 0 | 20 | .......... | .......... | .......... | .......... | .......... |
| Improved identification cards | 0 | 34 | 34 | 34 | .......... | .......... | .......... |
| Border patrol training | .......... | 0 | 3 | .......... | .......... | .......... | .......... |
| Pilot programs | 0 | 1 | .......... | .......... | .......... | .......... | .......... |
| Increased interior enforcement | 0 | 130 | 260 | 390 | 520 | 530 | 540 |
| Title II: | | | | | | | |
| Additional U.S. Attorneys | 0 | 8 | 8 | 8 | 8 | 8 | 8 |
| Title III: | | | | | | | |
| Increased detention facilities | 0 | 199 | 220 | 50 | 52 | 53 | 55 |
| Detention and removal of aliens [1] | 129 | 155 | 155 | 155 | 155 | 155 | 155 |
| Pay raise for immigration judges | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| Title IV: | | | | | | | |
| Additional INS investigators | 0 | 11 | 11 | 11 | 12 | 12 | 12 |
| Additional DOL employees | 0 | 12 | 12 | 13 | 13 | 14 | 14 |
| Work eligibility pilot program | 0 | (2) | (2) | (2) | .......... | .......... | .......... |
| Title V: | | | | | | | |
| Additional asylum officers | 0 | 34 | 34 | 35 | 36 | 37 | 38 |
| Visa reimbursement | 0 | 55 | .......... | .......... | .......... | .......... | .......... |
| Title VII: | | | | | | | |
| Additional land border inspectors | 0 | 36 | 39 | 43 | 44 | 45 | 46 |
| Total | 129 | 699 | 774 | 856 | 960 | 978 | 996 |

211

TABLE 3.—SPENDING SUBJECT TO APPROPRIATIONS ACTION—Continued

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Estimated outlays ........................................................ | 0 | 532 | 637 | 940 | 994 | 956 | 976 |

[1] Amounts for this provision are specified in the bill. The amount authorized for fiscal year 1996 was reduced to reflect $26 million in appropriations already provided.
[2] Less than $500,000.

### Revenues and direct spending

Table 4 details estimated changes in revenues and direct spending. The most significant changes in direct spending would result from provisions contained in Title VI of the bill, in particular, from the provisions changing benefits conferred through the Supplemental Security Income program, Medicaid, and the Earned Income Tax Credit.

TABLE 4.—CHANGES IN REVENUES AND DIRECT SPENDING

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | |
| New Criminal Fines and Forfeiture ......... | 0 | (1) | (1) | (1) | (1) | (1) | (1) |
| Earned Income Tax Credit ..................... | 0 | 14 | 13 | 12 | 13 | 13 | 13 |
| Total Revenues ..................................... | 0 | 14 | 13 | 12 | 13 | 13 | 13 |
| Direct Spending: | | | | | | | |
| New Criminal Fines and Forfeiture ......... | 0 | (1) | (1) | (1) | (1) | (1) | (1) |
| Immigration Enforcement Account .......... | 0 | (1) | (1) | (1) | (1) | (1) | (1) |
| Supplemental Security Income .............. | 0 | −10 | −80 | −160 | −260 | −370 | −670 |
| Food Stamps ......................................... | 0 | 0 | −15 | −45 | −100 | −170 | −250 |
| Family Support ...................................... | 0 | −1 | −13 | −23 | −48 | −63 | −78 |
| Medicaid ............................................... | 0 | −5 | −110 | −240 | −390 | −570 | −830 |
| Earned Income Tax Credit ..................... | 0 | −216 | −214 | −218 | −222 | −224 | −229 |
| Federal Employee Retirement ................ | 0 | 2 | 4 | 2 | 0 | 0 | 0 |
| Total Direct SApending ........................ | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |

[1] Less than $500,000.

*Fines.*—The imposition of new and enhanced civil and criminal fines in H.R. 2202 could cause governmental receipts to increase, but CBO estimates that any such increase would be less than $500,000 annually, civil fines would be deposited into the general fund of the Treasury. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

*Forfeiture.*—A new forfeiture provision in H.R. 2202 could lead to more assets seized and forfeited to the United States, but CBO estimates that any such increase would be less than $500,000 annually in value. Proceeds from the sale of any such assets would be deposited as revenues into the Assets Forfeiture Fund of the Department of Justice and spent out of that fund in the same year. Thus, direct spending from the Assets Forfeiture fund would match any increase in revenues.

*Immigration enforcement account.*—The creation of an immigration enforcement account in Title III would affect both direct spending and receipts. Currently, civil fines collected from viola-

212

tions of certain immigration laws are classified as revenues for budgetary purposes and deposited into the general fund of the Treasury. H.R. 2202 would deposit these collections as offsetting receipts into the immigration enforcement account and would spend them out of that fund. Thus, direct spending would increase, but this increase would be less than $500,000 annually.

*Legal immigration reform.*—H.R. 2202 would reduce legal immigration levels by roughly 100,000 entries annually. By law, the costs incurred by INS to oversee legal immigration are covered by fees it charges, so there is no net impact on the federal budget. Reducing legal immigration would decrease the fees collected by INS, so the agency would have to reduce its costs accordingly, mainly by cutting personnel. INS would attempt to maintain a balance between fee collections and costs, as it does now. Over time, any imbalance would be corrected to achieve a net budgetary impact of zero.

*Preinspection stations.*—Based on information from INS, CBO estimates that the costs to establish and maintain the first five preinspection stations would reach about $40 million annually, with similar costs for the second five stations. However, as required by law, costs of this sort would be covered by increased INS user fees charged to passengers entering the United States. Such fees would be recorded as offsetting receipts, and additional spending by the INS would be considered direct spending. Thus, there would be no net budgetary impact from any additional preinspection stations.

*Supplemental security income.*—The SSI program pays benefits to low-income people with few assets who are aged 65 or older or disabled. According to tabulations by the Congressional Research Service (CRS), the SSI program for the aged is the major benefit program with the sharpest contrast in participation between noncitizens and citizens. The CRS reported that nearly one-quarter of aliens over the age of 65 receive SSI, versus about 4 percent of citizens. The Social Security Administration states that about 700,000 legal aliens collect SSI (although some unknown fraction of those "aliens" are really naturalized citizens, whose change in status is not reflected in program records). About three-quarters of alien SSI recipients are immigrants legally admitted for permanent residence, who must serve out a waiting period during which their sponsor's income is "deemed" to them before they can go on the program. That waiting period was temporarily lengthened to 5 years in 1994 but is slated to return to 3 years in October 1996. The other one-quarter of alien recipients of SSI are refugees, asylees, and PRUCOLs.

H.R. 2202 would have little effect on the eligibility for SSI or other benefits of legal immigrants who are already in the U.S., because the bill would not direct the agencies administering these programs to make any changes in the way they treat aliens who were legally admitted for permanent residence before the bill's enactment. Any effect on such aliens would be indirect. The bill would amend the "public charge" section of the Immigration and Nationality Act to state that anyone who collected certain benefits within 7 years of arrival could be deported, and names the programs in which participation would brand the alien a public

213

charge. No benefits received before the date of enactment would count against the 7-year ban. Nor would benefits paid for certain reasons arising after entry—such as the death or disability of a breadwinner—count. A public charge ban (for 5, not 7 years after the alien's entry) is already on the books, but is hardly ever enforced through deportation. The ban apparently has not acted as a major deterrent to many aliens' participation in public assistance programs. CBO does not rule out that the proposed "public charge" language might make some aliens who are already here fearful of collecting benefits, but views such psychological effects as a tenuous basis for budget estimates.

For future entrants, though, the bill has real teeth. The bill's principal effect on the SSI program would be the proposed lengthening of the deeming period for future entrants. H.R. 2202 would require the government to draft a new affidavit of support explicitly telling sponsors that they are liable for any public assistance benefits provided to the alien. Furthermore, for immigrants covered by such affidavits, the deeming period would last until naturalization (if the immigrant was admitted as a parent of a citizen or legal resident) or for at least 7 years (if admitted in another category). CBO assumes that the new forms would be in place by early 1997 and that significant savings would begin in 2000—when that first group of entrants would otherwise have graduated from the 3-year deeming period under current law. Small savings would occur before 2000, because the bill would make two other changes in the way deeming now operates in the SSI program—specifically, by requiring that all income of the sponsor and spouse be deemed, instead of only a portion of it, and by repealing the exemption from deeming for aliens who become disabled after their arrival.

Because the stiffer deeming rules would make little difference in the near term, they account for just half of the estimated savings of $1.6 billion in SSI over the entire 1996–2000 period; nevertheless, they contribute two-thirds of the estimated savings in fiscal year 2002. H.R. 2202 also proposes to shave the number of overall immigrant admissions, and would explicitly limit the number of parents of citizens or legal residents who may enter the country. Since deeming has proven to be a quite powerful tool in the SSI program, the proposed cutback in admissions is largely immaterial to CBO's estimate; from a dollar standpoint, it matters little whether immigrants can get into the country but are then barred from SSI, or whether they cannot get into the country in the first place.

Two other provisions of the bill would generate the remaining savings in SSI. First, H.R. 2202 would eliminate eligibility for SSI benefits of aliens permanently residing under color of law. That label covers such disparate groups as parolees, aliens who are granted a stay of deportation, and others with various legal statuses. PRUCOLs currently make up about 5 percent of aliens on the SSI rolls. CBO assumes that some would successfully seek to have their classification changed to another category (such as refugee or asylee) that would protect their SSI benefits. The remainder, though, would be barred from the program, generating savings of about $0.5 billion over 7 years.

214

The second provision would set a statutory ceiling on a number of refugee admissions, removing that prerogative from the President. The bill would limit refugee admissions to 75,000 in 1997 and 50,000 a year thereafter. It is impossible to say how many refugees would be admitted if current policy remained unchanged, since the ceiling is announced by the President annually and is affected by geopolitical conditions. For this estimate, CBO assumed that, under current policy, refugee admissions would drop from 90,000 in fiscal year 1996 (the ceiling announced by the President) to 75,000 in 1997 and beyond. Compared with that path, H.R. 2202 would require a reduction of 25,000 refugee admissions a year after 1997. Refugees often arrive with little or no money, poor English, and limited prospects for employment, so it is not surprising that they tend to rely on welfare at first. Tabulations by the Office of Refugee Resettlement in the Department of Health and Human Services indicate that, of refugees who arrived in the past 5 years, about 7 percent are on SSI, 24 percent on Aid to Families with Dependent Children (AFDC), and 60 percent on food stamps. Based on that pattern, CBO estimates that the limits on refugee admissions in H.R. 2202 would lead to savings in the SSI program of $0.1 billion over the 1998–2002 period.

*Food stamps.*—The estimated savings in the Food Stamp program—$0.6 billion over 7 years—are considerably smaller than those in SSI but have essentially the same explanations. The Food Stamp program imposes a 3-year deeming period. Therefore, lengthening the deeming period (to at least 7 years for most future entrants and even longer for some) would save money in food stamps beginning in 2000. Restrictions on the number of legal entrants and particularly of refugees admitted into the country account for the rest of the savings. The Food Stamp program already denies benefits to most PRUCOLs, so no additional savings are estimated from that source.

Statistics compiled by CRS suggest that about 16 percent of noncitizens live in households that receive food stamps, not so sharply different from the 12 percent participation rate of citizens. Other data on them, though, are sketchier than data on aliens in the SSI program. For example, CBO lacks information on how long aliens (other than refugees) are in the country before going on food stamps, why they file for benefits, and how many of them have financial sponsors—information that would have helped greatly in estimating the effects of H.R. 2202.

*Family support.*—H.R. 2202 would lead to small savings in the AFDC program—again, from essentially the same provisions that would generate savings in SSI and food stamps. CRS tabulations show that noncitizens are only slightly more likely than citizens to participate in the AFDC program (6 percent of noncitizens, versus 5 percent of citizens). Often, the household consists of a noncitizen parent and a citizen child or children—in which case H.R. 2202 would directly affect only the parent's eligibility. As for food stamps, information on sponsorship, length of time in the country, and reason for participation by aliens in AFDC is scanty.

The AFDC program already deems income from sponsors to aliens for three years after the alien's arrival. H.R. 2202 would lengthen that period to 7 years in most cases. The $0.2 billion in

215

total savings over the 1997–2002 period would stem from lengthening the deeming period, restricting the number of admissions of immigrants and refugees, and ending the eligibility of PRUCOLs for AFDC benefits.

*Medicaid.*—H.R. 2202 would erect several barriers to Medicaid eligibility for future entrants into this country. In most cases, AFDC or SSI eligibility carries Medicaid eligibility along with it. By restricting aliens' access to those two cash programs, H.R. 2202 would generate savings in Medicaid. Medicaid now has no deeming requirement at all; that is, program administrators do not consider a sponsor's income when they gauge the alien's eligibility for benefits. Therefore, it is possible for a sponsored alien to qualify for Medicaid even before he or she has satisfied the SSI waiting period. H.R. 2202 would change that by requiring that every means-tested program weigh the income of a sponsor who signed one of the new, legally enforceable affidavits of support. Under current law, PRUCOLs are specifically eligible for Medicaid; H.R. 2202 would make them ineligible.

Finally, H.R. 2202 would bar immigration by parents of citizens and legal residents unless a sponsor could document that the parent would be covered by a private insurance policy that provides coverage similar to Medicare plus long-term care protection equivalent to Medicaid. Such coverage would be extremely expensive if it even exists. That requirement was not critical to CBO's estimate of Medicaid savings in H.R. 2202, because CBO judged that the other SSI provisions and the deeming requirements would effectively bar most elderly entrants from the Medicaid program over the 1997–2002 period. The estimate assumes that the new, legally enforceable affidavits will be in place by early 1997. If that assumed timetable were to slip, perhaps because of the sheer difficulty of crafting acceptable criteria for insurance coverage, estimates of savings in other programs that also hinge on the new affidavits could also slip. If enforced stringently, the insurance requirement could effectively forbid immigration of all except the wealthiest parents of U.S. residents.

CBO estimated the savings in Medicaid by first estimating the number of aliens who would be barred from the SSI and AFDC programs by other provisions of H.R. 2202. CBO then added another group—dubbed "noncash beneficiaries" in Medicaid parlance because they participate in neither of the two cash programs. CBO assumed that the noncash participants who would be affected by H.R. 2202 essentially fall into two groups. One is the group of elderly (and less importantly, disabled) aliens who enter in 1997 and beyond and who could, under current law, seek Medicaid even before they satisfied the 3-year wait for SSI, the second is poor children and pregnant women who could, under current law, qualify for Medicaid even if they do not get AFDC. CBO then multiplied the assumed number of aliens affected times an average Medicaid cost appropriate for their group. That average cost is significantly higher for an aged or disabled person than for a younger mother or child. In selecting an average cost, CBO took into account the fact that relatively few aged or disabled aliens receive expensive long-term care in Medicaid-covered institutions, but that on the other hand few are eligible for Medicare as their primary payer.

216

The resulting estimate of Medicaid savings was then trimmed by 25 percent to reflect the fact that—if the aliens in question were barred from regular Medicaid—the federal government would likely end up paying more in reimbursements for emergency care and for uncompensated care. The resulting savings in Medicaid would be negligible at first but would reach an estimated $0.8 billion by 2002, totaling $2.1 billion over the 1997–2002 period.

One of the few benefits for which illegal aliens now qualify is emergency Medicaid under section 1903(v) of the Social Security Act. H.R. 2202 contains a provision that is apparently intended to make the federal government responsible for the entire cost of emergency Medicaid services, instead of splitting the cost with states as under the current matching requirements. However, the drafting of the provision leaves several legal and practical issues dangling. H.R. 2202 would not repeal the current provision in section 1903(v). It also orders the Immigration and Naturalization Service to verify the identity of recipients in order for the states to qualify for the proposed reimbursement. Emergency patients often show up with no insurance and little other identification; therefore, if the INS drafted stringent rule for verification, it is possible that hardly any providers could collect under this section. On the other hand, if the INS required only minimal identification, providers would have an incentive to classify as many patients as possible in this category because that would maximize their federal reimbursement. Also unclear is whether any reimbursement would be subject to the usual limits on allowable charges in Medicaid, or whether providers could seek reimbursement for their entire cost.

*Earned income tax credit.*—H.R. 2202 would deny eligibility for the Earned Income Tax Credit (EITC) to workers who are not authorized to be employed in the U.S. In practice, that provision would work by requiring valid Social Security numbers to be filed for the primary and secondary taxpayers on returns that claim the EITC. A similar provision was contained in President Clinton's 1996 budget proposal and in last fall's reconciliation bill. The Joint Committee on Taxation estimates that the provision would reduce the deficit by approximately $0.2 billion a year. Most of this reduction would appear as lower outlays for the refundable portion of the credit, but there would also be a small increase in revenues.

*Federal employee retirement.*—H.R. 2202 would have a small effect on the net outlays of federal retirement programs. Section 533 and 356 of the bill would permit certain civilian and military retirees to collect their full pensions in addition to their salary if they are reemployed by the Department of Justice to help tackle a backlog of asylum applications or support the Institutional Hearing Program. Under current law, an employing agency must deduct the annuity amount from the paycheck of a reemployed civil service annuitant and remit that amount to the retirement trust fund. The retirement fund, in effect, makes no net annuity payments for the period of the annuitant's reemployment. (Rules governing the reemployment of military retirees are slightly more liberal, but still require forfeiture of part of the annuity.) Under the bill, the salary reduction requirement would be waived for up to 24 months of reemployment. CBO estimates that about 200 annuitants would be

217

affected, and that net outlays would increase by $2 million to $4 million a year in 1997 through 1999.

*Other programs.*—Entitlement or direct spending programs, other than those already listed, are estimated to incur negligible costs or savings over the 1997–2002 period as a consequence of H.R. 2202. The child nutrition program would be specifically exempt from H.R. 2202's ban on benefits to illegal aliens. It is possible that child nutrition would fall under the requirement that all means-tested programs develop sponsor-to-alien deeming provisions for future entrants; however, the applicability of that section is ambiguous, and it would take time to craft deeming rules and implement them in school systems nationwide in any case. The foster care program does not appear by name on any specific list of exemptions in H.R. 2202, but CBO assumes that it would be exempt under provisions protecting battered children. CBO estimates that the bill would not lead to any significant savings in the student loan program. The Title XX social services program, an entitlement program for the states, is funded at a fixed dollar amount set by the Congress; the eligibility or ineligibility of aliens for services would not have any direct effect on those dollar amounts.

7. Pay-as-you-go considerations: Section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 sets up pay-as-you-go procedures for legislation affecting direct spending or receipts through 1998. Because several sections of this bill would affect receipts and direct spending, pay-as-you-go procedures would apply. These effects are summarized in the following table.

[By fiscal year, in millions of dollars]

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Change in outlays | 0 | − 230 | − 428 |
| Change in receipts | 0 | 14 | 13 |

8. Estimated impact on state, local, and tribal governments: CBO has not completed its review of possible mandates in H.R. 2202. This section represents a preliminary analysis of the mandates contained in the bill and their likely impacts on the budgets of state, local, and tribal governments. A comprehensive mandate cost statement will be provided when CBO's analysis is completed.

H.R. 2202 contains a number of mandates on state and local governments. The major mandates would require that state and local governments:

Deny non-legal aliens, including those permanently residing under color of law, eligibility for all means-tested state and local benefit programs except emergency Medicaid, immunizations, disaster relief, and family violence services;

Distribute means-tested benefits only through individuals who are themselves eligible for the program, at least on the basis of their immigration status; and

Impose no restrictions on the exchange of information between governmental entities or officials and the Immigration and Naturalization Service regarding the immigration status of individuals.

In addition, H.R. 2202 would require employers, including state and local government personnel offices, in at least five states to

218

confirm through a toll-free telephone number (or other electronic media), the identity, Social Security number, and work eligibility of all employees within three days of hiring.

CBO's preliminary conclusion is that the total net costs of the bill's mandates on state and local governments would not exceed the $50 million annual threshold established in the Unfunded Mandates Reform Act.

9. Estimated impact on the private sector: H.R. 2202 contains several private sector mandates. Although CBO has not completed its analysis of impacts on the private sector, our preliminary analysis indicates that the expected direct costs of private sector mandates contained in H.R. 2202 would exceed $100 million a year.

Generally, speaking, the private sector mandates in H.R. 2202 lie in four areas: (1) provisions that affect aliens within the borders of the United States, (2) provisions that affect individuals who sponsor aliens and execute affidavits of support, (3) provisions that affect the transportation industry, and (4) provisions that affect employers of aliens. In addition, a few provisions would reduce existing mandates on employers and offset marginally some of the costs imposed by new mandates.

Specifially, we expect that the direct costs imposed on sponsors of aliens who execute affidavits of support to exceed $100 million a year within the first five years that the mandate is in effect. Those are costs now borne by the federal government and state and local governments for the provision of benefits under public assistance programs. We also expect that some direct costs would be imposed on aliens within U.S. borders, the transportation industry, and the employers of aliens but that those costs would not be significant.

10. Previous CBO estimate: In 1995 CBO prepared many estimates of the effects of restricting aliens' eligibility for public assistance in the context of the debate over welfare reform. Examples include CBO's estimates of H.R. 4 (the welfare reform bill) and of H.R. 2491 (the reconciliation bill), both of which were eventually vetoed. In general, however, those proposals did not draw a sharp distinction between aliens already in the country and future entrants. CBO has not previously estimated the effects of restrictions on public assistance like those in H.R. 2202 that are essentially targeted at future entrants.

11. Estimate prepared by: Federal Cost Estimate: Mark Grabowicz, Wayne Boyington, Sheila Dacey, Dorothy Rosenbaum, Robin Rudowitz, Kathy Ruffing, and Stephanie Weiner.

State and Local Government Estimate: Karen McVey and Leo Lex.

Private Sector Mandate Estimate: Matthew Eyles.

12. Estimate approved by: Paul N. Van de Water, Assistant Director, for Budget Analysis.

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 2202 will have no significant inflationary impact on prices and costs in the national economy.

219

SECTION BY SECTION ANALYSIS

TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

### Subtitle A—Improved Enforcement at Border

*Sec. 101.—Border patrol agents and support personnel*

Subsection (a) provides that the number of border patrol agents shall be increased by 1000 per year from 1996 through 2000. Subsection (b) provides that the number of support personnel for border enforcement, investigations, detention and deportation, intelligence, information and records, legal proceedings, and management and administration shall be increased beginning in fiscal year 1996 by 800 positions above the number existing as of September 30, 1994. Subsection (c) requires the deployment of new border patrol agents to border sectors in proportion to the level of illegal entries in the sectors.

*Sec. 102.—Improvement of barriers at border*

Subsection (a) provides that the Attorney General and the Commissioner of the Immigration and Naturalization Service (INS) shall install additional physical barriers and roads to deter illegal crossings into the U.S. in areas of high illegal entry.

Subsection (b) provides that in carrying out subsection (a) in the San Diego sector, the Attorney General shall provide for multiple fencing, separated by roads, for the 14 miles eastward of the Pacific Ocean. The Attorney General shall promptly acquire necessary easements for the fencing and roads. There are authorized to be appropriated $12,000,000 for these fences and roads.

Subsection (c) provides for a waiver of the Endangered Species Act to the extent necessary to expeditiously complete construction of the roads and fences under this section.

Subsection (d) requires the Attorney General to forward deploy existing border patrol agents in those border areas with high levels of illegal entry and to submit a report within 6 months of the date of enactment regarding the progress and effectiveness of such forward deployments.

*Sec. 103.—Improved border equipment and technology*

This section authorizes the Attorney General to acquire Federal equipment, including aircraft, helicopters, vehicles, and night vision equipment, to improve the deterrence of illegal immigration into the U.S. Some of this material may be acquired from the Department of Defense. Where necessary for the proper utilization of such equipment, the Committee believes that it would be appropriate for military personnel to provide training to Border Patrol agents and other immigration officers. Responsibility for operation of material acquired by the Attorney General would remain in the hands of employees of the Department of Justice.

220

*Sec. 104.—Improvement in border crossing identification card*

This section amends the definition in section 101(a)(6) of the Immigration and Nationality Act [121] of the "border crossing identification card." The amendment requires that within 6 months of the date of enactment, all new border crossing ID cards (which are issued only to aliens) include a biometric identifier, such as a handprint or fingerprint of the alien. The amendment also requires that within 36 months, an alien cannot be admitted to the United States on the basis of such a card unless the biometric identifier on the card matches the appropriate biometric characteristic of the alien. The amendment requires that within a year after implementing the requirement for new ID cards, the Attorney General shall report to Congress on the impact of issuing the new cards on border crossing activities.

*Sec. 105.—Civil penalties for illegal entry*

This section amends section 275 by redesignating subsections (b) and (c) and inserting a new subsection (b). The new subsection provides that an alien apprehended while entering or attempting to enter the U.S. illegally shall be subject to a civil penalty of not less than $50 nor more than $250. The penalties shall be doubled in the case of an alien previously subject to such penalties.

*Sec. 106.—Prosecution of aliens repeatedly re-entering the united states unlawfully*

This section authorizes the appropriations of such sums as may be necessary to provide for detention and prosecution of any alien who has illegally reentered the U.S. if the alien has illegally reentered the U.S. on two previous occasions. This section also states the sense of Congress that the Attorney General use available resources to detain and prosecute such aliens.

*Sec. 107.—Inservice training for the border patrol*

This section amends section 103 of the INA by adding a new subparagraph (e), to provide for programs that would train Border Patrol agents to ensure and safeguard the constitutional and civil rights, personal safety, and human dignity of aliens and citizens with whom they come into contact. The annual report of the INS shall include a description of the steps taken to carry out this provision.

SUBTITLE B—PILOT PROGRAMS.

*Sec. 111.—Pilot program on interior repatriation*

This section requires the Attorney General, after consultation with the Secretary of State, to establish a pilot program for up to 2 years to deter multiple illegal entries into the U.S., which may include interior repatriation, third country repatriation, and other disincentives to multiple unlawful entries. Not later than 30 months after the date of enactment, the Attorney General and Sec-

---

[121] Unless otherwise specified, all references to existing statutes are to sections of the Immigration and Nationality Act.

221

retary of State shall report on the pilot program, including whether the program or any part should be extended or made permanent.

*Sec. 112.—Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens*

This section requires the Attorney General and the Secretary of Defense to establish a pilot program for up to 2 years to determine the feasibility of using military bases closed because of a base closure law as detention centers for the Immigration and Naturalization Service. The Attorney General and the Secretary of State are to submit a report not later than 30 months after the date of enactment to the Committees on the Judiciary and the Committees on Armed Services of the House of Representatives and the Senate.

*Sec. 113.—Pilot program to collect records of departing passengers*

This section requires the Commissioner of the INS, within 180 days after the date of enactment, to establish a pilot program in which INS officers would collect a record of departure for every alien departing the U.S. and match the record of departure with the record of the alien's arrival in the U.S. The program shall be operated in not less than 3 of the 5 air ports of entry with the heaviest volume of arriving international air traffic. Instances of visa overstay identified through the pilot program shall be included in INS and Department of State databases. Not later than 2 years after the pilot program is implemented, the Commissioner shall submit a report on the number of departure records collected and other statistics, the estimated cost of establishing a national system to verify the departure from the U.S. of aliens admitted as nonimmigrants, and specific recommendations for the establishment of such a system.

Subtitle C—Interior Enforcement

*Sec. 121.—Increase in personnel for interior enforcement*

This section authorizes the appropriation of funds to increase the number of investigators and other enforcement personnel deployed in the interior of the United States to a level adequate to properly investigate violations of and enforce immigration law. It is the intent of this section to include among interior enforcement personnel inspectors at United States airports, as well as INS investigators and detention and deportation officers.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

This subtitle includes provisions in several immigration reform bills introduced in the 103rd Congress and the 104th Congress, and in the immigration reform legislation submitted by the Clinton Administration in May 1995.

222

*Sec. 201—Wiretap authority for alien smuggling investigations*

This section amends 18 U.S.C. 2516(1) to give INS the authority under that section to use wiretaps in investigations of alien smuggling and document fraud violations under section 1028 (production of false identification documents), 1541 (unauthorized issuance of passports), 1542 (false statements in passport applications), 1546 (fraud and misuse of visas, permits, and other documents) of title 18, or sections 274, 277, or 278 of the INA (smuggling of aliens).

*Sec. 202—Racketeering offenses relating to alien smuggling*

This section amends 18 U.S.C. 1961(1) to include as racketeering offenses acts indictable under: section 1028 (fraud and related activity in connection with identification documents), section 1542 (false statement in application and use of passport), 1543 (forgery and false use of passport), 1544 (misuse of passport), 1546 (fraud and misuse of visas, permits, and other documents), and 1581-1588 (peonage and slavery), and sections 274, 277, and 278 of the INA (alien smuggling and related offenses).

*Sec. 203—Increased criminal penalties for alien smuggling*

Subsection (a) amends section 274(a)(1)(B)(i) to provide that any person who violates the prohibitions in 274(a)(1)(A)(ii)-(iv) against transporting, harboring, or inducing an illegal alien to come to the U.S. may be imprisoned for up to 10 years if the offense was committed for purposes of commercial advantage or private financial gain.

Subsection (a) also adds a new subparagraph (C) to section 274(a)(1), providing that a person who engages in a conspiracy to commit or aids and abets in the commission of offenses under section 274(a)(1)(A) shall be fined and imprisoned for up to 10 years (alien smuggling) or up to 5 years (transportation, harboring, inducement).

Subsection (b) amends section 274(a)(2)(B) (bringing into the U.S. an alien not authorized to enter) by adding a new clause (iv) to make it an aggravating factor if the offense is committed with the intent or reason to believe that the alien will commit a crime punishable by imprisonment for more than one year. This subsection also amends this subparagraph to provide that if any of the aggravating factors are present, the violator shall be fined under title 18 and imprisoned for not less than 3 years nor more than 10 years.

Subsection (c) amends section 274(a)(2) to provide that the punishments for unlawfully bringing an alien to the U.S. shall apply to each alien with respect to whom a violation occurs, replacing the current provision that the punishments shall apply to "each transaction," regardless of the number of aliens involved.

*Sec. 204—Increased number of assistant United States Attorneys*

This section provides that the number of Assistant U.S. Attorneys shall be increased in fiscal years 1996 by 25, and that such new Assistant U.S. Attorneys shall prosecute persons involved in smuggling or harboring of illegal aliens, or other crimes involving illegal aliens.

223

*Sec. 205—Undercover investigation authority*

This section amends title II of the INA to add a new section 294, providing authority for the INS to use appropriated funds for the establishment and operation of undercover proprietary corporations or business entities.

Subtitle B—Deterrence of Document Fraud

*Sec. 211—Increased criminal penalties for fraudulent use of Government-issued documents*

Subsection (a) amends 18 U.S.C. 1028(b)(1), relating to fraud and misuse of government-issued identification documents, to increase the maximum term of imprisonment from 5 to 15 years. The sentence is increased 20 years if the offense is committed to facilitate a drug-trafficking crime, and to 25 years if committed to facilitate an act of international terrorism.

Subsection (b) directs the Sentencing Commission promptly to increase the basic offense levels for document fraud offenses under sections 1028(a) and 1546(a) of title 18: offense level 15 if the offense involved 100 or more documents; level 20 if the offense involved 1,000 or more documents or was done to facilitate a drug offense or aggravated felony, and level 25 if done to provide documents to persons engaged in terrorist activity or racketeering enterprises.

*Sec. 212.—New civil penalties for document fraud*

Subsection (a) amends section 274C(a) by adding a new paragraph (5) to make it unlawful for any person knowingly or in reckless disregard of the fact that the information is false or does not relate to the applicant, to prepare, file, or assist another person in preparing or filing, documents which are falsely made for the purpose of satisfying a requirement of the INA. "Falsely made" shall include a document submitted with knowledge or reckless disregard of the fact that the document contains a false, fictitious, fraudulent statement or material misrepresentation, has no basis in law or fact, or fails to state a material fact.

Subsection (b) makes conforming amendments to section 274C(d)(3).

Subsection (c) provides that the amendment shall apply to assistance, preparation, or submission of documents or applications occurring on or after the date of enactment.

*Sec. 213.—New civil penalty for failure to present documents and for preparing immigration documents without authorization*

Subsection (a) amends section 274C(a) by adding a new paragraph (6) to apply civil penalties against an alien who presents upon boarding a common carrier a document relating to the alien's eligibility to be admitted to the United States and then fails to present the document upon arrival. The Attorney General may waive these penalties if the alien is subsequently granted asylum. Subsection (a) also adds a new paragraph (7) to apply civil penalties against any person who prepares or assists in preparing immigration forms, petitions, and applications who is not authorized

224

to represent aliens or to assist in the preparation and submission of such forms.

Subsection (b) provides that these amendments shall apply to individuals who board a common carrier on or after 30 days after enactment.

*Sec. 214. New criminal penalties for failure to disclose role as preparer of false application for asylum and for preparing certain post-conviction applications*

This section amends section 274C of the INA by adding a new subsection (e), providing that a person who fails to disclose or conceals his role in preparing, for fee or other remuneration, a false application for asylum shall be imprisoned for not less than 2 years nor more than 5 years and also shall be prohibited from preparing, whether or not for fee or other remuneration, any other such application for at least 5 years and not more that 15 years. A person convicted under this section who later prepares or assists in preparing an application for asylum, regardless of whether for a fee or other remuneration, is subject to imprisonment of not less than 5 nor more than 15 years and is prohibited from preparing any other such application.

*Sec. 215.—Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact*

This section amends 18 U.S.C. 1546(a) to provide that the penalty for knowingly presenting a document which contains a false statement also extends to a document which fails to contain any reasonable basis in law or fact.

*Sec. 216.—Criminal penalties for false claim to citizenship*

This section amends 18 U.S.C. 1015 by adding new subparagraphs (e) and (f). New subparagraph (e) provides for criminal penalties against any person who makes a false claim to United States citizenship or nationality for the purpose of obtaining, for himself or any other person, any Federal benefit or service or employment in the United States. New subsection (f) provides for criminal penalties against any person who makes a false claim to United States citizenship in order to vote or register to vote in any Federal, State, or local election, including an initiative, recall, or referendum.

Subtitle C—Asset Forfeiture for Passport and Visa Offenses

*Sec. 221.—Criminal forfeiture for passport and visa related offenses*

This section amends 18 U.S.C. 982(a) by adding a new paragraph (6), providing that a person who is convicted of a violation of or of a conspiracy to violate sections 1541, 1542, 1543, 1544, or 1546 of title 18, or section 1028 of title 18 if committed in connection with passport or visa issuance or use, shall forfeit any property, real or personal, which was used or intended to be used in facilitating the violation, and any property constituting, derived from, or traceable to the proceeds of the violation.

225

*Sec. 222.—Subpoenas for bank records*

This section amends section 986(a) of title 18 to permit the issuance of subpoenas for bank records in investigations of offenses under sections 1028, 1541, 1542, 1543, 1544, and 1546 of title 18.

*Sec. 223. Effective date*

This provides that the amendments made by this subtitle take effect on the first day of the first month that begins more than 90 days after the date of enactment.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

*Sec. 300.—Overview of changes in removal procedures*

This section provides an overview of changes made in the procedures for inspection, exclusion, apprehension, and deportation of aliens under the Immigration and Nationality Act.

*Sec. 301.—Treating persons present in the United States without authorization as not admitted*

Subsection (a) of this section amends section 101(a)(13) of the INA by replacing the definition of "entry" with a definition for "admission" and "admitted": the entry of an alien into the United States after inspection and authorization by an immigration officer. An alien who is paroled under section 212(d)(5) shall not be considered to have been admitted. With certain exceptions (specified below) a returning lawful permanent resident alien (LPR) is not considered to be seeking admission.

*Comment.*—This subsection is intended to replace certain aspects of the current "entry doctrine," under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry. Hence, the pivotal factor in determining an alien's status will be whether or not the alien has been lawfully admitted. Parolees under INA section 212(d)(5), who are not considered to have made an "entry" under current law,[122] will likewise not be considered to have been admitted under this new definition. Finally, this section preserves a portion of the *Fleuti* doctrine[123] by stating that a returning lawful permanent resident shall not be regarded as seeking admission unless the alien has relinquished lawful permanent resident status; has engaged in criminal activity after having left the U.S.; has departed the U.S. while under removal or extradition proceedings; or has been convicted of an aggravated felony, unless since such conviction the alien has been granted relief under new section 240A(a) (cancellation of removal for certain aliens lawfully admitted for permanent residence). However, this section intends

---

[122] See *Leng May Ma* v. *Barber*, 357 U.S. 185 (1958); INA §212(d)(5), 8 U.S.C. §1182(d)(5).
[123] See *Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963) (lawful permanent resident returning from abroad not considered to have made a new "entry" if trip was "innocent, casual, and brief").

226

to overturn certain interpretations of *Fleuti*[124] by stating that a returning lawful permanent resident alien is seeking admission if the alien is attempting to enter or has entered the United States without inspection and authorization by an immigration officer.

Subsection (b) adds a new paragraph (9) to subsection 212(a) (grounds of inadmissibility). The new paragraph states in subparagraph (A) that an alien who is present in the U.S. without being admitted or paroled, or who has arrived in the U.S. at any time or place other than as designated by the Attorney General, is inadmissible. Subparagraph (B) provides that the grounds of inadmissibility shall not apply if: (I) the alien qualifies for immigrant status as the spouse or child of a United States citizen or lawful permanent resident; (II) the alien or the alien's child has been battered or subject to extreme cruelty; and (III) there was a substantial connection between the cruelty or battery and the alien's unlawful entry into the United States. As a matter of transition, the requirements under (II) and (III) shall not apply if the alien establishes that he or she first entered the United States prior to the effective date of Title III of this legislation, as set forth in section 309(a).

*Comment.*—This subsection will conform the grounds of inadmissibility under section 212(a) with the new doctrine of "admission" established in section 301(a) of the bill. Currently, aliens who have entered without inspection are deportable under section 241(a)(1)(B). Under the new "admission" doctrine, such aliens will not be considered to have been admitted, and thus, must be subject to a ground of inadmissibility, rather than a ground of deportation, based on their presence without admission. (Deportation grounds will be reserved for aliens who have been admitted to the United States.)

The exception in subparagraph (B) will ensure that this new ground of inadmissibility does not apply to certain battered or abused alien spouses and children, where the alien's illegal entry is substantially connected to the battery or abuse. The exception will apply to alien spouses and children who, due to the amendments to section 204(a)(1)(A) made by section 40701 of the Violent Crime Control and Law Enforcement Act of 1994, are eligible to petition for immigrant visas because they have been battered or subject to extreme cruelty as defined in that section, and who have been battered or subject to extreme cruelty as defined in subparagraph (B) if the alien's unlawful entry was substantially connected to such battery or cruelty.

The transition provision will ensure that aliens who were granted self-petition rights under section 40701 of VCCLEA and who were first present in the U.S. prior to the effective date of this title need meet no other criteria in order to be exempted from this new ground of inadmissibility.

Subsection (c) revises paragraph (6) of section 212(a) (inadmissibility for aliens previously removed from the United States). Current paragraph (6)(A) imposes a 1-year bar to admission for an alien ordered excluded and deported from the United States, and current paragraph (6)(B) imposes a 5-year bar to admission for an

---

[124]See, e.g., Matter of Romero, (BIA, Dec. 19, 1990).

227

alien deported from the United States, except in the case of an alien convicted of an aggravated felony, in which case the bar is for 20 years. Revised paragraph (6)(A)(i) provides that an alien ordered removed under revised section 235(b)(1), or at the end of proceedings under new section 240 that were initiated upon the alien's arrival in the United States, is inadmissible for a period of 5 years. Revised paragraph (6)(A)(ii) provides that an alien otherwise ordered removed from the United States shall be barred from admission for 10 years (or permanently in the case of an alien convicted of an aggravated felony). These bars to readmission can be waived (as in current law) if the Attorney General has given prior consent to the alien's reapplying for admission.

Revised paragraph (6)(B) provides that an alien unlawfully present in the United States for an aggregate period totalling 1 year is inadmissible unless the alien has remained outside of the United States for 10 years. No period of time in which the alien was present in the United States as a minor under the age of 18, as a bona fide applicant for asylum under section 208, as an alien authorized to be employed in the United States, or as a beneficiary of family unity protection, shall count towards the aggregate 1-year period. This bar shall not apply to an alien described in new section 212(a)(9)(B) (battered spouse or child). An alien may be granted a 3-month extension if the alien applies for such extension prior to the expiration of the 1-year period and the failure to extend the period would constitute extreme hardship to the alien. The Attorney General may waive this ground of inadmissibility if the Attorney General determines that admission of the alien would substantially benefit a specifically defined national interest or, in the case of an alien who is the spouse, parent, or child of a United States citizen of lawful permanent resident, for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

Subsection (d) revises section 212(i) to provide that the ground of inadmissibility under section 212(a)(6)(C) (fraud and misrepresentation) may be waived in the case of a spouse, son, or daughter of a United States citizen or, in the case of a spouse, son, or daughter of a lawful permanent resident, if the refusal of admission would result in extreme hardship to the lawfully resident spouse or parent.

*Comment.*—The intent of this amendment is to strengthen penalties against immigration fraud by making waiver of this ground of inadmissibility available only to members of nuclear families, and to apply an extreme hardship requirement in the case of family members of lawful permanent residents.

Subsection (e) amends redesignated section 212(a)(10) by adding a new subparagraph (D), making inadmissible any alien who had previously renounced United States citizenship for the purpose of avoiding taxation.

Subsection (f)(1) amends section 212(a)(1)(A) by adding a new clause (ii), making inadmissible any alien who seeks immigration as an immigrant who does not present evidence of vaccination against mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations recommended by the Advisory Committee for Immunization Practices.

228

Subsection (f)(2) amends section 212(g) to make conforming amendments and to add a new paragraph (3), providing that the new exclusion ground related to vaccinations may be waived if the alien receives the required vaccination or if a civil surgeon or similar official designated in 42 CFR 34.2 certifies that the vaccination would not be medically appropriate.

The foregoing amendments shall apply to applicants for immigrant visas or adjustment of status filed after September 30, 1996. The Committee anticipates that the INS and the State Department will provide notification to persons seeking admission to the U.S. of the need to obtain the required vaccinations.

Subsection (g) conforms references in section 241(a) (grounds of deportability) to reflect the change in nomenclature in section 212(a) from "excludable" to "inadmissible." Subparagraph (B) of paragraph 241(a)(1) (entry without inspection) will be amended to state that an alien present in the United States in violation of law is deportable. The current category of persons who are deportable because they have made an entry without inspection will, under subsection (c) of this section, be considered inadmissible under new paragraph (9) of subsection 212(a).

*Sec. 302.—Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235)*

This section will amend section 235 of the INA, regarding the inspection of aliens arriving in the U.S.

*Applicants for admission.*—New section 235(a) provides that an alien present in the United States who has not been admitted to the U.S. (see Section 301(a) of this bill), who arrives at the United States, whether or not at a designated port of arrival, or who is brought to the United States after having been interdicted in international or United States waters, shall be deemed an applicant for admission.

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. A stowaway shall not be eligible to apply for asylum in the United States unless the stowaway establishes a credible fear of persecution pursuant to the expedited review process in section 235(b)(1).

Aliens seeking admission, readmission, or transit through the United States shall be inspected by an immigration officer, who shall have the same authority to take statements and receive evidence as under current section 235 of the INA. An alien applying for admission may, at the discretion of the Attorney General, be permitted to withdraw the application for admission and depart immediately from the United States.

New section 235(b) establishes new procedures for the inspection and in some cases removal of aliens arriving in the United States.

*Expedited removal of arriving aliens.*—New paragraph (b)(1) provides that if an examining immigration officer determines that an alien is inadmissible under section 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents), the officer may order the alien removed without further hearing or review, unless the alien states a fear of persecution or a desire to apply for asylum.

229

An alien who states a fear of persecution or a wish to apply for asylum shall be referred for interview by an asylum officer, who is an immigration officer who has had professional training in asylum law, country conditions, and interview techniques. If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum. If the alien does not meet this standard, and the officer's decision is upheld by a supervisory asylum officer, the alien will be ordered removed. An alien may consult with a person of his or her choosing before the interview, at no expense to the Government and without delaying the interview. A "credible fear of persecution" means that it is more probable than not that the alien is telling the truth and the alien has a reasonable possibility of establishing eligibility for asylum.

There is no administrative review of a removal order entered into under this paragraph, but an alien claiming under penalty of perjury to be lawfully admitted for permanent residence shall be entitled to administrative review of such an order. An alien ordered removed under this paragraph may not make a collateral attack against the order in a prosecution under section 275(a) (illegal entry) or 276 (illegal reentry).

*Inspection of other arriving aliens.*—New paragraph (b)(2) provides that an alien determined to be inadmissible by an immigration officer (other than an alien subject to removal under paragraph (b)(1), or an alien crewman or stowaway) shall be referred for a hearing before an immigration judge under new section 240.

*Aliens inadmissible on national security grounds.*—Subsection (c) restates the provisions of current section 235(c) regarding the removal of aliens arriving in the United States who are inadmissible on national security grounds. This subsection is not intended to apply in the case of aliens who are inadmissible under new section 212(a)(9) because they are already present in the United States. Such aliens could be subject to the special removal procedures provided in Subtitle B of this Title.

*Authority of officers.*—New subsection (d) restates provisions currently in section 235(a) authorizing immigration officers to search conveyances, administer oaths, and receive evidence, and to issue subpoenas enforceable in a United States district court.

*Sec. 303—Apprehension and detention of aliens not lawfully in the United States (revised section 236)*

Subsection (a) of this section will amend section 236 of the INA to include provisions currently contained in sections 236 and 242. Subsection (b) authorizes an increase in INS detention facilities to 9,000 beds by FY 1997.

*Section 236.*—Section 236(a) restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States. (The current authority in section 242(a) for a court in habeas corpus proceedings to review the conditions of detention or release pending the determination of the alien's inadmissibility or deportability is not retained.) The minimum bond for an alien released pending removal proceedings is raised from $500 to $1500.

230

New section 236(b) restates the current provisions in section 242(a)(1) that the Attorney General may at any time revoke an alien's bond or parole.

New section 236(c) restates the current provisions in section 236(e) and 242(a)(2) regarding the detention of an alien convicted of an aggravated felony, and adds an additional provision enabling the release of such an alien if the Attorney General decides in accordance with 18 U.S.C. 3521 that release is necessary to provide protection to a witness, potential witness, a person cooperating with an investigation into major criminal activity, or a family member or close associate of such a witness or cooperator.

New section 236(d) restates the current provisions in section 242(a)(3) regarding the identification of aliens convicted of aggravated felonies and amends those provisions to require that information be provided to the Department of State for inclusion in its automated visa lookout system.

*Sec. 304—Removal proceedings; cancellation of removal and adjustment of status; Voluntary departure (revised and new sec. 239 to 240C)*

Subsection (a) of this section redesignates current section 239 (designation of ports of entry for aliens arriving by civil aircraft) as section 234, redesignates section 240 (records of admission) as section 240C, and inserts new sections 239, 240, 240A, and 240B. Subsection (b) of this section repeals section 212(c) of the INA.

*Section 239.*—New section 239 ("*Initiation of removal proceedings*") restates the provisions of current subsections (a) and (b) of section 242B regarding the provision of notice ("Notice to Appear") to aliens placed in removal proceedings. These provisions are conformed to the establishment of a single removal hearing to replace the proceedings under current section 236 (exclusion) and 242 (deportation). The requirement that the Notice to Appear (formerly "Order to Show Cause") be provided in Spanish as well as English is not retained. The mandatory period between notice and date of hearing is reduced to 10 days. Service is sufficient if there is proof of mailing to the last address provided by the alien.

*Section 240.*—New section 240 ("Removal Proceedings") restates provisions in current section 236 (exclusion proceedings) and 242 and 242B (deportation proceedings).

Section 240(a) provides that there shall be a single proceeding for deciding whether an alien is inadmissible under section 212(a) or deportable under section 237 (formerly section 241(a)). This subsection shall not affect proceedings under new section 235(c) (aliens inadmissible on national security grounds), new section 238 (currently section 242A) (aliens convicted of aggravated felonies), or new section 235(b)(1) (arriving aliens inadmissible for fraud or lack of documents).

Section 240(b) provides that the removal proceeding under this section shall be conducted by an immigration judge in largely the same manner as currently provided in sections 242 and 242B. Under paragraph (b)(2), the proceeding may take place in person, through video conference, or, with the consent of the alien in hearings on the merits, through telephone conference. Under paragraph (b)(5), an alien who fails to appear for a hearing may be ordered

231

removed if the Service establishes by clear, unequivocal, and convincing evidence that notice under section 239 was provided and the alien is inadmissible or deportable. There is no requirement to provide written notice if the alien has failed to provide the address required under section 239(a)(1)(F). An in absentia order can only be rescinded through a motion to reopen filed within 180 days if the alien demonstrates that the failure to appear was due to exceptional circumstances (as defined in section 240(e)), or a motion to reopen filed at any other time if the alien demonstrates that the alien either did not receive notice of the hearing or was in Federal or State custody and could not appear. An alien who fails to appear shall be ineligible for any relief under new sections 240A (voluntary departure) and 240B (cancellation of removal), and sections 245, 248, and 249.

Section 240(c) provides that the immigration judge shall make a decision on removability based only upon the evidence at the hearing. An alien applicant for admission shall have the burden to establish that he or she is beyond doubt entitled to be admitted. An alien who is not an applicant for admission shall have the burden to establish by clear and convincing evidence that he or she is lawfully present in the U.S. pursuant to a prior lawful admission. In the case of an alien who has been admitted to the U.S., the Service has the burden to establish by clear and convincing evidence that the alien is deportable.

An alien is limited to one motion to reconsider the decision of the immigration judge. Such motion shall be filed within 30 days of the final administrative order of removal and shall specify the errors of law or fact in the order. An alien is limited to one motion to reopen proceedings. Such motion shall be filed within 90 days of the final administrative order of removal and shall state the new facts to be proven at a hearing if the motion is granted. The deadline for a motion to reopen may be extended in the case of an application for asylum or withholding of removal that is based on new evidence of changed country conditions that was not available at the time of the initial hearing. The deadline also may be extended in the case of an in absentia order of removal if filed within 180 days and establishing that the alien's failure to appear was because of exceptional circumstances beyond the control of the alien (as defined in section 240(e)) or because the alien did not receive the notice required under section 239(a).

Section 240(d) provides that the Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien and the INS. Such an order shall be a conclusive determination of the alien's removability from the U.S.

Section 240(e) defines as "exceptional circumstances" the serious illness of the alien or the serious illness or death of the spouse, parent, or child of the alien, but not including less compelling circumstances. The subsection defines "removable" to mean that an alien who has not been admitted is inadmissible under section 212 and that an alien who has been admitted is deportable under section 237.

*Section 240A.*—New section 240A ("*Cancellation of removal; adjustment of status*") establishes revised rules for the type of relief

232

that is currently available to excludable and deportable aliens under section 212(c) and 244(a)–(d).

Section 240A(a) provides that the Attorney General may cancel removal in the case of an alien lawfully admitted for permanent residence for not less than 5 years if the alien has resided in the United States continuously for 7 years since being lawfully admitted in any status and has not been convicted of an aggravated felony or felonies the aggregate sentence for which is at least 5 years. This provision is intended to replace and modify the form of relief now granted under section 212(c) of the INA.

Section 240A(b)(1) provides that the Attorney General may cancel removal in the case of an alien who has been physically present in the United States for a continuous period of at least 7 years immediately preceding the date of applying for such relief, has been a person of good moral character, has not been convicted of an aggravated felony, and establishes that removal would result in extreme hardship to the alien or to the alien's spouse, parent, or child who is a citizen of the United States or an alien lawfully admitted for permanent residence. This provision is intended to replace and modify the relief of suspension of deportation now granted under section 244(a).

Section 240A(b)(2) restates the provisions in current section 244(a)(3), enacted in section 40703(a)(3) of the Violent Crime Control and Law Enforcement Act of 1994. It provides that the Attorney General may cancel removal if the inadmissible or deportable alien has been subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident, has been physically present in the United States for a continuous period of at least 3 years, has been a person of good moral character during such period, is not deportable or inadmissible on grounds related to criminal activity, national security, or marriage fraud, and establishes that removal would result in severe hardship.

Section 240A(b)(3) states that the Attorney General may adjust to the status of an alien lawfully admitted for permanent residence an alien who meets the requirements for cancellation of removal. The number of such adjustments shall not exceed 4,000 in any fiscal year.

Subsection 240A(c) provides that the following categories of aliens shall not be eligible for cancellation of removal under subsections (a) and (b)(1): an alien who entered as a crewman after June 30, 1964; an alien who was admitted as a nonimmigrant exchange alien under 101(a)(15)(J); an alien who was admitted as a nonimmigrant exchange alien under section 101(a)(15)(J), is subject to the two-year foreign residence requirement of section 212(e), and has not fulfilled that requirement or received a waiver; or an alien who is inadmissible under section 212(a)(3) or deportable under section 237(a)(4)(D) (national security and related grounds).

Subsection 240A(d) provides that the period of continuous residence or physical presence ends when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240). A period of continuous physical presence is broken if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless for

233

emergent reasons the return could not be accomplished in that time. The continuous physical presence requirement does not apply to an alien who has served 24 months in active-duty status in the United States armed forces, was in the United States at the time of enlistment or induction, and was honorably discharged.

*Section 240B.*—New section 240B ("*Voluntary departure*") establishes new conditions for the granting of voluntary departure, currently governed by section 242(b) and 244(e) of the INA.

Section 240B(a) provides that the Attorney General may permit an alien voluntarily to depart the United States at the alien's expense in lieu of being subject to removal proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable because of conviction for an aggravated felony or on national security and related grounds. Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days and an alien may be required to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the U.S. within the time specified. No alien arriving in the United States for whom removal proceedings under section 240 are instituted at the time of arrival is eligible for voluntary departure under this section. Such an alien may withdraw his or her application for admission to the United States in accordance with section 235(a)(4).

Section 240B(b) provides that the Attorney General may permit an alien voluntarily to depart the United States at the conclusion of proceedings under section 240 if the alien has been physically present for at least one year in the United States, the alien has been a person of good moral character for the preceding 5 years, the alien is not deportable because of conviction for an aggravated felony or on national security and related grounds, and the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so. The period for voluntary departure cannot exceed 60 days and a voluntary departure bond is required.

Section 240B(c) provides that an alien is not eligible for voluntary departure if the alien was previously granted voluntary departure after having been found inadmissible under section 212(a)(9) (present without admission).

Section 240B(d) provides that if an alien is permitted to depart voluntarily and fails to do so, the alien shall be subject to a civil penalty of not less than $1,000 nor more than $5,000 and shall not be eligible for any further relief under this section or sections 240A, 245, 248, or 249 for a period of 10 years.

Section 240B(e) provides that the Attorney General may by regulation limit eligibility for voluntary departure for any class or classes of aliens.

Section 240B(f) provides that an alien may appeal from a denial of an order of voluntary departure but shall be removable from the U.S. 60 days after the entry of the order of removal and may prosecute the appeal from abroad.

234

*Sec. 305—Detention and removal of aliens ordered removed (new section 241)*

Subsection (a) of this section strikes section 237, redesignates section 241 as section 237, and inserts a new section 241.

*Section 241*—New section 241 ("*Detention and removal of aliens ordered removed*") restates and revises provisions in current sections 237, 242, and 243 regarding the detention and removal of aliens.

Section 241(a) provides that the Attorney General shall remove an alien within 90 days of the alien being ordered removed. This removal period shall begin when the alien's order is administratively final, when the alien is released from non-immigration related detention or confinement, or, if the alien has appealed his order to a court and removal has been stayed, the date of the court's final order. The removal period is extended beyond 90 days if the alien wilfully refuses to apply for travel documents or takes other steps (other than appeals) to prevent removal.

The alien shall be detained during the removal period. If space is not available, the Attorney General may release the alien on bond and under any conditions that the Attorney General may prescribe. If the alien is not removed within 90 days, the alien shall be subject to supervision under conditions similar to those currently in section 242(d). An inadmissible alien who has been ordered removed may be detained beyond the 90-day period. The Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released, but parole, supervised release, probation, or the possibility of arrest are not grounds to defer removal.

If an alien reenters the United States illegally after having been removed or departed voluntarily under an order of removal, the prior order of removal is reinstated and the alien shall be removed under the prior order, which shall not be subject to review.

An alien who is subject to an order of removal may not be granted authorization to work in the United States unless there is no country willing to accept the alien, or the alien cannot be removed for reasons deemed strictly in the public interest.

Section 241(b) establishes the countries to which an alien may be removed. Subsection (b)(1) restates the provisions in current section 237(a); subsection (b)(2) restates the provisions in current sections 243 (a) and (b).

Section 241(c) provides that an alien arriving in the United States who is ordered removed shall be removed immediately by the vessel or aircraft that brought the alien, unless it is impracticable to do so or the alien is a stowaway who has been ordered removed by operation of section 235(b)(1) but has a pending application for asylum. This subsection also restates and revises the provisions in section 237(d) regarding stay of removal, and the provisions in section 237(a) regarding cost of detention and maintenance pending removal. These provisions make it clear that actual physical detention of an alien who has been permitted to land in the United States shall be the sole responsibility of the Attorney General and shall take place in INS facilities or contract facilities, even in cases where the liability for cost of detention is assigned to a private entity such as a carrier. The Committee further believes the

235

rate of reimbursement charged to the carrier to other entity made responsible for the cost of detention of an alien shall be at the same per diem rate charged to the government for the cost of detention.

In the case of an alien stowaway, the carrier shall be liable for the cost of detention incurred by the Attorney General. If the stowaway does not claim asylum, the only issue is to arrange for the stowaway's departure from the United States. This could occur directly on the vessel of arrival, particularly in the case of aircraft. However, the Committee understands that, due to commercial requirements, safety concerns, and other factors, it is often not practicable for the stowaway to be removed on the vessel of arrival, particularly in the case of commercial maritime vessels. For this reason, section 241(d)(2)(B) provides that an alien stowaway may be allowed to land in the United States for detention by the Attorney General or departure or removal of the stowaway. In such a case, the carrier shall be responsible, under section 241(c)(3)(A)(ii)(II), for the cost of detention by the Attorney General for the time reasonably necessary to arrange for repatriation or removal of the alien, including obtaining necessary travel documents. The carrier's liability shall not extend beyond the date on which it is ascertained that such travel documents cannot be obtained. The Committee expects that the carrier and the INS will work cooperatively in order to obtain such travel documents in an expeditious manner, but understands that there are circumstances in which foreign governments do not cooperate in issuing such documents. Since circumstances in such cases vary, the Committee has not designated a time period beyond which the financial responsibility for continued detention shifts from the carrier to the INS. The Committee expects that the INS, through regulations or internal policy guidance, will set a reasonable timeline and other criteria that will be applied uniformly in all INS districts. Such guidelines should include an obligation on the part of the carrier to continue efforts to obtain travel documents and make other arrangements for the departure of the stowaway from the U.S.

In the case of a stowaway who has claimed asylum and is being detained to pursue an application for asylum, the carrier shall be liable, under section 241(c)(3)(A)(ii)(III), for a period not to exceed 15 business days, excluding Saturdays, Sundays, and holidays. The 15-day period shall begin when the alien is determined, under section 235(b)(1), to have a credible fear of persecution and thus be eligible to apply for asylum, but not later than 72 hours after the actual arrival of the stowaway in the U.S. The 72-hour period is intended to provide adequate time for the Attorney General to determine if the stowaway has a credible fear of persecution and thus may be detained by the INS to pursue an asylum application. Under no circumstances shall the carrier be required to reimburse the INS for a period of detention greater than 15 business days, plus the portion of the initial 72-hour period required to determine if the stowaway is eligible to apply for asylum. The Committee believes that the obligation of the carrier to pay for detention costs shall not be extended to require the carrier to pay for the cost of translators, legal counsel, or other assistance in preparing and presenting the stowaway's claim for asylum. The Committee expects that the INS will adopt, through regulations consistent with the

236

provisions of this legislation, clear policy guidance regarding the conduct of interviews to determine if a stowaway has a credible fear of persecution.

Section 241(d) restates the provisions in current section 237(b) requiring the owner of the vessel or aircraft bringing an alien to the United States to comply with orders of an immigration officer regarding the detention or removal of the alien. This subsection also restates the provisions in section 243(e) that any carrier (not limited to the carrier who has brought an alien) comply with an order of the Attorney General to remove to a specific destination an alien who has been ordered removed.

Section 241(d) also revises and restates the requirements in section 273(d) regarding permission for a stowaway to land in the U.S. A carrier who has brought a stowaway shall, pending completion of the inspection of the stowaway, detain the stowaway on board the vessel or at another place designated by the INS. The carrier may not permit the stowaway to land except temporarily for medical treatment, for detention of the stowaway by the Attorney General, or for departure and removal of the stowaway. However, a carrier shall not be required to detain a stowaway who has been permitted to remain in the U.S. to pursue an application for asylum, who shall be detained by the Attorney General subject to the reimbursement requirements set forth in section 241(c). Furthermore, the Attorney General shall grant a timely request by a carrier to remove the stowaway on a vessel other than that on which the alien has arrived in the U.S., provided that the carrier pays the cost of removal and obtains all necessary travel documents. In this way, the stowaway can be rapidly repatriated to the country of origin, instead of being forced to remain on the vessel while it makes other ports of call.

Section 241(e) restates the provisions in current sections 237(c) and 243(c) regarding the payment of expenses for removal of aliens who have been ordered removed.

Section 241(f) restates the provisions in section 243(f) regarding the employment of persons to assist in the removal of aliens requiring personal care during removal.

Section 241(g) amends and restates the authority in current section 242(c) for construction and operation of detention facilities. The amendment states that before the construction of new facilities, the Commissioner of the INS shall consider the availability for purchase or lease of existing facilities.

Section 241(h) provides that nothing in section 241 shall be construed to create any substantive or procedural right or benefit that is legally enforceable against the United States, its agencies or officers, or any other person. This provision is intended, among other things, to prohibit the litigation of claims by aliens who have been ordered removed from the U.S. that they be removed at a particular time or to a particular place.

Subsection (b) of section 305 amends redesignated section 241(h) (reimbursement to States for incarceration of undocumented criminal alien felons—currently section 242(j)). The amendment provides that "incarceration" shall include imprisonment in a State or local facility that is counted towards completion of a sentence and also the imprisonment of a previously convicted felon or misdemeanant

237

who has been rearrested on new charges. The amendment also will permit reimbursement in the case of an alien convicted of two or more misdemeanors.

*Sec. 306—Appeals from orders of removal (new section 242)*

This section amends section 242 to revise and restate the provisions in current section 106, which is repealed.

Section 242(a) provides that a final order of removal, other than an order or removal under section 235(b)(1), is governed by chapter 158 of title 28. This is consistent with current section 106(a). This subsection also provides that no court shall have jurisdiction to review a decision by the Attorney General to invoke section 235(b)(1), the application of such section to individual aliens (including the determination under section 235(b)(1)(B) regarding credible fear of persecution), or procedures and policies to implement section 235(b)(1). Individual determinations under section 235(b)(1) may only be reviewed under new subsection 242(f).

Section 242(b)(1) provides that a petition for review must be filed within 30 days after the final order of removal in the federal court of appeals for the circuit in which the immigration judge completed proceedings. Subsection (b)(3)(B) provides that the filing of a petition stays the removal of the alien unless the alien has been convicted of an aggravated felony or has been ordered removed because alien is inadmissible under section 212, in which case removal is stayed only if specifically ordered by the court.

The remaining paragraphs of subsection (b) revise and restate the provisions in subsections (3) through (8) of current section 106 regarding form, service, decision, treatment of a petitioner's claim that he or she is a national of the United States, consolidation of motions to reopen and reconsider, challenge of validity of orders of removal, and detention and removal of alien petitioners.

Section 242(c) restates the provisions in the second sentence of subsection (c) of current section 106 that a petition for review must state whether a court has upheld the validity of an order of removal, and if so, identifying the court and date and type of proceeding.

Section 242(d) restates the provisions in the first and third sentences of subsection (c) of current section 106 requiring that a petitioner have exhausted administrative remedies and precluding a court from reviewing an order of removal that has been reviewed by another court absent a showing that the prior review was inadequate to address the issues presented in the petition, or that the petition presents new grounds that could not have been presented in the prior proceeding.

Section 242(e) provides that a petition for review from an order of removal under section 238 (expedited procedures for non-resident aliens convicted of an aggravated felony) may address only whether the alien has been correctly identified, has been convicted of an aggravated felony, and has been given the procedures described in section 238(b)(4).

Section 242(f) provides rules for judicial review of orders of removal under section 235(b)(1). No court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief against the operation of section 235(b)(1) (other than that specifi-

238

cally authorized in this subsection), or to certify a class under Rule 23 of the Federal Rules of Civil Procedure. Judicial review is only available in habeas corpus and is limited to whether the petitioner is an alien, whether the petitioner was ordered removed under section 235(b)(1), and whether the petitioner can prove by a preponderance of the evidence that he or she is an alien lawfully admitted for permanent residence. If the court determines that the petitioner was not ordered excluded or is an alien lawfully admitted for permanent residence, the court may order no relief other than to require that the alien be provided a hearing under section 240. The habeas corpus proceeding shall not address whether the alien actually is admissible or entitled to any relief from removal.

Section 242(g) provides that no court other than the Supreme Court shall have jurisdiction or authority to enjoin or restrain the operation of the provisions in chapter 4 of Title II of the INA, as amended by this legislation, other than with respect to the application of the provisions to an individual alien against whom removal proceedings have been initiated.

*Sec. 307. Penalties relating to removal (revised section 243)*

Subsection (a) restates the provisions in current section 242(e) regarding penalties for failure to depart within 90 days of the order of removal.

Subsection (b) restates the provisions in the third and final sentence of current section 242(d) regarding penalties for failure to comply with the terms of release under supervision pursuant to section 241(a)(3) (currently the first two sentences of section 242(d)).

Subsection (c) restates the provisions in the second and third sentences of current section 237(d) and the final clause of current section 243(e) regarding penalties for failure to comply with an order to remove an alien from the U.S., including civil money penalties and limitations on the clearance of vessels.

Subsection (d) revises and restates the provisions in current section 243(g) regarding sanctions against a country that refuses to accept an alien who is a citizen, subject, national, or resident of that country. Under the amendment, the Secretary of State shall order that the issuance of both immigrant and nonimmigrant visas to citizens, nationals, subjects, or nationals of that country be suspended until the country has accepted the alien.

*Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments*

This section makes a series of redesignations and conforming amendments in addition to those made in other sections.

Current section 232 is redesignated as section 232(a).

Current section 234 is redesignated as section 232(b).

Current section 238 is redesignated as section 233.

Current section 240 is redesignated as section 234A.

Current section 242A is redesignated as section 238, with conforming amendments.

Current section 242B is stricken.

Current section 244A is redesignated as section 244.

239

The provisions in current section 237(e) regarding the removal of an arriving alien who is helpless from sickness or mental or physical disorder are restated as a new section 232(c). Section 212(a)(10)(B), the redesignated ground of inadmissibility for an alien who is ordered to accompany such a helpless alien during removal, also is amended to conform to the amendments in new section 232(c).

Section 273(a) is amended by adding a new paragraph (2) to restate the provisions in current section 237(b)(5) prohibiting a carrier from taking any consideration contingent on whether an alien is admitted to or order removed from the U.S.

Section 273(d) is repealed.

*Sec. 309—Effective dates; transition*

Subsection (a) provides that the changes made in this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of enactment.

Subsection (b) provides that the Attorney General shall promulgate regulations to carry out this subtitle at least 1 month before the effective date in subsection (a).

Subsection (c) provides for the transition to new procedures in the case of an alien already in exclusion or deportation proceedings on the effective date. In general, the amendments made by this subtitle shall not apply and the proceedings (including judicial review) shall continue to be conducted without regard to such amendments.

The Attorney General may elect to apply the new procedures in a case in which an evidentiary hearing under current section 236 (exclusion) or sections 242 and 242B (deportation) has not been commenced as of the effective date. The Attorney General shall provide notice of such election to the alien, but the prior notice of hearing and order to show cause served upon the alien shall be effective to retain jurisdiction over the alien.

The Attorney General also may elect, in a case in which there has been no final administrative decision, to terminate proceedings without prejudice to the Attorney General's ability to initiate new proceedings under the amendments made by this subtitle. Determinations in the terminated proceeding shall not be binding in the new proceeding.

This subsection also provides that in the case where a final order of exclusion or deportation is entered on or after the date of enactment and for which a petition for review or for habeas corpus under section 106 has not been filed as of such date, new rules shall apply to subsequent petitions for judicial review. All judicial review, both of exclusion and deportation decisions, shall be by petition for review to the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer (immigration judge) were completed. The petition for review also must be filed not later than 30 days after the final order of exclusion or deportation.

The rules under new section 240A(d)(1) and (2) regarding continuous physical presence in the United States as a criterion for eligibility for cancellation of removal shall apply to any notice to appear

240

(including an Order to Show Cause under current section 242A) issued after the date of enactment of this Act.

Subtitle B—Removal of Alien Terrorists

*Part 1—Removal Procedures for Alien Terrorists*

*Sec. 321—Removal procedures for alien terrorists*

This section amends the INA by adding a new title V, entitled SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS.

Section 501 provides definitions to apply to title V. An "alien terrorist" is an alien deportable under current section 241(a)(4)(B).

Section 502 ("*Establishment of special removal court; panel of attorneys to assist with classified information*")

Sections 502(a) through (c) require the Chief Justice of the Supreme Court to publicly designate 5 district court judges from 5 of the U.S. judicial circuits who shall constitute a special court with jurisdiction to conduct special removal proceedings. The terms of the judges first appointed shall be so staggered that the term of one judge expires each year. The Chief Justice shall designate a chief judge, who shall serve a full five-year term.

Section 502(d) provides that the proceedings shall be conducted in conformance with section 103(c) of the Foreign Intelligence Surveillance Act of 1978.

Section 502(e) provides that the special court shall designate a panel of attorneys each of whom has a security clearance permitting access to classified information and has agreed to represent aliens lawfully admitted for permanent residence with respect to certain classified information used in special removal proceedings under the provisions of section 506(c).

Section 503 ("*Application for initiation of special removal proceeding*") provides that when the Attorney General has classified information that an alien is an alien terrorist, the Attorney General may seek removal through the filing under seal, ex parte and in camera, of a written application with the special court. The application, made under oath or affirmation, shall identify the attorney making the application; indicate the approval of the Attorney General or Deputy Attorney General to the filing of the application based on a finding that the alien is removable under this title; identify the alien for whom special removal proceedings are sought; and a statement of facts to establish that the alien is an alien terrorist, is physically present in the U.S., and that the use of removal procedures under title II would pose a risk to the national security of the U.S. The Attorney General may dismiss a removal action under this title at any time.

Section 504 ("*Consideration of application*") provides that a single judge on the removal court shall consider, ex parte and in camera, the application and other information, including classified information, presented under oath or affirmation. A verbatim record shall be kept of any hearing on the application. The judge shall enter ex parte an order approving the application if there is probable cause to believe that the alien has been correctly identified and is a terrorist, and that adherence to the provisions of title II regarding the removal of aliens would pose a risk to national secu-

241

rity. The judge, in the case of denial, shall prepare a written statement of the reasons therefor.

If an order is issued under this section, the alien's rights regarding removal and expulsion shall be governed exclusively by this title. No other provisions of the Act shall apply, unless otherwise specified in this title.

Section 505 ("*Special removal hearings*") provides that an alien shall be given reasonable of the nature of the charges and of the time and place of the hearing, and a general account of the basis for the charges. The hearing shall be held expeditiously and by the same judge who granted the application for the special removal proceeding under section 504. The hearing shall be open to the public and the alien shall have the right to be represented by counsel. An alien unable to afford counsel shall have counsel assigned, in accordance with section 3006A of title 18. The alien may introduce evidence and, subject to section 506, may examine the evidence and cross-examine any witnesses. A verbatim record shall be kept and the decision shall be based only on the evidence at the hearing.

An alien subject to proceedings under this section shall not be eligible for relief under section 208 (asylum), 243(h) (withholding of deportation), 244(a) (suspension of deportation), 244(e) (voluntary departure), 245 (adjustment of status), and 249 (registry).

The Department of Justice or the alien may request the judge to compel by subpoena the attendance of witnesses and the production of books, papers, documents, or other objects. Such requests may be made ex parte, but the judge may reveal an alien's request to the Department of Justice if the witness or material requested by the alien would reveal evidence or the source of evidence which the Department of Justice has received permission to introduce in camera and ex parte under section 505(e) or section 506.

Section 505(e) provides that classified information shall be introduced in camera and ex parte and that neither the alien nor the public shall be informed of such evidence or its sources other than by reference to a summary of the evidence prepared in accordance with section 506(b). Electronic surveillance information obtained through the Foreign Intelligence Surveillance Act of 1978 shall not be disclosed to the alien. The United States shall retain the right to seek protective orders and assert privileges ordinarily available to the U.S. to protect against the disclosure of classified information, including the military and state secrets privileges. The Federal Rules of Evidence shall not apply to hearings under this title.

At the end of the evidence, argument shall proceed with the Department of Justice opening and having final reply. Argument concerning evidence presented in camera and ex parte shall be heard under like circumstances. The Department has the burden to prove by clear and convincing evidence that the alien is an alien terrorist and thus subject to removal. If this burden is met, the judge shall order the alien detained pending removal and taken into custody if the alien had been released pending the hearing. The judge shall prepare a written order of findings of fact and conclusions of law, but shall not disclose to the public or the alien the source or substance of information received in camera and ex parte.

242

Section 506 ("*Consideration of classified information*") provides that the judge shall consider each item of classified information in camera and ex parte. The Department shall prepare a written summary of such classified information which summary does not pose a risk to the national security. The judge shall approve the summary if the judge finds that the summary is sufficient to inform the alien of the nature of the evidence and to permit the alien to prepare a defense; if the judge finds the summary insufficient, the Department shall have a reasonable opportunity to correct it.

If the summary remains insufficient, the judge shall terminate the proceedings unless the judge finds that the continued presence of the alien or the provision of the summary would cause serious and irreparable harm to the national security or death or serious bodily injury to any person. If the judge makes these findings, the special removal proceeding shall continue, the alien shall be informed that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to section 505(e).

Section 506(c) provides special procedures for cases involving an alien lawfully admitted for permanent residence in which the judge determines that no summary of classified evidence may be provided to the alien. In such cases, the judge shall appoint a special attorney (see section 502(e)) to whom the classified information may be disclosed for purposes of representing the alien in an in camera proceeding on the evidence. The special attorney may not disclose the classified information to the alien or to any other attorney representing the alien, and is subject to a prison term of not less than 10 nor more than 25 years in prison for violating these restrictions.

Section 507 ("*Appeals*") provides that the Department may seek review of a denial of an order to initiate a special removal hearing by filing an appeal within 20 days of the denial with the U.S. Court of Appeals for the D.C. Circuit. Either party may take an interlocutory appeal to the D.C. Circuit concerning evidentiary issues, including issues concerning the preparation and submission of a summary of classified information.

The decision of the judge after the special removal hearing may be appealed by either the alien or the Department to the D.C. Circuit. In the case of an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 506(b)(4) and to whom the procedures under section 506(c) have been applied, there shall be an automatic appeal, unless waived by the alien. To the extent such an appeal concerns classified information, the special attorney appointed for the alien shall represent the alien.

Appeals shall be filed within 20 days. The Court of Appeals shall hear the appeal as expeditiously as possible, and shall issue a decision within 60 days of the judge's final order. After the Court of Appeals decision, a petition for certiorari may be filed by either party to the Supreme Court. An appeal of an order of detention also shall be taken to the D.C. Circuit and shall be adjudicated in accordance with the provisions of sections 3145 through 3148 of title 18 regarding the review and appeal of a release or detention order, penalties for failure to appear or for committing a crime, and sanctions for violation of a release condition.

243

Section 508 ("*Detention and custody*") provides that the Attorney General may take into custody any alien against whom an application under section 503 has been filed to initiate special removal proceedings under this title. An alien lawfully admitted for permanent residence is entitled to a release hearing and may be released if the alien demonstrates that he is not likely to flee and that the release will not endanger national security or the safety of any person. An alien in detention under this title shall be entitled to reasonable opportunity to communicate with members of the alien's family or the alien's attorney, and to have contact with diplomatic officers of the alien's country of nationality.

If the special removal judge denies the order sought for in an application under section 503, the alien shall be released from custody. If the Department seeks review of the denial, the judge shall impose the least restrictive conditions that will reasonable assure the appearance of the alien and that the release will not endanger the safety of any person or the community. If no such conditions exist, the alien shall continue to be detained.

If after the hearing the judge decides that the alien should not be removed, the alien shall be released, unless the Attorney General takes an appeal, in which case the alien shall be detained subject to the conditions in section 3142 of title 18. If after the hearing the judge decides that the alien is to be removed, the alien shall be detained pending judicial review.

An alien ordered removed shall be removed to any country the alien shall designate. If the alien refuses to designate a country, or if removal to the designated country would impair an international obligation or adversely affect U.S. foreign policy, the removal shall be to any country willing to receive the alien. If no country is willing to receive the alien, the alien shall be detained. The Attorney General shall report to the alien's attorney every 6 months regarding efforts to find a country willing to accept the alien. An alien in this situation may be released by the Attorney General under such conditions as the Attorney General may prescribe. The removal of an alien ordered removed under this title may be delayed pending a criminal trial against the alien and the service of any sentence.

This section also amends section 276(b) to provide that an alien terrorist removed under the provisions of this title or under subsection 235(c) who enters or attempts to enter the U.S. without the permission of the Attorney General shall be fined and imprisoned for 10 years.

*Sec. 322—Funding for detention and removal of alien terrorists*

This section authorizes to be appropriated, in addition to amounts already appropriated, $5,000,000 for the purpose of detaining and deporting alien terrorists.

*Part 2—Exclusion and Denial of Asylum for Alien Terrorists*

*Sec. 331—Membership in a terrorist organization as ground of inadmissibility*

This section amends section 212(a)(3)(B) of the INA to provide that an alien who is a representative or member of an organization

244

that engages in or actively supports or advocates terrorist activity is excludable from the U.S.

This section also amends section 212(a)(3)(B) by adding a new clause (iv), defining "terrorist organization" to mean a foreign organization designated in the Federal Register by the Secretary of State, in consultation with the Attorney General, based on a finding that the organization engages in or has engaged in terrorist activity that threatens the national security. Congress shall be notified at least 3 days prior to the published designation and has the authority to remove, by law, any such designation. The designation shall be effective for 2 years and may be renewed not earlier than 60 days prior to its expiration. The Secretary of State, in consultation with the Attorney General, may remove a designation at any time. The designation is subject to judicial review.

This section also adds a new clause (v) to section 212(a)(3)(B), defining "representative" to include an officer, official, or spokesman of the organization and any person who directs, counsels, commands, or induces the organization to engage in terrorist activity. The determination of the Secretary of State or Attorney General that an alien is a representative of a terrorist organization is subject to judicial review.

*Sec. 332—Denial of relief for alien terrorists*

This section amends sections 243(h)(2) (withholding of deportation), 244(a) (suspension of deportation), 244(e)(2) (voluntary departure), 245(c) (adjustment of status), and 249(d) (registry) to provide that an alien who is deportable under section 241(a)(4)(B) is not eligible for these forms of relief.

Subtitle C—Deterring Transportation of Unlawful Aliens to the United States

*Sec. 341—Definition of stowaway*

This section amends section 101 of the INA to add a new paragraph (47), defining "stowaway" to mean any alien who obtains transportation without consent including through concealment. A passenger who boards with a valid ticket is not to be considered a stowaway.

*Comment:*—"Stowaway" is a term that has not previously been defined in the INA. Some passengers who board with valid tickets but destroy those tickets and other travel documents en route have been categorized as stowaways in the past. Current administrative practice limits the "stowaway" designation to passengers who have obtained passage without the consent of the carrier. Ordinarily, this will involve concealment on board the vessel, although it may on rare occasions result from failure to observe secure boarding procedures and allowing an illicit passenger who is plainly visible to obtain transport. This amendment is intended to codify the current administrative practice.

The definition clarifies that the term "stowaway" does not apply to a passenger boarding with a ticket. The Committee is aware of the trend in the airline industry toward so-called "ticketless" travel and does intend that the term "ticket" apply to any boarding pass

245

or other authorization to travel validly obtained through such a "ticketless" system.

*Sec. 342—List of alien and citizen passengers arriving*

This section amends section 231(a) to provide that carriers shall provide electronic manifests of persons arriving in the U.S., and that such lists include for each person transported the person's name, date of birth, gender, citizenship, and travel document number (if applicable). This provision shall be effective not later than 60 days after enactment.

Subtitle D—Additional Provisions.

*Sec. 351—Definition of conviction*

This section amends section 101(a) of the INA to add a new paragraph (47), defining conviction to mean a formal judgment of guilt entered by a court. If adjudication of guilt has been withheld, a judgment is nevertheless considered a conviction if (1) the judge or jury has found the alien guilty or the alien has pleaded guilty or nolo contendere; (2) the judge has imposed some form of punishment or restraint on liberty; and (3) a judgment of guilt may be imposed without further proceedings on guilt or innocence of the original charge if the alien violates the term of probation or otherwise fails to comply with the court's order.

*Sec. 352—Immigration judges and compensation*

Subsection (a) amends paragraph (4) of section 101(b) to replace the definition of "special inquiry officer" with a definition of "immigration judge:" an attorney designated by the Attorney General as an administrative judge within the Executive Order for Immigration Review to conduct proceedings, including proceedings under section 240.

Subsection (b) substitutes the term "immigration judge" for "special inquiry officer" wherever it appears in the INA.

Subsection (c) establishes a four-level pay scale for immigration judges, beginning at 70 percent and reaching 92 percent of the next to highest rate of basic pay for the Senior Executive Service.

*Sec. 353—Rescission of lawful permanent resident status*

This section amends section 246(a) of the INA to clarify that the Attorney General is not required to rescind the lawful permanent resident status of a deportable alien separate and apart from the removal proceeding under section 240.

*Sec. 354—Civil penalties for failure to depart*

This section adds a new section 274D to the INA, providing that aliens under an order of removal who willfully fail to depart or to take actions necessary to permit departure (e.g., apply for travel documents) to a $500 penalty for each day in violation. This section would not diminish the criminal penalties at section 243(a) (for failure to depart) or at any other section of the INA.

246

*Sec. 355—Clarification of district court jurisdiction*

This section clarifies that the grant of jurisdiction under section 279 of the INA is to permit the Government to institute lawsuits for enforcement of provisions of the INA, not for private parties to sue the Government. This has no effect on other statutory or constitutional grounds for private suits against the Government.

*Sec. 356—Use of retired Federal employees for Institutional Hearing Program*

This section permits the hiring of retired military or Federal civilian employees, with no reduction in retirement pay or annuity, for not longer than 24 months to perform duties in connection with the Institutional Hearing Program for removal of criminal aliens from the United States.

*Sec. 357—Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud*

This section instructs the Sentencing Commission to promptly promulgate amendments to the sentencing guidelines to reflect the amendments made in section 130001 and 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

*Sec. 358—Authorization of additional funds for removal of aliens*

This section authorizes to be appropriated beginning in fiscal year 1996 the sum of $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal. This section is intended to authorize sufficient funds in fiscal year 1996 for the hiring of 475 detention and deportation officers and support personnel and 475 investigators and support personnel.

*Sec. 359—Application of additional civil penalties to enforcement*

This section amends section 280(b) to provide for establishment of the "Immigration Enforcement Account," into which shall be deposited the civil penalties collected under sections 240B(d), 274C, 274D, and 275(b), as amended by this bill. The collected funds shall be used for specified immigration enforcement purposes.

*Sec. 360—Prisoner transfer treaties*

This section advises the President to negotiate and renegotiate bilateral prisoner transfer treaties to expedite the transfer to their countries of nationality of aliens unlawfully in the United States who are subject to incarceration. The negotiations are to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States, and to eliminate any requirement of prisoner consent to such transfer. The President shall submit an annual certification to Congress on whether each prisoner transfer treaty in force is effective in returning criminal aliens to their countries of nationality.

*Sec. 361—Criminal alien identification system*

Subsection (a) amends section 130002(a) of the Violent Crimes Control and Law Enforcement Act of 1994 to require that the criminal alien identification system be used to assist Federal,

247

State, and local law enforcement agencies in identifying and locating aliens who may be removable on account of criminal or other grounds. The system shall provide for recording of fingerprints of aliens previously arrested and removed.

Subsection (b) provides that at the request of a governor of a State, the INS shall provide assistance in the identification of aliens unlawfully present in the United States.

*Sec. 362—Waiver of exclusion and deportation ground for certain section 274C violations*

Subsection (a) of this section amends subparagraph 212(a)(6)(F) and adds a new paragraph 212(d)(12), to provide that an alien who is inadmissible for having been in violation of section 274C (civil document fraud) may have the ground of inadmissibility waived if the alien is a lawful permanent resident or an alien seeking admission and a family-sponsored or employment-based immigrant, and the violation was committed solely to assist the alien's spouse, parent, son, or daughter (and not another individual).

Subsection (b) amends subparagraph 241(a)(3)(C) (prior to redesignation as section 237(a)(3)(C)) to provide a similar waiver for an alien who is deportable due to a section 274C violation.

*Sec. 363—Authorizing registration of aliens on criminal probation or criminal parole*

This section amends section 263(a) to authorize the registration by the Attorney General of aliens who are or who have been on criminal probation or criminal parole within the U.S.

*Sec. 364—Confidentiality provision for certain alien battered spouses and children*

This section provides that the Attorney General shall not make an adverse determination of admissibility or deportability against an alien or an alien's child using information furnished solely by certain individuals who have battered or subjected to extreme cruelty that alien or that alien's child, unless the alien has been convicted of a crime identified in redesignated section 237(a)(2). Neither shall the Attorney General permit use by, or disclosure to (other than to an officer of the Department of Justice for official and certain other designated purposes) any information that relates to an alien who is the beneficiary of an application for relief (which has not been denied) under section 204(a)(1)(B) (self-petition for immigrant visa by alien who has been battered or subject to extreme cruelty), section 216(c)(4)(C) (hardship waiver allowing removal of conditional permanent resident status based on qualifying marriage because alien spouse or child has been subject to battery or extreme cruelty), or section 244(a)(3) (suspension of deportation for alien spouse or child who has been subject to battery or extreme cruelty). (This prohibition also should extend to applications for cancellation of removal under new section 240A(b)(2)). Penalties are established for violations.

248

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

*Sec. 401—Strengthened enforcement of the employer sanctions provisions*

This section requires that the number of full-time INS Investigators be increased by 350 and that the new agents be assigned to investigate violations of the employer sanctions provisions of the INA.

*Sec. 402—Strengthened enforcement of wage and hour laws*

This section requires the number of full-time Department of Labor Wage and Hour Division employees to be increased by 150 and that the new agents be assigned to investigate violations in areas where there are high concentrations of undocumented aliens.

*Sec. 403—Changes in the employer sanctions program*

Subsection (a) amends section 274A(b)(1)(B) of the INA to strike clauses (ii) through (iv). This eliminates three categories of documents that now can be used to establish both employment authorization and identity: certificate of citizenship, certificate of naturalization, and unexpired foreign passport stamped by Attorney General with employment authorization. After this amendment, only a United States passport, alien registration card, or other employment authorization document issued by Attorney General would be acceptable to establish both identity and work authorization.

Subsection (a) also amends section 274A(b)(1)(C) of the INA to eliminate a birth certificate as a document that can be used to establish work authorization. Only a social security card would be acceptable for this purpose. Subsection (a) also amends section 274A(b)(2) to require that an individual being hired provide his or her social security number on the employment verification attestation form.

Subsection (b) ("Employment Eligibility Confirmation Process") amends subsections (a) and (b) of section 274A to require the development and use, on a pilot basis, of an employment eligibility confirmation mechanism.

Section 274A(a)(3) currently provides a defense against liability for hiring an unauthorized alien if the employer has complied in good faith with the document-based employment verification system in section 274A(b). Under this subsection, section 274A(a)(3) is amended to state that if an employer who (1) employs more than 3 employees and (2) is subject to the pilot program in 274A(b)(7) does not obtain appropriate confirmation through the new mechanism of the identity, social security number, and work eligibility of an individual through this process, this defense does not apply. To preserve the defense, an employer must make an inquiry through the mechanism within 3 working days after the date of hiring, unless the confirmation mechanism has registered that not all inquiries were responded to during that time, in which case the inquiry can be made on the first subsequent working day in which the confirmation mechanism is responding to all inquiries. The employer also must receive a confirmation within a time to be specified in

249

regulations by the Attorney General (but not to exceed 10 working days), in order to preserve the defense.

Section 274A(b)(3) currently provides that the employer must retain for a period of 3 years the verification form completed by the employee. This subsection amends section 274A(b)(3) to incorporate the requirements in amended section 274A(a)(3) regarding use of the confirmation mechanism to verify the accuracy of information provided on the form, and to require that the employer retain both the verification form as well as the receipt of confirmation for at least 3 years after the date of hiring, recruiting, or referral of the employee. It will be unlawful for an employer with more than 3 employees to hire an individual without complying with the new confirmation mechanism set out in section 274A(b)(3).

Section 274A(b)(6) is amended to require the Attorney General (or a designee that may include a private entity) to respond to inquiries by employers, through a toll-free telephone line or other electronic media, in the form of a confirmation code signifying whether or not an individual is authorized to be employed. The Attorney General shall establish expedited procedures to confirm the validity of information used under the confirmation mechanism in cases in which confirmation is sought but not provided by the mechanism. The confirmation mechanism shall be designed to maximize the reliability and ease of use of the confirmation process consistent with protecting the privacy and security of the underlying information, and to register all times when the system is not able to respond to all inquiries on whether individuals are authorized to be employed. The mechanism shall compare the name and social security account number and, in certain instances, the alien identification number, supplied by the new employee against records of the Social Security Administration and the INS to determine the validity of the information provided and whether or not the individual has presented a social security number or an alien number that is not valid for employment. The Attorney General shall provide a confirmation or tentative nonconfirmation within 3 working days of the initial inquiry. The Attorney General, in consultation with the Commissioner of Social Security and the Commissioner of INS, shall designate an expedited time period (not to exceed 10 days) within which final confirmation or denial must be provided through the confirmation mechanism. No social security information may be disclosed or released.

No individual shall be denied employment because of inaccurate or inaccessible data in the confirmation mechanism, and the Attorney General shall provide a timely and accessible process for challenging failures to confirm eligibility for employment. If an individual would not have been dismissed from a job but for an error of the confirmation mechanism, the individual is entitled to compensation through the mechanism of the Federal Tort Claims Act. The Attorney General also shall implement a program of testers and investigative activities to monitor and prevent unlawful discrimination through use of the mechanism. No person shall be civilly or criminally liable for any action taken in good faith reliance on information provided through the confirmation mechanism.

A new section 274A(b)(7) is added to require that the new requirements for employers added in subsection (b) shall only be im-

250

plemented (and tested for reliability and ease of use) through pilot projects in at least 5 of the 7 States with the highest estimated population of unauthorized aliens. The pilot projects shall be started within 6 months of the date of enactment, and shall terminate by no later than October 1, 1999. The confirmation mechanism shall not be established in other States unless Congress so provides by law. The Attorney General shall issue annual reports, beginning in 1997, on the development and implementation of the mechanism in the pilot states. The reports may include information on whether the mechanism: is reliable and easy to use; limits to less than 1 percent job loss due to inaccurate information; increases or decreases discrimination; protects individual privacy; and burdens employers with costs or administrative requirements.

Subsection (c) amends section 274A(a) by adding a new paragraph (6), to reduce paperwork requirements for the subsequent employers of certain employees whose eligibility to work has been confirmed by a prior employer. This provision applies in the case of an individual who is employed under a collective bargaining agreement entered into with an association of two or more employers, whose prior employer has complied with the employment verification process, and whose subsequent employer is a member of the same multi-employer association. The period during which this deeming can take place is up to 5 years in the case of a United States national or an alien lawfully admitted for permanent residence, and 3 years in the case of any other individual.

If an employer who has taken advantage of this provision is found to have hired an unauthorized alien, that hiring shall be presumed to be a knowing hire in violation of section 274A(a). The employer may rebut the presumption by presentation of clear and convincing evidence.

Subsection (d) strikes subsection (i) through (n) of section 274A, which are dated provisions.

Subsection (e) sets forth effective dates for the amendments made by this section. In general, the amendments shall be effective not later than 180 days after the date of enactment. The amendments made in subsections (a)(1) and (a)(2) (regarding reductions in the number of documents that may be presented by new employees) shall be effective not later than 18 months after enactment. The amendments made in subsection (c) (paperwork reduction) shall apply to all individuals hired on or after 60 days after enactment.

In addition, the Attorney General shall within 180 days of enactment issue regulations which provide for electronic storage of the I-9 form, in satisfaction of the record retention requirements in section 274A(b)(3).

*Sec. 404—Reports on earnings of aliens not authorized to work*

This section revises section 290(c) of the INA to require that the Social Security Administration (SSA) report to Congress on the number of social security numbers issued to aliens not authorized to be employed in the United States for which earnings were reported to the SSA. After January 1, 1996, if earnings are reported to the SSA for any such social security account number, the SSA shall report to the Attorney General the name and address of the

251

person for whom the earnings were reported and the name and address of the person (employer) reporting the earnings.

*Sec. 405—Authorizing maintenance of certain information on aliens*

This section amends section 264 of the INA to clarify that the Attorney General may require any alien to provide his or her social security number to include in any record of the alien.

*Sec. 406—Limiting liability for certain technical violations of paperwork requirements*

This section amends section 274A(e)(1) to provide that an employer shall not be considered to have been in violation of the verification requirements based upon a technical or procedural failure to meet a requirement unless the INS has explained the basis for the failure and given the employer 10 business days to correct it, and the employer has not corrected the failure during that period.

*Sec. 407—Unfair immigration-related employment practices*

Subsection (a) amends section 274B(g)(2) to require that employers subject to a final order for an immigration-related unfair employment practice be ordered to retain records for each person applying for employment for a period up to 3 years and be fined not less than $250 nor more than $2000 for each individual discriminated against.

Subsection (b) amends section 274B(a)(6) by providing that in the case of an employee who has presented a time-limited work authorization document to satisfy section 274A(b)(1), an employer may request a document proving that employment authorization has been renewed. The amendment also provides that if the employer has reason to believe that an alien who has presented a document valid on its face is nevertheless an unauthorized alien, the employer may inform the employee of the questions regarding the document's validity and the employer's intention to verify its validity. If the verification confirms that the employee is unauthorized to work, the employee may be discharged with no benefits or rights accruing on the basis of the period employed.

TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

*Sec. 500—Overview of new legal immigration system*

This section provides an overview of the legal immigration system that will be in effect beginning with fiscal year 1997.

Subtitle A—Worldwide Numerical Limits

*Sec. 501—Worldwide numerical limitation on family-sponsored immigrants*

This section amends section 201(c) to provide for a worldwide level for family-sponsored immigrants of 330,000. This level is to be reduced (but not below 110,000) for each fiscal year by the number of spouses and children of citizens admitted as immigrants in the previous fiscal year. There will be no limit on admission of spouses and children of citizens. The number of visas available to spouses and children of lawful permanent residents would not go below 85,000, and the number for parents of United States citizens

252

would not go below 25,000. Any excess in family immigration above 330,000 would come from other unused immigrant visas.

Reductions for excess family-based admissions would be computed in the following manner. The number of excess family admissions is the extent to which the number of family-based immigrant visas exceeded 330,000 in a given fiscal year. This excess would first be offset by the number of unused immigrant visas in that year in the employment-based categories. If any excess remained ("net excess"), the worldwide family level for the following fiscal year would be reduced by the amount of the net excess (but not below 110,000: 85,000 for the spouses and children of lawful permanent residents, and 25,000 for the parents of citizens). If any excess still remained ("remaining excess"), there would be reductions during the following fiscal year of up to half of the otherwise available visas in the category for investors (total available = 10,000). Any remaining excess ("carryforward excess") would be carried over into the calculations for subsequent fiscal years and would be drawn down by similar borrowing in following fiscal years from the investor category.

*Sec. 502—Worldwide numerical limitation on employment-based immigrants*

This section amends section 201(d) to provide that the worldwide level for employment-based immigrants is 135,000. This number may be reduced by the number of investor visas (not to exceed 5,000) used to offset excess family admissions (see section 501), and also by the number of visas (not to exceed 5,000) made available under section 512 to meet excess demand in the category for adult sons and daughters.

*Sec. 503—Worldwide numerical limitation on diversity immigrants*

This section amends section 201(e) to provide that the worldwide level of diversity immigrants is 27,000 for each fiscal year.

*Sec. 504—Establishment of numerical limitations on humanitarian immigrants*

This section amends subsections (a)(4) and (f) of section 201 to provide a worldwide level of humanitarian immigrants equal to 70,000 for each fiscal year (95,000 for FY 1997). The worldwide level shall be reduced by the number of aliens (not to exceed 50,000, or 75,000 in FY 1997, unless the number is increased by Congress) who were admitted as non-emergency refugees under section 207 in the previous year, by the number of aliens granted asylum who adjusted status under section 209(b) in the previous year, and by the number of aliens who were granted relief under suspension of deportation (current section 244(a)), section 240A (cancellation of removal) and 249 (registry) in the prior fiscal year.

*Sec. 505—Requiring congressional review and reauthorization of worldwide levels every 5 Years*

This section amends section 201 by adding a new subsection (g), providing that each fifth fiscal year starting in 2004, the Congress, after thorough review of appropriate immigration levels by the Committees on the Judiciary of the House and the Senate, shall

253

authorize by law the worldwide levels to apply beginning with the second subsequent fiscal year (i.e., FY 2006). The worldwide levels specified previously in section 201 are applicable only for the period of such authorization.

Subtitle B—Changes in Preference System

*Sec. 511—Limitation of immediate relatives to spouses and children*

This section amends section 201(b)(2)(A) to substitute the phrase "spouses and children of a citizen of the United States" in place of "immediate relatives."

This section also adds a new subsection (i) to section 204, to provide that the age of an alien child being issued an immigrant visa as a nuclear family member shall be determined as of the date of the filing of a classification petition under section 204(a)(1). This is to prevent such children from "aging out" of eligibility to immigrate if they turn 21 while waiting for a visa to become available.

*Sec. 512—Change in family-sponsored classification*

Subsection (a) amends section 203(a) by striking paragraphs (1) through (4) (the current family-sponsored preference categories) and inserting new paragraphs (1), (2), and (3).

Section 203(a)(1) defines as the first family-sponsored preference category the spouses and children of aliens lawfully admitted for permanent residence. The number for this category is not to exceed 85,000, plus any unused visas in the second category.

Section 203(a)(2) defines the second family-sponsored preference category as the parents of U.S. citizens. The number of visas assigned to this category is the lesser of 45,000 or the number by which the worldwide level calculated under amended section 201(c) exceeds 85,000, but shall not be less than 25,000. Such aliens may only be admitted if they meet certain insurance requirements in new section 212(a)(4)(D).

Section 203(a)(3) defines the third family-sponsored preference category as the adult sons and daughters of either a citizen of the United States or of a lawful permanent resident, provided that the son or daughter is less than 26 years of age, never-married, childless, and eligible, but for the residence requirements, to be declared as a dependent for Federal income tax purposes. The number of visas available for this category shall be the lesser of 5,000 or the number by which the worldwide family level exceeds the sum of 85,000 plus the number of visas used for parents of U.S. citizens under section 203(a)(2). If the demand for such visas exceeds 5,000 (or the lesser number referred to in the previous sentence), up to 5,000 additional visas may be made available by reducing the number of visas in the employment-based categories in proportion to the visa numbers allocated for each of those categories. A son or daughter admitted under this category shall be admitted on a conditional basis. The Attorney General shall issue regulations for the removal of conditional status similar to those set forth in section 216A. An alien in such status must demonstrate that he or she met the requirements for admission in this category on the date of approval of the alien's classification petition.

254

Subsection (b) amends section 212(a)(4) (the public charge ground for inadmissibility, as amended by section 621 of H.R. 2202) by adding a new subparagraph (D). This provision requires that an alien who seeks admission as a parent must demonstrate to the satisfaction of the Attorney General and the consular officer that the alien will have adequate health insurance comparable to that provided under the Medicare program (title XVIII) of the Social Security Act), and long-term health coverage comparable to that provided under the Medicaid program (title XIX). In making this determination, the Attorney General shall take into account the age of the parent and the likelihood of the parent securing health insurance through employment.

*Sec. 513—Change in employment-based classification*

Subsection (a) amends section 203(b) by striking paragraphs (1) through (5) (the current employment-based preference categories) and inserting new paragraphs (1) through (6).

Paragraph (1) defines as the first employment-based preference category aliens with extraordinary ability, and assigns to this category visas not to exceed 15,000. This category includes aliens currently defined in section 203(b)(1)(A).

Paragraph (2) defines as the second employment-based preference category aliens who are outstanding professors and researchers or multinational executives and managers, and assigns to this category visas not to exceed 30,000, plus any visas not required under paragraph (1). This category includes aliens currently defined in section 203(b)(1)(B) and (C).

Paragraph (3) defines as the third employment-based preference category aliens who are members of the professions holding advanced degrees or aliens of exceptional ability, and assigns to this category visas not to exceed 30,000, plus any unused visas from the previous categories. This category includes aliens currently defined in section 203(b)(2) as members of the professions holding advanced degrees or aliens of exceptional ability.

Aliens admitted under paragraph (3) are subject to the labor certification requirement under section 212(a)(5)(A). This requirement may be waived in the national interest if such action is necessary to substantially benefit the national defense, national security, or law enforcement; health care, housing, or educational opportunities in a low-income population or in an underserved area; economic or employment opportunities for a specific industry or geographic area; the development of new technologies; or environmental protection or the productive use of natural resources. An alien admitted on such a waiver must engage in a specific undertaking to advance one or more of these interests.

Paragraph (4) defines as the fourth employment-based preference category skilled workers and professionals, and assigns to this category visas not to exceed 45,000, plus any unused visas from the previous categories. Under subparagraph (B), an alien is a skilled worker if the alien is capable of performing skilled labor requiring at least 2 years training or experience, not of a temporary or seasonal nature, for which qualified workers are not available in the United States, and who has a total of 4 years of training or experience (or both) with respect to such labor. Under subparagraph

255

(C)(i), an alien is a professional if the alien holds a baccalaureate degree and has at least 2 years experience in the profession after such degree. Under subparagraph (C)(ii), an alien who is a teacher and has within the previous 5 years at least 2 years of experience teaching a language other than English full-time also may be admitted as a professional if the alien is seeking admission to teach such language at an accredited elementary or middle school. A labor certification under section 212(a)(5)(A) also is required for immigrants under this paragraph.

Paragraph (5) defines as the fifth employment-based preference category investors seeking admission for the purpose of engaging in a new commercial enterprise in which the alien has invested $1 million and will employ full-time not less than 10 U.S. citizens or lawful permanent residents. Visas assigned are not to exceed 10,000, less the reduction provided in section 201(c)(5)(A) for excess family-based admissions. This section also provides for establishment of a pilot program to permit in fiscal years 1997 and 1998 the issuance of 2,000 of these investor visas to immigrants willing to invest $500,000 in an enterprise that will employ 5 full-time employees. The Attorney General shall submit a report to Congress in 1998 on the operation of this pilot program, with recommendations.

Paragraph (6) defines as the sixth employment-based preference category qualified special immigrants defined in section 101(a)(27), with 5,000 assigned visas, not more than 4,000 of which may be issued to special religious workers under section 101(a)(27)(C)(ii)(II) or (III).

Paragraph (7) is the new designation for current paragraph (6), dealing with special K immigrants.

Paragraph (8) provides that work experience as an unauthorized alien shall not be taken into account in calculating the experience required under this subsection.

Subsection (b) adds a new section 216B to the INA, under which the provisions of section 216A regarding conditional permanent resident status shall apply to foreign language teachers admitted under section 203(b)(3)(C)(ii). Such teachers shall remain in conditional status for a period of five years, less the number of years the teacher spent teaching a language other than English full-time at the elementary or middle school level during the 5 years immediately prior to obtaining conditional permanent resident status.

*Sec. 514—Changes in diversity immigrant program*

Subsection (a) amends section 203(c)(1)(B)(ii) to provide that the Attorney General shall identify, within each region, the 10 states which had the highest number of registrants for the diversity immigrant program between October 1, 1994 and September 30, 1996, and which are not high-admission states. This subsection also amends section 203(c)(1)(E) to provide that only natives of these 10 states in each region are eligible for diversity visas.

Subsection (b) amends section 203(c)(1)(F) to strike the designation of Northern Ireland as a separate foreign state and by treating Mexico as part of North America.

Subsection (c) amends section 203(c)(2) to provide that an alien is not eligible for a diversity visa unless the alien has a verified job offer in the United States; at least a high school education or its

256

equivalent; and at least two years experience in an occupation which requires 2 years of training.

Subsection (d) amends section 203(c) by adding a new paragraph (4), providing that the Secretary of State may set fees for processing applications and issuing visas under the diversity program, and adding a new paragraph (5), providing that no alien who is unlawfully present in the United States at the time of filing an application, or has been unlawfully present within the previous 5 years or at any time subsequent to the application, is eligible for a diversity visa.

*Sec. 515—Authorization to require periodic confirmation of classification petitions*

Subsection (a) amends section 204(b) to add a new paragraph (2) providing that the Attorney General may provide that an approved classification petition shall expire not less than two years after the date of approval unless the petitioner files a prescribed form to reconfirm the continued intention of the petitioner to seek admission of the alien and to update the contents of the petition.

Subsection (b) provides that, with exceptions to ensure that no previously-filed petition expires before October 1, 2000, the amendments made by subsection (a) shall not apply to classification petitions filed before October 1, 1996.

*Sec. 516—Changes in special immigrant status*

Subsection (a) repeals certain obsolete special immigrant provisions.

Subsection (b) amends section 101(a)(27) to provide special immigrant status for certain NATO civilian employees.

Subsection (c) adopts a conforming amendment to section 101(a)(15)(N) regarding nonimmigrant status for certain parents of special immigrant children.

Subsection (d) amends section 101(a)(27)(C)(ii) to extend the sunset date for the religious worker special immigrant category to FY 2005.

Subsection (e) makes additional conforming amendments.

Subsection (f) provides that, unless otherwise specified, the amendments made by this section shall be effective on the date of enactment.

*Sec. 517—Requirements for removal of conditional status of entrepreneurs*

Subsection (a) revises section 216A(b)(1)(B)(ii) to provide that the conditional permanent resident status of an alien entrepreneur may be terminated if it is determined that the alien did not invest the requisite capital and employ the requisite number of employees throughout substantially the entire period [up to 2 years] since the alien's admission. A good faith exception is provided for an alien who attempts to meet the capital investment and employment requirements but is unable to do so due to circumstances beyond the alien's control. For such an alien, the period for applying for removal of conditional status and for terminating such status shall be extended for up to 3 years to enable to alien to meet the capital and employment requirements for a period of 2 years.

257

Subsection (b) provides that the amendments in this section shall apply to aliens admitted on or after the date of enactment.

*Sec. 518—Adult disabled children*

This section amends the definition of "child" in section 101(b)(1) to include the child of a citizen or lawful permanent resident, regardless of age, who has never been married, and who has a severe mental or physical impairment which is likely to continue indefinitely and causes substantially total inability to perform functions necessary for independent living. A child may not be considered disabled unless the physical or mental impairment is being ameliorated to the maximum extent reasonably possible given the resources of the child and the parent.

*Sec. 519—Miscellaneous conforming amendments*

Subsection (a) makes various conforming amendments relating to the striking of the term "immediate relative" to describe an immigrant visa category.

Subsection (b) makes a number of conforming amendments for family-sponsored immigrants. This subsection also revises paragraph (4) of section 202(a) to provide that 75 percent of the visas available to family-sponsored immigrants in the new first preference category (spouses and children of aliens lawfully admitted for permanent residence) shall not be subject to the per-country levels in paragraph of section 202(a)(2). If, for a particular foreign state or dependent area, the number of aliens admitted in the first preference category exceeds the per country level, then for purposes of the operation of section 202(e), all visas shall be deemed to have been required for the first preference category. No visas then would be available for the second preference category (parents).

Subsection (c) makes a number of conforming amendments relating to employment-based immigrants, including special K immigrants.

### Subtitle C—Refugees, Parole, and Humanitarian Admissions

*Sec. 521—Changes in refugee annual admissions*

Subsection (a) amends paragraphs (1) and (2) of section 207(a) to provide that the number of annual refugee admissions designated by the President may not exceed 75,000 in fiscal year 1997 or 50,000 in any succeeding fiscal year. The number may exceed these limits if Congress by law provides for a higher number.

Subsection (b) amends section 207(b) and section 207(d)(3)(B) to strike the modifier "unforeseen" before the word "emergency." The effect of this change is to enable the President to exercise the authority to admit refugees on an emergency basis regardless of whether the specific emergency was foreseen or unforeseen.

Subsection (b) also amends section 207(d)(1) to require that the President shall report before June 1 of the preceding fiscal year to the Judiciary Committees of the House and Senate on the foreseeable number of refugees requiring resettlement. It also amends section 207(e) to require that the consultation with respect to the admission of refugees shall occur before July 1 of the preceding fiscal

258

year and in the case of emergency refugee admissions, not later than 30 days after the President proposes such admissions.

The Committee intends that the President's determination of the annual number of refugee admissions as described in subsection (a)(1) occur after the consultation process prescribed in section 207(d)(1). Only in this way will the consultation process serve its intended purpose of giving Congress a meaningful role in establishing refugee policy. In the absence of an emergency, the President's determination shall not exceed the target established in section 207(a), although the President can request that Congress raise that target level be raised.

*Sec. 522—Persecution for resistance to coercive population control methods*

Subsection (a) amends the definition of refugee at section 101(a)(42) to provide that a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear of being compelled to undergo such a procedure or being subject to such persecution shall be deemed to have a well founded fear of persecution on account of political opinion.

Subsection (b) amends section 207(a) to provide that not more than 1,000 refugees shall be admitted on the basis of persecution under coercive population control policies.

Further explanation of this provision is set forth in the preceding discussion of the provisions of H.R. 2202.

*Sec. 523—Parole available only on a case-by-case basis for humanitarian reasons or significant public benefit*

Subsection (a) amends section 212(d)(5) to provide that the Attorney General may on a case-by-case basis parole an alien into the United States temporarily only for an urgent humanitarian reason (limited to medical emergencies or the imminent death of a family member) or for a reason deemed strictly in the public interest (limited to cases where the alien's presence is required as a witness or the alien has assisted the United States Government and the alien's life would be threatened if not permitted to be in the United States; or to cases where the alien is to be prosecuted in the United States for a crime). The Attorney General shall submit a report not later than 90 days after the end of each fiscal year reporting on the number and status of aliens paroled.

Subsection (b) makes these changes effective to individuals paroled into the U.S. on the first month beginning more than 60 days after the date of enactment.

*Sec. 524—Admission of humanitarian immigrants*

This section amends section 203(c) to provide for the admission, subject to the worldwide level specified in section 201(e) (as amended by section 503 of this bill), of qualified immigrants of special humanitarian concern to the U.S. Such immigrants shall be selected on a case-by-case basis after having been identified for potential

259

eligibility by the Attorney General. One acceptable use of this visa might be in a particularly egregious case of battery, where the battered alien may not otherwise qualify for relief under the INA. It is contemplated that the Attorney General will have the discretion to defer adverse action against a candidate for a humanitarian visa (who is otherwise deportable) for a short period of time until a humanitarian visa becomes available.

An alien who is a refugee is not entitled to admission as a humanitarian immigrant unless there are compelling reasons in the public interest to admit the alien under this provision rather than under section 207.

This section also limits issuance of humanitarian visas to 50 percent of a single foreign state's (or 15 percent of a dependent area's) allotted level of immigrant visas. The Attorney General may waive the public charge ground of inadmissibility in the case of a humanitarian immigrant.

Subtitle D—Asylum Reform

*Sec. 531—Asylum reform*

This section will amend section 208 of the Immigration and Nationality Act.

Section 208(a) provides that any alien who is physically present in the United States or at the border of the United States, regardless of status, is eligible to apply for asylum. However, an alien is not eligible to apply if the Attorney General determines that the alien can be returned to a country (other than the alien's country of nationality or last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection. The Attorney General may, however, permit such an alien to apply if it is in the public interest for the alien to be granted asylum in the United States. An alien also is not eligible to apply if the alien has not filed an application within 30 days of arriving in the United States, or if the alien has previously applied for and been denied asylum; these bars do not apply if the alien demonstrates the existence of fundamentally changed circumstances which affect the applicant's eligibility for asylum. A determination by the Attorney General that an alien is ineligible to apply for asylum due to one of these enumerated reasons is not subject to judicial review.

In applying the time deadline in section 208(a), the Committee expects that the Attorney General will promulgate a form of application for asylum in which the applicant will be required to present only a brief statement of his or her claim, and which can be completed by the applicant in a brief period of time, with minimal assistance. Further presentation of the details of the applicant's claim would be presented prior to or at the time of the interview by the asylum officer.

Subsection (b) provides that asylum may be granted to an alien who meets the definition of a refugee under section 101(a)(42) of the INA. Asylum may not be granted to an alien who has engaged

260

in persecution of others, has been convicted of a particularly serious crime (including an aggravated felony), has committed a serious non-political crime outside of the U.S., is regarded on reasonable grounds as a danger to national security, is inadmissible on national security or terrorist grounds, or has been firmly resettled in another country. The Attorney General may designate by regulation additional limitations and conditions on eligibility for asylum. A spouse or child of an alien granted asylum, if accompanying or following to join such alien, may be given the same status.

Subsection (c) provides that an alien granted asylum shall not be removed to his country of nationality or last habitual residence, shall be granted authorization to work, and may be allowed to travel abroad with prior consent of the Attorney General. This subsection also provides that asylum may be terminated if the alien: is no longer a refugee under section 101(a)(42); is ineligible for asylum under subsection (b); may be returned to a third country where the alien would receive asylum or other temporary protection; has voluntarily returned to his country of nationality or last habitual residence with lawful permanent resident or equivalent status; or has acquired a new nationality which confers protection on the alien. A determination that asylum should be terminated is not subject to judicial review. An alien whose asylum is terminated is subject to any applicable ground of inadmissibility or deportation.

Subsection (d) provides that the Attorney General shall establish procedures for considering applications for asylum. The applicant must submit fingerprints and a photograph. An applicant is not entitled to be employed and, unless otherwise authorized to be employed, cannot be granted permission to work until at least 180 days after the filing of the asylum application. The Attorney General may charge a fee for asylum applications, and may provide for payment over time or in installments. The alien shall be provided at the time of application a notice of the consequences of knowingly filing an application for asylum that is frivolous (including an application that contains a willful misrepresentation of a material fact), as well as a current list of attorneys willing to represent asylum applicants on a pro bono basis.

Subsection (d) also provides that the asylum procedures shall include the following: that asylum cannot be granted until the identity of the applicant is checked against all appropriate records maintained by the Attorney General and the Secretary of State, including the Automated Visa Lookout System, to determine if the alien is inadmissible or deportable from the U.S.; that in the absence of exceptional circumstances the initial interview on the asylum application shall take place within 45 days of the application and the administrative adjudication (not counting administrative appeal) concluded within 180 days; that administrative appeals are to be filed within 30 days of initial decision; and that an application may be dismissed if the alien fails to appear for a scheduled hearing or interview without advance notice or in the case of exceptional circumstances. Nothing in subsection (d) shall be construed to create any substantive or procedural right or benefit that is enforceable by any party against the United States.

Subsection (b) makes conforming and clerical amendments. Subsection (c) provides that the amendments made by this section

261

shall take effect on the first day of the first month beginning more than 180 days after the date of enactment.

*Sec. 532—Fixing numerical adjustments for asylees at 10,000 each year*

This section amends section 209(b) to provide that not more than 10,000 persons who have been granted asylum may in any one year adjust to the status of an alien lawfully admitted for permanent residence.

*Sec. 533—Increased resources for reducing asylum application backlogs*

This section authorizes the temporary employment, without reduction in retired pay, retainer pay, or annuity, of former members of the Armed Forces or retired employees of the Federal Government to adjudicate applications for asylum pending as of the date of enactment. This section also authorizes, subject to the availability of appropriations, an increase to 600 in the number of asylum officers by FY 1997.

Subtitle E—General Effective Dates; Transition Provisions

*Sec. 551—General effective date*

The amendments made by this title, unless otherwise specified, shall take effect October 1, 1996, and apply beginning with fiscal year 1997.

*Sec. 552—General transition for current classification petitions*

This section provides for transition of current classification petitions to the amendments made by this title. Under subsection (a), any petition filed before October 1, 1996, for immediate relative status under section 201(b)(2)(A) (as in effect before October 1, 1996), shall be deemed to be an application for status under amended section 201(b)(2)(A) (spouse or child) or under amended 203(a)(2) (parent). A petition filed for preference status under existing section 203(a)(2) (spouse or child of a lawful permanent resident) shall be deemed on October 1, 1996, to be a petition under amended section 203(a)(1).

Under subsection (b), similar transition is made for petitions for employment-based visas filed prior to October 1, 1996.

Under subsection (c), when an immigrant holding an unexpired immigrant visa issued before October 1, 1996, makes application for admission, the immigrant's admissibility under section 212(a)(7)(A) shall be determined as of the date the visa was issued.

Subsection (d) provides that nothing in this title shall be construed to affect the following provisions: section 2(c)(1) of the Virgin Islands Nonimmigrant Alien Adjustment Act of 1982 (Pub. L. 97-271) (waiving application of numerical limitations to aliens who adjust immigration status under that Act); section 202(e) of the Immigration Reform and Control Act of 1986 (Pub. L. 99-603) (Cuban-Haitian adjustments); and section 19 of the Immigration and Nationality Act Amendments of 1981 (Pub. L. 97-116).

262

*Sec. 553—Special transition for certain backlogged spouses and children of lawful permanent resident aliens*

This section provides that in addition to immigrant visas otherwise available, a number of immigrant visas shall be available in each year from 1997 to 2001 for aliens who have petitions approved for classification as spouses or minor children of lawful permanent residents. The number of such additional visas shall be the greater of 50,000, or 20 percent of the number of aliens for whom petitions are pending at the beginning of the fiscal year, and with respect to whom the petitioning alien became a lawful permanent resident under section 210 (Special Agricultural Worker legalization) or 245A (legalization).

The additional visas shall be available in the order in which the petition for classification of the alien has been filed with the Attorney General, and shall first be available to the spouses and children of lawful permanent residents who did not gain that status under the legalization (section 245A) or special agricultural worker (section 210) programs. The per country numerical limitations of section 202 shall not apply with respect to the additional visa numbers made available under this section. The Attorney General shall submit a report to Congress by April 1, 2001, on the operation of this section and whether it will result in visas being made available on a current basis by October 1, 2001.

*Sec. 554—Special treatment of certain disadvantaged family first preference immigrants*

This section provides that the per country numerical limitations in section 202(a) shall not apply in the last half of fiscal year 1996 to the extent necessary to ensure that the priority date for an alien classified as an unmarried son or daughter of a citizen is not earlier than the priority date for aliens classified as unmarried sons and daughters of aliens lawfully admitted for permanent residence.

This section also provides that additional visa numbers shall be available in fiscal year 1997 without regard to per country numerical limitations for alien sons and daughters of citizens for whom a preference petition was approved as of September 30, 1996, and whose priority date was earlier than the priority date for alien sons and daughters of lawful permanent resident aliens of the same nationality for whom a petition had been approved on that date.

*Sec. 555—Authorization of reimbursement of petitioners for eliminated family-sponsored categories*

Subsection (a) provides that there shall be a procedure to reimburse, subject to appropriations, all fees required to be paid under the INA by a petitioner for a family-sponsored visa in a category eliminated by this bill, provided that the visa has not been issued and the petition has not been disapproved.

Subsection (b) authorizes the appropriation of funds necessary to carry out this section.

263

TITLE VI—RESTRICTIONS ON BENEFITS FOR ILLEGAL ALIENS

*Sec. 600—Statements on national policy concerning welfare and immigration*

This section states national policy with respect to welfare and immigration.

Subtitle A—Eligibility of Illegal Aliens for Public Benefits

*Part 1—Public Benefits Generally*

*Sec. 601—Making illegal aliens ineligible for public assistance, contracts, and licenses*

Subsections (a) and (b) provide that aliens not lawfully present in the United States are ineligible to receive benefits under any means-tested program provided or funded, in whole or in part, by the Federal or State Governments and also are ineligible to receive any grant, to enter into any contract or loan agreement, or to be issued or have renewed any professional or commercial license, provided or funded by the Federal or State Governments.

Subsection (c) provides that Federal agencies must require applicants to provide sufficient proof of identity to receive a Federal contract, grant, loan, or license, or the following types of public assistance: supplemental security income (SSI); Aid to Families with Dependent Children (AFDC); social services block grants; Medicaid; Food Stamps; or housing assistance. Proof of identity is limited to showing the following documents: a United States passport (either current or expired if issued within the previous 20 years and after the individual has reached the age of 18); a resident alien card; or a State driver's license or identity card, if presented with the individual's social security card.

Subsection (d) authorizes State agencies to require proof of eligibility to receive State assistance.

Subsection (e) provides exceptions to the limitations in subsections (a) and (b) in the case of an alien who (or whose child) has been battered or subject to extreme cruelty. The alien must have applied (or apply within 45 days of the initial application for benefits) for family-sponsored immigration status or classification, or cancellation of removal and adjustment of status, or the alien must be the beneficiary of a petition for family-sponsored immigration or classification. The exception terminates if no application setting forth a prima facie case for such immigration benefits has been filed or when an application is denied.

The rationale behind this provision is straightforward: aliens who are in the U.S. illegally should not be entitled to receive any of the privileges or benefits of membership in American society. It is unfair to citizens and legal residents to allow illegal aliens to access public benefits.

No aspect of illegal immigration angers the American people more than illegal aliens using taxpayer-funded public benefits. Poll after poll shows that the American people are tired of footing the bill for those who are in the country illegally. The passage of Proposition 187 in California, and other similar movements in Florida and Arizona are evidence of this. While the availability of public

264

benefits may not be the chief magnet that draws illegal aliens to the U.S., it is certainly one of the most powerful. As a matter of national immigration policy, Congress must remove all of the possible incentives that may lure illegal aliens to either come to or stay in the U.S. The Committee believes that, to thoroughly combat illegal immigration, illegal aliens must not be given taxpayer-funded public benefits at any level—Federal, State or local.

The prohibition on Federal, State and local contracts, grants, loans, licenses, and welfare assistance as contained in this section is not intended to address the issue of alien eligibility for a basic public education as determined by the U.S. Supreme Court in *Plyler* v. *Doe*.[125]

*Sec. 602—Making unauthorized aliens ineligible for unemployment benefits*

This section provides that aliens are ineligible for unemployment benefits payable in whole or in part out of Federal funds to the extent such benefits are attributable to any employment for which the alien had not had authorization. Benefits providers must make such inquiries as may be necessary to assure that applicants are eligible.

*Sec. 603—General exceptions*

This section provides that sections 601 and 602 shall not apply to the provision of emergency medical services, public health immunizations, short-term emergency relief, school lunch programs, child nutrition programs, and family violence services.

The allowance for treatment of communicable diseases is very narrow. The Committee intends that it only apply where absolutely necessary to prevent the spread of such diseases. This is only a short term measure until the deportation of an alien who is unlawfully present in the U.S. It is not intended to provide authority for continued long-term treatment of such diseases as a means for illegal aliens to delay their removal from the country. However, it is the Committee's intent to give public health providers the ability, within the scope of their professional judgment, to treat individuals who might have, or require immunization against, communicable diseases. So long as that judgment was made in good faith it is intended to fall within the exception for immunizations, testing, and treatment for communicable diseases. Furthermore, this exception is also intended to permit health care providers to examine patients sufficient to determine whether testing, treatment, or immunization is appropriate.

The allowance for emergency medical services under Medicaid is very narrow. The Committee intends that it only apply to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. The Committee does not intend that emergency medical services include pre-natal or delivery care assistance that is not strictly of an emergency nature as specified herein. The Committee intends that any provision of services under this exception for mental health disorders be limited to circumstances in which

---

[125] *Plyler* v. *Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

265

the alien's condition is such that he is a danger to himself or to others and has therefore been judged incompetent by a court of appropriate jurisdiction.

*Sec. 604—Treatment of expenses subject to emergency medical services exception*

Subsection (a) provides that, subject to advance appropriations, a State or local government that provides emergency medical services through a public hospital (including through a contract with another hospital or facility) to an illegal alien is entitled to receive payment from the Federal Government for the costs of the services, but only to the extent that such costs are not reimbursed through any other Federal program and cannot be recovered from the alien or another person. Reimbursement also may be made to a hospital eligible for additional payment adjustment under section 1886(d)(5) of the Social Security Act.

Subsection (b) provides that no payment shall be made unless the identity and immigration status of the alien has been verified with the INS. Subsection (c) provides that the program shall be administered by the Attorney General in consultation with the Secretary of Health and Human Services. Subsection (d) provides that subsection (a) shall not apply to emergency medical services furnished before October 1, 1995.

*Sec. 605—Report on disqualification of illegal aliens from housing assistance programs*

This section provides that the Secretary of Housing and Urban Development shall submit a report within 90 days to certain committees of Congress describing the manner in which the Secretary is enforcing section 214 of the Housing and Community Development Act of 1980.

*Sec. 606—Verification of student eligibility for postsecondary federal student financial assistance*

This section provides that no student shall be eligible for postsecondary Federal student financial assistance unless the student has certified that he or she is a citizen or national of the United States, or an alien lawfully admitted for permanent residence, and the Secretary of Education has verified such status through a procedure determined by the Attorney General.

*Sec. 607—Payment of public assistance benefits*

This section provides that in carrying out the provisions of this part, payment of means-tested benefits identified in section 601 (other than those exempted by section 603) shall be made only through an individual or person who is not ineligible to receive such benefits under section 601.

*Sec. 608—Definitions*

This section provides that for purposes of this title, an alien shall not be considered lawfully present in the U.S. merely because the alien may be considered to be permanently residing in the United States under color of law for purposes of any particular program.

266

*Sec. 609—Regulations and effective dates*

This section requires that the Attorney General issue regulations carrying out this subpart (other than section 605) within 60 days of enactment. The Attorney General shall apply section 601 to assistance provided, contracts or loan agreements entered into, and professional and commercial licenses issued or renewed at least 30 and not more than 60 days after the date the regulations are first issued, but may waive this section in the case of applications which are pending or approved on or before this date. The Attorney General shall apply section 602 to unemployment benefits provided on or after a date at least 30 and not more than 60 days after the date the regulations are first issued, but may waive this section in the case of applications for benefits pending as of this date. The Attorney General must broadly disseminate information regarding these restrictions on eligibility before the effective dates.

## Part 2—Earned Income Tax Credit

*Sec. 611—Earned income tax credit denied to individuals not authorized to be employed in the United States*

This section amends section 32(c)(1) of the Internal Revenue Code of 1986 by adding a new subparagraph (F), providing that an individual is not eligible for the earned income tax credit if the individual does not include a taxpayer identification number on the tax return. This section also amends section 32 of the Internal Revenue Code to add a new subsection (k), providing that a taxpayer identification number means a social security account number other than one that has been issued to an individual not authorized to work in the U.S.

## Subtitle B—Expansion of Disqualification from Immigration Benefits on the Basis of Public Charge

*Sec. 621—Ground for inadmissibility*

This section amends paragraph (4) of section 212(a) (public charge exclusion ground) to provide that a family-sponsored immigrant or nonimmigrant is inadmissible if the alien cannot demonstrate that the alien's age, health, family status, education, skills, or a combination thereof, or an affidavit of support, or both, make it unlikely that the alien will become a public charge. An employment-based immigrant is inadmissible, other than an immigrant of extraordinary ability, unless the immigrant has a valid job offer at the time of immigration. An employment-based immigrant who receives a visa by virtue of a job offer from a business owned by a relative, or from a business in which a relative has a significant ownership interest, is inadmissible (inadmissible) unless the relative has executed an affidavit of support.

*Sec. 622—Ground for deportability*

This section amends paragraph (5) of redesignated section 237(a) (public charge deportation ground) to provide that an alien is deportable if the alien becomes a public charge within 7 years of admission from causes arising before entry or admission. The ground may be waived in the case of an alien who is admitted as a refugee

267

or granted asylum. An alien is considered a public charge if he or she receives benefits under (1) Supplemental Security Income, (2) Aid to Families with Dependent Children, (3) Medicaid, (4) Food Stamps, (5) State General Assistance or (6) certain Federal housing assistance, for an aggregate period of at least 12 months within 7 years of admission. An alien shall not be considered to be a public charge on the basis of receipt of emergency medical services, public health immunizations and short-term emergency relief. In the case of an alien who (or whose child) has been battered or subject to extreme cruelty, the aggregate period for receipt of benefits shall be 48 months within 7 years, if the need for such benefits has a substantial connection to the abuse, and may exceed 48 months if the alien can demonstrate that the abuse is ongoing and has led to an issuance of an administrative or judicial order, or there has been a prior determination of abuse by the INS.

### Subtitle C—Attribution of Income and Affidavits of Support

*Sec. 631—Attribution of sponsor's income and resources to family-sponsored immigrants*

This section provides that in determining the eligibility and the amount of benefits of an alien for any Federal means-tested public benefits program, the income and resources of the alien shall be deemed to include those of the person who executed an affidavit of support on behalf of such alien, and that person's spouse. States may act similarly in determining the eligibility and the amount of benefits of an alien for any State means-tested public benefits program. Such deeming shall end for parents of United States citizens at the time the parent becomes a citizen; for spouses of citizens and lawful permanent residents at the earlier of 7 years after the date the spouse becomes an alien lawfully admitted for permanent residence or the date the spouse becomes a citizen; and for minor children at the time the child reaches 21 years of age or, if earlier, the date the child becomes a citizen. The deeming period may end earlier than specified above if the alien is employed long enough to qualify for social security retirement income.

In the case of an alien who (or whose child) has been battered or subject to extreme cruelty, the deeming requirements shall not apply for 48 months if the need for such benefits has a substantial connection to the abuse, or for more than 48 months if the alien can demonstrate that the abuse is ongoing and has led to an issuance of an administrative or judicial order or there has been a prior determination of abuse by the INS.

For States that choose to follow the Federal model of deeming that a sponsor's income and resources is available to the sponsored immigrant for the purpose of qualifying for State or local means-tested public benefits, those States shall be deemed by any Federal or State court to have chosen the least restrictive means available for achieving the compelling government interest of assuring that aliens be self-reliant in accordance with national immigration policy.

268

*Sec. 632—Requirements for sponsor's affidavit of support*

Subsection (a) of this section amends title II of the INA by adding a new section 213A.

Section 213A(a) provides that an affidavit of support may only be accepted as establishing that an alien is not inadmissible as a public charge if it is executed as a contract legally enforceable against the sponsor in any Federal or State court by the Federal Government, and by any State which provided any means-tested public benefits, for a period 10 years after the alien last received any benefit. Such contract shall be enforceable with respect to benefits provided for parents of United States citizens until the time the parent becomes a citizen; for spouses of United States citizens and lawful permanent residents at the earlier of 7 years after the date the spouse becomes an alien lawfully admitted for permanent residence or the date the spouse becomes a citizen; and for minor children at the time the child reaches 21 years of age. The sponsorship period may end earlier than specified above if the alien is employed long enough to qualify for social security retirement income.

Section 213A(b) provides that upon notification that a sponsored alien has received a benefit, the appropriate official shall request reimbursement from the sponsor. If the sponsor does not indicate a willingness to reimburse, or fails to abide by repayment terms, an action may be brought. The appropriate agency may appoint or hire a person to act on its behalf in collecting moneys owed. Section 213A(c) provides that available remedies include those described in sections 3201, 3203, 3204, and 3205 of title 28, U.S. Code, as well as specific performance, reimbursement of legal fees and collection costs, and corresponding State law remedies. Section 213A(d) provides that subject to civil penalties, a sponsor shall notify the federal government and the sponsored alien's State of residence of any change of address of the sponsor.

Section 213A(e) limits eligibility to sponsor an alien into the United States to individuals only (not institutions). Sponsors also must be: the United States citizen or lawful permanent resident who is petitioning for the alien's admission, or an individual who will accept joint and several liability with the petitioner; at least 18 years old; and domiciled in a State. Finally, sponsors must demonstrate, through a certified copy of a tax return, the means to maintain an annual income equal to at least 200 percent of the poverty level for the individual, the individual's family, and the sponsored alien and the alien's nuclear family, if any, who arrive with the alien at the time of the alien's admission. In the case of an individual who is on active duty in the Armed Forces, the income requirement is 100 percent of the poverty level.

Subsection (b) refers to the requirement for an affidavit of support from individuals who file petitions for a relative as an employment-based immigrant.

Subsection (c) amends section 316(a) of the INA by adding a new clause to provide that no person shall be naturalized who has received assistance under a federal or State means-tested public benefit program with respect to which amounts may be owing under an affidavit of support unless he or she provides satisfactory evidence that there are no outstanding amounts owed pursuant to such affidavit. This subsection also amends section 316 by adding

269

a new subsection (g), providing that the amendment made in section 316(a)(4) shall not apply to a battered alien spouse or child under specified conditions.

Subsection (d) makes a clerical amendment. Subsections (e) and (f) provide that the Attorney General shall promulgate within 90 days of enactment a new standard form for the affidavit of support that complies with new section 213A(a), and that the new section 213A(a) shall apply to affidavits of support executed on a specified date not less than 60 days nor more than 90 days after promulgation of the new form.

TITLE VII—FACILITATION OF LEGAL ENTRY

*Sec. 701—Additional land border inspectors; infrastructure improvements*

This section requires the Attorney General and the Secretary of the Treasury to increase the number of full-time land border inspectors in the INS and the Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes, and that personnel be deployed in proportion to the number of land border crossings in the border sectors.

This section also requires that in completing infrastructure improvements to expedite the inspection of persons and vehicles seeking lawful admission at land borders, the Attorney General give priority to those areas where the need for such improvements is greatest.

*Sec. 702—Commuter lane pilot programs*

This section amends section 286(q) of the INA and the 1994 Justice appropriations act to permit the expansion of commuter lane pilot programs at land borders.

*Sec. 703—Preinspection at foreign airports*

This section amends the INA to create a new section 235A, providing for the establishment within 2 years of preinspection stations at 5 of the 10 foreign airports having the greatest number of departures for the U.S., and to establish an additional 5 preinspection stations within 4 years.

*Sec. 704—Training of airline personnel in detection of fraudulent documents*

Subsection (a) amends section 286(h)(2)(A)(iv) to provide that funds may expended from the Immigration User Fee Account for the training of commercial airline personnel in the detection of fraudulent documents, and that not less than 5 percent of the expenses incurred out of the Account in a given fiscal year shall be expended for this purpose.

Subsection (b) amends section 212(f) to provide that if a commercial airline has failed to comply with regulations of the Attorney General relating to the detection of fraudulent documents, including the training of personnel, the Attorney General may suspend the entry of aliens transported to the U.S. by the airline.

Subsection (c) provides that the Attorney General shall issue the regulations called for in subsection (b) within 90 days of enactment.

270

TITLE VIII—MISCELLANEOUS PROVISIONS

Subtitle A—Amendments to the Immigration and Nationality Act

*Sec. 801—Nonimmigrant status for spouses and children of members of the armed services*

This section amends section 101(a)(15) by adding a new subparagraph (T), creating a nonimmigrant category for an alien who is the spouse or child of another alien who is serving on active duty in the Armed Forces and is stationed in the U.S.

*Sec. 802—Amended definition of aggravated felony*

This section amends the definition of aggravated felony in section 101(a)(43) of the INA, as amended by section 222 of the Immigration and Nationality Technical Corrections Act of 1994, to make certain technical corrections and to make the definition effective to all convictions entered at any time before, on, or after the date of enactment.

*Sec. 803—Authority to determine visa processing procedures*

Subsection (a) amends section 202(a)(1) of the INA to clarify that the Secretary of State has non-reviewable authority to establish procedures for the processing of immigrant visa applications and the locations where visas will be processed.

Subsection (b) amends section 222 by adding a new subsection (g), providing that an alien who has remained in the U.S. beyond the authorized period of stay is not eligible to be admitted to the U.S. as a nonimmigrant unless the alien has received a visa in a consular office located in the country of the alien's nationality (or, if there is no such office, at a consular office designated by the Secretary of State).

*Sec. 804—Waiver authority concerning notice of denial of applications for visas*

This section amends section 212(b) of the INA to permit the Secretary of State to waive, in the case of an alien denied a visa by a consular officer on the basis of the exclusion grounds in section 212(a)(2) (criminal activity) or 212(a)(3) (national security and terrorist), the requirement that the alien be provided notice of the reason for denial. Currently, all foreign nationals who are denied a visa are entitled to notice of the basis for the denial. This creates a difficult situation in those instances where an alien is denied entry on the basis, for example, of being a drug trafficker or a terrorist. Clearly, the information that U.S. government officials are aware of such drug trafficking or terrorist activity would be highly valued by the alien and may hamper further investigation and prosecution of the alien and his or her confederates.

An alien has no constitutional right to enter the U.S. and no right to be advised of the basis for the denial of such a privilege. Thus, there is no impediment to the limitation on disclosure in this section.

271

*Sec. 805—Treatment of Canadian landed immigrants*

This section amends section 212(d)(4)(B) to provide that the Attorney General may waive the requirements of section 212(a)(7)(b)(i) regarding presentation of documents in the case of aliens who are granted permanent residence by the government of a foreign contiguous territory and who are residing in that territory.

*Sec. 806—Changes relating to H–1B nonimmigrants*

This section amends section 212(n) to provide for changes in the statutory and regulatory requirements for visas issued to nonimmigrants under section 101(a)(15)(H)(i)(B) ("H–1B visas").

Subsection (a) provides that no employer shall be required to have and document an objective system to determine the wages of workers.

For purposes of determining the actual wage level an employer pays to individuals with similar experience and qualifications in the specific employment of an H–1B worker, a non-H–1B dependent employer (see below for definition) of more than 1,000 full-time equivalent employees in the United States may demonstrate that in determining the wages of its H–1B workers, it utilizes a compensation and benefits system that has been previously certified by the Secretary of Labor (and recertified at such intervals the Secretary may designate) to satisfy the five following conditions: (1) The employer has a company-wide compensation policy for its full-time equivalent employees which ensures salary equity among employees similarly employed, (2) the employer has a company-wide benefits policy under which all full-time equivalent employees similarly employed are eligible for substantially the same benefits or under which some employees may accept higher pay, at least equal in value to the benefits, in lieu of benefits, (3) the compensation and benefits policy is communicated to all employees, (4) the employer has a human resources or compensation function that administers its compensation system, and (5) the employer has established documentation for the job categories in question. An employer's payment of wages to an H–1B worker consistent with a system which meets these conditions and which has been certified by the Secretary of Labor shall be deemed to satisfy the actual wage requirement of section 212(n)(1)(A)(i)(I).

For purposes of determining and enforcing the prevailing wage level for the occupational classification in the area of employment of an H–1B worker, employers may provide a published survey, a State Employment Security Agency determination, a determination by an accepted private source or any other legitimate source. The Secretary of Labor shall, no later than 180 days from the date of enactment of this Act, provide for acceptance of prevailing wage determinations not made by a State Employment Security Agency. The Secretary must either accept such a wage determination or issue a written decision rejecting the determination and detailing the legitimate reasons that the determination is not acceptable. If a detailed rejection is not issued within 45 days of receipt by the Secretary of Labor, the determination will be deemed accepted. An employer's payment of wages consistent with a prevailing wage de-

272

termination not rejected by the Secretary shall be deemed to satisfy the prevailing wage requirement of section 212(n)(1)(A)(i)(II).

Subsection (b) provides that employers which are non-H–1B dependent employers do not have to abide by certain regulations promulgated by the Department of Labor which went into effect on January 19, 1995. An H–1B dependent employer is defined as an employer which (1) has fewer than 21 full-time equivalent employees who are employed in the United States, 4 or more of whom are H–1B workers, (2) has at least 21 but not more than 150 full-time equivalent employees who are employed in the United States, 20% or more of whom are H–1B workers, or (3) has at least 151 full-time equivalent employees who are employed in the United States, 15 percent or more of whom are H–1B workers. An alien employed under an H–1B petition shall be treated as an employee of the employer for purposes of this subsection.

An employer which is H–1B dependent can nevertheless be treated as non-H–1B dependent for up to five years on a probationary status if (1) the employer has demonstrated to the satisfaction of the Secretary of Labor that it has developed a reasonable plan for reducing its use of H–1B workers over a five year period to the level of a non-H–1B dependent employer, and (2) annual reviews of the plan by the Secretary indicate successful implementation of the plan. If the Secretary determines that the employer has not met the requirements of (1) or (2), the probationary status ends and the employer shall be treated as H–1B dependent until such time as the employer can prove to the Secretary of Labor that it is no longer H–1B dependent, as defined previously. All opportunities for probationary status end five years after the date of enactment.

The regulatory relief provided to non-H–1B dependent employers includes:

(1) A non-H–1B dependent employer does not have to post a notice at a worksite visited by an H–1B worker that is within the area of intended employment listed on that worker's labor condition application but is not itself listed on the application.

(2) A non-H–1B dependent employer is not required to file and have certified an additional labor condition application (LCA) with respect to an H–1B worker for an area of employment not listed in the worker's initial LCA because the employer has placed that or other H–1B workers (who did not have that area of employment listed in their LCAs) in that area for any period of time, except that such employer can only place an H–1B worker in areas of employment not listed in the worker's LCA for a period exceeding 45 workdays in any 12-month period and 90 workdays in any 3 year period if (1) the employer files and has certified an additional LCA for the H–1B worker listing such areas of employment visited after the 45/90 limit is reached, or (2) the H–1B worker's principal place of employment has not changed to a non-listed area.

(3) A non-H–1B dependent employer is not required to pay per diem and transportation costs at any specified rate when sending H–1Bs to areas of employment not listed in their LCAs.

(4) The Secretary of Labor can file a complaint respecting an employer's failure to meet a condition specified on an LCA or misrepresentation of a material fact on an LCA only in the case of an

273

H–1B dependent employer (including an H–1B dependent employer which is on probationary status as a non-H–1B dependent employer when the Secretary is conducting an annual review of the employer's plan and the review indicates that there appears to be a violation of an attestation or a misrepresentation of a material fact). No investigation or hearing shall be conducted with respect to a non-H–1B dependent employer except in response to a complaint.

Subsection (c) provides that when filing an LCA, an employer must attest that within the period beginning six months before and ending 90 days following the filing of the application and during the 90 days immediately preceding and following the filing of any visa petition supported by the application, the employer has not laid off and will not lay off protected individuals with substantially equivalent qualifications and experience in the specific employment as to which the H–1B worker is sought or employed, unless the employer will pay a wage to the H–1B worker that is at least 110 percent of the mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the mean of the highest wage earned by all such laid off individuals within the most recent year if the employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

For purposes of the "no layoff" provisions in section 806 restricting the ability of an employer to lay off a domestic worker in the specific employment as to which an H–1B alien is sought or is employed, the term "specific employment" can be coterminous with a concept such as occupational category ("engineer"), or it can be narrower in scope. It can also be coterminous with a broad subcategory of occupational category ("chemical engineer"), or it can be narrower in scope. Specific employment means a specific job with specific responsibilities. For example, in a small company this may be a job of great breadth—the accountant who does all the books or the programmer who designs all the software. Conversely, in a large company this may be very specialized—the engineer whose job it is to design the gyroscope for a new rocket or the programmer whose job it is to design a new spreadsheet program. The question to ask is: "In the context of a specific employer, is it reasonable to conclude that a domestic worker is being replaced by an H–1B alien?" In any case, merely minor changes in a job description are not sufficient to change the specific employment. And an employer cannot shift a domestic employee from his or her specific employment—in which an H–1B alien is sought or is employed— to a different job preparatory to laying him or her off merely as a ruse to avoid the "no layoff" provisions. In such a case, the domestic worker's specific employment should be considered his or her initial job.

In the case of an H–1B dependent employer, the employer shall not place an H–1B worker with another employer where (1) the H–1B performs his or her duties in whole or in part at worksite(s) owned, operated, or controlled by the other employer, and (2) there are indicia of an employment relationship between the alien and the other employer. This prohibition will not apply if either (1) the other employer has executed an attestation that within the period

274

beginning six months before and ending 90 days following the filing of the LCA and during the 90 days immediately preceding and following the filing of any visa petition supported by the LCA the other employer has not laid off and will not lay off protected individuals with substantially equivalent qualifications and experience in the specific employment as to which the H–1B worker is sought or employed, or (2) the employer pays a wage to the H–1B worker that is at least 110 percent of the mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the mean of the highest wage earned by all such laid off individuals within the most recent year if the other employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

The term "laid off" refers to the individual's loss of employment, other than a discharge for inadequate performance, cause, voluntary departure, or retirement, and does not include any situation in which the employee is offered a similar job opportunity with the same employer (or the other employer with which an H–1B worker is placed by an H–1B dependent employer referenced in the preceding paragraph) carrying equivalent or higher compensation and benefits, regardless of whether or not the employee accepts the offer.

The term "protected individual" refers to an individual who is a citizen or national of the United States or is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a), 210A(a), or 245(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208.

The provisions of section 212(n)(2), including the process for the receipt, investigation, and disposition of complaints, the imposition of administrative remedies and back pay, and the prohibition of the Attorney General from approving an employer's petitions for alien workers, shall apply to failures of an employer to comply with the new attestation required of it under this Act and to complaints respecting a failure of another employer with which an H–1B worker is placed by an H–1B dependent employer to comply with the new attestation required of it under this Act.

Subsection (d) provides for enhanced penalties for violations of an attestation or misrepresentation of a material fact in an LCA. Maximum civil penalties are increased to $5,000 per violation. The Attorney General is prohibited from approving petitions for aliens to be employed by an employer for a period of at least 1 year in the case of the first determination of a violation or any subsequent determination of a non-willful violation occurring within 1 year of that first violation or any subsequent determination of a non-wilful violation occurring more than 1 year after the first violation; for a period of at least 5 years in the case of a determination of a willful violation occurring more than one year after the first violation; and at any time in the case of a determination of a willful violation occurring more than 5 years after a violation resulting in a bar of at least five years. If a penalty has been imposed in the case of a willful violation, an additional punishment consisting of a civil mone-

275

tary penalty will be imposed on the employer in an amount equalling twice the amount of back pay awarded.

When computing the prevailing wage level in the case of an employee of an institution of higher education or a related or affiliated nonprofit entity, or a nonprofit scientific research organization, the level shall only take into account employees at such institutions and entities in the area of employment.

In general, the changes to the H–1B program contained in the Act will take effect on the date of enactment and shall apply to applications filed with the Secretary of Labor on or after 30 days after the date of enactment. The changes to the complaint and investigation process shall apply to complaints filed, and to investigations or hearings initiated, on or after January 19, 1995.

*Sec. 807—Validity of period for visas*

Subsection (a) amends section 221(c) to provide that an immigrant visa shall be valid for a period of six months.

Subsection (b) amends section 221(c) to provide that the period for validity of a nonimmigrant visa issued to an alien of one nationality who has been granted refugee status and been firmly resettled in another country shall be based on the treatment granted by the country of resettlement to alien refugees resettled in the U.S.

*Sec. 808—Limitation on adjustment of status of individuals not lawfully present in the United States*

Subsection (a) amends section 245(i)(1)(B), as added by section 605(b) of the Department of State and Related Agencies Appropriations Act, 1995 (Public Law 103-317, 108 Stat. 1765) by requiring an application for adjustment of status under this provision to pay a fee of $2,500.

Subsection (b) strikes section 212(o).

*Sec. 809—Limited access to certain confidential INS files*

Subsection (a) amends section 245(A)(c)(5) by redesignating subparagraphs (A) through (C) and by adding a new subparagraph (C) to permit the Attorney General to make an application to a Federal judge, and for such Federal judge to authorize disclosure of information in an application for legalization for the following purposes: to identify an alien believed to be dead or severely incapacitated; or for criminal law enforcement purposes if the alleged criminal activity occurred after the legalization application was filed and involves terrorist activity, a crime prosecutable as an aggravated felony (without regard to length of sentence) or poses an immediate risk to life or national security. Information limited to the date and disposition of the application, the alien's immigration status (but only for the purpose of determining eligibility for relief from deportation or removal), or criminal convictions (if any) after the date of the application, may be disclosed for immigration enforcement purposes without petition to a Federal judge.

Subsection (b) makes parallel amendments to the confidentiality provisions in section 210(b) (Special Agricultural Worker Program).

The purpose of this section is to amend the provisions in sections 210 and 245A protecting the confidentiality of applications for legalization and to ensure that information contained in such appli-

276

cations would not be used for purposes of immigration law enforcement. A limited waiver of such confidentiality, subject to prior approval by a federal judge, is appropriate in order to identify an alien who is dead or severely incapacitated, or if the alien is alleged to have committed a serious criminal offense after the date of the application. Disclosure in these limited circumstances will not undermine the initial policy of confidentiality. An alien filing for legalization did not have a reasonable expectation, under the laws existing at that time, that information in his or her application could not be used for the purpose of identifying that alien for compelling circumstances, unrelated to immigration enforcement, that would arise after the filing of the application. The government interest in securing such information is compelling, and the requirement of judicial approval will further ensure that the legitimate confidentiality rights of legalization applicants are protected.

This section also clarifies that information outside of the actual application for legalization, as well as information limited to the date and disposition of the application, does not fall within the original confidentiality provisions on sections 210 and 245A, and can be used for immigration enforcement or other purposes without prior judicial approval. This clarification is needed because in certain circumstances, these confidentiality provisions have been erroneously interpreted to prohibit the disclosure of information in INS files pertaining to the disposition of the application, but not information contained in the application itself. The plain language in sections 245A(c)(5) and 210(b) is addressed solely to the contents of the application, not to information regarding the disposition of the application or the alien's subsequent immigration status.

*Sec. 810—Change of nonimmigrant application*

This section amends section 248 to provide that an alien whose status is changed under section 248 may apply directly to the Secretary of State for a visa without having to leave the United States.

Subtitle B—Other Provisions.

*Sec. 831—Commission report on fraud associated with birth certificates*

This section amends section 141(c) of the Immigration Act of 1990 to require that the Commission on Immigration Reform shall study and submit to Congress, not later than January 1, 1997, a report containing recommendations of methods to reduce or eliminate the fraudulent use of birth certificates for the purposes of obtaining identification documents that may be used to obtain benefits relating to immigration and employment. The Commission shall consider proposals to adopt national standards for issuing birth certificates and to limit the issuance of an individual's birth certificate to any person other than the individual or his or her representative.

*Sec. 832—Uniform vital statistics*

This section requires the Secretary of Health and Human Services, within 2 years of the date of enactment, to establish a pilot program for 3 of the 5 States with the largest population of un-

277

documented aliens for linking through electronic network the vital statistics records of such States. The network shall provide for the matching of deaths and births and shall institute measures to protect the integrity of the records, specifically to prevent fraud against the Government through use of false birth and death certificates. The Secretary shall issue a report to Congress not later than 180 days after establishment of the pilot program with recommendations on how the pilot program could be implemented as a national network.

*Sec. 833—Communication between state and local government agencies, and the immigration and naturalization service*

This section provides that notwithstanding any other provision of Federal, State, or local law, no State or local government entity shall prohibit or in any way restrict any government entity or official from sending to or receiving from the INS information regarding the immigration status of an alien in the United States.

The Committee intends to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, and activities of illegal aliens. This section is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The Committee believes that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the U.S. undetected and unapprehended.

*Sec. 834—Criminal alien reimbursement costs*

This section provides that amounts appropriated to carry out section 501 of the Immigration Control and Reform Act of 1986 shall be available to carry out section 242(j) of the INA with respect to undocumented criminal aliens incarcerated by the political subdivisions of a State.

*Sec. 835—Female genital mutilation*

This section requires aliens from certain countries specified by the INS in consultation with the Secretary of State to be advised prior to or at the time of entry into the United States of the severe harm caused by female genital mutilation and the potential legal consequences in the United States of performing female genital mutilation or of allowing a child to be subjected to female genital mutilation.

*Sec. 836—Designation of portugal as a visa waiver pilot program country with probationary status*

This section designates Portugal as a visa waiver pilot program country with probationary status under section 217(g) for each of the fiscal years 1996, 1997, and 1998.

278

Subtitle C—Technical Corrections.

*Sec. 851—Miscellaneous technical corrections*

This section makes a number of entirely technical corrections to the Immigration Reform and Control Act of 1986, the Immigration and Nationality Technical Corrections Act of 1994, the Immigration and Nationality Act, and other legislation.

### AGENCY VIEWS

The Administration has not provided a statement of its views regarding H.R. 2202 as reported by the Committee on October 24, 1996. The following is a statement of views received from the Attorney General regarding H.R. 2202 as introduced on August 4, 1995.

OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, DC, September 15, 1995.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR CHAIRMAN HYDE: This letter presents the views of the Administration concerning H.R. 2202, the "Immigration in the National Interest Act of 1995," as introduced on August 4, 1995.

Many of the provisions in H.R. 2202 advance the Administration's four-part strategy to control illegal immigration. This strategy calls for regaining control of our borders; removing the job magnet through worksite enforcement; aggressively pursuing the removal of criminal aliens and other illegal aliens; and securing from Congress the resources to assist states with the costs of illegal immigration that are a result of failed enforcement policies of the past. The Administration's legislative proposal to advance that strategy is H.R. 1929, the "Immigration Enforcement Improvements Act of 1995," introduced by Representative Howard Berman on June 27, 1995. We are pleased that the bill before the Committee follows our policies to a significant extent. Our positions on the provisions in the bill are summarized in the following discussion.

TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED
BORDER ENFORCEMENT AND PILOT PROGRAMS

The Administration has already demonstrated that our borders can be controlled when there is a commitment to do so by the President and Congress. With an unprecedented infusion of resources since 1993, we have implemented a multi-year border control strategy of prevention through deterrence. We have carefully crafted long range strategic plans tailored to the unique geographic and demographic characteristics of each border area to restore integrity to the border.

Border Patrol Agents: We have increased the number of Border Patrol agents by 40% since 1993 and we support a further increase of 700 agents per year to reach a total strength of at least 7,281 Border Patrol agents by the end of FY 1998.

279

Document Security: We support improved security of Border Crossing Cards and other documents, using advanced technology, within a reasonable period of time.

Interior Repatriation: We support pilot programs to deter multiple unauthorized entries, including interior and third country repatriation.

Penalty for illegal entry: We are currently prosecuting more repeat criminal alien illegal entry offenders than ever. Our increase in prosecutions is preferable to a burdensome civil penalty.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

The Administration is aggressively investigating, apprehending, and prosecuting alien smugglers. H.R. 2202 and the Administration bill have a common goal of significantly increasing penalties for alien smuggling, document fraud, and related crimes. In face, our bill goes beyond the provisions of H.R. 2202 by making conspiracy to violate the alien smuggling statutes a RICO predicate and by providing for civil forfeiture of proceeds of and property used to facilitate alien smuggling.

Penalty increases: We support increases in the sentences for aliens who fail to obey a deportation order, illegally re-enter the U.S. after deportation, or commit passport of visa fraud.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Removals of criminal aliens have increased rapidly during this Administration. More than four times as many criminal aliens were removed in 1994 than in 1988. We will nearly triple the number of criminal alien removals from 20, 138 in FY 93 to 58,200 in FY 96 by streamlining deportation procedures, expending the Institutional Hearing Program, and enhancing the international prisoner transfer treaty program. Immigration and Naturalization Service (INS) technology enhancements have also played a critical role in removing criminal aliens, as have INS alternatives to formal deportation, such as stipulated, judicial, and administrative deportation.

Special exclusion: We support special exclusion provisions which allow the Attorney General to order an alien excluded and deported without a hearing before an immigration judge when extraordinary situations threaten our ability to process cases and in the case of irregular boat arrivals.

Removal procedures: We support consolidating exclusion and deportation into one removal process and facilitating telephone and video hearings which save resources.

Authorization for removals: We urge the Committee to increase the authorization for funding the detention and removal of inadmissible or deportable aliens to $177.7 million, the amount in the President's FY 96 budget request, rather than the $150 million in H.R. 2202.

Relief from deportation: We support consolidating the processes and restricting the grounds which permit relief from deportation.

280

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

The Administration strongly believes that jobs are the greatest magnet for illegal immigration and that a comprehensive effort to deter illegal immigration, particularly visa overstaying, must make worksite enforcement a top priority. The Administration is concerned by the cautious steps back H.R. 2202 takes with regard to enforcement of employer sanctions and will continue to work with the Committee to address this priority enforcement area.

Enforcement personnel: The President's FY budget request calls for 202 new DOL Wage and Hour personnel while H.R. 2202 calls for 150. We support the levels of new INS investigations personnel and new DOL Wage and Hour personnel requested in the President's FY 96 budget. These resources will enhance enforcement of laws prohibiting employment of illegal aliens and the minimum labor standards laws.

Employment verification: H.R. 2202, in contrast to the Administration's bill, rejects the principle worksite enforcement recommendation of the Commission on Immigration Reform which was to thoroughly test and evaluate verification techniques before implementing them nationwide. We support continued pilot projects which will aid in the development of a system for accurate verification of a potential employee's status. Such a system will greatly assist employers in meeting their obligation to hire only authorized workers. Testing what works—from business impact, cost effectiveness, privacy and discrimination perspectives—is a necessary prerequisite for a nationwide verification system.

Employment documents. We strongly support the reduction in the number of documents that can establish employment authorization.

TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

The Administration seeks legal immigration reform that promotes family reunification, protects U.S. workers from unfair competition while promoting the global competitiveness of our employers, and encourages naturalization to encourage full participation in the national community. The Administration supports a reduction in the overall level of legal immigration consistent with these principles.

We are proposing to reform legal immigration in ways that are consistent with the Jordan Commission's recommendations, that reduce annual levels of legal immigration, and that reach those lower numbers faster. We are also proposing a few ideas on how to use naturalization to reduce the second preference backlog numbers, which is a priority for the Commission and the Administration, while maintaining first and third family preferences for reunification of adult children of U.S. citizens.

Refugee admissions: We do not support a statutory cap on the number of refugees resettled in the U.S. Refugee admissions, which have declined in recent years, are better determined through the established consultation process between the President and the Congress.

281

Asylum proceedings: We do not support extensive changes in the asylum process which would reverse the significant progress the Administration has made in the asylum area.

TITLE VI—RESTRICTIONS ON BENEFITS FOR UNAUTHORIZED ALIENS

The Administration supports the denial of benefits to undocumented immigrants. The only exceptions should include matters of public health and safety—such as emergency medical services, immunization and temporary disaster relief assistance—and every child's right to a public education. In so doing, care must be taken not to limit or deny benefits or services to eligible individuals or in instances where denial does not serve the national interest. The Administration also supports tightening sponsorship and eligibility rules for non-citizens and requiring sponsors of legal immigrants to bear greater responsibility through legally enforceable sponsorship agreements for those whom they encourage to enter the United States. The Administration, however, strongly opposes application of new eligibility and deeming provisions to current recipients, including the disabled who are exempted under current law. The Administration also is deeply concerned about the application of deeming provisions to Medicaid and other programs where deeming would adversely affect public health and welfare.

TITLE VII—FACILITATION OF LEGAL ENTRY

The Administration is committed to improving services for legal entrants, and we support the provisions of this bill which enable us to do so. We are already conducting commuter land pilot programs on the Northern border to facilitate traffic at the ports of entry. Revenues from new service charges will enable us to hire additional inspectors and to enhance customer service to the traveling public at land border ports of entry.

As for air travel, our pre-inspection facilities enable us to expedite inspection at the arrival airports. In addition, we are already working with the travel industry to deter illegal traffic and improve customer services. For the past five years we have conducted a Carrier Consultant program at both United States and foreign locations in which we train airline employees and foreign government officials in the detection of fraudulent travel documents. This has resulted in a marked reduction of mala fide arrivals at United States gateway airports.

TITLE VIII—MISCELLANEOUS

Adjustment of status: We do not support limiting the class of aliens who can adjust status under section 245(i) of the Immigration and Nationality Act. This section has eliminated a burdensome paper process, and allowed resources to be shifted to anti-fraud and naturalization efforts.

Mr. Chairman, we want to work with you on bipartisan immigration enforcement legislation that is in the national interest. We look forward to working with you to address the core issues of worksite enforcement, border control, criminal alien deportation and comprehensive immigration law enforcement.

282

The Office of Management and Budget has advised that there is no objection to the submission of this letter from the standpoint of the Administration's program.

Sincerely,

JAMIE S. GORELICK,
*Deputy Attorney General.*

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## IMMIGRATION AND NATIONALITY ACT

\*         \*         \*         \*         \*         \*         \*

TABLE OF CONTENTS

TITLE I—GENERAL

Sec. 101.   Definitions.
Sec. 102.   Applicability of title II to certain nonimmigrants.
Sec. 103.   Powers and duties of the Attorney General and the Commissioner.

\*         \*         \*         \*         \*         \*         \*

【Sec. 106.   Judicial review of orders of deportation and exclusion.】

TITLE II—IMMIGRATION

CHAPTER 1—SELECTION SYSTEM

Sec. 201.   Worldwide level of immigration.
Sec. 202.   Numerical limitation to any single foreign state.
Sec. 203.   Allocation of immigrant visas.

\*         \*         \*         \*         \*         \*         \*

【Sec. 208.   Asylum procedure.】
*Sec. 208. Asylum.*

\*         \*         \*         \*         \*         \*         \*

CHAPTER 2—QUALIFICATIONS FOR ADMISSION OF ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

Sec. 211.   Documentary requirements.
Sec. 212.   General classes of aliens ineligible to receive visas and excluded from admission; waivers of inadmissibility.
Sec. 213.   Admission of certain aliens on giving bond.
*Sec. 213A.   Requirements for sponsor's affidavit of support.*

\*         \*         \*         \*         \*         \*         \*

*Sec. 216B.  Conditional permanent resident status for certain foreign language teachers.*

\*         \*         \*         \*         \*         \*         \*

CHAPTER 3—ISSUANCE OF ENTRY DOCUMENTS

Sec. 221.   Issuance of visas.
Sec. 222.   Applications for visas.
Sec. 223.   Reentry permits.
【Sec. 224.   Immediate relative and special immigrant visas.】
*Sec. 224.   Visas for spouses and children of citizens and special immigrants.*

283

⟦CHAPTER 4—PROVISIONS RELATING TO ENTRY AND EXCLUSION

⟦Sec. 231.   Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.
⟦Sec. 232.   Detention of aliens for observation and examination.
⟦Sec. 234.   Physical and mental examination.
⟦Sec. 235.   Inspection by immigration officers.
⟦Sec. 236.   Exclusion of aliens.
⟦Sec. 237.   Immediate deportation of aliens excluded from admission or entering in violation of law.
⟦Sec. 238.   Entry through or from foreign contiguous territory and adjacent islands; landing stations.
⟦Sec. 239.   Designation of ports of entry for aliens arriving by civil aircraft.
⟦Sec. 240.   Records of admission.

⟦CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS

⟦Sec. 241.   General classes of deportable aliens.
⟦Sec. 242.   Apprehension and deportation of aliens.
⟦Sec. 242A.  Expedited procedures for deportation of aliens convicted of committing aggravated felonies.
⟦Sec. 242B.  Deportation procedures.
⟦Sec. 243.   Countries to which aliens shall be deported; cost of deportation.
⟦Sec. 244.   Suspension of deportation; voluntary departure.
⟦Sec. 244A.  Temporary protected status.⟧

*CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL*

*Sec. 231.   Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.*
*Sec. 232.   Detention of aliens for physical and mental examination.*
*Sec. 233.   Entry through or from foreign contiguous territory and adjacent islands; landing stations.*
*Sec. 234.   Designation of ports of entry for aliens arriving by civil aircraft.*
*Sec. 235.   Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.*
*Sec. 235A.  Preinspection at foreign airports.*
*Sec. 236.   Apprehension and detention of aliens not lawfully in the United States.*
*Sec. 237.   General classes of deportable aliens.*
*Sec. 238.   Expedited removal of aliens convicted of committing aggravated felonies.*
*Sec. 239.   Initiation of removal proceedings.*
*Sec. 240.   Removal proceedings.*
*Sec. 240A.  Cancellation of removal; adjustment of status.*
*Sec. 240B.  Voluntary departure.*
*Sec. 240C.  Records of admission.*
*Sec. 241.   Detention and removal of aliens ordered removed.*
*Sec. 242.   Judicial review of orders of removal.*
*Sec. 243.   Penalties relating to removal.*
*Sec. 244.   Temporary protected status.*

*CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS*

*       *       *       *       *       *       *

CHAPTER 8—GENERAL PENALTY PROVISIONS

Sec. 271.   Prevention of unauthorized landing of aliens.
Sec. 272.   Bringing in aliens subject to ⟦exclusion⟧ *denial of admission* on a health-related ground.
Sec. 273.   Unlawful bringing of aliens into United States.
Sec. 274.   Bringing in and harboring certain aliens.
Sec. 274A.  Unlawful employment of aliens.
Sec. 274B.  Unfair immigration-related employment practices.
Sec. 274C.  Penalties for document fraud.
*Sec. 274D.  Civil penalties for failure to depart.*
Sec. 275.   Entry of alien at improper time or place; misrepresentation and concealment of facts.

Sec. 276.   Reentry of 〔deported〕 *removed* alien.
Sec. 277.   Aiding or assisting certain aliens to enter the United States.

\*       \*       \*       \*       \*       \*       \*

CHAPTER 9—MISCELLANEOUS

Sec. 281.   Nonimmigrant visa fees.
Sec. 282.   Printing of reentry permits and blank forms of manifests and crew lists.
Sec. 283.   Travel expenses and expense of transporting remains of immigration officers and employees who die outside of the United States.

\*       \*       \*       \*       \*       \*       \*

Sec. 293.   Deposit of and interest on cash received to secure immigration bonds.
*Sec. 294.   Undercover investigation authority.*

\*       \*       \*       \*       \*       \*       \*

*TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS*

*Sec. 501.   Definitions.*
*Sec. 502.   Establishment of special removal court; panel of attorneys to assist with classified information.*
*Sec. 503.   Application for initiation of special removal proceeding.*
*Sec. 504.   Consideration of application.*
*Sec. 505.   Special removal hearings.*
*Sec. 506.   Consideration of classified information.*
*Sec. 507.   Appeals.*
*Sec. 508.   Detention and custody.*

## TITLE I—GENERAL

### DEFINITIONS

SECTION 101. (a) As used in this Act—
(1)   \*   \*   \*

\*       \*       \*       \*       \*       \*       \*

(6) The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations. *Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.*

\*       \*       \*       \*       \*       \*       \*

〔(13) The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no per-

285

son whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.]

*(13)(A) The terms "admission" and "admitted" mean, with respect to an alien, the entry of the alien into the United States after inspection and authorization by an immigration officer.*

*(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.*

*(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—*

*(i) has abandoned or relinquished that status,*

*(ii) has engaged in illegal activity after having departed the United States,*

*(iii) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,*

*(iv) has been convicted of an aggravated felony, unless since such conviction the alien has been granted relief under section 240A(a), or*

*(v) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.*

\*      \*      \*      \*      \*      \*      \*

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

(A)  \*  \*  \*

\*      \*      \*      \*      \*      \*      \*

(K) an alien who is the fiancée or fiancé of a citizen of the United States and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after [entry] *admission*, and the minor children of such fiancée or fiancé accompanying him or following to join him;

\*      \*      \*      \*      \*      \*      \*

(N)(i) the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i) *(or under analogous authority under paragraph (27)(L))*, but only if and while the alien is a child, or (ii) a child of such parent or of an alien accorded the status of a special immigrant under clause (ii), (iii), or (iv) of paragraph (27)(I) *(or under analogous authority under paragraph (27)(L))*;

\*      \*      \*      \*      \*      \*      \*

(R) an alien, and the spouse and children of the alien if accompanying or following to join the alien, who—

(i) for the 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States; and

286

(ii) seeks to enter the United States for a period not to exceed 5 years to perform the work described in subclause (I), (II), or (III) of paragraph (27)(C)(ii); [or]

(S) subject to section [214(j)] *214(k)*, an alien—

(i) * * *

(ii) who the Secretary of State and the Attorney General jointly determine—

(I) is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

(II) is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

(III) will be or has been placed in danger as a result of providing such information; and

(IV) is eligible to receive a reward under section 36(a) of the State Department Basic Authorities Act of 1956,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien[.]*; or*

*(T) an alien who is the spouse or child of a another alien who is serving on active duty in the Armed Forces of the United States during the period in which the other alien is stationed in the United States.*

*       *       *       *       *       *       *

(17) The term "immigration laws" includes this Act and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, [or expulsion] *expulsion, or removal* of aliens.

*       *       *       *       *       *       *

(27) The term "special immigrant" means—

(A) * * *

[(B) an immigrant who was a citizen of the United States and may, under section 324(a) or 327 of title III, apply for reacquisition of citizenship;]

(C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—

(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

(ii) seeks to enter the United States—

(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

(II) before October 1, [1997] *2005*, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

(III) before October 1, [1997] *2005*, in order to work for the organization (or for a bona fide organization

287

which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986) at the request of the organization in a religious vocation or occupation; and

(iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

(D) an immigrant who is an employee, or an honorably retired former employee, of the United States Government abroad, or of the American Institute in Taiwan, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: *Provided,* That the principal officer of a Foreign Service establishment (or, in the case of the American Institute in Taiwan, the Director thereof), in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status;

〖(E) an immigrant, and his accompanying spouse and children, who is or has been an employee of the Panama Canal Company or Canal Zone Government before the date on which the Panama Canal Treaty of 1977 (as described in section 3 (a)(1) of the Panama Canal Act of 1979) enters into force, who was resident in the Canal Zone on the effective date of the exchange of instruments of ratification of such Treaty, and who has performed faithful service as such an employee for one year or more;

〖(F) an immigrant, and his accompanying spouse and children, who is a Panamanian national and (i) who, before the date on which such Panama Canal Treaty of 1977 enters into force, has been honorably retired from United States Government employment in the Canal Zone with a total of 15 years or more of faithful service, or (ii) who on the date on which such Treaty enters into force, has been employed by the United States Government in the Canal Zone with a total of 15 years or more of faithful service and who subsequently is honorably retired from such employment or continues to be employed by the United States Government in an area of the former Canal Zone or continues to be employed by the United States Government in an area of the former Canal Zone;

〖(G) an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977, who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment;

〖(H) an immigrant, and his accompanying spouse and children, who—

288

⟦(i) has graduated from a medical school or has qualified to practice medicine in a foreign state,

⟦(ii) was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

⟦(iii) entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) before January 10, 1978, and

⟦(iv) has been continuously present in the United States in the practice or study of medicine since the date of such entry;⟧

\*　　\*　　\*　　\*　　\*　　\*　　\*

(J) an immigrant (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who has been deemed eligible by that court for long-term foster care, and (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; except that no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; ⟦or⟧

(K) an immigrant who has served honorably on active duty in the Armed Forces of the United States after October 15, 1978, and after original lawful enlistment outside the United States (under a treaty or agreement in effect on the date of the enactment of this subparagraph) for a period or periods aggregating—

(i) 12 years and who, if separated from such service, was never separated except under honorable conditions, or

(ii) 6 years, in the case of an immigrant who is on active duty at the time of seeking special immigrant status under this subparagraph and who has reenlisted to incur a total active duty service obligation of at least 12 years,

and the spouse or child of any such immigrant if accompanying or following to join the immigrant, but only if the executive department under which the immigrant serves or served recommends the granting of special immigrant status to the immigrant⟦.⟧; or

*(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause—*

*(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North American Treaty Organization (NATO);*

*(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO–6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Head-*

289

*quarters under the "Protocol on the Status of International Military Headquarters" set up pursuant to the North Atlantic Treaty, or as a dependent); and*

*(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the Immigration in the National Interest Act of 1995.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(30) The term "passport" means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the ⟦entry⟧ *admission* of the bearer into a foreign country.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(42) The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such circumstances as the President after appropriate consultation (as defined in section 207(e) of this Act) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. *For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.*

(43) The term "aggravated felony" means—

(A) murder;

\*　　\*　　\*　　\*　　\*　　\*　　\*

(K) an offense that—

(i) relates to the owning, controlling, managing, or supervising of a prostitution business; or

(ii) is described in section 1581, 1582, 1583, 1584, 1585, or 1588⟦,⟧ of title 18, United States Code (relating to peonage, slavery, and involuntary servitude);

\*　　\*　　\*　　\*　　\*　　\*　　\*

290

(N) an offense described in section 274(a)(1) 〖of title 18, United States Code〗 *of this Act* (relating to alien smuggling) for the purpose of commercial advantage;

(O) an offense described in section 1546(a) of title 18, United States Code (relating to document fraud) 〖which constitutes trafficking in the documents described in such section for which the term of imprisonment imposed (regardless of any suspicion of such imprisonment) is at least 5 years〗, *for the purpose of commercial advantage*;

*       *       *       *       *       *       *

(Q) an attempt or conspiracy to commit an offense described in this paragraph.

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. *Notwithstanding any other provision of law, the term applies for all purposes to convictions entered before, on, or after the date of enactment of the Immigration and Nationality Technical Corrections Act of 1994.*

*       *       *       *       *       *       *

*(47) The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.*

*(48) The term "conviction" means a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where all of the following elements are present:*

*(A) A judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt.*

*(B) The judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.*

*(C) A judgment or adjudication of guilt may be entered if the alien violates the terms of the probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the alien's guilt or innocence of the original charge.*

(b) As used in titles I and II—

(1) The term "child" means an unmarried person under twenty-one years of age who is—

(A) a child born in wedlock;

*       *       *       *       *       *       *

(D) a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person;

(E) a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years:

291

*Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; ⟦or⟧

(F) a child, under the age of sixteen at the time a petition is filed in his behalf to accord a classification ⟦as an immediate relative under section 201(b)⟧ *as a child of a citizen of the United States*, who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care and has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who personally saw and observed the child prior to or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who have or has complied with the preadoption requirements, if any, of the child's proposed residence: *Provided,* That the Attorney General is satisfied that proper care will be furnished the child if admitted to the United States: *Provided further,* That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act⟦.⟧; *or*

(G) *a child of a citizen or national of the United States or lawful permanent resident alien, regardless of age, who has never been married, and who has a severe mental or physical impairment, or combination of mental or physical impairments, which—*

    *(i) is likely to continue indefinitely; and*

    *(ii) causes substantially total inability to perform functions necessary for independent living, including but not necessarily limited to 3 or more of the following areas of major life activity—*

        *(I) self-care,*

        *(II) interpersonal communication,*

        *(III) learning,*

        *(IV) mobility, and*

        *(V) self-direction:*

*Provided, That no child may be considered to be a child within the meaning of this subparagraph on the basis, in whole or in part, of any physical or mental impairment that is not being ameliorated through medical treatment to the maximum extent reasonably possible given the ability and resources of such child and the citizen, national, or lawful permanent resident alien who is the child's parent.*

    \*       \*       \*       \*       \*       \*       \*

⟦(4) The term "special inquiry officer" means any immigration officer who the Attorney General deems specially qualified to conduct specified classes of proceedings, in whole or in part, required by this Act to be conducted by or before a special inquiry officer and who is designated and selected by the Attorney General, individually or by regulation, to conduct such proceedings. Such special in-

292

quiry officer shall be subject to such supervision and shall perform such duties, not inconsistent with this Act, as the Attorney General shall prescribe.⟧

*(4) The term "immigration judge" means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.*

  \*  \*  \*  \*  \*  \*  \*

(c) As used in title III—

(1) The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, and, except as otherwise provided in sections 320⟦, 321, and 322⟧ *and 321* of title III, a child adopted in the United States, if such legitimation or adoption takes place before the child reaches the age of sixteen years, and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

  \*  \*  \*  \*  \*  \*  \*

(f) For the purposes of this Act—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

  (1) \* \* \*

  \*  \*  \*  \*  \*  \*  \*

  (3) a member of one or more of the classes of persons, whether ⟦excludable⟧ *inadmissible* or not, described in paragraphs (2)(D), (6)(E), and (9)(A) of section 212(a) of this Act; or subparagraphs (A) and (B) of section 212(a)(2) and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana); if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

  \*  \*  \*  \*  \*  \*  \*

(g) For the purposes of this Act any alien ordered deported *or removed* (whether before or after the enactment of this Act) who has left the United States, shall be considered to have been deported *or removed* in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

  \*  \*  \*  \*  \*  \*  \*

APPLICABILITY OF TITLE II TO CERTAIN NONIMMIGRANTS

SEC. 102. Except as otherwise provided in this Act, for so long as they continue in the nonimmigrant classes enumerated in this

293

section, the provisions of this Act relating to ineligibility to receive visas and the ⟦exclusion or deportation⟧ *removal* of aliens shall not be construed to apply to nonimmigrants—

(1)   *   *   *

*          *          *          *          *          *          *

POWERS AND DUTIES OF THE ATTORNEY GENERAL AND THE
COMMISSIONER

SEC. 103. (a)   *   *   *

*          *          *          *          *          *          *

(c)(1)   *   *   *

(2) Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have ⟦been excluded or deported⟧ *not been admitted or have been removed* from the United States, on the number of applications filed and granted for ⟦suspension of deportation⟧ *cancellation of removal*, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

*          *          *          *          *          *          *

*(e)(1) The Attorney General shall continue to provide for such programs (including intensive language training programs) of inservice training for full-time and part-time personnel of the Border Patrol in contact with the public as will familiarize the personnel with the rights and varied cultural backgrounds of aliens and citizens in order to ensure and safeguard the constitutional and civil rights, personal safety, and human dignity of all individuals, aliens as well as citizens, within the jurisdiction of the United States with whom such personnel have contact in their work.*

*(2) The Attorney General shall provide that the annual report of the Service include a description of steps taken to carry out paragraph (1).*

*          *          *          *          *          *          *

⟦JUDICIAL REVIEW OF ORDERS OF DEPORTATION AND EXCLUSION

⟦SEC. 106. (a) The procedure prescribed by, and all the provisions of chapter 158 of title 28, United States Code, shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 242(b) or pursuant to section 242A of this Act or comparable provisions of any prior Act, except that—

⟦(1) a petition for review may be filed not later than 90 days after the date of the issuance of the final deportation order, or, in the case of an alien convicted of an aggravated felony (including an alien described in section 242A), not later than 30 days after the issuance of such order;

⟦(2) the venue of any petition for review under this section shall be in the judicial circuit in which the administrative pro-

294

ceedings before a special inquiry officer were conducted in whole or in part, or in the judicial circuit wherein is the residence, as defined in this Act, of the petitioner, but not in more than one circuit;

〖(3) the action shall be brought against the Immigration and Naturalization Service, as respondent. Service of the petition to review shall be made upon the Attorney General of the United States and upon the official of the Immigration and Naturalization Service in charge of the Service district in which the office of the clerk of the court is located. The service of the petition for review upon such official of the Service shall stay the deportation of the alien pending determination of the petition by the court, unless the court otherwise directs or unless the alien is convicted of an aggravated felony (including an alien described in section 242A), in which case the Service shall not stay the deportation of the alien pending determination of the petition of the court unless the court otherwise directs;

〖(4) except as provided in clause (B) of paragraph (5) of this subsection, the petition shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive;

〖(5) whenever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, the court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court under the provisions of section 2201 of title 28, United States Code. Any such petitioner shall not be entitled to have such issue determined under section 360(a) of this Act or otherwise;

〖(6) whenever a petitioner seeks review of an order under this section, any review sought with respect to a motion to reopen or reconsider such an order shall be consolidated with the review of the order;

〖(7) if the validity of a deportation order has not been judicially determined, its validity may be challenged in a criminal proceeding against the alien for violation of subsection (d) or (e) of section 242 of this Act only by separate motion for judicial review before trial. Such motion shall be determined by the court without a jury and before the trial of the general issue. Whenever a claim to United States nationality is made in such motion, and in the opinion of the court, a genuine issue of material fact as to the alien's nationality is presented, the court shall accord him a hearing de novo on the nationality claim and determine that issue as if proceedings had been initiated under the provisions of section 2201 of title 28, United

295

States Code. Any such alien shall not be entitled to have such issue determined under section 360(a) of this Act or otherwise. If no such hearing de novo as to nationality is conducted, the determination shall be made solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial and probative evidence on the record considered as a whole, shall be conclusive. If the deportation order is held invalid, the court shall dismiss the indictment and the United States shall have the right to appeal to the court of appeals within thirty days. The procedure on such appeals shall be as provided in the Federal rules of criminal procedure. No petition for review under this section may be filed by any alien during the pendency of a criminal proceeding against such alien for violation of subsection (d) or (e) of section 242 of this Act;

〖(8) nothing in this section shall be construed to require the Attorney General to defer deportation of an alien after the issuance of a deportation order because of the right of judicial review of the order granted by this section, or to relieve any alien from compliance with subsections (d) and (e) of section 242 of this Act. Nothing contained in this section shall be construed to preclude the Attorney General from detaining or continuing to detain an alien or from taking him into custody pursuant to subsection (c) of section 242 of this Act at any time after the issuance of a deportation order;

〖(9) it shall not be necessary to print the record or any part thereof, or the briefs, and the court shall review the proceedings on a typewritten record and on typewritten briefs; and

〖(10) any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings.

〖(b) Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 236 of this Act or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings and not otherwise.

〖(c) An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order. Every petition for review or for habeas corpus shall state whether the validity of the order has been upheld in any prior judicial proceeding, and, if so, the nature and date thereof, and the court in which such proceeding took place. No petition for review or for habeas corpus shall be entertained if the validity of the order has been previously determined in any civil or criminal proceeding, unless the petition presents grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the order.

〖(d)(1) A petition for review or for habeas corpus on behalf of an alien against whom a final order of deportation has been issued pursuant to section 242A(b) may challenge only—

296

〔(A) whether the alien is in fact the alien described in the order;

〔(B) whether the alien is in fact an alien described in section 242A(b)(2);

〔(C) whether the alien has been convicted of an aggravated felony and such conviction has become final; and

〔(D) whether the alien was afforded the procedures required by section 242A(b)(4).

〔(2) No court shall have jurisdiction to review any issue other than an issue described in paragraph (1).〕

## TITLE II—IMMIGRATION

### CHAPTER 1—SELECTION SYSTEM

#### WORLDWIDE LEVEL OF IMMIGRATION

SEC. 201. (a) IN GENERAL.—Exclusive of aliens described in subsection (b), aliens born in a foreign state or dependent area who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence are limited to—

(1)  * * *

(2) employment-based immigrants described in section 203(b) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(b)), in a number not to exceed in any fiscal year the number specified in subsection (d) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year; 〔and〕

(3) for fiscal years beginning with fiscal year 1995, diversity immigrants described in section 203(c) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(c)) in a number not to exceed in any fiscal year the number specified in subsection (e) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year〔.〕*; and*

*(4) for fiscal years beginning with fiscal year 1997, humanitarian immigrants described in section 203(e) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(e)) in a number not to exceed in any fiscal year the number specified in subsection (f) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year.*

(b) ALIENS NOT SUBJECT TO DIRECT NUMERICAL LIMITATIONS.—Aliens described in this subsection, who are not subject to the worldwide levels or numerical limitations of subsection (a), are as follows:

(1)(A) Special immigrants described in subparagraph (A) 〔or (B)〕 of section 101(a)(27).

*       *       *       *       *       *       *

297

(C) Aliens whose status is adjusted to permanent residence under section 210⟦, 210A,⟧ or 245A.

(D) Aliens whose ⟦deportation is suspended⟧ *removal is canceled* under section ⟦244(a)⟧ *240A(a).*

(E) Aliens provided permanent resident status under section 249.

(2)(A)(i) ⟦Immediate relatives.—For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age.⟧ *An alien who is a spouse or child of a citizen of the United States.* In the case of an alien who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, the alien (and each child of the alien) shall be considered, for purposes of this subsection, to remain ⟦an immediate relative⟧ *a spouse of a citizen of the United States* after the date of the citizen's death but only if the spouse files a petition under section 204(a)(1)(A)(ii) within 2 years after such date and only until the date the spouse remarries.

(ii) Aliens admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent who is ⟦such an immediate relative⟧ *a spouse of a citizen of the United States.*

(B) Aliens born to an alien lawfully admitted for permanent residence during a temporary visit abroad.

⟦(c) Worldwide Level of Family-Sponsored Immigrants.— (1)(A) The worldwide level of family-sponsored immigrants under this subsection for a fiscal year is, subject to subparagraph (B), equal to—

⟦(i) 480,000, minus

⟦(ii) the number computed under paragraph (2), plus

⟦(iii) the number (if any) computed under paragraph (3).

⟦(B)(i) For each of fiscal years 1992, 1993, and 1994, 465,000 shall be substituted for 480,000 in subparagraph (A)(i).

⟦(ii) In no case shall the number computed under subparagraph (A) be less than 226,000.

⟦(2) The number computed under this paragraph for a fiscal year is the sum of the number of aliens described in subparagraphs (A) and (B) of subsection (b)(2) who were issued immigrant visas or who otherwise acquired the status of aliens lawfully admitted to the United States for permanent residence in the previous fiscal year.

⟦(3)(A) The number computed under this paragraph for fiscal year 1992 is zero.

⟦(B) The number computed under this paragraph for fiscal year 1993 is the difference (if any) between the worldwide level established under paragraph (1) for the previous fiscal year and the number of visas issued under section 203(a) during that fiscal year.

⟦(C) The number computed under this paragraph for a subsequent fiscal year is the difference (if any) between the maximum number of visas which may be issued under section 203(b) (relating to employment-based immigrants) during the previous fiscal year

298

and the number of visas issued under that section during that year.]

(c) WORLDWIDE LEVEL OF FAMILY-SPONSORED IMMIGRANTS.—

(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of family-sponsored immigrants under this subsection (in this subsection referred to as the "worldwide family level") for a fiscal year is 330,000.

(2) REDUCTION FOR SPOUSES AND CHILDREN OF UNITED STATES CITIZENS AND CERTAIN OTHER FAMILY-RELATED IMMI-GRANTS.—The worldwide family level for a fiscal year shall be reduced (but not below a number sufficient to provide for the minimum visa numbers described in paragraph (4)) by the number of aliens described in subsection (b)(2) who were issued immigrant visas or who otherwise acquired the status of aliens lawfully admitted to the United States for permanent residence in the previous fiscal year.

(3) FURTHER REDUCTION FOR ANY PREVIOUS EXCESS FAMILY IMMIGRATION.—

(A) IN GENERAL.—If there are excess family admissions in a particular fiscal year (as determined under subparagraph (B)) beginning with fiscal year 1997, then for the following fiscal year the worldwide family level shall be reduced (but not below a number sufficient to provide for the minimum visa numbers described in paragraph (4)) by the net number of excess admissions in that particular fiscal year (as defined in subparagraph (C)).

(B) DETERMINATION OF EXCESS FAMILY ADMISSIONS.—For purposes of subparagraph (A), there are excess family admissions in a fiscal year if—

(i) the number of aliens who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(a) or subsection (b)(2) in a fiscal year, exceeds

(ii) 330,000, less the carryforward number of excess admissions for the previous fiscal year (as defined in subparagraph (D)).

For purposes of this subparagraph, immigrant visa numbers issued under section 553 of the Immigration in the National Interest Act of 1995 (relating to certain transition immigrants) shall not be counted under clause (i).

(C) NET NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (A), the "net number of excess admissions" for a fiscal year is—

(i) the excess described in subparagraph (B) for the fiscal year, reduced (but not below zero) by

(ii) the number (if any) by which the worldwide level under subsection (d) for the previous fiscal year exceeds the number of immigrants who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(b) in that previous fiscal year.

(D) CARRYFORWARD NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (B)(ii), the carryforward

*number of excess admissions for a particular fiscal year is the net number of excess admissions for the previous fiscal year (as defined in subparagraph (C)), reduced by the reductions effected under subparagraph (A) and paragraph (5) in visa numbers for the particular fiscal year.*

*(4) NO REDUCTION IN NUMBER OF SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENTS OR PARENTS OF UNITED STATES CITIZENS.—*

*(A) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENTS.—Any reductions in the worldwide family level for a fiscal year under paragraph (2) or (3) shall not reduce the number of visas available to spouses and children of lawful permanent residents below 85,000.*

*(B) PARENTS OF UNITED STATES CITIZENS.—Any reductions in the worldwide family level for a fiscal year under paragraph (2) or (3) shall not reduce the number of visas available to parents of United States citizens below 25,000.*

*(5) ADJUSTMENT IN CERTAIN EMPLOYMENT-BASED VISA NUMBERS IN CASE OF REMAINING EXCESS FAMILY ADMISSIONS.—*

*(A) IN GENERAL.—If there is a remaining excess number of family admissions (as described in subparagraph (B)) in a fiscal year (beginning with fiscal year 1997) that is greater than zero, then for the following fiscal year there shall be reductions in immigrant visa numbers made available under subsection (d) and section 203(b)(4) by the lesser of—*

*(i) the remaining excess number of family admissions (described in subparagraph (B)), or*

*(ii) ½ of the maximum number of visa numbers that could (but for this paragraph) otherwise be made available under section 203(b)(5) in such following fiscal year.*

*(B) REMAINING EXCESS NUMBER OF FAMILY ADMISSIONS DESCRIBED.—For purposes of subparagraph (A), the "remaining excess number of family admissions" in a fiscal year is the net number of excess admissions for the fiscal year (as defined in paragraph (3)(C)), reduced by the reduction (if any) effected under paragraph (3) in visa numbers for the succeeding fiscal year.*

〖(d) WORLDWIDE LEVEL OF EMPLOYMENT-BASED IMMIGRANTS.— (1) The worldwide level of employment-based immigrants under this subsection for a fiscal year is equal to—

〖(A) 140,000, plus

〖(B) the number computed under paragraph (2).

〖(2)(A) The number computed under this paragraph for fiscal year 1992 is zero.

〖(B) The number computed under this paragraph for fiscal year 1993 is the difference (if any) between the worldwide level established under paragraph (1) for the previous fiscal year and the number of visas issued under section 203(b) during that fiscal year.

〖(C) The number computed under this paragraph for a subsequent fiscal year is the difference (if any) between the maximum number of visas which may be issued under section 203(a) (relating to family-sponsored immigrants) during the previous fiscal year

300

and the number of visas issued under that section during that year.]

*(d) WORLDWIDE LEVEL OF EMPLOYMENT-BASED IMMIGRANTS.—The worldwide level of employment-based immigrants under this subsection for a fiscal year is—*

*(1) 135,000, minus*

*(2) beginning with fiscal year 1998, the total of the reductions (if any) in visa numbers under section 203(a)(3)(C) made for the fiscal year pursuant to subsection (c)(5) and in visa numbers under this subsection for the fiscal year pursuant to section 203(a)(3)(B)(ii)(II).*

[(e) WORLDWIDE LEVEL OF DIVERSITY IMMIGRANTS.—The worldwide level of diversity immigrants is equal to 55,000 for each fiscal year.]

*(e) WORLDWIDE LEVEL OF DIVERSITY IMMIGRANTS.—The worldwide level of diversity immigrants is equal to 27,000 for each fiscal year.*

*(f) WORLDWIDE LEVEL OF HUMANITARIAN IMMIGRANTS.—*

*(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of humanitarian immigrants (in this subsection referred to as the "worldwide humanitarian level") under this subsection for a fiscal year is equal to 70,000.*

*(2) REDUCTION FOR HUMANITARIAN IMMIGRANTS WHO ARE REFUGEES OR ASYLEES.—The worldwide humanitarian level for a fiscal year shall be reduced by the sum of—*

*(A) 50,000, or, if less, the number of aliens who were admitted as refugees under section 207 in the previous fiscal year, and*

*(B) the number of aliens who had been granted asylum whose status was adjusted in the previous fiscal year under section 209(b).*

*(3) REDUCTION FOR PRIOR YEAR CANCELLATION OF REMOVAL AND REGISTRY.—The worldwide humanitarian level for a fiscal year shall be further reduced by the sum of—*

*(A) the number of aliens whose removal was canceled and who were provided lawful permanent resident status in the previous fiscal year under section 240A, and*

*(B) the number of aliens who were provided permanent resident status in the previous fiscal year under section 249.*

*(4) LIMITATION.—In no case shall the worldwide humanitarian level for a fiscal year (taking into account any reductions under paragraphs (2) and (3)) exceed 10,000.*

*(g) REQUIREMENT FOR PERIODIC REVIEW AND REAUTHORIZATION OF WORLDWIDE LEVELS.—*

*(1) CONGRESSIONAL REVIEW.—The Committees on the Judiciary of the House of Representatives and of the Senate shall undertake during fiscal year 2004 (and each fifth fiscal year thereafter) a thorough review of the appropriate worldwide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.*

*(2) CONGRESSIONAL REAUTHORIZATION.—The Congress, after consideration of the reviews under paragraph (1) and by*

301

*amendment to this section, shall specify the appropriate world-wide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.*

*(3) SUNSET IN ABSENCE OF REAUTHORIZATION.—The world-wide levels specified under the previous provisions of this section are applicable only to fiscal years 1997 through 2005. Immigrant visa numbers for fiscal years after fiscal year 2005 that are subject to such levels are only authorized to the extent provided by amendment under paragraph (2) made to this section.*

NUMERICAL LIMITATION TO ANY SINGLE FOREIGN STATE

SEC. 202. (a) PER COUNTRY LEVEL.—

(1) NONDISCRIMINATION.—Except as specifically provided in ⟦paragraph (2)⟧ *paragraphs (2) and (5)* and in sections 101(a)(27), 201(b)(2)(A)(i), and 203, no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

\*        \*        \*        \*        \*        \*        \*

⟦(4) SPECIAL RULES FOR SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—

⟦(A) 75 PERCENT OF 2ND PREFERENCE SET-ASIDE FOR SPOUSES AND CHILDREN NOT SUBJECT TO PER COUNTRY LIMITATION.—

⟦(i) IN GENERAL.—Of the visa numbers made available under section 203(a) to immigrants described in section 203(a)(2)(A) in any fiscal year, 75 percent of the 2–A floor (as defined in clause (ii)) shall be issued without regard to the numerical limitation under paragraph (2).

⟦(ii) 2–A FLOOR DEFINED.—In this paragraph, the term "2–A floor" means, for a fiscal year, 77 percent of the total number of visas made available under section 203(a) to immigrants described in section 203(a)(2) in the fiscal year.

⟦(B) TREATMENT OF REMAINING 25 PERCENT FOR COUNTRIES SUBJECT TO SUBSECTION (e).—

⟦(i) IN GENERAL.—Of the visa numbers made available under section 203(a) to immigrants described in section 203(a)(2)(A) in any fiscal year, the remaining 25 percent of the 2–A floor shall be available in the case of a state or area that is subject to subsection (e) only to the extent that the total number of visas issued in accordance with subparagraph (A) to natives of the foreign state or area is less than the subsection (e) ceiling (as defined in clause (ii)).

⟦(ii) SUBSECTION (e) CEILING DEFINED.—In clause (i), the term "subsection (e) ceiling" means, for a foreign state or dependent area, 77 percent of the maximum number of visas that may be made available under section 203(a) to immigrants who are natives of the

302

state or area under section 203(a)(2) consistent with subsection (e).

⟦(C) TREATMENT OF UNMARRIED SONS AND DAUGHTERS IN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, the number of immigrant visas that may be made available to natives of the state or area under section 203(a)(2)(B) may not exceed—

⟦(i) 23 percent of the maximum number of visas that may be made available under section 203(a) to immigrants of the state or area described in section 203(a)(2) consistent with subsection (e), or

⟦(ii) the number (if any) by which the maximum number of visas that may be made available under section 203(a) to immigrants of the state or area described in section 203(a)(2) consistent with subsection (e) exceeds the number of visas issued under section 203(a)(2)(A),

whichever is greater.

⟦(D) LIMITING PASS DOWN FOR CERTAIN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 203(a)(2) exceeds the maximum number of visas that may be made available to immigrants of the state or area under section 203(a)(2) consistent with subsection (e) (determined without regard to this paragraph), in applying paragraphs (3) and (4) of section 203(a) under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraphs (1) and (2) of such section.⟧

*(4) SPECIAL RULES FOR SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—*

*(A) 75 PERCENT OF 1ST PREFERENCE NOT SUBJECT TO PER COUNTRY LIMITATION.—Of the visa numbers made available under section 203(a) to immigrants described in paragraph (1) of that section in any fiscal year, 63,750 shall be issued without regard to the numerical limitation under paragraph (2).*

*(B) LIMITING PASS DOWN FOR CERTAIN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 203(a)(1) exceeds the maximum number of visas that may be made available to immigrants of the state or area under such section consistent with subsection (e) (determined without regard to this paragraph), in applying paragraph (2) of section 203(a) under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraph (1) of such section.*

*(5) PER COUNTRY LEVELS FOR HUMANITARIAN IMMIGRANTS.— The total number of immigrant visas made available to natives of any single foreign state or dependent area under section 203(d) in any fiscal year may not exceed 50 percent (in the case of a single foreign state) or 15 percent (in the case of a depend-*

303

*ent area) of the total number of such visas made available under such subsection in that fiscal year.*

*(6) Construction.—Nothing in paragraph (1) shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.*

\*      \*      \*      \*      \*      \*      \*

(e) Special Rules for Countries at Ceiling.—If it is determined that the total number of immigrant visas made available under subsections (a) and (b) of section 203 to natives of any single foreign state or dependent area will exceed the numerical limitation specified in subsection (a)(2) in any fiscal year, in determining the allotment of immigrant visa numbers to natives under subsections (a) and (b) of section 203, visa numbers with respect to natives of that state or area shall be allocated (to the extent practicable and otherwise consistent with this section and section 203) in a manner so that—

(1) the ratio of the visa numbers made available under section 203(a) to the visa numbers made available under section 203(b) is equal to the ratio of the worldwide level of immigration under section 201(c) to such level under section 201(d) *(determined without regard to subsections (c)(4) and (d)(2) of section 201)*;

(2) except as provided in subsection (a)(4), the proportion of the visa numbers made available under each of ⟦paragraphs (1) through (4)⟧ *paragraphs (1) and (2)* of section 203(a) is equal to the ratio of the total number of visas made available under the respective paragraph to the total number of visas made available under section 203(a), and

(3) the proportion of the visa numbers made available under each of paragraphs (1) ⟦through (5)⟧ *through (6)* of section 203(b) is equal to the ratio of the total number of visas made available under the respective paragraph to the total number of visas made available under section 203(b).

Nothing in this subsection shall be construed as limiting the number of visas that may be issued to natives of a foreign state or dependent area under section 203(a) or 203(b) if there is insufficient demand for visas for such natives under section 203(b) or 203(a), respectively, or as limiting the number of visas that may be issued under section ⟦203(a)(2)(A)⟧ *203(a)(1)* pursuant to subsection (a)(4)(A).

\*      \*      \*      \*      \*      \*      \*

ALLOCATION OF IMMIGRANT VISAS

Sec. 203. (a) Preference Allocation for Family-Sponsored Immigrants.—Aliens subject to the worldwide level specified in section 201(c) for family-sponsored immigrants shall be allotted visas as follows:

⟦(1) Unmarried sons and daughters of citizens.—Qualified immigrants who are the unmarried sons or daughters of citizens of the United States shall be allocated visas in a num-

304

ber not to exceed 23,400, plus any visas not required for the class specified in paragraph (4).

〚(2) SPOUSES AND UNMARRIED SONS AND UNMARRIED DAUGHTERS OF PERMANENT RESIDENT ALIENS.—Qualified immigrants—

〚(A) who are the spouses or children of an alien lawfully admitted for permanent residence, or

〚(B) who are the unmarried sons or unmarried daughters (but are not the children) of an alien lawfully admitted for permanent residence,

shall be allocated visas in a number not to exceed 114,200, plus the number (if any) by which such worldwide level exceeds 226,000, plus any visas not required for the class specified in paragraph (1); except that not less than 77 percent of such visa numbers shall be allocated to aliens described in subparagraph (A).

〚(3) MARRIED SONS AND MARRIED DAUGHTERS OF CITIZENS.—Qualified immigrants who are the married sons or married daughters of citizens of the United States shall be allocated visas in a number not to exceed 23,400, plus any visas not required for the classes specified in paragraphs (1) and (2).

〚(4) BROTHERS AND SISTERS OF CITIZENS.—Qualified immigrants who are the brothers or sisters of citizens of the United States, if such citizens are at least 21 years of age, shall be allocated visas in a number not to exceed 65,000, plus any visas not required for the classes specified in paragraphs (1) through (3).〛

*(1) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—Immigrants who are the spouses and children of an alien lawfully admitted for permanent residence shall be allocated visas in a number not to exceed 85,000, plus any immigrant visas not used under paragraphs (2) and (3).*

*(2) PARENTS OF UNITED STATES CITIZENS.—*

*(A) IN GENERAL.—Immigrants who are the parents of an individual who is at least 21 years of age and a citizen of the United States shall be allocated visas in a number, which is not less than 25,000 and does not exceed the lesser of—*

*(i) 45,000, or*

*(ii) the number by which the worldwide level exceeds 85,000.*

*(B) REFERENCE TO INSURANCE REQUIREMENT.—For requirement relating to insurance for parents, see section 212(a)(4)(D).*

*(3) ADULT SONS AND DAUGHTERS.—*

*(A) IN GENERAL.—Immigrants who are the qualifying adult sons or daughters (as defined in subparagraph (C)) of an individual who is (i) at least 21 years of age and (ii) either a citizen of the United States or an alien lawfully admitted for permanent residence shall be allocated visas according to the levels established in subparagraph (B).*

*(B) ALLOCATION OF VISAS TO ADULT SONS AND DAUGHTERS OF UNITED STATES CITIZENS AND PERMANENT RESIDENT ALIENS.—*

305

(i) IN GENERAL.—Subject to clause (ii), any remaining visas shall be allocated under this paragraph in a number not to exceed the lesser of—

(I) 5,000, or

(II) the number by which the worldwide level exceeds the sum of 85,000 and the number of immigrant visas used under paragraph (2).

(ii) ALLOCATION OF ADDITIONAL VISA NUMBERS.—

(I) IN GENERAL.—If the demand for visa numbers under this paragraph exceeds the number (if any) available under clause (i) in any fiscal year, an additional number of visas shall be made available under this paragraph, but not to exceed 5,000 additional visas numbers in any fiscal year.

(II) OFFSETTING REDUCTION IN THE LEVELS OF EMPLOYMENT-BASED VISAS.—If an additional number of visa numbers are made available under subclause (I) in a fiscal year, the number of visas made available under section 201(a)(2) and paragraphs (1) through (6) of subsection (b) in the fiscal year shall be reduced by a number equal to such additional number reduced by the amount (if any) by which 110,000 exceeds the number of immigrant visas used under paragraphs (1) and (2) of this subsection in the fiscal year. The reduction under each such paragraph of subsection (b) shall be in the same proportion to the total reduction as the ratio of the numerical limitation under each such paragraph specified under such subsection to the worldwide level of employment-based immigrants (as specified in section 201(d)).

(C) QUALIFICATIONS.—For purposes of this paragraph, the term "qualifying adult son or daughter" means an immigrant who, as of the date of approval of the classification petition under section 204(a)(1)—

(i) is at least 21, but not more than 25 years of age,

(ii) has never been married,

(iii) is childless, and

(iv) would qualify as a dependent of the petitioning individual for Federal income tax purposes, except that the immigrant does not meet the residence requirements.

(D) THREE-YEAR CONDITIONAL REQUIREMENT.—

(i) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of this Act, an alien provided lawful permanent residence status on the basis of being a qualifying adult son or daughter shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this subparagraph.

(ii) REQUIREMENTS OF NOTICE AND PETITIONING FOR REMOVAL OF CONDITIONAL STATUS.—The Attorney General shall establish, by regulation, procedures which

306

*incorporate the requirements of notice and petitioning for removal of conditional status similar to the requirements for removal of conditional status under section 216A.*

*(iii) TERMINATION OF STATUS.—In the case of an alien with permanent resident status on a conditional basis under clause (i), the alien must demonstrate that the alien met the qualifications set forth in subparagraph (C) as of the date of approval of the classification petition under section 204(a). In the absence of such a demonstration by the alien, the alien's status shall be terminated.*

*(iv) SPECIAL RULE.—In applying section 216A under this subparagraph, any reference to the "second" anniversary in such section is deemed a reference to the "third" anniversary.*

(b) PREFERENCE ALLOCATION FOR EMPLOYMENT-BASED IMMIGRANTS.—Aliens subject to the worldwide level specified in section 201(d) for employment-based immigrants in a fiscal year shall be allotted visas as follows:

⟦(1) PRIORITY WORKERS.—Visas shall first be made available in a number not to exceed 28.6 percent of such worldwide level, plus any visas not required for the classes specified in paragraphs (4) and (5), to qualified immigrants who are aliens described in any of the following subparagraphs (A) through (C):

⟦(A) ALIENS WITH EXTRAORDINARY ABILITY.—An alien is described in this subparagraph if—

⟦(i) the alien has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation,

⟦(ii) the alien seeks to enter the United States to continue work in the area of extraordinary ability, and

⟦(iii) the alien's entry into the United States will substantially benefit prospectively the United States.

⟦(B) OUTSTANDING PROFESSORS AND RESEARCHERS.—An alien is described in this subparagraph if—

⟦(i) the alien is recognized internationally as outstanding in a specific academic area,

⟦(ii) the alien has at least 3 years of experience in teaching or research in the academic area, and

⟦(iii) the alien seeks to enter the United States—

⟦(I) for a tenured position (or tenure-track position) within a university or institution of higher education to teach in the academic area,

⟦(II) for a comparable position with a university or institution of higher education to conduct research in the area, or

⟦(III) for a comparable position to conduct research in the area with a department, division, or institute of a private employer, if the department, division, or institute employs at least 3 persons

307

full-time in research activities and has achieved documented accomplishments in an academic field.

〔(C) CERTAIN MULTINATIONAL EXECUTIVES AND MANAGERS.—An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

〔(2) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

〔(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 28.6 percent of such worldwide level, plus any visas not required for the classes specified in paragraph (1), to qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

〔(B) WAIVER OF JOB OFFER.—The Attorney General may, when he deems it to be in the national interest, waive the requirement of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States.

〔(C) DETERMINATION OF EXCEPTIONAL ABILITY.—In determining under subparagraph (A) whether an immigrant has exceptional ability, the possession of a degree, diploma, certificate, or similar award from a college, university, school, or other institution of learning or a license to practice or certification for a particular profession or occupation shall not by itself be considered sufficient evidence of such exceptional ability.

〔(3) SKILLED WORKERS, PROFESSIONALS, AND OTHER WORKERS.—

〔(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 28.6 percent of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) and (2), to the following classes of aliens who are not described in paragraph (2):

〔(i) SKILLED WORKERS.—Qualified immigrants who are capable, at the time of petitioning for classification under this paragraph, of performing skilled labor (requiring at least 2 years training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States.

308

⟦(ii) Professionals.—Qualified immigrants who hold baccalaureate degrees and who are members of the professions.

⟦(iii) Other workers.—Other qualified immigrants who are capable, at the time of petitioning for classification under this paragraph, of performing unskilled labor, not of a temporary or seasonal nature, for which qualified workers are not available in the United States.

⟦(B) Limitation on other workers.—Not more than 10,000 of the visas made available under this paragraph in any fiscal year may be available for qualified immigrants described in subparagraph (A)(iii).

⟦(C) Labor certification required.—An immigrant visa may not be issued to an immigrant under subparagraph (A) until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

⟦(4) Certain special immigrants.—Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified special immigrants described in section 101(a)(27) (other than those described in subparagraph (A) or (B) thereof), of which not more than 5,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of section 101(a)(27)(C)(ii).

⟦(5) Employment creation.—

⟦(A) In general.—Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise—

⟦(i) which the alien has established,

⟦(ii) in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and

⟦(iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

⟦(B) Set-aside for targeted employment areas.—

⟦(i) In general.—Not less than 3,000 of the visas made available under this paragraph in each fiscal year shall be reserved for qualified immigrants who establish a new commercial enterprise described in subparagraph (A) which will create employment in a targeted employment area.

⟦(ii) Targeted employment area defined.—In this paragraph, the term "targeted employment area" means, at the time of the investment, a rural area or

309

an area which has experienced high unemployment (of at least 150 percent of the national average rate).

⟦(iii) RURAL AREA DEFINED.—In this paragraph, the term "rural area" means any area other than an area within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States).

⟦(C) AMOUNT OF CAPITAL REQUIRED.—

⟦(i) IN GENERAL.—Except as otherwise provided in this subparagraph, the amount of capital required under subparagraph (A) shall be $1,000,000. The Attorney General, in consultation with the Secretary of Labor and the Secretary of State, may from time to time prescribe regulations increasing the dollar amount specified under the previous sentence.

⟦(ii) ADJUSTMENT FOR TARGETED EMPLOYMENT AREAS.—The Attorney General may, in the case of investment made in a targeted employment area, specify an amount of capital required under subparagraph (A) that is less than (but not less than ½ of) the amount specified in clause (i).

⟦(iii) ADJUSTMENT FOR HIGH EMPLOYMENT AREAS.— In the case of an investment made in a part of a metropolitan statistical area that at the time of the investment—

⟦(I) is not a targeted employment area, and
⟦(II) is an area with an unemployment rate significantly below the national average unemployment rate,

the Attorney General may specify an amount of capital required under subparagraph (A) that is greater than (but not greater than 3 times) the amount specified in clause (i).⟧

*(1) ALIENS WITH EXTRAORDINARY ABILITY.—Visas shall first be made available in a number not to exceed 15,000 of such worldwide level to immigrants—*

*(A) who have extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through sufficient documentation,*

*(B) who seek to be admitted into the United States to continue work in the area of extraordinary ability, and*

*(C) whose admission into the United States will substantially benefit prospectively the United States.*

*(2) ALIENS WHO ARE OUTSTANDING PROFESSORS AND RESEARCHERS OR MULTINATIONAL EXECUTIVES AND MANAGERS.—*

*(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the class specified in paragraph (1), to immigrants who are aliens described in subparagraph (B) or (C).*

310

(B) OUTSTANDING PROFESSORS AND RESEARCHERS.—An alien is described in this subparagraph if—

(i) the alien is recognized internationally as outstanding in a specific academic area,

(ii) the alien has at least 3 years of experience in teaching or research in the academic area, and

(iii) the alien seeks to enter the United States—

(I) for a tenured position (or tenure-track position) within a university or institution of higher education to teach in the academic area,

(II) for a comparable position with a university or institution of higher education to conduct research in the area, or

(III) for a comparable position to conduct research in the area with a department, division, or institute of a private employer, if the department, division, or institute employs at least 3 persons full-time in research activities and has achieved documented accomplishments in an academic field.

(C) CERTAIN MULTINATIONAL EXECUTIVES AND MANAGERS.—An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

(3) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) and (2), to immigrants who are aliens described in subparagraph (B).

(B) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

(i) IN GENERAL.—An alien is described in this subparagraph if the alien is a member of a profession holding an advanced degree or its equivalent or who because of exceptional ability in the sciences, arts, or business will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

(ii) DETERMINATION OF EXCEPTIONAL ABILITY.—In determining under clause (i) whether an immigrant has exceptional ability, the possession of a degree, diploma, certificate, or similar award from a college, uni-

311

versity, school, or other institution of learning or a license to practice or certification for a particular profession or occupation shall not by itself be considered sufficient evidence of such exceptional ability.

(iii) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this subparagraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

(iv) NATIONAL INTEREST WAIVER.—The Attorney General may waive the requirement under clause (iii) and the requirement under clause (i) that an alien's services be sought by an employer in the United States only if—

(I) such a waiver is necessary to substantially benefit—

(aa) the national security, national defense, or Federal, State, or local law enforcement;

(bb) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;

(cc) economic or employment opportunities for a specific industry or a specific geographical area;

(dd) the development of new technologies; or

(ee) environmental protection or the productive use of natural resources, and

(II) the alien will engage in a specific undertaking to advance one or more of the interests under subclause (I).

(4) SKILLED WORKERS AND PROFESSIONALS.—

(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 45,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) through (3) to immigrants who are described in subparagraph (B) or (C).

(B) SKILLED WORKERS.—An alien described in this subparagraph is an immigrant who is capable, at the time a petition is filed, of performing skilled labor (requiring at least 2 years of training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States, and who has a total of 4 years of training or experience (or both) with respect to such labor.

(C) PROFESSIONALS.—

(i) IN GENERAL.—An alien described in this subparagraph is an immigrant who holds a baccalaureate degree and is a member of the professions and, subject to clause (ii), has at least 2 years of experience in the profession after the receipt of the degree.

(ii) SPECIAL RULE FOR LANGUAGE TEACHERS.—An alien who is a teacher and has (within the previous 5 years) at least 2 years of experience teaching a lan-

312

guage (other than English) full-time at an accredited elementary or middle school may be classified and admitted as a professional under this subparagraph if the alien is seeking admission to teach such language full-time in an accredited elementary or middle school.

(D) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this paragraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

(E) EXPERIENCE REQUIREMENT.—Any period of experience acquired as a nonimmigrant under section 101(a)(15)(E), 101(a)(15)(H)(i), or 101(a)(15)(L) may be used to fulfill a requirement for experience under this paragraph.

(5) INVESTORS IN JOB CREATION.—

(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 10,000 of such worldwide level less the reduction in visa numbers under this paragraph required to be effected under section 201(c)(5)(A) for the fiscal year involved, to immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise—

(i) which the alien has established,

(ii) in which the alien has invested (after the date of the enactment of the Immigration Act of 1990), or is actively in the process of investing, capital in an amount not less $1,000,000, and

(iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

(B) PILOT PROGRAM.—For each of fiscal years 1997 and 1998, up to 2,000 visas otherwise made available under this paragraph shall be made available to immigrants who would be described in subparagraph (A) if "$500,000" were substituted for "$1,000,000" in subparagraph (A)(ii) and if "for not fewer than 5" were substituted for "for not fewer than 10" in subparagraph (A)(iii). By not later than April 1, 1998, the Attorney General shall submit to Congress a report on the operation of this subparagraph and shall include in the report information describing the immigrants admitted under this paragraph and the enterprises they invest in and a recommendation on whether the pilot program under this subparagraph should be continued or modified.

(6) CERTAIN SPECIAL IMMIGRANTS.—Visas shall be made available, in a number not to exceed 5,000 of such worldwide level, to qualified special immigrants described in section 101(a)(27) (other than those described in subparagraph (A) thereof), of which not more than 4,000 may be made available

313

in any fiscal year to special immigrants described in subclause (II) or (III) of section 101(a)(27)(C)(ii).

⟦(6)⟧ *(7)* SPECIAL RULES FOR "K" SPECIAL IMMIGRANTS.—

(A) NOT COUNTED AGAINST NUMERICAL LIMITATION IN YEAR INVOLVED.—Subject to subparagraph (B), the number of immigrant visas made available to special immigrants under section 101(a)(27)(K) in a fiscal year shall not be subject to the numerical limitations of this subsection or of section 202(a).

(B) COUNTED AGAINST NUMERICAL LIMITATIONS IN FOLLOWING YEAR.—

(i) REDUCTION IN EMPLOYMENT-BASED IMMIGRANT CLASSIFICATIONS.—The number of visas made available in any fiscal year under paragraphs (1), (2), ⟦and (3) shall each be reduced by ⅓⟧ *(3), and (4) shall each be reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs) that were made available under each respective paragraph,* of the number of visas made available in the previous fiscal year to special immigrants described in section 101(a)(27)(K).

(ii) REDUCTION IN PER COUNTRY LEVEL.—The number of visas made available in each fiscal year to natives of a foreign state under section 202(a) shall be reduced by the number of visas made available in the previous fiscal year to special immigrants described in section 101(a)(27)(K) who are natives of the foreign state.

(iii) REDUCTION IN EMPLOYMENT-BASED IMMIGRANT CLASSIFICATIONS WITHIN PER COUNTRY CEILING.—In the case of a foreign state subject to section 202(e) in a fiscal year (and in the previous fiscal year), the number of visas made available and allocated to each of paragraphs (1) through ⟦(3) of this subsection in the fiscal year shall be reduced by ⅓⟧ *(4) in the fiscal year reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs to natives of the foreign state) that were made available under each respective paragraph to such natives,* of the number of visas made available in the previous fiscal year to special immigrants described in section 101(a)(27)(K) who are natives of the foreign state.

*(8) NOT COUNTING WORK EXPERIENCE AS AN UNAUTHORIZED ALIEN.—For purposes of this subsection, work experience obtained in employment in the United States with respect to which the alien was an unauthorized alien (as defined in section 274A(h)(3)) shall not be taken into account.*

(c) DIVERSITY IMMIGRANTS.—

(1) IN GENERAL.—Except as provided in paragraph (2), aliens subject to the worldwide level specified in section 201(e) for diversity immigrants shall be allotted visas each fiscal year as follows:

314

(A) Determination of preference immigration.—The Attorney General shall determine for the most recent previous 5-fiscal-year period for which data are available, the total number of aliens who are natives of each foreign state and who (i) were admitted or otherwise provided lawful permanent resident status (other than under this subsection) and (ii) were subject to the numerical limitations of section 201(a) (other than paragraph (3) thereof) or who were admitted or otherwise provided lawful permanent resident status as an immediate relative or other alien described in section 201(b)(2).

(B) Identification of high-admission and low-admission regions and high-admission and low-admission states.—The Attorney General—

(i) shall identify—

(I) each region (each in this paragraph referred to as a "high-admission region") for which the total of the numbers determined under subparagraph (A) for states in the region is greater than 1/6 of the total of all such numbers, and

(II) each other region (each in this paragraph referred to as a "low-admission region"); and

(ii) shall identify—

(I) each foreign state for which the number determined under subparagraph (A) is greater than 50,000 (each such state in this paragraph referred to as a "high-admission state"),

(II) each other foreign state (each such state in this paragraph referred to as a "low-admission state")[.], *and*

*(III) within each region, the 10 foreign states which had the highest number of registrants for the diversity immigrant program under this subsection for the period beginning October 1, 1994, and ending September 30, 1996, and which are not high-admission states.*

(C) Determination of percentage of worldwide immigration attributable to high-admission regions.—The Attorney General shall determine the percentage of the total of the numbers determined under subparagraph (A) that are numbers for foreign states in high-admission regions.

(D) Determination of regional populations excluding high-admission states and ratios of populations of regions within low-admission regions and high-admission regions.—The Attorney General shall determine—

(i) based on available estimates for each region, the total population of each region not including the population of any high-admission state;

(ii) for each low-admission region, the ratio of the population of the region determined under clause (i) to the total of the populations determined under such clause for all the low-admission regions; and

315

(iii) for each high-admission region, the ratio of the population of the region determined under clause (i) to the total of the populations determined under such clause for all the high-admission regions.

(E) DISTRIBUTION OF VISAS.—

(i) NO VISAS FOR NATIVES OF HIGH-ADMISSION STATES.—The percentage of visas made available under this paragraph to natives of a high-admission state is 0.

(ii) FOR LOW-ADMISSION STATES IN LOW-ADMISSION REGIONS.—Subject to clauses (iv) and (v), the percentage of visas made available under this paragraph to natives (other than natives of a high-admission state) in a low-admission region is the product of—

(I) the percentage determined under subparagraph (C), and

(II) the population ratio for that region determined under subparagraph (D)(ii).

(iii) FOR LOW-ADMISSION STATES IN HIGH-ADMISSION REGIONS.—Subject to clauses (iv) and (v), the percentage of visas made available under this paragraph to natives (other than natives of a high-admission state) in a high-admission region is the product of—

(I) 100 percent minus the percentage determined under subparagraph (C), and

(II) the population ratio for that region determined under subparagraph (D)(iii).

(iv) REDISTRIBUTION OF UNUSED VISA NUMBERS.—If the Secretary of State estimates that the number of immigrant visas to be issued to natives in any region for a fiscal year under this paragraph is less than the number of immigrant visas made available to such natives under this paragraph for the fiscal year, subject to clause (v), the excess visa numbers shall be made available to natives (other than natives of a high-admission state) of the other regions in proportion to the percentages otherwise specified in clauses (ii) and (iii).

(v) LIMITATION ON VISAS FOR NATIVES OF A SINGLE FOREIGN STATE.—The percentage of visas made available under this paragraph to natives of any single foreign state for any fiscal year shall not exceed 7 percent.

(vi) TEN STATES ELIGIBLE IN EACH REGION.—Only natives of the 10 states identified for each region in subparagraph (B)(ii)(III) are eligible for diversity visas.

(F) REGION DEFINED.—Only for purposes of administering the diversity program under this subsection, 〔Northern Ireland shall be treated as a separate foreign state,〕 each colony or other component or dependent area of a foreign state overseas from the foreign state shall be treated as part of the foreign state〔,〕 and the areas described in each of the following clauses shall be considered to be a separate region:

(i) Africa.

316

(ii) Asia.

(iii) Europe.

(iv) North America ⟦(other than Mexico)⟧.

(v) Oceania.

(vi) South America, ⟦Mexico,⟧ Central America, and the Caribbean.

⟦(2) REQUIREMENT OF EDUCATION OR WORK EXPERIENCE.—An alien is not eligible for a visa under this subsection unless the alien—

⟦(A) has at least a high school education or its equivalent, or

⟦(B) has, within 5 years of the date of application for a visa under this subsection, at least 2 years of work experience in an occupation which requires at least 2 years of training or experience.⟧

*(2) REQUIREMENT OF JOB OFFER AND EDUCATION OR SKILLED WORKER.—An alien is not eligible for a visa under this subsection unless the alien—*

*(A) has a job offer in the United States which has been verified;*

*(B) has at least a high school education or its equivalent; and*

*(C) has at least 2 years of work experience in an occupation which requires at least 2 years of training.*

(3) MAINTENANCE OF INFORMATION.—The Secretary of State shall maintain information on the age, occupation, education level, and other relevant characteristics of immigrants issued visas under this subsection.

*(4) FEES.—Fees for the furnishing and verification of applications for visas under this subsection and for the issuance of visas under this subsection may be prescribed by the Secretary of State in such amounts as are adequate to compensate the Department of State for the costs of administering the diversity immigrant program. Any such fees collected may be deposited as an offsetting collection to the appropriate Department of State appropriation to recover the costs of such program and shall remain available for obligation until expended.*

*(5) INELIGIBILITY OF ALIENS UNLAWFULLY PRESENT IN THE UNITED STATES.—An alien who is unlawfully present in the United States at the time of filing of an application, within 5 years prior to the filing of such application, or at any time subsequent to the filing of the application is ineligible for a visa under this subsection.*

*(d) HUMANITARIAN IMMIGRANTS.—*

*(1) IN GENERAL.—Aliens subject to the worldwide humanitarian level specified in section 201(e) shall be allotted visas only if the aliens have been selected by the Attorney General under paragraph (2) as of special humanitarian concern to the United States.*

*(2) SELECTION OF IMMIGRANTS.—*

*(A) IN GENERAL.—The Attorney General shall, on a case-by-case basis and based on humanitarian concerns and the public interest, select aliens for purposes of this subsection.*

317

(B) Restriction.—The Attorney General may not select an alien under this paragraph if the alien is a refugee (within the meaning of section 101(a)(42)) unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be admitted into the United States as a humanitarian immigrant under this subsection rather than as a refugee under section 207.

(3) Annual report.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing the number of immigrant visas issued under this subsection and the individuals to whom the visas were issued.

〔(d)〕 *(e)* Treatment of Family Members.—A spouse or child as defined in subparagraph (A), (B), (C), (D), or (E) of section 101(b)(1) shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a)*(2)*, (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.

〔(e)〕 *(f)* Order of Consideration.—(1) Immigrant visas made available under subsection (a) or (b) shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General (or in the case of special immigrants under section 101(a)(27)(D), with the Secretary of State) as provided in section 204(a).

(2) Immigrant visa numbers made available under subsection (c) (relating to diversity immigrants) shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved.

*(3) Immigrant visa numbers made available under subsection (d) (relating to humanitarian immigrants) shall be issued to eligible immigrants in an order specified by the Attorney General.*

〔(3)〕 *(4)* Waiting lists of applicants for visas under this section shall be maintained in accordance with regulations prescribed by the Secretary of State.

〔(f)〕 *(g)* Authorization for Issuance.— In the case of any alien claiming in his application for an immigrant visa to be described in section 201(b)(2) or in subsection (a), (b), or (c) of this section, the consular officer shall not grant such status until he has been authorized to do so as provided by section 204.

〔(g)〕 *(h)* Lists.—For purposes of carrying out the Secretary's responsibilities in the orderly administration of this section, the Secretary of State may make reasonable estimates of the anticipated numbers of visas to be issued during any quarter of any fiscal year within each of the categories under subsections (a), (b), and (c) and to rely upon such estimates in authorizing the issuance of visas. The Secretary of State shall terminate the registration of any alien who fails to apply for an immigrant visa within one year following notification to the alien of the availability of such visa, but the Secretary shall reinstate the registration of any such alien who establishes within 2 years following the date of notification of the avail-

318

ability of such visa that such failure to apply was due to circumstances beyond the alien's control.

PROCEDURE FOR GRANTING IMMIGRANT STATUS

SEC. 204. (a)(1)(A)(i) Any citizen of the United States claiming that an alien is entitled to classification by reason of a relationship described in ⟦paragraph (1), (3), or (4)⟧ *paragraph (2) or (3)* of section 203(a) or ⟦to an immediate relative status⟧ *to status as the spouse or child of a citizen of the United States* under section 201(b)(2)(A)(i) may file a petition with the Attorney General for such classification.

(ii) An alien spouse described in the second sentence of section 201(b)(2)(A)(i) also may file a petition with the Attorney General under this subparagraph for classification of the alien (and the alien's children) under such section.

(iii) An alien who is the spouse of a citizen of the United States, who is a person of good moral character, who is eligible to be classified ⟦as an immediate relative⟧ *as the spouse of a citizen of the United States* under section 201(b)(2)(A)(i), and who has resided in the United States with the alien's spouse may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien if such a child has not been classified under clause (iv)) under such section if the alien demonstrates to the Attorney General that—

(I) the alien is residing in the United States, the marriage between the alien and the spouse was entered into in good faith by the alien, and during the marriage the alien or a child of the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's spouse; and

(II) the alien is a person whose ⟦deportation⟧ *removal*, in the opinion of the Attorney General, would result in extreme hardship to the alien or a child of the alien.

(iv) An alien who is the child of a citizen of the United States, who is a person of good moral character, who is eligible to be classified ⟦as an immediate relative⟧ *as a child of a citizen of the United States* under section 201(b)(2)(A)(i), and who has resided in the United States with the citizen parent may file a petition with the Attorney General under this subparagraph for classification of the alien under such section if the alien demonstrates to the Attorney General that—

(I) the alien is residing in the United States and during the period of residence with the citizen parent the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's citizen parent; and

(II) the alien is a person whose ⟦deportation⟧ *removal*, in the opinion of the Attorney General, would result in extreme hardship to the alien.

(B)(i) Any alien lawfully admitted for permanent residence claiming that an alien is entitled to a classification by reason of the relationship described in ⟦section 203(a)(2)⟧ *paragraph (1) or (3) of section 203(a)(1)* may file a petition with the Attorney General for such classification.

(ii) An alien who is the spouse of an alien lawfully admitted for permanent residence, who is a person of good moral character, who

319

is eligible for classification under section 〖203(a)(2)(A)〗 *203(a)(1)*, and who has resided in the United States with the alien's legal permanent resident spouse may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien if such a child has not been classified under clause (iii)) under such section if the alien demonstrates to the Attorney General that the conditions described in subclauses (I) and (II) of subparagraph (A)(iii) are met with respect to the alien.

(iii) An alien who is the child of an alien lawfully admitted for permanent residence, who is a person of good moral character, who is eligible for classification under section 〖203(a)(2)(A)〗 *203(a)(1)*, and who has resided in the United States with the alien's permanent resident alien parent may file a petition with the Attorney General under this subparagraph for classification of the alien under such section if the alien demonstrates to the Attorney General that—

(I) the alien is residing in the United States and during the period of residence with the permanent resident parent the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's permanent resident parent; and

(II) the alien is a person whose 〖deportation〗 *removal*, in the opinion of the Attorney General, would result in extreme hardship to the alien.

(C) Any alien desiring to be classified under section 〖203(b)(1)(A)〗 *203(b)(1)*, or any person on behalf of such an alien, may file a petition with the Attorney General for such classification.

(D) Any employer desiring and intending to employ within the United States an alien entitled to classification under 〖section 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), or 203(b)(3)〗 *section 203(b)(2), 203(b)(3), or 203(b)(4)* may file a petition with the Attorney General for such classification.

〖(F)〗 *(E)* Any alien desiring to be classified under section 〖203(b)(5)〗 *203(b)(4)* may file a petition with the Attorney General for such classification.

〖(E)〗 *(F)*(i) Any alien (other than a special immigrant under section 101(a)(27)(D)) desiring to be classified under section 〖203(b)(4)〗 *203(b)(6)*, or any person on behalf of such an alien, may file a petition with the Attorney General for such classification.

(ii) Aliens claiming status as a special immigrant under section 101(a)(27)(D) may file a petition only with the Secretary of State and only after notification by the Secretary that such status has been recommended and approved pursuant to such section.

(G)(i) Any alien desiring to be provided an immigrant visa under section 203(c) may file a petition at the place and time determined by the Secretary of State by regulation. Only one such petition may be filed by an alien with respect to any petitioning period established. If more than one petition is submitted all such petitions submitted for such period by the alien shall be voided.

(ii)(I) The Secretary of State shall designate a period for the filing of petitions with respect to visas which may be issued under section 203(c) for the fiscal year beginning after the end of the period.

320

(II) Aliens who qualify, through random selection, for a visa under section 203(c) shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.

(III) The Secretary of State shall prescribe such regulations as may be necessary to carry out this clause.

(iii) A petition under this subparagraph shall be in such form as the Secretary of State may by regulation prescribe and shall contain such information and be supported by such documentary evidence as the Secretary of State may require.

(H) In acting on petitions filed under clause (iii) or (iv) of subparagraph (A) or clause (ii) or (iii) of subparagraph (B), the Attorney General shall consider any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

*(I) Any alien desiring to be provided an immigrant visa under section 203(d) may file a petition with the Attorney General for such classification, but only if the Attorney General has identified the alien as possibly qualifying for such a visa.*

(2)(A) The Attorney General may not approve a spousal second preference petition for the classification of the spouse of an alien if the alien, by virtue of a prior marriage, has been accorded the status of an alien lawfully admitted for permanent residence as the spouse of a citizen of the United States or as the spouse of an alien lawfully admitted for permanent residence, unless—

(i) a period of 5 years has elapsed after the date the alien acquired the status of an alien lawfully admitted for permanent residence, or

(ii) the alien establishes to the satisfaction of the Attorney General by clear and convincing evidence that the prior marriage (on the basis of which the alien obtained the status of an alien lawfully admitted for permanent residence) was not entered into for the purpose of evading any provision of the immigration laws.

In this subparagraph, the term "spousal second preference petition" refers to a petition, seeking preference status under section 203(a)(2), for an alien as a spouse of an alien lawfully admitted for permanent residence.

(B) Subparagraph (A) shall not apply to a petition filed for the classification of the spouse of an alien if the prior marriage of the alien was terminated by the death of his or her spouse.

(b)*(1)* After an investigation of the facts in each case, and after consultation with the Secretary of Labor with respect to petitions to accord a status under section 203(b)(2) or 203(b)(3), the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is 【an immediate relative specified in section 201(b)】 *a spouse or child of a citizen of the United States under section 201(b)* or is eligible for preference under subsection (a) or (b) of section 203, approve the petition and forward one copy thereof to the Department of State. The Secretary of State shall then authorize the consular officer concerned to grant the preference status.

321

*(2)(A) The Attorney General may provide that a petition approved with respect to an alien (and the priority date established with respect to the petition) shall expire after a period (specified by the Attorney General and of not less than 2 years) following the date of approval of the petition, unless the petitioner files with the Attorney General a form described in subparagraph (B).*

*(B) The Attorney General shall specify the form to be used under this paragraph. Such form shall be designed—*

*(i) to reconfirm the continued intention of the petitioner to seek admission of the alien based on the classification involved, and*

*(ii) as may be provided by the Attorney General, to update the contents of the original classification petition.*

*(C) The Attorney General may apply subparagraph (A) to one or more classes of classification petitions and for different periods of time for different classes of such petitions, as specified by the Attorney General.*

(c) Notwithstanding the provisions of subsection (b) no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, 【an immediate relative or preference】 *a preferential* status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

(d) Notwithstanding the provisions of subsections (a) and (b) no petition may be approved on behalf of a child defined in section 101(b)(1)(F) unless a valid home-study has been favorably recommended by an agency of the State of the child's proposed residence, or by an agency authorized by that State to conduct such a study, or, in the case of a child adopted abroad, by an appropriate public or private adoption agency which is licensed in the United States.

(e) Nothing in this section shall be construed to entitle an immigrant, in behalf of whom a petition under this section is approved, to enter the United States as an immigrant under subsection (a), (b), or (c) of section 203 or as 【an immediate relative】 *a spouse or child of a citizen of the United States* under section 201(b) if upon 【his】 *the alien's* arrival at a port of 【entry】 *admission* in the United States 【he】 *the alien* is found not to be entitled to such classification.

(f)(1) Any alien claiming to be an alien described in paragraph (2)(A) of this subsection (or any person on behalf of such an alien) may file a petition with the Attorney General for classification under section 201(b)【, 203(a)(1), or 203(a)(3)】 *or 203(a)(2),* as appropriate. After an investigation of the facts of each case the Attorney General shall, if the conditions described in paragraph (2) are met, approve the petition and forward one copy to the Secretary of State.

\*      \*      \*      \*      \*      \*      \*

(g) Notwithstanding subsection (a), except as provided in section 245(e)(3), a petition may not be approved to grant an alien 【imme-

322

diate relative status⟧ *status as a spouse or child of a citizen of the United States or other* or preference status by reason of a marriage which was entered into during the period described in section 245(e)(2), until the alien has resided outside the United States for a 2-year period beginning after the date of the marriage.

    \*      \*      \*      \*      \*      \*      \*

*(i) For purposes of applying section 101(b)(1) in the case of issuance of an immigrant visa to, or admission or adjustment of status of, an alien under section 201(b)(2)(A), section 203(a)(1), or 203(e) as a child of a citizen of the United States or a permanent resident alien, the age of the alien shall be determined as of the date of the filing of the classification petition under section 204(a)(1) as such a child of a citizen of the United States or a permanent resident alien.*

REVOCATION OF APPROVAL OF PETITIONS

    SEC. 205. The Attorney General may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 204. Such revocation shall be effective as of the date of approval of any such petition. In no case, however, shall such revocation have effect unless there is mailed to the petitioner's last known address a notice of the revocation and unless notice of the revocation is communicated through the Secretary of State to the beneficiary of the petition before such beneficiary commences his journey to the United States. If notice of revocation is not so given, and the beneficiary applies for admission to the United States, his admissibility shall be determined in the manner provided for by sections 235 and ⟦236⟧ *240.*

UNUSED IMMIGRANT VISAS

    SEC. 206. If an immigrant having an immigrant visa is ⟦excluded from admission to the United States and deported⟧ *denied admission to the United States and removed*, or does not apply for admission before the expiration of the validity of his visa, or if an alien having an immigrant visa issued to him as a preference immigrant is found not to be a preference immigrant, an immigrant visa or a preference immigrant visa, as the case may be, may be issued in lieu thereof to another qualified alien.

ANNUAL ADMISSION OF REFUGEES AND ADMISSION OF EMERGENCY SITUATION REFUGEES

    SEC. 207. (a)⟦(1) Except as provided in subsection (b), the number of refugees who may be admitted under this section in fiscal year 1980, 1981, or 1982, may not exceed fifty thousand unless the President determines, before the beginning of the fiscal year and after appropriate consultation (as defined in subsection (e)), that admission of a specific number of refugees in excess of such number is justified by humanitarian concerns or is otherwise in the national interest.⟧

    *(1) Except as provided in paragraph (2) and subsection (b), the number of refugees who may be admitted under this section in any fiscal year shall be such number as the President determines, before*

323

*the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.*

〔(2) Except as provided in subsection (b), the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.〕

*(2)(A) Except as provided in subparagraph (B), the number determined under paragraph (1) for a fiscal year may not exceed—*
　　　*(i) 75,000 in the case of fiscal year 1997, or*
　　　*(ii) 50,000 in the case of any succeeding fiscal year.*
*(B) The number determined under paragraph (1) for a fiscal year may exceed the limit specified under subparagraph (A) if Congress enacts a law providing for a higher number.*

(3) Admissions under this subsection shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.

〔(4) In the determination made under this subsection for each fiscal year (beginning with fiscal year 1992), the President shall enumerate, with the respective number of refugees so determined, the number of aliens who were granted asylum in the previous year.〕

*(4) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the last sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).*

(b) If the President determines, after appropriate consultation, that (1) an 〔unforeseen〕 emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United States of these refugees cannot be accomplished under subsection (a), the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided under this subsection.

*　*　*　*　*　*　*　*　*　*　*　*　*　*

(d)(1) 〔Before the start of each fiscal year〕 *Before June 1 of the preceding fiscal year* the President shall report to the Committee on the Judiciary of the House of Representatives and of the Senate regarding the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions during the fiscal year. The President shall provide for periodic discussions between designated representatives of the President and members of such committees regarding changes in the worldwide refugee situation, the progress of refugee

324

admissions, and the possible need for adjustments in the allocation of admissions among refugees.

(2) As soon as possible after representatives of the President initiate appropriate consultation with respect to the number of refugee admissions under subsection (a) or with respect to the admission of refugees in response to an emergency refugee situation under subsection (b), the Committees on the Judiciary of the House of Representatives and of the Senate shall cause to have printed in the Congressional Record the substance of such consultation.

(3)(A) After the President initiates appropriate consultation prior to making a determination under subsection (a), a hearing to review the proposed determination shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

(B) After the President initiates appropriate consultation prior to making a determination, under subsection (b), that the number of refugee admissions should be increased because of an ⟦unforeseen⟧ emergency refugee situation, to the extent that time and the nature of the emergency refugee situation permit, a hearing to review the proposal to increase refugee admissions shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

(e) For purposes of this section, the term "appropriate consultation" means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

(1) A description of the nature of the refugee situation.

(2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.

(3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.

(4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.

(5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.

(6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.

(7) Such additional information as may be appropriate or requested by such members.

To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members. *Such discussions shall occur before July 1 of the fiscal*

325

*year preceding the fiscal year of admissions, except that discussions relating to an emergency refugee situation shall occur not more than 30 days after the President proposes admissions in response to the emergency.*

〖ASYLUM PROCEDURE

〖Sᴇᴄ. 208. (a) The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

〖(b) Asylum granted under subsection (a) may be terminated if the Attorney General, pursuant to such regulations as the Attorney General may prescribe, determines that the alien is no longer a refugee within the meaning of section 101(a)(42)(A) owing to a change in circumstances in the alien's country of nationality or, in the case of an alien having no nationality, in the country in which the alien last habitually resided.

〖(c) A spouse or child (as defined in section 101(b)(1) (A), (B), (C), (D), or (E)) of an alien who is granted asylum under subsection (a) may, if not otherwise eligible for asylum under such subsection, be granted the same status as the alien if accompanying, or following to join, such alien.

〖(d) An alien who has been convicted of an aggravated felony, notwithstanding subsection (a), may not apply for or be granted asylum.

〖(e) An applicant for asylum is not entitled to employment authorization except as may be provided by regulation in the discretion of the Attorney General.〗

*ASYLUM*

*Sᴇᴄ. 208. (a) Aᴜᴛʜᴏʀɪᴛʏ ᴛᴏ Aᴘᴘʟʏ ꜰᴏʀ Aꜱʏʟᴜᴍ.—*

*(1) Iɴ ɢᴇɴᴇʀᴀʟ.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival), irrespective of such alien's status, may apply for asylum in accordance with this section.*

*(2) Exᴄᴇᴘᴛɪᴏɴꜱ.—*

*(A) Sᴀꜰᴇ ᴛʜɪʀᴅ ᴄᴏᴜɴᴛʀʏ.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.*

326

(B) TIME LIMIT.—Paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 30 days after the alien's arrival in the United States.

(C) PREVIOUS ASYLUM APPLICATIONS.—Paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

(D) CHANGED CONDITIONS.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General the existence of fundamentally changed circumstances which affect the applicant's eligibility for asylum.

(3) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

(b) CONDITIONS FOR GRANTING ASYLUM.—

(1) IN GENERAL.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

(2) EXCEPTIONS.—

(A) IN GENERAL.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—

(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

(vi) the alien was firmly resettled in another country prior to arriving in the United States.

(B) SPECIAL RULES.—

(i) CONVICTION OF AGGRAVATED FELONY.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be

327

considered to have been convicted of a particularly serious crime.

(ii) OFFENSES.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

(C) ADDITIONAL LIMITATIONS.—The Attorney General may by regulation establish additional limitations and conditions under which an alien shall be ineligible for asylum under paragraph (1).

(D) NO JUDICIAL REVIEW.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

(3) TREATMENT OF SPOUSE AND CHILDREN.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

(c) ASYLUM STATUS.—

(1) IN GENERAL.—In the case of an alien granted asylum under subsection (b), the Attorney General—

(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

(2) TERMINATION OF ASYLUM.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

(B) the alien meets a condition described in subsection (b)(2);

(C) the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien cannot establish that it is more likely than not that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country

328

with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

(E) the alien has acquired a new nationality and enjoys the protection of the country of his new nationality.

(3) REMOVAL WHEN ASYLUM IS TERMINATED.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

(4) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

(d) ASYLUM PROCEDURE.—

(1) APPLICATIONS.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). An application for asylum shall not be considered unless the alien submits fingerprints and a photograph in a manner to be determined by regulation by the Attorney General.

(2) EMPLOYMENT.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

(3) FEES.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

(4) NOTICE OF PRIVILEGE OF COUNSEL AND CONSEQUENCES OF FRIVOLOUS APPLICATION.—At the time of filing an application for asylum, the Attorney General shall—

(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(5) CONSIDERATION OF ASYLUM APPLICATIONS.—

(A) PROCEDURES.—The procedure established under paragraph (1) shall provide that—

(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Auto-

329

*mated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;*

*(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;*

*(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;*

*(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and*

*(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.*

*(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.*

*(6) FRIVOLOUS APPLICATIONS.—*

*(A) IN GENERAL.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.*

*(B) MATERIAL MISREPRESENTATIONS.—An application shall be considered to be frivolous if the Attorney General determines that the application contains a willful misrepresentation or concealment of a material fact.*

*(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

ADJUSTMENT OF STATUS OF REFUGEES

SEC. 209. (a)(1) Any alien who has been admitted to the United States under section 207—

(A) whose admission has not been terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe,

(B) who has been physically present in the United States for at least one year, and

(C) who has not acquired permanent resident status,

330

shall, at the end of such year period, return or be returned to the custody of the Service for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 235, ⟦236⟧ *240*, and ⟦237⟧ *241*.

(2) Any alien who is found upon inspection and examination by an immigration officer pursuant to paragraph (1) or after a hearing before ⟦a special inquiry officer⟧ *an immigration judge* to be admissible (except as otherwise provided under subsection (c)) as an immigrant under this Act at the time of the alien's inspection and examination shall, notwithstanding any numerical limitation specified in this Act, be regarded as lawfully admitted to the United States for permanent residence as of the date of such alien's arrival into the United States.

(b) ⟦Not more than 10,000 of the refugee admissions authorized under section 207(a) in any fiscal year may be made available by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to adjust⟧ *The Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, and in a number not to exceed 10,000 aliens in any fiscal year, may adjust* to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—

(1) applies for such adjustment,

(2) has been physically present in the United States for at least one year after being granted asylum,

(3) continues to be a refugee within the meaning of section 101(a)(42)(A) or a spouse or child of such a refugee,

(4) is not firmly resettled in any foreign country, and

(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this Act at the time of examination for adjustment of such alien.

Upon approval of an application under this subsection, the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

(c) The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) shall not be applicable to any alien seeking adjustment of status under this section, and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) or subparagraph (A), (B), (C), or (E) of paragraph (3)) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

SPECIAL AGRICULTURAL WORKERS

SEC. 210. (a)  * * *

(b) APPLICATIONS FOR ADJUSTMENT OF STATUS.—

(1)  * * *

*       *       *       *       *       *       *

(5) LIMITATION ON ACCESS TO INFORMATION.—Files and records prepared for purposes of this section by designated entities operating under this section are confidential and the Attorney General and the Service shall not have access to such

331

files or records relating to an alien without the consent of the alien, *except as permitted under paragraph (6)(B).*

(6) CONFIDENTIALITY OF INFORMATION.—〔Neither〕 *(A) Except as provided in subparagraph (B), neither* the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

〔(A)〕 *(i)* use the information furnished pursuant to an application filed under this section for any purpose other than to make a determination on the application including a determination under subparagraph (a)(3)(B), or for enforcement of paragraph (7)〔.〕,

〔(B)〕 *(ii)* make any publication whereby the information furnished by any particular individual can be identified, or

〔(C)〕 *(iii)* permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

*(B) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien to be used—*

*(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated, or*

*(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the special agricultural worker application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant.*

〔Anyone〕
*(C) Anyone* who uses, publishes, or permits information to be examined in violation of this paragraph shall be fined in accordance with title 18, United States Code, or imprisoned not more than five years, or both.

*(D) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:*

*(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work).*

*(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.*

*(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.*

*(iv) The date or disposition of the application.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(e) ADMINISTRATIVE AND JUDICIAL REVIEW.—

332

(1)  * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) JUDICIAL REVIEW.—

(A) LIMITATION TO REVIEW OF EXCLUSION OR DEPORTA-TION.—There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation under section 106 *(as in effect before October 1, 1996)*.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

GENERAL CLASSES OF ALIENS INELIGIBLE TO RECEIVE VISAS AND ⟦EX-CLUDED FROM⟧ *INELIGIBLE FOR* ADMISSION; WAIVERS OF INADMISSIBILITY

SEC. 212. (a) ⟦CLASSES OF EXCLUDABLE ALIENS.—Except as otherwise provided in this Act, the following describes classes of excludable aliens who are ineligible to receive visas and who shall be excluded from admission into the United States:⟧ *CLASSES OF ALIENS INELIGIBLE FOR VISAS OR ADMISSION.—Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:*

(1) HEALTH-RELATED GROUNDS.—

(A) IN GENERAL.—Any alien—

(i) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance, which shall include infection with the etiologic agent for acquired immune deficiency syndrome,

*(ii) who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,*

⟦(ii)⟧ *(iii)* who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)—

(I) to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

(II) to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

333

〔(iii)〕 *(iv)* who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict, 〔is excludable〕 *is inadmissible*.

(B) WAIVER AUTHORIZED.—For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

(2) CRIMINAL AND RELATED GROUNDS.—

(A) CONVICTION OF CERTAIN CRIMES.—

(i) IN GENERAL.—Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of—

(I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

(II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)),

〔is excludable〕 *is inadmissible*.

(ii) EXCEPTION.—Clause (i)(I) shall not apply to an alien who committed only one crime if—

(I) the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II) the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

(B) MULTIPLE CRIMINAL CONVICTIONS.—Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement actually imposed were 5 years or more 〔is excludable〕 *is inadmissible*.

(C) CONTROLLED SUBSTANCE TRAFFICKERS.—Any alien who the consular or immigration officer knows or has reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing

334

assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance, 〔is excludable〕 *is inadmissible*.

(D) PROSTITUTION AND COMMERCIALIZED VICE.—Any alien who—

(i) is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, 〔entry〕 *admission*, or adjustment of status,

(ii) directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, 〔entry〕 *admission*, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

(iii) is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

〔is excludable〕 *is inadmissible*.

(E) CERTAIN ALIENS INVOLVED IN SERIOUS CRIMINAL ACTIVITY WHO HAVE ASSERTED IMMUNITY FROM PROSECUTION.—Any alien—

(i) who has committed in the United States at any time a serious criminal offense (as defined in section 101(h)),

(ii) for whom immunity from criminal jurisdiction was exercised with respect to that offense,

(iii) who as a consequence of the offense and exercise of immunity has departed from the United States, and

(iv) who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

〔is excludable〕 *is inadmissible*.

(F) WAIVER AUTHORIZED.—For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

(3) SECURITY AND RELATED GROUNDS.—

(A) IN GENERAL.—Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in—

(i) any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

(ii) any other unlawful activity, or

(iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

〔is excludable〕 *is inadmissible*.

335

(B) TERRORIST ACTIVITIES.—
   (i) IN GENERAL.—Any alien who—
      (I) has engaged in a terrorist activity, ⟦or⟧
      (II) a consular officer or the Attorney General knows, or has reasonable ground to believe, *engaged in or* is likely to engage after entry in any terrorist activity (as defined in clause (iii)),
      *(III) is a representative of a terrorist organization, or*
      *(IV) is a member of a terrorist organization which the alien knows or should have known is a terrorist organization,*
⟦is excludable⟧ *is inadmissible*. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this Act, to be engaged in a terrorist activity.

*       *       *       *       *       *       *

   *(iv) TERRORIST ORGANIZATION DEFINED.—*
      *(I) DESIGNATION.—For purposes of this Act, the term "terrorist organization" means a foreign organization designated in the Federal Register as a terrorist organization by the Secretary of State, in consultation with the Attorney General, based upon a finding that the organization engages in, or has engaged in, terrorist activity that threatens the national security of the United States.*
      *(II) PROCESS.—At least 3 days before designating an organization as a terrorist organization through publication in the Federal Register, the Secretary of State, in consultation with the Attorney General, shall notify the Committees on the Judiciary of the House of Representatives and the Senate of the intent to make such designation and the findings and basis for designation. The Secretary of State, in consultation with the Attorney General, shall create an administrative record and may use classified information in making such a designation. Such information is not subject to disclosure so long as it remains classified, except that it may be disclosed to a court ex parte and in camera under subclause (III) for purposes of judicial review of such a designation. The Secretary of State, in consultation with the Attorney General, shall provide notice and an opportunity for public comment prior to the creation of the administrative record under this subclause.*
      *(III) JUDICIAL REVIEW.—Any organization designated as a terrorist organization under the preceding provisions of this clause may, not later than 30 days after the date of the designation, seek judicial review thereof in the United States Court of Appeals for the District of Columbia Circuit. Such review shall be based solely upon the administrative record, except that the Government may sub-*

336

*mit, for ex parte and in camera review, classified information considered in making the designation. The court shall hold unlawful and set aside the designation if the court finds the designation to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under the previous sentence, contrary to constitutional right, power, privilege, or immunity, or not in accord with the procedures required by law.*

*(IV) C*ONGRESSIONAL REMOVAL AUTHORITY.—*The Congress reserves the authority to remove, by law, the designation of an organization as a terrorist organization for purposes of this Act.*

*(V) S*UNSET.—*Subject to subclause (IV), the designation under this clause of an organization as a terrorist organization shall be effective for a period of 2 years from the date of the initial publication of the terrorist organization designation by the Secretary of State. At the end of such period (but no sooner than 60 days prior to the termination of the 2-year-designation period), the Secretary of State, in consultation with the Attorney General, may redesignate the organization in conformity with the requirements of this clause for designation of the organization.*

*(VI) R*EMOVAL AUTHORITY.—*The Secretary of State, in consultation with the Attorney General, may remove the terrorist organization designation from any organization previously designated as such an organization, at any time, so long as the Secretary publishes notice of the removal in the Federal Register. The Secretary is not required to report to Congress prior to so removing such designation.*

*(v) R*EPRESENTATIVE DEFINED.—

*(I) I*N GENERAL.—*In this subparagraph, the term "representative" includes an officer, official, or spokesman of the organization and any person who directs, counsels, commands or induces the organization or its members to engage in terrorist activity.*

*(II) J*UDICIAL REVIEW.—*The determination under this subparagraph that an alien is a representative of a terrorist organization shall be subject to judicial review under section 706 of title 5, United States Code.*

(C) FOREIGN POLICY.—

(i) IN GENERAL.—An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have poten-

337

tially serious adverse foreign policy consequences for the United States ⟦is excludable⟧ *is inadmissible.*

(ii) EXCEPTION FOR OFFICIALS.—An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

(iii) EXCEPTION FOR OTHER ALIENS.—An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

(iv) NOTIFICATION OF DETERMINATIONS.—If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

(D) IMMIGRANT MEMBERSHIP IN TOTALITARIAN PARTY.—

(i) IN GENERAL.—Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, ⟦is excludable⟧ *is inadmissible.*

(ii) EXCEPTION FOR INVOLUNTARY MEMBERSHIP.—Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

(iii) EXCEPTION FOR PAST MEMBERSHIP.—Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that—

338

(I) the membership or affiliation terminated at least—

(a) 2 years before the date of such application, or

(b) 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

(II) the alien is not a threat to the security of the United States.

(iv) EXCEPTION FOR CLOSE FAMILY MEMBERS.—The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

(E) PARTICIPANTS IN NAZI PERSECUTIONS OR GENOCIDE.—

(i) PARTICIPATION IN NAZI PERSECUTIONS.—Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(I) the Nazi government of Germany,

(II) any government in any area occupied by the military forces of the Nazi government of Germany,

(III) any government established with the assistance or cooperation of the Nazi government of Germany, or

(IV) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion 〔is excludable〕 *is inadmissible.*

(ii) PARTICIPATION IN GENOCIDE.—Any alien who has engaged in conduct that is defined as genocide for purposes of the International Convention on the Prevention and Punishment of Genocide 〔is excludable〕 *is inadmissible.*

〔(4) PUBLIC CHARGE.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable.〕

*(4) PUBLIC CHARGE.—*

*(A) FAMILY-SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(a), who cannot demonstrate to the consular officer at the time of application for a visa, or*

339

to the Attorney General at the time of application for admission or adjustment of status, that the alien's age, health, family status, assets, resources, financial status, education, skills, or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

(B) NONIMMIGRANTS.—Any alien who seeks admission under a visa number issued under section 214, who cannot demonstrate to the consular officer at the time of application for the visa that the alien's age, health, family status, assets, resources, financial status, education, skills or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

(C) EMPLOYMENT-BASED IMMIGRANTS.—

(i) IN GENERAL.—Any alien who seeks admission or adjustment of status under a visa number issued under paragraph (2) or (3) of section 203(b) who cannot demonstrate to the consular officer at the time of application for a visa, or to the Attorney General at the time of application for admission or adjustment of status, that the immigrant has a valid offer of employment is inadmissible.

(ii) CERTAIN EMPLOYMENT-BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible unless such relative has executed an affidavit of support described in section 213A with respect to such alien.

(D) INSURANCE REQUIREMENTS FOR PARENTS.—

(i) IN GENERAL.—Any alien who seeks admission as a parent under section 203(a)(2) is inadmissible unless the alien demonstrates at the time of issuance of the visa (and at the time of admission) to the satisfaction of the consular officer and the Attorney General that the alien—

(I) will have coverage under an adequate health insurance policy (at least comparable to coverage provided under the medicare program under title XVIII of the Social Security Act), and

(II) will have coverage with respect to long-term health needs (at least comparable to such coverage provided under the medicaid program under title XIX of such Act for the State in which either the alien intends to reside or in which the petitioner (on behalf of the alien under section 204(a)(1)) resides,

throughout the period the individual is residing in the United States.

340

(ii) FACTORS TO BE TAKEN INTO ACCOUNT.—In making a determination under clause (i), the Attorney General shall take into account the age of the parent and the likelihood of the parent securing health insurance coverage through employment.

(E) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under subparagraph (A) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).

(5) LABOR CERTIFICATION AND QUALIFICATIONS FOR CERTAIN IMMIGRANTS.—

(A) LABOR CERTIFICATION.—

(i) IN GENERAL.—Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor ⟦is excludable⟧ *is inadmissible*, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that—

(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

(II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

(ii) CERTAIN ALIENS SUBJECT TO SPECIAL RULE.—For purposes of clause (i)(I), an alien described in this clause is an alien who—

(I) is a member of the teaching profession, or

(II) has exceptional ability in the sciences or the arts.

(B) UNQUALIFIED PHYSICIANS.—An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession ⟦is excludable⟧ *is inadmissible*, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

341

(C) APPLICATION OF GROUNDS.—The grounds for ⟦exclusion⟧ *inadmissibility* of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph ⟦(2) or (3)⟧ *(3) or (4)* of section 203(b)*, and shall not apply to immigrants seeking admissions as humanitarian immigrants under section 203(d)*.

(6) ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—

⟦(A) ALIENS PREVIOUSLY DEPORTED.—Any alien who has been excluded from admission and deported and who again seeks admission within one year of the date of such deportation is excludable, unless prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory the Attorney General has consented to the alien's reapplying for admission.

⟦(B) CERTAIN ALIENS PREVIOUSLY REMOVED.—Any alien who—

⟦(i) has been arrested and deported,

⟦(ii) has fallen into distress and has been removed pursuant to this or any prior Act,

⟦(iii) has been removed as an alien enemy, or

⟦(iv) has been removed at Government expense in lieu of deportation pursuant to section 242(b),

⟦and (a) who seeks admission within 5 years of the date of such deportation or removal, or (b) who seeks admission within 20 years in the case of an alien convicted of an aggravated felony, is excludable, unless before the date of the alien's embarkation or reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory the Attorney General has consented to the alien's applying or reapplying for admission.⟧

(A) ALIENS PREVIOUSLY REMOVED.—

*(i)* ARRIVING ALIENS.—*Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal is inadmissible.*

*(ii)* OTHER ALIENS.—*Any alien not described in clause (i) who has been ordered removed under section 240 or any other provision of law and who again seeks admission within 10 years of the date of such removal (or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.*

*(iii)* EXCEPTION.—*Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.*

*(B)* ALIENS PRESENT UNLAWFULLY FOR MORE THAN 1 YEAR.—

342

(i) IN GENERAL.—Any alien who was unlawfully present in the United States for an aggregate period totaling 1 year is inadmissible unless the alien has remained outside the United States for a period of 10 years.

(ii) EXCEPTIONS.—

(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(III) ALIENS WITH WORK AUTHORIZATION.—No period of time in which an alien is provided authorization to engage in employment in the United States (including such an authorization under section 244A(a)(1)(B)), or in which the alien is the spouse of such an alien, shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(IV) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(V) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien described in paragraph (9)(B).

(iii) EXTENSION.—The Attorney General may extend the period of 1 year under clause (i) to a period of 15 months in the case of an alien who applies to the Attorney General (before the alien has been present unlawfully in the United States for a period totaling 1 year) and establishes to the satisfaction of the Attorney General that—

(I) the alien is not inadmissible under clause (i) at the time of the application, and

(II) the failure to extend such period would constitute an extreme hardship for the alien.

(iv) WAIVER.—In the case of an alien who is the spouse, parent, or child of a United States citizen or the spouse or child of a permanent resident alien, the Attorney General may waive clause (i) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

(v) NATIONAL INTEREST WAIVER.—The Attorney General may waive clause (i) if the Attorney General determines that such a waiver is necessary to substantially benefit—

343

*(I) the national security, national defense, or Federal, State, or local law enforcement;*

*(II) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;*

*(III) economic or employment opportunities for a specific industry or specific geographical area;*

*(IV) the development of new technologies; or*

*(V) environmental protection or the productive use of natural resources; and*

*the alien will engage in a specific undertaking to advance one or more of the interests identified in subclauses (I) through (V).*

(C) MISREPRESENTATION.—

(i) IN GENERAL.—Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or ⟦entry⟧ *admission* into the United States or other benefit provided under this Act ⟦is excludable⟧ *is inadmissible.*

(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (i).

(D) STOWAWAYS.—Any alien who is a stowaway ⟦is excludable⟧ *is inadmissible.*

(E) SMUGGLERS.—

(i) IN GENERAL.—Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law ⟦is excludable⟧ *is inadmissible.*

(ii) SPECIAL RULE IN THE CASE OF FAMILY REUNIFICATION.—Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as ⟦an immediate relative⟧ *a spouse, child, or parent of a citizen of the United States* or under section ⟦203(a)(2)⟧ *203(a)(1)* (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

(iii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(11).

⟦(F) SUBJECT OF CIVIL PENALTY.—An alien who is the subject of a final order for violation of section 274C is excludable.⟧

*(F) SUBJECT OF CIVIL PENALTY.—*

*(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.*

344

*(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12).*

(7) DOCUMENTATION REQUIREMENTS.—

(A) IMMIGRANTS.—

(i) IN GENERAL.—Except as otherwise specifically provided in this Act, any immigrant at the time of application for admission—

(I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 211(a), or

(II) whose visa has been issued without compliance with the provisions of section 203,

⟦is excludable⟧ *is inadmissible.*

*(ii) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under clause (i) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).*

⟦(ii)⟧ *(iii)* WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (k).

(B) NONIMMIGRANTS.—

(i) IN GENERAL.—Any nonimmigrant who—

(I) is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

(II) is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

⟦is excludable⟧ *is inadmissible.*

(ii) GENERAL WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(4).

(iii) GUAM VISA WAIVER.—For provision authorizing waiver of clause (i) in the case of visitors to Guam, see subsection (l).

(iv) VISA WAIVER PILOT PROGRAM.—For authority to waive the requirement of clause (i) under a pilot program, see section 217.

(8) INELIGIBLE FOR CITIZENSHIP.—

(A) IN GENERAL.—Any immigrant who is permanently ineligible to citizenship ⟦is excludable⟧ *is inadmissible.*

(B) DRAFT EVADERS.—Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national

345

emergency ⟦is excludable⟧ *is inadmissible*, except that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

*(9) PRESENT WITHOUT ADMISSION OR PAROLE.—*

*(A) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.*

*(B) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Subparagraph (A) shall not apply to an alien who can demonstrate that—*

*(i) the alien qualifies for immigrant status under subparagraphs (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),*

*(ii)(I) the alien has been battered or subject to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and*

*(iii) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.*

⟦(9)⟧ *(10)* MISCELLANEOUS.—

(A) PRACTICING POLYGAMISTS.—Any immigrant who is coming to the United States to practice polygamy ⟦is excludable⟧ *is inadmissible.*

⟦(B) GUARDIAN REQUIRED TO ACCOMPANY EXCLUDED ALIEN.—Any alien accompanying another alien ordered to be excluded and deported and certified to be helpless from sickness or mental or physical disability or infancy pursuant to section 237(e), whose protection or guardianship is required by the alien ordered excluded and deported, is excludable.⟧

*(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—*

*(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and*

*(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),*

*is inadmissible.*

(C) INTERNATIONAL CHILD ABDUCTION.—

(i) IN GENERAL.—Except as provided in clause (ii), any alien who, after entry of an order by a court in the

346

United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, 〔is excludable〕 *is inadmissible* until the child is surrendered to the person granted custody by that order.

(ii) EXCEPTION.—Clause (i) shall not apply so long as the child is located in a foreign state that is a party to the Hague Convention on the Civil Aspects of International Child Abduction.

*(D) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounced United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.*

(b) NOTICES OF DENIALS.—〔If〕 *(1) Subject to paragraph (2), if* an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be 〔excludable〕 *inadmissible* under subsection (a), the officer shall provide the alien with a timely written notice that—

〔(1)〕 *(A)* states the determination, and

〔(2)〕 *(B)* lists the specific provision or provisions of law under which the alien is 〔excludable or ineligible for entry〕 *inadmissible* or adjustment of status.

*(2) With respect to applications for visas, the Secretary of State may waive the application of paragraph (1) in the case of a particular alien or any class or classes of aliens inadmissible under subsection (a)(2) or (a)(3).*

〔(c) Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) (other than paragraphs (3) and (9)(C)). Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 211(b). The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.〕

(d)(1) The Attorney General shall determine whether a ground for 〔exclusion〕 *inadmissibility* exists with respect to a nonimmigrant described in section 101(a)(15)(S). The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a)*(2)* (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 101(a)(15)(S), if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting 〔deportation〕 *removal* proceedings against an alien admitted as a nonimmigrant under section 101(a)(15)(S) for conduct committed after the alien's admission into the United States, or for conduct or a condition that

347

was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 101(a)(15)(S).

(3) Except as provided in this subsection, an alien (A) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (B) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of ⟦excludable⟧ *inadmissible* aliens applying for temporary admission under this paragraph.

(4) Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands ⟦and residents⟧, *residents* thereof having a common nationality with such ⟦nationals,⟧ *nationals, and aliens who are granted permanent residence by the government of the foreign contiguous territory and who are residing in that territory* or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 238(c).

⟦(5)(A) The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

⟦(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.⟧

*(5)(A) Subject to the provisions of this paragraph and section 214(f)(2), the Attorney General, in the sole discretion of the Attorney General, may on a case-by-case basis parole an alien into the United States temporarily, under such conditions as the Attorney General may prescribe, only—*

348

*(i) for an urgent humanitarian reason (as described under subparagraph (B)); or*

*(ii) for a reason deemed strictly in the public interest (as described under subparagraph (C)).*

*(B) The Attorney General may parole an alien based on an urgent humanitarian reason described in this subparagraph only if—*

*(i) the alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted through the normal visa process;*

*(ii) the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member; or*

*(iii) the alien has a close family member in the United States whose death is imminent and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted through the normal visa process.*

*(C) The Attorney General may parole an alien based on a reason deemed strictly in the public interest described in this subparagraph only if—*

*(i) the alien has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States; or*

*(ii) the alien is to be prosecuted in the United States for a crime.*

*(D) The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.*

*(E) Parole of an alien under this paragraph shall not be considered an admission of the alien into the United States. When the purposes of the parole of an alien have been served, as determined by the Attorney General, the alien shall immediately return or be returned to the custody from which the alien was paroled and the alien shall be considered for admission to the United States on the same basis as other similarly situated applicants for admission.*

*(F) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and the Senate describing the number and categories of aliens paroled into the United States under this paragraph. Each such report shall contain information and data concerning the number and categories of aliens paroled, the duration of parole, and the current status of aliens paroled during the preceding fiscal year.*

(7) The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. Any alien described in this paragraph,

349

who is 【excluded from】 *denied* admission to the United States, shall be immediately 【deported】 *removed* in the manner provided by section 【237(a)】 *241(c)* of this Act.

    \*      \*      \*      \*      \*      \*      \*

    (11) The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(E) in the case of any alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of 【deportation】 *removal*, and who is otherwise admissible to the United States as a returning resident under section 211(b) and in the case of an alien seeking admission or adjustment of status as 【an immediate relative】 *a spouse or child of a citizen of the United States* or 【immigrant under section 203(a) (other than paragraph (4) thereof)】 *an immigrant under section 203(a)* if the alien has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

    *(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(F)—*

        *(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation and who is otherwise admissible to the United States as a returning resident under section 211(b), and*

        *(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),*

*if the violation under section 274C was committed solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and not another individual).*

    \*      \*      \*      \*      \*      \*      \*

    (f) Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. *Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.*

    (g) The Attorney General may waive the application of—

        (1) subsection (a)(1)(A)(i) in the case of any alien who—

            (A) is the spouse or the unmarried son or daughter, or the minor unmarried lawfully adopted child, of a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa, or

350

(B) has a son or daughter who is a United States citizen, or an alien lawfully admitted for permanent residence, or an alien who has been issued an immigrant visa⟦, or

⟦(2) subsection (a)(1)(A)(ii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in his discretion after consultation with the Secretary of Health and Human Services, may by regulation prescribe.⟧;

*in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;*

*(2) subsection (a)(1)(A)(ii) in the case of any alien—*

*(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination, or*

*(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by 42 C.F.R. 34.2) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate; or*

*(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.*

(h) The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if—

(1)(A) in the case of any immigrant it is established to the satisfaction of the Attorney General that—

(i) the alien is ⟦excludable⟧ *inadmissible* only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is ⟦excludable⟧ *inadmissible* occurred more than 15 years before the date of the alien's application for a visa, ⟦entry⟧ *admission*, or adjustment of status,

(ii) the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

(iii) the alien has been rehabilitated; or

(B) in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's ⟦exclusion⟧ *denial of admission* would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; and

\*       \*       \*       \*       \*       \*       \*

351

⟦(i) The Attorney General may, in his discretion, waive application of clause (i) of subsection (a)(6)(C)—

⟦(1) in the case of an immigrant who is the spouse, parent, or son or daughter of a United States citizen or of an immigrant lawfully admitted for permanent residence, or

⟦(2) if the fraud or misrepresentation occurred at least 10 years before the date of the immigrant's application for a visa, entry, or adjustment of status and it is established to the satisfaction of the Attorney General that the admission to the United States of such immigrant would not be contrary to the national welfare, safety, or security of the United States.⟧

*(i) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C)—*

*(1) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen; or*

*(2) in the case of an immigrant who is the spouse or son or daughter of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the lawfully resident spouse or parent of such an alien.*

(j)(1) The additional requirements referred to in section 101(a)(15)(J) for an alien who is coming to the United States under a program under which he will receive graduate medical education or training are as follows:

(A)   * * *

*      *      *      *      *      *      *

(D) The duration of the alien's participation in the program of graduate medical education or training for which the alien is coming to the United States is limited to the time typically required to complete such program, as determined by the Director of the United States Information Agency at the time of the alien's ⟦entry⟧ *admission* into the United States, based on criteria which are established in coordination with the Secretary of Health and Human Services and which take into consideration the published requirements of the medical specialty board which administers such education or training program; except that—

(i) such duration is further limited to seven years unless the alien has demonstrated to the satisfaction of the Director that the country to which the alien will return at the end of such specialty education or training has an exceptional need for an individual trained in such specialty, and

(ii) the alien may, once and not later than two years after the date the alien ⟦enters⟧ *is admitted to* the United States as an exchange visitor or acquires exchange visitor status, change the alien's designated program of graduate medical education or training if the Director approves the change and if a commitment and written assurance with respect to the alien's new program have been provided in accordance with subparagraph (C).

*      *      *      *      *      *      *

352

(k) Any alien, 〚excludable〛 *inadmissible* from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an immigrant visa may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that 〚exclusion〛 *inadmissibility* was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

(l)(1)  \* \* \*

(2) An alien may not be provided a waiver under this subsection unless the alien has waived any right—

(A) to review or appeal under this Act of an immigration officer's determination as to the admissibility of the alien at the port of entry into Guam, or

(B) to contest, other than on the basis of an application for asylum, any action for 〚deportation against〛 *removal of* the alien.

\*      \*      \*      \*      \*      \*      \*

(n)(1) No alien may be admitted or provided status as a nonimmigrant described in section 101(a)(15)(H)(i)(b) *(in this subsection referred to as an "H–1B nonimmigrant")* in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

(A) The employer—

(i) is offering and will offer during the period of authorized employment to aliens admitted or provided status as a 〚nonimmigrant described in section 101(a)(15)(H)(i)(b)〛 *H–1B nonimmigrant* wages that are at least—

(I)  \* \* \*

\*      \*      \*      \*      \*      \*      \*

*(E)(i) If the employer, within the period beginning 6 months before and ending 90 days following the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has laid off or lays off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the nonimmigrant is sought or is employed, the employer will pay a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).*

*(ii) Except as provided in clause (iii), in the case of an H–1B-dependent employer which employs an H–1B nonimmigrant, the employer shall not place the nonimmigrant with another employer where—*

353

(I) the nonimmigrant performs his or her duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer, and

(II) there are indicia of an employment relationship between the nonimmigrant and such other employer.

(iii) Clause (ii) shall not apply to an employer's placement of an H–1B nonimmigrant with another employer if—

(I) the other employer has executed an attestation that it, within the period beginning 6 months before and ending 90 days following the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has not laid off and will not lay off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the H–1B nonimmigrant is being sought or is employed, or

(II) the employer pays a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the other employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

(iv) For purposes of this subparagraph, the term "laid off", with respect to an individual—

(I) refers to the individual's loss of employment, other than a discharge for inadequate performance, cause, voluntary departure, or retirement, and

(II) does not include any situation in which the individual involved is offered, as an alternative to such loss of employment, a similar job opportunity with the same employer (or with the H–1B-dependent employer described in clause (ii)) carrying equivalent or higher compensation and benefits as the position from which the employee was laid off, regardless of whether or not the employee accepts the offer.

(v) For purposes of this subparagraph, the term "protected individual" means an individual who—

(I) is a citizen or national of the United States, or

(II) is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a), 210A(a), or 245(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208.

\*          \*          \*          \*          \*          \*          \*

(2)(A) The Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives), *except that the Secretary may only file such a complaint in the case of an H–1B-dependent employer (as defined in subpara-*

354

*graph (E)) or when conducting an annual review of a plan pursuant to subparagraph (F)(i) if there appears to be a violation of an attestation or a misrepresentation of a material fact in an application. No investigation or hearing shall be conducted with respect to a non-H–1B-dependent employer except in response to a complaint filed under the previous sentence.* No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

*   *   *   *   *   *   *

(C) If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B) *or (1)(E)*, a substantial failure to meet a condition of paragraphs (1)(C) or (1)(D), a willful failure to meet a condition of paragraph (1)(A), or a misrepresentation of material fact in an application—

(i) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed ⟦$1,000⟧ *$5,000* per violation) as the Secretary determines to be appropriate, and

⟦(ii) the Attorney General shall not approve petitions filed with respect to that employer under section 204 or 214(c) during a period of at least 1 year for aliens to be employed by the employer.⟧

*(ii) the Attorney General shall not approve petitions filed with respect to that employer (or any employer who is a successor in interest) under section 204 or 214(c) for aliens to be employed by the employer—*

*(I) during a period of at least 1 year in the case of the first determination of a violation or any subsequent determination of a violation occurring within 1 year of that first violation or any subsequent determination of a nonwillful violation occurring more than 1 year after the first violation;*

*(II) during a period of at least 5 years in the case of a determination of a willful violation occurring more than 1 year after the first violation; and*

*(III) at any time in the case of a determination of a willful violation occurring more than 5 years after a violation described in subclause (II).*

(D) If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed. *If a penalty under subparagraph (C) has been imposed in the case of a willful violation, the Secretary shall impose on the employer a civil monetary penalty in an amount equalling twice the amount of backpay.*

355

(E) In this subsection, the term "H–1B-dependent employer" means an employer that—

(i)(I) has fewer than 21 full-time equivalent employees who are employed in the United States, and (II) employs 4 or more H–1B nonimmigrants; or

(ii)(I) has at least 21 but not more than 150 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 20 percent of the number of such full-time equivalent employees; or

(iii)(I) has at least 151 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

In applying this subparagraph, any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 shall be treated as a single employer. Aliens employed under a petition for H–1B nonimmigrants shall be treated as employees, and counted as nonimmigrants under section 101(a)(15)(H)(i)(b) under this subparagraph. In this subsection, the term "non-H–1B-dependent employer" means an employer that is not an H–1B-dependent employer.

(F)(i) An employer who is an H–1B-dependent employer as defined in subparagraph (E) can nevertheless be treated as a non-H–1B-dependent employer for five years on a probationary status if—

(I) the employer has demonstrated to the satisfaction of the Secretary of Labor that it has developed a reasonable plan for reducing its use of H–1B nonimmigrants over a five-year period to the level of a non-H–1B-dependent employer, and

(II) annual reviews of that plan by the Secretary of Labor indicate successful implementation of that plan.

If the employer has not met the requirements established in this clause, the probationary status ends and the employer shall be treated as an H–1B-dependent employer until such time as the employer can prove to the Secretary of Labor that it no longer is an H–1B-dependent employer as defined in subparagraph (E).

(ii) The probationary program set out in clause (i) shall be effective for no longer than five years after the date of the enactment of this subparagraph.

(G) Under regulations of the Secretary, the previous provisions of this paragraph shall apply to complaints respecting a failure of an other employer to comply with an attestation described in paragraph (1)(E)(iii)(I) in the same manner that they apply to complaints with respect to a failure to comply with a condition described in paragraph (1)(E)(i).

(3) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), an employer shall not be required to have and document an objective system to determine the wages of workers.

(4) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), a non-H–1B-dependent employer of more than 1,000 full-time equivalent employees in the United States may demonstrate that in determining the wages of H–1B nonimmigrants, it utilizes a compensation and benefits system that has been pre-

356

*viously certified by the Secretary of Labor (and recertified at such intervals the Secretary of Labor may designate) to satisfy all of the following conditions:*

*(A) The employer has a company-wide compensation policy for its full-time equivalent employees which ensures salary equity among employees similarly employed.*

*(B) The employer has a company-wide benefits policy under which all full-time equivalent employees similarly employed are eligible for substantially the same benefits or under which some employees may accept higher pay, at least equal in value to the benefits, in lieu of benefits.*

*(C) The compensation and benefits policy is communicated to all employees.*

*(D) The employer has a human resources or compensation function that administers its compensation system.*

*(E) The employer has established documentation for the job categories in question.*

*An employer's payment of wages consistent with a system which meets the conditions of subparagraphs (A) through (E) of this paragraph which has been certified by the Secretary of Labor pursuant to this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(I).*

*(5) For purposes of determining the prevailing wage level paid under paragraph (1)(A)(i)(II), employers may provide a published survey, a State Employment Security Agency determination, a determination by an accepted private source, or any other legitimate source. The Secretary of Labor shall, not later than 180 days from the date of enactment of this paragraph, provide for acceptance of prevailing wage determinations not made by a State Employment Security Agency. The Secretary of Labor or the Secretary's designate must either accept such a non-State Employment Security Agency wage determination or issue a written decision rejecting the determination and detailing the legitimate reasons that the determination is not acceptable. If a detailed rejection is not issued within 45 days of the date of the Secretary's receipt of such determination, the determination will be deemed accepted. An employer's payment of wages consistent with a prevailing wage determination not rejected by the Secretary of Labor under this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(II).*

*(6) In carrying out this subsection in the case of an employer that is a non-H–1B-dependent employer—*

*(A) the employer is not required to post a notice at a worksite that was not listed on the application under paragraph (1) if the worksite is within the area of intended employment listed on such application for such nonimmigrant; and*

*(B) if the employer has filed and had certified an application under paragraph (1) with respect to one or more H–1B nonimmigrants for one or more areas of employment—*

*(i) the employer is not required to file and have certified an additional application under paragraph (1) with respect to such a nonimmigrant for an area of employment not listed in the previous application because the employer has placed one or more such nonimmigrants in such a nonlisted area so long as either (I) each such nonimmigrant*

357

*is not placed in such nonlisted areas for a period exceeding 45 workdays in any 12-month period and not to exceed 90 workdays in any 36-month period, or (II) each such nonimmigrant's principal place of employment has not changed to a nonlisted area, and*

*(ii) the employer is not required to pay per diem and transportation costs at any specified rates for work performed in such a nonlisted area.*

*(7) In computing the prevailing wage level for an occupational classification in an area of employment for purposes of paragraph (1)(A)(i)(II) and subsection (a)(5)(A) in the case of an employee of (A) an institution of higher education (as defined in section 1201(a) of the Higher Education Act of 1965), or a related or affiliated nonprofit entity, or (B) a nonprofit scientific research organization, the prevailing wage level shall only take into account employees at such institutions and entities in the area of employment.*

〚(o) An alien who has been physically present in the United States shall not be eligible to receive an immigrant visa within ninety days following departure therefrom unless—

〚(1) the alien was maintaining a lawful nonimmigrant status at the time of such departure, or

〚(2) the alien is the spouse or unmarried child of an individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986 at any date, who—

〚(A) as of May 5, 1988, was the unmarried child or spouse of the individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986;

〚(B) entered the United States before May 5, 1988, resided in the United States on May 5, 1988, and is not a lawful permanent resident; and

〚(C) applied for benefits under section 301(a) of the Immigration Act of 1990.〛

\*          \*          \*          \*          \*          \*          \*

ADMISSION OF CERTAIN ALIENS ON GIVING BOND

SEC. 213. An alien 〚excludable〛 *inadmissible* under paragraph (4) of section 212(a) may, if otherwise admissible, be admitted in the discretion of the Attorney General upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States, and to all States, territories, counties, towns, municipalities, and districts thereof holding the United States and all States, territories, counties, towns, municipalities, and districts thereof harmless against such alien becoming a public charge. Such bond or undertaking shall terminate upon the permanent departure from the United States, the naturalization, or the death of such alien, and any sums or other security held to secure performance thereof, except to the extent forfeited for violation of the terms thereof, shall be returned to the person by whom fur-

358

nished, or to his legal representatives. Suit may be brought thereon in the name and by the proper law officers of the United States for the use of the United States, or of any State, territory, district, county, town, or municipality in which such alien becomes a public charge, irrespective of whether a demand for payment of public expenses has been made.

*REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT*

SEC. 213A. (a) ENFORCEABILITY.—(1) *No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not inadmissible as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—*

    *(A) that is legally enforceable against the sponsor by the Federal Government and by any State (or any political subdivision of such State) that provides any means-tested public benefits program, subject to subsection (b)(4); and*

    *(B) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).*

*(2)(A) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the parent of a United States citizen under section 203(a)(2) until the alien is naturalized as a citizen of the United States.*

*(B) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the spouse of a United States citizen or lawful permanent resident under section 201(b)(2) or 203(a)(2) until—*

    *(i) 7 years after the date the alien is lawfully admitted to the United States for permanent residence, or*

    *(ii) such time as the alien is naturalized as a citizen of the United States,*

*whichever occurs first.*

*(C) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the minor child of a United States citizen or lawful permanent resident under section 201(b)(2) or section 203(a)(2) until the child attains the age of 21 years.*

*(D)(i) Notwithstanding any other provision of this subparagraph, a sponsor shall be relieved of any liability under an affidavit of support if the sponsored alien is employed for a period sufficient to qualify for old age benefits under title II of the Social Security Act and the sponsor or alien is able to prove to the satisfaction of the Attorney General that the alien so qualifies.*

*(ii) The Attorney General shall ensure that appropriate information pursuant to clause (i) is provided to the System for Alien Verification of Eligibility (SAVE).*

*(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—(1)(A) Upon notification that a sponsored alien has received any benefit under any means-tested public benefits program, the appropriate Federal,*

359

State, or local official shall request reimbursement by the sponsor in the amount of such assistance.

(B) The Attorney General, in consultation with the Secretary of Health and Human Services, shall prescribe such regulations as may be necessary to carry out subparagraph (A).

(2) If within 45 days after requesting reimbursement, the appropriate Federal, State, or local agency has not received a response from the sponsor indicating a willingness to commence payments, an action may be brought against the sponsor pursuant to the affidavit of support.

(3) If the sponsor fails to abide by the repayment terms established by such agency, the agency may, within 60 days of such failure, bring an action against the sponsor pursuant to the affidavit of support.

(4) No cause of action may be brought under this subsection later than 10 years after the alien last received any benefit under any means-tested public benefits program.

(5) If, pursuant to the terms of this subsection, a Federal, State, or local agency requests reimbursement from the sponsor in the amount of assistance provided, or brings an action against the sponsor pursuant to the affidavit of support, the appropriate agency may appoint or hire an individual or other person to act on behalf of such agency acting under the authority of law for purposes of collecting any moneys owed. Nothing in this subsection shall preclude any appropriate Federal, State, or local agency from directly requesting reimbursement from a sponsor for the amount of assistance provided, or from bringing an action against a sponsor pursuant to an affidavit of support.

(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.

(d) NOTIFICATION OF CHANGE OF ADDRESS.—(1) The sponsor of an alien shall notify the Federal Government and the State in which the sponsored alien is currently residing within 30 days of any change of address of the sponsor during the period specified in subsection (a)(1).

(2) Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall be subject to a civil penalty of—

(A) not less than $250 or more than $2,000, or

(B) if such failure occurs with knowledge that the sponsored alien has received any benefit under any means-tested public benefits program, not less than $2,000 or more than $5,000.

(e) DEFINITIONS.—For the purposes of this section—

(1) SPONSOR.—The term "sponsor" means, with respect to an alien, an individual who—

(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

360

*(B) is 18 years of age or over;*

*(C) is domiciled in any State;*

*(D) demonstrates, through presentation of a certified copy of a tax return or otherwise, (i) the means to maintain an annual income equal to at least 200 percent of the poverty level for the individual and the individual's family (including the alien and any other aliens with respect to whom the individual is a sponsor), or (ii) for an individual who is on active duty (other than active duty for training) in the Armed Forces of the United States, the means to maintain an annual income equal to at least 100 percent of the poverty level for the individual and the individual's family including the alien and any other aliens with respect to whom the individual is a sponsor); and*

*(E) is petitioning for the admission of the alien under section 204 (or is an individual who accepts joint and several liability with the petitioner).*

*(2) FEDERAL POVERTY LINE.—The term "Federal poverty line" means the income official poverty line (as defined in section 673(2) of the Community Services Block Grant Act) that is applicable to a family of the size involved.*

*(3) MEANS-TESTED PUBLIC BENEFITS PROGRAM.—The term "means-tested public benefits program" means a program of public benefits (including cash, medical, housing, and food assistance and social services) of the Federal Government or of a State or political subdivision of a State in which the eligibility of an individual, household, or family eligibility unit for benefits under the program, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit.*

ADMISSION OF NONIMMIGRANTS

SEC. 214. (a)   * * *

*          *          *          *          *          *          *

(c)(1)   * * *

(2)(A) The Attorney General shall provide for a procedure under which an importing employer which meets requirements established by the Attorney General may file a blanket petition to import aliens as nonimmigrants described in section 101(a)(15)(L) instead of filing individual petitions under paragraph (1) to import such aliens. Such procedure shall permit the expedited processing of visas for ⟦entry⟧ *admission* of aliens covered under such a petition.

*          *          *          *          *          *          *

(5)(A)   * * *

(B) In the case of an alien who ⟦enters⟧ *is admitted to* the United States in nonimmigrant status under section 101(a)(15)(O) or 101(a)(15)(P) and whose employment terminates for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of return transportation of the alien abroad. The petitioner shall pro-

361

vide assurance satisfactory to the Attorney General that the reasonable cost of that transportation will be provided.

\*         \*         \*         \*         \*         \*         \*

(d) A visa shall not be issued under the provisions of section 101(a)(15)(K) until the consular officer has received a petition filed in the United States by the fiancée or fiancé of the applying alien and approved by the Attorney General. The petition shall be in such form and contain such information as the Attorney General shall, by regulation, prescribe. It shall be approved only after satisfactory evidence is submitted by the petitioner to establish that the parties have previously met in person within 2 years before the date of filing the petition, have a bona fide intention to marry, and are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival, except that the Attorney General in his discretion may waive the requirement that the parties have previously met in person. In the event the marriage with the petitioner does not occur within three months after the ⟦entry⟧ *admission* of the said alien and minor children, they shall be required to depart from the United States and upon failure to do so shall be ⟦deported⟧ *removed* in accordance with sections ⟦242⟧ *240* and ⟦243⟧ *241.*

\*         \*         \*         \*         \*         \*         \*

(f)(1) Except as provided in paragraph (3), no alien shall be entitled to nonimmigrant status described in section 101(a)(15)(D) if the alien intends to land for the purpose of performing service on board a vessel of the United States (as defined in section 2101(46) of title 46, United States Code) or on an aircraft of an air carrier (as defined in ⟦section 101(3) of the Federal Aviation Act of 1958⟧ *section 40102(a)(2) of title 49, United States Code*) during a labor dispute where there is a strike or lockout in the bargaining unit of the employer in which the alien intends to perform such service.

\*         \*         \*         \*         \*         \*         \*

⟦(j)⟧ *(k)*(1)  \*  \*  \*

\*         \*         \*         \*         \*         \*         \*

(4) As a condition for the admission, and continued stay in lawful status, of such a nonimmigrant, the nonimmigrant—

(A)  \*  \*  \*

\*         \*         \*         \*         \*         \*         \*

(C) must have executed a form that waives the nonimmigrant's right to contest, other than on the basis of an application for withholding of ⟦deportation⟧ *removal*, any action for ⟦deportation⟧ *removal* of the alien instituted before the alien obtains lawful permanent resident status; and

\*         \*         \*         \*         \*         \*         \*

⟦(k)⟧ *(l)*(1)  \*  \*  \*

\*         \*         \*         \*         \*         \*         \*

(3) Notwithstanding any other provision of this subsection, the two-year foreign residence requirement under section 212(e) shall apply with respect to an alien described in clause (iii) of that section⟦, who has not otherwise been accorded status under section

362

101(a)(27)(H),⟧ if at any time the alien practices medicine in an area other than an area described in paragraph (1)(C).

\*     \*     \*     \*     \*     \*     \*

CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN ALIEN SPOUSES AND SONS AND DAUGHTERS

SEC. 216. (a)  \* \* \*

(b) TERMINATION OF STATUS IF FINDING THAT QUALIFYING MARRIAGE IMPROPER.—

(1) IN GENERAL.—In the case of an alien with permanent resident status on a conditional basis under subsection (a), if the Attorney General determines, before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence, that—

(A) the qualifying marriage—

(i) was entered into for the purpose of procuring an alien's ⟦entry⟧ *admission* as an immigrant, or

(ii) has been judicially annulled or terminated, other than through the death of a spouse; or

\*     \*     \*     \*     \*     \*     \*

(2) HEARING IN ⟦DEPORTATION⟧ *REMOVAL* PROCEEDING.—Any alien whose permanent resident status is terminated under paragraph (1) may request a review of such determination in a proceeding to ⟦deport⟧ *remove* the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that a condition described in paragraph (1) is met.

(c) REQUIREMENTS OF TIMELY PETITION AND INTERVIEW FOR REMOVAL OF CONDITION.—

(1)  \* \* \*

(2) TERMINATION OF PERMANENT RESIDENT STATUS FOR FAILURE TO FILE PETITION OR HAVE PERSONAL INTERVIEW.—

(A)  \* \* \*

(B) HEARING IN ⟦DEPORTATION⟧ *REMOVAL* PROCEEDING.— In any ⟦deportation⟧ *removal* proceeding with respect to an alien whose permanent resident status is terminated under subparagraph (A), the burden of proof shall be on the alien to establish compliance with the conditions of paragraphs (1)(A) and (1)(B).

(3) DETERMINATION AFTER PETITION AND INTERVIEW.—

(A)  \* \* \*

\*     \*     \*     \*     \*     \*     \*

(D) HEARING IN ⟦DEPORTATION⟧ *REMOVAL* PROCEEDING.— Any alien whose permanent resident status is terminated under subparagraph (C) may request a review of such determination in a proceeding to ⟦deport⟧ *remove* the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that the facts and information described in subsection (d)(1) and alleged in the petition are not true with respect to the qualifying marriage.

363

(4) HARDSHIP WAIVER.—The Attorney General, in the Attorney General's discretion, may remove the conditional basis of the permanent resident status for an alien who fails to meet the requirements of paragraph (1) if the alien demonstrates that—

(A) extreme hardship would result if such alien is 〖deported〗 *removed*,

\*       \*       \*       \*       \*       \*       \*

(d) DETAILS OF PETITION AND INTERVIEW.—

(1) CONTENTS OF PETITION.—Each petition under subsection (c)(1)(A) shall contain the following facts and information:

(A) STATEMENT OF PROPER MARRIAGE AND PETITIONING PROCESS.—The facts are that—

(i) the qualifying marriage—

(I) was entered into in accordance with the laws of the place where the marriage took place,

(II) has not been judicially annulled or terminated, other than through the death of a spouse, and

(III) was not entered into for the purpose of procuring an alien's 〖entry〗 *admission* as an immigrant; and

\*       \*       \*       \*       \*       \*       \*

(2) PERIOD FOR FILING PETITION.—

(A) 90-DAY PERIOD BEFORE SECOND ANNIVERSARY.—Except as provided in subparagraph (B), the petition under subsection (c)(1)(A) must be filed during the 90-day period before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence.

(B) DATE PETITIONS FOR GOOD CAUSE.—Such a petition may be considered if filed after such date, but only if the alien establishes to the satisfaction of the Attorney General good cause and extenuating circumstances for failure to file the petition during the period described in subparagraph (A).

(C) FILING OF PETITIONS DURING 〖DEPORTATION〗 *REMOVAL*.—In the case of an alien who is the subject of 〖deportation〗 *removal* hearings as a result of failure to file a petition on a timely basis in accordance with subparagraph (A), the Attorney General may stay such 〖deportation〗 *removal* proceedings against an alien pending the filing of the petition under subparagraph (B).

\*       \*       \*       \*       \*       \*       \*

(f) TREATMENT OF CERTAIN WAIVERS.—In the case of an alien who has permanent residence status on a conditional basis under this section, if, in order to obtain such status, the alien obtained a waiver under subsection (h) or (i) of section 212 of certain grounds of 〖exclusion〗 *inadmissibility*, such waiver terminates upon the termination of such permanent residence status under this section.

(g) DEFINITIONS.—In this section:

364

(1) The term "alien spouse" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise)—

(A) as ⟦an immediate relative (described in section 201(b)) as the spouse of a citizen of the United States⟧ *the spouse of a citizen of the United States (described in section 201(b)),*

(B) under section 214(d) as the fiancee or fiance of a citizen of the United States, or

(C) under section 203(a)⟦(2)⟧ *(1)* as the spouse of an alien lawfully admitted for permanent residence,

by virtue of a marriage which was entered into less than 24 months before the date the alien obtains such status by virtue of such marriage, but does not include such an alien who only obtains such status as a result of section ⟦203(d)⟧ *203(e).*

(2) The term "alien son or daughter" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) by virtue of being the son or daughter of an individual through a qualifying marriage.

(3) The term "qualifying marriage" means the marriage described to in paragraph (1).

(4) The term "petitioning spouse" means the spouse of a qualifying marriage, other than the alien.

CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN ALIEN ENTREPRENEURS, SPOUSES, AND CHILDREN

SEC. 216A. (a)   *   *   *

(b) TERMINATION OF STATUS IF FINDING THAT QUALIFYING ENTREPRENEURSHIP IMPROPER.—

(1) IN GENERAL.—In the case of an alien entrepreneur with permanent resident status on a conditional basis under subsection (a), if the Attorney General determines, before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence, that—

(A) the establishment of the commercial enterprise was intended solely as a means of evading the immigration laws of the United States,

(B)(i) a commercial enterprise was not established by the alien,

⟦(ii) the alien did not invest or was not actively in the process of investing the requisite capital; or⟧

*(ii) subject to paragraph (3), the alien did not invest (and maintain investment of) the requisite capital, or did not employ the requisite number of employees, throughout substantially the entire period since the alien's admission; or*

(iii) the alien was not sustaining the actions described in clause (i) or (ii) throughout the period of the alien's residence in the United States, or

(C) the alien was otherwise not conforming to the requirements of section 203(b)(5),

then the Attorney General shall so notify the alien involved and, subject to paragraph (2), shall terminate the permanent

365

resident status of the alien (and the alien spouse and alien child) involved as of the date of the determination.

(2) HEARING IN ⟦DEPORTATION⟧ *REMOVAL* PROCEEDING.—Any alien whose permanent resident status is terminated under paragraph (1) may request a review of such determination in a proceeding to deport the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that a condition described in paragraph (1) is met.

(3) EXCEPTIONS.—

(A) GOOD FAITH EXCEPTION.—*Paragraph (1)(B)(ii) shall not apply to an alien to the extent that the alien continues to attempt in good faith throughout the period since admission to invest (and maintain investment of) the requisite capital, and to employ the requisite number of employees, but was unable to do so due to circumstances for which the alien should not justly be held responsible.*

(B) EXTENSION.—*In the case of an alien to whom the exception under subparagraph (A) applies, the application period under subsection (d)(2) (and period for termination under paragraph (1)) shall be extended (for up to 3 additional years) by such additional period as may be necessary to enable the alien to have had the requisite capital and number of employees throughout a 2-year period. Such extension shall terminate at any time at which the Attorney General finds that the alien has not continued to attempt in good faith to invest such capital and employ such employees.*

(c) REQUIREMENTS OF TIMELY PETITION AND INTERVIEW FOR REMOVAL OF CONDITION.—

(1)   \* \* \*

(2) TERMINATION OF PERMANENT RESIDENT STATUS FOR FAILURE TO FILE PETITION OR HAVE PERSONAL INTERVIEW.—

(A)   \* \* \*

(B) HEARING IN ⟦DEPORTATION⟧ *REMOVAL* PROCEEDING.—In any ⟦deportation⟧ *removal* proceeding with respect to an alien whose permanent resident status is terminated under subparagraph (A), the burden of proof shall be on the alien to establish compliance with the conditions of paragraphs (1)(A) and (1)(B).

(3) DETERMINATION AFTER PETITION AND INTERVIEW.—

(A)   \* \* \*

\*        \*        \*        \*        \*        \*        \*

(D) HEARING IN ⟦DEPORTATION⟧ *REMOVAL* PROCEEDING.—Any alien whose permanent resident status is terminated under subparagraph (C) may request a review of such determination in a proceeding to ⟦deport⟧ *remove* the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that the facts and information described in subsection (d)(1) and alleged in the petition are not true with respect to the qualifying commercial enterprise.

(d) DETAILS OF PETITION AND INTERVIEW.—

(1)   \* \* \*

366

(2) PERIOD FOR FILING PETITION.—
    (A)  * * *

\*      \*      \*      \*      \*      \*      \*

    (C) FILING OF PETITIONS DURING 【DEPORTATION】 *RE-MOVAL*.—In the case of an alien who is the subject of 【deportation】 *removal* hearings as a result of failure to file a petition on a timely basis in accordance with subparagraph (A), the Attorney General may stay such 【deportation】 *removal* proceedings against an alien pending the filing of the petition under subparagraph (B).

\*      \*      \*      \*      \*      \*      \*

(f) DEFINITIONS.—In this section:
    (1) The term "alien entrepreneur" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) under section 203(b)【(5)】*(4)*.

\*      \*      \*      \*      \*      \*      \*

*CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN FOREIGN LANGUAGE TEACHERS*

*SEC. 216B. (a) IN GENERAL.—Subject to the succeeding provisions of this section, section 216A shall apply to an alien foreign language teacher (as defined in subsection (d)(1)) and to an alien spouse or alien child (as defined in subsection (d)(2)) in the same manner as such section applies to an alien entrepreneur and an alien spouse or alien child.*

*(b) TIMING FOR PETITION.—*

    *(1) IN GENERAL.—In applying section 216A under subsection (a), any reference to a "second anniversary of an alien's lawful admission for permanent residence" is deemed a reference to the end of the time period described in paragraph (2).*

    *(2) TIME PERIOD FOR DETERMINATION.—The time period described in this paragraph is 5 years less the period of experience, during the 5-year period ending on the date the alien foreign language teacher obtains permanent resident status, of teaching a language (other than English) full-time at an accredited elementary or middle school.*

*(c) REQUIREMENT FOR TOTAL OF 5 YEARS' TEACHING EXPERIENCE.—In applying section 216A under subsection (a), the determination of the Attorney General under section 216A(b)(1) shall be whether (and the facts and information under section 216A(d)(1) shall demonstrate that) the alien has been employed on a substantially full-time basis as a foreign language teacher at an accredited elementary or middle school in the United States during the period since obtaining permanent residence status (instead of the determinations described in section 216A(b)(1) and of the facts and information described in section 216A(d)(1)).*

*(d) DEFINITIONS.—In this section:*

    *(1) The term "alien foreign language teacher" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise)*

367

*under section 203(b)(4)(C)(ii) on the basis of less than 5 years' teaching experience.*

*(2) The term "alien spouse" and the term "alien child" mean an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) by virtue of being the spouse or child, respectively, of an alien foreign language teacher.*

VISA WAIVER PILOT PROGRAM FOR CERTAIN VISITORS

SEC. 217. (a)   * * *

(b) WAIVER OF RIGHTS.—An alien may not be provided a waiver under the pilot program unless the alien has waived any right—

(1) to review or appeal under this Act of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or

(2) to contest, other than on the basis of an application for asylum, any action for ⟦deportation against⟧ *removal of* the alien.

(c) DESIGNATION OF PILOT PROGRAM COUNTRIES.—

(1)   * * *

*       *       *       *       *       *       *

(3) CONTINUING AND SUBSEQUENT QUALIFICATIONS.—For each fiscal year (within the pilot program period) after the initial period—

(A) CONTINUING QUALIFICATION.—In the case of a country which was a pilot program country in the previous fiscal year, a country may not be designated as a pilot program country unless the sum of—

(i) the total of the number of nationals of that country who were ⟦excluded from admission⟧ *denied admission at the time of arrival* or withdrew their application for admission during such previous fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as nonimmigrant visitors during such previous fiscal year and who violated the terms of such admission,

was less than 2 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during such previous fiscal year.

*       *       *       *       *       *       *

(f) DEFINITION OF PILOT PROGRAM PERIOD.—For purposes of this section, the term "pilot program period" means the period beginning on October 1, 1988, and ending on September 30, 1996.

(g) PILOT PROGRAM COUNTRY WITH PROBATIONARY STATUS.—

(1) IN GENERAL.—The Attorney General and the Secretary of State acting jointly may designate any country as a pilot program country with probationary status if it meets the requirements of paragraph (2).

(2) QUALIFICATIONS.—A country may not be designated as a pilot program country with probationary status unless the following requirements are met:

368

(A) NONIMMIGRANT VISA REFUSAL RATE FOR PREVIOUS 2-YEAR PERIOD.—The average number of refusals of nonimmigrant visitor visas for nationals of the country during the two previous full fiscal years was less than 3.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years.

(B) NONIMMIGRANT VISA REFUSAL RATE FOR PREVIOUS YEAR.—The number of refusals of nonimmigrant visitor visas for nationals of the country during the previous full fiscal year was less than 3 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year.

(C) LOW EXCLUSIONS AND VIOLATIONS RATE FOR PREVIOUS YEAR.—The sum of—

(i) the total number of nationals of that country who were ⟦excluded from admission⟧ *denied admission at the time of arrival* or withdrew their application for admission during the preceding fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as nonimmigrant visitors during the preceding fiscal year and who violated the terms of such admission,

was less than 1.5 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during the preceding fiscal year.

(D) MACHINE READABLE PASSPORT PROGRAM.—The government of the country certifies that it has or is in the process of developing a program to issue machine-readable passports to its citizens.

(3) CONTINUING AND SUBSEQUENT QUALIFICATIONS FOR PILOT PROGRAM COUNTRIES WITH PROBATIONARY STATUS.—The designation of a country as a pilot program country with probationary status shall terminate if either of the following occurs:

(A) The sum of—

(i) the total number of nationals of that country who were ⟦excluded from admission⟧ *denied admission at the time of arrival* or withdrew their application for admission during the preceding fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as visitors during the preceding fiscal year and who violated the terms of such admission,

is more than 2.0 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during the preceding fiscal year.

(B) The country is not designated as a pilot program country under subsection (c) within 3 fiscal years of its designation as a pilot program country with probationary status under this subsection.'".

(4) DESIGNATION OF PILOT PROGRAM COUNTRIES WITH PROBATIONARY STATUS AS PILOT PROGRAM COUNTRIES.—In the case of

369

a country which was a pilot program country with probation-
ary status in the preceding fiscal year, a country may be des-
ignated by the Attorney General and the Secretary of State,
acting jointly, as a pilot program country under subsection (c)
if—

    (A) the total of the number of nationals of that country
who were 〖excluded from admission〗 *denied admission at
the time of arrival* or withdrew their application for admis-
sion during the preceding fiscal year as a nonimmigrant
visitor, and

    (B) the total number of nationals of that country who
were admitted as nonimmigrant visitors during the preced-
ing fiscal year and who violated the terms of such admis-
sion,

was less than 2 percent of the total number of nationals of that
country who applied for admission as nonimmigrant visitors
during such preceding fiscal year.

    \*      \*      \*      \*      \*      \*      \*

CHAPTER 3—ISSUANCE OF ENTRY DOCUMENTS

ISSUANCE OF VISAS

SEC. 221. (a) Under the conditions hereinafter prescribed and
subject to the limitations prescribed in this Act or regulations is-
sued thereunder, a consular officer may issue (1) to an immigrant
who has made proper application therefor, an immigrant visa
which shall consist of the application provided for in section 222,
visaed by such consular officer, and shall specify the foreign state,
if any, to which the immigrant is charged, the immigrant's particu-
lar status under such foreign state, the preference〖, immediate rel-
ative,〗 or special immigrant classification to which the alien is
charged, the date on which the validity of the visa shall expire, and
such additional information as may be required; and (2) to a non-
immigrant who has made proper application therefor, a non-
immigrant visa, which shall specify the classification under section
101(a)(15) of the nonimmigrant, the period during which the non-
immigrant visa shall be valid, and such additional information as
may be required.

    \*      \*      \*      \*      \*      \*      \*

(c) An immigrant visa shall be valid for such period, not exceed-
ing 〖four months〗 *six months*, as shall be by regulations pre-
scribed, except that any visa issued to a child lawfully adopted by
a United States citizen and spouse while such citizen is serving
abroad in the United States Armed Forces, or is employed abroad
by the United States Government, or is temporarily abroad on
business, shall be valid until such time, for a period not to exceed
three years, as the adoptive citizen parent returns to the United
States in due course of his service, employment, or business. A non-
immigrant visa shall be valid for such periods as shall be by regu-
lations prescribed. In prescribing the period of validity of a non-
immigrant visa in the case of nationals of any foreign country who
are eligible for such visas, the Secretary of State shall, insofar as
practicable, accord to such nationals the same treatment upon a re-

370

ciprocal basis as such foreign country accords to nationals of the United States who are within a similar class; *except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States.* An immigrant visa may be replaced under the original number during the fiscal year in which the original visa was issued for an immigrant who establishes to the satisfaction of the consular officer that he was unable to use the original immigrant visa during the period of its validity because of reasons beyond his control and for which he was not responsible: *Provided,* That the immigrant is found by the consular officer to be eligible for an immigrant visa and the immigrant pays again the statutory fees for an application and an immigrant visa.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(f) Each nonimmigrant shall present or surrender to the immigration officer at the port of entry such documents as may be by regulation required. In the case of an alien crewman not in possession of any individual documents other than a passport and until such time as it becomes practicable to issue individual documents, such alien crewman may be admitted, subject to the provisions of this title, if his name appears in the crew list of the vessel or aircraft on which he arrives and the crew list is visaed by a consular officer, but the consular officer shall have the right to 〚exclude〛 *deny admission to* any alien crewman from the crew list visa.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(h) Nothing in this Act shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to 〚enter〛 *be admitted* the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this Act, or any other provision of law. The substance of this subsection shall appear upon every visa application.

\*　　\*　　\*　　\*　　\*　　\*　　\*

APPLICATIONS FOR VISAS

SEC. 222. (a)　\*　\*　\*

\*　　\*　　\*　　\*　　\*　　\*　　\*

*(g) In the case of an alien who has entered and remained in the United States beyond the authorized period of stay, the alien is not eligible to be admitted to the United States as a nonimmigrant on the basis of a visa issued other than in a consular office located in the country of the alien's nationality (or, if there is no office in such country, at such other consular office as the Secretary of State shall specify).*

\*　　\*　　\*　　\*　　\*　　\*　　\*

371

〚IMMEDIATE RELATIVE AND SPECIAL IMMIGRANT VISAS〛

*VISAS FOR SPOUSES AND CHILDREN OF CITIZENS AND SPECIAL IMMIGRANTS*

SEC. 224. A consular officer may, subject to the limitations provided in section 221, issue an immigrant visa to a special immigrant or 〚immediate relative〛 *a spouse or child of a citizen of the United States* as such upon satisfactory proof, under regulations prescribed under this Act, that the applicant is entitled to special immigrant or 〚immediate relative status〛 *status or status as a spouse or child of a citizen of the United States.*

〚CHAPTER 4—PROVISIONS RELATING TO ENTRY AND EXCLUSION〛

*CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL*

LISTS OF ALIEN AND CITIZEN PASSENGERS ARRIVING OR DEPARTING; RECORD OF RESIDENT ALIENS AND CITIZENS LEAVING PERMANENTLY FOR FOREIGN COUNTRY

SEC. 231. (a) 〚Upon the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having any such person on board to deliver to the immigration officers at the port of arrival typewritten or printed lists or manifests of the persons on board such vessel or aircraft.〛 *In connection with the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having such person on board to deliver to the immigration officers at the port of arrival, or other place designated by the Attorney General, electronic, typewritten, or printed lists or manifests of the persons on board such vessel or aircraft.* Such lists or manifests 〚shall be prepared〛 *shall be prepared and submitted* at such time, be in such form and shall contain such information as the Attorney General shall prescribe by regulation as being necessary for the identification of the persons transported and for the enforcement of the immigration laws. *Such lists or manifests shall contain, but not be limited to, for each person transported, the person's full name, date of birth, gender, citizenship, travel document number (if applicable) and arriving flight number.* This subsection shall not require the master or commanding officer, or authorized agent, owner, or consignee of a vessel or aircraft to furnish a list or manifest relating (1) to an alien crewman or (2) to any other person arriving by air on a trip originating in foreign contiguous territory, except (with respect to such arrivals by air) as may be required by regulations issued pursuant to section 239.

*       *       *       *       *       *       *

372

〔DETENTION OF ALIENS FOR OBSERVATION AND EXAMINATION〕

*DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION*

SEC. 232. *(a) DETENTION OF ALIENS.*—For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes 〔excluded by〕 *inadmissible under* this Act, by reason of being afflicted with any of the diseases or mental or physical defects or disabilities set forth in section 212(a), or whenever the Attorney General has received information showing that any aliens are coming from a country or have embarked at a place where any of such diseases are prevalent or epidemic, such aliens shall be detained by the Attorney General for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to 〔the excluded classes〕 *inadmissible classes.*

*(b) PHYSICAL AND MENTAL EXAMINATION.*—The physical and mental examination of arriving aliens (including alien crewmen) shall be made by medical officers of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the 〔special inquiry officers〕 *immigration judges*, any physical and mental defect or disease observed by such medical officers in any such alien. If medical officers of the United States Public Health Service are not available, civil surgeons of not less than four years' professional experience may be employed for such service upon such terms as may be prescribed by the Attorney General. Aliens (including alien crewmen) arriving at ports of the United States shall be examined by at least one such medical officer or civil surgeon under such administrative regulations as the Attorney General may prescribe, and under medical regulations prepared by the Secretary of Health and Human Services. Medical officers of the United States Public Health Service who have had special training in the diagnosis of insanity and mental defects shall be detailed for duty or employed at such ports of entry as the Attorney General may designate, and such medical officers shall be provided with suitable facilities for the detention and examination of all arriving aliens who it is suspected may be 〔excludable〕 *inadmissible* under paragraph (1) of section 212(a), and the services of interpreters shall be provided for such examination. Any alien certified under paragraph (1) of section 212(a) may appeal to a board of medical officers of the United States Public Health Service, which shall be convened by the Secretary of Health and Human Services, and any such alien may introduce before such board one expert medical witness at his own cost and expense.

*(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.*—*If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.*

373

ENTRY THROUGH OR FROM FOREIGN CONTIGUOUS TERRITORY AND
ADJACENT ISLANDS; LANDING STATIONS

SEC. 〔238.〕 *233.* (a) The Attorney General shall have power to
enter into contracts with transportation lines for the 〔entry and〕
inspection *and admission* of aliens coming to the United States
from foreign contiguous territory or from adjacent islands. No such
transportation line shall be allowed to land any such alien in the
United States until and unless it has entered into any such con-
tracts which may be required by the Attorney General.

\*        \*        \*        \*        \*        \*        \*

DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL
AIRCRAFT

SEC. 〔239.〕 *234.* The Attorney General is authorized (1) by regu-
lation to designate as ports of entry for aliens arriving by aircraft
any of the ports of entry for civil aircraft designated as such in ac-
cordance with law; (2) by regulation to provide such reasonable re-
quirements for aircraft in civil air navigation with respect to giving
notice of intention to land in advance of landing, or notice of land-
ing, as shall be deemed necessary for purposes of administration
and enforcement of this Act; and (3) by regulation to provide for
the application to civil air navigation of the provisions of this Act
where not expressly so provided in this Act to such extent and
upon such conditions as he deems necessary. Any person who vio-
lates any regulation made under this section shall be subject to a
civil penalty of $2,000 which may be remitted or mitigated by the
Attorney General in accordance with such proceedings as the Attor-
ney General shall by regulation prescribe. In case the violation is
by the owner or person in command of the aircraft, the penalty
shall be a lien upon the aircraft, and such aircraft may be libeled
therefor in the appropriate United States court. The determination
by the Attorney General and remission or mitigation of the civil
penalty shall be final. In case the violation is by the owner or per-
son in command of the aircraft, the penalty shall be a lien upon
the aircraft and may be collected by proceedings in rem which shall
conform as nearly as may be to civil suits in admiralty. The Su-
preme Court of the United States, and under its direction other
courts of the United States, are authorized to prescribe rules regu-
lating such proceedings against aircraft in any particular not other-
wise provided by law. Any aircraft made subject to a lien by this
section may be summarily seized by, and placed in the custody of
such persons as the Attorney General may by regulation prescribe.
The aircraft may be released from such custody upon deposit of
such amount not exceeding $2,000 as the Attorney General may
prescribe, or of a bond in such sum and with such sureties as the
Attorney General may prescribe, conditioned upon the payment of
the penalty which may be finally determined by the Attorney Gen-
eral.

〔PHYSICAL AND MENTAL EXAMINATION

〔SEC. 234. The physical and mental examination of arriving
aliens (including alien crewmen) shall be made by medical officers

374

of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the special inquiry officers, any physical and mental defect or disease observed by such medical officers in any such alien. If medical officers of the United States Public Health Service are not available, civil surgeons of not less than four years' professional experience may be employed for such service upon such terms as may be prescribed by the Attorney General. Aliens (including alien crewmen) arriving at ports of the United States shall be examined by at least one such medical officer or civil surgeon under such administrative regulations as the Attorney General may prescribe, and under medical regulations prepared by the Secretary of Health and Human Services. Medical officers of the United States Public Health Service who have had special training in the diagnosis of insanity and mental defects shall be detailed for duty or employed at such ports of entry as the Attorney General may designate, and such medical officers shall be provided with suitable facilities for the detention and examination of all arriving aliens who it is suspected may be excludable under paragraph (1) of section 212(a), and the services of interpreters shall be provided for such examination. Any alien certified under paragraph (1) of section 212(a) may appeal to a board of medical officers of the United States Public Health Service, which shall be convened by the Secretary of Health and Human Services, and any such alien may introduce before such board one expert medical witness at his own cost and expense.]

⟦INSPECTION BY IMMIGRATION OFFICERS

⟦SEC. 235. (a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are hereby authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States. The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States, whether or not he intends to remain in the United States permanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the Unit-

375

ed States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 212. The Attorney General and any immigration officer, including special inquiry officers, shall have power to require by subpena the attendance and testimony of witnesses before immigration officers and special inquiry officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States. Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer or special inquiry officer may, in the event of neglect or refusal to respond to a subpena issued under this subsection or refusal to testify before an immigration officer or special inquiry officer, issue an order requiring such persons to appear before an immigration officer or special inquiry officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

〖(b) Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

〖(c) Any alien (including an alien crewman) who may appear to the examining immigration officer or to the special inquiry officer during the examination before either of such officers to be excludable under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3) shall be temporarily excluded, and no further inquiry by a special inquiry officer shall be conducted until after the case is reported to the Attorney General together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith and such an inquiry or further inquiry is directed by the Attorney General. If the Attorney General is satisfied that the alien is excludable under any of such paragraphs on the basis of information of a confidential nature, the disclosure of which the Attorney General, in the exercise of his discretion, and after consultation with the appropriate security agencies of the Government, concludes would be prejudicial to the public interest, safety, or security, he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer. Nothing in this subsection shall be regarded as requiring an inquiry before a special inquiry officer in the case of an alien crewman.〗

376

*INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING*

*SEC. 235. (a) INSPECTION.—*

*(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—An alien present in the United States who has not been admitted, who arrives in the United States (whether or not at a designated port of arrival), or who is brought to the United States after having been interdicted in international or United States waters shall be deemed for purposes of this Act an applicant for admission.*

*(2) STOWAWAYS.—An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.*

*(3) INSPECTION.—All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.*

*(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.*

*(5) STATEMENTS.—An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.*

*(b) INSPECTION OF APPLICANTS FOR ADMISSION.—*

*(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES.—*

*(A) SCREENING.—If the examining immigration officer determines that an alien arriving in the United States (whether or not at a port of entry) is inadmissible under section 212(a)(6)(C) or 212(a)(7) and the alien—*

*(i) does not indicate either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall order the alien removed from the United States without further hearing or review; or*

*(ii) indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).*

*(B) ASYLUM INTERVIEWS.—*

377

(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall promptly conduct interviews of aliens referred under subparagraph (A)(ii).

(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

(I) IN GENERAL.—Subject to subclause (II), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

(II) REVIEW OF DETERMINATION BY SUPERVISORY OFFICER.—The Attorney General shall promulgate regulations to provide for the immediate review by a supervisory asylum officer at the port of entry of a determination under subclause (I).

(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not delay the process.

(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term "credible fear of persecution" means (I) that it is more probable than not that the statements made by the alien in support of the alien's claim are true, and (II) that there is a significant possibility, in light of such statements and of such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

(C) LIMITATION ON ADMINISTRATIVE REVIEW.—A removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence.

(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii)(I).

378

(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term "asylum officer" means an immigration officer who—

(i) has had professional training in country conditions, asylum law, and interview techniques, and

(ii) is supervised by an officer who meets the condition described in clause (i).

(2) INSPECTION OF OTHER ALIENS.—

(A) IN GENERAL.—Subject to subparagraph (B), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a hearing under section 240.

(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

(i) who is a crewman,

(ii) to whom paragraph (1) applies, or

(iii) who is a stowaway.

(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a hearing under section 240.

(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

(A) order the alien removed, subject to review under paragraph (2);

(B) report the order of removal to the Attorney General; and

(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

(B) If the Attorney General—

(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

379

  (3) *SUBMISSION OF STATEMENT AND INFORMATION.*—*The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.*

(d) *AUTHORITY RELATING TO INSPECTIONS.*—

  (1) *AUTHORITY TO SEARCH CONVEYANCES.*—*Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.*

  (2) *AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.*—*Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States*—

   (A) *to detain the alien on the vessel or at the airport of arrival, and*

   (B) *to deliver the alien to an immigration officer for inspection or to a medical officer for examination.*

  (3) *ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.*—*The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.*

  (4) *SUBPOENA AUTHORITY.*—(A) *The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.*

  (B) *Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.*

*PREINSPECTION AT FOREIGN AIRPORTS*

  *SEC. 235A. (a) ESTABLISHMENT OF PREINSPECTION STATIONS.*— (1) *Subject to paragraph (4), not later than 2 years after the date of the enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of passengers who arrive from abroad by air at ports of entry within*

380

the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of this section.

(2) Not later than November 1, 1995, and each subsequent November 1, the Attorney General shall compile data identifying—

(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years,

(B) the number and nationality of such aliens arriving from each such foreign airport, and

(C) the primary routes such aliens followed from their country of origin to the United States.

(3) Subject to paragraph (4), not later than 4 years after the date of enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines based on the data compiled under paragraph (2) and such other information as may be available would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States without valid documentation. Such preinspection stations shall be in addition to those established prior to or pursuant to paragraph (1).

(4) Prior to the establishment of a preinspection station the Attorney General, in consultation with the Secretary of State, shall ensure that—

(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection,

(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety, and

(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967).

(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(2), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.

⟦EXCLUSIONS OF ALIENS

⟦SEC. 236. (a) A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported. The determination of such special inquiry officer shall be

381

based only on the evidence produced at the inquiry. No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 235 and 287(b), and such regulations as the Attorney General shall prescribe, and shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section. At such inquiry, which shall be kept separate and apart from the public, the alien may have one friend or relative present, under such conditions as may be prescribed by the Attorney General. A complete record of the proceedings and of all testimony and evidence produced at such inquiry, shall be kept.

〔(b) From a decision of a special inquiry officer excluding an alien, such alien may take a timely appeal to the Attorney General, and any such alien shall be advised of his right to take such appeal. No appeal may be taken from a temporary exclusion under section 235(c). From a decision of the special inquiry officer to admit an alien, the immigration officer in charge at the port where the inquiry is held may take a timely appeal to the Attorney General. An appeal by the alien, or such officer in charge, shall operate to stay any final action with respect to any alien whose case is so appealed until the final decision of the Attorney General is made. Except as provided in section 235(c) such decision shall be rendered solely upon the evidence adduced before the special inquiry officer.

〔(c) Except as provided in subsections (b) or (d), in every case where an alien is excluded from admission into the United States, under this Act or any other law or treaty now existing or hereafter made, the decision of a special inquiry officer shall be final unless reversed on appeal to the Attorney General.

〔(d) If a medical officer or civil surgeon or board of medical officers has certified under section 234 that an alien has a disease, illness, or addiction which would make the alien excludable under paragraph (1) of section 212(a), the decision of the special inquiry officer shall be based solely upon such certification. No alien shall have a right to appeal from such an excluding decision of a special inquiry officer.

〔(e)(1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense).

〔(2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 243(g) exists.

〔(3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—

〔(A) a procedure for review of each request for relief under this subsection has been established,

382

⟦(B) such procedure includes consideration of the severity of the felony committed by the alien, and

⟦(C) the review concludes that the alien will not pose a danger to the safety of other persons or to property.⟧

*APPREHENSION AND DETENTION OF ALIENS NOT LAWFULLY IN THE UNITED STATES*

SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—*On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—*

*(1) may continue to detain the arrested alien; and*

*(2) may release the alien on—*

*(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or*

*(B) conditional parole; but*

*(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.*

(b) REVOCATION OF BOND OR PAROLE.—*The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.*

(c) ALIENS CONVICTED OF AGGRAVATED FELONIES.—

*(1)* CUSTODY.—*The Attorney General shall take into custody any alien convicted of an aggravated felony when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.*

*(2)* RELEASE.—*The Attorney General may release the alien only if—*

*(A) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding;*

*(B) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding; or*

*(C) the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation.*

383

*A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.*

(d) IDENTIFICATION OF ALIENS CONVICTED OF AGGRAVATED FELONIES.—(1) *The Attorney General shall devise and implement a system—*

(A) *to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;*

(B) *to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and*

(C) *which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony and who have been removed.*

(2) *The record under paragraph (1)(C) shall be made available—*

(A) *to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any such previously removed alien seeking to reenter the United States, and*

(B) *to officials of the Department of State for use in its automated visa lookout system.*

GENERAL CLASSES OF DEPORTABLE ALIENS

SEC. 【241.】 *237.* (a) CLASSES OF DEPORTABLE ALIENS.—Any alien (including an alien crewman) 【in the United States】 *in and admitted to the United States* shall, upon the order of the Attorney General, be 【deported】 *removed* if the alien is within one or more of the following classes of deportable aliens:

(1) 【EXCLUDABLE】 *INADMISSIBLE* AT TIME OF ENTRY OR OF ADJUSTMENT OF STATUS OR VIOLATES STATUS.—

(A) 【EXCLUDABLE】 *INADMISSIBLE* ALIENS.—Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens 【excludable】 *inadmissible* by the law existing at such time is deportable.

【(B) ENTERED WITHOUT INSPECTION.—Any alien who entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this Act or any other law of the United States is deportable.】

(B) *PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.*

\*        \*        \*        \*        \*        \*        \*

(E) SMUGGLING.—

(i) IN GENERAL.—Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to

384

enter or to try to enter the United States in violation of law is deportable.

(ii) Special rule in the case of family reunifica-tion.—Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was phys-ically present in the United States on May 5, 1988, and is seeking admission as 【an immediate relative】 *a spouse, child, or parent of a citizen of the United States* or under section 【203(a)(2)】 *203(a)(1)* (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individ-ual) to enter the United States in violation of law.

(iii) Waiver authorized.—The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) in the case of any alien lawfully admitted for permanent resi-dence if the alien has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

【(F) Failure to maintain employment.—Any alien who obtains the status of an alien lawfully admitted for tem-porary residence under section 210A who fails to meet the requirement of section 210A(d)(5)(A) by the end of the ap-plicable period is deportable.】

(G) Marriage fraud.—An alien shall be considered to be deportable as having procured a visa or other docu-mentation by fraud (within the meaning of section 212(a)(6)(C)(i)) and to be in the United States in violation of this Act (within the meaning of subparagraph (B)) if—

(i) the alien obtains any 【entry】 *admission* into the United States with an immigrant visa or other docu-mentation procured on the basis of a marriage entered into less than 2 years prior to such 【entry】 *admission* of the alien and which, within 2 years subsequent to any 【entry】 *admission* of the alien in the United States, shall be judicially annulled or terminated, un-less the alien establishes to the satisfaction of the At-torney General that such marriage was not contracted for the purpose of evading any provisions of the immi-gration laws, or

(ii) it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of pro-curing the alien's 【entry】 *admission* as an immigrant.

(H) Waiver authorized for certain misrepresenta-tions.—The provisions of this paragraph relating to the 【deportation】 *removal* of aliens within the United States

385

on the ground that they were ⟦excludable⟧ *inadmissible* at the time of ⟦entry⟧ *admission* as aliens described in section 212(a)(6)(C)(i), whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien (other than an alien described in paragraph (4)(D)) who—

> (i) is the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

> (ii) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such ⟦entry⟧ *admission* except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 212(a) which were a direct result of that fraud or misrepresentation.

A waiver of ⟦deportation⟧ *removal* for fraud or misrepresentation granted under this subparagraph shall also operate to waive ⟦deportation⟧ *removal* based on the grounds of inadmissibility ⟦at entry⟧ directly resulting from such fraud or misrepresentation.

(2) CRIMINAL OFFENSES.—

    (A) GENERAL CRIMES.—

> (i) CRIMES OF MORAL TURPITUDE.—Any alien who—

>> (I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section ⟦245(i)⟧ *245(j)*) after the date of ⟦entry⟧ *admission*, and

>> (II) either is sentenced to confinement or is confined therefor in a prison or correctional institution for one year or longer,

> is deportable.

> (ii) MULTIPLE CRIMINAL CONVICTIONS.—Any alien who at any time after ⟦entry⟧ *admission* is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

> (iii) AGGRAVATED FELONY.—Any alien who is convicted of an aggravated felony at any time after ⟦entry⟧ *admission* is deportable.

> (iv) WAIVER AUTHORIZED.—Clauses (i), (ii), and (iii) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.

    (B) CONTROLLED SUBSTANCES.—

> (i) CONVICTION.—Any alien who at any time after ⟦entry⟧ *admission* has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign coun-

386

try relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

(ii) Drug abusers and addicts.—Any alien who is, or at any time after ⟦entry⟧ *admission* has been, a drug abuser or addict is deportable.

(C) Certain firearm offenses.—Any alien who at any time after ⟦entry⟧ *admission* is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of title 18, United States Code) in violation of any law is deportable.

(D) Miscellaneous crimes.—Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate—

(i) any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of title 18, United States Code, for which a term of imprisonment of five or more years may be imposed;

(ii) any offense under section 871 or 960 of title 18, United States Code;

(iii) a violation of any provision of the Military Selective Service Act (50 U.S.C. App. 451 et seq.) or the Trading With the Enemy Act (50 U.S.C. App. 1 et seq.); or

(iv) a violation of section 215 or 278 of this Act, is deportable.

(3) Failure to register and falsification of documents.—

(A) Change of address.—An alien who has failed to comply with the provisions of section 265 is deportable, unless the alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

(B) Failure to register or falsification of documents.—Any alien who at any time has been convicted—

(i) under section 266(c) of this Act or under section 36(c) of the Alien Registration Act, 1940,

(ii) of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.), or

(iii) of a violation of, or an attempt or a conspiracy to violate, section 1546 of title 18, United States Code (relating to fraud and misuse of visas, permits, and other entry documents),

is deportable.

387

〔(C) DOCUMENT FRAUD.—Any alien who is the subject of a final order for violation of section 274C is deportable.〕
    *(C) DOCUMENT FRAUD.—*

       *(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.*

       *(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if the alien's civil money penalty under section 274C was incurred solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and no other individual).*

(4) SECURITY AND RELATED GROUNDS.—

    (A) IN GENERAL.—Any alien who has engaged, is engaged, or at any time after 〔entry〕 *admission* engages in—

       (i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

       (ii) any other criminal activity which endangers public safety or national security, or

       (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

    (B) TERRORIST ACTIVITIES.—Any alien who has engaged, is engaged, or at any time after 〔entry〕 *admission* engages in any terrorist activity (as defined in section 212(a)(3)(B)(iii)) is deportable.

    (C) FOREIGN POLICY.—

       (i) IN GENERAL.—An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.

       (ii) EXCEPTIONS.—The exceptions described in clauses (ii) and (iii) of section 212(a)(3)(C) shall apply to deportability under clause (i) in the same manner as they apply to 〔excludability〕 *inadmissibility* under section 212(a)(3)(C)(i).

    (D) ASSISTED IN NAZI PERSECUTION OR ENGAGED IN GENOCIDE.—Any alien described in clause (i) or (ii) of section 212(a)(3)(E) is deportable.

〔(5) PUBLIC CHARGE.—Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.〕
    *(5) PUBLIC CHARGE.—*

    *(A) IN GENERAL.—Any alien who, within 7 years after the date of entry or admission, becomes a public charge is deportable.*

    *(B) EXCEPTIONS.—(i) Subparagraph (A) shall not apply if the alien establishes that the alien has become a public*

388

*charge from causes that arose after entry or admission. A condition that the alien knew (or had reason to know) existed at the time of entry or admission shall be deemed to be a cause that arose before entry or admission.*

*(ii) The Attorney General, in the discretion of the Attorney General, may waive the application of subparagraph (A) in the case of an alien who is admitted as a refugee under section 207 or granted asylum under section 208.*

*(C) INDIVIDUALS TREATED AS PUBLIC CHARGE.—*

*(i) IN GENERAL.—For purposes of this title, an alien is deemed to be a "public charge" if the alien receives benefits (other than benefits described in subparagraph (E)) under one or more of the public assistance programs described in subparagraph (D) for an aggregate period, except as provided in clauses (ii) and (iii), of at least 12 months within 7 years after the date of entry. The previous sentence shall not be construed as excluding any other bases for considering an alien to be a public charge, including bases in effect on the day before the date of the enactment of the Immigration in the National Interest Act of 1995. The Attorney General, in consultation with the Secretary of Health and Human Services, shall establish rules regarding the counting of health benefits described in subparagraph (D)(iv) for purposes of this subparagraph.*

*(ii) DETERMINATION WITH RESPECT TO BATTERED WOMEN AND CHILDREN.—For purposes of a determination under clause (i) and except as provided in clause (iii), the aggregate period shall be 48 months within 7 years after the date of entry if the alien can demonstrate that (I) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the need for the public benefits received has a substantial connection to the battery or cruelty described in subclause (I) or (II).*

*(iii) SPECIAL RULE FOR ONGOING BATTERY OR CRUELTY.—For purposes of a determination under clause (i), the aggregate period may exceed 48 months within 7 years after the date of entry if the alien can demonstrate that any battery or cruelty under clause (ii) is ongoing, has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service, and that the need for the benefits*

389

*received has a substantial connection to such battery or cruelty.*

*(D) PUBLIC ASSISTANCE PROGRAMS.—For purposes of subparagraph (B), the public assistance programs described in this subparagraph are the following (and include any successor to such a program as identified by the Attorney General in consultation with other appropriate officials):*

*(i) SSI.—The supplemental security income program under title XVI of the Social Security Act, including State supplementary benefits programs referred to in such title.*

*(ii) AFDC.—The program of aid to families with dependent children under part A or E of title IV of the Social Security Act.*

*(iii) MEDICAID.—The program of medical assistance under title XIX of the Social Security Act.*

*(iv) FOOD STAMPS.—The program under the Food Stamp Act of 1977.*

*(v) STATE GENERAL CASH ASSISTANCE.—A program of general cash assistance of any State or political subdivision of a State.*

*(vi) HOUSING ASSISTANCE.—Financial assistance as defined in section 214(b) of the Housing and Community Development Act of 1980.*

*(E) CERTAIN ASSISTANCE EXCEPTED.—For purposes of subparagraph (B), an alien shall not be considered to be a public charge on the basis of receipt of any of the following benefits:*

*(i) EMERGENCY MEDICAL SERVICES.—The provision of emergency medical services (as defined by the Attorney General in consultation with the Secretary of Health and Human Services).*

*(ii) PUBLIC HEALTH IMMUNIZATIONS.—Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment for communicable diseases.*

*(iii) SHORT-TERM EMERGENCY RELIEF.—The provision of non-cash, in-kind, short-term emergency relief.*

*        *        *        *        *        *        *

(c) Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of ⟦exclusion⟧ *inadmissibility* described in paragraph (2) or (3) of section 212(a)) shall not apply to a special immigrant described in section 101(a)(27)(J) based upon circumstances that existed before the date the alien was provided such special immigrant status.

⟦IMMEDIATE DEPORTATION OF ALIENS EXCLUDED FROM ADMISSION OR ENTERING IN VIOLATION OF LAW

⟦SEC. 237. (a)(1) Any alien (other than an alien crewman) arriving in the United States who is excluded under this Act, shall be immediately deported, in accommodations of the same class in which he arrived, unless the Attorney General, in an individual

390

case, in his discretion, concludes that immediate deportation is not practicable or proper. Deportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States, unless the alien boarded such vessel or aircraft in foreign territory contiguous to the United States or in any island adjacent thereto or adjacent to the United States and the alien is not a native, citizen, subject, or national of, or does not have a residence in, such foreign contiguous territory or adjacent island, in which case the deportation shall instead be to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island. The cost of the maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained, shall be borne by the owner or owners of the vessel or aircraft on which he arrived, except that the cost of maintenance (including detention expenses and expenses incident to detention while the alien is being detained prior to the time he is offered for deportation to the transportation line which brought him to the United States) shall not be assessed against the owner or owners of such vessel or aircraft if (A) the alien was in possession of a valid, unexpired immigrant visa, or (B) the alien (other than an alien crewman) was in possession of a valid, unexpired nonimmigrant visa or other document authorizing such alien to apply for temporary admission to the United States or an unexpired reentry permit issued to him, and (i) such application was made within one hundred and twenty days of the date of issuance of the visa or other document, or in the case of an alien in possession of a reentry permit, within one hundred and twenty days of the date on which the alien was last examined and admitted by the Service, or (ii) in the event the application was made later than one hundred and twenty days of the date of issuance of the visa or other document or such examination and admission, if the owner or owners of such vessel or aircraft established to the satisfaction of the Attorney General that the ground of exclusion could not have been ascertained by the exercise of due diligence prior to the alien's embarkation, or (C) the person claimed United States nationality or citizenship and was in possession of an unexpired United States passport issued to him by competent authority.

⟦(2) If the government of the country designated in paragraph (1) will not accept the alien into its territory, the alien's deportation shall be directed by the Attorney General, in his discretion and without necessarily giving any priority or preference because of their order as herein set forth, either to—

⟦(A) the country of which the alien is a subject, citizen, or national;

⟦(B) the country in which he was born;

⟦(C) the country in which he has a residence; or

⟦(D) any country which is willing to accept the alien into its territory, if deportation to any of the foregoing countries is impracticable, inadvisable, or impossible.

⟦(b) It shall be unlawful for any master, commanding officer, purser, person in charge, agent, owner, or consignee of any vessel or aircraft (1) to refuse to receive any alien (other than an alien crewman), ordered deported under this section back on board such

391

vessel or aircraft or another vessel or aircraft owned or operated by the same interests; (2) to fail to detain any alien (other than an alien crewman) on board any such vessel or at the airport of arrival of the aircraft when required by this Act or if so ordered by an immigration officer, or to fail or refuse to deliver him for medical or other inspection, or for further medical or other inspection, as and when so ordered by such officer; (3) to refuse or fail to remove him from the United States to the country to which his deportation has been directed; (4) to fail to pay the cost of his maintenance while being detained as required by this section; (5) to take any fee, deposit, or consideration on a contingent basis to be kept or returned in case the alien is landed or excluded; or (6) knowingly to bring to the United States any alien (other than an alien crewman) excluded or arrested and deported under any provision of law until such alien may be lawfully entitled to reapply for admission to the United States. If it shall appear to the satisfaction of the Attorney General that any such master, commanding officer, purser, person in charge, agent, owner, or consignee of any vessel or aircraft has violated any of the provisions of this section, such master, commanding officer, purser, person in charge, agent, owner, or consignee shall pay to the Commissioner the sum of $2,000 for each violation. No such vessel or aircraft shall have clearance from any port of the United States while any such fine is unpaid or while the question of liability to pay any such fine is being determined, nor shall any such fine be remitted or refunded, except that clearance may be granted prior to the determination of such question upon the deposit with the Commissioner of a bond or undertaking approved by the Attorney General or a sum sufficient to cover such fine.

⟦(c) An alien shall be deported on a vessel or aircraft owned by the same person who owns the vessel or aircraft on which the alien arrived in the United States, unless it is impracticable to so deport the alien within a reasonable time. The transportation expense of the alien's deportation shall be borne by the owner or owners of the vessel or aircraft on which the alien arrived. If the deportation is effected on a vessel or aircraft not owned by such owner or owners, the transportation expense of the alien's deportation may be paid from the appropriation for the enforcement of this Act and recovered by civil suit from any owner, agent, or consignee of the vessel or aircraft on which the alien arrived.

⟦(d) The Attorney General, under such conditions as are by regulations prescribed, may stay the deportation of any alien deportable under this section, if in his judgment the testimony of such alien is necessary on behalf of the United States in the prosecution of offenders against any provision of this Act or other laws of the United States. The cost of maintenance of any person so detained resulting from a stay of deportation under this subsection and a witness fee in the sum of $1 per day for each day such person is so detained may be paid from the appropriation for the enforcement of this title. Such alien may be released under bond in the penalty of not less than $500 with security approved by the Attorney General on condition that such alien shall be produced when required as a witness and for deportation, and on such other conditions as the Attorney General may prescribe.

392

〔(e) Upon the certificate of an examining medical officer to the effect that an alien ordered to be excluded and deported under this section is helpless from sickness or mental and physical disability, or infancy, if such alien is accompanied by another alien whose protection or guardianship is required by the alien ordered excluded and deported, such accompanying alien may also be excluded and deported, and the master, commanding officer, agent, owner, or consignee of the vessel or aircraft in which such alien and accompanying alien arrived in the United States shall be required to return the accompanying alien in the same manner as other aliens denied admission and ordered deported under this section.〕

EXPEDITED 〔DEPORTATION〕 *REMOVAL* OF ALIENS CONVICTED OF COMMITTING AGGRAVATED FELONIES

Sec. 〔242A.〕 *238.* (a) 〔DEPORTATION〕 *REMOVAL* OF CRIMINAL ALIENS.—

(1) IN GENERAL.—The Attorney General shall provide for the availability of special 〔deportation〕 *removal* proceedings at certain Federal, State, and local correctional facilities for aliens convicted of aggravated felonies (as defined in section 101(a)(43)). Such proceedings shall be conducted in conformity with section 〔242〕 *240* (except as otherwise provided in this section), and in a manner which eliminates the need for additional detention at any processing center of the Service and in a manner which assures expeditious 〔deportation〕 *removal*, where warranted, following the end of the alien's incarceration for the underlying sentence. *Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

(2) IMPLEMENTATION.—With respect to an alien convicted of an aggravated felony who is taken into custody by the Attorney General pursuant to section 〔242(a)(2)〕 *236(c)*, the Attorney General shall, to the maximum extent practicable, detain any such felon at a facility at which other such aliens are detained. In the selection of such facility, the Attorney General shall make reasonable efforts to ensure that the alien's access to counsel and right to counsel under section 292 are not impaired.

(3) EXPEDITED PROCEEDINGS.—(A) Notwithstanding any other provision of law, the Attorney General shall provide for the initiation and, to the extent possible, the completion of 〔deportation〕 *removal* proceedings, and any administrative appeals thereof, in the case of any alien convicted of an aggravated felony before the alien's release from incarceration for the underlying aggravated felony.

(B) Nothing in this section shall be construed as requiring the Attorney General to effect the 〔deportation〕 *removal* of any alien sentenced to actual incarceration, before release from the penitentiary or correctional institution where such alien is confined.

(4) REVIEW.—(A) The Attorney General shall review and evaluate 〔deportation〕 *removal* proceedings conducted under this section. Within 12 months after the effective date of this section, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate concerning

393

the effectiveness of such 〚deportation〛 *removal* proceedings in facilitating the 〚deportation〛 *removal* of aliens convicted of aggravated felonies.

(B) The Comptroller General shall monitor, review, and evaluate 〚deportation〛 *removal* proceedings conducted under this section.

(b) 〚DEPORTATION〛 *REMOVAL* OF ALIENS WHO ARE NOT PERMANENT RESIDENTS.—

(1) The Attorney General may, in the case of an alien described in paragraph (2), determine the deportability of such alien under section 〚241(a)(2)(A)(iii)〛 *237(a)(2)(A)(iii)* (relating to conviction of an aggravated felony) and issue an order of 〚deportation〛 *removal* pursuant to the procedures set forth in this subsection or section 〚242(b)〛 *240.*

(2) An alien is described in this paragraph if the alien—

(A) was not lawfully admitted for permanent residence at the time at which proceedings under this section commenced; and

(B) is not eligible for any relief from 〚deportation〛 *removal* under this Act.

(3) The Attorney General may not execute any order described in paragraph (1) until 30 calendar days have passed from the date that such order was issued, unless waived by the alien, in order that the alien has an opportunity to apply for judicial review under section 〚106〛 *242.*

(4) Proceedings before the Attorney General under this subsection shall be in accordance with such regulations as the Attorney General shall prescribe. The Attorney General shall provide that—

(A) the alien is given reasonable notice of the charges and of the opportunity described in subparagraph (C);

(B) the alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose;

(C) the alien has a reasonable opportunity to inspect the evidence and rebut the charges;

(D) a record is maintained for judicial review; and

(E) the final order of 〚deportation〛 *removal* is not adjudicated by the same person who issues the charges.

〚(d)〛 *(c)* JUDICIAL 〚DEPORTATION〛 *REMOVAL.*—

(1) AUTHORITY.—Notwithstanding any other provision of this Act, a United States district court shall have jurisdiction to enter a judicial order of 〚deportation〛 *removal* at the time of sentencing against an alien whose criminal conviction causes such alien to be deportable under section 241(a)(2)(A), if such an order has been requested by the United States Attorney with the concurrence of the Commissioner and if the court chooses to exercise such jurisdiction.

(2) PROCEDURE.—

(A) The United States Attorney shall file with the United States district court, and serve upon the defendant and the Service, prior to commencement of the trial or entry of a guilty plea a notice of intent to request judicial 〚deportation〛 *removal.*

394

(B) Notwithstanding section 242B, the United States Attorney, with the concurrence of the Commissioner, shall file at least 30 days prior to the date set for sentencing a charge containing factual allegations regarding the alienage of the defendant and identifying the crime or crimes which make the defendant deportable under section 241(a)(2)(A).

(C) If the court determines that the defendant has presented substantial evidence to establish prima facie eligibility for relief from 〖deportation〗 *removal* under this Act, the Commissioner shall provide the court with a recommendation and report regarding the alien's eligibility for relief. The court shall either grant or deny the relief sought.

(D)(i) The alien shall have a reasonable opportunity to examine the evidence against him or her, to present evidence on his or her own behalf, and to cross-examine witnesses presented by the Government.

(ii) The court, for the purposes of determining whether to enter an order described in paragraph (1), shall only consider evidence that would be admissible in proceedings conducted pursuant to section 〖242(b)〗 *240*.

(iii) Nothing in this subsection shall limit the information a court of the United States may receive or consider for the purposes of imposing an appropriate sentence.

(iv) The court may order the alien 〖deported〗 *removed* if the Attorney General demonstrates that the alien is deportable under this Act.

(3) NOTICE, APPEAL, AND EXECUTION OF JUDICIAL ORDER OF 〖DEPORTATION〗 *REMOVAL*.—

(A)(i) A judicial order of 〖deportation〗 *removal* or denial of such order may be appealed by either party to the court of appeals for the circuit in which the district court is located.

(ii) Except as provided in clause (iii), such appeal shall be considered consistent with the requirements described in section 〖106〗 *242*.

(iii) Upon execution by the defendant of a valid waiver of the right to appeal the conviction on which the order of 〖deportation〗 *removal* is based, the expiration of the period described in section 〖106(a)(1)〗 *242(b)(1)*, or the final dismissal of an appeal from such conviction, the order of 〖deportation〗 *removal* shall become final and shall be executed at the end of the prison term in accordance with the terms of the order. If the conviction is reversed on direct appeal, the order entered pursuant to this section shall be void.

(B) As soon as is practicable after entry of a judicial order of 〖deportation〗 *removal*, the Commissioner shall provide the defendant with written notice of the order of 〖deportation〗 *removal*, which shall designate the defendant's country of choice for 〖deportation〗 *removal* and any alternate country pursuant to section 243(a).

395

(4) DENIAL OF JUDICIAL ORDER.—Denial without a decision on the merits of a request for a judicial order of 〖deportation〗 *removal* shall not preclude the Attorney General from initiating 〖deportation〗 *removal* proceedings pursuant to section 〖242〗 *240* upon the same ground of deportability or upon any other ground of deportability provided under section 241(a).

*INITIATION OF REMOVAL PROCEEDINGS*

SEC. 239. (a) NOTICE TO APPEAR.—

(1) IN GENERAL.—In removal proceedings under section 240, written notice (in this section referred to as a "notice to appear") shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

(A) The nature of the proceedings against the alien.

(B) The legal authority under which the proceedings are conducted.

(C) The acts or conduct alleged to be in violation of law.

(D) The charges against the alien and the statutory provisions alleged to have been violated.

(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.

(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

(iii) The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.

(G)(i) The time and place at which the proceedings will be held.

(ii) The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.

(2) NOTICE OF CHANGE IN TIME OR PLACE OF PROCEEDINGS.—

(A) IN GENERAL.—In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—

(i) the new time or place of the proceedings, and

(ii) the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.

(B) EXCEPTION.—In the case of an alien not in detention, a written notice shall not be required under this paragraph

396

*if the alien has failed to provide the address required under paragraph (1)(F).*

*(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).*

*(b) SECURING OF COUNSEL.—*

*(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.*

*(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.*

*(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).*

*(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.*

*(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

### REMOVAL PROCEEDINGS

*SEC. 240. (a) PROCEEDING.—*

*(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.*

*(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).*

*(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.*

*(b) CONDUCT OF PROCEEDING.—*

*(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or*

397

inaction) in contempt of the judge's proper exercise of authority under this Act.

(2) FORM OF PROCEEDING.—

    (A) IN GENERAL.—The proceeding may take place—

        (i) in person,

        (ii) through video conference, or

        (iii) subject to subparagraph (B), through telephone conference.

    (B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

    (A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

    (B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government, and

    (C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

(5) CONSEQUENCES OF FAILURE TO APPEAR.—

    (A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

    (B) NO NOTICE IF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

    (C) RESCISSION OF ORDER.—Such an order may be rescinded only—

        (i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

        (ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section

398

> 239(a) or the alien demonstrates that the alien was in Federal or State custody and did not appear through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion.

> (D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

> (A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

> (B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

> (C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

> (7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

(c) DECISION AND BURDEN OF PROOF.—

(1) DECISION.—

> (A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

> (B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

399

(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or

(B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

(4) NOTICE.—If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

(5) MOTIONS TO RECONSIDER.—

(A) IN GENERAL.—The alien may file one motion to reconsider a decision that the alien is removable from the United States.

(B) DEADLINE.—The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

(C) CONTENTS.—The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

(6) MOTIONS TO REOPEN.—

(A) IN GENERAL.—An alien may file one motion to reopen proceedings under this section.

(B) CONTENTS.—The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

(C) DEADLINE.—

(i) IN GENERAL.—Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

(ii) ASYLUM.—There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

(iii) FAILURE TO APPEAR.—A motion to reopen may be filed within 180 days after the date of the final order

400

*of removal if the order has been entered pursuant to subsection (b)(5) due to the alien's failure to appear for proceedings under this section and the alien establishes that the alien's failure to appear was because of exceptional circumstances beyond the control of the alien or because the alien did not receive the notice required under section 239(a)(2).*

(d) STIPULATED REMOVAL.—*The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.*

(e) DEFINITIONS.—*In this section and section 240A:*

(1) EXCEPTIONAL CIRCUMSTANCES.—*The term "exceptional circumstances" refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.*

(2) REMOVABLE.—*The term "removable" means—*

(A) *in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or*

(B) *in the case of an alien admitted to the United States, that the alien is deportable under section 237.*

CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS

SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—*The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—*

(1) *has been an alien lawfully admitted for permanent residence for not less than 5 years,*

(2) *has resided in the United States continuously for 7 years after having been admitted in any status, and*

(3) *has not been convicted of an aggravated felony or felonies for which the alien has been sentenced, in the aggregate, to a term of imprisonment of at least 5 years.*

(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—

(1) IN GENERAL.—*The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—*

(A) *has been physically present in the United States for a continuous period of not less than 7 years immediately preceding the date of such application;*

(B) *has been a person of good moral character during such period;*

(C) *has not been convicted of an aggravated felony; and*

(D) *establishes that removal would result in extreme hardship to the alien or to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.*

(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—*The Attorney General may cancel removal in the case of an alien who*

401

is inadmissible or deportable from the United States if the alien—

(A) has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);

(B) has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

(C) has been a person of good moral character during such period;

(D) is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and

(E) establishes that removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

(3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

(c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

(1) An alien who entered the United States as a crewman subsequent to June 30, 1964.

(2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

(3) An alien who—

(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

(B) is subject to the two-year foreign residence requirement of section 212(e), and

402

(C) has not fulfilled that requirement or received a waiver thereof.

(4) An alien who is inadmissible under section 212(a)(3) or deportable under subparagraph (B) or (D) of section 237(a)(4).

(d) SPECIAL RULES RELATING TO CONTINUOUS RESIDENCE OR PHYSICAL PRESENCE.—

(1) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a).

(2) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless the Attorney General finds that return could not be accomplished within that time period due to emergent reasons.

(3) CONTINUITY NOT REQUIRED BECAUSE OF HONORABLE SERVICE IN ARMED FORCES AND PRESENCE UPON ENTRY INTO SERVICE.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

(B) at the time of the alien's enlistment or induction was in the United States.

VOLUNTARY DEPARTURE

SEC. 240B. (a) CERTAIN CONDITIONS.—

(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

(3) BOND.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

(4) TREATMENT OF ALIENS ARRIVING IN THE UNITED STATES.— In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

(b) AT CONCLUSION OF PROCEEDINGS.—

(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the

403

*immigration judge enters an order granting voluntary departure in lieu of removal and finds that—*

*(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);*

*(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;*

*(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and*

*(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.*

*(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.*

*(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.*

*(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(9).*

*(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249.*

*(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens.*

*(f) APPEALS OF DENIALS.—An alien may appeal from denial of a request for an order of voluntary departure under subsection (b) in accordance with the procedures in section 242. Notwithstanding the pendency of such appeal, the alien shall be removable from the United States 60 days after entry of the order of removal. The alien's removal from the United States shall not moot the appeal.*

RECORDS OF ADMISSION

SEC. 〖240.〗 *240C.* (a) The Attorney General shall cause to be filed, as a record of admission of each immigrant, the immigrant visa required by section 221(e) to be surrendered at the port of entry by the arriving alien to an immigration officer.

(b) The Attorney General shall cause to be filed such record of the 〖entry〗 *admission* into the United States of each immigrant admitted under section 211(b) and of each nonimmigrant as the Attorney General deems necessary for the enforcement of the immigration laws.

404

*DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED*

SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS OR-
DERED REMOVED.—

(1) REMOVAL PERIOD.—

(A) IN GENERAL.—*Except as otherwise provided in this
section, when an alien is ordered removed, the Attorney
General shall remove the alien from the United States
within a period of 90 days (in this section referred to as the
"removal period").*

(B) BEGINNING OF PERIOD.—*The removal period begins
on the latest of the following:*

(i) *The date the order of removal becomes adminis-
tratively final.*

(ii) *If the removal order is judicially reviewed and
such review serves to stay the removal of the alien, the
date of the court's final order.*

(iii) *If the alien is detained or confined (except under
an immigration process), the date the alien is released
from detention or confinement.*

(C) SUSPENSION OF PERIOD.—*The removal period shall be
extended beyond a period of 90 days and the alien may re-
main in detention during such extended period if the alien
willfully fails or refuses to make timely application in good
faith for travel or other documents necessary to the alien's
departure or conspires or acts to prevent the alien's removal
subject to an order of removal.*

(2) DETENTION AND RELEASE BY THE ATTORNEY GENERAL.—
*During the removal period, the Attorney General shall detain
the alien. If there is insufficient detention space to detain the
alien, the Attorney General shall make a specific finding to this
effect and may release the alien on a bond containing such con-
ditions as the Attorney General may prescribe.*

(3) SUPERVISION AFTER 90-DAY PERIOD.—*If the alien does not
leave or is not removed within the removal period, the alien,
pending removal, shall be subject to supervision under regula-
tions prescribed by the Attorney General. The regulations shall
include provisions requiring the alien—*

(A) *to appear before an immigration officer periodically
for identification;*

(B) *to submit, if necessary, to a medical and psychiatric
examination at the expense of the United States Govern-
ment;*

(C) *to give information under oath about the alien's na-
tionality, circumstances, habits, associations, and activities,
and other information the Attorney General considers ap-
propriate; and*

(D) *to obey reasonable written restrictions on the alien's
conduct or activities that the Attorney General prescribes
for the alien.*

(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPER-
VISED RELEASE, OR PROBATION.—*Except as provided in section
343(a) of the Public Health Service Act (42 U.S.C. 259(a)), the
Attorney General may not remove an alien who is sentenced to*

405

*imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.*

*(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS IL-LEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of re-moval, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, and the alien shall be removed under the prior order at any time after the reentry.*

*(6) INADMISSIBLE ALIENS.—An alien ordered removed who is inadmissible under section 212 may be detained beyond the re-moval period and, if released, shall be subject to the terms of supervision in paragraph (3).*

*(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—*

*(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or*

*(B) the removal of the alien is otherwise impracticable or contrary to the public interest.*

*(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—*

*(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—*

*(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be re-moved to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.*

*(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or is-land.*

*(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:*

*(i) The country of which the alien is a citizen, sub-ject, or national.*

*(ii) The country in which the alien was born.*

*(iii) The country in which the alien has a residence.*

*(iv) A country with a government that will accept the alien into the country's territory if removal to each*

406

*country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.*

(2) OTHER ALIENS.—*Subject to paragraph (3)—*

(A) SELECTION OF COUNTRY BY ALIEN.—*Except as otherwise provided in this paragraph—*

(i) *any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and*

(ii) *the Attorney General shall remove the alien to the country the alien so designates.*

(B) LIMITATION ON DESIGNATION.—*An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.*

(C) DISREGARDING DESIGNATION.—*The Attorney General may disregard a designation under subparagraph (A)(i) if—*

(i) *the alien fails to designate a country promptly;*

(ii) *the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;*

(iii) *the government of the country is not willing to accept the alien into the country; or*

(iv) *the Attorney General decides that removing the alien to the country is prejudicial to the United States.*

(D) ALTERNATIVE COUNTRY.—*If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—*

(i) *does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or*

(ii) *is not willing to accept the alien into the country.*

(E) ADDITIONAL REMOVAL COUNTRIES.—*If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:*

(i) *The country from which the alien was admitted to the United States.*

(ii) *The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.*

(iii) *A country in which the alien resided before the alien entered the country from which the alien entered the United States.*

(iv) *The country in which the alien was born.*

407

*(v) The country that had sovereignty over the alien's birthplace when the alien was born.*

*(vi) The country in which the alien's birthplace is located when the alien is ordered removed.*

*(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.*

*(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—*

*(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or*

*(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.*

*(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—*

*(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—*

*(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or*

*(B) the alien is a stowaway—*

*(i) who has been ordered removed in accordance with section 235(a)(1),*

*(ii) who has requested asylum, and*

*(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.*

*(2) STAY OF REMOVAL.—*

*(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—*

*(i) immediate removal is not practicable or proper; or*

*(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.*

*(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from*

408

the appropriation "Immigration and Naturalization Service—Salaries and Expenses"—

    (i) the cost of maintenance of the alien; and

    (ii) a witness fee of $1 a day.

  (C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

    (i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

    (ii) condition that the alien appear when required as a witness and for removal; and

    (iii) other conditions the Attorney General may prescribe.

  (3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

    (A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

      (i) while the alien is detained under subsection (d)(1), and

      (ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

        (I) subsection (d)(2)(A) or (d)(2)(B)(i),

        (II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

        (III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

    (B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

      (i) the alien is a crewmember;

      (ii) the alien has an immigrant visa;

      (iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

      (iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

      (v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for tem-

409

porary admission to the United States or a reentry permit;

(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

(vi) the individual claims to be a national of the United States and has a United States passport.

(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

(B) take the alien to the foreign country to which the alien is ordered removed.

(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

(i) for medical treatment,

(ii) for detention of the stowaway by the Attorney General, or

(iii) for departure or removal of the stowaway; and

(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if any travel documents necessary for departure or repatriation of the stowaway have been obtained and removal of the stowaway will not be unreasonably delayed.

(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

(e) PAYMENT OF EXPENSES OF REMOVAL.—

410

(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—*In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—*

*(A) pay the cost from the appropriation "Immigration and Naturalization Service—Salaries and Expenses"; and*

*(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.*

(2) COSTS OF REMOVAL OF PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—*In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.*

(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

*(A)* THROUGH APPROPRIATION.—*Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.*

*(B)* THROUGH OWNER.—

*(i)* IN GENERAL.—*In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.*

*(ii)* ALIENS DESCRIBED.—*An alien described in this clause is an alien who—*

*(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or*

*(II) is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.*

*(C)* COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—*In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.*

(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

411

*(1) IN GENERAL.—If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.*

*(2) COSTS.—The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.*

*(g) PLACES OF DETENTION.—*

*(1) IN GENERAL.—The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service—Salaries and Expenses", without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.*

*(2) DETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.*

*(h) STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

⟦(j)⟧ *(i)* INCARCERATION.—

(1) If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General—

(A) enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

(2) Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

(3) For purposes of this subsection, the term "undocumented criminal alien" means an alien who—

(A) has been convicted of a ⟦felony and sentenced to a term of imprisonment⟧ *felony or two or more misdemeanors*; and

412

(B)(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General;

(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 248, or to comply with the conditions of any such status.

(4)(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

(5) There are authorized to be appropriated such sums as may be necessary to carry out this subsection, of which the following amounts may be appropriated from the Violent Crime Reduction Trust Fund:

(A) $130,000,000 for fiscal year 1995;

(B) $300,000,000 for fiscal year 1996;

(C) $330,000,000 for fiscal year 1997;

(D) $350,000,000 for fiscal year 1998;

(E) $350,000,000 for fiscal year 1999; and

(F) $340,000,000 for fiscal year 2000.

*(6) In this subsection, the term "incarceration" includes imprisonment in a State or local prison or jail the time of which is counted towards completion of a sentence or the detention of an alien previously convicted of a felony or misdemeanor who has been arrested and is being held pending judicial action on new charges or pending transfer to Federal custody.*

〖CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS〗

*CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS*

〖APPREHENSION AND DEPORTATION OF ALIENS〗

〖SEC. 242. (a)(1) Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Except as provided in paragraph (2), any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole. But such bond or parole, whether heretofore or hereafter authorized, may be revoked at any time by the Attorney General, in his discretion, and the

413

alien may be returned to custody under the warrant which initiated the proceedings against him and detained until final determination of his deportability. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or parole pending final decision of deportability upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability.

〖(2)(A) The Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense). Notwithstanding paragraph (1) or subsections (c) and (d) but subject to subparagraph (B), the Attorney General shall not release such felon from custody.

〖(B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.

〖(3)(A) The Attorney General shall devise and implement a system—

〖(i) to make available, daily (on a 24–hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

〖(ii) to designate and train officers and employees of the Service within each district to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

〖(iii) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony and who have been deported; such record shall be made available to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any such previously deported alien seeking to reenter the United States.

〖(B) The Attorney General shall submit reports to the Committees on the Judiciary of the House of Representatives and of the Senate at the end of the 6–month period and at the end of the 18–month period beginning on the effective date of this paragraph which describe in detail specific efforts made by the Attorney General to implement this paragraph.

〖(b) A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and as authorized by the Attorney General, shall make determinations, including orders of deportation. Determination of deportability in any case shall be made only upon a record made in a proceeding before a special in-

414

quiry officer, at which the alien shall have reasonable opportunity to be present, unless by reason of the alien's mental incompetency it is impracticable for him to be present, in which case the Attorney General shall prescribe necessary and proper safeguards for the rights and privileges of such alien. If any alien has been given a reasonable opportunity to be present at a proceeding under this section, and without reasonable cause fails or refuses to attend or remain in attendance at such proceeding, the special inquiry officer may proceed to a determination in like manner as if the alien were present. In any case or class of cases in which the Attorney General believes that such procedure would be of aid in making a determination, he may require specifically or by regulation that an additional immigration officer shall be assigned to present the evidence on behalf of the United States and in such case such additional immigration officer shall have authority to present evidence, and to interrogate, examine and cross-examine the alien or other witnesses in the proceedings. Nothing in the preceding sentence shall be construed to diminish the authority conferred upon the special inquiry officer conducting such proceedings. No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer acting under the provisions of this section shall be in accordance with such regulations, not inconsistent with this Act, as the Attorney General shall prescribe. Such regulations shall include requirements that are consistent with section 242B and that provide that—

⟦(1) the alien shall be given notice, reasonable under all the circumstances, of the nature of the charges against him and of the time and place at which the proceedings will be held,

⟦(2) the alien shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose,

⟦(3) the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government, and

⟦(4) no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

Except as provided in section 242A(d), the procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section. In any case in which an alien is ordered deported from the United States under the provisions of this Act, or of any other law or treaty, the decision of the Attorney General shall be final. In the discretion of the Attorney General, and under such regulations as he may prescribe, deportation proceedings, including issuance of a warrant of arrest, and a finding of deportability under this section need not be required in the case of any alien who admits to belonging to a class of aliens who are deportable under section 241 if such alien voluntarily departs from the United States at his own expense, or is removed at Government expense as hereinafter authorized, unless the Attorney General has reason to believe that such alien is deportable under

415

paragraph (2), (3), or (4) of section 241(a). If any alien who is au-
thorized to depart voluntarily under the preceding sentence is fi-
nancially unable to depart at his own expense and the Attorney
General deems his removal to be in the best interest of the United
States, the expense of such removal may be paid from the appro-
priation for the enforcement of this Act.

〔(c) When a final order of deportation under administrative proc-
esses is made against any alien, the Attorney General shall have
a period of six months from the date of such order, or, if judicial
review is had, then from the date of the final order of the court,
within which to effect the alien's departure from the United States,
during which period, at the Attorney General's discretion, the alien
may be detained, released on bond in an amount and containing
such conditions as the Attorney General may prescribe, or released
on such other conditions as the Attorney General may prescribe.
Any court of competent jurisdiction shall have authority to review
or revise any determination of the Attorney General concerning de-
tention, release on bond, or other release during such six-month pe-
riod upon a conclusive showing in habeas corpus proceedings that
the Attorney General is not proceeding with such reasonable dis-
patch as may be warranted by the particular facts and cir-
cumstances in the case of any alien to effect such alien's departure
from the United States within such six-month period. If deporta-
tion has not been practicable, advisable, or possible, or departure
of the alien from the United States under the order of deportation
has not been effected, within such six-month period, the alien shall
become subject to such further supervision and detention pending
eventual deportation as is authorized in this section. The Attorney
General is hereby authorized and directed to arrange for appro-
priate places of detention for those aliens whom he shall take into
custody and detain under this section. Where no Federal buildings
are available or buildings adapted or suitably located for the pur-
pose are available for rental, the Attorney General is hereby au-
thorized, notwithstanding section 3709 of the Revised Statutes, as
amended (41 U.S.C. 5), or section 322 of the Act of June 30, 1932,
as amended (40 U.S.C. 278a), to expend, from the appropriation
provided for the administration and enforcement of the immigra-
tion laws, such amounts as may be necessary for the acquisition of
land and the erection, acquisition, maintenance, operation, remod-
eling, or repair of buildings, sheds, and office quarters (including
living quarters for officers where none are otherwise available), and
adjunct facilities, necessary for the detention of aliens. For the pur-
poses of this section an order of deportation heretofore or hereafter
entered against an alien in legal detention or confinement, other
than under an immigration process, shall be considered as being
made as of the moment he is released from such detention or con-
finement, and not prior thereto.

〔(d) Any alien, against whom a final order of deportation as de-
fined in subsection (c) heretofore or hereafter issued has been out-
standing for more than six months, shall, pending eventual depor-
tation, be subject to supervision under regulations prescribed by
the Attorney General. Such regulations shall include provisions
which will require any alien subject to supervision (1) to appear
from time to time before an immigration officer for identification;

416

(2) to submit, if necessary, to medical and psychiatric examination at the expense of the United States; (3) to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper; and (4) to conform to such reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case. Any alien who shall willfully fail to comply with such regulations, or willfully fail to appear or to give information or submit to medical or psychiatric examination if required, or knowingly give false information in relation to the requirements of such regulations, or knowingly violate a reasonable restriction imposed upon his conduct or activity, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

⟦(e) Any alien against whom a final order of deportation is outstanding by reason of being a member of any of the classes described in section 241(a), who shall willfully fail or refuse to depart from the United States within a period of six months from the date of the final order of deportation under administrative processes, or, if judicial review is had, then from the date of the final order of the court, or shall willfully fail or refuse to make timely application in good faith for travel or other documents necessary to his departure, or who shall connive or conspire, or take any other action, designed to prevent or hamper or with the purpose of preventing or hampering his departure pursuant to such order of deportation, or who shall willfully fail or refuse to present himself for deportation at the time and place required by the Attorney General pursuant to such order of deportation, shall upon conviction be guilty of a felony, and shall be imprisoned not more than four years, or shall be imprisoned not more than ten years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 241(a).: *Provided,* That this subsection shall not make it illegal for any alien to take any proper steps for the purpose of securing cancellation of or exemption from such order of deportation or for the purpose of securing his release from incarceration or custody: *Provided further,* That the court may for good cause suspend the sentence of such alien and order his release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as (1) the age, health, and period of detention of the alien; (2) the effect of the alien's release upon the national security and public peace or safety; (3) the likelihood of the alien's resuming or following a course of conduct which made or would make him deportable; (4) the character of the efforts made by such alien himself and by representatives of the country or countries to which his deportation is directed to expedite the alien's departure from the United States; (5) the reason for the inability of the Government of the United States to secure passports, other travel documents, or deportation facilities from the country or countries to which the alien has been ordered deported; and (6) the eligibility of the alien for discretionary relief under the immigration laws.

⟦(f) Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether be-

417

fore or after the date of enactment of this Act, on any ground described in any of the paragraphs enumerated in subsection (e), the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry. For the purposes of subsection (e) the date on which the finding is made that such reinstatement is appropriate shall be deemed the date of the final order of deportation.

〔(g) If any alien, subject to supervision or detention under subsections (c) or (d) of this section, is able to depart from the United States under the order of deportation, except that he is financially unable to pay his passage, the Attorney General may in his discretion permit such alien to depart voluntarily, and the expense of such passage to the country to which he is destined may be paid from the appropriation for the enforcement of this Act, unless such payment is otherwise provided for under this Act.

〔(h) An alien sentenced to imprisonment shall not be deported until such imprisonment has been terminated by the release of the alien from confinement. Parole, supervised release, probation, or possibility of rearrest or further confinement in respect of the same offense shall not be a ground for deferral of deportation.

〔(i) In the case of an alien who is convicted of an offense which makes the alien subject to deportation, the Attorney General shall begin any deportation proceeding as expeditiously as possible after the date of the conviction.〕

*JUDICIAL REVIEW OF ORDERS OF REMOVAL*

Sec. 242. (a) Applicable Provisions.—

(1) General orders of removal.—*Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.*

(2) Limitations on review relating to section 235(b)(1).—*Notwithstanding any other provision of law, no court shall have jurisdiction to review—*

(A) except as provided in subsection (f), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

(B) a decision by the Attorney General to invoke the provisions of such section,

(C) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

(D) procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

(3) Treatment of certain decisions.—*No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).*

418

(b) REQUIREMENTS FOR ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

(3) SERVICE.—

(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the initial proceedings under section 240 were conducted.

(B) STAY OF ORDER.—

(i) IN GENERAL.—Except as provided in clause (ii), service of the petition on the officer or employee stays the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

(ii) EXCEPTION.—If the alien has been convicted of an aggravated felony, or the alien has been ordered removed pursuant to a finding that the alien is inadmissible under section 212, service of the petition does not stay the removal unless the court orders otherwise.

(4) DECISION.—Except as provided in paragraph (5)(B)—

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

(B) the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole, and

(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law.

(5) TREATMENT OF NATIONALITY CLAIMS.—

(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

419

(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.—When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

(8) CONSTRUCTION.—This subsection—

(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

(C) except as provided in paragraph (3), does not require the Attorney General to defer removal of the alien.

(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal shall state whether a court has

420

upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

(d) REVIEW OF FINAL ORDERS.—A court may review a final order of removal only if—

(1) the alien has exhausted all administrative remedies available to the alien as of right, and

(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

(e) LIMITED REVIEW FOR NON-PERMANENT RESIDENTS CONVICTED OF AGGRAVATED FELONIES.—

(1) IN GENERAL.—A petition for review filed by an alien against whom a final order of removal has been issued under section 238 may challenge only whether—

(A) the alien is the alien described in the order,

(B) the alien is an alien described in section 238(b)(2) and has been convicted after entry into the United States of an aggravated felony, and

(C) proceedings against the alien complied with section 238(b)(4).

(2) LIMITED JURISDICTION.—A court reviewing the petition has jurisdiction only to review the issues described in paragraph (1).

(f) JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).—

(1) APPLICATION.—The provisions of this subsection apply with respect to judicial review of orders of removal effected under section 235(b)(1).

(2) LIMITATIONS ON RELIEF.—Regardless of the nature of the action or claim and regardless of the identity of the party or parties bringing the action, no court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief not specifically authorized in this subsection, or to certify a class under Rule 23 of the Federal Rules of Civil Procedure.

(3) LIMITATION TO HABEAS CORPUS.—Judicial review of any matter, cause, claim, or individual determination made or arising under or pertaining to section 235(b)(1) shall only be available in habeas corpus proceedings, and shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

(4) DECISION.—In any case where the court determines that the petitioner—

(A) is an alien who was not ordered removed under section 235(b)(1), or

(B) has demonstrated by a preponderance of the evidence that the alien is a lawful permanent resident,

421

*the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).*

*(5) SCOPE OF INQUIRY.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.*

*(g) LIMIT ON INJUNCTIVE RELIEF.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Immigration in the National Interest Act of 1995, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.*

⟦DEPORTATION PROCEDURES

⟦SEC. 242B. (a) NOTICES.—

⟦(1) ORDER TO SHOW CAUSE.—In deportation proceedings under section 242, written notice (in this section referred to as an "order to show cause") shall be given in person to the alien (or, if personal service is not practicable, such notice shall be given by certified mail to the alien or to the alien's counsel of record, if any) specifying the following:

⟦(A) The nature of the proceedings against the alien.

⟦(B) The legal authority under which the proceedings are conducted.

⟦(C) The acts or conduct alleged to be in violation of law.

⟦(D) The charges against the alien and the statutory provisions alleged to have been violated.

⟦(E) The alien may be represented by counsel and the alien will be provided a list of counsel prepared under subsection (b)(2).

⟦(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 242.

⟦(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

⟦(iii) The consequences under subsection (c)(2) of failure to provide address and telephone information pursuant to this subparagraph.

⟦(2) NOTICE OF TIME AND PLACE OF PROCEEDINGS.—In deportation proceedings under section 242—

⟦(A) written notice shall be given in person to the alien (or, if personal service is not practicable, written notice shall be given by certified mail to the alien or to the alien's

422

counsel of record, if any), in the order to show cause or otherwise, of—

〔(i) the time and place at which the proceedings will be held, and

〔(ii) the consequences under subsection (c) of the failure, except under exceptional circumstances, to appear at such proceedings; and

〔(B) in the case of any change or postponement in the time and place of such proceedings, written notice shall be given in person to the alien (or, if personal service is not practicable, written notice shall be given by certified mail to the alien or to the alien's counsel of record, if any) of—

〔(i) the new time or place of the proceedings, and

〔(ii) the consequences under subsection (c) of failing, except under exceptional circumstances, to attend such proceedings.

In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under subsection (a)(1)(F).

〔(3) FORM OF INFORMATION.—Each order to show cause or other notice under this subsection—

〔(A) shall be in English and Spanish, and

〔(B) shall specify that the alien may be represented by an attorney in deportation proceedings under section 242 and will be provided, in accordance with subsection (b)(1), a period of time in order to obtain counsel and a current list described in subsection (b)(2).

〔(4) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

〔(b) SECURING OF COUNSEL.—

〔(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 242, the hearing date shall not be scheduled earlier than 14 days after the service of the order to show cause, unless the alien requests in writing an earlier hearing date.

〔(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 242. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

〔(c) CONSEQUENCES OF FAILURE TO APPEAR.—

〔(1) IN GENERAL.—Any alien who, after written notice required under subsection (a)(2) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under section 242, shall be ordered deported under section 242(b)(1) in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is deportable. The written notice by the Attorney General shall be considered sufficient for pur-

423

poses of this paragraph if provided at the most recent address provided under subsection (a)(1)(F).

〔(2) NO NOTICE IF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under paragraph (1) if the alien has failed to provide the address required under subsection (a)(1)(F).

〔(3) RESCISSION OF ORDER.—Such an order may be rescinded only—

〔(A) upon a motion to reopen filed within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (f)(2)), or

〔(B) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with subsection (a)(2) or the alien demonstrates that the alien was in Federal or State custody and did not appear through no fault of the alien.

The filing of the motion to reopen described in subparagraph (A) or (B) shall stay the deportation of the alien pending disposition of the motion.

〔(4) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 106 of an order entered in absentia under this subsection shall, notwithstanding such section, be filed not later than 60 days (or 30 days in the case of an alien convicted of an aggravated felony) after the date of the final order of deportation and shall (except in cases described in section 106(a)(5)) be confined to the issues of the validity of the notice provided to the alien, to the reasons for the alien's not attending the proceeding, and to whether or not clear, convincing, and unequivocal evidence of deportability has been established.

〔(d) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

〔(1) define in a proceeding before a special inquiry officer or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

〔(2) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

〔(3) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this subsection shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

〔(e) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—

〔(1) AT DEPORTATION PROCEEDINGS.—Any alien against whom a final order of deportation is entered in absentia under this section and who, at the time of the notice described in subsection (a)(2), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (f)(2)) to attend a proceeding under section 242, shall not be eligible for relief

424

described in paragraph (5) for a period of 5 years after the date of the entry of the final order of deportation.

⟦(2) Voluntary departure.—

⟦(A) In general.—Subject to subparagraph (B), any alien allowed to depart voluntarily under section 244(e)(1) or who has agreed to depart voluntarily at his own expense under section 242(b)(1) who remains in the United States after the scheduled date of departure, other than because of exceptional circumstances, shall not be eligible for relief described in paragraph (5) for a period of 5 years after the scheduled date of departure or the date of unlawful reentry, respectively.

⟦(B) Written and oral notice required.—Subparagraph (A) shall not apply to an alien allowed to depart voluntarily unless, before such departure, the Attorney General has provided written notice to the alien in English and Spanish and oral notice either in the alien's native language or in another language the alien understands of the consequences under subparagraph (A) of the alien's remaining in the United States after the scheduled date of departure, other than because of exceptional circumstances.

⟦(3) Failure to appear under deportation order.—

⟦(A) In general.—Subject to subparagraph (B), any alien against whom a final order of deportation is entered under this section and who fails, other than because of exceptional circumstances, to appear for deportation at the time and place ordered shall not be eligible for relief described in paragraph (5) for a period of 5 years after the date the alien was required to appear for deportation.

⟦(B) Written and oral notice required.—Subparagraph (A) shall not apply to an alien against whom a deportation order is entered unless the Attorney General has provided, orally in the alien's native language or in another language the alien understands and in the final order of deportation under this section of the consequences under subparagraph (A) of the alien's failure, other than because of exceptional circumstances, to appear for deportation at the time and place ordered.

⟦(4) Failure to appear for asylum hearing.—

⟦(A) In general.—Subject to subparagraph (B), any alien—

⟦(i) whose period of authorized stay (if any) has expired through the passage of time,

⟦(ii) who has filed an application for asylum, and

⟦(iii) who fails, other than because of exceptional circumstances, to appear at the time and place specified for the asylum hearing,

shall not be eligible for relief described in paragraph (5) for a period of 5 years after the date of the asylum hearing.

⟦(B) Written and oral notice required.—Subparagraph (A) shall not apply in the case of an alien with respect to a failure to be present at a hearing unless—

425

⟦(i) written notice in English and Spanish, and oral notice either in the alien's native language or in another language the alien understands, was provided to the alien of the time and place at which the asylum hearing will be held, and in the case of any change or postponement in such time or place, written notice in English and Spanish, and oral notice either in the alien's native language or in another language the alien understands, was provided to the alien of the new time or place of the hearing; and

⟦(ii) notices under clause (i) specified the consequences under subparagraph (A) of failing, other than because of exceptional circumstances, to attend such hearing.

⟦(5) RELIEF COVERED.—The relief described in this paragraph is—

⟦(A) voluntary departure under section 242(b)(1),

⟦(B) suspension of deportation or voluntary departure under section 244, and

⟦(C) adjustment or change of status under section 245, 248, or 249.

⟦(f) DEFINITIONS.—In this section:

⟦(1) The term "certified mail" means certified mail, return receipt requested.

⟦(2) The term "exceptional circumstances" refers to exceptional circumstances (such as serious illness of the alien or death of an immediate relative of the alien, but not including less compelling circumstances) beyond the control of the alien.

⟦COUNTRIES TO WHICH ALIENS SHALL BE DEPORTED; COST OF DEPORTATION

⟦SEC. 243. (a) The deportation of an alien in the United States provided for in this Act, or any other Act or treaty, shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory, unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States. No alien shall be permitted to make more than one such designation, nor shall any alien designate, as the place to which he wishes to be deported, any foreign territory contiguous to the United States or any island adjacent thereto or adjacent to the United States unless such alien is a native, citizen, subject, or national of, or had a residence in such designated foreign contiguous territory or adjacent island. If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation may thereafter be disregarded. Thereupon deportation of such alien shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory. If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable under the

426

circumstances in a particular case, whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth either—

〔(1) to the country from which such alien last entered the United States;

〔(2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory;

〔(3) to the country in which he was born;

〔(4) to the country in which the place of his birth is situated at the time he is ordered deported;

〔(5) to any country in which he resided prior to entering the country from which he entered the United States;

〔(6) to the country which had sovereignty over the birthplace of the alien at the time of his birth; or

〔(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory.

〔(b) If the United States is at war and the deportation, in accordance with the provisions of subsection (a), of any alien who is deportable under any law of the United States shall be found by the Attorney General to be impracticable, inadvisable, inconvenient, or impossible because of enemy occupation of the country from which such alien came or wherein is located the foreign port at which he embarked for the United States or because of reasons connected with the war, such alien may, in the discretion of the Attorney General, be deported as follows:

〔(1) If such alien is a citizen or subject of a country whose recognized government is in exile, to the country in which is located that government in exile if that country will permit him to enter its territory; or

〔(2) if such alien is a citizen or subject of a country whose recognized government is not in exile, then to a country or any political or territorial subdivision thereof which is proximate to the country of which the alien is a citizen or subject, or, with the consent of the country of which the alien is a citizen or subject, to any other country.

〔(c) If deportation proceedings are instituted at any time within five years after the entry of the alien for causes existing prior to or at the time of entry, the cost of removal to the port of deportation shall be at the expense of the appropriation for the enforcement of this Act, and the deportation from such port shall be at the expense of the owner or owners of the vessels, aircraft, or other transportation lines by which such alien came to the United States, or if in the opinion of the Attorney General that is not practicable, at the expense of the appropriation for the enforcement of this Act: *Provided,* That the costs of the deportation of any such alien from such port shall not be assessed against the owner or owners of the vessels, aircraft, or other transportation lines in the case of any alien who arrived in possession of a valid unexpired immigrant visa and who was inspected and admitted to the United States for permanent residence. In the case of an alien crewman, if deportation

427

proceedings are instituted at any time within five years after the granting of the last conditional permit to land temporarily under the provisions of section 252, the cost of removal to the port of deportation shall be at the expense of the appropriation for the enforcement of this Act and the deportation from such port shall be at the expense of the owner or owners of the vessels or aircraft by which such alien came to the United States, or if in the opinion of the Attorney General that is not practicable, at the expense of the appropriation for the enforcement of this Act.

〔(d) If deportation proceedings are instituted later than five years after the entry of the alien, or in the case of an alien crewman later than five years after the granting of the last conditional permit to land temporarily, the cost thereof shall be payable from the appropriation for the enforcement of this Act.

〔(e) A failure or refusal on the part of the master, commanding officer, agent, owner, charterer, or consignee of a vessel, aircraft, or other transportation line to comply with the order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be deported under the provisions of this Act, or a failure or refusal by any such person to comply with an order of the Attorney General to pay deportation expenses in accordance with the requirements of this section, shall be punished by the imposition of a penalty in the sum and manner prescribed in section 237(b).

〔(f) When in the opinion of the Attorney General the mental or physical condition of an alien being deported is such as to require personal care and attendance, the Attorney General shall, when necessary, employ a suitable person for that purpose who shall accompany such alien to his final destination, and the expense incident to such service shall be defrayed in the same manner as the expense of deporting the accompanied alien is defrayed, and any failure or refusal to defray such expenses shall be punished in the manner prescribed by subsection (e) of this section.

〔(g) Upon the notification by the Attorney General that any country upon request denies or unduly delays acceptance of the return of any alien who is a national, citizen, subject, or resident thereof, the Secretary of State shall instruct consular officers performing their duties in the territory of such country to discontinue the issuance of immigrant visas to nationals, citizens, subjects, or residents of such country, until such time as the Attorney General shall inform the Secretary of State that such country has accepted such alien.

〔(h)(1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(4)(D)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

〔(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

〔(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

428

【(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

【(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

【(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.】

*PENALTIES RELATED TO REMOVAL*

SEC. 243. (a) PENALTY FOR FAILURE TO DEPART.—

(1) IN GENERAL.—*Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—*

(A) *willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,*

(B) *willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,*

(C) *connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or*

(D) *willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,*

*shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.*

(2) EXCEPTION.—*It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.*

(3) SUSPENSION.—*The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—*

(A) *the age, health, and period of detention of the alien;*

(B) *the effect of the alien's release upon the national security and public peace or safety;*

(C) *the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;*

(D) *the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;*

429

(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

(F) the eligibility of the alien for discretionary relief under the immigration laws.

(b) WILLFUL FAILURE TO COMPLY WITH TERMS OF RELEASE UNDER SUPERVISION.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—

(1) CIVIL PENALTIES.—

(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.

(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.

(2) CLEARING VESSELS AND AIRCRAFT.—

(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.

⟦SUSPENSION OF DEPORTATION; VOLUNTARY DEPARTURE

⟦SEC. 244. (a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien (other than an alien described in section 241(a)(4)(D))) who applies to the Attorney General for suspension of deportation and—

430

⟦(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence;

⟦(2) is deportable under paragraph (2), (3), or (4) of section 241(a); has been physically present in the United States for a continuous period of not less than 10 years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence; or

⟦(3) is deportable under any law of the United States except section 241(a)(1)(G) and the provisions specified in paragraph (2); has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application; has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent); and proves that during all of such time in the United States the alien was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or the alien's parent or child.

⟦(b)(1) The requirement of continuous physical presence in the United States specified in paragraphs (1) and (2) of subsection (a) of this section shall not be applicable to an alien who (A) has served for a minimum period of twenty-four months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and (B) at the time of his enlistment or induction was in the United States.

⟦(2) An alien shall not be considered to have failed to maintain continuous physical presence in the United States under paragraphs (1) and (2) of subsection (a) if the absence from the United States was brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence.

⟦(c) Upon application by any alien who is found by the Attorney General to meet the requirements of subsection (a) of this section the Attorney General may in his discretion suspend deportation of such alien.

431

〔(d) Upon the cancellation of deportation in the case of any alien under this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the cancellation of deportation of such alien is made.

〔(e)(1) Except as provided in paragraph (2), the Attorney General may, in his discretion, permit any alien under deportation proceedings, other than an alien within the provisions of paragraph (2), (3), or (4) of section 241(a) (and also any alien within the purview of such paragraphs if he is also within the provisions of paragraph (2) of subsection (a) of this section), to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.

〔(2) The authority contained in paragraph (1) shall not apply to any alien who is deportable because of a conviction for an aggravated felony.

〔(f) The provisions of subsection (a) shall not apply to an alien who—

〔(1) entered the United States as a crewman subsequent to June 30, 1964;

〔(2) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education, or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e); or

〔(3)(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training, (B) is subject to the two-year foreign residence requirement of section 212(e), and (C) has not fulfilled that requirement or received a waiver thereof.

〔(g) In acting on applications under subsection (a)(3), the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.〕

TEMPORARY PROTECTED STATUS

SEC. 〔244A.〕 *244.* (a) GRANTING OF STATUS.—

(1) IN GENERAL.—In the case of an alien who is a national of a foreign state designated under subsection (b) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state) and who meets the requirements of subsection (c), the Attorney General, in accordance with this section—

(A) may grant the alien temporary protected status in the United States and shall not 〔deport〕 *remove* the alien from the United States during the period in which such status is in effect, and

432

(B) shall authorize the alien to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

(2) DURATION OF WORK AUTHORIZATION.—Work authorization provided under this section shall be effective throughout the period the alien is in temporary protected status under this section.

(3) NOTICE.—

(A) Upon the granting of temporary protected status under this section, the Attorney General shall provide the alien with information concerning such status under this section.

(B) If, at the time of initiation of a ⟦deportation⟧ *removal* proceeding against an alien, the foreign state (of which the alien is a national) is designated under subsection (b), the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(C) If, at the time of designation of a foreign state under subsection (b), an alien (who is a national of such state) is in a ⟦deportation⟧ *removal* proceeding under this title, the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

\*        \*        \*        \*        \*        \*        \*

(b) DESIGNATIONS.—

(1)   \* \* \*

\*        \*        \*        \*        \*        \*        \*

(5) REVIEW.—

(A) DESIGNATIONS.—There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

(B) APPLICATION TO INDIVIDUALS.—The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in ⟦deportation⟧ *removal* proceedings if the alien demonstrates that the alien is a national of a state designated under paragraph (1).

(c) ALIENS ELIGIBLE FOR TEMPORARY PROTECTED STATUS.—

(1)   \* \* \*

(2) ELIGIBILITY STANDARDS.—

(A)   \* \* \*

(B) ALIENS INELIGIBLE.—An alien shall not be eligible for temporary protected status under this section if the Attorney General finds that—

(i) the alien has been convicted of any felony or 2 or more misdemeanors committed in the United States, or

433

(ii) the alien is described in section 〖243(h)(2)〗 *208(b)(2)(A).*

\*       \*       \*       \*       \*       \*       \*

(e) Relation of Period of Temporary Protected Status to 〖Suspension of Deportation〗 *Cancellation of Removal.*— With respect to an alien granted temporary protected status under this section, the period of such status shall not be counted as a period of physical presence in the United States for purposes of section 〖244(a)〗 *240A(a),* unless the Attorney General determines that extreme hardship exists. Such period shall not cause a break in the continuity of residence of the period before and after such period for purposes of such section.

\*       \*       \*       \*       \*       \*       \*

ADJUSTMENT OF STATUS OF NONIMMIGRANT TO THAT OF PERSON
ADMITTED FOR PERMANENT RESIDENCE

Sec. 245. (a)   \*  \*  \*

\*       \*       \*       \*       \*       \*       \*

(c) Subsection (a) shall not be applicable to (1) an alien crewman; (2) an alien (other than 〖an immediate relative as defined in section 201(b)〗 *a spouse or child of a citizen of the United States under section 201(b) or a parent of a citizen under section 203(a)(2)* or a special immigrant described in section 〖101(a)(27)(H), (I),〗 *101(a)(27)(I),* (J), or (K)) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States; (3) any alien admitted in transit without visa under section 212(d)(4)(C); (4) an alien (other than 〖an immediate relative as defined in section 201(b)〗 *a spouse or child of a citizen of the United States under section 201(b) or a parent of a citizen under section 203(a)(2))* who was admitted as a nonimmigrant visitor without a visa under section 212(l) or section 217; 〖or〗 (5) an alien who was admitted as a nonimmigrant described in section 101(a)(15)(S)*, or (6) an alien who is deportable under section 237(a)(4)(B).*

(d) The Attorney General may not adjust, under subsection (a), the status of an alien lawfully admitted to the United States for permanent residence on a conditional basis under section 216. The Attorney General may not adjust, under subsection (a), the status of a nonimmigrant alien described in section 101(a)(15)(K) (relating to an alien fiancee or fiance or the minor child of such alien) except to that of an alien lawfully admitted to the United States on a conditional basis under section 216 as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent) to the citizen who filed the petition to accord that alien's nonimmigrant status under section 101(a)(15)(K).

(e)(1) Except as provided in paragraph (3), an alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a).

434

(2) The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to ⟦enter⟧ *be admitted* or remain in the United States.

(3) Paragraph (1) and section 204(g) shall not apply with respect to a marriage if the alien establishes by clear and convincing evidence to the satisfaction of the Attorney General that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place and the marriage was not entered into for the purpose of procuring the alien's ⟦entry⟧ *admission* as an immigrant and no fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) for the filing of a petition under section 204(a) or 214(d) with respect to the alien spouse or alien son or daughter. In accordance with regulations, there shall be only one level of administrative appellate review for each alien under the previous sentence.

(f) The Attorney General may not adjust, under subsection (a), the status of an alien lawfully admitted to the United States for permanent residence on a conditional basis under section 216A.

*      *      *      *      *      *      *

(i)(1) Notwithstanding the provisions of subsections (a) and (c) of this section, an alien physically present in the United States who—

(A) entered the United States without inspection; or

(B) is within one of the classes enumerated in subsection (c) of this section

may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence. The Attorney General may accept such application only if the alien remits with such application a sum equalling ⟦five times the fee required for the processing of applications under this section as of the date of receipt of the application,⟧ *$2,500* but such sum shall not be required from a child under the age of seventeen, or an alien who is the spouse or unmarried child of an individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986 at any date, who—

(i) as of May 5, 1988, was the unmarried child or spouse of the individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986;

(ii) entered the United States before May 5, 1988, resided in the United States on May 5, 1988, and is not a lawful permanent resident; and

(iii) applied for benefits under section 301(a) of the Immigration Act of 1990. The sum specified herein shall be in addition to the fee normally required for the processing of an application under this section.

(2) Upon receipt of such an application and the sum hereby required, the Attorney General may adjust the status of the alien to that of an alien lawfully admitted for permanent residence if—

435

    (A) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and

    (B) an immigrant visa is immediately available to the alien at the time the application is filed.

(3) Sums remitted to the Attorney General pursuant to paragraphs (1) and (2) of this subsection shall be disposed of by the Attorney General as provided in sections 286 (m), (n), and (o) of this title.

〔(i)〕 *(j)*(1) If, in the opinion of the Attorney General—

    (A) a nonimmigrant admitted into the United States under section 101(a)(15)(S)(i) has supplied information described in subclause (I) of such section; and

      *       *       *       *       *       *       *

(3) Upon the approval of adjustment of status under 〔paragraphs (1) or (2)〕 *paragraph (1) or (2)*, the Attorney General shall record the alien's lawful admission for permanent residence as of the date of such approval and the Secretary of State shall reduce by one the number of visas authorized to be issued under sections 201(d) and 203(b)〔(4)〕 *(6)* for the fiscal year then current.

ADJUSTMENT OF STATUS OF CERTAIN ENTRANTS BEFORE JANUARY 1, 1982, TO THAT OF PERSON ADMITTED FOR LAWFUL RESIDENCE

SEC. 245A. (a) TEMPORARY RESIDENT STATUS.—The Attorney General shall adjust the status of an alien to that of an alien lawfully admitted for temporary residence if the alien meets the following requirements:

    (1) TIMELY APPLICATION.—

      (A) DURING APPLICATION PERIOD.—Except as provided in subparagraph (B), the alien must apply for such adjustment during the 12-month period beginning on a date (not later than 180 days after the date of enactment of this section) designated by the Attorney General.

      (B) APPLICATION WITHIN 30 DAYS OF SHOW-CAUSE ORDER.—An alien who, at any time during the first 11 months of the 12-month period described in subparagraph (A), is the subject of an order to show cause issued under section 242 *(as in effect before October 1, 1996)*, must make application under this section not later than the end of the 30-day period beginning either on the first day of such 12-month period or on the date of the issuance of such order, whichever day is later.

      *       *       *       *       *       *       *

(c) APPLICATIONS FOR ADJUSTMENT OF STATUS.—

    (1)  *  *  *

      *       *       *       *       *       *       *

    (5) CONFIDENTIALITY OF INFORMATION.—〔Neither〕 *(A) Except as provided in this paragraph, neither* the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

      〔(A)〕 *(i)* use the information furnished pursuant to an application filed under this section for any purpose other than to make a determination on the application or for en-

436

forcement of paragraph (6) or for the preparation of reports to Congress under section 404 of the Immigration Reform and Control Act of 1986,

〖(B)〗 *(ii)* make any publication whereby the information furnished by any particular individual can be identified, or

〖(C)〗 *(iii)* permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications〖;〗.

〖except that the〗

*(B) The* Attorney General may provide, in the Attorney General's discretion, for the furnishing of information furnished under this section in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

*(C) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien under this section to be used—*

*(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated; or*

*(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the legalization application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant.*

*(D)* Anyone who uses, publishes, or permits information to be examined in violation of this paragraph shall be fined in accordance with title 18, United States Code, or imprisoned not more than five years, or both.

*(E) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:*

*(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work) but only for purposes of a determination of whether the applicant is eligible for relief from deportation or removal and not otherwise.*

*(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.*

*(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.*

*(iv) The date or disposition of the application.*

\*      \*      \*      \*      \*      \*      \*

437

(f) Administrative and Judicial Review.—
　(1)  *  *  *

\*　　\*　　\*　　\*　　\*　　\*　　\*

　(4) Judicial review.—
　　(A) Limitation to review of deportation.—There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 106 *(as in effect before October 1, 1996)*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

RESCISSION OF ADJUSTMENT OF STATUS

Sec. 246. (a) If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 245 or 249 of this Act or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling ⟦deportation⟧ *removal* in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this Act to the same extent as if the adjustment of status had not been made. *Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

ADJUSTMENT OF STATUS OF CERTAIN RESIDENT ALIENS TO NONIMMIGRANT STATUS

Sec. 247. (a) The status of an alien lawfully admitted for permanent residence shall be adjusted by the Attorney General, under such regulations as he may prescribe, to that of a nonimmigrant under paragraph (15)(A), (15)(E), or (15)(G) of section 101(a), if such alien had at the time of ⟦entry⟧ *admission* or subsequently acquires an occupational status which would, if he were seeking admission to the United States, entitle him to a nonimmigrant status under such sections. As of the date of the Attorney General's order making such adjustment of status, the Attorney General shall cancel the record of the alien's admission for permanent residence, and the immigrant status of such alien shall thereby be terminated.

\*　　\*　　\*　　\*　　\*　　\*　　\*

CHANGE OF NONIMMIGRANT CLASSIFICATION

Sec. 248. The Attorney General may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status, except in the case of—

438

(1) an alien classified as a nonimmigrant under subparagraph (C), (D), (K), or (S) of section 101(a)(15),

\*   \*   \*   \*   \*   \*   \*

(4) an alien admitted as a nonimmigrant visitor without a visa under section 212(l) or section 217.

*Any alien whose status is changed under this section may apply to the Secretary of State for a visa without having to leave the United States and apply at the visa office.*

RECORD OF ADMISSION FOR PERMANENT RESIDENCE IN THE CASE OF CERTAIN ALIENS WHO ENTERED THE UNITED STATES PRIOR TO JULY 1, 1924 OR JANUARY 1, 1972

SEC. 249. A record of lawful admission for permanent residence may, in the discretion of the Attorney General and under such regulations as he may prescribe, be made in the case of any alien, as of the date of the approval of his application or, if entry occurred prior to July 1, 1924, as of the date of such entry, if no such record is otherwise available and such alien shall satisfy the Attorney General that he is not inadmissible under section 212(a)(3)(E) or under section 212(a) insofar as it relates to criminals, procurers and other immoral persons, subversives, violators of the narcotic laws or smugglers of aliens, and he establishes that he—

(a) entered the United States prior to January 1, 1972;

(b) has had his residence in the United States continuously since such entry;

(c) is a person of good moral character; and

(d) is not ineligible to citizenship *and is not deportable under section 237(a)(4)(B).*

\*   \*   \*   \*   \*   \*   \*

CHAPTER 6—SPECIAL PROVISIONS RELATING TO ALIEN CREWMEN

\*   \*   \*   \*   \*   \*   \*

CONDITIONAL PERMITS TO LAND TEMPORARILY

SEC. 252. (a)   \*  \*  \*

(b) Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1), take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be 【deported】 *removed* from the United States at the expense of the transportation line which brought him to the United States. Until such alien is so 【deported】 *removed*, any expenses of his detention shall be borne by such transportation company. Nothing in this section shall be construed to require the procedure prescribed

439

in section 【242】 *240* of this Act to cases falling within the provisions of this subsection.

\*        \*        \*        \*        \*        \*        \*

CONTROL OF ALIEN CREWMEN

SEC. 254. (a) The owner, agent, consignee, charterer, master, or commanding officer of any vessel or aircraft arriving in the United States from any place outside thereof who fails (1) to detain on board the vessel, or in the case of an aircraft to detain at a place specified by an immigration officer at the expense of the airline, any alien crewman employed thereon until an immigration officer has completely inspected such alien crewman, including a physical examination by the medical examiner, or (2) to detain any alien crewman on board the vessel, or in the case of an aircraft at a place specified by an immigration officer at the expense of the airline, after such inspection unless a conditional permit to land temporarily has been granted such alien crewman under section 252 or unless an alien crewman has been permitted to land temporarily under section 212(d)(5) or 253 for medical or hospital treatment, or (3) to 【deport】 *remove* such alien crewman if required to do so by an immigration officer, whether such 【deportation】 *removal* requirement is imposed before or after the crewman is permitted to land temporarily under section 212(d)(5), 252, or 253, shall pay to the Commissioner the sum of $3,000 for each alien crewman in respect of whom any such failure occurs. No such vessel or aircraft shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the Commissioner. The Attorney General may, upon application in writing therefor, mitigate such penalty to not less than $500 for each alien crewman in respect of whom such failure occurs, upon such terms as he shall think proper.

(b) Except as may be otherwise prescribed by regulations issued by the Attorney General, proof that an alien crewman did not appear upon the outgoing manifest of the vessel or aircraft on which he arrived in the United States from any place outside thereof, or that he was reported by the master or commanding officer of such vessel or aircraft as a deserter, shall be prima facie evidence of a failure to detain or 【deport】 *remove* such alien crewman.

(c) If the Attorney General finds that 【deportation】 *removal* of an alien crewman under this section on the vessel or aircraft on which he arrived is impracticable or impossible, or would cause undue hardship to such alien crewman, he may cause the alien crewman to be 【deported】 *removed* from the port of arrival or any other port on another vessel or aircraft of the same transportation line, unless the Attorney General finds this to be impracticable. All expenses incurred in connection with such 【deportation】 *removal*, including expenses incurred in transferring an alien crewman from one place in the United States to another under such conditions and safeguards as the Attorney General shall impose, shall be paid by the owner or owners of the vessel or aircraft on which the alien

440

arrived in the United States. The vessel or aircraft on which the alien arrived shall not be granted clearance until such expenses have been paid or their payment guaranteed to the satisfaction of the Attorney General. An alien crewman who is transferred within the United States in accordance with this subsection shall not be regarded as having been landed in the United States.

\*      \*      \*      \*      \*      \*      \*

LIMITATIONS ON PERFORMANCE OF LONGSHORE WORK BY ALIEN CREWMEN

SEC. 258. (a)  \* \* \*
(b) LONGSHORE WORK DEFINED.—
    (1)  \* \* \*
    (2) EXCEPTION FOR SAFETY AND ENVIRONMENTAL PROTEC-TION.—The term "longshore work" does not include the loading or unloading of any cargo for which the Secretary of Transportation has, under the authority contained in chapter 37 of title 46, United States Code (relating to Carriage of Liquid Bulk Dangerous Cargoes), section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321), section 4106 of the Oil Pollution Act of 1990, or ⟦section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)⟧ *section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code* prescribed regulations which govern—
        (A) the handling or stowage of such cargo,
        (B) the manning of vessels and the duties, qualifications, and training of the officers and crew of vessels carrying such cargo, and
        (C) the reduction or elimination of discharge during ballasting, tank cleaning, handling of such cargo.

\*      \*      \*      \*      \*      \*      \*

PROVISIONS GOVERNING REGISTRATION OF SPECIAL GROUPS

SEC. 263. (a) Notwithstanding the provisions of sections 261 and 262, the Attorney General is authorized to prescribe special regulations and forms for the registration and fingerprinting of (1) alien crewmen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order of ⟦deportation⟧ *removal*, ⟦and (5)⟧ *(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)* aliens of any other class not lawfully admitted to the United States for permanent residence.

\*      \*      \*      \*      \*      \*      \*

FORMS AND PROCEDURE

SEC. 264. (a)  \* \* \*

\*      \*      \*      \*      \*      \*      \*

*(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social*

441

*security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.*

\*       \*       \*       \*       \*       \*       \*

PENALTIES

SEC. 266. (a)  \* \* \*

(b) Any alien or any parent or legal guardian in the United States of any alien who fails to give written notice to the Attorney General, as required by section 265 of this title, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $200 or be imprisoned not more than thirty days, or both. Irrespective of whether an alien is convicted and punished as herein provided, any alien who fails to give written notice to the Attorney General, as required by section 265, shall be taken into custody and 【deported】 *removed* in the manner provided by chapter 【5】 *4* of this title, unless such alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

(c) Any alien or any parent or legal guardian of any alien, who files an application for registration containing statements known by him to be false, or who procures or attempts to procure registration of himself or another person through fraud, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000, or be imprisoned not more than six months, or both; and any alien so convicted shall, upon the warrant of the Attorney General, be taken into custody and be 【deported】 *removed* in the manner provided in chapter 【5】 *4* of this title.

\*       \*       \*       \*       \*       \*       \*

CHAPTER 8—GENERAL PENALTY PROVISIONS

\*       \*       \*       \*       \*       \*       \*

BRINGING IN ALIENS SUBJECT TO 【EXCLUSION】 *DENIAL OF ADMISSION ON A HEALTH-RELATED GROUND*

SEC. 272. (a) Any person who shall bring to the United States an alien (other than an alien crewman) who is 【excludable】 *inadmissible* under section 212(a)(1) shall pay to the Commissioner for each and every alien so afflicted the sum of $3,000 unless (1) the alien was in possession of a valid, unexpired immigrant visa, or (2) the alien was allowed to land in the United States, or (3) the alien was in possession of a valid unexpired nonimmigrant visa or other document authorizing such alien to apply for temporary admission to the United States or an unexpired reentry permit issued to him, and (A) such application was made within one hundred and twenty days of the date of issuance of the visa or other document, or in the case of an alien in possession of a reentry permit, within one hundred and twenty days of the date on which the alien was last examined and admitted by the Service, or (B) in the event the application was made later than one hundred and twenty days of the date of issuance of the visa or other document or such examination and admission, if such person establishes to the satisfaction of the Attorney General that the existence of the 【excluding condition】

442

*condition causing inadmissibility* could not have been detected by the exercise of due diligence prior to the alien's embarkation.

(b) No vessel or aircraft shall be granted clearance papers pending determination of the question of liability to the payment of any fine under this section, or while the fines remain unpaid, nor shall such fines be remitted or refunded; but clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fines or of a bond with sufficient surety to secure the payment thereof, approved by the Commissioner.

(c) Nothing contained in this section shall be construed to subject transportation companies to a fine for bringing to ports of entry in the United States aliens who are entitled by law to exemption from the ⟦excluding⟧ provisions of section 212(a).

(d) As used in this section, the term "person" means the owner, master, agent, commanding officer, charterer, or consignee of any vessel or aircraft.

UNLAWFUL BRINGING OF ALIENS INTO UNITED STATES

SEC. 273. (a)*(1)* It shall be unlawful for any person, including any transportation company, or the owner, master, commanding officer, agent, charterer, or consignee of any vessel or aircraft, to bring to the United States from any place outside thereof (other than from foreign contiguous territory) any alien who does not have a valid passport and an unexpired visa, if a visa was required under this Act or regulations issued thereunder.

*(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.*

(b) If it appears to the satisfaction of the Attorney General that any alien has been so brought, such person, or transportation company, or the master, commanding officer, agent, owner, charterer, or consignee of any such vessel or aircraft, shall pay to the Commissioner a fine of $3,000 for each alien so brought, and, except in the case of any such alien who is admitted, or permitted to land temporarily, in addition, an amount equal to that paid by such alien for his transportation from the initial point of departure, indicated in his ticket, to the port of arrival, such latter fine to be delivered by the Commissioner to the alien on whose account the assessment is made. No vessel or aircraft shall be granted clearance pending the determination of the liability to the payment of such fine or while such fine ⟦remain⟧ *remains* unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of an amount sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the Commissioner.

\*          \*          \*          \*          \*          \*          \*

⟦(d) The owner, charterer, agent, consignee, commanding officer, or master of any vessel or aircraft arriving at the United States from any place outside the United States who fails to deport any alien stowaway on the vessel or aircraft on which such stowaway

443

arrived or on another vessel or aircraft at the expense of the vessel or aircraft on which such stowaway arrived when required to do so by an immigration officer, shall pay to the Commissioner the sum of $3,000 for each alien stowaway, in respect of whom any such failure occurs. Pending final determination of liability for such fine, no such vessel or aircraft shall be granted clearance, except that clearance may be granted upon the deposit of an amount sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the Commissioner. The provisions of section 235 for detention of aliens for examination before special inquiry officers and the right of appeal provided for in section 236 shall not apply to aliens who arrive as stowaways and no such alien shall be permitted to land in the United States, except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure or removal or deportation of such alien from the United States.⟧

\*        \*        \*        \*        \*        \*        \*

BRINGING IN AND HARBORING CERTAIN ALIENS

SEC. 274. (a) CRIMINAL PENALTIES.—(1)(A)  \*  \*  \*

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

    (i) in the case of a violation of subparagraph (A)(i) *or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain*, be fined under title 18, United States Code, imprisoned not more than 10 years, or both;

\*        \*        \*        \*        \*        \*        \*

    *(C) Any person who engages in any conspiracy to commit, or aids or abets the commission of, any of the acts described in—*

        *(i) subparagraph (A)(i) shall be fined under title 18, United States Code, imprisoned not more than 10 years, or both; or*

        *(ii) clause (ii), (iii), or (iv) of subparagraph (A) shall be fined under title 18, United States Code, imprisoned not more than 5 years, or both.*

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, ⟦for each transaction constituting a violation of this paragraph, regardless of the number of aliens involved⟧ *for each alien in respect to whom a violation of this paragraph occurs*—

    (A) be fined in accordance with title 18, United States Code, or imprisoned not more than one year, or both; or

    (B) in the case of—

        (i) a second or subsequent offense,

        (ii) an offense done for the purpose of commercial advantage or private financial gain, ⟦or⟧

        (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry, *or*

444

*(iv) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,*

⟦be fined in accordance with title 18, United States Code, or in the case of a violation of subparagraph (B)(ii), imprisoned not more than 10 years, or both; or in the case of a violation of subparagraph (B)(i) or (B)(iii), imprisoned not more than 5 years, or both.⟧ *be fined under title 18, United States Code, and shall be imprisoned not less than 3 years or more than 10 years.*

\*       \*       \*       \*       \*       \*       \*

UNLAWFUL EMPLOYMENT OF ALIENS

SEC. 274A. (a) MAKING EMPLOYMENT OF UNAUTHORIZED ALIENS UNLAWFUL.—

    (1)  \* \* \*

\*       \*       \*       \*       \*       \*       \*

    (3) DEFENSE.—*(A)* A person or entity that establishes that it has complied in good faith with the requirements of subsection (b) with respect to the hiring, recruiting, or referral for employment of an alien in the United States has established an affirmative defense that the person or entity has not violated paragraph (1)(A) with respect to such hiring, recruiting, or referral.

    *(B) FAILURE TO SEEK AND OBTAIN CONFIRMATION.—Subject to subsection (b)(7), in the case of a hiring of an individual for employment in the United States by a person or entity that employs more than 3 employees, the following rules apply:*

        *(i) FAILURE TO SEEK CONFIRMATION.—*

            *(I) IN GENERAL.—If the person or entity has not made an inquiry, under the mechanism established under subsection (b)(6), seeking confirmation of the identity, social security number, and work eligibility of the individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring, the defense under subparagraph (A) shall not be considered to apply with respect to any employment after such 3 working days, except as provided in subclause (II).*

            *(II) SPECIAL RULE FOR FAILURE OF CONFIRMATION MECHANISM.—If such a person or entity in good faith attempts to make an inquiry during such 3 working days in order to qualify for the defense under subparagraph (A) and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses and qualify for the defense.*

445

(ii) FAILURE TO OBTAIN CONFIRMATION.—If the person or entity has made the inquiry described in clause (i)(I) but has not received an appropriate confirmation of such identity, number, and work eligibility under such mechanism within the time period specified under subsection (b)(6)(D)(iii) after the time the confirmation inquiry was received, the defense under subparagraph (A) shall not be considered to apply with respect to any employment after the end of such time period.

\*     \*     \*     \*     \*     \*     \*

(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOY-EES.—

(A) IN GENERAL.—For purposes of paragraphs (1)(B) and (3), if—

(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

(B) PERIOD.—The period described in this subparagraph is—

(i) up to 5 years in the case of an individual who has presented documentation identifying the individual as a national of the United States or as an alien lawfully admitted for permanent residence; or

(ii) up to 3 years (or, if less, the period of time that the individual is authorized to be employed in the United States) in the case of another individual.

(C) LIABILITY.—

(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an unauthorized alien, then for the purposes of paragraph (1)(A), subject to clause (ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an unauthorized alien.

(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and

446

*could not reasonably have known) that the individual at the time of hiring or afterward was an unauthorized alien.*

(b) EMPLOYMENT VERIFICATION SYSTEM.—The requirements referred to in paragraphs (1)(B) and (3) of subsection (a) are, in the case of a person or other entity hiring, recruiting, or referring an individual for employment in the United States, the requirements specified in the following three paragraphs:

(1) ATTESTATION AFTER EXAMINATION OF DOCUMENTATION.—

(A) * * *

(B) DOCUMENTS ESTABLISHING BOTH EMPLOYMENT AUTHORIZATION AND IDENTITY.—A document described in this subparagraph is an individual's—

(i) United States passport; *or*

⟦(ii) certificate of United States citizenship;

⟦(iii) certificate of naturalization;

⟦(iv) unexpired foreign passport, if the passport has an appropriate, unexpired endorsement of the Attorney General authorizing the individual's employment in the United States; or⟧

⟦(v)⟧ *(ii)* resident alien card ⟦or other alien registration card, if the card⟧, *alien registration card, or other document designated by regulation by the Attorney General, if the document—*

(I) contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this subsection, and

(II) is evidence of authorization of employment in the United States.

⟦(C) DOCUMENTS EVIDENCING EMPLOYMENT AUTHORIZATION.—A document described in this subparagraph is an individual's—

⟦(i) social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States);

⟦(ii) certificate of birth in the United States or establishing United States nationality at birth, which certificate the Attorney General finds, by regulation, to be acceptable for purposes of this section; or

⟦(iii) other documentation evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable for purposes of this section.⟧

*(C) SOCIAL SECURITY ACCOUNT NUMBER CARD AS EVIDENCE OF EMPLOYMENT AUTHORIZATION.—A document described in this subparagraph is an individual's social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States).*

447

(D) DOCUMENTS ESTABLISHING IDENTITY OF INDIVID-UAL.—A document described in this subparagraph is an individual's—

(i) driver's license or similar document issued for the purpose of identification by a State, if it contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this section; or

(ii) in the case of individuals under 16 years of age or in a State which does not provide for issuance of an identification document (other than a driver's license) referred to in clause (i), documentation of personal identity of such other type as the Attorney General finds, by regulation, provides a reliable means of identification.

⟦(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZA-TION.—The individual must attest, under penalty of perjury on the form designated or established for purposes of paragraph (1), that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this Act or by the Attorney General to be hired, recruited, or referred for such employment.

⟦(3) RETENTION OF VERIFICATION FORM.—After completion of such form in accordance with paragraphs (1) and (2), the person or entity must retain the form and make it available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending—

⟦(A) in the case of the recruiting or referral for a fee (without hiring) of an individual, three years after the date of the recruiting or referral, and

⟦(B) in the case of the hiring of an individual—

⟦(i) three years after the date of such hiring, or

⟦(ii) one year after the date the individual's employment is terminated,

whichever is later.⟧

*(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZATION AND PROVISION OF SOCIAL SECURITY ACCOUNT NUMBER.—The individual must—*

*(A) attest, under penalty of perjury on the form designated or established for purposes of paragraph (1), that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this Act or by the Attorney General to be hired, recruited, or referred for such employment; and*

*(B) provide on such form the individual's social security account number.*

*(3) RETENTION OF VERIFICATION FORM AND CONFIRMATION.—After completion of such form in accordance with paragraphs (1) and (2), the person or entity must—*

448

(A) retain the form and make it available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending—

(i) in the case of the recruiting or referral for a fee (without hiring) of an individual, three years after the date of the recruiting or referral, and

(ii) in the case of the hiring of an individual—

(I) three years after the date of such hiring, or

(II) one year after the date the individual's employment is terminated,

whichever is later; and

(B) subject to paragraph (7), if the person employs more than 3 employees, seek to have (within 3 working days of the date of hiring) and have (within the time period specified under paragraph (6)(D)(iii)) the identity, social security number, and work eligibility of the individual confirmed in accordance with the procedures established under paragraph (6), except that if the person or entity in good faith attempts to make an inquiry in accordance with the procedures established under paragraph (6) during such 3 working days in order to fulfill the requirements under this subparagraph, and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity shall make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses.

(4) COPYING OF DOCUMENTATION PERMITTED.—Notwithstanding any other provision of law, the person or entity may copy a document presented by an individual pursuant to this subsection and may retain the copy, but only (except as otherwise permitted under law) for the purpose of complying with the requirements of this subsection.

(5) LIMITATION ON USE OF ATTESTATION FORM.—A form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this Act and sections 1001, 1028, 1546, and 1621 of title 18, United States Code.

(6) EMPLOYMENT ELIGIBILITY CONFIRMATION PROCESS.—

(A) IN GENERAL.—Subject to paragraph (7), the Attorney General shall establish a confirmation mechanism through which the Attorney General (or a designee of the Attorney General which may include a nongovernmental entity)—

(i) responds to inquiries by employers, made through a toll-free telephone line or other electronic media in the form of an appropriate confirmation code or otherwise, on whether an individual is authorized to be employed by that employer, and

(ii) maintains a record that such an inquiry was made and the confirmation provided (or not provided).

449

(B) EXPEDITED PROCEDURE IN CASE OF NO CONFIRMATION.—In connection with subparagraph (A), the Attorney General shall establish, in consultation with the Commissioner of Social Security and the Commissioner of the Service, expedited procedures that shall be used to confirm the validity of information used under the confirmation mechanism in cases in which the confirmation is sought but is not provided through the confirmation mechanism.

(C) DESIGN AND OPERATION OF MECHANISM.—The confirmation mechanism shall be designed and operated—

(i) to maximize the reliability of the confirmation process, and the ease of use by employers, recruiters, and referrers, consistent with insulating and protecting the privacy and security of the underlying information, and

(ii) to respond to all inquiries made by employers on whether individuals are authorized to be employed by those employers, recruiters, or referrers registering all times when such response is not possible.

(D) CONFIRMATION PROCESS.—(i) As part of the confirmation mechanism, the Commissioner of Social Security shall establish a reliable, secure method, which within the time period specified under clause (iii), compares the name and social security account number provided against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided and whether the individual has presented a social security account number that is not valid for employment. The Commissioner shall not disclose or release social security information.

(ii) As part of the confirmation mechanism, the Commissioner of the Service shall establish a reliable, secure method, which, within the time period specified under clause (iii), compares the name and alien identification number (if any) provided against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided and whether the alien is authorized to be employed in the United States.

(iii) For purposes of this section, the Attorney General (or a designee of the Attorney General) shall provide through the confirmation mechanism confirmation or a tentative nonconfirmation of an individual's employment eligibility within 3 working days of the initial inquiry. In cases of tentative nonconfirmation, the Attorney General shall specify, in consultation with the Commissioner of Social Security and the Commissioner of the Service, an expedited time period not to exceed 10 working days within which final confirmation or denial must be provided through the confirmation mechanism in accordance with the procedures under subparagraph (B).

(iv) The Commissioners shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information.

450

(E) PROTECTIONS.—(i) In no case shall an individual be denied employment because of inaccurate or inaccessible data under the confirmation mechanism.

(ii) The Attorney General shall assure that there is a timely and accessible process to challenge nonconfirmations made through the mechanism.

(iii) If an individual would not have been dismissed from a job but for an error of the confirmation mechanism, the individual will be entitled to compensation through the mechanism of the Federal Tort Claims Act.

(F) TESTER PROGRAM.—As part of the confirmation mechanism, the Attorney General shall implement a program of testers and investigative activities (similar to testing and other investigative activities assisted under the fair housing initiatives program under section 561 of the Housing and Community Development Act of 1987 to enforce rights under the Fair Housing Act) in order to monitor and prevent unlawful discrimination under the mechanism.

(G) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE EMPLOYMENT ELIGIBILITY CONFIRMATION MECHANISM.—No person shall be civilly or criminally liable for any action taken in good faith reliance on information provided through the employment eligibility confirmation mechanism established under this paragraph (including any pilot program established under paragraph (7)).

(7) APPLICATION OF CONFIRMATION MECHANISM THROUGH PILOT PROJECTS.—

(A) IN GENERAL.—Subsection (a)(3)(B) and paragraph (3) shall only apply to individuals hired if they are covered under a pilot project established under this paragraph.

(B) UNDERTAKING PILOT PROJECTS.—For purposes of this paragraph, the Attorney General shall undertake pilot projects for all employers in at least 5 of the 7 States with the highest estimated population of unauthorized aliens, in order to test and assure that the confirmation mechanism described in paragraph (6) is reliable and easy to use. Such projects shall be initiated not later than 6 months after the date of the enactment of this paragraph. The Attorney General, however, shall not establish such mechanism in other States unless Congress so provides by law. The pilot projects shall terminate on such dates, not later than October 1, 1999, as the Attorney General determines. At least one such pilot project shall be carried out through a nongovernmental entity as the confirmation mechanism.

(C) REPORT.—The Attorney General shall submit to the Congress annual reports in 1997, 1998, and 1999 on the development and implementation of the confirmation mechanism under this paragraph. Such reports may include an analysis of whether the mechanism implemented—

(i) is reliable and easy to use;

(ii) limits job losses due to inaccurate or unavailable data to less than 1 percent;

(iii) increases or decreases discrimination;

451

*(iv) protects individual privacy with appropriate policy and technological mechanisms; and*

*(v) burdens individual employers with costs or additional administrative requirements.*

*       *       *       *       *       *       *

(e) COMPLIANCE.—

(1) COMPLAINTS AND INVESTIGATIONS.—The Attorney General shall establish procedures—

(A) for individuals and entities to file written, signed complaints respecting potential violations of subsection (a) or (g)(1),

(B) for the investigation of those complaints which, on their face, have a substantial probability of validity,

(C) for the investigation of such other violations of subsection (a) or (g)(1) as the Attorney General determines to be appropriate, ⟦and⟧

(D) for the designation in the Service of a unit which has, as its primary duty, the prosecution of cases of violations of subsection (a) or (g)(1) under this subsection⟦.⟧, *and*

*(E) under which a person or entity shall not be considered to have failed to comply with the requirements of subsection (b) based upon a technical or procedural failure to meet a requirement of such subsection in which there was a good faith attempt to comply with the requirement unless (i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure, (ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and (iii) the person or entity has not corrected the failure voluntarily within such period, except that this subparagraph shall not apply with respect to the engaging by any person or entity of a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).*

*       *       *       *       *       *       *

⟦(i) EFFECTIVE DATES.—

⟦(1) 6-MONTH PUBLIC INFORMATION PERIOD.—During the six-month period beginning on the first day of the first month after the date of the enactment of this section—

⟦(A) the Attorney General, in cooperation with the Secretaries of Agriculture, Commerce, Health and Human Services, Labor, and the Treasury and the Administrator of the Small Business Administration, shall disseminate forms and information to employers, employment agencies, and organizations representing employees and provide for public education respecting the requirements of this section, and

⟦(B) the Attorney General shall not conduct any proceeding, nor issue any order, under this section on the basis of any violation alleged to have occurred during the period.

⟦(2) 12-MONTH FIRST CITATION PERIOD.—In the case of a person or entity, in the first instance in which the Attorney Gen-

452

eral has reason to believe that the person or entity may have violated subsection (a) during the subsequent 12-month period, the Attorney General shall provide a citation to the person or entity indicating that such a violation or violations may have occurred and shall not conduct any proceeding, nor issue any order, under this section on the basis of such alleged violation or violations.

⟦(3) DEFERRAL OF ENFORCEMENT WITH RESPECT TO SEASONAL AGRICULTURAL SERVICES.—

⟦(A) IN GENERAL.—Except as provided in subparagraph (B), before the end of the application period (as defined in subparagraph (C)(i)), the Attorney General shall not conduct any proceeding, nor impose any penalty, under this section on the basis of any violation alleged to have occurred with respect to employment of an individual in seasonal agricultural services.

⟦(B) PROHIBITION OF RECRUITMENT OUTSIDE THE UNITED STATES.—

⟦(i) IN GENERAL.—During the application period, it is unlawful for a person or entity (including a farm labor contractor) or an agent of such a person or entity, to recruit an unauthorized alien (other than an alien described in clause (ii)) who is outside the United States to enter the United States to perform seasonal agricultural services.

⟦(ii) EXCEPTION.—Clause (i) shall not apply to an alien who the person or entity reasonably believes meets the requirements of section 210(a)(2) of this Act (relating to performance of seasonal agricultural services).

⟦(iii) PENALTY FOR VIOLATION.—A person, entity, or agent that violates clause (i) shall be deemed to be subject to an order under this section in the same manner as if it had violated subsection (a)(1)(A), without regard to paragraph (2) of this subsection.

⟦(C) DEFINITIONS.—In this paragraph:

⟦(i) APPLICATION PERIOD.—The term "application period" means the period described in section 210(a)(1).

⟦(ii) SEASONAL AGRICULTURAL SERVICES.—The term "seasonal agricultural services" has the meaning given such term in section 210(h).

⟦(j) GENERAL ACCOUNTING OFFICE REPORTS.—

⟦(1) IN GENERAL.—Beginning one year after the date of enactment of this section, and at intervals of one year thereafter for a period of three years after such date, the Comptroller General shall prepare and transmit to the Congress and to the taskforce established under subsection (k) a report describing the results of a review of the implementation and enforcement of this section during the preceding twelve-month period, for the purpose of determining if—

⟦(A) such provisions have been carried out satisfactorily;

⟦(B) a pattern of discrimination has resulted against citizens or nationals of the United States or against eligible workers seeking employment; and

453

〖(C) an unnecessary regulatory burden has been created for employers hiring such workers.

〖(2) DETERMINATION ON DISCRIMINATION.—In each report, the Comptroller General shall make a specific determination as to whether the implementation of this section has resulted in a pattern of discrimination in employment (against other than unauthorized aliens) on the basis of national origin.

〖(3) RECOMMENDATIONS.—If the Comptroller General has determined that such a pattern of discrimination has resulted, the report—

〖(A) shall include a description of the scope of that discrimination, and

〖(B) may include recommendations for such legislation as may be appropriate to deter or remedy such discrimination.

〖(k) REVIEW BY TASKFORCE.—

〖(1) ESTABLISHMENT OF JOINT TASKFORCE.—The Attorney General, jointly with the Chairman of the Commission on Civil Rights and the Chairman of the Equal Employment Opportunity Commission, shall establish a taskforce to review each report of the Comptroller General transmitted under subsection (j)(1).

〖(2) RECOMMENDATIONS TO CONGRESS.—If the report transmitted includes a determination that the implementation of this section has resulted in a pattern of discrimination in employment (against other than unauthorized aliens) on the basis of national origin, the taskforce shall, taking into consideration any recommendations in the report, report to Congress recommendations for such legislation as may be appropriate to deter or remedy such discrimination.

〖(3) CONGRESSIONAL HEARINGS.—The Committees on the Judiciary of the House of Representatives and of the Senate shall hold hearings respecting any report of the taskforce under paragraph (2) within 60 days after the date of receipt of the report.

〖(l) TERMINATION DATE FOR EMPLOYER SANCTIONS.—

〖(1) IF REPORT OF WIDESPREAD DISCRIMINATION AND CONGRESSIONAL APPROVAL.—The provisions of this section shall terminate 30 calendar days after receipt of the last report required to be transmitted under subsection (j), if—

〖(A) the Comptroller General determines, and so reports in such report, that a widespread pattern of discrimination has resulted against citizens or nationals of the United States or against eligible workers seeking employment solely from the implementation of this section; and

〖(B) there is enacted, within such period of 30 calendar days, a joint resolution stating in substance that the Congress approves the findings of the Comptroller General contained in such report.

〖(2) SENATE PROCEDURES FOR CONSIDERATION.—Any joint resolution referred to in clause (B) of paragraph (1) shall be considered in the Senate in accordance with subsection (n).

〖(m) EXPEDITED PROCEDURES IN THE HOUSE OF REPRESENTATIVES.—For the purpose of expediting the consideration and adop-

454

tion of joint resolutions under subsection (l), a motion to proceed to the consideration of any such joint resolution after it has been reported by the appropriate committee shall be treated as highly privileged in the House of Representatives.

〔(n) Expedited Procedures in the Senate.—

〔(1) Continuity of session.—For purposes of subsection (l), the continuity of a session of Congress is broken only by an adjournment of the Congress sine die, and the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of the period indicated.

〔(2) Rulemaking power.—Paragraphs (3) and (4) of this subsection are enacted—

〔(A) as an exercise of the rulemaking power of the Senate and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the procedure to be followed in the Senate in the case of joint resolutions referred to in subsection (l), and supersede other rules of the Senate only to the extent that such paragraphs are inconsistent therewith; and

〔(B) with full recognition of the constitutional right of the Senate to change such rules at any time, in the same manner as in the case of any other rule of the Senate.

〔(3) Committee consideration.—

〔(A) Motion to discharge.—If the committee of the Senate to which has been referred a joint resolution relating to the report described in subsection (l) has not reported such joint resolution at the end of ten calendar days after its introduction, not counting any day which is excluded under paragraph (1) of this subsection, it is in order to move either to discharge the committee from further consideration of the joint resolution or to discharge the committee from further consideration of any other joint resolution introduced with respect to the same report which has been referred to the committee, except that no motion to discharge shall be in order after the committee has reported a joint resolution with respect to the same report.

〔(B) Consideration of motion.—A motion to discharge under subparagraph (A) of this paragraph may be made only by a Senator favoring the joint resolution, is privileged, and debate thereon shall be limited to not more than 1 hour, to be divided equally between those favoring and those opposing the joint resolution, the time to be divided equally between, and controlled by, the majority leader and the minority leader or their designees. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

〔(4) Motion to proceed to consideration.—

〔(A) In general.—A motion in the Senate to proceed to the consideration of a joint resolution shall be privileged. An amendment to the motion shall not be in order, nor

455

shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

〚(B) DEBATE ON RESOLUTION.—Debate in the Senate on a joint resolution, and all debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, to be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

〚(C) DEBATE ON MOTION.—Debate in the Senate on any debatable motion or appeal in connection with a joint resolution shall be limited to not more than 1 hour, to be equally divided between, and controlled by, the mover and the manager of the joint resolution, except that in the event the manager of the joint resolution is in favor of any such motion or appeal, the time in opposition thereto shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a joint resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

〚(D) MOTIONS TO LIMIT DEBATE.—A motion in the Senate to further limit debate on a joint resolution, debatable motion, or appeal is not debatable. No amendment to, or motion to recommit, a joint resolution is in order in the Senate.〛

UNFAIR IMMIGRATION-RELATED EMPLOYMENT PRACTICES

SEC. 274B. (a) PROHIBITION OF DISCRIMINATION BASED ON NATIONAL ORIGIN OR CITIZENSHIP STATUS.—

(1)   * * *

\*         \*         \*         \*         \*         \*         \*

(3) DEFINITION OF PROTECTED INDIVIDUAL.—As used in paragraph (1), the term "protected individual" means an individual who—

(A) is a citizen or national of the United States, or

(B) is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a)〚, 210A(a),〛 or 245A(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208; but does not include (i) an alien who fails to apply for naturalization within six months of the date the alien first becomes eligible (by virtue of period of lawful permanent residence) to apply for naturalization or, if later, within six months after the date of the enactment of this section and (ii) an alien who has applied on a timely basis, but has not been naturalized as a citizen within 2 years after the date of the application, unless the alien can establish that the alien is actively pursuing naturalization, except that time consumed in the Service's processing the application shall not be counted toward the 2-year period.

\*         \*         \*         \*         \*         \*         \*

456

(6) TREATMENT OF CERTAIN DOCUMENTARY PRACTICES AS EM-
PLOYMENT PRACTICES.—**[**For**]** *(A) Subject to subparagraph (B),
for* purposes of paragraph (1), a person's or other entity's re-
quest, for purposes of satisfying the requirements of section
274A(b), for more or different documents than are required
under such section or refusing to honor documents tendered
that on their face reasonably appear to be genuine shall be
treated as an unfair immigration-related employment practice
relating to the hiring of individuals.

*(B) A person or other entity—*

*(i) may request a document proving a renewal of employ-
ment authorization when an individual has previously sub-
mitted a time-limited document to satisfy the requirements
of section 274A(b)(1); or*

*(ii) if possessing reason to believe that an individual pre-
senting a document which reasonably appears on its face to
be genuine is nonetheless an unauthorized alien, (I) may
inform the individual of the question about the document's
validity, and of such person or other entity's intention to
verify the validity of such document, and (II) upon receiv-
ing confirmation that the individual is unauthorized to
work, may dismiss the individual with no benefits or rights
accruing on the basis of the period employed.*

*Nothing in this provision prohibits an individual from offering
alternative documents that satisfy the requirements of section
274A(b)(1).*

\*          \*          \*          \*          \*          \*          \*

(g) DETERMINATIONS.—

(1) ORDER.—The administrative law judge shall issue and
cause to be served on the parties to the proceeding an order,
which shall be final unless appealed as provided under sub-
section (i).

(2) ORDERS FINDING VIOLATIONS.—

(A) IN GENERAL.—If, upon the preponderance of the evi-
dence, an administrative law judge determines that any
person or entity named in the complaint has engaged in or
is engaging in any such unfair immigration-related em-
ployment practice, then the judge shall state his findings
of fact and shall issue and cause to be served on such per-
son or entity an order which requires such person or entity
to cease and desist from such unfair immigration-related
employment practice. *Such order also shall require the per-
son or entity to comply with the requirements of clauses (ii)
and (vi) of subparagraph (B).*

(B) CONTENTS OF ORDER.—**[**Such an order**]** *Subject to
the second sentence of subparagraph (A), such an order* also
may require the person or entity—

(i) to comply with the requirements of section
274A(b) with respect to individuals hired (or recruited
or referred for employment for a fee) during a period
of up to three years;

\*          \*          \*          \*          \*          \*          \*

457

(vi) to educate all personnel involved in hiring and complying with this section or section 274A about the requirements of this section or such section *and to certify the fact of such education*;

\*       \*       \*       \*       \*       \*       \*

PENALTIES FOR DOCUMENT FRAUD

SEC. 274C. (a) ACTIVITIES PROHIBITED.—It is unlawful for any person or entity knowingly—

(1) to forge, counterfeit, alter, or falsely make any document for the purpose of satisfying a requirement of this Act,

(2) to use, attempt to use, possess, obtain, accept, or receive or to provide any forged, counterfeit, altered, or falsely made document in order to satisfy any requirement of this Act,

(3) to use or attempt to use or to provide or attempt to provide any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of satisfying a requirement of this Act, 【or】

(4) to accept or receive or to provide any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of complying with section 274A(b)【.】,

*(5) in reckless disregard of the fact that the information is false or does not relate to the applicant, to prepare, to file, or to assist another in preparing or filing, documents which are falsely made for the purpose of satisfying a requirement of this Act,*

*(6) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States and to fail to present such document to an immigration officer upon arrival at a United States port of entry, or*

*(7) to prepare or assist in the preparation and submission of immigration forms, petitions, and applications if the person or entity is not authorized to represent aliens, or to prepare or assist in the preparation and submission of such forms, petitions, and applications pursuant to regulations promulgated by the Attorney General.*

*For purposes of this section, the term "falsely made" includes, with respect to a document or application, the preparation or provision of the document or application with knowledge or in reckless disregard of the fact that such document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a material fact pertaining to the document or application. The Attorney General may, in the discretion of the Attorney General, waive the penalties of this section with respect to an alien who knowingly violates paragraph (6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).*

\*       \*       \*       \*       \*       \*       \*

(d) ENFORCEMENT.—

458

(1)   * * *

\* \* \* \* \* \* \* \*

(3) Cease and desist order with civil money penalty.— With respect to a violation of subsection (a), the order under this subsection shall require the person or entity to cease and desist from such violations and to pay a civil penalty in an amount of—

(A) not less than $250 and not more than $2,000 for ⟦each document used, accepted, or created and each instance of use, acceptance, or creation⟧ *each instance of a violation under subsection (a)*, or

(B) in the case of a person or entity previously subject to an order under this paragraph, not less than $2,000 and not more than $5,000 for ⟦each document used, accepted, or created and each instance of use, acceptance, or creation⟧ *each instance of a violation under subsection (a).*

In applying this subsection in the case of a person or entity composed of distinct, physically separate subdivisions each of which provides separately for the hiring, recruiting, or referring for employment, without reference to the practices of, and not under the control of or common control with, another subdivision, each such subdivision shall be considered a separate person or entity.

\* \* \* \* \* \* \*

*(e) Criminal Penalties for Failure To Disclose Role as Document Preparer.—*

*(1) If a person is required by law or regulation to disclose the fact that the person, on behalf of another person and for a fee or other remuneration, has prepared or assisted in preparing an application for asylum pursuant to section 208, or the regulations promulgated thereunder, and the person knowingly and willfully fails to disclose, conceals, or covers up such fact, and the application was falsely made, the person shall—*

*(A) be imprisoned for not less than 2 nor more than 5 years, fined in accordance with title 18, United States Code, or both, and*

*(B) be prohibited from preparing or assisting in preparing, regardless of whether for a fee or other remuneration, any other such application for a period of at least 5 years and not more than 15 years.*

*(2) Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for asylum pursuant to section 208, or the regulations promulgated thereunder, regardless of whether for a fee or other remuneration, in violation of paragraph (1)(B) shall be imprisoned for not less than 5 years or more than 15 years, fined in accordance with title 18, United States Code, or both, and prohibited from preparing or assisting in preparing any other such application.*

*civil penalties for failure to depart*

*Sec. 274D. (a) In General.—Any alien subject to a final order of removal who—*

459

    *(1) willfully fails or refuses to—*
      *(A) depart from the United States pursuant to the order,*
      *(B) make timely application in good faith for travel or other documents necessary for departure, or*
      *(C) present for removal at the time and place required by the Attorney General; or*
    *(2) conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,*
*shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.*

    *(b)* CONSTRUCTION.—*Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.*

ENTRY OF ALIEN AT IMPROPER TIME OR PLACE; MISREPRESENTATION AND CONCEALMENT OF FACTS

    SEC. 275. (a) Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under title 18, United States Code, or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under title 18, United States Code, or imprisoned not more than 2 years, or both.

    *(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—*
    *(1) at least $50 and not more than $250 for each such entry (or attempted entry), or*
    *(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.*
*Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.*

    〔(b)〕 *(c)* An individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both.

    〔(c)〕 *(d)* Any individual who knowingly establishes a commercial enterprise for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, fined in accordance with title 18, United States Code, or both.

REENTRY OF 〔DEPORTED〕 *REMOVED* ALIEN

    SEC. 276. (a) Subject to subsection (b), any alien who—
    (1) has been arrested and 〔deported or excluded and deported〕 *denied admission or removed,* and thereafter
    (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place

460

outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously 〖excluded and deported〗 *denied admission and removed*, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,

shall be fined under title 18, United States Code, or imprisoned not more than 2 years, or both.

(b) Notwithstanding subsection (a), in the case of any alien described in such subsection—

(1) whose 〖deportation〗 *removal* was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under title 18, United States Code, imprisoned not more than 10 years, or both; 〖or〗

(2) whose 〖deportation〗 *removal* was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both〖.〗 *; or*

*(3) who has been removed from the United States pursuant to subsection 235(c) because the alien was inadmissible under subsection 212(a)(3)(B) or who has been removed from the United States pursuant to the provisions of title V, and who thereafter, without the permission of the Attorney General, enters the United States or attempts to do so shall be fined under title 18, United States Code, and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence.*

For the purposes of this subsection, the term "〖deportation〗 *removal*" includes any agreement in which an alien stipulates to 〖deportation〗 *removal* during a criminal trial under either Federal or State law.

AIDING OR ASSISTING CERTAIN ALIENS TO ENTER THE UNITED STATES

SEC. 277. Any person who knowingly aids or assists any alien 〖excludable〗 *inadmissible* under section 212(a)(2) (insofar as an alien 〖excludable〗 *inadmissible* under such section has been convicted of an aggravated felony) or 212(a)(3) (other than subparagraph (E) thereof) to enter the United States, or who connives or conspires with any person or persons to allow, procure, or permit any such alien to enter the United States, shall be fined under title 18, United States Code, or imprisoned not more than 10 years, or both.

\*        \*        \*        \*        \*        \*        \*

JURISDICTION OF DISTRICT COURTS

SEC. 279. 〖The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this title.〗 *The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by*

461

*the United States that arise under the provisions of this title.* It shall be the duty of the United States attorney of the proper district to prosecute every such suit when brought by the United States. Notwithstanding any other law, such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with a violation under section 275 or 276 may be apprehended. No suit or proceeding for a violation of any of the provisions of this title shall be settled, compromised, or discontinued without the consent of the court in which it is pending and any such settlement, compromise, or discontinuance shall be entered of record with the reasons therefor. *Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.*

COLLECTION OF PENALTIES AND EXPENSES

SEC. 280. (a) Notwithstanding any other provisions of this title, the withholding or denial of clearance of or a lien upon any vessel or aircraft provided for in section 231, 【237, 239, 243】 *234, 243(c)(2)*, 251, 253, 254, 255, 256, 271, 272, or 273 of this title shall not be regarded as the sole and exclusive means or remedy for the enforcement of payments of any fine, penalty or expenses imposed or incurred under such sections, but, in the discretion of the Attorney General, the amount thereof may be recovered by civil suit, in the name of the United States, from any person made liable under any of such sections.

【(b) Notwithstanding section 3302 of title 31, United States Code, the increase in penalties collected resulting from the amendments made by sections 203(b), 543(a), and 544 of the Immigration Act of 1990 shall be credited to the appropriation—

　　【(1) for the Immigration and Naturalization Service for activities that enhance enforcement of provisions of this title, including—

　　　　【(A) the identification, investigation, and apprehension of criminal aliens,

　　　　【(B) the implementation of the system described in section 242(a)(3)(A), and

　　　　【(C) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States; and

　　【(2) for the Executive Office for Immigration Review in the Department of Justice for the purpose of removing the backlogs in the preparation of transcripts of deportation proceedings conducted under section 242.】

*(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the "Immigration Enforcement Account". Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.*

　　*(2) The amounts described in this paragraph are the following:*

　　　　*(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.*

462

(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).

(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title, including—

(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;

(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and

(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.

(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

CHAPTER 9—MISCELLANEOUS

\*       \*       \*       \*       \*       \*       \*

DISPOSITION OF MONEYS COLLECTED UNDER THE PROVISIONS OF THIS TITLE

SEC. 286. (a)   \*   \*   \*

\*       \*       \*       \*       \*       \*       \*

(h) DISPOSITION OF RECEIPTS.—(1)(A) There is established in the general fund of the Treasury a separate account which shall be known as the "Immigration User Fee Account". Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration User Fee Account all fees collected under subsection (d) of this section, to remain available until expended. At the end of each 2-year period, beginning with the creation of this account, the Attorney General, following a public rulemaking with opportunity for notice and comment, shall submit a report to the Congress concerning the status of the account, including any balances therein, and recommend any adjustment in the prescribed fee that may be required to ensure that the receipts collected from the fee charged for the succeeding two years equal, as closely as possible, the cost of providing these services.

(B) Notwithstanding any other provisions of law, all civil fines and penalties collected pursuant to sections 【271】 243(c), 271, and 273 of this title and all liquidated damages and expenses collected pursuant to this Act shall be deposited in the Immigration User Fee Account.

(2)(A) The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney

463

General in providing immigration inspection and preinspection services for commercial aircraft or vessels and in—

(i) providing overtime immigration inspection services for commercial aircraft or vessels;

(ii) administration of debt recovery, including the establishment and operation of a national collections office;

(iii) expansion, operation and maintenance of information systems for nonimmigrant control and debt collection;

(iv) detection of fraudulent documents used by passengers traveling to the United States, *including training of, and technical assistance to, commercial airline personnel regarding such detection*; 【and】

(v) providing detention and 【deportation】 *removal* services for【: excludable】 *inadmissible* aliens arriving on commercial aircraft and vessels【; and】 *and for* any alien who is 【excludable】 *inadmissible* under section 212(a) who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry【.】*; and*

(vi) providing 【exclusion】 *removal* and asylum proceedings at air or sea ports-of-entry for【: excludable】 *inadmissible* aliens arriving on commercial aircraft and vessels including immigration 【exclusion】 *removal* proceedings resulting from presentation of fraudulent documents and failure to present documentation【; and】 *and for* any alien who is 【excludable】 *inadmissible* under section 212(a) who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry.

*The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.*

(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

\*         \*         \*         \*         \*         \*         \*

(q) LAND BORDER INSPECTION FEE ACCOUNT.—(1) Notwithstanding any other provision of law, the Attorney General is authorized to establish, by regulation, 【a project】 *projects* under which a fee may be charged and collected for inspection services provided at one or more land border points of entry. 【Such project】 *Such projects* may include the establishment of commuter lanes to be made available to qualified United States citizens and aliens, as determined by the Attorney General.

\*         \*         \*         \*         \*         \*         \*

【(5)(A) The program authorized in this subsection shall terminate on September 30, 1993, unless further authorized by an Act of Congress.

【(B) The provisions set forth in this subsection shall take effect 30 days after submission of a written plan by the Attorney General

464

detailing the proposed implementation of the project specified in
paragraph (1).

〖(C) If implemented, the Attorney General shall prepare and
submit on a quarterly basis, until September 30, 1993, a status re-
port on the land border inspection project.〗

(r) BREACHED BOND/DETENTION FUND.—

    (1)   *   *   *

      *      *      *      *      *      *      *

    (4) The amount required to be refunded from *the* Fund for
fiscal year 1994 and thereafter shall be refunded in accordance
with estimates made in the budget request of the Attorney
General for those fiscal years: *Provided,* That any proposed
changes in the amounts designated in said budget requests
shall only be made after notification to the Committees on Ap-
propriations of the House of Representatives and the Senate in
accordance with section 606 of Public Law 102–395.

      *      *      *      *      *      *      *

    (6) For fiscal year 1993 only, the Attorney General may
transfer up to $1,000,000 from the Immigration User Fee Ac-
count to *the* Fund for initial expenses necessary to enhance col-
lection efforts: *Provided,* That any such transfers shall be re-
funded from Fund back to the Immigration User Fee Account
by December 31, 1993.

      *      *      *      *      *      *      *

POWERS OF IMMIGRATION OFFICERS AND EMPLOYEES

SEC. 287. (a) Any officer or employee of the Service authorized
under regulations prescribed by the Attorney General shall have
power without warrant—

    (1) to interrogate any alien or person believed to be an alien
as to his right to be or to remain in the United States;

    (2) to arrest any alien who in his presence or view is enter-
ing or attempting to enter the United States in violation of any
law or regulation made in pursuance of law regulating the ad-
mission, exclusion, 〖or expulsion〗 *expulsion, or removal* of
aliens, or to arrest any alien in the United States, if he has
reason to believe that the alien so arrested is in the United
States in violation of any such law or regulation and is likely
to escape before a warrant can be obtained for his arrest, but
the alien arrested shall be taken without unnecessary delay for
examination before an officer of the Service having authority
to examine aliens as to their right to enter or remain in the
United States;

      *      *      *      *      *      *      *

    (4) to make arrests for felonies which have been committed
and which are cognizable under any law of the United States
regulating the admission, exclusion, 〖or expulsion〗 *expulsion,
or removal* of aliens, if he has reason to believe that the person
so arrested is guilty of such felony and if there is likelihood of
the person escaping before a warrant can be obtained for his
arrest, but the person arrested shall be taken without unneces-

465

sary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

\*      \*      \*      \*      \*      \*      \*

(c) Any officer or employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power to conduct a search, without warrant, of the person, and of the personal effects in the possession of any person seeking admission to the United States, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for ⟦exclusion from⟧ *denial of admission to* the United States under this Act which would be disclosed by such search.

\*      \*      \*      \*      \*      \*      \*

(f)(1) Under regulations of the Attorney General, the Commissioner shall provide for the fingerprinting and photographing of each alien 14 years of age or older against whom a proceeding is commenced under section ⟦242⟧ *240.*

(2) Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies, upon request.

\*      \*      \*      \*      \*      \*      \*

CENTRAL FILE; INFORMATION FROM OTHER DEPARTMENTS AND AGENCIES

SEC. 290. (a) There shall be established in the office of the Commissioner, for the use of the security and enforcement agencies of the Government of the United States, a central index, which shall contain the names of all aliens heretofore ⟦admitted to the United States, or excluded therefrom⟧ *admitted or denied admission to the United States,* insofar as such information is available from the existing records of the Service, and the names of all aliens hereafter ⟦admitted to the United States, or excluded therefrom⟧ *admitted or denied admission to the United States,* the names of their sponsors of record, if any, and such other relevant information as the Attorney General shall require as an aid to the proper enforcement of this Act.

(b) Any information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to the Service upon request made by the Attorney General to the head of any such department or agency.

⟦(c) The Secretary of Health and Human Services shall notify the Attorney General upon request whenever any alien is issued a social security account number and social security card. The Secretary shall also furnish such available information as may be requested by the Attorney General regarding the identity and location of aliens in the United States.⟧

*(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1995), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate number of social security account numbers issued to aliens not authorized to be employed*

466

*to which earnings were reported to the Social Security Administration in such fiscal year.*

*(2) If earnings are reported on or after January 1, 1996, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.*

\*         \*         \*         \*         \*         \*         \*

BURDEN OF PROOF

SEC. 291. Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not ⟦subject to exclusion⟧ *inadmissible* under any provision of this Act, and, if an alien, that he is entitled to the nonimmigrant; ⟦immigrant, special immigrant, immediate relative⟧ *immigrant status, special immigrant status, status as a spouse or child of a citizen of the United States*, or refugee status claimed, as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not ⟦subject to exclusion⟧ *inadmissible* under any provision of this Act. In any ⟦deportation⟧ *removal* proceeding under chapter ⟦5⟧ *4* against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law.

RIGHT TO COUNSEL

SEC. 292. In any ⟦exclusion or deportation⟧ *removal* proceedings before ⟦a special inquiry officer⟧ *an immigration judge* and in any appeal proceedings before the Attorney General from any such ⟦exclusion or deportation⟧ *removal* proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

\*         \*         \*         \*         \*         \*         \*

467

*UNDERCOVER INVESTIGATION AUTHORITY*

SEC. 294. (a) IN GENERAL.—With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—

(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),

(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),

(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),

(D) the third undesignated paragraph under the heading "Miscellaneous" of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),

(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),

(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and

(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254 (a) and (c));

(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);

(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and

(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection

468

*(a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.*

*(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.*

## TITLE III—NATIONALITY AND NATURALIZATION

\*       \*       \*       \*       \*       \*       \*

### CHAPTER 2—NATIONALITY THROUGH NATURALIZATION

\*       \*       \*       \*       \*       \*       \*

REQUIREMENTS AS TO RESIDENCE, GOOD MORAL CHARACTER, ATTACHMENT TO THE PRINCIPLES OF THE CONSTITUTION, AND FAVORABLE DISPOSITION TO THE UNITED STATES

SEC. 316. (a) No person, except as otherwise provided in this title, shall be naturalized, unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, ⟦and⟧ (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States, *and (4) in the case of an applicant that has received assistance under a means-tested public benefits program (as defined in subsection (f)(3) of section 213A) administered by a Federal, State, or local agency and with respect to which amounts may be owing under an affidavit of support executed under such section, provides satisfactory evidence that there are no outstanding amounts that may be owed to any such Federal, State, or local agency pursuant to such affidavit by the sponsor who executed such affidavit, except as provided in subsection (g).*

\*       \*       \*       \*       \*       \*       \*

(f)(1) Whenever the Director of Central Intelligence, the Attorney General and the Commissioner of Immigration determine that an applicant otherwise eligible for naturalization has made an extraordinary contribution to the national security of the United States or

469

to the conduct of United States intelligence activities, the applicant may be naturalized without regard to the residence and physical presence requirements of this section, or to the prohibitions of section 313 of this Act, and no residence within a particular State or district of the Service in the United States shall be required: *Provided,* That the applicant has continuously resided in the United States for at least one year prior to naturalization: *Provided further,* That the provisions of this subsection shall not apply to any alien described in 〚subparagraphs (A) through (D) of paragraph 243(h)(2)〛 *clauses (i) through (v) of section 208(b)(2)(A)* of this Act.

*        *        *        *        *        *        *

*(g) Clause (4) of subsection (a) shall not apply to an applicant where the applicant can demonstrate that—*

    *(A) either—*

        *(i) the applicant has been battered or subject to extreme cruelty in the United States by a spouse or parent or by a member of the spouse or parent's family residing in the same household as the applicant and the spouse or parent consented or acquiesced to such battery or cruelty, or*

        *(ii) the applicant's child has been battered or subject to extreme cruelty in the United States by the applicant's spouse or parent (without the active participation of the applicant in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the applicant when the spouse or parent consented or acquiesced to and the applicant did not actively participate in such battery or cruelty;*

    *(B) such battery or cruelty has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service; and*

    *(C) the need for the public benefits received as to which amounts are owing had a substantial connection to the battery or cruelty described in subparagraph (A).*

PREREQUISITE TO NATURALIZATION; BURDEN OF PROOF

SEC. 318. Except as otherwise provided in this title, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this Act. The burden of proof shall be upon such person to show that he entered the United States lawfully, and the time, place, and manner of such entry into the United States, but in presenting such proof he shall be entitled to the production of his immigrant visa, if any, or of other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry, in the custody of the Service. Notwithstanding the provisions of section 405(b), and except as provided in sections 328 and 329 no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this or any other Act; and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a 〚deportation〛 *removal* proceeding pursuant to a warrant of arrest issued under the provisions of this or any

470

other Act: *Provided,* That the findings of the Attorney General in terminating 〖deportation〗 *removal* proceedings or in 〖suspending〗 *canceling* the 〖deportation〗 *removal* of an alien pursuant to the provisions of this Act, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization as required by this title.

\*        \*        \*        \*        \*        \*        \*

CHAPTER 3—LOSS OF NATIONALITY

\*        \*        \*        \*        \*        \*        \*

RESTRICTIONS ON LOSS OF NATIONALITY

SEC. 351. (a) Except as provided in paragraphs (6) and (7) of section 349(a) of this title, no national of the United States can lose United States nationality〖,〗 under this Act while within the United States or any of its outlying possessions, but loss of nationality shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this chapter if and when the national thereafter takes up a residence outside the United States and its outlying possessions.

\*        \*        \*        \*        \*        \*        \*

CHAPTER 4—MISCELLANEOUS

\*        \*        \*        \*        \*        \*        \*

PROCEEDINGS FOR DECLARATION OF UNITED STATES NATIONALITY IN THE EVENT OF DENIAL OF RIGHTS AND PRIVILEGES AS NATIONAL

SEC. 360. (a) If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of title 28, United States Code, against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of or in connection with any 〖exclusion〗 *removal* proceeding under the provisions of this or any other act, or (2) is in issue in any such 〖exclusion〗 *removal* proceeding. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is hereby conferred upon those courts.

\*        \*        \*        \*        \*        \*        \*

(c) A person who has been issued a certificate of identity under the provisions of subsection (b), and while in possession thereof,

471

may apply for admission to the United States at any port of entry, and shall be subject to all the provisions of this Act relating to the conduct of proceedings involving aliens seeking admission to the United States. A final determination by the Attorney General that any such person is not entitled to admission to the United States shall be subject to review by any court of competent jurisdiction in habeas corpus proceedings and not otherwise. Any person described in this section who is finally ⟦excluded from⟧ *denied* admission to the United States shall be subject to all the provisions of this Act relating to aliens seeking admission to the United States.

\*        \*        \*        \*        \*        \*        \*

## TITLE IV—MISCELLANEOUS AND REFUGEE ASSISTANCE

\*        \*        \*        \*        \*        \*        \*

### Chapter 2—Refugee Assistance

\*        \*        \*        \*        \*        \*        \*

#### AUTHORIZATION FOR PROGRAMS FOR DOMESTIC RESETTLEMENT OF AND ASSISTANCE TO REFUGEES

Sec. 412. (a)  \*  \*  \*
(b) Program of Initial Resettlement. —(1)  \*  \*  \*

\*        \*        \*        \*        \*        \*        \*

(3) The Secretary is authorized⟦,⟧ to make arrangements (including cooperative arrangements with other Federal agencies) for the temporary care of refugees in the United States in emergency circumstances, including the establishment of processing centers, if necessary, without regard to such provisions of law (other than the Renegotiation Act of 1951 and section 414(b) of this chapter) regulating the making, performance, amendment, or modification of contracts and the expenditure of funds of the United States Government as the Secretary may specify.

(4) The Secretary⟦,⟧ shall—

(A) assure that an adequate number of trained staff are available at the location at which the refugees enter the United States to assure that all necessary medical records are available and in proper order;

\*        \*        \*        \*        \*        \*        \*

## TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

#### DEFINITIONS

*Sec. 501. In this title:*

*(1) The term "alien terrorist" means an alien described in section 241(a)(4)(B).*

*(2) The term "classified information" has the meaning given such term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.).*

472

(3) The term "national security" has the meaning given such term in section 1(b) of the Classified Information Procedures Act (18 U.S.C. App.).

(4) The term "special attorney" means an attorney who is on the panel established under section 502(e).

(5) The term "special removal court" means the court established under section 502(a).

(6) The term "special removal hearing" means a hearing under section 505.

(7) The term "special removal proceeding" means a proceeding under this title.

ESTABLISHMENT OF SPECIAL REMOVAL COURT; PANEL OF ATTORNEYS TO ASSIST WITH CLASSIFIED INFORMATION

SEC. 502. (a) IN GENERAL.—The Chief Justice of the United States shall publicly designate 5 district court judges from 5 of the United States judicial circuits who shall constitute a court which shall have jurisdiction to conduct all special removal proceedings.

(b) TERMS.—Each judge designated under subsection (a) shall serve for a term of 5 years and shall be eligible for redesignation, except that the four associate judges first so designated shall be designated for terms of one, two, three, and four years so that the term of one judge shall expire each year.

(c) CHIEF JUDGE.—The Chief Justice shall publicly designate one of the judges of the special removal court to be the chief judge of the court. The chief judge shall promulgate rules to facilitate the functioning of the court and shall be responsible for assigning the consideration of cases to the various judges.

(d) EXPEDITIOUS AND CONFIDENTIAL NATURE OF PROCEEDINGS.— The provisions of section 103(c) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(c)) shall apply to proceedings under this title in the same manner as they apply to proceedings under such Act.

(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The special removal court shall provide for the designation of a panel of attorneys each of whom—

(1) has a security clearance which affords the attorney access to classified information, and

(2) has agreed to represent permanent resident aliens with respect to classified information under section 506 in accordance with (and subject to the penalties under) this title.

APPLICATION FOR INITIATION OF SPECIAL REMOVAL PROCEEDING

SEC. 503. (a) IN GENERAL.—Whenever the Attorney General has classified information that an alien is an alien terrorist, the Attorney General, in the Attorney General's discretion, may seek removal of the alien under this title through the filing of a written application described in subsection (b) with the special removal court seeking an order authorizing a special removal proceeding under this title. The application shall be submitted in camera and ex parte and shall be filed under seal with the court.

(b) CONTENTS OF APPLICATION.—Each application for a special removal proceeding shall include all of the following:

473

(1) The identity of the Department of Justice attorney making the application.

(2) The approval of the Attorney General or the Deputy Attorney General for the filing of the application based upon a finding by that individual that the application satisfies the criteria and requirements of this title.

(3) The identity of the alien for whom authorization for the special removal proceedings is sought.

(4) A statement of the facts and circumstances relied on by the Department of Justice to establish that—

(A) the alien is an alien terrorist and is physically present in the United States, and

(B) with respect to such alien, adherence to the provisions of title II regarding the removal of aliens would pose a risk to the national security of the United States.

(5) An oath or affirmation respecting each of the facts and statements described in the previous paragraphs.

(c) RIGHT TO DISMISS.—The Department of Justice retains the right to dismiss a removal action under this title at any stage of the proceeding.

CONSIDERATION OF APPLICATION

SEC. 504. (a) IN GENERAL.—In the case of an application under section 503 to the special removal court, a single judge of the court shall be assigned to consider the application. The judge, in accordance with the rules of the court, shall consider the application and may consider other information, including classified information, presented under oath or affirmation. The judge shall consider the application (and any hearing thereof) in camera and ex parte. A verbatim record shall be maintained of any such hearing.

(b) APPROVAL OF ORDER.—The judge shall enter ex parte the order requested in the application if the judge finds, on the basis of such application and such other information (if any), that there is probable cause to believe that—

(1) the alien who is the subject of the application has been correctly identified and is an alien terrorist, and

(2) adherence to the provisions of title II regarding the removal of the identified alien would pose a risk to the national security of the United States.

(c) DENIAL OF ORDER.—If the judge denies the order requested in the application, the judge shall prepare a written statement of the judge's reasons for the denial.

(d) EXCLUSIVE PROVISIONS.—Whenever an order is issued under this section with respect to an alien—

(1) the alien's rights regarding removal and expulsion shall be governed solely by the provisions of this title, and

(2) except as they are specifically referenced, no other provisions of this Act shall be applicable.

SPECIAL REMOVAL HEARINGS

SEC. 505. (a) IN GENERAL.—In any case in which the application for the order is approved under section 504, a special removal hearing shall be conducted under this section for the purpose of determining whether the alien to whom the order pertains should be re-

474

moved from the United States on the grounds that the alien is an alien terrorist. Consistent with section 506, the alien shall be given reasonable notice of the nature of the charges against the alien and a general account of the basis for the charges. The alien shall be given notice, reasonable under all the circumstances, of the time and place at which the hearing will be held. The hearing shall be held as expeditiously as possible.

(b) USE OF SAME JUDGE.—The special removal hearing shall be held before the same judge who granted the order pursuant to section 504 unless that judge is deemed unavailable due to illness or disability by the chief judge of the special removal court, or has died, in which case the chief judge shall assign another judge to conduct the special removal hearing. A decision by the chief judge pursuant to the preceding sentence shall not be subject to review by either the alien or the Department of Justice.

(c) RIGHTS IN HEARING.—

(1) PUBLIC HEARING.—The special removal hearing shall be open to the public.

(2) RIGHT OF COUNSEL.—The alien shall have a right to be present at such hearing and to be represented by counsel. Any alien financially unable to obtain counsel shall be entitled to have counsel assigned to represent the alien. Such counsel shall be appointed by the judge pursuant to the plan for furnishing representation for any person financially unable to obtain adequate representation for the district in which the hearing is conducted, as provided for in section 3006A of title 18, United States Code. All provisions of that section shall apply and, for purposes of determining the maximum amount of compensation, the matter shall be treated as if a felony was charged.

(3) INTRODUCTION OF EVIDENCE.—The alien shall have a right to introduce evidence on the alien's own behalf.

(4) EXAMINATION OF WITNESSES.—Except as provided in section 506, the alien shall have a reasonable opportunity to examine the evidence against the alien and to cross-examine any witness.

(5) RECORD.—A verbatim record of the proceedings and of all testimony and evidence offered or produced at such a hearing shall be kept.

(6) DECISION BASED ON EVIDENCE AT HEARING.—The decision of the judge in the hearing shall be based only on the evidence introduced at the hearing, including evidence introduced under subsection (e).

(7) NO RIGHT TO ANCILLARY RELIEF.—In the hearing, the judge is not authorized to consider or provide for relief from removal based on any of the following:

(A) Asylum under section 208.

(B) Withholding of removal under section 241(b)(3).

(C) Cancellation of removal under section 240A.

(D) Voluntary departure under section 240B.

(E) Adjustment of status under section 245.

(F) Registry under section 249.

(d) SUBPOENAS.—

(1) REQUEST.—At any time prior to the conclusion of the special removal hearing, either the alien or the Department of Jus-

475

tice may request the judge to issue a subpoena for the presence of a named witness (which subpoena may also command the person to whom it is directed to produce books, papers, documents, or other objects designated therein) upon a satisfactory showing that the presence of the witness is necessary for the determination of any material matter. Such a request may be made ex parte except that the judge shall inform the Department of Justice of any request for a subpoena by the alien for a witness or material if compliance with such a subpoena would reveal evidence or the source of evidence which has been introduced, or which the Department of Justice has received permission to introduce, in camera and ex parte pursuant to subsection (e) and section 506, and the Department of Justice shall be given a reasonable opportunity to oppose the issuance of such a subpoena.

(2) PAYMENT FOR ATTENDANCE.—If an application for a subpoena by the alien also makes a showing that the alien is financially unable to pay for the attendance of a witness so requested, the court may order the costs incurred by the process and the fees of the witness so subpoenaed to be paid from funds appropriated for the enforcement of title II.

(3) NATIONWIDE SERVICE.—A subpoena under this subsection may be served anywhere in the United States.

(4) WITNESS FEES.—A witness subpoenaed under this subsection shall receive the same fees and expenses as a witness subpoenaed in connection with a civil proceeding in a court of the United States.

(5) NO ACCESS TO CLASSIFIED INFORMATION.—Nothing in this subsection is intended to allow an alien to have access to classified information.

(e) INTRODUCTION OF CLASSIFIED INFORMATION.—

(1) IN GENERAL.—When classified information has been summarized pursuant to section 506(b) or where a finding has been made under section 506(b)(5) that no summary is possible, classified information shall be introduced (either in writing or through testimony) in camera and ex parte and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to such section. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.

(2) TREATMENT OF ELECTRONIC SURVEILLANCE INFORMATION.—

(A) USE OF ELECTRONIC SURVEILLANCE.—The Government is authorized to use in a special removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act.

(B) NO DISCOVERY OF ELECTRONIC SURVEILLANCE INFORMATION.—An alien subject to removal under this title shall

476

*have no right of discovery of information derived from electronic surveillance authorized under the Foreign Intelligence Surveillance Act of 1978 or otherwise for national security purposes. Nor shall such alien have the right to seek suppression of evidence.*

*(C) Certain procedures not applicable.—The provisions and requirements of section 3504 of title 18, United States Code, shall not apply to procedures under this title.*

*(3) Rights of united states.—Nothing in this section shall prevent the United States from seeking protective orders and from asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and state secrets privileges.*

*(f) Inclusion of Certain Evidence.—The Federal Rules of Evidence shall not apply to hearings under this section. Evidence introduced at the special removal hearing, either in open session or in camera and ex parte, may, in the discretion of the Department of Justice, include all or part of the information presented under section 504 used to obtain the order for the hearing under this section.*

*(g) Arguments.—Following the receipt of evidence, the attorneys for the Department of Justice and for the alien shall be given fair opportunity to present argument as to whether the evidence is sufficient to justify the removal of the alien. The attorney for the Department of Justice shall open the argument. The attorney for the alien shall be permitted to reply. The attorney for the Department of Justice shall then be permitted to reply in rebuttal. The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.*

*(h) Burden of Proof.—In the hearing the Department of Justice has the burden of showing by clear and convincing evidence that the alien is subject to removal because the alien is an alien terrorist. If the judge finds that the Department of Justice has met this burden, the judge shall order the alien removed and detained pending removal from the United States. If the alien was released pending the special removal hearing, the judge shall order the Attorney General to take the alien into custody.*

*(i) Written Order.—At the time of rendering a decision as to whether the alien shall be removed, the judge shall prepare a written order containing a statement of facts found and conclusions of law. Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.*

*CONSIDERATION OF CLASSIFIED INFORMATION*

*Sec. 506. (a) Consideration In Camera and Ex Parte.—In any case in which the application for the order authorizing the special procedures of this title is approved, the judge who granted the order shall consider each item of classified information the Department of Justice proposes to introduce in camera and ex parte at the special removal hearing and shall order the introduction of such information pursuant to section 505(e) if the judge determines the information to be relevant.*

*(b) Preparation and Provision of Written Summary.—*

477

(1) PREPARATION.—The Department of Justice shall prepare a written summary of such classified information which does not pose a risk to national security.

(2) CONDITIONS FOR APPROVAL BY JUDGE AND PROVISION TO ALIEN.—The judge shall approve the summary so long as the judge finds that the summary is sufficient—

(A) to inform the alien of the general nature of the evidence that the alien is an alien terrorist, and

(B) to permit the alien to prepare a defense against removal.

The Department of Justice shall cause to be delivered to the alien a copy of the summary.

(3) OPPORTUNITY FOR CORRECTION AND RESUBMITTAL.—If the judge does not approve the summary, the judge shall provide the Department a reasonable opportunity to correct the deficiencies identified by the court and to submit a revised summary.

(4) CONDITIONS FOR TERMINATION OF PROCEEDINGS IF SUMMARY NOT APPROVED.—

(A) IN GENERAL.—If, subsequent to the opportunity described in paragraph (3), the judge does not approve the summary, the judge shall terminate the special removal hearing unless the judge makes the findings described in subparagraph (B).

(B) FINDINGS.—The findings described in this subparagraph are, with respect to an alien, that—

(i) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

(ii) the provision of the required summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.

(5) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in paragraph (4)(B)—

(A) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subsection (c) shall apply; and

(B) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to section 505(e).

(c) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

(1) IN GENERAL.—The procedures described in this subsection are that the judge (under rules of the special removal court) shall designate a special attorney to assist the alien—

(A) by reviewing in camera the classified information on behalf of the alien, and

478

(B) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

(2) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under paragraph (1)—

(A) shall not disclose the information to the alien or to any other attorney representing the alien, and

(B) who discloses such information in violation of subparagraph (A) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.

APPEALS

SEC. 507. (a) APPEALS OF DENIALS OF APPLICATIONS FOR ORDERS.—The Department of Justice may seek a review of the denial of an order sought in an application by the United States Court of Appeals for the District of Columbia Circuit by notice of appeal which must be filed within 20 days after the date of such denial. In such a case the entire record of the proceeding shall be transmitted to the Court of Appeals under seal and the Court of Appeals shall hear the matter ex parte. In such a case the Court of Appeals shall review questions of law de novo, but a prior finding on any question of fact shall not be set aside

unless such finding was clearly erroneous.

(b) APPEALS OF DETERMINATIONS ABOUT SUMMARIES OF CLASSIFIED INFORMATION.—Either party may take an interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit of—

(1) any determination by the judge pursuant to section 506(a)—

(A) concerning whether an item of evidence may be introduced in camera and ex parte, or

(B) concerning the contents of any summary of evidence to be introduced in camera and ex parte prepared pursuant to section 506(b); or

(2) the refusal of the court to make the findings permitted by section 506(b)(4)(B).

In any interlocutory appeal taken pursuant to this subsection, the entire record, including any proposed order of the judge or summary of evidence, shall be transmitted to the Court of Appeals under seal and the matter shall be heard ex parte.

(c) APPEALS OF DECISION IN HEARING.—

(1) IN GENERAL.—Subject to paragraph (2), the decision of the judge after a special removal hearing may be appealed by either the alien or the Department of Justice to the United States Court of Appeals for the District of Columbia Circuit by notice of appeal.

(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 506(b)(4) and with respect to which the procedures

479

described in section 506(c) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 506(c)(1) on behalf of the alien.

(d) GENERAL PROVISIONS RELATING TO APPEALS.—

(1) NOTICE.—A notice of appeal pursuant to subsection (b) or (c) (other than under subsection (c)(2)) must be filed within 20 days after the date of the order with respect to which the appeal is sought, during which time the order shall not be executed.

(2) TRANSMITTAL OF RECORD.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c)—

(A) the entire record shall be transmitted to the Court of Appeals, and

(B) information received pursuant to section 505(e), and any portion of the judge's order that would reveal the substance or source of such information, shall be transmitted under seal.

(3) EXPEDITED APPELLATE PROCEEDING.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

(A) REVIEW.—The appeal or review shall be heard as expeditiously as practicable and the Court may dispense with full briefing and hear the matter solely on the record of the judge of the special removal court and on such briefs or motions as the Court may require to be filed by the parties.

(B) DISPOSITION.—The Court shall uphold or reverse the judge's order within 60 days after the date of the issuance of the judge's final order.

(4) STANDARD FOR REVIEW.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

(A) QUESTIONS OF LAW.—The Court of Appeals shall review all questions of law de novo.

(B) QUESTIONS OF FACT.—(i) Subject to clause (ii), a prior finding on any question of fact shall not be set aside unless such finding was clearly erroneous.

(ii) In the case of a review under subsection (c)(2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 506(b)(4), the Court of Appeals shall review questions of fact de novo.

(e) CERTIORARI.—Following a decision by the Court of Appeals pursuant to subsection (b) or (c), either the alien or the Department of Justice may petition the Supreme Court for a writ of certiorari. In any such case, any information transmitted to the Court of Appeals under seal shall, if such information is also submitted to the Supreme Court, be transmitted under seal. Any order of removal shall not be stayed pending disposition of a writ of certiorari except as provided by the Court of Appeals or a Justice of the Supreme Court.

(f) APPEALS OF DETENTION ORDERS.—

480

(1) IN GENERAL.— The provisions of sections 3145 through 3148 of title 18, United States Code, pertaining to review and appeal of a release or detention order, penalties for failure to appear, penalties for an offense committed while on release, and sanctions for violation of a release condition shall apply to an alien to whom section 508(b)(1) applies. In applying the previous sentence—

(A) for purposes of section 3145 of such title an appeal shall be taken to the United States Court of Appeals for the District of Columbia Circuit, and

(B) for purposes of section 3146 of such title the alien shall be considered released in connection with a charge of an offense punishable by life imprisonment.

(2) NO REVIEW OF CONTINUED DETENTION.—The determinations and actions of the Attorney General pursuant to section 508(c)(2)(C) shall not be subject to judicial review, including application for a writ of habeas corpus, except for a claim by the alien that continued detention violates the alien's rights under the Constitution. Jurisdiction over any such challenge shall lie exclusively in the United States Court of Appeals for the District of Columbia Circuit.

DETENTION AND CUSTODY

SEC. 508. (a) INITIAL CUSTODY.—

(1) UPON FILING APPLICATION.—Subject to paragraph (2), the Attorney General may take into custody any alien with respect to whom an application under section 503 has been filed and, notwithstanding any other provision of law, may retain such an alien in custody in accordance with the procedures authorized by this title.

(2) SPECIAL RULES FOR PERMANENT RESIDENT ALIENS.—An alien lawfully admitted for permanent residence shall be entitled to a release hearing before the judge assigned to hear the special removal hearing. Such an alien shall be detained pending the special removal hearing, unless the alien demonstrates to the court that—

(A) the alien, if released upon such terms and conditions as the court may prescribe (including the posting of any monetary amount), is not likely to flee, and

(B) the alien's release will not endanger national security or the safety of any person or the community.

The judge may consider classified information submitted in camera and ex parte in making a determination under this paragraph.

(3) RELEASE IF ORDER DENIED AND NO REVIEW SOUGHT.—

(A) IN GENERAL.—Subject to subparagraph (B), if a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice does not seek review of such denial, the alien shall be released from custody.

(B) APPLICATION OF REGULAR PROCEDURES.—Subparagraph (A) shall not prevent the arrest and detention of the alien pursuant to title II.

481

(b) CONDITIONAL RELEASE IF ORDER DENIED AND REVIEW SOUGHT.—

(1) IN GENERAL.—If a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice seeks review of such denial, the judge shall release the alien from custody subject to the least restrictive condition or combination of conditions of release described in section 3142(b) and clauses (i) through (xiv) of section 3142(c)(1)(B) of title 18, United States Code, that will reasonably assure the appearance of the alien at any future proceeding pursuant to this title and will not endanger the safety of any other person or the community.

(2) NO RELEASE FOR CERTAIN ALIENS.—If the judge finds no such condition or combination of conditions, the alien shall remain in custody until the completion of any appeal authorized by this title.

(c) CUSTODY AND RELEASE AFTER HEARING.—

(1) RELEASE.—

(A) IN GENERAL.—Subject to subparagraph (B), if the judge decides pursuant to section 505(i) that an alien should not be removed, the alien shall be released from custody.

(B) CUSTODY PENDING APPEAL.—If the Attorney General takes an appeal from such decision, the alien shall remain in custody, subject to the provisions of section 3142 of title 18, United States Code.

(2) CUSTODY AND REMOVAL.—

(A) CUSTODY.—If the judge decides pursuant to section 505(i) that an alien shall be removed, the alien shall be detained pending the outcome of any appeal. After the conclusion of any judicial review thereof which affirms the removal order, the Attorney General shall retain the alien in custody and remove the alien to a country specified under subparagraph (B).

(B) REMOVAL.—

(i) IN GENERAL.—The removal of an alien shall be to any country which the alien shall designate if such designation does not, in the judgment of the Attorney General, in consultation with the Secretary of State, impair the obligation of the United States under any treaty (including a treaty pertaining to extradition) or otherwise adversely affect the foreign policy of the United States.

(ii) ALTERNATE COUNTRIES.—If the alien refuses to designate a country to which the alien wishes to be removed or if the Attorney General, in consultation with the Secretary of State, determines that removal of the alien to the country so designated would impair a treaty obligation or adversely affect United States foreign policy, the Attorney General shall cause the alien to be removed to any country willing to receive such alien.

(C) CONTINUED DETENTION.—If no country is willing to receive such an alien, the Attorney General may, notwithstanding any other provision of law, retain the alien in cus-

482

*tody. The Attorney General, in coordination with the Secretary of State, shall make periodic efforts to reach agreement with other countries to accept such an alien and at least every 6 months shall provide to the attorney representing the alien at the special removal hearing a written report on the Attorney General's efforts. Any alien in custody pursuant to this subparagraph shall be released from custody solely at the discretion of the Attorney General and subject to such conditions as the Attorney General shall deem appropriate.*

*(D) FINGERPRINTING.—Before an alien is transported out of the United States pursuant to this subsection, or pursuant to an order of removal because such alien is inadmissible under section 212(a)(3)(B), the alien shall be photographed and fingerprinted, and shall be advised of the provisions of subsection 276(b).*

*(d) CONTINUED DETENTION PENDING TRIAL.—*

*(1) DELAY IN REMOVAL.—Notwithstanding the provisions of subsection (c)(2), the Attorney General may hold in abeyance the removal of an alien who has been ordered removed pursuant to this title to allow the trial of such alien on any Federal or State criminal charge and the service of any sentence of confinement resulting from such a trial.*

*(2) MAINTENANCE OF CUSTODY.—Pending the commencement of any service of a sentence of confinement by an alien described in paragraph (1), such an alien shall remain in the custody of the Attorney General, unless the Attorney General determines that temporary release of the alien to the custody of State authorities for confinement in a State facility is appropriate and would not endanger national security or public safety.*

*(3) SUBSEQUENT REMOVAL.—Following the completion of a sentence of confinement by an alien described in paragraph (1) or following the completion of State criminal proceedings which do not result in a sentence of confinement of an alien released to the custody of State authorities pursuant to paragraph (2), such an alien shall be returned to the custody of the Attorney General who shall proceed to carry out the provisions of subsection (c)(2) concerning removal of the alien.*

*(e) APPLICATION OF CERTAIN PROVISIONS RELATING TO ESCAPE OF PRISONERS.—For purposes of sections 751 and 752 of title 18, United States Code, an alien in the custody of the Attorney General pursuant to this title shall be subject to the penalties provided by those sections in relation to a person committed to the custody of the Attorney General by virtue of an arrest on a charge of a felony.*

*(f) RIGHTS OF ALIENS IN CUSTODY.—*

*(1) FAMILY AND ATTORNEY VISITS.—An alien in the custody of the Attorney General pursuant to this title shall be given reasonable opportunity to communicate with and receive visits from members of the alien's family, and to contact, retain, and communicate with an attorney.*

*(2) DIPLOMATIC CONTACT.—An alien in the custody of the Attorney General pursuant to this title shall have the right to contact an appropriate diplomatic or consular official of the alien's country of citizenship or nationality or of any country providing*

483

*representation services therefore. The Attorney General shall notify the appropriate embassy, mission, or consular office of the alien's detention.*

————————

## TITLE 18, UNITED STATES CODE

\*       \*       \*       \*       \*       \*       \*

# PART I—CRIMES

\*       \*       \*       \*       \*       \*       \*

## CHAPTER 46—FORFEITURE

\*       \*       \*       \*       \*       \*       \*

### §982. Criminal forfeiture

(a)(1) The court, in imposing sentence on a person convicted of an offense in violation of section 5313(a), 5316, or 5324 of title 31, or of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property. However, no property shall be seized or forfeited in the case of a violation of section 5313(a) of title 31 by a domestic financial institution examined by a Federal bank supervisory agency or a financial institution regulated by the Securities and Exchange Commission or a partner, director, or employee thereof.

\*       \*       \*       \*       \*       \*       \*

*(6) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States any property, real or personal, which the person used, or intended to be used, in committing, or facilitating the commission of, the violation, and any property constituting, or derived from, or traceable to, any proceeds the person obtained, directly or indirectly, as a result of such violation.*

(b)(1) Property subject to forfeiture under this section, any seizure and disposition thereof, and any administrative or judicial proceeding in relation thereto, shall be governed—

   (A) in the case of a forfeiture under subsection (a)(1) of this section, by subsections (c) and (e) through (p) of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853); and

   (B) in the case of a forfeiture under subsection (a)(2) *or (a)(6)* of this section, by subsections (b), (c), (e), and (g) through (p) of section 413 of such Act.

\*       \*       \*       \*       \*       \*       \*

### §986. Subpoenas for bank records

(a) At any time after the commencement of any action for forfeiture in rem brought by the United States under section *1028, 1541,*

484

*1542, 1543, 1544, 1546,* 1956, 1957, or 1960 of this title, section 5322 or 5324 of title 31, United States Code, or the Controlled Substances Act, any party may request the Clerk of the Court in the district in which the proceeding is pending to issue a subpoena duces tecum to any financial institution, as defined in section 5312(a) of title 31, United States Code, to produce books, records and any other documents at any place designated by the requesting party. All parties to the proceeding shall be notified of the issuance of any such subpoena. The procedures and limitations set forth in section 985 of this title shall apply to subpoenas issued under this section.

\*       \*       \*       \*       \*       \*       \*

## CHAPTER 47—FRAUD AND FALSE STATEMENTS

\*       \*       \*       \*       \*       \*       \*

### §1015. Naturalization, citizenship or alien registry

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(d) Whoever knowingly makes any false cer-tificate, acknowledgment or statement concerning the appearance before him or the taking of an oath or affirmation or the signature, attestation or execution by any person with respect to any application, declaration, petition, affidavit, deposition, certificate of naturalization, certificate of citizenship or other paper or writing required or authorized by the laws relating to immigration, naturalization, citizenship, or registry of aliens【—】; *or*

*(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal benefit or service, or to engage unlawfully in employment in the United States; or*

*(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—*

Shall be fined under this title or imprisoned not more than five years, or both.

\*       \*       \*       \*       \*       \*       \*

### §1028. Fraud and related activity in connection with identification documents

(a) \* \* \*

(b) The punishment for an offense under subsection (a) of this section is—

(1) *except as provided in paragraphs (3) and (4),* a fine of under this title or imprisonment for not more than 【five】 *15* years, or both, if the offense is—

(A) \* \* \*

\*       \*       \*       \*       \*       \*       \*

485

(2) *except as provided in paragraphs (3) and (4),* a fine of under this title or imprisonment for not more than three years, or both, if the offense is—

(A) any other production or transfer of an identification document or false identification document; or

(B) an offense under paragraph (3) of such subsection; 〚and〛

*(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);*

*(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and*

〚(3)〛 *(5)* a fine of under this title or imprisonment for not more than one year, or both, in any other case.

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 75—PASSPORTS AND VISAS

\*        \*        \*        \*        \*        \*        \*

## §1546. Fraud and misuse of visas, permits, and other documents

(a)  \*  \*  \*

\*        \*        \*        \*        \*        \*        \*

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document 〚containing any such false statement〛 *which contains any such false statement or which fails to contain any reasonable basis in law or fact*—

Shall be fined under this title or imprisoned not more than 10 years, or both.

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 96—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

\*        \*        \*        \*        \*        \*        \*

## §1961. Definitions

As used in this chapter—

(1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to

486

bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), *section 1028 (relating to fraud and related activity in connection with identification documents),* section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), *section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1588 (relating to peonage and slavery),* section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), sections 2251–2252 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of that title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, ⟦or⟧ (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act*, or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain*

487

*aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose).*

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 119—WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

\*     \*     \*     \*     \*     \*     \*

### § 2516. Authorization for interception of wire, oral, or electronic communications

(1) The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of—

(a)  \*  \*  \*

\*     \*     \*     \*     \*     \*     \*

(n) any violation of section 5861 of the Internal Revenue Code of 1986 (relating to firearms); 〚and〛

*(o)(1) a felony violation of section 1028 (relating to production of false identification documentation), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud or misuse of visas, permits, or other documents) of this title; or*

*(2) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (relating to the smuggling of aliens); or*

〚(o)〛 *(p)* any conspiracy to commit any offense described in any subparagraph of this paragraph.

\*     \*     \*     \*     \*     \*     \*

## PART III—PRISONS AND PRISONERS

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 306—TRANSFER TO OR FROM FOREIGN COUNTRIES

\*     \*     \*     \*     \*     \*     \*

488

## § 4113. Status of alien offender transferred to a foreign country

(a) An alien who is deportable from the United States but who has been granted voluntary departure pursuant to ⟦section 1252(b) or section 1254(e) of title 8, United States Code,⟧ *section 240B of the Immigration and Nationality Act* and who is transferred to a foreign country pursuant to this chapter shall be deemed for all purposes to have voluntarily departed from this country.

(b) An alien who is the subject of an order of ⟦deportation⟧ *removal* from the United States pursuant to ⟦section 1252 of title 8, United States Code,⟧ *section 240 of the Immigration and Nationality Act* who is transferred to a foreign country pursuant to this chapter shall be deemed for all purposes to have been ⟦deported⟧ *removed* from this country.

(c) An alien who is the subject of an order of ⟦exclusion and deportation⟧ *removal* from the United States pursuant to section ⟦1226 of title 8, United States Code⟧ *240 of the Immigration and Nationality Act*, who is transferred to a foreign country pursuant to this chapter shall be deemed for all purposes to have been excluded from admission and ⟦deported⟧ *removed* from the United States.

\*       \*       \*       \*       \*       \*       \*

—————

## IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994

\*       \*       \*       \*       \*       \*       \*

# TITLE I—NATIONALITY AND NATURALIZATION

### SEC. 101. EQUAL TREATMENT OF WOMEN IN CONFERRING CITIZENSHIP TO CHILDREN BORN ABROAD.

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(d) ⟦APPLICATION TO TRANSMISSION OF CITIZENSHIP.—This⟧ *APPLICABILITY OF TRANSMISSION REQUIREMENTS.—This* section, the amendments made by this section, and any retroactive application of such amendments shall not effect ⟦any residency or other retention requirements for⟧ *the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States* citizenship ⟦as in effect before October 10, 1978, with respect to the transmission of citizenship.⟧ *to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.*

### SEC. 102. NATURALIZATION OF CHILDREN ON APPLICATION OF CITIZEN PARENT.

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

489

*(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to "five years, at least two of which" is deemed a reference to "10 years, at least 5 of which".*

\* \* \* \* \* \* \*

# TITLE II—TECHNICAL CORRECTIONS OF IMMIGRATION LAWS

\* \* \* \* \* \* \*

**SEC. 207. TECHNICAL AMENDMENT REGARDING ONE-HOUSE VETO.**

Section 13(c) of the Act of September 11, 1957 (8 U.S.C. 1255b(c)) is amended—

(1) by striking the third sentence; and

(2) in the fourth sentence, by striking "If neither the Senate nor the House of Representatives passes such a resolution within the time above specified, the" and inserting "The".

\* \* \* \* \* \* \*

**SEC. 209. FINES FOR UNLAWFUL BRINGING OF ALIENS INTO THE UNITED STATES.**

(a) IN GENERAL.—Section 273 of the Immigration and Nationality Act (8 U.S.C. 1323) is amended—

(1) in subsections (b) and (d) by striking "the sum of 〖$3000〗 *$3,000*' and inserting "a fine of $3,000" each place it appears;

\* \* \* \* \* \* \*

(b) EFFECTIVE DATE.—The amendments made by this 〖sub-section〗 *section* shall apply with respect to aliens brought to the United States more than 60 days after the date of enactment of this Act.

\* \* \* \* \* \* \*

**SEC. 219. OTHER MISCELLANEOUS AND TECHNICAL CORRECTIONS TO IMMIGRATION-RELATED PROVISIONS.**

(a) \* \* \*

\* \* \* \* \* \* \*

(cc) Section 204(a)(1)(C) of the Immigration Reform and Control Act of 1986 is amended by striking 〖"year 1993 the first place it appears"〗 *"year 1993" the first place it appears* and inserting "years 1993".

\* \* \* \* \* \* \*

(ee)(1) \* \* \*

\* \* \* \* \* \* \*

*(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.*

\* \* \* \* \* \* \*

**SEC. 221. VISAS FOR OFFICIALS OF TAIWAN.**

Whenever the President of Taiwan or any other high-level official of Taiwan shall apply to visit the United States for the purposes

490

of discussions with United States Federal or State government officials concerning—

    (1) trade or business with Taiwan that will reduce the United States-Taiwan trade deficit【;】,

    (2) prevention of nuclear proliferation【;】,

    (3) threats to the national security of the United States【;】,

    (4) the protection of the global environment【;】,

    (5) the protection of endangered species【;】, or

    (6) regional humanitarian disasters【.】,

【The】 *the* official shall be admitted to the United States, unless the official is otherwise 【excludable】 *inadmissible* under the immigration laws of the United States.

\*     \*     \*     \*     \*     \*     \*

**SEC. 225. CONSTRUCTION OF EXPEDITED DEPORTATION REQUIRE-MENTS.**

No amendment made by this Act 【and nothing in section 242(i) of the Immigration and Nationality Act (8 U.S.C. 1252(i))】 shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

———

**IMMIGRATION ACT OF 1990**

\*     \*     \*     \*     \*     \*     \*

# TITLE I—IMMIGRANTS

## Subtitle A—Worldwide and Per Country Levels

\*     \*     \*     \*     \*     \*     \*

**SEC. 104. ASYLEE ADJUSTMENTS.**

  (a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

  (d) ADJUSTMENT OF CERTAIN FORMER ASYLEES.—

    (1) IN GENERAL.—Subject to paragraph (2), the provisions of section 209(b) of the Immigration and Nationality Act shall also apply to an alien—

      (A) who was granted asylum before the date of the enactment of this Act (regardless of whether or not such asylum has been terminated under section 【208(b)】 *208* of the Immigration and Nationality Act),

\*     \*     \*     \*     \*     \*     \*

## Subtitle C—Commission and Information

**SEC. 141. COMMISSION ON IMMIGRATION REFORM.**

  (a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

491

(b) FUNCTIONS OF COMMISSION.—The Commission shall—

(1) review and evaluate the impact of this Act and the amendments made by this Act, in accordance with subsection (c); 【and】

(2) transmit to the Congress—

(A) not later than September 30, 1994, a first report describing the progress made in carrying out paragraph (1), and

(B) not later than September 30, 1997, a final report setting forth the Commission's findings and recommendations, including such recommendations for additional changes that should be made with respect to legal immigration into the United States as the Commission deems appropriate【.】*; and*

*(3) transmit to Congress, not later than January 1, 1997, a report containing recommendations (consistent with subsection (c)(3)) of methods of reducing or eliminating the fraudulent use of birth certificates for the purpose of obtaining other identity documents that may be used in securing immigration, employment, or other benefits.*

(c) CONSIDERATIONS.—

(1) * * *

(2) DIVERSITY PROGRAM.—The Commission shall analyze the information maintained under section 203(c)(3) of the Immigration and Nationality Act and shall report to Congress in its report under subsection (b)(2) on—

(A) the characteristics of individuals admitted under section 203(c) of the Immigration and Nationality Act, and

(B) how such characteristics compare to the characteristics of family-sponsored immigrants and employment-based immigrants.

The Commission shall include in the report an assessment of the effect of the requirement of paragraph (2) of section 203(c) of the Immigration and Nationality Act on the diversity, educational, and skill level of aliens admitted.

*(3) FOR REPORT ON REDUCING BIRTH CERTIFICATE FRAUD.—In the report described in subsection (b)(3), the Commission shall consider and analyze the feasibility of—*

*(A) establishing national standards for counterfeit-resistant birth certificates, and*

*(B) limiting the issuance of official copies of a birth certificate of an individual to anyone other than the individual or others acting on behalf of the individual.*

\*        \*        \*        \*        \*        \*        \*

# Subtitle D—Miscellaneous

\*        \*        \*        \*        \*        \*        \*

**SEC. 154. PERMITTING EXTENSION OF PERIOD OF VALIDITY OF IMMIGRANT VISAS FOR CERTAIN RESIDENTS OF HONG KONG.**

(a) * * *

(b) ALIENS COVERED.—An alien is described in this subsection if the alien—

492

(1)(A) * * *

(B)(i) is residing in Hong Kong as of the date of the enactment of this Act and is issued an immigrant visa under paragraph (1), (2), (4), or (5) of section 203(a) of the Immigration and Nationality Act (as in effect on the date of the enactment of this Act) or under section 203(a) or 203(b)(1) of such Act (as in effect on and after October 1, ⟦1991)⟧ *1991, and before October 1, 1996) or under section 203(a), 203(b)(1), or 203(b)(2) (as in effect on and after October 1, 1996),* or (ii) is the spouse or child (as defined in subsection (d)) of an alien described in clause (i), if accompanying or following to join the alien in coming to the United States; or

\*            \*            \*            \*            \*            \*            \*

# Subtitle E—Effective Dates; Conforming Amendments

**SEC. 161. EFFECTIVE DATES.**

(a) * * *

(c) GENERAL TRANSITIONS.—

(1) * * *

\*            \*            \*            \*            \*            \*            \*

(3) In the case of an alien who is described in section 203(a)(8) of the Immigration and Nationality Act (as in effect before October 1, 1991) as the spouse or child of an alien admitted for permanent residence as a preference immigrant under section 203(a)(3) or 203(a)(6) of such Act (as in effect before such date) and who would be entitled to enter the United States under such section 203(a)(8) but for the amendments made by this title, such an alien shall be deemed to be described in section 203(d) of such Act as the spouse or child ⟦an an⟧ *of an* alien described in section 203(b)(2) or 203(b)(3)(A)(i), respectively, of such Act with the same priority date as that of the principal alien.

\*            \*            \*            \*            \*            \*            \*

# TITLE II—NONIMMIGRANTS

# Subtitle A—General and Permanent Provisions

\*            \*            \*            \*            \*            \*            \*

**SEC. 204. TREATY TRADERS (E NONIMMIGRANTS).**

(a) * * *

(b) APPLICATION OF TREATY TRADER FOR CERTAIN FOREIGN STATES.—Each of the following foreign states shall be considered, for purposes of section 101(a)(15)(E) of the Immigration and Nationality Act, to be a foreign state described in such section if the foreign state extends reciprocal nonimmigrant treatment to nationals of the United States:

493

(1) The largest foreign state in each region (as defined in section 203(c)(1) of the Immigration and Nationality Act) which (A) has 1 or more dependent areas (as determined for purposes of section 202 of such Act) and (B) does not have a treaty of commerce and navigation with the United States.

\* \* \* \* \* \* \*

## SEC. 206. INTRA-COMPANY TRANSFEREES (L NONIMMIGRANTS).

(a) CLARIFICATION OF TREATMENT OF CERTAIN INTERNATIONAL ACCOUNTING FIRMS.—In applying sections 101(a)(15)(L) and ⟦203(b)(1)(C)⟧ *203(b)(2)(C)* of the Immigration and Nationality Act and section 124(a)(3)(A) of this Act, in the case of a partnership that is organized in the United States to provide accounting services and that markets its accounting services under an internationally recognized name under an agreement with a worldwide coordinating organization that is owned and controlled by the member accounting firms, a partnership (or similar organization) that is organized outside the United States to provide accounting services shall be considered to be an affiliate of the United States partnership if it markets its accounting services under the same internationally recognized name under the agreement with the worldwide coordinating organization of which the United States partnership is also a member.

\* \* \* \* \* \* \*

# TITLE III—FAMILY UNITY AND TEMPORARY PROTECTED STATUS

## SEC. 301. FAMILY UNITY.

(a) TEMPORARY STAY OF ⟦DEPORTATION⟧ *REMOVAL* AND WORK AUTHORIZATION FOR CERTAIN ELIGIBLE IMMIGRANTS.—The Attorney General shall provide that in the case of an alien who is an eligible immigrant (as defined in subsection (b)(1)) as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C)) or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A)), who has entered the United States before such date, who resided in the United States on such date, and who is not lawfully admitted for permanent residence, the alien—

(1) may not be ⟦deported⟧ *removed* or otherwise required to depart from the United States on a ground specified in paragraph (1)(A), (1)(B), (1)(C), (3)(A), of section 241(a) of the Immigration and Nationality Act (other than so much of section 241(a)(1)(A) of such Act as relates to a ground of ⟦exclusion⟧ *inadmissibility* described in paragraph (2) or (3) of section 212(a) of such Act), and

\* \* \* \* \* \* \*

(e) EXCEPTION FOR CERTAIN ALIENS.—An alien is not eligible for the benefits of this section if the Attorney General finds that—

(1) the alien has been convicted of a felony or 3 or more misdemeanors in the United States, or

494

(2) the alien is described in section 〔243(h)(2)〕 *208(b)(2)(A)* of the Immigration and Nationality Act.

\*       \*       \*       \*       \*       \*       \*

**SEC. 303. SPECIAL TEMPORARY PROTECTED STATUS FOR SALVA-DORANS.**

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(d) ENFORCEMENT OF REQUIREMENT TO DEPART AT TIME OF TER-MINATION OF DESIGNATION.—

(1) \* \* \*

(2) SANCTION FOR FAILURE TO APPEAR.—If an alien is provided an order to show cause under paragraph (1) and fails to appear at such proceedings, except for exceptional circumstances, the alien may be deported in absentia under section 〔242B〕 *240(b)(5)* of the Immigration and Nationality Act (inserted by section 545(a) of this Act) and certain discretionary forms of relief are no longer available to the alien pursuant to such section.

\*       \*       \*       \*       \*       \*       \*

# TITLE V—ENFORCEMENT

\*       \*       \*       \*       \*       \*       \*

## Subtitle D—General Enforcement

\*       \*       \*       \*       \*       \*       \*

**SEC. 545. DEPORTATION PROCEDURES; REQUIRED NOTICE OF DEPORTATION HEARING; LIMITATION ON DISCRETIONARY RELIEF.**

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(g) EFFECTIVE DATES.—

(1) NOTICE-RELATED PROVISIONS.—

(A) \* \* \*

(B) The Attorney General shall certify to the Congress when the central address file system (described in section 〔242B(a)(4)〕 *239(a)(4)* of the Immigration and Nationality Act) has been established.

\*       \*       \*       \*       \*       \*       \*

# TITLE VI—EXCLUSION AND DEPORTATION

**SEC. 601. REVISION OF GROUNDS FOR EXCLUSION.**

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

495

(c) REVIEW OF EXCLUSION LISTS.—The Attorney General and the Secretary of State shall develop protocols and guidelines for updating lookout books and the automated visa lookout system and similar mechanisms for the screening of aliens applying for visas for admission, or for admission, to the United States. Such protocols and guidelines shall be developed in a manner that ensures that in the case of an alien—

(1) whose name is in such system, and

(2) who either (A) applies for [entry] *admission* after the effective date of the amendments made by this section, or (B) requests (in writing to a local consular office after such date) a review, without seeking admission, of the alien's continued [excludability] *inadmissibility* under the Immigration and Nationality Act,

if the alien is no longer [excludable] *inadmissible* because of an amendment made by this section the alien's name shall be removed from such books and system and the alien shall be informed of such removal and if the alien continues to be [excludable] *inadmissible* the alien shall be informed of such determination.

\*        \*        \*        \*        \*        \*        \*

————————

## SECTION 128 OF THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1992 AND 1993

**SEC. 128. VISA LOOKOUT SYSTEMS.**

(a) VISAS.—The Secretary of State may not include in the Automated Visa Lookout System, or in any other system or list which maintains information about the [excludability] *inadmissibility* of aliens under the Immigration and Nationality Act, the name of any alien who is not [excludable] *inadmissible* from the United States under the Immigration and Nationality Act, subject to the provisions of this section.

(b) CORRECTION OF LISTS.—Not later than 3 years after the date of enactment of this Act, the Secretary of State shall—

(1) correct the Automated Visa Lookout System, or any other system or list which maintains information about the [excludability] *inadmissibility* of aliens under the Immigration and Nationality Act, by deleting the name of any alien not [excludable] *inadmissible* under the Immigration and Nationality Act; and

(2) report to the Congress concerning the completion of such correction process.

\*        \*        \*        \*        \*        \*        \*

(e) LIMITATION.—

(1) The Secretary may add or retain in such system or list the names of aliens who are not [excludable] *inadmissible* only if they are included for otherwise authorized law enforcement purposes or other lawful purposes of the Department of State. A name included for other lawful purposes under this paragraph shall include a notation which clearly and distinctly indicates that such person is not presently [excludable] *inadmissible*. The Secretary of State shall adopt procedures to en-

496

sure that visas are not denied to such individuals for any reason not set forth in the Immigration and Nationality Act.

\*      \*      \*      \*      \*      \*      \*

─────────

## SECTION 1073 OF THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1995

**SEC. 1073. SENSE OF CONGRESS CONCERNING VISAS FOR HIGH-LEVEL OFFICIALS OF TAIWAN.**

It is the sense of Congress that no visa should be denied for a high-level official of Taiwan to enter the United States unless the official is otherwise ⟦excludable⟧ *inadmissible* under the immigration laws of the United States.

─────────

## SECTION 401 OF THE REFUGEE ACT OF 1980

SEC. 401. (a) \* \* \*

\*      \*      \*      \*      \*      \*      \*

(c) This section applies with respect to any alien in the United States (1) who has applied before November 1, 1979, for asylum in the United States, (2) who has not been granted asylum, and (3) with respect to whom a final, nonappealable, and legally enforceable order of ⟦deportation or exclusion⟧ *removal* has not be entered.

\*      \*      \*      \*      \*      \*      \*

─────────

## SECTION 501 OF THE REFUGEE EDUCATION ASSISTANCE ACT OF 1980

AUTHORITIES FOR OTHER PROGRAMS AND ACTIVITIES

SEC. 501. (a) \* \* \*

\*      \*      \*      \*      \*      \*      \*

(e) As used in this section, the term "Cuban and Haitian entrants" means—

(1) any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) or granted any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided; and

(2) any other national of Cuba or Haiti—

(A) who—

(i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act;

(ii) is the subject of ⟦exclusion or deportation⟧ *removal* proceedings under the Immigration and Nationality Act; or

(iii) has an application for asylum pending with the Immigration and Naturalization Service; and

497

(B) with respect to whom a final, nonappealable, and legally enforceable order of 【deportation or exclusion】 *removal* has not been entered.

\*　　\*　　\*　　\*　　\*　　\*　　\*

―――――――

## VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE II—PRISONS

\*　　\*　　\*　　\*　　\*　　\*　　\*

## Subtitle C—Alien Incarceration

SEC. 20301. INCARCERATION OF UNDOCUMENTED CRIMINAL ALIENS.
(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) TERMINATION OF LIMITATION.—Notwithstanding section 【242(j)(5)】 *241(h)(5)* of the Immigration and Nationality Act, as added by subsection (a), the requirements of section 【242(j)】 *241(h)* of the Immigration and Nationality Act, as added by subsection (a), shall not be subject to the availability of appropriations on and after October 1, 2004.

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE VI—DEATH PENALTY

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 60024. ENHANCED PENALTIES FOR ALIEN SMUGGLING.
Section 274(a) of the Immigration and Nationality Act (8 U.S.C. 1324(a)) is amended—
(1) in paragraph (1)—
(A) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(F) by striking "shall be fined in accordance with title 18, *United States Code,* or imprisoned not more than five years, or both, for each alien in respect to whom any violation of this paragraph occurs" and inserting "shall be punished as provided in subparagraph (B)"; and

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE XIII—CRIMINAL ALIENS AND IMMIGRATION ENFORCEMENT

\*　　\*　　\*　　\*　　\*　　\*　　\*

498

**SEC. 130002. CRIMINAL ALIEN TRACKING CENTER.**

⟦(a) OPERATION.—The Attorney General shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien tracking center.⟧

*(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 236(d) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.*

\*        \*        \*        \*        \*        \*        \*

**SEC. 130003. ALIEN WITNESS COOPERATION AND COUNTERTERRORISM INFORMATION.**

(a) \* \* \*

(b) CONDITIONS OF ENTRY.—

(1) \* \* \*

(3) PROHIBITION OF CHANGE OF STATUS.—Section 248(1) of the Immigration and ⟦Naturalization⟧ *Nationality* Act (8 U.S.C. 1258(1)) is amended by striking "or (K)" and inserting "(K), or (S)".

\*        \*        \*        \*        \*        \*        \*

**SEC. 130005. EXPEDITIOUS ⟦DEPORTATION⟧ *REMOVAL* FOR DENIED ASYLUM APPLICANTS.**

(a) IN GENERAL.—The Attorney General may provide for the expeditious adjudication of asylum claims and the expeditious ⟦deportation⟧ *removal* of asylum applicants whose applications have been finally denied, unless the applicant remains in an otherwise valid nonimmigrant status.

\*        \*        \*        \*        \*        \*        \*

**SEC. 130007. EXPANDED SPECIAL DEPORTATION PROCEEDINGS.**

(a) IN GENERAL.—Subject to the availability of appropriations, the Attorney General may expand the program authorized by section ⟦242A(d)⟧ *238(a)(3)* and ⟦242(i)⟧ *239(d)* of the Immigration and Nationality Act to ensure that such aliens are immediately deportable upon their release from incarceration.

\*        \*        \*        \*        \*        \*        \*

————————

## SECTION 7 OF CENTRAL INTELLIGENCE AGENCY ACT OF 1949

SEC. 7. Whenever the Director, the Attorney General and the Commissioner of Immigration shall determine ⟦that the entry⟧ *that the admission* of a particular alien into the United States for

499

permanent residence is in the interest of national security or essential to the furtherance of the national intelligence mission, such alien and his immediate family shall be 〔given entry into〕 *admitted to* the United States for permanent residence without regard to their inadmissibility under the immigration or any other laws and regulations, or to the failure to comply with such laws and regulations pertaining to admissibility: *Provided,* That the number of aliens and members of their immediate families 〔entering〕 *admitted to* the United States under the authority of this section shall in no case exceed one hundred persons in any one fiscal year.

————

## SECTION 4 OF THE ATOMIC WEAPONS AND SPECIAL NUCLEAR MATERIALS REWARDS ACT

SEC. 4. If the information leading to award under section 3 is furnished by an alien, the Secretary of State, the Attorney General, and the Director of Central Intelligence, acting jointly, may determine that the 〔entry〕 *admission* of such alien into the United States is in the public interest and, in that event, such alien and the members of his immediate family may receive immigrant visas and may be admitted to the United States for permanent residence, notwithstanding the requirements of the Immigration and Nationality Act.

————

## SECTION 8 OF THE FOREIGN AGENTS REGISTRATION ACT OF 1938

### ENFORCEMENT AND PENALTIES

SEC. 8. (a) * * *

* * * * * * *

(c) Any alien who shall be convicted of a violation of, or a conspiracy to violate, any provisions of this Act or any regulation thereunder shall be subject to 〔deportation in the manner provided by sections 241, 242, and 243 of the Immigration and Nationality Act.〕 *removal pursuant to chapter 4 of title II of the Immigration and Nationality Act.*

* * * * * * *

————

## SECTION 9 OF THE PEACE CORPS ACT

### PARTICIPATION OF FOREIGN NATIONALS

SEC. 9. In order to provide for assistance by foreign nationals in the training of volunteers, and to permit effective implementation of Peace Corps projects with due regard for the desirability of cost-sharing arrangements, where appropriate, the President may make provision for transportation, housing, subsistence, or per diem in lieu thereof, and health care or health and accident insurance for foreign nationals engaged in activities authorized by this Act while they are away from their homes, without regard to the provisions of any other law: *Provided, however,* That per diem in lieu of subsistence furnished to such persons shall not be at rates higher than

500

those prescribed by the Secretary of State pursuant to section 12 of Public Law 84–885 (70 Stat. 890). Such persons, and persons coming to the United States under contract pursuant to section 10(a)(5), may be admitted to the United States, if otherwise qualified, as nonimmigrants under section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)) for such time and under such conditions as may be prescribed by regulations promulgated by the Secretary of State and the Attorney General. A person admitted under this section who fails to maintain the status under which he was admitted or who fails to depart from the United States at the expiration of the time for which he was admitted, or who engages in activities of a political nature detrimental to the interests of the United States, or in activities not consistent with the security of the United States, shall, upon the warrant of the Attorney General, be taken into custody and promptly 【deported pursuant to sections 241, 242, and 243 of the Immigration and Nationality Act. Deportation】 *removed pursuant to chapter 4 of title II of the Immigration and Nationality Act* proceedings under this section shall be summary and the findings of the Attorney General as to matters of fact shall be conclusive.

———————

## SECTION 6 OF THE ACT OF AUGUST 1, 1956

SEC. 6. (a) * * *
(b) Any alien convicted of a violation of this Act or any regulation thereunder is subject to deportation in the manner provided by 【chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)】 *chapter 4 of title II of the Immigration and Nationality Act.*

\*       \*       \*       \*       \*       \*       \*

———————

## SECTION 2 OF THE VIRGIN ISLANDS NONIMMIGRANT ALIEN ADJUSTMENT ACT OF 1982

ADJUSTMENT OF IMMIGRATION STATUS

SEC. 2. (a) * * *

\*       \*       \*       \*       \*       \*       \*

(c)(1) * * *
(2) The Secretary of State, in his discretion and after consultation with the Secretary of the Interior and the Governor of the Virgin Islands of the United States, may limit the number of immigrant visas that may be issued in any fiscal year to aliens with respect to whom second preference petitions *or first or third family preference petitions* (filed by aliens who have had their status so adjusted) are approved.
(3) Notwithstanding any other provision of law, no alien shall be eligible to receive an immigrant visa (or to otherwise acquire the status of an alien lawfully admitted to the United States from permanent residence)—
    (A) by virtue of a fourth or fifth preference petition filed by an individual who had his status adjusted under this section unless the individual establishes to the satisfaction of the At-

501

torney General that exceptional and extremely unusual hardship exists for permitting the alien to receive such visa (or otherwise acquire such status); [or]

(B) by virtue of a second preference petition filed by an individual who was admitted to the United States as an immigrant by virtue of an immediate relative petition filed by the son or daughter of the individual, if that son or daughter had his or her status adjusted under this section[.]; or

*(C) by virtue of a first or third family preference petition filed by an individual who was admitted to the United States as an immigrant by virtue of a second family preference petition filed by the son or daughter of the individual, if that son or daughter had his or her status adjusted under this section.*

(4) For purposes of this subsection, the terms "second preference petition", "fourth preference petition", "fifth preference petition", and "immediate relative petition" mean, in the case of an alien, a petition filed under section 204(a) of the Act to grant preference status to the alien by reason of the relationship described in section 203(a)(2), 203(a)(4), 203(a)(5), or 201(b), respectively, of the Act (as in effect before October 1, 1991) or by reason of the relationship described in section 203(a)(2), 203(a)(3), or 201(b)(2)(A)(i), respectively, of such Act (as in effect [on or after such date).] *on or after such date and before October 1, 1996). For purposes of this subsection, the terms "first family preference petition", "second family preference petition", and "third family preference petition" mean, in the case of an alien, a petition filed under section 204(a) of the Act to grant preference status to the alien by reason of the relationship described in section 203(a)(1), 203(a)(2), or 203(a)(3), respectively (as in effect on and after October 1, 1996).*

\*　　\*　　\*　　\*　　\*　　\*　　\*

—————

## SECTION 2 OF THE CHINESE STUDENT PROTECTION ACT OF 1992

**SEC. 2. ADJUSTMENT TO LAWFUL PERMANENT RESIDENT STATUS OF CERTAIN NATIONALS OF THE PEOPLE'S REPUBLIC OF CHINA.**

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) OFFSET IN PER COUNTRY NUMERICAL LEVEL.—

(1) \* \* \*

(2) ALLOTMENT IF SECTION 202(e) APPLIES.—If section 202(e) of the Immigration and Nationality Act is applied to the People's Republic of China in an applicable fiscal year, in applying such section—

(A) 300 immigrant visa numbers shall be deemed to have been previously issued to natives of that foreign state under section [203(b)(3)(A)(i)] *203(b)(4)(B)* of such Act in that year, and

502

(B) 700 immigrant visa numbers shall be deemed to have been previously issued to natives of that foreign state under section 203(b)(5) of such Act in that year.

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

## SECTION 1821 OF TITLE 28, UNITED STATES CODE

### § 1821. Per diem and mileage generally; subsistence

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(e) An alien who has been paroled into the United States for prosecution, pursuant to section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), or an alien who either has admitted belonging to a class of aliens who are deportable or has been determined pursuant to section ⟦242(b)⟧ *240* of such Act (8 U.S.C. 1252(b)) to be deportable, shall be ineligible to receive the fees or allowances provided by this section.

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

## IMMIGRATION REFORM AND CONTROL ACT OF 1986

### TITLE II—LEGALIZATION

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 202. CUBAN-HAITIAN ADJUSTMENT.**

(a) ADJUSTMENT OF STATUS.—The status of any alien described in subsection (b) may be adjusted by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to that of an alien lawfully admitted for permanent residence if—

(1) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) the alien is not an alien described in section 243(h)(2) of such Act;

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 204. STATE LEGALIZATION IMPACT-ASSISTANCE GRANTS.**

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) PROVIDING ASSISTANCE.—(1) Of the amounts allotted to a State under this section, the State may only use such funds, in accordance with this section—

(A) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(D) to make payments for public education and outreach (including the provision of information to individual applicants) to inform temporary resident aliens regarding—

503

　　　(i) the requirements of sections 210**[**, 210A,**]** and 245A of the Immigration and Nationality Act regarding the adjustment of resident status,

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(j) DEFINITIONS.—For purposes of this section:
　　　(1) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

　　　(4) The term "eligible legalized alien" means an alien who has been granted lawful temporary resident status under section 210**[**, 210A,**]** or 245A of the Immigration and Nationality Act, but only until the end of the five-year period beginning on the date the alien was first granted such status, except that the five-year limitation shall not apply for the purposes of making payments from funds appropriated under the fiscal year 1995 Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for providing public information and outreach activities regarding naturalization and citizenship; and English language and civics instruction to any adult eligible legalized alien who has not met the requirements of section 312 of the Immigration and Nationality Act for purposes of becoming naturalized as a citizen of the United States.

### TITLE III—REFORM OF LEGAL IMMIGRATION

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### Part B—Other Changes in the Immigration Law

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

**SEC. 315. MISCELLANEOUS PROVISIONS.**
　(a) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

　(c) SENSE OF CONGRESS RESPECTING TREATMENT OF CUBAN POLITICAL PRISONERS.—It is the sense of the Congress that the Secretary of State should provide for the issuance of visas to nationals of Cuba who are or were imprisoned in Cuba for political activities without regard to section **[**243(g)**]** *243(d)* of the Immigration and Nationality Act (8 U.S.C. **[**1253(g)**]** *1253(d)*).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### TITLE IV—REPORTS TO CONGRESS

**SEC. 401. TRIENNIAL COMPREHENSIVE REPORT ON IMMIGRATION.**
　(a) TRIENNIAL REPORT.—The President shall transmit to the Congress, not later than January 1, 1989, and not later than January 1 of every third year thereafter, a comprehensive immigration-impact report.
　(b) DETAILS IN EACH REPORT.—Each report shall include—
　　　(1) the number and classification of aliens admitted (whether as **[**immediate relatives**]** *spouses and children of citizens*, special immigrants, refugees, or under the preferences classifica-

504

tions, or as nonimmigrants), paroled, or granted asylum, during the relevant period;

\*       \*       \*       \*       \*       \*       \*

---

## SECTION 702 OF THE DEPARTMENTS OF COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATIONS ACT, 1988

SEC. 702. (a) \* \* \*

(b) PROCESSING OF IMMIGRANT VISA APPLICATIONS OF CUBAN NATIONALS IN THIRD COUNTRIES.—Notwithstanding section 212(f) and section 【243(g)】 *243(d)* of the Immigration and Nationality Act, on and after the date of the enactment of this Act, consular officers of the Department of State shall process immigrant visa applications by nationals of Cuba located in third countries on the same basis as immigrant visa applications by nationals of other countries.

\*       \*       \*       \*       \*       \*       \*

---

## SECTION 903 OF THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1988 AND 1989

SEC. 903. PROCESSING OF CUBAN NATIONALS FOR ADMISSION TO THE UNITED STATES.

(a) \* \* \*

(b) PROCESSING OF IMMIGRANT VISA APPLICATIONS OF CUBAN NATIONALS IN THIRD COUNTRIES.—Notwithstanding section 212(f) and section 【243(g)】 *243(d)* of the Immigration and Nationality Act, on and after the date of the enactment of this Act, consular officers of the Department of State shall process immigrant visa applications by nationals of Cuba located in third countries on the same basis as immigrant visa applications by nationals of other countries.

\*       \*       \*       \*       \*       \*       \*

---

## SECTION 6 OF THE FOOD STAMP ACT OF 1977

ELIGIBILITY DISQUALIFICATIONS

SEC. 6. (a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(f) No individual who is a member of a household otherwise eligible to participate in the food stamp program under this section shall be eligible to participate in the food stamp program as a member of that or any other household unless he or she is (1) a resident of the United States and (2) either (A) a citizen or (B) an alien lawfully admitted for permanent residence as an immigrant as defined by sections 101(a)(15) and 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15) and 8 U.S.C. 1101(a)(20)), excluding, among others, alien visitors, tourists, diplomats, and students who enter the United States temporarily with

505

no intention of abandoning their residence in a foreign country; or (C) an alien who entered the United States prior to June 30, 1948, or such subsequent date as is enacted by law, has continuously maintained his or her residence in the United States since then, and is not ineligible for citizenship, but who is deemed to be lawfully admitted for permanent residence as a result of an exercise of discretion by the Attorney General pursuant to section 249 of the Immigration and Nationality Act (8 U.S.C. 1259); or (D) an alien who has qualified for conditional entry pursuant to sections 207 and 208 of the Immigration and Nationality Act (8 U.S.C. 1157 and 1158); or (E) an alien who is lawfully present in the United States as a result of an exercise of discretion by the Attorney General for emergent reasons or reasons deemed strictly in the public interest pursuant to section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)); or (F) an alien within the United States as to whom the Attorney General has withheld deportation pursuant to section 243 of the Immigration and Nationality Act (8 U.S.C. 1253(h)). No aliens other than the ones specifically described in clauses (B) through (F) of this subsection shall be eligible to participate in the food stamp program as a member of any household. The income (less a pro rata share) and financial resources of the individual rendered ineligible to participate in the food stamp program under this subsection shall be considered in determining the eligibility and the value of the allotment of the household of which such individual is a member.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

———————

## SECTION 214 OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1980

Sec. 214. (a) Notwithstanding any other provision of law, the Secretary of Housing and Urban Development may not make financial assistance available for the benefit of any alien unless that alien is a resident of the United States and is—

(1) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(5) an alien who is lawfully present in the United States as a result of the Attorney General's withholding deportation pursuant to section 【243(h)】 *241(b)(3)* of the Immigration and Nationality Act (8 U.S.C. 1253(h)); or

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

———————

## SECTION 304 OF THE MISCELLANEOUS AND TECHNICAL IMMIGRATION AND NATURALIZATION AMENDMENTS OF 1991

SEC. 304. CORRECTIONS RELATING TO TITLE III OF THE IMMIGRATION ACT OF 1990.

(a) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

506

(c)(1) In the case of an alien described in paragraph (2) whom the Attorney General authorizes to travel abroad temporarily and who returns to the United States in accordance with such authorization—

(A) the alien shall be inspected and admitted in the same immigration status the alien had at the time of departure if—

(i) in the case of an alien described in paragraph (2)(A), the alien is found not to be excludable on a ground of exclusion referred to in section 301(a)(1) of the Immigration Act of 1990, or

(ii) in the case of an alien described in paragraph (2)(B), the alien is found not to be excludable on a ground of exclusion referred to in section 244A(c)(2)(A)(iii) of the Immigration and Nationality Act; and

(B) the alien shall not be considered, by reason of such authorized departure, to have failed to maintain continuous physical presence in the United States for purposes of section 〔244(a)〕 *240A(a)* of the Immigration and Nationality Act if the absence meets the requirements of section 〔244(b)(2)〕 *240A(b)(2)* of such Act.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

———————

## SOVIET SCIENTISTS IMMIGRATION ACT OF 1992

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

**SEC. 3. WAIVER OF JOB OFFER REQUIREMENT.**

The requirement in section 〔203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))〕 *203(b)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(3)(B)(i))* that an alien's services in the sciences, arts, or business be sought by an employer in the United States shall not apply to any eligible independent states or Baltic scientist who is applying for admission to the United States for permanent residence in accordance with that section.

**SEC. 4. CLASSIFICATION OF INDEPENDENT STATES SCIENTISTS AS HAVING EXCEPTIONAL ABILITY.**

(a) IN GENERAL.—The Attorney General shall designate a class of eligible independent states and Baltic scientists, based on their level of expertise, as aliens who possess "exceptional ability in the sciences", for purposes of section 〔203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))〕 *203(b)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(3)(B)(i))*, whether or not such scientists possess advanced degrees.

(b) REGULATIONS.—The Attorney General shall prescribe regulations to carry out subsection (a).

(c) LIMITATION.—Not more than 750 eligible independent states and Baltic scientists (excluding spouses and children if accompanying or following to join) within the class designated under subsection (a) may be allotted visas under section 〔203(b)(2)(A) of the

507

Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))】 *203(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)).*

\*     \*     \*     \*     \*     \*     \*

------

### SECTION 9 OF THE IMMIGRATION AND NATIONALITY AMENDMENTS OF 1976

【SEC. 9. (a) The amendments made by this Act shall not operate to affect the entitlement to immigrant status or the order of consideration for issuance of an immigrant visa of an alien entitled to a preference status, under section 203(a) of the Immigration and Nationality Act, as in effect on the day before the effective date of this Act, on the basis of a petition filed with the Attorney General prior to such effective date.

【(b) An alien chargeable to the numerical limitation contained in section 21(e) of the Act of October 3, 1965 (79 Stat. 921), who established a priority date at a consular office on the basis of entitlement to immigrant status under statutory or regulatory provisions in existence on the day before the effective date of this Act shall be deemed to be entitled to immigrant status under section 203(a)(8) of the Immigration and Nationality Act and shall be accorded the priority date previously established by him. Nothing in this section shall be construed to preclude the acquisition by such an alien of a preference status under section 203(a) of the Immigration and Nationality Act, as amended by section 4 of this Act. Any petition filed by, or on behalf of, such an alien to accord him a preference status under section 203(a) shall, upon approval, be deemed to have been filed as of the priority date previously established by such alien. The numerical limitation to which such an alien shall be chargeable shall be determined as provided in sections 201 and 202 of the Immigration and Nationality Act, as amended by this Act.】

------

### SECTION 19 OF THE IMMIGRATION AND NATIONALITY AMENDMENTS OF 1981

【SEC. 19. The numerical limitations contained in sections 201 and 202 of the Immigration and Nationality Act shall not apply to any alien who is present in the United States and who, on or before June 1, 1978—

【(1) qualified as a nonpreference immigrant under section 203(a)(8) of such Act (as in effect on June 1, 1978);

【(2) was determined to be exempt from the labor certification requirement of section 212(a)(14) of such Act because the alien had actually invested, before such date, capital in an enterprise in the United States of which the alien became a principal manager and which employed a person or persons (other than the spouse or children of the alien) who are citizens of the United States or aliens lawfully admitted for permanent residence; and

508

⟦(3) applied for adjustment of status to that of an alien lawfully admitted for permanent residence.⟧

———————

**INTERNAL REVENUE CODE OF 1984**

# Subtitle A—Income Taxes

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 1—NORMAL TAXES AND SURTAXES

\*     \*     \*     \*     \*     \*     \*

## Subchapter A—Determination of Tax Liability

\*     \*     \*     \*     \*     \*     \*

### PART IV—CREDITS AGAINST TAX

\*     \*     \*     \*     \*     \*     \*

#### Subpart B—Foreign Tax Credits, Etc.

\*     \*     \*     \*     \*     \*     \*

**SEC. 32. EARNED INCOME.**

(a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

(c) DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

(1) ELIGIBLE INDIVIDUAL.—

(A) \* \* \*

\*     \*     \*     \*     \*     \*     \*

*(F) IDENTIFICATION NUMBER REQUIREMENT.—The term "eligible individual" does not include any individual who does not include on the return of tax for the taxable year—*

*(i) such individual's taxpayer identification number, and*

*(ii) if the individual is married (within the meaning of section 7703), the taxpayer identification number of such individual's spouse.*

\*     \*     \*     \*     \*     \*     \*

(k) IDENTIFICATION NUMBERS.—For purposes of subsections (c)(1)(F) and (c)(3)(D), a taxpayer identification number means a social security number issued to an individual by the Social Security Administration (other than a social security number issued pursuant to clause (II) (or that portion of clause (III) that relates to clause (II)) of section 205(c)(2)(B)(i) of the Social Security Act).

\*     \*     \*     \*     \*     \*     \*

509

# Subtitle F—Procedure and Administration

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 63—ASSESSMENT

\*     \*     \*     \*     \*     \*     \*

## Subchapter B—Deficiency Procedures in the Case of Income, Estate, Gift, and Certain Excise Taxes

\*     \*     \*     \*     \*     \*     \*

**SEC. 6213. RESTRICTIONS APPLICABLE TO DEFICIENCIES; PETITION TO TAX COURT**

(a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

(g) DEFINITIONS.—For purposes of this section—

(1) \* \* \*

(2) MATHEMATICAL OR CLERICAL ERROR.—The term "mathematical or clerical error" means—

(A) \* \* \*

\*     \*     \*     \*     \*     \*     \*

(D) an omission of information which is required to be supplied on the return to substantiate an entry on the return, ⟦and⟧

(E) an entry on a return of a deduction or credit in an amount which exceeds a statutory limit imposed by subtitle A or B, or chapter 41, 42, 43, or 44, if such limit is expressed—

(i) as a specified monetary amount, or

(ii) as a percentage, ratio, or fraction,

and if the items entering into the application of such limit appear on such return⟦.⟧, *and*

*(F) an omission of a correct taxpayer identification number required under section 23 (relating to credit for families with younger children) or section 32 (relating to the earned income tax credit) to be included on a return.*

\*     \*     \*     \*     \*     \*     \*

————————

## THE DEPARTMENTS OF COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATION ACT, 1994

### TITLE I—DEPARTMENT OF JUSTICE AND RELATED AGENCIES

\*     \*     \*     \*     \*     \*     \*

### DEPARTMENT OF JUSTICE

\*     \*     \*     \*     \*     \*     \*

510

IMMIGRATION AND NATURALIZATION SERVICE

SALARIES AND EXPENSES

For expenses, not otherwise provided for, necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, including not to exceed $50,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; purchase for police-type use (not to exceed 597 of which 302 are for replacement only) without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance and operation of aircraft; and research related to immigration enforcement; $1,048,538,000, of which not to exceed $400,000 for research shall remain available until expended, and of which not to exceed $10,000,000 shall be available for costs associated with the Training program for basic officer training: *Provided,* That none of the funds available to the Immigration and Naturalization Service shall be available for administrative expenses to pay any employee overtime pay in an amount in excess of $25,000: *Provided further,* That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: *Provided further,* That not to exceed $5,000 shall be available for official reception and representation expenses【: *Provided further,* That the Land Border Fee Pilot Project scheduled to end September 30, 1993, is extended to September 30, 1996 for projects on the northern border of the United States only】.

*     *     *     *     *     *     *

─────────

## SECTION 506 OF THE INTELLIGENCE AUTHORIZATION ACT, FISCAL YEAR 1990

REQUIREMENTS FOR CITIZENSHIP FOR STAFF OF UNITED STATES ARMY RUSSIAN INSTITUTE

SEC. 506. (a) For purposes of section 319(c) of the Immigration and Nationality Act (8 U.S.C. 1430(c)), the United States Army Russian Institute, located in Garmisch, Federal Republic of Germany, shall be considered to be an organization described in clause (1) of 【this section】 *such section.*

*     *     *     *     *     *     *

─────────

## SECTION 140 OF THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1994 AND 1995

SEC. 140. VISAS.
(a) * * * *

*     *     *     *     *     *     *

(f) Not later than December 31, 1996, the Secretary of State and the Director of the Federal Bureau of Investigation shall jointly submit to the Committee on Foreign Affairs and the Committee on the Judiciary of the House of Representatives, and the Committee

511

on Foreign Relations and the Committee on the Judiciary of the Senate, a report on the effectiveness of the procedures authorized in subsections (d) and (e).

〖(g) This subsection shall〗 *(g) Subsections (d) and (e) shall* cease to have effect after December 31, 1997.

## ADDITIONAL VIEWS OF REP. ELTON GALLEGLY

One of the most critical challenges facing the 104th Congress is the passage of comprehensive and effective immigration reform legislation. For many years, the American people have expressed frustration that its leaders in Congress have failed to enact policies to eliminate the unacceptably high levels of illegal migration to our country. Under the able leadership of Representative Lamar Smith, Chairman of the House Subcommittee on Immigration and Claims, the Judiciary Committee has approved legislation, H.R. 2202, which finally addresses in a serious manner the public's concern over this problem.

In an effort to find solutions to this on-going crisis, Speaker Newt Gingrich earlier this year appointed me Chairman of the Congressional Task Force on Immigration Reform, which was comprised of fifty-four Members of Congress, both Republicans and Democrats. We were asked to provide a report to the Speaker and relevant congressional committees by June 30, 1995. In preparing its findings, the Task Force on Immigration Reform reviewed existing laws; committee reports; testimony before Committees of Congress; and various existing reports prepared by a wide-range of organizations and individuals. To enhance the expertise of the panel and obtain a first-hand view of the problem, the Task Force conducted fact-finding missions to San Diego, California; New York, New York; and Miami, Florida.

The Task Force was organized into six working groups to focus on the most crucial areas of immigration policy most in need of reform. The groups were: Border Enforcement, Chaired by Congressman Royce (R–CA); Workplace Enforcement, Chaired by Congressman Deal (R–GA); Public Benefits, Chaired by Congressman Goss (R–FL); Political Benefits, Chaired by Congressman Goss (R–FL); Political Asylum, Chaired by Congressman McCollum (R–FL); Deportation, Chaired by Congressman Condit (D–CA); and Visa Overstays, Chaired by Congressman Goodlatte (R–VA). These working groups met individually and made specific recommendations to the entire Task Force.

The Task Force has worked closely with Chairman Smith to include over 80% of these recommendations in H.R. 2202—the Immigration in the National Interest Act. Many measures were incorporated in the original bill, while others have been successfully added to the legislation through amendments.

At the time of introduction, H.R. 2202 included over twenty-five Task Force recommendations. In the area of border enforcement, these recommendations included the doubling of the number of border patrol agents stationed at the border over a five year period, increasing penalties for immigrant smuggling and the construction of a triple-barrier fencing along the U.S.-Mexico border.

513

H.R. 2202 also incorporated in its entirety H.R. 1765, a bill which I introduced earlier this year that targets long-term illegal immigration. This legislation prohibits anyone who has been in this country illegally for more than one year from receiving a visa for a ten-year period. This will serve as a strong encouragement for illegal immigrants—both persons who overstayed their visa and those who crossed the border illegally—to return to their native countries and re-enter through legal channels.

During markup of the bill in the Immigration and Claims Subcommittee, I offered four amendments, including three en bloc amendments which were accepted. The first amendment authorized full reimbursement to state and local governments for the costs of providing emergency health care service to illegal immigrants. Hospitals are required to verify with INS that the patient is illegally in the U.S. as a condition for such reimbursement.

A major focus of the three en bloc amendments involved bolstering enforcement efforts targeted at criminal aliens. They provided for improving the identification of criminal aliens by state and local authorities; mandatory detention of all illegal aliens caught re-entering the United States on three occasions; increasing penalties for immigrant smuggling; increasing funds for investigators and border patrol located in the interior; increasing criminal penalties for possessing, producing or transferring fraudulent documents; and increasing the amount reimbursable for states and local governments for the costs of incarcerating criminal aliens. Another important measure dealing with criminal aliens authorizes the President to enter into negotiations with foreign countries for the purpose of reaching agreement on the transfer of alien prisoners.

Furthermore, the en bloc amendments authorized a major expansion in the number of asylum officers and more than doubled the number of detention spaces available to the Immigration and Naturalization Service. This latter provision will allow the INS to house illegal entrants determined to be high-flight risk or pose a danger to the community.

As H.R. 2202 was considered by the full Judiciary Committee, I offered nine additional amendments, all of which were accepted. Two amendments strengthened measures against criminal aliens, including one providing that upon the request of a state governor, the INS will assist state courts in the identification of illegal aliens pending criminal prosecution.

Several other measures specifically targeted illegal aliens who attempt to receive government benefits. One important amendment requires the Department of Education to verify the immigration status of persons who apply for higher education benefits. This provision was promoted by an Education Department report which found that ineligible aliens are awarded over $70 million in Pell Grants and $45 million in Stafford Loans each year. Another measure ensures that state officials are able to communicate with the Immigration and Naturalization Service for the purpose of verifying the immigration status of aliens who are applying for public benefits. This measure also ensures that state government entities can report to the INS when an alien is illegally attempting to access taxpayer financed programs.

514

Finally, in an effort to protect American jobs and discourage illegal immigration, I introduced an amendment to close a major loophole in the existing immigration law. Under existing law, an alien who applies for permanent residency based on a job offer must demonstrate to INS and the Department of Labor that, depending on the visa category, they possess at least a specific level of work experience. However, illegal work is currently allowed to be counted as valid experience for this purpose. This encourages persons to come to the U.S., work illegally and then apply for a green card based on that illegal work experience. My amendment, which was adopted by the Judiciary Committee, would prohibit aliens from using this illegal work as evidence that he or she possesses sufficient experience and skills to obtain a green card.

The bill reported by the Judiciary Committee represents a watershed in our attempt to once and for all address the perplexing issues of illegal immigration. We have a good product. However, several additional provisions need to be added to the H.R. 2202 when it comes to the House floor. At this time, there are several possible amendments under consideration, including amendments to give states the option of denying free public education benefits to illegal aliens and close the loopholes in current law that allow many illegal immigrants to improperly receive free public housing.

Above all else, this landmark legislation is firmly rooted in the rule of law. As a society, we simply cannot allow anyone, regardless of motivation, to illegally cross our borders or overstay their legal welcome in this country with impunity. If enacted, this legislation will represent a major step in restoring the confidence of our people in the ability of the federal government to respond effectively to this crisis.

ELTON GALLEGLY.

## ADDITIONAL VIEWS

We want to explain the reasons for two amendments, adopted by voice vote in the Judiciary Committee markup. One kept the TWOV fine at the current level. The second defined "stowaway."

The effect of the first amendment was to keep the civil penalty assessed against airlines for bringing inadmissible aliens from contiguous countries, those commonly referred to as aliens "traveling without visa" (TWOVs), at its current level of $3,000. The original bill would have raised the fee to $5,000.

This amendment, which received the strong bipartisan support of our colleagues, was offered for several reasons. In our view, this is not the time to raise the fine amount.

First, we believe the airlines have made significant compliance efforts, especially considering that the number of passengers has risen at the same time as the amount collected in fines has dropped. The airlines paid $21.4 million in fines in fiscal year 1992, $18.3 million in fiscal year 1993, and $13.4 million in fiscal year 1994. The airlines also invest much effort each year in training their staffs in proper documentation screening.

Second, the Immigration and Naturalization Service has not yet acted on the direction of Congress in 1994 to establish a fine mitigation program. We are concerned that this program, as required under Section 273(e) of the Immigration and Nationality Act, has yet to be established. Therefore, we urge the INS to propose as soon as possible a rule establishing a fine mitigation program, pursuant to Congressional intent in Public Law 103–416.

Finally, it should be remembered that the airlines already pay for the detention of TWOV passengers through a 1986 agreement, a $6 per ticket user fee. The user fee, which goes to the INS, generated $288 million in fiscal year 1994 alone, including a surplus of nearly $40 million. Yet the INS maintains a policy that forces U.S. air carriers to assume custody and financial responsibility for improperly documented passengers, contrary to the 1986 accord.

This current policy continues to be contrary to Congressional intent as expressed in H.R. Rept. No. 197, 99th Congress, 1st Sess. 38 (1985) and H.R. Rept. No. 669, 99th Congress, 2nd Sess 35 (1986), and reconfirmed in Linea Area Nacional de Chile v. Meissner, No. 94–6288 (2d Cir., Sept. 11 1995). We believe such passengers should be detained at Federal detention centers by trained law enforcement officers, rather than at accommodations paid for by private transportation lines. The INS should therefore assume custodial responsibility for all such improperly documented aliens, and should pay for these detention costs from the Immigration User Fee Account. Funds in this account are intended to cover expenses incurred in the provision of various INS services, including the detention costs of excludable aliens.

(515)

516

The second amendment defines "stowaway" as someone who boards a vessel without consent through concealment. This definition comports with the "stowaway" definition in 18 U.S.C. 2199. Further, the definition excludes someone who boards an aircraft or other vessel with a ticket. In plain language, someone boarding with a ticket does not stow himself away seeking to obtain transportation without official consent. Thus, it would do violence to plain English language to call someone a "stowaway" who boards a vessel in plain view and by normal means.

In defining the term "stowaway," the language in the bill as amended is intended to include those who use normal boarding procedures. We are aware of the trend in the airline industry toward so-called "ticketless" travel. We intend that the term "ticket" as used in this section of the bill would apply as well to those passengers boarding with a boarding pass or other indication, including electronic entries, of proper boarding authorization in a developing "ticketless" environment.

Sincerely,

Ed Bryant.
Howard Coble.
Fred Heineman.
Steven Schiff.
Martin R. Hoke.
Bob Barr.
Melvin L. Watt.
Steve Chabot.
Sonny Bono.

## ADDITIONAL VIEWS OF CONGRESSMAN REED

I voted for H.R. 2202, but did so with certain reservations. I believe the United States must take action to address the problem of widespread illegal immigration, and H.R. 2202 takes many important and necessary steps in this regard.

However, I have serious concerns about the provisions on legal immigration, and believe the House should address these very different issues in separate legislation. The issue of legal immigration should not be considered in the context of the emotionally charged debate on illegal immigration. Addressing illegal immigration involves criminal laws, border enforcement, deportation issues, and workplace enforcement. The policy decisions to be made regarding legal immigration are completely different.

I support reasonable restrictions on legal immigration: The United States has the right and responsibility to ensure that only those who are likely to become productive citizens may immigrate to our shores. However, this bill goes too far. For example, it arbitrarily denies millions of U.S. citizens who have played by the rules and waited in line, in many cases for as long as a decade after having paid fees and gotten applications approved, the opportunity to sponsor and reunite with an overseas family member. The bill also adopts a new definition of "family member" for immigration purposes which excludes brothers and sisters as well as most children over age 21. Most Americans do not believe that any of their children, regardless of how old they are, are distant family members. These are but a few of the most troubling legal immigration provisions.

I am also opposed to the cap on refugee admissions, and voted to lift the cap, and reform the consultation process. Unfortunately, this amendment by Representative Schiff narrowly failed on a 16 to 15 vote, with several Members absent. It is my hope that this statutory cap will be eliminated when H.R. 2202 is considered on the House floor. The admission of refugees to the United States is intimately connected to our foreign policy concerns. We must be able to adjust to swiftly changing international conditions. Legislating a cap on refugee admissions would send the wrong message to nations that share the responsibility for the world's refugees and needlessly jeopardize the international system of protection and resettlement of those fleeing persecution, torture, and other life-threatening situations.

The current system of consultation between the Administration and Congress requires an annual analysis of worldwide conditions and provides for emergency situations. It is a responsible and flexible system that includes Congressional participation in setting annual admissions and determining our response to emerging international crises.

(517)

518

    Finally, I would like to commend Subcommittee Chairman Lamar Smith and Ranking Member John Bryant for their willingness to address these issues. I received assurances from Mr. Smith that the House would have the opportunity to address the concerns that I have outlined above when the bill is considered on the floor. I look forward to working with him to make further improvements to this legislation.

JACK REED.

## ADDITIONAL VIEWS CONCERNING EMPLOYMENT VERIFICATION SYSTEM

Amazingly, at a time when many argue that Government is too intrusive and bureaucratic and spends too much, Title IV of H.R. 2202 proposes a computerized national employment registry under the guise of immigration reform. This "employment verification system" represents a perilous threat to our Constitutional rights. By forcing the government to maintain a file on every single individual within a covered state and to approve every single hiring decision within that state, H.R. 2202 will truly usher in the era of a "Big Brother," all-intrusive federal bureaucracy. Even more ominously, since the telephone verification system will inevitably be subject to government errors and discrepancies, it may will be a mere prelude to a full-fledged national ID card, complete with voice, retina and fingerprint identifiers.[1]

Although styled a "pilot program," the registry would take place in the five states with the largest illegal alien population (i.e., California, Texas, New York, Florida, and Illinois)[2] and cover 92.8 million people.[3] Businesses in these States would understandably desire to see Congress quickly impose the verification system on the rest of the country, less they be placed at an unfair economic disadvantage.

Under the pilot project, no individuals in these States will be hired without the express approval of the Federal Government. H.R. 2202 requires that all employers in these states—from General Motors to households with domestic help—report new employees to the Federal Government by a telephone 1–800 number or through computer E-mail within three days. The Federal Government would then check the employee's name and social security number through its database. If the Government does not verify that the person is authorized to work, the worker would have 10 days to try to verify his or her eligibility and two weeks in which to appeal the decision pursuant to the Federal Tort Claims Act. These procedures would apply any time anyone begins a new job, and burdens business with an additional layer on top of the current I–9 document verification requirements.

The employee verification system will not be foolproof. During hearings on the bill it was conceded that the SSA and INS computers do not even have the capacity to read each other's data.[4] A recent study by the INS found a 28 percent error rate in the Social

---

[1] This is in addition to provision in Title I providing for a "biometric identifier" (e.g., finger or hand print for aliens frequently crossing the Mexican border).
[2] U.S. Commission on Immigration Reform, U.S. Immigration Policy: Restoring Credibility, September 1994 at 64 [hereinafter Commission Report].
[3] Cato Institute, Statistical Abstract of the United States. (1993 figures).
[4] See Transcript of Oversight Hearing on Work Site Enforcement of Employer Sanctions, Friday, March 3, 1995, U.S. House of Representatives, Subcommittee on Immigration and Claims, Committee on the Judiciary.

520

Security Administration (SSA) database.[5] This verification requirement therefore creates huge possibilities for flawed information being disseminated to employers which will deny American citizens and lawful permanent residents the opportunity to work. Even if the error rate could be substantially reduced, it will still translate into millions of postponed or lost job opportunities.

The "verification system" is no answer to the problem of discrimination. In order to avoid the disruptions resulting from government errors and discrepancies, employers would most likely continue to avoid including individuals whose appearance, name, accent or family background make their profile appear "foreign." Moreover, as amended, H.R. 2202 would require that a person alleging discrimination under the existing employer sanctions provision show that the employer intended to discriminate, a burden of proof that is extremely difficult to satisfy.

And the tester program included in the bill[6] will not redeem a bad program. We doubt the Republican Majority will be clamoring to appropriate funds for testers in the present budget environment. Even if they did, the program would be able to effect only a small fraction of the nation's employers.

The verification system proposed in this bill will also dangerously increase the Federal Government's ability to monitor individuals. Although the legislation purports to limit the use of the information maintained in these new files to "employment verification" purposes only, the system is bound to be subject to unauthorized disclosures and leaks. Just as supposedly sacrosanct census data were used to identify Japanese-Americans for internment during World War II, the massive new data base necessitated by the Republican immigration bill will prove a tempting target for future legislation intent on cracking down on tax cheaters, "deadbeat" dads, or unpopular dissident groups.

The U.S. Commission on Immigration Reform estimates the cost of design and development of the combined SSA/INS database at $4 million over a two year period.[7] The Commission further estimates the annual cost of maintaining and operating the verification system at $32 million.[8] Whatever the cost, we believe that the verification system is a poor allocation of scarce resources. And the costs to the private sector will be many, many times greater, as employers will be forced to incur major operational and administrative costs in order to verify new employees.[9] Worst of all, inevitable system errors will result in economic injustice to those individuals whose right to work will be lost to computer error.

---

[5] Telephone Verification System (TVS) Pilot, Report on the Demonstration Pilot-Phase I (1993) (9 company test) [hereinafter TVS Pilot Report].

[6] This requires the Attorney General implement a "tester" program which includes individuals posing as genuine applicants, in order to monitor and ensure that the verification system is being applied fairly.

[7] Commission Report, supra note 2 at 70.

[8] The report also states that correcting errors in the database will require the largest financial output. Discrepancies referred to the Social Security Administration will cost approximately $122 million initially with an annual cost of $30 million. Commission Report, supra note 2 at 64.

[9] The INS pilot project indicated compliance costs of $5,000 for each company, but actual compliance costs would be several times that, since the pilot project only checked prospective employees who identified themselves as immigrants, not every individual offered a job. See TVS Pilot Report, supra note 5.

521

Certainly illegal immigration is a problem. But to adopt a system that punishes honest employers and lawful residents and citizens in order to deter others from breaking the law is to lose all sense of perspective. We urge the Members to oppose the employment verification provisions of H.R. 2202.

JOHN CONYERS, Jr.
PAT SCHROEDER.
ZOE LOFGREN.
JERROLD NADLER.
SHEILA JACKSON-LEE.
MELVIN L. WATT.
JOSÉ E. SERRANO.
XAVIER BECERRA.

## ADDITIONAL VIEWS CONCERNING INVESTORS PREFERENCE PROGRAMS

On whichever side of the immigration debate one falls, we should all be able to agree that maintaining the Investor's Preference Program is unconscionable in a bill otherwise reducing the number of legal immigrants in most categories. Yet, H.R. 2202 reserves 10,000 spots for anyone who happens to be wealthy enough to spend $1 million to start a business in the U.S. (or $500,000 under a special pilot program), even though only 400 immigrants were admitted through this program last year.

Simply being wealthy should not entitle immigrants to a place in line for themselves and their families. By maintaining this program, we are sending the message that wealth for the sake of wealth is a virtue, regardless of the individual's ability or character.

Proponents of the Investor's Preference Program argue there is nothing inappropriate about an immigration policy that gives a priority to those who can contribute to this country's financial wellbeing. We agree. We believe that typical legal immigrants, with their entrepreneurial spirits and work ethic, make such contributions. Few come here with a million dollars in their pockets, yet many become successful entrepreneurs. Some are millionaires today. This is what America is about—opportunity, not birthright.

Not surprisingly, wealthy foreigners have discovered ways to exploit the Investor's Preference Program to their advantage. In fact, an entire cottage industry has emerged where "investment advisors" take the money, invest it in what they advertise as "INS approved" businesses and then guarantee residence status AND a return of the investment.

Suffice it to say there is no due diligence required to confirm that the invested funds come from legitimate sources. Thus, deposed dictators could raid their countries' treasuries and then find themselves at the front of our immigration line. Drug cartel kingpins escaping prosecution in their home countries could do the same.

It is worth noting that there is nothing in our current immigration policy to prevent a foreign national from starting a business here or investing in an existing American venture. The fact that America is one of the strongest consumer markets in the world provides ample incentive for foreign investment here.

523

We do not need to bribe foreign investors with an offer of permanent residence status, particularly since such status is the first step to American citizenship. American citizenship simply is not a commodity for sale. Not for a million dollars. And not at any other price.

For these reasons, we dissent from the investor preference provisions in H.R. 2202.

John Conyers, Jr.
John Bryant.
Bobby Scott.
Melvin L. Watt.
Jerrold Nadler.
José E. Serrano.
Xavier Becerra.
Barney Frank.

## ADDITIONAL VIEWS CONCERNING H–1B TEMPORARY VISA PROGRAM

We oppose the provisions in Title VIII relating to the H–1B, or "temporary" visa program for skilled workers. We agree with other opponents that the H–1B program displaces American workers, drives down wages in certain sectors, creates an indentured class of foreign workers, and discourages Americans from entering certain fields (most notably, science and engineering).

As Secretary Reich has said:

We have seen numerous instances in which American businesses have brought in foreign skilled workers after having laid off skilled American workers, simply because they can get the foreign workers more cheaply. The program has become a major means of circumventing the costs of paying skilled American workers or the costs of training them.[1]

Moreover, H.R. 2202 would require that only "depending" H–1B employers abide by all Department of Labor H–1B program regulations.[2] Other employers will not be required to obtain a "joint attestation" from clients stating that they have not and will not lay off any U.S. worker doing the same job as the contract H–1B employee or that they will pay the H–1B employee 100% of the mean of the laid-off worker's wage. They will not be required to post notices informing U.S. workers of the employment of H–1B foreign workers when they move them to new job sites.[3] They will not be required to file a new Labor Condition Application when an H–1B employee is moved to work or temporarily travels to work in a city not listed on the original application, unless the principal place of employment changes. They will not be required to pay per diem when temporarily sending H–1B foreign workers to other job sites. And, they will not be subject to Department of Labor compliance inves-

---

[1] *Washington Post,* October 21, 1995.

Among other criticisms of the current H–1B program is that it does not require any labor market test for availability of qualified American workers before seeking H–1B workers, and there is no prohibition against laying off American workers and replacing them with H–1B foreign workers. Businesses have sprung up for the sole function of bringing in H–1B foreign workers and shopping them around to other businesses for a fee. Certain companies (see e.g., AIG (American International Group), Washington Post, October 21, 1995; Sealand Inc., a division of CSX Corp., Wall Street Journal, October 9, 1995) have laid off entire departments to utilize these H–1B job contractors.

[2] Section 806(b) of the bill defines a dependent H–1B employer as one with less than 21 employees, four or more of whom are H–1B nonimmigrant foreign workers; employers with at least 21 but not more than 150 employees, 20% of whom are H–1B nonimmigrant foreign workers; and, employers with at least 151 employees, 15% of whom are H–1B nonimmigrant foreign workers. However, dependent employers who file plans with the Department of Labor to reduce their dependency over time are treated the same as non-dependent employers.

[3] Central to the proper working of the entire H–1B system is the provision of notice to U.S. workers that the employer is bringing H–1B foreign workers to the job site. If an American worker is unaware of the occurrence or the terms and conditions, or subsequently finds the employer is not fulfilling the H–1B visa requirements—i.e., paying the H–1B foreign worker the prevailing wage—then the American worker would know a complaint can be filed with the Department of Labor. Without the notice requirement, the predominantly compliance-driven H–1B enforcement system collapses.

(524)

525

tigations unless someone files a complaint with the Department against them—i.e., the Department cannot initiate such investigations.

At the same time, the Department of Labor is given only 45 days to accept or reject "private source" wage information. We believe the combination of these changes will lead to grave mischief and serious harm to American workers. It also would result in shifting some compliance burdens from the employers who benefit from the H–1B program to the government (i.e., the taxpayers).

Although we understand required that foreign workers be paid "110% of the mean" laid-off worker's wages rule as one meant to be an incentive against laying off U.S. workers, we consider it a modest one at best, and—if history is any guide—one subject to easy circumvention. In addition, why should any employer—at any price—be permitted to lay off American workers in order to hire foreign workers with impunity?

Finally, it must not go unnoted that—at the same time Congress is cutting the Department of Labor's appropriations—this Committee is increasing the Department's workload under the H–1B program and imposing serious time constraints in accomplishing much of that additional work, but providing no additional resources.

Instead we believe, as Secretary Reich has urged since 1993, the displacement of American workers through the use of the H–1B program must be faced head on. To do this, the H–1B program must be returned to its original purpose—to provide temporary assistance to domestic businesses to fill short-term unique, high-skilled needs. There must be a flat prohibition against laying off American workers and replacing them with H–1B foreign workers. U.S. employers must be required to take timely, specific steps to recruit and retain American workers to wean themselves from the use of H–1B foreign workers. The length of time for an H–1B "temporary" visa must be reduced—from the current 6 year maximum to a maximum of three years. Further, the existing Department of Labor regulations on the H–1B program are salutary to the operation of the program and must be maintained for all employers of H–1B foreign workers.

JOHN CONYERS, Jr.
JERROLD NADLER.
HOWARD L. BERMAN.
BOBBY SCOTT.
JOHN BRYANT.
SHEILA JACKSON-LEE.
MELVIN L. WATT.
JOSÉ E. SERRANO.
XAVIER BECERRA.

## DISSENTING VIEWS

Although, we support legislation which would more effectively prevent illegal immigration, we strongly oppose the bill's historically shortsighted and dramatic reductions and attacks against legal immigrants, refugees, and asylum seekers. The lawful and orderly admission of close family relatives of U.S. citizens—their children, spouses, parents, brothers and sisters—strengthens American families, upholds family values, and benefits the Nation as a whole. If enacted, H.R. 2202 would create myriad hardships and inequities for millions of U.S. citizens who would be prohibited from reuniting with close family members. Moreover, according to the State Department, an estimated 2.5 million U.S. citizens who have pending petitions to secure visas for close relatives and have waited for years for the visa to be issued would have their hopes of reuniting their families arbitrarily destroyed by the bill.[1]

H.R. 2202 also makes it virtually impossible for those legitimately fleeing persecution to claim political asylum. In addition, the bill imposes a cap that will result in a reduction of admissions of refugees in fleeing persecution. This will close America's doors to many Cubans fleeing Castro, Bosnians uprooted by civil war, and Jews, Christians and other religious or ethnic minorities seeking safe haven and protection.

Some argue that dramatic cuts in legal immigration and protection of refugees are supported by the American people. Unlike this bill, however, voters draw a clear distinction between illegal and legal immigration.[2] More than eight out of ten voters believe that Congress should settle the problem of illegal immigration before worrying about reducing the number of legal immigrants.[3] In addition, by a margin of seven to one, voters reject measures which would unfairly penalize prospective legal immigrants who are following the rules in their efforts to enter the United States.[4]

The House should enact an immigration bill to address legitimate issues and concerns regarding illegal immigration. The House should *reject* the proposed dramatic reductions and restrictions in legal immigration, refugee admissions and access to political asylum which H.R. 2202 seeks to impose.

---

[1] See infra note 70.
[2] Research by Public Opinion Researcher Dr. Vincent J. Breglio on the Public's View of U.S. Immigration Policy (February 27, 1996).
[3] Id.
[4] Id.

527

TITLE I. DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

*Triple tier fence endangers lives*

Section 102, which would mandatorily institute a 14-mile three-tier fence along the U.S.-Mexico border in San Diego, constitutes a dangerous attempt to micromanage the Immigration and Naturalization Service's (INS) authority. The INS already uses fencing where the topography, support personnel, and technology make it an effective component of its overall deterrence strategy; this bill will require fencing where its use would be ineffective and even dangerous to INS personnel. Douglas Kruhm, Chief of Border Patrol has written that installing triple-tier fencing along 14 miles of the San Diego sector would:

> [I]ncrease the danger to agents by enclosing them in areas without easy escape routes . . . [O]ur experience tells us that multiple fencing with intervening roads presents multiple dangers for the physical safety of our agents [and] has shown that when we travel in a single, predictable line, aliens will attack vehicles and agents with rocks.[5]

Although section 102 authorizes appropriations of $12 million to build the fencing, the INS estimates that its cost, including land purchase, construction, and maintenance, would be between $85 and $115 million.[6] At a time when the United States economy is becoming increasingly integrated with the economies of other countries, it seems particularly inappropriate to erect more fences and walls between ourselves and friends, neighbors and trading partners.

TITLE III. INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

*I. "Streamlined" Deportation Procedures Are Unnecessary and Unfair*

Subtitle A restructures the exclusion and deportation provisions of the immigration laws in a manner which strips the process of essential due process safeguards. Although the purported purpose for many of these changes is to "streamline" existing procedures and eliminate fraud in the system, many of the new procedures will serve only to prevent individuals from knowing about, or effectively asserting, their rights under U.S. law. It would be far preferable to rely on current law, under which increased staffing and enhanced INS procedures have resulted in significant gains in expediting decisions and reducing backlogs.[7] Deportations of criminal and illegal aliens in 1995 exceeded 51,600, a 15% increase over the

---

[5] Letter from Douglas Kruhm, Chief, Border Patrol Immigration and Naturalization Service, U.S. Department of Justice, to Honorable Henry Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (September 18, 1995).

[6] Letter from Jamie S. Gorelick, Deputy Attorney General, U.S. Department of Justice, to Honorable Henry J. Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (September 15, 1995) [hereinafter, House Judiciary Views Letter].

[7] CFR Part 208 (1995). See also John M. Goshko, Revised Political Asylum System Shows Promise in Early Stages, The Washington Post, July 9, 1995, at A16.

528

preceding year, and a 75% increase over 1990.[8] The simplified, new asylum procedures have reduced the incentives for false claims and resulted in a drastic reduction in the asylum case load (new cases dropped by 57%) and a doubling of INS's productivity (completing 126,000 cases during 1995 compared with 61,000 in 1994).[9]

The bill includes several harsh new bans on the ability of aliens to seek lawful entry into this country. Sec. 301(c)(A) of the bill lengthens the period for which an individual is barred from the United States from one to five years in the case of an alien who has been turned away upon his or her arrival to the United States; and from five to ten years (20 years in the case of an aggravated felon) in the case of an alien who is deported from the United States. Sec. 301(c)(B) bans persons who have resided in the United States without lawful documentation for a total of 12 months from reentry for 10 years. These inflexible provisions would cause great hardship, not just to new immigrants, but to their American families. As Mr. Bryant of Texas, a cosponsor of this legislation, argued:

> I think it is a mistake for us to put [the 10-year ban] into the law because I think undoubtedly thousands of people are going to accidentally be caught by this provision when we pass this law and suddenly will be faced with not being able to reenter the United States for 10 years . . . I think that situation is going to result in a flood of individual cases coming before this committee trying to get relief . . . and every one of the cases, undoubtedly, every one of the cases, are going to be heartrending and tear-jerking and probably meritorious and we are going to turn this committee into a virtual immigration court for the next several years. I just don't think it will work.[10]

Although a few modest exceptions to this punitive provision were added during Committee markup,[11] the 10-year ban on reentry will inevitably divide families that have been waiting in line for immigrant visas for many years and inflict extreme hardship on U.S. citizens and permanent residents who will be forced to make the impossible choice of having their family divided until a visa is available or leaving the U.S. themselves to keep their families together. The Justice Department has also asserted that enforcing the 10-year ban "would generate needless and costly litigation."[12]

Section 302, providing for the expedited removal of aliens, will unfairly result in bona fide asylum seekers being expelled to face persecution. Under this section, aliens could be removed based merely on the unreviewed judgment of an immigration officer and his or her supervisor. Such "expedited" removal may be ordered if the examining immigration officer determines that an alien is inadmissible under INA sections 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents). The notion that fraudulent documents, or the absence of appropriate documents, can be

---

[8] Immigration and Naturalization Service, INS Ends 1995 with New Record in Alien Removals (December 28, 1995).

[9] INS News Release, INS Successfully Reforms U.S. Asylum System, January 4, 1996 [hereinafter INS News Release].

[10] Judiciary Committee Markup Transcript on H.R. 2202, September 20, 1995 p. 134.

[11] The Committee agreed to a number of limited exceptions, including not counting toward 12 month unlawful documentation period during which an alien is a minor, a bona fide asylum applicant, has Family Unity protection, or has work authorization. Similarly an amendment offered by Representative Berman authorizes the Attorney General to provide a waiver for the 10-year reentry ban "to assure family unity, or when it is otherwise in the public interest" for the spouse, parent or child of either a U.S. citizen or permanent resident. And an amendment added by Representative Lofgren provides that waivers would be available for certain "national security interests."

[12] House Judiciary Views Letter, supra note 6 at 17–18.

529

used to trigger this procedure virtually guarantees that individuals genuinely fleeing persecution and therefore least likely to obtain appropriate documents from their persecutors will be returned to the persecutors.

The new substantive standard for determining whether an alien may be subjected to expedited exclusion is similarly unworkable in the context of initial screening. Under proposed section 235(B)(v) of the INA, in order to establish a credible fear of persecution, the applicant for asylum would need to establish that "it is more probable than not that the statements made by the alien in support of the alien's claim are true, and * * * there is a significant possibility, in light of such statements * * * that the alien could establish eligibility for asylum." This is simply too onerous a standard for an asylee to meet who has just escaped dangerous persecution.

Current law and procedure strike a far more appropriate balance between the need to screen out truly frivolous claims and to afford applicants due process. Under current procedures, a person who fears persecution may go before an immigration judge to prove eligibility for asylum and can seek an administrative appeal if the claim is rejected. The asylum seeker may be represented at no cost to the government during this process.[13]

Section 304 of H.R. 2202 would eliminate the Attorney General's discretionary section 212(c) or "cancellation of removal" authority if a person is sentenced to five years, in the aggregate, for one or more aggravated felony convictions. This change would needlessly deprive the Attorney General of the discretion to provide relief to an individual who, having been convicted, did not serve a single day in prison.

## II. Using Secret Evidence To Deport Aliens Poses a Threat to Due Process

Section 321 of the bill would for the first time allow aliens (including permanent residents) to be deported based on classified evidence submitted on an *ex parte* basis. An alien alleged to be involved in "terrorism" would not be permitted to receive a summary of the evidence against him or her if the 5-judge panel finds that his or her presence or the preparation of the summary would likely cause serious and irreparable harm or injury. Although permanent residents are permitted to have a member of a panel of specially approved attorneys review the secret evidence, the bill does not permit the permanent resident to select his or her own attorney—even from the pre-approved panel—or confer with such counsel concerning the secret evidence. Section 321 also provides for immediate detention without bail and limited one-sided appellate rights only for the government. Further, there is no requirement that the government disclose any exculpatory evidence to the alien or even to the special court.

This provision is a clear violation of the right to due process as guaranteed by the Fifth and Fourteenth Amendments.[14] The car-

---

[13] 8 CFR 3.16(b) (1995).

[14] Provisions limiting an alien's right to select an attorney and denying the attorney the ability to discuss the evidence with his or her client also raise serious ethical and lawyer-client privilege issues. It has also been noted that the section is inconsistent with U.S. treaty obliga-

Continued

530

dinal rule of due process is that evidence used against a party must be fully disclosed to that party. The Supreme Court and lower courts have consistently held that aliens who have entered the United States gain the full protections of the Constitution's due process clause, and cannot be deported on the basis of evidence not disclosed to them.[15] In the 1976 case of *Matthews* v. *Diaz,* the Court wrote:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment as well as the Fourteenth Amendment, protects every one of these persons from deprivations of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.[16]

In *American-Arab Anti-Discrimination Committee* v. *Reno,*[17] the Ninth Circuit recently reaffirmed this principle when it found that "[a]liens who reside in this country are entitled to full due process protections" and noted that "the very foundation of the adversary process assumes the use of undisclosed information will violate due process. * * *"[18] The Court acknowledged that while "not all of the rights of criminal defendants are applicable in the civil context, the procedural due process notice and hearing requirements have 'ancient roots' in the rights to confrontation and cross-examination" and should be fully provided for in deportation proceedings.[19]

*III. Excluding Individuals Based on Mere Membership in Designated Organizations Threatens Freedom of Speech and Association*

We also object to section 331 of the bill which specifies that membership in any organization designated as "terrorist" constitutes grounds for deporting or excluding an alien from the United States, regardless of whether or not the individual has engaged in or supported any unlawful acts.[20] This provision would resurrect the infa-

---

tions pertaining to due process protections and freedom of association under the International Covenant on Civil and Political Rights. *See* Letter from Lawyers Committee for Human Rights to Subcomm. on Crime, Committee on the Judiciary, U.S. House of Representatives (May 12, 1995).

[15] *See Kwong Hai Chew* v. *Colding,* 344 U.S. 590 (1953) (INS could not subject returning permanent resident alien to "summary exclusion" based on secret evidence); *Rafeedie* v. *INS,* 795 F. Supp. 13 (D.D.C. 1992) (INS attempt to expel a permanent resident alien on the basis of undisclosed classified information held to be unconstitutional).

[16] *Matthews* v. *Diaz,* 426 U.S. 67, 77 (1976).

[17] 70 F.3d 1045 (9th Cir. 1995).

[18] *Id.* at 1067.

[19] *Id.* at 1066.

Although we have previously allowed the use of secret evidence to exclude aliens who have not yet entered this country, our experience with such procedures highlights the dangers present in denying any party due process. In the infamous case *U.S. ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537 (1950), secret evidence was used to exclude from the United States the German wife of a U.S. citizen who had fled to England when Hitler came to power. In his dissenting opinion, Justice Jackson argued, "[t]he plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected." In a subsequent hearing necessitated by public outrage over the denial of Mrs. Knauff's visa it was learned that the "confidential source" offering the secret evidence was a jilted lover. When the INS sought to use secret evidence to expel an alien several years ago, the D.C. Circuit likened the alien's position to that of "Joseph K. in The Trial," finding that "[i]t is difficult to imagine how even someone innocent of all wrongdoing could meet such a burden." *Rafeedie* v. *INS,* 880 F.2d 506, 516 (D.C. Cir. 1989).

[20] Under current law, a person who has engaged in terrorism, or about whom a consular officer or the Attorney General has a reasonable ground to believe is likely to engage in any terrorism, is already excludable from the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i).

531

mous McCarran-Walter Act,[21] which was repealed by Congress in 1990 after it was held to be unconstitutional as applied to several aliens.[22]

The fact that aliens in this country are entitled to full First Amedment rights was also forcefully reaffirmed in *American-Arab Anti-Discrimination Committee* v. *Reno*.[23] The Ninth Circuit found that the proposed deportation of seven Palestinians and a Kenyan for their alleged ties to the Popular Front for the Liberation of Palestine was inconsistent with First Amendment freedom of association protections, holding that "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting."[24]

*IV. Waiver of Exclusion and Deportation for Certain 274C Violations Too Narrow To Ensure Against Extreme Hardship on Families of Citizens and Lawful Permanent Residents*

The Committee agreed to authorize the Attorney General to waive exclusion or deportation for an alien who is already a lawful permanent resident and who has temporarily proceeded abroad and has committed document fraud on behalf of a spouse, parent, or son or daughter.[25] Although this waiver improves current law and is a welcome addition to the bill, we believe that it should be expanded to ensure that the law does not impose extreme hardship on families of any alien who commits a 274C violation. An alien who is the spouse, parent, son or daughter of a United States citizen or lawful permanent resident whould not be excluded or deported for committing a 274C violation if the refusal of admission would result in extreme hardship to the citizen or lawful permanent resident family member. The Attorney General should at least be granted this limited amount of discretion when considering the permanent separation of close families.

---

[21] The McCarran-Walter Act allowed, among other things, for the deportation of aliens who "advocate the economic, international and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with any organization" that so advocates. 8 U.S.C. 1251(a)(6)(D) & (H) (1988). That law, which applied to aliens who were members of the communist party or advocated communist doctrine, was used to exclude Pierre Trudeau, the former Prime Minister of Canada, French actor Yves Montand, British author Grapham Greene, and Columbian Nobel laureate Gabriel Garcia Marquez. See Counter Terrorism Legislation, Hearing before the Subcomm. on Terrorism, Technology, and Government Information of the Senate Comm. on the Judiciary, 104th Cong., 1st Sess. 21 (May 4, 1995) (statement of Professor David Cole).

[22] See Immigration Act of 1990, Pub. L. No. 101–649 (repealing McCarran-Walter Act); *Rafeedie* v. *INS*, 795 F. Supp. 13, 22–23 (D.D.C. 1992); *American-Arab Anti-Discrimination Comm.* v. *Meese*, 714 F. Supp. 1060 (C.D. Cal. 1989), vacated, *American-Arab Anti-Discrimination Comm.* v. *Thornburgh*, 970 F.2d 501 (9th Cir. 1991) (holding the McCarran-Walter Act to be unconstitutional as applied).

[23] 70 F.3d 1045 (9th Cir. 1995).

[24] Id. at 1063. A Washington Post editorial emphasized the fundamental fairness of the American-Arab Anti-Discrimination Comm. decision:

"[T]he bottom line from the appellate court is this: Aliens present in the United States have the same right to political speech and association as citizens. Aliens cannot be singled out for deportation because they exercise those rights. * * * These clear and principled determinations are on firm constitutional ground.

Aliens and Speech, Wash. Post, Nov. 13, 1995 at A20.

[25] H.R. 2202 § 362 (1995). Under current law, section 274C of the INA, at 8 U.S.C. 1324c prohibits the use or creation of a fraudulent document for immigration purposes. Violation of this provision would subject an alien to both a civil penalty as well as exclusion under section 212(a)(6)(F) of the INA, at 8 U.S.C. 1182 (a)(6)(F)) or deportation under section 241(a)(3)(C) of the INA, at 8 U.S.C. 1251 (a)(3)(C)).

532

TITLE IV. ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

A wide range of views exists regarding whether and to what extent the proposed new worker verification "pilot project" established under Section 403 represents sound public policy. There is no disagreement among us, however, on two key points: (i) if a verification system is ultimately adopted, protections should be afforded innocent employers and workers who might be adversely affected by inaccurate information; and (ii) regardless of whether it is adopted, the INS and Department of Labor must be granted enhanced authority to penalize unscrupulous employers who consistently hire undocumented aliens and exploit them in near "slave-labor" conditions.

### I. Protecting the rights of employees and employers under the verification system

In recognition of the potential liability that innocent employers may face by dismissing or refusing to hire job applicants due to errors in government databases or in the operation of the verification pilot program, the Committee adopted an amendment protecting from liability those employers who, in "good faith," rely on the verification confirmation mechanism. It is important to note, in this context, that the amendment should not be interpreted to prevent dismissed employees or unsuccessful job applicants from challenging employers who had other, unlawful motivations to dismiss or refuse to hire such employees and applicants. The intent is carefully limited to protect employers only under circumstances in which the relevant hiring decision is triggered solely by inaccurate information provided by the confirmation mechanism.

Equally important in this regard is an amendment offered by Representative Frank (and approved by the Committee by voice vote) protecting innocent employees from errors arising from the verification mechanism, by allowing them to seek compensation under the Federal Tort Claims Act (FTCA).[26] Because the verification process would (like employer sanctions) be administered at the time of hire, all authorized workers who may be adversely affected by errors in the pilot verification system will be afforded redress through at least one of several existing mechanisms. For example, any employee who is hired, if even for a few hours, and who is subsequently dismissed because of inaccurate information provided by the confirmation mechanism will automatically be entitled to compensation under the FTCA. In this connection, we note that the amendment's wording "shall be entitled to compensation" indicates that the employee in such circumstances need only to demonstrate, based on a preponderance of evidence, that the dismissal was attributable to an error in the confirmation mechanism. No proof of negligence is required and none of the existing exemptions from liability in the FTCA (including for harm flowing from policy decisions or claims arising from "misrepresentation, deceit, or interference with contract rights") are applicable to this new form of redress.

---

[26] 28 U.S.C. §§ 2671–2680.

533

To the extent that employers verify prospective employees selectively, or apply the results of information differently based, for example, on national origin or citizenship status, such employers would be liable for discrimination claims brought by the affected job applicants. In such cases job applicants have several avenues to pursue redress. First, selective application of verification procedures is already prohibited under INA §274B ("Unfair Immigration-Related Employment Practices"). Second, such actions may also be prohibited (depending on the specific circumstances), under Title VII of the Civil Rights Act and/or under 42 U.S.C. §1981, both of which address employment discrimination claims based on race and national origin. In this respect, we note that the "good faith" immunity provision does not protect employers who abuse the verification system by applying it in ways not required by the law.

The Committee also tried to strike a careful balance between protecting the rights of the employer and the rights of the employee in certain unusual circumstances arising from the temporary or time-limited nature of employment authorization documents possessed by certain individuals, or cases in which employers have reason to believe that individuals presenting what appear to be genuine documents are nonetheless unauthorized to work. At issue is the existing provision of INA §274A, which prohibits employers who have been provided documents which on their face appear genuine from requiring the production of a specific document or additional documents.[27] The Frank amendment addresses two specific circumstances in which it may be permissible for employers to request additional documents from individuals. It permits employers to request from an employee who previously submitted a time-limited employment authorization document an additional document demonstrating continuing employment eligibility. In addition, if an employer has a reasonable basis to believe that an individual who presents a document which appears on its face to genuine is in fact unauthorized to work, the bill only permits such employer to: (1) inform the individual of his intention to verify the validity of the document; and (2) dismiss the individual upon receiving confirmation that the individual is authorized to work.

Nothing in the legislation, however, prohibits the individual from offering alternative documents which demonstrate employment authorization. In addition, while verification is pending, the employer may not delay the hiring of, refuse to hire, or dismiss, or take any adverse employment-related action incident to the hiring against the individual, unless such action is wholly unrelated to the eligibility issue. In this context, nothing in the bill can or should be read to permit any action related to the document verification process in general, or to the request for additional documents or additional verification of documents presented in particular, that is a mere pretext for unlawful discrimination.

---

[27] Adopted as part of the Immigration Act of 1990, this provision is designed to prevent adverse impact on authorized workers who have been required by employers to produce additional documents, even after presenting legitimate documents demonstrating employment authorization. Some employers, apparently fearing the consequences of requiring such employees to produce additional or subsequent documents, have requested a clarification of what is and what is not permitted in such circumstances.

534

*II. The legislation fails to recognize that labor law enforcement is
vital to employer sanctions enforcement*

The opportunity for employment is the single most important
and pervasive incentive for illegal immigration. There are indus-
tries which rely upon and, more often than not, exploit the work
of undocumented workers. H.R. 2202 fails to recognize the impor-
tant role played by the Department of Labor in helping combat ille-
gal immigration by complementing enforcement of employer sanc-
tions. The bill would authorize only 150 additional staff positions
for the Wage and Hour Division to investigate violations of wage
and hour laws in areas where there are high concentrations of un-
documented workers,[28] a substantially weaker commitment to
worksite enforcement than the President's FY96 budget request
calling for (202 additional positions).[29] Even this weak provision is
meaningless, since the Republican Majority has previously voted to
cut funding for DOL Wage and Hour Division.[30] In this sense the
bill lacks teeth by refusing to allow the Administration to complete
its comprehensive anti-illegal immigration strategy which has thus
far been highly successful at the border.[31]

The Committee rejected, by a party line vote, an important
amendment offered by Representative Berman which would have
authorized funding the new Wage and Hour inspectors, given the
Secretary of Labor authority to issue subpoenas and collect evi-
dence against violating employers and doubled the penalties for
employers found to have violated both labor standards and immi-
gration laws. This would assist the INS and Department of Labor
in uncovering horrible situations like the incarceration and en-
slavement of Thai immigrants in El Monte, California by garment
manufacturers,[32] and crack down on employers who treat the pen-
alties available under current law as a mere cost of doing busi-
ness.[33] In rejecting Representative Berman's amendment, the Ma-
jority signals an unwillingness to enforce the law. Minor and spo-
radic sanctions will never be sufficient to overcome the economic
and competitive advantages that unscrupulous employers may
achieve by hiring and exploiting illegal immigrants, thereby under-
cutting competitors who provide fair wages and working conditions.

TITLE V. REFORM OF LEGAL IMMIGRATION SYSTEM

Under the bill, legal immigration would be reduced from 800,000
admissions to a nominal 535,000 immigrants a (thirty percent re-
duction).[34] In addition, the bill includes a whole host of new proce-

---

[28] H.R. 2202, § 102 (2).
[29] House Judiciary Views Letter, supra note 6. See also Worksite Enforcement of Employer
Sanctions: Hearing Before the Subcom. on Immigration and Claims, 104th Cong., 1st Sess.
(1995) (statement of Maria Echaveste, Administrator, Wage and Hour Division, U.S. Depart-
ment of Labor) [hereinafter Statement of Maria Echaveste].
[30] 141 Cong. Rec. H3281–H3303 (daily ed. March 16, 1995). See also Statement of Maria
Echaveste supra note 29.
[31] "A Good Border Year: 1995 was a Year of Progress and Innovation", San Diego Union-Trib-
une, December 29, 1995. See also "Encouraging Progress on Deportations: Statistics Support the
Steady, Measured Approach of the INS," Los Angeles Times, January 12, 1996.
[32] Editorial, Slavery's Long Gone? Don't Bet on it, L.A. Times, August 4, 1995, at B8. (Thais
paid $1.60 an hour and found confined in illegal garment factory in El Monte). See also George
White, Workers held in Near-Slavery, Officials Say, L.A. Times, August 3, 1995, at A1.
[33] Id.
[34] See CRS Report for Congress, Immigration: Analysis of Major Proposals to Revise Family
and Employment Admissions, February 14, 1996.

535

dural rules which would push the numbers far below the 535,000 cap.[35] Moreover, after a short transition period, through category elimination or new restrictions, U.S. citizens will be virtually unable to sponsor their mother, father, brother, sister or adult child for immigration. The bill sets up a false dichotomy between the "nuclear family" of permanent residents on the immigration waiting lists and the relatives of U.S. citizens. Title V's reductions in the number of legal immigrants and in access to legal immigration reflect a fundamental misunderstanding of the character and benefits of America's historic commitment to legal immigration, family reunification and protection of refugees.

Title V's premise is that legal immigration and refugee admissions are higher than ever, and create problems and costs rather than benefits and opportunities. This is a false and distorted understanding, belied by numerous government and private sector studies and the reality of how today's immigrants are revitalizing communities across the country. Last year's legal immigrant and refugee admissions roughly equaled the level of immigration in the early 1900's, but as a proportion of the population, today's admissions are about one third the level of that time period.[36]

According to both conservative and liberal analysts, from organizations such as the CATO Institute, the Urban Institute and the Councils of Economic Advisors of Presidents Reagan and Bush, immigrants pay much more in taxes than the cost of services to them (although most taxes are paid to the Federal Government and most services, especially education and health care, are provided by local governments).[37] Indeed, the Urban Institute concluded in 1994 after reviewing all relevant studies that immigrants pay $25–30 billion annually more in total taxes than the total cost of services.[38] A 1994 survey of leading U.S. economists, including seven Nobel laureates, found that 80% believed immigration has had a "very favorable impact" on economic growth.[39] The Department of Labor and the AFL–CIO have also concluded that in the aggregate immigrants stimulate the economy.[40] Moreover, a 1990 study found that there is no correlation between the levels of immigration and unemployment either in states or on the national level.[41]

Perhaps more important than the economic contributions are the familial, social and political contributions of immigrants. Legal immigrants, refugees and persons granted asylum are "new Americans" who do not threaten, but rather strengthen the great American experiment in freedom and democratic pluralism. Immigrants have died defending American interests in foreign wars and have

---

[35] See discussion, infra.

[36] Current Population Reports (1994 March Supplement), U.S. Bureau of Census. On an annual basis, total legal immigration constitutes only three immigrants for every 1,000 Americans, and immigrants comprise only 8.7% of the U.S. population.

[37] Julian N. Simon, Immigration: The Demographic and Economic Facts published by CATO Institute and the National Immigration Forum.

[38] Fix, Michael and Jeffery Passel, Setting the Record Straight: Immigration and Immigrants (Urban Institute Press: 1994) (Washington, D.C.) [hereinafter Setting the Record].

[39] Survey of Economists, conducted by the Alexis de Tocqueville Institution cited in An Analysis of H.R. 2202: The Immigration in the National Interest Act of 1995 by Stuart Anderson, (September 1995) at p. 12 [hereinafter Anderson Analysis]. See also Stuart Anderson, Employment Based Immigration and High Technology February 1996

[40] See, Press Release—United States Department of Labor, July 11, 1989. See also Resolutions 59–61, AFL–CIO 1995 Resolution Book One, October 23–26, 1995.

[41] Richard Vedder, Lowell Gallaway, and Stephen Moore, Immigration and Unemployment: New Evidence, Alexis de Tocqueville Institution, July 1994.

536

made discoveries which have strengthened our military capacity. Immigrants who have fled tyranny and oppression deeply appreciate the freedom which America offers, and their work and perspective serves to enhance the American commitment to freedom and democracy.

*I. Dramatically reduces family-sponsored immigration and punishes those who have waited to lawfully enter the United States*

As noted above after a short transition period, the bill would make it virtually impossible for U.S. citizens to sponsor their mother, father, brother, sister, or adult child for immigration. In addition, the bill would set an annual cap on family immigration of 330,000—more than one-third below current levels. This arbitrary cap is inadequate to meet the needs of U.S. citizen families and would create immediate backlogs for spouses and minor children of lawful permanent residents as well as parents of U.S. citizens. We also object to the bill's arbitrary reduction to 85,000 in the number of visas granted to spouses and minor children of lawful permanent residents.[42] Immigration by spouses and minor children of lawful permanent residents is currently set at approximately 98,000 per year,[43] a number that does not meet current demand and is already creating massive backlogs.

We object to the arbitrary exclusion of parents from the immediate relative category, thereby subjecting them to a 45,000 cap and a 25,000 floor.[44] There is no justification for limiting immigration by parents who may be the main source of childcare and other familial support for working families.[45] The 25,000 visa limit would mean that 50% of U.S. citizen sponsors who wish to reunite with their parents would be prevented from doing so a massive new blacklog would be created. While we agree that spouses and minor children should receive priority, we see no rationale for this arbitrary limit on parents of U.S. citizens.

In addition, Section 512(b)'s requirement that parents of citizens procure health insurance before they can obtain a visa represents a nearly insurmountable obstacle to their immigration. The Administration estimates that even where it may be possible to purchase the required health insurance for an elderly parent, it would cost an average of $9,000 or more a year, prohibitively high for most American families.[46] We are also concerned that insurers may not agree to offer health insurance for immigrating parents at any cost.[47]

---

[42] H.R. 2202, §512(a)(1).

[43] Immigration and Naturalization Factbook Summary of Recent Immigration Data, August 1995, at p. 8 [hereinafter Factbook].

[44] H.R. 2202, §512(a)(2)(A).

[45] Parent immigration currently numbers approximately 56,000 per year. As the number of spouses and children of citizens increase, the number of visas available for spouses and children of permanent residents decrease. Since that category is guaranteed of minimum of 85,000, the residuum that is left for parents of United States citizens decreases. Thus the overall family cap, combined with projected need, means that immigration by parents under H.R. 2202's would immediately meet the 25,000 floor set by the bill. The cap of 45,000 would be meaningless, as other superseding categories would prevent this number from being reached. See Factbook supra, note 43 at 13.

[46] Letter from Jamie Gorelick, Deputy Attorney General, U.S. Department of Justice, to Orrin G. Hatch, Chairman, Committee on the Judiciary, U.S. Senate (February 14, 1996).

[47] Id.

537

H.R. 2202 also unfairly eliminates immigration by married adult children of U.S. citizens, siblings of U.S. citizens, and most unmarried adult children of both citizens and residents. It is disturbing to think that government policy would keep American parents and their children apart simply because a child is older than 21 years of age. Of all immigrants, children on the brink of entering the workforce are exactly the type of new Americans this country needs, they will be here in their most productive years and they will be here to care for their parents in their golden years.[48]

We also find little rationale for eliminating immigration by siblings of U.S. citizens.[49] Brothers and sisters help to reinforce the family unit. They contribute to the economic and emotional strength of a family in many ways, such as pooling money to open businesses and sharing in the care of parents of each other's children.[50]

## II. Unjustifiable cap on refugees

We strongly object to the bill limiting admissions of refugees to 50,000 per year—reducing current admissions by approximately half.[51] Such a cap would undermine our efforts to encourage the international community to be more forthcoming on refugee resettlement and send the wrong signal to those governments who may question our commitment to promoting human rights around the world. Given the political and economic instability in almost every region of the world, it is imperative that the United States maintain its current flexible admissions policy for domestic resettlement that allows for expansion and contraction of numbers in response to changing conditions.

A cap on refugee admissions would represent an historic shift in the country's commitment to protecting people worldwide who have been persecuted or fear persecution because of their race, religion, nationality, political opinion, or membership in a particular group. Current law provides an orderly but flexible process in which the Administration can, in consultation with Congress, set the number of annual refugee admissions at a level that accounts for both the global situation and our international commitments.[52] Congress maintains the final say over refugee admissions through the appropriations process, even as the President has the authority to provide additional slots if justified by "urgent humanitarian concerns

---

[48] Representative Smith's amendment allowing immigration by certain adult sons and daughters of U.S. citizens and lawful permanent residents is so narrow as to be virtually meaningless. We see no logic in barring all adult children who are over age 25 and imposing a requirement that the son/daughter has "never been married" is absolutely unjustified. This requirement would bar a 21-year-old daughter whose husband has died and who remains dependent on the family for emotional and physical support, especially in a time of grief and transition. Similarly, this requirement would bar a daughter who has fled from an abusive situation and sought a divorce in order to save her own life. And imposing a requirement that the son or daughter be childless serves only to harm innocent dependents who might at that point be in dire need of the support that grandparents can provide.

[49] At a minimum, this category should be maintained at least until those who have been waiting lawfully in line with approved petitions are allowed to immigrate to the United States.

[50] Immigration by brothers and sisters of U.S. citizens currently numbers approximately 65,000, while adult unmarried sons and daughters number only approximately 46,000 per year. Moreover, immigration by married sons and daughters of U.S. citizens are limited to 23,400. These are modest numbers and should be maintained.

[51] H.R. 2202 §521(a)(2)(A). In FY 1995, 98,000 refugees were admitted, and in FY 1996 90 slots have been set aside. See CRS Report: Immigration, Public Policy Institute, Ruth Wassen, Joyce Vialet, William Krouse, January 17, 1996.

[52] 8 U.S.C. 1157 §207.

538

or are otherwise in the national interest." H.R. 2202 would take the dramatic step of requiring a full-fledged act of Congress to allow any additional refugees to meet compelling humanitarian needs.

H.R. 2202's proposed policy shift could not come at a more inappropriate time. The United Nations High Commissioner for Refugees has estimated that since 1992 the number of refugees worldwide has risen to 20 million.[53] The consequences of a refugee cap are neither abstract nor theoretical: it would require dramatic reductions not only in the number of former Soviet Jews, Evangelical Christians, and Ukrainian Catholics admitted as refugees, but also in the number of Vietnamese, Bosnian and Cuban admissions. By forcing the government to choose among equally worthy groups, the cap would politicize refugee admissions and endanger the lives of thousands of people worldwide.[54] For example, we expect to admit 40,000 Jewish refugees from the former Soviet Union over the next several years, but we are also committed to accepting between 7,000 to 14,000 Cubans as part of our agreement with Cuba. Just these two programs could exceed the 50,000 cap.[55]

An amendment was made by Chairman Hyde to permit the annual 50,000 cap to be exceeded in the event of an "emergency" at some time after the annual consultation with Congress on refugee numbers. It is unlikely, however, that the cap would be pierced. Once the State Department has squeezed the numbers down to 50,000 for a given year, by shutting down or reducing ongoing programs it is most unlikely to reverse itself by raising the numbers and re-establishing these same programs in mid-year no matter how compelling the circumstances.

### III. Severely limits attorney general's humanitarian parole authority

We oppose the bill's sweeping new restrictions on the Attorney General's parole authority. Section 524 of the bill states that the Attorney General may parole aliens on a case by case basis only for urgent humanitarian reasons or for a reason deemed strictly in the public interest. We believe that there is no rationale for this legislative change. The current law provides the Attorney General with appropriate flexibility to deal with compelling immigration situations.[56] For example, the amendment would not permit the parole of an alien to attend the funeral of a close family member or of a parent to accompany a child paroled into the United States for an organ transplant.[57] In light of the proposed refugee cap, this provision unwisely ties the Administration's hand in an area where

---

[53] Letter from Reno von Rooyen, Representative of the United Nations High Commissioner for Refugees, to Hon. Henry J. Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (October 25, 1995).

[54] The refugee cap is in direct conflict with the will of the House of Representatives. On May 28, 1995, the House adopted an amendment to H.R. 1561 that questions the potential forced repatriation of Vietnamese asylum seekers held in detention throughout Southeast Asia. It also foresaw the potential resettlement of these Vietnamese, which would put additional pressures on the U.S. refugee admissions program just as a refugee cap of 50,000 is enacted. The amendment, sponsored by Representative Chris Smith, requires the United States to offer as many as 40,000 of these people the opportunity to resettle here or in other free countries would be impossible to implement under a "hard cap" of 50,000 refugees per year.

[55] Anderson Analysis, supra, note 39, p. 26.

[56] 8 U.S.C. §1157.

[57] Letter from Jamie S. Gorelick, Deputy Attorney General, U.S. Department of Justice, to Henry J. Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (September 15, 1995) at 4.

539

flexibility is always needed to deal with unforeseen emergency migration circumstances.

### IV. Asylum procedures contravene international norms

Section 531 represents an unnecessary and dangerous effort to reform the system by which asylum is granted to persons who have a well-founded fear of persecution and need protection in the United States. As a result of the regulatory changes adopted in January of 1995,[58] and the increases in appropriations provided under the 1994 Crime Bill, the asylum process has been improved substantially.[59] Additional asylum officers and the increases in the immigration judge corps have allowed us to gain control over the potential fraud in asylum applications and increase our effectiveness in completing cases within 180 days of application. New asylum claims filed with the INS since the reforms have decreased by 57 percent, from 123,000 in 1994 to 53,000 in 1995.[60] And the asylum process was able to process more than 126,000 cases as compared to only 61,000 cases in the previous year.[61] Eighty-four percent of cases are now heard within 60 days of applications,[62] ensuring that applicants obtain access to a speedy procedure. At the same time, the INS has redirected their sources to focus on fraud investigations concerning asylum, and several cases have resulted in convictions.[63] Yet, in the face of these positive developments, H.R. 2202 unnecessarily imposes time limits on applications and restricts the Attorney General's discretionary authority to withhold deportation.

The 30-day time limit for filing asylum applications set forth in Section 531 will create a complex layer of adjudication and divert resources from resolving the merits of the asylum applications.[64] The 30-day time limit will also result in increased applications which have not been carefully prepared, since asylum seekers will be forced to submit by the deadline or be categorically denied. Most meritorious applicants rarely make their first contact with human rights organizations, much less find legal assistance for the preparation of their applications, within such a short time period.[65]

The requirement that asylum applications be filed within 30 days also violates U.S. international obligations. Article 33 of the 1967 Protocol regarding the Status of Refugees binds signatories to the duty of not returning any refugee who could face a threat to his or her life or liberty in the country of reared persecution, regardless of when the person makes known the claim to need such pro-

---

[58] 59 Fed. Reg. 62284–62303 (1994) (amending 8. C.F.R. §228 effective January 4, 1995).
[59] See Celia W. Dugger, Immigration Bills' Deadlines May Imperil Asylum Seekers, N.Y. Times, February 12, 1996, at B1.
[60] INS News Release supra note 9.
[61] Id.
[62] Id.
[63] William Branigan, INS Chief Highlights Reform in Political Asylum System: Year-Long Campaign Slashes New Claims by 57 Percent, Wash. Post, January 5, 1996, at A2.
[64] Since the bill rightfully does not apply a 30 day limit to withholding of deportation, the Attorney General will have to decide the merits of a refugee's claim regardless of the timeliness of the application. Also, while the Committee correctly amended the bill to incorporate a waiver of the 30 day time limit where there has been a change of in any circumstances, the INS will now not only have to divert resources to adjudicate the timeliness of the application, but to adjudicate the waivers available for changed personal circumstances as well as country conditions.
[65] Since many asylum seekers flee their home countries with few resources, many persons cannot afford private attorneys and have to rely on church groups, charitable organizations and other low cost legal service providers. See David Cole, Making Time for Freedom Thirty-Day Deadline for Political Asylum Requests Defies Reality, Legal Times, December 4, 1995, at 20.

540

tection. While the United Nations High Commissioner for Refugees has acknowledged that some countries can impose filing deadlines, they have forcefully stated that the failure to abide by such deadlines cannot be a reason by which the application is not considered at any future time.[66]

Section 305 of the bill eliminates the Attorney General's current discretionary authority of "withholding of deportation." This is a serious breach of current policy and U.S. obligations under United Nations conventions.[67] Under current law, if a person is denied discretionary asylum, he or she can still seek protection under a higher standard for withholding of deportation. This requires that the applicant show that it is more likely than not that his or her life or freedom would be threatened in the country of origin. By eliminating such withholding of deportation discretion, the bill abrogates international refugee law requiring that a country not forcibly return (refoul) a person to a place of persecution.[68]

We would also note that under section 531 asylum may be precluded if the Attorney General, pursuant to bilateral agreements with third countries, is able to find another country that is willing to accept that person. In our view it is essential that the third country return provision be construed to retain a high level of discretion for the Attorney General to decide what is most appropriate in individual cases, consistent with humanitarian circumstances and United States security concerns.[69]

## IV. Keeps families separated and fails to eliminate backlogs

While the formula for backlog reduction set forth in section 553 of the bill addresses a substantial portion of the existing backlog for spouses and minor children of lawful permanent residents, it does nothing to address the issue of equity for those in eliminated family categories who have been waiting lawfully for their turn to immigrate for many years.[70] Even with the visas provided to ad-

---

[66]During Committee mark-up of the bill, the Majority stated the Committee's expectation that the application itself could be simplified, so that asylum seekers could submit a short and simplified application within the 30 day time limit, with a second opportunity to amplify and strengthen the application at a later date. While this is not the best or the preferred solution, if necessary the Committee should make this understanding very clear to the Administration so that the regulations clearly allow for a subsequent opportunity for the applicant to supplement, amplify, and complete the formal application at a later date after the 30-day period.

[67]U.N. Convention on the Status of Refugees—Article 33 (1951).

[68]During deliberations at the Committee mark-up, there were several statements by the Majority that it is their intent that withholding of deportation will be restored as the bill moves to a floor vote. *See* Judiciary Committee Markup Transcript October 11, 1995, at p. 101–103. We fully expect such a change to be made, consistent with current law and obligations under international refugee law, and are willing to work with the Majority to ensure that this vital protection remains in the U.S. law.

[69]In this regard, the discussion at the Committee mark-up highlighted the common understanding about this flexibility for the Attorney General, and the inclusion of a public interest exception in this discretionary authority. We view the potential of these return agreements with caution. Assurances must be obtained that the intent of the agreement now being negotiated with Canada, and other future schemes with other countries, will not serve to diminish refugee protection for those who need it. In this regard, we urge that such agreements be based not on the concept of entry, but targeted to reduce the number of double applications. What is important is not necessarily the route which a refugee goes through before applying for asylum in a given country, but rather that an asylum seeker can make a claim in one country, and if found not to be refugee under a fair and substantive procedure, he or she would be prevented from shopping around and making unfounded claims in other countries. Return agreements should not focus on the method, time or process of transit and entry; they should focus on the need to prevent duplicate applications in various nations, when their cases have been already fairly determined not to be well founded and are clearly abusive.

[70]There are approximately 2.5 million eligible relatives in the potentially eliminated categories whose visa petitions have been approved according to Testimony by Cornelius D. Scully,

541

dress the backlog of spouses and minor children of lawful permanent residents, there will remain as estimated 300,000 people in the backlog at the end of five years.[71] Tragically, the bill would result in the permanent separation of the families of U.S. citizens, in a purported effort to benefit the immediate relatives of lawful permanent residents in the second family preference category.

Proponents of this legislation have argued that the elimination of the adult children and siblings family preference categories is necessary in order to expedite the reunification of the "nuclear families" of permanent residents—for which there is a 1.1 million person backlog. Approximately 850,000 of the people in the backlog are the spouses and minor children of permanent residents who were undocumented immigrants who were granted legalized status according to the legalization provisions of the Immigration Reform and Control Act of 1986 (IRCA).[72] It has been estimated that up to half[73] of the 850,000 are already in the country under quasi-legal resident status under the Family Unity protection provisions of the Immigration Act of 1990.[74]

Nearly all of the immigrants legalized by IRCA have now satisfied the five-year residency requirement for naturalization.[75] The newly gained eligibility for naturalization of legalized permanent residents is contributing greatly to the record surge of naturalization applications being filed at INS district offices throughout the United States.[76] The families of those who are naturalizing will become eligible to immigrate immediately and subject to no numerical limits as the spouses and minor children of new citizens.

At the same time, as noted above, this legislation would eliminate forever, the ability of United States citizens and lawful permanent residents to petition for the immigration of their children over the age of 21 or to bring in their siblings. Given these changes, a more equitable solution to the backlog problem would be to "grandfather in" all those with approved visa petitions, or at least those within a year or two after enactment of reaching their "priority date." A new legal immigration system that begins with backlogs is not a system that has been meaningfully reformed.

### V. Sunset provision is backdoor attempt to stop all immigration

We are extremely troubled by Section 505 which amends Section 201 of the INA to require Congressional review of the numerical limits placed on immigration. Although, the review provision has been described as merely requiring a "periodic" revisitation of immigration policy by Congress, we are concerned, however, that the sunset provision, could end all numerically limited immigration

---

Director, Office of Legislation, Regulation and Advisory Assistance, U.S. State Department, at Markup of H.R. 1915, Immigration in the National Interest Act of 1995, U.S. House of Representatives, Subcomm. on Immigration and Claims, Committee on the Judiciary, (July 17, 1995).

[71] *Id.*

[72] *Id.*

[73] *See* CRS Report for Congress, Immigration: Analysis of Major Proposals to Revise Family and Employment Admissions, February 14, 1996.

[74] Pub. L. No. 101–649, 105 Stat. 322, §301 (1990).

[75] *See* 8 U.S.C. §1447.

[76] Harry Pachon, *Prop. 187 Isn't All That's Propelling Latinos to INS, The Sacramento Bee,* May 22, 1995, at B7.

542

into the United States after the fiscal year 2004, the year the bill
designates as the first period of review.

This provision could be construed as a backdoor attempt at a
moratorium on immigration. Under this provision determined immi-
gration opponents would be given significant leverage in block-
ing new immigration legislation. If, for example, during a review
period, a small group of Senators who are opponents of all immi-
gration decide to filibuster the required reauthorization bill, the
sunset requires that all numerically limited immigration be halted.
Ultimately, this section could have the effect of eliminating immi-
gration to the United States, with the exception of the immediate
relatives of U.S. citizens who fall within a numerically unrestricted
category.[77]

### TITLE VI. RESTRICTIONS ON BENEFITS FOR ILLEGAL ALIENS

Title VI effectuates a number of redundant[78] and unneeded
changes relating to the availability of public benefits not only to
undocumented but also to legal aliens, and imposes a series of
harsh new restrictions and burdens on families seeking to sponsor
immigrants.

#### I. Unfunded mandates on state and local governments and harsh restrictions on public assistance available to legal immigrants

Section 601(b) would require state and local governments to deny
any contracts, loan agreements, and professional or commercial li-
censes funded by the state to aliens not lawfully present in the
United States. This would impose significant new unfunded man-
dates on state and local governments, and slow down services for
all residents, aliens and citizens alike.[79] Although section 603 con-
tains a list of programs that would be excepted from the require-
ments of section 601 and 602 (e.g., for "non-cash, in-kind, short-
term emergency disaster relief"), the language is too narrowly
drawn to relieve states and localities from most of these time-con-
suming, administrative requirements.

The "public charge" provisions of section 622 are also far too
rigid.[80] For example, it would require the deportation of someone
for having received public benefits even if the individual later be-
comes completely self-reliant. Another example of the rigidity of

---

[77] See also Letter from Larry M. Eig, Legislative Attorney, American Law Division, Congres-
sional Research Service, to Honorable Patsy T. Mink, Member, U.S. Congress (February 28,
1996).

[78] Most major needs-based programs are already denied to illegal aliens. Generally, those pro-
grams that do not check immigration status provide crisis intervention, public health service
or services for small children; or small programs such as soup kitchens and baseball leagues
that are administered by non-profit charities or church groups. See, Larry Eig and Joyce Vialet,
CRS Report 93–1046A, Alien Eligibility Requirements for Major Federal Assistance Programs
(December 8, 1993).

[79] This provision would require that federal, state and local government entities that issue
such licenses develop a system to verify the immigration status of every applicant for such li-
censes. For example, section 601(b)'s prohibition on state and local governments' provision of
professional or commercial licenses to persons not lawfully present implicitly requires that all
federal, state and local government entities that issue such licenses develop systems to verify
the immigration status of every applicant for such licenses. Not only would this likely result
in discriminatory treatment, it would also pose an enormous unfunded burden on state and local
entities that would inhibit their ability to provide services to all applicants and residents in
their states or localities.

[80] Current law already provides for the deportation of immigrants who become public charges,
and we feel it more appropriate that we encourage the Immigration and Naturalization Service
to step up its enforcement of existing law. See 8 U.S.C. 1251(a)(1)(A).

543

section 622 is its subjecting refugees or asylees who become "public charges" to deportation notwithstanding the fact that requirement is waived at the time of entry.[81] We are also troubled by the list of programs in section 622 for which receipt by an immigrant would constitute being a "public charge." For instance, Title XX Social Service Block Grants to states (used for emergency needs such as homeless shelters, soup kitchens, and battered spouse shelters) are included on the list even though these programs are provided through state and local governments and are often administered by private charities.[82]

*II. Harsh restrictions on sponsors of immigrants*

Under section 631's "deeming" provision, the income and resources of an immigrant's sponsor would be attributed to the immigrant for purposes of determining eligibility for public benefits without regard to whether the sponsor is actually making any contribution to the immigrant's well-being or whether the sponsor is able to meet his or her own family obligations. Section 631 also dramatically expands the number of federal programs that are "deemed" (SSI, AFDC, and Food Stamps) to include nearly every federal means-tested benefit—both cash and non-cash.

Programs that receive federal funds and would be forced to implement these burdensome restrictions include child protective services, foster care, prenatal care, job training, teen crisis centers, soup kitchens, homeless shelters, Pell grants for education, and student loans. This means that state and local governments, colleges and universities, and private charities would have to ask all of their clients, including U.S. citizens, whether they came to the U.S. as immigrants and whether they had sponsors. Furthermore, these individuals would have to demonstrate their sponsors' incomes before they could be considered eligible for services.

These punitive changes are being made despite the fact that many of the programs for which immigrants would be "deemed" are relatively low-cost and are of vital importance to the immigrant (e.g., programs to assist the homeless, the hungry, abused and neglected children, and emergency Medicaid). If immigrants cannot get access to health care, the entire community suffers.

Section 631 would also repeal the current exemption from "deeming" for sponsored immigrants who become disabled after entry and create new administrative complexities and requirements for state and local governments and private charities. Further, by attributing 100 percent of a sponsor's income and resources to the immigrant, the bill is inconsistent with current practice in the major entitlement programs and could cause severe problems where the spouse of a signatory to an affidavit of support becomes separated or divorced from the sponsor.

---

[81] Under current law a refugee or asylee who is admitted to the United States is admitted without regard to whether they may later become a public charge because it is thought their flight from persecution and our offer of safe harbor should not be dependent on their financial circumstance. See 8 U.S.C. §§ 1157(c)(3), 1159(c). Yet, section 622 would subject these individuals to public charge deportation if they were to use more than 12 months of public services within their first seven years in the United States.

[82] See 42 U.S.C. 1397(o).

544

*III. Deters individuals from becoming sponsors*

We also object to section 632's requirement that a sponsor earn more than 200% of the Federal poverty income guideline to be eligible to execute an affidavit of support for a family member. The 200% income requirement constitutes nothing less than "class warfare," and tells the world that immigration is only for the wealthy. This would require that a sponsor with a family of four maintain an income above \$35,420 to qualify as a sponsor,[83] and mean that 91 million people in America could not sponsor a family member for immigration.[84] The requirement is unnecessary since current law already provides that an immigrant may not be admitted to the United States unless he or she can prove that they are unlikely to become a public charge.[85]

Section 632 also requires that the sponsor be the petitioner and prevents organizations from sponsoring individuals. Since the bill unilaterally eliminates whole categories of family reunification, this would preclude U.S. citizens from sponsoring all but their "nuclear family" as immigrants. Under this harsh and nonsensical provision a child would be precluded from sponsoring his or her stepparents or grandparents; an immigrant spouse would be unable to sponsor his or her brothers and sisters; and a church could not sponsor a parishioner's child. The fact that these relatives were otherwise fully eligible to immigrate to the United States would be of no avail.

*IV. Unreasonable requirements of paying off benefits before naturalization*

We also oppose section 632(c)'s requirement that sponsored immigrants "pay off" certain benefits that they may have received before they are permitted to become naturalized U.S. citizens. This would deny citizenship simply because a person temporarily fell on hard times. Under this provision an immigrant who, as a child, received school lunch benefits would be obligated to pay back those benefits before becoming a naturalized U.S. citizen.

We are also troubled by Section 632's requirement that a family-based immigrant's sponsor notify the government within thirty days of any time he or she changes residences.[86] This burdensome provision would necessitate the creation of a recordkeeping bureaucracy at the state and Federal level to monitor and penalize U.S. citizens or lawful permanent residents who have sponsored the immigration of a close family member.

*V. Denying benefits to legal permanent residents and citizens based on parent's citizenship*

We are also troubled by language in section 607 which precludes the provision of any benefit (even to U.S. citizens) if that benefit

---

[83] Current Population Survey (March 1994 Supplement) from the U.S. Bureau of the Census. Poverty level determined by the U.S. Department of Labor.
[84] Anderson Analysis supra note 39 at 16.
[85] 8 U.S.C. 1182 (a)(4). Nearly all incoming immigrants quickly support themselves, and do not have to rely on the help of their sponsors. According to a 1995 study by the Urban Institute, 93.4 percent of foreign born in America survive without public assistance. See Setting the Record, supra note 38.
[86] H.R. 2202, § 632.

545

is being administered by someone who is not lawfully present in the United States. Under this provision, a child who is a U.S. citizen would not be able to receive food stamps or housing assistance simply because his or her parent is not lawfully present in the United States. This provision is blatantly disrespectful of an individual's 14th Amendment citizenship and equal protection rights, and could impose a "caste" system on innocent children.

### VI. Unrealistic requirements for hospital reimbursement

Section 604 provides state and local governments with reimbursements of emergency medical services provided to undocumented aliens. Although we support the goal of reimbursement, we are concerned that language denying reimbursement unless the identity and immigration status of the individual has been verified with the INS. The INS does not have a data base listing illegal immigrants nor does it have a database that lists all U.S. citizens, making verification nearly impossible. The provision would also require that all hospital personnel become experts in citizenship verification forms. In addition, because the bill requires each person be verified, it would create a huge administrative burden for hospitals. The verification requirement will also keep many ill aliens away from emergency rooms, raising severe public health risks.

CONCLUSION

We believe it is imperative that the Congress pass legislation increasing enforcement against illegal immigration. However, reforming immigration does not mean denying asylees' rights to legitimate due process, drastically capping family immigrant and refugee admissions, or endangering our public heath by denying crucial benefits to children. We urge the Members to reject H.R. 2202 and pass immigration reform that respects our heritage as a "nation of immigrants" and invests in our country's future.

JOHN CONYERS, Jr.
PATRICIA SCHROEDER.
SHEILA JACKSON-LEE.
HOWARD L. BERMAN.
MELVIN L. WATT.
ZOE LOFGREN.
JERROLD NADLER.
BOBBY SCOTT.
BARNEY FRANK.
JOSÉ E. SERRANO.
XAVIER BECERRA.

○