# EXHIBIT 216

| 104TH CONGRESS<br>*2d Session* | COMMITTEE PRINT | WMCP:<br>104–15 |
|---|---|---|

## COMMITTEE ON WAYS AND MEANS
## U.S. HOUSE OF REPRESENTATIVES

———

# SUMMARY OF WELFARE REFORMS MADE BY PUBLIC LAW 104–193 THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT AND ASSOCIATED LEGISLATION



**NOVEMBER 6, 1996**

Prepared for the use of Members of the Committee on Ways and Means by members of its staff. This document has not been officially approved by the Committee and may not reflect the views of its Members

———

U.S. GOVERNMENT PRINTING OFFICE

27–305 CC                    WASHINGTON : 1996

**COMMITTEE ON WAYS AND MEANS**

**U.S. HOUSE OF REPRESENTATIVES**

————————

ONE HUNDRED FOURTH CONGRESS

BILL ARCHER, TEXAS, *Chairman*

————————

PHILLIP D. MOSELEY, *Chief of Staff*

This document was prepared by the staff of the Committee of Ways and Means and is issued under the authority of Chairman Bill Archer. This document has not been reviewed or officially approved by the Members of the Committee.

# CONTENTS

————————

|  | Page |
|---|---|
| SECTION 1. HISTORICAL BACKGROUND AND NEED FOR REFORM ........ | 1 |
| SECTION 2. SUMMARY OF THE NEW WELFARE REFORM LAW BY TITLE ................................................................................................. | 13 |
| Title I. Block Grants to States for Temporary Assistance of Needy Families (TANF) ...................................................................... | 14 |
| Title II. Supplemental Security Income ........................................... | 24 |
| Title III. Child Support ...................................................................... | 27 |
| Title IV. Restricting Welfare and Public Benefits for Noncitizens ............... | 34 |
| Title V. Child Protection ................................................................... | 40 |
| Title VI. Child Care ........................................................................... | 42 |
| Title VII. Child Nutrition .................................................................. | 48 |
| Title VIII. Food Stamps and Commodity Distribution ..................... | 60 |
| Title IX. Miscellaneous ..................................................................... | 76 |
| SECTION 3. STATE-BY-STATE ALLOCATION OF GRANTS FOR TEMPORARY ASSISTANCE FOR NEEDY FAMILIES AND CHILD CARE | 78 |
| SECTION 4. SUMMARY OF EFFECTIVE DATES BY TITLE ........................... | 96 |
| SECTION 5. CONGRESSIONAL BUDGET OFFICE ESTIMATES ................... | 110 |

# SECTION 1.
## HISTORICAL BACKGROUND
## AND
## NEED FOR REFORM

3

## SECTION 1. HISTORICAL BACKGROUND AND NEED FOR REFORM

### OVERVIEW

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) signed into law on August 22, 1996, transforms large parts of the Nation's welfare system. The most important change is that the entitlement to cash welfare under title IV–A of the Social Security Act is ended. In place of the entitlement concept, the new law creates two block grants that provide States with the funds necessary to help families escape welfare. In particular, States are given a block grant to provide cash and other benefits to help needy families support their children while simultaneously requiring families to make verifiable efforts to leave welfare for work and to avoid births outside marriage. In addition, funds from the block grant can be used by States to encourage the formation and maintenance of two-parent families.

The second block grant provides funds to States to help them subsidize child care for families on welfare, families leaving welfare, and low-income families whose precarious financial status may result in future welfare spells.

The new law also limits the provision of welfare benefits to several categories of recipients for whom the continued provision of permanent entitlement benefits was viewed as inappropriate. These groups include most noncitizens, families that have been on welfare for more than 5 years, and children who are judged to be disabled solely because of age-inappropriate behavior. In earlier versions of the welfare reform bill in the 104th Congress, the entitlement to cash payments under the Supplemental Security Income Program for drug addicts and alcoholics also was ended. Congress passed this provision as part of Public Law 104–121, the Contract With America Advancement Act.

The welfare reform law also contains major new policies aimed at reducing the rate of nonmarital births as well as substantial revisions in the Federal-State child support enforcement program, in the food stamp and commodity distribution programs, and in child nutrition programs. Taken together, the provisions of this legislation constitute the most far-reaching reform of the Nation's welfare system in several decades.

### HIGHLIGHTS OF THE NEW LAW

Since creation of the first Federal welfare entitlements in 1935 to help States aid the needy who were aged, blind, or children, the Federal Government has gradually expanded the entitlement concept. As a result, the Nation's welfare system now provides millions of families headed by able-bodied adults with a package of guaranteed benefits. These entitlement benefits include cash, medical care, and food stamps. The combined value of this package of benefits in 1995 was about $12,000 per year in the median State (about $8,300 of which was paid with Federal funds). In addition to these entitlement programs, scores of additional programs, most provided on a nonentitlement basis, are available to poor and low-income individuals and families (see table 1). In fiscal year 1994, one-sixth

4

of the Federal budget—about $246 billion—was spent on means-tested aid (Burke, 1995).

TABLE 1.—NUMBER OF PROGRAMS IN EIGHT SOCIAL POLICY DOMAINS, 1994

| Social Policy Domain | Number of Programs |
|---|---|
| Cash Welfare | 8 [1] |
| Child Welfare and Child Abuse | 38 [2] |
| Child Care | 46 [3] |
| Employment and Training | 154 [4] |
| Social Services | 30 [5] |
| Food and Nutrition | 11 [1] |
| Housing | 27 [6] |
| Health | 22 [7] |

Note. Some programs counted as separate programs in this table are actually part of larger programs; e.g., child care is a component of both several job training programs and food and nutrition programs. In addition, some programs may be counted in more than one of the eight domains.

Sources: [1] Burke (1995); [2] Robinson & Forman (1994); [3] Forman (1994); [4] U.S. General Accounting Office (1994); [5] Robinson (1994); [6] Vanhorenbeck & Foote (1994); [7] Klebe (1994).

Although roughly half the families that enter AFDC leave the rolls within 1 year, most of them return. In fact, as indicated in chart 1, of the 4.4 million families now on welfare, about 65 percent or 2.9 million will eventually be on welfare for 8 years or more (Ellwood, 1986). Research also shows that despite the short welfare spells of some families, the average length of stay on welfare, counting repeat spells, for families enrolled at any given moment is 13 years (Pavetti, 1995).

**CHART 1. LONG-TERM DEPENDENCY OF WELFARE RECIPIENTS**



Source: Ellwood (1986).

5

The major goal of Public Law 104–193 is to reduce the length of welfare spells by attacking dependency while simultaneously preserving the function of welfare as a safety net for families experiencing temporary financial problems. Based on the view that the permanent guarantee of benefits plays a major role in welfare dependency, Congress is fundamentally altering the nature of the AFDC Program by making cash welfare benefits temporary and provisional. Both food stamps and Medicaid, however, continue as individual entitlements.

Welfare under the new block grant is made temporary by limiting the receipt of cash benefits from the block grant to 5 years (although the law allows States to exempt up to 20 percent of their caseload from this provision). Welfare under the block grant is made contingent by requiring recipients to work. All able-bodied adults who have been on welfare for 2 years must participate in some activity designed to help them become self-supporting. In addition, the law establishes strict work standards. When fully implemented, States are required to have one-half of their recipients in work programs for 30 hours per week.

To help States meet their participation standards while encouraging adults to leave welfare for work, the legislation also combines funds from several child care programs under jurisdiction of the House Committees on Ways and Means and Economic and Educational Opportunities to create a single child care block grant. Money for the child care block grant is increased by more than $4 billion over the amount of money available under prior law. Equally important, States will have great flexibility in using the child care money to meet the needs of low-income parents for child care, thereby allowing available funds to be used more efficiently.

In addition to repealing the entitlement to cash benefits under the AFDC Program, the new law ends or modifies the entitlement benefits of several other groups receiving welfare benefits. Although the concept of entitlement has been the focus of congressional debate for several years, Public Law 104–193 marks the first time that major welfare entitlement benefits have been repealed or substantially altered.

The children's entitlement under the Supplemental Security Income Program is also reformed by the act. The number of children on SSI has increased substantially in recent years, rising from about 300,000 in 1989 to nearly 900,000 in 1994, an increase of 200 percent in just 5 years. If recent trends had been allowed to continue, SSI enrollment could have reached 1.9 million by the year 2000, according to the U.S. General Accounting Office (1995a).

The new law focuses on the "Individualized Functional Assessment" (IFA) process that purports to detect whether a child behaves in an age-inappropriate manner and therefore qualifies for SSI. A recent U.S. General Accounting Office report (1995b) concluded that there were fundamental flaws in the IFA. The report stated that "each step of the process relies heavily on adjudicators' judgments, rather than objective criteria from the Social Security Administration, to assess the age-appropriateness of children's behavior. As a result, the subjectivity of the process calls into question the Social Security Administration's ability to assure reasonable consistency in administering the SSI program" (p. 2). By the

6

end of 1994, about 225,000 of the 890,000 children on SSI had qualified under an IFA.

Public Law 104–193 ends the IFA process. Children who are truly disabled continue to receive benefits through the reformed program. Although the new approach prevents the provision of benefits to about 235,000 children annually who would have qualified under the IFA process, the number of children receiving SSI will nonetheless grow from 995,000 to 1,089,000 between 1996 and 2002.

Another major area of entitlement reform taken up by the Congress was welfare benefits for noncitizens. The reforms of entitlement benefits for noncitizens include a broad ban on benefits for illegal aliens that applies to most entitlement and nonentitlement programs. The result is that, with the exception of selected emergency benefits and benefits that promote public health, illegal aliens no longer qualify for most public benefits, including means-tested benefits.

Since Congress passed the first immigration law in 1882, it has been a basic tenet of American immigration policy that legal aliens should not be eligible for public aid. Immigration officials are charged with being certain that immigrants will be self-supporting before they can be admitted to the United States. Moreover, for over 100 years, immigration law has stated that becoming a public charge is cause for deportation. Even so, welfare use among noncitizens has increased rapidly in recent years. By 1995, the Federal Government was spending about $8 billion annually on welfare for noncitizens, and spending was increasing dramatically each year. In the Supplemental Security Income Program, for example, the number of noncitizens receiving benefits increased from over 244,000 in 1986 to almost 800,000 in 1996, an increase of about 230 percent (U.S. General Accounting Office, 1996). By 1995, slightly more than one-half the SSI benefits provided to the elderly were collected by noncitizens. GAO (1995a) has estimated that if current policies had remained in place, by the year 2000, nearly 2 million noncitizens would have been receiving SSI benefits.

Given the expansion of welfare use by noncitizens, the original welfare reform bill (H.R. 1157) reported by the House Committee on Ways and Means on March 15, 1995, ended welfare benefits for most noncitizens. The exact provisions were modified several times during the course of congressional debate, particularly by exempting from the ban military veterans and families that had combined work histories of 10 years or more. In addition, several programs were exempted from the ban, including education and training programs that noncitizens could use to better prepare for work and public health programs designed to protect public safety.

Thus, Public Law 104–193 returns American policy on welfare for noncitizens to its roots by barring most noncitizens who arrive in the future from receiving welfare benefits. Current resident noncitizens face changes only in those programs subject to abuse (SSI and food stamps) or with a significant State financial commitment (cash welfare, Medicaid, and social services).

In addition to welfare dependency and entitlements, another major social problem addressed by this legislation is the high rate of nonmarital births. In 1994, nearly one-third of the Nation's chil-

7

dren were born outside marriage; among black Americans the rate was 70 percent (chart 2). In some inner-city neighborhoods, 8 of 10 babies are born to single mothers.

**CHART 2. ILLEGITIMACY RATE AS A PERCENTAGE OF LIVE BIRTHS**



Source: National Center for Health Statistics (1977, 1988); Ventura, et al. (1994, 1995).

There is substantial evidence that children reared without the active involvement of two parents are at a substantial disadvantage. These children are more likely to be abused, to make poor grades in school, to quit school, to be unemployed as adults, to be poor, to go on welfare, to have long welfare spells, and to commit crimes (Maynard, 1996; Zill, 1996). In addition, research shows that teens who give birth outside marriage are very likely to use welfare. Within 5 years of a nonmarital birth, more than 75 percent of teen mothers are or have been on welfare (Adams & Williams, 1990). Nor are the impacts of nonmarital births on welfare use confined to teen mothers. Across all mothers who give birth outside marriage, the percentage of those who have welfare spells of 10 years or more is nearly 3 times greater than the percentage of divorced mothers who have spells totaling 10 years or more (Ellwood, 1986).

Given the negative impacts of nonmarital births on mothers and children, Public Law 104–193 contains several provisions designed to reduce nonmarital births in general and teen nonmarital births in particular. These measures include requiring teen mothers to live at home or with a responsible adult; requiring teen mothers to attend school; imposing a mandatory 25 percent benefit reduction on unmarried mothers who do not help establish paternity; providing entitlement funding for abstinence education; requiring the Secretary of Health and Human Services to annually rank States

8

on their performance in reducing nonmarital birth ratios; providing $1 billion over 5 years for performance bonuses to reward States that achieve the goals of the act, including reduced nonmarital births and increased incidence of two-parent families; and providing $400 million in bonus payments to States that reduce their illegitimacy rates.

Finally, the new law addresses one of the most vexing social problems faced by the Nation today; namely, the remarkably low level of child support payments by noncustodial parents. Some scholars have estimated that a highly effective child support system could produce as much as $34 billion more for children than the amount now collected (Sorensen, 1995). The reformed child support program attacks this problem by pursuing five major goals: automating many child support enforcement procedures; establishing uniform tracking procedures; strengthening interstate child support enforcement; requiring States to adopt stronger measures to establish paternity; and creating new and stronger enforcement tools to increase actual child support collections. The law envisions a child support system in which all States have similar child support laws, all States share information through the Federal child support office, mass processing of information is routine, and interstate cases are handled expeditiously.

SPENDING

According to the Congressional Budget Office, total spending over 6 years on all welfare programs affected by H.R. 104–193 will grow from $198 billion in 1996 to $296.6 billion in 2002. As shown in chart 3, the budget impact of the act is to reduce the rate of growth of welfare spending somewhat below the rate of growth in prior law baseline spending, while still providing for an increase in welfare spending of about 50 percent in 6 years. As shown by the budget projections in table 2, spending under nearly all the constituent programs grows over the period. Across the 6 years covered by the act, total spending under all the affected programs will be $1.509 trillion, as compared with $1.563 trillion under the prior-law CBO baseline. Thus, the budget impact of the reforms is to reduce the budget deficit by nearly $55 billion by moderating the rate of welfare spending growth.

9

**CHART 3. PUBLIC LAW 104–193 MODERATES THE GROWTH OF WELFARE SPENDING WHILE SAVING $54.6 BILLION**



Source: Congressional Budget Office.

10

TABLE 2.—SPENDING ON WELFARE PROGRAMS AFFECTED BY PUBLIC LAW 104–193, 1996–2002

| Welfare Program | Year | | | | | | | Total 1997–2002 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | |
| **Under Prior Law Baseline** | | | | | | | | |
| Family Support Payments | $18,371 | $18,805 | $19,307 | $19,935 | $20,557 | $21,245 | $21,937 | $121,786 |
| Supplemental Security Income | 24,017 | 27,904 | 30,210 | 32,576 | 37,995 | 34,515 | 40,348 | 203,548 |
| Child Protection | 3,840 | 4,285 | 4,687 | 5,083 | 5,506 | 5,960 | 6,433 | 31,954 |
| Child Nutrition | 8,428 | 8,898 | 9,450 | 10,012 | 10,580 | 11,166 | 11,767 | 61,873 |
| Medicaid | 95,786 | 105,081 | 115,438 | 126,366 | 138,154 | 151,512 | 166,444 | 802,995 |
| Food Stamps | 26,220 | 28,094 | 29,702 | 31,092 | 32,476 | 33,847 | 35,283 | 190,494 |
| Social Services Block Grant | 2,880 | 3,010 | 3,050 | 3,000 | 2,920 | 2,870 | 2,840 | 17,690 |
| Earned Income Credit | 18,440 | 20,191 | 20,894 | 21,691 | 22,586 | 23,412 | 24,157 | 132,931 |
| Total | 197,982 | 216,268 | 232,738 | 249,755 | 270,774 | 284,527 | 309,209 | 1,563,271 |
| **Under Public Law 104–193** | | | | | | | | |
| Family Support Payments | 18,371 | 19,680 | 20,207 | 20,842 | 21,334 | 21,716 | 21,806 | 125,585 |
| Supplemental Security Income | 24,017 | 27,111 | 26,284 | 28,296 | 33,171 | 30,171 | 35,390 | 180,823 |
| Child Protection | 3,840 | 4,353 | 4,712 | 5,099 | 5,537 | 6,001 | 6,484 | 32,186 |
| Child Nutrition | 8,428 | 8,770 | 9,047 | 9,518 | 10,027 | 10,561 | 11,097 | 59,020 |
| Medicaid | 95,786 | 105,043 | 114,924 | 125,799 | 137,573 | 150,564 | 165,011 | 978,914 |
| Food Stamps | 26,220 | 25,996 | 25,753 | 26,053 | 28,267 | 29,498 | 30,700 | 167,167 |
| Social Services Block Grant | 2,880 | 2,635 | 2,630 | 2,580 | 2,500 | 2,450 | 2,420 | 15,215 |
| Earned Income Credit | 18,440 | 19,746 | 20,438 | 21,228 | 22,106 | 22,919 | 23,642 | 130,079 |
| Total | 197,982 | 213,334 | 224,395 | 240,315 | 260,515 | 273,880 | 296,550 | 1,508,989 |

Source: Congressional Budget Office
[1] Total does not include an additional $394 million in revenues that result from the Earned Income Credit reforms, $203 in spending on abstinence education under Title V of the Social Security Act, or $85 million in savings under the Disability Insurance Program.

Case 6:22-cv-01130-DCJ-CBW   Document 218-16   Filed 01/29/24   Page 14 of 159 PageID #: 12129

## REFERENCES

Adams, G., & Williams, R.C. (1990). *Targeting would-be long-term recipients of AFDC* (Department of Health and Human Services Contract No. 100–84–0059). Princeton, NJ: Mathematica Policy Research.

Burke, V. (1995, December 19). *Cash and noncash benefits for persons with limited income: Eligibility rules, recipient and expenditure data, FYs 1992–1994* (96–159 EPW). Washington, DC: Congressional Research Service.

Ellwood, D.T. (1986, January). *Targeting "would-be" long-term recipients of AFDC* (MPR No. 7617–953). Princeton, NJ: Mathematica Policy Research.

Forman, M. (1994, October 20). *Federal funding for child care* (Memorandum to the Committee on Ways and Means). Washington, DC: Congressional Research Service.

Klebe, E.R. (1994, November 25). *Health programs for low-income persons* (Memorandum to the Committee on Ways and Means). Washington, DC: Congressional Research Service.

Maynard, R. (Ed.). (1996). *Kids having kids.* New York: Robin Hood Foundation.

National Center for Health Statistics. (1977). *Vital statistics of the United States, 1973* (Vol. 1: Natality). Washington, DC: U.S. Public Health Service.

National Center for Health Statistics. (1988). *Vital statistics of the United States, 1985* (Vol. 1: Natality). Washington, DC: U.S. Public Health Service.

Pavetti, L. (1995, September). *Questions and answers on welfare dynamics.* Washington, DC: Urban Institute.

Robinson, D. (1994, November 23). *Comparison of selected Federal social service programs* (Memorandum to the Committee on Ways and Means). Washington, DC: Congressional Research Service.

Robinson, D. & Forman, M. (1994, November 8). *Comparison of selected Federal child welfare and child abuse programs* (Memorandum to the Committee on Ways and Means). Washington, DC: Congressional Research Service.

Sorensen, E. (1995, April). *The benefits of increased child support enforcement* (Welfare Reform Briefs, No. 2). Washington, DC: Urban Institute.

U.S. General Accounting Office. (1994, January). *Multiple employment and training programs: Overlapping programs can add unnecessary administrative costs* (GAO/HEHS–94–80). Washington, DC: Author.

U.S. General Accounting Office. (1995a, January 27). *Supplemental Security Income: Recent growth in rolls raises fundamental program concerns* (GAO/T–HEHS–95–67). Washington, DC: Author.

U.S. General Accounting Office. (1995b, March). *Social Security: New functional assessments for children raise eligibility questions* (GAO/HEHS–95–66). Washington, DC: Author.

U.S. General Accounting Office. (1996). *Supplemental Security Income: Noncitizen caseload continues to grow* (GAO/T–HEHS–96–149). Washington, DC: Author.

12

Vanhorenbeck, S. & Foote, B. (1994, November 22). *Table of authorizations and FY 1995 appropriations for housing programs* (Memorandum to the Committee on Ways and Means). Washington, DC: Congressional Research Service.

Ventura, S.J., Martin, J.A., Taffel, S.M., Mathews, T.J., & Clarke, S.C. (1994, October 25). Advance report of final natality statistics, 1992. *Monthly Vital Statistics Report, 43*(5). Washington, DC: U.S. Public Health Service.

Ventura, S.J., Martin, J.A., Taffel, S.M., Mathews, T.J. & Clarke, S.C. (1995, September 21). Advance report of final natality statistics, 1993. *Monthly Vital Statistics Report, 44*(3). Washington, DC: U.S. Public Health Service.

Zill, N. (1996, March 12). Unmarried parenthood as a risk factor for children. *The causes of poverty, with a focus on out-of-wedlock births: Hearing before the Subcommittee on Human Resources of the Committee on Ways and Means, U.S. House of Representatives,* 104th Congress, 2d Sess.

13

# SECTION 2.

# SUMMARY OF THE NEW WELFARE REFORM LAW BY TITLE

14

## SECTION 2. SUMMARY OF THE NEW WELFARE LAW BY TITLE

### TITLE I: BLOCK GRANTS TO STATES FOR TEMPORARY ASSISTANCE FOR NEEDY FAMILIES (TANF)

*Creation of the cash welfare block grant*

The Personal Responsibility and Work Opportunity Reconciliation Act creates a cash welfare block grant called Temporary Assistance for Needy Families (TANF). Its purpose is to increase State flexibility in providing assistance to needy families so that children may be cared for at home; end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage; prevent and reduce the incidence of out-of-wedlock pregnancies; and encourage the formation and maintenance of two-parent families. The TANF block grant replaces four current cash welfare and related programs: Aid to Families With Dependent Children (AFDC), AFDC Administration, the Job Opportunities and Basic Skills Training (JOBS) Program, and the Emergency Assistance Program. In addition, a new block grant for child care replaces AFDC-related child care, effective October 1, 1996. To allow States the opportunity to pass legislation needed to implement reformed welfare programs, the implementation date for the TANF block grant is July 1, 1997, but States may begin their block grant programs sooner.

Spending through the TANF block grant is capped and funded at $16.4 billion per year, slightly above fiscal year 1995 Federal expenditures for the four component programs. Each year between 1996 and 2002, the basic block grant provides each State with the amount of Federal money it received for the four constituent programs in fiscal year 1995, fiscal year 1994 (increased in some cases by higher Emergency Assistance spending in fiscal year 1995), or the average of fiscal year 1992 through fiscal year 1994, whichever is highest.

To receive each year's full TANF block grant, a State must spend in the previous year on behalf of TANF-eligible families a sum equal to 75 percent of State funds used in fiscal year 1994 on the replaced programs (its "historic" level of welfare expenditures). If a State fails to meet work participation rates, its required "maintenance of effort" spending rises to 80 percent.

Over 6 years, the Congressional Budget Office (CBO) estimates that Federal spending on family support payments (a classification that includes cash welfare, work programs for welfare recipients, and welfare-related child care) will be $3.8 billion above projected spending under the superseded AFDC law. This increased spending is due to several factors: (1) States are eligible to receive a TANF block grant that matches the highest of recent annual funding levels; (2) Federal outlays under the new child care block grant are estimated by CBO to be $3.5 billion higher than projected outlays under old law; (3) States with above-average population growth or below-average Federal welfare funding per poor person will qualify for supplemental grants above their TANF block grant (out of a total of $800 million provided over 4 years); (4) States that attain a performance score (for achieving the goals of the TANF block

15

grant) that equals a threshold set by the HHS Secretary will receive a high-performance bonus (out of a total of $1 billion provided over 5 years); and (5) up to 5 States will receive bonuses for achieving the largest percentage reduction in the number of out-of-wedlock births while also reducing the rate of abortion (a total of $400 million is available over 4 years). In addition, States undergoing recession, as shown by high and rising unemployment or rising food stamp caseloads, may be eligible to receive up to $2 billion over 5 years in matching "contingency" funds (CBO estimates Federal outlays of contingency funds at more than $1 billion). Taken together, these provisions are intended to ensure that States, even in times of recession, have sufficient funds to operate welfare programs that stress work instead of government dependence.

The new law earmarks some TANF funds (to be subtracted from relevant State block grants) for direct administration by applicant Indian tribes and Native Alaskan organizations. It entitles Puerto Rico, Guam, and the Virgin Islands to TANF grants plus reimbursement (at a 75 percent Federal rate) for welfare outlays above the Federal block grant level, but below new and enlarged funding ceilings. (For details of financing and State TANF allocations, see appendix.)

The individual entitlement to cash welfare payments currently provided under the Aid to Families With Dependent Children Program is ended by the new law. TANF block grant funds are guaranteed payments to States, but can be reduced if States fail to meet specified requirements such as providing data to the Federal Government, ensuring that funds are spent on children and families, enforcing penalties against persons who fail to cooperate in establishing paternity, maintaining specified levels of State spending, and meeting work participation requirements. State plans must set forth objective criteria for the delivery of benefits and the determination of eligibility and for fair and equitable treatment, and must explain how States will provide opportunities for appeal by adversely affected recipients.

*Requiring work and rewarding States that conduct successful work programs*

The new law contains three provisions requiring work or work preparation by adults in welfare families:

1. Adults receiving assistance through the block grant are required to "engage in work" (as defined by the State) after 2 years (or less at State option); otherwise, their assistance under the block grant is ended. Unless States opt out, adult recipients not working must participate in community service employment with hours and tasks set by the State after receiving benefits for 2 months. This requirement does not apply to single parents of a child under 6 who are unable to obtain needed child care. Further, States may exempt parents of a child under age 1 from this or any other work requirement.

2. States are required to have a specific and gradually increasing percentage of their caseload in work activities. Work activities are tightly defined to include actual work in the private or public sector plus, to a limited degree, education, vocational education training, and job search. (See below.) The participa-

16

tion requirement begins at 25 percent in 1997 and increases by 5 percentage points a year to 50 percent in 2002. In calculating required participation rates, States are given credit for reducing their welfare rolls, provided the decrease is not due to changed eligibility criteria (the required participation rate is adjusted down one percentage point for each percentage point that the State's welfare caseload is below fiscal year 1995 levels). As noted above, States may exempt single parents of a child under age 1 from the work requirement. If they do so, these families are omitted from the calculation of work participation rates (for no more than a total of 12 months for any single family). At least one adult in 75 percent of two-parent families must be working in 1997 and 1998, as under previous law, but the rate rises so that adults in at least 90 percent of two-parent families on welfare must be working in 1999 and thereafter. States not meeting these work participation rates for single-parent or two-parent families face a reduction in TANF block grant funds: 5 percent the first year and then 7 percent, 9 percent, 11 percent and so forth in subsequent consecutive years of failure; the maximum penalty for failing to meet State work requirements is the loss of 21 percent of the State's block grant.

3. Cash payments and other benefits from the block grant are forbidden for a family with a member who has received aid as an adult for 5 years. States may set a shorter time limit. The maximum time limit of 5 years requires families to become independent of TANF block grant assistance at that point (eligibility for other programs such as food stamps and Medicaid would continue, subject to program income limits). States may make exceptions to the 5-year limit for up to 20 percent of their caseload if the State judges that special circumstances (for example, family violence or borderline disabilities) justify an extension of benefits. In addition, States may use their own funds to assist families made ineligible by the 5-year time limit; States also may use title XX social services block grant funds (including amounts transferred out of the cash welfare block grant into the title XX block grant) to provide assistance to these families.

For purposes of calculating State participation rates described in (2) above, the new law defines 12 activities as "work activities:" unsubsidized employment; subsidized private employment; subsidized public employment; work experience; on-the-job training; job search and job readiness assistance, for up to 6 weeks (12 weeks, if the State's unemployment rate is 50 percent above the national average), of which only 4 can be consecutive; community service programs; vocational education training (for a maximum of 12 months); provision of child care to TANF recipients participating in a community service program; job skills training directly related to employment; education directly related to employment (for high school dropouts only); or satisfactory attendance at secondary school or in a course of study leading to an equivalency certificate (for high school dropouts only). Not more than 20 percent of the required number of work participants can qualify because they par-

17

ticipated in vocational training or were a teen head-of-household in secondary school.

In order to count toward fulfilling a State's participation rate, a recipient generally must engage in one of the first nine activities above (that is, one other than job skills training or education) for an average of 20 hours weekly. The total number of required hours of work rises to 25 in fiscal year 1999 and to a peak of 30 in fiscal year 2000. However, required work hours of a single parent of a child under 6 do not rise above 20, and a teen head of household (under age 20) without a high school diploma is counted as a work participant if she maintains secondary school attendance or, for the required minimum number of hours, participates in education directly related to employment.

Special rules apply to two-parent families. An adult in these families must work an average of 35 hours weekly, with at least 30 hours attributable to one of the first nine activities cited above. Also, if the family receives federally funded child care, the second parent, unless disabled or caring for a disabled child, must make satisfactory progress for at least 20 hours weekly in employment, work experience, on-the-job training, or community service.

Expressed as a percentage, work participation rates equal the number of all recipient families in which an individual is engaged in work activities for the month, divided by the number of recipient families with an adult recipient, but excluding families with children under 1 for up to a total of 12 months per family, if the State exempts them from work, and excluding families being sanctioned (for no more than 3 months within the preceding 12 months) for refusal to work.

A TANF recipient may fill a vacant employment position in order to engage in a work activity. However, no adult in a work activity who receives Federal funds shall be employed or assigned to a position when another person is on layoff from the same or any substantially equivalent job. States must establish and maintain a grievance procedure for resolving complaints of alleged job displacement.

Adults who refuse to engage in required work will face at least pro rata reductions in benefits. Thus, if a parent is required to work 20 hours and works only 10, her benefit will be reduced by at least 50 percent. States may not penalize single parents with children under 6 if the parent proves her inability to obtain needed child care for a specified reason. States are encouraged to place the highest priority on requiring adults in two-parent families and single parents with school-age children (especially older school-age children) to participate in work activities. Congressional committees are to review the implementation of State work programs during fiscal year 1999.

As noted before, States are required to maintain 75 percent of their 1994 level of State spending on the replaced programs for 6 years, fiscal year 1997 through 2002; however, States that fail to meet required work participation rates must maintain at least 80 percent of historic spending levels. In addition, the law creates a $1 billion performance bonus to provide cash rewards to States that succeed in meeting program goals, as measured by a formula to be

18

developed by the Secretary in consultation with the National Governors' Association and the American Public Welfare Association

The Secretary is required to annually rank the States in order of their success in placing recipients of assistance in long-term private sector jobs and in reducing the overall caseload.

### Providing Child Care for Recipients Who Work

The act repeals the child care guarantee for recipients of cash aid who need it to work or study and, for up to 1 year, for individuals who leave welfare bcause of employment. The act also ends existing AFDC-related child care programs. It entitles States to $13.9 billion for child care under title IV–A of the Social Security Act for a period of over 6 years. This amount is comprised of $1.2 billion annually in 100 percent Federal grants (roughly equal to recent Federal spending for AFDC-related child care) and an average of about $1.1 billion yearly in matching grants, which are subject to maintenance-of-effort spending rules. At least 70 percent of these entitlement funds must be spent for services for TANF recipients or ex-recipients or low-income working families at risk of TANF eligibility. These welfare-related child care funds are transferred to the lead agency under the Child Care and Development Block Grant (CCDBG) and made subject to its rules. For CCDBG, the law authorizes $1 billion annually in discretionary funds. (For further information, see title VI: Child Care, below.)

### Combating Out-of-Wedlock Births and Promoting Paternity Establishment

The new law gives States wide flexibility along with added funds to combat the rising number of out-of-wedlock births, which increase welfare use and long-term dependency. For example, unmarried teen parents must live at home or in another adult-supervised setting and attend school in order to be eligible for payments; States may end cash payments altogether for teen parents who have children outside marriage. Further, States may end the practice of providing extra Federal payments to families that have an additional child while on welfare, employing a policy sometimes called the "family cap."

The new law contains several provisions that encourage marriage and family and discourage out-of-wedlock childbearing. More specifically, the legislation:

1. Creates a $90 billion TANF block grant for States to use to "prevent and reduce the incidence of out-of-wedlock pregnancies," among other purposes;
2. Requires State plans to establish goals and take action to prevent and reduce the incidence of out-of-wedlock pregnancies, with special emphasis on teenage pregnancies, and to establish numerical goals for reducing the State illegitimacy ratio for 1996 through 2005;
3. Provides a total of $400 million in added grants (of up to $25 million annually per State) for the five States that are the most successful in reducing the number of out-of-wedlock births while decreasing abortion rates;

19

4. Makes States that are successful in reducing illegitimacy, strengthening families, and meeting other program goals eligible for a share of a new $1 billion "performance bonus" fund;
5. Provides $50 million in entitlement funding for abstinence education for each of fiscal years 1998 through 2002;
6. Allows any State to establish a family cap policy ending the practice of increasing Federal cash welfare benefits when mothers on welfare have babies;
7. Allows States to limit or deny cash welfare for unmarried teen parents;
8. Requires unwed teen parents to be in school and living at home or with an adult in order to receive assistance; States may use block grant funds to provide, or assist in locating, adult-supervised living arrangements, such as second-chance homes, for teen mothers;
9. Deters out-of-wedlock births, encourages paternity establishment, and provides for the payment of child support by: (1) requiring States to reduce cash welfare payments by at least 25 percent for families that include a parent who fails to cooperate in establishing paternity or obtaining child support (States may end benefits altogether); and (2) barring Federal funds for families with a member who has not assigned support rights to the State;
10. Requires the Secretary of HHS to implement, within 1 year, a strategy for preventing teen pregnancies, assuring that 25 percent of communities have prevention programs;
11. Requires the Secretary of Health and Human Services to annually rank all States according to out-of-wedlock birth ratios and changes in ratios over time, and to review the five highest and five lowest ranking States; and
12. Includes numerous findings on the crisis posed by out-of-wedlock births for children, families, and the Nation; encourages States to adopt an effective strategy to combat teen pregnancy by addressing the issue of male responsibility, including statutory rape culpability and prevention.

PROVIDING MAXIMUM STATE FLEXIBILITY

To increase State flexibility in the use of Federal funds, States are allowed to transfer up to 30 percent of their Temporary Assistance for Needy Families block grant into the Child Care and Development Block Grant (CCDBG) and the title XX social services block grant. However, States may shift no more than one-third of the total amount transferred (that is, no more than 10 percent of the TANF block grant) into the social services block grant; funds transferred into the social services block grant must be used only for programs and services for children and families with incomes below 200 percent of the poverty level. The law explicitly permits use of funds transferred into the Social Services Block Grant for families who lose TANF eligibility because of the 5-year time limit or because the State adopts a family cap.

To assist in recessions or other emergencies, States may: (1) receive matching grants from the $2 billion contingency fund described above; (2) borrow from a $1.7 billion Federal loan fund; and

20

(3) save an unlimited amount of their TANF block grant funds for use in later years.

The new law also contains supplemental grants to assist States with above average population growth and below average Federal welfare funding per poor person (reflecting historically low benefit levels). These grants will provide eligible States with an additional $800 million in Federal funds between fiscal year 1998 and 2001.

States may provide families on welfare moving into the State with the same benefit they received in their former State for a period of up to 12 months.

States shall not be prohibited by the Federal Government from testing recipients for use of controlled substances nor from sanctioning those who test positive.

To encourage work, States may use TANF block grant funds to operate an employment placement program. States may not use block grant funds to provide medical services (but may use them for family planning) and may not spend more than 15 percent of the block grant on administrative expenses. Spending for information technology and computerization required to perform case tracking and monitoring, however, is not counted toward the 15 percent cap on administrative expenditures.

To encourage saving for specified purposes, States may use block grant funds to help fund individual development accounts (IDAs) for persons eligible for TANF, with no dollar limit.

In recognition of the fact that creating block grants and increasing State control over program operation will lessen Federal control, the law requires a reduction of 75 percent of the full-time positions at the Department of Health and Human Services that relate to any direct spending program, or program funded through discretionary spending, that is converted into a block grant program. The law specifies that the Secretary of HHS must reduce the Federal welfare work force by 245 full-time positions related to the AFDC Program and by 60 full-time equivalent managerial positions.

To encourage States to involve religious and other private organizations in the delivery of welfare services to the greatest extent possible, States are specifically authorized to administer and provide family assistance services through contracts with charitable, religious, or private organizations or through vouchers or certificates that may be redeemed for services at charitable, religious, or private organizations.

To encourage States to adopt an electronic benefits transfer (EBT) system for TANF, the new law permits use of TANF funds for implementing EBT and limits State liability for lost/stolen benefits distributed via EBT.

States will set TANF eligibility standards and benefit levels. They may deny or offer aid to two-parent families or to any group; however, as noted above, if States offer TANF to unmarried teen parents they must require them to meet Federal conditions concerning living arrangements and school.

Setting National Priorities

The new law gives States the widest possible latitude in developing innovative programs that will get families off welfare and into jobs. Nonetheless, a small set of principles must be followed to en-

21

sure the nationwide success of welfare reform. States therefore are prohibited from using Federal cash welfare block grant funds to:

1. Pay benefits to parents who fail to participate in work or a State-designed welfare-to-work program after 24 months (or a shorter period) of receiving cash welfare;
2. Provide cash or noncash TANF benefits to families in which a member—as an adult—already has received assistance through the block grant for 5 years (however, up to 20 percent of the State's caseload may receive an exemption, and funds transferred to the title XX social services block grant and State funds may aid these families); and
3. Pay TANF benefits to noncitizens arriving after the date of enactment during their first 5 years in the United States (for details, see title IV: Restricting Welfare and Public Benefits for Noncitizens).

In addition, only families with minor children and pregnant women are eligible for assistance under the block grant. No assistance can be provided to families that include a child who has been absent from the home for more than 45 days, nor can assistance be given to a parent or caretaker who fails to report a missing child within 5 days.

Individuals convicted of fraudulently misrepresenting residence to obtain Federal welfare benefits in two or more States at the same time must be denied benefits for 10 years. States are prohibited from providing assistance from the Temporary Family Assistance Block Grant, food stamps, or Supplemental Security Income to fugitive felons fleeing prosecution or confinement or violating probation or parole. State welfare agencies are required to share information on fugitive felons with law enforcement officials under most circumstances.

Unless a State "opts out" by enacting a new law, an individual convicted after August 22, 1996, of a felony involving the possession, use, or distribution of illegal drugs shall not be eligible for cash welfare benefits or food stamps. States may limit the period of ineligibility by passage of a new law, and children in families that include an adult affected by this prohibition would continue to be eligible to receive benefits.

Ensuring Medical Coverage for Low-Income Families

States are required to provide Medicaid coverage to:

1. Families that become ineligible for cash welfare assistance because of increased earnings from work (for 1 year—6 months of full Medicaid, 6 months of subsidized Medicaid if family income is less than 185 percent of the Federal poverty level);
2. Families that become ineligible for cash welfare assistance because of increased earnings from child support (for 4 months); and
3. Families that would have been eligible for AFDC—and as a result guaranteed Medicaid coverage—under program income and resource standards in effect on July 16, 1996. States may reduce these standards to their May 1, 1988, level and may increase them by the rise in the Consumer Price Index.

The first two provisions are designed to maintain current law standards ensuring Medicaid coverage for families who move off

22

welfare. The third provision, by requiring Medicaid coverage for families according to recent AFDC standards, assures medical assistance to many families that might not qualify for benefits under States' new TANF block grant programs. To encourage work, however, States may end medical coverage for parents who become ineligible for TANF benefits because of a failure to work (children in these families would remain eligible for medical assistance). The law also extends the authorization of the first two provisions above until 2002.

ENSURING COMPLIANCE WITH NATIONAL PRIORITIES

In addition to the penalty of losing 5 percent or more of the State's block grant for failing to meet required work participation rates (see above), States are subject to several other penalties if they fail to meet certain Federal standards:

1. If block grant funds are found by audit to have been misspent, the State loses an equal amount from its next block grant payment, and it must repay the misspent amount using State funds (if the State cannot prove that the misuse was unintentional, an additional 5 percent of its annual block grant will be deducted from the next quarterly payment);

2. States that fail to submit required reports lose 4 percent of their block grant;

3. States that fail to participate in the Income and Eligibility Verification System (IEVS) lose up to 2 percent of their block grant;

4. States that fail to enforce penalties requested by the child support agency against persons who do not cooperate in establishing paternity or in establishing, modifying, or enforcing a child support order lose up to 5 percent of their block grant; States that do not comply substantially with child support enforcement program requirements face these penalties: 1 to 2 percent of the block grant for the first finding of noncompliance; 2 to 3 percent for the second finding; and 5 percent for the third or later finding;

5. States that fail to repay loans from the Federal loan fund in a timely fashion have any outstanding loan plus interest deducted from their next block grant payment;

6. States that fail to maintain 75 percent of historic State spending in fiscal year 1998 through 2003 (or 80 percent in the case of States that fail to meet minimum work participation rates) lose the difference between what the State actually spent and the minimum required level of spending from the following year's block grant;

7. States that fail to comply with the 5-year limit on assistance lose 5 percent of their block grant;

8. States that fail to maintain 100 percent of historic spending levels during fiscal years in which the State receives contingency funds have the amount of the contingency funds subtracted from their following year's block grant; and

9. States that penalize for failure to work single parents with children under age 6 who have a demonstrated inability to obtain child care lose up to 5 percent of their block grant.

23

States must replace with State funds any block grant amounts lost because of the above penalties. Except in the case of failure to repay loan funds or failure to maintain 75 (or 80) percent of historic levels of State welfare spending, the Secretary may opt not to impose the above penalties if she determines that the State had reasonable cause not to comply. States may enter into a corrective action plan upon being notified of their failure to comply with any of the above provisions; if the Secretary of Health and Human Services accepts the plan and the State corrects the violation, no penalty will be assessed. When penalties are assessed, total penalties cannot exceed 25 percent of the block grant in any single quarter. Penalties that exceed 25 percent are to be assessed in subsequent quarters. With the exception of penalties for the misuse of funds (and penalties that could take effect only at later dates), States will not face penalties for failing to comply with new Federal requirements until the later of July 1, 1997, or the date that is 6 months after the State submits its plan. Penalties will apply only to conduct that occurs after these dates. Finally, States have the right to appeal adverse decisions made by the Secretary.

TREATMENT OF WAIVERS

State programs may include provisions granted by waivers under section 1115 before enactment of the new law on August 22, 1996. On the other hand, States have the option of terminating waiver projects before their scheduled expiration date. States that elect to end ongoing waivers are held harmless for accrued cost neutrality liabilities if the request is submitted promptly. If States opt to continue a waiver, they must bring their programs in line with the terms and conditions of the revised block grant program once the waiver expires.

Waivers granted after the date of enactment may not override provisions of the TANF law that concern mandatory work requirements. For these postenactment waivers, a State must demonstrate to the satisfaction of the Secretary that the waiver will not result in increasing Federal welfare spending above the TANF block grant level.

DATA REPORTING AND EVALUATION

To help Congress determine whether the purposes of this legislation are being achieved, and to help Congress, the States, scholars, and the American public learn whether the reforms are producing positive results, States are required to report a broad range of data and several studies are authorized. States may fulfill the data collection and reporting requirements by reporting data for their entire caseload under the block grant or by use of statistical sampling, on the condition that sampling methods must be approved by the Secretary of HHS as scientifically acceptable.

The Census Bureau is provided with $10 million per year to expand the ongoing Survey of Income and Program Participation (SIPP) and to focus special data collection efforts on welfare families. By studying a random sample of American families both before and after implementation of this legislation, the Census Bureau will provide useful and reliable information on whether families

24

were able to escape welfare, on the factors that facilitate and impede movement off welfare, on the types of jobs obtained by former welfare recipients, on the impact of welfare reform on children, and on a host of other issues. The study will pay particular attention to the issues of welfare dependency, out-of-wedlock births, the beginning and end of welfare spells, and causes of repeat welfare spells. The Census Bureau also is directed to expand questions on the decennial and the mid-decade census to distinguish the number of households in which a grandparent is the primary care giver.

Within 6 months of enactment, the Secretary of Health and Human Services must report to Congress on the ability of States to employ automatic data processing systems capable of gathering required information, limiting fraud and abuse, and maintaining State progress in achieving the goals of this legislation. States must comply with the new data reporting requirements by July 1, 1997, and must continue to report information according to current law requirements until that date.

Beginning 3 years after the date of enactment, the Secretary must submit annual reports to Congressional committees on the impact of program changes on: (1) children in families made ineligible for assistance by the 5-year time limit, (2) children born to teenage parents, and (3) teenage parents. States must annually submit to the Secretary a statement of the child poverty rate in the State. If the child poverty rate has increased by 5 percent or more in the preceding year "as a result of" the TANF block grant program, the State must submit a corrective action plan outlining how it will reduce child poverty rates.

The Secretary may assist States in developing innovative welfare approaches and shall evaluate them. States are eligible to receive funding to evaluate their programs, but must generally pay at least 10 percent of the cost.

The Secretary must submit to Congress by September 30, 1998, a study on ways to evaluate program success other than by using minimum work participation rates. This study of "alternative outcomes measures" shall indicate whether the measures should be applied nationally or on a State-by-State basis.

The law limits Federal authority, providing that no officer or employee of the Federal Government may regulate the conduct of States under title IV–A of the Social Security Act (which authorizes the TANF block grant program) or enforce any provisions of title IV–A, except to the extent expressly provided in title IV–A.

TITLE II: SUPPLEMENTAL SECURITY INCOME

*Ensuring that prisoners and other criminals do not receive SSI benefits*

The new law provides for incentive payments from SSI Program funds to State and local penal institutions for furnishing information (date of confinement and certain other identifying information) to the Social Security Administration (SSA) that results in suspension of benefits (up to $400 for information received within 30 days of confinement or up to $200 for information received from 31 to 90 days after confinement). The provision applies to individuals whose period of confinement commences on or after March 1, 1997.

25

In order to facilitate the exchange of information, the SSI reporting agreements under which incentive payments are made are exempted from the Computer Matching and Privacy Protection Act of 1988. SSA is authorized to provide, on a reimbursable basis, information obtained pursuant to SSI reporting agreements to any Federal or federally assisted cash, food, or medical assistance program for eligibility purposes.

The Commissioner of the Social Security Administration is required to study and report to Congress within 1 year of enactment on the feasibility of information exchange on prisoners, especially by electronic means, between SSA, the courts, and correctional facilities. SSA also is required to provide Congress not later than October 1, 1998, with a list of institutions that are and are not providing information on SSI recipients to SSA.

The law denies eligibility for SSI to individuals fleeing prosecution, to fugitive felons, or to those violating a condition of probation or parole imposed under State or Federal law. SSA must provide, upon written request of any law enforcement officer, the current address, Social Security number, and photograph (if available) of any SSI recipient who: is fleeing to avoid prosecution, custody, or confinement after a felony conviction; is violating a condition of probation or parole; or has information necessary for the officer to conduct his official duties.

The law denies SSI benefits for a period of 10 years to an individual convicted in Federal or State court of having made a fraudulent statement with respect to his or her place of residence in order to receive benefits simultaneously in two or more States.

*Reforming the disability determination process for children*

The new law makes several changes designed to maintain the SSI Program's goal of providing benefits for severely disabled children while preventing children without serious impairments from receiving benefits.

First, the act replaces the former law "comparable severity" test with the following new definition of childhood disability:

An individual under the age of 18 is considered disabled under SSI if the child has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Second, the Commissioner of SSA is required to discontinue use of the Individualized Functional Assessment (IFA), an evaluation instrument that requires subjective judgment to determine children's eligibility for SSI. The IFA is also the source of many complaints about SSI providing cash benefits to children who act up in school or demonstrate only mild impairments.

Third, the Commissioner of SSA must eliminate references to "maladaptive behavior" in the Listings of Impairments (among medical criteria for evaluation of mental and emotional disorders in the domain of personal/behavioral function).

The provisions eliminating the use of the IFA and eliminating references to maladaptive behavior in the listings are effective for all new and pending applications upon enactment. Current beneficiaries receiving benefits due to an IFA or maladaptive behavior

26

listing will receive notice no later than January 1, 1997, that their benefits may end and their case will be redetermined. The Commissioner will redetermine eligibility of those currently receiving benefits using the new eligibility criteria within 1 year from the date of enactment. Should an individual be found ineligible for benefits, his benefits will end July 1, 1997, or the date of the redetermination, whichever is later.

At least once every 3 years, the Commissioner must conduct continuing disability reviews (CDRs) of children receiving SSI benefits. At the time of the CDR, the representative payee (usually a parent or other family member) must provide evidence demonstrating that the child is, and has been, receiving treatment, if appropriate. If the representative payee refuses to comply, an alternative representative payee will be found.

The eligibility of children qualifying for SSI benefits must be redetermined under the adult criteria within 1 year after the child turns 18. In addition, a CDR must be completed 12 months after the birth of a child who was allowed benefits because of low birth weight.

The new law makes several other changes designed to improve accountability in the SSI Program. First, the act requires lump sum payments in excess of $2,820 to children under age 18 (effective with respect to payments made after the date of enactment) to be paid into a dedicated savings account. Spending from this account must be for allowable expenses and must be monitored by the Commissioner. Allowable expenses include personal needs assistance, education or job skills training, special equipment, home modifications, medical treatment, therapy or rehabilitation services, or other items approved by the Commissioner so long as the expenses benefit the child or are related to the child's disability.

Second, the act requires that past-due benefits (effective with respect to past-due benefits payable after the third month following the month of enactment) larger than $5,640 for an individual and $8,460 for a couple be paid via three installments in 6-month intervals. Installment limits may be exceeded, however, to pay certain debts and expenses, and certain other exceptions apply.

Finally, children in medical institutions with private insurance currently receiving a full SSI benefit will have their benefits reduced to a personal needs allowance of $30 per month, the same amount that is given to children in institutions for whom more than half the costs are paid by the Medicaid Program. This provision is effective with respect to benefits for months beginning 90 or more days after the date of enactment.

New regulations implementing the changes related to benefits for disabled children must be promulgated by SSA within 3 months after the enactment date. These regulations (with supporting documentation including a cost analysis, workload impact, and caseload projections that will result from the new regulations) must be provided to Congress at least 45 days before they are implemented.

Within 180 days of enactment, the Commissioner will send to Congress a report on the progress made in implementing the provisions of these amendments.

The act takes a number of steps to evaluate and improve the disability determination process and to assess the effect of changes on families and children:

1. The SSA Commissioner, not later than May 30 of each year, must prepare and present an annual report to the President and the Congress on the SSI Program; and

2. The General Accounting Office, not later than January 1, 1999, must study the impact of the reforms; the study must include an examination of extra expenses (if any) incurred by families of children receiving SSI benefits that are not covered by other Federal, State, or local programs.

The act authorizes the appropriation of an additional $150 million in fiscal year 1997 and $100 million in fiscal year 1998 for the costs of processing CDRs and redeterminations.

### Other SSI changes

The new law provides that an individual's application for SSI benefits would be effective on the first day of the month following the date on which the application is filed, or on which the individual first becomes eligible, whichever is later. The law also permits the issuance of an emergency advance payment to an individual who is presumptively eligible and has a financial emergency in the month the application is filed. The emergency advance payment must be repaid through proportional reductions in benefits payable over a period of not more than 6 months. These provisions are effective for applications filed on or after the date of enactment.

A provision denying SSI or disability benefits to persons disabled solely because of addictions became part of H.R. 3136, the Contract With America Advancement Act (Public Law 104–121).

### TITLE III: CHILD SUPPORT

The act contains nearly 50 changes, many of them major, to current child support law. The summary below organizes these changes into several major categories.

### State obligation to provide services and distribution rules

The rules governing how child support collections are distributed among the Federal Government, State governments, and families that are on or have been on welfare are substantially changed. The current passthrough of the first $50 in child support collections to families on welfare is no longer a Federal requirement. Instead, payments to families that leave welfare are more generous. By October 1, 1997, States must distribute to the family current support and arrears that accrue after the family leaves welfare before the State is reimbursed for welfare costs. By October 1, 2000, States must also distribute to the family arrears that accrued before the family began receiving welfare before the State is reimbursed. These new rules, however, do not apply to collections made by intercepting tax refunds. The result of these changes is that States are required to pay a higher fraction of child support collections on arrearages to families that have left welfare by making these payments to families first (before the State). If this change in policy results in States losing money relative to current law, the Federal Government will reimburse States for any losses. This section of

28

the law also contains clarifications of the "fill-the-gap" policy so that States now operating those programs can continue to do so, provides safeguards against unauthorized use of paternity or child support information, requires States to inform parents of proceedings in which child support might be established or modified, and requires States to provide parents with a copy of any changes in the child support order within 14 days.

*Locate and case tracking*

The Federal Government makes major new investments to help States acquire, automate, and use information. First, States must establish a registry of all IV–D cases and all other new or modified child support cases in the State. The registry must contain specified minimum data elements for all cases. For cases enforced by the State child support enforcement (IV–D) program, the registry must also contain a wide array of information that is regularly updated, including the amount of each order and a record of payments and arrearages. In the case of orders that include withholding but are not in the IV–D system, the State must also keep records of payments. In IV–D cases, this information is used both to enforce and update child support orders by conducting matches with information in other State and Federal data systems and programs. Second, States must create an automated disbursement unit to which child support payments are paid and from which they are distributed and that contains accurate records of child support payments. This disbursement unit will handle payments in all cases enforced by the IV–D program and in all cases in the State with income withholding orders. In IV–D cases requiring income withholding, within 2 days of receipt of information about a support order and a parent's source of income, the automated system must send a withholding notice to employers. Third, States must require employers to send information on new employees to a centralized State Directory of New Hires within 20 days of the date of hire; employers that report electronically or by magnetic tape can file twice per month. States must routinely match the new hire information, which must be entered in the State data base within 5 days, against the State Case Registry using Social Security numbers. In the case of matches, within 2 days of entry of data in the Registry, employers must be notified of the amount to be withheld and where to send the money. Within 3 days, new employee information must be reported by States to the National Directory of New Hires. New hire information must also be shared with State agencies administering unemployment, workers' compensation, welfare, Medicaid, food stamp, and other specified programs. States using private contractors may share the new hire information with the private contractors, subject to privacy safeguards.

States must have laws clarifying that child support orders not subject to income withholding must immediately become subject to income withholding without a hearing if arrearages occur. The law includes rules that clarify how employers are to accomplish income withholding in interstate cases and establishes a uniform definition of income. Employers must remit withheld income to the State Disbursement Unit within 7 days of the normal date of payment to the employee.

29

All State and Federal child support agencies must have access to the motor vehicle and law enforcement locator systems of all States.

The Federal Parent Locator Service (FPLS) is given several new functions. The law clarifies that the purposes for which the FPLS can be used include establishing parentage, setting, modifying or enforcing support orders, and enforcing custody or visitation orders. In addition to being the repository for information from every State Case Registry and Directory of New Hires (information on new hires must be entered in the FPLS within 2 days of receipt), the FPLS must match information from State case registries with information from State new hire directories at least every 2 days and report matches to State agencies within 2 days. All Federal agencies must also report information, including wages, on all employees (except those involved in security activities who might be compromised) to the FPLS for use in matching against State child support cases. State unemployment agencies must report quarterly wage and unemployment compensation information to the FPLS. The Secretary must ensure that FPLS information is shared with the Social Security Administration, State child support agencies, and other agencies authorized by law. However, the Secretary must also ensure both that fees are established for agencies that use FPLS information and that the information is used only for authorized purposes.

The Secretaries of HHS and Labor must work together to develop a cost-effective means of accessing information in the various directories established by the law.

All States must have procedures for recording the Social Security numbers of applicants on the application for professional licenses, commercial drivers' licenses, occupational licenses, and marriage licenses; States must also record Social Security numbers in the records of divorce decrees, child support orders, paternity orders, and death certificates.

*Streamlining and uniformity of procedures*

All States must enact the Uniform Interstate Family Support Act (UIFSA), including all amendments adopted by the National Conference of Commissioners of Uniform State Laws before January 1, 1998. Recent provisions recommended by the Commissioners on procedures in interstate cases are included in the law. States are not required to use UIFSA in all cases if they determine that using other interstate procedures would be more effective. The law also clarifies the definition of a child's home State, makes several revisions to ensure that full faith and credit laws can be applied consistently with UIFSA, and clarifies the rules regarding which child support order States must honor when there is more than one order.

States must have laws that permit them to send orders to and receive orders from other States. Responding States must, within 5 days of receiving a case from another State, match the case against its data bases, take appropriate action if a match occurs, and send any collections to the initiating State. The Secretary must issue forms that States must use for withholding income, imposing liens, and issuing administrative subpoenas in interstate cases.

30

States must adopt laws that provide the child support agency with the authority to initiate a series of expedited procedures without the necessity of obtaining an order from any other administrative or judicial tribunal. These actions include: ordering genetic testing; issuing subpoenas; requiring public and private employers and other entities to provide information on employment, compensation, and benefits or be subject to penalties; obtaining access to vital statistics, State and local tax records, real and personal property records, records of occupational and professional licenses, business records, employment security and public assistance records, motor vehicle records, corrections records, customer records of utilities and cable TV companies pursuant to an administrative subpoena, and records of financial institutions; directing the obligor to make payments to the child support agency in public assistance or income withholding cases; ordering income withholding in IV–D cases; securing assets to satisfy arrearages, including the seizure of lump sum payments, judgments, and settlements; and increasing the monthly support due to make payments on arrearages.

*Paternity establishment*

States are required to have laws that permit paternity establishment until at least age 18 even in cases previously dismissed because a shorter statute of limitations was in effect. In contested paternity cases, except where barred by State laws or where there is good cause not to cooperate, all parties must submit to genetic testing at State expense; States may recoup costs from the father if paternity is established. States must take several actions to promote paternity establishment including creating a simple civil process for voluntary acknowledgment of paternity, maintaining a hospital-based paternity acknowledgment program as well as programs in other State agencies (including the birth record agency), and issuing an affidavit of voluntary paternity acknowledgment based on a form developed by the Secretary. When the child's parents are unmarried, the father's name will not appear on the birth certificate unless there is an acknowledgment or adjudication of paternity. Signed paternity acknowledgments must be considered a legal finding of paternity unless rescinded within 60 days; thereafter, acknowledgments can be challenged only on the basis of fraud, duress, or material mistake of fact, with the burden of proof on the challenger. Results of genetic testing must be admissible in court without foundation or other testimony unless objection is made in writing. State law must establish either a rebuttable or conclusive presumption of paternity when genetic testing indicates a threshold probability of paternity.

States must require issuance of temporary support orders if paternity is indicated by genetic testing or other clear and convincing evidence. Bills for pregnancy, childbirth, and genetic testing must be admissible in judicial proceedings without foundation testimony and must constitute prima facie evidence of costs incurred for such services. Fathers must have a reasonable opportunity to initiate a paternity action. Voluntary acknowledgments of paternity and adjudications of paternity must be filed with the State registry of birth records for matches with the State Case Registry of Child

31

Support Orders and States must publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support.

Individuals who apply for public assistance must provide specific identifying information about the noncustodial parent and must appear at interviews, hearings, and other legal proceedings. States must have good cause and other exceptions from these requirements which take into account the best interests of the child. Exceptions may be defined and applied by the State child support, welfare, or Medicaid agencies. Families that refuse to cooperate with these requirements must have their grant reduced at least 25 percent.

*Program administration and funding*

The Secretary must develop a proposal for a new child support incentive system and report the details to Congress by March 1, 1997. States are given a new option for computing the paternity establishment rate; in addition to the current procedure of calculating the rate relative to the IV–D caseload, States may calculate the rate relative to all out-of-wedlock births in the State. The mandatory paternity establishment rate of prior law is increased from 75 percent to 90 percent. States are allowed several years to reach the 90 percent standard, but must increase their establishment rate by 2 percentage points a year when the State rate is between 75 and 90 percent.

States must annually review and report to the Secretary information adequate to determine the State's compliance with Federal requirements for expedited procedures, timely case processing, and improvement on the performance indicators. The Secretary must establish, and States must use, uniform definitions in complying with this requirement. The Secretary must use this information to calculate incentive payments and penalties as well as to review compliance with Federal requirements. To determine the quality of data reported by States for calculating performance indicators and to assess the adequacy of financial management of the State program, the Secretary must conduct an audit of every State at least once every 3 years and more often if a State fails to meet Federal requirements.

States must establish an automated data system that maintains data necessary to meet Federal reporting requirements, that calculates State performance for incentives and penalties, and that ensures the completeness, reliability, and accuracy of data. The system must also have privacy safeguards. Data requirements enacted before or during 1988 must be met by October 1, 1997; funding that includes the 90 percent Federal match is made available (including retroactive funding for amounts spent since October 1, 1995) to meet these requirements. A total of $400 million, to be divided among the States in a manner determined by the Secretary, is made available for meeting the data requirements imposed by this legislation; this money is made available to States at a Federal match rate of 80 percent.

The Secretary can use 1 percent of the Federal share of child support collections on behalf of welfare families to provide technical assistance to the States; if needed, the Secretary can use up to 2

32

percent of the Federal share to operate the Federal Parent Locator Service.

The Secretary is required to provide several new pieces of information to the Congress on an annual basis. This new information includes the total amount of child support collected, the costs to the State and Federal Governments of furnishing child support services, and the total amount of support due and collected as well as due and unpaid.

*Establishment and modification of support orders*

The mandatory 3-year review of child support orders is slightly modified to permit States some flexibility in determining which reviews of welfare cases should be pursued and in choosing methods of review; States must review orders every 3 years (or more often at State option) if either parent or the State requests a review in welfare cases or if either parent requests a review in nonwelfare IV–D cases. Consumer credit agencies must release information on parents who owe child support to child support agencies that follow several requirements such as ensuring privacy. Financial institutions are provided immunity from prosecution for providing information to child support agencies; however, individuals who knowingly make unauthorized disclosures of financial records are subject to civil actions and a maximum penalty of $1,000 for each unauthorized disclosure.

*Enforcement of support orders*

Child support enforcement for Federal employees, including retirees and military personnel, is substantially revamped and strengthened. As under prior law, Federal employees are subject to wage withholding and other actions taken against them by State child support agencies. Every Federal agency is responsible for responding to a State child support program as if the Federal agency were a private business. The head of each Federal agency must designate an agent, whose name and address must be published annually in the Federal Register, to be responsible for handling child support cases. The agent must respond to withholding notices and other matters brought to her attention by child support officials. The definition of income for Federal employees is broadened to conform to the general IV–D definition and child support claims are given priority in the allocation of Federal employee income. The Secretary of Defense must establish a central personnel locator service, which must be updated on a regular basis, that permits location of every member of the Armed Services. The Secretary of each branch of the military service must grant leave to facilitate attendance at child support hearings and other child support proceedings. The Secretary of each branch must also withhold support from retirement pay and forward it to State disbursement units.

States must have laws that permit the voiding of any transfers of income or property that were made to avoid paying child support. State law must permit a court or administrative process to issue an order requiring individuals owing past-due support to either pay the amount due, follow a plan for repayment, or participate in work activities. States must periodically report to credit bureaus, after fulfilling due process requirements, the names of par-

33

ents owing past-due child support. States must also have proce-
dures under which liens arise by operation of law against property
for the amount of overdue child support; States must grant full
faith and credit to the liens of other States. States also must have
the authority to withhold, suspend, or restrict the use of drivers'
licenses, professional and occupational licenses, and recreational li-
censes of individuals owing past-due child support. In addition,
State child support agencies must enter into agreements with fi-
nancial institutions to develop and operate a data match system in
which the financial institution supplies, on a quarterly basis, the
name, address, and Social Security number of parents identified by
the State as owing past-due child support. In response to a lien or
levy from the State, financial institutions must surrender or en-
cumber assets of the parent owing delinquent child support.

The Internal Revenue Code is amended so that no additional fees
can be assessed for adjustments to previously certified amounts for
the same obligor. In the case of individuals owing child support ar-
rearages in excess of $5,000, the Secretary of HHS must request
that the State Department deny, revoke, restrict, or limit the indi-
vidual's passport.

The Secretary of State, working with the Secretary of HHS, is
authorized to declare reciprocity with foreign countries for the pur-
poses of establishing and enforcing support orders. U.S. residents
must be able to access services, free of cost, in nations with which
the United States has reciprocal agreements; these services should
include establishing parentage, establishing and enforcing support,
and disbursing payments. State plans for child support must in-
clude provision for treating requests for services from other nations
the same as interstate cases.

The United States Bankruptcy Code is amended to ensure that
any child support debt that is owed to a State and that is enforce-
able under the child support section of the Social Security Act (title
IV–D) cannot be discharged in bankruptcy proceedings.

A State that has Indian country may enter into a cooperative
agreement with an Indian tribe if the tribe demonstrates it has an
established court system that can enter child support and paternity
orders; the Secretary may make direct payments to tribes that
have approved plans.

*Medical support*

The definition of "medical child support order" in the Employee
Retirement Income Security Act (ERISA) is expanded to clarify
that any judgment, decree, or order that is issued by a court or by
an administrative process has the force and effect of law. All orders
enforced by the State child support agency must include a provision
for health care coverage. If the noncustodial parent changes jobs
and the new employer provides health coverage, the State must
send notice of coverage to the new employer; the notice must serve
to enroll the child in the health plan of the new employer.

*Enhancing responsibility and opportunity for nonresidential parents*

The act guarantees $10 million per year for funding grants to
States for access and visitation programs including mediation,
counseling, education, development of parenting plans, and super-

34

vised visitation. A formula for dividing the grant money among the States is included. States must monitor, evaluate, and report on their program in accord with regulations issued by the Secretary.

### TITLE IV: RESTRICTING WELFARE AND PUBLIC BENEFITS FOR NONCITIZENS

*Overview*

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act makes significant changes in the eligibility of noncitizens, both legal and illegal, for Federal, State, and local benefits.

Regarding Federal programs, the act contains three new restrictions on the eligibility of legal aliens for means-tested benefits. The first of these is a bar on qualified aliens, a term that includes legal immigrants, from Supplemental Security Income (SSI) and food stamps. The second is a bar of most qualified aliens arriving after August 22, 1996, from most means-tested programs during their first 5 years here. The third restriction, which applies to aliens in the United States on August 22, 1996, and to new entrants after their first 5 years, is a State option to deny qualified aliens assistance under the following federally funded programs: Temporary Assistance for Needy Families (TANF), which replaces AFDC; social services block grants; and Medicaid (other than emergency services). The new restrictions are not absolute, and the exceptions to them are discussed below.

Additionally, the act expands sponsor-to-alien deeming, which imputes the income and resources of a sponsor to an alien who is applying for needs-based assistance. This expansion may further affect eligibility for and the amount of needs-based benefits for certain qualified aliens who arrive after the date of enactment.

Separately, the act denies most Federal benefits, regardless of whether they are means tested, to aliens who are not qualified aliens—illegal aliens, aliens admitted temporarily for a limited purpose (nonimmigrants), aliens paroled into the United States by the Attorney General for briefer than a year, and other aliens allowed to reside in the United States (e.g., those granted deferred action status or stay of deportation). This denial covers many programs whose enabling statutes do not make citizenship or immigration status a criterion for participation.

Regarding State benefits, States are given broad authority to decide which noncitizens may participate in State and local programs, including authority to mirror Federal sponsor-to-alien deeming rules. However, the act initially denies illegal aliens most State and local benefits, and illegal aliens may qualify for those benefits only through newly enacted State laws which explicitly extend eligibility for benefits to illegal aliens.

While the act's new restrictions on the eligibility of aliens for public benefits are extensive, they cease to apply upon naturalization. Once an alien becomes a citizen, she becomes eligible for benefits on the same basis as other citizens.

35

*Federal benefits*

*"Qualified" aliens.*— Section 402 of the act restricts eligibility for major programs for qualified aliens, including legal permanent residents, aliens paroled into the United States for at least 1 year, refugees, and aliens granted asylum or certain similar relief. The restrictions include a direct bar on eligibility for: (1) the Supplemental Security Income (SSI) Program under title XVI of the Social Security Act, including State supplementary payments paid through the Federal Government; and (2) the Food Stamp Program. The restrictions also include a State option to restrict the eligibility of some or all qualified aliens under: (1) block grants to States for Temporary Assistance for Needy Families (TANF); (2) block grants to States for social services under title XX of the Social Security Act; and (3) Medicaid, except that treatment for emergency medical conditions (other than those related to an organ transplant) may not be restricted.

The act contains three exceptions to the SSI/food stamp bar and the State option for qualified aliens who meet other eligibility requirements. The first is a time-limited exception for humanitarian entrants. Under this exception, benefits may not be restricted during the 5 years after an alien is admitted as a refugee or is granted asylum or similar relief.

The second exception is based on service in the United States Armed Forces. Honorably discharged veterans, active duty service personnel (other than those on active duty for training), and their spouses and unmarried dependent children fall within the service-related exception. The third exception is premised on working in the United States. The work-related exception covers permanent resident aliens who have worked, or may be credited with, at least 40 qualifying quarters of employment for purposes of title II of the Social Security Act. In applying this test, the alien may take into account qualifying quarters of work performed by: (1) the alien; (2) the alien's spouse after their marriage (but only if the alien remains married to the spouse or the spouse is deceased); or (3) the alien's parent before the alien reached age 18. At the same time, no qualifying quarter beginning after 1996 may be credited if the worker (be it the alien or the alien's spouse or parent) received means-based Federal assistance during the period.

Agencies that administer the SSI and Food Stamp Programs are to redetermine the eligibility of recipients within 1 year of enactment. The State option regarding TANF, social services block grants, and Medicaid may not be exercised until January 1, 1997, for legal residents who were receiving benefits on the date of enactment.

*Five-year bar on new entrants.*—With limited exception, section 403 of the act makes qualified aliens who enter the United States after enactment ineligible for Federal means-tested benefits for 5 years after entry. Honorably discharged veterans, active duty service personnel (other than those on active duty for training), and their spouses and unmarried dependent children are excepted from the 5-year bar, as are refugees and aliens granted asylum or similar relief.

Several types of benefits are also excepted, including:

36

1. Treatment under Medicaid for emergency medical conditions (other than those related to an organ transplant);
2. Short-term, in-kind emergency disaster relief;
3. Assistance under the National School Lunch Act or the Child Nutrition Act of 1966;
4. Immunizations against diseases and testing for and treatment of symptoms of communicable diseases;
5. Foster care and adoption assistance under title IV of the Social Security Act, unless the foster parent or adoptive parent is an alien other than a qualified alien;
6. Education assistance under the Elementary and Secondary Education Act of 1965, specified titles (IV, V, IX, and X) of the Higher Education Act of 1965, or specified titles (III, VII, and VIII) of the Public Health Service Act;
7. Benefits under the Head Start Act;
8. Benefits under the Job Training Partnership Act; and
9. Services or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelters) designated by the Attorney General as: (i) delivering in-kind services at the community level; (ii) providing assistance without individual determinations of each recipient's needs; and (iii) being necessary for the protection of life and safety.

A separate exception is made for refugee and entrant assistance under title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 provided to Cuban and Haitian entrants (as defined in section 501 of the Refugee Education Assistance Act of 1980).

Once the initial 5-year period expires, an alien becomes subject to other restrictions on alien eligibility for Federal benefits in the act (i.e., the SSI/food stamp bar; the State option for Medicaid, TANF, and social services block grants; and sponsor-to-alien deeming) or, if those restrictions do not pertain, to alienage restrictions in pertinent enabling statutes or other applicable laws.

*Aliens other than "qualified" aliens.*—Section 401 of the act makes ineligible for Federal public benefits aliens who are not qualified aliens. These aliens include illegal aliens, aliens in the United States without valid immigration documents or other legal permission; nonimmigrant aliens, or aliens admitted into the United States for a limited time for a limited purpose (e.g., tourists, students, business visitors); aliens paroled into the United States by the Attorney General for briefer than 1 year; and other aliens allowed by the Attorney General to reside in the United States (e.g., those granted deferred action status or stay of deportation).

The Federal public benefits denied other aliens are broadly defined to include: (1) grants, contracts, loans, and licenses and (2) retirement, welfare, health, disability, housing, food, unemployment, postsecondary education, and similar benefits. Excepted programs include:

1. Treatment under Medicaid for emergency medical conditions (other than those related to an organ transplant);
2. Short-term, in-kind emergency disaster relief;
3. Immunizations against immunizable diseases and testing for and treatment of symptoms of communicable diseases;

37

4. Services or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelters) designated by the Attorney General as: (i) delivering in-kind services at the community level; (ii) providing assistance without individual determinations of each recipient's needs; and (iii) being necessary for the protection of life and safety; and

5. To the extent that an alien is receiving assistance on the date of enactment, programs administered by the Secretary for Housing and Urban Development, programs under title V of the Housing Act of 1949, and assistance under section 306C of the Consolidated Farm and Rural Development Act.

Section 401 also excepts Old Age, Survivors, and Disability Insurance benefits under title II of the Social Security Act that are protected by that title or by treaty or that are paid under applications made before enactment. Licenses and contracts related to a nonimmigrant's lawful employment activities also are excepted. Separately, section 742 of the act states that individuals who are eligible for free public education benefits under State and local law shall remain eligible to receive school lunch and school breakfast benefits. (The act itself does not address a State's obligation to grant all aliens equal access to education in accordance with the Supreme Court's decision in *Plyler* v. *Doe*.) Section 742 further states that nothing shall prohibit or require a State to provide aliens who are not qualified aliens other benefits under the National School Lunch Act or the Child Nutrition Act or under the Emergency Food Assistance Act, section 4 of the Agriculture and Consumer Protection Act, or the food distribution program on Indian reservations under the Food Stamp Act.

*Sponsor-to-alien deeming and affidavits of support.*—The Immigration and Nationality Act excludes from the United States aliens who appear likely to become a public charge at any time. Unless this ground for exclusion is waived, as it is in the case of refugees and asylees, an alien seeking to become a legal permanent resident must show adequate resources or job prospects or, in their absence, must present one or more affidavits of support signed by U.S. residents. Under sponsor-to-alien deeming, the income and resources of an individual who signed an affidavit (the "sponsor") and those of the sponsor's spouse are added to the means of a sponsored alien who applies for needs-based assistance during the applicable "deeming period" in determining whether the alien is sufficiently needy to qualify for assistance.

Approximately one-half of the aliens who obtain permanent resident status have had affidavits of support filed on their behalf. Despite the frequency of their use, the pledges of support contained in affidavits have not been regarded by the courts to be legally enforceable. Section 423 of the Personal Responsibility and Work Opportunity Reconciliation Act aims to rectify this problem. Under the act, sponsors must sign affidavits of support that allow sponsored aliens to seek support. The affidavits also would permit government agencies to obtain reimbursement of benefits provided to sponsored aliens. Sponsors are not required to reimburse benefits made available under those programs that are excepted from the 5-year bar for new entrants, which are listed above. However, the obligation to reimburse covered benefits applies to all benefits pro-

38

vided before a sponsored alien becomes a citizen even if sponsor-to-alien deeming has ended before then.

Section 421 of the act imposes additional sponsor-to-alien deeming requirements on sponsored aliens who have had one of the new, enforceable affidavits filed for them. Generally, if a sponsor has executed an affidavit that complies with the act's requirements, the income and resources of the sponsor and the sponsor's spouse are added to those of the sponsored alien in determining the eligibility of the alien under Federal needs-based programs until the alien becomes a citizen. Nevertheless, sponsor-to-alien deeming may end before the alien becomes a citizen if the alien meets the 40 qualifying quarter test that applies under the SSI/food stamp restrictions, described above. The programs that are excepted from the 5-year bar for new entrants, which are listed above, also are excepted from the sponsor-to-alien deeming requirements.

*Earned income credit.*—The act conditions eligibility for the earned income credit (EIC) on an individual's including his or her Social Security number and that of the individual's spouse on their tax return for the applicable taxable year. This requirement is intended to disqualify illegal aliens and other noncitizens who are not authorized to work in the United States.

*State benefits*

Three sections of the Personal Responsibility and Work Opportunity Reconciliation Act address alien eligibility for State and local public benefits.

Section 411 of the act directly denies State and local benefits to aliens who are not qualified aliens, nonimmigrant aliens, aliens paroled into the United States for briefer than 1 year, or other aliens allowed by the Attorney General to reside in the United States (e.g., those granted deferred action stay or stay of deportation). State and local benefits are broadly defined to include licenses, contracts, grants, loans, and assistance, but State and local benefits do not include those funded or provided in part by the Federal Government. Also, exceptions from the bar on State and local benefits are made for:

1. Treatment for emergency medical conditions (other than those related to an organ transplant);
2. Short-term, in-kind emergency disaster relief;
3. Immunizations against diseases and testing for and treatment of symptoms of communicable diseases; and
4. Services or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelters) designated by the Attorney General as: (i) delivering in-kind services at the community level; (ii) providing assistance without individual determinations of each recipient's needs; and (iii) being necessary for the protection of life and safety.

Additionally, section 433 states that nothing in the act is to be construed as addressing eligibility for basic public education. Notwithstanding its broad ban on State and local benefits for illegal aliens, section 411 permits States to provide illegal aliens with other barred benefits through enactment of new State laws.

Section 412 of the act authorizes the States to determine the eligibility for State and local benefits of qualified aliens, non-

immigrant aliens, and aliens paroled into the United States for briefer than 1 year. However, this authority cannot be exercised with respect to a refugee during the 5 years following admission nor with respect to an alien granted asylum or similar relief during the 5 years following the granting of relief. Also excepted are honorably discharged veterans, active duty service personnel (other than those on active duty for training), and their spouses and unmarried dependent children. Finally, there is a 40 qualifying quarter exception to State authority to deny State and local benefits that is similar to the exception that applies to the State option regarding Medicaid and designated block grants, described above. The authority to deny State and local benefits under section 412 cannot be exercised until January 1997 with respect to aliens who were receiving assistance on August 22, 1996.

Section 422 of the act allows States and their political subdivisions to mirror Federal sponsor-to-alien deeming requirements in their programs.

*Verification and reporting*

Under section 432 of the act, the Attorney General, in consultation with the Secretary of Health and Human Services, is required to adopt regulations within 18 months of enactment on verifying immigration status for the purpose of implementing the act's denial of Federal benefits to aliens who are not qualified aliens. States that administer a program through which a restricted federally assisted benefit is provided must have a verification program that complies with these regulations within 24 months of their adoption.

Section 404 of the act requires the following entities to provide the Immigration and Naturalization Service (INS) at least 4 times annually and at INS' request the name, address, and other information they have regarding each individual whom they know is in the United States unlawfully: (1) States receiving block grants for Temporary Assistance for Needy Families (TANF); (2) the Commissioner of Social Security; (3) States operating under agreements for the payment of SSI State supplements through the Federal Government; (4) the Secretary of Housing and Urban Development; and (5) public housing agencies operating under contracts for assistance under sections 6 or 8 of the United States Housing Act of 1937. Separately, section 434 of the act states that no State or local entity may be prohibited or in any way restricted from sending to or receiving from the INS information regarding an individual's immigration status.

The alien eligibility rules were amended and supplemented in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. This immigration enforcement legislation, which was enacted as Division C of H.R. 3610, Department of Defense Appropriations for fiscal year 1997, the Omnibus Consolidated Appropriations Act of 1997 Public Law 104–208, makes affidavits of support mandatory for most family-sponsored immigrants. It also sets a minimum means test of 125 percent of poverty level for sponsors and requires sponsors to provide sponsored aliens with a corresponding level of support. At the same time, sponsorship is not limited to the person who is seeking immigration preference for a

relative, but rather an affidavit of support may be cosigned by a third party who meets the minimum income requirements.

Additionally, the new immigration law allows nonprofit charitable organizations to provide a Federal public benefit without having to verify the immigration status of the recipients. In other ways, however, the law expands the alien eligibility verification and reporting requirements of the welfare bill. Regarding alien access to benefits, the immigration law classifies certain alien battered spouses and children as "qualified aliens," delays the beginning of the transition period for redetermination of food stamp eligibility until April 1, 1997, and specifically prohibits payment of Social Security benefits to aliens not lawfully present. It puts certain housing restrictions in statute.

TITLE V: CHILD PROTECTION

The Personal Responsibility and Work Opportunity Reconciliation Act contains several amendments to prior law governing child protection programs. However, unlike the House-passed version of H.R. 3734 and earlier welfare reform legislation in the 104th Congress, the final conference agreement makes no significant changes in current programs.

Grants to States for child welfare services will continue to be authorized under title IV–B of the Social Security Act as a discretionary program. Likewise, grants to States for family preservation and family support services will continue to be authorized under title IV–B as a capped entitlement. The existing open-ended entitlement under title IV–E for foster care and adoption assistance maintenance payments, administration and training is retained, as well as capped entitlement grants to States for independent living services. The new law makes no amendments to the existing Child Abuse Prevention and Treatment Act (CAPTA) and related discretionary programs.

*Foster care payments to for-profit institutions*

Under title IV–E, Federal foster care payments can be made to licensed foster family homes and to licensed public or private nonprofit child care institutions. The law deletes the word "nonprofit" from the statute so that States may use the services of any private institution that meets their standards, regardless of whether the institution is operated for profit. States remain responsible for establishing and enforcing licensing standards and for ensuring that children are in safe and reliable care.

*Enhanced match for statewide automated child welfare information systems*

In 1986, Congress authorized a planning process that was intended to result in a comprehensive, nationwide system for collecting data on foster care and adoption. The Department of Health and Human Services (HHS) published final regulations for this new Adoption and Foster Care Analysis and Reporting System (AFCARS) in December 1993, and the first transmission of data was due May 1995. All States currently are participating in the mandatory AFCARS system and HHS is analyzing the first data sets transmitted by the States. The system is intended to provide

41

data on child welfare trends; to enable policymakers to track children in foster care; and to learn why children enter foster care, how long children stay in care, and what happens to children during their foster care stay as well as after they leave care.

Under title IV–E of the Social Security Act, States are eligible to receive 50 percent Federal matching funds for these data collection functions. However, in 1993, Congress authorized enhanced Federal matching of 75 percent during fiscal years 1994–96 to help States automate their data collection systems. To receive these enhanced funds, State systems must: meet AFCARS requirements; provide for electronic data exchange within the State among related systems; provide for automated data collection on all children in foster care under State responsibility; collect information necessary to deliver services and determine program eligibility; support case management requirements; monitor case plan development and other ongoing activities; and ensure confidentiality and security of information.

Enhanced Federal matching for statewide Automated Child Welfare Information Systems (SACWIS) is scheduled to expire at the end of fiscal year 1996. Public Law 104–193 extends the 75 percent matching rate for one additional year, through fiscal year 1997, to enable more States to complete their automation process.

*National random sample study of child welfare*

The law provides the Secretary of HHS with $6 million in entitlement funds for each of fiscal years 1996 through 2002 to conduct a national random sample study of children who are at risk of abuse or neglect, or who have been determined by States to have been abused or neglected. The study must have a longitudinal component and yield data that are reliable at the State level for as many States as the Secretary determines is feasible. The law states that the Secretary should carefully consider selecting the sample from confirmed cases of abuse or neglect, and to follow each case for several years.

Among other types of information to be collected, the law states that the Secretary should collect information on the type of abuse or neglect involved; the frequency of contact with State or local agencies; whether the child had been separated from the family and the circumstances of such separation; the number, type and characteristics of out-of-home placements for the child; and the average duration of each placement. The Secretary is directed to prepare reports summarizing the results of the study and to make them available to the public.

*Kinship care*

The law amends title IV–E of the Social Security Act, which specifies provisions that must be included in State foster care and adoption assistance plans. The law adds a new plan element by requiring that State plans provide that the State shall consider giving preference to an adult relative over a nonrelated care giver when determining a placement for a child, as long as the relative care giver meets all relevant State child protection standards.

42

*Provision removing barriers to interethnic adoption*

The provision to remove barriers to interethnic adoption has an extensive legislative history. It was contained in the Contract With America and was passed by the House as part of H.R. 3286, the Adoption Promotion and Stability Act of 1996. The interethnic adoption provision also passed the House as part of welfare reform in H.R. 4, H.R. 2491, and subsequently, H.R. 3734. The provision was deleted from the final Conference Report accompanying H.R. 3734 because of a Senate parliamentary rule that restricts provisions allowed on a reconciliation bill. However, the provision was added to H.R. 3448, the Small Business Job Protection Act of 1996, which was signed into law by the President on August 20, 1996 (Public Law 104–188).

Many States require race matching foster or adoptive parents with children either through regulation, statute, policy or practice. The Howard M. Metzenbaum Multiethnic Placement Act of 1994 (Public Law 103–382) was intended to end the delays that children experience waiting for foster or adoptive families because of race matching practices. Section 553 of the Metzenbaum Act, however, contained language that was internally inconsistent with the purpose of the act (section 552); moreover, it lacked a strong enforcement provision. To remedy these deficiencies, section 553 of the Metzenbaum Act was repealed by Public Law 104–188.

In its place, section 1808 of the Small Business Job Protection Act of 1996 amends the Social Security Act to prohibit a State or other entity that receives Federal assistance from denying to any person the opportunity to become an adoptive or a foster parent on the basis of the race, color, or national origin of the person or of the child involved. Similarly, no State or other entity receiving Federal funds can delay or deny the placement of a child for adoption or foster care on the basis of the race, color, or national origin of the adoptive or foster parent or of the child involved.

Violations of the act can be discovered as a result of a review conducted under section 1123A of the Social Security Act "or otherwise" (that is, through the filing of a complaint by an individual, a group of individuals, or an agency). If a State is found to have violated the terms of this act, the State must correct the violation within 6 months (or less, at the Secretary's discretion); failure to do so will result in the imposition of graduated penalties. States found to be in violation would have their quarterly funds under title IV–E of the Social Security Act reduced by 2 percent for the first violation, by 3 percent for the second violation, and by 5 percent for the third or subsequent violation. The total amount of penalties which can be applied in a fiscal year cannot exceed 5 percent of a State's total IV–E grant.

Noncompliance with this provision is also deemed a violation of title VI of the Civil Rights Act of 1964. The Indian Child Welfare Act of 1978 is not affected by changes made in this title.

TITLE VI: CHILD CARE

The Personal Responsibility and Work Opportunity Reconciliation Act combines four major child care programs for low-income families into a single block grant to States. An expanded Child

Care and Development Block Grant (CCDBG) becomes the primary Federal child care subsidy program and replaces child care activities previously authorized under title IV–A of the Social Security Act (AFDC Child Care, Transitional Child Care for former AFDC recipients, and At-Risk Child Care for low-income working families).

This consolidation eliminates conflicting provisions among programs, including income eligibility standards, time limits on the receipt of assistance, and work requirements. Under the new system, Federal funds will follow the parent whether the parent is receiving public cash assistance while participating in a work-related activity or education program, has recently left public assistance, or is working but very low income and would be at risk of becoming dependent on welfare in the absence of subsidized child care. This approach is intended to eliminate the eligibility gaps, service disruptions, and paperwork caused by having separate programs for each of these groups of parents.

The law's child care provisions are structured as an amendment to the Child Care and Development Block Grant Act. Unless amended or repealed as described below, prior law under the CCDBG remains in effect. At the Federal level, the program is administered by the Department of Health and Human Services (HHS).

*Goals*

The new law establishes five goals for the expanded CCDBG, including: allowing States maximum flexibility in developing their programs; promoting parental choice; encouraging States to provide consumer education information to parents; helping States provide child care to parents trying to become independent of public assistance; and helping States implement health, safety, licensing, and registration standards established in State regulations.

*Funding provisions*

*Discretionary funds.*—The law provides both discretionary and entitlement funding for child care services. Discretionary funds are provided by reauthorization of the CCDBG through fiscal year 2002, at an annual authorization level of $1 billion. These funds are allocated among States according to the existing CCDBG formula, which is based on the number of children in low-income families and State per capita income. Territories will continue to receive one-half of 1 percent of discretionary funds.

As under prior law, there is no requirement for States to match these discretionary funds. The new law deletes a prior law provision that required States to use CCDBG funds to supplement, rather than supplant, other public funds available for child care. The new law also amends prior law to require States to obligate funds either in the year they are received or in the subsequent fiscal year. Previously, States had 3 years and 1 day in which to expend their funds. Prior law provisions that require the Secretary to reallocate unused funds remain in effect.

*Entitlement funds.*—Entitlement funding is provided for child care under the amended title IV–A of the Social Security Act, which authorizes Temporary Assistance for Needy Families

44

(TANF). These entitlement funds are provided to the lead CCDBG agency and spent subject to the requirements and limitations of the CCDBG Act. The bill authorizes and appropriates the following entitlement funds for child care: $2 billion in fiscal year 1997; $2.1 billion in fiscal year 1998; $2.2 billion in fiscal year 1999; $2.4 billion in fiscal year 2000; $2.6 billion in fiscal year 2001; and $2.7 billion in fiscal year 2002.

When added together, discretionary and entitlement funding for child care provided under the law equals $20 billion during the 6-year period, fiscal years 1997–2002. (Earlier descriptions have stated that the bill provides $22 billion during the 7-year period, fiscal years 1996–2002; the $22 billion figure includes fiscal year 1996 spending.)

Of all funds appropriated for child care, both discretionary and entitlement, the Secretary must reserve between 1 and 2 percent for payments to Indian tribes and tribal organizations. After funds are reserved for Indian tribes, remaining entitlement funds are allocated to States in two components. First, each State will receive a fixed amount each year, equal to the funding received by the State under the previous child care programs authorized by title IV–A (AFDC Child Care, Transitional Child Care, and At-Risk Child Care) in fiscal years 1994 or 1995, or the average of fiscal years 1992–94, whichever is greatest. This amount is expected to equal approximately $1.2 billion each year in fiscal years 1997–2002. No State match is required for these funds, which will remain available for expenditure by States with no fiscal year limitation.

Second, remaining entitlement funds (up to the total dollar amounts described above) are allocated to States according to each State's share of children under age 13. States must meet maintenance-of-effort and matching requirements to receive these funds. States must spend all of their "guaranteed" Federal entitlement funds for child care described above, plus 100 percent of the amount they spent of their own funds in fiscal years 1994 or 1995, whichever is higher, under the previous child care programs under title IV–A. Further, States must provide matching funds at the fiscal year 1995 Medicaid matching rate to receive these additional entitlement funds for child care. These remaining funds also are subject to redistribution rules. If the Secretary determines that a State will not spend its entire allotment for a given fiscal year, then the unused amounts are redistributed among other States which apply for the funds according to those States' share of children under age 13.

*Use of funds for certain populations*

Of their total entitlement funds, States must use at least 70 percent to provide child care services to families that are receiving public assistance under the new TANF Program, families that are trying to become independent of public assistance through work activities, and families that are at risk of becoming dependent on public assistance. In their State plans, States must demonstrate how they will meet the specific child care needs of these families. Of their remaining child care funds (including discretionary funds), States must ensure that a substantial portion is used for child care

45

services to eligible families other than those described above. The definition of "eligible child" is revised to increase the maximum family income to 85 percent of State median, instead of 75 percent as contained in prior law.

*State administration*

As under prior law, States are required to designate a lead agency for administration of Federal funds received for child care. However, the new law allows the State lead agency to administer the program directly or through an appropriate public or private entity. The lead agency is required to provide sufficient time and statewide notice of public hearings to be held on development of the State plan.

The law establishes a limit of 5 percent on the States' use of funds for administrative costs. This limit applies to all funds received for child care, both discretionary and entitlement. The law states that the term "administrative costs" does not include the costs of providing services. The conference agreement further states that the Secretary should issue regulations that define administrative costs, and that the following activities should not be considered administrative costs: eligibility determination and redetermination, preparation and participation in judicial hearings, child care placement, recruitment, licensing, inspection, reviews and supervision of child care placements, rate setting, resource and referral services, training, and establishment and maintenance of computerized child care information.

*Application and plan*

Under the law, States are required to submit plans covering a 2-year period. The new law amends prior law to require that States "certify" rather than "provide assurances" with regard to the plan components. As described below, State plans must make several certifications regarding parental choice, access, and complaints, consumer education information, licensing and regulation, and health and safety requirements.

*Parental choice, access and complaints.*—Prior law provisions that promote parental choice of providers, require unlimited access by parents to their children while in care, and require States to maintain and make available a record of substantiated parent complaints about providers remain unchanged, including the requirement that parents be offered the option of receiving child care assistance through certificates (vouchers) or cash. The law adds a new requirement that State plans include a detailed description of how these provisions are implemented.

The law also expands the definition of "child care certificate" to allow its use as a deposit for child care services, if such deposits are required of other children cared for by the same provider. The definition of "eligible child care provider" also is expanded to include individuals caring for their great grandchild or sibling (if the sibling provider lives in a separate residence). The prior law requirement that relative care givers be registered is deleted; relatives are required to comply with any "applicable" rather than "State" requirements.

46

*Consumer education information.*—States are required to collect and disseminate, to parents of eligible children and to the general public, consumer education information that promotes informed child care choices. Previously, the CCDBG required States to make information available regarding licensing and regulatory requirements, complaint procedures, and child care policies and practices within the State.

*Licensing and regulation.*—The law requires that States have in effect licensing requirements applicable to child care services provided within the State, and requires State plans to include a detailed description of these requirements and how they are effectively enforced. This provision shall not be construed to require that licensing requirements be applied to specific types of providers. The legislation is not intended to either prohibit or require States to differentiate between federally subsidized child care and nonsubsidized child care with regard to the application of specific standards and regulations.

The prior law provision that required unlicensed or unregulated child care providers to register with the State is deleted. Likewise, provisions that require States to notify HHS of any reduction in their child care standards, and to conduct a review of their licensing and regulatory requirements within 18 months of enactment of the CCDBG Act of 1990, also are repealed.

*Health and safety requirements.*—The new law leaves intact the requirement that States must have in effect, under State or local law, health and safety requirements that are applicable to child care providers, and that procedures are in effect to ensure that subsidized child care providers comply with applicable health and safety requirements. States must have health and safety requirements in the following areas: prevention and control of infectious diseases (including immunization), building and physical premises safety, and health and safety training.

## Use of funds

Funds provided under the bill may be used for child care services provided on a sliding fee scale basis, activities to improve the quality or availability of child care, or any other activity considered appropriate by the State to achieve the goals described above.

*Child care services.*—As under prior law, States must establish payment rates for child care services that are sufficient to ensure equal access for eligible children to comparable services provided to children whose parents are not eligible for subsidies. The act eliminates the requirement that payment rates must consider the variations in costs of serving children in different settings, of different age groups, and with special needs. The law adds a requirement that State plans must include a summary of the facts relied upon by the State to determine the sufficiency of payment rates to ensure equal access.

*Quality and availability improvement.*—The law requires States to spend no less than 4 percent of their total child care funds each year (discretionary and entitlement) for activities to provide comprehensive consumer education to parents and the public, activities that increase parental choice, and activities designed to improve

47

the quality and availability of child care (such as resource and referral services).

The law deletes a former provision that reserved 25 percent of discretionary CCDBG funds for two functions: activities to improve the quality and availability of child care, and expansion of before and afterschool child care and early childhood development services.

### Federal Enforcement

The law authorizes the Secretary, upon finding that a State is out of compliance with the act or the State plan, to require that the State reimburse the Federal Government for any misspent funds, or to withhold the amount from the administrative portion of the State's allotment for the next fiscal year, or to take a combination of these steps. Prior law required the Secretary to withhold any future payments to a State until the compliance failure was corrected.

### Data collection

Under the former CCDBG, States were required to submit annual aggregate data reports to HHS on their child care programs, and the Secretary was required to report annually to Congress. The new law replaces these provisions with a requirement that States submit disaggregated data on children and families receiving assistance to HHS every quarter, and aggregate data twice a year. The law further requires the Secretary to submit a report to Congress once every 2 years.

Specifically, States must collect the following information on each family unit receiving assistance, to be included in quarterly reports: family income; county of residence; gender, race, and age of children receiving assistance; whether the family includes only one parent; sources of family income, separately identified and including amounts; number of months the family has received benefits; the type of child care received; whether the child care provider was a relative; the cost of child care; and the average hours per week of care.

Aggregate data to be reported every 6 months include: the number of child care providers that receive funding under this program, separately identified by type; the monthly cost of child care services, and the portion that is subsidized by this program, identified by type; the number of payments made by the State through vouchers, contracts, cash, and disregards under public benefit programs, identified by type of child care provided; the manner in which consumer education information was provided and the number of parents to whom it was provided; and the total unduplicated number of children and families served by this program.

### Indian tribes and tribal organizations

As described earlier, the Secretary must reserve between 1 and 2 percent of all child care funds, both discretionary and entitlement, for payments to Indian tribes and tribal organizations. The law also requires the Secretary to reallocate among other tribes and organizations any discretionary funds that an Indian tribe or

48

tribal organization does not use in a manner consistent with the statute.

The Secretary, in consultation with the tribes and tribal organizations, must develop minimum child care standards that reflect tribal needs and available resources. These standards apply to child care provided by Indian tribes and tribal organizations in lieu of licensing and regulatory requirements that would otherwise be applicable under State or local law.

Under prior law, CCDBG funds could not be used for construction or renovation of facilities. However, the new law allows Indian tribes or tribal organizations to submit a request to the Secretary to use funds for these purposes. The Secretary may approve the request after a determination that adequate facilities are not otherwise available and that the lack of such facilities will inhibit the operation of child care programs in the future. The Secretary may not approve the request if it will reduce the level of child care services provided from the level provided by the tribe or organization in the previous year.

*Effective date*

All amendments are effective on October 1, 1996, except for the authorization of appropriations for the CCDBG, which becomes effective upon enactment.

TITLE VII: CHILD NUTRITION

*Overview*

The amendments made by title VII of the Personal Responsibility and Work Opportunity Reconciliation Act are intended to better target Federal child nutrition support on low-income children, conform summer program subsidies more closely to rates paid in other child nutrition programs, reduce requirements for "expanding" child nutrition programs, and return more program control to States and localities. Child nutrition provisions:

1. Means test the family and group day care home component of the child and adult care food program, reducing Federal subsidies for meals and supplements (snacks) served by eligible day care homes not located in low-income areas or without a low-income provider;
2. Reduce subsidies for summer food service programs;
3. End special startup and expansion grants for school breakfast and summer food service programs;
4. Change rounding rules applied to Federal subsidies for meals/snacks served to children who pay "full price" in school lunch and breakfast programs and child care centers (i.e., for meals/snacks served to children not receiving free or reduced-price meals/snacks because of their families' limited income); and
5. Remove numerous overly prescriptive Federal rules governing operations of State and local child nutrition providers, as well as over 20 out-of-date and redundant provisions of the National School Lunch and Child Nutrition Acts.

The new law also: (1) allows all schools that participate under a provision of law ("provision 2") that permits them to collect applications for free and reduced-price meals less frequently than once a

49

year (in exchange for offering all meals free) to participate under the terms of provision 2 for 5 years, rather than 3 years, without a redetermination of their status; (2) eliminates subsidies for a fourth meal/snack each day in summer camps, migrant service institutions, and child care centers; (3) ends a requirement for advance payments to participating child care institutions; (4) eliminates special summer food service program rules for National Youth Sports Program sponsors; (5) makes funding for the nutrition education and training program a "discretionary" appropriation, rather than "mandatory" spending; and (6) disqualifies stores participating in the special supplemental nutrition program for women, infants, and children (the WIC Program) if they are disqualified for Food Stamp Program violations.

The Congressional Budget Office (CBO) estimates that these changes in child nutrition law will reduce Federal outlays by $2.853 billion for fiscal years 1997 through 2002, with savings rising from $128 million in 1997 to $670 million in 2002. The bulk of this spending reduction (85 percent) is the result of restructured subsidies for day care homes.

### Child and adult care food program: day care homes

The new act completely restructures the subsidies received by family and group day care homes under the child and adult care food program.[1]

*Federal payments for homes.*—Federal subsidy rates for meals/snacks served to children in eligible day care homes are not currently differentiated by the family income of the child, unlike payments to day care centers (and schools).[2] Standard day care home rates are 7–15 percent lower (depending upon the meal served) than those for free meals/snacks served to low-income children by participating centers, but much higher (3 to 9 times more) than rates for meals/snacks served to nonpoor children in centers. However, approximately two-thirds of the spending for the day care home component of the child and adult care food program goes to support meals/snacks served to nonpoor children with family income above 185 percent of the Federal poverty guidelines (the income ceiling for receipt of free or reduced-price meals in other child nutrition programs). For the July 1996 to June 1997 period, the subsidy rates for day care homes are: $1.575 for each lunch/supper, 86.25 cents for breakfasts, and 47 cents for snacks. Assuming a 3-percent inflation adjustment in July 1997, the rates would rise to about $1.62, 88 cents, and 48 cents, respectively, under former rules.

In order to better target Federal support for day care homes to low-income children, the new act divides participating homes into two categories, or "tiers," and bases their Federal reimbursement on which tier they qualify for.

Tier I homes will be: (1) those located in low-income areas (areas in which at least half of the children are in households with income

---

[1] Federal payments to day care *centers* under the child and adult care food program are not currently affected by these changes. However, changes to rounding rules and elimination of payments for a fourth meal/snack each day will reduce some payments to day care centers. (See below.)

[2] Day care centers typically serve more than 40 children; homes generally have 4–7 children.

50

below 185 percent of the poverty guidelines, based on Census data, or served by a school enrolling elementary students in which at least half the children are certified eligible to receive free or reduced-price school meals), and (2) those operated by a provider whose income is verified by a sponsor to be below 185 percent of the poverty guidelines. These homes will receive payments very close to those provided under preamendment rules, with two relatively minor differences: beginning with the July 1997 annual inflation adjustment: (1) adjustments for inflation will be based on changes in the "food at home" component of the CPI–U, rather than the "food away from home" component; and (2) after adjusting for inflation, payment rates will be rounded down to the nearest whole cent, rather than rounded to the nearest quarter cent.[3] The CBO estimates that about 35 percent of meals/snacks served by day care homes will be subsidized at tier I rates.

Tier II homes will be those that do not meet tier I low-income standards. With the exception of tier II homes that take advantage of a conditional option to receive the higher tier I rates (see below), the act sets base rates for tier II homes at 95 cents for lunches/suppers, 27 cents for breakfasts, and 13 cents for supplements. These base rates will be indexed for inflation on July 1, 1997 (the effective date for the new two-tiered system), and, because of this, when the new system is actually implemented, the initial subsidy rate for lunches/suppers will be slightly higher. Assuming 3 percent inflation, the July 1997 lunch/supper rate will probably be 97 cents.[4] As with tier I rates, inflation adjustments applied to tier II subsidies will be based on the CPI–U food at home component and rounded down to the nearest whole cent.

Following preamendment procedures, the new tier II rates will be varied for Alaska and Hawaii (as will tier I rates), and rules against subsidies for providers' children unless they meet free or reduced-price income standards are retained.

The new legislation was designed to better target assistance to day care homes, but not to impose too great an administrative burden on homes and their sponsors by mandating income-testing of individual children. However, tier II homes will be able to elect to receive higher tier I subsidies for meals/snacks served to children who are members of households with income below 185 percent of the poverty guidelines if their sponsor collects the necessary information and makes the appropriate eligibility determination in accordance with Federal rules. Tier II homes also will be able to opt to receive tier I subsidies for meals/snacks served to children (or children whose parents are) participating in, or subsidized under, a federally or State-supported child care or other benefit program with an income eligibility limit that does not exceed 185 percent of the poverty guidelines. And they will be allowed to restrict their claim for tier I reimbursement to these "program-eligible" children if they choose not to collect income statements from all parents/caretakers.

---

[3] Although each payment rate is rounded down, the bases used for the next adjustment will be the unrounded rates for the previous 12 months.

[4] A 3-percent adjustment will not be large enough to affect initial subsidy rates for breakfasts and snacks.

51

In determining homes' tier I or II status, the most current available data (Census, enrollment, provider income) must be used, and a determination that a home is located in a tier I area will generally be effective for 3 years.

*Federal payments for sponsors.*—Basic Federal payments made to day care home sponsoring organizations for administrative costs (based on the number of homes sponsored) are not affected by the new two-tier system. However, the act does make two changes to the rules governing administrative funding sponsors receive. It prohibits funding for sponsors that base payments to employees on the number of homes "recruited." And it replaces existing permission for sponsors to use administrative funds to conduct "outreach" to and "recruitment" of unlicensed day care homes so that they may become licensed with permission to use administrative funds to assist unlicensed homes in becoming licensed.

*New Federal and State responsibilities.*—Under the new 2-tier system for day care homes, the Agriculture Department will have new responsibilities. It is required to provide Census data necessary for determining homes' tier I/II status and will establish minimum requirements for verifying children's family income and program participation status when tier II homes elect to claim tier I reimbursement rates. It also is required to prescribe "simplified" meal counting and reporting procedures for use when tier II homes elect to claim tier I reimbursement for children meeting income or program participation standards for low income. These procedures can include: (1) setting an annual percentage of meals/snacks to be subsidized at tier I rates based on the family income of children enrolled in a specific month or other period; (2) placing a home in a Federal reimbursement category based on its percentage of children with household income below 185 percent of the poverty guidelines; or (3) any other procedures judged appropriate. In addition, States are required to provide school enrollment data necessary to determine homes' tier I/II status.

*Implementation grants.*—In order to assist implementation of the new 2-tier subsidy system for day care homes, the new act requires that $5 million be reserved from fiscal year 1997 funding for the child and adult care food program and used to make grants to States to aid homes and their sponsors in putting the new system in place.[5] The grants are to be used to: (1) assist sponsors (and other appropriate organizations) in securing and providing training, materials, automated data processing, and other aid for sponsors' staff; and (2) provide training and other implementation assistance to participating homes. States may retain no more than 30 percent of their grant for their use.

*Study.*—The Agriculture Department, in conjunction with the Department of Health and Human Services, is required to undertake a comprehensive study of the participation and nutrition effects of the amendments restructuring day care home reimbursements, due in August 1998. To facilitate the study, States must submit participation and other data requested by the Agriculture Department.

---

[5] This $5 million is to be allocated among the States based on the number of day care homes participating in fiscal year 1995, with a minimum allocation of $30,000 for each State.

52

*Implementation schedule.*—The new two-tier subsidy system is effective beginning July 1, 1997. However, the act directs the Agriculture Department to issue interim regulations related to the restructuring of subsidies for day care homes, provision of data necessary to implement the new system, and changes to rules governing sponsors' use of administrative funds by January 1, 1997. Final regulations are required by July 1, 1997. The change affecting funding for sponsors basing payments to employees on the number of homes recruited is effective on August 22, 1996.

### Child and adult care food program: additional amendments

*Rounding rule.*—As with day care home subsidies, the new act requires that, when adjusted annually for inflation, Federal subsidy rates for meals and snacks served by child and adult centers to participants that are not eligible for free or reduced-price meals/snacks must be rounded down to the nearest whole cent (rather than rounded to the nearest quarter cent). Although the result of each annual inflation adjustment will be rounded down to the nearest whole cent, the base for the next adjustment will be the unrounded amount calculated for the previous 12-month period.

*Advance payments.*—States must provide monthly advance payments to approved day care institutions in an amount that reflects the level of valid claims customarily received (or the State's best estimate in the case of newly participating institutions). The new act makes provision of advance payments a State option.

*Additional meals/snacks.*—The act authorizes Federal payments to day care centers for up to two meals and one snack each day. Prior law allowed payment for two meals and two snacks or three meals and one snack for children in child care for 8 or more hours a day.

*Paperwork, outreach, and administrative provisions.*—The Agriculture Department has a responsibility to act to "expand" child care food services, and States must take affirmative action to expand the availability of child and adult care food program benefits, including annual notification to all nonparticipating day care homes. The Department also must conduct demonstration projects to test approaches to removing or reducing barriers to participation by homes; the Department and the States must provide training and technical assistance to day care home sponsors in reaching low-income children; and States are required to provide information and training about child health and development through sponsors. The Department is further required to provide State agencies with information about the WIC Program, and State agencies must provide child care institutions with specific WIC materials, annually update the materials, and ensure that, at least once a year, the institutions provide parents with written information about the WIC Program. Finally, the Department is required to provide "additional" technical assistance to child care institutions and sponsors that are having difficulty maintaining compliance with nutrition requirements, and State agencies must provide technical assistance to institutions submitting incomplete applications.

The new act deletes all of these requirements on the Department and the States and replaces them with a general requirement that States provide sufficient training, technical assistance, and mon-

53

itoring to facilitate effective operation of the child and adult care food program. Further, the Agriculture Department must assist States in developing plans to do so. A requirement that States and participating institutions make accounts and records available at all times is changed to a requirement that they be available at "any reasonable time."

*Summer food service program*

The new law makes five major substantive changes to the summer food service program: lowering Federal subsidy rates, changing the rounding rule, ending authority for reimbursements for a fourth meal/snack each day, dropping special rules for national youth sports program sponsors, and permitting some summer sponsors to exercise an "offer versus serve" option. In addition, it makes a number of administrative amendments to delete unnecessary Federal requirements. With the exception of the reduction in Federal subsidies (effective January 1, 1997, for the summer of 1997), the summer food service program amendments are effective on August 22, 1996.

*Reduced Federal subsidies.*—Federal operating cost subsidy rates for meals/snacks served free by summer food service providers are substantially higher than those for free meals/snacks in other child nutrition programs. For the summer of 1996, the rates are: $2.1675 for each lunch/supper, $1.2075 for breakfasts, and 57 cents for snacks. Assuming a 3 percent inflation adjustment in January 1997 (for the summer of 1997), they would rise to about $2.23, $1.24, and 58 cents, respectively, under prior rules. By comparison, the basic July 1996 to June 1997 rate for free lunches in the school lunch program (including commodity assistance) is $1.98, and the basic July 1996 to June 1997 rate for free breakfasts in the school breakfast program is $1.0175.

In order to more closely conform summer food service program operating subsidies to those for free meals/snacks in other child nutrition programs (while recognizing the higher costs of summer sponsors), the act reduces summer program reimbursement rates beginning with the summer of 1997. The new base rates are set at $1.97 for lunches/suppers, $1.13 for breakfasts, and 46 cents for snacks. However, these rates will be indexed for inflation on January 1, 1997, and, because of this, when they actually take effect in the summer of 1997, they will be somewhat higher than the base rates laid out in the new law. Assuming a 3 percent inflation adjustment, they probably will be about $2.02, $1.16, and 47 cents, respectively.

Summer food service program providers also receive inflation-indexed administrative cost payments based on the number of meals/snacks served. These amounts are not changed by the new law.

*Rounding rule.*—When indexed annually for inflation, summer program operating cost subsidy rates will be rounded down to the nearest whole cent (rather than rounded to the nearest quarter cent), beginning with the January 1997 adjustment. Annual adjustments will be based on the unrounded rates for the previous 12-month period.

54

*Additional meals/snacks.*—Payments to summer camps and institutions serving migrants will be limited to the regular three meals or two meals and a snack under the provisions of the new act, rather than the four meals/snacks under prior law.

*National Youth Sports Program.*—Higher education institutions operating programs under the National Youth Sports Program (NYSP) may be summer program sponsors; several special rules apply to them. They may receive payments for meals/snacks served in months other than the normal program months of May through September, and children and institutions are eligible to participate "without application." Their meal/snack subsidy rates are different than other summer sponsors—lunches and suppers are reimbursed at the school lunch program's free lunch rate, and breakfasts and snacks are subsidized at the school breakfast program's "severe need" rate. And they operate under different meal pattern requirements than other summer sponsors. The new act removes these special provisions for NYSP sponsors.

*"Offer versus serve."*—The new law authorizes school food authorities participating as summer program sponsors to permit children attending a site on school premises operated by the authority to refuse 1 or more items of a meal without affecting reimbursement for the meal—using rules the school uses for its school meal programs.

*Additional amendments.*—The new law deletes certain detailed mandates on the Department of Agriculture and State agencies in administering the summer food service programs. The Agriculture Department has a responsibility to "expand" the summer food service program and provide "additional" technical assistance to summer program sponsors that are having difficulty maintaining compliance with nutrition requirements. The new act eliminates these provisions of law.

State agencies must establish and implement an ongoing training and technical assistance program for private nonprofit sponsors. They also must include in their State plans: (1) the State's method of assessing need for the summer program; (2) the State's best estimate of the number and character of service institutions and sites to be approved (and children and meals to be served), as well as the estimating methods used; (3) the State's schedule for providing technical assistance and training to service institutions; and (4) the State's plans and schedule for informing service institutions of the availability of the summer food service program. The new act drops these requirements on States.

Under prior law, three advance payments to summer program operators were required during any summer program. The second of these may not be released to any service institution that has not certified it has held training sessions for its own personnel and site personnel. The act limits this condition for receiving the second advance payment to nonschool providers. It also replaces a requirement that service institutions' contracts with food service management companies must require that bacteria levels conform to standards applied by the local health authority with a more general requirement that these contracts conform to all standards set by local health authorities. Finally, the new act revises a requirement that States and summer program service institutions make accounts

55

and records available at all times to a requirement that they be available "at any reasonable time."

*Startup and expansion grants*

Provisions in the Child Nutrition Act require the Agriculture Department to use $5 million a year through fiscal year 1997, $6 million in 1998, and $7 million in each subsequent year to fund a program of competitively bid grants to State education agencies for the purpose of initiating or expanding the school breakfast and summer food service programs. The act ends the requirement for these startup and expansion grants, effective October 1, 1996.

*Eligibility of aliens*

Section 742 of the act modifies provisions of title IV that would bar illegally present aliens from eligibility for programs under the National School Lunch and Child Nutrition Acts. The section provides that individuals eligible to receive free public education benefits under State or local law will not be made ineligible for benefits under the school lunch and breakfast programs on the basis of citizenship, alienage, or immigration status. In addition, nothing in the new act (including the provisions of title IV) will "prohibit or require a State to provide" other benefits under the National School Lunch and Child Nutrition Acts to illegally present aliens. This provision is effective on August 22, 1996.

*School meal programs*

In addition to provisions dealing with startup and expansion grants for the school breakfast program and the eligibility of illegal aliens (both noted above), the new law makes one major substantive amendment affecting the school lunch and breakfast programs. Effective with the next annual inflation adjustment to school meal subsidy rates (July 1, 1997), it requires that the rates for "full price" lunches and breakfasts be rounded down to the nearest whole cent (rather than rounded to the nearest quarter cent).[6] The new law includes a number of administrative amendments dropping or revising overly prescriptive provisions of law governing school meal programs. More specifically, the new act removes:

1. A requirement that the Agriculture Department establish "administrative procedures" designed to diminish food waste in schools;
2. A requirement that schools use commodities designated as being in "abundance;"
3. A prohibition against States imposing any requirement with respect to teaching personnel, curriculum, and instruction in any school when carrying out provisions of the National School Lunch and Child Nutrition Acts (a similar prohibition on the Federal Government is retained);
4. With respect to waivers, requirements that: (1) waiver applications describe "management goals" to be achieved, a timetable for implementation, and the process to be used for monitoring

---

[6]As with other changes in rounding rules, annual adjustments will be based on the unrounded rates for the previous 12-month period, then rounded down.

56

progress in implementing the waiver (including cost implications); (2) the Agriculture Department state in writing the expected outcome of any approved waiver; (3) the Agriculture Department's decision on any waiver be disseminated through "normal means of communication;" (4) waivers may not exceed 3 years (unless extended); (5) waivers relating to "offer versus serve" rules are prohibited; and (6) service providers annually submit reports describing the use of their waivers and evaluating how the waiver contributed to improved services (and that States submit a summary of these);

5. A requirement that the Agriculture Department provide "additional" technical assistance to schools that are having difficulty maintaining compliance with nutrition requirements; and

6. A requirement that the Agriculture Department and State education agencies carry out information, promotion, and outreach programs to expand the school breakfast program, including the use of "language-appropriate" materials.

The new law also revises existing Federal requirements:

1. It makes clear that States can terminate or suspend agreements with schools participating in school meal programs;

2. It replaces existing mandates to notify children and parents about the nutrition content of school meals and their consistency with the Dietary Guidelines for Americans with a requirement that schools serve meals that are consistent with the Dietary Guidelines by the beginning of the 1996–97 school year, unless a waiver is granted by a State education agency. Meals must provide, on average over each week, at least one-third of the National Academy of Sciences' daily recommended dietary allowances (in the case of lunches) or one-quarter of the allowances (in the case of breakfasts);[7]

3. It provides that school food authorities may not be required to submit free and reduced-price "policy statements" to State education agencies unless there is a substantive change in policy. Routine changes (e.g., adjusting income eligibility standards for inflation) are not sufficient cause for requiring submission of a policy statement;

4. Schools electing to serve all children free meals for three successive years may be paid special assistance payments for free and reduced-price meals based on the number of meals served free or at a reduced price in the first year ("provision 2"). Schools that elected this option as of November 1994 are allowed to receive a 2-year extension if it is determined that the income level of the school's population has remained stable, and schools receiving a 2-year extension are eligible to receive subsequent 5-year extensions. The new law allows all schools taking the provision two option to qualify for extensions;

5. It removes a requirement that State education agencies report each month the average number of children receiving free and reduced price lunches in the immediately preceding month and replaces it with a provision to report this information at the Agriculture Department's request; and

---

[7] This amendment does not affect provisions of law enacted earlier this year (the Healthy Meals for Children Act; Public Law 104–149) that provided that schools may use "any reasonable approach" to meeting Federal nutrition standards for school meals.

57

6. It revises a requirement that States, State education agencies, and schools make accounts and records available at all times to a requirement that they be available at "any reasonable time."

*Assistance for State administrative expenses*

The new law makes two changes in rules governing Federal aid for State child nutrition administrative expenses:

1. It eliminates a provision of law that authorizes the Agriculture Department to withhold Federal funding for State administrative expenses when a State fails to agree to participate in a study or survey under the National School Lunch or Child Nutrition Acts; and
2. It removes a requirement for annual plans for the use of State administrative expense funds and replaces it with a mandate to submit any substantive plan changes for approval.

*Commodity distribution*

The new law includes four changes that affect commodity distribution for child nutrition programs:

1. A requirement that cereal and shortening and oil products be included among products donated to the school lunch program is eliminated;
2. A mandate to purchase specific amounts of low-fat cheese for school meal programs is ended;
3. The requirement for formal State advisory councils on selection and distribution of commodities is replaced with a requirement that State agencies meet with local school food service personnel when making decisions regarding commodities used in school meal programs; and
4. Authority for the Agriculture Department to prescribe the terms and conditions under which donated commodities will be used in schools and other participating institutions is ended.

*The WIC Program*

The act adds a new major provision affecting operations of the special supplemental food program for women, infants, and children (WIC). Effective on enactment, WIC vendors that have been disqualified from participation in the Food Stamp Program will be disqualified as WIC vendors. The disqualification is for the same period as the food stamp disqualification and will not be subject to separate WIC Program administrative and judicial review procedures. In addition, effective on enactment, the new law contains a number of administrative amendments removing or revising Federal requirements.

Detailed mandates and requirements that are eliminated by the new act include:

1. A requirement that the Agriculture Department "promote" the WIC Program by producing and distributing materials, including public service announcements in English and other appropriate languages;
2. A requirement for a biennial report from the Agriculture Department on the characteristics of WIC participants, participation by migrants, and other matters;

58

3. A mandate that State agencies annually evaluate nutrition education and breast feeding support and promotion activities;

4. Specific permission for local WIC agencies to use "master files" with regard to monitoring individuals required to be included in group nutrition education classes;

5. A State plan requirement for an estimate of increased participation when "funds conversion" authority is opted for by a State;

6. Requirements as to how quickly State agencies must respond to local agency applications to participate; requirements as to the content of recipient suspension and termination notices;

7. A directive for Federal administrative standards for States, including staffing standards;

8. A provision that stipulates that products specifically designed for pregnant, postpartum, and breastfeeding women or infants, may be made available if they are commercially available or are federally approved based on clinical tests;

9. A provision specifically allowing States to adopt benefit delivery methods that accommodate the special needs and problems of incarcerated individuals;

10. A requirement for pilot projects to determine the feasibility of using "universal product codes" to aid vendors in providing the correct infant formula to WIC participants;

11. Specific rules governing the Agriculture Department when it solicits infant formula bids on behalf of States (authority to do so is retained); [8] and

12. Requirements that the Agriculture Department "promote" the joint purchase of infant formula by States, "encourage" the purchase of items other than infant formula under "cost containment" procedures, inform States of the benefits of cost containment procedures, and provide technical assistance related to cost containment.

In other areas, the new legislation changes Federal rules by:

1. Stipulating that, after 1 year in a temporary accommodation, individuals will not be considered "homeless;"

2. Removing requirements that State agencies "ensure" that: (1) written information about food stamps and the AFDC and child support enforcement programs is provided to WIC applicants and participants; and (2) local agencies maintain and make available a list of local resources for substance abuse counselling and treatment. These are replaced with: (1) authority for State agencies to provide local agencies with materials describing other programs for which WIC participants may be eligible; and (2) a requirement that local agencies maintain and make available lists of local substance abuse counselling and treatment resources;

3. Revising a requirement for annual State plans to provide that State agencies only be required to submit substantive changes in their plan for Federal approval;

4. Removing State plan requirements for coordination with a specific list of special counselling services and programs and re-

---

[8] None of the amendments affecting procurement practices are to affect contracts for infant formula in effect on August 22, 1996.

59

placing them with a general directive to coordinate WIC operations with other services and programs;

5. Dropping requirements that State plans include an explanation of how the State will provide WIC benefits to unserved and underserved areas, those most in need, and incarcerated persons, but retaining plan requirements for improving access for the employed and those in rural areas and reaching and enrolling migrants and women in the early months of pregnancy;

6. Converting the requirement to provide WIC services and materials in languages other than English from a mandate to an option;

7. Revising authority for the Agriculture Department to ask for such other information "as may be required" in a State's plan to a stipulation that plans must include only other information as may "reasonably" be required;

8. Changing the requirement that State and local WIC agencies make accounts and records available at all times to a requirement that they be made available at "any reasonable time;"

9. Making it a local agency option whether to provide information about other potential sources of food assistance; and

10. Providing that the National Advisory Council on Maternal, Infant, and Fetal Nutrition rather than the Secretary of Agriculture, will select its Chairman and Vice Chairman.

*Nutrition education and training*

The primary amendment made to provisions for the nutrition education and training program converts it from a program for which funding is "mandatory" (required and permanently appropriated) to one for which funding is "discretionary" (dependent on decisions made with each year's appropriations). State grants from the amount appropriated will be based on a rate of 50 cents for each child enrolled in schools and institutions participating in child nutrition programs, with a minimum award of $75,000. If funds are insufficient to provide grants based on the 50 cent/$75,000 rule, the amount of each State's grant will be ratably reduced.

In addition to the funding amendment, the new law rewords and simplifies the statute's provisions regarding the purpose of the nutrition education and training program, revises a requirement that State education agencies make accounts and records available at all times to a directive that they be available at "any reasonable time," and, in the interest of limiting Federal directives to States, eliminates specific provisions of law directing how nutrition education and training funds may be spent. The bill replaces the following detailed list of purposes for which specific permission is given with general authority for States to use nutrition, education, and training funds for other "appropriate activities" as determined by the State:

1. Funding a nutrition component in homemaking and health education;

2. Instructing teachers and school staff on how to promote better nutritional health and motivate children from a variety of linguistic and cultural backgrounds to practice sound eating habits;

60

3. Developing means of providing nutrition education in "language-appropriate" materials through afterschool programs;
4. Training related to healthy and nutritious meals;
5. Creating instructional programming on the "Food Guide Pyramid" (including language-appropriate materials);
6. Funding aspects of the "Strategic Plan for Nutrition Education;"
7. Encouraging public service advertisements to promote healthy eating habits for children (including language-appropriate materials and advertisements);
8. Coordinating and promoting nutrition education and training activities in local school districts;
9. Contracting with public and private nonprofit education institutions to conduct nutrition education and training;
10. Increasing public awareness of the importance of breakfasts; and
11. Coordinating and promoting nutrition education and training activities that include the summer and child care food programs.

The new legislation also: (1) ends planning and assessment grants for nutrition education and training (and their attendant comprehensive plans); and (2) eliminates specific Federal requirements for State nutrition education coordinators' assessment of the nutrition education and training needs of the State.

*Pilot projects*

The act makes two changes affecting pilot project authority under the National School Lunch Act:

1. It eliminates authorization for "universal free lunch" projects that are similar to "provision 2" authority found elsewhere in law (separate, additional authority for "universal" free meal projects is retained); and
2. It makes funding for pilot projects for grants to provide meals and snacks to adolescents in programs outside school hours optional and authorizes "such sums as are necessary" for fiscal years 1997 and 1998.[9]

*Coordination*

Finally, the new act requires the Agriculture Department to develop proposed changes to regulations for the school lunch, school breakfast, and summer food service programs in order to simplify them and coordinate them into a comprehensive meal program. The Department must consult with local, State, and regional administrators in developing these proposed changes and submit to Congress a report on them by November 1, 1997.

TITLE VIII: FOOD STAMPS AND COMMODITY DISTRIBUTION

*Overview*

Subtitle A of title VIII of the Personal Responsibility and Work Opportunity Reconciliation Act contains major and extensive revisions to the Food Stamp Program, the most substantial changes

[9] Under prior law, these projects were *required* to be funded at $475,000 a year in fiscal years 1996 and 1997 and $525,000 in 1998.

61

since the Food Stamp Act was rewritten in 1977. It greatly expands States' role in the program (helping to broaden their authority over the welfare system, as with other components of the act), adds to and strengthens work and other nonfinancial eligibility requirements, controls future spending increases, expands penalties for rules violations and controls over food stamp trafficking, and encourages the electronic delivery of benefits. It also authorizes food stamp appropriations through fiscal year 2002, without specific dollar limits on appropriations or spending. Separately, title IV of the act bars food stamp eligibility for most legally present aliens (illegal aliens are already ineligible for food stamps), and provisions in title I disqualify those convicted of drug-related felonies.

Subtitle B of title VIII amends various laws to combine the emergency food assistance program with other commodity distribution programs for soup kitchens and food banks. It also requires that $100 million a year (through fiscal year 2002) be used for purchasing commodities for the new combined emergency food assistance program—drawn from food stamp appropriations.

Congressional Budget Office (CBO) estimates of the act's spending effects indicate that changes made to the regular Food Stamp Program by the amendments specific to the Food Stamp Act itself will reduce projected spending growth under preamendment law by $23.7 billion through fiscal year 2002.[10] In addition, denial of food stamp eligibility to legally resident aliens will, it is estimated, bring on spending reductions totaling $3.7 billion through 2002, for an overall total of $27.4 billion. However, net savings will be less than this amount. The act includes a provision that requires new spending (reducing savings) under the aegis of Food Stamp Act appropriations: $600 million (through 2002) for the new combined emergency food assistance program. And savings are further lessened because of provisions in the new act that significantly change the operations of other welfare programs (e.g., approximately $3 billion in added food stamp costs because of the act's SSI and TANF block grant provisions). As a result, the net Federal food-stamp-related outlay savings under the act are estimated at $23.3 billion through 2002.

*Expanding State control and options*

*State option for a simplified Food Stamp Program.*—The new act's primary change giving States more control over the Food Stamp Program permits them to operate a "simplified Food Stamp Program" under which they may determine food stamp benefits for households in which all members receive TANF aid using TANF rules and procedures, food stamp rules and procedures, or a combination of both.[11] In doing so, States may operate a simplified program statewide or in regions of the State and may standardize food

---

[10] This amount does not include some $345 million in fiscal year 1997 savings that the CBO has attributed to the fiscal year 1997 agriculture appropriations measure, which included an amendment identical to one in the Personal Responsibility and Work Opportunity Reconciliation Act (freezing the "standard deduction" for fiscal year 1997).

[11] Households in which all members are TANF recipients are automatically eligible for food stamps, but households may not receive food stamp benefits under a simplified program unless the Agriculture Department determines that any household with income above 130 percent of the Federal poverty guidelines is ineligible for the program.

62

stamp "deductions." However, they must comply with the following Federal food stamp rules:

1. Requirements governing issuance procedures and the rule that benefits be calculated by subtracting 30 percent of household income (as determined under the simplified program option by State-established, not Federal, standards) from the maximum food stamp benefit;

2. Bars against counting food stamp benefits as income or resources in other programs and for tax purposes and against discrimination by reason of race, sex, religious creed, national origin, or politics;

3. Requirements that State agencies assume responsibility for eligibility certification and issuance of benefits and keep records for inspection and audit;

4. Requirements related to submission and approval of State plans of operation, and administration of the Food Stamp Program on reservations;

5. Limits on the use and disclosure of information about food stamp households;

6. Requirements for notice to and fair hearings for aggrieved households (or comparable requirements established by the State);

7. Requirements for submission of reports and other federally required information;

8. The requirement to report illegally resident aliens to the INS; and

9. Requirements to ensure that households are not receiving duplicate benefits and that they provide Social Security numbers as a condition of eligibility.

In addition, States' simplified programs may not increase Federal food stamp costs. If the Agriculture Department determines that a State's program has increased Federal costs for any year (or portion of a year), it must notify the State within 30 days.[12] Within 90 days, the State must then submit, for Federal approval, a corrective action plan designed to prevent its simplified program from increasing Federal food stamp costs. If the State does not submit or carry out a plan, its simplified program will be terminated, and the State will be ineligible to operate a simplified program in the future.

States opting for a simplified program must include in their State plans the rules and procedures they will follow, how they will address the needs of households with high shelter costs, and a description of how they will carry out their Food Stamp Program "quality control" system obligations (these remain in place for opting States).

Finally, simplified programs may include households in which members are not TANF recipients, if approved by the Agriculture Department, and congressional conferees on the measure encourage the Department to work with States to test methods for applying a single set of rules and procedures to households in which some,

---

[12] In carrying out this cost-neutrality requirement, States may not be required to collect information on households not in their simplified programs, and the Agriculture Department may approve alternative (nonfiscal-year) accounting periods.

63

but not all, members receive cash welfare benefits under State
rules.

*Food stamp treatment for violations of other programs' rules.*—
The act makes three revisions in how food stamp recipients are
treated if they are penalized under another public assistance pro-
gram.

If an individual is disqualified for failure to perform an action re-
quired under a Federal, State, or local law related to means-tested
public assistance, the State agency is permitted to impose the same
disqualification for food stamps, and, if the disqualification is im-
posed under a TANF program's rules, States may use TANF rules
and procedures to impose the food stamp disqualification.[13] Indi-
viduals disqualified from food stamps because of this new rule, are
permitted to apply for food stamps again as new applicants after
the disqualification period has expired, but prior disqualification
under Food Stamp Program work/training rules must be considered
in reinstating their eligibility.

A requirement that a cash welfare or unemployment insurance
program work requirement must be "comparable" to a food stamp
work requirement to bring on disqualification from food stamps is
eliminated.

Increased food stamp allotments are barred when nonfood-stamp
benefits to a household are reduced under a Federal, State, or local
means-tested public assistance program for failure to perform a re-
quired action. In addition, States are permitted to reduce a house-
hold's food stamp allotment by up to 25 percent in these cases, and,
if the allotment reduction is for failure to perform an action re-
quired under a TANF program, the State may use TANF rules and
procedures to do so.

*Waivers of Federal rules.*—Under prior law, Federal Food Stamp
Act requirements could be waived to conduct pilot/demonstration
projects, but, in general, no project could be implemented that
would lower or restrict benefits or eligibility standards. The new
legislation permits the Agriculture Department to conduct pilots
and demonstrations and waive Food Stamp Act requirements to the
extent necessary, with a number of limitations and conditions that
are, overall, somewhat less restrictive than prior law.

1. Projects/demonstrations must be consistent with the Food
   Stamp Program goal of providing food assistance to raise levels
   of nutrition among low-income individuals and must include an
   evaluation and be limited to a specific time period.
2. Permissible projects are those that will improve administration
   of the Food Stamp Program, increase self-sufficiency of partici-
   pants, test innovative welfare reform strategies, or allow great-
   er conformity with the rules of other programs. However, if the
   Agriculture Department finds that a project/demonstration
   would require the reduction of benefits by more than 20 per-
   cent, for more than 5 percent of the households subject to the
   project/demonstration, the project cannot include more than 15

---

[13] State plans must include the guidelines used in carrying out this new disqualification rule.

64

percent of the State's food stamp population and is limited to 5 years (unless an extension is approved).[14]

3. Waivers *cannot* be approved for projects that: (1) involve the payment of food stamp allotments in cash (unless approved prior to enactment); (2) have the effect of transferring Food Stamp Program funds to services or benefits provided through another public assistance program; (3) have the effect of using Food Stamp Program funds for any purpose other than the purchase of food, program administration, or an employment and training program; (4) have the effect of granting or increasing shelter expense deductions to households with either no out-of-pocket shelter expenses or shelter expenses that represent a low percentage of their income; or (5) have the effect of absolving the State from acting with reasonable promptness on substantial reported changes in income or household size (other than changes related to deductions). In addition, waivers of simplified Food Stamp Program provisions are not allowed when carrying out a simplified program.

4. Pilot/demonstration projects with waivers may not be conducted if they are inconsistent with certain Food Stamp Act requirements: (1) the bar against providing benefits to those in institutions (with certain exceptions); (2) the requirement to provide assistance to all those eligible (so long as they have not failed to comply with any food stamp or other program's work, behavioral, or other "conduct" requirements); (3) the gross income eligibility limit (130 percent of the Federal poverty guidelines) for households without an elderly or disabled member; (4) a rule that no parent/caretaker of a dependent child under age 6 will be subject to work/training requirements;[15] (5) the rule that the total hours of work required in an employment/ training or workfare program be limited to the household's monthly allotment divided by the applicable minimum wage; (6) the limit on the amount of employment/training funding under the Food Stamp Act that can be used for TANF recipients; (7) the requirement that the value of food stamp benefits not be considered income or resources for any other purpose; (8) application and application processing requirements (including the rule that benefits must be provided within 30 days, but not including expedited service requirements); (9) Federal-State cost-sharing rules; (10) "quality control" requirements; and (11) the waiver limits themselves.

Moreover, the new law requires that, not later than 60 days after receiving a demonstration/pilot project waiver request, the Agriculture Department must (1) approve the request, (2) deny it and explain any modifications needed for approval, (3) deny it and explain the grounds for denial, or (4) ask for clarification of the request. If a response is not forthcoming in 60 days, the waiver is considered approved; if a waiver is denied, the Agriculture Department must provide a copy of the request and the grounds for denial to Congress.

---

[14] The 5-percent rule does not include those whose benefits would be reduced because of a failure to comply with work or other conduct-related requirements.

[15] Certain projects allowing this are permitted. See the discussion of new work rules.

65

*Expedited service.*—The new act: (1) requires that State agencies provide "expedited service" to certain households within 7 (rather than 5) days of application; (2) removes a requirement for expedited service to "homeless" households that do not otherwise meet criteria for severely limited income and resources; and (3) for those entitled to expedited service who apply after the 15th of the month, allows (rather than requires) State agencies to provide an allotment that is the aggregate of their initial (prorated) allotment and their first regular allotment (as is the case with others applying after the 15th of the month).

*Collecting overissued benefits.*—The new legislation replaces overissuance collection rules that generally restrict State agencies' collection efforts with provisions requiring them to collect any overissued benefits by reducing future benefits, withholding unemployment compensation, recovering from Federal pay or income tax refunds, or any other means—unless the State agency demonstrates that all of the means available are not cost effective. Benefit reduction collections (absent an intentional program violation) are limited to the greater of 10 percent of the monthly allotment or $10 a month. State agencies may collect overissued benefits in accordance with State-established requirements for notice, electing a means of payment, and setting a schedule for payment.

In addition, the new law changes the percentage of over issuance collections that States may retain—from 50 percent of collections in "fraud" cases and 25 percent of collections in "nonfraud" cases (other than those arising from State agency error) to 35 and 20 percent, respectively.

*Child support.*—The amendments in the act give States the option to disqualify individuals from food stamps when they do not cooperate with child support agencies or are in arrears in their child support.

Custodial parents of children under age 18 who have an absent parent may be disqualified unless they cooperate with the State child support enforcement agency in establishing the child's paternity and obtaining support for themselves and the child. Cooperation is not required if the State finds there is good cause for the failure (in accordance with Federal standards that take into account the child's best interest), and fees or other costs for services may not be charged.

Noncustodial parents of children under 18 also may be disqualified if they fail to cooperate with the State child support enforcement agency in establishing paternity and providing support for the child. The Agriculture and Health and Human Services Departments must develop guidelines as to what constitutes a refusal to cooperate in these instances, and States must develop procedures (using these guidelines) for determining whether there has been a refusal to cooperate. Fees and other costs for services may not be charged, and States must provide privacy safeguards.

Finally, States may disqualify individuals during any period in which they are delinquent in any court-ordered child support payment, unless the court is allowing a delay or they are complying with a payment plan approved by the court or a State child support agency.

66

*Eligibility certification periods.*—The new act replaces provisions that limit State agencies' authority to establish eligibility certification periods with a general requirement that certification periods not exceed 12 months, or 24 months if all adult household members are elderly or disabled. However, State agencies must have at least 1 contact with each certified household every 12 months.

*Operation of food stamp offices and administrative rules.*—The new law changes State plan requirements as to the operation of food stamp offices, removing numerous specific Federal rules and replacing them with more general mandates. Moreover, it amends a series of other Federal administrative rules controlling State agency operations.

*State plan requirements.*—The specific State plan provisions removed include requirements that States must:

1. Allow households contacting a food stamp office in person during office hours to make an oral/written request for aid and receive and file an application on the same day;
2. Use a simplified, uniform, federally designed application, unless a waiver is approved;
3. Include certain specific information in applications;
4. Waive in-person interviews under certain circumstances and use telephone interviews or home visits instead;
5. Provide for telephone contact and mail application by households with transportation or similar difficulties;
6. Assist households in obtaining verification and completing applications;
7. Not require additional verification of currently verified information (unless there is reason to believe that the information is inaccurate, incomplete, or inconsistent);
8. Not deny an application solely because a nonhousehold member fails to cooperate and process applications if the household meets cooperation requirements;
9. Give households a Statement of reporting responsibilities at certification and recertification;
10. Provide a toll-free or local telephone number at which households can reach State agency personnel;
11. Display and make available nutrition information; and
12. Use mail issuance in rural areas where low-income households face substantial difficulties in obtaining transportation.

In place of these provisions, the new law requires that States:

1. Establish procedures governing the operation of food stamp offices that they determine will best serve households in the State, including those with special needs (such as households with elderly or disabled members, those in rural areas, the homeless, households residing on reservations, and households speaking a language other than English);
2. Provide timely, accurate, and fair service to applicants and recipients; and
3. Permit applicants to apply and participate on the same day they first contact a food stamp office during office hours and consider an application filed on the date an application is filed with the applicant's name, address, and signature.

Additional State plan amendments include provisions that: (1) permit States to establish operating procedures that vary for local

67

food stamp offices; and (2) make clear that nothing in the Food Stamp Act prohibits electronic storage of application and other information.

*Other administrative rules.*—Amendments made to administrative rules by the new law also include provisions that:

1. Drop requirements as to joint interviews and applications for food stamps and public assistance and food stamp determinations based on other public assistance program information;

2. Permit State agencies to allow households to withdraw fair hearing requests in writing or orally (if it is an oral request, the State must provide written notice confirming the request and give the household another chance to ask for a fair hearing);

3. Make it a State option to use the Federal "income and eligibility verification systems" established under provisions of the Social Security Act (including a system for verifying financial circumstances, "IEVS," and a system for verifying alien status, "SAVE"); and

4. In the case of substance abuse centers with food stamp recipient residents, allow State agencies to: (1) divide a month's food stamp benefits between the center and a recipient who leaves the center; and (2) require center residents to designate the center as their "authorized representative."

*Calculating income.*—The new act gives States greater latitude in calculating the cost of producing self-employment income and the income of households containing certain ineligible aliens. It provides that the Agriculture Department must establish procedures by which States may submit for approval a method for determining reasonable estimates of the cost of producing self-employment income (so long as the method is designed not to increase Federal costs). Further, it gives States the option to count all of the income and resources of an alien who is ineligible for food stamps under provisions of the Food Stamp Act as available to the remainder of the household in which the alien lives (as opposed to counting the alien's income and resources, less a pro rata share for the alien).

*Federal standards.*—The new law eliminates certain Federal standards governing State administration. It drops requirements that the Agriculture Department establish standards for efficient and effective administration (including standards for review of food stamp office hours) and that States report on administrative actions taken to meet the standards. Moreover, it deletes a Federal requirement that States provide continuing and comprehensive training for all certification personnel (including provisions for intensive training of those certifying farm households and training and assistance to organizations offering outreach services and eligibility screening).

## Work and training

*New work requirement.*—The new act adds a new work requirement for able-bodied adult food stamp recipients without dependents.

*The requirement.*—No covered individual (see below for exemptions) may be eligible for food stamps if, during the preceding 36-

68

month period, the individual received food stamp benefits for any 3 months while not: (1) working at least 20 hours a week (averaged monthly); (2) participating in and complying with a work program for at least 20 hours a week (as determined by the State agency); or (3) participating in and complying with a workfare program. A work program is defined as a program under the Job Training Partnership Act (JTPA), a Trade Adjustment Assistance Act Program, or a program of employment and training operated or supervised by a State or political subdivision that meets standards approved by the Governor—including a Food Stamp Act employment and training program, but not including job search or job search training activities.

Individuals denied eligibility under the new work rule can regain eligibility if, during a 30-day period, the individual: (1) works 80 or more hours; (2) participates in and complies with the requirements of a work program (as defined above) for 80 or more hours (as determined by the State agency); or (3) participates in and complies with a workfare program. After having met this 30-day work/training requirement, the individual can remain eligible for a consecutive period of 3 months without working at least 20 hours a week or participating in an employment/training or workfare program. For example, if an individual works 20 hours a week for at least 30 days and reenters the Food Stamp Program, but then loses a job, the individual could retain food stamp eligibility for 3 consecutive months without working or being in a training/workfare program. But individuals cannot take advantage of this provision for an additional 3 months of eligibility (while not working or in an employment/training or workfare program) for more than a single 3-month period in any 36 months. Individuals regaining eligibility also can remain eligible for food stamps as long as they continue to meet requirements as to working at least 20 hours a week or participating in a training/workfare program.

*Exemptions and waivers.*—The new work rule does not apply to: (1) those under 18 or over 50; (2) those who are medically certified as physically or mentally unfit for employment; (3) parents or other household members with the responsibility for a dependent child; (4) pregnant women; and (5) those otherwise exempt from any Food Stamp Program work requirement (e.g., those responsible for the care of an incapacitated person, postsecondary students already meeting a similar work requirement, residents of substance abuse treatment programs, or those meeting unemployment compensation requirements).

In addition, on a State agency's request, the Agriculture Department may waive application of the new work requirement to any group of individuals if the Department determines that the area where they reside (1) has an unemployment rate over 10 percent or (2) does not have a sufficient number of jobs to provide them employment. The basis for any waiver must be reported to Congress.

Receipt of food stamp benefits while exempt (including participation under the additional 3-month eligibility provision described above) or covered by a waiver will not count toward an individual's basic 3-month eligibility period under the new work rule.

*Transition provision.*—The 36-month period established by the new work requirement will not include any period before the ear-

69

lier of the date the State notifies recipients about the new rule (through individual notices or otherwise) or November 22, 1996.

*Expansion of existing work/training requirements and penalties.*—In addition to establishing the new work requirement for adults without dependents, the legislation expands on prior work/training requirements and sets mandatory minimum disqualification periods related to these and the prior requirements.

The new act adds work-related eligibility conditions making individuals ineligible if they: (1) refuse without good cause to provide sufficient information to allow the State agency to determine their employment status or job availability; or (2) voluntarily and without good cause reduce work effort and (after the reduction) are working less than 30 hours a week. It also provides that all individuals (not just heads of household) will be ineligible if they voluntarily quit a job without good cause and removes lack of child care as an explicit good cause exemption for refusal to participate in an employment or training program.

New provisions as to the duration of ineligibility and household (as opposed to individual) ineligibility are added. Mandatory minimum disqualification periods are established for individuals failing to comply with prior work requirements (as expanded):

1. For the first violation, individuals are ineligible until they fulfill work/training conditions, for 1 month, or for a period (set by the State agency) not to exceed 3 months—whichever is later;
2. For the second violation, individuals are ineligible until they fulfill work/training conditions, for 3 months, or for a period (set by the State agency) not to exceed 6 months—whichever is later; and
3. For a third or subsequent violation, individuals are ineligible until they fulfill work/training conditions, for 6 months, until a date set by the State agency, or (at State option) permanently, whichever is longer.

The new rule pertaining to the ineligibility of *households* when an individual fails to comply with work/training conditions is: if any individual who is head of household is disqualified, the entire household is, at State option, ineligible for a period not to exceed the duration of the individual's ineligibility or 180 days, whichever is shorter.

Finally, the new law permits certain States to partially limit an exemption from employment and training requirements for parents and caretakers of children under age 6. States that have requested a waiver to lower the age of a dependent child that exempts the parent or caretaker, and had the waiver denied as of August 1, 1996, may lower that age (to not under age 1) for not more than 3 years.

*Revision of requirements for employment and training programs.*—The new act changes the Federal rules governing State-operated employment and training programs for food stamp recipients. It:

1. Makes clear that work experience is a purpose of employment and training programs and requires that each component of an employment/training program be delivered through a "State-wide work force development system," where available;

70

2. Expands the State option to apply work/training requirements to applicants to include all requirements, not only job search;

3. Removes specific Federal rules governing job search components of State programs;

4. Drops provisions requiring that employment/training components of State programs related to work experience be in public service work and use recipients' prior training/experience;

5. Removes specific Federal rules as to States' authority to exempt persons form employment/training requirements, giving them full latitude to determine exemptions;

6. Eliminates requirements for serving volunteers;

7. Drops a requirement for "conciliation procedures" for resolving disputes involving participation in employment/training programs; and

8. Removes provisions for Federal performance standards for States' employment/training programs.

*Funding for employment and training programs.*—The new law increases the base Federal funding level for employment and training programs from $75 million a year to $79 million in fiscal year 1997, $81 million in 1998, $84 million in 1999, $86 million in 2000, $88 million in 2001, and $90 million in 2002. State allocations from these amounts are to be based on a "reasonable formula" (determined by the Agriculture Department) that gives consideration to each State's population of persons subject to the new work requirement (described earlier). The existing 50-percent Federal match for costs above each State's share of these basic grants is retained, and a specific provision is included allowing these funds to be used for case management/casework. Finally, the provisions of the new act limit Food Stamp Program employment and training funding for services to TANF recipients to the amount used by the State for AFDC recipients in fiscal year 1995.

*Work supplementation or support programs.*—The new act establishes an option for States to operate work supplementation or support programs under which the value of public assistance benefits, *including food stamps,* are provided to employers who hire recipients and, in turn, use the benefits to supplement the wages paid to the recipient. These programs must adhere to standards set by the Agriculture Department, be available for new employees only, and not displace employment of those who are not supplemented/supported. The food stamp benefit value of the supplement will not be considered income for other purposes, and opting States must provide a description of how recipients in their program will, within a specific period of time, be moved to unsubsidized employment.

*Employment initiatives program.*—The new legislation provides an option for a limited number of States (those with not less than half their food stamp households receiving AFDC benefits in 1993) to issue food stamps in cash to households participating in both the State's TANF program and food stamps—if a member of the household has been working for at least 3 months and earns at least $350 a month in unsubsidized employment. Those receiving cash payments may continue to receive them after leaving a TANF program because of increased earnings, and a household eligible to receive its allotment in cash may choose food stamps instead. States opting for these cash payments are required to increase food stamp

71

benefits (and pay for the increase) to compensate for any State/local sales taxes on food purchases and must provide a written evaluation.

*Benefits and eligibility*

*Limiting basic benefits.*—The new act reduces basic (maximum) food stamp monthly benefits from amounts equal to 103 percent of the cost of the Agriculture Department's "Thrifty Food Plan" (its cheapest plan for purchasing a low-cost nutritious diet) to 100 percent of cost of the plan. However, benefits will not drop below current levels due to this change. Basic benefits will continue to be indexed annually for food-price inflation measured by the cost of the Thrifty Food Plan. This change is effective October 1, 1996, and coincides with the regular inflation increase in basic benefits. As a result, food stamp benefits will rise, but by less than under prior law because the 3-percent "add-on" will not be included.

*Deductions from income.*—When recipients' benefits are calculated, their counted monthly income is reduced by several "deductions," including (1) a "standard deduction" and (2) a deduction for excessively high shelter expenses, thereby raising food stamp allotments. The standard deduction normally is inflation indexed every October, and a monthly dollar limit on shelter expense deductions (applied to households without elderly or disabled members) was, under prior law, scheduled to be eliminated in January 1997.

The new act freezes the standard deduction at its current level ($134 a month, with differing amounts for Alaska, Hawaii, and outlying areas).[16] It also repeals the scheduled end of the limit on shelter expense deductions, replacing it with an increase in the existing ceiling: the "cap" on shelter expense deductions will rise, in 3 steps, from the current $247 a month to $300 beginning in fiscal year 2001.[17]

In addition, the new legislation:

1. Permits States to make use of "standard utility allowances" (as opposed to actual utility costs) mandatory for all households when calculating the amount of a household's shelter expenses (if the Agriculture Department approves them and they will not result in increased Federal costs);
2. Allows States not choosing to make standard utility allowances mandatory to limit the extent to which households may switch between claiming a standard allowance and actual costs (i.e., only at certification and recertification of eligibility;
3. Disallows "earned income deductions" (20 percent of any earnings) for income not reported in a timely manner and for the public assistance portion of income earned under a work supplementation/support program (see earlier discussion); and

---

[16] The fiscal year 1996 appropriations measure for food stamps (Public Law 104–37) stipulated that the normal October inflation increase in the standard deduction not be implemented for fiscal year 1996; it would have risen to $138. Separately from this welfare reform measure, the freeze on the amount of the standard deduction was continued for fiscal year 1997 in the 1997 agriculture appropriations measure (Public Law 104–180); it would have risen to $142. The Congressional Budget Office attributes the 1997 Federal outlay savings for this freeze (some $345 million) to the appropriations act.

[17] The cap will first rise to $250 in January 1997, and then be increased to $275 in October 1998 and $300 in October 2000. Concurrent increases are included for the separate excess shelter expense deduction ceilings for Alaska, Hawaii, and outlying areas.

4. Allows (rather than requires) States to develop and mandate the use of a special "homeless shelter allowance" for those not in free shelter throughout a month —as long as it is not more than $143 a month (the former, inflation-indexed maximum).

*Energy assistance.*—The new law requires that State and local energy assistance be counted as income and mandates an income disregard for one-time payments or allowances under a Federal or State law for the costs of weatherization or emergency repair/replacement of unsafe/inoperative furnaces or heating/cooling devices. prior treatment of Federal energy assistance (e.g., a disregard of assistance under the Low-Income Home Energy Assistance Act) is not changed.

*Vehicle allowance.*—In determining a household's liquid assets for food stamp eligibility purposes, a vehicle's fair market value in excess of $4,600 is counted. Under prior law, this threshold was scheduled to be increased (to $5,000) and inflation indexed beginning in October 1996. The new act raises it to $4,650 (effective October 1996), but provides for no further increases.

*Treatment of children living at home.*—The new law requires all children 21 years of age or younger who live with their parents to apply together with their parents as a single food stamp household—removing an exception for children living with their parents who are themselves married or have children.

*Student earnings.*—The new legislation requires that the earnings of secondary school students be counted for food stamp purposes once they reach age 18—as opposed to age 22.

*Benefits on recertification of eligibility.*—For those who do not complete all eligibility recertification requirements in the last month of their certification period, but are then determined to be eligible after their certification period has expired, the new law requires that they receive reduced benefits for the first month of the new certification period (i.e., their first-month benefits will be prorated to the date they met eligibility requirements). This eliminates a rule giving these households a 1-month "grace period" to meet eligibility requirements before their benefits are reduced.

*Minimum allotments.*—The new act drops a requirement that minimum allotments for one- and two-person households (set at $10 a month) be indexed for inflation.

*Transitional housing.*—The new law ends a rule disregarding as income housing assistance paid by cash welfare programs on behalf of households residing in "transitional housing for the homeless."

## Program integrity

*Increased penalties for intentional violations and trafficking.*—The new act increases the Food Stamp Program disqualification period for a first intentional violation of program requirements from 6 months to 1 year, and the disqualification penalty for a second intentional violation (and the first involving a controlled substance) from 1 year to 2 years.[18] It also adds a requirement for permanent

---

[18] Requirements for longer (including permanent) disqualification are retained; e.g., permanent disqualification is required for a third intentional violation, a second violation involving trading of a controlled substance, and the first violation involving trading of firearms, ammunition, or explosives.

73

disqualification for persons convicted of trafficking in food stamps where the benefits have a value of $500 or more.

*Disqualification for receipt of multiple benefits.*—The new law adds a provision making individuals ineligible for food stamps for 10 years if they are found to have made a fraudulent Statement with respect to identity or residence in order to receive food stamp benefits in multiple jurisdictions simultaneously.

*Disqualification of fleeing felons.*—The legislation adds a provision making individuals ineligible while they are fleeing to avoid prosecution, custody, or confinement for a felony or attempted felony (or violating a condition of probation or parole).

*Criminal forfeiture rules.*—The new law establishes "criminal forfeiture" rules for those involved in food stamp trafficking. In imposing sentence on those convicted of trafficking, courts are required to order that the person forfeit property to the United States. Property subject to forfeiture includes all property (real and personal) used in a transaction (or attempted transaction) to commit (or facilitate the commission of) a trafficking violation other than a misdemeanor. Proceeds traceable to the violation also are subject to forfeiture, but an owner's property interest would not be subject to forfeiture if the owner establishes that the violation was committed without the owner's knowledge or consent. The proceeds from any sale of forfeited property, and any money forfeited, is required to be used to reimburse Federal and State agencies for their investigative and prosecutorial costs and, by the Agriculture Department, for retailer/wholesaler monitoring activities.

*Retailer/wholesaler disqualification related to the WIC Program.*—The legislation requires the Agriculture Department to issue regulations providing criteria for disqualifying from Food Stamp Program participation retailers/wholesalers that been disqualified from the WIC Program. Disqualification must be for the same length of time, may begin at a later date, and is not subject to separate food stamp administrative or judicial review provisions.

*Suspension of retailers and wholesalers.*—The new act requires that any permanent disqualification of a retailer or wholesaler from the Food Stamp Program (i.e., disqualification for a serious violation) be effective from the date of receipt of notice of the disqualification determination, pending administrative and judicial review. If the disqualification is reversed through administrative/judicial review, the Federal Government will not be liable for lost sales.

*Authorization periods for retailers and wholesalers.*—The new law requires the Agriculture Department to establish specific time periods during which retail food stores' and wholesale food concerns' authorization to accept and redeem food stamp benefits will be valid.

*Waiting periods.*—The law provides that retailers and wholesalers that have failed to be approved for participation in the Food Stamp Program may not submit a new application to participate for at least 6 months. The Agriculture Department may establish longer periods (including permanent disqualification) that reflect the severity of the basis for denial.

74

*Falsified retailer/wholesaler applications.*—The new act requires disqualification for retailers and wholesalers that knowingly submit an application to accept and redeem food stamp benefits that contains false information about a substantive matter—for a reasonable period of time determined by the Agriculture Department (including permanent disqualification).

*Verifying retailer/wholesaler eligibility to participate.*—The law permits: (1) the Agriculture Department to require that retailers and wholesalers seeking approval to accept and redeem food stamp benefits submit relevant income and sales tax filing documents; and (2) Federal regulations requiring retailers and wholesalers to provide written authorization for the Agriculture Department to verify all relevant tax filings and obtain corroborating documentation from other sources in order to verify the accuracy of the information provided.

*Evidence for retailer/wholesaler violations.*—The new act requires that Federal regulations provide criteria for the finding of retailer/wholesaler violations on the basis of evidence that may include facts established through onsite investigations, inconsistent benefit redemption data, or evidence obtained through electronic benefit transaction reports.

*Visits prior to approval.*—The new law provides that no food concerns (of a type determined by the Agriculture Department based on factors including size, location, and types of items sold) will be approved for participation unless visited by an Agriculture Department employee, or, whenever possible, a State or local government designee.

*Electronic benefit transfer (EBT) systems*

*Regulation E.*—The new act provides that the Federal Reserve Board's "Regulation E" (dealing with certain protections for consumers using cards to electronically access their accounts) will not apply to any EBT system distributing needs-tested benefits established or administered by State or local governments. In addition, it incorporates language that specifically provides that Regulation E will not apply to food stamp benefits delivered through an EBT system.

*Antitying restrictions.*— The new law stipulates that a company may not sell or provide EBT services, or fix or vary the consideration for these services, on the condition or requirement that the customer obtain some additional point-of-sale service from the company or any affiliate. The Agriculture Department is required to consult with the Federal Reserve before issuing regulations to carry out this provision against tying of services. In effect, this applies the "antitying" restrictions of the Bank Holding Act amendments of 1970 to EBT services offered by "nonbanks."

*Other rules for EBT systems.*—The new legislation also:
1. Deletes a requirement that EBT systems be cost neutral compared to coupon-based systems in any given year;
2. Adds a requirement that regulations regarding the replacement of benefits and liability for replacement under an EBT system be similar to those in effect for a paper coupon food stamp issuance system;

75

3. Permits State agencies to collect a charge for replacing EBT cards by reducing food stamp allotments;
4. Provides that States must implement EBT systems ("on-line" or "off-line") before October 2002, unless a waiver is granted;
5. Permits State agencies to procure and implement EBT systems under the terms, conditions, and design they consider appropriate—subject to Federal standards, which are expanded to include procurement standards;
6. Adds a requirement for EBT standards that follow generally accepted operating rules based on commercial technology, the need to permit interstate operations and law enforcement, and the need to permit monitoring and investigations by law enforcement officials;
7. Adds requirements that Federal EBT standards include measures to maximize security and (not later than August 22, 1998) measures to permit EBT systems to differentiate among food items; and
8. With certain conditions, permits State agencies to require that EBT cards contain the photograph of 1 or more household members.

*Miscellaneous additional provisions*

*Federal cost sharing for outreach activities.*—The new act terminates any Federal cost sharing for "recruitment activities" that are part of any State-option informational (outreach) efforts.

*Exchange of law enforcement information.*—The legislation requires State food stamp agencies to make available to law enforcement officers the address, Social Security number, and photograph (when available) of food stamp recipients if the officer furnishes the recipient's name and notifies the agency that the individual is fleeing to avoid prosecution, custody, or confinement for a felony, is violating a condition of parole or probation, or has information necessary for the officer to conduct an official duty related to a felony/parole violation.

*Definition of a homeless individual.*—For purposes of the Food Stamp Program, the new law provides that persons whose primary nighttime residence is a temporary accommodation in the home of another may be considered homeless only if the accommodation is for no more than 90 days.

*Definition of "coupon."*—In order to ensure that all forms of food stamp benefit delivery are covered by trafficking restrictions and penalties, the new legislation expands the definition of food stamp "coupon" to include authorization cards, cash or checks issued in lieu of coupons, and "access devices" (including electronic benefit transfer cards and personal identification numbers).

*Vitamins and minerals study.*—The law requires that the Agriculture Department, in consultation with the National Academy of Sciences and Centers for Disease Control and Prevention, conduct a study of the use of food stamp benefits to purchase vitamins and minerals. A report is due to Congress no later than December 15, 1998.

76

*Commodity distribution*

The new law establishes a single emergency food assistance program to distribute federally donated commodities that combines the preexisting emergency food assistance program, the commodity distribution program for soup kitchens, and the commodity distribution program for food banks. States will receive Federal commodities under a formula allocation (based on unemployment and other factors) and distribute them to emergency feeding organizations, soup kitchens, food banks, and other outlets under the terms of their State plans. Through fiscal year 2002, an annual amount of $100 million (drawn from Food Stamp Act appropriations) is required to be spent for purchasing commodities for this new, combined emergency food assistance program. Funding for administrative and distribution costs continues to be authorized, not required.

TITLE IX: MISCELLANEOUS

The Personal Responsibility and Work Opportunity Reconciliation Act makes the following miscellaneous changes:

1. Funds from certain Federal block grants to the States must be expended in accordance with the laws and procedures applicable to the expenditure of the States' own resources (i.e., appropriated through the State legislature). This provision applies to block grants for Temporary Assistance for Needy Families (TANF) and child care (CCDBG). Thus, in the States in which the Governor previously had control over Federal funds, the State legislatures now would share control according to State laws regarding State expenditures;

2. States must not be prohibited by the Federal Government from sanctioning welfare recipients who test positive for use of controlled substances;

3. Persons who are fleeing to avoid prosecution after conviction for a crime, or attempt to commit a crime, that is a felony where committed (or, in the case of New Jersey, is a high misdemeanor), or who is violating a condition of probation or parole, immediately lose their eligibility for public housing and section 8 housing assistance. Specified public housing agencies must furnish any Federal, State, or local law enforcement officer, upon request by the officer, with the current address, Social Security number, and photograph (if applicable) of any SSI recipient, if the officer furnishes the public housing agency with the person's name and notifies the agency that the recipient is a fugitive felon (or in the case of New Jersey, a person fleeing because of a high misdemeanor) or a probation or parole violator or that the person has information that is necessary for the officer to conduct his official duties. The location or apprehension of the recipient must be within the officer's official duties;

4. The law expresses the sense of the Senate that States should pursue child support payments under all circumstances even if the noncustodial parent is unemployed or his whereabouts are unknown. States are also encouraged to pursue pilot programs in which the parents of a minor noncustodial parent who re-

fuses or is unable to pay child support contribute to the child support owed;

5. The law requires the Secretary of HHS to establish and implement by January 1, 1997, a strategy for reducing out-of-wedlock teenage pregnancies while assuring that at least 25 percent of U.S. communities have teenage pregnancy programs in place. The Department of HHS is required to report to Congress by June 30, 1998, on progress made toward meeting these two goals;

6. State and local jurisdictions are encouraged to aggressively enforce statutory rape laws;

7. The law exempts from Regulation E requirements (a regulation issued under the authority of the Electronic Funds Transfer Act that contains consumer protections for those using electronic funds transfer systems) any EBT program distributing means-tested benefits established under State or local law or administered by a State or local government;

8. For the fiscal years 1997 through 2002, the Social Services block grant authorized by title XX of the Social Security Act is reduced by 15 percent from its former $2.8 billion annual level. In fiscal year 2003 and thereafter the block grant is returned to $2.8 billion per year;

9. The new law contains three modifications of the earned income credit (EIC). One of these, the provision requiring that returns that do not include the worker's taxpayer identification number be treated by the Internal Revenue Service as a mathematical or clerical error, was described above as part of title IV. The second provision expands the definition of disqualified income to include capital gains net income and net passive income other than self-employment income. This provision also reduces the threshold for disqualified income from $2,350 to $2,200 and indexes the threshold for inflation. Third, the law modifies the definition of adjusted gross income (AGI) for phasing out the earned income credit by disregarding certain losses;

10. If a person's means-tested benefits from a Federal, State, or local program are reduced because of an act of fraud, his benefits from public or assisted housing (and food stamps and AFDC or TANF) may not be increased in response to the income loss caused by the penalty;

11. The law amends the Maternal and Child Health block grant (title V of the Social Security Act) to directly appropriate $50 million for each of fiscal years 1998 through 2002 to provide abstinence education and to provide, at State option, mentoring, counseling, and adult supervision to promote abstinence. Abstinence programs must be directed at those groups most likely to bear children outside marriage.

78

SECTION 3.

**STATE-BY-STATE ALLOCATION OF GRANTS FOR TEMPORARY ASSISTANCE FOR NEEDY FAMILIES AND CHILD CARE**

## SECTION 3. STATE-BY-STATE ALLOCATION OF GRANTS FOR TEMPORARY ASSISTANCE FOR NEEDY FAMILIES AND CHILD CARE [1]

### INTRODUCTION

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ends Aid to Families With Dependent Children (AFDC) and related programs and replaces them with a new program of Temporary Assistance for Needy Families (TANF). TANF provides capped Federal funding through fiscal year 2002 of $16.4 billion per year (plus supplemental grants—see below). The new law also restructures and expands the Child Care and Development Block Grant (CCDBG). Among other reforms, the expanded block grant authorizes a total of $6 billion in discretionary and $14 billion in entitlement child care funds for the States and Indian tribes over the 6-year period fiscal year 1997 through fiscal year 2002.

### TEMPORARY ASSISTANCE FOR NEEDY FAMILIES

TANF replaces AFDC, State and local administration of AFDC and related programs, Emergency Assistance, and the Job Opportunities and Basic Skills (JOBS) program. States must end these programs and begin TANF by July 1, 1997, but can opt to begin TANF sooner.

TANF creates a basic annual block grant for States as well as several supplemental grants to serve special purposes. Each grant is outlined in separate sections below.

*Family assistance grant*

TANF's basic block grant is the family assistance grant, which entitles the 50 States and the District of Columbia to a total of $16.4 billion annually through fiscal year 2002. TANF is 100 percent federally funded, but would be reduced if a State failed to meet a fiscal maintenance of effort requirement. The family assistance grant must also be reduced for other penalties levied against the State.

The family assistance grant is based on the Federal payments to the States during recent fiscal years. States would be entitled to the greatest of:

1. Average required Federal payments to the States for AFDC, AFDC Administration, Emergency Assistance, and JOBS for fiscal year 1992 through fiscal year 1994;
2. Required Federal payments to the States for these programs for fiscal year 1994 (adjusted for higher 1995 EA payments to States that amended their EA plans in fiscal year 1994 or fiscal year 1995); or
3. Required Federal payments to the States for these programs for fiscal year 1995.

Table 3 (all tables are located at the end of this section) shows the basic family assistance grant for the 50 States and the District of Columbia under TANF. The territories would also operate temporary assistance programs, but they are treated separately from

---

[1] This section was prepared by the Congressional Research Service.

80

the 50 States and the District of Columbia. The grants shown in table 3 are before States pay the Federal Government for its share of child support enforcement collections for families receiving assistance payments. Under current law, these collections are deducted from AFDC grants to States.

The estimated payments to the States provided in table 3 are based on available State-reported financial data. For AFDC, State and local administration (including the program for enhanced payments for developing automated management information systems), and Emergency Assistance, the financial data represent the Federal share of total expenditures for the programs as reported to the Department of Health and Human Services (DHHS) by the States. The information is reported by the States to DHHS on ACF Form 231 each quarter. The Federal share of total expenditures are expenditures reported for the current quarter plus or minus any adjustments for prior quarter expenditures.

The Federal share of AFDC expenditures used in calculating the family assistance grant is a gross amount, before deductions for the Federal share of child support enforcement collections. The State expenditure reports include both the gross Federal share and a net Federal share of AFDC expenditures. The net Federal share includes a deduction for the Federal share of child support enforcement collections. Reporting of the net Federal share of AFDC expenditures was necessary because, under prior law, AFDC payments to the States were reduced for a share of child support enforcement collections for families receiving AFDC (above the $50 passed through to the families). TANF grant allotments are not reduced for the Federal share of child support enforcement collections, though title IV–D continues the requirement that States remit to the Federal Government a share of child support enforcement collections.

Because States may revise their financial reports, section 403(a)(1) specifies that the Secretary use the data available as of a certain date for each of the fiscal years. For JOBS, the financial data represent grant awards, though for fiscal year 1992 through fiscal year 1994 any adjustments for actual State expenditures after the close of the fiscal year are reflected in the data. The JOBS grant awards, rather than the Federal share of expenditures, were used to compute the family assistance grant because JOBS expenditure data are incomplete far into subsequent fiscal years. States have 2 years in which to expend JOBS funds. Therefore, States may expend fiscal year 1995 JOBS funds through September 30, 1996, making this information incomplete for the purposes of computing the family assistance grant.

Fiscal year 1995 payments are annualized data from the first three quarters of the fiscal year for AFDC, State and local administration, and Emergency Assistance plus the JOBS grant awards as of October 5, 1996. The formula for the family assistance grant dates back to that contained in the Balanced Budget Act of 1995 (H.R. 2491), which passed Congress in November 1995 but was vetoed by President Clinton. At that time, only the first three quarters of expenditure information on AFDC and related programs were available.

81

*Grants to States that reduce out-of-wedlock births*

Additional funds are provided to States that have lower out-of-wedlock births and lower abortion rates than in fiscal year 1995. The five States with the greatest decline in out-of-wedlock births, and that also reduce their abortion rates, receive a bonus of $20 million. If there are fewer than five States eligible for these funds, the bonus would increase to $25 million.

*Supplemental grants to States with high population growth and/or low grants per poor person*

For fiscal year 1998 through fiscal year 2001, certain States will qualify for supplemental funds based on their population growth or their low Federal AFDC-related spending per poor person. A total of $800 million is provided for these States over the 4 years. Under this supplemental grant, certain States qualify for supplemental funds automatically for each year from fiscal year 1998 to fiscal year 2001. A State is deemed to automatically qualify in all 4 years if it:

1. Had fiscal year 1994 Federal expenditures per poor person (poverty count based on the 1990 census) for AFDC and related programs below 35 percent of the national average welfare spending per poor person; or
2. Had population growth in excess of 10 percent from April 1, 1990 to July 1, 1994.

Based on Congressional Research Service (CRS) calculations, 11 States would automatically qualify for supplemental funds—Alabama, Arkansas, Louisiana, Mississippi, and Texas because these States met the very low Federal expenditure per poor person criterion in 1994, and Alaska, Arizona, Colorado, Idaho, Nevada, and Utah because these States met the very high population growth criterion in 1990–94.

To qualify otherwise, States must meet each of two conditions:

1. Federal expenditures per poor person (poverty count based on the 1990 census) for AFDC and related programs below the fiscal year 1994 national average Federal expenditures per poor person in AFDC and related programs; and
2. A population growth rate that exceeds the rate of growth for the Nation as a whole.

In order to qualify for supplemental funds on these dual grounds, States must meet the qualification criteria in fiscal year 1998. CRS estimates that nine additional States would qualify on these grounds: Florida, Georgia, Montana, New Mexico, North Carolina, South Carolina, Tennessee, Virginia, and Wyoming. These estimates are based on forecasts of population growth. The number of States that actually qualify will be determined when the Census Bureau releases its estimates of actual population growth between 1995 and 1996. Census Bureau population estimates of actual population growth are usually made available in December of each year.

For fiscal year 1998, the supplemental grant is computed as 2.5 percent of the amount required to be paid to the State under AFDC and related programs in fiscal year 1994. In subsequent years, it is computed as 2.5 percent of the sum of fiscal year 1994 expenditures and the prior year's supplemental grant.

82

Total supplemental grants are limited to $800 million for the 4 years fiscal year 1998 through fiscal year 2001. If funding is insufficient to pay the full supplemental amounts, grants would be proportionately reduced for each qualifying State so that the $800 million limit would not be breached. Based on CRS estimates, the $800 million would be sufficient to pay the full supplemental grant in fiscal year 1998 through fiscal year 2000, but funding would be exhausted in fiscal year 2001, requiring a pro rata reduction in the supplemental grants. No supplemental funds are provided in fiscal year 2002, the last year of the TANF program. Table 4 shows CRS estimates of supplemental grants for population growth and/or low grant amounts per poor person for fiscal year 1998 through fiscal year 2001.

*Bonus to reward high-performance States*

For fiscal year 1999 through fiscal year 2003, additional funds are provided for States that are successful in meeting the goals of the TANF program. Within 1 year of enactment, the Secretary of DHHS, in consultation with the National Governors Association and the American Public Welfare Association, is required to develop a formula for measuring State performance under the program. In developing the performance bonus formula, the criteria for successful performance are the purposes of the TANF block grant. More specifically, the criteria are providing assistance to needy families so that children can be reared at home or with relatives; ending the dependence of needy parents on government benefits by promoting job preparation, work, and marriage; preventing and reducing the incidence of out-of-wedlock pregnancies and establishing numerical goals for preventing and reducing these pregnancies; and encouraging the formation and maintenance of two-parent families. The Secretary is required to set a performance threshold that States must meet in order to receive bonus payments. Total bonuses for the 5 years are set at $1 billion.

*Contingency fund*

TANF provides additional matching grants for States that experience high and increasing unemployment rates or increased food stamp caseloads. A total of $2 billion is appropriated for fiscal year 1997 through fiscal year 2001.

To qualify for contingency funds, a State must expend from its own funds on TANF an amount equal to at least 100 percent of the amount it spent on AFDC, State and local administration, Emergency Assistance, AFDC-related child care, and JOBS in fiscal year 1994. It must also meet one of two need-based criteria:

1. Its seasonally adjusted unemployment rate averaged over the most recent 3-month period must be at least 6.5 percent and at least 10 percent higher than the rate in the corresponding 3-month period in either of the previous 2 years; or

2. Its food stamp caseload over the most recent 3-month period must be at least 10 percent higher than the food stamp caseload would have been, according to the Secretary of Agriculture, in the corresponding 3-month period in fiscal year 1994 or 1995 if Public Law 104–193 had been in effect then.

83

The unemployment criteria are the same as the optional criteria available to the States for triggering extended benefits (EB) in the unemployment compensation program. The information to determine whether a State qualifies for contingency funds is available from the Department of Labor, which issues weekly extended benefit trigger notices.

The Secretary of the Department of Agriculture determines whether a State qualifies for contingency funds based on a rise in food stamp caseloads. The Secretary is instructed to adjust the fiscal year 1994 caseload data to determine what the caseload would have been had the amendments made by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 been in effect during that year.

The amount of contingency funds for a State is the Federal Medical Assistance Percentage of a State's excess expenditures in the TANF program. Excess expenditures are the difference between a State's total TANF expenditures from its own funds (plus expenditures financed from advances from the contingency fund itself) minus an amount equal to fiscal year 1994 State spending on AFDC, State and local administration, Emergency Assistance, AFDC-related child care, and JOBS. If a State receives matching funds for child care, any child expenditures made under TANF are disregarded in the calculation and AFDC-related child care spending also is subtracted from the fiscal year 1994 base.

Contingency funds are capped at 20 percent of the State's family assistance grant. A State may receive in each month that it qualifies, up to one-twelfth of its maximum contingency grant. States must remit any overpayments made under the contingency fund at the end of the fiscal year. If a State failed to meet the maintenance of effort requirement for contingency funds, but received contingency money, its subsequent year s family assistance grant would be reduced by the amount of contingency funds it received.

### CHILD CARE

Under the reformed Child Care and Development Block Grant (CCDBG), the Federal Government provides States with both discretionary and entitlement funding for child care. Over the 6 years, fiscal year 1997 through fiscal year 2002, a maximum of $19.9 billion would be provided for child care. Of this amount, $6 billion are in discretionary funds, and hence actual funding will be determined by annual appropriations. However, a total of $13.9 billion is provided as entitlements to States and Indian tribes. All Federal funds are consolidated under the expanded CCDBG. More specifically:

1. *Discretionary funds.*—CCDBG discretionary funding is authorized at $1 billion per year through fiscal year 2002. Actual funding would depend upon annual appropriations. Up to 2 percent of appropriated funds, but no less than 1 percent of the amount appropriated, is reserved for Indian tribes;

2. *Entitlements to the States.*—The law provides $1.967 billion in entitlement funds for fiscal year 1997. The annual entitlement amount then gradually rises to $2.717 billion in fiscal year 2002. These funds are divided as follows:

84

— States would receive grants totaling $1.2 billion each year based on Federal payments to the States for AFDC-related child care programs in recent fiscal years;
— Indian tribes would be entitled to up to 2 percent, but not less than 1 percent, of the amount of entitlement funds provided for child care; and
— Remaining funds would be available for matching grants to the States.

Table 5 provides an estimate of the maximum potential allocations to each State for child care for fiscal year 1997 through fiscal year 2002. The table assumes that: (1) Congress appropriates the full $1 billion authorized each year for discretionary child care funds; (2) all States receive the maximum matching grant for child care; and (3) Indian tribes receive their maximum 2 percent of child care funds.

DISCRETIONARY FUNDING

Discretionary funds are allocated to the States based on the formula in the CCDBG which divides appropriated funds based on each State's: (1) share of the population aged 5 and younger; (2) share of children receiving free or reduced price school lunches; and (3) per-capita income. State allotments are determined after funds are set aside for Indian tribes and the territories. Indian tribes will receive up to 2 percent, but no less than 1 percent of appropriated funds. The territories of Guam, the Virgin Islands, and the Northern Marianas are eligible for one-half of 1 percent of appropriated funds (Puerto Rico is treated as a State).

Table 6 provides estimated allocations to the States for discretionary child care funds. For the 50 States, the District of Columbia, and Puerto Rico, the estimates are from DHHS and reflect the State shares based on preliminary fiscal year 1996 allocation. Territory allotments are based on estimated fiscal year 1996 shares of the territory set-aside allotted to each of the territories. It should be noted that changes in formula factors over the fiscal year 1997 through fiscal year 2002 period may occur, and therefore each year's actual discretionary allotments may differ from those based on fiscal year 1997 shares. The estimates also assume that Indian tribes receive the maximum set-aside of 2 percent and that DHHS withholds one-fourth of 1 percent of State allotments for technical assistance.

MANDATORY FUNDING

States are also entitled to mandatory funding under the CCDBG. These grants would replace the prior law title IV–A child care programs of AFDC/JOBS, transitional, and at-risk child care. Federal funds for child care provided under title IV–A are transferred to the CCDBG, and are subject to the rules and conditions that apply to the CCDBG.

Mandatory child care funding is divided into three parts. First, States are entitled to a certain amount based on their recent expenditures in the prior law title IV–A programs. These recent expenditures are the greatest of the Federal share of expenditures for title IV–A child care programs: (1) in fiscal year 1995; (2) in fiscal

85

year 1994; or (3) on average, over the fiscal year 1992 to fiscal year 1994 period. The total of these expenditures is $1.2 billion annually. This $1.2 billion is referred to as the amount guaranteed to the States for child care. Second, Indian tribes are entitled to up to 2 percent of mandatory child care funding. Third, remaining funds are available for matching grants. In order to qualify for matching grants, a State must first expend on child care all of its guaranteed child care grant (its share of the $1.2 billion a year) plus an amount equal to what was spent from its own funds on title IV–A child care in fiscal year 1994 or fiscal year 1995, whichever is higher. State matching grants are capped based on a share of available funds. The State's share, in turn, is based on its share of the population under age 13.

Table 7 shows the amount guaranteed to the States for each year, fiscal year 1997 through fiscal year 2002. Table 8 shows each State's estimated yearly maximum matching grant.

86

TABLE 3.—ANNUAL FAMILY ASSISTANCE GRANTS BY STATE,
FISCAL YEARS 1997–2002

[$ in thousands]

| State | Family assist-ance grant | State | Family assist-ance grant |
|---|---|---|---|
| Alabama | $93,006 | Montana | $45,534 |
| Alaska | 63,609 | Nebraska | 58,029 |
| Arizona | 222,420 | Nevada | 43,977 |
| Arkansas | 56,733 | New Hampshire | 38,521 |
| California | 3,733,818 | New Jersey | 404,035 |
| Colorado | 135,553 | New Mexico | 126,103 |
| Connecticut | 266,788 | New York | 2,359,975 |
| Delaware | 32,291 | North Carolina | 302,240 |
| District of Columbia | 92,610 | North Dakota | 25,888 |
| Florida | 560,956 | Ohio | 727,968 |
| Georgia | 330,742 | Oklahoma | 148,014 |
| Hawaii | 98,905 | Oregon | 167,925 |
| Idaho | 31,851 | Pennsylvania | 719,499 |
| Illinois | 585,057 | Rhode Island | 95,022 |
| Indiana | 206,799 | South Carolina | 99,968 |
| Iowa | 130,088 | South Dakota | 21,894 |
| Kansas | 101,931 | Tennessee | 189,788 |
| Kentucky | 181,288 | Texas | 486,257 |
| Louisiana | 163,972 | Utah | 74,952 |
| Maine | 78,121 | Vermont | 47,353 |
| Maryland | 229,098 | Virginia | 158,285 |
| Massachusetts | 459,371 | Washington | 399,637 |
| Michigan | 775,353 | West Virginia | 110,176 |
| Minnesota | 266,398 | Wisconsin | 318,188 |
| Mississippi | 86,768 | Wyoming | 21,781 |
| Missouri | 214,582 | | |
| | | Total | 16,389,114 |

Source: Table prepared by the Congressional Research Service based on allocations from the U.S. Department of Health and Human Services.

87

TABLE 4.—ESTIMATED GRANTS TO STATES WITH HIGH POPULATION GROWTH AND/OR
LOW WELFARE GRANTS PER POOR PERSON,
FISCAL YEARS 1998—2001

[$ in thousands]

| State | Year | | | |
|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 |
| Alabama | $2,671 | $5,410 | $8,216 | $8,264 |
| Alaska | 1,659 | 3,359 | 5,102 | 5,131 |
| Arizona | 5,762 | 11,667 | 17,720 | 17,822 |
| Arkansas | 1,497 | 3,032 | 4,606 | 4,632 |
| California | 0 | 0 | 0 | 0 |
| Colorado | 3,268 | 6,617 | 10,051 | 10,108 |
| Connecticut | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 |
| Florida | 14,547 | 29,457 | 44,740 | 44,997 |
| Georgia | 8,978 | 18,181 | 27,614 | 27,773 |
| Hawaii | 0 | 0 | 0 | 0 |
| Idaho | 842 | 1,706 | 2,591 | 2,606 |
| Illinois | 0 | 0 | 0 | 0 |
| Indiana | 0 | 0 | 0 | 0 |
| Iowa | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 |
| Kentucky | 0 | 0 | 0 | 0 |
| Louisiana | 4,100 | 8,303 | 12,611 | 12,684 |
| Maine | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 |
| Michigan | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 |
| Mississippi | 2,176 | 4,406 | 6,692 | 6,731 |
| Missouri | 0 | 0 | 0 | 0 |
| Montana | 1,131 | 2,289 | 3,477 | 3,497 |
| Nebraska | 0 | 0 | 0 | 0 |
| Nevada | 899 | 1,821 | 2,765 | 2,781 |
| New Hampshire | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 |
| New Mexico | 3,246 | 6,573 | 9,983 | 10,041 |
| New York | 0 | 0 | 0 | 0 |
| North Carolina | 8,696 | 17,609 | 26,745 | 26,899 |
| North Dakota | 0 | 0 | 0 | 0 |
| Ohio | 0 | 0 | 0 | 0 |
| Oklahoma | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 |
| Pennsylvania | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 |
| South Carolina | 2,596 | 5,257 | 7,984 | 8,030 |
| South Dakota | 0 | 0 | 0 | 0 |
| Tennessee | 5,193 | 10,516 | 15,973 | 16,064 |
| Texas | 12,693 | 25,703 | 39,039 | 39,263 |
| Utah | 2,096 | 4,245 | 6,447 | 6,484 |

88

TABLE 4.—ESTIMATED GRANTS TO STATES WITH HIGH POPULATION GROWTH AND/OR
LOW WELFARE GRANTS PER POOR PERSON,—Continued
FISCAL YEARS 1998–2001

[$ in thousands]

| State | Year | | | |
|-------|------|------|------|------|
| | 1998 | 1999 | 2000 | 2001 |
| Vermont ...................................... | 0 | 0 | 0 | 0 |
| Virginia ..................................... | 4,381 | 8,873 | 13,476 | 13,553 |
| Washington ................................ | 0 | 0 | 0 | 0 |
| West Virginia ............................. | 0 | 0 | 0 | 0 |
| Wisconsin .................................. | 0 | 0 | 0 | 0 |
| Wyoming .................................... | 582 | 1,178 | 1,790 | 1,800 |
| Annual total .......................... | 87,014 | 176,204 | 267,623 | 269,160 |
| Cumulative total .................... | 87,014 | 263,218 | 530,840 | 800,000 |

Source: Table prepared by Congressional Research Service based on data from the Department of Health and Human Services and the Bureau of the Census.

89

TABLE 5.—TOTAL FUNDING UNDER THE CHILD CARE AND DEVELOPMENT BLOCK GRANT, FISCAL YEARS 1997–2002

| State | Year | | | | | | Total 1997–2002 |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | |
| Alabama | $47,775 | $49,936 | $51,610 | $54,896 | $58,215 | $60,764 | $323,196 |
| Alaska | 7,480 | 7,953 | 8,279 | 8,912 | 9,555 | 10,053 | 52,233 |
| Arizona | 51,166 | 52,071 | 53,808 | 57,194 | 60,601 | 63,196 | 338,036 |
| Arkansas | 23,824 | 24,617 | 25,475 | 27,216 | 28,953 | 30,258 | 160,343 |
| California | 309,577 | 325,220 | 339,349 | 367,123 | 395,348 | 417,180 | 2,153,796 |
| Colorado | 31,519 | 32,780 | 34,199 | 37,010 | 39,817 | 41,931 | 217,255 |
| Connecticut | 34,522 | 35,566 | 36,628 | 38,786 | 40,893 | 42,391 | 228,785 |
| Delaware | 9,191 | 9,479 | 9,745 | 10,273 | 10,800 | 11,197 | 60,685 |
| District of Columbia | 7,387 | 7,929 | 8,024 | 8,256 | 8,484 | 8,646 | 49,325 |
| Florida | 129,038 | 132,336 | 136,984 | 146,278 | 155,539 | 162,442 | 862,616 |
| Georgia | 88,883 | 91,473 | 94,338 | 99,961 | 105,616 | 109,908 | 590,178 |
| Hawaii | 12,207 | 12,778 | 13,298 | 14,304 | 15,344 | 16,165 | 84,096 |
| Idaho | 11,494 | 11,998 | 12,533 | 13,573 | 14,636 | 15,471 | 79,705 |
| Illinois | 130,341 | 134,581 | 138,967 | 147,766 | 156,547 | 163,117 | 871,318 |
| Indiana | 59,542 | 61,857 | 63,968 | 68,179 | 72,388 | 75,545 | 401,478 |
| Iowa | 25,406 | 26,520 | 27,434 | 29,332 | 31,216 | 32,605 | 172,513 |
| Kansas | 25,862 | 26,954 | 27,907 | 29,849 | 31,798 | 33,266 | 175,636 |
| Kentucky | 44,508 | 45,938 | 47,272 | 49,952 | 52,634 | 54,636 | 294,939 |
| Louisiana | 53,260 | 54,951 | 56,525 | 59,795 | 63,076 | 65,578 | 353,186 |
| Maine | 10,126 | 10,479 | 10,815 | 11,542 | 12,252 | 12,752 | 67,966 |
| Maryland | 50,172 | 52,689 | 54,687 | 58,619 | 62,545 | 65,486 | 344,196 |
| Massachusetts | 74,745 | 76,331 | 78,138 | 81,852 | 85,442 | 87,934 | 484,443 |
| Michigan | 87,517 | 91,905 | 95,473 | 102,626 | 109,756 | 115,048 | 602,325 |
| Minnesota | 49,714 | 51,293 | 52,870 | 56,108 | 59,303 | 61,632 | 330,920 |
| Mississippi | 31,409 | 32,273 | 33,237 | 35,218 | 37,203 | 38,710 | 208,050 |
| Missouri | 57,153 | 58,830 | 60,577 | 64,182 | 67,741 | 70,370 | 378,853 |
| Montana | 8,774 | 9,085 | 9,404 | 10,047 | 10,698 | 11,195 | 59,204 |
| Nebraska | 21,415 | 22,042 | 22,610 | 23,786 | 24,961 | 25,834 | 140,648 |
| Nevada | 11,012 | 11,287 | 11,899 | 13,071 | 14,253 | 15,158 | 76,680 |
| New Hampshire | 10,721 | 11,007 | 11,363 | 12,102 | 12,821 | 13,331 | 71,345 |
| New Jersey | 71,278 | 74,083 | 76,995 | 82,729 | 88,420 | 92,602 | 486,107 |
| New Mexico | 23,363 | 24,157 | 24,925 | 26,434 | 27,970 | 29,165 | 156,014 |
| New York | 210,973 | 216,787 | 222,960 | 235,437 | 247,717 | 256,586 | 1,390,460 |
| North Carolina | 116,740 | 118,734 | 121,354 | 126,478 | 131,585 | 135,400 | 750,291 |

TABLE 5.—TOTAL FUNDING UNDER THE CHILD CARE AND DEVELOPMENT BLOCK GRANT, FISCAL YEARS 1997–2002—Continued

| State | Year | | | | | | Total 1997–2002 |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | |
| North Dakota | 6,572 | 6,748 | 6,929 | 7,328 | 7,719 | 8,004 | 43,300 |
| Ohio | 135,123 | 139,091 | 142,885 | 150,579 | 158,189 | 163,764 | 889,630 |
| Oklahoma | 49,138 | 50,099 | 51,170 | 53,417 | 55,664 | 57,350 | 316,838 |
| Oregon | 37,571 | 38,935 | 40,143 | 42,529 | 44,951 | 46,827 | 250,958 |
| Pennsylvania | 118,360 | 122,295 | 126,141 | 133,952 | 141,601 | 147,094 | 789,443 |
| Rhode Island | 11,880 | 12,151 | 12,445 | 13,058 | 13,655 | 14,074 | 77,263 |
| South Carolina | 37,794 | 39,519 | 40,897 | 43,657 | 46,419 | 48,501 | 256,787 |
| South Dakota | 6,961 | 7,295 | 7,575 | 8,144 | 8,718 | 9,147 | 47,840 |
| Tennessee | 72,107 | 73,649 | 75,464 | 79,080 | 82,678 | 85,369 | 468,347 |
| Texas | 209,799 | 216,455 | 224,252 | 239,766 | 255,444 | 267,471 | 1,413,186 |
| Utah | 28,824 | 29,895 | 30,918 | 32,944 | 35,039 | 36,700 | 194,320 |
| Vermont | 7,381 | 7,585 | 7,771 | 8,155 | 8,532 | 8,804 | 48,229 |
| Virginia | 57,639 | 60,439 | 62,867 | 67,660 | 72,435 | 75,998 | 397,038 |
| Washington | 72,671 | 75,324 | 77,553 | 81,918 | 86,348 | 89,761 | 483,575 |
| West Virginia | 20,692 | 21,376 | 21,926 | 23,047 | 24,159 | 24,981 | 136,180 |
| Wisconsin | 53,294 | 55,226 | 56,983 | 60,568 | 64,109 | 66,703 | 356,883 |
| Wyoming | 5,789 | 6,034 | 6,219 | 6,602 | 6,998 | 7,313 | 38,954 |
| Indian set-aside | 59,340 | 61,340 | 63,340 | 67,340 | 71,340 | 74,340 | 397,040 |
| Puerto Rico[1] | 24,956 | 24,956 | 24,956 | 24,956 | 24,956 | 24,956 | 149,735 |
| Guam[1] | 2,404 | 2,404 | 2,404 | 2,404 | 2,404 | 2,404 | 14,425 |
| Virgin Islands[1] | 1,687 | 1,687 | 1,687 | 1,687 | 1,687 | 1,687 | 10,121 |
| Northern Marianas[1] | 909 | 909 | 909 | 909 | 909 | 909 | 5,454 |
| Totals | 2,959,583 | 3,059,333 | 3,159,083 | 3,358,583 | 3,558,083 | 3,707,708 | 19,802,370 |

Note: Funding in thousands. These allocations also reflect a regulatory provision that withholds 1/4 of 1 percent of State allotments for payment to DHHS for technical assistance. This reduction in State allotments currently applies to discretionary CCDBG funds.

[1] Discretionary amounts for the territories.

Source: Table prepared by the Congressional Research Service. Fiscal year 1997 allocations are from the Department of Health and Human Services.

91

TABLE 6.—STATE ANNUAL ALLOTMENTS OF DISCRETIONARY CHILD CARE FUNDS, FISCAL YEARS 1997–2002

[$ in thousands]

| State | Allotment | Percent |
|---|---|---|
| Alabama | $20,236 | 2.03 |
| Alaska | 1,907 | 0.19 |
| Arizona | 18,512 | 1.86 |
| Arkansas | 11,896 | 1.19 |
| California | 120,467 | 12.08 |
| Colorado | 11,060 | 1.11 |
| Connecticut | 7,225 | 0.72 |
| Delaware | 2,112 | 0.21 |
| District of Columbia | 1,979 | 0.20 |
| Florida | 50,046 | 5.02 |
| Georgia | 32,158 | 3.22 |
| Hawaii | 3,662 | 0.37 |
| Idaho | 5,134 | 0.51 |
| Illinois | 37,706 | 3.78 |
| Indiana | 18,065 | 1.81 |
| Iowa | 9,229 | 0.93 |
| Kansas | 8,899 | 0.89 |
| Kentucky | 17,943 | 1.80 |
| Louisiana | 26,680 | 2.67 |
| Maine | 3,873 | 0.39 |
| Maryland | 13,203 | 1.32 |
| Massachusetts | 14,395 | 1.44 |
| Michigan | 29,218 | 2.93 |
| Minnesota | 13,483 | 1.35 |
| Mississippi | 17,359 | 1.74 |
| Missouri | 18,227 | 1.83 |
| Montana | 3,213 | 0.32 |
| Nebraska | 5,537 | 0.56 |
| Nevada | 4,134 | 0.41 |
| New Hampshire | 2,567 | 0.26 |
| New Jersey | 18,640 | 1.87 |
| New Mexico | 9,447 | 0.95 |
| New York | 57,493 | 5.76 |
| North Carolina | 28,149 | 2.82 |
| North Dakota | 2,345 | 0.24 |
| Ohio | 35,119 | 3.52 |
| Oklahoma | 15,233 | 1.53 |
| Oregon | 9,973 | 1.00 |
| Pennsylvania | 32,711 | 3.28 |
| Rhode Island | 2,721 | 0.27 |
| South Carolina | 18,121 | 1.82 |
| South Dakota | 3,155 | 0.32 |
| Tennessee | 20,849 | 2.09 |
| Texas | 92,921 | 9.32 |
| Utah | 9,396 | 0.94 |
| Vermont | 1,715 | 0.17 |
| Virginia | 19,258 | 1.93 |
| Washington | 15,905 | 1.59 |

92

TABLE 6.—STATE ANNUAL ALLOTMENTS OF DISCRETIONARY CHILD CARE FUNDS,—
Continued

FISCAL YEARS 1997–2002

[$ in thousands]

| State | Allotment | Percent |
|---|---|---|
| West Virginia | 7,719 | 0.77 |
| Wisconsin | 14,924 | 1.50 |
| Wyoming | 1,627 | 0.16 |
| Indian tribe set-aside | 20,000 | 2.01 |
| Puerto Rico | 24,956 | 2.50 |
| Guam | 2,404 | 0.24 |
| Virgin Islands | 1,687 | 0.17 |
| Northern Marianas | 909 | 0.09 |
| Total | 997,500 | 100.00 |

Note: State allotments are based on the fiscal year 1996 State shares of Child Care and Development Block Grant (CCDBG) funds. The shares may change over time.

Source: Table prepared by the Congressional Research Service (CRS). Allotments for the 50 States, District of Columbia, and Puerto Rico are estimates from the Department of Health and Human Services based on 1996 shares. Allotments for the territories are CRS estimates based on each territory's share of the 0.5 percent set-aside for the territories in fiscal year 1996 published in the Administration for Children and Families appropriation justifications document for fiscal year 1997.

93

TABLE 7.—STATE ANNUAL ALLOTMENTS OF GUARANTEED CHILD CARE FUNDING, FISCAL YEARS 1997–2002

[in thousands]

| State | Guaranteed child care funds | State | Guaranteed child care funds |
|---|---|---|---|
| Alabama | $16,442 | Montana | $3,191 |
| Alaska | 3,545 | Nebraska | 11,338 |
| Arizona | 19,891 | Nevada | 2,580 |
| Arkansas | 5,300 | New Hampshire | 5,052 |
| California | 92,946 | New Jersey | 31,663 |
| Colorado | 10,174 | New Mexico | 8,703 |
| Connecticut | 18,738 | New York | 104,894 |
| Delaware | 5,179 | North Carolina | 69,639 |
| District of Columbia | 4,721 | North Dakota | 2,506 |
| Florida | 43,027 | Ohio | 70,445 |
| Georgia | 36,523 | Oklahoma | 24,910 |
| Hawaii | 5,221 | Oregon | 19,409 |
| Idaho | 2,868 | Pennsylvania | 55,337 |
| Illinois | 59,609 | Rhode Island | 6,634 |
| Indiana | 26,182 | South Carolina | 9,867 |
| Iowa | 8,878 | South Dakota | 1,711 |
| Kansas | 9,812 | Tennessee | 37,702 |
| Kentucky | 16,702 | Texas | 59,844 |
| Louisiana | 13,865 | Utah | 12,592 |
| Maine | 3,137 | Vermont | 4,148 |
| Maryland | 23,301 | Virginia | 21,329 |
| Massachusetts | 44,973 | Washington | 41,948 |
| Michigan | 32,082 | West Virginia | 8,841 |
| Minnesota | 23,368 | Wisconsin | 24,511 |
| Mississippi | 6,293 | Wyoming | 2,815 |
| Missouri | 24,669 | | |
| | | Total | 1,199,051 |

Source: Table prepared by the Congressional Research Service based on allotments from the Department of Health and Human Services.

94

TABLE 8.—STATE ESTIMATED ALLOTMENTS UNDER THE ENTITLEMENT CHILD CARE MATCHING GRANTS, FISCAL YEARS 1997–2002

| State | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
| Alabama | $11,097 | $13,259 | $14,932 | $18,218 | $21,537 | $24,086 |
| Alaska | 2,029 | 2,502 | 2,828 | 3,461 | 4,104 | 4,602 |
| Arizona | 12,763 | 13,668 | 15,405 | 18,791 | 22,198 | 24,793 |
| Arkansas | 6,628 | 7,421 | 8,778 | 10,019 | 11,757 | 13,062 |
| California | 96,164 | 111,808 | 125,536 | 153,710 | 181,936 | 203,767 |
| Colorado | 10,285 | 11,546 | 12,965 | 15,776 | 18,584 | 20,697 |
| Connecticut | 8,559 | 9,603 | 10,665 | 12,823 | 14,930 | 16,428 |
| Delaware | 1,900 | 2,188 | 2,454 | 2,982 | 3,509 | 3,906 |
| District of Columbia | 1,287 | 1,229 | 1,324 | 1,556 | 1,784 | 1,946 |
| Florida | 35,965 | 39,264 | 43,911 | 53,205 | 62,466 | 69,369 |
| Georgia | 20,202 | 22,792 | 25,657 | 31,281 | 36,935 | 41,227 |
| Hawaii | 3,324 | 3,895 | 4,415 | 5,421 | 6,461 | 7,282 |
| Idaho | 3,492 | 3,997 | 4,532 | 5,571 | 6,635 | 7,470 |
| Illinois | 33,026 | 37,266 | 41,652 | 50,451 | 59,232 | 65,802 |
| Indiana | 15,294 | 17,609 | 19,721 | 23,932 | 28,140 | 31,297 |
| Iowa | 7,299 | 8,413 | 9,327 | 11,225 | 13,109 | 14,498 |
| Kansas | 7,151 | 8,243 | 9,197 | 11,138 | 13,088 | 14,556 |
| Kentucky | 9,864 | 11,294 | 12,627 | 15,307 | 17,989 | 19,991 |
| Louisiana | 12,715 | 14,407 | 15,981 | 19,250 | 22,532 | 25,033 |
| Maine | 3,116 | 3,468 | 3,804 | 4,532 | 5,242 | 5,742 |
| Maryland | 13,667 | 16,184 | 18,182 | 22,115 | 26,040 | 28,981 |
| Massachusetts | 15,377 | 16,963 | 18,770 | 22,484 | 26,073 | 28,565 |
| Michigan | 26,217 | 30,605 | 34,173 | 41,327 | 48,456 | 53,748 |
| Minnesota | 12,863 | 14,442 | 16,019 | 19,257 | 22,452 | 24,781 |
| Mississippi | 7,757 | 8,620 | 9,585 | 11,565 | 13,550 | 15,058 |
| Missouri | 14,258 | 15,934 | 17,681 | 21,286 | 24,845 | 27,474 |
| Montana | 2,371 | 2,682 | 3,001 | 3,644 | 4,295 | 4,792 |
| Nebraska | 4,540 | 5,167 | 5,735 | 6,911 | 8,086 | 8,959 |
| Nevada | 4,298 | 4,572 | 5,185 | 6,356 | 7,539 | 8,444 |

| | | | | | | |
|---|---|---|---|---|---|---|
| New Hampshire | 3,102 | 3,389 | 3,744 | 4,483 | 5,203 | 5,713 |
| New Jersey | 20,975 | 23,781 | 26,693 | 32,427 | 38,118 | 42,300 |
| New Mexico | 5,213 | 6,007 | 6,776 | 8,285 | 9,821 | 11,016 |
| New York | 48,587 | 54,400 | 60,573 | 73,051 | 85,331 | 94,200 |
| North Carolina | 18,381 | 20,946 | 23,565 | 28,689 | 33,797 | 37,612 |
| North Dakota | 1,721 | 1,897 | 2,078 | 2,477 | 2,868 | 3,153 |
| Ohio | 29,559 | 33,527 | 37,321 | 45,015 | 52,625 | 58,200 |
| Oklahoma | 8,995 | 9,956 | 11,027 | 13,274 | 15,521 | 17,207 |
| Oregon | 8,189 | 9,554 | 10,762 | 13,148 | 15,569 | 17,446 |
| Pennsylvania | 30,311 | 34,247 | 38,093 | 45,904 | 53,553 | 59,046 |
| Rhode Island | 2,525 | 2,797 | 3,091 | 3,703 | 4,301 | 4,719 |
| South Carolina | 9,806 | 11,531 | 12,909 | 15,669 | 18,301 | 20,513 |
| South Dakota | 2,095 | 2,429 | 2,709 | 3,278 | 3,852 | 4,281 |
| Tennessee | 13,557 | 15,098 | 16,614 | 20,529 | 24,128 | 26,818 |
| Texas | 57,034 | 63,690 | 71,487 | 87,001 | 102,679 | 114,706 |
| Utah | 6,837 | 7,908 | 8,930 | 10,957 | 13,052 | 14,712 |
| Vermont | 1,519 | 1,723 | 1,908 | 2,292 | 2,670 | 2,942 |
| Virginia | 17,052 | 19,853 | 22,280 | 27,073 | 31,848 | 35,411 |
| Washington | 14,818 | 17,470 | 19,700 | 24,065 | 28,495 | 31,907 |
| West Virginia | 4,192 | 4,816 | 5,566 | 6,487 | 7,599 | 8,201 |
| Wisconsin | 13,189 | 15,791 | 17,548 | 21,133 | 24,674 | 27,268 |
| Wyoming | 1,347 | 1,592 | 1,777 | 2,160 | 2,556 | 2,871 |
| Totals | 723,692 | 821,442 | 919,192 | 1,114,692 | 1,310,192 | 1,456,817 |

Note: Funding in thousands. These allocations assume a maximum 2 percent set-aside for Indians. They also reflect a regulatory provision that withholds 1/4 of 1 percent of State allotments for payment to the Department of Health and Human Services (DHHS) for technical assistance. This reduction in State allotments currently applies to discretionary Child Care and Development Block Grant funds.

Source: Table prepared by the Congressional Research Service. Fiscal year 1997 allocations are from DHHS.

96

=======================================

# SECTION 4.

# SUMMARY OF EFFECTIVE DATES
# BY TITLE

=======================================

97

SECTION 4.—SUMMARY OF EFFECTIVE DATES BY TITLE

## Title I. Temporary Assistance for Needy Families Block Grant

| Section | Provision | Effective date |
|---|---|---|
| 103a(402)[1] ................ | State plan requirements | July 1, 1997, or earlier at State option. |
| 103a(403a1) ................ | Block grants to States | July 1, 1997, or earlier at State option. |
| 103a(403a2) ................ | Illegitimacy reduction bonus | Oct. 1, 1998. |
| 103a(403a3) ................ | Population growth fund | Oct. 1, 1997. |
| 103a(403a4) ................ | High performance bonus | Oct. 1, 1998. |
| 103a(403b) ................ | Contingency fund | Oct. 1, 1996. |
| 103a(404) ................ | Conditions on use of block grants to States | July 1, 1997, or earlier at State option. |
| 103a(405) ................ | Administrative provisions | July 1, 1997, or earlier at State option. |
| 103a(406) ................ | Federal loan fund | Oct. 1, 1996. |
| 103a(407a–h) ................ | Mandatory work requirements | July 1, 1997, or earlier at State option. (annual work participation rates apply to all of fiscal year 1997 regardless of when State begins operating its block grant program; however, the penalty for failure to meet participation rates does not take effect until the later of July 1, 1997 or 6 months after plan submission and shall apply only to conduct that occurs on that date or later; see "Penalties" below). |
| 103a(407i) ................ | Review of implementation of work programs | Between Oct. 1, 1998 and Sept. 30, 1999 (reviews by Congressional committees must be conducted in fiscal year 1999). |
| 103a(408) ................ | Prohibitions, requirements | July 1, 1997, or earlier at State option (prohibitions and requirements take effect on the date the State begins operating its block grant program; e.g., the 5-year time limit for benefit eligibility, requirement that teenage parents attend school, etc.). |

98

SECTION 4.—SUMMARY OF EFFECTIVE DATES BY TITLE—Continued

| Section | Provision | Effective date |
|---------|-----------|----------------|
| 103a(409) | Penalties | For failure to repay loans and for failure to maintain prior spending, Oct. 1, 1996; otherwise the later of July 1, 1997, or 6 months after the State submits its plan. |
| 103a(410) | Appeal of adverse decision | Follows penalty schedule above; requires timely notice of adverse action; specifies time allowed for appeals (administrative and Federal) and for administrative decision on appeal. |
| 103a(411) | Data collection and reporting | Later of July 1, 1997, or 6 months after the State submits its plan; the Secretary must send Congress a report by Mar. 31, 1998, and annually thereafter, on whether States are meeting major goals and on program characteristics. |
| 103a(412) | Direct funding and administration by Indian tribes | Oct. 1, 1996. |
| 103a(413) | Research, evaluation, and national studies | 1. Annual ranking of States on work and on illegitimacy: July 1, 1997 (or earlier if State begins operating its TANF block grant program sooner). 2. Reports by Secretary on children affected by changes: Aug. 22, 1999. 3. States must submit annual reports of child poverty rates beginning not later than Nov. 20, 1996. |
| 103a(414) | Study by Census Bureau | Aug. 22, 1996. |
| 103a(415) | Waivers | Aug. 22, 1996 (current waivers may continue to supersede provisions of this law, including work requirements, for the life of the waiver and for the area and issue of the waiver only). |
| 103a(416) | Administration | July 1, 1997. |
| 103a(417) | Limitation on Federal authority | July 1, 1997 (earlier if State opts for TANF sooner). |

| Section | Description | Effective date |
|---|---|---|
| 103b | Grants to outlying areas (Puerto Rico, Virgin Islands, American Samoa) | For increase in funding ceilings, Oct. 1, 1996; for the start of the TANF block grant, July 1, 1997 (or earlier at the option of the territory). |
| 103c | Elimination of child care programs under the Social Security Act | Oct. 1, 1996. |
| 104 | Services provided by charitable, religious, or private organizations | July 1, 1997 (earlier if State opts for TANF sooner). |
| 105 | Census data on grandparents as primary care givers | Not later than Nov. 20, 1996. |
| 106 | Report on data processing | Not later than Feb. 22, 1997. |
| 107 | Study on alternative outcomes measures | Secretary must consider alternatives to work requirements (which begin Oct. 1, 1996) and must report findings to Congress no later than Sept. 30, 1998. |
| 108 | Conforming amendments to the Social Security Act | July 1, 1997 (except section 603 provisions about the new child care entitlement in the Social Security Act, which take effect Oct. 1, 1996). |
| 109 | Conforming amendments to the Food Stamp Act | July 1, 1997. |
| 110 | Conforming amendments to other laws | July 1, 1997. |
| 111 | Development of prototype of counterfeit-resistant Social Security card | Commissioner of Social Security must report to Congress by Aug. 22, 1997. |
| 112 | Modification of JOLI program | July 1, 1997. |
| 113 | Secretarial submission of technical and conforming amendments | Secretary must submit proposal by Nov. 20, 1996. |
| 114 | Assuring Medicaid coverage | July 1, 1997 (earlier if State opts for TANF sooner). |
| 115 | Denial of assistance for drug-related convictions | July 1, 1997 (mandated restrictions, from which States could "opt-out," apply only to individuals convicted after Aug. 22, 1996). |
| 116a–b | Effective date, transition rule | General effective date is July 1, 1997; special transition rules apply for States opting to begin their block grant programs earlier. |
| 116c | Termination of individual entitlement to AFDC | Oct. 1, 1996. |

100

SECTION 4.—SUMMARY OF EFFECTIVE DATES BY TITLE—Continued

| Section | Provision | Effective date |
|---|---|---|
| | **Title II. Supplemental Security Income (SSI)** | |
| 201 .............. | Denial of SSI benefits for 10 years to individuals found to have fraudulently misrepresented residence in order to obtain benefits simultaneously in two or more States | Aug. 22, 1996. |
| 202 .............. | Denial of SSI benefits for fugitive felons and probation and parole violators | Aug. 22, 1996. |
| 203 .............. | Financial incentives for State or local penal institutions to provide SSA information on prisoners receiving benefits | Applies to individuals whose period of confinement in an institution commences on or after Mar. 1, 1997. |
| | Study of other potential improvements in the collection of information regarding public inmates | Aug. 22, 1996; results of the study are due Aug. 22, 1997. |
| | Institution compliance report | Aug. 22, 1996; report due Oct. 1, 1998. |
| 204 .............. | Effective date of application for benefits | Applies to applications filed on or after Aug. 22, 1996. |
| 211 .............. | New definition of childhood disability, elimination of references to maladaptive behavior and discontinuance of the individualized functional assessment | Applies to new and pending applications on or after Aug. 22, 1996. Current beneficiaries must be notified by Jan. 1, 1997, and redeterminations are to be completed by Aug. 22, 1997. Current beneficiaries found ineligible upon redetermination will continue to receive benefits until July 1, 1997 or the date of their redetermination, whichever is later. |
| | Progress report on implementation to Congress | Aug. 22, 1996; report due within 180 days. |
| | Regulations submitted to Congress for review | Aug. 22, 1996; regulations must be submitted for review not later than 45 days before the effective date of the regulations. |
| | Authorization of additional funding | Aug. 22, 1996. |

| | | |
|---|---|---|
| 212 ........... | Eligibility redeterminations and continuing disability reviews | Applies to benefits for the months beginning on or after Aug. 22, 1996. |
| 213 ........... | Requirement to establish an account | Applies to payments made after Aug. 22, 1996. |
| 214 ........... | Reduction in cash benefits payable to institutionalized individuals whose medical costs are covered by private insurance | Applies to benefits beginning in Dec. 1996. |
| 215 ........... | Regulations | Are required to be published by Nov. 22, 1996. |
| 221 ........... | Installment payment of large past-due SSI benefits | Effective with respect to past-due benefits payable after Nov. 1996. |
| 222 ........... | Regulations | Are required to be published by Nov. 22, 1996. |
| 231 ........... | Annual report on the SSI Program | Aug. 22, 1996; report due not later than May 30 of each year. |
| 232 ........... | GAO study | Aug. 22, 1996; report due not later than Jan. 1, 1999. |

### Title III. Child Support

| | | |
|---|---|---|
| 302 ........... | Distribution of arrear ages that accrued after the family ceased to receive welfare | Oct. 1, 1997. |
| 302 ........... | Distribution of arrear ages that accrued before the family received welfare | Oct. 1, 2000. |
| 302 ........... | Study by Secretary on new rules of child support distribution | Oct. 1, 1998. |
| 302 ........... | General effective date for distribution rules and "gap" payments | Oct. 1, 1996, or earlier at State option. |
| 303 ........... | Privacy safeguards for all child support information | Oct. 1, 1997. |
| 304 ........... | Right to notification of hearing | Oct. 1, 1997. |
| 311 ........... | State Case Registry | Oct. 1, 1998. |
| 312 ........... | State Disbursement Unit | Oct. 1, 1998. |
| 313 ........... | Directory of New Hires | Oct. 1, 1997 (but States that have a new hire system in place may continue their system until Oct. 1, 1998). |
| 313 ........... | Comparison of new hire information in State Case Registry and other sources and sending information to the National Directory of New Hires | May 1, 1998. |

102

SECTION 4.—SUMMARY OF EFFECTIVE DATES BY TITLE—Continued

| Section | Provision | Effective date |
|---|---|---|
| 314 | Orders not subject to withholding must automatically be subject to withholding if arrearages occur | Oct. 1, 1996. |
| 316 | Expansion of Federal Parent Locator Service to include Federal Case Registry of Orders | Oct. 1, 1998. |
| 316 | Expansion of Federal Parent Locator Service to include the National Directory of New Hires | Oct. 1, 1997. |
| 321 | Adoption of Uniform Interstate Family Support Act (UIFSA) | Jan. 1, 1998. |
| 322 | Improvements to full faith and credit for child support orders | Aug. 22, 1996. |
| 324 | Secretary promulgate forms to be used in interstate cases for use in withholding income, imposing liens, and issuing administering subpoenas | Oct. 1, 1996. |
| 324 | States must use the forms promulgated by the Secretary for income withholding, liens and administrative subpoenas | Mar. 1, 1997. |
| 341 | Secretary's report on a new incentive system of child support financing | Mar. 1, 1997. |
| 341 | Implementation of revised incentive system | Oct. 1, 1999. |
| 341 | State option for calculation of paternity establishment percentage | Aug. 22, 1996. |
| 342 | Federal and State reviews and audits | First calendar quarter after Aug. 22, 1996. |
| 343 | Required reporting procedures | Aug. 22, 1996. |
| 344 | Completion of automated data processing requirements in effect on or before the enactment of the Family Support Act of 1988 | Oct. 1, 1997 |
| 344 | Completion of automated data processing enacted on or before Aug. 22, 1996 | Oct. 1, 2000. |
| 345 | Technical assistance | Aug. 22, 1996. |

103

| | | |
|---|---|---|
| 346 | New requirements for Secretary's annual report to Congress | Oct. 1, 1996. |
| 352 | Consumer reports | Aug. 22, 1996. |
| 353 | Nonliability for financial institutions | Aug. 22, 1996. |
| 361 | Fees for Internal Revenue Service collection of arrearages | Oct. 1, 1997. |
| 362 | Reforms of Child Support Collections for Federal Employees (including military personnel) | Feb. 22, 1997. |
| 363 | Enforcement of child support obligations of military personnel | Aug. 22, 1996. |
| 366 | Definition of support order | Aug. 22, 1996. |
| 370 | Denial of passports for nonpayment of child support | Oct. 1, 1997. |
| 371 | International support enforcement | Aug. 22, 1996. |
| 374 | Nondischargeability in bankruptcy | Aug. 22, 1996. |
| 381 | Correction of ERISA definition of medical child support order | General effective date is Aug. 22, 1996, but if pension plan needs to be amended, first plan year after Jan. 1, 1997. |
| 391 | Grants to States for access and visitation programs | Aug. 22, 1996. |

104

SECTION 4—SUMMARY OF EFFECTIVE DATES BY TITLE—Continued

| Section | Provision | Effective date |
|---|---|---|
| 395 .......... | General effective date | Provisions of this act that require amendment of State laws under section 466 of the Social Security Act, or revision of State plans under section 454, are effective on Oct. 1, 1996; all other provisions (except those with special effective dates as outlined above) are effective upon enactment; if States must amend State law to comply with this act, the changes must be made no later than the first day of the first quarter after the close of the first regular session of the State legislature that begins after enactment of this act. If States must amend their constitution to comply with this act, the State is not out of compliance until the earlier of 1 year after the effective date of a State constitutional amendment or Aug. 22, 2001. |

**Title IV. Restricting Welfare and Public Benefits for Aliens**

| Section | Provision | Effective date |
|---|---|---|
| 401 .......... | Illegal aliens and nonimmigrants ineligible for most Federal benefits | Aug. 22, 1996. |
| 402a .......... | Legal noncitizens ineligible for SSI and food stamps | Current recipients may remain eligible until as late as Aug. 22, 1997; all others ineligible after Aug. 22, 1996. |
| 402b | State option to provide AFDC/cash welfare, Medicaid, and social services to legal noncitizens | State option after Aug. 22, 1996 (other than for future entrants during their first 5 years—see below), but current recipients remain eligible until Jan. 1, 1997. |

105

| | | |
|---|---|---|
| 403 | 5-year limited eligibility for most Federal welfare benefits for future entrants | Changes affect noncitizens arriving after Aug. 22, 1996, for the individual's first 5 years in the U.S. |
| 404 | Agencies must inform the public and notify recipients affected by eligibility changes | After Aug. 22, 1996 (current recipients of SSI must be notified by Mar. 1, 1997). |
| 411 | Illegal aliens ineligible for most State benefits (with State "opt-out") | Aug. 22, 1996. |
| 412 | State authority to limit eligibility for most State welfare benefits for legal noncitizens | State option after Aug. 22, 1996, but current recipients remain eligible until Jan. 1, 1997. |
| 421 | Deeming of sponsor's income in determining noncitizen eligibility for most Federal benefits | Changes apply only to individuals arriving under revised sponsorship agreements (see below). |
| 422 | State authority to expand deeming to apply to most State programs | Changes apply only to individuals arriving under revised sponsorship agreements (see below). |
| 423 | Requirements for revised sponsorship agreements (affidavits of support) | Attorney General must formulate revised affidavits within 90 days of Aug. 22, 1996; the revised affidavits become effective between 60 and 90 days after the Attorney General has finalized the form. |
| 432 | Verification of eligibility for Federal public benefits | By Feb. 22, 1998, the Attorney General must promulgate regulations requiring verification of eligibility for Federal benefits; States that administer programs providing Federal public benefits have 24 months following the promulgation of regulations to have verification systems in effect. |
| 435 | No counting of quarters of work during which an alien received welfare benefits | Begins Jan. 1, 1997. |

106

SECTION 4.—SUMMARY OF EFFECTIVE DATES BY TITLE—Continued

| Section | Provision | Effective date |
|---|---|---|
| **Title V. Child Protection [2]** | | |
| **Title VI. Child Care [3]** | | |
| 603a .............. | Authorization of appropriations and entitlement authority | Authorization for discretionary grants to Child Care and Development Block Grant (CCDBG): Aug. 22, 1996; appropriation for new mandatory child care block grants, Oct. 1, 1996. |
| 612 .............. | Report by the Secretary | Oct. 1, 1996 (first biennial report must be submitted no later than Dec. 31, 1997). |
| **Title VII. Child Nutrition [4]** | | |
| 704 .............. | Special assistance | Aug. 22, 1996, except that new rounding rules will not affect Federal subsidy rates until the regular July 1, 1997, inflation adjustment. |
| 706 .............. | Summer food service program | Aug. 22, 1996, except that reduced subsidies and new rounding rules will not be effective until Jan. 1, 1997 (for the summer of 1997). |
| 708 .............. | Child and adult care food program | Aug. 22, 1996, except that the new restructured system for day care home subsidies and new rounding rules will not be effective until July 1, 1997, and interim regulations governing the restructured system are due by Jan. 1, 1997. |
| 723 .............. | School breakfast program authorization | Aug. 22, 1996, except that termination of the requirement for school breakfast and summer food service program startup and expansion grants is effective Oct. 1, 1996. |

| 731 | Nutrition education and training | Aug. 22, 1996, except that conversion of funding for the nutrition education and training program from mandatory to discretionary appropriations is effective Oct. 1, 1996. |
| 741 | Coordination of school lunch, school breakfast, and summer food service programs | Aug. 22, 1996, with the report due Nov. 1, 1997. |

**Title VIII. Food Stamps and Commodity Distribution [5]**

| 804 | Adjustment of the thrifty food plan | Oct. 1, 1996. |
| 809 | Deductions from income | Aug. 22, 1996, except that the ceiling on excess shelter expense deductions will rise on Jan. 1, 1997, Oct. 1, 1998, and Oct. 1, 2000. |
| 810 | Vehicle allowance | Oct. 1, 1996. |
| 824 | Work requirement for able-bodied adults with dependents | Aug. 22, 1996, except that transition provisions stipulate that months before recipients are notified of the new work requirement or 3 months after Aug. 22, 1996 (whichever is earlier) will not count toward the requirement's time limit. |
| 855 | Study of the use of food stamps to purchase vitamins and minerals | Aug. 22, 1996, with the study due by Dec. 15, 1998. |

**Title IX. Miscellaneous**

| 901 | Appropriation by State legislatures | July 1, 1997, or earlier at State option for TANF block grants; Oct. 1, 1996, for Child Care and Development Block Grant (CCDBG) funds. |
| 902 | Sanctioning for testing positive for controlled substances | Aug. 22, 1996. |
| 903 | Elimination of housing assistance with respect to fugitive felons and probation and parole violators | Aug. 22, 1996. |

108

SECTION 4.—SUMMARY OF EFFECTIVE DATES BY TITLE—Continued

| Section | Provision | Effective date |
|---|---|---|
| 905 | Establishing national goals to prevent teenage pregnancies | By Jan. 1, 1997, the Secretary of HHS must implement a strategy for preventing out-of-wedlock pregnancies; by June 30, 1998, she must report to Congress on progress in meeting goals. |
| 906 | Sense of the Senate regarding enforcement of statutory rape laws | By Jan. 1, 1997, the Attorney General must implement a program that educates State and local law enforcement officials on the prevention and prosecution of statutory rape. |
| 907 | Provisions to encourage electronic benefit transfer systems | Aug. 22, 1996. |
| 908 | Reduction of block grants to States for social services; use of vouchers | Oct. 1, 1996 for reduction in grants; Aug. 22, 1996, for authority to use funds for vouchers. |
| 909 | Rules relating to denial of earned income credit on basis of disqualified income | In general, applies to taxable years beginning after Dec. 31, 1995; for individuals who before June 26, 1996, had in effect an earned income eligibility certificate for taxable year 1996, applies to taxable years beginning after Dec. 31, 1996. |
| 910 | Modification of adjusted gross income definition for earned income credit | Same as for section 909 above. |
| 911 | Fraud under means-tested welfare and public assistance programs | Aug. 22, 1996. |
| 912 | Abstinence education | Oct. 1, 1997. |
| 913 | Change in reference | Jan. 1, 1997. |

[1] Section numbers in parentheses are references to the Social Security Act.
[2] All provisions of this title are effective upon enactment (Aug. 22, 1996).
[3] With the exception of the following sections, all provisions of this title are effective Oct. 1, 1996.
[4] With the exception of the following sections, all provisions of this title are effective upon enactment (Aug. 22, 1996).
[5] The Food Stamp Program's quality control system will not penalize States for errors resulting from changes in food stamp law effective on enactment until at least 150 days after enactment, and States are expected to implement new rules when households apply or are recertified. With the exception of the following sections, all provisions of this title are effective upon enactment (Aug. 22, 1996).

109

## SECTION 5.

## CONGRESSIONAL BUDGET OFFICE ESTIMATES

110



**CONGRESSIONAL BUDGET OFFICE**
**U.S. CONGRESS**
**WASHINGTON, D.C. 20515**

August 9, 1996

June E. O'Neill
Director

Honorable Jacob J. Lew
Acting Director
Office of Management and Budget
Washington, D.C. 20503

Dear Mr. Lew:

The Congressional Budget Office, after consulting with the Committees on the Budget of the House of Representatives and the Senate, provides the following estimate of the pay-as-you-go effects of H.R. 3734, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. The estimate is required by section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985. The Congress completed action on H.R. 3734 on August 1, 1996.

|  | (by fiscal year, in millions of dollars) | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
| Change in outlays | 0 | -2,934 | -8,325 |
| Change in receipts | 0 | 60 | 61 |

The enclosure contains details on the estimate. If you wish further information, we will be pleased to provide it. The CBO staff contacts for income security programs are Sheila Dacey, Justin Latus, Dorothy Rosenbaum, and Kathy Ruffing, all of whom can be reached at 226-2820, and for Medicaid, Jean Hearne and Robin Rudowitz, both of whom can be reached at 226-9010.

Sincerely,

*James L. Blum*

for    June E. O'Neill

Enclosure

111

Hon. Jacob J. Lew
Page 2

cc: Hon. Bill Archer
    Chairman
    House Committee on Ways and Means

    Hon. Sam Gibbons
    Ranking Minority Member
    House Committee on Ways and Means

    Hon. William V. Roth, Jr.
    Chairman
    Senate Committee on Finance

    Hon. Daniel Patrick Moynihan
    Ranking Minority Member
    Senate Committee on Finance

    Hon. Pete V. Domenici
    Chairman
    Senate Committee on the Budget

    Hon. J. James Exon
    Ranking Minority Member
    Senate Committee on the Budget

    Hon. John R. Kasich
    Chairman
    House Committee on the Budget

    Hon. Martin Olav Sabo
    Ranking Minority Member
    House Committee on the Budget

    Hon. Nancy Landon Kassebaum
    Chairman
    Senate Committee on Labor and Human Resources

112

Hon. Jacob J. Lew
Page 3

Hon. Edward M. Kennedy
Ranking Minority Member
Senate Committee on Labor and Human Resources

Hon. William F. Goodling
Chairman
House Committee on Economic and Educational Opportunities

Hon. William Clay
Ranking Minority Member
House Committee on Economic and Educational Opportunities

Hon. Thomas J. Bliley, Jr.
Chairman
House Committee on Commerce

Hon. John D. Dingell
Ranking Minority Member
House Committee on Commerce

Hon. Richard G. Lugar
Chairman
Senate Committee on Agriculture, Nutrition, and Forestry

Hon. Patrick J. Leahy
Ranking Minority Member
Senate Committee on Agriculture, Nutrition, and Forestry

Hon. Pat Roberts
Chairman
House Committee on Agriculture

Hon. E de la Garza
Ranking Minority Member
House Committee on Agriculture

113

## FEDERAL BUDGETARY IMPLICATIONS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

The Congressional Budget Office (CBO) has reviewed the conference report on H.R. 3734, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. The bill would replace Federal payments under the current Aid to Families With Dependent Children Program with a block grant to States, restrict the eligibility of legal aliens for welfare benefits, modify the benefits and eligibility requirements in the Food Stamp and Child Nutrition Programs, change the operation and financing of the Federal and State child support enforcement system, increase funding for child care programs, and tighten the eligibility requirements for disabled children under the Supplemental Security Income Program.

Although the estimate assumes that the bill will be enacted by September 1, 1996, its impact on direct spending and revenues in 1996 is estimated to be negligible. The bill would reduce Federal spending by $2.9 billion in 1997 and by $54.2 billion over the 1997–2002 period, as well as increase revenues by $60 million and $394 million over these respective periods. Summary tables I and II present estimates of the bill's total effects by program and by title, respectively. The underlying assumptions and methodology are described below, and detailed tables for each title of the bill appear at the end.

### TITLE I: TEMPORARY ASSISTANCE FOR NEEDY FAMILIES BLOCK GRANT

Title I would alter the method by which the Federal Government shares in the cost of providing cash and training assistance to low-income families with children. It would combine several current entitlement programs—Aid to Families with Dependent Children (AFDC), Emergency Assistance, and the Job Opportunities and Basic Skills Training Program (JOBS)—into a single block grant with a fixed funding level. Title I would also repeal current child care funding for low-income families. (Title VI establishes a new program to fund these activities.) Finally, it would extend an existing Medicaid benefit for families leaving public assistance and provide new funding for determining eligibility for Medicaid.

In 1997, CBO projects that under current law the Federal Government would spend $15.9 billion on AFDC benefits, AFDC administration, AFDC emergency assistance and the JOBS Program, or $0.7 billion less than the Federal Government would spend under title I (excluding child care and Medicaid). By 2002, projected spending under current law ($18.3 billion) would exceed projected spending under title I (excluding child care and Medicaid) by $0.3 billion (see table 1).

*Effect of the block grant on cash and training assistance.*—The new Temporary Assistance for Needy Families Block Grant (TANF) would replace Federal participation for AFDC benefit payments, AFDC administrative costs, AFDC emergency assistance benefits, and the JOBS Program. The bill would fix the base level of the block grant at $16.4 billion annually through 2002. Each State would be entitled to a portion of the grant based on its recent

114

spending in the AFDC and JOBS Programs. States could operate under the current law AFDC and JOBS Programs until July 1, 1997, but would be subject to the financing limitations of the block grant as of October 1, 1996.

A State could qualify to receive more than the basic block grant amount in four ways. First, a State that meets specified criteria related to its poverty level and population growth would receive a supplemental grant in 1998 equal to 2.5 percent of Federal 1994 payments to the State for AFDC, Emergency Assistance, and JOBS. In each successive year that the State meets the criteria, the supplemental grant would increase. Supplemental grants would be available from 1998 through 2001, and the total amount of additional funding for these supplemental grants would be capped at $800 million. A State that did not meet the qualifying criteria in 1998 would not be eligible to qualify in any later year. CBO estimates that 18 States would receive supplemental grants totaling $87 million in 1998 growing to $278 million by 2001 (see table 1).

Second, up to five States could receive bonuses of $20–$25 million each year from 1999–2002 if the number of out-of-wedlock births in the State for the prior 2 years decreased compared to the number of out-of-wedlock births in the 2-year period before that. A State would not be eligible for such a grant in a year that its abortion rate is higher than its 1995 rate. CBO estimates that on average two States would qualify each year at a Federal cost of $50 million each fiscal year.

Third, a State that meets criteria set by the Secretary of Health and Human Services (HHS) for high performing States could receive a bonus of up to 5 percent of its block grant each year. High performance bonuses are capped at $200 million each year for 1999–2003.

Fourth, the bill would establish a fund (called the Contingency Fund for State Welfare Programs) of $2.0 billion for use in fiscal years 1997–2001 by States with high and increasing unemployment rates or growth in food stamp caseloads.[1] CBO assumes that the contingency fund would continue in 2002 under the same terms. (The Balanced Budget and Emergency Deficit Control Act of 1985 requires that mandatory programs greater than $50 million are continued in the baseline.) A State could receive an annual maximum of 20 percent of its block grant amount if it was an eligible State in each month of the year. States would be required to match Federal payments at the current-law Federal medical assistance percentage. CBO estimates that States would draw down about $100 million from the contingency fund in 1997 and would use a little over $2 billion from the fund over the 1998–2002 period.

The bill would authorize the Secretary of HHS to make loans to States to use for welfare programs. States could borrow up to 10 percent of their family assistance grant and would have to repay borrowed amounts, with interest, within 3 years. Any State could

---

[1] A State that experiences an unemployment rate for the most recent quarter greater than or equal to 6.5 percent and 10 percent or more higher than the unemployment rate for either of the corresponding quarters in the 2 previous years would be eligible to draw from the contingency fund. Also, a State that experiences an increase in participation in the Food Stamp Program of at least 10 percent over the 1994 or 1995 participation (adjusted for the impact of this bill had it been in effect in those years) would be eligible. A State would be eligible in any month it meets these criteria and in the following month.

115

borrow from the loan fund in any year regardless of particular economic circumstances. CBO estimates the creation of the loan authority would not generate additional outlays. Although up to $1.7 billion would be made available to States for loans, CBO assumes that every State borrowing funds would repay its loans with interest. The Secretary has the authority to withhold any unpaid loan amount from future TANF block grant payments. Therefore, the program would involve no long-run loss to the Federal Government, and under the credit reform provisions of the Congressional Budget Act, it would have no cost.

The bill would provide additional Federal funds for a study by the Census Bureau ($10 million per year), research, evaluations, and national studies ($15 million per year), and grants for Indian tribes that received JOBS funds in 1995 ($7.6 million per year). Also, the bill would allow States that are operating demonstration projects under waivers to discontinue those projects. The States would not be required to pay the Federal Government for any accrued Federal costs of those waivers. CBO estimates this would cost the Federal Government $50 million in 1997. In addition, CBO has estimated that penalties of $50 million for failure to meet the bill's work participation requirements would be applied in each fiscal year 1999–2002. Finally, the bill would raise the amounts of money available to territories for assistance programs and provide greater flexibility in how the money is spent. The new $116 million cap on payments to the territories represents an increase of about $10 million over current-law amounts.

The bill would maintain the current-law Medicaid transitional benefits for individuals who would otherwise lose coverage due to increased child support or due to increased earnings from employment. The sunset date for the work transition benefit was extended from 1998 to 2001. In general, the bill retains categorical eligibility for Medicaid families that meet the current eligibility criteria for AFDC despite changes in welfare eligibility resulting from the new block grant program. The bill provides up to $500 million over the 1997–2000 period for additional administrative expenses associated with carrying out these eligibility determinations.

*Criteria for State participation in the block grant.*—To participate in the block grant program, States would present an assistance plan to the Department of Health and Human Services and would ensure that block grant funds would be spent only on needy families with minor children. States would be required to continue to spend some of their own resources in order to receive their full block grant allotment. The Federal grant would be reduced $1 for every dollar that State spending fell below 80 percent of historical State spending levels (75 percent of the historical level for any State that meets the bill's work participation requirements). In addition, States would have to satisfy other conditions. Notably, States would be prohibited from providing Federal dollars to most families who have received cash assistance for more than 5 years since the effective date of the block grant program (July 1, 1997, or earlier at State option). At their option, States could choose a shorter time limit and could grant hardship exemptions for up to 20 percent of all families. Although no family could encounter a 5-year time limit until October 1, 2001, the limit's effect on welfare

116

participation could be noticed sooner if recipients shortened their stays on welfare or delayed childbearing in order to preserve access to the system in future years. CBO estimates that the full effect of such a limit would not be realized until 2004 or later. Eventually, under current demographic assumptions, this provision could reduce cash assistance rolls by 30 percent to 40 percent. The actual effect of the time limit on families is uncertain, however, because the bill would permit States and localities to provide cash assistance to such groups using their own resources. The inclusion of the time limit in the legislation does not affect the CBO estimate of Federal costs because it would not directly change the amount of block grant funds disbursed to the States.

*Work and training requirements under the block grant.*—Title I would require States to provide work and training activities for an increasing percentage of recipients of Temporary Assistance to Needy Families (TANF) or face penalties of up to 5 percent of the State's share of the block grant. States would face three separate requirements, each becoming increasingly difficult to satisfy over time.

First, the bill requires that, in 1997, States have 25 percent of certain families receiving cash assistance in work activities. The participation rates rise by 5 percentage points a year through 2002. Participants would be required to work 20 hours a week through 1998, 25 hours in 1999, and 30 hours in 2000 and after. Families with no adult recipient or with a recipient experiencing a sanction for nonparticipation (for up to 3 months) are not included in the participation calculation. Families in which the youngest child is less than 1 year old would be exempt for up to 1 year at State option.

States would have to show on a monthly basis that individuals in 50 percent of all nonexempt families are participating in work activities in 2002. CBO estimates that this would require participation of 1.7 million families. By contrast, program data for 1994 indicate that, in an average month, approximately 450,000 individuals participated in the JOBS Program. (The bill limits the number of individuals in education and training programs that could be counted as participants, so many of these individuals would not qualify as participants under the new program.) Most States would be unlikely to satisfy this requirement for several reasons. The costs of administering such a large scale work and training program would be high, and Federal funding would be frozen at historic levels. CBO estimates that States would need to invest an additional $13 billion in 1997–2002 in order to administer programs that would satisfy the requirements. Because the payoff for such programs has been shown to be low in terms of reductions in the welfare caseload, States may be reluctant to commit their own funds to employment programs. Moreover, although States may succeed in reducing their caseloads through other measures, which would in turn free up Federal funds for training, the requirements would still be difficult to meet because the remaining caseload would likely consist of individuals who would be the most difficult and expensive to train.

Second, while tracking the work requirement for all families, States simultaneously would track a separate guideline for the

117

smaller number of nonexempt families with two parents participating in the AFDC–Unemployed Parent (AFDC–UP) Program. By 2002, the bill would require that 90 percent of such families have an adult participate in work-related activities at least 35 hours per week. In addition, if the family used Federal funds to pay for child care, the spouse would have to participate in work activities at least 20 hours per week. In 1994, States attempted to implement a requirement that 40 percent of AFDC–UP families participate, and roughly 40 States failed the requirement.

Finally, States would have to ensure that all parents who have received cash assistance for more than 2 years would engage in work activities. CBO estimates that approximately 70 percent of all parents on the cash assistance rolls in 2002 would have received such assistance for 2 years or more since the bill's effective date. The experience of the JOBS Program to date suggests that such a requirement is well outside the States' abilities to implement.

In sum, each work requirement would represent a significant challenge to States. Given the costs and administrative complexities involved, CBO assumes that most States would simply accept penalties rather than implement the requirements. Although the bill would authorize penalties of up to 5 percent of the block grant amount, CBO assumes—consistent with current practice—that the Secretary of Health and Human Services would impose small penalties (less than one-half of 1 percent of the block grant) on non-complying States.

*Effect of the block grant on the Food Stamp Program.*—CBO estimates that enactment of the block grant for family support would result in families receiving lower average cash payments relative to current law and consequently, higher food stamp benefits. Under current rules, each dollar lost in cash would increase a participating family's food stamp benefits by about 30 cents. CBO estimates the incomes of AFDC families would decline relative to current projections by $2.3 billion in 2002, generating a food stamp cost in that year of nearly $700 million. By 2002, the block grant amount is 10 percent lower than projections of Federal spending under current law on AFDC and related programs. For the purposes of determining food stamp costs, CBO assumes that by 2002 cash benefits funded by the block grant would be 10 percent lower than under current law. In addition, CBO assumes that by 2002 States—on average—would spend 15 percent less of their own funds on cash benefits than they would spend under current law. Should States decide to spend more or less than this amount, the costs of the Food Stamp Program would be smaller or greater than the estimate.

*Effect of the block grant on the foster care program.*—Although the bill does not directly amend foster care maintenance payments, which would remain an open-ended entitlement with State expenditures matched by the Federal Government, the bill could affect foster care spending. By retaining the foster care benefits as a matched entitlement, the bill would create an incentive for States to shift AFDC children who are also eligible for foster care benefits into the foster care program. AFDC administrative data for 1993 suggest that roughly 500,000 children (5 percent of all children on AFDC) fall into this category because they live in a household without a parent. CBO assumes a number of legal and financial bar-

118

riers would prevent States from transferring a large share of such children and estimates States would collect an additional $10 million in foster care payments in 1999, rising to $45 million in 2002.

*Effect of the block grant on the Medicaid Program.*—In general, the bill retains categorical eligibility for Medicaid families that meet the eligibility criteria for AFDC as they are in current law with some modifications. States must use AFDC income and resource standards and methodologies in effect on July 16, 1996, to determine Medicaid eligibility. As under current law, States have the option to lower income standards to May 1, 1988, levels or to increase income standards; however, these increases are limited to the annual increase in the Consumer Price Index (CPI). Unlike current law, States may increase resource standards (by no more than the annual increase in the CPI) and link eligibility to compliance with work requirements under TANF. Overall, CBO judges that there would be no significant budgetary effect of the block grant on the Medicaid Program.

### TITLE II: SUPPLEMENTAL SECURITY INCOME

The bulk of the savings in title II would stem from imposing tighter eligibility criteria for children seeking disability benefits under the Supplemental Security Income (SSI) Program. title II would also make a variety of other changes. It would reduce the amount of the benefit in the first month for new SSI applicants, require the disbursement of large retroactive payments in installments rather than in a single lump, and offer payments to prison officials who help to identify ineligible SSI recipients in their institutions. Net savings, which reflect additional food stamp spending, are estimated to equal $2.0 billion in 2002 and $8.6 billion over the 1997–2002 period (see table 2). A small amount of the savings ($5 million in 1997, $10 million in 1998, and $85 million over the 6-year period) occurs in the Old-Age, Survivors, and Disability Insurance Programs, and is excluded from the pay-as-you-go totals.

*Disabled children.*—The SSI Program, run by the Social Security Administration (SSA), pays benefits to certain low-income aged and disabled people. The bill would revamp the SSI Program for disabled children. Under current law, low-income children can qualify for the SSI Program and its Federal cash benefits of up to $470 a month in two ways. Their condition may match one of the medical listings (a catalog of specific impairments, with accompanying clinical findings), or they may be evaluated under an individualized functional assessment (IFA) that determines whether an unlisted impairment seriously limits a child from performing activities normal for his or her age. Both methods are spelled out in regulation. Until the Supreme Court's decision in the *Zebley* case in 1990, the medical listings were the sole path to eligibility for children. Adults, in contrast, could receive an assessment of their functional and vocational capacities even if they did not meet the listings. The court ruled that sole reliance on the listings did not satisfy the law's requirement to gauge whether children's disorders were of "comparable severity" to impairments that would disable adults.

The bill would eliminate childhood IFAs and their statutory underpinning, the "comparable severity" rule, as a basis for receipt of benefits. Many children on the rolls as a result of an IFA (roughly

119

a quarter of children now on SSI) would have their benefits terminated, and future awards based on an IFA would be barred. Thus, the program would be restricted to those who met or equaled the listings. The bill would also remove the reference to maladaptive behavior—behavior that is destructive to oneself, others, property, or animals—from the personal/behavioral domain of the medical regulations, thereby barring its consideration as a basis for award.

Even as it repeals the "comparable severity" language, the bill would create a new statutory definition of childhood disability. It States that a child would be considered disabled if he or she has "a medically determinable physical or mental impairment which results in marked and severe functional limitations (and can be expected to last 12 months or lead to death)." That language is intended to preserve SSI eligibility for some of the most severely impaired children who now qualify by way of an IFA because they do not happen to match one of the medical listings.

CBO estimated the savings from these changes by judging how many child recipients would likely qualify under the old and new criteria. CBO relied extensively on SSA program data and on analyses conducted by the General Accounting Office and the Inspector General of the Department of Health and Human Services. Approximately 1 million children now collect SSI benefits, and CBO projects that the number would reach 1.4 million in 2002 if policies were unchanged. CBO assumed that most children who qualify through an IFA would be rendered ineligible under the proposed criteria—specifically, those who fail to rate a "marked" or "extreme" impairment in at least two areas of functioning. CBO also assumes that the provisions on maladaptive behavior would bar a small percentage of children from eligibility for benefits. Overall, CBO judges that approximately 22 percent of children who would collect benefits under current law would be rendered ineligible.

CBO estimates the savings in cash benefits relative to current law by multiplying the number of children assumed to lose benefits by the average benefit. That average benefit was about $430 a month in December 1995 and—because it is indexed to inflation—would grow to an estimated $528 in 2002. New awards would be affected immediately. Children already on the rolls would be reviewed under the new criteria within 1 year of enactment. Total savings in cash benefits would equal $0.1 billion in 1997 and $2 billion in 2002.

The proposed cutbacks in children's SSI benefits would affect spending in two other Federal programs. Food stamp outlays would automatically increase to replace a portion of the cash income lost by the children's families. The extra food stamp costs exceed $.2 billion a year after 1998. Under current law, eligibility for SSI benefits generally confers eligibility for Medicaid as well. Once the reviews of children currently on the SSI rolls are finished, CBO estimates savings in Medicaid of roughly $40 million to $60 million a year from the tighter SSI criteria. That amount is relatively small, because most of the children dropped from SSI would still qualify for Medicaid based on meeting AFDC criteria or because of their poverty status. No effects on the TANF Program are included in CBO's estimate. Under current law, about half of the disabled children losing SSI benefits would be likely to end up on the AFDC

120

Program; but because that program would be abolished in title I and replaced by TANF, which is a fixed block grant to the States, no extra Federal spending would result.

The bill would make several other changes to the SSI Program for disabled children. One would set the benefit at $30 a month for children who are hospitalized and whose bill is partly or fully covered by private insurance. A similar provision already applies to SSI recipients who are hospitalized and whose care is covered by Medicaid. CBO assumes the proposal would trim benefits for about 10,000 children in a typical month, with savings of $55 to $70 million a year after 1997. The bill would also make a number of changes in the responsibility of representative payees (people who administer benefits for children or other recipients who are incapable of managing funds). CBO does not estimate significant budgetary effects from any of those changes. The bill also mandates several studies of disability issues.

SSA would face very heavy one-time costs for reviewing its current caseload of disabled children under the new, tighter criteria proposed in the bill. CBO estimates that SSA would have to collect detailed medical and functional information for 300,000 to 400,000 disabled children on the rolls at enactment, at a total cost of about $300 million. In addition, under restrictions proposed in title IV, SSA would have to review the continued eligibility of about 1.4 million recipients who are recorded as aliens or whose citizenship is unknown. Most of the cost would be incurred in 1997 and early 1998. For that reason, the bill allows an adjustment to the discretionary spending caps in the Balanced Budget Act to cover SSA's one-time costs. Specifically, the caps will be increased by up to $150 million in 1997 and $100 million in 1998 if the Congress passes appropriations earmarked for these reviews. Because that total adjustment of $250 million hinges on future appropriation action, CBO does not include it as a cost in this bill.

*Prorated benefits in month of application.*—More than 800,000 people are newly awarded SSI benefits every year. Under current law, they eventually receive a prorated benefit for their month of application. A person who applied on the 15th of the month, for example, could receive 2 weeks of benefits for that month. (The typical applicant does not get that money immediately, because it may take several months for SSA to process his or her application.) The bill proposes instead to compute benefits beginning on the first day of the month following the date of application. CBO estimated the savings by multiplying the annual volume of awards by an assumed loss of 2 weeks' benefits for the average person affected. The provision would affect only applications filed after enactment, and savings would equal $150 million a year or more when it is fully effective.

*Installment payments of retroactive benefits.*—Another provision of the bill would change the method for disbursing large amounts of retroactive benefits. Under current law, retroactive benefits—which occasionally amount to thousands of dollars, if the period they cover is a long one—are paid all at once. Under the bill, any retroactive payment that exceeded 12 times the maximum monthly benefit—about $5,600, in 1996 dollars—would be paid in installments at 6-month intervals, with each installment equaling up to

121

12 times the maximum benefit. Exemptions would be granted to recipients suffering from terminal illnesses or other special hardships. The vast majority of recipients would still get their retroactive benefits in a single check, but a minority (chiefly those whose awards were decided after long appeals) would get them in two or three installments. The proposal would save money principally in the first year. Based on the relatively small number of people who get very large retroactive payments, CBO estimated that about $200 million of payments would shift from 1997 into 1998. Savings after that would be much smaller.

*Enforcement of restrictions on prisoners' benefits.*—Current law sets strict limits on payment of SSI benefits to incarcerated people, and somewhat milder limits on such payments in the Old-Age, Survivors, and Disability Insurance (OASDI) Program. SSI recipients who are in prison for a full month—regardless of whether they are convicted—are to have their benefits suspended. OASDI recipients who have been convicted of an offense carrying a maximum sentence of 1 year or more are to have their benefits suspended. Those who are convicted of lesser crimes, and those who are in jail while awaiting trial, may still collect OASDI benefits. Currently, those provisions are enforced chiefly by an exchange of computerized data between the Social Security Administration and the Federal Bureau of Prisons, State prisons, and some county jails. According to SSA's Office of the Inspector General, agreements now cover roughly 73 percent of inmates—all Federal and State prisoners but only about 15 percent of county prisoners. Those agreements are voluntary and involve no payments to the institutions.

This bill proposes to compensate correctional institutions that provide data to SSA. It proposes to provide correctional institutions $400 if they report information to SSA that leads to identification of an ineligible SSI recipient within 30 days of incarceration, and $200 if they report within 30 to 90 days.

Information on prisoners who collect benefits is poor. Inmates may know or suspect that their benefits are illegal and thus hide them, and may misreport such crucial identifying information as Social Security numbers. For its estimate, CBO assumes that between 4 and 5 percent of inmates are collecting OASDI or SSI when they enter prison. That figure appears in a Justice Department survey of prisoners in 1991 and in a recent report by SSA's Office of Inspector General. CBO assumes that the recipient population consists roughly half-and-half of OASDI and SSI recipients. At any one time, about 70 percent of prisoners are in State or Federal prisons and the rest in county jails, where spells of incarceration are much shorter and turnover rates are very high.

The proposal would have two principal budgetary effects. First, the payments to prison officials would spark greater participation in matching agreements. CBO assumed that State prison officials—who now often let matching agreements lapse for several months at renewal—would renew them more promptly, that a majority of counties would sign up, and that data would be submitted with a shorter lag. From a budgetary standpoint, those changes would lead to savings in benefit payments and offsetting costs for the payments to penal institutions. The bill proposes that payments be made only to those institutions that assist in tagging ineligible SSI

122

recipients. Nevertheless, in the course of matching Social Security numbers and other identifying information, SSA would find that some of the inmates collect OASDI. Therefore, benefit savings in both Programs—SSI and OASDI—would result. Second, the proposal would add to the workload of SSA. Even if data are submitted electronically, SSA must follow up manually when it appears that an inmate may be receiving benefits. In many cases, SSA may find that the Social Security number is inaccurate or the inmate has already left the jail, leading to little or no saving in benefits from that particular investigation.

Because these provisions would first apply to prisoners whose periods of incarceration begin 7 months after enactment, CBO assumed that the provision would yield little benefit savings in fiscal year 1997. Thereafter, benefit savings would take another year or two to be fully realized as word spread among State and local correctional officials and as they became more attuned to the specific information (such as accurate Social Security numbers) they would need to provide. CBO assumes that SSA would start making payments (averaging $300) fairly soon to jurisdictions that already have matching agreements, and later to new jurisdictions that sign up. Over the 1997–2002 period, benefit savings are expected by CBO to equal $130 million and payments to jurisdictions to cost $30 million, for a net savings of $100 million; the OASDI component of the benefit savings is $85 million. SSA's extra administrative costs—which, in contrast to those two items, would require Congressional appropriation—are estimated at $70 million.

### TITLE III: CHILD SUPPORT ENFORCEMENT

Title III would change many aspects of the operation and financing of the Federal and State child support enforcement system. CBO estimates that relative to current law these changes would cost $25 million in fiscal year 1997 and $74 million in 2002 (see table 3). The key provisions of title III would mandate the use of new enforcement techniques with a potential to increase collections, eliminate a current $50 payment to welfare recipients for whom child support is collected, allow former public assistance recipients to keep a greater share of their child support collections, and authorize new spending on automated systems.

*New enforcement techniques.*—Based on reports on the performance of various enforcement strategies at the State level, CBO estimates that child support collections received for families on cash assistance in 2002 would increase under the bill by roughly 18 percent over current projections (from $3.6 billion to $4.2 billion). Most of the improvement would result from the creation of a new-hire registry (designed to speed the receipt of earnings information on noncustodial parents) and provisions that would expedite the process by which States seize the assets of noncustodial parents who are delinquent in their child support payments. Some States have already applied the proposed enforcement techniques, thereby reducing the potential for improving collections further. CBO projects that the additional collections would result in savings of roughly $320 million in 2002 to the Federal Government through shared child support collections, as well as reduced spending in food stamps and Medicaid.

123

*Lost AFDC collections due to reduced cases funded by the block grant.*-Similar to current law, the bill would require that States share with the Federal Government child support collected on behalf of families who receive cash assistance through the Temporary Assistance for Needy Families block grant. CBO assumes that by 2002, 20 percent of States would significantly reduce the number of families served under the block grant. CBO estimates that this reduction would reduce the Federal share of child support collections by $224 million in 2002. States that reduce the number of families served under the block grant may still provide benefits to those families using their own resources.

*Elimination of the $50 passthrough.*—Additional Federal savings would be generated by eliminating the current $50 passthrough. Under current law, amounts up to the first $50 in monthly child support collected are paid to the family receiving cash assistance without affecting the level of the welfare benefit. Thus, families for whom noncustodial parents contribute child support get as much as $50 more a month than do otherwise identical families for whom such contributions are not made. Under current law, eight States pay families on public assistance on whose behalf the State receives child support payments a supplemental payment ("gap payment") based on the amount of the support collected and a standard of need. The proposal would give these States the option of continuing to provide these additional benefits to families. CBO assumes States providing half of the supplemental payments would exercise the option. Eliminating the $50 child support passthrough beginning in 1997 while excluding gap payments from the new rules would save the Federal Government between $100 million and $165 million annually.

*Distribution of additional child support to former AFDC recipients.*—The provision would require States to share more child support collections with former recipients of public assistance, reducing Federal and State recoupment of prior benefit payments. When someone ceases to receive public assistance, States continue to collect and enforce the family's child support order. All amounts of child support collected on time are sent directly to the family. If a State collects past-due child support, however, it may either send the amount to the family or use the collection to reimburse itself and the Federal Government for past AFDC payments. The proposal would require States to send a larger share of arrearage collections to families. The new distribution rules would phase in starting in 1998, and States would have the option of applying the new distribution rules earlier. CBO estimates that this provision would cost the Federal Government $51 million in 1998 and $150 million in 2002.

*Hold States harmless for lower child support collections.*—A hold-harmless provision guarantees each State that its share of child support collections will not fall below the amount it retained in 1995. In general, CBO estimates that States would experience increases in child support collections as a result of this bill. The new distribution rule that allows former AFDC families to keep more support is the only provision that would reduce the States' share of support collections. However, the States' share of collections is based on the collections on behalf of families that receive assistance

124

through the TANF block grant. A State that has significantly fewer families served under the block grant than were served under the AFDC Program may experience lower collections. CBO assumes that 20 percent of States would make caseload reductions significant enough to trigger the hold-harmless provision, at a Federal cost of $29 million in 2002. States that reduce the number of families served under the block grant may still provide benefits to those families using their own resources.

*Optional modification of support orders.*—Under current law, a State is required to review the child support orders of recipients of public assistance every 3 years. If a review shows a significant change in the financial circumstances of a parent, the child support order is adjusted accordingly. Evaluations of pilot programs testing similar review and modification procedures found that such reviews raised both the average amounts of support orders and the average payments received. This bill makes review and modification a State option unless the family requests such a review. CBO assumes that 40 percent fewer reviews would be performed, resulting in an administrative savings of $5 million in 1997 and a cost, reflecting lower collections due to lower amounts of support orders, of $20 million by 2002.

*Additional provisions with budgetary implications.*—The bill would also increase Federal spending on several other activities including development, operation, and maintenance of automated data processing, technical assistance to States, reviews and audits, and grants to States for visitation. Federal spending for these other provisions would total $156 million in fiscal year 2002 and $1.2 billion over the 1997–2002 period.

## TITLE IV: NONCITIZENS

Title IV would limit the eligibility of legal aliens for public assistance programs. It would explicitly make most immigrants ineligible for SSI and food stamp benefits. Significant savings would also be realized in two other programs—Medicaid and the earned income credit. Overall, the provisions of title IV are estimated to reduce the deficit by $1.2 billion in 1997 and by $5.1 billion in 2002 (see table 4).

*Supplemental security income.*—In general, legal aliens are now eligible for SSI and other benefits administered by the Federal Government. Few aliens, other than refugees, collect SSI during their first few years in the United States, because administrators must deem a portion of a sponsor's income to the alien during that period when determining the alien's eligibility. The bill would eliminate SSI benefits altogether for most legal aliens. Exceptions would be made for groups that together make up about one-quarter of aliens on the SSI rolls: refugees who have been in the country for less than 5 years, aliens who have a solid work history in the United States (as evidenced by 40 or more quarters of employment covered by Social Security), and veterans or active-duty members of the U.S. military. All other legal aliens now on SSI would be reviewed within 1 year and removed from the rolls.

CBO bases its estimate of savings on administrative records for the SSI Program. Those data suggested that there were about 785,000 noncitizen beneficiaries in December 1995, or 13 percent of

125

all recipients of Federal SSI payments in that month, and that their numbers might be expected to climb in the absence of a change in policy. Those records, though, are of uncertain quality. They rarely reflect changes in citizenship status (such as naturalization) that may have occurred since the recipient first began collecting benefits. It has not been important for government agencies to keep citizenship status up to date so long as they have verified that the recipient is legally eligible. That problem is thought to be common to all programs but particularly acute for SSI, where some beneficiaries identified as aliens have been on the rolls for many years. Recognizing this problem, CBO assumes that 15 percent of SSI beneficiaries recorded as aliens are in fact naturalized citizens.

CBO estimates the number of noncitizen recipients who would be removed from the SSI rolls by projecting the future caseload in the absence of policy change and subtracting the groups (chiefly certain refugees and Social Security recipients) exempted under the bill. CBO then assumes that some of the remainder will be spurred to become naturalized. The rest, estimated by CBO at approximately one-half million legal aliens, would be cut from the SSI rolls. Multiplying by the average benefits paid to such aliens—assumed to equal nearly $400 a month in 1997, with subsequent cost-of-living adjustments—yields annual Federal budgetary savings of between $2 billion and $3 billion 1 year after 1997.

These estimates, and other CBO estimates concerning legal aliens, are rife with uncertainties. First, administrative data in all programs are of uncertain quality. Citizenship status is not recorded at all for about 8 percent of SSI recipients, and—as previously noted—some persons coded as aliens are certainly naturalized citizens by now. Second, it is hard to judge how many more noncitizens would react to the legislation by becoming citizens. At least 80 percent of legal aliens now on the SSI rolls are eligible to become citizens; the fact that they have not been naturalized may be attributable, in part, to the lack of a strong financial incentive. After all, legal immigrants are not now barred from most jobs, from eligibility for benefits, or from most other privileges except voting. Because the naturalization process takes time and effort, CBO assumes that only about one-third of those whose benefits would otherwise be eliminated will become citizens by the year 2000.

*Food stamps.*—The bill proposes the same curbs on food stamp payments to legal aliens as on SSI. Therefore, aliens could not receive food stamps unless they fell in one of the exempted groups—chiefly refugees who have been here for less than 5 years or aliens with substantial work (defined as 40 quarters) in the United States.

CBO assumes that, under current policies, the number of legal aliens receiving food stamp benefits would climb gradually from about 1.8 million now to 2 million in 2002. Around 800,000 would fall in one of the exempt categories. The rest would lose benefits unless they became naturalized. Again, CBO assumed that some of the aliens targeted for the cutoff would be spurred to become citizens. Savings of about $0.6 billion to $0.7 billion 1 year after 1997 would result.

126

*Medicaid.*—Unlike SSI and food stamps, the bill does not call for a mass cutoff of aliens from the Medicaid Program. Instead, it calls for tight restrictions on the eligibility of future immigrants for Medicaid for at least their first 5 years in the United States, but it leaves the coverage of most aliens already here to the option of the States.

The bill forbids States to provide regular Medicaid coverage to future entrants (except refugees) for their first 5 years. New deeming requirements in all means-tested programs would bar most future immigrants with financial sponsors from Medicaid for even longer—until they work for 40 quarters or until they are naturalized. Medicaid coverage for aliens currently residing in the United States would be at the States' option. CBO assumes that States would continue to cover many of these immigrants, because they would otherwise lose Federal Medicaid matching dollars for their care. The bill preserves Medicaid coverage for emergency medical services for all legal immigrants.

A number of legal immigrants currently residing in the United States would lose Medicaid under the bill because they have been eliminated from receiving SSI cash benefits and cannot qualify for Medicaid under any other eligibility category. However, CBO assumed that most disabled and about half of the aged would retain Medicaid under State medically needy programs. In total, CBO assumed that nearly 300,000 aliens would lose their eligibility for Medicaid in 1998 (when the reviews of aliens on the SSI Program have been completed) and that the number would more than double by 2002. CBO estimated the resulting savings by multiplying the number of people losing benefits times the assumed average benefit times the Federal share. That per-capita Federal cost is assumed to be more than $5,000 in 2002 for an average aged or disabled alien, and between $1,000 and $2,000 for a child or a non-disabled adult. CBO reduced the resulting savings by one-third, because the bill explicitly continues coverage for emergency medical care for legal aliens and because other services for aliens may be covered through increases in Medicaid's payments for uncompensated care. Total savings in Federal Medicaid costs are estimated at $0.1 billion in 1997 and $1.5 billion in 2002.

*Other direct spending programs.*—The foster care program, student loans for postsecondary students, and the child nutrition program would be exempt from any of the restrictions on benefits to legal aliens. title IV is silent on the eligibility for child nutrition programs of schoolchildren who are illegal aliens. However, another provision of the bill—section 742 in title VII—specifically States that the school breakfast and school lunch programs shall continue to administered without regard to students' immigration or citizenship status. Therefore, CBO estimates no savings from restrictions on aliens' eligibility in any of these programs.

*Earned income credit.*—The bill would deny eligibility for the earned income credit (EIC) to workers who are not authorized to be employed in the United States. In practice, that provision would require valid Social Security numbers (SSNs) to be filed for the primary and secondary taxpayers on returns that claim the EIC, and would permit the Internal Revenue Service to apply the streamlined rules it already uses for mathematical or clerical errors to

127

claims that lack valid SSNs. A similar provision was contained in President Clinton's 1997 budget proposal and in last fall's reconciliation bill. The Joint Committee on Taxation (JCT) estimates that the provision would reduce the deficit by approximately $0.3 billion a year.

### TITLE V: CHILD PROTECTION

Title V would extend the enhanced match for the purchase of computer equipment for foster care data collection systems. Under current law, the Federal match for these types of purchases is 75 percent through the end of fiscal year 1996 and will decrease to 50 percent beginning in fiscal year 1997. This provision would continue the 75-percent match for one more year through the end of fiscal year 1997. CBO estimates that this change would increase budget authority by $80 million in fiscal year 1997 and outlays by $66 million in 1997 and $14 million in 1998 (see table 5). This estimate was developed in consultation with analysts at the Department of Health and Human Services and is based on States' estimates of their expenditures under current law and expectations of increased spending if the higher match rate were extended.

title V would also appropriate $6 million a year for fiscal years 1996 through 2002 for a national random sample study of child welfare, increasing direct spending by $37 million over that period. The study would be conducted by the Secretary of Health and Human Services and would track abused or neglected children as they move through States' child welfare systems.

### TITLE VI: CHILD CARE

Title VI would create a new mandatory block grant to States for the provision of child care to low-income people. Individual States would be entitled to the amount they received for AFDC Work-Related Child Care, Transitional Child Care, and At-Risk Child Care in 1994, 1995, or the average of 1992–94, whichever is greatest. States that maintain the higher of their 1994 or 1995 spending on these programs would be able to draw down an additional amount at the Medicaid match rate. Further, the title would allow funds to be redistributed to States that have higher child care needs.

The budget authority for this block grant, as Stated in the bill, would be $1.967 billion in fiscal year 1997 and would total $13.9 billion over the 1997–2002 period. CBO estimates that States would not draw down all of this money and that outlays for the 1997–2002 period would be $12.8 billion (see table 6). CBO assumes that the block grant would not be completely drawn down for several reasons. The block grant levels are over $4 billion, or nearly 50 percent, higher than what would be spent on the child care programs they are replacing. Discussions with State officials and national experts in the field, as well as an examination of how much States would be able to increase spending on working poor families, pointed to CBO's conclusion that States would not be able to use all of the child care money.

The net impact of repealing current law child care programs (in title I) and creating a new block grant under this title would be to

increase Federal outlays by $0.3 billion in 1997 and $3.5 billion over the 1997–2002 period.

### TITLE VII: CHILD NUTRITION PROGRAMS

CBO estimates that provisions in title VII that affect child nutrition programs would lower Federal outlays by $128 million in fiscal year 1997, $670 million in fiscal year 2002, and $2.85 billion over the 1997–2002 period relative to current law (see table 7).

*Special assistance.*—The bill would allow all schools that participate in the school lunch and breakfast programs under a provision that allows them to offer all meals free in exchange for collecting applications less frequently to participate for 5 years at a time without a redetermination rather than 3 years at a time. Currently only schools that were participating at the time of the 1994 reauthorization of the programs can participate under these terms. CBO assumes that this change would make participation under such terms slightly more attractive to schools and would cost $1 million a year in each of fiscal years 1999 through 2002.

*Rounding rules.*—The bill would also change the rounding rules for annual inflation adjustments in the reimbursement rates for meals served to children who pay full price in the school lunch and breakfast programs and the center component of the child and adult care food program. Under current law, the rates are rounded to the nearest quarter cent. Under the bill, the rates for paying children would be rounded down to the nearest whole cent. The change would be effective on July 1, 1997. CBO estimates the provisions would lower Federal outlays for child nutrition programs by $1 million in 1997 and $15 million in 2002.

*Summer food service program for children.*—Section 706 would reduce reimbursement rates for the summer food service program to $1.97 for lunches, $1.13 for breakfasts, and $0.46 for supplements. These rates would be adjusted for inflation on January 1, 1997, and would first become effective in the summer of 1997. Rates would be rounded to the lower cent, rather than the nearest quarter cent, in the calculation of the annual adjustment for inflation. Under current law, CBO projects the summer 1997 rates would be $2.22 for lunches, $1.24 for breakfasts, and $0.58 for supplements. CBO estimates these provisions would save $19 million in 1997 and $39 million in 2002.

*Child and adult care food program.*—Section 708 would restructure the family day care home component of the child and adult care food program and would thereby save $80 million in 1997 and $565 million in 2002. Currently, meals served in family day care homes all receive the same reimbursement rates: $1.575 for lunches, $0.8625 for breakfasts, and $0.470 for supplements, from July 1996 to June 1997. The bill would create two tiers of reimbursement rates. The first tier would apply to homes that are located in an area in which at least 50 percent of the children are from households whose incomes are below 130 percent of poverty, or are operated by a provider whose household income is less than 130 percent of poverty. Rates for tier I homes would be the same as current law rates, except the rates would be rounded down each year to the lower cent, rather than to the nearest quarter cent. All other homes would receive a lower, tier II rate—$0.95 for lunch,

129

$0.27 for breakfast, and $0.13 for supplements. These rates would be adjusted annually (beginning July 1, 1997) and rounded down to the lower cent. Homes in tier II would be able to claim the tier I rates for any children who are from families with incomes below 130 percent of poverty. CBO estimates that 35 percent of meals would be reimbursed at the higher, tier I rates, and that somewhat fewer meals would be served in the program because of the reduction in rates for most meals. In addition, the bill would provide grants to States in 1997 for training and other assistance to sponsoring organizations and homes in implementing the new provisions.

Section 708 would also limit to three the number of meals that can be reimbursed in a given day in eligible child care centers. CBO estimates savings of $10 million in 1997 and $20 million in 2002 from this change.

In total, CBO estimates savings of $90 million in 1997 and $585 million in 2002 from changes in the child and adult care food program.

*School breakfast program authorization.*—Section 723 of the bill would eliminate funding for school breakfast startup grants under the Child Nutrition Act starting in fiscal year 1997. Startup grants are currently funded at $5 million a year through fiscal year 1997, $6 million in fiscal year 1998, and $7 million in fiscal year 1999. Funds are to be used for assisting schools and other institutions in initiating and expanding school breakfast programs and summer food service programs. In addition, CBO estimates that repealing the money for startup grants would result in fewer meals served over the period. The savings from fewer meals would be $3 million in 1997 and $22 million in 2002.

*Nutrition education and training.*—Section 731 would shift funding for nutrition education and training to be a discretionary appropriation rather than mandatory spending. CBO estimates $10 million each year in direct spending savings starting in fiscal year 1997.

*Noncitizens served in child nutrition programs.*—Section 742 provides that if an individual is eligible to receive public education in a State, assistance under the National School Lunch Act and the Child Nutrition Act shall not be contingent on citizenship or immigration status. This section conflicts with a general provision in title IV of the bill which could eliminate eligibility for means-tested child nutrition programs for undocumented noncitizens. CBO estimates that there would be no savings from the provision of title IV because this provision would supersede it.

## TITLE VIII: FOOD STAMPS AND COMMODITY DISTRIBUTION

CBO estimates that changes to food stamps in title VIII of the bill would reduce Federal outlays by $1.8 billion in 1997, $5.0 billion in 2002, and $23.1 billion over the 1997–2002 period relative to current law (see table 8). The following paragraphs describe the savings attributable to specific provisions.

*Treatment of children living at home.*—Under current law, members of households who purchase food and prepare meals together must generally participate in the program as part of the same food stamp unit. In addition, certain people, such as spouses who live

130

together, are required to participate in the same unit. The bill would change the definition of household by removing the exception in current law that allows persons age 21 and under who are themselves parents or married, and who live with a parent, to participates a separate household. This change would lower food stamp benefits because income and resources of the household members who are not now in the food stamp unit would be counted. CBO estimates that the change would affect about 150,000 current food stamp households and would reduce food stamp outlays by $115 million in 1997 and $290 million in 2002.

*Adjustment of thrifty food plan.*—Section 804 of the bill would reduce the maximum food stamp benefit relative to current law. Under current law, maximum benefits are set each October at 103 percent of the cost of the thrifty food plan—a specific low-cost diet for a family of four. For fiscal year 1996, maximum benefits are $397 a month for a family of four. The bill would set maximum benefits at 100 percent of the thrifty food plan beginning with the October 1996 adjustment, but would not allow the nominal maximum benefit to decline from fiscal year 1996 to fiscal year 1997. The change would lower average food stamp benefits (compared with current law) by about $3 per person a month in 1997. CBO estimates that food stamp outlays would decrease by $935 million in 1997 and $1.2 billion in 2002 as a result of this change.

*Earnings of older students.*—Under current law, earned income of household members who are elementary or secondary school students and are 21 years old or younger is disregarded in the consideration of income for food stamps. Section 807 would lower the cutoff to age 17. CBO estimates that this change would lower spending for food stamps by $10 million in fiscal year 1997 and $15 million in 2002.

*Energy assistance.*—Under this legislation, energy assistance from nonFederal sources would be counted as income in determining food stamp benefits; currently, no energy assistance is counted as income. A handful of States currently provide part of their AFDC or General Assistance benefit as a separate energy assistance payment, which is disregarded in the calculation of food stamp benefits. CBO estimates that a $1 increase in countable income to a food stamp household results in about a 30-cent reduction in food stamp benefits. In the 9 States that currently make separate energy assistance payments, the payments range from about $15 a month to $120 a month. CBO estimates that counting these State energy assistance payments as income would save $125 million in food stamp benefits in 1997 and $180 million in 2002.

*Deductions from income.*—Section 809 of the bill would set the standard deduction in most States at $134 for fiscal year 1997 and later years. Under current law, the standard deduction is to be adjusted annually to reflect changes in the Consumer Price Index (CPI). CBO estimates that the level of the standard deduction would be $8 below current law in fiscal year 1997 and $30 below current law in 2002. The corresponding savings from the reduction in the standard deduction would be $345 million in 1997, rising to $1.5 billion in 2002. This amount corresponds to an average decrease in monthly benefits, relative to current law, of $1 per person in 1997 and about $4 per person by 2002.

131

The 1997 Agriculture Appropriations Act froze the standard deduction in food stamps for fiscal year 1997 at $134, the same level as is set by this bill. Because that bill passed both houses of Congress before the Personal Responsibility and Work Opportunity Reconciliation Act, CBO does not include any savings for fiscal year 1997 from the freeze of the standard deduction in its estimate of this bill.

Section 809 would also retain the cap on the excess shelter expense deduction. In determining food stamp benefits, shelter costs are deducted to the extent that they exceed 50 percent of net income after all other deductions. Under current law the excess shelter deduction is capped at $247 through December 1996, when the cap expires. This bill would extend the cap at $250 for the remainder of fiscal year 1997 and fiscal year 1998, $275 for fiscal years 1999 and 2000, and $300 for each later fiscal year. CBO estimates savings of $350 million in fiscal year 1997 and $500 to $550 million in each later year from this change.

The bill would allow States to require the use of a standard utility allowance for determining utility costs counted toward the shelter deduction, rather than allowing recipients to use actual utility costs, if higher, as under current law. In States that do not require the use of a standard utility allowance, households would be allowed to change between the standard utility allowance and actual costs only at recertification, rather than at one additional time during a certification period. CBO estimates that States representing half of total food stamp outlays would choose to adopt a mandatory standard utility allowance. These provisions would lower food stamp outlays by $35 million in 1997 and $85 million in 2002.

The bill also would require States to establish a standard homeless shelter deduction of $143 or less per month for homeless households that do not receive free shelter throughout the month. Currently, homeless households claim a standard shelter expense amount set by the State, or actual shelter expenses, if higher. CBO estimates that the provision would save $5 million a year by 2002.

*Vehicle allowance.*—Section 810 would freeze the vehicle allowance at $4,650 for fiscal years beginning with fiscal year 1997. Under current law, the fair market value of vehicles is counted as an asset in determining food stamp eligibility when the value is more than $4,600. This figure is scheduled to increase to an estimated $5,150 for fiscal year 1997 and to increase in each succeeding year for inflation. CBO estimates that freezing the vehicle allowance at $4,650 would reduce food stamp outlays by $45 million in 1997 and $245 million in 2002.

*Vendor payments for transitional housing counted as income.*—Housing assistance payments made to a third party on behalf of a household that resides in transitional housing for the homeless are not now counted as income. Section 811 would delete this exclusion. CBO estimates savings of $10 million a year as a result of the change.

*Disqualification, comparable treatment for disqualification, permanent disqualification for participating in two or more States, and failure to comply with other welfare and public assistance programs.*—Four sections of the bill would change the penalties associated with noncompliance with public assistance requirements. Sec-

132

tion 815 would increase the penalties and revise sanctions for individuals and households that fail to comply with work rules. CBO estimates the longer periods of disqualification for people found to have not complied with work requirements would save $5 million a year.

Section 819 would allow States to disqualify an individual from food stamps if the individual is disqualified from another public assistance program for failing to perform a required action under that program. For example, if an individual is disqualified from AFDC for failure to have a child immunized under a State's welfare reform initiative, the individual could also be disqualified from food stamps. CBO estimates that this provision would save $20 million a year from 1997 through 2001 and $25 million in 2002.

Section 820 would permanently disqualify from food stamps any individual who is found to have participated fraudulently in the Food Stamp Program simultaneously in two or more States. Under current law, an individual is disqualified from food stamps permanently only after the third violation and faces periods of ineligibility for the first and second violation. CBO estimates that the provision would save approximately $5 million a year.

Section 829 would prohibit food stamp benefits from increasing if benefits are reduced under another public assistance program for the failure to perform an action required under that program. In addition, the State agency could reduce the food stamp allotment by up to 25 percent. CBO estimates the provision would save $25 million a year.

*Employment and training.*—The 1996 farm bill (Public Law 104–127) provided funding for grants to States for food stamp employment and training at $75 million for each fiscal year through 2002. Section 817 would fund the program at higher levels in each fiscal year. CBO estimates costs of $2 million in fiscal year 1997 and $15 million in 2002 from the change.

*Food stamp eligibility.*—Under current law, if a household has a member who is not eligible for food stamps on the basis of his or her citizenship status, the income of that person is prorated, and only a portion of it is counted toward the food stamp benefit. Section 818 would give States the option to count all of the ineligible person's income. CBO assumes that one-quarter of the States would elect this option and that food stamp spending would be lowered by $15 million in 1997 and $27 million in 2002.

*Cooperation with child support agencies.*—Two sections of the bill would address the relationship between the child support enforcement system and individuals who receive food stamps. Section 822 would allow States to require custodial parents to cooperate in child support enforcement as a condition for food stamp eligibility. Requiring custodial parents to participate in child support enforcement affects only custodial parents who receive food stamps but not AFDC because AFDC recipients are already required to comply with child support enforcement. Based on a recent study published by the Food and Consumer Service, CBO estimates that the Food Stamp Program would save money because some recipients would receive more income from child support, a few additional people would choose not to participate in the program, and some participants would have their benefits reduced for noncompliance. Be-

133

cause of the administrative costs of finding noncustodial parents and obtaining and enforcing child support orders, much of the food stamp savings would be offset by costs in the child support enforcement system. These costs are shared by States and the Federal Government. In 2000, when the provision would be fully implemented, CBO estimates that States with 25 percent of the food stamp caseload would opt to implement the provision, outlays for food stamps would be $20 million lower, and Federal outlays for child support enforcement would be $15 million higher.

Section 823 would allow States to eliminate food stamp eligibility for noncustodial parents who are delinquent in payment of child support. CBO estimates that States with 50 percent of the caseload would choose to deny food stamp eligibility to individuals in arrears on child support payments. This change would eliminate 25,000 people from the program and save $30 million annually by 2002.

*Work requirement.*—Section 824 would limit receipt of food stamp benefits to a period of 3 months in any 36-month period for able-bodied individuals who do not have dependent children and who are not working or participating in an appropriate training or work activity. Based on the Food Stamp Quality Control (QC) data, the Survey of Income and Program Participation (SIPP), and studies of caseload dynamics, CBO estimates that approximately 1.1 million people would potentially be subject to disqualification in an average month.

The bill allows for a number of waivers and exemptions from the 3-month restriction. First, if the Secretary of Agriculture determines that an area has an unemployment rate greater than 10 percent or has insufficient jobs, the area could receive a waiver from the provision. CBO estimates that 2 percent of people who would otherwise be disqualified because of the provision would live in areas under a waiver. Second, an individual could reestablish eligibility for another 3-month period after a month of working or participating in an allowable employment or training program. CBO estimates that about 30,000 people in an average month would be in a subsequent period of eligibility within the 36-month period. Furthermore, CBO assumes that States would dedicate their food stamp employment and training efforts toward people who would otherwise be disqualified and would serve over 140,000 individuals in an average month. After these exclusions, the provision would remove an estimated 800,000 individuals from the rolls in an average month in fiscal year 1998 and up to 1 million individuals in an average month once the provision is implemented fully, resulting in savings of $160 million in food stamp benefits in 1997 and $1.1 billion in 2002.

*Minimum allotment.*—Food stamp households with one or two persons who are eligible for less than $10 a month receive a minimum allotment of $10. This minimum allotment is currently adjusted each October to reflect the change in the cost of the thrifty food plan, with the result rounded to the nearest $5. Under CBO's economic forecast, the minimum benefit would rise to $15 in 1998. Section 826 would remove the inflation adjustment and keep the minimum benefit at $10. CBO estimates that retaining a $10 minimum benefit would save $30 million in each of fiscal years 1998 to 2000 and $35 million in 2001 and 2002.

134

*Benefits on recertification.*—Current law allows food stamp households that fail to complete recertification requirements in the last month of a certification period to receive full benefits in the following month if they are certified eligible by the end of the first month of the subsequent certification period. Section 827 would prorate benefits for the first month of the new certification period based on the date on which the household is determined to be eligible. CBO estimates this change would save $25 million a year in 1997 through 2000 and $30 million in 2001 and 2002.

*Income, eligibility, and immigration status verification systems.*—Section 840 would grant States a greater degree of flexibility in the types of verification systems they use, resulting in $5 million a year in estimated savings.

*Collection of overissuances.*—Section 844 would amend the procedures for collecting claims and would save money in four ways. First, CBO estimates savings of $5 million a year from mandating States to use the Internal Revenue Service tax offset procedures. Second, allowing States to recoup benefits to collect overpayments resulting from errors by State agencies would save another $5 million a year. Third, allowing for garnishing of Federal pay in instances of food stamp overissuance would save $1 million a year once it is fully implemented but $5 million in fiscal years 1998 and 1999 because the provision would affect a backlog of overissuances.

Fourth, the bill would change claims retention rates to allow States to retain 35 percent of all claims collected from overissuances due to fraud and 20 percent for other types of collections, except for collections from claims resulting from State agency error. Under this policy the Federal Government would receive a larger portion of claims collections and States would retain less. This change would result in additional estimated savings to the Federal Government of about $15 million in 1997 through 2001 and $20 million in 2002.

*Limitation of Federal match for optional information activities.*—Section 847 would end the Federal match of administrative funds spent on informational activities. Based on information from the Food and Consumer Service, CBO estimates that $2 million a year would otherwise be spent on these activities.

*Work supplementation or support program.*—Section 849 would allow States to use the amount of food stamp benefits that would otherwise be provided to a household to subsidize employers in hiring and employing public assistance recipients for up to 1 year for any given recipient. CBO estimates that the Federal Government would incur additional costs from this provision, because research has demonstrated that persons participating in grant diversion programs receive public assistance for longer periods of time. Based on the interest of States in work supplementation programs in the JOBS Program, CBO assumes that about 20,000 additional people would participate in a work supplementation program in any given month once the provision is implemented fully. CBO estimates that food stamp outlays would be higher by $30 million in 2000, when the programs would be fully implemented.

*Employment initiatives program.*—Section 852 would allow States where half or more of the food stamp households in the summer of 1993 were also AFDC recipients to pay benefits in cash to

135

households that also receive benefits from AFDC or Temporary Assistance for Needy Families and have a member who is employed. Based on recent studies of cash-out demonstrations, CBO estimates that issuing food stamps as cash saves about $1 a month relative to coupon issuance. Furthermore, based on QC data, CBO estimates that 10 States would be eligible to participate based on the proportion of their caseload that was also receiving AFDC benefits in the summer of 1993, and that these States would have about 300,000 households eligible for cash benefits under the policy. CBO anticipates that States with half of the households eligible for cash benefits would choose to provide benefits in cash, and that total savings would be $2 million a year once the provision is phased in.

*Simplified Food Stamp Program.* Section 854 would give States the option of simplifying Food Stamp Program rules, within certain limits, for families that receive assistance under AFDC or TANF. The bill stipulates that the Secretary of Agriculture could approve a State plan for a simplified program only if the State documents that the plan would not increase Federal costs. CBO cannot determine how many States would apply to use simplified rules or what the Secretary's criteria for approving such plans would be. Because there is no mechanism for States to reimburse the Federal Government if costs are higher than under current rules, and because there is a lag between when such costs occur and when corrective action is taken, CBO estimates that the provision would entail some costs. CBO estimates higher food stamp outlays of $5 million in fiscal year 1998 and $25 million in fiscal year 2002.

*Emergency Food Assistance Program.*—The Emergency Food Assistance Program is currently subject to annual appropriation. Section 871 of the bill would create an entitlement to States for their portion of the program and would fund it at $100 million a year.

*Interactions among provisions.*—The estimates of individual provisions shown in table 8 do not reflect the effects of other provisions in the title. If the bill were enacted, total savings would be less than the sum of the estimates of individual provisions. For example, savings attributed to lower maximum benefits, a lower standard deduction, and the reinStatement of the cap on the excess shelter deduction—which are estimated based on food stamp participation under current law—would not be achieved for people who would lose their benefits because of the work requirements. CBO estimates that the interactions among overlapping provisions in title VIII would reduce savings relative to the sum of the independent estimates by $20 million in 1997 and $166 million in 2002.

TITLE IX: MISCELLANEOUS

This title of the bill includes reductions in the Social Services Block Grant and the earned income credit to achieve total budget savings (including the revenue effect) of $0.6 billion in 1997 and $3.9 billion during the 1997–2002 period (see table 9).

*Reduction in Social Services Block Grant.*—Under title XX of the Social Security Act, funds in the form of a block grant are made available to States for them to provide a variety of social services to low-income families and individuals. Among the services covered are home-based services (such as homemaker, home health, and home maintenance), day care for children and adults, special serv-

136

ices for the disabled, social support, prevention and intervention services, family planning, as well as many other services. The Social Services Block Grant has a permanent authorization of $2.8 billion. title IX would reduce this amount by 15 percent, resulting in outlay savings of $375 million in 1997 and $2.5 billion over 6 years.

*Earned Income Credit.*—The earned income credit (EIC) is a refundable tax credit directed toward low-income workers. The refundable portion of the credit has estimated outlays of $18.4 billion in 1996. Under current law, income tax filers with two or more children are eligible for an EIC of 40 percent of earnings in 1996 with a maximum credit of $3,556. The credit is phased out based on the maximum of earnings or adjusted gross income over the range from $11,610 to $28,495. The maximum credit for a return with one child is $2,152, and it is phased out at incomes between $11,610 and $25,078. Finally, a maximum credit of $323 is available for filers without children and is phased out over the $5,280–$9,500 range. title IX contains two changes to the EIC.

Section 909 would require that the EIC be denied in cases where the tax filer had disqualified income. Under current law, tax filers with more than $2,350 in taxable investment income are disqualified from the use of the EIC. The bill would lower the limit to $2,200 and would expand the definition of investment income to include positive capital gains and passive income. This change, which would be effective for tax years beginning after December 31, 1995, would reduce outlays by $170 million in 1997 and $947 million over the 1997–2002 period. The corresponding revenue increases are $26 million and $151 million, respectively.

Section 910 would modify the definition of adjusted gross income (AGI) for the calculation of the EIC. Certain losses—such as from nonbusiness rent and royalties, capital losses, and other business or investment losses—would not be allowed in modified AGI for the calculation of the EIC. Outlays for the refundable component of the EIC would be reduced by $98 million in 1997 and $704 million over 6 years. Revenues would be higher by $15 million in 1997 and by $128 million over the 1997–2002 period.

Because of interactions between the various EIC provisions, including those in title IV and title IX, the total estimated effects of the changes to the EIC differs from the sum of the individual estimates over 6 years.

*Abstinence Education.*—Subtitle D of title IX would amend the Social Security Act to authorize grants to States for the purpose of providing abstinence education, which is defined as an educational or motivational program which "has as its exclusive purpose, teaching the social, psychological, and health gains to be realized by abstaining from sexual activity." The bill would provide $50 million in budget authority for these activities in each of the fiscal years 1998 through 2002. The funds would be distributed among the States according to the proportion of children in each State. CBO estimates that outlays of $18 million in 1998 and $203 million through 2002 would result.

137

SUMMARY TABLE I.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996, As passed by the Congress

Assumes enactment by September 1, 1996

(By fiscal year, in millions of dollars)

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|---|
| **Projected Direct Spending Under Current Law:** | | | | | | | | | |
| Family Support Payments [1] | $18,086 | $18,371 | $18,805 | $19,307 | $19,935 | $20,557 | $21,245 | $21,937 | |
| Food Stamp Program [2] | 25,554 | 26,220 | 28,094 | 29,702 | 31,092 | 32,476 | 33,847 | 35,283 | |
| Supplemental Security Income | 24,510 | 24,017 | 27,904 | 30,210 | 32,576 | 37,995 | 34,515 | 40,348 | |
| Medicaid | 89,070 | 95,786 | 105,081 | 115,438 | 126,366 | 138,154 | 151,512 | 166,444 | |
| Child Nutrition [3] | 7,899 | 8,428 | 8,898 | 9,450 | 10,012 | 10,580 | 11,166 | 11,767 | |
| Old-Age, Survivors and Disability Insurance | 333,273 | 348,186 | 365,403 | 383,402 | 402,351 | 422,412 | 444,081 | 466,767 | |
| Foster Care [4] | 3,282 | 3,840 | 4,285 | 4,687 | 5,083 | 5,506 | 5,960 | 6,433 | |
| Social Services Block Grant | 2,797 | 2,880 | 3,010 | 3,050 | 3,000 | 2,920 | 2,870 | 2,840 | |
| Earned Income Credit | 15,244 | 18,440 | 20,191 | 20,894 | 21,691 | 22,586 | 23,412 | 24,157 | |
| Maternal and Child Health | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Total | 519,715 | 546,168 | 581,671 | 616,140 | 652,106 | 693,186 | 728,608 | 775,976 | |
| **Proposed Changes:** | | | | | | | | | |
| Family Support Payments [1] | 0 | * | 875 | 900 | 907 | 777 | 471 | −131 | 3,800 |
| Food Stamp Program [2] | 0 | * | −2,098 | −3,949 | −4,139 | −4,209 | −4,349 | −4,583 | −23,330 |
| Supplemental Security Income | 0 | * | −793 | −3,526 | −4,280 | −4,824 | −4,344 | −4,958 | −22,725 |
| Medicaid | 0 | 0 | −38 | −514 | −567 | −581 | −948 | −1,433 | −4,082 |
| Child Nutrition [3] | 0 | * | −128 | −403 | −494 | −553 | −605 | −670 | −2,853 |
| Old-Age, Survivors and Disability Insurance | 0 | 0 | −5 | −10 | −15 | −15 | −20 | −20 | −85 |
| Foster Care [4] | 0 | * | 68 | 25 | 16 | 31 | 41 | 51 | 232 |
| Social Services Block Grant | 0 | 0 | −375 | −420 | −420 | −420 | −420 | −420 | −2,475 |
| Earned Income Credit | 0 | 0 | −445 | −456 | −463 | −480 | −493 | −515 | −2,852 |
| Maternal and Child Health | 0 | 0 | 0 | 18 | 35 | 50 | 50 | 50 | 203 |
| Total | 0 | * | −2,939 | −8,335 | −9,419 | −10,224 | −10,618 | −12,630 | −54,167 |
| **Revenues:** | | | | | | | | | |
| Earned Income Credit | 0 | * | 60 | 61 | 62 | 65 | 68 | 78 | 394 |
| Net Deficit Effect | 0 | * | −2,999 | −8,396 | −9,481 | −10,289 | −10,686 | −12,708 | −54,561 |

SUMMARY TABLE I.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY—Continued

RECONCILIATION ACT OF 1996, As passed by the Congress

Assumes enactment by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|---|
| Projected Direct Spending Under Proposal: | | | | | | | | | |
| Family Support Payments [1] | 18,086 | 18,371 | 19,680 | 20,207 | 20,842 | 21,334 | 21,716 | 21,806 | |
| Food Stamp Program [2] | 25,554 | 26,220 | 25,996 | 25,753 | 26,953 | 28,267 | 29,498 | 30,700 | |
| Supplemental Security Income | 24,510 | 24,017 | 27,111 | 26,684 | 28,296 | 33,171 | 30,171 | 35,390 | |
| Medicaid | 89,070 | 95,786 | 105,043 | 114,924 | 125,799 | 137,573 | 150,564 | 165,011 | |
| Child Nutrition [3] | 7,899 | 8,428 | 8,770 | 9,047 | 9,518 | 10,027 | 10,561 | 11,097 | |
| Old-Age, Survivors and Disability Insurance | 333,273 | 348,186 | 365,398 | 383,392 | 402,336 | 422,397 | 444,061 | 466,747 | |
| Foster Care [4] | 3,282 | 3,840 | 4,353 | 4,712 | 5,099 | 5,537 | 6,001 | 6,484 | |
| Social Services Block Grant | 2,797 | 2,880 | 2,835 | 2,630 | 2,580 | 2,500 | 2,450 | 2,420 | |
| Earned Income Credit | 15,244 | 18,440 | 19,746 | 20,438 | 21,228 | 22,106 | 22,919 | 23,642 | |
| Maternal and Child Health | 0 | 0 | 0 | 18 | 35 | 50 | 50 | 50 | |
| Total | 519,715 | 546,168 | 578,732 | 607,805 | 642,686 | 682,962 | 717,991 | 763,347 | |

Note.—Details may not add to totals because of rounding.

[*] Benefits less than $500,000.

[1] Under current law, Family Support Payments includes spending on Aid to Families With Dependent Children (AFDC), AFDC-related child care, administrative costs for child support enforcement, net Federal savings from child support collections, and the Job Opportunities and Basic Skills Training Program (JOBS). Under proposed law, Family Support Payments would include spending on the Temporary Assistance for Needy Families Block Grant, administrative costs for child support enforcement, the Child Care Block Grant, and net Federal savings from child support collections.

[2] Food Stamps includes Nutrition Assistance for Puerto Rico under both current law and proposed law, and the Emergency Food Assistance Program under proposed law.

[3] Child Nutrition Programs refer to direct spending authorized by the National School Lunch Act and the Child Nutrition Act.

[4] Under current law, Foster Care includes Foster Care, Adoption Assistance, Independent Living, and Family Preservation and Support. Under proposed law, Foster Care includes these programs plus the National Random Sample Study of Child Welfare.

139

SUMMARY TABLE II.—FEDERAL BUDGET EFFECTS OF H.R. 3734,
THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996
As passed by the Congress
Assumes enactment by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Direct Spending: | | | | | | | | |
| Title I: Temporary Assistance For Needy Families Block Grant | | | | | | | | |
| Budget Authority .......... | $10 | $−212 | $−1,125 | $−989 | $−837 | $−1,109 | $−1,839 | $−6,100 |
| Outlays ....................... | * | −569 | −937 | −819 | −667 | −1,054 | −1,814 | −5,859 |
| Title II: Supplemental Security Income | | | | | | | | |
| Budget Authority .......... | * | −408 | −1,031 | −1,525 | −1,869 | −1,729 | −2,048 | −8,610 |
| Outlays ....................... | * | −408 | −1,031 | −1,525 | −1,869 | −1,729 | −2,048 | −8,610 |
| Title III: Child Support Enforcement | | | | | | | | |
| Budget Authority .......... | 88 | −21 | 144 | 168 | 183 | 110 | 74 | 746 |
| Outlays ....................... | * | 25 | 148 | 172 | 184 | 110 | 74 | 712 |
| Title IV: Restricting Welfare And Public Benefits For Aliens | | | | | | | | |
| Budget Authority .......... | * | −1,174 | −3,947 | −4,311 | −4,662 | −4,525 | −5,036 | −23,655 |
| Outlays ....................... | * | −1,174 | −3,947 | −4,311 | −4,662 | −4,525 | −5,036 | −23,655 |
| Title V: Child Protection | | | | | | | | |
| Budget Authority .......... | 6 | 86 | 6 | 6 | 6 | 6 | 6 | 122 |
| Outlays ....................... | * | 68 | 25 | 6 | 6 | 6 | 6 | 117 |
| Title VI: Child Care | | | | | | | | |
| Budget Authority .......... | * | 1,967 | 2,067 | 2,167 | 2,367 | 2,567 | 2,717 | 13,852 |
| Outlays ....................... | * | 1,635 | 1,975 | 2,082 | 2,227 | 2,377 | 2,482 | 12,778 |
| Title VII: Child Nutrition Programs | | | | | | | | |
| Budget Authority .......... | * | −151 | −449 | −505 | −563 | −615 | −680 | −2,963 |
| Outlays ....................... | * | −128 | −403 | −494 | −553 | −605 | −670 | −2,853 |
| Title VIII: Food Stamps And Commodity Distribution | | | | | | | | |
| Budget Authority .......... | * | −1,792 | −3,539 | −3,918 | −4,282 | −4,580 | −4,990 | −23,103 |
| Outlays ....................... | * | −1,792 | −3,539 | −3,918 | −4,282 | −4,580 | −4,990 | −23,103 |
| Title IX: Miscellaneous | | | | | | | | |
| Budget Authority .......... | 0 | −641 | −594 | −597 | −608 | −618 | −634 | −3,692 |
| Outlays ....................... | 0 | −596 | −626 | −612 | −608 | −618 | −634 | −3,694 |
| | | | | | | | | |
| Total, Direct Spending | | | | | | | | |
| Budget Authority .......... | 104 | −2,346 | −8,468 | −9,504 | −10,265 | −10,493 | −12,430 | −53,403 |
| Outlays ....................... | * | −2,939 | −8,335 | −9,420 | −10,223 | −10,618 | −12,630 | −54,167 |

*Denotes less than $500,000.

140

TABLE 1.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE I—TEMPORARY ASSISTANCE FOR NEEDY FAMILIES BLOCK GRANT, As Passed by the Congress

Assumed to be enacted by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Direct Spending: | | | | | | | | |
| Repeal AFDC, Emergency Assistance, and JOBS | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | * | $−8,021 | $−16,550 | $−17,003 | $−17,439 | $−17,893 | $−18,342 | $−95,247 |
| Outlays | * | −7,925 | −16,510 | −16,973 | −17,409 | −17,863 | −18,322 | −95,001 |
| Repeal of Child Care Programs[1] | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | −1,405 | −1,480 | −1,540 | −1,595 | −1,655 | −1,715 | −9,390 |
| Outlays | 0 | −1,345 | −1,475 | −1,535 | −1,590 | −1,650 | −1,710 | −9,305 |
| Authorize Temporary Family Assistance Block Grant[1] | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | * | 8,368 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 90,314 |
| Outlays | * | 8,300 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 90,246 |
| Supplemental Grants related to Population Growth and Poverty Level | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 87 | 174 | 261 | 278 | 800 |
| Outlays | 0 | 0 | 0 | 87 | 174 | 261 | 278 | 800 |
| Food Stamp Program | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | −5 | −10 | −15 | −15 | −45 |
| Outlays | 0 | 0 | 0 | −5 | −10 | −15 | −15 | −45 |
| Grants to States that Reduce Out-of-Wedlock Births | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 0 | 50 | 50 | 50 | 200 |
| Outlays | 0 | 0 | 0 | 0 | 50 | 50 | 50 | 200 |
| Bonus to Reward High Performance States | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 0 | 200 | 200 | 200 | 800 |
| Outlays | 0 | 0 | 0 | 0 | 200 | 200 | 200 | 800 |
| Contingency Fund[3] | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 0 | 107 | 210 | 313 | 393 | 473 | 565 |
| Outlays | 0 | 0 | 107 | 210 | 313 | 393 | 473 | 565 |
| Food Stamp Program | | | | | | | | |

Case 6:22-cv-01130-DCJ-CBW   Document 218-16   Filed 01/29/24   Page 144 of 159 PageID #: 12259

| Program | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Budget Authority | 0 | −5 | −15 | −20 | −25 | −30 | −35 | −130 |
| Outlays | 0 | −5 | −15 | −20 | −25 | −30 | −35 | −130 |
| **Loans to States for Welfare Programs** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Outlays | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Study by the Bureau of the Census** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | $10 | 10 | 10 | 10 | 10 | 10 | 10 | 70 |
| Outlays | * | 4 | 18 | 10 | 10 | 10 | 10 | 62 |
| **Research, Evaluations, and National Studies** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 15 | 15 | 15 | 15 | 15 | 15 | 90 |
| Outlays | 0 | 3 | 15 | 15 | 15 | 15 | 15 | 78 |
| **Grants to Indian Tribes that received JOBS Funds in 1995** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 8 | 8 | 8 | 8 | 8 | 6 | | 46 |
| Outlays | 6 | 8 | 8 | 8 | 8 | 6 | | 44 |
| **Hold States Harmless for Cost-Neutrality Liabilities** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 50 |
| Outlays | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 50 |
| **Penalties for State Failure to Meet Work Requirements** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | −50 | −50 | −50 | −50 | −200 |
| Outlays | 0 | 0 | 0 | −50 | −50 | −50 | −50 | −200 |
| **Grants to Territories** | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 116 | 116 | 116 | 116 | 116 | 116 | | 696 |
| Outlays | 116 | 116 | 116 | 116 | 116 | 116 | | 696 |
| **Extension of Transitional Medicaid Benefits** | | | | | | | | |
| Medicaid | | | | | | | | |
| Budget Authority | 0 | 0 | 180 | 390 | 400 | 210 | | 1,180 |
| Outlays | 0 | 0 | 180 | 390 | 400 | 210 | | 1,180 |
| **Increased Medical Administrative Payment** | | | | | | | | |
| Medicaid | | | | | | | | |
| Budget Authority | 500 | 0 | 0 | 0 | 0 | 20 | | 500 |
| Outlays | 75 | 135 | 135 | 135 | 0 | 20 | | 500 |
| **Effect of the Temporary Assistance Block Grant on the Food Stamp Program** | | | | | | | | |
| Food Stamp Program | | | | | | | | |

142

TABLE 1.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE I—TEMPORARY ASSISTANCE FOR NEEDY FAMILIES BLOCK GRANT, As Passed by the Congress

Assumed to be enacted by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Budget Authority | 0 | 45 | 90 | 170 | 430 | 560 | 695 | 1,990 |
| Outlays | 0 | 45 | 90 | 170 | 430 | 560 | 695 | 1,990 |
| Effect of the Temporary Assistance Block Grant on the Foster Care Program | | | | | | | | |
| Foster Care Program | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 10 | 25 | 35 | 45 | 115 |
| Outlays | 0 | 0 | 0 | 10 | 25 | 35 | 45 | 115 |
| Effect of the Temporary Assistance Block Grant on the Medicaid Program [4] | | | | | | | | |
| Medicaid | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Outlays | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Direct Spending, Title I, By Account: | | | | | | | | |
| Family Support Payments | | | | | | | | |
| Budget Authority | 10 | −752 | −1,195 | −1,319 | −1,642 | −2,059 | −2,754 | −9,710 |
| Outlays | 0 | −684 | −1,142 | −1,284 | −1,607 | −2,024 | −2,729 | −9,469 |
| Food Stamp Program | | | | | | | | |
| Budget Authority | 0 | 40 | 70 | 140 | 390 | 515 | 660 | 1,815 |
| Outlays | 0 | 40 | 70 | 140 | 390 | 515 | 660 | 1,815 |
| Foster Care Program | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 10 | 25 | 35 | 45 | 115 |
| Outlays | 0 | 0 | 0 | 10 | 25 | 35 | 45 | 115 |
| Medicaid | | | | | | | | |
| Budget Authority | 0 | 500 | 0 | 180 | 390 | 400 | 210 | 1,680 |
| Outlays | 0 | 75 | 135 | 315 | 525 | 420 | 210 | 1,680 |
| Direct Spending total, All Accounts—Title I: | | | | | | | | |
| Budget Authority | 10 | −212 | −1,125 | −989 | −837 | −1,109 | −1,839 | −6,100 |
| Outlays | 10 | −569 | −937 | −819 | −667 | −1,054 | −1,814 | −5,659 |

* Denotes less than $500,000.
1 Funds for existing child care programs are repealed by this title, but equal or greater funding for similar activities is restored in title VI.
2 States have the option to begin to operate under the Temporary Assistance for Needy Families Block Grant any time between the enactment date and July 1, 1997. A few States may opt to do so in FY 1996 creating small savings in the AFDC, Emergency Assistance, and JOBS Programs and small costs in the TANF Program.
3 The bill appropriates $2 billion for the contingency fund for use in years 1997–2001. The estimate shows costs of the contingency fund in 2002 because section 25(7)(a)(2) of the Balanced Budget and Emergency Deficit Control Act of 1985 requires that the baseline shall assume that mandatory programs greater than $50 million dollars are continued.
4 The bill retains categorical eligibility for Medicaid for families that meet the eligibility criteria for Aid to Families with Dependent Children as they are in current law.

143

TABLE 2.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE II—SUPPLEMENTAL SECURITY INCOME; As passed by the Congress

Assumed to be enacted by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Direct Spending: | | | | | | | | |
| SSI Benefits to Certain Children: | | | | | | | | |
| Supplemental Security Income: | | | | | | | | |
| Budget Authority .................... | * | $−125 | $−925 | $−1,450 | $−1,800 | $−1,675 | $−2,000 | $−7,975 |
| Outlays .................... | * | −125 | −925 | −1,450 | −1,800 | −1,675 | −2,000 | −7,975 |
| Family Support Payments: | | | | | | | | |
| Budget Authority .................... | * | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Outlays .................... | * | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Food stamps [2] | | | | | | | | |
| Budget Authority .................... | * | 20 | 130 | 210 | 240 | 265 | 290 | 1,155 |
| Outlays .................... | * | 20 | 130 | 210 | 240 | 265 | 290 | 1,155 |
| Medicaid: | | | | | | | | |
| Budget Authority .................... | * | −5 | −25 | −40 | −45 | −55 | −60 | −230 |
| Outlays .................... | * | −5 | −25 | −40 | −45 | −55 | −60 | −230 |
| Subtotal, provision: | | | | | | | | |
| Budget Authority .................... | * | −110 | −820 | −1,280 | −1,605 | −1,465 | −1,770 | −7,050 |
| Outlays .................... | * | −110 | −820 | −1,280 | −1,605 | −1,465 | −1,770 | −7,050 |
| Reduction in SSI Benefits to Certain Hospitalized Children With Private Insurance: | | | | | | | | |
| Supplemental Security Income: | | | | | | | | |
| Budget Authority .................... | 0 | −40 | −55 | −60 | −70 | −60 | −65 | −350 |
| Outlays .................... | 0 | −40 | −55 | −60 | −70 | −60 | −65 | −350 |
| Funding for Cost of Reviews: [2] | | | | | | | | |
| Supplemental Security Income: | | | | | | | | |
| Budget Authority .................... | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 |
| Outlays .................... | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 |
| End Payment of Prorated Benefits for Month of Application: | | | | | | | | |
| Supplemental Security Income: | | | | | | | | |
| Budget Authority .................... | * | −55 | −130 | −150 | −160 | −165 | −175 | −835 |
| Outlays .................... | * | −55 | −130 | −150 | −160 | −165 | −175 | −835 |
| Pay Large Retroactive Benefit Amounts in Installments: | | | | | | | | |
| Supplemental Security Income: | | | | | | | | |
| Budget Authority .................... | 0 | −200 | −15 | −15 | −15 | −15 | −15 | −275 |
| Outlays .................... | 0 | −200 | −15 | −15 | −15 | −15 | −15 | −275 |
| Make Payments to Penal Institutions That Report Ineligible SSI Recipients: | | | | | | | | |
| Old-Age, Survivors and Disability Insurance—benefits saved: [4] | | | | | | | | |
| Budget Authority .................... | 0 | −5 | −10 | −15 | −15 | −20 | −20 | −85 |
| Outlays .................... | 0 | −5 | −10 | −15 | −15 | −20 | −20 | −85 |
| Supplemental Security Income—benefits saved: | | | | | | | | |
| Budget Authority .................... | 0 | −* | −5 | −10 | −10 | −10 | −10 | −45 |
| Outlays .................... | 0 | −* | −5 | −10 | −10 | −10 | −10 | −45 |
| Old-Age, Survivors and Disability Insurance—payments to prison officials: | | | | | | | | |
| Budget Authority .................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Outlays .................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Supplemental Security Income—payments to prison officials: | | | | | | | | |
| Budget Authority .................... | 0 | 2 | 4 | 5 | 6 | 6 | 7 | 30 |

144

TABLE 2.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE II—SUPPLEMENTAL SECURITY INCOME; As passed by the Congress

Assumed to be enacted by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Outlays .................................. | 0 | 2 | 4 | 5 | 6 | 6 | 7 | 30 |
| Subtotal, provision: | | | | | | | | |
| Budget Authority .................. | 0 | −3 | −11 | −20 | −19 | −24 | −23 | −100 |
| Outlays .................................. | 0 | −3 | −11 | −20 | −19 | −24 | −23 | −100 |
| Total Direct Spending: | | | | | | | | |
| Supplemental Security Income: | | | | | | | | |
| Budget Authority .................. | * | −418 | −1,126 | −1,680 | −2,049 | −1,919 | −2,258 | −9,450 |
| Outlays .................................. | * | −418 | −1,126 | −1,680 | −2,049 | −1,919 | −2,258 | −9,450 |
| Food Stamps:[2] | | | | | | | | |
| Budget Authority .................. | * | 20 | 130 | 210 | 240 | 265 | 290 | 1,155 |
| Outlays .................................. | * | 20 | 130 | 210 | 240 | 265 | 290 | 1,155 |
| Medicaid: | | | | | | | | |
| Budget Authority .................. | * | −5 | −25 | −40 | −45 | −55 | −60 | −230 |
| Outlays .................................. | * | −5 | −25 | −40 | −45 | −55 | −60 | −230 |
| Family Support Payments: | | | | | | | | |
| Budget Authority .................. | * | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Outlays .................................. | * | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Old-Age, Survivors and Disability Insurance: | | | | | | | | |
| Budget Authority .................. | 0 | −5 | −10 | −15 | −15 | −20 | −20 | −85 |
| Outlays .................................. | 0 | −5 | −10 | −15 | −15 | −20 | −20 | −85 |
| Total, All Accounts: | | | | | | | | |
| Budget Authority .................. | * | −408 | −1,031 | −1,525 | −1,869 | −1,729 | −2,048 | −8,610 |
| Outlays .................................. | * | −408 | −1,031 | −1,525 | −1,869 | −1,729 | −2,048 | −8,610 |

* Denotes less than $500,000.
[1] Proposed to be block-granted elsewhere in the bill.
[2] Includes interactions with other food stamp provisions of the bill.
[3] The bill proposes an adjustment to the discretionary spending caps of $150 million in 1997 and $100 million in 1998 to cover the costs of reviewing 300,000 to 400,000 children on the SSI rolls under the new, tighter criteria. The bill does not, however, directly appropriate that money. Its availability remains contingent on future appropriation action. In addition to those one-time costs of $250 million or more, the bill would require that most disabled children who qualify even under the tighter eligibility criteria be reviewed every 3 years to see if their medical condition has improved. That cost, which CBO estimates at about $100 million a year beginning in 1998, could be met by raising the caps on discretionary spending as permitted in P.L. 104-121. The cap adjustment in that law, however, was designed to cover periodic reviews and not the heavy volume of one-time reviews that would be mandated in 1997 by this legislation.
[4] The provision would encourage prison officials to exchange data with SSA by paying them up to $400 for providing information that helps to identify each inmate who receives SSI and whose benefits should therefore be suspended. In the course of checking that information, SSA would find that some inmates collect OASDI. Therefore, although the language makes no mention of OASDI, savings in that program would result.

145

TABLE 3.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE III—CHILD SUPPORT ENFORCEMENT; As Passed by the Congress

Assumed to be enacted by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| New Enforcement Techniques: | | | | | | | | |
| State directory of new hires | | | | | | | | |
|     Family support payments ...... | 0 | 0 | $−1 | $−4 | $−6 | $−9 | $−10 | $−30 |
|     Food stamp program ............ | 0 | 0 | −1 | −7 | −12 | −18 | −21 | −59 |
|     Medicaid ................................ | 0 | 0 | −3 | −11 | −20 | −31 | −38 | −102 |
|       Subtotal ........................ | 0 | 0 | −5 | −21 | −38 | −58 | −70 | −192 |
| State laws providing expedited enforcement of child support: | | | | | | | | |
|     Family support payments ...... | 0 | 0 | 0 | −17 | −35 | −55 | −77 | −185 |
|     Food stamp program ............ | 0 | 0 | 0 | −6 | −13 | −21 | −30 | −70 |
|     Medicaid ................................ | 0 | 0 | 0 | −5 | −11 | −18 | −26 | −59 |
|       Subtotal ........................ | 0 | 0 | 0 | −28 | −59 | −94 | −133 | −314 |
| State laws concerning paternity: | | | | | | | | |
|     Family support payments ...... | 0 | $−16 | −18 | −20 | −22 | −24 | −26 | −127 |
|     Food stamp program ............ | 0 | −3 | −3 | −4 | −4 | −4 | −5 | −23 |
|     Medicaid ................................ | 0 | −2 | −2 | −2 | −3 | −3 | −3 | −15 |
|       Subtotal ........................ | 0 | −21 | −23 | −26 | −28 | −31 | −34 | −164 |
| Suspend Drivers' Licenses: | | | | | | | | |
|     Family support payments ...... | 0 | −4 | −9 | −14 | −19 | −20 | −21 | −88 |
|     Food stamp program ............ | 0 | −2 | −5 | −8 | −12 | −12 | −13 | −52 |
|     Medicaid ................................ | 0 | −1 | −3 | −5 | −7 | −8 | −9 | −35 |
|       Subtotal ........................ | 0 | −8 | −17 | −27 | −38 | −41 | −43 | −175 |
| Adoption of uniform state laws: | | | | | | | | |
|     Family support payments ...... | 0 | 10 | 2 | −7 | −11 | −15 | −21 | −41 |
|     Food stamp program ............ | 0 | 0 | −1 | −3 | −4 | −6 | −9 | −24 |
|     Medicaid ................................ | 0 | 0 | −2 | −3 | −6 | −8 | −11 | −30 |
|       Subtotal ........................ | 0 | 10 | −1 | −13 | −21 | −30 | −41 | −95 |
|       Subtotal, New Enforcement ...................... | 0 | −19 | −46 | −115 | −185 | −254 | −322 | −940 |
| Lost AFDC Collections due to Reduced Cases Funded by Block Grant Funds: | | | | | | | | |
|     Family support payments ...... | 0 | 0 | 29 | 63 | 142 | 200 | 224 | 658 |
|     Food stamp program ............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|     Medicaid ................................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|       Subtotal ........................ | 0 | 0 | 29 | 63 | 142 | 200 | 224 | 658 |
| Eliminate $50 Passthrough and Exclude Gap Payments from Distribution Rules at State Option: | | | | | | | | |
|     Family support payments ...... | 0 | −222 | −236 | −260 | −285 | −311 | −336 | −1,650 |
|     Food stamp program ............ | 0 | 114 | 122 | 139 | 147 | 164 | 171 | 858 |
|     Medicaid ................................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|       Subtotal ........................ | 0 | −108 | −114 | −121 | −139 | −147 | −165 | −793 |
| Distribute Child Support Arrears to Former AFDC Families First: | | | | | | | | |
|     Family support payments ...... | 0 | 0 | 62 | 69 | 76 | 148 | 183 | 539 |
|     Food stamp program ............ | 0 | 0 | −11 | −12 | −14 | −27 | −33 | −96 |
|     Medicaid ................................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|       Subtotal ........................ | 0 | 0 | 51 | 57 | 63 | 122 | 150 | 442 |

146

TABLE 3.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE III—CHILD SUPPORT ENFORCEMENT; As Passed by the Congress

Assumed to be enacted by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Hold States Harmless for Lower Child Support Collections: | | | | | | | | |
| Family support payments ...... | 0 | 0 | 17 | 29 | 34 | 39 | 29 | 148 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | 0 | 0 | 17 | 29 | 34 | 39 | 29 | 148 |
| Optional Modification of Support Orders: | | | | | | | | |
| Family support payments ...... | 0 | −5 | 0 | 10 | 15 | 15 | 20 | 55 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | 0 | −5 | 0 | 10 | 15 | 15 | 20 | 55 |
| Other Provisions with Budgetary Implications: | | | | | | | | |
| Automated data processing development. | | | | | | | | |
| Family support payments ...... | * | 83 | 91 | 129 | 129 | 8 | 0 | 440 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | * | 83 | 91 | 129 | 129 | 8 | 0 | 440 |
| Automated data processing operation and maintenance:. | | | | | | | | |
| Family support payments ...... | 0 | 12 | 55 | 52 | 52 | 46 | 40 | 257 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | 0 | 12 | 55 | 52 | 52 | 46 | 40 | 257 |
| Technical assistance to state programs:. | | | | | | | | |
| Family support payments ...... | * | 48 | 51 | 50 | 48 | 47 | 45 | 290 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | * | 48 | 51 | 50 | 48 | 47 | 45 | 290 |
| State obligation to provide services:. | | | | | | | | |
| Family support payments ...... | 0 | 0 | 0 | 3 | 11 | 22 | 39 | 75 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | 0 | 0 | 0 | 3 | 11 | 22 | 39 | 75 |
| Federal and state reviews and audits:. | | | | | | | | |
| Family support payments ...... | 0 | 3 | 3 | 3 | 3 | 3 | 3 | 20 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | 0 | 3 | 3 | 3 | 3 | 3 | 3 | 20 |
| Grants to States for Visitation:. | | | | | | | | |
| Family support payments ...... | * | 10 | 10 | 10 | 10 | 10 | 10 | 60 |
| Food stamp program ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medicaid .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal ........................ | * | 10 | 10 | 10 | 10 | 10 | 10 | 60 |

147

TABLE 3.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE III—CHILD SUPPORT ENFORCEMENT; As Passed by the Congress

Assumed to be enacted by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

|  | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| Subtotal, Other provisions ........................ | * | 156 | 210 | 248 | 254 | 136 | 137 | 1,197 |
| Total, by account: |  |  |  |  |  |  |  |  |
| Family support payments ...... | * | −81 | 57 | 99 | 142 | 103 | 101 | 421 |
| Food stamp program ............. | 0 | 109 | 100 | 99 | 88 | 76 | 62 | 533 |
| Medicaid ................................. | 0 | −3 | −9 | −27 | −46 | −68 | −88 | −242 |
| Total ................................ | * | 25 | 148 | 172 | 184 | 110 | 74 | 712 |
| Family support payments: Budget Authority: ** |  |  |  |  |  |  |  |  |
| Automated data processing development ........................... | 42 | 42 | 91 | 129 | 129 | 8 | 0 | 440 |
| Technical assistance to state programs ................................... | 36 | 44 | 47 | 46 | 48 | 47 | 45 | 314 |
| Grants to States for Visitation ..... | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 70 |
| All other Provisions ....................... | 0 | −222 | −95 | −91 | −45 | 38 | 45 | −369 |
| Total ............................... | 88 | −127 | 53 | 95 | 142 | 103 | 101 | 455 |

*Denotes less than $500,000.

**Budget Authority is generally equal to the Outlays shown in this table. Where this is not the case, Budget Authority is shown here.

148

TABLE 4.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE IV—RESTRICTING WELFARE AND PUBLIC BENEFITS FOR ALIENS; As passed by the Congress

Assumed to be enacted by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 7-year total |
|---|---|---|---|---|---|---|---|---|
| **Direct Spending:** | | | | | | | | |
| Supplemental Security Income[1] | | | | | | | | |
| Budget Authority | * | $-375 | $-2,400 | $-2,600 | $-2,775 | $-2,425 | $-2,700 | $-13,275 |
| Outlays | * | -375 | -2,400 | -2,600 | -2,775 | -2,425 | -2,700 | -13,275 |
| Food Stamps[1] | | | | | | | | |
| Budget Authority | * | -470 | -700 | -660 | -630 | -610 | -590 | -3,660 |
| Outlays | * | -470 | -700 | -660 | -630 | -610 | -590 | -3,660 |
| Medicaid | | | | | | | | |
| Budget Authority | * | -105 | -615 | -815 | -1,015 | -1,245 | -1,495 | -5,290 |
| Outlays | * | -105 | -615 | -815 | -1,015 | -1,245 | -1,495 | -5,290 |
| Family support payments | | | | | | | | |
| Budget Authority | 0 | [2] | [2] | [2] | [2] | [2] | [2] | [2] |
| Outlays | 0 | [2] | [2] | [2] | [2] | [2] | [2] | [2] |
| Child nutrition[3] | | | | | | | | |
| Budget Authority | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Outlays | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Earned income credit | | | | | | | | |
| Budget Authority | 0 | -224 | -232 | -236 | -242 | -245 | -251 | -1,430 |
| Outlays | 0 | -224 | -232 | -236 | -242 | -245 | -251 | -1,430 |
| **Total Direct Spending:** | | | | | | | | |
| Budget Authority | 0 | -1,174 | -3,947 | -4,311 | -4,662 | -4,525 | -5,036 | -23,655 |
| Outlays | 0 | -1,174 | -3,947 | -4,311 | -4,662 | -4,525 | -5,036 | -23,655 |
| **Revenues:** | | | | | | | | |
| Earned income credit | 0 | 28 | 29 | 29 | 30 | 30 | 31 | 177 |
| Deficit Effect | * | -1,202 | -3,976 | -4,340 | -4,692 | -4,555 | -5,067 | -23,832 |

Note: The CBO estimate assumes that the proposed exemption for public health programs that provide immunizations will be interpreted to permit continued Medicaid funding for pediatric vaccines.

* Denotes less than $500,000.

[1] Includes interactions with other food stamp provisions of the bill.

[2] Proposed to be block-granted elsewhere in the bill.

[3] Section 742 of the bill, in title VII, specifically states that benefits under the school breakfast and school lunch programs shall not be contingent on students' immigration or citizenship status. Therefore, CBO estimates no savings in the child nutrition program from the general restrictions contained in title IV on immigrants' eligibility for Federal benefits.

149

TABLE 5.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE V—CHILD PROTECTION; As passed by the Congress

Assumes enactment by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| **Direct Spending:** | | | | | | | | |
| Extend Enhanced Match Rate for Computer Purchases for Foster Care Data Collection: | | | | | | | | |
| Budget Authority | 0 | $80 | 0 | 0 | 0 | 0 | 0 | $80 |
| Outlays | 0 | 66 | $14 | 0 | 0 | 0 | 0 | 80 |
| National Random Sample Study of Child Welfare: | | | | | | | | |
| Budget Authority | $6 | 6 | 6 | $6 | $6 | $6 | 6 | 42 |
| Outlays | * | 2 | 11 | 6 | 6 | 6 | 6 | 37 |
| **Total Direct Spending:** | | | | | | | | |
| Foster Care: | | | | | | | | |
| Budget Authority | 6 | 86 | 6 | 6 | 6 | 6 | 6 | 122 |
| Outlays | * | 68 | 25 | 6 | 6 | 6 | 6 | 117 |

*Denotes less than $500,000.

150

TABLE 6.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE VI—CHILD CARE; As passed by the Congress

Assumes enactment by September 1, 1996

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| Direct Spending: | | | | | | | | |
| New Child Care Block Grant | | | | | | | | |
| Budget Authority | 0 | $1,967 | $2,067 | $2,167 | $2,367 | $2,567 | $2,717 | $13,852 |
| Outlays | 0 | 1,635 | 1,975 | 2,082 | 2,227 | 2,377 | 2,482 | 12,778 |

Note: For States to draw down the child care block grant remainder, this subtitle requires them to maintain the greater of fiscal year 1994 or 1995 spending.

151

TABLE 7.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE VII—CHILD NUTRITION PROGRAMS; As passed by the Congress

Assumes enactment by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

| Section | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| Direct Spending: | | | | | | | | |
| 704 Special assistance | | | | | | | | |
| Extension of payment period | | | | | | | | |
| Budget Authority | 0 | * | * | $1 | $1 | $1 | $1 | $4 |
| Outlays | 0 | * | * | 1 | 1 | 1 | 1 | 4 |
| Rounding rules for lunch, break-fast, and supplement rates | | | | | | | | |
| Budget Authority | 0 | $−2 | $−15 | −15 | −15 | −15 | −15 | −77 |
| Outlays | 0 | −1 | −10 | −15 | −15 | −15 | −15 | −71 |
| 706 Summer food service program for children | | | | | | | | |
| Budget Authority | 0 | −24 | −29 | −29 | −34 | −34 | −39 | −189 |
| Outlays | 0 | −19 | −29 | −29 | −34 | −34 | −39 | −184 |
| 708 Child and adult care food pro-gram | | | | | | | | |
| Budget Authority | 0 | −105 | −380 | −430 | −480 | −535 | −595 | −2,525 |
| Outlays | 0 | −90 | −340 | −420 | −470 | −525 | −585 | −2,430 |
| 723 School breakfast program au-thorization | | | | | | | | |
| Budget Authority | 0 | −10 | −15 | −22 | −25 | −22 | −22 | −116 |
| Outlays | 0 | −8 | −14 | −21 | −25 | −22 | −22 | −112 |
| 731 Nutrition education and train-ing programs | | | | | | | | |
| Budget Authority | 0 | −10 | −10 | −10 | −10 | −10 | −10 | −60 |
| Outlays | 0 | −10 | −10 | −10 | −10 | −10 | −10 | −60 |
| Total, Child Nutrition Programs: Direct Spending | | | | | | | | |
| Budget Authority | 0 | −151 | −449 | −505 | −563 | −615 | −680 | −2,963 |
| Outlays | 0 | −128 | −403 | −494 | −553 | −605 | −670 | −2,853 |

\* Denotes less than $500,000.

  Details may not add to totals because of rounding.

152

TABLE 8.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE VIII—FOOD STAMPS AND COMMODITY DISTRIBUTION; As passed by the Congress

Assumes enactment by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

| Section | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| 801 Definition of certification period .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 802 Definition of coupon ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 803 Treatment of children living at home ................................. | 0 | $ −115 | $ −245 | $ −255 | $ −265 | $ −280 | $ −290 | $ −1,450 |
| 804 Adjustment of thrifty food plan ........................................ | 0 | −935 | −980 | −1,025 | −1,070 | −1,115 | −1,155 | −6,280 |
| 805 Definition of homeless individual ........................................ | 0 | −* | −* | −* | −* | −* | −* | −* |
| 806 State option for eligibility standards ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 807 Earnings of students .............. | 0 | −10 | −10 | −10 | −10 | −15 | −15 | −70 |
| 808 Energy assistance ................. | 0 | −125 | −170 | −175 | −175 | −180 | −180 | −1,005 |
| 809 Deductions from income: | | | | | | | | |
| Standard deduction at $134 each year [1] ............................. | 0 | 0 | −555 | −770 | −990 | −1,220 | −1,465 | −5,000 |
| Homeless shelter allowance ..... | 0 | −1 | −1 | −2 | −3 | −3 | −5 | −15 |
| Cap excess shelter deduction at $247 through 12/31/96, $250 from 1/1/97 through FY98, $275 in FY99 and FY00, and $300 in each later fiscal year ............................. | 0 | −350 | −570 | −505 | −565 | −490 | −550 | −3,030 |
| State option for mandatory standard utility allowance and otherwise allow change between SUA and actual costs only at recertification | 0 | −35 | −70 | −75 | −80 | −80 | −85 | −425 |
| 810 Vehicle Allowance at $4,650 FY97–2002 .............................. | 0 | −45 | −140 | −175 | −200 | −225 | −245 | −1,030 |
| 811 Vendor payments for transitional housing counted as income ...................................... | 0 | −10 | −10 | −10 | −10 | −10 | −10 | −60 |
| 812 Simplified calculation of income for the self-employed ....... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 813 Doubled penalties for violating Food Stamp Program requirements ................................... | 0 | −* | −* | −* | −* | −* | −* | −* |
| 814 Disqualification of convicted individuals ............................... | 0 | −* | −* | −* | −* | −* | −* | −* |
| 815 Disqualification ..................... | 0 | −5 | −5 | −5 | −5 | −5 | −5 | −30 |
| 816 Caretaker exemption .............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 817 Employment and training ....... | 0 | 2 | 6 | 9 | 11 | 13 | 15 | 56 |
| 818 Food stamp eligibility ........... | 0 | −15 | −21 | −27 | −27 | −27 | −27 | −145 |
| 819 Comparable treatment for disqualification ............................ | 0 | −20 | −20 | −20 | −20 | −20 | −25 | −125 |
| 820 Disqualification for receipt of multiple food stamp benefits .... | 0 | −5 | −5 | −5 | −5 | −5 | −5 | −30 |
| 821 Disqualification of fleeing felons ........................................ | 0 | −* | −* | −* | −* | −* | −* | −* |
| 822 Cooperation with child support agencies: | | | | | | | | |
| Option to require custodial parent cooperation | | | | | | | | |
| Food Stamps ......................... | 0 | −5 | −10 | −15 | −20 | −20 | −20 | −90 |
| Family support payments ...... | 0 | 5 | 10 | 10 | 15 | 15 | 15 | 70 |
| 823 Disqualification relating to child support arrears ................. | 0 | −5 | −15 | −25 | −25 | −30 | −30 | −130 |

153

TABLE 8.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE VIII—FOOD STAMPS AND COMMODITY DISTRIBUTION; As passed by the Congress

Assumes enactment by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

| Section | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| 824 Work requirement ..................... | 0 | −160 | −830 | −960 | −1,010 | −1,050 | −1,100 | −5,110 |
| 825 Encourage electronic benefit transfer systems ........................ | 0 | * | * | * | * | * | * | * |
| 826 Value of minimum allotment ..... | 0 | 0 | −30 | −30 | −30 | −35 | −35 | −160 |
| 827 Benefits on recertification ...... | 0 | −25 | −25 | −25 | −25 | −30 | −30 | −160 |
| 828 Optional combined allotment for expedited households ........... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 829 Failure to comply with other means-tested public assistance programs ................................... | 0 | −25 | −25 | −25 | −25 | −25 | −25 | −150 |
| 830 Allotments for households residing in centers ...................... | 0 | * | * | * | * | * | * | * |
| 831 Condition precedent for approval of retail stores and wholesale food concerns ........... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 832 Authority to establish authorization periods .......................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 833 Information for verifying eligibility for authorization ............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 834 Waiting period for stores that fail to meet authorization criteria .......................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 835 Operation of food stamp offices ......................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 836 State employee and training standards .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 837 Exchange of law enforcement information .............................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 838 Expedited coupon service ......... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 839 Withdrawing fair hearing requests ...................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 840 Income, eligibility, and immigration status verification systems ......................................... | 0 | −5 | −5 | −5 | −5 | −5 | −5 | −30 |
| 841 Investigations ........................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 842 Disqualification of retailers who intentionally submit falsified applications ...................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 843 Disqualification of retailers who are disqualified under the WIC program .......................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 844 Collection of overissuances .... | 0 | −25 | −30 | −30 | −25 | −25 | −30 | −165 |
| 845 Authority to suspend stores violating program requirements pending administrative and judicial review ............................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 846 Expanded criminal forfeiture for violations .......................... | 0 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 847 Limitation of Federal match ... | 0 | −2 | −2 | −2 | −2 | −2 | −2 | −12 |
| 848 Standards for administration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 849 Work supplementation or support program ............................. | 0 | 5 | 15 | 20 | 30 | 30 | 30 | 130 |
| 850 Waiver authority ...................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 851 Response to waivers ............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 852 Employment initiatives program ......................................... | 0 | −1 | −2 | −2 | −2 | −2 | −2 | −11 |
| 853 Reauthorization ........................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

154

TABLE 8.—FEDERAL BUDGET EFFECTS OF H.R. 3734, THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE VIII—FOOD STAMPS AND COMMODITY DISTRIBUTION; As passed by the Congress

Assumes enactment by September 1, 1996

[Outlays by fiscal year, in millions of dollars]

| Section | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| 854 Simplified Food Stamp Program .............. | 0 | 0 | 5 | 10 | 20 | 20 | 25 | 80 |
| 855 A study of the use of food stamps to purchase vitamins and minerals ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 856 Deficit reduction .................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 871 Emergency Food Assistance Program .................. | 0 | 100 | 100 | 100 | 100 | 100 | 100 | 600 |
| 872 Food bank demonstration project ................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 873 Hunger prevention programs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 874 Report on entitlement commodity processing ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 891 Provisions to encourage electronic benefit systems [3] ............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interactions among provisions | 0 | 20 | 101 | 111 | 136 | 141 | 166 | 674 |
| Direct Spending: | | | | | | | | |
| Food stamp program | | | | | | | | |
| Budget Authority .................. | 0 | −1,797 | −3,549 | −3,928 | −4,297 | −4,595 | −5,005 | −23,173 |
| Outlays .................. | 0 | −1,797 | −3,549 | −3,928 | −4,297 | −4,595 | −5,005 | −23,173 |
| Family support payments | | | | | | | | |
| Budget Authority .................. | 0 | 5 | 10 | 10 | 15 | 15 | 15 | 70 |
| Outlays .................. | 0 | 5 | 10 | 10 | 15 | 15 | 15 | 70 |
| Total Direct Spending: | | | | | | | | |
| Budget Authority .................. | 0 | −1,792 | −3,539 | −3,918 | −4,282 | −4,580 | −4,990 | −23,103 |
| Outlays .................. | 0 | −1,792 | −3,539 | −3,918 | −4,282 | −4,580 | −4,990 | −23,103 |

Details may not add to totals because of rounding.

[*] Denotes less than $500,000

[1] No savings are shown in fiscal year 1997 for setting the standard deduction at $134 because the fiscal year 1997 Agriculture Appropriations Act, which cleared the Congress before this bill cleared, contained a similar provision.

[2] Any proceeds from this provision would be used to reimburse law enforcement agencies or for retail compliance investigations. Thus, CBO estimates no net effect on the Federal budget, though funds could be received in 1 year and not spent until a later year.

[3] This provision is included elsewhere in the bill. If the exemption from Regulation "e" were not enacted, there likely would be costs to the Federal Government. CBO estimates these costs would be small.

155

TABLE 9.—FEDERAL BUDGET EFFECTS OF THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996

TITLE IX—MISCELLANEOUS; As passed by the Congress

Assumes enactment by September 1, 1996

[By fiscal year, in millions of dollars]

| Section | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| Direct Spending and Revenues: | | | | | | | | |
| 908 Reduction in block grants to states for social services | | | | | | | | |
| Social Services Block Grant | | | | | | | | |
| Budget Authority | 0 | $−420 | $−420 | $−420 | $−420 | $−420 | $−420 | $−2,520 |
| Outlays | 0 | −375 | −420 | −420 | −420 | −420 | −420 | −2,475 |
| 909 Denial of earned income credit on basis of disqualified income [1] | | | | | | | | |
| Budget Authority | 0 | −170 | −168 | −151 | −146 | −152 | −160 | −947 |
| Outlays | 0 | −170 | −168 | −151 | −146 | −152 | −160 | −947 |
| Revenue | 0 | 26 | 27 | 27 | 23 | 23 | 25 | 151 |
| Net Deficit Effect | 0 | −196 | −195 | −178 | −169 | −175 | −185 | −1,098 |
| 910 Modification of adjusted gross income definition for earned income credit [1] | | | | | | | | |
| Budget Authority | 0 | −98 | −106 | −112 | −120 | −129 | −138 | −704 |
| Outlays | 0 | −98 | −106 | −112 | −120 | −129 | −138 | −704 |
| Revenue | 0 | 15 | 18 | 20 | 22 | 25 | 28 | 128 |
| Net Deficit Effect | 0 | −113 | −125 | −133 | −141 | −154 | −166 | −832 |
| 911 Abstinence Education | | | | | | | | |
| Budget Authority | 0 | 0 | 50 | 50 | 50 | 50 | 50 | 250 |
| Outlays | 0 | 0 | 18 | 35 | 50 | 50 | 50 | 203 |
| Interactions among revenue provisions. | | | | | | | | |
| Budget Authority | 0 | 47 | 50 | 36 | 28 | 33 | 34 | 229 |
| Outlays | 0 | 47 | 50 | 36 | 28 | 33 | 34 | 229 |
| Revenue | 0 | −9 | −13 | −14 | −10 | −10 | −6 | −62 |
| Net Deficit Effect | 0 | 56 | 63 | 50 | 38 | 43 | 40 | 291 |

156

TABLE 9.—FEDERAL BUDGET EFFECTS OF THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996—Continued

TITLE IX.—MISCELLANEOUS; As passed by the Congress

Assumes enactment by September 1, 1996

[By fiscal year, in millions of dollars]

| Section | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 1996–2002 |
|---|---|---|---|---|---|---|---|---|
| Total, Miscellaneous—Title IX: | | | | | | | | |
| Direct Spending | | | | | | | | |
| Social Services Block Grant | | | | | | | | |
| Budget Authority | 0 | −420 | −420 | −420 | −420 | −420 | −420 | −2,520 |
| Outlays | 0 | −375 | −420 | −420 | −420 | −420 | −420 | −2,475 |
| Earned Income Credit | | | | | | | | |
| Budget Authority | 0 | −221 | −224 | −227 | −238 | −248 | −264 | −1,422 |
| Outlays | 0 | −221 | −224 | −227 | −238 | −248 | −264 | −1,422 |
| Maternal and Child Health Services Block Grant | | | | | | | | |
| Budget Authority | 0 | 0 | 50 | 50 | 50 | 50 | 50 | 250 |
| Outlays | 0 | 0 | 18 | 35 | 50 | 50 | 50 | 203 |
| Total, All Accounts: | | | | | | | | |
| Budget Authority | 0 | −641 | −594 | −597 | −608 | −618 | −634 | −3,692 |
| Outlays | 0 | −596 | −626 | −612 | −608 | −618 | −634 | −3,694 |
| Revenues: | | | | | | | | |
| Revenues [1] | 0 | 32 | 32 | 33 | 35 | 38 | 47 | 217 |

[1]Estimates provided by the Joint Committee on Taxation. Components may not sum to totals because of rounding.