# EXHIBIT 217



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

October 19, 2021

Attorney General Merrick B. Garland
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Secretary Alejandro Mayorkas
Department of Homeland Security
Washington, D.C. 20528

*Via regulations.gov.*

**RE: DHS Docket No. USCIS-2021-0012 – Proposed Rule by the Department of Homeland Security and Executive Office for Immigration Review – Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers**

Dear Attorney General Garland and Secretary Mayorkas:

The undersigned Attorneys General, as the chief legal officers of our States, write to express concern about and opposition to the Department of Homeland Security's ("DHS") and the Department of Justice's (collectively, "the Departments") August 20, 2021, proposal to amend regulations governing the determination of certain protection claims raised by individuals subject to expedited removal and found to have a credible fear of persecution or torture ("the Proposed Rule").

<u>GENERAL COMMENT:</u>

The Proposed Rule advances troubling revisions to asylum procedures, generally, and the credible fear determination process, specifically, that exacerbate loopholes in the expedited removal process. Indeed, the Proposed Rule prioritizes administrative efficiency and expediency over national security, health risks, the impact to the States, and basic common-sense solutions and effective border security policies.[1]

Congress enjoys formidable power in setting the nation's immigration policy. "The power of Congress over the admission of aliens and their right to remain [in the United States] is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and national security."[2] While the effective legislation and faithful execution of our nation's immigration laws necessarily requires coordination between the Executive and Legislative Branches,

---

[1] *See* 86 Fed. Reg. 46,906 (Aug. 20, 2021).
[2] *Galvan v. Press*, 347 U.S. 522, 530 (1954).

Page 2

the Executive Branch may not "disregard legislative direction in the statutory scheme it administers."[3] Nor may the Executive Branch "ignore statutory mandates or prohibitions merely because of policy disagreements with Congress."[4] That is so because "[n]o matter how successful Congress might be in crafting a set of immigration laws that would – in theory – lead to the most long-term benefits to the American people, such benefits will not actually occur if those laws cannot be enforced."[5]

The United States faces an unprecedented immigration crisis at the Southwest Border. July 2021 proved the busiest month for illegal border crossings at the Southwest Border in over 21 years, with 212,672 encounters between migrants and U.S. Customs and Border Protection ("CBP") agents.[6] August 2021 again exceeded the 200,000 encounter threshold, with 208,887 migrant encounters at the Southwest Border.[7] Indeed, the Departments' Proposed Rule itself recognizes the significant challenges presented by such a sharp increase in non-citizens attempting to cross (and in many cases successfully crossing) the nation's Southwest Border.[8]

The Departments point to an "overwhelmed" and back-logged asylum system that "delays justice and certainty for those who need protection" and, as presently constructed, "encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[9] However, much of this crisis was created by the new Administration's own policies and "priorities." The changes suggested by the Department's Proposed Rule, at best, miss the mark, and at worst, shift significant burdens to the States and local communities.

**SPECIFIC COMMENT 1: The Departments should clarify how the statutory changes advocated by the Proposed Rule comply or conflict with the Departments' existing legal obligations under the Migrant Protection Protocols.**

The undersigned Attorneys General have serious concerns as to whether the statutory revisions suggested by the Proposed Rule are consistent with the legal obligations imposed by the Migrant Protection Protocols ("MPP"), informally known as the "Remain in Mexico" program.

On December 20, 2018, then-Secretary of Homeland Security Kirstjen M. Nielsen announced MPP,[10] under which DHS planned to initiate the process of removing non-citizens from the United

---

[3] *Heckler v. Chaney*, 470 U.S. 821, 833 (1985).

[4] *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013).

[5] S. Rep. No. 104-249, at 3 (1996).

[6] U.S. Customs and Border Protection, *CBP Releases July 2021 Operational Update*, (Aug. 12, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2021-operational-update; Nick Miroff, *July was busiest month for illegal border crossings in 21 years, CBP data shows*, WASHINGTON POST (Aug. 12, 2021, 9:43 p.m.), https://www.washingtonpost.com/national/record-numbers-illegal-border-crossings/2021/08/12/e3d305e2-facd-11eb-b8dd-0e376fba55f2_story.html.

[7] U.S. Customs and Border Protection, *CBP Releases August 2021 Operational Update*, (Sep. 15, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-august-2021-operational-update.

[8] *See* 86 Fed. Reg. at 46,907 ("As the number of [asylum and related protection] claims [have] skyrocketed over the years, the system has proven unable to keep pace, resulting in large backlogs and lengthy adjudication delays.").

[9] *Id.*

[10] Department of Homeland Security, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration*, (Dec. 20, 2018), *available at* https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

Page 3

States pursuant to 8 U.S.C. § 1225(b)(2)(C)[11] for the duration of the non-citizen's removal proceedings under 8 U.S.C. § 1229a.[12] One stated goal of MPP is to ensure that

> [c]ertain aliens attempting to enter the U.S. illegally or without documentation, *including those who claim asylum*, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim.[13]

Specifically as it pertains to the Southwest Border, MPP authorizes "DHS to return to Mexico certain third-country nationals— *i.e.*, aliens who are not nationals or citizens of Mexico – arriving in the United States from Mexico for the duration of their removal proceedings under 8 U.S.C. § 1229a."[14]

Predictably, MPP faced legal challenges in federal district court[15] and in the United States Court of Appeals for the Ninth Circuit.[16] A California federal district court enjoined the implementation of MPP and the Ninth Circuit affirmed the injunction on the merits.[17] The United States Supreme Court thereafter stayed the district court's injunction in March 2020[18] and dismissed the legal challenges against MPP as moot in June 2021.[19] Thus, MPP remained in effect before and at the time when President Biden took office on January 20, 2021.

Notwithstanding the clear, recognized success achieved through MPP's implementation,[20] DHS unilaterally suspended new enrollment in the program on January 20, 2021, Inauguration Day, subject to a department-wide review of the program.[21] On June 1, 2021, Secretary Mayorkas issued a document titled "Termination of the Migrant Protection Protocols Program" that terminated MPP in its entirety.[22] This action precipitated yet another round of legal challenges concerning MPP.

In April 2021, Texas and Missouri challenged DHS's suspension of MPP—and later DHS's wholesale termination of MPP (which mooted the initial suspension challenge)—in the United States

---

[11] 8 U.S.C. § 1225(b)(2)(c) provides that: "In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title."

[12] *See* 8 U.S.C. § 1229a (providing for removal proceedings).

[13] *See supra* note 11 (emphasis added).

[14] *State v. Biden*, --- F. Supp. 3d ---, 2021 WL 3603341, at *5 (N.D. Tex. Aug. 13, 2021).

[15] *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110 (N.D. Cal. 2019).

[16] *See Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020).

[17] *Id.* at 1095 (holding that "[b]ecause the MPP is invalid in its entirety due to its inconsistency with [8 U.S.C.] § 1225(b), it should be enjoined in its entirety.").

[18] *Wolf v. Innovation Law Lab*, --- U.S. ---, 140 S. Ct. 1564, 206 L.Ed.2d 389 (2020) (mem.).

[19] *Mayorkas v. Innovation Law Lab*, ---U.S. ---, 141 S. Ct. 2842, --- L.Ed.2d --- (2021) (mem.).

[20] Department of Homeland Security, *Assessment of the Migrant Protection Protocols (MPP)*, (Oct. 28, 2019), *available at* https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp.

[21] Department of Homeland Security, *DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program*, (Jan. 20, 2021), https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

[22] Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, on Termination of the Migrant Protection Protocols Program (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

Page 4

District Court for the Northern District of Texas.[23] On August 13, 2021, the District Court entered a nationwide permanent injunction that ordered DHS to, among other things:

> enforce and implement MPP *in good faith* until such a time as it has been lawfully rescinded in compliance with the APA **and** until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1225 without releasing any aliens *because of* a lack of detention resources.[24]

DHS sought an emergency stay of the injunction. The United States Court of Appeals for the Fifth Circuit denied DHS's motion for stay pending appeal on August 19, 2021.[25] The Proposed Rule was announced the next day, August 20, 2021. Four days later, the Supreme Court refused to consider DHS's application for a stay of the District Court's permanent injunction.[26] Thus, the District Court's nationwide injunction compelling DHS to implement MPP remains in *full legal effect* pending appeal and resolution on the merits in the Fifth Circuit and ultimately the Supreme Court.

The undersigned Attorneys General remain concerned with DHS's sluggishness in implementing MPP in a manner consistent with the District Court's permanent injunction.[27] Indeed, DHS's unilateral cancellation of the program and sluggish restarting of it have contributed significantly to the crisis at the Southwest Border.  In short, DHS *created* and is *perpetuating* the very crisis it purports to address with this Proposed Rule. The Departments should at the very least clarify how and to what extent the Proposed Rule complies—or conflicts—with the existing legal obligations imposed by MPP and why implementing MPP would not adequately reduce the demand on the system in processing individuals who appear at the Border.

In addition, the undersigned Attorneys General request that a non-citizen's eligibility for MPP be part of a threshold screening process, similar to the process that applies to non-citizens barred from seeking asylum pursuant to the safe-third country agreement with Canada.[28]  In making an early, initial determination that a non-citizen is eligible for MPP, the Departments would preserve detention space for vulnerable non-citizens, enhance security at the border, and promote humanitarian interests.

**S**PECIFIC **C**OMMENT **2**: **Permitting asylum officers to fully adjudicate asylum claims could encourage a substantial increase in non-meritorious credible fear claims.**

In the context of immigration policies and procedures, the ends to achieve goals of expediency and administrative efficiency do not justify the means. The Departments do not analyze or discuss the likelihood that the Proposed Rule's revisions to the asylum process would encourage *more* non-citizens to seek asylum. For example, the Departments consider the administrative efficiencies expected to be gained from the Proposed Rule and the expected benefits conferred upon non-citizens availing themselves of the asylum process through quicker adjudication timelines. But the Departments fail to analyze (much less discuss) whether these changes to the asylum process will in fact make the Border

---

[23] *See supra* note 14.
[24] *State*, 2021 WL 3603341, at *27 (emphases in original).
[25] *State v. Biden*, 10 F.4th 538 (5th Cir. 2021) (per curiam).
[26] *Biden v. Texas*, --- U.S. ---, --- S.Ct. ---, --- L.Ed.2d ---, 2021 WL 3732667, at *1 (Aug. 24, 2021) (mem.).
[27] Grace Dixon, *States Say Feds Are Slow-Walking 'Remain in Mexico' Reboot*, L**AW**360 (Sep. 24, 2021, 5:45 p.m.), https://www.law360.com/immigration/articles/1425004/states-say-feds-are-slow-walking-remain-in-mexico-reboot.
[28] *See* 86 Fed. Reg. at 46,945; *see also* 8 U.S.C. § 208.30(6) (providing for threshold screening to determine asylum eligibility prior to credible fear determination).

Page 5

crisis worse by encouraging non-citizens living abroad to make their way to the United States. And an increase in non-citizens seeking to enter the United States (illegally or to claim asylum) will further drive up enforcement actions at the Southwest Border and increase the statistical likelihood of non-meritorious asylum claims and illegal entry overall.

Many non-citizens already attempt to seek asylum in the United States based on nothing other than their inability to find work in their home countries. But this is not a basis for asylum. As reported in *The Texas Tribune*, a migrant from South America readily admitted to the press that he and his family were encamped under a bridge in Del Rio, Texas, and planned on seeking asylum in the United States on the basis that he "couldn't find work to support his family."[29] This "economic asylum" is a far cry from the statutory requirements for asylum, such as a credible fear of persecution or torture.[30]

MPP, for example, achieved concrete results in managing asylum seekers attempting to cross the Southwest Border, but it is unclear whether the Proposed Rule would achieve even remotely the same results because the Departments failed to analyze this issue.

At a minimum, the Departments should address with specificity whether the Proposed Rule is expected to stem or grow the number of non-citizens attempting to travel to the United States in order to seek asylum and explain the basis for its conclusions. It is likely that this policy will exacerbate the existing Border crisis because the Departments' Proposed Rule creates a super-highway for asylum applications with little to no oversight. The Proposed Rule does not address this problem.

SPECIFIC COMMENT 3: **The Proposed Rule affords little or no opportunity for meaningful, independent review of positive credible fear determinations made by an asylum officer.**

Enforcement of immigration policies and procedures demands both intra- and inter-agency cooperation. Nowhere is this inter-agency cooperation more vital (or more visible) than in the cooperation between USCIS asylum officers and EOIR immigration judges ("IJs"). This Proposed Rule seems to unravel that inter-agency coordination.

Through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress established the process for expedited removal, which is codified in the Immigration Nationality Act ("INA") § 235.3(b), 8 U.S.C. § 1225(b)(1)(A)(i). The expedited removal process authorizes DHS to remove non-citizens arriving if they (1) lack valid entry documents, or (2) tried to procure their admission into the United States through fraud or misrepresentation.[31] Non-citizens attempting to enter the United States at a port of entry and those apprehended within 100 miles of the U.S. border within 14 days of entering the United States are both subject to the expedited removal process.[32] These non-citizens are to be "removed from the United States without further hearing or review" unless

---

[29] Uriel J. García and Jolie McCullough, *Thousands of Haitian migrants fleeing disaster and unrest seek asylum at Del Rio bridge*, THE TEXAS TRIBUNE (Sep. 17, 2021 7:00 p.m.), https://www.texastribune.org/2021/09/17/texas-border-del-rio-migrants/.
[30] Alicia A. Caldwell, *Middle-Class Migrants Fly to Mexico and Then Cross U.S. Border Illegally*, THE WALL STREET JOURNAL (Oct. 13, 2021 5:30 a.m.), https://www.wsj.com/articles/middle-class-migrants-fly-to-mexico-and-then-cross-u-s-border-illegally-11634117401.
[31] HILLEL R. SMITH, CONG. RESEARCH SERV., IF11357, EXPEDITED REMOVAL OF ALIENS: AN INTRODUCTION 1 (2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11357.
[32] *Id.*

Page 6

they meet one of the few exceptions to expedited removal, *i.e.*, they indicate "an intention to apply for asylum" or "a fear of persecution."[33]

A non-citizen expressing an intention to apply for asylum or a fear of persecution is referred to a USCIS asylum officer for an asylum interview to determine whether the non-citizen has a "credible fear" of persecution or torture. "Credible fear of persecution" is statutorily defined as a "significant possibility" that the noncitizen could establish eligibility for asylum.[34] As noted by the Congressional Research Service,

> [a] credible fear determination is a screening process that evaluates whether an alien might qualify for one of three forms of relief from removal: asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Asylum is the only form of relief that gives the alien a permanent legal foothold in the United States.[35]

A non-citizen may apply for asylum in the United States through one of two methods: affirmative asylum processing or defensive asylum processing.[36] Affirmative asylum processing permits a non-citizen physically present in the United States to apply for asylum within one year of the date of their last arrival, regardless of the non-citizen's immigration status.[37] Defensive asylum processing is an application for asylum that occurs when a non-citizen is placed in removal proceedings before an immigration court with EOIR and the non-citizen requests asylum as "a defense against removal from the United States."[38]

Under the current regulatory scheme, a non-citizen found to have a positive credible fear is placed into full removal proceedings before an IJ. The asylum applicant bears the burden of proving that they qualify for asylum; *the IJ*—not the asylum officer—serves as the adjudicator as to whether a non-citizen is eligible for asylum in the United States.[39] However, the Department's Proposed Rule offers a puzzling solution insofar as it would effectively permit the *asylum officer* to have the final say on whether a non-citizen may receive asylum once a positive credible fear determine has been made.

If implemented, the Proposed Rule would permit asylum officers, upon making a positive credible fear determination, to adjudicate in the first instance—through a non-adversarial hearing—the protection claims of non-citizens otherwise subject to expedited removal.[40] Thus, the Proposed Rule entirely *strips* IJs (and thus the EOIR) from meaningful participation in the asylum determination process once an asylum officer has determined that a credible fear exists. This Proposed Rule starkly departs from the present statutory regime as envisioned by Congress.

Administrative judges are a vital component to the asylum system, because the ultimate question is whether the non-citizen meets a legal standard. Asylum officers, employed by USCIS, do not weigh evidence or test claims as part of their intake process.  In Fiscal Year ("FY") 2019, asylum

---

[33] INA § 235.3(b)(4); 8 U.S.C. § 1225(b)(1)(A)(i).
[34] 8 U.S.C. § 1225(b)(1)(B)(v).
[35] SMITH, *supra* note 31, at 1.
[36] U.S. Citizenship and Immigration Services, *Obtaining Asylum in the United States*, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/obtaining-asylum-in-the-united-states  (last  updated Sept. 16, 2021).
[37] *Id.*
[38] *Id.*
[39] *See generally* 8 C.F.R. § 1240.1 (providing for the immigration judge's authority).
[40] The Proposed Rule would significantly alter 8 C.F.R. §§ 208.2, 208.3, and 208.9 to achieve these goals.

Page 7

officers found that 73.6 percent of non-citizens claiming credible fear passed that bar.[41] However, only 15.1 percent of non-citizens were ultimately granted asylum by an IJ.[42]  While some of that delta relates to non-citizens never filing a claim for asylum, the vast difference in grant rates illustrates that the two entities have different, if not incompatible, missions. While asylum officers review claims for whether, if true, the claims *might* support a finding of refugee status, immigration judges determine whether the non-citizen has actually carried his or her burden. This requires evidence, an evaluation of the standard of proof, and other features of our legal system that make asylum officers improper decision-makers.

As justification, the Departments contend that permitting asylum officers to adjudicate asylum claims in the first instance will relieve "strain" on the asylum system and address the significant backlog of cases.  While many observers may readily agree that the current immigration system is strained, and that certain asylum procedures are untenable in the long-term, the undersigned Attorneys General sharply dispute that a viable solution to a situation significantly exacerbated by the Administration's unlawful refusal to implement proven policies, like MPP and removal of violent criminals, involves wholesale removal of IJs and the EOIR from the asylum determination process. Making the matter worse, the Departments do not address at all the vast difference in training, qualifications, and adjudicatory conditions between the two different officers.

The Proposed Rule does not state whether the Departments sought or evaluated any alternative means of reducing caseloads and stemming rapid growth of EOIR caseloads outside of removing the EOIR from the asylum adjudication process entirely. One thing is clear, however: the Proposed Rule offers *no meaningful administrative review* by an IJ once an asylum officer makes a positive credible fear determination and proceeds to consider the wide array of benefits able to award the non-citizen.

**S**PECIFIC **C**OMMENT **4**: The Proposed Rule dramatically alters the burden of proof that more appropriately rests with the non-citizen applying for asylum protections, rather than USCIS.

Whether a non-citizen affirmatively or defensively applies for asylum, it is incumbent on *the non-citizen* to take the necessary steps in filing an application for asylum. If referred to an IJ for full removal proceedings, the burden rests with the applicant to demonstrate eligibility for asylum.[43] The Department's Proposed Rule turns this burden on its head and demands that USCIS assume the burden in what should be the non-citizen's role in the asylum application process.

The Proposed Rule provides that

[a]s part of this new procedure for "further consideration," and to eliminate delays between a positive credible fear determination and the filing of an application for asylum, the

---

[41] *See* USCIS, Credible Fear Workload Report Summary, FY2019 Total Caseload, *available at* https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf.

[42] D*EPARTMENT OF* H*OMELAND* S*ECURITY*, O*FFICE OF* I*MMIGRATION* S*TATISTICS*, 2019 R*EFUGEE AND* A*SYLEES* A*NNUAL* F*LOW* R*EPORT* 6-7 (S*EP*. 2020), *available at* https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2019/refugee_and_asylee_2019.pdf.

[43] *See* 8 C.F.R. § 208.2(c)(3)(i) (applying the same procedures as removal proceedings held under 8 C.F.R. § 240, subpart A); 8 C.F.R. § 1240.8(d) ("The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief [from removal] may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

Departments propose that the written record of the credible fear determination created by USCIS during the credible fear process, and subsequently served on the individual together with the service of the credible fear decision itself, would be treated as an "application for asylum," with the date of service on the individual considered the date of filing. 8 CFR 208.3(a)(2) (proposed). Every individual who receives a positive credible fear determination would be considered to have filed an application for asylum at the time the determination is served on him or her.[44]

By the Departments' own admission, credible fear *claims* made at the border (one of the few exceptions to placement in expedited removal proceedings) now appear to be the norm.[45] In a February 2020 report to Congress, the Government Accountability Office ("GAO") found that 73 to 80 percent of all credible fear assessments resulted in positive credible fear determinations between FY 2014 through the first two quarters of FY 2019.[46] The Departments assert that the asylum system is overwhelmed, yet the Proposed Rule would treat every positive credible fear determination as an application for asylum. The overwhelming majority of non-citizens seeking asylum in the United States will not receive it. During FY 2019, USCIS received 96,952 applications for affirmative asylum and EOIR received 210,752 applications for defensive asylum as a defense to removal from the United States.[47] Of these, 46,508 non-citizens received asylum, with 27,643 individuals receiving it through the affirmative asylum process and 18,865 individuals receiving it through the defensive asylum process.[48] So, to put these numbers into perspective, only 46,508 non-citizens received asylum in FY 2019 out of the 307,704 applications received by USCIS and EOIR—a mere 15.1 percent. It is clear that the problem is *not* that too many non-citizens are granted asylum. In fact, quite the opposite. It is the unmanageable amount of non-meritorious asylum applications about which the Departments complain.

Curiously, the Proposed Rule appears to promote the filing of asylum applications, an action that seems counterproductive to the purported goals set out by the Departments. While the Proposed Rule may in fact reduce administrative delay between the time a non-citizen is placed into full removal proceedings before an IJ (after a positive credible fear determination is made), it does so at the expense of the secondary review Congress expected to evaluate that initial decision. This appears to be the actual purpose of the Proposed Rule – to avoid the secondary review, which would dramatically increase the number of non-citizens released at a border entry point into the United States. The undersigned Attorneys General have serious concerns about the Proposed Rule's impact on the amount of non-citizens that may attempt to unlawfully enter the United States in the hope of obtaining asylum and the burden that places on our States. This problem may be further exacerbated were USCIS permitted to virtually prepare the application for asylum on behalf of the non-citizen. The Departments should strongly reconsider these proposed changes.

---

[44] 86 Fed. Reg. at 46,916.

[45] *Id.* at 46,909 ("These steps are meant to ensure greater efficiency in the system, which was initially designed for protection claims to be the exception, not the rule, among those encountered at or near the border").

[46] U.S. GOV'T ACCOUNTABILITY OFF., GAO-20-250, ACTIONS NEEDED TO STRENGTHEN USCIS'S OVERSIGHT AND DATA QUALITY OF CREDIBLE AND REASONABLE FEAR SCREENINGS 15 (2020), *available at* https://www.gao.gov/assets/gao-20-250.pdf.

[47] DEPARTMENT OF HOMELAND SECURITY, *supra* note 42, 6-7.

[48] *Id.* at 8.

Page 9

**SPECIFIC COMMENT 5: The Proposed Rule includes revisions to parole considerations that undercut and substitute the mandatory detention standard as envisioned by Congress in favor of subjective, ambiguous standards for parole created by administrative rule.**

The Departments' Proposed Rule envisions significant changes to parole considerations made prior to a positive credible fear determination. Currently, 8 C.F.R. § 235.3 requires mandatory detention pending a credible fear determination, providing that:

> [a]n alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section *shall be detained* pending determination and removal, except that parole of such alien . . . may be permitted only when the Attorney General determines, in the exercise of discretion, *that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.*[49]

The Departments revise this mandatory statutory language by permitting DHS to consider whether parole is required "because detention is unavailable or impracticable."[50] The proposed changes to parole considerations, presently submitted, are problematic because they are overly broad and subjective. The issue of space for detention is squarely within the control of DHS, specifically ICE. For example, in a January 2021 report to the Chairman of the Committee on Homeland Security in the House of Representatives, GAO found that ICE, among other things, "agreed to pay detention facility operators for a fixed number of detention beds regardless of whether it use[d] them" and "spent millions of dollars a month on unused detention space" between FY 2017 through May 2020.[51] Thus, DHS can unilaterally restrict available space and create its own discretionary safe-harbor that evades the clear intent of Congress regarding mandatory detention. DHS has not imposed upon itself or disclosed any meaningful limits on its power to *make* detention "unavailable." And the Proposed Rule plainly envisions no change to detention facility capacity.[52] In addition, DHS does not address what condition or set of conditions would be sufficient for the DHS to consider detention "impracticable."

Recent press coverage highlights a disturbing trend: DHS is following its own standards instead of the statutory standards envisioned by Congress when it comes to releasing and paroling out non-citizens from detention centers.[53] According to this reporting, the Biden Administration has released at least 160,000 illegal immigrants into the United States since March and has made liberal use of statutory parole standards.[54] Former Border Patrol Chief Rodney Scott put it simply:

---

[49] 8 C.F.R. § 235.3(b)(2)(iii) (emphases added). *See also* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . in his discretion parole into the United States temporarily" any noncitizen apply for admission "under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit . . . .").
[50] 86 Fed. Reg. at 46,913.
[51] U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-149, ACTIONS NEEDED TO IMPROVE PLANNING, DOCUMENTATION, AND OVERSIGHT OF DETENTION FACILITY CONTRACTS 24 (2021), *available at* https://www.gao.gov/assets/gao-21-149.pdf.
[52] *See* 86 Fed. Reg. at 46,939 ("The proposed rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence . . . .").
[53] Bill Melugin & Adam Shaw, *Leaked Border Patrol docs show mass release of illegal immigrants into US by Biden administration*, FOX NEWS (Oct. 13, 2021), https://www.foxnews.com/politics/leaked-border-patrol-docs-release-immigrants-us-biden-administration.
[54] *Id.*

'By law and regulation a parole shall only be granted on a case by case basis and only for significant humanitarian reasons or significant public benefit. Neither of these appear to apply to the current situation,' he said, adding that the number of paroles brings into question the review and approval process.[55]

DHS must remain within the statutory bounds envisioned by Congress. The vague standards offered by the Proposed Rule appear to be intended to evade the clear limits on such unbounded discretion that Congress intended to apply. The Proposed Rule is unclear and inconsistent with the statute. The Departments should utilize more definite language if they insist on revising the mandatory detention provisions contained in 8 C.F.R. § 235.3.

SPECIFIC COMMENT 6: **The Proposed Rule fails to acknowledge and in fact disclaims any impact on States, which incur much of the social and economic costs related to positive asylum determinations with little recourse available.**

America has benefited much from lawful immigration and the contributions made by immigrants lawfully present within the United States. The unfortunate challenge facing the Nation presently, however, is one of a grim reality: States and local communities disproportionately bear the social and economic costs of illegal immigration.

First, the social cost. The unfortunate truth is that many non-citizens seeking asylum in the United States—regardless of whether their circumstances *actually* merit the ultimate legal status of asylee—arrive with little or no resources – usually only what they can carry. Recent press reports detail ICE officers dropping off non-citizens at shelters, bus stations, and airports without resources, language skills, or assistance. Some non-governmental organizations ("NGOs") have decried this treatment and complained about ICE failing to give any notice.[56] Immigration advocacy groups have similarly complained of the "chaotic way" in which ICE has elected to release non-citizens at various urban and rural locations.[57] Additionally, state and local officials have accused ICE of providing "little to no warning" prior to the release of non-citizens,[58] and members of Congress have sought information on ICE's conduct.[59] Regrettably, over the past few months, ICE has employed such

---

[55] *Id.*

[56] Dan Lieberman, *U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources*, PBS: NEWS HOUR (Jun. 4, 2021   6:48   p.m.),   https://www.pbs.org/newshour/show/u-s-border-patrol-is-increasingly-dropping-off-migrants-in-rural-areas-lacking-resources.

[57] Destinee Patterson, *Some asylum seekers dropped off in Shreveport reportedly were not allowed to call their families*, KSLA NEWS 12 (Jul. 19, 2021 at 4:48 p.m.), https://www.ksla.com/2021/07/19/some-asylum-seekers-dropped-off-shreveport-reportedly-were-not-allowed-call-their-families/.

[58] Bill Lunn, *ICE releases immigrants in Shreveport with little warning to local officials*, KTBS 3 (Jul. 16, 2021), https://www.ktbs.com/news/3investigates/ice-releases-immigrants-in-shreveport-with-little-warning-to-local-officials/article_f764e9a4-e678-11eb-a69f-13f40e85871f.html; Matt Sledge, *Disorganized immigration releases draw concern from advocates, U.S. Sen. Bill Cassidy*, NOLA.COM (Jul. 20, 2021), https://www.nola.com/news/politics/article_f7e6d19e-e8d5-11eb-b64b-8b51fd85a303.html.

[59] *See* Press Release, Bill Cassidy, U.S. Senator, Cassidy Statement on ICE Immigrant Dropoff in Shreveport (Jul. 18, 2021), https://www.cassidy.senate.gov/newsroom/press-releases/cassidy-statement-on-ice-immigrant-dropoff-in-shreveport.

Page 11

tactics not only in Louisiana, but in Arizona,[60] Georgia,[61] and Mississippi,[62] to name a few examples. This troubling practice adversely impacts States and local communities, who have little choice other than to bear these consequences without assistance from the Federal government.

As the Supreme Court has noted, "deportable criminal aliens who remain[ ] in the United States often commit[ ] more crimes before being removed."[63] Many non-citizens arrested by ICE have previously been convicted of *at least* one crime or had criminal charges pending against them at the time of their arrest. According to ICE's Fiscal Year 2020 Enforcement and Removal Operations Report, ICE conducted 103,603 administrative arrests in FY 2020.[64] Ninety percent of the non-citizens arrested had either criminal convictions or criminal charges pending.[65] ICE effectuated even more administrative arrests of non-citizens with criminal histories in FY 2019, totaling 143,099.[66] Additionally, ICE effectuated 4,360 criminal arrests in FY 2020 and assisted prosecutorial agencies in securing 5,397 convictions.[67] According to ICE's own statistical reporting, many of the non-citizens arrested in FY 2019, 2020, and 2021 have criminal histories that include crimes of violence, sex offenses, property crimes, weapon and drug offenses, trafficking, kidnapping, and fraud.[68] To be sure, States and local communities are the ones that overwhelmingly bear the tangible and intangible costs of crimes committed by non-citizens.

In a September 30, 2021, memorandum, Secretary Mayorkas instructed ICE to prioritize the apprehension and removal of non-citizens based on three enumerated factors: 1) threat to national security; 2) threat to public safety; and 3) threat to border security.[69] This memorandum demands ICE officials examine the "totality of the circumstances" and consider "mitigating factors that militate in favor of declining enforcement action."[70] Even more concerning, DHS imposes these final guidelines

---

[60] Aila Slisco, *ICE Resumes Dropping Migrants Off at Greyhound Terminal Instead of Welcome Center*, NEWSWEEK (May 7, 2021 9:45 p.m.), https://www.newsweek.com/ice-resumes-dropping-migrants-off-greyhound-terminal-instead-welcome-center-1589765; Kirk Siegler, *Why The U.S. Government Is Dropping Off Migrants In Rural Arizona Towns*, NPR (Apr. 15, 2021 6:57 p.m.), https://www.npr.org/2021/04/15/987618530/why-the-u-s-government-is-dropping-off-migrants-in-rural-arizona-towns.

[61] Lautaro Grinspan, *When ICE detainees are dropped off at Atlanta airport, this group helps*, THE ATLANTA JOURNAL-CONSTITUTION (Sep. 24, 2021), https://www.ajc.com/news/when-ice-detainees-are-dropped-off-at-atlanta-airport-this-group-helps/2RNBQ25RTRBB7H7DMUQLSMDN4E/.

[62] Jan Griffey, *Update: ICE drops more than 90 immigrants at Natchez bus station*, THE NATCHEZ DEMOCRAT, (Jul. 16, 2021 7:41 p.m.), https://www.natchezdemocrat.com/2021/07/16/ice-drops-more-than-90-immigrants-at-natchez-bus-station/.

[63] *Demore v. Kim*, 538 U.S. 510, 518 (2003) (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)).

[64] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FISCAL YEAR 2020 ENFORCEMENT AND REMOVAL OPERATIONS REPORT 13 (2020), *available at* https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf.

[65] *Id.*

[66] *Id.* at 14.

[67] *Id.* at 16.

[68] U.S. Customs and Border Protection, Criminal Noncitizen Statistics Fiscal Year 2021, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last updated Sep. 15, 2021).

[69] Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, on Guidelines for the Enforcement of Civil Immigration Law 3-4 (Sep. 30, 2021), *available at* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

[70] These mitigating factors include considerations such as: (1) advanced or tender age; (2) lengthy presence in the United States; (3) a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment; (4) status as a victim of crime or victim, witness, or party in legal proceedings; (5) the impact of removal on family in the United States, such as loss of provider or caregiver; (6) whether the noncitizen may be eligible for

Page 12

even though the interim guidelines on this issue hampered ICE's ability to make arrests—reportedly only averaging one arrest every two months.[71]

This Proposed Rule, which relaxes parole considerations and encourages more asylum seekers to travel to the United States, will only make matters worse for an already overwhelmed Southwest Border. The Proposed Rule blatantly disregards the social costs to States and local communities.

Second, this extraordinary shift in immigration policy will have a deleterious effect on the States' public fisc.[72] Non-citizens granted the legal status of asylee are entitled to certain public benefits such as Social Security Income, Medicaid, welfare and food stamps, employment authorization, a driver's license, and more.[73] Critically though, as explained in more detail below, many non-citizens (and their minor children) are entitled to many of these benefits while they remain in the United States as undocumented immigrants, while they await removal proceedings outside of a detention facility, or while they have their removal from the United States withheld, even if they are not ultimately granted asylum. The Proposed Rule will have financial impacts on States ranging from costs of border security to education to medical care and other public services. Notably, the Supreme Court and the Fifth Circuit have recognized injuries to a local or state government's financial interest based on the actions of the federal government, specifically in the context of immigration.[74]

In a 2017 report titled *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, the Federation for American Immigration Reform ("FAIR") examined "the fiscal impact of illegal aliens as reflected in both federal and state budgets."[75] FAIR analyzed state expenditures associated with border security and policing, actions which require substantial expenditure of state monies. In 2017, Texas allocated $800 million to operations to secure the Texas-Mexico border, with the federal government "ignoring reimbursement requests for Texas funds spent on border security."[76] Similarly, and over the same period, New Mexico and Arizona spent approximately $49.1 million and $29.6 million, respectively, on border security.[77]

---

humanitarian protection or other immigration relief; (7) military or other public service of the noncitizen or their immediate family; (8) time since an offense and evidence of rehabilitation; or (9) whether a criminal conviction was vacated or expunged. *See id.*

[71] Nolan Rappaport, *Biden isn't doing as well as Trump at removing aliens who pose a threat to public safety*, THE HILL (Oct. 7, 2021), https://thehill.com/opinion/immigration/575710-biden-isnt-doing-as-well-as-trump-at-removing-aliens-who-pose-a-threat-to?rl=1.

[72] *See Texas v. United States*, 524 F. Supp. 3d 598, 619-628 (S.D. Tex. 2021) (discussing DHS's 100-day pause on removal of non-citizens, analyzing the impact of this decision on the State of Texas's public fisc, and enjoining the implementation of the 100-day pause on removal of non-citizens).

[73] U.S. Citizen and Immigration Services, Benefits and Responsibilities of Asylees, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/benefits-and-responsibilities-of-asylees (last updated Mar. 8, 2018).

[74] *See Clinton v. City of New York*, 524 U.S. 417, 430-31 (1998) (finding a local government to have standing when challenging immigration policies for purposes of the local government's claim to suffering injury to its "borrowing power, financial strength, and fiscal planning."); *see also Texas v. United States*, 809 F.3d 134, 152-53 (5th Cir. 2015) (finding sufficient for standing purposes several States' claims to suffering injury to their public fiscs).

[75] Matthew O'Brien, Spencer Raley, and Jack Martin, *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, FEDERATION FOR AMERICAN IMMIGRATION REFORM 1 (2017), *available at* https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf.

[76] *Id.* at 44.

[77] *Id.*

Page 13

But the States' financial obligations do not begin and end with securing their borders. Many non-citizens unlawfully entering the country often arrive with children, whom States are required to protect and educate and provide health care.[78] States are required to provide free public education to the children of unlawfully present non-citizens pursuant to the Supreme Court decision in *Plyler v. Doe*, which presents the States with an unfunded mandate.[79] According to FAIR's analysis, much of the public school expenditures involve limited English proficiency ("LEP") programs which require specialize training in English language skills for children possessing limited abilities to speak, read, and write in English.[80] In a 2016 report titled *The Elephant in the Classroom Mass Immigration's Impact on Education*, FAIR noted that the federal government provides a mere 8 percent of public school funding, with the lion's share funded by state and local government, and only 1 percent of cost associated with LEP programs.[81] As public education budgets have witnessed cuts over the past decade in tandem with an overall increase in the number of non-citizen children enrolled in public schools and relying on LEP, it is not difficult to understand that many municipalities' LEP programs are growing at a rate faster than the municipalities' ability to operate or fund them effectively.[82] Additionally, FAIR examined various aid and subsidy programs—the benefits of which are sometimes obtained by fraud—and found that the states overwhelming make up the federal shortfall in these programs, with approximately $2.6 billion in state and local funds being drawn on by ineligible illegal aliens nationwide.[83]

States also provide public services such as emergency medical care to non-citizens who lack other medical resources.[84] Many millions of undocumented non-citizens seeking medical care lack health insurance, and often an emergency room visit is their only source of health care.[85] And to make matters worse, we are still coping with the global COVID-19 pandemic, with hospitals in many of our states advising they have limited capacity. Some are even rationing care. The Departments' denial of any impact to states is flatly contradicted by the daily news and on-the-ground reports in our States from a wide scope of state officials and NGOs.[86] Given the current crisis at our borders, these numbers are no doubt exponentially larger. Health care and other costs arising from the pandemic also must be added to the current costs.

**Specific Comment 7**: The Proposed Rule fails to properly consider and analyze substantial Federalism concerns.

The Proposed Rule wholly fails to provide a federalism summary impact statement, as required by, *inter alia*, the Unfunded Mandates Reform Act ("UMRA"), which requires that "[e]ach agency shall

---

[78] *Id.* at 36, 40.

[79] *Id.* at 37 (citing *Plyler v. Doe*, 457 U.S. 202 (1982)).

[80] *Id.*

[81] Marc Ferris and Spencer Raley, *The Elephant in the Classroom Mass Immigration's Impact on Education*, FEDERATION FOR AMERICAN IMMIGRATION REFORM 6 (September 2016), *available at* https://www.fairus.org/sites/default/files/2017-08/FAIR-Education-Report-2016.pdf.

[82] *Id.* 6-7.

[83] O'Brien, *supra* note 75, at 46-48.

[84] *Id.* at 40-42.

[85] *See* Whitney L. Duncan & Sarah B. Horton, *Serious Challenges And Potential Solutions for Immigrant Health During COVID-19*, HEALTH AFFAIRS BLOG (April 18, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200416.887086/full/.

[86] Julia Harte & Sharon Berstein, *Some U.S. Hospitals forced to ration care amid staffing shortages, COVID-19 surge*, Reuters (Sep. 17, 2021 7:39 p.m.), https://www.reuters.com/world/us/some-us-hospitals-forced-ration-care-amid-staffing-shortages-covid-19-surge-2021-09-17/.

Page 14

. . . assess the effects of Federal regulatory actions on State, local, and tribal governments, and the private sector."[87] Astonishingly, the Departments contend that the Proposed Rule insubstantially impacts States and presents *no substantial Federalism concerns*. The Departments state that

> [t]his proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.[88]

This position is as astonishing as it is false. Federalism concerns abound. "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."[89] Admittedly, under our constitutional design, States have ceded to the federal government the authority to establish a "uniform Rule of Naturalization"[90] as well as the authority to regulate and enforce immigration policies.[91] Nevertheless, the fundamental premise that States "bear[ ] many of the consequences of unlawful immigration" cannot be seriously disputed.[92] Indeed, the Supreme Court and Fifth Circuit have recognized that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States."[93] To be sure, "[t]he problems posed to the State[s] by illegal immigration must not be underestimated."[94] This Proposed Rule nakedly underestimates these concerns.

The impact of the Proposed Rule on the States is wide-range, affecting State finances and resources, public safety, and public health during the midst of the COVID-19 global pandemic, to say the least. Whether the Departments choose to recognize these concerns has *no* bearing on the fact that they exist. Nor does it change the fact that the States will be left to navigate the consequences of ill-conceived immigration policies. Despite these serious concerns, however, the undersigned Attorneys General are unable to provide meaningful comment on this issue because the Proposed Rule contains no Federalism analysis or impact statement.

At a minimum, the Departments should reassess the Federalism implications of this Proposed Rule and republish the Proposed Rule with an appropriate Federalism summary impact statement.

**Specific Comment 8: The Proposed Rule fails to adequately analyze whether an unfunded mandate is imposed on the States through this Proposed Rule.**

The Proposed Rule states that "the Departments do not believe this proposed rule would impose any unfunded Federal mandates on State, local, and Tribal governments, in the aggregate, or on the private sectors" because, in the Departments' view, "[t]he impacts are likely to apply to

---

[87] 2 U.S.C. §1531.
[88] 86 Fed. Reg. at 46,939.
[89] *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)).
[90] U.S. Const. art. 1, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization").
[91] *Texas*, 524 F. Supp. 3d at 617.
[92] *Arizona*, 567 U.S. at 397.
[93] *Id.*; *see also Texas*, 809 F.3d at 163.
[94] *Arizona*, 567 U.S. at 398.

Page 15

individuals, potentially in the form of beneficial distributional effects and cost savings."[95] The undersigned Attorneys General sharply dispute this contention.

UMRA considers a mandate unfunded unless the legislation authorizing the mandate fully meets its estimated direct costs by either (1) providing new budget authority (direct spending authority or entitlement authority) or (2) authorizing appropriations. If appropriations are authorized, the mandate is still considered unfunded unless the legislation ensures that in any fiscal year, either (1) the actual costs of the mandate are estimated not to exceed the appropriations actually provided; (2) the terms of the mandate will be revised so that it can be carried out with the funds appropriated; (3) the mandate will be abolished; or (4) Congress will enact new legislation to continue the mandate as an unfunded mandate.[96] The Departments address the requirements of the Act by *denying* any impact. But the undersigned Attorneys General have already raised concerns and provided examples of how States are forced to incur costs as a result of immigration.

The Departments cannot avoid their obligations under UMRA by blinding themselves to reality, nor may they adopt conclusory statements of Adminspeak. Whatever "beneficial distributional effects and cost savings" means, it is at best unsupported and conclusory. The undersigned Attorneys General submit that it is also flatly contradicted by the findings of several federal courts as well as economic studies and our experiences.  "Although the State has no interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service."[97] At bottom, the Departments must assess the financial costs associated with the Proposed Rule, which clearly constitute an unfunded Federal mandate. Because the Departments did not perform a thorough analysis of this issue, it is difficult for the undersigned Attorneys General to provide a meaningful comment on the specific impact of the unfunded mandates imposed by the Proposed Rule.

UMRA also requires that "[e]ach agency shall . . . develop an effective process to permit elected officers of State, local, and tribal governments . . . to provide *meaningful and timely* input in the development of regulatory proposals containing significant Federal intergovernmental mandates."[98] The Departments never allowed elected leaders in State, local, and tribal governments to provide *any* input into the development of the new Proposed Rule. The Departments must therefore allow State, local, and tribal governments to provide meaningful and timely input before republishing the Proposed Rule.

**Specific Comment 9: Environmental costs related to immigration and population growth were not considered by the Departments, in contravention of applicable regulations and statutory directives.**

The Proposed Rule, as presently submitted, contains only a cursory environmental analysis under the National Environmental Policy Act ("NEPA").[99] NEPA includes two statutory directives: it places an obligation on federal agencies to "consider every significant aspect of the environmental

---

[95] 86 Fed. Reg. at 46,939.
[96] *See* 2 U.S.C. § 658d(a)(2); § 425 of the Congressional Budget and Impoundment Control Act of 1974, as amended, P.L. 93-344, 88 Stat. 297, 2 U.S.C. § 658, *et seq.*
[97] *Plyler*, 457 U.S. at 228 n.23.
[98] 2 U.S.C. §1534(a) (emphasis added)
[99] *See* 86 Fed. Reg. 46,939-940.

Page 16

impact of a proposed action," and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[100] To put it lightly, the Proposed Rule's NEPA analysis leaves much to be desired.

The Proposed Rule acknowledges the obligations imposed by NEPA; however, the Departments contend that no NEPA analysis is required because the Proposed Rule "clearly fits within categorical exclusion A3(d) [and] A3(a)" in the Instruction Manual.[101] Specifically, the Departments state that "NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impact would be largely, if not completely, speculative."[102] Moreover, the Departments aver that

> [t]he proposed rule also would not make any changes to detention facilities. Rather, the detention facilities are already in existence and to attempt to calculate how many noncitizens would be paroled—a highly discretionary benefit—and how many would proceed to the detention centers would be near impossible to determine. The Departments have no reason to believe that these amendments would change the environmental effect, if any, of the existing regulations.[103]

Thus, the Departments rely on categorical exclusions to avoid a more fulsome NEPA analysis. The undersigned Attorneys General sharply dispute the Departments' assertions that the potential environmental impacts of the Proposed Rule are "largely, if not completely, speculative" and that statutory amendments proffered by the Proposed Rule would not change the environmental effect of the existing regulations.

While it may be an inconvenient truth for some, concerns about the environmental costs of immigration and population growth are not new. Title I, Section 101 of NEPA contains a "Congressional Declaration of National Environmental Policy" which, among other things, recognizes "the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth[.]"[104] A recent report from the U.S. Census Bureau indicates that "[d]ifferent levels of immigration between now and 2060 could change the projection of the population in that year by as much as 127 million people, with estimates ranging any-where from 320 to 447 million U.S. residents."[105] Environmental challenges posed by mass immigration include loss of biodiversity, water shortages, increased urban sprawl, overcrowding cities, and an increase in carbon emissions.[106] Some studies suggest that non-citizens, particularly those migrating from lower-polluting countries, produce more $CO_2$ annually than these

---

[100] *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

[101] 86 Fed. Reg. 46,940 (citing Department of Homeland Security, *Implementing the National Environmental Policy Act* (Directive 023-01, issued Oct. 31, 2014, and Instruction Manual, issued Nov. 6, 2014), *available at* https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex).

[102] *Id.* at 46,939.

[103] *Id.* at 46,939-40

[104] *See* NEPA, Pub. L. 91-190, 42 U.S.C. § 4321, *et seq.*, Jan. 1, 1970, 93 Stat. 852.

[105] U.S. CENSUS BUREAU, P25-1146, A CHANGING NATION: POPULATION PROJECTIONS UNDER ALTERNATIVE IMMIGRATION SCENARIOS 1 (FEBRUARY 2020), *available at* https://www.census.gov/content/dam/Census/library/publications/2020/demo/p25-1146.pdf.

[106] Matthew Sussis, *Five Ways Immigration-Driven Population Growth Impacts Our Environment*, CENTER FOR IMMIGRATION STUDIES (Nov. 19, 2018), https://cis.org/Sussis/Five-Ways-ImmigrationDriven-Population-Growth-Impacts-Our-Environment.

Page 17

non-citizens would have produced had they remained in their home countries.[107] The same is undoubtedly true of other greenhouse gasses and other pollutants. In declining to perform a NEPA analysis, the Departments ignored the potential increase in environmental harm that the Proposed Rule is likely to directly and indirectly cause.

Moreover, the Proposed Rule makes no mention of the guidance provided by President Biden's January 20, 2021, Executive Order on *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*.[108] This Executive Order instructs an Interagency Working Group ("IWG") to analyze the social cost of carbon, social cost of nitrous oxide, and social cost of methane, which "are estimates of monetized damages associated with incremental increases in greenhouse gas emissions."[109] The Executive Order then instructs agencies to rely on an interim social cost analysis "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions" until a final social cost analysis is published no later than January 2022.[110] Given the Proposed Rule's cursory NEPA analysis, it is readily apparent that the Departments did not refer to or rely on President Biden's Executive Order concerning the social cost of carbon. Louisiana and other States are challenging the legality and use of the IWG values for the social cost of carbon and other greenhouse gasses.[111] But to the extent the federal government is permitted to implement them, it is clearly arbitrary and capricious to use them only when the Biden Administration dislikes a policy.

**<u>Specific Comment 10</u>: Automatically starting the work-authorization time clock increases the illegal immigration pull-factor and harms U.S. workers.**

The Proposed Rule treats a positive credible-fear finding, which has little relation to whether an individual will ultimately qualify for asylum, as a properly filed asylum application that starts the clock for eligibility to file for work authorization. Because only 56 percent of non-citizens who meet the credible fear bar currently apply for asylum, this change will drastically increase the number of work-eligible non-citizens in the United States.[112]

This change will exacerbate the asylum system as a backdoor immigration system for economic non-citizens. By speeding up the process by which a non-citizen can gain work authorization, the Departments are creating yet another pull factor that will exacerbate the crisis at the Southwest Border. At no point does the Proposed Rule address this concern or determine ways to mitigate it. Moreover, the impact on U.S. workers could be severe. The U.S. economy generated only 194,000 jobs in September.[113] Meanwhile, border agents are encountering more than 200,000 inadmissible non-citizens monthly.[114] Without sufficient job-growth, and with hundreds of thousands of working age non-citizens gaining work authorization, U.S. workers may experience wage depression. While this shift may benefit some business owners, that benefit represents a transfer of wealth *away* from low-wage U.S. workers. The Proposed Rule acknowledges a potential "distributional economic impact"

---

[107] *Id.*
[108] Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021).
[109] *Id.* at § 5(a), 86 Fed. Reg. at 7,040.
[110] *Id.* at § 5(b)(ii)(A), 86 Fed. Reg. at 7.040.
[111] *Louisiana, et al., v. Biden, et al.*, No. 2:21-01074 (W.D. La.)
[112] U.S. GOV'T ACCOUNTABILITY OFF., *supra* note 46, at 20.
[113] U.S. BUREAU OF LABOR STATISTICS, USDL-21-1799, EMPLOYMENT SITUATION SUMMARY (Oct. 8, 2021), *available at* https://www.bls.gov/news.release/empsit.nr0.htm.
[114] *See supra* notes 6 & 7.

Page 18

from U.S. workers to asylum seekers, but fails to quantify it or otherwise acknowledge the serious economic issues that could arise if U.S. workers see their wages decrease in a time of drastic inflation.[115]

\*        \*        \*        \*

The Proposed Rule represents a fundamental shift in immigration policy in the United States and raises several grounds for concern about the Departments' methodology and analysis. It is unclear how the Proposed Rule complies or conflicts with other existing legal obligations. Also unclear is the intersection between this Proposed Rule and an increase in asylum seekers seeking safe haven in the United States. Importantly, the Proposed Rule ignored entirely any Federalism analysis, any explanation of how States and local communities will be impacted by such a momentous change in immigration policy, meaningful and timely input from State governments, and an environmental assessment. The Departments should withdraw the Proposed Rule, or must substantially revise it, consistent with the contours of the Administrative Procedure Act and UMRA.

Sincerely,

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Steve Marshall
Alabama Attorney General

Eric Schmitt
Missouri Attorney General

Mark Brnovich
Arizona Attorney General

Austin Knudsen
Montana Attorney General

---

[115] Gwynn Guilford, *Accelerating Inflation Spreads Through the Economy*, THE WALL STREET JOURNAL (Oct. 13, 2021 3:30 p.m.), https://www.wsj.com/articles/us-inflation-consumer-price-index-september-2021-11634074529.

Page 19

Leslie Rutledge
Arkansas Attorney General

Dave Yost
Ohio Attorney General

Ashley Moody
Florida Attorney General

John O'Connor
Oklahoma Attorney General

Christopher Carr
Georgia Attorney General

Alan Wilson
South Carolina Attorney General

Todd Rokita
Indiana Attorney General

Ken Paxton
Texas Attorney General

Derek Schmidt
Kansas Attorney General

Patrick Morrisey
West Virginia Attorney General



Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/) (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/) (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah) (https://www.youtube.com/user/customsborderprotect)

(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)

U.S. Customs and
Border Protection
(/)

# CBP Releases July 2021 Operational Update

**Release Date:** August 12, 2021

**WASHINGTON** — U.S. Customs and Border Protection (CBP) today released operational statistics for July 2021, which can be viewed online **here (https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics)**.

"In July, U.S. Customs and Border Protection played an important role in our nation's ongoing economic rebound, facilitating a continued growth of legitimate travel and trade, while protecting consumers and our country's agriculture. Commercial trucks this fiscal year are transiting through our ports of entry at higher numbers than they did in Fiscal Year 2019, while passenger vehicle, pedestrian travel, and air travel numbers are bouncing back from a comparable period in 2020 affected by the pandemic," said CBP Acting Commissioner Troy Miller. "CBP continues to take necessary measures to safely manage the Southwest Border and protect the health of communities, personnel, and migrants themselves. The



vast majority of single adults and many families continue to be expelled under the CDC's Title 42 authority, and those who cannot be expelled under Title 42 and do not have a legal basis to remain are placed in expedited removal proceedings. CBP has also adapted to changing dynamics between ports of entry along the Southwest Border, continuing to take steps to mitigate the spread of COVID-19 by expelling roughly half of those encountered under CDC's Title 42 public health authority."

### *CBP Enforcement Numbers for July 2021*

The large number of expulsions during the pandemic has contributed to a larger-than-usual number of migrants making multiple border crossing attempts, which means that total encounters somewhat overstate the number of unique individuals arriving at the border.

- The number of unique encounters in July 2021 was 154,288.
- In total, there were 212,672 encounters along the Southwest Border, 27 percent of which involved individuals who had at least one prior encounter in the previous 12 months, compared to an average one-year re-encounter rate of 14 percent for Fiscal Years 2014-2019.
- A majority (52 percent) of encounters continue to be single adults, with 110,443 encounters in July, a 6 percent decrease from June.
- 95,788 encounters, more than 45 percent of the total, were processed for expulsion under Title 42. 116,884 encounters were processed under Title 8.
  - 85,563 encounters involving single adults (78 percent) were processed for expulsion under Title 42, with 24,880 processed under Title 8.
  - 9,948 encounters involving family unit individuals (12 percent) were processed for expulsion under Title 42, with 73,018 processed under Title 8.
- A total of 845,307 unique individuals have been encountered year-to-date during Fiscal Year 2021, compared to 796,400 during the same time period in Fiscal Year 2019.
- So far in Fiscal Year 2021, U.S. Border Patrol agents along the Southwest Border have placed more than 60,500 migrants who cannot be expelled under Title 42 in Expedited Removal proceedings.
- To address recidivism, in July CBP began a Repeat Offender initiative, under which single adults who have previously been apprehended and deported under Title 8 are referred for prosecution.

### Unaccompanied Children

- Encounters of unaccompanied children increased 24 percent, with 18,962 encounters in July compared with 15,234 in June. In July, the average number of unaccompanied children in CBP custody was 1,363 per day, compared with an average of 794 per day in June.

### Family Unit individuals

- Encounters of family unit individuals increased by 49 percent from 55,839 in June to 82,966 in July—still below the peak of 88,587 encounters in May 2019.  The number of encounters with family unit individuals so far this fiscal year (328,121) remains below the number of encounters at the same point in Fiscal Year 2019 (474,545).

### International Travel and Trade

One of CBP's core mission objectives is to enhance the nation's economic prosperity, including through the facilitation of lawful trade and travel. CBP's role is vital to America's economic rebound from the impacts of the ongoing COVID-19 pandemic. CBP continues to protect America's national and economic security by facilitating legitimate trade while rigorously enforcing U.S. customs laws and regulations.

While CBP's trade and travel numbers have not entirely returned to pre-pandemic levels, they have increased significantly in recent months. For commercial trucks, CBP has processed a higher overall number so far this fiscal year compared to the same period in Fiscal Year 2019.

| Count | FY 2019 (Oct-Jul) | FY 2020 (Oct-Jul) | FY 2021 (Oct-Jul) | FY2020 Through COVID (Mar-July) | FY2021 Through COVID (Mar-July) | Mar-July % Change |
|-------|-------|-------|-------|-------|-------|-------|
| Air | 111,564,028 | 59,258,802 | 32,766,956 | 7,609,285 | 21,323,445 | 180.23% |
| Passenger Vehicles | 82,219,857 | 60,351,021 | 47,332,904 | 19,974,086 | 25,471,141 | 27.52% |
| Pedestrians | 42,205,647 | 29,486,806 | 20,614,785 | 8,213,295 | 11,094,272 | 35.08% |
| Commercial Trucks | 10,014,998 | 9,379,173 | 10,379,183 | 4,484,521 | 5,366,545 | 19.67% |

As international travel begins to rebound toward pre-pandemic levels, CBP also anticipates an increase in border wait times. To ensure a smooth, more efficient inspection process, travelers should:

- Acquire a Western Hemisphere Travel Initiative (WHTI) document and/or apply for a trusted traveler program.
- Use the CBP OneTM mobile application, an intuitive single point of entry for travelers and stakeholders to access CBP mobile applications and services, including obtaining proof of their electronic I-94 form on their mobile device.

CBP encourages Visa Waiver Program travelers seeking to obtain an approved **ESTA (https://esta.cbp.dhs.gov/)** to take advantage of the time savings offered by using CBP OneTM or the **CBP I-94 website (https://i94.cbp.dhs.gov/I94/#/home)**. With an ESTA, these travelers can apply for their I-94 in advance of arrival and avoid filling out the Form I-94W at a port of entry.

### *Facial Biometrics*

One of the most important ways that CBP is transforming international travel is through using facial biometrics to create a safe and seamless travel experience for all passengers. Through programs such as Simplified Arrival, CBP is using biometric facial comparison technology to meet the Congressional mandate while further securing and streamlining lawful travel. Please see more **here (https://biometrics.cbp.gov/land)**.

Case 1:22-cv-01130-DCJ-CBW   Document 218-17   Filed 01/29/24   Page 24 of 503 PageID #:
12298

- To date, more than 88 million travelers have participated in the biometric facial comparison process at air, land, and seaports of entry.
- Since September 2018, CBP has leveraged facial biometrics to prevent more than 870 imposters from illegally entering the United States by using genuine travel documents that were issued to other people.

### Trade Stats/Seizures – Protecting the American Consumer

In Fiscal Year 2021 to date, CBP has processed approximately $2.3 trillion of imports, an increase of nearly 14 percent compared to the same period in Fiscal Year 2020. CBP has also seized 63,200 shipments for trade violations in the current fiscal year. In July alone, CBP processed more than 3.2 million entry summaries valued at more than $248 billion, identifying estimated duties of nearly $8 billion to be collected by the U.S. government. Trade via the ocean accounted for more than 40 percent of the total import value, followed by air, truck, and rail.

- Intellectual property rights violations continue to put America's innovation economy at risk. Trade in **counterfeit and pirated goods (/FakeGoodsRealDangers)** threatens the competitiveness of U.S. businesses, the livelihoods of American workers, and the health and safety of consumers.

  - In July 2021, CBP seized 2,564 shipments that contained $395,533,125 million of counterfeit goods, including counterfeit **Apple AirPods (/newsroom/local-media-release/thousands-fake-apple-airpods-worth-13-million-seized-cincinnati-cbp)** and **auto parts (/newsroom/local-media-release/philadelphia-cbp-seizes-nearly-300k-counterfeit-auto-parts-china)**, and critical personal protective equipment for healthcare workers and first responders.

### Forced Labor Enforcement

CBP continues to aggressively investigate and prevent goods made by **forced labor (/trade/programs-administration/forced-labor)** from entering U.S. commerce. Forced labor is a form of modern-day slavery that violates **international labor standards (https://www.ilo.org/global/topics/forced-labour/publications/WCMS_203832/lang--en/index.htm)** and universal human rights.

- CBP has issued seven Withhold Release Orders in Fiscal Year 2021 to protect American consumers and businesses from goods made by forced labor. Those orders target **cotton products (/newsroom/national-media-release/cbp-issues-detention-order-cotton-products-made-xinjiang-production)** and **tomato products (/newsroom/national-media-release/cbp-issues-region-wide-withhold-release-order-products-made-slave)** from China's Xinjiang Uyghur Autonomous Region; **silica-based products (/newsroom/national-media-release/department-homeland-security-issues-withhold-release-order-silica)** made by a company that operates in Xinjiang; **palm oil (/newsroom/national-media-release/cbp-issues-withhold-release-order-palm-oil-produced-forced-labor)** from a Malaysian company; and tuna and other seafood harvested by a **Chinese fishing fleet (/newsroom/national-media-release/cbp-issues-withhold-release-order-chinese-fishing-fleet)**, a **Taiwan-flagged fishing vessel (/newsroom/national-media-release/cbp-**

issues-withhold-release-order-seafood-harvested-forced-labor-0)**, and a **Fijian-flagged fishing vessel (/newsroom/national-media-release/cbp-issues-withhold-release-order-seafood-harvested-forced-labor-0)**.

- In Fiscal Year 2021 to date, CBP has detained 967 shipments that contained approximately $367 million of goods suspected to be made by forced labor. The United States will not tolerate forced labor in our supply chains and stands against cruel and inhumane labor practices.

### Drug Seizures

CBP officers, Border Patrol agents, and Air and Marine Operations agents continue to interdict the flow of illicit narcotics across the border. Nationwide, drug seizures were up 10 percent in July, a reflection of CBP's commitment to protecting the people and economy of the United States.  Seizures were as follows:

- Cocaine seizures increased 91 percent;
- Methamphetamine seizures increased 20 percent;
- Heroin seizures decreased 17 percent;
- Fentanyl seizures decreased 22 percent.

Additional CBP drug seizure statistics can be found **here (/newsroom/stats/drug-seizure-statistics)**.

### Agriculture Stats/Seizures – Securing American Agriculture

In July 2021, CBP agriculture specialists helped protect America's agriculture, natural resources, and economic prosperity.

- 5,699 emergency action notifications issued for restricted and prohibited plant and animal products entering the United States.
- 65,633 positive passenger inspections conducted, and 575 civil penalties and/or violations issued to the traveling public for failing to declare.

Last month, the U.S. Department of Agriculture's Foreign Animal Disease Diagnostic Laboratory confirmed African swine fever (ASF) in samples collected from pigs in the Dominican Republic through an existing cooperative surveillance program.

In response, CBP's officers and agriculture specialists took steps to prevent the introduction of the ASF virus into the United States by increasing inspections of flights from the Dominican Republic and ensuring that garbage from these airplanes is properly disposed of.

Also last month, CBP's Laredo Field Office confirmed three first-in-the-nation pest interdictions.

- Cyclocephala forcipulata (a type of scarab beetle)
- Alampyris fuliginea (a type of longhorn beetle)
- Eburia nigrovittata (a type of longhorn beetle)

If introduced into the United States, these non-native pests could cause irreparable harm to American agriculture and the timber industry.

### Heroic Acts

CBP officers and Border Patrol agents have displayed acts of heroism both at work and off duty.

- Air and Marine Operations (AMO) agents rescued approximately 30 individuals in the month of July. In Tucson, AZ, a Black Hawk crew hoist-extracted a man from the rugged terrain of the Baboquivari Mountains.
- On July 19, 2021, an off-duty Border Patrol agent apprehended a man who was **wielding a knife toward civilians (/newsroom/local-media-release/duty-usbp-agent-stops-knife-wielding-suspect)** in downtown San Diego.
- On July 25, 2021, an off-duty Border Patrol agent from the El Centro Sector successfully **stopped a carjacking (/newsroom/local-media-release/heroic-act-duty-border-patrol-agent)** in progress in Westmorland, CA.
- On July 31, 2021, an off-duty Border Patrol agent pulled a man from a **burning vehicle (/newsroom/local-media-release/duty-border-patrol-agent-pulls-man-burning-car)** before the vehicle exploded and was engulfed in flames.

### CBP COVID-19 Response

The safety of our workforce, our communities, and individuals in our care is a top priority.  CBP personnel put themselves and their families at risk with every encounter with the public. Since the start of the pandemic:

- More than 9,800 CBP employees have tested positive for COVID-19.
- 35 have passed away, two in the last month.

CBP continues to explore adjustments to workforce posture and health protocols based on widespread vaccine access and easing public health metrics:

- CBP provides migrants who can't be expelled under Title 42 or are awaiting processing with PPE from the moment they are taken into custody, and migrants are required to keep masks on at all times.
- CBP works with appropriate agencies that facilitate testing, diagnosis, isolation, and treatment of migrants, including:
    - Local governments and non-governmental organizations for persons released from CBP custody;
    - DHS and ICE for testing of persons to be released from CBP custody, particularly in locations without local government or NGO testing capability; and,
    - HHS for testing of unaccompanied children.
- DHS has developed a partnership model to test and isolate families who test positive for COVID-19, and reimburse 100 percent of the cost, provided that the state does not stand in the way.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the management, control and protection of our nation's borders at and between official ports of entry. CBP is charged with securing the borders of the United States while enforcing hundreds of laws and facilitating lawful trade and travel.*

**Last modified:** August 12, 2021

**Tags:**

Border Security,  About CBP,  Trade Enforcement,  Travel,  Agriculture,  Office of Field Operations,
Forced Labor,  COVID-19,  Unaccompanied Children (UC),  Search and Rescue,  Drug Trafficking,
Smuggling,  Statistics

 Share This Page.

**The Washington Post**  *Democracy Dies in Darkness*

# July was busiest month for illegal border crossings in 21 years, CBP data shows

By Nick Miroff

August 12, 2021 at 9:43 p.m. EDT

  

The number of migrants detained along the Mexico border crossed a new threshold last month, exceeding 200,000 for the first time in 21 years, according to U.S. Customs and Border Protection enforcement data released Thursday.

Among the 212,672 migrants taken into U.S. custody in July were 82,966 family members and 18,962 unaccompanied teenagers and children — an all-time high. The unaccompanied minors' custody requirements have once more overwhelmed the Biden administration as it struggles to care for them safely in the middle of the pandemic.

Biden officials predicted earlier this year that the volume of people crossing the border would decline with the summer heat. Instead, Central American adults and children are crossing again in large groups of 300 or more, and U.S. border facilities are jammed with migrants shoulder-to-shoulder in detention facilities.

More than 15,000 minors who arrived without parents are in government custody, many sleeping in grim military barracks. A South Texas park along the Rio Grande has been converted into a sprawling quarantine camp for more than 1,000 parents and children who have tested positive for the coronavirus or been exposed to infection.

"The situation at the border is one of the toughest challenges we face," Homeland Security Secretary Alejandro Mayorkas said Thursday, speaking in the Rio Grande Valley of South Texas, where the strain has been most acute. "It is complicated, changing and involves vulnerable people at a time of a global pandemic."

The July arrest total marked a 13 percent increase from June, and was the second-highest number of arrests along the Mexico border on record, according to CBP statistics. Biden officials are projecting a record-setting year along the Mexico border, where authorities have stopped more than 1.3 million migrants since October.

The Biden administration continues to rely on a U.S. public health code known as Title 42 to bypass normal immigration proceedings and rapidly "expel" most single adult migrants to Mexico, but many attempt to cross again and again until they successfully evade capture.

The monthly data compiled by CBP is a gauge of enforcement activity along the border, rather than a count of distinct individuals. Of the more than 212,000 taken into U.S. custody last month, about 154,288 were unique individuals, Mayorkas said. CBP figures show 27 percent of border-crossers who were taken into custody in July had been previously detained.

In recent months, border officials have also reported more than 1,000 daily "got-away" incidents, in which authorities are able to detect an illegal entry — often using cameras and sensors — but do not make an arrest.

With the number of migrants arriving to the Rio Grande Valley of South Texas exceeding 20,000 per week last month, the Biden administration has introduced new enforcement measures in an attempt to deter illegal crossings. It has

restarted fast-track deportation flights for some families who do not claim a fear of persecution if returned while transporting others to border areas further west where Mexican authorities will accept the returns.

Most notably, Biden officials for the first time have launched "expulsion flights" that use Title 42 authority to fly Central American families deep into southern Mexico, hoping they will opt to return home rather than trying to reenter the United States. Hundreds of those migrants, including small children, have been dropped off in remote towns with little shelter capacity, rights advocates say, a pattern the United Nations refugee agency called "troubling."

"At a time of significantly increased movement of asylum-seekers and migrants in the region, the Title 42 expulsion flights will also further strain the overburdened humanitarian response capacity in southern Mexico, heighten the risk of COVID-19 transmission across national borders and run counter to steps being taken to share responsibility among countries of the region in addressing the root causes of forced displacement and migration," said Matthew Reynolds, the agency's U.S. representative, in a statement.

Mayorkas addressed the flights to Mexico's interior in his remarks, the first time U.S. officials have spoken publicly about the controversial practice.

"We are expelling them further into the interior of Mexico, where it's far more difficult to try again," he said. "We are working with Mexico to ensure for individuals subject to the expulsion flights [that] their needs are addressed."

Mayorkas said the United States' primary responsibility, however, is to "protect the American public" from the pandemic. The positivity rate of migrants tested along the Mexico border is on par with or lower than U.S. community rates, he added.

About 45 percent of border-crossers who arrived last month were turned back to Mexico, data shows, the lowest percentage since Biden took office.

Along the U.S. southern border, U.S. Immigration and Customs Enforcement has sent 350 officers and staff to help CBP cope with the influx, senior ICE official Corey Price told agency employees Wednesday in an email obtained by The Washington Post.

Price also told staff that ICE's Port Isabel facility in South Texas is being used as a large "staging site" where ICE personnel will process migrants CBP is too overwhelmed to handle.

Price also said in the email that ICE medical personnel have begun providing coronavirus vaccinations to some migrants in CBP custody. ICE officials, however, provided a statement late Thursday, attributed to Price, saying the agency is not vaccinating migrants in CBP custody.

Price's email also told staffers that ICE was seeking more emergency bed space and staging facilities for the growing number of families arriving along the border.

Over the past several months, the arrival of soaring numbers of migrants from Ecuador, Brazil, Haiti, Venezuela and nations in Africa has complicated the Biden administration's attempt to ease pressure on the border through a strategy based on addressing the "root causes" of emigration from Central America.

Officials in Panama this week held talks with Colombia and other nations in the region to urge tighter visa restrictions, as jungle camps holding U.S.-bound migrants have swelled with thousands of stranded migrants. About 10,000 people, mainly from Haiti and Cuba, are stuck in the small port town of Necoclí, Colombia, awaiting sea passage to Panama.





Official website of the Department of Homeland Security

**(https://www.facebook.com/CBPgov/)**    **(https://www.instagram.com/cbpgov/)**

**(https://www.flickr.com/photos/cbpphotos/)**    **(https://twitter.com/cbp)**

**(https://www.linkedin.com/company/2997?trk=tyah)**    **(https://www.youtube.com/user/customsborderprotect)**

U.S. Customs and

Border Protection

**(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)**

(/)

# CBP Releases August 2021 Operational Update

**Release Date:** September 15, 2021

WASHINGTON — U.S. Customs and Border Protection (CBP) today released operational statistics for August 2021, which can be viewed online **here (/newsroom/stats/cbp-enforcement-statistics)**.

"In August, U.S. Customs and Border Protection played an important role in Operation Allies Refuge and Operation Allies Welcome, as well as in support of the Gulf Coast after Hurricane Ida and the people of Haiti after their earthquake. We rose to those challenges even as we continued our vital work in support of our economy and national security at our ports of entry and along our borders," said CBP Acting Commissioner Troy Miller. "In August, CBP processed a significant growth of legitimate travel and trade, with commercial truck transit on par with numbers at this point in Fiscal Year 2019, and passenger vehicle, pedestrian travel, and air travel numbers continuing to progress toward pre-pandemic levels.



"The men and women at CBP continue to step up to meet the demands of high numbers of encounters at our southern border. CBP recorded 2 percent fewer encounters in August than July. The vast majority of single adults encountered in August, along with a substantial share of families, continued to be expelled under the CDC's Title 42 authority."

## CBP Enforcement Numbers for August 2021

The large number of expulsions during the pandemic has contributed to a larger-than-usual number of migrants making multiple border crossing attempts, which means that total encounters somewhat overstate the number of unique individuals arriving at the border.

- The number of unique encounters in August 2021 was 156,641.

- In total, there were 208,887 encounters along the Southwest Border, a 2 percent drop compared to July. Of those, 25 percent involved individuals who had at least one prior encounter in the previous 12 months, compared to an average one-year re-encounter rate of 14 percent for Fiscal Years 2014-2019.
- Nearly half (49 percent) of encounters were single adults, with 103,129 encounters in August, a 7 percent decrease compared to July.
- 93,414 encounters, more than 44 percent of the total, were processed for expulsion under Title 42. 115,473 encounters were processed under Title 8.
  - 76,895 encounters involving single adults (75 percent) were processed for expulsion under Title 42, with 26,234 processed under Title 8.
  - 16,240 encounters involving family unit individuals (19 percent) were processed for expulsion under Title 42, with 70,247 processed under Title 8.
- A total of 1,002,722 unique individuals have been encountered year-to-date during Fiscal Year 2021, compared to 851,513 during the same time period in Fiscal Year 2019.
- In July, CBP began a Repeat Offender initiative, under which single adults who have previously been apprehended and deported under Title 8 are referred for prosecution.
- As part of the United States' mitigation efforts in response to the rise in COVID-19 cases due to the Delta variant, the Department of Homeland Security has begun to transport individuals expelled under Title 42 by plane to the Mexican interior.
- Certain individuals who are not able to be expelled under Title 42 are placed in expedited removal proceedings. Expedited removal provides an accelerated procedure to remove individuals who do not have a basis under U.S. law to be in the United States. So far in Fiscal Year 2021, U.S. Border Patrol agents have placed nearly 72,000 migrants in expedited removal proceedings.

## Unaccompanied Children

- Encounters of unaccompanied children decreased 1 percent, with 18,847 encounters in August compared with 18,958 in July. In August, the average number of unaccompanied children in CBP custody was 1,435 per day, compared with an average of 1,353 per day in July.

## Family Unit individuals

- Encounters of family unit individuals increased by 4 percent from 83,493 in July to 86,487 in August—still below the peak of 88,587 encounters in May 2019. The number of encounters with family unit individuals so far this fiscal year (415,185) remains below the number of encounters at the same point in Fiscal Year 2019 (505,102).

## Operation Allies Refuge and Operation Allies Welcome

As part of Operation Allies Refuge, CBP deployed over 190 personnel among the approximately 400 DHS professionals deployed to Bahrain, Germany, Kuwait, Italy, Qatar, Spain, and UAE. CBP personnel worked in coordination with the Department of Homeland Security, Department of Defense, and Department of State to process, screen, and vet Afghans who have worked for and on behalf of the United States and for other vulnerable Afghans. These deployments did not affect CBP operations on the southwest border.

In August, President Biden designated the Department of Homeland Security as the lead federal agency to coordinate Operation Allies Welcome, the ongoing effort to bring Americans and vulnerable Afghans – many of whom worked on behalf of the United States – to the United States and support their resettlement.

The U.S. government continues to work around the clock to conduct the screening and vetting of vulnerable Afghans prior to their arrival in the United States, consistent with the dual goals of protecting national security and providing protection for vulnerable Afghans.

## International Travel and Trade

One of CBP's core mission objectives is to enhance the nation's economic prosperity, including through the facilitation of lawful trade and travel. CBP's role is vital to America's economic rebound from the impacts of the ongoing COVID-19 pandemic. CBP continues to protect America's national and economic security by facilitating legitimate trade while rigorously enforcing U.S. customs laws and regulations. While CBP's trade and travel numbers have not entirely returned to pre-pandemic levels, they have increased significantly in recent months.

| Count | FY 2019 (Oct-Aug) | FY 2020 (Oct-Aug) | FY 2021 (Oct-Aug) | FY2020 Through COVID (Mar-Aug) | FY2021 Through COVID (Mar-Aug) | Mar-Aug % Change |
|---|---|---|---|---|---|---|
| Air | 124,963,637 | 60,710,442 | 39,389,879 | 9,060,925 | 27,946,368 | 208.43% |
| Passenger Vehicles | 91,412,498 | 64,477,843 | 52,866,450 | 24,102,179 | 31,004,687 | 28.64% |
| Pedestrians | 46,822,775 | 31,254,069 | 22,928,463 | 9,983,504 | 13,407,352 | 34.30% |
| Commercial Trucks | 11,482,465 | 10,399,808 | 11,460,836 | 5,505,156 | 6,448,198 | 17.13% |

To ensure a smooth, more efficient inspection process at the border, CBP recommends that travelers:

- Acquire a Western Hemisphere Travel Initiative (WHTI) document and/or apply for a trusted traveler program.
- Use the CBP OneTM mobile application, an intuitive single point of entry for travelers and stakeholders to access CBP mobile applications and services, including obtaining proof of their electronic I-94 form on their mobile device.

CBP encourages Visa Waiver Program travelers seeking to obtain an approved **ESTA (https://esta.cbp.dhs.gov/)** to take advantage of the time savings offered by using CBP OneTM or the **CBP I-94 website (https://i94.cbp.dhs.gov/I94/#/home)**. With an ESTA, these travelers can apply for their I-94 in advance of arrival and avoid filling out the Form I-94W at a port of entry.

## Facial Biometrics

One of the most important ways that CBP is transforming international travel is through the use of facial biometrics to create a safe and seamless travel experience for all passengers. U.S. Customs and Border Protection has a Congressional mandate to biometrically record all foreign nationals who enter and exit the United States. Years of testing have demonstrated that implementing biometric facial comparison technology through public-private partnerships is the most secure, efficient, and cost-effective way to fulfill the Congressional mandate while protecting the privacy of all travelers. The use of facial biometrics provides travelers with a secure, touchless process that modernizes air travel. With enhanced processes like Simplified Arrival and biometric boarding at select locations, CBP is using biometric facial comparison technology to meet the Congressional mandate while further securing and streamlining lawful travel. Please see more **here (http://www.cbp.gov/biometrics)**.
To date, more than 96 million travelers have participated in the biometric facial comparison process at air, land, and seaports of entry.

- Since September 2018, CBP has leveraged facial biometrics to prevent more than 900 imposters from illegally entering the United States by using genuine travel documents that were issued to other people.

## Trade Stats/Seizures – Protecting the American Consumer

In Fiscal Year 2021 to date, CBP has processed approximately $2.6 trillion of imports, an increase of nearly 15 percent compared to the same period in Fiscal Year 2020. CBP has also seized 77,416 shipments for trade violations in the current fiscal year. In August alone, CBP processed more than 3 million entry summaries valued at more than $262 billion, identifying estimated duties of nearly $8.5 billion to be collected by the U.S. government.  Trade via the ocean accounted for more than 40 percent of the total import value, followed by air, truck, and rail.

- Intellectual property rights violations continue to put America's innovation economy at risk. Trade in **counterfeit and pirated goods (/FakeGoodsRealDangers)** threatens the competitiveness of U.S. businesses, the livelihoods of American workers, and the health and safety of consumers.

- In August 2021, CBP seized 2,186 shipments that contained more than $300 million of counterfeit goods.

## Forced Labor Enforcement

CBP continues to aggressively investigate and prevent goods made by **forced labor (/trade/programs-administration/forced-labor)** from entering U.S. commerce.  Forced labor is a form of modern-day slavery that violates **international labor standards (https://www.ilo.org/global/topics/forced-labour/publications/WCMS_203832/lang--en/index.htm)** and universal human rights.

- CBP has issued seven Withhold Release Orders in Fiscal Year 2021 to protect American consumers and businesses from goods made by forced labor.  Those orders have targeted **cotton products (/newsroom/national-media-release/cbp-issues-detention-order-cotton-products-made-xinjiang-production)** and **tomato products (/newsroom/national-media-release/cbp-issues-region-wide-withhold-release-order-products-made-slave)** from China's Xinjiang Uyghur Autonomous Region; **silica-based products (/newsroom/national-media-release/department-homeland-security-issues-withhold-release-order-silica)** made by a company that operates in Xinjiang; **palm oil (https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-palm-oil-produced-forced-labor)** from a Malaysian company; and tuna and other seafood harvested by a **Chinese fishing fleet (/newsroom/national-media-release/cbp-issues-withhold-release-order-chinese-fishing-fleet)**, a **Taiwan-flagged fishing vessel (/newsroom/national-media-release/cbp-issues-withhold-release-order-seafood-harvested-forced-labor-0)**, and a **Fijian-flagged fishing vessel (/newsroom/national-media-release/cbp-issues-withhold-release-order-seafood-harvested-forced-labor-0)**.

- On Sept. 10, 2021, CBP announced that it had **modified (/newsroom/national-media-release/cbp-modifies-forced-labor-finding-top-glove-corporation-bhd)** the forced labor finding on Top Glove Corporation Bhd.  Effective immediately, CBP will permit the importation of disposable gloves made at Top Glove facilities in Malaysia. Notice of the modification of the forced labor Finding on Top Glove is available in the **Federal Register (https://www.federalregister.gov/public-inspection/2021-19535/determination-maintenance-of-finding-pertaining-to-certain-disposable-gloves-produced-in-malaysia-is)** and in the **Customs Bulletin (/trade/rulings/bulletin-decisions)**.

- In Fiscal Year 2021 to date, CBP has detained 1,213 shipments that contained approximately $414 million of goods suspected to be made by forced labor. The United States will not tolerate forced labor in our supply chains and stands against cruel and inhumane labor practices.

## Drug Seizures

CBP officers, Border Patrol agents, and Air and Marine Operations agents continue to interdict the flow of illicit narcotics across the border. Nationwide, drug seizures were down 9 percent in August, a reflection of CBP's commitment to protecting the people and economy of the United States.  Seizures were as follows:

- Cocaine seizures increased 32 percent;
- Methamphetamine seizures increased 13 percent;
- Heroin seizures decreased 36 percent;
- Fentanyl seizures increased 34 percent.

Additional CBP drug seizure statistics can be found **here (/newsroom/stats/drug-seizure-statistics)**.

## Agriculture Stats/Seizures – Securing American Agriculture

In August 2021, CBP agriculture specialists helped protect America's agriculture, natural resources, and economic prosperity.

- CBP issued 6,079 emergency action notifications for restricted and prohibited plant and animal products entering the United States.
- CBP conducted 69,978 positive passenger inspections and issued 734 civil penalties and/or violations to the traveling public for failing to declare prohibited agriculture items.

## Hurricane and Earthquake Response

CBP is a member agency of the Department of Homeland Security's National Response Framework (NRF) in responding to emergencies as part of a whole-of-government approach to prepare for, and to respond to all hazards. CBP contributes both assets and personnel with capabilities unique to CBP that significantly contributes to lifesaving and response management efforts.

- CBP personnel from across the Southeastern United States supported local, state and federal partners in Hurricane Ida response efforts. CBP's highest priorities in hurricane response are to promote lifesaving and life-sustaining activities, the safe evacuation of people leaving the impacted area, the maintenance of public order, the prevention of the loss of property to the extent possible and the speedy recovery of the region.

- Following a 7.2 magnitude earthquake in Haiti, AMO National Air Security Operations Center— Jacksonville **sent P-3 Airborne Early Warning crews to the Caribbean nation in support of the Haitian Response efforts (/newsroom/national-media-release/air-and-marine-operations-works-partners-haitian-earthquake-relief)**. Working with U.S. Coast Guard partners, NASOC—J P-3 AEW crews flew more than 20 hours conducting communication coordination missions for rescue, relief, and other responding aircraft.

## CBP COVID-19 Response

The safety of our workforce, our communities, and individuals in our care is a top priority.  CBP personnel put themselves and their families at risk with every encounter with the public. Since the start of the pandemic:

- More than 10,900 CBP employees have tested positive for COVID-19.
- 43 have passed away, eight in the last month.

**CBP continues to explore adjustments to workforce posture and health protocols based on widespread vaccine access and easing public health metrics:**

- CBP provides migrants who can't be expelled under Title 42 or are awaiting processing with PPE from the moment they are taken into custody, and migrants are required to keep masks on at all times.
- CBP works with appropriate agencies that facilitate testing, diagnosis, isolation, and treatment of migrants, including:
    - Local governments and non-governmental organizations for persons released from CBP custody;
    - DHS and ICE for testing of persons to be released from CBP custody, particularly in locations without local government or NGO testing capability; and,
    - HHS for testing of unaccompanied children.
- DHS has developed a partnership model to test and isolate families who test positive for COVID-19, and reimburse 100 percent of the cost, provided that the state does not stand in the way.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the management, control and protection of our nation's borders at and between official ports of entry. CBP is charged with securing the borders of the United States while enforcing hundreds of laws and facilitating lawful trade and travel.*

**Last modified:** September 15, 2021

**Tags:**

**About CBP, Accountability and Transparency, Agriculture, Air and Marine Operations, Border Security, Biometrics, COVID-19, U.S. Border Patrol, Office of Field Operations, Trade Enforcement, Travel, Statistics**

 Share This Page.



🇺🇸 Official website of the Department of Homeland Security



U.S. Department of
omeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs

# Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration

**Release Date:** December 20, 2018

### Announces Migration Protection Protocols

">

WASHINGTON   Today, Secretary of Homeland Security Kirstjen M  Nielsen announced historic action to confront the illegal immigration crisis facing the United States.  Effective immediately, the United States will begin the process of invoking Section 235(b)(2)(C) of the Immigration and Nationality Act.  Under the Migration Protection Protocols (MPP), individuals arriving in or entering the United States from Mexico   illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings.

"Today we are announcing historic measures to bring the illegal immigration crisis under control," said Secretary Nielsen.  "We will confront this crisis head on, uphold the rule of law, and strengthen our humanitarian commitments.  Aliens trying to game the system to get into our country illegally will no longer be able to disappear into the United States, where many skip their court dates   Instead, they will wait for an immigration court decision while they are in Mexico.  'Catch and release' will be replaced with 'catch and return.'  In doing so, we will reduce illegal migration by removing one of the key incentives that encourages people from

taking the dangerous journey to the United States in the first place.  This will also allow us to focus more attention on those who are actually fleeing persecution

"Let me be clear:  we will undertake these steps consistent with all domestic and international legal obligations, including our humanitarian commitments.  We have notified the Mexican government of our intended actions   In response, Mexico has made an independent determination that they will commit to implement essential measures on their side of the border.  We expect affected migrants will receive humanitarian visas to stay on Mexican soil, the ability to apply for work, and other protections while they await a U.S. legal determination "

## Background

Illegal aliens have exploited asylum loopholes at an alarming rate   Over the last five years, DHS has seen a 2000 percent increase in aliens claiming credible fear (the first step to asylum), as many know it will give them an opportunity to stay in our country, even if they do not actually have a valid claim to asylum.  As a result, the United States has an overwhelming asylum backlog of more than 786,000 pending cases   Last year alone the number of asylum claims soared 67 percent compared to the previous year.  Most of these claims are not meritorious—in fact *nine out of ten asylum claims are not granted by a federal immigration judge*.  However, by the time a judge has ordered them removed from the United States, many have vanished

## Process

- Aliens trying to enter the U S  to claim asylum will no longer be released into our country, where they often disappear before a court can determine their claim's merits.
- Instead, those aliens will be processed by DHS and given a "Notice to Appear" for their immigration court hearing
- While they wait in Mexico, the Mexican government has made its own determination to provide such individuals humanitarian visas, work authorization, and other protections  Aliens will have access to immigration attorneys and to the U S  for their court hearings.
- Aliens whose claims are upheld by U.S. judges will be allowed in. Those without valid claims will be deported to their home countries

## Anticipated Benefits

- As we implement, illegal immigration and false asylum claims are expected to decline.

- Aliens will not be able to disappear into U.S. before court decision.

- More attention can be focused on more quickly assisting legitimate asylum-seekers, as fraudsters are disincentivized from making the journey

- Precious border security personnel and resources will be freed up to focus on protecting our territory and clearing the massive asylum backlog.

- Vulnerable populations will get the protection they need while they await a determination in Mexico.

Topics  Border Security (/topics/border security) , Immigration and Customs Enforcement (/topics/immigration enforcement) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Keywords: Border Security (/keywords/border-security) , Immigration Enforcement (/keywords/immigration-enforcement) , Southwest Border (/keywords/southwest-border)

Last Published Date: December 20, 2018

**Assessment of the Migrant Protection Protocols (MPP)**
**October 28, 2019**

## I.   Overview and Legal Basis

The Department of Homeland Security (DHS) remains committed to using all available tools to address the unprecedented security and humanitarian crisis at the southern border of the United States.

- At peak of the crisis in May 2019, there were more than 4,800 aliens crossing the border daily—representing an average of more than *three apprehensions per minute*.

- The law provides for mandatory detention of aliens who unlawfully enter the United States between ports of entry if they are placed in expedited removal proceedings. However, resource constraints during the crisis, as well as other court-ordered limitations on the ability to detain individuals, made many releases inevitable, particularly for aliens who were processed as members of family units.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) authorizes the Department of Homeland Security to return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry), pending removal proceedings under INA § 240.

- Consistent with this express statutory authority, DHS began implementing the Migrant Protection Protocols (MPP) and returning aliens subject to INA § 235(b)(2)(C) to Mexico, in January 2019.

- Under MPP, certain aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico who are not admissible may be returned to Mexico for the duration of their immigration proceedings.

The U.S. government initiated MPP pursuant to U.S. law, but has implemented and expanded the program through ongoing discussions, and in close coordination, with the Government of Mexico (GOM).

- MPP is a core component of U.S. foreign relations and bilateral cooperation with GOM to address the migration crisis across the shared U.S.-Mexico border.

- MPP expansion was among the key "meaningful and unprecedented steps" undertaken by GOM "to help curb the flow of illegal immigration to the U.S. border since the launch of the U.S.-Mexico Declaration in Washington on June 7, 2019."[1]

---

[1] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/

- On September 10, 2019, Vice President Pence and Foreign Minister Ebrard "agree[d] to implement the Migrant Protection Protocols to the fullest extent possible."[2]

- Therefore, disruption of MPP would adversely impact U.S. foreign relations—along with the U.S. government's ability to effectively address the border security and humanitarian crisis that constitutes an ongoing national emergency.[3]

## II.   MPP Has Demonstrated Operational Effectiveness

In the past nine months—following a phased implementation, and in close coordination with GOM—DHS has returned more than 55,000 aliens to Mexico under MPP. MPP has been an indispensable tool in addressing the ongoing crisis at the southern border and restoring integrity to the immigration system.

### Apprehensions of Illegal Aliens are Decreasing

- Since a recent peak of more than 144,000 in May 2019, total enforcement actions—representing the number of aliens apprehended between points of entry or found inadmissible at ports of entry—have decreased by 64%, through September 2019.

- Border encounters with Central American families—who were the main driver of the crisis and comprise a majority of MPP-amenable aliens—have decreased by approximately 80%.

- Although MPP is one among many tools that DHS has employed in response to the border crisis, DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.

### MPP is Restoring Integrity to the System

- Individuals returned to Mexico pursuant to MPP are now at various stages of their immigration proceedings: some are awaiting their first hearing; some have completed their first hearing and are awaiting their individual hearing; some have received an order of removal from an immigration judge and are now pursuing an appeal; some have established a fear of return to Mexico and are awaiting their proceedings in the United States; some have been removed to their home countries; and some have withdrawn claims and elected to voluntarily return to their home countries.

---

[2] https://www.whitehouse.gov/briefings-statements/readout-vice-president-mike-pences-meeting-mexican-foreign-secretary-marcelo-ebrard/
[3] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/

- MPP returnees with meritorious claims can be granted relief or protection within months, rather than remaining in limbo for years while awaiting immigration court proceedings in the United States.

  o The United States committed to GOM to minimize the time that migrants wait in Mexico for their immigration proceedings.  Specifically, the Department of Justice (DOJ) agreed to treat MPP cases such as detained cases such that they are prioritized according to longstanding guidance for such cases.

  o The first three locations for MPP implementation—San Diego, Calexico, and El Paso—were chosen because of their close proximity to existing immigration courts.

  o After the June 7, 2019, Joint Declaration between GOM and the United States providing for expansion of MPP through bilateral cooperation, DHS erected temporary, dedicated MPP hearing locations at ports of entry in Laredo and Brownsville, in coordination with DOJ, at a total six-month construction and operation cost of approximately $70 million.

  o Individuals processed in MPP receive initial court hearings within two to four months, and—as of October 21, 2019—almost 13,000 cases had been completed at the immigration court level.

  o A small subset of completed cases have resulted in grants of relief or protection, demonstrating that MPP returnees with meritorious claims can receive asylum, or any relief or protection for which they are eligible, more quickly via MPP than under available alternatives.

  o Individuals not processed under MPP generally must wait years for adjudication of their claims.  There are approximately one million pending cases in DOJ immigration courts.  Assuming the immigration courts received no new cases and completed existing cases at a pace of 30,000 per month—it would take several years, until approximately the end of 2022, to clear the existing backlog.

- MPP returnees who do not qualify for relief or protection are being quickly removed from the United States.  Moreover, aliens without meritorious claims—which no longer constitute a free ticket into the United States—are beginning to voluntarily return home.

  o According to CBP estimates, approximately 20,000 people are sheltered in northern Mexico, near the U.S. border, awaiting entry to the United States.  This number—along with the growing participation in an Assisted Voluntary Return (AVR) program operated by the International Organization for Migration (IOM), as described in more detail below—suggests that a significant proportion of the 55,000+ MPP returnees have chosen to abandon their claims.

**III.     Both Governments Endeavor to Provide Safety and Security for Migrants**

- The Government of Mexico (GOM) has publicly committed to protecting migrants.

    o A December 20, 2018, GOM statement indicated that "Mexico will guarantee that foreigners who have received their notice fully enjoy the rights and freedoms recognized in the Constitution, in the international treaties to which the Mexican State is a party, as well as in the current Migration Law.  They will be entitled to equal treatment without any discrimination and due respect to their human rights, as well as the opportunity to apply for a work permit in exchange for remuneration, which will allow them to meet their basic needs."

        ▪ Consistent with its commitments, GOM has accepted the return of aliens amenable to MPP.  DHS understands that MPP returnees in Mexico are provided access to humanitarian care and assistance, food and housing, work permits, and education.

        ▪ GOM has launched an unprecedented enforcement effort bringing to justice transnational criminal organizations (TCOs) who prey on migrants transiting through Mexico—enhancing the safety of all individuals, including MPP-amenable aliens.

    o As a G-20 country with many of its 32 states enjoying low unemployment and crime, Mexico's commitment should be taken in good faith by the United States and other stakeholders.  Should GOM identify any requests for additional assistance, the United States is prepared to assist.

- Furthermore, the U.S. government is partnering with international organizations offering services to migrants in cities near Mexico's northern border.

    o In September 2019, the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) funded a $5.5 million project by IOM to provide shelter in cities along Mexico's northern border to approximately 8,000 vulnerable third-country asylum seekers, victims of trafficking, and victims of violent crime in cities along Mexico's northern border.

    o In late September 2019, PRM provided $11.9 million to IOM to provide cash-based assistance for migrants seeking to move out of shelters and into more sustainable living.

- The U.S. Government is also supporting options for those individuals who wish to voluntarily withdraw their claims and receive free transportation home.  Since November 2018, IOM has operated its AVR program from hubs within Mexico and Guatemala, including Tijuana and Ciudad Juarez.  PRM has provided $5 million to IOM to expand that program to Matamoros and Nuevo Laredo and expand operations in other Mexican

4

northern border cities.  As of mid-October, almost 900 aliens in MPP have participated in the AVR program.

- The United States' ongoing engagement with Mexico is part of a larger framework of regional collaboration.  Just as United Nations High Commissioner for Refugees has called for international cooperation to face the serious challenges in responding to large-scale movement of migrants and asylum-seekers travelling by dangerous and irregular means, the U.S. Government has worked with Guatemala, El Salvador, and Honduras to form partnerships on asylum cooperation (which includes capacity-building assistance), training and capacity building for border security operations, biometrics data sharing and increasing access to H-2A and H-2B visas for lawful access to the United States.

## IV.    Screening Protocols Appropriately Assess Fear of Persecution or Torture

- When a third-country alien states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, the alien is referred to U.S. Citizenship & Immigration Services (USCIS).  Upon referral, USCIS conducts an MPP fear-assessment interview to determine whether it is more likely than not that the alien will be subject to torture or persecution on account of a protected ground if returned to Mexico.

  o MPP fear assessments are conducted consistent with U.S. law implementing the *non-refoulement* obligations imposed on the United States by certain international agreements and inform whether an alien is processed under—or remains—in MPP.

  o As used here, "persecution" and "torture" have specific international and domestic legal meanings distinct from fear for personal safety.

- Fear screenings are a well-established part of MPP.  As of October 15, 2019, USCIS completed over 7,400 screenings to assess a fear of return to Mexico.

  o That number included individuals who express a fear upon initial encounter, as well as those who express a fear of return to Mexico at any subsequent point in their immigration proceedings, including some individuals who have made multiple claims.

  o Of those, approximately 13% have received positive determinations and 86% have received negative determinations.

  o Thus, the vast majority of those third-country aliens who express fear of return to Mexico are not found to be more likely than not to be tortured or persecuted on account of a protected ground there.  This result is unsurprising, not least because aliens amenable to MPP voluntarily entered Mexico en route to the United States.

**V.     Summary and Conclusion**

In recent years, only about 15% of Central American nationals making asylum claims have been granted relief or protection by an immigration judge.  Similarly, affirmative asylum grant rates for nationals of Guatemala, El Salvador, and Honduras were approximately 21% in Fiscal Year 2019.  At the same time, there are—as noted above—over one million pending cases in DOJ immigration courts, in addition to several hundred thousand asylum cases pending with USCIS.

These unprecedented backlogs have strained DHS resources and challenged its ability to effectively execute the laws passed by Congress and deliver appropriate immigration consequences: those with meritorious claims can wait years for protection or relief, and those with non-meritorious claims often remain in the country for lengthy periods of time.

This broken system has created perverse incentives, with damaging and far-reaching consequences for both the United States and its regional partners.  In Fiscal Year 2019, certain regions in Guatemala and Honduras saw 2.5% of their population migrate to the United States, which is an unsustainable loss for these countries.

MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, many of which may be meritless, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings. Even more importantly, MPP also provides an opportunity for those entitled to relief to obtain it within a matter of months.  MPP, therefore, is a cornerstone of DHS's ongoing efforts to restore integrity to the immigration system—and of the United States' agreement with Mexico to address the crisis at our shared border.

**Appendix A: Additional Analysis of MPP Fear-Assessment Protocol**

U.S. Citizenship and Immigration Services (USCIS) strongly believes that if DHS were to change its fear-assessment protocol to affirmatively ask an alien amenable to MPP whether he or she fears return to Mexico, the number of fraudulent or meritless fear claims will significantly increase. This prediction is, in large part, informed by USCIS's experience conducting credible fear screenings for aliens subject to expedited removal. Credible fear screenings occur when an alien is placed into expedited removal under section 235(b)(1) of the Immigration and Nationality Act – a streamlined removal mechanism enacted by Congress to allow for prompt removal of aliens who lack valid entry documents or who attempt to enter the United States by fraud – and the alien expresses a fear of return to his or her home country or requests asylum. Under current expedited removal protocol, the examining immigration officer – generally U.S. Customs and Border Protection officers at a port of entry or Border Patrol agents – read four questions, included on Form I-867B, to affirmatively ask each alien subject to expedited removal whether the alien has a fear of return to his or her country of origin.[4]

The percentage of aliens subject to expedited removal who claimed a fear of return or requested asylum was once quite modest. However, over time, seeking asylum has become nearly a default tactic used by undocumented aliens to secure their release into the United States. For example, in 2006, of the 104,440 aliens subjected to expedited removal, only 5% (5,338 aliens) were referred for a credible fear interview with USCIS. In contrast, 234,591 aliens were subjected to expedited removal in 2018, but 42% (or 99,035) were referred to USCIS for a credible fear interview, significantly straining USCIS resources.

Table A1: Aliens Subject to Expedited Removal and Share Making Fear Claims, FY 2006 - 2018

| Fiscal Year | Subjected to Expedited Removal | Referred for a Credible Fear Interview | Percentage Referred for Credible Fear |
|---|---|---|---|
| 2006 | 104,440 | 5,338 | 5% |
| 2007 | 100,992 | 5,252 | 5% |
| 2008 | 117,624 | 4,995 | 4% |
| 2009 | 111,589 | 5,369 | 5% |
| 2010 | 119,876 | 8,959 | 7% |
| 2011 | 137,134 | 11,217 | 8% |
| 2012 | 188,187 | 13,880 | 7% |
| 2013 | 241,442 | 36,035 | 15% |
| 2014 | 240,908 | 51,001 | 21% |
| 2015 | 192,120 | 48,052 | 25% |
| 2016 | 243,494 | 94,048 | 39% |
| 2017 | 178,129 | 78,564 | 44% |
| 2018 | 234,591 | 99,035 | 42% |

---

[4] *See* 8 C.F.R. § 235.3(b)(2).

Transitioning to an affirmative fear questioning model for MPP-amenable aliens would likely result in a similar increase.  Once it becomes known that answering "yes" to a question can prevent prompt return to Mexico under MPP, DHS would experience a rise in fear claims similar to the expedited removal/credible fear process.  And, affirmatively drawing out this information from aliens rather than reasonably expecting them to come forward on their own initiative could well increase the meritless fear claims made by MPP-amenable aliens.

It also bears emphasis that relatively small proportions of aliens who make fear claims ultimately are granted asylum or another form of relief from removal. Table A2 describes asylum outcomes for aliens apprehended or found inadmissible on the Southwest Border in fiscal years 2013 – 2018.  Of the 416 thousand aliens making fear claims during that six-year period, 311 thousand (75 percent) had positive fear determinations, but only 21 thousand (7 percent of positive fear determinations) had been granted asylum or another form of relief from removal as of March 31, 2019, versus 72 thousand (23 percent) who had been ordered removed or agreed to voluntary departure. (Notably, about 70 percent of aliens with positive fear determinations in FY 2013 – 2018 remained in EOIR proceedings as of March 31, 2019.)

Table A2: Asylum Outcomes, Southwest Border Encounters, FY 2013 – 2018

| Year of Encounter | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| Total Encounters | 490,093 | 570,832 | 446,060 | 560,432 | 416,645 | 522,626 | 3,006,688 |
| Subjected to ER | 225,426 | 222,782 | 180,328 | 227,382 | 160,577 | 214,610 | 1,231,105 |
| Fear Claims[1] | 39,648 | 54,850 | 50,588 | 98,265 | 72,026 | 100,756 | 416,133 |
| Positive Fear Determinations[2] | 31,462 | 36,615 | 35,403 | 76,005 | 55,251 | 75,856 | 310,592 |
| Asylum Granted or Other Relief[3] | 3,687 | 4,192 | 3,956 | 4,775 | 2,377 | 2,168 | 21,155 |
| | *11.7%* | *11.4%* | *11.2%* | *6.3%* | *4.3%* | *2.9%* | *6.8%* |
| Removal Orders[4] | 9,980 | 11,064 | 9,466 | 17,700 | 12,130 | 11,673 | 72,013 |
| | *31.7%* | *30.2%* | *26.7%* | *23.3%* | *22.0%* | *15.4%* | *23.2%* |
| Asylum Cases Pending | 17,554 | 21,104 | 21,737 | 53,023 | 40,586 | 61,918 | 215,922 |
| | *55.8%* | *57.6%* | *61.4%* | *69.8%* | *73.5%* | *81.6%* | *69.5%* |
| Other | 241 | 255 | 244 | 507 | 158 | 97 | 1,502 |

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

Notes for Table A2: Asylum outcomes are current as of March 31, 2019.
[1] Fear claims include credible fear cases completed by USCIS as well as individuals who claimed fear at the time of apprehension but who have no record of a USCIS fear determination, possibly because they withdrew their claim.
[2] Positive fear determinations include positive determinations by USCIS as well as negative USCIS determinations vacated by EOIR.
[3] Asylum granted or other relief includes withholding of removal, protection under the Convention Against Torture, Special Immigrant Juvenile status, cancelation of removal, and other permanent status conferred by EOIR.
[4] Removal orders include completed repatriations and unexecuted orders of removal and grants of voluntary departure.

Implementing MPP assessments currently imposes a significant resource burden to DHS.  As of October 15, 2019, approximately 10% of individuals placed in MPP have asserted a fear of return to Mexico and have been referred to an asylum officer for a MPP fear assessment.  The USCIS Asylum Division assigns on average approximately 27 asylum officers per day to handle this caseload nationwide.  In addition, the Asylum Division must regularly expend overtime resources after work hours and on weekends to keep pace with the same-day/next-day processing requirements under MPP. This workload diverts resources from USCIS's affirmative asylum caseload, which currently is experiencing mounting backlogs.

Most importantly, DHS does not believe amending the process to affirmatively ask whether an alien has a fear of return to Mexico is necessary in order to properly identify aliens with legitimate fear claims in Mexico because under DHS's current procedures, aliens subject to MPP **may raise a fear claim to DHS at any point in the MPP process**.  Aliens are not precluded from receiving a MPP fear assessment from an asylum officer if they do not do so initially upon apprehension or inspection, and many do.  As of October 15, 2019[5], approximately 4,680 aliens subject to MPP asserted a fear claim and received an MPP fear-assessment **after** their initial encounter or apprehension by DHS, with 14% found to have a positive fear of return to Mexico.  Additionally, Asylum Division records indicate as of October 15, 2019[6], approximately 618 aliens placed into MPP have asserted **multiple** fear claims during the MPP process (from the point of placement into MPP at the initial encounter or apprehension) and have therefore received multiple fear assessments to confirm whether circumstances have changed such that the alien should not be returned to Mexico.  Of these aliens, 14% were found to have a positive fear of return to Mexico.

Additionally, asylum officers conduct MPP fear assessments with many of the same safeguards provided to aliens in the expedited removal/credible fear context.  For example, DHS officers conduct MPP assessment interviews in a non-adversarial manner, separate and apart from the general public, with the assistance of language interpreters when needed.[7]

In conducting MPP assessments, asylum officers apply a "more likely than not" standard, which is a familiar standard.  "More likely than not" is equivalent to the "clear probability" standard for statutory withholding and not unique to MPP.  Asylum officers utilize the same standard in the reasonable fear screening process when claims for statutory withholding of removal and protection under the Convention Against Torture (CAT).[8]  The risk of harm standard for withholding (or deferral) of removal under the Convention Against Torture (CAT) implementing regulations is the same, i.e., "more likely than not."[9]  In addition to being utilized by asylum

---

[5] USCIS began tracking this information on July 3, 2019.
[6] USCIS began tracking this information on July 3, 2019.
[7] USCIS Policy Memorandum PM-602-0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, 2019 WL 365514 (Jan. 28, 2019).
[8] See INA § 241(b)(3); 8 C.F.R. § 1208.16(b)(2) (same); See 8 C.F.R. § 1208.16(c)(2).
[9] *See* 8 C.F.R. § 1208.16(c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (Feb. 19, 1999) (detailing incorporation of the "more likely than not" standard into U.S. CAT ratification history); *see also Matter of J-F-F-*, 23 I&N Dec. 912 (BIA 2006).

officers in other protection contexts, the "more likely than not" standard satisfies the U.S. government's *non-refoulement* obligations.

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

# DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program

**Release Date:** January 20, 2021

En español (/news/2021/01/20/declaraci-n-del-dhs-sobre-la-suspensi-n-de-nuevos-registros-en-el-programa-de)

Today, DHS is announcing the suspension of new enrollments in the Migrant Protection Protocols (MPP) program. Effective tomorrow, January 21, the Department will cease adding individuals into the program. However, current COVID-19 non-essential travel restrictions, both at the border and in the region, remain in place at this time. All current MPP participants should remain where they are, pending further official information from U.S. government officials.

Please note: Individuals outside of the United States will not be eligible for legal status under the bill President Biden sent to Congress today. The legalization provisions in that bill apply only to people already living in the United States.

Topics: Border Security (/topics/border-security) , Citizenship and Immigration Services (/topics/immigration-and-citizenship-services)

Keywords: Border Security (/keywords/border-security) , Immigration (/keywords/immigration) , Migrant Protection Protocols (MPP) (/keywords/migrant-protection-protocols-mpp)

Last Published Date: January 21, 2021

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

June 1, 2021

MEMORANDUM FOR:     Troy A. Miller
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    Tae D. Johnson
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Tracy L. Renaud
                    Acting Director
                    U.S. Citizenship and Immigration Services

FROM:               Alejandro N. Mayorkas
                    Secretary

SUBJECT:            **Termination of the Migrant Protection Protocols Program**

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." Over the course of the Migrant Protection Protocols (MPP) program, the Department of Homeland Security and its components issued further policy guidance relating to its implementation. In total, approximately 68,000 individuals were returned to Mexico following their enrollment in MPP.[1]

On January 20, 2021, then-Acting Secretary David Pekoske issued a memorandum suspending new enrollments in MPP, effective the following day.[2] On February 2, 2021, President Biden issued Executive Order 14010, 86 Fed. Reg. 8267, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed me, in coordination with the Secretary of State, the Attorney General, and the Director of the Centers for Disease Control and Prevention, to "promptly

---

[1] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, available at https://www.dhs.gov/publication/metrics-and-measures.

[2] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocols Program* (Jan. 20, 2021).

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 2**

consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims," and "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[3]

On February 11, the Department announced that it would begin the first phase of a program to restore safe and orderly processing at the Southwest Border of certain individuals enrolled in MPP whose immigration proceedings remained pending before the Department of Justice's Executive Office for Immigration Review (EOIR).[4]  According to Department of State data, between February 19 and May 25, 2021, through this program's first phase approximately 11,200 individuals were processed into the United States.  The Department is continuing to work with interagency partners to carry out this phased effort and to consider expansion to additional populations enrolled in MPP.

Having now completed the further review undertaken pursuant to Executive Order 14010 to determine whether to terminate or modify MPP, and for the reasons outlined below, I am by this memorandum terminating the MPP program.  I direct DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program.

**Background**

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), authorizes DHS to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service primarily used this authority on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry, though the provision was occasionally used for third country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.

On December 20, 2018, the Department announced the initiation of a novel program, the Migrant Protection Protocols, to implement the contiguous-territory-return authority under Section 235(b)(2)(C) on a wide-scale basis along the Southwest Border.  On January 25, 2019, DHS issued policy guidance for implementing MPP, which was subsequently augmented a few days later by guidance from U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.  During the course of MPP, DHS and its components continued to update and supplement the policy, including through the "Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols" issued on December 7,

---

[3] Executive Order 14010, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021), available at https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

[4] U.S. Department of Homeland Security, *DHS Announces Process to Address Individuals in Mexico with Active MPP Cases*, Feb. 11, 2021, available at https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 3**

2020 by the Senior Official Performing the Duties of the Under Secretary for Strategy, Policy, and Plans.

Under MPP, it was DHS policy that certain non-Mexican applicants for admission who arrived on land at the Southwest Border could be returned to Mexico to await their removal proceedings under INA Section 240.  To attend removal proceedings, which were prioritized by EOIR on the non-detained docket, DHS facilitated program participants' entry into and exit from the United States.  Due to public health measures necessitated by the ongoing COVID-19 pandemic, however, DHS and EOIR stopped being able to facilitate and conduct immigration court hearings for individuals enrolled in MPP beginning in March 2020.[5]

Following the Department's suspension of new enrollments in MPP, and in accordance with the President's direction in Executive Order 14010, DHS has worked with interagency partners and facilitating organizations to implement a phased process for the safe and orderly entry into the United States of certain individuals who had been enrolled in MPP.

**Determination**

In conducting my review of MPP, I have carefully evaluated the program's implementation guidance and programmatic elements; prior DHS assessments of the program, including a top-down review conducted in 2019 by senior leaders across the Department, and the effectiveness of related efforts by DHS to address identified challenges; the personnel and resource investments required of DHS to implement the program; and MPP's performance against the anticipated benefits and goals articulated at the outset of the program and over the course of the program.  I have additionally considered the Department's experience to date carrying out its phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP.  In weighing whether to terminate or modify the program, I considered whether and to what extent MPP is consistent with the Administration's broader strategy and policy objectives for creating a comprehensive regional framework to address the root causes of migration, managing migration throughout North and Central America, providing alternative protection solutions in the region, enhancing lawful pathways for migration to the United States, and—importantly—processing asylum seekers at the United States border in a safe and orderly manner consistent with the Nation's highest values.

As an initial matter, my review confirmed that MPP had mixed effectiveness in achieving several of its central goals and that the program experienced significant challenges.

- I have determined that MPP does not adequately or sustainably enhance border management in such a way as to justify the program's extensive operational burdens and other shortfalls.  Over the course of the program, border encounters increased during certain periods and decreased during others.  Moreover, in making my assessment, I share the belief that we can only manage migration in an effective, responsible, and durable manner if we approach the issue comprehensively, looking well beyond our own borders.

---

[5] *See* "Joint DHS/EOIR Statement on MPP Rescheduling," Mar. 23, 2020, available at https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 4**

- Based on Department policy documents, DHS originally intended the program to more quickly adjudicate legitimate asylum claims and clear asylum backlogs. It is certainly true that some removal proceedings conducted pursuant to MPP were completed more expeditiously than is typical for non-detained cases, but this came with certain significant drawbacks that are cause for concern. The focus on speed was not always matched with sufficient efforts to ensure that conditions in Mexico enabled migrants to attend their immigration proceedings. In particular, the high percentage of cases completed through the entry of *in absentia* removal orders (approximately 44 percent, based on DHS data) raises questions for me about the design and operation of the program, whether the process provided enrollees an adequate opportunity to appear for proceedings to present their claims for relief, and whether conditions faced by some MPP enrollees in Mexico, including the lack of stable access to housing, income, and safety, resulted in the abandonment of potentially meritorious protection claims. I am also mindful of the fact that, rather than helping to clear asylum backlogs, over the course of the program backlogs increased before both the USCIS Asylum Offices and EOIR.

- MPP was also intended to reduce burdens on border security personnel and resources, but over time the program imposed additional responsibilities that detracted from the Department's critically important mission sets. The Department devoted resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities to support EOIR; facilitating the parole of individuals into and out of the United States multiple times in order to attend immigration court hearings; and providing transportation to and from ports of entry in certain locations related to such hearings. Additionally, as more than one-quarter of individuals enrolled in MPP were subsequently re-encountered attempting to enter the United States between ports of entry, substantial border security resources were still devoted to these encounters.

A number of the challenges faced by MPP have been compounded by the COVID-19 pandemic. As immigration courts designated to hear MPP cases were closed for public health reasons between March 2020 and April 2021, DHS spent millions of dollars each month to maintain facilities incapable of serving their intended purpose. Throughout this time, of course, tens of thousands of MPP enrollees were living with uncertainty in Mexico as court hearings were postponed indefinitely. As a result, any benefits the program may have offered are now far outweighed by the challenges, risks, and costs that it presents.

In deciding whether to maintain, modify, or terminate MPP, I have reflected on my own deeply held belief, which is shared throughout this Administration, that the United States is both a nation of laws and a nation of immigrants, committed to increasing access to justice and offering protection to people fleeing persecution and torture through an asylum system that reaches decisions in a fair and timely manner. To that end, the Department is currently considering ways to implement long-needed reforms to our asylum system that are designed to shorten the amount of time it takes for migrants, including those seeking asylum, to have their cases adjudicated, while still ensuring adequate procedural safeguards and increasing access to counsel. One such initiative that DHS recently announced together with the Department of Justice is the creation of a Dedicated Docket to

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 5**

process the cases of certain families arriving between ports of entry at the Southwest Border.[6]  This process, which will take place in ten cities that have well-established communities of legal service providers, will aim to complete removal proceedings within 300 days—a marked improvement over the current case completion rate for non-detained cases.  To ensure that fairness is not compromised, noncitizens placed on the Dedicated Docket will receive access to legal orientation and other supports, including potential referrals for pro bono legal services. By enrolling individuals placed on the Dedicated Docket in Alternatives to Detention programs, this initiative is designed to promote compliance and increase appearances throughout proceedings.  I believe these reforms will improve border management and reduce migration surges more effectively and more sustainably than MPP, while better ensuring procedural safeguards and enhancing migrants' access to counsel.  We will closely monitor the outcomes of these reforms, and make adjustments, as needed, to ensure they deliver justice as intended: fairly and expeditiously.

In arriving at my decision to now terminate MPP, I also considered various alternatives, including maintaining the status quo or resuming new enrollments in the program.  For the reasons articulated in this memorandum, however, preserving MPP in this manner would not be consistent with this Administration's vision and values and would be a poor use of the Department's resources.  I also considered whether the program could be modified in some fashion, but I believe that addressing the deficiencies identified in my review would require a total redesign that would involve significant additional investments in personnel and resources.  Perhaps more importantly, that approach would come at tremendous opportunity cost, detracting from the work taking place to advance the vision for migration management and humanitarian protection articulated in Executive Order 14010.

Moreover, I carefully considered and weighed the possible impacts of my decision to terminate MPP as well as steps that are underway to mitigate any potential negative consequences.

- In considering the impact such a decision could have on border management and border communities, among other potential stakeholders, I considered the Department's experience designing and operating a phased process, together with interagency and nongovernmental partners, to facilitate the safe and orderly entry into the United States of certain individuals who had been placed in MPP.  Throughout this effort, the Department has innovated and achieved greater efficiencies that will enhance port processing operations in other contexts.  The Department has also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that have facilitated their onward movement to final destinations away from the border.  The Department's partnership with the Government of Mexico has been an integral part of the phased process's success.  To maintain the integrity of this safe and orderly entry process for individuals enrolled in MPP and to encourage its use, the Department has communicated the terms of the process clearly to all stakeholders and has continued to use, on occasion and where appropriate, the return-to-contiguous-territory authority in INA Section 235(b)(2)(C) for MPP enrollees who nevertheless attempt to enter between ports of entry instead of through the government's process.

---

[6] *See* U.S. Department of Homeland Security, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2011, available at https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 6**

- In the absence of MPP, I have additionally considered other tools the Department may utilize to address future migration flows in a manner that is consistent with the Administration's values and goals. I have further considered the potential impact to DHS operations in the event that current entry restrictions imposed pursuant to the Centers for Disease Control and Prevention's Title 42 Order are no longer required as a public health measure. At the outset, the Administration has been—and will continue to be—unambiguous that the immigration laws of the United States will be enforced. The Department has at its disposal various options that can be tailored to the needs of individuals and circumstances, including detention, alternatives to detention, and case management programs that provide sophisticated wraparound stabilization services. Many of these detention alternatives have been shown to be successful in promoting compliance with immigration requirements. This Administration's broader strategy for managing border processing and adjudicating claims for immigration relief—which includes the Dedicated Docket and additional anticipated regulatory and policy changes—will further address multifaceted border dynamics by facilitating both timely and fair final determinations.

- I additionally considered the Administration's important bilateral relationship with the Government of Mexico, our neighbor to the south and a key foreign policy partner. Over the past two-and-a-half years, MPP played an outsized role in the Department's engagement with the Government of Mexico. Given the mixed results produced by the program, it is my belief that MPP cannot deliver adequate return for the significant attention that it draws away from other elements that necessarily must be more central to the bilateral relationship. During my tenure, for instance, a significant amount of DHS and U.S. diplomatic engagement with the Government of Mexico has focused on port processing programs and plans, including MPP. The Government of Mexico was a critically important partner in the first phase of our efforts to permit certain MPP participants to enter the United States in a safe and orderly fashion and will be an important partner in any future conversations regarding such efforts. But the Department is eager to expand the focus of the relationship with the Government of Mexico to address broader issues related to migration to and through Mexico. This would include collaboratively addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more. Terminating MPP will, over time, help to broaden our engagement with the Government of Mexico, which we expect will improve collaborative efforts that produce more effective and sustainable results than what we achieved through MPP.

Given the analysis set forth in this memorandum, and having reviewed all relevant evidence and weighed the costs and benefits of either continuing MPP, modifying it in certain respects, or terminating it altogether, I have determined that, on balance, any benefits of maintaining or now modifying MPP are far outweighed by the benefits of terminating the program. Furthermore, termination is most consistent with the Administration's broader policy objectives and the Department's operational needs. Alternative options would not sufficiently address either consideration.

Therefore, in accordance with the strategy and direction in Executive Order 14010, following my review, and informed by the current phased strategy for the safe and orderly entry into the United States of certain individuals enrolled in MPP, I have concluded that, on balance, MPP is no longer a

**Subject: Termination of the Migrant Protection Protocols Program**
**Page 7**

necessary or viable tool for the Department.  Because my decision is informed by my assessment that MPP is not the best strategy for implementing the goals and objectives of the Biden-Harris Administration, I have no intention to resume MPP in any manner similar to the program as outlined in the January 25, 2019 Memorandum and supplemental guidance.

Accordingly, for the reasons outlined above, I hereby rescind, effective immediately, the Memorandum issued by Secretary Nielsen dated January 25, 2019 entitled "Policy Guidance for Implementation of the Migrant Protection Protocols," and the Memorandum issued by Acting Secretary Pekoske dated January 20, 2021 entitled "Suspension of Enrollment in the Migrant Protection Protocols Program."  I further direct DHS personnel, effective immediately, to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP.  Furthermore, DHS personnel should continue to participate in the ongoing phased strategy for the safe and orderly entry into the United States of individuals enrolled in MPP.

The termination of MPP does not impact the status of individuals who were enrolled in MPP at any stage of their proceedings before EOIR or the phased entry process describe above.

*     *     *     *     *

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

CC:     Kelli Ann Burriesci
        Acting Under Secretary
        Office of Strategy, Policy, and Plans



**Portfolio Media  Inc**  | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# States Say Feds Are Slow-Walking 'Remain In Mexico' Reboot

By **Grace Dixon**

Law360 (September 24, 2021, 5:45 PM EDT) -- Texas and Missouri have blasted the Biden administration's delays in complying with a court order to restart a Trump-era program requiring asylum-seekers to wait in Mexico, saying the government need not hash out an agreement with Mexico before reinstating the policy.

The two states told a Texas federal court Thursday that the administration's explanations for why it hasn't yet reimplemented the "Remain in Mexico" program, formally known as the Migrant Protection Protocols, are not in good faith. The states argued that the court should order the federal government to take concrete steps toward compliance and allow expedited discovery to gain a complete picture of the influx of Haitian migrants at the border.

"Their sloth in implementing MPP is especially salient with the crisis in Del Rio, Texas, where thousands of Haitian migrants — who would have been subject to MPP had it been in effect — have been camping after illegally entering the country from Mexico," the states said.

The motion comes after the Biden administration **informed that court** that it needed to wrap up talks with Mexico before implementing the order to restart the program, an order that **both the Fifth Circuit** and the **U.S. Supreme Court** declined to postpone.

The federal government told U.S. District Judge Matthew Kacsmaryk that it's still discussing details with Mexico, including which migrants will be subject to the policy, where and how they'll return to Mexico, how they can enter the U.S. for court hearings and what support they'll receive from Mexico.

But the two states argued in their Thursday motion that the Biden administration need not reach a consensus with Mexico to begin reimplementing the policy. They also contended that the administration does not need to build facilities or implement COVID-19 protocols before complying with the preliminary injunction.

"This Court's injunction noted that DHS [U.S. Department of Homeland Security] instituted MPP unilaterally — without an agreement with Mexico," Texas and Missouri said. "And in rejecting defendants' stay request, the Fifth Circuit rejected their argument that 'aliens cannot be returned to Mexico without Mexico's consent.'"

Instead, the states argued that the influx of Haitian asylum-seekers over the border and the related humanitarian crisis at an encampment in Del Rio, Texas, highlighted the need for immediate action.

"Given the credible reports that tens of thousands more migrants may be on their way, it is essential that MPP be implemented before those migrants set foot in the United States," they said.

Judy Rabinovitz, ACLU special counsel and lead attorney in a separate suit that secured an injunction against MPP later **unraveled by the high court**, told Law360 that the motion flies in the face of the fact that the Trump administration sought Mexico's consent the first time around.

"In enacting the policy, the Trump administration justified it based on Mexico's assurances that migrants returned to Mexico would be safe there and would have the right to reside and work in Mexico," Rabinovitz said. "To suggest that migrants can be sent back without even that level of assurance is truly astonishing, even taking into account these officials' hostility to immigration and to

the principle of asylum."

Texas and Missouri had argued that the Trump administration's initial rollout or Remain in Mexico provides an easy blueprint for the current administration to follow.

The states also asked Judge Kacsmaryk to expedite discovery and order the federal government to turn over more detailed documentation of migrant encounters at the border and information on whether migrants continue to be released on parole within the U.S.

"As the crisis at the border continues to grow, threatening our national security and creating ripe conditions for human traffickers, the Biden Administration has not re-implemented the Remain in Mexico policy as they're required to do," Missouri Attorney General Eric Schmitt said in a statement to Law360. "If the Biden Administration won't take action to secure the border, we certainly will."

When asked to respond to the states' allegations of foot-dragging, a spokesperson for the U.S. Department of Justice noted there was a Sept. 15 status update detailing the ongoing negotiations with Mexico.

In a status report filed later on Thursday, DHS announced that Immigration and Customs Enforcement apprehended nearly 30,000 noncitizens at the border during August and released or paroled a total of 86,752 noncitizens in the country in the same month.

Representatives for Texas and DHS didn't respond to requests for comment on Friday.

Texas and Missouri are represented by Judd Edward Stone II of the Texas Attorney General's Office.

The U.S. is represented by Joseph Darrow of the U.S. Department of Justice's Office of Immigration Litigation.

The case is Texas et al. v. Biden et al., case number 2:21-cv-00067, in the U.S. District Court for the Northern District of Texas.

--Additional reporting by Alyssa Aquino. Editing by Jill Coffey.

All Content © 2003-2021, Portfolio Media, Inc.



Vaccine Mandates Ban    Abortion Restrictions    Redistricting    Hood County    Watch the Legislature    Corona

≡ MENU

# Thousands of Haitian migrants fleeing disaster and unrest seek asylum at Del Rio bridge

With an estimated 12,000 migrants already crowded under the international bridge and thousands more expected, Del Rio's mayor declared an emergency Friday and requested state assistance.

BY **URIEL J. GARCÍA** AND **JOLIE MCCULLOUGH**    SEPT. 17, 2021    UPDATED: 7 PM CENTRAL

| | | | COPY LINK |
|---|---|---|---|



Migrants crossed the Rio Grande between Texas and Mexico with supplies Thursday as they prepared to spend the night under the international bridge connecting Del Rio and Ciudad Acuña. 📷 Jordan Vonderhaar for The Texas Tribune

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

DEL RIO — Five days after Haitian President Jovenel Moise was assassinated by a group of foreign mercenaries on July 7, 29-year-old Stelin Jean decided to flee the country with his wife and two children — traveling to Bolivia, where many Haitians have arrived recently before starting an arduous overland trek to the United States.

The family was in Panama last month when a 7.2 magnitude earthquake struck Haiti, destroying thousands of homes and killing more than 2,000 people. Jean said some of his family members were injured in the earthquake, which only increased their sense of urgency to make it to the United States.

"There's people killing each other in Haiti, there's just no justice," said Jean, who arrived at the U.S.-Mexico border on Wednesday afternoon after a two-month trek through the jungles of South America and then crossed the Rio Grande at Del Rio to claim asylum. "I just want to live a calm life without any problems, I want to live somewhere where I know there's justice."

The Texas Tribune thanks its sponsors. **Become one**.



The family has joined an estimated 12,000 migrants who in recent days have arrived at the border and are now waiting under the Del Rio international bridge, about 150 miles west of San Antonio, to be processed by U.S. Customs and Border Protection. Most are from Haiti and are seeking asylum in the U.S.

On Friday, Del Rio Mayor Bruno Lozano declared a local state of disaster and said the city is closing the toll booths on the international bridge connecting the city to Ciudad Acuña to halt traffic across the bridge, as a security measure.

The city later released a statement that said "international traffic will continue as normal" and people could be seen going back and forth on the bridge Friday evening. But late Friday, U.S. Customs and Border Protection announced that the port of entry would temporarily shutter.

Case 6:22-cv-01130-DCJ-CBW Document 218-17 Filed 01/30/24 Page 63 of 503 PageID #: 12337

"This temporary closure and shift is necessary in order for CBP to respond to urgent safety and security needs presented by an influx of migrants into Del Rio and is effective immediately," the agency said in a statement. "It will advance and protect national interests and help ensure the safety of the traveling public, commercial traffic, and CBP employees and facilities."

Traffic that normally uses border bridges into Del Rio will be directed 57 miles east to Eagle Pass, federal officials said. They did not indicate how long the Del Rio closures would last.

Lozano said earlier he had requested assistance from the state to help deter more migrants from entering the city. He said the city expects an additional 8,000 migrants to arrive in the coming days.

The sheer numbers arriving so quickly in Del Rio, a city of about 35,000 residents, has local officials worrying about how to feed and house thousands of migrants who for now are being forced to wait in the shade of the bridge.

"Dire circumstances require dire responses," Lozano said. "There's people having babies down there [under the bridge], there's people collapsing out of the heat. They're pretty aggressive, rightly so — they've been in the heat day after day after day."

At an appearance in Fort Worth on Friday, Gov. Greg Abbott said the U.S. Department of Defense and the Department of Homeland Security have told the state that the migrants will be relocated to Arizona, California and perhaps Laredo. "But one thing that we know for a fact and that is, there's nothing but uncertainty and indecision by the Biden administration about exactly what they're going to do," Abbott said.

Many of the migrants in Del Rio said they began their journey years ago, fleeing Haiti after previous disasters such as the devastating 2010 earthquake.

Junior Pacheco, 38, said he left Haiti for Chile, where he lived for five years before he made his way to the Texas-Mexico border in August. He said that after arriving in Mexico, police asked for his passport as he was exiting a charter bus and never returned it.

"There's a lot of abuse on the way here. From people to the police, they steal our money, our passports. There's some people who get stranded on the way," he said in a phone interview from Ciudad Acuña, where he was buying food, water and a tent so his family could have somewhere to sleep.







Migrants cross the Rio Grande between the United States and Mexico in Ciudad Acuña, across the border from Del Rio. 📷 Jordan Vonderhaar for the Texas Tribune

"Things are calm right now, we just wanted to get here," he said. "We're not afraid anymore."

Migrants who fled to South America say the trek north was treacherous, with criminals and vendors taking advantage of vulnerable migrants. Videos shared widely on social media in recent weeks show the Mexican military using force as they attempted to stop Haitians from crossing the country's border with Guatemala.

On Thursday, hundreds of migrants waded across the Rio Grande between Del Rio and Ciudad Acuña, carrying children on their shoulders, carrying water bottles over their heads and gathering cardboard to sleep on.

Eduardo Vargas, 27, said he arrived in Del Rio from his native Chile on Tuesday with his 8-month-old daughter and his wife to make an asylum claim. He said he left Chile because he couldn't find work to support his family.

The Texas Tribune thanks its sponsors. **Become one**.

Like the others waiting under the bridge, he said he received a ticket from U.S. officials and is waiting for his number to be called so he can request asylum.

He said in the time his family has been in Del Rio, he and other migrants have routinely crossed the shallow Rio Grande to buy food and water in Ciudad Acuña. They've been sleeping on the ground under the bridge and bathing and washing their clothes in the river, he said.

"We want to leave here," he said. "We don't have a lot of money to buy food, and we're not eating well or drinking a lot of water. We're hungry."

Tomas Jean, 49, left his wife and son in Haiti, and if he is able to start a new life in the U.S., he said he plans to bring his family. He said he left because of the political turmoil in Haiti.



Migrants have waded across the Rio Grande to buy water, food and other supplies in Ciudad Acuña as they wait for their turn to request asylum on the U.S. side. 📷 Jordan Vonderhaar for The Texas Tribune

"In Haiti there's a lot of problems, that's why a lot of Haitians are leaving because they're looking for a better life," he said.

He said he started his trip with money, legal papers and other personal belongings. By the time he arrived in Del Rio, he said, he only had his passport and enough money to buy deodorant in Ciudad Acuña, where he was also scavenging for cardboard.

"There was a lot of problems coming through South America, there were criminals, the police and immigration," he said. "Robbers demanded my money and took a lot of my paperwork, too."

Tiffany Burrow, operations director of the Val Verde Border Humanitarian Coalition respite center, said once the thousands of migrants waiting under the bridge are released by U.S. Customs and Border Protection, the coalition won't have the space or resources to help them all.

The Texas Tribune thanks its sponsors. Become one.

"Simple things, like juice boxes, we've run out of, but there will be community people who will ask what we need and we'll be able to [get more]," she said. "But can we get 10,000? Probably not."

*Jordan Vonderhaar and James Barragán contributed to this story.*

*Join us Sept. 20-25 at the 2021 Texas Tribune Festival. Tickets are on sale now for this multi-day celebration of big, bold ideas about politics, public policy and the day's news, curated by The Texas Tribune's award-winning journalists. Learn more.*

## Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**



**INFO**

About Us

Our Staff

Jobs

Congressional Research Service
Informing the legislative debate since 1914



Updated January 21, 2021

# Expedited Removal of Aliens: An Introduction

Non-U.S. nationals (aliens) who do not meet requirements governing their entry or continued presence in the United States may be subject to removal. The Immigration and Nationality Act (INA) establishes different removal processes for different categories of aliens. Most removable aliens apprehended within the interior of the United States are subject to "formal" removal proceedings under INA § 240. Aliens in these proceedings are given certain procedural guarantees including the rights to counsel, to appear at a hearing before an immigration judge (IJ), to present evidence, and to appeal an adverse decision. The INA, however, sets forth a streamlined "expedited removal" process for certain arriving aliens and aliens who recently entered the United States without inspection. This In Focus provides a brief introduction to the expedited removal framework. For a more detailed discussion, see CRS Report R45314, *Expedited Removal of Aliens: Legal Framework*, by Hillel R. Smith.

## Statutory Framework and Current Implementation

The expedited removal process, created by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, is codified in INA § 235(b)(1). The statute permits the Department of Homeland Security (DHS) to summarily remove aliens arriving at a designated U.S. port of entry (arriving aliens) "without further hearing or review" if they are inadmissible either because they (1) lack valid entry documents, or (2) tried to procure their admission into the United States through fraud or misrepresentation. INA § 235(b)(1) also authorizes—but does not require—DHS to extend application of expedited removal to "certain other aliens" inadmissible on the same grounds if they (1) were not admitted or paroled into the United States by immigration authorities and (2) cannot establish at least two years' continuous physical presence in the United States at the time of apprehension.

Immigration authorities have implemented expedited removal mainly for three overarching categories of aliens who lack valid entry documents or attempted to falsely procure admission:

1. arriving aliens (defined by regulation as aliens arriving at U.S. ports of entry);
2. aliens who entered the United States by sea without being admitted or paroled into the United States, and who have been in the country less than two years; and
3. aliens apprehended within 100 miles of the U.S. border within 14 days of entering the country, and who have not been admitted or paroled.

Most aliens subject to expedited removal have thus been apprehended either at a designated port of entry or near the international border when trying to enter, or shortly after entering, the United States unlawfully between ports of entry.

## Exceptions to Expedited Removal

An alien subject to expedited removal typically will be ordered removed without further hearing or the ability to contest a removal determination. But exceptions exist for certain categories of aliens.

### Credible Fear Determinations

An alien otherwise subject to expedited removal who expresses an intent to apply for asylum or a fear of persecution if returned to a particular country is entitled to administrative review of that claim before being removed. INA § 235(b)(1) instructs that the examining immigration officer must refer the alien for an interview with an asylum officer to determine whether the alien has a "credible fear" of persecution or torture.

A credible fear determination is a screening process that evaluates whether an alien might qualify for one of three forms of relief from removal: asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Asylum is the only form of relief that gives the alien a permanent legal foothold in the United States. The credible fear determination is not intended fully to assess the alien's claims, but only to determine whether they are sufficiently viable to warrant more thorough review.

An alien who shows a credible fear of persecution is placed in formal removal proceedings rather than expedited removal. There, the alien may pursue applications for asylum, withholding of removal, and CAT protection.

If an asylum officer determines that an alien does not have a credible fear of persecution, the alien may request review of that determination before an IJ. If the IJ concurs with the negative credible fear finding, the alien will be subject to expedited removal. But if the IJ finds that the alien has a credible fear of persecution, the IJ will vacate the asylum officer's determination and the alien will be placed in formal removal proceedings.

### Aliens Who Claim to Be U.S. Citizens, Lawful Permanent Residents, Refugees, or Persons Granted Asylum

INA § 235(b)(1) creates an exception to expedited removal procedures for an alien who claims to be either a U.S. citizen, lawful permanent resident (LPR), admitted refugee, or asylee. Under implementing regulations, an immigration

officer must attempt to verify any such claim before issuing an expedited removal order. If the immigration officer cannot verify the claim, the alien may seek administrative review of it before an IJ.

### Withdrawal of Application for Admission

As an alternative to expedited removal, DHS may permit an alien to withdraw voluntarily his or her application for admission if the alien intends, and is able, to depart the United States immediately. The immigration officer typically considers several factors to determine whether an alien may withdraw the application for admission, such as the alien's prior immigration history, age and health, and other humanitarian concerns.

### Unaccompanied Children

Under federal statute, unaccompanied alien children (UACs) are not subject to expedited removal and are placed in formal removal proceedings instead. UACs are generally put in the custody of the Department of Health and Human Services' Office of Refugee Resettlement, but may be released to an adult sponsor. DHS may permit UACs to return voluntarily to their countries in lieu of removal proceedings if they are nationals of Mexico or Canada and meet certain criteria.

## Detention and Parole of Aliens Subject to Expedited Removal

INA § 235(b)(1) generally requires the detention of aliens placed in expedited removal, as well as during any credible fear determination or administrative review of a claim that the alien has legal status. The statute's mandatory detention requirements have been construed to cover aliens who are first screened for expedited removal, even if they are later placed in formal removal proceedings (e.g., because the alien established a credible fear of persecution). DHS, however, may "parole" an alien otherwise subject to detention under INA § 235(b)(1) for "urgent humanitarian reasons or significant public benefit," enabling the alien to be released from the agency's physical custody. In addition, a 1997 court settlement agreement known as the *Flores* Settlement generally limits the period in which an alien minor may be detained by DHS.

## Limitations to Judicial Review of an Expedited Order of Removal

INA § 242(a)(2) generally bars judicial review of an expedited removal order. But judicial review is still available in limited circumstances.

### Habeas Corpus Proceedings

Under INA § 242(e)(2), an alien may challenge an expedited removal order in habeas corpus proceedings, contesting the legality of his or her detention. The habeas court's jurisdiction, however, is limited to whether (1) the petitioner in the habeas action is an alien; (2) the petitioner

was ordered removed under INA § 235(b)(1)'s expedited removal provisions; and (3) the petitioner can prove by a preponderance of the evidence that he or she is an LPR, refugee, or asylee. Most courts have construed INA § 242(e)(2) as barring review of the legality of the underlying expedited removal proceedings. *In Dep't of Homeland Security v. Thuraissigiam*, the Supreme Court upheld these judicial review limitations against a constitutional challenge.

### Challenges to the Expedited Removal System

Under INA § 242(e)(3), an alien subject to an expedited order of removal may challenge the validity of the expedited removal system by filing a lawsuit in the U.S. District Court for the District of Columbia. The district court's review is limited to determining whether (1) the expedited removal statute or its implementing regulations is constitutional; and (2) a regulation, written policy directive, written policy guideline, or written procedure issued by DHS to implement expedited removal is consistent with the statute or other laws. The lawsuit must be brought within 60 days after implementation of the challenged statutory provision, regulation, directive, guideline, or procedure.

### Collateral Challenges Raised as a Defense During Criminal Proceedings for Unlawful Reentry

INA § 235(b)(1) provides that in criminal prosecutions for unlawful reentry into the United States after removal, courts lack jurisdiction to consider claims challenging the validity of an expedited removal order serving as the basis for the reentry prosecution. But some federal appellate courts have held that the statute does not bar judicial review of whether a prior expedited removal proceeding was "fundamentally unfair" (i.e., that the proceeding violated the alien's right to due process and deprived the alien of the opportunity to seek relief). Thus, in some cases, an alien criminally charged with unlawful reentry after removal may collaterally challenge a prior expedited removal order.

## Expansion of Expedited Removal

In 2019, DHS exercised authority to employ expedited removal to the full degree authorized by INA § 235(b)(1), to include all aliens physically present in the United States without being admitted or paroled, who have been in the country less than two years, and who lack valid entry documents or procured admission through fraud or misrepresentation. A federal district court initially enjoined DHS from implementing this initiative pending a legal challenge, but the D.C. Circuit reversed that decision, enabling DHS to apply expedited removal in the interior of the United States pending the outcome of the litigation.

**Hillel R. Smith**, Legislative Attorney

IF11357

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

United States Government Accountability Office



Report to Congressional Addressees

**February 2020**

# IMMIGRATION

# Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings

# GAO Highlights

Highlights of GAO-20-250, a report to congressional addressees

**February 2020**

# IMMIGRATION

## Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings

## Why GAO Did This Study

Individuals apprehended by DHS and placed into expedited immigration proceedings are to be removed from the country without a hearing in immigration court unless they express an intention to apply for asylum, or a fear of persecution, torture, or return to their country. Those with such "fear claims" are referred to USCIS for a credible fear screening. Individuals who have certain criminal convictions or who have a reinstated order of removal and claim fear are referred for a reasonable fear screening. Those with negative outcomes can request a review by EOIR's immigration judges. GAO was asked to review USCIS's and EOIR's processes for fear screenings.

This report examines (1) USCIS and EOIR data on fear screenings, (2) USCIS policies and procedures for overseeing fear screenings, and (3) USCIS and EOIR processes for workload management. GAO analyzed USCIS and EOIR data from fiscal years 2014 through mid-2019; interviewed relevant headquarters and field officials; and observed fear screenings in California, Texas, and Virginia, where most screenings occur.

## What GAO Recommends

GAO is making four recommendations, including that USCIS provide additional pre-departure training to USCIS asylum officers before they begin screening families, systematically record case outcomes of family members, and collect and analyze information on case delays. DHS concurred with GAO's recommendations.

View GAO-20-250. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

Data from the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and Department of Justice's Executive Office for Immigration Review (EOIR) indicate that their credible and reasonable fear caseloads generally increased from fiscal year 2014 through fiscal year 2018.

- USCIS's caseloads nearly doubled during this timeframe—from about 56,000 to almost 109,000 referrals for credible and reasonable fear screenings. Further, the credible fear caseload was larger in the first two quarters of fiscal year 2019 alone than in each of fiscal years 2014 and 2015. Referrals to USCIS for reasonable fear screenings also increased from fiscal years 2014 through 2018. USCIS asylum officers made positive determinations in 71 percent of all credible and reasonable fear screenings between fiscal years 2014 and the first two quarters of fiscal year 2019. The outcomes of the remaining screenings were generally split evenly (14 percent each) between negative determinations or administrative closures (such as if the applicant was unable to communicate).
- EOIR's caseload for immigration judge reviews of USCIS's negative credible and reasonable fear determinations also increased between fiscal year 2014 and fiscal year 2018. EOIR's immigration judges reviewed about 55,000 cases from fiscal year 2014 through the third quarter of 2019 (the most recent data available), and judges upheld USCIS's negative determinations in about three-quarters of all reviews.

Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019



Source: GAO analysis of USCIS data.  |  GAO-20-250

[a]According to USCIS, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence in state or federal custody, inability to communicate, or other reasons.

[b]USCIS cases occurred from October 1, 2013 through March 30, 2019 and their status was as of July 22, 2019. Cases that remained in progress as of July 22, 2019 were "pending resolution."

_____
**United States Government Accountability Office**

USCIS has developed various policies and procedures for overseeing credible and reasonable fear screenings in accordance with the regulations governing those screenings, such as interview requirements and mandatory supervisory review. USCIS provides basic training for new asylum officers and other training at individual asylum offices that includes credible and reasonable fear. The training at asylum offices includes on-the-job training for officers newly-assigned to credible and reasonable fear cases and ongoing weekly training for incumbent officers—some of which includes credible and reasonable fear. However, USCIS asylum offices do not all provide additional pre-departure training before officers begin screening families in person at DHS's family residential centers. Asylum Division officials told GAO that additional training for asylum officers before they begin screening such cases is important—in particular, credible fear screenings at these facilities represent about one-third of USCIS's caseload. Almost all USCIS asylum offices send officers to the family residential centers, including those offices with small fear caseloads at the local level. Some asylum offices provide pre-departure training to officers being sent to screen families, but such training is inconsistent across offices. By comparison, officials from the Chicago and New York offices stated they do not provide formal pre-departure training, but rather direct or recommend that officers review Asylum Division guidance and procedures on family processing independently before they travel. Officials from two other offices stated they rely on the training asylum officers may receive throughout the year related to credible and reasonable fear, which can vary. Providing pre-departure training, in addition to USCIS's basic training for new asylum officers, would help USCIS ensure that officers from all asylum offices are conducting efficient and effective fear screenings of families.

Further, consistent with regulation, USCIS policy is to include any dependents on a principal applicant's credible fear determination if the principal applicant receives a positive determination, resulting in the principal and any dependents being placed into full removal proceedings with an opportunity to apply for various forms of relief or protection, including asylum. For example, a parent as a principal applicant may receive a negative determination, but his or her child may receive a separate positive determination. In the interest of family unity, USCIS may use discretion to place both the parent and child into full removal proceedings rather than the parent being expeditiously ordered removed in accordance with the expedited removal process. However, USCIS's case management system does not allow officers to record whether an individual receives a determination on his or her case as a principal applicant, dependent, or in the interest of family unity. Without complete data on all such outcomes, USCIS is not well-positioned to report on the scope of either the agency's policy for family members who are treated as dependents, pursuant to regulation, or USCIS's use of discretion in the interest of family unity.

USCIS and EOIR have processes for managing their respective credible and reasonable fear workloads. For example, USCIS uses national- and local-level staffing models to inform staffing allocation decisions. USCIS also sets and monitors timeliness goals for completing credible and reasonable fear cases. Although USCIS monitors overall processing times, it does not collect comprehensive data on some types of case delays, which officers told us can occur on a regular basis. Asylum officers whom GAO interviewed stated that certain delays could affect the number of credible or reasonable fear cases they can complete each day. Collecting and analyzing additional information on case delays would better position USCIS to mitigate the reasons for the delays and improve efficiency. EOIR has developed processes for immigration courts and judges to help manage its workload that include performance measures with timeliness goals for credible and reasonable fear reviews. EOIR data indicate that about 30 percent of credible and reasonable fear reviews are not completed within the required timeframes. EOIR officials said they plan to implement an automated tool in early 2020 to monitor court performance, including the credible and reasonable fear performance goals. Because implementation of the automated tool is planned for early 2020, it is too soon to know if EOIR will use the tool to monitor adherence to the required credible and reasonable fear review time frames or if it will help EOIR understand reasons for case delays.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 6 |
| | USCIS's and EOIR's Credible and Reasonable Fear Caseloads Generally Increased from Fiscal Years 2014 through 2018, and a Majority of USCIS Screening Outcomes were Positive | 12 |
| | USCIS Has Policies and Procedures for Overseeing Credible and Reasonable Fear Screenings, but Gaps in Training, Quality Assurance, and Family Processing Exist | 21 |
| | USCIS and EOIR Have Processes for Managing Credible and Reasonable Fear Workloads, but USCIS Does Not Have Complete Data on Case Delays | 40 |
| | Conclusions | 56 |
| | Recommendations for Executive Action | 57 |
| | Agency Comments | 58 |
| Appendix I | Objectives, Scope, and Methodology | 61 |
| Appendix II | Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases | 74 |
| Appendix III | Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security | 79 |
| Appendix IV | Comments from the Department of Homeland Security | 107 |
| Appendix V | GAO Contact and Staff Acknowledgments | 111 |

Tables

Table 1: Department of Homeland Security (DHS) and Department of Justice (DOJ) Roles and Responsibilities in the Credible and Reasonable Fear Processes 9

Table 2: Credible and Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS), Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019 13

Table 3: Credible Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Centers, and Related Positive Outcomes, Fiscal Years 2014 through the First Two Quarters of 2019 38

Table 4: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Authorized and On Board, as of March 2019 41

Table 5: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Case Processing Times, Fiscal Years 2014 through 2017 45

Table 6: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Case Processing Times for Nondetained and Detained Cases without Clock Pauses, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019 48

Table 7: Executive Office for Immigration Review (EOIR) Credible and Reasonable Fear Review Time Frames, Fiscal Years 2014 through Third Quarter 2019 55

Table 8: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible Fear as Provided in Federal Law and Regulation 74

Table 9: Eligibility, Screening Standards, and Possible Screening Outcomes for Reasonable Fear as Provided in Federal Law and Regulation 77

Table 10: U.S. Border Patrol (Border Patrol) Apprehensions and Processing Dispositions, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019 81

Table 11: U.S. Border Patrol (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, By Age, Fiscal Years 2014 through the First Two Quarters of 2019 83

Table 12: U.S. Border Patrol (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings

with Credible and Reasonable Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019          84

Table 13: Number of Family Unit Members among U.S. Border Patrol Apprehensions Who Were Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019          85

Table 14: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions Placed into Expedited Removal Proceedings with Credible Fear Claims, by Age, Fiscal Years 2014 through the First Two Quarters of 2019          90

Table 15: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions Placed into Expedited Removal Proceedings with Credible Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019          91

Table 16: Number of Family Unit Member Apprehensions U.S. Customs and Border Protection's Office of Field Operations (OFO) Placed into Expedited Removal Proceedings with Credible Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019          92

Table 17: Noncitizens in Expedited Removal Proceedings Detained in U.S. Immigration and Customs Enforcement (ICE) Detention Facilities with Credible Fear Claims, Fiscal Years 2014 through 2018          93

Table 18: Noncitizen Family Unit Members in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018          94

Table 19: Noncitizen Adults and Children in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018          95

Table 20: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019          97

Table 21: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019          99

Table 22: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019   100

Table 23: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019   101

Table 24: Top Five Detention Facilities and Family Residential Centers with the Highest Number of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019   102

Table 25: Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Facilities, and Related Positive Outcomes, Fiscal Years 2014 through First Two Quarters of 2019   103

Table 26: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of 2019   105

Table 27: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of Fiscal Year 2019   106

Figures

Figure 1: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019   14

Figure 2: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019   15

Figure 3: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019   17

Figure 4: Numbers and Outcomes of Executive Office for Immigration Review (EOIR) Immigration Judge Reviews

of Negative U.S. Citizenship and Immigration Services Fear (USCIS) Determinations, Fiscal Year 2014 through June 2019                                                                           19

Figure 5: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Screening Families in U.S. Immigration and Customs Enforcement Family Residential Centers in Fiscal Year 2018, by Asylum Office                                                                                                                      30

Figure 6: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Processing for Parents and Children Detained Together in U.S. Immigration and Customs Enforcement Family Residential Centers                                                          36

Figure 7: U.S. Border Patrol's (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings with a Credible Fear Claim, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019                                        82

Figure 8: Dispositions of U.S. Customs and Border Protection Office of Field Operations (OFO) Apprehensions, Including those with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019                                  87

Figure 9: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions Placed into Expedited Removal with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019                          88

Figure 10: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019                                                            96

Figure 11: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019                                                              98

**Abbreviations**

| | |
|---|---|
| Border Patrol | U.S. Border Patrol |
| CBP | U.S. Customs and Border Protection |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| EOIR | Executive Office for Immigration Review |
| FDNS | Fraud Detection and National Security Directorate |
| ICE | U.S. Immigration and Customs Enforcement |
| OFO | Office of Field Operations |
| RAIO | Refugee, Asylum, and International Operations Directorate |
| USCIS | U.S. Citizenship and Immigration Services |
| VTC | Video teleconferencing |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

February 19, 2020

Congressional Addressees

The Department of Homeland Security's (DHS) U.S. Customs and Border Protection (CBP) has reported a significant increase in recent years in apprehensions of noncitizen adults and family units[1] who claim an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country.[2] CBP may place apprehended adults and family units into full or expedited removal proceedings before an immigration court, consistent with the Immigration and Nationality Act.[3] In full removal proceedings, they may apply for various forms of relief or protection, including asylum. U.S. immigration law provides that noncitizens physically present within the United States, whether or not at a designated port of entry, may be granted asylum if they are found to be

---

[1]CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien". The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to "noncitizen parent(s) or legal guardian(s)".

[2]Within CBP, the U.S. Border Patrol (Border Patrol) apprehends individuals at U.S. borders between ports of entry, and the Office of Field Operations (OFO) encounters individuals that arrive at ports of entry. According to CBP officials, OFO encounters noncitizens (instead of apprehending) them because, at ports of entry, individuals do not enter the United States until OFO officers have processed them. For the purposes of this report, we use the term "apprehend" to describe both Border Patrol and OFO's first interactions with noncitizens at the border. In addition, while OFO typically refers to its officers as "Customs and Border Protection officers," we use the term "OFO officers" in this report for clarity.

[3]See 8 U.S.C. §§ 1225(b), 1229a; see also 8 C.F.R. § 235.3(b)(4) .With some exceptions, including unaccompanied alien children (UAC), noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days may be placed into expedited removal. See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004); see also 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to two years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on September 27, 2019 and as of November 2019, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D. D.C. Sept. 27, 2019) (order granting preliminary injunction).

GAO-20-250  Fear Screenings

unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion (referred to as "protected grounds").[4] If they are precluded from obtaining asylum based on, for example, past convictions of certain crimes, but their life or freedom would be threatened based on the protected grounds or they would potentially be tortured if removed, they may also seek withholding of removal.[5]

If noncitizens are placed into expedited removal proceedings instead of full removal proceedings, they are to be ordered removed from the United States without further hearing before an immigration judge unless they indicate either (1) an intention to apply for asylum or (2) a fear of persecution or torture, or a fear of return to their country (referred to throughout this report as making a "fear claim"). In such cases, they are referred to DHS's U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening by an asylum officer. If they have been issued a final administrative removal order after conviction for an aggravated felony or have a prior order of removal that is reinstated, and express a fear of return, they are referred to an asylum officer for a reasonable fear

---

[4]The laws governing asylum protection were first established in statute with the passage of the Refugee Act of 1980, Pub. L. No. 96-212, tit. II, § 201, 94 Stat. 102, 102-06 (1980) (codified at 8 U.S.C. §§ 1101(a)(42), 1157-1159). The legal standard for a refugee and asylee are generally the same, but noncitizens must apply for refugee status from outside the United States and for asylum status from within the United States.

[5]See 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.13(c) (establishing a number of grounds for mandatory denial of asylum, including, among others, conviction of certain crimes, being reasonably regarded as a danger to the security of the United States, and the third country asylum bar), 208.16 (codifying both withholding of removal under the Immigration and Nationality Act and the Convention against Torture). For the purposes of this report, we refer to withholding of removal under the Immigration and Nationality Act and withholding of removal under the Convention against Torture collectively as "withholding of removal." If an individual is found to be entitled to protection under the Convention against Torture, but is subject to a provision for mandatory denial of withholding of removal, such as a prior conviction of a particularly serious crime, the individual may be granted deferral of removal. This type of protection can be terminated at any time, resulting in the individual's removal from the United States, based on new evidence or diplomatic assurances provided by the Department of State. See 8 C.F.R. § 208.17.

screening.[6] USCIS data indicate that its credible fear caseload nearly doubled from fiscal years 2015 to 2016 (approximately 48,000 to 91,000 cases) and generally remained at that level through fiscal year 2018. Further, USCIS reported that it received more than 105,000 credible fear cases in fiscal year 2019.

Through these screenings, USCIS makes a determination about whether these individuals have a credible or reasonable fear of persecution or torture if returned to their country and the likelihood they can establish in a hearing before an immigration judge that these threats exist. If USCIS determines that the individual has a credible fear of persecution or torture, he or she will be placed into full immigration proceedings. If the individual receives a negative determination, he or she can request a review of that determination by an immigration judge within the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

We were asked to review DHS's and DOJ's processes for screening noncitizens who arrive at the southwest border expressing an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country, and the resources needed to carry out these screenings within applicable time frames.[7] This report discusses (1) what USCIS and EOIR data show about the credible fear and reasonable fear processes, (2) the extent to which USCIS has policies and procedures for overseeing credible fear and reasonable fear screenings, and (3) the extent to which USCIS and EOIR have processes for managing their respective credible fear and reasonable fear-related workloads.

For these objectives, we interviewed DHS and DOJ officials. Specifically, we interviewed officials from CBP's Border Patrol and Office of Field Operations (OFO); ICE's Enforcement and Removal Operations; USCIS's

---

[6]See 8 C.F.R. §, 208.31. Noncitizens convicted of crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of persecution or torture, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. An "asylum officer" is defined as an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications and is supervised by an officer who has had such training and has had substantial experience adjudicating asylum applications. See 8 U.S.C. § 1225(b)(1)(E). We use this term to refer to any officer conducing credible and reasonable fear screenings.

[7]See Pub. L. No. 116-26, tit. V, § 506, 133 Stat. 1018, 1027 (2019).

Asylum Division; and EOIR. We conducted site visits at Border Patrol stations and OFO ports of entry in Arizona, California, and Texas; ICE single adult and family residential centers in California and Texas; and USCIS asylum offices in Texas and Virginia, from September 2018 to April 2019. During these site visits, we interviewed Border Patrol, OFO, ICE, USCIS, and EOIR officials and observed credible and reasonable fear interviews, among other activities. To select these locations, we reviewed USCIS data on credible and reasonable fear cases in fiscal year 2018, and identified specific locations that received the vast majority of cases during that year. We also considered the geographical proximity of multiple CBP and ICE facilities to maximize observations. Our observations during site visits are not generalizable to all Border Patrol, OFO, ICE, USCIS, or EOIR operations, but provided us the opportunity to learn more about policies and procedures for credible and reasonable fear.

To address the first objective, we reviewed record-level data from USCIS and EOIR. For USCIS, we reviewed record-level data from USCIS's automated case management system to identify the number, characteristics, and outcomes of credible and reasonable fear cases between fiscal year 2014 through the second quarter of fiscal year 2019 (the most current data available from USCIS at the time of our review). For EOIR, we reviewed data on immigration judge reviews of credible and reasonable fear cases posted on its public website. We also requested data from EOIR on credible and reasonable fear reviews for those individuals detained in ICE's family residential centers. Further, we reviewed EOIR data on credible and reasonable fear reviews from fiscal year 2014 through the third quarter of 2019 (the most current data available from EOIR at the time of our review). To assess the reliability of USCIS and EOIR data, we completed a number of data reliability steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing information about the data and systems that produced them, such as relevant training materials for USCIS officers who use agency data systems; and (3) discussing data entry issues and data limitations with USCIS and EOIR officials. We determined the data were sufficiently reliable to describe the number, outcomes, and characteristics of credible and reasonable fear cases.

To address the second objective, we reviewed USCIS policy documents, training materials, and other guidance documents, such as procedures manuals for credible and reasonable fear. In particular, we reviewed USCIS Asylum Division quarterly training reports for fiscal year 2018 to

analyze the weekly training activities in each asylum office for each week of the reporting quarter. We also reviewed asylum officer training materials, reports from the Asylum Division's periodic quality assurance reviews of credible and reasonable fear cases at individual asylum offices conducted between November 2017 and May 2018, and USCIS guidance on processing families in credible and reasonable fear cases. In addition, we conducted interviews with USCIS headquarters and asylum office officials, and we observed asylum officers screening credible and reasonable fear cases. We compared USCIS policies and procedures to *Standards for Internal Control in the Federal Government* related to developing competent individuals qualified to carry out assigned responsibilities, ongoing monitoring activities and evaluation of results, and obtaining high quality data.[8]

To address the third objective, we reviewed USCIS and EOIR documents and data and conducted interviews with USCIS and EOIR officials, to evaluate the extent to which USCIS and EOIR have processes for managing their respective credible and reasonable fear-related workloads. For USCIS, we reviewed policy documents, training materials, and other guidance documents related to USCIS's staffing allocation model for the credible and reasonable fear workload. In addition, we analyzed record-level USCIS data to calculate processing times and case delays for credible and reasonable fear cases from fiscal year 2014 through the second quarter of fiscal year 2019. We also reviewed USCIS's publicly-reported data on credible fear processing times during this time period. We compared USCIS policies and procedures to *Standards for Internal Control in the Federal Government* related to obtaining data on a timely basis for management to use for effective monitoring and processing data into high quality information.[9] For EOIR, we reviewed required time frames for EOIR's review of USCIS's credible and reasonable fear determinations; data that EOIR has publicly reported about its workload and case adjudications; and policy documents, such as EOIR's 2018 memorandum on case priorities. In addition, we analyzed summary data on EOIR's credible and reasonable fear review processing times for fiscal year 2014 through the third quarter of fiscal year 2019 (the most current data available at the time of our review) and compared EOIR's processing times with required time frames. To assess the reliability of the data, we reviewed documentation on USCIS's and EOIR's

---

[8]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[9]GAO-14-704G.

data systems, interviewed knowledgeable officials, and conducted electronic testing of USCIS's record-level data for obvious errors. We determined that the USCIS and EOIR data we reviewed on credible and reasonable fear workloads and processing times were sufficiently reliable to describe credible and reasonable fear processing times and case delays. For more information about our scope and methodology, see appendix I.

We conducted this performance audit from November 2018 to February 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Within CBP, Border Patrol is responsible for securing U.S. borders and apprehending individuals arriving at the border between ports of entry. Also within CBP, OFO is responsible for inspecting travelers and cargo seeking to enter the United States through ports of entry and encounters or apprehends individuals determined to be inadmissible to the country. Upon apprehension of individuals at or between ports of entry, Border Patrol agents and OFO officers generally decide whether to (1) place apprehended adults and family units into expedited removal proceedings, or (2) initiate full immigration proceedings, according to CBP officials. If agents or officers place individuals into expedited removal proceedings, CBP will transfer them to DHS's U.S. Immigration and Customs Enforcement (ICE) for longer-term detention (see appendix II for more information on eligibility, screening standards, and possible screening outcomes for credible and reasonable fear cases).[10] Noncitizen adults and family units may make a fear claim in CBP custody at any point after

---

[10]Generally, individuals placed into expedited removal proceedings are required to be detained until removal or, if applicable, until receiving a final determination of credible fear. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). ICE manages the U.S. immigration detention system, which detains noncitizens, including families, whose immigration cases are pending or who have been ordered removed from the country. Since June 2014, ICE has operated four family residential centers in Texas, Pennsylvania, and New Mexico for family units who may be subject to removal while they await the resolution of their immigration cases or who have been ordered removed from the United States. As of October 2019, ICE maintains three family residential centers—in Dilley and Karnes, Texas, and Leesport, Pennsylvania—with a cumulative capacity of 3,326 beds. The facility in New Mexico ceased operating as a family residential center in November 2014.

apprehension, and during the pendency of their expedited removal proceedings in ICE custody (see appendix III for data on apprehensions of noncitizens placed into expedited removal who claimed fear of returning to their country, along with other characteristics of their cases).

ICE is generally responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. If USCIS makes a negative determination and the determination is either not reviewed by an immigration judge, because the noncitizen has declined immigration judge review, or, if reviewed, is upheld by a reviewing immigration judge, ICE is then responsible for removing the person from the country.[11]

Within USCIS, the Refugee, Asylum, and International Operations Directorate (RAIO) is to provide, among other things, services for people who are fleeing oppression, persecution, or torture or facing urgent humanitarian situations. RAIO is made up of two divisions: the Asylum Division and the International and Refugee Affairs Division. USCIS's Asylum Division is responsible for, among other responsibilities, adjudicating affirmative asylum applications—that is, claims made at the initiative of the individual who files an application for asylum with USCIS—and screening credible and reasonable fear cases. As of March 2019, USCIS had 546 asylum officers on board and eligible to screen credible and reasonable fear cases (out of 745 authorized positions).[12] Asylum officers screen cases at the Asylum Prescreening Center in Arlington, Virginia, and eight asylum offices nationwide.[13] USCIS established the Asylum Pre-Screening Center in fiscal year 2016 to provide additional support for the credible and reasonable fear caseload. As of April 2019, the Asylum Pre-Screening Center and the Arlington

---

[11]See generally 8 U.S.C. §§ 1228, 1231(a)(5); 8 C.F.R. §§ 208.30-208.31.

[12]USCIS reported it executed a plan in fiscal year 2019 to hire 500 staff for the Asylum Division by the end of December 2019. According to USCIS, this includes new asylum officer, supervisory asylum officer, and mission operations staff positions to fill staffing needs in all Asylum Offices. The Asylum Division reported it achieved its goals for selecting individuals to fill these positions, 304 of whom had entered onto duty as of September 30, 2019.

[13]The Asylum Pre-Screening Center is co-located with the asylum office in Arlington, Virginia. According to USCIS officials, asylum officers from the Arlington asylum office may also be assigned to screen credible and reasonable fear cases that are under the jurisdiction of the Asylum Pre-Screening Center. In addition to its eight asylum offices, USCIS maintains two asylum sub-offices in Metairie, Louisiana and Boston, Massachusetts.

asylum office together had jurisdiction over 27 ICE detention centers across the United States.

EOIR is responsible for conducting immigration court proceedings, appellate reviews, and administrative hearings to fairly, expeditiously, and uniformly administer and interpret U.S. immigration laws and regulations. As of September 30, 2019, 442 immigration judges presided over EOIR's 63 immigration courts nationwide. In addition to removal proceedings, immigration judges also conduct certain other types of hearings, such as the review of negative credible fear determinations. Table 1 provides additional information about DHS's and DOJ's roles in the credible and reasonable fear processes.

**Table 1: Department of Homeland Security (DHS) and Department of Justice (DOJ) Roles and Responsibilities in the Credible and Reasonable Fear Processes**

| Agency | Role |
|---|---|
| DHS's U.S. Customs and Border Protection's (CBP) U.S. Border Patrol (Border Patrol) and Office of Field Operations (OFO) | Among other things, OFO officers conduct immigration and customs inspections at ports of entry and Border Patrol agents secure the U.S. border between ports of entry. |
| | Among other processing activities, CBP's Border Patrol agents and OFO officers run background checks on immigration and criminal history, and use this and other information to inform processing decisions. For example, among other things, Border Patrol agents and OFO officers determine whether to place an individual in expedited removal.[a] |
| | Border Patrol agents and OFO officers are to interview apprehended noncitizens to obtain the specifics of their cases and record that information on DHS's Form I-213, *Record of Deportable/Inadmissible Alien.*[b] |
| | After placing an individual into expedited removal proceedings, Border Patrol agents and OFO officers are to record any fear claims in the individual's alien file (or "A-file") and their agencies' respective automated data systems. |
| DHS's U.S. Immigration and Customs Enforcement (ICE) | ICE, among other things, receives referrals from Border Patrol and OFO for aliens whom CBP has deemed inadmissible and placed in expedited removal. |
| | ICE officers are to review the A-files prepared by Border Patrol agents or OFO officers and have the authority to accept or deny a referral for detention from CBP based on detention space availability. Upon acceptance, ICE officers determine whether to detain, release, or remove individuals based on a variety of factors, including statutory requirements, medical considerations, and the availability of space at one of its single adult detention centers or family residential centers. ICE officers collect and record information on individuals in ICE's automated data systems. |
| | ICE is responsible for referring individuals, as appropriate, to U.S. Citizenship and Immigration Services (USCIS) for a credible fear or reasonable fear screening. |
| | Pending the outcome of the credible or reasonable fear screening, ICE will refer individuals determined to have a credible fear to EOIR for full removal proceedings before an immigration judge. For those found not to have a credible fear, ICE will process them for removal from the country. ICE will also decide whether to continue detaining or to release individuals who are awaiting full removal proceedings. Individuals who are transferred from expedited removal proceedings to full removal proceedings after establishing a credible fear of persecution or torture are generally ineligible for release on bond and must be detained until removal proceedings conclude, unless granted parole by ICE.[c] |

| Agency | Role |
|---|---|
| DHS's U.S. Citizenship and Immigration Services (USCIS) | In screening noncitizens for credible or reasonable fear,[d] an asylum officer's tasks include, but are not limited, to, reviewing various forms from the referring officer to ensure that USCIS has jurisdiction to conduct the credible or reasonable fear interview; performing background checks; interviewing the individual to obtain more details on his or her fear claim, overall credibility, and the nature of any relationships with family members with whom they were apprehended; and determining whether there are any dependents who could potentially be included in the individual's fear determination.[e] |
| | USCIS officers are to conduct the interview in a non-adversarial manner, separate and apart from the general public. |
| | A USCIS asylum officer is to determine if the individual has any bars to asylum or withholding of removal that will be pertinent if the individual is referred to immigration court for full removal proceedings.[f] |
| | For cases in which the USCIS asylum officer concludes a credible fear screening with a positive determination, USCIS is to issue a Notice to Appear, thereby placing the individual into full removal proceedings before an EOIR immigration judge. Similarly, for reasonable fear cases where the asylum officer makes a positive determination, USCIS issues a Notice of Referral to an immigration judge for removal proceedings to consider the applicants' eligibility for withholding of removal or deferral of removal.[g] |
| | For cases in which the USCIS asylum officer concludes a credible or reasonable fear screening with a negative determination, USCIS is to refer the individual to ICE for removal from the United States, unless the noncitizen requests a review of the negative determination by an immigration judge. If this review is requested, USCIS will issue a Notice of Referral to the immigration judge. |
| DOJ's Executive Office for Immigration Review (EOIR) | Within EOIR, immigration judges preside over removal proceedings for respondents detained by ICE or released pending the outcome of their proceedings, to determine their removability and eligibility for any relief being sought. |
| | In addition to removal proceedings, immigration judges conduct certain other types of hearings, such as to review negative credible or reasonable fear determinations at the noncitizen's request. After receiving a referral for such a review, EOIR must generally complete reviews of negative determinations of credible fear by USCIS within seven days and negative determinations of reasonable fear cases within 10 days. |

Source: GAO analysis of statutes and DHS and DOJ documents. | GAO-20-250

[a]Generally, noncitizens placed into expedited removal proceedings are required to be detained for the duration of their credible fear screening or, if found not to have a credible fear, until removal. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). As a result, Border Patrol and OFO officials stated that Border Patrol agents and OFO officers must determine whether ICE has space in its detention facilities before placing individuals into expedited removal proceedings. If agents and officers place noncitizens into full immigration removal proceedings, they typically issue individuals a Notice to Appear before immigration court, where they may seek various forms of immigration relief such as asylum.

[b]The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). We use the term "noncitizen" to refer to individuals who would meet the definition of "alien."

[c]See 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.3(b)(2)(iii). See also Matter of M-S-, 27 I & N Dec. 509 (A.G. 2019); Jennings v. Rodriguez, 138 S. Ct. 830, 844–45 (2018) (recognizing that the expedited removal statute generally mandates detention throughout the completion of removal proceedings unless the alien is paroled).

[d]See generally 8 U.S.C. § 1225(b)(1)(B)(iii); 8 C.F.R. §§ 208.30-208.31, 1208.30-1208.31. In addition to conducting credible and reasonable fear screenings, USCIS is also responsible for adjudicating affirmative asylum applications—that is, claims made at the initiative of the individual who files an application for asylum with USCIS.

[e]See 8 C.F.R. § 208.2(c)(2).

[f]In June 2019, Border Patrol agents on assignment to USCIS began conducting credible fear interviews and, in September 2019, began conducting credible fear interviews at the family residential center in Dilley, Texas. Border Patrol agents conducting credible fear interviews are to receive credible fear training from USCIS before conducting interviews and are to be supervised by a supervisory asylum officer with substantial experience adjudicating asylum applications in order to satisfy the statutory definition of an asylum officer. See 8 U.S.C. § 1225(b)(1)(E).

[g]U.S. immigration law provides that noncitizens physically present within the United States, whether or not at a designated port of arrival, may be granted asylum if they are found to be unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution based on their race, religion, nationality, membership in a particular social group, or political opinion (referred to as "protected grounds"). Additionally, if they are precluded from asylum based on, for example, past convictions of serious crimes, but their life or freedom would be threatened based on the protected grounds or would be tortured if removed, they may also seek withholding of removal. See 8 U.S.C. §§ 1101(a)(42), 1157-1159; See 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16 (codifying both withholding of removal under the Immigration and Nationality Act and the Convention against Torture). For the purposes of this report, we refer to withholding of removal under the Immigration and Nationality Act and withholding of removal under the Convention against Torture collectively as "withholding of removal."

In July 2019, USCIS made several changes to its credible fear screening processes in response to an interim final rule implementing a new mandatory bar to asylum, known as the "third country transit bar."[14] Under the interim final rule, noncitizens who enter, attempt to enter, or arrive in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside their country of citizenship, nationality, or last lawful habitual residence en route to the United States, must be found ineligible for asylum unless they

[14]The regulations governing the credible fear process were amended by an interim final rule published on July 16, 2019, which became effective on the date of publication. See 84 Fed. Reg. 33,829 (July 16, 2019) (codified as amended at 8 C.F.R. §§ 208.13, 208.30). However, in a lawsuit filed to challenge, a district court granted a nationwide preliminary injunction, preventing DHS from taking any action to implement the rule. See East Bay Sanctuary Covenant v. Barr, No. 19-04073 (N. D. Cal. July 24, 2019) (order granting preliminary injunction). This injunction was then briefly limited to the jurisdiction of the court of appeals for the Ninth Circuit before it was ultimately appealed to the Supreme Court of the United States, which allowed the interim final rule to go into effect nationwide on September 11, 2019, pending further proceedings. See Barr v. East Bay Sanctuary Covenant, No. 19-A230 (U.S. September 11, 2019) (opinion staying nationwide injunction). As of February 2020, this litigation was ongoing.

demonstrate that they fall under an exception to the third country transit bar.[15]

# USCIS's and EOIR's Credible and Reasonable Fear Caseloads Generally Increased from Fiscal Years 2014 through 2018, and a Majority of USCIS Screening Outcomes were Positive

## USCIS's Credible and Reasonable Fear Caseload Nearly Doubled from Fiscal Years 2014 through 2018

As shown in table 2, USCIS's credible and reasonable fear caseloads nearly doubled from fiscal year 2014 (over 56,000 referrals to USCIS) to fiscal year 2018 (almost 109,000 referrals)—the most recent full year of USCIS data available at the time of our analysis. From fiscal year 2014 through the first two quarters of fiscal year 2019, referrals to USCIS for credible fear screenings comprised about 89 percent of all credible and reasonable fear referrals. The number of referrals for credible fear screenings in the first two quarters of fiscal year 2019 alone was larger than the total number of referrals in each of fiscal years 2014 and 2015. Referrals for reasonable fear screenings also increased from fiscal years 2014 to 2018, and comprised between 9 and 15 percent of all referrals during that time period. Appendix III contains additional information on the

---

[15]See 8 C.F.R. § 208.13(c)(4). These exceptions are: (1) if the noncitizen demonstrates that he or she applied for protection from persecution or torture in at least one country outside the noncitizen's country of citizenship, nationality, or last lawful habitual residence through which the noncitizen transited en route to the United States, and received a final judgment denying protection in such country; (2) the noncitizen demonstrates the he or she meets the definition of "victim of a severe form of trafficking in persons (as defined in 8 C.F.R. § 214.11 to generally mean either commercial sex trafficking or involuntary servitude or slavery); or (3) the countries through which the noncitizen transited in route to the United States were not, at the time of transit, parties to international refugee and humanitarian protection agreements.

characteristics of credible and reasonable fear applicants from fiscal year 2014 through March 2019.

**Table 2: Credible and Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS), Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal year | Total number of credible fear referrals | Percent of total referrals | Total number of reasonable fear referrals | Percent of total referrals | Total credible fear and reasonable fear referrals |
|---|---|---|---|---|---|
| 2014 | 47,754 | 85 | 8,602 | 15 | **56,356** |
| 2015 | 48,089 | 86 | 8,000 | 14 | **56,089** |
| 2016 | 91,598 | 91 | 9,274 | 9 | **100,872** |
| 2017 | 77,698 | 89 | 9,792 | 11 | **87,490** |
| 2018 | 98,083 | 90 | 10,697 | 10 | **108,780** |
| 2019 (first two quarters) | 50,091 | 89 | 6,121 | 11 | **56,212** |
| **Total** | **413,313** | **89** | **52,486** | **11** | **465,799** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

## A Majority of Credible and Reasonable Fear Referrals to USCIS from Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019 Resulted in Positive Determinations

As shown in figure 1, USCIS asylum officers made positive determinations in about 71 percent of all credible and reasonable fear screenings between fiscal years 2014 and the first two quarters of fiscal year 2019. The remaining credible and reasonable fear screenings were almost evenly divided between negative determinations and administrative closures (approximately 14 percent each) with a small remainder of screenings pending resolution (0.1 percent).[16] Individually, from fiscal year 2014 through the first 2 quarters of fiscal year 2019, USCIS asylum officers made positive determinations in nearly 77 percent

[16]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

of all credible fear screenings; officers made positive determinations in about 30 percent of reasonable fear screenings.

**Figure 1: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**



0.1%

14.4%

14.2%

71.4%

- ☐ Positive determination
- ☐ Negative determination
- ☐ Administrative closure[a]
- ☐ Pending resolution[b]

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: USCIS cases included in our analysis were referred to USCIS from October 1, 2013 through March 30, 2019 and the status of cases was as of July 22, 2019.

With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

Total percentages do not equal 100 percent due to rounding.

[a]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

[b]We considered cases that remained in progress as of July 22, 2019 to be "pending resolution."

Regarding credible fear screenings specifically, the percentage of positive determinations ranged from about 73 to 80 percent of total credible fear cases completed each year from fiscal year 2014 through the first two quarters of fiscal year 2019 (see fig. 2).

**Figure 2: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019**



Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: USCIS cases included in our analysis were referred to USCIS from October 1, 2013 through March 30, 2019 and the status of cases was as of July 22, 2019.

With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

Total percentages do not equal 100 percent due to rounding.

**GAO-20-250  Fear Screenings**

aWe considered cases that remained in progress as of July 22, 2019 to be "pending resolution." For fiscal year 2014 through the first 2 quarters of fiscal year 2019, these cases were still in progress and accounted for 0.1 percent or less of total credible fear cases.

bAccording to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

Regarding reasonable fear screenings, as shown in figure 3, outcomes for reasonable fear cases from fiscal year 2014 through the first two quarters of fiscal year 2019 were generally split evenly each year among positive determinations (from 28 to 32 percent), negative determinations (from 29 to 35 percent), and administrative closures (from 35 to 42 percent).[17]

[17]Since 2014, administrative closures decreased by about 7 percentage points, while positive and negative determinations increased by about 2 and 5 percentage points, respectively.

GAO-20-250  Fear Screenings

**Figure 3: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019**



Source: GAO analysis of USCIS data. | GAO-20-250

Notes: USCIS cases included in our analysis were referred to USCIS from October 1, 2013 through March 30, 2019 and the status of cases was as of July 22, 2019.

Noncitizens issued a final administrative removal order after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of persecution or torture, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

Total percentages do not equal 100 percent due to rounding.

[a]We considered cases that remained in progress as of July 22, 2019 to be "pending resolution." For fiscal year 2014 through the first 2 quarters of fiscal year 2019, these cases are still in progress and accounted for 0.1 percent or less of total credible fear cases.

[b]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

**EOIR Reviewed Over 50,000 USCIS Credible Fear Decisions from Fiscal Year 2014 through the First Three Quarters of Fiscal Year 2019; Immigration Judges Upheld Most Decisions**

EOIR's credible and reasonable fear workload increased by about 16 percent—from about 8,100 reviews to about 9,400 reviews each year—between fiscal year 2014 and fiscal year 2018. According to EOIR data, from fiscal year 2014 through the third quarter of 2019 (the most recent data available at the time of our analysis), EOIR's immigration judges, at the noncitizens' requests, reviewed about 55,000 cases in which USCIS asylum officers made a negative credible or reasonable fear determination (see figure 4).[18] Approximately 10 percent of these reviews were for individuals detained at the Karnes, Dilley, or Berks family residential centers.[19]

---

[18]We obtained aggregate EOIR data from fiscal year 2014 through June 2019—the most recent, complete data available at the time of our review. The most recent, full year for which data were available at the time of our analysis was fiscal year 2018.

[19]We excluded reviews that took place at the Artesia Family Residential Center from this analysis, as Artesia was operational for only 6 months, from June through November 2014. According to USCIS data, credible and reasonable fear screenings at Artesia represent less than 1 percent of all screenings at ICE's family residential centers from fiscal years 2014 through March 2019.

**Figure 4: Numbers and Outcomes of Executive Office for Immigration Review (EOIR) Immigration Judge Reviews of Negative U.S. Citizenship and Immigration Services Fear (USCIS) Determinations, Fiscal Year 2014 through June 2019**





Source: GAO analysis of EOIR data.  |  GAO-20-250

Note: Procedures for review of negative credible and reasonable fear findings by an immigration judge are governed by 8 C.F.R. §§ 1208.30-1208.31. According to EOIR, "other" includes administrative closures.

As shown in figure 4, immigration judges upheld USCIS's negative credible and reasonable fear determinations in 77 percent of all reviews judges conducted from fiscal year 2014 through the third quarter of fiscal year 2019. During this time period, immigration judges vacated (or overturned) 22 percent of USCIS's negative determinations—meaning, judges found that those individuals had a credible or reasonable fear, as appropriate. As a result, individuals found to have a credible fear were to

be placed in full removal proceedings and individuals found to have a reasonable fear were to be placed into more limited removal proceedings to consider the applicants' eligibility for withholding of removal or deferral of removal. Immigration judges upheld 45 percent of USCIS's negative determinations and vacated 54 percent of USCIS's negative determinations for individuals in ICE's Dilley, Karnes, or Berks family residential centers.

In addition, EOIR publicly reports data on the outcomes of removal cases across immigration courts that originated with a positive credible fear determination.[20] EOIR reported that, from fiscal years 2014 through March 2019, immigration judges completed about 135,000 cases that began with a positive credible fear determination.[21] Individuals in about 75,800 of the completed removal cases filed applications for asylum (56 percent). In about 59,200 of the completed removal cases (44 percent), individuals did not file an asylum application. However, as previously described, individuals who have received positive credible fear determinations may apply for other forms of relief or protection besides asylum, such as withholding of removal, and those applications are not represented in the statistics on EOIR's website.

Further, EOIR officials told us that, for data reporting purposes, each member of a family who receives a Notice to Appear before an immigration judge is counted as one EOIR removal case and each removal case may or may not include an asylum application. However, for a number of immigration applications before the court, including asylum and the related screening for credible fear, a spouse or child (defined as an unmarried natural or legally adopted child under 21 years of age) may be included as a dependent on a principal's application and derive lawful immigration status from the principal applicant if the application is granted.[22] As previously discussed, individuals detained in family residential centers—including individuals who could be eligible dependents for credible fear screening and asylum application purposes—comprise a substantial proportion of those who receive positive credible fear determinations. As such, according to EOIR

---

[20]As previously stated, an individual who receives a positive credible fear determination is placed into full removal proceedings where he or she can apply for multiple forms of relief or protection before an immigration judge, including asylum.

[21]As of April 2019, EOIR reported that there were 214,855 pending removal cases that originated with a positive credible fear claim.

[22]See 8 U.S.C. § 1101(b)(1); see also 8 C.F.R. § 208.30(b).

officials, each family member would not be expected to file a separate asylum application. For example, a mother and her two children whose removal cases originated with a positive credible fear screening would comprise three removal cases in EOIR's publically reported data, but it is likely that only the mother's case would include an application for asylum, with her children as dependents on that application. For those removal cases in which the noncitizen applied for asylum, immigration judges granted asylum in about 19,300 cases (25 percent of the 75,800 completed removal cases with an asylum application).[23]

# USCIS Has Policies and Procedures for Overseeing Credible and Reasonable Fear Screenings, but Gaps in Training, Quality Assurance, and Family Processing Exist

## USCIS Has Policies and Procedures for Managing and Overseeing the Credible and Reasonable Fear Screening Process, Including Requiring Supervisory Review of All Cases

USCIS has developed various policies and procedures related to managing and overseeing credible and reasonable fear cases in accordance with the regulations governing credible and reasonable fear screenings, including setting requirements for interview procedures, background and security checks, and supervisory review.[24] In particular, USCIS has a *Credible Fear Procedures Manual* and a *Reasonable Fear Procedures Manual* that outline the procedures officers are to follow in screening these cases.

**Interview procedures.** As of July 2019, an asylum office is to wait a minimum of one full calendar day from the applicant's arrival at an ICE

[23]According to EOIR officials, spouses or children included as dependents on a spouse or parent's asylum application are included in the total number of asylum grants.

[24]See 8 C.F.R. §§ 208.30-208.31.

detention facility before conducting a credible fear interview; an asylum office is to wait 48 hours after an initial orientation on the reasonable fear process before a reasonable fear interview, according to USCIS policy.[25] However, both credible and reasonable fear interviews generally occur at least 48 hours after the applicant's arrival at a detention facility, according to USCIS officials.[26] Asylum officers may conduct credible and reasonable fear interviews either in-person or on the phone. Asylum officers are to arrange the assistance of an interpreter, generally connected over the phone, if the applicant is unable to proceed effectively in English pursuant to regulation.[27] Asylum officers are to verify and document that applicants have received and understood information regarding the credible or reasonable fear process before they begin asking substantive questions during the interview about the applicant's claim.

According to USCIS documents and officials, during the interview, asylum officers are to elicit all information relevant to a credible or reasonable fear claim, and regulation requires they conduct interviews in a non-adversarial manner. For example, asylum officers are to ask applicants questions to determine whether they can establish a credible or reasonable fear of persecution based on their race, religion, nationality, membership in a particular social group, or political opinion. In addition, asylum officers are to ask applicants questions to determine whether they can establish a credible or reasonable fear of torture if returned to their

---

[25]Prior to July 2019, USCIS policy was to wait at least 48 hours from the applicant's arrival at an ICE detention facility to conduct the credible fear interview. USCIS policy for reasonable fear interviews has not changed, according to officials.

[26]At the time of our February 2019 site visit to ICE's family residential centers in Dilley and Karnes, Texas, Houston asylum office policy was to wait 72 hours between an orientation on the credible or reasonable fear process, and the interview. The orientation consisted of a short video describing the credible or reasonable fear process, followed by additional explanations in-person from an asylum officer. At that time, asylum officers would also answer any questions applicants had about the process, according to USCIS officials. As of November 2019, USCIS officials stated they continued to show the short video describing the credible or reasonable fear process at the family residential center in Dilley; USCIS was no longer conducting the in-person orientations at the family residential center in Dilley.

[27]See 8 C.F.R. § 208.30(d)(5). According to Asylum Division policy, an asylum officer fluent in the applicant's language can conduct an interview in a language other than English if their language ability has been certified by the Department of State.

home country.[28] During our observations of in-person and telephone interviews, we observed asylum officers asking questions to ensure they fully explored any aspect of the claim related to a protected ground that could result in a positive determination. For example, we observed asylum officers asking applicants separate questions about each protected ground, even if the applicant had not previously expressed they were harmed because of their political beliefs or race.

USCIS policy notes the applicant's credibility is dependent on various factors such as comparing information provided during the interview with that previously provided in the applicant's sworn statement to Border Patrol or OFO when initially apprehended. If asylum officers identify an issue with the applicant's credibility, they are to inform the applicant of the concerns and ask the applicant for his or her perspectives. During our site visits, we observed asylum officers questioning applicants on inconsistencies, in a non-adversarial manner, between information provided during the interview as compared to the applicant's sworn statements to Border Patrol agents upon apprehension. At the end of the interview, asylum officers are to provide a verbal summary of the material facts of the applicant's claim, and provide an opportunity for the applicant to make any corrections or additions. We observed asylum officers providing such summaries in all but one of the interviews that we observed in full.[29]

According to USCIS policy, asylum officers are to record key information about the applicant's claim, as well as specific details of the determination, on required forms that serve as the official record of the

---

[28]As part of the analysis to determine whether the applicant is likely to be persecuted based on a protected ground or tortured, if an applicant says they were harmed or threatened, asylum officers are to ask questions related to government involvement. In general, persecution does not include the actions of private citizens unless the government is complicit in those acts or is unwilling or unable to take steps to prevent them. Individuals and asylum officers are also to assess whether an applicant could have safely relocated within their country of origin unless the persecutor is the government or is government-sponsored. See generally 8 C.F.R. §§ 208.13-208.31; see also, e.g., Halim v. Holder, 755 F.3d 506, 513 (7th Cir. 2014). We observed asylum officers asking questions about the level of government involvement, such as whether the applicant saw the individual who harmed them interacting with the police, and what exactly they saw or experienced that made them think the individual was connected with the police.

[29]Of the 20 interviews we observed in full, 19 included a verbal summary at the end. The remaining interview did not include a verbal summary at the end.

credible or reasonable fear screening.[30] In addition, asylum officers use a "checklist" to record more detailed legal analysis related to the applicant's claim. Asylum officers also generally type notes during interviews in a question and answer format, capturing each question and follow-up question they ask, and each response the applicant provides. We observed asylum officers documenting interviews in this way during all of the interviews where we observed the asylum officer in person.[31]

**Background and security checks.** USCIS policy requires asylum officers to ensure certain background and security checks are conducted. If security checks or information discovered during the interview raises concerns related to fraud, public safety, or national security, asylum officers are to refer the case to USCIS's Fraud Detection and National Security Directorate (FDNS) for assistance.[32] FDNS officials told us the short time frames in the credible and reasonable fear process, among other factors, make direct involvement in individual cases less likely than in other caseloads at USCIS, such as affirmative asylum cases.[33] As such, the scope and extent of FDNS investigations into credible and reasonable fear cases is limited relative to other USCIS caseloads. FDNS data indicate that asylum officers referred approximately 1,400 total credible and reasonable fear cases to FDNS between fiscal years 2017

---

[30]For credible fear cases, the official record of the screening is USCIS Form I-870, *Record of Determination/Credible Fear Worksheet*. For reasonable fear cases, the official record is USCIS Form I-899, *Record of Determination/Reasonable Fear Worksheet*.

[31]We observed the asylum officer in person for 17 interviews.

[32]FDNS is responsible for leading USCIS's efforts to detect immigration benefit fraud and help detect national security issues and public safety concerns. FDNS's roles and responsibilities related to the credible and reasonable fear process include performing enhanced security checks and vetting of cases referred for assistance; conducting investigations in cases of suspected fraud or national security concerns, as appropriate; prescreening files in order to identify fraud trends and national security concerns prior to interviews; and, providing training to asylum office staff on local trends in fraud, national security, and public safety. For more information about FDNS's roles and responsibilities in the affirmative asylum process, see GAO, *Asylum: Additional Actions needed to Assess and Address Fraud Risks*, GAO-16-50 (Washington, D.C.: Dec. 2, 2015).

[33]Affirmative asylum applications involve claims filed with USCIS at the initiative of the noncitizen. An affirmative asylum applicant may be in the United States lawfully or unlawfully, and must file for asylum directly with USCIS within 1 year of his or her most recent arrival in the country unless he or she can demonstrate changed or extraordinary circumstances.

and 2018.[34] Of those, 13 cases resulted in a formal finding, called a *Statement of Finding*.[35] FDNS officials told us referrals from asylum officers on credible and reasonable fear cases typically result in FDNS conducting research related to an applicant's criminal history or travel patterns. FDNS may refer this information, in turn, to ICE to reference in the applicant's removal proceedings, as appropriate. In contrast, according to FDNS officials, a fraud referral in the affirmative asylum context may result in a more formal finding of fraud in a *Statement of Finding*.

**Supervisory review.** USCIS oversight of credible and reasonable fear cases includes a required supervisory review of each case after an asylum officer makes a positive or negative determination.[36] USCIS officials said supervisors are to review cases for legal sufficiency and accuracy, including a review of the screening checklist and the asylum officer's supporting interview notes. According to officials, supervisors are to communicate the results of their review to the asylum officer informally (e.g., via email or in-person discussion) for small issues, such as an administrative error, or through a formal write-up for larger issues, such as if the asylum officer's legal analysis was insufficient and requires a second interview with the applicant.[37]

---

[34]FDNS made improvements to its data system in fiscal year 2016, including the ability to track the types of cases referred for review. Data for fiscal years 2017-2018 was the most recent, complete year data available at the time of our review.

[35]According to officials, FDNS prepares a *Statement of Findings* in the credible and reasonable fear context when FDNS immigration officers find information related to egregious public safety concerns, national security, or fraud that rises to the level of a finding. When this occurs, FDNS officers document a summary of the finding and relay the information to ICE, as appropriate.

[36]A supervisory asylum officer reviews each credible fear case pursuant to 8 CFR § 208.30(e)(7) and each reasonable fear case pursuant to USCIS policy.

[37]As a result of his or her review, a supervisor may take one of the following actions: (1) concur with the determination, with no adjustments needed; (2) concur with the determination, but ask the asylum officer to make adjustments to the analysis, or correct any inaccuracies; (3) non-concur with the determination, and discuss the evidence and legal analysis with the asylum officer. If the supervisor and asylum officer cannot come to an agreement on the determination, a second line supervisor makes the determination. In addition, a supervisor may request that the asylum officer re-interview the applicant to gain additional information needed for the legal sufficiency of the determination. A re-interview may result in the same determination, or may change the determination.

## USCIS Provides Initial Training on Credible and Reasonable Fear to New Asylum Officers and Asylum Offices Are Required to Provide Ongoing On-the-Job Training

USCIS oversight of credible and reasonable fear cases includes basic training for new asylum officers and ongoing training for incumbent officers at asylum offices; these trainings include information specific to credible fear and reasonable fear screenings. As of the time of our review, the initial training program for asylum officers is comprised of two main components:

- **Distance Training.** New asylum officers participate in 3 weeks of self-paced RAIO Directorate and Asylum Division distance training in their respective asylum offices. During distance training, asylum officers are expected to participate in webinars, read the training materials and complete exercises and quizzes in preparation for residential training. The Asylum Division distance training includes course readings on credible and reasonable fear, and observations of credible and reasonable fear interviews.

- **Residential Basic Training.** Asylum officers participate in a 6-week residential basic training program, which includes 3 weeks of training in issue areas common across USCIS's Refugees, Asylum, and International Operations Directorate, as well as three weeks of Asylum Division-specific training. In the first 3-week session, courses include classroom instruction, practical exercises, and interviewing exercises on a variety of topics and skills relevant to multiple areas of USCIS's work, such as on affirmative asylum and refugee adjudications. The legal topics and skills covered in this initial training include eligibility for asylum, an applicant's nexus to protected grounds, and eliciting testimony, among others. The second 3-week session focuses on division-specific policy, procedure, and law related to asylum adjudications and screenings. For example, the 3-week session includes training on the affirmative asylum process, and multiple mock affirmative asylum interviews, among others, as well as 2 days of training specific to credible and reasonable fear cases. These 2 days include practical exercises; one mock credible fear interview exercise; and formal presentations on interviewing skills and security checks in a credible fear context, forms required for credible and reasonable fear, and on the Convention against Torture. At the end of the 6-week residential training course, new asylum officers must pass final exams with a score of at least 70 percent. We

reviewed a version of the exam and found that it included questions specific to credible and reasonable fear screenings.[38]

Asylum Division officials said the 9 combined weeks of distance and residential basic training constitute the minimum amount of formal training required for asylum officers to effectively screen credible and reasonable fear cases. However, Asylum Division officials said it is important for individual asylum offices to provide additional, on-the-job training to new officers assigned to screen credible and reasonable fear cases, specifically. Asylum officers screen credible and reasonable fear cases under shorter time frames and with less corroborating documentation compared to affirmative asylum cases. As such, Asylum Division officials told us that officers accustomed to adjudicating affirmative asylum cases may need to adjust to the shorter time frames required in credible and reasonable fear cases.[39] For example, some asylum offices have developed formal presentations on local policies and procedures, or provide officers with an opportunity to observe other officers conducting credible or reasonable fear interviews and gradually increase the number of cases they screen per day. Given their caseloads, the Houston and Arlington asylum offices provide 3 and 4 weeks of additional credible and reasonable fear training for new asylum officers, respectively. By comparison, the San Francisco and Newark asylum offices provide 1 week of training on credible and reasonable fear procedures for new asylum officers and Los Angeles provides 2 days of such training, according to officials.

For incumbent asylum officers, USCIS policy requires asylum offices to allocate four hours per week for formal or informal training. The training can range from classroom instruction by a training officer, to individual study time that asylum officers can use to review case law, research country conditions affecting asylum applicants, or read new USCIS procedures and guidance. Individual asylum offices design their weekly training programs based on the types of cases their office generally receives, according to Asylum Division officials. The Asylum Division requires training officers to track the date and topic of each weekly

---

[38]For example, some questions included example credible or reasonable fear fact patterns. Questions also tested asylum officers on the legal standards for these screenings and how to elicit testimony in a credible fear interview, among other topics.

[39]In addition, credible and reasonable fear cases may require an asylum officer to assess the likelihood that an individual will receive protection from removal, such as withholding of removal under the Convention against Torture, a type of protection that can be granted by an immigration judge, but is not generally adjudicated by an asylum officer handling affirmative asylum cases.

training session and report that information to Asylum Division headquarters on a quarterly basis. Our analysis of fiscal year 2018 quarterly training reports for all asylum offices and sub-offices indicates that offices with larger credible and reasonable fear caseloads generally provided more weekly trainings on these topics. For example, Houston and Arlington conducted seven or more weekly training sessions on credible and reasonable fear screenings in fiscal year 2018. By comparison, two offices with smaller credible and reasonable fear caseloads—Newark and New York—conducted one or fewer weekly sessions on credible and reasonable fear (see app. III for credible and reasonable fear workload data by asylum office).[40]

In addition to this training program for asylum officers, USCIS trains officers from outside the Asylum Division to screen credible and reasonable fear cases, including refugee officers and others.[41] Refugee officers receive some of the same basic training as asylum officers, as they participate in the same RAIO distance training and RAIO Directorate residential training. Refugee officers do not participate in Asylum Division distance training or residential training. As a result, USCIS provides refugee officers with 3 days of training on screening credible fear cases before they can begin screening cases. We reviewed training materials for the refugee officer training, and found the sessions are similar to Asylum Division residential training sessions on credible fear screening.

---

[40]USCIS elicits and evaluates feedback on training needs from asylum officers and supervisors every two years through a training needs assessment. The 2018 Asylum Division Training Needs Assessment surveyed approximately 755 asylum officers, supervisory asylum officers, training officers, and refugee officers on detail to the Asylum Division. USCIS received responses from 616 individuals. The assessment includes multiple questions specific to training needs for credible and reasonable fear. For the 2018 Asylum Division training needs assessment, the majority of responding officers said two to seven weekly training sessions each year should be spent on credible and reasonable fear topics.

[41]In addition to refugee officers, former refugee or asylum officers now working with USCIS's Field Office Directorate, Service Center Operations, and Fraud Detection and National Security Directorate conduct credible and reasonable fear screenings for USCIS. Refugee officers on detail to the Asylum Division, particularly those assigned to the Houston or Arlington asylum office, screen credible fear cases at the family residential centers. For example, in fiscal year 2018, 105 refugee officers screened cases at the family residential centers, according to USCIS. In addition, beginning in June 2019, Border Patrol agents on assignment to USCIS began screening credible fear cases only, including credible fear cases at the family residential center in Dilley, Texas. Border Patrol agents screening credible fear cases are to receive credible fear training from USCIS before conducting interviews and be supervised by a supervisory asylum officer who has substantial experience adjudicating asylum applications in order to satisfy the statutory definition of an asylum officer. See 8 U.S.C. § 1225(b)(1)(E).

In addition, some materials provide information and guidance on the differences between adjudicating refugee cases and screening credible fear cases. Officials said refugee officers generally screen credible fear cases, including at the family residential centers, only if they are detailed to the Houston and Arlington asylum offices. Both Houston and Arlington provide refugee officers detailed to their offices with 1-2 weeks of additional training on credible fear screening, similar to the procedural training they provide to new asylum officers. At both offices, trainings include formal presentations or exercises on legal concepts and procedures specific to credible fear, credible fear interview observations, and a gradual increase in the number of cases refugee officers screen each day.

## Pre-departure Training for USCIS Asylum Officers Screening Family Units at ICE Family Residential Centers Is Inconsistent Across Asylum Offices

Although all new asylum officers receive basic training on the credible and reasonable fear screening process and may also receive on-the-job training in their home offices, not all offices provide additional pre-departure training to asylum officers before they begin screening cases for family units at ICE family residential centers. Credible fear screenings at ICE's family residential centers, in particular, represent a significant percentage—about 34 percent—of all credible fear cases asylum officers screened from fiscal year 2014 though the second quarter of fiscal year 2019. As discussed previously, asylum offices with relatively small credible and reasonable fear local caseloads generally provide less on-the-job training throughout the year on credible and reasonable fear. However, almost all asylum offices send officers to the family residential centers in Texas for in-person interviews, including those offices with small credible and reasonable fear caseloads at the local level. Asylum Division officials said they require asylum offices to send a specific number of asylum officers—a number in proportion to the size of the office—with the largest offices sending the most officers to the family residential centers each year. For example, in fiscal year 2018, Newark, Los Angeles, Houston, and Chicago sent the most officers to the family residential centers, as shown in figure 5 below.

**Figure 5: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Screening Families in U.S. Immigration and Customs Enforcement Family Residential Centers in Fiscal Year 2018, by Asylum Office**



Source: GAO analysis of USCIS data. | GAO-20-250

Notes: According to USCIS officials, the Miami asylum office did not send asylum officers to the family residential centers in order to focus on reducing its affirmative asylum backlog during fiscal year 2018. However, officials said the Miami asylum office did send officers in previous years.

Total percentages do not equal 100 percent due to rounding.

At least two asylum offices provide pre-departure training to asylum officers being sent to ICE's family residential centers. To support officers who are more accustomed to adjudicating affirmative asylum cases, the Los Angeles asylum office provides pre-departure training for officers before they travel to the family residential centers. In Los Angeles, officers observe credible and reasonable fear interviews and gradually increase to a full caseload of credible or reasonable fear cases at their home office, according to officials. In San Francisco, officers receive pre-departure training highlighting procedures unique to the family residential centers or to processing family units in credible and reasonable fear. Specifically, San Francisco pre-departure training includes a formal presentation on family residential center procedures, including discussion of challenges officers may experience, according to officials. By comparison, officials from the Chicago and New York offices told us they do not provide formal pre-departure training but rather direct or recommend that officers review Asylum Division guidance and procedures on family processing independently before they travel. Officials from two other offices told us they rely on the training asylum

officers may receive throughout the year related to credible and reasonable fear, which can vary, as previously discussed.

Asylum officers also noted inconsistent pre-departure training prior to their temporary duty during our February 2019 visits to two Texas family residential centers in Dilley and Karnes. For example, some asylum officers we interviewed said they screened credible and reasonable fear cases at their home office in preparation for their assignment. Others said they reviewed procedures independently on family processing in credible and reasonable fear cases. Officers from one asylum office said they relied primarily on an email from USCIS support staff located at the family residential centers to learn about screening family cases.

Asylum officers are to review the procedures on family processing in credible and reasonable fear before they arrive at the family residential centers, according to officials. However, there is no minimum amount of pre-departure training, or required content for such training, that all asylum offices are to provide before officers begin screening family units. Asylum Division officials acknowledged that training on screening of family units for credible and reasonable fear varies by asylum office and noted that offices have been given discretion to determine what, if any, pre-departure training to provide on screening family units. Arlington and Houston asylum office officials stated that inconsistent asylum officer training on credible and reasonable fear cases negatively impacts efficiency at the family residential centers. Specifically, these officials noted that asylum officers who typically adjudicate affirmative asylum applications benefit from training on key differences between credible fear, reasonable fear, and affirmative asylum. For example, officials said more training could reduce administrative errors in applicants' paperwork, and changes needed during supervisory review, both of which occur more often for officers with less experience and training, according to officials. Further, officials said asylum officers less experienced in credible and reasonable fear may not be able to handle a full caseload at the family residential centers when they first arrive. As a result, Houston officials said they may spend the first week of a 2-week assignment providing additional support to inexperienced officers as they gradually increase to a full caseload.

*Standards for Internal Control in the Federal Government* states management should demonstrate a commitment to recruit, develop, and retain competent individuals. The standards also note that competence is the qualification to carry out assigned responsibilities, and requires relevant knowledge, skills, and abilities, which are gained largely from

professional experience, training, and certifications. As previously noted, Asylum Division officials told us additional training for asylum officers before they begin screening cases at the family residential centers is important. Officials also said their intention is to balance such training against the need for rapid deployment, in some cases. Although additional training may not be feasible before every deployment, providing asylum officers additional pre-departure training before they begin screening credible and reasonable fear cases for family units would better prepare officers and help ensure efficient and effective case processing at ICE's family residential centers.

## USCIS Conducts Various Quality Assurance Reviews of Credible and Reasonable Fear Cases, but Does Not Document Results in a Consistent Manner

USCIS relies primarily on two quality assurance reviews for assessing quality of credible and reasonable fear cases, but does not document the results of one of these reviews in a consistent manner.[42]

**Annual, Asylum Division-wide reviews.** The Asylum Division conducts division-wide quality assurance reviews on a random sampling of credible fear, reasonable fear, or affirmative asylum cases selected proportionally from asylum offices nationwide. To do so, the Asylum Division works in collaboration with the RAIO Directorate. The reviews occur each year, and rotate between a sampling of credible fear cases, reasonable fear cases, and affirmative asylum cases.[43]

For credible and reasonable fear reviews, USCIS randomly selects a specified number of cases after supervisory review, but before officers

---

[42]USCIS also conducts weekly reviews of credible and reasonable fear cases that assess a small number of cases. Officials said the weekly reviews provide limited information on the overall quality of credible fear and reasonable fear cases. The officials added that, due to the limited information provided, they are considering discontinuing these weekly reviews in the future. They noted that, at various points throughout the year, they temporarily suspended weekly reviews of reasonable fear cases to focus Asylum Division resources on other priorities, such as credible fear cases.

[43]USCIS conducted a pilot Asylum Division-wide review of credible fear cases in 2015, and a pilot for reasonable fear cases in 2016. Subsequently, USCIS conducted full Asylum Division-wide reviews of credible fear cases in 2016 and 2018, and of reasonable fear cases in 2017.

serve determinations to the applicant.[44] Reviewers use a checklist to identify and track quality issues arising in each reviewed case, such as accurate data entry, appropriate legal analysis, asylum officer notes that reflect a skilled interview, and others. The review process for each case includes two lines of review. If the two reviewers come to different conclusions, they discuss any differences in their reviews and reach consensus about how to score the case. USCIS records the results of these reviews in a document that lays out the numbers and percentages of errors in areas covered in the review checklist. For example, for the 2018 review of credible fear cases, the document states asylum officer notes did not reflect a skilled interview in an estimated 58 percent of cases.[45] For most of these cases, the reason for the error that reviewers noted was insufficient follow-up questions. USCIS officials said while the sample across asylum offices is generalizable with respect to the credible or reasonable fear caseloads nationwide, the samples taken from each asylum office are not large enough to draw conclusions about trends at individual asylum offices. Officials said they rely on periodic reviews to identify trends by asylum office.

**Periodic, asylum office reviews.** In addition to the Asylum Division-wide quality assurance reviews, the Asylum Division began conducting periodic reviews at asylum offices in November 2017. As of November 2019, the Asylum Division had conducted periodic reviews of credible and reasonable fear cases or affirmative asylum adjudications at some asylum offices, as well as a review of credible and reasonable fear cases at the family residential centers. For periodic reviews, the Asylum Division selects cases over a period of several weeks. For example, based on the Asylum Division's draft standard operating procedures for the periodic reviews, an asylum office may send two to four credible and reasonable fear cases every day for several weeks to reach the required total number of cases. According to the draft standard operating procedures, Asylum Division reviewers are to use a reviewer checklist, modeled off the

---

[44]USCIS works with a statistician to develop the sampling methodology used for the Asylum Division-wide reviews. For example, for the 2018 review of credible fear cases, USCIS considered the overall number of credible fear cases from October 1, 2017 through June 17, 2018, and used a standard approach to calculate a sample size for the given population. Asylum offices were then to select credible fear cases for review using specified parameters.

[45]Percentage estimates from the 2018 review of credible fear cases have margins of error at the 90 percent confidence level of plus or minus 4 percentage points or fewer.

checklist used for the Asylum Division-wide reviews, as a starting point for what factors to review.

However, USCIS does not document the results of the periodic reviews in a consistent manner. We reviewed the reports resulting from six periodic reviews conducted at the Arlington, Chicago, Miami, and Houston asylum offices, the New Orleans sub-office, and the family residential centers.[46] We found that all reports included information on strengths and weaknesses, and some reports further organized analysis into additional categories. For example, some reports had analysis on details related to procedures, eliciting testimony, and issues related to fraud detection and national security. Other reports included analysis of specific trends in persecution cases and in Convention against Torture cases. Some reports also included analysis on legal sufficiency, applicant country of origin, determination outcomes, and others. According to the draft standard operating procedure, reviewers are to note trends, common errors, and collect samples to create a deliverable, such as a short report or other deliverables, for the asylum office at the end of the review. However, the Asylum Division has not provided guidance on what specific information is important to include in reports resulting from periodic reviews in order to track trends within an asylum office over time, or across asylum offices.

*Standards for Internal Control in the Federal Government* states management should establish and operate monitoring activities to oversee the internal control system and evaluate the results. Management should document the results of ongoing monitoring and separate evaluations to identify internal control issues, and should use this evaluation to determine the effectiveness of the internal control system. Asylum Division officials told us the primary purpose of the periodic reviews is to collect information about current, office-specific trends, and provide timely support in the form of training sessions and other guidance. Further, the Asylum Division historically has not used the periodic reviews to compare one office to another, though they have sometimes noted issues from these reviews requiring similar guidance across multiple offices. Documenting the results of periodic reviews in a

---

[46]These six periodic reviews took place between November 2017 and May 2018 and represented all those periodic review reports available at the time of our review. As of November 2019, the Asylum Division had also conducted periodic reviews of credible and reasonable fear cases at the Newark and San Francisco asylum offices, the Boston sub-office, and a second review at the Houston asylum office, according to officials. In addition, Asylum Division officials told us they conducted periodic reviews of affirmative asylum adjudications at the remaining asylum offices.

consistent manner would help the Asylum Division identify trends and provide support across asylum offices.

The draft standard operating procedures for the periodic review provides general directions for reviewers to share information on trends to asylum office personnel, such as strengths, weaknesses, and other developing trends. However, the draft standard operating procedures do not specify requirements for documenting the results of these reviews. Asylum Division officials told us the periodic review standard operating procedures are in draft form, and that they may provide more specific guidance on aspects of the reviews in the future. However, officials also said they are not planning any changes or additions to the standard operating procedure as of September 2019. More specific guidance on requirements for documenting results would better position USCIS to track trends in a consistent manner for credible and reasonable fear reviews within and across asylum offices.

## USCIS Does Not Systematically Record Case Outcomes When Screening Family Members for Credible Fear

By regulation, dependents, specifically a spouse or child, of a noncitizen (referred to as the "principal applicant") can be included in the applicant's credible fear determination if the dependent (1) arrived in the United States concurrently with the principal applicant, and (2) desires to be included in the principal applicant's determination.[47] However, any noncitizen may have his or her credible fear determination made separately, if he or she expresses such a desire.

USCIS policy is to include any dependents on a principal applicant's credible fear determination if the principal applicant receives a positive determination, resulting in both the principal applicant and any dependents being issued a Notice to Appear for full removal proceedings.[48] For example, USCIS may process credible fear cases together for family units detained at ICE's family residential centers, including children as dependents on a parent's case, or issuing a Notice To Appear for the parent and children in the interest of family unity (see figure 6). We observed asylum officers at the family residential centers

[47]See 8 C.F.R. § 208.30(b). For a number of immigration applications, including asylum and the related screening for credible fear, a spouse or child (defined as an unmarried natural or legally adopted child under 21 years of age) may be included as dependents on a principal's application and derive lawful immigration status from the principal applicant if the application is granted. See 8 U.S.C. § 1101(b)(1).

[48]For cases in which the asylum officer concludes the screening with a positive determination, USCIS is to issue a Notice to Appear before an immigration court, thereby placing the individual into full removal proceedings before an EOIR immigration judge.

asking principal applicants whether they were apprehended with any family members. If yes, asylum officers asked for the names and dates of birth of those family members, and recorded the information in their typed notes. For parents who received a positive determination, we observed asylum officers including the child on the parent's case as a dependent.

**Figure 6: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Processing for Parents and Children Detained Together in U.S. Immigration and Customs Enforcement Family Residential Centers**



Source. 8 C.F.R. § 208.30(b)) and USCIS policy.  |  GAO-20-250

Notes: For a number of immigration applications, including asylum and the related screening for credible fear, a spouse or child (defined as an unmarried natural or legally adopted child under 21 years of age) may be included as dependents on a principal's application and derive lawful immigration status from the principal applicant if the application is granted. See 8 U.S.C. § 1101(b)(1). Separately, the exercise of discretion to issue a Notice to Appear to both the parent and children in the interest of family unity is limited to children under the age of 18 because, according to the policy, family unity interests are more compelling when the child is a minor.

Further, if a parent receives a negative credible fear determination, and his or her child receives a positive credible fear determination, USCIS may issue a Notice to Appear to the child as a positive credible fear determination and to the parent in the interest of family unity. In that case, because a parent could not be a "dependent" of a child under the

regulation, USCIS policy is to use its discretion to issue a Notice to Appear to both the child receiving a positive determination and the parent he or she arrived with, in the interest of family unity, even though the parent initially received a negative determination. Issuing the parent and child a Notice to Appear places them into full removal proceedings where they can apply for multiple forms of relief or protection before an immigration judge, including asylum, rather than being expeditiously ordered removed in accordance with the expedited removal process. The exercise of this discretion to issue a Notice to Appear to both the child receiving a positive determination and the parent he or she arrived with in the interest of family unity is limited to cases in which the children are under the age of 18 because, according to the policy, family unity interests are more compelling when the child is a minor.

USCIS data indicate that asylum officers screened more than 141,000 credible fear cases at ICE's four family residential centers between fiscal years 2014 and the first two quarters of 2019 (see table 3).[49] In addition, USCIS data indicate that positive credible fear determination rates are higher at the family residential centers—87 percent compared with the nationwide rate of 77 percent from fiscal year 2014 through the second quarter of fiscal year 2019 (see app. III for data on reasonable fear cases screened at ICE's family residential centers).

---

[49]ICE detained families at the family residential centers (Artesia Family Residential Center, Berks County Residential Center, Karnes County Residential Center, and the South Texas Family Residential Center) for varying periods between fiscal year 2014 and fiscal year 2019.

**Table 3: Credible Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Centers, and Related Positive Outcomes, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total credible fear referrals to USCIS | Total credible fear referrals from ICE's family residential centers | Percentage of credible fear referrals from ICE's family residential centers | Total and percentage of positive determinations for all credible fear referrals | Total and percentage of positive determinations from ICE's family residential centers only |
|---|---|---|---|---|---|
| 2014 | 47,754 | 1,549 | 3 | 34,901 (73) | 1,021 (66) |
| 2015 | 48,089 | 9,933 | 21 | 34,996 (73) | 8,818 (89) |
| 2016 | 91,598 | 41,254 | 45 | 72,989 (80) | 36,697 (89) |
| 2017 | 77,698 | 31,574 | 41 | 59,581 (77) | 27,762 (88) |
| 2018 | 98,083 | 44,062 | 45 | 75,473 (77) | 37,180 (84) |
| 2019 (first two quarters) | 50,091 | 12,796 | 26 | 38,844 (78) | 10,697 (84) |
| **Total** | **413,313** | **141,168** | **34** | **316,784 (77)** | **122,175 (87)** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

Asylum officers are to record individual case outcomes for all family members in USCIS's automated case management system. However, Asylum Division officials said their system does not allow asylum officers to record whether an individual receives a credible fear determination as a principal applicant, dependent, or in the interest of family unity. Instead, asylum officers are to record positive determinations in the USCIS case management system for both (1) dependents on the basis of the principal applicant's positive case, and (2) parents with negative determinations, on the basis of their child's positive case. USCIS does record more specific information related to outcomes for family units in the family

members' individual hardcopy alien files, but this information is not readily available in an automated manner.[50]

USCIS's case management system allows asylum officers to record family relationships—that is, officials stated that asylum officers are to record who is a principal applicant, and who is a spouse, child, parent, or sibling of the principal applicant. According to USCIS officials, asylum officers are to record a parent who receives a positive credible fear determination as the principal applicant, and record any children as a child. Further, asylum officers are to link known family members' cases in the system, but adding a description of the family relationship is up to asylum officers' discretion. However, the system does not allow officers to record whether an applicant's determination stems from his or her own case, or from a family member's case. As a result, USCIS does not maintain automated data in a readily accessible manner on outcomes for family members in a manner that indicates whether (1) an eligible family member received a positive determination as a dependent on a principal applicant's positive case or (2) whether a parent was issued a Notice to Appear based on his or her child's positive determination, after the parent received a negative determination.

*Standards for Internal Control in the Federal Government* states that management should process obtained data into quality information that supports the internal control system. Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Although USCIS data indicate that positive credible fear determination rates are higher at the family residential centers compared to rates of positive credible fear determinations across all detention facilities, USCIS officials stated the higher rates result from the ability to (1) include children under 18 on a parent's positive credible fear determination, and (2) record all family members as positive in the system when USCIS uses its discretion in the interest of family unity. USCIS officials told us that systematically recording all outcomes of credible fear screenings for

---

[50]If a principal applicant receives a positive determination, asylum officers are to record biographic information for all their dependents, and to record whether dependents entered the United States concurrently with the principal applicant, on the principal applicant's USCIS Form I-870, *Record of Determination/Credible Fear Worksheet*. If a parent receives a negative determination, asylum officers are to interview the child. If the child receives a positive credible fear determination, asylum officers are also to include a note in the comment section on the child's Form I-870 that the parent was present for the interview. Asylum officers are also to include a note in the comment section of the child's Form I-870 that the parent received a negative determination, but that USCIS was using its discretion to place the parent into full removal proceedings in the interest of family unity.

family members in a more complete manner would require changes to their case management system; according to Asylum Division officials, they are continually exploring options to improve the system's capabilities. Without complete data in its case management system on all outcomes of credible fear screenings at family residential centers, USCIS is not well-positioned to report on the scope of either the agency's policy for family members who are treated as dependents, pursuant to regulation, or USCIS's use of discretion in the interest of family unity.

# USCIS and EOIR Have Processes for Managing Credible and Reasonable Fear Workloads, but USCIS Does Not Have Complete Data on Case Delays

## USCIS Makes Staffing Allocation Decisions Based on National and Local Staffing Models

USCIS manages its credible and reasonable fear workloads using national- and local-level staffing models to inform staffing allocation decisions. Specifically, USCIS has an agency-wide staffing model to allocate staff to different workload categories, including credible and reasonable fear workloads, for each upcoming fiscal year.[51]

Asylum Division headquarters officials stated they collaborate with USCIS's Office of Performance and Quality,[52] USCIS administrative offices, and local asylum offices to develop the national staffing model. Headquarters officials said the national staffing model is intended to allocate staff for each workload category for the upcoming fiscal year.

[51]According to USCIS, the Asylum Division's authorized staffing level increased from 605 permanent, full-time federal employees in fiscal year 2012 to 1,712 in fiscal year 2019. USCIS reported that the increase in hiring, particularly in fiscal year 2019, was necessary to meet the increase in the credible fear and affirmative asylum workloads.

[52]Asylum Division officials noted USCIS's Office of Performance and Quality is responsible for establishing national annual staffing recommendations and manages the statistical models that forecast future workload volume, which support their recommendations.

They begin working on the staffing model in June for any given year in anticipation of resource decisions the agency will make before a new fiscal year begins, usually in September or October. According to officials, the national staffing model for credible and reasonable fear is based on historical case receipt and workload data, historical staffing data and future staffing workload forecasting data, bi-weekly reports on staffing and workload data, and observations from asylum offices submitted to headquarters, among other things.

The Asylum Division also maintains staffing models that guide local staffing deployment, according to headquarters officials. Asylum offices make local staffing allocation decisions in collaboration with the Asylum Division at headquarters. Headquarters officials stated they consider several factors in allocating staff specifically for the credible and reasonable fear workloads for local asylum offices. Such factors include workload projections, available facilities and planned facilities projects, and existing workforce and vacancy levels (table 4 shows the number of asylum officers authorized and on board for each asylum office in March 2019). In addition, headquarters officials said they work with local asylum offices to review the number of credible and reasonable fear case receipts and current staffing allocations by asylum office on a daily basis. Headquarters officials stated they change staffing allocation as necessary to address changes in credible or reasonable fear case receipts.

**Table 4: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Authorized and On Board, as of March 2019**

| Asylum Office | Total number of asylum officers authorized | Total number of asylum officers onboard | Percent of asylum officers onboard |
|---|---|---|---|
| Arlington Pre-Screening Center and Arlington[a] | 133 | 96 | 72 |
| Chicago | 70 | 61 | 87 |
| Houston and New Orleans Sub Office[a] | 138 | 91 | 66 |
| Los Angeles | 97 | 78 | 80 |
| Miami | 70 | 56 | 80 |
| Newark and Boston Sub Office[a] | 91 | 70 | 77 |
| New York | 65 | 42 | 65 |
| San Francisco | 81 | 52 | 64 |
| **Total** | **745** | **546** | **73** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

[a]The number of asylum officers are combined for asylum offices and their respective sub offices.

In the Houston and Arlington asylum offices, in particular, officials stated they review headquarters data on workload projections to assign personnel to the credible and reasonable fear workloads for their offices. For example, officials in the Houston office said they look at the projected credible and reasonable fear workload to determine the number of officers they may need. Houston office officials said they assign officers based on officer availability, considering factors such as leave or training schedules. Similarly, a senior official responsible for staffing in the Arlington office said they look at the projected numbers of credible and reasonable fear cases, as well as the location of the cases, to determine the target number of officers assigned to a specific workload. Once they set targets for the number of officers needed, a senior official responsible for staffing in the Arlington office said they assign personnel based on a number of factors, including officer preferences, seniority, and locations with the greatest need.

Although USCIS uses national and local staffing models for determining staffing needs and allocating staff at and across field offices, senior Asylum Division officials stated that predicting future workload for credible fear cases is challenging. Moreover, headquarters officials told us that USCIS's credible fear workload projections have been off by as much as 50 percent when comparing projected and actual credible fear workload volume in recent years.[53] For example, the USCIS projections for credible fear cases in fiscal year 2015 were 78,485, but actual case receipts totaled 48,052.[54] More recently in fiscal year 2018, USCIS projected 70,000 credible fear case receipts, but actual case receipts totaled 99,035. Headquarters officials stated that a variety of external factors—unpredictable changes in country conditions, and CBP and ICE decisions to either place individuals in expedited removal or issue Notices to Appear before an immigration judge—make it difficult to project this workload. Furthermore, headquarters officials stated the volume of credible fear cases can fluctuate on a weekly basis, while reasonable fear projections have been fairly accurate, since the number of reasonable fear cases has remained relatively stable in recent years.

---

[53]USCIS established a Volume Projection Committee composed of subject matter experts from various directorates to collaborate and project the workload for all operational forms for USCIS. The Office of Chief Financial Officer and the Office of Performance and Quality co-chair the committee, and Asylum Division officials stated they collaborated with the two offices to project the credible fear workload.

[54]Actual case receipt numbers are from USCIS's publicly-reported data on credible fear case receipts.

To manage its workload of credible and reasonable fear cases, USCIS relies on a flexible workforce to respond to fluctuations in cases, in addition to asylum officers who generally screen credible and reasonable fear cases. For example, USCIS pulls asylum officers from affirmative asylum adjudications and uses overtime hours to handle surges in credible and reasonable fear case receipts, according to officials. Senior Asylum Division officials stated they do not receive staffing increases to account for lost or stopped work in other workload categories, such as affirmative asylum, that result from surges in credible fear case receipts. They stated surges in credible and reasonable fear case receipts may require immediate staff redeployment from the affirmative asylum workload. As a result, asylum offices have sometimes canceled planned affirmative asylum interviews and have prioritized credible and reasonable fear screenings over affirmative asylum cases, which have significantly contributed to the current backlog in pending affirmative asylum cases, according to headquarters officials. As previously discussed, asylum offices across the country also send officers on details to ICE's family residential centers to conduct credible and reasonable fear screenings.[55]

In addition, the Asylum Division headquarters tracks the number of asylum officers assigned to the credible and reasonable fear workload, among other workload categories such as affirmative asylum, through biweekly reports received from local asylum offices. Headquarters officials told us they use the reports to respond to specific requests for information about Asylum Division staffing allocation. For example, Congress may request information on the number of USCIS personnel working on credible fear cases for a particular time period, according to headquarters officials, so they maintain these reports to fulfill such requests.

Specifically, with regard to the biweekly reports, asylum offices record the number of asylum officers assigned to credible and reasonable fear cases for each day in the 2-week pay period.[56] The resulting biweekly reports are spreadsheets with 15 tabs, one tab for each day in a pay period and

---

[55]Further, USCIS has historically assigned detailees from outside the Asylum Division to conduct credible fear screenings, including refugee officers and former asylum or refugee officers now working with USCIS's Field Office Directorate, Service Center Operations Directorate, and FDNS.

[56]These reports also include asylum and refugee officers who may be temporarily assigned to the asylum office (from other asylum offices or USCIS headquarters) to conduct credible and reasonable fear screenings, among other categories of work.

one tab summarizing the pay period, with 26 separate spreadsheets for each year per asylum office. Headquarters officials stated the biweekly reports are manually compiled and may contain errors, but the biweekly reports have historically provided the overall number of personnel performing credible and reasonable fear work for any particular date or pay period. As of October 2019, headquarters officials said they are developing automated software that will track information similar to that collected in the biweekly reports, which will allow more systematic analysis of the staffing data that the current biweekly reports contain.

## USCIS Monitors Credible and Reasonable Fear Processing Times to Help Manage Its Workload

USCIS sets and monitors timeliness goals for completing credible and reasonable fear cases.

**Monitoring timeliness goals for credible fear cases.** USCIS monitors credible fear processing times by setting timeliness goals for completing credible fear cases and those goals have changed over time. USCIS regulation does not require that credible fear cases be completed in a specific time frame; however, Asylum Division headquarters officials said they have used timeliness goals to help monitor their credible fear workload. In addition, case delays may occur for credible fear cases (discussed further below). Specifically, from fiscal year 2009 through the first quarter of fiscal year 2018, USCIS used a 14-day goal to monitor credible fear case processing times.[57] In other words, USCIS monitored the extent to which officers completed credible fear cases within 14 calendar days of USCIS receiving referral documents from ICE and created an electronic file for the case in their case management system.[58] According to our analysis, USCIS completed at least 81 percent of

---

[57]According to Asylum Division headquarters officials, credible fear processing times are measured in calendar days and reasonable fear processing times are measured in court days. According to USCIS officials, court days are equivalent to business days.

[58]According to USCIS documents, the clock automatically starts for credible fear cases when USCIS receives a referral for individuals in expedited removal proceedings. ICE is responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a fear screening.

credible fear cases in 14 or fewer days for each fiscal year from 2014 to 2017—the last full fiscal year under the 14-day goal (see table 5).[59]

**Table 5: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Case Processing Times, Fiscal Years 2014 through 2017**

| Fiscal year | Total number and percentage of credible fear cases processed in 14 days or less | Total number and percentage of credible fear cases processed in over 14 days | Total number of credible fear cases |
|---|---|---|---|
| 2014 | 43,310 (91) | 4,435 (9) | **47,745** |
| 2015 | 39,862 (83) | 8,219 (17) | **48,081** |
| 2016 | 74,415 (81) | 17,168 (19) | **91,583** |
| 2017 | 63,187 (81) | 14,491 (19) | **77,678** |
| **Total** | **220,774 (83)** | **44,313 (17)** | **265,087** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: For the purposes of our analysis of USCIS data, we calculated the number of days for credible fear case processing times in calendar days, which includes weekends and federal holidays. In calculating case processing times, we used the difference between beginning and end dates for cred ble fear cases. We considered the case processing time to begin when a credible fear case was referred to an asylum office. According to USCIS documents, the date an asylum office receives a referral automatically starts the clock for case processing. For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a fear screening. According to USCIS documents, a nondetained individual's interview date is used as the starting clock date. We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We considered the case processing time to end when a cred ble fear case either received a fear determination or an administrative closure. We included credible fear cases that either received a fear determination or an administrative closure for detained and nondetained individuals. Specifically, for credible fear cases that received a fear determination, we used the date when an individual was served a decision from USCIS. Administrative closures occur when the USCIS asylum officer conducting the screening closes the case without a determination for reasons such as death of the individual, inability of the individual to communicate, dissolved cases due to withdrawals of fear claims, or other reasons, according to officials. Additionally, the case processing clock automatically stops for cases that receive an administrative closure, according to USCIS documents.

[59]In calculating credible fear case processing times, we used the difference between beginning and end dates for credible fear cases. We considered the case processing time to begin when a credible fear case was referred to an asylum office. According to USCIS documents, the date an asylum office receives a referral automatically starts the clock for case processing. We considered the case processing time to end when a credible fear case either received a fear determination or an administrative closure. Specifically, for credible fear cases that received a fear determination, we used the date when an applicant was served a decision from USCIS. Administrative closures occur when the USCIS asylum officer conducting the screening closes the case without a determination for reasons such as death of the individual, inability of the individual to communicate, dissolved cases due to withdrawals of fear claims, or other reasons, according to officials. Additionally, the case processing clock automatically stops for cases that receive an administrative closure, according to USCIS documents.

In February 2018, USCIS lowered its credible fear processing time goal to 10 days.[60] USCIS completed 68 percent of credible fear cases in 10 or fewer days between February and September 2018.[61]

**Monitoring timeliness requirements for reasonable fear cases.** USCIS monitors reasonable fear processing times by setting a 10-day goal. Pursuant to regulation, asylum officers are to conduct reasonable fear interviews and make a determination within 10 days of receiving a referral from CBP or ICE with an indication that the individual has made a fear claim, absent exceptional circumstances.[62] Additionally, a 2015 settlement agreement in the *Alfaro-Garcia v. Johnson* case ("Alfaro-Garcia" Settlement Agreement) requires USCIS to achieve an average national reasonable fear determination period of no more than 10 court days (i.e. business days), calculated on a monthly basis, for cases in which individuals are detained by DHS.[63] For reasonable fear cases subject to this settlement agreement that take longer than 20 court days to complete, asylum offices are to notify the Chief of the Asylum Division in writing and provide an explanation for the delay. Further, USCIS must provide class counsel in the Alfaro-Garcia case a notice and remedial

---

[60]USCIS reports data on credible fear processing time by fiscal year. The processing time goal listed on its public website changed in the second quarter of fiscal year 2018.

[61]We report on USCIS credible fear processing times in 10 or fewer days between February and September 2018 because USCIS started using the 10-day goal in February 2018. We ended our analysis in September 2018 to complete the remaining months in fiscal year 2018. Our analysis of USCIS data further showed that from fiscal year 2014 through March 2019, USCIS completed 89 percent of all credible fear cases in 20 or fewer calendar days.

[62]See 8 C.F.R. § 208.31(b).

[63]See Alfaro Garcia v. Johnson, No. 14-1775 (N.D. Cal. Oct. 27, 2015) (settlement agreement and release) (*Settlement Agreement*). An average of 10 court days is achieved, according to the agreement, if the average is less than 10.5 court days. Cases subject to this agreement may also be tolled for exceptional circumstances, consistent with 8 C.F.R. § 208.31(b). Exceptional circumstances do not include unusual but reasonably foreseeable circumstances, shall be determined on an individualized basis, and shall be of limited duration. The agreement applies to eligible individuals referred to as "class members" who: (1) are subject to a reinstated order of removal or administrative order of removal; (2) have expressed, or in the future expresses, a fear of returning to their country of removal; (3) are detained in the custody of DHS; and (4) have not received, or do not receive, an initial reasonable fear determination by USCIS under 8 C.F.R. § 208.31 within 10 days of referral to USCIS. The agreement specifies that reasonable fear processing times are calculated in court days. According to USCIS officials, court days are equivalent to business days.

plan of action for cases that exceed 20 days that are subject to that settlement agreement.

Consistent with USCIS policy and the Alfaro-Garcia settlement agreement,[64] officers may pause the clock for reasonable fear cases—and thus case processing times—in the following limited circumstances:

- the applicant or the applicant's representative requests to defer the reasonable fear interview;

- the applicant refuses to participate in the reasonable fear interview or accept service of a reasonable fear determination; or

- exceptional circumstances.

USCIS pauses processing times for detained reasonable fear cases by recording the dates when the case was paused and when processing resumed, once the basis for pausing the clock no longer exists. Asylum Division headquarters officials said pauses in reasonable fear case processing times are separate from case delay reasons, but case delays may occur for reasonable fear cases. In our case processing time analysis of USCIS data, we excluded approximately 13 percent of reasonable fear cases that had at least one pause in case processing time from our analysis because, in conducting our analysis, we could not systematically confirm the appropriate order of dates for those cases. As shown in table 6, our review of USCIS data for cases that did not include pauses found that USCIS completed at least 91 percent of reasonable fear cases within 10 or fewer court days from fiscal year 2016 to the second quarter of fiscal year 2019.

---

[64]*Settlement Agreement* at 5, No. 14-1775 (N.D. Cal. Oct. 27, 2015). The settlement agreement refers to pausing the clock as "tolling" the reasonable fear determination period.

**Table 6: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Case Processing Times for Nondetained and Detained Cases without Clock Pauses, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal year | Total number and percentage of reasonable fear cases processed in 10 days or less | Total number and percentage of reasonable fear cases processed in 1 1-20 days | Total number and percentage of reasonable fear cases processed over 20 days | Total number of reasonable fear cases |
|---|---|---|---|---|
| 2014 | 2,119 (25) | 975 (11) | 5,508 (64) | 8,602 |
| 2015 | 3,856 (50) | 1,559 (20) | 2,298 (30) | 7,713 |
| 2016 | 6,912 (92) | 579 (8) | 33 (0.44) | 7,524 |
| 2017 | 7,574 (95) | 379 (5) | 26 (0.33) | 7,979 |
| 2018 | 7,991 (91) | 741 (8) | 4 (0.05) | 8,736 |
| 2019 (first two quarters) | 4,624 (92) | 418 (8) | 0 (0) | 5,042 |
| **Total** | **33,076 (73)** | **4,651 (10)** | **7,869 (17)** | **45,596** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: A 2015 settlement agreement in the Alfaro Garcia v. Johnson case ("Alfaro-Garcia Settlement Agreement") requires USCIS to achieve an average national reasonable fear determination period of no more than 10 court days, calculated on a monthly basis, for reasonable fear cases in which individuals are detained by the Department of Homeland Security and to report these averages to class counsel. See Alfaro Garcia v. Johnson, No. 14-1775 (N.D. Cal. Oct. 27, 2015) (settlement agreement and release). For the purposes of our analysis of USCIS data of nondetained and detained reasonable fear cases, we calculated the number of days for reasonable fear case processing times in court days, where we excluded weekends and federal holidays. In calculating case processing times, we used the difference between beginning and end dates for reasonable fear cases. According to USCIS documents, the date an asylum office receives a proper referral starts the clock for case processing for detained reasonable fear cases. For nondetained individuals, the clock starts for reasonable fear cases when a USCIS asylum office conducts the interview for a reasonable fear screening. According to USCIS documents, a nondetained individual's interview date is used as the starting clock date. We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We considered the case processing time to end when a reasonable fear case had a determination that was served, or for a case that was administratively closed. We included reasonable fear cases that either received a fear determination or an administrative closure for both detained and nondetained individuals. Specifically, for reasonable fear cases that received a fear determination, we used the date when the individual was served a determination from DHS. Administrative closures occur when the USCIS asylum officer conducting the screening closes the case without a determination for reasons such as death of the individual, inability of the individual to communicate, dissolved cases due to withdrawals of fear claims, or other reasons, according to officials. Additionally, the case processing clock automatically stops when cases are administratively closed, according to USCIS procedures. We excluded approximately 13 percent of reasonable fear cases that had at least one pause in case processing time from our analysis. Percentages do not equal 100 percent due to rounding.

## USCIS Does Not Have Complete Data on Reasons for Case Delays

Although the Asylum Division monitors overall processing times for credible and reasonable fear cases, it does not collect comprehensive data in its case management system on some types of case delays. For example, USCIS tracks whether cases are delayed for certain reasons related to the individual—such as if he or she has a medical condition that prevents the asylum officer from conducting the interview, if the individual

requests that the interview be rescheduled, or if the individual is detained in a remote location. In addition, USCIS's system can track if cases are delayed for logistical or resource constraints. Specifically, asylum officers may select "lack of resources" as one case delay reason in the system. However, this field in the system does not allow officers to distinguish more specific types of delays—such as a lack of space in detention facilities for officers to screen fear cases, telephones not working properly, and other types of delays—which officers told us occur on a regular basis.[65]

Asylum officers we interviewed in the Arlington and Houston offices stated that logistical delays could affect the number of credible or reasonable fear cases they can complete each day. Specifically, some asylum officers said they have experienced delays up to 30 minutes waiting for phone lines to work properly at detention facilities. Moreover, supervisors we interviewed in the Arlington office stated telephone and interpreter delays could add 20 or 30 minutes per case, resulting in a cumulative delay that could affect an officer's productivity for any given day. Moreover, supervisors in the Arlington office said it is challenging to identify the appropriate number of cases to assign to officers because the number depends on whether or not disruptions occur. Asylum officers in Arlington said they are expected to conduct a certain number of credible or reasonable fear screenings per day, but expectations for completing their assigned cases may be tempered by circumstances such as interpreter availability or if there are issues at the detention facility, including physical space shortfalls or difficulty in locating the individual at the facility.[66] Similarly, asylum officers in Houston said they are expected to complete a certain number of credible or reasonable fear cases per day, but supervisors understand that they may face logistical challenges such as interpreter or telephone issues.

---

[65]Asylum Division headquarters officials stated they completed the transition to a new data system in February 2018. While the prior system tracked similar case delays, headquarters officials said some case delay reasons that migrated from the prior system to the new system may no longer be relevant due to modernization efforts and the current environment of conducting credible and reasonable fear determinations.

[66]As part of its hiring plan for fiscal year 2019, USCIS also reported that it is seeking to ameliorate a physical space shortfall for approximately 159 of the new employees within its facilities. According to USCIS, the Asylum Division has identified certain solutions to address the space shortfall, including expanded telework for qualifying workloads and space sharing.

In addition to system limitations in tracking case delay reasons, Asylum Division headquarters officials said their case management system does not have the capability to track how long case delays may last. Our analysis of USCIS data from fiscal year 2014 through the second quarter of fiscal year 2019 indicates that 21,528 credible fear cases and 6,724 reasonable fear cases[67] had delays. USCIS's system can calculate the number of days for each credible and reasonable fear case—in other words, the total processing time for each case—and the system can produce daily reports noting these overall processing times. However, officials in the Houston office told us they must investigate individual cases on an ad hoc basis to understand how long cases have been delayed during processing. Specifically, officials in the Houston office said they maintain weekly "late reports" using information from USCIS's case management system that show pending credible and reasonable fear cases with the longest processing times and that they must spend time researching cases on the report to determine the length of the delays.

*Standards for Internal Control in the Federal Government* state that management should obtain data on a timely basis so that they can be used for effective monitoring.[68] These standards also state that management should process the obtained data into quality information that supports the internal control system. As previously discussed, USCIS's case management system does not track specific logistical reasons for any delays in credible and reasonable fear cases, which affect the number of cases an officer can complete in a day. Furthermore, USCIS's system can calculate the number of processing days for each credible and reasonable fear case. However, the system cannot track how long a case delay lasts. Headquarters officials said they evaluate the usefulness of their system, and consider options for improvements or changes, on an ongoing basis. However, as of October 2019, they stated they did not have plans for significant changes to the system to track

---

[67]This figure includes all reasonable fear cases with case delays, including those cases with clock pauses pursuant to the Alfaro-Garcia Settlement Agreement that we did not include in the data analysis presented in table 6. As previously mentioned, officers may pause the clock for detained reasonable fear cases in certain limited circumstances as outlined in the Alfaro-Garcia settlement agreement, including if the applicant requests to defer the interview, refuses to participate in the interview or accept service of the decisions, or if exceptional circumstances apply. See *Settlement Agreement* at 5, No.14-7775 (N.D. Cal. Oct.27, 2015). The clock may be paused only for these reasons, but, according to Asylum Division headquarters officials, case delays, which do not pause the clock, may also occur for other reasons, such as delays for logistical or resource constraints.

[68]GAO-14-704G.

more specific case delay reasons. Collecting additional information in its automated case management system on case delays would provide USCIS with more readily available information and analyzing such data could help USCIS identify case delay reasons relevant in the current environment for officers conducting fear screenings and better position USCIS to mitigate the reasons for the delays and improve efficiency in case processing.

## EOIR Has Processes to Manage the Credible and Reasonable Fear Review Workload and Is Developing a Tool to Monitor Adherence to Required Review Processing Times

EOIR has developed processes for immigration courts and judges to help manage its workload related to credible and reasonable fear reviews. As previously discussed, in the event of a negative outcome of their credible or reasonable fear screening, noncitizens can request a review of USCIS's negative determination by an immigration judge. The Immigration and Nationality Act, as amended, and regulation require that such reviews occur within certain time frames. Specifically,

- immigration judge reviews of negative credible fear determinations are to be conducted no later than 7 days after referral from USCIS, to the maximum extent practicable,[69] and

- immigration judge reviews of negative reasonable fear determinations are to be conducted within 10 days of referral, in the absence of exceptional circumstances.[70]

EOIR officials told us that increased resources, beginning in fiscal year 2015, and a faster process for hiring immigration judges have allowed EOIR to increase the number of immigration judges. As of September 30, 2019, EOIR reported that it had 442 immigration judges on board, including 173 judges hired in fiscal year 2018 and fiscal year 2019. EOIR reports that the number of immigration judges has increased each year from fiscal year 2015 through fiscal year 2019. EOIR officials told us that

---

[69]See 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

[70]See 8 C.F.R. § 208.31(g).

they plan to hire an additional 100 judges in fiscal year 2020.[71] Additionally, EOIR officials told us that they prioritize credible and reasonable fear reviews and that these reviews can generally be accommodated within EOIR's existing resources—specifically, by finding efficiencies within judges' existing schedules to add credible or reasonable fear review hearings or by conducting hearings via video teleconferencing (VTC).[72] EOIR officials also said that credible and reasonable fear reviews for individuals in ICE's family residential centers comprise a small portion of EOIR's overall workload.

According to EOIR officials, each ICE detention facility is assigned to the jurisdiction of an immigration court, and the workload for credible and reasonable fear reviews is managed locally by the court to which each detention facility is assigned. ICE officers are to initiate the immigration judge's review by filing a request with the appropriate immigration court.[73] Some courts are co-located with ICE detention facilities in which the detainee requesting the credible or reasonable fear review is housed. EOIR officials said that reviews in those locations are typically heard in person by immigration judges assigned to that facility, and that the court finds room in the judge's regular calendar to hear credible and reasonable fear reviews.[74] For individuals in detention facilities without a co-located

---

[71]In 2017, we reported that EOIR did not have efficient practices for hiring new immigration judges, which contributed to immigration judges being staffed below authorized levels. We recommended that the Director of EOIR assess the immigration judge hiring process to identify opportunities for efficiency; use the assessment results to develop a hiring strategy to target short- and long-term human capital needs; and implement any corrective actions related to the hiring process resulting from this assessment, among other things. In response, EOIR stated that it assessed the immigration judge hiring process and had actions under way to implement a hiring streamlining plan. As of November 2019, we are continuing to monitor EOIR's actions in response to our recommendation. See GAO, *Immigration Courts: Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges*, GAO-17-438 (Washington, D.C.: June 1, 2017).

[72]EOIR officials estimated that judges spend about 30 to 45 minutes on each credible or reasonable fear review and that court staff require about 25 to 30 minutes to complete the paperwork associated with each review.

[73]Immigration judges are to receive the following documentation, among other things: the record of the USCIS negative credible fear determination, including the asylum officer's notes, as well as other materials upon which the determination was made. See 8 C.F.R. §§ 1208.30-1208.31.

[74]EOIR officials said that for courts co-located with ICE detention facilities, DHS owns and manages all of the space in which the courts are located, including the courtrooms and any telephone or broadband infrastructure that EOIR uses.

immigration court, including ICE family residential centers, immigration judges typically conduct credible and reasonable fear reviews via VTC.[75] Judges conducting credible or reasonable fear reviews via VTC may be located in any immigration court in the United States.[76] According to EOIR officials, the Assistant Chief Immigration Judge for each court is responsible for managing the court's workload, including seeking support from judges outside the court in circumstances where there are too many cases for the court's assigned judges. EOIR officials told us that the use of VTC technology—which is available in all courtrooms—provides flexibility to the courts in balancing workloads related to credible and reasonable fear reviews, among other workloads.

In addition, EOIR officials stated that judges' credible and reasonable fear workload is impacted, in particular, by immigration enforcement priorities and USCIS credible or reasonable fear determinations. For example, if DHS places more noncitizens into expedited removal proceedings who subsequently express fear or intent to apply for asylum, EOIR's related workload might increase. In addition, because immigration judges do not review USCIS's positive credible fear determinations, if USCIS's screenings result in more negative determinations, EOIR's caseload related to credible or reasonable fear reviews might increase.

As of January 2018, EOIR has performance measures that include timeliness goals for credible and reasonable fear reviews, and these timeliness goals align with the required credible and reasonable fear review time frames. However, EOIR data we reviewed indicate that about 30 percent of credible and reasonable fear reviews are not completed within the required time frames. Specifically, EOIR's memorandum on *Case Priorities and Immigration Court Performance Measures* states that 100 percent of credible fear reviews should be completed within seven days of an asylum officer's negative determination and that 100 percent of reasonable fear reviews should be completed within 10 days of the

---

[75]In locations other than ICE detention facilities, the judge conducts the credible or reasonable fear review from their regular courtroom via VTC connected to a hearing room in the ICE detention facility. Officials said that limited bandwidth or internet connection may limit the number of credible or reasonable fear reviews that can occur simultaneously, particularly for ICE detention facilities in rural locations.

[76]In recent years, EOIR has opened two courts that exclusively conduct proceedings via VTC. EOIR officials said that these courts provide capacity for surges in workload and coverage for judges on leave. These courts are located in Fort Worth, Texas (capacity for about 15 judges), and in Falls Church, Virginia (five judges).

filing of a negative reasonable fear determination.[77] Further, according to EOIR officials, courts are to assign credible and reasonable fear reviews to a judge within 48 hours of receipt of the request from ICE, and immigration judges are to complete such reviews within 24 hours after they are assigned.

EOIR officials said their automated case management system maintains data on the date when courts receive a request from ICE for an immigration judge review, the date the review is assigned to a judge, and the date the review takes place.[78] EOIR headquarters officials told us that they monitor the extent to which judges are completing reviews within 24 hours after they are assigned using an automated immigration judge performance dashboard, which allows officials to review this performance measure for all judges combined, for individual courts, or for individual judges. Further, EOIR officials told us that if courts are scheduling credible and reasonable fear reviews within 48 hours after receipt and judges are completing reviews within 24 hours after they are assigned, they expect that EOIR should be meeting the required time frames (7 days after ICE's referral for credible fear reviews and 10 days after ICE's referral for reasonable fear review) for conducting credible and reasonable fear reviews.

EOIR data we reviewed indicate that, from fiscal year 2014 through June 2019, approximately 28 percent of credible fear and 36 percent of reasonable fear reviews exceeded the required time frames, as shown in table 7 below.

[77]Department of Justice, Executive Office for Immigration Review, Office of the Director, *Case Priorities and Immigration Court Performance Measures*, Memorandum to The Office of the Chief Immigration Judge, All Immigration Judges, All Court Administrators, and All Immigration Court Staff (January 17, 2018).

[78]According to EOIR officials, the system also tracks some reasons for delays immigration judges may experience when completing reviews, such as incomplete DHS paperwork, an applicant under medical quarantine, and others.

**Table 7: Executive Office for Immigration Review (EOIR) Credible and Reasonable Fear Review Time Frames, Fiscal Years 2014 through Third Quarter 2019**

| Fiscal year | Credible fear reviews | | | Reasonable fear reviews | | |
|---|---|---|---|---|---|---|
| | 0-7 Days | More than 7 days | Percent More than 7 days | 0-10 days | More than 10 days | Percent More than 10 days |
| 2014 | 4,889 | 1,411 | 22 | 1,031 | 681 | 40 |
| 2015 | 5,000 | 1,618 | 24 | 1,516 | 1,052 | 41 |
| 2016 | 5,664 | 1,800 | 24 | 1,672 | 869 | 34 |
| 2017 | 4,150 | 2,347 | 36 | 1,568 | 877 | 36 |
| 2018 | 4,449 | 2,188 | 33 | 1,769 | 1,001 | 36 |
| 2019a | 4,986 | 1,895 | 28 | 1,680 | 688 | 29 |
| **Total** | **29,138** | **11,259** | **28** | **9,236** | **5,168** | **36** |

Source: EOIR data.  |  GAO-20-250

aData include credible and reasonable fear reviews through the third quarter of fiscal year 2019.

As previously discussed, the Immigration and Nationality Act and regulation allow for some flexibility with regard to the required credible and reasonable fear review time frames. Specifically, credible fear reviews are to be completed within 7 days, to the maximum extent practicable, and reasonable fear reviews are to be completed within 10 days, absent exceptional circumstances. EOIR officials we spoke with said there are a variety of court, judge, or applicant-related reasons that reviews could exceed the required time frames. For example, case file documentation sent from USCIS to the court may be incomplete. Further, a detention facility may have a medical quarantine that restricts court proceedings for a certain period of time.

EOIR headquarters officials told us that, as of October 2019, they review weekly reports that include the median processing times for completed credible and reasonable fear reviews. For example, according to one weekly report from October 2019, the median completion time for credible fear reviews was 7 days.[79] These reports also include information about the average and median number of days pending per case, for those credible and reasonable fear reviews that are not complete. For example, the weekly report we reviewed from October 2019 showed that EOIR had 553 pending credible fear reviews that week, with a median of 7 days pending and an average of 18 days pending. While these weekly reports allow EOIR headquarters officials to monitor some information about their

---

[79]This report showed the median processing time for credible fear reviews completed from October 1 through October 25, 2019, according to EOIR officials.

credible and reasonable fear workload, they do not provide information to EOIR officials about the proportion of EOIR's credible and reasonable fear reviews that are completed within the required time frames, or whether any reviews are delayed for reasons within the limits set out in the law or regulation.

EOIR officials said they plan to implement an automated court operations dashboard in early 2020 which is to, among other things, monitor court performance against the performance goals EOIR established in January 2018, including the credible and reasonable fear performance goals. This automated dashboard is to be similar to the immigration judge performance dashboard, which EOIR implemented in early 2019. According to EOIR, the court operations dashboard is intended to operationalize EOIR's performance measures—including completion of 100 percent of credible fear reviews with 7 days and 100 percent of reasonable fear reviews within 10 days—by providing court staff with daily alerts and warning notices to help court administrators prioritize the scheduling of cases based on the performance measures. This prioritization, combined with EOIR's monitoring of judge performance to ensure that credible and reasonable fear reviews are completed within 24 hours after they are scheduled, should provide EOIR officials with sufficient information to monitor EOIR's adherence to the required credible and reasonable fear review time frames. Because implementation of the court operations dashboard is planned for early 2020, it is too soon to know if EOIR will use the dashboard to monitor adherence to the required credible and reasonable fear review time frames or if it will help EOIR understand reasons for delays in those cases that take longer than 7 or 10 days.

## Conclusions

The number of credible and reasonable fear cases has increased since fiscal year 2014, and USCIS policies and procedures require completion of those cases within short time frames. The Asylum Division provides training for credible and reasonable fear cases to new asylum officers in basic training, given the differences between these screenings and affirmative asylum adjudications. However, not all offices provide additional training on screening such cases at the family residential centers. Ensuring that all asylum offices provide such training, in addition to basic training for new officers, would better prepare them to screen those cases efficiently and effectively. In addition, USCIS relies on its periodic quality assurance reviews to assess the quality of credible and reasonable fear cases across asylum offices. Developing and implementing more specific guidance on requirements for documenting

the results of its periodic quality assurance reviews would better position the agency to track trends for credible and reasonable fear reviews across asylum offices. USCIS data show that positive credible fear determination rates are higher at the family residential centers than they are nationwide, in part because USCIS's automated case management system does not track whether an individual receives a credible fear determination as a principal applicant, dependent, or in the interest of family unity. Without systematically recording credible fear determinations involving family members, USCIS may not have complete data on credible fear determination rates, and the agency may not be in a position to report on the scope of its policy for family members in the credible fear process.

Asylum officers have experienced logistical delays that can affect the number of credible and reasonable fear cases they complete each day. Although USCIS tracks some of these delays in its case management system, the system does not distinguish between specific reasons for logistical case delays, such as telephones nor working properly or lack of space at detention facilities for officers to screen cases. Furthermore, USCIS's system can calculate the number of processing days for each credible and reasonable fear case. However, the system cannot track how long case delays last. By collecting and analyzing additional information on case delays, including specific reasons for delays and how long they last, USCIS can identify relevant case delays for officers conducting fear screenings. Moreover, analyzing specific case delay information could help USCIS mitigate reasons for case delays and improve efficiency in case processing.

# Recommendations for Executive Action

We are making the following four recommendations to USCIS:

The Director of USCIS should ensure that, in addition to USCIS's basic asylum officer training, all asylum offices provide pre-departure training on the credible and reasonable fear processes before their officers begin screening cases at the family residential centers. (Recommendation 1)

The Director of USCIS should develop and implement more specific guidance on requirements for documenting results of Asylum Division periodic quality assurance reviews. (Recommendation 2)

The Director of USCIS should ensure asylum officers systematically record in USCIS's automated case management system if individuals receive credible fear determinations as principal applicants, dependents,

or in the interest of family unity, pursuant to regulation or USCIS policy. (Recommendation 3)

The Director of USCIS should collect and analyze additional information on case delays, including specific reasons for delays and how long they last, that asylum officers may face when screening credible and reasonable fear cases. (Recommendation 4)

## Agency Comments

We provided a draft of this report to DHS and DOJ for review and comment. DHS provided formal, written comments, which are reproduced in full in appendix IV. DHS also provided technical comments, which we incorporated as appropriate. DOJ told us they had no comments on the draft report. DHS concurred with our recommendations and described actions planned or underway to address them. For example, regarding our recommendation that all USCIS asylum offices provide officers with pre-departure training on credible and reasonable fear before they officers begin screening cases at family residential centers, DHS stated that USCIS plans to develop a standardized pre-departure training and provide this training to all asylum officers prior to their deployment to the family residential centers. In addition, regarding our recommendation that USCIS ensure that asylum officers record in their automated case management system if individuals receive credible fear determinations as principal applicants, dependents, or in the interest of family unity, DHS noted USCIS will explore ways to modify its case management system to ensure that asylum officers record such data and train officers on any subsequent system changes.

We are sending copies of this report to the appropriate congressional committees, the Acting Secretary of Homeland Security, the Attorney General, and other interested parties. In addition, the report is available at no charge on GAO's website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Key contributors to this report are listed in appendix V.

Rebecca S. Gambler
Director, Homeland Security and Justice

*List of Addressees*

The Honorable Ron Johnson
Chairman
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Shelley M. Capito
Chairman
The Honorable Jon Tester
Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
United States Senate

The Honorable Bennie G. Thompson
Chairman
Committee on Homeland Security
House of Representatives

The Honorable Lucille Roybal-Allard
Chairwoman
The Honorable Chuck Fleischmann
Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
House of Representatives

The Honorable Zoe Lofgren
Chairwoman
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

# Appendix I: Objectives, Scope, and Methodology

We were asked to review processes for screening noncitizens[1] who arrive at the southwest border expressing an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country, and the resources needed to carry out these screenings within applicable time frames[2] by the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR). This report discusses (1) what USCIS and EOIR data show about the credible fear and reasonable fear processes, (2) the extent to which USCIS has policies and procedures for overseeing credible fear and reasonable fear screenings, and (3) the extent to which USCIS and EOIR have processes for managing their respective credible fear and reasonable fear-related workloads.

To address all three objectives, we interviewed USCIS headquarters personnel from the Refugee, Asylum, and International Operations Directorate (RAIO) and RAIO's Asylum Division who are responsible for managing USCIS's credible and reasonable fear screening processes. We also interviewed officials from USCIS's Fraud Detection and National Security Directorate (FDNS), which is responsible for leading USCIS's efforts to detect and deter immigration benefit fraud and help detect national security and public safety threats. We conducted site visits at two of USCIS's eight asylum offices—Houston, Texas and Arlington, Virginia—in April 2019.[3] We selected these asylum offices based on the relatively large size of their credible and reasonable fear caseloads in fiscal year 2018—the most recent, complete data available at the time of our review. During these visits, we conducted in-person, semi-structured interviews with asylum officers, supervisory asylum officers, training officers, FDNS immigration officers, and asylum office management. During these interviews, we discussed topics related to data quality, supervisory review, training, quality assurance, family processing, and resource allocation. While the views expressed in these interviews do not represent those of all Houston and Arlington asylum office officials, they provide valuable insights from stakeholders who have experience with

---

[1]The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). For the purposes of this report, we use the term "noncitizen" to refer to individuals who would meet the definition of "alien."

[2]See Pub. L. No. 116-26, tit. V, § 506, 133 Stat. 1018, 1027 (2019).

[3]The Arlington asylum office and the Arlington Pre-Screening Center are collocated. The Arlington Pre-Screening Center provides additional support for the credible and reasonable fear caseloads.

credible and reasonable fear policies and procedures. In addition, we collected written responses from the remaining six asylum offices on the same topics.

Further, we conducted site visits to U.S. Immigration and Customs Enforcement (ICE) adult detention centers and family residential centers. Specifically, we visited single adult detention facilities in San Diego, California (September 2018), and Port Isabel and Pearsall, Texas (October 2018 and February 2019, respectively). We selected these ICE single adult facilities based on their geographic proximity to various CBP field locations we visited (discussed below). In addition, in February 2019, we visited ICE's Enforcement and Removal Operations field office in San Antonio, Texas, as well as ICE's South Texas Family Residential Center in Dilley, Texas, and Karnes County Residential Center in Karnes, Texas. We selected these two ICE family residential centers for field visits because they accounted for more credible and reasonable fear referrals to USCIS than any other single adult detention facility or family residential center. We also selected them to examine unique aspects of ICE and USCIS processing of credible and reasonable fear claims made by members of family units.

During these visits to USCIS asylum offices and ICE detention facilities, we observed USCIS asylum officers conducting credible or reasonable fear screenings of single adults and family unit members either in person or via telephone. In total, we observed more than 20 credible and reasonable fear interviews across our site visits. Our observations are not generalizable to all USCIS asylum offices conducting credible and reasonable fear screenings, but provided us the opportunity to learn more about how USCIS personnel conduct interviews, make fear determinations, process these cases, and coordinate with ICE officials.

For additional context about how noncitizens are apprehended at the border, processed into expedited or full immigration removal proceedings, transferred to ICE, and ultimately referred to USCIS for credible and reasonable fear screenings, as appropriate, we interviewed headquarters personnel from DHS's U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) who are responsible for apprehending noncitizens at or between U.S. ports of entry. In addition, we conducted site visits at CBP facilities in California and Texas from September 2018 to October 2018. In California, we visited Border Patrol's San Diego sector headquarters and Imperial Beach station, and OFO's San Ysidro port of entry. In Texas, we visited CBP's Central Processing Center and McAllen Border Patrol

station in McAllen, Texas; Border Patrol's Fort Brown, Weslaco, and
Harlingen stations; and OFO's Hidalgo and Brownsville ports of entry.
During these visits, we interviewed Border Patrol and OFO officials and
observed how CBP personnel processed apprehended individuals and,
as appropriate, documented whether those individuals expressed an
intention to apply for asylum, a fear of persecution or torture, or a fear of
return to their country. To select these locations, we assessed CBP data
on Border Patrol and OFO apprehensions along the southwest border
and targeted specific locations that saw the greatest increase in the
number of apprehensions of individuals from fiscal year 2016 to 2017. As
noted previously, we also considered the geographical proximity of
multiple CBP and ICE facilities to maximize observations. Our
observations during site visits are not generalizable to all Border Patrol
and OFO operations along the southwest border, but provided us the
opportunity to learn more about policies and procedures for processing
noncitizens into removal proceedings and documenting any fear claims.

To address the first objective, we obtained and analyzed data and
documentation from USCIS and EOIR. Regarding USCIS, we analyzed
record-level data from USCIS's automated case management system
from fiscal year 2014 through the second quarter of fiscal year 2019
(March 2019)—the most recent time period for which complete data were
available at the time of our review.[4] We analyzed these data to identify
the number, characteristics, and outcomes of credible and reasonable
fear cases. According to USCIS officials, USCIS's system creates a
unique number, or "case ID" for each case.[5] USCIS officials told us that a
previous system used a different identifier for each case—the individual's
Alien number (or "A-number")—and did not use a "case ID" field. USCIS
transitioned from its previous system to its current system in February
2018 and, according to USCIS officials, cases originally opened prior to
the transition to the new system may have been re-opened under the
same "case ID" number in the new system. As part of our data reliability
testing, we checked for unique "case ID" numbers by searching for
duplicate values and determined the data did not have duplicate values
for "case ID" numbers. For our analysis of USCIS data specifically for ICE
detention facilities and family residential centers, we only included

---

[4]We used "cases" rather than "individuals" as the unit of analysis for the USCIS data we
reported because an individual may have been screened for fear by USCIS multiple times
during the time period covered by our data.

[5]According to USCIS officials, the "case ID" field is not a number used during the
adjudication process, nor is the "case ID" reflected in an individual's file.

credible and reasonable fear cases for detained individuals. To assess the reliability of USCIS data, we completed a number of steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and the systems that produced them, such as relevant training materials for USCIS officers who use the system; and (3) discussing data entry issues and data limitations with USCIS officials. We determined the data were sufficiently reliable to describe the number, outcomes, and characteristics of credible and reasonable fear cases.

Regarding EOIR, we reviewed data on immigration judge reviews of credible and reasonable fear cases posted on its public website. Specifically, we reviewed EOIR data on credible and reasonable fear reviews from fiscal year 2014 through June 2019—the most recent, complete data available at the time of our review. We also obtained and analyzed summary data from EOIR on credible and reasonable fear reviews for those individuals detained in ICE's family residential centers. We analyzed the data to determine the outcomes of all credible and reasonable fear reviews and compared the outcomes of all reviews with the outcomes of reviews at ICE's family residential centers. Finally, we reviewed EOIR data on the outcomes in immigration court for those completed removal cases that began with a positive credible or reasonable fear determination. In addition, we interviewed immigration judges and other court personnel serving both detained and nondetained dockets from EOIR's Otay Mesa Immigration Court and San Diego Immigration Court in California, and from EOIR's Harlingen Immigration Court in Texas. We also observed two immigration judge reviews of negative credible fear determinations. Our observations are not generalizable to all immigration judge reviews, but provided us the opportunity to learn more about EOIR's processes.

We interviewed EOIR officials about their data entry and management practices for credible and reasonable fear reviews. We determined that the data EOIR provided, much of which they report publicly on their website, are sufficiently reliable for analyzing the number and duration of credible and reasonable fear reviews that are received, completed, and pending.

To provide additional context on the numbers, characteristics, and outcomes of CBP apprehensions, we obtained and analyzed record-level data on all apprehensions by Border Patrol and OFO from fiscal year 2014 through the second quarter of fiscal year 2019. We also obtained and analyzed record-level data on ICE detentions from fiscal year 2014

through fiscal year 2018 (see app. III for the results of our analyses). To assess the reliability of Border Patrol, OFO, and ICE data, we completed a number of data reliability steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and systems that produced them, such as relevant training materials for Border Patrol agents and OFO, and ICE officers who use agency data systems; and (3) discussing data entry issues and data limitations with Border Patrol, OFO, and ICE officials. We also received demonstrations on the data systems from Border Patrol, OFO, and ICE officials at headquarters and in the field. As described below, we determined that the data are sufficiently reliable for providing information on the numbers, characteristics, and outcomes of CBP apprehensions and ICE detentions.

**Border Patrol data.** For our analysis of Border Patrol data, we used "apprehensions" as our unit of analysis, instead of the number of individuals apprehended, because an individual may have been apprehended multiple times in the same year.[6] We identified a small number of Border Patrol apprehension records that had the same date of apprehension and unique identifier ("A-number"). It is possible that these apprehension records represented one apprehended individual that Border Patrol agents processed as two apprehensions. These records comprised less than one percent of the more than 2.3 million apprehension records we analyzed. We included these apprehension records in our analysis because Border Patrol considers them unique apprehensions and because their small number did not materially affect our analysis.

In addition, Border Patrol did not systematically track family relationships in its data systems until fiscal year 2016, as we have previously reported.[7] Therefore, our analysis of Border Patrol apprehensions of family unit members processed under expedited removal proceedings is for fiscal years 2016 through the first two quarters of 2019.[8]

---

[6]For our analysis, we only included apprehensions for deportable noncitizens as opposed to any U.S. citizens or other non-deportable individuals apprehended by the Border Patrol.

[7]GAO, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163 (Washington, D.C.: Oct. 9, 2018).

[8]Consistent with CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search*, for the purposes of this report, we define a "family unit" as a group of apprehended individuals that includes one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

Further, according to Border Patrol officials, Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, we are reporting the number of reasonable fear cases recorded by the Border Patrol in its automated system from fiscal year 2017 (the first full year for which Border Patrol recorded this information in its system) through the second quarter of fiscal year 2019. We did not include the 860 reasonable fear cases that Border Patrol recorded in its automated system for fiscal year 2016, since this number represents only partial-year data. According to Border Patrol officials, prior to April 2016, these reasonable fear cases would likely have been recorded under other case dispositions in their automated system, such as one indicating the reinstatement of a prior removal order.

We determined that Border Patrol data are sufficiently reliable to describe the numbers and demographic characteristics of individuals and family unit members apprehended from fiscal year 2014 through the second quarter of fiscal year 2019.

**OFO data.** For our analysis of OFO data, we used "apprehensions" as our unit of analysis, instead of the number of individuals apprehended.

We excluded approximately 13 percent of all apprehension records (including single adults, unaccompanied alien children, and parents and children that arrived as part of a family unit) from our analyses because we could not confirm an A-number for those apprehensions. Among the apprehension records missing an A-number, 44 percent were cases in which OFO officers paroled the individuals and, according to OFO officials, officers are not required to assign an A-number to these individuals.[9] In addition, 47 percent of the records with a missing A-number were cases that involved the individual withdrawing their application for admission into the United States, in which OFO officers have discretion whether to assign an A-number.[10] According to OFO officials, additional records with missing A-numbers may be due to data entry errors or problems with the data system saving this information in the database that OFO used to pull the data. Finally, we collapsed

---

[9]Parole generally refers to permitting an individual to enter the United States for a limited purpose, such as to be placed in removal proceedings or to allow the individual to apply for asylum.

[10]OFO officials stated that officers have discretion as to whether or not they assign an A-number for those individuals who have withdrawn their application for admission into the United States so that the apprehension event does not affect the individual's future applications for admission to the United States.

182,266 apprehension records into 86,597 apprehension records
because we determined that they were duplicate records for the same
individual and the same apprehension, based on factors such as alien
number, birth date, and date and time of apprehension.

As a result, we determined that we could not present precise figures for
analyses that include OFO data and instead provided approximations
throughout the report. We rounded all data and figures on OFO
apprehensions down to the hundreds place and described relevant data
using modifiers such as "at least" because of possible missing
information.

In addition, according to OFO officials, OFO does not capture information
in its automated data system on individuals who were processed under
expedited removal with a reasonable fear claim. OFO officials stated that,
since OFO has historically processed a relatively small number of such
apprehensions, it does not collect automated data on reasonable fear
claims.

With the previously-described modifications, we determined that OFO
data are sufficiently reliable to generally describe the numbers and
demographic characteristics of individuals and family unit members
apprehended from fiscal year 2014 through the second quarter of fiscal
year 2019.

**ICE data.** To report on ICE detentions of adults and family unit members,
we obtained and analyzed ICE detention data from fiscal years 2014 to
2018, the most current data available at the time of our review.[11] The ICE
data we obtained contained information on whether adults and family
members booked-in to an ICE detention facility had a fear claim recorded
in ICE's data system as of the date our data were pulled.[12] Specifically,
we divided our analysis of ICE detention data into two parts. First, we
obtained data on all individuals (all adults and children without
consideration of any family relationships) detained from fiscal year 2014

---

[11]The data for all fiscal years is current as of May 2019 and includes unique individuals
detained by ICE for each fiscal year.

[12]According to ICE officials, fear claims in ICE's data system are identified by the "case
category" recorded for each individual. The officials explained that these case categories
may be updated as the person moves through the immigration process. Therefore, our
data reflect the fear claim status for each individual as of May 2019—the date our data
were pulled by ICE.

through fiscal year 2018. Second, we obtained data specifically on family unit members apprehended by CBP and housed at the four ICE family residential centers from fiscal year 2014 through fiscal year 2018.[13]

Regarding our analysis of family unit members who made a fear claim in one of ICE's family residential centers, we excluded less than one percent of all detention records from our analyses because we could not confirm a unique identifier for the individual. In addition, for individual family unit members who were detained more than once in a fiscal year, we included the most recent record for the individuals in our analyses to report on the most recent information available about each individual. This accounted for less than one percent of all detention records in our time period of analysis.

We determined that the data were sufficiently reliable to describe the numbers of individuals (adults and family unit members) who were apprehended by CBP and recorded by ICE as having made a credible fear claim.

To address our second objective, in addition to our aforementioned interviews and site visits, we reviewed relevant laws and regulations governing the credible and reasonable fear screening process. We collected and analyzed documentation on key USCIS oversight mechanisms related to credible and reasonable fear screenings—supervisory review, asylum officer training, and quality assurance reviews. In particular, we reviewed the *Credible Fear Procedures Manual, and the Reasonable Fear Procedures Manual,* standard operating procedures, training and quality assurance records and materials, and guidance on conducting credible and reasonable fear screenings for families in ICE detention.

Specifically, we reviewed USCIS asylum officer basic training materials from RAIO and the Asylum Division, and training materials for officers from outside the Asylum Division who screen credible and reasonable fear cases. In particular, we reviewed USCIS Asylum Division quarterly

---

[13]For family unit members, we analyzed detention records for individuals apprehended by CBP and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

training reports for fiscal year 2018 and used them to analyze the weekly training activities in each asylum office for each week of the reporting quarter. We compared RAIO and Asylum Division training materials with federal internal control standards related to developing competent individuals qualified to carry out assigned responsibilities.[14] We also reviewed documents associated with the quality assurance reviews that the Asylum Division conducted, including those reviews conducted in collaboration with RAIO. Specifically, we reviewed standard operating procedures, reviewer checklists, and resulting reports and analysis for three RAIO nationwide reviews of credible and reasonable fear cases and for the six periodic reviews of credible and reasonable fear cases the Asylum Division conducted at asylum offices and at the family residential centers between November 2017 and May 2018. We compared these policy documents and their role in providing oversight of the credible and reasonable fear process against federal internal control standards related to ongoing monitoring activities and evaluation of results. We also reviewed USCIS standard operating procedures, requirements, and training materials for processing family members, and corresponding data on applicant family relationships. We then compared the procedures, requirements and data against federal internal control standards related to obtaining high quality data.[15]

To address our third objective, we reviewed USCIS and EOIR documents and data, and interviewed relevant officials to evaluate the extent to which USCIS and EOIR have process for managing their respective credible and reasonable fear-related workloads.

**USCIS.** In particular, we reviewed USCIS documentation and spoke with officials from Asylum Division headquarters and local asylum offices regarding the Asylum Division's staffing allocation model for the credible and reasonable fear workload. In addition, we obtained and analyzed record-level data from USCIS's automated case management system to identify processing times and case delays for credible and reasonable fear cases between fiscal year 2014 through the second quarter of fiscal year 2019 (March 2019). We included cases that had a fear determination that was served or an administrative closure for both detained and nondetained individuals.

---

[14]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[15]GAO-14-704G.

In this report, we present information on both credible and reasonable fear case receipts and analysis of processing times for the cases using the "clock-in" date recorded in USCIS's automated case management system. However, while USCIS relies on the "clock-in" date to track case processing times, according to an Asylum Division official USCIS tracks and reports the number of credible and reasonable fear case receipts based on the date cases are input into, or "created" in, its automated system. According to the official, these "created" and "clock-in" dates are often the same, but can differ slightly.[16] Therefore, the number of case receipts tracked and reported by USCIS may differ slightly from those presented in this report.

Regarding credible fear cases, we determined case processing times by calculating the difference between the beginning and end dates for credible fear cases. We considered credible fear case processing times for detained individuals to begin on the day when USCIS receives referral documents and records a "clock-in" date in the automated case management system, as noted previously.[17] For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a credible fear screening.[18] We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We considered credible fear case processing times to end on the day when cases either had a fear determination that was served or an administrative closure.[19] We included credible fear cases that had a fear determination that was served or an administrative

---

[16]According to the Asylum Division official, USCIS uses the automated system's "clock-in" date to denote the date on which ICE refers the case to USCIS and when case processing begins, thus establishing USCIS jurisdiction over the case. However, the official added that the date USCIS establishes jurisdiction over the credible or reasonable fear referral (and is reflected by the system's "clock-in" date) may differ slightly from the date the case is data-entered and "created" in the case management system.

[17]According to USCIS documents, the clock automatically starts for credible fear cases when USCIS receives a referral for individuals in expedited removal proceedings. ICE is responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a fear screening.

[18]According to USCIS documents, a nondetained individual's interview date is used as the starting clock date.

[19]We identified 1,187 credible fear cases that received both a fear determination and administrative closure. For calculating processing times for those credible fear cases, we selected the earlier of the two dates.

closure for detained and nondetained individuals.[20] We also reviewed USCIS's publicly-reported data on credible fear processing times during this time period.

Regarding reasonable fear cases, we used USCIS data to count the number of processing days and percent of cases completed in certain time intervals. We determined reasonable fear processing times by calculating the difference between the beginning and end dates for reasonable fear cases. We considered reasonable fear case processing times for detained individuals to begin on the day when USCIS receives referral documents and records a "clock-in" date in the automated case management system, as noted previously. For nondetained individuals, the clock starts for reasonable fear cases when a USCIS asylum office conducts the interview for a reasonable fear screening.[21] We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We calculated reasonable fear processing times in court days by excluding weekends and federal holidays.[22] USCIS may also pause the clock when processing reasonable fear cases in certain circumstances.[23] We excluded approximately 13 percent of reasonable fear cases that had at least one pause in case processing time from our analysis because in conducting our analysis we could not systematically confirm the appropriate order of dates for those cases.[24] We considered reasonable fear case processing times to end on the day when cases either had a fear determination that was served or administrative

---

[20]We identified 57 credible fear cases for individuals with unknown detention status and included these cases in our analyses.

[21]According to USCIS documents, the clock automatically starts for detained reasonable fear cases when USCIS receives a referral for individuals in expedited removal proceedings. ICE is responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. According to USCIS documents, a nondetained individual's interview date is used as the starting clock date.

[22]According to the Alfaro-Garcia settlement agreement, reasonable fear processing times are measured in court days. See Alfaro Garcia v. Johnson, No. 14-1775 (N.D. Cal. Oct. 27, 2015) (settlement agreement and release).  According to USCIS officials, court days are equivalent to business days.

[23]USCIS policy states that officers may pause reasonable fear cases in limited circumstances, such as if the applicant or the applicant's representative requests to defer the interview, the applicant refuses to participate in the interview or accept service of a fear determination, or in exceptional circumstances.

[24]The 13 percent of reasonable fear cases with pauses includes reasonable fear cases that had at least one clock stop and restart, or other combinations of clock stops and restarts.

closure.[25] We also included reasonable fear cases that were served a fear determination or received an administrative closure for detained and nondetained individuals.[26]

To identify the reasons for delays in credible and reasonable fear cases during the time period of our analysis, we identified the fields that USCIS's case management system tracks for case delays related to the credible and reasonable fear workload. In addition, we reviewed USCIS's manuals and documentation on its case management system. We compared USCIS's recording and tracking of data on case delays to federal internal control standards related to obtaining data on a timely basis for management to use for effective monitoring and that data should be processed into high quality information.[27] We determined that the USCIS data we reviewed on credible and reasonable fear processing times and case delays were sufficiently reliable for our purposes.

**EOIR.** To evaluate EOIR's process for managing its credible and reasonable fear-related workload, we interviewed EOIR officials about their practices to manage the credible and reasonable fear workload, including immigration judge hiring, oversight of credible and reasonable fear review processing times, infrastructure requirements for credible and reasonable fear reviews, and the use of video teleconferencing by judges to conduct credible and reasonable fear reviews. We reviewed publicly available data about EOIR's workload and case adjudications, including data about the number of credible and reasonable fear reviews EOIR judges completed and data about judges hired from fiscal year 2014 through fiscal year 2019. We also reviewed guidance documents, such as EOIR's 2018 Case Priorities and Performance Measures memorandum, which established performance measures for credible and reasonable fear reviews. In addition, we used EOIR data to analyze the timeliness of EOIR's completion of credible and reasonable fear reviews and compared EOIR's processing times for fiscal year 2014 through the third quarter of fiscal year 2019 with required time frames. By reviewing documentation on EOIR's case management system and interviewing officials with knowledge about EOIR's case management system and the methodology

---

[25]We identified 162 reasonable fear cases with no pauses in processing time that received both a fear determination and administrative closure. For calculating processing times for those reasonable fear cases, we selected the earlier of the two dates.

[26]We identified 30 reasonable fear cases for individuals with unknown detention status and included these cases in our analysis.

[27]GAO-14-704G.

**Appendix I: Objectives, Scope, and Methodology**

used to calculate the publicly-reported data, we determined that the EOIR data we reviewed on credible and reasonable fear review processing times and outcomes was sufficiently reliable for analyzing the number of credible and reasonable fear reviews completed and pending, and the duration of the reviews.

We conducted this performance audit from November 2018 to February 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient and appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases

This appendix provides detailed information on eligibility, screening standards, and possible screening outcomes for both credible fear and reasonable fear cases.[1] Noncitizens placed into expedited removal who make fear claims will be referred to U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening by an asylum officer or, if the individual has been issued a final administrative removal order after conviction for an aggravated felony or has a prior order of removal that is reinstated, and expressed a fear of return, for a reasonable fear screening.[2] Table 8 below describes the eligibility and screening standards, as well as the potential outcomes for USCIS's credible fear screening cases. Similarly, table 9 details eligibility, screening standards, and potential outcomes for reasonable fear screening cases.

**Table 8: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible Fear as Provided in Federal Law and Regulation[a]**

| | |
|---|---|
| Eligibility | • Under the Immigration and Nationality Act, individuals placed into expedited removal are subject to credible fear screening if the individual expresses a fear of returning to his or her country or last habitual residence (if stateless), a fear of persecution or torture, or intent to apply for asylum. This is because, unlike full removal proceedings, where individuals may apply for relief from removal or other protection, including asylum, before an immigration judge, if noncitizens are placed into expedited removal proceedings instead of full removal proceedings, they are to be ordered removed from the United States without further hearing before an immigration judge unless they indicate either an intention to apply for asylum or a fear of return, a fear of persecution or torture (referred to throughout this report as making a "fear claim").[b] With some exceptions, including unaccompanied alien children, noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days may be placed into expedited removal.[c] |

---

[1]See 8 C.F.R. §§8 C.F.R. §§ 208.13(c) (establishing a number of grounds for mandatory denial of asylum, including, among others, conviction of certain crimes, being reasonably regarded as a danger to security of the United States, and the third country asylum bar); 208.30-208.31.

[2]See 8 U.S.C. §§ 1225(b), 1228, 1231(a)(5). An "asylum officer" is defined as "an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum applications] and is supervised by an officer who has had such training and has had substantial experience adjudicating asylum applications." See 8 U.S.C. § 1225(b)(1)(E). We use this term to refer to any officer conducing credible and reasonable fear screenings.

**Appendix II: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases**

| Screening standard | Prior to September 2019[a] | Amended Process Effective Nationwide as of September 2019[a] |
|---|---|---|
| | • Asylum officers are to assess whether there is a "significant possibility" that the individual can establish in a hearing before an immigration judge that he or she has been persecuted or has a well-founded fear of persecution on account of race, religion, nationality, particular social group, or political opinion if returned to his or her country. They are also to assess whether there is a "significant possibility" that he or she would be tortured in his or her country of removal, or, if the applicant is stateless, the applicant's country of last habitual residence. | • Asylum officers are to first assess whether or not the noncitizen is subject to a new mandatory bar to asylum known as the "third country transit bar." Under the interim final rule, any noncitizen who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the noncitizen's country of citizenship, nationality or last lawful habitual residence en route to the United States, that individual must be found ineligible for asylum unless the noncitizen demonstrates that he or she falls under an exception to the third country transit bar.[d]<br><br>• If the asylum officer determines that the noncitizen is subject to the third country transit bar, the officer is then to determine if there is a "reasonable possibility" the individual would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a "reasonable possibility" that he or she would be tortured in his or her country of removal. According to Department of Homeland Security (DHS) U.S. Citizenship and Immigration Services (USCIS) policy, this is a higher standard than the "significant possibility" standard.<br><br>• If the asylum officer determines that the noncitizen is not subject to the third country transit bar, the asylum officer is to assess whether there is a "significant possibility" that the individual can establish in a hearing before an immigration judge that he or she has been persecuted or has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion if returned to his or her country. They are also to assess whether there is a "significant possibility" that he or she would be tortured in his or her country of removal. |

Appendix II: Eligibility, Screening Standards,
and Possible Screening Outcomes for Credible
and Reasonable Fear Cases

| Possible screening outcomes | Prior to September 2019ᵃ | Amended Process Effective Nationwide as of September 2019ᵃ |
|---|---|---|
| | • **Positive determination:** USCIS is to issue a "notice to appear" to the individual to appear before an immigration court where his or her case will be heard in full removal proceedings. During these proceedings, the person may apply for asylum or other forms of relief or protection—i.e., withholding of removal or deferral of removal (deferral applies if the person has a bar that would prevent them being eligible for asylum or withholding). <br><br> • **Negative determination:** USCIS is to notify U.S. Immigration and Customs Enforcement (ICE) of the determination. ICE is to initiate the removal process for the individual. <br><br> The individual may request a review by a Department of Justice (DOJ) immigration judge in which case USCIS will issue a Notice of Referral. The immigration judge can reverse (or "vacate") the USCIS decision and enter the person into full removal proceedings before the court where he or she may then apply for asylum or other forms of relief. If the immigration judge agrees with the negative fear determination (or the individual decides not to ask for review of the asylum officer's negative determination), ICE will remove the individual from the United States | • **Not subject to third country bar – positive determination of "significant possibility" of persecution:** USCIS is to issue a "notice to appear" to the individual to appear before an immigration court where his or her case will be heard in full removal proceedings. <br><br> • During these proceedings, the person may apply for asylum or other forms of relief or protection—i.e., withholding of removal or deferral of removal (deferral applies if the person has a bar that would prevent them being eligible for asylum or withholding). <br><br> • **Subject to third country bar – positive determination of "reasonable possibility" of persecution:** USCIS is to issue a "notice to appear" to the individual to appear before an immigration court where his or her case will be heard in full removal proceedings. During these proceedings, the immigration court may determine the individual's eligibility for relief or protection, such as withholding of removal or deferral of removal, (deferral applies if the person has a bar that would prevent them being eligible for asylum or withholding). <br><br> • **Negative determination:** USCIS is to notify ICE of the determination. ICE is to initiate the removal process for the individual. <br><br> • The individual may request a review by an immigration judge who can reverse (or "vacate") the USCIS decision and place the person into full removal proceedings before the court where he or she may then apply for asylum or other forms of relief, as appropriate. If the immigration judge agrees with the negative fear determination (or the individual decides not to ask for review of the asylum officer's negative determination), ICE will remove the individual from the United States |

Source: GAO analysis of 8 C.F.R. § 208.30, as amended, and DHS and DOJ documentation.  I  GAO-20-250

ᵃThe regulations governing the credible fear process were amended by an interim final rule published by DHS on July 16, 2019, which became effective on the date of publication. See 84 Fed. Reg. 33,829 (July 16, 2019) (codified as amended at 8 C.F.R. §§ 208.13, 208.30). However, in a lawsuit filed to challenge the interim final rule, the district court for the Northern District of California granted a nationwide preliminary injunction, preventing DHS from taking any action to implement the Rule. See East Bay Sanctuary Covenant v. Barr, No. 19-04073 (N. D. Cal. July 24, 2019) (order granting preliminary injunction). This injunction was then briefly limited to the jurisdiction of the court of appeals for the Ninth Circuit before it was ultimately appealed to the Supreme Court of the United States, which allowed the interim final rule to go into effect nationwide on September 11, 2019, pending further proceedings in the district court and court of appeals for the Ninth Circuit. See Barr v. East Bay Sanctuary Covenant, No. 19-A230 (U.S. September 11, 2019) (opinion staying nationwide injunction). As of November 2019, this litigation is still ongoing. Additionally, on November 19, 2019, DHS published an interim final rule, which became effective on publication, to modify existing regulations, including credible fear regulations, to provide for the implementation of Asylum Cooperative Agreements that the United States enters with other countries. See 84 Fed. Reg. 63994

Appendix II: Eligibility, Screening Standards,
and Possible Screening Outcomes for Credible
and Reasonable Fear Cases

(Nov.19, 2019). This table does not reflect amendments to the credible fear process as a result of this new rulemaking.

[b]See 8 U.S.C. §§ 1225(b); 1229a.

[c]See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004); see also 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to two years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on September 27, 2019 and as of November 2019, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D. D.C. Sept. 27, 2019) (order granting preliminary injunction).

[d]See 8 C.F.R. § 208.13(c)(4). These exceptions are: (1) if the noncitizen demonstrates that he or she applied for protection from persecution or torture in at least one country outside the noncitizen's country of citizenship, nationality, or last lawful habitual residence through which the noncitizen transited en route to the United States, and received a final judgment denying protection in such country; (2) the noncitizen demonstrates the he or she meets the definition of "victim of a severe form of trafficking in persons (as defined in 8 C.F.R. § 214.11 to generally mean either commercial sex trafficking or involuntary servitude or slavery); (3) or the countries through which the noncitizen transited en route to the United States were not, at the time of transit, parties to international refugee and humanitarian protection agreements.

**Table 9: Eligibility, Screening Standards, and Possible Screening Outcomes for Reasonable Fear as Provided in Federal Law and Regulation[a]**

| Eligibility | • The individual is either (1) subject to the reinstatement of a prior order of removal from the United States, or (2) has been issued a final administrative order of removal after conviction for certain serious crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act. The individual must also have received a final administrative removal order and expressed a fear of return to their country.[a] |
|---|---|
| Screening standard | • Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) is to determine if there is a "reasonable possibility" the individual would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a "reasonable possibility" that he or she would be tortured in his or her country of removal. According to USCIS policy, this is a higher standard than the "significant possibility" standard. |
| Possible screening outcomes | • **Positive determination:** USCIS issues a Notice of Referral to an immigration judge for removal proceedings to consider the applicants' eligibility for withholding of removal or deferral of removal.[b] Individuals in reasonable fear cases are not eligible for asylum.<br><br>• **Negative determination:** Individuals who receive a negative reasonable fear determination may request immigration judge review of the determination by USCIS. For these cases, USCIS will issue a Notice of Referral to a Department of Justice (DOJ) immigration judge. U.S. Immigration and Customs Enforcement will remove the individual if the immigration judge upholds USCIS's negative determination or if the person does not request a review.<br><br>If the immigration judge reverses a negative reasonable fear finding by USCIS, the individual will be placed in proceedings before the immigration judge for a determination on eligibility for withholding of removal or deferral of removal only. |

Source: GAO analysis of 8 C F.R. § 208.31 and DHS and DOJ documentation and DHS and DOJ documentation.  I  GAO-20-250

[a]See 8 U.S.C. §§ 1228, 1231(a)(5); 8 C.F.R. § 208.31.

[b]U.S. immigration law provides that noncitizens physically present within the United States, whether or not at a designated port of arrival, may be granted asylum if they are found to be unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution based on their race, religion, nationality, membership in a particular social group, or political opinion (referred to as "protected grounds").  Additionally, if they are precluded from asylum based on, for example, past convictions of serious crimes, but their life or freedom would be threatened based on the protected grounds or would be tortured if removed, they may also seek withholding of removal. See 8 U.S.C. §§ 1101(a)(42), 1157-1159; See  8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16 (codifying both withholding of removal under the Immigration and Nationality Act and

**Appendix II: Eligibility, Screening Standards,
and Possible Screening Outcomes for Credible
and Reasonable Fear Cases**

the Convention Against Torture). For the purposes of this report, we refer to withholding of removal under the Immigration and Nationality Act and withholding of removal under the Convention against Torture collectively as "withholding of removal."

# Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security

If noncitizens are placed into expedited removal proceedings instead of full removal proceedings,[1] they are to be ordered removed from the United States without further hearing before an immigration judge unless they indicate either an intention to apply for asylum or a fear of persecution or torture or a fear of return to their country (referred to throughout this appendix as making a "fear claim").[2] This appendix provides information on the number and dispositions (such as full removal proceedings or expedited removal proceedings, among others) of noncitizens who were apprehended by the Department of Homeland Security's (DHS) U.S. Customs and Border Protection's (CBP) U.S. Border Patrol (Border Patrol) and Office of Field Operations (OFO) at or between U.S. ports of entry from fiscal year 2014 through the second quarter of fiscal year 2019.[3] It also includes U.S. Immigration and Customs Enforcement (ICE) data on detentions of noncitizens who made a credible fear claim.[4] For cases in which noncitizens were referred to U.S. Citizenship and Immigration Services (USCIS) for a fear screening,

---

[1]CBP's October 2015 National Standards on Transport, Escort, Detention, and Search defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien". The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to "noncitizen parent(s) or legal guardian(s)".

[2]Noncitizens placed into expedited removal who make fear claims will be referred to U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening by an asylum officer or, if the individual has been issued a final administrative removal order after conviction for an aggravated felony or has a prior order of removal that is reinstated, and expressed a fear of return, for a reasonable fear screening.  See 8 C.F.R. §§ 208.30-31. We use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

[3]Within CBP, Border Patrol apprehends individuals at U.S. borders between ports of entry, and the Office of Field Operations encounters individuals that arrive at ports of entry. According to CBP officials, OFO encounters noncitizens instead of apprehending them because the noncitizens have not entered the United States at ports of entry until OFO officers have processed them. For the purposes of this report, we use the term "apprehend" to describe both Border Patrol and OFO's first interactions with noncitizens at the border. In addition, while OFO typically refers to its officers as "Customs and Border Protection officers," we use the term "OFO officers" in this report for clarity.

[4]We report the numbers of detentions rather than the number of noncitizens detained as our unit of analysis because the individual may have been detained multiple times in the same year. Further, upon initial book-in to a detention facility, ICE personnel will record a specific case category in the automated system for instances where the noncitizen is making a credible fear claim.

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

this appendix also provides additional information on the characteristics of these cases, including their country of origin, age, gender, whether they had representation, and location of their screenings.

## Case Dispositions for Border Patrol Apprehensions of Noncitizens from Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As shown in table 10, Border Patrol apprehensions totaled more than 2.3 million from fiscal year 2014 through the second quarter of fiscal year 2019.[5] Further, Border Patrol data indicate that agents processed about 687,000 (or 30 percent) for full immigration proceedings and nearly 931,000 (or 40 percent) under expedited removal proceedings. For those apprehensions that agents processed under expedited removal, more than 197,000 (approximately 9 percent of total apprehensions) included a credible fear claim made in Border Patrol custody. As also shown in table 10, during fiscal years 2017 through the first two quarters of 2019, Border Patrol apprehended more than 10,000 additional noncitizens who made reasonable fear claims.[6]

---

[5]We used "number of apprehensions," rather than number of noncitizens apprehended, as our unit of analysis for Border Patrol data because an individual may have been apprehended multiple times in the same year.

[6]Border Patrol did not begin recording reasonable fear claims in its automated database until April 2016. Therefore, the first full fiscal year for which we have reasonable fear data from the Border Patrol is 2017.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Table 10: U.S. Border Patrol (Border Patrol) Apprehensions[a] and Processing Dispositions, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019**

| Fiscal year | Total apprehensions | Given a notice to appear (NTA) before an immigration court | Total apprehensions placed in expedited removal (ER) | Number placed in ER with credible fear claims | Number of reasonable fear claims[b] | Other case dispositions[c] |
|---|---|---|---|---|---|---|
| 2014 | 486,651 | 118,753 | 199,161 | 16,122 | — | 168,737 |
| 2015 | 337,116 | 64,775 | 148,148 | 16,894 | — | 124,193 |
| 2016 | 415,816 | 93,146 | 186,292 | 48,365 | — | 136,378 |
| 2017 | 310,531 | 88,315 | 126,498 | 36,265 | 2,200 | 95,718 |
| 2018 | 404,136 | 116,427 | 175,321 | 51,389 | 3,810 | 112,388 |
| 2019 (first 2 quarters) | 365,148 | 205,369 | 95,226 | 28,262 | 4,296 | 64,553 |
| **Total** | **2,319,398** | **686,785** | **930,646** | **197,297** | **10,306** | **701,967** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for cred ble fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

[b]Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the term "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening. Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

[c]Other case dispositions in the Border Patrol data include a reinstatement of a prior order of removal (without an associated fear claim) and voluntary returns (meaning the process by which an individual at the border admits being unlawfully present in the United States and is allowed to return to his or her country of citizenship in lieu of full removal proceedings), among other dispositions.

As shown in figure 7, the number of Border Patrol apprehensions of individuals who were placed into expedited removal proceedings with a credible fear claim increased from more than 16,000 apprehensions in fiscal year 2014 to more than 51,000 in fiscal year 2018. These

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

apprehensions of individuals claiming fear ranged from 3 percent to 13 percent of total apprehensions during these fiscal years.

**Figure 7: U.S. Border Patrol's (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings with a Credible Fear Claim, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019**



Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

## Characteristics of Noncitizens Apprehended by Border Patrol Processed Under Expedited Removal Who Claimed Fear

Border Patrol data include various characteristics of each apprehension such as age, gender, and whether a noncitizen was a member of a family unit. For example, of the nearly 208,000 apprehensions processed under expedited removal with a credible or reasonable fear claim during fiscal years 2014 through the first half of fiscal year 2019, approximately 166,000 (or 80 percent) were adults age 18 and above with the remaining 42,000 (or 20 percent) encompassing children age 17 and under (see table 11).

**Table 11: U.S. Border Patrol (Border Patrol) Apprehensions[a] of Noncitizens Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, By Age, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total Border Patrol fear claims[b] | Adults claiming fear (age 18 and above) | Percentage of total fear claims (adults) | Children claiming fear (age 17 and below) | Percentage of total fear claims (children) |
|---|---|---|---|---|---|
| 2014 | 16,121 | 15,055 | 93 | 1,066 | 7 |
| 2015 | 16,894 | 14,382 | 85 | 2,512 | 15 |
| 2016 | 48,365 | 35,482 | 73 | 12,883 | 27 |
| 2017 | 38,465 | 29,227 | 76 | 9,238 | 24 |
| 2018 | 55,196 | 43,026 | 78 | 12,170 | 22 |
| 2019 (first two quarters) | 32,558 | 28,377 | 87 | 4,181 | 13 |
| **Total** | **207,599** | **165,549** | **80** | **42,050** | **20** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening, and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

Border Patrol's automated system did not contain dates of birth for four apprehensions during this time period (one apprehension in fiscal year 2014 and three apprehensions in fiscal year 2018). Since this did not allow us to determine whether these noncitizens were adults or children, we did not include those four apprehensions in this table for those years.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

[b]Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases (as part of overall fear cases along with credible fear) for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

Of the nearly 208,000 apprehensions processed under expedited removal with a credible or reasonable fear claim during fiscal years 2014 through the first half of fiscal year 2019, approximately 117,000 (or 56 percent) were male and the remaining 90,000 (44 percent) were female (see table 12).

Table 12: U.S. Border Patrol (Border Patrol) Apprehensions[a] of Noncitizens Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019[b]

| Fiscal year | Total Border Patrol fear claims | Male | Percentage of total fear claims (male) | Female | Percentage of total fear claims (female) |
|---|---|---|---|---|---|
| 2014 | 16,122 | 9,256 | 57 | 6,866 | 43 |
| 2015 | 16,894 | 9,875 | 58 | 7,019 | 42 |
| 2016 | 48,365 | 24,497 | 51 | 23,868 | 49 |
| 2017 | 38,465 | 20,243 | 53 | 18,222 | 47 |
| 2018 | 55,199 | 31,629 | 57 | 23,570 | 43 |
| 2019 (first two quarters) | 32,558 | 21,739 | 67 | 10,819 | 33 |
| **Total** | **207,603** | **117,239** | **56** | **90,364** | **44** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening, and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

[b]Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases (as part of overall fear cases along with credible fear) for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

As shown in table 13, for fiscal years 2016 through the first two quarters of 2019, Border Patrol apprehended nearly 456,000 noncitizens who were members of families.[7] Of these, Border Patrol processed more than 120,000 (or 26 percent) under expedited removal proceedings. Nearly 71,000 apprehensions during this time period (15 percent of total family unit members apprehended and 59 percent of those placed in expedited removal) included a credible fear claim.

**Table 13: Number of Family Unit Members among U.S. Border Patrol Apprehensions[a] Who Were Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019**

| Fiscal year | Total family unit members | Family unit members placed in expedited removal | Family unit members with credible fear claims | Family unit members with reasonable fear claims[b] |
|---|---|---|---|---|
| 2016 | 77,376 | 37,373 | 22,942 | NA[c] |
| 2017 | 75,738 | 27,262 | 16,799 | 701 |
| 2018 | 112,339 | 40,901 | 23,163 | 1,361 |
| 2019 (first two quarters) | 190,212 | 14,492 | 7,602 | 2,372 |
| **Total** | **455,665** | **120,028** | **70,506** | **4,434** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening, and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

[b]Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

[c]Not applicable.

[7]We collected family-specific Border Patrol data for fiscal year 2016 through the second quarter of fiscal year 2019 because the Border Patrol began to systematically collect data on individuals that arrived as part of a family unit in fiscal year 2016.

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

## Case Dispositions for OFO Apprehensions from Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

From fiscal year 2014 through March 2019, OFO apprehensions at ports of entry totaled at least 546,900.[8] Of these 546,900 apprehensions, OFO officers placed at least 193,500 (or 35 percent) into expedited removal proceedings. For those in expedited removal proceedings, OFO data indicate that at least 104,600 apprehensions included a credible fear claim in OFO custody (19 percent of total apprehensions).[9] In addition, OFO issued Notices to Appear before an immigration judge for full immigration proceedings to at least 167,400 (or 31 percent) of the approximately 546,900 total apprehensions (see figure 8).

[8]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis for OFO data because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report. Appendix I provides additional details about our methodology for assessing limitations of OFO's data and making rounding decisions.

[9]With regard to reasonable fear cases, OFO officials stated they do not systematically track these cases in their automated system. OFO officials explained that, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. OFO officials stated that, in the rare cases where they encounter a reasonable fear claim, OFO officers in the field document that claim in a narrative in the noncitizen's hardcopy file. When transferring noncitizens to ICE custody, OFO field officers are to include information to indicate fear claims by noncitizens subject to reinstatement of a prior removal order.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Figure 8: Dispositions of U.S. Customs and Border Protection Office of Field Operations (OFO) Apprehensions[a], Including those with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019**



Source: GAO analysis of OFO data. | GAO-20-250

Notes: OFO apprehensions totaled approximately 547,000 at ports of entry during the period covered by this figure.

According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

[b]Other processing dispositions in the OFO data include, among other dispositions, withdrawals (where an individual is permitted to voluntarily retract an application for admission in the discretion of the Department of Homeland Security in lieu of being placed into removal proceedings) and individuals who are paroled at the ports of entry (on humanitarian, public interest grounds or for a limited purpose such as to attend immigration proceedings through the Migrant Protection Protocols).

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

As shown in figure 9, the number of OFO apprehensions in expedited removal proceedings with a credible fear claim generally increased over this time period from at least 11,600 apprehensions in fiscal year 2014 to at least 27,000 in fiscal year 2018 (the last full year of data available at the time of our analysis). In addition to this overall increase, the percentage of OFO's total apprehensions placed into expedited removal proceedings with a credible fear claim also increased. Specifically, these apprehensions increased from about 17 percent of all apprehensions in fiscal year 2014 to about 26 percent in fiscal year 2018.

**Figure 9: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions[a] Placed into Expedited Removal with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019**



Source: GAO analysis of OFO data. | GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report,

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

we use the term "credible fear claim" to describe individuals who are referred to USCIS for a cred ble fear screening.

aWe used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

## Characteristics of Noncitizens Apprehended by OFO and Placed into Expedited Removal Proceedings with a Credible Fear Claim

OFO apprehension data include various characteristics such as age, gender, and whether an apprehension involved a member of a family unit. For example, as shown in table 14, of the approximately 104,300 OFO apprehensions with credible fear claims, at least 78,500 (or 75 percent) were adults age 18 and above with about 25,700 (or 25 percent) of the remaining credible fear claims encompassing children age 17 and under. Also, for each year during this period, the percentage of adults versus children was generally consistent with this overall percentage with the exception of fiscal year 2019, for which the partial year's data show that about 98 percent of those apprehensions processed under expedited removal with a credible fear claim were adults.[10]

[10]According to OFO officials, the drop off in the percentage of children making credible fear claims between fiscal year 2018 and the first two quarters of fiscal year 2019 could possibly be attributed to OFO officers not being required to ask the standard fear questions of noncitizens being referred for full removal proceedings before an immigrations judge. The OFO officials added that another contributing factor could be the fact that this lower percentage is based on partial-year data for fiscal year 2019.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Table 14: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions[a] Placed into Expedited Removal Proceedings with Credible Fear Claims, by Age, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total OFO credible fear claims | Adults with credible fear claims (age 18 and above) | Percentage of total credible fear claims (adults) | Children with credible fear claims (age 17 and below) | Percentage of total credible fear claims (children)[b] |
|---|---|---|---|---|---|
| 2014 | 11,600 | 8,600 | 74 | 3,000 | 26 |
| 2015 | 14,300 | 11,100 | 78 | 3,100 | 22 |
| 2016 | 23,500 | 16,300 | 69 | 7,200 | 31 |
| 2017 | 16,800 | 11,800 | 70 | 5,000 | 30 |
| 2018 | 27,000 | 19,800 | 73 | 7,200 | 27 |
| 2019 (first two quarters) | 11,100 | 10,900 | 98 | 200 | 2 |
| **Total** | **104,300** | **78,500** | **75** | **25,700** | **25** |

Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

[b]According to OFO officials, the drop off in the percentage of children making credible fear claims between fiscal year 2018 and the first two quarters of fiscal year 2019 could possibly be attributed to OFO officers not being required to ask the standard fear questions of noncitizens being referred for full removal proceedings before an immigrations judge. The OFO officials added that another contributing factor could be the fact that this lower percentage is based on partial-year data for fiscal year 2019.

In addition, for fiscal years 2014 through the first two quarters of fiscal 2019, at least 56,500 (or 54 percent) of these apprehensions involving a fear claim were male and at least 47,400 (or 45 percent) were female (see table 15). Also, for each year during this period, the number of males and females were almost evenly split with the exception of fiscal year 2019, for which the partial year's data show a larger proportion of males claiming fear.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Table 15: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions[a] Placed into Expedited Removal Proceedings with Credible Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total OFO fear claims | Male | Percentage of total credible fear claims (male)[b] | Female | Percentage of total credible fear claims (female)[b] |
|---|---|---|---|---|---|
| 2014 | 11,600 | 6,200 | 53 | 5,300 | 46 |
| 2015 | 14,300 | 8,100 | 57 | 6,100 | 43 |
| 2016 | 23,500 | 11,900 | 51 | 11,500 | 49 |
| 2017 | 16,800 | 8,800 | 52 | 8,000 | 48 |
| 2018 | 27,000 | 13,600 | 50 | 13,300 | 49 |
| 2019 (first two quarters) | 11,100 | 7,900 | 71 | 3,200 | 29 |
| **Total** | **104,300** | **56,500** | **54** | **47,400** | **45** |

Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

Approximately 180 apprehensions in OFO data (0.2 percent of total OFO fear claims) did not indicate gender. According to OFO officials, cases where no gender was recorded in their automated system are potentially attributable to error by the system operator based on the fact that gender may not have been a mandatory field for data entry at the time.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

[b]Percentages in some years do not equal 100 percent due to rounding.

As shown in table 16, for fiscal years 2016 through the first two quarters of 2019, OFO had a total of at least 144,100 apprehensions involving members of family units.[11] Of these approximately 144,100 apprehensions, OFO placed at least 39,100 (27 percent) into expedited removal proceedings of which at least 32,900 (about 23 percent of total

[11]We collected family-specific OFO data for fiscal year 2016 through the second quarter of fiscal year 2019 because OFO began to systematically collect data on individuals that arrived as part of a family and families in fiscal year 2016.

family unit members apprehended and approximately 84 percent of those placed in expedited removal) claimed a credible fear of returning to their country.

**Table 16: Number of Family Unit Member Apprehensions[a] U.S. Customs and Border Protection's Office of Field Operations (OFO) Placed into Expedited Removal Proceedings with Credible Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019**

| Fiscal year | Total family unit members | Family unit members placed in expedited removal | Family unit members with credible fear claims |
|---|---|---|---|
| 2016 | 42,900 | 13,600 | 12,100 |
| 2017 | 29,300 | 9,900 | 8,300 |
| 2018 | 48,400 | 14,500 | 12,100 |
| 2019 (first 2 quarters) | 23,500 | 1,100 | 400 |
| **Total** | **144,100** | **39,100** | **32,900** |

Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

## Number of Individuals in ICE Detention with a Credible Fear Claim, Fiscal Years 2014 through 2018

The number of individuals in expedited removal proceedings detained in ICE facilities with a credible fear claim increased from fiscal years 2014 to

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

2018.[12] Specifically, as shown in table 17, ICE data indicate that the number of individuals in expedited removal proceedings with a recorded credible fear claim while in ICE detention increased from about 37,000 (or 9 percent) in fiscal year 2014 to about 99,000 (or 26 percent) in fiscal year 2018. The period of greatest percentage increase was from fiscal years 2015 to 2016 when the percentage of individuals in expedited removal proceedings with a credible fear claim while in ICE custody increased from approximately 15 percent to 25 percent.

**Table 17: Noncitizens in Expedited Removal Proceedings Detained in U.S. Immigration and Customs Enforcement (ICE) Detention Facilities with Credible Fear Claims, Fiscal Years 2014 through 2018**

| Fiscal year | Unique individuals detained each year | Number of unique individuals detained with a credible fear claim | Percentage of unique individuals detained with a credible fear claim |
|---|---|---|---|
| 2014 | 396,595 | 37,180 | 9.4 |
| 2015 | 290,458 | 42,593 | 14.7 |
| 2016 | 337,039 | 84,537 | 25.1 |
| 2017 | 309,582 | 66,606 | 21.5 |
| 2018 | 384,499 | 99,065 | 25.8 |
| **Total** | **1,718,173** | **329,981** | **19.2** |

Source: GAO analysis of ICE data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizens in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

Numbers in the table are unique individuals detained in each fiscal year. Therefore, the totals are likely overstated due to the possibility that some individuals were detained across more than one fiscal year.

[12]The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizens in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security

For fiscal years 2014 through 2018, the majority of family unit members in ICE's four family residential centers had a credible fear claim (81 percent), as demonstrated in table 18.[13] The number of family unit members with a fear claim ranged from approximately 69 percent in fiscal year 2015 to 88 percent in fiscal year 2018.

**Table 18: Noncitizen Family Unit Members in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018**

| Fiscal year | Unique individual family unit members in family residential centers | Number of family unit members in family residential centers with a credible fear claim | Percentage of family unit members in family residential centers with a credible fear claim |
|---|---|---|---|
| 2014 | 2,047 | 1,441 | 70.4 |
| 2015 | 12,541 | 8,594 | 68.5 |
| 2016 | 43,163 | 35,588 | 82.5 |
| 2017 | 37,490 | 28,018 | 74.7 |
| 2018 | 45,904 | 40,557 | 88.4 |
| **Total**a | **141,145** | **114,198** | **80.9** |

Source: GAO analysis of ICE data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizen family unit members in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

For family unit members, we analyzed detention records for individuals apprehended by CBP and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

[13]For family unit members, we analyzed detention records for individuals apprehended by CBP and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security

ªNumbers in the table are unique individuals detained in each fiscal year. Therefore, the totals are likely overstated due to the possibility that some individuals were detained across more than one fiscal year.

For fiscal years 2014 through 2018, slightly more than half of all family unit members in ICE's four family residential centers with a credible fear claim were children under the age of 18 (55 percent). As also shown in table 19, the division between adults and children with fear claims varied little each year.

**Table 19: Noncitizen Adults and Children in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018**

| Fiscal year | Number of family unit members in family residential centers with a credible fear claim | Number and percentage of adult family unit members with a credible fear claimª | Number and percentage of children among family unit members with a credible fear claimª |
|---|---|---|---|
| 2014 | 1,441 | 623 (43) | 818 (57) |
| 2015 | 8,594 | 3,674 (43) | 4,920 (57) |
| 2016 | 35,588 | 15,534 (44) | 20,054 (56) |
| 2017 | 28,018 | 12,697 (45) | 15,321 (55) |
| 2018 | 40,557 | 18,732(46) | 21,825 (54) |
| **Total** | **114,198** | **51,260 (45)** | **62,938 (55)** |

Source: GAO analysis of ICE data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible claim" to describe individuals who are referred to USCIS for a credible fear screening.

The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizen family unit members in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

For family unit members, we analyzed detention records for individuals apprehended by U.S. Customs and Border Protection and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

ªPercentages do not equal 100 percent due to rounding.

... 

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

## Nationalities of Noncitizens Referred to USCIS for Credible or Reasonable Fear Screenings from Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019

As shown in Figure 10, the majority of credible fear cases referred to USCIS for screening from fiscal year 2014 through the first two quarters of fiscal year 2019 had applicants who were nationals of El Salvador, Honduras, Guatemala, or Mexico.[14] Citizens of these countries accounted for 74 percent of all credible fear cases during this time period (approximately 306,000 referrals).

**Figure 10: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019**



- El Salvador
- Honduras
- Guatemala
- Mexico
- All other countries

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

[14]USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

USCIS received approximately 413,000 credible fear referrals during the period covered by this graphic.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data. Percentages do not equal 100 percent due to rounding.

USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

As shown in table 20, El Salvador had the most credible fear referrals to USCIS each year from fiscal year 2014 through fiscal year 2017.[15] However, beginning in fiscal year 2018, Honduras accounted for the most credible fear referrals to USCIS among these four countries.

**Table 20: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal Year | El Salvador | Honduras | Guatemala | Mexico | All Other countries | Total cases |
|---|---|---|---|---|---|---|
| 2014 | 18,305 | 7,563 | 6,196 | 4,131 | 11,449 | **47,754** |
| 2015 | 14,299 | 7,635 | 7,151 | 7,250 | 11,647 | **48,089** |
| 2016 | 32,386 | 19,513 | 14,820 | 7,432 | 17,250 | **91,598** |
| 2017 | 20,114 | 16,652 | 15,738 | 4,904 | 20,160 | **77,698** |
| 2018 | 13,471 | 25,874 | 24,502 | 6,855 | 27,234 | **98,083** |
| 2019 (first two quarters) | 6,035 | 14,242 | 8,511 | 2,039 | 19,262 | **50,091** |
| **Total** | **104,610** | **91,479** | **76,918** | **32,611** | **107,002** | **413,313** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

---

[15]USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

As shown in Figure 11, applicants from the countries of Mexico, Honduras, El Salvador, and Guatemala accounted for all but approximately 7 percent of the reasonable fear cases screened by USCIS for fiscal years 2014 through the first two quarters of fiscal year 2019.[16] Overall, Mexican nationals accounted for the largest number of reasonable fear cases among these four countries (33 percent of total reasonable fear cases).

**Figure 11: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**



El Salvador
Honduras
Guatemala
Mexico
All other countries

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

USCIS received approximately 52,000 reasonable fear referrals during the period covered by this graphic.

[16]USCIS's automated system did not record citizenship for nearly 500 reasonable fear cases (0.9 percent of total reasonable fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

**Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security**

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as
our unit of analysis because an individual noncitizen may have claimed fear and been screened more
than once during the time period covered by our data. Percentages do not equal 100 percent due to
rounding.

USCIS's automated system did not record citizenship for nearly 500 reasonable fear cases (0.9
percent of reasonable fear cases). According to USCIS officials, these are likely cases where the
individual's citizenship was unknown.

As shown in table 21, Mexico had the most reasonable fear referrals to
USCIS each year from fiscal years 2014 through the first two quarters of
fiscal year 2019.

**Table 21: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases,
Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal year | Mexico | Honduras | El Salvador | Guatemala | All other countries | Total cases |
|---|---|---|---|---|---|---|
| 2014 | 2,835 | 1,649 | 1,744 | 1,509 | 686 | 8,602 |
| 2015 | 2,943 | 1,423 | 1,685 | 1,302 | 551 | 8,000 |
| 2016 | 2,956 | 1,903 | 2,200 | 1,537 | 587 | 9,274 |
| 2017 | 3,281 | 2,097 | 1,989 | 1,792 | 588 | 9,792 |
| 2018 | 3,638 | 2,621 | 1,672 | 2,132 | 590 | 10,697 |
| 2019 (first two quarters) | 1,796 | 1,777 | 868 | 1,223 | 456 | 6,121 |
| Total | 17,449 | 11,470 | 10,158 | 9,495 | 3,458 | 52,486 |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: Noncitizens issued a final administrative order of removal after conviction for crimes that meet
the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal
order is reinstated may be placed into streamlined removal proceedings where they cannot apply for
asylum. However, if they express a fear of return, they are to be screened for "reasonable fear,"
which is a screening for withholding or deferral of removal, more limited forms of humanitarian
protection. See 8 C.F.R. §§ 208.31, 208.16.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as
our unit of analysis because an individual noncitizen may have claimed fear and been screened more
than once during the time period covered by our data.

USCIS's automated system did not record citizenship for nearly 500 reasonable fear cases (0.9
percent of total reasonable fear cases). According to USCIS officials, these are likely cases where the
individual's citizenship was unknown.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

Outcomes of USCIS Credible Fear and Reasonable Fear Screenings Based on the Presence of Representation at the Applicant's Interview

As table 22 shows, noncitizens making credible fear claims who had representation present at their interviews with asylum officers more often received positive determinations of fear by the asylum officer. Overall, during this time period, the number of positive determinations in cases with representation was nearly 10 percentage points greater than those without representation.

**Table 22: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Percentage of positive determinations when the applicant has representation | Percentage of positive determinations when the applicant does not have representation |
|---|---|---|
| 2014 | 82.5 | 69.5 |
| 2015 | 81.3 | 69.7 |
| 2016 | 86.1 | 78.3 |
| 2017 | 86.1 | 74.8 |
| 2018 | 86.5 | 75.8 |
| 2019 (first two quarters) | 89.7 | 75.9 |
| Total | 84.9 | 74.9 |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: The data presented in this table on representation are based on the number of credible fear cases for which USCIS's automated case management system indicates the individual had either an attorney or consultant present at the interview.

With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

According to USCIS, a consultant may be a relative, friend, clergy person, attorney, or representative. We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

As table 23 shows, similar to credible fear cases, noncitizens making reasonable fear claims who had representation present at their interviews with asylum officers more often received positive determinations of fear by the asylum officer. Overall, during this time period, the number of

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

positive determinations in cases with representation was over 20 percentage points greater than those without representation.

**Table 23: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Percentage of positive determinations when the applicant has representation | Percentage of positive determinations when the applicant does not have representation |
|---|---|---|
| 2014 | 45.8 | 22.2 |
| 2015 | 45.2 | 24.0 |
| 2016 | 49.3 | 27.7 |
| 2017 | 48.6 | 24.7 |
| 2018 | 48.7 | 23.3 |
| 2019 (first two quarters) | 53.6 | 26.6 |
| **Total** | **47.9** | **24.7** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: The data presented in this table on representation is based on the number of reasonable fear cases for which USCIS's automated case management system indicates the individual had either an attorney or consultant present at the interview.

Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

**Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security**

## ICE Detention Facilities and Family Residential Centers Making the Most Credible Fear and Reasonable Fear Referrals to USCIS for Screening During Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As table 24 shows, two of ICE's family residential centers (Dilley and Karnes family residential centers) accounted for the highest number of credible and reasonable fear referrals, among the top five facilities making these referrals, from fiscal years 2014 through the first two quarters of fiscal year 2019.

**Table 24: Top Five Detention Facilities and Family Residential Centers with the Highest Number of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal Year | Dilley Family Residential Center[a] | Karnes Family Residential Center[b] | Pearsall Detention Complex | Hutto Residential Center | Port Isabel Service Processing Center | All other facilities | Top five facilities as percent of all facilities |
|---|---|---|---|---|---|---|---|
| 2014 | — | 620 | 3,920 | 5,080 | 2,099 | 42,995 | 21 |
| 2015 | 6,680 | 2,943 | 3,729 | 3,303 | 2,941 | 31,566 | 38 |
| 2016 | 27,275 | 14,681 | 4,327 | 3,820 | 3,207 | 45,786 | 54 |
| 2017 | 21,223 | 10,389 | 5,348 | 3,340 | 3,068 | 38,219 | 53 |
| 2018 | 32,114 | 11,453 | 6,069 | 4,751 | 3,622 | 48,485 | 54 |
| 2019 (first two quarters) | 10,057 | 2,945 | 2,741 | 2,345 | 2,274 | 35,337 | 37 |
| **Total** | **97,349** | **43,031** | **26,134** | **22,639** | **17,211** | **242,388** | **46** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

[a]U.S. Immigration and Customs Enforcement (ICE) housed families at the South Texas Family Residential Center in Dilley, Texas from November 2014 to present.

[b]ICE housed families at the Karnes Family Residential Center in Karnes, Texas from July 2014 to March 2019 and October 2019 to present.

## Reasonable Fear Referrals to USCIS from ICE's Family Residential Centers, and Related Positive Outcomes, During Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As shown in table 25, reasonable fear screenings for those in ICE family residential centers comprised 6 percent of all such cases referred to USCIS during this same period with the percentage of positive determinations (77 percent) higher than that for all reasonable fear cases nationwide (30 percent).

Table 25: Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Facilities, and Related Positive Outcomes, Fiscal Years 2014 through First Two Quarters of 2019

| Fiscal year | Total reasonable fear referrals to USCIS | Total reasonable fear referrals from ICE's family residential centers | Percentage of reasonable fear referrals from ICE's family residential centers | Total and percentage of positive determinations for all reasonable fear referrals | Total and percentage of positive determinations from ICE's family residential centers |
|---|---|---|---|---|---|
| 2014 | 8,602 | 87 | 1 | 2,493 (29) | 62 (71) |
| 2015 | 8,000 | 374 | 5 | 2,423 (30) | 285 (76) |
| 2016 | 9,274 | 964 | 10 | 3,005 (32) | 717 (74) |
| 2017 | 9,792 | 550 | 6 | 2,942 (30) | 417 (76) |
| 2018 | 10,697 | 703 | 7 | 3,014 (28) | 557 (79) |
| 2019 (first two quarters) | 6,121 | 425 | 7 | 1,913 (31) | 358 (84) |
| Total | 52,486 | 3,103 | 6 | 15,790 (30) | 2,396 (77) |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

## Number of Credible Fear and Reasonable Fear Cases Screened, by USCIS Asylum Office, for Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As shown in table 26, the Houston asylum office screened two-thirds (67 percent) of credible fear cases from fiscal year 2014 through the first two quarters of fiscal year 2019. Also, over this same time period, USCIS's Los Angeles asylum office screened the second most credible fear cases (11 percent). However, since fiscal year 2018, USCIS's Asylum Pre-Screening Center has screened the second most credible fear cases after Houston.[17]

---

[17]The Asylum Pre-Screening Center is co-located with the Arlington asylum office in Arlington, VA. USCIS established the Asylum Pre-Screening Center in fiscal year 2016 to provide additional support for the credible and reasonable fear caseload. As of April 2019, the Asylum Pre-Screening Center and the Arlington Asylum Office together had jurisdiction over 27 ICE detention centers across the United States. According to USCIS officials, asylum officers from the Arlington asylum office may also be assigned to screen credible and reasonable fear cases that are under the jurisdiction of the Asylum Pre-Screening Center.

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Table 26: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of 2019**

| Asylum Office | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 (first two quarters) | Total | Percent of total credible fear cases for all years |
|---|---|---|---|---|---|---|---|---|
| Asylum Pre-Screening Center[a] | — | — | 3 | 1,357 | 11,024 | 6,956 | **19,340** | 4.7 |
| Arlington | 1,776 | 1,749 | 3,060 | 3,550 | 3,481 | 1,621 | **15,237** | 3.7 |
| Boston Sub Office[b] | — | 1 | — | 141 | 240 | 104 | **486** | 0.1 |
| Chicago | 1,199 | 529 | 1,873 | 1,410 | 1,502 | 1,091 | **7,604** | 1.8 |
| Houston | 26,845 | 28,248 | 64,631 | 52,442 | 69,032 | 33,868 | **275,066** | 66.6 |
| Los Angeles | 8,620 | 9,199 | 11,039 | 9,911 | 4,854 | 2,718 | **46,341** | 11.2 |
| Miami | 2,010 | 1,707 | 3,464 | 1,672 | 815 | 786 | **10,454** | 2.5 |
| Newark | 5,247 | 3,447 | 4,643 | 2,719 | 1,970 | 493 | **18,519** | 4.5 |
| New York | 147 | 84 | 96 | 390 | 91 | 125 | **933** | 0.2 |
| New Orleans Sub Office[c] | — | — | 1 | 1,696 | 2,059 | 1,084 | **4,840** | 1.2 |
| San Francisco | 1,910 | 3,125 | 2,788 | 2,410 | 3,015 | 1,245 | **14,493** | 3.5 |
| **Total** | **47,754** | **48,089** | **91,598** | **77,698** | **98,083** | **50,091** | **413,313** | **—** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

[a]The Asylum Pre-Screening Center, which is located in Arlington, Virginia, became operational in fiscal year 2016.

[b]The Boston office, a sub-office under the Newark asylum office, did not receive credible fear cases until fiscal year 2015, had no credible fear cases in fiscal year 2016, and resumed processing credible fear cases for the remainder of the time period covered by our data.

[c]The New Orleans office, a sub-office under Houston's jurisdiction, did not receive credible fear cases until fiscal year 2016 and reasonable fear cases until fiscal year 2017.

As shown in table 27, the Houston asylum office screened nearly half (approximately 45 percent) of reasonable fear cases from fiscal year 2014 through the first two quarters of fiscal year 2019. Also, over this same time period, USCIS's Los Angeles asylum office screened the second most reasonable fear cases (12 percent). However, since fiscal year

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

2018, USCIS's Asylum Pre-Screening Center has screened the second most reasonable fear cases after Houston.

**Table 27: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of Fiscal Year 2019**

| Asylum Office | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 (first two quarters) | Total | Percent of total reasonable fear cases for all years |
|---|---|---|---|---|---|---|---|---|
| Asylum Pre-Screening Center[a] | — | — | — | 408 | 1,781 | 1,008 | **3,197** | 6.1 |
| Arlington | 758 | 715 | 823 | 1,164 | 1,342 | 702 | **5,504** | 10.5 |
| Boston Sub Office[b] | — | — | — | 8 | 82 | 52 | **142** | 0.3 |
| Chicago | 534 | 439 | 498 | 576 | 607 | 410 | **3,064** | 5.8 |
| Houston | 3,537 | 3,507 | 5,220 | 4,132 | 4,392 | 2,649 | **23,437** | 44.7 |
| Los Angeles | 1,375 | 1,381 | 1,223 | 1,473 | 488 | 323 | **6,263** | 11.9 |
| Miami | 395 | 303 | 184 | 222 | 283 | 162 | **1,549** | 3.0 |
| Newark | 862 | 606 | 551 | 549 | 368 | 194 | **3,130** | 6.0 |
| New York[c] | 30 | 49 | 6 | — | 149 | 28 | **262** | 0.5 |
| New Orleans Sub Office[d] | — | — | — | 334 | 565 | 326 | **1,225** | 2.3 |
| San Francisco | 1,111 | 1,000 | 769 | 926 | 640 | 267 | **4,713** | 9.0 |
| **Total** | **8,602** | **8,000** | **9,274** | **9,792** | **10,697** | **6,121** | 52,486 | — |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: Noncitizens issued a final administrative order of removal after convection for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data

[a]The Asylum Pre-Screening Office, which is located in Arlington, VA, did not receive any records of reasonable fear cases for FY 2014 and FY 2015 because the Asylum Pre-Screening Office became operational in fiscal year 2016.

[b]The Boston office, a sub-office under the Newark asylum office, did not receive reasonable fear cases until fiscal year 2017.

[c]The New York office did not receive any reasonable fear cases in fiscal year 2017.

[d]The New Orleans office, a sub-office under Houston's jurisdiction, did not receive credible fear cases until fiscal year 2016 and reasonable fear cases until fiscal year 2017.

# Appendix IV: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

January 29, 2020

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Re:     Management Response to Draft Report GAO-20-250, "IMMIGRATION: Actions
        Needed to Strengthen USCIS's Oversight and Data Quality of Credible and
        Reasonable Fear Screenings"

Dear Ms. Gambler:

Thank you for the opportunity to review and comment on this draft report.  The U.S.
Department of Homeland Security (DHS) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing
this report.

The Department appreciates the GAO's reporting of DHS's credible and reasonable fear
screening programs.  During Fiscal Year (FY) 2019, U. S. Citizenship and Immigration
Services (USCIS) received historic levels of both credible fear and reasonable fear cases
with more than 105,000 and 13,000 cases respectively, surpassing records set in previous
years.  The USCIS Asylum Division was assisted by refugee officers and former asylum
officers from USCIS, as well as U.S. Border Patrol Agents (BPAs) from U.S. Customs
and Border Protection, in order to complete the record number of credible fear and
reasonable fear cases received.  DHS remains committed to conducting credible fear and
reasonable fear cases in a thorough and timely manner to fulfill international and
domestic protection laws and obligations while also ensuring that the U.S. border is
secure.

As noted in the draft report, starting in June 2019, BPAs were assigned to a credible fear
task force to complete credible fear interviews and determinations.  More than 75 BPAs
have completed training and have conducted credible fear interviews throughout the
United States.  Starting in September 2019, the BPAs have primarily been assigned to
conduct credible fear interviews at the Family Residential Center (FRC) in Dilley, Texas.

Throughout FY 2019, USCIS continued to improve its new case management system for tracking credible fear and reasonable fear case processing, conducted user interviews with staff to gain valuable feedback, and implemented new tools within the case management system to assist with tracking and increasing efficiency. For example, USCIS implemented the uploading of working documents into the case management system to allow more flexibility with case assignments and less dependence on paper files and e-mail. In addition, USCIS began using electronic signatures for officers and supervisors and exploring improved document generation to support the credible and reasonable fear caseload.

The draft report contained four recommendations with which the Department concurs. Attached find our detailed responses to each recommendation. DHS previously submitted technical comments under a separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Sincerely,

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Attachment: Management Response to Recommendations Contained in GAO-20-250**

GAO recommended that the Director of USCIS:

**Recommendation 1:** Ensure that, in addition to USCIS's basic asylum officer training, all asylum offices provide pre-departure training on credible and reasonable fear processes before their officers begin screening cases at the family residential centers.

**Response:** Concur. USCIS Directorate for Refugee, Asylum & International Operations (RAIO) staff already provides family processing training to all USCIS officers and Border Patrol Agents (BPAs) detailed to its Asylum Division. In addition, for more than a decade USCIS has required weekly training for USCIS asylum officers on a variety of adjudication topics. In the future, USCIS will provide a refresher training to all staff conducting asylum-related screening. In addition, USCIS will develop a standardized pre-departure training and provide this training to all detailees prior to deployment to the family residential centers (FRCs). Estimated Completion Date (ECD): September 30, 2020.

**Recommendation 2:** Develop and implement more specific guidance on requirements for documenting results of Asylum Division periodic quality assurance reviews.

**Response:** Concur. USCIS RAIO will create a results template to ensure that the outcomes of periodic quality assurance reviews involving similar case types are documented in a consistent manner to better track trends across the asylum offices. Staff assigned to participate in these reviews will be trained on how to use this template. ECD: June 30, 2020.

**Recommendation 3:** Ensure asylum officers systematically record in USCIS's automated case management system if individuals receive credible fear determinations as principal applicants, dependents, or in the interest of family unity, pursuant to regulation or USCIS policy.

**Response:** Concur. USCIS RAIO will explore ways to modify its case management system so that asylum officers can record whether the individual received a positive credible fear determination as a principal, dependent, or in the interest of family unity. USCIS will make any appropriate changes in the case management system and will train asylum officers on these changes. ECD: December 31, 2020.

**Recommendation 4:** Collect and analyze additional information on case delays, including specific reasons for delays and how long they last, that asylum officers may face when screening credible and reasonable fear cases.

3

Appendix IV: Comments from the Department
of Homeland Security

**Response:** Concur. As noted in the draft report, USCIS does track limited information about some case delays. However, USCIS will explore ways to collect additional information on credible and reasonable fear case delays in the case management system. Once USCIS has identified ways to collect the additional information, it will modify the case management system, as appropriate, instruct users on the changes, and begin collecting and analyzing the information. ECD: December 31, 2020.

4

# Appendix V: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Kathryn Bernet (Assistant Director), Michael Harmond (Analyst-in-Charge), Hiwotte Amare, Miranda Cohen, Benjamin Crossley, Michele Fejfar, Cynthia Grant, Jan Montgomery, Heidi Nielson, Mary Pitts, Adam Vogt, and Jessica Walker made key contributions to this work. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: |
| | Website: https://www.gao.gov/fraudnet/fraudnet.htm |
| | Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.



## U.S. Citizenship
## and Immigration
## Services

Home > Humanitarian > Refugees and Asylum > Asylum > Obtaining Asylum in the United States

# Obtaining Asylum in the United States

> ℹ️ To continue to keep our workforce and applicants safe during the COVID-19 pandemic while maintaining efficiency and access to the asylum process, USCIS announced another extension, with modification, to the temporary final rule (TFR) that requires certain asylum applicants to use our contract telephonic interpreters instead of bringing their own interpreters to their asylum interviews. This rule is in effect through March 16, 2022. For more information, please visit our TFR webpage.

The two ways of obtaining asylum in the United States are through the affirmative process and defensive process.

 Close All    Open All

## Affirmative Asylum Processing with USCIS ⌃

To obtain asylum through the affirmative asylum process you must be physically present in the United States. You may apply for asylum regardless of how you arrived in the United States or your current immigration status.

You must apply for asylum within one year of the date of your last arrival in the United States, unless you can show:

- Changed circumstances that materially affect your eligibility for asylum or extraordinary circumstances relating to the delay in filing; and
- You filed within a reasonable amount of time given those circumstances.

You may apply for affirmative asylum by submitting Form I-589, Application for Asylum and for Withholding of Removal, to USCIS.

If your case is not approved and you do not have a legal immigration status, we will issue a Form I-862, Notice to Appear (NTA), and refer your case to an immigration judge at the Executive Office for Immigration Review (EOIR). The immigration judge conducts a "de novo" hearing of the case. This means that the judge conducts a new hearing and issues a decision that is independent of the decision made by USCIS. In certain circumstances, if USCIS does not have jurisdiction over your case,

the asylum office will issue a Form I-863, Notice of Referral to Immigration Judge, for an asylum-only hearing. See the section "Defensive Asylum Processing With EOIR" below if this situation applies to you.

If you were previously issued an NTA that was not filed and docketed with the EOIR immigration court, or your previously issued NTA was filed and docketed with EOIR either shortly before (within 21 days) or after you filed your Form I-589 with USCIS, USCIS will refile your NTA (if necessary) and send your Form I-589 to the immigration court for adjudication.

To determine where to file your Form I-589, follow the instructions under the "Where to File" section on our Form I-589 page. For more information, please see What Happens After You File Your Form I-589 With USCIS.

You may live in the United States while your Form I-589 is pending before USCIS. If you are found ineligible, you can remain in the United States while your Form I-589 is pending with the immigration judge. Asylum applicants are not authorized to work unless you meet certain requirements. For more information, please see Permission to Work in the United States. Affirmative asylum applicants are rarely detained by U.S. Immigration and Customs Enforcement (ICE).

Please see the Affirmative Asylum Process for step-by-step information on applying for asylum through the affirmative asylum process.

## Defensive Asylum Processing with EOIR    ⌄

A defensive application for asylum occurs when you request asylum as a defense against removal from the United States. For asylum processing to be defensive, you must be in removal proceedings in immigration court with the Executive Office for Immigration Review (EOIR).

Individuals are generally placed into defensive asylum processing in one of two ways:

- They are referred to an immigration judge by USCIS after they have been determined to be ineligible for asylum at the end of the affirmative asylum process, or

- They are placed in removal proceedings because they:

  - Were apprehended in the United States or at a U.S. port of entry without proper legal documents or in violation of their immigration status; or

  - Were apprehended by U.S. Customs and Border Protection (CBP) trying to enter the United States without proper documentation, were placed in the expedited removal process, and were found to have a credible fear of persecution or torture by an asylum officer. See Questions & Answers: Credible Fear Screenings for more information on the credible fear process.

Immigration judges hear defensive asylum cases in adversarial (courtroom-like) proceedings. The judge will hear arguments from both of the following parties:

- You (and your attorney, if represented)

10/18/24, 9:06 AM
Obtaining Asylum in the United States | USCIS
Case 6:22-cv-01130-DCJ-CBW   Document 218-17   Filed 01/29/24   Page 194 of 503 PageID #: 12468

- The U.S. government, which is represented by an attorney from U.S. Immigration and Customs Enforcement (ICE)

The immigration judge then decides whether you are eligible for asylum. If the immigration judge finds you eligible, they will grant asylum. If the immigration judge finds you ineligible for asylum, they will determine whether you are eligible for any other forms of relief from removal. If the immigration judge finds you ineligible for other forms of relief, they will order you to be removed from the United States. Either party can appeal the immigration judge's decision.

See the [Granted a Green Card by an Immigration Judge or Board of Immigration Appeals](#) page for information about the grant of asylum by an immigration judge.

For information about the Executive Office for Immigration Review, including the Immigration Courts and the Board of Immigration Appeals, see [Executive Office for Immigration Review](#). To determine where to file your Form I-589, follow the instructions under the "Where to File" section on our [Form I-589](#) page.

---

## Key Differences Between "Affirmative" and "Defensive" Asylum Process 

### Key Differences Between "Affirmative" and "Defensive" Asylum Process

| Affirmative | Defensive |
|---|---|
| Individual has not been placed in removal proceedings before an immigration judge. | Individual has been placed in removal proceedings before an immigration judge. |
| Individual affirmatively submits Form I-589 to USCIS. | Individual:<br><br>- Is placed in removal proceedings by an asylum officer;<br>- Is placed in removal proceedings for immigration violations; or<br>- Tried to enter the United States without proper documents and was found to have a credible fear of persecution or torture.<br><br>If the individual was referred by USCIS, the asylum application already filed will carry over to the immigration judge. If the individual did not yet submit an asylum application, they will submit it to the immigration judge. |

| Affirmative | Defensive |
|---|---|
| Individual appears before a USCIS asylum officer for a non-adversarial interview | Individual appears before an immigration judge with the Executive Office for Immigration Review for an adversarial, court-like hearing. |
| Individual must provide a qualified interpreter for the asylum interview. | The immigration court provides a qualified interpreter for the asylum hearing and all other court proceedings. |

## Related Links ⌄

 Close All     Open All

Last Reviewed/Updated: 09/16/2021

**Annual Flow Report**

SEPTEMBER 2020

# Refugees and Asylees: 2019

**RYAN BAUGH**

The United States provides protection to certain persons who have been persecuted or have a well-founded fear of persecution through two programs: a refugee program for persons outside the United States and their eligible relatives, and an asylum program for persons physically present or arriving in the United States and their eligible relatives.[1] The 2019 *Refugee and Asylees Annual Flow Report*, authored by the Office of Immigration Statistics (OIS) in the Department of Homeland Security (DHS), presents information on persons admitted to the United States as refugees, those who applied for asylum in the United States, and those granted asylum in the United States in Fiscal Year (FY) 2019.[2,3]

A total of 29,916 persons were admitted to the United States as refugees during 2019.[4] The leading countries of nationality for refugees admitted during this period were the Democratic Republic of the Congo (Congo), Burma, and Ukraine. An additional 46,508 individuals were granted asylum during 2019,[5] including 27,643 individuals who were granted asylum affirmatively by DHS,[6] and 18,865 individuals who were granted asylum defensively by the U.S. Department of Justice (DOJ). The leading countries of nationality for persons granted either affirmative or defensive asylum were the People's Republic of China (China), Venezuela, and El Salvador. Approximately 3,300 additional individuals received derivative asylum status while residing in the United States, and approximately 6,300 additional individuals were approved for derivative asylum abroad and were issued travel documents that allow their travel to the United States.

## DEFINING "REFUGEE" AND "ASYLUM" STATUS

To be eligible for refugee or asylum status, a principal applicant must meet the definition of a refugee set forth in section 101(a)(42) of the Immigration and Nationality Act (INA), which states in part that a refugee is a person who is unable or unwilling to return to his or her country of nationality because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.[7] Applicants for refugee status are outside the United States, whereas applicants seeking asylum are either within the United States or arriving at a U.S. port of entry (POE).

To meet the INA's refugee definition, a person generally must be outside their country of nationality, unless the person has no nationality or is considered "stateless," in which case they must be outside of the country in which they "last habitually resided."[8]

The INA provides the President with the authority to designate countries whose nationals may be processed for refugee status within their respective countries (referred to as 'in-country processing'). In 2019, certain nationals of Eurasia and the Baltics were redesignated for in-country processing, as were qualified Iraqis with ties to the United States. In-country processing is also authorized for extraordinary individual protection cases for which resettlement consideration is requested by a U.S. Ambassador in any location.

---

[1] Additionally, U.S. law bars removing individuals to a country where their "life or freedom would be threatened... because of the alien's race, religion, nationality, memebership in a particular social group or political opinion." INA § 231(b)(3); 8 U.S.C. 1231(b)(3).

[2] In this report, a year refers to a fiscal year (October 1 to September 30).

[3] The 2019 Yearbook of Immigration Statistics and other OIS reports contain additional context. Not all numbers reported are contained in this report's tables.

[4] Refugee data in this report may differ slightly from numbers reported by the Department of State (DOS). DOS refugee numbers include Amerasians (children born in Cambodia, Korea, Laos, Thailand, or Vietnam after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen), whereas DHS reports Amerasians as lawful permanent residents.

[5] These asylum grants were based upon a principal asylum applicant's application, which may also include an accompanying spouse and unmarried children under 21 years of age. They do not include individuals who were approved for follow-to-join asylum status while residing in the United States or abroad.

[6] Affirmative asylum data for fiscal year 2019 were retrieved by OIS in February 2020. Data in this report may differ slightly from fiscal year-end 2019 numbers retrieved and reported at different times by DHS's U.S. Citizenship and Immigration Services (USCIS) Asylum Division.

[7] Congress expanded this definition in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, providing that persons who have been forced to abort a pregnancy or undergo involuntary sterilization or who have been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program shall be deemed to have been persecuted on account of political opinion.

[8] INA § 101(a)(42), 8 U.S.C. § 1101(a)(42).



**Office of Immigration Statistics**

OFFICE OF STRATEGY, POLICY, AND PLANS

## REFUGEES

### History of U.S. Refugee Resettlement

The United States has a long history of refugee resettlement. The Displaced Persons Act of 1948 was passed to address the migration crisis in Europe resulting from World War II, wherein millions of people had been forcibly displaced from their home countries and could not return. By 1952, the United States had admitted over 400,000 displaced people under the Act. The United States extended its commitments to refugee resettlement through legislation including the Refugee Relief Act of 1953 and the Fair Share Refugee Act of 1960. The United States also used the Attorney General's parole authority to bring large groups of persons into the country for humanitarian reasons, including over 38,000 Hungarian nationals beginning in 1956 and over a million Indochinese beginning in 1975.

Obligations of the United States under the 1967 United Nations Protocol relating to the Status of Refugees (to which the United States acceded in 1968) generally prohibit the United States from returning a refugee to a country where their life or freedom would be threatened on account of a protected ground. The Refugee Act of 1980 amended the INA to bring U.S. law into greater accord with U.S. obligations under the Protocol, which specifies a geographically and politically neutral refugee definition. The Act also established formal refugee and asylum programs.

**Table 1.**

**Proposed and Actual Refugee Admissions by Regions: Fiscal Years 2017 to 2019**

| Region | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Ceiling | Admissions | Ceiling | Admissions | Ceiling | Admissions |
| Total. . . . . . . . . . . . . . . | 110,000 | 53,691 | 45,000 | 22,405 | 30,000 | 29,916 |
| Africa . . . . . . . . . . . . . . | 35,000 | 20,232 | 19,000 | 10,459 | 11,000 | 16,366 |
| East Asia . . . . . . . . . . . . | 12,000 | 5,148 | 5,000 | 3,582 | 4,000 | 4,946 |
| Europe/Central Asia . . . . . | 4,000 | 5,205 | 2,000 | 3,612 | 3,000 | 4,994 |
| Latin America/Caribbean . . | 5,000 | 1,688 | 1,500 | 955 | 3,000 | 809 |
| Near East/South Asia . . . . | 40,000 | 21,418 | 17,500 | 3,797 | 9,000 | 2,801 |
| Unallocated Reserve . . . . . | 14,000 | - | - | - | - | - |

- Represents zero.
Note: Ceiling  and admission numbers reflect revisions made each fiscal year.
Source: U.S. Department of State.

### Refugee Admissions Ceiling

Under the INA, the President establishes an overall refugee admissions ceiling and regional allocations before the beginning of each fiscal year following "appropriate consultation" with Congress.[9] In 2019, the refugee ceiling was set at 30,000—its lowest level since the inception of the program in 1980.

The largest regional allocation in 2019 was for Africa with 11,000, followed by the Near East/South Asia with 9,000 (Table 1).

### Refugee Eligibility Requirements

To qualify for refugee status, a principal applicant must: (1) be of special humanitarian concern to the United States; (2) meet the refugee definition as set forth in section 101(a)(42) of the INA; (3) be admissible under the INA (or be granted a waiver of inadmissibility); (4) not be firmly resettled in any foreign country; and (5) merit a favorable exercise of discretion. Derivative refugees need not meet all these eligibility requirements, but they must be admissible to the United States and demonstrate a relationship as the spouse or child of a principal refugee applicant or an admitted refugee. Any person who has ordered, incited, assisted, or otherwise participated in the persecution of another on account of race, religion, nationality, membership in a particular social group, or political opinion is ineligible for refugee status, including as a derivative refugee.

### Refugee Application Process

The U.S. Refugee Admissions Program (USRAP) establishes processing priorities that identify individuals and groups who are of special humanitarian concern to the United States and who are eligible for refugee resettlement consideration. The priority categories are Priority 1 (P-1)—individuals referred by the United Nations High Commission on Refugees (UNHCR), a U.S. Embassy, or certain non-governmental organizations (NGOs); Priority 2 (P-2)—groups of special humanitarian concern; and Priority 3 (P-3)—family reunification cases. Once principal refugee applicants are referred or granted access to USRAP under any of these priorities, they still must meet all other eligibility criteria. Upon referral, a Resettlement Support Center, working under a cooperative agreement with DOS, conducts pre-screening interviews with the applicants. A USCIS officer then interviews applicants and accompanying derivatives to determine eligibility for resettlement in the United States. Multiple security checks must be completed before an application for refugee classification is approved. Additionally, applicants must also undergo a medical exam.

Individuals who are approved for refugee classification are assigned to a resettlement agency (sponsor) that assists with housing, employment, and other services upon arrival. The International Organization for Migration (IOM) makes arrangements for the refugee's travel to the United States. After arrival, refugees are authorized to work and may request documentation to travel outside the United States.

---

[9]  In many cases, an unallocated reserve is also designated which can be used in any region if the need arises and only after notification to Congress.



**Figure 1.**

**Refugee Admissions and Proposed Ceilings to the United States: Fiscal Years 1990 to 2019**

Source: U.S. Department of State.

## DATA

All refugee data presented in this report are from the Worldwide Refugee Admissions Processing System (WRAPS) of the Bureau of Population, Refugees, and Migration of DOS.

## TRENDS AND CHARACTERISTICS OF REFUGEES

Since the inception of the program in 1980, the United States has accepted more than 3.7 million refugees and asylees. In 2019, the United States admitted 29,916 refugees, a 34 percent increase from the 22,405 refugees admitted in the previous year. At a high level, the trend in refugee admissions has gone through three periods since reaching its peak under the current legal framework at 122,066 in 1990 (Figure 1). Admissions generally declined during the 1990s, as the refugee program's focus shifted to more diverse populations across the world. Admissions reached a low point in 2002, due in part to security procedures and changes to admission requirements after September 11, 2001. Refugee admissions reached a post-2001 peak of 84,988 in 2016 under the Obama administration, the highest number in 17 years. More recently, the Trump administration reduced the refugee ceiling and implemented new refugee vetting and screening procedures, contributing to a decrease in admission since 2017 (Figure 1).

The spouse and unmarried children under the age of 21 of a principal refugee may obtain refugee status as an accompanying derivative.[10] Accompanying derivatives may enter the United States with the principal refugee or within 4 months after the principal refugee's admission.[11] A spouse or child who joins the principal refugee more than 4 months after admission to the United States is a follow-to-join derivative. Principal refugees may petition for follow-to-join benefits for their qualifying derivatives up to 2 years after the principal was granted refugee status; the principal and the derivative relative's relationship must have existed at the time of the principal's admission into the United States. Principal refugees must file Form I-730, *Refugee/Asylee Relative Petition*,[12] for each qualifying follow-to-join derivative family member, who may be located abroad or in the United States. These beneficiaries are not required to demonstrate an independent refugee claim. Once a principal's I-730 has been approved for an individual located abroad, there are no time constraints placed upon that derivative relative's travel to the United States, provided that (1) the principal's status has not been revoked; (2) the relationship of the derivative to the principal is unchanged; and (3) in the case of a child, the child remains unmarried.

**Table 2.**

**Refugee Arrivals by Relationship to Principal Applicant and Case Priority: Fiscal Years 2017 to 2019**

| Category of admission and case priority | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **RELATIONSHIP TO PRINCIPAL APPLICANT** | | | | | | |
| Total. . . . . . . . . . . . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| Principal Applicant. . . . . . . . . | 21,272 | 39.6 | 8,863 | 39.6 | 12,291 | 41.1 |
| Dependents . . . . . . . . . . . . . | 32,419 | 60.4 | 13,542 | 60.4 | 17,625 | 58.9 |
| Spouse . . . . . . . . . . . . . . | 7,507 | 14.0 | 2,842 | 12.7 | 3,262 | 10.9 |
| Child . . . . . . . . . . . . . . . | 24,678 | 46.0 | 10,563 | 47.1 | 14,211 | 47.5 |
| Siblings, parents, and other . . | 234 | 0.4 | 137 | 0.6 | 152 | 0.5 |
| **CASE PRIORITY** | | | | | | |
| Total. . . . . . . . . . . . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| Priority 1. . . . . . . . . . . . . . | 33,291 | 62.0 | 12,001 | 53.6 | 16,744 | 56.0 |
| Priority 2. . . . . . . . . . . . . . | 18,477 | 34.4 | 9,592 | 42.8 | 12,393 | 41.4 |
| Priority 3. . . . . . . . . . . . . . | 244 | 0.5 | 95 | 0.4 | 224 | 0.7 |
| Follow-to-join beneficiaries . . . . | 1,679 | 3.1 | 717 | 3.2 | 555 | 1.9 |

Note: Numbers in the Principal Applicant category previously included siblings, parents, and other dependents, who are now reported as Dependents.
Source: U.S. Department of State.

---

[10] Children may include those age 21 or over who are covered by provisions in the Child Status Protection Act, Pub. L. No. 107-208 (Aug. 6, 2002). A derivative child must remain unmarried until the time of admission to qualify.

[11] In practice, the vast majority of accompanying derivative refugees enter the United States with the principal refugee.

[12] The petition is used to file for relatives of refugees and asylees. The USRAP program handles only *refugee* follow-to-join petitions, which are counted within the annual refugee ceiling. Asylum follow-to-join petitions are processed by USCIS and are not counted in the annual admission ceilings.

## Category of Admission

In 2019, the majority of refugees were admitted under P-1 processing (56 percent)—individuals referred by the UNHCR, a U.S. Embassy, or certain NGOs—and P-2 processing (41 percent)—groups of special humanitarian concern (Table 2). P-3 processing (family reunification cases) constituted 0.7 percent of refugees admitted, and follow-to-join refugee beneficiaries made up 1.9 percent of refugees admitted. Principal refugees accounted for 12,291 (41 percent) of the 29,916 refugees admitted to the United States in 2019, while accompanying spouses and dependent children represented 11 and 48 percent, respectively.[13] Two percent of admissions (555 refugees) were follow-to-join beneficiaries.

## Country of Nationality

In 2019, the leading countries of nationality for individuals admitted as refugees were Congo (43 percent), Burma (16 percent), Ukraine (15 percent), Eritrea (5.9 percent), and Afghanistan (4.0 percent) (Table 3). These top five countries made up 85 percent of total refugee admissions in 2019, up from 41 percent in 2017 and 72 percent in 2018.

Since the inception of the refugee program, the nationalities of refugees admitted to the United States have changed as U.S. policies evolved and new conflicts around the world arose. Since 2000 (the earliest year for which we have microdata), the United States has admitted just over 1.1 million refugees from around the world. Sixteen percent (178,663) have been from Burma, 13 percent (148,248) from Iraq, and 10 percent (114,949) from Somalia (Figure 2).

## Age, Sex, and Marital Status

More than three-quarters of refugees admitted to the United States in 2019 were under 35 years of age, and three out of seven were children under 18 years old (Table 4). Refugees tend to be relatively younger than the native-born population, with a median age of 21 years for those arriving in 2019, compared to a median age of 36 years for the native-born population.[14] Refugee median age varies widely by region and country of birth: refugees from Africa had the lowest median age of 18 years, while those from the Near East/South Asia had the highest median age of 26. Roughly an equal number of male and female refugees were admitted in 2019, and 26 percent of adults were married at arrival, compared to 31 percent in 2018.

## State of Initial Resettlement

In 2019, more than half of admitted refugees (53 percent) were resettled in the top ten resettling states (Table 5). Texas, Washington, and New York resettled the most refugees (8.1, 6.5, and 6.2 percent of admitted refugees, respectively), and Kentucky, Idaho, and Washington resettled the most refugees per capita, each resettling between 26 and 32 refugees per 100,000 population (Figure 3). Majorities of refugees resettling in Kentucky and Idaho were from Congo (74 percent each), while the majority of those settling in Washington were from Ukraine (71 percent).

## Lawful Permanent Residence and Naturalization of Refugees

One year after being admitted to the United States, refugees are statutorily required to apply for lawful permanent resident (LPR) status. Of those arriving as refugees between 2000 and 2017, 96 percent gained LPR status by the end of 2019.[15] Refugees granted LPR status may apply for naturalization 5 years

**Table 3.**

**Refugee Arrivals by Country of Nationality: Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country of nationality | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| Congo, Democratic Republic. . . . . . . | 9,377 | 17.5 | 7,878 | 35.2 | 12,958 | 43.3 |
| Burma . . . . . . . . . . . . . . . . . . . . . . | 5,078 | 9.5 | 3,555 | 15.9 | 4,932 | 16.5 |
| Ukraine . . . . . . . . . . . . . . . . . . . . . | 4,264 | 7.9 | 2,635 | 11.8 | 4,451 | 14.9 |
| Eritrea . . . . . . . . . . . . . . . . . . . . . | 1,917 | 3.6 | 1,269 | 5.7 | 1,757 | 5.9 |
| Afghanistan . . . . . . . . . . . . . . . . . | 1,311 | 2.4 | 805 | 3.6 | 1,198 | 4.0 |
| Syria . . . . . . . . . . . . . . . . . . . . . . | 6,557 | 12.2 | 62 | 0.3 | 563 | 1.9 |
| Iraq . . . . . . . . . . . . . . . . . . . . . . | 6,886 | 12.8 | 140 | 0.6 | 465 | 1.6 |
| Sudan . . . . . . . . . . . . . . . . . . . . . | 980 | 1.8 | 76 | 0.3 | 382 | 1.3 |
| El Salvador . . . . . . . . . . . . . . . . . . | 1,124 | 2.1 | 725 | 3.2 | 311 | 1.0 |
| Colombia . . . . . . . . . . . . . . . . . . . | 233 | 0.4 | 128 | 0.6 | 298 | 1.0 |
| All other countries, including unknown. | 15,964 | 29.7 | 5,132 | 22.9 | 2,601 | 8.7 |

Source: U.S. Department of State.



**Figure 2.**

**Refugee Arrivals by Top Country of Nationality: Fiscal Years 2000 to 2019**

Source: U.S. Department of State.

---

[13] Numbers in the Principal Applicant category previously included siblings, parents, and other dependents, who are now reported as Dependents. In addition, a small number of follow-to-join children are listed as principle applicants rather than children in WRAPS, and are therefore counted as principle applicants in OIS data.
[14] Calculated from the 2019 March Current Population Survey as downloaded from IPUMS-CPS, University of Minnesota, www.ipums.org.
[15] Although the majority of refugees apply for LPR status 1 year after admission, due to operational and other factors, processing time can vary widely for those who apply.

**Table 4.**

**Refugee Arrivals by Age, Sex, and Marital Status: Fiscal Years 2017 to 2019**

| Characteristic | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total. . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| 0 to 17 years . . | 22,884 | 42.6 | 9,722 | 43.4 | 12,909 | 43.2 |
| 18 to 24 years . . | 7,874 | 14.7 | 3,465 | 15.5 | 4,315 | 14.4 |
| 25 to 34 years . | 9,570 | 17.8 | 3,862 | 17.2 | 5,819 | 19.5 |
| 35 to 44 years . | 6,290 | 11.7 | 2,491 | 11.1 | 3,277 | 11.0 |
| 45 to 54 years . | 3,663 | 6.8 | 1,493 | 6.7 | 1,726 | 5.8 |
| 55 to 64 years . | 2,058 | 3.8 | 781 | 3.5 | 1,138 | 3.8 |
| 65 years and over . . . . . | 1,352 | 2.5 | 591 | 2.6 | 732 | 2.4 |
| **SEX** | | | | | | |
| Total. . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| Female. . . . . . . | 26,979 | 50.2 | 11,099 | 49.5 | 14,651 | 49.0 |
| Male  . . . . . . . . | 26,712 | 49.8 | 11,306 | 50.5 | 15,265 | 51.0 |
| **MARITAL STATUS** | | | | | | |
| Total. . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| Married[1] . . . . . . | 17,525 | 32.6 | 6,891 | 30.8 | 7,770 | 26.0 |
| Single[2] . . . . . . . | 33,241 | 61.9 | 14,405 | 64.3 | 20,828 | 69.6 |
| Other[3]  . . . . . . . | 2,925 | 5.4 | 1,109 | 4.9 | 1,318 | 4.4 |

[1] Includes persons in common law marriage.
[2] Includes persons who were engaged and not yet married.
[3] Includes persons who were divorced, separated, widowed, or of unknown marital status.
Source: U.S. Department of State.

**Table 5.**

**Refugee Arrivals by State of Residence: Fiscal Years 2017 to 2019**
(Ranked by 2019 state of residence)

| State of residence | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . | 53,691 | 100.0 | 22,405 | 100.0 | 29,916 | 100.0 |
| Texas . . . . . . . . | 4,765 | 8.9 | 1,669 | 7.4 | 2,433 | 8.1 |
| Washington. . . . | 2,920 | 5.4 | 1,537 | 6.9 | 1,945 | 6.5 |
| New York  . . . . . | 3,098 | 5.8 | 1,281 | 5.7 | 1,845 | 6.2 |
| California . . . . . | 5,160 | 9.6 | 1,362 | 6.1 | 1,841 | 6.2 |
| Ohio. . . . . . . . . | 2,867 | 5.3 | 1,408 | 6.3 | 1,426 | 4.8 |
| Kentucky. . . . . . | 1,618 | 3.0 | 896 | 4.0 | 1,421 | 4.7 |
| North Carolina. . | 1,916 | 3.6 | 934 | 4.2 | 1,255 | 4.2 |
| Arizona . . . . . . . | 2,249 | 4.2 | 998 | 4.5 | 1,216 | 4.1 |
| Georgia  . . . . . . | 1,869 | 3.5 | 833 | 3.7 | 1,182 | 4.0 |
| Michigan. . . . . . | 2,536 | 4.7 | 651 | 2.9 | 1,146 | 3.8 |
| Other . . . . . . . . | 24,693 | 46.0 | 10,836 | 48.4 | 14,206 | 47.5 |

Source: U.S. Department of State.

## ASYLEES

### Filing of Claims

Generally, any foreign national physically present in the United States or arriving at a POE may seek asylum regardless of immigration status. Those seeking asylum must apply within 1 year from the date of last arrival or establish that an exception applies based on changed or extraordinary circumstances.[18] Principal applicants obtain asylum in one of two ways: affirmatively through a USCIS asylum officer or defensively in removal proceedings before an immigration judge of DOJ's Executive Office for Immigration Review (EOIR). An individual applies for asylum by filing Form I-589, *Application for Asylum and for Withholding of Removal*.

Spouses and unmarried children under the age of 21[19] who are listed on the principal's asylum application but not included in the principal's grant of asylum may obtain derivative asylum status. A principal asylee may petition for follow-to-join benefits for qualifying derivatives up to 2 years after he or she was granted asylum, as long as the relationship between the principal and their spouse and/or child existed on the date the principal was granted asylum.[20]



**Figure 3.**

**Per Capita Refugee Resettlement by State of Residence: Fiscal Year 2019**

per 100,000 of State Population (# of States)
- 0 – 5 (15)
- 6 – 10 (14)
- 11 – 15 (13)
- 16 – 32 (9)

Source: U.S. Department of State and U.S. Census Bureau.

after their admission as refugees. Refugees have some of the highest naturalization rates of all immigrants: of the approximately 600,000 adults who obtained LPR status from 2000 to 2013 based on prior admission as a refugee, 49 percent naturalized within 5 years and 57 percent did so within 6 years.[16]

In comparison, the 10.8 million non-refugee adult immigrants who obtained LPR status from 2000 to 2013 had 5- and 6-year naturalization rates of 12 and 29 percent, respectively.[17]

[16] The data were restricted to immigrants who were 18 years of age and older when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.
[17] For more discussion of refugee naturalization see Mossaad N., Ferwerda J., Lawrence D., Weinstein J. M., Determinants of refugee naturalization in the United States. Proceedings of the National Academy of Sciences U.S.A. 115, 9175–9180 (2018).
[18] Unaccompanied alien children are not subject to the 1-year filing requirement. INA § 208(a)(2)(E); 8 U.S.C. 1158(a)(2)(E).
[19] See reference to Child Status Protection Act, n. 11, *supra*.
[20] In practice, the vast majority of derivative asylum status beneficiaries receive follow-to-join benefits.

DHS and DOJ published a regulation on July 16, 2019 to add a new bar to eligibility for asylum for an alien who enters or attempts to enter the United States across the Southern Border, but who transited through a third country en route to the United States and did not apply for protection there. A total of 25,096 aliens were subject to the bar between July 16 and September 30, 2019, including 398 who were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of February 24, 2020, another 10,468 individuals subject to the asylum bar had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture. In addition, the United States signed Asylum Cooperative Agreements (ACAs) in 2019 with Guatemala, Honduras, and El Salvador. These agreements are intended to ensure migrants in need of protection have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection within the region, many times closer to their home countries. In general, ACAs allow DHS to transfer asylum claimants to a country other than the country of the alien's nationality, to one of these three countries to seek protection there. None of the ACAs, however, went into effect during FY 2019, so they are not covered in this report.

The principal asylee must file an I-730 for each qualifying family member, who may be located abroad or in the United States. Once an I-730 is approved for an individual located abroad, there are no time constraints placed upon the derivative relative's travel to the United States, as long as (1) the principal's status has not been revoked; (2) the relationship of the derivative to the principal is unchanged; and, (3) in the case of a child, the child remains unmarried.

### Adjudication of Claims

The USCIS Asylum Division adjudicates claims and may grant asylum directly through the affirmative asylum process. Asylum officers conduct interviews to determine asylum eligibility using an applicant's testimony, information on Form I-589, and any accompanying evidence provided by the applicant. The asylum applicant must meet the definition of a refugee, be credible considering the totality of the circumstances and all relevant factors, and not be barred from obtaining asylum. If the officer finds that the applicant satisfies the eligibility requirements, then the officer determines whether the application warrants a grant of asylum as a matter of discretion. Individuals may be barred for previously committing certain crimes, posing a national security threat, engaging in the persecution of others, or firmly resettling in another country before coming to the United States.

If applicants with a valid immigration status (e.g., a foreign student) fail to establish eligibility for asylum, USCIS denies the application, and the applicant remains in his or her valid status. If applicants are not in a valid status and are found ineligible for asylum, USCIS places these applicants in removal proceedings before an EOIR immigration judge, where the application is considered anew.

Individuals who have not previously filed for asylum may apply defensively after being placed in removal proceedings by immigration enforcement officials because they are illegally present, are in violation of their status, or were apprehended while attempting to illegally enter into the United States. Defensive applicants apply for asylum directly with EOIR. During the proceedings, an immigration judge may grant asylum or deny the asylum application and issue a removal order if the alien does not qualify for any other forms of relief. Defensive and affirmative applicants may appeal an EOIR denial to the Board of Immigration Appeals and, if unsuccessful there, may seek further review by a U.S. Court of Appeals, and finally the U.S. Supreme Court.

Follow-to-join asylum beneficiaries are not required to demonstrate a persecution claim because their status is derived from the principal asylee. Beneficiaries in the United States at the time of application are granted derivative asylum immediately upon the approval of their I-730 petitions. Beneficiaries abroad at the time of application are granted derivative asylum when admitted into the United States at a POE.

**Table 6a.**

**Affirmative Asylum Cases Filed (USCIS) by Country of Nationality: Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . . . | 139,917 | 100.0 | 106,128 | 100.0 | 96,952 | 100.0 |
| Venezuela . . . . . . . . . . . . . . . . . . . | 27,576 | 19.7 | 28,426 | 26.8 | 25,210 | 26.0 |
| Guatemala . . . . . . . . . . . . . . . . . . . | 12,185 | 8.7 | 10,192 | 9.6 | 9,684 | 10.0 |
| China, People's Republic . . . . . . . . . . | 16,810 | 12.0 | 8,181 | 7.7 | 9,640 | 9.9 |
| El Salvador . . . . . . . . . . . . . . . . . . . | 11,941 | 8.5 | 9,140 | 8.6 | 5,951 | 6.1 |
| Honduras . . . . . . . . . . . . . . . . . . . . | 7,005 | 5.0 | 6,143 | 5.8 | 5,609 | 5.8 |
| Mexico . . . . . . . . . . . . . . . . . . . . . . | 11,931 | 8.5 | 6,618 | 6.2 | 4,588 | 4.7 |
| Haiti . . . . . . . . . . . . . . . . . . . . . . . . | 3,872 | 2.8 | 2,958 | 2.8 | 3,278 | 3.4 |
| India . . . . . . . . . . . . . . . . . . . . . . . . | 4,039 | 2.9 | 2,909 | 2.7 | 2,957 | 3.0 |
| Colombia . . . . . . . . . . . . . . . . . . . . | 2,659 | 1.9 | 2,571 | 2.4 | 2,897 | 3.0 |
| Nigeria . . . . . . . . . . . . . . . . . . . . . . | 2,238 | 1.6 | 3,325 | 3.1 | 2,760 | 2.8 |
| All other countries, including unknown. . | 39,661 | 28.3 | 25,665 | 24.2 | 24,378 | 25.1 |

Source: U.S. Department of Homeland Security.

## Lawful Permanent Residence and Citizenship

One year after being granted asylum, asylees are eligible to apply for LPR status along with qualifying family members who meet the eligibility criteria. Asylees may apply for naturalization 5 years after their final grant of asylum, provided they applied for and were granted LPR status.[21]

## DATA

The affirmative asylee data presented in this report were obtained from Global, a cloud-based platform of USCIS that has replaced the Refugees, Asylum, and Parole System (RAPS) Mainframe system for storing affirmative asylee data.[22]

Defensive asylee data were obtained from EOIR. Follow-to-join asylum derivative data for people residing outside the United States at the time of their admission were obtained from the Case and Activity Management for International Operations (CAMINO) system of USCIS and the Consular Consolidated Database (CCD) of DOS. These data reflect travel documents issued, not admissions. Follow-to-join data for people residing within the United States at the time of the approval of their I-730 petition were obtained from the USCIS Computer-Linked Application Information Management System (CLAIMS).

### TRENDS AND CHARACTERISTICS OF ASYLEES

#### Asylum Filings

Affirmative asylum filings with USCIS decreased by 8.6 percent from 106,128 applications in 2018 to 96,952 in 2019.[23] Venezuelan applications made up 26 percent of total applications in 2019, despite dropping 11 percent from 2018, and Guatemalan applications made up 10 percent of total applications in 2019, despite dropping 5.0 percent from 2018. Applications from Chinese nationals increased 18 percent from 2018 to reach 9.9 percent of total applications in 2019, becoming the third highest nationality and surpassing El Salvadoran applications which simultaneously saw a 35 percent decrease. The next-highest numbers of applications in 2019 came from Honduran and Mexican nationals, despite decreases from 2018 of 8.7 percent and 31 percent, respectively (Table 6a). Unaccompanied children from Central America's Northern Triangle countries (El Salvador, Guatemala, and Honduras) accounted for 92 percent of all unaccompanied child asylum applications in 2019 and made up the majority (52 percent) of affirmative asylum applications from these three countries.

**Table 6b.**

**Defensive Asylum Cases Received (EOIR) by Country of Nationality: Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . | 144,662 | 100.0 | 163,271 | 100.0 | 210,752 | 100.0 |
| Guatemala . . . . . . . . . . . . . . . . . . . | 23,935 | 16.5 | 26,965 | 16.5 | 41,365 | 19.6 |
| Honduras . . . . . . . . . . . . . . . . . . . | 21,269 | 14.7 | 22,014 | 13.5 | 31,649 | 15.0 |
| Mexico . . . . . . . . . . . . . . . . . . . . | 22,473 | 15.5 | 24,752 | 15.2 | 30,357 | 14.4 |
| El Salvador . . . . . . . . . . . . . . . . . . | 38,029 | 26.3 | 32,233 | 19.7 | 29,779 | 14.1 |
| Venezuela. . . . . . . . . . . . . . . . . . . . | 418 | 0.3 | 5,246 | 3.2 | 11,623 | 5.5 |
| India . . . . . . . . . . . . . . . . . . . . . | 4,729 | 3.3 | 7,831 | 4.8 | 11,019 | 5.2 |
| China, People's Republic . . . . . . . . . | 6,309 | 4.4 | 8,091 | 5.0 | 6,838 | 3.2 |
| Cuba . . . . . . . . . . . . . . . . . . . . . | 584 | 0.4 | 1,154 | 0.7 | 5,491 | 2.6 |
| Ecuador . . . . . . . . . . . . . . . . . . . | 4,000 | 2.8 | 4,019 | 2.5 | 4,431 | 2.1 |
| Nicaragua. . . . . . . . . . . . . . . . . . . | 611 | 0.4 | 736 | 0.5 | 3,857 | 1.8 |
| All other countries, including unknown . | 22,305 | 15.4 | 30,230 | 18.5 | 34,343 | 16.3 |

Source: U.S. Department of Justice.



**Figure 4.**

**Annual Grants of Affirmative and Defensive Asylum: Fiscal Years 1990 to 2019**

Note: Data exclude follow-to-join asylees.
Source: U.S. Department of Homeland Security and U.S. Department of Justice.

---

[21] Asylees may count a maximum of 1 year of their time in asylum status toward the required 5 years of permanent residence for naturalization eligibility purposes.
[22] The migration from RAPS to Global caused slight changes in historical numbers.
[23] These include principal applicants only. There were an additional 51,746 dependents.

**Table 7.**

**Individuals Granted Asylum Affirmatively or Defensively by Country of Nationality:**
**Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . | 26,199 | 100.0 | 37,567 | 100.0 | 46,508 | 100.0 |
| China, People's Republic . . . . . . . . . | 5,550 | 21.2 | 6,794 | 18.1 | 7,478 | 16.1 |
| Venezuela. . . . . . . . . . . . . . . . . . . | 550 | 2.1 | 5,849 | 15.6 | 6,821 | 14.7 |
| El Salvador . . . . . . . . . . . . . . . . . . | 3,453 | 13.2 | 2,919 | 7.8 | 3,212 | 6.9 |
| Guatemala . . . . . . . . . . . . . . . . . . | 2,948 | 11.3 | 2,322 | 6.2 | 2,591 | 5.6 |
| India . . . . . . . . . . . . . . . . . . . . . . | 671 | 2.6 | 1,301 | 3.5 | 2,259 | 4.9 |
| Egypt . . . . . . . . . . . . . . . . . . . . . . | 1,154 | 4.4 | 1,566 | 4.2 | 2,301 | 4.9 |
| Honduras . . . . . . . . . . . . . . . . . . . | 2,040 | 7.8 | 1,998 | 5.3 | 1,819 | 3.9 |
| Turkey. . . . . . . . . . . . . . . . . . . . . . | 28 | 0.1 | 501 | 1.3 | 1,799 | 3.9 |
| Mexico . . . . . . . . . . . . . . . . . . . . . | 1,028 | 3.9 | 1,344 | 3.6 | 1,593 | 3.4 |
| Russia . . . . . . . . . . . . . . . . . . . . . | 347 | 1.3 | 883 | 2.4 | 1,408 | 3.0 |
| All other countries, including unknown . | 8,430 | 32.2 | 12,090 | 32.2 | 15,227 | 32.7 |

Note: Data exclude follow-to-join asylees.
Source: U.S. Department of Homeland Security and U.S. Department of Justice.

**Table 8.**

**Individuals Granted Asylum Affirmatively by Country of Nationality:**
**Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . | 15,639 | 100.0 | 24,382 | 100.0 | 27,643 | 100.0 |
| Venezuela. . . . . . . . . . . . . . . . . . . | 482 | 3.1 | 5,726 | 23.5 | 6,320 | 22.9 |
| China, People's Republic . . . . . . . . . | 2,822 | 18.0 | 3,747 | 15.4 | 4,027 | 14.6 |
| Egypt . . . . . . . . . . . . . . . . . . . . . . | 1,014 | 6.5 | 1,402 | 5.8 | 2,156 | 7.8 |
| Turkey. . . . . . . . . . . . . . . . . . . . . . | 15 | 0.1 | 475 | 1.9 | 1,739 | 6.3 |
| Russia . . . . . . . . . . . . . . . . . . . . . | 288 | 1.8 | 765 | 3.1 | 1,109 | 4.0 |
| Guatemala . . . . . . . . . . . . . . . . . . | 1,998 | 12.8 | 1,307 | 5.4 | 1,047 | 3.8 |
| El Salvador . . . . . . . . . . . . . . . . . . | 2,112 | 13.5 | 1,148 | 4.7 | 897 | 3.2 |
| Mexico . . . . . . . . . . . . . . . . . . . . . | 477 | 3.1 | 717 | 2.9 | 791 | 2.9 |
| Nigeria . . . . . . . . . . . . . . . . . . . . . | 123 | 0.8 | 461 | 1.9 | 785 | 2.8 |
| Honduras . . . . . . . . . . . . . . . . . . . | 1,085 | 6.9 | 817 | 3.4 | 532 | 1.9 |
| All other countries, including unknown . | 5,223 | 33.4 | 7,817 | 32.1 | 8,240 | 29.8 |

Note: Data exclude follow-to-join asylees.
Source: U.S. Department of Homeland Security.

**Table 9.**

**Individuals Granted Asylum Defensively by Country of Nationality:**
**Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . | 10,560 | 100.0 | 13,185 | 100.0 | 18,865 | 100.0 |
| China, People's Republic . . . . . . . . . | 2,728 | 25.8 | 3,047 | 23.1 | 3,451 | 18.3 |
| El Salvador . . . . . . . . . . . . . . . . . . | 1,341 | 12.7 | 1,771 | 13.4 | 2,315 | 12.3 |
| India . . . . . . . . . . . . . . . . . . . . . . | 457 | 4.3 | 951 | 7.2 | 1,921 | 10.2 |
| Guatemala . . . . . . . . . . . . . . . . . . | 950 | 9.0 | 1,015 | 7.7 | 1,544 | 8.2 |
| Honduras . . . . . . . . . . . . . . . . . . . | 955 | 9.0 | 1,181 | 9.0 | 1,287 | 6.8 |
| Mexico . . . . . . . . . . . . . . . . . . . . . | 551 | 5.2 | 627 | 4.8 | 802 | 4.3 |
| Cuba . . . . . . . . . . . . . . . . . . . . . . | 62 | 0.6 | 161 | 1.2 | 710 | 3.8 |
| Cameroon. . . . . . . . . . . . . . . . . . . | 219 | 2.1 | 312 | 2.4 | 657 | 3.5 |
| Nepal. . . . . . . . . . . . . . . . . . . . . . | 290 | 2.7 | 469 | 3.6 | 603 | 3.2 |
| Venezuela. . . . . . . . . . . . . . . . . . . | 68 | 0.6 | 123 | 0.9 | 501 | 2.7 |
| All other countries, including unknown . | 2,939 | 27.8 | 3,528 | 26.8 | 5,074 | 26.9 |

Note: Data exclude follow-to-join asylees.
Source: U.S. Department of Justice.

The total number of defensive asylum applications filed with EOIR increased for the fifth consecutive year, from 47,137 applications in 2014 to 210,752 in 2019.[24] Similar to last year, the largest numbers of applications lodged with the courts were from citizens of the Northern Triangle countries (102,793) and Mexico (30,357) (Table 6b). These four countries made up 63 percent of defensive asylum applications filed with EOIR.

**Asylum Grants**

The total number of persons granted asylum in the United States increased 24 percent from 37,567 in 2018 to 46,508 in 2019. USCIS granted asylum affirmatively to 27,643 people in 2019, an increase of 13 percent from 2018 and an increase of 77 percent from 2017; and EOIR immigration judges granted defensive asylum to 18,865 people in 2019, an increase of 43 percent from 2018 and an increase of 79 percent from 2017 (Figure 4).

**Country of Nationality**

The three leading countries of nationality of persons granted affirmative or defensive asylum in 2019 were China (16 percent), Venezuela (15 percent), and El Salvador (6.9 percent) (Table 7). Nationals of these countries accounted for 38 percent of all persons granted asylum, down from 41 percent in 2018. Of the top ten countries of nationality, only Honduras went down between 2018 and 2019, and Turkey and India experienced the greatest numerical and proportional increases, with 3.6 and 1.7 times the number of asylum grants as in 2018, respectively. Among the top ten countries of nationality, asylum grants for nationals of Central America's Northern Triangle countries (El Salvador, Guatemala, and Honduras) and India have increasingly come from defensive

[24] EOIR has recently changed its methodology in reporting affirmative asylum cases appealed from USCIS. Instead of using the court application date as they do for defensive asylum cases, EOIR now reports on affirmative cases based on the date of the initial asylum application filing with USCIS. This change may result in a slight difference in historical numbers, and OIS has updated the data reported here and in the Yearbook of Immigration Statistics for 2015-2019.

cases rather than affirmative cases in the last few years, while Venezuelan asylum grants have remained mostly affirmative, and grants to Chinese nationals have remained fairly evenly split between defensive and affirmative.

The leading countries of nationality for persons granted affirmative asylum were Venezuela (23 percent), China (15 percent), Egypt (7.8 percent), and Turkey (6.3 percent) (Table 8). Fifty-two percent of those granted asylum affirmatively in 2019 were nationals of these countries.

The leading countries of nationality for persons granted defensive asylum were China (18 percent), El Salvador (12 percent), India (10 percent), and Guatemala (8.1 percent) (Table 9). Forty-nine percent of those granted asylum defensively in 2019 were nationals of these countries.

The leading countries of nationality for follow-to-join asylees authorized for travel to the United States in 2019 were China (23 percent), India (9.7 percent), Eritrea (8.9 percent), and Guatemala (5.3 percent) (Table 10). Nationals of these four countries accounted for almost half of all follow-to-join derivative relatives issued travel documents prior to their admission into the United States. Additionally, 3,343 individuals were approved for derivative asylum status while residing in the United States.

### Age, Sex, and Marital Status

In 2019, 63 percent of persons granted affirmative asylum were between the ages of 18 and 44 (Table 11). Like refugees, affirmative asylees are younger on average than the native-born U.S. population: the median age of persons granted affirmative asylum in 2019 was 30 years, compared to 36 for the native-born population. Fifty-one percent were male, and 55 percent of adults were married. Just under half (49 percent) of follow-to-join beneficiaries were under the age of 18. The median age of follow-to-join beneficiaries was 18 years (Table 12). Data on marital status are not available for this group.

### State of Residence

In 2019, the leading states of residence for individuals granted asylum affirmatively were California (34 percent), New Jersey (9.3 percent), and Florida (9.1 percent) (Table 13). More than half (52 percent) of individuals granted affirmative asylum in 2019 resided in these three states. Per capita, the leading areas include New Jersey and California, with approximately 29 and 24 recipients per 100,000 residents, respectively.

State of residence data are not available for defensive or follow-to-join asylees.

**Table 10.**

**Follow-to-join Asylee Travel Documents Issued by Country of Nationality: Fiscal Years 2017 to 2019**
(Ranked by 2019 country of nationality)

| Country | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . . . . | 6,915 | 100.0 | 6,076 | 100.0 | 6,270 | 100.0 |
| China, People's Republic . . . . . . . . . | 1,781 | 25.8 | 1,609 | 26.5 | 1,451 | 23.1 |
| India . . . . . . . . . . . . . . . . . . . . . . . | 508 | 7.3 | 521 | 8.6 | 607 | 9.7 |
| Eritrea . . . . . . . . . . . . . . . . . . . . . | 180 | 2.6 | 200 | 3.3 | 560 | 8.9 |
| Guatemala . . . . . . . . . . . . . . . . . . . | 337 | 4.9 | 365 | 6.0 | 331 | 5.3 |
| Nepal . . . . . . . . . . . . . . . . . . . . . . | 524 | 7.6 | 466 | 7.7 | 277 | 4.4 |
| Egypt . . . . . . . . . . . . . . . . . . . . . . | 188 | 2.7 | 133 | 2.2 | 226 | 3.6 |
| Ethiopia . . . . . . . . . . . . . . . . . . . . | 316 | 4.6 | 284 | 4.7 | 191 | 3.0 |
| El Salvador . . . . . . . . . . . . . . . . . . | 276 | 4.0 | 335 | 5.5 | 169 | 2.7 |
| Pakistan . . . . . . . . . . . . . . . . . . . . | 183 | 2.6 | 135 | 2.2 | 142 | 2.3 |
| Syria . . . . . . . . . . . . . . . . . . . . . . | 99 | 1.4 | 89 | 1.5 | 135 | 2.2 |
| Cameroon. . . . . . . . . . . . . . . . . . . . | 267 | 3.9 | 173 | 2.8 | 134 | 2.1 |
| All other countries, including unknown . | 2,256 | 32.6 | 1,766 | 29.1 | 2,047 | 32.6 |

Source: U.S. Department of State and U.S. Department of Homeland Security.

**Table 11.**

**Individuals Granted Asylum Affirmatively by Age, Sex, and Marital Status: Fiscal Years 2017 to 2019**

| Characteristic | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total. . . . . . . . . . . . . . . . . . . . . . . | 15,639 | 100.0 | 24,382 | 100.0 | 27,643 | 100.0 |
| 0 to 17 years . . . . . . . . . . . . . . . . . | 4,905 | 31.4 | 5,704 | 23.4 | 6,119 | 22.1 |
| 18 to 24 years . . . . . . . . . . . . . . . . | 3,041 | 19.4 | 3,892 | 16.0 | 3,832 | 13.9 |
| 25 to 34 years . . . . . . . . . . . . . . . . | 3,381 | 21.6 | 6,351 | 26.0 | 7,073 | 25.6 |
| 35 to 44 years . . . . . . . . . . . . . . . . | 2,611 | 16.7 | 5,180 | 21.2 | 6,384 | 23.1 |
| 45 to 54 years . . . . . . . . . . . . . . . . | 1,192 | 7.6 | 2,291 | 9.4 | 2,920 | 10.6 |
| 55 to 64 years . . . . . . . . . . . . . . . . | 357 | 2.3 | 700 | 2.9 | 1,013 | 3.7 |
| 65 years and over . . . . . . . . . . . . . . | 152 | 1.0 | 264 | 1.1 | 302 | 1.1 |
| **SEX** | | | | | | |
| Total. . . . . . . . . . . . . . . . . . . . . . . | 15,639 | 100.0 | 24,382 | 100.0 | 27,643 | 100.0 |
| Female. . . . . . . . . . . . . . . . . . . . . . | 7,434 | 47.5 | 11,960 | 49.1 | 13,552 | 49.0 |
| Male . . . . . . . . . . . . . . . . . . . . . . . | 8,205 | 52.5 | 12,422 | 50.9 | 14,088 | 51.0 |
| Unknown . . . . . . . . . . . . . . . . . . . . | - | - | | - | 3 | - |
| **MARITAL STATUS** | | | | | | |
| Total. . . . . . . . . . . . . . . . . . . . . . . | 15,639 | 100.0 | 24,382 | 100.0 | 27,643 | 100.0 |
| Married . . . . . . . . . . . . . . . . . . . . . | 5,169 | 33.1 | 9,715 | 39.8 | 11,800 | 42.7 |
| Single. . . . . . . . . . . . . . . . . . . . . . | 9,914 | 63.4 | 13,569 | 55.7 | 14,442 | 52.2 |
| Other* . . . . . . . . . . . . . . . . . . . . . . | 556 | 3.6 | 1,098 | 4.5 | 1,401 | 5.1 |

- Represents zero or rounds to zero.
* Includes persons who were divorced, separated, widowed, or of unknown marital status.
Note: Data exclude follow-to-join asylees.
Source: U.S. Department of Homeland Security.

**Table 12.**

**Follow-to-Join Asylee Travel Documents Issued by Age and Sex:**
**Fiscal Years 2017 to 2019**

| Characteristic | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **AGE** | | | | | | |
| Total. . . . . . . . . . . . . . . . . . . . . . | 6,915 | 100.0 | 6,076 | 100.0 | 6,270 | 100.0 |
| 0 to 17 years . . . . . . . . . . . . . . . . | 3,515 | 50.8 | 3,165 | 52.1 | 3,074 | 49.0 |
| 18 to 24 years . . . . . . . . . . . . . . . | 1,394 | 20.2 | 1,132 | 18.6 | 1,211 | 19.3 |
| 25 to 34 years . . . . . . . . . . . . . . . | 712 | 10.3 | 635 | 10.5 | 646 | 10.3 |
| 35 to 44 years . . . . . . . . . . . . . . . | 711 | 10.3 | 603 | 9.9 | 673 | 10.7 |
| 45 to 54 years . . . . . . . . . . . . . . . | 430 | 6.2 | 395 | 6.5 | 464 | 7.4 |
| 55 to 64 years . . . . . . . . . . . . . . . | 133 | 1.9 | 132 | 2.2 | 171 | 2.7 |
| 65 years and over . . . . . . . . . . . . . | 20 | 0.3 | 14 | 0.2 | 31 | 0.5 |
| **SEX** | | | | | | |
| Total. . . . . . . . . . . . . . . . . . . . . . | 6,915 | 100.0 | 6,076 | 100.0 | 6,270 | 100.0 |
| Female . . . . . . . . . . . . . . . . . . . . . | 3,701 | 53.5 | 3,339 | 55.0 | 3,323 | 53.0 |
| Male . . . . . . . . . . . . . . . . . . . . . . | 3,151 | 45.6 | 2,731 | 44.9 | 2,916 | 46.5 |
| Unknown . . . . . . . . . . . . . . . . . . . | 63 | 0.9 | 6 | 0.1 | 31 | 0.5 |

Source: U.S. Department of State and U.S. Department of Homeland Security.

**Table 13.**

**Individuals Granted Asylum Affirmatively by State of Residence:**
**Fiscal Years 2017 to 2019**
(Ranked by 2019 state of residence)

| State of residence | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . | 15,639 | 100.0 | 24,382 | 100.0 | 27,643 | 100.0 |
| California . . . . . . . . . . . . . . . . . . . . | 7,290 | 46.6 | 8,111 | 33.3 | 9,336 | 33.8 |
| New Jersey . . . . . . . . . . . . . . . . . . . | 764 | 4.9 | 1,342 | 5.5 | 2,568 | 9.3 |
| Florida . . . . . . . . . . . . . . . . . . . . . | 582 | 3.7 | 3,073 | 12.6 | 2,516 | 9.1 |
| New York . . . . . . . . . . . . . . . . . . . | 1,468 | 9.4 | 2,022 | 8.3 | 2,131 | 7.7 |
| Texas . . . . . . . . . . . . . . . . . . . . . . | 595 | 3.8 | 1,582 | 6.5 | 1,802 | 6.5 |
| Illinois . . . . . . . . . . . . . . . . . . . . . | 384 | 2.5 | 890 | 3.7 | 1,468 | 5.3 |
| Pennsylvania. . . . . . . . . . . . . . . . . . | 286 | 1.8 | 573 | 2.4 | 787 | 2.8 |
| Ohio. . . . . . . . . . . . . . . . . . . . . . . | 174 | 1.1 | 243 | 1.0 | 660 | 2.4 |
| Indiana. . . . . . . . . . . . . . . . . . . . . | 91 | 0.6 | 291 | 1.2 | 657 | 2.4 |
| Washington. . . . . . . . . . . . . . . . . . . | 324 | 2.1 | 396 | 1.6 | 484 | 1.8 |
| Other . . . . . . . . . . . . . . . . . . . . . . | 3,681 | 23.5 | 5,859 | 24.0 | 5,234 | 18.9 |

Note: Data exclude follow-to-join asylees.
Source: U.S. Department of Homeland Security.

## Naturalization of Asylees

Ninety percent of those granted affirmative asylum from 2009 to 2017 gained LPR status by the end of 2019. Similar to refugees, asylees have some of the highest naturalization rates of all immigrants. Of the almost 500,000 adults who obtained LPR status from 2000 to 2013 based on the prior grant of asylum (affirmative or defensive), 56 percent naturalized within 6 years.[25]

## FOR MORE INFORMATION

Visit the Office of Immigration Statistics web page at http://www.dhs.gov/immigration-statistics.

---

[25] The data were restricted to individuals who were at least 18 years old when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.



United States Government Accountability Office

Report to the Chairman
Committee on Homeland Security
House of Representatives

**January 2021**

# IMMIGRATION DETENTION

# Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts



A Century of Non-Partisan Fact-Based Work

**GAO-21-149**

# GAO@100
# Highlights

Highlights of GAO-21-149, a report to the Chairman, Committee on Homeland Security, House of Representatives

**January 2021**

# IMMIGRATION DETENTION

## Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts

## Why GAO Did This Study

The Department of Homeland Security's ICE detained approximately 48,500 foreign nationals a day, on average, for 72 hours or more in fiscal year 2019. ICE was appropriated about $3.14 billion in fiscal year 2020 to operate the immigration detention system. ICE has three ways of acquiring detention space—IGSAs with state or local government entities; agreements with Department of Justice U.S. Marshals Service to join an existing contract or agreement (known as a "rider"); or contracts.

This report examines (1) what data show about the characteristics of contracts and agreements; (2) the extent to which ICE developed and implemented processes and a strategic approach to acquire space; and (3) the extent to which ICE has overseen and enforced contracts and agreements. GAO reviewed documentation of acquisition and oversight efforts at facilities used to hold detainees for 72 hours or more; analyzed ICE data for the last 3 fiscal years—2017 through 2019; conducted site visits to new and long-standing detention facilities; and interviewed ICE officials.

## What GAO Recommends

GAO is making five recommendations, including that ICE include stakeholder input and document decision-making for new detention space acquisitions; implement a strategic approach to using guaranteed minimums; and revise its supervisory structure for contract oversight. DHS concurred with four recommendations and disagreed with revising its supervisory structure. GAO believes the recommendation remains valid, as discussed in the report.

View GAO-21-149. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

In fiscal year 2019, U.S. Immigration and Customs Enforcement (ICE) had detention contracts or agreements with 233 facilities, 185 of which it used to hold detainees, as shown below.

**U.S. Immigration and Customs Enforcement (ICE) Detention Space Acquisition Methods, Fiscal Year 2019**

| Acquisition method | Total facilities | Facilities that held detainees | Percentage of average daily population held in facility |
|---|---|---|---|
| Intergovernmental service agreement | 133 | 108 | 59 |
| U.S. Marshals Service rider | 85 | 62 | 17 |
| Federal Acquisition Regulation-based contract | 15 | 15 | 24 |
| **Total** | **233** | **185** | **100** |

Source: GAO analysis of ICE data. | GAO-21-149

ICE primarily uses intergovernmental service agreements (IGSA) to acquire detention space. Officials said IGSAs offer several benefits over contracts, including fewer requirements for documentation or competition.

ICE has a process for obtaining new detention space, but it did not follow this process for most of its recent acquisitions and does not have a strategic approach to using guaranteed minimum payments in its detention contracts and agreements. From fiscal year 2017 through May 11, 2020, ICE entered into 40 contracts and agreements for new detention space. GAO's review of ICE's documentation found that 28 of 40 of these contracts and agreements did not have documentation from ICE field offices showing a need for the space, outreach to local officials, or the basis for ICE's decisions to enter into them, as required by ICE's process. Until ICE consistently uses its process, it will not have reasonable assurance that it is making cost-effective decisions that best meet its operational needs. ICE has increasingly incorporated guaranteed minimum payments into its contracts and agreements, whereby ICE agrees to pay detention facility operators for a fixed number of detention beds regardless of whether it uses them. However, ICE has not taken a strategic approach to these decisions and has spent millions of dollars a month on unused detention space. Planning for detention space needs can be challenging, according to ICE officials, because the agency must respond to factors that are dynamic and difficult to predict. A strategic approach to using guaranteed minimums could help position ICE to balance these factors and make more effective use of federal funds.

ICE relies on Contracting Officer's Representatives (COR) to oversee detention contracts and agreements, but the COR's supervisory structure—where field office management, rather than headquarters, oversee COR work and assess COR performance—does not provide sufficient independence for effective oversight. CORs in eight of 12 field offices identified concerns including lacking resources or support, as well as supervisors limiting their ability to use contract enforcement tools and bypassing CORs' oversight responsibilities in contracting matters. Revising its supervisory structure could help ICE ensure that detention contract and agreement terms are enforced.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 7 |
| | ICE Primarily Acquires Detention Space Using Intergovernmental Service Agreements; Characteristics Vary Based on Facility Operator, Cost, and Other Factors | 11 |
| | ICE Has Not Consistently Followed Its Process for Obtaining Detention Space and Its Guaranteed Payments to Contractors Have Not Been Guided by a Strategic Approach | 18 |
| | ICE's Supervisory Structure and Incomplete Information on Penalties Limit Oversight and Enforcement of Detention Contracts and Agreements | 30 |
| | Conclusions | 43 |
| | Recommendations for Executive Action | 44 |
| | Agency Comments and Our Evaluation | 44 |
| Appendix I | Selected Characteristics of U.S. Immigration and Customs Enforcement (ICE) Contracts and Agreements | 48 |
| Appendix II | Comments from Department of Homeland Security (DHS) | 53 |
| Appendix III | GAO Contact and Staff Acknowledgments | 58 |
| Tables | | |
| | Table 1: U.S. Immigration and Customs Enforcement (ICE) Methods for Acquiring Immigration Detention Space | 7 |
| | Table 2: U.S. Immigration and Customs Enforcement (ICE) Over-72-Hour Detention Facility Types and Average Daily Detainee Population, as of the End of Fiscal Year 2019 | 11 |
| | Table 3: Selected Characteristics for Entering into U.S. Immigration and Customs Enforcement's (ICE) Detention Facility Contracts and Agreements | 14 |

Figures

Figure 1: U.S. Immigration and Customs Enforcement (ICE) Offices Responsible for Detention Facility Contract and Agreement Management and Oversight                8

Figure 2: Example of U.S. Immigration and Customs Enforcement (ICE) Intergovernmental Service Agreement (IGSA) Model for Subcontracting Detention Services to Private Provider                16

Figure 3: U.S. Immigrations and Customs Enforcement (ICE) Over-72-Hour Detention Facilities with New Contracts or Agreements, Fiscal Year 2017 through May 11, 2020                20

Figure 4: U.S. Immigration and Customs Enforcement (ICE) Detention Contracts and Agreements with Guaranteed Minimums, Fiscal Years 2017 to May 2020.                25

Figure 5: U.S. Immigration and Customs Enforcement (ICE) Guaranteed Beds and Average Detainee Populations for One Field Office, May 2019 to May 2020                28

Figure 6: U.S. Immigration and Customs Enforcement (ICE) Discrepancy Report Process                39

Figure 7: U.S. Immigration and Customs Enforcement (ICE) Detention Bed Rates, by Facility Type, Fiscal Year 2019                50

**Abbreviations**

| | |
|---|---|
| COR | Contracting officer's representative |
| DHS | Department of Homeland Security |
| ERO | Enforcement and Removal Operations |
| FAR | Federal Acquisition Regulation |
| ICE | U.S. Immigration and Customs Enforcement |
| IGSA | Intergovernmental service agreement |
| OIG | Office of Inspector General |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

**GAO@100**  **U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

441 G St. N.W.
Washington, DC 20548

January 13, 2021

The Honorable Bennie G. Thompson
Chairman
Committee on Homeland Security
House of Representatives

Dear Mr. Chairman:

In fiscal year 2019, U.S. Immigration and Customs Enforcement (ICE), within the Department of Homeland Security (DHS), detained approximately 48,500 foreign nationals a day, on average, for 72 hours or more, according to agency data. ICE is the lead agency responsible for providing safe, secure, and humane confinement for detained foreign nationals in the United States. Immigration detention is a civil function rather than a criminal process. ICE detains certain foreign nationals whose immigration cases are pending, or who have been ordered removed from the United States, for the administrative purpose of holding, processing, determining removability, and preparing them for removal. To this end, the DHS Appropriations Act, 2020, provided ICE about $3.14 billion to operate the immigration detention system.[1]

ICE has three ways of acquiring detention space—contracts with private detention companies, intergovernmental service agreements (IGSA) with state and local government entities, and through riders on Department of Justice U.S. Marshals Service contracts and agreements. Some facilities exclusively hold ICE detainees while others hold ICE detainees along with other confined populations. In fiscal year 2019, ICE had contracts and agreements with over 230 facilities to hold detainees for 72 hours or more.

Since 2018, the DHS Office of Inspector General (OIG) issued two reports on ICE detention contracts and agreements. In February 2018, the DHS OIG reported that ICE improperly modified an existing detention facility IGSA; that ICE's policies and procedures for negotiating, executing, and modifying agreements with local government agencies were insufficient to ensure proper use of such modifications; and that ICE

---

[1]See Explanatory Statement, 165 Cong. Rec. H10613, H11033 (daily ed. Dec. 17, 2019), accompanying Division D—DHS Appropriations Act, 2020, Pub. L. No. 116-93, div. D, 1333 Stat. 2371 (2019).

lacked assurance that its contracts were executed in the best interest of taxpayers, the federal government, or detainees.[2] The DHS OIG recommended that ICE address these issues by establishing written procedures for IGSAs, among other actions, which ICE subsequently implemented. In January 2019, the DHS OIG reported that ICE did not consistently use available enforcement tools (such as financial penalties) to hold detention facility operators to contract or agreement terms and did not consistently impose penalties when those requirements were not met.[3] The DHS OIG made recommendations to help address these issues, which we discuss later in this report.

You asked us to review ICE's processes for acquiring immigration detention space used to hold detainees for 72 hours or more. This report examines:

1. what data show about the characteristics of contracts and agreements for immigration detention facilities;

2. the extent to which ICE has developed and implemented processes and a strategic approach to acquire space to meet its detention needs; and

3. the extent to which ICE has overseen and enforced the terms and conditions of detention facility contracts and agreements.

To address these questions, we focused our review on ICE detention space acquisition and oversight efforts at facilities that hold detainees for

---

[2]DHS OIG, *Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services*, OIG-18-53 (Washington, D.C.: Feb. 21, 2018).

[3]DHS OIG, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, OIG-19-18 (Washington, D.C.: Jan. 29, 2019).

72 hours or more.[4] For all three objectives, we analyzed ICE documentation and interviewed relevant ICE officials and selected owners and operators of immigration detention facilities. Specifically, we interviewed ICE headquarters officials from Enforcement and Removal Operations (ERO), Office of Acquisition Management, and Office of the Principal Legal Advisor—offices responsible for approving, negotiating, and reviewing detention space contracts and agreements, among other roles.

We also interviewed officials from a non-generalizable sample of 12 of 24 ERO field offices. ERO field offices are responsible for identifying detention space needs and overseeing operator performance at detention facilities within their geographic areas, among other duties. We selected these field offices to represent a range of characteristics, including varying numbers of facilities and average daily detainee populations; preponderance of new contracts or agreements; geographic variation; and use of differing detention space acquisition methods (i.e., contracts, agreements, or U.S. Marshals Service riders).[5] We conducted site visits to the Seattle and New Orleans field offices, where in addition to meeting with ERO staff, we met with officials from entities that operated five detention facilities and/or held contracts or agreements with ICE for the facilities.[6] We selected these facilities to encompass a range of new and long-running ICE detention facility contracts and agreements. The information we obtained from our field office interviews and site visits

---

[4]ICE also holds detainees in shorter-term, under-72-hour detention facilities. In addition, ICE has holding facilities typically for holding individuals for 24 hours or less, but generally no more than 72 hours, in order to complete general processing and determine the appropriate course of action, such as transfer into an ICE under- or over-72-hour detention facility. When ICE detains children, it does so with their families at a family residential facility. Responsibility for housing unaccompanied children lies with the Office of Refugee Resettlement in the Department of Health and Human Services. ICE must transfer unaccompanied alien children less than 18 years of age who are unlawfully in the United States without a parent or other legal guardian to the Department of Health and Human Services Office of Refugee Resettlement's custody within 72 hours of determining that they are unaccompanied alien children. See 8 U.S.C. § 1232(b)(3). This report does not address short-term facilities or Office of Refugee Resettlement facilities.

[5]We met with officials from the Atlanta, Baltimore, Chicago, Dallas, Los Angeles, Miami, New Orleans, St. Paul, San Antonio, Seattle, Phoenix, and Washington ERO field offices. As of December 2019, these 12 field offices were responsible for 62 percent of ICE's over-72-hour detention facilities and 71 percent of ICE's average daily detainee population.

[6]The facilities we visited included Northwest ICE Processing Center in the Seattle field office area of responsibility; and River Correctional Center and Jackson Parish Correctional Center, LaSalle ICE Processing Center, and Winn Correctional Center in the New Orleans field office area of responsibility.

cannot be generalized to all ERO field offices or detention facilities, but offers insight into ICE detention space acquisition and oversight efforts. We also met with officials from the Department of Justice U.S. Marshals Service to discuss ICE's use of U.S. Marshals Service contracts and agreements.

To describe what data show about the characteristics of contracts and agreements for immigration detention facilities, we analyzed ICE data from fiscal years 2017 through 2019—the 3 most recent fiscal years for which complete data were available at the time of our review. We analyzed these data to determine the composition of ICE's detention space portfolio, including the number and types of detention contracts and agreements, variations in contract and agreement costs, and other characteristics. We assessed the reliability of these data by reviewing related documentation, reviewing the data for any obvious errors and anomalies, and interviewing knowledgeable ICE officials. We determined that these data were sufficiently reliable for the purposes of describing the characteristics of contracts and agreements. In addition, we interviewed ERO and Office of Acquisitions and Management headquarters officials, ERO field office officials, and facility operators and owners to discuss contract and agreement costs and other characteristics.

To evaluate the extent to which ICE has developed and implemented processes and a strategic approach to acquire space to meet its detention needs, we analyzed ICE's detention space acquisition proposals (referred to as white papers) and ERO's corresponding evaluations from fiscal year 2017 to May 11, 2020.[7] We analyzed these documents to determine what factors ICE considered when acquiring new detention space, among other information. We also analyzed selected information on contracts and agreements ICE entered into during fiscal years 2017 through 2019 from its Facility List Report—an internal spreadsheet with facility and contract and agreement information. Specifically, we analyzed information on guaranteed minimum payments to detention facility operators (including the number of guaranteed detention beds and associated costs), average daily detainee populations (to determine the extent to which ICE met its guaranteed minimums), and other descriptive information. We reviewed these data for obvious errors and outliers and discussed the data with ERO and Office of Acquisition Management officials. We determined that the data were sufficiently

---

[7]We selected this period to focus on the 3 most recent fiscal years for which complete data were available at the time of our review.

reliable for the purposes of analyzing ICE's strategy and processes for acquiring detention space.

We also interviewed officials from ICE headquarters and ERO field offices to discuss their roles in the detention space acquisition process. During our site visits, we met with staff from three private detention companies—CoreCivic, GEO Group, and LaSalle Corrections—to discuss their companies' roles in ICE detention space acquisition, among other topics. We compared ICE's detention space acquisition efforts to its own internal policy documents and guidance, as well as ICE's most current strategic plan. We also compared ICE's efforts to *Standards for Internal Control in the Federal Government* and best practices in portfolio management from the Project Management Institute.[8] The establish structure, responsibility, and authority component of internal controls—documentation of the internal control system—was significant to this objective, along with the related principle that management should maintain effective documentation to provide a means to retain organizational knowledge and communicate that knowledge to external parties, such as external auditors. We reviewed ICE documentation of its detention space acquisition processes and compared this with internal control criteria to identify any gaps.

To evaluate the extent to which ICE has overseen and enforced the terms and conditions of detention facility contracts and agreements, we reviewed all available contract discrepancy reports for incidents occurring from fiscal years 2016 through 2019 and the procedures ICE used to track and report on them.[9] We analyzed these reports to identify any trends, such as the types of facilities where discrepancies occurred or how the discrepancies were resolved. We also analyzed ICE internal memorandums, guidance, and other documents regarding the roles and responsibilities of ICE staff with regard to contract oversight. Additionally, we interviewed contracting officer's representatives (COR)—ICE field

---

[8]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sep. 10, 2014); and Project Management Institute, *The Standard for Portfolio Management, 4th ed.* (Newtown Square, PA: 2017).

[9]We selected this period to focus on the most recent years for which reports were available at the time of our review and to ensure we had a sufficient number of reports to analyze. Contract discrepancy reports are used to document performance issues and may include a recommendation for financial penalties. Although ICE refers to these reports as "contract discrepancy reports," we refer to them as "discrepancy reports" for our purposes because they are used to document violations of the terms and conditions set forth in both contracts and agreements.

office officials responsible for monitoring the performance of facility operators—from 12 of 24 ERO field offices. We also interviewed management from five field offices, as well as ICE headquarters officials, regarding ICE's efforts to oversee and enforce contracts and agreements.[10] We compared ICE's actions to its internal guidance and *Standards for Internal Control in the Federal Government.*[11] Specifically, we found three areas of internal controls that were particularly relevant— the control environment, documentation of the internal control system, and the sharing of information and ongoing communication with stakeholders.[12]

We conducted this performance audit from August 2019 to January 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[10]We interviewed field office management from the Baltimore, New Orleans, San Antonio, Seattle, and Chicago ERO field offices.

[11]GAO-14-704G.

[12]The control environment component of internal controls—segregation of duties—was significant to this objective, along with the related principles that management should consider segregating incompatible duties, as segregation of duties helps prevent fraud, waste, and abuse in the internal control system, and can address the risk of management override. Second, the establish structure, responsibility, and authority component of internal controls—documentation of the internal control system—was significant to this objective, along with the related principle that management should maintain effective documentation to provide a means to retain organizational knowledge and communicate that knowledge to external parties, such as external auditors. Finally, the information and communication component was significant, along with the related principle that management should use quality information to make informed decisions and evaluate the entity's performance. We compared ICE's efforts to oversee and enforce contract terms to these criteria to identify any gaps.

# Background

## ICE Methods for Acquiring Detention Space

ICE has three methods for acquiring detention space, as described in table 1.

**Table 1: U.S. Immigration and Customs Enforcement (ICE) Methods for Acquiring Immigration Detention Space**

| Method | Description |
|---|---|
| Contracts | ICE contracts directly with detention facility operators (e.g., private companies such as CoreCivic, GEO Group, and LaSalle Corrections) to hold detainees at facilities the operators own or to assist in operating a facility ICE owns. These contracts are generally governed by the Federal Acquisition Regulation (FAR) and related competition requirements. |
| Intergovernmental service agreements (IGSA) | ICE uses a Department of Homeland Security (DHS) authority under the Immigration and Nationality Act to enter into IGSAs with state or local entities (e.g., a county sheriff or a city government). These entities in turn may contract the provision of detention services to a private company, or provide the services using local law enforcement (such as a local jail that holds local criminal populations and ICE detainees) [a] DHS's IGSA authority is separate from the statutory framework governing federal contracts which generally must adhere to FAR requirements. |
| Intergovernmental agreements with U.S. Marshals Services | ICE enters into these agreements with the U.S. Marshals Service, where ICE joins an existing U.S. Marshals Service contract or agreement to use Marshals Service-acquired bed space in a local prison, jail, or private detention facility. This is known as a "rider" on a U.S. Marshals Service contract or agreement, and the ability to use the beds is contingent upon availability. |

Source: GAO analysis of ICE information. I GAO 21-149

[a]The Immigration and Nationality Act, as amended, grants ICE the authority to enter into an agreement with a state or locality to provide necessary clothing, medical care, requisite guard hire; and the housing, care, and security for detained individuals. See 8 U.S.C. § 1103(a)(11)(A).

## ICE Organizational Structure and Responsibilities

Several ICE offices are responsible for detention facility contract and agreement management and oversight, as shown in figure 1.

**Figure 1: U.S. Immigration and Customs Enforcement (ICE) Offices Responsible for Detention Facility Contract and Agreement Management and Oversight**



Source: GAO analysis of Department of Homeland Security Office of Inspector General information.  |  GAO-21-149

**ERO**. Within ICE, ERO identifies, apprehends, and detains potentially removable foreign nationals, and removes individuals subject to a final order of removal from the United States. Several divisions within ERO that carry out this work have responsibilities related to detention facility contracts and agreements, including:

- **ERO's Custody Management Division**. This division oversees detention facility compliance with ICE detention standards. It is also responsible for analyzing detention space needs identified by ERO field offices and submitting requests for detention contract and agreement action to ICE's Office of Acquisition Management.

- **ERO's Operations Support Division**. Within this division, the Fiscal Management Division oversees the Contract Management Unit, which is responsible for funding contracts and agreements, and monitoring that funding.

- **ERO's Field Operations Division**. This division oversees ERO's 24 field offices, which manage local detention operations and work directly with detention facilities in their geographic regions. Field offices are responsible for identifying needs for additional detention space and preparing detention space acquisition requests.

**ICE's Office of Acquisition Management**. This office is responsible for preparing, executing, and maintaining contracts and agreements for detention facilities, and for processing any contract and agreement modifications. Contracting officers within the office also assign duties and responsibilities to ERO CORs. The contracting officer formally appoints a COR for each contract and agreement in writing, which allows the COR to assist in acquisition planning and other duties, including assessing facility operator performance to ensure compliance with the government's performance objectives and to evaluate the quality and timeliness of the products or services produced. As of September 2020, the Office of Acquisition Management reported that there were 17 detention-related contracting officers.

## Oversight and Enforcement of Contracts and Agreements

**Contracting Officer**

Contracting officers are responsible for appointing contracting officer's representatives (COR) and assigning CORs duties as specifically outlined in each individual contract and agreement. CORs are to monitor contract and agreement performance on behalf of their contracting officer.

Source: GAO analysis of U.S. Immigration and Customs Enforcement information. I GAO-21-149

CORs are responsible for overseeing all types of detention facility contracts and agreements, including IGSAs and contracts. CORs are located in ERO field offices and overseen by field office management. As CORs monitor facility operator performance, they are to report information that may affect contractual commitments and requirements (such as issues related to contractor performance) to the contracting officers within the Office of Acquisition Management. As of January 2020, there were 28 CORs across ERO's 24 field offices. CORs are also responsible for overseeing contracts that support detention facility operations, such as transportation contracts.

Detention facility contracts and agreements establish requirements facility operators are to adhere to, including specific detention standards operators are to meet to ensure humane confinement for detainees.

**Contracting Officer's Representative (COR)**

A COR is appointed by a contracting officer and provides technical direction, clarification, and guidance with respect to the contract or agreement terms.

The COR is the technical liaison between the detention facility operator and the contracting officer, and is responsible for monitoring the performance of the facility operator according to the contract or agreement.

Source: GAO analysis of U.S. Immigration and Customs Enforcement information. I GAO-21-149

These standards cover a variety of issues, including detainee safety, security, care, and the administration and management of the facilities. CORs have the following enforcement tools to assist in holding detention facility operators accountable for adhering to requirements established in contracts and agreements:

- **Quality assurance surveillance plan.** A quality assurance surveillance plan is a standard template included in detention facility contracts and agreements that outlines requirements for complying with applicable ICE detention standards and potential actions ICE can take when a contractor does not meet those requirements. When facilities are found to be noncompliant, CORs may submit a discrepancy report.

- **Discrepancy report.** A discrepancy report is formal documentation by the COR of a performance issue committed by a detention facility operator. CORs may issue discrepancy reports for violations of the terms and conditions set forth in contracts or agreements, such as staffing levels below required minimums or inappropriate use of force towards detainees. Operators are required to create corrective action plans and eventually correct deficiencies identified in the discrepancy report. If an operator fails to respond to a discrepancy report appropriately, ICE can levy financial penalties against the operator.

- **Financial penalty.** In response to a contract or agreement deficiency, ICE can deduct funds from an invoice (deduction) or withhold an amount from an invoice payment pending the correction of a deficiency (withholding). A COR may recommend financial penalties when submitting a discrepancy report to the contracting officer. A number of ICE headquarters entities contribute to the final determination on whether or not to impose a financial penalty, including ICE's Office of Acquisition Management, ERO's Custody Management Division, and the Office of the Principal Legal Advisor.[13]

---

[13]ICE's Office of the Principal Legal Advisor's Commercial and Administrative Law Division provides legal support to the Office of Acquisition Management by completing legal reviews of contracts and agreements, as well as reviews of discrepancy reports with proposed penalties. The Commercial and Administrative Law Division reviews discrepancy reports to confirm that the contract or agreement has sufficient authority to issue a penalty and advises on whether the proposed penalty amount is appropriate.

## ICE Primarily Acquires Detention Space Using Intergovernmental Service Agreements; Characteristics Vary Based on Facility Operator, Cost, and Other Factors

The contracts and agreements ICE uses to acquire space in detention facilities vary with respect to facility operator, cost, and other factors; however, ICE primarily acquires detention space through agreements between ICE and state and local governments, collectively referred to as IGSAs. Our analysis of ICE data showed that by the end of fiscal year 2019, ICE had contracts or agreements in place with a total of 233 over-72-hour detention facilities, with space in about 57 percent of these facilities (133 of 233) acquired through IGSAs.[14] After IGSAs, detention space was most commonly acquired through ICE joining, or "riding", U.S. Marshals Service contracts and agreements (36 percent of facilities), and least frequently through contracts (6 percent of facilities).[15] Although ICE data indicated the agency had contracts and agreements in place with 233 facilities, in fiscal year 2019 ICE held detainees in 79 percent (185 of 233) of those facilities, as shown below in table 2.

**Table 2: U.S. Immigration and Customs Enforcement (ICE) Over-72-Hour Detention Facility Types and Average Daily Detainee Population, as of the End of Fiscal Year 2019**

| | Description | Number of facilities | Number of facilities that held detainees | Percentage of average daily population held in facility |
|---|---|---|---|---|
| Non-dedicated intergovernmental service agreement (IGSA) | Facility owned by state or local government or private company, operated under an agreement with ICE; holds ICE detainees and other confined populations, either together or separately | 116 | 91 | 30 |
| Dedicated IGSA | Facility owned by state or local government or private company, operated under an agreement with ICE; exclusively holds ICE detainees | 14 | 14 | 25 |
| Family residential center | Facility owned and operated by a state or local government entity under an agreement with ICE that holds children and their families and exclusively holds ICE detainees | 3 | 3 | 4 |
| U.S. Marshals Service intergovernmental contract or agreement | Facility owned by state or local government or private company, operated under an agreement or contract with U.S. Marshals Service. ICE uses "riders" on these contracts and agreements to hold ICE detainees, either together or separately from other populations | 85 | 62 | 17 |
| Contract detention facility | Facility owned and operated by private company under direct ICE contract; exclusively holds ICE detainees | 10 | 10 | 16 |

[14]IGSAs can be dedicated (i.e., facilities that hold only ICE detainees) or non-dedicated (i.e., facilities that hold ICE detainees along with other confined populations). ICE's family residential centers also operate under IGSAs.

[15]Percentages for each acquisition method do not add to 100 percent due to rounding.

| | Description | Number of facilities | Number of facilities that held detainees | Percentage of average daily population held in facility |
|---|---|---|---|---|
| Service processing center | Facility owned and primarily operated by ICE with assistance from contractors. ICE acquires various services through contracts, such as guards, food, and facility maintenance. Exclusively holds ICE detainees. | 5 | 5 | 8 |
| **Total** | | **233** | **185** | **100** |

Source: GAO analysis of ICE data. | GAO-21-149

Notes: ICE data included 97 additional agreements that ICE had not used since fiscal year 2015. According to Office of Acquisition Management officials, if ICE has not used facilities for 3 years, it is reasonable to assume that there is not an active agreement in place. Accordingly, we excluded these agreements from our analysis.

ICE authorizes facilities to hold detainees for up to 72 hours or more than 72 hours. In addition to the over-72-hour facilities listed in this table, ICE used 36 IGSA facilities and 57 U.S. Marshals Service agreement facilities to hold detainees for up to 72 hours in fiscal year 2019.

ICE officials explained that unused facility space gives ICE flexibility to respond to potential surges in the overall number of detainees for those facilities where ICE only pays for the detention beds it uses. ICE may choose not to use a facility with which it has a contract or agreement because of changes in transportation routes or the addition of other facilities with guaranteed minimums where ICE pays for a fixed number of detention beds regardless of whether they are used, according to ICE officials.[16] Further, ICE may choose not to use a facility with which it has a contract or agreement because the facility has not been inspected under ICE's current detention standards.[17]

ICE officials said that each detention space acquisition method has tradeoffs, but the agency primarily relies on IGSAs and U.S. Marshals Service riders. Officials gave several reasons for this. For one, officials said that contract detention facilities may allow ICE to customize the facility to better meet its detention standards, but these facilities are more

---

[16]For example, ICE officials said they moved detainees out of a facility in northwest Louisiana because its remote location made transportation a challenge and because ICE had recently acquired detention space in new facilities with guaranteed minimums—beds ICE pays for regardless of whether they are filled—and therefore needed to transfer detainees to meet those minimums.

[17]In addition, ICE officials noted that the agency may not use a facility with which it has an agreement if the facility has not been used in many years and the agreement becomes unacceptable (e.g., because the amount ICE pays is no longer acceptable to the vendor or the facility does not meet ICE's current detention standards). After ICE has not used a facility for 36 months, new terms or a new agreement would likely have to first be renegotiated for ICE to use the detention space, according to ICE officials.

expensive and the lead-time to acquire them is 18 months or longer, which officials said is often not responsive enough for ICE's detention space needs.

Similarly, officials said that new contracts for ICE-owned service processing centers are not a viable option because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority. A 2016 Homeland Security Advisory Council report on privatized detention facilities echoed this, noting that ICE-owned service processing centers, which ICE primarily operates, are generally more expensive than contractor-run detention facilities. The report noted that for this reason, ICE has been under sustained pressure from congressional appropriators to reduce the use of service processing centers and has closed several centers over recent years.[18]

ICE officials told us that IGSAs and U.S. Marshals Service riders offer the agency several additional benefits over contracts. For one, ICE officials said the agency's detention space needs are often time-sensitive and fluctuate regularly, thus putting a premium on obtaining bed space quickly. Officials said that agreements can be executed in a matter of weeks, as opposed to contracts which, as noted previously, can take 18 months or longer to complete. For example, the COR in one field office said that acquiring detention space in a local jail with a U.S. Marshals Service agreement in place is the fastest and easiest option for ICE because ICE does not have to negotiate any new terms, rates, or conditions—it is simply added to the Marshals' existing agreement.

Further, according to ICE officials, the agency is typically able to enter into IGSAs more quickly than contracts because IGSAs include fewer requirements and less documentation than contracts. For example, unlike contract requirements under FAR, according to ICE guidance there is no legal requirement to competitively award an IGSA.[19] Further, when

---

[18]See *Homeland Security Advisory Council, Report of the Subcommittee on Privatized Immigration Detention Facilities*, Dec. 1, 2016. The Homeland Security Advisory Council provides advice and recommendations to the Secretary of Homeland Security on pertinent matters. The council comprises leaders from state and local government, the private sector, and academia, among others.

[19]See 8 U.S.C. § 1103(a)(11)(A). ICE has authority under the Immigration and Nationality Act to enter into IGSAs separate from the statutory framework generally requiring adherence to the FAR, and full and open contract competition. IGSA holders are also not required to competitively award any contracts awarded pursuant to the IGSA.

awarding an IGSA, ICE is not required to evaluate the past performance of detention facility operators. Under FAR, however, ICE requires that prospective contractors submit information on their performance in recent contracts. ICE uses the information, along with information from other sources on contractors' past performance, to evaluate the proposals. To evaluate the past performance of detention facility operators under IGSAs, Office of Acquisition Management officials said they perform internet searches of facilities to see if any alarming incidents have happened in the past. If an incident has happened, such as a riot or a major disease outbreak, officials said they may suggest that ERO enhance security requirements in the IGSA—such as the number of required guards or health staff—to mitigate concerns. However, acquisition officials noted that they defer to the local ERO field offices on any additional agreement requirements.[20] Table 3 below summarizes these various characteristics for entering into ICE's detention facility contracts and agreements.

**Table 3: Selected Characteristics for Entering into U.S. Immigration and Customs Enforcement's (ICE) Detention Facility Contracts and Agreements**

| Characteristic | Federal Acquisition Regulation (FAR)-based contract | Intergovernmental service agreement (IGSA) | U.S. Marshals Service contract or agreement rider |
|---|---|---|---|
| Competition | More competition (ICE competes contracts according to FAR requirements) | Less competition (ICE does not formally compete IGSAs) | N/A (ICE does not compete U.S. Marshals Service contracts or agreements) |
| Acquisition process timelines | Longer timelines (it typically takes 6 months to a year to complete this process) | Shorter timelines (it typically takes 2 weeks to 2 months to complete this process) | Shorter timelines (it typically takes 1 to 2 weeks to complete this process) |
| Past performance of operators | More information on facility operator past performance (this information is available to ICE and is an official part of the contract proposal review process) | Less information on facility operator past performance (this information is only available to ICE through internet searches) | Less information on operator past performance (this information is available to ICE only through internet searches) |

Source: GAO analysis of ICE documentation and testimony. | GAO-21-149

[20]For example, one official stated he was researching a potential facility that had a prison riot occur in the past. As a result, he suggested that ERO hire more security personnel for the facility and develop a physical security plan. There was another facility he was researching in New Mexico that had a salmonella outbreak among its detainees, so the Office of Acquisition Management recommended that ERO increase its medical staff. Office of Acquisition Management officials said these additions (or others, such as increased recreation time or adding phones) would likely increase costs. Accordingly, it is up to local ERO subject matter experts to decide whether or not to add these additional measures to the agreement.

IGSAs are also unique with respect to the relationship between ICE and the entity that operates the detention facility and provides various services to detainees (facility operator). Specifically, the IGSA-holder can operate the facility, such as a county sheriff housing ICE detainees in a county jail, or ICE can modify the agreement to allow the IGSA-holder to sub-contract facility operations to a private, for-profit company, as shown below in figure 2.[21]

---

[21]In instances in which ICE modifies an agreement so that the IGSA holder can engage a private company to operate the facility, the IGSA holder technically does so under a contract. However, we refer to such instances as "subcontracts" to reflect the fact that the contract is independent of ICE and directly between the IGSA holder and the private company.

**Figure 2: Example of U.S. Immigration and Customs Enforcement (ICE) Intergovernmental Service Agreement (IGSA) Model for Subcontracting Detention Services to Private Provider**



Source: GAO analysis of California State Auditor information.  |  GAO-21-149

Under such an arrangement, a state, county, or city enters into an agreement with ICE for the provision of detention operations and services. The government entity can subcontract with a private company, such as GEO Group or CoreCivic, to be the facility operator. As discussed previously, these agreements and related contracts and subcontracts are not required to be competitively awarded. The IGSA establishes a fixed bed rate—that is, a per diem payment based on the costs associated with the agreement. According to a 2019 report from the

California State Auditor, detention subcontracts for three of the state's IGSAs showed that cities agreed to pay the private detention facility operators the same per diem rate that ICE paid the city under the terms of the agreement, essentially passing through all of the payments to the private facility operator.[22]

For administering the ICE agreements, the private facility operators agree to pay the IGSA-holders various fees. ICE does not track the amount of money IGSA holders collect from facility operators when they subcontract detention services, as this is directly negotiated between the IGSA-holder and the facility operator. However, the California State Auditor found that since July 2016, the city of Adelanto received about $1 million annually from GEO Group. This included an administrative fee of $50,000 as well as a fee of $1 per contracted bed per day (regardless of whether the bed was occupied by a detainee or not), and approximately $339,000 annually for additional police officers to handle detention facility-related issues within the city.

Although ICE does not track how much facility operators pay state or local governments in fees for administering IGSAs, officials from one ERO field office stated that ICE is generally aware at the local level how much IGSA-holders receive. Officials gave examples of IGSA-holder compensation ranging from $.50 to $3.50 per detainee per day, or at between $84,000 to $438,000 annually. ICE data does not allow us to reliably identify how many IGSAs are operated by private detention companies. However, as of the end of fiscal year 2019, at least 31 of the 108 IGSA facilities ICE used to hold detainees were operated by private operators.

In addition to varying with respect to the facility operator, ICE detention contracts and agreements also vary with respect to cost, utilization, and other characteristics. For example, the cost of detention facility contracts and agreements varies based on how much ICE pays to hold one detainee per day (or bed rate). The cost also varies based on whether a contract or agreement includes a guaranteed minimum—a fixed number of beds that ICE is required to pay for regardless of whether they are filled. Additionally, costs vary based on whether contracts and agreements with guaranteed minimums include tiered pricing, in which ICE pays a lower bed rate for each detainee housed above the agreed-

**Role of the Government Entity in a U.S. Immigration and Customs Enforcement (ICE) Intergovernmental Service Agreement (IGSA) for Immigration Detention**

One sheriff we interviewed whose office is an IGSA-holder said that dwindling state inmate populations had resulted in prison closures, negatively affecting the local economy.

The sheriff said he was approached by local elected officials and a private facility operator to discuss if he would be interested in pursuing an IGSA with ICE to hold immigration detainees.

He agreed, and the private facility operator provided funding to renovate a decommissioned state corrections center to bring it to ICE's standards.

The sheriff and officials from the private facility operator said that the private operator serves as what they called the "management company" – handling the day-to-day operations of the facility. The management company is responsible for knowing ICE policies and ensuring the facility meets ICE standards.

He said that overall, serving as an IGSA-holder was beneficial, in part because ICE pays more per detainee than the state—about $60 dollars a day for ICE detainees compared to about $25 dollars a day per state inmate.

Source: GAO | GAO-21-149.

---

[22]California State Auditor, *City and County Contracts with U.S. Immigration and Customs Enforcement, Local Governments Must Improve Oversight to Address Health and Safety Concerns and Cost Overruns* (Sacramento, CA: Feb. 16, 2019).

upon guaranteed minimum. Appendix I provides additional information on variation in ICE's detention contracts and agreements.

# ICE Has Not Consistently Followed Its Process for Obtaining Detention Space and Its Guaranteed Payments to Contractors Have Not Been Guided by a Strategic Approach

## ICE Has Not Consistently Followed Its Process for Identifying and Obtaining Detention Space and has Limited Documentation to Support Its Recently Acquired Detention Space

ICE has a process for identifying needs and initiating efforts to obtain new detention space that starts with individual ICE field offices; however, ICE has not consistently followed its process to obtain field-level input or document its decision making for recent detention space acquisitions. ICE's process for identifying and obtaining new detention space is designed to be "bottom up" and, according to ICE officials, is to identify a field office's detention needs and evaluate costs and other tradeoffs. Field offices are to identify needs and evaluate costs in detention space requirements documents (referred to as white papers), which are evaluated by the ERO Detention Management Division's Detention Planning and Acquisition unit.

The white paper template directs field officials to provide narrative support for how the additional detention space at the proposed location will support the local- and national-level ERO mission. The template also directs field officials to include documentation that key local stakeholders (such as mayors or sheriffs) have indicated support for the proposal; transportation plan requirements; information on how ICE will ensure adequate medical care; and whether current funding and staffing are adequate to support the expansion, among other information.

After the field office completes the white paper, ERO headquarters provides a written evaluation of the proposal, which includes an assessment of the field office's current and historic detainee population

trends, transportation and staffing capabilities, and a documented cost analysis of the proposed bed rate. The white paper process allows different levels within ICE to weigh in on the need for additional detention space and provides transparency in how ICE is evaluating cost and operational supportability. However, ICE has not consistently followed its process for identifying and obtaining new detention space. In particular, ICE has not consistently obtained input from relevant ERO field offices or documented its decision making for new detention contracts, including how it evaluated costs and other tradeoffs.

From fiscal year 2017 through May 11, 2020, ICE entered into 40 new contracts and agreements for detention space (in both new facilities and existing facilities), as shown below in figure 3.[23]

---

[23]Twenty-four of the 40 new contracts and agreements since fiscal year 2017 were at new facilities. The remaining 16 were at facilities ICE had been using prior to fiscal year 2017, but with which it established a new contract or agreement since fiscal year 2017.

**Figure 3: U.S. Immigrations and Customs Enforcement (ICE) Over-72-Hour Detention Facilities with New Contracts or Agreements, Fiscal Year 2017 through May 11, 2020**



Source: GAO analysis of ICE data.  |  GAO-21-149

[a]The average daily population of detainees is for fiscal year 2020, as of May 11, 2020.

Our review of ICE's white papers and other documentation for those 40 contracts and agreements found that the majority (28 of 40) did not have a corresponding white paper or other documentation showing coordination with the field or other stakeholders or the basis for ICE's decisions to enter into the contracts and agreements.

Further, field-level officials we interviewed raised questions or expressed concerns about their lack of input into the process for acquiring detention facilities—noting that most new contracts and agreements in recent fiscal years were identified and negotiated by headquarters with limited input

from field offices. For example, field-level officials expressed concerns about the costs and operational supportability of some of these contracts and agreements, as well as whether the facilities could adequately meet detainee needs. Among others, these concerns included:

- **Cost.** Field office officials said, and ICE data supports, that many of ICE's new contracts and agreements had provisions guaranteeing that ICE would pay for a fixed number of beds each month; however, officials said many of these guaranteed minimums were not supportable by current detainee populations (as discussed later in this report). ERO field office management also raised concerns that bringing some headquarters-identified facilities into compliance with ICE's detention standards would require extensive renovations for which ICE would have to pay.[24]

- **Operational supportability.** Officials from three field offices said that some new contracts and agreements were for facilities that were remote and therefore difficult to staff, and required potentially expensive changes to the field office's transportation networks. For example, officials in one ERO field office expressed concerns that one headquarters-directed facility was in a rural location that would be difficult to staff for the contractor as well as ERO. Additionally, the officials stated that there was no specialized medical care nearby and any chronic care would require significant logistical support. Field office officials said they suggested expanding an agreement that was already in place with a county facility instead, since the county facility was closer and operationally more supportable. Officials said they were nonetheless told to use the facility, which ICE headquarters approved under a 2019 letter approving five different headquarters-identified facilities with minimal justification other than to say ICE urgently needed a significant number of beds to support the 2019 detainee population surge.

- **Detainee needs.** In addition to the challenges noted above with remote locations and limited medical care, field officials raised concerns about the suitability of certain facilities for ICE detainees, whose detention is to be administrative and not punitive in nature. For example, in a facility where ICE would be joining a U.S. Marshals

---

[24]ICE's guidance on IGSAs states that IGSA-providers (such as private detention operators) may seek to amortize construction costs through a negotiated bed day rate over the life of the agreement. In other words, detention operators can reimburse themselves for the cost of renovations or construction needed to meet ICE's facility standards by factoring those costs into the bed rate charged to ICE. See ICE Office of Acquisition Management, *Procurement Guide 18-02, Revision 1, Inter-Governmental Service Agreements*, March 22, 2019.

Service contract, the field office officials expressed concerns regarding what they referred to as a very hardened design and perimeter, including the existence of an electrified fence. The officials added that whether operable or not, the electrified fence created poor optics and significant message challenges. Officials also believed the facility was not safe, as the facility layout presented challenges with ensuring sufficient lines of sight and did not have enough staff, which presented safety issues for detainees and staff, according to officials.

In another field office, officials said they strongly disagreed with adding a facility that had previously been under a Bureau of Prisons contract because of that facility's history of chronic understaffing in correctional and health services. The Department of Justice Office of Inspector General concluded that these staffing shortages had contributed to a 2012 riot that resulted in the death of a corrections officer and injuries to approximately 20 inmates and staff. The Office of Inspector General reported in 2016 that the facility continued to be understaffed.[25] The field officials we interviewed said they were directed by headquarters to retroactively write a white paper to support using the facility after the agreement terms (including a nearly $4 million a month guaranteed payment for 1,100 detention beds) had already been negotiated between ICE headquarters, the IGSA-holder, and the detention operator. A field official said that the office used the white paper to express their disagreement with the agreement and its terms.

ICE headquarters officials stated that not all facilities undergo the white paper evaluation process. For instance, ICE headquarters officials stated that facilities that are used irregularly or infrequently, facilities that are being expanded, or facilities that provide emergency surge capacity may not always submit white papers.[26] However, our analysis of ICE facility data did not always find this to be the case. For example, the fiscal year 2020 average daily detainee population through May 11, 2020, nine of the 28 facilities without white papers exceeded 500 detainees per day, with one facility holding over 1,000 detainees a day. Four of the 28 facilities had been used consistently since fiscal year 2011, suggesting that they may have been expansions (thus not undergoing the white paper

---

[25]Department of Justice Office of Inspector General, *Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi*, Audit Division 17-08 (Washington, D.C.: Dec. 2016).

[26]ICE officials noted that these facilities may be subject to ICE inspections if their usage is under ICE jurisdiction and if they are used for 60 days or more within a fiscal year.

process, according to ICE officials). However, ICE's white paper template specifically asks field offices to include information on the existing detainee capacity of a facility as well as the total number of additional beds proposed, suggesting that the white paper process is to be followed in the case of expansions.[27]  Finally, 14 of the 28 facilities without white papers have contractually guaranteed minimum payments—guaranteeing payments for 8,009 total beds per day—suggesting these are not facilities ICE is using irregularly or infrequently or for emergency surge capacity.

ICE's detention space acquisition guidance states that when additional bed space is requested, ICE should begin the acquisition process with submission of the white paper proposal.[28] This documented proposal is to serve as the foundation used by headquarters to determine detention space requirements, including the number of beds, number of guards, and medical needs. Additionally, *Standards for Internal Control in the Federal Government* states that documentation is a necessary part of an effective internal control system. Documentation provides a means to retain organizational knowledge, as well as a means to communicate that knowledge as needed to external parties, such as external auditors.[29] Moreover, the Project Management Institute states that communicating and working with stakeholders—such as the ICE field offices—allows project managers to increase support and minimize resistance from stakeholders, significantly increasing the chances of achieving project success.[30] ICE officials have said that in urgent circumstances, the agency needs to retain ultimate flexibility in decision-making. As a result, ICE headquarters took action to identify facilities and negotiate contracts to meet the demand for detention space, according to these officials. However, without consistently using a process to obtain new detention facility space that includes stakeholder input and documentation of its decision-making, ICE does not have reasonable assurance that it has

---

[27]An ERO official said that facilities with new contracts and agreements that did not include additional detention beds—that is, new contracts and agreements without expansions—would also not need to undergo the white paper process. Therefore, if the four facilities did not add additional beds when their contracts and agreements were renewed in fiscal years 2018 and 2019, ICE would not have required a white paper, according to this official. ICE data did not allow us to conclusively determine if these four facilities' contracts and agreements included the addition of any new detention space.

[28]ICE OAQ Procurement Guide 18-02, Revision 1, Inter-Governmental Service Agreements, March 22, 2019.

[29]GAO-14-704G.

[30]Project Management Institute, Inc. *The Standard for Portfolio Management-Fourth Edition*, 2017.

appropriately considered and weighed relevant factors to make the most cost effective decisions that best meet its operational needs.

## ICE Has Not Taken a Strategic Approach to Using Guaranteed Minimums when Obtaining Detention Space

ICE has increasingly incorporated guaranteed minimums into individual detention contracts and agreements, but has not taken a strategic approach to these decisions and has spent millions of dollars a month on unused detention beds. Acquiring and maintaining a sufficient number of cost-effective detention beds that meet ICE detention standards is a complex challenge that requires ICE to balance sufficient detention space to respond to surges in detainees with unnecessarily paying for unused detention beds.

From fiscal years 2017 to 2019, ICE increased its number of contracts and agreements with guaranteed minimums by about 38 percent—from 29 in fiscal year 2017 to 43 as of May 11, 2020 (the most current data available at the time of our review).[31] With this increase came a corresponding increase in the number of beds ICE guarantees to pay for—from 19,342 beds in fiscal year 2017 to 28,043 in May 2020—which ICE has consistently not used, as shown below in figure 4.[32]

[31]Of these 43 contracts and agreements, 17 were contracts for contract detention facilities (12 contracts) or service processing centers (5 contracts). Twenty-five were IGSAs (including family residential centers), and one was a U.S. Marshals Service contract rider. For the contracts, 7 of the 17 were for facilities that ICE has used to house detainees since 1990 or before. Two facilities with contracts have dates of first use after 2018.

[32]Although ICE data identifies 45 facilities as having guaranteed minimums, ICE has 43 unique contracts and agreements for these facilities because four facilities share a guaranteed minimum. For example, under one agreement, two facilities share a 650-person guaranteed minimum for about $2 million a month.

GAO-21-149 Immigration Detention

**Figure 4: U.S. Immigration and Customs Enforcement (ICE) Detention Contracts and Agreements with Guaranteed Minimums, Fiscal Years 2017 to May 2020.**



Source: GAO analysis.  |  GAO-21-149

Note: Data are as of May 11, 2020.

More specifically, from May 2019 through May 11, 2020, the average daily detainee population of these facilities was below the guaranteed minimum for 22 of 43 facilities. As of May 11, 2020, ICE was paying for 12,027 empty beds a day, on average, at a cost of $20.5 million for the

month.[33] This figure does not take into account the 13 facilities for which ICE pays a guaranteed flat rate (rather than a per diem for each bed). ICE's average daily detainee population did not meet the guaranteed minimum for 11 of these facilities. As a result, at these 11 facilities ICE paid $41.2 million for the month of May while using 38 percent of the beds it paid for. Further, five of these 11 facilities did not meet the guaranteed minimum for a single month in the entire prior year (May 2019 to May 2020).[34]

ICE's 2016-2020 Strategic Plan states that one of ICE's objectives is to improve the detention system.[35] As part of this effort, ICE states that it will seek favorable business terms in contracts. Further, the Office of Acquisition Management's mission statement for detention procurement is to acquire the necessary detention space and services to assist ICE's enforcement operations in an effective and cost efficient manner. Along these lines, the office's guiding principles for new detention acquisitions include (1) clearly defining and communicating decision-making processes and criteria and (2) procuring space that allows for flexibility in detained populations and that can handle influxes without abandoning cost considerations. Further, Office of Management and Budget guidance on capital planning states that all of the items in a portfolio—such as all of the different types of detention contracts and agreements ICE maintains—must support strategic plans, goals, objectives and priorities.

According to ICE headquarters officials, the agency works to attain a balance between having sufficient space to meet its current detention needs while being able to quickly respond to any potential surges in the number of individuals it must detain. However, ICE's approach does not align its use of contracts or agreements that guarantee payments for a fixed number of beds with the agency's strategic plan and other guiding acquisition principles. More specifically, officials did not provide or explain an approach to ICE's use of guaranteed minimums that shows how

---

[33]The number of empty beds per day, on average, fluctuated monthly from May 2019 to May 2020. As of May 11, 2020, the number of empty beds, based on the average daily detainee population that month, was 12,027 beds. That number declined to a low of 4,588 unused beds in October 2019. The number of unused beds then generally increased, with 6,537 unused beds in March 2020 and 9,685 unused beds in April 2020.

[34]An ERO official said that restrictions related to Coronavirus Disease 2019 contributed to the number of unused beds in May 2020. However, the number of unused beds had generally increased since October 2019 and several facilities had not met their guaranteed minimums for the entire prior year (May 2019 to May 2020).

[35]DHS, *U.S. Immigration and Customs Enforcement Strategic Plan 2016-2020.*

decisions made on these minimums relate to or support ICE's strategic plans, goals, and priorities or help to ensure effective use of tax dollars.

For example, ICE headquarters officials described the agency's approach to using guaranteed minimums (and the ensuing negotiations between the detention service providers, ERO, and Office of Acquisition Management), as often difficult, and stated that the terms ICE accepts tend to depend on ICE's need for beds at that time. Specifically, an ERO official said that in situations where ICE has an urgent need for detention space, such as during a surge or when it must replace detention beds that are no longer available, ICE is limited in its options and often will agree with the service provider's terms on bed rates or guaranteed minimums. Internal ICE guidance states that detention operators prefer contracts with guaranteed minimums because they protect operators from losing money and can increase profits. ICE guidance also states that contracts with guaranteed minimums, if structured to include lower priced bed rates if ICE uses more than the minimum number of detention beds required in the contract or agreement, can potentially save ICE money while also improving relations with the detention operators.

Officials we spoke with from two field offices also stated that ICE's urgent need for bed space has driven the increase in guaranteed minimums; however, officials from three field offices disagreed with the recently negotiated guaranteed minimums, and officials from four stated that, in their view, many of these contracts and agreements were not in the best interest of the government. Officials also said that the decision to include a guaranteed minimum was driven by ICE headquarters without field input.

For example, an official from one ERO field office said his office expected to pay at least a million dollars a month for empty beds in recently negotiated contracts and agreements that the field office did not believe were necessary. Our review of ICE data supports this, showing that ICE has committed to 5,245 guaranteed beds across six IGSA facilities in this particular field office's area of responsibility. The May 2019 to May 2020 average daily detainee population was below the guaranteed minimums for five of the six facilities, resulting in ICE paying an average of about $1.2 million per month for empty beds, as shown below in figure 5.

**Figure 5: U.S. Immigration and Customs Enforcement (ICE) Guaranteed Beds and Average Detainee Populations for One Field Office, May 2019 to May 2020**

| Intergovernmental service agreement | Guaranteed minimum number of beds ICE pays for | Guaranteed payment per bed per ICE's agreement with the facility[a] | Average daily detainee population, May 2019 - May 2020 | Meeting or below guaranteed minimum | Empty guaranteed beds per day, on Average | Average amount ICE paid per month for empty beds[b] |
|---|---|---|---|---|---|---|
| Facility A | 550 | $76.63 | 362 | Below | 188 | $431,060.62 |
| Facility B | 625 | $75.01 | 442 | Below | 183 | $411,804.90 |
| Facility C | 700 | $81.50 | 564 | Below | 136 | $332,520.00 |
| Facility D | 1,100 | $3,950,885.89 (flat monthly fee) | 762 | Below | 338 | N/A |
| Facility E | 1,100 | $72.96[c] | 1,112 | Meeting | 0 | N/A |
| Facility F | 1,170 | $76.64 | 1,161 | Below | 9 | $20,692.80 |
| Total | 5,245 | N/A | 734 | N/A | 854 | $1,196,078.32 |

Meeting guaranteed minimum     Below guaranteed minimum

Source: GAO analysis of ICE data. | GAO-21-149

[a]For nearly all of ICE's contracts and agreements with guaranteed minimums, ICE pays a discounted bed rate for each individual detained above the guaranteed minimum. Tiered pricing is not shown on this table because ICE generally did not exceed the guaranteed minimums.

[b]Payment calculation is based on a 30-day month.

[c]This facility agreement did not include a discounted bed rate for when ICE exceeded the guaranteed minimum number of detainees. In other words, ICE exceeded the minimum but still paid $72.96 per detainee. The bed rate at this facility decreases to $36 when ICE exceeds 1,400 detainees.

Note: Data are as of May 11, 2020.

Planning for detention space needs can be challenging, according to ICE officials, because the agency must respond to a number of dynamic factors that are difficult to predict. An ERO headquarters official said that detainee numbers fluctuate and surge regularly, and changes in national immigration policy can result in increasing (or decreasing) numbers of detainees. ICE also shares space with the U.S. Marshals Service in some facilities, and when the Marshals Service needs that space, ICE officials said the agency has had to move its detainees elsewhere on short notice. Further, officials from the Custody Management Division at ICE headquarters told us that ICE's bargaining power was declining, as some state and local agencies have made decisions not to work with ICE on immigration detention. Accordingly, ICE officials stated that private facility operators and a smaller pool of localities have an advantage when it

comes to negotiating bed rates, including whether a contract or agreement will include guaranteed payments.[36]

However, documents from ICE's Office of Acquisition Management indicate that ICE is well-positioned to negotiate favorable terms in its contracts and agreements. Specifically, a 2019 internal presentation on the detention market structure and private facility operator profiles states that two operators, which provide over 60 percent of ICE's total private beds, lead the market for private detention services. However, according to Office of Acquisition Management officials, ICE has leverage in negotiations because it is the largest customer in the detention market and is responsible for more than 20 percent of overall detention industry revenue.[37]

Given that ICE has to consider various factors in planning for and acquiring detention space, a strategic approach could better position the agency to weigh and balance among these factors. ICE has increased its use of guaranteed minimums in its recent contracts and agreements, committing millions of dollars to detention beds regardless of whether the beds are used. As ICE considers how it can meet its current and projected detention needs, documenting and implementing a strategic approach for using guaranteed minimums—that is, an approach that supports ICE's strategic plans, goals, and priorities—could help position ICE to better balance these factors and seek better contract and agreement terms while making more effective use of federal funds.

---

[36]Officials added that although the agency has had to pay guaranteed minimums in some cases, it may pay a discounted bed rate if it exceeds that minimum.

[37]Although Office of Acquisition Management has produced negotiations guidance, an official with Office of Acquisition Management said that ERO's Custody Management Division drives decision-making on guaranteed minimums. Office of Acquisition Management officials said they will accept what Custody Management Division tells them with respect to whether a facility should have a guaranteed minimum or not.

# ICE's Supervisory Structure and Incomplete Information on Penalties Limit Oversight and Enforcement of Detention Contracts and Agreements

## ICE's Supervisory Structure Does Not Provide Sufficient Independence for Effective Oversight of Detention Facility Contracts and Agreements

ICE primarily relies on its CORs to oversee detention facility contracts and agreements; however, the COR's supervisory structure—where field office management directly oversees the CORs' work and assesses CORs' performance—limits CORs' ability to provide independent oversight of contracts and agreements. ICE's guidance states that CORs are to function as the "eyes and ears" of the contracting officer by monitoring technical performance and reporting any potential or actual problems to the contracting officer. This includes ensuring the contractor is performing per the terms of the contract, and also applies to ICE's IGSAs.

ICE created a full-time COR program in 2009 to ensure the proper oversight and administration of detention contracts and agreements in each field office, as well as provide project management support for facility projects. According to their position description, ERO CORs are to spend 100 percent of their time on the planning, oversight, and management of ERO field office contracts, agreements, and leases. The COR positions were initially established in ERO field offices, with ERO headquarters' Contract Management Unit serving as the CORs' first line supervisor.[38] Internal ICE documents stated that CORs were to report directly to ICE headquarters to ensure independence and consistency in their efforts. Further, CORs were expected to primarily interact with field office personnel and communicate with ICE headquarters for status reporting. CORs were directly supervised by headquarters, while field office management were expected to provide input on COR performance

---

[38]The COR position was created under the Office of Detention and Removal Operations, now titled Enforcement and Removal Operations.

work plans and ratings and were responsible for day-to-day management (such as time-keeping, scheduling leave, and training).

In 2010, ICE moved direct oversight of the CORs from ERO headquarters' Contract Management Unit to each of the 24 ERO field offices, resulting in 24 separate first line supervisors.[39] Thus, since 2010, CORs' work and performance has been overseen by ERO field office management. ICE guidance states that management officials within ERO's field offices are responsible for assessing CORs' performance and balancing CORs' workloads to provide them with adequate time and resources to perform all of their delegated duties, which include inspecting supplies or services, performing technical reviews of invoices for payment, and ensuring the timely submission of required reports.[40]

In addition, according to ICE guidance, CORs have a dual reporting structure in that they report both to ERO field office management and to contracting officers within the Office of Acquisition Management. Under this dual reporting structure, ICE guidance states that contracting officers are to appoint the COR and delegate the COR's specific roles and responsibilities for each contract and agreement. CORs are to monitor technical performance and report any information that may affect contractual commitments and requirements to their contracting officers. The COR's ERO field office supervisor is responsible for ensuring that the COR successfully carries out the duties as delegated by the contracting officer. A contracting officer has the authority to terminate a COR's appointment from a contract or agreement, but field office management can recommend termination to the contracting officer, according to ICE guidance.

---

[39]A 2010 memorandum from ICE to ERO field office directors stated that the reporting relationship of CORs (supporting the ERO field office while under ERO headquarters supervision) was proving to be cumbersome and sub-optimal. We asked ICE officials for further information about why ICE found the headquarters-based reporting structure cumbersome and sub-optimal; however, officials we spoke with did not elaborate on the agency's reasoning. Similarly, in January 2019, the DHS OIG reported that ICE officials did not provide additional explanation as to why ICE moved supervision of CORs from ERO headquarters to ERO field offices. See OIG-19-18.

[40]Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations Contracting Officer's Representative Supplement*, Version 1.0 (October 2015). ERO's COR Supplement states that it was developed to distill the most relevant information from DHS's COR Supplement for reinforcement and ease of reference.

ICE officials identified various reasons for why its supervisory structure for CORs—in which field office management supervises and oversees CORs' performance and functions—is beneficial. For example, one field office manager told us that having a COR in the field office chain of command was important because the manager could ensure that the field office and the facility operators worked together to resolve issues. Specifically, the manager also stated that he wanted to be in a position to be able to personally give headquarters advance notice of any possible contract or agreement issues, including advance notice of any discrepancy reports being sent to the contracting officer. Further, one COR noted that since moving to field office supervision, he has received better administrative support for travel and technology issues. Additionally, officials from the Office of Acquisition Management said that CORs reporting to the field office is positive insofar as it drives a consensus-based decision on a discrepancy report sent to headquarters for review.

While ICE officials identified some benefits from field office management supervising and overseeing the performance and work of CORs, we have identified concerns that this supervisory structure limits CORs' ability to conduct independent oversight of contracts and agreements. For example, an official with the ERO headquarters Contract Management Unit—the original office that had direct supervision of CORs—said that moving CORs to ERO field office supervision had a detrimental impact on CORs' ability to complete their work with independence and created other challenges. The official noted that Field Office Directors are responsible for all detention facilities in their areas of responsibility and face competing priorities in terms of ensuring sufficient detention space for the offices' operational needs while also holding facility operators accountable for their performance under the contracts or agreements. In balancing these priorities, the official noted that Field Office Directors may exclude CORs from key conversations with facility operators and otherwise minimize the COR role in order to optimize their offices' broader enforcement and removal goals, of which detention facilities are a part.

We also found that ERO field office managers provided varying views on the supervisory structure of CORs. Field office management and the COR in one field office told us about an instance in which a prior Field Office Director did not allow the COR to write a discrepancy report to a facility that the COR said was notably uncooperative and non-compliant. In this instance the COR and field office managers told us that it was their understanding that the COR could not circumvent the Field Office Director

in submitting a discrepancy report to the contracting officer at headquarters. Field office managers and CORs told us that, in their view, the ability of CORs to effectively carry out their functions is dependent on the working relationships between the CORs and field office managers. For instance, field office managers in two field offices and CORs in six field offices said that a CORs' ability to conduct oversight depends on the level of support provided by field office managers.

CORs also identified challenges and concerns with the current supervisory structure. Our interviews with CORs from 12 of 24 ERO field offices—whose contracts and agreements encompass detention facilities that hold two-thirds of ICE's detained population—suggest that this supervisory structure does not provide CORs' oversight functions with sufficient independence from local field office management, thus limiting CORs' ability to effectively ensure contracts and agreements are properly administered. For example, CORs in eight of 12 offices stated that supervision by field office management has hindered their ability to conduct oversight and enforcement of their detention facility contracts and agreements. CORs identified to us concerns about reporting to ERO field offices that included lack of resources or support to carry out their oversight duties, limitations of their ability to use enforcement tools, and being bypassed by field office management.

- **Lack of resources or support in carrying out oversight.** CORs from seven field offices said that field office management did not provide sufficient support or resources to carry out their oversight functions, as called for in ICE guidance. ICE guidance states that ERO field office supervisors are responsible for ensuring CORs have adequate time and resources to perform all of their delegated duties.[41] However, CORs in five offices said that they did not have enough time to conduct their oversight duties and CORs in three offices reported that their field office management did not provide them with the means to conduct in-person visits to detention facilities. A COR in another field office said that field office management asked for contract and agreement oversight to be conducted by phone rather

---

[41]Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations Contracting Officer's Representative Supplement*, Version 1.0 (October 2015).

than in person, which the COR considered ineffective oversight.[42] CORs from three offices stated that they were excluded from conversations between their field office supervisor and detention facility operators pertaining to the facility contract or agreement. This limits CORs' ability to be the "eyes and ears" of the contracting officer and hinders COR's ability to relay information to headquarters that may affect contractual commitments or requirements.

- **Limited ability to use enforcement tools.** CORs in four field offices said that ERO field office management limited the CORs' ability to issue discrepancy reports for contract or agreement violations, including in instances of a detainee escape and a guard who abandoned an assigned post. CORs from two field offices stated that ERO field office managers may be reluctant to issue discrepancy reports because they prefer to handle violations informally, or because the field office may not want to damage their relationship with the detention facility operator. Conversely, CORs from two offices stated that their field office management pressured them to issue discrepancy reports that the COR found to be unwarranted, which one COR said put him in a position where he lacked sufficient independence.

ICE's discrepancy report guidance states that reports are to be generated at the field office level by CORs based on an observed infraction, or through audits and inspections.[43] The guidance states that CORs and facility operators can work together to resolve issues informally. However, when the COR determines that documentation of an issue or deficiency is required, the COR is to initiate the discrepancy report process and alert the contracting officer.

Although ICE's policy does not specify a role for ERO field office management in this process, our interviews with ICE headquarters, field office officials, and CORs indicated that, in practice, field office management generally determine whether an issue rises to the level at which a COR will notify the contracting officer, or whether the issue

---

[42]CORs are expected to conduct periodic site visits as necessary, with the number and frequency depending on facility size, contract (or agreement) complexity, and level of acceptable performance by the facility operators. ICE ERO headquarters officials stated that they expect CORs to have a physical presence at detention facilities in their area of responsibility.

[43]U.S. Immigration and Customs Enforcement, Office of Acquisition Management. *Procurement Guide 20-04, Contract Discrepancy Reports (CDR) Detention Contracts* (January 31, 2020). Discrepancy reports are discussed in more detail later in this report.

will be handled locally.[44] ICE guidance states that if CORs identify unsatisfactory performance, they should immediately bring that to the attention of the contracting officer so that corrective action can be taken.[45] However, local field office management are CORs' first line supervisors, and if field office management disagrees with the CORs' assessment, CORs do not have sufficient independence to challenge the direction of their management over whether a discrepancy report should be formally documented or brought to the contracting officer, according to CORs we interviewed.

- **Being bypassed by field office management.** Additionally, CORs in two offices said that ERO field office managers made requests for work directly to contractors (including for the installation of televisions and an exercise room for ICE staff at a detention facility) outside the terms of a contract or agreement, which the CORs felt unable to challenge.[46] CORs from two offices said that after expressing concern regarding provisions that ERO field office management wanted to include in an agreement, their duties were reassigned to an ICE employee who was not appointed as an oversight entity in the contract. These CORs reported that they felt unable to carry out their oversight duties due to fear of retaliation.

---

[44]For example, ICE headquarters officials stated that the field office manager's authority to review discrepancy reports is implied by the chain of command, as field office management supervise the COR, and that field office managers may prefer to review discrepancy reports before the COR submits them to the contracting officer. At the field office level, a field office manager we met with stated that he expected CORs to bring certain matters directly to field office management, who will then choose whether to elevate issues to ICE headquarters. Further, one COR stated that field office managers generally review discrepancy reports and determine whether they can be sent to the contracting officer.

[45]ICE's discrepancy report guidance states that the contracting officer is ultimately responsible for the final determination of the adequacy of the detention facility operator's performance, but Office of Acquisition Management officials told us that in practice this determination is made by senior officials within ERO's Custody Management Division for discrepancy reports with recommended penalties over $100 thousand. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations Contracting Officer's Representative Supplement*, Version 1.0 (October 2015).

[46]In instances where field offices would like additional work outside of the terms of a contract or agreement, CORs must notify the contracting officer, who has the authority to modify contract and agreement terms. According to ICE guidance, the COR must have full knowledge of all executed modifications and pending modifications to contracts and agreements as they occur.

In addition to our findings, the DHS OIG has raised concerns about the supervisory structure of CORs. In a 2019 report, the DHS OIG found that CORs may not be able to carry out their oversight and enforcement duties due to pressure from field office management to do things outside of protocol. For example, the DHS OIG reported that two CORs stated they were hesitant to identify instances of noncompliance or to issue discrepancy reports out of fear of retaliation from their field office supervisors. The report further noted that contracting officers expressed concerns about the CORs' inability to conduct their work independently. The DHS OIG recommended ICE evaluate the organizational placement of CORs, and if CORs remained under field office supervision, to develop safeguards to prevent field office supervisors from interfering with CORs' ability to fulfill their contract oversight duties.[47]

DHS OIG officials and ICE reported that ICE has taken some actions in response to this recommendation, but that as of August 2020, the DHS OIG still considered the recommendation open.[48] Specifically, ICE maintained its existing supervisory structure for CORs and implemented actions intended to serve as safeguards for CORs. For instance, ICE's Office of the Principal Legal Advisor prepared a list of what they termed "do's and don'ts for non-contracting officials," which ERO officials said would be sent to Field Office Directors in summer 2020 via internal broadcast. This document also included a reminder to Field Office Directors to include contracting officers and CORs in discussions with detention facility operators, and that only warranted contracting officers were authorized to enter into contracts and negotiate contract terms and conditions. ICE also reported shifting CORs' direct supervision from lower-level managers to Field Office Directors or Deputy Field Office Directors. ICE officials said this was done to make COR supervision more consistent across field offices.

While these could be positive steps towards implementing the DHS OIG's recommendation to develop safeguards, they do not address the issues we identified. For example, these steps do not address CORs' and some ICE headquarters officials' concerns that the ability of CORs to independently and effectively carry out their oversight functions is dependent on relationships between the CORs and field office managers.

---

[47]OIG-19-18.

[48]OIG-19-18 included four additional recommendations to improve oversight and compliance of ICE detention facility contracts and agreements. According to the DHS OIG, ICE has fully addressed one of the five recommendations.

Further, these steps do not address the concerns we identified with CORs having sufficient support and resources to conduct their oversight functions.

In addition, CORs and Office of Acquisition Management officials identified benefits to CORs being able to report directly to a headquarters entity. For example, CORs said that headquarters supervision could provide them with a safeguard for instances where they believe they should push back on ERO field office management in order to uphold the terms and conditions of a particular contract by, for example, issuing a discrepancy report. Office of Acquisition Management officials also said that ERO headquarters makes many oversight-related decisions that it could communicate to CORs more efficiently and effectively if the CORs reported to headquarters.

Office of Management and Budget guidance states that management is responsible for the establishment of a governance structure that effectively implements, directs, and oversees internal controls; and that successful implementation requires agencies to establish a culture that encourages people to communicate with their superiors about potential risk and concerns without fear of retaliation or blame.[49] Management should also implement control activities to ensure that agency objectives are met, which includes ensuring the proper segregation of duties. *Standards for Internal Control in the Federal Government* states that management should consider segregation of duties in designing control activity responsibilities so that incompatible duties are segregated, as segregation of duties helps prevent fraud, waste, and abuse in the internal control system. In particular, internal control standards state that segregation of duties can address the risk of management override.[50]

Revising its supervisory structure to ensure that CORs have sufficient independence from ERO field office management to carry out their oversight duties could better position CORs to more effectively conduct detention contract and agreement oversight and enforcement, while still allowing for collaboration and communication between CORs and field office management. These revisions—which could include reverting to ICE's initial supervisory structure where CORs were stationed in field

---

[49]United States Office of Management and Budget, *Management's Responsibility for Enterprise Risk Management and Internal Control*, OMB Circular A-123 (Washington D.C.: July 15, 2016).

[50]GAO-14-704G.

offices but supervised and assessed by ICE headquarters—could help ICE better ensure that detention contracts and agreements are properly managed and that their terms are properly enforced.

## ICE Does Not Have Complete Information on Discrepancy Reports and Their Resolution, Limiting Oversight and Analysis Efforts

ICE's detention contracts and agreements generally include quality assurance tools that CORs can use to hold contractors and agreement-holders accountable, but ICE does not maintain complete information on the use of these tools, limiting oversight and analysis efforts. In 2019, the DHS OIG reported on ICE's use of quality assurance tools and found that ICE had not consistently included quality assurance surveillance plans in detention facility contracts and agreements, which led to confusion among CORs about how to issue discrepancy reports.[51] The OIG reported that this problem was compounded by ICE not tracking these reports and rarely imposing financial consequences.

The DHS OIG recommended that ICE develop protocols to guide CORs and contracting officers in issuing discrepancy reports and imposing appropriate financial penalties against detention facility operators in response to contract and agreement noncompliance. The DHS OIG recommended that such protocols include clear guidance for determining when to issue a discrepancy report, as well as a process to track all discrepancy reports and any financial penalties imposed by ICE, including the final resolution of the issue that led to the discrepancy report or financial penalty. Following the DHS OIG's report, in 2019 ICE developed an internal website where CORs can upload discrepancy reports, along with a spreadsheet to serve as a tool for tracking relevant information.[52] Additionally, in January 2020 ICE issued a procurement guide with discrepancy report procedures, as shown below figure 6.[53]

---

[51]OIG-19-18.

[52]The tracking spreadsheet ICE developed includes fields for the contract number, name of the detention facility, a description of the incident, any financial penalties proposed by the CORs, and the outcome of any proposed financial penalties.

[53]Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Contract Discrepancy Reports (CDR) (Detention Contracts),* Procurement Guide 20-04 (January 31, 2020). As of August 2020, the DHS OIG considers this recommendation open.

**Figure 6: U.S. Immigration and Customs Enforcement (ICE) Discrepancy Report Process**

- The Contracting Officer's Representative (COR) identifies a contract (or agreement) discrepancy and informs the facility operator.
- The COR may then submit a discrepancy report or a written warning to the facility operator for correction or explanation.
- The facility operator may respond to the discrepancy report with a correction to the deficiency or a corrective action plan. The COR then evaluates the facility operator's response.
- The COR can recommend a withholding (money the operator can recover), or a deduction (money the operator cannot recover), to the contracting officer.
   - For discrepancy reports with no proposed penalty, the COR does not pass the report to the contracting officer, but maintains documentation of the discrepancy in the contract or agreement file. The COR is to involve ICE headquarters entities—such as Enforcement and Removal Operations (ERO) and the Office of Acquisition Management—in the discrepancy report review process when the recommended penalty is over $100,000.
- If the contracting officer agrees with the COR's proposed penalty, the officer is to organize a meeting with the COR, ICE ERO field office officials, and ICE headquarters to ensure agreement.
- Once all stakeholders agree, the contracting officer notifies the facility operator of ICE's decision and the COR moves forward with the proposed penalty.
- The facility operator has 10 days to appeal the decision. The contracting officer is to review any appeal and transmit a final version of the discrepancy report, including a final decision on penalties, to the facility operator. ICE ERO's Custody Management Division senior officials make the final decision regarding a facility operator's appeal, and can choose to reduce or eliminate the financial penalty.
- The COR is to maintain a record of all open and resolved discrepancy reports, and log all reports in ICE's tracking tool.

Source: GAO Analysis of ICE Documentation and Interviews with ICE Officials. | GAO-21-149

The guide focuses on the accurate tracking of specific issues in order to hold facility operators—such as jails or private detention companies—accountable to the level of service and standards established in their contract or agreement. The guide describes the documentation that CORs must maintain in their local files, and further states that CORs must record discrepancy reports into an online report tracking tool. The guide states that the tracking tool will allow ERO and Office of Acquisition Management to (1) track historic trends at particular facilities; (2) provide guidelines on consistent sanction processing across facilities around the country; (3) proactively monitor facilities with a history of discrepancy reports; and (4) analyze trends, including most common causes and best practices in how issues can be remedied. The guide says the tracking tool can also aid in response to inquiries (such as external audits) regarding discrepancies and contract oversight.

However, our analysis of available discrepancy reports and the tracking tool indicates that the data in the tool are not complete enough to allow ICE to determine the extent to which the agency is enforcing the terms

and conditions of facility contracts and agreements or to conduct the types of analyses set forth in its guidance. Specifically, our analysis indicates that information for many discrepancy reports that was included in the tracking tool was incomplete, and in some cases inaccurate. Further, our analysis indicates that the tracking tool did not contain all discrepancy reports that CORs have issued since ICE developed the tool.

Specifically, ICE provided two versions of its tracking tool—one from July 2019 that showed 42 discrepancy reports (18 of which recommended deductions), and another from May 2020 that showed 17 new reports (7 of which recommended deductions). However, the May 2020 tool did not include 36 reports that were found on the 2019 version. Further, our review of ICE's discrepancy report documentation identified an additional three reports with recommended penalties that were not found on either version of the tracking tool. Our review also found two instances where the tracking tool incorrectly stated that no penalty was recommended when the reports themselves identified over $10,500 in recommended penalties.

The 2019 tracking tool also contained incomplete information with respect to whether ICE ultimately assessed the financial penalties proposed by the CORs. Specifically 18 discrepancy reports included a proposed penalty from the COR, but the tracking tools provided information on the resolution of only 10 of these.[54] The remaining eight reports recommended a percentage to deduct from the facility operator's invoice.[55] However, for three reports with recommended percentages to deduct, the reports themselves (not the tracking tool) listed recommended penalties of about $2.2 million. Examples of contract or agreement violations that ICE identified for which there was no documented resolution in the tracking tool included multiple instances of detainee

[54]One deduction from March 2019 was listed as pending. For the 10 discrepancy reports where the tracking tool indicated that ICE assessed a penalty, it indicated that ICE collected about $1.6 million dollars for contract and agreement discrepancies that included: the 2017 death of a detainee as a result of deficient medical care and a detainee escape during transport.

[55]A contract or agreement's quality assurance surveillance plan outlines the standards that the COR will use to evaluate the facility operator's compliance with contract and agreement provisions, and generally will include percentage ranges of a facility operator's monthly invoice that can be withheld or deducted if the facility provider fails to meet those standards.

escapes, overpayments for vacant staff positions, and the negligent deaths of two detainees in 2018.

We asked ICE Office of Acquisition Management officials about the outcomes of 14 discrepancy reports that recommended financial penalties. Of these 14 reports, 11 were on the tracking tool without a recorded resolution, and three were not on the tracking tool (but recommended penalties).[56] The officials were able to identify the outcomes of most of these reports through outreach to CORs and reviewing contract files, as detailed below:

- Six of the 14 discrepancy reports ultimately resulted in a financial penalty to the facility operator, either in the form of deductions or withholdings. These six discrepancy reports resulted in deductions and withholdings totaling about $3.9 million, of which ICE returned about $2.6 million to the detention operators after the discrepancies were resolved.[57] Examples of discrepancies for which ICE withheld or deducted funds included improper use of pepper spray, detainee escapes, and ICE paying for vacant staff positions.

- Four of the 14 discrepancy reports resulted in no financial penalty. Office of Acquisition Management officials provided varying reasons why ICE did not impose the recommended penalties. For example, one discrepancy report stated that staffing at a facility was below the requirements outlined in the agreement, and therefore the COR recommend a penalty to recover overpayments. Officials said the penalty was never imposed because the IGSA did not include a staffing plan; however, as a result of the discrepancy report the facility operator agreed to modify the IGSA to incorporate a staffing plan. Other reasons that penalties were not imposed included CORs resolving issues directly with the detention facility operator, and an instance in which officials said that ERO's Custody Management Division took too long to review the discrepancy report for ICE to impose the penalty. In this instance, the field office also said it was satisfied with the facility operator's corrective actions. Two reports were under legal review with ICE headquarters. Additionally, ICE

---

[56]We selected these 14 from the 2019 version of the discrepancy report tracker and available discrepancy reports from ICE as of March 2020 in order to provide for sufficient time to have passed for there to be a resolution of the recorded incident.

[57]In one of these cases, the facility operator submitted a claim to ICE requesting a reduced deduction—from a penalty of about $900,000 to about $600,000. As of June 5, 2020 the request was still under legal review. The $3.9 million total includes the amount of the full deduction.

could not locate one of the reports and did not provide a response for another.

Office of Acquisition Management guidance requires CORs to enter information into the tracking tool for the contracts and agreements they oversee; however, there are not processes in place to ensure that the data are complete and accurate. For example, ICE ERO's Custody Management Division—which is responsible for determining whether a financial penalty will be assessed—does not enter any information into the tracking tool regarding the final outcome of the discrepancy report. As a result, the only way for the Office of Acquisition Management to obtain complete information on all discrepancy reports is to compile it from the individual contract files maintained by CORs, which officials said is a time-consuming and laborious process.

Office of Acquisition Management officials explained that the office developed the tracking tool in response to repeated requests for data about discrepancy reports and their status, but the office does not use the tool for any internal or programmatic purposes. Rather, the tracking tool solely serves as a centralized source of information for responding to external data requests. However, the tracking tool is insufficient for that purpose because its incomplete data limit ICE's and external reviewers' ability to determine whether financial sanctions are being levied, and if not, why not.

Although the information ICE maintains on discrepancy reports is incomplete, our analysis of available reports—which came from 11 of ICE's 24 field offices—and the tracking tool confirmed that analyzing information in accordance with ICE's guidance could help identify useful information, such as inconsistencies in when penalties are levied, facilities with histories of discrepancies, and trends in common causes. For example, at least 50 of the reports were for multiple violations of similar issues, such as violations of agreed-upon discipline processes and staffing shortages that compromised detainee health or safety. Additionally, at least 12 reports with recommended financial penalties were written to the same three facilities, which included penalties for the deaths of three detainees, multiple detainee escapes, violation of use of force policies regarding the use of pepper spray and restraints, and other violations.

In addition to ICE's discrepancy report guidance requiring that CORs record discrepancy reports in a tracking tool and citing the benefits of analyzing the information to identify trends, *Standards for Internal Control*

*in the Federal Government* notes that documentation is a necessary part of an effective internal control system.[58] Documentation provides a means to retain organizational knowledge and mitigate the risk of having that knowledge limited to a few personnel, as well as a means to communicate that knowledge as needed to external parties, such as external auditors. Further, *Standards for Internal Control in the Federal Government* provides that management should process data into quality information and use the information to make informed decisions that support program goals. Ensuring the completeness and reliability of its discrepancy report tracking tool and analyzing the information therein could help ICE better report, track, and resolve identified contract or agreement deficiencies and hold facility operators accountable to the service levels required by their contracts and agreements.

## Conclusions

The immigration detention system in the United States is a multi-billion dollar a year enterprise. ICE has entered into contracts and agreements for detention space at over 230 facilities, but needs to improve its detention space acquisition planning and oversight to more effectively use federal funds. First, ICE has not consistently followed its process for obtaining detention space. Consistently using a process that includes gathering input from relevant stakeholders and documenting the basis for decisions made before entering into contracts for new or expanded detention space could help provide assurance that ICE has appropriately considered and weighed relevant factors to make the most cost effective decisions that meet its operational needs. Second, in recent years ICE has entered into a dozen contracts and agreements that included guaranteed payments—putting taxpayers in the position of compensating local government entities and private detention companies for millions of dollars a month for detention space that may not be used. Documenting and implementing a strategic approach for using guaranteed minimums that is linked to ICE's strategic plans, goals, and priorities could help ICE seek better contract terms and more effectively use federal funds. Third, ICE took some actions to safeguard contract oversight, but revising its supervisory reporting structure to properly segregate duties could help ICE ensure that officials responsible for contract oversight have sufficient independence from local management, while still allowing for collaboration and communication at the local level. This could allow ICE to conduct contract and agreement oversight and enforcement in a more objective, uniform, and effective manner, thereby better ensuring that ICE detention contracts and agreements are enforced. Last, ensuring that ICE

---

[58] GAO-14-704G.

has complete and reliable information on instances where detention facility operators fail to meet their requirements—and analyzing that information in a manner that enables trends in contract and agreement deficiencies to be identified and addressed—could help ICE hold facility operators accountable to the service levels required by their contracts and agreements.

## Recommendations for Executive Action

We are making the following five recommendations to ICE:

- The Director of ICE should ensure that ERO consistently uses a process that includes input from relevant stakeholders and documentation of the basis for decisions made before entering into contracts or agreements for new or expanded detention space. (Recommendation 1)

- The Director of ICE should document and implement a strategic approach for using guaranteed minimums in detention contracts and agreements that supports ICE's strategic plans, goals, and priorities. (Recommendation 2)

- The Director of ICE should revise its supervisory structure so that the CORs' oversight functions are independent of field office management. (Recommendation 3)

- The Director of ICE should ensure that the agency has complete and reliable information on discrepancy reports and their resolution. (Recommendation 4)

- Once ICE has complete and reliable discrepancy report information, the Director of ICE should regularly analyze the information in a manner that enables trends in facility operator and agreement-holder deficiencies to be identified and addressed. (Recommendation 5)

## Agency Comments and Our Evaluation

We provided a draft of this report to DHS and DOJ for review and comment. DOJ did not provide written comments. DHS provided written comments, which are reproduced in appendix II. DHS also provided technical comments, which we incorporated as appropriate. DHS concurred with four of the five recommendations and described actions to address them. DHS did not concur with one recommendation.

With regard to our first recommendation that ERO consistently use a process that includes input from relevant stakeholders and documentation of the basis for decisions made before entering into contracts or agreements for new or expanded detention space, DHS concurred. DHS stated that ICE plans to review and revise its operating guidance to

ensure consistent implementation of its white paper process across various offices for detention space acquisition. Provided that ICE implements its revised operating guidance, these actions should address the intent of our recommendation.

With regard to our second recommendation that ICE document and implement a strategic approach for using guaranteed minimums in detention contracts and agreements that supports ICE's strategic plans, goals, and priorities, DHS concurred. DHS stated that ICE will review existing guidance to ensure its acquisition strategy for guaranteed minimum payments is appropriately documented and supports ICE's strategic plans, goals, and priorities. Provided that ICE implements its guidance after it finishes its planned review, these actions should address the intent of our recommendation.

DHS did not concur with our third recommendation that ICE revise its supervisory structure so that CORs' oversight functions are independent of field office management. DHS stated that in 2019, ICE ERO Field Operations evaluated the supervisory structure of CORs and determined that the optimal alignment was for them to remain within the chain of command of field office management. Further, DHS stated that COR positions were intended to reduce the administrative workload of officers that were previously performing COR duties in the field, providing officers with more time to engage in detention and removal activities. DHS stated that ERO ensures the COR appointment and supervisory notification letters for each detention contract detail the responsibilities of each role and that field office management assures adherence.

We continue to believe that revising its supervisory structure to ensure that CORs have sufficient independence from ERO field office management would better position CORs to more effectively conduct detention contract and agreement oversight and enforcement, while still allowing for collaboration and communication at the field office level. As discussed in this report, interviews with CORs from 12 ERO field offices—whose contracts and agreements encompass detention facilities that hold two-thirds of ICE's detained population—suggest that the existing supervisory structure does not provide CORs' oversight functions with sufficient independence from field office management. CORs reported that they lacked resources (including adequate time) or support in carrying out their oversight duties; that field office management had limited CORs' ability to use contract enforcement tools; and that field office management had by-passed CORs' authority in some instances. These concerns echo those reported by the DHS OIG in 2019, and this

report discusses the actions ICE took in response to the DHS OIG's recommendation to evaluate the organizational placement of CORs and to develop appropriate safeguards. However, ICE's actions in response to the DHS OIG's recommendation do not address the issues we identified. For example, as discussed in this report, these actions do not address CORs' and some ICE headquarters officials' concerns that the ability of CORs to independently carry out their oversight functions is dependent on relationships between the CORs and field office managers. Further, they do not address the concerns we identified with CORs having sufficient support and resources to carry out their oversight duties. A revised supervisory structure—which could include reverting to ICE's original structure for the CORs where they were stationed in the field but supervised by ICE headquarters—could help ensure CORs have sufficient independence to carry out their oversight duties.

With regard to our fourth recommendation to ensure ICE has complete and reliable information on discrepancy reports and their resolution, DHS concurred. DHS stated that ICE Office of Acquisition Management's Quality Assurance Division has been tasked with recording pertinent data elements for all submitted discrepancy reports into a tracking spreadsheet and ensuring that the spreadsheet is up to date. Office of Acquisition Management will also work with ICE ERO to ensure CORs comply with the requirement to submit all discrepancy reports to the contracting officers for tracking submissions. Once completed, these actions should address the intent of our recommendation.

With regard to our fifth recommendation to analyze discrepancy report information in a manner that enables trends in facility operator and agreement-holder deficiencies to be identified and addressed, DHS concurred. DHS stated that upon ICE Office of Acquisition Management completing the discrepancy report tracking mechanism and notifying CORs of their duties related to discrepancy report submission, ERO Custody Management will implement procedures to periodically analyze the tracking spreadsheet to identify any trends in facility operator deficiencies. DHS stated that this analysis will aid in identifying best practices, among other things, and that supporting guidance may be updated accordingly. Once completed, these actions should address the intent of our recommendation.

As agreed with your office, unless you publically announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the Acting Secretary of Homeland Security and the Acting Attorney General. In addition, the report will be available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made significant contributions to this report are listed in appendix III.

Sincerely yours,

Rebecca Gambler
Director, Homeland Security and Justice

# Appendix I: Selected Characteristics of U.S. Immigration and Customs Enforcement (ICE) Contracts and Agreements

ICE's detention contracts and agreements vary across several characteristics. This appendix provides information on how contracts and agreements vary with respect to:

- Total value
- Bed rate
- Guaranteed minimums
- Utilization

## Total Value

ICE internal guidance defines total value as the entire value of the contract or agreement over a given period of time. It is calculated by adding up all costs and profit on ICE's detention services cost statement.[1] Costs are broken down into two categories—operating and non-operating.

- Operating costs include staffing, facility costs (such as building rent and utilities), and other direct costs (such as food; recreation; or other detainee supplies, such as linens or toiletries).
- Non-operating costs include depreciation and interest on any buildings or equipment, contracted services (such as medical, education, or food services) and general and administrative costs (such as accounting, human resources, and insurance costs).

The Office of Acquisition Management defines profit (sometimes called "margin" or "return") as the money that detention operators have left over after expenses. In other words, profit is the total contract value, minus total costs.

Given the range of costs within a facility, as well as the variations in operator profits, the total value of contracts and agreements across ICE's detention portfolio varies substantially. For example, ICE entered into a contract in 2015 with a total value of approximately $747 million over a 10-year period. According to ICE data, in fiscal year 2019 ICE spent about $70 million against this contract to hold a daily average of 1,342 detainees. In another example, ICE entered into a 6-year contract with a total value of approximately $207 million. In fiscal year 2019, ICE spent

---

[1]The detention services cost statement is an Excel workbook that ICE uses to gather cost or pricing data. According to the related handbook, the data helps ICE to determine a fair and reasonable price for each detention facility, in collaboration with the detention service provider. Further, it allows for quicker processing times for requests for equitable adjustments due to new wage determinations.

Appendix I: Selected Characteristics of U.S.
Immigration and Customs Enforcement (ICE)
Contracts and Agreements

$33 million against this contract to hold a daily average of 651 detainees, according to ICE data.

## Bed Rate

ICE's contracts and agreements also vary with respect to the bed rate—the amount ICE pays a facility to hold one detainee for 1 day. Guidance from ICE's Office of Acquisition Management states that bed rate is calculated by dividing the total contract value by the facility's population, by 365. The guidance notes that use of a bed rate allows for comparisons across different facilities. It also states that a number of factors impact the bed rate, including:

- The number of beds at the facility;

- Fixed costs–expenses which must be paid regardless of the beds used, such as property loans or maintenance;

- Variable costs–expenses that fluctuate with the number of beds used, such as detainee clothing and food;

- The service provider's expected rate of return, or profit; and

- How much of the facility operator's "business risk" that ICE shares. Business risk is the possibility that a company will have lower than anticipated profits or operate at a loss. Business risk sharing refers to the way that a detention operator's business risk is distributed between the operator and ICE.

According to ICE data, in fiscal year 2019, bed rates for facilities that held detainees ranged from about $28 to $162, with an overall median of $75 per detainee per day, as shown in figure 7.[2]

---

[2]In 2014, we reported on limitations with ICE's data on facility costs, including the bed rate, but determined that the data were sufficiently reliable to provide a general indication of approximate bed rate ranges across and within facility types. See GAO, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards*, GAO-15-153 (Washington, D.C.: October 10, 2014). We determined that the data continue to be sufficiently reliable to provide approximate bed rate ranges.

Appendix I: Selected Characteristics of U.S.
Immigration and Customs Enforcement (ICE)
Contracts and Agreements

**Figure 7: U.S. Immigration and Customs Enforcement (ICE) Detention Bed Rates, by Facility Type, Fiscal Year 2019**



IGSA    Intergovernment Service Agreement

Source: GAO analysis of ICE data.  |  GAO-21-149

Note: The overall median bed rate of $75 does not include family residential centers. ICE uses bed rates from individual facilities to estimate an overall bed rate across detention facilities, which it uses to project adult detention costs. In 2018, we reported that including both adult and family beds in ICE's overall bed rate results in double counting of certain costs in bed rate projections. As a result, ICE removed family residential center costs from its calculation of the overall adult bed rate. See GAO, Immigration Detention: Opportunities Exist to Improve Cost Estimates, GAO-18-343, (Washington, D.C.: April 18, 2018). Facilities with a guaranteed minimum have a tiered bed rate where ICE typically pays a lower bed rate after it meets the facility's guaranteed minimum. For those facilities, we used ICE's theoretical bed rate calculation based on 100 percent utilization.

In 2014, we reported that variation in bed rates results from such factors as the different services provided at the facility, as well as the facility location and type.[3] For example, we reported that labor costs make up the majority of all facility costs, and according to ICE officials, the number of staff needed at each facility can vary based on factors such as a facility's physical layout. Additionally, we reported that variations in local pay rates may contribute to differences in bed rates across geographic regions, according to ICE officials. We also reported that an ICE study

---

[3]GAO-15-153.

Appendix I: Selected Characteristics of U.S.
Immigration and Customs Enforcement (ICE)
Contracts and Agreements

had found that bed rates were higher at service processing centers as compared to ICE's other facility types. This was due to the use of separate contracts for guards, food, facility maintenance, and other services, which can increase overhead costs. ICE officials we interviewed during our review stated that these factors continue to contribute to variation in bed rates.

## Guaranteed Minimums

ICE contracts and agreements may include a guaranteed minimum number of beds that ICE is required to pay for regardless of whether they are filled. Specifically, as of May 11, 2020, ICE data indicated that it had 43 contracts and agreements with guaranteed minimums, which encompassed about a quarter of the 178 facilities ICE had used in fiscal year 2020.[4] Across these 43 contracts and agreements, ICE guaranteed payment for approximately 28,000 beds a day nationwide at a total annual cost of approximately $1.3 billion, according to ICE data. The value of the guaranteed payments varied across contracts and agreements and ranged from about $1.6 million to about $254.5 million annually, according to ICE data.

The number of guaranteed beds per contract and agreement also varied, ranging from 40 beds (in a county correctional center) to 2,400 at a family residential facility. According to ICE data, all but five of its contracts and agreements with guaranteed minimums also included tiered pricing. In these arrangements, ICE pays a lower bed rate for each detainee housed above the agreed-upon guaranteed minimum. For example, in one private detention facility, ICE guaranteed payment for 640 beds at $155.65 a bed. If ICE exceeds 640 detainees, the rate for each additional bed drops to $45.46.

## Utilization

ICE generally has a set number of beds available for use at each facility, which may be less than the total bed space at the facility. If ICE's contract or agreement with a facility does not have a guaranteed payment, ICE will pay the established bed rate for the number of beds it utilizes at the facility.

[4]Although ICE data identifies 45 facilities as having guaranteed minimums, ICE has 43 unique contracts and agreements for these facilities because four facilities share a guaranteed minimum. For example, under one agreement, two facilities share a 650 person guaranteed minimum for about $2 million a month. For our purposes, we are counting these as four unique facilities under two agreements with guaranteed minimums.

**Appendix I: Selected Characteristics of U.S. Immigration and Customs Enforcement (ICE) Contracts and Agreements**

ICE tracks utilization rates for facilities at which it has a set number of beds.[5] Of the 185 facilities ICE used in fiscal year 2019, 109 had a set number of beds. Among the 109 facilities, those that housed only ICE detainees (contract detention facilities, service processing centers, dedicated IGSAs) generally operated at capacity or close to capacity (on average 93 percent) during fiscal year 2019. At those of the 109 facilities that housed ICE detainees and other populations (non-dedicated IGSAs and U.S. Marshals Service-contracted facilities) ICE utilized a lower portion of available beds (on average 69 percent), according to ICE data. This is due in part to ICE's ability to use these facilities on an as-needed basis, according to ICE officials. ICE data indicated that facilities that exclusively hold families with children (family residential centers) had a lower utilization rate (on average 50 percent) during fiscal year 2019.

[5]ICE calculates a facility's utilization rate by dividing average detainee population by the facility's set number of beds (capacity). ICE data include utilization rates for 109 of the 185 facilities ICE used in fiscal year 2019. For the remaining 76 facilities, ICE data note an "as needed" capacity, which according to ICE officials, means that detention beds are available for ICE to use if the bed is open and available (i.e., not being used by a county or state inmate) at the time that ICE requests to house a detainee. As a result, ICE data do not include utilization rates for these 76 facilities and they are not included in our analysis.

# Appendix II: Comments from Department of Homeland Security (DHS)



U.S. Department of Homeland Security
Washington, DC 20528

December 14, 2020

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:     Management Response to Draft Report GAO-21-149, "IMMIGRATION
        DETENTION: Actions Needed to Improve Planning, Documentation, and
        Oversight of Detention Facility Contracts"

Dear Ms. Gambler:

Thank you for the opportunity to comment on this draft report. The U.S. Department of Homeland Security (DHS or the Department) appreciates the U.S. Government Accountability Office's (GAO) work in planning and conducting its review and issuing this report.

The Department is pleased to note GAO's acknowledgment of the challenges inherent in planning for detention space needs. U.S. Immigration and Customs Enforcement (ICE) endeavors to deliver quality acquisition solutions in support of this aspect of its mission. More specifically, during the acquisition process ICE reviews offers or quotes received against the evaluation factors set forth in the solicitation. Proposals deemed compliant are evaluated to ensure that the award is made to a vendor that meets or exceeds the selection criteria and will be able to perform or provide deliverables in accordance with the contract requirements, terms, and conditions.

ICE continuously strives to improve the efficiency and effectiveness of its operations and services. For example, in July 2020, the ICE Office of Acquisition Management (OAQ) developed and implemented new guidance for contracting staff to improve the contract discrepancy reports process and data collection. The new process also consists of OAQ and ICE Enforcement and Removal Operations (ERO) working jointly to identify undesirable trends and implement necessary corrective actions regarding oversight of detention contracts. ICE will also begin better leveraging the data collected to more fully

**Appendix II: Comments from Department of Homeland Security (DHS)**

understand its resource needs and link them to acquisition strategies for critical mission operations.

The draft report contained five recommendations, with which the Department concurs with four (Recommendations 1, 2, 4, and 5) and non-concurs with one (Recommendation 3). Attached find our detailed response to each recommendation. DHS previously submitted technical comments addressing several accuracy and contextual issues under a separate cover for GAO's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Sincerely,

JIM H CRUMPACKER   Digitally signed by JIM H CRUMPACKER
Date: 2020.12.14 10:19:59 -05'00'

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Attachment:  Management Response to Recommendations Contained in GAO-21-149**

GAO recommended that the Director of ICE should:

**Recommendation 1:**  Ensure that ERO consistently uses a process that includes input from relevant stakeholders and documentation of the basis for decisions made before entering into contracts or agreements for new or expanded detention space.

**Response:**  Concur.  ICE ERO agrees that its bedspace acquisition process should be consistently applied, whether the process is initiated by a field component or by headquarters.  Within ERO, the Detention Planning and Acquisition Unit (DPAU) oversees planning and acquisition activities to provide civil detention space at strategically located sites in support of efficient immigration enforcement and removal operations.  DPAU coordinates detention-related requirements at the national level with input from ERO field offices, Criminal Alien Program, Fugitive Operations, Homeland Security Investigations, OAQ, U.S. Customs and Border Protection, and other federal, state, local, and tribal stakeholders.  These collaborative efforts result in the acquisition of safe and secure detention facilities that are in compliance with applicable detention standards at fair and reasonable costs to the government.  ERO will review and revise its operating guidance to ensure consistent implementation of its white paper process across the enterprise for detention space acquisition.  Estimated Completion Date (ECD): December 31, 2021.

**Recommendation 2:**  Document and implement a strategic approach for using guaranteed minimums in detention contracts and agreements that supports ICE's strategic plans, goals, and priorities.

**Response:**  Concur.  ICE ERO has implemented a strategic approach in its acquisition of detention space that appropriately accounts for guaranteed minimum payments within detention contracts and agreement.  Prior to the Coronavirus Disease 2019 pandemic, ICE acquired guaranteed minimums and surge beds to meet historically high demand in Fiscal Year (FY) 2019.  ERO DPAU has continuously supported the evaluation of detention beds acquisition and the reporting of their usage.  DPAU will review existing guidance to ensure the ICE acquisition strategy for guaranteed minimum payments is appropriately documented and supports ICE's strategic plans, goals, and priorities.  ECD: December 31, 2021.

**Recommendation 3:**  Revise its supervisory structure so that the CORs' [Contracting Officer's Representatives] oversight functions are independent of field office management.

3

Appendix II: Comments from Department of
Homeland Security (DHS)

**Response:**  Non-concur.  In 2019, ICE ERO Field Operations evaluated the supervisory
structure of CORs assigned to detention facility contracts and determined the optimal
alignment is for them to remain within the chain of command of field office management.
The COR positions were established in each field office to ensure the proper oversight
and administration of contracts and contractual agreements supporting each field office,
as well as to provide project management support for facility-related projects.  The
positions were intended to reduce the administrative workload of officers that were
previously performing COR duties in the field, providing them with more time to engage
in detention and removal activities.  ERO ensures the COR appointment and supervisory
notification letters for each detention contract detail the responsibilities of each role, and
field office management assures adherence.  We request that GAO consider this
recommendation resolved and closed as implemented.

**Recommendation 4:**  Ensure that the agency has complete and reliable information on
discrepancy reports and their resolution.

**Response:**  Concur.  ICE OAQ implemented an appendix to the ICE Acquisition Manual
(ICAM) in June of 2020 related to Contract Discrepancy Report (CDR) processing and
tracking.  The OAQ ICAM implements and supplements the Federal Acquisition
Regulation, the Homeland Security Acquisition Regulation, and the Homeland Security
Acquisition Manual.  It is non-regulatory in nature and provides uniform procedures for
the internal operation of acquiring supplies and services within OAQ.  The CDR
appendix establishes guidelines for processing and tracking CDRs associated with OAQ
detention and related services contracts.  In addition, the CDR process is outlined in a
contract's Quality Assurance Surveillance Plan.  The intent of the ICAM appendix is to
serve as a guide for OAQ staff to ensure CDRs and any associated actions (i.e.,
withholdings, deductions, cure notices) are resolved, closed out, and properly tracked.  In
conjunction with the issuance of the ICAM guidance, OAQ also instituted a CDR
submission mailbox for Contracting Officers (COs) to submit completed CDRs for
tracking.  The OAQ Quality Assurance Division has been tasked with recording pertinent
data elements for all submitted CDRs into a tracking spreadsheet and ensuring the
spreadsheet is up to date.  OAQ will work with ERO to ensure CORs comply with the
requirement to submit all CDRs to the COs for tracking submission.  The ICAM
appendix, submission mailbox, and tracking mechanism are completed.  The notification
to ERO CORs of expected compliance will be completed by the end of FY 2021 Quarter
2.  ECD:  June 30, 2021.

**Recommendation 5:**  Once ICE has complete and reliable discrepancy report
information, the Director of ICE should regularly analyze the information in a manner
that enables trends in facility operator and agreement-holder deficiencies to be identified
and addressed.

4

**Appendix II: Comments from Department of Homeland Security (DHS)**

**Response:**  Concur.  Upon OAQ's completion of the tracking mechanism and notification to ERO CORs of expected compliance for CDR submissions, ERO Custody Management will implement procedures to periodically analyze the OAQ tracking spreadsheet to identify any trends in facility operator deficiencies.  This analysis will aid in identifying the most common causes and best practices with corrective actions taken to address issues with facility operators.  Supporting guidance, if applicable, will be updated accordingly.  ECD:  December 31, 2021.

5

# Appendix III: GAO Contact and Staff Acknowledgments

| GAO Contact | Rebecca Gambler, at (202) 512-8777 or gamblerr@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the contact named above, Taylor Matheson (Assistant Director), Charlotte Gamble (Analyst-in-Charge), Kelsey M. Carpenter, Benjamin Crossley, Pamela Davidson, Hannah Hubbard, Sasan J. "Jon" Najmi, Danielle Pakdaman, and Adam Vogt made key contributions to this report. |

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet:<br><br>Website: https://www.gao.gov/fraudnet/fraudnet.htm<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Acting Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

Case 6:22-cv-01130-DCJ-CBW    Document 218-17    Filed 01/29/24    Page 269 of 503 PageID #:
12543

JOE BIDEN     Published 5  ays a  o

# Leaked Border Patrol docs show mass release of illegal immigrants into US by Biden administration

The Biden admi  istration is releasing enormous numbers of migrants into the U S , often with little to no oversight

 By **Bill Melugin** , **Adam Shaw** | Fox News



**Leaked document reveals numbers of migrants released into the U.S.**

Fox News nat ona  correspondent B   Me ug n reports on  eaked document revea  ng over 135K m grants were re eased  nto the U S  s nce August 6th

**EXCLUSIVE:** At least 160,000 illegal immigrants have been released into the U.S., often with little to no supervision, by the Biden administration since March – including a broad use of limited parole authorities to make more than 30,000 eligible for work permits since August, Border Patrol documents obtained by Fox News show.

The documents give a partial snapshot into how the Biden administration has been releasing enormous numbers of migrants into the U.S. often with little to no oversight, supervision or immediate risk of deportation.

**BORDER CRISIS OVERWHELMING OFFICIAL, COMMUNITIES AS MIGRANT NUMBERS KEEP SURGING**

Since March 20, at least 94,570 illegal immigrants have been released into the U.S. with Notices to Report. Those who receive such a notice are only required to check in with an ICE office when they get to their final destination – which could be anywhere across the country. Those who check in are not deported or detained as their immigration proceedings move forward.

Meanwhile, since Aug 6th, the administration has released roughly 32,000 immigrants into the U.S. via parole – which gives migrants a form of legal status and the ability to apply for work permits.

Federal law says parole authority is to be used on a case-by-case basis for "urgent humanitarian purposes" and "significant public benefit." Typically only a handful of parole cases are granted by officials, but the Biden administration has been using it more broadly, including in its parole of tens of thousands of Afghans into the United States as part of Operation Allies Welcome.

Former Border Patrol Chief Rodney Scott, who served under President Biden, reviewed the documents and told Fox News that he believes the administration is abusing its parole authority.

"By law and regulation a parole shall only be granted on a case by case basis and only for significant humanitarian reasons or significant public benefit. Neither of these appear to apply to the current situation," he said, adding that the number of paroles brings into question the review and approval process.

"As a field chief, I don't believe I ever approved more than 5 or 10 paroles in a year," he said. "When I did, I ensured that the alien was monitored continuously and was detained or removed as soon as the circumstances allowed."

**SEN. BLACKBURN TOURS BORDER, SAYS CRISIS 'CANNOT CONTINUE' AS SHE CALLS ON BIDEN TO STEP UP**

10/18/24, 6:22 PM    Case 6:22-cv-01130-DCJ-CBW   Leaked Border Patrol docs reveal release of illegal immigrants in US by Biden administration
Document 218-17   Filed 01/29/24   Page 271 of 503 PageID #:
12545

The documents also show that since Aug 6, the administration has released an additional 40,000 illegal immigrants on their own recognizance. The documents also show that on one single day in Del Rio sector, 128 single adult illegal immigrants were released into the U.S. without ATD – which typically includes tracking by an ankle monitor or phone.



A Customs and Border Protection (CBP) official told Fox that mechanisms like paroling, the use of NTRs and enrolling migrants in Alternatives to Detention (ATD) "provides mechanisms to require family units released from CBP custody to report to ICE within a specified time."

The official also cited figures that show that between 2014 and 2020, 81% of those released into the U S did report in for their immigration proceedings

The agency has not released its numbers for September, but in both July and August there were more than 200,000 migrant encounters, marking some of the highest numbers in two decades. Since then, migrants have kept coming in large numbers According to the documents, Rio Grande Valley encountered 5,900 migrants in one week, while Del Rio encountered more than 2,900 in the same period

**CLICK HERE TO GET THE FOX NEWS APP**

DHS Secretary Alejandro Mayorkas, who has repeatedly claimed that the border is not open, reportedly warned officials of a worst case scenario of up to 400,000 encounters if Title 42 public health protections were ended.

Republicans have blamed the Biden administration's rapid rollback of Trump-era border protections for the ongoing crisis at the border  The administration however has focused on an explanation emphasizing "root causes" like poverty, corruption and violence in Central America.

"The downturn in economies, the attendant rise in violence, the downturn in economies made more acute by reason of the impact of the COVID 19 pandemic, the suppression of any humanitarian relief over the past number of years, and the pent-up thirst for relief among many different populations," Mayorkas told Yahoo News this week  "I think an accumulation of factors contributes to the rise in migration that we ve seen."

Bill Melugin currently serves as a national correspondent for FOX News Channel based out of the Los Angeles bureau.



## Conversation 9.5K Comments

  2 Viewing

What do you think?

Sort by **Best** ˅

**geefostabc** · 13 October, 2021                                                                 ...

Case 6:22-cv-01130-DCJ-CBW Document 218-17 Filed 01/29/24 Page 273 of 503 PageID #: 12547



**PBS NEWS HOUR**

# U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources

Jun 4, 2021 6:48 PM EDT

A surge in crossings at the U.S.-Mexico border in recent months has led U.S. Border agents to drop some migrants off at sites in rural American towns, to begin their wait for court hearings. But these towns often lack the means to cope with the influx, even though aid groups have stepped in to help. Special correspondent Dan Lieberman reports.

## Read the Full Transcript

**Judy Woodruff:**

A surge in crossings at the U.S.-Mexican border in recent months has led U.S. border agents to drop some migrants off at sites in rural Am ri an t wns t  b gin th  ir wait f r   urt h  arings

As special correspondent Dan Lieberman reports, these towns often lack the means to cope with the influx, even though aid groups have stepped in to help.

**Dan Lieberman:**

It's another hot day on the border for Fernie Quiroz, a volunteer with the Arizona California Humanitarian Coalition, a group that was   r at d t r sp nd t  a gr wing tr nd, b rd r Patr l r l  asing migrants in small t wns that la k th  r s ur  st r sp nd

**Fernie Quiroz:**

They have nowhere to call, where to go. They don't even know where the bus station is. Where is an airport? Where is a local hotel?

**Dan Lieberman:**

Instead of releasing the migrants onto the streets, Border Patrol began dropping them off at the Regional Center for Border Health in Somerton, a rural city near Yuma, Arizona, where they get COVID-tested and are given food and water before boarding a charter bus to sh  lt rs h  urs away Fr m th r , th y  ft n trav l hundr ds  f mil  s t  stay with family m  mb rs  r a sp  ns r

**Fernie Quiroz:**

The 41 individuals that were released to us today, this time tomorrow, they will be in the arms of their family.

**Dan Lieberman:**

10/18/23, 8:06 AM    U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources | PBS NewsHour

Case 6:22-cv-01130-DCJ-CBW Document 218-17 Filed 01/29/24 Page 274 of 503 PageID #: 12548

The next day, we met C and her 9-year-old daughter from Nicaragua. For her own protection, we are using just her first initial. I asked her why she decided to leave now.

---

**C (through translator):**

Th r  is a l t  f  nfli t  Th r  is n      n my, th  r  is n  w rk  Th r  is n  way t  g t  ah ad  B  sid s, w  ar  afraid  f b ing in a country where there is great danger for everyone.

---

**Dan Lieberman:**

Once they got to the U.S. border, they crossed between official ports of entry to get into the U.S.

---

**C (through translator):**

The area where we crossed, the wall is there, but it's open. The wall isn't closed. There's an entryway.

---

**Dan Lieberman:**

W  'r  right up against th  b  rd r with M xi   , wh r  just a small f n    and  anal s  parat  th  tw     untri s

We were told by Customs and Border Protection that a majority of migrants are choosing to cross at places like this one, instead of ports of entry. Under Title 42, the pandemic era rule that expels most migrants, many know that, if they cross here or other places like it and turn themselves into Border Patrol, they can claim asylum.

Cust  ms and B rd r Pr t   ti n say th y hav r    ntly s   n th  high st numb r  f appr h nsi ns al ng th  S  uthw st rn b rd r in two decades, with nearly 180,000 in April alone, a 34 percent increase from the last surge in the spring of 2019.

When you see these rural drop-offs occur, what does that say about the system?

---

**Robert Bushell:**

U.S. Well, it would say that the system is bogged down.

---

**Dan Lieberman:**

R  b rt Bush ll is a sp   ial  p rati ns sup rvis r with B rd r Patr l's Tu s n S   t r H  p ints  ut that, by law, Cust  ms and B rd r Protection has to release migrant families within 72 hours of their arrival in the U.S. Unaccompanied children are transferred to a Health and Human Services shelter, until they can be connected with vetted family or sponsors.

---

**Robert Bushell:**

We don't have facilities that are built to house these populations like family units. When it's time to transfer custody, let's say to ICE, if

10/18/22, 8:06 AM
U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources | PBS NewsHour

Case 6:22-cv-01130-DCJ-CBW Document 218-17 Filed 01/29/24 Page 275 of 503 PageID #: 12549

ICE is n t abl t tak th s t lks int th ir ust dy, w r ally n      n    butt r l as th m with an ti   t app ar

---

**Alexandra Millers:**

Some end up paroled into the community and some end up in detention.

---

**Dan Lieberman:**

Alex Miller is an attorney with The Florence Project, a legal services organization that provides free counsel to migrants.

She says while some, like C, are processed into the U.S., most are still being immediately expelled back to Mexico under a pandemic
 ra rul    all d Titl  42

Initially implemented by President Trump, the Biden administration has continued the policy, which closes the border indefinitely to nonessential travel to stop the spread of COVID-19.

---

**Alexandra Millers:**

We see it applied differently to people from different geographical backgrounds or demographics.

But, f r th  m st part, individuals and famili s fr m C ntral Am ri a t nd t  b r turn d t M xi     And f lks fr m furth r afi ld, fr m South America end up getting put into normal immigration proceedings.

---

**Dan Lieberman:**

Some residents of this Arizona border community have been frustrated by the releases, seeing it as one more symbol of a broken immigration system.

---

**John Boelts:**

If p  pl  d n't se  it as a  risis, it's pr bably be aus  th y hav n't s  n it

---

**Dan Lieberman:**

John Boelts is a fifth-generation produce farmer in Yuma County who's struggled to maintain a legal and reliable work force.

---

**John Boelts:**

Right now, the message is, come cross any which way you can and seek asylum, and we will put you up in a hotel. That's odd. That's not a great way. And it just — it makes Customs and Border Protection's work that much more difficult.

What w w uld lik  t s   is l gal  mm r  at th  b rd r, l gal traffi  at th  b rd r, n  th  situati n w  hav  t day

---

10/18/23, 8:08 AM
U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources | PBS NewsHour

Case 6:22-cv-01130-DCJ-CBW Document 218-17 Filed 01/29/24 Page 276 of 503 PageID #:
12550

**Dan LiebermanN:**

He says many of his own workers, some of whom cross the border every day, are as frustrated as he is.

---

**John Boelts:**

To legally immigrate into this country, if you want to work in agriculture, that takes months, years of applications, tens of thousands of dollars. So, it can be frustrating to see somebody else getting a much easier path.

---

**Dan LiebermanN:**

F r Mari  Jaur gui, wh   wns a busin ss in th  n arby b rd r  ity  f San Luis, it's a qu sti n  f taxpay r d llars

---

**Mario Jauregui:**

What's next for those families? Where are they going? Who's going to be taking care of them? Who's going to be feeding them? Who's going to be the health care that they need to be receiving? This is going to put a tremendous burden on — on the American people.

---

**Dan Lieberman:**

Border Patrol acknowledges it presents challenges for the agency, too.

---

**Robert Bushell:**

As B rd r Patr l ag nts, ur j b is t  kn w wh  and what is   ming a r ss  ur b rd rs b tw  n th  p rts  f  ntry And wh n w  encounter large groups of children or family units, more of our resources that should be on the border looking for the who and the what's crossing are now diverted for a certain period of time to deal with those kids or those families that just entered.

---

**Dan Lieberman:**

Carlos Bernal, whose family emigrated from Mexico in 1972, believes the U.S. must welcome them.

---

**Carlos Bernal (through translator):**

Why d  w  hav  t d ny th  m th  univ rsal right  f th  Am ri an dr am? This land isn't  wn d by any individual p rs n It's everyone's land. We are all immigrants.

---

**Doug Nicholls:**

I think we need to really talk about our small communities along the border.

**Dan Lieberman:**

Doug Nicholls is the mayor of Yuma.

---

**Doug Nicholls:**

W  r  ally n   d t  hav  a  p  li  y in pla   that pr  t   ts th  m and that tak  s  ar   f what th  issu  s ar   n th  r l  as  t  n  t adv  rs  ly affect the small communities, where they need to transport to other communities, when DHS is already present in those other communities.

At the end of the day, this will just be a cycle that repeats itself if we don't get to the heart of the issues.

---

**Dan Lieberman:**

Al  x Mill  r, with Th  Fl  r  n   Pr  j   t, agr   s that th  syst  m  n   ds t   hang

---

**Alexandra Miller:**

One way to relieve some of the pressure on Border Patrol in rural areas is to make sure that migrants who want to seek asylum at ports have that opportunity.

---

**Dan LiebermanN:**

After leaving Somerton, C and her daughter arrived safely at Casa Alitas, a shelter in Tucson, almost four hours from where we first m  t th  m

They were given a place to sleep, new clothes, and food before heading to the airport to fly to San Antonio to reunite with her brother, who she hasn't seen in 10 years. I asked her what her hopes are now.

---

**C (through translator):**

I have to work so that my daughter can study. I want her to have a better future. I feel happy to have had the opportunity to come to this    untry

---

**Dan Lieberman:**

If the Biden administration ends Title 42, as they just did with Trump's remain-in-Mexico policy, aid groups and Border Patrol anticipate there will be a significant increase in the number of migrants crossing the border again. They're waiting to hear what comes next.

F  r th   "PBS N  wsH  ur," I'm Dan Li  b  rman in Ariz  na

---

10/18/23, 8:38 AM    U.S. Border Patrol is increasingly dropping off migrants in rural areas lacking resources | PBS NewsHour

Case 6:22-cv-01130-DCJ-CBW Document 218-17 Filed 01/29/24 Page 278 of 503 PageID #: 12552

*By*   **Dan Lieberman**

*By*   **Lena I. Jackson**

*By*   **David Coles**

68°
Shreveport, LA

☰ **Watch Live**   **News**   **Weather**   **COVID-19**   **Great Health Divide**   🔍

Closings And Delays                                                                 ✕

ADVERTISEMENT

# Some asylum seekers dropped off in Shreveport reportedly were not allowed to call their families

"ICE is required to allow immigrants to call their families to let them know they're getting out"



(Source: Gray TV file photo)

By Destinee Patterson

*Published: Jul. 19, 2021 at 4:48 PM CDT  |  Updated: Jul. 19, 2021 at 5:31 PM CDT*

SHREVEPORT, La. (KSLA) — It's been four days since ICE dropped off 20-30 Haitian immigrants in Shreveport.

Greyhound buses brought the two groups to the city's bus station Thursday, July 15 from two ICE detention centers in Louisiana, said Frances Kelley, of Louisiana Advocates for Immigrants in Detention.

Many of them were not allowed to contact family members and, therefore, had nowhere to go once they reached Shreveport, she continued.

"ICE is required to allow immigrants to call their families to let them know they're getting out. We've had multiple people tell us that was not the case," Kelley said.

"One immigrant was told, 'If you don't get on this bus right now, you'll have to stay here forever' when he asked to call his family to let them know that he was getting out."

All of the immigrants have since been reunited with their families and friends in the United States, Kelley said.

"Once notified of the sudden release, most of their families quickly purchased plane or bus tickets for their loved ones," she added. "A few immigrants whose families could not afford plane tickets received free plane tickets from the nonprofit Miles for Migrants, which helps reunite refugees and asylum seekers with their families."

People, however, still are taking issue with the lack of support for the asylum seekers.

U.S. Sen. Bill Cassidy has called it "horrible mismanagement."

In an email, a spokesperson for U.S. Immigration and Customs Enforcement says its "Enforcement and Removal Operations (ERO), New Orleans Field Office, is transporting individuals, in accordance with COVID-19 protocols, released from ICE custody to regional airports or bus stations. Individuals released from ICE custody have a transportation and a temporary support plan in place prior to release."

ICE also is "coordinating with non-governmental organizations to ensure individuals have immediate needs such as temporary shelter upon their release, as well as food, water, clothing and transportation services to help mitigate strains placed on resources in the local community," the ICE spokesperson added.

Kelley said the chaotic way in which ICE released asylum seekers at the Shreveport bus station without allowing them to first contact their families is only one example of many similar incidents that have been documented in Louisiana over recent months.

Several of the nine ICE immigration detention centers in Louisiana, many of which are in rural areas of the state, are under federal investigation due to allegations of torture, abuse and medical neglect, Kelley added.

On Friday, July 16, Louisiana Advocates for Immigrants in Detention, Freedom for Immigrants, the Southern Poverty Law Center and several other groups filed a civil rights complaint against ICE for alleged "blatant violations of the ICE Performance-Based National Detention Standards 2011 regarding release protocols in Louisiana and Mississippi, causing serious harm to the well-being and safety of those being released."

The petition says those violations include not allowing immigrants to contact their families prior to being released in order to make travel arrangements and not providing access to interpreters and translated materials to inform them of their post-release transportation options.

Since late March, volunteers in Shreveport have helped more than 400 immigrants from 42 countries travel to reunite with their families or friends in other states, according to Louisiana Advocates for Immigrants in Detention. Among them were several parents who were reunited with their children after being separated for anywhere from months to years.

***Following is the latest directive on U.S. Immigration and Customs Enforcement's enforcement priorities:***

Ad

https://www.ktbs.com/news/3investigates/ice-releases-immigrants-in-shreveport-with-little-warning-to-local-officials/article_f764e9a4-e678-11eb-a69f-13f40e85871f.html

## ICE releases immigrants in Shreveport with little warning to local officials

Bill Lunn

Jul 16, 2021

Case 6:22-cv-01130-DC-JCB Document 218-17 Filed 01/29/24 Page 282 of 503 PageID #: 12556



ICE releases immigrants in Shreveport with little warning to local of…

Case 6:22-cv-01130-DC-JCB   Document 218-17   Filed 01/29/24   Page 283 of 503   PageID #:
12557

SHREVEPORT, La. -- Approximately 80 Haitian immigrants were dropped off in the city
Thursday by U.S. Immigration and Customs Enforcement (ICE), and local officials are
warning there may be more busloads to come.

The influx of immigrants came in two waves to the SporTran Intermodal Terminal at
Texas and Murphy streets in downtown Shreveport, according to a SporTran official who
did not want to be identified. ICE confirmed the arrival of two buses.

But the influx came with apparently little or no warning to City of Shreveport government
and law enforcement officials. Marquel Sennet, spokeswoman for Mayor Adrian Perkins,
said the city was notified the same day.

Local government officials confirmed to KTBS-3 News that one bus arrived Thursday with
about 50 immigrants on board. A second bus arrived later at about 5:30 p.m. with 29
people aboard -- 22 men and seven women.

A source with SporTran told KTBS that the men all had money, and all made travel
connections, most on Greyhound. Some even had airline tickets and headed straight to
the airport. But that source said some of the women had little or no money.



They were helped by the Church for the Highlands, confirmed pastor John Henson, who said they provided transportation, telephones, WiFi and help with travel logistics.

"The Bible says to help aliens and people in distress, those who are in need, and that's exactly what we are doing," Henson said

Another local non profit which did not want to be named confirmed it provided funding for hotel rooms for some of the immigrants.

KTBS also contacted the ICE field office in New Orleans responsible for the drop off. The head of the office, Caridad Cephas Kimbrough, declined to comment on the operation over the phone, but instead referred KTBS to a public information officer, Sarah Loicano.

Loicano released a written statement that read, in part: "ICE's enforcement and removal operations New Orleans field office is transporting individuals, in accordance with COVID 19 protocols, released from ICE custody to regional airports or bus stations. Individuals released from ICE custody have a transportation and a temporary support plan in place prior to release."

10/18/23, 2:02 PM    ICE releases immigrants in Shreveport with little warning to local officials | 3 Investigates | ktbs.com

Case 6:22-cv-01130-DCJ-CBW    Document 218-17    Filed 01/29/24    Page 285 of 503 PageID #:
12559

SporTran sources were told up to 17 more bus loads of immigrants and refugees are coming to Shreveport. Loicano told KTBS Friday that number may be high. However, she could not provide a specific number, nor a time frame for those arrivals.

Two local law enforcement agencies also confirmed to KTBS-3 News that they were not told of this plan by ICE. They expressed concern and said they are watching the situation closely.

And it's not just Shreveport. KTBS-3 News is getting reports of similar drop offs in communities all over Louisiana and Mississippi.

Report a typo on this article

---

**Bill Lunn**

**Get Every Story → Subscribe for 50% off your first 4 months**

https://www.nola.com/news/politics/article_f7e6d19e-e8d5-11eb-b64b-8b51fd85a303.html

# Disorganized immigration releases draw concern from advocates, U.S. Sen. Bill Cassidy

**BY MATT SLEDGE | STAFF WRITER**
**JUL 20, 2021 - 4:00 AM**



Volunteer Brian St. George helps groups of immigration detainees to check in for their flights out of the Baton Rouge Metropolitan Airport Friday. The detainees were released on parole from facilities in Central and Northern Louisiana only if they had air tickets paid for by their families here in the U.S.

PHOTO BY PATRICK DENNIS

Matt Sledge

**Get Every Story → Subscribe for 50% off your first 4 months**

Federal officials have released increasing numbers of immigrants from rural Louisiana lockups in recent days, leaving some stranded in detention center lobbies or at transit hubs, according to observers and volunteers.

While few plan to stay in Louisiana, the sudden, uncoordinated drop-offs at places like the Shreveport bus station have flummoxed local officials, drawn concern from U.S. Sen. Bill Cassidy and, on Friday, prompted a letter of complaint from advocates.

As of July 8, there were 2,347 immigrants held in detention in Louisiana, the second-most of any state. While Louisiana doesn't share a border with a foreign country, in recent years sheriffs have welcomed detainees as a way to plug budget holes left by criminal justice reforms.



**RELATED**

**Biden made sweeping changes to immigration enforcement, but change comes slowly in Louisiana**

Get Every Story → Subscribe for 50% off your first 4 months

The bulk of those being released appear to be asylum-seekers making claims of persecution in other countries, according to volunteers and Homero López, an attorney with the non-profit group Immigration Services and Legal Advocacy. The United States has signed international treaties establishing those immigrants' legal right to seek asylum.

U.S. Immigration and Customs Enforcement declined to provide information about the number or type of detainees being let go, but the sheriff overseeing the highest-population detention facility in the state confirmed releases are up.

"They're just running them through and getting them out," Winn Parish Sheriff Cranford Jordan said. "Most of them are not staying long at all."

Because new detainees arrive almost as soon as others leave, the overall number of immigrants held at the Winn Correctional Center is up slightly from 466 in January -- Donald Trump's last month in office -- to 488 at the most recent count on July 8.

Get Every Story → Subscribe for 50% off your first 4 months

Nationwide, the number of people held in immigration detention has risen to its highest point since May 2020.



**RELATED**

**'Tantamount to torture':
Complaint alleges inhumanity,
overuse of solitary at Pine
Prairie center**

Shortly after Biden took office, ICE issued interim guidance directing its employees to focus enforcement and deportation efforts on a limited set of national security, border security and public safety priorities, and deportations dropped. When asked about the releases in Louisiana in recent weeks, an ICE spokeswoman pointed to the guidance.

Get Every Story → Subscribe for 50% off your first 4 months



Groups of immigration detainees check in for their flights out of the Baton Rouge Metropolitan Airport Friday. The detainees were released on parole from facilities in Central and Northern Louisiana only if they had air tickets paid for by their families here in the U.S.

PHOTO BY PATRICK DENNIS

Critics like Sheriff Jordan say they prefer the more aggressive approach to deportations taken by the Trump administration.

"In the old days, when they left our facility, they were being taken to Alexandria to be put on a plane to go back to their home country, and now they're not doing that," he said. "I don't agree with it, but that's not my decision."

 **RELATED**

**Get Every Story →** Subscribe for 50% off your first 4 months

## Special report: In north Louisiana, sheriff and private prison operator trade prisoners for ICE detainees

While immigrant advocates are pleased that asylum seekers are being paroled to wait out the resolution of their cases, they said in the Friday letter that ICE should give immigrants more information about transportation options and better coordinate with volunteers.

ICE has a policy requiring immigrants to be transported to bus and train stations or airports. But for years, advocates say, detention centers in Louisiana have forced immigrants to pay for taxi rides costing up to $600 to reach those transit hubs. Volunteers have mobilized to pick up immigrants for free, but that requires coordination, according to Frances Kelley, a volunteer with Louisiana Advocates for Immigrants in Detention.



**RELATED**

## As number of immigrants behind bars soars under Trump, Louisiana becomes detention hub

Get Every Story → Subscribe for 50% off your first 4 months

A man who says he was subjected to political persecution in Venezuela spoke through an interpreter to describe his experience. A volunteer was supposed to pick him up, but guards at the facility told the volunteer that he wasn't there, the man said. The man said he slept on the lobby floor without food for 18 hours until a volunteer returned the next day.

"They wouldn't let me communicate with my family to ask them what was going on," the man said. "Nobody was telling us what was going on. They just left us there waiting."

The man declined to be identified out of fear that it could harm his asylum case.

Last week, ICE began busing immigrants to transportation hubs to address concerns about the expensive cab rides, Kelley said. But that came with its own shortcomings.

Get Every Story → Subscribe for 50% off your first 4 months



Volunteer Brian St. George, blute shirt, left, helps groups of immigration detainees to check in for their flights out of the Baton Rouge Metropolitan Airport Friday. The detainees were released on parole from facilities in Central and Northern Louisiana only if they had air tickets paid for by their families here in the U.S.

PHOTO BY PATRICK DENNIS

In Shreveport, 80 immigrants from Haiti were dropped off without advance notice to city officials on Thursday, KTBS-TV reported. Another busload was dropped off in Monroe on July 12 without warning, Kelley said.

Then on Friday, immigrants were dropped off at the Baton Rouge bus station with just hours notice.

To exacerbate problems, some immigrants have been given little information about how they're supposed to reach their final destinations. One

Get Every Story → Subscribe for 50% off your first 4 months

man with an intellectual disability was dropped off at a bus station without money, a phone or advance warning to his family, Kelley said.

"They're undergoing immense suffering and then being released in a disorganized and chaotic way, and without the necessary support that they need," she said.



**RELATED**

**Texas, Louisiana sues U.S. government over failure to hold some immigrants for deportation**

On Sunday, Cassidy issued a statement criticizing the Biden administration's handling of the releases.

"The White House cannot dump groups of Haitian refugees into Louisiana communities with nowhere to go, no photo ID, and no money," Cassidy said.



U.S. Sen. Bill Cassidy, R–La.
PHOTO BY JIM LO SCALZO VIA THE ASSOCIATED PRESS

"It appears Washington told ICE to just 'send them somewhere,' and apparently gave little to



ALERT: HURRICANE IDA RECOVERY INFORMATION



ALERT: CLICK HERE: INFRASTRUCTURE INVESTMENT AND JOBS ACT INFORMATION, BENEFITS FOR LOUISIANA

07.18.21

# Cassidy Statement on ICE Immigrant Dropoff in Shreveport

WASHINGTON – Today, U.S. Senator Bill Cassidy, M.D. (R-LA) released the following statement on the drop off of approximately 80 Haitian immigrants in Shreveport, Louisiana by the U.S. Immigration and Customs Enforcement (ICE) with little to no notice to state and local officials.

"The White House cannot dump groups of Haitian refugees into Louisiana communities with nowhere to go, no photo ID, and no money. It appears Washington told ICE to just 'send them somewhere,' and apparently gave little to no notice to state and local officials. Horrible mismanagement. Do President Biden and Vice President Harris care about communities, immigrants, and controlling the border?" **said Dr. Cassidy.**

KTBS reported on this situation and noted there are "similar drop offs in communities all over Louisiana and Mississippi."

###

SUBSCRIBE >

Search

**U.S.**

**World**

**Business**

**Tech & Science**

**Culture**

**Autos**

**Sports**

**Health**

**Opinion**

**Experts**

**Education**

**Podcasts**

**NEWS**

# ICE Resume ~~pp~~ng Migrants Off at Greyhound Terminal Instead of Welcome Center

BY **AILA SLISCO** ON 5/7/21 AT 9:45 PM EDT

SUBSCRIBE ›



NEWS      ICE      IMMIGRATION      ARIZONA

Listen to this article now

⊕ Powered by **Trinity Audio**

00:00                                    ~ 5 min



**A**dvocates are questioning why Immigration and Customs Enforcement (ICE) has resumed the practice of dropping off migrants at a Phoenix, Arizona Greyhound station instead of a nearby purpose-built Welcome Center.

ICE spokespers            n Pitts-O'Keefesaid in a statement obtained by *Newsweek* that            not being dropped off at the bus station but are instead being released to specialized shelter facilities or nonprofits. She said that the single adults who are being dropped off at the station, by ICE's Enforcement Removal Operations (ERO) division, were given clearance in advance and an opportunity to plan their travel. Those released are also provided with "a list of legal, medical, and social services that are available in the release community"

SUBSCRIBE >

have coordinated travel arrangements prior to departure from the facility, whether a bus ticket is being or has been purchased on their behalf, or whether they have made arrangements for pick up from a friend or family member," Pitts-O'Keefe said. "These inquiries take place prior to the individual's transportation to the bus station."



The Welcome Center is only 2 miles away from the Greyhound station. It is operated by humanitarian aid group International Rescue Committee (IRC) and opened in Phoenix in the summer of 2019. ICE dropped off so many migrants at the Phoenix Greyhound station that year that the company began blocking them from entering the           without a ticket.

**NEWSWEEK NEWS           N-UP >**

Stanford Prescott, IRC's community engagement coordinator, told the *The Arizona Republic* that migrants being dropped off at Greyhound station in 2021 made little sense while there is ample capacity at the Welcome Center.

"There's no reason why individuals cannot be taken to services that are explicitly there to serve them, when there's available capacity," Prescott said.

SUBSCRIBE >



ICE has recently resumed the practice of dropping off some migrants at a Greyhound bus station in Phoenix, Arizona. A different Greyhound terminal is pictured in this photo taken in Calexico, California on July 22, 2020.
MARIO TAMA/GETTY

Prescott said that ICE told Phoenix-area leaders that it would resume dropping the migrants off at the Greyhound station on April 19. IRC said that 100 to 200 individuals had been dropped off at a Phoenix bus station days later, according to

SUBSCRIBE >

migrants may be vulnerable to fraud in an unfamiliar country or unprepared to deal with the harsh Phoenix weather, where temperatures often exceed 100 degrees.

**NEWSWEEK SUBSCRIPTION OFFERS >**

"I think the Welcome Center is the humane source, and the current system of dropping off outside of Greyhound does feel a little bit inhumane," Phoenix Mayor Kate Gallego told the *Republic*. "Councilwoman (Laura) Pastor and I have reached out to the administration to ask that they take a look at this and go back to the original policy."

Concerns have also been raised about the potential public health consequences of the policy. Pitts-O'Keefe said that migrants are given "necessary" personal protective equipment before being released but noted that ICE is not authorized to prevent those who have tested positive for COVID-19 from being released, raising the possibility that those dropped off at the Greyhound station could be unwittingly spreading infection.

ICE has dropped off migrants at Greyhound bus stations beyond Phoenix. In March, Greyhou         with Homeland Security Secretary Alejandro Mayorkas to ens          Ξ provide proof that the migrants being dropped off are free from CO

"We need assurance that any detainees released by ICE have proof of a negative COVID-19 test, similar to the proof required for international airline passengers who arrive at US ports of entry," Greyhound President and CEO David Leach wrote Mayorkas in a letter obtained by Border Report.

SUBSCRIBE ›

not feeling well or have been diagnosed with COVID," he added. "However, migrants simply do not have that choice unless the government or their sponsors house them while they quarantine."

Leach also requested federal funds to help meet the demands being placed on the company by ICE, saying that Greyhound does "not have buses and drivers ready to meet surges in demand without emergency funding."

**READ MORE**

- ICE Drops 200 Asylum Seekers at El Paso Bus Stop
- ACLU Calls on (          Stop Letting Border Patrol Agents Board Buses
- Arizona Sheriff           )s of Human Skull, Bones in Warning to Migrants

While many have noted a recent influx of migrants, particularly unaccompanied minors, that have arrived at the U.S.-Mexico border since President Joe Biden took office, ICE detentions are at historic lows. Detentions recently averaged fewer than 15,000 per day, down from a 2019 peak of more than 56,000.

SUBSCRIBE >

In addition, deportations have dipped to record lows, with ICE deporting 2,962 people during the month of April—the lowest monthly count of deportations ever seen and a roughly 20 percent drop from the 3,716 deportations recorded in March.

**Update 5/7, 10:28 p.m.:** *This article has been updated to incorporate a statement obtained by Newsweek from ICE spokesperson Yasmeen Pitts-O'Keefe.*

REQUEST REPRINT & LICENSING, SUBMIT CORRECTION OR VIEW EDITORIAL GUIDELINES

SPONSORED CONTENT

mgid ▷


**Disturbing Photo: Be Discussed For**
History Daily


**These 2 Vegetables Will Kill Your Belly And Arm Fat Overnight**
Weight Loss


**Baton Rouge: Actual Whole Mouth Dental Implant Cost In 2021 (See List)**
Search Ads


**"They Almost Killed Me" Why Tommy Chong Doesn't Trust CBD**
CBD Good Vibes


**Here's Exactly What To Do If You Choke While Eating Alone**
LifeVac


**Here's Why Some Doctors May Not Prescribe Metformin**
Gluco Freeze





DONATE

**NATIONAL**

# Why The U.S. Government Is Dropping Off Migrants In Rural Arizona Towns

April 15, 2021 · 6:57 PM ET

KIRK SIEGLER



Ajo, a former copper mining town more than 100 miles from Phoenix, is unincorporated. The U.S. government began dropping off migrants on the historic plaza in Ajo in March.

*Kirk Siegler/NPR*

Drive west 100 miles from Tucson, Ariz., across the rugged and mountainous Sonoran Desert, and Highway 86 starts getting more potholed and narrow as you get close to the old copper mining town of Ajo.

Here, off the historic Ajo Plaza with its ornate Spanish colonial buildings, a pair of white U.S. Border Patrol vans pulls into a dusty alley, already hot even on an early April afternoon.

Two agents hop out, slide open the doors, and families with children pile out. They look exhausted and stressed. One woman limps as she picks up her suitcase and a plastic bag with bed sheets. A volunteer with an ad hoc group of local humanitarians then quickly ushers them inside a small gym they've converted to an improvised shelter, where they're handed water and told where they are.

Most have no idea. They've just been released from detention.

"Border Patrol drops them off here in town, where else can they go?" asks Jose Castillo, who's helping as an interpreter. "It's like me taking you all the way to China, drop you in the middle of town, what are you gonna do?"





Jose Castillo, 82, volunteers as an interpreter because most of the migrants dropped in town speak little if any English.
*Kirk Siegler/NPR*

In one corner of the room, a greeter explains to the group of 15 migrants now assembled at tables that they'll first need a COVID-19 test. The U.S. government is reportedly only testing people in detention who show symptoms. Volunteers can be seen donning PPE to get ready to administer those while the families, most of whom look middle class, sit at tables filling out paperwork.

One woman and her young son are literally just getting reunited with their confiscated belts and shoelaces. The young boy tries to lace his shoes while his mom, crying, makes her first phone call in days letting a loved one know they're safe.

### 'Rural releases'

All of this is the immediate aftermath of a controversial practice known as "rural releases" that the U.S. government began doing in the borderlands last month.

The Border Patrol, which did not respond to NPR's requests for an on the record interview, says the pandemic is limiting how many people they can safely hold at nearby facilities. Officials say funding and jurisdiction issues are also mostly preventing them from transporting migrants to cities. So in practice, that means migrants who do qualify for potential asylum and can prove they have sponsors in the U.S. are just being dropped in rural Arizona towns like Ajo that are close to overflowing Border Patrol facilities.

There is no public transportation here, let alone even a local government. Ajo is unincorporated. So for now, the burden is mostly on private donors and volunteers like Castillo.

"When somebody needs help, that's what we're here for," Castillo says. The 82-year-old has spent most of his life in Ajo, working at the copper mine until it closed in 1983.

His family lived on both sides of the border where migrants have crossed for generations, he says, looking for work or fleeing bad situations in their home countries.

**Border apprehensions up**

The number of people U.S. authorities are taking into custody at the southern border is on pace to set records. More than 170,000 migrants were nabbed illegally crossing the border in March, the highest monthly total since 2006.

The number of migrants caught trying to illegally cross the southern border in March was the highest since 2006.
*Kirk Siegler/NPR*

Most are being sent back to Mexico, unless they're unaccompanied children, or in some cases families like these from countries like Cuba or Venezuela. That's because the Mexican authorities are refusing to take back migrants that aren't from Central America.

If it sounds confusing and messy, that's because it is, says Regina Romero, the mayor of Tucson.

"We are dealing with the effects of the previous four years of the Trump administration's policy of cruelty and chaos," Romero says.

Romero's parents were farm workers and is the city's first Hispanic mayor in more than a century. She says the former President Donald Trump tried to dismantle the country's immigration and refugee system. She is willing to give President Biden some time to fix things. But local leaders like her say the rural releases aren't fair to the migrants, or the people who live in the remote Sonoran towns.

The mayor of Gila Bend, Arizona declared a state of emergency last month over the issue.

"What is not acceptable is for Border Patrol to drop off asylum seekers and individuals and many times children without taking them to a particular location where we have a process," Romero says.

Indeed, there is a process in Tucson, that began in 2014 under similar circumstances when the U.S. government began dropping off would-be asylum seekers and others in local parks. Churches and humanitarians ended up setting up a shelter called the Casa Alitas Welcome Center, where migrants could stay temporarily while they arranged for travel to reach family sponsors in other states while they awaited court dates.

Casa Alitas, housed in a converted juvenile detention facility south of downtown, has seen an uptick in guests in recent weeks, according to its program manager, Diego Javier Pena Lopez. Volunteers with a Catholic non-profit along with Pima County are now scrambling to send vans to towns like Ajo when they hear about Border Patrol drop offs.

Casa Alitas manager Diego Javier Pena Lopez stands next to donated cots that will soon be sent to remote border towns where the rural releases have been occurring

*Kirk Siegler/NPR*

"It's obviously so challenging and concerning that we have to be prepping in this way," Pena Lopez says. "The possibility is we could see rural releases start tomorrow in a new community."

## A 'surge' at the U.S.-Mexico border

The Biden administration is saying only that it will open a more official migrant shelter in Tucson in the next month. It also plans to house other migrants in hotels in the Phoenix area. Local governments and aid groups expect they'll get reimbursed, as has been happening after Tucson officials paid to house COVID-19 positive migrants in local hotels recently.

For now, Pena Lopez says things are mostly manageable. He disputes assertions by politicians in Arizona and nationally that there is a "surge" at the U.S. border.

"Walk through this space and you [do] not see us drowning in people," he says. "The exact opposite, you're seeing volunteers organizing, thinking ahead on how to work with these rural communities where people have stacked the deck against us."

That also seems to be the prevailing sentiment back in Ajo. Border towns like this don't feel like they're being overrun. The plaza and its historic train depot is quiet. Local artists have reopened their studios. A few tourists browse the local galleries and eat tacos at a sidewalk cafe.

Since the rural releases began March 18, there hasn't been a single overnight stay by migrants here. And the cadre of volunteers, coordinated by a local environmental and economic development nonprofit, has found a daily rhythm. They get a heads up text from officials at the local Border Patrol station 10 miles away, then head down to the plaza to help.

It's just not sustainable, says Jose Castillo, the interpreter.

"My way of seeing things, this is not Ajo's problem, this is the government's problem," he says. "They created it, they own it."

migrants    asylum

# More Stories From NPR

**BUSINESS**
**House Lawmakers ask Amazon to prove Bezos and other execs didn't lie to Congress**

**OBITUARIES**
**Colin Powell, a former secretary of state, dies at 84**

**FOOD**
**She barely made it out of Kabul. Now she's welcoming Afghans with a familiar meal.**

**NATIONAL**
**What you need to know about the trial set to begin in the killing of Ahmaud Arbery**

**LAW**
**LA County wants Vanessa Bryant to get a psych exam before her lawsuit goes to trial**

**OBITUARIES**
**Megan Rice, peace activist nun imprisoned for nuclear site break-in, dies at 91**

The Atlanta
Journal-Constitution

 Log In

It's worth knowing what's really going on.          Subscribe today for 99¢.

# When ICE detainees are dropped off at Atlanta airport, this group helps



‹ Capt on

Credit: Alyssa Pointer

NEWS

By Lautaro Grinspan, The Atlanta Journal-Constitution

Sept 24, 2021

**Large groups of migrants at ATL reflect long reach of migration surge at southern border**

The Atlanta Journal-Constitution and Report for America are partnering to improve coverage of immigrant communities. Please help by donating to this initiative.

As travelers milled about Hartsfield-Jackson International Airport on a recent Thursday afternoon, an unmarked white van came to a stop beside the airport's domestic terminal, having completed its two-hour trip from a sprawling immigration detention facility in

Southwest Georgia. A guard got out of the driver's seat and opened one of the van's side doors, releasing a group of about 20 asylum seekers, many of whom had spent roughly two months at the Stewart Detention Center after crossing the U.S.-Mexico border.

The asylum seekers, all women, greeted their newfound freedom with joy, hugging and cheering as they gathered by the airport's entrance. Some wore street clothes and a backpack. Others were clad in monochromatic prison scrubs, carrying no personal items besides a picture ID from CoreCivic, one of the largest private prison companies in the U.S. — and the operator of the Stewart facility.

The women crossed the border illegally, but have started the legal process of applying for asylum protections while in custody. Under U.S. law, migrants have the right to claim asylum however they enter the country ("It doesn't matter how you arrived," reads the website of the U.S. Citizenship and Immigration Services). If approved, asylum lets applicants live and work legally in the U.S., and puts them on a path to permanent resident status and citizenship.

"I still can't believe it," said Cynthia, who told the AJC she was fleeing political persecution in Venezuela and spent two and a half months in detention. Like the rest of the migrants featured in this story, she asked to be identified by her first name only, to avoid putting her ongoing immigration case in jeopardy.

"Until I'm with my family, I won't be able to believe it," she said in Spanish. "Some friends who got out before me told me that they don't even want to open their eyes in the morning. They are scared it might all be a dream."

ADVERTISING



The presence of Cynthia and the other women in the bustling Atlanta airport reflects the long reach of the migration surge at the southern border, which has seen unprecedented numbers of illegal crossings in recent months. While the Biden administration is relying on a Trump-era expulsion policy to rapidly send most border crossers back to Mexico and keep official ports of entry closed, some asylum seekers crossed into the U.S. and have been funneled into the immigration detention system.



Credit: Alyssa Pointer

On that Thursday, welcoming the group of migrants who made it to the airport — and a second, similarly sized group that arrived at 9:30 p.m. — was Anton Flores-Maisonet, a longtime immigrant rights advocate and co-founder of Atlanta-based Casa Alterna, a nonprofit and hospitality house. Flores-Maisonet has mobilized a group of volunteers to assist migrants released from Stewart and dropped off at the airport since the spring of 2020, when the incipient pandemic (and a judge's order) triggered reductions in ICE's detained population.

Flores-Maisonet said that, in the early days, released migrants numbered in the single digits. But over the summer, drop-offs from Stewart, which take place nearly every weekday, ballooned in size, with dozens of people released at once — a strain on Casa Alterna's volunteers and resources. In July, up to 79 migrants were released in one night, according to Flores-Maisonet.

"My team is so overwhelmed," he said.

Flores-Maisonet's operation is part of an "underground railroad" of volunteers, churches and shelters across the country that helps house and facilitate travel for people released but not deported by federal immigration authorities.

Over the summer, immigration advocates elsewhere in the South have rung the alarm, warning that the large-scale and sometimes chaotic nature of recent ICE releases in their areas could cause a crisis.

In July, the Southern Poverty Law Center, Freedom for Immigrants and several other organizations filed a civil rights complaint against ICE "regarding release protocols in Louisiana and Mississippi, causing serious harm to the well-being and safety of those being released."

The situation in Stewart, with detainees being driven to the Atlanta airport, is "not the crisis we have heard about in other states," said Amilcar Valencia, executive director of El Refugio, a nonprofit that supports immigrant detainees at Stewart Detention Center.

When asked about the release process at Stewart, which holds the second largest number of ICE detainees in the country, a spokesman for CoreCivic deferred to ICE for comment. ICE has not responded to questions from the AJC.



Credit: Alyssa Pointer

## Helping migrants

Casa Alterna's work has two facets. For released migrants with same or next-day travel plans to join family members living in the U.S., volunteers help them navigate the airport and reach their plane, bus or a taxi. Those who need more time to work out travel plans or housing arrangements are offered free accommodation at the nonprofit's hospitality house, located inside a Quaker church in Decatur. All are given food and water, and hygiene kits when in stock.

Since March 2020, Casa Alterna has assisted over 2,000 migrants at the Atlanta airport and hosted nearly 300 overnight guests (the average stay is three nights). Around 40 volunteers, many of whom have immigrant backgrounds, split the work, from guiding people at the airport to keeping the hospitality house clean and well-stocked.

Although Flores-Maisonet says his operation is "not here to rescue anyone" and migrants are "resilient," he understands there are significant, logistical hurdles to clear in the transition from immigrant detention to life in the U.S. Most migrants have no English-language skills, very limited funds, and little experience navigating an international airport. Some don't know what Atlanta or Georgia are and ask Flores-Maisonet to show them where they're located on a map.

"My job here is not to fix and I can't fix, but at least I can make sure that you don't feel alone in a system that none of us can change, seemingly, in this moment," Flores-Maisonet said. "Knowing you're not alone is the best gift that I can give."

Volunteers know when drop-offs are happening, and how many migrants to expect, because they are in contact with detention center staff.

On that recent Thursday, Flores-Maisonet led the group of former detainees into a room Casa Alterna uses located pre-security on the second floor of the domestic terminal. There, volunteers asked migrants to fill out a form with their flight information. Almost all had flights scheduled for later that night, paid for by relatives who had been informed ahead of time of their loved ones' release date. Focusing first on those with earlier departure times, volunteers printed migrants' boarding passes, then walked folks past security and to their boarding gate. Because the second group of migrants was dropped off from Stewart at 9:30 p.m., later than originally planned, many had already missed their flights, prompting volunteers to reach out to family members to get them to book new ones, often at significant cost — a frustratingly common occurrence, according to Flores-Maisonet.

❮ Capt on

Credit: Alyssa Pointer

That day, the migrants who were released were mostly from Venezuela and Central America. There were also people from Cuba, Brazil, and a woman from China (Casa Alterna volunteers used Google Translate to communicate with her). After weeks on the road to the southern border and months in detention, migrants were setting their sights on joining their sponsors — people who accept financial responsibility for asylum seekers during the application process — in places like Los Angeles, Tampa, Orlando, Salt Lake City, Newark or Houston. At least a couple of women planned on staying in the Atlanta metro area.

Among the bustle of the second-story airport room was Wendy, a Cuban national. She was in detention when many of her countrymen and women poured into the streets in July, staging the biggest protests in decades against Cuba's Communist regime. Although she was moved when she heard of the marches and rallies, she shared that, in her mind, authorities' draconian crackdown against activists validated her decision to leave.

"Cubans have to put up with so much, so many threats, so much mistreatment, so much persecution," said Wendy, who plans on "hunkering down" and studying English when she joins her family in Florida.

"I'm so grateful to the U.S. for giving me an opportunity to make it here," she added. "We're all grateful."

Flores-Maisonet said that people like Wendy, asylum seekers who came in contact with immigration authorities at the border, account for nearly all of the recent releases from Stewart. That's likely because new arrivals represent a growing share of all immigrant detainees, a

product of the surge at the border and the Biden administration's decision to narrow the scope of internal immigration enforcement, which involves ICE targeting migrants already living in U.S. cities and towns.

As of last month, over 80% of detainees had been apprehended by Border Patrol officials, and less than 20% by ICE agents, official ICE figures show. Last July, under President Donald Trump, 40% of migrants in detention were arrested by the Border Patrol, and 60% by ICE.



Credit: Alyssa Pointer

Cynthia, Wendy and other asylum seekers who spoke with the AJC at the airport said they had passed their credible fear interviews while in detention, an early screening step in the asylum application process, and were released on parole. Once they reunite with their sponsors, they will receive a hearing date in immigration court.

Also among the groups of asylum seekers at the airport was Luz, who said she fled Venezuela because a member of the security forces killed her brother, and was threatening her, too. She explained she was happy to be released, and close to joining her husband and daughter who had already made it to Orlando. But she found herself on the verge of tears. Her mother, who was to join them, had died of COVID-19 the day before.

"My mom died yesterday. She was back in Venezuela and got sick with COVID. She died in a week," she said. "She had told me that she couldn't wait for the three of us to be together again

in Orlando, and for me to send her a photo of us three."

## 'This work is heavy'

Yehimi Cambrón is an Atlanta-based artist born in Michoacán, Mexico, and a beneficiary of the Deferred Action for Childhood Arrivals program, or DACA, under which she and thousands of other immigrants brought to the U.S. as children are shielded from deportation. She is perhaps best known for her murals: colorful, public work that embeds immigrant faces and stories into the Atlanta streetscape.



View this post on Instagram

A post shared by Yehimi Cambrón (@ycambron)

On that recent Thursday, Cambrón was at the airport, not far from one of her creations, where she stayed until midnight printing boarding passes and helping migrants get where they needed to go.

"Especially if you are someone who is undocumented or has undocumented family members, doing this work is heavy. It's heavy because you are really witnessing the violence of the immigration system," said Cambrón. "Even though immigration detention and ICE are things I've always been scared of, I've never experienced detention in my own skin. So I started volunteering (with Casa Alterna) to educate myself and figure out what it is that I could do with my artwork."



Credit: Alyssa Pointer

With thousands of followers on Instagram, Cambrón has used her social media platform to recruit more volunteers and raise money for supplies for migrants. It's an engagement that feels personal, Cambrón explained.

"Like, how do you not see your parents in them, you know? Or your siblings."

Making his way to security with the last group of asylum seekers accompanied by Casa Alterna volunteers was Medardo, from Nicaragua. The 25-year-old said his nearly three months in detention were "psychologically traumatizing."

"You don't know what's going to happen. You're just praying to God to help you, to consider your dreams."

Medardo was about to complete his last year in university and become an agricultural engineer when his opposition to President Daniel Ortega put him in danger. He hopes to one day complete his training in the U.S.

"I've always said, if I'm able to live in this country, what I am going to do before anything is respect this country's laws and be an example for the other young people coming through. That's my objective: to move forward, to give my life some sense."



Credit: Alyssa Pointer

## Spending the night

Because of the larger groups of detainees arriving at the Atlanta airport, Casa Alterna is unable to provide housing to everyone. On that recent Thursday, those who had flights scheduled for the following morning were instructed to wait inside the airport. Only two women with later flights spent the night at Casa Alterna's hospitality house, having been driven there by Flores-Maisonet and arriving near midnight.

The facilities include beds and sleeping cots for up to 14 people, a bathroom, and a kitchen, where Flores-Maisonet had already laid out food for the following morning's breakfast.

The Atlanta Journal-Constitution

Credit: Alyssa Pointer

"That's called a bagel," he told the women. "Have you heard of it?"

"Never."

Before going to bed, the women were offered toiletries, clothes and backpacks. They also took part in a Casa Alterna tradition: placing a pin on a map to show where they are from (one of them was from Brazil, the other from Nicaragua). Flores-Maisonet says most guests as of late have been from Haiti. The island was no longer visible on the map under a flurry of colorful pins.

Looking forward, Flores-Maisonet would like to expand the hospitality operation to house not just recent detainees, but also other people in the "detention to deportation pipeline," including immigrants who must come to Atlanta to report to the city's immigration court system.

"I have all these ideas of all these different ways I could see this grow," he said.



Credit: Alyssa Pointer

## By the numbers

Official ICE detention data shows both releases and intakes are on the rise.

- 20,000 - Average number of migrants per month released June-August 2021

- 3,000 - Average number of migrants per month released October-December 2020

- 25,700 - Detainees in ICE custody, August 2021

- 21,000 - Detainees in ICE custody, August 2020

- 55,000 - Detainees in ICE custody, August 2019

- 1,357 - Detainees in Georgia immigrant detention, September 2021; the fourth highest number of migrants in ICE custody in the nation after Texas, Louisiana and Arizona.

*Sources: U.S. Immigration and Customs Enforcement; Transactional Records Access Clearinghouse (TRAC), a research institute at Syracuse University*

*Lautaro Grinspan is a Report for America corps member covering metro Atlanta's immigrant communities.*

## Editors' Picks

# UPDATE: ICE drops more than 90 immigrants at Natchez bus station

Published 7:41 pm Friday, July 16, 2021

**By Jan Griffey (https://www.natchezdemocrat.com/author/jangriffey-2/)**



EDITOR'S NOTE: This story has been corrected in order to clarify that, while some detainees are given money upon release, that money does not come from ICE or the private prison facility, say activists who work with released detainees. Rather, any money comes from funds the detainee's family members may have sent to the facility to help the detainee. Also, activists here have responded to say the Core Civic-operated Adams County Correctional Facility has taken part in releasing immigrant detainees, leaving in bus stations and other locations.

NATCHEZ — On Wednesday, personnel at the Natchez Transit System on Wood Avenue became overwhelmed during the third day of having immigrants, most of whom did not speak English, simply dropped at the bus station.

In three days, a total of more than 90 immigrants went through the same ordeal.

They began arriving on Monday. The immigrants had been previously detained by the U.S. Immigration and Customs Enforcement Agency and were ordered released.

Adams County Sheriff Travis Patten said workers at the bus station reached out for help when it continued to happen on the third day.

Patten emphasized these immigrants were not being held and had not been released from the Core Civic-operated Adams County Correctional Facility.

"I can tell you that what happened this week was not the norm. That was not normal procedure," Patten said. "They (Adams County Correctional Facility) release these guys and give them $300 to get to wherever they are going, whether by bus, cab or plane. And they have to have some kind of relative's address they are going to. They have a travel plan. That was not the case this week."

Activists who work with released detainees said no money given to the detainees upon release comes from ICE or the private prison facility. Rather, any money provided to detainees comes from funds the detainee's family members may have sent to the facility to help the detainee.

Also, activists here have responded to say the Core Civic-operated Adams County Correctional Facility has taken part in releasing immigrant detainees, leaving in bus stations and other locations without any plans for travel.

Natchez Mayor Dan Gibson added the Core Civic facility in Adams County also does not release any inmate or detainee without a clear COVID-19 test.

When the bus station workers couldn't handle the situation because of the language barrier, they called for help.

"There was no fight, no struggle, no scuffle. They just couldn't communicate. And these people weren't just speaking Spanish. They were speaking all kinds of languages. It's like someone looked at a map and found the nearest bus station and just dropped them here," Patten said. "Myself, the mayor, Chief Daughtry, Sheriff Hedrick, two county supervisors — we were all there."

He said he and the other officials began making phone calls to try to find out who had deposited the immigrants in Natchez, including calling various U.S. Consulates in New Orleans to try to find out what was going on.

Gibson said, "Within the course of just a few hours, we reached out to so many people and got great results."

Gibson thanks Patten, Daughtry and Concordia Parish Sheriff David Hedrick for their work. Hedrick was able to track the detainees to the River Correctional Facility in Ferriday, Louisiana, a private facility, Gibson said.

Looking on a map and finding the nearest bus station was exactly how the detainees wound up in Natchez.

"ICE, working from their main office, ordered the release of these detainees. They simply Googled the nearest bus station and the Natchez Transit System popped up and that is where they sent them," Gibson said. "I have not been able to get a complete count, but it was something like 90 to 100, and they were planning to send 70 more the next day."

Gibson said the detainees "could not have been nicer to work with. They were all so kind. We were able to get protocols in place and had everyone on buses or vans, mainly to Alexandria, Louisiana, or New Orleans. Most had ample funds for bus tickets and we have volunteers in our community who stepped up to help those who did not.

"What could have been a very bad day ended up being a good day. Sheriff Patten and Sheriff Hedrick assisted us in getting in touch with ICE and got their assurance they would not perform such an act again without proper notice and proper organization of everyone involved."

Gibson was critical of how the immigrants were released by ICE, saying every human deserves respect.

"If our federal government is going to release these individuals who have been detained, they need to make sure they are doing so in a humane manner. They need to take every step they can to help them. People are worthy of respect and being treated with respect. You don't just put people out there who can't speak the language and have no phone and maybe not the funds to get anyplace," he said.



ENFORCEMENT AND REMOVAL OPERATIONS

# U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report



U.S. Immigration and Customs Enforcement

# Table of Contents

Executive Summary ................................................................................................................ 3
ICE Custody and Case Management ..................................................................................... 5
    *ICE Initial Book-Ins from CBP Apprehensions* ................................................................ 6
    *ICE Average Daily Population* ......................................................................................... 7
    *Detained Population* ........................................................................................................ 9
    *Average Length of Stay*……………………………………………………...………...10
    *ICE Non-Detained National Docket* ............................................................................. 11
    *Alternatives to Detention* ............................................................................................... 12
ERO Administrative Arrests .................................................................................................. 12
Criminal Arrests and Prosecutions ....................................................................................... 16
ICE Detainers ......................................................................................................................... 17
ICE Removals ........................................................................................................................ 18
    *Title 42 Expulsions* ........................................................................................................ 20
    *Removals of USBP Apprehended Family Units and Unaccompanied Alien Children* ......... 20
    *Removals by Criminality* ............................................................................................... 23
Conclusion ............................................................................................................................. 25
Appendix ................................................................................................................................ 26
    *Appendix A: Methodology* ............................................................................................. 26
    *Appendix B: Removals by Country of Citizenship* .......................................................... 26

**Executive Summary**

U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) shares responsibility for administering and enforcing the nation's immigration laws with ICE Homeland Security Investigations (HSI), as well as other Department of Homeland Security (DHS) component agencies, including U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE ERO is responsible for protecting the homeland through the arrest, detention, and removal of aliens who undermine public safety or the integrity of United States immigration laws, and its main areas of focus are interior enforcement operations, management of the agency's detained population nationwide, and repatriation of aliens who have received a final order of removal.

During Fiscal Year (FY) 2020,[1] ICE ERO faced an unprecedented challenge in the form of the coronavirus disease 2019 (COVID-19) global pandemic. Like nearly every agency in the United States Government, ICE ERO experienced impacts to its workforce and daily operations as a result, and made significant changes to ensure the safety of both detainees and personnel in order to meet or exceed Centers for Disease Control and Prevention (CDC) guidance.[2] Pandemic safety measures, along with extremely low numbers of CBP apprehensions along the Southwest Border due to the use of 42 U.S.C. §§ 265 and 268 authority,[3] have resulted in temporary decreases in many of ICE ERO's traditional metrics. However, the agency has continued to carry out its public safety mission while refocusing many of its efforts on ensuring health and safety during the pandemic.

This report presents ICE ERO's FY 2020 year-end statistics in the following areas: Custody and Case Management, Administrative and Criminal Arrests, ICE Detainers, and Removals. While many of these metrics have fallen by a third or more since FY 2019, ICE notes that these decreases are the result of temporary conditions during a global pandemic, and projects that conditions may shift rapidly once conditions resolve. As a result, while these metrics provide a snapshot in time, they do not reflect post-pandemic operational conditions or resource requirements.

- **_Custody and Case Management:_** During the COVID-19 pandemic, ICE ERO decreased its detained population to allow for social distancing, temporarily adjusted its enforcement posture to narrowly focus on criminal aliens and public safety threats, and received far fewer intakes from CBP. While ICE ERO's detained population generally averages around 45,000 and peaked at 55,000 during the 2019 border surge, it fell to approximately 20,000 by the end of FY 2020.

  However, detention remained necessary for some aliens, and it continued to be the primary pathway by which ICE ERO was able to effectuate removals. Throughout the

---

[1] FY 2020 indicates October 1, 2019 through September 30, 2020.
[2] The CDC remains the authoritative information source on how to reduce exposure to and the spread of COVID-19.
[3] This use of title 42 U.S.C. §§ 265 and 268 authority allows the expulsion of aliens from the United States to prevent the introduction of COVID-19 into the country.

pandemic, ICE ERO has taken multiple steps ensure safety in its detention facilities, including the development and implementation of comprehensive protocols in accordance with CDC guidance, reduction of the detained population, and the continual expansion of COVID-19 testing capabilities. As of the end of FY 2020, ICE ERO had tested more than 40,000 detainees.

Additionally, beyond managing ICE's detained population, ICE ERO also manages non-detained cases. In FY 2020, the number of aliens on ICE ERO's non-detained national docket remained consistent with FY 2019 at 3.26 million cases. ICE's Alternatives to Detention (ATD) program, which has expanded dramatically in recent years, remained relatively constant during FY 2020, with 90,000 aliens enrolled in the program at the end of the year. However, ATD experienced an increase in absconder rates among both single adult enrollees and family units, and the overall absconder rate of 33 percent in FY 2020 demonstrated the continuing challenges associated with the growth of this program in recent years.

- ***Administrative and Criminal Arrests:*** Due to the COVID-19 pandemic, in March 2020, ICE ERO temporarily adjusted its enforcement posture to narrowly focus enforcement efforts on public safety risks and individuals subject to mandatory detention based on criminal grounds. In FY 2020 ICE ERO conducted 103,603 administrative arrests, a 28 percent decline from FY 2019, and 90 percent of those arrested had criminal convictions or pending criminal charges at the time of arrest.

  In addition to arresting aliens for administrative violations of the immigration laws, ICE ERO also conducts criminal arrests and assists with pursuing prosecutions related to such criminal activity. In FY 2020, ICE ERO enforcement activities resulted in 4,360 criminal arrests, 4,479 criminal charges, and 5,397 convictions.

- ***ICE Detainers:*** In FY 2020, ICE ERO issued 122,233 detainers, a 26 percent decline from FY 2019. This was likely impacted by decreased numbers of individuals in state and local custody nationwide, ICE's own temporary reduction in enforcement activity early in the pandemic, an increasing number of jurisdictions that do not cooperate with immigration enforcement activities, and court rulings limiting ICE's ability to lodge detainers.

- ***Removals:*** ICE ERO conducted 185,884 removals during FY 2020, a 30 percent decrease from FY 2019. This decrease primarily resulted from a sharp decline in CBP apprehensions at the Southwest Border due to the use of authority under 42 U.S.C. §§ 265 and 268 to expel aliens from the United States to prevent the introduction of COVID-19, though it was also impacted by a decline in ICE ERO interior arrests. The vast majority of ICE ERO's interior removals – 92 percent – had criminal convictions or pending criminal charges, demonstrating ICE ERO's commitment to removing those who pose the greatest risk to the safety and security of the United States. Additionally, despite the overall decrease in removals, ICE ERO assisted CBP with 17,000 air charter

4

expulsions under Title 42, and also saw increases in removals to several countries that were previously uncooperative with removal efforts.

**ICE Custody and Case Management**

ICE custody and case management operations are integral to effectuating removals. ICE ERO detains individuals to ensure their presence for immigration proceedings and to secure their departure from the United States once they become subject to an executable final order of removal. While operations have changed due to COVID-19, detention remained necessary for some aliens, and it continued to be the primary pathway by which ICE ERO was able to effectuate removals. For example, in FY 2020, 82 percent of those removed spent time in ICE detention prior to their departure from the country.

The health and safety of both detainees and personnel is of paramount importance, especially during a global pandemic, and ICE ERO has taken a number of steps to ensure safety and allow for social distancing, including a temporary reduction in the detained population. ICE began developing and implementing comprehensive protocols in accordance with CDC guidance on January 22, 2020, and contributed to the development of the CDC's *Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities*[4] by sharing expertise related to ICE ERO's handling of infectious diseases in a custodial environment. Guidance provided by the CDC rapidly evolved as epidemiologists and public health experts learned more about COVID-19. As a result, ICE ERO medical and operational personnel monitor and review this guidance daily, and continually update applicable policies and procedures.

On March 27, 2020, ICE ERO issued a memorandum to all Detention Wardens and Superintendents entitled, *Memorandum on COVID-19 Action Plan, Revision 1.*[5] The measures in the memorandum were developed to reduce exposure to COVID-19, protect the detained population, and optimize employee health and availability for duty. Subsequently, on April 10, 2020, ICE ERO released the COVID-19 *Pandemic Response Requirements* (PRR),[6] a guidance document developed in consultation with the CDC that builds upon previously issued guidance, and sets forth specific requirements that must be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities. ICE ERO subsequently released updated versions of the PRR on June 22, July 28, September 4, and October 27, and continues to monitor evolving conditions and court rulings.

In March 2020, ICE ERO convened a working group of medical professionals, disease control specialists, detention experts, and field operators to identify enhanced steps to minimize the

---

[4]Centers of Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Oct. 15, 2020).
[5] Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, *Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1* (Mar. 27, 2020)
[6] *Pandemic Response Requirements* (PRR), https://www.ice.gov/coronavirus/prr (last visited Oct. 27, 2020).

5

spread of COVID-19, which recommended that all facilities make efforts to reduce the population at detention facilities to 75 percent of capacity or less to allow for increased social distancing opportunities. ICE ERO asked local jails to meet this target as quickly as possible and also set a target of 70 percent of population capacity for ICE dedicated facilities, exceeding the CDC and working group recommendations of 75 percent.

Like many federal, state, and local agencies and facilities across the country, ICE has been impacted by nationwide COVID-19 testing shortages. However, in addition to decreasing detention facility capacity, ICE ERO has been evaluating its testing processes and increasing these capabilities throughout the pandemic. This has included gains in testing upon intake, saturation testing (one-time testing of an entire population at a location to detect potential asymptomatic positive cases), and implementation of testing protocols for transfers and removals. As of the end of FY 2020, seventy-four facilities were testing all new intakes, and ICE ERO has continued to expand saturation testing at multiple sites across the country. From the initial test in February 2020 through the end of FY 2020, more than 42,000 detainees had been tested for COVID-19, and the agency continues to publish the latest data on testing at ice.gov/coronavirus.

As a result of the extensive pandemic mitigation measures ICE has implemented, as well as a sharp decrease in arrivals at the Southwest Border, initial book-ins to ICE custody as well as the overall Average Daily Population (ADP) in ICE custody decreased significantly in FY 2020. However, the non-detained docket, which contains more than 3.26 million cases of aliens in all stages of the immigration process across the country, has remained consistent throughout FY 2020 as the pandemic slowed the previously growing national docket.

*ICE Initial Book-Ins from CBP Apprehensions*

When an alien is apprehended by CBP, he or she may be returned immediately by CBP or transferred to ICE custody pending removal proceedings or execution of a removal order. An initial book-in to an ICE detention facility is defined as the first time an alien enters ICE custody for a detention stay and does not include transfers between facilities. In FY 2020, ICE ERO experienced a decline in overall book-ins from CBP largely due to border closures and fewer apprehensions at the border throughout the global pandemic, as well as CBP's use of Title 42 authority. During FY 2020, initial book-ins to ICE custody from CBP declined by 78 percent over FY 2019.

Overall, there were 182,869 initial book-ins to ICE custody in FY 2020 resulting from both CBP and ICE ERO arrests. These began to decline sharply in April 2020, coinciding with changes resulting from the global pandemic. Forty-five percent of initial book-ins were turned over from CBP in FY 2020, compared to 73 percent in FY 2019.

**Figure 1: FY 2018 – FY 2020 ICE Initial Book-Ins by Arresting Agency**



**Figure 2: FY 2019 – FY 2020 ICE Initial Book-Ins by Arresting Agency and Month**

*ICE Average Daily Population*

ICE ERO's ADP measures the number of individuals in ICE custody on an average day during the fiscal year. In FY 2020, the ADP was 33,724, a decline of 33 percent compared to FY 2019. Like ICE ERO's initial book-ins, the decrease in ADP in FY 2020 was driven by a reduction in

7

CBP apprehensions turned over to ICE for detention and removal, as well as necessary mitigation measures due to COVID-19.

**Figure 3: FY 2018 – FY 2020 Average Daily Population by Arresting Agency**



**Figure 4: FY 2019 – FY 2020 Average Daily Population by Arresting Agency and Month**

8

*Detained Population*

ICE ERO detains individuals to secure their presence for immigration proceedings and removal from the United States, with detention resources focused on those who represent a danger to persons or property, for whom detention is mandatory by law,[7] or who may be a flight risk.

While ICE ERO has temporarily drawn down its detained population to 75 percent or less in line with CDC and working group guidance, it has continued to detain a relatively small number of aliens during the pandemic. In general, ICE's detained population of between 20,000 and 50,000 represents a small fraction of the overall number of removal cases it manages nationwide, which stood at more than 3.26 million at the end of FY 2020.

From March 1 through August 1, 2020, ICE's detained population decreased by 44 percent, and by the end of FY 2020 the detained population stood at just 19,068 - 63 percent less than at the end of FY 2019. The majority of those detained were subject to mandatory detention (63 percent) and of the remaining 37 percent who were not subject to mandatory detention, 71 percent had criminal convictions and/or pending criminal charges.

These significant decreases came as direct result of COVID-19 mitigation efforts, as well as extremely low numbers of arrivals at the Southwest Border during the pandemic. However, DHS and its component agencies have handled multiple historic migration surges at the Southwest Border since 2014, with ICE's detained population peaking at more than 55,000 during the summer of 2019. Because COVID-19 has severely impacted the global economy, once pandemic conditions begin to resolve within the United States, ICE anticipates that migration may meet or surpass pre-pandemic levels, and the agency will require adequate resources to address such a shift.

---

[7] Under the Immigration and Nationality Act (INA), ICE may not release any alien subject to mandatory detention unless ordered to do so by a judge, and these provisions have been upheld by the Supreme Court.

9

**Figure 5: FY 2018 – FY 2020 Currently Detained Population Snapshots by Arresting Agency**



*Average Length of Stay (ALOS)*

The average length of stay (ALOS) represents the average amount of time an alien is detained in ICE custody. While ICE ERO's ALOS has been decreasing for several years, in FY 2020, the downward trend reversed for an overall ALOS of 63.5 days.

Although the average length of stay remained relatively stable from October 2019 until March 2020, it increased significantly in April 2020, the first full month of the COVID-19 pandemic. The pandemic has resulted in a number of factors which have significantly changed the removal landscape, including closure of the Southwest Border, courts not operating normally and processing times increasing significantly, limited availability of commercial flights, CDC recommendations for 14-day cohorting to reduce the spread of illness in detention, and foreign governments which have denied or delayed the return of their nationals. As a result, while ALOS is complex, ICE's analysis shows that pandemic-related factors played a major role in this increase.

**Figure 7: FY 2018 – FY 2020 Average Length of Stay by Arresting Agency**



*ICE Non-Detained National Docket*

ICE ERO manages cases amenable to removal going through the immigration process via the ICE Non-detained National Docket. The national docket includes all aliens in removal proceedings and encompasses both the smaller detained docket and the much larger non-detained docket. Cases on the non-detained docket include aliens who are both pre- and post-final order, and who have been released on parole, bond, an Order of Recognizance, or an Order of Supervision. In FY 2020, the number of aliens on ICE's non-detained national docket remained consistent with FY 2019 at 3.26 million cases.

**Figure 8: End of FY 2020 ICE National Docket Snapshot**



11

*Alternatives to Detention*

ICE ERO's ATD program uses technology and case management to monitor aliens' court appearances and compliance with release conditions while their removal proceedings are pending on the non-detained immigration court docket. ATD is not a substitute for detention, but instead complements immigration enforcement efforts by offering increased supervision for a subset of eligible aliens who are not currently detained.

ATD may serve as an appropriate additional layer of supervision for an alien who is released from detention pursuant to an Order of Recognizance, an Order of Supervision (for aliens already subject to final removal orders), a grant of parole, or a bond. Adults age 18 and over may be eligible for participation in ATD but must be thoroughly vetted by ERO officers, who review an alien's criminal, immigration, and supervision history, family and/or community ties, status as a caregiver or provider, and humanitarian or medical considerations when making enrollment determinations in order to determine whether a candidate is likely to comply with the terms of the program. ICE ERO typically utilizes ATD to encourage compliance for aliens who may be a flight risk but either lack a criminal history or the criminal history is minor or non-violent. ICE ERO strongly recommends against the use of ATD to monitor those who have been accused of serious and violent criminal activity, as it does nothing to prevent such an individual from reoffending or to protect the initial victim.[8]

While ICE ERO has expanded its use of ATD from approximately 23,000 participants in FY 2014 to 90,000 as of the end of FY 2020, this expansion has come with a number of challenges, including increasing levels of absconders among both single adult enrollees as well as family units. Between FY 2019 and FY 2020, the absconder rate[9] for family units increased from 26.9 percent to 39 percent, while the absconder rate among single adults increased from 12.3 percent to 21 percent. Overall, FY 2020 saw a 33 percent absconder rate for ATD participants, demonstrating the growing challenges that large numbers of ATD enrollments create for immigration enforcement.

Additionally, there are currently over 3.26 million cases assigned to the non-detained docket. With approximately 5,300 ERO officers across 24 field offices, ICE ERO's ability to closely monitor the majority of cases on its non-detained docket and to provide robust case management for this segment of the population is extremely limited. On average, participants currently spend between 14 and 18 months enrolled in the program before they are removed or terminated from the program to make room for new participants who have recently entered the United States and/or those who are being released from ICE custody.

---

[8] *See Matter of Urena*, 25 I&N Dec. 140 (BIA 2009) (holding that aliens posing a danger to the United States should be detained without bond pending their removal proceedings, as conditions of release only mitigate the risk of flight).

[9] Absconder Rate = Count of Absconders/Count of Overall Terminations. ICE calculates the percentage of absconders by looking at the overall number of aliens who concluded the ATD program in a given time period ("overall terminations"), and the number of those terminations which occurred due to a participant absconding.

12

Ultimately, because ICE ERO lacks sufficient resources to keep all current participants enrolled through the pendency of their removal proceedings, or to locate and arrest the significant number of participants who abscond, current problems with the ATD program will only be exacerbated by enrolling greater numbers of participants without the addition of appropriate case management and enforcement resources. While ICE ERO has continued to expand the use of ATD to monitor the non-detained population in FY 2020, particularly in light of the pandemic, the program will need to be further resourced in order to appropriately monitor participants, including through the addition of officers who can locate, arrest, and remove those who fail to adhere to conditions of enrollment.

**ERO Administrative Arrests**

ICE ERO arrests aliens for administrative violations of United States immigration law. ICE ERO conducts enforcement actions based on intelligence-driven leads in communities nationwide (at-large arrests) and also works with prisons and jails to identify aliens who are amenable to removal and who have been arrested by state or local authorities for criminal activity (custodial arrests).

Due to the COVID-19 pandemic, in March 2020 ICE ERO temporarily adjusted its enforcement posture to narrowly focus enforcement efforts on public safety risks and individuals subject to mandatory detention based on criminal grounds. ERO officers have continued to undertake enforcement actions during the pandemic and have implemented procedures to effectively perform their duties in light of COVID-19. However, ICE enforcement activities, including ERO administrative arrests, slowed sharply for several months during the spring and summer, contributing to a lower number of arrests overall during the fiscal year. There were 103,603 ERO administrative arrests in FY 2020, a 28 percent decline from FY 2019, with similar declines in both at-large and custodial arrests.

While ICE ERO administrative arrests have declined since FY 2019, ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to public safety and security threats to the United States. As a result, the majority of aliens arrested by ICE ERO are convicted criminals, followed by those with pending criminal charges at the time of arrest. In FY 2020, 90 percent of ICE ERO's administrative arrests were for aliens with criminal convictions or pending criminal charges while the remaining 10 percent were other immigration violators.[10] Many of those arrested have extensive criminal histories with multiple criminal convictions or pending charges, and the agency continued to carry out its key public safety mission during the pandemic by locating and arresting such aliens. Of the 93,061 ERO administrative arrests with criminal convictions or pending criminal charges in FY 2020, the criminal history for this group

---

[10] ICE defines immigration violators' criminality in the following manner: Convicted Criminal: Immigration Violators with a criminal conviction entered into the ICE system of record at the time of the enforcement action; Pending Criminal Charges: Immigration Violators with pending criminal charges entered into the ICE system of record at the time of the enforcement action; Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into the ICE system of record at the time of the enforcement action.

13

included more than 374,000 total criminal convictions and pending charges as of the date of arrest – an average of four per alien.

**Figure 9: FY 2018 – FY 2020 ERO Administrative Arrests by Criminality**



**Figure 10: FY 2019 – FY 2020 ERO Administrative Arrests by Month**

14



Figure 11: FY 2018 – FY 2020 At-Large Arrests by Criminality

Table 1: FY 2020 Criminal Charges and Convictions for ERO Administrative Arrests[11, 12]

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Traffic Offenses – DUI | 20,091 | 35,716 | 55,807 |
| Dangerous Drugs | 15,265 | 36,647 | 51,912 |
| Traffic Offenses | 19,910 | 29,009 | 48,919 |
| Immigration | 7,637 | 40,921 | 48,558 |
| Assault | 17,232 | 20,015 | 37,247 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 7,310 | 6,949 | 14,259 |
| General Crimes | 5,895 | 7,166 | 13,061 |
| Larceny | 3,459 | 8,847 | 12,306 |
| Obstructing the Police | 4,386 | 6,815 | 11,201 |
| Fraudulent Activities | 2,977 | 5,888 | 8,865 |

[11] The specific criminal charges and convictions represent the criminal history as entered in the ICE system of record based on the FBI's National Crime Information Center (NCIC) offense codes. Each alien may have multiple criminal convictions or charges at the time of their administrative arrest, and Table 1 lists categories which accounted for at least 1,000 combined charges and convictions among those who were administratively arrested by ERO in FY 2020.

[12] Notes: "Traffic Offenses" include (besides Traffic Offenses – DUI which is listed separately) Hit and Run, Transport Dangerous Material, and Traffic Offense. "Immigration" offenses include Illegal Entry, Illegal Reentry, False Claim to U.S. Citizenship, and Alien Smuggling. "Obstructing Judiciary, Congress, Legislature, Etc.," refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear. "General Crimes" include Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

15

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Burglary | 1,988 | 6,149 | 8,137 |
| Weapon Offenses | 2,688 | 5,426 | 8,114 |
| Public Peace | 2,695 | 4,114 | 6,809 |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,733 | 4,184 | 5,917 |
| Sexual Assault | 1,334 | 3,051 | 4,385 |
| Invasion of Privacy | 1,512 | 2,817 | 4,329 |
| Family Offenses | 1,880 | 2,336 | 4,216 |
| Robbery | 883 | 2,933 | 3,816 |
| Stolen Vehicle | 1,104 | 2,697 | 3,801 |
| Forgery | 1,095 | 2,240 | 3,335 |
| Damage Property | 1,434 | 1,652 | 3,086 |
| Liquor | 1,602 | 1,424 | 3,026 |
| Flight / Escape | 1,010 | 1,647 | 2,657 |
| Stolen Property | 808 | 1,674 | 2,482 |
| Homicide | 369 | 1,468 | 1,837 |
| Kidnapping | 736 | 901 | 1,637 |
| Health / Safety | 398 | 659 | 1,057 |

**Criminal Arrests and Prosecutions**

In addition to arresting aliens for administrative violations of immigration law, ICE ERO also conducts criminal arrests and assists with pursuing prosecutions related to such criminal activity. In FY 2020, ERO enforcement activities resulted in 4,360 criminal arrests (a 35 percent decline from FY 2019), 4,479 charges (a 34 percent decline from FY 2019), and 5,397 convictions (a 24 percent decline from FY 2019). These efforts resulted in the prosecutions of offenses which include, but are not limited to: 8 U.S.C § 1253, Penalties Related to Removal, U.S.C § 1325, Illegal Entry into the United States; 8 U.S.C § 1326, Illegal Re-Entry of Removed Alien; 18 U.S.C. § 1361, Destruction of Government Property, 18 U.S.C § 1546, Fraud and Misuse of Visas, Permits and Other Documents; 18 U.S.C § 111, Assaulting and/or Resisting an Officer; and 18 U.S.C § 922(g)(5), Felon in Possession of a Firearm.



Figure 12: FY 2018 – FY 2020 Prosecution Statistics

## ICE Detainers

A detainer is a request from ICE to local law enforcement agencies to notify DHS as early as practicable before a removable alien is released from local custody. Detainers also request that local law enforcement agencies maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise be released, which allows DHS to assume custody for removal purposes in accordance with federal law.

Detainers reduce potential risks to ERO officers, removable aliens, and the general public by allowing arrests to be made in secure custodial settings as opposed to at-large in communities. The use of detainers also conserves scarce government resources and allows ICE ERO to assume custody of criminal aliens before they have an opportunity to reoffend. In FY 2020, ICE ERO issued 122,233 detainers, and the aliens who were the subjects of these detainers had criminal histories[13] including, but not limited to, the following crimes: more than 1,900 homicide-related offenses, 1,900 kidnappings, 3,600 robberies, 42,800 assaults, and 11,900 sex crimes.

Similar to other decreases in interior enforcement activity due to COVID-19, the number of detainers issued in FY 2020 declined by 26 percent. Reduced detained populations in state and local jails, along ICE ERO's own temporary reduction in enforcement activity early in the pandemic, likely contributed to this decrease. However, ICE also continues to encounter jurisdictions that do not cooperate with its enforcement efforts and estimates that limited visibility into state and local law enforcement activities in non-cooperating jurisdictions also

---

[13] "Criminal history" includes all criminal convictions and pending charges associated with the group of aliens who were the subjects of detainers in FY 2020. Criminal charges may be added or dropped at any point and convictions may be overturned, so this data is a snapshot in time but is representative of the serious criminal histories and corresponding public safety risk associated with this group of individuals.

impacted the number of detainers issued. Additionally, the court's ruling in *Gonzalez v. U.S. Immigr. and Customs Enf't*, 416 F. Supp. 3d 995 (C.D. Cal. 2019), which limited the agency's ability to lodge biometric detainers, may have further contributed to reduced activity in this area.

**Figure 13: FY 2018 – FY 2020 ICE ERO Detainers Issued**



## ICE Removals

An ICE removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States.[14] ICE removals include both aliens arrested by ICE ERO in the interior of the country and aliens who are apprehended by CBP and subsequently turned over to ICE ERO for removal. While ICE removal operations continued throughout FY 2020, the overall removal number decreased due to 1) much lower numbers of aliens arriving at the Southwest Border, 2) CBP's use of Title 42 authority, 3) a temporary decrease in ICE ERO enforcement actions within the interior of the country, 4) precautions taken by ICE ERO to help ensure the safety of those being removed, as well as staff and contractors, 5) restrictions on air travel, and 6) the reluctance of a number of countries to accept the return of their nationals early on in the pandemic. In FY 2020, ICE ERO conducted 185,884 removals, a 30 percent decrease over FY 2019. However, ICE ERO noted significant increases in removals to countries that were previously non-cooperative, including Bangladesh, Cuba, Haiti, and India, a direct result of engagement efforts by ICE and the Department of State (**Appendix B**).

---

[14] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens who have received a final order of removal, as well as those who have been processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VRs after June 1st, 2013 and not detained by ICE are primarily processed by the USBP. CBP should be contacted for those statistics.

During the pandemic, ICE ERO has taken significant steps toward safeguarding aliens with final orders of removal and does not remove any detainee who is confirmed or suspected of having COVID-19. Medical checks occur at several stages in custody, and if an individual exhibits symptom of respiratory disease, he or she is referred to a medical provider and segregated from others. Additionally, while the CDC recommends a temperature threshold of 100.4 degrees, out of an abundance of caution ICE ERO has lowered this threshold even further, to 99 degrees. Temperature checks are performed no more than 12 hours before a detainee's departure, and anyone recording a temperature of 99 degrees or higher or exhibiting symptoms of a health condition that is potentially contagious to other detainees, staff, or third parties is denied boarding and referred for further screening and evaluation. All detainees must wear a mask prior to arrival at the flight line, and ICE ERO also conducts COVID-19 testing prior to removal where deemed warranted/practicable and by specific bilateral arrangement with a given nation's government.

**Figure 14: FY 2018 – FY 2020 ICE Removals**



19

**Figure 15: FY 2018 – FY 2020 ICE Removals by Arresting Agency**



**Figure 16: FY 2018 – FY 2020 ICE Removals by Arresting Agency and Month**



*Title 42 Expulsions*

In addition to the removal of aliens represented in Figures 14, 15, and 16, during FY 2020, ICE ERO also assisted CBP with a subset of Title 42 expulsions. While individuals returned to their last transit point or countries of origin under Title 42 authority represent CBP "expulsions" rather than ICE removals, ICE plays a supporting role in this process.

20

During the COVID-19 pandemic, the CDC determined the potential introduction and spread of the virus in CBP stations and facilities presented a serious danger to migrants, CBP's frontline agents and officers, and the general populace. As a result, the U.S. Department of Health and Human Services issued an order pursuant to its authority under 42 U.S.C. §§ 265 and 268, which directs that DHS assist it in preventing the introduction into the United States persons who create a serious danger of introducing communicable diseases. On March 21, the CDC issued an order under Title 42 for assistance by DHS customs officers. Under this authority, illegal border crossers may be expeditiously returned to their country of last transit – Canada or Mexico – or, when such a return is not possible, to their country of origin. While both CBP and ICE are tasked with supporting the CDC in the application of Title 42, CBP determines which aliens are subject to Title 42 expulsions, while ERO's role is limited to obtaining a foreign government's authorization to receive Title 42 expulsions, as well as coordinating such expulsions. In FY 2020, from March 23 to September 30, ICE ERO assisted with more than 17,000 air charter expulsions under Title 42.

*Removals of USBP Apprehended Family Units and Unaccompanied Alien Children*

Since the initial surge at the Southwest Border in FY 2014 and through the start of FY 2020, the United States border experienced a sustained increase in arrivals of both family unit members and Unaccompanied Alien Children (UAC). The large number of arrivals placed a strain on DHS resources at the border, as well as United States Government resources in the interior of the country. During FY 2018, FY 2019, and FY 2020 as a whole, the U.S. Border Patrol (USBP) apprehended 601,534 family unit members and 148,012 UAC, while ICE ERO removed only 22,912 family unit members and 15,978 UAC during the same time period – a 3.8 percent and 10.8 percent removal rate, respectively.[15] Although apprehensions at the Southwest Border decreased during the COVID-19 pandemic, ICE anticipates a renewed increase in border arrivals once pandemic conditions in the United States subside, which may pose significant resource and policy challenges for the United States Government and DHS agencies.

In FY 2020 ICE ERO removed 14,499 aliens identified as family unit members based on USBP apprehension data from the initial surge in FY 2014 through FY 2020. Although these removals represent only a small percentage of overall family unit apprehensions, they increased by 154 percent from FY 2019, primarily as a result of the Electronic Nationality Verification (ENV) Program, which began in July 2019 and reduces time spent in detention by returning nationals of participating countries (currently El Salvador, Guatemala, and Honduras) in an expeditious manner by verifying nationality electronically. However, ICE notes that more than 13,000 of the family unit removals in FY 2020 (90 percent) occurred between October 2019 and March 2020, and the onset of the COVID-19 pandemic resulted in a sharp decrease.

---

[15] ICE ERO removals of family unit members and UAC include all those identified as members of these populations by the USBP; some of the removals that occurred during this three-year time period may correspond to aliens who were apprehended prior to this time period.

In FY 2020 ICE ERO also removed 4,056 UAC who were identified as UAC from FY 2009 through FY 2020 based on USBP data.[16] The removals of UAC declined 36 percent from FY 2019.

**Figure 17: FY 2018 – FY 2020 ICE Removals of USBP-Identified Family Unit Apprehensions**



**Figure 18: FY 2018 – FY 2020 ICE Removals of Unaccompanied Alien Children**

---

[16] Removal counts are based on UAC designation at the time of initial book-in, and subjects may no longer be under the age of 18 at the time of removal.

22

*Removals by Criminality*

During FY 2020, ICE ERO maintained its commitment to removing those aliens posing the greatest risk to the safety and security of the United States. The vast majority of removals in FY 2020 were of aliens with a criminal history. For FY 2020 interior removals, meaning those who were initially arrested by ICE ERO (not CBP), 92 percent had criminal convictions or pending criminal charges.

**Figure 19: FY 2018 – FY 2020 ICE Removals by Criminality**



**Figure 20: FY 2018 – FY 2020 ICE Interior Removals by Criminality**



23

ICE ERO removals of known or suspected gang members and known or suspected terrorists (KSTs) are instrumental to the agency's national security and public safety mission. ICE ERO identifies gang members and KSTs by checking an alien's background in federal law enforcement databases, conducting interviews with aliens, and reviewing information received from its law enforcement partners, which is noted accordingly in the agency's system of record. In FY 2020, ICE ERO removed 4,276 known or suspected gang members and 31 known or suspected terrorists.

**Figure 21: FY 2018 – FY 2020 ICE Removals of Known or Suspected Gang Members**



**Figure 22: FY 2018 – FY 2020 ICE Removals of Known or Suspected Terrorists**



24

**Conclusion**

As the agency primarily responsible for immigration enforcement efforts in the interior of the United States, ICE ERO plays a critical role in upholding the immigration laws set by the United States Congress, as well as helping ensure public safety and the integrity of the immigration system. Like many other agencies, ICE ERO was significantly impacted by the COVID-19 pandemic, with effects on its workforce, its enforcement operations, and the detained population. Despite the pandemic, however, key front-line law enforcement operations such as arrests of aliens who represent a threat to public safety or border security, management of the detained population, and removals of those who have received a final order have continued to the extent possible. As of the close of FY 2020, ICE ERO personnel continue to monitor and adapt to operational conditions resulting from the pandemic, and the agency continues to prepare for a shift in operational posture once current conditions resolve.

25

**Appendix**
*Appendix A: Methodology*

Data Source
Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

Data Run Dates
FY2020: IIDS v.1.34 run date 10/04/2020; ENFORCE Integrated Database (EID) as of 10/02/2020
FY2019: IIDS v.1.34 run date 10/06/2019; ENFORCE Integrated Database (EID) as of 10/04/2019
FY2018: IIDS v.1.34 run date 10/08/2018; ENFORCE Integrated Database (EID) as of 10/06/2018

Removals
ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ERO for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY 2009, ERO began to "lock" removal statistics on October 5 at the end of each fiscal year and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. The number of removals in FY 2017, excluding the "lag" from FY 2016, was 220,649. The number of removals in FY 2018, excluding the "lag" from FY 2017, was 252,405. The number of removals in FY 2019, excluding the "lag" from FY 2018, was 262,591. The number of removals in FY 2020, excluding the "lag" from FY 2019, was 177,516.

*Appendix B: Removals by Country of Citizenship*

**Table X: FY 2018 – FY 2020 ICE Removals by Country of Citizenship[17]**

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| Total | 256,085 | 267,258 | 185,884 |
| AFGHANISTAN | 30 | 36 | 25 |
| ALBANIA | 98 | 80 | 53 |
| ALGERIA | 17 | 20 | 5 |

[17] Country of citizenship is reported as it appears in ICE's system of record at the time the data is pulled but may be updated as additional information is discovered or verified.

26

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| ANDORRA | 0 | 0 | 1 |
| ANGOLA | 32 | 40 | 43 |
| ANGUILLA | 0 | 2 | 0 |
| ANTIGUA-BARBUDA | 24 | 12 | 6 |
| ARGENTINA | 121 | 130 | 87 |
| ARMENIA | 27 | 48 | 31 |
| ARUBA | 1 | 1 | 0 |
| AUSTRALIA | 39 | 40 | 39 |
| AUSTRIA | 7 | 8 | 6 |
| AZERBAIJAN | 14 | 10 | 9 |
| BAHAMAS | 101 | 109 | 76 |
| BAHRAIN | 1 | 2 | 0 |
| BANGLADESH | 147 | 159 | 305 |
| BARBADOS | 17 | 29 | 6 |
| BELARUS | 10 | 18 | 11 |
| BELGIUM | 17 | 7 | 10 |
| BELIZE | 91 | 90 | 78 |
| BENIN | 10 | 9 | 5 |
| BERMUDA | 5 | 2 | 1 |
| BHUTAN | 1 | 1 | 0 |
| BOLIVIA | 81 | 64 | 49 |
| BOSNIA-HERZEGOVINA | 47 | 36 | 27 |
| BOTSWANA | 1 | 3 | 2 |
| BRAZIL | 1,691 | 1,770 | 1,902 |
| BRITISH VIRGIN ISLANDS | 1 | 4 | 5 |
| BRUNEI | 0 | 0 | 0 |
| BULGARIA | 34 | 21 | 21 |
| BURKINA FASO | 35 | 20 | 4 |
| BURMA | 40 | 29 | 26 |
| BURUNDI | 14 | 5 | 10 |
| CAMBODIA | 110 | 80 | 32 |
| CAMEROON | 72 | 76 | 54 |
| CANADA | 342 | 318 | 320 |
| CAPE VERDE | 68 | 50 | 15 |
| CAYMAN ISLANDS | 0 | 3 | 1 |
| CENTRAL AFRICAN REPUBLIC | 2 | 7 | 1 |
| CHAD | 13 | 3 | 1 |

27

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| CHILE | 166 | 253 | 351 |
| CHINA, PEOPLES REPUBLIC OF | 726 | 637 | 337 |
| CHRISTMAS ISLAND | 0 | 0 | 0 |
| COLOMBIA | 1,162 | 1,158 | 931 |
| COMOROS | 0 | 0 | 0 |
| CONGO | 18 | 15 | 12 |
| COSTA RICA | 162 | 176 | 130 |
| CROATIA | 12 | 9 | 4 |
| CUBA | 463 | 1,179 | 1,583 |
| CYPRUS | 3 | 1 | 2 |
| CZECH REPUBLIC | 47 | 56 | 22 |
| CZECHOSLOVAKIA | 4 | 2 | 1 |
| DEM REP OF THE CONGO | 79 | 81 | 96 |
| DENMARK | 2 | 5 | 12 |
| DJIBOUTI | 3 | 3 | 0 |
| DOMINICA | 19 | 16 | 13 |
| DOMINICAN REPUBLIC | 1,769 | 2,186 | 1,835 |
| EAST TIMOR | 0 | 0 | 0 |
| ECUADOR | 1,264 | 2,253 | 2,951 |
| EGYPT | 85 | 57 | 78 |
| EL SALVADOR | 15,445 | 18,981 | 12,590 |
| EQUATORIAL GUINEA | 5 | 5 | 7 |
| ERITREA | 62 | 49 | 37 |
| ESTONIA | 13 | 9 | 6 |
| ESWATINI | 0 | 1 | 0 |
| ETHIOPIA | 36 | 32 | 43 |
| FIJI | 21 | 11 | 9 |
| FINLAND | 3 | 3 | 4 |
| FRANCE | 85 | 78 | 83 |
| FRENCH GUIANA | 0 | 2 | 0 |
| FRENCH POLYNESIA | 0 | 2 | 0 |
| GABON | 6 | 8 | 4 |
| GAMBIA | 111 | 124 | 45 |
| GEORGIA | 20 | 38 | 44 |
| GERMANY | 72 | 77 | 63 |
| GHANA | 243 | 203 | 121 |
| GREECE | 22 | 32 | 17 |

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| GRENADA | 9 | 13 | 6 |
| GUADELOUPE | 1 | 1 | 1 |
| GUATEMALA | 50,390 | 54,919 | 29,790 |
| GUINEA | 219 | 102 | 44 |
| GUINEA-BISSAU | 5 | 4 | 0 |
| GUYANA | 142 | 125 | 84 |
| HAITI | 934 | 690 | 895 |
| HONDURAS | 28,894 | 41,800 | 21,139 |
| HONG KONG | 15 | 7 | 3 |
| HUNGARY | 81 | 71 | 44 |
| ICELAND | 2 | 0 | 1 |
| INDIA | 611 | 1,616 | 2,312 |
| INDONESIA | 110 | 77 | 62 |
| IRAN | 22 | 21 | 16 |
| IRAQ | 48 | 84 | 32 |
| IRELAND | 47 | 33 | 19 |
| ISRAEL | 93 | 89 | 52 |
| ITALY | 125 | 140 | 139 |
| IVORY COAST | 82 | 39 | 41 |
| JAMAICA | 792 | 751 | 523 |
| JAPAN | 28 | 21 | 27 |
| JORDAN | 94 | 106 | 70 |
| KAZAKHSTAN | 30 | 26 | 25 |
| KENYA | 140 | 122 | 85 |
| KIRIBATI | 0 | 0 | 0 |
| KOREA | 32 | 59 | 23 |
| KOSOVO | 14 | 15 | 13 |
| KUWAIT | 11 | 21 | 14 |
| KYRGYZSTAN | 15 | 19 | 3 |
| LAOS | 8 | 5 | 11 |
| LATVIA | 17 | 15 | 19 |
| LEBANON | 51 | 48 | 41 |
| LESOTHO | 1 | 0 | 0 |
| LIBERIA | 113 | 108 | 112 |
| LIBYA | 8 | 6 | 4 |
| LIECHTENSTEIN | 0 | 0 | 0 |
| LITHUANIA | 49 | 37 | 22 |
| LUXEMBOURG | 0 | 0 | 1 |

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| MACAU | 1 | 2 | 1 |
| MACEDONIA | 18 | 0 | 0 |
| MADAGASCAR | 1 | 0 | 0 |
| MALAWI | 3 | 1 | 2 |
| MALAYSIA | 11 | 9 | 11 |
| MALDIVES | 1 | 0 | 0 |
| MALI | 63 | 52 | 15 |
| MALTA | 0 | 1 | 1 |
| MARSHALL ISLANDS | 35 | 32 | 16 |
| MARTINIQUE | 0 | 0 | 0 |
| MAURITANIA | 98 | 41 | 25 |
| MAURITIUS | 0 | 1 | 0 |
| MEXICO | 141,045 | 127,492 | 100,388 |
| MICRONESIA, FEDERATED STATES OF | 99 | 91 | 24 |
| MOLDOVA | 38 | 28 | 17 |
| MONACO | 0 | 0 | 0 |
| MONGOLIA | 28 | 19 | 19 |
| MONTENEGRO | 18 | 23 | 7 |
| MONTSERRAT | 1 | 1 | 0 |
| MOROCCO | 58 | 33 | 27 |
| MOZAMBIQUE | 0 | 3 | 2 |
| NAMIBIA | 2 | 0 | 0 |
| NAURU | 0 | 0 | 1 |
| NEPAL | 45 | 162 | 97 |
| NETHERLANDS | 40 | 40 | 31 |
| NETHERLANDS ANTILLES | 2 | 6 | 4 |
| NEW CALEDONIA | 0 | 0 | 0 |
| NEW ZEALAND | 24 | 22 | 13 |
| NICARAGUA | 879 | 2,240 | 1,416 |
| NIGER | 5 | 13 | 5 |
| NIGERIA | 369 | 286 | 199 |
| NORTH KOREA | 0 | 0 | 0 |
| NORTH MACEDONIA | 0 | 15 | 10 |
| NORWAY | 7 | 9 | 11 |
| OMAN | 0 | 0 | 2 |
| PAKISTAN | 235 | 202 | 207 |

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| PALAU | 9 | 10 | 4 |
| PALESTINE | 0 | 0 | 0 |
| PANAMA | 59 | 55 | 36 |
| PAPUA NEW GUINEA | 1 | 2 | 1 |
| PARAGUAY | 6 | 7 | 9 |
| PERU | 581 | 571 | 353 |
| PHILIPPINES | 217 | 176 | 120 |
| PITCAIRN ISLANDS | 0 | 0 | 0 |
| POLAND | 123 | 135 | 102 |
| PORTUGAL | 96 | 101 | 47 |
| QATAR | 2 | 3 | 1 |
| REUNION | 0 | 0 | 0 |
| ROMANIA | 403 | 400 | 263 |
| RUSSIA | 107 | 153 | 108 |
| RWANDA | 2 | 12 | 8 |
| SAMOA | 30 | 17 | 4 |
| SAN MARINO | 0 | 0 | 0 |
| SAO TOME AND PRINCIPE | 0 | 0 | 0 |
| SAUDI ARABIA | 135 | 79 | 60 |
| SENEGAL | 125 | 55 | 52 |
| SERBIA | 30 | 31 | 16 |
| SERBIA AND MONTENEGRO | 2 | 2 | 1 |
| SEYCHELLES | 0 | 1 | 1 |
| SIERRA LEONE | 79 | 86 | 23 |
| SINGAPORE | 6 | 3 | 5 |
| SLOVAKIA | 35 | 22 | 12 |
| SLOVENIA | 1 | 1 | 2 |
| SOLOMON ISLANDS | 0 | 0 | 0 |
| SOMALIA | 229 | 151 | 112 |
| SOUTH AFRICA | 42 | 39 | 31 |
| SOUTH KOREA | 122 | 127 | 129 |
| SOUTH SUDAN | 61 | 65 | 41 |
| SPAIN | 209 | 259 | 235 |
| SRI LANKA | 36 | 112 | 119 |
| ST. HELENA | 0 | 0 | 0 |
| ST. KITTS-NEVIS | 15 | 11 | 3 |
| ST. LUCIA | 28 | 22 | 10 |

31

| Country of Citizenship | FY 2018 | FY 2019 | FY 2020 |
|---|---|---|---|
| ST. PIERRE AND MIQUELON | 0 | 0 | 0 |
| ST. VINCENT-GRENADINES | 13 | 19 | 8 |
| STATELESS | 0 | 0 | 0 |
| SUDAN | 42 | 18 | 17 |
| SURINAME | 19 | 12 | 1 |
| SWAZILAND | 0 | 0 | 0 |
| SWEDEN | 19 | 21 | 9 |
| SWITZERLAND | 4 | 6 | 10 |
| SYRIA | 7 | 9 | 2 |
| TAIWAN | 27 | 51 | 42 |
| TAJIKISTAN | 8 | 4 | 4 |
| TANZANIA | 19 | 25 | 13 |
| THAILAND | 55 | 46 | 25 |
| TOGO | 24 | 16 | 14 |
| TONGA | 21 | 10 | 10 |
| TRINIDAD AND TOBAGO | 104 | 106 | 73 |
| TUNISIA | 16 | 20 | 6 |
| TURKEY | 85 | 113 | 77 |
| TURKMENISTAN | 2 | 4 | 0 |
| TURKS AND CAICOS ISLANDS | 4 | 3 | 3 |
| TUVALU | 0 | 0 | 0 |
| UGANDA | 13 | 22 | 21 |
| UKRAINE | 105 | 125 | 106 |
| UNITED ARAB EMIRATES | 2 | 3 | 3 |
| UNITED KINGDOM | 209 | 198 | 173 |
| UNKNOWN | 42 | 46 | 30 |
| URUGUAY | 47 | 51 | 28 |
| UZBEKISTAN | 41 | 45 | 49 |
| VANUATU | 0 | 0 | 0 |
| VENEZUELA | 336 | 327 | 193 |
| VIETNAM | 122 | 80 | 93 |
| YEMEN | 24 | 46 | 14 |
| YUGOSLAVIA | 5 | 3 | 6 |
| ZAMBIA | 12 | 7 | 8 |
| ZIMBABWE | 19 | 16 | 16 |

32

Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/) (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/) (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah) (https://www.youtube.com/user/customsborderprotect)

(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)

U.S. Customs and Border Protection (/)

# Criminal Noncitizen Statistics Fiscal Year 2021

The following is a summary of U.S. Border Patrol enforcement actions related to arrests of criminal noncitizens for Fiscal Years 2016 - 2021.

Records checks of available law enforcement databases following the apprehension of an individual may reveal a history of criminal conviction(s). That conviction information is recorded in a U.S. Customs and Border Protection database, from which the data below is derived.

## Arrests of Individuals with Criminal Convictions

The term "criminal noncitizens" refers to individuals who have been convicted of one or more crimes, whether in the United States or abroad, prior to interdiction by the U.S. Border Patrol; it does not include convictions for conduct that is not deemed criminal by the United States. Arrests of criminal noncitizens are a subset of total apprehensions by U.S. Border Patrol.

| | FY16 | FY17 | FY18 | FY 19 | FY20 | FY21 TD AUG |
|---|---|---|---|---|---|---|
| U.S. Border Patrol Criminal Noncitizen Arrests | 12,842 | 8,531 | 6,698 | 4,269 | 2,438 | 9,728 |

*Fiscal Year 2021 runs October 01, 2020 - September 30, 2021.*

## Total Criminal Convictions by Type

This table organizes nationwide convictions of criminal noncitizens by type of criminal conduct. Because some criminal noncitizens may be convicted of multiple criminal offenses, total convictions listed below exceed the total arrests noted in the table above.

|  | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 TD AUG |
|---|---|---|---|---|---|---|
| **Assault, battery, domestic violence** | 1,007 | 692 | 524 | 299 | 208 | 1,062 |
| **Burglary, robbery, larceny, theft, fraud** | 825 | 595 | 347 | 184 | 143 | 738 |
| **Driving under the influence** | 2,458 | 1,596 | 1,113 | 614 | 364 | 1,510 |
| **Homicide, manslaughter** | 8 | 3 | 3 | 2 | 3 | 53 |
| **Illegal drug possession, trafficking** | 1,797 | 1,249 | 871 | 449 | 386 | 1,935 |
| **Illegal entry, re-entry** | 7,060 | 4,502 | 3,920 | 2,663 | 1,261 | 5,552 |
| **Illegal weapons possession, transport, trafficking** | 237 | 173 | 106 | 66 | 49 | 305 |
| **Sexual offenses** | 155 | 137 | 80 | 58 | 156 | 448 |
| **Other** 1 | 2,544 | 1,851 | 1,364 | 814 | 580 | 2,470 |

*Fiscal Year 2021 runs October 01, 2020 - September 30, 2021.*

[1] "Other" includes any conviction not included in the categories above.

**Last modified:** September 15, 2021

**Tags:**   Statistics



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

September 30, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

CC:                Troy Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

                   Katherine Culliton-González
                   Officer for Civil Rights and Civil Liberties
                   Office for Civil Rights and Civil Liberties

                   Lynn Parker Dupree
                   Chief Privacy Officer
                   Privacy Office

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our
frontline personnel for the candor and openness of the engagements we have had to help shape this
guidance. Thank you especially for dedicating yourselves – all your talent and energy – to the
noble law enforcement profession. In executing our solemn responsibility to enforce immigration

1

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation. Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition. The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States. We do not have the resources to apprehend and seek the removal of every one of these noncitizens. Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years. They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways. Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them. We will use our discretion and focus our enforcement resources in a more targeted way. Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being. We do not lessen our commitment to enforce immigration law to the best of our ability. This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have.  We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A.  Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B.  Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories.  It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action.  Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action. Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

3

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

4

### III.  Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV.  Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities.  Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices.  A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V.  The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

5

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

A.  Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

B.  Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department.  It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned.  Assessment of implementation of this guidance should be continuous.

C.  Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

D.  Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

**VI.  Implementation of the Guidance**

This guidance will become effective in sixty (60) days, on November 29, 2021.  Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively. Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

## VII. Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.



# Biden isn't doing as well as Tru removing aliens who pose a th public safety

BY NOLAN RAPPAPORT, OPINION CONTRIBUTOR — 10/07/21 11:00 AM EDT
THE VIEWS EXPRESSED BY CONTRIBUTORS ARE THEIR OWN AND NOT THE VIEW OF THE HILL

**Just In...**

**UK Parliament opens session honoring lawmaker slain last week**
INTERNATIONAL — 4M 7S AGO

**Did the US betray France, or is outrage over a submarine deal simply sour grapes?**
OPINION — 4M 15S AGO

**Egypt to require all public servants get vaccinated or present weekly negative test**
HEALTHCARE — 13M 6S AGO

**Fox News anchor deletes tweet suggesting Powell's death 'raises new concerns' about vaccine efficacy**
MEDIA — 32M 31S AGO

**China denies it tested missile, says it was space vehicle**
INTERNATIONAL — 33M 4S AGO

**A pandemic of hyper-hypocrisy is infecting American politics**
OPINION — 34M 14S AGO

**Watch live: Blinken delivers remarks on the passing of Colin Powell**
IN THE NEWS — 44M 45S AGO

**California state assemblymember Salas**

**205** SHARES                                                                 SHARE                TW



© Getty Images

Department of Homeland Security (DHS) Secretary **Alejandro Mayorkas** recently issued a memorandum with enforcement guidelines for the apprehension and removal of aliens who are in the United States in violation of our immigration laws. The objective of the guidelines is to prioritize the apprehension and removal of deportable aliens who pose a threat to national security, public safety, or border security.

Mayorkas' guidelines are the final version of interim guidelines that were issued in a previous memorandum on Jan. 20, 2021.

Former president **Donald Trump** also prioritized the removal of aliens who pose a threat to our public safety, and he was successful in achieving that objective.

Biden won't be.

Biden's interim guidelines severely impede ICE's efforts to arrest aliens who pose a threat to public safety — and the final guidelines will too.

In fiscal 2018, approximately 138,117 (87 percent) of the 158,681 aliens Trump's administration arrested in the interior of the country were convicted criminals or had pending criminal charges; in fiscal 2019, it was

**launches bid against Valadao**

CAMPAIGN — 50M 32S AGO

**VIEW ALL**

**View Latest Opinions >>**

123,128 (86 percent) of 143,099, and in fiscal 2020, it was 93,061 (90 percent) of 103,603.

According to a Washington Post article, Biden's interim guidelines reined in ICE enforcement so severely that the agency's 6,000 officers were averaging one arrest every two months, which isn't enough to achieve enforcement objectives of any kind. And the situation hasn't improved much since then.

ICE arrested and booked into detention 4,281 aliens during September 2021. This raises the average number of arrests — with detention — per agent to almost one every month and a half, but 75.6 percent of them had no criminal record.

Biden's enforcement guidelines also may be responsible to some extent for the border crisis, but that situation may be due primarily to reversing Trump's border security measures.

Mayorkas's memorandum prioritizes deportable aliens in the following categories (slightly paraphrased):

1. **Threat to National Security —** An alien is considered a threat to national security if he has engaged in or is suspected of engaging in terrorism or espionage.

2. **Threat to Public Safety —** Determining whether a deportable alien poses a threat to public safety requires an assessment of the totality of the facts and circumstances.

Factors that may militate in favor of an enforcement action include:

- The gravity of any criminal offenses;
- The nature and degree of harm criminal offenses have caused; and
- The use of a dangerous weapon in committing a crime.

Factors that may militate against an enforcement action include:

- Advanced or tender age;
- Lengthy presence in the United States;
- A mental condition that may have contributed to any criminal conduct;
- A physical or mental condition requiring care or treatment;
- The impact of removal on the alien's family in the United States;
- Military or other public service; and
- Evidence of rehabilitation.

Enforcement officers must evaluate the totality of the facts and circumstances to determine whether an alien poses a threat to public safety.

3. **Threat to Border Security —** An alien is considered a threat to border security if he was apprehended while attempting to make an unlawful entry, or he was apprehended after unlawfully entering the United States after November 1, 2020. The totality of the facts and circumstances must be considered here too.

The memorandum requires ICE to establish a rigorous review process to ensure proper compliance with these guidelines and to collect "detailed,

precise, and comprehensive data as to every aspect" of enforcement actions.

**Separation of powers**

Presidents have prosecutorial discretion, but this does not mean that they can disregard the statutory deportation grounds in federal law and write their own — which appears to be what Biden is trying to do. Compare his priority categories to the list of "deportable aliens" in section 1227 of the Immigration and Nationality Act (INA).

The U.S. Constitution divides the government into separate branches, each of which has separate and independent powers. Congress writes the laws, and the president enforces them. This is the separation of powers principle.

And some of the enforcement provisions in the law are not subject to prosecutorial discretion, such as the mandatory detention provisions in sections 1226(c) and 1231(a)(2) of the INA. Biden currently is in court over refusing to comply with these provisions. The judge's decision on a temporary injunction in that case sums up the separation of powers problem Biden is causing by quoting from a Senate report on alien criminality in the United States:

> "No matter how successful Congress might be in crafting a set of immigration laws that would — in theory — lead to the most long-term benefits to the American people, such benefits will not actually occur if those laws cannot be enforced."

**Information that is not available**

Biden's enforcement guidelines require an assessment of the totality of an alien's circumstances before taking an enforcement action against him or her — but the data needed to make such an assessment isn't available to ICE officers in the field and probably won't be at their offices either. DHS might have records on the aliens ICE officers need to assess from previous encounters, but the officers involved in the previous encounters may not have been able to get much information on them either.

It is possible to obtain at least some of the information needed for the required assessment from state and local police — or prison authorities — who have arrested or incarcerated aliens for committing crimes in the United States, but that source of information is withheld when the officers holding the aliens are subject to sanctuary policies that prevent them from cooperating with ICE — and Biden apparently supports such policies. Trump issued an executive order in 2017 that directed the Departments of Justice and Homeland Security to withhold federal funding from sanctuary jurisdictions; Biden rescinded the order.

Lack of information isn't the only problem.

---

**Robert Gates says 'extreme polarization' is the greatest threat to US...**

**Sunday shows - Buttigieg warns supply chain issues could stretch to...**

---

Four Texas sheriffs and an association of ICE officers have sued Biden, claiming that his enforcement guidelines are allowing "extremely dangerous illegal aliens" to be released onto the streets.

Unless Biden makes his enforcement guidelines easier to apply, Americans are going to be victims of crimes — perhaps many crimes — committed by undocumented aliens who would have been deported under other circumstances and by other administrations.

*Nolan Rappaport was detailed to the House Judiciary Committee as an executive branch immigration law expert for three years. He subsequently served as an immigration counsel for the Subcommittee on Immigration, Border Security and Claims for four years. Prior to working on the Judiciary Committee, he wrote decisions for the Board of Immigration Appeals for 20 years. Follow his blog at* [https://nolanrappaport.blogspot.com](https://nolanrappaport.blogspot.com)*.*

**TAGS   IMMIGRATION AND CUSTOMS ENFORCEMENT   ALEJANDRO MAYORKAS   DONALD TRUMP   JOE BIDEN   ILLEGAL IMMIGRATION TO THE UNITED STATES   REMOVAL PROCEEDINGS   DEPORTATION   PUBLIC SAFETY   SANCTUARY CITIES   BIDEN IMMIGRATION POLICY**

SHARE          TWEET



**THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE © 1998 - 2021 NEXSTAR MEDIA INC. | ALL RIGHTS RESERVED.**



Home > Humanitarian > Refugees and Asylum > Asylum > Benefits and Responsibilities of Asylees

# Benefits and Responsibilities of Asylees

⤢ Close All    ⤢ Open All

## Working in the United States    ⌃

If you are granted asylum, you are authorized to work in the United States whether or not you have an Employment Authorization Document (Form I-766/EAD). If for some reason you do not receive an EAD after being granted asylum, you should contact the asylum office that granted your case. You may use the EAD to present to an employer as a List A document on the Form I-9, Employment Eligibility Verification Form. You are eligible to use employment services from One-Stop Career Centers including:

- Job search assistance
- Career counseling
- Occupational skills training

For information, call 1-877-872-5627.

## Obtaining a Social Security Card    ⌃

You may immediately apply for an unrestricted Social Security card at a Social Security office once you have asylees status. You can get Social Security Card information by contacting the Social Security Administration. For more information, see the Social Security Administration website.

## Asylum for Family    ⌃

You may request derivative asylum status for your spouse or children who were listed on your asylum application. For more information, see the Family of Refugees and Asylees page.

## Permanent Residence (Green Card) 

After one year in the United States, you may apply for permanent residence (a Green Card). You must file a Form I-485, Application to Register Permanent Residence or Adjust Status, for yourself and each qualifying family member who wants to become permanent residents.

For more information, see the Green Card for Asylees page.

## Services and Help 

You may be eligible to receive the help from an organization in your area funded by the Office of Refugee Resettlement (ORR). Service may include:

- Financial assistance
- Medical assistance
- Employment preparation and job placement
- English language training

Many of these programs are available for a limited time period once you are granted asylum. Find out more by calling 1-800-354-0365 or see the Office of Refugee Resettlement website.

## Travel Documents 

Asylees are subject to special rules for traveling outside the United States. If you plan to leave the United States, you must receive prior permission to by obtaining a refugee travel document.

For more information, see How Do I Get a Refugee Travel Document? (PDF, 622.89 KB).

## Change of Address 

You must inform USCIS of your new address within 10 days of moving. You may do so by:

- Using the Online Change of Address tool
- Calling the USCIS Contact Center at 800-375-5283. For people who are deaf, hard of hearing or have a speech disability: TTY 800-767-1833.
- Filing a Form AR-11, Alien's Change of Address Card

## Selective Service Registration

All male asylees between the ages of 18 and 26 must register for the Selective Service. If you fail to register for the Selective Service, your ability to become a U.S. citizen or obtain other benefits in the United States may be negatively affected. For Selective Service registration information, see the Selective Service System website.

✕ Close All    ↗ Open All

Last Reviewed/Updated: 03/08/2018

Case 6:22-cv-01130-DCJ-CBW   Document 218-17   Filed 01/29/24   Page 372 of 503 PageID #: 12646

A report from the Federation for American Immigration Reform



# FAIR

# The Fiscal Burden of Illegal Immigration

## On United States Taxpayers (2017)

# Contents

INTRODUCTION                                                          1

PART I: FEDERAL EXPENDITURES AND RECEIPTS                             7

  Federal Expenditures                                     8
    Education                                     8
    Medical Costs                                 10
    Justice Enforcement                           14
    Welfare Programs                              20
    Total Federal Expenditures                    25

  Federal Tax Payments and Credits                         26
    Income Tax                                    27
    Other Taxes                                   31

  Net Federal Impact of Illegal Aliens                     33

PART II: STATE AND LOCAL EXPENDITURES AND RECEIPTS                   35

  State and Local Expenditures                             37
    Education                                     37
    Medical Costs                                 40
    Administration of Justice                     43
    Welfare Programs                              46
    Total State Expenditures                      49

  State and Local Taxes Collected                          50

  Net State Impact of Illegal Aliens                       55

PART III: TOTAL FEDERAL AND STATE FISCAL OUTLAYS                     56

CONCLUSION                                                           58

ENDNOTES                                                             59

# The Fiscal Burden of Illegal Immigration

## On United States Taxpayers (2017)

BY MATTHEW O'BRIEN, DIRECTOR OF RESEARCH
SPENCER RALEY, RESEARCH ASSOCIATE AND
JACK MARTIN, ADVISORY BOARD MEMBER

# The Fiscal Burden of Illegal Aliens on U.S. Taxpayers

## Total Governmental Expenditures on Illegal Aliens



Total Federal Expenditures
$45,870,474,332

Total State & Local Expenditures
$88,992,981,032

Total National Expenditures
$134,863,455,364

## Total Tax Contributions by Illegal Aliens



Total Federal Taxes Paid
$15,447,897,700

Total State & Local Taxes Paid
$3,520,960,000

Total Tax Contributions
$18,968,857,700

## Total Fiscal Burden of Illegal Aliens



Total National Expenditures
$134,863,455,364

Total Tax Contributions
$18,968,857,700

**Total Fiscal Burden of Illegal Aliens on U.S. Taxpayers:**

# $115,894,597,664

# Introduction

A continually growing population of illegal aliens, along with the federal government's ineffective efforts to secure our borders, present significant national security and public safety threats to the United States. They also have a severely negative impact on the nation's taxpayers at the local, state, and national levels. Illegal immigration costs Americans billions of dollars each year. Illegal aliens are net consumers of taxpayer-funded services and the limited taxes paid by some segments of the illegal alien population are, in no way, significant enough to offset the growing financial burdens imposed on U.S. taxpayers by massive numbers of uninvited guests.

Political and judicial efforts to accord illegal aliens the same government benefits available to U.S. citizens (e.g., the Supreme Court's holding in Plyler v. Doe guaranteeing illegal alien children a free public education, at taxpayer expense) have increasingly stressed federal, state and local budgets — to the detriment of Americans, particularly the poor, elderly, and disabled. The impact on public school systems[1] and criminal justice institutions[2] has been particularly harsh. And the situation has been greatly exacerbated by government refusal to implement measures aimed at deterring, detecting and prosecuting illegal aliens who commit fraud to obtain benefits and/or to avoid deportation following a criminal conviction.

This study examines the fiscal impact of illegal aliens as reflected in both federal and state budgets. It does not address the question of whether unchecked mass migration is a net boon to the United States. Most studies that extol the many benefits that allegedly accrue from illegal immigration suffer from a number of key problems:

- Unreasonable assumptions about who is an illegal alien. Most relevant datasets don't clearly distinguish who is an illegal alien and who isn't. Studies that wish to portray illegal immigration in a favorable light frequently rely on narrow definitions of "illegal alien" to skew data in their favor.

- Failure to examine whether the same, or even more significant, benefits would be achieved by filling vacant jobs, at market wages, with American employees.

- Refusal to acknowledge that there are many activities which create profit but remain illegal because of their negative effects on society as a whole. The exploitation of illegal alien labor to increase the profits of unscrupulous employers falls squarely into this category.

- A deceptive and inappropriate focus on the amount of taxes remitted by illegal aliens, rather than the taxes actually paid by illegal aliens. The American system of taxation returns a significant portion of monies paid by people earning low incomes. As a result, most illegal aliens receive a refund of all tax payments along with additional net income from the federal government, in the form of tax credits.

- Erroneous claims that illegal aliens subsidize federal benefit programs through un-refunded tax payments remitted by illegal aliens who are unable collect a return. Most illegal aliens are able to file a tax return using an Individual Tax Identification Number (ITIN). In addition, neither the states or the federal government have any data indicating how much of the pool of unclaimed tax refunds is attributable to illegal aliens versus deceased taxpayers, foreign investors, etc.

1

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

Even in the absence of any complex studies, basic mathematics make it self-evident that illegal aliens are a drain on the U.S. economy. For example, in its report *The Sinking Lifeboat: Uncontrolled Immigration and the U.S. Health Care System in 2009*, FAIR found that, in some hospitals, as many as two-thirds of total operating costs are attributable to uncompensated care for illegal aliens.[3] If those costs are being borne by American taxpayers, rather than the illegal aliens who received medical treatment, then those illegal aliens are consuming more services than they pay for, and the costs of providing those services are never recouped. That makes them a net drain on the economy.

A careful examination of the federal budget shows an annual outlay of approximately $46 billion for expenses related to illegal immigration. A review of state budgets indicates even greater local costs, estimated at $89 billion annually. This means that the overall costs attributable to illegal aliens totals an annual bill of $135 billion. That equates to over $8,000 per illegal alien and dependent, per year.

Some illegal aliens do pay certain taxes. However, employers usually hire illegal aliens to obtain cheap labor at wages well below the market rate for a given area. Many of those employers pay illegal aliens "under-the-table" and do not deduct payroll taxes. Due to their lack of immigration status, illegal aliens are unlikely to report their income to the Internal Revenue Service (IRS). Therefore, state and local governments, as well as the federal government, are not collecting enough taxes from illegal aliens to cover the costs of the services they consume. We estimate that illegal aliens actually pay just under $19 billion in combined state, local, and federal taxes. That means that the United States recoups only about 14 percent of the amount expended annually on illegal aliens. If the same jobs held by illegal aliens were filled by legal workers, at the prevailing market wage, it may safely be presumed that federal, state and local governments would receive higher tax payments.

FAIR firmly believes that the costs of illegal immigration (and massive legal immigration) significantly outweigh any perceived benefit. Accordingly, this study focuses only on calculating the overall costs of illegal immigration.

## How Many Illegal Aliens Currently Reside in the United States?

Estimating the fiscal burden of illegal immigration on the U.S. taxpayer depends on the size and characteristics of the illegal alien population. FAIR defines "illegal alien" as anyone who entered the United States without authorization and anyone who unlawfully remains once his/her authorization has expired.

It is challenging to determine how many illegal aliens are present in the United States at any given time. The Department of Homeland Security only counts those foreigners who enter and leave the country through lawful channels. Those who deliberately evade immigration authorities and sneak across the border remain uncounted.

Once in the United States, most illegal aliens live in the shadows and interact with the government only on a very limited basis. Others commit ongoing immigration and identity fraud, claiming to be either green card holders or U.S. citizens. As a result, the U.S. government typically becomes aware of illegal aliens when they are encountered by state and local, or federal, law enforcement agencies. Unfortunately, the U.S. government has no central database containing information on the citizenship status of everyone lawfully present in the United States. Therefore it is often difficult for police, prison officials, and other enforcement entities to determine whether an individual they encounter is actually lawfully present in the United States, or whether that individuals is falsely claiming to be here legally.

The overall problem of estimating the illegal alien population is further complicated by the fact that the majority of available sources on immigration status rely on self-reported data. Given that illegal aliens have a motive to lie about their immigration status, in order to avoid discovery, the accuracy of these statistics is dubious, at best. Census Bureau data, for example, differentiates between citizens, lawfully present aliens, and illegal aliens. But that information is reported by census survey respondents and is not verified against any accurate independent source.

An additional complication arises because many people who enter the United States lawfully will subsequently become illegal aliens by remaining in the U.S. beyond their authorized period of admission. In theory, the government should be able to keep a running tally of those who came here but overstay their visas. Practically speaking, however, this type of count is not maintained. The lack of reliable data regarding those who have become illegal by failing to comply with the terms of their stay often leads researchers unfamiliar with immigration law to omit persons who have fallen out of status from their approximations of the illegal alien populace.

All of the foregoing issues make it very difficult to assess the current illegal alien population of the United States. However, FAIR now estimates that there are approximately 12.5 million illegal alien residents. This number uses FAIR's previous estimates but adjusts for suspected changes in levels of unlawful migration, based on information available from the Department of Homeland Security, data available from other federal and state government agencies, and other research studies completed by reliable think tanks, universities, and other research organizations.

FAIR's estimates have been relatively close to — but slightly larger than — those produced by groups like Pew Research, etc. However, for ideological reasons, Pew, and similar groups, classify the large influx of unaccompanied alien minors (UAMs), Temporary Protected Status (TPS) recipients and Deferred Action for Childhood Arrivals (DACA) beneficiaries as being in the United States "legally." FAIR disagrees with this characterization. Recipients of TPS, DACA, etc. have not received "lawful immigration status" as that term is commonly understood. Rather, as a matter of administrative convenience, the U.S. government recognizes that these individuals are unlawfully present and declines to take immediate action against them. Accordingly, when calculating the illegal alien population, FAIR includes adults and children without any immigration status, as well as individuals who have received temporary reprieves through TPS, DACA, etc.

FAIR believes that this broader definition of who should be included in the illegal alien population is essential to an accurate calculation of the costs of illegal migration. Those classified under such special programs have most often entered, or remained in, the United States unlawfully (only a *very* small number of applicants move from a valid non-immigrant visa status to TPS). In addition, they are, almost uniformly, low-skilled, low-wage earners who are dependent upon taxpayer-funded programs for basic subsistence. The mere fact that their unlawful presence has been acknowledged by the government does not diminish the fact that they entered the U.S. without authorization nor does it reduce their fiscal impact on the American taxpayer.

The total national illegal alien estimate includes about 11 million adult illegal aliens (the commonly accepted base number for 2017), approximately 350,000 TPS beneficiaries (mostly Central Americans) and roughly 730,000[4] DACA recipients.[5] The ten states with the largest estimated illegal alien populations (Ariz., Calif., Fla., Ga., Ill., N.J., N.Y., N.C., Tex., and Wash.) account for nearly three-fourths (73.7%) of the national total.

3

The overall population that we analyze, for the purposes of determining the costs of illegal immigration, also includes about 4.2 million American-born minor children of illegal aliens. Although, the U.S.-born children of illegal aliens are, under the current interpretation of the 14th Amendment to the Constitution, *de jure* U.S. citizens, they are also typically "targeted low-income children," who are eligible for a variety of federal benefits. While not counted as illegal aliens, these children are a significant part of illegal immigration's fiscal impact on the U.S. taxpayer. Because they would not be present in the United States but for their parents violation of American immigration law, we consider them to be appropriately considered part of the cost of illegal immigration.

We have confirmed the above estimates using Census Bureau data on total occupied households and the subset of households occupied by the foreign-born who are not naturalized citizens. This approach is similar to that used by other research organizations. However, as noted already, Census Bureau estimates are likely to be low due the various incentives illegal aliens have to avoid disclosing their lack of status. It also bears repeating that all of the illegal alien population numbers referenced herein (both FAIR's estimate and any others) are approximations based on the available data. There is no official illegal alien count — even estimates made by different federal government agencies vary widely. And, the fact remains that the U.S. government does not possess the firm data that it should have on the size and scope of the illegal alien problem.

## National vs. State and Local Fiscal Impact

Both national and state budgets are heavily impacted by illegal immigration. In many cases, the same program, such as Medicaid, affects both federal and state coffers. For the purposes of this study, we split the fiscal impact into two sections, separating federal costs from state costs. Accordingly, certain programs will be referenced in both the federal and state sections of this study.

## Summary of Methodology

A more detailed methodology is included in both parts of this report, however there are a few important details to keep in mind while examining the findings that follow.

First: when FAIR completed it's 2010 Fiscal Cost Study[6], the pool of sources from which fiscal estimations could be calculated was much more limited. Additional government data relating to immigration is constantly being made available in more easily accessible digital formats. Additionally, recent elections, including the 2016 presidential election, have renewed public interest in policy issues connected to immigration. Therefore, academic institutions, think tanks, policy researchers and government agencies, both state and local, have produced new in-depth studies on immigration topics. As a result, it is now possible to corroborate old data against new sources. It is also possible to make updated estimations based on fresh data. We hope that this has led to a more accurate fiscal cost study.

Second: FAIR makes every effort to examine raw data from government agencies and testimony from government officials. We attempt to use that data as the foundation of our estimates. When government data is unclear or unavailable, FAIR attempts to obtain necessary information from studies generated by credible, non-partisan organizations that are widely respected in their fields by proponents of all political ideologies. On the rare occasions that a calculation must be estimated and/or assumed, detailed reasoning for the estimation is offered so that readers can examine the relevant information and judge our conclusions for themselves. In order to stay as accurate as possible, we have noted various areas where it is impossible to calculate, or estimate, a cost. Because it is impossible to accurately calculate all

4

costs associated with illegal immigration, this study can be assumed to underestimate the fiscal burden imposed on the U.S. taxpayer.

All calculations are based on the most recent data available. The majority of the data is drawn from sources covering the 2014, 2015, and 2016 fiscal years. Most of these statistics reflect the fiscal impact of immigration policies pursued by the Obama administration during its final years in office. Future studies should allow for a comparative examination of the economic effects of President Trump's aggressive approach to immigration enforcement versus President Obama's "alien rights first" approach.

# Federal Expenses: The Cost of Illegal Immigration on Taxpayers



| | | | | | |
|---|---|---|---|---|---|
| Education | Medical | Law Enforcemen |
| $1.69 Billion | $17.14 Billion | $13.15 Billion |
| Welfare | Other | |
| $5.85 Billion | $8.04 Billion | |

# TOTAL Expenses: $45.87 Billion

# Part I: Federal Expenditures and Receipts



# Federal Expenditures

## EDUCATION

### 1.  Primary and Secondary Education                    $943,200,000

The Elementary and Secondary Education Act of 1965, Title I provides supplemental federal funding to increase educational opportunities and improve the academic performance of children from poor families. In 2015, an estimated $13.1 billion was budgeted for this program. The vast majority of the children of illegal aliens will fall within the economic eligibility criteria applicable to this program. FAIR estimates that approximately 3.62 million K-12 students are the children of illegal aliens.[7] Considering there were 50.4 million students in U.S. public schools in 2016[8], that means roughly 7.2 percent of K-12 enrollment nationally is composed of the children of illegal aliens. Based on a proportional calculation, we estimate that approximately $943 million of this funding goes to children of illegal aliens.

### 2.  Limited English Proficiency (LEP) – Title III        $541,694,040

The federal government provides funding to the states based on Census data on school-aged LEP youth. According to U.S. Department of Education data, in fiscal year 2016 it distributed approximately $737.4 million in support of supplemental English language instruction.[9] Of that amount, $677.4 million was distributed to the states based on the number of English learners in their schools. In FAIR's recent report on education, we estimate that approximately 73.46 percent of all LEP students are either illegal aliens or the children of illegal aliens.[10] The rest of the LEP population consists of legally present immigrants, Native American students who may have learned a tribal language before English, and American citizens who are not yet proficient in English.

Based on the latest estimate of the LEP population in public schools, federal funding amounted to about $135 per student. The largest share of the funding, by far (over 20 percent), was allocated to California. The top nine states with the highest illegal alien population, according to FAIR estimates, accounted for more than seven-tenths (or $517 million) of the total federal funding for K-12 English teaching.

8

### 3.   Migrant schooling (Title I C)                    $206,140,000

The Migrant Education Program (MEP) was established in 1966 as part of the Elementary and Secondary Education Act. Its goal is to "provide state grants to support high quality education programs for migratory children and help ensure that migratory children who move among the states are not penalized in any manner by disparities among states in curriculum, graduation requirements or state academic content and student academic achievement standards."[11] The federally appropriated funds for this program were $374.8 million in fiscal year 2016.[12]

The U.S. Department of Education indicates that the primary beneficiaries of the MEP program are "the children of migrant agricultural workers and fishers."[13] The majority of migrant agriculture and fisheries workers are illegal aliens — approximately 55 percent — according to a recent study conducted by the Pew Research Center.[14] Therefore, FAIR estimates that approximately $206,140,000 of the MEP budget goes to educating the children of illegal aliens.

### 4.   Head Start

The federal Head Start and Early Head Start programs combine federal funding ($10.1 billion budgeted for fiscal year 2016) with local matching funds. There is insufficient data to estimate how many children of illegal aliens may be enrolled in these programs, but participation by Latinos — who constitute the majority of illegal aliens — was approximately 38 percent in fiscal year 2015[15]. However, participation by illegal alien families appears to be low.[16] Local policies in some states preclude the participation of children who are illegal residents. Due to a lack of relevant data, we do not ascribe an estimate of the fiscal impact of this program, although there is undoubtedly some.

**Total Federal Educational Expenditures:**

| | |
|---|---|
| Primary and Secondary Education | $943,200,000 |
| Limited English Proficiency (LEP) – Title III | $541,694,040 |
| Migrant schooling (Title I C) | $206,140,000 |
| Total | $1,691,034,040 |



# MEDICAL COSTS

Pursuant to Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (P.L. 104-193) illegal aliens are ineligible for most federal, state, and local healthcare benefits. However, the fact that federal medical insurance coverage excludes illegal aliens does not mean they receive no taxpayer-supported medical services. Under federal law, hospitals and emergency clinics are required to provide urgent medical care without regard to a patient's immigration status or ability to pay.

In addition, many states provide "low-cost" healthcare services to illegal aliens. These health services programs probably violate the terms of the PRWORA because, while the illegal aliens do pay for treatment, that medical care is heavily subsidized using taxpayer dollars. The diversion of state taxes into these types of programs inevitably results in larger state requests for federal budget assistance. Much of this assistance is provided in the form of supplemental health care funding distributed to state providers.

Medicaid is a joint federal and state program that provides healthcare coverage to children, pregnant women, senior citizens, and individuals with disabilities, among others. While illegal aliens are technically excluded from Medicaid programs, they still receive Medicaid coverage for prenatal and obstetric care. These services are provided based on the legal fiction that the unborn fetus, rather than the illegal alien mother, receives medical treatment. In addition, under the current interpretation of the 14th Amendment to the Constitution, the children of illegal aliens, who are born on U.S. soil, are natural-born U.S. citizens. Typically, they are also considered to be "targeted low-income children," who are eligible for Medicaid and other federal medical assistance programs.

## 1.   Uncompensated Hospital Expenditure                    $8,200,000,000

In 2013, the federal outlay to help cover uncompensated care provided to uninsured individuals was $32.8 billion.[17] The national uninsured population was 28.5 million as of 2015[18]. According to U.S. Congressional Budget Office estimates at least one quarter of those without insurance are illegal aliens.[19] This means roughly 7.125 million of the illegal aliens currently in the United States are uninsured. That is approximately 60 percent of the total illegal population. If uninsured illegal aliens are assumed to require healthcare at a rate similar to other uninsured persons, they would make up approximately $8.2 billion of the uncompensated hospital expenditures in the United States.

## 2.    Medicaid Births                                      $1,242,990,372

After rising rapidly since the 1980s, births to illegal alien mothers dropped during the great recession (2008-2010). Since then, the numbers appear to have held relatively steady. Pew Research estimated that by the end of 2013, illegal alien mothers gave birth to approximately 275,000 children in the United States. In 2015 (the most recent year for which statistics are available), foreign-born mothers accounted for a disproportionate share of a nationwide total of about 3.98 million births: 872,256 or 22 percent of the total.[20]

Medicaid paid for 45 percent of all births in 2010.[21] Presuming that Medicaid also paid for 45 percent of all births in 2015, it covered the costs for about 392,000 births to foreign-born mothers. The cost of those births is shared between the federal taxpayer and the state taxpayer. The total cost depends on the type of delivery and whether complications occur.

We assume that the birthing costs incurred by illegal alien mothers will be roughly similar to legal immigrant and native mothers. According to past medical research conducted in Colorado, illegal alien mothers "have lower rates of pre-term delivery and low birth weight infants, but higher rates of pregnancy related risk factors." These risk factors are offset by other factors, such as illegal alien mothers consuming less tobacco and alcohol than the national average, lower hypertension rates and other factors.[22] Based on the birth rates observed in the Colorado study, this indicates that roughly 187,000 (68 percent) of current illegal alien births were natural, and 88,000 (32 percent) were surgical.

The federal share of the expenditure varies among states, averaging out to approximately 63 percent overall. So to determine the cost of illegal aliens using Medicaid to fund births, we remove the percentage of aliens believed to have some form of health insurance, which most organizations agree is between 33.3 percent and 40 percent. That comes out to 184,250 births — 125,290 naturally, and 58,960 by surgical intervention. With natural births totaling approximately 9,131, and surgically-assisted births costing approximately $14,060, the total, combined, state and federal expenditure for obstetric medical costs is approximately $1,973,000,590. And with 63 percent of these costs being covered by the federal government, the total federal cost comes out to $1.24 billion.

That estimate is almost certainly too conservative. In 2007, a report in the Journal of the American Medical Association found, "... a little-known part of the state-federal health insurance program for the poor pays about $2 billion a year for emergency treatment for a group of patients who, according to hospitals, mostly comprise illegal immigrants. Most of it goes to reimburse hospitals for delivering babies for women who show up in their emergency rooms, according to interviews with hospital officials and studies."[23] A portion of this expenditure should be added to the $1.24 billion Medicaid spends on illegal alien births. However, there is a lack of hard data regarding what percentage of that $2 billion expense covers obstetrical services for illegal aliens. So it is difficult to determine exactly how much to add. Without further data, FAIR is unable to estimate a reliable value for this additional expenditure. As a result, we can only note that our estimate is supported by hard data, but is probably low.

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

### 3.     Improper Medicaid Payments                    $3,458,475,000

The total amount of improper Medicaid payouts in the United States during fiscal year 2016 was approximately $36 billion. About 10 percent of beneficiaries fraudulently or improperly used the system.[24] Of that amount, only about $744 million of improper payouts is recouped annually.[25]

Assuming that uninsured illegal aliens receive improper Medicaid payouts and/or commit Medicaid fraud at the same rate as U.S. Citizens — a conservative estimate, considering illegal aliens are both more likely to commit document-related fraud and have greater incentive to commit Medicaid fraud — there would be approximately 712,500 illegal aliens receiving improper Medicaid payouts each year. The average improper Medicaid payout per-person comes out to approximately $4,854, meaning the overall annual total loss attributable to illegal aliens is approximately $3.5 billion.

### 4.     Medicaid for U.S.-born Children of Illegal Aliens    $4,234,129,200

U.S. citizens and Lawful Permanent Residents (aka: "green card-holders") are eligible for Medicaid benefits. Accordingly, the U.S.-born children of illegal aliens are eligible for Medicaid. By operation of law, these children are born United States citizens. Nevertheless, they would not be present in the United States but for their parents unlawful migration. These children are typically classified as low-income. And they represent a significant burden on U.S. taxpayers as net consumers of government services — in particular, Medicaid.

There is a strong correlation between uninsured status and low income.[26] The vast majority of uninsured people in the United States are low-income earners.[27] These individuals typically do not receive healthcare coverage as an employment benefit and they lack sufficient resources to pay directly for medical care on a cash-for-services basis. As such, they depend upon government healthcare programs to pay for any medical treatment that they require.

Per federal guidelines, in order to be eligible for Medicaid on the basis of low-income, children must be members of a family earning an income less than 138 percent of the federal poverty level (FPL). States have the option to extend Medicaid coverage to those whose income is too high to qualify under federal guidelines. Most states have set their guidelines between 138 percent and 150 percent of the FPL. The average family headed by an illegal alien falls in the low-income bracket, earning between 138 percent and 150 percent of the FPL. Most of these families will access taxpayer-funded programs to pay for their healthcare.

Just over 60 percent of illegal alien households are uninsured, meaning that upwards of 2.52 million U.S.-born children of illegal aliens are without insurance. Based on the foregoing evidence, FAIR presumes that the 2.52 million U.S.-born children of illegal aliens are eligible for, and receiving, Medicaid as members of low-income households.

According to the federal government, in 2015 there were a total of 36.8 million children enrolled in Medicaid. These children receive Medicaid benefits based on a variety of qualifying factors including parental income, disability or, in a minority of cases, placement

in foster care. Per the Casey Foundation, there were 24.35 million children in families with incomes below 150 percent of the federal poverty level, who, presumably receive Medicaid on the basis of low income. As such, the U.S.-born children of illegal aliens appear to constitute roughly 10 percent of the total population of children currently receiving Medicaid because their parents earn incomes below 138 percent of the FPL.

Per the Kaiser Family Foundation, average Medicaid spending per enrolled child in 2011 was $2,463.[28] Assuming that the average spending rate has remained roughly the same, but adjusting it for inflation, the total today would be $2,667. This would make the annual Medicaid spending on the U.S.-born children of illegal aliens about $6.72 billion. The federal share of that expenditure (63%) is about $4.2 billion annually, with the remainder being a cost borne by the states.

This estimate is likely to be low because there are no statistics available estimating the number of U.S. citizen children of illegal aliens who receive Medicaid solely on the basis of qualifying disabilities or as the result of having been placed in foster care.

## Total Federal Medical Expenditures

| | |
|---|---|
| Uncompensated Hospital Expenditure | $8,200,000,000 |
| Medicaid Births | $1,242,990,372 |
| Medicaid Fraud | $3,458,475,000 |
| Medicaid for U.S.-born Kids of Illegal Aliens | $4,234,129,200 |
| Total | $17,135,594,572 |



# JUSTICE ENFORCEMENT

Immigration enforcement constitutes a significant portion of the overall federal law enforcement budget. However, because every crime committed by an illegal alien is, inherently, a preventable crime, immigration has a broad effect on justice and law enforcement expenditures beyond those costs directly involved in securing the borders and managing ports-of-entry. Therefore, federal immigration enforcement expenditures is separated into two categories: 1) money spent securing the border, managing ports of entry, and removing immigration violators from the interior; and 2) money spent subsidizing state and local law enforcement expenses connected with illegal alien crime (e.g. housing illegal aliens in local jails, information sharing costs, etc.)

The majority of these expenditures cannot be eliminated as long as the United States remains a popular destination for immigrant populations. However, many of them could be considerably reduced by the construction of a functional border barrier, the implementation of effective deterrents to unlawful re-entry after deportation and the criminalization of unlawful presence (as opposed to unlawful entry) in the United States. In addition, the refusal of many countries to accept their own citizens when they are deported from the United States also increases costs to the American taxpayer. Consistent with the relevant statutes, the Department of State should to refuse to issue visas to nationals of recalcitrant countries until those countries begin accepting deportees.

## 1.     Federal Incarceration                                              $1,240,000,000

The illegal alien population consists of both those aliens who entered the United States without authorization and those who entered the United States lawfully but overstayed their authorized period of stay. Illegal aliens are subject to removal from the United States simply because they are present in the United States without authorization. However, many illegal aliens come to the attention of DHS when they are arrested for the commission of a crime.

Legal aliens are also subject to deportation if convicted of certain crimes. Generally speaking, legal aliens tend to offend at a lower rate than illegal aliens. This is unsurprising since a significant percentage of illegal aliens cross the border without authorization specifically for the purpose of engaging in criminal

14

activity within the U.S. Meanwhile, legal aliens have a greater incentive to avoid criminal behavior due to the likelihood of deportation, if convicted.

The majority of legal aliens convicted of crimes are prosecuted in state courts and confined to state correctional facilities to serve out their sentences. These expenses are addressed in the section of this report covering the state-borne costs of illegal immigration. By contrast, the population of foreign-born individuals incarcerated in Federal Bureau of Prisons (BOP) facilities tends to include more illegal aliens than foreign-born populations incarcerated in state prisons. This is because the federal government has exclusive jurisdiction over both immigration-specific crimes and civil violations of the Immigration and Nationality Act. Therefore, both legal and illegal migrants convicted of criminal violations of the INA are confined to federal prisons. Similarly, illegal aliens who have been taken into custody by the federal government and placed in deportation proceedings will also be held in federal detention facilities. Both BOP and ICE maintain such facilities. This section addresses BOP costs. The following sections on ICE expenditures include the costs of detaining aliens in facilities owned and operated by that agency.

BOP statistics indicate that, in 2016, there were 43,856 deportable aliens in federal penitentiaries and private prison facilities leased by the BOP. That alien cohort is estimated to be approximately 90 percent illegal aliens and 10 percent legal aliens. According to the BOP, the average annual cost of incarceration of a federal inmate in fiscal year 2014 was $30,619.85. The average annual incarceration cost has been steadily rising (e.g., $26,359 in 2012); therefore, we assume an adjusted annual average cost of $31,000 per inmate. If we assume that housing approximately 40,000 illegal alien inmates costs the federal prison system $31,000, per alien, per year, the total cost would come out to $1.24 billion annually.

## 2.    Enforcement and Removal                               $3,218,000,000

The branch of DHS responsible for interior enforcement of the Immigration and Nationality Act is U.S. Immigration and Customs Enforcement (ICE). Within ICE, the office most directly involved in the arrest and deportation of illegal aliens is the Office of Enforcement and Removal Operations (ERO). ERO is responsible for apprehending illegal aliens, placing them in removal proceedings, detaining aliens who are a flight risk, and effectuating the removal of aliens who have been ordered deported by the U.S. Immigration and Customs Court or Federal District Courts. To accomplish its mission, ERO works with state, local, and other federal law enforcement agencies to identify and process illegal aliens. This includes lodging "detainer" requests with state and local agencies to ensure that criminal illegal aliens are transferred into DHS custody. ERO also liaises with the Federal BOP to ensure that illegal aliens being held for ICE pending immigration hearings are processed appropriately. In addition, ERO also works with BOP to make sure that illegal aliens incarcerated for federal crimes are promptly deported when their sentences are completed. ERO activities incur a broad range of annual expenses, including holding aliens in DHS-operated detention facilities, or leased facilities. The 2016 budget for ERO was about $3.2 billion.[29]

## 3.    Customs and Border Protection                        $5,968,729,360

U.S. Customs and Border Protection (CBP), another DHS agency, is responsible for securing the borders of the United State and managing ports-of-entry. CBP acts as the first line of defense against unlawful entry, alien smuggling, and human trafficking. A large portion of CBP's responsibilities relate directly to detecting, deterring, and prosecuting illegal immigration.

CBP is also responsible for the trade management, impost collection, licensing and enforcement duties that were handled by the U.S. Customs Service prior to the formation of DHS. Therefore, we

must determine which costs relate to trade management and impost functions, and which costs arise directly from border security functions. According to a 2014 CBP "Performance and Accountability" report, approximately 44 percent of CBP funding goes to securing the border and preventing illegal immigration, while around 52 percent goes to customs enforcement and related operations. The rest, roughly 4 percent, is dedicated to intelligence and reporting activities.[30]

Applying these percentages to CBP's 2016 budget, the total cost of operations aimed at securing the border comes out to just under $6 billion.[31]

## 4.   Other ICE Operations                                   $1,126,840,000

ICE is responsible for enforcing both civil and criminal immigration laws within the interior of the United States. Non-ERO ICE operations primarily involve detecting, arresting, and prosecuting lawfully present aliens who engage in criminal acts that violate the terms of their admission to the United States, as well as detecting, detaining, and criminally prosecuting illegal aliens involved in people smuggling, human trafficking, drug trafficking, and gun running. ICE is also responsible for enforcement of U.S. customs laws within the interior of the United States. As such, it handles some of the impost collection, licensing and enforcement duties that were handled by the U.S. Customs Service prior to the formation of DHS.

Accordingly, it is necessary to distinguish non-ERO ICE expenses associated with the criminal prosecution of lawfully admitted alien criminals, and customs enforcement duties, from those expenses related to the criminal prosecution of illegal aliens. Non-ERO ICE operations amount to roughly $2.6 billion. Using CBP as a general guide, we can assume that roughly 44 percent of non-ERO ICE operations are aimed at combating illegal immigration, which would indicate an expenditure of just over $1.1 billion.

## 5.   State Criminal Alien Assistance Program            $210,000,000

The State Criminal Alien Assistance Program (SCAAP) provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating criminal illegal aliens who have at least one felony or two misdemeanor convictions for violations of state or local law, and who are incarcerated for at least 4 consecutive days during the reporting period. In fiscal year 2016, Congress appropriated $210 million to fund the SCAAP program.[32]

## 6.   Executive Office for Immigration Review            $168,120,000

The Executive Office for Immigration Review (EOIR) is a U.S. Department of Justice (DOJ) Agency that consists of the U.S. Immigration Court, the Board of Immigration Appeals (BIA) and the Office of the Chief Administrative Hearing Officer (OCAHO). The U.S. Immigration Court hears deportation cases lodged against both lawfully admitted and illegal aliens. The BIA hears appeals of U.S. Immigration Court Decisions. The OCAHO hears cases involving allegations of knowingly hiring illegal aliens and failure to comply with employment verification requirements. The vast majority of the work performed by EOIR, by significant orders of magnitude, is handled by the U.S. Immigration Court which received 328,112 cases in FY2016 — as compared to 30,200 cases received by the BIA, and 37 cases received by OCAHO.[33]

Based on data available through Syracuse University's Transactional Records Access Clearinghouse (TRAC), which analyzes deportation cases by the type of charge levied against the respondent, FAIR estimates that roughly 60 percent of EOIR's workload consists of cases involving lawfully admitted aliens who have violated the terms of their admission and roughly 40 percent consists of cases involving illegal

aliens.[34] This disparity is largely attributable to the fact that many illegal aliens are subject to removal via summary, non-court deportation procedures handled entirely by ICE.

In fiscal year 2016, the budget for EOIR was $420.3 million. Therefore, FAIR estimates that 40 percent of EOIR costs are directly attributable to illegal immigration, indicating an expenditure of roughly $168.1 million.

## 7.    Alien Minors                                                      $1,200,000,000

Largely due to the Obama administration's irresponsible and illegal DACA and DAPA programs, the number of unaccompanied minors (UAMs) apprehended by the Border Patrol while illegally entering the country surged beginning in FY2013 (38,759), rising to an all-time peak in FY2014 (68,541), then declined in FY2015 (39,970).[35] In FY2016, the number rose again to 59,962.[36]

The Department of Health and Human Services (HHS), Administration for Children and Families (ACF) is tasked with providing for these minors until they are connected with family residing in the United States, placed in foster care, or repatriated. In FY 2016, HHS requested $967 million ($948 million in base funding plus $19 million in contingency funds) for the care UAMs.[37] For FY2017 HHS requested $1.321 billion ($1.226 billion in base funding plus $95 million in contingency funds).[38] (Contingency funds are appropriated but held in reserve to fund programs when caseloads exceed levels that can be paid for with base funding and any prior-year carryover."[39])

During hearings before the House Committee on Appropriations, Subcommittee on Homeland Security, U.S. Customs and Border Protection estimated that it would apprehend up to 75,000 UAMs in FY2017.[40] Based on HHS budget requests, this means that ACF estimated its per UAM cost for FY2017 at approximately $17,613.



Over the duration of the UAM crisis, both CBP and ICE expended significant funds that are not included in other cost calculations relating to those agencies. In a July 15, 2015 report, the General Accountability Office estimated that combined CBP and ICE costs for UAM apprehension, custody, and care amounted to $97 million from February 2014 to March 2014.[41] This is a monthly cost of approximately $14 million, which would indicate an annual cost of approximately $168 million. For FY2016 DHS requested up to $162 million in contingency obligation authority to respond to UAM and other border surges.[42] The FY2017 DHS budget included $319 million to cover the costs associated with the temporary care and

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

transport of up to 75,000 UAMs and contingency budget authority to support agency operations in the event of a surge in UAM apprehensions.[43]

Accordingly, FAIR estimates that, over the life of the UAM crisis, the average annual total cost to the American taxpayer was approximately $1.2 billion dollars.

For FY2018 HHS has requested a return to FY2016 ACF funding levels.[44] By contrast, DHS failed to include any specific funding for UAMs in its FY2018 budget request but appears to have included anticipated UAM costs under its $2.7 billion detention budget.[45]

It remains to be see whether the Trump administration's firm stance on border enforcement will reduce the number of UAMs encountered in FY2018 or whether deteriorating economic and social conditions in places like Venezuela and Brazil will provoke a new surge.

The financial impact of UAMs on the nation's public school systems is included, as a separate cost, in the section of this report pertaining to education.

## 8.   Byrne Grants                                                    $16,920,000

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to state and local jurisdictions. The JAG Program provides state and local governments with funding to support law enforcement, prosecution, court, and corrections programs. Funding for this program was $376 million in fiscal year 2016.[46]

The federal government provides SCAAP funding to states for roughly 4.5 percent of the national total of state and local prisoners. Presuming that the majority of illegal aliens held in state and local custody are prosecuted in state and local courts, this is a good measure for estimating the share of Byrne grants attributable to the arrest, prosecution, and incarceration of illegal aliens. 4.5 percent of $376 million is approximately $16.9 million.

## 9.   Criminal Gangs

In its 2009 National Gang Threat Assessment, the FBI concluded that criminal street gangs, whose members are overwhelmingly illegal aliens, are responsible for the vast majority of violent crimes in the United States, as well as the distribution and trafficking of most illegal drugs.[47] In the intervening years, the presence of illegal alien gangs, especially from Central America, has only increased. Established gangs like MS-13, its rival the 18th Street Gang, the Latin Kings, and growing numbers of new Dominican, Middle Eastern, and Somali gangs are responsible for a broad range of both local and transnational crimes, including: theft, extortion, murder, drug trafficking, human/sex trafficking and gun running.

Because it is impossible to truly quantify the cost of gangs to American taxpayers, FAIR does not included an estimate of those expenditures. Nevertheless, it is important to remember that crimes committed by transnational gangs represent a significant portion of the costs imposed on U.S. taxpayers by lax immigration enforcement and irresponsible immigration policies.

Federal Expenditures

## Total Federal Justice Enforcement Expenditures

| | |
|---|---|
| Federal Incarceration | $1,240,000,000 |
| Enforcement and Removals | $3,218,000,000 |
| Customs and Border Protection | $5,968,729,360 |
| Other ICE Operations | $1,126,840,000 |
| State Criminal Alien Assistance Program (SCAAP) | $210,000,000 |
| Executive Office for Immigration Review (EOIR) | $168,120,000 |
| Alien Minors | $1,200,000,000 |
| Byrne grants | $16,920,000 |
| Total | $13,148,609,360 |



# WELFARE PROGRAMS

This section details the profound impact that illegal immigration exerts on programs intended to provide funding or services exclusively for low-income Americans. Most — but not all — welfare programs are unavailable to illegal aliens. However, all welfare programs available to U.S. citizens are available to the children of illegal aliens born on U.S. soil — because they are, as a matter of law, U.S. citizens. We include this information because the costs of providing benefits to this cohort of children are directly attributable to their parents' illegal presence in the United States.

## 1.    USDA Food and Nutrition Service                         $1,003,000,000

The U.S. Department of Agriculture's (USDA) Food and Nutrition Service (FNS) operates the National School Lunch Program (NSLP), the School Breakfast Program (SBP), Special Milk Program (SMP) and other food programs that provide subsidized meals to school children. These programs operate in over 100,000 public and non-profit private schools and residential child care institutions. They furnish low-cost, or free, breakfasts, lunches, and snacks to millions of children each school day. However, there is no effort to identify whether the students using these programs are lawfully present in the United States.

There are approximately 30 million children receiving meals pursuant to these programs. According to research conducted by the Center for Immigration (CIS) studies, approximately 48 percent of illegal alien households receive some form of benefit under the school lunch program. [48] FAIR estimates that there are roughly 3.6 million students (per our latest education report[49]) who are the children of illegal aliens (whether those children are U.S. born, lawfully present, or illegally here themselves).

48 percent of 3.6 million is just over 1.7 million children. The funding for school food programs — including breakfasts, lunch, snacks and milk was valued at nearly $17 billion in 2015.[50] To estimate the impact of illegal immigration on school nutrition programs, we take our estimate of the number of illegal alien children and compare it to the total number of participants in school nutrition programs — indicating that roughly 6 percent of the children receiving meals are part of an illegal alien household. Therefore, we conclude that, each year, approximately $1 billion of the federal funds expended on USDA FNS programs goes to the children of illegal aliens.

Federal Expenditures

## 2.      Supplemental Nutrition Assistance Program          $1,963,416,000

Colloquially referred to as "Food Stamps," the Supplemental Nutrition Assistance Program (SNAP) is also administered by USDA-FNS. Illegal aliens are ineligible for SNAP but their U.S.-born children are eligible. (In certain limited circumstances, elderly and disabled citizens residing with illegal alien relatives may qualify for SNAP benefits but they account for only a very small percentage of SNAP use by illegal alien households.)

The eligibility requirements for SNAP are based on household income. However, income earned by illegal alien parents is not used to calculate whether their U.S. citizen children qualify for the program. Accordingly, virtually all citizen children of illegal aliens qualify for SNAP.

Research conducted by the Center for Immigration Studies (CIS) found that approximately 31 percent of illegal alien households with children use SNAP.51 The estimated total number of American households headed by an illegal alien is approximately 4 million, which would indicate that around 1.24 million illegal alien households draw benefits under SNAP.

FAIR estimates that there are approximately 4.2 million U.S.-born children of illegal aliens currently residing in the United States. As such, the average U.S. citizen child-per-illegal alien household would appear to be 1.05.

Therefore, approximately 1.3 million children of illegal aliens are likely to draw SNAP benefits. Data from the U.S. Department of Agriculture indicates that the average monthly benefit per participant in 2016 was $125.67, or $1,508 per year. Accordingly, the total estimated cost of the program to the American taxpayer is just under $2 billion.

## 3.      Women Infants and Children          $1,097,820,360

The Special Supplemental Nutrition Program for Women, Infants, and Children, commonly known as "WIC," provides Federal grants to States for supplemental foods, health care referrals, and nutrition education for low-income, pregnant, breastfeeding, and non-breastfeeding postpartum women, and to infants and children up to age five who are found to be at nutritional risk.

The WIC program is funded, primarily, through two separate federal grants; a food grant, and the Nutrition Services and Administration grant. In 2016, the food grant was approximately $4.6 billion. The Nutrition Services grant was approximately $2.0 billion. The total grant allocation was $6,588,937,961. [52]

Eligibility for WIC is established by income. Currently, those earning 185 percent of the federal poverty level, or lower, are eligible to apply for this benefit. According to the U.S. Department of Agriculture, WIC served 53 percent of all infants born in the United States in 2013. WIC is available to anyone who is in the United States and falls within a WIC eligible category (*i.e.*, pregnant, postpartum, breastfeeding, infants under one year of age, and children under five years of age), is a full-time resident of the state where he/she is applying for WIC, meets the income requirements, and is at risk for malnutrition. As a federally funded, state administered program, each state is entitled to determine whether it will allow illegal aliens to draw WIC benefits. All fifty states have extended eligibility to illegal aliens.

A study by the Center for Immigration (CIS) studies found that approximately 35.1 percent of illegal alien households with children use the WIC program.[53] Using a baseline of 4.0 million illegal alien households, this would indicate that approximately 1.4 million illegal alien households draw benefits under the WIC

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

program. Per the "WIC Participant and Program Characteristics 2014" published by HHS, approximately 9.3 million individuals received WIC benefits in 2014 (the last year for which statistics are available).

[54]In 2006, the Urban Institute estimated that approximately 11.7 percent of all WIC participants were children who come from a home where one or both parents are illegal aliens.[55] That represented a 50 percent increase over the 1997 rate of 6.8% or an increase of roughly 5 percent per annum. Presuming that the rate of increase held steady over the last decade, roughly 23 percent of all WIC participants (or approximately 2,139,000 individuals) are currently children who come from a home where at least one parent is an illegal alien.

Based on preliminary FY2016 data, the average annual benefit per participant is approximately $513.24.[56] This would mean that the cost to taxpayers for providing WIC to illegal aliens is approximately $1 billion.

## 4.    Temporary Assistance for Needy Families           $1,785,000,000

The Temporary Assistance for Needy Families (TANF) program is the current successor to the former Aid to Families with Dependent Children program. TANF was created to help needy families achieve self-sufficiency by providing temporary cash assistance to supplement their earned income. In order to qualify, applicants must be either pregnant or responsible for a child under 19 years of age, meet income requirements, and be underemployed, about to become unemployed, or about to become unemployed. Recipients must be working or actively seeking employment; and, generally speaking, adults with dependent children receiving TANF must continue to meet financial and technical eligibility requirements.

Like SNAP, TANF is a welfare program that is not available to illegal aliens. However, illegal alien families that have U.S.-born children may still obtain significant financial assistance via this program. Certain TANF benefits are available to the U.S. citizen children of illegal aliens who are being cared for by grandparents, foster parents, aunts, and uncles. These are referred to as "child-only" applications.

Despite TANF eligibility provisions requiring that applicants be working, seeking work, or training for employment, neither the income earned by parents, nor caregiver resources, are considered when a child-only TANF case is processed. Therefore, virtually all U.S. citizen children of illegal aliens may be eligible for TANF, under the right circumstances, and the costs for providing TANF to the U.S. citizen children of illegal aliens is borne entirely by the U.S. taxpayer.

There were 2,681,139 child recipients of TANF benefits in 2014 according to the Department of Health and Human Services' Office of Family Assistance.[57][i]  Since then, the number of child-only cases nationally has grown slightly.

In 2013, according to the Congressional Budget Office, federal spending on TANF amounted to about $17 billion.[58][ii] Data from a General Accountability Office (GAO) report in 2010 indicated that the child-only cases resulting from a parent being "ineligible because of immigration status," accounted for approximately 10.5 percent of the total TANF cases reported by states furnishing caseload data. Using this percentage, the total cost for providing TANF benefits to the U.S. citizen children of illegal aliens comes out to approximately $1.785 billion.

Given the recent influx of UAMs under Obama administration, this may be a low estimate, but there is currently only limited data on the use of federal benefit programs by unaccompanied alien children admitted to the U.S. since 2008.

## 5.   Child Care and Development Fund

The federal Child Care and Development Fund (CCDF) programs are a further source of welfare benefits that are available for some U.S.-born children of illegal aliens and some illegal alien children through the Head Start and Early Head Start programs. The CCDF program is funded at the federal level, with nearly $5.2 billion in fiscal year 2015, and matched in part by state funding. These programs are not subject to verification of immigration status.



There is no reliable way of identifying whether or not CCDF beneficiaries are illegal aliens. However, if the percentage is similar to the recipients of TANF — which isn't an unreasonable estimation — this price tag is likely in the hundreds of billions. Since an accurate estimation is unavailable, due to the lack of information on demographics and immigration status, FAIR does not attempt to include this cost in the overall illegal immigration burden borne by U.S. taxpayers.

## 6.   Supplemental Security Income

The Supplemental Security Income (SSI) program applies to some U.S.-born children of illegal aliens if they have a "medically determinable physical or mental impairment, (including an emotional or learning problem) that results in marked and severe functional limitations; and can be expected ... to last for a continuous period of not less than 12 months."

According to the existing research on this issue, it appears that only a small number of SSI beneficiaries are illegal aliens. For that reason, FAIR does not calculate an estimate in this study, even though there is some cost incurred. Rates of illegal alien SSI fraud are not currently known.

## 7.   Public Housing

Where a household is eligible for public housing benefits, but where one or more members are illegal aliens, the GAO states that, "A prorated housing benefit is calculated by reducing the benefit due to the family by the proportion of nonqualified aliens in the household."[59] However, housing benefit fraud is common, and illegal aliens often live covertly with citizen and lawfully present relatives who are receiving housing benefits.

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

Currently there is no relevant data on the use of housing benefits by families with illegal alien members. Similarly, there is a lack of data on housing benefit fraud by illegal aliens. As such, FAIR does not include an estimate of the taxpayer burden created by housing benefits for illegal aliens.

### Total Federal Welfare Programs

| | |
|---|---|
| Meals in Schools | $1,003,000,000 |
| Supplemental Nutrition Assistance Program | $1,963,416,000 |
| Women Infants and Children | $1,097,820,360 |
| Temporary Assistance for Needy Families | $1,785,000,000 |
| Total | $5,849,236,360 |

# TOTAL FEDERAL EXPENDITURES

## General Federal Expenditures                    $8,046,000,000

Aside from the specific federal expenditures enumerated above that are directly increased by the illegal alien population, there are other general government expenditures that vary depending on the size of the population receiving those services. Some examples of general expenditures are infrastructure maintenance (i.e., roads and bridges), emergency response, regulation of commerce, workplace safety, etc.

Research studies by the Heritage Foundation estimate the federal cost for providing general government services at approximately $2,000 per household headed by an illegal alien, annually, based on 4.0 million households.[60] This total comes out to approximately $8,046,000,000.

Typically, general government services are financed by tax collection. FAIR estimates that the illegal alien population and the U.S.-born children of illegal aliens constitute a 5.6 percent share of the overall U.S. population.[61] However, as we shall demonstrate, the taxes collected from illegal aliens are insufficient to cover the $8 billion expenditure required to provide them with general governmental services.

## Overall Federal Fiscal Costs Before Revenue

The approximately $46 billion in federal expenditures attributable to illegal aliens is staggering. Assuming an illegal alien population of approximately 12.5 million illegal aliens and 4.2 million U.S.-born children of illegal aliens, that amounts to roughly $2,746 per illegal alien, per year. For the sake of comparison, the average American college student receives only $4,800 in federal student loans each year.[62]

FAIR maintains that every concerned American citizen should be asking our government why, in a time of increasing costs and shrinking resources, is it spending such large amounts of money on individuals who have no right, nor authorization, to be in the United States? This is an especially important question in view of the fact that the illegal alien beneficiaries of American taxpayer largess offset very little of the enormous costs of their presence by the payment of taxes. Meanwhile, average Americans pay approximately 30% of their income in taxes.[63]

### Total Overall Federal Expenditures

| | |
|---|---|
| Educational Expenditures: | $1,691,034,040 |
| Medical Expenditures | $17,135,594,572 |
| Law Enforcement | $13,148,609,360 |
| Welfare Programs | $5,849,236,360 |
| General Federal Expenditures | $8,046,000,000 |
| Total Federal Expenditures | $45,870,474,332 |



# Federal Tax Payments and Credits

Taxes collected from illegal aliens offset fiscal outlays and, therefore must be included in any examination of the cost of illegal immigration. However, illegal alien apologists frequently cite the allegedly large tax payments made by illegal aliens as a justification for their unlawful presence, and as a basis for offering them permanent legal status through a new amnesty, similar to the one enacted in 1986. That argument is nothing more than a red herring. In fact, in November 2016, The Heritage Foundation estimated that an amnesty would require an immediate tax increase of $1.29 *trillion* to finance the infrastructure, school, welfare, and other public costs associated with illegal aliens.[64]

FAIR believes that most studies grossly overestimate both the taxes actually collected from illegal aliens and, more importantly, the amount of taxes actually *paid* by illegal aliens (*i.e.*, the amount of money collected from illegal aliens and actually kept by the federal government). This belief is based on a number of factors: Since the 1990's, the United States has focused on apprehending and removing criminal aliens. The majority of illegal aliens seeking employment in the United States have lived in an environment where they have little fear of deportation, even if discovered. This has created an environment where most illegal aliens are both able and willing to file tax returns. Because the vast majority of illegal aliens hold low-paying jobs, those who are subject to wage deductions actually wind up receiving a complete refund of all taxes paid, plus net payments made on the basis of tax credits.

As a result, illegal aliens actually *profit* from filing a tax return and, therefore, have a strong interest in doing so. The Tax Policy Center, an Urban Institute/Brookings Institution joint project, notes that, "Most low-income households do not pay federal income taxes, typically because their incomes are lower than the combination of their allowed standard deduction and their personal and dependent exemptions, or because *they receive substantial rebates via refundable tax credits.*"[65] (Emphasis added.)

According to a study conducted by The Heritage Foundation, in 2013 households with college-educated heads typically received roughly $24,839 in government benefits (mostly "public goods" such as public education, police and fire protection, etc.) but they pay around $54,089 in taxes each year.[66] By way of contrast, households headed by individuals with no high school diploma typically received roughly $46,582 in government benefits while paying only $11,469 in taxes.[67] Based on those figures, the average college-

26

Federal Tax Payments and Credits

educated household generated a fiscal surplus of $29,250, while the average low-education household caused a $35,113 fiscal deficit. Due to wage stagnation in low-skilled jobs and the continuing disappearance of reasonably paid, low-skill, industrial and manufacturing jobs, that gap is likely to have increased — with college-educated households paying *more* taxes and low-education households paying *even fewer*.

Organizations such as The Heritage Foundation, Pew Research and Center for Immigration Studies estimate that there are approximately four million households headed by an illegal alien head.[68] According to Pew Research, these illegal alien households are typically headed by someone without a high school diploma, earn approximately $36,000/year and are classified as "low-income." [69] That means that the overwhelming majority of illegal aliens in the United States pay no taxes and collect what amounts to a stipend funded by the American taxpayer.

These studies are backed up by government data. According to the latest information available from the Congressional Budget Office (CBO) (for FY 2013 but furnished by CBO in June 2016):

- The lowest-income households (the bottom 20%) had an average income of about $25,000 and paid an average federal income tax rate of –7.2 percent.

- The second-lowest 20 percent had income of about $47,000 and paid a federal income tax rate of –1.2 percent.[70]

The average illegal alien household makes approximately $36,000/year. Accordingly, the average working illegal alien has zero tax liability. Instead, he/she receives a reimbursement of all taxes paid, in addition to various tax credits that lead to the government *paying the alien*.

Therefore, any logical analysis of the economic impact of illegal immigration must attempt to determine how many illegal aliens actually incur a positive tax liability (*i.e.*, pay taxes) — as opposed to simply filing a tax return in order to receive a net payment from the U.S. taxpayer.

# INCOME TAX

## 1.   Income Tax Paid                                    $3,299,957,700

To determine how many illegal aliens earn an income significant enough to require that they pay more in income taxes than they receive in benefits, several factors must be considered. First: many illegal aliens who work under the table, and are paid in cash, avoid paying taxes, regardless of what their income level happens to be. Second: there is a relatively small population of visa overstayers and illegal entrants who are likely to possess the specialized skills necessary to earn an income significant enough to result in a net tax contribution greater than the amount they receive in benefits. Third: those illegal aliens who are neither "white collar" nor "highly-skilled" business visa overstayers are very unlikely to be paying more in taxes than they receive in benefits (see our references to the Heritage Foundation's studies on this issue in the preceding section).

However, a very small portion of the illegal alien population will practice a highly-skilled trade, open a business, obtain white-collar employment, etc. This is possible due to flaws in the INA which remove any responsibility for verifying employment eligibility when individuals or companies engage independent contractors. Operating as independent contractors, many illegal aliens with an appropriate background are able to offer their services without ever having anyone check whether

they are authorized to work in the United States. Still others, particularly those qualified for white-collar employment, will fraudulently establish their eligibility to accept employment in the U.S. All of these individuals are still unlawfully present in the United States and are still illegally earning income. However, they are much more likely to pay taxes.

In order to create an employment profile for illegal aliens who make a net contribution of income taxes, we must examine their earnings and offset that against taxes paid. In order to do this, we assume that a white collar or highly-skilled illegal alien will earn an income similar to that generated by legal non-citizen workers with at least a bachelor's degree. In 2007, the median income of a non-citizen family where the head-of-household held a bachelors degree or higher, was $70,781[71], when adjusted for inflation, that comes out to current earnings of approximately $82,140. An annual income in the neighborhood of $82,000 places the earner squarely within the 25 percent federal tax bracket if filing as a head-of-household. Assuming that a person earning this income files for the standard itemized deductions and two personal exemptions, their taxable income would total approximately $64,690. This means the filer would owe the federal government approximately $10,425 in federal income taxes, or $9,782 after receiving one standard child tax credit.

According to a Government Accountability Office (GAO) study, in 2013 CBP reported a total of approximately 1.2 million "unmatched arrival records."[72] These are CBP logs of individuals admitted to the United States for which there is no corresponding departure log. The total number of unmatched arrival records provides a rough estimate of the number of visa overstayers currently present in the United States.

The GAO study also detailed unmatched arrival records by type of visa. Based on that information we can extrapolate the approximate number of overstayers who are likely to possess the skill set necessary to generate a household income sufficient enough to incur a positive tax liability.

Overall, based on the GAO report, we estimate that 12 percent of 1.2 million the visa overstayers fall within visa categories that indicate they would be likely to find white collar or highly-skilled positions in the United States. This includes visas categorized as B-1 business visitors, H-2B temporary workers, visa-waiver visitors for business, and the 4 percent classified as "others."

In addition, we also include three percent of the garden-variety illegal alien population and exclude the population currently employed in the "underground" economy. Most, if not all, of these individuals will be illegal entrants — as opposed to lawful entrants who overstayed their visas — who possess the job and business skills necessary to generate significant income in the United States. As part of their efforts to avoid detection, these individuals are likely to file income tax returns and pay taxes. These individuals stand in direct distinction to those illegal aliens who operate in what amounts to a black market for labor, who tend to be paid in cash and whose employers deduct no withholding from their wages.

Taken together, these two groups amount to upwards of 337,350 illegal aliens who are presumed to actually pay income taxes, most likely as a head of household. This is approximately 15 percent of the 6,445,000 illegal aliens who are currently believed to be working in the above-ground economy. The number of illegal aliens working non-black market jobs was calculated by taking the overall number of illegal aliens and subtracting the total number of illegal children, disabled illegal workers (based on the prevailing rate[73]), those illegals employed in the underground economy, and the suspected pool of unemployed illegal aliens (based on the overall unemployment rate of foreign born workers[74]). This provided a total estimate of employed illegal aliens.

28

Federal Tax Payments and C

Therefore, based on 337,350 illegal aliens paying approximately $9,782 in income taxes, the total annual revenue collected from income taxes paid by illegal aliens amounts to approximately $3,299,957,700.

## 2.   Additional Child Tax Credit                                       $4,200,000,000

Although it seems counterintuitive, large numbers of illegal aliens file tax returns. Many wish to establish a record of having tried to comply with internal revenue code, in case a new amnesty is enacted (full payment of taxes owed was a requirement under the 1986 amnesty). It is more likely, however that illegal aliens are attempting to take advantage of the Additional Child Tax Credit (ACTC), which is a lump sum paid by the U.S. Treasury to low income workers with children. That payment is made to qualifying low income filers even if they do not have an SSN and even if they have no tax liability. As the IRS explains on its website, "It [the ACTC] is a refundable credit, which means taxpayers may receive refunds even when they do not owe any tax."[75] However, to receive the funds, a tax return must be filed.

Most illegal aliens who are not using a stolen or fraudulent SSN file their tax return using an Individual Tax Identification Number (ITIN). An ITIN is a tax processing number issued by the Internal Revenue Service (IRS). IRS issues ITINs to any foreign nationals — regardless of immigration status — who have federal tax reporting or filing requirements and do not qualify for SSNs.

Per the Treasury Inspector General for Tax Administration (TIGTA), the U.S. Department of Treasury paid $4.2 billion to 2.18 million illegal alien claimants using Individual Taxpayer Identification Numbers (ITINs) in 2010.[76] The TIGTC's report noted a very strong correlation between tax returns filed using an ITIN and the claim for the ACTC, i.e., 93 percent of all such cases. In addition, the report noted allegations that some filers for the credit were identifying children who did not have SSNs because they lived abroad. However, it still offers strong evidence that as many or more than 90 percent of ITIN filers for tax credits are illegal aliens.

As the number of illegal alien support groups proliferated, and more illegal aliens became willing to apply for such benefits under the Obama administration, it is highly likely that the number of illegal alien claims to the ACTC increased. There is also strong evidence of ITIN abuse by illegal alien households, according to independent news investigations and IRS whistleblowers.[77] However, apart from new information becoming available, it is necessary to continue using the figure of $4.2 billion, with the understanding that this amount could now be considerably higher.

## 3.   Earned Income Tax Credit                                         $2,543,200,000

The Earned Income Tax Credit (EITC) is refundable tax credit available to low- and moderate-income individuals who are employed. The amount paid depends on a recipient's income, marital status, and number of children. The credit increases with each additional dollar earned, until a maximum credit amount is reached. In tax year 2015, these limits ranged from $503 to $6,242.[78] The average EITC benefit in 2013 was $2,362 according to the GAO.[79]

According to IRS Publication 596 (2015) a worker with $34,000 in earnings and two dependents would have zero tax liability and qualify for an EITC of $2,890. So instead of paying a tax on income, that worker would receive a net profit, courtesy of the American taxpayer. Based on an

annual household income of approximately $36,000 and three dependents, most illegal alien households would qualify for a credit in the $2,890 range. If they were eligible for the program, that is.

Theoretically, illegal aliens are barred from participating in the EITC program. However, there is no provision in the relevant statutes specifically barring individuals who are unlawfully present from collecting an EITC. Rather, anyone filing for an EITC is required to have a valid SSN. This requirement blocks illegal aliens, who cannot lawfully obtain a SSN, from collecting an EITC. In theory, the program is also closed to ITIN holders.

However, these barriers do not appear to have prevented illegal aliens from accessing the program. The use of fraudulent SSNs is common among illegal aliens and the IRS has a history of erroneously paying EITCs to ITIN holders.[80] A 2016 report by the TIGTA indicated that IRS "erroneously" paid out $15.6 billion in EITCs during the previous tax year.[81] That is just shy of $16 billion taken out of the pockets of American taxpayers and transferred to individuals who were wholly ineligible for the credit.

Another major factor that could influence EITC costs attributable to illegal aliens is the DACA program. Beneficiaries of President Obama's unilateral executive amnesty were made eligible for a SSN, meaning they will be eligible to file for EITCs. In addition, the IRS has ruled that DACA beneficiaries will be able to retroactively file for EITCs under rules that allow taxpayers to amend their returns from the **prior three years,** once they receive a social security number.[82]

As of the second quarter of FY2017, USCIS had approved a total of 886,814 initial DACA applications.[83] DACA applicants may be as old as age 36. In FY2013, a Brookings Institution study found that 64 percent of DACA applicants were past high-school age.[84] That would mean that roughly 500,000 DACA recipients would currently be 18 or older. Presuming that roughly half of those individuals chose to work, rather than attend college, or start a family as a stay-at-home parent, that would mean DACA added an additional 250,000 individuals to the workforce. And as SSN-holders, they will be eligible for an EITC.

The above-referenced TIGTA report does not specify how much of the $15.6 billion in erroneous payouts were made to illegal aliens. However, it is likely that the majority of the mistaken payouts made to filers using fraudulent SSNs and ITINs are attributable to illegal aliens. If we add together 90 percent of 700,000 claims based on fraudulent SSN usage (i.e., 630,000) and include the 250,000 DACA beneficiaries presumed to have entered the workforce (who, under current immigration law remain illegal aliens), we obtain a pool of approximately 880,000 EITC claims that appear to have been made by illegal aliens. At the aforementioned rate of $2,890 per claim, the total amount of EITCs payed to illegal aliens would total $2.5 billion. Again, because the number of DACA recipients is likely to rise, at least until the program is canceled, this number is almost certainly a significant underestimate.

## 4.    Net Tax Payment and Credit Receipt                    $3,541,600,000

As a result of our estimates of tax payments of about $2.5 billion and the receipt of tax credits of $4.2 billion (ACTC) and $3.5 billion (EITC), the result is a net deficit to the Treasury of about $3.5 billion annually.



# OTHER TAXES

### 1.    Social Security and Medicare Taxes                    $18,490,000,000

Illegal alien workers in the formal economy likely have Social Security and Medicare taxes withheld, with a matching amount paid by the employer. The standard amount for both worker and employer is 6.2 percent each for Social Security and 2.9 percent for Medicare.

A 2010 Social Security Administration (SSA) report estimated that illegal aliens pay a total of $13 billion into the trust fund annually. The report also stated that retirees, even though they are technically excluded from retirement benefits, managed to receive approximately $1 billion payouts every year. This makes the total net payment into the fund by illegal aliens approximately $12 billion annually.

Since the total number of illegal aliens within the United States has increased only slightly since 2010, the basis for this payout total is likely still relatively accurate. However, as noted previously in this report, the average estimated income earned by illegal aliens has increased from $34,000 to $36,000 — approximately 5 percent. Therefore, we add an additional $600 million to the payments made into the Social Security trust fund, bringing the total to approximately $12.6 billion.

Because nearly all who pay into the Social Security Trust Fund will also pay into Medicare, and since the rate is similarly fixed, we can use a proportional calculation of Social Security payments to determine how much illegal aliens pay into Medicare. The Medicare rate is 2.9 percent for both employees and employers. That's 47 percent of the Social Security rate. Therefore, the total amount paid into Medicare should be 47 percent of the Social Security rate. This comes out to approximately $5.9 billion.

This estimate of Medicare contributions by illegal aliens is likely to be slightly high. Federal law prohibits the distribution of Medicare benefits to beneficiaries who are unlawfully present in the United States on the date of service. Nevertheless, 2013 and 2014 audits by the inspector general for the Centers for Medicare and Medicaid Services (CMMS) identified approximately $9.3 million in erroneous Medicare payments.[85] The CMMS inspector general announced formal plans to recoup these funds but there is no clear data on how much of the erroneous payout was ever recovered. Furthermore the CMMS audit did not address the issue of Medicare fraud by illegal aliens, which is a growing concern for the agency, and may significantly offset the Medicare contributions made by illegal aliens.

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

Adding these figures together, we estimate that illegal aliens make approximately $18.5 billion in Social Security and Medicare tax contributions annually.

### 2.   Excise taxes                     $401,140,000

The federal government also receives revenue in the form of excise taxes on the sale of consumer goods such as fuel, tobacco, alcohol and airline tickets. Here, we include a rough estimate of receipts by the federal government from fuel, tobacco, and alcohol purchases. We do not include an estimate of excise revenue generated by illegal alien purchases of airline tickets, based on the presumption that most illegal aliens engage only in very limited airline travel.

The United States consumed approximately 143.37 billion gallons of gasoline in 2016, which averages out to about 650 gallons per licensed driver.[86] We assume that the illegal alien rate of gasoline purchases is lower than for the legal resident and U.S. citizen population. This presumption is based on the fact that the majority of states do not permit illegal aliens to obtain driver's licenses. In addition, most illegal aliens fall into an income bracket which prohibits the expenditures necessary to purchase, maintain, and insure a motor vehicle. Based on illegal aliens' preference for alternate forms (scooters, mopeds, limited use of borrowed vehicles, etc.) of transportation we estimate illegal alien gasoline consumption at somewhere around 325 gallons of gasoline each year. The current federal fuel tax of 18.4 cents per gallon times 325 gallons per year multiplied by five million aliens yields annual revenue of $299 million.

We presume that illegal aliens, in general, will prefer beer or wine because it is less expensive than liquor and can, generally be purchased in grocery and convenience stores. The excise tax on beer is $18 per barrel (31 gallons) for beer.[87]

We presume an average consumption of approximately one fifth of a barrel of wine or beer by each of three million illegal aliens, each year, per year. (This presumption is predicated on multiple studies that indicate alcohol consumption varies widely among various immigrant groups but that overall immigrants tend to drink less than native-born U.S. citizens[88].) This amounts to approximately $1.4 million in excise revenue generated by illegal alien alcohol purchases.[89]

Studies of smokers have found an incidence of smokers among the foreign-born population to be about one-third lower than for the native-born population.[90] If that share of the adult illegal alien population consumes on average about 20 cigarette packs per year, with a tax of $1.01 per pack, that produces federal revenue of about $101 million.

The total federal excise tax revenue from the illegal alien population for fuel, alcohol, and cigarettes, therefore, totals about $286 million annually.

# Net Federal Impact of Illegal Aliens

## Federal Receipts from Illegal Aliens

| | |
|---|---|
| Income Taxes | $3,299,957,700 |
| Social Security and Medicare Taxes | $18,490,000,000 |
| Excise taxes | $401,140,000 |
| Total Receipts | $22,191,097,700 |

## Credits Given to Illegal Aliens

| | |
|---|---|
| ACTC | $4,200,000,000 |
| EITC | $2,543,200,000 |
| Total Credits | $6,743,200,000 |

## Net Federal Receipts from Illegal Aliens

| | |
|---|---|
| Total Receipts | $22,191,097,700 |
| Total Credits | $6,743,200,000 |
| Net Federal Receipts from Illegal Aliens | $ 15,447,897,700 |

## Net Federal Impact of Illegal Aliens

| | |
|---|---|
| Total Federal Outlays | $45,870,474,332 |
| Net Federal Receipts | $15,447,897,700 |
| Net Fiscal Impact | $30,422,576,632 |

**State by State Costs of Illegal Immigration (Excluding federal costs)**

| State | # of Illegal Aliens | # of Illegal Aliens & their Kids | Cost Per Alien to State Taxpayers | Cost Of Illegal Aliens To State Taxpayers | Cost of Illegal Aliens & their Kids to State Taxpayers |
|---|---|---|---|---|---|
| California | 2,646,100 | 3,535,190 | $ 6,517 | $ 17,244,105,803 | $ 23,038,125,353 |
| Texas | 1,857,900 | 2,482,154 | $ 4,429 | $ 8,229,501,909 | $ 10,994,614,550 |
| Florida | 957,100 | 1,278,686 | $ 4,919 | $ 4,708,405,021 | $ 6,290,429,108 |
| New York | 872,650 | 1,165,860 | $ 6,424 | $ 5,605,644,728 | $ 7,489,141,357 |
| New Jersey | 563,000 | 752,168 | $ 5,939 | $ 3,343,442,047 | $ 4,466,838,574 |
| Illinois | 506,700 | 676,951 | $ 4,758 | $ 2,410,754,129 | $ 3,220,767,517 |
| Georgia | 422,250 | 564,126 | $ 4,410 | $ 1,862,065,496 | $ 2,487,719,503 |
| North Carolina | 394,100 | 526,518 | $ 4,630 | $ 1,824,824,186 | $ 2,437,965,113 |
| Arizona | 365,950 | 488,909 | $ 4,733 | $ 1,732,134,704 | $ 2,314,131,964 |
| Virginia | 337,800 | 451,301 | $ 4,983 | $ 1,683,307,209 | $ 2,248,898,431 |
| Maryland | 281,500 | 376,084 | $ 6,326 | $ 1,780,686,338 | $ 2,378,996,947 |
| Washington | 281,500 | 376,084 | $ 5,199 | $ 1,463,445,549 | $ 1,955,163,254 |
| Nevada | 236,460 | 315,911 | $ 4,978 | $ 1,177,156,427 | $ 1,572,680,987 |
| Massachusetts | 236,460 | 315,911 | $ 6,340 | $ 1,499,252,379 | $ 2,003,001,178 |
| Colorado | 225,200 | 300,867 | $ 5,385 | $ 1,212,656,960 | $ 1,620,109,699 |
| Pennsylvania | 202,680 | 270,780 | $ 5,003 | $ 1,013,956,732 | $ 1,354,646,193 |
| Michigan | 146,380 | 195,564 | $ 4,385 | $ 641,929,838 | $ 857,618,264 |
| Oregon | 146,380 | 195,564 | $ 6,238 | $ 913,046,575 | $ 1,219,830,224 |
| Connecticut | 135,120 | 180,520 | $ 6,326 | $ 854,729,442 | $ 1,141,918,535 |
| Tennessee | 135,120 | 180,520 | $ 4,395 | $ 593,874,756 | $ 793,416,673 |
| Indiana | 123,860 | 165,477 | $ 4,439 | $ 549,847,251 | $ 734,595,928 |
| Minnesota | 112,600 | 150,434 | $ 4,885 | $ 550,067,941 | $ 734,890,769 |
| Utah | 112,600 | 150,434 | $ 4,630 | $ 521,378,339 | $ 696,561,461 |
| Oklahoma | 106,970 | 142,912 | $ 4,366 | $ 467,006,026 | $ 623,920,051 |
| Ohio | 106,970 | 142,912 | $ 4,542 | $ 485,874,957 | $ 649,128,942 |
| New Mexico | 95,710 | 127,869 | $ 4,714 | $ 451,143,987 | $ 602,728,367 |
| South Carolina | 95,710 | 127,869 | $ 4,924 | $ 471,309,467 | $ 629,669,448 |
| Wisconsin | 90,080 | 120,347 | $ 4,723 | $ 425,488,862 | $ 568,453,120 |
| Kansas | 84,450 | 112,825 | $ 4,464 | $ 376,964,815 | $ 503,624,993 |
| Arkansas | 78,820 | 105,304 | $ 4,307 | $ 339,475,230 | $ 453,538,907 |
| Louisiana | 78,820 | 105,304 | $ 4,596 | $ 362,261,394 | $ 483,981,024 |
| Alabama | 73,190 | 97,782 | $ 4,439 | $ 324,909,739 | $ 434,079,412 |
| Missouri | 61,930 | 82,738 | $ 4,415 | $ 273,406,387 | $ 365,270,933 |
| Kentucky | 56,300 | 75,217 | $ 4,635 | $ 260,965,031 | $ 348,649,281 |
| Hawaii | 50,670 | 67,695 | $ 9,197 | $ 466,012,925 | $ 622,593,268 |
| Idaho | 50,670 | 67,695 | $ 4,449 | $ 225,434,063 | $ 301,179,908 |
| Nebraska | 50,670 | 67,695 | $ 4,601 | $ 233,130,600 | $ 311,462,482 |
| Iowa | 45,040 | 60,173 | $ 4,523 | $ 203,696,172 | $ 272,138,086 |
| Rhode Island | 33,780 | 45,130 | $ 6,037 | $ 203,916,861 | $ 272,432,927 |
| Delaware | 28,150 | 37,608 | $ 5,022 | $ 141,379,047 | $ 188,882,407 |
| Washington DC | 28,150 | 37,608 | $ 7,511 | $ 211,447,882 | $ 282,494,370 |
| Mississippi | 28,150 | 37,608 | $ 4,165 | $ 117,241,161 | $ 156,634,191 |
| Alaska | 11,260 | 15,043 | $ 6,443 | $ 72,551,589 | $ 96,928,923 |
| New Hampshire | 11,260 | 15,043 | $ 5,782 | $ 65,103,327 | $ 86,978,045 |
| South Dakota | <6,000 | <8,000 | $ 4,910 | $ 27,641,328 | $ 36,930,385 |
| Wyoming | <6,000 | <8,000 | $ 4,640 | $ 26,124,089 | $ 34,903,269 |
| Maine | <6,000 | <8,000 | $ 5,635 | $ 31,724,079 | $ 42,385,172 |
| Montana | <6,000 | <8,000 | $ 4,802 | $ 27,034,432 | $ 36,119,538 |
| North Dakota | <6,000 | <8,000 | $ 4,866 | $ 27,393,052 | $ 36,598,675 |
| Vermont | <6,000 | <8,000 | $ 5,914 | $ 33,296,490 | $ 44,486,003 |
| West Virginia | <6,000 | <8,000 | $ 4,670 | $ 26,289,606 | $ 35,124,408 |

# Part II: State and Local Expenditures and Receipts

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

## Introduction

Even though the costs of illegal immigration borne by tax payers at the federal level are staggering, they only pale in comparison to the fiscal burden shouldered by taxpayers at the state level. Most government taxes and fees remitted to government by Americans are paid in forms other than income taxes submitted to the IRS on April 15th. There are city and state income taxes, fuel surcharges, sales and property taxes, etc…. States and localities also bear the main burden for costs associated with public education, city and county infrastructure, and local courts and jails.

As uninvited guests in our country, illegal aliens and their families use nearly all government services and amenities. However, as noted previously, illegal aliens typically earn far less than their lawful neighbors. Many pay no taxes at all. Others actually receive a net profit through government tax credit programs. Add to this the fact that most households with an illegal head send large portions of their income to relatives still in their country-of-origin, in the form of remittance payments. Because that money is not spent in the United States, none of it goes toward paying sales, restaurant, vehicle purchase and other excise taxes that fund government programs.

A further complication is the fact that, while barred from many federal benefits, state laws allow illegal aliens to access many state-funded social welfare programs. Because so little data is collected on the immigration status of individuals collecting benefits, it is difficult to determine the rate at which illegal aliens use welfare programs. However, based on the average income of illegal alien households, it appears they use these programs at a rate higher than lawfully present aliens or citizens.[91]

## A Note about Methodology

As noted in the federal cost portion of this report, FAIR's state and local estimates also include the fiscal costs attributable to both aliens illegally present in the United States, as well as the American-born children of illegal aliens. As previously specified, they are included because their presence is a direct result of the illegal actions of their parents. The following fiscal cost estimates include an estimated population of about one and one-half million minors who are illegal aliens themselves, and a population of over four million U.S.- born minors who live in illegal alien households. Some children in this pool are younger than school age.

Estimations of the state and local costs associated with illegal aliens are considerably more difficult to pinpoint than the federal costs. State and local practices regarding illegal alien access to benefit programs are widely divergent and state populations of illegal aliens vary significantly. Therefore, we attempt to estimate aggregate costs when available, and make special notations of states that bear a disproportionate share of the load.

Also, considering each state has varying numbers of illegal aliens as residents, and thousands of cities and municipalities, costs must be broken into state averages before being accumulated into a nationwide state cost estimate. Whenever possible, we break down costs by the proportion of illegal aliens residing in each state. To do this, we use the state-by-state totals of illegal aliens compiled by credible research institutions[92] and adjust the totals to include DACA recipients and other individuals who should be counted.



# State and Local Expenditures

## EDUCATION

**1.    Public School Expenditures                $43,396,433,856**

Of the 1.58 million illegal alien minors and 4.2 million U.S.-born children who live in illegal alien households, approximately 3.6 million are enrolled in public schools. The vast majority of illegal alien children currently in the United States possess limited ability to speak, read, and write in English when they begin their education. Many require additional limited English proficiency (LEP) assistance during their academic careers. Due to the need for additional, specialized training in English language skills, it is considerably more expensive to educate any child whose first language is not English. Accordingly, in acknowledgment of the fact that nearly all illegal alien students require some degree of LEP assistance during their education, FAIR uses the average cost of educating an LEP student, $12,128 per pupil, as the basis for our calculations.

This figure represents a national average. However, it may differ from the average cost estimates for educating an LEP student in a particular state. In some cases, the per student cost in a specific state skews well above the national average. For example, large numbers of illegal alien students live in New York and Illinois where the respective costs are $25,189/ LEP pupil and $15,268 LEP Pupil, respectively. However, costs in California ($10,808/LEP Pupil) and Florida ($9,920/LEP Pupil) are closer to the national average. Many of these differences are attributable to differing state laws regarding the services that must be provided to LEP students.

The United States spends approximately $43.9 billion on educating illegal aliens and the children of illegal aliens. The vast majority of this bill is allocated to the states via an unfunded mandate passed down from the U.S. Supreme Court in its *Plyler v Doe* ruling.[93] In fact, according to FAIR's cost study on the public education of LEP students, a whopping 98.9 percent of these costs are borne by local governments: a total of just under $43.4 billion.

The factors affecting the costs of educating illegal aliens are discussed in-depth in FAIR's report *The Elephant in the Classroom: Mass Immigration's Impact on Public Education*.[94]

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

## 2.    Post-Secondary Tuition Assistance                    $1,040,000,000

Illegal aliens are precluded from receiving a taxpayer-subsidized education by a provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. However, largely in response to the efforts of illegal alien advocacy groups, eleven states had begun offering in-state tuition to illegal aliens, as of 2010. Three of those states offered scholarship assistance students who are unlawfully present.

In the intervening years, that number has increased significantly. According to the National Conference of State Legislators, there are now at least 18 states that allow in-state tuition rates for undocumented students.[95] This means that significantly more illegal aliens are eligible for grants, state-funded scholarships and subsidized loans, driving up higher education costs for states.



pay reduced in-state tuition rates. In others, students with approved DACA status. In still tion is granted under a "don't-ask-don't-tell" policy, mply declining to solicit any information on a n states that do not offer discounted in-state tuition g likelihood that many unlawfully present pupils because few states verify enrollee immigration Verification (SAVE) for Entitlements database.

gun to offer scholarship assistance to illegal alien rado, Colorado, Connecticut, Minnesota, New Mexico, Texas g these. We exclude this further tuition assistance ause data is scarce, and it is hard to discern whether rivate or public universities.

*national Business Times* report on college ns, "Enrollment numbers [of illegal aliens] t three years as immigrants received temporary The same article identified 225,000 illegal alien post-secondary studies. Fragmentary data on offering in-state tuition to illegal alien residents nay be 160,000 students in schools that offer this subsidized enrollment amounts to about $850 This increase from our earlier study is due to both expansion of states offering this benefit to illegal increase in enrollment likely fomented by the cholarship financial assistance.

for illegal aliens in public post-secondary rse — especially where there is a lack of specific ermit such enrollment. To estimate the fiscal l alien use of in-state tuition on taxpayers, FAIR ompared available enrollment data with data on the CA recipients into state universities. For example, 000 illegal alien students admitted into the state

university and community college systems in California. This includes DACA recipients under the state's AB-540 program,[97] illegal alien applicants and the children of illegal aliens.

This compares with just under 240,000 DACA-approved applications from the state. So the total accepted into a post-secondary educational institutions is approximately 18 percent of approved DACA applicants. In Texas, the enrollment of nearly 25,000 illegal alien enrolled in higher education also represents approximately 18 percent of DACA approved illegal aliens. In other states with the most populous number of DACA recipients, where data is available, the proportions also ranged just below 20 percent, on average.[98] Accordingly, DACA applicants applying for admission to institutions of higher learning provide a good baseline for calculating rough percentages of the overall illegal alien population likely to enroll in colleges and universities in a particular state.

This correlation between a willingness to apply for deferred action and to apply for acceptance into an institution of higher education enables us to form a rough estimate based on the available data.

The states that bear the greatest fiscal impact from their in-state tuition benefit to illegal aliens are California ($486M), Texas ($131M), New York ($108M), Colorado ($48M), Illinois ($40M), Florida and Washington ($23M) and New Jersey ($21M). Those eight states account for about seven-eighths (85%) of the estimated in-state tuition fiscal impact of about $1.04 billion.[99] All of these states have a large population of illegal aliens and few laws place to deter them from applying for enrollment at institutions of higher education.

## Total State Educational Expenditures

| | |
|---|---|
| Public School Expenditures | $43,396,433,856 |
| Post-secondary tuition assistance | $1,040,000,000 |
| Total Educational Expenditures | $44,436,433,856 |



## MEDICAL COSTS

The illegal alien population accesses taxpayer-supported medical assistance in several ways. One is the legal requirement that public hospitals provide emergency medical assistance regardless of the patient's ability to pay. This obligation was imposed by the Emergency Medical Treatment and Labor Act (EMTALA). Unfortunately, populations lacking healthcare insurance often rely on hospital emergency rooms as a source of free or low-cost healthcare. This abuse of EMTALA often leads to significant increases in hospital operating costs because of the higher expenses incurred when treating basic medical conditions in an emergency environments. EMTALA also covers labor costs for indigent mothers who give birth in emergency rooms. Many illegal aliens rely on emergency care facilities for child delivery. Adding further to the expenses imposed on health care providers by EMTALA, it covers delivery costs for mothers who deliberately cross the border, without authorization, specifically for the purpose of accessing U.S. hospitals. This is a major source of uncompensated operating costs for hospitals in border regions, particularly in Arizona, California, and Texas.

New York City provides a powerful illustration of the fiscal costs imposed on local taxpayers by furnishing free healthcare to illegal aliens:

*"At an April press conference, Dr. Ram Ramu, [a New York City health official], said that caring for illegals consumes about one-third of his $7.6 billion annual budget. Rounding down, that means that $2.5 billion—of which the city is picking up an increasingly large chunk every year, as state and federal aid dries up—goes toward providing health care to illegal aliens in New York,"*[100]

Although federal funds cannot be used to provide non-emergency health care to illegal aliens, some states and local governments use their own funds to offer coverage to undocumented children. For example, the "Healthy Kids" program in San Francisco covers uninsured children under the age of 19, including illegal alien children. Similarly, the "All Kids" program in Illinois covers all children under the age of 19 who meet program income requirements, regardless of immigration status.[101] These types of state-funded programs may not result in the direct expenditure of federal tax revenues to provide healthcare services to those unlawfully present in the U.S. However, they simply cause state governments to request more federal money to cover other expenses like criminal justice programs and highway maintenance.

The scope of services available through the Medicaid programs varies by state. For example, in New York, Medicaid for Emergency Care is used to provide chemotherapy and radiation to undocumented patients with cancer. In New York, California, and North Carolina, it can be used to provide outpatient dialysis for undocumented patients. These are medically important procedures, but they impose a heavy burden on taxpayers who are attempting to deal with the increasing costs of providing healthcare for themselves and their dependents.

## 1.    Medicaid births                                $730,010,218

States pay a matching share for all Medicaid births, as mentioned in the federal portion of this cost study. For most Medicaid expenses, this comes out to nearly 63 percent of the total cost. After removing costs covered by health insurance, for those illegal aliens who have it, the total cost comes out to $1.97 billion, with $1.24 billion covered by the federal government. This leaves the states with a burden of $730,010,218.

## 2.    Uncompensated Medical Expense                $6,930,000,000

As noted earlier, unpaid medical expenses incurred by uninsured illegal aliens are split between states and the federal government. The Kaiser Family Foundation estimated that, in 2013, states paid for $19.8 billion in total uninsured medical costs.[102]

Only about 40 percent of illegal aliens have health insurance. This means that about 10 million illegal aliens and their U.S.-born children are uninsured. And many of those who do have health insurance do not have comprehensive plans, leaving them uncovered for certain ailments. As of 2015, according to the Kaiser Family Foundation, there are about 28.5 million uninsured people in America.[103] This means that just over 35 percent of the total uninsured population is composed of illegal aliens. That indicates a total expenditure for uncompensated medical expenses incurred by those unlawfully present of approximately $6.93 billion.

An Arizona medical doctor wrote in 2010, "It is significant that the 4 states with the highest number of uninsured patients are the southern Border States that also have the highest burden of illegal immigrants: California, Arizona, New Mexico and Texas."[104]

## 3.    Improper Medicaid Payments                    $2,031,025,000

As described in the federal expenditures section, there is significant evidence of fraudulent use of Medicaid enrollment by illegal aliens. If we assume that these costs are split between states and the federal government, the states will pay approximately $2 billion.

## 4.    Medicaid for U.S.-born Kids of Illegal Aliens    $2,486,710,800

63 percent of the Medicaid costs for U.S.-born children of illegal aliens is shouldered by the federal government. That amounts to approximately $4.2 billion of the total $6.72 billion cost, leaving the states with a cost of $2.49 billion.

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

## Total State Medical Expenditures

| | |
|---|---|
| Medicaid births | $730,010,218 |
| Uncompensated Medical Expense | $6,930,000,000 |
| Improper Medicaid Payouts | $2,031,025,000 |
| Medicaid for Citizen Children of Illegal Alien | $2,486,710,800 |

Total Medical Expenditures $12,177,746,018



# ADMINISTRATION OF JUSTICE

Immigration enforcement is a completely federal responsibility — at least, that is the argument of those who oppose state and local efforts to cooperate with the Department of Homeland Security. But the truth is that state and local governments face extensive criminal justice expenditures related to the presence of illegal aliens. These costs essentially fall into three categories:

Some of those fiscal costs relate to police operations in response to criminal activity by illegal aliens, especially in municipalities where gang activity and drug trafficking is rampant.

Other expenditures involve pre-trial detention, court hearings, and probation of illegal aliens who stand accused of criminal offenses. These costs are significantly higher than average because of the frequent need for bi-lingual court services programs in order to ensure that due process requirements are met.

The third area of expenditures relates to the costs for state and local incarceration of illegal alien criminals.

As previously mentioned, the federal government operates a program to help defray the state and local costs of incarceration of illegal aliens, SCAAP (see Part I). But that program only covers a minute share of the expenses.

The U.S. Bureau of Justice Statistics provides a useful estimate of the state and local expenditures.[105] We use this data and assign costs for each state proportionate to the size of the illegal and deportable alien population reported by the local authorities in the SCAAP reporting. This method slightly understates the expenditures because not all jurisdictions that imprison illegal aliens participate in the SCAAP compensation program. Our estimations are listed below as an aggregate for all 50 states:

| | |
|---|---|
| Policing | **$4,727,322,309** |
| Judicial | **$2,227,368,973** |
| Corrections | **$3,622,579,699** |

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

SCAAP reimburses approximately $189 million (5.2% of corrections costs), which means that the state and local expenditure amounts to about $10.4 billion annually.

## State Border Security Costs                          $490,780,000

In addition to costs by ICE, CBP, the National Guard, etc, border states also allocate money to their own law enforcement agencies to combat the public safety and national security threats associated with illegal migration. Some states even fund the deployment of National Guard Troops to support U.S. Customs and Border Protection. Listed below are the states that share a border with Mexico, along with the portion of their state budget that is dedicated to combating illegal immigration:



- Texas: $412 million — The Texas Legislature meets every two years. In their 2017 session, they dedicated $800 million to operations on the border over the next two years.[106] In addition, Governor Greg Abbott revealed that his office designates approximately $1 million per month in discretionary spending dollars to activate additional National Guard troops on the border.[107] The federal government is ignoring reimbursement requests for Texas funds spent on border security. Therefore, the entirety of these costs are being paid for by state taxpayers.



- New Mexico: $49,180,000 — New Mexico's Border Authority is a state agency that focuses on "creating new infrastructure, trade opportunities, job opportunities, job training capabilities and many other activities that contribute to development of a productive economy along the New Mexico border."[108] The agency maintains a close working relationship with the U.S. Department of Homeland Security and, based on budget analysis, appears that at least 10 percent of the New Mexico Border Authority's budget goes to border security and stemming the tide of illegal immigration.[109]



- Arizona: $29.6 million — In September of 2015, Governor Ducey established the Arizona Border Strike Force Bureau, a division of the Arizona State Troopers, as an additional security measure on the state's border with Mexico.[110] In FY 2016, the Arizona legislature appropriated $26.6 to fund the program.[111] Other border security related appropriations, to police and state homeland security agencies, total about $3 million.[112]



- California: *negligible* — California's governor Jerry Brown not only refused to send National Guard troops to the border like Texas, he mocked other state's decision to do so.[113] In general, California avoids spending state money on border security. This is one of the reasons the border is so porous in the state. Sadly, the Golden State is actually spending public funds to stop the federal government from securing the border, appropriating millions of taxpayer dollars to fight the Trump administration on immigration issues.[114]

The vast majority of state border security funding efforts come from Texas. For the past two legislative sessions, the state has reinforced it's dedication to combat illegal immigration and the drug trade epidemic until the federal government effectively addresses the issue. Arizona's $26.6 million task force is also a relatively new endeavor with the same goal. All of these costs are directly attributable to the failure of the federal government to secure the border and remove incentives that encourage illegal immigration.

## Total State Administration of Justice Expenditures

| | |
|---|---|
| Policing | $4,727,322,000 |
| Judicial | $2,227,368,973 |
| Corrections | $3,622,579,000 |
| State Border | $490,780,000 |
| | |
| Total | $11,068,049,973 |
| SCAAP funds from Federal Government | -$189,000,000 |
| | |
| Net Justice Expenditures | $10,879,049,981 |



# WELFARE PROGRAMS

Illegal aliens are supposedly barred from receiving welfare benefits through targeted aid programs that are jointly administered by the states and the federal government. This bar was put in place by the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA).[115] However, by its terms the PRWORA states that "aliens who are not qualified aliens" are ineligible for "federal public benefits" and for "state and local public benefits." The act defines qualified aliens as people with certain legal documents, meaning that many people who are unlawfully present in the United States, but have who been accorded work authorization, deferred action, parole, or quasi-legal status under programs like TPS actually do collect certain state and local benefits. In addition, there are some recipients of welfare who obtain it by fraud, and some programs and localities do not inquire about immigration status, thereby tacitly allowing participation. Accordingly, the state and local expenditures associated with illegal alien usage of these programs is higher than would typically be expected for programs that were intended to be closed to those unlawfully present in the U.S.

## 1.    Child Care and Development Fund                    $657,320,607

The U.S. Department of Health and Human Services' Childcare and Development Fund is the primary source of state funds for child care subsidy programs.

Pursuant to the Child Care and Development Block Grant Act of 2014, the program matches state funds expended on programs to provide affordable child-care services to low-income families who work, train for work, attend school, or whose children receive government protective services.[116] While this is a federal/state matching program, it is included in our state expenditures section because the states determine the total program outlay and disburse all program funds, even those allocated by the federal government.

Beginning in FY 2015, Congress authorized $2.97 billion dollars in CCDBG funding, each year through 2020.[117] However, those funds are not guaranteed and must be allocated by Congress each year. In FY2016, funds actually appropriated by Congress amounted to approximately $2.761 billion, which was

46

slightly less than the previous year.[118] Assistance is provided in the form of either a contracted child care slot or a voucher that may be used to access care by any provider that meets state requirements. Eligibility requirements for these programs vary widely among the states.

Illegal aliens are not eligible for the CCDF programs. However, under relevant federal rules and regulations, the recipient child is considered the primary beneficiary of CCDF childcare programs. Accordingly, benefits are awarded based on the immigration status of the child, not the parents.[119] As a result many children whose parents are illegal aliens receive subsidized childcare under CCDF programs.

Since the child is considered the primary beneficiary of CCDF programs, HHS appears to collect little information on the immigration status of recipient children's parents. Therefore, we estimate state expenses for childcare for illegal aliens, paid out under CCDF programs using the data on TANF child-only cases. We do this because the demographics of children from illegal alien households who are eligible for CCDF are nearly identical to the population that will typically seek child-only TANF benefits. This method may result in a slight underestimation of children with at least one illegal alien parent who are collecting CCDF benefits. However, it provides the most accurate approximation.

Applying this proportion to CCDF expenditures, this works out to about $657 million spent on children with at least one illegal alien parent.

## 2.    Temporary Assistance to Needy Families            $321,200,000

TANF programs vary widely by state, which presents difficulties in estimating the amount of TANF funding attributable to the presence of illegal aliens and their citizen children who are benefiting from the program. A report to Congress by the GAO on TANF included partial data supplied by the states on their "ineligible immigrant parent (IIP)" caseloads.[120] Thirty states (including California and Texas) reported about 81,400 cases. Four states reported zero IIP cases.

The same states reported the monthly payments per child in those cases ranged from $6,036 in Maine to $1,044 in Nevada and Oklahoma. Because illegal aliens are not eligible for welfare benefits, and legally admitted immigrants are eligible for TANF after their first five years in the U.S., most of the IIP cases are likely to involve payments made for U.S.-born children of illegal aliens.

Overall state spending on TANF programs amounted to about $14.7 billion in fiscal year 2015. The share paid out for IIP cases, which would represent the state program costs attributable to illegal immigration, is approximately $321 million.

## 3.    Meals in Schools                                    $1,950,000,000

The federal free and reduced price meal program for K-12 students has a state matching requirement. State expenditures are much lower than they are at the federal level. To receive federal funding for subsidized school lunch programs, states must contribute matching funds equal to 30 percent of the federal funds they received in 1980. Because the matching funds requirements are frozen at 1980 levels, state required contributions are often very small relative to the federal reimbursement level.

The 1980 total cost to the federal government was approximately $3.2 billion.[121] That means that states would be required to contribute at least $960 million. As noted earlier, FAIR estimates that 5.9 percent of participants in this program are illegal aliens or the children of illegal aliens, meaning the total current state burden in this program would be a minimum of $56.64 million. However, the USDA has indicated

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

in the past that federal funds and the required matching state funds fall about 9 percent short of the full cost of this program, leaving the rest to local school districts.[122] This would mean that localities and states make up the federal shortfall with local funds. FAIR estimates that approximately $2 billion of those shortfall expenditures is directly attributable to use of school nutrition programs by children from illegal alien households. So while the official matching funds are very small, the total state contribution is significant due to the gap between funding and actual costs.

### Total State Welfare Expenditures

| | |
|---|---|
| Child Care and Development Fund | $657,320,000 |
| Temporary Assistance to Needy Families | $321,000,000 |
| Meals in Schools | $1,950,000,000 |
| Total Welfare Expenditure | $2,928,322,607 |

# TOTAL STATE EXPENDITURES

## General Expenditures                                    $18,571,428,571

The combined total of state and local government general expenditures on illegal aliens is $18,571,428,571 billion. The services referenced in this section are supported directly by the payment of city and state taxes and related fees. At the state level, examples of general expenditures would be the costs of general governance, fire departments, garbage collection, street cleaning and maintenance, etc. The state, county or municipality — or even a special taxing district in some situations — may provide some of these services. In most cases, localities offer more services than the state. By FAIR's estimate, there is approximately a 65 percent to 35 percent cost share between local and state governments.

The estimate of general expenditure services received by illegal alien households, beyond the specific outlays mentioned in the sections above, excludes capital expenditures and debt servicing. The calculation for each state is based on the state's annual operating budget, reduced by the amount covered by the federal government. That expenditure is then reduced further based on the relative size of the estimated population of illegal aliens and their U.S.-born minor children. As noted in our population estimate, this means states like California, Texas, Florida, New York, etc., with larger illegal alien cohorts, will bear larger shares of these costs.

## Other Expenditures

Certain expenditures are not included in this study because the data available is not sufficient to allow the calculation of reasonable estimates. One example is public housing. Generally speaking, although there is anecdotal evidence that illegal aliens create significant public housing costs, there is not enough reliable information to estimate the overall costs of public housing furnished to illegal aliens. This is only one example of significant costs that accrue due to unchecked illegal migration but which are not readily or easily calculated.

| Total State and Local Expenditures | |
|---|---|
| Total Education Expenditures | $44,436,433,856 |
| Total Medical Expenditures | $12,177,746,018 |
| Total Administration of Justice Costs | $10,879,049,981 |
| Total Welfare Expenditure | $2,928,322,607 |
| General Expenditures | $18,571,428,571 |
| State and Local Total | $88,992,981,032 |

## Fiscal Cost per Illegal Alien

The $89 billion in state and local expenditures attributable to illegal aliens is a major burden on the taxpayer. On the individual level, that amount of fiscal outlays amounts to about $5,329 per illegal alien each year, based on 12.5 million illegal aliens and 4.2 million citizen children.



# State and Local Taxes Collected

Offsetting the fiscal costs of the illegal alien population are the taxes collected from them at the state and local level. Many proponents of illegal immigration argue that the taxes paid to the states render illegal aliens a net boon to state and local economies. However, this is a spurious argument. Evidence shows that the tax payments made by illegal aliens fail to cover the costs of the many services they consume.

It is also important to note that calling illegal alien tax payments a net receipt is something of a misnomer. The overall wage depression inflicted on local labor markets by the presence of large numbers of illegal aliens willing to work for less than the prevailing rate has far-reaching fiscal implications. Low wage workers generally access more government benefit programs than higher-paid employees. Frequently they also consume government services at a higher rate than their more highly paid counterparts. However, because this study looks at the fiscal effects of illegal immigration, and tax collections are a fiscal effect, we estimate how much of the fiscal costs borne by taxpayers are reduced by taxes paid by illegal aliens.

Illegal aliens are not typical taxpayers. First, as previously noted in this study, the large percentage of illegal aliens who work in the underground economy frequently avoid paying any income tax at all. (Many actually receive a net cash profit through refundable tax credit programs.) Second, and also previously noted, the average earnings of illegal alien households are considerably lower than both legal aliens and native-born workers.

## Disposable Income Profile of Illegal Aliens at the State and Local Level

FAIR estimates there are about 7.0 million illegal aliens in the workforce, and that 35 percent of working illegal aliens operate in the underground economy. As noted previously, the average household with an illegal head earns approximately $36,000 annually. However, those working in the underground economy certainly earn far less.

The Institute for Taxation and Economic Policy (ITEP), an organization that attempts to defend illegal immigration to the United States, believes that illegal alien households and single workers contribute approximately $11.74 billion into state and local economies.[123] According to ITEP, this total is achieved

50

through "a combination of sales and excise, personal income, and property taxes" to approximately 8 percent of illegal alien's annual incomes.

Remittances are payments sent by illegal aliens to family members still residing in their country of origin. ITIP's study estimates remittances sent abroad from the United States averaged 10 percent of the net household income of illegal aliens. An examination of remittances by the *LA Times* supports the ITIP estimate that all immigrants, legal and illegally present, send about 10 percent of their income home.

Mexico receives a massive amount of remittances from aliens in the United States -- a whopping total of $24.8 billion in 2015, according to the Bank of Mexico.[124] India, China, Brazil and countries in the Caribbean basin are also likely to receive significant quantities of remittance cash. Remittances reduce the amount of disposable income spent by illegal aliens in states and localities where the reside. This, in turn, lowers the tax revenue generated from the purchase of goods and services. And, since the United States does not currently tax remittances, this loss is not even partially recouped.

However, since illegal aliens typically have a larger number of dependents who remain in their home country than legal alien households, it is likely that their average rate of remittance is significantly higher. For example, while Mexico sits on the lower end of the scale with just over 10 percent of immigrant's average immigrant income remitted, those originally hailing from Honduras and Guatemala send home 30 percent.[125] Therefore, FAIR estimates that, on average, illegal alien households remit closer to 20 percent of their household income back to their native countries,. This would lower the disposable income that a typical illegal alien household spends on taxable goods by approximately $7,200 per family.

After housing, transportation is generally the second largest outlay. According to the Bureau of Labor Statistics (BLS), transportation represented an expenditure of 13.6 percent of income for the average family in 2015, i.e., about $3,830.[126] Illegal aliens must still rely on some form of transportation. However, since most states deny driver's licenses to illegal aliens, it can be safely assumed that illegal aliens purchase, insure, and operate motor vehicles at a lower rate then either lawfully present immigrants or U.S. citizens. And those that do drive are likely to drive less than average in order to minimize the risk of being caught by law enforcement. While this frees up disposable income that legal or citizen families would spend on car-related expenses, it also reduces the amount of excise taxes paid on vehicle purchases and gasoline, as well as fees generated through vehicle registration and inspections.

BLS data for 2015 show average food expenditures at 13.1 percent of net income. However, illegal aliens may be able to lower that expense with a diet emphasizing staples. In addition, as previously noted, if the children are in school, they likely qualify for free breakfast and lunch programs. Furthermore, if U.S.-born children are present in the household, the family may be receiving food stamps. To account for this, we estimate that 10 percent of illegal alien annual income will go to food purchases — and that the remaining 3.1 percent is saved by accessing state and local nutrition and food assistance programs.

After adding in clothing, which generally accounts for about 5 percent of disposable income, general living expenses account for most of the relatively low earnings brought in by the typical illegal alien household. These stark economic realities mean that illegal aliens in the United States make significantly lower payments into to state and local treasuries through sales and other related spending taxes than do their lawfully present and U.S. citizen neighbors.

In estimating the income tax receipts from illegal aliens, we focus only on the population of workers in the above ground economy that may have had state taxes withheld from their earnings. We use a base income

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

of $36,000 for a family of 3.2 in estimating tax contributions made by illegal aliens. We then reduce the estimated contributions by the amount of the Earned Income Tax Credit paid out to illegal aliens in those states where such credits are available to anyone with a qualifying taxpayer identification number. There are 23 states plus Washington DC and New York City that offer this credit if it exceeds the tax owed (another 5 states have an EITC, but allow it only to apply against tax owed with no refundable portion).

The profile of earnings and expenditures for the illegal alien population results in the following estimates:

## Income Tax Receipts                    $1,049,760,000

As noted in the Federal portion of this cost study, most illegal alien households will have little income tax liability, if any at all, and millions more avoid liability by working in the "underground economy." For the most part, this holds true at the state level as well.

Nearly 26 percent of all illegal aliens in the United States reside within the seven states without a state income tax: Texas, Florida, Nevada, Washington, Wyoming, Alaska and South Dakota. California, where nearly 20 percent of the nation's illegal aliens reside, the tax bracket for those making the standard wage for illegal alien household is a measly 2 percent. Add to that the fact that California hosts many, if not most, of the illegal alien population that works in agriculture — an industry that pays even less, and is rife with underground workers who likely pay no income taxes at all.

So considering that 46 percent of all illegal aliens pay a negligible amount of state income tax by default, and 35 percent of all illegal aliens work in the underground market, that leaves perhaps just over 40 percent of all households likely to pay any state income tax at all — if they qualify.



Based on average incomes, this leaves approximately $58.32 billion in total income subject to state taxes by illegal alien households. Reducing that amount by another 10 percent for credits and deductions, and $52.49 billion remains. Liberally assuming a state tax rate of 2 percent after all deductions and tax credits, except for the Earned Income Tax Credit, that leaves the total amount of state income taxes paid at $1.05 billion.

## Property Tax Receipts        $918,000,000

Families who own residences pay property taxes. Individuals living in rental property do not pay property taxes directly, although their rent may have been calculated to subsidize a portion of their landlord's property taxes.

For states that host the largest number of illegal immigrants, property taxes hover right under the 1 percent mark. Also, in many states like Texas and Florida, property can be purchased for well under $100,000. In fact, the median home value for the entire state of Texas was only $164,500 in 2017.[127]

Of course, very few illegal alien households will be homeowners. In 2009, Pew Research indicated that only 35 percent of illegal alien households owned a home.[128] Home ownership has dropped approximately 5 percent across the board since then, according to the Census Bureau.[129] Assuming, then, that approximately 30 percent of illegal alien households own a home, there would be roughly 1.2 million illegal homeowners currently residing in the United States. Assuming home values of $90,000 and average annual property taxes of 0.85 percent, which totals approximately $765 annually per household, the total revenue comes out to $918 million.

## Fuel/Transportation Tax                    $598,600,000

The average total combined state/federal fuel tax for the United States comes out to 49.5 cents per gallon, according to the American Petroleum Institute.[130] Average fuel taxes have remained significantly more stable than the national gas price average, which has teetered above and below $2.25 per gallon between June of 2016 and February of 2017.[131] The United States consumed approximately 143.37 billion gallons of gasoline in 2016, which averages out to about 650 gallons per licensed driver.[132]

Since most illegal aliens do not hold a valid driver's license, and try to avoid contact with law enforcement officials, they drive much less than the average native or legally present American. However, even if they drive half as much as the national average, they are still likely consume somewhere around 325 gallons of gasoline each year, and drive approximately 4,700 miles annually if their vehicles average 20 miles per gallon. This lower-than-average total is reasonable in light of illegal aliens' preference for alternate forms of gas-powered transportation (scooters, mopeds, limited use of borrowed vehicles, etc.). In addition, it takes into account the fact that, due to issues connected with licensing and vehicle registration — as well as reduced disposable income — illegal aliens are highly unlikely to take long "road trips."

Based on these calculations, the average illegal alien driver spends approximately $731 annually on fuel, $161 of which would then go to fuel taxes. Although, according to the Federal Highway Administration, approximately 65 percent of the entire U.S. population are considered drivers,[133] the total number of illegal aliens driving will be considerably lower than the national average. If the percentage is dropped to an even 50 percent of illegal aliens, this still leaves 6.25 million drivers. In total, this comes out to approximately $1 billion spent in fuel taxes by illegal aliens.

In order to obtain the state total, we must subtract the federal excise taxes that were detailed in the federal portion of this cost study. This brings the total to approximately $598.6 million.

## Sales Tax Receipts                    $1,000,000,000

To calculate sales tax, we take net household income and subtract remittances sent back to an illegal alien's home country every year. As noted previously, this comes out to approximately 20 percent of the average income, or $7,200 annually. This bring the total average annual income of an illegal alien that is subject to sales tax down to $28,800.

In almost all states, staple groceries and most other food items are exempted from sales tax. As noted before, we list this at 10 percent of the household annual income, or $2,880. After removing net taxes paid to both states and the federal government, about $4,400, the total disposable income likely to be spent in a state, and therefore be subjected to state sales taxes, is reduced to about $21,520. Even after this, most typical household expenditures (i.e., rent, mortgage payments, healthcare expenditures, etc.) are not subject to state and local sales taxes. In addition, Delaware, Montana, Oregon and New Hampshire have

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

no sales tax. Alaska's rate is a minuscule 1.69 percent.[134] This means that, overall, the income generated by most illegal alien households is subject only to very limited sales taxation.

Based on the above figures, a safe assumption is that approximately 1.5 percent of the average illegal alien's household's annual is actually used for purchases subject to a sales tax. Depending on housing prices, state tax rates, etc., this number could be higher or lower. This makes the annual sales tax bill paid by illegal alien households somewhere around $250 per household, for a contribution of roughly $1 billion to state and local treasuries.

## Earned Income Tax Credits                           $45,400,000

Some of the states that levy income taxes also have an Earned Income Tax Credit (EITC) that works as an offset against taxes or as a refund to the taxpayer. FAIR's analysis indicates that these state and local tax credits total approximately $45 million. This is a small amount, but it still reduces the total taxes paid by illegal immigrant households.

# Net State Impact of Illegal Aliens

### Total State Tax Receipts

| | |
|---|---|
| Property Tax Receipts: | $918,000,000 |
| Income Tax Receipts: | $1,049,760,000 |
| Fuel/Transportation | $598,600,000 |
| Sales Tax Receipts: | $1,000,000,000 |
| Total State Taxes Paid: | $3,566,360,000 |
| Earned Income Tax Credits | -$45,400,000 |
| Net State Tax Receipts | $3,520,960,000 |

The state tax payments made by illegal aliens fall far short of the costs incurred by their presence, as detailed below. These figures negate the argument that illegal aliens represent a net economic boon to the United States.

| | |
|---|---|
| Total State and Local Expenditures | $88,992,981,032 |
| Total State and Local Tax Receipts | -$3,520,960,000 |
| Net State and Local Fiscal Impact | $85,472,021,032 |

# Part III: Total Federal and State Fiscal Outlays

Total Federal and State Fiscal Outlays

At the federal, state, and local levels, taxpayers shell out approximately $134.9 billion to cover the costs incurred by the presence of more than 12.5 million illegal aliens, and about 4.2 million citizen children of illegal aliens. That amounts to a tax burden of approximately $8,075 per illegal alien family member. These figures are before taxes paid by illegal aliens are factored in. The totals with taxes factored in are as follows:

### Total Expenditures

| | |
|---|---|
| Total Federal Expenditures | $45,870,474,332 |
| Total State and Local Expenditures | $88,992,981,032 |
| Total National Expenditures | $134,863,455,364 |

### Total Tax Contributions

| | |
|---|---|
| Total Federal Taxes Paid | $15,447,897,700 |
| Plus Total State and Local Taxes Paid | +$3,520,960,000 |
| Total Tax Contributions | $18,968,857,700 |

### Total Cost of Illegal Immigration

| | |
|---|---|
| Total National Expenditures | $134,863,455,364 |
| Minus Total Tax Contributions | $18,968,857,700 |

## Total Fiscal Cost of Illegal Aliens on Taxpayers:      $115,894,597,664

The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)

# Conclusion

The total cost of illegal immigration to U.S. taxpayers is both staggering and crippling. In 2013, FAIR estimated the total cost to be approximately $113 billion. So, in under four years, the cost has risen nearly $3 billion. This is a disturbing and unsustainable trend.

This report, in essence, provides a detailed analysis of the costs of illegal immigration at the conclusion of the Obama administration, which was notoriously soft on immigration enforcement and welcoming to illegal aliens. Future estimates will indicate whether the situation has improved or worsened under subsequent presidential administrations.

# Endnotes

1   Elizabeth English, "Illegal Immigration and K-12 Education," American Enterprise Institute, February 25, 2015, http://www.aei.org/publication/illegal-immigration-k-12-education/

2   Joel Gherke, "Report: U.S. Spent $1.87 Billion to Incarcerate Illegal-Immigrant Criminals in 2014," National Review, July 28, 2015, http://www.nationalreview.com/article/421673/report-us-spent-187-billion-incarcerate-illegal-immigrant-criminals-2014-joel-gehrke

3   Erik Ruark and Jack Martin, "The Sinking Lifeboat: Uncontrolled Immigration and the U.S. Healthcare System in 2009," Federation for American Immigration Reform, 2009, http://www.fairus.org/site/DocServer/healthcare_09.pdf?docID=3521

4   DHS/CIS: Number of I-821D,Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2016 (March 31)

5   Some illegal aliens are temporarily protected against deportation. Most of them are in one of three programs; Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA), and Cubans who benefit from the "wet-foot-dry-foot executive policy. The first two programs, if allowed to expire would restore beneficiaries to illegal alien status and for that reason the beneficiaries are treated in this study as part of the illegal alien population. The Cuban illegal entrants, on the other hand, are provided permanent legal status under the Cuban Adjustment Act after one year in the country, and are not, therefore, included in our calculation of the illegal alien population, despite the fact that their illegal entry is indistinguishable from the entry of other illegal aliens, and certainly constitutes a negative fiscal impact at the federal and local level.

6   Martin, Jack, Ruark, Eric, "The Fiscal Burden of Illegal Immigration on United States Taxpayers," Federation for American Immigration Reform, 2013, http://www.fairus.org/DocServer/research-pub/USCostStudy_2013upd.pdf

7   Ferris, Raley, "The Elephant in the Classroom: Mass Immigration's Impact on Public Education," Federation for American Immigration Reform, 2016, http://www.fairus.org/publications/the-elephant-in-the-classroom-mass-immigrations-impact-on-public-education

8   National Center for Education Statistics, "Fast Facts," 2016, https://nces.ed.gov/fastfacts/display.asp?id=372

9   U.S. Dept. of Education, Budget Tables, English Language Acquisition (ESEA III, Part A) https://www2.ed.gov/about/overview/budget/budget17/17action.pdf

10  Ferris, Raley, "The Elephant in the Classroom: Mass Immigration's Impact on Public Education," Federation for American Immigration Reform, 2016, http://www.fairus.org/publications/the-elephant-in-the-classroom-mass-immigrations-impact-on-public-education

11  U.S. Department of Education, Programs, "Migrant Education--Basic State Formula Grants," https://www2.ed.gov/programs/mep/index.html

12  Department of Education, Congressional Action, FY2017, https://www2.ed.gov/about/overview/budget/budget17/17action.pdf

13  U.S. Department of Education, "High Standards for All Students: A Report from the National Assessment of Title I on Progress and Challenges Since the 1994 Reauthorization," https://www2.ed.gov/rschstat/eval/disadv/nati.pdf

14   Desilver, "Immigrants don't make up a majority of workers in any U.S. industry," Pew Research Center, March, 2017, http://www.pewresearch.org/fact-tank/2017/03/16/immigrants-dont-make-up-a-majority-of-workers-in-any-u-s-industry/

15   U.S. Department of Health and Human Services, "Head Start Program Facts," FY 2015, https://eclkc.ohs.acf.hhs.gov/hslc/data/factsheets/2015-hs-program-factsheet.html

16   Mistry, Saurez-Orozco, "Preschool Makes a Difference for Poor Immigrant Children," The New York Times, February, 2013, http://www.nytimes.com/roomfordebate/2013/02/25/is-public-preschool-a-smart-investment/preschool-makes-a-difference-for-poor-immigrant-children

17   Coughlin, Holahan, Caswell, McGrath, "Uncompensated Care for the Uninsured in 2013: A Detailed Examination," The Henry J. Kaiser Family Foundation, 2013, http://kff.org/uninsured/report/uncompensated-care-for-the-uninsured-in-2013-a-detailed-examination/

18   "Key Facts about the Uninsured Population," The Henry J. Kaiser Family Foundation, September, 2016, http://kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/#footnote-198942-12

19   Radnofsky, "Illegal Immigrants Get Public Health Care, Despite Federal Policy," The Wall Street Journal, March, 2016, https://www.wsj.com/articles/illegal-immigrants-get-public-health-care-despite-federal-policy-1458850082

20   Centers for Disease Control and Prevention, "Births in the United States," 2015, https://www.cdc.gov/nchs/products/databriefs/db258.htm

21   Markus, Andre, West, Garro, Pellegrini, "Medicaid Covered Births, 2008 Through 2010, in the Context of the Implementation of Health Reform," Women's Health Issues, September-October, 2013, http://www.whijournal.com/article/S1049-3867(13)00055-8/fulltext

22   Reed, Westfall, Bublitz, Battaglia, Fickenscher, "Birth outcomes in Colorado's undocumented immigrant population," BioMed Central, 2005, https://bmcpublichealth.biomedcentral.com/articles/10.1186/1471-2458-5-100

23   "How Undocumented Immigrants Sometimes Receive Medicaid Treatment," PBS Newshour, February 13, 2013 Also see "Trends in Emergency Medicaid Expenditures for Recent and Undocumented Immigrants" JAMA, March 14, 2007.

24   U.S. Government Accountability Office, "Financial Audit: Fiscal Years 2016 and 2015 Consolidated Financial Statements of the U.S. Government," January, 2017, http://www.gao.gov/assets/690/682081.pdf

25   U.S. Department of Health and Human Services, "Medicaid Fraud Control Units Fiscal Year 2015 Annual Report," 2016, https://oig.hhs.gov/oei/reports/oei-07-16-00050.pdf

26   Pfizer Medical Division, "A Profile of Uninsured Persons in the United States," 2008, http://www.pfizer.com/files/products/Profile_of_uninsured_persons_in_the_United_States.pdf

27   Kaiser Family Foundation, "Key Facts About the Uninsured Population," September 29, 2016, http://www.kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/

28   "Medicaid Spending per Enrollee — Full or Partial Benefit," The Henry J. Kaiser Family Foundation, 2011, http://kff.org/medicaid/state-indicator/medicaid-spending-per-enrollee/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

29   National Immigration Forum, "Department of Homeland Security — The President's FY 2017 Budget," http://immigrationforum.org/blog/the-presidents-fiscal-year-2017-budget-the-department-of-homeland-security/

30    U.S. Customs and Border Protection, "CBP Performance and Accountability Report," FY 2014, https://www.cbp.gov/sites/default/files/documents/CBP_DHS_2014%20PAR_508C.PDF

31    U.S. Department of Homeland Security, "Budget in Brief," FY 2016, https://www.dhs.gov/sites/default/files/publications/FY_2016_DHS_Budget_in_Brief.pdf

32    U.S. Department of Justice - Office of Justice Programs, "Program Name: State Criminal Alien Assistance Program (SCAAP)," FY2016, https://ojp.gov/about/pdfs/BJA_SCAAP%20Prog%20Summary_For%20FY%2017%20PresBud.pdf

33    U.S. Department of Justice, "FY 2016 Statistics Yearbook," March 2017, https://www.justice.gov/eoir/page/file/fysb16/download shows 328,112

34    TracImmigration website, "Nature of Charge in New Filings Seeking Removal Orders Through May 2017," http://trac.syr.edu/phptools/immigration/charges/apprep_newfiling_charge.php

35    William A. Kandel, "Unaccompanied Alien Children: An Overview," Congressional Research Service, January 18, 2017 https://fas.org/sgp/crs/homesec/R43599.pdf

36    Ibid.

37    U.S. Department of Health and Human Services, "FY2017 Justification of Estimates for Appropriations Committees," https://www.acf.hhs.gov/sites/default/files/olab/final_cj_2017_print.pdf

38    U.S. Department of Health and Human Services, "FY2017 Justification of Estimates for Appropriations Committees," https://www.acf.hhs.gov/sites/default/files/olab/final_cj_2017_print.pdf

39    U.S. Department of Health and Human Services, FY 2016 President's Budget for HHS, Department of Health and Human Services, (www.hhs.gov/about/budget/fy2016/budget-in-brief/index.html) website consulted August 9, 2016.

40    U.S. Government Printing Office, "Department of Homeland Security Appropriations for 2017," February 24, 2017 https://www.gpo.gov/fdsys/pkg/CHRG-114hhrg20679/pdf/CHRG-114hhrg20679.pdf

41    General Accountability Office, "Unaccompanied Alien Children: Actions Needed to Ensure Children Receive Required Care in DHS Custody," July 2015, http://www.gao.gov/assets/680/671393.pdf

42    U.S. Department of Homeland Security, "Homeland Security: Budget-in-Brief Fiscal Year 2016," https://www.dhs.gov/sites/default/files/publications/FY_2016_DHS_Budget_in_Brief.pdf

43    U.S. Department of Homeland Security, "Homeland Security: Budget-in-Brief Fiscal Year 2017," https://www.dhs.gov/sites/default/files/publications/FY2017BIB.pdf

44    Executive Office of the President, "Department of Health and Human Services Budget," https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/hhs.pdf

45    U.S. Department of Homeland Security, "Homeland Security: Budget-in-Brief Fiscal Year 2018," https://www.dhs.gov/sites/default/files/publications/DHS%20FY18%20BIB%20Final.pdf

46    U.S. Department of Justice - Office of Justice Programs, "Byrne Justice Assistance Grant (JAG) Program," FY 2016, https://ojp.gov/about/pdfs/BJA_Byrne%20Justice%20Assistance%20Grants%20(JAG)%20Program%20Summary_For%20FY%2017%20PresBud.pdf

47    Federal Bureau of Investigation, "National Gang Threat Assessment – 2009," January 2009, https://www.fbi.gov/file-repository/stats-services-publications-national-gang-threat-assessment-2009-pdf/view

48    Camarota, Steven A. "Welfare Use by Legal and Illegal Immigrant Households," Center for Immigration Studies, September 2015.

49    Ibid Ferris, Raley

50    U.S. Department of Agriculture, "Child Nutrition Tables" Federal Cost of School Food Programs, website visited October 19, 2016 (http://www.fns.usda.gov/pd/child-nutrition-tables )

51    Camarota, Steven A. "Welfare Use by Legal and Illegal Immigrant Households," Center for Immigration Studies, September 2015, http://cis.org/Welfare-Use-Legal-Illegal-Immigrant-Households

52    U.S. Department of Agriculture, Food and Nutrition Service, WIC Program, WIC Funding and Program Data, https://www.fns.usda.gov/wic/wic-funding-and-program-data

53    Camarota, Steven A. "Welfare Use by Legal and Illegal Immigrant Households," Center for Immigration Studies, September 2015.

54    U.S. Department of Health and Human Services, "WIC Participant and Program Characteristics 2014," November 2015, https://www.fns.usda.gov/sites/default/files/ops/WICPC2014.pdf

55    The Urban Institute/University of Maryland Baltimore County, "Effects of Immigration on WIC and NSLP Caseloads," September 2010, http://www.urban.org/sites/default/files/publication/29156/412214-Effects-of-Immigration-on-WIC-and-NSLP-Caseloads.PDF

56    United States Department of Agriculture, Food and Nutrition Service, WIC Program, Monthly Data, https://www.fns.usda.gov/pd/wic-program

57    [i] "TANF Caseload Data 2014," May 22, 2015,HHS website visited October 21, 2016, (http://www.acf.hhs.gov/ofa/resource/caseload-data-2014 )

58    [ii] Congressional Budget Office, "Temporary Assistance for Needy Families: Spending and Policy Options," FY2013, https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/49887-tanf.pdf

59    Congressional Research Service, "Immigration: Non-Citizen Eligibility for Needs-Based Housing Programs," July, 2008, https://www.ilw.com/immigrationdaily/news/2011,0113-crs.pdf

60    Richwine, Rector, "The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer," The Heritage Foundation, 2013, http://www.heritage.org/immigration/report/the-fiscal-cost-unlawful-immigrants-and-amnesty-the-us-taxpayer

61    Forum on Child and Family Statistics, "Child Population: Number of Children," Projections 2016-2050, https://www.childstats.gov/americaschildren/tables/pop1.asp

62    The College Board, "Trends in Student Aid 2015," http://trends.collegeboard.org/sites/default/files/trends-student-aid-web-final-508-2.pdf

63    The Motley Fool, LLC, "What's the Average American's Tax Rate?" March 4, 2017, https://www.fool.com/retirement/2017/03/04/whats-the-average-americans-tax-rate.aspx

64    Robert Rector and Jamie Hall, "National Academy of Sciences Report Indicates Amnesty for Unlawful Immigrants Would Cost Trillions of Dollars," The Heritage Foundation, December 22, 2016, http://www.heritage.org/immigration/report/national-academy-sciences-report-indicates-amnesty-unlawful-immigrants-would

65    The Tax Policy Center, "Tax Policy Center Briefing Book: Key Elements of the U.S. Tax System," http://www.taxpolicycenter.org/briefing-book/how-does-federal-tax-system-affect-low-income-households

66    Jason Richwine and Robert Rector, "The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer," The Heritage Foundation, May 6, 2013, http://www.heritage.org/immigration/report/the-fiscal-cost-unlawful-immigrants-and-amnesty-the-us-taxpayer

67   Ibid.

68   Op Cite, Richwine, Rector, Camarota, Cohn, Passel

69   Passel, Jeffrey S., Cohn, D'Vera, Pew Research, "A Portrait of Unauthorized Immigrants in the United States," 2009, http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/

70   Congressional Budget Office, "The Distribution of Household Income and Federal Taxes, 2013," June 2016, https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51361-householdincomefedtaxesonecol.pdf

71   http://www.pewhispanic.org/files/reports/95.pdf

72   http://www.gao.gov/assets/660/656316.pdf

73   https://www.ssa.gov/policy/docs/statcomps/di_asr/2011/sect01.html

74   https://www.bls.gov/news.release/forbrn.t01.htm

75   "ARRA and the Additional Child Tax Credit," accessed August 26,2016, https://www.irs.gov/uac/arra-and-the-additional-child-tax-credit

76   Treasury Inspector General for Tax Adminsitration, Individuals Who Are Not Authorized in the United States Were Paid $4.2 billion in Refundable credits," July, 2011, https://www.treasury.gov/tigta/auditreports/2011reports/201141061fr.pdf

77   Numbers USA, "Whistleblower Says IRS Managers Ignored Illegal-Aliens ITIN Fraud," July, 2012, https://www.numbersusa.com/content/news/july-3-2012/whistleblower-says-irs-managers-ignored-illegal-alien-itin-fraud.html

78   U.S. Internal Revenue Service, "2015 EITC Income Limits, Maximum Credit Amounts, and Tax Law Updates," https://www.irs.gov/credits-deductions/individuals/earned-income-tax-credit/eitc-income-limits-maximum-credit-amounts-1-year

79   "Refundable Tax Credits: Comprehensive Compliance Strategy and Expanded Use of Data Could Strengthen IRS's Efforts to Address Noncompliance," GAO-16-475, May 2016.

80   Treasury Inspector General for Tax Administration, "Existing Compliance Processes Will Not Reduce the Billions of Dollars in Improper Earned Income Tax Credit and Additional Child Tax Credit Payments," September 29, 2014, https://www.treasury.gov/tigta/auditreports/2014reports/201440093fr.pdf

81   "Without Expanded Error Correction Authority, Billions of Dollars in Identified Potentially Erroneous Earned Income Credit Claims Will Continue to Go Unaddressed Each Year," U.S. Treasury Inspector General Report No. 2016-40-036, April 27, 2016.

82   Internal Revenue Service, "Internal Revenue Service Nationla Office Chief Counsel Advice," July 14, 2000, https://www.irs.gov/pub/irs-wd/0028034.pdf

83   U.S. Citizenship and Immigration Services, "Number of Form I-821D,Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake,Biometrics and Case Status Fiscal Year 2012-2017—FY2017, Q2," March 31, 2017, https://www.h1bvisalawyerblog.com/2017/06/daca-statistics-daca-quarterly-report-fy2017-q2.html

84   Brookings Institution, "Immigration Facts: Deferred Action for Childhood Arrivals (DACA)," August 14, 2013, https://www.brookings.edu/research/immigration-facts-deferred-action-for-childhood-arrivals-daca/

85    Department of Health and Human Services, Office of the Inspector General, "Medicare Improperly Paid Millions of Dollars for Unlawfully Present Beneficiaries for 2013 and 2014," September 2016, https://oig. hhs.gov/oas/reports/region7/71501159.pdf

86    U.S. Energy Information Administration, "Frequently Asked Questions: How Much Gasoline Does the United States Consume?," Accessed June, 2017, https://www.eia.gov/tools/faqs/faq.php?id=23&t=10

87    Tax Policy Center, "What Are the Major Federal Excise Taxes, and How Much Money do they Raise?," FY 2015, http://www.taxpolicycenter.org/briefing-book/what-are-major-federal-excise-taxes-and-how-much-money-do-they-raise

88    Magdelena Szaflarski, Lisa A. Cubbins, and Jun Ying, "Epidemiology of Alcohol Abuse Among U.S. Immigrant Populations," Journal of Immigrant Minor Health, August 13, 2011, https://www.ncbi.nlm.nih. gov/pmc/articles/PMC3133815/

89    Frohlich, Thomas C., "States Drinking the Most Beer," USA Today, July,2015, https://www.usatoday.com/ story/money/business/2015/07/02/24-7-wall-st-states-drinking-most-beer/29574619/ ;  Kirin Holdings Company, "Per-Capita Beer Consumption by Country," 2014, http://www.kirinholdings.co.jp/english/ news/2015/1224_01.html#table3

90    Bosdriesz, Jizzo; Lichthart, Nienke; Witvliet, Margot; Busschers, Wim; Stronks, Karien; Kunst, Anton, "Smoking Prevalence among Migrants in the US Compared to the US-Born and the Population in Countries of Origin," PLOS, March, 2013, http://journals.plos.org/plosone/article?id=10.1371/journal. pone.0058654

91    Steven A. Camarota, "Welfare Use by Legal and Illegal Immigrant Households: An Analysis of Medicaid, Cash, food, and Housing Programs," Center for Immigration Studies, September 9, 2015< https://cis.org/ Report/Welfare-Use-Legal-and-Illegal-Immigrant-Households

92    Pew Research Center, Hispanic Trends, "U.S. Unauthorized Immigration Population Estimates, By State," 2014, http://www.pewhispanic.org/interactives/unauthorized-immigrants/

93    "Plyler v. Doe," Oyez, Retrieved May 12, 2017, https://www.oyez.org/cases/1981/80-1538

94    Op Cite, Raley, Ferris

95    National Conference of State Legislators, "Undocumented Student Tuition: Overview," October 29, 2015, http://www.ncsl.org/research/education/undocumented-student-tuition-overview.aspx

96    "Immigration Reform 2015: More Undocumented Immigrants Enrolling In College As States Debate Tuition Laws," International Business Times, February 11, 2015.

97    What is AB540, http://ab540.com/What_Is_AB540_.html

98    Unites States Citizenship and Immigration Services, "Number of I-821D, Consideration of Deferred Action for Childhood Arrivals," 2012-2016, https://www.uscis.gov/sites/default/files/USCIS/Resources/ Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_ performancedata_fy2016_qtr3.pdf

99    Gordon, Larry, Ed Source, "Colleges Expand Services for Undocumented Students as Legislation Seeks More," September, 2016, https://edsource.org/2016/colleges-expand-services-for-undocumented-students-as-legislation-seeks-more/569296

100   "Undocumented—and Unmeasured," "New York's political leaders obscure the costs of illegal immigration under sentimental rhetoric.", Seth Barron , City Journal, September 2, 2016

101    Gusmano, Michael, "Undocumented Immigrants in the United States: U.S. Health Policy and Access to Care", (http://www.undocumentedpatients.org/issuebrief/health-policy-and-access-to-care/) website consulted September 29, 2016.

102    Coughlin , Teresa A, ibid.

103    "Key Facts about the Uninsured Population," Sep 29, 2016 Kaiser Family Foundation website (http://kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/), consulted October 5, 2016.

104    Vliet, Elizabeth Lee, M.D., **"Illegal Immigration Healthcare Costs Affect YOU!,"** AAPS News of the Day Blog, June 1,2010

105    Based on compilation of available SCAAP data. See, U.S. Department of Justice, Bureau of Justice Statistics, "State Criminal Alien Assistance Program — Archives," https://www.bja.gov/ProgramDetails.aspx?Program_ID=86#horizontalTab8

106    Aguilar, Julian, "Even under Trump, state budget writers deliver big on border security funding," The Texas Tribune, May, 2017, Accessed June, 2017, https://www.texastribune.org/2017/05/23/even-under-trump-state-budget-writers-deliver-big-border-security-fund/

107    Grissom, Brandi, "Gov. Abbott extends National Guard on the border in response to unaccompanied minors," The Dallas Morning News, December, 2015, Accessed June, 2017, https://www.dallasnews.com/news/politics/2015/12/15/gov-abbott-extends-national-guard-on-the-border-in-response-to-unaccompanied-minors

108    New Mexico Border Authority, "Welcome the New Mexico Border Authority," http://www.nmborder.com/

109    State of New Mexico, "Report of the Legislative Finance Committee to the Fifty-Second Legislator, Second Session," January, 2016, https://www.nmlegis.gov/lcs/lfc/lfcdocs/budget/2017RecommendVolI.pdf

110    Arizona Department of Public Safety — Arizona State Troopers, "Border Strike Force Bureau," https://www.azdps.gov/organization/CID/bsf

111    Office of the Governor, "State of Arizona FY 2017 Budget," FY 2017, https://azgovernor.gov/fy17budget

112    State of Arizona, "FY 2016 Appropriations Report," FY 2016, http://www.azleg.gov/jlbc/16AR/FY2016AppropRpt.pdf

113    "Gov. Brown takes dig at Texas national guard border plan," KSBW8, July 28,2014, Accessed June, 2017, http://www.ksbw.com/article/gov-brown-takes-dig-at-texas-national-guard-border-plan/1054616

114    Murphy, Katy, "Gov. Jerry Brown unveils new state budget proposal with rosier outlook," The Mercury News," May 11, 2017, Accessed June, 2017, http://www.mercurynews.com/2017/05/11/jerry-brown-unveils-new-state-budget-proposal-thursday/

115    United States Congress, "Personal Responsibility and Work Opportunity Reconciliation Act of 1996," https://www.congress.gov/104/plaws/publ193/PLAW-104publ193.pdf

116    U.S. Department of Health and Human Services, Administration for Children and Families, "CCDF Reauthorization Frequently Asked Questions," March 25, 2015, https://www.acf.hhs.gov/occ/resource/ccdf-reauthorization-faq-archived

117    Hannah Matthews, Karen Schulman, Julie Vogtman, Christine Johnson-Staub, and Helen Blank, "Implementing the Child Care and Development Block Grant Reauthorization: A Guide for States," National Women's Law Center — Center for Law and Social Policy, 2015, http://www.clasp.org/resources-and-publications/publication-1/ccdbg-guide-for-states-final.pdf

118   U.S. Department of Health and Human Services, Administration for Children and Families, "Fiscal Year 2016 Federal Child Care and Related Appropriations," January 4, 2016, https://www.acf.hhs.gov/occ/resource/fiscal-year-2016-federal-child-care-and-related-appropriations#_ftnref1

119   U.S. Department of Health and Human Services, Administration for Children and Families, "Clarification of Interpretation of 'Federal Public Benefit' Regarding CCDF Services," Program Instruction: ACYF-PI-CC-98-08, November 25, 1998, https://www.acf.hhs.gov/occ/resource/pi-cc-98-08

120   TANF and Child Welfare Programs," Government Accountability Office, October 2011

121   United States Department of Agriculture, "National School Lunch Program," Accessed May, 2017, https://www.fns.usda.gov/sites/default/files/NSLPFactSheet.pdf

122   Neuberger, Zoe, Namian, Tina, "Who Benefits from Federal Subsidies for Free and Reduced Price School Meals," Center on Budget and Policy Priorities, 2010, http://www.cbpp.org/research/who-benefits-from-federal-subsidies-for-free-and-reduced-price-school-meals#_ftn11

123   "Undocumented Immigrants State and Local Tax Contributions," Institute on Taxation and Economic Policy, 2017, https://itep.org/immigration/

124   "Mexico Got More Money from Remittances than from Oil Revenues in 2015," NBC News, February, 2016, Accessed May 23, 2017, http://www.nbcnews.com/news/latino/mexico-got-more-money-remittances-oil-revenues-2015-n510346

125   Bernal, Rafael, "Mexicans in the US Sending Less Money Homes," The Hill, May, 2016, Accessed May, 2017, http://thehill.com/latino/278655-mexicans-in-the-us-sending-less-money-home

126   "Consumer Expenditures—2015," Bureau of Labor Statistics, website visited November 2, 2016 (http://www.bls.gov/news.release/cesan.nr0.htm).

127   Zillow, "Texas Home Prices and Values," Accessed June, 2017, https://www.zillow.com/tx/home-values/

128   Passel, Jeffrey; Cohn, D'Vera, "A Portrait of Unauthorized Immigrants in the United States," Pew Hispanic Center, April, 2009, http://www.pewhispanic.org/files/reports/107.pdf

129   United States Census Bureau, "Quarterly Residential Vacancies and Homeownership," Second Quarter, 2017, https://www.census.gov/housing/hvs/files/currenthvspress.pdf

130   American Petroleum Institute, "State Motor Fuel Taxes," April, 2017, http://www.api.org/~/media/Files/Statistics/State-Motor-Fuel-Taxes-Report-Apr-2017.pdf

131   Gas Buddy, "24 Month Average Retail Price Chart," Data Accessed June, 2017, http://www.gasbuddy.com/Charts

132   U.S. Energy Information Administration, "Frequently Asked Questions: How Much Gasoline Does the United States Consume?," Accessed June, 2017, https://www.eia.gov/tools/faqs/faq.php?id=23&t=10

133   U.S. Department of Transportation, Federal Highway Administration, "Highway Finance Data Collection," 2011, https://www.fhwa.dot.gov/policyinformation/pubs/hf/pl11028/chapter4.cfm

134   Caplinger, Dan, "The 5 States Without Sales Tax," AOL Finance, May, 2013, Accessed June, 2017, https://www.aol.com/article/2013/05/05/the-5-states-with-no-sales-tax/20558414/

# Stay informed. Get Involved. Make a Difference!

FAIR is dedicated to promoting public understanding and critical thinking about immigration's impact on every aspect of life in America.

United with and supported by more than 500,000 concerned citizens who are willing to take action to secure our nation's future, we fight battles across the country against those who would exploit the national immigration policy to enhance their private interests or political power.

We believe our nation can and must have immigration policies that are nondiscriminatory and designed to serve the societal, environmental, and economic needs of our country. Recent polls show that the American public feels the same way.

## BOARD OF DIRECTORS

Donald A. Collins Jr., Chairman
Duane Austin
Douglas E. Caton (*Major General, U.S. Army Retired*)
James R. Dorcy

Kevin Donaleski
Sarah G. Epstein
Dale M. Herder, Ph.D.
Frank Morris, Ph.D.
Blake Swensrud II

## NATIONAL BOARD OF ADVISORS

The Hon. Brian Bilbray, Co-Chair
Donald A. Collins Sr., Co-Chair
Nancy S. Anthony
John Brock
The Hon. Louis Barletta
Sharon Barnes
Gwat Bhattacharjie
Gerda Bikales
J. Bayard Boyle Jr.
Hugh Brien
John Brock
Pat Choate, Ph.D.
Clifford Colwell, M.D.
Thomas Connolly
Alfred P. Doyle, M.D.
Paul Egan
Don Feder
Robert Gillespie
Otis W. Graham Jr., Ph.D.
Joseph R. Guzzardi
Robert E. Hannay
Hessie Harris
Lawrence #. Harrison
Sheriff Tom Hodgson

Diana Hull, Ph.D.
Glenn Jackson
Carol Joyal
The Hon. Richard Lamm
Roy C. Lierman
Donald Mann
Jack Martin
K.C. McAlpin
Joel McCleary
Scott McConnell
James G. McDonald, Esq.
Paul K. Nachman
Peter Nunez
Robert D. Park
Fred Pinkham, Ph.D.
Randall Pullen
Bruce S. Reid
Teela Roche
David P. Schippers, Esq.
The Hon. Alan Simpson
John Philip Sousa IV
John Tanton, M.D.
Alan N. Weeden
The Hon. Curtin Winsor Jr.

As America approaches a defining moment it its immigration history, your support is crucial to our fight for immigration policies that serve the interests of the American people.

## ENCLOSED IS MY DONATION OF:

○$1,000   ○$500   ○$250   ○$100   ○$50
○$25   ○Other $_____

## PAYMENT METHOD:

○ Check made payable to FAIR
○ Credit Card: ○Visa ○Mastercard ○Amex ○Discover

_____
Cardholder's Name

_____
Card Number

_____
Expiration Date        Signature

_____
Address

_____
City                           State
Zip

_____
Email

IN ADDITION TO MEMBERSHIP AND GENERAL DONATIONS, THERE ARE OTHER OPPORTUNITIES FOR SUPPORTING OUR WORK.

## PLEASE SEND ME INFORMATION ABOUT:

○ Becoming monthly Cornerstone Contributor
○ Seventh Generation Legacy Society estate planning
○ Corporate Gift Matching
○ Other ways to give

All contributions to FAIR are tax deductible.

TO LEARN MORE ABOUT FAIR, THE NEED FOR IMMIGRATION REFORM, AND WHAT YOU CAN DO, VISIT US ON THE WEB AT FAIRus.org.





# FAIR

Federation for American Immigration Reform
25 Massachusetts Avenue NW, Suite 330 | Washington, DC 20001
202.328.7004 |



© SEPTEMBER 2017 | FAIR HORIZON PRESS™ | ALL RIGHTS RESERVED | ISBN: 978-0-9978627-5-1



# The Elephant in the Classroom

## Mass Immigration's Impact on Public Education

A SPECIAL REPORT BY
MARC FERRIS AND SPENCER RALEY

FAIR

What Every Parent and Taxpayer Should Know About
Immigration and the Public Education Crisis

# Contents

Overview                                              5

The Scope of the Problem                              6

The Cost to Taxpayers                                 7

The Special Case ofUnaccompanied Alien Minors        11

Spending More, Getting Less                           13

Troubling Teacher Trends                             17

Conclusion                                           19

Recommendations                                      20

Background Statistics                                22

Methodology                                          24

Endnotes                                             25



# The Elephant in the Classroom
## Mass Immigration's Impact on Education

A special report by Marc Ferris and Spencer Raley | September 2016





© SEPTEMBER 2016 | FAIR HORIZON PRESS™ | ALL RIGHTS RESERVED | ISBN: 978-0-9978627-1-3



*Ratio of LEP certified to non-LEP certified teachers*

# Overview

Public school districts across the United States are suffering under a massive unfunded mandate imposed by the federal government: the requirement to educate millions of illegal aliens, the school age children of illegal aliens, refugees and legal immigrant students. FAIR estimates that it currently costs public schools $59.8 billion to serve this burgeoning population. The struggle to fund programs for students with Limited English Proficiency (LEP), sometimes called English Language Learners (ELL), represents a major drain on school budgets. Yet due to political correctness, it is taboo to raise the issue even though scarce resources are redirected away from American citizens to support programs like English for Speakers of Other Languages (ESOL) and English as a Second Language (ESL).

The influx of newcomers to the public schools is helping President Barack Obama fulfill the promise he made five days before his election in 2008 to "fundamentally [transform] the United States." Almost one in every ten students enrolled in public schools is designated as LEP. For kindergarteners, the figure is 17.4 percent. In 2013, the Department of Education determined that the United States will require 82,408 new certified or trained LEP teachers by 2018 at a cost of $6.3 billion in salaries and benefits on top of what is spent now—if school districts can find enough qualified candidates. Despite the growing LEP population, only 1 percent of teachers are certified or trained in ESL.[1]

## Factors Straining Public Schools

- A surge of Unaccompanied Alien Minors crossing the border from Mexico, Guatemala, Honduras and El Salvador beginning in 2014
- Family units entering the country illegally
- People overstaying their visas
- Higher-than-average birthrates among families with an illegal head-of-household
- Around a million legal immigrants granted permanent resident status every year since 2004

In addition, the spread of "sanctuary" policies across the country—cities, counties and two states (California and Connecticut) that refuse to cooperate with federal immigration agencies—also serves as a magnet for illegal aliens. Almost every school district highlighted in this report operates in an active sanctuary jurisdiction.[2]

# The Scope of the Problem

The federal government provides approximately 8 percent of public school funding. The rest comes from state and local resources split roughly down the middle. Regarding LEP programs, however, Congress contributes just over 1 percent of the cost. With school budgets shrinking across the country since 2008, it will become harder to absorb all the refugees and new immigrants who require LEP services without impacting other students. This year in Chicago, for example, the school system is preparing for "historic" budget cuts exceeding 20 percent that will require laying off teachers, trimming resources and increasing class sizes. In 2016, the average property tax bill in the city mushroomed by 13 percent over the previous year, but some residents of affluent neighborhoods saw their taxes increase as much as 90 percent. "The unfortunate truth is that the pain is not over," said a local attorney who specializes in real estate taxation. "It is just the beginning." Chicago and many other municipalities in Illinois tout their status as sanctuary districts, yet by 2018 the state will have to almost triple its current LEP outlay and spend $1.9 billion every year to educate 186,646 English language students.[3]

---

In many municipalities, LEP programs are growing faster than the school district's ability to run or fund them effectively

---

Nationwide, public school enrollment is projected to rise 6.3 percent to 53 million students between 2014 and 2024. Schools will require increased funding, but delivering a quality education to every pupil presents a challenge. Between 2008 and 2013, capital spending to upgrade facilities, add space or build new schools dropped 37 percent. And, 297,000 education jobs disappeared from 2008 through 2015 even as enrollment swelled by 804,000. The Center on Budget and Policy Priorities determined that at least 31 states "provide less support per student for elementary and secondary schools—in some cases, much less—than before the Great Recession" of 2008. Some states continue to cut even further. Though spending on education is expected to rise 27 percent from 2009 to 2022, when the overall outlay for public education is projected to reach $699 billion per year, the infrastructure is strained. According to the National Center for Education Statistics, 31 percent of all public schools have set up temporary trailers and modular spaces to accommodate the student overflow and 53 percent of schools need to "spend money on repairs, renovations and modernizations to put the school's onsite buildings in good overall condition."[4]

6 Adding to the burden, the number of LEP students in public schools jumped from around 3.5 million in 1998 to 4.93 million in 2013.[5] Currently, to educate 4.9 million LEP students nationwide, public school districts spent $21.5 billion in salaries for 346,776 LEP-certified

or trained teachers in 2013 and $6.9 billion in benefits, a total of $28.4 billion. Hempstead, New York, for example, spends almost 33 percent of all teacher salaries on the district's ELL program, not counting benefits, which FAIR calculates to cost just under a third of salaries. In addition to requiring a tremendous amount of money, at the end of the 2011 school year, for example, 1,817,842 teachers (55.6 percent of the total) taught at least one LEP student, even though as many as 1,471,066 teachers lack the certification or training to teach this population.[6]

In many municipalities, LEP programs are growing faster than the school district's ability to run—or fund—them effectively. In Alaska, California, Colorado, Nevada, New Mexico, Texas and Washington, D. C., 10 percent or more of all students are enrolled in LEP programs. The five states with the highest number of LEP students are California, Texas, Florida, New York and Illinois, respectively, which is unsurprising. It is startling, however, that the next five—Colorado, Washington, Virginia, North Carolina and Georgia, in order—are located far from the southern border and enroll at least 100,000 LEP students each (except for Georgia, which comes close at 98,603). The impact on schools is tangible: one out of every five students in Georgia and 40 percent of students in Denver—a sanctuary city—are enrolled in LEP programs. By contrast, New Jersey, a longstanding destination for immigrants, enrolls 68,396 LEP students.[7]

# The Cost to Taxpayers

Illustrating the impact of exploding LEP costs, 13 states spent more than $1 billion on LEP programs in 2016, including Colorado, Washington, Virginia, Georgia, Michigan and Maryland. By 2018, four states will need to find at least $1 billion in revenue on top of what they now spend to hire additional LEP teachers, including California ($20 billion), Texas ($2.4 billion), Illinois ($1.9 billion) and Nevada ($1.4 billion). Many other states will need to double, triple or even quadruple their LEP programs' salary budgets to manage the rising tide of LEP students in their schools.

In all but 14 states, the percentage of LEP students swelled between 2003 and 2013. Almost one in every 10 states serves more than 100,000 LEP students and 22 educate 50,000 or more. In urban areas, 14 percent of students are LEP. Though this demographic is the fastest-growing segment of the public school population in many areas, few districts are adequately dealing with this crisis as language programs eat up a growing share of local school budgets. In Boston, a sanctuary city where thousands of high school students walked out of classes in March 2016 to protest budget cuts, around a third of all students are enrolled in LEP programs. In Lexington, Nebraska, a meat-packing town in the western part of the state, the figure is almost 20 percent.[8]

7

The situation in Nashville is emblematic of the problem. With the number of ELL students in the city rising from 8,751 in 2011 to 12,329 in 2015, the district plans to boost funding and add 105 new positions to serve this population. In 2015, two new schools opened to accommodate 855 students. Spending on ELL programs represents the second highest percentage increase in the district's 2016-2017 budget after the rise in the total number of students. To compensate, however, the district is slashing funds for new textbooks and science kits. With city officials eager to accept and accommodate legal and illegal immigrants, local teacher Wendy Wilson wrote about the obvious, insidious "strain" on public education caused by the glut of LEP students, but lamented that raising the issue is forbidden due to fears of being branded a racist or xenophobe.[9]

In affluent Montgomery County, Maryland—a suburb of Washington, D. C. that champions sanctuary policies and openly welcomes illegal aliens—around 15 percent of all students attend the ESOL program, which has grown 42 percent since 2010. Over the same period, however, ESOL costs increased 53 percent to $462 million, indicating that spending is rising faster than enrollment. In Boston, moreover, LEP expenditures ballooned from $9.1 million in 2014 to $13.6 million despite a drop of 775 students in the program, which suggests that the district cannot properly manage the spiraling costs associated with this needy population. Two headlines, one from 2011, the other from 2015, suggest that Clark County, Nevada schools have been in a "crisis" mode over the LEP issue for years: "we're all going to sink," said the president of the state Board of Education in 2015. "This is horrific." Clark County, which includes Las Vegas, is a sanctuary jurisdiction.[10]

Though LEP spending is rising in school districts with high numbers of immigrants, overall outlays on education are dropping and the situation is dire. Based in large measure on the 1982 Supreme Court ruling Plyler v. Doe, the Obama administration decreed that school districts must fully accommodate the children of illegal aliens, offering a carrot (supplemental educational support) and a stick (threats of lawsuits). This mandate, along with rising enrollment, creates an acute need for educators who are capable of teaching LEP students and makes it difficult and expensive to keep schools properly staffed.[11]



## LEP Education Costs by State

WA $1.3B
OR $606.8M
ID $98.2M
MT $43.5M
ND $46.5M
MN $977M
WI $611.6M
MI $1.1B
NH $72.9M
VT $35.1M
ME $84.5M
NY $6B
SD $49.9M
WY $66.4M
IA $315.1M
PA $793.8M
MA $1.4B
RI $170.6M
CT $713.8M
NV $627.5M
UT $423.6M
NE $270.2M
IL $2.8B
IN $609.8M
OH $677.9M
WV $39M
VA $1.3B
NJ $1.6B
DE $140.5M
MD $1.1B
DC $156.9M
CA $16.1B
CO $1.2B
KS $608.9M
MO $312.7M
KT $240.3M
NC $976.5M
AZ $742.5M
NM $608.3M
OK $394.6M
AR $394.3M
TN $341.9M
SC $472.9M
MS $77M
AL $200.6M
GA $1B
TX $7.5B
LA $217.3M
FL $2.8B
AL $384.1M
HI $233.1M

*Legend:* States Spending at least $1B on LEP Education

\* Nationwide Estimate

| 3.618M | $12,128 | $43.9B |
|---|---|---|
| Total Illegal Students Nationwide | Average Cost per Illegal Student | Total Cost to Educate Illegal Aliens * |

# Current and Projected Costs for LEP Teachers

| State | Current LEP Teachers | Current Cost* | Additional Needed | Cost Increase* | Total New Cost* |
|---|---|---|---|---|---|
| California | 203,395 | $18.6 B | 17,104 | $1.6 B | $20.2 B |
| Florida | 49,654 | $3.1 B | Adequate # of teachers | | $3.1 B |
| Texas | 24,654 | $1.6 B | 13,297 | $844.4 M | $2.4 B |
| Illinois | 8,760 | $683.5 M | 15,897 | $1.2 B | $1.9 B |
| Nevada | 2,733 | $201.9 M | 16,111 | $1.2 B | $1.4 B |
| New York | 6,211 | $617.2 M | 2,025 | $201.2 M | $818.4 M |
| Colorado | 7,478 | $492.0 M | 1,500 | $98.7 M | $590.7 M |
| Arizona | 5,422 | $357.0 M | 1,317 | $86.7 M | $443.8 M |
| New Jersey | 3,987 | $362.1 M | 150 | $13.6 M | $375.7 M |
| Washington | 1,193 | $84.4 M | 2,232 | $157.8 M | $242.2 M |
| New Mexico | 2,887 | $177.5 M | 500 | $30.7 M | $208.2 M |
| Indiana | 2,179 | $148.0 M | 800 | $54.3 M | $202.3 M |
| Alabama | 2,910 | $184.2 M | 224 | $14.2 M | $198.4 M |
| Georgia | 2,195 | $153.2 M | 564 | $39.4 M | $192.6 M |
| Arkansas | 2,377 | $146.3 M | 549 | $33.8 M | $180.1 M |
| Massachusetts | 1,285 | $124.0 M | 500 | $48.3 M | $172.3 M |
| Wisconsin | 1,936 | $141.0 M | 281 | $20.5 M | $161.5 M |
| Minnesota | 1,361 | $101.1 M | 625 | $46.4 M | $147.5 M |
| Pennsylvania | 1,371 | $115. M | 331 | $27.8 M | $142.7 M |
| North Carolina | 1,711 | $103.8 M | 574 | $34.8 M | $138.6 M |
| Iowa | 500 | $34.0 M | 1,500 | $102.0 M | $136. M |
| Maryland | 1,023 | $88.1 M | 492 | $41.2 M | $129.3 M |
| Virginia | 1,240 | $81.6 M | 700 | $46.1 M | $127.7 M |
| Oregon | 838 | $65.0 M | 300 | $23.3 M | $88.3 M |
| Missouri | 478 | $30.0 M | 912 | $57.2 M | $87.2 M |
| Ohio | 745 | $57.1 M | 317 | $24.3 M | $81.4 M |
| Tennessee | 1,118 | $71.3 M | 116 | $7.4 M | $78.7 M |
| Connecticut | 721 | $66.4 M | 22 | $2.0 M | $68.4 M |
| Michigan | 532 | $43.2 M | 175 | $14.2 M | $57.5 M |
| Nebraska | 809 | $52.3 M | 80 | $5.2 M | $57.4 M |
| Oklahoma | 551 | $32.1 M | 400 | $23.3 M | $55.4 M |
| Louisiana | 493 | $34.8 M | 299 | $20.3 M | $55.0 M |
| Utah | 646 | $42.1 M | 85 | $5.5 M | $47.7 M |
| Idaho | 608 | $39.9 M | 50 | $3.3 M | $43.2 M |
| Dist of Columbia | 89 | $8.3 M | 345 | $32.3 M | $40.6 M |
| Hawaii | 297 | $21.3 M | 250 | $17.9 M | $39.2 M |
| Kentucky | 174 | $11.6 M | 405 | $26.9 M | $38.5 M |
| South Carolina | 536 | $33.9 M | 57 | $3.6 M | $37.5 M |
| Kansas | 132 | $8.3 M | 382 | $23.9 M | $32.2 M |
| Rhode Island | 312 | $26.1 M | 50 | $4.2 M | $30.3 M |
| Montana | 410 | $27.1 M | Adequate # of teachers | | $27.1 M |
| Alaska | 56 | $4.8 M | 173 | $15.0 M | $19.8 M |
| Mississippi | 91 | $5.0 M | 247 | $13.7 M | $18.7 M |
| Delaware | 153 | $12.1 M | 50 | $3.9 M | $16.0 M |
| Maine | 109 | $6.9 M | 120 | $7.6 M | $14.5 M |
| New Hampshire | 143 | $10.5 M | 30 | $2.2 M | $12.7 M |
| South Dakota | 24 | $1.3 M | 150 | $7.8 M | $9.1 M |
| Vermont | 78 | $5.4 M | 25 | $1.7 M | $7.1 M |
| North Dakota | 84 | $5.2 M | 25 | $1.6 M | $6.8 M |
| West Virginia | 33 | $2.0 M | 60 | $3.7 M | $5.7 M |
| Wyoming | 54 | $4.1 M | 10 | $.8 M | $4.9 M |

*Figures rounded after calculations

*Includes teacher salary and benefit costs

# The Special Case of Unaccompanied Alien Minors

Driving LEP costs even higher, it takes at least $1.7 billion each year to educate the almost 119,000 UAMs who crossed the border from Mexico, Guatemala, Honduras and El Salvador. And they are still arriving: UAM numbers are up 78 percent in the first half of FY2016 compared with the first six months of FY2015. There is little indication that this trend will end any time soon. In fact, it appears that in 2016 about the same number of UAMs will arrive in the United States that entered in 2014, a record-shattering year. From January 2014 to June 2016, the federal government placed 118,929 UAMs with sponsors in the United States, typically a relative or acquaintance. This figure does not include UAMs who may have slipped past the Border Patrol. Though teenagers make up the majority of UAMs, the highest increase is with children age 12 and under. Several states balked at receiving UAMs, but the Obama administration squelched all attempts to refuse their resettlement.

> The flood of new immigrants continues to devastate historically disadvantaged African-Americans, many of whom lag academically as resources are lavished on the newcomers, including those here illegally.

These developments illustrate the dramatic demographic transformation taking place in the Washington, D.C. area that is hitting taxpayers in the wallet. In Baltimore, Maryland (a sanctuary city), the school system announced at least 50 layoffs in 2016, including central office staff and school police officers. In 2015, Baltimore schools eliminated 202 positions to help tackle a $63 million budget shortfall, the first layoffs in a decade. Property taxes in Montgomery County, Maryland, will rise almost 9 percent in 2016, the largest spike in eight years. Also in 2016, Calvert County, Maryland, raised property taxes and income taxes for the first time since 1987 and 2004, respecti[...] is the case nationally, the flood of new immigrants continues [...] devastate historically disadvantaged African-Americans, ma[...] of whom lag behind academically as resources are lavished o[...] the newcomers, including those here illegally. After education officials in Prince George's County, Maryland, proposed building a new school and using a portion of another to accommodate the LEP population, the local NAACP chapter threatened to file a lawsuit. In Fairfax County, Virginia, officials bumped up property taxes by 6 percent in 2016, to help close a $68 million school budget gap.[12]



## State Spending on UAM Education



Other states with low average annual per pupil expenditures that traditionally attracted few immigrants are now taking in large numbers of UAMs. Thus, the overall cost figure of low-spending states like Georgia, North Carolina, Tennessee and Florida is less than in high-spending states like New York, New Jersey and Maryland. For example, Florida is absorbing the third highest number of UAMs nationwide but will only reach 40 percent of New York's outlay.

Many school districts in the heartland are also feeling the pinch, thanks to federally mandated LEP programs and the presence of UAMs. To deal with a $5.4 million school budget deficit in 2016, Omaha's Westside district plans to cut 18 teaching positions, gut the instrumental music program, replace elementary language teachers with computer software and dip into its reserve fund, among other measures. Despite these reductions, however, officials still plan to hire one additional LEP teacher. Omaha Public Schools, which earmarked $469 million in

## Highest UAM Populations by State



its 2011 general fund to serve 50,378 students, spent $557 million in 2015 to educate 52,906 pupils, just 2,528 additional students. In other words, the higher than average cost of LEP programs led to a budget increase of 16 percent to accommodate a mere 5 percent rise in the student population. The number of LEP students in Omaha, situated in a sanctuary county, has "steadily increased over the past several years," rising 397 percent since 2000 to now include more than 17,000 students. Since 2014, Nebraska absorbed 1,027 UAMs at an annual $15 million education price tag.[13]

Schools in Oklahoma are also experiencing budget shortfalls. Plummeting oil prices play a role, but the expansion of LEP programs contributes to the state's financial crunch. In May 2016, more than 1,100 Oklahoma City students walked out of their high schools to protest budget cuts of $30 million. One school laid off 20 teachers. "By firing our teachers, it's making our classes larger and it's disrupting the learning environment," said one student. "Sports, teachers . . . the arts program, they're all being cut here at the school," said another. How, then, will the state be able to spend $7 million educating 826 UAMs without affecting the rest of the school population? [14]

# Spending More, Getting Less

LEP students are more expensive to educate and the cost of these programs is rising. In a 2010 study, FAIR calculated that LEP costs nationwide totaled $51.2 billion (compared with $59.8 billion in 2016). Yet the underlying tragedy behind this mad dash to accommodate illegal aliens, refugees and legal immigrants is that despite all the money spent, there is little to show for it. LEP students consistently demonstrate dismal progress in all subject areas and the fallout is affecting other students.

Educators measure four categories of achievement: Below Basic, Basic, Proficient and Advanced. The National Assessment of Educational Progress (NAEP), administered by the U. S. Department of Education, indicates that only 7 percent of fourth grade LEP students performed at the Proficient level and just one percent demonstrated the ability to master Advanced work. That leaves 92 percent performing at Basic or Below Basic levels. In comparison, 40 percent of non-LEP fourth graders achieved the two highest levels, Proficient and Advanced, with one-third displaying Basic skills. The rest, 27 percent, scored Below Basic. Thus, even though non-LEP fourth graders perform better than their LEP counterparts, six of every 10 only manage to accomplish Basic or Below Basic work.[15]

As students progress through the system, achievement levels plunge. In 2015, eighth grade LEP pupils demonstrated a limited ability to grasp their school work: 71 percent are mired at the Below Basic level, one quarter acquired Basic skills and only 4 percent are Proficient. The percentage of students capable of Advanced work rounds out to zero. Results for 12th grade LEP students in reading are abominable: 76 percent demonstrate Below Basic skills—more

than three out of every four test-takers—and just 20 percent are at the Basic level. The failure extends beyond language because math scores are even worse: 79 percent Below Basic, 15 percent Basic. From 1998, when the Department of Education first administered the test, to 2015, the statistics for Advanced work in math and reading for LEP students round to zero.[16]

LEP student performance is so terrible that educators created a new term. Long Term English Language Learners (LTEL) are pupils who have been enrolled in school for six or more years but are making scant progress learning English. Three out of every five students in California fall into this category and the National Education Association estimates that nationwide, the term applies to anywhere from one quarter to half of all LEP students.[17]

> Also troubling, the performance of non-LEP students is sinking, according to the latest figures. An older study suggested that the presence of immigrants in schools "diminished the educational attainment of native minorities by meaningful amounts."

The low academic performance of LEP students also results in appalling graduation rates. Only 39 percent of LEP pupils in New York, 24 percent in Nevada and 20 percent in Arizona graduate on time. Of course, taxpayers continue to shell out for students who stay in high school longer than four years. Other states have higher rates, but just because someone graduates, there is no guarantee that schools are holding students to rigorous standards. Across the country, in fact, educators are lowering graduation requirements and making it harder to fail classes. Lexington, Nebraska, dropped graduation thresholds in part to accommodate its LEP population. In New York state, it is easier than ever to graduate from a public high school, but the results are tragic: the City University of New York, which absorbs a large proportion of New York City public school students, requires almost 80 percent of freshmen to take remedial courses that offer "basic skills that should have been taught in high school." New York City is, of course, a sanctuary city.[18]

An article in a Nashville newspaper about public schools "straining at the seams" chronicled an ELL student who maintained a B grade point average but lacked the ability to read or write English. In one LEP class, 35 students spoke 16 languages and displayed skills ranging from illiterate to high functioning, which made it "that much harder to tailor lesson plans." Several graduates of John Overton High School in Nashville returned to tell the principal that "they went out in to the world, only to find they lacked the English skills they should have gotten" in school. The mayor of Lynn, Massachusetts, admitted that adult illegal aliens are enrolled in city high schools, that illegal immigrant students often repeat grades and that an influx of immigrants is straining the school system and other city services.[19]



## NAEP Proficiency in Percentages by Grade, Subject, and LEP Status



KEY

= 100%

Below Basic   Basic   Proficient   Advanced

Also troubling, the performance of non-LEP students is sinking, according to the latest figures. An older study suggested that the presence of immigrants in schools "diminished the educational attainment of native minorities by meaningful amounts," a finding that has come to fruition. An unacceptable proportion of non-LEP eighth graders score Proficient or Advanced on the NAEP: just 18 percent in United States history, 27 percent in geography, 27 percent in writing and 33 percent in math. In 2015, only one out of every four high school seniors scored Proficient or above in math—38 percent scored Below Basic. In reading, 37 percent met the Proficient or Advanced benchmarks, meaning that almost two out of every three students display Basic and Below Basic skills. Nationwide, math and reading results for Proficient and Advanced work dipped a percentage point compared to 2013 results and non-LEP African-Americans and Hispanics consistently score worse than average on assessments.[20]

Expect this downward trajectory to continue. In 2015, one New York City student expressed shock when her public school handed her a diploma that she "didn't deserve" and pushed her out the door. Schools across the country are adopting lax policies that include accepting late work, allowing students to retake failed tests and doling out inflated grades that reward student effort rather than reflect mastery of the material. As this disconcerting development becomes more prevalent around the country, critics complain that students quickly learn how to game the system to graduate, despite having learned little during their years in school. "Many students have already started to figure out that they don't have to do very much but they can still pass," said one teacher in Fairfax County, Virginia.[21]

In addition to padding graduation statistics, school districts have found another way to gloss over the LEP problem: cheating. Educators in Houston, Atlanta, Philadelphia and Washington, D.C. changed answers on tests to boost results. Several teachers and administrators went to prison over the Atlanta scandal (three received seven year sentences). Like many districts across the country, including Montgomery County, Maryland, school

classes with End-of-Course exams, allegedly so that those students' scores would not be counted in scores used to judge the schools." One teacher testified that as far back as 2010, "immigrant students were pulled from English II—which counted against the scores for the school—and put into English IV, which did not count." As one bold Nashville teacher put it, government officials and their education lackeys want it all: "a welcome mat rolled out for immigrants, who require numerous supports, and high graduation rates and test scores."[22]

# Troubling Teacher Trends

One impediment to improvement is that LEP teacher training and certification is uneven across the country. Florida requires all teachers to acquire training in LEP instruction. Other states offer full LEP certification or supplemental training for teachers certified in other subject areas. Also complicating matters, Spanish is spoken by 76.5 percent of LEP students, yet Arabic, Chinese, Vietnamese, Hmong, Haitian Creole, Somali, Russian, Korean, Tagalog and Urdu speakers are also prevalent. Despite the hodgepodge of languages spoken in a given LEP classroom, teachers are expected to provide a quality education to all.[23]

In Portland, Maine, a sanctuary city more than 2,000 miles from the southern border, 27 percent of public school students are enrolled in LEP programs and 36 percent of students speak a primary language other than English at home.

## 10 Most Common Home Languages of LEP Students



| | |
|---|---|
| Spanish/Castilian | 76.5% |
| Arabic | 2.2% |
| Chinese | 2.2% |
| English | 1.9% |
| Vietnamese | 1.8% |
| Hmong | 0.8% |
| Haitian/Haitian Creole | 0.8% |
| Somali | 0.7% |
| Russian | 0.7% |
| Korean | 0.7% |

17

In Nashville, for example, ELL students speak more than 120 languages and LEP students make up 14 percent of the total school population. In Portland, Maine, a sanctuary city more than 2,000 miles from the southern border, 27 percent of public school students are enrolled in LEP programs and 36 percent of students speak a primary language other than English at home. Of the 59 languages spoken, the largest groups are, in order: Somali, Arabic, Spanish, French, Vietnamese, Khmer, Portuguese, Kinyarwanda and Acholi. Like other districts with large LEP programs, student performance is poor, with 30 percent of all high schoolers performing Proficient or above in math and 43 percent performing the same in reading.[24]

In addition to a growing teacher-student ratio that began during the Great Recession in 2008, along with a decline in annual spending per pupil, adjusted for inflation, another obstacle to delivering a quality education to all students is the high rate of teacher burnout and turnover. Nationwide, 8 percent of all teachers leave the profession each year. In Colorado, "more teachers left the school districts where they work [in 2014] than at any point in the past 15 years." The state's turnover rate grew from 13.1 percent in 2009 to 17.1 percent in 2014, but in Denver, the numbers are 14 percent and 22 percent, respectively. A third of all teachers in the Harrison 2 school district of Colorado Springs vacate their jobs every year. Oklahoma teachers also leave at a high rate: 17 percent of first year teachers leave the state and in urban areas, 24 percent of all teachers abandon their schools every year. In Nebraska, moreover, 18 percent of school principals leave their jobs annually. The Georgia Department of Education issued a report in December 2015 titled "Georgia's Teacher Dropout Crisis: A Look at Why Nearly Half of Georgia Public School Teachers Are Leaving the Profession."[25]



# Conclusion

Across the country, public schools are grappling with budget shortages and lagging achievement. And, as UAMs and families continue to stream across the southern border, the Obama administration is exacerbating the situation by flying in UAMs from Central America to reunite with family members and shepherding refugees to our shores.[26] By any measure, taxpayers are paying more for LEP programs and getting less from their investment. As one student protesting the Oklahoma City school budget cuts put it, "our generation is the future . . . and if children [aren't] learning to read and write because their classes are overcrowded and there's not enough teachers, our generation from here on out will become nothing but illiterate and ignorant."[27]

As standards drop and student achievement declines across the country, LEP programs are draining resources for all students. Yet educators and politicians, who use political correctness and name-calling to avoid debating the issue's merits, display a shameful lack of accountability. Only by changing course can the nation avoid a bleak future, but the time to act is now.

Case 6:22-cv-01130-DCJ-CBW   Document 218-17   Filed 01/29/24   Page 454 of 503 PageID #: 12728

# Recommendations

## Overturn Plyler v. Doe

The Supreme Court's Plyler decision is currently interpreted to require that states educate illegal aliens and the children of illegal aliens. Since federal money only covers approximately 1 percent of education costs for LEP students, this decision created one of the largest unfunded mandates ever enacted by the U.S. government. Free education is attractive to illegal aliens. Families with an illegal head of household already average a tax deficit of more than $14,000, so the entire cost of this mandate is shouldered by United States taxpayers. One way to challenge the ruling would be for legislatures to pass a law requiring that school districts gather immigration information on their students and attempt to demonstrate that the cost of educating illegal aliens represents a financial burden, one of the requirements mentioned in the majority opinion.[28]



## Amend the William Wilberforce Trafficking Victims Protection Reauthorization Act

Originally designed to protect victims of human trafficking from possibly falling back into the hands of cartel members and smugglers, the 2008 Wilberforce Trafficking Act has since been hijacked as an avenue to resettle UAMs in the United States. This act must be reformed in a manner that allows the United States to process UAMs and reunite them with their families and homes outside the U.S. in an expedited manner while simultaneously protecting victims of human trafficking. FAIR recommends the passage of the Protection of Children Act of 2015, or a bill with similar content, that closes the loopholes in the original act preventing the removal of UAMs.[29]



## Remove Incentives that Attract Families into the U.S. Illegally

As long as the rewards for illegal immigration outweigh the risk, families will continue flooding across the border unlawfully. The ability to find work is the primary draw for illegal immigration, so mandating the use of E-Verify will help stop employers from hiring illegal aliens. Other benefits for illegal aliens also have an impact. Providing



incentives like free lunch programs and taxpayer-funded English language classes entice families to immigrate illegally. States that offer drivers' licenses, like Maryland and California, for example, see a disproportionate number of illegal aliens settle in their state.[30]

## End "Sanctuary" Policies

One of the largest incentives for illegal immigrants to resettle their families in the United States is the existence of more than 300 unconstitutional "sanctuary" cities, which prohibit local and state law enforcement from cooperating with federal authorities regarding an individual's immigration status. States like California, with broad sanctuary policies in effect statewide, are also the ones where the cost of educating LEP students are highest and place a disproportionately larger tax burden on law-abiding citizens. Eliminating consequences for breaking our immigration laws encourages illegal immigration.[31]



## Limit Overall Immigration

In addition to ending incentives for illegal immigrants, FAIR recommends that legal immigration be capped at 300,000 annually, as opposed to the million or so admitted each year since 2005. Immigration policy should also abolish family chain migration and limit it to spouses and unmarried minor children as opposed to extended family members, which would alleviate the burden placed on schools.



## Secure the Borders

With families and UAMs able to cross the border almost at will, schools have to absorb tens of thousands of new illegal aliens every year. Secure borders will also increase the effectiveness of deportations, since the current situation nullifies immigrant enforcement mechanisms. Once the border is secure, we can robustly and uniformly enforce our immigration laws knowing that once someone is deported, he or she cannot simply come back at will.



455 of 503 PageID #:
12729

# Background Statistics

## There are **50.1 million** students enrolled in U.S. public schools.[32]



**4.9 million** of public school students receive Limited English Proficiency education.

**3.6 million** of the LEP students are illegal aliens or the children of illegal aliens (119,000 Unauthorized Alien Minors).

**17.4 percent** of kindergartners are enrolled in LEP programs. LEP students tend to perform poorly in core subjects. In 2015, **76 percent** of LEP students scored Below Basic on a national reading test.

---

## The U.S. has **3.1 million** full-time equivalent public school teachers.[33]

**346,776** are LEP certified. In the 2013-2014 school year, the national cost for LEP teachers was **$28.4 billion**.

By 2018, an additional **82,408** LEP teachers will be needed nationwide to serve the student population. This will increase total LEP teacher costs to **$34.7 billion**.



## It costs **$59.8 billion** to educate LEP students (**$12,128** per student).

LEP student eduation costs are **$1,365** higher than the national average per student. The Federal government pays **$637 million** towards these costs, leaving the lion's share of **$59.2 billion** to be borne by states and municipalities

**$44.8 billion** in taxes are used to educate illegal aliens and the children of illegal aliens.



---

## The average illegal immigrant household receives **$24,721** in tax benefits.





| Illegal Immigrant[34] | Lawful Immigrant[35] | Native[36] |
|---|---|---|
| Avg. taxes: **$10,334** | Avg. taxes: **$30,879** | Avg. taxes: **$30,916** |
| Avg. benefits: **$24,721** | Avg. benefits: **$35,223** | Avg. benefits: **$31,226** |
| Avg. deficit: **$-14,387** | Avg. deficit: **$-4,344** | Avg. deficit: **$-310** |

*Based on 2010 Census*

# Methodology

To determine the approximate number of refugees, legal immigrants and illegal aliens in the public school system, the Pew Research Center[37] ratio of students with illegal alien parents during the 2012-2013 school year is applied in contrast to the national number of K-12 students overall, as documented by the National Center for Education Statistics (NCES). This number has changed less than 0.4 percent nationwide since Pew Research released its last ratio of illegal to legal students at the beginning of the 2012 school year. Since 2006, this ratio has fluctuated less than 0.6 overall and there is a lack of data suggesting a change in this ratio except for a surge of UAMs beginning in 2014, which is included in the estimate of 3.6 million illegal alien students.[38] The National Clearinghouse for English Language Acquisition (NCELA) estimates that just over 4.9 million students are enrolled in LEP programs. Excluding a miniscule number of Native Americans, this population consists entirely of immigrants, legal and illegal, and their children.[39]

Roughly 10 percent of all children born in the Unites States are the children of illegal aliens.[40] The federal government recognizes these children as United States citizens and excludes them in the overall data they release specifically concerning illegal immigrants. This makes it harder to track the overall impact that illegal immigration places on the shoulders of Americans and their exclusion misrepresents the facts, since they would have been born outside the United States had their parents not come here illegally. The vast majority of these minors who are still in school are enrolled in LEP programs. Due to high birthrates, the children of illegal immigrants make up twice the population share of newborns than do their parents. Excluding the four in five children of illegal immigrants born in the United States, therefore, makes the overall negative impact illegal immigration is having on schools appear less severe.[41]

To calculate the national and state-by-state costs of LEP education, the average cost per LEP pupil must be factored in for each state. The NCES reports the average cost-per pupil at $10,763.[42] Data drawn from NCELA, Pew Research, FAIR, NCES and an extensive analysis of district budgets across the U.S. place the national average cost to educate an LEP pupil at about 20 percent above the national average cost to educate all students. The brunt of these costs consist of providing salaries and benefits to hundreds of thousands of LEP teachers, followed by additional requirements for tutoring, bilingual textbooks and material, additional administrative tasks and facility enlargement/enhancement needed to incorporate the increased number of students. This percentage is then adjusted proportionally to align with the more or less expensive per pupil costs in each state. The additional cost to educate an LEP student is then added to the base average cost and multiplied by the number of LEP students in the state, providing the total figure. The amount of federal aid provided is then subtracted and the remaining figure is the total cost borne by individual states and municipalities.

To determine the total salaries and projected salaries of LEP teachers, both nationally and on a state-by-state basis, FAIR multiplied the NCELA figures for current and projected teachers for each state by the NCES average teacher salary for each state. Based on a close analysis of multiple state and district budgets across the U. S., an estimate of 32 percent is added to each state salary total for teacher benefits.

# Endnotes

[1] "English Language Learners in Public Schools," May 2016, NCES, http://nces.ed.gov/programs/coe/indicator_cgf.asp;

Lauren Camera, "Wanted: Bilingual Teachers," U.S. News, October 16, 2015, http://www.usnews.com/news/articles/2015/10/16/us-faces-shortage-of-bilingual-teachers;

Face the Facts USA, "Limited-English Students Test Public Schools," August 2013, http://www.facethefactsusa.org/facts/limited-english-students-test-public-schools

[2] Title III State Profiles, NCELA, http://www.ncela.us/t3sis/;

[3] "The Federal Role in Education," U. S. Department of Education, http://www2.ed.gov/about/overview/fed/role.html

Lauren Jiggetts, "Chicago Public Schools Planning Historic Budget Cuts," NBC Chicago, May 12, 2016, http://www.nbcchicago.com/news/local/Chicago-Public-Schools-Planning-Historic-Budget-Cuts-379296681.html

Hal Dardick, "Chicago Property Tax Bill Double Whammy: Increases Plus an Assessment Hike," Chicago Tribune, July 31, 2016, http://www.chicagotribune.com/news/local/politics/ct-chicago-property-tax-double-whammy-met-20160731-story.html

[4] Michael Leachmon, Nick Albares, Kathleen Masterson, Marlana Wallace, "Most States Have Cut School Funding, and Some Continue Cutting," Center on Budget and Policy Priorities, January 2016, http://www.cbpp.org/sites/default/files/atoms/files/12-10-15sfp.pdf;

Table 203.20, Enrollment in Public Elementary and Secondary Schools, by Region, State, and Jurisdiction: Selected Years, Fall 1990 Through Fall 2024, NCES, http://nces.ed.gov/programs/digest/d14/tables/dt14_203.20.asp?current=yes;

Debbie Alexander, Laurie Lewis, John Ralph, "Condition of America's Public School Facilities: 2012-2013," NCES, March 2014, http://nces.ed.gov/pubs2014/2014022.pdf;

William J. Hussar, Tabitha M. Bailey, "Projection of Education Statistics," Forty-First Edition, National Center for Education Statistics, February 2014, p. 16, https://nces.ed.gov/pubs2014/2014051.pdf

[5] Ariel G. Ruiz Soto, Sarah Hooker, Jeanne Batalova, "States and Districts with the Highest Number and Share of English Language Learners," Migration Policy Institute, 2015, http://www.migrationpolicy.org/research/states-and-districts-highest-number-and-share-english-language-learners

[6] Schools and Staffing Survey, NCES, 2011-2012, https://nces.ed.gov/surveys/sass/tables/sass1112_498_t1n.asp;

Hempstead UFSD 2014-2015 Proposed Budget, http://www.hempsteadschools.org/Page/107;

Salary Calculations based on data retrieved from the National Clearinghouse for English Language Acquisition (NCLEA) and the NCES, 2012-2013 school year, http://www.ncela.us/t3sis/;

21 Table 211.60, Estimated Average Annual Salary of Teachers in Public Elementary and Secondary Schools, by State: Selected Years, 1969-70 Through 2012-13, NCES, http://nces.ed.gov/programs/digest/d13/tables/dt13_211.60.asp

7 Migration Policy Institute, "Education Reform in a Changing Georgia: Promoting High School and College Success for Immigrant Youth," March 2014, http://www.migrationpolicy.org/research/education-reform-changing-georgia-promoting-high-school-and-college-success-immigrant-youth;

Press Release, "U.S. Department of Education and Justice Release Joint Guidance to Ensure English Learner Students Have Equal Access to High-Quality Education," U.S. Department of Education, January 7, 2015, http://www.ed.gov/news/press-releases/us-departments-education-and-justice-release-joint-guidance-ensure-english-learn

8 Number and Percentage of Public School Students Participating in Programs for English Language Learners By State: Selected years, 2003-04 through 2013-14, Table 204.20, http://nces.ed.gov/programs/digest/d15/tables/dt15_204.20.asp;

"English Language Learners in Public Schools," http://nces.ed.gov/programs/coe/indicator_cgf.asp;

"The Condition of Education 2016," National Center for Education Statistics, p. 88; pp. 92-93, http://nces.ed.gov/pubs2016/2016144.pdf;

Allison Pohle, "More Than 2,000 Boston Public School Students Walk Out of Class to Protest Budget Cuts," Boston Globe, March 7, 2016, http://www.boston.com/news/local-news/2016/03/07/more-than-2000-boston-public-school-students-walk-out-of-class-to-protest-budget-cuts;

Boston Public Schools FY15 Weighted Student Funding Budget Template, http://bostonpublicschools.org/cms/lib07/MA01906464/Centricity/Domain/184/FY15%20budget%20resources/WSF%20School%20Templates%20FY15.pdf

Jonathon Braden, "Federal Policy at Root of Grad Requirement Shifts," Lexington Clipper-Herald, March 7, 2011, http://lexch.com/news/local/federal-policy-at-root-of-grad-requirement-shifts/article_a6441bb4-b74d-5dfc-a585-ec4201befe15.html

9 Jason Gonzales, "Nashville Schools Have Thousands of ELL Students," Tennessean, November 14, 2015, http://www.tennessean.com/story/news/education/2015/11/14/nashville-schools-have-thousands-ell-students/75704226/;

Jason Gonzales, Melanie Balakit, "Nashville School Board Budget Puts Priority on English Services," Tennessean, April 12, 2016, http://www.tennessean.com/story/news/education/2016/04/12/nashville-school-board-budget-puts-priority-english-services/82816924/;

Jason Gonzales, "Nashville Schools Lay Out Plan to Target ELL Needs," Tennessean, September 23, 2015, http://www.tennessean.com/story/news/education/2015/09/22/nashville-schools-lay-out-plan-target-ell-needs/72625384/;

Wendy Wilson, "Come See What Mass Immigration Looks Like In My School," The Federalist, March 3, 2016, http://thefederalist.com/2016/03/21/come-see-what-mass-immigration-looks-like-in-my-school/

10 Bill Turque, Donna St. George, "Proposed Montgomery County Budget Has Biggest Property-Tax Hike in Eight Years," Washington Post, March 15, 2016, https://www.washingtonpost.com/local/md-politics/montgomery-proposes-property-tax-hike/2016/03/15/c45c9a9e-e9f2-11e5-bc08-3e03a5b41910_story.html;

Boston Public Schools FY15 Weighted Student Funding Budget Template, http://bostonpublicschools.org/budget;

Lynnette Curtis, "Budget Crisis Could Sink English Language Learner Program," Las Vegas Review-Journal, April 24, 2011, http://www.reviewjournal.com/news/education/budget-crisis-could-sink-english-language-learner-program;

Trevon Milliard, "Schools in 'Crisis': Nevada Short Nearly 1,000 Teachers," Reno Gazette-Journal, October 9, 2015, http://www.rgj.com/story/news/education/2015/10/08/schools-crisis-nevada-short-

nearly-1000-teachers/73618992/

11 "Joint 'Dear Colleague' Letter," U.S. Department of Justice, U.S. Department of Education, 2011, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201101.html

Jens Manuel Krogstad, Ana Gonzalez-Barrera, Mark Hugo Lopez, "Fact Tank, Children 12 and Under Are Fastest Growing Group of Unaccompanied Minors at U.S. Border," Pew Research, http://www.pewresearch.org/fact-tank/2014/07/22/children-12-and-under-are-fastest-growing-group-of-unaccompanied-minors-at-u-s-border/

"UAMs and Family Unite Border Surge Continues Undeterred," FAIR Legislative Update, June 6, 2016, http://www.fairus.org/legislative-updates/legislative-update-6-28-2016;

Chance Seales, "Unaccompanied Children Crossing Southern Border Up 78% in 2016," KRQE, June 21, 2016, http://krqe.com/2016/06/21/unaccompanied-children-crossing-southern-border-up-78-in-2016/

12 Erica L. Green, "Baltimore Teachers Union Calls on School District to Rescind Layoff Notices," Baltimore Sun, May 27, 2016, http://www.baltimoresun.com/news/education/bs-md-ci-union-layoff-letter-20160527-story.html;

Erica L. Green, "City Schools Lay Off Employees in Central Office Shake-Up," Baltimore Sun, May 27, 2015, http://www.baltimoresun.com/news/maryland/education/blog/bal-layoff-notices-go-out-at-city-school-headquarters-20150526-story.html;

"Tax Increase Proposed in Local County," Bay Net, April 29, 2016, http://www.thebaynet.com/articles/0416/tax-increase-proposed-in-local-county.html;

Armando Trull, "Prince George's County Opening Special Schools for English Language Learners," WAMU 88.5, March 3, 2015, http://wamu.org/news/15/03/03/special_schools_for_english_language_learners_plan_in_prince_georges_courts_controversy

Karen Goff, "Supervisors Approve Budget With Tax Hike For Fairfield County Home Owners," Reston Now, April 26, 2016, https://www.restonnow.com/2016/04/26/supervisors-approve-budget-with-tax-hike-for-fairfax-county-homeowners/

13 Omaha Public Schools 2015-2016 Budget; Erin Duffy, "Westside's $4 Million In Proposed Cuts Include Teachers, Summer Programs, Bus Routes," Omaha World-Herald, March 3, 2016, http://www.omaha.com/news/education/westside-s-million-in-proposed-cuts-include-teachers-summer-program/article_7136d097-ba94-5f50-8fa6-5fe64d17d854.html;

"Report to the Community, 2014-2015," Omaha Public Schools, http://district.ops.org/DEPARTMENTS/GeneralFinanceandAdministrativeServices/DistrictCommunications/Documents.aspx

14 Tim Willert, "Hundreds of Students Walk Out to Protest Budget Cuts," Oklahoman, May 16, 2016, see video, http://newsok.com/article/5498469

15 All achievement figures from the Nation's Report Card, http://www.nationsreportcard.gov/

16 ibid

17 Laurie Olson, "Meeting the Unique Needs of Long Term English Language Learners," National Education Association, 2014, http://www.nea.org/assets/docs/15420_LongTermEngLangLearner_final_web_3-24-14.pdf

18 Graduation figures from www.ncela.us;

Carl Campanile, "New Plan Still Might Let Students Who Flunk Regents Graduate," New York Post, January 11, 2016, http://nypost.com/2016/01/11/education-officials-want-to-make-it-easier-for-students-to-skip-regents-exams/;

Jonathon Braden, "Federal Policy at Root of Grad Requirement Shifts," Lexington Clipper-Herald, March 7, 2011, http://lexch.com/news/local/federal-policy-at-root-of-grad-requirement-shifts/article_a6441bb4-b74d-5dfc-a585-ec4201befe15.html;

"Shocker: 80% of NYC Graduates Unable to Read," March 10, 2013, https://www.rt.com/usa/nyc-graduates-unable-to-read-011/

[19] Andrea Zelinski, "As Nashville's Immigrant Population Grows, Metro Public Schools are Straining at the Seams," Nashville Scene, October 16, 2014, http://www.nashvillescene.com/nashville/as-nashvilles-immigrant-population-grows-metro-public-schools-are-straining-at-the-seams/Content?oid=4738332;

Ryan Lovelace, "Adult Illegal Immigrants Posing as Children to Enroll in High School," National Review, July 11, 2014, http://www.nationalreview.com/article/382483/adult-illegal-immigrants-posing-children-enroll-high-school-ryan-lovelace;

"Lynn Officials: Illegal Immigrant Children are Stressing City Services," WFXT Fox 25, July 14, 2014, http://www.fox25boston.com/news/lynn-officials-illegal-immigrant-children-are-stressing-city-services/142063086

[20] Julian R. Betts, "Have Inflows of Immigrants Diminished Natives Educational Attainment? A Review," Public Policy Institute of California, 1999, p. 8, http://www.ppic.org/content/pubs/op/OP_399JBOP.pdf

[21] Melissa Mejia, "Student's Stunning Plea: Why Did NYC Let Me Graduate High School?" New York Post, August 2, 2015, http://nypost.com/2015/08/02/students-stunning-plea-why-did-nyc-let-me-graduate-high-school/;

Moriah Balingit, Donna St. George, "Is It Becoming Too Hard For Students to Fail in School," Washington Post, July 6, 2016, https://www.washingtonpost.com/local/education/is-it-becoming-too-hard-to-fail-schools-are-shifting-toward-no-zero-grading-policies/2016/07/05/3c464f5e-3cb0-11e6-80bc-d06711fd2125_story.html

[22] Lois Beckett, "America's Most Outrageous teacher Cheating Scandals," ProPublica, April 1, 2013, https://www.propublica.org/article/americas-most-outrageous-teacher-cheating-scandals;

Vince Lattanzio, "Philadelphia Teachers, Principal Charged in Test Cheating Scandal," NBC10 Philadelphia, May 8, 2014, http://www.nbcphiladelphia.com/news/local/Teachers-Principal-Charged-in-Philadelphia-School-Cheating-Scandal-258455781.html

Press Release, "Former EPISD Superintendent Garcia Sentenced to Federal Prison," October 2012, Federal Bureau of Investigation, https://www.fbi.gov/elpaso/press-releases/2012/former-e.p.i.s.d.-superintendent-garcia-sentenced-to-federal-prison;

Tony McConkey, "Maryland Schools Cheating Scandal," Delegate Tony McConkey's Official Blog, November 29, 2013, http://www.leg33.com/maryland-schools-cheating-scandal/;

D. Patel, "Testing Scandal Raises Questions About Maryland Public Education Claims," Montgomery County GOP, December 8, 2013 http://mcgop.com/2013/12/08/testing-scandal-raises-questions-about-maryland-public-education-claims/;

Phil Williams, "Educators Question MNPS Handling of Immigrant Students," WTVF, February 1, 2016, http://www.newschannel5.com/news/newschannel-5-investigates/educators-question-mnps-handling-of-immigrant-students

Wendy Wilson, "Come See What Mass Immigration Looks Like In My School," The Federalist, March 3, 2016, http://thefederalist.com/2016/03/21/come-see-what-mass-immigration-looks-like-in-my-school/

[23] "English Language Learners in the Public Schools," NCES, http://nces.ed.gov/program\s/coe/indicator_cgf.asp

[24] Jason Gonzalez, "Nashville Schools Have Thousands of ELL Students," Tennessean, November 14, 2015, http://www.tennessean.com/story/news/education/2015/11/14/nashville-schools-have-thousands-ell-students/75704226;

"English Language Learners in the Public Schools," NCES, http://nces.ed.gov/programs/coe/indicator_cgf.asp;

"Fact Facts," Portland Public Schools, Fall 2015, https://www2.portlandschools.org/UserFiles/Servers/Server_1094153/File/District%20Information/Fast%20Facts%20Fall%202015.1.compressed.pdf

[25] "The Condition of Education 2016," NCES, pp. 126-127, p. 134, http://nces.ed.gov/pubs2016/2016144.pdf

Rebecca Goldring, Soheyla Taie, Minsun Riddles, "Teacher Attrition and Mobility: Results From the 2012-2013 Teacher Follow Up Survey," NCES, September 2014, p. 3, http://nces.ed.gov/pubs2014/2014077.pdf;

Matthew D. Hendricks, "An Empirical Analysis of Teacher Salaries and Labor Market Outcomes in Oklahoma," Oklahoma Business & Education Coalition, http://www.ossba.org/Websites/ossba/images/Teacher_Pay_Study/Teacher_Pay_FINAL_revised_cw.pdf;

Nebraska Educators Equity Plan, Elementary and Secondary Education Act (ESEA) Sections 1111 (b)(8)(C) and Section 1111 (e)(2) June 1, 2015, https://www.education.ne.gov/federalprograms/Documents/Main%20Page/Nebraska%20Educator%20Equity%20Plan%20%20REVISIONS%208%204%2015.pdf;

Stephen J. Owens, "Georgia's Teacher Dropout Crisis: A Look at Why Nearly Half of Georgia Public School Teachers Are Leaving the Profession," Georgia Department of Education, December 2015, http://www.gadoe.org/External-Affairs-and-Policy/communications/Documents/Teacher%20Survey%20Results.pdf;

Jaclyn Zubrzycki, "More Teachers Left Their School Districts Last Year," Chalkbeat.com, May 28, 2015, http://www.chalkbeat.org/posts/co/2015/05/28/more-colorado-teachers-left-their-school-districts-last-year/#.V3PfWLsrIdU

[26] Dale Wilcox, "Just Before Election, Obama Doubles Down on Illegal Immigrant Fly-In Program," The Hill, July 29, 2016, http://thehill.com/blogs/congress-blog/judicial/289742-just-before-election-obama-doubles-down-on-illegal-immigrant-fly

[27] Tim Willert, "Hundreds of Students Walk Out to Protest Budget Cuts," Oklahoman, May 16, 2016, see video, http://newsok.com/article/5498469;

[28] "Plyler v. Doe," Oyez, https://www.oyez.org/cases/1981/80-1538

[29] "William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008," http://www.state.gov/j/tip/laws/113178.htm

[30] Carl Hulse, "Immigrant Surge Rooted in Law to Curb Child Trafficking," New York Times, http://www.nytimes.com/2014/07/08/us/immigrant-surge-rooted-in-law-to-curb-child-trafficking.html

[31] Bryan Griffith, Jessica Vaughan, Marguerite Telford, "Map: Sanctuary Cities, Counties, and States," Center for Immigration Studies, Updated March 3, 2016, http://cis.org/Sanctuary-Cities-Map

[32] Fast Facts, Enrollment for Fall, 2015, National Center for Education Statistics (NCES), http://nces.ed.gov/fastfacts/display.asp?id=372

[33] ibid

[34] Robert Rector, Jason Richwine, "The Fiscal Cost of Unlawful Immigrants and Amnesty to the U.S. Taxpayer," Heritage Foundation, 2010, http://www.heritage.org/research/reports/2013/05/the-fiscal-cost-of-unlawful-immigrants-and-amnesty-to-the-us-taxpayer

[35] ibid

[36] ibid

[37] Pew Research Center, "Unauthorized Immigrant Totals Rise in 7 States, Fall in 14," November 2014, p. 8, http://www.pewhispanic.org/files/2014/11/2014-11-18_unauthorized-immigration.pdf

[38] FAIR estimate based on Pew Research and Border Patrol statistics from 2014 to June 2016; Jeffrey

S. Passel, D'Vera Cohn, "A Portrait of Unauthorized Immigrants in the United States," April 14, 2009, http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/;

Press Release, "United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016," United States Customs and Border Protection, https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016

[39] Title III State Profiles, NCELA, http://www.ncela.us/t3sis/

[40] "Ten Percent of Births in U.S. to Illegal Aliens," FAIR Legislative Update, May 5, 2015, http://www.fairus.org/legislative-updates/legislative-update-5-5-2015#1

[41] Jeffery Passel, Paul Taylor, "Unauthorized Immigrants and Their U.S.-Born Children," Pew Research, August, 11, 2010, http://www.pewhispanic.org/2010/08/11/unauthorized-immigrants-and-their-us-born-children/

[42] Table 4, "Revenues and Expenditures for Public and Secondary Education: 2012-2013," NCES, http://nces.ed.gov/pubs2015/2015301.pdf

# Stay informed. Get Involved. Make a Difference!

FAIR is dedicated to promoting public understanding and critical thinking about immigration's impact on every aspect of life in America.

United with and supported by more than 500,000 concerned citizens who are willing to take action to secure our nation's future, we fight battles across the country against those who would exploit the national immigration policy to enhance their private interests or political power.

We believe our nation can and must have immigration policies that are nondiscriminatory and designed to serve the societal, environmental, and economic needs of our country. Recent polls show that the American public feels the same way.

## BOARD OF DIRECTORS

Donald A. Collins Jr., Chairman
Duke Austin
Sharon Barnes
Douglas E. Caton
*Major General, U.S. Army Retired*

James R. Dorcy
Sarah G. Epstein
Dale M. Herder, Ph.D.
Frank Morris, Ph.D.
Blake Swensrud

## NATIONAL BOARD OF ADVISORS

The Honorable Louis Barletta
Gwat Bhattacharjie
Mrs. Gerda Bikales
The Honorable Brian Bilbray
J. Bayard Boyle, Jr.
Hugh Brien
John Brock
Frances Burke, Ph.D.
William W. Chip, Esq.
Pat Choate, Ph.D.
Donald Collins, Sr.
Clifford Colwell, M.D.
Thomas A. Connolly
Kevin Donaleski
Alfred P. Doyle, M.D.
Dino Drudi
Paul Egan
Bonnie Erbé
Don Feder
Robert W. Gillespie
Otis Graham Jr., Ph.D.
Joseph R. Guzzardi
Robert E. Hannay
Hessie Harris

Lawrence E. Harrison
Diana Hull, Ph.D.
Glenn Jackson
Carol Joyal
The Honorable Richard D. Lamm
Roy C. Lierman
Donald Mann
K.C. McAlpin
Joel McCleary
Scott McConnell
James G. McDonald, Esq.
Paul K. Nachman
Peter Nunez
Robert D. Park
Fred Pinkham, Ph.D.
Randy Pullen
Bruce S. Reid
Teela Roche
David P. Schippers, Esq.
The Honorable Alan Simpson
John Phillip Sousa, IV
John Tanton, M.D.
Alan N. Weeden
The Honorable Curtin Winsor, Jr.

As America approaches a defining moment it its immigration history, your support is crucial to our fight for immigration policies that serve the interests of the American people.

ENCLOSED IS MY DONATION OF:
○$1,000  ○$500  ○$250  ○$100  ○$50
○$25  ○Other $_____

All contributions to FAIR are tax deductible.

PAYMENT METHOD:
○ Check made payable to FAIR
Credit Card
○Visa  ○Mastercard  ○Amex  ○Discover

_____
Cardholder's Name

_____
Card Number

_____  _____
Expiration Date      Signature

_____
Address

_____
City            State            Zip

_____
Email

In addition to membership and general donations, there are other opportunities for supporting our work.

Please send me information about:
○  Becoming a Cornerstone Contributor
○  Seventh Generation Legacy Society estate planning
○  The Combined Federal Campaign workplace giving
○  Matching Gifts
○  Other ways to give

**To learn more about FAIR, the need for immigration reform, and what you can do, visit us on the web at FAIRus.org.**



This report was digitally printed on responsibly forested paper.

Subscribe/Renew    🛒 Cart    👤 Login



▶ f 🐦 in

**HEALTH AFFAIRS BLOG**

RELATED TOPICS:

IMMIGRANTS  | COVID-19  | PANDEMICS  | CORONAVIRUS  | MEDICAID  | PUBLIC HEALTH  | UNEMPLOYMENT  | ACCESS TO CARE  | CLINICS  | UNINSURED

# Serious Challenges And Potential Solutions For Immigrant Health During COVID-19

Whitney L. Duncan, Sarah B. Horton

**APRIL 18, 2020**  **DOI:** 10.1377/hblog20200416.887086



As cases of COVID-19 continue to skyrocket in the United States, it is no surprise that pre-existing health inequalities are worsening. Health and immigration policies put in

place long before the pandemic reached the United States set the stage for these inequalities and will contribute to unnecessary suffering, sickness, and fear during this crisis. It is essential to ensure that all community members, regardless of immigration status, have the resources they need to weather this storm. This is vital not only for the health of immigrants themselves, but also for the health of the broader public.

## Barriers To COVID-19 Testing And Treatment For Undocumented Immigrants

Increased immigration enforcement around the country has led to understandable fear among undocumented immigrants, fear that has extended to accessing basic resources like education, economic assistance, and—perhaps most crucially at the moment—healthcare. Some immigrants have expressed concerns around even leaving the house because of threats of increased Immigration and Customs Enforcement (ICE) activity in their communities. Indeed, although ICE announced it would slow civil immigration enforcement actions during the pandemic, news reports suggest that enforcement has continued in some areas. Uncertainty also extends into clinical spaces, where immigrants worry about ICE presence or about staff sharing patients' legal status.

Even those without active fears around immigration enforcement may be reluctant to access healthcare due to policies like the "public charge" rule change, which went into effect on February 24, 2020, just days before the first reported instances of community spread of the COVID-19 virus in the United States. The rule penalizes immigrants who have used forms of public assistance including Medicaid, making it harder for them to adjust their immigration status. In the months after its proposal, widespread confusion and misinformation around whom the rule would affect contributed to untold numbers of immigrant parents disenrolling their U.S. citizen children from Medicaid—a predictable "chilling effect" on healthcare utilization. Even as testing and treatment for COVID-19 has been explicitly excluded from the public charge rule and as the U.S. Citizenship and Immigration Services (USCIS) has explicitly encouraged immigrants to receive care, many immigrants had already acted to limit their interactions with medical institutions and their reliance on public assistance.

Notably, public health agencies, providers, and front-line medical staff at community health centers and hospitals have worked tirelessly to maintain immigrant patients' trust, allay their fears, and encourage them to seek the care they need. Yet their assurances only have so much power when juxtaposed with anti-immigrant messaging and policies. These policies erode trust between immigrants and the clinics that serve them and may hamper efforts to treat and stem the spread of COVID-19.

Even aside from these concerns, millions of undocumented immigrants lack health insurance, in large part of course because they are barred from coverage through the Affordable Care Act, Medicare, and many Medicaid programs. Among the nonelderly population, fewer than one in ten U.S. citizens are uninsured, while more than four in ten undocumented immigrants lack insurance. Many of these uninsured immigrants will not have the option of complying with guidance to call primary care physicians in case of COVID-19 symptoms. The Families First Coronavirus Response Act provides free coronavirus testing for the uninsured. However, it does not cover coronavirus treatment. Although the Coronavirus Aid, Relief, and Economic Security (CARES) Act provides $100 billion to hospitals to treat the uninsured, it does not exempt patients from cost-sharing or physician bills. Alarmed about out-of-pocket medical costs, many undocumented immigrants will wait to seek care until their symptoms are life-threatening. If these policies encourage segments of the immigrant population to avoid health care, this will create pockets of infection that will be difficult to eradicate.

Access to care for undocumented immigrants with COVID-19 depends both on the availability of safety-net care as well as each state's individually administered Medicaid and Emergency Medicaid benefits. Although the Emergency Medical Treatment and Active Labor Act restricts the use of federal Emergency Medicaid funds for the uninsured to "acute symptoms of sufficient severity" so as to cause "serious impairment," bodily harm, or death, states themselves can define the diagnoses and services covered by Emergency Medicaid—and only a few include COVID-19 treatment.

More broadly, despite the fact that immigrants are disproportionately represented in sectors of the economy most impacted by the pandemic, undocumented immigrants are ineligible for unemployment insurance. Nor will those without Social Security numbers receive payments under the CARES Act, the recently passed federal stimulus bill. But the exclusion goes further: the CARES Act also excludes anyone who lives in a household in which *anyone* uses an ITIN (Individual Taxpayer Identification Number) to file taxes. This exclusion will disadvantage not only undocumented immigrants, but also the 8 million citizens living with undocumented family members, of whom 5.9 million are U.S. citizen children. In response, Democratic lawmakers recently introduced the Leave No Taxpayer Behind Act, which would amend the CARES Act to include taxpayers who use ITINs. To be sure, absent any systemic form of financial relief at the moment, immigrants who work in low-wage jobs without paid sick leave—even during state-mandated stay-at-home orders—may have few options but to continue working even if they are sick. Of course, this is not only detrimental to immigrants' health but will help spread the pandemic.

# Limitations to Immigrant Coverage Prevent Full COVID-19 Treatment and Put All Communities at Risk

Immigration and health care policies may not only discourage immigrants from receiving the testing and treatment they will need during this crisis, but they may also complicate clinicians' efforts to provide them with quality care. Regardless of legal status, all individuals who meet federal income guidelines are eligible for coverage through Emergency Medicaid for emergency medical care. In the wake of the pandemic, the Centers for Medicare and Medicaid Services recently expanded Medicare coverage for telehealth services and many states are now including telehealth as a benefit covered under Medicaid. Emergency Medicaid benefits are state determined, however, and so far, only a few states such as New York have expanded them to cover coronavirus testing or treatment. It is considered best practice for physicians to send patients with COVID-19 home with oxygen if they require oxygen therapy and monitor them closely via telehealth when they no longer require hospitalization. Because Emergency Medicaid does not cover these services, even those undocumented immigrants who could otherwise be discharged will need to remain hospitalized. This will keep undocumented immigrants from receiving the standard of care and run counter to the goal of freeing up hospital beds.

## Potential Solutions

Ensuring that all members of the public receive timely testing and treatment for COVID-19 is not only a matter of health equity, but also of sound public health. Local, state, and federal officials can implement bold new policy changes to protect immigrants and the public.

First, state, county, and municipal governments and public health agencies should double down on linguistically and culturally appropriate messaging and outreach that acknowledges immigrants' concerns around accessing care in a climate of fear and distrust. Safety-net clinics and hospitals should pro-actively contact immigrant patients and make sure they have necessary information, resources, and plans in the event of illness.

Second, states must immediately modify their Emergency Medicaid definitions or provider billing manuals to include comprehensive COVID-19 treatment, including services such as diagnostic testing, telemedicine, primary care, and oxygen. These services are critical right now to reduce transmission and facilitate the discharge of hospitalized patients. During the pandemic states should also consider using their own

funds to open Medicaid to the undocumented, as California has done for youth in the past.

Third, federal law prevents states from including undocumented immigrants in their unemployment plans, but states can act to include categories of immigrants they previously excluded. Some have already taken such steps. For example, California, Colorado, New York, and Texas allow DACA recipients (Deferred Action for Childhood Arrivals) to receive unemployment benefits. States should go even further. States can extend unemployment insurance not only to DACA recipients but also to those with Temporary Protected Status (TPS) and those who have applied for asylum or a green card. Moreover, states should also conduct outreach to ensure that immigrants are aware that unemployment benefits do not count towards public charge determinations, and that the US Citizenship and Immigration Services has said it will also take the pandemic into consideration when reviewing immigrants' work history. This will ensure more immigrants can meet their basic needs during the pandemic and comply with shelter-in-place orders meant to stem the spread of COVID-19.

Fourth, constituents concerned about community health during COVID-19 should press their local legislators to support inclusive measures at the federal level. For example, The Coronavirus Immigrant Families Protection Act, unveiled on April 3, would extend COVID-19 testing and treatment to undocumented immigrants, provide $100 million to the CDC for linguistically appropriate outreach on the coronavirus, allow immigrants to access relief funds with ITIN numbers, further limit ICE activity, and suspend the public charge rule. Indeed, although US Citizenship and Immigration Services recently clarified that coronavirus testing will not count towards public charge determinations, immigrants are likely to remain skeptical. Suspending the rule at least during the coronavirus outbreak would make immigrants more confident that their use of benefits will not impact future status adjustments.

Finally, any future stimulus bill must include immigrants, regardless of documentation status, as beneficiaries. In the meantime, and especially if the Leave No Taxpayer Behind amendment to the CARES Act and The Coronavirus Immigrant Families Protection Act do not gain traction, state and local governments should immediately allocate relief funds specifically for immigrants who do not qualify for benefits from the CARES Act so they can stay afloat during the crisis even if they are unable to work. For example, Chicago has made undocumented immigrants eligible for all of its assistance and disaster relief programs, including a COVID-19 Housing Assistance Grant, and California is considering rectifying the CARES Act's oversight by creating its own stimulus bill that would provide relief regardless of immigration status.

The coronavirus pandemic has struck at a moment when immigrant communities are wary of public health authorities, of clinics, and of clinical care. Inclusive actions on the part of the federal government are essential, but barring those, local governments, county and state public health agencies, state Medicaid offices, and community clinics must work to rebuild trust with immigrant communities and forestall unnecessary suffering and death. These measures will not only help avert a crisis in immigrant communities but also help curb the pandemic. In a pandemic, we are only as healthy as the most vulnerable members among us.



**Health Affairs Comment Policy**

Comment moderation is in use. Please do not submit your comment twice -- it will appear shortly.

Please read our Comment Policy before commenting.



**0 Comments**　　**Health Affairs**　　🔒 **Privacy Policy**　　　　　　　🅛 **Login** ▾

♡ **Recommend**　1　　💬 Tweet　　f Share　　　　　　　Sort by Best ▾

Start the discussion…

LOG IN WITH　　　　　OR SIGN UP WITH DISQUS ?

Name

Be the first to comment.



# Related

## CONTENT

COVID-19

## TOPICS

Immigrants

COVID-19

Pandemics

Coronavirus

Medicaid

Public Health

Unemployment

Access To Care

Clinics

Uninsured

# Cite As

"Serious Challenges And Potential Solutions For Immigrant Health During COVID-19, " Health Affairs Blog, April 18, 2020.
DOI: 10.1377/hblog20200416.887086

**HealthAffairs**

*1220 19th Street, NW, Suite 800*

*Washington, DC 20036*

*T 301 656 7401*

*F 301 654 2845*

*customerservice@healthaffairs.org*

**TOPICS**

Access & Use

Costs & Spending

COVID-19

Health Equity

Health Reform

Leading To Health

More Topics

**CONTENT**

Journal

Blog

Briefs

Events

Podcasts

Collected Works

**INFORMATION FOR**

Authors

Request For Abstracts

Reviewers

Subscribers

Advertisers

Media News Room

Funders

Event Attendees

**SERVICES & RESOURCES**

Submit Content

Subscribe/Renew

Manage My Account
Purchase Content
Permissions
Alerts
Newsletter Sign Up
Advertising Kit

**HEALTH AFFAIRS**
About
Terms & Conditions
Privacy Policy
Jobs At Health Affairs
Contact Us

Terms and conditions        Privacy        Project HOPE

Health Affairs is pleased to offer Free Access for low-income countries. Health Affairs gratefully acknowledges the support of many funders.

Project HOPE is a global health and humanitarian relief organization that places power in the hands of local health care workers to save lives across the globe. Project HOPE has published Health Affairs since 1981.

Copyright 1995 - 2021 by Project HOPE: The People-to-People Health Foundation, Inc., eISSN 1544-5208.

  Sign In    Register    

September 17, 2021 7:39 PM CDT Last Updated a month ago

**United States**

# Some U.S. hospitals forced to ration care amid staffing shortages, COVID-19 surge

By Julia Harte and Sharon Bernstein                                    4 minute read

    

/

fi

o  ge ,    f


 f t


   ile   e e

Since May, the number of COVID-19 cases at hospitals run by the University of Wisconsin's UW Health system has quadrupled, Dr. Jeff Pothof said in an interview.

Emergency rooms are so full that doctors are having to seek rooms for their patients in other facilities, he said, a trend seen in other states, including Florida.

"For the first time in my career we're at the point where not every patient in need will get the care we might wish we could give," Dr Shelly Harkins, chief medical officer and president of St. Peter's Health in Helena, Montana said in a video announcement Thursday.

In West Virginia, COVID-19 hospitalizations this week have far outstripped their previous peak of 815, rising from 852 on Monday to 922 on Friday, said Jim Kaufman, the president and CEO of the West Virginia Hospital Association.

The state's hospitals are also facing severe staffing shortages, resulting in fewer patients treated and delays in non-emergency care.

Smaller hospitals are sending patients to larger ones that can accommodate them, Kaufman said. In Oklahoma, new hospitalizations declined by 11% during the week ending Sept. 10 compared with the previous week, but 35% of hospitals in the state report staffing shortages, according to the CDC.

Reporting by Julia Harte in New York, Sharon Bernstein in Sacramento, Calif., Maria Caspani in New York and Deena Beasley in Los Angeles. Additional reporting by Barbara Goldberg in New Jersey and Anurag Maan in Bengaluru; Editing by Aurora Ellis

Our Standards: **The Thomson Reuters Trust Principles.**

## More from Reuters



'We owe you' -Biden to families of fallen

# A Changing Nation: Population Projections Under Alternative Immigration Scenarios

Population Estimates and Projections

## Current Population Reports

By Sandra Johnson

P25-1146

Issued February 2020

## INTRODUCTION

Higher international immigration over the next four decades would produce a faster growing, more diverse, and younger population for the United States. In contrast, an absence of migration into the country over this same period would result in a U.S. population that is smaller than the present. Different levels of immigration between now and 2060 could change the projection of the population in that year by as much as 127 million people, with estimates ranging anywhere from 320 to 447 million U.S. residents.

Beyond influencing the number of people in the population, immigration patterns over the next four decades will also shape the racial and ethnic composition of the population. In 2016, Asians were the fastest-growing racial group in the nation, and immigration was the primary driver behind the growth in this group. If immigration increases, the Asian alone population could grow by as much as 162 percent between 2016 and 2060 and go from 5.7 percent of the total U.S. population to 10.8 percent. The future size of this population is particularly sensitive to immigration. Under a scenario with no immigration, the Asian alone population in the United States would decline over time, representing just 4.5 percent of the total population in 2060.

Regardless of immigration, the population is expected to continue to age between now and 2060. Low fertility rates coupled with large cohorts of baby boomers reaching their "golden years" are expected to shift the age distribution of the population so that the share of the population aged 65 and older exceeds the share of the population under the age of 18. The timing of this shift, however, will vary depending on the amount of immigration that occurs. High immigration levels will delay this milestone more than a decade relative to scenarios with lower levels of migration.

The 2017 National Projections main series, released in September 2018, present one scenario for the future population.[1] These projections will only hold true if the assumptions about births, deaths, and migration match the actual trends in these components of population change. International migration is difficult to project because political and economic conditions are nearly impossible to anticipate, yet factor heavily into migration movements into and out of a country. While we do not attempt to predict future policy or economic cycles, we do recognize the uncertainty surrounding migration and the impact that different migration outcomes could have on the future population. To account for this, we have produced three alternate sets of projections that use the same methodology and assumptions for fertility, mortality, and emigration, but differ in the levels of immigration that they assume: high, low, and zero immigration. This report compares the results from the three alternative scenarios of projections and the main series, focusing on differences in the pace at which the U.S. population grows, diversifies, and ages.

---

[1] The 2017 National Projections were initially released in December 2017, but were retracted when an error was identified in the mortality rates. A revised version was released in September 2018.

United States Census Bureau

**U.S. Department of Commerce**
U.S. CENSUS BUREAU
*census.gov*

## 2017 NATIONAL POPULATION PROJECTIONS ALTERNATIVE SCENARIOS

The results in this report are based on the 2017 National Population Projections, which are the third set of projections based on the 2010 Census, and cover the period from 2017 to 2060. The 2017 National Population Projections include projections of the resident population by age, sex, race, Hispanic origin, and nativity (whether people were born in the United States or another country). They are based on official population estimates through 2016. This series uses the cohort-component method, which projects the three components of population change—fertility, mortality, and international migration—separately for each birth cohort based on historical trends. The base population is advanced each year using projected survival rates and net international migration. New birth cohorts are added to the population by applying the annual projected fertility rates to the female population.

The main series of projections, released in September 2018, assumes that future international migration will mirror recent historical trends; this is the "middle" migration assumption. In addition to the main series, we also produced three alternative scenarios that are "what if" exercises, examining how the U.S. population would change if future patterns of immigration differ radically from historical trends. For each of the three scenarios described below, the fertility, mortality, and emigration assumptions are the same as those used in the main series; the only component that differs is immigration.

**Zero immigration scenario.** Assumes that immigration into the United States falls to zero (the theoretical minimum). Under this scenario, there is no immigration, but we still allow for emigration out of the United States. This offers the most dramatic picture of demographic change.

**High immigration scenario.** Assumes immigration increases by 50.0 percent compared with levels from 2011 to 2015 for all projected years. This scenario shows what the outcome would be if we were underestimating immigration by half in the main series.

**Low immigration scenario.** Assumes that immigration rates are roughly cut in half from their 2011 to 2015 levels. This scenario is not strictly 50.0 percent less, but is log symmetrical to the values for the high migration scenario. As a result, the projected migration rates vary between 40 and 50 percent less than those projected for the main series in any of the given years, starting with 2017.

For more information on the data and methodology, see the report on the 2017 National Population Projections: Methodology and Assumptions <www.census.gov/programs-surveys/popproj /technical-documentation/methodology.html>.

### HIGHLIGHTS FROM THE 2017 NATIONAL POPULATION PROJECTIONS

#### Population Growth

- Over the next four decades, the population is expected to increase from its 2016 level in two out of the three alternative scenarios. In the high scenario, the population will increase by 124 million, reaching 447 million in 2060. In the low scenario, the 2060 population is projected to be 376 million, representing an increase of 53 million people.

- Under a zero immigration scenario, the population is projected to increase until 2035, at which point the population would peak at 333 million. After that, the population is projected to decline through 2060, when it could reach a low of 320 million.

- In the main series of projections, the population is projected to reach the 400 million milestone in 2058. This threshold is crossed 15 years earlier in the high scenario and is not attained in either the low or zero immigration scenario.

- The average annual growth in the population is 2.8 million people in the high scenario, compared to 1.8 million in the main series, 1.2 million in the low, and –78 thousand in the zero immigration scenario.

## Population Diversity

- The share of the population that is White alone is projected to decline in all scenarios of population projections between 2016 and 2060. For the high, middle, and low scenarios, the number of residents classified as White alone actually increases from the 2016 values, but these increases are outpaced by increases in the other racial and ethnic groups.

- The non-Hispanic White alone population is projected to decline in all scenarios between 2016 and 2060. In 2016, there were an estimated 198 million individuals in this group. In the high scenario, this number is projected to decrease by 11 million in 2060 to 187 million. The

2060 projection for this group in the low scenario is 174 million, a decrease of 24 million; and in the zero scenario, it is 163 million. The non-Hispanic White alone population is projected to decrease the most between 2016 and 2060 in the zero immigration scenario (35 million).

- The Two or More Races group is the fastest-growing racial group between 2016 and 2060 in all projection scenarios. In 2016, just under 8.5 million residents were classified as more than one race. This number is projected to more than double for all scenarios. The zero immigration scenario, with a projected 160 percent increase, has the smallest Two or More Races population in 2060 (22 million). In contrast, the high immigration scenario has the largest increase (216 percent or 18 million) and the largest Two or More Races population in 2060 (27 million).

- Projected changes in the foreign-born population between 2016 and 2060 vary across the scenarios and are consistent with the immigration assumptions used. In the high immigration scenario, the percentage of the population that is foreign-born is projected to increase from 13.6 percent

to 21.6 percent. In the low, it remains relatively stable at just under 14 percent through 2060; and in the zero immigration scenario, it decreases to a historic low of 4.6 percent.

## Population Aging

- The population aged 65 and older is projected to surpass the population under the age of 18 in size in all immigration scenarios. The date at which this occurs is earliest in the zero immigration scenario (2029), followed by the low immigration scenario (2031), and then the high (2045).

- By 2030, more than 20 percent of the U.S. population will be aged 65 and older. In the high scenario, this milestone is reached in 2028. For the low scenario, it occurs in 2026; and in 2025 for the zero scenario.

- The number of children (ages 0–17) is projected to decline in both the low and zero immigration scenarios. In 2016, there were an estimated 74 million children in the population. By 2060, this is projected to decline to 59 million in the zero scenario and to 73 million in the low scenario. Conversely, the child population is projected to increase to just under 91 million by 2060 in the high scenario.

## POPULATION GROWTH

The projected change in the population depends on what assumptions are made about the fertility, mortality, and migration behaviors of that population in the future. Changing the assumptions about any one of these components will alter the projected size and composition of the population over time. For the alternative population projections, we have developed three scenarios where we increase, decrease, and eliminate immigration. These complementary projections provide information on how different immigration trends could shape the U.S. population through 2060.

Comparing population growth over time from all of the scenarios reveals patterns that are consistent with the different immigration assumptions used (Table 1 and Figure 1). Higher immigration produces more population growth relative to the main series of projections, and lower immigration produces diminished growth. In the main series of population projections, the U.S. population is projected to increase by 25 percent between 2016 and 2060, from 323 million to 404 million. In a higher immigration scenario, the 2060 population is projected to grow to 447 million, an increase of 38 percent over the 2016 value.

Table 1.

### Projected U.S. Population by Immigration Scenario: 2016 to 2060

(Numbers in thousands)

| Year | Main series | Alternative immigration scenario | | |
| --- | --- | --- | --- | --- |
| | | Low | High | Zero |
| **Numeric change: 2016 to 2060** . . . . . . . . | **81,356** | **53,099** | **123,738** | **–3,422** |
| **Percent change: 2016 to 2060** . . . . . . . . | **25.18** | **16.43** | **38.29** | **–1.06** |
| 2016 . . . . . . . . . . . . . . . . . . | 323,128 | 323,128 | 323,128 | 323,128 |
| 2017 . . . . . . . . . . . . . . . . . . | 325,511 | 325,024 | 326,243 | 324,048 |
| 2018 . . . . . . . . . . . . . . . . . . | 327,892 | 326,909 | 329,366 | 324,943 |
| 2019 . . . . . . . . . . . . . . . . . . | 330,269 | 328,782 | 332,499 | 325,809 |
| 2020 . . . . . . . . . . . . . . . . . . | 332,639 | 330,640 | 335,638 | 326,641 |
| 2021 . . . . . . . . . . . . . . . . . . | 334,998 | 332,477 | 338,781 | 327,434 |
| 2022 . . . . . . . . . . . . . . . . . . | 337,342 | 334,289 | 341,921 | 328,183 |
| 2023 . . . . . . . . . . . . . . . . . . | 339,665 | 336,071 | 345,056 | 328,884 |
| 2024 . . . . . . . . . . . . . . . . . . | 341,963 | 337,820 | 348,179 | 329,533 |
| 2025 . . . . . . . . . . . . . . . . . . | 344,234 | 339,532 | 351,287 | 330,128 |
| 2026 . . . . . . . . . . . . . . . . . . | 346,481 | 341,213 | 354,384 | 330,675 |
| 2027 . . . . . . . . . . . . . . . . . . | 348,695 | 342,849 | 357,464 | 331,157 |
| 2028 . . . . . . . . . . . . . . . . . . | 350,872 | 344,439 | 360,521 | 331,573 |
| 2029 . . . . . . . . . . . . . . . . . . | 353,008 | 345,979 | 363,552 | 331,920 |
| 2030 . . . . . . . . . . . . . . . . . . | 355,101 | 347,467 | 366,552 | 332,198 |
| 2031 . . . . . . . . . . . . . . . . . . | 357,147 | 348,901 | 369,517 | 332,408 |
| 2032 . . . . . . . . . . . . . . . . . . | 359,147 | 350,281 | 372,445 | 332,549 |
| 2033 . . . . . . . . . . . . . . . . . . | 361,099 | 351,607 | 375,335 | 332,624 |
| 2034 . . . . . . . . . . . . . . . . . . | 363,003 | 352,881 | 378,186 | 332,636 |
| 2035 . . . . . . . . . . . . . . . . . . | 364,862 | 354,104 | 380,999 | 332,587 |
| 2036 . . . . . . . . . . . . . . . . . . | 366,676 | 355,277 | 383,775 | 332,478 |
| 2037 . . . . . . . . . . . . . . . . . . | 368,448 | 356,404 | 386,514 | 332,314 |
| 2038 . . . . . . . . . . . . . . . . . . | 370,179 | 357,485 | 389,219 | 332,096 |
| 2039 . . . . . . . . . . . . . . . . . . | 371,871 | 358,524 | 391,892 | 331,827 |
| 2040 . . . . . . . . . . . . . . . . . . | 373,528 | 359,522 | 394,536 | 331,510 |
| 2041 . . . . . . . . . . . . . . . . . . | 375,152 | 360,484 | 397,154 | 331,146 |
| 2042 . . . . . . . . . . . . . . . . . . | 376,746 | 361,411 | 399,748 | 330,739 |
| 2043 . . . . . . . . . . . . . . . . . . | 378,314 | 362,308 | 402,324 | 330,293 |
| 2044 . . . . . . . . . . . . . . . . . . | 379,861 | 363,178 | 404,885 | 329,810 |
| 2045 . . . . . . . . . . . . . . . . . . | 381,390 | 364,026 | 407,437 | 329,295 |
| 2046 . . . . . . . . . . . . . . . . . . | 382,907 | 364,856 | 409,984 | 328,752 |
| 2047 . . . . . . . . . . . . . . . . . . | 384,415 | 365,672 | 412,529 | 328,183 |
| 2048 . . . . . . . . . . . . . . . . . . | 385,918 | 366,477 | 415,078 | 327,592 |
| 2049 . . . . . . . . . . . . . . . . . . | 387,419 | 367,274 | 417,635 | 326,983 |
| 2050 . . . . . . . . . . . . . . . . . . | 388,922 | 368,068 | 420,202 | 326,358 |
| 2051 . . . . . . . . . . . . . . . . . . | 390,431 | 368,862 | 422,783 | 325,720 |
| 2052 . . . . . . . . . . . . . . . . . . | 391,947 | 369,657 | 425,381 | 325,072 |
| 2053 . . . . . . . . . . . . . . . . . . | 393,473 | 370,455 | 427,998 | 324,416 |
| 2054 . . . . . . . . . . . . . . . . . . | 395,009 | 371,258 | 430,634 | 323,753 |
| 2055 . . . . . . . . . . . . . . . . . . | 396,557 | 372,068 | 433,290 | 323,084 |
| 2056 . . . . . . . . . . . . . . . . . . | 398,118 | 372,884 | 435,966 | 322,412 |
| 2057 . . . . . . . . . . . . . . . . . . | 399,691 | 373,708 | 438,663 | 321,737 |
| 2058 . . . . . . . . . . . . . . . . . . | 401,277 | 374,540 | 441,379 | 321,061 |
| 2059 . . . . . . . . . . . . . . . . . . | 402,874 | 375,380 | 444,114 | 320,384 |
| 2060 . . . . . . . . . . . . . . . . . . | 404,483 | 376,226 | 446,866 | 319,706 |

Source: U.S. Census Bureau, 2017 National Population Projections.



Figure 1.

**U.S. Population 1900–2016, Population Projections 2017–2060 by Immigration Scenario**
(In millions)

The U.S. population would shrink under a zero immigration scenario.

Note: Census values for 1950 and earlier exclude the populations of Alaska and Hawaii.
Source: U.S. Census Bureau, 2017 National Population Projections; U.S. Census Bureau, 2016 National Population Estimates;
U.S. Census Bureau, 1900–2000 Decennial Censuses.

Lower levels of immigration would reduce the growth in the population, so that by 2060 the population is projected to only increase by 16 percent to 376 million. Under the scenario with no immigration, the population is projected to shrink from its 2016 value by 1.1 percent down to 320 million people in 2060 (Figure 2).



Figure 2.

**Projected Population Change Between 2016 and 2060 by Immigration Scenario**

Population change between 2016 and 2060 ranges from –3.4 to 123.7 million, depending on immigration.

Source: U.S. Census Bureau, 2017 National Population Projections.

The zero immigration scenario offers the most dramatic picture of demographic change. This assumption is hypothetical, and shows what would happen to the existing U.S. population if it did not grow through immigration. Births are the only way for the population to grow in the zero immigration model, but the population can decrease through deaths and emigration (Table 2). Between 2016 and 2038 in this scenario, the number of births and deaths are projected to converge, with births declining and deaths increasing. In 2039, the number of deaths is projected to be larger than the number of births; and natural increase (the difference between births and deaths) becomes negative for the first time (Figure 3). Negative natural increase produces a shrinking population in the zero immigration scenario, with annual declines starting in 2035 and continuing at an accelerated pace through 2060.

Though natural increase does not become negative in any of the other scenarios, it is projected to decline in all of them. Large baby boom cohorts will be entering older ages where mortality rates are higher. This is expected to produce a higher number of deaths, especially between 2020 and 2050. At the same time, fertility rates are expected to remain low, with only slight increases in births projected over the time series. A faster increase in deaths relative to births decreases the pace of population growth through natural increase. Migration offsets this decline in natural increase in all but the zero immigration scenario. In the main series, migration becomes a larger source of population growth than natural increase starting in 2030. In the low immigration scenario, migration outpaces natural increase as the leading contributor to population growth starting in 2035; and in the high immigration scenario, migration levels are always assumed to be higher than natural increase.

Table 2.
### Projected Change in the U.S. Population From Births, Deaths, and Migration[1] by Immigration Scenario: 2019 to 2060
(Numbers in thousands)

| Scenario | 2019 to 2020 | 2029 to 2030 | 2039 to 2040 | 2049 to 2050 | 2059 to 2060 |
|---|---|---|---|---|---|
| **Total Population Change** | | | | | |
| Main series | 2,370 | 2,093 | 1,657 | 1,503 | 1,609 |
| Low scenario | 1,858 | 1,488 | 999 | 794 | 847 |
| High scenario | 3,139 | 3,000 | 2,644 | 2,567 | 2,752 |
| Zero scenario | 832 | 278 | –318 | –625 | –678 |
| **International Migration** | | | | | |
| Main series | 1,010 | 1,064 | 1,098 | 1,110 | 1,118 |
| Low scenario | 542 | 616 | 653 | 671 | 687 |
| High scenario | 1,711 | 1,736 | 1,766 | 1,767 | 1,763 |
| Zero scenario | –393 | –279 | –237 | –206 | –174 |
| **Natural Change[2]** | | | | | |
| Main series | 1,360 | 1,028 | 558 | 394 | 491 |
| Low scenario | 1,315 | 871 | 345 | 123 | 160 |
| High scenario | 1,428 | 1,264 | 878 | 800 | 988 |
| Zero scenario | 1,225 | 557 | –81 | –419 | –504 |
| **Births** | | | | | |
| Main series | 4,112 | 4,162 | 4,196 | 4,304 | 4,397 |
| Low scenario | 4,063 | 3,990 | 3,951 | 3,978 | 3,977 |
| High scenario | 4,186 | 4,421 | 4,564 | 4,794 | 5,027 |
| Zero scenario | 3,965 | 3,645 | 3,461 | 3,324 | 3,135 |
| **Deaths** | | | | | |
| Main series | 2,752 | 3,134 | 3,638 | 3,910 | 3,906 |
| Low scenario | 2,748 | 3,118 | 3,606 | 3,855 | 3,817 |
| High scenario | 2,757 | 3,157 | 3,686 | 3,994 | 4,039 |
| Zero scenario | 2,741 | 3,087 | 3,542 | 3,743 | 3,639 |

[1] Migration refers to net international migration, the number of people entering the country minus the number leaving it.

[2] Natural change is the number of births added to the population minus the number of deaths. A positive number means that more births are projected than deaths (i.e., a natural increase in the population), whereas a negative number means more deaths are projected than births (i.e., a natural decrease in the population).

Source: U.S. Census Bureau, 2017 National Population Projections.

Figure 3.
**Natural Increase[1] and Net International Migration by Immigration Scenario: 2017 to 2060**

Net international migration surpasses natural increase as the leading contributor to population growth in all migration scenarios.

— Natural increase    — Net international migration









[1] Natural increase is births minus deaths during a specified time period.
Source: U.S. Census Bureau, 2017 National Population Projections.

## HOW DO THE SAME FERTILITY AND MORTALITY ASSUMPTIONS PRODUCE DIFFERENT BIRTHS AND DEATHS?

The same fertility and mortality assumptions are used in the main series and three alternate scenarios of population projections, yet the projected values for births and deaths are different. How is this possible?

This happens because the fertility and mortality inputs used in the projections are rates. We project age-specific fertility rates and age-specific mortality rates and apply these to the projected population to produce births and deaths. The differences seen in the births and deaths are not because the fertility and mortality assumptions have changed, but instead stem from changes in the population to which they are applied.

Using fertility as an example, let's assume that there are 104.3 births for every 1,000 women in the population aged 25–29.[1] If we project that there

are 10,000 women in the population and apply our assumed rate, we would get a projection of 1,043 births. Doubling the number of women in that age group, say through increased migration, while maintaining the same rate would produce double the number of births: 2,086. This is a simple illustration to show how the same fertility assumption can yield a very different number of projected births. Each scenario includes the same rates as inputs for fertility and mortality, but the births and deaths are different because the migration assumptions change the population. This is what is happening in the alternate projection scenarios.

Fertility and mortality rates used in the projections are available to download at <www.census.gov /data/datasets/2017/demo/popproj/2017 -popproj.html>.

[1] See <www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_01.pdf>.

---

Annual growth in the population across the scenarios follows the expected pattern based on the immigration assumptions used (Table 3): the average annual growth in the population is 2.8 million people (0.74 percent) in the high scenario, compared to 1.8 million (0.51 percent) in the main series, 1.2 million (0.35 percent) in the low, and –78 thousand (–0.02 percent) in the zero scenario. Though the amount of people added to the population each year varies, the scenarios (excluding zero immigration) follow similar growth trajectories. For all scenarios, the annual increases in the population are largest in the early years of the time series. For example, in the high scenario, the

population is projected to increase by 3.1 million people (0.94 percent) between 2019 and 2020. One decade later, the projected growth drops to 3.0 million (0.83 percent). Between 2039 and 2040, the population is projected to increase by 2.6 million (0.67 percent). Growth remains relatively stable after this through 2060. The same pattern of decreasing growth followed by stabilization from 2040 to 2060 occurs in the main series and low scenario. This is because the pattern largely reflects the population changes stemming from declining natural increase. While the alternate migration assumptions change the level of immigration, they do so evenly over the time series and, therefore,

do not change the general pattern of population growth in the projections.

## POPULATION DIVERSITY

Changing our assumptions about immigration over the next four decades impacts the composition of the projected population with respect to nativity in expected ways (Table 4). In the main series of projections, we estimated a 3.6 percentage-point increase in the share of the U.S. population that is foreign-born between 2016 and 2060. In 2016, 14 percent of the population was foreign-born, compared to a projected 17 percent in 2060. The number of foreign-born in the nation in the main series was projected

Table 3.
## Projected Rate of Population Change by Immigration Scenario: 2016 to 2060
(Numbers in thousands)

| Year | Main series | | Alternative immigration scenario | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | | High | | Zero | |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| **Average change per year: 2016 to 2060 . . . . . . . . . . . . .** | **1,849** | **0.51** | **1,207** | **0.35** | **2,812** | **0.74** | **–78** | **–0.02** |
| 2020 . . . . . . . . . . . . . . . . . . . . . . | 2,370 | 0.72 | 1,858 | 0.56 | 3,139 | 0.94 | 832 | 0.26 |
| 2025 . . . . . . . . . . . . . . . . . . . . . . | 2,271 | 0.66 | 1,712 | 0.51 | 3,109 | 0.89 | 596 | 0.18 |
| 2030 . . . . . . . . . . . . . . . . . . . . . . | 2,093 | 0.59 | 1,488 | 0.43 | 3,000 | 0.83 | 278 | 0.08 |
| 2035 . . . . . . . . . . . . . . . . . . . . . . | 1,859 | 0.51 | 1,223 | 0.35 | 2,813 | 0.74 | –50 | –0.01 |
| 2040 . . . . . . . . . . . . . . . . . . . . . . | 1,657 | 0.45 | 999 | 0.28 | 2,644 | 0.67 | –318 | –0.10 |
| 2045 . . . . . . . . . . . . . . . . . . . . . . | 1,529 | 0.40 | 848 | 0.23 | 2,552 | 0.63 | –515 | –0.16 |
| 2050 . . . . . . . . . . . . . . . . . . . . . . | 1,503 | 0.39 | 794 | 0.22 | 2,567 | 0.61 | –625 | –0.19 |
| 2055 . . . . . . . . . . . . . . . . . . . . . . | 1,548 | 0.39 | 809 | 0.22 | 2,656 | 0.62 | –668 | –0.21 |
| 2060 . . . . . . . . . . . . . . . . . . . . . . | 1,609 | 0.40 | 847 | 0.23 | 2,752 | 0.62 | –678 | –0.21 |

Note: Rates for individual years refer to the size of population change between July 1 of the indicated year and July 1 of the preceding year.
Source: U.S. Census Bureau, 2017 National Population Projections.

Table 4.
## Projected Size of the Foreign-Born Population by Immigration Scenario: 2016 to 2060
(Numbers in thousands)

| Year | Main series | | | Low scenario | | | High scenario | | | Zero scenario | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Population | | Percent foreign-born | Population | | Percent foreign-born | Population | | Percent foreign-born | Population | | Percent foreign-born |
| | Total | Foreign-born | | Total | Foreign-born | | Total | Foreign-born | | Total | Foreign-born | |
| 2016 . . . . | 323,128 | 43,845 | 13.57 | 323,128 | 43,845 | 13.57 | 323,128 | 43,845 | 13.57 | 323,128 | 43,845 | 13.57 |
| 2020 . . . . | 332,639 | 46,703 | 14.04 | 330,640 | 44,815 | 13.55 | 335,638 | 49,536 | 14.76 | 326,641 | 41,037 | 12.56 |
| 2025 . . . . | 344,234 | 50,270 | 14.60 | 339,532 | 46,129 | 13.59 | 351,287 | 56,481 | 16.08 | 330,128 | 37,846 | 11.46 |
| 2030 . . . . | 355,101 | 53,783 | 15.15 | 347,467 | 47,464 | 13.66 | 366,552 | 63,261 | 17.26 | 332,198 | 34,825 | 10.48 |
| 2035 . . . . | 364,862 | 57,104 | 15.65 | 354,104 | 48,642 | 13.74 | 380,999 | 69,797 | 18.32 | 332,587 | 31,718 | 9.54 |
| 2040 . . . . | 373,528 | 60,156 | 16.10 | 359,522 | 49,600 | 13.80 | 394,536 | 75,991 | 19.26 | 331,510 | 28,486 | 8.59 |
| 2045 . . . . | 381,390 | 62,894 | 16.49 | 364,026 | 50,303 | 13.82 | 407,437 | 81,780 | 20.07 | 329,295 | 25,121 | 7.63 |
| 2050 . . . . | 388,922 | 65,310 | 16.79 | 368,068 | 50,760 | 13.79 | 420,202 | 87,134 | 20.74 | 326,358 | 21,660 | 6.64 |
| 2055 . . . . | 396,557 | 67,434 | 17.00 | 372,068 | 51,016 | 13.71 | 433,290 | 92,061 | 21.25 | 323,084 | 18,179 | 5.63 |
| 2060 . . . . | 404,483 | 69,333 | 17.14 | 376,226 | 51,147 | 13.59 | 446,866 | 96,611 | 21.62 | 319,706 | 14,775 | 4.62 |
| **Change: 2016 to 2060 . .** | **81,356** | **25,488** | **3.57** | **53,099** | **7,303** | **0.03** | **123,738** | **52,766** | **8.05** | **–3,422** | **–29,070** | **–8.95** |

Source: U.S. Census Bureau, 2017 National Population Projections.

to increase by 25 million, or 58 percent, from 44 million in 2016 to 69 million in 2060. The high immigration scenario produces a larger projected foreign-born population in 2060 than the main series. Under our assumption of high immigration, 97 million individuals, (22 percent of the population) are projected to be foreign-born in 2060. This is a 120 percent increase in the foreign-born population between 2016 and 2060. Under the low immigration scenario, the projected increase of 7 million, or 17 percent, in the foreign-born population is much lower, and the share of the population that is foreign-born remains relatively stable at around 14 percent for all years between 2016 and 2060. The zero scenario, which assumes that no new international migrants enter the nation between 2016 and 2060, projects a predictable decline in the foreign-born population to 15 million or 4.6 percent of the total U.S. population in 2060.



Figure 4.

**Percentage of the U.S. Population That Is Foreign-Born: 1850 to 2016, Projected 2017 to 2060**

A high immigration scenario would produce a historic-high share of foreign-born in the United States in 2060.

Source: U.S. Census Bureau, 2017 National Population Projections; 2016 American Community Survey; and 1850–2000 Historical Statistics on the Foreign-Born Population.

Figure 4 illustrates the impact that different immigration assumptions could have on the projected foreign-born population. Consistent with our assumptions about immigration, higher immigration produces a larger share of foreign-born in the population. In both the main series and the high scenario, the share of the population in 2060 that is foreign-born is projected to exceed the historic high of 14.8 percent. Conversely, the zero immigration scenario projects the share of the population that is foreign-born will decline to 4.6 percent in 2060, lower than the historic low of 4.7 percent.

Though we assume different levels of immigration in our alternative scenarios, each of the scenarios

with immigration assumes the same country of origin distribution for the immigrants as was included in the main series. For example, we did not increase migration from Asian nations any more than we did for other nations. Changing just the level of migration has implications for the race and ethnic makeup of the country in the coming decades, but there are some patterns that persist regardless of immigration scenario.

In all immigration scenarios, we are projecting declines in the share of the total U.S. population that is White (Figure 5). The amount of decline varies across scenarios, with assumptions of higher migration producing populations that have lower

percentages of people reported as White. At the start of the projection period, 77 percent of the U.S. population was White alone. In the main series, the share of the population that is White alone is projected to decline 8.9 percentage points to 68 percent of the population in 2060. These percentage-point declines between 2016 and 2060 are larger in the high scenario and smaller in the low and zero scenarios. In 2060, the projected share of the population that is White alone ranges from 67 percent in the high scenario to 72 percent in the zero scenario.

The number of individuals identifying as White alone is expected to increase over time, with the declining share of the population



Figure 5.
**Percentage-Point Change in the Race Distribution of the U.S. Population Between 2016 and 2060 by Immigration Scenario**

Changing immigration levels has a large impact on the share of the population that is Asian alone.

Z Rounds to zero.
Note: AIAN is American Indian and Alaska Native and NHPI is Native Hawaiian and Other Pacific Islander. Black is used interchangeably with Black or African American.
Source: U.S. Census Bureau, 2017 National Population Projections.

in this group resulting from faster growth in the other races. In contrast, the non-Hispanic White alone population is projected to decline in all scenarios between 2016 and 2060 (Table 5). In 2016, there were an estimated 198 million individuals in this group. In the high scenario, this number is projected to decrease by 11 million (5.5 percent) to 187 million in 2060. The 2060 projection for this group in the low scenario is 174 million, representing a decrease of 24 million (12 percent), and in the zero immigration scenario it is 163 million. The non-Hispanic White alone population is projected to decrease the most between 2016 and 2060 in the zero immigration scenario (35 million or 17 percent). In all but the zero immigration scenario, the share of the population that is non-Hispanic White

alone is expected to decline to less than 50 percent by 2060, falling from 61 percent in 2016 to 46 percent in the low scenario, 44 percent in the main, and 42 percent in the high. In the zero immigration scenario, 51 percent of the U.S. population is projected to be non-Hispanic White alone in 2060.

Another consistent pattern projected in all migration scenarios is the multiple race population growing faster than single race groups between 2016 and 2060. In 2016, just under 8.5 million residents were classified as more than one race. This number is projected to more than double for all scenarios. The zero immigration scenario, with a projected 160 percent increase, has the smallest Two or More Races population in 2060 (22 million). In contrast, the

high immigration scenario has the largest increase in this category (216 percent or 18 million) and the largest Two or More Races population in 2060 (27 million).

Of the single race groups, the Asian population is impacted the most by the varying assumptions of immigration. In the main series, the Asian alone population was projected to increase from 18 million in 2016 to 37 million in 2060. This is an increase of 101 percent. Whereas the Asian population is projected to double in the main series, the low scenario projects slower growth with an increase of 11 million or 60 percent. In the high scenario, the Asian alone population in 2060 is projected to be 2.6 times larger than it was in 2016, representing a growth of 30 million or 162 percent. The zero scenario provides an interesting

Table 5.
## Projected Race and Hispanic Origin by Immigration Scenario: 2016 to 2060
(Numbers in thousands)

| Characteristic | Estimate | | Change: 2016 to 2060 | |
|---|---|---|---|---|
| | 2016 | 2060 | Number | Percent |
| **Main series, total population . . . . . . . . . . . . .** | **323,128** | **404,483** | **81,355** | **25.2** |
| One race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 314,648 | 379,228 | 64,580 | 20.5 |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 248,503 | 275,014 | 26,511 | 10.7 |
| Non–Hispanic White . . . . . . . . . . . . . . . . . | 197,970 | 179,162 | –18,808 | –9.5 |
| Black or African American . . . . . . . . . . . . . . . | 43,001 | 60,690 | 17,689 | 41.1 |
| American Indian and Alaska Native . . . . . . . . | 4,055 | 5,583 | 1,528 | 37.7 |
| Asian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,319 | 36,815 | 18,496 | 101.0 |
| Native Hawaiian and Other Pacific Islander . . . . . . . . | 771 | 1,125 | 354 | 45.9 |
| Two or More Races . . . . . . . . . . . . . . . . . . . . . . | 8,480 | 25,255 | 16,775 | 197.8 |
| | | | | |
| Hispanic or Latino. . . . . . . . . . . . . . . . . . . . . . . . | 57,470 | 111,216 | 53,746 | 93.5 |
| | | | | |
| **Alternative Net Migration Scenarios** | | | | |
| | | | | |
| **Low scenario, total population . . . . . . . . . . .** | **323,128** | **376,226** | **53,098** | **16.4** |
| One race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 314,648 | 352,003 | 37,355 | 11.9 |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 248,503 | 259,559 | 11,056 | 4.4 |
| Non–Hispanic White . . . . . . . . . . . . . . . . . | 197,970 | 173,886 | –24,084 | –12.2 |
| Black or African American . . . . . . . . . . . . . . . | 43,001 | 56,696 | 13,695 | 31.8 |
| American Indian and Alaska Native . . . . . . . . | 4,055 | 5,377 | 1,322 | 32.6 |
| Asian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,319 | 29,336 | 11,017 | 60.1 |
| Native Hawaiian and Other Pacific Islander . . . . . . . . | 771 | 1,035 | 264 | 34.2 |
| Two or More Races . . . . . . . . . . . . . . . . . . . . . . | 8,480 | 24,223 | 15,743 | 185.6 |
| | | | | |
| Hispanic or Latino. . . . . . . . . . . . . . . . . . . . . . . . | 57,470 | 100,039 | 42,569 | 74.1 |
| | | | | |
| **High scenario, total population . . . . . . . . . .** | **323,128** | **446,866** | **123,738** | **38.3** |
| One race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 314,648 | 420,106 | 105,458 | 33.5 |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 248,503 | 298,198 | 49,695 | 20.0 |
| Non–Hispanic White . . . . . . . . . . . . . . . . . | 197,970 | 187,068 | –10,902 | –5.5 |
| Black or African American . . . . . . . . . . . . . . . | 43,001 | 66,675 | 23,674 | 55.1 |
| American Indian and Alaska Native . . . . . . . . | 4,055 | 5,892 | 1,837 | 45.3 |
| Asian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,319 | 48,074 | 29,755 | 162.4 |
| Native Hawaiian and Other Pacific Islander . . . . . . . . | 771 | 1,268 | 497 | 64.5 |
| Two or More Races . . . . . . . . . . . . . . . . . . . . . . | 8,480 | 26,760 | 18,280 | 215.6 |
| | | | | |
| Hispanic or Latino. . . . . . . . . . . . . . . . . . . . . . . . | 57,470 | 127,978 | 70,508 | 122.7 |
| | | | | |
| **Zero scenario, total population . . . . . . . . . .** | **323,128** | **319,706** | **–3,422** | **–1.1** |
| One race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 314,648 | 297,699 | –16,949 | –5.4 |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 248,503 | 228,680 | –19,823 | –8.0 |
| Non–Hispanic White . . . . . . . . . . . . . . . . . | 197,970 | 163,326 | –34,644 | –17.5 |
| Black or African American . . . . . . . . . . . . . . . | 43,001 | 48,712 | 5,711 | 13.3 |
| American Indian and Alaska Native . . . . . . . . | 4,055 | 4,955 | 900 | 22.2 |
| Asian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,319 | 14,511 | –3,808 | –20.8 |
| Native Hawaiian and Other Pacific Islander . . . . . . . . | 771 | 842 | 71 | 9.2 |
| Two or More Races . . . . . . . . . . . . . . . . . . . . . . | 8,480 | 22,007 | 13,527 | 159.5 |
| | | | | |
| Hispanic or Latino. . . . . . . . . . . . . . . . . . . . . . . . | 57,470 | 77,691 | 20,221 | 35.2 |

Note: Hispanic origin is considered an ethnicity, not a race. Hispanics may be of any race. Responses of "Some Other Race" from the 2010 Census are modified. For more information, see <https://www2.census.gov/programs-surveys/popest/technical-documentation /methodology/modified-race-summary-file-method/mrsf2010.pdf>.

Source: U.S. Census Bureau, 2017 National Population Projections.

## PROJECTING RACIAL DIVERSITY

The 2017 National Projections are calculated using race categories consistent with the 1997 Office of Management and Budget (OMB) revised standards for the classification of federal data on race and ethnicity. The five primary race categories are:

**White:** A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Black or African American:** A person having origins in any of the black racial groups of Africa.[1]

**American Indian and Alaska Native (AIAN):** A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

**Asian:** A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including countries such as Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

**Native Hawaiian and Other Pacific Islander (NHPI):** A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.[2]

Since the 2000 Census, individuals have been able to self-identify with one or more racial groups. Additionally, individuals are asked to self-identify their ethnicity as either Hispanic or not Hispanic. Therefore, official U.S. Census Bureau estimates are produced for the 31 combinations of race groups and two ethnic groups, creating a total of 62 possible race and Hispanic origin categories. In our population projection publications, we tabulate race data for single race groups (e.g., White alone) as well as for race categories either alone or in combination with another racial group (e.g., White alone or in combination). Some Census Bureau tabulations also present the race and Hispanic origin data side-by-side to provide mutually exclusive race and Hispanic origin population groups (e.g., Hispanic, non-Hispanic White, non-Hispanic Black, etc.) which add to the total population.

We understand that the projected future racial and ethnic diversity of the nation depends on which tabulations are employed to present the race and Hispanic origin distributions of the U.S. population, and therefore we present these data in several ways. In our tabulations, we present one approach where the percentage of the U.S. population that is "White" (defined as non-Hispanic White alone) in the main series is projected to decrease from 61 percent in 2016 to 44 percent in 2060. In another tabulation, we present the "White" population as White alone or in combination, regardless of Hispanic origin, which represents a larger share of the overall population and is projected to have a smaller decrease over time, from 79 percent in 2016 to 74 percent in 2060. One of the challenges with using the alone or in combination groups as a comparative statistic, however, is that there is overlap with them and they do not sum up to the total population because people identifying with more than one race are counted in more than one category.

In addition, there are other caveats to keep in mind when considering the projected future racial and ethnic diversity of the nation. Such caveats do not apply to demographic characteristics that have a biological basis and can be measured objectively, such as age and sex (Hogan et al., 2015). The racial

---

[1] The terms "Black or African American" and "Black" are used interchangeably in this report.

[2] In this report, the acronym "NHPI" is sometimes used to refer to the Native Hawaiian and Other Pacific Islander population. The formal "Native and Other Pacific Islander" term generally is used in the tables and graphs.

**PROJECTING RACIAL DIVERSITY**—Con.

and ethnic groups that we have currently defined for future population projections are based upon current conceptual definitions. They are understood to be sociopolitical constructs and subject to change over time, as they did in 1997 when OMB issued revised federal standards for race and ethnicity. Since the first census in 1790, the Census Bureau has collected information on race/ethnicity and the census form has reflected changes in society and in the way the Census Bureau classifies race and ethnicity. Today, the Census Bureau collects race and ethnic data following OMB guidelines, and these data are based upon self-identification.

Furthermore, recent research has shown that the official OMB definitions of racial and ethnic groups do not necessarily align with how many individuals see themselves and identify on census forms (Mathews et al., 2017). One challenge we currently face is how Americans view "race" and "ethnicity" differently than in decades past. In our diverse society, a growing number of people find the

current race and ethnic categories confusing, or they wish to see their own specific group reflected on the census questionnaire. Census Bureau research has found that over time, there have been a growing number of people, especially people of Hispanic, Caribbean, Middle Eastern, North African, or multiracial heritage who do not identify with any of the official OMB race categories. For example, an individual with Middle Eastern heritage, while defined as "White" by the current OMB standards, may not identify as White and instead identify with a different racial group or groups. Additionally, there is evidence showing that some people change their own racial identity over time (Liebler et al., 2017). These complexities have not been incorporated into our methodological assumptions about the future racial composition of the U.S. population and how that may change over time or how this could contribute to differences between what we are currently projecting and what may actually happen over the next four decades.

comparison point for examining changes in the size of the projected Asian population. All of the changes in the racial and ethnic composition in the population for the zero immigration scenario are the result of population momentum, or the births and deaths occurring to the population existing at the start of the projection period. In this scenario, the Asian alone population is projected to decline by 3.8 million or 21 percent between 2016 and 2060. The projected Asian growth in the other scenarios is driven entirely by immigration. Asians are assumed to have below-replacement fertility throughout the time series. Without immigration, their numbers will decline.

The Hispanic[2] population is similarly impacted by changing assumptions of immigration, though to a lesser extent than the Asian population. In all scenarios with immigration, the Hispanic population is projected to increase in size between 2016 and 2060, with increases ranging from 43 million (low) to 71 million (high). High immigration scenarios project a larger share of the population to be Hispanic in 2060 than lower immigration scenarios; 29 percent of the U.S. population is projected to be Hispanic in the high immigration scenario compared to 27 percent in the low. In the zero immigration scenario, the share of the U.S. population

that is Hispanic is still projected to increase from 18 percent in 2016 to 24 percent in 2060; and the Hispanic population is projected to grow by 20 million, or 35 percent, during that time. The Hispanic population, in contrast to the Asian population, has higher levels of fertility, which allow that population to grow even in the absence of new migration into the country.

**POPULATION AGING**

Projected increases in life expectancy coupled with low fertility produce an aging population in all of the projection scenarios (Tables 6a and 6b). By 2030, more than 20 percent of the U.S. population will be aged 65 and older. In the high scenario, this milestone

---

[2] The terms "Hispanic or Latino" and "Hispanic" are used interchangeably in this report.

Table 6a.
## Age Distribution of the Population by Immigration Scenario: 2016 to 2060
(Numbers in thousands)

| Age | 2016 | 2020 | 2030 | 2040 | 2050 | 2060 | Change: 2016 to 2060 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Number | Percent |
| **Main series, total population . . . . .** | **323,128** | **332,639** | **355,101** | **373,528** | **388,922** | **404,483** | **81,355** | **25.18** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . | 73,642 | 73,967 | 75,652 | 77,131 | 78,225 | 80,137 | 6,495 | 8.82 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . | 200,241 | 202,621 | 206,311 | 215,571 | 225,023 | 229,670 | 29,429 | 14.70 |
| 65 years and over . . . . . . . . . . . . . . . . . . . | 49,244 | 56,052 | 73,138 | 80,827 | 85,675 | 94,676 | 45,432 | 92.26 |
| **Alternative Immigration Scenarios** | | | | | | | | |
| **Low scenario, total population . . .** | **323,128** | **330,640** | **347,467** | **359,522** | **368,068** | **376,226** | **53,098** | **16.43** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . | 73,642 | 73,532 | 73,555 | 73,044 | 72,666 | 73,040 | −602 | −0.82 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . | 200,241 | 201,169 | 201,238 | 206,637 | 211,552 | 211,772 | 11,531 | 5.76 |
| 65 years and over . . . . . . . . . . . . . . . . . . . | 49,244 | 55,938 | 72,674 | 79,841 | 83,850 | 91,414 | 42,170 | 85.63 |
| **High scenario, total population. . .** | **323,128** | **335,638** | **366,552** | **394,536** | **420,202** | **446,866** | **123,738** | **38.29** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . | 73,642 | 74,618 | 78,797 | 83,261 | 86,563 | 90,780 | 17,138 | 23.27 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . | 200,241 | 204,799 | 213,922 | 228,970 | 245,228 | 256,517 | 56,276 | 28.10 |
| 65 years and over . . . . . . . . . . . . . . . . . . . | 49,244 | 56,221 | 73,832 | 82,305 | 88,411 | 99,569 | 50,325 | 102.20 |
| **Zero scenario, total population . . .** | **323,128** | **326,641** | **332,198** | **331,510** | **326,358** | **319,706** | **−3,422** | **−1.06** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . | 73,642 | 72,663 | 69,360 | 64,870 | 61,546 | 58,842 | −14,800 | −20.10 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . | 200,241 | 198,265 | 191,090 | 188,770 | 184,610 | 175,974 | −24,267 | −12.12 |
| 65 years and over . . . . . . . . . . . . . . . . . . . | 49,244 | 55,712 | 71,748 | 77,870 | 80,201 | 84,890 | 35,646 | 72.39 |

Source: U.S. Census Bureau, 2017 National Population Projections.

Table 6b.
## Age Distribution of the Population by Immigration Scenario: 2016 to 2060
(In percent)

| Age | 2016 | 2020 | 2030 | 2040 | 2050 | 2060 | Percentage-point change: 2016 to 2060 |
|---|---|---|---|---|---|---|---|
| **Main series, total population . . . . . .** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **X** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . . | 22.79 | 22.24 | 21.30 | 20.65 | 20.11 | 19.81 | −2.98 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . . | 61.97 | 60.91 | 58.10 | 57.71 | 57.86 | 56.78 | −5.19 |
| 65 years and over . . . . . . . . . . . . . . . . . . . . | 15.24 | 16.85 | 20.60 | 21.64 | 22.03 | 23.41 | 8.17 |
| **Alternative Immigration Scenarios** | | | | | | | |
| **Low scenario, total population . . . . .** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **X** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . . | 22.79 | 22.24 | 21.17 | 20.32 | 19.74 | 19.41 | −3.38 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . . | 61.97 | 60.84 | 57.92 | 57.48 | 57.48 | 56.29 | −5.68 |
| 65 years and over . . . . . . . . . . . . . . . . . . . . | 15.24 | 16.92 | 20.92 | 22.21 | 22.78 | 24.30 | 9.06 |
| **High scenario, total population. . . . .** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **X** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . . | 22.79 | 22.23 | 21.50 | 21.10 | 20.60 | 20.31 | −2.48 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . . | 61.97 | 61.02 | 58.36 | 58.04 | 58.36 | 57.40 | −4.57 |
| 65 years and over . . . . . . . . . . . . . . . . . . . . | 15.24 | 16.75 | 20.14 | 20.86 | 21.04 | 22.28 | 7.04 |
| **Zero scenario, total population. . . . .** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **100.00** | **X** |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . . | 22.79 | 22.25 | 20.88 | 19.57 | 18.86 | 18.40 | −4.39 |
| 18 to 64 years . . . . . . . . . . . . . . . . . . . . . . | 61.97 | 60.70 | 57.52 | 56.94 | 56.57 | 55.04 | −6.93 |
| 65 years and over . . . . . . . . . . . . . . . . . . . . | 15.24 | 17.06 | 21.60 | 23.49 | 24.57 | 26.55 | 11.31 |

X Not applicable.
Source: U.S. Census Bureau, 2017 National Population Projections.

Figure 6.

## Numeric Difference Between the Population Under 18 and the Population Aged 65 and Older by Immigration Scenario: 2016 to 2060

In all migration scenarios, the population aged 65 and older will be larger than the child population by 2060.



Note: Differences are calculated by subtracting the population aged 65 and older from the population aged 0 to 17. Years with negative differences are years where the population aged 65 and older is larger than the population under the age of 18.
Source: U.S. Census Bureau, 2017 National Population Projections.

is reached in 2028. For the low scenario, it occurs in 2026; and in 2025 for the zero scenario. The size of the population aged 65 and older is projected to exceed the population under the age of 18 in all immigration scenarios. The date at which this occurs is earliest in the zero immigration scenario (2029), followed by the low immigration scenario (2031), and then the high (2045) (Figure 6).

Looking at the zero immigration scenario relative to the other projection scenarios illustrates how immigration helps to slow the pace of aging by adding to the population at the younger ages. Between 2016 and 2060, the zero immigration scenario projects declines in all age groups below 65 years. The population under the age of 18 is projected to decline by 15 million or 20 percent between 2016 and 2060, while

the population aged 18 to 64 is projected to decline by 24 million (12 percent) over the same time period. In contrast, the population aged 65 and older is projected to nearly double between 2016 and 2060, increasing from 49 million in 2016 to 85 million in 2060. The share of the U.S. population that is aged 65 or older in the zero scenario is projected to increase from 15 percent in 2016 to 27 percent in 2060.

## SUMMARIZING THE AGE STRUCTURE OF A POPULATION

Demographers have a number of tools that they use to communicate the age structure of a population. Among the most common of these are median age, dependency ratios, and population pyramids.

Median age (Table 7) tells the age at which half of a population is older and half of the population is younger. An increase in median age, such as we see in each of the population projection scenarios, provides evidence of population aging. Differences in the amount of increase help us to see which of the immigration scenarios produce the oldest population. In 2016, median age for the United States was 37.9 years. By 2060, median age in the main series is projected to increase to 42.9 years. Projected increases in median age between 2016 and 2060 range from a low of 4.0 years in the high scenario to 7.8 years in the zero scenario. The zero immigration scenario, which has the largest increase in the share of the population over the age of 65 between 2016 and 2060, also has the highest median age in 2060, 45.7. Looking at median age over time can give some information on how the age of the population is changing, but it is just one summary measure and therefore does not provide a complete picture of a population's age distribution.

Dependency ratios (Table 8) are another summary measure used to describe age structure. Dependency ratios are an indicator of the potential burden of the dependent population, approximated by those under 18 years and those 65 years and over, on those in the working-age population. The ratios are calculated by dividing the number of people in the dependent age groups by the number in the working ages and then multiplying by 100. Growth in the old age dependency ratio over time, as we see in each of these scenarios, is consistent with the larger shares of the population in the oldest ages relative to the share of the population in the adult ages. Similarly, the youth dependency ratio in each of the scenarios decreases between 2016 and 2060, consistent with the decreasing shares of the population in the youngest ages. The high immigration scenario, which has the largest projected youth population in 2060, has the largest youth dependency ratio (35.4), while the zero immigration scenario has the largest old-age dependency ratio in 2060 (48.2).

Population pyramids (Figure 7) differ slightly from the other two measures in that they are a visual tool for evaluating the age structure of the population. Population pyramids provide a comprehensive look at the age structure of the population by showing the share of the population in each age as opposed to providing a simple summary statistic like the other measures do. Looking at population pyramids from each of the scenarios for the same year shows the impact that migration has on the size of the population across age groups. The shape of the overall pyramid is similar for the main, low, and high scenarios, but the bars are longer in the high scenario relative to the others because there are more people in all age groups. In the zero immigration scenario, there is a narrowing of the base, which shows that the child and young adult population in this scenario is smaller in 2060 than the population in the older age groups.

Table 7.
## Projected Median Age by Immigration Scenario: 2016 to 2060

| Year | Main series | Alternative immigration scenario | | |
| | | Low | High | Zero |
| --- | --- | --- | --- | --- |
| 2016 . . . . . . . . . . . . . . . . . . . | 37.9 | 37.9 | 37.9 | 37.9 |
| 2020 . . . . . . . . . . . . . . . . . . . | 38.5 | 38.6 | 38.4 | 38.8 |
| 2030 . . . . . . . . . . . . . . . . . . . | 40.1 | 40.4 | 39.6 | 41.2 |
| 2040 . . . . . . . . . . . . . . . . . . . | 41.5 | 42.0 | 40.8 | 43.3 |
| 2050 . . . . . . . . . . . . . . . . . . . | 42.3 | 42.9 | 41.5 | 44.5 |
| 2060 . . . . . . . . . . . . . . . . . . . | 42.9 | 43.7 | 41.9 | 45.7 |
| **Change: 2016 to 2060 . . .** | **5.0** | **5.8** | **4.0** | **7.8** |

Source: U.S. Census Bureau, 2017 National Population Projections.

Table 8.
## Projected Dependency Ratios by Immigration Scenario: 2020 to 2060

| Old-age dependency | | | | |
| Year | Main series | Alternative immigration scenario | | |
| | | Low | High | Zero |
| --- | --- | --- | --- | --- |
| 2020 . . . . . . . . . . . . . . . . | 27.7 | 27.8 | 27.5 | 28.1 |
| 2030 . . . . . . . . . . . . . . . . | 35.5 | 36.1 | 34.5 | 37.5 |
| 2040 . . . . . . . . . . . . . . . . | 37.5 | 38.6 | 35.9 | 41.3 |
| 2050 . . . . . . . . . . . . . . . . | 38.1 | 39.6 | 36.1 | 43.4 |
| 2060 . . . . . . . . . . . . . . . . | 41.2 | 43.2 | 38.8 | 48.2 |

| Youth dependency | | | | |
| Year | Main series | Alternative immigration scenario | | |
| | | Low | High | Zero |
| --- | --- | --- | --- | --- |
| 2020 . . . . . . . . . . . . . . . . | 36.5 | 36.6 | 36.4 | 36.6 |
| 2030 . . . . . . . . . . . . . . . . | 36.7 | 36.6 | 36.8 | 36.3 |
| 2040 . . . . . . . . . . . . . . . . | 35.8 | 35.3 | 36.4 | 34.4 |
| 2050 . . . . . . . . . . . . . . . . | 34.8 | 34.3 | 35.3 | 33.3 |
| 2060 . . . . . . . . . . . . . . . . | 34.9 | 34.5 | 35.4 | 33.4 |

Note: Dependency ratios are a measure of potential burden on the working-age population. Old-age dependency represents the population aged 65 and older divided by the working-age population (18 to 64 years old), and the youth ratio is the population aged 0 to 17 divided by the working-age population. These values are multiplied by 100.
Source: U.S. Census Bureau, 2017 National Population Projections.

A growing older population is not unique to the zero immigration scenario; all of the scenarios show projected increases in the size of the population that is aged 65 and older between 2016 and 2060. The largest increase is projected to occur in the high immigration scenario, where the population in this age group is expected to increase by 50 million, or 102 percent, reaching just under 100 million in 2060. Larger increases in the higher immigration scenario are not unexpected since those migrants who enter the population and remain are aged forward throughout the time series.

Though the high immigration scenario shows the largest numeric and percentage increases in the population aged 65 and older, its increase in the share of the total population aged 65 and older between 2016 and 2060 is projected to be the smallest across the scenarios. By 2060, 22.3 percent of the U.S. population is projected to be aged 65 or older in the high scenario, compared to 23.4 in the main series, 24.3 in the low, and 26.6 in the zero.

A decline in the share of the population under the age of 18 is also expected to occur across all immigration scenarios. In 2016, 22.8 percent of the U.S. population was under the age of 18, but by 2060, this percentage is projected to drop to 20.3 in the high scenario, 19.8 in the middle, 19.4 in the low, and 18.4 in the zero. Aside from the zero immigration scenario, the low scenario is the only other scenario in which we are projecting numeric declines in the youth population. The population under the age of 18 is projected to decline by 602,000 (0.8 percent) between 2016 and 2060 in the low scenario. During this same time, it is projected to increase by 6.5 million (8.8 percent) in the main series and 17 million (23 percent) in the high scenario. Again, this pattern of change is not unexpected. Higher levels of migration bring in more people at the younger ages who add to the population both through their presence and through their fertility.

Figure 7.
## United States Population by Age and Sex in 2060 by Immigration Scenario

Reduced immigration decreases the size of the child population in 2060.



Source: U.S. Census Bureau, 2017 National Population Projections.

## SUMMARY

Population projections are a useful planning tool, but their utility is limited by the extent to which the assumptions about population change reflect the actual trends that occur in the future. The alternative scenarios of projections discussed throughout this report are a way of examining the impact that changing our assumptions about one component of population change—immigration—would have on the size and composition of the U.S. population in the years to come. Projecting international migration is challenging because it is influenced by political, economic, and social factors from both the sending and receiving nations. This creates a level of uncertainty that is not present in fertility and mortality. Creating projections with different migration scenarios is one way of addressing this uncertainty. By varying the levels of immigration, we get a range of potential outcomes for the size and composition of the U.S. population in the years to come. Different assumptions about international migration lead to changes in the projected growth of the total population, the racial and ethnic makeup of the population, and its age structure. Higher immigration produces a larger, younger, and more diverse population, while the absence of immigration over the next four decades will have the opposite result.

## DATA SOURCES AND METHODOLOGY

The projections in this report are the third series of national population projections based on the 2010 Census. They project the total U.S. population as of July 1 for the years 2017 to 2060, using official population estimates for 2016 as the base population. When both population estimates and projections are available, estimates are the preferred data. The universe is the resident population of the United States (50 states and the District of Columbia). The 2017 National Population Projections include projections of the resident population by age, sex, race, Hispanic origin, and nativity.

The projections were produced using a cohort-component method beginning with an estimated base population for July 1, 2016. In this method, the components of population change are projected separately for each birth cohort (persons born in a given year) based on past trends. For each year from 2017 to 2060, the population is advanced one year of age using the projected age-specific survival rates and levels of net international migration for that year. A new birth cohort is added to the population by applying the projected age-specific fertility rates to the female population. Births, adjusted for infant mortality and net international migration, form the new population under 1 year old. In its simplest form,

the cohort component method is expressed as:

$$P_t = P_{t-1} + B_{t-1,t} - D_{t-1,t} + M_{t-1,t}$$

Where:

$P_t$ = population at time t.

$P_{t-1}$ = population at time t-1.

$B_{t-1,t}$ = births in the interval from time t-1 to time t.

$D_{t-1,t}$ = deaths in the interval from time t-1 to time t.

$M_{t-1,t}$ = net migration in the interval from time t-1 to time t.

Projections produced through the cohort-component method are driven by assumptions regarding each of the components of change. In order to project the base population forward in this manner, separate projections of fertility, mortality, and net international migration are required to serve as inputs into the cohort-component model.

Historical mortality trends were calculated using the National Center for Health Statistics' data on deaths and the U.S. Census Bureau's population estimates for 1989 to 2014. Fertility trends were calculated using the National Center for Health Statistics' birth data and the Census Bureau's estimates of the female population. The time series included data from 1990 to 2014. Trends in net international migration were primarily based on decennial census and American Community Survey estimates on foreign-born immigration for the period from 1980 to 2015.

For more information on the data and methodology, see the report on 2017 National Population Projections: Methodology and Assumptions <www.census.gov /programs-surveys/popproj /technical-documentation /methodology.html>.

## DATA ACCURACY

The accuracy of the projections depend on the accuracy and validity of several data sources. First, the projections are based on the 2010 Census, which may contain nonsampling error because of errors in enumeration such as undercounting or overcounting different demographic groups. Nonsampling error may be a byproduct of how a questionnaire is designed, how respondents interpret questions, how able or willing respondents are to provide correct answers, and how accurately the answers are coded and classified. Technical documentation for the 2010 Census is available at <www.census.gov/prod /cen2010/doc/sf1.pdf>.

Second, the projections use administrative records from the National Center for Health Statistics on births and deaths. Reporting error on the birth or death certificates would affect the population projections because these data are used to calculate fertility rates and mortality rates for the population. Third, the projections use the American Community Survey to assign nativity to the base population and calculate immigration and emigration rates of the foreign-born. Statistics that come from surveys are subject to nonsampling error, as noted above, as well as sampling error. The latter occurs because surveys measure the characteristics of a sample of people, instead of those of the entire population (as from a census). Sample-based estimates vary depending on the particular sample that is selected from the population, but all survey-based estimates attempt to approximate the actual figures from the population. Measures of the size of sampling error reflect variation in the estimates over all possible samples that could have been selected from the population using the same sampling, data collection, and processing methods. Technical documentation for the American Community Survey is available at <www.census.gov /programs-surveys/acs /methodology.html>.

Lastly, the projections did not attempt to predict future changes in policy or other factors, such as natural disasters or changing economic cycles, that might influence the population components and their magnitude of change. The projections are accurate only insofar as the assumptions about fertility, mortality, and net international migration hold true—assumptions that are based on historical trends. If the future trends or levels in fertility, mortality, or international migration differ radically from the historical patterns, then the population projections will be less accurate.

## REFERENCES

Hogan, Howard, Jennifer Ortman, and Sandra Colby, "Projecting Diversity: The Methods, Results, Assumptions, and Limitations of the U.S. Census Bureau's Population Projections," *West Virginia Law Review* 117(3), 2015.

Liebler, Carolyn, Sonya Porter, Leticia Fernandez, James Noon, and Sharon Ennis, "America's Churning Races: Race and Ethnicity Response Changes between Census 2000 and the 2010 Census," *Demography* 54:259-284, 2017.

Mathews, Kelly, Jessica Phelan, Nicholas Jones, Sarah Konya, Rachel Marks, Beverly Pratt, Julia Coombs, and Michael Bentley, "2015 National Content Test: Race and Ethnicity Analysis Report," U.S. Census Bureau, 2017, <www.census.gov/programs -surveys/decennial-census /2020-census/planning -management/final-analysis /2015nct-race-ethnicity -analysis.html>.

## SUGGESTED CITATION

Johnson, Sandra, "A Changing Nation: Population Projections Under Alternative Migration Scenarios," *Current Population Reports*, P25-1146, U.S. Census Bureau, Washington, DC, 2020.

## CONTACT

Sandra Johnson
Sandra.leigh.johnson@census.gov
301-763-4217

 Center for Immigration Studies

# Five Ways Immigration-Driven Population Growth Impacts Our Environment

By Matthew Sussis on November 19, 2018

Population growth in the United States is almost entirely driven by the federal government's immigration policy. The Census Bureau predicts that the nation's population will grow from 325.5 million today to 403.7 million by 2060 — and 96 percent of that increase of 78 million people is due to the current historically high level of immigration. As both Americans and as global citizens, we have an obligation to consider how such rapid growth might impact the planet around us.

As outlined in the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA), federal agencies are supposed to weigh the environmental impact of any new policies they introduce. Strangely enough, federal agencies have almost completely ignored these laws when it comes to immigration, even though immigration-driven population growth has a huge impact on the environment.

But how exactly does population growth affect America's natural resources and Americans' ways of life? Doesn't America, with its vast swaths of land in the middle of the country, have enough room to accommodate far more people than it currently does? In two now-deleted tweets that went viral last week, *New Yorker* journalist Osita Nwanevu mocked Americans who are concerned about immigration as "Elmer Whoever[s]" given that middle America is full of "vast and mostly empty country where 40 percent of the land is for cows":



While it is true that much of America's physical land is not currently used for residential purposes, but rather for agriculture, Nwanevu's logic ignores a whole plethora of problems related to large-scale population growth (not to mention the necessity of agriculture). Here are five of the biggest impacts that immigration-driven population growth is already having on our environment and our living conditions:

**1. Loss of Biodiversity and Species Extinction.** Overpopulation directly threatens a wide range of endangered animal species in the United States, as human consumption of resources crowds out and poisons other animals. The Center for Biological Diversity listed the top-10 U.S. species being driven to extinction by overpopulation. This includes the Florida panther, whose habitat has been destroyed by urban sprawl from the city centers in Florida; the San Joaquin kit fox, which has lost almost all of its habitat as grasslands were converted into farms; and the Loggerhead sea turtle, whose nesting areas have been converted into recreational beaches.

Overall, there are over 1,300 endangered or threatened species in the United States today and as a growing population demands more and more resources — from farmland to residential real estate to urban sprawl — these species will have fewer places to live.

**2. Water Shortages.** As immigration continues to drive the United States population higher, the demand for water continues to rise, yet the availability continues to decline. For example, a study out of Columbia University found that massive droughts in the Southeastern United States in 2007-2008 were due to the region's exploding population, which posed "the root of the water supply problem." Georgia's population grew from 6.5 million in 1990 to 9.5 million in 2007, and has now reached 10.4 million. Nearly a quarter of total water use in Georgia is for public water supply, meaning a higher population puts a large strain on water availability.

This problem goes beyond the Southeast, although it is especially visible there. Water managers in 40 states expect water shortages in the next decade, according to the National Environmental Education Foundation. These problems will likely be amplified by climate change, as warming climates mean higher rates of evaporation and lower snowpack, leading to less freshwater.

**3. Urban Sprawl.** More and more Americans live in cities, and this effect is amplified by immigration — both because it boosts the total number of Americans, and because immigrants disproportionately live in urban areas. Urban sprawl, or the expansion of cities, leads to the conversion of farmlands and grasslands into cities. A paper from the Public Library of Science found that the Southeastern United States will expand urbanization by 101 to 192 percent over the next 50 years. The researchers note that this urbanization, by fragmenting natural landscape, will "reduce habitat availability, suppress natural disturbance processes (such as wildfires), hinder management actions that come into conflict with urban areas, and likely eliminate existing corridors."

**4. Overcrowded Cities.** While the overcrowding of cities could possibly be mitigated by more immigrants moving to rural areas, the reality is that for a whole host of cultural and economic reasons, most settle in or near cities. Indeed, according to the census, immigrants are currently driving the increased population in most American cities, and the foreign-born population is heavily concentrated in the country's 10 largest metro areas. On top of the geographic expansion of cities, the actual number of residents in these urban areas will put growing levels of strain on public utilities such as trains.

The effects of overcrowding are already particularly visible in New York City, which is amplified by the fact that Manhattan is an island.

According to the *New York Times*, overcrowding is by far the largest cause of subway delays in Manhattan. There were approximately 20,000 average monthly delays in 2012, and more than 67,450 delays by mid-2017. That is partially due to the fact that the number of subway riders has risen to a 70-year high of six million riders per day. And of course, most Manhattanites cannot avoid the subway by taking a car instead. Just as the number of subway riders has grown, so too has the number of cars — a problem that led the New York City Council to restrict the number of Uber and Lyft cars on the road.

As immigration continues to fuel population growth, more and more cities will feel the strain of overcrowding that New York City is already experiencing, making mass transportation far more arduous.

**5. Carbon Emissions.** Immigration transfers populations of people from lower-polluting parts of the world to the United States, where CO2 emissions are far higher per person. According to a CIS study, U.S. immigrants produce an estimated 637 million tons of CO2 annually, which is 482 million tons more than these immigrants would have produced had they remained in their home countries.

Of course, this does not make immigrants responsible for global warming, nor does it mean that native-born Americans shouldn't do more to reduce their own footprints — in fact, the average immigrant in America emits 18 percent less CO2 than the average native-born American. However, it is dishonest to discuss large-scale immigration without considering the impact that immigration has on our climate.

Overall, it is tempting to survey the nearly four million square miles that makes up the land area of the United States — particularly low-density states such as Wyoming, Montana, and the Dakotas — and conclude that America could seamlessly grow its population much more through immigration with minimal repercussions. The reality is, however, that most immigrants do not settle in rural areas. Besides, regardless of where they settle, a larger number of Americans simply means a larger amount of strain on our finite natural resources. As climate change continues to impact everything from water supply to biodiversity, lawmakers ought to think long and hard about the wisdom of exacerbating those effects through a policy of large-scale immigration-driven population growth.

Topics: Population and Environment, National Environmental Policy Act (NEPA)

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/us-inflation-consumer-price-index-september-2021-11634074529

U.S. ECONOMY

# Accelerating Inflation Spreads Through the Economy

Higher inflation weighs on Fed policy, starts to have a broader impact on cost of living, wages and social-benefits programs



The Labor Department said consumer prices rose a seasonally adjusted 0.4% in September from August.

**PHOTO:** JOE RAEDLE/GETTY IMAGES

*By* [Gwynn Guilford](#)
Updated Oct. 13, 2021 3:30 pm ET

U.S. inflation accelerated last month and remained at its highest rate in over a decade, with price increases from pandemic-related labor and materials shortages rippling through the economy.

The Labor Department said last month's consumer-price index, which measures what consumers pay for goods and services, rose by 5.4% from a year earlier, in unadjusted terms. That is <u>the same rate as in June and July as the economy reopened</u>, and slightly higher than in August. The so-called core price index, which excludes the often-volatile categories of food and energy, in September climbed 4% from a year earlier, the same rate as in August.

On a monthly basis, the CPI <u>rose a seasonally adjusted 0.4% in September</u> from August, also faster than in August, which rose 0.3%.

The stretch of higher inflation — which many economists now expect to linger — is <u>weighing on policy decisions at the Federal Reserve</u> and starting to have a broader impact on the overall cost of living, wages and social benefits programs. The Social Security Administration said on Wednesday that higher inflation would trigger <u>a 5.9% increase for Social Security benefits</u> that seniors and other Americans receive, the largest increase in nearly 40 years. It also will increase Social Security taxes for high-wage workers. Last week, the Labor Department said employers increased wages in September by 4.6% compared with a year ago, a pickup from previous months.

**WSJ NEWSLETTER**

## Notes on the News

The news of the week in context, with
Tyler Blint-Welsh.

---

☑ I would also like to receive updates and special offers from Dow Jones and affiliates. I can unsubscribe at any time.

☐ I agree to the **Privacy Policy** and **Cookie Notice**.

| Enter your email | | SIGN UP |

In minutes released on Wednesday, the Fed said officials last month worried that disrupted supply chains were raising the risks of more persistent inflation as they firmed up plans to conclude their bond buying stimulus program by the middle of next year.

Unusually high demand is a crucial factor driving higher inflation. Spending jumped at an 11.9% pace in the second quarter as more people received Covid-19 vaccinations, businesses reopened and trillions of dollars in federal aid coursed through the economy. <u>Consumer spending continued to surge</u> in August.

<u>The shortage of workers</u> is also driving up wages, putting pressure on companies to raise prices. A sharp uptick in restaurant prices during the past few months is a sign of this pass-through from wages into higher prices, economists say.

**Consumer-price index, percent change from a month ago**



Source: Labor Department

<u>Rising energy prices</u>  driven by the global recovery in demand, disrupted supply and geopolitical forces—<u>could also keep prices aloft</u>. U.S. consumers are now paying an average of $3.29 a gallon for gasoline, the highest level in seven years, according to the U.S. Energy Information Administration. Steeper energy bills for businesses could increase the pressure to raise prices.

"Housing costs, low inventories and rising energy prices will keep inflation higher for longer," said James Knightley, chief international economist at ING, who now expects consumer inflation to remain above 5% through the first quarter of 2022. He added inflation could prompt the Federal Reserve to act "earlier and swifter" to alter monetary policy to head off inflation.

Prices for groceries, gasoline and heating fuels rose in September along with the cost of new vehicles, rent and furniture, the Labor Department said. Prices fell for used autos, airline fares and apparel.

Companies are struggling with scarce materials caused by a combination of snarled supply chains, disrupted production and elevated demand because of the pandemic. The

combination of truck-driver shortages and continued consumer demand for goods has gummed up ports, causing delays in deliveries of goods and sending shipping prices soaring.



Restaurant prices have risen sharply in recent months, as a worker shortage boosts wages. An Arlington, Va., restaurant in September.
**PHOTO:** JACQUELYN MARTIN/ASSOCIATED PRESS

Adam Lewin, who owns a building-materials distribution business based in Columbus, Ohio, started noticing the price increases in the spring. "And then it was just one after another," he said. His company, Hamilton Parker, sells masonry, tile, fireplaces and other building products to consumers and to other businesses, and it soon raised its own prices to keep up.

Shipping delays are compounding the uncertainty around prices. Delivery times for all of the company's products are stretched. Garage doors are arriving in 15 weeks when they used to take just two, Mr. Lewin said. With shipments so delayed, suppliers have begun raising prices on orders that had already been negotiated.

"The risk to us as a result of price changes is that projects can be canceled, impacting future sales. Customer relationships can be challenged based on unforeseen price changes, and there is significant stress on my team communicating these price updates," he said.

## 'The real story in the inflation data was the upside in the more cyclical and persistent components like rent.'

— Robert Rosener, senior U.S. economist, Morgan Stanley

Many companies are already planning to pass on higher labor and materials costs to consumers. In September, some 46% of small businesses said they planned to raise prices in the next three months, on net, according to the National Federation of Independent Business, a trade association, the most since monthly records began in 1986.

"It looks like some of these supply-chain and inventory challenges are going to stick with us for a bit longer—at least through the rest of this year," said Omair Sharif, founder of Inflation Insights LLC.

An example is the shortage of semiconductors that has curbed auto production, causing prices to soar for new and used vehicles. As new car sales slowed for the fifth straight month, the average price for a new vehicle in September soared nearly $4,900 from a year earlier, according to Kelley Blue Book. However, despite private-sector data signaling a rebound in used-car prices, the Labor Department tracked a slight decline last month.

Falling prices for used cars and airline fares masked the underlying inflationary trend, said Robert Rosener, senior U.S. economist at Morgan Stanley.

"The real story in the inflation data was the upside in the more cyclical and persistent components like rent," he said. "That tells us that there's an important source of support that is likely to keep the inflation data firm in the months ahead and potentially beyond."

Rent is a key category because it makes up nearly one-third of the CPI index and tends to influence inflation's future path. Tenant rent jumped 0.5% in September from August, the sharpest monthly rise since 2001. So-called owners' equivalent rent, which estimates what homeowners would pay each month to rent their own home, rose 0.4%, the most since 2006.

Fed officials are closely watching many inflation measures to gauge whether the recent jump in prices will prove temporary or lasting. One such factor is consumer expectations of future inflation, which can prove self-fulfilling as households are more likely to demand higher wages and accept higher prices when they anticipate higher future price growth. Consumers' median inflation expectation for three years from now rose to 4.2% in September, from 4% a month earlier, according to a survey by the New York Fed. September's reading was the highest since the survey began in 2013. Business expectations for inflation a year from now held steady at 3.1% in early October, the highest since the survey began in 2011, according to the Atlanta Fed.

Alternative inflation measures also show that price increases driving inflation <u>are coming from a broader set of products and services</u>, moving beyond pandemic driven forces that economists expect to be temporary. The Cleveland Fed's 16% trimmed-mean CPI, which captures price changes in the middle of the index, rose 3.6% in September compared with the same month a year ago, up from 3.2% in July and well above the 2% average between 2012 and 2019.



Clogged ports, such as in Los Angeles, are helping to lift shipping prices.

PHOTO: FREDERIC J. BROWN/AGENCE FRANCE-PRESSE/GETTY IMAGES

---

THE ECONOMY

More WSJ coverage, selected by the editors

Social Security Benefits to Rise by Highest Amount in 40 Years

Heard on the Street: Think You Can Predict Inflation? Think Again

Global Economy Falters Due to Inflation and Supply-Chain Woes

Fed Signals Asset Purchases Could End by Mid-2022

Capital Account: Is Fed's View Built on Sand?

---

**Write to** Gwynn Guilford at gwynn.guilford@wsj.com