# EXHIBIT 220



**United States Government Accountability Office**

Report to Congressional Addressees

February 2020

# IMMIGRATION

# Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings

LADOJ-ASYLUM2178



# GAO Highlights

Highlights of GAO-20-250, a report to congressional addressees

February 2020

## IMMIGRATION

## Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings

## Why GAO Did This Study

Individuals apprehended by DHS and placed into expedited immigration proceedings are to be removed from the country without a hearing in immigration court unless they express an intention to apply for asylum, or a fear of persecution, torture, or return to their country. Those with such "fear claims" are referred to USCIS for a credible fear screening. Individuals who have certain criminal convictions or who have a reinstated order of removal and claim fear are referred for a reasonable fear screening. Those with negative outcomes can request a review by EOIR's immigration judges. GAO was asked to review USCIS's and EOIR's processes for fear screenings.

This report examines (1) USCIS and EOIR data on fear screenings, (2) USCIS policies and procedures for overseeing fear screenings, and (3) USCIS and EOIR processes for workload management. GAO analyzed USCIS and EOIR data from fiscal years 2014 through mid-2019; interviewed relevant headquarters and field officials; and observed fear screenings in California, Texas, and Virginia, where most screenings occur.

## What GAO Recommends

GAO is making four recommendations, including that USCIS provide additional pre-departure training to USCIS asylum officers before they begin screening families, systematically record case outcomes of family members, and collect and analyze information on case delays. DHS concurred with GAO's recommendations.

View GAO-20-250. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

Data from the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and Department of Justice's Executive Office for Immigration Review (EOIR) indicate that their credible and reasonable fear caseloads generally increased from fiscal year 2014 through fiscal year 2018.

- USCIS's caseloads nearly doubled during this timeframe—from about 56,000 to almost 109,000 referrals for credible and reasonable fear screenings. Further, the credible fear caseload was larger in the first two quarters of fiscal year 2019 alone than in each of fiscal years 2014 and 2015. Referrals to USCIS for reasonable fear screenings also increased from fiscal years 2014 through 2018. USCIS asylum officers made positive determinations in 71 percent of all credible and reasonable fear screenings between fiscal years 2014 and the first two quarters of fiscal year 2019. The outcomes of the remaining screenings were generally split evenly (14 percent each) between negative determinations or administrative closures (such as if the applicant was unable to communicate).
- EOIR's caseload for immigration judge reviews of USCIS's negative credible and reasonable fear determinations also increased between fiscal year 2014 and fiscal year 2018. EOIR's immigration judges reviewed about 55,000 cases from fiscal year 2014 through the third quarter of 2019 (the most recent data available), and judges upheld USCIS's negative determinations in about three-quarters of all reviews.



**Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

- 0.1%
- 14.4%
- 14.2%
- 71.4%

Legend:
- Positive determination
- Negative determination
- Administrative closure[a]
- Pending resolution[b]

Source: GAO analysis of USCIS data.  |  GAO-20-250

[a]According to USCIS, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence in state or federal custody, inability to communicate, or other reasons.

[b]USCIS cases occurred from October 1, 2013 through March 30, 2019 and their status was as of July 22, 2019. Cases that remained in progress as of July 22, 2019 were "pending resolution."

United States Government Accountability Office

LADOJ-ASYLUM2179

USCIS has developed various policies and procedures for overseeing credible and reasonable fear screenings in accordance with the regulations governing those screenings, such as interview requirements and mandatory supervisory review. USCIS provides basic training for new asylum officers and other training at individual asylum offices that includes credible and reasonable fear. The training at asylum offices includes on-the-job training for officers newly-assigned to credible and reasonable fear cases and ongoing weekly training for incumbent officers—some of which includes credible and reasonable fear. However, USCIS asylum offices do not all provide additional pre-departure training before officers begin screening families in person at DHS's family residential centers. Asylum Division officials told GAO that additional training for asylum officers before they begin screening such cases is important—in particular, credible fear screenings at these facilities represent about one-third of USCIS's caseload. Almost all USCIS asylum offices send officers to the family residential centers, including those offices with small fear caseloads at the local level. Some asylum offices provide pre-departure training to officers being sent to screen families, but such training is inconsistent across offices. By comparison, officials from the Chicago and New York offices stated they do not provide formal pre-departure training, but rather direct or recommend that officers review Asylum Division guidance and procedures on family processing independently before they travel. Officials from two other offices stated they rely on the training asylum officers may receive throughout the year related to credible and reasonable fear, which can vary. Providing pre-departure training, in addition to USCIS's basic training for new asylum officers, would help USCIS ensure that officers from all asylum offices are conducting efficient and effective fear screenings of families.

Further, consistent with regulation, USCIS policy is to include any dependents on a principal applicant's credible fear determination if the principal applicant receives a positive determination, resulting in the principal and any dependents being placed into full removal proceedings with an opportunity to apply for various forms of relief or protection, including asylum. For example, a parent as a principal applicant may receive a negative determination, but his or her child may receive a separate positive determination. In the interest of family unity, USCIS may use discretion to place both the parent and child into full removal proceedings rather than the parent being expeditiously ordered removed in accordance with the expedited removal process. However, USCIS's case management system does not allow officers to record whether an individual receives a determination on his or her case as a principal applicant, dependent, or in the interest of family unity. Without complete data on all such outcomes, USCIS is not well-positioned to report on the scope of either the agency's policy for family members who are treated as dependents, pursuant to regulation, or USCIS's use of discretion in the interest of family unity.

USCIS and EOIR have processes for managing their respective credible and reasonable fear workloads. For example, USCIS uses national- and local-level staffing models to inform staffing allocation decisions. USCIS also sets and monitors timeliness goals for completing credible and reasonable fear cases. Although USCIS monitors overall processing times, it does not collect comprehensive data on some types of case delays, which officers told us can occur on a regular basis. Asylum officers whom GAO interviewed stated that certain delays could affect the number of credible or reasonable fear cases they can complete each day. Collecting and analyzing additional information on case delays would better position USCIS to mitigate the reasons for the delays and improve efficiency. EOIR has developed processes for immigration courts and judges to help manage its workload that include performance measures with timeliness goals for credible and reasonable fear reviews. EOIR data indicate that about 30 percent of credible and reasonable fear reviews are not completed within the required timeframes. EOIR officials said they plan to implement an automated tool in early 2020 to monitor court performance, including the credible and reasonable fear performance goals. Because implementation of the automated tool is planned for early 2020, it is too soon to know if EOIR will use the tool to monitor adherence to the required credible and reasonable fear review time frames or if it will help EOIR understand reasons for case delays.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 6 |
| | USCIS's and EOIR's Credible and Reasonable Fear Caseloads Generally Increased from Fiscal Years 2014 through 2018, and a Majority of USCIS Screening Outcomes were Positive | 12 |
| | USCIS Has Policies and Procedures for Overseeing Credible and Reasonable Fear Screenings, but Gaps in Training, Quality Assurance, and Family Processing Exist | 21 |
| | USCIS and EOIR Have Processes for Managing Credible and Reasonable Fear Workloads, but USCIS Does Not Have Complete Data on Case Delays | 40 |
| | Conclusions | 56 |
| | Recommendations for Executive Action | 57 |
| | Agency Comments | 58 |
| Appendix I | Objectives, Scope, and Methodology | 61 |
| Appendix II | Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases | 74 |
| Appendix III | Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security | 79 |
| Appendix IV | Comments from the Department of Homeland Security | 107 |
| Appendix V | GAO Contact and Staff Acknowledgments | 111 |

LADOJ-ASYLUM2181

Tables

Table 1: Department of Homeland Security (DHS) and Department of Justice (DOJ) Roles and Responsibilities in the Credible and Reasonable Fear Processes                                    9

Table 2: Credible and Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS), Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019                                    13

Table 3: Credible Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Centers, and Related Positive Outcomes, Fiscal Years 2014 through the First Two Quarters of 2019                                    38

Table 4: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Authorized and On Board, as of March 2019                                    41

Table 5: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Case Processing Times, Fiscal Years 2014 through 2017                                    45

Table 6: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Case Processing Times for Nondetained and Detained Cases without Clock Pauses, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019                                    48

Table 7: Executive Office for Immigration Review (EOIR) Credible and Reasonable Fear Review Time Frames, Fiscal Years 2014 through Third Quarter 2019                                    55

Table 8: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible Fear as Provided in Federal Law and Regulation                                    74

Table 9: Eligibility, Screening Standards, and Possible Screening Outcomes for Reasonable Fear as Provided in Federal Law and Regulation                                    77

Table 10: U.S. Border Patrol (Border Patrol) Apprehensions and Processing Dispositions, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019                                    81

Table 11: U.S. Border Patrol (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, By Age, Fiscal Years 2014 through the First Two Quarters of 2019                                    83

Table 12: U.S. Border Patrol (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings

LADOJ-ASYLUM2182

with Credible and Reasonable Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019     84

Table 13: Number of Family Unit Members among U.S. Border Patrol Apprehensions Who Were Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019     85

Table 14: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions Placed into Expedited Removal Proceedings with Credible Fear Claims, by Age, Fiscal Years 2014 through the First Two Quarters of 2019     90

Table 15: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions Placed into Expedited Removal Proceedings with Credible Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019     91

Table 16: Number of Family Unit Member Apprehensions U.S. Customs and Border Protection's Office of Field Operations (OFO) Placed into Expedited Removal Proceedings with Credible Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019     92

Table 17: Noncitizens in Expedited Removal Proceedings Detained in U.S. Immigration and Customs Enforcement (ICE) Detention Facilities with Credible Fear Claims, Fiscal Years 2014 through 2018     93

Table 18: Noncitizen Family Unit Members in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018     94

Table 19: Noncitizen Adults and Children in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018     95

Table 20: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019     97

Table 21: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019     99

LADOJ-ASYLUM2183

Table 22: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019                    100

Table 23: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019                    101

Table 24: Top Five Detention Facilities and Family Residential Centers with the Highest Number of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019                    102

Table 25: Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Facilities, and Related Positive Outcomes, Fiscal Years 2014 through First Two Quarters of 2019                    103

Table 26: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of 2019                    105

Table 27: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of Fiscal Year 2019                    106

Figures

Figure 1: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019                    14

Figure 2: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019                    15

Figure 3: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019                    17

Figure 4: Numbers and Outcomes of Executive Office for Immigration Review (EOIR) Immigration Judge Reviews

LADOJ-ASYLUM2184

of Negative U.S. Citizenship and Immigration Services Fear (USCIS) Determinations, Fiscal Year 2014 through June 2019                                                                                    19

Figure 5: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Screening Families in U.S. Immigration and Customs Enforcement Family Residential Centers in Fiscal Year 2018, by Asylum Office                                                                                    30

Figure 6: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Processing for Parents and Children Detained Together in U.S. Immigration and Customs Enforcement Family Residential Centers                          36

Figure 7: U.S. Border Patrol's (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings with a Credible Fear Claim, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019                82

Figure 8: Dispositions of U.S. Customs and Border Protection Office of Field Operations (OFO) Apprehensions, Including those with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019            87

Figure 9: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions Placed into Expedited Removal with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019            88

Figure 10: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019                                              96

Figure 11: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019                                              98

LADOJ-ASYLUM2185

## Abbreviations

| | |
|---|---|
| Border Patrol | U.S. Border Patrol |
| CBP | U.S. Customs and Border Protection |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| EOIR | Executive Office for Immigration Review |
| FDNS | Fraud Detection and National Security Directorate |
| ICE | U.S. Immigration and Customs Enforcement |
| OFO | Office of Field Operations |
| RAIO | Refugee, Asylum, and International Operations Directorate |
| USCIS | U.S. Citizenship and Immigration Services |
| VTC | Video teleconferencing |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2186



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.
Washington, DC 20548**

February 19, 2020

Congressional Addressees

The Department of Homeland Security's (DHS) U.S. Customs and Border Protection (CBP) has reported a significant increase in recent years in apprehensions of noncitizen adults and family units[1] who claim an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country.[2] CBP may place apprehended adults and family units into full or expedited removal proceedings before an immigration court, consistent with the Immigration and Nationality Act.[3] In full removal proceedings, they may apply for various forms of relief or protection, including asylum. U.S. immigration law provides that noncitizens physically present within the United States, whether or not at a designated port of entry, may be granted asylum if they are found to be

---

[1]CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien". The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to "noncitizen parent(s) or legal guardian(s)".

[2]Within CBP, the U.S. Border Patrol (Border Patrol) apprehends individuals at U.S. borders between ports of entry, and the Office of Field Operations (OFO) encounters individuals that arrive at ports of entry. According to CBP officials, OFO encounters noncitizens (instead of apprehending) them because, at ports of entry, individuals do not enter the United States until OFO officers have processed them. For the purposes of this report, we use the term "apprehend" to describe both Border Patrol and OFO's first interactions with noncitizens at the border. In addition, while OFO typically refers to its officers as "Customs and Border Protection officers," we use the term "OFO officers" in this report for clarity.

[3]See 8 U.S.C. §§ 1225(b), 1229a; see also 8 C.F.R. § 235.3(b)(4) .With some exceptions, including unaccompanied alien children (UAC), noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days may be placed into expedited removal. See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004); see also 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to two years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on September 27, 2019 and as of November 2019, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D. D.C. Sept. 27, 2019) (order granting preliminary injunction).

LADOJ-ASYLUM2187

unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion (referred to as "protected grounds").[4] If they are precluded from obtaining asylum based on, for example, past convictions of certain crimes, but their life or freedom would be threatened based on the protected grounds or they would potentially be tortured if removed, they may also seek withholding of removal.[5]

If noncitizens are placed into expedited removal proceedings instead of full removal proceedings, they are to be ordered removed from the United States without further hearing before an immigration judge unless they indicate either (1) an intention to apply for asylum or (2) a fear of persecution or torture, or a fear of return to their country (referred to throughout this report as making a "fear claim"). In such cases, they are referred to DHS's U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening by an asylum officer. If they have been issued a final administrative removal order after conviction for an aggravated felony or have a prior order of removal that is reinstated, and express a fear of return, they are referred to an asylum officer for a reasonable fear

---

[4]The laws governing asylum protection were first established in statute with the passage of the Refugee Act of 1980, Pub. L. No. 96-212, tit. II, § 201, 94 Stat. 102, 102-06 (1980) (codified at 8 U.S.C. §§ 1101(a)(42), 1157-1159). The legal standard for a refugee and asylee are generally the same, but noncitizens must apply for refugee status from outside the United States and for asylum status from within the United States.

[5]See 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.13(c) (establishing a number of grounds for mandatory denial of asylum, including, among others, conviction of certain crimes, being reasonably regarded as a danger to the security of the United States, and the third country asylum bar), 208.16 (codifying both withholding of removal under the Immigration and Nationality Act and the Convention against Torture). For the purposes of this report, we refer to withholding of removal under the Immigration and Nationality Act and withholding of removal under the Convention against Torture collectively as "withholding of removal." If an individual is found to be entitled to protection under the Convention against Torture, but is subject to a provision for mandatory denial of withholding of removal, such as a prior conviction of a particularly serious crime, the individual may be granted deferral of removal. This type of protection can be terminated at any time, resulting in the individual's removal from the United States, based on new evidence or diplomatic assurances provided by the Department of State. See 8 C.F.R. § 208.17.

LADOJ-ASYLUM2188

screening.[6] USCIS data indicate that its credible fear caseload nearly doubled from fiscal years 2015 to 2016 (approximately 48,000 to 91,000 cases) and generally remained at that level through fiscal year 2018. Further, USCIS reported that it received more than 105,000 credible fear cases in fiscal year 2019.

Through these screenings, USCIS makes a determination about whether these individuals have a credible or reasonable fear of persecution or torture if returned to their country and the likelihood they can establish in a hearing before an immigration judge that these threats exist. If USCIS determines that the individual has a credible fear of persecution or torture, he or she will be placed into full immigration proceedings. If the individual receives a negative determination, he or she can request a review of that determination by an immigration judge within the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

We were asked to review DHS's and DOJ's processes for screening noncitizens who arrive at the southwest border expressing an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country, and the resources needed to carry out these screenings within applicable time frames.[7] This report discusses (1) what USCIS and EOIR data show about the credible fear and reasonable fear processes, (2) the extent to which USCIS has policies and procedures for overseeing credible fear and reasonable fear screenings, and (3) the extent to which USCIS and EOIR have processes for managing their respective credible fear and reasonable fear-related workloads.

For these objectives, we interviewed DHS and DOJ officials. Specifically, we interviewed officials from CBP's Border Patrol and Office of Field Operations (OFO); ICE's Enforcement and Removal Operations; USCIS's

---

[6]See 8 C.F.R. §, 208.31. Noncitizens convicted of crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of persecution or torture, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. An "asylum officer" is defined as an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications and is supervised by an officer who has had such training and has had substantial experience adjudicating asylum applications. See 8 U.S.C. § 1225(b)(1)(E). We use this term to refer to any officer conducing credible and reasonable fear screenings.

[7]See Pub. L. No. 116-26, tit. V, § 506, 133 Stat. 1018, 1027 (2019).

LADOJ-ASYLUM2189

Asylum Division; and EOIR. We conducted site visits at Border Patrol stations and OFO ports of entry in Arizona, California, and Texas; ICE single adult and family residential centers in California and Texas; and USCIS asylum offices in Texas and Virginia, from September 2018 to April 2019. During these site visits, we interviewed Border Patrol, OFO, ICE, USCIS, and EOIR officials and observed credible and reasonable fear interviews, among other activities. To select these locations, we reviewed USCIS data on credible and reasonable fear cases in fiscal year 2018, and identified specific locations that received the vast majority of cases during that year. We also considered the geographical proximity of multiple CBP and ICE facilities to maximize observations. Our observations during site visits are not generalizable to all Border Patrol, OFO, ICE, USCIS, or EOIR operations, but provided us the opportunity to learn more about policies and procedures for credible and reasonable fear.

To address the first objective, we reviewed record-level data from USCIS and EOIR. For USCIS, we reviewed record-level data from USCIS's automated case management system to identify the number, characteristics, and outcomes of credible and reasonable fear cases between fiscal year 2014 through the second quarter of fiscal year 2019 (the most current data available from USCIS at the time of our review). For EOIR, we reviewed data on immigration judge reviews of credible and reasonable fear cases posted on its public website. We also requested data from EOIR on credible and reasonable fear reviews for those individuals detained in ICE's family residential centers. Further, we reviewed EOIR data on credible and reasonable fear reviews from fiscal year 2014 through the third quarter of 2019 (the most current data available from EOIR at the time of our review). To assess the reliability of USCIS and EOIR data, we completed a number of data reliability steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing information about the data and systems that produced them, such as relevant training materials for USCIS officers who use agency data systems; and (3) discussing data entry issues and data limitations with USCIS and EOIR officials. We determined the data were sufficiently reliable to describe the number, outcomes, and characteristics of credible and reasonable fear cases.

To address the second objective, we reviewed USCIS policy documents, training materials, and other guidance documents, such as procedures manuals for credible and reasonable fear. In particular, we reviewed USCIS Asylum Division quarterly training reports for fiscal year 2018 to

LADOJ-ASYLUM2190

analyze the weekly training activities in each asylum office for each week of the reporting quarter. We also reviewed asylum officer training materials, reports from the Asylum Division's periodic quality assurance reviews of credible and reasonable fear cases at individual asylum offices conducted between November 2017 and May 2018, and USCIS guidance on processing families in credible and reasonable fear cases. In addition, we conducted interviews with USCIS headquarters and asylum office officials, and we observed asylum officers screening credible and reasonable fear cases. We compared USCIS policies and procedures to *Standards for Internal Control in the Federal Government* related to developing competent individuals qualified to carry out assigned responsibilities, ongoing monitoring activities and evaluation of results, and obtaining high quality data.[8]

To address the third objective, we reviewed USCIS and EOIR documents and data and conducted interviews with USCIS and EOIR officials, to evaluate the extent to which USCIS and EOIR have processes for managing their respective credible and reasonable fear-related workloads. For USCIS, we reviewed policy documents, training materials, and other guidance documents related to USCIS's staffing allocation model for the credible and reasonable fear workload. In addition, we analyzed record-level USCIS data to calculate processing times and case delays for credible and reasonable fear cases from fiscal year 2014 through the second quarter of fiscal year 2019. We also reviewed USCIS's publicly-reported data on credible fear processing times during this time period. We compared USCIS policies and procedures to *Standards for Internal Control in the Federal Government* related to obtaining data on a timely basis for management to use for effective monitoring and processing data into high quality information.[9] For EOIR, we reviewed required time frames for EOIR's review of USCIS's credible and reasonable fear determinations; data that EOIR has publicly reported about its workload and case adjudications; and policy documents, such as EOIR's 2018 memorandum on case priorities. In addition, we analyzed summary data on EOIR's credible and reasonable fear review processing times for fiscal year 2014 through the third quarter of fiscal year 2019 (the most current data available at the time of our review) and compared EOIR's processing times with required time frames. To assess the reliability of the data, we reviewed documentation on USCIS's and EOIR's

---

[8]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[9]GAO-14-704G.

LADOJ-ASYLUM2191

data systems, interviewed knowledgeable officials, and conducted electronic testing of USCIS's record-level data for obvious errors. We determined that the USCIS and EOIR data we reviewed on credible and reasonable fear workloads and processing times were sufficiently reliable to describe credible and reasonable fear processing times and case delays. For more information about our scope and methodology, see appendix I.

We conducted this performance audit from November 2018 to February 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Within CBP, Border Patrol is responsible for securing U.S. borders and apprehending individuals arriving at the border between ports of entry. Also within CBP, OFO is responsible for inspecting travelers and cargo seeking to enter the United States through ports of entry and encounters or apprehends individuals determined to be inadmissible to the country. Upon apprehension of individuals at or between ports of entry, Border Patrol agents and OFO officers generally decide whether to (1) place apprehended adults and family units into expedited removal proceedings, or (2) initiate full immigration proceedings, according to CBP officials. If agents or officers place individuals into expedited removal proceedings, CBP will transfer them to DHS's U.S. Immigration and Customs Enforcement (ICE) for longer-term detention (see appendix II for more information on eligibility, screening standards, and possible screening outcomes for credible and reasonable fear cases).[10] Noncitizen adults and family units may make a fear claim in CBP custody at any point after

[10]Generally, individuals placed into expedited removal proceedings are required to be detained until removal or, if applicable, until receiving a final determination of credible fear. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). ICE manages the U.S. immigration detention system, which detains noncitizens, including families, whose immigration cases are pending or who have been ordered removed from the country. Since June 2014, ICE has operated four family residential centers in Texas, Pennsylvania, and New Mexico for family units who may be subject to removal while they await the resolution of their immigration cases or who have been ordered removed from the United States. As of October 2019, ICE maintains three family residential centers—in Dilley and Karnes, Texas, and Leesport, Pennsylvania—with a cumulative capacity of 3,326 beds. The facility in New Mexico ceased operating as a family residential center in November 2014.

LADOJ-ASYLUM2192

apprehension, and during the pendency of their expedited removal proceedings in ICE custody (see appendix III for data on apprehensions of noncitizens placed into expedited removal who claimed fear of returning to their country, along with other characteristics of their cases).

ICE is generally responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. If USCIS makes a negative determination and the determination is either not reviewed by an immigration judge, because the noncitizen has declined immigration judge review, or, if reviewed, is upheld by a reviewing immigration judge, ICE is then responsible for removing the person from the country.[11]

Within USCIS, the Refugee, Asylum, and International Operations Directorate (RAIO) is to provide, among other things, services for people who are fleeing oppression, persecution, or torture or facing urgent humanitarian situations. RAIO is made up of two divisions: the Asylum Division and the International and Refugee Affairs Division. USCIS's Asylum Division is responsible for, among other responsibilities, adjudicating affirmative asylum applications—that is, claims made at the initiative of the individual who files an application for asylum with USCIS—and screening credible and reasonable fear cases. As of March 2019, USCIS had 546 asylum officers on board and eligible to screen credible and reasonable fear cases (out of 745 authorized positions).[12] Asylum officers screen cases at the Asylum Prescreening Center in Arlington, Virginia, and eight asylum offices nationwide.[13] USCIS established the Asylum Pre-Screening Center in fiscal year 2016 to provide additional support for the credible and reasonable fear caseload. As of April 2019, the Asylum Pre-Screening Center and the Arlington

---

[11]See generally 8 U.S.C. §§ 1228, 1231(a)(5); 8 C.F.R. §§ 208.30-208.31.

[12]USCIS reported it executed a plan in fiscal year 2019 to hire 500 staff for the Asylum Division by the end of December 2019. According to USCIS, this includes new asylum officer, supervisory asylum officer, and mission operations staff positions to fill staffing needs in all Asylum Offices. The Asylum Division reported it achieved its goals for selecting individuals to fill these positions, 304 of whom had entered onto duty as of September 30, 2019.

[13]The Asylum Pre-Screening Center is co-located with the asylum office in Arlington, Virginia. According to USCIS officials, asylum officers from the Arlington asylum office may also be assigned to screen credible and reasonable fear cases that are under the jurisdiction of the Asylum Pre-Screening Center. In addition to its eight asylum offices, USCIS maintains two asylum sub-offices in Metairie, Louisiana and Boston, Massachusetts.

