EXHIBIT 222



CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE



A
# CBO
PAPER



*A Series on Immigration*

# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

**DECEMBER 2007**

LADOJ-ASYLUM001

Pub. No. 2500

LADOJ-ASYLUM002



# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

December 2007

The Congress of the United States ■ Congressional Budget Office

LADOJ-ASYLUM003

LADOJ-ASYLUM004



# Preface

According to available estimates, there are about 12 million unauthorized immigrants in the United States. Federal, state, and local governments spend public funds that benefit those immigrants, and those immigrants pay individual income, sales, and property taxes. Most available studies conclude that the unauthorized population pays less in state and local taxes than it costs state and local governments to provide services to that population. However, those estimates have significant limitations; they are not a suitable basis for developing an aggregate national effect across all states.

This paper, requested by the Chairman and Ranking Member of the Senate Finance Committee, is one of several reports prepared by the Congressional Budget Office (CBO) that present facts and research on immigration. The paper focuses on the estimated costs that certain state and local governments incur for providing various services—especially those related to education, health care, and law enforcement—to unauthorized immigrants. It also looks at the estimated taxes those individuals pay and at certain types of federal assistance that are available to states to help provide such services. In keeping with CBO's mandate to provide objective, nonpartisan analysis, the paper makes no recommendations.

Melissa Merrell of CBO's State and Local Government Cost Estimates Unit wrote the paper under the supervision of Peter Fontaine, Theresa Gullo, and Robert Sunshine. Douglas Hamilton is the coordinator of CBO's series of reports on immigration. Raymond J. Hall and Eric Schatten reviewed the manuscript for factual accuracy, and Lauren McMahon provided research assistance. David Brauer, Patrice Gordon, Arlene Holen, Leo Lex, Noah Meyerson, Robert Murphy, Paige Piper/Bach, Lisa Ramirez-Branum, Eric Rollins, Ralph Smith, Shinobu Suzuki, and G. Thomas Woodward provided comments on early drafts of the paper, as did Paul Cullinan and Donald B. Marron (both formerly of CBO), and Alan Auerbach of the University of California, Berkeley. (The assistance of external reviewers implies no responsibility for the final product, which rests solely with CBO.)

Loretta Lettner edited the paper, and Christine Bogusz proofread it. Maureen Costantino prepared the paper for publication and designed the cover. Lenny Skutnik printed the initial copies, Linda Schimmel coordinated the print distribution, and Simone Thomas produced the electronic version for CBO's Web site (www.cbo.gov).

Peter R. Orszag
Director

December 2007

LADOJ-ASYLUM006



# **Contents**

**Introduction**                                                                                         1

**The Budgetary Effects of Unauthorized Immigrants**                                  2

**Size and Characteristics of the Unauthorized Population**                        3

**Spending by State and Local Governments**                                            7

    Education                                                                                          7

    Health Care                                                                                       8

    Law Enforcement                                                                             9

**Revenues Versus Spending**                                                                    9

**Federal Assistance**                                                                                 10

    Education                                                                                          10

    Health Care                                                                                       11

    Law Enforcement                                                                             12

**Bibliography**                                                                                            13


**Box**

    1.    The Challenges of Estimating an Aggregate Effect                        4

LADOJ-ASYLUM007

LADOJ-ASYLUM008

# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

## Introduction

Over the past two decades, most efforts to estimate the fiscal impact of immigration in the United States have concluded that, in aggregate and over the long term, tax revenues of all types generated by immigrants—both legal and unauthorized—exceed the cost of the services they use.[1, 2] Generally, such estimates include revenues and spending at the federal, state, and local levels.[3] However, many estimates also show that the cost of providing public services to unauthorized immigrants at the state and local levels exceeds what that population pays in state and local taxes. It is important to note, though, that currently available estimates have significant limitations;

therefore, using them to determine an aggregate effect across all states would be difficult and prone to considerable error.

The impact of unauthorized immigrants on the federal budget differs from that population's effect on state and local budgets primarily because of the types of services provided at each level of government and the rules governing those programs. For instance, most unauthorized immigrants are prohibited from receiving many of the benefits that the federal government provides through Social Security and such need-based programs as Food Stamps, Medicaid (other than emergency services), and Temporary Assistance for Needy Families. At the same time, the federal government requires that state and local governments provide certain services to individuals, regardless of their immigration status or ability to pay, in order for those states or localities to participate in some of its assistance programs. Various court decisions also restrict the authority of state and local governments to avoid or constrain the cost of providing services to unauthorized immigrants who reside in their jurisdictions. In general, state and local governments bear much of the cost of providing certain public services—especially services related to education, health care, and law enforcement—to individuals residing in their jurisdictions. Such programs constitute a major portion of those governments' annual expenditures, but spending by state and local governments on services specifically provided to unauthorized immigrants makes up a small percentage of those governments' total spending.

Another factor that affects state and local spending is the extent to which the unauthorized population uses certain public services. For example, because unauthorized immigrants are less likely to have health insurance, they are

---

1. The term "unauthorized immigrants" refers to foreign citizens residing in the United States illegally. It applies to two categories of immigrants: those who enter the country without approval of the immigration process and those who violate the terms of a temporary admission without acquiring either permanent resident status or temporary protection from removal. Members of this population are also referred to as illegal or undocumented immigrants or aliens.

2. See Ronald D. Lee and Timothy W. Miller, "The Current Fiscal Impact of Immigrants and Their Descendants: Beyond the Immigrant Household," in James P. Smith and Barry Edmonston, eds., *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1998); James P. Smith and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1997); Georges Vernez and Kevin F. McCarthy, *The Costs of Immigration to Taxpayers: Analytical and Policy Issues* (Santa Monica, Calif.: RAND Corporation, 1996); and George Vernez and Kevin F. McCarthy, *Immigration in a Changing Economy: California's Experience* (Santa Monica, Calif.: RAND Corporation, 1998).

3. Typically, the estimates measure the costs and revenues attributed to immigrants during a specific period of time, usually one fiscal year.

LADOJ-ASYLUM009

more likely to rely on emergency facilities or public hospitals for treatment of nonemergency illnesses and other health-related problems. In 2000 and 2001, researchers from the RAND Corporation and the University of California surveyed immigrants in Los Angeles County and found that 65 percent of those respondents who identified themselves as unauthorized had no health insurance in the two years preceding the survey.[4] In a separate study, the Pew Hispanic Center estimated that in 2004, more than 50 percent of those children who were themselves unauthorized immigrants and almost 60 percent of adult unauthorized immigrants were uninsured. Moreover, 25 percent of those children who, by virtue of their birth, were U.S. citizens—but whose parents were unauthorized immigrants—also lacked health insurance.[5] In terms of public education, unauthorized immigrants who are minors increase the overall number of students attending public schools, and they may also require more educational services than do native-born children because of a lack of proficiency in English. Analyses from several states indicate that the costs of educating students who did not speak English fluently were 20 percent to 40 percent higher than the costs incurred for native-born students.[6, 7]

In addition to differences in the types of services that federal, state, and local governments provide and the extent to which the unauthorized population participates in those programs, the income that unauthorized immigrants earn and the taxes they pay also contribute to their net impact on state and local budgets. Unauthorized immigrants typically earn less than do native-born citizens and other immigrant groups and, partly as a result, they also pay a smaller portion of their income in taxes.

