EXHIBIT 231



# Medicaid: An Overview

Updated February 8, 2023

**Congressional Research Service**

https://crsreports.congress.gov

R43357

# Summary

Medicaid is a means-tested entitlement program that finances the delivery of primary and acute medical services as well as long-term services and supports (LTSS) to an estimated 85 million people at a cost to states and the federal government of $748 billion in FY2021. Medicaid is one of the largest payers in the U.S. health care system, representing 17% of national health care spending in CY2021; in that year, private health insurance and Medicare accounted, respectively, for 34% and 21% of national health care spending.

Participation in Medicaid is voluntary for states; all states, the District of Columbia, and the territories choose to participate. The federal government requires states to cover certain mandatory populations and services. The federal government also allows states to cover other optional populations and services. The Social Security Act (i.e., the underlying statute for the Medicaid program) authorizes several waiver (e.g., Section 1115, Section 1915(b), and Section 1915(c)) and demonstration authorities that allow states to operate their Medicaid programs outside of federal rules. Due to these flexibilities, there is substantial variation among the states in terms of factors such as Medicaid eligibility, covered benefits, and provider payment rates.

Historically, Medicaid eligibility generally has been limited to low-income children, pregnant women, parents of dependent children, elderly individuals, and individuals with disabilities. Since 2014, states have had the option to cover nonelderly adults with income up to 133% of the federal poverty level (FPL) under the Patient Protection and Affordable Care Act (ACA; P.L. 111-148, as amended) Medicaid expansion.

Medicaid coverage includes a variety of primary and acute-care services as well as LTSS. Not all Medicaid enrollees have coverage for the same set of services. An enrollee's eligibility pathway determines the services within a benefit package. Federal law provides two primary types of benefit packages for state Medicaid programs: (1) traditional benefits and (2) alternative benefit plans (ABPs). Beneficiary cost sharing (e.g., premiums and co-payments) is limited under the Medicaid program.

Medicaid enrollees generally receive benefits via one of two service delivery systems: fee-for-service (FFS) or managed care. Under FFS, health care providers are paid by the state Medicaid program for each service provided to a Medicaid enrollee. Under managed care, Medicaid enrollees get some or all of their services through an organization under contract with the state. Most states use a combination of FFS and managed care.

The federal government and the states jointly finance Medicaid. The federal government reimburses states for a portion of each state's Medicaid program costs. Federal Medicaid funding is an open-ended entitlement to states, which means there is no upper limit or cap on the amount of federal Medicaid matching funds a state may receive.

Medicaid provider payment rates are set by states within federal rules. In some cases, states make supplemental payments to Medicaid providers that are separate from, and in addition to, the payment rates for services rendered to Medicaid enrollees.

State Medicaid programs, through their program integrity initiatives, have primary responsibility for preventing and, when necessary, recovering improper payments due to fraud, waste, and abuse.

# Contents

Introduction ........................................................................................................................... 1

Eligibility .............................................................................................................................. 4
    Categorical Eligibility ..................................................................................................... 5
    Financial Eligibility ......................................................................................................... 7
    Additional Eligibility Requirements for LTSS Coverage ................................................ 8
    Medicaid Enrollment ...................................................................................................... 8
    Share of Enrollment Versus Expenditures, by Population ............................................. 10

Benefits ................................................................................................................................ 11
    Primary Benefit Packages ............................................................................................. 12
        Traditional Medicaid Benefits ................................................................................ 12
        Alternative Benefit Plans ....................................................................................... 12
        Comparing Traditional Medicaid Benefits to ABPs ............................................... 13
    Other State Plan Coverage Options ............................................................................... 14
    Medicaid Service Spending ........................................................................................... 15

Beneficiary Cost Sharing ..................................................................................................... 15

Service Delivery Systems ..................................................................................................... 16

Financing ............................................................................................................................. 18
    Federal Share ................................................................................................................ 19
    State Share .................................................................................................................... 20
    Expenditures ................................................................................................................. 20

Medicaid Program Waivers .................................................................................................. 21

Provider Payments ............................................................................................................... 24

Program Integrity ................................................................................................................ 25

Additional Medicaid Resources ........................................................................................... 26
    Selected CRS Products ................................................................................................. 26
        Overview ............................................................................................................... 26
        Eligibility .............................................................................................................. 26
        Benefits ................................................................................................................. 26
        Financing .............................................................................................................. 27
        COVID-19 ............................................................................................................. 27
    Laws ............................................................................................................................. 27
    Regulations ................................................................................................................... 28
    More Information .......................................................................................................... 28

# Figures

Figure 1. Percentage of Medicaid Coverage of the Nonelderly Population by
    Race/Ethnicity ............................................................................................................... 3
Figure 2. Past and Projected Medicaid Enrollment ................................................................. 9
Figure 3. Estimated Medicaid Enrollment and Expenditures for Benefits, by Enrollment
    Group as a Share of Total ............................................................................................. 10
Figure 4. Medicaid Medical Assistance Expenditures, by Service Category ........................... 15

Figure 5. Percentage of Medicaid Enrollees with Comprehensive Risk-Based Managed
   Care, by State ................................................................................................................... 18
Figure 6. Federal and State Actual Medicaid Expenditures .......................................................... 21

## Tables

Table 1. Examples of Medicaid Mandatory and Optional Benefits for Traditional Benefits
   and Alternative Benefit Plans (ABPs) ......................................................................................11
Table 2. Key Characteristics of the Primary Medicaid Waiver Authorities Compared to
   State Plan Requirements............................................................................................................ 23

## Contacts

Author Information..................................................................................................................... 29

# Introduction

Medicaid is a joint federal-state program that finances the delivery of primary and acute medical services, as well as long-term services and supports (LTSS), to a diverse low-income population, including children, pregnant women, adults, individuals with disabilities, and people aged 65 and older. State participation in Medicaid is voluntary; all states, the District of Columbia, and the territories choose to participate.[1]

Medicaid was enacted in 1965 as part of the same law that created the Medicare program (the Social Security Amendments of 1965; P.L. 89-97). Medicaid was designed to provide coverage to groups with a wide range of health care needs that historically were excluded from the private health insurance market (e.g., individuals with disabilities who require LTSS or indigent populations in geographic locations where access to providers is limited). Because of the diversity of the populations that Medicaid serves, Medicaid offers some benefits that typically are not covered by major insurance plans offered in the private market (e.g., institutional and home and community-based LTSS or early and periodic screening, diagnostic, and treatment [EPSDT] services).[2]

At the federal level, Medicaid is administered by the Centers for Medicare & Medicaid Services (CMS) within the Department of Health and Human Services (HHS). States must follow broad federal rules to receive federal matching funds, but they have flexibility to design their own versions of Medicaid within the federal statute's basic framework. In general, states specify the nature and scope of their Medicaid programs through a Medicaid state plan approved by CMS.[3] The Social Security Act (SSA) authorizes several waiver (e.g., Section 1115, Section 1915(b), and Section 1915(c)) and demonstration authorities that allow states to operate their Medicaid programs outside of federal rules.[4] These flexibilities result in variability across state Medicaid programs.

The federal government and the states jointly finance the Medicaid program. Federal Medicaid spending is an entitlement, with total expenditures dependent on state policy decisions and use of services by enrollees. Medicaid is an entitlement for both states and individuals. The Medicaid entitlement to states ensures that, so long as states operate their programs within the federal requirements, states are entitled to federal Medicaid matching funds. Medicaid also is an individual entitlement, which means that anyone eligible and enrolled in Medicaid under his or her state's eligibility standards is guaranteed Medicaid coverage.

---

[1] The five territories are American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands. In this report, the term *state* includes the 50 states, the District of Columbia, and the territories, unless otherwise specified.

[2] The early and periodic screening, diagnostic, and treatment (EPSDT) program is a required benefit for nearly all children (under the age of 21) who are enrolled in Medicaid that provides comprehensive and preventive health care services.

[3] The Medicaid state plan is an agreement between the state and the federal government that details how the state will administer its program (e.g., eligibility requirements, benefit coverage, provider reimbursement, delivery systems) and certifies that the state has met program requirements set forth in federal statute and regulations. If a state wants to change how its program operates (e.g., by adjusting eligibility levels or benefit coverage) or if Congress modifies a requirement (e.g., adds a new state plan option), the state must submit a state plan amendment describing the change to Centers for Medicare & Medicaid (CMS) for approval.

[4] States submit waiver applications for CMS approval before implementing a waiver program. For Section 1115 demonstration waivers, the Special Terms and Conditions is the formal document outlining the arrangements agreed to under the demonstration program. Other waiver programs operate under the conditions specified in the waiver agreement as approved by CMS.

---

In FY2021, Medicaid is estimated to have provided health care services to an estimated 85 million individuals at a total cost of $748 billion, with the federal government paying $518 billion of that total.[5] In comparison, the Medicare program provided health care benefits to nearly 63 million individuals in that same year at a cost of roughly $875 billion.[6]

Medicaid provides a health care safety net for low-income populations,[7] with approximately 21% of the total U.S. population with Medicaid coverage in 2021.[8] Medicaid plays a more significant role for other certain subpopulations. For example, in 2021, Medicaid provided health coverage for 39% of all children in the United States;[9] in the same year, it provided health coverage for 59% of all nonelderly individuals with income below 100% of the federal poverty level (FPL).[10]

The percentage of individuals covered by Medicaid varies by race, ethnicity, or both, with Medicaid providing coverage as shown in **Figure 1**. Among the nonelderly population (i.e., individuals under 65 years of age), Medicaid provided coverage for 17% of White individuals, 35% of Black individuals, 17% of Asians/Native Hawaiians and Pacific Islanders, 38% of American Indians/Alaska Natives, 27% of individuals with multiple races, and 31% of Hispanic individuals (who may be of any race) in 2021.[11]

---

[5] This enrollment figure is the average monthly enrollment from the Congressional Budget Office (CBO), *Medicaid Baseline Projections,* May 2022, https://www.cbo.gov/system/files?file=2022-05/51301-2022-05-medicaid.pdf. The expenditures figures are from CMS, Form CMS-64 Data as reported by states to the Medicaid Budget and Expenditure System, as of July 19, 2022, https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

[6] CBO, "Medicare – CBO's May 2022 Baseline," May 2022, https://www.cbo.gov/system/files?file=2022-05/51302-2022-05-medicare.pdf.

