**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| The STATE of ARIZONA, et al.,  ) | |
| ) | |
| *Plaintiffs,*  ) | |
| ) | |
| v.  ) | Civil Action No. 6:22-cv-01130 |
| ) | |
| MERRICK GARLAND,  ) | |
| in his official capacity as  ) | |
| Attorney General of the  ) | |
| United States, *et al.*,  ) | |
| ) | |
| *Defendants.*  ) | |

**DEFENDANTS' REPLY IN SUPPORT OF**
**THEIR MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.     PLAINTIFFS LACK ARTICLE III STANDING ...................................................1

    A.    Injury is judged as of the time of the operative complaint ...................................1

    B.    The Memorandum of Understanding (MOU) does not support finding standing ...............................................................................................................................4

    C.    Plaintiffs' arguments about the effects of other policies not challenged in this case are irrelevant to their standing to challenge the IFR ...................................4

    D.    The Court can consider Dr. Clemens' expert testimony that there is no evidence that the IFR has harmed Plaintiffs ........................................................................6

    E.    Plaintiffs' claim that the IFR increases grant rates is based on irrelevant data 10

    F.    Plaintiffs have not shown increased expenditures on public benefits form the rule ................................................................................................................12

    G.    Plaintiffs' alleged indirect financial injuries are attenuated and non-cognizable ...............................................................................................................................19

    H.    Plaintiffs cannot assert a standalone procedural injury ......................................22

II.    THE COURT LACKS JURISDICTION UNDER 8 U.S.C. § 1252(e) ................25

III.    THE COURT SHOULD DISMISS THE TAKE CARE CLAUSE AND SECURE FENCE ACT CLAIMS ........................................................................................26

CONCLUSION ................................................................................................................27

## TABLE OF AUTHORITIES

### CASES

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    38 F. Supp. 2d 114 (D.D.C. 1999) ......................................................................28

*Arizona v. Mayorkas*,
    584 F. Supp. 3d 783 (D. Ariz. 2022) ..................................................................9

*Biden v. Texas*,
    597 U.S. 785 (2022) .........................................................................................31

*BNSF Ry. Co. v. Bhd. of Maint. of Way Emps.*,
    550 F.3d 418 (5th Cir. 2008) ............................................................................18

*Boelens v. Redman Homes, Inc.*,
    759 F.2d 504 (5th Cir. 1985) ..............................................................................2

*Brnovich v. Biden*,
    630 F. Supp. 3d 1157 (D. Ariz. 2022) ...............................................................32

*California v. Texas*,
    593 U.S. 659 (2021) .........................................................................................20

*Campaign Legal Ctr. v. Scott*,
    49 F.4th 931 (5th Cir. 2022) .............................................................................30

*Cent. Pines Land Co. v. United States*,
    274 F.3d 881 (5th Cir. 2001) ............................................................................31

*City of Arlington, Tex. v. F.C.C.*,
    668 F.3d 229 (5th Cir. 2012) ............................................................................28

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .............................................................................................5

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ....................................................................................5, 20

*Comm'r v. Sunnen*,
    333 U.S. 591 (1948) .........................................................................................10

*Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020) ............................................................................26

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ............................................................................19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ..........................................................................................11

*Davis v. FEC*,
   554 U.S. 724 (2008) ........................................................................................4, 5

*DeCanas v. Bica*,
   424 U.S. 351 (1976) ..........................................................................................25

*Department of Homeland Security et al., v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) ......................................................................................26

*E. Bay Sanct. Covenant v. Biden*,
   2023 WL 4729278 (N.D. Cal. July 25, 2023) ....................................................26

*Florida v. United States*,
   660 F. Supp. 3d 1239 (N.D. Fla.) ........................................................................9

*Frank v. Gaos*,
   139 S. Ct. 1041 (2019) ......................................................................................28

*Gahagan v. USCIS*,
   911 F.3d 298 (5th Cir. 2018) ............................................................................31

*Gen. Land Off. v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ..........................................................................2, 3

*Guillory v. Dotmar Indus.*,
   95 F.3d 1320 (5th Cir. 1996) ............................................................................11

*Heston as Next Friend of A.H. v. Austin Indep. Sch. Dist.*,
   71 F.4th 355 (5th Cir. 2023) ..............................................................................9

*Jackson v. U.S. Dep't of Hous. & Urb. Dev.*,
   116 F.3d 477 (5th Cir. 1997) ............................................................................12

*Kaboh v. Barr*,
   826 F. App'x 381 (5th Cir. 2020) ......................................................................26

*Landry v. Biden*,
   64 F.4th 674 (5th Cir. 2023) ............................................................................25

*Laufer v. Mann Hosp., L.L.C.*,
   996 F.3d 269 (5th Cir. 2021) ............................................................................30

*Lightfoot v. D.C.*,
   273 F.R.D. 314 (D.D.C. 2011) ............................................................................9

iv

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ....................................................................................*passim*

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ............................................................................6, 7, 8

*Norton v. S. Utah Wilderness,*
    *All.*, 542 U.S. 55 (2004)................................................................................8

*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981) .............................................................4, 25, 29

*Paz v. Brush Eng'd Materials, Inc.,*
    555 F.3d 383 (5th Cir. 2009) ......................................................................11

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007) ................................................................................2, 7

*Smith v. Palafox,*
    728 F. App'x 270 (5th Cir. 2018) ...............................................................12

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ......................................................................27, 28, 29

*State of Tex. v. United States,*
    106 F.3d 661 (5th Cir. 1997) .......................................................................27

*Summer v. Earth Island Inst.,*
    555 U.S. 488 (2009)...............................................................................28, 30

*Taylor v. B&J Martin, Inc.,*
    611 F. Supp. 3d 278 (E.D. La. 2020) .....................................................15, 16

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ...................................................................30, 31

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) .......................................................................29

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .......................................................................26

*Town of Lantana Fla. v. Hopper,*
    102 F.2d 118 (5th Cir. 1939) .........................................................................4

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)...................................................................................30

*Ungerbuehler v. FDIC*,
   No. 5:08-cv-20, 2010 WL 3732205 (E.D. Ky. Sept. 20, 2010).........................................10, 12

*United States v. Kirk*,
   528 F.2d 1057 (5th Cir. 1976) ...............................................................................................31

*United States v. Texas*,
   599 U.S. 670 (2023) ...............................................................................................25, 27, 30

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) .....................................................................................................9

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) ..............................................................................................3, 29

*Winstead v. Georgia Gulf Corp.*,
   77 F. App'x 267 (5th Cir. 2003) ...........................................................................................12

## FEDERAL STATUTES

8 U.S.C. §1252(e)(3).........................................................................................................30, 31

8 U.S.C. § 1103....................................................................................................................32

8 U.S.C. § 1182(d)(5)(A) ......................................................................................................26

8 U.S.C. § 1225(b)(1)............................................................................................................26

8 U.S.C. § 1252(e) ...............................................................................................................30

8 U.S.C. § 1252(f)(1).............................................................................................................27

8 U.S.C. § 1252(a)(2)(A)........................................................................................................31

## STATE STATUTES

La. Rev. Stat. § 25:651..........................................................................................................19

## FEDERAL RULES

Fed. R. Civ. P. 26.................................................................................................................15

Fed. R. Evid. 702 .................................................................................................................11

## FEDERAL REGULATIONS

8 C.F.R. § 274a.12(c)(11)......................................................................................................24

# INTRODUCTION

As explained in Defendants' Motion to Dismiss, ECF No. 214-1 ("Mot."), the Court should dismiss this case because Plaintiffs lack Article III standing and their claims are not justiciable. Plaintiffs do not meaningfully respond to these arguments in their opposition. *See* ECF No. 217 ("Opp."). Instead, Plaintiffs attack other policy decisions that they do not challenge in their complaint and that are unrelated to the rule they challenge in this case, attempt to shift the burden to Defendants, and argue that the Court should find standing based on speculative, unsupported allegations of possible future harm. *Id*. In response to a factual attack on standing, however, where Defendants provided evidence that contradicts Plaintiffs' allegations of harm, Plaintiffs must provide concrete evidence of harm traceable to the rule to survive dismissal. Despite nearly a year of reciprocal jurisdictional discovery, neither Louisiana nor Florida has produced or identified any concrete evidence of harm traceable to the Interim Final Rule ("IFR") at issue in this case. This Court also lacks jurisdiction under § 1252(e)(3) and Plaintiffs' arguments to the contrary are based on case law that has been reversed by the Supreme Court. And Plaintiffs fail to meaningfully defend their Secure Fence Act and Take Care Clause claims.   The Court should dismiss this case.

# ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING

### A.  Injury is judged as of the time of the operative complaint.

Plaintiffs first argue that the Court cannot consider anything occurring after their April 28, 2022 complaint when analyzing standing because standing is ordinarily determined at the time the complaint was filed. Opp. at 14. Opp. at 14. Plaintiffs are incorrect. Standing is judged based on the facts at the time of the *operative* complaint. Where, as here, Plaintiffs amended the complaint, the Supreme Court has held that standing is assessed as of the time of the amendment. While "[t]he existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint*

*is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992), "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) ("we must look to the amended complaint in assessing … jurisdiction")). The Court should thus assess standing as of November 10, 2022, when Plaintiffs filed the operative complaint in this case. *See* ECF No. 86.

Plaintiffs failed to allege any concrete injury in their November 2022 amended complaint even though the IFR had been in effect for some time at that point, and during nearly a year of discovery, failed to produce any evidence of harm traceable to the rule. This failure dooms any claim to standing. Mot. at 25-27. Plaintiffs cite *Gen. Land Off. v. Biden*, 71 F.4th 264, 269 (5th Cir. 2023), to argue a lack of evidence of harm in the months following the IFR cannot defeat standing based on their incorrect argument that evidence—or lack thereof—after the initial complaint is irrelevant. Opp. at 14. But *Gen. Land Off.* says nothing about facts that pre-date an amended complaint and, unlike here, the court had to take the allegations in that case as true because defendants did not raise a factual attack on standing. *See id.* at 269, 272 (noting "[i]njury in fact [was] not at issue" because the "Federal Defendants [did] not contest the sufficiency" of plaintiffs' pleading with respect to harm). Here, Defendants contest that Plaintiffs have evidence to support any allegations of harm from the rule. If Plaintiffs have any such evidence, they did not produce it in discovery or identify it anywhere in their response brief. As "[t]he party invoking federal jurisdiction" Plaintiffs "bear[ ] the burden of establishing" standing, *Lujan,* 504 U.S. at 561, and in response to a factual attack on standing, that burden requires producing evidence to support any allegation of harm by a preponderance of the evidence, *see Williamson v. Tucker*, 645

F.2d 404, 413 (5th Cir. 1981); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).[1]

Perhaps acknowledging their inability to show evidence of actual harm, Plaintiffs raise, but do not develop, an argument that "the injury required for standing need not be actualized," and that a "party facing prospective injury has standing to sue." Opp. at 14 (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). This argument faces the same problems. Plaintiffs cannot rely on allegations of prospective harm when the evidence prior to the operative complaint forecloses any argument for imminent harm. A prospective injury must still be "actual or imminent" or "*certainly* impending," to establish standing. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (emphasis in original). Even assuming Plaintiffs believed they faced imminent injury when they first filed suit, they cannot show any such injury came to pass in the months after the IFR became effective and until November 2022 when they amended their complaint, despite extensive jurisdictional discovery. To raise a "prospective injury," Plaintiffs still must show "the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). They have failed that test. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) ("Abstract injury is not enough"—"injury must be both real and immediate, not conjectural or hypothetical."); *Clapper*, 568 U.S. at 409 ("allegations of *possible* future injury are not sufficient" (quotation marks and brackets omitted)); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("a regulation is

---

[1]   In a factual attack on standing, no presumption of truthfulness attaches to Plaintiffs' allegations, and they must prove harm by a preponderance of the evidence. Mot. at 7. Plaintiffs argue "the Court must accept as true all allegations not specifically disputed," citing out of context language in a 1939 case. Opp. at 13-14 (citing *Town of Lantana Fla. v. Hopper*, 102 F.2d 118, 119 (5th Cir. 1939)). The Fifth Circuit ultimately resolved *Lantana* based on the allegations that were denied, noting that jurisdiction, "though properly alleged must be proved by plaintiff if denied by defendant." *Id*. Where, as here, Defendants dispute Plaintiffs' allegations and produced evidence showing the IFR has not harmed them, and Plaintiffs have failed to produce any contrary evidence, the Court must dismiss because, "if the issue is presented in any way the burden of proving jurisdiction rests upon him who invokes it," and where "plaintiff fail[s] to sustain the burden of proving jurisdiction, there [is] nothing for the District Court to do but dismiss." *Id*.

not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation").[2]

### B. The Memorandum of Understanding (MOU) does not support finding standing.

Plaintiffs argue that a 2021 MOU that stated certain changes to immigration policy may affect States supports their argument for standing. Opp. at 15. As explained, Plaintiffs are incorrect because injury is a jurisdictional requirement that must be established as a matter of fact and cannot be manufactured by agreement—as Plaintiffs concede, *see* Opp. at 16—especially one that was void from the start. Mot. at 15-16. Plaintiffs seek to prop up the MOU by arguing Rodney Scott reviewed the MOU and agreed with some of its statements, and they urge the Court to treat those statements as admissions of fact. Opp. at 15-16. The problem with this argument is the MOU contains no factual allegations related to the IFR at all. This is not surprising because the MOU is from January 2021, well before the IFR was announced. The MOU thus contains no relevant facts, and Rodney Scott's agreement with certain statements in the MOU does nothing to meet Plaintiffs' burden to show standing. Plaintiffs must show "a causal connection between" the "conduct complained of"—the IFR—and a concrete "injury." *Lujan*, 504, U.S. at 560. An MOU that says nothing about the rule cannot establish injury that is fairly traceable "to the challenged action." *Id*.

### C. Plaintiffs' arguments about the effects of other policies not challenged in this case are irrelevant to their standing to challenge the IFR.

Plaintiffs next raise arguments about various other policies that are unrelated to the challenged rule. They cite actions related to visa restrictions, Opp. at 16, the border wall, *id.*, and

---

[2]   The evidence post-dating the operative complaint only further confirms that the IFR has had no negative impact on Florida or Louisiana, and that Plaintiffs did not assert any imminent injury at the time of the operative complaint.

detention space, *id.* at 16-17, as "expediting the flow of people into the United States," *id.*, and argue the Administration ignored warnings about the decision to end the Migrant Protection Protocols, *id.* at 17 Even if any of these things were true, Plaintiffs do not argue any of these separate decisions relate to the IFR, nor could they. Plaintiffs must establish concrete harm traceable to the rule to establish standing, and their disagreements with the Administration's approach to unrelated policy choices they do not challenge here does nothing to make that showing.

