**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **STATE OF ARIZONA, ET AL** | **CIVIL DOCKET NO. 6:22-cv-01130** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **MERRICK GARLAND, ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

<u>**MEMORANDUM RULING**</u>

This is a challenge by 19 states to an administrative action of the Executive Branch establishing a new procedure for adjudicating asylum applications under federal immigration law.  The new process – set forth in an Interim Final Rule (the "Asylum IFR") promulgated by the Departments of Justice and Homeland Security ("DOJ" and "DHS," respectively) – changes the way applications for asylum are considered and decided after a determination of credible fear has been made.  Most significantly, for those asylum applications initiated under 8 U.S.C. § 1225, the Asylum IFR dispenses with the adversarial process in the adjudication of asylum claims and vests authority to decide asylum claims in asylum officers rather than immigration judges.  The 19 plaintiff states (the "Plaintiff States")[1] seek declaratory relief and vacatur against the United States, DHS, DOJ, and other government agencies and officials[2] on grounds that the Asylum IFR violates the Administrative

---

[1]      The Plaintiff States are: Louisiana, Florida, Idaho, South Carolina, Mississippi, Montana, Oklahoma, Georgia, Missouri, Nebraska, Kansas, Arkansas, Utah, West Virginia, Alabama, Alaska, Indiana, Wyoming, and the Commonwealth of Kentucky.  Although the State of Arizona was a plaintiff in this matter at the inception of the lawsuit, Arizona dismissed all claims against the Defendants on February 16, 2023.  [Doc. 102].

[2]      The Defendants in this case are: the United States of America; DOJ; DHS; Merrick Garland, in his official capacity as Acting Director of Executive Office for Immigration

Procedures Act ("APA"), 60 Stat. 237, 5 U.S.C. § 1001, *et seq.*, 5 U.S.C. § 1001, *et seq.*, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, the Homeland Security Act ("HSA"), Pub. L. No. 107-296 (2002), the Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638 (2006), and the Take Care Clause, art. II, § 3 of the Constitution.

Now before the Court is the Defendants' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM (the "Motion") [Doc. 214], in which Defendants argue the Plaintiff States: (i) do not have standing to bring the instant lawsuit; and (ii) fail to state a claim under the Secure Fence Act and the Take Care Clause because neither provides independent grounds to challenge discretionary agency action implementing the INA. The Defendants also argue that judicial review is not proper in this Court and request that the Court transfer this matter to a different venue. For the reasons that follow, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

---

Review; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; David Neal, in his official capacity as Acting Director of the Executive Office for Immigration Review, Executive Off of Immigration Review; Chris Magnus, in his official capacity as Senior Official Performing the Duties of the Commissioner of U.S. Customs & Border Protection; U.S. Customs & Border Protection; Tae Johnson, in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration & Customs Enforcement; U.S. Immigration & Customs Enforcement; Ur M. Jaddou, in her official capacity as Director of U.S. Citizenship & Immigration Services; U.S. Citizenship & Immigration Services; Raul Ortiz, in his official capacity as Chief of U.S. Border Patrol; and U.S. Border Patrol.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Over the past three years, the policies and executive actions of the current administration have resulted in a dramatic increase in illegal aliens entering the United States through the southern border.  This has resulted in a breakdown of governmental control along the U.S. – Mexico border, resulting in general lawlessness and providing fertile ground for the trafficking of fentanyl, methamphetamine, and human beings, among other criminal enterprises.  It has also resulted in reasonable concerns about a heightened threat to our national security.  Litigation over border regulations has erupted, with states challenging the power of the Executive Branch to implement certain immigration policies.  *See, e.g., Florida v. United States*, 660 F.Supp.3d 1239, 1247 (N.D. Fla. 2023) ("The evidence establishes that the current status quo at the Southwest Border is unsustainable …"), *appeal docketed*, No. 23-11642 (11th Cir. May 17, 2023); *State of Tex. v. U.S. Dep't of Homeland Sec.*, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, J.) ("[t]he number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022"); *see also State v. United States Dep't of Homeland Sec.*, 88 F.4th 1127, 1130 (5th Cir. 2023) ("In recent years, illegal crossings have increased dramatically… Unsurprisingly, the situation has been exploited by drug cartels, who have made "an incredibly lucrative enterprise" out of trafficking human beings and illegal drugs like fentanyl, which "is frequently encountered in vast quantities at the border."), *vacated sub nom.*, *Dep't of Homeland Sec. v. Tex.*, 2024 WL 222180 (U.S. Jan. 22, 2024).

From 2011 to 2017, encounters[3] along the southwest border averaged fewer than 400,000 per year.   In 2022, however, DHS reported more than 2.2 million encounters – a nearly 600% increase.  *Texas v. United States Dep't of Homeland Sec.*, 2024 WL 1021068, at *1 (S.D. Tex. Mar. 8, 2024) (Tipton, J.).   In December 2023 alone, U.S. Customs and Border Protection recorded 249,785 encounters between ports of entry along the southwest border, the highest monthly total on record, resulting in a total of 302,034 encounters along the southwest border.[4]

Despite the scale of the problem, the controversy before the Court is a limited one.   Here, the Plaintiff States' challenge only the lawfulness of the Executive Branch's creation of a new process for adjudicating asylum claims through the Asylum IFR.

As background, in 1996 Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), 110 Stat. 3009–546, an immigration bill authorizing DHS to summarily remove from the United States certain inadmissible aliens[5] who arrive at or near ports of entry or "certain other aliens who recently entered the country as designated by the Secretary.   *See* 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3(b); 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).   Under this summary-

---

[3]     An "encounter" is defined as ["t]he sum of U.S. Border Patrol (USBP) Title 8 apprehensions, Office of Field Operations (OFO) Title 8 inadmissibles, and noncitizens processed for expulsions under Title 42 authority by USBP or OFO."   *See Reporting Terminology and Definitions*, http://www.dhs.gov/ohss/about-data/glossary.

[4]     https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2023-monthly-update (U.S. Customs and Border Protection website).

[5]     The Court uses the term "alien" throughout this ruling to describe foreign nationals entering the United States.   This term is used to be consistent with federal immigration statutes and jurisprudence.

removal mechanism – known as expedited removal under the "Expedited Removal Statute" – an alien "arriving in the United States" who an immigration officer determines lacks valid entry documentation or makes certain kinds of material misrepresentations, shall be "order[ed] ... removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see* id. § 1182(a)(6)(C), (a)(7).

The Expedited Removal Statute also includes procedures to apply when, during the process of screening aliens for expedited removal, the alien asserts an "intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii); *see also Id.* at §§ 1158(a)(1), 1225(b)(1)(A)(ii). In that situation, an alien is provided a non-adversarial interview with an asylum officer during which the officer determines whether the alien has a "credible fear of persecution" or torture and is provided the right to request *de novo* review of that determination by an immigration judge ("IJ"), to consult with a person of the alien's choosing during the credible fear process, and to an interpreter. 8 U.S.C. §§ 1225(b)(1)(A)(ii), (b)(1)(B)(iii)(II), (b)(1)(B)(iv), (v); *see* 8 C.F.R. §§ 208.30(d), (d)(4), (d)(5); 1003.42(d), 1208.30(g)(2). If the asylum officer in the first instance or a reviewing IJ determines the alien has a credible fear of persecution or torture, the statute requires that the alien must be "detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). Alternatively, if both the officer and the IJ find that the alien lacks a credible fear of persecution, the alien shall be "removed from the United States

without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)(iii)(I), (b)(1)(C); 1252(a)(2)(A)(iii), (e)(2); 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(A).