LADOJ-ASYLUM2193

asylum office together had jurisdiction over 27 ICE detention centers across the United States.

EOIR is responsible for conducting immigration court proceedings, appellate reviews, and administrative hearings to fairly, expeditiously, and uniformly administer and interpret U.S. immigration laws and regulations. As of September 30, 2019, 442 immigration judges presided over EOIR's 63 immigration courts nationwide. In addition to removal proceedings, immigration judges also conduct certain other types of hearings, such as the review of negative credible fear determinations. Table 1 provides additional information about DHS's and DOJ's roles in the credible and reasonable fear processes.

LADOJ-ASYLUM2194

**Table 1: Department of Homeland Security (DHS) and Department of Justice (DOJ) Roles and Responsibilities in the Credible and Reasonable Fear Processes**

| Agency | Role |
|---|---|
| DHS's U.S. Customs and Border Protection's (CBP) U.S. Border Patrol (Border Patrol) and Office of Field Operations (OFO) | Among other things, OFO officers conduct immigration and customs inspections at ports of entry and Border Patrol agents secure the U.S. border between ports of entry. |
| | Among other processing activities, CBP's Border Patrol agents and OFO officers run background checks on immigration and criminal history, and use this and other information to inform processing decisions. For example, among other things, Border Patrol agents and OFO officers determine whether to place an individual in expedited removal.[a] |
| | Border Patrol agents and OFO officers are to interview apprehended noncitizens to obtain the specifics of their cases and record that information on DHS's Form I-213, *Record of Deportable/Inadmissible Alien*.[b] |
| | After placing an individual into expedited removal proceedings, Border Patrol agents and OFO officers are to record any fear claims in the individual's alien file (or "A-file") and their agencies' respective automated data systems. |
| DHS's U.S. Immigration and Customs Enforcement (ICE) | ICE, among other things, receives referrals from Border Patrol and OFO for aliens whom CBP has deemed inadmissible and placed in expedited removal. |
| | ICE officers are to review the A-files prepared by Border Patrol agents or OFO officers and have the authority to accept or deny a referral for detention from CBP based on detention space availability. Upon acceptance, ICE officers determine whether to detain, release, or remove individuals based on a variety of factors, including statutory requirements, medical considerations, and the availability of space at one of its single adult detention centers or family residential centers. ICE officers collect and record information on individuals in ICE's automated data systems. |
| | ICE is responsible for referring individuals, as appropriate, to U.S. Citizenship and Immigration Services (USCIS) for a credible fear or reasonable fear screening. |
| | Pending the outcome of the credible or reasonable fear screening, ICE will refer individuals determined to have a credible fear to EOIR for full removal proceedings before an immigration judge. For those found not to have a credible fear, ICE will process them for removal from the country. ICE will also decide whether to continue detaining or to release individuals who are awaiting full removal proceedings. Individuals who are transferred from expedited removal proceedings to full removal proceedings after establishing a credible fear of persecution or torture are generally ineligible for release on bond and must be detained until removal proceedings conclude, unless granted parole by ICE.[c] |

LADOJ-ASYLUM2195

| Agency | Role |
|---|---|
| DHS's U.S. Citizenship and Immigration Services (USCIS) | In screening noncitizens for credible or reasonable fear,[d] an asylum officer's tasks include, but are not limited, to, reviewing various forms from the referring officer to ensure that USCIS has jurisdiction to conduct the credible or reasonable fear interview; performing background checks; interviewing the individual to obtain more details on his or her fear claim, overall credibility, and the nature of any relationships with family members with whom they were apprehended; and determining whether there are any dependents who could potentially be included in the individual's fear determination.[e] |
| | USCIS officers are to conduct the interview in a non-adversarial manner, separate and apart from the general public. |
| | A USCIS asylum officer is to determine if the individual has any bars to asylum or withholding of removal that will be pertinent if the individual is referred to immigration court for full removal proceedings.[f] |
| | For cases in which the USCIS asylum officer concludes a credible fear screening with a positive determination, USCIS is to issue a Notice to Appear, thereby placing the individual into full removal proceedings before an EOIR immigration judge. Similarly, for reasonable fear cases where the asylum officer makes a positive determination, USCIS issues a Notice of Referral to an immigration judge for removal proceedings to consider the applicants' eligibility for withholding of removal or deferral of removal.[g] |
| | For cases in which the USCIS asylum officer concludes a credible or reasonable fear screening with a negative determination, USCIS is to refer the individual to ICE for removal from the United States, unless the noncitizen requests a review of the negative determination by an immigration judge. If this review is requested, USCIS will issue a Notice of Referral to the immigration judge. |
| DOJ's Executive Office for Immigration Review (EOIR) | Within EOIR, immigration judges preside over removal proceedings for respondents detained by ICE or released pending the outcome of their proceedings, to determine their removability and eligibility for any relief being sought. |
| | In addition to removal proceedings, immigration judges conduct certain other types of hearings, such as to review negative credible or reasonable fear determinations at the noncitizen's request. After receiving a referral for such a review, EOIR must generally complete reviews of negative determinations of credible fear by USCIS within seven days and negative determinations of reasonable fear cases within 10 days. |

Source: GAO analysis of statutes and DHS and DOJ documents. | GAO-20-250

[a]Generally, noncitizens placed into expedited removal proceedings are required to be detained for the duration of their credible fear screening or, if found not to have a credible fear, until removal. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). As a result, Border Patrol and OFO officials stated that Border Patrol agents and OFO officers must determine whether ICE has space in its detention facilities before placing individuals into expedited removal proceedings. If agents and officers place noncitizens into full immigration removal proceedings, they typically issue individuals a Notice to Appear before immigration court, where they may seek various forms of immigration relief such as asylum.

[b]The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). We use the term "noncitizen" to refer to individuals who would meet the definition of "alien."

[c]See 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.3(b)(2)(iii). See also Matter of M-S-, 27 I & N Dec. 509 (A.G. 2019); Jennings v. Rodriguez, 138 S. Ct. 830, 844–45 (2018) (recognizing that the expedited removal statute generally mandates detention throughout the completion of removal proceedings unless the alien is paroled).

[d]See generally 8 U.S.C. § 1225(b)(1)(B)(iii); 8 C.F.R. §§ 208.30-208.31, 1208.30-1208.31. In addition to conducting credible and reasonable fear screenings, USCIS is also responsible for adjudicating affirmative asylum applications—that is, claims made at the initiative of the individual who files an application for asylum with USCIS.

[e]See 8 C.F.R. § 208.2(c)(2).

LADOJ-ASYLUM2196

fIn June 2019, Border Patrol agents on assignment to USCIS began conducting credible fear interviews and, in September 2019, began conducting credible fear interviews at the family residential center in Dilley, Texas. Border Patrol agents conducting credible fear interviews are to receive credible fear training from USCIS before conducting interviews and are to be supervised by a supervisory asylum officer with substantial experience adjudicating asylum applications in order to satisfy the statutory definition of an asylum officer. See 8 U.S.C. § 1225(b)(1)(E).

gU.S. immigration law provides that noncitizens physically present within the United States, whether or not at a designated port of arrival, may be granted asylum if they are found to be unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution based on their race, religion, nationality, membership in a particular social group, or political opinion (referred to as "protected grounds"). Additionally, if they are precluded from asylum based on, for example, past convictions of serious crimes, but their life or freedom would be threatened based on the protected grounds or would be tortured if removed, they may also seek withholding of removal. See 8 U.S.C. §§ 1101(a)(42), 1157-1159; See 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16 (codifying both withholding of removal under the Immigration and Nationality Act and the Convention against Torture). For the purposes of this report, we refer to withholding of removal under the Immigration and Nationality Act and withholding of removal under the Convention against Torture collectively as "withholding of removal."

In July 2019, USCIS made several changes to its credible fear screening processes in response to an interim final rule implementing a new mandatory bar to asylum, known as the "third country transit bar."[14] Under the interim final rule, noncitizens who enter, attempt to enter, or arrive in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside their country of citizenship, nationality, or last lawful habitual residence en route to the United States, must be found ineligible for asylum unless they

[14]The regulations governing the credible fear process were amended by an interim final rule published on July 16, 2019, which became effective on the date of publication. See 84 Fed. Reg. 33,829 (July 16, 2019) (codified as amended at 8 C.F.R. §§ 208.13, 208.30). However, in a lawsuit filed to challenge, a district court granted a nationwide preliminary injunction, preventing DHS from taking any action to implement the rule. See East Bay Sanctuary Covenant v. Barr, No. 19-04073 (N. D. Cal. July 24, 2019) (order granting preliminary injunction). This injunction was then briefly limited to the jurisdiction of the court of appeals for the Ninth Circuit before it was ultimately appealed to the Supreme Court of the United States, which allowed the interim final rule to go into effect nationwide on September 11, 2019, pending further proceedings. See Barr v. East Bay Sanctuary Covenant, No. 19-A230 (U.S. September 11, 2019) (opinion staying nationwide injunction). As of February 2020, this litigation was ongoing.

LADOJ-ASYLUM2197

demonstrate that they fall under an exception to the third country transit bar.[15]

# USCIS's and EOIR's Credible and Reasonable Fear Caseloads Generally Increased from Fiscal Years 2014 through 2018, and a Majority of USCIS Screening Outcomes were Positive

## USCIS's Credible and Reasonable Fear Caseload Nearly Doubled from Fiscal Years 2014 through 2018

As shown in table 2, USCIS's credible and reasonable fear caseloads nearly doubled from fiscal year 2014 (over 56,000 referrals to USCIS) to fiscal year 2018 (almost 109,000 referrals)—the most recent full year of USCIS data available at the time of our analysis. From fiscal year 2014 through the first two quarters of fiscal year 2019, referrals to USCIS for credible fear screenings comprised about 89 percent of all credible and reasonable fear referrals. The number of referrals for credible fear screenings in the first two quarters of fiscal year 2019 alone was larger than the total number of referrals in each of fiscal years 2014 and 2015. Referrals for reasonable fear screenings also increased from fiscal years 2014 to 2018, and comprised between 9 and 15 percent of all referrals during that time period. Appendix III contains additional information on the

---

[15]See 8 C.F.R. § 208.13(c)(4). These exceptions are: (1) if the noncitizen demonstrates that he or she applied for protection from persecution or torture in at least one country outside the noncitizen's country of citizenship, nationality, or last lawful habitual residence through which the noncitizen transited en route to the United States, and received a final judgment denying protection in such country; (2) the noncitizen demonstrates the he or she meets the definition of "victim of a severe form of trafficking in persons (as defined in 8 C.F.R. § 214.11 to generally mean either commercial sex trafficking or involuntary servitude or slavery); or (3) the countries through which the noncitizen transited in route to the United States were not, at the time of transit, parties to international refugee and humanitarian protection agreements.

LADOJ-ASYLUM2198

characteristics of credible and reasonable fear applicants from fiscal year 2014 through March 2019.

**Table 2: Credible and Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS), Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal year | Total number of credible fear referrals | Percent of total referrals | Total number of reasonable fear referrals | Percent of total referrals | Total credible fear and reasonable fear referrals |
|---|---|---|---|---|---|
| 2014 | 47,754 | 85 | 8,602 | 15 | **56,356** |
| 2015 | 48,089 | 86 | 8,000 | 14 | **56,089** |
| 2016 | 91,598 | 91 | 9,274 | 9 | **100,872** |
| 2017 | 77,698 | 89 | 9,792 | 11 | **87,490** |
| 2018 | 98,083 | 90 | 10,697 | 10 | **108,780** |
| 2019 (first two quarters) | 50,091 | 89 | 6,121 | 11 | **56,212** |
| **Total** | **413,313** | **89** | **52,486** | **11** | **465,799** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

## A Majority of Credible and Reasonable Fear Referrals to USCIS from Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019 Resulted in Positive Determinations

As shown in figure 1, USCIS asylum officers made positive determinations in about 71 percent of all credible and reasonable fear screenings between fiscal years 2014 and the first two quarters of fiscal year 2019. The remaining credible and reasonable fear screenings were almost evenly divided between negative determinations and administrative closures (approximately 14 percent each) with a small remainder of screenings pending resolution (0.1 percent).[16] Individually, from fiscal year 2014 through the first 2 quarters of fiscal year 2019, USCIS asylum officers made positive determinations in nearly 77 percent

[16]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

of all credible fear screenings; officers made positive determinations in about 30 percent of reasonable fear screenings.

**Figure 1: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**



- ☐ Positive determination
- ☐ Negative determination
- ☐ Administrative closure[a]
- ☐ Pending resolution[b]

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: USCIS cases included in our analysis were referred to USCIS from October 1, 2013 through March 30, 2019 and the status of cases was as of July 22, 2019.

With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

Total percentages do not equal 100 percent due to rounding.

[a]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

[b]We considered cases that remained in progress as of July 22, 2019 to be "pending resolution."

LADOJ-ASYLUM2200

Regarding credible fear screenings specifically, the percentage of positive determinations ranged from about 73 to 80 percent of total credible fear cases completed each year from fiscal year 2014 through the first two quarters of fiscal year 2019 (see fig. 2).

**Figure 2: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Credible Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019**



Percentage

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Administrative closure | .03% | .04% | .03% | .03% | .1% | .1% |
| | 8.7% | 11% | 10.2% | 12.8% | 13.5% | 11.6% |
| Negative determination | 18.2% | 16.2% | 10.1% | 10.5% | 9.5% | 10.7% |
| Positive determination | 73.1% | 72.8% | 79.7% | 76.7% | 76.9% | 77.5% |

Fiscal Year                                                        *(First two quarters)*

☐ Positive determination
◩ Negative determination
■ Administrative closure[a]
■ Pending resolution[b]

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: USCIS cases included in our analysis were referred to USCIS from October 1, 2013 through March 30, 2019 and the status of cases was as of July 22, 2019.

With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

Total percentages do not equal 100 percent due to rounding.

LADOJ-ASYLUM2201

[a]We considered cases that remained in progress as of July 22, 2019 to be "pending resolution." For fiscal year 2014 through the first 2 quarters of fiscal year 2019, these cases were still in progress and accounted for 0.1 percent or less of total credible fear cases.

[b]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

Regarding reasonable fear screenings, as shown in figure 3, outcomes for reasonable fear cases from fiscal year 2014 through the first two quarters of fiscal year 2019 were generally split evenly each year among positive determinations (from 28 to 32 percent), negative determinations (from 29 to 35 percent), and administrative closures (from 35 to 42 percent).[17]

---

[17]Since 2014, administrative closures decreased by about 7 percentage points, while positive and negative determinations increased by about 2 and 5 percentage points, respectively.

LADOJ-ASYLUM2202

**Figure 3: Outcomes of U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Screenings, Fiscal Years 2014 through the First Two Quarters of 2019**



Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: USCIS cases included in our analysis were referred to USCIS from October 1, 2013 through March 30, 2019 and the status of cases was as of July 22, 2019.

Noncitizens issued a final administrative removal order after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of persecution or torture, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

Total percentages do not equal 100 percent due to rounding.

[a]We considered cases that remained in progress as of July 22, 2019 to be "pending resolution." For fiscal year 2014 through the first 2 quarters of fiscal year 2019, these cases are still in progress and accounted for 0.1 percent or less of total credible fear cases.

[b]According to USCIS officials, administrative closures occur when the asylum officer conducting the screening closes the case without a determination for reasons such as death, presence of the applicant in state or federal custody, inability of the applicant to communicate, dissolved cases due to withdrawals of fear claims, or other reasons.

LADOJ-ASYLUM2203

## EOIR Reviewed Over 50,000 USCIS Credible Fear Decisions from Fiscal Year 2014 through the First Three Quarters of Fiscal Year 2019; Immigration Judges Upheld Most Decisions

EOIR's credible and reasonable fear workload increased by about 16 percent—from about 8,100 reviews to about 9,400 reviews each year—between fiscal year 2014 and fiscal year 2018. According to EOIR data, from fiscal year 2014 through the third quarter of 2019 (the most recent data available at the time of our analysis), EOIR's immigration judges, at the noncitizens' requests, reviewed about 55,000 cases in which USCIS asylum officers made a negative credible or reasonable fear determination (see figure 4).[18] Approximately 10 percent of these reviews were for individuals detained at the Karnes, Dilley, or Berks family residential centers.[19]

---

[18]We obtained aggregate EOIR data from fiscal year 2014 through June 2019—the most recent, complete data available at the time of our review. The most recent, full year for which data were available at the time of our analysis was fiscal year 2018.

[19]We excluded reviews that took place at the Artesia Family Residential Center from this analysis, as Artesia was operational for only 6 months, from June through November 2014. According to USCIS data, credible and reasonable fear screenings at Artesia represent less than 1 percent of all screenings at ICE's family residential centers from fiscal years 2014 through March 2019.

LADOJ-ASYLUM2204

**Figure 4: Numbers and Outcomes of Executive Office for Immigration Review (EOIR) Immigration Judge Reviews of Negative U.S. Citizenship and Immigration Services Fear (USCIS) Determinations, Fiscal Year 2014 through June 2019**



All immigration judge reviews of USCIS negative fear determinations

54,974 total reviews

5%
1%
21%
17%
56%



Immigration judge reviews of USCIS negative fear determinations at Dilley, Karnes, and Berks family residential centers

5,670 total reviews

3%
1%
8%
46%
42%

☐ Affirmed USCIS decision - no credible fear
☐ Vacated USCIS decision - found credible fear
☐ Affirmed USCIS decision - no reasonable fear
☐ Vacated USCIS decision - found reasonable fear
■ Other

Source: GAO analysis of EOIR data. | GAO-20-250

Note: Procedures for review of negative credible and reasonable fear findings by an immigration judge are governed by 8 C.F.R. §§ 1208.30-1208.31. According to EOIR, "other" includes administrative closures.

As shown in figure 4, immigration judges upheld USCIS's negative credible and reasonable fear determinations in 77 percent of all reviews judges conducted from fiscal year 2014 through the third quarter of fiscal year 2019. During this time period, immigration judges vacated (or overturned) 22 percent of USCIS's negative determinations—meaning, judges found that those individuals had a credible or reasonable fear, as appropriate. As a result, individuals found to have a credible fear were to

LADOJ-ASYLUM2205

be placed in full removal proceedings and individuals found to have a reasonable fear were to be placed into more limited removal proceedings to consider the applicants' eligibility for withholding of removal or deferral of removal. Immigration judges upheld 45 percent of USCIS's negative determinations and vacated 54 percent of USCIS's negative determinations for individuals in ICE's Dilley, Karnes, or Berks family residential centers.

In addition, EOIR publicly reports data on the outcomes of removal cases across immigration courts that originated with a positive credible fear determination.[20] EOIR reported that, from fiscal years 2014 through March 2019, immigration judges completed about 135,000 cases that began with a positive credible fear determination.[21] Individuals in about 75,800 of the completed removal cases filed applications for asylum (56 percent). In about 59,200 of the completed removal cases (44 percent), individuals did not file an asylum application. However, as previously described, individuals who have received positive credible fear determinations may apply for other forms of relief or protection besides asylum, such as withholding of removal, and those applications are not represented in the statistics on EOIR's website.

Further, EOIR officials told us that, for data reporting purposes, each member of a family who receives a Notice to Appear before an immigration judge is counted as one EOIR removal case and each removal case may or may not include an asylum application. However, for a number of immigration applications before the court, including asylum and the related screening for credible fear, a spouse or child (defined as an unmarried natural or legally adopted child under 21 years of age) may be included as a dependent on a principal's application and derive lawful immigration status from the principal applicant if the application is granted.[22] As previously discussed, individuals detained in family residential centers—including individuals who could be eligible dependents for credible fear screening and asylum application purposes—comprise a substantial proportion of those who receive positive credible fear determinations. As such, according to EOIR

---

[20]As previously stated, an individual who receives a positive credible fear determination is placed into full removal proceedings where he or she can apply for multiple forms of relief or protection before an immigration judge, including asylum.

[21]As of April 2019, EOIR reported that there were 214,855 pending removal cases that originated with a positive credible fear claim.

[22]See 8 U.S.C. § 1101(b)(1); see also 8 C.F.R. § 208.30(b).

LADOJ-ASYLUM2206

officials, each family member would not be expected to file a separate asylum application. For example, a mother and her two children whose removal cases originated with a positive credible fear screening would comprise three removal cases in EOIR's publically reported data, but it is likely that only the mother's case would include an application for asylum, with her children as dependents on that application. For those removal cases in which the noncitizen applied for asylum, immigration judges granted asylum in about 19,300 cases (25 percent of the 75,800 completed removal cases with an asylum application).[23]

# USCIS Has Policies and Procedures for Overseeing Credible and Reasonable Fear Screenings, but Gaps in Training, Quality Assurance, and Family Processing Exist

## USCIS Has Policies and Procedures for Managing and Overseeing the Credible and Reasonable Fear Screening Process, Including Requiring Supervisory Review of All Cases

USCIS has developed various policies and procedures related to managing and overseeing credible and reasonable fear cases in accordance with the regulations governing credible and reasonable fear screenings, including setting requirements for interview procedures, background and security checks, and supervisory review.[24] In particular, USCIS has a *Credible Fear Procedures Manual* and a *Reasonable Fear Procedures Manual* that outline the procedures officers are to follow in screening these cases.

**Interview procedures.** As of July 2019, an asylum office is to wait a minimum of one full calendar day from the applicant's arrival at an ICE

---

[23]According to EOIR officials, spouses or children included as dependents on a spouse or parent's asylum application are included in the total number of asylum grants.

[24]See 8 C.F.R. §§ 208.30-208.31.

LADOJ-ASYLUM2207

detention facility before conducting a credible fear interview; an asylum office is to wait 48 hours after an initial orientation on the reasonable fear process before a reasonable fear interview, according to USCIS policy.[25] However, both credible and reasonable fear interviews generally occur at least 48 hours after the applicant's arrival at a detention facility, according to USCIS officials.[26] Asylum officers may conduct credible and reasonable fear interviews either in-person or on the phone. Asylum officers are to arrange the assistance of an interpreter, generally connected over the phone, if the applicant is unable to proceed effectively in English pursuant to regulation.[27] Asylum officers are to verify and document that applicants have received and understood information regarding the credible or reasonable fear process before they begin asking substantive questions during the interview about the applicant's claim.

According to USCIS documents and officials, during the interview, asylum officers are to elicit all information relevant to a credible or reasonable fear claim, and regulation requires they conduct interviews in a non-adversarial manner. For example, asylum officers are to ask applicants questions to determine whether they can establish a credible or reasonable fear of persecution based on their race, religion, nationality, membership in a particular social group, or political opinion. In addition, asylum officers are to ask applicants questions to determine whether they can establish a credible or reasonable fear of torture if returned to their

[25]Prior to July 2019, USCIS policy was to wait at least 48 hours from the applicant's arrival at an ICE detention facility to conduct the credible fear interview. USCIS policy for reasonable fear interviews has not changed, according to officials.

[26]At the time of our February 2019 site visit to ICE's family residential centers in Dilley and Karnes, Texas, Houston asylum office policy was to wait 72 hours between an orientation on the credible or reasonable fear process, and the interview. The orientation consisted of a short video describing the credible or reasonable fear process, followed by additional explanations in-person from an asylum officer. At that time, asylum officers would also answer any questions applicants had about the process, according to USCIS officials. As of November 2019, USCIS officials stated they continued to show the short video describing the credible or reasonable fear process at the family residential center in Dilley; USCIS was no longer conducting the in-person orientations at the family residential center in Dilley.

[27]See 8 C.F.R. § 208.30(d)(5). According to Asylum Division policy, an asylum officer fluent in the applicant's language can conduct an interview in a language other than English if their language ability has been certified by the Department of State.

LADOJ-ASYLUM2208

home country.[28] During our observations of in-person and telephone interviews, we observed asylum officers asking questions to ensure they fully explored any aspect of the claim related to a protected ground that could result in a positive determination. For example, we observed asylum officers asking applicants separate questions about each protected ground, even if the applicant had not previously expressed they were harmed because of their political beliefs or race.

USCIS policy notes the applicant's credibility is dependent on various factors such as comparing information provided during the interview with that previously provided in the applicant's sworn statement to Border Patrol or OFO when initially apprehended. If asylum officers identify an issue with the applicant's credibility, they are to inform the applicant of the concerns and ask the applicant for his or her perspectives. During our site visits, we observed asylum officers questioning applicants on inconsistencies, in a non-adversarial manner, between information provided during the interview as compared to the applicant's sworn statements to Border Patrol agents upon apprehension. At the end of the interview, asylum officers are to provide a verbal summary of the material facts of the applicant's claim, and provide an opportunity for the applicant to make any corrections or additions. We observed asylum officers providing such summaries in all but one of the interviews that we observed in full.[29]

According to USCIS policy, asylum officers are to record key information about the applicant's claim, as well as specific details of the determination, on required forms that serve as the official record of the

---

[28]As part of the analysis to determine whether the applicant is likely to be persecuted based on a protected ground or tortured, if an applicant says they were harmed or threatened, asylum officers are to ask questions related to government involvement. In general, persecution does not include the actions of private citizens unless the government is complicit in those acts or is unwilling or unable to take steps to prevent them. Individuals and asylum officers are also to assess whether an applicant could have safely relocated within their country of origin unless the persecutor is the government or is government-sponsored. See generally 8 C.F.R. §§ 208.13-208.31; see also, e.g., Halim v. Holder, 755 F.3d 506, 513 (7th Cir. 2014). We observed asylum officers asking questions about the level of government involvement, such as whether the applicant saw the individual who harmed them interacting with the police, and what exactly they saw or experienced that made them think the individual was connected with the police.