One study conducted by analysts at the Urban Institute found that in 1998, unauthorized immigrants in New York State paid an average of 15 percent of their income in federal, state, and local taxes; other immigrant groups paid between 21 percent and 31 percent.[8] The average household income for unauthorized families is significantly less than that of both legal immigrants and native-born citizens; therefore, that income is taxed at a lower rate than the income of other groups. The Pew Hispanic Center estimates that in 2004, the average annual income for unauthorized families was $27,400, compared with $47,800 for legal immigrant families and $47,700 for native-born families.[9]

A related effect is that lower-paying jobs also result in unauthorized immigrants' having less disposable income to spend on purchases subject to sales or use taxes. State and local governments typically rely more heavily on revenues from those and other sources (such as property taxes) than revenues generated by taxes on income.[10]

## The Budgetary Effects of Unauthorized Immigrants

In preparing its analysis, the Congressional Budget Office (CBO) reviewed 29 reports published over the past 15 years that attempted to evaluate the impact of unauthorized immigrants on the budgets of state and local governments. (See the bibliography for a complete list of those reports.) CBO did not assess the data underlying those estimates or the validity of the models used to prepare them. The estimates—whether from formal studies, analyses of data on particular topics, or less-formal inquiry—show considerable consensus regarding the

---

4. See Dana P. Goldman, James P. Smith, and Neeraj Sood, "Legal Status and Health Insurance Among Immigrants," *Health Affairs,* vol. 24, no. 6 (2005), pp. 1640–1653, available at http://content.healthaffairs.org/cgi/reprint/24/6/1640.

5. See Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics* (background briefing prepared for the Task Force on Immigration and America's Future, Washington, D.C., Pew Hispanic Center, June 14, 2005), available at http://pewhispanic.org/files/reports/46.pdf.

6. See Jose Cardenas and others, *Bilingual Education Cost Analysis* (San Antonio: Intercultural Development Research Association, 1976).

7. See Albert Cortez, *Insufficient Funding for Bilingual Education in Texas,* IDRA Newsletter (San Antonio: Intercultural Development Research Association, 2004).

8. See Jeffrey S. Passel and Rebecca L. Clark, *Immigrants in New York: Their Legal Status, Incomes, and Taxes* (Washington, D.C.: Urban Institute, 1998).

9. See Passel, *Unauthorized Migrants*.

10. According to data from the Bureau of the Census, in 2005, almost 60 percent of revenue collected by state governments (excluding intergovernmental transfers) came from two sources: general sales taxes and certain taxes on business profits (35 percent) and individual income taxes (25 percent). For local governments, property taxes made up the largest source of revenue (45 percent), while general sales taxes accounted for about 10 percent and individual income taxes represented about 3 percent. See Bureau of the Census, *Federal, State, and Local Governments: State and Local Government Finances: 2004–05,* "State and Local Summary Tables by Level of Government," available at www.census.gov/govs/www/estimate05.html.

overall impact of unauthorized immigrants on state and local budgets. However, the scope and analytical methods of the studies vary, and the reports do not provide detailed or consistent enough data to allow for a reliable assessment of the aggregate national effect of unauthorized immigrants on state and local budgets. (See Box 1 for a discussion of the challenges of estimating such an aggregate effect). After reviewing the estimates, CBO drew the following conclusions:

■ **State and local governments incur costs for providing services to unauthorized immigrants and have limited options for avoiding or minimizing those costs.** All of the estimates that CBO reviewed, regardless of the jurisdiction examined or programs considered, reached this conclusion. Rules governing many federal programs, as well as decisions handed down by various courts, limit the authority of state and local governments to avoid or constrain the costs of providing services to unauthorized immigrants. For example, both state and federal courts have ruled that states may not refuse to provide free public education to a student on the basis of his or her immigration status. Furthermore, many states have their own statutory or constitutional requirements concerning the provision of certain services to needy residents.

■ **The amount that state and local governments spend on services for unauthorized immigrants represents a small percentage of the total amount spent by those governments to provide such services to residents in their jurisdictions.** The estimates that CBO reviewed measured costs associated with providing services to unauthorized immigrants that ranged from a few million dollars in states with small unauthorized populations to tens of billions of dollars in California (currently the state with the largest population of unauthorized immigrants). Costs were concentrated in programs that make up a large percentage of total state spending—specifically, those associated with education, health care, and law enforcement.[11] In most of the estimates that CBO examined, however, spending for unauthorized immigrants accounted for less than 5 percent of total state and local spending for those services. Spending for unauthorized immigrants in certain jurisdictions in California was higher but still represented less than 10 percent of total spending for those services.

■ **The tax revenues that unauthorized immigrants generate for state and local governments do not offset the total cost of services provided to those immigrants.** Most of the estimates found that even though unauthorized immigrants pay taxes and other fees to state and local jurisdictions, the resulting revenues offset only a portion of the costs incurred by those jurisdictions for providing services related to education, health care, and law enforcement. Although it is difficult to obtain precise estimates of the net impact of the unauthorized population on state and local budgets (see Box 1), that impact is most likely modest.

■ **Federal aid programs offer resources to state and local governments that provide services to unauthorized immigrants, but those funds do not fully cover the costs incurred by those governments.** Some of the reports that CBO examined did not include such federal transfers when estimating the net effect of the unauthorized population on state and local governments.

## Size and Characteristics of the Unauthorized Population

There are no comprehensive records that document the number of unauthorized immigrants currently residing in the United States; as a result, the size of that population must be estimated by indirect means.[12] Such estimates are subject to considerable uncertainty because of questions surrounding the following: the extent to which that population is undercounted in the census; rates of emigration and mortality; and whether immigrants who are in the United States in a quasi-legal capacity should be classified as unauthorized.[13] The Department of Homeland Security has reported that there were approximately

---

11. On the basis of data collected by the National Association of State Budget Officers, between 1995 and 2006, almost 60 percent of spending from state general funds was used for elementary and secondary education (35 percent), Medicaid (16 percent), and corrections (7 percent). See National Association of State Budget Officers, *State Expenditure Report: Fiscal Year 2005* (Washington, D.C.: 2006), available at www.nasbo.org/Publications/PDFs/2005%20State%20Expenditure%20Report.pdf.

12. See Congressional Budget Office, *A Description of the Immigrant Population* (November 2004).

13. Quasi-legal immigrants include those individuals whose legal authorization has expired but for whom renewals of or adjustments to status have not yet been finalized.

LADOJ-ASYLUM011

**Box 1.**

## The Challenges of Estimating an Aggregate Effect

Among the available estimates that the Congressional Budget Office reviewed for its analysis, the general consensus is that unauthorized immigrants impose a net cost on state and local budgets. However, no agreement exists as to the size of, or even the best way of measuring, that cost on a national level. Questions surround both methodology and the available data, including the following:

■ *What unit of time should be used for the estimate?* Most of the research available to date measures the impact of unauthorized immigrants in terms of the funds spent and revenues collected within a given period, typically one fiscal year. Some analysts point out that such a method ignores the long-term impact of that population. A better measure, they suggest, would evaluate the lifetime costs that unauthorized immigrants impose on federal, state, and local governments and the lifetime revenues they generate. Generally, immigrants' use of services and their contributions to revenues vary over time as they become better integrated into U.S. society and labor markets. Most analysts believe that those general trends also apply to the portion of the population that is unauthorized.