[7] The *health care safety net* consists of those organizations and programs, in both the public and private sectors, with a legal obligation or a commitment to provide direct health care services to uninsured and underinsured populations.

[8] U.S. Census Bureau, American Community Survey Tables for Health Insurance Coverage, "Table HI-05, Health Insurance Coverage Status and Type of Coverage by State and Age for All People: 2021" at https://www2.census.gov/programs-surveys/demo/tables/health-insurance/2022/acs-hi/hi05_acs.xlsx.

[9] U.S. Census Bureau, 2021 American Community Survey One-Year Estimates, "Public Health Insurance Coverage by Type and Selected Characteristics," Table S2704, at https://data.census.gov/cedsci/table?q=S2704&tid=ACSST1Y2021.S2704.

[10] Henry J. Kaiser Family Foundation, *Health Insurance Coverage of the Nonelderly (0-64) with Incomes below 100% Federal Poverty Level (FPL)*, State Health Facts, at https://www.kff.org/other/state-indicator/nonelderly-up-to-100-fpl/.

[11] Persons in the multiple race category provided two or more races in their response to the 2021 American Community Survey. Persons of Hispanic origin may be of any race; all other racial/ethnic groups are non-Hispanic. (Henry J. Kaiser Family Foundation (KFF), *Medicaid Coverage Rates for the Nonelderly by Race/Ethnicity*, State Health Facts, at https://www.kff.org/medicaid/state-indicator/nonelderly-medicaid-rate-by-raceethnicity/.)

**Figure 1. Percentage of Medicaid Coverage of the Nonelderly Population by Race/Ethnicity**

(2021)



**Source:** Henry J. Kaiser Family Foundation (KFF), *Medicaid Coverage Rates for the Nonelderly by Race/Ethnicity*, State Health Facts, at https://www.kff.org/medicaid/state-indicator/nonelderly-medicaid-rate-by-raceethnicity/.

**Notes:** KFF estimates based on the 2021 American Community Survey (ACS), One-Year Estimates. Includes those covered by Medicaid, Medical Assistance, State Children's Health Insurance Plan (CHIP), or any kind of government-assistance plan for those with low incomes or a disability, as well as those who have both Medicaid and another type of coverage, such as dual-eligible individuals who are also covered by Medicare. Persons in the multiple race category provided two or more of the following race categories: White, Black, Asian, Native Hawaiian or Other Pacific Islander, or some other race. Persons of Hispanic origin may be of any race; all other racial/ethnic groups are non-Hispanic.

For some types of services, Medicaid is a significant payer. For instance, in 2020, Medicaid accounted for about 42% of national spending on LTSS.[12] Medicaid paid for 42% of all births in the United States in 2020.[13] In 2019, Medicaid paid for 26% of behavioral health services, including mental health and substance use disorder services, which made Medicaid the single biggest payer of behavioral health services.[14]

Medicaid also pays for Medicare premiums and/or cost sharing for low-income seniors and individuals with disabilities, who are eligible for both programs and referred to as *dual-eligible beneficiaries*. For other Medicaid enrollees, cost sharing (e.g., premiums and co-payments) generally is nominal, which may not be the case with coverage available through the private health insurance market. The Medicaid program is a significant payer for services provided by

---

[12] Based on CRS analysis of National Health Expenditure Account (NHEA) data obtained from CMS, Office of the Actuary, prepared December 2021.

[13] Michelle J.K. Osterman, et al., *Births: Final Data for 2020*, National Center for Health Statistics, National Vital Statistics Reports, Volume 70, Number 17, February 7. 2022, at https://stacks.cdc.gov/view/cdc/112078.

[14] CMS, "Medicaid and CHIP Access: Coverage and Behavioral Health Data Spotlight," at https://www.medicaid.gov/medicaid/access-care/downloads/coverage-and-behavioral-health-data-spotlight.pdf. See also, Anita Soni, *Health Care Expenditures for Treatment of Mental Disorders: Estimates for Adults Ages 18 and Older, U.S. Civilian Noninstitutionalized Population, 2019,* Statistical Brief #539, Agency for Healthcare Research and Quality, February 2022, at https://meps.ahrq.gov/data_files/publications/st539/stat539.pdf.

special classes of providers, such as federally qualified health centers (FQHCs), rural health clinics (RHCs), and Indian Health Service (IHS) facilities that provide health care services to populations in areas where access to traditional physician care may be limited.

This report describes the basic elements of Medicaid, focusing on who is eligible, what services are covered, how enrollees share in the cost of care, and how the program is financed. The report also explains waivers, provider payments, and program integrity activities. At the end of the report is a section with additional Medicaid resources.

# Eligibility

Eligibility for Medicaid is determined by both federal and state law, whereby states set individual eligibility criteria within federal minimum standards. As a result, there is substantial variability in Medicaid eligibility across states. Therefore, the ways that an individual might qualify for Medicaid are largely reflective of state policy decisions within broad federal requirements.

In general, individuals qualify for Medicaid coverage by meeting the requirements of a specific eligibility pathway offered by the state. Some eligibility pathways are mandatory, meaning all states with a Medicaid program must cover them; others are optional. Within this framework, states are afforded discretion in determining certain eligibility criteria for both mandatory and optional eligibility groups. In addition, states may apply to CMS for a waiver of federal law to expand health coverage beyond the mandatory and optional eligibility groups specified in federal statute (see the "Medicaid Program Waivers" section for more information).

An eligibility pathway is the federal statutory reference(s) under SSA Title XIX that extends Medicaid coverage to one or more groups of individuals.[15] Each eligibility pathway specifies the group of individuals covered by the pathway (i.e., *categorical criteria*), the financial requirements applicable to the group (i.e., *financial criteria*),[16] whether the pathway is mandatory or optional, and the extent of the state's discretion over the pathway's requirements. Individuals in need of Medicaid-covered LTSS must demonstrate the need for long-term care by meeting state-based eligibility criteria for services, and they also may be subject to a separate set of Medicaid financial eligibility rules in order to receive LTSS coverage. All Medicaid applicants regardless of their eligibility pathway must meet federal and state requirements regarding residency, immigration status, and documentation of U.S. citizenship.[17] For more information about noncitizens, see the textbox entitled "Noncitizen Eligibility for Medicaid."

---

[15] Although most eligibility pathways are specified in Title XIX of the Social Security Act (SSA), some pathways are specified in other parts of the SSA, in other federal laws, or in regulations prescribed by CMS pursuant to authority provided in the SSA. See SSA §1939.

[16] Some groups, such as young people under the age of 26 who have aged out of foster care and individuals eligible through the breast and cervical cancer treatment pathway, are eligible for Medicaid coverage without regard to income and assets.

[17] Federal Medicaid residency requirements can be found at SSA §§1902(a)(16), 1902(a) and 1902(b)(2). Federal Medicaid eligibility requirements for noncitizens generally can be found at SSA §§401, 402(b), 403, 1137, and §421 of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA; P.L. 104-193). Federal Medicaid citizenship documentation requirements can be found at SSA §§1902(a)(46), 1902(ee), 1903(x), and 1903(a)(3)(H).

Often an applicant's eligibility pathway dictates the Medicaid state plan services that a given program enrollee is entitled to (e.g., women eligible due to their pregnancy status are entitled to Medicaid pregnancy-related services). When applying to a state's Medicaid program, an individual may be eligible for the program through more than one pathway. In this situation, an individual is generally permitted to choose the pathway that would be most beneficial in terms of the treatment of income and sometimes assets when determining Medicaid eligibility, but also in terms of the available benefits associated with each eligibility pathway.

> **Noncitizen Eligibility for Medicaid**
>
> Noncitizens' eligibility for Medicaid and CHIP largely depends on (1) an applicant's immigration status; (2) whether they arrived in the United States (or were enrolled in Medicaid) before August 22, 1996; and (3) how long they have lived and worked in the United States. In addition, alien applicants must meet the programs' other eligibility requirements (e.g., financial, categorical, state residency). The Migration Policy Institute estimates 2.4 million low-income noncitizens were enrolled in Medicaid in 2019.
>
> **Notes:** See CRS In Focus IF11912, *Noncitizen Eligibility for Medicaid and CHIP* and Valerie Lacarte, Mark Greenberg, and Randy Capps, "Medicaid Access and Participation: A Data Profile of Eligible and Ineligible Immigrant Adults," Migration Policy Institute, Policy Brief, October 2021, p. 6.

Medicaid eligibility determinations generally apply for 12 months before an eligibility redetermination must occur. Individuals may be retroactively eligible for Medicaid up to three months prior to the month of application, if the individual received covered services and would have been eligible had he or she applied during that period.[18]

The following sections describe Medicaid's categorical and financial eligibility criteria as well as additional eligibility requirements for Medicaid covered-LTSS.

# Categorical Eligibility

Medicaid categorical eligibility criteria are the characteristics that define the population qualifying for Medicaid coverage under a particular eligibility pathway; in other words, the nonfinancial requirements that an individual must meet to be considered eligible under an eligibility group. Medicaid covers several broad coverage groups, including children, pregnant women, adults, individuals with disabilities, and individuals 65 years of age and older (i.e., aged). There are a number of distinct Medicaid eligibility pathways within each of these broad coverage groups.

Historically, Medicaid eligibility was limited to poor families with dependent children who received cash assistance under the former Aid to Families with Dependent Children (AFDC) program, as well as poor aged, blind, or disabled individuals who received cash assistance under the Supplemental Security Income (SSI) program. Medicaid eligibility rules reflected these historical program linkages both in terms of the categories of individuals who were served and in that the financial eligibility rules were generally based on the most closely related social program for the group involved (e.g., AFDC program rules for low-income families with dependent children and pregnant women, and SSI program rules for aged, blind, or disabled).[19] Over time, Medicaid eligibility has expanded to allow states to extend Medicaid coverage to individuals beyond those who were eligible based on receipt of cash assistance. Eligibility expansions include new groups of individuals who are less likely to have access to and/or are able to afford health insurance coverage, such as foster care youth through the age of 26 without regard to annual

---

[18] SSA §1902(a)(34); 42 C.F.R. §435.916.