The APA authorizes challenges "to discrete agency action," such as a particular rule, and thus "precludes the kind of broad programmatic attack" Plaintiffs raise here. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see also* 33 Charles Alan Wright *et al.*, Fed. Prac. & Proc. § 8322 (2d ed., Apr. 2021) (The APA "does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'"). Plaintiffs must prove harm and link that harm directly to "some particular 'agency action'," *i.e.*, the IFR they challenge. *Lujan*, 497 U.S. at 891. They "cannot seek *wholesale* improvement" of the Executive's approach to immigration or establish standing to challenge the IFR based on unsupported allegations about unrelated policy choices. *Id.*; *see also Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 (9th Cir. 2021) ("Plaintiffs cannot obtain review of *all* of DHS's individual actions pertaining to … immigration in one fell swoop by simply labeling them a program." (quotation marks omitted)); *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 791 (D. Ariz. 2022); *Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011).[3]

---

[3]   Plaintiffs also argue for issue preclusion for facts found adversely to the United States in *Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla.), Opp. at 17 n.4, but the IFR was not challenged in that case, so any facts found in *Florida* are irrelevant and not a basis for issue preclusion. *Heston as Next Friend of A.H. v. Austin Indep. Sch. Dist.*, 71 F.4th 355, 357 (5th Cir. 2023) ("issue preclusion 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged'" (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948)).

Plaintiffs next argue, again exclusively by reference to other policies not at issue in this case, that changes to immigration policy can affect migration, including creating "pull factors" that can increase "border flow." Opp. at 17-18. Again, Plaintiffs fail to link their argument to the IFR. Indeed, when asked whether the rule is a significant pull factor now, Plaintiffs' own expert testified "the answer to that is it's de minimis." Opp. Ex. 257 at 140:3-5. Plaintiffs must show implementing the IFR directly caused them harm, and they make no real attempt to do so.

Plaintiffs' argument about the effect of the IFR is limited to hearsay that an unnamed Border Patrol official advised an unknown DHS official that the proposed rule could increase border flow. Opp. at 18-19; Opp. Ex. 250 at 83:1-20 (stating that "one of my staff members vented directly to me that" "[h]e was talking to one of the political appointees, I do not know which one" about the "idea" for the rule "before publication").[4] In any event, statements of an unnamed official about the "idea" for the rule before the final version was drafted and issued cannot overcome the actual evidence Defendants have submitted showing that there is no basis to conclude the IFR was a pull factor or harmed Florida or Louisiana. *See* Mot. at 11-12 (summarizing expert evidence that encounters were lower in the months following the IFR).

### D. The Court can consider Dr. Clemens' expert testimony that there is no evidence that the IFR has harmed Plaintiffs.

<u>Dr. Clemens' expert report is admissible.</u> Plaintiffs next challenge the admissibility of Dr. Clemens' expert report, but there is no merit to their argument. Opp. at 24. Under Rule 702,[5] Dr.

---

[4]   Plaintiffs argue this hearsay is "an admission by a party opponent," Opp. at 19, but, among other problems, they have not provided the actual statement, just a relaying of it by another person, making it hearsay within hearsay, and without even naming the person who made, it is impossible to determine whether they had the authority to speak for the agency. *See Ungerbuehler v. FDIC*, No. 5:08-cv-20, 2010 WL 3732205, at *7 (E.D. Ky. Sept. 20, 2010).

[5]   Rule 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify so long as: a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; b) the testimony is based on sufficient facts or data; c) the testimony is the product of reliable

Clemens is clearly qualified to provide expert testimony. Dr. Clemens was trained as an economist at Harvard University and is now a tenured professor. Mot. Ex. M at 20, 31. He has 21 years of experience conducting peer-reviewed research, specializes in the causes and effects of international migration, and has proffered his opinion using statistical methods and tools that are considered best practices by other experts in his discipline. *Id.* at 1; Opp. Ex. 2 at 142:10-19. [6]

Plaintiffs cite two cases for the proposition that Dr. Clemens' expert report is inadmissible because it is unsworn. Opp. at 24 (*citing Smith v. Palafox*, 728 F. App'x 270, 275-76 (5th Cir. 2018); *Winstead v. Georgia Gulf Corp.*, 77 F. App'x 267, 271 (5th Cir. 2003)). But those cases are inapplicable because they concern the evidentiary standard on a motion for summary judgment. Dr. Clemens' expert report was produced as part of jurisdictional discovery, and Rule 26(a)(2)(B) does not require that expert reports be sworn—just signed, which Dr. Clemens' report is. Similarly, while Plaintiffs point to *Jackson v. U.S. Dep't of Hous. & Urb. Dev.*, 116 F.3d 477 (5th Cir. 1997) for the proposition that "materials outside the pleadings must conform to the rules and standards of admissibility," Opp. at 24, the admissibility standards *Jackson* refers to are those "that govern at trial." *Id.* at *2. Of course, at trial, Defendants would rely on Dr. Clemens' testimony rather than his report. Indeed, even Rule 56 allows a party to offer a statement provided it could be reduced to admissible form at trial. Rule 56(c)(2). In short, Defendants complied with the requirements for expert reports as set forth in Rule 26. Plaintiffs have no basis to challenge the authenticity of Dr. Clemens' report. They deposed Dr. Clemens under oath, and Dr. Clemens acknowledged authoring

---

principles and methods; and d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

[6]  This is not the correct forum for Plaintiffs to challenge an expert designation. Plaintiffs cite two additional cases addressing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *See Paz v. Brush Eng'd Materials, Inc.*, 555 F.3d 383, 388-89 (5th Cir. 2009); *Guillory v. Dotmar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996). However, Plaintiffs have not filed a *Daubert* motion, so these cases are unnecessary in this analysis.

his report and adopted the conclusions set forth therein. Opp. Ex. 2 at 27:12-14 ("My report is complete given the information that I had when preparing it and which I summarize in it.").[7]

<u>Dr. Clemens' analysis discredits Plaintiffs' standing argument</u>. As to the substance of Dr. Clemens' report, Plaintiffs make several arguments, none of which support standing. Opp. at 24-27. First, Plaintiffs dispute the data used by Dr. Clemens, contending that he used an "oddly limited set of data." Opp. at 24. Dr. Clemens explained that his data series includes a vast timeframe, from October 2011 through March 2023. Mot. Ex. M at 3-4; Opp. Ex. 2 at 165:21-166:3. He also used a large assortment of public data including from CBP and the Syracuse University Transactional Records Access Clearinghouse ("TRAC") comprehensive database on all inadmissible migrants encountered at the southwest border, along with data on U.S. unemployment rates and the implementation of the IFR. Mot. Ex. M at 3-4, 7-8; Opp. Ex. 2 at 15:16-17:18; 84:12-16. Dr. Clemens also accounted for possible inconsistencies in definitions in different data sets. Opp. Ex. 2 at 65:3-9; 66:9-67:5.

Plaintiffs also argue over the scope of the data, particularly related to undetected unlawful entries they referred to as "gotaways." Gotaways are not processed under the IFR because a noncitizen would need to encounter an immigration officer to be processed under the IFR, so this data is not relevant. Moreover, Dr. Clemens explained that "gotaway" data is also unnecessary because the estimated percentage for all attempted unlawful border crossings intercepted by CBP was highly stable between FY 2014-2021, so there is no reason to conclude a sudden change occurred. Opp. Ex. 2 at 99:11-103:10. [8]

---

[7]    Plaintiffs' argument that Dr. Clemens improperly relied on post-complaint data, Opp. at 24, lacks merit for the reasons noted because the data pre-dates the operative complaint. *Supra* I.A.

[8]    Plaintiffs attempt to weaken Dr. Clemens' expertise in econometrics by testing him on border patrol techniques and tactics, such as the use of aerostats, *i.e.*, aerial cameras, to detect "gotaways," but this approach is ineffective because Dr. Clemens has the qualifications necessary to opine on

Second, Plaintiffs emphasize the limits of Dr. Clemens' analysis, Opp. at 26, but his analysis nonetheless provides strong evidence that the IFR has not negatively affected Florida or Louisiana. Dr. Clemens explained that border flow is driven by "a complex confluence" of factors, such as "relative incentives, information, perceptions, means, and opportunity." Opp. Ex. 2 at 42:12-18. For this reason, he engaged in three separate, in-depth tests and analyses, (Mot. Ex. M at 3-11), *all* of which demonstrate there is *no* evidence that the IFR, by itself,[9] is "sufficient to substantially affect overall CBP encounters at the Southwest Border." *Id.* at 3. The force of the three tests come from analyzing them together, but even in isolation *none* of these tests detected a positive effect.[10] Opp. Ex. 2 at 127:11-128:9.