The prior regulations implementing § 1225(b)(1)(B)(ii) provided that those aliens who are determined to have a "credible fear" should be placed in normal removal proceedings before an IJ, during which the alien would be able to apply for asylum subject to the provisions and limitations of 8 U.S.C. § 1158. 8 U.S.C. § 1229(a); *see also* 8 C.F.R. § 208.30(f). Indeed, the congressional committee report accompanying passage of § 1225(b) specifically explained its intent that, "the further consideration of the application for asylum by an alien who has established a credible fear of persecution will be provided for in the context of [normal removal proceedings before an IJ]." 62 Fed. Reg. 10320 (Mar. 6, 1997).

In spite of this, on March 29, 2022, purportedly under their authority to implement the Expedited Removal Statute, DOJ and DHS issued the Asylum IFR, entitled "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers." 87 Fed. Reg. 18078-01 (Mar. 29, 2022).[6] The "[Asylum] IFR addresses how the phrase

---

[6]     The opening paragraph explaining the legal authority for the Asylum IFR states:

The Departments are publishing this IFR pursuant to their respective and joint authorities concerning asylum, statutory withholding of removal, and protection under the [Convention Against Torture]. Section 235 of the INA provides that if an asylum officer determines that a noncitizen subject to expedited removal has a credible fear of persecution, the noncitizen shall receive "further consideration of the application for asylum." INA 235(b)(1)(B)(ii), 8 U.S.C. § 1225(b)(1)(B)(ii). This IFR addresses how that further consideration, including of the noncitizen's related claims to statutory withholding of removal and CAT protection, will occur.

"detained for further consideration of the application for asylum" will occur.[7]  *Id.* at 18080.  The Asylum IFR expressly states that it "establishes a new process by which such 'further consideration' may occur, wherein [an alien] will have their asylum claim adjudicated following an Asylum Merits interview before a [U.S. Citizenship and Immigration Services] asylum officer in the first instance, rather than by an IJ in section 240 removal proceedings."[8]  *Id.* at 18085.

On April 28, 2022, one month after the Asylum IFR was announced, the Plaintiff States filed the instant lawsuit challenging it.  [Doc. 2].[9]  They have since twice amended their complaint.  [Docs. 14, 86].  In the operative Second Amended Complaint (the "Complaint") [Doc. 86], filed on November 10, 2022, the Plaintiff States allege that the Asylum IFR's adjudication and parole provisions violate the APA as arbitrary and capricious; exceed statutory authority; lacked notice and comment; and violate the Secure Fence Act and the Take Care Clause of the U.S. Constitution.  [Doc. 86].  The Plaintiff States further allege that the undisputed

---

*See* Asylum IFR, Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078-01 at *18080.

[7]    The Asylum IFR also addresses how an alien's related claims to statutory withholding of removal and [the Convention Against Torture ("CAT")] protection will occur.  87 Fed. Reg. 18080.

[8]    The new processes for asylum adjudication in the Asylum IFR were initially applied only to aliens in a limited group "whose intended destination is one of nine destination cities," which are "Arlington [Virginia], Boston, Chicago, Los Angeles, Miami, New Orleans, New York, Newark, and San Francisco."  [Doc. 214-2, U.S. DHS, "Asylum Processing Rule Cohort Report – August 2023" at 1.  *See also* U.S. Citizenship and Immigration Services ("USCIS") "FACT SHEET: Implementation of the Credible Fear and Asylum Processing Interim Final Rule."].

[9]    Although the Plaintiff States requested a preliminary and permanent injunction in their original Complaint [Doc. 2], they withdrew that request on May 16, 2022.  [Doc. 22].

evidence shows the Asylum IFR will speed the grant of status-dependent benefits in the areas of education, healthcare, public assistance, and general government services, and that the Plaintiff States will therefore suffer direct financial harm in the form of increased costs for State-paid, status-dependent benefits including Medicaid, Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance for Needy Families ("TANF").  In the Complaint, Plaintiff States also sue to vindicate their "sovereign, quasi-sovereign, and proprietary interests, including [their] interests in protecting [their] citizens." [Second Amended Complaint, Doc. 86, ¶¶ 24, 29].

From the outset of this litigation, the Court expressed concern about whether the Plaintiff States have Article III standing to sue.  [Doc. 24].  Accordingly, the Court permitted the parties to conduct jurisdictional discovery.  [*See e.g.,* Docs. 88, 89, 98]. Although initially limited to a 30-day period, Plaintiff States and Defendants requested numerous extensions of time of the discovery period [Docs. 62, 128, 152, 172, 177, 182, 184, 186, 189, 196], and jointly requested to stay the case for a period. [Doc. 78].  After approximately two years, the Defendants finally filed the instant Motion on December 22, 2023, [Doc. 214] seeking to dismiss the case for lack of jurisdiction and failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(1) and (6), respectively.  Plaintiffs filed their Response on January 29, 2024 [Doc. 217] and Defendants filed a Reply on February 21, 2024 [Doc. 228].

In the Motion, Defendants argue that the Plaintiff States lack standing to bring the instant lawsuit because: (i) there is no data suggesting the Asylum IFR is

incentivizing more illegal immigration; and (ii) the Plaintiff States have produced no evidence that they have sustained increased costs in terms of education, healthcare, and the provision of other social services to aliens because of the Asylum IFR. Instead, Defendants argue that the new processes created by the Asylum IFR allow for "a more efficient application of the expedited removal provisions that facilitate the [DHS's] removal of certain noncitizens with non-meritorious asylum claims more quickly" by bypassing the "backlogged ordinary section 240 removal proceedings" under 8 U.S.C. § 1229(a), thereby enabling DHS to "more efficiently obtain orders of removal. *Id.* at 18108-09.  Defendants also argue that for those illegal aliens with meritorious asylum claims, the Asylum IFR allows "[illegal aliens] to receive protection more promptly without "undue delays."  [Doc. 214-1, p. 1].  In addition to their request for dismissal, Defendants also renew a prior motion requesting the transfer of this case to the District Court for the District of Columbia on grounds that the validity of the Asylum IFR is only reviewable in that forum.  In response to the Motion, Louisiana and Florida have submitted evidence on behalf of all Plaintiff States, which they contend demonstrates standing and propriety of review in this Court.[10]

Against this historical background, and with all jurisdictional briefing having been completed, the Motion is now ripe for review.

---

[10]    On January 17, 2023, the Plaintiff States advised the Court that they intend to establish Article III standing by showing the effects of the Asylum IFR on certain discrete programs in the states of Louisiana and Florida only.  [Doc. 98].

<u>LAW AND ANALYSIS</u>

## I.      Legal Standards Under FRCP 12(b)(1) and 12(b)(6)

Defendants seek dismissal of the Plaintiff States' claims under both FRCP 12(b)(1) and 12(b)(6).  Because Defendants have submitted materials outside the pleadings in support of their 12(b)(1) motion, they have asserted a factual attack on the subject matter jurisdiction of the court.  *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  Under these circumstances, the Plaintiffs are required to submit facts through some evidentiary method, and they have the burden of proving by a preponderance of the evidence that the trial court has subject matter jurisdiction.  *Id.* at 523.  The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Williamson*, 645 F.2d at 413.