[29]Of the 20 interviews we observed in full, 19 included a verbal summary at the end. The remaining interview did not include a verbal summary at the end.

LADOJ-ASYLUM2209

credible or reasonable fear screening.[30] In addition, asylum officers use a "checklist" to record more detailed legal analysis related to the applicant's claim. Asylum officers also generally type notes during interviews in a question and answer format, capturing each question and follow-up question they ask, and each response the applicant provides. We observed asylum officers documenting interviews in this way during all of the interviews where we observed the asylum officer in person.[31]

**Background and security checks.** USCIS policy requires asylum officers to ensure certain background and security checks are conducted. If security checks or information discovered during the interview raises concerns related to fraud, public safety, or national security, asylum officers are to refer the case to USCIS's Fraud Detection and National Security Directorate (FDNS) for assistance.[32] FDNS officials told us the short time frames in the credible and reasonable fear process, among other factors, make direct involvement in individual cases less likely than in other caseloads at USCIS, such as affirmative asylum cases.[33] As such, the scope and extent of FDNS investigations into credible and reasonable fear cases is limited relative to other USCIS caseloads. FDNS data indicate that asylum officers referred approximately 1,400 total credible and reasonable fear cases to FDNS between fiscal years 2017

---

[30]For credible fear cases, the official record of the screening is USCIS Form I-870, *Record of Determination/Credible Fear Worksheet*. For reasonable fear cases, the official record is USCIS Form I-899, *Record of Determination/Reasonable Fear Worksheet*.

[31]We observed the asylum officer in person for 17 interviews.

[32]FDNS is responsible for leading USCIS's efforts to detect immigration benefit fraud and help detect national security issues and public safety concerns. FDNS's roles and responsibilities related to the credible and reasonable fear process include performing enhanced security checks and vetting of cases referred for assistance; conducting investigations in cases of suspected fraud or national security concerns, as appropriate; prescreening files in order to identify fraud trends and national security concerns prior to interviews; and, providing training to asylum office staff on local trends in fraud, national security, and public safety. For more information about FDNS's roles and responsibilities in the affirmative asylum process, see GAO, *Asylum: Additional Actions needed to Assess and Address Fraud Risks*, GAO-16-50 (Washington, D.C.: Dec. 2, 2015).

[33]Affirmative asylum applications involve claims filed with USCIS at the initiative of the noncitizen. An affirmative asylum applicant may be in the United States lawfully or unlawfully, and must file for asylum directly with USCIS within 1 year of his or her most recent arrival in the country unless he or she can demonstrate changed or extraordinary circumstances.

LADOJ-ASYLUM2210

and 2018.[34] Of those, 13 cases resulted in a formal finding, called a *Statement of Finding*.[35] FDNS officials told us referrals from asylum officers on credible and reasonable fear cases typically result in FDNS conducting research related to an applicant's criminal history or travel patterns. FDNS may refer this information, in turn, to ICE to reference in the applicant's removal proceedings, as appropriate. In contrast, according to FDNS officials, a fraud referral in the affirmative asylum context may result in a more formal finding of fraud in a *Statement of Finding*.

**Supervisory review.** USCIS oversight of credible and reasonable fear cases includes a required supervisory review of each case after an asylum officer makes a positive or negative determination.[36] USCIS officials said supervisors are to review cases for legal sufficiency and accuracy, including a review of the screening checklist and the asylum officer's supporting interview notes. According to officials, supervisors are to communicate the results of their review to the asylum officer informally (e.g., via email or in-person discussion) for small issues, such as an administrative error, or through a formal write-up for larger issues, such as if the asylum officer's legal analysis was insufficient and requires a second interview with the applicant.[37]

---

[34]FDNS made improvements to its data system in fiscal year 2016, including the ability to track the types of cases referred for review. Data for fiscal years 2017-2018 was the most recent, complete year data available at the time of our review.

[35]According to officials, FDNS prepares a *Statement of Findings* in the credible and reasonable fear context when FDNS immigration officers find information related to egregious public safety concerns, national security, or fraud that rises to the level of a finding. When this occurs, FDNS officers document a summary of the finding and relay the information to ICE, as appropriate.

[36]A supervisory asylum officer reviews each credible fear case pursuant to 8 CFR § 208.30(e)(7) and each reasonable fear case pursuant to USCIS policy.

[37]As a result of his or her review, a supervisor may take one of the following actions: (1) concur with the determination, with no adjustments needed; (2) concur with the determination, but ask the asylum officer to make adjustments to the analysis, or correct any inaccuracies; (3) non-concur with the determination, and discuss the evidence and legal analysis with the asylum officer. If the supervisor and asylum officer cannot come to an agreement on the determination, a second line supervisor makes the determination. In addition, a supervisor may request that the asylum officer re-interview the applicant to gain additional information needed for the legal sufficiency of the determination. A re-interview may result in the same determination, or may change the determination.

LADOJ-ASYLUM2211

## USCIS Provides Initial Training on Credible and Reasonable Fear to New Asylum Officers and Asylum Offices Are Required to Provide Ongoing On-the-Job Training

USCIS oversight of credible and reasonable fear cases includes basic training for new asylum officers and ongoing training for incumbent officers at asylum offices; these trainings include information specific to credible fear and reasonable fear screenings. As of the time of our review, the initial training program for asylum officers is comprised of two main components:

- **Distance Training.** New asylum officers participate in 3 weeks of self-paced RAIO Directorate and Asylum Division distance training in their respective asylum offices. During distance training, asylum officers are expected to participate in webinars, read the training materials and complete exercises and quizzes in preparation for residential training. The Asylum Division distance training includes course readings on credible and reasonable fear, and observations of credible and reasonable fear interviews.

- **Residential Basic Training.** Asylum officers participate in a 6-week residential basic training program, which includes 3 weeks of training in issue areas common across USCIS's Refugees, Asylum, and International Operations Directorate, as well as three weeks of Asylum Division-specific training. In the first 3-week session, courses include classroom instruction, practical exercises, and interviewing exercises on a variety of topics and skills relevant to multiple areas of USCIS's work, such as on affirmative asylum and refugee adjudications. The legal topics and skills covered in this initial training include eligibility for asylum, an applicant's nexus to protected grounds, and eliciting testimony, among others. The second 3-week session focuses on division-specific policy, procedure, and law related to asylum adjudications and screenings. For example, the 3-week session includes training on the affirmative asylum process, and multiple mock affirmative asylum interviews, among others, as well as 2 days of training specific to credible and reasonable fear cases. These 2 days include practical exercises; one mock credible fear interview exercise; and formal presentations on interviewing skills and security checks in a credible fear context, forms required for credible and reasonable fear, and on the Convention against Torture. At the end of the 6-week residential training course, new asylum officers must pass final exams with a score of at least 70 percent. We

LADOJ-ASYLUM2212

reviewed a version of the exam and found that it included questions specific to credible and reasonable fear screenings.[38]

Asylum Division officials said the 9 combined weeks of distance and residential basic training constitute the minimum amount of formal training required for asylum officers to effectively screen credible and reasonable fear cases. However, Asylum Division officials said it is important for individual asylum offices to provide additional, on-the-job training to new officers assigned to screen credible and reasonable fear cases, specifically. Asylum officers screen credible and reasonable fear cases under shorter time frames and with less corroborating documentation compared to affirmative asylum cases. As such, Asylum Division officials told us that officers accustomed to adjudicating affirmative asylum cases may need to adjust to the shorter time frames required in credible and reasonable fear cases.[39] For example, some asylum offices have developed formal presentations on local policies and procedures, or provide officers with an opportunity to observe other officers conducting credible or reasonable fear interviews and gradually increase the number of cases they screen per day. Given their caseloads, the Houston and Arlington asylum offices provide 3 and 4 weeks of additional credible and reasonable fear training for new asylum officers, respectively. By comparison, the San Francisco and Newark asylum offices provide 1 week of training on credible and reasonable fear procedures for new asylum officers and Los Angeles provides 2 days of such training, according to officials.

For incumbent asylum officers, USCIS policy requires asylum offices to allocate four hours per week for formal or informal training. The training can range from classroom instruction by a training officer, to individual study time that asylum officers can use to review case law, research country conditions affecting asylum applicants, or read new USCIS procedures and guidance. Individual asylum offices design their weekly training programs based on the types of cases their office generally receives, according to Asylum Division officials. The Asylum Division requires training officers to track the date and topic of each weekly

---

[38]For example, some questions included example credible or reasonable fear fact patterns. Questions also tested asylum officers on the legal standards for these screenings and how to elicit testimony in a credible fear interview, among other topics.

[39]In addition, credible and reasonable fear cases may require an asylum officer to assess the likelihood that an individual will receive protection from removal, such as withholding of removal under the Convention against Torture, a type of protection that can be granted by an immigration judge, but is not generally adjudicated by an asylum officer handling affirmative asylum cases.

LADOJ-ASYLUM2213

training session and report that information to Asylum Division headquarters on a quarterly basis. Our analysis of fiscal year 2018 quarterly training reports for all asylum offices and sub-offices indicates that offices with larger credible and reasonable fear caseloads generally provided more weekly trainings on these topics. For example, Houston and Arlington conducted seven or more weekly training sessions on credible and reasonable fear screenings in fiscal year 2018. By comparison, two offices with smaller credible and reasonable fear caseloads—Newark and New York—conducted one or fewer weekly sessions on credible and reasonable fear (see app. III for credible and reasonable fear workload data by asylum office).[40]

In addition to this training program for asylum officers, USCIS trains officers from outside the Asylum Division to screen credible and reasonable fear cases, including refugee officers and others.[41] Refugee officers receive some of the same basic training as asylum officers, as they participate in the same RAIO distance training and RAIO Directorate residential training. Refugee officers do not participate in Asylum Division distance training or residential training. As a result, USCIS provides refugee officers with 3 days of training on screening credible fear cases before they can begin screening cases. We reviewed training materials for the refugee officer training, and found the sessions are similar to Asylum Division residential training sessions on credible fear screening.

---

[40]USCIS elicits and evaluates feedback on training needs from asylum officers and supervisors every two years through a training needs assessment. The 2018 Asylum Division Training Needs Assessment surveyed approximately 755 asylum officers, supervisory asylum officers, training officers, and refugee officers on detail to the Asylum Division. USCIS received responses from 616 individuals. The assessment includes multiple questions specific to training needs for credible and reasonable fear. For the 2018 Asylum Division training needs assessment, the majority of responding officers said two to seven weekly training sessions each year should be spent on credible and reasonable fear topics.

[41]In addition to refugee officers, former refugee or asylum officers now working with USCIS's Field Office Directorate, Service Center Operations, and Fraud Detection and National Security Directorate conduct credible and reasonable fear screenings for USCIS. Refugee officers on detail to the Asylum Division, particularly those assigned to the Houston or Arlington asylum office, screen credible fear cases at the family residential centers. For example, in fiscal year 2018, 105 refugee officers screened cases at the family residential centers, according to USCIS. In addition, beginning in June 2019, Border Patrol agents on assignment to USCIS began screening credible fear cases only, including credible fear cases at the family residential center in Dilley, Texas. Border Patrol agents screening credible fear cases are to receive credible fear training from USCIS before conducting interviews and be supervised by a supervisory asylum officer who has substantial experience adjudicating asylum applications in order to satisfy the statutory definition of an asylum officer. See 8 U.S.C. § 1225(b)(1)(E).

LADOJ-ASYLUM2214

In addition, some materials provide information and guidance on the differences between adjudicating refugee cases and screening credible fear cases. Officials said refugee officers generally screen credible fear cases, including at the family residential centers, only if they are detailed to the Houston and Arlington asylum offices. Both Houston and Arlington provide refugee officers detailed to their offices with 1-2 weeks of additional training on credible fear screening, similar to the procedural training they provide to new asylum officers. At both offices, trainings include formal presentations or exercises on legal concepts and procedures specific to credible fear, credible fear interview observations, and a gradual increase in the number of cases refugee officers screen each day.

## Pre-departure Training for USCIS Asylum Officers Screening Family Units at ICE Family Residential Centers Is Inconsistent Across Asylum Offices

Although all new asylum officers receive basic training on the credible and reasonable fear screening process and may also receive on-the-job training in their home offices, not all offices provide additional pre-departure training to asylum officers before they begin screening cases for family units at ICE family residential centers. Credible fear screenings at ICE's family residential centers, in particular, represent a significant percentage—about 34 percent—of all credible fear cases asylum officers screened from fiscal year 2014 though the second quarter of fiscal year 2019. As discussed previously, asylum offices with relatively small credible and reasonable fear local caseloads generally provide less on-the-job training throughout the year on credible and reasonable fear. However, almost all asylum offices send officers to the family residential centers in Texas for in-person interviews, including those offices with small credible and reasonable fear caseloads at the local level. Asylum Division officials said they require asylum offices to send a specific number of asylum officers—a number in proportion to the size of the office—with the largest offices sending the most officers to the family residential centers each year. For example, in fiscal year 2018, Newark, Los Angeles, Houston, and Chicago sent the most officers to the family residential centers, as shown in figure 5 below.

LADOJ-ASYLUM2215

**Figure 5: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Screening Families in U.S. Immigration and Customs Enforcement Family Residential Centers in Fiscal Year 2018, by Asylum Office**



Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: According to USCIS officials, the Miami asylum office did not send asylum officers to the family residential centers in order to focus on reducing its affirmative asylum backlog during fiscal year 2018. However, officials said the Miami asylum office did send officers in previous years.

Total percentages do not equal 100 percent due to rounding.

At least two asylum offices provide pre-departure training to asylum officers being sent to ICE's family residential centers. To support officers who are more accustomed to adjudicating affirmative asylum cases, the Los Angeles asylum office provides pre-departure training for officers before they travel to the family residential centers. In Los Angeles, officers observe credible and reasonable fear interviews and gradually increase to a full caseload of credible or reasonable fear cases at their home office, according to officials. In San Francisco, officers receive pre-departure training highlighting procedures unique to the family residential centers or to processing family units in credible and reasonable fear. Specifically, San Francisco pre-departure training includes a formal presentation on family residential center procedures, including discussion of challenges officers may experience, according to officials. By comparison, officials from the Chicago and New York offices told us they do not provide formal pre-departure training but rather direct or recommend that officers review Asylum Division guidance and procedures on family processing independently before they travel. Officials from two other offices told us they rely on the training asylum

LADOJ-ASYLUM2216

officers may receive throughout the year related to credible and reasonable fear, which can vary, as previously discussed.

Asylum officers also noted inconsistent pre-departure training prior to their temporary duty during our February 2019 visits to two Texas family residential centers in Dilley and Karnes. For example, some asylum officers we interviewed said they screened credible and reasonable fear cases at their home office in preparation for their assignment. Others said they reviewed procedures independently on family processing in credible and reasonable fear cases. Officers from one asylum office said they relied primarily on an email from USCIS support staff located at the family residential centers to learn about screening family cases.

Asylum officers are to review the procedures on family processing in credible and reasonable fear before they arrive at the family residential centers, according to officials. However, there is no minimum amount of pre-departure training, or required content for such training, that all asylum offices are to provide before officers begin screening family units. Asylum Division officials acknowledged that training on screening of family units for credible and reasonable fear varies by asylum office and noted that offices have been given discretion to determine what, if any, pre-departure training to provide on screening family units. Arlington and Houston asylum office officials stated that inconsistent asylum officer training on credible and reasonable fear cases negatively impacts efficiency at the family residential centers. Specifically, these officials noted that asylum officers who typically adjudicate affirmative asylum applications benefit from training on key differences between credible fear, reasonable fear, and affirmative asylum. For example, officials said more training could reduce administrative errors in applicants' paperwork, and changes needed during supervisory review, both of which occur more often for officers with less experience and training, according to officials. Further, officials said asylum officers less experienced in credible and reasonable fear may not be able to handle a full caseload at the family residential centers when they first arrive. As a result, Houston officials said they may spend the first week of a 2-week assignment providing additional support to inexperienced officers as they gradually increase to a full caseload.

*Standards for Internal Control in the Federal Government* states management should demonstrate a commitment to recruit, develop, and retain competent individuals. The standards also note that competence is the qualification to carry out assigned responsibilities, and requires relevant knowledge, skills, and abilities, which are gained largely from

LADOJ-ASYLUM2217

professional experience, training, and certifications. As previously noted, Asylum Division officials told us additional training for asylum officers before they begin screening cases at the family residential centers is important. Officials also said their intention is to balance such training against the need for rapid deployment, in some cases. Although additional training may not be feasible before every deployment, providing asylum officers additional pre-departure training before they begin screening credible and reasonable fear cases for family units would better prepare officers and help ensure efficient and effective case processing at ICE's family residential centers.

## USCIS Conducts Various Quality Assurance Reviews of Credible and Reasonable Fear Cases, but Does Not Document Results in a Consistent Manner

USCIS relies primarily on two quality assurance reviews for assessing quality of credible and reasonable fear cases, but does not document the results of one of these reviews in a consistent manner.[42]

**Annual, Asylum Division-wide reviews.** The Asylum Division conducts division-wide quality assurance reviews on a random sampling of credible fear, reasonable fear, or affirmative asylum cases selected proportionally from asylum offices nationwide. To do so, the Asylum Division works in collaboration with the RAIO Directorate. The reviews occur each year, and rotate between a sampling of credible fear cases, reasonable fear cases, and affirmative asylum cases.[43]

For credible and reasonable fear reviews, USCIS randomly selects a specified number of cases after supervisory review, but before officers

---

[42]USCIS also conducts weekly reviews of credible and reasonable fear cases that assess a small number of cases. Officials said the weekly reviews provide limited information on the overall quality of credible fear and reasonable fear cases. The officials added that, due to the limited information provided, they are considering discontinuing these weekly reviews in the future. They noted that, at various points throughout the year, they temporarily suspended weekly reviews of reasonable fear cases to focus Asylum Division resources on other priorities, such as credible fear cases.

[43]USCIS conducted a pilot Asylum Division-wide review of credible fear cases in 2015, and a pilot for reasonable fear cases in 2016. Subsequently, USCIS conducted full Asylum Division-wide reviews of credible fear cases in 2016 and 2018, and of reasonable fear cases in 2017.

LADOJ-ASYLUM2218

serve determinations to the applicant.[44] Reviewers use a checklist to identify and track quality issues arising in each reviewed case, such as accurate data entry, appropriate legal analysis, asylum officer notes that reflect a skilled interview, and others. The review process for each case includes two lines of review. If the two reviewers come to different conclusions, they discuss any differences in their reviews and reach consensus about how to score the case. USCIS records the results of these reviews in a document that lays out the numbers and percentages of errors in areas covered in the review checklist. For example, for the 2018 review of credible fear cases, the document states asylum officer notes did not reflect a skilled interview in an estimated 58 percent of cases.[45] For most of these cases, the reason for the error that reviewers noted was insufficient follow-up questions. USCIS officials said while the sample across asylum offices is generalizable with respect to the credible or reasonable fear caseloads nationwide, the samples taken from each asylum office are not large enough to draw conclusions about trends at individual asylum offices. Officials said they rely on periodic reviews to identify trends by asylum office.

**Periodic, asylum office reviews.** In addition to the Asylum Division-wide quality assurance reviews, the Asylum Division began conducting periodic reviews at asylum offices in November 2017. As of November 2019, the Asylum Division had conducted periodic reviews of credible and reasonable fear cases or affirmative asylum adjudications at some asylum offices, as well as a review of credible and reasonable fear cases at the family residential centers. For periodic reviews, the Asylum Division selects cases over a period of several weeks. For example, based on the Asylum Division's draft standard operating procedures for the periodic reviews, an asylum office may send two to four credible and reasonable fear cases every day for several weeks to reach the required total number of cases. According to the draft standard operating procedures, Asylum Division reviewers are to use a reviewer checklist, modeled off the

---

[44]USCIS works with a statistician to develop the sampling methodology used for the Asylum Division-wide reviews. For example, for the 2018 review of credible fear cases, USCIS considered the overall number of credible fear cases from October 1, 2017 through June 17, 2018, and used a standard approach to calculate a sample size for the given population. Asylum offices were then to select credible fear cases for review using specified parameters.

[45]Percentage estimates from the 2018 review of credible fear cases have margins of error at the 90 percent confidence level of plus or minus 4 percentage points or fewer.

LADOJ-ASYLUM2219

checklist used for the Asylum Division-wide reviews, as a starting point for what factors to review.

However, USCIS does not document the results of the periodic reviews in a consistent manner. We reviewed the reports resulting from six periodic reviews conducted at the Arlington, Chicago, Miami, and Houston asylum offices, the New Orleans sub-office, and the family residential centers.[46] We found that all reports included information on strengths and weaknesses, and some reports further organized analysis into additional categories. For example, some reports had analysis on details related to procedures, eliciting testimony, and issues related to fraud detection and national security. Other reports included analysis of specific trends in persecution cases and in Convention against Torture cases. Some reports also included analysis on legal sufficiency, applicant country of origin, determination outcomes, and others. According to the draft standard operating procedure, reviewers are to note trends, common errors, and collect samples to create a deliverable, such as a short report or other deliverables, for the asylum office at the end of the review. However, the Asylum Division has not provided guidance on what specific information is important to include in reports resulting from periodic reviews in order to track trends within an asylum office over time, or across asylum offices.

*Standards for Internal Control in the Federal Government* states management should establish and operate monitoring activities to oversee the internal control system and evaluate the results. Management should document the results of ongoing monitoring and separate evaluations to identify internal control issues, and should use this evaluation to determine the effectiveness of the internal control system. Asylum Division officials told us the primary purpose of the periodic reviews is to collect information about current, office-specific trends, and provide timely support in the form of training sessions and other guidance. Further, the Asylum Division historically has not used the periodic reviews to compare one office to another, though they have sometimes noted issues from these reviews requiring similar guidance across multiple offices. Documenting the results of periodic reviews in a

---

[46]These six periodic reviews took place between November 2017 and May 2018 and represented all those periodic review reports available at the time of our review. As of November 2019, the Asylum Division had also conducted periodic reviews of credible and reasonable fear cases at the Newark and San Francisco asylum offices, the Boston sub-office, and a second review at the Houston asylum office, according to officials. In addition, Asylum Division officials told us they conducted periodic reviews of affirmative asylum adjudications at the remaining asylum offices.

LADOJ-ASYLUM2220

consistent manner would help the Asylum Division identify trends and provide support across asylum offices.

The draft standard operating procedures for the periodic review provides general directions for reviewers to share information on trends to asylum office personnel, such as strengths, weaknesses, and other developing trends. However, the draft standard operating procedures do not specify requirements for documenting the results of these reviews. Asylum Division officials told us the periodic review standard operating procedures are in draft form, and that they may provide more specific guidance on aspects of the reviews in the future. However, officials also said they are not planning any changes or additions to the standard operating procedure as of September 2019. More specific guidance on requirements for documenting results would better position USCIS to track trends in a consistent manner for credible and reasonable fear reviews within and across asylum offices.

## USCIS Does Not Systematically Record Case Outcomes When Screening Family Members for Credible Fear

By regulation, dependents, specifically a spouse or child, of a noncitizen (referred to as the "principal applicant") can be included in the applicant's credible fear determination if the dependent (1) arrived in the United States concurrently with the principal applicant, and (2) desires to be included in the principal applicant's determination.[47] However, any noncitizen may have his or her credible fear determination made separately, if he or she expresses such a desire.

USCIS policy is to include any dependents on a principal applicant's credible fear determination if the principal applicant receives a positive determination, resulting in both the principal applicant and any dependents being issued a Notice to Appear for full removal proceedings.[48] For example, USCIS may process credible fear cases together for family units detained at ICE's family residential centers, including children as dependents on a parent's case, or issuing a Notice To Appear for the parent and children in the interest of family unity (see figure 6). We observed asylum officers at the family residential centers

---

[47]See 8 C.F.R. § 208.30(b). For a number of immigration applications, including asylum and the related screening for credible fear, a spouse or child (defined as an unmarried natural or legally adopted child under 21 years of age) may be included as dependents on a principal's application and derive lawful immigration status from the principal applicant if the application is granted. See 8 U.S.C. § 1101(b)(1).

[48]For cases in which the asylum officer concludes the screening with a positive determination, USCIS is to issue a Notice to Appear before an immigration court, thereby placing the individual into full removal proceedings before an EOIR immigration judge.

LADOJ-ASYLUM2221

asking principal applicants whether they were apprehended with any family members. If yes, asylum officers asked for the names and dates of birth of those family members, and recorded the information in their typed notes. For parents who received a positive determination, we observed asylum officers including the child on the parent's case as a dependent.

**Figure 6: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Processing for Parents and Children Detained Together in U.S. Immigration and Customs Enforcement Family Residential Centers**



Source: 8 C.F.R. § 208.30(b)) and USCIS policy. | GAO-20-250

Notes: For a number of immigration applications, including asylum and the related screening for credible fear, a spouse or child (defined as an unmarried natural or legally adopted child under 21 years of age) may be included as dependents on a principal's application and derive lawful immigration status from the principal applicant if the application is granted. See 8 U.S.C. § 1101(b)(1). Separately, the exercise of discretion to issue a Notice to Appear to both the parent and children in the interest of family unity is limited to children under the age of 18 because, according to the policy, family unity interests are more compelling when the child is a minor.