■ *Are all costs and revenues captured?* Many of the estimates took into account certain selected costs and revenues; no study, including those that reported net costs, attempted to look at total costs and revenues.

■ *To what extent does this population pay taxes and consume government-provided services?* Research that examines the extent to which unauthorized immigrants pay taxes is limited, as are available data that examine the extent to which the unauthorized population uses public services. For example, there is little information on the proportion of students participating in specialized language classes who are unauthorized immigrants or the frequency with which those immigrants use publicly funded health services.

---

11.6 million unauthorized immigrants in the United States in January 2006.[14] Researchers at the Pew Hispanic Center estimated an unauthorized population of between 11.5 million and 12.0 million in March 2006. Using a model developed by the former Immigration and Naturalization Service, Pew estimated that as much as one-half of the population of unauthorized immigrants (4.5 million to 6.0 million people) were admitted legally—with visas or border crossing cards—but overstayed or otherwise violated the terms of their authorization; and the remainder of that population (an estimated 6 million to 7 million individuals) entered the United States illegally.[15, 16]

State-level estimates are subject to even more uncertainty than estimates of the total size of the population. Historically, most foreign-born residents, including unauthorized immigrants, have settled in a few states. In 1990, almost 75 percent of the total foreign-born population and almost 90 percent of unauthorized immigrants lived

---

14. See Michael Hoefer, Nancy Rytina, and Christopher Campbell, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2006* (Department of Homeland Security, Office of Immigration Statistics, 2007), available at www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf.

15. For more information on this model, see Robert Warren, *Estimates of the Undocumented Population Residing in the United States: October 1996* (Immigration and Naturalization Service, Office of Policy and Planning, 1996). As part of the Homeland Security Act of 2002, the functions of the Immigration and Naturalization Service were transferred to the Department of Homeland Security. Immigration and naturalization are the responsibility of Citizenship and Immigration Services. The border enforcement functions are split between two offices: Customs and Border Protection and Immigration and Customs Enforcement.

16. Pew Hispanic Center, *Modes of Entry for the Unauthorized Migrant Population: Fact Sheet* (Washington, D.C.: Pew Hispanic Center, May 22, 2006), available at http://pewhispanic.org/files/factsheets/19.pdf.

LADOJ-ASYLUM012

## Box 1.

## Continued

In addition to disagreements about the methods that should be used to determine a national aggregate effect and the lack of reliable and consistent data, a number of other factors make it difficult to compare findings across studies:

- *The estimates use varying sources of data for people and fiscal information.* The studies used data from a variety of sources, including but not limited to the Census Bureau, Immigration and Customs Enforcement, the former Immigration and Naturalization Service, the National Center for Education Statistics, a model developed by the Institute for Taxation and Economic Policy that estimates tax payments, and data from individual state and local programs.

- *The population is not defined in the same way across reports.* Because the estimates looked at different populations of immigrants, few of them are comparable. For example, although most estimates looked only at unauthorized immigrants, others did not differentiate between unauthorized and legal immigrants. Some included all foreign-born residents, regardless of their immigration status, and some included children of unauthorized immigrants who were born in the United States (even though those children are U.S. citizens). If the U.S.-born children of unauthorized immi-

grants had been included in the estimates, the costs of certain programs, particularly education, would be higher.

- *State and local governments vary widely in the types of benefits they provide and how they collect tax revenue.* Benefit programs and tax policies vary greatly among and even within states, making it difficult to produce a national estimate of the aggregate budget impact on all state and local jurisdictions. Even the studies that considered multiple jurisdictions or programs were constrained by those geographic variations.

- *The impact in one jurisdiction cannot be generalized to other areas.* Because many unauthorized immigrants reside in a few states, most studies to date have focused on the jurisdictions in which those immigrants have traditionally lived and therefore are most likely not representative of the effects in other states. Demographic changes suggest, however, that other states whose populations of unauthorized immigrants are rapidly increasing also will face growing fiscal pressures in the future. Recent reports have estimated those costs in states—such as Minnesota, Missouri, North Carolina, and Oregon—that have not traditionally had large populations of unauthorized immigrants.

---

in six states: California, Florida, Illinois, New Jersey, New York, and Texas.[17] The concentration of that population in just a few states has been diminishing, however, as

more immigrants settle in states not traditionally considered destinations for recent immigrant populations. Using census data, Pew found that, in 2004, 10 times as many unauthorized immigrants lived outside the six traditional settlement states than in 1990. There was a marked increase in the number of unauthorized immigrants settling in states such as Arizona, Georgia, North Carolina, and Tennessee—states that previously had little

---

17. See "States Ranked by Numeric Difference in the Foreign-Born Population: 1990, 2000, and 2005," *Migration Information Source* (Washington, D.C.: Migration Policy Institute), available at www.migrationinformation.org/DataHub/acscensus.cfm.

LADOJ-ASYLUM013

experience with such immigration.[18, 19] That phenomenon notwithstanding, unauthorized immigrants in most states make up a small portion of the state's population. In California, however, where Pew estimates that one-quarter of all unauthorized immigrants live, those immigrants make up an estimated 8 percent of the total state population.[20]

Demographic characteristics are key factors in estimating the unauthorized population's fiscal impact on state and local governments. Characteristics such as age, gender, employment status, occupation, and level of income are needed to estimate school attendance and tax revenues, for example. Using data from the Census Bureau's March 2005 Current Population Survey (CPS), Pew analysts found that of the approximately 11 million unauthorized immigrants living in the United States in 2005, 5.4 million were adult males, 3.9 million were adult females, and 1.8 million were children under 18 years of age. An additional 3.1 million children of unauthorized immigrants were U.S. citizens, Pew estimated.[21] Among Pew's other findings: Members of unauthorized families were typi-

cally much younger and less educated than members of families composed of legal immigrants and U.S. citizens. The unauthorized population included 7.2 million workers, typically employed in lower-wage occupations in the agricultural, construction, and service industries. Analysts at the Urban Institute reported that in 2004, unauthorized immigrant men were less likely to be unemployed than native-born men (4.6 percent compared with 6.5 percent) and unauthorized immigrant women were more likely to be unemployed than native-born women (8.2 percent compared with 5.2 percent).[22]

In addition to demographic information, the extent to which this population pays taxes is also an important determinant of the fiscal impact of unauthorized immigrants. Data from the Social Security Administration (SSA) and the Internal Revenue Service (IRS) suggest that some unauthorized immigrants use false or fraudulently obtained Social Security numbers (SSNs) to satisfy paperwork requirements during the hiring process and that employers use those numbers to withhold federal, state, and local income and payroll taxes for employees. Workers who do not qualify for SSNs can use Individual Tax Identification Numbers issued by the IRS to file tax returns, make payments, and apply for refunds. Although there are no reliable data on unauthorized immigrants' rate of compliance with tax laws, the IRS estimates that about 6 million unauthorized immigrants file individual income tax returns each year.[23] Other researchers estimate that between 50 percent and 75 percent of unauthorized immigrants pay federal, state, and local taxes. For example:

■ The SSA assumes that about half of unauthorized immigrants pay Social Security taxes.[24]

---

18. Although not traditionally a destination for unauthorized immigrants, Arizona has seen a dramatic increase in that population in recent years, making it the state with the fourth highest estimated number of unauthorized immigrants (about 575,000, in 2007) and one of the states with the highest estimated percentage of unauthorized immigrants (9 percent). See *Immigrants in the United States, 2007: A Profile of America's Foreign-Born Population* (Washington, D.C.: Center for Immigration Studies, November 2007), available at www.cis.org/articles/2007/back1007.html

19. See Jeffrey S. Passel, *Estimates of the Size and Characteristics of the Undocumented Population* (Washington, D.C.: Pew Hispanic Center, March 21, 2005).