[19] 42 C.F.R. §435.601.

income, and the ACA Medicaid expansion population (i.e., nonelderly adults with income up to 133% of FPL).[20] Medicaid's financial eligibility rules also have been modified over time for certain groups.[21]

As a condition of state participation in Medicaid, the following are examples of eligibility groups that *must* be provided Medicaid coverage:

- certain low-income families, including parents, that meet the financial requirements of the former AFDC cash assistance program;

- pregnant women with annual income at or below 133% of FPL;

- children with family income at or below 133% of FPL;

- aged, blind, or disabled individuals who receive cash assistance under the SSI program;[22]

- children receiving foster care, adoption assistance, or kinship guardianship assistance under SSA Title IV–E;

- certain former foster care youth;[23]

- individuals eligible for the Qualified Medicare Beneficiary program;[24] and

- certain groups of legal permanent resident immigrants.[25]

Examples of eligibility groups to which participating states *may* provide Medicaid include the following:

- pregnant women with annual income between 133% and 185% of FPL;

- infants with family income between 133% and 185% of FPL;

---

[20] The poverty guidelines (also referred to as the federal poverty level) are issued each year in the *Federal Register* by Department of Health and Human Services (HHS). The guidelines, which is a simplification of the U.S. Census Bureau's poverty thresholds, are used for administrative purposes—for instance, determining financial eligibility for certain federal programs. The 2023 poverty guidelines for an individual are $14,580 in the 48 contiguous states; $18,210 in Alaska; and $16,770 in Hawaii. For more information, see HHS, ASPE, "Poverty Guidelines," as of January 19, 2023, https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines.

[21] For more information, see CRS Report R43861, *The Use of Modified Adjusted Gross Income (MAGI) in Federal Health Programs*.

[22] For SSI recipients, states have the option to use certain eligibility criteria for Medicaid that are more restrictive than SSI but no more restrictive than those criteria in effect on January 1, 1972. In these states, SSI receipt does not automatically extend Medicaid eligibility. States that use this alternative to SSI program rules typically are referred to as *209(b) states*, which is the section of the Social Security Amendments of 1972 (SSA 72; P.L. 92-603) that provided this authority. In 2022, eight states provided Medicaid to SSI recipients using this method: Connecticut, Hawaii, Illinois, Minnesota, Missouri, New Hampshire, North Dakota, and Virginia. (Medicaid and CHIP Payment and Access Commission [MACPAC], MACStats: Medicaid and CHIP Data Book, Exhibit 37, December 2022, at https://www.macpac.gov/wp-content/uploads/2022/12/EXHIBIT-37.-Medicaid-Income-Elig-Levels-as-a-Percentage-of-FPL-for-Age-65-and-Older-and-Persons-with-Disabilities-by-State-2022.pdf.)

[23] For more information, see CRS In Focus IF11010, *Medicaid Coverage for Former Foster Youth Up to Age 26*.

[24] Under the Qualified Medicare Beneficiary (QMB) program, Medicaid helps pay premiums, deductibles, coinsurance, and co-payments for Medicare Part A, Medicare Part B, or both for dual-eligible individuals (i.e., individuals eligible for both Medicare and Medicaid) with annual income less than 100% of the federal poverty level.

[25] These groups also must meet all other Medicaid eligibility requirements and include refugees for the first seven years after entry into the United States; asylees for the first seven years after asylum is granted; lawful permanent aliens with 40 quarters of creditable coverage under Social Security; and immigrants who are honorably discharged U.S. military veterans. For more information, see CRS In Focus IF11912, *Noncitizen Eligibility for Medicaid and CHIP* and CRS Report R47351, *Immigrants' Access to Health Care*.

- certain individuals who require institutional care and have incomes up to 300% of the SSI federal benefit rate;

- certain *medically needy* individuals (e.g., children, pregnant women, aged, blind, or disabled) who are otherwise eligible for Medicaid but who have incomes too high to qualify and spend down their income on medical care;[26] and

- nonelderly adults with income at or below 133% of FPL (i.e., the ACA Medicaid expansion).[27]

Some individuals who are eligible for Medicaid are also eligible for Medicare. Individuals enrolled in both Medicaid and Medicare are referred to as *dual eligibles*. For more information about this population, see the textbox entitled "Dual Eligibles."

## Financial Eligibility

Medicaid is also a means-tested program that is limited to those with financial need. The criteria used to determine financial eligibility—income and sometimes resource (i.e., asset) tests—vary by eligibility group.

For most eligibility groups the criteria used to determine eligibility are based on modified adjusted gross income (MAGI) income counting rules. There is no resource or asset test used to determine Medicaid financial eligibility for MAGI-eligible individuals.[28]

While MAGI applies to most Medicaid-eligible populations, certain populations such as older adults and individuals with disabilities are statutorily exempt from MAGI income counting rules. Instead, Medicaid financial eligibility for MAGI-exempted populations is based on the income counting rules that match the most closely related social program for the group involved (e.g., SSI program rules for aged, blind, or disabled eligibility groups). For MAGI-exempt eligibility groups, income disregards and assets or resource tests may apply.

---

**Dual Eligibles**

Individuals eligible for both Medicare and Medicaid (dual eligibles) are an important Medicaid subgroup because, due to their substantial health care needs, they account for a disproportionate share of Medicaid expenditures. Dual eligibles experience high rates of chronic illnesses, many need LTSS, and they often have social risk factors; 60% of dual eligibles have multiple chronic conditions, 49% receive LTSS, and 41% have at least one mental health diagnosis. Dual eligible enrollment has increased from 2006 to 2019 by an annual average of 2.8%, growing from 8.6 million in 2006 to 12.3 million in 2019.

Dual eligible beneficiaries generally are Medicare beneficiaries whose low-income makes them also eligible to receive Medicaid benefits. Depending on their income and resources, dual eligibles may be fully or partially eligible for Medicaid. Partial-benefit dual eligibles receive full Medicare benefits plus state Medicaid program assistance with some or all Medicare premiums and cost sharing. Full-benefit dual eligibles receive full Medicare coverage, full Medicaid benefits, and coverage of Medicare premiums and cost sharing. In 2019, about 8.8 million of dual eligibles were fully eligible for Medicaid, while about 3.6 million received partial Medicaid benefits (does not add to 12.3 million due to rounding).

**Source:** Centers for Medicare & Medicaid Services (CMS), Medicare-Medicaid Coordination Office (MMCO), *Fact Sheet: People Dually Eligible for Medicare and Medicaid*, March 2020; and CMS, MMCO, *Data Analysis Brief: Medicare-Medicaid Dual Enrollment, 2006-2019*, November 2020.

---

[26] For these groups, individuals may qualify for Medicaid by meeting the medically needy income standard or spend down to the medically needy income standard by incurring and paying for medical expenses.

[27] For more information about the ACA Medicaid expansion, see CRS In Focus IF10399, *Overview of the ACA Medicaid Expansion*.

[28] In addition, for some groups, such as former foster-care youth who have aged out of foster care, no income eligibility test is applied. For more information on the use of modified adjusted gross income (MAGI) as well as MAGI-exempt groups, see CRS Report R43861, *The Use of Modified Adjusted Gross Income (MAGI) in Federal Health Programs*.

## Additional Eligibility Requirements for LTSS Coverage

Medicaid enrollees, many of whom qualify based on aged or disabled categorical criteria, may also have long-term care needs. In general, individuals in need of Medicaid-covered LTSS must also meet state-based functional and/or disease or condition-specific eligibility criteria. In other words, they must demonstrate the need for long-term care. There are certain pathways that establish eligibility to Medicaid-covered LTSS either for individuals receiving institutional care or for those who need the level of care provided in an institution and opt to receive Medicaid-covered home and community-based services (HCBS).[29] Most states offer HCBS under waiver programs that operate outside of Medicaid state plan requirements (see the "Medicaid Program Waivers" section for more information).

Applicants seeking certain Medicaid-covered LTSS are also subject to a separate set of Medicaid financial eligibility rules in order to receive such services (e.g., limits on the value of home equity, asset transfer rules). These additional financial rules attempt to ensure that program applicants apply their assets toward the cost of their care and do not divest them to gain eligibility sooner than would occur otherwise.

In addition, Medicaid specifies rules for equitably allocating income and assets to non-Medicaid-covered spouses for the purposes of determining LTSS coverage eligibility for nursing facility services and some HCBS. Commonly referred to as spousal impoverishment rules, these rules are intended to prevent the impoverishment of the spouse who does not need LTSS.[30]

## Medicaid Enrollment

**Figure 2** shows historical and projected Medicaid enrollment for FY1970 through FY2021. The figure shows steady enrollment growth over this period. During periods of economic downturn, Medicaid programs face enrollment increases at a faster rate because job and income losses make more people eligible.[31]

---

[29] There are certain optional eligibility pathways for older adults and individuals with disabilities—Special Income Level, Special Home and Community-Based Waiver Group, Home and Community-Based Services (HCBS) State Plan, and Katie Beckett—that establish eligibility to Medicaid-covered long-term services and supports (LTSS) either for individuals receiving institutional care or those who need the level of care provided in an institution and receive Medicaid-covered HCBS.

[30] Historically, these rules have applied to the spouse of participants receiving institutional care. However, under ACA §2404, these rules were extended for a limited time to the spouse of participants receiving certain home and community-based services and are scheduled to sunset on September 30, 2027. CRS Report R43506, *Medicaid Financial Eligibility for Long-Term Services and Supports*.

[31] For information about when the United States was in recession since 1970 see NBER, "Business Cycle Dating," at https://www.nber.org/cycles.html. For information about recessions and Medicaid, see CRS In Focus IF11686, *Impact of the Recession on Medicaid* and CRS Report R46346, *Medicaid Recession-Related FMAP Increases*.

## Figure 2. Past and Projected Medicaid Enrollment
### (FY1970-FY2021)



Enrollment is measured by average monthly enrollment.

**Source:** Medicaid and CHIP Payment and Access Commission (MACPAC), MACStats: Medicaid and CHIP Data Book, Exhibit 10, December 15, 2022, at https://www.macpac.gov/publication/medicaid-enrollment-and-total-spending-levels-and-annual-growth/.

**Notes:** Enrollment is measured by average monthly enrollment. For fiscal years prior to FY1990, Medicaid enrollment was estimated from Medicaid enrollees who received covered services to individuals enrolled in Medicaid. Enrollment data for FY2013-FY2021 are projected. Enrollment for FY1999-FY2021 include estimates for the territories.