Third, Plaintiffs raise critiques of Dr. Clemens' conclusions based on statements from a non-economist and former political appointee, Rodney Scott. But Mr. Scott's views on border operations cannot overcome the comprehensive analysis figures supplied by Dr. Clemens using established methods in his field. *See generally* Ex. M. In contrast, Plaintiffs' putative expert, Mr.

---

the factual assertions made in the complaint and conduct the research to determine if there is an effect on migration due to the implementation of the IFR.

[9]   Dr. Clemens determined the effect of the IFR separate from other policies using two time-series econometrics. Opp. Ex. 2 at 75:19-77:18. One test used information before the IFR to assess patterns in individuals unaffected by the policy, and the second test used information from before and after the enactment of the policy. *Id.* at 78:3-22; 84:8-11.

[10]   Plaintiffs attack Dr. Clemens' use of an ARIMA model, Opp. at 26, n.9, but provide no contrary expert evidence undermining the usefulness of such models. As Dr. Clemens explained, "the ARIMA model is the most well-established and commonly-used method for assessing patterns in univariate time series and making predictions based on those patterns." Opp. Ex. 2 at 213:7-10. Based on the data, Dr. Clemens found the ARIMA model was "highly informative because [] from [his] decades of experience doing an applied econometrics model that is capable of making an out-of-sample prediction of a highly varying time series over a substantial period like this that matches to a degree of 1.4 percent is an extraordinarily informative and predictive model." *Id.* at 169:3-9. Plaintiffs' questions, such as those requesting a "goodness of fit" or the use of a logarithmic scale were simply not relevant to Dr. Clemens' conclusions. *Id.* at 158:11-22; 179:5-10. Plaintiffs also critique Dr. Clemens' third test on whether migrants reacted to public information about the policy change in the way that the Complaint in this case asserts. Opp. at 27, n.9; Mot. Ex. M at 9. Plaintiffs' critique is, however, based on information that was not contained in the IFR, and so is irrelevant to the test Dr. Clemens performed.

Scott, did not submit an expert report and has not held himself out as an expert.[11] Last, Plaintiffs undermine their own standing argument by stating that "[t]he Asylum IFR has only been implemented for a tiny percentage of asylum applicants," Opp. at 27, effectively conceding their claims are not yet ripe for adjudication.

### E.  Plaintiffs' claim that the IFR increases grant rates is based on irrelevant data.

As explained, Plaintiffs' theory of injury is belied by the facts because the evidence demonstrates the IFR has neither increased the positive-credible-fear rate nor the asylum-grant rate, indicating that there are not, nor is there reason to expect there will be, more noncitizens present in the United States due to the IFR.[12] Mot. at 12-14.

Plaintiffs do not and cannot dispute the math based on publicly available statistics presented by Defendants. *Id.* Instead, they quibble in the margins. They first argue that the IFR's provision streamlining the asylum application process means there will be more asylum grants because, absent that provision, some percentage of those noncitizens might fail to submit asylum applications. Opp. at 27-28. However, Plaintiffs offer no evidence that that percentage of noncitizens did not pursue asylum applications because they were seeking or had obtained other types of immigration status or relief from removal. And they compound their error by relying on outdated data: Plaintiffs cite statistics from FY 2008-2019, when more recent statistics from 2022

---

[11]    Plaintiffs proffered Mr. Scott as a non-retained expert. Under Rule 26(a)(2)(c)(ii), he was required to provide a summary of his opinions and the facts supporting them. *Id.*; Fed. R. Civ. P. 26, Adv. Comm. Note (2010); *Taylor v. B&J Martin, Inc.*, 611 F. Supp. 3d 278, 289 (E.D. La. 2020). The disclosure he provided, however, contained a list of assertions Mr. Scott contends are facts, not his opinions. Opp. Ex. 250 at 87:5-88:4 (referring to each statement in his disclosure, "[E]very one of them is a fact."). Mr. Scott also testified that he had not seen the disclosure until the day before his deposition. *Id.* at 58:14-21. Therefore, these factual assertions cannot be credibly considered as Mr. Scott's if he did not prepare, review, or even read the disclosure before it was produced. This Court should therefore not consider him an expert witness.

[12] And even if Plaintiffs demonstrated more noncitizens present due to the IFR, this would not establish standing absent evidence that those same noncitizens caused a net increase in costs to the state. *See, e.g.*, Mot. at 8-24.

immediately preceding implementation of the IFR show the credible fear rate at only 66% (not the 83% Plaintiffs cite) and indicate that the nationality makeup of the encountered population has shifted since previous years, which alters relevant factors such as the type of relief available (as does the timing of noncitizen's entry into the United States, which Plaintiffs' analysis also ignores). *See* www.uscis.gov/sites/default/files/document/data/AsylumDivisionQuarterlyStats _FY22Q2_Screening_Outcomes_ASY_Division.csv; *see also* U.S. DHS, Refugees and Asylees Annual Flow Report, "Refugees and Asylees: 2020," Table 6a, https://www.dhs.gov/ohss/topics /immigration/refugees-asylees-AFR. Plaintiffs take issue with Defendants not addressing the pre-IFR percentage of noncitizens who fail to pursue asylum claims, but the abandonment rate is wholly irrelevant to the central question posed by Plaintiffs' theory of standing and directly addressed by Defendants' calculation: do asylum officers grant asylum more often than immigration judges? The data shows they do not.

Plaintiffs next argue that the IFR's treatment of a positive credible fear finding as an asylum application removes some procedural hurdles the noncitizen might otherwise face if attempting to gain asylum outside of the IFR's asylum merits interview ("AMI") process. Opp. at 27-28. But their contention about a slightly less onerous administrative *procedure* bears no relation to the *substantive* meritoriousness of the claims undergoing that procedure, and Plaintiffs offer no evidence that asylum officers have granted asylum in even one AMI case where asylum was not merited under the statutory standard.[13] Further, Plaintiffs suggest there are no procedural requirements to obtain asylum through an AMI, which is inaccurate: the noncitizen still must show up for and actively participate in the interview, submit further evidence as requested or necessary to meet their burden of proof, and pursue the claim if referred to immigration court, to name a few

---

[13]   Similarly, Plaintiffs offer no evidence any alleged "ideological predilections" of the director of USCIS or its union led to even one case asylum grant that was not merited. *See* Opp. at 29.

examples. *See, e.g.,* 87 Fed. Reg. at 18081-82.

Finally, Plaintiffs attempt to argue that the asylum grant is not as low under the IFR as the math otherwise demonstrates by adding the immigration judge ("IJ") grant rate to the rate for asylum officers conducting AMIs. Opp. at 28-29. But Plaintiffs do not challenge IJ asylum grants; indeed, they claim injury from the IFR due to its shifting some of the asylum adjudication arising from credible-fear screening *from IJs* to asylum officers, who they claim will grant asylum more frequently. *See, e.g.*, ECF No. 86 ¶¶ 3-6. Thus, the relevant comparison as to Plaintiffs' alleged injury is the rate of granting asylum on the same population at issue here—noncitizens demonstrating a credible fear and seeking to establish asylum defensively to removal—which means IJ figures for processing outside the IFR  (because they were responsible for granting asylum to this population then) versus asylum officer AMI figures under the IFR (when they received the opportunity to adjudicate asylum for some of this population). As Defendants explained, that comparison demonstrates that asylum is being granted by asylum officers in AMIs less frequently than by IJs under pre-IFR procedure in FY 2017-2021, dooming Plaintiffs' argument that the AMI process created by the IFR leads to more grants of asylum. Mot. at 13.[14]

### F. Plaintiffs have not shown increased expenditures on public benefits from the rule.

Louisiana and Florida allege harms in the form of costs incurred from providing various governmental services. Opp. at 20-23. Plaintiffs have provided no evidence to support these allegations or demonstrate an actual injury traceable to the IFR.[15]

---

[14]   The unchanged or declining grant rates also foreclose Plaintiffs' argument that the AMI procedures increase fraudulent claims, Opp. 19-20, because if the IFR led to grants of fraudulent claims as compared to IJs, there would be evidence the grant rate had increased.