To survive a Rule 12(b)(6) motion to dismiss, the plaintiffs must plead enough facts "to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232–33 (5th Cir.2009); *Baker v. Putnal*, 75 F.3d 190, 196

(5th Cir.1996).  But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 129 S. Ct. at 1949–50.

## II.      Motion to Transfer

Before considering the issue of standing, the Court will first address Defendants' renewed request that the Court transfer this case and, more broadly, the question of judicial review in this district.  On April 29, 2022, Defendants moved to transfer this case to the District Court for the District of Columbia on grounds the unambiguous statutory text of 8 U.S.C. § 1252(a)(2)(A) and § 1252(e)(3) forecloses jurisdiction for any review of or challenge to the Asylum IFR in this forum.  [Doc. 5].  Defendants relied on the text of § 1252(a)(2)(A), titled "review relating to section 1225(b)(1)," which states that "notwithstanding any other provision of law" and "except as provided in subsection (e)," no court has jurisdiction over any challenge to "decision[s] by the [Secretary of Homeland Security] to invoke" the expedited removal provisions or to review any "procedures and policies adopted by the [Secretary] to implement the provisions of section 1225(b)(1)."  8 U.S.C. § 1252(a)(2)(A)(ii), (iv).  Defendants further argued that Section 1252(e) imposes several limitations on the "[j]udicial review" that is permitted related to "section 1225(b)(1)," and contended that § 1252(e)(3), which is titled "[c]hallenges on validity of the system," requires that "[j]udicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia."

The Court heard oral argument on the Motion to Transfer on May 18, 2022, and although the Court denied the motion, it stated it would reconsider the issue if

the facts and circumstances so required.  [*See* Minutes of Motion Hearing, Doc. 25].

As the Defendants re-urge the issue of judicial review and transfer of this case in the instant Motion, the Court will elucidate its prior ruling.

The Court starts with the general premise of jurisdiction under the APA, which creates a "basic presumption of judicial review.  Any proper plaintiff aggrieved by final agency action may presumptively challenge that action in federal court." *Texas v. Biden ("MPP II")*, 20 F.4th 928, 976 (5th Cir. 2021), *reversed and remanded on other grounds*, *Biden v. Texas*, 597 U.S. 785, 142 S. Ct. 2528, 213 L.Ed.2d 956 (2022), *citing Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ——, 140 S. Ct. 1891, 1905, 207 L.Ed.2d 353 (2020); *see also* 5 U.S.C. § 702.  This presumption is "strong" and "well-settled," *Texas v. United States ("DAPA")*, 809 F.3d 134, 163 (5th Cir. 2015) (going on to note that rebutting the presumption requires "clear and convincing evidence"), and can be rebutted "by a showing that [1] the relevant statute precludes review, § 701(a)(1), or [2] that the agency action is committed to agency discretion by law, § 701(a)(2)." *Regents*, 140 S. Ct. at 1905 (quotation omitted).

Next, since it is undisputed that § 1252(e) only limits the jurisdiction of courts to review executive actions taken under § 1225(b)(1), the Court must determine whether the Asylum IFR was properly issued under the Defendants' claimed authority.  In 1996, when Congress enacted the IIRIRA, it enacted 8 U.S.C. § 1158 (the "Asylum Statute") to govern claims for asylum by aliens.  IIRIRA § 604; *see also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 420, 119 S. Ct. 1439, 143 L.Ed.2d 590 (1999). Importantly, § 1158 applies broadly to "any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated

point of arrival …) irrespective of such alien's status," and permits an alien to "apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). The Asylum Statute provides broad restrictions on the aliens who may apply for asylum. 8 U.S.C. § 1158(a)(2). Among other things, it establishes a time limit for applying for asylum and limitations on asylum eligibility for aliens who may be removed to another safe country and those who have previously applied for asylum. *Id.* In § 1158(b), Congress also set forth a list of "Conditions for Granting Asylum," listing statutory requirements for asylum grants, including the burden of proof, credibility determinations, and methods of proving asylum eligibility. *Id.* at § 1158(b)(1). Importantly, the Asylum Statute also lists extensive exceptions to asylum eligibility for those who, among other things: (i) have engaged in persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion," § 1158(b)(2)(A)(i); (ii) have been convicted of a serious crime or poses a danger to the community, § 1158(b)(2)(A)(ii); and (iii) where there is evidence that the alien has committed a serious nonpolitical crime in a foreign country or is a threat to national security, § 1158(b)(2)(A)(iii).

The Asylum Statute vests much authority with the Executive Branch allowing that, "the Secretary of Homeland Security or the Attorney General may grant asylum to an alien in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General <u>under this section</u> …" § 1158(b)(1)(A) (emphasis added). In this regard, the Asylum Statute specifically directs the Attorney General to "establish a procedure for the consideration of asylum applications" properly applied for under subsection (a) (*i.e.*, initiated under either §

1158 or § 1225(b)), § 1158(d)(1), and goes on to list certain statutory procedures for how asylum applications are supposed to be processed, including strict time limitations for asylum determinations and background checks for asylum applicants. § 1158(d)(5). Congress has therefore clearly and unequivocally spoken on the requirements and limitations of the nation's asylum program, as well as the authority of the Executive Branch to issue regulations pertaining to asylum. Important here, it did so in 8 U.S.C. § 1158.

Section 1225 is the Expedited Removal Statue. While § 1225(b) does mention asylum, Congress's clear intent in § 1225(b) was only to provide an entry point into the asylum process for those aliens who would otherwise be subject to expedited removal. Generally, § 1225 directs that if "an immigration officer determines that an alien … [who has not been admitted or paroled into the United States and has not been present in the United States continuously for 2 years] is inadmissible … the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." § 1225(b)(1)(A)(i). Thus, the only reference to the asylum process in § 1225(b) is in the context of immigration officers' screening of inadmissible aliens otherwise subject to expedited removal to determine if they intend to apply for asylum or have a fear of persecution if returned to their home countries. If so, they are then routed to an asylum officer to determine whether the aliens fear of persecution is "credible." § 1225(b)(1)(B)(ii). For those aliens determined to have a credible fear, the statute then states only that they "be detained for further consideration of the application for asylum." *Id.* Thus, read in context, §

1225(b) is Congress's voice on the discrete issue of expeditiously processing the removal of certain aliens who are in the United States unlawfully.

It is therefore unequivocal that § 1158 – not § 1225(b) – grants the Executive Branch the authority to determine the procedures for adjudicating asylum claims. Defendants have represented to the Court in this litigation that Congress intended for the phrase mandating that aliens "shall be detained for further consideration of the application for asylum," § 1225(b)(B)(ii), as granting the Executive Branch the authority to create out of whole cloth a new and alternate asylum procedure and requirements. The Court finds this position disingenuous and completely unsupportable.  Congress did not grant the Executive Branch this authority in § 1225(b).  Rather, Congress specifically and explicitly permitted the Executive Branch to issue asylum-related regulations in the Asylum Statute (§ 1158(b)(1)(A)), subject to the terms and limitations of that statute.