Further, if a parent receives a negative credible fear determination, and his or her child receives a positive credible fear determination, USCIS may issue a Notice to Appear to the child as a positive credible fear determination and to the parent in the interest of family unity. In that case, because a parent could not be a "dependent" of a child under the

LADOJ-ASYLUM2222

regulation, USCIS policy is to use its discretion to issue a Notice to Appear to both the child receiving a positive determination and the parent he or she arrived with, in the interest of family unity, even though the parent initially received a negative determination. Issuing the parent and child a Notice to Appear places them into full removal proceedings where they can apply for multiple forms of relief or protection before an immigration judge, including asylum, rather than being expeditiously ordered removed in accordance with the expedited removal process. The exercise of this discretion to issue a Notice to Appear to both the child receiving a positive determination and the parent he or she arrived with in the interest of family unity is limited to cases in which the children are under the age of 18 because, according to the policy, family unity interests are more compelling when the child is a minor.

USCIS data indicate that asylum officers screened more than 141,000 credible fear cases at ICE's four family residential centers between fiscal years 2014 and the first two quarters of 2019 (see table 3).[49] In addition, USCIS data indicate that positive credible fear determination rates are higher at the family residential centers—87 percent compared with the nationwide rate of 77 percent from fiscal year 2014 through the second quarter of fiscal year 2019 (see app. III for data on reasonable fear cases screened at ICE's family residential centers).

---

[49]ICE detained families at the family residential centers (Artesia Family Residential Center, Berks County Residential Center, Karnes County Residential Center, and the South Texas Family Residential Center) for varying periods between fiscal year 2014 and fiscal year 2019.

LADOJ-ASYLUM2223

**Table 3: Credible Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Centers, and Related Positive Outcomes, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total credible fear referrals to USCIS | Total credible fear referrals from ICE's family residential centers | Percentage of credible fear referrals from ICE's family residential centers | Total and percentage of positive determinations for all credible fear referrals | Total and percentage of positive determinations from ICE's family residential centers only |
|---|---|---|---|---|---|
| 2014 | 47,754 | 1,549 | 3 | 34,901 (73) | 1,021 (66) |
| 2015 | 48,089 | 9,933 | 21 | 34,996 (73) | 8,818 (89) |
| 2016 | 91,598 | 41,254 | 45 | 72,989 (80) | 36,697 (89) |
| 2017 | 77,698 | 31,574 | 41 | 59,581 (77) | 27,762 (88) |
| 2018 | 98,083 | 44,062 | 45 | 75,473 (77) | 37,180 (84) |
| 2019 (first two quarters) | 50,091 | 12,796 | 26 | 38,844 (78) | 10,697 (84) |
| **Total** | **413,313** | **141,168** | **34** | **316,784 (77)** | **122,175 (87)** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

Asylum officers are to record individual case outcomes for all family members in USCIS's automated case management system. However, Asylum Division officials said their system does not allow asylum officers to record whether an individual receives a credible fear determination as a principal applicant, dependent, or in the interest of family unity. Instead, asylum officers are to record positive determinations in the USCIS case management system for both (1) dependents on the basis of the principal applicant's positive case, and (2) parents with negative determinations, on the basis of their child's positive case. USCIS does record more specific information related to outcomes for family units in the family

LADOJ-ASYLUM2224

members' individual hardcopy alien files, but this information is not readily available in an automated manner.[50]

USCIS's case management system allows asylum officers to record family relationships—that is, officials stated that asylum officers are to record who is a principal applicant, and who is a spouse, child, parent, or sibling of the principal applicant. According to USCIS officials, asylum officers are to record a parent who receives a positive credible fear determination as the principal applicant, and record any children as a child. Further, asylum officers are to link known family members' cases in the system, but adding a description of the family relationship is up to asylum officers' discretion. However, the system does not allow officers to record whether an applicant's determination stems from his or her own case, or from a family member's case. As a result, USCIS does not maintain automated data in a readily accessible manner on outcomes for family members in a manner that indicates whether (1) an eligible family member received a positive determination as a dependent on a principal applicant's positive case or (2) whether a parent was issued a Notice to Appear based on his or her child's positive determination, after the parent received a negative determination.

*Standards for Internal Control in the Federal Government* states that management should process obtained data into quality information that supports the internal control system. Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Although USCIS data indicate that positive credible fear determination rates are higher at the family residential centers compared to rates of positive credible fear determinations across all detention facilities, USCIS officials stated the higher rates result from the ability to (1) include children under 18 on a parent's positive credible fear determination, and (2) record all family members as positive in the system when USCIS uses its discretion in the interest of family unity. USCIS officials told us that systematically recording all outcomes of credible fear screenings for

---

[50]If a principal applicant receives a positive determination, asylum officers are to record biographic information for all their dependents, and to record whether dependents entered the United States concurrently with the principal applicant, on the principal applicant's USCIS Form I-870, *Record of Determination/Credible Fear Worksheet*. If a parent receives a negative determination, asylum officers are to interview the child. If the child receives a positive credible fear determination, asylum officers are also to include a note in the comment section on the child's Form I-870 that the parent was present for the interview. Asylum officers are also to include a note in the comment section of the child's Form I-870 that the parent received a negative determination, but that USCIS was using its discretion to place the parent into full removal proceedings in the interest of family unity.

LADOJ-ASYLUM2225

family members in a more complete manner would require changes to their case management system; according to Asylum Division officials, they are continually exploring options to improve the system's capabilities. Without complete data in its case management system on all outcomes of credible fear screenings at family residential centers, USCIS is not well-positioned to report on the scope of either the agency's policy for family members who are treated as dependents, pursuant to regulation, or USCIS's use of discretion in the interest of family unity.

# USCIS and EOIR Have Processes for Managing Credible and Reasonable Fear Workloads, but USCIS Does Not Have Complete Data on Case Delays

## USCIS Makes Staffing Allocation Decisions Based on National and Local Staffing Models

USCIS manages its credible and reasonable fear workloads using national- and local-level staffing models to inform staffing allocation decisions. Specifically, USCIS has an agency-wide staffing model to allocate staff to different workload categories, including credible and reasonable fear workloads, for each upcoming fiscal year.[51]

Asylum Division headquarters officials stated they collaborate with USCIS's Office of Performance and Quality,[52] USCIS administrative offices, and local asylum offices to develop the national staffing model. Headquarters officials said the national staffing model is intended to allocate staff for each workload category for the upcoming fiscal year.

---

[51]According to USCIS, the Asylum Division's authorized staffing level increased from 605 permanent, full-time federal employees in fiscal year 2012 to 1,712 in fiscal year 2019. USCIS reported that the increase in hiring, particularly in fiscal year 2019, was necessary to meet the increase in the credible fear and affirmative asylum workloads.

[52]Asylum Division officials noted USCIS's Office of Performance and Quality is responsible for establishing national annual staffing recommendations and manages the statistical models that forecast future workload volume, which support their recommendations.

LADOJ-ASYLUM2226

They begin working on the staffing model in June for any given year in anticipation of resource decisions the agency will make before a new fiscal year begins, usually in September or October. According to officials, the national staffing model for credible and reasonable fear is based on historical case receipt and workload data, historical staffing data and future staffing workload forecasting data, bi-weekly reports on staffing and workload data, and observations from asylum offices submitted to headquarters, among other things.

The Asylum Division also maintains staffing models that guide local staffing deployment, according to headquarters officials. Asylum offices make local staffing allocation decisions in collaboration with the Asylum Division at headquarters. Headquarters officials stated they consider several factors in allocating staff specifically for the credible and reasonable fear workloads for local asylum offices. Such factors include workload projections, available facilities and planned facilities projects, and existing workforce and vacancy levels (table 4 shows the number of asylum officers authorized and on board for each asylum office in March 2019). In addition, headquarters officials said they work with local asylum offices to review the number of credible and reasonable fear case receipts and current staffing allocations by asylum office on a daily basis. Headquarters officials stated they change staffing allocation as necessary to address changes in credible or reasonable fear case receipts.

**Table 4: Number of U.S. Citizenship and Immigration Services (USCIS) Asylum Officers Authorized and On Board, as of March 2019**

| Asylum Office | Total number of asylum officers authorized | Total number of asylum officers onboard | Percent of asylum officers onboard |
|---|---|---|---|
| Arlington Pre-Screening Center and Arlington[a] | 133 | 96 | 72 |
| Chicago | 70 | 61 | 87 |
| Houston and New Orleans Sub Office[a] | 138 | 91 | 66 |
| Los Angeles | 97 | 78 | 80 |
| Miami | 70 | 56 | 80 |
| Newark and Boston Sub Office[a] | 91 | 70 | 77 |
| New York | 65 | 42 | 65 |
| San Francisco | 81 | 52 | 64 |
| **Total** | **745** | **546** | **73** |

Source: GAO analysis of USCIS data. | GAO-20-250

[a]The number of asylum officers are combined for asylum offices and their respective sub offices.

LADOJ-ASYLUM2227

In the Houston and Arlington asylum offices, in particular, officials stated they review headquarters data on workload projections to assign personnel to the credible and reasonable fear workloads for their offices. For example, officials in the Houston office said they look at the projected credible and reasonable fear workload to determine the number of officers they may need. Houston office officials said they assign officers based on officer availability, considering factors such as leave or training schedules. Similarly, a senior official responsible for staffing in the Arlington office said they look at the projected numbers of credible and reasonable fear cases, as well as the location of the cases, to determine the target number of officers assigned to a specific workload. Once they set targets for the number of officers needed, a senior official responsible for staffing in the Arlington office said they assign personnel based on a number of factors, including officer preferences, seniority, and locations with the greatest need.

Although USCIS uses national and local staffing models for determining staffing needs and allocating staff at and across field offices, senior Asylum Division officials stated that predicting future workload for credible fear cases is challenging. Moreover, headquarters officials told us that USCIS's credible fear workload projections have been off by as much as 50 percent when comparing projected and actual credible fear workload volume in recent years.[53] For example, the USCIS projections for credible fear cases in fiscal year 2015 were 78,485, but actual case receipts totaled 48,052.[54] More recently in fiscal year 2018, USCIS projected 70,000 credible fear case receipts, but actual case receipts totaled 99,035. Headquarters officials stated that a variety of external factors—unpredictable changes in country conditions, and CBP and ICE decisions to either place individuals in expedited removal or issue Notices to Appear before an immigration judge—make it difficult to project this workload. Furthermore, headquarters officials stated the volume of credible fear cases can fluctuate on a weekly basis, while reasonable fear projections have been fairly accurate, since the number of reasonable fear cases has remained relatively stable in recent years.

---

[53]USCIS established a Volume Projection Committee composed of subject matter experts from various directorates to collaborate and project the workload for all operational forms for USCIS. The Office of Chief Financial Officer and the Office of Performance and Quality co-chair the committee, and Asylum Division officials stated they collaborated with the two offices to project the credible fear workload.

[54]Actual case receipt numbers are from USCIS's publicly-reported data on credible fear case receipts.

LADOJ-ASYLUM2228

To manage its workload of credible and reasonable fear cases, USCIS relies on a flexible workforce to respond to fluctuations in cases, in addition to asylum officers who generally screen credible and reasonable fear cases. For example, USCIS pulls asylum officers from affirmative asylum adjudications and uses overtime hours to handle surges in credible and reasonable fear case receipts, according to officials. Senior Asylum Division officials stated they do not receive staffing increases to account for lost or stopped work in other workload categories, such as affirmative asylum, that result from surges in credible fear case receipts. They stated surges in credible and reasonable fear case receipts may require immediate staff redeployment from the affirmative asylum workload. As a result, asylum offices have sometimes canceled planned affirmative asylum interviews and have prioritized credible and reasonable fear screenings over affirmative asylum cases, which have significantly contributed to the current backlog in pending affirmative asylum cases, according to headquarters officials. As previously discussed, asylum offices across the country also send officers on details to ICE's family residential centers to conduct credible and reasonable fear screenings.[55]

In addition, the Asylum Division headquarters tracks the number of asylum officers assigned to the credible and reasonable fear workload, among other workload categories such as affirmative asylum, through biweekly reports received from local asylum offices. Headquarters officials told us they use the reports to respond to specific requests for information about Asylum Division staffing allocation. For example, Congress may request information on the number of USCIS personnel working on credible fear cases for a particular time period, according to headquarters officials, so they maintain these reports to fulfill such requests.

Specifically, with regard to the biweekly reports, asylum offices record the number of asylum officers assigned to credible and reasonable fear cases for each day in the 2-week pay period.[56] The resulting biweekly reports are spreadsheets with 15 tabs, one tab for each day in a pay period and

---

[55]Further, USCIS has historically assigned detailees from outside the Asylum Division to conduct credible fear screenings, including refugee officers and former asylum or refugee officers now working with USCIS's Field Office Directorate, Service Center Operations Directorate, and FDNS.

[56]These reports also include asylum and refugee officers who may be temporarily assigned to the asylum office (from other asylum offices or USCIS headquarters) to conduct credible and reasonable fear screenings, among other categories of work.

LADOJ-ASYLUM2229

one tab summarizing the pay period, with 26 separate spreadsheets for each year per asylum office. Headquarters officials stated the biweekly reports are manually compiled and may contain errors, but the biweekly reports have historically provided the overall number of personnel performing credible and reasonable fear work for any particular date or pay period. As of October 2019, headquarters officials said they are developing automated software that will track information similar to that collected in the biweekly reports, which will allow more systematic analysis of the staffing data that the current biweekly reports contain.

## USCIS Monitors Credible and Reasonable Fear Processing Times to Help Manage Its Workload

USCIS sets and monitors timeliness goals for completing credible and reasonable fear cases.

**Monitoring timeliness goals for credible fear cases.** USCIS monitors credible fear processing times by setting timeliness goals for completing credible fear cases and those goals have changed over time. USCIS regulation does not require that credible fear cases be completed in a specific time frame; however, Asylum Division headquarters officials said they have used timeliness goals to help monitor their credible fear workload. In addition, case delays may occur for credible fear cases (discussed further below). Specifically, from fiscal year 2009 through the first quarter of fiscal year 2018, USCIS used a 14-day goal to monitor credible fear case processing times.[57] In other words, USCIS monitored the extent to which officers completed credible fear cases within 14 calendar days of USCIS receiving referral documents from ICE and created an electronic file for the case in their case management system.[58] According to our analysis, USCIS completed at least 81 percent of

---

[57]According to Asylum Division headquarters officials, credible fear processing times are measured in calendar days and reasonable fear processing times are measured in court days. According to USCIS officials, court days are equivalent to business days.

[58]According to USCIS documents, the clock automatically starts for credible fear cases when USCIS receives a referral for individuals in expedited removal proceedings. ICE is responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a fear screening.

LADOJ-ASYLUM2230

credible fear cases in 14 or fewer days for each fiscal year from 2014 to 2017—the last full fiscal year under the 14-day goal (see table 5).[59]

**Table 5: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Case Processing Times, Fiscal Years 2014 through 2017**

| Fiscal year | Total number and percentage of credible fear cases processed in 14 days or less | Total number and percentage of credible fear cases processed in over 14 days | Total number of credible fear cases |
|---|---|---|---|
| 2014 | 43,310 (91) | 4,435 (9) | 47,745 |
| 2015 | 39,862 (83) | 8,219 (17) | 48,081 |
| 2016 | 74,415 (81) | 17,168 (19) | 91,583 |
| 2017 | 63,187 (81) | 14,491 (19) | 77,678 |
| **Total** | **220,774 (83)** | **44,313 (17)** | **265,087** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: For the purposes of our analysis of USCIS data, we calculated the number of days for credible fear case processing times in calendar days, which includes weekends and federal holidays. In calculating case processing times, we used the difference between beginning and end dates for credible fear cases. We considered the case processing time to begin when a credible fear case was referred to an asylum office. According to USCIS documents, the date an asylum office receives a referral automatically starts the clock for case processing. For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a fear screening. According to USCIS documents, a nondetained individual's interview date is used as the starting clock date. We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We considered the case processing time to end when a credible fear case either received a fear determination or an administrative closure. We included credible fear cases that either received a fear determination or an administrative closure for detained and nondetained individuals. Specifically, for credible fear cases that received a fear determination, we used the date when an individual was served a decision from USCIS. Administrative closures occur when the USCIS asylum officer conducting the screening closes the case without a determination for reasons such as death of the individual, inability of the individual to communicate, dissolved cases due to withdrawals of fear claims, or other reasons, according to officials. Additionally, the case processing clock automatically stops for cases that receive an administrative closure, according to USCIS documents.

[59]In calculating credible fear case processing times, we used the difference between beginning and end dates for credible fear cases. We considered the case processing time to begin when a credible fear case was referred to an asylum office. According to USCIS documents, the date an asylum office receives a referral automatically starts the clock for case processing. We considered the case processing time to end when a credible fear case either received a fear determination or an administrative closure. Specifically, for credible fear cases that received a fear determination, we used the date when an applicant was served a decision from USCIS. Administrative closures occur when the USCIS asylum officer conducting the screening closes the case without a determination for reasons such as death of the individual, inability of the individual to communicate, dissolved cases due to withdrawals of fear claims, or other reasons, according to officials. Additionally, the case processing clock automatically stops for cases that receive an administrative closure, according to USCIS documents.

LADOJ-ASYLUM2231

In February 2018, USCIS lowered its credible fear processing time goal to 10 days.[60] USCIS completed 68 percent of credible fear cases in 10 or fewer days between February and September 2018.[61]

**Monitoring timeliness requirements for reasonable fear cases.**
USCIS monitors reasonable fear processing times by setting a 10-day goal. Pursuant to regulation, asylum officers are to conduct reasonable fear interviews and make a determination within 10 days of receiving a referral from CBP or ICE with an indication that the individual has made a fear claim, absent exceptional circumstances.[62] Additionally, a 2015 settlement agreement in the *Alfaro-Garcia v. Johnson* case ("Alfaro-Garcia" Settlement Agreement) requires USCIS to achieve an average national reasonable fear determination period of no more than 10 court days (i.e. business days), calculated on a monthly basis, for cases in which individuals are detained by DHS.[63] For reasonable fear cases subject to this settlement agreement that take longer than 20 court days to complete, asylum offices are to notify the Chief of the Asylum Division in writing and provide an explanation for the delay. Further, USCIS must provide class counsel in the Alfaro-Garcia case a notice and remedial

---

[60]USCIS reports data on credible fear processing time by fiscal year. The processing time goal listed on its public website changed in the second quarter of fiscal year 2018.

[61]We report on USCIS credible fear processing times in 10 or fewer days between February and September 2018 because USCIS started using the 10-day goal in February 2018. We ended our analysis in September 2018 to complete the remaining months in fiscal year 2018. Our analysis of USCIS data further showed that from fiscal year 2014 through March 2019, USCIS completed 89 percent of all credible fear cases in 20 or fewer calendar days.

[62]See 8 C.F.R. § 208.31(b).

[63]See Alfaro Garcia v. Johnson, No. 14-1775 (N.D. Cal. Oct. 27, 2015) (settlement agreement and release) (*Settlement Agreement*). An average of 10 court days is achieved, according to the agreement, if the average is less than 10.5 court days. Cases subject to this agreement may also be tolled for exceptional circumstances, consistent with 8 C.F.R. § 208.31(b). Exceptional circumstances do not include unusual but reasonably foreseeable circumstances, shall be determined on an individualized basis, and shall be of limited duration. The agreement applies to eligible individuals referred to as "class members" who: (1) are subject to a reinstated order of removal or administrative order of removal; (2) have expressed, or in the future expresses, a fear of returning to their country of removal; (3) are detained in the custody of DHS; and (4) have not received, or do not receive, an initial reasonable fear determination by USCIS under 8 C.F.R. § 208.31 within 10 days of referral to USCIS. The agreement specifies that reasonable fear processing times are calculated in court days. According to USCIS officials, court days are equivalent to business days.

LADOJ-ASYLUM2232

plan of action for cases that exceed 20 days that are subject to that settlement agreement.

Consistent with USCIS policy and the Alfaro-Garcia settlement agreement,[64] officers may pause the clock for reasonable fear cases—and thus case processing times—in the following limited circumstances:

- the applicant or the applicant's representative requests to defer the reasonable fear interview;

- the applicant refuses to participate in the reasonable fear interview or accept service of a reasonable fear determination; or

- exceptional circumstances.

USCIS pauses processing times for detained reasonable fear cases by recording the dates when the case was paused and when processing resumed, once the basis for pausing the clock no longer exists. Asylum Division headquarters officials said pauses in reasonable fear case processing times are separate from case delay reasons, but case delays may occur for reasonable fear cases. In our case processing time analysis of USCIS data, we excluded approximately 13 percent of reasonable fear cases that had at least one pause in case processing time from our analysis because, in conducting our analysis, we could not systematically confirm the appropriate order of dates for those cases. As shown in table 6, our review of USCIS data for cases that did not include pauses found that USCIS completed at least 91 percent of reasonable fear cases within 10 or fewer court days from fiscal year 2016 to the second quarter of fiscal year 2019.

---

[64]*Settlement Agreement* at 5, No. 14-1775 (N.D. Cal. Oct. 27, 2015). The settlement agreement refers to pausing the clock as "tolling" the reasonable fear determination period.

LADOJ-ASYLUM2233

**Table 6: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Case Processing Times for Nondetained and Detained Cases without Clock Pauses, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal year | Total number and percentage of reasonable fear cases processed in 10 days or less | Total number and percentage of reasonable fear cases processed in 1 1-20 days | Total number and percentage of reasonable fear cases processed over 20 days | Total number of reasonable fear cases |
|---|---|---|---|---|
| 2014 | 2,119 (25) | 975 (11) | 5,508 (64) | 8,602 |
| 2015 | 3,856 (50) | 1,559 (20) | 2,298 (30) | 7,713 |
| 2016 | 6,912 (92) | 579 (8) | 33 (0.44) | 7,524 |
| 2017 | 7,574 (95) | 379 (5) | 26 (0.33) | 7,979 |
| 2018 | 7,991 (91) | 741 (8) | 4 (0.05) | 8,736 |
| 2019 (first two quarters) | 4,624 (92) | 418 (8) | 0 (0) | 5,042 |
| **Total** | **33,076 (73)** | **4,651 (10)** | **7,869 (17)** | **45,596** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: A 2015 settlement agreement in the Alfaro Garcia v. Johnson case ("Alfaro-Garcia Settlement Agreement") requires USCIS to achieve an average national reasonable fear determination period of no more than 10 court days, calculated on a monthly basis, for reasonable fear cases in which individuals are detained by the Department of Homeland Security and to report these averages to class counsel. See Alfaro Garcia v. Johnson, No. 14-1775 (N.D. Cal. Oct. 27, 2015) (settlement agreement and release). For the purposes of our analysis of USCIS data of nondetained and detained reasonable fear cases, we calculated the number of days for reasonable fear case processing times in court days, where we excluded weekends and federal holidays. In calculating case processing times, we used the difference between beginning and end dates for reasonable fear cases. According to USCIS documents, the date an asylum office receives a proper referral starts the clock for case processing for detained reasonable fear cases. For nondetained individuals, the clock starts for reasonable fear cases when a USCIS asylum office conducts the interview for a reasonable fear screening. According to USCIS documents, a nondetained individual's interview date is used as the starting clock date. We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We considered the case processing time to end when a reasonable fear case had a determination that was served, or for a case that was administratively closed. We included reasonable fear cases that either received a fear determination or an administrative closure for both detained and nondetained individuals. Specifically, for reasonable fear cases that received a fear determination, we used the date when the individual was served a determination from DHS. Administrative closures occur when the USCIS asylum officer conducting the screening closes the case without a determination for reasons such as death of the individual, inability of the individual to communicate, dissolved cases due to withdrawals of fear claims, or other reasons, according to officials. Additionally, the case processing clock automatically stops when cases are administratively closed, according to USCIS procedures. We excluded approximately 13 percent of reasonable fear cases that had at least one pause in case processing time from our analysis. Percentages do not equal 100 percent due to rounding.

## USCIS Does Not Have Complete Data on Reasons for Case Delays

Although the Asylum Division monitors overall processing times for credible and reasonable fear cases, it does not collect comprehensive data in its case management system on some types of case delays. For example, USCIS tracks whether cases are delayed for certain reasons related to the individual—such as if he or she has a medical condition that prevents the asylum officer from conducting the interview, if the individual

LADOJ-ASYLUM2234

requests that the interview be rescheduled, or if the individual is detained in a remote location. In addition, USCIS's system can track if cases are delayed for logistical or resource constraints. Specifically, asylum officers may select "lack of resources" as one case delay reason in the system. However, this field in the system does not allow officers to distinguish more specific types of delays—such as a lack of space in detention facilities for officers to screen fear cases, telephones not working properly, and other types of delays—which officers told us occur on a regular basis.[65]

Asylum officers we interviewed in the Arlington and Houston offices stated that logistical delays could affect the number of credible or reasonable fear cases they can complete each day. Specifically, some asylum officers said they have experienced delays up to 30 minutes waiting for phone lines to work properly at detention facilities. Moreover, supervisors we interviewed in the Arlington office stated telephone and interpreter delays could add 20 or 30 minutes per case, resulting in a cumulative delay that could affect an officer's productivity for any given day. Moreover, supervisors in the Arlington office said it is challenging to identify the appropriate number of cases to assign to officers because the number depends on whether or not disruptions occur. Asylum officers in Arlington said they are expected to conduct a certain number of credible or reasonable fear screenings per day, but expectations for completing their assigned cases may be tempered by circumstances such as interpreter availability or if there are issues at the detention facility, including physical space shortfalls or difficulty in locating the individual at the facility.[66] Similarly, asylum officers in Houston said they are expected to complete a certain number of credible or reasonable fear cases per day, but supervisors understand that they may face logistical challenges such as interpreter or telephone issues.