20. In 2006, Pew estimated that between 55 percent and 60 percent of all unauthorized immigrants lived in six states: Arizona, California, Florida, New York, Texas, and Illinois. See Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for States Based on the March 2005 CPS* (Washington, D.C.: Pew Hispanic Center, April 26, 2006). Comparing those estimates to census data, unauthorized immigrants ranged from about 3 percent of the total state population in Illinois to 8 percent in California.

21. See Jeffrey S. Passel, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.: Estimates Based on the March 2005 Current Population Survey* (Washington, D.C.: Pew Hispanic Center, March 7, 2006), available at http://pewhispanic.org/files/reports/61.pdf.

22. See Karina Fortuny and others, *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States* (Washington, D.C.: Urban Institute, 2007)

23. See Paula N. Singer and Linda Dodd-Major, "Identification Numbers and U.S. Government Compliance Initiatives," *Tax Notes,* vol. 104 (September 20, 2004), pp. 1429–1433.

24. Social Security Advisory Board, Issue Brief No. 1, *The Impact of Immigration on Social Security and the National Economy* (report prepared by Joel Feinleib and David Warner, December 2005), available at www.ssab.gov/brief-1-immigration.pdf.

- Several of the states whose estimates CBO reviewed used a model developed by the Institute for Taxation and Economic Policy (ITEP) to determine state and local taxes paid by unauthorized immigrants. ITEP assumes a 50 percent compliance rate for income and payroll taxes.[25]

- Researchers from the Urban Institute, the Migration Policy Institute, the Pew Hispanic Center, and the Center for Immigration Studies have assumed a 55 percent compliance rate for income, Social Security, and Medicare taxes.[26]

- As part of a larger study on migration, the Center for Comparative Immigration Studies at the University of California at San Diego conducted a survey of unauthorized immigrants and found that, in 2006, 75 percent had taxes withheld from their paychecks, filed tax returns, or both.[27]

## Spending by State and Local Governments

Over the past two decades, many state and local governments, as well as researchers and academics, have tried to identify and quantify the fiscal impact of immigration on state and local governments. Most of those estimates have concentrated on costs associated with unauthorized immigrants, but some include costs related to other categories of people, such as children of unauthorized immigrants born in the United States, legal immigrants, refugees, and asylum-seekers.[28] The estimates looked at a range of public services, primarily concentrating on the cost of programs over which states have limited options for controlling costs, such as those related to education, health care, and law enforcement (including incarceration).[29]

### Education

Education is the largest single expenditure in state and local budgets. Because state and local governments bear the primary fiscal and administrative responsibility of providing schooling from kindergarten through grade 12, they incur substantial costs to educate children who are unauthorized immigrants.[30, 31] In 1982, the Supreme Court ruled that states may not exclude children from public education because of their immigration status.[32] Current estimates indicate that about 2 million school-age children (5 to 17 years old) in the United States are unauthorized immigrants; an additional 3 million

---

25. See Robin Baker and Rich Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants*, Issue Brief No. 3 (Denver: Bell Policy Center, June 30, 2006), available at www.thebell.org/PUBS/IssBrf/2006/06ImmigTaxes.pdf; Sarah Beth Coffey, *Undocumented Immigrants in Georgia: Tax Contributions and Fiscal Concerns* (Atlanta: Georgia Budget and Policy Institute, January 2006), available at www.gbpi.org/pubs/garevenue/20060119.pdf; Ruth Ehresman, *Undocumented Workers: Impact on Missouri's Economy* (St. Louis: Missouri Budget Project, June 21, 2006), available at www.mobudget.org/newstatebudgetreports.htm; and New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico: State Tax Contributions and Fiscal Concerns* (Albuquerque: New Mexico Voices for Children, May 2006), available at www.nmvoices.org/attachments/immigrant_tax_report.pdf.

26. See Steve Camarota, *The High Cost of Cheap Labor* (Washington, D.C.: Center for Immigration Studies, 2004); and Randy Capps and others, *Civic Contributions: Taxes Paid by Immigrants in the Washington, D.C., Metropolitan Area* (Washington, D.C.: Urban Institute, 2006).

27. See Wayne A. Cornelius and Jessica M. Lewis, eds., *Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities* (La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007).

28. Refugees and asylum-seekers are people who are unable or unwilling to return to their country of origin because of the risk of persecution or because of a well-founded fear of persecution. Refugees apply for admission from outside of the United States; asylum-seekers request legal admission from within the United States or at a U.S. port of entry.

29. Several of the earlier estimates also examined spending on public assistance programs. However, the main federal program for providing public assistance during that time, Aid to Families with Dependent Children, no longer exists, and there have been no comprehensive estimates of the costs imposed by unauthorized immigrants on the program that replaced it, Temporary Assistance for Needy Families. CBO has therefore not included those findings in its analysis.

30. The federal government provides about 10 percent of the total amount spent by all levels of government on kindergarten through grade 12 each year.

31. Most of the estimates that CBO reviewed did not include costs associated with children who were born to unauthorized immigrants in the United States because those children are U.S. citizens. If those children had been included in the estimates, their fiscal impact—particularly on education—would have been higher.

32. *Plyler v. Doe*, 457 U.S. 202 (1982).

children are U.S. citizens born to unauthorized immigrants.[33] According to the most recent population data released by the Census Bureau, as of July 2006, there were 53.3 million school-age children in the United States.[34] Thus, children who are unauthorized immigrants represent almost 4 percent of the overall school-age population. Their numbers are growing quickly in some states, adding additional budgetary pressures. For example:

■ As part of a larger study on the impact of unauthorized immigrants in Minnesota, the state's Department of Administration estimated that, during the 2003–2004 school year, the state and local governments in Minnesota spent between $79 million and $118 million to educate an estimated 9,400 to 14,000 children who were unauthorized immigrants.[35] The agency also estimated that an additional $39 million was spent for children who were U.S. citizens but whose parents were unauthorized immigrants. According to census data, Minnesota state and local governments spent about $8 billion for elementary and secondary education during the 2003–2004 school year (excluding capital costs for building maintenance and construction). The state estimated that its population of immigrant students—both legal and unauthorized—had almost doubled, from about 9,000 to more than 16,000, between 2000 and 2004.

■ On the basis of a population estimate developed by the Pew Hispanic Center, analysts at the New Mexico Fiscal Policy Project reported that, for the 2003–2004 school year, total spending in New Mexico at the state and local levels for 9,200 unauthorized immigrant schoolchildren was about $67 million.[36] The Census

Bureau reports that state and local expenditures for elementary and secondary education during that period in New Mexico totaled almost $3 billion. Of the estimated 40,000 unauthorized immigrants currently living in New Mexico, 95 percent are believed to be recent arrivals, having lived in that state for fewer than 10 years.