The implementation of the ACA Medicaid expansion in 2014 contributed to Medicaid enrollment increasing by an estimated 8.8% in FY2014 and 7.2% in FY2015. The growth in Medicaid enrollment is estimated to have slowed to 3.3% in FY2016, 1.7% in FY2017, 0.7% in FY2018, and 0.0% in FY2019.[32] States attribute the slowing in Medicaid enrollment growth from FY2016-FY2019 to improving economic conditions and barriers to enrollment (e.g., periodic eligibility checks between renewals) in some states.[33]

During the Coronavirus Disease 2019 (COVID-19) public health emergency period, Medicaid enrollment has increased by 1.9% in FY2020 and 14.6% in FY2021.[34] Initially, the recession at the beginning of the pandemic increased the rate of growth for Medicaid enrollment.[35] Since then,

---

[32] Christopher J. Truffer et al., *2018 Actuarial Report on the Financial Outlook for Medicaid*, Office of the Actuary, CMS, HHS, 2020, at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/MedicaidReport; Medicaid and CHIP Payment and Access Commission (MACPAC), MACStats: Medicaid and CHIP Data Book, Exhibit 10, December 15, 2022, at https://www.macpac.gov/publication/medicaid-enrollment-and-total-spending-levels-and-annual-growth/.

[33] Samantha Artiga and Olivia Pham, *Recent Medicaid/CHIP Enrollment Declines and Barriers to Maintaining Coverage*, Kaiser Family Foundation, September 24, 2019, https://www.kff.org/medicaid/issue-brief/recent-medicaid-chip-enrollment-declines-and-barriers-to-maintaining-coverage/; Harris Meyer, *Faulty state renewal processes blamed for Medicaid coverag*, Modern Healthcare, April 19, 2019, https://www.modernhealthcare.com/government/faulty-state-renewal-processes-blamed-medicaid-coverage-declines; Anne B. Martin, et al., "National Health Care Spending In 2019: Steady Growth For The Fourth Consecutive Year," *Health Affairs*, vol. 40, no. 1 (December 16, 2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2020.02022.

[34] The percentage change in Medicaid enrollment has varied by state. (MACPAC, MACStats: Medicaid and CHIP Data Book, Exhibit 10, December 15, 2022, at https://www.macpac.gov/publication/medicaid-enrollment-and-total-spending-levels-and-annual-growth/.)

[35] For more information about Medicaid and recessions, see CRS In Focus IF11686, *Impact of the Recession on Medicaid*.

the continuous coverage requirement for the Family First Coronavirus Response Act (FFCRA; P.L. 116-127) federal medical assistance percentage (FMAP) increase has driven the Medicaid enrollment increases (see the "Federal Share" for more information about FMAP and this increase).[36]

## Share of Enrollment Versus Expenditures, by Population

Different Medicaid enrollment groups have different service utilization patterns. Larger enrollment groups account for a smaller proportion of Medicaid expenditures, while some smaller enrollment groups are responsible for a larger proportion of Medicaid expenditures. Individuals with disabilities and the aged populations tend to be sicker and use more health care services, including LTSS, than the children, nonexpansion adults, and expansion adults populations. As a result, the expenditures for the individuals with disabilities and the aged populations are relatively higher.

As shown in **Figure 3**, for calendar years 2018 and 2019 together, Medicaid enrollment for children, nonexpansion adults, and expansion adults comprised 77% of Medicaid enrollment but accounted for 44% of Medicaid's total benefit spending. In contrast, together individuals with disabilities and the aged populations represented less than a quarter (23%) of Medicaid enrollment but accounted for more than a half of Medicaid benefit spending (56%).[37] Although these statistics vary somewhat from year to year and state to state, the patterns described above generally hold true across years.

**Figure 3. Estimated Medicaid Enrollment and Expenditures for Benefits, by Enrollment Group as a Share of Total**

(2018 and 2019)



**Source:** Centers for Medicare & Medicaid (CMS), 2022 *Medicaid and CHIP Beneficiary Profile: Enrollment, Expenditures, Characteristics, Health Status, and Experience,* July 2022, at https://www.medicaid.gov/medicaid/quality-of-care/downloads/beneficiary-profile-2022.pdf.

**Notes:** CMS calculated these figures for calendar years 2018 and 2019 using Transformed Medicaid Statistical Information System (T-MSIS) data to determine the percentage of total Medicaid expenditures accounted for by each beneficiary category, then applied that percentage to the net total Medicaid expenditures (federal and state) states reported to the Medicaid Budget and Expenditure System (MBES) in form CMS-64. These national estimates include state-reported data from the 50 states, DC, Puerto Rico, and the U.S. Virgin Islands. Total net expenditures exclude spending for administrative expenses and Medicaid disproportionate share hospital payments. May not sum to totals due to rounding.

---

[36] The federal government's share of most Medicaid expenditures is established by the federal medical assistance percentage (FMAP) rate. (CMS, *August 2022 Medicaid and CHIP Enrollment Trends Snapshot*, November 29, 2022, at https://www.medicaid.gov/medicaid/national-medicaid-chip-program-information/downloads/august-2022-medicaid-chip-enrollment-trend-snapshot.pdf.)

[37] Dual-eligible individuals are primarily included in the individuals with disabilities and the aged populations.

# Benefits

Medicaid coverage includes a wide variety of preventive, primary, and acute care services as well as LTSS.[38] Not everyone enrolled in Medicaid has coverage for the same set of services. An enrollee's eligibility pathway determines the available services within a benefit package. Federal law provides two primary benefit packages for state Medicaid programs: (1) traditional benefits and (2) alternative benefit plans (ABPs). Each of these packages is summarized in **Table 1**. For the medically needy subgroup, states may offer a more restrictive benefit package than is available to other enrollees. States also have statutory options to include other types of coverage that targets specific benefits to targeted groups through certain state plan options. In addition, states can use waiver authority (e.g., SSA Section 1115) to tailor benefit packages to specified Medicaid subgroups as well as offer services outside traditional or ABP coverage, such as LTSS (see "Medicaid Program Waivers" for more information about Section 1115 waivers).

**Table 1. Examples of Medicaid Mandatory and Optional Benefits for Traditional Benefits and Alternative Benefit Plans (ABPs)**

| Type of Benefit | Traditional Benefits | ABPs |
|---|---|---|
| Mandatory | • Inpatient hospital services<br>• EPSDT (< the age of 21)<br>• FQHC services<br>• Family planning services<br>• Emergency and nonemergency medical transportation<br>• Pregnancy-related services<br>• Nursing facility care (aged 21+)<br>• Physician services<br>• Home health | • Hospitalization services<br>• EPSDT (< the age of 21)<br>• FQHC services<br>• Family planning services<br>• Emergency and nonemergency medical transportation<br>• Maternity and newborn care<br>• Preventive services<br>• Prescription drugs<br>• Rehabilitative services<br>• Mental health and substance use disorder services |
| Optional | • Clinic services<br>• Prescription drugs<br>• Physical, occupational, and speech therapy services<br>• Dental services for adults<br>• Personal care | For special-needs subgroups, option to receive traditional benefits or enroll in an ABP plan. |

**Sources:** Title XIX of the Social Security Act and related federal guidance.

**Notes:** ABP = alternative benefit plan; EPSDT = early and periodic screening, diagnostic, and treatment services; FQHC = federally qualified health center.

In general, when Medicaid enrollees have other sources of insurance/payment (including Medicare), Medicaid is the payer of last resort. States can provide Medicaid coverage to individuals whose existing health insurance is limited (sometimes referred to as underinsured). In

---

[38] LTSS benefits are available in institutional and home and community-based (HCBS) settings, and they include nursing facility services, home health, case management services, personal care services, and private duty nursing, among others.

these cases, Medicaid wraps around that coverage (i.e., additional coverage for services covered under Medicaid but not under the other source of coverage).[39]

# Primary Benefit Packages

The following sections summarize the primary benefit packages: Medicaid traditional benefits and ABPs. Then, there is a section comparing benefits included in traditional Medicaid coverage and those that are commonly included in ABPs.

## Traditional Medicaid Benefits

Traditional Medicaid benefits include primary and acute care as well as LTSS.[40] The traditional Medicaid program requires states to cover a wide array of mandatory services (e.g., inpatient hospital care, lab and x-ray services, physician care, nursing facility services for individuals aged 21 and older). In addition, states may provide optional services, some of which commonly are covered are personal care services, prescription drugs, clinic services, physical therapy, and prostheses.

States define the specific features of each covered benefit within four broad federal guidelines:

- Each service must be *sufficient in amount*, *duration*, and *scope* to reasonably achieve its purpose. States may place appropriate limits on a service based on such criteria as medical necessity.
- Within a state, services available to the various population groups must be equal in amount, duration, and scope. This requirement is the *comparability rule*.
- With certain exceptions, the amount, duration, and scope of benefits must be the same statewide, referred to as the *statewideness rule*.
- With certain exceptions, enrollees must have *freedom of choice* among health care providers.

The breadth of coverage for a given benefit can, and does, vary from state to state, even for mandatory services. For example, states may place different limits on the amount of inpatient hospital services a beneficiary can receive in a year (e.g., up to 15 inpatient days per year in one state versus unlimited inpatient days in another state)—as long as applicable requirements are met regarding sufficiency of amount, duration, and scope; comparability; statewideness; and freedom of choice. Exceptions to state limits may be permitted under circumstances defined by the state.

## Alternative Benefit Plans

As an alternative to providing all the mandatory and selected optional benefits under traditional Medicaid, the Deficit Reduction Act of 2005 (DRA; P.L. 109-171) gave states the option to enroll state-specified groups in what was referred to as benchmark or benchmark-equivalent coverage at the time of enactment but currently are called alternative benefit plans (ABPs).[41] Under ABPs, states must provide comprehensive benefit coverage that is based on a coverage benchmark rather than a list of discrete items and services as under traditional Medicaid.[42]

---

[39] For related details, see federal regulations at 42 C.F.R. 433.135, 433.138, and 433.152.

[40] In general, traditional Medicaid benefits are listed under the definition of medical assistance at SSA Section 1905.

[41] See generally SSA Section 1937.