[15]   At various points in their brief, Plaintiffs ask the Court to draw an adverse inference against Defendants for, in their view, "proffering a small number of documents and an unsworn expert report." Opp. at 29. An adverse inference is a sanction for destroying evidence or disregarding a Court order to provide evidence, which has no application here. *See, e.g., BNSF Ry. Co. v. Bhd. of Maint. of Way Emps.*, 550 F.3d 418, 424 (5th Cir. 2008).

Education. In claiming injury based on education services, Plaintiffs focus on "alien children who are not English speakers" and claim this is a "rough proxy" for immigrant students. Opp. at 21. Plaintiffs claim Louisiana has more than 33,000 English Language Learned ("ELL") students and Florida has over 116,000 immigrant students. *Id.* These allegations are not sufficient.

First, ELL students and immigrant students are not the equivalent of noncitizen students who were released under the IFR, which is what Plaintiffs would have to track to show actual injury traceable to the IFR. Louisiana admits ELL students are not synonymous with immigrants and they do not track the citizenship status of its students. Mot. Ex. O at 52:9-12; 43:22-44:10; 53:9-11. For the first time in their opposition, Plaintiffs claim "experts" estimate that 6% of Louisiana and 31% of Florida public school students are from noncitizen households. Opp. at 21. But these numbers are not relevant to the Court's analysis. First, Plaintiffs concede these are only "estimates," which cannot meet their burden to show actual injury. *See Crane v. Johnson*, 783 F.3d 244, 255 (5th Cir. 2015) (holding that State's allegation of a fiscal burden was too speculative because it was based on estimates of the annual cost of immigration). Second, whether a student is from an "alien household" is not the relevant inquiry—Plaintiffs have the burden to prove they have suffered higher costs due to noncitizen students released under the IFR. As discussed in Defendants' motion, Plaintiffs cannot show any actual injury based on education costs traceable to the IFR. Mot. at 19-21.[16]

Neither Florida nor Louisiana has  shown that their overall expenses on education have risen because of the IFR. In fact, the overall number of students in Louisiana has decreased since

---

[16]   Plaintiffs' attempt to equate ELLs with migrants falls short for another reason. In Louisiana, the Legislature has continued to "preserve, promote, and develop Louisiana's French and Creole culture, heritage and language," La. Rev. Stat. § 25:651, and Louisiana has created French immersion programs all over the state. *Id.* It follows that any student speaking French or Creole at home who attends regular public school in Louisiana would be considered an ELL, further undercutting Plaintiffs' claim that ELL is a proxy for noncitizen students.

the IFR was implemented. Mot. Ex. Q. Despite Plaintiffs' attempt to claim otherwise, Opp. at 36 n.12, this fact is relevant to the standing analysis because the Court must consider net costs when determining harm. Mot. at 18-19. Despite months of discovery, Plaintiffs concede they can provide nothing more than estimates as to the number of noncitizen students in their states. Opp. at 21. Such broad numbers, not traceable to the IFR, are not sufficient. Mot. at 25-27.

Emergency Medical Care. Plaintiffs have the same problem with their alleged injuries as a result of emergency medical care. While emergency Medicaid is available regardless of immigration status, the States have not shown that they have made emergency Medicaid expenditures for any additional noncitizens because of the IFR. *See* Mot. Ex. T ¶ 4. Plaintiffs claim that Florida pays between $1M and $6M on "aliens … receiving emergency medical services each month." Opp. at 21-22. Plaintiffs provide these numbers only as to noncitizens generally, which encompasses individuals in many possible immigration statuses, including individuals here long before the IFR. *Id.* They have failed to show that these alleged expenditures on "aliens" were for individuals paroled or granted asylum under the IFR.

Plaintiffs' purported injuries from noncitizens using emergency medical services also requires multiple levels of "speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Noncitizens would have to be paroled or granted asylum under the IFR, then go to Louisiana or Florida, have a medical emergency, go to the hospital or public clinic for medical treatment, and not have health insurance or pay for those services out of pocket. Such a string of speculation is not sufficient to prove standing. *See California v. Texas*, 593 U.S. 659, 674-676 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing … is ordinarily substantially more difficult to establish.'" (quoting *Lujan*, 504 U.S. at 562)). Without being able to trace these costs to the IFR or show that they suffered an increase in their overall expenses in this area because of the IFR,

Plaintiffs cannot have standing based on these expenditures.

_Medicaid, SNAP, TANF._ Plaintiffs contend the IFR has increased the number of individuals eligible for SNAP, TANF, and Medicaid, Opp. at  22, implying that their expenditures for such programs have increased. _Id._ But Plaintiffs have not provided the Court with any evidence that their costs for SNAP, TANF, or Medicaid have gone up, let alone due to the IFR. Nor have they even demonstrated that more individuals are eligible for these programs now than were before. As to both eligibility and net expenses, Plaintiffs have not put forth data showing harm.

Plaintiffs claim that they "spend Medicaid funds on asylees." Opp. at 22. In support of this assertion, they cite a declaration from Kimberly Sullivan. Opp. at 22. But Ms. Sullivan simply attests that "every year," Louisiana incurs a cost for providing Medicaid benefits on behalf of asylees. Sullivan Decl. at ¶ 7. Critically, she does not claim that Louisiana's Medicaid costs have increased since the IFR, _id_, nor have Plaintiffs offered evidence that any of the asylees for whom they have incurred Medicaid costs since March 2022 were processed under the IFR. And while Plaintiffs point to the fact that about 1,500 noncitizens with Florida or Louisiana addresses were granted asylum in 2022, Opp. at 23, that number is irrelevant. The chart upon which Plaintiffs rely contains information about the number of _affirmative_ asylum grants made to individuals with Florida or Louisiana addresses. Exhibit 259. Affirmative asylum is available to noncitizens already in the United States who are lawfully present or have not yet been encountered by immigration officials.[17] It is not available to noncitizens in removal proceedings, who may apply for asylum defensively, or noncitizens who have sought asylum after receiving a positive credible fear determination—_i.e.,_ anyone processed under the IFR. _Id._[18] The States have not shown that more

---

[17]    _See_ https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/the-affirmative-asylum-process.

[18]    Indeed, if the Court wanted to look at the number of individuals processed under the IFR who were granted asylum in 2022, the correct chart to look would be Defendants' Exhibit A, ECF 214,

people were granted asylum under the IFR, that any of them used and failed to pay for medical services resulting in a Medicaid cost to either Louisiana or Florida, or that the States' net Medicaid costs increased since the IFR.

As to SNAP, the federal government fully funds the cost of benefits under the SNAP program and covers 50% of the States' administrative costs as well. Mot. at 16. Nonetheless, Plaintiffs claim that they have incurred "increased compliance costs" for SNAP, Opp. at 23, citing to the declaration of Monica Brown, the declaration of Andrew Arthur, and nine pages of Mr. Arthur's Rule 30(b)(6) deposition testimony. Opp. at 23. But none of those sources provide any data as to this purported increase, or even affirm that there was an increase. For example, Ms. Brown says only that Louisiana provides interpreters for SNAP applicants who do not speak English and that interviews with interpreters take more time. Brown Decl. at ¶ 10. Notably, she does not suggest that the use of interpreters has increased since March 2022, or that the State's administrative or "compliance" costs have increased. *Id.* Indeed, she does not address costs to the State at all—other than summarily noting that the States's administrative costs are shared with the federal government. *Id.* at ¶ 10.