Moreover, the Asylum IFR profoundly changes the asylum procedures and standards for those aliens otherwise subject to the Expedited Removal Statute, ending the decades-long protocol of considering asylum claims in adversarial proceedings before immigration judges and, instead, placing those determinations in the hands of agency civil servants in non-adversarial proceedings.  The Asylum IFR also permits the record of a credible fear interview to serve as an asylum application, rather than requiring the distinct filing of a Form I-589 within the one-year period set by statute (8 CFR § 208.3(a)(2)), thereby starting the 180-day clock for employment authorization. Importantly, nowhere in § 1225(b) did Congress expressly grant the Executive Branch this authority.  Simply put, had Congress intended to

grant such authority, it would not have hidden that regulatory elephant in the residual mousehole of § 1225(b)'s phrase, "shall be detained for further consideration of the application for asylum."

Such a fundamental change to established immigration procedures absent clear congressional intent implicates the Major Questions Doctrine, which, summarized by the Fifth Circuit, holds that courts should "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022) (finding that the Major Questions Doctrine prohibited the President from issuing executive order and agency actions requiring federal contractors to ensure that their employees were fully vaccinated for COVID-19). In *West Virginia v. EPA*, the Supreme Court emphasized that "[a]gencies have only those powers given to them by Congress, and "enabling legislation" is generally not an "open book to which the agency [may] add pages and change the plot line." 597 U.S. 697, 723, 142 S. Ct. 2587, 2609 (2022) (internal citations omitted). Presuming that "Congress intends to make major policy decisions itself, not leave those decisions to agencies," the Supreme Court explained that in extraordinary cases, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to 'clear congressional authorization' for the power it claims." *EPA*, 597 U.S. at 723, (internal citations omitted), *citing Make the Rd. New York v. McAleenan*, 405 F.Supp.3d 1, 11 (D.D.C. 2019), *rev'd and remanded sub nom. Make The Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020). Here, had Congress intended to grant the Executive

Branch the authority to use the Expedited Removal Statute to drastically change the procedures for adjudicating asylum claims, it would have said so.  It clearly did not.

Second, even if the Court were to assume the Asylum IFR was properly issued under § 1225, there is precedent that § 1252(e) does not strip this Court of jurisdiction to review actions unrelated to the removal process.  In *East Bay Sanctuary Covenant v. Biden*, certain legal services organizations that assisted migrants seeking asylum sued the President and Executive Branch agencies and officials, challenging a new rule promulgated by DHS and DOJ that, in combination with a presidential proclamation, stripped asylum eligibility from every migrant who crossed into the United States at places other than ports of entry.  993 F.3d 640, 658-59 (9th Cir. 2021).  The plaintiff organizations alleged the new asylum rule violated the APA and the INA.  *East Bay*, 993 F.3d at 659.  On appeal from the district court, the government argued that §§ 1252(e)(3), 1252(a)(5), and 1252(b)(9) divested the court of jurisdiction to entertain the appeal on grounds these statutes required the plaintiffs to bring their claims in individual-removal proceedings or in the District Court for the District of Columbia.  *Id.* at 666.  But the Ninth Circuit disagreed, explaining that these provisions prohibit "a claim by an alien, however it is framed, [that] challenges the procedure and substance of an agency determination that is inextricably linked to [an] order of removal[.]" *Id.*, *citing Martinez v. Napolitan*o, 704 F.3d 620, 623 (9th Cir. 2012).  The court went on to prescribe that "claims that are independent of or collateral to the removal process" are not actions taken to "remove an alien from the United States." *East Bay*, 993 F.3d at 666, *citing J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016).  Finding that the new asylum rule was collateral

to the removal of specific aliens, the Ninth Circuit held it had jurisdiction to review the claims, explaining:

> We do not conduct independent policy analyses of executive decisions. But we do "police the separation of powers in litigation involving the executive[.]" For this reason, there is a strong presumption favoring judicial review of administrative action … non-reviewability is an exception that must be clearly evidenced in the statute… Without such review, "statutes would in effect be blank checks drawn to the credit of some administrative officer or board." Efficient agency administration always requires some authority and responsibility to resolve questions left unanswered by Congress. It does not include the "power to revise clear statutory terms."
>
> We are therefore responsible for reviewing whether the government has overstepped its delegated authority under the INA and encroached upon Congress's legislative prerogative.

*Id.* at 665 (internal citations omitted).

Similarly, in *Texas v. Mayorkas*, 2022 WL 2652963, at *4 (N.D. Tex. July 8, 2022 (Kacsmaryk, J.), *reconsideration denied*, 2022 WL 4240894 (N.D. Tex. Sept. 14, 2022), the district court considered the same Asylum IFR at issue in this case, and the same arguments of the government, and concluded that the jurisdiction-stripping provisions of § 1252 did not bar judicial review of Texas's challenge to the Asylum IFR. In so doing, the court undertook a textual and contextual analysis of the provisions of § 1252 and concluded that § 1252(e)(3) does not bar judicial review of the Asylum IFR, which that court held applies to actions involving *individual* aliens rather than a state's challenge to the legality of the system. 2022 WL 2652963, at *4.[11]

---

[11]     *See also Texas*, 20 F.4th at 978 ("When read in context, § 1225(b)(2) comes nowhere close to giving the Government unreviewable discretion to terminate [Migrant Parole Protocol] MPP and release undocumented immigrants into the United States *en masse*"), *as revised* (Dec. 21, 2021), *rev'd and remanded on other grounds*, 597 U.S. 785, 142 S. Ct. 2528,

Here, DOJ and DHS have created an entirely new immigration procedure by way of the Asylum IFR, purportedly pursuant to authority granted them in § 1225(b). Of course, Congress clearly intended in § 1252 to limit judicial review of certain immigration policies.[12]  But § 1252(e)(3), which limits judicial review of challenges to the "validity of the system" stemming from the Executive Branch's implementation of the Expedited Removal Statute, cannot be read in context to govern the process for determining asylum claims.  Stated differently, the judicial review provision in § 1252(e)(3)(A) – which was clearly intended to *limit judicial review of the expedited removal of unlawful aliens* – does not extend to the Executive Branch's misuse of § 1225(b) to create new procedures and authorities for granting asylum.

Accordingly, because: (a) the Executive Branch acted unlawfully in issuing the Asylum IFR under the Expedited Removal Statute, and (b) Congress clearly did not intend the jurisdiction-stripping provisions of § 1252(e)(3)(A) to apply to asylum processing procedures that are "independent of or collateral to the removal process," *East Bay*, 993 F.3d at 666, the Court concludes that the jurisdiction-stripping provisions of §§ 1252(a)(2)(A) and (e)(3) do not bar this Court's review of the Asylum IFR.  Defendants' renewed motion to transfer is therefore DENIED.

---

213 L.Ed.2d 956 (2022).  Importantly, although the Supreme Court ultimately reversed the district court and the Fifth Circuit on the underlying merits of the claims, it remanded *to the District Court for the Northern District of* Texas for further proceedings, thereby affirming the lower courts' findings with respect to judicial review.

[12]     *See, e.g., Wilkinson v. Garland*, 601 U.S. ---, 144 S. Ct. 780, 2024 WL 1160995, *9 (Mar. 19, 2024) (the INA's jurisdiction-stripping provisions operate to exclude agency fact-finding from review); *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1966, 207 L.Ed.2d 427 (2020) (a major objective of IIRIRA was to "protec[t] the Executive's discretion" from undue interference by the courts; indeed, "that can fairly be said to be the theme of the legislation.").