---

[65]Asylum Division headquarters officials stated they completed the transition to a new data system in February 2018. While the prior system tracked similar case delays, headquarters officials said some case delay reasons that migrated from the prior system to the new system may no longer be relevant due to modernization efforts and the current environment of conducting credible and reasonable fear determinations.

[66]As part of its hiring plan for fiscal year 2019, USCIS also reported that it is seeking to ameliorate a physical space shortfall for approximately 159 of the new employees within its facilities. According to USCIS, the Asylum Division has identified certain solutions to address the space shortfall, including expanded telework for qualifying workloads and space sharing.

LADOJ-ASYLUM2235

In addition to system limitations in tracking case delay reasons, Asylum Division headquarters officials said their case management system does not have the capability to track how long case delays may last. Our analysis of USCIS data from fiscal year 2014 through the second quarter of fiscal year 2019 indicates that 21,528 credible fear cases and 6,724 reasonable fear cases[67] had delays. USCIS's system can calculate the number of days for each credible and reasonable fear case—in other words, the total processing time for each case—and the system can produce daily reports noting these overall processing times. However, officials in the Houston office told us they must investigate individual cases on an ad hoc basis to understand how long cases have been delayed during processing. Specifically, officials in the Houston office said they maintain weekly "late reports" using information from USCIS's case management system that show pending credible and reasonable fear cases with the longest processing times and that they must spend time researching cases on the report to determine the length of the delays.

*Standards for Internal Control in the Federal Government* state that management should obtain data on a timely basis so that they can be used for effective monitoring.[68] These standards also state that management should process the obtained data into quality information that supports the internal control system. As previously discussed, USCIS's case management system does not track specific logistical reasons for any delays in credible and reasonable fear cases, which affect the number of cases an officer can complete in a day. Furthermore, USCIS's system can calculate the number of processing days for each credible and reasonable fear case. However, the system cannot track how long a case delay lasts. Headquarters officials said they evaluate the usefulness of their system, and consider options for improvements or changes, on an ongoing basis. However, as of October 2019, they stated they did not have plans for significant changes to the system to track

---

[67]This figure includes all reasonable fear cases with case delays, including those cases with clock pauses pursuant to the Alfaro-Garcia Settlement Agreement that we did not include in the data analysis presented in table 6. As previously mentioned, officers may pause the clock for detained reasonable fear cases in certain limited circumstances as outlined in the Alfaro-Garcia settlement agreement, including if the applicant requests to defer the interview, refuses to participate in the interview or accept service of the decisions, or if exceptional circumstances apply. See *Settlement Agreement* at 5, No.14-7775 (N.D. Cal. Oct.27, 2015). The clock may be paused only for these reasons, but, according to Asylum Division headquarters officials, case delays, which do not pause the clock, may also occur for other reasons, such as delays for logistical or resource constraints.

[68]GAO-14-704G.

LADOJ-ASYLUM2236

more specific case delay reasons. Collecting additional information in its automated case management system on case delays would provide USCIS with more readily available information and analyzing such data could help USCIS identify case delay reasons relevant in the current environment for officers conducting fear screenings and better position USCIS to mitigate the reasons for the delays and improve efficiency in case processing.

## EOIR Has Processes to Manage the Credible and Reasonable Fear Review Workload and Is Developing a Tool to Monitor Adherence to Required Review Processing Times

EOIR has developed processes for immigration courts and judges to help manage its workload related to credible and reasonable fear reviews. As previously discussed, in the event of a negative outcome of their credible or reasonable fear screening, noncitizens can request a review of USCIS's negative determination by an immigration judge. The Immigration and Nationality Act, as amended, and regulation require that such reviews occur within certain time frames. Specifically,

- immigration judge reviews of negative credible fear determinations are to be conducted no later than 7 days after referral from USCIS, to the maximum extent practicable,[69] and

- immigration judge reviews of negative reasonable fear determinations are to be conducted within 10 days of referral, in the absence of exceptional circumstances.[70]

EOIR officials told us that increased resources, beginning in fiscal year 2015, and a faster process for hiring immigration judges have allowed EOIR to increase the number of immigration judges. As of September 30, 2019, EOIR reported that it had 442 immigration judges on board, including 173 judges hired in fiscal year 2018 and fiscal year 2019. EOIR reports that the number of immigration judges has increased each year from fiscal year 2015 through fiscal year 2019. EOIR officials told us that

---

[69]See 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

[70]See 8 C.F.R. § 208.31(g).

LADOJ-ASYLUM2237

they plan to hire an additional 100 judges in fiscal year 2020.[71] Additionally, EOIR officials told us that they prioritize credible and reasonable fear reviews and that these reviews can generally be accommodated within EOIR's existing resources—specifically, by finding efficiencies within judges' existing schedules to add credible or reasonable fear review hearings or by conducting hearings via video teleconferencing (VTC).[72] EOIR officials also said that credible and reasonable fear reviews for individuals in ICE's family residential centers comprise a small portion of EOIR's overall workload.

According to EOIR officials, each ICE detention facility is assigned to the jurisdiction of an immigration court, and the workload for credible and reasonable fear reviews is managed locally by the court to which each detention facility is assigned. ICE officers are to initiate the immigration judge's review by filing a request with the appropriate immigration court.[73] Some courts are co-located with ICE detention facilities in which the detainee requesting the credible or reasonable fear review is housed. EOIR officials said that reviews in those locations are typically heard in person by immigration judges assigned to that facility, and that the court finds room in the judge's regular calendar to hear credible and reasonable fear reviews.[74] For individuals in detention facilities without a co-located

---

[71]In 2017, we reported that EOIR did not have efficient practices for hiring new immigration judges, which contributed to immigration judges being staffed below authorized levels. We recommended that the Director of EOIR assess the immigration judge hiring process to identify opportunities for efficiency; use the assessment results to develop a hiring strategy to target short- and long-term human capital needs; and implement any corrective actions related to the hiring process resulting from this assessment, among other things. In response, EOIR stated that it assessed the immigration judge hiring process and had actions under way to implement a hiring streamlining plan. As of November 2019, we are continuing to monitor EOIR's actions in response to our recommendation. See GAO, *Immigration Courts: Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges*, GAO-17-438 (Washington, D.C.: June 1, 2017).

[72]EOIR officials estimated that judges spend about 30 to 45 minutes on each credible or reasonable fear review and that court staff require about 25 to 30 minutes to complete the paperwork associated with each review.

[73]Immigration judges are to receive the following documentation, among other things: the record of the USCIS negative credible fear determination, including the asylum officer's notes, as well as other materials upon which the determination was made. See 8 C.F.R. §§ 1208.30-1208.31.

[74]EOIR officials said that for courts co-located with ICE detention facilities, DHS owns and manages all of the space in which the courts are located, including the courtrooms and any telephone or broadband infrastructure that EOIR uses.

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2238

immigration court, including ICE family residential centers, immigration judges typically conduct credible and reasonable fear reviews via VTC.[75] Judges conducting credible or reasonable fear reviews via VTC may be located in any immigration court in the United States.[76] According to EOIR officials, the Assistant Chief Immigration Judge for each court is responsible for managing the court's workload, including seeking support from judges outside the court in circumstances where there are too many cases for the court's assigned judges. EOIR officials told us that the use of VTC technology—which is available in all courtrooms—provides flexibility to the courts in balancing workloads related to credible and reasonable fear reviews, among other workloads.

In addition, EOIR officials stated that judges' credible and reasonable fear workload is impacted, in particular, by immigration enforcement priorities and USCIS credible or reasonable fear determinations. For example, if DHS places more noncitizens into expedited removal proceedings who subsequently express fear or intent to apply for asylum, EOIR's related workload might increase. In addition, because immigration judges do not review USCIS's positive credible fear determinations, if USCIS's screenings result in more negative determinations, EOIR's caseload related to credible or reasonable fear reviews might increase.

As of January 2018, EOIR has performance measures that include timeliness goals for credible and reasonable fear reviews, and these timeliness goals align with the required credible and reasonable fear review time frames. However, EOIR data we reviewed indicate that about 30 percent of credible and reasonable fear reviews are not completed within the required time frames. Specifically, EOIR's memorandum on *Case Priorities and Immigration Court Performance Measures* states that 100 percent of credible fear reviews should be completed within seven days of an asylum officer's negative determination and that 100 percent of reasonable fear reviews should be completed within 10 days of the

---

[75]In locations other than ICE detention facilities, the judge conducts the credible or reasonable fear review from their regular courtroom via VTC connected to a hearing room in the ICE detention facility. Officials said that limited bandwidth or internet connection may limit the number of credible or reasonable fear reviews that can occur simultaneously, particularly for ICE detention facilities in rural locations.

[76]In recent years, EOIR has opened two courts that exclusively conduct proceedings via VTC. EOIR officials said that these courts provide capacity for surges in workload and coverage for judges on leave. These courts are located in Fort Worth, Texas (capacity for about 15 judges), and in Falls Church, Virginia (five judges).

LADOJ-ASYLUM2239

filing of a negative reasonable fear determination.[77] Further, according to EOIR officials, courts are to assign credible and reasonable fear reviews to a judge within 48 hours of receipt of the request from ICE, and immigration judges are to complete such reviews within 24 hours after they are assigned.

EOIR officials said their automated case management system maintains data on the date when courts receive a request from ICE for an immigration judge review, the date the review is assigned to a judge, and the date the review takes place.[78] EOIR headquarters officials told us that they monitor the extent to which judges are completing reviews within 24 hours after they are assigned using an automated immigration judge performance dashboard, which allows officials to review this performance measure for all judges combined, for individual courts, or for individual judges. Further, EOIR officials told us that if courts are scheduling credible and reasonable fear reviews within 48 hours after receipt and judges are completing reviews within 24 hours after they are assigned, they expect that EOIR should be meeting the required time frames (7 days after ICE's referral for credible fear reviews and 10 days after ICE's referral for reasonable fear review) for conducting credible and reasonable fear reviews.

EOIR data we reviewed indicate that, from fiscal year 2014 through June 2019, approximately 28 percent of credible fear and 36 percent of reasonable fear reviews exceeded the required time frames, as shown in table 7 below.

[77]Department of Justice, Executive Office for Immigration Review, Office of the Director, *Case Priorities and Immigration Court Performance Measures*, Memorandum to The Office of the Chief Immigration Judge, All Immigration Judges, All Court Administrators, and All Immigration Court Staff (January 17, 2018).

[78]According to EOIR officials, the system also tracks some reasons for delays immigration judges may experience when completing reviews, such as incomplete DHS paperwork, an applicant under medical quarantine, and others.

LADOJ-ASYLUM2240

**Table 7: Executive Office for Immigration Review (EOIR) Credible and Reasonable Fear Review Time Frames, Fiscal Years 2014 through Third Quarter 2019**

| Fiscal year | Credible fear reviews | | | Reasonable fear reviews | | |
|---|---|---|---|---|---|---|
| | 0-7 Days | More than 7 days | Percent More than 7 days | 0-10 days | More than 10 days | Percent More than 10 days |
| 2014 | 4,889 | 1,411 | 22 | 1,031 | 681 | 40 |
| 2015 | 5,000 | 1,618 | 24 | 1,516 | 1,052 | 41 |
| 2016 | 5,664 | 1,800 | 24 | 1,672 | 869 | 34 |
| 2017 | 4,150 | 2,347 | 36 | 1,568 | 877 | 36 |
| 2018 | 4,449 | 2,188 | 33 | 1,769 | 1,001 | 36 |
| 2019[a] | 4,986 | 1,895 | 28 | 1,680 | 688 | 29 |
| **Total** | **29,138** | **11,259** | **28** | **9,236** | **5,168** | **36** |

Source: EOIR data.  |  GAO-20-250

[a]Data include credible and reasonable fear reviews through the third quarter of fiscal year 2019.

As previously discussed, the Immigration and Nationality Act and regulation allow for some flexibility with regard to the required credible and reasonable fear review time frames. Specifically, credible fear reviews are to be completed within 7 days, to the maximum extent practicable, and reasonable fear reviews are to be completed within 10 days, absent exceptional circumstances. EOIR officials we spoke with said there are a variety of court, judge, or applicant-related reasons that reviews could exceed the required time frames. For example, case file documentation sent from USCIS to the court may be incomplete. Further, a detention facility may have a medical quarantine that restricts court proceedings for a certain period of time.

EOIR headquarters officials told us that, as of October 2019, they review weekly reports that include the median processing times for completed credible and reasonable fear reviews. For example, according to one weekly report from October 2019, the median completion time for credible fear reviews was 7 days.[79] These reports also include information about the average and median number of days pending per case, for those credible and reasonable fear reviews that are not complete. For example, the weekly report we reviewed from October 2019 showed that EOIR had 553 pending credible fear reviews that week, with a median of 7 days pending and an average of 18 days pending. While these weekly reports allow EOIR headquarters officials to monitor some information about their

[79]This report showed the median processing time for credible fear reviews completed from October 1 through October 25, 2019, according to EOIR officials.

credible and reasonable fear workload, they do not provide information to EOIR officials about the proportion of EOIR's credible and reasonable fear reviews that are completed within the required time frames, or whether any reviews are delayed for reasons within the limits set out in the law or regulation.

EOIR officials said they plan to implement an automated court operations dashboard in early 2020 which is to, among other things, monitor court performance against the performance goals EOIR established in January 2018, including the credible and reasonable fear performance goals. This automated dashboard is to be similar to the immigration judge performance dashboard, which EOIR implemented in early 2019. According to EOIR, the court operations dashboard is intended to operationalize EOIR's performance measures—including completion of 100 percent of credible fear reviews with 7 days and 100 percent of reasonable fear reviews within 10 days—by providing court staff with daily alerts and warning notices to help court administrators prioritize the scheduling of cases based on the performance measures. This prioritization, combined with EOIR's monitoring of judge performance to ensure that credible and reasonable fear reviews are completed within 24 hours after they are scheduled, should provide EOIR officials with sufficient information to monitor EOIR's adherence to the required credible and reasonable fear review time frames. Because implementation of the court operations dashboard is planned for early 2020, it is too soon to know if EOIR will use the dashboard to monitor adherence to the required credible and reasonable fear review time frames or if it will help EOIR understand reasons for delays in those cases that take longer than 7 or 10 days.

## Conclusions

The number of credible and reasonable fear cases has increased since fiscal year 2014, and USCIS policies and procedures require completion of those cases within short time frames. The Asylum Division provides training for credible and reasonable fear cases to new asylum officers in basic training, given the differences between these screenings and affirmative asylum adjudications. However, not all offices provide additional training on screening such cases at the family residential centers. Ensuring that all asylum offices provide such training, in addition to basic training for new officers, would better prepare them to screen those cases efficiently and effectively. In addition, USCIS relies on its periodic quality assurance reviews to assess the quality of credible and reasonable fear cases across asylum offices. Developing and implementing more specific guidance on requirements for documenting

LADOJ-ASYLUM2242

the results of its periodic quality assurance reviews would better position the agency to track trends for credible and reasonable fear reviews across asylum offices. USCIS data show that positive credible fear determination rates are higher at the family residential centers than they are nationwide, in part because USCIS's automated case management system does not track whether an individual receives a credible fear determination as a principal applicant, dependent, or in the interest of family unity. Without systematically recording credible fear determinations involving family members, USCIS may not have complete data on credible fear determination rates, and the agency may not be in a position to report on the scope of its policy for family members in the credible fear process.

Asylum officers have experienced logistical delays that can affect the number of credible and reasonable fear cases they complete each day. Although USCIS tracks some of these delays in its case management system, the system does not distinguish between specific reasons for logistical case delays, such as telephones nor working properly or lack of space at detention facilities for officers to screen cases. Furthermore, USCIS's system can calculate the number of processing days for each credible and reasonable fear case. However, the system cannot track how long case delays last. By collecting and analyzing additional information on case delays, including specific reasons for delays and how long they last, USCIS can identify relevant case delays for officers conducting fear screenings. Moreover, analyzing specific case delay information could help USCIS mitigate reasons for case delays and improve efficiency in case processing.

# Recommendations for Executive Action

We are making the following four recommendations to USCIS:

The Director of USCIS should ensure that, in addition to USCIS's basic asylum officer training, all asylum offices provide pre-departure training on the credible and reasonable fear processes before their officers begin screening cases at the family residential centers. (Recommendation 1)

The Director of USCIS should develop and implement more specific guidance on requirements for documenting results of Asylum Division periodic quality assurance reviews. (Recommendation 2)

The Director of USCIS should ensure asylum officers systematically record in USCIS's automated case management system if individuals receive credible fear determinations as principal applicants, dependents,

LADOJ-ASYLUM2243

or in the interest of family unity, pursuant to regulation or USCIS policy. (Recommendation 3)

The Director of USCIS should collect and analyze additional information on case delays, including specific reasons for delays and how long they last, that asylum officers may face when screening credible and reasonable fear cases. (Recommendation 4)

## Agency Comments

We provided a draft of this report to DHS and DOJ for review and comment. DHS provided formal, written comments, which are reproduced in full in appendix IV. DHS also provided technical comments, which we incorporated as appropriate. DOJ told us they had no comments on the draft report. DHS concurred with our recommendations and described actions planned or underway to address them. For example, regarding our recommendation that all USCIS asylum offices provide officers with pre-departure training on credible and reasonable fear before they officers begin screening cases at family residential centers, DHS stated that USCIS plans to develop a standardized pre-departure training and provide this training to all asylum officers prior to their deployment to the family residential centers. In addition, regarding our recommendation that USCIS ensure that asylum officers record in their automated case management system if individuals receive credible fear determinations as principal applicants, dependents, or in the interest of family unity, DHS noted USCIS will explore ways to modify its case management system to ensure that asylum officers record such data and train officers on any subsequent system changes.

LADOJ-ASYLUM2244

We are sending copies of this report to the appropriate congressional committees, the Acting Secretary of Homeland Security, the Attorney General, and other interested parties. In addition, the report is available at no charge on GAO's website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Key contributors to this report are listed in appendix V.

Rebecca S. Gambler
Director, Homeland Security and Justice

*List of Addressees*

The Honorable Ron Johnson
Chairman
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Shelley M. Capito
Chairman
The Honorable Jon Tester
Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
United States Senate

The Honorable Bennie G. Thompson
Chairman
Committee on Homeland Security
House of Representatives

The Honorable Lucille Roybal-Allard
Chairwoman
The Honorable Chuck Fleischmann
Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
House of Representatives

The Honorable Zoe Lofgren
Chairwoman
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

LADOJ-ASYLUM2246

# Appendix I: Objectives, Scope, and Methodology

We were asked to review processes for screening noncitizens[1] who arrive at the southwest border expressing an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country, and the resources needed to carry out these screenings within applicable time frames[2] by the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR). This report discusses (1) what USCIS and EOIR data show about the credible fear and reasonable fear processes, (2) the extent to which USCIS has policies and procedures for overseeing credible fear and reasonable fear screenings, and (3) the extent to which USCIS and EOIR have processes for managing their respective credible fear and reasonable fear-related workloads.

To address all three objectives, we interviewed USCIS headquarters personnel from the Refugee, Asylum, and International Operations Directorate (RAIO) and RAIO's Asylum Division who are responsible for managing USCIS's credible and reasonable fear screening processes. We also interviewed officials from USCIS's Fraud Detection and National Security Directorate (FDNS), which is responsible for leading USCIS's efforts to detect and deter immigration benefit fraud and help detect national security and public safety threats. We conducted site visits at two of USCIS's eight asylum offices—Houston, Texas and Arlington, Virginia—in April 2019.[3] We selected these asylum offices based on the relatively large size of their credible and reasonable fear caseloads in fiscal year 2018—the most recent, complete data available at the time of our review. During these visits, we conducted in-person, semi-structured interviews with asylum officers, supervisory asylum officers, training officers, FDNS immigration officers, and asylum office management. During these interviews, we discussed topics related to data quality, supervisory review, training, quality assurance, family processing, and resource allocation. While the views expressed in these interviews do not represent those of all Houston and Arlington asylum office officials, they provide valuable insights from stakeholders who have experience with

---

[1]The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). For the purposes of this report, we use the term "noncitizen" to refer to individuals who would meet the definition of "alien."

[2]See Pub. L. No. 116-26, tit. V, § 506, 133 Stat. 1018, 1027 (2019).

[3]The Arlington asylum office and the Arlington Pre-Screening Center are collocated. The Arlington Pre-Screening Center provides additional support for the credible and reasonable fear caseloads.

LADOJ-ASYLUM2247

credible and reasonable fear policies and procedures. In addition, we collected written responses from the remaining six asylum offices on the same topics.

Further, we conducted site visits to U.S. Immigration and Customs Enforcement (ICE) adult detention centers and family residential centers. Specifically, we visited single adult detention facilities in San Diego, California (September 2018), and Port Isabel and Pearsall, Texas (October 2018 and February 2019, respectively). We selected these ICE single adult facilities based on their geographic proximity to various CBP field locations we visited (discussed below). In addition, in February 2019, we visited ICE's Enforcement and Removal Operations field office in San Antonio, Texas, as well as ICE's South Texas Family Residential Center in Dilley, Texas, and Karnes County Residential Center in Karnes, Texas. We selected these two ICE family residential centers for field visits because they accounted for more credible and reasonable fear referrals to USCIS than any other single adult detention facility or family residential center. We also selected them to examine unique aspects of ICE and USCIS processing of credible and reasonable fear claims made by members of family units.

During these visits to USCIS asylum offices and ICE detention facilities, we observed USCIS asylum officers conducting credible or reasonable fear screenings of single adults and family unit members either in person or via telephone. In total, we observed more than 20 credible and reasonable fear interviews across our site visits. Our observations are not generalizable to all USCIS asylum offices conducting credible and reasonable fear screenings, but provided us the opportunity to learn more about how USCIS personnel conduct interviews, make fear determinations, process these cases, and coordinate with ICE officials.

For additional context about how noncitizens are apprehended at the border, processed into expedited or full immigration removal proceedings, transferred to ICE, and ultimately referred to USCIS for credible and reasonable fear screenings, as appropriate, we interviewed headquarters personnel from DHS's U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) who are responsible for apprehending noncitizens at or between U.S. ports of entry. In addition, we conducted site visits at CBP facilities in California and Texas from September 2018 to October 2018. In California, we visited Border Patrol's San Diego sector headquarters and Imperial Beach station, and OFO's San Ysidro port of entry. In Texas, we visited CBP's Central Processing Center and McAllen Border Patrol

LADOJ-ASYLUM2248

station in McAllen, Texas; Border Patrol's Fort Brown, Weslaco, and Harlingen stations; and OFO's Hidalgo and Brownsville ports of entry. During these visits, we interviewed Border Patrol and OFO officials and observed how CBP personnel processed apprehended individuals and, as appropriate, documented whether those individuals expressed an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their country. To select these locations, we assessed CBP data on Border Patrol and OFO apprehensions along the southwest border and targeted specific locations that saw the greatest increase in the number of apprehensions of individuals from fiscal year 2016 to 2017. As noted previously, we also considered the geographical proximity of multiple CBP and ICE facilities to maximize observations. Our observations during site visits are not generalizable to all Border Patrol and OFO operations along the southwest border, but provided us the opportunity to learn more about policies and procedures for processing noncitizens into removal proceedings and documenting any fear claims.

To address the first objective, we obtained and analyzed data and documentation from USCIS and EOIR. Regarding USCIS, we analyzed record-level data from USCIS's automated case management system from fiscal year 2014 through the second quarter of fiscal year 2019 (March 2019)—the most recent time period for which complete data were available at the time of our review.[4] We analyzed these data to identify the number, characteristics, and outcomes of credible and reasonable fear cases. According to USCIS officials, USCIS's system creates a unique number, or "case ID" for each case.[5] USCIS officials told us that a previous system used a different identifier for each case—the individual's Alien number (or "A-number")—and did not use a "case ID" field. USCIS transitioned from its previous system to its current system in February 2018 and, according to USCIS officials, cases originally opened prior to the transition to the new system may have been re-opened under the same "case ID" number in the new system. As part of our data reliability testing, we checked for unique "case ID" numbers by searching for duplicate values and determined the data did not have duplicate values for "case ID" numbers. For our analysis of USCIS data specifically for ICE detention facilities and family residential centers, we only included

---

[4]We used "cases" rather than "individuals" as the unit of analysis for the USCIS data we reported because an individual may have been screened for fear by USCIS multiple times during the time period covered by our data.

[5]According to USCIS officials, the "case ID" field is not a number used during the adjudication process, nor is the "case ID" reflected in an individual's file.