### Health Care

Immigrants in the United States, both authorized and unauthorized, are less likely than their native-born counterparts to have health insurance.[37] As a result, they are more likely to rely on emergency rooms or public clinics for health care. The federal government requires health facilities that receive federal assistance to provide a certain level of service to residents, regardless of their ability to pay for such medical services or their immigration status. The amount of uncompensated care provided by some state and local governments is growing because an increasing number of unauthorized immigrants are using those services. According to a report commissioned by the United States/Mexico Border Counties Coalition, in 2000, county governments that share a border with Mexico incurred almost $190 million in costs for providing uncompensated care to unauthorized immigrants; that figure represented about one-quarter of all uncompensated health costs incurred by those governments in that year.[38]

While those costs are increasing rapidly for some jurisdictions, they account for a small percentage of spending by most state and local governments. For example, in 2006, the Oklahoma Health Care Authority estimated that it would spend about $9.7 million on emergency Medicaid services for unauthorized immigrants that year, and that 80 percent of those costs would be for services associated

---

33. See Urban Institute, *Children of Immigrants: Facts and Figures* (Washington, D.C.: Urban Institute, 2006); and Passel, *Unauthorized Migrants.*

34. See Bureau of the Census, *Annual Estimates of the Population by Selected Age Groups and Sex for the United States: April 1, 2000, to July 1, 2006,* Series NC-EST2006-02 (last updated May 17, 2007), available at www.census.gov/popest/national/asrh/NC-EST2006-sa.html. (This estimate includes children 5 to 17 years of age.)

35. See Minnesota Department of Administration, Office of Strategic Planning and Results Management, *The Impact of Illegal Immigration on Minnesota: Costs and Population Trends* (December 8, 2005), available at www.leg.state.mn.us/lrl/issues/immigration.asp.

36. See New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico.*

37. The Census Bureau estimates that foreign-born individuals are between two and two-and-a-half times more likely than native-born residents to lack health insurance. See Robert J. Mills and Shailesh Bhandari, *Health Insurance Coverage in the United States: 2002* (Bureau of the Census, 2003).

38. See MGT of America, *Medical Emergency: Costs of Uncompensated Care in Southwest Border Counties* (report prepared for the United States/Mexico Border Counties Coalition, September 2002), available at www.bordercounties.org.

LADOJ-ASYLUM016

with childbirth.[39] The agency's actual total spending for that year was $3.1 billion. The agency also reported that, since fiscal year 2003 (the first fiscal year considered), the services provided to unauthorized immigrants have accounted for less than 1 percent of the total individuals served and cost less than 1 percent of the total dollars spent for Medicaid services.

### Law Enforcement
Unauthorized immigrants who commit criminal acts or who require law enforcement services to protect them from criminal acts or behavior impose a variety of costs on state and local budgets. Although state and local law enforcement activities related to unauthorized immigrants include the same protections that ordinary citizens rely upon (such as investigating reports of criminal activity that may have targeted an unauthorized immigrant), the estimates that are currently available include only costs related to the prosecution and incarceration of unauthorized immigrants under state and local laws.

Unauthorized immigrants accused or convicted of committing crimes (other than immigration-related offenses) are not deported immediately; rather, they enter into and are processed through the local criminal justice system in the same fashion that any other suspect would be. The federal government may take custody of those who are convicted after they have completed their sentences and then begin the deportation process, but until that point, state and local governments bear the cost of investigating, detaining, prosecuting, and incarcerating such immigrants.

Researchers from Rutgers University have found that, in general, immigrants are less likely than native-born citizens to be incarcerated.[40] However, the number of unauthorized immigrants in some state and local criminal justice systems adds significantly to law enforcement costs. For example, in 2001, the United States/Mexico Border Counties Coalition reported that law enforcement activities involving unauthorized immigrants in four states—California, Arizona, New Mexico, and Texas—cost some county governments that share a border with Mexico a combined total of more than $108 million in 1999.[41] Of the counties included in the report, San Diego County incurred the largest cost, spending over $50 million that year, or almost half of all estimated costs incurred by the border counties. That amount represented about 9 percent of San Diego County's total spending ($541 million) for law enforcement activities that year. The report identified several factors that influenced the fiscal impact on each county, including the number of ports of entry, the population of neighboring Mexican communities, border terrain, and federal programs for deterring illegal entry.

## Revenues Versus Spending
The available estimates of the budgetary impact of unauthorized immigrants vary greatly in their timing and scope. Most of the studies that include both revenues and costs for multiple programs show that state and local governments spend more on unauthorized immigrants than they collect in revenues from that population. For example:

■ Recent estimates indicate that annual costs for unauthorized immigrants in Colorado were between $217 million and $225 million for education, Medicaid, and corrections.[42] By comparison, taxes collected from unauthorized immigrants at both the state and local levels amounted to an estimated $159 million to $194 million annually.[43]

39. See statement of Nico Gomez, spokesman for Oklahoma Health Care Authority, before the Oklahoma Senate Task Force on Immigration, September 18, 2006. The Medicaid program is funded jointly by the states and the federal government. This report did not include the federal portion of funding for the program.

40. See Kristin F. Butcher and Anne Morrison Piehl, *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation*, Working Paper No. 2005-19 (Chicago: Federal Reserve Bank of Chicago, November 2005), available at www.chicagofed.org/publications/workingpapers/wp2005_19.pdf.

41. See Tanis J. Salant and others, *Illegal Immigrants in U.S./Mexico Border Counties: The Costs for Law Enforcement, Criminal Justice, and Emergency Medical Services* (report prepared for the United States/Mexico Border Counties Coalition, February 2001). That report included costs incurred by the offices of the sheriff, the marshal, the district attorney, the public defender, the superior court, the medical examiner, and probation and juvenile services. It did not include activities related to border enforcement.

42. See Robin Baker and Rich Jones, *Costs of Federally Mandated Services to Undocumented Immigrants in Colorado,* Issue Brief No. 4 (Denver: Bell Policy Center, June 30, 2006). See also Elizabeth Burger, *Immigration in Colorado: State Impact and Recent Legislation,* Legislative Council, Staff Issue Brief No. 06-04 (Denver: Colorado General Assembly, 2006). This estimate used figures for multiple years for each of the three program areas and offset costs with federal transfers for incarceration and Medicaid.

43. See Baker and Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants.*

■ The Iowa Legislative Services Agency reported that the estimated 70,000 unauthorized immigrants in the state paid between $45.5 million and $70.9 million in state income and sales taxes in fiscal year 2004.[44] The report did not quantify the costs of providing specific services to unauthorized immigrants. Rather, it estimated an average benefit of $1,534 per state resident based on total spending from the state's general fund and the number of state residents (including unauthorized immigrants). Using that average benefit calculation, the estimated cost for providing all services to unauthorized immigrants was $107.4 million in fiscal year 2004.

Some studies estimated that states may collect more in taxes from unauthorized immigrants than they spend to provide education for children who are unauthorized immigrants, but those studies do not include costs associated with health care or law enforcement. For example:

■ In 2006, the Missouri Budget Project estimated that unauthorized immigrants paid between $29 million and $57 million in state income, property, and excise taxes.[45] That organization estimated that the state spent between $17.5 million and $32.6 million to provide elementary and secondary education for between 5,800 and 10,833 unauthorized immigrants. Local districts incurred between $26.5 million and $49.3 million in additional costs for educational services.