[42] For more information on Medicaid Alternative Benefit Plan Coverage, see CRS Report R45412, *Medicaid*

ABPs must qualify as either benchmark or benchmark-equivalent coverage. Under benchmark coverage, ABP benefits are at least equal to one of the statutorily specified benchmark plans (i.e., one of three commercial health insurance products, or a fourth "Secretary-approved" coverage option).[43] Under benchmark-equivalent coverage, ABP benefits include certain specified services and the overall benefits are at least actuarially equivalent to one of the statutorily specified benchmark coverage packages.

Unlike traditional Medicaid benefit coverage, coverage under an ABP must include at least the essential health benefits (EHBs) that most plans in the private health insurance market are required to furnish.[44] In addition, ABPs must include a variety of specific services, including services under Medicaid's EPSDT benefit;[45] family planning services and supplies; and both emergency and nonemergency transportation to and from providers. In general, the EHBs do not include LTSS. However, states may choose to include LTSS in their ABPs.

Under ABPs, states are permitted to waive the statewideness and comparability requirements that apply to traditional Medicaid benefits. This flexibility permits the state to define populations that are served and the specific benefit packages that apply.

States that choose to implement the ACA Medicaid expansion are required to provide ABP coverage to the individuals eligible for Medicaid through the expansion (with exceptions for selected special-needs subgroups). Specific populations are exempt from mandatory enrollment in ABPs (e.g., those with special health care needs such as disabling mental disorders or serious and complex medical conditions). These individuals must be offered the option of a benefit plan that includes traditional Medicaid state plan services, which may include LTSS.

## Comparing Traditional Medicaid Benefits to ABPs

It is difficult to draw comparisons about the ways in which traditional Medicaid benefits are similar to and different from ABP benefits, because the scope of each type of benefit package varies from state to state. This variability is largely a reflection of state choices in covering optional benefits, in addition to the mandatory Medicaid state plan benefits, as well as state choices for the base-benchmark for the EHBs that must be covered under ABPs.

Differences in the federal laws regarding the scope of required benefits under traditional Medicaid and those required under ABPs highlight some common differences between the two types of benefits packages. For example, care in a nursing facility for individuals over the age of

---

*Alternative Benefit Plan Coverage: Frequently Asked Questions.*

[43] The three ABP benchmark commercial insurance products include (1) the standard Blue Cross/Blue Shield preferred provider option service plan offered through the Federal Employees Health Benefit Program-equivalent health insurance coverage; (2) the health benefits coverage plan offered to state employees; and (3) the commercial health maintenance organization with the largest insured commercial, non-Medicaid enrollment in the state.

[44] The 10 essential health benefits required under the ACA include (1) ambulatory patient services, (2) emergency services, (3) hospitalization, (4) maternity and newborn care, (5) mental health and substance use disorder services (including behavioral health treatment), (6) prescription drugs, (7) rehabilitative and habilitative services and devices, (8) laboratory services, (9) preventive and wellness services and chronic disease management, and (10) pediatric services, including oral and vision care. For more information about EHBs, see CRS In Focus IF10287, *The Essential Health Benefits (EHB)*.

[45] The early and periodic screening, diagnostic, and treatment (EPSDT) program is a required benefit for nearly all children (under the age of 21) who are enrolled in Medicaid. It covers health screenings and services, including assessments of each child's physical and mental health development; laboratory tests (including lead blood level assessment); appropriate immunizations; health education; and vision, dental, and hearing services. The screenings and services must be provided at regular intervals that meet "reasonable" medical or dental practice standards. States are required to provide all federally allowed treatment to correct problems identified through screenings, even if the specific treatment needed is not otherwise covered under a given state's Medicaid plan.

21 is a required benefit under traditional Medicaid, whereas nursing home care is not a required benefit under ABPs.

Conversely, rehabilitative and habilitative services and devices, preventive and wellness services, and mental health and substance use disorder services are all required benefits under ABPs. By contrast, these APB benefit categories do not correspond to specific benefit categories under traditional Medicaid. Rather, services in these benefit categories could be covered under different benefit categories, such as physician services or physical, occupational, and speech therapy services.

To further illustrate this point, *behavioral health* (or any similar term) is not explicitly included among the required benefit categories under traditional Medicaid. Instead, most types of behavioral health benefits (e.g., the services of clinical psychologists and licensed clinical social workers and prescription drugs) are optional. By contrast, behavioral health benefits are mandatory under ABPs because "mental health and substance use disorder services, including behavioral health treatment" are included among the EHBs.

## Other State Plan Coverage Options

States also have statutory options to include other types of coverage that targets specific benefits for certain subpopulations. The Medicaid statutory authority for these coverage options falls under different sections of Title XIX of the SSA than those for traditional Medicaid benefits or ABPs, discussed above. For certain coverage options, states are not required to comply with specific federal requirements that apply to other state plan benefits (e.g., "statewideness," "comparability," any other Medicaid requirement as determined necessary by the HHS Secretary to implement the state plan option). These state plan options also may have additional requirements for state Medicaid program administration, financing, and delivery. The following provides selected examples of these coverage options:[46]

- **State Plan HCBS Option (SSA Section 1915(i))**—Allows states to offer a broad range of HCBS, similar to the Section 1915(c) HCBS waiver program authority (see section entitled "Medicaid Program Waivers"). States can make this option available to specific populations (e.g., children or adults with mental health and substance use disorders; individuals with developmental disabilities) and can vary the benefit package, as well as the amount, duration, or scope of the benefits for each population.

- **Community First Choice (CFC) State Plan Option (SSA Section 1915(k))**—Allows states to offer community-based attendant services and supports to certain eligible beneficiaries who need LTSS and meet institutional care criteria. Among other requirements, states must provide these services on a statewide basis and in the most integrated community-based setting. States receive increased FMAP rates for this state plan option.

- **Health Homes (SSA Section 1945)**—Allows states to integrate services and coordinate care for targeted groups of Medicaid enrollees with complex or chronic physical or behavioral health needs. Target populations may include enrollees with (1) two or more chronic conditions, (2) one chronic condition who are at risk for a second, or (3) a serious and persistent mental health condition.

---

[46] For more information about these coverage options see CRS Report R43328, *Medicaid Coverage of Long-Term Services and Supports*.

States receive increased federal financial assistance for a specified period of time during the startup phase of this state plan option.

## Medicaid Service Spending

**Figure 4** below shows the nationwide distribution of Medicaid expenditures across broad categories of service for FY2021. These data illustrate that 55% of benefit spending was for capitated payments under managed care arrangements (see "Service Delivery Systems" for information about managed care). The remaining 45% of benefit spending was fee for service (FFS), and FFS spending on acute care services and LTSS each accounted for 18% of Medicaid benefit spending.

**Figure 4. Medicaid Medical Assistance Expenditures, by Service Category**

(FY2021)



**Source:** CRS analysis of CMS, Form CMS-64 Data as reported by states to the Medicaid Budget and Expenditure System, as of July 19, 2022, at https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

**Notes:** DSH = disproportionate share hospital.

Medical assistance expenditures exclude Medicaid expenditures for administrative activities. Managed care includes capitated payments under which Medicaid enrollees get most or all of their services through an organization under contract with the state (see "Service Delivery Systems" for information about managed care). Supplemental payments are Medicaid payments made to providers that are separate from and in addition to the standard payment rates for services rendered to Medicaid enrollees, and DSH payments are one type of supplemental payment. Acute care services include prescription drugs.

# Beneficiary Cost Sharing

Federal statutes and regulations address the circumstances under which enrollees may share in the costs of Medicaid, (1) in terms of participation-related cost sharing (e.g., monthly premiums), (2) point-of-service cost sharing (e.g., co-payments [i.e., flat dollar amounts paid directly to providers for services rendered]), and (3) share of cost for certain LTSS.

For the first two types of enrollee cost sharing, states can require certain beneficiaries to share in the cost of certain Medicaid services, but there are limits on (1) the amounts that states can impose, (2) the beneficiary groups that can be required to pay, and (3) the services for which cost sharing can be charged.[47]

---

[47] SSA §§1916 and 1916A. For more information about these limits, see CMS, *Cost Sharing Out of Pocket Costs*, at https://www.medicaid.gov/medicaid/cost-sharing/out-of-pocket-costs/index.html.

In general, premiums and enrollment fees often are prohibited. However, premiums may be imposed on certain enrollees, such as individuals with incomes above 150% of FPL, certain working individuals with disabilities, and certain children with disabilities.

States can impose cost sharing at the point of service, such as co-payments,[48] coinsurance,[49] deductibles,[50] and other similar charges, on most Medicaid-covered benefits up to federal limits that vary by income. Some subgroups of beneficiaries are exempt from cost sharing (e.g., children under 18 years of age and pregnant women).

The aggregate cap on participation-related cost sharing (e.g., monthly premiums) and point-of-service cost sharing (e.g., co-payments) is generally up to 5% of monthly or quarterly household income.[51]

For the third type of enrollee cost sharing, which applies to certain enrollees receiving Medicaid-covered LTSS, states are required to apply enrollees monthly income toward the cost of their care under *post-eligibility treatment of income (PETI)* rules.[52] These reductions in monthly income are not subject to the 5% aggregate cost-sharing cap described above. The amounts an enrollee may retain for their personal use vary by care setting (i.e., nursing facility versus home and community-based).

# Service Delivery Systems

In general, most benefits to Medicaid enrollees are delivered and paid for via two service delivery systems: *fee-for-service* (FFS) or *managed care*. Under the FFS delivery system, health care providers are paid by the state Medicaid program for each service provided to a Medicaid enrollee. Under the managed care delivery system, Medicaid enrollees get some or all of their services through an organization under contract with the state.

States traditionally have used the FFS service delivery model for Medicaid, but since the 1990s, the share of Medicaid enrollees covered by the managed care model has increased dramatically. Initially, states used managed care to deliver health care services to the healthiest Medicaid populations, including children and parents. However, recently, more states are turning to managed care for their aged and disabled populations.

There are three main types of Medicaid managed care:

- **Comprehensive risk-based managed care**—states contract with managed care organizations (MCOs) to provide a comprehensive package of benefits to certain Medicaid enrollees. States usually pay the MCOs on a capitated basis, which means the states prospectively pay the MCOs a fixed monthly rate per enrollee to provide or arrange for most health care services. MCOs then pay providers for services to enrollees.

- **Primary care case management (PCCM)**—states contract with primary care providers to provide case management services to Medicaid enrollees. Typically,

---

[48] A *co-payment* is a specified dollar amount for each item or service delivered.