Mr. Arthur also fails to provide evidence of increased administrative costs borne by either Louisiana or Florida. Instead, he simply postulates that "to the extent that" the IFR speeds up processing times, individuals may be granted asylum faster and thus may be eligible for SNAP benefits sooner. Arthur Decl. at ¶ 135. He also speculates that "to the extent" the IFR "acts as an immigration magnet," more individuals may apply for SNAP. *Id.* Thus, according to Mr. Arthur, *if* there are more asylees or *if* more people seek asylum because of the IFR, there may be an increase

---

the AMI Cases page. It shows that between June 2022 and December 2022, 238 people were granted asylum under the IFR. *Id.* None of them were processed by the New Orleans Asylum Office. Only 35 were processed in Miami. *Id.* And, of course, that says nothing about whether these individuals went on to cause the State to spend Medicaid funds on their behalf.

in the States' fifty-percent share of administrative costs. *Id*. at ¶ 139.[19] There are many problems with Mr. Arthur's conclusions. First, Plaintiffs have not demonstrated that as a result of shortening asylum processing times, more individuals have sought SNAP benefits—sooner or otherwise. Second, Plaintiffs have not demonstrated that the IFR has increased the asylum grant rate. Mot. at 6-7, 13; *supra* at I.E. Third, Plaintiffs have not shown that IFR has acted as a magnet for illegal migration. Dr. Clemens' analysis refutes this contention. Mot. at 12. Furthermore, SNAP benefits are not available to most asylum applicants who have been paroled under the IFR, Mot. at 16-17, and Plaintiffs have not shown that more parolees have sought or received SNAP benefits.[20]

Finally, and critically, neither Mr. Arthur nor any other declarant has demonstrated *any* increase in Louisiana or Florida's SNAP administrative costs since March of 2022. *See generally* Plaintiffs' Opp. While Plaintiffs have referred the Court to nine pages of Mr. Arthurs's 30(b)(6) deposition in support of their contention that Louisiana has incurred "increased [SNAP] compliance costs" from the IFR, those nine pages contain no data supporting that assertion. *See* Opp. Ex. 256 at pgs. 64-71, 73. Likewise, the fact that Florida has quantified their share of the administrative costs from SNAP as "$2.17 per alien[21]," Opp. at 23, is irrelevant. They have not shown that their net administrative costs have increased since the IFR or that any individuals processed under the IFR have received SNAP benefits that could contribute towards the alleged

---

[19]   Mr. Arthur notes that Chase Bank, for example, charges $0.15 per transaction, and "multiplied on a monthly basis by the thousands of additional [SNAP] eligible aliens," the States will incur "a measurable financial outlay." *Id*. As set forth above, Plaintiffs have not shown there have been *any* additional SNAP applicants since the IFR was promulgated, let alone thousands more each month.
[20]   Louisiana has offered Exhibit 142 to demonstrate that "380 individuals in 223 asylee case files [] received food stamps between March 2020 and June 2023." Opp. at 23. Though it is not self-evident how this document shows that, regardless, the IFR was implemented in March 2022, making most of this data irrelevant. Further, at his 30(b)(6) deposition, Mr. Arthur confirmed that Louisiana has no way of determining if any of the individuals referenced in exhibit 142 were processed under the IFR. Opp. Ex. 256 at 78:8-80:16.
[21]   Florida points to Exhibit 102 to substantiate this figure, but it is not at all clear from this exhibit how they come to that calculation. Nor do Plaintiffs explain this.

increased administrative expenses. In short, nowhere in the evidence before this Court is there any data showing that either Louisiana or Florida's administrative costs for administering SNAP have increased since March 2022, let alone because of the IFR.

With respect to TANF, the federal government covers one hundred percent of the cost of TANF (aka FITAP in Louisiana) as well as all the administrative costs of the program. Mot. at 16. Nonetheless, Louisiana claims it has incurred injury from the program because asylees "draw down a fixed block grant, leaving fewer benefits for citizens." Opp. at 23.[22] Tellingly, Plaintiffs offer no evidence that any asylees processed under the IFR have claimed TANF benefits, let alone that the State's expenditures on behalf of such individuals precluded citizens from obtaining benefits. Indeed, Exhibit 101 does not contain data of past expenditures (or provide information as to who received them) but rather contains future forecasts for expenses for 2023-2027.[23] At bottom, Plaintiffs have not provided this Court with any evidence that they have incurred a cost from TANF, notwithstanding the fact that the government covers the cost of the program and its administration.

In a last-ditch effort to establish harm from these programs, Plaintiffs argue that: (i) the IFR will result in the provision of work permits to asylum seekers faster, (ii) more work permits for noncitizens will result in fewer jobs for American citizens; and (iii) that more American citizens will seek SNAP, TANF, and Medicaid benefits as a result of their underemployment. Opp. at 23.

---

[22]   In support of this assertion, Plaintiffs cite to Mr. Arthur's 30(b)(6) deposition and exhibit 101. But this evidence is inconsistent. Mr. Arthur testified the block grant is $164 million a year. Opp. Ex. 256 at 87:22-88:3. Exhibit 101 projects TANF expenditures for 2022 to 2023 of $115.4 million, which it claims exceeds appropriations by $17.4 million. Exhibit 101 contradicts Mr. Arthur's testimony and there is no way for this Court to determine which, if either, is correct.

[23]   The document is also hearsay and inadmissible expert testimony by an unknown author. Ms. Bivens claims the document was "produced in the ordinary course of business." Bivens Decl. at ¶ 2. But Federal Rule of Evidence 803(6) requires far more than this truncated statement to get around the hearsay rules. Further, the document conveys expert analysis (costs projections) without any accompanying disclosure sufficient to satisfy Rule 702.

Plaintiffs' layered speculation fails at each step. At the outset, the IFR does not provide work authorization or change the criteria for work authorization. The process for applying for work authorization is governed by separate regulation, 8 C.F.R. § 274a.12(c)(11), which Plaintiffs have not challenged. Moreover, Plaintiffs offer no evidence that, with the unemployment rate at the lowest level in fifty-four years,[24] providing parolees work authorization will adversely affect citizens—other than a 1976 case from an entirely different context that noted "[e]mployment of *illegal* aliens in times of *high unemployment* deprives citizens and legally admitted aliens of jobs." *DeCanas v. Bica*, 424 U.S. 351, 356 (1976) (emphasis added); Opp. at 23. In short, Plaintiffs' argument that the IFR will cause more citizens to seek Medicaid, SNAP, and TANF at a cost to the States is simply lawyer-theorized speculation involving several impermissible inferences and assumptions. *Louisiana by & through Landry v. Biden*, 64 F.4th 674, 677-78 (5th Cir. 2023) (States cannot base standing "on a chain of hypotheticals.").

### G.  Plaintiffs' alleged indirect financial injuries are attenuated and non-cognizable.

Even if Plaintiffs could show additional expenditures on public benefits following the IFR, as explained, Mot. at 25-26, 29-34, the *Priorities* case, *United States v. Texas*, 599 U.S. 670 (2023), made two principles clear that prevent finding standing here. First, in assessing Article III standing, the Court must first decide whether the case is even judicially cognizable by looking to "history and tradition" to determine if the "asserted injury" is the type that has "traditionally" been "redressable in federal court" as opposed to the political process. *Priorities*, 599 U.S. at 676. Second, allegations of attenuated, indirect injuries of the very same type Plaintiffs assert here—alleged social-service costs attributed to noncitizens who themselves (not the States) are the

---

[24]   *See* https://www.commerce.gov/news/blog/2023/02/news-unemployment-its-lowest-level-54-years#:~:text=%E2%80%9CWhen%20President%20Biden%20took%20office,the%20lowest%20in%2054%20years.%E2%80%9D.

subjects of the agency action—require States to meet an even higher evidentiary bar to establish Article III standing. *See id.* at 680 n.3; *Paterson*, 644 F.2d at 523. Plaintiffs' opposition fails to show both a tradition of courts recognizing the type of injuries they allege and that they meet the preponderance standard, let alone *Priorities'* heightened bar. *See* Opp. at 29-32.