### III.   Standing

#### A.   Article III Standing

Article III of the Constitution confines the federal judicial power to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Under Article III, a case or controversy can exist only if a plaintiff has standing to sue – a bedrock constitutional requirement that the Supreme Court has applied to all manner of important disputes.  *United States v. Texas*, 599 U.S. 670, 675, 143 S. Ct. 1964, 1969, 216 L.Ed.2d 624 (2023). Article III standing is "not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 476, 102 S. Ct. 752, 70 L.Ed.2d 700 (1982).  In this regard, it is "buil[t] on a single basic idea – the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984). Accordingly, one of the primary purposes of federal courts ensuring a plaintiff has standing to sue is to "prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 185 L.Ed.2d 264 (2013).

Article III standing requires, at a minimum, that the plaintiff has a "personal stake" in the case.  The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992).  First, a plaintiff must demonstrate that they have "suffered a concrete and particularized injury that is either actual or imminent."

*Massachusetts v. E.P.A.*, 549 U.S. 497, 517, 127 S. Ct. 1438, 167 L.Ed.2d 248 (2007). Second, a plaintiff must show that there is a causal connection between the alleged injury and the complained-of conduct – essentially, that "the injury is fairly traceable to the defendant." *Id.* Finally, standing requires that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560, *quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41– 42, 96 S. Ct. 1917, 48 L.Ed.2d 450 (1976). *See also Biden v. Nebraska*, 143 S. Ct. 2355, 2365, 216 L.Ed.2d 1063 (2023) (internal citations omitted) (plaintiff must have suffered an injury in fact – a concrete and imminent harm to a legally protected interest, like property or money – that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit).  If at least one plaintiff has standing, the suit may proceed. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565, 204 L.Ed.2d 978 (2019) (for a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue).  Here, the Plaintiff States, as the parties invoking the Court's jurisdiction, bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).[13]

---

[13]      The parties dispute the time that standing should be assessed.  The Plaintiff States argue that the Court cannot consider evidence that post-dates the filing of their Complaint – April 28, 2022 – when analyzing standing, because standing is ordinarily determined at the time the complaint was filed.  However where, as here, Plaintiffs amended the complaint, the Supreme Court has held that standing is assessed as of the time of the amendment.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) ("when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts took to the amended complaint to determine jurisdiction."), *citing Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) ("we must look to the amended complaint in assessing … jurisdiction").  Accordingly, in the instant case, the Court assesses standing as of November

### B.    Prudential Standing

To the extent the Plaintiff States argue that their sovereign or quasi-sovereign interests are harmed, that they are suffering procedural harm, or that they fall within the INA's "zone of interests," they are arguing they are entitled to standing under several prudential standing doctrines.  The Supreme Court has described prudential standing as a doctrine that embodies judicially self-imposed limits on the exercise of federal jurisdiction.  *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."), *citing Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L.Ed.2d 98 (2004) (citations and internal quotation marks omitted). *See also Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 801 (5th Cir. 2012).

The doctrine of *parens patriae* permits a state to bring suit to protect the interests of its citizens.  *Texas v. United States*, 86 F.Supp.3d 591, 625 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *citing Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 601, 102 S. Ct. 3260, 73 L.Ed.2d 995 (1982). Meaning literally "parent of the country," *parens patriae* recognizes the interests "that the State has in the well-being of its populace" and allows it to bring

---

10, 2022, the date the Plaintiff States filed the operative Second Amended Complaint.  [Doc. 86].

suit when those interests are threatened.  *Alfred L. Snapp & Son*, 458 U.S. at 602; Black's Law Dictionary 1287 (10th ed.2014).   Here, the Plaintiff States correctly assert that they have a quasi-sovereign interest in the general economic well-being of their residents.  *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881–82 (5th Cir. 2023), *citing Snapp*, 458 U.S. at 607.  More specifically, Louisiana and Florida assert that the Asylum IFR injures those interests because of the significant adverse impact the Asylum IFR will have on their economies.  However, under the doctrine of *parens patriae*, Louisiana and Florida must show that any such injury affects "a sufficiently substantial segment of its population."  *Louisiana Dep't of Wildlife & Fisheries*, 70 F.4th at 881–82.  Both states falter on this requirement for lack of evidence, as both Louisiana and Florida fail to provide evidence substantiating the Asylum IFR's impact on the general economic welfare of its citizens.  Thus, because Louisiana and Florida are unable to show that a sufficiently substantial segment of their populations has been injured, they are not entitled to standing under this doctrine.

To satisfy the "zone of interests" test, the Plaintiff States must show only that their asserted interest is "arguably within the zone of interests to be protected or regulated by" the statutes they claim have been violated.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25, 132 S. Ct. 2199, 183 L.Ed.2d 211 (2012) (explaining that the inquiry is "not especially demanding"). "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Patchak*, 567 U.S. at 224–25.

Nevertheless, the jurisprudence makes clear that the zone of interests test cannot alone confer standing. Rather, in an APA case, plaintiffs "must satisfy *not only* Article III's standing requirements," but the zone of interests test as well. *DAPA*, *supra*, 809 F.3d at 162 (emphasis added). Because, as discussed below, the Court concludes that the Plaintiff States lack Article III standing, the zone of interests test – which the Court presumes the Plaintiff States satisfy – does not allow the Plaintiff States to proceed.

Finally, the Plaintiff States are also unable to establish a right to relief for their claim of "procedural injury." It is well-settled that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009). "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id.* Thus, even if the Court finds the Asylum IFR violated the notice-and-comment requirement, the States still must show a concrete injury beyond that procedural violation. In other words, the Plaintiff States cannot successfully "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341, 136 S. Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016), as revised (May 24, 2016).

For these reasons, the Court finds the prudential standing doctrines invoked by the Plaintiff States do not independently confer standing to proceed.

IV.     **Analysis of Article III Standing**

A.      **Injury in Fact**

To prove an injury in fact, Louisiana and Florida must show "an invasion of a legally protected interest which is: (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136. Injury in fact is the "[f]irst and foremost" of standing's three elements. *Spokeo*, 578 U.S. at 338–39, *citing Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103, 118 S. Ct. 1003, 140 L.Ed.2d 210 (1998).   Injury in fact is a constitutional requirement, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 578 U.S. at 339.  *See also Summers* 555 U.S. at 497; *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S. Ct. 1601, 60 L.Ed.2d 66 (1979) ("In no event ... may Congress abrogate the Art. III minima.").

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S., at 560, 112 S. Ct. 2130 (internal quotation marks omitted).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339, *citing Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990) ("distinct"); *Allen v. Wright*, 468 U.S. at 751 ("personal"); *United States v. Richardson*, 418 U.S. 166, 177, 94 S. Ct. 2940, 41 L.Ed.2d 678 (1974) (not "undifferentiated"); *Public Citizen, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 489 F.3d 1279, 1292–1293 (C.A.D.C.2007) (collecting cases).