LADOJ-ASYLUM2249

credible and reasonable fear cases for detained individuals. To assess the reliability of USCIS data, we completed a number of steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and the systems that produced them, such as relevant training materials for USCIS officers who use the system; and (3) discussing data entry issues and data limitations with USCIS officials. We determined the data were sufficiently reliable to describe the number, outcomes, and characteristics of credible and reasonable fear cases.

Regarding EOIR, we reviewed data on immigration judge reviews of credible and reasonable fear cases posted on its public website. Specifically, we reviewed EOIR data on credible and reasonable fear reviews from fiscal year 2014 through June 2019—the most recent, complete data available at the time of our review. We also obtained and analyzed summary data from EOIR on credible and reasonable fear reviews for those individuals detained in ICE's family residential centers. We analyzed the data to determine the outcomes of all credible and reasonable fear reviews and compared the outcomes of all reviews with the outcomes of reviews at ICE's family residential centers. Finally, we reviewed EOIR data on the outcomes in immigration court for those completed removal cases that began with a positive credible or reasonable fear determination. In addition, we interviewed immigration judges and other court personnel serving both detained and nondetained dockets from EOIR's Otay Mesa Immigration Court and San Diego Immigration Court in California, and from EOIR's Harlingen Immigration Court in Texas. We also observed two immigration judge reviews of negative credible fear determinations. Our observations are not generalizable to all immigration judge reviews, but provided us the opportunity to learn more about EOIR's processes.

We interviewed EOIR officials about their data entry and management practices for credible and reasonable fear reviews. We determined that the data EOIR provided, much of which they report publicly on their website, are sufficiently reliable for analyzing the number and duration of credible and reasonable fear reviews that are received, completed, and pending.

To provide additional context on the numbers, characteristics, and outcomes of CBP apprehensions, we obtained and analyzed record-level data on all apprehensions by Border Patrol and OFO from fiscal year 2014 through the second quarter of fiscal year 2019. We also obtained and analyzed record-level data on ICE detentions from fiscal year 2014

LADOJ-ASYLUM2250

through fiscal year 2018 (see app. III for the results of our analyses). To assess the reliability of Border Patrol, OFO, and ICE data, we completed a number of data reliability steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and systems that produced them, such as relevant training materials for Border Patrol agents and OFO, and ICE officers who use agency data systems; and (3) discussing data entry issues and data limitations with Border Patrol, OFO, and ICE officials. We also received demonstrations on the data systems from Border Patrol, OFO, and ICE officials at headquarters and in the field. As described below, we determined that the data are sufficiently reliable for providing information on the numbers, characteristics, and outcomes of CBP apprehensions and ICE detentions.

**Border Patrol data.** For our analysis of Border Patrol data, we used "apprehensions" as our unit of analysis, instead of the number of individuals apprehended, because an individual may have been apprehended multiple times in the same year.[6] We identified a small number of Border Patrol apprehension records that had the same date of apprehension and unique identifier ("A-number"). It is possible that these apprehension records represented one apprehended individual that Border Patrol agents processed as two apprehensions. These records comprised less than one percent of the more than 2.3 million apprehension records we analyzed. We included these apprehension records in our analysis because Border Patrol considers them unique apprehensions and because their small number did not materially affect our analysis.

In addition, Border Patrol did not systematically track family relationships in its data systems until fiscal year 2016, as we have previously reported.[7] Therefore, our analysis of Border Patrol apprehensions of family unit members processed under expedited removal proceedings is for fiscal years 2016 through the first two quarters of 2019.[8]

---

[6]For our analysis, we only included apprehensions for deportable noncitizens as opposed to any U.S. citizens or other non-deportable individuals apprehended by the Border Patrol.

[7]GAO, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163 (Washington, D.C.: Oct. 9, 2018).

[8]Consistent with CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search*, for the purposes of this report, we define a "family unit" as a group of apprehended individuals that includes one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

LADOJ-ASYLUM2251

Further, according to Border Patrol officials, Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, we are reporting the number of reasonable fear cases recorded by the Border Patrol in its automated system from fiscal year 2017 (the first full year for which Border Patrol recorded this information in its system) through the second quarter of fiscal year 2019. We did not include the 860 reasonable fear cases that Border Patrol recorded in its automated system for fiscal year 2016, since this number represents only partial-year data. According to Border Patrol officials, prior to April 2016, these reasonable fear cases would likely have been recorded under other case dispositions in their automated system, such as one indicating the reinstatement of a prior removal order.

We determined that Border Patrol data are sufficiently reliable to describe the numbers and demographic characteristics of individuals and family unit members apprehended from fiscal year 2014 through the second quarter of fiscal year 2019.

**OFO data.** For our analysis of OFO data, we used "apprehensions" as our unit of analysis, instead of the number of individuals apprehended.

We excluded approximately 13 percent of all apprehension records (including single adults, unaccompanied alien children, and parents and children that arrived as part of a family unit) from our analyses because we could not confirm an A-number for those apprehensions. Among the apprehension records missing an A-number, 44 percent were cases in which OFO officers paroled the individuals and, according to OFO officials, officers are not required to assign an A-number to these individuals.[9] In addition, 47 percent of the records with a missing A-number were cases that involved the individual withdrawing their application for admission into the United States, in which OFO officers have discretion whether to assign an A-number.[10] According to OFO officials, additional records with missing A-numbers may be due to data entry errors or problems with the data system saving this information in the database that OFO used to pull the data. Finally, we collapsed

---

[9]Parole generally refers to permitting an individual to enter the United States for a limited purpose, such as to be placed in removal proceedings or to allow the individual to apply for asylum.

[10]OFO officials stated that officers have discretion as to whether or not they assign an A-number for those individuals who have withdrawn their application for admission into the United States so that the apprehension event does not affect the individual's future applications for admission to the United States.

LADOJ-ASYLUM2252

182,266 apprehension records into 86,597 apprehension records because we determined that they were duplicate records for the same individual and the same apprehension, based on factors such as alien number, birth date, and date and time of apprehension.

As a result, we determined that we could not present precise figures for analyses that include OFO data and instead provided approximations throughout the report. We rounded all data and figures on OFO apprehensions down to the hundreds place and described relevant data using modifiers such as "at least" because of possible missing information.

In addition, according to OFO officials, OFO does not capture information in its automated data system on individuals who were processed under expedited removal with a reasonable fear claim. OFO officials stated that, since OFO has historically processed a relatively small number of such apprehensions, it does not collect automated data on reasonable fear claims.

With the previously-described modifications, we determined that OFO data are sufficiently reliable to generally describe the numbers and demographic characteristics of individuals and family unit members apprehended from fiscal year 2014 through the second quarter of fiscal year 2019.

**ICE data.** To report on ICE detentions of adults and family unit members, we obtained and analyzed ICE detention data from fiscal years 2014 to 2018, the most current data available at the time of our review.[11] The ICE data we obtained contained information on whether adults and family members booked-in to an ICE detention facility had a fear claim recorded in ICE's data system as of the date our data were pulled.[12] Specifically, we divided our analysis of ICE detention data into two parts. First, we obtained data on all individuals (all adults and children without consideration of any family relationships) detained from fiscal year 2014

---

[11]The data for all fiscal years is current as of May 2019 and includes unique individuals detained by ICE for each fiscal year.

[12]According to ICE officials, fear claims in ICE's data system are identified by the "case category" recorded for each individual. The officials explained that these case categories may be updated as the person moves through the immigration process. Therefore, our data reflect the fear claim status for each individual as of May 2019—the date our data were pulled by ICE.

LADOJ-ASYLUM2253

through fiscal year 2018. Second, we obtained data specifically on family unit members apprehended by CBP and housed at the four ICE family residential centers from fiscal year 2014 through fiscal year 2018.[13]

Regarding our analysis of family unit members who made a fear claim in one of ICE's family residential centers, we excluded less than one percent of all detention records from our analyses because we could not confirm a unique identifier for the individual. In addition, for individual family unit members who were detained more than once in a fiscal year, we included the most recent record for the individuals in our analyses to report on the most recent information available about each individual. This accounted for less than one percent of all detention records in our time period of analysis.

We determined that the data were sufficiently reliable to describe the numbers of individuals (adults and family unit members) who were apprehended by CBP and recorded by ICE as having made a credible fear claim.

To address our second objective, in addition to our aforementioned interviews and site visits, we reviewed relevant laws and regulations governing the credible and reasonable fear screening process. We collected and analyzed documentation on key USCIS oversight mechanisms related to credible and reasonable fear screenings—supervisory review, asylum officer training, and quality assurance reviews. In particular, we reviewed the *Credible Fear Procedures Manual, and the Reasonable Fear Procedures Manual,* standard operating procedures, training and quality assurance records and materials, and guidance on conducting credible and reasonable fear screenings for families in ICE detention.

Specifically, we reviewed USCIS asylum officer basic training materials from RAIO and the Asylum Division, and training materials for officers from outside the Asylum Division who screen credible and reasonable fear cases. In particular, we reviewed USCIS Asylum Division quarterly

---

[13]For family unit members, we analyzed detention records for individuals apprehended by CBP and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

LADOJ-ASYLUM2254

training reports for fiscal year 2018 and used them to analyze the weekly training activities in each asylum office for each week of the reporting quarter. We compared RAIO and Asylum Division training materials with federal internal control standards related to developing competent individuals qualified to carry out assigned responsibilities.[14] We also reviewed documents associated with the quality assurance reviews that the Asylum Division conducted, including those reviews conducted in collaboration with RAIO. Specifically, we reviewed standard operating procedures, reviewer checklists, and resulting reports and analysis for three RAIO nationwide reviews of credible and reasonable fear cases and for the six periodic reviews of credible and reasonable fear cases the Asylum Division conducted at asylum offices and at the family residential centers between November 2017 and May 2018. We compared these policy documents and their role in providing oversight of the credible and reasonable fear process against federal internal control standards related to ongoing monitoring activities and evaluation of results. We also reviewed USCIS standard operating procedures, requirements, and training materials for processing family members, and corresponding data on applicant family relationships. We then compared the procedures, requirements and data against federal internal control standards related to obtaining high quality data.[15]

To address our third objective, we reviewed USCIS and EOIR documents and data, and interviewed relevant officials to evaluate the extent to which USCIS and EOIR have process for managing their respective credible and reasonable fear-related workloads.

**USCIS.** In particular, we reviewed USCIS documentation and spoke with officials from Asylum Division headquarters and local asylum offices regarding the Asylum Division's staffing allocation model for the credible and reasonable fear workload. In addition, we obtained and analyzed record-level data from USCIS's automated case management system to identify processing times and case delays for credible and reasonable fear cases between fiscal year 2014 through the second quarter of fiscal year 2019 (March 2019). We included cases that had a fear determination that was served or an administrative closure for both detained and nondetained individuals.

---

[14]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[15]GAO-14-704G.

LADOJ-ASYLUM2255

In this report, we present information on both credible and reasonable fear case receipts and analysis of processing times for the cases using the "clock-in" date recorded in USCIS's automated case management system. However, while USCIS relies on the "clock-in" date to track case processing times, according to an Asylum Division official USCIS tracks and reports the number of credible and reasonable fear case receipts based on the date cases are input into, or "created" in, its automated system. According to the official, these "created" and "clock-in" dates are often the same, but can differ slightly.[16] Therefore, the number of case receipts tracked and reported by USCIS may differ slightly from those presented in this report.

Regarding credible fear cases, we determined case processing times by calculating the difference between the beginning and end dates for credible fear cases. We considered credible fear case processing times for detained individuals to begin on the day when USCIS receives referral documents and records a "clock-in" date in the automated case management system, as noted previously.[17] For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a credible fear screening.[18] We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We considered credible fear case processing times to end on the day when cases either had a fear determination that was served or an administrative closure.[19] We included credible fear cases that had a fear determination that was served or an administrative

---

[16]According to the Asylum Division official, USCIS uses the automated system's "clock-in" date to denote the date on which ICE refers the case to USCIS and when case processing begins, thus establishing USCIS jurisdiction over the case. However, the official added that the date USCIS establishes jurisdiction over the credible or reasonable fear referral (and is reflected by the system's "clock-in" date) may differ slightly from the date the case is data-entered and "created" in the case management system.

[17]According to USCIS documents, the clock automatically starts for credible fear cases when USCIS receives a referral for individuals in expedited removal proceedings. ICE is responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. For nondetained individuals, the clock starts for credible fear cases when a USCIS asylum office conducts the interview for a fear screening.

[18]According to USCIS documents, a nondetained individual's interview date is used as the starting clock date.

[19]We identified 1,187 credible fear cases that received both a fear determination and administrative closure. For calculating processing times for those credible fear cases, we selected the earlier of the two dates.

LADOJ-ASYLUM2256

closure for detained and nondetained individuals.[20] We also reviewed USCIS's publicly-reported data on credible fear processing times during this time period.

Regarding reasonable fear cases, we used USCIS data to count the number of processing days and percent of cases completed in certain time intervals. We determined reasonable fear processing times by calculating the difference between the beginning and end dates for reasonable fear cases. We considered reasonable fear case processing times for detained individuals to begin on the day when USCIS receives referral documents and records a "clock-in" date in the automated case management system, as noted previously. For nondetained individuals, the clock starts for reasonable fear cases when a USCIS asylum office conducts the interview for a reasonable fear screening.[21] We used the starting clock date for detained and nondetained individuals provided by USCIS for our analysis. We calculated reasonable fear processing times in court days by excluding weekends and federal holidays.[22] USCIS may also pause the clock when processing reasonable fear cases in certain circumstances.[23] We excluded approximately 13 percent of reasonable fear cases that had at least one pause in case processing time from our analysis because in conducting our analysis we could not systematically confirm the appropriate order of dates for those cases.[24] We considered reasonable fear case processing times to end on the day when cases either had a fear determination that was served or administrative

---

[20]We identified 57 credible fear cases for individuals with unknown detention status and included these cases in our analyses.

[21]According to USCIS documents, the clock automatically starts for detained reasonable fear cases when USCIS receives a referral for individuals in expedited removal proceedings. ICE is responsible for referring any fear claims to USCIS for a fear screening after individuals enter detention. According to USCIS documents, a nondetained individual's interview date is used as the starting clock date.

[22]According to the Alfaro-Garcia settlement agreement, reasonable fear processing times are measured in court days. See Alfaro Garcia v. Johnson, No. 14-1775 (N.D. Cal. Oct. 27, 2015) (settlement agreement and release).  According to USCIS officials, court days are equivalent to business days.

[23]USCIS policy states that officers may pause reasonable fear cases in limited circumstances, such as if the applicant or the applicant's representative requests to defer the interview, the applicant refuses to participate in the interview or accept service of a fear determination, or in exceptional circumstances.

[24]The 13 percent of reasonable fear cases with pauses includes reasonable fear cases that had at least one clock stop and restart, or other combinations of clock stops and restarts.

LADOJ-ASYLUM2257

closure.[25] We also included reasonable fear cases that were served a fear determination or received an administrative closure for detained and nondetained individuals.[26]

To identify the reasons for delays in credible and reasonable fear cases during the time period of our analysis, we identified the fields that USCIS's case management system tracks for case delays related to the credible and reasonable fear workload. In addition, we reviewed USCIS's manuals and documentation on its case management system. We compared USCIS's recording and tracking of data on case delays to federal internal control standards related to obtaining data on a timely basis for management to use for effective monitoring and that data should be processed into high quality information.[27] We determined that the USCIS data we reviewed on credible and reasonable fear processing times and case delays were sufficiently reliable for our purposes.

**EOIR.** To evaluate EOIR's process for managing its credible and reasonable fear-related workload, we interviewed EOIR officials about their practices to manage the credible and reasonable fear workload, including immigration judge hiring, oversight of credible and reasonable fear review processing times, infrastructure requirements for credible and reasonable fear reviews, and the use of video teleconferencing by judges to conduct credible and reasonable fear reviews. We reviewed publicly available data about EOIR's workload and case adjudications, including data about the number of credible and reasonable fear reviews EOIR judges completed and data about judges hired from fiscal year 2014 through fiscal year 2019. We also reviewed guidance documents, such as EOIR's 2018 Case Priorities and Performance Measures memorandum, which established performance measures for credible and reasonable fear reviews. In addition, we used EOIR data to analyze the timeliness of EOIR's completion of credible and reasonable fear reviews and compared EOIR's processing times for fiscal year 2014 through the third quarter of fiscal year 2019 with required time frames. By reviewing documentation on EOIR's case management system and interviewing officials with knowledge about EOIR's case management system and the methodology

---

[25]We identified 162 reasonable fear cases with no pauses in processing time that received both a fear determination and administrative closure. For calculating processing times for those reasonable fear cases, we selected the earlier of the two dates.

[26]We identified 30 reasonable fear cases for individuals with unknown detention status and included these cases in our analysis.

[27]GAO-14-704G.

**Appendix I: Objectives, Scope, and
Methodology**

used to calculate the publicly-reported data, we determined that the EOIR
data we reviewed on credible and reasonable fear review processing
times and outcomes was sufficiently reliable for analyzing the number of
credible and reasonable fear reviews completed and pending, and the
duration of the reviews.

We conducted this performance audit from November 2018 to February
2020 in accordance with generally accepted government auditing
standards. Those standards require that we plan and perform the audit to
obtain sufficient and appropriate evidence to provide a reasonable basis
for our findings and conclusions based on our audit objectives. We
believe that the evidence obtained provides a reasonable basis for our
findings and conclusions based on our audit objectives.

LADOJ-ASYLUM2259

# Appendix II: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases

This appendix provides detailed information on eligibility, screening standards, and possible screening outcomes for both credible fear and reasonable fear cases.[1] Noncitizens placed into expedited removal who make fear claims will be referred to U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening by an asylum officer or, if the individual has been issued a final administrative removal order after conviction for an aggravated felony or has a prior order of removal that is reinstated, and expressed a fear of return, for a reasonable fear screening.[2] Table 8 below describes the eligibility and screening standards, as well as the potential outcomes for USCIS's credible fear screening cases. Similarly, table 9 details eligibility, screening standards, and potential outcomes for reasonable fear screening cases.

**Table 8: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible Fear as Provided in Federal Law and Regulation[a]**

| Eligibility | • Under the Immigration and Nationality Act, individuals placed into expedited removal are subject to credible fear screening if the individual expresses a fear of returning to his or her country or last habitual residence (if stateless), a fear of persecution or torture, or intent to apply for asylum. This is because, unlike full removal proceedings, where individuals may apply for relief from removal or other protection, including asylum, before an immigration judge, if noncitizens are placed into expedited removal proceedings instead of full removal proceedings, they are to be ordered removed from the United States without further hearing before an immigration judge unless they indicate either an intention to apply for asylum or a fear of return, a fear of persecution or torture (referred to throughout this report as making a "fear claim").[b] With some exceptions, including unaccompanied alien children, noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days may be placed into expedited removal.[c] |
|---|---|

---

[1]See 8 C.F.R. §§8 C.F.R. §§ 208.13(c) (establishing a number of grounds for mandatory denial of asylum, including, among others, conviction of certain crimes, being reasonably regarded as a danger to security of the United States, and the third country asylum bar); 208.30-208.31.

[2]See 8 U.S.C. §§ 1225(b), 1228, 1231(a)(5). An "asylum officer" is defined as "an immigration officer who has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum applications] and is supervised by an officer who has had such training and has had substantial experience adjudicating asylum applications." See 8 U.S.C. § 1225(b)(1)(E). We use this term to refer to any officer conducing credible and reasonable fear screenings.

LADOJ-ASYLUM2260

Appendix II: Eligibility, Screening Standards,
and Possible Screening Outcomes for Credible
and Reasonable Fear Cases

| Screening standard | Prior to September 2019[a] | Amended Process Effective Nationwide as of September 2019[a] |
|---|---|---|
| | • Asylum officers are to assess whether there is a "significant possibility" that the individual can establish in a hearing before an immigration judge that he or she has been persecuted or has a well-founded fear of persecution on account of race, religion, nationality, particular social group, or political opinion if returned to his or her country. They are also to assess whether there is a "significant possibility" that he or she would be tortured in his or her country of removal, or, if the applicant is stateless, the applicant's country of last habitual residence. | • Asylum officers are to first assess whether or not the noncitizen is subject to a new mandatory bar to asylum known as the "third country transit bar." Under the interim final rule, any noncitizen who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the noncitizen's country of citizenship, nationality or last lawful habitual residence en route to the United States, that individual must be found ineligible for asylum unless the noncitizen demonstrates that he or she falls under an exception to the third country transit bar.[d] |
| | | • If the asylum officer determines that the noncitizen is subject to the third country transit bar, the officer is then to determine if there is a "reasonable possibility" the individual would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a "reasonable possibility" that he or she would be tortured in his or her country of removal. According to Department of Homeland Security (DHS) U.S. Citizenship and Immigration Services (USCIS) policy, this is a higher standard than the "significant possibility" standard. |
| | | • If the asylum officer determines that the noncitizen is not subject to the third country transit bar, the asylum officer is to assess whether there is a "significant possibility" that the individual can establish in a hearing before an immigration judge that he or she has been persecuted or has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion if returned to his or her country. They are also to assess whether there is a "significant possibility" that he or she would be tortured in his or her country of removal. |

LADOJ-ASYLUM2261

**Appendix II: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases**

| Possible screening outcomes | **Prior to September 2019[a]** | **Amended Process Effective Nationwide as of September 2019[a]** |
|---|---|---|
| | • **Positive determination:** USCIS is to issue a "notice to appear" to the individual to appear before an immigration court where his or her case will be heard in full removal proceedings. During these proceedings, the person may apply for asylum or other forms of relief or protection—i.e., withholding of removal or deferral of removal (deferral applies if the person has a bar that would prevent them being eligible for asylum or withholding). | • **Not subject to third country bar – positive determination of "significant possibility" of persecution:** USCIS is to issue a "notice to appear" to the individual to appear before an immigration court where his or her case will be heard in full removal proceedings. |
| | • **Negative determination:** USCIS is to notify U.S. Immigration and Customs Enforcement (ICE) of the determination. ICE is to initiate the removal process for the individual. | • During these proceedings, the person may apply for asylum or other forms of relief or protection—i.e., withholding of removal or deferral of removal (deferral applies if the person has a bar that would prevent them being eligible for asylum or withholding). |
| | The individual may request a review by a Department of Justice (DOJ) immigration judge in which case USCIS will issue a Notice of Referral. The immigration judge can reverse (or "vacate") the USCIS decision and enter the person into full removal proceedings before the court where he or she may then apply for asylum or other forms of relief. If the immigration judge agrees with the negative fear determination (or the individual decides not to ask for review of the asylum officer's negative determination), ICE will remove the individual from the United States | • **Subject to third country bar – positive determination of "reasonable possibility" of persecution:** USCIS is to issue a "notice to appear" to the individual to appear before an immigration court where his or her case will be heard in full removal proceedings. During these proceedings, the immigration court may determine the individual's eligibility for relief or protection, such as withholding of removal or deferral of removal, (deferral applies if the person has a bar that would prevent them being eligible for asylum or withholding). |
| | | • **Negative determination:** USCIS is to notify ICE of the determination. ICE is to initiate the removal process for the individual. |
| | | • The individual may request a review by an immigration judge who can reverse (or "vacate") the USCIS decision and place the person into full removal proceedings before the court where he or she may then apply for asylum or other forms of relief, as appropriate. If the immigration judge agrees with the negative fear determination (or the individual decides not to ask for review of the asylum officer's negative determination), ICE will remove the individual from the United States |

Source: GAO analysis of 8 C.F.R. § 208.30, as amended, and DHS and DOJ documentation.  |  GAO-20-250

[a]The regulations governing the credible fear process were amended by an interim final rule published by DHS on July 16, 2019, which became effective on the date of publication. See 84 Fed. Reg. 33,829 (July 16, 2019) (codified as amended at 8 C.F.R. §§ 208.13, 208.30). However, in a lawsuit filed to challenge the interim final rule, the district court for the Northern District of California granted a nationwide preliminary injunction, preventing DHS from taking any action to implement the Rule. See East Bay Sanctuary Covenant v. Barr, No. 19-04073 (N. D. Cal. July 24, 2019) (order granting preliminary injunction). This injunction was then briefly limited to the jurisdiction of the court of appeals for the Ninth Circuit before it was ultimately appealed to the Supreme Court of the United States, which allowed the interim final rule to go into effect nationwide on September 11, 2019, pending further proceedings in the district court and court of appeals for the Ninth Circuit. See Barr v. East Bay Sanctuary Covenant, No. 19-A230 (U.S. September 11, 2019) (opinion staying nationwide injunction). As of November 2019, this litigation is still ongoing. Additionally, on November 19, 2019, DHS published an interim final rule, which became effective on publication, to modify existing regulations, including credible fear regulations, to provide for the implementation of Asylum Cooperative Agreements that the United States enters with other countries. See 84 Fed. Reg. 63994

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2262

Appendix II: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases

(Nov.19, 2019). This table does not reflect amendments to the credible fear process as a result of this new rulemaking.

[b]See 8 U.S.C. §§ 1225(b); 1229a.

[c]See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004); see also 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to two years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on September 27, 2019 and as of November 2019, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D. D.C. Sept. 27, 2019) (order granting preliminary injunction).