■ The New Mexico Fiscal Policy Project estimated that the state collects about $69 million annually in individual income, property, and sales taxes from unauthorized immigrants, about $1 million to $2 million more annually than it spends on public elementary and secondary education for children who are unauthorized immigrants.[46]

Another report—prepared by the state comptroller of Texas—estimated that, in 2006, the state collected $424 million more in revenue from unauthorized immi-

grants than it spent to provide education, health care, and law enforcement activities for that population.[47] However, the state estimated that local governments incurred $1.4 billion in uncompensated costs for health care and law enforcement.

## Federal Assistance

Federal lawmakers have established several programs to assist state and local governments in funding the additional costs associated with providing services to unauthorized immigrants. Those programs, however, do not offset the full costs of providing those services. Although some of the reports that CBO reviewed included such transfers in their estimates of the net impact of unauthorized immigrants, most did not.

### Education

The Department of Education estimates that out of the nearly $1 trillion slated to be spent nationwide during the 2007–2008 school year on all levels of education, about 90 percent of those funds will come from state, local, and private sources; the federal government typically provides funding for about 10 percent of total educational expenditures nationwide. Most federal funding for kindergarten through grade 12 comes from various grants authorized in the No Child Left Behind Act of 2001 and the Individuals with Disabilities Education Act of 2004; however, some funding also comes from the Head Start program administered by the Department of Health and Human Services and the School Lunch program administered by the Department of Agriculture. Most federal grants for education are allocated to schools at a per-student rate, regardless of the student's immigration status.

The federal government also provides grants specifically intended to subsidize the cost of educating immigrant schoolchildren. The English Language Acquisition program is the primary support program provided under No Child Left Behind. Through that program, schools receive funds for teaching English to children with limited language proficiency. Grants are allocated to states using a formula that awards 80 percent of the funds on

---

44. See Kerri Johannsen, *Undocumented Immigrants' Cost to the State* (Des Moines: Iowa Legislative Services Agency, February 22, 2007).

45. See Ehresman, *Undocumented Workers*.

46. See New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico*.

47. See Carole Keeton Strayhorn, *Undocumented Immigrants in Texas: A Financial Analysis of the Impact to the State Budget and Economy* (special report prepared by the Office of the Comptroller of Texas, December 2006), available at www.cpa.state.tx.us/specialrpt/ undocumented/undocumented.pdf.

LADOJ-ASYLUM018

the basis of the number of children in the state that participate in limited-English proficiency programs; the remaining funds are allocated proportionally on the basis of the number of children in the state who are immigrants (regardless of their legal status).[48] In fiscal year 2006, the states received $621 million through this program. Although those grant programs offset some of the costs that unauthorized immigrants impose on state and local governments, the available funding is targeted only to language education and does not cover costs for general education.

### Health Care

Most of the available estimates that CBO reviewed for its analysis were prepared when there was no federal program specifically designed to help state and local governments provide emergency health care to immigrants. However, several federal programs currently subsidize the states' costs of providing medical care to low-income and underserved populations, including, to some extent, uninsured authorized and unauthorized immigrants.

Of the programs that provide federal assistance for emergency health care, Medicaid is the largest. The federal government sets the basic rules governing administration, eligibility, the scope of coverage, and the quantity of services and shares the cost of the program with the states. The states have great flexibility in determining eligibility requirements for their Medicaid programs. Hence, there is great variation from state to state in terms of who qualifies for such services, the types of services provided, and how much the state pays for each service. Historically, the federal government has paid anywhere from 50 percent to 83 percent of all Medicaid costs (the weighted average is about 57 percent), depending on the per capita income of the state.

The Consolidated Omnibus Budget Reconciliation Act of 1986 amended Medicaid law to authorize assistance to health care providers for services related to childbirth and emergency medical treatment delivered to immigrants who would, except for their immigration status, qualify for Medicaid benefits. This program is often referred to as emergency Medicaid.[49] Unauthorized immigrants may receive care through this program under the following circumstances: if they meet certain income requirements and are pregnant; if they are under the age of 19 or at

least 65 years old; if they are disabled; or if they are the caregiver of a child under the age of 18. However, emergency Medicaid covers only those services that are necessary to stabilize a patient; any other services delivered after a patient is stabilized are not covered.

In 2003, the Congress and the President enacted the Medicare Modernization Act, which appropriated $250 million annually from fiscal year 2005 through 2008 to be distributed to hospitals and other health care providers for the cost of emergency health services for unauthorized immigrants. (A similar program, authorized in 1997, provided $25 million to 12 states for each fiscal year from 1998 to 2001; however, that program was not continued.)[50] By statute, two-thirds of the $250 million is to be divided proportionally among all states on the basis of the number of unauthorized immigrants residing in each state; the remaining one-third is to be split among the six states with the highest number of removable aliens that have been arrested by federal immigration officials.

According to the Centers for Medicare and Medicaid Services (CMS), more than 15,000 health care providers have registered for payments through this program. Analysis of the awards data shows that the total awards allocated to states have increased each quarter. For the third quarter of fiscal year 2005, CMS disbursed 20 percent of the available funds for that quarter. The amount remaining of the initial allocations for each state is available in the following quarters. By the end of the fourth quarter of fiscal year 2006, CMS awarded almost 95 percent of the newly available funds for that quarter. By the end of fiscal year 2006, providers in eight states—Alabama, Connecticut, Florida, Kansas, Louisiana, Nebraska, Nevada, and Texas—had submitted and received payments for at least 90 percent of the funds allocated to those states. In total, for fiscal years 2005 and 2006, CMS had awarded half of the $500 million available.

---

48. These programs may also be referred to as English as a Second Language, bilingual education, or dual immersion classes.

49. Hospitals can submit charges for providing care to "qualified immigrants," defined as those who are legal permanent residents, refugees, asylum-seekers, immigrants who have had deportation withheld, immigrants granted parole for at least one year, immigrants granted conditional entry, battered immigrants and their child/children, immigrants born in Canada who are at least 50 percent Native American, and immigrants who are Cuban or Haitian entrants.

50. Letter to state Medicaid directors from Sally K. Richardson, Director, Center for Medicaid and State Operations, Health Care Financing Administration, November 24, 1997.

## Law Enforcement

The Immigration Reform and Control Act of 1986 authorized the federal government to help state and local governments pay for some of the costs of incarcerating unauthorized immigrants who were convicted of committing crimes other than immigration-related offenses. The Department of Justice started providing assistance to states in 1994 through the State Criminal Alien Assistance Program (SCAAP). State and local governments apply for those funds annually by submitting demographic data on individual unauthorized immigrants who have been incarcerated, the length of each prisoner's incarceration, and the total costs per facility for the salaries of correction officers. The Department of Justice uses that information to determine the number of inmates meeting the program's requirements and to allocate available funding to each facility in proportion to the amount of money spent for the salaries of correction officers.

Between 2000 and 2006, the Department of Justice awarded almost $2.8 billion in SCAAP funds to more than 800 state and local jurisdictions, including all 50 states and the District of Columbia. Since the program began, those funds have offset only a portion of the amounts that state and local governments spent to incarcerate those criminals. In 2005, the awards represented 33 percent of eligible requests.