[49] *Coinsurance* is a specified percentage of the cost or charge for a specific service delivered.

[50] A *deductible* is a specified dollar amount paid for certain services rendered during a specific time period (e.g., per month or quarter) before health coverage (e.g., Medicaid) begins to pay for care.

[51] SSA §1916A.

[52] SSA §1902(q), 42 C.F.R. 435.733. SSA §1915(c), 42 C.F.R. 435.735. For further information on these Post-Eligibility Treatment of Income rules, see CRS Report R43506, *Medicaid Financial Eligibility for Long-Term Services and Supports*.

under PCCM, the primary care provider receives a monthly case management fee per enrollee for coordination of care, but the provider continues to receive fee-for-service payments for the medical care services utilized by Medicaid enrollees.

- **Limited benefit plans**—these plans look like MCOs in that states usually contract with a plan and pay it on a capitated basis. The difference is that limited benefit plans provide coverage for only one or two Medicaid services (e.g., behavioral health or dental services).

As of July 1, 2020, almost 84% of Medicaid enrollees were covered by some form of managed care.[53] Four states (Hawaii, South Carolina, Virginia, and Washington) covered all Medicaid enrollees under managed care, and two states (Alaska and Connecticut) did not have any managed care coverage. The rest of the states use some combination of managed care and FFS coverage.[54]

The most prevalent type of managed care is the comprehensive risk-based managed care that is provided through MCOs, with 72% of Medicaid enrollees with comprehensive risk-based managed care as of July 1, 2020.[55] States' use of comprehensive risk-based managed care varies significantly, as shown in **Figure 5**.

---

[53] This figure excludes Medicaid enrollment in the territories. (CMS, *Medicaid Managed Care Enrollment and Program Characteristics*, *2020*, Table 4, Spring 2022, at https://www.medicaid.gov/medicaid/managed-care/ enrollment-report/index.html.)

[54] Ibid.

[55] Ibid.

**Figure 5. Percentage of Medicaid Enrollees with Comprehensive Risk-Based Managed Care, by State**

(As of July 1, 2020)



**Source:** CMS, *Medicaid Managed Care Enrollment and Program Characteristics, 2020,* Table 4, Spring 2022, at https://www.medicaid.gov/medicaid/managed-care/enrollment-report/index.html.

**Notes:** Medicaid enrollment in comprehensive managed care represents an unduplicated count of Medicaid beneficiaries enrolled in a managed care plan that provides comprehensive benefits (acute, primary care, specialty, and any other), as well as Programs for All-Inclusive Care for the Elderly (PACE). It excludes enrollees in the territories and enrollees who are enrolled in a Financial Alignment Initiative Medicare-Medicaid Plan as their only form of managed care.

# Financing

The federal government and the states jointly finance Medicaid.[56] The federal government reimburses states for a portion (i.e., the federal share) of each state's Medicaid program costs. Because federal Medicaid funding is an open-ended entitlement to states, there is no upper limit or cap on the amount of federal Medicaid funds a state may receive. In FY2021, Medicaid expenditures totaled $748 billion. The federal share totaled $518 billion and the state share was $231 billion.[57]

---

[56] For more information about Medicaid financing and expenditures, see CRS Report R42640, *Medicaid Financing and Expenditures*.

[57] May not sum to totals due to rounding. (CMS, Form CMS-64 Data as reported by states to the Medicaid Budget and Expenditure System, as of July 19, 2022, https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.)

## Federal Share

The federal government's share of most Medicaid expenditures is established by the federal medical assistance percentage (FMAP) rate, which generally is determined annually and varies by state according to each state's per capita income relative to the U.S. per capita income.[58] The formula provides higher FMAP rates, or federal reimbursement rates, to states with lower per capita incomes, and it provides lower FMAP rates to states with higher per capita incomes.

FMAP rates have a statutory minimum of 50% and a statutory maximum of 83%.[59] For a state with an FMAP of 60%, the state gets 60 cents back from the federal government for every dollar the state spends on its Medicaid program. In FY2023, FMAP rates range from 50% (12 states) to 77.86% (Mississippi).[60]

During the COVID-19 public health emergency period, the FFCRA provides a 6.2-percentage-point increase to the regular FMAP rates for all states, the District of Columbia, and the territories that meet certain conditions.[61] The FFCRA FMAP increase began on January 1, 2020, and the FFCRA FMAP increase is set to phase out from April 1, 2023, through December 31, 2023.[62]

The FMAP rate is used to reimburse states for the federal share of most Medicaid expenditures. Exceptions to the regular FMAP rate have been made for certain states (e.g., the District of Columbia and the territories), situations (e.g., during economic downturns), populations (e.g., the ACA Medicaid expansion population and certain women with breast or cervical cancer), providers (e.g., Indian Health Service facilities), and services (e.g., family planning and home health services). In addition, the federal share for most Medicaid administrative costs does not vary by state and is generally 50%.

While most federal Medicaid funding is provided on an open-ended basis, certain types of federal Medicaid funding are capped. For instance, federal disproportionate share hospital (DSH)[63] funding to states cannot exceed a state-specific annual allotment. Also, Medicaid programs in the territories (i.e., American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the Virgin Islands) are subject to annual spending caps.[64]

---

[58] For more detail about the federal medical assistance percentage (FMAP) rate, see CRS Report R43847, *Medicaid's Federal Medical Assistance Percentage (FMAP)*.

[59] SSA §1905(b).

[60] HHS, "Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2022 Through September 30, 2023," 86 *Federal Register* 67479, November 26, 2021, https://www.federalregister.gov/documents/2021/11/26/2021-25798/federal-financial-participation-in-state-assistance-expenditures-federal-matching-shares-for.

[61] For more information about the Families First Coronavirus Response Act (FFCRA; P.L. 116-127) FMAP increase and the conditions for states to receive this increase, see CRS Report R46346, *Medicaid Recession-Related FMAP Increases*.

[62] Initially, the FFCRA FMAP increase was set to end on the last day of the calendar quarter in which the COVID-19 public health emergency period ends, but the Consolidated Appropriations Act, 2023 (P.L. 117-328) delinks the FFCRA FMAP increase from the COVID-19 public health emergency period and begins phasing down the FMAP increase on April 1, 2023.

[63] For more information about Medicaid DSH payments, see CRS Report R42865, *Medicaid Disproportionate Share Hospital Payments*.

[64] For more information about Medicaid funding for the territories, see CRS In Focus IF11012, *Medicaid Financing for the Territories*.

Medicaid is a federal entitlement to states, and in federal-budget parlance entitlement spending is categorized as *mandatory spending*, which is also referred to as *direct spending*. Although most mandatory spending programs bypass the annual appropriations process and automatically receive funding each year according to either permanent or multiyear appropriations in the substantive law, Medicaid is funded in the annual appropriations acts. For this reason, Medicaid is referred to as an appropriated entitlement.[65]

## State Share

The federal government provides broad guidelines to states regarding allowable funding sources for the *state share* (also referred to as the *nonfederal share*) of Medicaid expenditures. However, to a large extent, states are free to determine how to fund their share of Medicaid expenditures. As a result, there is significant variation from state to state in funding sources.

States can use state general funds (i.e., personal income, sales, and corporate income taxes) and other state funds (e.g., provider taxes,[66] local government funds, tobacco settlement funds) to finance the state share of Medicaid. Federal statute allows as much as 60% of the state share to come from local government funding.[67] Federal regulations also stipulate that the state share not be funded with federal funds (Medicaid or otherwise).[68] In state FY2021, on average, 70% of the state share of Medicaid expenditures was financed by state general funds, and the remaining 30% was financed by other state funds.[69]

## Expenditures

Enrollment increases due to expansions of eligibility and economic downturns account for much of Medicaid's expenditure growth over time. However, Medicaid expenditures are influenced by economic, demographic, and programmatic factors, along with health innovations and advances. Economic factors include health care prices, unemployment rates,[70] and individuals' wages. Demographic factors include population growth and the age distribution of the population. Programmatic factors include state decisions regarding optional eligibility groups, optional services, and provider payment rates. Other factors include the number of eligible individuals who enroll, utilization of covered services, and enrollment in other health insurance programs (including Medicare and private health insurance).

**Figure 6** shows actual Medicaid expenditures from FY1997 to FY2021 broken down by state and federal expenditures. In FY2021, Medicaid spending on services and administrative activities in the 50 states, the District of Columbia, and the territories totaled $748 billion.[71]

---

[65] For more information about appropriated entitlements, see CRS Report RS20129, *Entitlements and Appropriated Entitlements in the Federal Budget Process*.

[66] States are able to use revenues from health care provider taxes to help finance their share of Medicaid expenditures as long as the provider tax is broad-based and uniform. For more information about provider taxes, see CRS Report RS22843, *Medicaid Provider Taxes*.

[67] SSA §1902(a)(2).

[68] 42 C.F.R. 433.51(c).

[69] National Association of State Budget Officers, *State Expenditure Report: 2022 State Expenditure Report Fiscal Years 2020-2022*, 2022, at https://www.nasbo.org/reports-data/state-expenditure-report.

[70] For information about how the unemployment rate affects Medicaid enrollment, see CRS In Focus IF11686, *Impact of the Recession on Medicaid* and CRS Report R46346, *Medicaid Recession-Related FMAP Increases*.

[71] CMS, Form CMS-64 Data as reported by states to the Medicaid Budget and Expenditure System, as of July 19, 2022,

**Figure 6. Federal and State Actual Medicaid Expenditures**

(FY1997-FY2021)



**Sources:** CMS, Form CMS-64 Data as reported by states to the Medicaid Budget and Expenditure System, as of July 19, 2022, at https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

**Note:** The expenditures shown in this figure are total Medicaid expenditures, which include both administrative and benefit spending.