Plaintiffs first argue that *Priorities* was limited to cases challenging executive arrest and prosecution policies. *Id.* at 29-30. While those circumstances were the particular focus of that case, the Supreme Court's reminder that courts must first look to history and precedent to determine if a type of injury is fit for judicial resolution reiterates longstanding Article III principles that apply across the board. *See Priorities,* 599 U.S. at 676-77. Plaintiffs fail to point to any Supreme Court precedent recognizing a state's right to sue over federal regulation altering asylum-claims processing, and while they cite some lower court cases, those were brought on behalf of individuals directly affected by a rule, not states or other third parties claiming downstream injuries from changes to asylum procedures. Opp. at 31 (citing *E. Bay Sanct. Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020); *Kaboh v. Barr*, 826 F. App'x 381 (5th Cir. 2020); *E. Bay Sanct. Covenant v. Biden*, 2023 WL 4729278, at *6 (N.D. Cal. July 25, 2023)). The lack of history of courts recognizing such claims *by states or third parties* demonstrates their lack of cognizability.

Plaintiffs next argue this case falls within the categories that *Priorities* indicated could implicate a different analysis, such as cases involving wholesale "abandon[ment]" of statutory responsibilities, provision of "legal benefits or legal status," or "the continued detention of noncitizens" already arrested. Opp. at 30-31. However, Plaintiffs do not allege abandonment of any statutory responsibilities, just their disagreement with changes to credible-fear, asylum-interview, and parole procedures for noncitizens subject to 8 U.S.C. § 1225(b)(1). Nor do they challenge a policy that substantively provides "legal benefits or legal status." The IFR does not affect the standard for obtaining asylum and does not provide legal benefits or status to individuals

who could not already obtain them under separate provisions of federal law. *See* 87 Fed. Reg. at 18192. Plaintiffs' comparison to DACA and DAPA is inapt: according to the Courts who have reviewed DACA and DAPA, those programs directly provided both legal benefits—work authorization and Social Security and Medicare eligibility—and deferred action which, at least temporarily, prevented removal. *See id.*; *DHS v. Regents*, 140 S. Ct. 1891, 1906 (2020); *Texas v. United States*, 809 F.3d 134, 147-49 (5th Cir. 2015). The IFR does neither: it is a procedural reform that does not affect substantive rights, and the noncitizens subject to it are still removable unless and until they establish a right to relief or protection from removal under other federal laws. And as for detention, Plaintiffs cannot deny that the INA makes parole available as a matter of discretion for certain noncitizens, *see* 8 U.S.C. § 1182(d)(5)(A), and the IFR itself requires that any such parole be granted only on a case-by-case basis and that parole of a noncitizen in expedited removal or pending a credible fear determination cannot provide a basis for work authorization. 87 Fed. Reg. at 18088.

Finally, Plaintiffs maintain they have a sovereign injury from providing services to noncitizens improperly granted asylum because, they argue, asylum officers lack the authority to grant asylum in expedited removal proceedings and so the grants are "void ab initio." Opp. at 31-32. Regardless of whether their legal theory is correct (it is not), *see infra* n.25, this alleged injury fails to confer standing both because there is no evidence that Plaintiffs are actually providing services, at a net cost to the state, to individuals processed under the IFR, *supra*, and because the Court order they seek would not provide redress: because the IFR does not alter the asylum standard, 87 Fed. Reg. at 18192, vacating or enjoining it (which is already prohibited under 8 U.S.C. § 1252(f)(1)) would not prevent IJs from granting asylum based on the same circumstances presented to asylum officers in AMIs under the IFR. *See Priorities*, 599 U.S. at 690-92 (Gorsuch, J., concurring) (noting if government could arrive at same result even absent challenged policy,

redressability is lacking).

### H.  Plaintiffs cannot assert a standalone procedural injury.

As explained, Plaintiffs cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in fact requirement of Article III," and nowhere in Plaintiffs' response do they claim otherwise. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *see* Opp. at 32-34. Plaintiffs quibble with the facts of the cases Defendants cite, but do not cite any cases that say Plaintiffs can assert a pure procedural injury without showing a concrete injury in fact. *Id.* Plaintiffs correctly point out that *Spokeo* held that "the violation of a procedural right granted by statute can be sufficient," but then do not allege that there is any statute that provides Plaintiffs a specific procedural right to challenge asylum procedures. Opp. at 33. That is because they cannot—there are no statutes that have granted anyone, let alone States, the right to raise pure procedural injuries related to asylum procedures. The Supreme Court has "rejected the premise … that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Frank v. Gaos*, 139 S. Ct. 1041, 1045 (2019) (citing *Spokeo* 578 U.S. at 341). The "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summer v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). As discussed *supra*, Plaintiffs have failed to show any concrete, particularized injury in fact.

Nor do Plaintiffs elaborate on what their alleged procedural injury is. Plaintiffs cannot claim that they suffered injury based on an inability to comment prior to the IFR because, in fact, *they did* comment on the NPRM. *See* Opp. at 7 ("Louisiana, Florida, *et al* submitted a comment letter objecting to the proposed rule's impact on migration rates, increase in fraud, impact to States, and the incredible claim that there were no federalism concerns."); *see also* Opp. Ex. 217

(comments Plaintiffs submitted). Plaintiffs argue they were not given a chance to comment on 23 changes the IFR made from the NPRM. Opp. at 34. But Plaintiffs do not identify any particular change on which they had comments. This matters because "[a]n agency's failure to comply with the APA is harmless" if it "had no bearing" on "the substance of [the] decision reached." *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 243-44 (5th Cir. 2012) (declining to address argument that agency improperly "fail[ed] to use notice-and-comment rulemaking" where no harm resulted). Nowhere have Plaintiffs articulated what information they would have raised in response to an opportunity to comment on those changes in their opposition or in the operative complaint. *See generally* ECF No. 86; *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (finding harmless error where plaintiff "did not explain what it would have said had it been given an opportunity to respond").

Plaintiffs also had an opportunity to comment on the IFR and any changes it made from the NPRM. Notably, the IFR is titled as an "Interim final rule *with request for comments*" and called for the submission of public comments "on or before May 31, 2022." 87 Fed. Reg. at 18078 (emphasis added). Plaintiffs commented on the NPRM and were given an opportunity to comment on the IFR, and they therefore cannot claim to have suffered a procedural injury.

To the extent Plaintiffs argue Defendants failed to adequately consider their comments when drafting the IFR, that is a merits argument that is not properly part of this motion or relevant to the standing analysis. Plaintiffs argue that the Court must assume that the Plaintiff States are correct on the merits of their APA claims. Opp. at 33. But Plaintiffs fail to provide any explanation for how, even assuming *arguendo* that Plaintiffs were correct on their policy disagreements with the IFR, that shows they have suffered any concrete harm. As noted above, they have provided no evidence of any such harm, as they must to survive a factual attack on standing. *See, e.g.*, *Williamson*, 645 F.2d at 413; *Paterson*, 644 F.2d at 523. Plaintiffs cite *Texas v. EEOC*, 933 F.3d

23

433 (5th Cir. 2019), but that case involved employers taking actions that were inconsistent with State law and allegedly harmed the State as a result to comply with Federal guidance that, for purposes of standing, the court assumed was promulgated without properly complying with the APA. Plaintiffs have identified no similar evidence of concrete harm here.