In the context of state challenges to federal immigration policies, states have in some instances been able to show injury in fact by demonstrating the additional costs paid by state-funded agencies because of additional aliens. *United States v. Texas*, 599 U.S. 670, 676 (2023) *("Priorities")* ("[m]onetary costs are of course an injury."). *See also Texas v. United States*, 787 F.3d 733, 748-49 (5th Cir. 2015) ("It is well established that a financial loss generally constitutes an injury, as is any resulting pressure to change State law."). The most common showings include costs absorbed by the state in issuing driver's licenses, administering healthcare, and providing education. *See, e.g., MPP II*, *supra*, 20 F.4th at 968–969 (driver's licenses and healthcare); *Texas v. United States*, 50 F.4th 498, 517–518 (5th Cir. 2022) (healthcare and education) ("DACA"); *Gen. Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) *("GLO")* (all three). The jurisprudence makes clear that these types of fiscal harm suffice under Fifth Circuit precedent. *See, e.g., GLO*, 71 F.4th at 272.

But importantly, "harm" in the immigration context is understood and evaluated as "relative to the status quo, and relative to Plaintiff's position absent the challenged policy." *See Texas*, *supra*, 2024 WL 1021068 (explaining that the baseline for these analyses is not zero immigration; rather, the "increase" in unlawful immigration is relative to immigration levels prior to either the enactment or termination of the regulation at issue), *citing MPP II*, 20 F.4th at 969; *GLO*, 71 F.4th at 271-73; *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023) ("LDWF") (in each of these cases, the Fifth Circuit signaled that injury is relative). Thus, when deciding whether a state has been injured for Article III standing purposes, courts review whether the number of aliens, and the associated

costs attributable to them, increased relative to those same numbers prior to the implementation of the challenged program. *Texas*, 2024 WL 1021068, at *16.

With the foregoing in mind, and as the Court undertakes the analysis of whether Louisiana and Florida have sustained an injury in fact because of the Executive Branch's implementation of the Asylum IFR, the analysis of the claims of each state must begin with a key, central fact: Asylum positive credible fear findings and grant rates in the United States have gone down since the implementation of the Asylum IFR. From June 2022 through August 2023 – the period since the Asylum IFR was put in place through the most recent[14] DHS data report – asylum officers found credible fear of persecution in 52 percent of cases (3,037 positive credible fear findings out of 5,884 cases), compared to 68 percent of cases in 2021 (29,869 positive credible fear findings out of 43,958 cases), before the Asylum IFR was applied. [Doc. 214-2, "Outcome Summary," U.S. DHS, "Credible Fear Cases Completed and Referrals for Credible Fear Interview].[15]

The same is true for the asylum grant rate by asylum officers under the Asylum IFR. For fiscal years 2017 through 2021, prior to the Asylum IFR, overall approval rates for asylum claims adjudicated by both asylum officers[16] and IJs were in the 26

---

[14]   The DHS data reporting submitted by Defendants was current at the time of briefing.

[15]   https://www.dhs.gov/immigration-statistics/readingroom/RFA/credible-fear-cases-interview (at time of briefing, last visited Dec. 16, 2023).

[16]   As Defendants point out, even before the Asylum IFR took effect, asylum officers decided asylum claims in some circumstances, such as in affirmative asylum claims. *See* 87 Fed. Reg. at 18080 ("USCIS asylum officers conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's affirmative asylum application should be granted."); 87 Fed. Reg. at 18111 ("Determining asylum eligibility and vetting is already a necessary part of the day-to-day work of a USCIS asylum officer and will continue to be so after this rule takes effect."). *See also* 8 C.F.R §§ 208.2(a), 208.9(a), 208.30.

− 37% range.  87 Fed. Reg. at 18116 n.57.  By comparison, of the 1,824 total "asylum merits interview" ("AMI") cases handled by asylum officers under the Asylum IFR through April 2023, asylum was granted in 404 cases, yielding an approval rate of approximately 22.1%.  [Doc. 214-2, "Outcome Summary," *supra* n.15].  This rate is lower than the 31 − 39% IJ approval rate on asylum claims originating from credible fear screenings from FY 2017-2021.  87 Fed. Reg. at 18116 n.57.[17]

To be clear: the issue before the Court is not whether the Plaintiff States have been harmed by the cumulative effect of this administration's immigration policies and administrative actions.  It is whether the Asylum IFR, specifically, has caused an economic injury in fact to the States of Louisiana and Florida.  The Court will address the two states separately.

### 1.    Louisiana

Louisiana alleges additional expenditures in the areas of public assistance, healthcare, and education caused by the Asylum IFR.[18]  With respect to public assistance, Louisiana claims additional costs associated with providing services through SNAP and Financial Independence Temporary Assistance Program

---

[17]     In fiscal year 2023, in asylum cases originating from credible fear claims that are not processed under the Asylum IFR, IJs granted asylum 55% of the time (7,809 out of 14,173) in cases with merits dispositions (i.e., setting aside cases that were abandoned, closed, or withdrawn). *See* EOIR, Workload & Adjudication Statistics, "Asylum Decision Rates in Cases Originating with a Credible Fear Claim," https://www.justice-gov/eoir/workload-and-adjudication-statistics (at time of briefing, last updated Dec. 8, 2023).

[18]     Defendants aver that, at the time of the filing of the instant Motion, only six (6) asylum merits interviews have been conducted out of the New Orleans field office, and none resulted in the grant of asylum.  [Doc. 214-2, "AMI Cases"].

("FITAP").[19]  [Doc. 86 at ¶ 128].  Louisiana also claims it will incur additional costs with respect to Medicaid and emergency Medicaid.  [*Id.* at ¶¶ 43, 96-97].

Louisiana argues that records produced by the Louisiana Department of Children and Family Services identify 380 individuals in 223 asylee case files who received food stamps between March 2020 and June 2023.  [Doc. 217-23, Brown Decl. ¶ 8 & Doc. 217-26].  But Louisiana is unable to show that any of these 380 asylees who received SNAP benefits during this period were processed under the Asylum IFR, and indeed, many of them most assuredly were not, given that the Asylum IFR did not go into effect until March 2022.  Furthermore, Louisiana acknowledges that the federal government fully funds both SNAP and FITAP.  As such, with respect to the benefits themselves, these costs are not expenditures of the state.

The federal government also fully pays the State's FITAP administrative costs, while administrative costs of the SNAP program are split between the Department of Agriculture and the State of Louisiana.  [Doc. 214-16, p. 16 n.9; 214-16, p. 68].  Louisiana was not able to quantify its portion of the SNAP administrative costs per alien, and moreover, Louisiana has not shown that any of its administrative costs have increased overall as a result of providing benefits to aliens processed under the Asylum IFR.

Nor has Louisiana produced data or statistics showing that it has sustained any specific monetary cost associated with FITAP, Medicaid, or emergency Medicaid on behalf of aliens processed under the Asylum IFR.  Louisiana's own expert witness,

---

[19]     In Louisiana, the program more commonly known as Temporary Assistance for Needy Families ("TANF") is called FITAP.  [Doc. 214-16, p. 69.].

retired Judge Andrew Arthur, testified at his deposition that because 8 C.F.R. § 208.6[20] limits the disclosure of information related to an individual who has applied for asylum or has gone through a credible fear proceeding, the State has no information on how many aliens released under the Asylum IFR are enrolled in the FITAP program in Louisiana.  [Doc. 214-16, pp. 77-78].  Indeed, with respect to any program for which the State of Louisiana argues there has been increased cost due to the Asylum IFR, its argument is belied by the testimony of the state's expert, who testified that "[t]here's no way for the State of Louisiana to know which individuals were released under the [Asylum] IFR because it doesn't differentiate with respect to the documents." [*Id.* at p. 80].  Furthermore, as Defendants point out in their Motion, most aliens paroled into the country under 8 U.S.C. § 1182(d)(5) – whether under the Asylum IFR or otherwise – are not eligible for FITAP, SNAP, TANF, or Medicaid benefits for five years after entering the country.[21]  The Asylum IFR has not yet been in effect for five years and Louisiana has not otherwise demonstrated that anyone granted asylum under the Asylum IFR has received SNAP, TANF, or Medicaid benefits.