[d]See 8 C.F.R. § 208.13(c)(4). These exceptions are: (1) if the noncitizen demonstrates that he or she applied for protection from persecution or torture in at least one country outside the noncitizen's country of citizenship, nationality, or last lawful habitual residence through which the noncitizen transited en route to the United States, and received a final judgment denying protection in such country; (2) the noncitizen demonstrates the he or she meets the definition of "victim of a severe form of trafficking in persons (as defined in 8 C.F.R. § 214.11 to generally mean either commercial sex trafficking or involuntary servitude or slavery); (3) or the countries through which the noncitizen transited en route to the United States were not, at the time of transit, parties to international refugee and humanitarian protection agreements.

**Table 9: Eligibility, Screening Standards, and Possible Screening Outcomes for Reasonable Fear as Provided in Federal Law and Regulation[a]**

| Eligibility | • The individual is either (1) subject to the reinstatement of a prior order of removal from the United States, or (2) has been issued a final administrative order of removal after conviction for certain serious crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act. The individual must also have received a final administrative removal order and expressed a fear of return to their country.[a] |
|---|---|
| Screening standard | • Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) is to determine if there is a "reasonable possibility" the individual would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a "reasonable possibility" that he or she would be tortured in his or her country of removal. According to USCIS policy, this is a higher standard than the "significant possibility" standard. |
| Possible screening outcomes | • **Positive determination:** USCIS issues a Notice of Referral to an immigration judge for removal proceedings to consider the applicants' eligibility for withholding of removal or deferral of removal.[b] Individuals in reasonable fear cases are not eligible for asylum.<br><br>• **Negative determination:** Individuals who receive a negative reasonable fear determination may request immigration judge review of the determination by USCIS. For these cases, USCIS will issue a Notice of Referral to a Department of Justice (DOJ) immigration judge. U.S. Immigration and Customs Enforcement will remove the individual if the immigration judge upholds USCIS's negative determination or if the person does not request a review.<br><br>If the immigration judge reverses a negative reasonable fear finding by USCIS, the individual will be placed in proceedings before the immigration judge for a determination on eligibility for withholding of removal or deferral of removal only. |

Source: GAO analysis of 8 C.F.R. § 208.31 and DHS and DOJ documentation and DHS and DOJ documentation.  I  GAO-20-250

[a]See 8 U.S.C. §§ 1228, 1231(a)(5); 8 C.F.R. § 208.31.

[b]U.S. immigration law provides that noncitizens physically present within the United States, whether or not at a designated port of arrival, may be granted asylum if they are found to be unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution based on their race, religion, nationality, membership in a particular social group, or political opinion (referred to as "protected grounds").  Additionally, if they are precluded from asylum based on, for example, past convictions of serious crimes, but their life or freedom would be threatened based on the protected grounds or would be tortured if removed, they may also seek withholding of removal. See 8 U.S.C. §§ 1101(a)(42), 1157-1159; See  8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16 (codifying both withholding of removal under the Immigration and Nationality Act and

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2263

**Appendix II: Eligibility, Screening Standards, and Possible Screening Outcomes for Credible and Reasonable Fear Cases**

the Convention Against Torture). For the purposes of this report, we refer to withholding of removal under the Immigration and Nationality Act and withholding of removal under the Convention against Torture collectively as "withholding of removal."

LADOJ-ASYLUM2264

# Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security

If noncitizens are placed into expedited removal proceedings instead of full removal proceedings,[1] they are to be ordered removed from the United States without further hearing before an immigration judge unless they indicate either an intention to apply for asylum or a fear of persecution or torture or a fear of return to their country (referred to throughout this appendix as making a "fear claim").[2] This appendix provides information on the number and dispositions (such as full removal proceedings or expedited removal proceedings, among others) of noncitizens who were apprehended by the Department of Homeland Security's (DHS) U.S. Customs and Border Protection's (CBP) U.S. Border Patrol (Border Patrol) and Office of Field Operations (OFO) at or between U.S. ports of entry from fiscal year 2014 through the second quarter of fiscal year 2019.[3] It also includes U.S. Immigration and Customs Enforcement (ICE) data on detentions of noncitizens who made a credible fear claim.[4] For cases in which noncitizens were referred to U.S. Citizenship and Immigration Services (USCIS) for a fear screening,

---

[1]CBP's October 2015 National Standards on Transport, Escort, Detention, and Search defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien". The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to "noncitizen parent(s) or legal guardian(s)".

[2]Noncitizens placed into expedited removal who make fear claims will be referred to U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening by an asylum officer or, if the individual has been issued a final administrative removal order after conviction for an aggravated felony or has a prior order of removal that is reinstated, and expressed a fear of return, for a reasonable fear screening. See 8 C.F.R. §§ 208.30-31. We use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

[3]Within CBP, Border Patrol apprehends individuals at U.S. borders between ports of entry, and the Office of Field Operations encounters individuals that arrive at ports of entry. According to CBP officials, OFO encounters noncitizens instead of apprehending them because the noncitizens have not entered the United States at ports of entry until OFO officers have processed them. For the purposes of this report, we use the term "apprehend" to describe both Border Patrol and OFO's first interactions with noncitizens at the border. In addition, while OFO typically refers to its officers as "Customs and Border Protection officers," we use the term "OFO officers" in this report for clarity.

[4]We report the numbers of detentions rather than the number of noncitizens detained as our unit of analysis because the individual may have been detained multiple times in the same year. Further, upon initial book-in to a detention facility, ICE personnel will record a specific case category in the automated system for instances where the noncitizen is making a credible fear claim.

LADOJ-ASYLUM2265

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

this appendix also provides additional information on the characteristics of these cases, including their country of origin, age, gender, whether they had representation, and location of their screenings.

## Case Dispositions for Border Patrol Apprehensions of Noncitizens from Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As shown in table 10, Border Patrol apprehensions totaled more than 2.3 million from fiscal year 2014 through the second quarter of fiscal year 2019.[5] Further, Border Patrol data indicate that agents processed about 687,000 (or 30 percent) for full immigration proceedings and nearly 931,000 (or 40 percent) under expedited removal proceedings. For those apprehensions that agents processed under expedited removal, more than 197,000 (approximately 9 percent of total apprehensions) included a credible fear claim made in Border Patrol custody. As also shown in table 10, during fiscal years 2017 through the first two quarters of 2019, Border Patrol apprehended more than 10,000 additional noncitizens who made reasonable fear claims.[6]

---

[5]We used "number of apprehensions," rather than number of noncitizens apprehended, as our unit of analysis for Border Patrol data because an individual may have been apprehended multiple times in the same year.

[6]Border Patrol did not begin recording reasonable fear claims in its automated database until April 2016. Therefore, the first full fiscal year for which we have reasonable fear data from the Border Patrol is 2017.

LADOJ-ASYLUM2266

**Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security**

**Table 10: U.S. Border Patrol (Border Patrol) Apprehensions[a] and Processing Dispositions, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019**

| Fiscal year | Total apprehensions | Given a notice to appear (NTA) before an immigration court | Total apprehensions placed in expedited removal (ER) | Number placed in ER with credible fear claims | Number of reasonable fear claims[b] | Other case dispositions[c] |
|---|---|---|---|---|---|---|
| 2014 | 486,651 | 118,753 | 199,161 | 16,122 | — | 168,737 |
| 2015 | 337,116 | 64,775 | 148,148 | 16,894 | — | 124,193 |
| 2016 | 415,816 | 93,146 | 186,292 | 48,365 | — | 136,378 |
| 2017 | 310,531 | 88,315 | 126,498 | 36,265 | 2,200 | 95,718 |
| 2018 | 404,136 | 116,427 | 175,321 | 51,389 | 3,810 | 112,388 |
| 2019 (first 2 quarters) | 365,148 | 205,369 | 95,226 | 28,262 | 4,296 | 64,553 |
| **Total** | **2,319,398** | **686,785** | **930,646** | **197,297** | **10,306** | **701,967** |

Source: GAO analysis of Border Patrol data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

[b]Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the term "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening. Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

[c]Other case dispositions in the Border Patrol data include a reinstatement of a prior order of removal (without an associated fear claim) and voluntary returns (meaning the process by which an individual at the border admits being unlawfully present in the United States and is allowed to return to his or her country of citizenship in lieu of full removal proceedings), among other dispositions.

As shown in figure 7, the number of Border Patrol apprehensions of individuals who were placed into expedited removal proceedings with a credible fear claim increased from more than 16,000 apprehensions in fiscal year 2014 to more than 51,000 in fiscal year 2018. These

LADOJ-ASYLUM2267

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

apprehensions of individuals claiming fear ranged from 3 percent to 13 percent of total apprehensions during these fiscal years.

Figure 7: U.S. Border Patrol's (Border Patrol) Apprehensions of Noncitizens Placed into Expedited Removal Proceedings with a Credible Fear Claim, Fiscal Years 2014 through First Two Quarters of Fiscal Year 2019



Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

LADOJ-ASYLUM2268

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

## Characteristics of Noncitizens Apprehended by Border Patrol Processed Under Expedited Removal Who Claimed Fear

Border Patrol data include various characteristics of each apprehension such as age, gender, and whether a noncitizen was a member of a family unit. For example, of the nearly 208,000 apprehensions processed under expedited removal with a credible or reasonable fear claim during fiscal years 2014 through the first half of fiscal year 2019, approximately 166,000 (or 80 percent) were adults age 18 and above with the remaining 42,000 (or 20 percent) encompassing children age 17 and under (see table 11).

**Table 11: U.S. Border Patrol (Border Patrol) Apprehensions[a] of Noncitizens Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, By Age, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total Border Patrol fear claims[b] | Adults claiming fear (age 18 and above) | Percentage of total fear claims (adults) | Children claiming fear (age 17 and below) | Percentage of total fear claims (children) |
|---|---|---|---|---|---|
| 2014 | 16,121 | 15,055 | 93 | 1,066 | 7 |
| 2015 | 16,894 | 14,382 | 85 | 2,512 | 15 |
| 2016 | 48,365 | 35,482 | 73 | 12,883 | 27 |
| 2017 | 38,465 | 29,227 | 76 | 9,238 | 24 |
| 2018 | 55,196 | 43,026 | 78 | 12,170 | 22 |
| 2019 (first two quarters) | 32,558 | 28,377 | 87 | 4,181 | 13 |
| **Total** | **207,599** | **165,549** | **80** | **42,050** | **20** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening, and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

Border Patrol's automated system did not contain dates of birth for four apprehensions during this time period (one apprehension in fiscal year 2014 and three apprehensions in fiscal year 2018). Since this did not allow us to determine whether these noncitizens were adults or children, we did not include those four apprehensions in this table for those years.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

LADOJ-ASYLUM2269

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

[b]Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases (as part of overall fear cases along with credible fear) for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

Of the nearly 208,000 apprehensions processed under expedited removal with a credible or reasonable fear claim during fiscal years 2014 through the first half of fiscal year 2019, approximately 117,000 (or 56 percent) were male and the remaining 90,000 (44 percent) were female (see table 12).

**Table 12: U.S. Border Patrol (Border Patrol) Apprehensions[a] of Noncitizens Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019[b]**

| Fiscal year | Total Border Patrol fear claims | Male | Percentage of total fear claims (male) | Female | Percentage of total fear claims (female) |
|---|---|---|---|---|---|
| 2014 | 16,122 | 9,256 | 57 | 6,866 | 43 |
| 2015 | 16,894 | 9,875 | 58 | 7,019 | 42 |
| 2016 | 48,365 | 24,497 | 51 | 23,868 | 49 |
| 2017 | 38,465 | 20,243 | 53 | 18,222 | 47 |
| 2018 | 55,199 | 31,629 | 57 | 23,570 | 43 |
| 2019 (first two quarters) | 32,558 | 21,739 | 67 | 10,819 | 33 |
| **Total** | **207,603** | **117,239** | **56** | **90,364** | **44** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening, and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

[b]Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases (as part of overall fear cases along with credible fear) for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

LADOJ-ASYLUM2270

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

As shown in table 13, for fiscal years 2016 through the first two quarters of 2019, Border Patrol apprehended nearly 456,000 noncitizens who were members of families.[7] Of these, Border Patrol processed more than 120,000 (or 26 percent) under expedited removal proceedings. Nearly 71,000 apprehensions during this time period (15 percent of total family unit members apprehended and 59 percent of those placed in expedited removal) included a credible fear claim.

**Table 13: Number of Family Unit Members among U.S. Border Patrol Apprehensions[a] Who Were Placed into Expedited Removal Proceedings with Credible and Reasonable Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019**

| Fiscal year | Total family unit members | Family unit members placed in expedited removal | Family unit members with credible fear claims | Family unit members with reasonable fear claims[b] |
|---|---|---|---|---|
| 2016 | 77,376 | 37,373 | 22,942 | NA[c] |
| 2017 | 75,738 | 27,262 | 16,799 | 701 |
| 2018 | 112,339 | 40,901 | 23,163 | 1,361 |
| 2019 (first two quarters) | 190,212 | 14,492 | 7,602 | 2,372 |
| **Total** | **455,665** | **120,028** | **70,506** | **4,434** |

Source: GAO analysis of Border Patrol data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, individuals apprehended by Border Patrol may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving noncitizen or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16. For the purposes of this report, we use the terms "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening, and "reasonable fear claim" to describe individuals who are referred to USCIS for a reasonable fear screening.

[a]We use the number of apprehensions, rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year.

[b]Border Patrol did not record reasonable fear cases in its automated data system before April 2016. Therefore, this table presents Border Patrol's data on reasonable fear cases for fiscal year 2017 through the first two quarters of fiscal year 2019 only—the most complete fiscal year data at the time of our analysis.

[c]Not applicable.

[7]We collected family-specific Border Patrol data for fiscal year 2016 through the second quarter of fiscal year 2019 because the Border Patrol began to systematically collect data on individuals that arrived as part of a family unit in fiscal year 2016.

LADOJ-ASYLUM2271

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

## Case Dispositions for OFO Apprehensions from Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

From fiscal year 2014 through March 2019, OFO apprehensions at ports of entry totaled at least 546,900.[8] Of these 546,900 apprehensions, OFO officers placed at least 193,500 (or 35 percent) into expedited removal proceedings. For those in expedited removal proceedings, OFO data indicate that at least 104,600 apprehensions included a credible fear claim in OFO custody (19 percent of total apprehensions).[9] In addition, OFO issued Notices to Appear before an immigration judge for full immigration proceedings to at least 167,400 (or 31 percent) of the approximately 546,900 total apprehensions (see figure 8).

[8]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis for OFO data because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report. Appendix I provides additional details about our methodology for assessing limitations of OFO's data and making rounding decisions.

[9]With regard to reasonable fear cases, OFO officials stated they do not systematically track these cases in their automated system. OFO officials explained that, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. OFO officials stated that, in the rare cases where they encounter a reasonable fear claim, OFO officers in the field document that claim in a narrative in the noncitizen's hardcopy file. When transferring noncitizens to ICE custody, OFO field officers are to include information to indicate fear claims by noncitizens subject to reinstatement of a prior removal order.

LADOJ-ASYLUM2272

**Figure 8: Dispositions of U.S. Customs and Border Protection Office of Field Operations (OFO) Apprehensions[a], Including those with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019**



- Apprehensions placed into full immigration removal proceedings with a Notice to Appear
- Apprehensions placed in expedited removal with credible fear claim
- Apprehensions in expedited removal without a credible fear claim
- Other processing dispositions[b]

Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: OFO apprehensions totaled approximately 547,000 at ports of entry during the period covered by this figure.

According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

[b]Other processing dispositions in the OFO data include, among other dispositions, withdrawals (where an individual is permitted to voluntarily retract an application for admission in the discretion of the Department of Homeland Security in lieu of being placed into removal proceedings) and individuals who are paroled at the ports of entry (on humanitarian, public interest grounds or for a limited purpose such as to attend immigration proceedings through the Migrant Protection Protocols).

LADOJ-ASYLUM2273

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

As shown in figure 9, the number of OFO apprehensions in expedited removal proceedings with a credible fear claim generally increased over this time period from at least 11,600 apprehensions in fiscal year 2014 to at least 27,000 in fiscal year 2018 (the last full year of data available at the time of our analysis). In addition to this overall increase, the percentage of OFO's total apprehensions placed into expedited removal proceedings with a credible fear claim also increased. Specifically, these apprehensions increased from about 17 percent of all apprehensions in fiscal year 2014 to about 26 percent in fiscal year 2018.

**Figure 9: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions[a] Placed into Expedited Removal with Credible Fear Claims, Fiscal Year 2014 through First Two Quarters of Fiscal Year 2019**



Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report,

LADOJ-ASYLUM2274

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

## Characteristics of Noncitizens Apprehended by OFO and Placed into Expedited Removal Proceedings with a Credible Fear Claim

OFO apprehension data include various characteristics such as age, gender, and whether an apprehension involved a member of a family unit. For example, as shown in table 14, of the approximately 104,300 OFO apprehensions with credible fear claims, at least 78,500 (or 75 percent) were adults age 18 and above with about 25,700 (or 25 percent) of the remaining credible fear claims encompassing children age 17 and under. Also, for each year during this period, the percentage of adults versus children was generally consistent with this overall percentage with the exception of fiscal year 2019, for which the partial year's data show that about 98 percent of those apprehensions processed under expedited removal with a credible fear claim were adults.[10]

[10]According to OFO officials, the drop off in the percentage of children making credible fear claims between fiscal year 2018 and the first two quarters of fiscal year 2019 could possibly be attributed to OFO officers not being required to ask the standard fear questions of noncitizens being referred for full removal proceedings before an immigrations judge. The OFO officials added that another contributing factor could be the fact that this lower percentage is based on partial-year data for fiscal year 2019.

LADOJ-ASYLUM2275

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Table 14: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions[a] Placed into Expedited Removal Proceedings with Credible Fear Claims, by Age, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total OFO credible fear claims | Adults with credible fear claims (age 18 and above) | Percentage of total credible fear claims (adults) | Children with credible fear claims (age 17 and below) | Percentage of total credible fear claims (children)[b] |
|---|---|---|---|---|---|
| 2014 | 11,600 | 8,600 | 74 | 3,000 | 26 |
| 2015 | 14,300 | 11,100 | 78 | 3,100 | 22 |
| 2016 | 23,500 | 16,300 | 69 | 7,200 | 31 |
| 2017 | 16,800 | 11,800 | 70 | 5,000 | 30 |
| 2018 | 27,000 | 19,800 | 73 | 7,200 | 27 |
| 2019 (first two quarters) | 11,100 | 10,900 | 98 | 200 | 2 |
| **Total** | **104,300** | **78,500** | **75** | **25,700** | **25** |

Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

[b]According to OFO officials, the drop off in the percentage of children making credible fear claims between fiscal year 2018 and the first two quarters of fiscal year 2019 could possibly be attributed to OFO officers not being required to ask the standard fear questions of noncitizens being referred for full removal proceedings before an immigrations judge. The OFO officials added that another contributing factor could be the fact that this lower percentage is based on partial-year data for fiscal year 2019.

In addition, for fiscal years 2014 through the first two quarters of fiscal 2019, at least 56,500 (or 54 percent) of these apprehensions involving a fear claim were male and at least 47,400 (or 45 percent) were female (see table 15). Also, for each year during this period, the number of males and females were almost evenly split with the exception of fiscal year 2019, for which the partial year's data show a larger proportion of males claiming fear.

LADOJ-ASYLUM2276

Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security

**Table 15: U.S. Customs and Border Protection's Office of Field Operations (OFO) Apprehensions[a] Placed into Expedited Removal Proceedings with Credible Fear Claims, by Gender, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Total OFO fear claims | Male | Percentage of total credible fear claims (male)[b] | Female | Percentage of total credible fear claims (female)[b] |
|---|---|---|---|---|---|
| 2014 | 11,600 | 6,200 | 53 | 5,300 | 46 |
| 2015 | 14,300 | 8,100 | 57 | 6,100 | 43 |
| 2016 | 23,500 | 11,900 | 51 | 11,500 | 49 |
| 2017 | 16,800 | 8,800 | 52 | 8,000 | 48 |
| 2018 | 27,000 | 13,600 | 50 | 13,300 | 49 |
| 2019 (first two quarters) | 11,100 | 7,900 | 71 | 3,200 | 29 |
| **Total** | **104,300** | **56,500** | **54** | **47,400** | **45** |

Source: GAO analysis of OFO data. | GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

Approximately 180 apprehensions in OFO data (0.2 percent of total OFO fear claims) did not indicate gender. According to OFO officials, cases where no gender was recorded in their automated system are potentially attributable to error by the system operator based on the fact that gender may not have been a mandatory field for data entry at the time.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

[b]Percentages in some years do not equal 100 percent due to rounding.

As shown in table 16, for fiscal years 2016 through the first two quarters of 2019, OFO had a total of at least 144,100 apprehensions involving members of family units.[11] Of these approximately 144,100 apprehensions, OFO placed at least 39,100 (27 percent) into expedited removal proceedings of which at least 32,900 (about 23 percent of total

[11]We collected family-specific OFO data for fiscal year 2016 through the second quarter of fiscal year 2019 because OFO began to systematically collect data on individuals that arrived as part of a family and families in fiscal year 2016.

LADOJ-ASYLUM2277

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

family unit members apprehended and approximately 84 percent of those placed in expedited removal) claimed a credible fear of returning to their country.

**Table 16: Number of Family Unit Member Apprehensions[a] U.S. Customs and Border Protection's Office of Field Operations (OFO) Placed into Expedited Removal Proceedings with Credible Fear Claims, Fiscal Years 2016 through the First Two Quarters of 2019**

| Fiscal year | Total family unit members | Family unit members placed in expedited removal | Family unit members with credible fear claims |
|---|---|---|---|
| 2016 | 42,900 | 13,600 | 12,100 |
| 2017 | 29,300 | 9,900 | 8,300 |
| 2018 | 48,400 | 14,500 | 12,100 |
| 2019 (first 2 quarters) | 23,500 | 1,100 | 400 |
| **Total** | **144,100** | **39,100** | **32,900** |

Source: GAO analysis of OFO data.  |  GAO-20-250

Notes: According to OFO officials, due to the relatively small number of reasonable fear cases they encounter each year, OFO does not have a specific field in its automated database to track reasonable fear cases. With some exceptions, including unaccompanied alien children, individuals apprehended by OFO may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

[a]We used "number of apprehensions" rather than number of noncitizens apprehended, as our unit of analysis because an individual may have been apprehended multiple times in the same year. According to our analysis of the OFO data, OFO did not have a unique identifier for approximately 13 percent of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, we rounded all OFO data in this report.

## Number of Individuals in ICE Detention with a Credible Fear Claim, Fiscal Years 2014 through 2018

The number of individuals in expedited removal proceedings detained in ICE facilities with a credible fear claim increased from fiscal years 2014 to

LADOJ-ASYLUM2278

2018.[12] Specifically, as shown in table 17, ICE data indicate that the number of individuals in expedited removal proceedings with a recorded credible fear claim while in ICE detention increased from about 37,000 (or 9 percent) in fiscal year 2014 to about 99,000 (or 26 percent) in fiscal year 2018. The period of greatest percentage increase was from fiscal years 2015 to 2016 when the percentage of individuals in expedited removal proceedings with a credible fear claim while in ICE custody increased from approximately 15 percent to 25 percent.

**Table 17: Noncitizens in Expedited Removal Proceedings Detained in U.S. Immigration and Customs Enforcement (ICE) Detention Facilities with Credible Fear Claims, Fiscal Years 2014 through 2018**

| Fiscal year | Unique individuals detained each year | Number of unique individuals detained with a credible fear claim | Percentage of unique individuals detained with a credible fear claim |
|---|---|---|---|
| 2014 | 396,595 | 37,180 | 9.4 |
| 2015 | 290,458 | 42,593 | 14.7 |
| 2016 | 337,039 | 84,537 | 25.1 |
| 2017 | 309,582 | 66,606 | 21.5 |
| 2018 | 384,499 | 99,065 | 25.8 |
| **Total** | **1,718,173** | **329,981** | **19.2** |

Source: GAO analysis of ICE data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizens in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

Numbers in the table are unique individuals detained in each fiscal year. Therefore, the totals are likely overstated due to the possibility that some individuals were detained across more than one fiscal year.

[12]The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizens in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

LADOJ-ASYLUM2279

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

For fiscal years 2014 through 2018, the majority of family unit members in ICE's four family residential centers had a credible fear claim (81 percent), as demonstrated in table 18.[13] The number of family unit members with a fear claim ranged from approximately 69 percent in fiscal year 2015 to 88 percent in fiscal year 2018.

**Table 18: Noncitizen Family Unit Members in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018**

| Fiscal year | Unique individual family unit members in family residential centers | Number of family unit members in family residential centers with a credible fear claim | Percentage of family unit members in family residential centers with a credible fear claim |
|---|---|---|---|
| 2014 | 2,047 | 1,441 | 70.4 |
| 2015 | 12,541 | 8,594 | 68.5 |
| 2016 | 43,163 | 35,588 | 82.5 |
| 2017 | 37,490 | 28,018 | 74.7 |
| 2018 | 45,904 | 40,557 | 88.4 |
| **Total**[a] | **141,145** | **114,198** | **80.9** |

Source: GAO analysis of ICE data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear claim" to describe individuals who are referred to USCIS for a credible fear screening.

The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizen family unit members in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

For family unit members, we analyzed detention records for individuals apprehended by CBP and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

[13]For family unit members, we analyzed detention records for individuals apprehended by CBP and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

LADOJ-ASYLUM2280

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

ªNumbers in the table are unique individuals detained in each fiscal year. Therefore, the totals are likely overstated due to the possibility that some individuals were detained across more than one fiscal year.