For several reasons, the total costs reported by state and local governments for incarcerating unauthorized immigrants exceed federal payments. First, according to the program's guidelines, applicants may request assistance only for unauthorized immigrants who have committed felonies or multiple misdemeanor offenses and who have been incarcerated for at least four days. Second, the formula used to calculate each jurisdiction's aid includes only the costs of providing correction officers' salaries. The department then allocates whatever funds are appropriated for the program on the basis of the number of verified prisoners and the salary costs per facility. The program does not include costs for the detention of aliens who do not meet program guidelines or for the costs of housing, feeding, or providing medical care to those prisoners. State and local governments bear those costs.

LADOJ-ASYLUM020

# Bibliography

The references cited in this Congressional Budget Office (CBO) paper fall into three main categories:

- Reports that served as the backdrop for CBO's analysis. These reports specifically explore the impact of unauthorized immigrants on the budgets of state and local governments;

- CBO publications—testimony, cost estimates, and reports—that focus on the general issue of immigration;[1] and

- Related studies and publications.

## Reports Reviewed by CBO

Baca, Leroy D., *The Impact of Criminal Aliens on the Los Angeles County Jail System* (Los Angeles: Los Angeles County Sheriff's Department, 2000).

Baker, Robin, and Rich Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants,* Issue Brief No. 3 (Denver: Bell Policy Center, June 30, 2006), available at www.thebell.org/PUBS/IssBrf/2006/ 06ImmigTaxes.pdf.

Brown, Mark G., *The Impact of Illegal Immigrants in Rhode Island* (Providence: Rhode Island Department of Administration, Division of Planning, 1995).

Burger, Elizabeth, *Immigration in Colorado: State Impact and Recent Legislation,* Legislative Council Staff Issue Brief No. 06-04 (Denver: Colorado General Assembly, 2006).

Capps, Randy, and others, *Civic Contributions: Taxes Paid by Immigrants in the Washington, DC, Metropolitan Area* (Washington, D.C.: Urban Institute, May 2006), available at www.urban.org/UploadedPDF/ 411338_civic_contributions.pdf.

Clark, Rebecca L., and others, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C.: Urban Institute, September 1, 1994), available at www.urban.org/url.cfm?ID= 405796.

Clark, Rebecca L., and Jeffrey S. Passel, *How Much Do Immigrants Pay in Taxes: Evidence from Los Angeles County* (Washington, D.C.: Urban Institute, August 1993), available at www.urban.org/url.cfm?ID= 405130.

Clark, Rebecca L., and Scott A. Anderson, *Illegal Aliens in Federal, State, and Local Criminal Justice Systems* (Washington, D.C.: Urban Institute, June 2000), available at www.urban.org/url.cfm?ID=410366.

Coffey, Sarah Beth, *Undocumented Immigrants in Georgia: Tax Contributions and Fiscal Concerns* (Atlanta: Georgia Budget and Policy Institute, January 2006), available at www.gbpi.org/pubs/garevenue/ 20060119.pdf.

Donges, Kelli, *Health Care for Undocumented Immigrants: Who Pays?* House Research Organization Focus Report No. 77-13 (prepared for the Texas House of Representatives, October 29, 2001), available at www.hro.house.state.tx.us/focus/immigrant.pdf.

Ehresman, Ruth, *Undocumented Workers: Impact on Missouri's Economy* (St. Louis: Missouri Budget Project, June 21, 2006), available at www.mobudget. org/newstatebudgetreports.htm.

---

1. References to CBO testimony, cost estimates, and reports are arranged in reverse chronological order, according to the date of publication or issuance; all other citations are arranged alphabetically. CBO's publications are available online at www.cbo.gov.

Florida Advisory Council on Intergovernmental Relations, *Florida Newcomers: Inventory of Services and Program Costs Incurred by Governmental and Non-Governmental Agencies: Final Report* (September 1994), available at www.floridalcir.gov/UserContent/docs/File/reports/newcomers94.pdf.

Florida Hospital Association, *Care for Uninsured Non-Citizens: A Growing Burden on Florida's Hospitals* (updated February 2003), available at www.fha.org/acrobat/Noncitizensreport.pdf.

Johannsen, Kerri, *Undocumented Immigrants' Cost to the State* (Des Moines: Iowa Legislative Services Agency, February 22, 2007).

Jones, Rich, and Robin Baker, *Costs of Federally Mandated Services to Undocumented Immigrants in Colorado,* Issue Brief No. 4 (Denver: Bell Policy Center, June 30, 2006), available at www.thebell.org/PUBS/IssBrf/2006/06ImmigCosts.pdf.

Kasarda, John D., and James H. Johnson Jr., *The Economic Impact of the Hispanic Population on the State of North Carolina* (Chapel Hill, N.C.: University of North Carolina, Frank Hawkins Kenan Institute of Private Enterprise, January 2006), available at www.kenan-flagler.unc.edu/assets/documents/2006_KenanInstitute_HispanicStudy.pdf.

Los Angeles County Internal Services Department, *Impact of Undocumented Persons and Other Immigrants on Costs, Revenues and Services in Los Angeles County: A Report* (report prepared for Los Angeles County Board of Supervisors, November 6, 1992).

Martin, Jack, and Ira Mehlman, *The Costs of Illegal Immigration to Californians* (Washington, D.C.: Federation for American Immigration Reform, November 2004), available at www.fairus.org/site/PageServer?pagename=iic_immigrationissuecentersffec.

MGT of America, *Medical Emergency: Costs of Uncompensated Care in Southwest Border Counties* (report prepared for the United States/Mexico Border Counties Coalition, September 2002), available at www.bordercounties.org/vertical/Sites/%7BB4A0F1FF-7823-4C95-8D7A-F5E400063C73%7D/uploads/%7BFAC57FA3-B310-4418-B2E7-B68A89976DC1%7D.PDF.

Minnesota Department of Administration, Office of Strategic Planning and Results Management, *The Impact of Illegal Immigration on Minnesota: Costs and Population Trends* (December 8, 2005), available at www.leg.state.mn.us/lrl/issues/immigration.asp.

New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico: State Tax Contributions and Fiscal Concerns* (Albuquerque: New Mexico Voices for Children, May 2006), available at www.nmvoices.org/attachments/immigrant_tax_report.pdf.

Oregon Center for Public Policy, *Undocumented Workers Are Taxpayers, Too,* Issue Brief (April 1, 2006), available at www.ocpp.org/2006/issue060401%20Immigrants.pdf.

Padavan, Frank, *Our Teeming Shore: A Legislative Report on the Impact of U.S. Immigration Policy on New York State* (prepared for the New York State Senate, Majority Task Force on Immigration, January 1994).

Padavan, Frank, *Our Teeming Shore, 2: A Legislative Update on the Impact of U.S. Immigration Policy on New York State* (prepared for the New York State Senate, Majority Task Force on Immigration, April 1995).

Parker, Richard A., and Louis M. Rae, *Illegal Immigration in San Diego County: Analysis of Costs and Revenues* (prepared for the California State Senate Special Committee on Border Issues, 1993).

Passel, Jeffrey S., and Rebecca L. Clark, *Immigrants in New York: Their Legal Status, Incomes, and Taxes* (Washington, D.C.: Urban Institute, April 1, 1998), available at www.urban.org/url.cfm?ID=407432.