Historically, in a typical year, the average federal share of Medicaid expenditures was about 57%, which means the average state share was about 43%. However, the federal government's share of Medicaid expenditures increased since the implementation of the ACA Medicaid expansion in January 2014, because the federal government is funding a vast majority of the cost of the expansion through the enhanced federal matching rates.[72] In addition, the FFCRA 6.2-percentage-point increase to the FMAP rates during the COVID-19 public health emergency has increased the federal share of Medicaid since January 2020. In FY2021, the average federal share of Medicaid is estimated to have been 69%.[73]

# Medicaid Program Waivers

The Social Security Act authorizes several waiver and demonstration authorities to provide states with the flexibility to operate their Medicaid programs. Waiver authorities permit states to disregard certain requirements and operate their programs outside of Medicaid rules. States submit waiver specifications or proposals outlining the demonstration program to CMS for approval prior to implementation. Under the various waiver authorities, states may try new or different approaches to the delivery of health care services or adapt their programs to the special needs of particular geographic areas or groups of Medicaid enrollees

---

https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

[72] For more information about the enhanced federal matching rates for the ACA Medicaid expansion, see CRS In Focus IF10399, *Overview of the ACA Medicaid Expansion*.

[73] CMS, Form CMS-64 Data as reported by states to the Medicaid Budget and Expenditure System, as of July 19, 2022, https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

Each waiver authority has a distinct purpose and specific requirements. The statutory requirements that may be waived under each type of waiver are different, but all types of waivers are time limited and approvals may be subject to reporting and evaluation requirements. In addition, certain waivers types must comply with various financing requirements (e.g., budget neutrality,[74] cost-effectiveness,[75] or cost-neutrality).[76] The primary Medicaid waiver authorities include the following:

- **Section 1115 Research and Demonstration Projects**—SSA Section 1115 authorizes the HHS Secretary to waive Medicaid requirements contained in SSA Section 1902 (including but not limited to rules regarding *freedom of choice* of provider, *comparability* of services, and *statewideness*) and/or provide expenditure authority for expenditures that do not otherwise qualify for federal financial participation under SSA Section 1903 (referred to as *costs not otherwise matchable*) in order to permit states to conduct experimental, pilot, or demonstration projects that, in the judgment of the Secretary of HHS, are likely to assist in promoting the objectives of the Medicaid program. States use this waiver authority in a variety of ways, for example, to change eligibility criteria to offer coverage to new groups of people; to condition Medicaid eligibility on an enrollee's ability to meet work or other community engagement requirements; to provide services that are not otherwise covered such as temporary housing support or other health-related social needs for specified populations; to offer different service packages or a combination of services in different parts of the state (e.g., coverage of nonelderly adults who are patients in institutions for mental disease);[77] to cap program enrollment, and to implement innovative service delivery systems.

- **Section 1915(b) Managed Care/Freedom of Choice Waivers**—SSA Section 1915(b) authorizes the HHS Secretary to waive the *freedom of choice* of provider requirement to establish mandatory managed care programs or otherwise limit enrollees' choice of providers.[78]

- **Section 1915(c) Home and Community-Based Services Waivers**—SSA Section 1915(c) authorizes the HHS Secretary to waive requirements regarding *comparability* of services and *statewideness* in covering a broad range of HCBS (including services not available under the Medicaid state plan) for certain persons with LTSS needs. States also may waive certain income and resource rules applicable to persons in the community, which means that a spouse's or parent's income and, to some extent, resources are not considered available to the applicant for the purposes of determining Medicaid financial eligibility. States may use

---

[74] *Budget neutrality* means the estimated spending under the waiver cannot exceed the estimated cost of the state's Medicaid program without the waiver.

[75] *Cost-effectiveness* means the cost of payments under managed care cannot exceed the cost of fee-for-service absent the waiver.

[76] Under the cost-neutrality test, expenditures under the waiver may not exceed the cost of institutional care that would have been provided to waiver recipients absent the waiver.

[77] For information about the institutions for mental disease exclusion, see CRS In Focus IF10222, *Medicaid's Institutions for Mental Disease (IMD) Exclusion*.

[78] There are four types of authorities under SSA §1915(b) that states may request: (b)(1) allows states to require Medicaid beneficiaries to enroll in managed care; (b)(2) allows states to designate a "central broker" to assist Medicaid beneficiaries in choosing among competing health care plans; (b)(3) allows states to use cost savings made possible through the recipients' use of more cost-effective medical care to provide additional services; and (b)(4) allows states to limit the beneficiaries' choice of providers (except in emergency situations, for recipients residing in a long-term care facility, and with respect to family planning services).

Section 1915(c) concurrently with other waiver authorities. For example, states may combine Sections 1915(b) and 1915(c) authorities to offer mandatory managed care for HCBS.

States often operate multiple waiver programs with their state plans. Key characteristics of these primary Medicaid waiver authorities compared with state plan requirements are summarized in **Table 2**.

### Table 2. Key Characteristics of the Primary Medicaid Waiver Authorities Compared to State Plan Requirements

| Key Characteristic | §1115 Research and Demonstration Waivers | §1915(b) Managed Care/Freedom of Choice Waivers | §1915(c) Home and Community-Based Services (HCBS) Waivers | Medicaid State Plan |
|---|---|---|---|---|
| **Number of Waivers (as of December 2022)** | 84 waivers (in 49 states and DC)[a] | 80 waivers (in 37 states)[b] | 263 waivers (in 47 states and DC)[b] | N/A |
| Statewideness[c] | √ | √ | √ | N/A |
| Comparability of Services[d] | √ | √ | √ | N/A |
| Freedom of Choice of Provider[e] | √ | √ | — | N/A |
| Income and Resource Rules[f] | — | — | √ | N/A |
| Federal Matching Funds for Costs Not Otherwise Matchable[g] | √ | √ | √ | N/A |
| **Evaluations Required** | √ | √ | √ | N/A |
| **Duration** | 5 year initial, generally renewed for up to 3-year intervals (or up to 10 years for specified waivers) | 2 year initial, renewed for up to 2-year intervals | 3 year initial, renewed for up to 5-year intervals | Once approved duration indefinite |
| **Financing** | Budget neutral over the life of the program | Must meet cost-effectiveness test | Must meet cost-neutrality test | Open-ended mandatory entitlement |
| **Enrollment Caps and Waiting Lists Permitted** | √ | — | √ | Individual entitlement |

**Source:** Prepared by CRS based on program rules and regulations.

a.  This waiver count identifies operational Section 1115 demonstration programs (including disaster-related Section 1115 waivers) as posted on the Centers for Medicare & Medicaid (CMS) website, as of December 19, 2022. Operational waivers are defined as Section 1115 waivers that have been granted CMS approval (and agreed upon by the state) for a current effective period as specified in the waiver Special Terms and Conditions (STCs), or as otherwise specified through a CMS waiver approval letter (e.g., a CMS approval

letter that grants a temporary extension for all [or part] of the underlying demonstration waiver). This count may include waivers that are pending implementation as long as there is official documentation to show that the state has accepted the waiver conditions as outlined in the STCs and related documents (e.g., extension letters, amendment letters). For a list of operational Section 1115 waivers and official waiver-related correspondence, see Medicaid.gov, "State Waivers List," at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/index.html.

b.   The waiver counts for Section 1915(b) and (c) waiver programs are the number of waivers listed as "approved" on the CMS website as of December 15, 2022.

c.   Waiving the statewideness requirement (as permitted under §1902[a][1] of the Social Security Act [SSA]) allows states to target waivers to particular areas of the state where the need is greatest or where certain types of providers are available, for example.

d.   Waiving comparability of services (SSA §1902[a][10][B]) allows states to target waiver services to particular groups of individuals or to target services on the basis of disease or condition.

e.   Waiving the freedom of choice requirement (SSA §1902[a][23]) allows states to implement managed care delivery systems or otherwise limit choice of provider.

f.   Waiving income and resource rules applicable to the community (SSA §1902[a][10][C][i][III])) means that a spouse's or parent's income and, to some extent, resources are not considered available to the applicant for the purposes of determining Medicaid financial eligibility.

g.   States may seek CMS approval to provide expenditure authority for expenditures that do not otherwise qualify for federal financial participation under SSA §1903.

During public health emergencies, additional waiver authorities are available under the Medicaid program (see textbox "Emergency-Related Authorities").

---

### Emergency-Related Authorities

Medicaid plays a critical role in helping states respond to public health emergencies (e.g., the COVID-19 public health emergency), as well as natural and human-made disasters. The Centers for Medicare & Medicaid Services (CMS) and state Medicaid agencies rely on emergency-related authorities for additional flexibility to support program operations and enrollee health care needs during times of crises. Key emergency statutory and waiver authorities include the following:

**Disaster Relief State Plan Amendments.** State plan amendments allow states to revise Medicaid eligibility, enrollment, and benefit requirements in their state plan for the duration of a disaster or emergency.

**Disaster-Related Section 1115 Waivers.** In an emergency, Section 1115 waivers may be approved without regard to normal process-related requirements and do not need to be budget neutral to the federal government.

**Section 1915(c) Appendix K Waivers.** Appendix K is a stand-alone appendix that states may use during emergency situations to request amendments to existing1915(c) Home and Community Based waivers.

**Section 1135 Waivers.** When certain emergency conditions are met, Section 1135 waivers allow the Department of Health and Human Services (HHS) Secretary to temporarily waive Medicaid statutory requirements, such as provider licensure, to ensure sufficient health care items and services are available to meet the needs of enrollees in an emergency area.

**Notes:** For more information, see CMS, Medicaid and CHIP Coverage Learning Collaborative, Inventory of Medicaid and CHIP Flexibilities and Authorities in the Event of a Disaster, August 20, 2018. For background information on emergency authorities and links to lists with state approvals; and CMS, Coronavirus Waivers & Flexibilities, last modified October 13, 2022. For more information about these emergency-related authorities during the COVID-19 public health emergency, see Medicaid.gov, "Coronavirus Disease 2019 (COVID-19)."