Finally, Plaintiffs raise special solicitude, but it is unclear how that is relevant to Plaintiffs' claim of suffering a procedural injury. If Plaintiffs are claiming that special solicitude permits them to allege a standalone procedural injury without having to show an actual injury in fact, they are wrong. Supreme Court case law is clear that a plaintiff cannot allege a pure procedural injury without also showing a concrete, actualized injury. *See, e.g.,* S*pokeo*, 578 U.S. at 341 ("[B]are procedural violation[s], divorced from any concrete harm" are not sufficient for Article III standing); *Summer*, 555 U.S. at 496-97 (same); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021) (same); *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 936-37 (5th Cir. 2022) ("Regardless of whether a statutory right is procedural or substantive, *Spokeo* emphasized that Article III standing requires a concrete injury *even in the context of a statutory violation.*") (internal citations omitted); *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 272 (5th Cir. 2021) ("[S]tatutes may define what injuries are legally cognizable—including intangible or previously unrecognized harms—but cannot dispense with the injury requirement altogether.") (internal citations omitted). Plaintiffs do not cite any cases to the contrary. *See* Opp. at 32-34. Even if special solicitude did somehow relax the pleading standards for pure procedural injuries—which it does not—Plaintiffs are not entitled to special solicitude here, as discussed in Defendants' motion. *See* Mot. at 34.[25]

---

[25]    Plaintiffs also maintain they are entitled to special solicitude for their quasi-sovereign injury. Opp. at 34. However, if their generic APA challenge qualified as a "procedural right" under that doctrine, it would have in *Priorities* as well, where Texas also brought an APA challenge. *See* 599 U.S. at 673-675. Rather, *Priorities* rejected reliance on the doctrine, explaining that the procedural right that garnered special solicitude in *Massachusetts v. EPA* was a denial of a petition for rulemaking authorized under a separate statutory scheme. *Id.* at 685 n.6. And while Plaintiffs claim

**II.    THE COURT LACKS JURISDICTION UNDER 8 U.S.C. § 1252(e)**

Plaintiffs next respond to Defendants' argument that under 8 U.S.C. §1252(e)(3) only the district court in the District of Columbia has jurisdiction to hear challenges to rules related to the expedited removal process, Mot. at 35-38, by first arguing that § 1252 applies only to denials of relief to individual noncitizens, citing the Fifth Circuit's decision in *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) ("*Texas MPP*"). Opp. at 38. Plaintiffs ignore, however, that the Supreme Court overturned that decision and foreclosed this narrow reading of Section 1252. In *Texas MPP*, the Supreme Court held that another provision of § 1252—§ 1252(f)(1)—applied in that case and barred a State's claims for injunctive relief. *See Biden v. Texas*, 597 U.S. 785 (2022). Accordingly, if Plaintiffs were correct that the title of  § 1252 indicates that it applies only to claims from individual noncitizens, Opp. at 38, then the Supreme Court could not have held that § 1252(f) applied to State plaintiffs. Yet the Supreme Court held § 1252 *did* apply in that case, precluding any argument that § 1252 or its various sub-provisions must be read based on the title or structure of that section only to apply in individual cases challenging removal orders. *See* 597 U.S. at 797-98. The Fifth Circuit's dicta generally addressing the scope of § 1252, *Texas MPP*, *see* 20 F.4th at 978 n.11, does not survive that Supreme Court decision. *See United States v. Kirk*, 528 F.2d 1057, 1063-64 (5th Cir. 1976) (noting Fifth Circuit decisions are no longer good law once "overruled" either "expressly or implicitly"); *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) (same). "Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion 'establishes a rule of law inconsistent with' that precedent." *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) (citation omitted).

---

they have a quasi-sovereign interest in "classifying aliens," the IFR would not injure any such purported interest: again, it is a procedural rule governing the credible fear and asylum process in limited circumstances, and it does not provide any new or different classifications for noncitizens.

Second, Plaintiffs argue the IFR does not implement § 1225(b) and therefore § 1252 does not apply. Opp. at 38-39. As Defendants have previously explained, however, the IFR expressly implements the expedited-removal provisions of § 1225(b)(1). Mot. at 37; ECF No. 5. Evidence produced in discovery only further confirms that the IFR implements § 1225(b)(1), *see* Mot. at 38, and in a factual attack on standing, the Court has to make findings as to why the IFR does not implement § 1225 or the Court must dismiss the case. See 8 U.S.C. § 1252(e)(3). Section 1252(a)(2)(A) eliminates jurisdiction over challenges to any policies and procedures implementing § 1225(b)(1), subject to a limited exception that permits review of certain types of claims in the United States District Court for the District of Columbia under § 1252(e)(3). *See* 8 U.S.C. § 1252(e)(3)(A)(i)-(ii); *id.* § 1252(a)(2)(A)(iv) (barring review of "procedures and policies adopted … to implement the provisions of section 1225(b)(1)" except in D.C.).

## III.   THE COURT SHOULD DISMISS THE TAKE CARE CLAUSE AND SECURE FENCE ACT CLAIMS

Plaintiffs do not defend the viability of their Take Care Clause claim and concede they have not identified any case where a court has held the Take Care Clause provides a private right of action. Opp. at 40. Instead, they argue—tellingly without authority—that as a State, they are differently situated than private litigants. No court has accepted that argument. *See Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1178 (D. Ariz. 2022) (dismissing Take Care Clause claim brought by State of Arizona as no Court has recognized a private right action under the Clause). Plaintiffs also ignore Defendants' argument that Plaintiffs' Take Care Clause claim fails because § 1158(a), (b), and § 1182(d)(5)(A) confer purely discretion authority, rather than ministerial obligations. *See* Mot. at 39-40. For the reasons previously asserted in the motion, Plaintiffs' Take Care Clause claim should be dismissed.

Plaintiffs' arguments in defense of their Secure Fence Act ("SFA") claim fare no better.

26

Faced with the undisputable fact that the SFA vests the Secretary with discretion to determine appropriate border control strategies, Mot. at 38, Plaintiffs argue the statute relevant to their SFA claim is not the SFA, but rather the INA. Opp. at 39. That argument does not save the claim from dismissal. First, the Third Count of the operative complaint, where Plaintiffs assert their SFA claim, makes no reference to the INA. ECF No. 86, ¶¶ 166-170. Rather, they assert that the IFR violates the "operational control" provision of the SFA. *Id.* at ¶¶ 168, 170. Plaintiffs' argument now that the IFR violates the SFA because it violates the INA is new and also redundant of its more general APA claims. Second, the INA is not a singular statute. It is a series of statutes enacted in 1952, amended many times over the years. But, even if it could be viewed as a singular entity, the law is clear that the Secretary has broad discretion in administering the INA. *State of Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) (noting that 8 U.S.C. § 1103 "commits enforcement of the INA to" the Secretary's "discretion," which "is unreviewable under the [APA] because a court has no workable standard against which to judge the agency's exercise of discretion"). Indeed, it is not surprising that Plaintiffs cannot point the Court to precedent sustaining an SFA claim of the type alleged here. For the reasons set forth in Defendants' motion, the Court should dismiss this claim.

## CONCLUSION

For these reasons, and those in Defendants' motion, the Court should dismiss this case.

Dated: February 21, 2024          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI

*Counsel*

BRIAN C. WARD
*Senior Litigation Counsel*

JOSEPH A. DARROW
ELISSA P. FUDIM
SYDNEY A. JACKSON
*Trial Attorneys*

/s/ *Erin T. Ryan*
ERIN T. RYAN
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 532-5802
Erin.t.ryan@usdoj.gov

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2024, I electronically filed this reply with the Clerk of the Court for the United States District Court for the Western District of Louisiana by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Erin T. Ryan*
ERIN T. RYAN
U.S. Department of Justice