---

[20]     8 C.F.R. § 208.6(a) provides:

(a) Information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary.

[21]     https://www.fns.usda.gov/snap/eligibility/citizen/non-citizen-policy.

With respect to education, Louisiana alleges sustained financial injuries from the expense of educating children who have come to the state as a result of the Asylum IFR. [Doc. 86 at ¶¶ 3, 69, 70]. However, Louisiana acknowledges that DOJ and the Department of Education ("DOE") do not allow schools to inquire into the immigration status of students, and they therefore concede that they do not have data on the exact number of school-age aliens who have settled in the State of Louisiana. In their Complaint, the Plaintiff States allege that Defendants have that information in their possession and that the numbers would "come to light during discovery." [Doc. 86, ¶ 70]. In support of their Motion, however, Defendants submitted a DOE spreadsheet showing the "Statistics By School System for Total Public School Students" for the months of February and October in the years 2019, 2020, 2021, 2022, and February 2023. [Doc. 214-18]. These records show that the number of children educated in public schools in the State of Louisiana has *decreased* since the Asylum IFR was implemented. *Id.* And because the State of Louisiana admits that it does not track the citizenship status of students and considering that the total numbers of students in the public school system has actually decreased since the Asylum IFR went into effect, Louisiana cannot demonstrate that it has actually incurred additional expenses in the area of education as a result of the Asylum IFR. [Doc. 214-16, pp. 60-61].

## 2.   Florida

Similarly, the State of Florida alleges sustained increased costs in terms of education, healthcare, and the provision of other social services to aliens as a direct result of the Asylum IFR. Florida's injury argument is premised largely on the

Eleventh Circuit's decision in *Florida v. United States*, wherein the court held the state had standing to pursue claims against the government for promulgation of regulations that allowed release of aliens arriving at the southwest border into the country *en masse* through various "non-detention policies," including the "Parole+ATD" policy and the exercise of "prosecutorial discretion" under 8 U.S.C. § 1226(a).   660 F.Supp.3d 1239, 1249 (N.D. Fla. 2023), *appeal dismissed*, 2023 WL 5212561 (11th Cir. July 11, 2023).   But this Court cannot "borrow" Florida's standing in another case dealing with different regulations, *Lewis v. Casey*, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L.Ed.2d 606 (1996) ("The actual-injury requirement would hardly serve [its] purpose … if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.").   Standing to challenge the Asylum IFR must be established in *this* case.

The analysis of Florida's claims begins with Florida's stipulations that it does not track: (i) the immigration status of its students; (ii) the information necessary to determine which, if any, individuals using the services of the Florida Department of Education ("DOE") were released pending their application for asylum or granted asylum under the Asylum IFR; (iii) the information necessary to determine which, if any, individuals using the services of Florida's Agency for Healthcare Administration ("AHCA"), including but not limited to Medicaid, were released pending their application for asylum or granted asylum under the Asylum IFR; and (iv) the information necessary to determine which, if any, individuals using the services of the Florida Department of Children and Families ("DCF"), including but not limited

to SNAP and TANF, were released pending their application for asylum or granted asylum under the Asylum IFR.  [Doc. 214-20, ¶¶ 2-5].

Specifically, with respect to social benefits, Florida argues that hundreds of thousands of aliens receive SNAP or TANF and cost the state hundreds of thousands of dollars every month.  Florida supports its allegation of harm with the Declaration of Tera Bivens, Deputy Assistant Secretary for Economic Self Sufficiency at the Florida Department of Children and Families ("FDCF"), who attests that each SNAP recipient costs Florida $2.17 per alien, per month, reflecting Florida's administrative cost share of the SNAP program.  [Doc. 217-1, ¶ 3].  But Florida's claim that each alien costs the state $2.17 in SNAP administrative costs per month is unconvincing. Florida arrived at this number by calculating the total amount it pays in SNAP administrative fees and divided that number by the number of individuals drawing SNAP benefits.  Florida has not shown that <u>an additional</u> administrative cost of $2.17 is incurred by Florida for each alien in the state who was admitted under the Asylum IFR.  Further, because Florida does not track the information necessary to determine which, if any, individuals receiving SNAP benefits were granted asylum under the Asylum IFR, Florida cannot directly tie these administrative costs to aliens processed under the Asylum IFR.

Florida also alleges an increase in asylum grants due to the Asylum IFR will increase costs associated with drivers' licenses.  But Robert Kynoch, the Director of Motor Services at the Florida Department of Highway Safety and Motor Vehicles, testified at a 30(b)(6) deposition in *Florida v. United States, et al.*, Civil Action No. 3:21-cv-1066 (N.D. Fla.), that the State of Florida has no information regarding the

asylum status of its drivers' license applicants.  [Doc. 214-21, pp. 43-44, 57-58].  Thus, Florida has put forth no evidence or data regarding how many asylees – much less, asylees granted asylum under the Asylum IFR – have applied for, and received, drivers' licenses in the state of Florida.  Florida has also failed to otherwise produce evidence demonstrating that its overall expenses on education and health care have risen as a result of the Asylum IFR.[22]

The Plaintiff States credibly point to substantial evidence that the cumulative effect of the current administration's immigration policies has resulted in an increased number of aliens in the Plaintiff States and that the states have incurred attendant costs.  Specifically, this administration's termination of the Migrant Protection Protocols ("MPP") and *en masse* parole and release of aliens arriving at the southwest border into the country has no doubt led to the country's growing immigration crisis.  *See, e.g.*, *Texas*, 2024 WL 1021068, at *1-2 (between May 1 and October 17 of 2022, an estimated 113,229 Venezuelan nationals were encountered at the southwest border, and 99,055 – 87 percent – of them were conditionally released; from October 2022 to June 2023, DHS adjudicated 194,683 applications for "Cuban, Haitian, Nicaraguan, and Venezuelan nationals" ("CHNV nationals") and approved

---

[22] Nor do the Plaintiff States' invocation of the "special solicitude" afforded States in the standing analysis, *see Texas*, 50 F.4th at 514, rescue their standing arguments.  Special solicitude merely changes "the normal standards for redressability and immediacy," *Id.* (citation omitted); it is not a standing shortcut when standing is otherwise lacking.  Indeed, "special solicitude" does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor the Fifth Circuit has held that it alters the requirements that the injury must be concrete and particularized.  *Louisiana Dep't of Wildlife & Fisheries*, 70 F.4th at 882, *citing Massachusetts v. EPA*, 549 U.S. 497, 517–20, 127 S. Ct. 1438, 167 L.Ed.2d 248 (2007); *Texas*, 50 F.4th at 514.