For fiscal years 2014 through 2018, slightly more than half of all family unit members in ICE's four family residential centers with a credible fear claim were children under the age of 18 (55 percent). As also shown in table 19, the division between adults and children with fear claims varied little each year.

**Table 19: Noncitizen Adults and Children in Expedited Removal Proceedings Housed in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers with Credible Fear Claims, Fiscal Years 2014 through 2018**

| Fiscal year | Number of family unit members in family residential centers with a credible fear claim | Number and percentage of adult family unit members with a credible fear claimª | Number and percentage of children among family unit members with a credible fear claimª |
| --- | --- | --- | --- |
| 2014 | 1,441 | 623 (43) | 818 (57) |
| 2015 | 8,594 | 3,674 (43) | 4,920 (57) |
| 2016 | 35,588 | 15,534 (44) | 20,054 (56) |
| 2017 | 28,018 | 12,697 (45) | 15,321 (55) |
| 2018 | 40,557 | 18,732(46) | 21,825 (54) |
| **Total** | **114,198** | **51,260 (45)** | **62,938 (55)** |

Source: GAO analysis of ICE data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to the Department of Homeland Security's U.S. Citizenship and Immigration Services for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. For the purposes of this report, we use the term "credible fear" to describe individuals who are referred to USCIS for a credible fear screening.

The ICE data we obtained included a case category field indicating credible fear claims made by individual noncitizen family unit members in ICE detention and denotes their current status at the time our data were pulled by ICE—May 2019. Therefore, these case category data obtained did not include any possible updates made at a later time to the case category such as those reflecting a subsequent fear claim made at another detention facility.

For family unit members, we analyzed detention records for individuals apprehended by U.S. Customs and Border Protection and housed in one of ICE's four family residential centers. During the time period covered by our data, ICE detained families at four family residential centers for varying periods between fiscal year 2014 and fiscal year 2019. These family residential centers included Artesia Family Residential Center, Berks Family Residential Center, Karnes Family Residential Center, and the South Texas Family Residential Center.

ªPercentages do not equal 100 percent due to rounding.

LADOJ-ASYLUM2281

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

## Nationalities of Noncitizens Referred to USCIS for Credible or Reasonable Fear Screenings from Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019

As shown in Figure 10, the majority of credible fear cases referred to USCIS for screening from fiscal year 2014 through the first two quarters of fiscal year 2019 had applicants who were nationals of El Salvador, Honduras, Guatemala, or Mexico.[14] Citizens of these countries accounted for 74 percent of all credible fear cases during this time period (approximately 306,000 referrals).

**Figure 10: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Year 2014 through the First Two Quarters of Fiscal Year 2019**



| | |
|---|---|
| ☐ | El Salvador |
| ☐ | Honduras |
| ☐ | Guatemala |
| ☐ | Mexico |
| ☐ | All other countries |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

[14]USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

LADOJ-ASYLUM2282

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

USCIS received approximately 413,000 credible fear referrals during the period covered by this graphic.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data. Percentages do not equal 100 percent due to rounding.

USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

As shown in table 20, El Salvador had the most credible fear referrals to USCIS each year from fiscal year 2014 through fiscal year 2017.[15] However, beginning in fiscal year 2018, Honduras accounted for the most credible fear referrals to USCIS among these four countries.

**Table 20: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal Year | El Salvador | Honduras | Guatemala | Mexico | All Other countries | Total cases |
|---|---|---|---|---|---|---|
| 2014 | 18,305 | 7,563 | 6,196 | 4,131 | 11,449 | **47,754** |
| 2015 | 14,299 | 7,635 | 7,151 | 7,250 | 11,647 | **48,089** |
| 2016 | 32,386 | 19,513 | 14,820 | 7,432 | 17,250 | **91,598** |
| 2017 | 20,114 | 16,652 | 15,738 | 4,904 | 20,160 | **77,698** |
| 2018 | 13,471 | 25,874 | 24,502 | 6,855 | 27,234 | **98,083** |
| 2019 (first two quarters) | 6,035 | 14,242 | 8,511 | 2,039 | 19,262 | **50,091** |
| **Total** | **104,610** | **91,479** | **76,918** | **32,611** | **107,002** | **413,313** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

---

[15]USCIS's automated system did not record citizenship for nearly 700 credible fear cases (0.2 percent of total credible fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

LADOJ-ASYLUM2283

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

As shown in Figure 11, applicants from the countries of Mexico, Honduras, El Salvador, and Guatemala accounted for all but approximately 7 percent of the reasonable fear cases screened by USCIS for fiscal years 2014 through the first two quarters of fiscal year 2019.[16] Overall, Mexican nationals accounted for the largest number of reasonable fear cases among these four countries (33 percent of total reasonable fear cases).

**Figure 11: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**



El Salvador
Honduras
Guatemala
Mexico
All other countries

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

USCIS received approximately 52,000 reasonable fear referrals during the period covered by this graphic.

[16]USCIS's automated system did not record citizenship for nearly 500 reasonable fear cases (0.9 percent of total reasonable fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

LADOJ-ASYLUM2284

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data. Percentages do not equal 100 percent due to rounding.

USCIS's automated system did not record citizenship for nearly 500 reasonable fear cases (0.9 percent of reasonable fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

As shown in table 21, Mexico had the most reasonable fear referrals to USCIS each year from fiscal years 2014 through the first two quarters of fiscal year 2019.

**Table 21: Top Four Countries of Nationality for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal year | Mexico | Honduras | El Salvador | Guatemala | All other countries | Total cases |
|---|---|---|---|---|---|---|
| 2014 | 2,835 | 1,649 | 1,744 | 1,509 | 686 | 8,602 |
| 2015 | 2,943 | 1,423 | 1,685 | 1,302 | 551 | 8,000 |
| 2016 | 2,956 | 1,903 | 2,200 | 1,537 | 587 | 9,274 |
| 2017 | 3,281 | 2,097 | 1,989 | 1,792 | 588 | 9,792 |
| 2018 | 3,638 | 2,621 | 1,672 | 2,132 | 590 | 10,697 |
| 2019 (first two quarters) | 1,796 | 1,777 | 868 | 1,223 | 456 | 6,121 |
| Total | 17,449 | 11,470 | 10,158 | 9,495 | 3,458 | 52,486 |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

USCIS's automated system did not record citizenship for nearly 500 reasonable fear cases (0.9 percent of total reasonable fear cases). According to USCIS officials, these are likely cases where the individual's citizenship was unknown.

LADOJ-ASYLUM2285

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

## Outcomes of USCIS Credible Fear and Reasonable Fear Screenings Based on the Presence of Representation at the Applicant's Interview

As table 22 shows, noncitizens making credible fear claims who had representation present at their interviews with asylum officers more often received positive determinations of fear by the asylum officer. Overall, during this time period, the number of positive determinations in cases with representation was nearly 10 percentage points greater than those without representation.

**Table 22: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Percentage of positive determinations when the applicant has representation | Percentage of positive determinations when the applicant does not have representation |
|---|---|---|
| 2014 | 82.5 | 69.5 |
| 2015 | 81.3 | 69.7 |
| 2016 | 86.1 | 78.3 |
| 2017 | 86.1 | 74.8 |
| 2018 | 86.5 | 75.8 |
| 2019 (first two quarters) | 89.7 | 75.9 |
| Total | 84.9 | 74.9 |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: The data presented in this table on representation are based on the number of credible fear cases for which USCIS's automated case management system indicates the individual had either an attorney or consultant present at the interview.

With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

According to USCIS, a consultant may be a relative, friend, clergy person, attorney, or representative. We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

As table 23 shows, similar to credible fear cases, noncitizens making reasonable fear claims who had representation present at their interviews with asylum officers more often received positive determinations of fear by the asylum officer. Overall, during this time period, the number of

LADOJ-ASYLUM2286

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

positive determinations in cases with representation was over 20 percentage points greater than those without representation.

**Table 23: Outcomes for U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases Where the Applicant Had a Representative Present (Attorney or Other Consultant) During the Interview, Fiscal Years 2014 through the First Two Quarters of 2019**

| Fiscal year | Percentage of positive determinations when the applicant has representation | Percentage of positive determinations when the applicant does not have representation |
|---|---|---|
| 2014 | 45.8 | 22.2 |
| 2015 | 45.2 | 24.0 |
| 2016 | 49.3 | 27.7 |
| 2017 | 48.6 | 24.7 |
| 2018 | 48.7 | 23.3 |
| 2019 (first two quarters) | 53.6 | 26.6 |
| **Total** | **47.9** | **24.7** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: The data presented in this table on representation is based on the number of reasonable fear cases for which USCIS's automated case management system indicates the individual had either an attorney or consultant present at the interview.

Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

LADOJ-ASYLUM2287

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

## ICE Detention Facilities and Family Residential Centers Making the Most Credible Fear and Reasonable Fear Referrals to USCIS for Screening During Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As table 24 shows, two of ICE's family residential centers (Dilley and Karnes family residential centers) accounted for the highest number of credible and reasonable fear referrals, among the top five facilities making these referrals, from fiscal years 2014 through the first two quarters of fiscal year 2019.

**Table 24: Top Five Detention Facilities and Family Residential Centers with the Highest Number of U.S. Citizenship and Immigration Services (USCIS) Credible and Reasonable Fear Cases, Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019**

| Fiscal Year | Dilley Family Residential Center[a] | Karnes Family Residential Center[b] | Pearsall Detention Complex | Hutto Residential Center | Port Isabel Service Processing Center | All other facilities | Top five facilities as percent of all facilities |
|---|---|---|---|---|---|---|---|
| 2014 | — | 620 | 3,920 | 5,080 | 2,099 | 42,995 | 21 |
| 2015 | 6,680 | 2,943 | 3,729 | 3,303 | 2,941 | 31,566 | 38 |
| 2016 | 27,275 | 14,681 | 4,327 | 3,820 | 3,207 | 45,786 | 54 |
| 2017 | 21,223 | 10,389 | 5,348 | 3,340 | 3,068 | 38,219 | 53 |
| 2018 | 32,114 | 11,453 | 6,069 | 4,751 | 3,622 | 48,485 | 54 |
| 2019 (first two quarters) | 10,057 | 2,945 | 2,741 | 2,345 | 2,274 | 35,337 | 37 |
| **Total** | **97,349** | **43,031** | **26,134** | **22,639** | **17,211** | **242,388** | **46** |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

LADOJ-ASYLUM2288

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

[a]U.S. Immigration and Customs Enforcement (ICE) housed families at the South Texas Family Residential Center in Dilley, Texas from November 2014 to present.

[b]ICE housed families at the Karnes Family Residential Center in Karnes, Texas from July 2014 to March 2019 and October 2019 to present.

## Reasonable Fear Referrals to USCIS from ICE's Family Residential Centers, and Related Positive Outcomes, During Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As shown in table 25, reasonable fear screenings for those in ICE family residential centers comprised 6 percent of all such cases referred to USCIS during this same period with the percentage of positive determinations (77 percent) higher than that for all reasonable fear cases nationwide (30 percent).

**Table 25: Reasonable Fear Referrals to U.S. Citizenship and Immigration Services (USCIS) from U.S. Immigration and Customs Enforcement's (ICE) Family Residential Facilities, and Related Positive Outcomes, Fiscal Years 2014 through First Two Quarters of 2019**

| Fiscal year | Total reasonable fear referrals to USCIS | Total reasonable fear referrals from ICE's family residential centers | Percentage of reasonable fear referrals from ICE's family residential centers | Total and percentage of positive determinations for all reasonable fear referrals | Total and percentage of positive determinations from ICE's family residential centers |
|---|---|---|---|---|---|
| 2014 | 8,602 | 87 | 1 | 2,493 (29) | 62 (71) |
| 2015 | 8,000 | 374 | 5 | 2,423 (30) | 285 (76) |
| 2016 | 9,274 | 964 | 10 | 3,005 (32) | 717 (74) |
| 2017 | 9,792 | 550 | 6 | 2,942 (30) | 417 (76) |
| 2018 | 10,697 | 703 | 7 | 3,014 (28) | 557 (79) |
| 2019 (first two quarters) | 6,121 | 425 | 7 | 1,913 (31) | 358 (84) |
| **Total** | **52,486** | **3,103** | **6** | **15,790 (30)** | **2,396 (77)** |

Source: GAO analysis of USCIS data.  |  GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30. Noncitizens issued a final administrative

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2289

**Appendix III: Data on Noncitizens Apprehended, Detained, and Screened for Credible or Reasonable Fear by Department of Homeland Security**

order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

## Number of Credible Fear and Reasonable Fear Cases Screened, by USCIS Asylum Office, for Fiscal Years 2014 through the First Two Quarters of Fiscal Year 2019

As shown in table 26, the Houston asylum office screened two-thirds (67 percent) of credible fear cases from fiscal year 2014 through the first two quarters of fiscal year 2019. Also, over this same time period, USCIS's Los Angeles asylum office screened the second most credible fear cases (11 percent). However, since fiscal year 2018, USCIS's Asylum Pre-Screening Center has screened the second most credible fear cases after Houston.[17]

---

[17]The Asylum Pre-Screening Center is co-located with the Arlington asylum office in Arlington, VA. USCIS established the Asylum Pre-Screening Center in fiscal year 2016 to provide additional support for the credible and reasonable fear caseload. As of April 2019, the Asylum Pre-Screening Center and the Arlington Asylum Office together had jurisdiction over 27 ICE detention centers across the United States. According to USCIS officials, asylum officers from the Arlington asylum office may also be assigned to screen credible and reasonable fear cases that are under the jurisdiction of the Asylum Pre-Screening Center.

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2290

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

**Table 26: U.S. Citizenship and Immigration Services (USCIS) Credible Fear Cases by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of 2019**

| Asylum Office | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 (first two quarters) | Total | Percent of total credible fear cases for all years |
|---|---|---|---|---|---|---|---|---|
| Asylum Pre-Screening Center[a] | — | — | 3 | 1,357 | 11,024 | 6,956 | **19,340** | 4.7 |
| Arlington | 1,776 | 1,749 | 3,060 | 3,550 | 3,481 | 1,621 | **15,237** | 3.7 |
| Boston Sub Office[b] | — | 1 | — | 141 | 240 | 104 | **486** | 0.1 |
| Chicago | 1,199 | 529 | 1,873 | 1,410 | 1,502 | 1,091 | **7,604** | 1.8 |
| Houston | 26,845 | 28,248 | 64,631 | 52,442 | 69,032 | 33,868 | **275,066** | 66.6 |
| Los Angeles | 8,620 | 9,199 | 11,039 | 9,911 | 4,854 | 2,718 | **46,341** | 11.2 |
| Miami | 2,010 | 1,707 | 3,464 | 1,672 | 815 | 786 | **10,454** | 2.5 |
| Newark | 5,247 | 3,447 | 4,643 | 2,719 | 1,970 | 493 | **18,519** | 4.5 |
| New York | 147 | 84 | 96 | 390 | 91 | 125 | **933** | 0.2 |
| New Orleans Sub Office[c] | — | — | 1 | 1,696 | 2,059 | 1,084 | **4,840** | 1.2 |
| San Francisco | 1,910 | 3,125 | 2,788 | 2,410 | 3,015 | 1,245 | **14,493** | 3.5 |
| **Total** | **47,754** | **48,089** | **91,598** | **77,698** | **98,083** | **50,091** | **413,313** | — |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: With some exceptions, including unaccompanied alien children, apprehended individuals may be placed into administrative removal proceedings before an immigration judge or, if the individual is an arriving alien or encountered within 14 days and 100 miles of entry and is inadmissible based on fraud or misrepresentation, may be placed into expedited removal. Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution or torture, or a fear of return, in which case they are to be referred to USCIS for credible fear of persecution screening, as appropriate. See 8 U.S.C. § 1225(b); 8 C.F.R. § 208.30.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data.

[a]The Asylum Pre-Screening Center, which is located in Arlington, Virginia, became operational in fiscal year 2016.

[b]The Boston office, a sub-office under the Newark asylum office, did not receive credible fear cases until fiscal year 2015, had no credible fear cases in fiscal year 2016, and resumed processing credible fear cases for the remainder of the time period covered by our data.

[c]The New Orleans office, a sub-office under Houston's jurisdiction, did not receive credible fear cases until fiscal year 2016 and reasonable fear cases until fiscal year 2017.

As shown in table 27, the Houston asylum office screened nearly half (approximately 45 percent) of reasonable fear cases from fiscal year 2014 through the first two quarters of fiscal year 2019. Also, over this same time period, USCIS's Los Angeles asylum office screened the second most reasonable fear cases (12 percent). However, since fiscal year

GAO-20-250  Fear Screenings

LADOJ-ASYLUM2291

Appendix III: Data on Noncitizens
Apprehended, Detained, and Screened for
Credible or Reasonable Fear by Department of
Homeland Security

2018, USCIS's Asylum Pre-Screening Center has screened the second most reasonable fear cases after Houston.

**Table 27: U.S. Citizenship and Immigration Services (USCIS) Reasonable Fear Cases, by Asylum Office, Fiscal Years (FY) 2014 through the First Two Quarters of Fiscal Year 2019**

| Asylum Office | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 (first two quarters) | Total | Percent of total reasonable fear cases for all years |
|---|---|---|---|---|---|---|---|---|
| Asylum Pre-Screening Center[a] | — | — | — | 408 | 1,781 | 1,008 | **3,197** | 6.1 |
| Arlington | 758 | 715 | 823 | 1,164 | 1,342 | 702 | **5,504** | 10.5 |
| Boston Sub Office[b] | — | — | — | 8 | 82 | 52 | **142** | 0.3 |
| Chicago | 534 | 439 | 498 | 576 | 607 | 410 | **3,064** | 5.8 |
| Houston | 3,537 | 3,507 | 5,220 | 4,132 | 4,392 | 2,649 | **23,437** | 44.7 |
| Los Angeles | 1,375 | 1,381 | 1,223 | 1,473 | 488 | 323 | **6,263** | 11.9 |
| Miami | 395 | 303 | 184 | 222 | 283 | 162 | **1,549** | 3.0 |
| Newark | 862 | 606 | 551 | 549 | 368 | 194 | **3,130** | 6.0 |
| New York[c] | 30 | 49 | 6 | — | 149 | 28 | **262** | 0.5 |
| New Orleans Sub Office[d] | — | — | — | 334 | 565 | 326 | **1,225** | 2.3 |
| San Francisco | 1,111 | 1,000 | 769 | 926 | 640 | 267 | **4,713** | 9.0 |
| **Total** | **8,602** | **8,000** | **9,274** | **9,792** | **10,697** | **6,121** | **52,486** | — |

Source: GAO analysis of USCIS data. | GAO-20-250

Notes: Noncitizens issued a final administrative order of removal after conviction for crimes that meet the definition of an "aggravated felony" in the Immigration and Nationality Act or whose prior removal order is reinstated may be placed into streamlined removal proceedings where they cannot apply for asylum. However, if they express a fear of return, they are to be screened for "reasonable fear," which is a screening for withholding or deferral of removal, more limited forms of humanitarian protection. See 8 C.F.R. §§ 208.31, 208.16.

We use the number of cases, rather than number of individual noncitizens screened by USCIS, as our unit of analysis because an individual noncitizen may have claimed fear and been screened more than once during the time period covered by our data

[a]The Asylum Pre-Screening Office, which is located in Arlington, VA, did not receive any records of reasonable fear cases for FY 2014 and FY 2015 because the Asylum Pre-Screening Office became operational in fiscal year 2016.

[b]The Boston office, a sub-office under the Newark asylum office, did not receive reasonable fear cases until fiscal year 2017.

[c]The New York office did not receive any reasonable fear cases in fiscal year 2017.

[d]The New Orleans office, a sub-office under Houston's jurisdiction, did not receive credible fear cases until fiscal year 2016 and reasonable fear cases until fiscal year 2017.

LADOJ-ASYLUM2292

# Appendix IV: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

January 29, 2020

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Re:   Management Response to Draft Report GAO-20-250, "IMMIGRATION: Actions
       Needed to Strengthen USCIS's Oversight and Data Quality of Credible and
       Reasonable Fear Screenings"

Dear Ms. Gambler:

Thank you for the opportunity to review and comment on this draft report.  The U.S.
Department of Homeland Security (DHS) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing
this report.

The Department appreciates the GAO's reporting of DHS's credible and reasonable fear
screening programs.  During Fiscal Year (FY) 2019, U. S. Citizenship and Immigration
Services (USCIS) received historic levels of both credible fear and reasonable fear cases
with more than 105,000 and 13,000 cases respectively, surpassing records set in previous
years.  The USCIS Asylum Division was assisted by refugee officers and former asylum
officers from USCIS, as well as U.S. Border Patrol Agents (BPAs) from U.S. Customs
and Border Protection, in order to complete the record number of credible fear and
reasonable fear cases received.  DHS remains committed to conducting credible fear and
reasonable fear cases in a thorough and timely manner to fulfill international and
domestic protection laws and obligations while also ensuring that the U.S. border is
secure.

As noted in the draft report, starting in June 2019, BPAs were assigned to a credible fear
task force to complete credible fear interviews and determinations.  More than 75 BPAs
have completed training and have conducted credible fear interviews throughout the
United States.  Starting in September 2019, the BPAs have primarily been assigned to
conduct credible fear interviews at the Family Residential Center (FRC) in Dilley, Texas.

LADOJ-ASYLUM2293

**Appendix IV: Comments from the Department of Homeland Security**

Throughout FY 2019, USCIS continued to improve its new case management system for tracking credible fear and reasonable fear case processing, conducted user interviews with staff to gain valuable feedback, and implemented new tools within the case management system to assist with tracking and increasing efficiency.  For example, USCIS implemented the uploading of working documents into the case management system to allow more flexibility with case assignments and less dependence on paper files and e-mail.  In addition, USCIS began using electronic signatures for officers and supervisors and exploring improved document generation to support the credible and reasonable fear caseload.

The draft report contained four recommendations with which the Department concurs.  Attached find our detailed responses to each recommendation.  DHS previously submitted technical comments under a separate cover.

Again, thank you for the opportunity to review and comment on this draft report.  Please feel free to contact me if you have any questions.  We look forward to working with you again in the future.

Sincerely,

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

LADOJ-ASYLUM2294

**Attachment:  Management Response to Recommendations Contained in GAO-20-250**

GAO recommended that the Director of USCIS:

**Recommendation 1:**  Ensure that, in addition to USCIS's basic asylum officer training, all asylum offices provide pre-departure training on credible and reasonable fear processes before their officers begin screening cases at the family residential centers.

**Response:**  Concur.  USCIS Directorate for Refugee, Asylum & International Operations (RAIO) staff already provides family processing training to all USCIS officers and Border Patrol Agents (BPAs) detailed to its Asylum Division.  In addition, for more than a decade USCIS has required weekly training for USCIS asylum officers on a variety of adjudication topics.  In the future, USCIS will provide a refresher training to all staff conducting asylum-related screening.   In addition, USCIS will develop a standardized pre-departure training and provide this training to all detailees prior to deployment to the family residential centers (FRCs).  Estimated Completion Date (ECD):  September 30, 2020.

**Recommendation 2:**  Develop and implement more specific guidance on requirements for documenting results of Asylum Division periodic quality assurance reviews.

**Response:**  Concur.  USCIS RAIO will create a results template to ensure that the outcomes of periodic quality assurance reviews involving similar case types are documented in a consistent manner to better track trends across the asylum offices.  Staff assigned to participate in these reviews will be trained on how to use this template.  ECD:  June 30, 2020.

**Recommendation 3:**  Ensure asylum officers systematically record in USCIS's automated case management system if individuals receive credible fear determinations as principal applicants, dependents, or in the interest of family unity, pursuant to regulation or USCIS policy.

**Response:**  Concur.  USCIS RAIO will explore ways to modify its case management system so that asylum officers can record whether the individual received a positive credible fear determination as a principal, dependent, or in the interest of family unity.  USCIS will make any appropriate changes in the case management system and will train asylum officers on these changes.  ECD:  December 31, 2020.

**Recommendation 4:**  Collect and analyze additional information on case delays, including specific reasons for delays and how long they last, that asylum officers may face when screening credible and reasonable fear cases.

3

LADOJ-ASYLUM2295

**Appendix IV: Comments from the Department of Homeland Security**

**Response:** Concur. As noted in the draft report, USCIS does track limited information about some case delays. However, USCIS will explore ways to collect additional information on credible and reasonable fear case delays in the case management system. Once USCIS has identified ways to collect the additional information, it will modify the case management system, as appropriate, instruct users on the changes, and begin collecting and analyzing the information. ECD: December 31, 2020.

4

LADOJ-ASYLUM2296

# Appendix V: GAO Contact and Staff Acknowledgments

| GAO Contact | Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the contact named above, Kathryn Bernet (Assistant Director), Michael Harmond (Analyst-in-Charge), Hiwotte Amare, Miranda Cohen, Benjamin Crossley, Michele Fejfar, Cynthia Grant, Jan Montgomery, Heidi Nielson, Mary Pitts, Adam Vogt, and Jessica Walker made key contributions to this work. |

LADOJ-ASYLUM2297

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. <br> Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. <br> Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/fraudnet/fraudnet.htm <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

LADOJ-ASYLUM2298