Romero, Philip J., Andrew J. Chang, and Theresa Parker, *Shifting the Costs of a Failed Federal Policy: The Net Fiscal Impact of Illegal Immigrants in California* (prepared for the Governor's Office of Planning and Research and the California Department of Finance, September 1994).

Salant, Tanis J., and others, *Illegal Immigrants in U.S./Mexico Border Counties: The Costs for Law Enforcement, Criminal Justice, and Emergency Medical Services* (report prepared for the United States/Mexico Border Counties Coalition, February 2001).

LADOJ-ASYLUM022

Strayhorn, Carole Keeton, *Undocumented Immigrants in Texas: A Financial Analysis of the Impact to the State Budget and Economy* (special report prepared by the Office of the Comptroller of Texas, December 2006), available at www.cpa.state.tx.us/specialrpt/ undocumented/undocumented.pdf.

## CBO Publications

### Testimony

Statement of Peter R. Orszag, Director, Congressional Budget Office, *The Role of Immigrants in the U.S. Labor Market,* before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law of the House Committee on the Judiciary, May 3, 2007.

Statement of Paul R. Cullinan, Chief, Human Resources Cost Estimates Unit, Congressional Budget Office, *The Budgetary Impact of Current and Proposed Border Security and Immigration Policies,* before the Senate Committee on the Budget, August 30, 2006.

### Cost Estimates

Senate Amendment 1150 to S. 1348, the Comprehensive Immigration Reform Act of 2007, *Cost estimate for the amendment, as amended through May 4, 2007* (June 4, 2007).

Senate Amendment 1150 to S. 1348, the Comprehensive Immigration Reform Act of 2007 (Preliminary Information), *Letter to the Honorable Kent Conrad* (May 23, 2007).

S. 2611, Comprehensive Immigration Reform Act of 2006, *Cost estimate for the bill as passed by the Senate on May 25, 2006* (August 18, 2006).

S. 2611, Comprehensive Immigration Reform Act of 2006, *Letter to the Honorable Jeff Sessions providing additional detail on some components of the cost estimate for S. 2611, as introduced on April 7, 2006* (May 24, 2006).

S. 2611, Comprehensive Immigration Reform Act of 2006, *Letter to the Honorable Charles E. Grassley providing a cost estimate of the potential budgetary and economic impacts of S. 2611, as introduced on April 7, 2006* (May 16, 2006).

### Reports

*Projections of Net Migration to the United States* (June 2006).

*Immigration Policy in the United States* (February 2006).

*Global Population Aging in the 21st Century and Its Economic Implications* (December 2005).

"The Impact of Immigration on the Long-Term Budget Outlook," Box 1-2 in *The Long-Term Budget Outlook* (December 2005).

*The Role of Immigrants in the U.S. Labor Market* (November 2005).

*Remittances: International Payments by Migrants* (May 2005).

*A Description of the Immigrant Population* (November 2004).

## Related Works

Borjas, George J., "The Economics of Immigration," *Journal of Economic Literature,* vol. 32, no. 4 (December 1994), pp. 1667–1717.

Butcher, Kristin F., and Anne Morrison Piehl, *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation,* Working Paper No. 2005-19 (Chicago: Federal Reserve Bank of Chicago, November 2005), available at www.Chicagofed.org/publications/workingpapers/ wp2005_19.pdf.

Chiswick, Barry R., *The Economics of Immigration: Select Papers of Barry R. Chiswick* (Cheltenham, U.K.: Edward Elgar Publishing, 2005).

Clark, Rebecca L., *Costs of Providing Public Assistance to Immigrants* (Washington, D.C.: Urban Institute, August 1994), available at www.urban.org/ url.cfm?ID=405394.

Cowan, Cathy A., and others, "Burden of Health Care Costs: Businesses, Households, and Governments, 1987–2000," *Health Care Financing Review,* vol. 23, no. 3 (Centers for Medicare and Medicaid Services, Spring 2002).

Duignan, Peter, and Lewis H. Gann, eds., *The Debate in the United States over Immigration* (Stanford, Calif.: Stanford University, Hoover Press, December 5, 1997).

Edmonston, Barry, and Ronald Lee, eds., *Local Fiscal Effect of Illegal Immigration: Report of a Workshop* (Washington, D.C.: National Academies Press, 1996).

Goldman, Dana P., James P. Smith, and Neeraj Sood, "Legal Status and Health Insurance Among Immigrants," *Health Affairs,* vol. 24, no. 6 (2005), pp. 1640–1653.

Government Accountability Office, *Illegal Alien Schoolchildren: Issues in Estimating State-by-State Costs,* GAO-04-733 (June 2004), available at www.gao.gov/new.items/d04733.pdf.

Government Accountability Office, *Undocumented Aliens: Questions Persist About Their Impact on Hospitals' Uncompensated Care Costs,* GAO-04-472 (May 2004), available at www.gao.gov/new.items/d04472.pdf.

Hoefer, Michael, Nancy Rytina, and Christopher Campbell, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2005* (Department of Homeland Security, Office of Immigration Statistics, August 2006), available at www.dhs.gov/xlibrary/assets/statistics/publications/ILL_PE_2005.pdf.

Huddle, Donald, *Net Costs of Immigration: The Facts, Trends, and the Critics* (Washington, D.C.: Carrying Capacity Network, 1996).

National Association of State Budget Officers, *2004 State Expenditure Report* (2005).

Passel, Jeffrey S., *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.: Estimates Based on the March 2005 Current Population Survey* (Washington, D.C.: Pew Hispanic Center, March 7, 2006), available at http://pewhispanic.org/files/reports/61.pdf.

Passel, Jeffrey S., *Estimates of the Size and Characteristics of the Undocumented Population* (Washington, D.C.: Pew Hispanic Center, March 21, 2005), available at http://pewhispanic.org/files/reports/44.pdf.

Passel, Jeffrey S., *Unauthorized Migrants: Numbers and Characteristics* (background briefing prepared for the Task Force on Immigration and America's Future, Washington, D.C., Pew Hispanic Center, June 14, 2005), available at http://pewhispanic.org/files/reports/46.pdf.

Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for States Based on the March 2005 CPS: Fact Sheet* (Washington, D.C.: Pew Hispanic Center, April 26, 2006), available at http://pewhispanic.org/files/factsheets/17.pdf.

Pew Hispanic Center, *Modes of Entry for the Unauthorized Migrant Population: Fact Sheet* (Washington, D.C.: Pew Hispanic Center, May 22, 2006), available at http://pewhispanic.org/files/factsheets/19.pdf.

Social Security Advisory Board, Issue Brief No. 1, *The Impact of Immigration on Social Security and the National Economy* (prepared by Joel Feinleib and David Warner, December 2005), available at www.ssab.gov/brief-1-immigration.pdf.

Urban Institute, *Children of Immigrants, Facts and Figures* (Washington, D.C.: Urban Institute, 2006), available at www.urban.org/UploadedPDF/900955_children_of_immigrants.pdf.

Vernez, Georges, and Kevin F. McCarthy, *The Costs of Immigration to Taxpayers: Analytical and Policy Issues* (Santa Monica, Calif.: RAND Corporation, 1996).