---

# Provider Payments

For the most part, states establish their own payment rates for Medicaid providers. Federal statute requires that these rates be consistent with efficiency, economy, and quality of care and sufficient to enlist enough providers so that covered benefits are available to Medicaid enrollees at least to

the same extent they are available to the general population in the same geographic area.[79] This is known as the *equal access provision*. Low Medicaid provider payment rates in many states and their impact on provider participation have been perennial concerns for policymakers.[80]

Provider payment reductions are a tool for states to manage Medicaid program costs. As a result, states' provider rate changes are often a function of the economy. For instance, during economic downturns, many states reduced Medicaid provider payment rates due to budget pressures, and during periods of improved state finances, more states increase rather than reduce provider rates.[81]

In some cases, states make supplemental payments to Medicaid providers that are separate from, and in addition to, the payment rates for services rendered to Medicaid enrollees. Medicaid DSH payments are one type of supplemental payment, and federal statute requires that states make Medicaid DSH payments to hospitals treating large numbers of low-income patients.[82] States also are permitted to make non-DSH supplemental payments to providers, but these payments must adhere to upper payment limits (UPLs) for certain institutional providers.[83] The institutions subject to the UPL requirement are hospitals (separated into inpatient services and outpatient services), nursing facilities, intermediate care facilities for individuals with intellectual disabilities, and freestanding nonhospital clinics.[84]

# Program Integrity

State Medicaid programs are required to conduct a number of program integrity activities to prevent improper payments resulting from waste, fraud, and abuse.[85] Some federal requirements, such as screening providers and suppliers before they enroll in state Medicaid programs, are intended to prevent improper payments from occurring,[86] while other requirements ensure states identify and recover overpayments made to providers and suppliers.[87]

---

[79] SSA §1902(a)(30)(A).

[80] Stephen Zuckerman, Laura Skopec, and Joshua Aarons, "Medicaid Physician Fees Remained Substantially Below Fees Paid By Medicare In 2019," *Health Affairs*, vol. 40, no. 2 (February 2021), pp. 343-348, https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2020.00611; Sandra L. Decker, "In 2011 Nearly One-Third of Physicians Said They Would Not Accept New Medicaid Patients, But Rising Fees May Help," *Health Affairs*, vol. 31, no. 8 (August 2012), pp. 1673-1679, https://www.healthaffairs.org/doi/10.1377/hlthaff.2012.0294.

[81] Elizabeth Hinton, et al., How the Pandemic Continues to Shape Medicaid Priorities: Results from an Annual Medicaid Budget Survey for State Fiscal Years 2022 and 2023, Kaiser Family Foundation and National Association of Medicaid Directors, October 25, 2022, https://www.kff.org/medicaid/report/medicaid-budget-survey-for-state-fiscal-years-2022-and-2023/.

[82] For more information about Medicaid DSH payments, see CRS Report R42865, *Medicaid Disproportionate Share Hospital Payments*.

[83] Under the upper payment limit (UPL), federal Medicaid funding is not available for Medicaid payments that are more than Medicare would pay for the same or comparable services, and the UPL is an aggregate limit for each class of providers rather than a limit for individual providers.

[84] For more information about Medicaid supplemental payments, see CRS Report R45432, *Medicaid Supplemental Payments*.

[85] SSA §1902(a)(64).

[86] SSA §1902(a)(77). State Medicaid programs also are required to monitor and report on the quality of care provided to Medicaid beneficiaries, SSA §1139(B).

[87] SSA §1903(d)(2).

State Medicaid programs have primary responsibility for preventing and, when necessary, recovering improper payments due to fraud, waste, abuse. State Medicaid agencies operate program integrity units. In addition, states operate Medicaid Fraud Control Units (MFCUs), generally through state attorney general offices. MFCUs are responsible for investigating fraud as well as patient abuse and neglect in facilities that receive state Medicaid payments.[88] Federal agencies responsible for Medicaid program integrity include CMS and the HHS Office of Inspector General (OIG). CMS administers the Medicaid Integrity Program, which audits and monitors state Medicaid programs as well as supports state program integrity efforts.[89] OIG has broad program integrity enforcement authority for all federal health care programs, including Medicaid.[90]

The federal government and states contribute equally to fund most state-based Medicaid program integrity activities, although for some activities, the federal government provides additional funds through enhanced FMAP rates. As mentioned earlier, all states receive the same FMAP rate for administrative expenditures, including most program integrity activities, which generally is 50%. States receive higher FMAP rates for selected administrative activities, such as 90% for the startup of MFCUs and 75% for ongoing MFCU operation.

# Additional Medicaid Resources

This section provides links to a number of Medicaid resources grouped by selected Congressional Research Service (CRS) products, other background resources, laws, regulations, and other information.

## Selected CRS Products

### Overview

- CRS In Focus IF10322, *Medicaid Primer*

### Eligibility

- CRS In Focus IF10399, *Overview of the ACA Medicaid Expansion*
- CRS Report R46111, *Medicaid Eligibility: Older Adults and Individuals with Disabilities*
- CRS In Focus IF11010, *Medicaid Coverage for Former Foster Youth Up to Age 26*
- CRS In Focus IF11912, *Noncitizen Eligibility for Medicaid and CHIP*
- CRS In Focus IF11830, *Medicaid and Incarcerated Individuals*

### Benefits

- CRS Report R45412, *Medicaid Alternative Benefit Plan Coverage: Frequently Asked Questions*
- CRS Report R43328, *Medicaid Coverage of Long-Term Services and Supports*

---

[88] SSA §1902(a)(61) and SSA §1903(q).

[89] SSA §1936.

[90] SSA §1902(a)(69).

- CRS In Focus IF11545, *Overview of Federally Certified Long-Term Care Facilities*
- CRS Report R43778, *Medicaid Prescription Drug Pricing and Policy*
- CRS In Focus IF10222, *Medicaid's Institutions for Mental Disease (IMD) Exclusion*
- CRS Report R46785, *Federal Support for Reproductive Health Services: Frequently Asked Questions*

## Financing

- CRS Report R42640, *Medicaid Financing and Expenditures*
- CRS Report R43847, *Medicaid's Federal Medical Assistance Percentage (FMAP)*
- CRS Report R46346, *Medicaid Recession-Related FMAP Increases*
- CRS In Focus IF11012, *Medicaid Financing for the Territories*
- CRS Report R42865, *Medicaid Disproportionate Share Hospital Payments*
- CRS In Focus IF10422, *Medicaid Disproportionate Share Hospital (DSH) Reductions*
- CRS Report R45432, *Medicaid Supplemental Payments*

## COVID-19

- CRS In Focus IF11664, *Medicaid Telehealth Policies in Response to COVID-19*
- CRS Report R46346, *Medicaid Recession-Related FMAP Increases*
- CRS In Focus IF11686, *Impact of the Recession on Medicaid*
- CRS Legal Sidebar LSB10430, *Section 1135 Waivers and COVID-19: An Overview*
- CRS Report R46481, *COVID-19 Testing: Frequently Asked Questions*

Other CRS reports on Medicaid are available at https://www.crs.gov/search/#/?termsToSearch=medicaid.

## Laws

Most federal Medicaid law is in SSA Title XIX (as amended): https://www.govinfo.gov/content/pkg/COMPS-8765/pdf/COMPS-8765.pdf

SSA Title XIX is codified in the *U.S. Code* (42 U.S.C. §1396 to 1396w-6): http://uscode.house.gov/view.xhtml?path=/prelim@title42/chapter7/subchapter19&edition=prelim

SSA Title XI has several general provisions relevant to Medicaid, including, for example, provisions on demonstration projects, the Center for Medicare & Medicaid Innovation, quality measures, and program integrity: https://www.govinfo.gov/content/pkg/COMPS-8763/pdf/COMPS-8763.pdf

SSA Title XI is codified in the *U.S. Code* (42 U.S.C. §§1301 to 1320f-7): http://uscode.house.gov/view.xhtml?path=/prelim@title42/chapter7/subchapter11&edition=prelim

*Reference Guide to Federal Medicaid Statute and Regulations* (Medicaid and CHIP Payment and Access Commission, MACPAC) can help with locating specific Medicaid provisions within the SSA:
https://www.macpac.gov/reference-guide-to-federal-medicaid-statute-and-regulations/

## Regulations

Most federal Medicaid regulations are in Title 42 of the *Code of Federal Regulations* (42 C.F.R. §§430.0 to 456.725):
https://ecfr.federalregister.gov/current/title-42/chapter-IV/subchapter-C

*Reference Guide to Federal Medicaid Statute and Regulations* (Medicaid and CHIP Payment and Access Commission, MACPAC) can help with locating specific Medicaid provisions within the *Code of Federal Regulations*:
https://www.macpac.gov/reference-guide-to-federal-medicaid-statute-and-regulations/

In addition to federal laws and regulations, CMS issues sub-regulatory program guidance through publications such as

- informational bulletins and letters to State Medicaid Directors
  https://www.medicaid.gov/federal-policy-guidance/index.html
- the State Medicaid Manual
  https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html
- frequently asked questions
  https://www.medicaid.gov/faq/index.html

## More Information

- Medicaid is administered at the federal level by CMS in HHS:
  https://www.cms.gov/
- CMS Office of the Actuary, "Medicaid: A Brief Summary," in *Brief Summaries of Medicare & Medicaid*:
  https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MedicareProgramRatesStats/SummaryMedicareMedicaid.html
- The federal Medicaid and CHIP Payment and Access Commission (MACPAC) publishes data and policy analysis and makes recommendations to Congress, the HHS Secretary, and states:
  https://www.macpac.gov/
- MACPAC, *Medicaid 101*:
  https://www.macpac.gov/medicaid-101/
- CMS, "Medicaid":
  https://www.medicaid.gov/medicaid/index.html
- MACPAC's "MACStats" compiles key national and state statistics from a variety of sources:
  https://www.macpac.gov/macstats/
- *CMS Fast Facts* has national statistics on beneficiaries, expenditures, and services:
  https://data.cms.gov/fact-sheet/cms-fast-facts

Each state operates its own Medicaid programs within federal guidelines.

- Links to information on each state's Medicaid program: https://www.medicaid.gov/state-overviews/index.html
- Links to each state's Medicaid agency website and contact information: https://www.medicaid.gov/about-us/beneficiary-resources/index.html#statemenu

## Author Information

Alison Mitchell, Coordinator
Specialist in Health Care Financing

Evelyne P. Baumrucker
Specialist in Health Care Financing

Kirsten J. Colello
Specialist in Health and Aging Policy

Angela Napili
Senior Research Librarian

Cliff Binder
Analyst in Health Care Financing

Sarah K. Braun
Research Librarian

## Key Policy Staff

| Area of Expertise | Name |
|---|---|
| Eligibility, benefits, cost sharing, waiver authorities, premium assistance models, and interaction with other federal programs | Evelyne Baumrucker |
| Prescription drugs, administration, program integrity, and dual-eligible beneficiaries | Cliff Binder |
| Long-term services and supports | Kirsten Colello |
| Financing, managed care, FMAP, DSH, ACA Medicaid expansion, provider taxes, provider payments, and territories | Alison Mitchell |

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.