189,942 of them—an approval rate of 97.5 percent).  *See also Florida*, 660 F.Supp.3d at 1251 ("In total, between March 2021 and November 2022, the data shows that more than 1.16 million aliens have been released under the NTA/OR and Parole+ATD categories."); *Texas v. Biden*, 554 F.Supp.3d 818, 833 (N.D. Tex. 2021), *reversed and remanded on other grounds, Biden v. Texas*, 597 U.S. 785, 142 S. Ct. 2528, 213 L.Ed.2d 956 (2022) (since the termination of the Migrant Parole Protocol ("MPP"), encounters jumped from 75,000 in January 2021, when MPP was suspended, to approximately 173,000 in April 2021; 189,000 encounters occurred in June 2021 alone).[23]

But it is not the province of the Court to determine the cumulative effect this administration's policy choices have had on Plaintiff States.  Rather, the Court must determine only whether there is evidence in the record substantiating the Plaintiff States' claims that the *Asylum IFR* specifically contributed to these increased costs. Plaintiff States fail to make this showing.  Rather, the record shows: (i) Asylum grant rates in the United States have gone down since the implementation of the Asylum IFR; (ii) where the Asylum IFR's asylum-adjudication procedures have been applied, the Rule has not resulted in a higher rate of positive credible fear findings or asylum grants by asylum officers; and (iii) Louisiana and Florida are unable to otherwise demonstrate increased costs attributable to the implementation of the Asylum IFR relative to their costs before the Asylum IFR was implemented.  Because of this lack of evidence, Louisiana and Florida fail to show concrete or particularized economic

---

[23]    *Texas*, 554 F.Supp.3d at 833, *citing* U.S. Customs and Border Protection, Southwest Land Border Encounters, CBP (Aug. 3, 2021) https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

harm because of the Asylum IFR.  Therefore, they lack standing to bring their claims challenging the Asylum IFR under the APA.

### B.      The Secure Fence Act

In 2006, Congress passed the Secure Fence Act ("SFA"), which requires the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States."  Pub. L. No. 109–367, 120 Stat. 2638 (2006) (codified as 8 U.S.C. § 1701, *et seq*.).  The bill implementing this Act specifically defines "operational control" to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband."  *Id.*  Defendants seek dismissal of the Plaintiff States' SFA claim under FRCP Rule 12(b)(6) on grounds the "operational control" provision of the SFA vests discretion over the administration of the SFA in the Secretary of Homeland Security. Pub. L. No. 109-367, § 2, 120 Stat. 2638 (2006), 8 U.S.C. § 1701.

In evaluating this claim, the Court starts with the basic premise that the Executive Branch has the duty to faithfully execute this law and maintain operational control of the border. But there is no obvious judicial remedy.  In 2011, the District Court for the District of Arizona, in assessing a claim by the State of Arizona against several government agencies including DOJ and DHS for failure and refusal to achieve and maintain "operational control" of the Arizona-Mexico border; failure and refusal to protect Arizona from invasion and domestic violence; and

abdication of statutory responsibilities (enforcement of the federal immigration laws), stated:

> The Secure Fence Act's "operational control" requirement does not mandate a discrete action that the Court could compel under the APA. The requirement that the Secretary achieve "operational control" does not mandate any discrete agency action "with the clarity necessary to support judicial action." Rather, the Act creates an objective and leaves the DHS and the Secretary with "a great deal of discretion in deciding how to achieve it." The APA does not empower the Court to enter a general order compelling compliance with the broad statutory objective of "operational control."

*United States v. State of Arizona*, 2011 WL 13137062, at *8-9 (D. Ariz. Oct. 21, 2011) (internal citations omitted). This Court finds the Arizona district court's reasoning apt and adopts it herein in concluding that the Plaintiff States fail to state a claim under the SFA. Moreover, the Supreme Court has stressed that for federal courts to hear a claim, "the alleged injury must be legally and judicially cognizable," *U.S. v. Texas*, 599 U.S. at 676, which "requires, among other things," that the "dispute is traditionally thought to be capable of resolution through the judicial process." *Id.* Here, this Court cannot redress the issue of operational control at the border. *See also Webster v. Doe*, 486 U.S. 592, 600 (1988) (rejecting review where statute provided for termination when the CIA Director "deem[ed] such termination necessary or advisable"); *Drake v. FAA*, 291 F.3d 59, 72 (D.C. Cir. 2002) (rejecting review where "the only statutory reference point is the Administrator's own beliefs"). Consequently, the Plaintiff States fail to state a claim under the SFA.

### C.     The Take Care Clause of the Constitution

Finally, in their Complaint, the Plaintiff States allege that "[t]he Asylum IFR represents an abdication of multiple duties placed upon DHS to enforce immigration

law, including clear statutory mandates" [Doc. 86, ¶¶ 216-220], thereby alleging a claim under the Take Care Clause of the United States Constitution.[24]  Defendants argue this claim should be dismissed on grounds no court has yet held that the Take Care Clause provides a private right to sue or cause of action.  *See, e.g., Las Americas Immigrant Advocacy Center v. Biden*, 571 F.Supp.3d 1173, 1180 (D. Or. 2021) (collecting cases); *City of Columbus v. Trump*, 453 F.Supp.3d 770, 800 (D. Md. 2020) ("No court in this circuit, or any other circuit, has definitively found that the 'Take Care Clause' provides a private  cause of action which a Plaintiff may bring against the President of the United States or his administration."); *Brnovich v. Biden*, 630 F.Supp.3d 1157, 1178 (D. Ariz. 2022) (similar); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.) (similar), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985).

Plaintiffs are unable to cite a case wherein the plaintiff successfully prosecuted a Take Care Clause claim against a president or members of his administration. Furthermore, the Plaintiff States' Take Care Clause claim merely re-states their APA claims with respect to the Asylum IFR, and the Plaintiff States allege no independent constitutional allegations against the Defendants under this provision.  *Ctr. for Biological Diversity v. Trump*, 453 F.Supp.3d 11, 53 (D.D.C. 2020) (dismissing plaintiff's Take Care claim and finding that plaintiffs were attempting to allege a constitutional violation where only a statutory one existed), *citing Dalton v. Specter*, 511 U.S. 462, 471–72, 114 S. Ct. 1719, 128 L.Ed.2d (1994).  Consequently, this claim also must fail under the facts alleged.

---

[24]     Article II, Section 3 of the Constitution provides that "[t]he President has a constitutional duty to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

<u>CONCLUSION</u>

Thus, for the reasons stated herein,

IT IS HEREBY ORDERED that Defendants' MOTION TO TRANSFER [Doc. 5] is DENIED.

IT IS FURTHER ORDERED that Defendants' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM [Doc. 214] is GRANTED IN PART, this Court having concluded that the States of Louisiana and Florida do not have Article III standing to challenge the Asylum IFR, and all other Plaintiff States having abandoned their claims of standing with respect to the Asylum IFR. Accordingly, all claims of the Plaintiff States challenging the Asylum IFR under the APA are DENIED and DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that all Plaintiff States fail to state a cause of action under either the Secure Fence Act or the Take Care Clause of the United States Constitution, and these claims are therefore DENIED and DISMISSED WITH PREJUDICE.

THUS, DONE AND SIGNED in Chambers on this 16th day of April 2024.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE